# EXHIBIT W

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/15/2025 10:19 AM
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners/Plaintiffs Center for
Biological Diversity and Wishtoyo Foundation*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA BARBARA
## SOUTH COUNTY REGION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive, <br><br> Respondents/Defendants. <hr> SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive, <br><br> Real Parties in Interest. | Case No. 25CV02244 <br><br> **VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> [Code Civ. Proc. §§ 1094.5, 1085; Pub. Resources Code § 21000 *et seq.* (California Environmental Quality Act); Gov. Code § 51010 *et seq.*; 49 U.S.C. § 60101 *et seq.* (Pipeline Safety Laws)] |

VERIFIED PETITION AND COMPLAINT

Petitioners and Plaintiffs Center for Biological Diversity and Wishtoyo Foundation bring this action on their own behalf, on behalf of their members, on behalf of the general public, and in the public interest, and allege as follows:

**INTRODUCTION**

1.       This Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief challenges the December 17, 2024, decision of the California Department of Forestry and Fire Protection and its Office of the State Fire Marshal (collectively Cal Fire) to grant pipeline safety regulation waivers (State Waivers) that enable Sable Offshore Corp. to restart the Las Flores Pipeline System and its connected oil and gas production and transport infrastructure ten years after a catastrophic oil spill from the pipeline system shut down operations. Cal Fire approved the State Waivers without any environmental review, public notice, hearing, opportunity for public comment, or the required findings in violation of the California Environmental Quality Act (CEQA) and California and federal pipeline safety laws.

2.       The onshore Las Flores Pipeline System carried oil from the Santa Ynez Unit off the coast of Santa Barbara until May 19, 2015, when Line 901 (now known as CA-324) ruptured after extensively corroding over time, causing one of the largest oil spills in California's history, known as the Refugio State Beach oil spill.

3.       According to the Pipeline & Hazardous Materials Safety Administration's (PHMSA) failure investigation report, the direct and proximate cause of the rupture was "progressive external corrosion" that occurred due to the pipelines' ill-designed coating and insulation system and the inability of the pipeline system's "cathodic protection system" to effectively prevent corrosion as intended.

4.       The spill had devastating environmental impacts: it damaged approximately 1,500 acres of shoreline habitat and 2,200 acres of subtidal and fish habitats; it killed at least 558 birds—across over 28 species—and 232 marine mammals; and it resulted in the loss of over 140,000 user days in Santa Barbara and Ventura counties—including opportunities to fish, harvest shellfish, camp, sunbathe, beach comb, exercise, swim, view wildlife, dive, boat, and surf.

1

5. After the spill, the then-owners and operators of the Santa Ynez Unit oil and gas assets did not attempt to restart the failed and defectively designed pipeline system, with its attendant risks to public health and safety. Instead, it pursued permits to truck oil across California highways in the short term, while seeking permits to build a new replacement pipeline system for the long term.

6. As described in more detail below, the previous owners abandoned the pipeline replacement plans and sold the Santa Ynez Unit assets to a newly formed Texas company, Sable Offshore Corp., which is now attempting to restart the corroded pipeline system without fixing the core problem that caused the 2015 rupture. This proposal comes with great risk. According to a draft Environmental Impact Report prepared by Santa Barbara County for the abandoned pipeline replacement project, restarting the existing pipeline could result in an oil spill *once a year* and a rupture *once every four years* even with the installation of additional valve stations intended to reduce spill volumes. According to the same document, the public safety and oil spill risks of a restart would be significant and unavoidable. The analysis also notes a Cal Fire report that indicates the risk of a spill from the pipeline system without effective cathodic protection system is a full five times greater than had previously been estimated.

7. To restart the heavily corroded and corrosion-prone Las Flores Pipeline System without effective cathodic protection and with its fundamental design flaws, Sable Offshore Corp.'s only option was to seek State Waivers from federal pipeline safety laws from Cal Fire. Without these waivers, restart is not an option. By taking this restart and State Waivers pathway, Sable is essentially abandoning a front-end, corrosion-preventing cathodic protection system and replacing it with an untested, kludged-together collection of risk management and monitoring procedures on the back end that are not consistent with public safety or protection of the environment or as safe as a properly designed pipeline.

8. Although Cal Fire initially made assurances that it would not issue the State Waivers before holding a public meeting, on information and belief, Cal Fire did not post any notice or hold any public comment period or hearing before granting the State Waivers. On information and belief, Cal Fire also did not post any notice after it approved the State Waivers

2

VERIFIED PETITION AND COMPLAINT

to indicate how it had fulfilled its CEQA responsibilities. Rather, nearly four weeks after approving the State Waivers, Cal Fire posted the State Waivers on its website *Pathways for Restarting CA-324 and CA-325,* https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

9. Forty years ago, state and federal agencies prepared a National Environmental Policy Act (NEPA)/CEQA review on the environmental impacts of what was called the Celeron/All American and Getty Pipeline Projects to transport heated crude oil 1,200 miles from the Santa Barbara and Santa Maria Basins to a pump station in Kern County (via what is now known as the Las Flores Pipeline System) and onward to McCamey, Texas. That NEPA/CEQA review contemplated a 30-year service life for the Las Flores Pipeline System, which came online in 1991–1992. The Environmental Impact Report (EIR)/Environmental Impact Statement (EIS) stated that the "entire pipeline system would be protected from corrosion" by proper coating and a functioning cathodic protection system, that it would not experience corrosion problems, and that it would have a low oil spill risk. It failed to address the environmental consequences of a pipeline system that failed catastrophically, whose primary pipeline integrity and spill prevention technology is defective, whose critically flawed anti-corrosion cathodic protection system cannot be fixed, and that now requires State Waivers from otherwise federally-mandated corrosion prevention and mitigation measures to restart—waivers that rely on alternative measures that have their own, never-analyzed impacts.

10. Cal Fire was required by law to initiate a new environmental review process, consult with all other responsible agencies, and provide public hearing and comment opportunities before granting State Waivers that enable Sable Offshore Corp. to restart the Santa Ynez Unit oil and gas operations and transport of oil through the Las Flores Pipeline System (Project).

11. Petitioners Center for Biological Diversity and Wishtoyo Foundation challenge Respondents' issuance of the State Waivers for this Project absent new environmental review and without a public hearing and public comment opportunities despite the pipeline system's inherent design flaws, history of failure, continued susceptibility to corrosion, and the extensive

3

VERIFIED PETITION AND COMPLAINT

environmental impacts associated with the waivers themselves and the Santa Ynez Unit restart as a whole.

12.     Cal Fire's approval of the State Waivers for the Project violated CEQA and state and federal pipeline safety laws including, without limitation, failing to conduct full environmental review; failing to provide public notice and a public hearing; failing to demonstrate that the State Waivers are consistent with pipeline safety, that they are not a risk to public safety, and that the probability of injury or damage is remote; and failing to provide a statement of reasons and discussion of significant factors before issuing its decisions.

**PARTIES**

13.     Petitioner and Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a nonprofit conservation organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center has over 93,900 members worldwide, including over 18,000 members who live in California, and over 550 members who live in Santa Barbara, San Luis Obispo, and Kern counties. The Center has worked for many years to protect imperiled plants and wildlife, open space, air and water quality, and the overall quality of life for people in the region where the Project is proposed. Members of the Center will be directly and adversely affected by the approval and operation of the Project. Although there has been no formal public comment opportunity, the Center nonetheless submitted numerous written comments to Cal Fire objecting to and commenting on the Project.

14.     Petitioner and Plaintiff WISHTOYO FOUNDATION was founded in 1997 to preserve and protect Chumash culture, the culture of first nations peoples; to protect natural cultural resources essential to Chumash lifeways and all people; and to educate and instill in youth environmental values, awareness, and stewardship. Wishtoyo is a place, organization, and movement inspiring people to live in harmony with our Earth again. Wishtoyo serves as a "rainbow bridge" linking Chumash and indigenous lifeways with the protection of natural and cultural resources, utilizing traditional ecological knowledge to provide environmental and cultural preservation, justice, education, research, and advocacy. Wishtoyo has a longstanding

4

VERIFIED PETITION AND COMPLAINT

record of protecting and restoring the coastal watersheds of Chumash homelands, the Santa Barbara Channel, and the Pacific Ocean.

15. Petitioners are organizations whose missions and work for decades have focused on combatting the negative impacts of oil development and transportation on human health and the environment and whose members both in and outside of Santa Barbara, San Luis Obispo, and Kern counties care about air quality, water quality, wildlife and their habitat, cultural and historic resources, and human health. Their members' very safety and enjoyment of this region will be directly affected by the outcome of this case. Petitioners and their members have been engaged in a years-long effort to ensure that after the Refugio State Beach oil spill disaster, no restart will occur without full compliance with the law, including CEQA and pipeline safety statutes and regulations. The Center and Wishtoyo Foundation represent members across the three directly implicated counties and have interests in protecting public health, cultural resources, and the environment from the environmental impacts of the Project. Petitioners' members include people who reside, go to school, recreate, and work in areas around the Las Flores Pipeline System and other Santa Ynez Unit infrastructure and would be impacted by the Project. The Project could jeopardize their health, safety, and enjoyment of the area.

16. On information and belief, Respondent and Defendant CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION is a political subdivision of the State of California, organized and existing under the laws of the State of California, with the capacity to sue and be sued. The California Department of Forestry and Fire Protection includes several organizational programs, including the Office of the State Fire Marshal.

17. On information and belief, Respondent and Defendant OFFICE OF THE STATE FIRE MARSHAL is a political subdivision of the State of California, organized and existing under the laws of the State of California, with the capacity to sue and be sued. The Office of the State Fire Marshal is the state agency responsible for ensuring the safety of intrastate hazardous liquid pipelines and their compliance with state and federal laws. In 2016, the Office of the State Fire Marshal assumed authority to regulate the Las Flores Pipeline System (Lines 901/CA-324

VERIFIED PETITION AND COMPLAINT

and 903/CA-325) from the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA).

18.    On information and belief, Respondent and Defendant DANIEL BERLANT is the State Fire Marshal and is sued in his official capacity as head of the Office of the State Fire Marshal.

19.    On information and belief, Real Party in Interest SABLE OFFSHORE CORP. (Sable) is a Project applicant for purposes of the State Waivers and CEQA, the operator of the Las Flores Pipeline System, and a recipient of the approvals challenged in this action.

20.    On information and belief, Real Party in Interest PACIFIC PIPELINE COMPANY is a wholly owned subsidiary of Sable, the legal owner of the Las Flores Pipeline System, a Project applicant for purposes of the State Waivers and CEQA, and a recipient of the approvals challenged in this action.

21.    Petitioners do not know the true names and capacities, whether individual, corporate, associate, or otherwise, of respondents DOES 1 through 10, inclusive, and therefore sue said respondents under fictitious names. Petitioners will amend this Petition to show their true names and capacities when they have been ascertained. Each of the respondents is the agent and/or employee of Respondents, and each performed acts on which this action is based within the course and scope of such respondents' agency and/or employment.

22.    Petitioners do not know the true names and capacities, whether individual, corporate, associate, or otherwise, of real parties in interest DOES 11 through 20, inclusive, and therefore sue said real parties in interest under fictitious names. Petitioners will amend this Petition to show their true names and capacities when they have been ascertained.

**JURISDICTION AND VENUE**

23.    This Court has jurisdiction under California Code of Civil Procedure section 1085 or, in the alternative, section 1094.5 and under Article VI, section 10 of the California Constitution to issue a writ of mandate setting aside the California Department of Forestry and Fire Protection and its Office of the State Fire Marshal's (collectively Cal Fire) decision to

VERIFIED PETITION AND COMPLAINT

approve the Project. Judicial review of Petitioners' CEQA claims is governed by Public Resources Code sections 21167, 21168, 21168.5, and/or 21168.9.

24.    Venue for this action properly lies in the Superior Court of Santa Barbara County under Code of Civil Procedure sections 393, 395, and 401, subdivision (1), because a significant portion of the proposed site of the Project is in the County, many of the significant environmental impacts from the Project would occur in the County, and the Project affects the interests of County residents, including members of Petitioners.

25.    Respondents have taken final agency action by approving the State Waivers for the Project and did not undertake any CEQA environmental review process when it did so. Respondents had a duty to comply with CEQA prior to issuing the discretionary approvals at issue in this lawsuit.

26.    On information and belief, Cal Fire did not post any notice of exemption or notice of determination for this Project. This action is timely filed within 180 days of Cal Fire's decision to issue the State Waivers in accordance with Public Resources Code section 21167, subdivision (a), and California Code of Regulations, title 14, section 15112, subdivision (c)(5).[1]

27.    Petitioners complied with the requirements of Public Resources Code section 21167.5 on April 12, 2025, by serving a written notice of Petitioners' intention to commence this action on Respondents. A copy of the written notice and proof of service is attached as **Exhibit A.**

28.    Petitioners elected to prepare the record of proceedings in this proceeding or pursue an alternative method of record preparation pursuant to Public Resources Code section 21167.6, subdivision (b)(2). A copy of Petitioners' Election to Prepare Administrative Record of Proceedings is attached as **Exhibit B.**

29.    Petitioners complied with Public Resources Code section 21167.7 and Code of Civil Procedure section 388 by providing the Attorney General of the State of California with a

---

[1] CEQA Guidelines are codified in title 14, section 15000 et seq. of the California Code of Regulations; all references to "CEQA Guidelines" refer to these sections in title 14.

VERIFIED PETITION AND COMPLAINT

copy of the Petition and notice of filing this action. A true and correct copy of the notice and proof of service to the Attorney General are attached as **Exhibit C**.

30.     Petitioners complied with the requirements of CEQA Guidelines section 15232 by concurrently filing a request for a hearing. A copy of the Petitioners' Request for Hearing and Notice of Request is attached as **Exhibit D.**

31.     Petitioners have satisfied all conditions precedent to filing this instant action and have exhausted any and all administrative remedies to the extent required by law. This Petition is timely filed in accordance with Public Resources Code section 21167 and California Code of Regulations, title 14, section 15112.

32.     Petitioners do not have a plain, speedy, or adequate remedy at law because Petitioners and their members will be irreparably harmed by Cal Fire's issuance of the State Waivers in violation state and federal law and the environmental damage the Project will cause.

### STATEMENT OF FACTS

**A.     The Las Flores Pipeline System and Environmental Setting**

33.     There are currently thirty active oil and gas leases on the Pacific Outer Continental Shelf (OCS) from which oil and gas drilling extraction activities occur or have occurred. Most of these leases are organized into units. The Santa Ynez Unit is in the Santa Barbara Channel and consists of sixteen leases issued between 1968 and 1982.

34.     There are three offshore production platforms at the Santa Ynez Unit: Platform Harmony, Platform Heritage; and Platform Hondo. Platform Hondo was installed in June 1976, Platform Harmony in June 1989, and Platform Heritage in October 1989. Production began from these platforms between April 1981 and December 1993.

35.     In 1986, Santa Barbara County approved the Celeron/All American Pipeline Projects to transport oil from the Santa Ynez Unit onshore under a Final Development Plan and Development Plan Conditions. The County relied on a 1984 Draft EIR/EIS and Final EIR/EIS for the Celeron/All American Pipeline and Getty Pipeline Projects that was prepared by the California State Lands Commission and the U.S. Department of the Interior's Bureau of Land Management and certified in January 1985.

8

VERIFIED PETITION AND COMPLAINT

36.     Pipelines with effective coating and cathodic protection systems designed to prevent corrosion and minimize the risk of oil spills were fundamental to the 1985 pipeline system design, environmental analysis, and ultimate approvals. For example, the EIR/EIS contended, "[t]he entire pipeline would be protected from corrosion with cathodic protection systems." It specified that certain "design features" were proposed "to prevent the adverse impacts of an oil spill," with the first being a cathodic protection system. It noted that the pipeline system's coating and cathodic corrosion protection were "very effective in reducing the risk" of oil spills and the environmental harm they cause, thereby concluding that "it is unlikely that any spills would occur."

37.     Pipelines like these corrode because of an electro-chemical reaction between the steel pipe and its environment. When metal is exposed to oxygen, water, and other elements, its surface loses ions, resulting in corrosion. Corrosion can cause general pipewall thinning and various forms of corrosion cracking, such as stress corrosion cracking, selective seam corrosion cracking, and pit corrosion. Each of these types of corrosion can lead to a pipeline failure.

38.     Cathodic protection is the chief method required and relied upon to prevent and reduce external corrosion in buried, steel pipelines—like Line 901/CA-324 and Line 903/CA-325 that make up the Las Flores Pipeline System. It is intended to function by impressing a weak electrical current into the pipeline to stop the process of corrosion. So long as the current reaching the pipe's surface is sufficient, corrosion can be prevented or minimized.

39.     The Las Flores Pipeline System's steel pipelines were constructed from 1988 to 1991. Line 901/CA-324 is a buried, insulated, 24-inch diameter pipeline that extends just under eleven miles along the ecologically rich and undeveloped Gaviota coastline. When operational, the line transported heated crude oil from ExxonMobil's storage tanks in Las Flores Canyon to the Gaviota Pump Station. Line 901/CA-324 went into service in 1992.

40.     Line 903/CA-325 is a 30-inch diameter pipeline that extends approximately 114 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc and Pentland. The crude oil was ultimately delivered to various inland refineries. Line 903/CA-325 became operational in 1991.

9

VERIFIED PETITION AND COMPLAINT

41. The pipelines are coated with coal tar urethane and covered with foam insulation covered by a tape wrap over the insulation. Shrink wrap sleeves intended to provide a barrier between the pipelines and soil to prevent corrosion are present at all of Line 901/CA-324's pipeline joints and "multiple locations" on Line 903/CA-325.

42. When operational, the pipelines carried high viscosity crude oil at a high temperature (approximately 135 degrees Fahrenheit) to facilitate transport.

43. The Las Flores Pipeline System starts at 150 feet of elevation and rises to close to 3,000 feet of elevation before dropping to approximately 690 feet of elevation at its Pentland Station terminus. The required operating temperatures to transport heavy crude oil across that elevation profile are uniquely high. These high operating temperatures accelerate external pipeline corrosion.

44. The approximately 125-mile pipeline system crosses three California counties: Santa Barbara County (over 72 miles), San Luis Obispo County (over 37 miles), and Kern County (over 13 miles).

45. The Las Flores Pipeline System travels along the coastline and across more than 20 miles of public lands, including Gaviota State Park (4.1 miles), the Los Padres National Forest (6.3 miles), Carrizo Plain Ecological Reserve (4.5 miles), Carrizo Plain National Monument (4.5 miles), and Bitter Creek National Wildlife Refuge (0.98 miles).

46. The Pipeline System crosses what are known as High Consequence Areas, including unusually sensitive areas. It crosses active faults; steep slopes; sensitive groundwater basins; drinking water aquifers; floodplains; and numerous streams, creeks, and rivers, including Gaviota Creek, the Santa Ynez River, Sisquoc River, and Cuyama River.

47. The Pipeline System also traverses the critical habitat of several threatened and endangered species, including the California red-legged frog, Gaviota tarplant, Southwestern willow flycatcher, and Southern California steelhead. It also crosses areas with documented occurrences of other special status, threatened, and endangered species, including but not limited to the California tiger salamander, California condor, Crotch's bumble bee, Kern mallow, Nelson's antelope squirrel, San Joaquin kit fox, San Joaquin woollythreads, blunt-nosed leopard

10

VERIFIED PETITION AND COMPLAINT

lizard, giant kangaroo rat, monarch butterfly, southwestern pond turtle, tidewater goby, and western spadefoot toad.

48.     Finally, the Pipeline System also passes through a suburban neighborhood in the city of Buellton, California, close to schools, parks, and homes.

**B.     The 2015 Refugio State Beach Oil Spill**

49.     For decades, ExxonMobil Corporation owned and operated all three offshore oil and gas platforms and produced oil from the Santa Ynez Unit. The original owner and operator of the pipeline system was Celeron Pipeline Company, which in 1998 sold the pipelines to Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P.

50.     In 2015, Line 901/CA-324, carrying oil from the Santa Ynez Unit, ruptured and caused one of the most disastrous oil spills in California history, devastating approximately 150 miles of the California coast.

51.     The corroded pipeline spilled what is now believed to be over 450,000 gallons of oil, killing hundreds of birds and mammals and closing fisheries and beaches. A wide variety of nearshore fish species were impacted by the spill, including surfperch and grunion, which were spawning when the spill occurred. The spill also impacted a wide variety of coastal habitats, including that for kelp wrack, feather boa kelp, surfgrass, and eelgrass. Species protected under the Endangered Species Act (including humpback whales and Western snowy plovers) were observed swimming through oil or with oil on them.

52.     On May 21, 2015, PHMSA issued a Corrective Action Order that ordered the operator to shut down Line 901/CA-324. PHMSA then conducted an investigation into what caused the  rupture and a spill of this magnitude.

53.     The PHMSA Failure Report, issued a year later, noted that while thankfully there were no human injuries or fatalities as a result of the rupture or spill, it "resulted in substantial damage to natural habitats and wildlife." The PHMSA Failure Report found that the pipeline wall had corroded to 1/16th of an inch before the spill occurred. Notably, the pipeline was only operating at approximately 55 percent of its maximum operating pressure at the time it failed.

VERIFIED PETITION AND COMPLAINT

The report documented pervasive corrosion and metal loss throughout the Las Flores Pipeline System.

54.    The Failure Report concluded that the "proximate or direct cause" of the failure was "progressive external corrosion" that occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied to the bare pipe, which was then covered by foam thermal insulation and wrapped with Polyken tape. The Failure Report noted that water had been trapped inside the pipeline's foam insulation, "indicating that the integrity of the coating system had been compromised."

55.    With the coating compromised, the pipeline system's cathodic protection system was rendered ineffective at "preventing corrosion from occurring beneath the pipeline's coating/insulation system." The Failure Report stated that "[i]ndustry practices recognize that the [cathodic protection] system like the one utilized on Line 901 cannot protect an insulated steel pipeline should the coating (tape wrap over insulation) become compromised." It is now well accepted that impressed cathodic protection systems cannot protect insulated pipelines like Line 901/CA-324 and Line 903/CA-325 from external corrosion.

56.    In the Failure Report's "Cathodic Protection Findings," PHMSA noted that federal pipeline safety regulations (49 C.F.R. § 195.563) require cathodic protection to "prevent external corrosion of buried pipelines," which are generally more prone to corrosion. The report noted that historical cathodic protection records for Line 901/CA-324 reveal "protection levels that typically are sufficient to protect non-insulated, coated steel pipe. Line 901 and 903, however, are insulated." The findings conclude by stating, "[a]n increasing frequency and extent of corrosion anomalies were noted on both Line 901 and 903 in [In-Line Inspection] survey results, anomaly excavations and repairs" and that PHMSA inspectors "noted moisture entrained in the insulation at four excavations performed by Plains on Line 901" after the spill and before the pipelines were ordered purged.

57.    In addition to ineffective cathodic protection, PHMSA's Failure Report found that the operator failed to detect and mitigate the corrosion, highlighting that the "in-line inspection

VERIFIED PETITION AND COMPLAINT

(ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately."

58.    While the Las Flores Pipeline System was classified as an interstate pipeline at the time of the spill and was therefore exclusively regulated by the federal government, PHMSA formally acknowledged in a May 2016 Memorandum of Understanding (MOU) that Lines 901/CA-324 and 903/CA-325 were no longer considered interstate hazardous liquid pipelines and are now classified as intrastate pipelines subject to the regulatory and enforcement jurisdiction of Cal Fire, pursuant to state certification from PHMSA.

59.    In March 2020, the federal government and State of California sued Plains All American Pipeline, L.P., and Plains Pipeline, L.P., for the extensive natural resource and other damages the spill caused (*see United States v. Plains All American Pipeline*, Civil Action No. 2:20-cv-02415 (C.D. Cal.)) The case was resolved through a Consent Decree entered later that year, which incorporated elements of three post-spill Corrective Action Orders from PHMSA. The Consent Decree envisioned three possible pathways forward for the pipeline system: Plains All American could replace the pipeline, abandon the pipeline, or pursue restarting the pipeline if conducted in accordance with the Consent Decree's terms "and applicable law."

60.    For any operating segments of the Las Flores Pipeline System, the Consent Decree required the operator to "remediate all internal or external metal loss anomalies that have an ILI reported depth of 40 [percent] or greater wall loss, within one year of discovery."

61.    The Consent Decree also expressly required that prior to any restart, the operator "shall apply for a State Waiver through [Cal Fire] for the limited effectiveness of cathodic protection" and that it "must receive a State Waiver from [Cal Fire] prior to restarting." Cal Fire has described a State Waiver as "an order that modifies compliance with a regulatory requirement if an operator demonstrates that alternative measures are consistent with pipeline safety."

62.    The Consent Decree stated that Cal Fire has the discretion to require additional terms and conditions if it grants any request for a State Waiver. The Consent Decree also noted

13

VERIFIED PETITION AND COMPLAINT

that "[n]othing in it shall be interpreted to limit" Cal Fire's authority to require additional terms and conditions in any State Waiver.

**C.      Sable's Pursuit of Restart and the Implications of Cal Fire's State Waivers**

63.      For almost ten years since the 2015 Refugio State Beach oil spill, the three offshore platforms, offshore pipelines, the two onshore processing facilities, and the onshore Las Flores Pipeline System have been shut down.

64.      On February 14, 2024, Sable closed on a Purchase and Sale Agreement with ExxonMobil Corporation and Mobil Pacific Pipeline Company to acquire the Santa Ynez Unit assets as well as all outstanding shares of Pacific Offshore Pipeline Company and Pacific Pipeline Company. According to the terms of that acquisition, if production of oil and gas does not resume from the Santa Ynez Unit by early 2026, the assets revert to ExxonMobil Corporation, which loaned Sable the majority of the funding it needed to acquire the assets.

65.      Sable is now the listed owner and operator of Platforms Harmony, Heritage, and Hondo and lessee on all sixteen federal oil and gas leases in the Santa Ynez Unit. Pacific Offshore Pipeline Company (POPCO) remains the legal owner of the POPCO Gas Plant, and Pacific Pipeline Company remains the legal owner of the Las Flores Pipelines.

66.      While its predecessors once pursued building new, replacement pipelines for the Las Flores Pipeline System, Sable is instead taking the third path laid out in the 2020 Consent Decree and attempting to restart Santa Ynez Unit oil production and transport using the old, extensively corroded pipeline system that failed in 2015 and has exceeded its intended thirty-year lifespan.

67.      Setting its sights on restart, Sable set out to complete the require anomaly repairs where it has found corrosion has reached an unacceptable level. Sable identified 121 anomalies requiring repairs, many of which it contends it has completed. To this end, the company has undertaken extensive development along the pipeline system, which the California Coastal Commission has determined was and is unauthorized. These activities are now the subject of a Commission cease-and-desist order, restoration order, and administrative penalty order. Other state and federal agencies have also issued notices of violation or potential violation to Sable for

14

this work on and along the pipeline, including the State Water Control Resource Board, Regional Water Quality Control Board, California Department of Fish and Wildlife, Department of Parks and Recreation, and U.S. Fish and Wildlife Service. As a second step of a possible restart, Sable has pursued State Waivers to address the ineffective cathodic protection system and consequent ongoing risk of corrosion under insulation.

68.    Since learning of this restart plan, Petitioners have repeatedly put Cal Fire on notice of their concerns and urged the agency (through calls, emails, and letters) to conduct an analysis on the Project and provide opportunities for meaningful public participation under CEQA. For example, on September 24, 2024, Petitioners submitted a letter to Cal Fire about the agency's duty to conduct a CEQA review process and requesting that it prepare an environmental impact report for any approvals it issues enabling the restart of Lines 901/CA-324 and 901/CA-325 given the pipeline system's failure, the previous catastrophic rupture and spill, and the fact that it had been idle for almost ten years.

69.    The comments documented how restarting this decades-old, post-failure Las Flores Pipeline System would have serious environmental impacts across multiple categories, including air, health, climate, water, and species. For example, the comments included information and references relating to the risks of oil spills in aging pipelines; the increased risks of oil spills in pipelines without effective cathodic protection systems; the restart's impacts on climate change; the human health impacts associated with oil and gas operations; and the impacts of restart on sensitive habitat and rare, threatened, and endangered species.

70.    On April 24, 2024, Sable and Pacific Pipeline Company confirmed by letter to Cal Fire their intention to continue to pursue State Waiver applications submitted by their predecessors in July 2023. The applications request permission to restart the pipelines even though the thermally insulated pipeline's cathodic protection system has "limited effectiveness" and Sable would need "relief from the requirements to evaluate and remediate all corrosion of or along longitudinal seam welds per 49 C.F.R. § 195.452(h)(4)(iii)(H)."

71.    Although Cal Fire previously assured the public and state legislators it would not issue any waiver absent a public meeting, Sable filed a Form 8-K with the U.S. Securities and

VERIFIED PETITION AND COMPLAINT

Exchange Commission on December 17, 2024, in which it announced that Cal Fire issued the State Waivers on that same day, unbeknownst to the public. Indeed, Petitioners only learned of the State Waivers from the December 17, 2024, filing, despite having submitted a California Public Records Act Request to Cal Fire on September 13, 2024, requesting records relating to Sable's application for and Cal Fire's consideration and issuance of any State Waivers (to which Cal Fire only responded in March 2025).

72.     After Cal Fire issued the State Waivers in December, it was required by law to transmit them to PHMSA for a 60-day review period during which PMHSA could approve, object to, or remain silent on the waiver, in which case the waivers would take effect after the review period lapsed.

73.     On December 23, 2024, the Center sent a letter to Cal Fire and PHMSA to communicate its concern that Sable had announced it received State Waivers on December 17, 2024, particularly given, that on and information and belief, Cal Fire had previously communicated that it would not issue any State Waivers until after holding a public meeting.

74.     The Center's December 23, 2024, letter referenced and attached an *Evaluation of the Las Flores Pipeline System Startup Proposal* prepared by Accufacts Inc. for the Center for Biological Diversity and Environmental Defense Center. Accufacts Inc. reviewed the publicly available information on the pipeline system and conveyed serious technical concerns with the proposed pipeline system restart given the condition of the pipeline, its design flaws, and the risks associated with reliance on inspection tools in lieu of effective cathodic protection. Accufacts Inc.'s president who authored the evaluation, Richard Kuprewicz, is a chemical engineer with over fifty years of experience in the energy industry, including extensive experience conducting pipeline incident investigations after pipeline rupture tragedies.

75.     On December 24, 2024, the Center sent an additional email inquiry to Cal Fire about the Center's Public Record Act Request, as it had not received any response or any responsive records from the agency. On January 15, 2025, the Center received an email from Cal Fire that the agency had posted the State Waivers on a webpage it developed for the proposed restart (after repeated requests from the public for more transparency), titled *Pathways for*

16

VERIFIED PETITION AND COMPLAINT

*Restarting CA-324 and CA-325.* It did not provide the application for the State Waivers or any further responsive records relating to its issuance of the State Waivers at that time.

76. The State Waiver issued for Line 901/CA-324 covers a 10.86-mile, 24-inch outside diameter pipeline segment along the coast in Santa Barbara County. It waives compliance with just one pipeline safety regulations, specifically relating to remediation measures for "[c]orrosion of or along a longitudinal seam weld." (49 C.F.R. § 195.452(h)(4)(iii)(H).) According to the State Waiver, "Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP)."

77. The State Waiver issued for Line 903/CA-325A/B covers a 30-inch outside diameter pipeline segment that crosses 113.56 miles in Santa Barbara County, San Luis Obispo County, and Kern County (Gaviota to Pentland). As with the waiver issued for the coastal segment of the pipeline, it waives the requirement to remediate the "[c]orrosion of or along a longitudinal seam weld." (49 C.F.R. § 195.452(h)(4)(iii)(H).) It also includes the same explanation attributed to Sable: that its goal and plan is to try to mitigate the risks posed by corrosion under insulation resulting from the ineffective cathodic protection system.

78. On January 17, 2025, PHMSA Deputy Administrator Tristan Brown sent the Center a letter acknowledging receipt of its December 23, 2024, letter and conveying that PHMSA had received the State Waivers from Cal Fire on December 18, 2024, starting the federal agency's 60-day review period. PHMSA's letter noted that it might need more time for review, it had communicated that possibility to Cal Fire, and "[a]llowing for additional time for review is merited here as it has been in certain other instances involving similar highly technical waiver reviews by PHMSA." PHMSA also opened a non-rulemaking federal docket for each State Waiver (Docket ID PHMSA-2025-002 for CA-324 and Docket ID PHMSA-2025-003 for CA-325) on January 28, 2025, on the website, Regulations.gov.

17

79.    In contrast to that communication, just fourteen days later, on February 11, 2025, PHMSA's Associate Administrator for Pipeline Safety issued two identical, brief letters concurring with Cal Fire's State Waivers, noting that the agency "does not object" to the granting of either waiver.

80.    The State Waivers in essence allow Sable to supplant corrosion-*preventing* cathodic protection requirements with corrosion-*monitoring* and risk management measures; including pipeline testing; in-line inspections; verification digs; repairs; corrosion growth rate and predicted failure analyses; and various recordkeeping and reporting requirements.

81.    If the Las Flores Pipeline System is allowed to restart using State Waivers from Cal Fire, external pipeline corrosion will not be prevented or even minimized by the ineffective cathodic protection system. Nor will the State Waivers address the years of accumulated corrosion that have not yet been identified as necessitating remediation. A 1994 Cal Fire report indicates that there is a five-fold increase in failure frequencies for pipelines that are not equipped with cathodic protection.

82.    This is not a repair of the failed cathodic protection system—it is essentially abandonment of that legally-required system. Pipeline integrity management tools are not a substitute for proper pipeline design and effective coating and cathodic protections. Current in-line inspection technologies are not able to adequately detect and inform an adequate assessment of all types of external corrosion threats that are most likely present along the Las Flores Pipeline System. The pipeline segments at the highest risk of failure are those at risk of corrosion related to cracking, including stress corrosion cracking and selective seam corrosion cracking. A pipeline's time to failure from stress corrosion cracking is difficult if not impossible to predict.

83.    Even if integrity management tools were a substitute for a properly designed and functioning pipeline (which they are not), the State Waivers contemplate over 190 digs and excavations over the next 10 years just to attempt to validate the results of the contemplated in-line inspections. There has been no environmental review of the impacts of such digs and excavations or any other aspects of this Project.

VERIFIED PETITION AND COMPLAINT

84.     Given its coating and cathodic protection design flaws and failures, projected thirty-year lifespan, and the existing corrosion along the pipelines, the Las Flores Pipeline System cannot be made as safe as new pipelines. It is also well-understood that the risk of spills increases with the age of a pipeline. As the 1985 Celeron/All American and Getty Pipeline Projects EIR/EIS acknowledged, the risk of an oil spill *more than doubles* as pipelines age from twenty to forty years. These pipelines were constructed in the late 1980s and went into service in 1991 (Line 903/CA-325) and 1992 (Line 901/CA-324).

85.     The Las Flores Pipeline System poses unique threats of environmental damage and future oil spills due to its age, design flaws, existing levels of corrosion, location, and necessary operating conditions, which Cal Fire has failed to meaningfully assess.

86.     Nor has Cal Fire assessed the Project's other significant environmental impacts as required. For example, resuming drilling and oil production at the Santa Ynez Unit would increase vessel traffic, thereby increasing the risk of vessel strikes of various threatened and endangered animals. Restart would also resume pollution from an onshore processing facility, which was Santa Barbara County's largest source of greenhouse gas emissions prior to being shut down. It emitted 55 percent of the County's greenhouse gas emissions along with a significant number of other pollutants, including particulate matter and volatile organic compounds (VOCs), which are harmful to human health.

87.     On March 2, 2025, the Center sent Cal Fire a letter requesting revocation of the State Waivers to ensure that (1) Cal Fire proceeds in full compliance with the procedural and substantive requirements of federal and state pipeline safety laws and CEQA, and (2) Sable's other noticed violations of law are remedied before the agency considers issuing any pipeline safety regulation waivers. The Center attached a second February 25, 2025, report prepared by Accufacts Inc. after it reviewed the State Waivers, which concludes that restarting the pipeline system continues to pose a high risk of dangerous corrosion and failure for reasons the State Waivers did not adequately address. A month later, Cal Fire responded to the Center's letter, communicating its position that revocation of the State Waivers is not appropriate at this time.

19

VERIFIED PETITION AND COMPLAINT

88.     On March 13, 2025, Cal Fire, the State Water Control Resources Board, Regional Water Quality Control Board, California Department of Fish and Wildlife, Department of Parks and Recreation, California Department of Conservation, and California Coastal Commission participated in a Town Hall meeting organized by state lawmakers representing Santa Barbara County to discuss the agencies' respective roles in the Project and to answer questions from the public about the status of the restart of oil and gas operations from the Santa Ynez Unit, including use of the Las Flores Pipeline System to transport crude oil. There, it was confirmed that, to date, no CEQA process has been initiated or completed for the Project.

89.     Sable announced in a March 17, 2025, Form 8-K filing that it intends to restart oil and gas production from the Santa Ynez Unit in the second quarter of 2025 (which we are now in) after completing the remaining anomaly repairs and hydrotesting the pipeline system.

## LEGAL BACKGROUND

**A.      Oil and Gas Pipeline Safety Laws and Regulations**

90.     Cal Fire implements and enforces a Pipeline Safety Program that is certified by the U.S. Department of Transportation under section 60105 of title 40 of the United States Code.

91.     California's Elder California Pipeline Safety Act of 1981 directed Cal Fire to "adopt hazardous liquid pipeline safety regulations in compliance with the federal law relating to hazardous liquid pipeline safety." (Gov. Code § 51011, subd. (a).) Cal Fire adopted the federal pipeline safety regulations (49 C.F.R. part 195) by reference as they relate to hazardous liquid pipelines. (Cal. Code Regs., tit. 19, § 2000.)

92.     Pursuant to these federal pipeline safety regulations (49 C.F.R. § 195.557), buried pipelines constructed after a certain date, including Line 901/CA-324 and Line 903/CA-325, must have an external coating to prevent external corrosion. Specifically, the external coating must:

> (a) Be designed to mitigate corrosion of the buried or submerged pipeline; (b) Have sufficient adhesion to the metal surface to prevent under film migration of moisture; (c) Be sufficiently ductile to resist cracking; (d) Have enough strength to resist damage due to handling and soil stress; (e) Support any supplemental cathodic protection; and (f) If the coating is an insulating type, have low moisture absorption and provide high electrical resistance.

20

VERIFIED PETITION AND COMPLAINT

(49 C.F.R. § 195.559.)

93.     Buried pipelines constructed after a certain date, including Line 901/CA-324 and Line 903/CA-325, must have cathodic protection. (49 C.F.R. § 195.563.)

94.     The federal pipeline safety risk indicator table places pipelines greater than 25 years of age in the "High" risk category. (Guidance for Implementation of an Integrity Management Program, 49 C.F.R. part 195 Appendix C, § III.

95.     Actions required to remediate pipeline integrity problems are defined in section 195.452(h). (49 C.F.R. § 195.452(h).) Despite the flaws and ineffectiveness of the pipeline system's coating and cathodic protection system, the sole regulation from which Sable sought State Waivers relates to "[c]orrosion of or along a longitudinal seam weld," which is considered a "180-day condition" for which an operator is required to schedule evaluation and remediation within 180 days of discovering the condition. (49 C.F.R. § 195.452(h)(4)(iii)(H).)

96.     State authorities like Cal Fire that have been certified by PHMSA may "waive compliance with a safety standard to which the certification or agreement applies *in the same way and to the same extent* the Secretary [of Transportation] may waive compliance under subsection (c) of this section." (49 U.S.C. § 60118(d)), italics added.)

97.     The Secretary of Transportation "by order may waiver compliance with any part of an applicable standard prescribed under this chapter [49 USCS §§ 60101 et seq.] with respect to such facility on terms the Secretary considers appropriate if the Secretary determines that the waiver is not inconsistent with pipeline safety." (49 U.S.C. § 60118(c); *see also* 49 C.F.R. § 190.341(a) (federal regulations relating to waivers the Department of Transportation issues.))

98.     The Secretary of Transportation may issue a waiver "only after notice and an opportunity for a hearing." (49 U.S.C. § 60118(c)(1)(B).) The Secretary is also required to include a "statement of reasons" in an order granting the waiver. (*Id*. § 60118(c)(3).)

99.     When it receives an application for a waiver, PHMSA provides a notice of intent to consider the application and "invite comment." (49 C.F.R. § 190.341(d)(1).). PHMSA also "may consult with other Federal agencies before granting or denying an application or renewal

VERIFIED PETITION AND COMPLAINT

on matters PHMSA believes may have significance for proceedings under their areas of responsibility." (*Id.*)

100.    Applications to PHMSA for waivers must contain a "detailed description of the pipeline facilities" for which the waiver, also known as a special permit, is sought, including proximity to "unusually sensitive areas," an explanation of the "unique circumstances that the applicant believes make the applicability of that regulation or standard (or portion thereof) unnecessary or inappropriate for this facility," a description of alternative measures or activities proposed and "how such measures will mitigate any safety or environmental risks," a description of "any positive or negative impacts on affected stakeholders and a statement indicating how operating the pipeline pursuant to a [waiver] would be in the public interest," and any other information that the agency may need "to process the application including environmental analysis where necessary." (49 C.F.R. § 190.341(c).) "Conditions may be imposed on the grant [of a waiver] if the Associate Administrator concludes they are necessary to assure safety, environmental protection, or are otherwise in the public interest." (49 C.F.R. § 190.341(d)(2).)

101.    The U.S. Department of Transportation conducts environmental review for waivers that it issues, consistent with governing legislation, Secretarial Order DOT 5610.1C, and PHMSA National Environmental Policy Act (NEPA) implementing procedures. Under its procedures, waivers are one of three general categories of PHMSA major federal actions that are subject to environmental review, along with regulatory actions and natural gas distribution grant actions. PHMSA's Pipeline and Hazardous Materials Safety Administration NEPA Implementing Procedures and Categorical Exclusions Report states:

> PHMSA's grant or denial of the special permit request is a major federal action under NEPA. Therefore, in addition to analyzing any potential risks to public safety, PHMSA also analyzes any potential risks to the environment that could result from such grant or denial. Specifically, PHMSA evaluates whether the special permit would significantly impact the likelihood of a pipeline spill or failure as compared to the environmental status quo in the absence of the special permit . . . issuance of special permits often prevents ground disturbance from excavation activities, thereby avoiding the associated environmental effects often associated with ground disturbance.

22

102.    The Elder California Pipeline Safety Act of 1981 contains additional requirements relevant to any State Waiver. It authorizes Cal Fire to "exempt the application of regulations adopted pursuant to this section to any pipeline, or portion thereof, when it is determined that the *risk to public safety is slight and the probability of injury or damage remote*." (*See* Gov. Code § 51011, subd. (b), italics added.) Notifications of exemption "shall be written, and shall include a discussion of those factors that the State Fire Marshal considers significant to the granting of the exemption." (Gov. Code § 51011, subd. (c).)

**B.    CEQA's Environmental Review Requirements**

103.    CEQA is a comprehensive statute designed to provide for the long-term protection of the environment. (Pub. Resources Code §§ 21001, subd. (d), 21080, subd. (a); Cal. Code Regs., tit. 14, § 1681 *et seq*.)

104.    One of the fundamental purposes of the CEQA process is to provide decisionmakers and the public with detailed information about the environmental impacts a proposed project is likely to have and to find feasible ways to avoid or significantly reduce those impacts. (CEQA Guidelines § 15002, subd. (a).) To that end, "[u]nder CEQA, an agency must solicit and respond to comments from the public and from other agencies concerned with the project" to ensure that the public and other agencies are informed and able to participate in the process. (*Id*. at subd. (j).)

105.    CEQA is triggered by any "project," which is defined as an action subject to a public agency's discretionary funding or approval that has the potential to either (1) cause a direct physical change in the environment; or (2) cause a reasonably foreseeable indirect physical change in the environment. (Pub. Resources Code § 21065.) A "project" includes (1) an activity directly undertaken by any public agency; (2) an activity undertaken by a private party but supported in whole or in part by public agency assistance such as contracts or grants, and (3) an activity that involves an agency's issuance to a person of a lease, permit, license, or other entitlement for use. (Pub. Resources Code § 21065; *Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 701 [overruled in part on other grounds].) "The key question is whether the public agency can use its subjective judgment to decide whether and how to carry out or approve

23

VERIFIED PETITION AND COMPLAINT

a project." (Cal. Code Regs., tit. 14, § 15357; *Protecting Our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 493.)

106.    CEQA defines a lead agency as "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (Pub. Resources Code § 21067; CEQA Guidelines § 15367.) Conversely, a responsible agency is "a public agency, other than the lead agency, which has responsibility for carrying out or approving a project." (Pub. Resources Code § 21069; CEQA Guidelines § 15381.)

107.    Where two or more public agencies are involved in a project and the project is to be carried out by a nongovernmental person or entity, the lead agency shall be the public agency with the greatest responsibility for supervising or approving the project. (CEQA Guidelines § 15051(b).) Where more than one public agency equally meets such criteria, the agency which acts first on the project is normally the lead agency. (*Id*. at subd. (c).)

108.    Subject to certain limited statutory and categorical exemptions, CEQA requires lead agencies to, at minimum, conduct an initial study on any project that "may have a significant effect on the environment." (CEQA Guidelines § 15063(a).) This study must examine all significant direct, indirect, and cumulative impacts of the proposed project.

109.    Where a lead agency determines after an initial study that the project may have a significant impact on the environment, the lead agency must prepare an Environmental Impact Report (EIR). (Pub. Res. Code § 21151; CEQA Guidelines § 15064(f) & (h).) The "heart" of CEQA's environmental review requirement is the EIR. (See *No Oil, Inc. v. City of Los Angeles* (1974) 529 P.2d 66, 76 (quoting *City of Inyo v. Yorty* (1973) 108 Cal.Rptr.3d 377, 388).) The EIR has been described as an environmental "alarm bell" whose purpose is to alert the public and decisionmakers to environmental changes "before they have reached ecological points of no return." (*City of Inyo v. Yorty*, *supra*, 108 Cal.Rptr.3d at page 388.)

110.    An EIR must identify and describe "[d]irect and indirect significant effects of the project on the environment." (CEQA Guidelines § 15126.2(a).) The EIR must also describe feasible mitigation measures and alternatives to the project that could avoid or minimize

significant environmental impacts. (CEQA Guidelines §§ 15126.4, 15126.6.) Additionally, an EIR must identify and analyze cumulative effects when the "incremental effects of an individual project are significant when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (Cal. Code Regs., tit. 14, § 15065, subd. (a)(3); *see also id.* § 15130, subd. (a).)

111. Immediately following its decision to prepare an EIR, the lead agency must issue a notice of preparation to the public and responsible agencies to allow for input. (CEQA Guidelines § 15082.) Additionally, the lead agency must file a notice of completion and notice of public availability as soon as a draft EIR is completed. (CEQA Guidelines §§ 15085, 15087.) A public review period of no less than 30 days must be provided. (CEQA Guidelines §§ 15105, 15073, subd. (a), 15087, subd. (e).)

112. The lead agency must consider all comments received during the public review period. (CEQA Guidelines §§ 15074, subd. (b), 15132, subd. (c).) Additionally, the lead agency must consult with and request comments from all responsible agencies and respond to all comments that raise significant environmental issues. (CEQA Guidelines §§ 15086, 15132, subd. (d).)

113. Under CEQA, agencies can only approve projects if all feasible alternatives or mitigation measures that would substantially lessen a project's significant environmental effects have been imposed. (Pub. Res. Code, § 21002; CEQA Guidelines § 15091.)

**FIRST CAUSE OF ACTION**
**(Violations of Federal Pipeline Safety Laws – 49 U.S.C. § 60118)**

114. Petitioners reallege and incorporate the allegations contained in the foregoing paragraphs.

115. Cal Fire violated the requirement that it only "waive compliance with a safety standard to which the certification or agreement applies *in the same way and to the same extent* the Secretary [of Transportation] may waive compliance under subsection (c) of this section." (49 U.S.C. § 60118(d), italics added.) It did so by failing to demonstrate that the State Waivers are consistent with pipeline safety; provide public notice and a public hearing before issuing the

25

waivers; include a statement of reasons in its decisions to approve the waivers; and conduct environmental review before issuing its waiver decisions.

116.    As discussed above, the risk to public safety and probability of environmental damage stemming from the Project—including restart of Line 901/CA-324 and Line 903/CA-325 with defective coating, ineffective cathodic protection, and serious ongoing corrosion threats—is significant. As a result, Cal Fire violated the federal requirement that waivers may only be issued if "not inconsistent with pipeline safety." (49 U.S.C. § 60118(c)(1)(A).)

117.    Cal Fire failed to provide any public notice or hearing opportunity prior to issuing the State Waivers, and therefore violated the requirement that waivers may be issued "only after notice and an opportunity for a hearing." (49 U.S.C. § 60118(c)(1)(B).)

118.    Cal Fire failed to provide an order containing "the reasons for granting the waiver(s)." 49 U.S.C. § 60118(c)(3).) The State Waivers merely recited Sable's request and included general conditions of approval.

119.    Cal Fire also failed to conduct any environmental review for the State Waivers, as discussed below, despite the U.S. Department of Transportation's requirement to conduct environmental review for waivers it issues, consistent with governing legislation, Secretarial Order DOT 5610.1C, and the PHMSA National Environmental Policy Act Implementing Procedures.

120.    Cal Fire committed a prejudicial abuse of discretion, violated mandatory duties under federal law, and failed to proceed in the manner required by law when it issued the State Waivers for the Project in violation of federal pipeline safety laws.

**SECOND CAUSE OF ACTION**
**(Violations of State Pipeline Safety Laws – Gov. Code § 51011)**

121.    Petitioners reallege and incorporate the allegations contained in the foregoing paragraphs.

122.    Cal Fire violated the requirement that it "may exempt the application of regulations adopted pursuant to this section to any pipeline, or portion thereof, when it is determined that the risk to public safety is slight and the probability of injury or damage remote."

26

VERIFIED PETITION AND COMPLAINT

(Gov. Code § 51011, subd. (b).) The State Waivers issued to Sable did not include any analysis or justifications for their issuance let alone findings related to risks to public safety or the probability of injury or damage.

123.    Cal Fire violated the requirement that waivers or exemptions "include a discussion of those factors that the State Fire Marshal considers significant to the granting of the exemption." (Gov. Code § 51011, subd. (c).) Instead of providing any Project-specific findings, evidence, or analysis justifying the decisions, Cal Fire merely recounts that

> Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation. Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

124.    The waivers contain no discussion of the risks that restarting these aged pipelines with ineffective external coating and cathodic protections poses to the environment, public safety, and the public interest. Nor do the waivers address the environmental and safety impacts of their conditions of approval (which will require repeated verification digs and excavations, among other activities).

125.    Cal Fire committed a prejudicial abuse of discretion, violated mandatory duties under state law, and failed to proceed in the manner required by law when it issued the State Waivers for the Project in violation of state pipeline safety laws.

### THIRD CAUSE OF ACTION
**(Violations of CEQA – Pub. Resources Section 21000, *et seq.*;
14 Cal. Code Regs. section 15000, *et seq.*)**

126.    Petitioners reallege and incorporate the allegations contained in the foregoing paragraphs.

127.    Cal Fire is the lead agency principally responsible for approving the Project as it has provided the majority of state oversight for the Project to date, including issuing the State Waivers for the Project and reviewing and approving compliance with the requirements of the

27

VERIFIED PETITION AND COMPLAINT

Consent Decree, pipeline integrity management requirements, and Sable's startup plans for the pipelines, among other responsibilities. (CEQA Guidelines §§ 15367, 15051, subd. (b).)

128. Cal Fire violated CEQA by issuing the State Waivers without preparing any environmental documentation or providing any public notice or public comment opportunity. Cal Fire therefore failed CEQA's core objective to provide decisionmakers and the public with detailed information about the Project's environmental impacts, consider appropriate mitigation measures, and properly weigh Project alternatives. (CEQA Guidelines § 15002(a).)

129. Cal Fire's violations include, but are not limited to, the following:

A. Failure to prepare an Initial Study for the Project. (CEQA Guidelines § 15063, subd. (a).)

B. Failure to prepare an Environmental Impact Report for the Project. (CEQA Guidelines § 15063, subd. (b).)

C. Failure to publish a Notice of Preparation for the Project. (CEQA Guidelines § 15082.)

D. Failure to file a Notice of Completion or provide a public notice of the availability of a draft Environmental Impact Report for the Project. (CEQA Guidelines §§ 15085, 15087.)

E. Failure to provide a public review period for the Project. (CEQA Guidelines §§ 15105, 15073, subd. (a), 15087, subd. (e).)

F. Failure to request, consider, and respond to comments on the Project. (CEQA Guidelines §§ 15074, subd. (b), 15086, 15132, subds. (b) & (d).)

G. Failure to certify that Cal Fire considered all pertinent environmental information in an Environmental Impact Report prior to approving the Project and that the Environmental Impact Report reflects Cal Fire's independent judgment and analysis. (CEQA Guidelines § 15090).

H. Failure to adopt a Mitigation Monitoring or Reporting Program for the Project. (CEQA Guidelines §§ 15074, subd. (d), 15097.)

VERIFIED PETITION AND COMPLAINT

I.      Failure to make written findings for the Project. (CEQA Guidelines §§ 15091, 15093.)

J.      Failure to file a Notice of Determination for the Project. (CEQA Guidelines §§ 15075, 15094.)

130.    In the alternative, Cal Fire violated CEQA by failing to conduct subsequent environmental review for the Project. (Pub. Resources Code § 21166; CEQA Guidelines §§ 15052, 15096(e), 15162.)

131.    Cal Fire committed a prejudicial abuse of discretion, failed to proceed in the manner required by law, and acted without substantial evidentiary support when it issued the State Waivers for the Project without environmental documentation or public involvement pursuant to CEQA.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners pray for entry of judgment as follows:

1.    For a writ of mandate or peremptory writ pursuant to Code of Civil Procedure section 1085, or in the alternative, section 1094.5, to:

A.    Declare that Cal Fire violated federal pipeline safety laws in approving the State Waivers without public notice, a public hearing, a statement of reasons, or environmental review;

B.    Declare that Cal Fire violated federal pipelines safety laws by issuing State Waivers without demonstrating that they are consistent with pipeline safety;

C.    Declare that Cal Fire violated state pipeline safety laws by issuing State Waivers without demonstrating that risk to public safety is slight and the probability of injury or damage remote;

D.    Declare that Cal Fire violated state pipeline safety laws by issuing State Waivers without including a discussion of the factors considered significant to the granting of the exemption;

VERIFIED PETITION AND COMPLAINT

E.  Declare that Cal Fire violated CEQA in approving the State Waivers without conducting the required CEQA review for the Project;

F.  Direct Cal Fire to vacate and set aside the State Waivers until Cal Fire complies with its obligations under federal and state pipeline safety laws and CEQA; and

G.  Direct Cal Fire to refrain from granting any further approvals for the Project unless and until Cal Fire complies with its obligations under CEQA and federal and state pipeline safety laws.

2.  For entry of temporary, preliminary, and permanent injunctive relief prohibiting Cal Fire and the Real Parties in Interest from conducting any further activity in furtherance of the Project until Cal Fire complies with the requirements of CEQA and federal and state pipeline safety laws.

3.  For Petitioners' fees and costs, including reasonable attorneys' fees and costs, as authorized by Code of Civil Procedure section 1021.5 and any other applicable provisions of law.

4.  For such other legal and equitable relief as this Court deems appropriate and just.

DATED: April 15, 2025                    Respectfully submitted,

s/ *Julie Teel Simmonds*

JULIE TEEL SIMMONDS (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
DAVID PETTIT (Bar No. 67128)
dpettit@biologicaldiversity.org
TALIA NIMMER (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100

*Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

30

VERIFIED PETITION AND COMPLAINT

**VERIFICATION**

I, Peter Galvin, hereby declare I am the Director of Programs for Petitioner Center for Biological Diversity, a non-profit corporation with offices in Oakland, California. I have read the foregoing petition and am familiar with its contents. The facts alleged in it are true to my personal knowledge and belief. I declare under penalty of perjury under the laws of the State of California that the above is true and correct and that this verification is executed on this 14th day of April 2025, in Athens, Alabama.

_____

Peter Galvin, Director of Programs
Center for Biological Diversity

31

VERIFIED PETITION AND COMPLAINT

## VERIFICATION

I, Mati Waiya hereby declare I am the Tribal Chair of the Coastal Band of the Chumash Nation and Executive Director of the Petitioner Wishtoyo Foundation, a non-profit corporation with an office in Malibu, California. I have read the foregoing petition and am familiar with its contents. The facts alleged in it are true to my personal knowledge and belief. I declare under penalty of perjury under the laws of the State of California that the above is true and correct and that this verification is executed on this 14th day of April 2025, in Santa Paula, California.

Mati Waiya
Executive Director
Wishtoyo Foundation

32

VERIFIED PETITION AND COMPLAINT

# Exhibit A

 CENTER *for* BIOLOGICAL DIVERSITY                    *Because life is good.*

*Via UPS*

April 12, 2025

Joe Tyler, Director/Fire Chief
Daniel Berlant, State Fire Marshal
California Department of Forestry and Fire Protection
710 Riverpoint Court
West Sacramento, CA 95605-1689

**Re: Notice of Commencement of Legal Action Pursuant to CEQA and Pipeline Safety Laws**

Dear Director Tyler and Fire Marshal Berlant:

Please take notice that the Center for Biological Diversity and Wishtoyo Foundation intend to file a Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief related to the State Waivers that the Office of the State Fire Marshal granted to Sable Offshore Corp. for the Las Flores Pipeline System (CA-324, CA-325A/B). We provide this notice pursuant to Public Resources Code section 21167.5.

This litigation will be filed in Santa Barbara County Superior Court on or after April 15, 2025, and it will be based on the Office of the State Fire Marshal's issuance of State Waivers to Sable Offshore Corp. without complying with the California Environmental Quality Act, Pub. Res. Code § 21000 *et seq.*, or the requirements of applicable federal and state pipeline safety laws and regulations. The Office of the State Fire Marshal granted the State Waivers on December 17, 2024, for Line CA-324 and Line CA-325A/B, and the Pipeline & Hazardous Materials Safety Administration's concurred in the issuance of these waivers on February 11, 2025.

Please contact one of us immediately if you need clarification or wish to discuss this notice.

Sincerely,

 s/ *Julie Teel Simmonds*

Julie Teel Simmonds
David Pettit
Talia Nimmer
CENTER FOR BIOLOGICAL DIVERSITY
(510) 844-7133

*Attorneys for Petitioners/Plaintiffs*

Attachment: Proof of Service

*Alaska • Arizona • California • Florida • Minnesota • Nevada • New Mexico • New York • Oregon • Vermont • Washington, DC*

**PROOF OF SERVICE**

I, Cynthia Elkins, declare as follows:

I am a resident of Humboldt County, California, and I am over the age of 18 and not a party to this action. My business address is Center for Biological Diversity, PO Box 220, Shelter Cove, California. My email address is celkins@biologicaldiversity.org.

On April 12, 2025, I served the preceding **Notice of Commencement of Legal Action Pursuant to CEQA** by enclosing a true and correct copy in a sealed envelope, which I deposited for collection and overnight delivery, postage fully pre-paid, at an office of an overnight delivery carrier in Athens, Alabama, addressed to the following persons:

Joe Tyler, Director/Fire Chief
California Department of Forestry and Fire Protection
710 Riverpoint Court
West Sacramento, CA 95605-1689

Daniel Berlant, State Fire Marshal
California Department of Forestry and Fire Protection
710 Riverpoint Court
West Sacramento, CA 95605-1689

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and this Declaration was executed in Athens, Alabama, on April 12, 2025.

Cynthia Elkins

# Exhibit B

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological
Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**
**SOUTH COUNTY REGION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive, <br><br> Respondents/Defendants. <br><br>———————————— <br><br> SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive, <br><br> Real Parties in Interest. | Case No. <br><br> **PETITIONER'S NOTICE OF ELECTION TO PREPARE THE ADMINISTRATIVE RECORD** <br><br> [Pub. Res. Code § 21167.6(b)(2)] |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to California Public Resources Code section 21167.6(b)(2), Petitioners CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION hereby elect to prepare the record of proceedings before Respondents CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION and OFFICE OF THE STATE FIRE MARSHAL, relating to the subject of the above-captioned action, or to pursue an alternative method of record preparation following further discussion with Respondents.

The record will be organized chronologically, paginated consecutively, and indexed so that each document may be clearly identified as to its contents and source, in a form and format consistent with California Rules of Court Rule 3.2205.

DATED: April 15, 2025                    Respectfully submitted,

s/ *Julie Teel Simmonds*
Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
Center for Biological Diversity
2100 Franklin St., Ste. 375
Oakland CA 94612

*Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

1

PETITIONER'S NOTICE OF ELECTION TO PREPARE THE ADMINISTRATIVE RECORD

# Exhibit C



CENTER *for* BIOLOGICAL DIVERSITY                          *Because life is good.*

April 15, 2025

Via USPS Priority Mail and Electronic Mail

CEQA Coordinator
Office of the Attorney General
Environment Section
1300 I Street
Sacramento, CA 95814-2919
CEQA@doj.ca.gov

**Re:**    **Notice of Commencement of Legal Action Alleging Environmental Harm: Cal Fire State Waivers for Las Flores Pipeline System**

Dear Attorney General Bonta:

Please take notice of the enclosed Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief, which the Center for Biological Diversity and Wishtoyo Foundation filed in Santa Barbara County Superior Court on April 15, 2025 (*Center for Biological Diversity v. California Department of Forestry and Fire Protection*). The Center and Wishtoyo Foundation provide this notice pursuant to Code of Civil Procedure section 388 and Public Resources Code section 21167.7.

This case challenges the California Department of Forestry and Fire Protection and Office of the State Fire Marshal's (Cal Fire's) failure to conduct an environmental review under the California Environmental Quality Act (CEQA) (Pub. Resources Code. § 21000, *et seq.*) before waiving federal pipeline safety regulations for an oil pipeline system in Santa Barbara, San Luis Obispo, and Kern counties. Specifically, Cal Fire issued two State Waivers to Sable Offshore Corp. in December 2024, which waive safety requirements meant to prevent corrosion of pipelines and minimize the risk of oil spills. The pipeline system, known as the Las Flores Pipeline System, ruptured and caused the catastrophic Refugio Oil Spill in 2015 due to excessive corrosion resulting from its flawed and ineffective coating and cathodic protection system. The State Waivers at issue in this case would allow Sable to restart offshore oil operations and transport that crude oil using the same defective and corrosion-prone pipeline system rather than replacing it.

Cal Fire's approvals of the State Waivers are likely to adversely impact air quality, water quality, cultural resources, and wildlife; deepen California's reliance on fossil fuels; ramp up local emissions of greenhouse gases that contribute to climate change; and increase the risk of another catastrophic oil spill. Cal Fire's decisions to grant these State Waivers are discretionary actions under CEQA.

*Arizona · California · Colorado · Florida · N. Carolina · New York · Oregon · Virginia · Washington, D.C. · La Paz, Mexico*

BiologicalDiversity.org

The Center and Wishtoyo Foundation now seek a court order setting aside the State Waivers and prohibiting Cal Fire and Real Parties of Interest from commencing any activities authorized in the State Waivers unless and until it considers, analyzes, and publicly discloses these impacts pursuant to CEQA, and unless and until it complies with applicable federal and state pipeline safety laws and regulations.

Thank you for your attention to this matter.

Sincerely,

 s/ *Julie Teel Simmonds*
JULIE TEEL SIMMONDS
jteelsimmonds@biologicaldiversity.org
DAVID PETTIT
dpettit@biologicaldiversity.org
TALIA NIMMER
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100

*Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

Attachment:
Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**PROOF OF SERVICE**

I, Cynthia Elkins, hereby declare:

I am over the age of 18 years, not a party to this action, and employed by the Center for Biological Diversity. My business and mailing address is PO Box 220, Shelter Cove, CA 95589.

On April 15, 2025, I mailed the preceding **Notice of Commencement of Legal Action**, along with an enclosed **Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief**, via First Class, Priority Mail by enclosing a true and correct copy of each document in a sealed envelope, which I deposited with the U.S. Postal Service, postage fully prepaid, in Rogersville, Alabama, addressed as follows:

CEQA Coordinator
Office of the Attorney General
1300 I Street
Sacramento, CA 95814-2919

Additionally, on April 15, 2025, I sent the Notice of Commencement and Verified Petition referenced above by electronic mail to the following address:

CEQA@doj.ca.gov

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct, and this Declaration was executed in Athens, Alabama, on April 15, 2025.

_____
Cynthia Elkins

# Exhibit D

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners/Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA BARBARA
## SOUTH COUNTY REGION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive, <br><br> Respondents/Defendants. <br><br>———————————————— <br><br> SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive, <br><br> Real Parties in Interest. | Case No. <br><br> **PETITIONER'S REQUEST FOR HEARING AND NOTICE OF REQUEST** <br><br> [Pub. Resources Code § 21167.4] <br><br> Petition Filed April 15, 2025 |

PETITIONER'S REQUEST FOR HEARING AND NOTICE OF REQUEST

NOTICE IS HEREBY GIVEN that, pursuant to Public Resources Code section 21167.4, Petitioners Center for Biological Diversity and Wishtoyo Foundation request a hearing on the merits of the Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief (Petition), which alleges violations of, inter alia, the California Environmental Quality Act (CEQA), Public Resources Code section 21000 *et seq*.

This request is being filed with the Court and served on the parties. Following the filing of this Request for Hearing and Notice of Request, any party may apply to the Court to establish a briefing schedule and hearing date for the hearing. (*Leavitt v. County of Madera* (2004) 123 Cal.App.4th 1502, 1514–23.) The hearing date, time, and place, and the briefing schedule for the hearing are to be established by the Court following such application by any party or at any case management conference to be scheduled by the Court. (*See id*.)

DATED: April 15, 2025                    Respectfully submitted,


 s/ *Julie Teel Simmonds*
Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
Center for Biological Diversity
2100 Franklin St., Ste. 375
Oakland CA 94612

*Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

1

PETITIONER'S REQUEST FOR HEARING AND NOTICE OF REQUEST

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

| | FOR COURT USE ONLY |
| --- | --- |
| | *(SOLO PARA USO DE LA CORTE)* |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/15/2025 10:19 AM
By: Narzralli Baksh , Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

California Department of Forestry and Fire Protection [Additional Parties Attachment Attached]

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Center for Biological Diversity and Wishtoyo Foundation

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Santa Barbara County Superior Court

Anacapa Division; 1100 Anacapa Street; Santa Barbara, CA 93121

| CASE NUMBER: |
| --- |
| *(Número del Caso):* |
| 25CV02244 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Julie Teel Simmonds; Center for Biological Diversity; 2100 Franklin St., Suite 375; Oakland, CA 94612; (510) 844-7100

DATE: 4/15/2025
*(Fecha)*

Clerk, by /s/ Narzralli Baksh , Deputy
*(Secretario)* *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)         ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use | | |
| --- | --- | --- |
| Judicial Council of California | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 |
| SUM-100 [Rev. July 1, 2009] | | *www.courts.ca.gov* |

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

[ Print this form ]   [ Save this form ]          [ Clear this form ]

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Center for Biological Diversity v. California Department of Forestry and Fire Protection | 25CV02244 |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,

Respondents and Defendants;

SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation; AND DOES 21 through 40, inclusive,

Real Parties in Interest.

Page _____ of _____

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-200(A) [Rev. January 1, 2007] | **ADDITIONAL PARTIES ATTACHMENT**<br>**Attachment to Summons** |
|---|---|

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

| Print this form | Save this form | Clear this form |
|---|---|---|

CM-010

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>Julie Teel Simmonds (CA Bar No. 208282)<br>Center for Biological Diversity; 2100 Franklin St., Suite 375; Oakland, CA 94612<br>TELEPHONE NO.: (510) 844-7100    FAX NO. : (510) 844-7150<br>EMAIL ADDRESS: jteelsimmonds@biologicaldiversity.org<br>ATTORNEY FOR *(Name):* Plaintiffs Center for Biological Diversity and Wishtoyo Foundation | **FOR COURT USE ONLY**<br>ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>4/15/2025 10:19 AM<br>By: Narzralli Baksh, Deputy |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**
STREET ADDRESS: 1100 Anacapa Street
MAILING ADDRESS: PO Box 21107
CITY AND ZIP CODE: Santa Barbara, CA 93121
BRANCH NAME: Anacapa Division, South County Region

CASE NAME:
Center for Biological Diversity, et al. v. California Department of Forestry and Fire Protection, et al.

| **CIVIL CASE COVER SHEET**<br>[x] **Unlimited**    [ ] **Limited**<br>(Amount     (Amount<br>demanded    demanded is<br>exceeds $35,000)   $35,000 or less) | **Complex Case Designation**<br>[ ] Counter    [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER: 25CV02244<br>JUDGE:<br>DEPT.: |
|---|---|---|

*Items 1–6 below must be completed (see instructions on page 2).*

1.  Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[x] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2.  This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
    a. [ ] Large number of separately represented parties
    b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
    c. [ ] Substantial amount of documentary evidence
    d. [ ] Large number of witnesses
    e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
    f. [ ] Substantial postjudgment judicial supervision

3.  Remedies sought *(check all that apply):* a. [ ] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4.  Number of causes of action *(specify):* three
5.  This case [ ] is [x] is not a class action suit.
6.  If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: April 15, 2025

Julie Teel Simmonds          *s/ Julie Teel Simmonds*
_____      _____
(TYPE OR PRINT NAME)        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.    Page 1 of 2

Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. January 1, 2024]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courts.ca.gov

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice– Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

CM-010 [Rev. January 1, 2024]                    **CIVIL CASE COVER SHEET**                    Page 2 of 2

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

| Print this form | Save this form | Clear this form |

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(NAME AND ADDRESS)*: <br> Julie Teel Simmonds (CA Bar No. 208282) <br> Center for Biological Diversity <br> 2100 Franklin St., Suite 375 <br> Oakland, CA 94612 <br> ATTORNEY FOR *(NAME):* Plaintiffs | TELEPHONE NO.: <br><br> (510) 844-7150 | *FOR COURT USE ONLY* |
|---|---|---|

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**

| ☒ Santa Barbara–Anacapa <br> 1100 Anacapa Street <br> Santa Barbara, CA  93101 | ☐ Santa Maria-Cook <br> 312-C East Cook Street <br> Santa Maria, CA  93454 | ☐ Lompoc Division <br> 115 Civic Center Plaza <br> Lompoc, CA  93436 |
|---|---|---|

PLAINTIFF:   Center for Biological Diversity and Wishtoyo Foundation

DEFENDANT: California Department of Forestry and Fire Protection et al.

| **CIVIL CASE COVER SHEET ADDENDUM** | CASE NUMBER: |
|---|---|

Santa Barbara County Superior Court Local Rule, rule 201 divides Santa Barbara County geographically into two separate regions referred to as "South County" and "North County," the boundaries of which are more particularly defined in rule 201.  "South County" includes the cities of Carpinteria, Santa Barbara, and Goleta; "North County" includes the cities of Santa Maria, Lompoc, Buellton and Solvang.  A map depicting this geographical division is contained in Appendix 1 to the local rules.

Local Rule 203 provides: "When, under California law, 'North County' would be a 'proper county' for venue purposes, all filings for such matters shall be in the appropriate division of the Clerk's office in North County.  All other filings shall be made in the Clerk's office in the appropriate division of the Court in South County.  The title of the Court required to be placed on the first page of documents pursuant to CRC 2.111 includes the name of the appropriate Court division."

A plaintiff filing a new complaint or petition is required by Local Rule 1310 to complete and file this Civil Case Cover Sheet Addendum to state the basis for filing in North County or South County.

The undersigned represents to the Court:

This action is filed in    ☐ North County   ☒ South County   because venue is proper in this region for the following reason(s):

☐  A defendant resides or has its principal place of business in this region at:  _____

_____

☐  The personal injury, damage to property, or breach of contract that is claimed in the complaint occurred in this region at: _____

☐  There is a related case filed with the court in this region (e.g., the related personal injury action to a petition to transfer structured settlement payments) [identify case, including case number]: _____

_____

☒ Venue is otherwise proper in this region because [explain]:  This action involves a claim under the California Environmental Quality Act, and the real property at dispute is located in this region (LR 203(b))

Dated:   April 15, 2025                                              s/ Julie Teel Simmonds

                                                                              *Signature of Plaintiff or Plaintiff's Counsel*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/15/2025 10:19 AM
By: Narzralli Baksh, Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological
Diversity and Wishtoyo Foundation*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA BARBARA
## SOUTH COUNTY REGION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>      Petitioners/Plaintiffs,<br><br>    v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>      Respondents/Defendants.<br><hr>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>      Real Parties in Interest. | Case No.        25CV02244<br><br>**PETITIONER'S NOTICE OF ELECTION TO PREPARE THE ADMINISTRATIVE RECORD**<br><br>[Pub. Res. Code § 21167.6(b)(2)] |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to California Public Resources Code section 21167.6(b)(2), Petitioners CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION hereby elect to prepare the record of proceedings before Respondents CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION and OFFICE OF THE STATE FIRE MARSHAL, relating to the subject of the above-captioned action, or to pursue an alternative method of record preparation following further discussion with Respondents.

The record will be organized chronologically, paginated consecutively, and indexed so that each document may be clearly identified as to its contents and source, in a form and format consistent with California Rules of Court Rule 3.2205.

DATED: April 15, 2025                     Respectfully submitted,

s/ *Julie Teel Simmonds*
Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
Center for Biological Diversity
2100 Franklin St., Ste. 375
Oakland CA 94612

*Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

1

PETITIONER'S NOTICE OF ELECTION TO PREPARE THE ADMINISTRATIVE RECORD

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/15/2025 10 19 AM
By Narzralli Baksh, Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners/Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA BARBARA
## SOUTH COUNTY REGION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | 25CV02244<br>Case No.<br><br>**PETITIONER'S REQUEST FOR HEARING AND NOTICE OF REQUEST**<br><br>[Pub. Resources Code § 21167.4]<br><br>Petition Filed April 15, 2025 |

NOTICE IS HEREBY GIVEN that, pursuant to Public Resources Code section 21167.4, Petitioners Center for Biological Diversity and Wishtoyo Foundation request a hearing on the merits of the Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief (Petition), which alleges violations of, inter alia, the California Environmental Quality Act (CEQA), Public Resources Code section 21000 *et seq*.

This request is being filed with the Court and served on the parties. Following the filing of this Request for Hearing and Notice of Request, any party may apply to the Court to establish a briefing schedule and hearing date for the hearing. (*Leavitt v. County of Madera* (2004) 123 Cal.App.4th 1502, 1514–23.) The hearing date, time, and place, and the briefing schedule for the hearing are to be established by the Court following such application by any party or at any case management conference to be scheduled by the Court. (*See id*.)

DATED: April 15, 2025          Respectfully submitted,


 s/ *Julie Teel Simmonds*
Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
Center for Biological Diversity
2100 Franklin St., Ste. 375
Oakland CA 94612

*Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

1

PETITIONER'S REQUEST FOR HEARING AND NOTICE OF REQUEST

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**<br><br>STREET ADDRESS:    1100 Anacapa Street<br>CITY AND ZIP CODE:    Santa Barbara CA  93101<br>BRANCH NAME:    Anacapa | *FOR COURT USE ONLY*<br><br>**F I L E D**<br>SUPERIOR COURT of CALIFORNIA<br>COUNTY of SANTA BARBARA<br>**04/15/2025**<br>Darrel E. Parker, Executive Officer<br>BY  Baksh, Narzralli<br>_____<br>Deputy Clerk |

CAPTION:

## Center for Biological Diversity  et al vs California Department of Forestry and Fire Protection  et al

| | |
|---|---|
| **ORDER & NOTICE OF CASE ASSIGNMENT** | CASE NUMBER:<br><br>**25CV02244** |

The above case is hereby assigned to Honorable Colleen K Sterne for ALL purposes, including trial.  All future matters, including ex-parte matters, are to be scheduled with the assigned judge.  Counsel shall include the name of the assigned judge in the caption of every document filed with the court.

ANY NEW PARTY BROUGHT INTO THIS CASE IS TO BE IMMEDIATELY NOTICED BY THE PLAINTIFF/PETITIONER OF THE JUDGE ASSIGNMENT AND A PROOF OF SERVICE OF THIS NOTICE IS TO BE FILED WITH THE COURT WITHIN FIVE (5) DAYS OF SERVICE OF NOTICE. FAILURE TO GIVE NOTICE AND FILE PROOF THEREOF MAY RESULT IN THE IMPOSITION OF SANCTI0NS.

Dated:    4/15/2025

_____
Judge of the Superior Court
Von Deroian

---

## CLERK'S CERTIFICATE OF SERVICE

I certify that I am not a party to this action and that a true copy of the foregoing was electronically served to the electronic service address shown, or mailed first class, postage prepaid, in a sealed envelope addressed as shown, and that the electronic service or mailing of the foregoing and execution of this certificate occurred at (*place*): Santa Barbara, California on (*date):* 04/15/2025.

Julie Teel Simmonds
Center for Biological Diversity
2100 Franklin St., Ste. 375
Oakland, CA  94612

Darrel E. Parker, Executive Officer          By    _____    Deputy Clerk
                                                        Narzralli Baksh

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**<br><br>STREET ADDRESS:  1100 Anacapa Street<br>CITY AND ZIP CODE:  Santa Barbara CA  93101<br>BRANCH NAME:  Anacapa | *FOR COURT USE ONLY*<br><br>**F I L E D**<br>SUPERIOR COURT of CALIFORNIA<br>COUNTY of SANTA BARBARA<br>**04/18/2025**<br>Darrel E. Parker, Executive Officer<br>BY  Baksh, Narzralli<br>_____<br>Deputy Clerk |

CAPTION:

**Center for Biological Diversity  et al vs California Department of Forestry and Fire Protection  et al**

CASE NUMBER: **25CV02244**

## ORDER & NOTICE OF CASE RE-ASSIGNMENT

The above case is hereby assigned to Honorable Thomas P Anderle for ALL purposes, including trial.
All future matters, including ex-parte matters, are to be scheduled with the new re-assigned judge

Dated:   4/18/2025

_____
Judge of the Superior Court
Von Deroian

---

### CLERK'S CERTIFICATE OF SERVICE

I certify that I am not a party to this cause, and that a true copy of this document was electronically served or mailed first class, postage prepaid in a sealed envelope addressed as shown, and that the electronic service or mailing of the foregoing and execution of this certificate occurred at *(place)*Santa Barbara, California on *(date)*: 04/18/2025.

**SEE ATTACHMENT**

Darrel E. Parker, Executive Officer           By _____/s/  Narzralli Baksh_____  Deputy Clerk

SC-2066N [Rev. April 19, 2001]           **ORDER & NOTICE OF CASE RE-ASSIGNMENT**

**ATTACHMENT – ALL SERVICE NAMES AND ADDRESSES**


Julie Teel Simmonds
Center for Biological Diversity
2100 Franklin Street Suite 375
Oakland, CA  94612


_____

| | FOR COURT USE ONLY |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**<br><br>STREET ADDRESS:   1100 Anacapa Street<br>CITY AND ZIP CODE:   Santa Barbara CA  93101<br>BRANCH NAME:   Anacapa | **FILED**<br>SUPERIOR COURT of CALIFORNIA<br>COUNTY of SANTA BARBARA<br>**04/18/2025**<br>Darrel E. Parker, Executive Officer<br>BY  Baksh, Narzralli<br>_____<br>Deputy Clerk |
| CAPTION:<br><br>**Center for Biological Diversity   et al vs California Department of Forestry and Fire Protection  et al** | |

| | |
|---|---|
| **NOTICE OF CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>**25CV02244** |

You are hereby notified that a Case Management Conference hearing has been set for

**07/16/2025** at **8:30 AM** in  **SB Dept 3** of the Superior Court located at the court address above.

Each party, or their counsel, appearing in the case shall attend the Case Management Conference.  The persons attending shall have sufficient knowledge of the case to represent to the court that the case is or is not ready for setting and to furnish sufficient information to the court concerning the case to permit the court to determine if the case is ready to be assigned a date certain for trial.

Appearance by Zoom video conference is currently optional for Civil Case Management Conferences. Please refer to the court's website for information about remote proceedings https://www.santabarbara.courts.ca.gov/system/files/general/information-remote-appearances-website.pdf. Use the links provided to access the Remote Hearing Information flyer in English https://www.santabarbara.courts.ca.gov/system/files/general/zoom-information-civil.pdf, and in Spanish https://www.santabarbara.courts.ca.gov/system/files/general/zoom-instructions-civil-spanish.pdf.  Or visit the to the court's website at https://santabarbara.courts.ca.gov/ and click on Remote Appearance by Zoom.

Darrel E. Parker, Executive Officer

Date:    4/18/2025                              By    _____
                                                                    Narzralli Baksh
                                                                    Deputy Clerk

---

### CLERK'S CERTIFICATE OF MAILING

I certify that I am not a party to this action and that a true copy of the foregoing was mailed first class, postage prepaid, in a sealed envelope addressed as shown, and that the mailing of the foregoing and execution of this certificate occurred at (*place*):Santa Barbara, California on (*date*) 04/18/2025

**SEE ATTACHMENT**

Darrel E. Parker, Executive Officer                    By    _____ , Deputy
                                                                                    Narzralli Baksh

SC-2025 [Rev. July 1, 2013]          **NOTICE OF CASE MANAGEMENT CONFERENCE**

**ATTACHMENT – ALL MAILING NAMES AND ADDRESSES**


Julie Teel Simmonds
Center for Biological Diversity
2100 Franklin Street Suite 375
Oakland CA 94612

———————————

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(NAME AND ADDRESS)*: | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|
| Julie Teel Simmonds, Center for Biological Diversity<br>2100 Franklin St., Suite 375; Oakland, CA 94612<br><br>EMAIL ADDRESS (Optional)  jteelsimmonds@biologicaldiversity.org<br>ATTORNEY FOR *(NAME):*   Center for Biological Diversity & Wishtoyo Foundation | 510-844-7100 | ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darre E. Parker, Executive Officer<br>4/22/2025 10:12 AM<br>By: Sarah Sisto , Deputy |

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**<br><br>☑ Santa Barbara–Anacapa      ☐ Santa Maria-Cook      ☐ Lompoc Division<br>1100 Anacapa Street        312-C East Cook Street    115 Civic Center Plaza<br>Santa Barbara, CA  93101    Santa Maria, CA  93454    Lompoc, CA  93436<br><br>PLAINTIFF:   Center for Biological Diversity and Wishtoyo Foundation<br><br>DEFENDANT: California Department of Forestry and Fire Protection, et al. | |

| DECLARATION OF PREJUDICE CCP §170.6<br>(PEREMPTORY CHALLENGE) | CASE NUMBER:<br><br>25CV02244 |
|---|---|

| Name of Judicial Officer: (PRINT)<br><br>Hon. Thomas P. Anderle | Dept. Number:<br><br>3 |
|---|---|
| ☑ Judge            ☐ Commissioner            ☐ Referee | |

I am a party (or attorney for a party) to this action or special proceeding. The judicial officer named above, before whom the trial of, or a hearing in, this case is pending, or to whom it has been assigned, is prejudiced against the party (or his or her attorney) or the interest of the party (or his or her attorney), so that declarant cannot, or believes that he or she cannot, have a fair and impartial trial or hearing before the judicial officer.

---

## DECLARATION

**I declare under penalty of perjury, under the laws of the State of California, that the information entered on this form is true and correct.**

Filed on behalf of:  Center for Biological Diversity and Wishtoyo Foundation
*(Name of Party)*

☑ Plaintiff/Petitioner          ☐ Cross Complainant
☐ Defendant/Respondent       ☐ Cross Defendant
☐ Other: _____

Dated:  April 21, 2025

_____
*(Signature of Declarant)*

Julie Teel Simmonds
*(Printed Name)*

Optional Form
SC-1002 [Rev. Feb. 2020]

**DECLARATION OF PREJUDICE CCP 170.6**
**(PEREMPTORY CHALLENGE)**

CCP §170.6

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS: 1100 Anacapa Street<br>CITY AND ZIP CODE: Santa Barbara CA 93101<br>BRANCH NAME: Anacapa | **FILED**<br>SUPERIOR COURT of CALIFORNIA<br>COUNTY of SANTA BARBARA<br>**04/22/2025**<br>Darrel E. Parker, Executive Officer<br>BY Buenrostro, Monica<br>Deputy Clerk |

| CAPTION:<br><br>**Center for Biological Diversity   et al vs California Department of Forestry and Fire Protection  et al** | |

| ORDER & NOTICE OF CASE RE-ASSIGNMENT;<br>NOTICE OF RESCHEDULED HEARING/CMC | CASE NUMBER:<br>**25CV02244** |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

The above case is hereby ordered re-assigned to **Donna D Geck** for ALL purposes, including trial.  All future matters, including ex-parte matters, are to be scheduled with the new re-assigned judge.

The **Case Management Conference** now scheduled is rescheduled as follows:

**07/18/2025** at **8:30 AM** in **SB Dept 4** of the court address above.

Please refer to the court's website for information about court proceedings authorized for remote appearance or that require a personal appearance https://www.santabarbara.courts.ca.gov/system/files/general/information-remote-appearances-website.pdf.  Authorized remote appearances are conducted by Zoom videoconferencing. If appearance by Zoom is not authorized for the above hearing, please plan to appear in-person.  All persons entering the courthouse must go through weapons screening and are subject to the face covering requirements in effect while on court premises.

For authorized appearances by Zoom, use the links provided to access the Remote Hearing Information flyer in English https://www.santabarbara.courts.ca.gov/system/files/general/zoom-information-civil.pdf and in Spanish https://www.santabarbara.courts.ca.gov/system/files/general/zoom-instructions-civil-spanish.pdf.

Or visit the to the court's website at https://santabarbara.courts.ca.gov/ and click on Remote Appearance by Zoom. The moving party must provide the Remote Hearing Information to all other parties to the hearing not listed on the Clerk's Certificate of Service.

Dated:   4/22/2025

By _____
Judge of the Superior Court

---

### CLERK'S CERTIFICATE OF SERVICE

I certify that I am not a party to this cause, and that a true copy of this document was electronically served or mailed first class, postage prepaid in a sealed envelope addressed as shown, and that the electronic service or mailing of the foregoing and execution of this certificate occurred at *(place)* Santa Barbara, California on *(date)*: 04/22/2025

**SEE ATTACHMENT**

Darrel E. Parker, Executive Officer                    By _____Monica Buenrostro_____ , Deputy

**ATTACHMENT**

**Mail Recipients:**

Julie Teel Simmonds
Center for Biological Diversity
2100 Franklin Street Suite 375
Oakland CA 94612

_____

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Jeffrey D. Dintzer (SBN 139056); Matthew Wickersham (SBN 241733) ALSTON & BIRD LLP 350 South Grand Avenue, 51st Floor Los Angeles, CA 90071-1410 TELEPHONE NO.: 213-576-1000    FAX NO. *(Optional):* 213-576-1100 E-MAIL ADDRESS *(Optional):* jeffrey.dintzer@alston.com; matt.wickersham@alston.com ATTORNEY FOR *(Name):* Sable Offshore Corp. and Pacific Pipeline Company | ELECTRONICALLY FILED Superior Court of California County of Santa Barbara Darrel E. Parker, Executive Officer 4/23/2025 5:20 PM By: Terri Chavez , Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **SANTA BARBARA**
STREET ADDRESS: 1100 Anacapa Street
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Barbara, CA 93101
BRANCH NAME:

| PLAINTIFF/PETITIONER: CENTER FOR BIOLOGICAL DIVERSITY et al. | CASE NUMBER: 25CV02244 |
|---|---|
| DEFENDANT/RESPONDENT: CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al. | JUDICIAL OFFICER: Donna D. Geck |
| **NOTICE OF RELATED CASE** | DEPT.: 4 |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1.  a.  Title: Sable Offshore Corp. et al. v . California Coastal Commission

    b.  Case number: 25CV00974

    c.  Court: ☒    same as above

        ☐    other state or federal court *(name and address):*

    d.  Department: 3

    e.  Case type: ☐ limited civil ☒ unlimited civil ☐ probate ☐ family law ☒ other *(specify):* Writ of Mandate

    f.  Filing date: February 18, 2025

    g.  Has this case been designated or determined as "complex?"    ☐    Yes    ☒    No

    h.  Relationship of this case to the case referenced above *(check all that apply):*

        ☒    involves the same parties and is based on the same or similar claims.

        ☒    arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐    involves claims against, title to, possession of, or damages to the same property.

        ☐    is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

            ☐    Additional explanation is attached in attachment 1h

    i.  Status of case:

        ☒    pending

        ☐    dismissed    ☐    with    ☐    without prejudice

        ☐    disposed of by judgment

2.  a.  Title: Environmental Defense Center et al .v. California Department of Forestry and Fire Protection et al.

    b.  Case number: 25CV02247

    c.  Court: ☒    same as above

        ☐    other state or federal court *(name and address):*

    d.  Department: 3

**Page 1 of 3**

| Form Approved for Optional Use Judicial Council of California CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Cal. Rules of Court, rule 3.300 www.courtinfo.ca.gov |
|---|---|---|

CM-015

| PLAINTIFF/PETITIONER: CENTER FOR BIOLOGICAL DIVERSITY et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al. | 25CV02244 |

2.  *(continued)*

   e.  Case type:  ☐ limited civil  ☒ unlimited civil  ☐ probate  ☐ family law  ☒ other *(specify):* Writ of

   f.  Filing date: April 15, 2025

   g.  Has this case been designated or determined as "complex?"  ☐ Yes  ☐ No

   h.  Relationship of this case to the case referenced above *(check all that apply):*

   ☒  involves the same parties and is based on the same or similar claims.

   ☒  arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

   ☐  involves claims against, title to, possession of, or damages to the same property.

   ☐  is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

   ☐  Additional explanation is attached in attachment 2h

   i.  Status of case:

   ☒  pending

   ☐  dismissed  ☐ with  ☐ without prejudice

   ☐  disposed of by judgment

3.  a.  Title:

   b.  Case number:

   c.  Court:  ☐ same as above

   ☐ other state or federal court *(name and address):*

   d.  Department:

   e.  Case type:  ☐ limited civil  ☐ unlimited civil  ☐ probate  ☐ family law  ☐ other *(specify):*

   f.  Filing date:

   g.  Has this case been designated or determined as "complex?"  ☐ Yes  ☐ No

   h.  Relationship of this case to the case referenced above *(check all that apply):*

   ☐  involves the same parties and is based on the same or similar claims.

   ☐  arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

   ☐  involves claims against, title to, possession of, or damages to the same property.

   ☐  is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

   ☐  Additional explanation is attached in attachment 3h

   i.  Status of case:

   ☐  pending

   ☐  dismissed  ☐ with  ☐ without prejudice

   ☐  disposed of by judgment

4.  ☐  Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: April 23, 2025

Jeffrey D. Dintzer
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ /s/ Jeffrey D. Dintzer
(SIGNATURE OF PARTY OR ATTORNEY)

CM-015 [Rev. July 1, 2007]                    **NOTICE OF RELATED CASE**                    **Page 2 of 3**

CM-015

| PLAINTIFF/PETITIONER:   CENTER FOR BIOLOGICAL DIVERSITY et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: CALIFORNIA DEPARTMENT OF FORESTRY AND ~~FIRE PROTECTION et al.~~ | 25CV02244 |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)*

1.  I am at least 18 years old and **not a party to this action.** I am a resident of or employed In the county where the mailing took place, and my residence or business address is *(specify):* Alston & Bird, LLP, 350 S. Grand Ave., 51st Floor, Los Angeles, CA  90071

2.  | served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*

    a. ☐   deposited the sealed envelope with the United States Postal Service.

    b. ☒   placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3.  The *Notice of Related Case* was mailed:
    a.  on *(date):* April 23, 2025
    b.  from *(city and state):* Los Angeles, CA

4.  The envelope was addressed and mailed as follows:

    a.  Name of person served: Julie Teel Simmonds

        Street address: 2100 Franklin St., Suite 374

        City: Oakland

        State and zip code: California 94612

    b.  Name of person served: Wyatt Sloan-Tribe

        Street address: 300 Spring Street, Suite 1702
        City: Los Angeles
        State and zip code: California 90013

    c.  Name of person served: Linda Krop

        Street address: 906 Garden Street

        City: Santa Barbara

        State and zip code: California 93101

    d.  Name of person served:

        Street address:
        City:
        State and zip code:

☐   Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 23, 2025

Kim Niz                                          ▶ /s/  Kim Niz
_____                          _____
(TYPE OR PRINT NAME OF DECLARANT)                (SIGNATURE OF DECLARANT)

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Linda Krop (Bar No. 118773); Jeremy Frankel (Bar No. 344500); Tara C. Rengifo (Bar No. 307670); 906 Garden Street, Santa Barbara, CA 93101<br><br>TELEPHONE NO.: (805) 963-1622    FAX NO. *(Optional):*<br>EMAIL ADDRESS *(Optional):* lkrop@environmentaldefensecenter.org<br>ATTORNEY FOR *(Name):* Environmental Defense Ctr. et al. (Petitioners in 25CV02247) | ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>4/24/2025 12:39 PM<br>By: Terri Chavez , Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SANTA BARBARA
STREET ADDRESS: 1100 Anacapa Street
MAILING ADDRESS: P.O. Box 21107
CITY AND ZIP CODE: Santa Barbara, CA 93121
BRANCH NAME: Anacapa

| | |
|---|---|
| PLAINTIFF/PETITIONER: Center for Biological Diversity et al. | CASE NUMBER:<br>25CV02244 |
| DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection et al. | JUDICIAL OFFICER:<br>Hon. Donna D. Geck |
| NOTICE OF RELATED CASE | DEPT:.<br>4 |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: Environmental Defense Center et al. v. California Department of Forestry and Fire Protection et al.

   b. Case number: 25CV02247

   c. Court: [x] same as above

   [ ] other state or federal court *(name and address):*

   d. Department:

   e. Case type: [ ] limited civil  [x] unlimited civil  [ ] probate  [ ] family law  [ ] other *(specify):*

   f. Filing date: April 15, 2025

   g. Has this case been designated or determined as "complex?" [ ] Yes  [x] No

   h. Relationship of this case to the case referenced above *(check all that apply):*

   [x] involves the same parties and is based on the same or similar claims.

   [x] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

   [ ] involves claims against, title to, possession of, or damages to the same property.

   [ ] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

   [ ] Additional explanation is attached in attachment 1h

   i. Status of case:

   [ ] pending

   [ ] dismissed [ ] with [ ] without prejudice

   [ ] disposed of by judgment

2. a. Title:

   b. Case number:

   c. Court: [ ] same as above

   [ ] other state or federal court *(name and address):*

   d. Department:

Page 1 of 3

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Cal. Rules of Court, rule 3.300<br>*www.courts.ca.gov* |

CM-015

| PLAINTIFF/PETITIONER: Center for Biological Diversity et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection et al. | 25CV02244 |

2. *(continued)*

    e.  Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify)*:

    f.  Filing date:

    g.  Has this case been designated or determined as "complex?" ☐ Yes ☐ No

    h.  Relationship of this case to the case referenced above *(check all that apply)*:

        ☐ involves the same parties and is based on the same or similar claims.

        ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐ involves claims against, title to, possession of, or damages to the same property.

        ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

          ☐ Additional explanation is attached in attachment 2h

    i.  Status of case:

        ☐ pending

        ☐ dismissed ☐ with ☐ without prejudice

        ☐ disposed of by judgment

3.  a.  Title:

    b.  Case number:

    c.  Court: ☐ same as above

        ☐ other state or federal court *(name and address):*

    d.  Department:

    e.  Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify)*:

    f.  Filing date:

    g.  Has this case been designated or determined as "complex?" ☐ Yes ☐ No

    h.  Relationship of this case to the case referenced above *(check all that apply)*:

        ☐ involves the same parties and is based on the same or similar claims.

        ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐ involves claims against, title to, possession of, or damages to the same property.

        ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

          ☐ Additional explanation is attached in attachment 3h

    i.  Status of case:

        ☐ pending

        ☐ dismissed ☐ with ☐ without prejudice

        ☐ disposed of by judgment

4.  ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: April 24, 2025

Jeremy Frankel

      (TYPE OR PRINT NAME OF PARTY OR ATTORNEY)          ▶         (SIGNATURE OF PARTY OR ATTORNEY)

CM-015 [Rev. July 1, 2007]         **NOTICE OF RELATED CASE**         **Page 2 of 3**

CM-015

| PLAINTIFF/PETITIONER:  Center for Biological Diversity et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT:  California Department of Forestry and Fire Protection et al. | 25CV02244 |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
## NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*
906 Garden Street, Santa Barbara, CA 93101

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*

   a. ☒  deposited the sealed envelope with the United States Postal Service.

   b. ☐  placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:

   a. on *(date):* April 24, 2025

   b. from *(city and state):*  Santa Barbara, California

4. The envelope was addressed and mailed as follows:

   a. Name of person served:
   CalFIRE - Office of the State Fire Marshal
   Street address: P.O. Box 944246
   City: Sacramento
   State and zip code: California 94244-2460

   c. Name of person served:
   State Fire Marshal Daniel Berlant
   Street address: P.O. Box 944246
   City: Sacramento
   State and zip code: California 94244-2460

   b. Name of person served:
   Sable Offshore Corp.; Jessie Gastelum, Registered Agent
   Street address: 330 North Brand Boulevard
   City: Glendale
   State and zip code: California 91203

   d. Name of person served:
   Pacific Pipeline Company; Jessie Gastelum, Reg. Agent
   Street address: 330 North Brand Boulevard
   City: Glendale
   State and zip code: California 92103

   ☐  Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 24, 2025

| Jeremy Frankel | |
|---|---|
| (TYPE OR PRINT NAME OF DECLARANT) | (SIGNATURE OF DECLARANT) |

POS-030

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Julie Teel Simmonds (Bar No. 208282)<br>Center for Biological Diversity<br>2100 Franklin St., Ste. 375<br>Oakland, CA 94612<br><br>TELEPHONE NO.: (510) 844-7100      FAX NO. *(Optional)*: (510) 844-7150<br>E-MAIL ADDRESS *(Optional)*: jteelsimmonds@biologicaldiversity.org<br>ATTORNEY FOR *(Name)*: Center for Biological Diversity and Wishtoyo Foundation | ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>4/28/2025 1:24 PM<br>By: Terri Chavez , Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SANTA BARBARA
  STREET ADDRESS: 1100 Anacapa Street
  MAILING ADDRESS:
  CITY AND ZIP CODE: Santa Barbara, CA 93101
  BRANCH NAME: Anacapa Division

PETITIONER/PLAINTIFF: Center for Biological Diversity and Wishtoyo Foundation
RESPONDENT/DEFENDANT: California Department of Forestry and Fire Protection, et al.

| PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL | CASE NUMBER:<br>25CV02244 |
|---|---|

*(Do not use this Proof of Service to show service of a Summons and Complaint.)*

1. I am over 18 years of age and **not a party to this action.** I am a resident of or employed in the county where the mailing took place.

2. My residence or business address is:
   PO Box 220
   Shelter Cove, CA 95589

3. On *(date):* April 25, 2025          I mailed from *(city and state):* Rogersville, Alabama
   the following **documents** *(specify):*

   [x]  The documents are listed in the *Attachment to Proof of Service by First-Class Mail—Civil (Documents Served)* (form POS-030(D)).

4. I served the documents by enclosing them in an envelope and *(check one):*

   a.  [x]  **depositing** the sealed envelope with the United States Postal Service with the postage fully prepaid.

   b.  [ ]  **placing** the envelope for collection and mailing following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

5. The envelope was addressed and mailed as follows:

   a.  **Name** of person served:

   b.  **Address** of person served:

   [x]  The name and address of each person to whom I mailed the documents is listed in the *Attachment to Proof of Service by First-Class Mail—Civil (Persons Served)* (POS-030(P)).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 28, 2025

Cynthia Elkins
_____
(TYPE OR PRINT NAME OF PERSON COMPLETING THIS FORM)          ▶          _____
                                                                        (SIGNATURE OF PERSON COMPLETING THIS FORM)

| Form Approved for Optional Use<br>Judicial Council of California<br>POS-030 [New January 1, 2005] | **PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL**<br>**(Proof of Service)** | Code of Civil Procedure, §§ 1013, 1013a<br>*www.courts.ca.gov* |
|---|---|---|

**POS-030(D)**

| SHORT TITLE: Ctr. for Biological Diversity v. Cal. Dept. of Forestry & Fire Protection | CASE NUMBER:<br>25CV02244 |
|---|---|

## ATTACHMENT TO PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL  (DOCUMENTS SERVED)

*(This Attachment is for use with form POS-030)*

**The documents that were personally served by first-class mail are as follows** *(describe each document specifically):*

Notice of Case Management Conference, Filed April 18, 2025

Order and Notice of Case Re-Assignment, Filed April 18, 2025

Declaration of Prejudice CCP § 170.6 (Peremptory Challenge), Filed April 22, 2025

Order and Notice of Case Re-Assignment; Notice of Rescheduled Hearing/CMC, Filed April 22, 2025

Form Approved for Optional Use
Judicial Council of California
POS-030(D) [New January 1, 2005]

**ATTACHMENT TO PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL (DOCUMENTS SERVED)**
**(Proof of Service)**

Page  2  of  3

**POS-030(P)**

| SHORT TITLE: Ctr. for Biological Diversity v. Cal. Dept. of Forestry & Fire Protection | CASE NUMBER:<br>25CV02244 |
|---|---|

## ATTACHMENT TO PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL (PERSONS SERVED)
*(This Attachment is for use with form POS-030)*

**NAME AND ADDRESS OF EACH PERSON SERVED BY MAIL:**

| Name of Person Served | Address *(number, street, city, and zip code)* |
|---|---|
| California Department of Forestry and Fire Protection | P.O. Box 944246<br>Sacramento, CA 94244-2460 |
| Office of the State Fire Marshal | P.O. Box 944246<br>Sacramento, CA 94244-2460 |
| Daniel Berlant, State Fire Marshal | P.O. Box 944246<br>Sacramento, CA 94244-2460 |
| Sable Offshore Corp.<br>Registered Agent | CT Corporation System<br>330 N Brand Blvd, Suite 700; Glendale, CA 91203 |
| Pacific Pipeline Company<br>Registered Agent | CT Corporation System<br>330 N Brand Blvd, Suite 700; Glendale, CA 91203 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Form Approved for Optional Use
Judicial Council of California
POS-030(P) [New January 1, 2005]

**ATTACHMENT TO PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL
(PERSONS SERVED)
(Proof of Service)**

Page   3   of   3

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners/Plaintiffs Center for
Biological Diversity and Wishtoyo Foundation*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/28/2025 1:22 PM
By: Laura Kenny , Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA BARBARA
## SOUTH COUNTY REGION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>Respondents/Defendants,<br><br>SABLE OFFSHORE CORP., et al.,<br><br>Real Parties in Interest. | Case No. 25CV02244<br><br>**NOTICE OF FILING PROOFS OF SERVICE OF PROCESS**<br><br>Judge:  Hon. Donna D. Geck<br>Dept:    4<br><br>Action Filed: April 15, 2025 |

NOTICE OF FILING PROOFS OF SERVICE OF PROCESS — CASE NO. 25CV02244

**TO RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL, AND DANIEL BERLANT:**

Petitioner Center for Biological Diversity, by and through their undersigned counsel, gives notice of filing the Proofs of Service on Respondents and Real Parties in Interest, which included each of the following documents:

1. Summons
2. Civil Case Cover Sheet
3. Civil Case Cover Sheet Addendum
4. Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief
5. Petitioner's Notice of Election to Prepare the Administrative Record
6. Petitioner's Request for Hearing and Notice of Request
7. Court-Administered Dispute Resolution Program Information (CADRe)

Respondent California Department of Forestry and Fire Protection received the documents on April 18, 2025, by personal service on Garrett Ryan, Associate Governmental Program Analyst, who is authorized to accept service of process on Respondent's behalf.

Respondent Office of the State Fire Marshal received the documents on April 18, 2025, by personal service on Garrett Ryan, Associate Governmental Program Analyst, who is authorized to accept service of process on Respondent's behalf.

Respondent Daniel Berlant received the documents on April 18, 2025, by personal service on Garrett Ryan, Associate Governmental Program Analyst, who is authorized to accept service of process on Respondent's behalf.

Real Party in Interest Sable Offshore Corp. received the documents on April 18, 2025, by personal service on Sarai Marin at CT Corporation System, who is authorized to accept service of process on Real Party's behalf.

Real Party in Interest Pacific Pipeline Company received the documents on April 18, 2025, by personal service on Sarai Marin at CT Corporation System, who is authorized to accept service of process on Real Party's behalf.

– 1 –

NOTICE OF FILING PROOFS OF SERVICE OF PROCESS — CASE NO. 25CV02244

Copies of the Proofs of Service are attached as Exhibit A.

DATED: April 28, 2025                    Respectfully Submitted,

                                          s/ *Julie Teel Simmonds*

                                         Julie Teel Simmonds (Bar No. 208282)
                                         jteelsimmonds@biologicaldiversity.org
                                         David Pettit (Bar No. 67128)
                                         dpettit@biologicaldiversity.org
                                         Talia Nimmer (Bar No. 331002)
                                         tnimmer@biologicaldiversity.org
                                         CENTER FOR BIOLOGICAL DIVERSITY
                                         2100 Franklin St., Ste. 375
                                         Oakland, CA 94612
                                         Tel. (510) 844-7100 / Fax: (510) 844-7150

                                         *Attorneys for Petitioners/Plaintiffs Center for*
                                         *Biological Diversity and Wishtoyo Foundation*

– 2 –

NOTICE OF FILING PROOFS OF SERVICE OF PROCESS — CASE NO. 23STCP03581

# Exhibit A

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| Julie Teel Simmonds (SBN 208282); David Pettit (SBN 67128); Talia Nimmer (SBN 331002)<br>CENTER FOR BIOLOGICAL DIVERSITY<br>2100 Franklin Street, Suite 375   Oakland, CA 94612<br>TELEPHONE NO.: (510) 844-7150 \| FAX NO.  \| E-MAIL ADDRESS jteelsimmonds@biologicaldiversity.org; dpettit@biologicaldiversity.org<br>ATTORNEY FOR *(Name):* Petitioners/Plaintiffs: CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**

STREET ADDRESS: 1100 Anacapa Street

CITY AND ZIP CODE: Santa Barbara, CA 93101

BRANCH NAME: ANACAPA DIVISON

| | |
|---|---|
| PLAINTIFF/PETITIONER: CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION<br>DEFENDANT/RESPONDENT: CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE<br>PROTECTION; et al | CASE NUMBER:<br>25CV02244 |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>2437875RC |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☑ Summons
   b. ☐ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents):* **VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; CIVIL CASE COVER SHEET ADDENDUM; PETITIONER'S NOTICE OF ELECTION TO PREPARE THE ADMINISTRATIVE RECORD; PETITIONER'S REQUEST FOR HEARING AND NOTICE OF REQUEST; ORDER & NOTICE OF CASE ASSIGNMENT**

3. a. Party served *(specify name of party as shown on documents served):*
   **CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **Garrett Ryan, Associate Governmental Program Analyst - Authorized person to accept service of process**
   **Age: 40 \| Weight: 200 lbs \| Hair: Grey \| Sex: Male \| Height: 5'6" \| Eyes: Blue \| Race: White**

4. Address where the party was served:  **715 P Street**
   **Sacramento, CA 95814**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.**   I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **4/18/2025**   (2) at *(time):* **12:33 PM**

   b. ☐ **by substituted service.** On *(date):* at *(time):* I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

   (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

   (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

   (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him of her of the general nature of the papers.

   (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):* from *(city):*          **or** ☐ a declaration of mailing is attached.

   (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| | | |
|---|---|---|
| Form Approved for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10<br>**POS010-1/2437875** |

| | |
|---|---|
| Plaintiff: **CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION**<br><br>Defendant: **CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; et al** | CASE NUMBER:<br>**25CV02244** |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on *(date):*                                          (2) from  *(city):*

(3) ☐  with two copies of the  *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. Proc., § 415.30.)

(4) ☐  to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

☐    Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐  as an individual defendant.

b. ☐  as the person sued under the fictitious name of  *(specify):*

c. ☐  as occupant.

d. ☑  On behalf of  *(specify):* **CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
under the following Code of Civil Procedure section:

☐  416.10 (corporation)                    ☐  415.95 (business organization, form unknown)
☐  416.20 (defunct corporation)            ☐  416.60 (minor)
☐  416.30 (joint stock company/association) ☐  416.70 (ward or conservatee)
☐  416.40 (association or partnership)      ☐  416.90 (authorized person)
☑  416.50 (public entity)                  ☐  415.46 (occupant)
                                            ☐  other:

7. **Person who served papers**
   a. Name:  **Brian Bernal - Ace Attorney Service, Inc.**
   b. Address:  **800 S. Figueroa Street, Suite 900  Los Angeles, CA 90017**
   c. Telephone number:  **(213) 623-3979**
   d. **The fee** for service was: **$ 177.72**
   e. I am:

   (1) ☐  not a registered California process server.
   (2) ☐  exempt from registration under Business and Professions Code section 22350(b).
   (3) ☑  registered California process server:
       (i) ☐ owner        ☑ employee        ☐  independent contractor.
       (ii) Registration No.: **2023-044**
       (iii) County: **SACRAMENTO**

8. ☑  **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

   or

9. ☐  **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date:  **4/22/2025**

| | |
|---|---|
| **Brian Bernal** | ▶ |
| (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL) | (Signature - Per CC §1633.7) |

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| Julie Teel Simmonds (SBN 208282); David Pettit (SBN 67128); Talia Nimmer (SBN 331002) CENTER FOR BIOLOGICAL DIVERSITY 2100 Franklin Street, Suite 375   Oakland, CA 94612 TELEPHONE NO.: (510) 844-7150 \| FAX NO.  \| E-MAIL ADDRESS jteelsimmonds@biologicaldiversity.org; dpettit@biologicaldiversity.org ATTORNEY FOR *(Name):* Petitioners/Plaintiffs: CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**

STREET ADDRESS: 1100 Anacapa Street

CITY AND ZIP CODE: Santa Barbara, CA 93101

BRANCH NAME: ANACAPA DIVISON

| | |
|---|---|
| PLAINTIFF/PETITIONER: CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION DEFENDANT/RESPONDENT: CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; et al | CASE NUMBER: 25CV02244 |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: 2437877RC |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:

   a. ☑  Summons

   b. ☐  Complaint

   c. ☑  Alternative Dispute Resolution (ADR) package

   d. ☑  Civil Case Cover Sheet

   e. ☐  Cross-Complaint

   f. ☑  other *(specify documents):* **VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; CIVIL CASE COVER SHEET ADDENDUM; PETITIONER'S NOTICE OF ELECTION TO PREPARE THE ADMINISTRATIVE RECORD; PETITIONER'S REQUEST FOR HEARING AND NOTICE OF REQUEST; ORDER & NOTICE OF CASE ASSIGNMENT**

3. a.  Party served *(specify name of party as shown on documents served):*

   **OFFICE OF THE STATE FIRE MARSHAL**

   b. ☑  Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*

   **Garrett Ryan, Associate Governmental Program Analyst - Authorized person to accept service of process**

   **Age: 40 | Weight: 200 lbs | Hair: Grey | Sex: Male | Height: 5'6" | Eyes: Blue | Race: White**

4. Address where the party was served:  **715 P Street**
   **Sacramento, CA 95814**

5. I served the party *(check proper box)*

   a. ☑  **by personal service.**   I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **4/18/2025**   (2) at *(time):* **12:33 PM**

   b. ☐  **by substituted service.** On *(date):* at  *(time):*   I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

   (1) ☐  **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served.  I informed him of her of the general nature of the papers.

   (2) ☐  **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party.  I informed him or her of the general nature of the papers.

   (3) ☐  **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him of her of the general nature of the papers.

   (4) ☐  I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):*    from *(city):*                    **or** ☐  a declaration of mailing is attached.

   (5) ☐  I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| Form Approved for Mandatory Use Judicial Council of California POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 **POS010-1/2437877** |
|---|---|---|

| Plaintiff: CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION | CASE NUMBER: |
|---|---|
| Defendant: **CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; et al** | **25CV02244** |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                                          *(2) from (city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of *(specify):* **OFFICE OF THE STATE FIRE MARSHAL**

    under the following Code of Civil Procedure section:

    ☐ 416.10 (corporation)                ☐ 415.95 (business organization, form unknown)

    ☐ 416.20 (defunct corporation)         ☐ 416.60 (minor)

    ☐ 416.30 (joint stock company/association)   ☐ 416.70 (ward or conservatee)

    ☐ 416.40 (association or partnership)     ☐ 416.90 (authorized person)

    ☑ 416.50 (public entity)               ☐ 415.46 (occupant)

                                           ☐ other:

7. **Person who served papers**

a. Name: **Brian Bernal - Ace Attorney Service, Inc.**

b. Address: **800 S. Figueroa Street, Suite 900  Los Angeles, CA 90017**

c. Telephone number: **(213) 623-3979**

d. **The fee** for service was: **$ 85.00**

e. I am:

    (1) ☐ not a registered California process server.

    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

    (3) ☑ registered California process server:

        (i) ☐ owner      ☑ employee      ☐ independent contractor.

        (ii) Registration No.: **2023-044**

        (iii) County: **SACRAMENTO**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **4/22/2025**

| **Brian Bernal** | ▶ | |
|---|---|---|
| (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL) | | (Signature - Per CC §1633.7) |

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| Julie Teel Simmonds (SBN 208282); David Pettit (SBN 67128); Talia Nimmer (SBN 331002)<br>CENTER FOR BIOLOGICAL DIVERSITY<br>2100 Franklin Street, Suite 375   Oakland, CA 94612<br>TELEPHONE NO.: (510) 844-7150 | FAX NO.  | E-MAIL ADDRESS jteelsimmonds@biologicaldiversity.org; dpettit@biologicaldiversity.org<br>ATTORNEY FOR *(Name):* Petitioners/Plaintiffs: CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**

STREET ADDRESS: 1100 Anacapa Street

CITY AND ZIP CODE: Santa Barbara, CA 93101

BRANCH NAME: ANACAPA DIVISON

| PLAINTIFF/PETITIONER: CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION<br>DEFENDANT/RESPONDENT: CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE<br>PROTECTION; et al | CASE NUMBER:<br>25CV02244 |
|---|---|

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>2437878RC |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:

   a. ☑ Summons
   b. ☐ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents):* **VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; CIVIL CASE COVER SHEET ADDENDUM; PETITIONER'S NOTICE OF ELECTION TO PREPARE THE ADMINISTRATIVE RECORD; PETITIONER'S REQUEST FOR HEARING AND NOTICE OF REQUEST; ORDER & NOTICE OF CASE ASSIGNMENT**

3. a. Party served *(specify name of party as shown on documents served):*
   **DANIEL BERLANT, in his official capacity as State Fire Marshal**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **Garrett Ryan, Associate Governmental Program Analyst - Authorized person to accept service of process on behalf of Daniel Berlant, in his official capacity as State Fire Marshal**
   **Age: 40 | Weight: 200 lbs | Hair: Grey | Sex: Male | Height: 5'6" | Eyes: Blue | Race: White**

4. Address where the party was served:  **715 P Street**
   **Sacramento, CA 95814**

5. I served the party *(check proper box)*

   a. ☑ **by personal service.**   I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **4/18/2025**   (2) at *(time):* **12:33 PM**

   b. ☐ **by substituted service.** On *(date):* at *(time):* I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

   (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

   (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

   (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him of her of the general nature of the papers.

   (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):* from *(city):* **or** ☐ a declaration of mailing is attached.

   (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| Form Approved for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10<br>**POS010-1/2437878** |
|---|---|---|

| Plaintiff: CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION | CASE NUMBER: |
|---|---|
| Defendant: **CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; et al** | **25CV02244** |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                                    *(2) from (city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☑ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☐ On behalf of *(specify):*

under the following Code of Civil Procedure section:

☐ 416.10 (corporation)               ☐ 415.95 (business organization, form unknown)
☐ 416.20 (defunct corporation)      ☐ 416.60 (minor)
☐ 416.30 (joint stock company/association)  ☐ 416.70 (ward or conservatee)
☐ 416.40 (association or partnership)    ☐ 416.90 (authorized person)
☐ 416.50 (public entity)             ☐ 415.46 (occupant)
                                   ☐ other:

7. **Person who served papers**
  a. Name: **Brian Bernal - Ace Attorney Service, Inc.**
  b. Address: **800 S. Figueroa Street, Suite 900  Los Angeles, CA 90017**
  c. Telephone number: **(213) 623-3979**
  d. **The fee** for service was: **$ 85.00**
  e. I am:

    (1) ☐ not a registered California process server.
    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
    (3) ☑ registered California process server:
        (i) ☐ owner    ☑ employee    ☐ independent contractor.
        (ii) Registration No.: **2023-044**
        (iii) County: **SACRAMENTO**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **4/22/2025**

| | |
|---|---|
| **Brian Bernal** | ▶ |
| (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL) | (Signature - Per CC §1633.7) |

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| Julie Teel Simmons (SBN 208282);David Pettit (SBN 67128); Talia Nimmer (SBN 331002); CENTER FOR BIOLOGICAL DIVERSITY 2100 Franklin St., Ste. 375  Oakland, CA 94612 TELEPHONE NO.: (510) 844-7100 \| FAX NO.  \| E-MAIL ADDRESS jteelsimmonds@biologicaldiversity.org; dpettit@biologicaldiversity.org; tnimmer@biologicaldiversity.org ATTORNEY FOR *(Name):* Petitioners/Plaintiffs Center for  Biological Diversity and Wishtoyo Foundation | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**

STREET ADDRESS: 1100 Anacapa Street

CITY AND ZIP CODE: Santa Barbara, CA 93101

BRANCH NAME: ANACAPA DIVISON

| PLAINTIFF/PETITIONER: CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION DEFENDANT/RESPONDENT: CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; et al | CASE NUMBER: 25CV02244 |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: 2437879M |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:

   a. ☑ Summons

   b. ☐ Complaint

   c. ☐ Alternative Dispute Resolution (ADR) package

   d. ☑ Civil Case Cover Sheet

   e. ☐ Cross-Complaint

   f. ☑ other *(specify documents):* **VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; CIVIL CASE COVER SHEET ADDENDUM; PETITIONER'S NOTICE OF ELECTION TO PREPARE THE ADMINISTRATIVE RECORD; PETITIONER'S REQUEST FOR HEARING AND NOTICE OF REQUEST; ORDER & NOTICE OF CASE ASSIGNMENT; CADRE PROGRAM INFORMATION**

3. a. Party served *(specify name of party as shown on documents served):*

   **Sable Offshore Corp., a Delaware Corporation**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*

   **CT Corporation System, Agent for Service of Process - by serving Sarai Marin, authorized person to accept service of process**

4. Address where the party was served:  **330 North Brand Boulevard,  Suite 700 Glendale, CA 91203**

5. I served the party *(check proper box)*

   a. ☑ **by personal service.**   I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **4/18/2025**    (2) at *(time):* **12:05 PM**

   b. ☐ **by substituted service.** On *(date):* at *(time):*  I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served.  I informed him of her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party.  I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him of her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):*    from *(city):*                            **or** ☐ a declaration of mailing is attached.

      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| Form Approved for Mandatory Use Judicial Council of California POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 **POS010-1/2437879** |
|---|---|---|

| Plaintiff: **CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION**<br><br>Defendant: **CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; et al** | CASE NUMBER:<br>**25CV02244** |
| --- | --- |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

   (1) on *(date):*                              *(2) from (city):*

   (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. Proc., § 415.30.)

   (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

   ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of *(specify):* **Sable Offshore Corp., a Delaware Corporation**
   under the following Code of Civil Procedure section:

   ☑ 416.10 (corporation)              ☐ 415.95 (business organization, form unknown)
   ☐ 416.20 (defunct corporation)      ☐ 416.60 (minor)
   ☐ 416.30 (joint stock company/association)  ☐ 416.70 (ward or conservatee)
   ☐ 416.40 (association or partnership)    ☐ 416.90 (authorized person)
   ☐ 416.50 (public entity)            ☐ 415.46 (occupant)
                                   ☐ other:

7. **Person who served papers**

a. Name: **Eric A. Rivers - Ace Attorney Service, Inc.**

b. Address: **800 S. Figueroa Street, Suite 900  Los Angeles, CA 90017**

c. Telephone number: **(213) 623-3979**

d. **The fee** for service was: **$ 196.53**

e. I am:

   (1) ☐ not a registered California process server.
   (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
   (3) ☑ registered California process server:
     (i) ☐ owner    ☑ employee    ☐ independent contractor.
     (ii) Registration No.: **6439**
     (iii) County: **ORANGE**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

   or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **4/22/2025**

_____
      **Eric A. Rivers**
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶                      _____
                           (Signature - Per CC §1633.7)

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| Julie Teel Simmons (SBN 208282);David Pettit (SBN 67128); Talia Nimmer (SBN 331002); CENTER FOR BIOLOGICAL DIVERSITY 2100 Franklin St., Ste. 375 Oakland, CA 94612 TELEPHONE NO.: (510) 844-7100 \| FAX NO. \| E-MAIL ADDRESS jteelsimmonds@biologicaldiversity.org; dpettit@biologicaldiversity.org; tnimmer@biologicaldiversity.org ATTORNEY FOR *(Name):* Petitioners/Plaintiffs Center for Biological Diversity and Wishtoyo Foundation | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**

STREET ADDRESS: 1100 Anacapa Street

CITY AND ZIP CODE: Santa Barbara, CA 93101

BRANCH NAME: ANACAPA DIVISON

| PLAINTIFF/PETITIONER: CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION DEFENDANT/RESPONDENT: CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; et al | CASE NUMBER: 25CV02244 |
|---|---|

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: 2437881M |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:

   a. ☑ Summons

   b. ☐ Complaint

   c. ☐ Alternative Dispute Resolution (ADR) package

   d. ☑ Civil Case Cover Sheet

   e. ☐ Cross-Complaint

   f. ☑ other *(specify documents):* **VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; CIVIL CASE COVER SHEET ADDENDUM; PETITIONER'S NOTICE OF ELECTION TO PREPARE THE ADMINISTRATIVE RECORD; PETITIONER'S REQUEST FOR HEARING AND NOTICE OF REQUEST; ORDER & NOTICE OF CASE ASSIGNMENT; CADRE PROGRAM INFORMATION**

3. a. Party served *(specify name of party as shown on documents served):*

   **Pacific Pipeline Company, a Delaware Corporation**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*

   **CT Corporation System, Agent for Service of Process - by serving Sarai Marin, authorized person to accept service of process**

4. Address where the party was served: **330 North Brand Boulevard, Suite 700 Glendale, CA 91203**

5. I served the party *(check proper box)*

   a. ☑ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **4/18/2025** (2) at *(time):* **12:05 PM**

   b. ☐ **by substituted service.** On *(date):* at *(time):* I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

   (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

   (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

   (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him of her of the general nature of the papers.

   (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):* from *(city):* **or** ☐ a declaration of mailing is attached.

   (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| Form Approved for Mandatory Use Judicial Council of California POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 **POS010-1/2437881** |
|---|---|---|

| Plaintiff: **CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION**<br><br>Defendant: **CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; et al** | CASE NUMBER:<br>**25CV02244** |
|---|---|

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                                 *(2) from (city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of *(specify):* **Pacific Pipeline Company, a Delaware Corporation**
    under the following Code of Civil Procedure section:

    ☑ 416.10 (corporation)           ☐ 415.95 (business organization, form unknown)
    ☐ 416.20 (defunct corporation)    ☐ 416.60 (minor)
    ☐ 416.30 (joint stock company/association)  ☐ 416.70 (ward or conservatee)
    ☐ 416.40 (association or partnership)  ☐ 416.90 (authorized person)
    ☐ 416.50 (public entity)           ☐ 415.46 (occupant)
                                    ☐ other:

7. **Person who served papers**

a. Name: **Eric A. Rivers - Ace Attorney Service, Inc.**

b. Address: **800 S. Figueroa Street, Suite 900  Los Angeles, CA 90017**

c. Telephone number: **(213) 623-3979**

d. **The fee for service was: $ 197.61**

e. I am:

    (1) ☐ not a registered California process server.

    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

    (3) ☑ registered California process server:

        (i) ☐ owner    ☑ employee    ☐ independent contractor.

        (ii) Registration No.: **6439**

        (iii) County: **ORANGE**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **4/22/2025**

| **Eric A. Rivers** | ▶ | *(Signature - Per CC §1633.7)* |
|---|---|---|
| (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL) | | |

**PROOF OF SERVICE**

I, Cynthia Elkins, declare as follows:

I am a resident of California, over the age of 18, and not a party to this action. My business address is Center for Biological Diversity; Post Office Box 220; Shelter Cove, California. My email address is celkins@biologicaldiversity.org.

On April 28, 2025, I served the preceding Notice of Filing Proofs of Service of Process as described below.

I sent the above-referenced document via First Class Mail by enclosing a true and correct copy in a sealed envelope, which was deposited at the U.S. Postal Service in Rogersville, Alabama, postage fully prepaid, addressed to each party as follows:

**Respondents**

California Department of Forestry and Fire Protection
715 P Street
Sacramento, CA 95814

Office of the State Fire Marshal
715 P Street
Sacramento, CA 95814

Daniel Berlant
715 P Street
Sacramento, CA 95814

**Real Parties in Interest**

Sable Offshore Corp.
Registered Agent
CT Corporation System
330 N Brand Blvd, Suite 700
Glendale, CA 91203

Pacific Pipeline Company
Registered Agent
CT Corporation System
330 N Brand Blvd, Suite 700
Glendale, CA 91203

– 1 –

PROOF OF SERVICE — CASE NO. 25CV02244

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct, and this Declaration was executed in Athens, Alabama, on April 28, 2025.

_____

Cynthia Elkins

– 2 –

PROOF OF SERVICE — CASE NO. 25CV02244

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
# FOR THE COUNTY OF SANTA BARBARA

| Date & Entered: | 5/5/2025 | Time: | n/a |
|---|---|---|---|
| **Judicial Officer:** | THOMAS P. ANDERLE | | |
| **Deputy Clerk:** | Naylea Calderon | **Dept:** | 3 |
| **Deputy Sheriff:** | // | | |
| **Court Reporter:** | // | **Case #:** | 25CV02247 |

**Caption:**     **Environmental Defense Center et al vs California Department of Forestry and Fire Protection et al**

**NATURE OF PROCEEDINGS**:   **NOTICE OF RELATED CASES DENIED**

On 04/23/2025 Plaintiff Environmental Defense Center filed a Notice of Related Case in case #25CV02247, relating the following cases:

25CV02244 - Center for Biological Diversity et al vs California Department of Forestry and Fire Protection et al
25CV00974 - Sable Offshore Corp et al vs California Coastal Commission

 The Court is not going to relate these cases at this time.

**DARREL E. PARKER, EXECUTIVE OFFICER**          **CLERK OF THE SUPERIOR COURT**

By, _____Deputy
                     Naylea Calderon

### CLERK'S CERTIFICATE OF MAILING

I certify that I am not a party to the action and that a true copy of the foregoing was mailed first class, postage prepaid, in a sealed envelope addressed as shown, and that the mailing of the foregoing and execution of this certificate occurred in Santa Barbara, California on: 5/5/2025

**DARREL E. PARKER, EXECUTIVE OFFICER**          **CLERK OF THE SUPERIOR COURT**

By, _____ Deputy
                     Naylea Calderon

**SEE ATTACHMENT**

---

**Minute Order**

**ATTACHMENT – ALL MAILING NAMES AND ADDRESSES**

Linda J Krop
Environmental Defense Center
906 Garden St
Santa Barbara, CA 93101

Wyatt E Sloan-Tribe
Deputy Attorney General
300 South Spring Street Suite 1702
Los Angeles,CA 90013

Julie Teel Simmonds
Center for Biological Diversity
2100 Franklin Street Suite 375
Oakland, CA 94612

Jeffrey D Dintzer
Alston & Bird LLP
350 South Grand Avenue 51st Floor
Los Angeles,CA 90071

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/2/2025 8:00 AM
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA BARBARA
## SOUTH COUNTY REGION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br><br>**PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR, IN THE ALTERNATIVE, AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED AND TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Filed Concurrently with Request for Judicial Notice; Declarations of Julie Teel Simmonds, Kara Clauser, Richard B. Kuprewicz, Blake Kopcho, Brady Bradshaw, Jeff Miller, and Tevin Schmitt; and (Proposed) Orders]<br><br>Date: June 3, 2025<br>Time: 8:30 a.m.<br>Dept: 4<br>Judge: Hon. Donna D. Geck<br><br>[Action Filed: April 15, 2025] |

1

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

## *EX PARTE* APPLICATION

TO THE HONORABLE COURT, ALL PARTIES, AND ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on June 3, 2025, at 8:30 a.m. or as soon thereafter as the matter may be heard in Department 4 of the Superior Court of Santa Barbara, located at 1100 Anacapa Street, Santa Barbara, California 93121, Petitioners Center for Biological Diversity and Wishtoyo Foundation (Petitioners) will apply *ex parte* for an immediate administrative stay of Respondents/Defendants California Department of Forestry and Fire Protection and its Office of the State Fire Marshal's (collectively Cal Fire) issuance of waivers from pipeline safety requirements to Sable for the Las Flores Pipeline System (State Waivers), a  pre-requisite for restarting the pipelines. In the alternative, Petitioners will seek (1) an order to show cause why a preliminary injunction should not be issued to prohibit Cal Fire from issuing any further authorizations for the Las Flores Pipeline System and to prohibit Real Parties in Interest Sable Offshore Corp. and its wholly-owned subsidiary Pacific Pipeline Company (collectively, Sable) from reliance on or actions taken pursuant to the State Waivers and from restarting the Las Flores Pipeline System to transport oil from the Santa Ynez Unit (SYU) pending judgment on the merits of this case and (2) a temporary restraining order prohibiting the same pending any preliminary injunction hearing.

Good cause and exigency exist because Sable has announced that it restarted oil production at the SYU and that it has satisfied the "final operational condition to restart the Onshore Pipeline." (*See* Declaration of Julie Teel Simmonds ¶¶ 2–4, Exs. 1–3. (Teel Decl.).) Additionally, an administrative stay or preliminary relief is in the public interest. Authorizing the restart of failed, ten-years-idled pipelines despite their lack of effective corrosion-prevention systems and inherent structural flaws will irreparably harm the Petitioners' members and the public's interest in informed decisionmaking with public participation and in preventing imminent impacts from the improper restart of SYU oil production and transport, including the risk of another devastating oil spill. The balance of harms tips sharply in favor of Petitioners and protecting California's irreplaceable resources from a rushed restart of this pipeline system—without environmental and procedural safeguards—ten years after its catastrophic failure.

As set forth in the attached Memorandum of Points and Authorities, the SYU has not produced oil since the 2015 Refugio Beach Oil Spill, when Line CA-324 (then called Line 901) ruptured due to

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

massive external corrosion, spilling what is now believed to be upwards of 450,000 gallons of oil and resulting in the deaths of hundreds of wild animals and the closure of fisheries and beaches. The direct and proximate cause of the rupture was the pipeline's inherently flawed design, which prevented federally mandated corrosion-prevention measures from working properly. Nonetheless, Cal Fire issued State Waivers for the SYU restart proposal (Project) exempting Sable's pipelines from compliance with certain pipeline safety mandates without the required environmental and pipeline safety review, public participation, and reasoned findings and decisions.

On May 19, 2025, the ten-year anniversary of the 2015 oil spill disaster, Sable publicly reported it resumed production from the SYU the previous Friday, storing the oil at the onshore Las Flores Canyon processing facilities with plans to resume use of the corrosion prone Las Flores Pipeline System in a matter of weeks. (*See* Teel Decl. ¶ 2, Ex. 1.) In its effort to restart oil production and transport using the very same pipelines that have already ruptured and caused massive irreparable harm, Sable has received several cease-and-desist orders and other notices of violation or potential violation, including a Cease-and-Desist Order, Restoration Order, and $18 million penalty from the California Coastal Commission. (*See* Teel Decl., ¶ 5, Ex. 4.) Nevertheless, Sable continued conducting work in an effort to restart the pipelines by the second quarter of 2025.

Given Sable's aggressive timeline and approach, preliminary relief is necessary to preserve the status quo and allow this Court to resolve the questions raised in this litigation. Restarting oil production and transport through this pipeline system prior to the resolution of this litigation will jeopardize public health and safety and prejudice the consideration of adequate mitigation measures and alternatives—including the alternative of not allowing the pipelines to restart at all due to their dangerous design flaws—and will entirely undercut the CEQA and pipeline safety law processes.

Pursuant to California Rule of Court 3.1202(b), Petitioners have made no previous application for similar relief. (Teel Decl., ¶ 30.) Further, pursuant to California Rules of Court 3.1203 and 3.1204(a), California Code of Civil Procedure section 527(c), and Local Rule 1009, notice of this Application and when it would be presented was provided to Respondents/Defendants and Real Parties in Interest on June 2, 2025. (*See* Teel Decl., ¶ 28.) At the time of submitting these documents to the filing service for filing and service, Respondents/Defendants and Real Parties in Interest had not yet responded to indicate

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

if they will attend the June 3 hearing on this Application or will oppose the requested relief. Petitioners

expect that Respondents/Defendants and Real Parties in Interest will appear and oppose the application.

(*See id*. ¶ 29.) Pursuant to California Rule of Court 3.1202(a), contact information for counsel for

Respondents/Defendants and potential counsel Real Parties in Interest is provided below:

>Michael S. Dorsi
>California Attorney General's Office
>55 Golden Gate Ave, Ste 11000,
>San Francisco, CA 94102
>Michael.Dorsi@doj.ca.gov
>(415) 510-3802
>*Attorney for Respondents/Defendants*
>
>Duncan Joseph Moore (before 5/27)
>Latham & Watkins
>355 S Grand Ave, Ste 100
>Los Angeles, CA 90071-3104
>dj.moore@lw.com
>(213) 485-1234
>
>Paul Hastings (as of 5/27)
>1999 Avenue of the Stars, 27th Floor
>Century City, California, 90067
>djmoore@paulhastings.com
>310-620-5879
>
>Matthew Wickersham
>Alston & Bird
>350 South Grand Avenue, 51st Floor
>Los Angeles, California 90071
>matt.wickersham@alston.com
>(213) 576-1185
>
>*Attorneys for Real Parties in Interest*

This *Ex Parte* Application is made pursuant to California Code of Civil Procedure sections 526,

527, and 1094.5(g), and California Rule of Court 3.1150. The application is based on Petitioners'

Verified Petition for Writ of Mandate and Complaint; the attached Memorandum of Points and

Authorities; the accompanying Declarations of Julie Teel Simmonds, Kara Clauser, Richard B.

Kuprewicz, Blake Kopcho, Brady Bradshaw, Jeffrey Miller, and Tevin Schmitt; the accompanying

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

Request for Judicial Notice; and such further evidence and argument that the Court may consider at or before the hearing on this Application.

Dated: June 2, 2025

Respectfully submitted,

/s/ *Julie Teel Simmonds*
Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

5

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS OF AUTHORITIES.................................................................. 10

STATEMENT OF FACTS ............................................................................................................ 10

    I.    Overview of the Las Flores Pipeline System.................................................... 10

    II.    Refugio Oil Spill and Pipeline Failure Report ................................................ 11

    III.    Transfer to Sable and Efforts to Restart.......................................................... 11

ARGUMENT ................................................................................................................................. 12

    I.    Legal Standard .................................................................................................. 12

    II.    The Public Interest Favors Protecting Irreplaceable Resources and Ensuring Public Safety................................................................................... 13

        A.    The Public Will Suffer Irreparable Harm Absent Preliminary Relief. ............................................................................. 14

        B.    The Risk of Pipeline Rupture is Substantial and Has Intolerable Consequences. ................................................................ 15

        C.    The Project Has Significant Unassessed Environmental Impacts. .............................................................................................. 18

        D.    Sable Has Begun Oil Production and the Risk of Harm Is Imminent ................................................................................. 18

        E.    Any Harm to Sable Is Minimal Compared to the Public Interest Harms at Stake. .............................................................. 19

    III.    Petitioners Are Likely to Prevail on the Merits .............................................. 20

        A.    Pipeline Safety Law Violations ........................................................... 20

        B.    CEQA Violations .................................................................................. 21

    IV.    No Bond Should Be Required.............................................................................. 23

CONCLUSION.............................................................................................................................. 24

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

**TABLE OF AUTHORITIES**

**Cases**

*Anderson v. County of Santa Barbara* (2023)
  94 Cal. App. 5th 554 ................................................................................................. 13

*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997)
  52 Cal.App.4th 1165 ................................................................................................. 23

*Bd. of Medical Quality Assurance v. Superior Court* (1980)
  114 Cal.App.3d 272 ................................................................................................. 12

*Best Friends Animal Society v. Macerich Westside Pavilion Property LLC* (2011)
  193 Cal.App.4th 168 ................................................................................................. 13

*Butt v. State of California* (1992) 4 Cal.4th 668 ........................................................ 13

*Canyon Crest Conservancy v. County of Los Angeles* (2020)
  46 Cal.App.5th 398 ............................................................................................. 12, 19

*Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007)
  149 Cal.App.4th 91 ................................................................................................. 22

*City of South Pasadena v. Slater* (C.D. Cal. 1999)
  56 F.Supp.2d 1106 ................................................................................................. 24

*Conover v. Hall* (1974)
  11 Cal.3d 842 ......................................................................................................... 23

*Costa Mesa City Employees Assn. v. City of Costa Mesa* (2012)
  209 Cal.App.4th 298 ............................................................................................... 13

*IT Corp. v. County of Imperial* (1983)
  35 Cal.3d 63 ........................................................................................................... 13

*King v. Meese* (1987) 43 Cal.3d 1217 ...................................................................... 13

*Laurel Heights Improvement Assn. v. Regents of Univ. of California* (1988)
  47 Cal.3d 376 .................................................................................................... 15, 19

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

*Mangini v. J.G. Durand* (1994)
   31 Cal.App.4th 214...................................................................................................... 24

*Maria P. v. Riles* (1987)
   43 Cal.3d 1281........................................................................................................... 13

*Natural Resources Defense Council, Inc. v. Morton* (D.D.C. 1971)
   337 F. Supp. 167........................................................................................................ 24

*O'Connell v. Superior Court* (2006)
   141 Cal.App.4th 1452................................................................................................ 14

*People v. Uber Technologies, Inc.* (2020)
   56 Cal.App.5th 266.................................................................................................... 19

*Rominger v. County of Colusa* (2014)
   229 Cal.App.4th 690.................................................................................................. 22

*Salmon Protection & Watershed Network v. County of Marin* (2004)
   125 Cal.App.4th 1098................................................................................................ 23

*Saltonstall v. City of Sacramento* (2014)
   231 Cal.App.4th 837.................................................................................................. 14

*Tulare Lake Canal Co. v. Stratford Public Utility Dist.* (2023)
   92 Cal.App.5th 380............................................................................................... 13-15

*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019)
   7 Cal.5th 1171........................................................................................................... 22

*White v. Davis* (2003)
   30 Cal.4th 528........................................................................................................... 13

**Statutes**

Code Civ. Proc., § 1094.5, subd. (g)............................................................................ 12

Code Civ. Proc., § 526, subd. (a)................................................................................. 13

Code Civ. Proc., § 527, subd. (c)................................................................................. 13

Code Civ. Proc., § 995.240.......................................................................................... 23

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

Gov. Code, § 51011, subd. (b) .................................................................................... 20, 22

Gov. Code, § 51011, subd. (c) ........................................................................................ 20

Pub. Res. Code, § 21002 ................................................................................................ 15

Pub. Res. Code, § 21065 ................................................................................................ 21

Pub. Res. Code, § 21166 ................................................................................................ 23

Pub. Res. Code, § 21168.9, subd. (a)(2) ........................................................................ 15

Pub. Res. Code, § , subd.

**Federal Statutes**

49 U.S.C. § 60102, subd. (a)(1) ..................................................................................... 14

49 U.S.C. § 60118, subd. (c)(1)(A) ................................................................................ 20

49 U.S.C. § 60118, subd. (c)(1)(B) ................................................................................ 20

49 U.S.C. § 60118, subd. (d) .................................................................................... 20, 22

**Regulations**

Cal. Code Regs., tit. 14, § 15002, subd. (a) .............................................................. 14, 21

Cal. Code Regs. tit. 14, § 15301 .................................................................................... 23

Cal. Code Regs. tit. 14, § 15378, subd. (c) .................................................................... 22

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

## MEMORANDUM OF POINTS OF AUTHORITIES

Ten years to the day after the devastating Refugio Oil Spill of 2015, Sable Offshore Corp. (Sable) publicly announced the restart of oil production at the Santa Ynez Unit (SYU) and anticipated oil sales from the Las Flores Pipeline System this summer. Petitioners Center for Biological Diversity (Center) and Wishtoyo Foundation (Wishtoyo) (collectively, Petitioners) are before the Court to ensure any such restart cannot occur until this case's California Environmental Quality Act (CEQA) and pipeline safety law claims are decided on the merits. The Las Flores Pipeline System is defectively designed and corrosion prone. When it failed in 2015 due to its defective coating, insulation, and cathodic protection system, three options were laid out in a Consent Decree: abandon the failed pipelines; build replacement pipelines; or restart the pipelines if all legal requirements could be met. Yet Respondents California Department of Forestry and Fire Protection and its Office of the State Fire Marshal (collectively Cal Fire) never conducted a CEQA process for this SYU restart project (Project) when approving it, nor did they comply with pipeline safety procedures or mandates. Restarting these defectively designed and corrosion-prone pipelines has major implications that have never been analyzed. Now is the time to ensure, through the requested relief, that the proper procedures and requirements are followed to prevent environmental harm and protect public safety before it is too late.

## STATEMENT OF FACTS

### I.    OVERVIEW OF THE LAS FLORES PIPELINE SYSTEM

In 1986, Santa Barbara County approved the Celeron/All American Pipeline Project to transport oil from the SYU. (Petitioners' Verified Petition for Writ of Mandate (Petition) at ¶ 35.) Line 901/CA-324, which became operational in 1992, is a 24-inch diameter, buried, insulated pipeline that extends just under eleven miles in length from storage tanks in Las Flores Canyon to the Gaviota Pumping Station. (*Id*. at ¶ 39) Line 903/CA-325, which became operational in 1991, is a 30-inch diameter pipeline that extends approximately 128 miles in length from Gaviota to the Emidio Pump Station. (*Id*. at ¶ 40.)

The Las Flores Pipeline System starts at 150 feet of elevation, rising to close to 3,000 feet before dropping to approximately 690 feet at its Pentland Station terminus. (Petition at ¶ 43.) The required operating temperatures to transport heavy crude oil across that elevation profile are uniquely high and accelerate external pipeline corrosion. (*Ibid*.) The approximately 125-mile pipeline system crosses three

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

California counties: Santa Barbara, San Luis Obispo, and Kern. (*Id*. at ¶ 44.) The pipeline system also crosses unusually sensitive areas, as well as active faults, sensitive groundwater basins, drinking water aquifers, flood plains, residential areas, and numerous streams, creeks and rivers. (*Id*. at ¶¶ 45–48.)

## II.    REFUGIO OIL SPILL AND PIPELINE FAILURE REPORT

On May 19, 2015, Line 901/CA-324 ruptured and caused one of the most disastrous oil spills in California history. (Petition at ¶ 50.) The corroded pipeline spilled what is now believed to be over 450,000 gallons of oil, killing hundreds of birds and mammals and closing fisheries and beaches. (*Id*. at ¶ 51.) A wide variety of nearshore fish species were impacted by the spill, including surfperch and grunion, which were spawning during the spill. The spill also impacted a wide variety of coastal habitats and species protected under the federal and state Endangered Species Acts. (*Ibid*.)

The Pipeline and Hazardous Materials Safety Administration's (PHMSA) Failure Report for the spill concluded that the direct cause of the failure was "progressive external corrosion" under the pipeline's coating system. (Petition at ¶ 54; Teel Decl., ¶ 6, Ex. 5 at p. 67.) The Report also confirmed that problems were not confined to the failure site and there was pervasive corrosion and metal loss throughout the Pipeline System. (Petition at ¶ 53.; Teel Decl., ¶ 7, Ex. 5 at p. 66)

Further, the Failure Report noted that water had been trapped inside the pipeline's foam insulation, "indicating that the integrity of the coating system had been compromised." (Teel Decl., ¶ 6, Ex. 5 at p. 67) The Report ultimately found that the pipelines' cathodic protection (CP) system was "not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system." (*Id*. at p. 56.) Additionally, the Failure Report noted that this CP system "cannot protect" the insulated steel pipelines when the coating becomes compromised. (*Id*. at p. 67.)

## III.    TRANSFER TO SABLE AND EFFORTS TO RESTART

On February 14, 2024, Sable closed on a Purchase and Sale Agreement with ExxonMobil Corporation and Mobil Pacific Pipeline Company to acquire the SYU assets as well as the outstanding shares of Pacific Offshore Pipeline Company and Pacific Pipeline Company. (Petition at ¶ 64.) According to the terms of the acquisition, if production of oil and gas does not restart from SYU by January 1, 2026, the assets revert to ExxonMobil Corporation. (*Ibid*.)

While its predecessors once pursued building new, replacement pipelines, Sable is not pursuing a

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

pipeline replacement project for the Las Flores Pipeline System and is instead trying to restart SYU activities using the old, extensively corroded, already-failed onshore pipeline system. (Petition at ¶ 66.) Sable identified 121 "anomalies" where work is required before it can even attempt to restart the pipeline system, (*id*. at ¶ 67), which Sable says it has now completed. (Teel Decl. ¶ 3, Ex. 2 at p. 36.)

Pursuant to the Consent Decree entered into by the former owner/operator of the pipeline system and numerous governmental entities, if restart is chosen over the other two options noted in the Consent Decree (pipeline replacement and pipeline abandonment), the operator "shall apply for a State Waiver through [Cal Fire] for the limited effectiveness of cathodic protection," which "must [be] receive[ed] . . . prior to restarting." (Teel Decl. ¶ 7, Ex. 6 at p. 78.)

On April 24, 2024, Sable applied for the State Waivers from Cal Fire to restart the pipelines even though the thermally insulated pipeline's cathodic protection has "limited effectiveness" and has corrosion of or along its longitudinal seam. (Teel Decl. ¶ 8, Ex. 7.) On December 17, 2024, Cal Fire issued the State Waivers without conducting any environmental review or providing a public comment or hearing opportunity. (*Id*. at ¶¶ 9-10, Exs. 8, 9.)  Amongst other measures proposed to try to offset the pipelines' inherent defects, the State Waivers contemplate over 190 digs and excavations over the next ten years to attempt to verify the results of in-line inspections. (*Id*.).

**ARGUMENT**

**I.      LEGAL STANDARD**

Courts may stay the operation of an administrative decision pending judgment if doing so is in the public interest. (Code Civ. Proc., § 1094.5, subd. (g).) In fact, whether the stay would be against the public interest should be the *only* factor informing the Court's decision. (*See Canyon Crest Conservancy v. County of Los Angeles* (2020) 46 Cal.App.5th 398, 407 [court "not required to make any additional findings" aside from "finding that granting a stay would not be against the public interest"]; *see also Bd. of Medical Quality Assurance v. Superior Court* (1980) 114 Cal.App.3d 272, 276.)

Similarly, Courts may grant temporary restraining orders on *ex parte* notice to maintain the status quo solely upon showings that the applicant informed the opposing party when and where the application would be made and that "[i]t appears from facts shown by affidavit or by the verified complaint that great or irreparable injury will result to the applicant before the matter can be heard on

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

notice." (Code Civ. Proc., § 527, subd. (c).) "The general purpose of [preliminary relief] is to preserve the status quo pending a determination on the merits of the action." (*Tulare Lake Canal Co. v. Stratford Public Utility Dist.* (2023) 92 Cal.App.5th 380, 396 (hereafter *Tulare*).)

Finally, courts may grant a preliminary injunction when "it appears by the complaint or affidavits that the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action." (Code Civ. Proc., § 526, subd. (a).) The test for interim relief involves consideration of two interrelated factors: "the likelihood that the plaintiff will prevail on the merits at trial" and "the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." (*Anderson v. County of Santa Barbara* (2023) 94 Cal. App. 5th 554, 567–68, quoting *Best Friends Animal Society v. Macerich Westside Pavilion Property LLC* (2011) 193 Cal.App.4th 168, 174.)

This determination "must be guided by a 'mix' of the potential-merit and interim-harm factors" because "the greater the plaintiff's showing on one, the less must be shown on the other to support an injunction." (*Butt v. State of California* (1992) 4 Cal.4th 668, 678, citing *King v. Meese* (1987) 43 Cal.3d 1217, 1227–28.) "*The ultimate goal* of any test to be used in deciding whether a preliminary injunction should issue *is to minimize the harm which an erroneous interim decision may cause*." (*White v. Davis* (2003) 30 Cal.4th 528, 554, quoting *IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 73.) While the mere possibility of harm is insufficient to justify a preliminary injunction, movants are "not required to wait until they have suffered *actual harm* before they apply for an injunction but may seek injunctive relief against the *threatened infringement* of their rights." (*Costa Mesa City Employees Assn. v. City of Costa Mesa* (2012) 209 Cal.App.4th 298, 305, quoting (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1292.)

## II. THE PUBLIC INTEREST FAVORS PROTECTING IRREPLACEABLE RESOURCES AND ENSURING PUBLIC SAFETY

The basic purposes of CEQA are to "(1) [i]nform governmental decision makers and the public about the potential, significant environmental effects of proposed activities[;] (2) [i]dentify ways that environmental damage can be avoided or significantly reduced[;] (3) [p]revent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures[;]. . . . [and] (4) [d]isclose to the public the reasons why a governmental agency approved the

project in the manner the agency chose . . . ." (Cal. Code Regs., tit. 14, § 15002, subd. (a).) Similarly, pipeline safety laws "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities" (49 U.S.C. § 60102, subd. (a)(1)), ensure "public safety," and prevent "the probability of injury or damage." (Gov. Code, § 51011, subd. (b).)

The public interests at the very core of CEQA and pipeline safety laws—establishing informed decisionmaking, ensuring public safety, and preventing avoidable environmental damage—are each significantly jeopardized here and necessitate an administrative stay or preliminary relief. Petitioners urge this Court to grant the requested relief to prevent potential irreparable damage before it is too late.

### A.   The Public Will Suffer Irreparable Harm Absent Preliminary Relief

The public interest in ensuring informed decisionmaking and disclosure of agency reasoning are critical here given the strong public interests this Project affects. (*See* Bradshaw Decl., ¶ 19 ["It's deeply alarming that [Cal Fire] has shut out the public's participation. If [they] had conducted a public hearing on the waivers, I would have attended to object to the intolerable risk of another oil spill"]; *see also* Schmitt Decl. at ¶ 10 ["actions like this betray public trust in government agencies"].) The health and safety of Californians along the pipeline route and the area's sensitive resources are threatened by Cal Fire's decision to waive pipeline safety requirements and allow Sable to start transporting oil through the defective, corrosion-prone pipeline system without any environmental review and public input.

A lack of agency CEQA review about the potential significant environmental effects of a project conclusively establishes harm to the public interest in informed decisionmaking. (*Tulare*, *supra*, at pp. 409.) Indeed, harm to the public interests in informed decisionmaking and public disclosure are precisely "the types of public interests that must be considered in evaluating the relative balance of harms from granting or denying a preliminary injunction." (*Id*. at p. 411; *see also Saltonstall v. City of Sacramento* (2014) 231 Cal.App.4th 837, 854, quoting *O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1471 ["It is well established that when injunctive relief is sought, consideration of public policy is not only permissible but mandatory"].)

Here, the public is irreparably harmed by a lack of informed decisionmaking and opportunity for public participation because it led to a foregone conclusion of just a single course of action—authorizing the restart of oil transport through defective pipelines that lack otherwise-required corrosion-prevention

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

and remediation measures—without the requisite consideration of impacts, alternatives, mitigation measures, and public input. (*See* Pub. Res. Code, § 21002; Petition at ¶ 128.) If the pipelines are allowed to restart before this case is resolved and without public notice, any CEQA and pipeline safety review ultimately ordered by this Court would "likely become nothing more than post hoc rationalizations to support action already taken." (*Tulare*, *supra*, at p. 416, quoting *Laurel Heights Improvement Assn. v. Regents of Univ. of California* (1988) 47 Cal.3d 376, 392.) An administrative stay or preliminary relief is necessary to protect the integrity of the review processes required here.

**B.     The Risk of Pipeline Rupture is Substantial and Has Intolerable Consequences**

An administrative stay or preliminary relief is also necessary to protect the public interest and the interests of Petitioners' members in preventing the irreparable environmental harm of another oil spill. Upon a finding that activities "will prejudice the consideration or implementation of particular mitigation measures or alternatives to the project," CEQA *requires* courts to enjoin project activities "that could result in an adverse change or alteration to the physical environment, until the public agency has taken any actions that may be necessary to bring the determination, finding, or decision into compliance" with CEQA. (Pub. Res. Code, § 21168.9, subd. (a)(2).)

As noted by pipeline safety expert Richard Kuprewicz, whose December 20, 2024, and February 21 2025, reports were provided to Cal Fire on December 23, 2024, and March 2, 2025, respectively (Teel Decl. ¶¶ 11-12, Exs. 10–11), the Las Flores Pipeline System is unusually dangerous given its inherent design flaws. (Kuprewicz Decl., ¶ 8.) The greatest threat to the integrity and safety of the pipelines is from external corrosion due to the poor design of the pipelines that render cathodic protections ineffective at reducing or preventing failure from external corrosion. (*Ibid.*) Without such protections, the pipelines are at particularly high risk of spilling again for the additional reason that the high temperature at which the pipeline system must operate across its hilly route accelerates corrosion. (*Id.* at ¶¶ 8, 10.) Pipeline integrity management tools like those included in the State Waivers have a significant margin for error, are not a substitute for proper pipeline design or effective cathodic protections, and create an illusion of safety. (*Ibid.*) Thus, the poorly designed pipelines cannot be made as safe as new pipelines that have properly functioning cathodic protections. (*Id.* at ¶ 11.)

Because the Las Flores Pipeline System has already ruptured once, the consequences of a spill

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

are already well known. The 2015 Refugio Beach Oil Spill damaged approximately 1,500 acres of shoreline habitat and 2,200 acres of subtidal and fish habitats; it killed at least 558 birds and 232 marine mammals; and it resulted in over 140,000 lost user days in Santa Barbara and Ventura counties. (*See* Teel Decl. ¶ 13, Ex. 12 at p. 163.) The estimated monetary value of these natural resources damages was $22.3 million. (*Id.* at p. 179.) And as of 2023, the aggregate total costs of the spill incurred by the pipeline owner were approximately $750 million. (*See id*. at ¶ 14, Ex. 13 at p. 183.) Preliminary relief is necessary to prevent such devastating environmental harm from occurring again.

Beyond the coastline, another oil spill could also irreparably harm the significant amount of wildlife and people all along the approximately 125-mile pipeline routes. The pipelines pass through a populated suburban neighborhood in the city of Buellton, close to schools, parks, and dozens of residential homes. (Petition at ¶ 48.) Moreover, there are at least five designated critical habitats and occurrences of at least sixteen federally and state-listed threatened and endangered species along the pipeline routes. (Clauser Decl., ¶ 5, Ex. 1.) Finally, the pipelines cross countless streams in addition to the Santa Ynez River, Sisquoc River, and Cuyama River, jeopardizing water quality. (*Id*. at ¶ 6, Ex. 2; Petition at ¶ 46.) If the pipelines were to rupture, there would be devastating health and safety impacts to California residents, natural resources, and biodiversity. Such risks are only compounded by the pipelines' crossing of more than a dozen quaternary faults (Clauser Decl., ¶ 7, Ex. 3), elevation levels exceeding 2,500 feet (*id*. at ¶ 8, Ex. 4), high wildfire hazard severity zones (*id*., ¶ 9, Ex. 5), and public lands like state parks and refuges (*id*. at ¶ 10, Ex. 6).

Another oil spill would also irreparably harm Petitioners and their members' interests in the environment and wildlife that inhabits it. For example, Center member Blake Kopcho lives in Santa Barbara and enjoys hiking, surfing, scuba diving, sailing, and spending time in and around the ocean, beach, and bluffs. (Kopcho Decl., ¶ 4) He regularly surfs, hikes, sails, scuba dives, camps, and watches wildlife all along the Santa Barbara Channel and Gaviota coast, including the Channel Islands. (*Id.* at ¶¶ 7–18.) The area's importance to Mr. Kopcho cannot be overstated. (*E.g., id.* at ¶ 18 ["Many of the best moments of my life have been spent surfing, sailing, and diving in the Santa Barbara Channel. These activities are a central part of my life"].) If the pipelines restart and another spill occurs, Mr. Kopcho would be irreparably harmed by being prevented from hiking, surfing, diving, and otherwise recreating

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

along Santa Barbara's coast, depriving him of the physical and mental benefits of connecting with the natural world. He also expressed concern that the Project will negatively impact his health and climate. (*Id*. at ¶¶ 19–27.) Center member Brady Bradshaw has similar recreational interests that would be irreparably damaged by another oil spill. (*See* Bradshaw Decl., ¶ 20 ["My freediving, swimming, and ocean-based spiritual practices are a core part of who I am and are central to my wellbeing"].)

Similarly, Wishtoyo member and Watershed Scientist Tevin Schmitt would be irreparably harmed by another oil spill. Mr. Schmitt's "interests, passions, volunteer efforts, hobbies, and ability to conduct [his] responsibilities as Watershed Scientist all depend on a clean environment with thriving wildlife." (Schmitt Decl., ¶ 15.) He is an avid birder who regularly leads educational hikes to teach the public about local ecology and bird identification in the Ventura and Santa Barbara area and will likely be leading a hike this upcoming fall at Emma Wood State Beach, Ormond Beach/Wetlands, or the Santa Clara River Estuary/McGrath State Beach, all of which were impacted by the 2015 oil spill. (Schmitt Decl., ¶¶ 6–8.) Birding is particularly important for Mr. Schmitt as he is "enthralled by the evolution of flight, the mastery of terrestrial and marine ecological niches, and their song." (*Id*. at ¶ 6.) He also regularly enjoys birding, camping, fishing, and game hunting in Los Padres National Forest, "the closest and most accessible national forest in the region" which sections of the pipelines cross. (*Id*. at ¶ 14.) "The looming threat of an oil spill from these facilities, as well as construction and associated pollution and greenhouse gas emissions, have negative impacts on my ability to recreate and enjoy the aesthetic beauty of these forested lands." (*Ibid*.) Center member Jeffrey Miller—a conservationist and avid birdwatcher who regularly visits Carrizo Plain National Monument, Gaviota State Park, and Los Padres National Forest for birdwatching, nature photography, and conservation purposes—similarly would be irreparably harmed should restart and another spill occur. (Miller Decl., ¶¶ 8–11, 17 ["My interests in the Los Padres National Forest, Carrizo Plain, and the many rare species they support are at imminent risk of harm the minute oil starts flowing through the pipelines"].)

Operation of these faulty, decades-old pipelines places California's sensitive habitat and residents in grave danger, as the impacts of another oil spill would be long-term, and in some cases permanent. The ongoing risk of irreparable harm to the Center's members and the public weighs heavily in favor of an administrative stay or preliminary injunctive relief.

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

**C.        The Project Has Significant Unassessed Environmental Impacts**

Beyond the risk of oil spills, restarting SYU oil production and transport will cause other significant environmental impacts that have gone entirely unassessed. For example, restarting the SYU activities will have significant greenhouse gas and air pollution impacts. Before it shut down in 2015, the Las Flores Canyon onshore facilities that processed oil and gas from the SYU were Santa Barbara County's largest source of greenhouse gas emissions. (Teel Decl. ¶ 14, Ex. 14 at p. 195.) It contributed 55 percent of Santa Barbara County's total greenhouse gas emissions. (*Id*.)

Additionally, the construction work associated with restarting the SYU also imposes significant unassessed air pollution, noise, aesthetics, and biological resource impacts. There has already been observed excavation with heavy equipment in the coastal zone; removal of major vegetation; and installation of fill material within wetlands. Work was conducted during the breeding season for the southern California steelhead and the California red legged frog and damaged sensitive species habitat. (Teel Decl. ¶ 5, Ex. 4 at p. 42, 46.) These same kinds of impacts are likely to continue in the future given the State Waivers' requirement of extensive digs and excavations.

The ongoing risk of irreparable harm from significant unmitigated environmental impacts stemming from the Project absent any environmental review also weighs heavily in favor of an administrative stay or preliminary injunctive relief.

**D.        Sable Has Begun Oil Production and the Risk of Harm Is Imminent**

Sable announced its intent to restart the Las Flores Pipeline System in the second quarter of 2025. (*See* Teel Decl. ¶ 19, Ex. 18 at p. 228.) On May 9, 2025, Sable obtained a right-of-entry from the Department of Parks and Recreation to conduct work on eighteen (18) discrete pipeline anomaly sites and complete what it said was the only remaining work needed to restart the pipelines. (*See* Teel Decl. ¶ 16, Ex. 15 at p. 203.) On May 19, Sable announced it restarted production at the SYU on May 15, producing and transporting oil to two onshore storage tanks, despite the lack of requisite communications with public agencies and approval to return the pipelines to service. (Teel Decl. ¶ 2, 4, Exs. 1, 3; *id*. at ¶ 17, Ex. 16.) Sable also stated it finished all anomaly work and hydrotesting and anticipates oil sales from the SYU using the Pipeline System in July 2025. (Teel Decl. ¶ 3, Ex. 2, p. 12.)

On May 28, 2025, a preliminary injunction was granted to the California Coastal Commission,

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

which restrains Sable from committing any further violation of the Commission's April 10, 2025 cease and desist order. (Teel Decl. ¶ 18, Ex. 17.) However, the injunction does not explicitly enjoin Sable from restarting the pipelines, and Sable has expressed its continued intention to do so in short order. (*Id*.) The requested relief is necessary given that oil could start flowing through the pipelines any day—with no notice to Petitioners or the public, opportunity for public involvement, or informed decisionmaking— leaving great risks to the environment and public interests, health, and safety. (Teel Decl. ¶ 27, Ex. 23.)

**E.      Any Harm to Sable Is Minimal Compared to the Public Interest Harms at Stake**

This Court has ample discretion to determine that enjoining the State Waivers and protecting the status quo of non-operational pipelines pending resolution of the merits more strongly serves the public interest than does protecting Sable and its shareholders from any alleged harms from delay.[1] (*See, e.g.*, *People v. Uber Technologies, Inc.* (2020) 56 Cal.App.5th 266, 312–13 ["rectifying . . . irreparable harm shown by the People more strongly serves the public interest than protecting. . . shareholders"].) Indeed, any potential harm to shareholders that Sable alleges underscores the importance of granting preliminary relief in this case. Oil flowing through the Las Flores Pipeline System will carry with it the exact "bureaucratic and financial momentum" that preliminary injunctive relief is designed to prevent. (*See Laurel Heights v. Regents*, *supra*, 47 Cal.3d at p. 395.)

Even if the Court determines Petitioners are unlikely to prevail on the merits, the balance of harms still weighs in favor of granting preliminary relief. Ensuring meaningful environmental and pipeline safety review to prevent avoidable harms certainly outweighs the harm of a mere *delay* in Sable's ability to profit. The pipelines have been shut-in for a full decade since the 2015 rupture, so pausing restart for a few more months pending a decision on the merits is a minor imposition on a company that has publicly acknowledged numerous risk factors. This includes warnings that "[m]any of these risks are heightened . . . [since the] equipment has been shut-in for more than eight years," and that "[t]here is no assurance that we will be successful in satisfying [permitting] obligations and requirements and restarting production . . . in a timely manner." (*See* Teel Decl. ¶ 20, Ex. 19.)

---

[1] As noted above, the Court need only consider the public interest and not the balance of harms for determining whether to grant an administrative stay. (*See Canyon Crest Conservancy, supra,* 46 Cal.App.5th at 407.)

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

## III.   PETITIONERS ARE LIKELY TO PREVAIL ON THE MERITS

### A.   Pipeline Safety Law Violations

Petitioners' first and second causes of action challenge Cal Fire's failure to comply with state and federal pipeline safety laws when issuing the State Waivers. First, Petitioners are likely to prevail on their claims that Cal Fire violated pipeline safety laws by issuing the State Waivers without any public notice and hearing or environmental review, as required.[2] (49 U.S.C. § 60118, subd. (c)(1)(B); Petition at ¶ 101.) Indeed, Petitioners only discovered that Cal Fire issued the State Waivers through Sable's December 17, 2024 U.S. Securities and Exchange Commission filing. (Petition at ¶ 71.)

Second, Petitioners are likely to prevail on their claim that Cal Fire violated state pipeline safety laws by failing to "include a discussion of those factors that the State Fire Marshal considers significant to the granting of the exemption." (Gov. Code, § 51011, subd. (c).) The State Waivers fail to provide any findings or analysis justifying the decisions. (Petition at ¶ 123.) Instead, they blanketly declare (1) Sable provided Cal Fire with certain proposed measures to mitigate the risk of corrosion and (2) Cal Fire safety engineers reviewed the provided materials and were in communication with PHMSA to incorporate PHMSA's recommends. (Teel Decl. ¶¶ 9-10, Exs. 8-9, at p. 118, 134.) Thus, the State Waivers contain no discussion of the risks that restarting pipelines with defective external coating and cathodic protections poses. The Waivers do not, for example, discuss the pipelines' continued vulnerability to corrosion, the implications of the high temperatures the pipelines must operate at to move the crude oil through hilly terrain, the shortcomings of inline inspection technologies and hydrotesting, or the threats to unusually sensitive areas which the pipelines cross. (Kuprewicz Decl., ¶¶ 8, 10; Petition at ¶ 46.)

Third, Petitioners are likely to prevail on their claims that Cal Fire failed to establish (1) "the waiver[s] [are] not inconsistent with pipeline safety" (49 U.S.C. § 60118, subd. (c)(1)(A)) or (2) "the risk to public safety is slight and the probability of injury or damage remote." (Gov. Code, § 51011, subd. (b).) As noted above, Cal Fire did not provide *any* analysis or discussion of how the measures mentioned in the State Waivers are consistent with pipeline and public safety. Among pipeline safety

---

[2] Cal Fire may only waive compliance with a safety standard "in the same way and to the same extent the Secretary [of Transportation] may waive compliance." (49 U.S.C. § 60118, subd. (d).)

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

expert Richard Kuprewicz's findings, (1) the poorly designed Las Flores Pipeline System is not equipped with cathodic protections capable of effectively preventing external corrosion and ruptures; (2) the high temperatures at which the Las Flores Pipeline System must operate significantly accelerate all forms of external pipeline corrosion and heighten the risk of pipeline failure; (3) current inline inspection technologies and methodologies upon which the State Waivers rely cannot adequately assess all forms of external corrosion threats (such as cracking and pitting) that most likely exist within the Las Flores Pipeline System; (4) segments at risk of corrosion-related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure; (5) the proposed hydrotests were insufficient to detect certain types of corrosion; (6) the Las Flores Pipeline System cannot be made to be as safe as a new pipeline; (7) pipeline integrity management tools are not a substitute for proper pipeline design or effective cathodic protections; and (8) without effective cathodic protections, the pipeline is at particularly high risk of spilling again. (Kuprewicz Decl., ¶¶ 8, 10.)

In sum, the State Waivers do not address the pipeline safety, public health, or environmental risks of restarting this pipeline system in its current condition without the otherwise required corrosion prevention measures. Instead, the State Waivers focus on monitoring and other backend mitigation measures without acknowledging the important tradeoffs. Absent analysis and inclusion of all pertinent information, Cal Fire cannot credibly opine, let alone establish, the State Waivers are consistent with pipeline safety or that the probability of injury and public safety risks is slight or remote.

**B.     CEQA Violations**

Petitioners are also likely to prevail on their CEQA claims. Cal Fire violated CEQA by issuing the State Waivers without preparing *any* environmental documentation or providing any public notice or public comment opportunity for the Project. Cal Fire therefore failed CEQA's core objectives to provide decisionmakers and the public with detailed information about potentially significant environmental impacts and to avoid or mitigate those impacts. (Cal. Code Regs. tit. 14, § 15002, subd. (a).)

Cal Fire had an affirmative duty to conduct CEQA review for the Project when it issued the State Waivers. CEQA applies to discretionary projects approved by public agencies. (Pub. Res. Code, § 21080, subd. (a).) CEQA broadly defines a "project" to include actions that may cause direct or indirect physical changes to the environment. (Pub. Res. Code, § 21065.) This includes activities that

21

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

"involve[] the issuance of a lease, permit, license, certificate, or other entitlement for use by a public agency." (*Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 701, revd. on other grounds in *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171; Pub. Res. Code, § 21065.)

The "term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Cal. Code Regs. tit. 14, § 15378, subd. (c); *see also Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 106.) Thus, Cal Fire's issuance of the State Waiver for the Project required CEQA review as they constitute an issuance of permits by a state agency which have significant potential to cause physical environmental changes like water and air pollution and damage to wildlife habitat—particularly given the pipelines' condition, history, and likelihood of future spills and ruptures. (Petition at ¶ 6; Teel Decl. ¶ 21, Ex. 20, p. 186 [restarting the pipelines "could result in an oil spill once a year and a rupture once every four years"].)

Further, Cal Fire's issuance of the State Waivers was a discretionary action. Cal Fire was under no obligation to issue the Waivers, as evidenced by the other options laid out in the Consent Decree. (Teel Decl. ¶ 7, Ex. 6 at p. 78.) The statutory provisions governing waivers that "may" (not must) be issued by Cal Fire in certain narrow instances, are also rife with discretionary language. (*See*, *e.g.*, 49 U.S.C. § 60118, subd. (d) ["the State authority may waive compliance"]; Gov. § Code, 51011, subd. (b) ["The State Fire Marshal may exempt the application of regulations" if "the risk to public safety is slight and the probability of injury or damage remote."]) And in fact, Cal Fire exercised significant discretion in determining whether and how to allow the pipelines to restart in the absence of required pipeline safety features when it chose conditions to include in the State Waivers, including over 190 digs and excavations over the next ten years that will attempt to validate inline inspection tool accuracy and inline inspection results. (Petition at ¶ 83; Teel Decl. ¶¶ 9-10, Exs. 8-9, at 124, n. 6, 140, n. 6.)

No CEQA exemption applies. In Cal Fire's responsible agency letter to Petitioners, it stated that it does not "view this as a project under CEQA and/or categorically exempt from CEQA." (Teel Decl. ¶ 22, Ex. 21.) While Cal Fire did not invoke any specific exemption, it is clear that restarting defective

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

pipelines by waiving pipeline safety requirements is not, for example, a repair or minor alteration to an existing facility involving negligible or no expansion of use. (Cal. Code Regs. tit. 14, § 15301.)

Additionally, there is no applicable CEQA exemption since "[o]nly those projects having no significant effect on the environment are categorically exempt from CEQA review. If a project may have a significant effect on the environment, CEQA review must occur." (*Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098, 1099); *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1195 [a determination that a project "pose[s] a threat to groundwater, air quality and public health. . . provides confirmation that [the project] do[es] not constitute a suitable class of properties for a categorical exemption"].) The waiver of pipeline safety measures to restart a failed pipeline system and its connected infrastructure certainly may have significant environmental effects, including anticipated future oil spills and attendant impacts on air, water, biological, and cultural resources. Cal Fire's approval of the State Waivers for the Project absent any public process or environmental review was a plain violation of its CEQA duties.

Furthermore, at a minimum, a Subsequent EIR is required because the Project meets each of the three individual triggering conditions. (Pub. Res. Code, § 21166 [requiring subsequent review where: (1) substantial changes in the project require major revisions to the EIR; (2) substantial changes to the project circumstances require major revisions; and (3) new information becomes available which was not and could not have been known at the time the EIR was certified].) The restart deviates significantly from the 1985 EIR's contemplated 30-year service life pipeline with a proper and functioning cathodic protection system which went on to catastrophically fail. (Petition at ¶ 9; Teel Decl. ¶ 23, Ex. 22.)

## IV.    NO BOND SHOULD BE REQUIRED

No bond is statutorily required in association with an administrative stay. (*See* Code Civ. Proc., § 1094.5, subd. (g).) Additionally, this Court has the power to waive or set only a nominal bond to secure preliminary relief when equitable principles require. (*See Conover v. Hall* (1974) 11 Cal.3d 842, 846–47.) The Code of Civil Procedure authorizes complete waiver of a bond, subject to the court's discretion, providing, "the court shall take into consideration all factors it deems relevant, including but not limited to the character of the action or proceeding, the nature of the beneficiary, whether public or private, and the potential harm to the beneficiary . . . ." (Code Civ. Proc., § 995.240.)

Requiring more than a nominal bond in this case would stifle the intent of CEQA and pipeline safety laws by effectively denying Petitioners of their right to judicial review of Cal Fire's actions. (*See Mangini v. J.G. Durand* (1994) 31 Cal.App.4th 214, 217 ["Any bond other than a nominal one could 'effectively deny access to judicial review' or 'close the courthouse door in public interest litigation by imposing a burdensome security requirement on plaintiffs who otherwise have standing' to raise an environmental challenge; *see also City of South Pasadena v. Slater* (C.D. Cal. 1999) 56 F.Supp.2d 1106, 1148 ["courts routinely impose either no bond or a minimal bond in public environmental cases"].)

Petitioners are organizations whose only interest in this lawsuit is to protect California's sensitive coast and natural resources as well as the wildlife and people who inhabit it. They have no financial interest in this case and seek no damages; they simply seek environmental protection and the enforcement of public duties. Waiving or setting only a nominal bond would protect the public interest by preventing the premature and irretrievable commitment to a single course of action—environmentally damaging oil activities using defective pipelines without CEQA or pipeline safety review.

Moreover, the enormous cost of failing to conduct environmental review and ensure pipeline safety, thereby risking another disastrous spill, outweighs any purported or delayed cost to Sable. (*See Natural Resources Defense Council, Inc. v. Morton* (D.D.C. 1971) 337 F. Supp. 167, 169 ["the public interest will be far more gravely damaged by failure . . . to rigorously and consistently enforce [review requirements] than by any harm which could possibly result from delaying [a] lease sale long enough to resolve the important legal issues presented"].) In fact, as Sable is not yet authorized to transport (and thus sell) the oil it is prematurely producing (Teel Decl., ¶ 2, Ex. 1, p. 12), there are no damages to bond.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully urge the Court to issue an immediate administrative stay of the State Waivers or, alternatively, to issue an order to show cause why a preliminary injunction should not be issued and a temporary restraining order prohibiting Cal Fire from issuing any further Project approvals and Sable from transporting oil onshore pending an injunction hearing and judgment on the case. Such measures are imperative to ensure that environmental review, public participation, and pipeline safety requirements are adhered to rather than allowing Cal Fire to blanketly waive pipeline safety requirements for failed and idled pipelines that pose rupture risks.

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

Dated: June 2, 2025

Respectfully submitted,

s/ *Julie Teel Simmonds*

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for*
*Biological Diversity and Wishtoyo Foundation*

25

PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR OSC RE PI AND TRO

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/2/2025 8:00 AM
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological
Diversity and Wishtoyo Foundation*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA BARBARA
### SOUTH COUNTY REGION

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive, <br><br> Respondents/Defendants. <br><hr> SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive, <br><br> Real Parties in Interest. | Case No.: 25CV02244 <br><br> **DECLARATION OF JULIE TEEL SIMMONDS IN SUPPORT OF PETITIONERS' EX PARTE APPLICATION FOR AN ADMINISTRATIVE STAY OR, IN THE ALTERNATIVE, AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED AND TEMPORARY RESTRAINING ORDER** <br><br> Date: June 3, 2025 <br> Time: 8:30 a.m. <br> Dept: 4 <br> Judge: Hon. Donna D. Geck <br><br> [Action Filed: April 15, 2025] |

1

DECLARATION OF JULIE TEEL SIMMONDS ISO PETITIONERS' *EX PARTE* APPLICATION

I, Julie Teel Simmonds, hereby declare as follows:

1.    I am at attorney at law admitted to practice before the courts of the State of California and am an attorney of record for Petitioners Center for Biological Diversity and Wishtoyo Foundation in the above-captioned case. I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify to them. I submit this declaration in support of the concurrently-filed Petitioners' *Ex Parte* Application for an Administrative Stay or, in the alternative, an Order to Show Cause Why a Preliminary Injunction Should Not Be Granted and a Temporary Restraining Order.

2.    Petitioners have obtained information that Real Parties in Interest have recently resumed oil production from the Santa Ynez Unit and are pushing forward with plans to restart the transport of that oil using the Las Flores Pipeline System, which is the subject of this litigation. Attached as Exhibit 1 is a true and correct copy of a Form 8-K Sable Offshore Corp. (Sable) filed with the U.S. Securities and Exchange Commission (SEC) on May 19, 2025. I obtained this document on May 20, 2025, from this U.S. Securities and Exchange Commission (SEC) webpage: https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000119312525122079/d943067d8k.htm. This document states that on May 19, Sable "issued a press release announcing restart of oil production at the Santa Ynez Unit and anticipated oil sales from the Las Flores Pipeline System in July 2025." The press release included with the filing notes that Sable "restarted production" of oil from the Santa Ynez Unit on May 15, 2025 and "has begun flowing oil production to the Las Flores Canyon ('LFC',) where it expects to "fill the ~ 540,000 barrels of crude oil storage capacity" by the "middle of June."

3.    Attached as Exhibit 2 is a true and correct copy of a Form 8-K Sable filed with the SEC on May 27, 2025.  I obtained this document on May 29, 2025, from this SEC webpage: https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000183148125000042/socc-20250527.htm.  This filing states that on May 27, 2025, "Sable Offshore Corp. conducted a successful hydrotest of the final segment of Line 325 and has now successfully hydrotested all segments of Line 324 and Line 325 (collectively, the 'Onshore Pipeline'), satisfying the final operational condition to restart [sic] the Onshore Pipeline as outlined in the Consent Decree."

4.    Attached as Exhibit 3 is a true and correct copy of Federal Defendants' Notice of Recent

DECLARATION OF JULIE TEEL SIMMONDS ISO PETITIONERS' *EX PARTE* APPLICATION

Developments in the ongoing case *Center for Biological Diversity, et al. v. Doug Burgum, et al.*, Case No. 2:24-cv-05459-MWC-MAA, which I obtained from PACER, https://pacer.login.uscourts.gov/, on May 23, 2025. This pleading states that counsel for the Federal Defendants learned of the restart of production on May 19, 2025 but had "not received notice from the California State Fire Marshal's Office Pipeline Division that Sable is approved to operate the onshore pipeline segments 901/903," which they had understood as a precondition of "returning to production."

5.    Attached as Exhibit 4 is a true and correct copy of an excerpt from the March 28, 2025, California Coastal Commission Staff Report, which I obtained on May 20, 2025, from this Commission webpage: https://documents.coastal.ca.gov/reports/2025/4/Th8.1-Th8.3/Th8.1-Th8.3-4-2025-report.pdf.

6.    Attached as Exhibit 5 is a true and correct copy of the Pipeline and Hazardous Materials Safety Administration (PHMSA) *Failure Investigation Report, Plains Pipeline, L.P., Line 901 Crude Oil Release*, May 19, 2015, Santa Barbara County, California (May 2016), which I obtained on May 19, 2025, from this PHMSA webpage: https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf.

7.    Attached as Exhibit 6 is a true and correct copy of an excerpt from the Consent Decree entered in *United States v. Plains All American Pipeline*, Civil Action No. 2:20-cv-02415 (C.D. Cal. Mar. 13, 2020), which I obtained on May 19, 2025, from this U.S. Environmental Protection Agency webpage: https://www.epa.gov/sites/default/files/2020-03/documents/plainsallamericanpipelinelp.pdf.

8.    Attached as Exhibit 7 is a true and correct copy of Sable's April 24, 2024, letter to Cal Fire confirming its intention to pursue applications for State Waivers submitted by Pacific Pipeline Company on July 10, 2023, which I obtained on May 20, 2025, from this PHMSA non-rulemaking docket webpage: https://www.regulations.gov/docket/PHMSA-2025-0003/document.

9.    Attached as Exhibit 8 is a true and correct copy of State Waiver (CA-324), which I obtained on May 20, 2025, from this Cal Fire webpage: https://34c031f8-c9fd-4018-8c5a-4159cdff6b0d-cdn-endpoint.azureedge.net/-/media/osfm-website/what-we-do/pipeline-safety-and-hazardous-materials/pathways-to-restoring-pipeline-docs/state-waiver-sable-ca324-osfm-line-0015-lod.pdf?rev=be79b9ad20814e34a8d57e.

3

DECLARATION OF JULIE TEEL SIMMONDS ISO PETITIONERS' *EX PARTE* APPLICATION

10. Attached as Exhibit 9 is a true and correct copy of State Waiver (CA-325A/B), which I obtained on May 20, 2025, from this Cal Fire webpage: https://34c031f8-c9fd-4018-8c5a-4159cdff6b0d-cdn-endpoint.azureedge.net/-/media/osfm-website/what-we-do/pipeline-safety-and-hazardous-materials/pathways-to-restoring-pipeline-docs/state-waiver-sable-ca325ab-osfm-line-0001-lod.pdf?rev=556af39b35804434b52e1272bb20b0ed&hash=251194D16C74105DCF520F69669072FC.

11. Attached as Exhibit 10 is a true and correct copy of a letter (without attachments) I sent to the Office of the State Fire Marshal and PHMSA on December 23, 2024, which included a copy of Accufacts Inc.'s first report on the proposed pipeline startup.

12. Attached as Exhibit 11 is a true and correct copy of a letter I sent to the Office of the State Fire Marshal on March 2, 2025, requesting revocation of the State Waivers for Pipelines CA-324 and CA-325 which included a copy of Accufacts Inc.'s second report on the proposed pipeline startup and the Fire Marshal's letters of decision on the State Waivers.

13. Attached as Exhibit 12 is a true and correct copy of an excerpt from the Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment (prepared by state and federal agencies and the University of California), which I obtained on May 19, 2025, from this California Department of Fish and Wildlife webpage: https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline/.

14. Attached as Exhibit 13 is a true and correct copy of an excerpt from Plains All American Pipeline, L.P.'s December 31, 2023, Form 10-K, which I obtained on May 21, 2025, from this SEC webpage: https://www.sec.gov/ix?doc=/Archives/edgar/data/0001581990/000158199024000008/pagp-20231231.htm.

15. Attached as Exhibit 14 is a true and correct copy of a letter I sent to the Office of the State Fire Marshal on September 24, 2024 (Notice of CEQA Violation and Request to Prepare EIR for Restart of SYU Infrastructure, Including Onshore Lines 901/903 (CA-324, CA-325), After Pipeline Failure, Major Oil Spill, and Ten Years Idle).

16. Attached as Exhibit 15 is a true and correct copy of the May 9, 2025 Notice of Exemption issued by the California Department of Parks and Recreation for the "Pacific Pipeline 2025 Anomaly Digs," which I obtained on May 20, 2025, from CEQAnet at https://files.ceqanet.opr.ca.gov/316906-

DECLARATION OF JULIE TEEL SIMMONDS ISO PETITIONERS' *EX PARTE* APPLICATION

1/attachment/E33Gamutm7E49c6E6mY6ReXby5dm3a3mGZBv4cIj6X13WsTxCnuMFKrsHundSmRFzjR2iR7KtTbP31Db0.

17.     Attached as Exhibit 16 is a true and correct copy of a letter the California State Lands Commission sent to Sable on May 23, 2025, which I obtained on May 29, 2025 from the following hyperlink included in a May 29, 2025, news article: https://ca-times.brightspotcdn.com/bf/6d/3d1400394f949c71e34f51813bcf/2025-05-23-cslc-letter-to-sable-re-resumption-of-operations.pdf.

18.     Attached as Exhibit 17 is a true and correct copy of a ruling and order issued by the Santa Barabara Superior Court on May 28, 2025 in *Sable Offshore Corp. et al. v. California Coastal Commission* (25CV00974) granting the Commission a preliminary injunction, which I obtained on May 30 2025 from the following Superior Court of California, County of Santa Barbara webpage: https://www.santabarbara.courts.ca.gov/tentative-ruling/25cv00974.

19.     Attached as Exhibit 18 is a true and correct copy of an excerpt of Sable's March 17, 2025, Form 10-K, which I obtained on May 21, 2025, from this SEC webpage: https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000183148125000016/socc-20241231.htm.

20.     Attached as Exhibit 19 is a true and correct copy of an excerpt of Sable's Form S-1 Registration Statement dated October 11, 2024, which I obtained on May 20, 2025, from this SEC webpage: https://www.sec.gov/Archives/edgar/data/1831481/000119312524236795/d862764ds1.htm.

21.     Attached as Exhibit 20 is a true and correct copy of an excerpt from the Administrative Draft Environmental Impact Report for Plains Pipeline Replacement Project, Section 5.6 (2022), which I obtained on May 23, 2025, from the following webpage: https://www.environmentaldefensecenter.org/wp-content/uploads/2024/08/DEIR_PlainsReplacementPipeline_03.21.22.pdf.

22.     Attached as Exhibit 21 is a true and correct copy of a letter I received from Joshua Cleaver, Staff Counsel for the California Department of Forestry and Fire Protection, on May 2, 2025, regarding responsible agencies.

23.     Attached as Exhibit 22 is a true and correct copy of an excerpt from the August 1984

DECLARATION OF JULIE TEEL SIMMONDS ISO PETITIONERS' *EX PARTE* APPLICATION

Draft Environmental Impact Report/ Environmental Impact Statement (EIR/EIS) for the Celeron/All American and Getty Pipeline Projects (SCH No. 83110902) prepared by the California State Lands Commission and Bureau of Land Management, which I obtained on May 31, 2025 from this County of Santa Barbara webpage: https://cosantabarbara.app.box.com/s/vi0hwxgg1abbkk0eqozq6864h126ayab. The Draft EIR/EIS combined with an addendum, is the Final EIR/EIS for those projects.

24.     On Friday May 16, 2025, Mr. Michael S. Dorsi sent me an email indicating he is an attorney for Respondents/Defendants and asking to schedule a call for the following week to discuss logistical matters related to this case. He is thus known to me to be an attorney for Respondents/Defendants for purposes of California Rule of Court 3.1202(a). His contact information is as follows: Michael S. Dorsi, California Attorney General's Office, 55 Golden Gate Ave, Suite 11000, San Francisco, California, 94102, Michael.Dorsi@doj.ca.gov, (415) 510-3802.

25.     Mr. Mathew Wickersham called me on Friday May 16, 2025 to discuss the deadline for responsive pleadings in this case and represented that he was an attorney for the Real Parties in Interest. He is thus known to me to be an attorney for purposes of California Rule of Court 3.1202(a). His contact information is Matthew Wickersham, Alston & Bird, 350 South Grand Avenue, 51st Floor, Los Angeles, California 90071, matt.wickersham@alston.com, (213) 576-1185.

26.     On May 19, 2025, Mr. Dorsi emailed Petitioners' counsel about the responsive pleading date in this case, copying and identifying Duncan Joseph (DJ) Moore at Latham & Watkins as counsel for Real Parties. He did not copy Mr. Wickersham. Contact information for Mr. Moore at that time was: DJ Moore, Latham & Watkins, 355 South Grand Avenue, Suite 100, Los Angeles, California, 90071-3104, DJ.Moore@lw.com, 213-485-1234. However, Plaintiffs' counsel learned Mr. Moore joined the firm of Paul Hastings this month, with the following contact information: 1999 Avenue of the Stars, 27th Floor Century City, California, 90067, djmoore@paulhastings.com, 310-620-5879.

27.     On May 27, 2025, I emailed counsel for Respondents/Defendants, Michael Dorsi, about Sable's restart of oil production at the Santa Ynez Unit. Attached as Exhibit 23 is a true and correct copy of that email. Mr. Dorsi called me that day and could not say with any certainty when his clients might approve final restart plans for the pipelines. On Wednesday, May 28, 2025, I received a call from Josh Cleaver, staff counsel for Respondents, who also did not know when final restart plans would be

DECLARATION OF JULIE TEEL SIMMONDS ISO PETITIONERS' *EX PARTE* APPLICATION

approved or made public.

28.    I provided notice to Respondents/Defendants and Real Parties in Interest by sending an email at 7:30 a.m. PST on June 2, 2025 to Mr. Dorsi, Mr. Wickersham, and Mr. Moore at the email addresses listed in paragraphs 24-26 above. Additionally, I sent this notice to Steve Rusch, Vice President of Environmental and Governmental Affairs for Real Parties in Interest, at srusch@sableoffshore.com. Petitioners' notice specified they are applying for an administrative stay or, in the alternative, an order to show cause why a preliminary injunction should not be granted and temporary restraining order. It also specified that Petitioners would present their application on June 3, 2025, at 8:30 a.m. in Department 4 of the Superior Court of Santa Barbara, located at 1100 Anacapa Street, Santa Barbara, California, 93121. My email requested a response concerning whether or not Respondents/Defendants and Real Parties would appear to oppose the application and requested confirmation of receipt of my email. I intend to follow up with counsel via telephone should I not receive that confirmation by 9:00 a.m. PST.

29.    At the time of sending Petitioners' application to the filing service for filing and personal service, Respondents/Defendants and Real Parties in Interest had not yet responded to indicate if they will attend the June 3 hearing on this application or will oppose the requested relief. Petitioners expect that Respondents/Defendants and Real Parties in Interest will appear and oppose the application.

30.    Petitioners have made no previous application for similar relief.

I declare under penalty of perjury under the laws of the State of California that the foregoing declaration is true and correct to the best of my knowledge.

Executed this 2nd day of June 2025,

s/ *Julie Teel Simmonds*

JULIE TEEL SIMMONDS (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612

7

DECLARATION OF JULIE TEEL SIMMONDS ISO PETITIONERS' *EX PARTE* APPLICATION

Tel. (510) 844-7100

*Attorney for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

DECLARATION OF JULIE TEEL SIMMONDS ISO PETITIONERS' *EX PARTE* APPLICATION

**INDEX OF EXHIBITS**

**Declaration of Julie Teel Simmonds**

| Exhibit No. | Description | Page No. |
|---|---|---|
| Exhibit 1 | Sable Offshore Corp. Form 8-K (May 19, 2025) | 10 |
| Exhibit 2 | Sable Offshore Corp. Form 8-K (May 27, 2025) | 34 |
| Exhibit 3 | Notice of Recent Developments, *CBD v. Burgum*, Case No. 2:24-cv-05459-MWC-MAA (May 23, 2025) | 37 |
| Exhibit 4 | Excerpt, California Coastal Commission Staff Report (March 28, 2025) | 41 |
| Exhibit 5 | PHMSA Failure Investigation Report (2016) | 53 |
| Exhibit 6 | Excerpt, Consent Decree, *U.S. v. Plains All American Pipeline*, Civil Action No. 2:20-cv-02415 (C.D. Cal. Mar. 13, 2020) | 75 |
| Exhibit 7 | Sable Offshore Corp. letter to Cal Fire (April 24, 2024) | 88 |
| Exhibit 8 | State Waiver (CA-324) | 116 |
| Exhibit 9 | State Waiver (CA-325A/B) | 132 |
| Exhibit 10 | Letter, CBD to Office of the State Fire Marshal (Dec. 23, 2024) | 148 |
| Exhibit 11 | Letter, CBD to Office of the State Fire Marshal (March 2, 2025) | 156 |
| Exhibit 12 | Excerpt, Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment | 160 |
| Exhibit 13 | Excerpt, Plains Pipeline Form 10-K (Dec. 31, 2023) | 181 |
| Exhibit 14 | Letter, CBD to Office of the State Fire Marshal (Sept. 24, 2024) | 184 |
| Exhibit 15 | State Parks Notice of Exemption (May 9, 2025) | 202 |
| Exhibit 16 | Letter, State Lands Commission to Sable (May 23, 2025) | 206 |
| Exhibit 17 | Superior Court ruling and order, *Sable Offshore Corp. et al. v. California Coastal Commission* (25CV00974) (May 28, 2025) | 209 |
| Exhibit 18 | Excerpt, Sable Offshore Corp. Form 10-K (March 17, 2025) | 225 |
| Exhibit 19 | Excerpt, Sable Form S-1 Registration Statement (Oct. 11, 2024) | 229 |
| Exhibit 20 | Excerpt, Administrative Draft Environmental Impact Report for Plains Pipeline Replacement Project (2022) | 233 |
| Exhibit 21 | Letter, Staff Counsel for the California Department of Forestry and Fire Protection to CBD (May 2, 2025) | 239 |
| Exhibit 22 | Excerpt, August 1984 Draft EIR/ EIS for Celeron/All American and Getty Pipeline Projects (SCH No. 83110902) | 241 |
| Exhibit 23 | Email, Julie Teel Simmonds to Michael Dorsi (May 27, 2025) | 245 |

# Exhibit 1

Declaration of Julie Teel Simmonds

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of Report (Date of earliest event reported): May 19, 2025**

# Sable Offshore Corp.

**(Exact name of registrant as specified in its charter)**

| Delaware | 001-40111 | 85-3514078 |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

**845 Texas Avenue, Suite 2920**
**Houston, Texas**
**(Address of Principal Executive Offices)**

**77002**
**(Zip Code)**

**(713) 579-6161**
**(Registrant's telephone number, including area code)**

Check the appropriate box below if the Form 8-K is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencements communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.0001 per share | SOC | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 7.01       Regulation FD Disclosure.**

On May 19, 2025, Sable Offshore Corp. (the "Company") issued a press release announcing restart of oil production at the Santa Ynez Unit and anticipated oil sales from the Las Flores Pipeline System in July 2025. A copy of the press release is attached hereto as Exhibit 99.1 and is incorporated herein by reference.

Also on May 19, 2025, the Company posted presentation materials on its website, www.sableoffshore.com. The presentation materials are attached hereto as Exhibit 99.2 and incorporated herein by reference. These materials may also be used by the Company at one or more presentations with analysts, investors or other stakeholders.

The information contained in the attached press release and presentation materials is summary information that is intended to be considered in the context of the Company's Securities and Exchange Commission filings and other public announcements. The Company undertakes no duty or obligation to publicly update or revise this information, although it may do so from time to time.

The information furnished pursuant to this Item 7.01, including Exhibits 99.1 and 99.2, shall not be deemed "filed" for purposes of Section 18 of the Exchange Act or otherwise subject to the liabilities under that Section and shall not be deemed to be incorporated by reference in any filing made by the Company under the Securities Act or the Exchange Act.

**Cautionary Statement Regarding Forward-Looking Statements**

The information in this Current Report on Form 8-K includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this press release, the words "could," "should," "will," " may," " believe," " anticipate," " intend," " estimate," "expect," "project," "continue," "plan," forecast," "predict," "potential," "future," "outlook," and "target," the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements will contain such identifying words. These statements are based on the current beliefs and expectations of Sable's management and are subject to significant risks and uncertainties. Actual results may differ materially from those described in the forward-looking statements. Factors that could cause Sable's actual results to differ materially from those described in the forward-looking statements include: the ability to recommence production of the SYU assets and the cost and time required therefor; litigation, complaints and/or adverse publicity; our ability to comply with laws and regulations applicable to our business; and other one-time events and other factors that can be found in Sable's Annual Report on Form 10-K for the year ended December 31, 2024, and any subsequent Quarterly Report on Form 10-Q or Current Report on Form 8-K, which are filed with the Securities and Exchange Commission and are available on Sable's website (www.sableoffshore.com) and on the Securities and Exchange Commission's website (www.sec.gov). Except as required by applicable law, Sable undertakes no obligation to publicly release the result of any revisions to these forward-looking statements to reflect the impact of events or circumstances that may arise after the date of this Current Report on Form 8-K.

**Disclaimer: Restart Production**

The SYU assets discussed in this Form 8-K have not sold commercial quantities of hydrocarbons since such SYU assets were shut in during June of 2015 when the only onshore pipeline transporting hydrocarbons produced from such SYU assets to market ceased transportation. There can be no assurance that the necessary permits will be obtained that would allow the onshore pipeline to recommence transportation and allow the SYU assets to recommence sales. If Restart Production (as defined in the purchase and sale agreement, dated November 1, 2022 (as amended, the "Sable-EM Purchase Agreement"), between Sable Offshore Corp., Exxon Mobil Corporation ("EM") and Mobil Pacific Pipeline Company) is not achieved by March 1, 2026, the terms of the Sable-EM Purchase Agreement with EM could result in the SYU assets being reverted to EM without any compensation to Sable therefor.

2

**Item 9.01**     **Financial Statements and Exhibits**

   (d)     *Exhibits*

| Exhibit No. | Description of Exhibits |
|---|---|
| 99.1 | Press Release of Sable Offshore Corp., dated May 19, 2025. |
| 99.2 | Presentation Materials. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

3

Teel Declaration
Page 13

3/4

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Sable Offshore Corp.**

Date: May 19, 2025

By: /s/ Gregory D. Patrinely
Name: Gregory D. Patrinely
Title: Executive Vice President and Chief Financial Officer

4

EX-99.1 2 d943067dex991.htm EX-99.1

**Exhibit 99.1**

**Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit and Anticipated Oil Sales from the Las Flores Pipeline System in July 2025**

**Houston, May 19, 2025** – Sable Offshore Corp. ("Sable," or the "Company")(NYSE: SOC) today announced that as of May 15, 2025, it has restarted production at the Santa Ynez Unit ("SYU") and has begun flowing oil production to Las Flores Canyon ("LFC"). Additionally, with the completion of the Gaviota State Park anomaly repairs on the Las Flores Pipeline System (the "Onshore Pipeline") on May 18, 2025, Sable has now completed its anomaly repair program on the Onshore Pipeline as specified by the Consent Decree, the governing document for the restart and operations of the Onshore Pipeline.

Seven of the eight sections of the Onshore Pipeline have been successfully hydrotested. Sable will complete the final hydrotest in order to meet the final operational condition to restart the Onshore Pipeline as outlined in the Consent Decree. Sable expects to fill the ~540,000 barrels of crude oil storage capacity at LFC by the middle of June 2025 and subsequently recommence oil sales in July 2025.

**Production Restart**

- On May 15, 2025, Sable initiated the flow of oil production from six wells on Platform Harmony of the SYU to LFC at a rate of ~6,000 barrels of oil per day.

- Sable has been testing wells on Platform Harmony throughout May 2025 and the well tests have performed consistently stronger than they did at the time of shut-in on May 19, 2015 when the SYU produced approximately 45,000 barrels of oil equivalent per day.

- Approximately 30% of the 32 producing wells at Platform Harmony have been tested as of May 18, 2025 with the remaining Platform Harmony wells projected to be tested over the course of the next several days.

- Sable expects to initiate production from the additional 44 wells on Platform Heritage and the additional 26 wells on Platform Hondo in July 2025 and August 2025, respectively.

**Updated Guidance**

| | 2H25 Guidance | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Prior Guidance [1] | | | Updated Guidance [2] | | |
| **Production** | | | | | | |
| Net Average Daily Production (BOE/D) | 20,000 | — | 25,000 | 40,000 | — | 50,000 |
| Working Interest (%) | | 100.0% | | | 100.0% | |
| Average Net Revenue Interest (%) | | 83.6% | | | 83.6% | |
| **Cash Costs ($ / BOE)** | | | | | | |
| Lease Operating Expense | $ 17.00 | — | $ 19.00 | $ 11.00 | — | $ 13.50 |
| *% Fixed LOE* | | | | | 75% | — | 85% |
| Gathering, Processing & Transportation | $ 2.50 | — | $ 3.50 | $ 2.50 | — | $ 3.50 |
| Cash General & Administrative | $ 4.50 | — | $ 5.50 | $ 2.50 | — | $ 3.50 |
| Severance & Ad Valorem Taxes (% of Revenue) | 0.5% | — | 1.0% | 0.5% | — | 1.0% |
| **Operational Capex** | | | | | | |
| Facilities Capex ($MM) | $ 50 | — | $ 60 | $ 50 | — | $ 60 |
| Workover Capex ($MM) | 20 | — | 30 | 20 | — | 30 |
| Total Capex ($MM) | $ 70 | — | $ 90 | $ 70 | — | $ 90 |

(1)   *Prior production and operational capex guidance reflect 2H25 guidance as of March 2025. Prior cash costs guidance reflects 4Q24 guidance as of May 2024.*

(2)   *Updated guidance amount is based on production level well test data at the time of the 2015 shut in, initial Harmony well results, the anticipated restart of production at Heritage and Hondo in Q3 2025, management's best estimates based upon numerous technical data points such as bottom-hole pressures, material balance calculations and estimates, reservoir simulations, management experience operating producing assets offshore California, and planned capital expenditures. Deviations from the anticipated timing and magnitude of such assumptions may impact actual results.*

**Management Commentary**

"SOC is proud to have safely and responsibly achieved first production at the Santa Ynez Unit" said Jim Flores, Chairman and Chief Executive Officer. He continued, "The impressive well tests from Platform Harmony confirm the prolific nature of the Santa Ynez Unit reservoir after being dormant for ten years. SOC is excited about our development plan and prospects for the future. This milestone achievement is a result of a tremendous amount of effort from all of Sable's employees, contractors, Board of Directors, stakeholders, and suppliers. We are very grateful for the cooperation and partnership from our local community and regulatory bodies as we seek to provide energy security to the State of California."

**About Sable**

Sable Offshore Corp. is an independent oil and gas company, headquartered in Houston, Texas, focused on responsibly developing the Santa Ynez Unit in federal waters offshore California. The Sable team has extensive experience safely operating in California.

**Forward-Looking Statements**

The information in this press release include "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this press release, the words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "expect," "project," "continue," "plan," "forecast," "predict," "potential," "future," "outlook," and "target," the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements will contain such identifying words. These statements are based on the current beliefs and expectations of Sable's management and are subject to significant risks and uncertainties. Actual results may differ materially from those described in the forward-looking statements. Factors that could cause Sable's actual results to differ materially from those described in the forward-looking statements include: the ability to recommence production of the SYU assets and the cost and time required therefor; global economic conditions and inflation; increased operating costs; lack of availability of drilling and production equipment, supplies, services and qualified personnel; geographical concentration of operations; environmental and weather risks; regulatory changes and uncertainties; litigation, complaints and/or adverse publicity; privacy and data protection laws, privacy or data breaches, or loss of data; our ability to comply with laws and regulations applicable to our business; and other one-time events and other factors that can be found in Sable's Annual Report on Form 10-K for the year ended December 31, 2024, and any subsequent Quarterly Report on Form 10-Q or Current Report on Form 8-K, which are filed with the Securities and Exchange Commission and are available on Sable's website (www.sableoffshore.com) and on the Securities and Exchange Commission's website (www.sec.gov). Except as required by applicable law, Sable undertakes no obligation to publicly release the result of any revisions to these forward-looking statements to reflect the impact of events or circumstances that may arise after the date of this press release.

**Disclaimers**

*Restart Production*

The SYU assets discussed in this press release have not sold commercial quantities of hydrocarbons since such SYU assets were shut in during June of 2015 when the only Onshore Pipeline transporting hydrocarbons produced from such SYU assets to market ceased transportation. There can be no assurance that the necessary permits will be obtained that would allow the Onshore Pipeline to recommence transportation and allow the SYU assets to recommence sales. If Restart Production (as defined in the purchase and sale agreement, dated November 1, 2022 (as amended, the "Sable-EM Purchase Agreement"), between Sable Offshore Corp., Exxon Mobil Corporation ("EM") and Mobil Pacific Pipeline Company) is not achieved by March 1, 2026, the terms of the Sable-EM Purchase Agreement with EM could result in the SYU assets being reverted to EM without any compensation to Sable therefor.

*Use of projections and estimates*

This presentation contains financial projections and estimates for Sable, including with respect to its future capital expenditures, initial timing and production estimates and future cash costs. Sable's auditors have not audited, reviewed, compiled or performed any procedures with respect to the projections and estimates for the purpose of their inclusion in this presentation, and, accordingly, no such auditors have expressed an opinion or provided any other form of assurance with respect thereto for the purpose of this presentation. These projections and estimates are for illustrative purposes only and should not be relied upon as being necessarily indicative of future results. The assumptions and estimates underlying the projected information are inherently uncertain and are subject to a wide variety of significant business, regulatory, economic and competitive risks and uncertainties that could cause actual results to differ materially from those contained in the projected information. Even if the assumptions and estimates are correct, projections and estimates are inherently uncertain due to a number of factors outside Sable's control. Accordingly, there can be no assurance that the projected results are indicative of Sable's future performance or that actual results will not differ materially from those presented in the projected information. Inclusion of the projected information in this presentation should not be regarded as a representation by any person, including, without limitation, Sable, that the results contained in the projected information will be achieved.

**Contacts**

Investor Contact:
Harrison Breaud
Vice President, Finance & Investor Relations
IR@sableoffshore.com
713-579-8111



# Disclaimer

### FORWARD LOOKING STATEMENTS

The information in this presentation includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this presentation, the words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "expect," "project," "continue," "plan," "forecast," "predict," "potential," "future," "outlook," and "target," the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements will contain such identifying words. These statements are based on the current beliefs and expectations of Sable's management and are subject to significant risks and uncertainties. Actual results may differ materially from those described in the forward-looking statements. Factors that could cause Sable's actual results to differ materially from those described in the forward-looking statements include: the ability to recommence production of the SYU assets and the cost and time required therefor; production levels once recommenced; commodity price volatility; low prices for oil and/or natural gas; global economic conditions and inflation; increased operating costs; lack of availability of drilling and production equipment, supplies, services and qualified personnel; processing volumes and pipeline throughput; geographical concentration of operations; environmental and weather risks; regulatory changes and uncertainties; the uncertainty inherent in estimating oil and natural gas resources and in projecting future rates of production; reductions in cash flow and lack of access to capital; restrictions in existing or future debt agreements or structured or other financing arrangements; managing growth and integration of acquisitions, and failure to realize the expected value of acquisitions; the ability to recognize the anticipated benefits of the business combination; developments relating to our competitors and our industry; litigation, complaints and/or adverse publicity; privacy and data protection laws, privacy or data breaches, or loss of data; our ability to comply with laws and regulations applicable to our business; and other one-time events and other factors that can be found in Sable's Annual Report on Form 10-K for the year ended December 31, 2024, and any subsequent Quarterly Report on Form 10-Q or Current Report on Form 8-K, which are filed with the Securities and Exchange Commission and are available on Sable's website (www.sableoffshore.com) and on the Securities and Exchange Commission's website (www.sec.gov). Except as required by applicable law, Sable undertakes no obligation to publicly release the result of any revisions to these forward-looking statements to reflect the impact of events or circumstances that may arise after the date of this presentation.

### RESTART PRODUCTION

The SYU assets discussed in this presentation have not sold commercial quantities of hydrocarbons since such SYU assets were shut in during June of 2015 when the only Onshore Pipeline transporting hydrocarbons produced from such SYU assets to market ceased transportation. There can be no assurance that the necessary permits will be obtained that would allow the Onshore Pipeline to recommence transportation and allow the SYU assets to recommence sales. If Restart Production (as defined in the purchase and sale agreement, dated November 1, 2022 (as amended, the "Sable-EM Purchase Agreement"), between Sable Offshore Corp., Exxon Mobil Corporation ("EM") and Mobil Pacific Pipeline Company) is not achieved by March 1, 2026, the terms of the Sable-EM Purchase Agreement with EM could result in the SYU assets being reverted to EM without any compensation to Sable therefor.

### OIL AND GAS RESOURCE INFORMATION

This presentation includes information regarding estimates of oil and natural gas resources attributable to the SYU. None of the oil and gas resources attributable to the SYU are currently classifiable as proved or other reserves because, since the cessation of operations on the pipeline transporting production from the assets, there has been no means to deliver production from the assets to market. Sable has obtained a report (the "NSAI Report") from Netherland, Sewell & Associates, Inc. ("NSAI"), independent petroleum consultants, with respect to the net estimated contingent resources attributable to the acquired assets and the related pre-tax discounted (at 10%) future net contingent cash flow from such contingent resources, as of December 31, 2021, based on 12-month unweighted arithmetic average of the first-day-of-the-month prices for each month in the period from January to December 2021. As defined by the Society of Petroleum Engineers and used in the NSAI Report, "contingent resources" are those quantities of petroleum which are estimated, on a given date, to be potentially recoverable from known accumulations, but which are not currently considered to be commercially recoverable. Contingent resource estimates may be characterized further as 1C (low estimate), 2C (best estimate) and 3C (high estimate). The contingent resources reflected in the NSAI Report are, as stated in the report, category 1C (low estimate). The NSAI Report states that the estimates included in the report are contingent on (1) approval from federal, state and local regulators to restart production, (2) reestablishment of oil transportation systems to deliver production to market, and (3) commitment to restart the wells and facilities. The NSAI Report states that, if these contingencies are successfully addressed, some portion of the contingent resources estimated in the report may be reclassified as reserves but notes that the estimates have not been risked to account for the possibility that the contingencies are not successfully addressed. The NSAI Report does not address (1) the portion of the contingent resources that could be reclassified as reserves if the contingencies are successfully addressed or (2) whether or to what extent any of the contingent resources that could be so reclassified would be classified as proved, probable or possible reserves. As defined in the Society of Petroleum Engineers' Petroleum Resources Management System ("PRMS"), "best estimate" is the most realistic assessment of recoverable quantities if only a single result were reported. There is at least a 50% probability that the quantities actually recovered will equal or exceed the "best estimate." As defined in the PRMS, "low estimate" is a conservative estimate of the quantity that will actually be recovered from the accumulation by a project. There is at least a 90% probability that the quantities actually recovered will equal or exceed the "low estimate." The resource estimates and related future cash flow information included in this presentation reflect management's estimates, based in part on the contingent resources estimated in the NSAI Report and supplemented by management's own estimates of contingent resources attributable to the acquired assets and using the pricing and other assumptions noted in this presentation, of the contingent resources and cash flow that may have been attributable to the acquired assets if the contingencies had been addressed successfully on the date as of which the information is presented. Resource engineering is a process of estimating underground accumulations of hydrocarbons that cannot be measured in an exact way. The accuracy of any resource or reserve estimate depends on the quality of available data, the interpretation of such data, and price and cost assumptions made by reserve engineers. In addition, the results of drilling, testing, and production activities may justify revisions of estimates that were made previously. If significant, such revisions could impact the combined company's strategy and change the schedule of any production and development drilling. Accordingly, resource estimates may differ significantly from the quantities of oil and natural gas that are ultimately recovered.

### USE OF PROJECTIONS AND ESTIMATES

This presentation contains financial projections and estimates for Sable, including with respect to its future capital expenditures, initial timing and production estimates and future cash costs. Sable's auditors have not audited, reviewed, compiled or performed any procedures with respect to the projections and estimates for the purpose of their inclusion in this presentation, and, accordingly, no such auditors have expressed an opinion or provided any other form of assurance with respect thereto for the purpose of this presentation. These projections and estimates are for illustrative purposes only and should not be relied upon as being necessarily indicative of future results. The assumptions and estimates underlying the projected information are inherently uncertain and are subject to a wide variety of significant business, regulatory, economic and competitive risks and uncertainties that could cause actual results to differ materially from those contained in the projected information. Even if the assumptions and estimates are correct, projections and estimates are inherently uncertain due to a number of factors outside Sable's control. Accordingly, there can be no assurance that the projected results are indicative of Sable's future performance or that actual results will not differ materially from those presented in the projected information. Inclusion of the projected information in this presentation should not be regarded as a representation by any person, including, without limitation, Sable, that the results contained in the projected information will be achieved.



2

# Sable Offshore Corp. (NYSE: SOC)

## Premier offshore California asset paired with experienced management team

**High Quality Asset**

### Santa Ynez Unit ("SYU") is a massive oil-weighted resource

- Three offshore platforms located in federal waters north of Santa Barbara, California
- Wholly-owned onshore production treatment facilities
- Discovered in 1968 with significant production history. SYU produced 45,000 boe/d rate at shut-in in 2015
- **Production restarted on May 15, 2025 with significantly improved well tests compared to those at shut-in[1]**
- >100 identified infill drilling and step-out opportunities, along with workovers and ESP[2] installation on existing wellbores



**Santa Ynez Unit**

**Highly-Qualified Stewards of the Asset**

### Sable management are well-qualified to operate Santa Ynez

- Exemplary track record of operating safely in California and offshore[3]
- Demonstrated expertise via numerous awards from state and federal agencies
- Developing strategy for carbon capture and storage ("CCS") leveraging existing infrastructure and access



**Las Flores Canyon Processing Facility**

(1) SYU-produced oil is being held in the Company's storage tanks at LFC while Sable completes the final hydrotest in order to meet the final operational condition to restart the Las Flores Pipeline System as outlined in the Consent Decree. Initial restart of production is higher than expected sustained production and there is uncertainty regarding the amount and timing of production decline from recently opened wells.
(2) Electric Submersible Pump.
(3) While at Plains Exploration & Production, current Sable management team operated platforms included Irene at Point Pedernales and Hidalgo, Harvest and Hermosa at Point Arguello.



3

# SYU History

## Premier offshore project developed by Exxon over 40+ years

### SYU Development Background

- Discovered in 1968, over the course of 14 years Exxon consolidated more than a dozen offshore federal oil leases into a streamlined production unit known as SYU

  - SYU construction began in 1976 with Platform Hondo, with first production in 1981, followed by Platform Harmony and Platform Heritage (both online in 1994); both Harmony and Heritage have dedicated rigs for future development

  - SYU includes 112 wells (90 producers, 12 injectors, 10 idle); sizable inventory of infill drilling and additional step-out drilling opportunities[1]

- Platforms located 5 to 9 miles offshore Santa Barbara County in shallow water depths of 900-1,200'[2]

- Wholly-owned onshore oil and natural gas processing facility at Las Flores Canyon (not visible from highway)

- Shut in from June 2015 to May 2025 due to pipeline issue (Plains All-American Pipeline ("AAPL") operated)

  - Production at all Exxon platforms and facilities was safely suspended. SYU was placed into a preserved state with regular inspections and maintenance

  - AAPL received Consent Decree and began work to re-start

  - Exxon acquired pipeline from AAPL

- Sable restarted production at SYU Platform Harmony in May 2025 and began flowing production to Las Flores Canyon[3]

- Sable actively evaluating strategy for CCS utilizing existing infrastructure and access



(1) Sable management have identified >100 infill drilling and step-out opportunities.
(2) Primary Reservoir: Miocene Monterey formation (Sour low-gravity oil (4-26 API); Secondary Reservoirs: Oligocene and Eocene oil/gas sandstone (Sweet high-gravity oil (35 API).
(3) SYU-produced oil is being held in the Company's storage tanks at LFC while Sable completes the final hydrotest in order to meet the final operational condition to restart the Las Flores Pipeline System as outlined in the Consent Decree.



4

# SYU Technical Overview

## Significant production history and massive resource potential

### Santa Ynez Unit Overview

- Between 1981 and 2014, SYU produced over 671 MMBoe
  - Production averaged 29 MBbl/d and 27 MMcf/d in 2014 (gross), the last full year when the asset was online
  - Low, stable decline anticipated of ~8% on average annually from existing NSAI Low Estimate Base Contingent Resources over the next five years[1]
- Sable has also identified >100 additional infill development and step-out opportunities across the leasehold
  - In 2010, Exxon drilled the world's longest extended-reach well from an existing fixed platform drilling rig, increasing the ability to produce more oil from existing facilities; the well extends more than six miles horizontally



### Robust Production Prior to Pipeline Closure



### 1 Billion + Barrels Recoverable



| SYU Reservoir Characterization | | |
|---|---|---|
| 1,700' | Original Oil Column |
| (300') | Depleted Oil |
| (400') | Gas Cap Expansion |
| 1,000' | Oil Column Remaining |

| Massive Resource | | |
|---|---|---|
| 1,207 | MMBoe of Net Recoverable Total Resources |
| (561) | MMBoe of Net Cum. Prod. |
| 646 | MMBoe of Remaining Total Net Estimated Contingent Resources |

Note: Management estimates are inherently uncertain and subject to numerous risks. Actual results may differ in a material amount from management estimates and projections.
(1) 5-year period begins after production re-start.



5

# Las Flores Canyon Infrastructure

## Wholly-owned infrastructure at Las Flores Canyon reduces cash costs



- Fully integrated oil and gas processing facilities acquired by Sable for managing 100% of the SYU produced volumes with additional capacity for future SYU development

- Gas and NGL volumes sold into the Southern California market to homes and businesses and oil volumes sold at Brent based pricing to local refineries

- Sable management believes that the facilities have been well maintained during the downtime

- Evaluating significant CCS opportunity leveraging existing infrastructure and access

**Las Flores Canyon Cogeneration & Processing Facility**

Transportation Terminal

Produced Water Pipeline

**Crude Storage Tanks**
- 540 kbbl capacity

**Biologic Water Treating Plant**
- Free Oil Removal
- Degassing
- Biological Treatment

**LPG Storage & Loading**

**POPCO Gas Plant**
- Gas Sweetening
- NGL Fractionation
- Sulfur Recovery
- Gas Compression

**Co-Generation Power Plant**
- Gas Turbine (40 MW)
- Steam Generation
- Steam Turbine (10 MW)

**Oil Treating Plant**
- Crude Dehydration
- Crude Stabilization
- Gas Separation & Compression

**Gas Processing Plant**
- Gas Sweetening
- Sulfur Recovery
- NGL Fractionation
- Fuel Gas sent to Power Plant
- CCS opportunities available through existing infrastructure



6

# SYU Acreage Overview

## SYU leases are all located in Federal waters



Note: Line 324 and Line 325 were formerly known as Line 901 and Line 903, respectively.

# Undrilled Inventory

## New Drill Inventory Overview

- Technical opportunity inventory is based on 80-acre drainage area, maturing field from original 120 acre spacing
- Future development strategy focuses on the high-quality Monterey Upper Siliceous reservoir in areas that have undergone increased diagenesis which leads to a more fractures, allowing for greater storage of oil and increased permeability
- Wellbores will be aligned to maximize contact with the primary fracture orientation for the field and average over 2,000' gross perforations per well

### Monterey Type Log

### Top of Monterey Structure

**Legend**
- Gas
- Oil
- Water
- Future Location



# Harmony Platform Commenced Restart Production

## Initial well tests at Harmony Platform have exceeded expectations

**Harmony Platform**

**Production Restart: May 15, 2025[1]**

- Estimated 2H25 net production: ~15.0 – 19.0 MBoe/d[2]
- Wells: 32
- Available well slots: 23-27[3]



**Heritage Platform**

**Estimated Production Restart: July 2025[4]**

- Estimated 2H25 net production: ~19.0 – 23.0 MBoe/d[2]
- Wells: 44
- Available well slots: 15-17[3]



**Hondo Platform**

**Estimated Production Restart: August 2025[4]**

- Estimated 2H25 net production: ~6.0 – 8.0 MBoe/d[2]
- Wells: 26
- Available well slots: 10[3]



(1)   SYU-produced oil is being held in the Company's storage tanks at LFC while Sable completes the final hydrotest in order to meet the final operational condition to restart the Las Flores Pipeline System as outlined in the Consent Decree. Initial restart of production is higher than expected sustained production and there is uncertainty regarding the amount and timing of production decline from recently opened wells.

(2)   Updated guidance amount is based on production levels at the time of the 2015 shut in, initial Harmony well results, the anticipated restart of production at Heritage and Hondo in Q3 2025, management's best estimates based upon numerous technical data points such as bottom-hole pressures, material balance calculations and estimates, reservoir simulations, management experience operating producing assets offshore California, and planned capital expenditures. Deviations from the anticipated timing and magnitude of such assumptions may impact actual results.

(3)   Available well slots include those either actively unused or available for opportunistic reclamation.

(4)   The timing of restart of production at Heritage and Hondo platforms is subject to numerous risks. Refer to slide *"Disclaimer – Forward-Looking Statements"*.

**SABLE OFFSHORE**

9

# Sable Operational Plan

**Maintain, re-allocate, and optimize total capital spend to grow initial flush production rates**



Note: Management estimates are inherently uncertain and subject to numerous risks. Actual results may differ in a material amount from management estimates and projections. Proposed development plan is based on market conditions and subject to annual Board approval.
(1)    Reflects midpoint of 2H25 guidance.

# Substantial Resource Base

## Contingent Resource Summary[(1)(2)(3)]

| Resource Category | Net Estimated Contingent Resources | | | | Estimated Cash Flows ($MM) | |
|---|---|---|---|---|---|---|
| | Oil (MMBbls) | Gas (Bcf) | NGL (MMBbls) | Total (MMBoe) | Capex ($MM) | PV-10 SEC Pricing |
| NSAI Adjusted Low Estimate Base Forecast[(4)] | 111 | 121 | 2 | 133 | – | $2,285 |
| ESP Installations Low Estimate[(5)] | 41 | 33 | 1 | 47 | $100 | 1,013 |
| **Total Low Estimate Contingent Resources** | 151 | 154 | 2 | 179 | $100 | $3,298 |
| Development Drilling Program Best Estimate[(6)] | 308 | 251 | 4 | 354 | $1,997 | $4,810 |
| Development Workover Program Best Estimate[(7)] | 98 | 80 | 1 | 113 | 245 | 1,921 |
| **Total Best Estimate Contingent Resources** | 406 | 332 | 5 | 467 | $2,242 | $6,731 |
| **Total Net Estimated Contingent Resources / Total Blended NAV** | 557 | 486 | 7 | 646 | $2,342 | $10,029 |

### Net Contingent Resources (MMBoe)
- Development Workover Program Best Estimate 113
- NSAI Adjusted Low Estimate Base Forecast 133
- ESP Installations Low Estimate 47
- Development Drilling Program Best Estimate 354

### PV-10 Contingent Resources ($MM)
- Development Workover Program Best Estimate $1,921
- NSAI Adjusted Low Estimate Base Forecast $2,285
- ESP Installations Low Estimate $1,013
- Development Drilling Program Best Estimate $4,810

### Contingent Resources by Commodity
- Gas 13%
- NGL 1%
- Oil 86%

(1) Assumes SEC pricing as of April 2024 and effective date of May 1, 2024. April 2024 SEC Pricing: Oil $83.14 / Bbl; Gas $2.40 / MMBtu; NGL $64.85 / Bbl.
(2) Management estimates are inherently uncertain. Actual results may differ in a material amount from management estimates and projections.
(3) Net quantities shown herein are unrisked volumes and may represent levels of uncertainty as to their technical and commercial recovery.
(4) Estimated using NSAI Report Resources at SEC Brent Pricing and Sable management estimated lease operating expenses; low estimate contingent resources with 90% probability of delivering unrisked remaining recoverable volumes from field-wide individual historical well performance. Assumes the wells and facilities will resume operation under similar production and sales conditions present at the time production was suspended.
(5) Low estimate contingent resources with 90% probability of delivering unrisked incremental recoverable volumes from statistical field-wide historical well performance driven by the installation of ESPs.
(6) Best estimate contingent resources with 50% probability of delivering unrisked remaining recoverable volumes from statistical field-wide historical new drill locations in untested fault compartments or sub-accumulations within test fault compartments.
(7) Best estimate contingent resources with 50% probability of delivering unrisked remaining recoverable volumes from existing wellbores calculated from statistical field-wide historical work-over well performance.

**SABLE OFFSHORE**

11



# Key Milestones

## Sable is steadily advancing through regulatory and technical milestones

| February 14, 2024 | May 23, 2024 | July 11, 2024 | August 30, 2024 | September 26, 2024 |
|---|---|---|---|---|
| Completed Business Combination with SOC and $440MM PIPE | BOEM[1] approved assignments of title from XOM to SOC; BSEE[2] approved SOC as operator of SYU | OSFM[3] affirmed Risk Analysis & Implementation Plan | Safety valve settlement agreement with Santa Barbara County | Closed $150MM PIPE |

| November 4, 2024 | December 19, 2024 | February 12, 2025 | May 15, 2025 | Q2 2025 |
|---|---|---|---|---|
| Completed redemption of public warrants for $183.5MM | OSFM[3] approved implementation of enhanced pipeline integrity standards | Received confirmation from Santa Barbara County that certain pipeline repair work is authorized by existing permits | Restarted production at the Harmony Platform[4] | Hydrotest of final pipeline segment in order to meet the final operational condition outlined in the Consent Decree |

**Completed**          **Anticipated**

(1) Bureau of Ocean Energy Management
(2) Bureau of Safety and Environmental Enforcement
(3) California Office of the State Fire Marshal.
(4) SYU-produced oil is being held in the Company's storage tanks at LFC while Sable completes the final hydrotest in order to meet the final operational condition to restart the Las Flores Pipeline System as outlined in the Consent Decree.



SABLE OFFSHORE

12

# Health, Safety, and Environmental Highlights

## Sable management team is an award-winning, safe, and prudent California Operator

### Offshore California Highlights



**2004:** Received Santa Barbara County's First and Only "Resolution for Good Operator" Recognizing PXP's Outstanding Operating Performance

**2008:** Santa Barbara County Commendation for Outstanding Maintenance Practices at LOGP



**2011:** Occupational Excellence Achievement Award for 21 PXP locations

**2009-2010:** Perfect Record Award for operating 11,390 employee hours without occupational injury or illness involving days away from work

**2009:** National Industry Leadership Award

**2007-2008:** Occupational Excellence Achievement Awards for Outstanding Safety Practices

Occupational Excellence Achievement Awards for Outstanding Safety Practices

BOEM[1]

**2004:** Ranked MMS's Best Operator in the Pacific OCS for Safety of Platform and Pipeline Operations

### Onshore California Highlights



**2006:** U.S. Bureau of Land Management Operator of the Year Award

**2006:** Best Management Practices National Award in Habitat Conservation



**2008-2004:** Recipient of the Environmental Lease Maintenance Award

**2006:** Recipient of the Clean Lease Awards

Division of Oil, Gas and Geothermal Resources (DOGGR) Lease Maintenance Award for Outstanding Safety and Lease Maintenance 12 years and 13 years in a row at Packard and San Vicente



**2010:** Occupational Excellence Achievement Award for PXP's California Los Angeles Basin San Vicente and Packard locations



Two commendations from the Air Pollution Control District for Emissions Reductions and Use of Innovative Emissions Control Technology at the Arroyo Grande Oil Field

### Risk Management Partner to Local Communities

- Sable Management has a track record of excellence as a safe and responsible steward of California's onshore and offshore resources
- As PXP, owned / operated offshore Point Arguello (Harvest Platform, Hermosa Platform, and Hidalgo Platform) and Point Pedernales (Irene Platform)
- Onshore operations included Arroyo Grande, Los Angeles Basin, and San Joaquin Valley assets

- *"Due to PXP's generosity and civic mindedness ... [using] their facility, nearly 200 firefighters have received important Survival Training"* – Ron Lawrence, **Central Regional Training / Safety Captain LA County Fire Department**
- *"The Culver City Fire Department is forever grateful to Plains Exploration & Production Co. for their continued training support and expertise"* – Tim Wilson, **Captain / Training Officer, Culver City Fire Dept.**



*Platform Heritage*



*Platform Hondo*

*Platform Harmony*

(1) Minerals Management Service (MMS) was reorganized into Bureau of Ocean Energy Management (BOEM) and Bureau of Safety and Environmental Enforcement (BSEE) in 2011.
(2) Division of Oil, Gas and Geothermal Resources (DOGGR) was reorganized into California Geologic Energy Management Division (CalGEM) in 2020.

**SABLE** OFFSHORE

13

# Financial Overview

## 2H 2025 Financial Guidance[1]

| | 2H25 Guidance | |
| --- | --- | --- |
| | Prior Guidance [2] | Updated Guidance |
| **Production** | | |
| Net Average Daily Production (BOE/D) | 20,000 – 25,000 | 40,000 – 50,000 |
| Working Interest (%) | 100.0% | 100.0% |
| Average Net Revenue Interest (%) | 83.6% | 83.6% |
| **Cash Costs ($ / BOE)** | | |
| Lease Operating Expense | $17.00 – $19.00 | $11.00 – $13.50 |
| % Fixed LOE | | 75% – 85% |
| Gathering, Processing & Transportation | $2.50 – $3.50 | $2.50 – $3.50 |
| Cash General & Administrative | $4.50 – $5.50 | $2.50 – $3.50 |
| Severance & Ad Valorem Taxes (% of Revenue) | 0.5% – 1.0% | 0.5% – 1.0% |
| **Operational Capex** | | |
| Facilities Capex ($MM) | $50 – $60 | $50 – $60 |
| Workover Capex ($MM) | 20 – 30 | 20 – 30 |
| Total Capex ($MM) | $70 – $90 | $70 – $90 |

## Capital Structure

| $MM, unless noted otherwise | Capitalization |
| --- | --- |
| Share Price (as of 5/16/2025) | $28.86 |
| (x) Common Shares Outstanding, MM [3] | 89.4 |
| **Equity Value** | **$2,580** |
| (+) 1L Term Loan (Net of Deposit) [4] | $855 |
| (–) Cash on Balance Sheet [3] | 189 |
| **Enterprise Value** | **$3,246** |

## Financial Objectives

- **Refinance 1st lien term loan**
  - Optimize capital structure to allow for maximum shareholder returns

- **Implement hedging program**
  - Reduce downside risk while maintaining upside exposure via combination of deferred premium puts and costless collars

- **Institute aggressive shareholder return program**
  - Target fixed quarterly dividend
  - Opportunistically repurchase shares with excess cash
  - Maintain conservative leverage profile

Note: Management estimates are inherently uncertain and subject to numerous risks. Actual results may differ in a material amount from management estimates and projections. Proposed development plan is based on market conditions and subject to annual Board approval.

(1) Updated guidance amount is based on production levels at the time of the 2015 shut in, initial Harmony well results, the anticipated restart of production at Heritage and Hondo in Q3 2025, management's best estimates based upon numerous technical data points such as bottom-hole pressures, material balance calculations and estimates, reservoir simulations, management experience operating producing assets offshore California, and planned capital expenditures. Deviations from the anticipated timing and magnitude of such assumptions may impact actual results.

(2) Prior production and operational capex guidance reflect 2H25 guidance as of March 2025. Prior cash costs guidance reflects 4Q24 guidance as of May 2024.

(3) Private Placement Warrants and Working Capital Warrants have the option to convert on a cashless basis. Common Shares Outstanding as of 5/16/2025.

(4) 1L Term Loan and Unrestricted Cash balances as of 3/31/2025.

**SABLE OFFSHORE**

14

# Attractive Production & Resources Profile at a Discount

| | | |
|---|---|---|
| **I** **Large Production Base** | **~45 MBoe/d** Net Production Midpoint Forecast for 2H 2025 | ▪ Substantial production base that is ~83% oil with decades of productive history<br>▪ Initial well tests consistently performing stronger than they did at time of shut-in on May 19, 2015 when SYU produced 45,000 Boe/d |
| **II** **Shallow Decline** | **~8% YoY** [2][3] 5-Year Annual Average Resource Decline | ▪ Shallow decline profile reduces reinvestment rate required to maintain projected production |
| **III** **Attractive Discount to NAV** | **1.6x** Low Estimate Contingent Resources (Including Workover Program) PV-10 / TEV | ▪ Attractive public valuation |
| **IV** **~32% Discount to Peer Group on PD Reserves** | **$11.08** TEV / Low Estimate Contingent Resources (Including Workover Program) $ / Boe | ▪ Versus peer group average of $16.25 [4] |
| **V** **Deep Inventory Opportunity** | **>100** Identified, Undrilled Opportunities | ▪ Highly economic oil development opportunities representing infill and step-out locations with decades of performance history |

Note: Management estimates are inherently uncertain and subject to numerous risks. Actual results may differ in a material amount from management estimates and projections. Market data as of May 16, 2025.
(1) Initial restart of production is higher than expected sustained production and there is uncertainty regarding the amount and timing of production decline from recently opened wells.
(2) 5-year period begins after production re-start.
(3) Based on projected 5-year average annual decline at time of the 2015 shut-in. Given promising initial well results due to increased bottom-hole pressures the go-forward average annual declines may differ from historical projections.
(4) Peer group includes: BRY, CHRD, CIVI, CRC, KOS, MGY, MUR, TALO and WTI.

**SABLE** OFFSHORE

15

Teel Declaration
Page 32



# Exhibit 2

Declaration of Julie Teel Simmonds

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 8-K

**CURRENT REPORT
PURSUANT TO SECTION 13 OR 15(D)
OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): **May 27, 2025**

# Sable Offshore Corp.

(Exact name of registrant as specified in its charter)

| **Delaware** | **001-40111** | **85-3514078** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification Number) |

| **845 Texas Avenue, Suite 2920 Houston, TX** | **77002** |
|---|---|
| (Address of Principal Executive Offices) | (Zip code) |

**(713) 579-6161**

(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.0001 | SOC | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company                    ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 8.01        Other Events.**

  On May 27, 2025 Sable Offshore Corp. conducted a successful hydrotest of the final segment of Line 325 and has now successfully hydrotested all segments of Line 324 and Line 325 (collectively, the "Onshore Pipeline"), satisfying the final operational condition to restart of the Onshore Pipeline as outlined in the Consent Decree. Therefore, no more repairs are required to the Onshore Pipelines prior to restart.

**Item 9.01        Financial Statements and Exhibits**

  (d) Exhibits:

| Exhibit No. | Description of Exhibits |
| --- | --- |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

# Exhibit 3

Declaration of Julie Teel Simmonds

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

DANIEL C. LUECKE (CA Bar No. 326695)
Trial Attorney, Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone:   (202) 598-7863
Email:       daniel.luecke@usdoj.gov

*Counsel for Federal Defendants*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT CALIFORNIA
## WESTERN DIVISION

_____

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; WISHTOYO FOUNDATION, | ) ) ) ) |
|  | ) Case No. 2:24-cv-05459-MWC-MAA |
| *Plaintiffs,* | ) ) |
| v. | ) **FEDERAL DEFENDANTS'** |
|  | ) **NOTICE OF RECENT** |
| DOUG BURGUM, et al., | ) **DEVELOPMENTS** |
|  | ) |
| *Federal Defendants* | ) ) |
| and | ) Honorable Michelle Williams |
|  | ) Court |
| SABLE OFFSHORE CORP., | ) United States District Judge |
|  | ) |
| *Intervenor-Defendant.* | ) ) |
|  | ) |

Teel Declaration
Page 38

In an abundance of caution, Federal Defendants respectfully submit this notice to inform the Court of certain statements in prior filings that, based on recent events, may no longer be accurate.

On May 19, 2025, the undersigned counsel learned that Sable had restarted production at the Santa Ynez Unit. At this time, the Bureau of Safety and Environmental Enforcement ("BSEE") has not received notice from the California State Fire Marshal Office's Pipeline Division that Sable is approved to operate the onshore pipeline segments 901/903.[1] Federal Defendants understand that Sable is now producing to onshore storage tanks at the Las Flores Canyon facility, but it is not currently producing to pipeline segments 901/903.

This is relevant because, on December 20, 2024, Federal Defendants filed the Declaration of Bruce Hesson, which stated that, "before returning to production, . . . the California State Fire Marshal[] Office's Pipeline Division must inform BSEE that Sable is approved to operate the onshore pipeline segments 901/903, which have been inoperable since 2015." ECF No. 37-1 at ¶ 14. Consistent with that declaration, Federal Defendants represented in their motion for voluntary remand that "Sable still needs approval from the California State Fire Marshal[] Office's Pipeline Division to operate the onshore pipeline or else establish some other means of transporting any oil and gas produced at the Unit." ECF No. 37 at 16. Finally, Federal Defendants' reply in support of the motion for voluntary remand stated that there were "several hurdles for Sable to overcome before it can resume production of oil and gas at the Santa Ynez Unit," including obtaining "final approval of Sable's startup plan" from the Office of the State Fire

---

[1] Sable's press release associated with the restart can be found here: https://sableoffshore.com/news/news-details/2025/Sable-Offshore-Corp--Reports-Restart-of-Oil-Production-at-the-Santa-Ynez-Unit-and-Anticipated-Oil-Sales-from-the-Las-Flores-Pipeline-System-in-July-2025/default.aspx.

1

Marshal ("OSFM"). ECF No. 60 at 6.

Federal Defendants will continue to gather information and will update the Court.

Respectfully submitted this 23rd day of May, 2025.

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

*/s/ Daniel C. Luecke*
DANIEL C. LUECKE
Trial Attorney (CA Bar 326695)
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
(202) 598-7863 | (202) 305-0506 (fax)
daniel.luecke@usdoj.gov

*Counsel for Federal Defendants*

2

# Exhibit 4

Declaration of Julie Teel Simmonds

# Th8.1, Th8.2 & Th8.3

Staff:          Stephanie Cook –SF
Staff Report:   March 28, 2025
Hearing Date:   April 10, 2025

**STAFF REPORT: RECOMMENDATIONS AND FINDINGS FOR CEASE AND DESIST ORDER, RESTORATION ORDER, AND ADMINISTRATIVE CIVIL PENALTY**

**Cease and Desist Order No.:**      **CCC-25-CD-01**

**Restoration Order No.:**           **CCC-25-RO-01**

**Administrative Penalty No.:**      **CCC-25-AP3-01**

**Related Violation File:**          **V-9-24-0152**

**Entity Subject to this Order:**        **Sable Offshore Corp.**

**Location:**                        The properties that are subject to this proceeding are at various locations along the existing Las Flores Pipelines CA-324 and CA-325 within the Coastal Zone, between the Gaviota coast and the Los Padres National Forest, and areas around those properties, that are being or could be impacted by the development activities at issue here, as described below, all within Santa Barbara County; as well as offshore locations in state waters, where the parties subject to this proceeding have undertaken unpermitted development in placing sand and cement bags on the seafloor below and adjacent to out-of-service offshore oil and water pipelines, all as part of an effort to restart Santa Ynez Unit oil production operations and bring the pipelines back into use.

**Violation Description:**               Activities onshore including, but not limited to, excavation with heavy equipment; removal of

Teel Declaration
Page 42

major vegetation; grading and widening of roads; installation of metal plates and other fill material within wetlands; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; installation of shutoff valves; and other development associated with the Las Flores Pipelines CA-324 and CA-325; as well as offshore development including, but not necessarily limited to, placing sand and cement bags on the seafloor below and adjacent to out-of-service offshore oil and water pipelines; all without the requisite Coastal Act authorization, as part of an effort to restart Santa Ynez Unit oil production operations and bring the pipelines back into use.

**Substantive File Documents:**     1. Public documents in the files for Cease-and-Desist Order CCC-25-CD-01, Restoration Order CCC-25-RO-01, and Administrative Civil Penalty Order CCC-25-AP3-01

2. Exhibits 1 through 130 and Appendix A of this staff report.

## SUMMARY OF STAFF RECOMMENDATIONS

### Introduction

These proceedings pertain to several ongoing and extensive Coastal Act violations undertaken by Sable Offshore Corp. ("Sable") at various onshore locations along existing crude oil conveyance pipelines on the Gaviota coast in Santa Barbara County, as well as offshore, along sections of related oil and water pipelines, located within state waters, that connect the offshore Santa Ynez Unit oil production platforms to shore. All the violations are at sites along or offshore of the Gaviota Coast, in Santa Barbara County, and all of which have adversely impacted, and continue to adversely impact, coastal resources as a result of Sable's outright refusal to comply with the Coastal Act.  Sable's development activities on the Pipelines have also been the concern of several other state environmental and natural resource agencies including the State Water Control Resources Board and Regional Water Quality Control Board, the California Department of Fish and Wildlife, and the Department of Parks and Recreation, all of which have similarly identified issues associated with Sable's lack of compliance with applicable environmental regulations. This issue has also generated concern from State legislators, culminating in a recent inter-agency Town Hall meeting where the aforementioned agencies, as well as some others, collectively met to discuss their respective roles, and interest, in this ongoing issue, as well as to answer questions from the public.

Both the onshore portion of the Pipelines and the offshore oil and water pipelines are part of the larger Santa Ynez Unit, which consists of three offshore platforms (Hondo, Harmony, and Heritage), the Las Flores Canyon processing facility, and associated electrical transmission and onshore and offshore oil, water and natural gas transport pipelines. The Las Flores Pipelines CA-324 and CA-325 (previously Lines 901 and 903 respectively) ("Pipelines") are located onshore, with Line CA-324 following along the coastline between the Las Flores Canyon Plant processing facility and the Gaviota Pump Station, and line CA-325 extending inland from the pump station. Separate offshore oil and water pipelines extend from the Las Flores facility into state coastal waters and ultimately connect to the three platforms offshore in federal waters, mentioned above.

## Background

This specific pipeline system is of particular historical importance as it is the source of the 2015 Refugio Beach oil spill, which caused significant environmental damage to approximately 150 miles of coastline. The oil spill occurred when a corroded portion of the onshore pipeline Line CA-324 ruptured, releasing more than 123,000 gallons of oil. Much of this oil flowed into a storm drain which traveled under the adjacent highway, before reaching the coast of Refugio State Beach, and continuing outward into the ocean.[1] The spill had a severe effect on the coast, negatively impacting wildlife and ecosystems along the coast, and requiring hundreds of millions of dollars in clean-up costs. In addition, the spill caused an estimated 140,000 lost recreation user days between Santa Barbara, Ventura, and Los Angeles Counties.[2] As a result of the oil spill, all production of oil was halted at the Santa Ynez Unit in 2015, and the pipelines have remained offline and out-of-service since that time.

The Las Flores Pipeline System was constructed in the 1980's after Celeron Pipeline Company ("Celeron") proposed to construct a pipeline that would transport crude oil produced from offshore platform locations to out-of-state refinery facilities. Celeron applied to Santa Barbara County and was granted a Conditional Use Permit ("CUP") and Final Development Permit ("FDP"). Additionally issued under the umbrella of the FDP were two coastal development permits, each of which incorporated by reference the language in the FDP. Celeron completed construction in 1990, and thereafter, the pipelines remained in service until the 2015 oil spill, at which point they were placed out of service.

Since that time, ownership of the Pipelines has been transferred from Plains Pipeline, L.P., owner and operator in 2015, when the lines were placed offline, to ExxonMobil Corporation ("Exxon") which purchased them on October 13, 2022. Exxon then entered into a purchase agreement with Sable one month later, on November 1, 2022. This purchase agreement between Exxon and Sable was finalized on February 14, 2024. Through this agreement, Sable purchased the entire Santa Ynez Unit ("SYU"), including the Pipelines, and all associated assets (the three offshore platforms, subsea pipelines and infrastructure, and Las Flores Canyon processing facility). As the new owner and operator of the Pipelines,

---

[1] https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline

[2] California Department of Fish and Wildlife et al., *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment*, p. 18 (June 2021) [hereinafter "NRDA"], available at: https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline.

Sable began undertaking efforts to transfer necessary permits and to restart use of the Pipelines and SYU offshore oil production operations.

In brief, this case seeks to resolve Coastal Act violations where Sable, the current owner and operator of the SYU, including the Pipelines and other associated assets as described above, has undertaken, and continues to undertake, development activities onshore, along the Pipelines, and at locations at offshore pipelines, as well, all without prior Coastal Act authorization. Importantly, most of the activities undertaken at locations onshore, along the Pipelines, and which Sable has refused to suspend, have been carried out in direct violation of several Notice of Violation and Notice of Intent letters, and in direct violation of Commission staff warnings and even a formal Cease and Desist Order.

**Violation Description**

As described in greater detail below, Sable undertook development at locations onshore, along the Pipelines, as early as, if not before, September of 2024. Sable undertook such activities without prior communication or notification to the California Coastal Commission ("Commission") staff, and without Coastal Act authorization. More specifically, at locations onshore, Sable undertook development activities including the following: 1) excavation with heavy equipment; 2) removal of major vegetation; 3) grading and widening of roads; 4) installation of metal plates and other fill material within wetlands; 5) dewatering and discharge of water, including into coastal waterways; 6) pipeline removal, replacement, and reinforcement; 7) installation of shutoff valves; as well as other development associated with the inspection and anomaly correction work on Las Flores Pipelines CA-324 and CA-325. At locations offshore, Sable undertook development beginning on November 29, 2024, including the placement of sand and cement bags on the seafloor below and adjacent to Sable's out-of-service offshore oil and water pipelines.

After acquiring the Pipelines, Sable began conducting inspections along the Pipelines to assess the many sites where the pipeline had corroded and was at risk of rupture. These inspections showed over 100 locations along the Pipelines, and within the Coastal Zone, where Sable determined the pipeline was defective, and in need of repair. To complete these repairs, Sable brought in heavy equipment to excavate substantial areas, and began either, removing or replacing whole sections of pipe, or installing external sleeves or coatings to expand and reinforce the pipeline. With regard to the installation of shutoff valves, as mentioned above, 16 shutoff valves were installed at onshore locations of the Pipelines and of those 16 valves, a total of seven were located in the Coastal Zone. The shutoff valves are large structures with various apparatuses that are installed directly on the Pipelines. In certain locations, installation of this type of apparatus involved extensive grading and removal of vegetation. Importantly, the full extent of development undertaken in accordance with the above-listed Coastal Act violations, is not fully known by Commission staff as Sable has repeatedly declined requests from Commission staff to provide full-scale project plans and detailed information about the scope of work it carried out.

The onshore development along the Pipelines has resulted in adverse impacts to various sensitive habitat areas in order to create access routes and staging areas, and for the

excavations themselves. Although some of the work has been in areas of less sensitive habitat, they still raise some concerns.is pastureland, Some of these excavations extend for roughly 100 ft, with a depth of roughly 10 ft, and some occurred on steep slopes (Exh. 112 and Exh. 113 and in protected habitat areas including federal designated critical habitat for wildlife protected under the Endangered Species Act, or within streambed corridors and wetlands. Over the months in which Sable has continued to undertake this work, Commission staff received reports with concerning images depicting potential for damage of these critical habitats, including images of excavators staged in particularly sensitive areas, such as above a pool of water where a southwestern pond turtle was seen to be swimming, or alongside two southern California steelhead (See exhibit 67 for image of critical species in pool under excavator). Notably, the southwestern pond turtle is proposed for federal listing as a threatened species and designated as a species of special concern, and the southern California steelhead is listed as an endangered species under the federal Endangered Species Act and is a candidate for listing under California's Endangered Species Act.

Sable characterizes the work as routine maintenance and claims that it was authorized by the original entitlements received in the 1980s.  However, despite many discussions with both Sable and the County and extensive research into the history, Commission staff has found no support for this position.  Furthermore, the level of work conducted along the onshore portions of the Pipeline is extraordinary. A single campaign to excavate over 100 separate pipeline sections across a modest distance; sever, remove and replace some sections; and expose, reinforce, seal, and coat others goes beyond what could possibly have been considered by the original permit and supporting documents.  The only way for this level of activity to have been contemplated at the time of the original permit would be if it were presumed that required inspections would be incapable of detecting corrosion and degradation throughout the line to the point that the pipeline ruptured at one location and was in imminent risk of rupturing at over 100 other locations.  When a pipeline is operated legally and responsibly – as would have been assumed by the permit and supporting documents – this level of degradation and subsequent need for simultaneous and comprehensive remediation across the entire line would never happen.

The timing of Sable's onshore work is also problematic in that it has occurred during the breeding season for the federally listed southern California steelhead and the California red legged frog, a species which is listed as threatened under the federal Endangered Species Act.  The work also occurred during the nesting season for most bird species, as well as the time of year in which ground disturbance is most likely to result in erosion, scarring, and discharge of sediment into wetlands and watercourses. Moreover, several work sites are in or adjacent to environmentally sensitive habitat areas (ESHA), including coastal scrub and chaparral habitats, and in, or near, areas mapped as wetlands and riparian habitat. Other work sites are in annual or native grassland, and woodlands. Importantly, native grasslands are ESHA, while certain non-native habitats such as annual grasslands can also be ESHA if rare species are present, under Policy NS-4 (Coastal) of Santa Barbara County's Gaviota Coast Plan.[3] While there appears to have been damage

---

[3]  *See* Gaviota Coast Plan ("GCP"), Santa Barbara County (Certified by CCC in 2018), Policy NS-4 (Coastal) at 2-16 to 2-18, available at https://cosantabarbara.app.box.com/s/67cui9hpdphz64ajtmbdndqwq1x8tr5h

to these areas, it is difficult for Commission staff to assess the full extent since vegetation was removed without first providing the Commission with adequate information, and without site-specific biological surveys taken by resource agency-approved independent experts at the appropriate times of year.

It also appears that Sable carried out work on the Pipelines without implementation of appropriate coastal resource protection measures. Images taken during the first week of October, after work had already commenced, demonstrate several erosion control measures had been installed improperly, and were therefore ineffective. Thus, not only was this work undertaken in areas which require critical measures in place to safeguard against degradation of environmental resources, it appears that even the measures which were observed to have been put in place were done so haphazardly.  While Sable has maintained that this work was done with thorough analysis, and consideration of potential environmental impacts, it is unclear how successful these measures were, and whether they had meaningful benefits. Without input from or review by the Commission or other independent biologists as to methods, parameters, and other critical components of any such measures, it is likely that such measures did not, in fact, provide appropriate protection to surrounding sensitive habitat areas. The limited information and photos available from the public regarding the work undertaken supports these conclusions.

Further, as noted above, Sable asserts that it can rely on permits issued nearly 40 years ago for the original construction and installation of the pipeline as authorization for the work undertaken now.  There are many reasons why this is not accurate, as discussed below, but it should be noted that any measures required decades ago simply could not incorporate protections for the current habitat and species on the site, as many sensitive resources have developed on the site or been identified or provided with legal protection in the time after that initial environmental review. These include the listing of several species under the federal Endangered Species Act that are present along the pipeline corridor, as well as the designation of Critical Habitat supporting them. No analysis or consideration of these species was made in the original permit and supporting documents from the 1980s. The Southern California Distinct Population Segment of steelhead ("Southern California steelhead") was federally listed Endangered in 1997 and state listed in 2022; tidewater goby was federally listed Endangered in 1994; California red legged frog was federally listed Threatened in 1996; southwestern pond turtle was proposed as federally Threatened in 2023.

In addition to the onshore violations described above, Sable has also conducted unpermitted development at locations offshore, along the oil pipeline that connects the offshore SYU platforms to shore and an adjacent produced water discharge pipeline. This development, as mentioned above, included deployment and positioning of sand and concrete bags to provide structural support below sections from which the seafloor had scoured or eroded. Reinforcement of these pipelines was also carried out as part of an effort to restart SYU oil production operations and bring the pipelines back into use. Specifically, the project deployed a remotely operated vehicle ("ROV") to place concrete bags along more than 750 linear feet of the pipelines to create support piers along 14 identified "spans" (sections of pipeline that are unsupported by the seabed), each measuring between 41 and 70 feet.

Commission staff and the Coastal Act provisions regarding oil and gas facilities support the thorough, and prompt, remediation of any problems that have the potential to adversely affect the structural integrity of active oil and gas pipelines, and the Coastal Act has a variety of regulatory review mechanisms to help ensure such efforts can be expedited and carried out in a timely manner. It is notable in this case, however, that Sable's pipelines were purged of oil and cleaned nearly ten years ago and currently have no potential to release or spill oil, thus reducing the time sensitive nature of the work Sable undertook. Whether expedited or carried out on a regular timeline, it is crucial, for the protection of coastal resources, that regulatory review occur in advance of construction activities to ensure that those activities are designed and carried out in a manner that avoids, minimizes and mitigates any adverse effects on coastal resources.  For example, certain methods of pipeline inspection and installation present enhanced risks of disturbance and displacement of commercial and recreational fishing activities and gear, marine mammal entanglement, sensitive habitat damage and disturbance, and marine debris generation and release, while others present lower risks. However, in refusing to apply for a coastal development permit ("CDP") for this type of work, and thereby not engaging in the thorough analysis that would be afforded through the CDP application and review process and having the work conditioned to minimize harms to coastal resources, Sable has engaged in activities for which the aforementioned risks are high. In contrast, because those risks could probably be lowered to the point where the work would be consistent with the Coastal Act and the County's Local Coastal Program, through the conditions and mitigations that can be provided in a CDP, it is likely this work would be approvable, if a permit were to be sought. Yet, instead, Sable opted to move forward with this work without seeking a CDP, despite being informed that doing so would be in violation of the Coastal Act.

## Initial Enforcement Actions

Since learning of the development activities undertaken at onshore locations along the Pipelines in September, Commission staff have made repeated, and extensive, attempts to work with Sable, and their counsel, in an effort to resolve both onshore and offshore Coastal Act violations. Throughout this time, Sable sporadically indicated willingness to comply and take steps toward resolving these violations, which prompted Commission staff to exert considerable resources, time, and efforts toward trying to reach an amicable resolution, including Coastal Act authorization for the work being undertaken. Ultimately, these efforts have proven unsuccessful.  Sable twice indicated an interest in settling in the context of a consent order and twice they ceased negotiations and ended up not agreeing to do so.

After Commission staff became aware of the activities taking place at onshore locations along the Pipeline in September of 2024, Commission staff immediately initiated conversations with Sable to discuss the activities, and a potential consent order to resolve the potential violations.  As described in greater detail below, Commission staff issued a Notice of Violation letter regarding these activities (Exh, 2), and then a Notice of Intent for an Executive Director Cease and Desist Order ("EDCDO"), (Exh, 3), followed by discussions to attempt to resolve this matter amicably.  When that was unsuccessful, the

Executive Director issued an EDCDO in November. (Exh.4) Importantly, after the issuance of the November EDCDO addressing the onshore work along the Pipelines, Sable did cease certain activities at those locations and complied with portions of the EDCDO. However, at this time, Sable also turned its focus to undertaking work at locations along its offshore pipelines, despite being advised by Commission permitting staff that such work would also require a CDP. In fact, mere weeks after the issuance of the November EDCDO, and after having been reminded that the planned offshore work also needed Coastal Act authorization, Sable undertook development activities at these offshore locations without Coastal Act authorization. Commission staff was unaware that they had undertaken this additional unpermitted work until January of the following year.

As noted, Commission staff have worked extensively with Sable in an attempt to resolve these issues, beginning with the activities conducted onshore along the Pipelines.  On September 18, 2024, after learning of the activities Sable was conducting at the onshore locations along the Pipelines, Commission staff initiated communications with Sable , to clarify, and confirm, that Sable was the current owner and operator of the Pipelines, as well as to confirm the specifics of the development undertaken at the onshore locations, and further to inform Sable that an application for an after the fact ("ATF") CDP would be required for the work undertaken, as well as a CDP application to address any future, proposed work. On September 20, 2024, Commission staff also initiated communications with Santa Barbara County Planning and Development Department ("County") staff, informing them of the development undertaken, the Commission's position that the development needed Coastal Act authorization and requesting that the County take enforcement action. These communications also noted that the Commission would assume jurisdiction under the Coastal Act provisions regarding enforcement jurisdiction if the County declined to act. The County responded that it would review and respond but no further response was received either indicating that the County was taking action or objecting to the Commission assuming jurisdiction over the matter. Exh.15)

On September 27, 2024, Commission staff issued Sable a Notice of Violation letter addressing the onshore Coastal Act violations and directing it to immediately cease any unpermitted activities within the coastal zone and to apply for both an ATF CDP for work undertaken, and a CDP for any future, planned work. Commission staff then met with Sable on October 1, 2024, to discuss the Notice of Violation letter, and actions to be taken. Commission staff, again, reiterated the imminent need to for Sable to immediately cease all work activities and, also asked for information as to the location and scale of Sable's work to date, as well as any additional planned work and requested full-scale project plans. At this time, Commission staff remained hopeful that Sable had undertaken the work without full understanding as to the requirements of the Coastal Act, and permit application processes. Commission staff discussed legal options, and discussed the potential permit options, as well as solicited input from Sable as to what measures they felt it was necessary to take to secure the open trench sites once work fully ceased.  Commission staff had hoped that they could work collaboratively to ensure the sites were secure, as Sable seemed receptive to applying to requisite CDPs, and finding an agreeable path forward to resolve the Coastal Act violations.

Teel Declaration
Page 49

Despite this conversation, Commission staff received reports that Sable had not ceased work in the Coastal Zone. On October 2, Commission staff received an email from Sable, in response to the September 27, 2024, Notice of Violation letter, which started that all work "subject to interim measures" had ceased. (Exh. 9)  Despite this, Commission staff continued to receive reports that work had not ceased. On October 4, Commission staff requested written assurance that work had ceased, including what Sable referred to as "interim measures," to be provided no later than 2 pm that day.  Commission staff additionally requested that Sable provide responses to staff's information request, in accordance with the September 27, 2024, Notice of Violation letter, no later than 5pm, the following Monday. At 1:57. on October 2, Sable, again, sent an email to Commission staff asserting that work had ceased. Yet again, Commission staff received reports that no cessation of work had occurred, and therefore, again, asked for written assurance from Sable, which was ultimately provided that afternoon. (Exh 135)  Sable did not, however, provide a full response to the request for information regarding what had been done, and where, by the 5pm deadline the following Monday. Sable did provide some information after the deadline regarding locations where work had been conducted within the Coastal Zone but asserted that the full information request could not be answered at that time.

Therefore, since Sable failed to satisfactorily provide information requested and, further, failed to provide written confirmation of an intent to apply for both an ATF CDP for work undertaken, and a CDP for future, proposed work, the Executive Director issued an Executive Director Cease and Desist Order ("EDCDO") to Sable.  This EDCDO directed Sable to cease all unpermitted development activities, undertake steps to temporarily secure the sites where Sable's development had temporarily ceased, and apply for CDPs, as described above. After issuance of the EDCDO, Sable ceased operations at locations in the Coastal Zone and instead shifted its focus to operations outside of the Coastal Zone. During this time, Sable undertook steps, pursuant to the EDCDO, to secure the sites where work had ceased, and Commission staff maintained regular communication with Sable's counsel, who indicated openness to submitting applications for CDPs, once time was afforded to more fully analyze the Pipelines' permitting history. As an accommodation, Commission staff provided a longer deadline for the application for CDPs, which extended beyond the February 10, 2025, expiration of the EDCDO, and provided Sable an additional 30 days, with a deadline of March 12, 2025, to submit such applications.

Regrettably, within a few days of the February 10, 2025, expiration of the EDCDO, Sable quickly resumed work, despite having not submitted any application for a CDP.  On February 14, 2025, Commission staff began to receive several reports of equipment having been staged at construction sites, as well as reports that development was being undertaken into evening hours, and through the weekend. (Exh. 100) Two days prior to receiving these messages, on February 12, 2024, Commission staff received a letter from the County (Exh. 38), responding to Commission's staff's previous, January 10, 2024 request that the County agree to the Commission's review of a consolidated permit application.  In the County's February 12th response, as discussed in greater detail in this staff report, the County asserted that Sable needed no permit for the work it had undertaken onshore, along the Pipelines, because that work was authorized by existing permits. The County also provided Commission staff with a copy of an additional letter, which the County sent to Sable, similarly notifying Sable that the work Sable had

Teel Declaration
Page 50

undertaken onshore, along the Pipelines, which was the subject of the EDCDO issued in November, was, and is, covered by existing permits.

On February 14, Commission staff sent a letter to the County, objecting to the County's February 12 letter on procedural grounds and also explaining staff's disagreement with the County's position on the merits and asking for language in any permit that would support the County's position by potentially authorizing such development. (Exh, 40) This letter was also addressed to Sable. However, the County did not respond, and Sable continued its work and sent its own letter later that day defending the County's position. (Exh 38) Thus, on Sunday, February 16, Commission staff issued a notice of intent to issue a second EDCDO. (Exh. 6) In response to that notice, on February 17, 2025, Sable sent a letter to Commission staff challenging Commission staff's jurisdiction to proceed. The next day, the Commission's Executive Director issued the second EDCDO. (Exh. 7) The next day, Commission staff learned that Sable had sued the Commission over the actions to date, alleging that the Notices of Violation and the first EDCDO were illegal and effected a taking of Sable's property.


Commission staff have continued to attempt to reach an amicable settlement with Sable, including, in this instance, an offer to resolve the short-term issues with a consent EDCDO. While Sable chose to move forward with undertaking continued, unpermitted activities at the onshore locations along the Pipeline, Commission staff continued to engage in conversations with Sable, in hopes of finding an amicable resolution. In the weeks after issuance of the EDCDO, Sable, again, indicated willingness to engage in conversations with Commission staff that could lead to a potential consent agreement, in the form of a consent Cease and Desist Order, To this end, Commission staff spent extensive resources working to pull together proposed language for the potential orders, mentioned above, then spent days on intensive negotiations with Sable.

During a virtual meeting on March 11, 2025, Sable and Commission staff discussed the aforementioned language, and potential pathways forward. After this meeting, Sable provided language to be reviewed by Commission staff, which Commission staff worked late through that evening to provide. Unfortunately, before Commission staff had the opportunity to discuss this language with Sable, Sable informed Commission staff that they were terminating discussions.

To date, Sable has made no efforts to comply with this second EDCDO, has not submitted any application for a CDP, and has refused to cease operations despite being fully informed of the ongoing Coastal Act Violations and ongoing threats to coastal resources associated with its activities. Commission staff have worked exhaustively with Sable in an effort to find an agreeable path forward, and to achieve resolution of the numerous ongoing Coastal Act violations but, unfortunately, have been unable to reach any such agreement. Thus, Sable's actions, and inactions with regard to these violations have led to this action for the Commission to consider issuance of this unilateral Cease and Desist Order, Restoration Order, and Civil Administrative Penalty Order, as described below.

*Proposed Resolution*

The unpermitted development Sable has undertaken at both onshore and offshore locations has resulted in damage to coastal resources, but the extent of this damage is not fully known because of Sable's continued refusal to provide complete and detailed information as to the work that it has undertaken, as well as proposed, future plans. Additionally, Sable has continued to undertake development activities at onshore locations along the Pipelines, despite issuance of two separate Cease and Desist Orders and in direct contravention of the resource protection provisions of the Coastal Act.

Commission staff recommends the Commission approve Cease and Desist Order No. CCC-25-CD-01 to ensure that Sable ceases any further development activities along the Pipelines, until a complete CDP[4] application has been submitted and addressed for future, proposed activities, as well as an ATF CDP application for all development activities already undertaken at the onshore locations along the Pipelines, and for all development activities undertaken along offshore sections of Sable's oil and water pipelines.

Commission staff also recommends that, in conjunction with the proposed Cease and Desist Order, the Commission approve Restoration Order No. CCC-25-RO-01 to address the effects of the unpermitted work.

Lastly, Commission staff recommends that the Commission issue Civil Administrative Penalty Order No. CCC-25-AP3-01. The Coastal Act provides five factors for the Commission to consider in imposing a penalty. Applying those factors here, and grouping and treating the violations as proposed herein, the Commission could justify imposing a penalty up to a maximum of $18,022,500 in this case. Commission staff recommends that a substantial fine be imposed, given the nature of the multiple violations at both onshore and offshore locations; the lengthy and substantial amount of Commission staff resources expended in attempting to resolve these violations; the unprecedented manner in which Sable has continually refused to comply with any such attempts to resolve these violations and even a valid administrative order issued, and other public and legal policies at issue here, including the need to secure compliance with the Coastal Act CDP process. Commission staff is recommending a penalty in the range of $12,000,000- $15,000,000. Within that range, Commission staff is recommending the Commission, in its discretion, specify a penalty of $14,987,250.

To address these violations, Commission staff recommends that the Commission approve issuance of Cease and Desist Order No. CCC-25-CD-01; Restoration Order No. CCC-25-RO-01; and Civil Administrative Penalty Order No. CCC-25-AP3-01 (collectively "the Orders"). The proposed Sable Orders are included as Appendix A to this Staff Report.

---

[4] Although the orders require the submittal of an application for a CDP, that does not preclude a more expeditious form of review.  Indeed, it is not uncommon for the Commission to approve such applications by issuing a waiver of the CDP requirement if the application materials demonstrate that the project is eligible for that form of Coastal Act authorization.  This requirement for a complete CDP application is to ensure that the Commission has the necessary information to make the correct determination and is not in any way prejudging the outcome, either substantively or procedurally."

# Exhibit 5

Declaration of Julie Teel Simmonds



# U.S. Department of Transportation

# Pipeline and Hazardous Materials Safety Administration

## Failure Investigation Report

## Plains Pipeline, LP, Line 901
## Crude Oil Release, May 19, 2015
## Santa Barbara County, California

## May 2016

Teel Declaration
Page 54

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Table of Contents

Executive Summary .................................................................................................. 3

Final Report Methodology ....................................................................................... 4

Facility Background .................................................................................................. 4

Events Immediately Prior to and During the Crude Oil Release ............................. 6

Plains' Field Response and National Response Center Notifications ...................... 7

PHMSA's Corrective Action Order ......................................................................... 9

Pipeline Alignment .................................................................................................. 9

 Las Flores Station to Gaviota Station Line 901 Elevation Description ................. 9

 Gaviota to Pentland Station Line 903 Elevation Description ............................... 10

Post-Incident Investigation Results ....................................................................... 11

 Metallurgical Evaluation of Failed Pipe ............................................................. 11

 In-Line Inspection Survey Review ...................................................................... 12

  Number of Anomalies ...................................................................................... 13

 Cathodic Protection Findings .............................................................................. 13

 Spill Volume Estimate from Plains' Third-Party Consultant .............................. 13

Investigation Findings and Conclusions ................................................................ 14

 Proximate or Direct Cause .................................................................................. 14

 Contributory Causes ............................................................................................ 14

PHMSA Post-Incident Action Chronology ........................................................... 18

Appendices ............................................................................................................. 20

Teel Declaration
Page 55

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Executive Summary

At approximately 10:55 a.m. Pacific Daylight Time (PDT) on May 19, 2015, the Plains Pipeline, LP (Plains), Line 901 pipeline in Santa Barbara County, CA, ruptured, resulting in the release of approximately 2,934 barrels (bbl) of heavy crude oil.[i]  An estimated 500 bbl of crude oil entered the Pacific Ocean.  Line 901 is a 24-inch diameter buried, insulated pipeline which extends approximately 10.7 miles in length and transports heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station.  On May 21, 2015, the Pipeline and Hazardous Materials Safety Administration (PHMSA), a regulatory agency within the U.S. Department of Transportation, issued a Corrective Action Order (CAO) that required the operator to shut down Line 901.  Concurrent with the issuance and implementation of the CAO, PHMSA conducted an investigation to identify causal factors that contributed to the occurrence and size of the crude oil release.  As the failure investigation progressed, the CAO was amended to address additional safety concerns that were identified. On June 18, 2015, Line 901 was purged and filled with inert nitrogen to enhance safety during the investigation and development of a remedial action plan.[ii] No fatalities or injuries occurred as a result of this rupture and release. The spill resulted in substantial damage to natural habitats and wildlife.

PHMSA's findings indicate that the proximate or direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. PHMSA's investigation identified numerous contributory causes of the rupture, including:

1) Ineffective protection against external corrosion of the pipeline

- The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.

- The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.

2) Failure by Plains to detect and mitigate the corrosion

- The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

3) Lack of timely detection of and response to the rupture

- The pipeline supervisory control and data acquisition (SCADA) system did not have safety-related alarms established at values sufficient to alert the control room staff to the release at this location.

- Control room staff did not detect the abnormal conditions in regards to the release as they occurred.  This resulted in a delayed shutdown of the pipeline.

- The pipeline controller restarted the Line 901 pipeline after the release occurred.

- The pipeline's leak detection system lacked instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it was operating or shut down.

- Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as

Page **3** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

alarms.

The consequences of the spill were additionally aggravated by an oil spill response plan that did not identify the culvert near the release site as a spill pathway to the Pacific Ocean.

This report contains factual information and analysis regarding the events leading up to the release, information collected during PHMSA's failure investigation to date, and the technical analysis of that information known at the time of the completion of this report. PHMSA used this information to mandate remedial measures on Line 901, Line 903, and associated stations and tankage. PHMSA will also use the information to determine whether violations of the federal pipeline safety regulations occurred.

## Final Report Methodology

PHMSA conducted relevant interviews, gathered and reviewed numerous historical documents and available records, and performed a thorough review of the Plains Control Room in Midland, TX. An ILI subject matter expert (SME) was hired to review the raw magnetic flux leakage (MFL) data and final vendor reports from the MFL surveys, and evaluated Plains actions as a result of their review of the vendor reports. PHMSA issued a CAO which in part instructed Plains to have the failed pipe examined by a PHMSA-approved metallurgical laboratory and to have a root cause failure analysis (RCFA) performed by a third party independent consultant.

The factual evidence reviewed includes: the Plains Integrity Management Plan (IMP), CP records, ILI reports, anomaly dig information, SCADA event and alarm logs, pressure and flow trends, procedures and reports obtained from the pipeline operator and PHMSA SMEs.

The arrangement of this report provides a general description of the pipeline system, the events that occurred on the day of the release, and acts or omissions of the operator that led to this failure and release of crude oil. Specific evidence is supplied and pertinent statements from each report are excerpted where appropriate.

## Facility Background

Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries. Plains' pipeline is composed of two major pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went into crude oil service in 1992 and 1991, respectively. The pipelines are coated with coal tar urethane and covered with foam insulation which in turn is covered by a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at all of the pipeline joints on Line 901 and multiple locations on Line 903. The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.

(1) Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles downstream of the Las Flores Station. All of Line 901 crude oil throughput enters Line 903. Line 901 was manufactured of low carbon steel by Nippon Steel

Page **4** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam.  The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990.



**Figure 1.** Map of Plains' Western Division Pipelines.  The arrow points to the approximate release site on Line 901.

At Sisquoc Station, crude oil can be pumped to one of two locations: a nearby refinery via a 12-inch diameter pipeline operated by Phillips 66, or continue down Line 903 to Pentland Station. There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream.  At Emidio Station crude oil is delivered to above-ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.

Prior to the May 19, 2015 release, there had been four small releases meeting PHMSA reportable criteria at pump stations on Lines 901 and 903. No releases were reported to PHMSA on the pipelines outside of pump stations prior to 2015.  The  operator reported maximum operating pressure (MOP) of Line 901 is 1,341 psig.

At the time of the spill, Plains All American Pipeline (PAAPL) operated Line 901 and Line 903 under a Federal Energy Regulatory Commission (FERC) certificate  of economic regulatory jurisdiction that was issued in 1987.  Plains Pipeline, LP, is a subsidiary of PAAPL.  Based on the FERC filing, Lines 901 and 903 were classified as interstate  pipelines, pursuant to 49 U.S.C. § 60101(7), as facilities used to transport hazardous liquid in  interstate or foreign commerce, and as such, were regulated by PHMSA as interstate pipelines. Plains cancelled the FERC certificates for Lines 901 and 903 on February 12, 2016 and April 29, 2016,

Page **5** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

respectively, stating that the transportation service was no longer available in interstate commerce. Line 903 from Gaviota to Sisquoc to Pentland Stations was purged with nitrogen in accordance with Amendment No. 2 to the CAO, and remains shut down between these stations. The Pentland to Emidio segment of Line 903 is active and operating intermittently at low pressures. This section of pipe between Pentland and Emidio is not directly connected to the Gaviota to Pentland segment and is used to transport crude product from breakout tanks in Pentland Station.

## Events Immediately Prior to and During the Crude Oil Release

On the morning of May 19, 2015, Lines 901 and 903 were transporting crude oil with a flow rate setpoint of 1,240 bbl per hour (BPH) leaving the Las Flores Station, and the discharge pressure was approximately 575 psig.  Pumps were operating at the Las Flores Station on Line 901 and Sisquoc Station on Line 903.  A Plains instrumentation and electrical technician was dispatched that morning to disconnect and remove a motor from a non-operational pump at the Sisquoc Station.  While the technician was performing his work, the operational pump (Pump 401) at the Sisquoc Station was shut down unintentionally (i.e., "uncommanded").  When Pump 401 on Line 903 stopped operating, the pressure in Line 901 increased. The pressure rose to a maximum of 696 psig at the Las Flores Station discharge.  The controller shut down the pump at Las Flores Station and the pressure remained at 677 psig.  Approximately four minutes later, the pump at Las Flores Station was restarted.  At approximately 10:55 a.m. PDT, the flow rate at Las Flores Station climbed from zero to 2,042 BPH.  Concurrently, the line pressure rose to a high of 721 psig, then dropped to 199 psig, and then slightly increased to approximately 210 psig until the Las Flores pump was shut down a second and final time.  Generally, a sudden increase in flow rate accompanied by a decrease in pressure is indicative of a release. PHMSA has determined that Pump 401 going offline in an "uncommanded" manner on the morning of May 19, 2015, was an abnormal event, but that this in itself should not have caused Line 901 to rupture.

PHMSA performed a detailed review of the SCADA event and alarm logs, and pressure and flow records.  The review indicated that there was information reported by the SCADA system that indicated a release had occurred by approximately 10:58 a.m., and an alarm was generated on low pressure.  The alarm was not set at an appropriate value.  The alarm also did not have a major priority/severity or safety-related alarm status.  The controller did not recognize the information he received as indicative of an abnormal operation.  Evidence indicates that the controller was focused on the events at Sisquoc Station (i.e., restarting the Sisquoc pump that had gone down once uncommanded, and a second time on high case temperature along with other duties).[iii]

Due to the Sisquoc Station maintenance activity resulting in an unplanned pump shutdown, the controller anticipated alarms would be activated from the pipeline leak monitoring (PLM) system.  According to interviews and a review of the alarm log, the PLM inhibit was requested by the controller to the step-up shift supervisor between 11:15 and 11:22 a.m.[iv]  The step-up shift supervisor then inhibited (shut off) the PLM system alarms.[v]  Also, during this time, the controller started an investigation of the SCADA data in an attempt to understand the operational abnormalities that were occurring.  After attempting to restart the Sisquoc pump twice, the controller shut down the pipeline.  PHMSA requested the operator review the flow imbalance calculations and provide a time when the PLM system would have generated an alarm if not inhibited, and it was determined that  alarms would have been generated

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

approximately two minutes before the controller shut down the pipeline.[vi]



**Figure 2**. Schematic of Plains Pipeline, LP, Line 901 and spill path.

## Plains' Field Response and National Response Center Notifications

The following is a timeline of Plains and emergency responder activities conducted immediately prior to locating the leak site:[vii]

- At 11:42 a.m. a call reporting a petroleum smell was received at Santa Barbara Fire Department (SBFD) Station 18.  Engine 18 left the station to investigate the odor complaint near Refugio State Beach.

- At approximately 12:15 p.m., prior to a scheduled tabletop spill drill required by federal regulations 49 C.F.R. §194, the pre-drill meeting was completed and adjourned.  A representative from  the Santa Barbara Office of Emergency Management (SB-OEM) received a call from the  SBFD reporting that there was oil on Refugio Beach.  The SB-OEM representative and  the Plains representatives left the spill drill and drove separately to Highway 101 at  Refugio Beach.

- The Santa Barbara Dispatch notified the National Response Center (NRC #1116950) at 12:43  p.m. PDT of an unknown sheen in the ocean at Highway 101 and Refugio Beach.[viii]

- At approximately 12:55 p.m., the two Plains representatives arrived at the south side of Highway 101 where the SBFD personnel were.  They noted oil in the ocean but could not  determine the source of the oil.  One of the Plains representatives told the assembled group that he did not think the oil was coming from Line 901 because the pipeline is located on the  other side of Highway 101, and there would be oil flowing across Highway 101 if Line 901 was leaking.

Page **7** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

- The Plains representatives drove to the company's pipeline right-of-way (ROW).  At approximately 1:27 p.m., the Plains representatives located the leak site on the Plains ROW.  They called the controller to report the leak and to tell the controller to leave Line 901 shut down and to close the Refugio gate valve.  The Plains representatives used their cell phones to contact other Plains personnel, the landowner where the leak occurred, Plains' oil spill response contractors, and others.  The Plains representatives noted that crude oil from the release site had entered a culvert that crosses under the Highway 101 and railroad tracks and discharges to Refugio Beach.  The Plains representatives, along  with Fire Department personnel, attempted to stop the flow of oil into the culvert.  However, the culvert was too large to stop the flow with shovels, and sand bags were not  readily available, so their immediate efforts were unsuccessful.  At approximately 3:00 p.m., additional equipment and  personnel arrived, the culvert was dammed and oil was prevented from entering the  culvert.

- At 2:56 p.m., a representative from Plains called the NRC to report (NRC #1116972) the release of crude oil  at 2:56 p.m. PDT. This report indicated that the release was at Latitude: 34° 27' 43" N; and  Longitude: 120° 05' 24" W.  This NRC report was made 89 minutes after the release site was  found by Plains field personnel.[ix]



**Figure 3**. Spill location relative to Refugio Beach in Santa Barbara County, CA. Photo: John L. Wiley http://flickr.com/jw4pix

Federal pipeline safety regulations, (49 C.F.R. § 195.52), require that the NRC be notified at the earliest practicable moment following discovery of a release of a hazardous liquid, including "[a]ny failure that resulted in pollution of any stream, river, lake, reservoir, or other similar body of water that violated applicable water quality stands, caused a discoloration of the surface of the water or adjoining shoreline, or deposited a sludge or emulsion beneath the surface of the water or upon adjoining shorelines."  On January 30, 2013, PHMSA issued an

Page **8** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

Advisory Bulletin clarifying that this was to be interpreted as within one hour of discovery.  Plains reported the rupture to the NRC approximately 89 minutes after discovery, thus notifying the NRC 29 minutes late.

The estimated costs reported by the operator as of December 23, 2015, were $142,931,884. This figure includes all costs the operator spent as a result of this release through the date reported, including commodity lost, the operator's property damage and repairs, operator's emergency response, environmental remediation, and estimated other costs spent including government agency costs and media relations expenses.[x]

## PHMSA's Corrective Action Order

On May 21, 2015, PHMSA issued a CAO, CPF No. 5-2015-5011H, to Plains.   The  CAO required Plains to purge Line 901; review the pipeline's construction, operating,  maintenance, and integrity management history; expedite the review of data from the May 5,  2015, ILI tool run; conduct metallurgical evaluation of the failed pipe; repair any   integrity-threatening anomalies identified by the ILI survey; and conduct a root cause failure  analysis.  The CAO requires Plains to purge Line 901 and to keep Line 901 shut down until PHMSA approves the restart of the pipeline.  Plains' Line 901 was purged and filled with an inert nitrogen gas on June 18, 2015.

On June 3, 2015, PHMSA issued Amendment No. 1 to the CAO.  The amendment was issued to address preliminary findings from the early stages of PHMSA's investigation, and the possibility that the conditions on Line 901 also existed on Plains Line 903.   The amendment to the CAO  required Plains to conduct additional non-destructive testing of ILI anomalies on Lines 901 and  903; review the construction, operating, maintenance, integrity management, and ILI history of  Line 903; and reduce the operating pressure of Line 903 to 80% of the highest pressure sustained  for a continuous 8-hour period during the month before the May 19 failure.  This pressure  reduction was intended to enhance safety until all facets of the line's integrity could be evaluated.

On November 12, 2015, PHMSA issued Amendment No. 2 to the CAO.  The amendment required Plains to empty and purge Line 903 between Gaviota and Pentland Stations and fill it with an inert gas.  Line 903 was purged between Gaviota and Pentland Stations and filled with inert nitrogen.  The complex purging operations began in December 2015, and were completed on April 18, 2016.  Both Line 901 and the purged sections of Line 903 will remain shut down until all actions required by PHMSA's CAO and subsequent amendments have been completed.  PHMSA may continue to issue additional amendments to the CAO as necessary.

## Pipeline Alignment

### Las Flores Station to Gaviota Station Line 901 Elevation Description

To fully understand the Line 901 release, it is vital to understand the elevation profile of Line 901 and Line 903 from the Las Flores Canyon to Pentland Station.  Line 901 starts at the Las Flores Station at an elevation of approximately 180 feet.  There are two large hills downstream of the originating pump station.  The first hill has a peak elevation of approximately 740 feet and the second hill has an elevation of approximately 600 feet.  The release occurred downstream of the second hill at an elevation of approximately 80 feet.  Immediately downstream of the release point, the pipeline rises slightly and then runs relatively level approaching the Gaviota station.  This fact is important because as soon as the pump at Las

Page **9** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

Flores Pump Station was turned off the second time, the only crude oil that could be released was the height of oil in the pipeline above the release site and not the amount located between the two aforementioned hills.

### Gaviota to Pentland Station Line 903 Elevation Description

Line 903 receives all of the crude oil delivered by Line 901. The line elevation at Gaviota is approximately 150 feet.  The elevation at Sisquoc is approximately 880 feet.  Downstream of Sisquoc,  Line 903 rises to 2,420 feet and then to a height of approximately 2,750 feet and ultimately to an elevation of close to 3,000 feet before dropping into Pentland Station at an elevation of approximately 690 feet.  Line 903 exhibits many of the same construction and operation conditions as Line 901 and was addressed by the amendments to the CAO. Pump 401 at Sisquoc Station has adequate capacity to push the oil up and over the downstream hills and into Pentland Station but only if it has full suction pressure and full flow coming into the pump. Because of the release, the pump could not push the oil over the downstream hills, and so the oil in the pump became hot and the pump shut down to prevent overheating.

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Post-Incident Investigation Results

### Metallurgical Evaluation of Failed Pipe

The failed pipe segment has been analyzed by third-party metallurgical experts, Det Norske Veritas (U.S.A.), Inc.'s (DNV-GL) in Dublin, OH.  The failed pipe assessment and testing was witnessed  by PHMSA, the California Department of Fish and Wildlife, and the U.S. Department of Justice.



**Figure 4**. The failed pipe and surrounding insulation and coating.



**Figure 5**. Pipe External Surface at the Line 901 failure site after cleaning.

Page **11** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

DNV-GL's draft report was completed and disseminated to Plains and PHMSA on August 6, 2015.  The draft report was reviewed by PHMSA engineers, and a number of comments and clarification  requests were made.  DNV-GL reviewed the comments and revised the report. The Final Report  was issued on September 18, 2015.

The Final Report provides a summary of findings, including the following excerpt:

"The results of the metallurgical analysis indicate that the leak occurred at an area of  external corrosion that ultimately failed in ductile overload under the imposed operating  pressure.  The morphology of the external corrosion observed on the pipe section is  consistent with corrosion under insulation facilitated by wet-dry cycling."[xi]

## In-Line Inspection Survey Review

Plains conducted ILI surveys on Line 901 (10.7 miles in length) to assess the integrity of the pipeline in accordance  with PHMSA regulations in 2007, 2012, and 2015.  According to 49 C.F.R. § 195.452(j)(3), the pipeline is required to be surveyed at  intervals commensurate with the pipeline's risk of integrity threats, but at least every 5 years.   Plains changed Line 901 from a 5-year assessment cycle to a 3-year assessment cycle after the 2012 ILI survey.

The data collected during these surveys must be fully evaluated within 180 days of the ILI, and an operator must take action upon discovery of any "immediate repair conditions" as defined in 49 C.F.R. § 195.452(h) unless the operator can demonstrate that the 180-day period is impracticable.

The most recent ILI survey for Line 901 was completed on May 6, 2015.  The 2015 ILI survey data for  the first 2 miles of Line 901, as measured from the Las Flores Station, was found to be incomplete and not useable for ILI analysis.   For the rest of the ILI survey, the correlation digs,  which are used to gauge survey data accuracy in the ILI vendor's preliminary report, had not been finished  at the time of the May 19, 2015 failure.

PHMSA's independent third-party ILI SME also performed an analysis of the data from past ILI surveys of  Line 901.  Preliminary data from the results of each of the ILI surveys are summarized below  and show a growing number of corrosion anomalies on Line 901.

Page **12** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

**Number of Anomalies**

| Metal loss | June 19, 2007 | July 3, 2012 | May 6, 2015 |
|---|---|---|---|
| Greater than 80% | 0 | 0 | 2 |
| 60-79% | 2 | 5 | 12 |
| 40-59% | 12 | 54 | 80 |

The May 6, 2015 ILI survey data and subsequent analysis by the ILI vendor predicted external corrosion at the failure site with an area of 5.38 inches by 5.45 inches, and a maximum depth of 47% of the original pipe wall thickness.  After the failure, the DNV-GL metallurgical investigators physically measured external corrosion at the failure site to have a maximum depth of 89%.[xii]  The dimensions of the corrosion feature were 12.1 inches axially by 7.4 inches in circumference.  The maximum depth, as measured using laser scan data, was 0.318 inches or 89% of the measured wall thickness (0.359 inches).

The ILI summary report prepared by PHMSA's SME also examined the "as-called" (ILI-predicted) versus as-found (field measured) lengths, widths and area for the excavated anomalies on Line 901.  The report demonstrates that the lengths and widths of the anomalies were under-called (underestimated) in many cases, however many were also over-called. Plains submitted little documentation concerning their analysis of how the field measured anomalies compared to the ILI vendor analysis.  Furthermore, Plains did not provide documentation showing that discrepancies between the originally reported anomaly sizes predicted by the ILI vendor and Plain's actual field-measured sizing of the corrosion anomalies were subsequently discussed with the ILI vendor, as required by Plains' IMP.[xiii]

## Cathodic Protection Findings

According to 49 C.F.R. § 195.563, CP is required under the federal Pipeline Safety Regulations to prevent external corrosion of buried pipelines.  Historical CP records for line 901 have been reviewed and reveal protection levels that typically are sufficient to protect non-insulated, coated steel pipe. Line 901 and Line 903, however, are insulated.  An increasing frequency and extent of corrosion anomalies were noted on both Lines 901 and 903 in ILI survey results, anomaly excavations, and repairs.  PHMSA inspectors noted moisture entrained in the insulation at four excavations performed by Plains on Line 901 after the May 19 spill and prior to the PHMSA-mandated purging of the pipelines.

## Spill Volume Estimate from Plains' Third-Party Consultant

Plains initially estimated the volume of spilled crude oil to be approximately 2,400 bbl, of which 500 bbl was estimated to have reached the ocean.   On  August 4, 2015, Plains reported to the Unified Command that the 2,400  bbl release estimate was still accurate.  However, after Plains completed the PHMSA-mandated purge, the  company's calculations indicated that up to 3,400 bbl had possibly been released from the  pipeline.   Plains notified the Unified Command

Page **13** of 21

Teel Declaration
Page 66

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

that RPS Knowledge Reservoir (RPS), a third-party investigator hired by Plains, was still trying to reconcile the difference.

On November 24, 2015, Plains informed PHMSA that RPS had completed their analysis regarding the release volume and produced a report of findings. RPS used the OLGA simulation software tool to model the behavioral dynamics of the pipeline prior to, during, and immediately after the May 19, 2015 leak. The report concluded that the discharge leak volume was 2,934 bbl. The RPS report was dated November 11, 2015. Plains has reported 1,100 bbl of crude oil have been recovered.

## Investigation Findings and Conclusions

Line 901 pipeline ruptured at approximately 56% of the MOP. Although the operational events that occurred on the morning of the release were abnormal, this should not have caused the release if the pipeline's integrity had been maintained to federal standards.

## Proximate or Direct Cause

PHMSA determined that the proximate or direct cause of the release was progressive external corrosion of the insulated, 24-inch diameter steel pipeline. The corrosion occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied directly to the bare pipe, covered by foam thermal insulation with an overlying Polyken tape wrap. Water has been noted in the foam insulation at a number of digs, indicating that the integrity of the coating system had been compromised. The external corrosion was facilitated by the environment's wet/dry cycling, as determined by the PHMSA-approved, third-party metallurgical laboratory. The release was a single event caused at an area where external corrosion had thinned the pipeline wall. There is no evidence that the pipeline leaked before the rupture. There was a telltale "fish mouth" (a split due to over-pressurization) at the release site indicating the line failed in a single event.

PHMSA's investigation identified numerous contributory causes of the rupture. The contributory causes can be grouped into three categories: 1) ineffective protection against external corrosion of the pipeline; 2) failure by Plains to detect and mitigate the corrosion;, and 3) lack of timely detection of the rupture. Below is a summary of the key contributory causes:

## Contributory Causes

1) Ineffective protection against external corrosion of the pipeline

   - Plains' CP system was ineffective in protecting thermally insulated underground pipeline systems from external corrosion. Industry practices recognize that an impressed current system like the one utilized on Line 901 cannot protect an insulated steel pipeline should the coating (tape wrap over insulation) become compromised. The external coating in the area of the rupture had allowed moisture to enter the insulation adjacent to the steel pipe.[xiv] Corrosion under insulation (CUI) cannot be prevented on insulated lines where the coating system has been compromised.[xv]

2) Failure by Plains to detect and mitigate external corrosion

   - Plains did not identify CUI as a risk-driving threat in their federally-mandated integrity management program (IMP).

Page **14** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

- Plains' did not fully implement their IMP.

    o Plains did not perform suitable analysis of the field measurements of the excavated corrosion anomalies that occurred after ILI surveys were completed in 2007 and 2012.

    o The data reported by the ILI vendor were inconsistent (and did not meet the published accuracy of the ILI tools of +/- 10%, 80% of the time for depth) when compared to the results of the field-measured corrosion anomalies.

    o Plains' as-found field measurements of corrosion anomalies were inconsistent with the as-called vendor-provided ILI data and analytical reports.  ILI surveys conducted in 2007 and 2012 revealed inconsistencies in the character of the anomalies.  In both of these cases, Plains did not consult the ILI vendor to help resolve the inconsistency.

    o Plains failed to follow written procedures directing the IMP group to perform appropriate statistical analysis after the anomaly dig reports were received from the field, and to discuss any inconsistencies with the ILI vendor.[xvi]

        ▪ Plains' Pipeline Integrity group created a unity plot for depth after the 2012 ILI survey and anomaly digs.  There is no documentation detailing what was done with the information from the unity plot.

    o Plains incorrectly added the over-called anomalies in the close-out reports.

        ▪ The close-out reports should have only reported the anomalies that were within the reported accuracy of the ILI tool. The reported tool accuracy is +/- 10 %, 80 % of the time. Adding the overcalled anomalies outside of the tool accuracy skews the data.

- Plains' Pipeline Integrity group was historically focused on pitting corrosion under "shrink sleeves" at the pipeline girth welds (circumferential welds to join pipe segments).

    o The release location was within 6 feet of a corrosion anomaly that was exposed and repaired after the 2012 ILI survey.  There was evidence of corrosion and degraded coating systems between the 2012 repair site and the 2015 rupture site.

    o The anomaly that ruptured was called out by the ILI tool at 45% depth in 2012.  Plains' IMP specified adding 10% to all anomalies (55% depth in this case) then "growing them" to predicted failure using an anticipated corrosion growth rate.  This analysis would provide a predicted failure time.  Plains did not excavate the anomaly that failed.

3) Lack of timely detection of and response to the rupture

- The controller did not have information communicated from the SCADA system in such a manner to be successful in detecting abnormal operations.  The pipeline SCADA system did not have safety-related alarms on low pressure configured at the

Page **15** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

correct value or priority to alert the control room staff of the rupture. When this alarm was provided to the controller, the discharge pressure at Las Flores was 199 psig but, within a minute, pressure elevated above 210 psig, the alarm status cleared, and the discharge pressure remained above 200 psig (approximately 210-211 psig) until the pipeline was purged. The pipeline was still leaking when the discharge pressure at Las Flores was above 200 psig, and continued to do so without additional alarm indications. When the pipeline was down, isolated but still leaking, the minimum pipeline discharge pressure at Las Flores remained at 210-211 psig. The low discharge pressure alarm setpoint value was not set properly as it should have been above 211 psig. This type of alarm should be identified as a high priority safety related alarm. While the controllers and shift supervisors can access historical trend data or continue to monitor a given pressure or flow, when the pipeline was ultimately shut down at 11:30 a.m., neither the controller nor step-up shift supervisor detected any drop of pressure at the specific failure location that would indicate that oil was being released.

- Neither the pipeline controller nor step-up shift supervisor detected the initial abnormal conditions as the release occurred. There was an indication of decreased pressure and increased flow between 10:53 and 10:58 a.m., which is consistent with a pipeline release. This resulted in a delayed shutdown of the pipeline. Adequate alarm setpoint values with correct priorities are essential to controller and shift supervisor recognition of abnormal operations, especially when many pipeline systems are operated from the same console.

- The pipeline controller restarted Line 901 after the release occurred.

- The pipeline leak detection system lacked instrumentation and associated calculations to monitor line pack.

  o The function of the PLM system was a simple line balance calculation based on flow meter values without line pack considerations. The PLM relies on comparing "meter in – meter out" calculations over time. This type of leak detection system without the use of safety-related, high-priority, low-pressure alarms does not provide the controller or shift supervisors with adequate information when the pipeline is down.

  o When the pipeline is not running, even if only due to scheduling and not required maintenance activities, flows will be close to zero and the imbalance calculation will provide little if any value as currently configured. Leak detection on a down pipeline requires a robust system of planned and accurate high-priority alarm types and alarm setpoint values in order for response to occur on critical low pressures.

  o The leak detection system for Lines 901 and 903 consists of two leak detection segments. Additional instrumentation such as pressure and temperature transmitters located at Refugio Gate and Cuyama valve settings (both transmitter types on each side of the valves) would allow additional information about the operating status of the pipeline to be presented and pack calculations pursued.

  o Plains utilizes the SimSuite application for other pipelines in the control

Page **16** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

center.  This application does allow for pack calculations to be utilized in the leak detection system.  According to information obtained during meetings with Plains hydraulic specialists, Lines 901 and 903 were pipeline systems with a low to medium priority defined for future modeling efforts compared to other assets in the Plains operations. The approach utilized by Plains for prioritizing which systems should be modeled first did not appear to take into account all appropriate consequence-based asset impacts (such as culverts providing a pathway to the ocean) associated with these two systems. Existing instrumentation and the need for added instrumentation would factor into this prioritization decision.

- Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as alarms.

  o Interviews determined that the step-up shift supervisor and shift supervisor training lacked formalized and succinct requirements, including that for leak detection system functions such as "inhibit" options.  The interviews determined that different shift supervisors performed PLM inhibit functions without contacting the console supervisor first as required by procedure.

  o Step-up and shift supervisor responsibilities include emergency shutdown of any pipeline.  However, training does not cover a means by which to accomplish this for all relevant pipelines.  A general emergency shutdown provision has not been programed for supervisory use on all systems.

- The oil spill response plan required by 49 C.F.R. §194 did not account for a culvert near the release site that traversed the Pacific Coast Highway and Amtrak railroad tracks.  This culvert provided a quick flow path between the pipeline ROW and the Pacific Ocean, thereby allowing crude oil to flow easily towards Refugio State Beach and the ocean.  The response plan did not have a response strategy that considered the presence of the culverts.

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## PHMSA Post-Incident Action Chronology

Following the May 19, 2015 Plains Pipeline, LP, Line 901 rupture in Santa Barbara County, CA, PHMSA took the following actions:

- On May 19, 2015, PHMSA deployed inspectors to investigate the Plains Pipeline LP Line 901 pipeline failure in Santa Barbara County, CA.  PHMSA also provided information updates to the Unified Command (UC), US Coast Guard, the Federal on Scene Coordinator (FOSC), State Fish and Wildlife, and other agencies on site.
- On May 21, 2015:
  - PHMSA issued a Corrective Action Order (CAO), CPF No. 5-2015-5011H,  to Plains Pipeline LP ordering it to suspend operations and to specific safety actions to further protect the public, property, and the environment from potential hazards associated with the recent failure.  PHMSA staff reviewed the CAO with the operator and briefed the California State Attorney on the CAO and provided an overview of PHMSA's regulations.
  - PHMSA sent an inspector to Plains' control room in Midland, Texas to collect operational data and interview the control room operators on duty at the time of the incident and their supervisors.  The inspector gathered any pertinent logs and information, including electronic copies of relevant data from the Supervisory Control and Data Acquisition (SCADA) system.
  - PHMSA staff worked with the operator to review their plan to expose the pipe and to cold tap it to ensure there was no pressure or crude left in the line at a low spot immediately downstream of the release point. The plan was signed off by the UC at approximately 5 pm PDT.
- On May 22, 2015:
  - PHMSA staff met with representatives from the Assistant U.S. Attorney, DOT Inspector General, EPA Criminal Investigation Division, California Attorney General, and others to brief them on PHMSA's process for securing and transporting the failed pipe to a metallurgical lab for evaluation.
  - PHMSA staff remained on the scene as the operator exposed, tapped, removed any remaining product, and excavated the pipeline downstream of the release site.
- On May 25, 2015:
  - PHMSA issued an approval letter for Plains to excavate, remove and secure the failed joint of pipe under the supervision of two DNV metallurgists (third party contractor) but requested that the coating and insulation not be touched until the failed pipe has been removed because the DNV personnel were interested in in gathering available samples there as well.
  - A PHMSA inspector returned to Midland, TX to interview the controller and the Operations Control Center supervisor and to obtain any handwritten logs created by the controller on the morning of the release.
- On May 28, 2015:
  - A PHMSA investigator was on site when affected pipeline was removed, crated, and transported to secure location for metallurgical evaluation.  PHMSA retained a third-party ILI expert to examine the 2012 and 2015 ILI runs. DNV personnel took soil and insulation samples.
- On June 3, 2015, PHMSA amended the CAO to address preliminary findings from the early stages of the investigation (Amendment No. 1).  The amended CAO mandated

Page **18** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

additional safety requirements on Line 901 and expanded the scope of the CAO to include the 128-mile long Line 903, which is located downstream of Line 901.  The amendment reduced the operating pressure of the Lone 903 by 80% of the highest 8 hour continuous pressure between April 19, 2015 and May 19, 2015.  On May 30, 2015, Plains voluntarily shutdown Line 903.

- On June 18, 2015, PHMSA staff monitored the Line 901 purge to ensure safety during the purging process. Plains completed the purge and injected inert gas in Line 901.
- On September 18, 2015, PHMSA received the DNV Final Mechanical and Metallurgical Report.  PHMSA staff reviewed the document and provided comments.
- On November 12, 2015, PHMSA issued Amendment No. 2 to the CAO, which ordered Plains to purge and shutdown Line 903 from Gaviota to Pentland.
- On December 1, 2015, PHMSA staff monitored Plains moving Freeport McMoRan crude oil from their offshore platforms into Line 903 from Gaviota Station to Sisquoc Station. Movement of the Freeport McMoRan oil was completed on December 10, 2015.
- On December 4, 2015, PHMSA staff received the DNV Root Cause Failure Analysis Report.  PHMSA reviewed and commented on the report.
- On December 14, 2015, PHMSA staff monitored the purge process on Line 903 from Gaviota Station to Sisquoc Station. The purge was completed on December 18, 2015 and the line was filled with inert gas.
- On February 17, 2016, PHMSA issued a Preliminary Factual Final Report.
- On April 2, 2016, PHMSA staff monitored the Line 903 Sisquoc to Pentland portion purge that was completed on April 18, 2016.  Line 901 and 903 are shutdown, except for the Pentland to Emidio section of Line 903, which is not connected to 903 any longer.

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## APPENDICES

A. Investigation Summary Detail

B. Supervisory Control and Data Acquisition (SCADA) Log Excerpts

C. Pipeline Leak Monitoring Details

D. Excerpts and Discussion of Plains Integrity Management Plan (IMP) Requirements

E. Corrosion Control and Pipeline Conditions

F. Industry Standards and General Requirements for In-Line Inspection

G. In-Line Inspection Report

H. PHMSA's Independent Analysis of In-Line Inspection Data

I. Maps and Photographs

J. National Response Center Report #1

K. National Response Center Report #2

L. Form PHMSA F 7000.1: Accident Report for Hazardous Liquid Pipeline Systems

M. Det Norske Veritas (U.S.A.), Inc. (DNV GL): Line 901 Release (5/19/15) Mechanical and Metallurgical Testing

N. Det Norske Veritas (U.S.A.), Inc. (DNV GL): Line 901 Release (5/19/15) Technical Root Cause Analysis

O. NACE International: Effectiveness of Cathodic Protection on Thermally Insulated Underground Metallic Structures

---

[i] According to the *FRACTURE CONTROL TECHNOLOGY FOR NATURAL GAS PIPELINES CIRCA 2001* (the PRCI report superseding NG-18 Report 208): "The distinction between leak and rupture for the pipeline community is based on the size and configuration of the breach, not how it develops." Based on these calculations and visual observations, the length of the feature is consistent with a leak, arresting within the corrosion feature, and did not propagate outside of the feature into nominal wall-thickness pipe. According to the instructions for completing PHMSA Accident Form 7000-1, this type of accident would be classified as a rupture since PHMSA defines a "rupture" as a "loss of containment that immediate impairs the operation of the pipeline".

[ii] The remedial action plan requires: a) investigation and remediation of anomalies on Line 901 (including anomalies requiring repair per 49 C.F.R. § 195.452(h) and similar anomalies); b) analysis of field measurements taken from anomaly investigations; c) re-grade of previous in-line inspection (ILI) data from 2012 and 2015 ILI surveys using an expanded set of interaction criteria; d) additional integrity assessments using a circumferential magnetic flux leakage (MFL-C) ILI tool and integration of MFL-C ILI data with previous ILI survey results; e) investigation and remediation of anomalies that are identified in the MFL-C tool run (if any); f) based on information collected from remedial work plan and root cause analysis report released by Det Norske Veritas (U.S.A.), Inc., improving the integrity management program; and g) integrity studies to reduce spill volumes, including an emergency flow restriction device evaluation and a surge study. Completion of the remedial work plan is required prior to the PHMSA Western Region Director approving a restart plan and return to service for Line 901.

[iii] High case temperature refers to the oil temperature inside the pump cavity.  The case holds the pump impeller

Page **20** of 21

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

where oil passes through.  This was a centrifugal pump that continues spinning whether there is product in the pump or not.  When the rupture occurred, there was not enough pressure or flow rate to allow the pump to continue pumping the oil over the hills and into Pentland Station.  Therefore, the oil that was in the pump remained in place and as the pump continued to spin, and temperature was reported to the SCADA system.  If the pump reaches the high temperature setpoint, the pump shuts itself off to protect itself from burning up.

[iv] The PCR utilizes two shift supervisors to cover the entire set of 22 consoles.  The California Console is handled by shift supervisor B.  The shift supervisor B position at the time of the failure was filled by a step-up shift supervisor.  A step-up shift supervisor is a controller who is currently qualified on a specific console in the PCR and has received some informal training by working on shift with other shift supervisors.  Step-up shift supervisors are used to cover the shift supervisor positions when additional personnel are needed due to illness, vacation, training, etc.  Plains has indicated that two step-up shift supervisors are not allowed to be on duty at the same time so one shift supervisor is paired with a step-up shift supervisor when additional personnel is needed.

[v] PLM is the SCADA vendor software tool that serves as the leak detection system for PCR.

[vi] *See* Appendix B.

[vii] SCADA Data/Plains Control Room time is local to the Central Time Zone.  A two-hour time difference separates Central Time from Pacific Time, with Central Time falling two hours ahead. The release occurred in the Pacific Time Zone which is two (2) hours earlier.  All times in this report have been adjusted to Pacific Time.

[viii] *See* Appendix J.

[ix] *See* Appendix K.

[x] *See* Appendix L.

[xi] *See* Appendix M.

[xii] PHMSA has access to this data through a view-only web portal.

[xiii] *See* Appendix G.

[xiv] The inability of an impressed cathodic protection system to protect insulated pipelines was most recently reaffirmed in the National Association of Corrosion Engineers (NACE) Publication 10A392 (2006 Edition) – "Effectiveness of Cathodic Protection (CP) on Thermally Insulated Underground Metallic Structures."

[xv] *See* NACE Report at Appendix O, Background section stating that "[o] n most thermally insulated oil and gas transmission pipelines installed prior to 1980 to 1981, a shop mold-formed thermal insulation was placed directly over the bare steel pipe, with an outer jacket applied to moisture-proof the system. At the field joint, preformed insulation half shells were applied over the joint area to fit between the ends of the shop-applied insulation. After the insulation was fitted, a heat shrink sleeve or a tape wrap was applied over the insulation. When the integrity of the outer moisture barrier was compromised, the space, gap, or void between the edges of the preformed half shells and the shop-applied insulation allowed oxygenated water to diffuse to the bare steel beneath. Damage to the outer moisture barrier has also occurred remote from the joint, allowing oxygenated ground water ingress.

"Thermally insulated pipelines have experienced relatively aggressive corrosion, with some failures occurring within three years of service, although acceptable industry standards of CP had been applied and maintained shortly after line construction. The most predominant failures have been those occurring at joints; however, moisture has migrated along the pipeline steel surface to create electrochemical corrosion cells remote from the field joint, culminating in extensive replacements of substantial lengths of line. An article titled 'Corrosion of Underground Insulated Pipelines' supports this committee's conclusions that sufficient CP current from an external source may not reach the insulated metallic surface in sufficient quantity to establish adequate corrosion control."

[xvi] *See* Appendix D.

Page **21** of 21

# Exhibit 6

Declaration of Julie Teel Simmonds

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>            Plaintiffs,<br><br>                         v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>            Defendants. | Civil Action No.<br><br>2:20-cv-02415<br><br>**CONSENT DECREE** |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

# APPENDIX B

# *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P. Consent Decree*

-74-

Teel Declaration
Page 77

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1. **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

   A. Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

   B. Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

   C. Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

   D. Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

   E. To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2. **Replacement, Restart, or Abandonment of Lines 901 and 903:**

   A. Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

1.    On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

    a.    Test for potential AC/DC interference.  Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

    b.    Conduct a close interval survey (CIS) and AC/DC interference survey.

    c.    Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B.    As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C.    As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3.    **Third-Party Analysis of Line 2000 ILI Data**

A.    Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B.    The consultant shall:

    1.    Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

    2.    Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

    3.    Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

    4.    Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

Teel Declaration
Page 79

# APPENDIX D

## *(Remaining Corrective Actions from the PHMSA CAO)*

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

*Consent Decree*

# APPENDIX D

1.    All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

   a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

   b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. The Restart Plan shall include:

   1)    Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

   2)    Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

   3)    Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

   4)    A specific day-light restart that includes advance communications with local emergency response officials;

   5)    Master Control Room enhancements, including:

   a) Implementation of advanced leak-detection

- 1 -

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1. Revised alarm threshold adjustments;

2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running.  Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6)      Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7)      Installation of additional safety valves as a result of Plains' EFRD evaluation;

8)      Installation of additional pressure sensors as a result of Plains' surge study;

9)      Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM.  The tool run shall be initiated during daylight hours.  If the tool run does not collect a complete data set, the UT tool shall be promptly re-run.  A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report.  Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10)     **Corrosion Prevention.**  Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan.  Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

- 3 -

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

903 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1)     Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2)     Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3)     Provisions for a daylight restart and advance communications with local emergency response officials.

g. **Line 903 Return to Service.** After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h. **Removal of Pressure Restriction for Line 903.** After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1)     The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)      The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction.  Requests for removal of the pressure restriction may be submitted by pipeline segment.

i.  **Notifications.**  Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j.  **Reporting Requirements for Lines 901 and 903.**  If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)      The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)      Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

3)    The Appendix D Documentation Report shall include but not be limited to:

A.    Table of Contents;

B.    [*intentionally left blank.*]

C.    [*intentionally left blank.*]

D.    Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

E.    [*intentionally left blank.*]

F.    [*intentionally left blank.*]

G.    Lessons learned while fulfilling the requirements of this Appendix D.

# Exhibit 7

Declaration of Julie Teel Simmonds

# SABLE
## OFFSHORE

April 24, 2024

Chief Jim Hosler
CAL FIRE – Office of the State Fire Marshal
Chief of Pipeline Safety and CUPA Programs
Pipeline Safety
3780 Kilroy Airport Way, Suite 500
Long Beach, CA  90806

**RE:    Pacific Pipeline Company (operated by Sable Offshore Corp., OPID #40851)**
**State Waiver Applications for:**
**Las Flores Pipeline CA-324 (OSFM #0015)**
**Las Flores Pipeline CA-325A/B (OSFM #0001)**

Chief Hosler,

As you are aware, Sable Offshore Corp. purchased exclusive ownership of the shares in Pacific Pipeline Company, owner of the Las Flores Pipeline, from ExxonMobil affiliate Mobil Pacific Pipeline Company, at which point Pacific Pipeline Company became a wholly owned subsidiary of Sable Offshore Corp.  Subsequent to its acquisition, Sable Offshore Corp. filed for and received an OPID from the U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration (OPID #40851) to be named operator of the Las Flores Pipeline system.

This letter serves to confirm Sable Offshore Corp.'s intention to continue pursuit of the referenced State Waiver Applications submitted by Pacific Pipeline Company on July 10, 2023.

Please update your office's records to reflect the new contact information for Pacific Pipeline Company as applicant and Sable Offshore Corp. as operator to be:

Pacific Pipeline Company
Sable Offshore Corp. (Operator ID #40851)
845 Texas Ave. Suite 2920
Houston, TX  77002
lyearwood@sableoffshore.com

If you have any questions, or require anything further, please do not hesitate to contact me at (832) 434-9461.

Sincerely,

Lance Yearwood
Vice President
Sable Offshore Corp.

**845 TEXAS AVENUE, SUITE 2920, HOUSTON, TEXAS 77002**

Teel Declaration
Page 89

**Pacific Pipeline Company**
22777 Springwoods Village Parkway
Spring, Texas 77389

July 10, 2023

<u>VIA ELECTRONIC MAIL</u>

James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
Pipeline Safety Division

3780 Kilroy Way, Suite 500
Long Beach, California 90806

**Subject:  Pacific Pipeline Company (OPID #40475) State Waiver Application for the**
***Las Flores Pipeline CA-324 (OSFM #0015)***

Dear Mr. Hosler:

Pacific Pipeline Company ("PPC") requests a ten-year State Waiver from the Office of the State Fire Marshal ("OSFM") for the intrastate pipeline segment CA-324 (formerly Line 901) to comply with Civil Action No. 2:20-CV-02415 Consent Decree, DOJ Case #90-5-1-1-1130, pursuant to Appendix B, Article I(1)A.  Within the State Waiver, PPC also requests relief from the requirements to evaluate and remediate all corrosion of or along longitudinal seam welds per 49 C.F.R. § 195.452(h)(4)(iii)(H).  (Collectively, the "Application").

Please note, the Application contains confidential information that is exempt from disclosure under the California Public Records Act (PRA), the Freedom of Information Act (FOIA), and other laws including, but not limited to, Gov't Code § 7927.705, § 7927.500, 5 U.S.C. § 552(b)(3), (4), (6), 6 U.S.C. § 133, and 6 U.S.C. § 1207-1208.  The submission also contains information that constitutes homeland security and critical infrastructure information that should be protected from public disclosure.  If OSFM does not concur that the information contained herein is exempt from disclosure, PPC hereby respectfully requests that OSFM contact me and our legal counsel, Rebekah Bennett (copied here) to discuss the matter and appropriate next steps.  PPC also requests OSFM to notify PPC if OSFM intends to provide copies of any of the enclosed materials to other public agencies (including those agencies that are parties to the Consent Decree) so that PPC and OSFM can further discuss and coordinate procedures to protect confidential information from public disclosure.  If OSFM subsequently receives a PRA request that seeks disclosure of the Application, PPC requests advance notice and the opportunity to contest any production of any confidential information to third parties.

The following information is provided as part of the State Waiver application:

---

**(1) The name, mailing address, and telephone number of the applicant and whether the applicant is an operator;**

Pacific Pipeline Company (Operator ID #40475)
Attn: Diana Skates, Pipeline Safety Advisor
22777 Springwoods Village Pkwy
Spring, TX 77389
diana.r.skates@exxonmobil.com

**(2) A detailed description of the pipeline facilities for which the special permit is sought, including:**

**(i) The beginning and ending points of the pipeline mileage to be covered and the Counties and States in which it is located;**

A State Waiver is sought for a segment of the Las Flores Pipeline system, identified under trunk line CA-324 (formerly Line 901).  Table 1 summarizes relevant information.  A map of the pipeline system is included as **Attachment A** and further details about the pipeline are included in **Attachment B**.

**Table 1: Pipelines Applicable to State Waiver Application**

| System Name | Line ID | Line Designation | Location | Mileage | California County |
|---|---|---|---|---|---|
| Las Flores Pipeline | 0015 | CA-324 | Las Flores Canyon to Gaviota<br>34.478915°, -120.041783°<br>34.476081°, -120.198142° | 10.86 | Santa Barbara |

**(ii) Whether the pipeline is interstate or intrastate and a general description of the right-of-way including proximity of the affected segments to populated areas and unusually sensitive areas;**

The Las Flores Pipeline is a common carrier intrastate pipeline.  CA-324 has potential to impact High Consequence Areas, including unusually sensitive areas.  A map of the pipeline system is included as **Attachment A** and further details about the pipeline and its right-of-way are included in **Attachment B**.

**(iii) Relevant pipeline design and construction information including the year of installation, the material, grade, diameter, wall thickness, and coating type;**

The Las Flores Pipeline CA-324 was constructed in 1990, hydrostatically tested in November 1990, and placed into crude oil service in 1992.  The Las Flores Pipeline is specifically designed and permitted to transport outer continental shelf (OCS) and other

locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins.

Additional, relevant, design and construction information is summarized in **Attachment B.**

*(iv)* ***Relevant operating information including operating, leak history, and most recent testing or assessment results;***

### Operating Information

The pipeline transported crude oil in continuous service from its initial commissioning until 2015.  CA-324 has not transported crude oil since May 19, 2015.  Information related to historic operations and continued operating information upon resuming transportation of crude oil is included in **Attachment B**.

### Leak History

Prior to May 19, 2015, there were no releases from CA-324 pipeline which met reportable criteria.  On May 19, 2015, CA-324 (formerly Line 901) experienced a release on a section of buried pipe.  PHMSA's Failure Investigation Report (May 2016) attributed the rupture of the pipeline to "progressive external corrosion of the insulated, 24-inch diameter steel pipeline."  PHMSA's findings indicate that the direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released crude oil.  PHMSA's investigation identified the following categories of contributory causes:

1. Ineffective protection against external corrosion of the pipeline
   - The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.
   - The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.
2. Failure by the Operator to detect and mitigate the corrosion
   - The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

Subsequently, PHMSA issued a Corrective Action Orders (CAOs) to the Operator identifying additional findings.  The Operator responded to PHMSA's CAOs and on October 14, 2020, a Consent Decree was entered by the United States District Court for the Central District of California.  Pursuant to Section X of the Consent Decree, the CAOs issued by PHMSA were closed and all remaining obligations of the CAOs became part of the Consent Decree.  Hence, the Consent Decree is the document governing the particular requirements and obligations of the Operator to resume crude oil transportation in the pipeline, including the requirement for a State Waiver. In October 2022, PPC acquired the pipeline asset and assumed certain obligations of the Consent Decree that transferred with the asset, including the requirement for a State Waiver for the Las Flores Pipeline.

### Assessment Results

Assessment results are included in **Attachment B.**

**(3) A list of the specific regulation(s) from which the applicant seeks relief;**

1. Pacific Pipeline Company is seeking to comply with Civil Action No. 2:20-CV-02415 Consent Decree, DOJ Case #90-5-1-1-1130, pursuant to Appendix B, Article I(1)A:
   A. *Prior to restarting [CA-324], [Pacific Pipeline Company] shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on [CA-324]. [Pacific Pipeline Company] must receive a State Waiver from the OSFM prior to restarting [CA-324].*

2. Pacific Pipeline Company seeks relief from 49 C.F.R. 195.452(h)(4)(iii)(H) – Corrosion of or along a longitudinal seam weld.

**(4) An explanation of the unique circumstances that the applicant believes make the applicability of that regulation or standard (or portion thereof) unnecessary or inappropriate for its facility;**

**General External Corrosion Under Insulation**
CA-324 was shutdown in 2015 following the release on CA-324.  A Consent Decree was entered by the District Court on October 14, 2020, that requires a State Waiver prior to restarting CA-324 and CA-325A/B.  These specific requirements of the Consent Decree became applicable to PPC upon transfer of the assets.  CA-324 is comprised of buried and insulated pipe.  The pipeline has a coal-tar coating system and insulation wrap that provides corrosion deterrence.

PPC seeks approval to manage external corrosion of the pipeline through a supplemental combination of accelerated reassessments, usage of the appropriate assessment tools, integration of data from the appropriate alternating ILI technologies, enhanced anomaly response criteria targeted at corrosion under insulation, and advanced data analysis techniques to account for potential growth of corrosion under insulation including feature interaction criteria for anomaly assessment.

**Selective Seam Weld Corrosion (SSWC)**
The PHMSA Fact Sheet on Selective Seam Corrosion (known in industry as SSC or SSWC) describes SSWC as "a localized corrosion attack along the bond line of low-frequency electric resistance welded (LF-ERW) and electric flash welded (EFW) piping, that leads to the development of a wedge-shaped groove that is often filled with corrosion products."[1]  The Fact Sheet goes on to say that "LF-ERW or EFW pipe manufacturing processes first came into use in the 1920s.  Both types of pipe are manufactured by forming steel plates into round cylinders and then joining the longitudinal edges through a welding process.  Due to technology and quality control issues with some of the pipe manufactured prior to 1970, the weld bondline may

---

[1] PHMSA Fact Sheet on Selective Seam Corrosion, December 1, 2011; <https://primis.phmsa.dot.gov/comm/FactSheets/FSSelectiveSeamCorrosion.htm>

Teel Declaration
Page 93

be susceptible to corrosion processes.  This is particularly true if the pipeline has the following conditions present:

- Exposure to corrosive conditions due to poor or absent coating;
- Ineffective cathodic protection; or
- The presence of non-metallic inclusions in the weld bondline region (e.g., contaminants present during the manufacturing process).

SSWC is generally not considered to be a concern with pipe manufactured after 1970 due to the use of cleaner steels having greatly reduced sulfur contents and the replacement of low frequency welding equipment with high frequency equipment in the manufacturing process." As provided in **Attachment B**, Line CA-324 contains exclusively high frequency ERW (HF-ERW) longitudinal seamed pipe manufactured in 1985 and 1986.  When ILI tools call corrosion along the seam, it may simply be corrosion incidental to the seam rather than preferential.  Indeed, SSWC has not been observed in the previous direct examinations that make up the extensive dig history on this system.  Therefore, the threat of SSWC is not considered applicable to Line CA-324.  As such, selection of future inspection technologies will prioritize the identification and characterization of external blunt metal loss as the primary threat to this buried, insulated line, namely ultrasonic wall measurement (UTWM) and axial magnetic flux leakage (MFL-A) technologies.

Note that PPC only accepts calls from circumferential magnetic flux leakage (MFL-C), spiral magnetic flux leakage (SMFL), ultrasonic crack detection (UTCD) and/or electro magnetic acoustic transducer (EMAT) ILI systems when applying criteria for corrosion interaction with the longitudinal seam weld, as these technologies are designed for and, therefore are best suited for detection of the longitudinal seam weld and axially oriented corrosion.  MFL-A and/or UTWM are not designed for detection of the longitudinal seam weld or axially oriented corrosion, so calls from those ILI systems are not reviewed for longitudinal seam weld interaction.

The CA-324 Las Flores Canyon to Gaviota testable segment was inspected using a MFL-C tool in February 2022, to better characterize the threat of external metal loss under insulation. Since SSWC has not been observed in the previous direct examinations that make up the extensive dig history on this system, PPC is therefore requesting OSFM to approve a State Waiver which allows for the use of prescript outlined engineering analysis and protocols to differentiate between corrosion anomalies that do not present a specific risk to the seam weld and associated heat affected zones in lieu of the current requirement under 49 C.F.R. § 195.452(h)(4)(iii)(H).  Remediation and repair activities would then be scheduled according to the findings of the proposed evaluation. The following protocols would be applied to the 2022 MFL-C assessment of CA-324, along with all subsequent assessment results (as applicable, per the discussion above regarding tool technology), until the termination of the waiver.

**(5) *A description of any measures or activities the applicant proposes to undertake as an alternative to compliance with the relevant regulation, including an explanation of how such measures will mitigate any safety or environmental risks;***

5

The Application includes memorializing certain integrity management procedures included in the Consent Decree in addition to further measures to maintain the integrity of the pipeline, including measures specific to SSWC.  Many of these measures were negotiated and aligned upon as part of the Consent Decree.

The following measures are proposed, and have been categorized under inspection frequency, inspection validation, remediation criteria, selective seam weld corrosion, and general programmatic considerations.

**Inspection Frequency**

Rather than relying solely on fitness for service analysis to determine the deadline for next inspection and associated interval, PPC proposes to manage the potential for external corrosion rates on the pipeline by the following prescriptive guidelines for inspection frequency:

- PPC will inspect for potential external metal loss prior to restarting CA-324.
- PPC will inspect using UTWM ILI technology within 7 days of achieving initial steady-state operation in accordance with an ILI survey schedule approved by OSFM.
- PPC will inspect CA-324 for potential external metal loss annually, not-to-exceed a 15-month interval between inspections.  The annual inspections will alternate ILI survey technologies employed (i.e., axial magnetic flux leakage (MFL-A) or ultrasonic wall measurement (UTWM)).  Alternatively, PPC may run a UTWM tool each year.
- Where any ILI survey fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, the ILI tool will be rerun to cover the area lacking coverage.

**Inspection validation**

Inspection validation is crucial to ensuring tool tolerances and developing corrosion growth analyses that accurately reflect the integrity condition of the pipeline.  Following an ILI survey to evaluate potential external metal loss, PPC proposes the following:

- ILI surveys will be validated consistent with API Standard 1163 In-line Inspection Systems Qualification, 3rd Edition, September 2021 Level 2 validation methodology, at a minimum. This process will leverage field direct examination measurements of previously repaired external metal loss anomalies that have been preserved (e.g. corrosion mechanism has been arrested by recoating or composite repair installation) to support validation as well as any additional external metal loss validation inspections necessary to support validation.  The depths relied upon for validation of the ILI survey will include external metal loss depths between 10% and 40%.
- ILI tool vendors will be required to apply interaction/clustering criteria of 6t by 6t for applicable ILI tools.
- ILI tool vendors will report all external metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.
- When employing magnetic flux leakage (MFL) ILI tools, ILI tool vendors will be required to manually grade any external metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss and the vendor's ILI report must note any

differences between what the computer algorithm reported and the vendor's manual grade.
- All field direct examination measurements gathered by PPC will be provided to the ILI tool vendor following completion of direct examinations for an ILI survey.

**Remediation criteria**

Following an ILI survey, the following guidelines are proposed to address survey results:

- PPC will remediate all external metal loss anomalies that have an ILI reported depth without including tool tolerance of 40% or greater wall loss, within one year of discovery.  If PPC is unable to remediate such anomalies within one year of discovery, PPC will notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).
- All external metal loss anomalies will be further evaluated via suitable remaining strength calculation methods, which per 49 C.F.R. § 195.452(h)(4)(i)(B) include, but are not limited to, ASME/ANSI B31G (incorporated by reference, see § 195.3) and PRCI PR-3-805 (R-STRENG) (incorporated by reference, see 49 C.F.R. § 195.3).  Anomalies will then be scheduled for remediation per 49 C.F.R. § 195.452(h)(4)(i), (ii), and (iii)(A-G) and (I), and consistent with PPC's Integrity Management Program.  All remaining anomalies that do not meet depth or remaining strength conditions for remediation will be subject to a corrosion growth analysis that accounts for ILI tool tolerance, and all anomalies will be reassessed or repaired by their resultant half-life.
- Any time a shrink sleeve is exposed during an anomaly investigation, the shrink sleeve will be removed, investigated circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoated with two-part epoxy.

Annual inspections will allow for prompt identification of locations with accelerated corrosion growth rates, and the proposed remediation criteria will effectively arrest corrosion growth of remaining features well before approaching potential failure states.  In fact, at a metal loss depth of 40% of nominal wall thickness, there is no credible length at which an anomaly will fail at a burst pressure (calculated using ASME/ANSI Modified B31G) less than or equal to MOP, for all pipe specifications across the entire Las Flores Pipeline system operated by PPC.

**Selective Seam Weld Corrosion**

PPC maintains that the pipe comprising the Las Flores Pipeline system is not susceptible to Selective Seam Weld Corrosion (SSWC), as supported by field data collected during excavation and inspection activities which finds the characterization of corrosion *incidental* to the long seam rather than *preferential* to the long seam. However, PPC proposes the following measures in relation to SSWC:

- All anomalies 'of or along the longitudinal seam weld' and associated heat affected zone (defined as being 1" wide on either side of the weld) will be subject to API RP 1176 for Assessment and Management of Cracking in Pipelines and associated response methodology, and in accordance with API 579-1/ASME FFS-1, December 2021 Fitness-For-Service.  All such anomalies will be further evaluated as blunt metal loss

7

corrosion via suitable remaining strength calculation methods.  Anomalies will then be scheduled for remediation per 49 C.F.R. § 195.452(h)(4)(i), (ii), and (iii)(A-G) and (I), and consistent with PPC's Integrity Management Program.

- All corrosion anomalies 'of or along the longitudinal seam weld' and associated heat affected zone will first be evaluated as crack-like features using API RP 579-1/ASME FFS-1, December 2021 – Level II or Level III fitness for service calculations to determine the Failure Pressure Ratio (FPR) for each anomaly.  Material properties will be selected consistent with 49 C.F.R. § 192.712 - Analysis of predicted failure pressure.  Anomaly depth and FPR values will then be evaluated against API RP 1176 response criteria (Section 11.7) for 'likely cracks' (most severe classification).  All remaining anomalies that do not meet depth or remaining strength conditions for remediation will be subject to fatigue analysis performed using an applicable fatigue growth law (e.g. Paris Law) or other technically appropriate engineering methodology.  Final anomaly size will be determined using a fracture mechanics model appropriate to the failure mode (ductile, brittle, or both) and boundary condition used (pressure test, ILI, or other).  Accounting for tool tolerance, all anomalies will be reassessed or repaired by their resultant half-life.

- All corrosion anomalies 'of or along the longitudinal seam weld' and associated heat affected zone will then be evaluated as blunt metal loss via suitable remaining strength calculation methods, which per 49 C.F.R. § 195.452(h)(4)(i)(B) include, but are not limited to, ASME/ANSI B31G (incorporated by reference, see § 195.3) and PRCI PR-3-805 (R-STRENG) (incorporated by reference, see § 195.3).  Anomalies will then be scheduled for remediation per 49 C.F.R. § 195.452(h)(4)(i), (ii), and (iii)(A-G) and (I), and consistent with PPC's Integrity Management Program. In addition to the standard requirements – and consistent with the set of waiver conditions proposed for External Corrosion – all metal loss anomalies with an ILI reported depth of 40% or greater wall loss will be scheduled for remediation within one year of Discovery.  As previously stated, if PPC is unable to remediate such anomalies within one year of Discovery, PPC will notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).  All remaining anomalies that do not meet depth or remaining strength conditions for remediation will be subject to a corrosion growth analysis, where once again – and accounting for tool tolerance – all anomalies will be reassessed or repaired by their resultant half-life.  Note that this does not supersede the annual UTWM/MFL requirements set forth per the External Corrosion waiver conditions.

- After the analyses are complete, anomalies not scheduled for remediation will be tracked, and corrosion growth will be assessed with each future ILI survey.  P&M measures will be assessed through regular IMP activities and implemented on the pipeline per 49 C.F.R. § 195.452 (f)(6) as needed.

**General Programmatic Considerations**

PPC will conduct its preventative and mitigative measures process to integrate and analyze all available data for CA-324, including, but not limited to:

- Assessment data from in-line inspection (ILI) tool runs;
- Anomaly investigation, inspection, and repair data;

- Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;
- Operational data, such as pressure and flow data;
- Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;
- Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results; and
- Other pipeline characteristics, such as length, diameter, presence of HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR § 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

The potential for external corrosion and selective seam weld corrosion will be re-examined as new and additional data becomes available through integrity assessment activities and through normal operation of the pipeline.  PPC will amend its Integrity Management Program, to include the State Waiver conditions specific to CA-324.

**(6) *A description of any positive or negative impacts on affected stakeholders and a statement indicating how operating the pipeline pursuant to a special permit would be in the public interest;***

Positive impacts on affected stakeholders and operating the covered pipeline segments in accordance with the State Waiver will be in the public interest for the following reasons:
- Limit impacts to the environment and potential locations for cultural resources by reducing unnecessary anomaly digs in areas of low or no risk.
- Maintain the priority of pipeline maintenance activities to sections of the pipeline in greatest need of monitoring for pipeline safety.
- Reduce unnecessary excavation around other critical infrastructure.
- Reduce the permitting workload of public agencies along the pipeline right-of-way.
- Reduce the general risks and impacts, to both the workforce and the public, associated with excavations in and along public highways and other rights-of-way.
- Limit disruptions to the public and to property owners.

**(7) *A certification that operation of the applicant's pipeline under the requested waiver would not be inconsistent with pipeline safety;***

Approval of this State Waiver request focused on characterization and remediation of external corrosion features, will help prioritize conditions that are the most important for the continued

safe operation of this pipeline system and will enhance the effectiveness of the Las Flores Pipeline integrity management program.  This request also supports prioritization of resources and aligns pipeline integrity evaluation criteria with explicit protocols.  All of the operational protocols that PPC is proposing exceed other regulatory requirements and are protective of pipeline safety.

**(8) If the application is for a renewal of a previously granted waiver or special permit, a copy of the original grant of the waiver or permit; and**

*N/A; this is an initial application.*

**(9) Any other information PHMSA may need to process the application including environmental analysis where necessary.**

Note that PPC is not seeking relief from 49 C.F.R. § 195.563 and the requirements to provide cathodic protection for buried pipelines.  The cathodic protection system remains active and continues to be maintained on the Las Flores Pipeline system.  Rather, PPC proposes the aforementioned inspection and remediation actions as a means of addressing the limitations of cathodic protection PHMSA observed for buried, insulated pipe.

Cathodic protection will continue to be implemented on the pipeline system at appropriate levels in adherence to 49 C.F.R. 195 and tested at appropriate intervals.  Cathodic protection will continue to function with high effectiveness at pipeline repair locations where the thermal insulation has been removed.

---

PPC maintains that the proposed conditions and facts-at-matter for the pipeline describe a conservative and measured approach to the identification and remediation of external corrosion metal loss features on the Las Flores Pipeline system, adequately manage risk factors associated with cathodic protection, and enable safe, long-term operation of the pipeline.

We thank you for your consideration of this State Waiver request.  If you have any questions, or require anything further to conduct your review of this request, please do not hesitate to contact me.  I also ask that PPC be given the opportunity to amend this application as needed to provide additional information or address deficiencies identified by the OSFM before formal action is taken to reject or deny the application.

Sincerely,


Diana Skates
Pipeline Safety Advisor
Pacific Pipeline Company

Attachments:   A:     Las Flores Pipeline System Map & Trunk Line Chart
               B:     Las Flores Pipeline Background Data

cc:  Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
     Andy Chau, Supervising Pipeline Safety Engineer, OSFM
     Brandon Ferry, Supervising Pipeline Safety Engineer, OSFM
     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
     Durga Shrestha, Pipeline Safety Engineer, OSFM
     Huy Tran, Supervising Pipeline Safety Engineer, OSFM
     Josh Cleaver, Staff Counsel, OSFM
     Matthew Young, Senior Pipeline Integrity Advisor, ExxonMobil Pipeline Company LLC (EMPCo)
     Rebekah Bennett, General Counsel, PPC & EMPCo

# ATTACHMENT A



# ATTACHMENT A



# *Pipeline System Background Data*

## Attachment B
## of
## State Waiver Application

### PACIFIC PIPELINE COMPANY

### LAS FLORES PIPELINE SYSTEM
### CA-324, CA-325A/B

**June 2023**

Issued by:

**PACIFIC PIPELINE COMPANY**

Teel Declaration
Page 103

## PURPOSE

Supplemental information to Pacific Pipeline Company's State Waiver Application is included herein to summarize relevant details related to the pipelines and associated operation that may be considered in support of State Waiver conditions.  The following is summarized:

- ▪ Pipeline Description
- ▪ Pipeline Specifications
- ▪ Hydrostatic Test Information
- ▪ Maximum Operating Pressure
- ▪ Normal Operating Pressures
- ▪ In-line Inspection History
- ▪ Coating and Cathodic Protection System Information

## PIPELINE DESCRIPTION

The CA-324 24-inch pipeline (formerly referred to as Line 901) is approx. 10.86 miles in length and generally parallels U.S. Highway 101 along the south coast between the Las Flores Canyon consolidated oil and gas processing facility and the Gaviota Station.  The pipeline is located north of U.S. 101 and generally follows powerline and/or natural gas pipeline rights-of-way across coastal terraces and incised canyons.

The CA-325A 30-inch pipeline (formerly referred to as Line 903 – Gaviota to Sisquoc) is approx. 38.72 miles in length.  The pipeline extends west from the Gaviota Station to an MOV located east of Gaviota Creek and U.S. Highway 101.  It then enters Gaviota State Park approx. 0.5 miles east of U.S. Highway 101 and extends westerly across the gently sloping coastal terrace and Cañada del Barro before dropping into the Cañada de la Gaviota drainage area.  It then crosses U.S. Highway 101 and Gaviota Creek (Cañada de la Gaviota) immediately south of the U.S. Highway 101 "Caltrans" rest stop area.  The pipeline then extends west and north from the Gaviota Creek MOV. The pipeline continues west up a broad spur ridge to the ridge crest and the westerly boundary of Gaviota State Park.  The pipeline traverses narrow ridge crests, crosses out of the Park and onto Hollister Ranch for approx. 0.5 miles, and then crosses back into the Park before descending toward the west fork of Gaviota Creek (Betty Creek).  The right-of-way passes west of the Vista del Mar School and Las Cruces Adobe and then crosses beneath Highway 1 west of its intersection with U.S. Highway 101.  The pipeline continues northward along the west side of U.S. Highway 101 through the Santa Ynez Mountains.  It crosses long expanses of grasslands across the Las Cruces Ranch and steep walled canyons that form part of the Nojoqui Creek watershed.  North of Moonshine Creek, the route crosses ridges with rock outcroppings.  The pipeline crosses beneath the Santa Ynez River west and south of Buellton and continues north across the Purisima and Solomon Hills.  It crosses the northern edge of the San Rafael Mountains and the eastern edge of the Santa Maria Valley.  The pipeline crosses beneath the Sisquoc River and continues north across the River Valley.  It traverses moderately to severely sloping foothills at Kelly Canyon and extends west to the Sisquoc Station at the southern end of Santa Maria Canyon.

The CA-325B 30-inch pipeline (formerly referred to as Line 903 – Sisquoc to Pentland) is approx. 74.84 miles in length.  The pipeline follows Santa Maria Canyon after leaving the Sisquoc Station.  It then extends northeast towards Tepusquet Road.  The route crosses relatively gentle terrain until it reaches the crest of the Sierra Madre Mountains where it traverses steep slopes approaching Suey Canyon and Buckhorn Canyon.  The pipeline follows the northern edge of the Sierra Madre Mountains south of State Highway 166 through the Los Padres National Forest.  The route crosses

---

rugged terrain across the crests of the Sierra Madre Mountains, descends the mountains, crosses the Sierra Madre Ridge Road, and enters the Cuyama River Valley near Gypsum Canyon.  At the Cuyama River crossing, the pipeline exits Santa Barbara County and enters San Luis Obispo County. The pipeline continues for approx. 44.5 miles through ranch land, terminating at the Pentland Station in Kern County.

The routing of the Las Flores Pipelines has been considered for its impact on High Consequence Areas (HCA) per established PPC Integrity Management Plan guidelines and applicable regulations. Table B-1 provides a high-level summary of High Consequence Areas (HCAs) along the Las Flores Pipeline System.

**TABLE B-1: HIGH CONSEQUENCE AREA SUMMARY**

| Pipeline Designation | Location | Total Mileage | High Consequence Area (HCA) Type |
|---|---|---|---|
| CA-324 | Las Flores Canyon to Gaviota | 10.86 | Impact to ecologically sensitive regions (coastline) |
| CA-325A | Gaviota to Sisquoc | 38.72 | Impact to the city of Buellton (population center, drinking water), and ecologically sensitive regions |
| CA-325B | Sisquoc to Pentland | 74.84 | Impact to ecologically sensitive regions |

The Las Flores Pipeline traverses multiple Counties as well as State and Federal jurisdictions. Approximate mileage is included in Table B-2, below.

**TABLE B-2: JURISDICTIONAL MILEAGE**

| | Jurisdiction | CA-324 (miles) | CA-325A (miles) | CA-325B (miles) | Total (miles) |
|---|---|---|---|---|---|
| **County** | Santa Barbara County | 10.9 | 38.7 | 23.8 | 73.4 |
| | San Luis Obispo County | 0 | 0 | 37.2 | 37.2 |
| | Kern County | 0 | 0 | 13.8 | 13.8 |
| | Total | 10.9 | 38.7 | 74.8 | 124.4 |
| **Sub-Jurisdiction (Note 1)** | California State Parks and Recreation (Gaviota State Park) | 0 | 4.1 | 0 | 4.1 |
| | U.S. Forest Service | 0 | 0 | 6.3 | 6.3 |
| | U.S. Fish and Wildlife (Bitter Creek Wildlife Refuge) | 0 | 0 | 4.5 | 4.5 |
| | California Dept. of Fish and Wildlife (Carrizo Plain Ecological Reserve) | 0 | 0 | 4.5 | 4.5 |
| | Bureau of Land Management | 0 | 0 | 1.0 | 1.0 |
| | City of Buellton | 0 | 1.1 | 0 | 1.1 |
| | Total | 0 | 5.2 | 16.3 | 21.5 |

*Note 1: Mileage included in County jurisdiction*

## PIPELINE SPECIFICATIONS

CA-324 is manufactured of low carbon steel.  It contains predominantly 0.344-inch nominal wall thickness, high frequency electric resistance welded (HF-ERW) API 5L X65 pipe manufactured in 1985 and 1986 by Nippon Steel Corp., Hikari Works mill, in Japan using plate steel with UOE pipe forming process.  A summary of CA-324 line pipe specifications is included in Table B-3.

CA-325A/B is manufactured of low carbon steel.  It contains various grades and wall thicknesses of double submerged arc welded (DSAW) API 5L pipe manufactured between 1984 and 1986, from a variety of mills in Belgium, Brazil, France, Germany, and Israel, summarized in Table B-4.  Additionally, it includes small portions of replaced sections with newer pipe, including HF-ERW.  A summary of CA-325A/B line pipe specifications is included in Table B-3.

### TABLE B-3: LINE PIPE SPECIFICATIONS

| Pipeline Designation | Outside Diameter (in) | Nominal Wall Thickness (in) | Grade | Seam Type | Year Installed | Length (mi) |
|---|---|---|---|---|---|---|
| CA-324 Las Flores Canyon to Gaviota | 24 | 0.344 | X65 | HF-ERW | 1990 | 10.69 |
| | 24 | 0.375 | X65 | HF-ERW | 1990 | 0.02 |
| | 24 | 0.5 | X60 | HF-ERW | 1990 | 0.16 |
| CA-325A Gaviota to Sisquoc | 30 | 0.281 | X70 | DSAW | 1986 | 21.85 |
| | 30 | 0.344 | X65 | DSAW | 1986 | 12.47 |
| | 30 | 0.375 | X65 | DSAW | 1986 | 2.27 |
| | 30 | 0.375 | X65 | DSAW | 2014 | 0.12 |
| | 30 | 0.406 | X65 | DSAW | 1986 | 0.38 |
| | 30 | 0.406 | X65 | HF-ERW | 2000 | 0.03 |
| | 30 | 0.438 | X70 | DSAW | 1986 | 0.17 |
| | 30 | 0.5 | X60 | DSAW | 1986 | 0.75 |
| | 30 | 0.5 | X70 | DSAW | 1986 | 0.28 |
| | 30 | 0.562 | X65 | DSAW | 1986 | 0.06 |
| | 30 | 0.75 | X65 | DSAW | 1986 | 0.35 |
| CA-325B Sisquoc to Pentland | 30 | 0.281 | X70 | DSAW | 1986 | 19.29 |
| | 30 | 0.344 | X65 | DSAW | 1986 | 17.03 |
| | 30 | 0.344 | X65 | DSAW | 2007 | 0.24 |
| | 30 | 0.375 | X65 | DSAW | 1986 | 12.88 |
| | 30 | 0.375 | X70 | DSAW | 2017 | 0.16 |
| | 30 | 0.375 | X70 | DSAW | 2018 | 0.02 |
| | 30 | 0.406 | X65 | DSAW | 1986 | 0.12 |
| | 30 | 0.438 | X70 | DSAW | 1986 | 24.41 |
| | 30 | 0.5 | X60 | DSAW | 1986 | 0.13 |
| | 30 | 0.5 | X70 | DSAW | 1986 | 0.28 |
| | 30 | 0.625 | X65 | DSAW | 1986 | 0.01 |
| | 30 | 0.75 | X70 | DSAW | 1986 | 0.27 |

**TABLE B-4: CA-325A/B LINE PIPE MILL INFORMATION**

| Mill | Location | Plate or Coil | Pipe Forming Process |
|---|---|---|---|
| Bergroh | Germany | Plate | Three Beam Rollers |
| Confab | Brazil | Plate | UOE |
| Hoesch | Germany | Coil | Spiral |
| Metco | Israel | Coil | Spiral |
| Sacilor | France | Coil | Spiral |
| Tubemeuse | Belgium | Coil | Spiral |
| Tubes de Belville | France | Plate | C-press |
| Vallourec (GTS) | France | Plate | UOE |
| Mannesmann | Germany | Plate | UOE |

## HYDROSTATIC TEST INFORMATION

CA-324 was hydrostatically pressure-tested on November 25, 1990 to 1765 pounds per square inch gauge (psig), as calculated at the highest elevation.  CA-325A was hydrostatically pressure-tested in nine separate segments between pressures of approx. 778 to 1757 psig, as calculated at the highest elevations of each segment, between October 14, 1986 and December 3, 1986.  CA-325B was hydrostatically pressure-tested within eleven separate segments between pressures of 686 to 1753 psig, as measured at the highest elevations of each segment, between January 13, 1986 and November 8, 1986.  Portions of pipe replaced after original construction hydrotest were tested at or above the originally established test pressure and established maximum operating pressure (MOP) prior to being placed into service.  A summary of the percent of specified minimum yield strength (%SMYS) and the corresponding MOP, as established by the original construction hydrotest records, is included in Table B-5.  A summary of original construction hydrotest records are included in Table B-6.

**TABLE B-5: ORIGINAL CONSTRUCTION HYDROTEST – %SMYS AND MOP RANGES**

| Pipeline Designation | %SMYS | | Corresponding MOP to Test Pressure (psig) | |
|---|---|---|---|---|
| | Min | Max | Min | Max |
| CA-324 | 54.5% | 72.0% | 1133 | 1410 |
| CA-325A | 25.8% | 72.0% | 622 | 1085 |
| CA-325B | 37.0% | 72.0% | 549 | 1472 |

**TABLE B-6: HISTORIC HYDROTEST SUMMARY**

| Pipeline Designation | Test Segment Identifier | Date | Begin Station | End Station | Minimum Test Pressure at Max Elevation (psig) | MOP at Max Elevation (psig) *(Note 1)* |
|---|---|---|---|---|---|---|
| CA-324 | LF – Gav | 11/25/1990 | 0 | 57352 | 1416 | 1133 |
| CA-325A | 11 | 10/14/1986 | 238652 | 259872 | 863 | 690 |
| | 12 | 11/14/1986 | 179721 | 235388 | 778 | 622 |
| | 13 | 11/14/1986 | 144307 | 179721 | 784 | 627 |
| | 14 | 11/21/1986 | 137049 | 144307 | 1083 | 866 |
| | SYR | 12/3/1986 | 135120 | 137049 | 1757 | 1406 |
| | 15-16 | 10/30/1986 | 111386 | 135120 | 1155 | 924 |
| | 17 | 10/29/1986 | 93221 | 111386 | 1120 | 896 |
| | 18 | 11/19/1986 | 66621 | 93221 | 906 | 725 |
| | 19 | 11/19/1986 | 55421 | 66621 | 1105 | 884 |
| CA-325B | 1 | 1/13/1986 | 639412 | 733359 | 1344 | 1075 |
| | 1A | 9/7/1986 | 618385 | 639412 | 1025 | 820 |
| | 2 | 9/9/1986 | 608271 | 618385 | 906 | 725 |
| | 3 | 9/14/1986 | 505520 | 608271 | 686 | 549 |
| | 4 | 9/17/1986 | 415547 | 505520 | 1125 | 900 |
| | 5A | 9/17/1986 | 385240 | 415547 | 1753 | 1403 |
| | 5B | 11/8/1986 | 359963 | 385240 | 1219 | 975 |
| | 6 | 10/18/1986 | 338470 | 359963 | 992 | 793 |
| | 7 | 10/21/1986 | 316971 | 338470 | 1484 | 1187 |
| | 8-9 | 10/16/1986 | 268171 | 316971 | 1183 | 946 |
| | 10 | 10/14/1986 | 260278 | 268171 | 1449 | 1160 |

*Note 1: This value is simply the resultant, corresponding, MOP based upon the hydrostatic test record. It does not reflect the MOP value the Operator, Pacific Pipeline Company, assigns the pipelines and is only included for context.*

## MAXIMUM OPERATING PRESSURE

Due to the dramatic elevation profile and resultant hydraulic pressure profile of the Las Flores Pipeline System, Maximum Operating Pressure (MOP) has been documented using a variable MOP methodology, in which MOP is a function of pipe stationing (distance).  The documented MOP is based upon hydrostatic test records, documented pipeline elevation profile, relevant design codes, and Pacific Pipeline Company's hydraulic analysis that contemplates all possible steady-state and transient operating scenarios, including surge and incorrect operations.

All potential modes of operation, including normal and abnormal, were evaluated in an engineering and hydraulic analysis conducted in 2023 to determine maximum pressures that may be experienced on the pipeline during various modes of operation.  The hydraulic analysis considered multiple worse-case steady-state operating conditions, such as maximum flow and maximum hydraulic pressure gradient scenarios as well as over sixty initiating transient events, including inadvertent valve closures, start-up and shutdown, and pump trips.

The maximum pressures that resulted from the analysis were compared to historic hydrostatic test records, official pipeline elevation data from inspections, and considered regulation and design

code.  The basis to define the pipeline's MOP for each segment is summarized in Table B-7.  The absolute maximum steady-state and transient pressure profile for all possible normal and abnormal operating modes is represented in Figures B-1, B-2, and B-3.  A summary of the percent of specified minimum yield strength (%SMYS) and the corresponding current, documented and official, MOP for the pipeline is included in Table B-8.

**TABLE B-7: SUMMARY OF MOP BASIS**

| Pipeline Designation | Explanation of MOP Basis |
|---|---|
| CA-324 | 100 psi above max steady-state & transient pressure profile |
| CA-325A | 100 psi above max steady-state & transient pressure profile |
| CA-325B | 50 psi above max steady-state & transient pressure profile for Mile Post 49.57 to Mile Post 117.41<br>80% of original construction hydrostatic test pressure for Mile Post 117.41 to Mile Post 124.42 |

**TABLE B-8: DOCUMENTED, OFFICIAL MOP – %SMYS AND MOP RANGES**

| Pipeline Designation | %SMYS | | Documented MOP (psig) | |
|---|---|---|---|---|
| | Min | Max | Min | Max |
| CA-324 | 28.5% | 55.4% | 684 | 1003 |
| CA-325A | 21.7% | 67.9% | 444 | 1000 |
| CA-325B | 21.9% | 72.0% | 317 | 1292 |

**FIGURE B-1: CA-324 MAXIMUM OPERATING PRESSURE**



## FIGURE B-2: CA-325A MAXIMUM OPERATING PRESSURE



## FIGURE B-3: CA-325B MAXIMUM OPERATING PRESSURE



Teel Declaration
Page 110

## NORMAL OPERATING PRESSURES

In order to establish the Normal Operating Pressure (NOP) range for the Las Flores Pipeline System, PPC evaluated over seventeen different operating conditions to document relevant hydraulic information.  An array of the following conditions and variables were considered to capture the range of potential operating conditions.

- Flow rates
- Suction pressure, discharge pressure, and backpressure control parameters
- Allowable pump and pressure/flow control device operating scenarios
- Fluid temperatures
- Soil temperatures
- Fluid characteristics (e.g. density, viscosity)

Historical operating data was used to validate the hydraulic model and ensure analysis accuracy, and a few historical operating data points are captured in Figures B-4, B-5, and B-6, for reference. The resultant minimum and maximum typical pressure ranges based upon the range of steady state scenarios are documented in Figures B-4, B-5, and B-6.

### FIGURE B-4: CA-324 NORMAL OPERATING PRESSURE



---

Attachment B                                  9                                  July 2023

**FIGURE B-5: CA-325A NORMAL OPERATING PRESSURE**



**FIGURE B-6: CA-325B NORMAL OPERATING PRESSURE**



## IN-LINE INSPECTION HISTORY

The following Table B-9 provides a summary of CA-324, CA-325A, and CA-325B In-Line Inspection (ILI) activities, as of July 2023. Note that CA-324 Las Flores Canyon to Gaviota has been inspected since the 2015 release, in February and December of 2022 (circumferential magnetic flux leakage (MFL-C) and ultrasonic wall measurement (UTWM) surveys, respectively).

**TABLE B-9: IN LINE INSPECTION SUMMARY**

| Pipeline Designation | Date of Inspection | Technology | Vendor | No. of Ext Metal Loss | No. of Ext ML On/Near Seam | No. of Int Metal Loss | No. of Dents | No. of Seam ML Anomalies | No. of Repair Digs |
|---|---|---|---|---|---|---|---|---|---|
| CA-324 Las Flores Canyon to Gaviota | 6/18/2007 | Def+MFL+IMU | Rosen | 386 | N/A | 237 | 0 | N/A | 13 |
| | 7/3/2012 | Def+MFL+IMU | Rosen | 1578 | N/A | 6 | 1 | N/A | 41 |
| | 5/6/2015 | Def+MFL+IMU | Rosen | 1747 | N/A | 0 | 6 | N/A | 25 |
| | 2/23/2022 | CMFL | Baker Hughes | 2489 | 415 | 151 | 8 | 330 | TBD |
| | 12/10/2022 | UTWM | Baker Hughes | 1603 | N/A | 205 | N/A | N/A | TBD |
| CA-325A Gaviota to Sisquoc | 1/1/2003 | Def+MFL+IMU | Tuboscope | 362 | N/A | 0 | 22 | N/A | 1 |
| | 3/20/2008 | Def+MFL+IMU | Rosen | 1772 | N/A | 4932 | 12 | N/A | 21 |
| | 4/21/2008 | Def | | | | | | | |
| | 5/8/2008 | Def+MFL+IMU | | | | | | | |
| | 4/29/2013 | Def+MFL+IMU | Rosen | 14152 | N/A | 21135 | 10 | N/A | 90 |
| CA-325B Sisquoc to Pentland | 10/1/1994 | Unknown | Tuboscope | Unknown | Unknown | Unknown | Unknown | Unknown | N/A |
| | 1/8/2003 | Def+MFL | Tuboscope | 295 | N/A | 0 | 9 | N/A | N/A |
| | 10/21/2006 | Def+MFL | Tuboscope | 162 | N/A | 0 | 4 | N/A | 2 |
| | 3/10/2012 | Def+MFL | TDW | 14459 | N/A | 27501 | 9 | N/A | 101 |
| | 6/12/2013 | MFL | | | | | | | |

## COATING AND CATHODIC PROTECTION SYSTEM INFORMATION

The Las Flores Pipeline System is externally coated with the following coating system as illustrated in Figure B-7:

- Coal tar urethane (CTU) coating in intimate contact with the steel pipe
- Layer of rigid thermal polyurethane (PU) foam insulation
- Outer layer of polyethylene (PE) tape wrap

**FIGURE B-7: EXTERNAL COATING SYSTEM DIAGRAM**



Shrink sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at original construction pipeline field joints.  The use of the PU foam and PE tape was selected at the time of original construction to minimize heat loss of the crude oil within the pipeline during transit.  The pipeline system has an impressed-current cathodic protection (CP) system that was energized at the time of installation.  The CP system consists of active rectifiers at Las Flores Canyon Station, Gaviota Station, and Sisquoc Station, a critical bond at Pentland, as well as over 140 test stations across the entire CA-324 and CA-325A/B pipeline.  The PU insulation and PE tape wrap has the ability to shield the cathodic protection.  As a result, the CP current may not reach the pipe surface to arrest corrosion in the limited instance the CTU coating becomes disbonded.  As a result, despite ongoing operation of the cathodic protection system in compliance with applicable regulations, the pipeline remains at risk of corrosion under insulation (CUI).

The CP system remains active and provides a level of external corrosion deterrence, and it is highly effective on portions of the pipeline without insulation (e.g. FBE and epoxy-coated regions).  Cathodic protection has and will continue to be implemented, tested, and maintained on the pipeline at appropriate levels and in compliance with applicable regulations.  Additionally, the use of

modern, advanced in-line inspection technologies, along with explicit integrity management programs and procedures for robust characterization, validation, and criteria for anomaly repair support supplemental integrity management steps that exceed regulatory corrosion protection requirements and enable safe, responsible operation.  Comprehensive conditions for effective management of the threat of external corrosion are included in Sections 5 of this Application.

# Exhibit 8

Declaration of Julie Teel Simmonds

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



### CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**  **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324)**

Operator:     Sable Offshore Corp
              OPID# 40851
              845 Texas Avenue, # 2920
              Houston, Texas 77002

Pipeline:     OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Teel Declaration
Page 119

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

**In-Line Inspection (ILI) Assessment and Frequency**

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

   a) Dates for integrity assessment

   b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 6

segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

c) In-line inspection tool vendor(s)

d) Required tool specifications including operational specifications and anomaly sizing tolerances

e) Tool validation methodology

f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

g) Criteria used to identify locations for excavation and field verification

h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

## 180-Day Repair Conditions[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
   a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 11

    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions

Lance Yearwood
December 17, 2024
Page 13

    e. Evaluation methodology used

    f. Models used

    g. Direct in situ examination data

    h. All in-line inspection tool assessments information evaluated

    i. Pressure test data and results

    j. All in-the-ditch assessments performed on the pipeline segments

    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

    l. All finite element analysis results

    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

    n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

    o. Safety factors used for fatigue life and/or predicted failure pressure calculations

    p. Reassessment time interval and safety factors

    q. The date of the review

    r. Confirmation of the results by qualified technical subject matter expert(s)

    s. Approval by responsible Sable management personnel

    t. Records of additional preventive and mitigative (P&M) measures performed

    u. Reports required by this State Waiver.

**Reporting**

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324*. The email notification shall include, if applicable:

    a. Tool type and run date

    b. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

    c. Dig sheets

    d. Field contact information for Sable

    e. Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Lance Yearwood
December 17, 2024
Page 14

       a. Tool type
       b. Run date
       c. Summary of Conditions Report[18]
       d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324.* At a minimum, the annual report shall contain the following, if applicable:

    a. A Closure Report for the previous calendar (CY) which contains:
       i. Features that were remediated in previous CY
          1. Provide documentation for the in-the-ditch assessments and repairs
       ii. Identify features that remain to be assessed
       iii. Unity Plots for previous ILI runs
    b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
    c. The third-party ILI expert reviews in accordance with Condition 52
    d. AC and DC Interference surveys that are due in accordance with Condition 53
    e. A copy of the CGRA for prior year including:
       i. Mean corrosion growth rate for the pipeline
       ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

**Limitations**

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Lance Yearwood
December 17, 2024
Page 15

        failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs


Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
      Andy Chau, Supervising Pipeline Safety Engineer, OSFM
      Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
      Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
      Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
      Tuan Tran, Pipeline Safety Engineer, OSFM
      Josh Cleaver, Staff Counsel, CAL FIRE
      Max Kieba, Engineering and Research Division, PHMSA
      Joshua Johnson, Engineering and Research Division, PHMSA

# Exhibit 9

Declaration of Julie Teel Simmonds

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



<u>**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15**</u>

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:    LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR
LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON
THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG
A LONGITUDINAL SEAM WELD (CA-325A/B)**

Operator:    Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

Pipeline:    OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of
Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa
Barbara County, San Luis Obispo County, and Kern County, California as
described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under
insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Teel Declaration
Page 133

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

## General Conditions

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Docusign Envelope ID: 166BEFF3-211F-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 4

8.  Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
    a.  API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
    b.  API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.
    At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]
9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.
10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.
11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b.  All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.
13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.
14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours.  Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b.  All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.
15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.
16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.
17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.
18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Lance Yearwood
December 17, 2024
Page 6

## In-Line Inspection (ILI) Assessment and Frequency

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination
20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 7

any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to  meet  the  tool  accuracy specification  provided  by  the  vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different.  If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.
    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.
    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

## Integrity Management

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

   a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

   b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

58. Sable must maintain the following records:
   a. Technical approach used for the analysis
   b. All data used and analyzed
   c. Pipe and longitudinal weld seam properties
   d. Procedures used to implement state waiver conditions
   e. Evaluation methodology used
   f. Models used
   g. Direct in situ examination data
   h. All in-line inspection tool assessments information evaluated
   i. Pressure test data and results
   j. All in-the-ditch assessments performed on the pipeline segments
   k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
   l. All finite element analysis results
   m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 13

    n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
    o. Safety factors used for fatigue life and/or predicted failure pressure calculations
    p. Reassessment time interval and safety factors
    q. The date of the review
    r. Confirmation of the results by qualified technical subject matter expert(s)
    s. Approval by responsible Sable management personnel
    t. Records of additional preventive and mitigative (P&M) measures performed
    u. Reports required by this State Waiver.

## Reporting

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B.* The email notification shall include, if applicable:
    d. Tool type and run date
    e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    f. Dig sheets
    g. Field contact information for Sable
    h. Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:
    i. Tool type
    j. Run date
    k. Summary of Conditions Report[18]
    l. Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B.* At a minimum, the annual report shall contain the following, if applicable:

a. A Closure Report for the previous calendar (CY) which contains:
   i. Features that were remediated in previous CY
      1. Provide documentation for the in-the-ditch assessments and repairs
   ii. Identify features that remain to be assessed
   iii. Unity Plots for previous ILI runs
b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
c. The third-party ILI expert reviews in accordance with Condition 53
d. AC and DC Interference surveys that are due in accordance with Condition 54
e. A copy of the CGRA for prior year including:
   i. Mean corrosion growth rate for the pipeline
   ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## **Limitations**

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 15


Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,



JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Tuan Tran, Pipeline Safety Engineer, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Max Kieba, Engineering and Research Division, PHMSA
        Joshua Johnson, Engineering and Research Division, PHMSA

Teel Declaration
Page 147

# Exhibit 10

Declaration of Julie Teel Simmonds

CENTER *for* BIOLOGICAL DIVERSITY                          *Because life is good.*

*Via Electronic Mail and Certified First-Class U.S. Mail, Return Receipt Requested*

December 23, 2024

Tristan Brown, Deputy Administrator
Pipeline and Hazardous Materials Safety
Administration (PHMSA)
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590
Tristan.Brown@dot.gov

Joe Tyler, Director/Fire Chief, CAL FIRE
Office of the State Fire Marshal
715 P Street
Sacramento, CA 94244-2460
Joe.Tyler@fire.ca.gov

**Subject:**    **Request for Objection to State Waiver for Restart of Pipelines CA-324 and CA-325 (Formerly Lines 901/903); Accufacts Inc. Evaluation of Pipeline Startup**

Dear Deputy Administrator Brown and Fire Chief Tyler,

On December 17, 2024 Sable Offshore Corp. announced in a Form 8-K filing that the California Office of the State Fire Marshal ("CalFIRE") has issued the company a State Waiver for the Las Flores Pipeline System, pipelines CA-324 and CA-325, formerly Lines 901 and 903.[1] As we noted in our letter to the Pipeline and Hazardous Materials Safety Administration (PHMSA) on September 17, 2024 (attachment 2) and September 24, 2024 letter to CalFIRE (attachment 3) , the effort to restart this failed pipeline (after abandoning plans to build a new, replacement pipeline) poses grave risks to public safety and the environment and should not be enabled through issuance of a State Waiver.

News of the Waiver came as a surprise given that CalFIRE previously informed the public and state legislators that it would not issue any Waiver until it held a public meeting,[2] which we understood would occur sometime in mid- or late January. The State Waiver (if it indeed issued) has not yet been posted on CalFIRE's webpage for the restart proposal. Nor to our knowledge has its submittal to PHMSA for review been noticed in the Federal Register. That said, a State Waiver "information poster" added to the CalFIRE webpage on December 18, 2024 indicates that the State Waiver may be predicated on stand-in measures that raise many red flags about what the Waiver itself might contain.[3]

---

[1] Sable Offshore Corp., U.S. Securities and Exchange Commission, Form 8-K (Dec. 17, 2024) (Att. 1).
[2] Nick Welsh, Sable Offshore Energy Clears Major Hurdle to Restart Damaged Pipeline in Santa Barbara County, Santa Barbara Independent (Dec. 20, 2024), available at https://www.independent.com/2024/12/20/sable-offshore-energy-clears-major-hurdle-to-restart-damaged-pipeline-in-santa-barbara-county/ (Att. 4).
[3] CalFIRE, State Waiver Informational Poster (Dec. 18, 2024), available here (Att. 5).

*Alaska . Arizona . California . Colorado . Florida . Hawaii . N.Carolina . New Mexico . New York . Oregon . Washington, D.C. . La Paz, Mexico*

P.O. Box 710, Tucson, AZ 85702-0710   tel (520) 623.5252   fax (520) 623.9797   BiologicalDiversity.org

Teel Declaration
Page 149

While the public has yet to see the State Waiver, Accufacts Inc. has reviewed publicly available information and prepared the attached *Evaluation of the Las Flores Pipeline System Startup Proposal* for the Center for Biological Diversity and Environmental Defense Center (Att. 6). Accufacts Inc.'s president, Richard Kuprewicz, is a chemical engineer with over fifty years of experience in the energy industry, including extensive experience conducting pipeline incident investigations after pipeline rupture tragedies. As explained in detail in the attached report:

Accufacts finds that the main technical issues concerning the restart of the Pipelines are:

1. **The poorly designed pipeline system renders required federal mandated cathodic protection ("CP"), intended to help address pipeline external corrosion, ineffective.**
2. **Current inline inspection ("ILI") technologies cannot adequately allow the assessment of all forms of external corrosion threats that most likely exist on the Pipelines.**
3. **The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective CP system once the Pipelines go into operation.**
4. **Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure. The poorly designed Pipelines cannot be made as safe as new pipelines.**

*Accufacts Inc. Evaluation* at 1.

The report concludes that:

> Given the ineffectiveness of the CP system to protect against external corrosion and the fact that the Pipelines have sat for over nine years without effective CP, and the failure of the Consent Decree to address these possible threats via proper hydrotesting and ILI, it is imprudent to expect that such limited assessment techniques can adequately protect against corrosion failure. Poor pipeline design and using the wrong set of integrity management tools (i.e., tools that do not adequately detect and permit the prudent evaluation of the type of corrosion threats specific to a given pipeline) can make the risk of an oil spill orders of magnitude worse. The Las Flores Pipeline System is unusually dangerous given its age and inherent design flaws.

*Accufacts Inc. Evaluation* at 15.

We are writing to request that PHMSA object to any State Waiver issued to Sable Offshore Corp. for the restart of the pipeline system that caused the devastating Refugio State Beach oil spill in 2015 and has been out of service for nearly a decade. Issuing a Waiver to this decades-old, poorly designed, corrosion-prone pipeline system with a waiver of crucial pipeline safety requirements is inconsistent with the special permit/state waiver standards, pipeline safety, and the public interest (49 U.S.C. Section 60118; 49 C.F.R. Section 190.341); risks another serious

2

oil spill; and fails to adequately protect public safety and the environment. Furthermore, we request that CalFIRE suspend the State Waiver. The absence of meaningful environmental review, public oversight, and informed decisionmaking on this State Waiver is unlawful and violates legal requirements to ensure the safety and integrity of pipelines, the protection of public resources and the environment, and public participation and transparency.

Sincerely,

Julie Teel Simmonds
Senior Counsel
jteelsimmonds@biologicaldiversity.org

cc:     Linda Krop, Chief Counsel, Environmental Defense Center
        lkrop@environmentaldefensecenter.org

        Dustin, Hubbard, Western Region Pipeline Safety Director, PHMSA
        dustin.hubbard@dot.gov

        Linda Daugherty, Deputy Associate Administrator for Field Operations, PHMSA
        linda.daugherty@dot.gov

        Janet Whitlock, Regional Environmental Officer, Region IX, Department of Interior
        janet_whitlock@ios.doi.gov

        Tracy Stone-Manning, Director, Bureau of Land Management
        tstonemanning@blm.gov

        Joe Stout, California State Director, Bureau of Land Management
        castatedirector@blm.gov

        Lieutenant Governor Eleni Kounalakis
        eleni.kounalakis@ltg.ca.gov

        Lisa Plowman, Director, Santa Barbara County Planning & Development Department
        lplowman@countyofsb.org

        Jennifer Lucchesi, Executive Officer
        California State Lands Commission
        Jennifer.Lucchesi@slc.ca.gov

        Matthew Dumlao, Chief of Staff
        Office of the Lieutenant Governor
        matthew.dumlao@ltg.ca.gov

3

Brian Goldman, Deputy Legal Affairs Secretary
Office of Governor Gavin Newsom
brian.goldman@gov.ca.gov

Lauren Sanchez, Senior Climate Advisor
Office of Governor Gavin Newsom
lauren.sanchez@gov.ca.gov

Rob Bonta, Attorney General
State of California Department of Justice
rob.bonta@doj.ca.gov

Angela Mo, Senior Counsel
angela.mo@usdoj.gov

Daniel Berlant, State Fire Marshal
Daniel.Berlant@fire.ca.gov

Jim Hosler, Chief /Assistant Deputy Director, CAL FIRE
Jim.Hosler@fire.ca.gov

Wade Crowfoot, Secretary
California Natural Resources Agency
wade.crowfoot@resources.ca.gov
secretary@resources.ca.gov

Armando Quintero, Director
California Department of Parks and Recreation
Armando.Quintero@parks.ca.gov

Charlton Bonham, Executive Director
California Department of Fish and Wildlife
director@wildlife.ca.gov

Ryan Lodge, Executive Officer
Central Coast Regional Water Quality Control Board
Ryan.Lodge@waterboards.ca.gov

Steve Monfort, Executive Director
UC Natural Reserve System
steve.monfort@ucop.edu

Barton Loundsbury, Senior Counsel
Regents of the University of California
barton.lounsbury@ucop.edu

4

Teel Declaration
Page 152

Heather Geldart, Administrator
Office of Spill Prevention & Response
California Department of Fish and Wildlife
Heather.Geldart@wildlife.ca.gov

Le-Quyen Nguyen, Deputy Secretary for Energy
California Natural Resources Agency
le-quyen.nguyen@resources.ca.gov

Gabe Tiffany, Acting Director
California Department of Conservation
gabe.tiffany@conservation.ca.gov

Benjamin Turner, Chief Policy and Planning Advisor
California Department of Conservation
Benjamin.turner@conservation.ca.gov

Kate Huckelbridge, Executive Director
California Coastal Commission
Kate.Huckelbridge@coastal.ca.gov

Cassidy Teufel, Deputy Director
California Coastal Commission
Cassidy.Teufel@coastal.ca.gov

Malia Cohen, State Controller
California State Controller's Office
malia.cohen@sco.ca.gov

Kristina Kunkel, Deputy State Controller
California State Controller's Office
kkunkel@sco.ca.gov

Joe Stephenshaw, Director
California Department of Finance
joe.stephenshaw@dof.ca.gov

Michele Perrault, Chief Deputy Director, Policy
California Department of Finance
michele.perrault@dof.ca.gov

Senator Monique Limón
California State Senate
Monique.limon@sen.ca.gov

5

Assemblymember Gregg Hart
California State Assembly
Gregg.hart@asm.ca.gov

Supervisor Das Williams, District 1
Santa Barbara County Board of Supervisors
dwilliams@countyofsb.org

Supervisor Laura Capps, District 2
Santa Barbara County Board of Supervisors
lcapps@countyofsb.org

Supervisor Joan Hartmann, District 3
Santa Barbara County Board of Supervisors
jhartmann@countyofsb.org
supervisorhartmann@countyofsb.org

Supervisor Bob Nelson, District 4
Santa Barbara County Board of Supervisors
bnelson@countyofsb.org

Supervisor Steve Lavagnino, District 5
Santa Barbara County Board of Supervisors
slavagnino@countyofsb.org

David Villalobos, Hearing Support Supervisor
Santa Barbara County Board of Supervisors
dvillalo@countyofsb.org

William Sarraf
Santa Barbara County Air Pollution Control District
SarrafW@sbcapcd.org

Deb Haaland, Secretary
U.S. Department of the Interior
Deb_Haaland@ios.doi.gov
exsec@ios.doi.gov

Martha Guzman, Regional Administrator
U.S. Environmental Protection Agency, Region IX
guzman.martha@epa.gov

Amy Miller, Director, Enforcement and Compliance Assurance Division
U.S. Environmental Protection Agency, Region IX
miller.amy@epa.gov

6

Tomas Torres, Director, Water Division
U.S. Environmental Protection Agency, Region IX
torres.tomas@epa.gov

Vasiliki Tsaganos, Acting Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety Administration
phmsachiefcounsel@dot.gov

7

# Exhibit 11

Declaration of Julie Teel Simmonds

CENTER *for* BIOLOGICAL DIVERSITY                    Because life is good.

*Via Electronic Mail*

March 2, 2025

Joe Tyler, Director/Fire Chief, CAL FIRE
Office of the State Fire Marshal
715 P Street
Sacramento, CA 94244-2460
Joe.Tyler@fire.ca.gov


**Subject:**     **Request for Revocation of State Waivers for Restart of Pipelines CA-324 and CA-325 (Formerly Lines 901/903); Accufacts Inc. Report on Letters of Decision**

Dear Fire Chief Tyler,

The Office of the State Fire Marshal ("CalFIRE") should revoke the State Waivers issued to Sable Offshore Corp. on December 17, 2024 for the Las Flores Pipeline System (CA-324 and CA-325, formerly Lines 901 and 903).[1] This decades-old, poorly designed, corrosion-prone pipeline system already failed catastrophically in 2015 and caused the devastating Refugio State Beach oil spill, which is now thought to have spilled over 450,000 gallons of oil.[2] As we have previously made clear to CalFIRE, issuance of State Waivers to restart this pipeline system is inconsistent with pipeline safety, public safety, and protection of the environment.[3] The Las Flores Pipeline System is unusually dangerous given its age and inherent design flaws, and the Santa Ynez Unit oil operations should not be allowed to restart using these fatally flawed pipelines.

CalFIRE nonetheless issued the State Waivers in December without public notice or a hearing and without the required review under the California Environmental Quality Act (CEQA), and

---

[1] CalFIRE Letter of Decision on the State Waiver Request for Limited Efectiveness [sic] of Cathodic Protection on Thermally Insulated Pipeline And Corrosion of or Along a Longitudinal Seam Weld (CA-324) (December 17, 2024); CalFIRE Letter of Decision on the State Waiver Request for Limited Efectiveness [sic] of Cathodic Protection on Thermally Insulated Pipeline And Corrosion of or Along a Longitudinal Seam Weld (CA-325A/B) (December 17, 2024).

[2] Expert Report of Igor Mezic, PhD, Case No. 2:15-cv-04113-PSG-JEM (Oct. 21, 2019) (Att. 1).

[3] Center for Biological Diversity letter to PHMSA and CalFIRE, Request for Objection to State Waiver for Restart of Pipelines CA-324 and CA-325 (Formerly Lines 901/903); Accufacts Inc. Evaluation of Pipeline Startup (December 23, 2024).

Alaska . Arizona . California . Colorado . Florida . Hawaii . N.Carolina . New Mexico . New York . Oregon . Washington, D.C. . La Paz, Mexico

P.O. Box 710, Tucson, AZ 85702-0710   tel (520) 623.5252   fax (520) 623.9797   BiologicalDiversity.org

Teel Declaration
Page 157

the agency received rubber-stamp concurrences from the Trump Administration on February 11, 2025.[4]

Once CalFIRE posted the State Waivers, Accufacts Inc. reviewed them and issued a report to supplement its *Evaluation of the Las Flores Pipeline System Startup Proposal*, which we previously submitted to CalFIRE. In this new February 25, 2025 report (Att.2), Accufacts Inc. explains its continuing, serious concerns about the restart of this pipeline system, which has ineffective cathodic protections across most the pipelines' mileage—due to fundamental flaws in its design and installation—and remains at high risk of dangerous corrosion and failure, which the waivers have not adequately addressed.

The State Waivers should be revoked as provided for in the "limitations" enumerated in the waivers themselves, which state that "[s]hould Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate" the agency "may revoke the state waiver and require Sable to comply with all applicable regulatory requirements."[5] The restart of the pipeline system using State Waivers is not appropriate, and Sable has also failed to comply with all applicable legal and regulatory requirements, including the most recent Cease and Desist Order issued by the California Coastal Commission,[6] among other legal violations the company still must resolve and approvals it must secure.[7]  CalFIRE should revoke the State Waivers pending resolution of these various violations and outstanding permit/authorization requirements and then only proceed in full compliance with the procedural and substantive requirements of federal and state pipeline safety laws and CEQA.

Sincerely,

Julie Teel Simmonds
Senior Counsel
jteelsimmonds@biologicaldiversity.org

---

[4] PHMSA previously stated that "[a]llowing for additional time for review is merited here as it has been in certain other instances involving similar highly technical waiver reviews by PHMSA." *See* January 17, 2025 letter from PHMSA to Center for Biological Diversity (Att. 1). Yet shortly thereafter, it issued its concurrences. Letter from PHMSA to CalFIRE re Sable CA-324, Regulations.gov Docket No. PHMSA-2025-0002 (February 11, 2025); Letter from PHMSA to CalFIRE re Sable CA-325, Regulations.gov Docket No. PHMSA-2025-0003 (February 11, 2025).

[5] CA-324 State Waiver at ¶ 63; CA-325AB State Waiver at ¶ 63.

[6] Executive Director Cease and Desist Order No. ED-25-CD-01 and Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order (February 18, 2025) (Att. 3).

[7] *See, e.g.*, California Natural Resources Agency, Summary of State Regulation of Crude Oil Pipelines in Santa Barbara County (January 13, 2025) (Att. 4) (explaining that in addition to Coastal Commission notices of violations, Sable has received notices of violation from the California Department of Fish and Wildlife and the Central Coast Regional Water Quality Board and needs other authorizations, including a new easement from the California Department of Parks and Recreation).

2

cc:     Wade Crowfoot, Secretary, California Natural Resources Agency
        Wade.Crowfoot@resources.ca.gov
        secretary@resources.ca.gov

        Kate Huckelbridge, Executive Director
        California Coastal Commission
        Kate.Huckelbridge@coastal.ca.gov

        Rob Bonta, Attorney General
        State of California Department of Justice
        rob.bonta@doj.ca.gov

        Charlton Bonham, Executive Director
        California Department of Fish and Wildlife
        director@wildlife.ca.gov

        Armando Quintero, Director
        California Department of Parks and Recreation
        Armando.Quintero@parks.ca.gov

        Ryan Lodge, Executive Officer
        Central Coast Regional Water Quality Control Board
        Ryan.Lodge@waterboards.ca.gov

        Senator Monique Limón
        California State Senate
        Monique.limon@sen.ca.gov

        Assemblymember Gregg Hart
        California State Assembly
        Gregg.hart@asm.ca.gov

3

# Exhibit 12

Declaration of Julie Teel Simmonds



   

# Refugio Beach Oil Spill
## Final Damage Assessment and Restoration Plan/Environmental Assessment

Prepared by:
California Department of Fish and Wildlife
California State Lands Commission
California Department of Parks and Recreation
University of California
The Department of Interior, U.S. Fish and Wildlife Service
National Oceanic and Atmospheric Administration

      

Refugio Beach Oil Spill

FINAL

Damage Assessment and Restoration Plan/Environmental Assessment

June 2021

**On the Cover:**
Oiled Beach by U.S. Coast Guard
Oiled octopus and invertebrates by Natural Resource Damage Assessment Trustees
Dolphins by Natural Resource Damage Assessment Trustees
Pelicans by Natural Resource Damage Assessment Trustees
Harbor seal by Santa Barbara Channelkeeper

**Suggested Citation:**
Refugio Beach Oil Spill Trustees. 2021. *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment.* Prepared by the California Department of Fish and Wildlife, California State Lands Commission, California Department of Parks and Recreation, Regents of the University of California, U.S. Department of the Interior, U.S. Fish and Wildlife Service, and National Oceanic and Atmospheric Administration.

2

# Refugio Beach Oil Spill Natural Resource Damage Assessment Summary:

## Shoreline Habitats
### $5.5 million

**Injury:** Approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.

**Restoration:** Remove Ellwood seawall, enhance black abalone populations, and restore degraded sand dune habitats.

## Subtidal and Fish Habitats
### $6.1 million

**Injury:** Approximately 2,200 acres of benthic subtidal habitat were impacted.

**Restoration:** Restore abalone populations in Marine Protected Areas, restore eelgrass beds in Refugio cove, remove Ellwood seawall, restore sand dwelling kelp offshore of Goleta Beach.

## Birds
### $2.2 million

**Injury:** 558 birds were estimated killed, representing over 28 different species.

**Restoration:** Remove invasive plants from brown pelican nesting colonies on Anacapa Island, reduce seabird injuries from recreational fishing, and implement conservation actions for western snowy plovers.

## Marine Mammals
### $2.3 million

**Injury:** 156 pinnipeds and 76 cetaceans were estimated injured or killed.

**Restoration:** Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbra and Ventura County, and Increase the capability to respond to instances of cetacean entanglement in the Santa Barbara Channel.

## Human Uses
### $3.9 million

**Injury:** The Trustees estimate over 140,000 lost recreational user days in Santa Barbara and Ventura Counties; six days of beach closures in Los Angeles County; and lost research, education, and outreach opportunities at the University of California, Santa Barbara Coal Oil Point Natural Reserve. Affected recreational activities included camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, fishing, diving, boating and surfing.

**Restoration:**
Restoration funds (53%) will be administered by State Parks for use on projects benefiting camping and shore-based recreation from Gaviota State Park to El Capitan State Beach.

Restoration funds (46%) will be administered by State Trustees for use on projects benefiting coastal recreation in Ventura County, Los Angeles County, and Santa Barbara County downcoast of El Capitan State Beach.

Restoration funds (approximately 1%) will be administered by the University of California for use on projects benefiting research, education, or outreach at the Coal Oil Point Reserve.

## Restoration Planning, Implementation, and Oversight
### $2 million

## Public Input

Full Document: https://go.usa.gov/xvWEg

Administrative Record: https://go.usa.gov/xvWEc

Submit Questions: RefugioRestoration@fws.gov

3

## Executive Summary

On May 19, 2015 a 24-inch diameter on-shore pipeline (Line 901) that extends approximately 10.7 miles along the Santa Barbara County coastline in California ruptured resulting in the release of approximately 2,934 barrels (123,228 gallons) of heavy crude oil (U.S. DOT 2016, hereafter referred to as "the spill"). Line 901 is a buried, insulated pipeline that transported heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station. The pipeline is owned and operated by Plains All American Pipeline, L.P., and Plains Pipeline, L.P. (jointly, Plains). The Pipeline and Hazardous Materials Safety Administration (PHMSA) determined that the cause of the Line 901 failure was external corrosion under insulation that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. Crude oil from the buried pipeline saturated the soil and flowed into a culvert that crosses under Highway 101 and railroad tracks, and ultimately discharged into the Pacific Ocean at Refugio State Beach.

The crude oil that entered the ocean posed a significant risk to and injured marine plants and wildlife, including seagrasses, kelp, invertebrates, fish, birds, and mammals. In addition to direct natural resource impacts, the closure of beaches and fisheries occurred just days before the Memorial Day weekend, resulting in losses for local businesses and lost opportunities for the public to visit and enjoy the shore and offshore areas. Tar balls attributable to the Line 901 release were carried by southerly ocean currents and eventually reached some beaches in Los Angeles County (California Department of Fish and Wildlife 2016).

The response (cleanup) to this significant spill brought together a number of federal, state, local agencies, and Native American tribes operating under a Unified Command. For the spill response, Incident Commanders consisted of representatives of the United States Coast Guard (USCG), California Department of Fish and Wildlife, Office of Spill Prevention and Response (CDFW-OSPR), Santa Barbara County, and Plains[1]. The Refugio Beach oil spill cleanup effort completed Phase I "active cleanup and gross oil removal" on August 31, 2015, and completed Phase II "refined oil cleanup endpoints for shorelines targeting maximum net environmental benefit" on January 22, 2016 (U.S. Coast Guard, 2016). Phase III monitoring activities were largely concluded on May 26, 2016 and the Unified Command disestablished on March 10, 2017 (U.S. Coast Guard 2017).

In parallel with the response and cleanup effort, the natural resources trustee agencies (Trustees) conducted a Natural Resource Damage Assessment (NRDA) to quantify the injuries to natural resources from the spill and assess natural resource damages. In this case, the Trustees for the natural resources injured by the spill include the United States Department of Commerce represented by the National Oceanic and Atmospheric Administration (NOAA); the United States Department of the Interior represented by the United States Fish and Wildlife Service

---

[1] The National Contingency Plan calls for the Responsible Party to be a member of the Unified Command; ref. 40 CFR 300.135(d)

4

(USFWS), National Park Service (NPS) and Bureau of Land Management (BLM); the CDFW-OSPR; the California Department of Parks and Recreation (CDPR); the California State Lands Commission (CSLC); and the Regents of the University of California (the Trustees). As a designated Trustee, each of these agencies is authorized to act on behalf of the public under state and/or federal laws to assess and recover natural resource damages and to plan and implement actions to restore, rehabilitate, replace, or acquire the equivalent of the affected natural resources injured as a result of a discharge of oil.

In accordance with the Oil Pollution Act (OPA) NRDA regulations (33 U.S.C. 2706(e)), the Trustees have cooperatively gathered information and prepared this Final Damage Assessment and Restoration Plan (DARP)/Environmental Assessment (EA). This document describes the injuries resulting from the spill and the restoration projects selected to compensate the public for those injuries. This document is also an Environmental Assessment intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the proposed restoration projects under the National Environmental Policy Act (NEPA) and is therefore called a DARP/EA. Prior to releasing this Final DARP/EA, the Trustees released a Draft DARP/EA for public review and comment.  After considering the public comments received, the Trustees prepared this Final DARP/EA.  A full environmental review would be premature for some of the selected projects in this Final DARP/EA, as well as projects that were deemed "second tier" or of lower priority. The need for additional NEPA review will be determined once detailed engineering design work or operational plans are developed for selected projects. Additional review may also be required if any second tier projects are implemented.

This document describes the restoration projects selected by the Trustees to address the various resources impacted by the spill, as well as a process to identify appropriate human use projects for funding. All of the selected projects are designed to restore, replace, or acquire the equivalent of the lost resources and/or their services through restorative on-the-ground actions. Furthermore, several of the projects address multiple resources. The projects were selected based upon the biological needs of the injured species and the feasibility of restoring the resources.

Under OPA, the responsible party is liable for the cost of implementing restoration projects, as well as the costs incurred by the Trustees to undertake this damage assessment. The Trustees settled their claim for natural resource damages with Plains. A summary of the injury to each resource category, the approximate allocation of damages and selected restoration projects are shown below. Web links to data used in the injury assessment can be found in Appendix B of the DARP/EA.

5

SHORELINE HABITATS $5.5 million

**Injury:** Trustees estimate that approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.

**Restoration:** Remove Ellwood seawall, enhance black abalone populations, and restore degraded sand dune habitats.



SUBTIDAL AND FISH HABITATS $6.1 million

**Injury:** Trustees estimate that approximately 2,200 acres of benthic subtidal and fish habitat were impacted.

**Restoration:** Restore abalone populations in Marine Protected Areas, restore eelgrass beds in Refugio cove, restore sand-dwelling kelp offshore of Goleta Beach, and remove Ellwood seawall.

6



BIRDS                                                                    $2.2 million

**Injury:** Trustees estimate 558 birds were killed, representing approximately 28 different species.

**Restoration:** Remove invasive plants from brown pelican nesting colonies on Anacapa Island, reduce seabird injuries from recreational fishing, and implement conservation actions for western snowy plovers.



MARINE MAMMALS                                                           $2.3 million

**Injury:** Trustees estimate 156 pinnipeds and 76 cetaceans were injured or killed.

**Restoration:** Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbara and Ventura Counties, and increase the capability to respond to instances of cetacean entanglement in the Santa Barbara Channel.



HUMAN USE                                                                                              $3.9 million

**Injury:** Trustees estimate over 140,000 recreational user days were lost.

**Restoration:** Various projects to improve human recreation, to be administrated as follows - 53% to State Parks for projects benefitting camping or shore-based recreation including and upcoast of El Capitan State Beach; 46% for a grants program for projects downcoast of El Capitan State Beach, on non-State Parks lands benefitting coastal recreation as well as boating and off-shore recreation in Santa Barbara, Ventura, and Los Angeles Counties; and approximately 1% to Coal Oil Point Reserve for projects benefitting research, education, and outreach.



RESTORATION PLANNING, IMPLEMENTATION, AND OVERSIGHT                    $2.0 million

The Trustees have prepared this Final DARP/EA to inform the public about the natural resource damage assessment (NRDA) and restoration planning efforts that have been conducted following the spill. This document is also an Environmental Assessment (EA) intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the selected restoration projects, and the alternatives considered, under NEPA.  As environmental review would be premature for some of the projects in the document, additional review may be required in some instances.  This will be determined once recreational use projects are identified and/or when more detailed engineering design work or operational plans for the selected projects are available.  To coordinate and oversee implementation of this DARP/EA, the Trustees have formed a Trustee Council comprised of representatives from each of the Trustee agencies.  To submit questions or contact the Trustee Council, please use the following contact information:

## Electronic Mail:
RefugioRestoration@fws.gov

## U.S. Mail:
Refugio Beach Oil Spill Natural Resource Trustees
C/O Ventura Fish and Wildlife Office
2493 Portola Road, Suite B
Ventura, California 93003

Attn:
Michael Anderson, California Department of Fish and Wildlife
Jennifer Boyce, National Oceanic and Atmospheric Administration
Colleen Grant, U.S. Fish and Wildlife Service

9

# 1.0   Introduction and Purpose

The purpose of this Final Damage Assessment and Restoration Plan (DARP)/Environmental Assessment (EA) is to provide information to the public about the results of the Natural Resource Damage Assessment (NRDA) that was conducted to assess injuries to natural resources that were caused by the Refugio Beach Oil Spill. This document further describes the selected restoration projects to restore habitats and natural resources affected by the spill and compensate for interim losses of natural resources and their services from the date of the incident until recovery.  A list of second tier restoration projects are also identified, should any selected restoration projects become infeasible or funded by other entities. The document incorporates feedback provided through the public comment process. A full summary of public comments received on the Draft DARP/EA and the Trustees' responses to those comments can be found in Appendix O. The document also serves as an Environmental Assessment under the National Environmental Policy Act (NEPA) evaluating the potential effects to the environment from implementing the selected restoration projects.

## 1.1   Overview of the Incident

On May 19, 2015, a 24-inch diameter buried pipeline known as Line 901, owned and operated by Plains All American Pipeline, L.P., and Plains Pipeline, L.P. (jointly, Plains), ruptured in Santa Barbara County, California, in the vicinity of Refugio State Beach. Line 901 transported heated crude oil extracted from deep subsea formations at several offshore platforms. As a result of the rupture, an estimated 2,934 barrels (123,228 gallons) of heavy crude oil were released from the pipeline (U.S. DOT 2016). A significant portion of the oil reached the Pacific Ocean at Refugio State Beach after flowing through culverts and across several upland areas (Figure 1). The incident is referred to throughout this document as the Refugio Beach Oil Spill or the "spill."

Plains initially estimated that approximately 2,400 barrels (100,800 gallons), of crude oil were spilled and that 500 barrels (21,000 gallons) reached the ocean (U.S. DOT 2016). The total volume released from the pipeline was later revised to 2,934 barrels (123,228 gallons) (U.S. DOT 2016). Subsequently, consultants for Plains increased the estimate of oil reaching the ocean to 598 barrels (25,116 gallons). An analysis on behalf of the Trustees concluded that as much as 1,262 barrels (53,000 gallons) of oil reached the ocean (Baker 2018).

Within hours of the spill, based on recommendations from the California Office of Environmental Health Hazard Assessment (OEHHA), the California Department of Fish and Wildlife (CDFW) initiated a fishery closure in the vicinity of the spill. The following day, Governor Edmund G. Brown, Jr., declared a state of emergency for Santa Barbara County. Several beaches in Santa Barbara County were closed to the public, including Refugio and El Capitan State Beaches (described further in Section 5.5). On May 21, 2015, the fishery closure was expanded along the shore and offshore out to 6 miles, encompassing a total area of 138 square miles, based on aerial observations and National Oceanic and Atmospheric

15

Administration (NOAA) oil spill trajectory models of where the oil was likely to move (OEHHA 2015). The fishery closure ended on June 29, 2015 (OEHHA 2015).



**Figure 1.** Flow path of the Line 901 pipeline rupture into culverts under Highway 101 and railroad tracks and ultimately into the Pacific Ocean at Refugio State Beach. Credit: John Wiley (http://flickr.com/jw4pix)

The crude oil smothered and soaked into terrestrial areas along the pathway from the pipeline rupture to the site where the oil entered the ocean, a short distance west of Refugio Cove (Figure 1). The shorelines from the release point, within Refugio State Beach to El Capitan State Beach, received the heaviest coastal oiling. Shorelines downcoast as far as Long Beach were intermittently oiled with tarballs and subject to beach closures, with the level of oiling generally decreasing farther away from the release point. Subtidal habitats in the vicinity of the release point also experienced oil exposure.

In the days after the spill, ocean surface currents and strong afternoon winds carried oil mostly downcoast, although some oil was deposited on beaches upcoast of the release site.

Marine organisms, including plants, invertebrates, fish, birds, and mammals, were exposed to oil. In addition to direct natural resource impacts, the closure of beaches and fisheries occurred just days before the Memorial Day weekend resulting in lost opportunities for the public to visit and enjoy the shore and offshore areas after the spill. Floating oil attributed to Line 901 was identified 17 km southwest of the release site, and more than 8 miles offshore (Valentine 2017). Tarballs attributed to the Line 901 release were identified as far south as Los Angeles County, more than 100 miles from the release site, where there were additional beach closures.

### 1.1.1  Cleanup Operations

The spill brought together many federal, state, and local agencies for cleanup operating under a Unified Command. For the spill response, the Incident Commanders consisted of representatives

16

of the USCG, CDFW-OSPR, Santa Barbara County, and Plains[2]. Throughout the response, the incident received high interest from news media, legislators, non-governmental organizations, members of the public, and other stakeholders.

The Unified Command conducted a phased approach to oil spill cleanup, in accordance with the National Oceanic and Atmospheric Administration's Shoreline Assessment Manual that provides for defined cleanup processes and goals for each cleanup phase. The cleanup effort completed Phase I "active cleanup and gross oil removal" on August 31, 2015, and completed Phase II "refined oil cleanup endpoints for shorelines targeting maximum net environmental benefit" on January 22, 2016 (U.S. Coast Guard 2016). Phase III monitoring activities were largely concluded on May 26, 2016, and the Unified Command was disestablished on March 10, 2017 (U.S. Coast Guard 2017).

The majority of the response effort was focused on minimizing environmental and cultural site damage and maximizing the recovery of discharged oil. Oil spill response operations were divided into three areas including an Inland Branch, Shoreline Branch, and On-water Branch.

The Inland Branch included the discharge site and pathway of oil to the Pacific Ocean. Inland branch response operations included oil recovery and removal, pipeline excavation, contaminated soil removal, contaminated vegetation removal, community and responder air monitoring, and oil sampling from the source of discharge.

The Shoreline Branch addressed oil in the path of discharge from the top of a cliff down to the beach and along 96 miles of affected shoreline. Response teams applied manual and mechanical recovery methods, primarily removal and disposal of oiled sand, wrack, and marine organisms. Removal of oil from rock was accomplished with scrapers or wire brushes. In some areas, dry ice was also used in conjunction with compressed air to freeze oil on rocks, allowing it to flake off more easily. In other areas, oiled cobble was placed in the surf zone to be scrubbed clean by wave action and tumbling amongst other cobble. Other operations included community and responder air monitoring, oil sampling, and wildlife recovery, rehabilitation, and release.

The On-water Branch addressed recoverable oil in offshore waters affected by the spill. On-water response operations included the use of oil containment and protection boom, skimmers, and oil recovery vessels. Local private vessels were also enlisted to assist with removal of oil from the marine environment.

---

[2] The National Contingency Plan calls for the Responsible Party, in this case Plains, to be a member of the Unified Command; ref. 40 CFR 300.135(d).

Staff responsible for conducting reconnaissance, recovery, and rehabilitation for wildlife exposed to Line 901 oil throughout the response area were organized and deployed through a Wildlife Branch that operated throughout the spill-affected area.

## 1.1.2   Transport and Fate of the spilled Oil

Line 901 oil coated shores predominantly downcoast for several miles from the release site within hours of the spill, primarily due to along-shore transport of the oil by currents, surge and surf action. While there are known active natural off-shore oil seeps in the spill vicinity, virtually all oil observed in the area from the release point to El Capitan in the days immediately after the spill, was from the Refugio Beach Oil Spill. Oil was also transported offshore by currents, surge action and wind drift and was observed during Unified Command overflights between May 20 and June 3 (Figure 3). Over time, oil from the spill spread farther offshore and downcoast, and in the days and weeks after the spill, light to moderate shoreline oiling, largely in the form of tarballs, occurred much farther away from the spill site. By May 28 unusually heavy tar ball stranding was reported in Ventura County near Oxnard. Soon after, unusually heavy depositions of tar balls were reported at several beaches near Redondo and Manhattan Beaches in Los Angeles County. The presence of stranded oil along some Los Angeles County beaches was heavy enough that several beach closures were declared by County officials, and a separate Unified Command was established in Los Angeles to respond to the oiling.



**Figure 2.** Results of hindcast modeling that shows the simulated oil transport trajectory based on the spill origin, winds, and currents that occurred between May 19, 2015 and May 29, 2015. The colors represent particle density, with red/orange being the highest density, yellow moderate density, and blue low density. See Appendix B for data associated with this figure.

To further understand and illustrate the transport and fate of spilled Line 901 oil, NOAA performed hindcast modeling using the General NOAA Operation Modeling Environment (GNOME). GNOME is an oil spill trajectory model in which the surface oil is divided into a

18

large number of small particles of equal mass that move under the influence of surface ocean currents, wind drift, and horizontal mixing from the time of the spill. GNOME also includes algorithms that simulate surface oil weathering, e.g., evaporation and dispersion. GNOME modeling snapshots (Figure 2) show Line 901 oil moving into the Santa Barbara Channel May 20, 2015 and May 21, 2015, transiting the waters of the Channel Islands National Marine Sanctuary, but no particles reached the Channel Island shores. Rather, the particles move east, making landfall on the Ventura coast about May 25, 2015 with subsequent deposition by May 29, 2015 in Los Angeles County. More information on the GNOME modeling can be found in Appendix A.



**Figure 3.** Map showing total U.S. Coast Guard overflight observations of surface oil over a 14 day period between May 21, 2015 and June 3, 2015. Note that the representations of sheen in this graphic are cumulative, i.e., oil was not in all of these locations at any given time. See Appendix B for data associated with this figure.

Line 901 oil was also transported downward through the water column due to mixing in the nearshore environment and the surf zone. Submerged oil was observed at several locations between May 22, 2015 and June 2, 2015 by UCSB and other entities. Of the oil observed, seven samples were collected and analyzed forensically, five of the samples matched Line 901 oil (Valentine 2019). The Unified Command undertook a submerged oil survey on May 29, 2015 through May 30, 2015 and reported no recoverable submerged oil. Oil may have been mixed with sediment through the surf action and was subsequently redistributed along the bottom and surface through sinking, tidal action, and surf transport. Based on general oceanographic conditions in the area vertical mixing of oil droplets and dissolved oils is estimated to occur to a depth of approximately 14 meters (Appendix A).

19

### 1.1.3  Forensic Identification of Line 901 Oil in the Environment

There are active, well-studied natural oil seeps in the region where the Refugio Beach Oil Spill occurred (Lorenson et al. 2009; Lorenson et al. 2011). These seafloor seeps release oil and gas that float to the ocean surface and periodically strand on regional shorelines, generally in the form of tar balls. Thus, not all of the oil evident in the region in the aftermath of the initial spill came from the Line 901 pipeline.

Spilled Line 901 oil can be distinguished from natural seep oil by using specialized chemical fingerprinting techniques[3]. In the days after the spill, hundreds of oil samples were collected from Santa Barbara, Ventura, Los Angeles, and Orange Counties. Selected samples were analyzed and forensically interpreted by experts working on behalf of the Natural Resource Trustees (Trustees), as well as by several other laboratories and experts engaged by the Unified Command and independently by Plains (Valentine 2015; Jeffrey 2016; Stout 2016; Stout et al. 2018). Oil samples collected from the ocean surface and from beaches were determined in some cases to be from Line 901, in other cases to be from known natural seeps, and in some cases to have characteristics of both, implying they were mixtures of natural seep and spilled oil.

After careful investigation, the Trustees concluded that oil from the Refugio Beach Oil Spill was deposited intermittently on shores from Gaviota State Park in Santa Barbara County to Los Angeles County (Figure 4). For purposes of the NRDA, the furthest southern extent of the spill was determined to be Long Beach based on beach closures.



**Figure 4.** Geographic extent of Line 901 oil. This Figure shows oil samples collected and analyzed on behalf of the Trustees through June 2, 2015 when the Trustees' trajectory modeling suggests that oil would have moved through the impacted area. This does not include samples collected by the response and analyzed for the criminal investigation. In People of the State of California v Plains All American Pipeline, L.P., Sup. Court of State of California, County of Santa Barbara, Case No. 1495091, People's Trial Exhibit 078.0001 oil was documented as far south as Seal Beach in Orange County. See Appendix B for data associated with this figure.

---

[3] Plains does not agree.

20

## 1.2 NRDA Overview

There are typically four types of claims that are made against responsible parties in an oil spill such as this one:

1. reimbursement for cleanup costs;
2. natural resource damages (including the costs of assessment);
3. fines and penalties under various laws; and
4. third-party claims (e.g. from non-government parties, such as commercial fisheries and affected businesses).

This document is only concerned with the second item, natural resource damages. This Damage Assessment and Restoration Plan and Environmental Assessment (DARP/EA) has been prepared by state and federal natural resource Trustee agencies responsible for restoring natural resources[4] and resource services[5] injured by the release of oil from the May 19, 2015, Refugio Beach Oil Spill. This document provides details regarding:

- Environment affected by the spill (Section 2);
- Coordination and compliance among the government agencies and responsible party (Section 3);
- Injury quantification and restoration planning methods (Section 4);
- Nature and scope of injuries and the quantification of those injuries (Section 5);
- Selected restoration projects to address the injuries (Section 5); and
- NEPA alternatives analysis (Section 6).

Consistent with the Oil Pollution Act (OPA) and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq., the purpose of restoration planning is to identify and evaluate restoration alternatives and to provide the public with an opportunity for review and comment on the proposed restoration alternatives. Restoration planning provides the link between injury and restoration. The purpose of restoration, as stated in this DARP/EA, is to make the environment and the public whole for injuries resulting from the spill by implementing restoration actions that return injured natural resources and services to baseline conditions and compensate for interim losses.

United States Department of Commerce represented by the National Oceanic and Atmospheric Administration (NOAA); the United States Department of the Interior represented by the U.S. Fish and Wildlife Service (USFWS), National Park Service (NPS), and Bureau of Land

---

[4] Natural resources are defined under the Oil Pollution Act as "land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States, any State or local government or Indian tribe, or any foreign government." 33 U.S.C. §2701(20).

[5] Services (or natural resources services) means the functions performed by a natural resource for the benefit of another natural resource and/or the public.

21

Management (BLM); the CDFW-OSPR; the California Department of Parks and Recreation (CDPR); the California State Lands Commission (CSLC); and the Regents of the University of California are the Trustees who are addressing the natural resources injured by the spill. As a designated Trustee, each agency is authorized to act on behalf of the public under state and/or federal law to assess and recover natural resource damages and to plan and implement actions to restore, rehabilitate, replace, or acquire the equivalent of the affected natural resources injured by a discharge of oil. For purposes of coordination and compliance with OPA and NEPA, NOAA is designated as the lead federal Trustee.

The Trustees have prepared this DARP/EA to inform the public about the NRDA and restoration planning efforts that have been conducted following the spill. This document is also an EA intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the selected restoration projects under NEPA. As full environmental review would be premature for some of the selected projects in the document pending development of sufficient project-level detail. This will be determined once detailed engineering design work or operational plans are developed for those projects.

## 1.3 Summary of Natural Resource Injuries

The injuries from the oil spill can be divided into the following categories: shoreline habitats, subtidal and fish habitats, birds, marine mammals, and human uses. The injuries to each category are summarized here (Figure 5) and presented in greater detail in Section 5.

- **Shoreline Habitats**: The Trustees estimate approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.
- **Subtidal and Fish Habitats**: The Trustees estimate approximately 2,200 acres of benthic subtidal habitat were impacted.
- **Birds:** The Trustees estimate 558 birds were killed, representing over 28 different species. The primary species impacted were brown pelicans, representing 57% of the total estimated mortality. Western snowy plovers were also impacted through effects to reproduction the year after the spill, following oil exposure.
- **Marine Mammals**: The Trustees estimate that 156 pinnipeds (94% California sea lions, 5% northern elephant seals and 1% Pacific harbor seals) and 76 cetaceans (95% long-beaked common dolphins and 5% common bottlenose dolphins) were injured or killed by the spill.
- **Human Uses**: The Trustees estimate over 140,000 lost recreational user days in Santa Barbara and Ventura Counties; six days of beach closures in Los Angeles County; and lost research, education, and outreach opportunities at the University of California, Santa Barbara Coal Oil Point Natural Reserve. Affected recreational activities included camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, fishing, diving, boating and surfing.

22



**Figure 5.** Refugio Beach Oil Spill fingerprint matches (red circles) along with the habitats and resources that were injured by the spill. See Appendix B for data associated with this figure.

## 1.4    Summary of Selected Restoration Projects

The Trustees' mandate under OPA (see 33 U.S.C. 2706(b)) is to make the environment and the public whole for injuries to natural resources and natural resource services resulting from the discharge of oil. This requirement must be achieved through the restoration, rehabilitation, replacement, or acquisition of equivalent natural resources and/or services. Thus, for a project to be considered there must be a connection, or nexus, between the natural resource injuries and the proposed restoration actions.

Compensatory restoration is any action taken to compensate for interim losses of natural resources and services pending recovery to baseline conditions. The scale, or amount, of the required compensatory restoration will depend on the extent and severity of the initial resource injury and how quickly each resource and associated service returns to baseline. Primary restoration actions that speed resource recovery will reduce the amount of required compensatory restoration.

The Trustees considered restoration concepts and alternatives with the potential to provide compensatory restoration. These were evaluated based on selection criteria developed by the Trustees, consistent with the legal guidelines provided in the OPA regulations (15 C.F.R. 990.54(a)). Section 4.2 presents OPA-based selection criteria developed by the Trustees for the spill. Based on the Trustees' evaluation, and after considering public comments on the Draft DARP/EA, a suite of preferred restoration projects were selected and are summarized below.

23

Additional details on all projects that met the threshold screening criteria are presented in Section 5.

The Trustees have grouped the injuries into categories, sometimes combining impacts to similar species. In this way, one restoration project, benefiting a suite of species or one primary species, may address all injuries for that category. In accordance with OPA, all of the selected projects have been "scaled" in size, such that the benefits of the restoration offset the injuries caused by the spill. Summaries of the selected restoration projects are provided below. More details on the projects are provided in Section 5.

Under OPA, the responsible party is liable for the cost of the compensatory restoration projects, as well as the costs incurred by the Trustees to undertake this damage assessment. The Trustees have settled this claim for natural resource damages with the responsible party for $22.3 million. The following amounts are allocated to fund the projects described in this document:

**Shoreline Habitats**                                                                 $5.5 million
- Remove the Ellwood seawall that is currently constraining natural functioning condition of sandy beach and subtidal habitats;
- Restore black abalone populations to enhance the overall health of rocky intertidal habitats; and
- Restore degraded sand dune habitats by removing invasive/non-native vegetation, and/or precluding disturbance to sensitive areas to allow native dune vegetation to regrow.

**Subtidal and Fish Habitats**                                                         $6.1 million
- Restore abalone populations in Marine Protected Areas along the Gaviota coast to enhance the overall health of subtidal habitats;
- Restore eelgrass beds on the Gaviota Coast to enhance overall health of subtidal habitat; and
- Extend a pilot project for restoring sand-dwelling kelp offshore of Goleta Beach to determine the feasibility of this novel method for restoring kelp forests.

**Birds**                                                                              $2.2 million
- Remove invasive plants from brown pelican nesting colonies on Anacapa Island to prevent these important breeding sites from becoming unsuitable for nesting;
- Reduce seabird injuries from recreational fishing; and
- Implement conservation actions for western snowy plovers at Coal Oil Point Reserve to protect and enhance breeding success.

24

**Marine Mammals** $2.3 million

- Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbara and Ventura Counties to increase survivorship of pinnipeds; and
- Expand the capacity to respond to instances of cetacean entanglement in the Santa Barbara Channel to increase survivorship of entangled cetaceans.

**Human Use** $3.9 million

- Restoration funds (53%) to be administered by State Parks for use on projects benefiting camping and shore-based recreation from Gaviota State Park to El Capitan State Beach;
- Restoration funds (46%) to be administered by State Trustees for use on projects outside of State Park property benefiting coastal recreation in Ventura County, Los Angeles County, and Santa Barbara County downcoast of El Capitan State Beach; and
- Restoration funds (approximately 1%) to be administered by the University of California for use on projects benefiting research, education, or outreach at the Coal Oil Point Reserve.

The remaining funds will be used by the Trustees for restoration planning and oversight. Any unused funds will be allocated toward one or more projects described in this document, or identified through further project scoping.

# Exhibit 13

Declaration of Julie Teel Simmonds

Table of Contents
Index to Financial Statements

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-K

**(Mark One)**

☑    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2023**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 1-36132**

# PLAINS GP HOLDINGS, L.P.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **90-1005472** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **333 Clay Street, Suite 1600, Houston, Texas** | **77002** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(713) 646-4100**

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on Which Registered |
|---|---|---|
| Class A Shares, Representing Limited Partner Interests | PAGP | Nasdaq |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☑  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes ☑  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ |
| Non-accelerated filer ☐ | Smaller reporting company ☐ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☑

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

The aggregate market value of the approximately 190.8 million Class A shares held by non-affiliates of the registrant (treating all executive officers and directors of the registrant and holders of 10% or more of the Class A shares outstanding, for this purpose, as if they are affiliates of the registrant) on June 30, 2023 was approximately $2.8 billion, based on a closing price of $14.83 per Class A share as reported on the Nasdaq Global Select Market on such date.

As of February 16, 2024, there were 197,121,318 Class A shares outstanding.

Table of Contents
Index to Financial Statements

Investments in unconsolidated entities accounted for under the equity method of accounting are assessed for impairment when events or circumstances suggest that a decline in value may be other than temporary. Examples of such events or circumstances include continuing operating losses of the entity and/or long-term negative changes in the entity's core business. When it is determined that an indicated impairment is other than temporary, a charge is recognized for the difference between the investment's carrying amount and its estimated fair value. We consider the fair value estimate used to calculate the impairment of investments in unconsolidated entities a critical accounting estimate. In determining the existence of an other-than-temporary impairment of carrying value, we make a number of subjective assumptions as to:

- whether there is an event or circumstance that may be indicative of a decline in value of the investment;

- whether the decline in value is other than temporary; and

- the fair value of the investment.

Intangible assets with indefinite lives are not amortized but are instead periodically assessed for impairment. Intangible assets with finite lives are amortized over their estimated useful life as determined by management. Impairment testing entails estimating future net cash flows relating to the business, based on the grouping of assets and management's estimate of future revenues, future cash flows and market conditions including pricing, demand, competition, operating costs and other factors. Uncertainties associated with these estimates include changes in production decline rates, production interruptions, fluctuations in refinery capacity or product slates, economic obsolescence factors in the area and potential future sources of cash flow. In addition, changes in our weighted average cost of capital from our estimates could have a significant impact on fair value. We cannot provide assurance that actual amounts will not vary significantly from estimated amounts. Resolutions of these uncertainties have resulted, and in the future may result, in impairments that impact our results of operations and financial condition.

A change in our outlook or use could result in impairments that may be material to our results of operations or financial condition. See "—Executive Summary— Market Overview and Outlook" and Note 6, Note 8 and Note 9 to our Consolidated Financial Statements for additional information.

*Inventory Valuations.* Inventory, including long-term inventory, primarily consists of crude oil and NGL and is valued at the lower of cost or net realizable value, with cost determined using an average cost method within specific inventory pools. At the end of each reporting period, we assess the carrying value of our inventory and use estimates and judgment when making any adjustments necessary to reduce the carrying value to net realizable value. Among the uncertainties that impact our estimates are the applicable quality and location differentials to include in our net realizable value analysis. Additionally, we estimate the upcoming liquidation timing of the inventory. Changes in assumptions made as to the timing of a sale can materially impact net realizable value. During the years ended December 31, 2023, 2022 and 2021, we did not record any charges related to the valuation adjustment of our inventory. See Note 5 to our Consolidated Financial Statements for further discussion regarding inventory.

*Line 901 Incident Insurance Receivable.* In May 2015, we experienced a crude oil release from our Las Flores to Gaviota Pipeline (Line 901) in Santa Barbara County, California. We have estimated that the aggregate total costs we have incurred or will incur with respect to the Line 901 incident will be approximately $750 million, which includes actual and projected emergency response and clean-up costs, natural resource damage assessments, fines and penalties payable pursuant to the Consent Decree, certain third-party claims settlements, and estimated costs associated with our remaining Line 901 lawsuits and claims, as well as estimates for certain legal fees and statutory interest where applicable. As of December 31, 2023, we have recognized a long-term receivable of approximately $225 million for the portion of the release costs that we believe is probable of recovery from insurance, net of deductibles and amounts already collected. Insurers responsible for the majority of our remaining insurance coverage have formally communicated a denial of coverage. We intend to vigorously pursue recovery from our insurers of all amounts for which we have claimed reimbursement. We believe that our claim for reimbursement from our insurers is strong and that our ultimate recovery of such amounts is probable. Various factors could impact the timing and amount of recovery of our insurance receivable, including future developments that adversely impact our assessment of the strength of our coverage claims, the outcome of any dispute resolution proceedings with respect to our coverage claims and the extent to which insurers may become insolvent in the future. Without limiting our view that our claim for reimbursement is strong and that ultimate recovery is probable, we cannot provide complete assurance that actual receivable amounts will not vary significantly from our estimated amounts. See Note 18 to our Consolidated Financial Statements for further discussion regarding the Line 901 incident and our related insurance receivable.

91

# Exhibit 14

Declaration of Julie Teel Simmonds

*Via e-mail and U.S. certified mail, return receipt requested*

September 24, 2024

Joe Tyler, Director/Fire Chief, CAL FIRE
Daniel Berlant, State Fire Marshal
Office of the State Fire Marshal
715 P Street
Sacramento, CA 94244-2460
Email: Joe.Tyler@fire.ca.gov; Daniel.Berlant@fire.ca.gov

Lisa Plowman, Director
Santa Barbara County
Planning & Development
123 East Anapamu Street
Santa Barbara, CA 93101
Email: lplowman@countyofsb.org

Jennifer Lucchesi, Executive Director
California State Lands Commission
100 Howe Avenue, Suite 100-South
Sacramento, CA 95825
Jennifer.Lucchesi@slc.ca.gov
Email: Jennifer.Lucchesi@slc.ca.gov

**Re:    Notice of CEQA Violation and Request to Prepare EIR for Restart of SYU Infrastructure, Including Onshore Lines 901/903 (CA-324, CA-325), After Pipeline Failure, Major Oil Spill, and Ten Years Idle**

Dear Fire Chief Tyler, State Fire Marshal Berlant, Planning and Development Director Plowman, and Executive Officer Lucchesi,

It is beyond comprehension that the unsafe pipeline system responsible for the 2015 Refugio Oil Spill, one of the largest oil spills in California's history, is on the brink of restart. While restart of this failed pipeline system should never be authorized, at a minimum, the Center for Biological Diversity and Wishtoyo Chumash Foundation request that the Office of the State Fire Marshal (CAL FIRE), the County of Santa Barbara, and the State Lands Commission initiate California Environmental Quality Act ("CEQA") review for this proposed restart project. No agency or local jurisdiction should issue any further or final approvals or other determinations concerning this restart of onshore pipelines 901 and 903 (now known as CA-324 and CA-325), and the connected offshore and onshore pipelines and other facilities, before a robust CEQA review

1

Teel Declaration
Page 185

process is concluded. Approval of this restart project without full compliance with CEQA is unsafe and unlawful.[1]

In 2015, the rupture and spill from Line 901 (CA-324) caused one of the most disastrous oil spills in California history. The corroded pipeline ruptured and spilled what is now believed to be about 450,000 gallons of oil,[2] killing hundreds of birds and mammals and closing fisheries and beaches. Consequently, three offshore platforms, two processing facilities and the offshore and onshore pipeline systems have been idled for nearly a decade. There are severe environmental and safety risks posed by restarting the Santa Ynez Unit infrastructure that must be disclosed to the public and analyzed by decisionmakers before restart is even considered.

Previously, the operator proposed constructing a new pipeline and the County of Santa Barbara initiated an Environmental Impact Report (EIR) process for that proposal. Plans for a new pipeline have now been cancelled, and instead the operator appears close to re-starting the same pipeline that ruptured in 2015.

The Pipeline and Hazardous Materials Safety Administration ("PHMSA") failure investigation on the 2015 Refugio State Beach oil spill reported that the pipeline wall had corroded to $1/16^{th}$ of an inch before the spill occurred, and that the rupture was caused in part by progressive external corrosion and ineffective protection against that corrosion.[3] Pipeline inspections from 2007 to 2015 showed "an increasing frequency and extent of corrosion anomalies" and excavations revealed moisture between the insulation and the pipeline.[4] Compounding the risk of aging infrastructure, facility startups are significantly more hazardous than normal operations.[5] It is irresponsible and dangerous to allow the old pipeline to return to service, certainly before any CEQA review is conducted.

The lack of any review for the proposal to re-start the existing failed pipeline is particularly startling given it is far more dangerous than building a new pipeline. As acknowledged by one prior analysis, the risk of a spill *more than doubles* as pipelines age from 20 to 40 years.[6] Further, there is a five times increase in failure frequencies for pipelines that are not equipped with cathodic protection over the average failure rate.[7] The County's draft EIR for the new pipeline proposal estimated that restarting the existing pipeline **could result in a spill once a year, and a rupture once every four years** even with the "installation of additional valve stations" as proposed in lieu of cathodic protection.[8]

---

[1] We note that there are multiple other agencies involved in the many aspects of this restart, and they should be included in the CEQA analysis as cooperating agencies.

[2] Expert Report of Igor Mezic, Ph.D., Andrews v. Plains All American Pipeline, L.P., United States District Court, Central District of California, Case No. 2:15-cv-04113-PSG-JEM, March 29, 2019 (pp. 16-17).

[3] U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 (May 2016).

[4] Id.

[5] Bridges, William, Necessity of Performing Hazard Evaluations (PHAs) of Non-Normal Modes of Operation (Startup, Shutdown,& Online Maintenance) (2015).

[6] *Id*. at 4-166.

[7] Administrative Draft of Draft EIR for Plains Pipeline Replacement Project, Section 5.6, p. 7.

[8] *Id*. at Section 5.6, p. 79.

2

Each agency here has oversight responsibilities and individually, and collectively, must conduct a meaningful environmental review. It appears, for example, that the California Department of Forestry and Fire Protection ("CAL FIRE") is poised to approve the restart of Lines 901/903 with a "State Waiver"[9], among other approvals, and without any CEQA review. Similarly, the County appears to be trying to limit its involvement in this momentous restart project to its consideration of applications to transfer permits to Sable, despite the County's prior commitment to require the Las Flores Pipeline systems' owners/operators to secure new permits or amendments to the Development Plan and Major Conditional Use Permit[10] should certain conditions arise (and with the 2015 catastrophic failure and spill and this proposal to restart, several conditions have).

And the State Lands Commission seems poised to allow restart of oil flow through offshore pipelines under its jurisdiction pursuant to leases that terminated several years ago (but that were extended in 2023 on a month to month basis) without any environmental review.[11] Nor to our knowledge (despite being a lead agency on the 1985 EIR/EIS for the Las Flores Pipeline system) has the State Lands Commission requested the County or CAL FIRE or any other state or federal agency to initiate a CEQA process for this pipeline system restart.

Taken together, the agencies' and County's failure to conduct CEQA on this restart is an absolutely startling prospect, is contrary to law, and poses considerable risks to both public safety and the environment. For something as significant as restarting the entire Santa Ynez Unit's offshore and onshore oil and gas operations after a significant oil spill, one would expect —and the law requires— a robust CEQA process alongside compliance with all other applicable laws before restart is even contemplated.

***The Santa Ynez Unit and its Infrastructure.*** There are currently 30 active oil and gas leases on the Pacific OCS from which oil and gas drilling extraction activities occur or have occurred. Most of these leases are organized into units. The Santa Ynez Unit ("SYU") is in the Santa Barbara Channel and consists of 16 leases issued between 1968 and 1982: Leases OCS-P 0180, 0181, 0182, 0183, 0187, 0188, 0189, 0190, 0191, 0192, 0193, 0326, 0329, 0461, 0194, 0195.[12]

There are three offshore production platforms at the SYU: Platform Harmony, Platform Heritage, and Platform Hondo. Platform Hondo was installed in June 1976, Platform Harmony in June

---

[9] A State Waiver is the term used to describe when a state waives or modifies compliance with a regulatory requirement, such as the requirement that cathodic protection is required to prevent external corrosion of buried pipelines. 49 C.F.R. § 195.563.

[10] ALL AMERICAN PIPELINE PROJECT FINAL DEVELOPMENT PLAN CONDITIONS 88-DPF-033 (RV01)z, 88-CP-60 (RV01) (88-DPF-25cz; 85-DP-66cz; 83-DP-25cz) December 12, 1988 (As Modified Through May 2003); Case No. 83-CP-97z.

[11] In 2023, the State Lands Commission approved the lease extensions on Exxon's expired leases with no environmental review and a legally questionable justification: "Staff recommends that the Commission find that this activity is exempt from the requirements of CEQA as a categorically exempt project. The project is exempt under Class 1, Existing Facilities; California Code of Regulations, title 2, section 2905, subdivision (a)(2)." Staff Report 58, Amendment of a General Lease – Right-of-Way Use (Lease No. 7163), December 5, 2023 meeting Agenda Item 58.

[12] *E.g.*, BOEM, Pacific OCS Region Map (updated May 2024).

1989, and Platform Heritage in October 1989.[13] Production began from these platforms between April 1981 and December 1993.[14] We can find very little information about precisely how the offshore pipelines that carry SYU oil were initially approved and what if any environmental review state and federal agencies conducted on those pipelines.

As far as the onshore pipelines, in 1986, Santa Barbara County approved the Celeron/All American Pipeline Project to transport oil from the SYU onshore under a Final Development Plan and Development Plan Conditions. The County relied on a 1984 Draft EIR/EIS and Final EIR/EIS (Addendum) that incorporated a series of Final Development Plan Conditions, which have subsequently been modified.[15] Pipelines with cathodic protections and other safety measures designed to prevent and minimize the risk of oil spills were an integral part of the pipeline system design, environmental analysis, and ultimate approvals. For example, the EIR/EIS claimed "[t]he entire pipeline would be protected from corrosion with cathodic protection systems."[16] It stated that the "following design features: were proposed "to prevent the adverse impacts of an oil spill," before listing a long, bulleted list of features starting with the first bullet for the cathodic protection system.[17]

The pipelines were constructed from 1988-91. Line 903 became operational in 1991, and Line 901 become operational in 1994.[18]

***The 2015 Refugio Oil Spill.*** For decades, the ExxonMobil Corporation ("Exxon") owned and operated all three platforms and produced oil from the SYU until the 2015 oil spill from the Plains All American Pipeline (Line 901), which ruptured and spilled what is now believed to be up to 460,000 gallons of oil on the Santa Barbara Coast.[19]

As noted above, the rupture was caused in part by progressive external corrosion and ineffective protection against that corrosion.[20] The PHMSA failure investigation report also stated that while

---

[13] *Id.*

[14] *Id.*

[15] ALL AMERICAN PIPELINE PROJECT FINAL DEVELOPMENT PLAN CONDITIONS, 88-DPF-033 (RV01)z, 88-CP-60 (RV01) (88-DPF-25cz; 85-DP-66cz; 83-DP-25cz) December 12, 1988 (As Modified Through May 2003).

[16] California State Lands Commission & Bureau of Land Management, Draft Environmental Impact Report/ Environmental Impact Statement ("1985 EIR/EIS") for the Celeron/All American and Getty Pipeline Projects (Aug. 1984) at 2-35 (as noted in a December 9, 1984 cover letter, the "Finalizing Addendum," "combined with the Draft EIR/EIS, is the Final EIR/ EIS for these projects," and was certified in January 1985); see also, for example *id.* at 2-13, 2-14, 4-106, 4-110 ("Internal corrosion is the largest cause of a spill due to pipeline fault and this is more characteristics of older pipelines which were constructed of different materials and did not have the cathodic protection systems proposed by Celeron/All American and Getty.").

[17] 1985 EIR/EIS at H-35.

[18] Revised NOP for Pipeline Replacement Project (April 26, 2022).

[19] Expert Report of Igor Mezic, Ph.D., Andrews v. Plains All American Pipeline, L.P., United States District Court, Central District of California, Case No. 2:15-cv-04113-PSG-JEM, March 29, 2019 (pp. 16-17).

[20] U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 (May 2016).

4

cathodic protection is "required under the federal Pipeline Safety Regulations to prevent external corrosion of buried pipelines," they failed here, and "[a]n increasing frequency and extent of corrosion anomalies were noted on both Lines 901 and 903 in [in line inspection] survey results."[21]

The 123.4-mile pipeline system (10.9-mile Line 901/CA-324 and 113.5-mile Line 903/CA-325) has sat idle in the environment ever since that disastrous rupture almost ten years ago. The pipelines had been regulated by PHMSA until 2016 as interstate pipelines. In 2016, after the pipeline failure, the federal government transferred the pipelines to the regulatory and enforcement jurisdiction of CAL FIRE, and to our knowledge from that date forward they have considered Lines 901 and 903 "intrastate hazardous liquid pipelines subject to the regulatory and enforcement jurisdiction of '[CAL FIRE], pursuant to state certification from PHMSA."[22]

After the spill and ensuing litigation, the parties entered into a Consent Decree, *U.S. v. Plains All American Pipeline*, Civil Action No. 2:20-cv-02415 (March 13, 2020), which incorporated elements of Corrective Action Orders issued by PHMSA and required many preconditions to restart (if chosen as an alternative to pipeline replacement or abandonment). Restart was a third option reflected in the Consent Decree, if done in accordance with its terms "and applicable law." [23] Regarding restart for Line 901 and 903, the Consent Decree required that prior to restart, "Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection" and that it "must receive a State Waiver from the OSFM prior to restarting."[24]

The Consent Decree notes that CAL FIRE has the discretion to require additional terms and conditions if it ever decides to grant any request for a State Waiver:

> To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms *that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver*. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.[25]

CAL FIRE clearly has the discretion to deny or modify the State Waiver and other elements of the restart project in ways to lessen and mitigate the higher risk of oil spill and devastating consequences on biological, cultural, water, and other resources, among other environmental harms.

---

[21]*Id.* at 13.

[22] PHMSA-CSFM-MOU for Plains Lines 901 and 903 (May 18, 2016).

[23] Consent Decree at Appendix B, Art. I, 2B.

[24] Consent Decree at Appendix B, Arts. I, 1A, 1B.

[25] Consent Decree at Appendix B, Art. I, 1E (emphasis added).

***The Sale of SYU Assets to Sable Offshore Corporation and Aggressive Push to Restart the Failed Pipeline System.*** In November 2022, Sable entered into a Purchase and Sale Agreement with ExxonMobil Corporation (Exxon) and Mobil Pacific Pipeline Company (MPPC) to acquire the SYU assets as well as all outstanding shares of Pacific Offshore Pipeline Company (POPCO) and Pacific Pipeline Company (PPC). The Purchase and Sale Agreement apparently closed on February 14, 2024. Sable asserts it is now the owner of the SYU assets, POPCO, and PPC. POPCO remains the legal owner of the POPCO Gas Plant, and PPC remains the legal owner of the Las Flores Pipelines.

Sable is now the listed owner and operator of Platforms Harmony, Heritage, and Hondo and lessee on all 16 oil and gas leases in the Santa Ynez Unit.

While its predecessors once pursued building replacement pipelines (and even proposed trucking oil on California highways in the interim),[26] Sable is not pursuing a pipeline replacement project and is instead doubling down on trying to restart the entire SYU operation using already-failed and ever-aging pipelines.[27] Sable recently told its investors that it "affirms that initial restart of production from Sable's [SYU] is expected in fourth quarter 2024."[28]

Sable is seeking a series of approvals from CAL FIRE. The agency posted a webpage laying out six critical requirements and approvals Sable will need before CAL FIRE would authorize restart.[29] They are:

1.  Coastal Best Available Technology. This requirement came about in response to the Refugio Oil Spill. It mandates the use of best available technology pipelines like those at issue here.
2.  Consent Decree compliance
3.  Integrity Management Program to assess and mitigate risks associated with pipeline integrity
4.  State Waiver, described as "an order that modifies compliance with a regulatory requirement if an operator demonstrates that alternative measures are consistent with pipeline safety."
5.  Deferred Maintenance required for idled pipelines
6.  Startup Plan that lays out "procedures and protocols for safely restarting"

---

[26] County of Santa Barbara, Planning & Development webpage for 901/903 Replacement Pipeline Project, https://www.countyofsb.org/3801/901903-Replacement-Pipeline-Project; County of Santa Barbara, Planning & Development, webpage for ExxonMobil Interim Trucking for SYU Phased Restart, https://www.countyofsb.org/872/ExxonMobil-Interim-Trucking-for-SYU-Phas (last visited September 21, 2024).

[27] Sable Offshore Corporation is now the listed owner and operator of Platforms Harmony, Heritage, and Hondo and lessee on all 16 oil and gas leases in the Santa Ynez Unit. It is also in the process of requesting assignment of its State Lands Commission-regulated offshore pipelines and associated infrastructure leases and its County of Santa Barbara-issued permits.

[28] Sable Offshore Corp., Security and Exchange Commission Form 8-K (Aug. 30, 2024).

[29] Pathways for Restarting CA-324 and CA-325 https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited September 21, 2024; last revised August 2, 2024).

6

The CAL FIRE webpage posted for the restart of Lines 901/903 lays out the process generally and includes some documents. Yet , it lacks detail about what progress Sable has or has not made on the various restart steps. Further, some key documents are missing or not even mentioned, like the Startup Plan Sable contends it submitted to CAL FIRE in late July,[30] or they are heavily redacted, like the Line 901 Risk Analysis Plains Pipeline, L.P. submitted and CAL FIRE apparently approved (for Sable's use) that looks like this in the version made publicly available:[31]



Sable is also in the process of requesting assignment of its State Lands Commission-regulated offshore pipeline and associated infrastructure leases in state waters. To date, all of the Commission's meetings about this topic have been in Closed Session.[32] For example, on June 7, 2024, the Closed Session item was described as follows:

> **NOTICE OF CONFERENCE WITH REAL PROPERTY NEGOTIATOR**: Instructions to staff negotiators in Closed Session, pursuant to Government Code section 11126(c)(7), regarding applications for assignment of four leases governing the use of existing offshore oil and gas pipelines traversing state waters associated with the Santa Ynez Unit in federal waters, the Ellwood Pier, and two mooring buoys, offshore Santa Barbara County. Negotiating Parties: State Lands Commission, ExxonMobil, and Sable Offshore Corp. Under negotiation: price and terms.

---

[30] Sable Offshore Corp. Reports Second Quarter 2024 Financial and Operational Results (August 13, 2024) ("On July 29, 2024, Sable met its 60-day advanced notice requirement to submit its production restart plans for the Pipelines to the OSFM for review and approval.")

[31] Plains Pipeline, L.P., State of California Assembly Bill 864: Coastal Best Available Technology Regulation Section 2113 Implementation Plan to Retrofit with Best Available Technology OSFM Line ID No. 0015 (Plains Pipeline, L.P. Line 901 Las Flores to Gaviota 24") (April 1, 2021).

[32] See, e.g., Staff Report 70 (Informational), August 29, 2024.

Sable is also actively seeking the following transfers from the County of Santa Barbara:

- a Change of Owner, Operator, and Guarantor of the Santa Ynez Unit's (SYU) Final Development Plan Permit No. 87-DP-032cz (RV06) from ExxonMobil Corporation to Sable;
- a Change of Owner, Operator, and Guarantor of the Pacific Offshore Pipeline Company (POPCO) Gas Plant's Final Development Plan Permit No. 93-FDP-015 and 74-CP-11(RV1) from ExxonMobil Corporation to Sable; and
- a Change of Owner, Operator, and Guarantor of the Las Flores Pipeline System's Final Development Plan Permit No. 88-DPF-033 (RV01)cz, 88-CP-60 (RV01), and 88-DPF-25cz (85-DP-66cz; 83-DP-25cz) from ExxonMobil Pipeline Company and ExxonMobil Corporation to Sable. In other words, Sable would be the Guarantor and Operator for all of the facilities.

These requests are set to be heard by the Planning Commission on October 9, 2024.[33]

More importantly, the County must require the owner/operator get a new permit for this restart project or at a minimum revise or modify the Development Plan and Conditional Use Permit for the pipeline system and conduct CEQA .The Final Development Plan Conditions of approval for the failed pipeline system include that:

> The *procedures, operating techniques, design, equipment and other descriptions* (hereinafter procedures) described by AAPLP in its application to the County 83-DP-25 cz, 83-CP-97 cz, and in subsequent clarifications and additions to that application and the Final Development Plan *are incorporated herein as permit conditions and shall be required elements of the project*. Since these procedures were part of the project description which received environmental analysis*, a failure to include such procedures in the actual project could result in significant unanticipated environmental impacts. Therefore, modifications of these procedures will not be permitted without a determination of substantial conformity or a new or modified permit*.[34]

The 1980s conditions of approval also require a "new or modified permit, or authority to continue operation under the existing permit prior to undertaking…: 1) major pipeline or pump station modifications"[35] and that the County can modify or revoke the permit under certain circumstances like failure to comply with any "permit condition."[36] Restart of these pipelines

---

[33] County of Santa Barbara, Planning & Development, webpage for Sable Offshore SYU, POPCO Gas Plant, and Las Flores Pipelines Change of Owner, Operator, and Guarantor, https://www.countyofsb.org/4189/SYU-POPCO-Gas-Plant-Las-Flores-Pipelines (last visited September 21, 2024).

[34] Las Flores Pipeline System Final Development Conditions, 88-DP-33 RV01, 88-CP-060 RV01, at A-7 (emphasis added).

[35] *Id.* at A-13.

[36] *Id*. at A-2 ("If the Planning Commission determines at a noticed public hearing that AAPLP is not in

after a catastrophic failure of its fundamental design and a massive oil spill (which now necessitates a whole new set of spill avoidance and mitigation measures, a State Waiver, assignments of leases and permits, new oil spill contingency plans, certificates of financial assurances, among other authorizations before restart may be allowed), are certainly such modifications.

***The Need for Robust Environmental Review Before Any Contemplation of Restart.*** This pipeline restart process cannot be approved until decisionmakers fully comply with CEQA. CEQA is California's bedrock environmental law. CEQA embodies the state's policy to "[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions." *No Oil, Inc. v. City of Los Angeles*, 13 Cal. 3d 68, 74 (1974) (quoting Pub. Res. Code § 21001(d)). To further CEQA's purpose, the statute must be "liberally construed to afford the fullest possible protection to the environment." *Protect Niles v. City of Fremont*, 25 Cal. App. 5th 1129, 1145 (2018); *see also Wildlife Alive v. Chickering*, 18 Cal. 3d 190, 206 (1976) (endorsing same principle).

CEQA mandates that public agencies prepare "an environmental impact report on any project that they intend to carry out or approve which may have a significant effect on the environment." Cal. Pub. Res. Code ("PRC") §§ 21151(a) (local agencies) and 21100(a) (state agencies). This EIR is "the heart of CEQA" and serves as "an environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return." *Laurel Heights Improvement Ass'n v. Regents of Univ. of Cal.*, 47 Cal. 3d 376, 392 (1989) (quoting *County of Inyo v. Yorty*, 32 Cal. App. 3d 795, 810 (1973)).

Here, CAL FIRE, the State Lands Commission, and Santa Barbara County have failed to initiate CEQA on the many discretionary approvals needed for a restart of this failed pipeline system. Santa Barbara County Planning & Development Department has previously acknowledged that discretionary action is needed from the County, CAL FIRE and PHMSA to restart the pipeline system, noting that it was adjusting the baseline conditions for the proposed 901/903 Replacement Pipeline Project after it had:

> confirmed with the California State Fire Marshal and the Pipeline and Hazardous Materials Safety Administration (PHMSA) that restarting the existing Line 901 and 903 pipeline system would require a State Waiver from the Fire Marshal and a Special Permit from PHMSA, as Plains cannot meet the current cathodic protection requirements outlined in PHMSA's Corrective Action Orders (CAOs) due to deficiencies in the existing pipeline coating. Further, if Plains were to pursue restart of the existing lines, they would be required to retrofit Line 901-903 using best available technologies pursuant to State Assembly Bill AB 864 prior to restart approval from the State Fire Marshal and PHMSA….Retrofits to the existing line (e.g installation of additional valves) would require discretionary action from SB County, via an amendment to the approved Development Plan No. 85-DP-66cz.

---

compliance with any permit condition*(s)*, pursuant to the provisions of Sec. 35-185 of Article II and/or Sec. 35-330 of Article III of the Santa Barbara County Code, the Planning Commission is empowered, in addition to revoking the permit pursuant to said section, to amend, alter, delete, or add conditions to this permit.")

> The work requested under this amendment application (case number 21AMD-00000-00009 amending 85-DP-66cz) is considered outside of regular maintenance and repair activities. ***Because discretionary actions to permit restart activities are needed from the California State Fire Marshal, PHMSA, and SB County***, the baseline conditions evaluated in the Draft EIR/EIS were changed to the conditions that existed on the ground at the time the 2019 NOP and NOIs were released, which is, and continues to be, a non-operational pipeline.[37]

Yet in the case of this pipeline restart project and the various agency approvals needed, no CEQA review has been initiated, the public has been largely in the dark, and decisionmaking has for the most part occurred behind closed doors, thwarting the public disclosure, informed decisionmaking, and environmental protection purposes of CEQA.[38]

While they have to our knowledge issued no publicly available CEQA determination or explanation for why they have failed to commence CEQA review, CAL FIRE, the State Lands Commission, and the County of Santa Barbara certainly cannot rely for their 2024 authorizations on a 1985 Joint Environmental Impact Report/Environmental Impact Statement (1985 EIR/EIS) prepared by the State Lands Commission, U.S. Bureau of Land Management, and U.S. Department of Interior[39] for the Celeron/All American and Getty Pipeline Projects (SCH 83110902), a full forty years and a major oil spill later. The 1985 EIR/EIS specifically evaluated a pipeline system whose key features failed and were deemed ineffective by PHMSA at preventing dangerous corrosion. In other words, the pipeline system evaluated in 1985 does not exist. Not only did the 1985 EIR/EIS fail to evaluate the pipeline system that now exists or the spill mitigation approaches now proposed in light of the pipeline system's failure, but presciently, the Draft 1985 EIR/EIS only specified a "projected 30-year life of the project."[40] This anticipated lifespan of the project lapsed the very same year of the Refugio Oil Spill, almost a decade ago. In sum, this 40-year old EIR/EIS is of very little relevance now.

---

[37] Revised NOP for the Draft Environmental Impact Report / Environmental Impact Assessment for the 901/903 Replacement Pipeline Project at 2-3 (emphasis added); the County has since been involved in litigation over their denial of a stand-alone 901/903 Valve Upgrade project (a request for an amendment to the Major Conditional Use Permit, Case No. 83-CP-97z and Development Plan 85-DP-66cz to allow for the installation of 16 new valves on existing Line 901 and Line 903 running from the Gaviota Coast to the Los Padres National Forest within Santa Barbara County). On September 19, 2024, the U.S. District Court for the Central District of California issued an Order on Stipulation to Vacate All Dates and Stay the Case in Light of Conditional Settlement in that litigation. *Pacific Pipeline Company and Sable Offshore Corporation v. Santa Babara County Planning Commission and Board of Supervisors*, Case No. CV 23-09218-DMG (MRWx). This letter's References include the Final Conditional Settlement Agreement (August 30, 2024).

[38] We have seen no notice to the public that any such process has commenced or that any agency has invoked any statutory or regulatory exemption to CEQA, which in any case would not apply to this project or the extraordinary circumstances under which it is proposed.

[39] The Joint review panel included the Santa Barbara County Resource Management Department and cooperating agencies that included the U.S. Forest Service, the U.S. Fish and Wildlife Service, the U.S. Federal Highway Administration, and California Secretary of Environmental Affairs.

[40] 1985 EIR/EIS at 2-35.

10

The current plan to somehow rehabilitate a post-failure, post-spill, ten years-idled pipeline system is hard to fathom, and its environmental implications certainly have never been assessed. This is even more troubling because re-starting the old, unsafe pipeline is even more dangerous than constructing a new pipeline. As the 1985 EIR/EIS acknowledged, the risk of a spill *more than doubles* as pipelines age from 20 to 40 years.[41] It cannot be relied upon for this 2024 proposed pipeline system restart project, a fundamentally different, post-failure, post-spill pipeline system.

As discussed in our many other letters concerning the restart of the SYU's oil and gas operations, several of which we hereby incorporate by reference,[42] these pipelines and other SYU infrastructure contribute to greenhouse gas pollution and the climate emergency, air pollution,[43] risk of oil spills and other accidents, water pollution, harm to biological resources including threatened and endangered species and their habitat, and harm to cultural resources among other impacts. These impacts have never been analyzed with respect to this pipeline system restart.

The draft EIR issued for the abandoned 901/903 Replacement Pipeline Project[44] is instructive on the risks a restart poses. It flags the risk of failures due to age and if cathodic protections could not be restored. It cites a 1993 Office of the State Fire Marshall report for the proposition that there is:

> a five times increase in failure frequencies for pipelines that are not equipped with cathodic protection over the average failure rate. In addition, because the existing pipeline is older, it could experience a higher failure rate due to age.[45]

It then estimated that restarting Lines 901/903 (CA-324 and CA-325) could result in a spill once a year, and a rupture once every four years even with the "installation of additional valve stations" as proposed.[46] Another recent analysis by Sable indicates that a worst-case spill from

---

[41] *Id*. at 4-166.

[42] *See, e.g.* May 23, 2024 Letter and References re Draft Part 70 Renewal Permits for Sable Offshore's Santa Ynez Unit Stationary Source; February 8, 2023 Letter and References re Extensions of ExxonMobil's Oil and Gas Leases on the Pacific Outer Continental Shelf; September 27, 2021 Center Comments and References re ExxonMobil Interim Trucking for SYU Phased Restart Project; June 4, 2019 Center et al. Comments and References re Draft Supplemental Environmental Impact Report for the Proposed Interim Trucking for Santa Ynez Unit (SYU) Phased Restart Project.

[43] Before shutting down in 2015, Exxon/Sable's Las Flores Canyon facility was Santa Barbara County's largest source of greenhouse gas, volatile organic compounds, fine particulate matter, and formaldehyde pollution in Santa Barbara County. California Air Resources Board, Pollution Mapping Tool Data, spreadsheet of Santa Barbara emissions for 2014, available at https://www.arb.ca.gov/ei/tools/pollution_map/; *see also* U.S. Environmental Protection Agency, 2014 Greenhouse Gas Emissions from Large Facilities, https://ghgdata.epa.gov/.  It constituted 55 percent of Santa Barbara County's total greenhouse gas emissions. *Id*.

[44] County of Santa Barbara, Planning & Development webpage for 901/903 Replacement Pipeline Project, https://www.countyofsb.org/3801/901903-Replacement-Pipeline-Project (last visited September 21, 2024).

[45] Administrative Draft of Draft EIR for Plains Pipeline Replacement Project, Section 5.6, p. 7.

[46] *Id*. at Section 5.6, p. 79.

11

this old pipeline could be 41,899 barrels of oil or *over 1.7 million gallons*.[47] The current restart plan with its higher oil spill risk (and attendant threats to water, cultural, biological and other resources) certainly constitutes "a reasonable possibility that the activity will have a significant effect on the environment," CEQA Guidelines § 15300.2(c), and thus is inappropriate for any exemption from CEQA and must be analyzed in a full EIR.

As a coalition of environmental organizations (including the Center) communicated in a recent letter to CAL FIRE,[48] the previously requested transparency, public process, and environmental review of the state waiver and restart process has been lacking despite "OSFM's Commitment" to full compliance with all requirements and applicable regulations before restart:

> The OSFM remains steadfast in its commitment to pipeline safety, serving the interests of both the State and local communities. Both CA-324 and CA-325 must fulfill **all** the aforementioned requirements before restarting operations. The pipeline operator must undergo a multi-stage review process to comply with these requirements and is expected to work with other agencies to meet their regulations, ***including any environmental review***, before potentially restarting the subject pipelines.[49]

The Center is aware of no CEQA analysis initiated by any agency or the County to analyze the present and future environmental impacts and risks of restarting these old, already-compromised pipelines almost ten years after the Refugio Oil Spill and cessation of operations. To the best of our knowledge, there is no CEQA review underway despite the fact that multiple agencies are considering multiple applications for authorization to restart various aspects of the pipeline systems, including but not limited to the request for a State Waiver to deviate from the once considered essential cathodic protections that were at the heart of the 1980s pipeline system design (and the Final EIR/EIS and project approvals). The bottom line is that potential impacts of restarting this pipeline system after a catastrophic failure and ten years sitting idle has never been adequately evaluated under CEQA by any permitting or approving agency.

**CONCLUSION**

Restarting Lines 901/903 (CA-324 and CA-325) and its connected onshore and offshore infrastructure risks significant harm to our beaches, waterways, air quality, wildlife, Tribal cultural resources, human health, ecosystems, and coastal economy and is contrary California's commitment to transition away from fossil fuels and their infrastructure. At a minimum, this restart project cannot be considered absent full compliance with CEQA.

The Center for Biological Diversity and Wishtoyo Chumash Foundation request that the Office of the State Fire Marshal, the County of Santa Barbara, and the State Lands Commission:

---

[47] Sable Offshore Corp., Pacific Pipeline Company Integrated Contingency Plan Las Flores Canyon Core Plan (Apr. 2024) at 14-4.

[48] September 10, 2024 Letter from 28 organizations to the Office of the State Fire Marshal.

[49] Pathways for Restarting Pipelines, Requirements for Restarting the CA-324 and CA-325 Revised: August 2, 2024 https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited on Sept. 13, 2024) (second emphasis added).

12

- immediately pause any further or final approvals concerning the restart of onshore pipelines 901 and 903 (now known as CA-324 and CA-325), and the connected offshore and onshore pipelines and other facilities, including but not limited to the State Waiver and restart plan and lease and permit transfers;
- release key documents and other pertinent information about the restart project and pending approvals to the public without delay and hold a public hearing on the restart proposal;
- clarify that new permits are needed for the pipeline system to restart (if it ever can) or in the alternative require a substantial revision of the existing Development Plan and Conditional Use permits and notify the pipeline system owner(s)/operator(s) that they must submit new applications for review;
- initiate CEQA review for the pipeline system restart project should you proceed to consider restart as a feasible option (which we do not) to ensure public transparency and informed decisionmaking.

Too much of the restart process has already happened behind closed doors. For an issue as important as restarting this old pipeline system that has already ruptured disastrously once, the public deserves—and the law requires—transparency and accountability at every step of the way from Santa Barbara County and the State of California's regulatory, public safety, and environmental agencies.[50]

Sincerely,

Julie Teel Simmonds, Senior Counsel
Center for Biological Diversity
619-990-2999
jteelsimmonds@biologicaldiversity.org


cc:    Lieutenant Governor Eleni Kounalakis
        Office of the Lieutenant Governor of California
        eleni.kounalakis@ltg.ca.gov

        Matthew Dumlao, Chief of Staff
        Office of the Lieutenant Governor
        matthew.dumlao@ltg.ca.gov

        Brian Goldman, Deputy Legal Affairs Secretary

---

[50] We will mail cited references on a USB drive and make them available here. Please let me know if you have problems accessing any of the documents.

Office of Governor Gavin Newsom
brian.goldman@gov.ca.gov

Lauren Sanchez, Senior Climate Advisor
Office of Governor Gavin Newsom
lauren.sanchez@gov.ca.gov

Rob Bonta, Attorney General
State of California Department of Justice
rob.bonta@doj.ca.gov

Angela Mo, Senior Counsel
angela.mo@usdoj.gov

Jim Hosler, Chief /Assistant Deputy Director, CAL FIRE
Jim.Hosler@fire.ca.gov

Wade Crowfoot, Secretary
California Natural Resources Agency
wade.crowfoot@resources.ca.gov
secretary@resources.ca.gov

Armando Quintero, Director
California Department of Parks and Recreation
Armando.Quintero@parks.ca.gov

Charlton Bonham, Executive Director
California Department of Fish and Wildlife
director@wildlife.ca.gov

Ryan Lodge, Executive Officer
Central Coast Regional Water Quality Control Board
Ryan.Lodge@waterboards.ca.gov

Steve Monfort, Executive Director
UC Natural Reserve System
steve.monfort@ucop.edu

Barton Loundsbury, Senior Counsel
Regents of the University of California
barton.lounsbury@ucop.edu

Heather Geldart, Administrator
Office of Spill Prevention & Response
California Department of Fish and Wildlife
Heather.Geldart@wildlife.ca.gov

14

Le-Quyen Nguyen, Deputy Secretary for Energy
California Natural Resources Agency
le-quyen.nguyen@resources.ca.gov

Gabe Tiffany, Acting Director
California Department of Conservation
gabe.tiffany@conservation.ca.gov

Benjamin Turner, Chief Policy and Planning Advisor
California Department of Conservation
Benjamin.turner@conservation.ca.gov

Jennifer Lucchesi, Executive Officer
California State Lands Commission
Jennifer.Lucchesi@slc.ca.gov

Kate Huckelbridge, Executive Director
California Coastal Commission
Kate.Huckelbridge@coastal.ca.gov

Cassidy Teufel, Deputy Director
California Coastal Commission
Cassidy.Teufel@coastal.ca.gov

Malia Cohen, State Controller
California State Controller's Office
malia.cohen@sco.ca.gov

Kristina Kunkel, Deputy State Controller
California State Controller's Office
kkunkel@sco.ca.gov

Joe Stephenshaw, Director
California Department of Finance
joe.stephenshaw@dof.ca.gov

Michele Perrault, Chief Deputy Director, Policy
California Department of Finance
michele.perrault@dof.ca.gov

Senator Monique Limón
California State Senate
Monique.limon@sen.ca.gov

Assemblymember Gregg Hart

15

Teel Declaration
Page 199

California State Assembly
Gregg.hart@asm.ca.gov

Supervisor Das Williams, District 1
Santa Barbara County Board of Supervisors
dwilliams@countyofsb.org

Supervisor Laura Capps, District 2
Santa Barbara County Board of Supervisors
lcapps@countyofsb.org

Supervisor Joan Hartmann, District 3
Santa Barbara County Board of Supervisors
jhartmann@countyofsb.org
supervisorhartmann@countyofsb.org

Supervisor Bob Nelson, District 4
Santa Barbara County Board of Supervisors
bnelson@countyofsb.org

Supervisor Steve Lavagnino, District 5
Santa Barbara County Board of Supervisors
slavagnino@countyofsb.org

David Villalobos, Hearing Support Supervisor
Santa Barbara County Board of Supervisors
dvillalo@countyofsb.org

William Sarraf
Santa Barbara County Air Pollution Control District
SarrafW@sbcapcd.org

Deb Haaland, Secretary
U.S. Department of the Interior
Deb_Haaland@ios.doi.gov
exsec@ios.doi.gov

Martha Guzman, Regional Administrator
U.S. Environmental Protection Agency, Region IX
guzman.martha@epa.gov

Amy Miller, Director, Enforcement and Compliance Assurance Division
U.S. Environmental Protection Agency, Region IX
miller.amy@epa.gov

Tomas Torres, Director, Water Division

16

U.S. Environmental Protection Agency, Region IX
torres.tomas@epa.gov

Vasiliki Tsaganos, Acting Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety Administration
phmsachiefcounsel@dot.gov

17

# Exhibit 15

Declaration of Julie Teel Simmonds

**State of California – The Resources Agency**
**DEPARTMENT OF PARKS AND RECREATION**

# NOTICE OF EXEMPTION

**TO:** Office of Planning and Research
1400 Tenth Street
Sacramento, CA 95814

**FROM:** Department of Parks and Recreation
1416 Ninth Street
P.O. Box 942896
Sacramento, CA 94296-0001

**PROJECT TITLE:** Pacific Pipeline 2025 Anomaly Digs

**LOCATION:** Gaviota State Park

**COUNTY:** Santa Barbara

**DESCRIPTION OF THE NATURE AND PURPOSE OF PROJECT:** The project is located in Gaviota S.P. along an existing crude oil pipeline known as Line 325 (see **Exhibit A**). The project entails granting a right-of-entry to the Pacific Pipeline Company, which would allow permittee to excavate and repair eighteen (18) discrete pipeline anomaly sites. When the work on each site is completed, the surface will be restored. Work will be performed by Pacific Pipeline Company and/or its subcontractors.

**PUBLIC AGENCY APPROVING THE PROJECT:** California Department of Parks and Recreation

**NAME OF DIVISION OR DISTRICT CARRYING OUT THE PROJECT:** Channel Coast District

**EXEMPT STATUS:**
☒ Statutory Exemption (Section 15284)
☒ Categorical Exemption
   *Classes:* 1, 2, 4, 5          *Sections:* 15301, 15302, 15304, 15305

**REASONS WHY PROJECT IS EXEMPT:**
- **Section 15284**: The project is less than eight miles in length; actual construction is not undertaken over a length of more than one-half mile at any one time; to State Parks' knowledge, the section of pipeline is not less than eight miles away from any section of pipeline that has been subject to this exemption in the past 12 months; the project is not solely for the purpose of excavating hazardous soil; the permittee's Integrated Contingency Plan results in notification of appropriate agencies to take action in the event of an emergency evacuation; project activities are undertaken within an existing right-of-way and the permit requires the right-of-way to be restored to its condition prior to the project; and the permit requires the permittee to comply with all conditions otherwise authorized by law.
- **Section 15301 (Class 1) Existing Facilities (d):** The project consists of restoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety.
- **Section 15302 (Class 2) Replacement or Reconstruction (b):** Replacement of a commercial structure with a new structure of substantially the same size, purpose, and capacity.
- **Section 15304 (Class 4) Minor Alterations to Land (f):** The project consists of minor trenching and backfilling activities with planned surface restoration.
- **Section 15305 (Class 5) Minor Alterations in Land Use Limitations:** The project consists of minor alterations in land use limitations in areas with an average slope of less than 20%.

No potential for significant or cumulative impacts to the environment is anticipated in compliance with CEQA §15301, 15302, 15304, and 15305, as the project consists of repairs to an existing facility with no expansion of use. The footprint of the pipeline remains the same. All work shall be performed in

DPR 508 (Rev. 4/2003)(Word 2/11/2005)

Teel Declaration
Page 203

accordance with applicable environmental regulations and State Parks' stipulated requirements, conditions, and restrictions to avoid and/or minimize the potential for environmental impact. All work shall be monitored by qualified environmental and cultural staff.

**CONTACT:** Dena Bellman  
Channel Coast District

**PHONE NO.:** (805) 331-3955  
**EMAIL:** Dena.Bellman@parks.ca.gov

DocuSigned by:

*Dena Bellman*

Dena Bellman  
District Superintendent  
Channel Coast District

5/9/2025

Date

**EXHIBIT A – Gaviota State Park Line 325A Topographic Map**

DPR 508 (Rev. 4/2003)(Word 2/11/2005)

# EXHIBIT A



# Exhibit 16

Declaration of Julie Teel Simmonds

STATE OF CALIFORNIA                                              GAVIN NEWSOM, *Governor*

## CALIFORNIA STATE LANDS COMMISSION



*Established in 1938*

**EXECUTIVE OFFICE**
100 Howe Avenue, Suite 100-South
Sacramento, CA  95825-8202

**GRACE KATO,** *Acting Executive Officer*
**916.574.1800**
*TTY CA Relay Service:* **711** *or Phone* **800.735.2922**
*from Voice Phone* **800.735.2929**
*or for Spanish* **800.855.3000**

May 23, 2025

File Ref.: Leases 7163 and 4977

Steve Rusch ([srusch@sableoffshore.com](mailto:srusch@sableoffshore.com))
Vice President of Environmental & Governmental Affairs
Sable Offshore Corp.

**Subject:   Sable's Claims Regarding Resumption of Oil and Gas Operations**

Dear Mr. Rusch:

I am writing to express my serious concerns regarding Sable Offshore Corp.'s press release dated May 19, 2025, entitled, "Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit and Anticipated Oil Sales from the Las Flores Pipeline System in July 2025," which you sent to Commission staff on the same day. The press release appears to mischaracterize the nature of recent activities, causing significant public confusion and raising questions regarding Sable's intentions.

Your press release also implies that Sable has restarted operations at the Santa Ynez Unit (SYU). However, Commission staff has informed me that the limited volume oil flows are the result of well-testing procedures required by the Bureau of Safety and Environmental Enforcement prior to restart. These activities do not constitute a resumption of commercial production or a full restart of the SYU. Characterizing testing activities as a restart of operations is not only misleading but also highly inappropriate – particularly given that Sable has not obtained the necessary regulatory approvals to fully resume operations at SYU.

I am also concerned that as Exxon's designated operator, Sable was required to communicate with Commission staff before initiating *any* oil flow through the offshore pipeline, even in this limited capacity. Sable's failure to clearly and timely communicate these activities to the Commission undermines trust of Sable's motives, demonstrates a lack of understanding of the significant concerns held by many regarding the resumption of activities, and raises serious questions about Sable's willingness to be a transparent operator.

Teel Declaration
Page 207

May 23, 2025
Page 2

Commission staff's letter dated May 9, 2025, made clear that failure to comply with applicable regulatory requirements or to resolve any outstanding regulatory issues could constitute a breach of the Commission's leases. Any attempt to restart commercial operations at the SYU without final regulatory approvals may place the company in violation of its lease terms and jeopardize the status of Sable's holdover lease.

As Chair of the State Lands Commission, it is my expectation that Sable will resolve all pending legal challenges and litigation with other state agencies prior to the full restart of operations. The willful disregard for the directives of regulatory agencies does not engender trust or confidence in Sable's willingness to serve as a responsible partner, and could weigh significantly into considerations on the future assignment of the SYU leases from Exxon to Sable.

As a reminder, in December 2023, the Commission authorized the preparation of an Analysis of Public Trust Resources and Values (APTR) to evaluate the risks and impacts to Public Trust resources of all 12 offshore oil and gas pipeline leases under the Commission's jurisdiction. Prior to the Commission's consideration of the APTR, no new offshore oil and gas pipeline leases will be considered, including leases 7163 and 4997, which will expire on January 31, 2029 and December 31, 2028, respectively.

Sincerely,

Eleni Kounalakis
Lieutenant Governor
Chair, California State Lands Commission

cc: The Honorable Malia Cohen, State Controller
     Joe Stephenshaw, Director, Department of Finance
     Michele Perrault, Chief Deputy Director of Policy, Department of Finance
     Grace Kato, Acting Executive Officer, State Lands Commission
     Seth Blackmon, Chief Counsel, State Lands Commission
     Chris Workman, Counsel, State Lands Commission
     Drew Simpkin, State Lands Commission
     Nathan Franka, ExxonMobil

# **Exhibit 17**

Declaration of Julie Teel Simmonds

5/30/25, 9:57 AM

Case 2:26-cv-05242-SVW-SSC 25CV00974 | Superior Court of California | County of Santa Barbara Page 326 of 433   Page ID #:9291

 SUPERIOR COURT OF CALIFORNIA
**COUNTY OF SANTA BARBARA**



# Sable Offshore Corp. and Pacific Pipeline Co. v. California Coastal Commission

## Case Number

25CV00974

## Case Type

Civil Law & Motion

## Hearing Date / Time

Wed, 05/28/2025 - 10:00

## Nature of Proceedings

Order to Show Cause re Issuance of Preliminary Injunction

## Tentative Ruling

*For Plaintiffs and Cross-Defendants Sable Offshore Corp. and Pacific Pipeline Co.*: Jeffrey D. Dintzer, Matthew C. Wickersham, Garrett B. Stanton, Alston & Bird LLP

*For Defendant and Cross-Complainant California Coastal Commission*: Rob Bonta, Norma N. Franklin, Wyatt E. Sloan-Tribe, John M. Natalizio, Office of the California Attorney General

**RULING**

**For the reasons set forth herein, the application of the California Coastal Commission for issuance of a preliminary injunction is granted. No bond is required. The Commission shall present a written order for entry by the court.**

Background

(Note: In making this ruling, the court has considered all of the admissible evidence and arguments presented by the parties. The summary presented herein is not intended to be exhaustive.)

On February 18, 2025, plaintiffs Sable Offshore Corp. and Pacific Pipeline Company (collectively, Sable) filed their original complaint for damages, declaratory relief, and injunctive relief against defendant California Coastal Commission (the Commission). On April 16, Sable filed an amended complaint, which includes a petition for writ of mandate.

Also on April 16, 2025, the Commission filed a cross-complaint for declaratory and injunctive relief against Sable. (Note: The Commission filed a first amended cross-complaint on May 15, 2025.) The cross-complaint alleges that Sable is the owner of the Las Flores Pipelines, which include pipeline segments designated as CA-324 and CA-325 (collectively, the Pipeline). (First Amended Complaint [FAC], ¶ 1; Cross-complaint, ¶ 2; Teufel decl., ¶ 3.) The Pipeline is located within the coastal zone in unincorporated Santa Barbara County. (Cook decl., ¶ 3 & exhibit A, at pp. 4, 9.) (Note: Sable's Statement of Defense and Response to Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order (the Sable Statement) is attached as exhibit A to the declaration of Stephanie Cook, but the document is not consecutively paginated as required by Cal. Rules of Court, rules 2.109 and 3.1110(c). The page numbers cited herein, to this and to other exhibits of the Commission, are to the pdf page of the filed document in which the cited material appears.) The Pipelines were operated until 2015, when the Pipelines were shut down as a result of the Refugio Oil Spill.

According to the Commission, in March 2025, Sable, in the Sable Statement, stated that several months ago Sable had undertaken steps to "repair certain 'anomalies' detected along Line CA-324 and planned to repair other identified anomalies along both Lines CA-324 and CA-325." (Sable Statement, p. 14.) A pipeline "anomaly" was explained as "a pipeline segment with some deviation from its original configuration." (*Ibid.*) Sable stated that repair of any particular detected anomaly generally requires that it: "(1) access the affected pipeline segment via existing roadways and rights-of-way, which in some locations requires placing metal plates over water courses; (2) excavate the anomaly site, including the dirt beneath the affected pipeline segment, which in some locations may require dewatering and associated discharge; (3) expose the pipeline segment by removing insulation and sandblasting; (4) evaluate whether a 'Composite Repair' or 'Cut-Out Repair' is required, (5) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap; (6) backfill the anomaly site, and (7) conduct final site cleanup including erosion control and revegetation work[.]" (*Id.* at p. 15, fn. omitted.) This work requires the use of heavy equipment and may involve the removal of vegetation. (*Ibid.*)

According to Sable, Sable began conducting repair and maintenance activities to the Las Flores Pipelines in 2024. (Rusch decl., ¶ 4.) Sable conducted repair and maintenance until receiving Notice of Violation File No. V-9-24-0152 and subsequent communications from Coastal Commission staff dated October 4, 2024. (*Ibid.*) Sable thereafter suspended repair and maintenance activities. (*Ibid.*) Sable resumed repair and maintenance activities on February 14, 2025, following confirmation from the County of Santa Barbara (County) that the repair and maintenance activities were authorized pursuant to existing permits. (*Ibid.*)

Sable has completed the safety valve installation work on the Las Flores Pipelines and all span remediation work on the Santa Ynez Pipelines. (Rusch decl., ¶ 5.) Sable has also completed in the Coastal Zone approximately 100 anomaly repairs, and the only work remaining includes approximately twenty-two (22) additional anomaly repairs to the Las Flores Pipelines, which will occur onshore in pre-disturbed areas along small sections of the Las Flores Pipelines. (*Ibid.*) Of the

approximately twenty-two remaining repairs, 18 repairs will be conducted within Sable's right of way provided by the California Department of Parks and Recreation within the Gaviota State Park. (*Ibid.*) Additionally, approximately four repairs will be conducted within Sable's right of entry obtained from the Land Trust for the County of Santa Barbara. (*Ibid.*) Sable's remaining repair and maintenance work will be completed in approximately six weeks. (*Ibid.*)

Sable currently has a right of entry to perform the repair and maintenance activities from the California Department of Parks and Recreation, and Plaintiffs are negotiating a slightly revised right of entry that is anticipated to be agreed upon following the hearing on the Commission's application for a temporary restraining order (TRO). (Rusch decl., ¶ 6.) Sable currently has a right of entry to property of the Land Trust for the County of Santa Barbara. (*Ibid.*) Sable is completing repair and maintenance activities pursuant to existing Coastal Development Permits (CDPs) for the Las Flores Pipelines, which were permitted by the County, not the Coastal Commission, under the County's Local Coastal Program pursuant to its delegated authority from the Coastal Commission. (*Id.* at ¶ 7.)

All work is being conducted in the disturbed pipeline corridor where all impacts were determined to be permanent for the lifetime of the Las Flores Pipelines. (Rusch decl., ¶ 8.) In addition, for all ongoing work, Sable is implementing robust construction best management practices, including conducting pre-construction biological resources surveys, including nesting bird surveys, ensuring that a biologist is available onsite to monitor work, and conducting environmental awareness training with all onsite personnel, to ensure that impacts to coastal resources would fall within the scope of impacts previously analyzed during the Las Flores Pipelines' environmental review, authorized under the CDPs, and approved by the County. (*Ibid.*)

According to the Commission, on April 9, 2025, Commission Energy and Ocean Resources staff conducted a site visit to a portion of pipeline segment CA-324. (Teufel decl., ¶¶ 4-5.) Commission staff observed the presence of various construction equipment, including several excavators excavating soil, a bulldozer grading an inland slope, and a mechanical crane lowering equipment or a pipeline section into a trench. (*Id.* at ¶ 4 & exhibit AA.) Personal and construction vehicles were parked at several locations within fields adjacent to the work area, and at least seven white construction trucks were also present, several bearing the emblem of Pacific Petroleum. (*Ibid.*) Staff also visited a site near Refugio Beach and observed heavy equipment, including an excavator. (*Id.* at ¶ 5) Staff further visited a third nearby site and observed a truck with a "Fence Factory" decal on the driver's side door parked adjacent to an above-ground valve, and personnel actively installing a fence post in the adjacent field. (*Id.* at ¶ 6.) Staff also observed construction equipment, vehicles, and portable restrooms along a section of pipeline segment CA-324 near the Gaviota Pump Station. (*Id.* at ¶ 7.) All of this activity took place within the coastal zone. (*Id.* at ¶ 10.) To the Commission's knowledge, Sable had never applied to the County for a CDP to perform this work, nor had Sable provided Commission staff with a detailed description of the nature of the anomaly work it was conducting on the onshore pipelines or the precise locations of the anomaly work. (*Ibid.*)

After a public hearing on April 10, 2025, the Commission issued a cease and desist order (CDO). (Commission Request for Judicial Notice [RJN], exhibit 1.) The CDO includes findings adopted by the Commission as set forth in the Commission's staff report. (RJN, exhibit 1, at pp. 27-28; RJN, exhibit 3.) The CDO includes the following orders that Sable:

Teel Declaration
Page 214

5/15

"Cease and desist from engaging in or undertaking any development, as that term is defined in the Coastal Act (PRC Section 30106) and the Santa Barbara County Local Coastal Program (at Section 35-58), on any of the property and/or locations defined in Section 4.3, below, as the Santa Ynez Unit, including but not limited to the following development undertaken or planned at A) locations onshore: excavation; removal of major vegetation; fill of wetlands; grading and widening of roads; installation of metal plates over water courses; dewatering and discharge of water; removal, replacement, and reinforcement of pipeline and pipeline infrastructure; and other development associated with the return to service of Las Flores Pipelines CA-324 and CA-325; and[ ]B) at locations offshore: placement of sand and cement bags on the seafloor below and adjacent to Sable's out-of-service offshore oil and water pipelines; as part of an effort to restart the Santa Ynez Unit oil production operations and bring the pipelines back into use; unless and until either: (a) Sable secures a new, final, operative CDP specifically covering the work to be performed; (b) Sables secures another final, operative, valid form of Coastal Act authorization for the work to be performed; or (c) Sable secures a final, formal determination that the work it will perform is exempt from the Coastal Act's permitting requirement. The word 'final' as used in the prior sentence shall mean that it is no longer subject to an administrative appeal, including to the Commission." (CDO, ¶¶ 1.0, 1.1.)

On April 16, 2025, the Commission filed its application for a TRO to restrain further violation of the CDO and for issuance of an order to show cause why a preliminary injunction should not issue (OSC). The application was opposed by Sable. The court heard the application on April 17 and granted the application in part. The court granted the application for issuance of the OSC to be heard on May 14, 2025, with further opposition papers to be filed and served no later than 20 days before the hearing (i.e., April 24) and reply papers to be filed and served no later than 10 days before the hearing (i.e., May 2). The court denied the application for issuance of a TRO.

On April 21, 2025, the Commission filed a notice of appeal as to the denial of the issuance of the TRO. In the Court of Appeal, on April 22, 2025, the Commission filed a petition for stay, writ of supersedeas, or other appropriate order. (Sable Offshore Corp. v. Cal. Coastal Commission (B345604, app. pending).)

No further opposition was filed by Sable in response to the OSC. The Commission filed a reply on May 2, 2025.

Teel Declaration
Page 215

On May 6, the court issued a case management order (CMO) requesting further briefing on the issue of this court's jurisdiction to rule on the OSC pending the appeal of the denial of the TRO while the petition for stay was pending. The court noted the lack of further opposition filed by Sable and continued the hearing on the OSC to this hearing date of May 28.

As discussed below, both parties filed briefs in response to the court's request in the CMO. On May 15, 2025, the Court of Appeal issued its order denying the Commission's petition for writ of supersedeas "without prejudice to appellant's right to seek preliminary injunctive relief in the superior court during the pendency of this appeal." (Order, filed May 15, 2025.)

On May 23, 2025, Sable filed evidentiary objections to the evidence of the Commission.

**Analysis**

(1) Jurisdiction

In the CMO, this court raised the threshold issue of whether this court had jurisdiction to rule on the OSC and determine whether or not to issue a preliminary injunction during the pendency of the appeal of the denial of the TRO in the absence of a ruling from the Court of Appeal on the petition for writ of supersedeas. The court noted a lack of case law directly on this point, but noted that different legal arguments supported both the existence of jurisdiction and the lack of jurisdiction. The parties filed supplemental briefing in which the Commission argued in favor of jurisdiction and Sable argued against jurisdiction.

The Court of Appeal's order of May 15, 2025, answers the jurisdiction question. By noting that the denial of the application for writ was without prejudice to the "right to seek preliminary injunctive relief in the superior court during the pendency of this appeal," the Court of Appeal necessarily implies that this court has jurisdiction to provide such injunctive relief.

(2) Evidentiary Matters

In support of the application, the Commission requested that the court take judicial notice of its RJN exhibits 1, 2, and 3. The court granted these requests in its order on the TRO. (Order after Hearing, filed Apr. 17, 2025, at pp. 4-5.)

On May 23, 2025, Sable filed evidentiary objections to the declaration of Cassidy Teufel, which was filed in support of the Commission's application. Each of the 23 objections are overruled.

(3) Preliminary Injunction Standards

A preliminary injunction is available "[w]hen it appears by the complaint or affidavits that the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action." (Code Civ. Proc., § 526, subd. (a)(2).)

"The trial courts consider two interrelated questions in deciding whether to issue a preliminary injunction: 1) are the plaintiffs likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant; and 2) is there a reasonable probability that the plaintiffs will prevail on the merits. [Citations.] '[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him.' [Citations.]" (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 206.)

This general standard for issuance of a preliminary injunction is qualified in the context of the California Coastal Act (Coastal Act, Pub. Resources Code, § 30000 et seq.):

"Any person may maintain an action for declaratory and equitable relief to restrain any violation of this division, of a cease and desist order issued pursuant to Section 30809 or 30810, or of a restoration order issued pursuant to Section 30811. On a prima facie showing of a violation of this division, preliminary equitable relief shall be issued to restrain any further violation of this division. No bond shall be required for an action under this section." (Pub. Resources Code, § 30803, subd. (a).)

(3) Likelihood of Success

The Commission's cross-complaint seeks injunctive relief to enforce its CDO and enjoin violation of the Coastal Act.

"The Coastal Act 'was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California. The Legislature found that "the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people"; that "the permanent protection of the state's natural and scenic resources is a paramount concern"; that "it is necessary to protect the ecological balance of the coastal zone" and that "existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state...." [Citation.]' [Citation.] The Coastal Act is to be 'liberally construed to accomplish its purposes and objectives.' [Citation.] Under it, with exceptions not applicable here, any person wishing to perform or undertake any development in the coastal zone must obtain a coastal development permit 'in addition to obtaining any other permit required by law from any local government or from any state, regional, or local agency....' [Citation.]" (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 793–794.)

The case of *Greenfield v. Mandalay Shores Community Assn.* (2018) 21 Cal.App.5th 896 (*Greenfield*), not cited by either party, is instructive as to the application of the Coastal Act to the facts of this case. In *Greenfield*, the plaintiffs owed a single- family residence in the City of Oxnard (Oxnard), and rented their home for rental periods of less than 30 days (a short-term rental). (*Id.* at p. 899.) After Oxnard announced that it was considering drafting an ordinance to license short-term rentals, the homeowners' association governing the plaintiffs' home adopted a resolution barring short-term rentals (STR ban). (*Ibid.*) The plaintiffs filed an action under Public Resources Code section 30803 for declaratory and injunctive relief. (*Ibid.*) The trial court denied an ex parte application and a preliminary injunction based upon its determination that the STR ban was not a "development" within the meaning of the Coastal Act. (*Ibid.*)

On appeal, the *Greenfield* court disagreed, finding that the STR ban was a "development" under the Coastal Act:

" 'Development' is broadly defined to include, among other things, any 'change in the density or intensity of use of land....' Our courts have given the term 'development' '[a]n expansive interpretation ... consistent with the mandate that the Coastal Act is to be "liberally construed to accomplish its purposes and objectives." [Citation.]' [Citation.] 'Development' under the Coastal Act 'is not restricted to activities that physically alter the land or water. [Citation.]' [Citation.]" (*Greenfield, supra,* 21 Cal.App.5th at p. 900.) "STR bans, however, are a matter for the City and Coastal Commission to address. STRs may not be regulated by private actors where it affects the intensity of use or access to single family residences in a coastal zone." (*Id.* at p. 901.)

The *Greenfield* court therefore found that a prima facie showing had been made to issue a preliminary injunction. (*Greenfield, supra,* 21 Cal.App.5th at p. 902.) The trial court's denial of the preliminary injunction was reversed, and the trial court was ordered to issue a new order granting the motion for a preliminary injunction. (*Ibid.*)

The first and most significant issue therefore is whether the Commission has made a prima facie showing of a violation of the Coastal Act or of the CDO.

1. Prima Facie Showing

"A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 851.) "The defining feature of the prima facie standard is that it creates an initial burden on a moving party to proffer evidence that would support a favorable ruling without a court's consideration of conflicting evidence put forth by the opponent. ' "A 'prima facie' showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited." ' [Citation.] ' "Prima facie evidence is that which will support a ruling in favor of its proponent if no controverting evidence is presented. [Citations.] It may be slight evidence which creates a reasonable inference of fact sought to be established but need not eliminate all contrary inferences." ' [Citation.]" (*Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 21.)

The Commission has presented credible evidence of violation of the Coastal Act and of the CDO.

" 'Development' means, on land, in or under water, the placement or erection of any solid material or structure; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; change in the density or intensity of use of land, ...; change in the intensity of use of water, or of access thereto; construction, reconstruction, demolition, or alteration of the size of any structure, including any facility of any private, public, or municipal utility; and the removal or harvesting of major vegetation .... [¶] As used in this section, 'structure' includes, but is not limited to, any building, road, pipe, flume, conduit, siphon, aqueduct, telephone line, and electrical power transmission and distribution line." (Pub. Resources Code, § 30106.)

The Commission has presented evidence of grading and removal of materials, reconstruction of a "structure," and change in the intensity of the use of land with respect to Sable's repair and maintenance activities. These activities fall squarely within the definition of "development" in the Coastal Act, and this point is not meaningfully disputed by Sable.

Except for emergency work exempted under subdivision (e), not applicable here, "and in addition to obtaining any other permit required by law from any local government or from any state, regional, or local agency, any person, as defined in Section 21066, wishing to perform or undertake any development in the coastal zone, other than a facility subject to Section 25500, shall obtain a coastal development permit." (Pub. Resources Code, § 30600, subd. (a).)

The Commission has presented evidence that Sable has not obtained a CDP for Sable's repair and maintenance activities. (Teufel decl., ¶ 11; CDO, ¶ 8.0; RJN, exhibit 3, pp. 44-45, 67-69 [Staff Report, pp. 5-6, 28-30].)

The Commission has presented evidence that it issued a CDO prohibiting further work with respect to Sable's repair and maintenance activities. (RJN, exhibit 1.)

The Commission has presented evidence that Sable has continued its repair and maintenance activities notwithstanding the CDO. (Teufel decl., ¶¶ 11, 12; Rusch decl., ¶ 5.)

This evidence is sufficient to make a prima facie showing of a violation of the Coastal Act. A prima facie showing is sufficient to issue a preliminary injunction under the Coastal Act, and hence to demonstrate a likelihood of success on the merits. (Pub. Resources Code, § 30803, subd. (a); *Greenfield, supra*, 21 Cal.App.5th at p. 902.)

   2. Sable Opposition

Teel Declaration
Page 220

11/15

As discussed above, under section 30803 and *Greenfield*, a prima facie showing is sufficient for issuance of a preliminary injunction under the Coastal Act. As also discussed above, a prima facie showing by the party applying for preliminary injunctive relief does not involve the consideration of opposition evidence. Nonetheless, it is important to discuss Sable's opposition arguments and evidence.

Sable's principal argument in opposition, supported by the February 2025 letter from the County, is that Sable's repair and maintenance work is authorized by existing CDPs issued by the County. (Opposition, at pp. 6-8; Rusch decl., ¶ 30 & exhibit C.) The existing CDPs upon which Sable relies are not presented to the court; the argument and County's letter discuss these permits but do not provide them directly. (Note: If such permits are included somewhere, there is no clear citation enabling the court to find such documents. (See Rusch decl., ¶¶ 15-29.)) The court therefore cannot directly analyze the issue of whether existing CDPs are sufficient to authorize the work at issue.

The structure of the Coastal Act for enforcement provides the framework for evaluating the conflicting arguments as to the whether the existing CDPs are sufficient to authorize the work at issue, and thus also the issue of whether the Commission was authorized on that basis to issue the CDO. Under section 30803, any person may seek and obtain preliminary injunctive relief upon a prima facie showing of a violation of the Coastal Act. A "person" is defined to include any governmental agency, such as the Commission. (Pub. Resources Code, § 30111.) Under this provision, the Coastal Act emphasizes the importance of stopping a potential violation of the Coastal Act so that a potential violation does not continue until the ultimate resolution of the merits. This legislative determination necessarily means that a person engaged in a development under the Coastal Act may be delayed in completing the development even if the evidence more strongly tips in favor of the developer. In other words, the Coastal Act favors moving cautiously where coastal development is challenged.

The Coastal Act in the same section 30803 provide a procedural vehicle for a party affected by a CDO to address that issue directly:

"A court may stay the operation of the cease and desist order after it provides notice to the commission and holds a hearing. Any such stay may be imposed or continued only if it is not against the public interest." (Pub. Resources Code, § 30803, subd. (b).)

Sable thus had the opportunity to seek a stay of the CDO in order to challenge the validity of the CDO under subdivision (b) on a basis broader than arguing against a prima facie showing by the Commission under subdivision (a). Sable filed its complaint in this action to challenge the Commission's orders, but did not correspondingly seek provisional relief from the CDO by a stay.

The most reasonable application of section 30803 under these circumstances, even if Sable's arguments and evidence are fully weighed and considered, favors finding a likelihood of success on the merits sufficient to issue a preliminary injunction in favor of the Commission.

(4) Balance of Harms

In its opposition, Sable argues that the Commission's arguments that it would suffer irreparable harm if the TRO were not issued are baseless because Sable is conducting its activities with robust construction best management practices. (Rusch decl., ¶ 8.) Sable also argues that, as of its opposition to the TRO, granting the TRO would cause substantial economic loss to Sable and employment loss to its employees and contractors. (Rusch decl., ¶ 10-12.) Because Sable failed to file further opposition, this information has not been updated since the TRO hearing.

In *Greenfield*, *supra*, the appellate court reversed the denial of the preliminary injunction without expressly considering the relative harms of the parties under the traditional test for a preliminary injunction. " '[T]he standard of review is not whether discretion was appropriately exercised but whether the statute was correctly construed. [Citation.]' [Citation.]" (*Greenfield*, *supra*, 21 Cal.App.5th at p. 900.) "Because standing is conferred on 'any person,' (§ 30803, subd. (a)) it matters not when [the plaintiffs] started renting to short term tenants or that appellants can be adequately compensated for economic damages if the STR ban is found to be invalid at trial." (*Ibid*.)

Under this standard, the prima facie showing of a violation of the Coastal Act itself is irreparable harm warranting an injunction.

In *IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63 (*IT Corp.*), the California Supreme Court addressed the question of "What is the proper test for issuance of a preliminary injunction when a governmental entity seeks to enjoin an alleged violation of a zoning ordinance which specifically provides for injunctive relief?" (*Id*. at p. 66.) The *IT Corp.* court answer the question with the following standard: "Where a governmental entity seeking to enjoin the alleged violation of an ordinance which specifically provides for injunctive relief establishes that it is reasonably probable it will prevail on the merits, a rebuttable presumption arises that the potential harm to the public outweighs the potential harm to the defendant. If the defendant shows that it would suffer grave or irreparable harm from the issuance of the preliminary injunction, the court must then examine the relative actual harms to the parties." (*Id*. at p. 72, fn. omitted.)

The *IT Corp.* standard and *Greenfield*'s interpretation of section 30803 are consistent. In requiring a prima facie showing, the Legislature set the standard to determine when there is a likelihood of success. This establishes the rebuttable presumption that the potential harm to the public outweighs the potential harm to the defendant. *Greenfield* found that the argument that the plaintiff's economic harm was compensable in money insufficient to deny the injunction. This court finds that the evidence presented by Sable here, and considering in particular its failure to file further opposition to the OSC re preliminary injunction updating its earlier evidence (where, by denial of the TRO, Sable has not been restrained by this court from continuing its activities in the interim and presumably lessening its asserted harm), is not sufficient to show grave or irreparable harm from the issuance of the preliminary injunction.

In any event, upon consideration of all of the admissible evidence and arguments of the parties, the court finds that the balance of harms weighs in favor of issuance of the preliminary injunction.

Conclusion

Based on the foregoing, upon consideration of all of the admissible evidence and arguments of the parties and on the standards applicable to the issuance of an injunction under the Coastal Act, the court finds the evidence supports issuance of the injunction. The Commission's application for issuance of a preliminary injunction will therefore be granted.

No bond is required. (Pub. Resources Code, § 30803, subd. (a).)

# JUDGES

## JUDGE THOMAS ANDERLE

Dept. 3 SB-Anacapa

1100 Anacapa Street P.O. Box 21107

Santa Barbara, CA 93121-1107

US

# Exhibit 18

Declaration of Julie Teel Simmonds

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 10-K

**(Mark One)**

☒    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2024**

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the transition period from _____ to _____**
**Commission File No. 001-40111**

# SABLE OFFSHORE CORP.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **85-3514078** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **845 Texas Avenue, Suite 2920** | |
| **Houston, TX** | **77002** |
| | **(Zip Code)** |
| (Address of Principal Executive Offices) | |

**(713) 579-6161**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.0001 per share | SOC | The New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☐ Yes ☒ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. ☐ Yes ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act): Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant was approximately $550.0 million as of June 28, 2024 (based on the closing stock price of such stock as quoted on the New York Stock Exchange).

Teel Declaration
Page 226

**Table of Contents**

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

Some of the statements contained in this annual report may constitute "forward-looking statements" for purposes of the federal securities laws. Our forward-looking statements include, but are not limited to, statements regarding our or our management team's expectations, hopes, beliefs, intentions or strategies regarding the future. In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intends," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements in this annual report may include, for example, statements about:

- our ability to maintain the listing of our Common Stock on the NYSE;
- our ability to recommence production of the SYU Assets and the cost and time required therefor, and production levels once recommenced;
- our financial performance;
- our ability to satisfy future cash obligations;
- restrictions in existing or future debt agreements or structured or other financing arrangements;
- commodity price volatility, low prices for oil and/or natural gas, global economic conditions, inflation, increased operating costs, lack of availability of drilling and production equipment, supplies, services and qualified personnel, processing volumes and pipeline throughput;
- uncertainties related to new technologies, geographical concentration of operations, environmental risks, weather risks, security risks, drilling and other operating risks, regulatory changes and regulatory risks;
- the uncertainty inherent in estimating oil and natural gas resources and in projecting future rates of production;
- reductions in cash flow and lack of access to capital;
- the timing of development expenditures, managing growth and integration of acquisitions, and failure to realize expected value creation from acquisitions;
- the ability to recognize the anticipated benefits of the Business Combination, which may be affected by, among other things, our ability to grow and manage growth profitably, maintain relationships with customers and compete within our industry;
- our success in retaining or recruiting, or changes required in, our officers, directors or other key personnel;
- our officers and directors allocating their time to other businesses and potentially having conflicts of interest with our business;
- developments relating to our competitors and our industry;
- the possibility that we may be adversely impacted by other economic, business, and/or competitive factors;
- litigation, complaints and/or adverse publicity;
- privacy and data protection laws, privacy or data breaches, or the loss of data;
- our ability to comply with laws and regulations applicable to our business;
- changes in applicable laws or regulations; or
- other risks and uncertainties described in this annual report, including those under the section titled "*Risk Factors*."

The forward-looking statements contained in this annual report are based on our current expectations and beliefs concerning future developments and their potential effects on us. There can be no assurance that future developments affecting us will be those that we have anticipated. These forward-looking statements involve a number of risks, uncertainties (some of which are beyond our control) or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors described under the section of this annual report entitled "*Risk Factors*." Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

**Table of Contents**

**PART I**

**Item 1.    Business**

*References in this section to "we," "our" and "us" generally refer to Legacy Sable (as defined below) prior to the Business Combination and Sable (as defined below) after the Business Combination.*

**Overview**

Sable Offshore Corp. ("Sable") (formerly known as Flame Acquisition Corp. or "Flame") was a blank check company originally incorporated on October 16, 2020 as a Delaware corporation for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or other similar business combination with one or more businesses or entities. On March 1, 2021, Flame consummated an initial public offering (the "Flame IPO"), after which its securities began trading on the New York Stock Exchange ("NYSE"). On November 2, 2022, Flame entered into that certain Agreement and Plan of Merger (the "Merger Agreement"), dated November 2, 2022 (as amended on December 22, 2022 and June 30, 2023), by and among Flame, Sable Offshore Holdings LLC, a Delaware limited liability company ("Holdco"), and Sable Offshore Corp., a Texas corporation and a wholly owned subsidiary of Holdco ("Legacy Sable").

Legacy Sable entered into a Purchase and Sale Agreement (as amended, the "Sable-EM Purchase Agreement") on November 1, 2022, with Exxon Mobil Corporation ("Exxon") and Mobil Pacific Pipeline Company ("MPPC," and together with Exxon, "EM") pursuant to which Legacy Sable agreed to acquire from EM certain assets constituting the Santa Ynez field in Federal waters offshore California and associated onshore processing and pipeline assets (such "Assets," as defined in the Sable-EM Purchase Agreement, the "SYU Assets").

Beginning in 1968 and over the course of 14 years, EM consolidated more than a dozen offshore federal oil leases and organized them into a streamlined production unit known as SYU. SYU consists of three offshore platforms and a wholly owned onshore processing facility located along the Gaviota Coast at Las Flores Canyon in Santa Barbara County, California. SYU's onshore facilities and the three offshore platforms remained in continuous operation until 2015. In May 2015, a Plains Pipeline that transported produced oil from SYU experienced a leak, as further described below under "—*Pipeline 901 Incident.*" The SYU platforms and facilities suspended production after the Line 901 incident, the SYU Assets were shut in and the facilities were placed in a safe state. The facilities are not currently producing oil and gas; however, all equipment remains in place in an operation-ready state, requiring ongoing inspections, maintenance and surveillance. As part of these suspension efforts, all SYU equipment was drained, flushed and purged in 2016. All hydrocarbon pipelines within SYU have been placed in a safe state and remain under regular monitoring. In 2020, Plains entered into a Consent Decree, described further below under "—*Pipeline 901 Incident,*" that provides a path for a potential restart of the pipelines.

On February 14, 2024 (the "Closing Date"), Sable consummated the mergers and related transactions contemplated by the Merger Agreement (the "Business Combination"), following which Flame was renamed "Sable Offshore Corp." Pursuant to the terms and subject to the conditions set forth in the Sable-EM Purchase Agreement, the transactions contemplated by the Sable-EM Purchase Agreement were also consummated on February 14, 2024, immediately after the Closing, as a result of which Sable purchased the SYU Assets, effective as of January 1, 2022. On February 15, 2024, Sable's shares of Common Stock, par value $0.0001 per share ("Common Stock") and warrants to purchase Common Stock at an exercise price of $11.50 per share (the "Public Warrants") began trading on NYSE under the symbols, "SOC" and "SOC.WS," respectively.

Since the Closing Date, the Company has invested significant capital to safely restore production operations to SYU. Sable began hydrotesting the Pipeline in early 2025 in advance of a potential restart of production from the Santa Ynez Unit offshore platforms and the associated Las Flores Canyon processing facilities in the second quarter of 2025.

Unless otherwise noted or the context otherwise requires, references to (i) the "Company," "Sable," "we," "us," or "our" are to Sable Offshore Corp, a Delaware corporation, and its consolidated subsidiaries, following the Business Combination, (ii) "Flame" refers to Flame Acquisition Corp. prior to the Business Combination, (iii) "PPC" refers to Pacific Pipeline Company, a Delaware corporation, the equity of which was transferred from MPPC to Sable on the Closing Date pursuant to the Sable-EM Purchase Agreement, and (iv) the "Pipelines" are to Pipeline Segments 324/325 (formally known as Pipeline Segments 901/903) and the other "324/325 Assets" (formally known as "901/903 Assets" and as defined in the Sable-EM Purchase Agreement).

# Exhibit 19

Declaration of Julie Teel Simmonds

**As filed with the Securities and Exchange Commission on October 11, 2024.**

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM S-1
## REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# Sable Offshore Corp.
**(Exact Name of Registrant as Specified in Its Charter)**

| Delaware | 1311 | 85-3514078 |
|---|---|---|
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(Primary Standard Industrial Classification Code Number)** | **(I.R.S. Employer Identification No.)** |

**845 Texas Avenue, Suite 2920**
**Houston, Texas 77002 (713) 579-6161**
**(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)**

**Gregory D. Patrinely**
**Executive Vice President and Chief Financial Officer**
**Sable Offshore Corp.**
**845 Texas Avenue, Suite 2920**
**Houston, Texas 77002 (713) 579-6161**
**(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent for Service)**

*Copies to:*
**Ryan J. Maierson**
**Latham & Watkins LLP**
**811 Main Street, Suite 3700**
**Houston, TX 77002**
**(713) 546-5400**

**Approximate date of commencement of proposed sale to the public**: As soon as practicable after the effective date of this Registration Statement

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, please check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 under the Securities Exchange Act of 1934:

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents

**Risk Factors Summary**

The below is a summary of principal risks to our business and risks associated with ownership of our Common Stock. It is only a summary. You should read the more detailed discussion of risks set forth below and elsewhere in this prospectus for a more complete discussion of the risks listed below and other risks.

- We need to satisfy a number of permitting obligations and other requirements before we can restart production of the SYU Assets. There is no assurance that we will be successful in satisfying such obligations and requirements and restarting production of the SYU Assets in a timely manner.

- Our assumptions and estimates regarding the total costs associated with restarting production may be inaccurate.

- There is no guarantee that we will have sufficient cash to restart production of the SYU Assets.

- Oil, natural gas and natural gas liquids, or "NGL(s)", prices are volatile, due to factors beyond our control, and greatly affect our business, results of operations and financial condition. Any decline in, or sustained low levels of, oil, natural gas and NGL prices will cause a decline in our cash flow from operations, which could materially and adversely affect our business, results of operations and financial condition.

- If commodity prices decline and remain depressed for a prolonged period, our business may become uneconomical and result in additional write downs of the value of our properties, which may adversely affect our financial condition and our ability to fund operations.

- An increase in the differential between the NYMEX or other benchmark prices of oil and natural gas and the wellhead price we expect to receive for our future production could significantly reduce our cash flow and adversely affect our financial condition.

- The estimated quantities of petroleum contained in the SYU Assets are classified as "contingent resources" rather than "reserves" because they are subject to numerous contingencies. There is no assurance that any of the petroleum contained in the SYU Assets will ever be recovered or reclassified as "reserves."

- Our hedging strategy in the future may not effectively mitigate the impact of commodity price volatility from our cash flows, and our hedging activities could result in cash losses and may limit potential gains.

- Developing and producing oil, natural gas and NGLs are costly and high-risk activities with many uncertainties that may result in a total loss of investment or otherwise adversely affect our business, financial condition, results of operations and cash flows. Many of these risks are heightened for us due to the fact that most of our equipment has been shut-in for more than eight years.

- The enactment of derivatives legislation could have an adverse effect on our ability to use derivative instruments to reduce the effect of commodity price, interest rate and other risks associated with our business.

- Development and production of oil, natural gas and NGLs in offshore waters have inherent and historically higher risk than similar activities onshore.

- Oil and natural gas producers' operations are substantially dependent on the availability of water and the disposal of waste, including produced water and drilling fluids. Restrictions on the ability to obtain water or dispose of waste may impact our operations.

- The unavailability or high cost of rigs, equipment, supplies and crews could delay our operations, increase our costs and delay forecasted revenue.

- The third parties on whom we rely for transportation services are subject to complex federal, state and other laws that could adversely affect the cost, manner or feasibility of conducting our business.

13

Table of Contents

gas, oil and NGL financial swaps. The prices and quantities at which we enter into commodity derivative contracts covering our production in the future will be dependent upon oil and natural gas prices and price expectations at the time we enter into these transactions, which may be substantially higher or lower than current or future oil and natural gas prices. Accordingly, our price hedging strategy may not protect us from significant declines in oil, natural gas and NGL prices received for our future production. Many of the derivative contracts to which we will be a party will require us to make cash payments to the extent the applicable index exceeds a predetermined price, thereby limiting our ability to realize the benefit of increases in oil, natural gas and NGL prices. If our actual production and sales for any period are less than our hedged production and sales for that period (including reductions in production due to operational delays) or if we are unable to perform our drilling activities as planned, we might be forced to satisfy all or a portion of our hedging obligations without the benefit of the cash flow from our sale of the underlying physical commodity, which may materially impact our liquidity.

***Developing and producing oil, natural gas and NGLs are costly and high-risk activities with many uncertainties that may result in a total loss of investment or otherwise adversely affect our business, financial condition, results of operations and cash flows. Many of these risks are heightened for us due to the fact that most of our equipment has been shut-in for more than eight years.***

Our development and production operations may be curtailed, delayed, canceled or otherwise negatively impacted as a result of many factors, including:

- high costs, shortages or delivery delays of rigs, equipment, labor, electrical power or other services;
- unusual or unexpected geological formations;
- composition of sour natural gas, including sulfur, carbon dioxide and other diluent content;
- unexpected operational events and conditions;
- failure of down hole equipment and tubulars;
- loss of wellbore mechanical integrity;
- failure, unavailability or shortage of capacity of gathering and transportation pipelines, or other transportation facilities;
- human errors, facility or equipment malfunctions and equipment failures or accidents, including acceleration of deterioration of our facilities and equipment due to the highly corrosive nature of sour natural gas;
- excessive wall loss or other loss of pipeline integrity;
- title problems;
- litigation, including landowner lawsuits;
- loss of drilling fluid circulation;
- hydrocarbon or oilfield chemical spills;
- fires, blowouts, surface craterings and explosions;
- surface spills or underground migration due to uncontrollable flows of oil, natural gas, formation water or well fluids;
- delays imposed by or resulting from compliance with environmental and other governmental or regulatory requirements;
- delays due to operations in environmentally sensitive areas; and
- adverse weather conditions and natural disasters.

20

# Exhibit 20

Declaration of Julie Teel Simmonds

Impacts related to Hazardous Materials and Risk of Upset would only be related to maintenance and construction activities and these maintenance activities would have a minor impact on risk due to the potential for localized spills of hydraulic or diesel oils. **Impact RISK.1, RISK.2, RISK.3** would not be applicable and mitigation measures RISK.2-1 through RISK.2-7 would not be applicable. Impacts would therefore be **insignificant**.

Construction activities related to valve stations, pump stations and some segments of the pipeline that could be abandoned could potentially produce an increased risk of wildfires during construction, and **RISK.4** would still be applicable and mitigation measures RISK.4-1 through RISK.4-4 would still be applicable. Impacts related to **Impact RISK.4** and wildfires would therefore be **significant but mitigable**.

### No Project, Existing Pipeline Restart Alternative

Under this alternative, the existing pipeline would be utilized instead of a new pipeline being installed, and transportation of crude oil would occur through the existing pipeline. The existing pipeline would be brought into compliance with existing requirements related to AB 864 and CSFM best available technologies (BAT), including the installation of additional valves along the pipeline route. The Applicant would have to apply to the CSFM for a waiver to utilize the existing pipeline since the existing pipeline is subject to corrosion under insulation, which could affect the efficacy of cathodic protection systems. Generally, a pipeline is not allowed to operate with ineffective cathodic protection systems. There is uncertainty as to whether the Applicant could demonstrate to the CSFM that the pipeline could be operated safely, and therefore this variation and the variation above (no Project, No Pipeline Alternative) are both addressed.

Assuming that a CSFM waiver is granted, the Applicant would have to install additional valves along the pipeline in order to comply with AB 864 and BAT requirements, similar to the proposed Project pipeline design. The installation of these additional valves would require some construction activities and some limited clearing at multiple locations along the pipeline ROW.

The existing pipeline is insulated, and therefore there would be no need for heaters at the Sisquoc Pump Station or the installation of the gas pipeline.

The installation of valves would most likely be at locations similar to the proposed Project valve installations as the pipeline would follow a similar ROW and similar terrain.

Hazards are associated with risks to the public from a spill and subsequent fire, as well as impacts from a spill to the environment, impacts to schools and potential wildfire impacts. The existing pipeline is a larger diameter pipeline, and therefore the draindown spill volumes would be larger than the proposed Project. This results in potentially larger spills and larger fires, impacting more people, as well as larger spills to the environment. In addition, the frequency of a spill from the existing pipeline would be higher due to its age and the potential for the cathodic protection to be compromised by the insulation. These factors have been incorporated into the analysis presented below.

### Risks to Public Safety

**Impact RISK.1** describes the potential spill sizes and the estimated frequency of spills from the pipeline system and the potential for immediate (fires, etc.) health impacts on the public.

### Crude Pipeline Spill Volumes

The spill volumes for this alternative were calculated based on the pipeline size, which would be larger than the proposed Project, and the associated terrain for different segments of the pipeline. The Applicant

Teel Declaration
Page 234

provided a risk assessment for the proposed Project and this analysis was utilized to estimate the spill volumes associated with a larger pipeline size. Figure 5.6-11 shows the estimated spill volumes along the pipeline route for each segment as a worst case for that segment. The worst-case sized spill volume is shown in Table 5.6-16 for the different portions of the crude oil pipeline alternative.

*Crude Pipeline Spill Frequencies*

Spill frequencies from a crude pipeline are based on the PHMSA failure rates for the California pipeline database. The PHMSA base failure rate for crude oil pipelines is shown in Table 5.6-17. The spill frequencies are adjusted for the pipeline potential higher failure rate due to the compromised cathodic protection system and the potential for corrosion under the insulation issues. This correction is based on the CSFM report (CSFM 1993) indicating a five times increase in failure frequencies for pipelines that are not equipped with cathodic protection over the average failure rate. In addition, because the existing pipeline is older, it could experience a higher failure rate due to age. However, the CSFM study indicated a minimal increase in failure rate for pipelines that are less than 40 years old and the PHMSA database used to estimate the base failure rate includes many older pipelines. Therefore, only the five times factor was applied as an estimate of the increased failure rate for this pipeline.

**Figure 5.6-11    No Project – Existing Pipeline Restart Alternative Spill Volume by Segment Milepost**



Source: based on Applicant QRA and EFRD 2019, with adjustments for the size of the existing pipeline.

Teel Declaration
Page 235

Draft Print
07/25/2024 12:45:32 PM

**Table 5.6-16    No Project – Existing Pipeline Restart Alternative Crude Pipeline Worst Case Spill Volumes**

| Location | Proposed Project - Maximum Spill Volume, gallons | Alternative - Maximum Spill Volume, gallons |
|---|---|---|
| LFC – Gaviota Plant | 84,000 | 126,000 |
| Gaviota – Sisquoc | 131,040 | 284,594 |
| Sisquoc - Pentland | 198,030 | 657,893 |
| Coastal Segments | 117,600 | 237,344 |

Source: based on Applicant QRA and EFRD 2019, with modification to address spill duration of 60 minutes. Coastal segments include up to valve station 2-500. Includes the installation of additional valve stations as per the proposed Project locations.

**Table 5.6-17    No Project – Existing Pipeline Restart Alternative Crude Pipeline Spill Frequencies**

| Location | Spill Frequency | Return Period, years rupture/leak/total |
|---|---|---|
| PHMSA California Crude oil base rate | 1.62 per 1,000-mile years | - |
| Adjustment due to Pipeline Condition | 5.3 factor | - |
| PHMSA Adjusted Rate | 8.56 per 1,000-mile years | - |
| Failure rate for L901R (49.2 miles) | 0.43 failures per year | 9/3/2 years |
| Failure Rate for L903R (74.1 miles) | 0.63 failures per year | 6/2/2 years |
| Failure Rate for L901R + L903R | 1.07 failures per year | 4/1/1 years |

Source: based on Applicant QRA and EFRD 2019 with CSFM 1991 adjustment factor. PHMSA data since 2010. The return period is the anticipated period between releases. Includes leaks and ruptures.

### Crude Pipeline Population Densities

The population densities along the route are based on estimates for remote, rural, low density and high-density areas with some additions for highways. The population densities are similar to those used for the proposed Project except for the area through the City of Buellton, since the existing pipeline would pass through the City of Buellton and the proposed Project would pass around the City of Buellton to the west.

### Crude Pipeline Fires

In the event of a spill of oil and subsequent ignition resulting in a pool fire, the heat (i.e., thermal radiation) from the fire could result in a serious injury or fatality. The assumptions for impacts would be the same as for the proposed Project.

### Gas Pipeline

The proposed gas pipeline would not be installed as part of this alternative since heaters at Sisquoc would not be installed.

### Alternative Pipeline: Public Safety Risk

The combination of scenario frequency and consequences is combined to estimate risk using FN curves. FN curves are depictions of the risk levels of a project and show the frequency (F) of scenarios that could produce a given fatality or injury level (N) or greater. These are presented for the proposed Project in **Impact RISK.1**. Santa Barbara County has established risk thresholds that use societal risk profiles (FN curves) to determine the significance of hazardous material releases. These FN curves address both injury and fatality. The Santa Barbara County's adopted thresholds are generally applicable to fixed facilities and pipelines. The risk FN curves are shown in Figure 5.6-12 and are based on the FN curves developed as part of the Plains 2019 QRA analysis, with adjustments for the existing pipeline (increased pipeline diameter

Teel Declaration
Page 236

Draft Print
07/25/2024  12:45:32 PM

and failure frequency). The FN curves would be located within the amber region, and the impacts to public health due to pipeline releases would be **significant and unavoidable.**

**Figure 5.6-12    No Project – Existing Pipeline Restart Alternative Pipeline Risk FN Curves**



Source: Plains 2019 with modifications

### Risks to the Environment

A spill of crude oil from the pipeline could impact resources in the vicinity of the pipeline ROW. See Section 5.2 Biological Resources, Section 5.4 Cultural Resources and Section 5.9 Hydrology and Water Quality for a discussion of the impacts of a crude oil spill on biological, hydrological and cultural resources along the crude oil pipeline ROW.

### Crude Pipeline Spill Volumes

The spill volumes are discussed above under **Impact RISK.1**. For the public health assessment under **Impact RISK.1**, a worst-case spill shutdown time of 15 minutes was used due to the already conservative analysis for fires and impacts to the public used in the QRA. However, for spills that could affect the environment, a longer duration is used. As evidenced by the May 2015 Refugio spill, there is the potential for a pipeline shutdown to take longer than 15 minutes.

### Crude Pipeline SCADA System

The SCADA system used for the alternative would be the same as that used for the proposed Project since the SCADA system would be required to be updated per CSFM and AB864 requirements.

Teel Declaration
Page 237


07/25/2024  12:45:32 PM

*Proposed Project Pipeline: Spills Affecting Marine Resources*

Portions of the pipeline extend along the Santa Barbara County coastline. A crude oil spill could drain from the spill location through existing culverts or drainages and enter the marine environment. This is what occurred during the May 2015 Refugio Beach spill. An estimated 43 percent of the oil entered the ocean from the Refugio spill location, which was an estimated 750-foot pathway from the ocean shoreline. Because the proposed pipeline is located onshore at various distances from the shoreline, a rupture at different locations spilling the same amount of oil could allow for oil to enter the marine environment. Assuming a linear function of oil being trapped and adsorbed onshore with distance, the maximum amount of oil could enter the ocean where the pipeline is closest to the ocean and potential worst-case spill volumes are large. An estimated maximum amount of 71,621 gallons of crude oil could enter the ocean at the worst-case spill location. An estimated 11.8 miles of the 16.6-mile coastal portion (71 percent) of the pipeline would be vulnerable to spills entering the ocean if a spill were to occur along any of those segments and the adsorption rate were similar to that which occurred during the Refugio spill. This assumes that no rain event is occurring and that drainages are not flowing.

There are a number of variables affecting the amount of oil that could reach the ocean from an onshore spill, including the terrain, the location of drainages under the freeway and the railroad tracks, the soil type, and extent of rocky interfaces as well as the amount of moisture. During a rain event, when drainages and creeks are flowing, a spill into the waterways could follow the flow and enter the marine environment more readily. A spill under these conditions would also have more extensive terrestrial impacts and reach the marine environment more readily but would also be subjected to turbulence and mixing along the drainages.

For inland areas, the area with the largest potential impacts is along the Cuyama River. Based on the elevation profile and the spill volumes, the maximum spill volume along the Cuyama River segments of the pipeline (between proposed Project valve 3-800 and 5-400 nearest the Cuyama River) and using the absorption rate as seen in the Refugio spill, a spill along the Cuyama River portion of the pipeline could impact resources a distance as far as about 3,200 feet, which means that pipeline segments within about 3,200 feet of the Cuyama River could potentially impact the river in the event of a spill.

*Potential Impacts*

Depending on the location of the spill, the environmental conditions, and the biological resources present, Impact RISK.2 short and long-term effects to biological resources associated with a crude oil spill has the potential to be significant and unavoidable. Mitigation measures RISK.1-1 through RISK.1-7 would apply. Due to the increased size and frequency of spills, this significant and unavoidable impact would be a greater severity than that presented by the proposed Project.

### Risks to Schools

For **Impact RISK.3** (schools), the pipeline construction activities for the existing pipeline would only affect areas near the proposed valve installations. The existing pipeline is located about 500 feet from the Oak Valley School in western Buellton. In order to address the risk levels to this school, the California Department of Education (CDE) school siting risk protocol was utilized to determine the risk levels.

The assessments demonstrated that the risk levels are acceptable under the CDE Risk Protocols with a Total Individual Risk/Individual Risk Criteria (TIR/IRC) ratio of 0.29, with a 1.0 TIR/IRC ratio being the CDE Protocol threshold. It is important to note that the CDE protocol examines the individual risk at the closest school and does not examine the risks cumulatively along the entire pipeline route. Because the CDE

Teel Declaration
Page 238

# Exhibit 21

Declaration of Julie Teel Simmonds

Docusign Envelope ID: 6DE10801-4B24-43B4-90C2-301A4F32884D

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                                                 Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
P.O. Box 944246
SACRAMENTO, CA  94244-2460
(916) 653-7772
Website:  www.fire.ca.gov



May 2, 2025

**<u>Sent Via Email and First Class Mail</u>**

Julie Teel Simmonds
Center for Biological Diversity
2100 Franklin St., Ste. 375
Oakland, CA 94612
jteelsimmonds@biologicaldiversity.org

> RE:   *Center for Biological Diversity, et al. v. California Department of Forestry and Fire Protection, et al.*, Santa Barbara County Superior Court case no. 25CV02244

Dear Ms. Teel Simmonds:

Pursuant to Public Resources Code section 21167.6.6, subdivision (b), Respondents are obligated to provide a list of responsible agencies. Because Respondents do not view this as a project under CEQA and/or categorically exempt from CEQA, there are no agencies to identify under this provision.

However, if Petitioners disagree or intend to act out of an abundance of caution with regard to their obligations under Public Resources Code section 21167.6.5, subdivision (c), agencies who Petitioners may wish to contact may include the California Coastal Commission, the California Department of Fish and Wildlife, the California Regional Water Quality Control Board--Central Coast Region, and the County of Santa Barbara.

Best,

*Joshua Cleaver*
—8E7940CF1519442...
Joshua Cleaver
Staff Counsel

Cc:   David Pettit dpettit@biologicaldiversity.org
       Talia Nimmer tnimmer@biologicaldiversity.org

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

# Exhibit 22

Declaration of Julie Teel Simmonds

# DRAFT
# ENVIRONMENTAL IMPACT REPORT
# ENVIRONMENTAL IMPACT STATEMENT



# PROPOSED CELERON / ALL AMERICAN AND GETTY PIPELINE PROJECTS

## CALIFORNIA STATE LANDS COMMISSION
### AND
## BUREAU OF LAND MANAGEMENT
## DEPARTMENT OF THE INTERIOR

State Clearing House No. 83110902
Contract No. R-8353



**ERT**

A COMSAT COMPANY
ENVIRONMENTAL RESEARCH & TECHNOLOGY, INC.
ANCHORAGE · CHICAGO · CONCORD, MA · FORT COLLINS, CO
HOUSTON · LOS ANGELES · PITTSBURGH · WASHINGTON, DC

# AUGUST 1984

Teel Declaration
Page 242

- 2 pumping stations,
- 1 heating station,
- 10 pumping and heating stations,
- 20-acre tank farm at Cadiz,
- 2 delivery stations.

No new access roads longer than 2,600 feet (ft) would be required to reach the pumping stations. Utility requirements (electricity and natural gas) for the Celeron/All American pipeline are shown in Table 2-4.

The Celeron/All American pipeline used for analysis in this EIR/EIS would have the following specifications: 30-inch outside diameter; 0.344 to 0.562-inch wall thicknesses, with corresponding maximum operating pressures of 991 to 1,618 psig, respectively. The entire Celeron pipeline segment and a minimum of 20 miles of pipe downstream from each heating station on the All American pipeline segment would be insulated. Inlet temperature of the crude oil would average 160°F. The pipelines would be insulated with 1.5 inches of polyurethane with a vinyl outer jacket to minimize heat loss from the line. The pipe coating, where not insulated, would be a double wrap of plastic tape; in selected areas, such as river crossings, the pipe would have a coal tar coating overlaid with a concrete jacket.

The entire pipeline would be protected from corrosion with cathodic protection systems consisting of groundbeds and rectifiers. The number and location of these systems would be based on tests of pipe-to-soil potential after construction. Corrosion protection test stations would be installed at least every 10 miles to test the performance of the cathodic protection system. These stations, which are about the size of a parking meter, would be within the ROW.

Pipeline block and check valves would be located at strategic locations along the route (see Map 1-2). Block valves at the pump stations and on the upstream (of oil flow) side of major stream crossings (Refugio Creek, Gaviota Creek, Santa Ynez River, Sisquoc River, La Brea Creek, Cuyama River, Mojave River, Colorado River, Gila River, Wild Cat Canyon Creek, Rio Grande, and Pecos River) would be remotely operated. Check valves would be installed on the downstream (of oil flow) side of all major river and stream crossings, and block valves would be installed on both sides of all pump stations. Each block valve setting would require a 10-ft by 20-ft area. Figure 2-1 shows a typical block valve installation.

Remote control block valves installed at the sensitive areas identified above would be operated in two basic ways. The more traditional way would be to use an electric motor to open and close the valve. This system requires both power and communications. The second method would use a pneumatic or hydraulic actuator and requires only communications. Energy would be supplied by bottled nitrogen gas or solar panels operating a small hydraulic pump. The second method would be used at block valve sites which are too remote to be supplied with line power.

2-5

Teel Declaration
Page 243

TABLE 4-33

SHORT-TERM AND LONG-TERM IMPACTS RESULTING FROM THE
CELERON/ALL AMERICAN PROPOSAL OR ALTERNATIVES

| Resource | Irreversible Impacts | Irretrievable Impacts | Relationship of Short-Term Use of Environment and Long-Term Productivity |
|---|---|---|---|
| Air Quality | no | no | The project would not significantly deteriorate existing air quality in the project area. |
| Geology | no | no | No significant short-term or long-term impacts are anticipated. |
| Soils | no | no | During construction there would be short-term losses of soil due to erosion; no significant long-term impacts to soils are anticipated. |
| Surface Water | no | no | There would be short-term impacts to surface water during construction; no significant long-term impacts are anticipated. |
| Groundwater | no | no | No significant short-term or long-term impacts are anticipated |
| Aquatic Biology | no | no | Short-term impacts such as substrate removal, increased sedimentation, and habitat alteration would occur during construction; no significant long-term impacts are anticipated. |
| Terrestrial Biology | no | yes | The losses of live oak trees and up to 230 desert tortoises would be irretrievable. All vegetation types crossed by the pipeline would suffer short-term impacts. Oak woodlands and desert scrubland would not regenerate within the life of the project (30 years) and would suffer long-term impacts. |
| Socioeconomics | no | no | In the short-term, construction of the project would provide direct employment for 1,954 workers in 1985 and result in increased spending in local areas.<br><br>Temporary housing demand would exceed supply in certain areas during pipeline construction. In the long-term, operations would employ 49 workers and increased property tax revenues would be realized by the counties crossed by the pipeline. |
| Land Use and Recreation | yes | yes | Short-term disruptions of agriculture and recreation activities would occur. These losses would be irretrievable. Long-term degradation of wilderness values would occur in the FPAs and WSAs crossed by the proposed pipeline or alternatives. This degradation would be irreversible. |
| Transportation | no | no | There would be no significant short-term or long-term impacts to transportation. |
| Cultural Resources | yes | yes | Additional information gained during project-related surveys for cultural resource sites would contribute to knowledge of the area's history. Disturbance of cultural resource sites could result in the permanent loss of data. |
| Visual Resources | no | yes | Short-term impacts to visual resources would occur during construction of the pipeline and the pump stations. Long-term impacts would occur in the PNF, at the Cadiz pump station/tank farm site, and at the Twelve-Gauge Lake pump station. |
| Noise | no | no | Short-term noise impacts would occur to nearby residences during pipeline construction. There would be no significant long-term impacts. |

4-174

Teel Declaration
Page 244

# Exhibit 23

Declaration of Julie Teel Simmonds

**Julie Teel Simmonds**

---

| | |
|---|---|
| **From:** | Julie Teel Simmonds |
| **Sent:** | Tuesday, May 27, 2025 12:41 PM |
| **To:** | Michael S Dorsi |
| **Cc:** | Matthew Bullock; Myung J. Park; Talia Nimmer; David Pettit |
| **Subject:** | RE: CBD v. CAL FIRE (Sable) |
| **Attachments:** | 73_Fed Ds Notice of Recent Developments.pdf |

Hello Michael – as you no doubt know, Sable restarted oil production (announced 5/19, restarted 5/15) much to the surprise of many, including federal regulators (see attached Dec). At my back of the envelope calculation, they will have refilled the onshore tanks in 90 days at the current rate of 6,000 barrels/day. We would really appreciate any updates you can give us about the status of the onshore pipelines (anomaly work, hydrotests) and OSFM's timeline for final review of the restart plans, etc. I'd like to talk to you today if possible.

Thank you,
Julie

Julie Teel Simmonds, Senior Counsel
Center *for* Biological Diversity, Oceans Program
510-844-7154
jteelsimmonds@biologicaldiversity.org

*This email may contain material that is confidential, privileged and/or attorney work product*
*for the sole use of the intended recipient. Any review, reliance or distribution by others or*
*forwarding without express permission is strictly prohibited. If you are not the intended recipient,*
*please contact the sender and delete all copies.*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/2/2025 8:00 AM
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA BARBARA
### SOUTH COUNTY REGION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br><br>**DECLARATION OF BRADY BRADSHAW IN SUPPORT OF PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR, IN THE ALTERNATIVE, AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED AND TEMPORARY RESTRAINING ORDER**<br><br>Date: June 3, 2025<br>Time: 8:30 a.m.<br>Dept: 4<br>Judge: Hon. Donna D. Geck<br><br>[Action Filed: April 15, 2025] |

1

DECLARATION OF BRADY BRADSHAW IN SUPPORT OF PETITIONERS' *EX PARTE* APPLICATION

I, Brady Bradshaw, declare as follows:

1.      I submit this declaration in support of Petitioners Center for Biological Diversity (the Center) and Wishtoyo Foundation's Ex Parte Application for an Administrative Stay or, in the alternative, an Order to Show Cause Why a Preliminary Injunction Should Not Be Granted and Temporary Restraining Order. I have personal knowledge of the statements in this declaration, and I could and would competently testify to these matters if called as a witness.

2.      I am currently employed by the Center  as a Senior Oceans Campaigner and have been a member of the Center since February 2022.

3.      I live in Santa Cruz, California, and frequently visit Santa Barbara for work and personal recreation. For example, I visited the area twice this spring, swimming and going on beach walks at Rincon Point and West Beach. I plan to visit a couple of times this summer or fall, during which I intend to visit Refugio State Beach and swim and dive in the Santa Barbara Channel.

4.      I visited Refugio State Beach just last Sunday (May 18) for a paddle-out in memory of the 10th anniversary of the Refugio Beach oil spill. I swam out into the water with friends, while others joined us on kayaks and surf boards. There were about 70 people there. It was a somber and mournful event, and I was brought to tears by the former tribal chair of the Coastal Band of the Chumash Nation, who spoke about what it's like to be ignored by people in power. I also reflected on what would happen if there was another spill that impacted Refugio State Beach. It was surreal to be in the water with so many people at a beautiful state beach while knowing that we could lose it all in another oil spill.

5.      It was also jarring to see excavators, machinery, and trucks doing construction on the pipeline in Gaviota State Park on the same day that we were mourning the devastation caused by the oil spill. There was dirt flying in the air, and I thought about the endangered Southern California steelhead living in the Gaviota Coast's streams that may have already been harmed by all the construction activity and what other sensitive species and habitats may have been harmed in the State Park. Last fall, I photographed similar construction work on the pipeline happening in the sensitive coastal habitats.

2

DECLARATION OF BRADY BRADSHAW IN SUPPORT OF PETITIONERS' *EX PARTE* APPLICATION



Figure 1. An excavator I photographed working on
the Las Flores Pipeline System on October 4, 2024.

6.      I enjoy the unique beauty of Santa Barbara's beaches, including places like Refugio State Beach and Rincon Point. Some of my favorite activities include swimming, snorkeling, and diving in the Santa Barbara Channel. I also enjoy skateboarding and biking along the coast. These activities are an important part of my life and something I will do as long as I can.

7.      I am a recreational and competitive freediver. I am on the U.S. National Team for freediving and have broken 13 national records. Freediving involves diving deep into the ocean without respiratory equipment and exploring the underwater world. My dives range from 10 to 180 feet, and I love being able to study the underwater world up close. Freediving is also central to my spirituality.

8.      I started freediving in 2015 and have done many trips off the Santa Barbara coast since 2018. I visit the area to dive at least once a year, but for the last two years I've gone diving and swimming there every few months. I love the natural diversity and environment in the area and intend to continue going as often and as long into the future as I can.

3

9.      One of my favorite places to dive is the Channel Islands. I did a particularly special dive in the Channel Islands in 2022. As I dove into the dense kelp forest, I was surrounded by marine life and recall seeing harbor seals swimming nearby. On the boat ride back to shore, I saw a superpod of dolphins, with hundreds of animals swimming freely. It gave me a lot of hope to see such an abundant, diverse, and thriving ecosystem.

10.      I always look for native species on dives and beach walks near Santa Barbara, where I have seen crabs, stingrays, a shark, kelp, sea lions, dolphins, giant starfish, cormorants, seagulls, and pelicans. I appreciate seeing these animals in the wild, and it gives me a lot of joy and benefits being able to do so.

11.      The ocean is an important part of my spiritual practice. I found spirituality in the water in 2015 around the same time that I started freediving. I pray at the water's edge and conduct rituals of exchange with the ocean that symbolize the weaving of my body into the sea. These rituals have marked important transition points in my life, helping me let go of the past while giving myself over to the ocean and fate. I have prayed and engaged in these rituals on Santa Barbara's beaches, including at Rincon Point and Gaviota State Park. In March, I visited Gaviota State Park to meditate and think about the coastal habitat and the way it connects to the marine ecosystems, while overlooking the Pacific Ocean and trying to envision a bright future.

12.      I have closely followed and opposed efforts to resume offshore oil and gas drilling in the Santa Barbara Channel, including the Office of State Fire Marshal's decision to waive the requirement that the onshore pipelines have effective cathodic protections. I am aware of the immense habitat destruction and animal deaths that resulted from the tens of thousands of gallons of oil that spilled onto Refugio Beach in 2015. I am deeply concerned that if production resumes in the Santa Ynez Unit and oil flows through the Las Flores Pipeline System, another oil spill will occur and cause great harm to my personal and professional interests.

13.      I find the biodiversity of the Santa Barbara Channel captivating and being able to swim and dive there is important to me recreationally, competitively, and spiritually. Oil production in the Santa Ynez Unit causes noise pollution, water pollution, vessel strikes, and other impacts that harm the animals I love to see and the coastal areas I love to explore.

4

DECLARATION OF BRADY BRADSHAW IN SUPPORT OF PETITIONERS' *EX PARTE* APPLICATION

14.     The impacts from production and risk of a spill exists every day that oil flows through the Las Flores Pipeline System. If production fully resumes, I believe it is only a matter of *when*—and not *if*—an oil spill will happen. I know the pipelines for the Santa Ynez Unit have already ruptured once, and know the pipelines are past their intended lifespans and are at higher risk of leaks and spills with each passing day. If a spill were to occur, I would not get back into the water for a very long time due to the health impacts the spill would cause. An oil spill would also inhibit my spiritual practices, preventing me from going to the affected shorelines to pray and conduct rituals of exchange with the ocean.

15.     I know that the Santa Ynez Unit's processing facilities were the largest sources of air pollution in Santa Barbara County when they were in operation. The quality of the air I breathe is particularly important to my experience of freediving. Maintaining healthy lungs is the most important part of my training as a diver. I have asthma, and breathing in the toxic polluted air associated with oil production and an oil spill would harm my health.

16.     But most troubling to me would be the irreparable harm that an oil spill would cause to the marine life that makes each dive so transformative, from kelp to fish to harbor seals.

17.     Water quality is also very important to my health and safety, because I spend long periods of time in the water and may ingest the water. I could be exposed to pollutants that reach the water from a spill or oil production operations. I have seen oil sheens on the water in the past. When I see one, I will not get into the water and end up missing out on the activities that are so physically and spiritually important to me. I have also seen oil sheens while diving, which harms my enjoyment of freediving because I know I may be breathing in fumes from pollutants while at the surface or absorbing them through my skin while underwater and that I may be harming my health. When this happens, I will end my dive. It also is upsetting to know that the sensitive plants and animals that live in the water could be sickened or killed by the oil.

18.     My work is dedicated to ending offshore oil drilling because of the damage that fossil fuels cause our planet. I am deeply worried about the irreparable harm that could result from restarting oil production in the Santa Ynez Unit using decades-old, corroded pipelines and platforms. That's why I have taken so many actions to oppose it, including testifying at numerous local and statewide public

DECLARATION OF BRADY BRADSHAW IN SUPPORT OF PETITIONERS' *EX PARTE* APPLICATION

hearings; organizing alongside community members who share my fears; contacting my elected representatives; and writing agency officials.

19.    It's absurd that not a single agency has conducted an environmental review of this project to consider the impacts of repairing and restarting these aging pipelines and any mitigation measures or alternatives to protect the ecosystems and species harmed by oil spills and construction work. The environmental stakes are so high in this case. It's deeply alarming that Cal Fire has shut out the public's participation. If Cal Fire had conducted a public hearing on the waivers, I would have attended to express my concerns about the intolerable risk of another oil spill. I would have explained that restarting these old, corroded pipelines threatens to undo all the progress we've made in restoring the ocean since the Refugio Beach Oil Spill. On one of my recent dives off California's central coast, I saw reason for hope when I spotted three sea otters, who restore kelp forests by eating sea urchins. The threat of an oil spill jeopardizes that hope.

20.    My freediving, swimming, and ocean-based spiritual practices are a core part of who I am and are central to my wellbeing. These interests are at risk of imminent, irreparable harm if this Court does not issue the requested relief..

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my personal knowledge, information, and belief.

Executed on May 31, 2025

_B. Bradu_

Brady Bradshaw

DECLARATION OF BRADY BRADSHAW IN SUPPORT OF PETITIONERS' *EX PARTE* APPLICATION

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/2/2025 8:00 AM
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological
Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**
**SOUTH COUNTY REGION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive, <br><br> Respondents/Defendants. <br><br> SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive, <br><br> Real Parties in Interest. | Case No.: 25CV02244 <br><br> **DECLARATION OF RICHARD B. KUPREWICZ IN SUPPORT OF PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR, IN THE ALTERNATIVE, AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED AND TEMPORARY RESTRAINING ORDER** <br><br> Date: June 3, 2025 <br> Time: 8:30 a.m. <br> Dept: 4 <br> Judge: Hon. Donna D. Geck <br><br> [Action Filed: April 15, 2025] |

1

DECLARATION OF RICHARD B. KUPREWICZ ISO PETITIONERS' EX PARTE APPLICATION

I, Richard B. Kuprewicz, declare as follows:

1.      I have personal knowledge of the matters set forth in this declaration and if called and sworn as a witness could competently testify thereto.

2.      I am a chemical engineer with over fifty years of experience in the energy industry. For over twenty-five years, I have worked as the president of Accufacts, Inc., which provides independent expert consulting services to assist decision makers in making informed decisions concerning oil and gas pipelines. I provide pipeline safety expertise in areas including (but not limited to): pipeline failure investigation; risk management and risk analysis; pipeline siting, construction, design, operation, and maintenance, training, and control room management, including Supervisory Control and Data Acquisition (SCADA) approaches; leak/rupture detection; integrity management; emergency and spill response; and pipeline safety regulatory development and compliance. Much of my background is grounded in conducting numerous pipeline incident investigations following pipeline rupture tragedies spanning several decades.

3.      I have developed and performed safety and risk management and analysis for chemical plants, liquefied natural gas facilities, refineries, and pipelines. I have also consulted for various local, state, and federal agencies, nonprofit organizations, and members of the public on pipeline regulation, operation, and design.

4.      For the past two decades I have been involved as a representative of the public in advancing pipeline safety regulations at the federal and various state levels. From 2004 to 2018, I served on the Technical Hazardous Liquid Pipeline Safety Standards Committee, also referred to as the Liquid Pipeline Advisory Committee (LPAC), to advise the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA) on improvements to pipeline safety regulations. After a brief hiatus, the Secretary of Transportation reappointed me in late 2024 to represent the public again on the LPAC. In the early 2000s while serving on the LPAC, I played a significant role representing the public in developing federal integrity management pipeline safety regulations for both liquid and gas transmission pipelines.[1] These regulatory approaches emulated safety process approaches that I instituted and developed for the City of Bellingham, Washington, to assure that a ruptured pipeline

---

[1] *See generally* 49 C.F.R. §§ 195.551-195.591, 192.901-192.951.

2

DECLARATION OF RICHARD B. KUPREWICZ ISO PETITIONERS' EX PARTE APPLICATION

there could be restarted and operated safely. I also served for seven years as a member of the Washington State Citizens Committee on Pipeline Safety ("CCOPS").  Positions to CCOPS are appointed by the Governor.

5.    I am an expert in oil and gas pipeline safety and risk management analysis based on my training, education, and experience. Attached as **Exhibit A** is my curriculum vitae.

6.    I have investigative expertise in the topic of various forms of seam corrosion, such as selective seam corrosion, stress corrosion cracking, and am a recognized expert in early vintage cracking having investigated pipeline ruptures associated with these types of cracking threats.

7.    I was asked by the Environmental Defense Center (EDC) and Center for Biological Diversity (CBD) to utilize my experience and expertise to evaluate safety and integrity issues regarding the proposal to restart the Las Flores Pipeline System, which includes CA-324 and CA-325A/B ("the Pipelines"). A true and correct copy of my report, titled *Evaluation of Las Flores Pipeline System Startup Proposal*, dated December 20, 2024, is attached to this declaration as **Exhibit B**.

8.    The report sets forth my opinion, based on my review of the Consent Decree and other documents, references, and regulations related to the Pipelines, including: the "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County," prepared by the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (May 2016); DNV-G Final Report, "Line 901 Release (5/15/15) Mechanical and Metallurgical Testing – Report No.: OAPUS309DNOR (PP136049)" (September 18, 2015); PHMSA – In the Matter of Plains Pipeline, LP, Respondent, "Amendment No. 1 to the Corrective Action Order – CPF No. 5-2015-5011H;" CA Code CCR 19 § 2111 – Risk Analysis (2) Pipeline Description (A); 49 CFR § 195.304 Test Pressure; and Sable's website concerning, "Sable Offshore Corp. Provides Update on Pacific Pipeline Company Operations," October 28, 2024, at: https://www.sableoffshore.com/news/news-details/2024/Sable-Offshore-Corp.-Provides-Update-on-Pacific-Pipeline-Company-Operations/default.aspx. In summary, I identified the following technical issues concerning the proposed restart of the Pipelines:

a.    The design of the Pipelines renders the federal mandated cathodic protection system, intended to help address pipeline external corrosion, ineffective.

DECLARATION OF RICHARD B. KUPREWICZ ISO PETITIONERS' EX PARTE APPLICATION

b. Current inline inspection (ILI) technologies cannot adequately assess all forms of external corrosion threats that most likely exist on the Pipelines.

c. The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective cathodic protection system once the Pipelines go into operation.

d. Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure.

e. The poorly designed Pipelines cannot be made as safe as new pipelines.

9. Following the preliminary approval of the State Waivers for the pipelines, EDC and CBD asked me to review and evaluate the Letters of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld for CA-324 and CA-325A/B ("State Waivers"). A true and correct copy of my report, titled *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart*, dated February 21, 2025, is attached to this declaration as **Exhibit C**.

10. The report sets forth my opinion based on my review of the State Waivers and related documents, references, and regulations, including: Pacific Pipeline Company (Aka now as Sable/PPC) letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115)," July 10, 2023, p. 5 related to MFL-C February 2020 ILI run; 49 CFR § 452(h)(4)(iii)(H); PHMSA website: https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview; Plains Administrative Draft EIR, "Plains Replacement Pipeline Project," February 2022; and "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County," prepared by the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (May 2016). My opinion, as set forth in my report, is as follows:

a. The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them.

DECLARATION OF RICHARD B. KUPREWICZ ISO PETITIONERS' EX PARTE APPLICATION

b. The proposed hydrotests are also insufficient to address certain types of corrosion or predict corrosion growth. For example, MOP hydrotests are not adequate to test for crack forming potential on the Pipelines.

c. The State Waivers do not assure adequate spike hydrotesting, which is a method to address various forms of crack forming potential. The values for the spike test on Line 324 are too low for corrosion cracking screening and evaluation. Hydrotesting for Lines 325 A and B must be conducted in segments given the elevation changes. It is unclear, however, whether the testing parameters are adequate for Line 325A due to missing information. In addition, the Waivers do not appear to require any hydrotesting for Line 325B.

d. A key corrosion performance tracking process set in the State Waivers for the Pipelines is missing. This information, which helps identify possible corrosion "hot spots," is especially important given the history of extensive corrosion on the Pipelines.

e. The State Waivers will not provide an equal or greater level of safety as if the Pipelines were equipped with an effective cathodic protection system to avoid pipeline failure due to external corrosion. The current design of the Pipeline renders the cathodic protection system ineffective. External corrosion on the Pipelines is exacerbated by operation of the Pipelines at elevated temperatures, which seriously increases the corrosion rate.

11. Based on the facts I reviewed and my professional analysis, in my opinion the Las Flores Pipeline System is not safe to operate, even if the conditions in the Fire Marshal's State Waivers are fulfilled.

DECLARATION OF RICHARD B. KUPREWICZ ISO PETITIONERS' EX PARTE APPLICATION

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my personal knowledge, information, and belief.

Executed this 30th day of May 2025, in Nipomo, California.

_____
Richard B. Kuprewicz
President, Accufacts, Inc.

6

DECLARATION OF RICHARD B. KUPREWICZ ISO PETITIONERS' EX PARTE APPLICATION

**INDEX OF EXHIBITS**
**Declaration of Richard B. Kuprewicz**

| Exhibit No. | Description | Starting Page No. |
|---|---|---|
| Exhibit A | Curriculum Vitae | 9 |
| Exhibit B | Evaluation of Las Flores Pipeline System Startup Proposal, (Dec. 20, 2024) | 19 |
| Exhibit C | Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart (Feb. 21, 2025) | 37 |

# EXHIBIT A

**Attachment 1**

## Curriculum Vitae.

# Richard B. Kuprewicz

8151 164th Ave NE
Redmond, WA   98052

**Tel: 425-802-1200 (Office)**
**E-mail: kuprewicz@comcast.net**

---

**Profile:**   As president of Accufacts Inc., I specialize in gas and liquid pipeline investigation, auditing, risk management, siting, construction, design, operation, maintenance, training, SCADA, leak detection, management review, emergency response, and regulatory development and compliance.  I have consulted for various local, state and federal agencies, NGOs, the public, and pipeline industry members on pipeline regulation, operation and design, with particular emphasis on operation in unusually sensitive areas of high population density or environmental sensitivity.

---

**Employment:**   **Accufacts Inc.**                           **1999 – Present**

Pipeline regulatory advisor, incident investigator, and expert witness on all matters related to gas and liquid pipeline siting, design, operation, maintenance, risk analysis, and management.

| | |
|---|---|
| **Position:** | President |
| **Duties:** | > Full business responsibility |
| | > Technical Expert |

**Alaska Anvil Inc.**                           **1993 – 1999**

Engineering, procurement, and construction (EPC) oversight for various clients on oil production facilities, refining, and transportation pipeline design/operations in Alaska.

| | |
|---|---|
| **Position:** | Process Team Leader |
| **Duties:** | > Led process engineers group |
| | > Review process designs |
| | > Perform hazard analysis |
| | > HAZOP Team leader |
| | > Assure regulatory compliance in pipeline and process safety management |

**ARCO Transportation Alaska, Inc.**           **1991 - 1993**

Oversight of Trans Alaska Pipeline System (TAPS) and other Alaska pipeline assets for Arco after the Exxon Valdez event.

| | |
|---|---|
| **Position:** | Senior Technical Advisor |
| **Duties:** | > Access to all Alaska operations with partial Arco ownership |
| | > Review, analysis of major Alaska pipeline projects |

**ARCO Transportation Co.**                    **1989 – 1991**

Responsible for strategic planning, design, government interface, and construction of new gas pipeline projects, as well as gas pipeline acquisition/conversions.

| | |
|---|---|
| **Position:** | Manager Gas Pipeline Projects |
| **Duties:** | > Project management |
| | > Oil pipeline conversion to gas transmission |
| | > New distribution pipeline installation |
| | > Full turnkey responsibility for new gas transmission pipeline, including FERC filing |

10-22-24                                                                                 Page 1 of 9

**<u>Four Corners Pipeline Co.</u>**                    **1985 – 1989**

Managed operations of crude oil and product pipelines/terminals/berths/tank farms operating in western U.S., including regulatory compliance, emergency and spill response, and telecommunications and SCADA organizations supporting operations.

**Position:**     Vice President and Manager of Operations
**Duties:**       > Full operational responsibility
          > Major ship berth operations
          > New acquisitions
          > Several thousand miles of common carrier and private pipelines

**<u>Arco Product CQC Kiln</u>**                    **1985**

Operations manager of new plant acquisition, including major cogeneration power generation, with full profit center responsibility.

**Position:**     Plant Manager
**Duties:**       > Team building of new facility that had been failing
          > Plant design modifications and troubleshooting
          > Setting expense and capital budgets, including key gas supply negotiations
          > Modification of steam plant, power generation, and environmental controls

**<u>Arco Products Co.</u>**                    **1981 - 1985**

Operated Refined Product Blending, Storage and Handling Tank Farms, as well as Utility and Waste Water Treatment Operations for the third largest refinery on the west coast.

**Position:**     Operations Manager of Process Services
**Duties:**       > Modernize refinery utilities and storage/blending operations
          > Develop hydrocarbon product blends, including RFGs
          > Modification of steam plants, power generation, and environmental controls
          > Coordinate new major cogeneration installation, 400 MW plus

**<u>Arco Products Co.</u>**                    **1977 - 1981**

Coordinated short and long-range operational and capital planning, and major expansion for two west coast refineries.

**Position:**     Manager of Refinery Planning and Evaluation
**Duties:**       > Establish monthly refinery volumetric plans
          > Develop 5-year refinery long range plans
          > Perform economic analysis for refinery enhancements
          > Issue authorization for capital/expense major expenditures

**<u>Arco Products Co.</u>**                    **1973 - 1977**

Operating Supervisor and Process Engineer for various major refinery complexes.

**Position:**     Operations Supervisor/Process Engineer
**Duties:**       > FCC Complex Supervisor
          > Hydrocracker Complex Supervisor
          > Process engineer throughout major integrated refinery improving process yield
            and energy efficiency

10-22-24

**Qualifications:**

Served for over fifteen years as a member representing the public on the federal Technical Hazardous Liquid Pipeline Safety Standards Committee (THLPSSC), a technical committee established by Congress to advise PHMSA on pipeline safety regulations.
Committee members are appointed by the Secretary of Transportation.

Served seven years, including position as its chairman, on the Washington State Citizens Committee on Pipeline Safety (CCOPS).
Positions are appointed by the governor of the state to advise federal, state, and local governments on regulatory matters related to pipeline safety, routing, construction, operation and maintenance.

Served on Executive subcommittee advising Congress and PHMSA on a report that culminated in new federal rules concerning Distribution Integrity Management Program (DIMP) gas distribution pipeline safety regulations.

As a representative of the public, advised the Office of Pipeline Safety on proposed new liquid and gas transmission pipeline integrity management rulemaking following the pipeline tragedies in Bellingham, Washington (1999) and Carlsbad, New Mexico (2000).

Member of Control Room Management committee assisting PHMSA on development of pipeline safety Control Room Management (CRM) regulations.

Certified and experienced HAZOP Team Leader associated with process safety management and application.

**Education:**

| | |
|---|---|
| MBA (1976) | Pepperdine University, Los Angeles, CA |
| BS Chemical Engineering (1973) | University of California, Davis, CA |
| BS Chemistry (1973) | University of California, Davis, CA |

Kuprewicz Declaration
Page 11

**Publications in the Public Domain:**

1.  "An Assessment of First Responder Readiness for Pipeline Emergencies in the State of Washington," prepared for the Office of the State Fire Marshall, by Hanson Engineers Inc., Elway Research Inc., and Accufacts Inc., and dated June 26, 2001.

2.  "Preventing Pipeline Failures," prepared for the State of Washington Joint Legislative Audit and Review Committee ("JLARC"), by Richard B. Kuprewicz, President of Accufacts Inc., dated December 30, 2002.

3.  "Pipelines - National Security and the Public's Right-to-Know," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated May 14, 2003.

4.  "Preventing Pipeline Releases," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated July 22, 2003.

5.  "Pipeline Integrity and Direct Assessment, A Layman's Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated November 18, 2004.

6.  "Public Safety and FERC's LNG Spin, What Citizens Aren't Being Told," jointly authored by Richard B. Kuprewicz, President of Accufacts Inc., Clifford A. Goudey, Outreach Coordinator MIT Sea Grant College Program, and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated May 14, 2005.

7.  "A Simple Perspective on Excess Flow Valve Effectiveness in Gas Distribution System Service Lines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated July 18, 2005.

8.  "Observations on the Application of Smart Pigging on Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated September 5, 2005.

9.  "The Proposed Corrib Onshore System - An Independent Analysis," prepared for the Centre for Public Inquiry by Richard B. Kuprewicz, dated October 24, 2005.

10. "Observations on Sakhalin II Transmission Pipelines," prepared for The Wild Salmon Center by Richard B. Kuprewicz, dated February 24, 2006.

11. "Increasing MAOP on U.S. Gas Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2006. This paper was also published in the June 26 and July 1, 2006 issues of the Oil & Gas Journal and in the December 2006 issue of the UK Global Pipeline Monthly magazines.

12. "An Independent Analysis of the Proposed Brunswick Pipeline Routes in Saint John, New Brunswick," prepared for the Friends of Rockwood Park, by Richard B. Kuprewicz, dated September 16, 2006.

13. "Commentary on the Risk Analysis for the Proposed Emera Brunswick Pipeline Through Saint John, NB," by Richard B. Kuprewicz, dated October 18, 2006.

14. "General Observations On the Myth of a Best International Pipeline Standard," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2007.

15. "Observations on Practical Leak Detection for Transmission Pipelines – An Experienced Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated August 30, 2007.

16. "Recommended Leak Detection Methods for the Keystone Pipeline in the Vicinity of the Fordville Aquifer," prepared for TransCanada Keystone L.P. by Richard B. Kuprewicz, President of Accufacts Inc., dated September 26, 2007.

17. "Increasing MOP on the Proposed Keystone XL 36-Inch Liquid Transmission Pipeline," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated February 6, 2009.

18. "Observations on Unified Command Drift River Fact Sheet No 1: Water Usage Options for the current Mt. Redoubt Volcano threat to the Drift River Oil Terminal," prepared for Cook Inletkeeper by Richard B. Kuprewicz, dated April 3, 2009.

10-22-24

19. "Observations on the Keystone XL Oil Pipeline DEIS," prepared for Plains Justice by Richard B. Kuprewicz, dated April 10, 2010.

20. "PADD III & PADD II Refinery Options for Canadian Bitumen Oil and the Keystone XL Pipeline," prepared for the Natural Resources Defense Council (NRDC), by Richard B. Kuprewicz, dated June 29, 2010.

21. "The State of Natural Gas Pipelines in Fort Worth," prepared for the Fort Worth League of Neighborhoods by Richard B. Kuprewicz, President of Accufacts Inc., and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated October, 2010.

22. "Accufacts' Independent Observations on the Chevron No. 2 Crude Oil Pipeline," prepared for the City of Salt Lake, Utah, by Richard B. Kuprewicz, dated January 30, 2011.

23. "Accufacts' Independent Analysis of New Proposed School Sites and Risks Associated with a Nearby HVL Pipeline," prepared for the Sylvania, Ohio School District, by Richard B. Kuprewicz, dated February 9, 2011.

24. "Accufacts' Report Concerning Issues Related to the 36-inch Natural Gas Pipeline and the Application of Appleview, LLC Premises:  7009 and 7010 River Road, North Bergen, NJ," prepared for the Galaxy Towers Condominium Association Inc., by Richard B. Kuprewicz, dated February 28, 2011.

25. "Prepared Testimony of Richard B. Kuprewicz Evaluating PG&E's Pipeline Safety Enhancement Plan," submitted on behalf of The Utility Reform Network (TURN), by Richard B. Kuprewicz, Accufacts Inc., dated January 31, 2012.

26. "Evaluation of the Valve Automation Component of PG&E's Safety Enhancement Plan," extracted from full testimony submitted on behalf of The Utility Reform Network (TURN), by Richard B.Kuprewicz, Accufacts Inc., dated January 31, 2012, Extracted Report issued February 20, 2012.

27. "Accufacts' Perspective on Enbridge Filing to NEB for Modifications on Line 9 Reversal Phase I Project," prepared for Equiterre Canada, by Richard B. Kuprewicz, Accufacts Inc., dated April 23, 2012.

28. "Accufacts' Evaluation of Tennessee Gas Pipeline 300 Line Expansion Projects in PA & NJ," prepared for the Delaware RiverKeeper Network, by Richard B. Kuprewicz, Accufacts Inc., dated June 27, 2012.

29. "Impact of an ONEOK NGL Pipeline Release in At-Risk Landslide and/or Sinkhole Karst Areas of Crook County, Wyoming," prepared for landowners, by Richard B. Kuprewicz, Accufacts Inc., and submitted to Crook County Commissioners, dated July 16, 2012.

30. "Impact of Processing Dilbit on the Proposed NPDES Permit for the BP Cherry Point Washington Refinery," prepared for the Puget Soundkeeper Alliance, by Richard B. Kuprewicz, Accufacts Inc., dated July 31, 2012.

31. "Analysis of SWG's Proposed Accelerated EVPP and P70VSP Replacement Plans, Public Utilities Commission of Nevada Docket Nos. 12-02019 and 12-04005," prepared for the State of Nevada Bureau of Consumer Protection, by Richard B. Kuprewicz, Accufacts Inc., dated August 17, 2012.

32. "Accufacts Inc. Most Probable Cause Findings of Three Oil Spills in Nigeria," prepared for Bohler Advocaten, by Richard B. Kuprewicz, Accufacts Inc., dated September 3, 2012.

33. "Observations on Proposed 12-inch NGL ONEOK Pipeline Route in Crook County Sensitive or Unstable Land Areas," prepared by Richard B. Kuprewicz, Accufacts Inc., dated September 13, 2012.

34. "Findings from Analysis of CEII Confidential Data Supplied to Accufacts Concerning the Millennium Pipeline Company L.L.C. Minisink Compressor Project Application to FERC, Docket No. CP11-515-000," prepared by Richard B. Kuprewicz, Accufacts Inc., for Minisink Residents for Environmental Preservation and Safety (MREPS), dated November 25, 2012.

35. "Supplemental Observations from Analysis of CEII Confidential Data Supplied to Accufacts Concerning Tennessee Gas Pipeline's Northeast Upgrade Project," prepared by Richard B. Kuprewicz, Accufacts Inc., for Delaware RiverKeeper Network, dated December 19, 2012.

10-22-24

36. "Report on Pipeline Safety for Enbridge's Line 9B Application to NEB," prepared by Richard B. Kuprewicz, Accufacts Inc., for Equiterre, dated August 5, 2013.

37. "Accufacts' Evaluation of Oil Spill Joint Investigation Visit Field Reporting Process for the Niger Delta Region of Nigeria," prepared by Richard B. Kuprewicz for Amnesty International, September 30, 2013.

38. "Accufacts' Expert Report on ExxonMobil Pipeline Company Silvertip Pipeline Rupture of July 1, 2011 into the Yellowstone River at the Laurel Crossing," prepared by Richard B. Kuprewicz, November 25, 2013.

39. "Accufacts Inc. Evaluation of Transco's 42-inch Skillman Loop submissions to FERC concerning the Princeton Ridge, NJ segment," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated June 26, 2014, and submitted to FERC Docket No. CP13-551.

40. Accufacts report "DTI Myersville Compressor Station and Dominion Cove Point Project Interlinks," prepared by Richard B. Kuprewicz for Earthjustice, dated August 13, 2014, and submitted to FERC Docket No. CP13-113-000.

41. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated September 3, 2014, and submitted to FERC Docket No. CP13-551.

42. Accufacts' "Evaluation of Actual Velocity Critical Issues Related to Transco's Leidy Expansion Project," prepared by Richard B. Kuprewicz for Delaware Riverkeeper Network, dated September 8, 2014, and submitted to FERC Docket No. CP13-551.

43. "Accufacts' Report to Portland Water District on the Portland – Montreal Pipeline," with Appendix, prepared by Richard B. Kuprewicz for the Portland, ME Water District, dated July 28, 1014.

44. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz and submitted to FERC Docket No. CP13-551.

45. Review of Algonquin Gas Transmission LLC's Algonquin Incremental Market ("AIM Project"), Impacting the Town of Cortlandt, NY, FERC Docket No. CP14-96-0000, Increasing System Capacity from 2.6 Billion Cubic Feet (Bcf/d) to 2.93 Bcf/d," prepared by Richard B. Kuprewicz, and dated Nov. 3, 2014.

46. Accufacts' Key Observations dated January 6, 2015 on Spectra's Recent Responses to FERC Staff's Data Request on the Algonquin Gas Transmission Proposal (aka "AIM Project"), FERC Docket No. CP 14-96-000) related to Accufacts' Nov. 3, 2014 Report and prepared by Richard B. Kuprewicz.

47. Accufacts' Report on Mariner East Project Affecting West Goshen Township, dated March 6, 2015, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

48. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing on the Proposed System Integrity Projects ("SIP") to the Mississippi Public Service Commission ("MPSC") under Docket No. 15-UN-049 ("Docket"), prepared by Richard B. Kuprewicz, dated June 12, 2015.

49. Accufacts' Report to the Shwx'owhamel First Nations and the Peters Band ("First Nations") on the Trans Mountain Expansion Project ("TMEP") filing to the Canadian NEB, prepared by Richard B. Kuprewicz, dated April 24, 2015.

50. Accufacts Report Concerning Review of Siting of Transco New Compressor and Metering Station, and Possible New Jersey Intrastate Transmission Pipeline Within the Township of Chesterfield, NJ ("Township"), to the Township of Chesterfield, NJ, dated February 18, 2016.

51. Accufacts Report, "Accufacts Expert Analysis of Humberplex Developments Inc. v. TransCanada Pipelines Limited and Enbridge Gas Distribution Inc.; Application under Section 112 of the National Energy Board Act, R.S.C. 1985, c. N-7," dated April 26, 2016, filed with the Canadian Nation Energy Board (NEB).

52. Accufacts Report, " A Review, Analysis and Comments on Engineering Critical Assessments as proposed in

PHMSA's Proposed Rule on Safety of Gas Transmission and Gathering Pipelines," prepared for Pipeline Safety Trust by Richard B. Kuprewicz, dated May 16, 2016.

53. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing to the Mississippi Public Utilities Staff, "Accufacts Review of Atmos Spending Proposal 2017 – 2021 (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 15, 2016.

54. Accufacts Report, "Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL")," prepared for Earthjustice by Richard B. Kuprewicz, dated October 28, 2016.

55. Accufacts' Report on Mariner East 2 Expansion Project Affecting West Goshen Township, dated January 6, 2017, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

56. Accufacts Review of Puget Sound Energy's Energize Eastside Transmission project along Olympic Pipe Line's two petroleum pipelines crossing the City of Newcastle, for the City of Newcastle, WA, June 20, 2017.

57. Accufacts Review of the Draft Environmental Impact Statement for the Line 3 Pipeline Project Prepared for the Minnesota Department of Commerce, July 9, 2017, filed on behalf of Friends of the Headwaters, to Minnesota State Department of Commerce for Docket Nos. CN-14-916 & PPL-15-137.

58. Testimony of Richard B. Kuprewicz, president of Accufacts Inc., in the matter West Goshen Township and Concerned Citizens of West Goshen Township v. Sunoco Pipelines, L.P. before the Pennsylvania Public Utilities Commission, Docket No. C-2017-2589346, on July 18, 2017, on Behalf of West Goshen Township and Concerned Citizens of West Goshen Township.

59. Direct Testimony of Richard B. Kuprewicz, president of Accufacts Inc., on Behalf of Friends of the Headwaters regarding Enbridge Energy, Limited Partnership proposal to replace and reroute an existing Line 3 to the Minnesota Office of Administrative Hearings for the Minnesota Public Utilities Commission (MPUC PL-9/CN-14-916 and MPUC PL-9/PPL-15-137), September 11, 2017 and October 23, 2017.

60. Direct Testimony of Richard B. Kuprewicz On Behalf of The District of Columbia Government, before the Public Service Commission of the District of Columbia, in the matter of the merger of AltaGas Ltd. and WGL Holdings, Inc., Formal Case No. 1142, September 29, 2017.

61. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2018 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated December 4, 2017.

62. Report to Hugh A. Donaghue, Esquire, Concord Township Solicitor, "Accufacts Comments on Adelphia Project Application to FERC (Docket No. CP18-46-000) as it might impact Concord Township," dated May 30, 2018.

63. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2019 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 20, 2018.

64. Report to West Goshen Township Manager, PA, "Accufacts report on the repurposing of an existing 12-inch Sunoco pipeline segment to interconnect with the Mariner East 2 and Mariner East 2X crossing West Goshen Township," dated November 8, 2018.

65. Report to West Whiteland Township Manager, PA, "Accufacts Observations on Possible Pennsylvania State Pipeline Safety Regulations," prepared by Richard B. Kuprewicz, dated March 22, 2019.

66. Accufacts Public Comments on the Proposed Joint Settlement, BI&E v. Sunoco Pipeline L.P. ("SPLP"), Docket No. C-2018-3006534 ("Proposed Settlement"), submitted on August 15, 2019 to the Pennsylvania Public Utility Commission on the behalf of West Goshen Township as an intervener.

67. Report to West Whiteland Township Manager, Ms. Mimi Gleason, "Accufacts Perspective on Two Questions from West Whiteland's Board of Supervisors on Proposed Changes to ME 2 and ME 2X Construction/Operational Activities within West Whiteland," dated September 5, 2019."

68. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the episode on the evening of 8-5-19 at the Mariner East Boot Road Pump Station ("Event"), Boot Road, West Goshen Township, PA," dated September 16, 2019.

69. Provided direct testimony before the Arizona Corporation Commission, In the Matter of the Application of Southwest Gas Corporation for the Establishment of Just and Reasonable Rates and Charges Designed to Realize a Reasonable Rate of Return on Fair Value of the Properties of Southwest Gas Corporation Devoted to its Arizona Operations (Docket No. G-01551A-19-0055), testified on behalf of Utilities Division Arizona Corporation Commission, February 19, 2020.

70. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the Mariner East 2X Pipeline Affecting West Goshen Township," dated July 23, 2020.

71. Assisted the Commonwealth of Massachusetts, Office of the Attorney General in developing pipeline safety processes to be incorporated into the settlement agreement related to Columbia Gas' sale of Assets to Eversource following the Merrimack Valley, Massachusetts overpressure event of September 13, 2018.

72. Report to Natural Resources Defense Council, Inc., "Accufacts' Observations on the Use of Keystone XL Pipeline Pipe Exhibiting External Coating Deterioration Issues from Long Term Storage Exposure to the Elements," October 1, 2020.

73. Report to Pennsylvania Public Utilities Commission ("PAPUC"), "Accufacts Comments on Proposed Pennsylvania Intrastate Liquid Pipeline Safety Regulations," dated October 29, 2021, prepared for West Whiteland Township Board of Supervisors, West Whiteland Township, PA. Filed to PAPUC public web docket November 5, 2021 by West Whiteland Township under Reference Docket Number L-2019-3010267. Addresses suggested improvements in proposed pipeline safety rules for PA intrastate liquid transmission pipelines.

74. Submitted written testimony of Richard B. Kuprewicz on Behalf of Bay Mills Indian Community to ALJ Dennis Mack, dated December 14, 2021, in the matter of the Application of Enbridge Energy, Limited Partnership for Authority to Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac, before the State of Michigan Public Service Commission, U-20763.

75. Public presentation to New York State Indian Point Nuclear Facility Decommissioning Oversight Board on Holtec removal activities in proximity to Enbridge three Natural Gas Transmission Pipelines, March 17, 2022.

76. Report to Pipeline Safety Trust and Bold Alliance, "Accufacts' Perspectives on the State of Federal Carbon Dioxide Transmission Pipeline Safety Regulations as it Relates to Carbon Capture, Utilization, and Sequestration within the U.S.," March 23, 2022.

77. Accufacts Inc., Public Presentation for the National Academies of Science Engineering Medicine and The Transportation Research Board, "To Committee on Criteria for Installing Automatic and Remote-Controlled Shutoff Valves on Existing Gas and Hazardous Liquid Transmission Pipelines," 4/27/22.

78. Accufacts Inc, "6/13/22 Webinar to Illinois Emergency Responders, Healthcare Providers, & Local Officials on Responses to $CO_2$ Transmission Pipeline Releases," 6/13/22.

79. Accufacts Report for Pipeline Safety Trust, "Safety of Hydrogen Transportation by Gas Pipelines," 11/28/22.

80. Completed a series of testimonies related to Enbridge's Line 5 proposal to replace 2 – 20-inch diameter existing submerged pipelines currently lying across the bottom of the Straits of Mackinac with a 30-inch diameter grade X-70 pipeline, proposed to be installed in a 21-foot diameter concrete tunnel to be installed across the approximate 4-mile span of the Straits of Mackinac. Testified on Behalf of the Bay Mill Indian Community before the State of Michigan Public Service Commission, Docket U-20763, in opposition to this very poorly designed proposal/installation allowing for movement of the pipeline on rollers within the tunnel. Final testimony to the docket submitted May 19, 2023. This is the only pipeline proposal I am aware of in the world that would place a crude oil and liquid propane pipeline, especially a 30-inch diameter pipeline, within a tunnel.

81. Issued to Ms. Niroop Srivatsa, City Manager, "Accufacts Report for the City of Lafayette on the Status of the Tree Assessment Process with PG&E," indicating most of the trees identified for removal by PG&E risk management

10-22-24

Page 8 of 9

approach have nothing to do with gas pipeline safety, June 15, 2023.

82. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the Navigator Heartland Greenway LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0161, on behalf of Citizens Against Heartland Pipeline ("CAHGP"), McDonough County, Christian County and Hancock County (the "Counties") (jointly, "Citizen and County Intervenors" of "CCI"), raising serious questions as to PHMSA's recent assertions of pipeline safety jurisdiction, and underscoring the ICC's authority for pipeline siting jurisdiction of said pipeline proposal in the State of Illinois, filed June15, 2023.  Applicant has terminated their application.

83. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the WOLF Carbon Solutions US LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0475, for a certificate of authority to construct and operate a carbon dioxide pipeline and when necessary to take interest in property as provided by law of eminent domain, testifying on Behalf of Citizens Against Predatory Pipelines ("CAPP"): 1) identifying serious inadequacies in PHMSA's pipeline safety regulations, 2) explaining why the Commission should require pipeline temperature profiles 3) detailing why DNV-RP-F104 is not relevant to this filing and 4) underscoring the ICC's authority to require additional critical information from the Applicant in this matter, filed October 24, 2023.  Applicant has withdrawn their submission to the Commission.

84. Provided general summary, main observations/concerns, on "Draft Environmental Impact Statement: Otter Tail to Wilkin Carbon Dioxide Pipeline Project" submitted to Minnesota Public Utilities Commission regarding Summit Carbon Solutions, LLC proposed 28 mile long 4-inch diameter $CO_2$ liquid transmission pipeline ("Otter Tail Pipeline") within Minnesota, PUC Docket No. IP-7093/PPL-22-422, provided to Clean Up the River Environment ("CURE") on 1/29/2024.

85. Issued to EarthJustice, "Observations concerning Kern County's Draft Environmental Impact Report ("DEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated February 26, 2024, "Observations concerning Kern County's Recent Recirculated Draft Environmental Impact Report ("RDEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated July 17, 2024, and "Evaluation of Kern County Response to Comments and Final Recirculated Environmental Impact Report on the TerraVault I Carbon Capture and Storage Project, dated October 15, 2024.  The Project situated in Kern County is proposed by the California Resources Corporation to separate a portion of the pre-combustion Elk Hills field gas production, treat and inject via liquid transmission pipelines, $CO_2$ into two sequestration injection wells within the Elk Hill oil field.  The reports identify many technical gaps in filings to Kern County.

86. Issued for the Tribal Partnerships Program, "Observations on the U.S. Army Corps of Engineers Draft Environmental Assessment, Clean Water Act Section 404(b)(1) Guidelines Evaluation, and Public Interest Review (collectively referenced as "DCDD") for the Enbridge Line 5 Wisconsin Segment Relocation Project ("Project"), dated May 2024," report dated July 31, 2024 affecting the Bad River Band of the Lake Superior Tribe of Chippewa Indians reservation.

10-22-24

Page 9 of 9

# EXHIBIT B

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Evaluation of Las Flores Pipeline System Startup Proposal*

**Prepared For**

# The Center for Biological Diversity
# &
# The Environmental Defense Center

**December 20, 2024**

Accufacts Inc. 12-20-24

## Table of Contents

I.    *Executive summary and major findings* ..............................................................*1*

II.   *Accufacts experience qualifying me as an expert in this matter.*................................*3*

III.  *A brief historical perspective*........................................................................*4*

IV.   *The Las Flores Pipeline System.* .....................................................................*5*

V.    *TIMP regulations are not working to protect the public or the environment.*.........*8*

   *1) Hydrotesting assessments.* ....................................................................**8**

   *2) ILI assessments.* ...................................................................................*10*

VI.   *The greatest threat on the Las Flores Pipeline System is from external corrosion.*
      ...........................................................................................................**11**

VII.   *High pipeline operating temperatures accelerate all forms of corrosion.*........... **13**

VIII.  *The Consent Decree agreement fails to require adequate IM processes to
       prevent another rupture of the poorly designed Pipelines.*.....................................**14**

IX.   *The poorly designed Pipelines cannot be made as safe as new pipelines.*.............. **14**

X.    *Conclusion.* ........................................................................................................ **15**

Accufacts Inc. 12-20-24                                                                  i

# I.    Executive summary and major findings

Accufacts Inc. ("Accufacts") was asked to review the documents related to the Las Flores Pipeline System ("Pipelines") for possible restart.  A Consent Decree signed in March, 2020 places responsibility for approving processes related to the onshore pipeline system restart on the California Office of the State Fire Marshal, or OSFM, the agency responsible for intrastate hazardous liquid pipeline safety.[1]  The Consent Decree replaces various Corrective Action Orders issued on the Pipelines by the Pipeline and Hazardous Materials Safety Administration, or PHMSA, the federal agency responsible for pipeline safety.[2]  PHMSA is the federal agency responsible for establishing minimum pipeline safety regulations for many pipelines operating in the U.S., including intrastate hazardous liquid transmission pipelines.  States meeting certain conditions can impose pipeline safety standards for intrastate pipelines beyond PHMSA regulations as long as such state regulations are not in conflict with PHMSA regulations.  By agreement, the Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed wavier alternative measures "provide an equal or greater level of safety."[3, 4]  The Consent Decree is inadequate, missing many corrosion threats to the Pipelines that can result in rupture.

Accufacts finds that the main technical issues concerning the restart of the Pipelines are:

1. **The poorly designed pipeline system renders required federal mandated cathodic protection ("CP"), intended to help address pipeline external corrosion, ineffective.**
2. **Current inline inspection ("ILI") technologies cannot adequately allow the assessment of all forms of external corrosion threats that most likely exist on the Pipelines.**
3. **The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective CP system once the Pipelines go into operation.**
4. **Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure. The poorly designed Pipelines cannot be made as safe as new pipelines.**

---

[1] Such state responsibility is dependent on whether the state agency meets certain qualifications required by PHMSA and whether the state Legislature has granted such state authority, as California has.

[2] UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA, UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, ex rel. DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, ex rel. CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, ex rel. CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, ex rel. CALIFORNIA STATE LANDS COMMISSION, ex rel. CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARCHALL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA (Plaintiffs) v. PLAINS ALL AMERICAN PIPELINE L.P. and PLAINS PIPELINE, L.P. (Defendants), Consent Decree, Civil Action No. 2:20-cv-20415 signed March 2020 ("Consent Decree").

[3] *Ibid.,* Appendix B & Appendix D, paragraph 1.

[4] PHMSA website, " Special Permits and State Waivers Overview," at https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

Accufacts Inc. 12-20-24                                                                 Page 1 of 15

Oil spills are catastrophic events, and operation of any pipeline carries a risk of spill. At best, good pipeline design and pipeline integrity management tools can reduce—but not eliminate—the risk. The Consent Decree is replacing incomplete integrity management ("IM") approaches implemented by Plains that failed to prevent a pipeline rupture from the poor design of the Pipelines, with another incomplete IM approach expecting a change in the outcome.

The Pipelines have been sitting shut down for over nine years at ambient temperatures without effective CP protection.  While external corrosion rates in this shutdown mode are significantly reduced because of lower temperatures as discussed later in this report, **the risk of external corrosion is not eliminated**.  The Consent Decree requires the OSFM to seek a waiver of the federal pipeline safety CP requirements defined under Subpart H, subject to the approval of PHMSA, to permit the Pipelines to restart.[5, 6]  Complicating this matter is the incorporation of risk analysis by the state into the Consent Decree that is under the control of the pipeline operator and is not made fully public, but subject only to the "review and comment" of the OSFM.  To be fair, the OSFM must meet certain state legislated risk analysis requirements that though well-meaning, are incomplete, such as, for example, how to define what a reasonable worst-case discharge is to prudently evaluate the risk of a pipeline failure.[7]  This is a problem I often see abused in federal pipeline oil spill response plans that doesn't adequately capture pipeline rupture hydraulics.[8]  One of the major problems with risk analysis, a determination of the likelihood of an event occurring, and why it is not codified into federal pipeline safety regulations, is that such approaches are usually not complete or representative of the true risks of a specific pipeline operation.  The impacts of any pipeline failure are significant and long-lasting, causing destruction of habitats, death of wildlife, and even human fatalities. It is impossible to predict a pipeline failure, and decision-making based on the perceived probability of failure does not adequately account for the severe consequences that will ensue, particularly if those decisions fail to capture pipeline rupture hydraulics. I call this "Space Shuttle Syndrome," because, in the rush to launch the space shuttle program, NASA decisionmakers understated its true risks and dismissed well established safety culture protocols, resulting in the loss of two space shuttles and their crews and ending the space shuttle program.

The Consent Decree is placing undue responsibilities on the OSFM which might not appreciate the limits of current inline inspection technical capabilities.  The Consent Decree overly relies on ILI technologies and their associated engineering critical assessments that are not capable of prudently addressing many forms of external corrosion, especially interactive forms such as Stress Corrosion Cracking, or SCC, whose time to failure is difficult, if not impossible, to predict as discussed later in this report.  The current poorly designed Pipelines do not permit CP protection to mitigate external corrosion on the Pipelines that must operate at uniquely high temperatures. The required high temperatures accelerate all forms of external corrosion.  New pipelines would incorporate proper design such as non-insulated pipe and newer forms of pipeline coating technology, that would permit CP to be effective in addressing external corrosion even at high temperatures to help assure pipeline safety.  No pipeline waiver issued under the conditions addressed in the Consent Decree is consistent with pipeline safety nor can ensure the same level

---

[5] 49CFR§195 Subpart H - Corrosion Control.
[6] Consent Decree, Appendix B, "State Waivers for Line 901, 903 …..,".
[7] CA Code CCR 19§2111 – Risk Analysis.
[8] 49CFR§194 Response Plans for Onshore Oil Pipelines.

Accufacts Inc. 12-20-24                                                          Page 2 of 15

of safety as that associated with a prudently designed pipeline system. Neither Plains, the pipeline operator at the time of the May 19, 2015 failure, nor the new owner, Sable, designed or built the present Pipelines with their serious deficiencies, but as a pipeline operator Sable bears the ultimate responsibilities should the Pipelines fail.

## II.    Accufacts experience qualifying me as an expert in this matter.

Accufacts Inc. ("Accufacts") was asked to review the Line 901/903 pipelines, now renamed Lines CA-324/CA-325 ("Pipelines"), and related documents such as those produced by the OSFM on their website.  A Consent Decree places responsibility for approving processes related to the onshore pipeline system restart first on the OSFM, then on PHMSA.[9]  The Center for Biological Diversity and The Environmental Defense Center asked Accufacts to provide an independent evaluation of documents related to a possible restart of the Pipelines to safely move heavy oil production from offshore platforms in the Santa Barbara Channel into the Pipelines.  It should be noted that the OSFM has recently issued a waiver on PHMSA's CP obligations for the Pipelines. I have not seen the details related to OSFM's decision on the granting of such a waiver.

I am a chemical engineer with over fifty years of experience in the energy industry, including over 25 years as president of Accufacts Inc. ("Accufacts").  Accufacts provides independent expert consulting services to assist decision makers in making informed decisions concerning pipelines. Pipeline safety expertise is provided in areas including, but not limited to: pipeline failure investigation, risk management/risk analysis, siting, construction, design, operation, maintenance, training, control room management including Supervisory Control and Data Acquisition ("SCADA") approaches, leak/rupture detection, integrity management, emergency and spill response, and pipeline safety regulatory development and compliance.  Much of my background is grounded in pipeline incident investigations following numerous pipeline rupture tragedies spanning several decades.

For the past two decades I have been involved as a representative of the public, which carries special obligations to avoid a conflict of interest, in advancing pipeline safety regulations at the federal and various state levels as demonstrated by my CV that is included as Attachment 1.  For example, I played a significant role representing the public in developing integrity management federal pipeline safety regulations in the early 2000s for both liquid and gas transmission pipelines. These regulatory approaches emulated safety process approaches that I instituted and developed for the City of Bellingham, WA to assure that a ruptured pipeline there could be restarted and operated safely.  This safety process approach, identified as the Pipeline Safety Immediate Action Plan, or PSIAP, identified steps that the pipeline operator was to complete following the Bellingham rupture tragedy of June 10, 1999, before that pipeline could be permitted to safely return to service.  The PSIAP is a matter of public record compliments of Washington State's Right-to-Know laws.  PSIAP formed a template for the integrity management safety regulations developed by the Office of Pipeline Safety, which morphed into PHMSA in 2003.

---

[9] Consent Decree, Appendix B & Appendix D.

Accufacts Inc. 12-20-24                                                      Page 3 of 15

For approximately fifteen years, through the development of federal standards for Transmission Integrity Management Programs ("TIMP") for both liquid and gas integrity regulations, control room management ("CRM"), and Operator Qualification ("OQ") rulemaking efforts, to cite a few pipeline safety rulemaking efforts, I served on the Technical Hazardous Liquid Pipeline Safety Standards Committee, also referred to as the Liquid Pipeline Advisory Committee, or LPAC, to advise PHMSA on possible pipeline safety regulation advancement. After a brief hiatus of several years, I have recently been reappointed by the Secretary of Transportation to represent the public again on LPAC, which carries numerous obligations to avoid a conflict of interest. I believe I am more than qualified to comment as an expert on the various issues related to CA-324/CA-325 pipeline system possible restart.

## III.    A brief historical perspective



**Figure 1 – Overview of Pipelines**

Since the May 19, 2015 onshore pipeline rupture and oil release that spilled into the Santa Barbara Channel and beyond, the pipeline system known at the time as Lines 901/903, and offshore oil platforms feeding this system have been shut down. Lines 901/903 have recently been renumbered CA-324 and CA-325, respectively. These pipelines, which were classified as interstate pipelines at the time of the release, were ordered to be shut down and oil purged from the Pipelines and placed under nitrogen atmospheres under Corrective Action Orders instituted by PHMSA. Line 901 experienced an onshore pipeline rupture failure caused by massive external corrosion and released on the late morning of May 19, 2015 near Refugio State Beach that placed a considerable amount of oil into the sensitive waters of the Santa Barbara Channel and beyond. While the years since 2015 involved discussions for possible construction of new pipelines to replace the poorly

Accufacts Inc. 12-20-24                                                                 Page 4 of 15

designed Lines 901/903, recent activities shifting ownership of the pipelines and associated infrastructure to Sable Offshore Corp. ("Sable"), are now focused on restarting the existing pipelines under new ownership and conditions stated under a Consent Decree.

The May 19, 2015 Line 901 rupture failure occurred at approximately 4 miles (MP 4) downstream of the Las Flores Canyon Pump Station due to extensive external corrosion. The Line 901 ruptured at approximately 56 % of the maximum operating pressure ("MOP") of 1341 pounds per square inch gauge ("psig") (which is 72 % specified minimum yield strength ("SMYS")).[10] In addition, further metallurgical forensic reports attached to the PHMSA Final Report, indicate that pipeline ruptured at a pressure of 737 psig, which was 39.6% of SMYS.[11] This pipeline failed at very low stress levels, not a surprise given that the depth of the corrosion failure was 89% of the measured wall thickness, and the ILI tools significantly mis indicated the size of the corrosion threats.[12]

**Figure 2 – Overview of Pipelines route with MPs estimated**



## IV.   The Las Flores Pipeline System.

The following is based on information readily in the public domain, as demonstrated by the footnote references. Because of many variations in MP numbers in various documents, MP numbers referenced in this report should be considered approximate with slight variations that don't really impact my findings/conclusions/recommendations.

---

[10] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.14 of 23.

[11] DNV-G Final Report, "Line 901 Release (5/15/15) Mechanical and Metallurgical Testing, - Report No: OAPUS309DNOR (PP136049)," September 18, 2015, p. iii.

[12] *Ibid.,* "Summary of Observations," p. vi.

Accufacts Inc. 12-20-24                                                                 Page 5 of 15

The Pipelines, formerly identified as Line 901/903 operated by Plains (aka Plains All American Pipeline L.P. and Plains Pipeline L.P.), represent a pipeline system of approximately 125 miles in length running from the Las Flores Canyon Pump Station (milepost 0) to the Pentland Metering (and Storage) facility (at Milepost 125.3). Figure 1 is a general overview of the Pipelines routing. CA-224 (old Line 901) that runs from the Las Flores Canyon Pump Station (Milepost 0) to the Gaviota Meter Station (Milepost 10.7). Note that I have reversed the Milepost reported in PHMSA's Final Report to follow more conventional milepost numbering, increasing from the pipeline inlet at the Las Flores Canyon Pump Station (MP 0), to the pipeline outlet of the 24-inch diameter Line 901/CA-224 pipeline, the Gaviota Metering Station (MP 10.7). CA-324 is the sole feed into the 30-inch pipeline, CA-325A. CA-325A runs from the Gaviota Metering Station to the Sisquoc pump station (MP 49.2). CA-325B, also a 30-inch diameter pipeline, runs from the Sisquoc pump station (MP 49.2) to the Pentland metering station (~MP 125.3). Figure 2 shows the general route adding approximate MP numbers following this similar MP increasing numbering all the way to Pentland.

According to the PHMSA Final Report on the 2015 rupture:

> Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries. Plains' pipeline is composed of two major pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went into crude oil service in 1992 and 1991, respectively. The pipelines are coated with coal tar urethane and covered with foam insulation which in turn is covered by a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at all of the pipeline joints on Line 901 and multiple locations on Line 903. The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.

> Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles downstream of the Las Flores Station. All of Line 901 crude oil throughput enters Line 903. Line 901 was manufactured of low carbon steel by Nippon Steel in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam. The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990. There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream. At Emidio Station crude oil is delivered to above-

ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.[13]

**Figure 3 - Approximate Elevation Profile - Las Flores Canyon Pump Station (MP 0) to Pentland Station (MP ~125.3)**



PHMSA provided additional information related to Line 903:

> (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). [14]

> Plains has informed PHMSA that Line 903 has insulation and shrink wrap sleeves on the girth welds similar to the Affected Pipeline {Line 901}.[15]

It is not clear from the documents produced if Line 903 insulation is also tape wrapped like Line 901, that would further shield the CP system from the Pipelines, assuring that CP is ineffective.

Figure 3 is an approximate elevation profile (approximate elevation of pipeline in feet versus pipeline milepost) for the Las Flores Pipeline System developed by the Center for Biological Diversity's Geographic Information System, or GIS, specialist using information readily available in the public domain. Pipeline elevation profiles play a critical role in understanding liquid transmission pipeline operation and risks, such as evaluating ILI runs, valve placement/actuator decisions, emergency and oil spill actions, and spill response planning. In addition, if a pipeline hydraulic profile, also referred to as a hydraulic gradient, is superimposed on an elevation profile, much information about pipeline risk can be gained. A hydraulic gradient is required of the pipeline operator under California Risk Analysis regulation.[16] A pipeline hydraulic gradient includes a plot of operating pressure versus milepost for a specified crude oil gravity and flow rate, but for this unique system, a crude oil viscosity and temperature should also be included on the

---

[13] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016, pp. 4 & 5 of 21.
[14] *Ibid.,* p. 4 of 21.
[15] PHMSA – In the Matter of Plains Pipeline, LP, Respondent, "Amendment No. 1 to the Corrective Action Order – CPF No. 5-2015-5011H," p. 2.
[16] CA Code CCR 19§2111 – Risk Analysis (2) Pipeline Description (A).

Accufacts Inc. 12-20-24                                                      Page 7 of 15

hydraulic gradient as these parameters seriously impact the hydraulic gradient evaluation. Such hydraulic gradient information is important in evaluating the risks of a pipeline restart program, especially on the Pipelines given their highly unique elevation profile among other factors (See Figure 3). This information is probably not likely to be made public, though a competent experienced engineer can develop an approximate hydraulic profile for a pipeline system if they understand certain crude oil blended properties and temperatures.

## V. TIMP regulations are not working to protect the public or the environment.

In the passage of the federal pipeline safety regulations setting standards for Transmission Integrity Management Programs, or TIMP, first for liquid, then gas, in 2002 and 2003, respectively, the use of performance-based approaches versus more prescriptive based regulations were agreed to as a compromise to advance important needed pipeline safety regulation in this area. Until the passage of TIMP regulations, pipeline operators were under no obligation to periodically assess the condition of their mainline pipelines. Performance-based regulation, in theory, allows a pipeline operator to choose between various alternatives that may work best for their pipeline. Prescriptive-based pipeline safety regulations historically have been imposed in federal pipeline safety regulatory efforts. Prescriptive regulations impose certain conditions that pipeline operators must, or shall, follow.

TIMP efforts for liquid pipelines define four basic approaches permitted in pipeline integrity assessment, depending on the pipeline threat that a pipeline segment might experience. Briefly, the major assessment methods most appropriate for this pipeline system are hydrostatic pressure testing ("hydrotesting") and inline inspection ("ILI") also known as smart pigging. As the Line 901 onshore oil release that flowed into sensitive waterway areas has clearly demonstrated, TIMP regulation is not working for many pipeline operators, even after the operator had run multiple ILI corrosion tool runs which I will expand on further below. Another unexpected outcome of TIMP performance-based regulation is that such less than clear regulation efforts are harder to enforce.

It's important to note that pipeline integrity management tools are not a substitute for proper pipeline design or effective cathodic protections. Their purpose is simply to monitor the condition of pipelines over time and identify threats to the pipeline's integrity.

### 1) Hydrotesting assessments.

Properly performed hydrotesting can be an important pipeline integrity assessment tool that proofs a pipeline's fitness for service to safely operate at MOP at the time of the hydrotest. Hydrotesting involves shutting down a pipeline and filling a pipeline segment with water. Proof of pipeline integrity or fitness for service testing is verified by carefully increasing water pressure with a water injection pump after air has been removed and the pipeline segment temperature stabilized. While federal pipeline safety regulations for liquid transmission pipelines define a "Subpart E" hydrotest to establish or verify maximum operating pressure, or MOP, a term having specific meaning in regulation, the regulations are not specific on important parameters to ensure a quality hydrotest that doesn't damage the pipe. Minimum hydrotest pressures are established to verify the MOP at the time of the hydrotest, with

Accufacts Inc. 12-20-24                                                      Page 8 of 15

sufficient pressure safety margin at the time of the hydrotest.  A Subpart E hydrotest is a proof for fitness test that the pipeline, at the time of the test, can withstand pressures above the MOP with a certain margin of pressure safety.[17]

One important caveat is needed regarding Subpart E hydrotests, which are often called strength tests.  For a pipeline experiencing certain cracking threats such as selective seam cracking (SSC) or stress corrosion cracking (SCC)—corrosion threats that likely exist along the Las Flores Pipeline System—**a subpart E hydrotest is inadequate**.  Current ILI technology cannot reliably identify if such cracking threats are present.  More importantly, nor can associated engineering critical assessments provide prudent evaluation of such threats due to the inability to reliably predict corrosion colonies that can interact or link together in unpredictable ways.  SCC colonies can be associated with disbonded coatings such as that occurring on the Pipelines where CP current is prevented from reaching the outer pipewall steel.  A much higher pressure (higher % Specified Minimum Yield Strength, or SMYS) hydrotest is warranted.  A prudent risk analysis should clearly demonstrate if such external corrosion cracking threats from environmental factors are possible around the Pipelines.  **I need to note that it is not clear whether hydrotesting, if performed, will be a Subpart E test or a higher % SMYS hydrotest intended to address cracking threats such as SCC**.  The Consent Decree strangely makes no mention of corrosion cracking threats or hydrotesting.

While considerable discussion in the Consent Decree has focused on the use of ILI to identify possible general wall loss corrosion threats well before failure, this agreement makes no mention of other forms of corrosion related threats such as corrosion cracking SCC or SSC.  These forms of corrosion cracking are very challenging to identify via ILI, and more importantly, engineering critical assessments associated with ILI to predict time to failure can be highly unreliable, given the inactive threat nature of these type of corrosion cracking threats.  The corrosion cracking threats tend to fail as pipeline ruptures.  It is important that the cracking threat potentials on the Pipelines be prudently addressed and proposed solution be made public and transparent.

For pipeline segments that undergo large elevation changes, like the Line 325A/B segments, the pipeline must be cut up into segments to assure hydrotesting pressure ranges do not permanently deform the pipe.  Hydrotesting can be more expensive than other pipeline integrity assessments such as ILI, but there are no built-in assumptions about the quality and thoroughness of the assessment that can be mismanaged such as that which can and often does occur with ILI approaches resulting in numerous pipeline ruptures after ILI assessments, as the May 19, 2015 release has clearly demonstrated.  Hydrotesting is much more reliable than other pipeline integrity assessment approaches, such as ILI, at verifying a pipeline's fitness for service at the time of the test.  Hydrotesting is usually performed by contractor firms experienced and qualified to perform a proper hydrotest for specific types of threats.  The Consent Decree requires certain threshold general corrosion threats if identified by ILI be remediated before restart.[18]

---

[17] 49CFR§195.304 Test pressure
[18] Consent Decree, Appendix B (4) Integrity Management.

Accufacts Inc. 12-20-24                                                          Page 9 of 15

Hydrotesting is warranted, justified, and vastly appropriate for the Pipelines which have been sitting for over nine years without effective CP. I also need to mention that the use of nitrogen gas to idle the pipeline was meant to avoid internal corrosion attack and plays no role in preventing external corrosion attacks to keep the Pipelines in a "corrosion-free state" as mentioned by Steve Rusch, Sable's vice president of environmental and regulatory affairs.[19] The external corrosion sites experience reduced corrosion rates from the lower ambient soil temperatures as no hot oil was passing through the system, but the corrosion sites are not inactive, especially if CP systems are ineffective, such as on the Pipelines.

**2) ILI assessments.**

In the U.S., ILI or smart pig tool efforts started to develop in the early 1980s depending on the threat a pipeline operator was trying to address. ILI tools are usually multi-ton devices run inside a pipeline while the pipeline is operating to ascertain the condition of the pipeline depending on the type of threats trying to be analyzed. Given the advancements in technology including shrinking the equipment, ultrasonic, or UT, approaches that focus on direct anomaly measurement has historically proven superior for general wall thinning corrosion evaluation to approaches using inferred software-based algorithms, such as magnetic flux leakage ("MFL") testing. Some ILI tools are more suitable than others depending on the threat. There is a wide spectrum of ILI tools and different technological approaches to select from depending on the type of threat trying to be reviewed. Operators don't always select the ILI technology best suited to help identify threats on their system. Even with the advances in tool development and approaches there can still be a wide variation as to whether a specific ILI tool or vendor can properly identify a specific pipe threat and permit it to be further properly characterized after an ILI run. This is why pipeline operators will incorporate ILI tool tolerances and perform field verification digs to produce "unity plots" for a specific ILI run, to verify ILI vendor claims about their technology and its specific performance. This field verification data was not shared by Plains with the ILI vendor, a serious deficiency in ILI utilization. It is worth noting the PHMSA made it a point in their Failure Analysis of the Line 901 release, that the pipeline operator had not provided field dig verification feedback to the ILI vendor to confirm ILI capability.[20] For example, corrosion attacks can take on many forms such as general pipewall thinning (usually the easiest to determine depending on the ILI technology), various forms of corrosion cracking such as stress corrosion cracking ("SCC"), selective seam corrosion cracking ("SSC"), and pit corrosion. All such corrosion threats can lead to a pipeline failure and release. Based on my experience involving investigations of liquid transmission pipeline ruptures from SCC and SSC after ILI runs, some segments of the Pipelines exhibit the potential for SCC or SSC. Such external corrosion cracking threats are often found on pipelines with disbonded coating that are exposed to corrosion environments such as that introduced by the Pipeline's insulation. It is incumbent on the new Pipeline operator, Sable, to demonstrate to the OSFM, and to the public and various regulatory agencies that SCC/SSC external cracking environments do not exist.

---

[19] Los Angeles Times article by Tony Briscoe, "*Plan to restart pipeline sparks anger*," Front page, October 20, 2024.
[20] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.13 of 21.

Accufacts Inc. 12-20-24                                                      Page 10 of 15

Some forms of ILI technology to identify certain pipeline threats, if properly managed, can be superior to hydrotesting as they may identify some threats well before they go to failure. As too clearly demonstrated, however, in the May19, 2015 Line 901 rupture, ILI cannot address all forms of external corrosion threat that are likely to exist on the Pipelines because of their poor design, their unique high temperature operation, and ineffectiveness of CP. If a corrosion ILI tool can be utilized within the limits of the pig vendor specification (i.e., such as maintaining pig speed within the operating pipeline), and if the ILI tool run is independently field verified, some ILI tools can be a superior form of assessment for many types of pipeline threats, such as general internal and external corrosion (i.e. wall-thinning) if prudently managed. The more specialized forms of corrosion, cracking and pitting, or corrosion within dents, however, can be much more challenging as ILI tools and their related engineering critical assessments still have technical limits. ILI tool vendors place specific limitations on their various tools, and it is important that the pipeline operator follow such restrictions that can easily invalidate an ILI tool run reading or result. ILI runs in hilly terrain, such as that which exist with the Pipelines (See Figure 3) can be quite challenging for ILI tools that can easily exceed multiple tons in weight as gravity never shuts off.

In investigating numerous pipeline rupture failures after ILI tool runs, I consistently see failures on the part of the pipeline operators to perform sufficient field verification digs to determine if bias is being introduced in a specific ILI tool approach on a specific pipeline segment, for a specific pipeline threat, and that the ILI tool selected is really appropriate to identify certain pipeline threats. Some pipeline operators repeatedly fail to recognize or even consider ILI tool capabilities and tolerances, especially as ILI vendors and pipeline engineers have tried to improve technologies and assessment techniques. It is worth noting that no one markets ILI tools claiming they don't work. An important consideration in integrity management approaches is whether the right ILI technology has been selected and is being prudently utilized by the pipeline operator. It is further worth noting that while running an ILI tool is not inexpensive, the cost of running such a tool is relatively less expensive compared to the overall quality of the field integrity verification program to assure the ILI tool is doing its job for a specific type of pipeline threat, on a specific pipeline segment.

Part of the problem is that many forms of interactive external corrosion pipeline cracking threats cannot be accurately characterized to allow meaningful engineering critical assessments that are reliable. Such assumptions or inability to properly engineer and predict interactive threats introduce significant margins of error to fitness for service predictions using ILI assessments. Just doing ILI reassessments when they really aren't capable of dealing with interactive corrosion threats is an illusion of safety. Basically, performing an inappropriate ILI assessment more often is not the solution as further explained below.

## VI. The greatest threat on the Las Flores Pipeline System is from external corrosion.

It should not take a pipeline failure to identify that the greatest pipeline integrity threat on the Pipelines is from various forms of external corrosion due to poor design of these Pipelines rendering CP systems ineffective at reducing or preventing external corrosion failure.

Accufacts Inc. 12-20-24                                                    Page 11 of 15

The PHMSA Final Report stated:

**Proximate or Direct Cause**

PHMSA determined that the proximate or direct cause of the release was progressive external corrosion of the insulated 24-inch diameter steel pipeline. The corrosion occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied directly to the bare pipe, covered by foam thermal insulation with an overlying Polyken tape wrap. Water has been noted in the foam insulation at a number of digs, indicating that the integrity of the coating system had been compromised. The external corrosion was facilitated by the environment's wet/dry cycling, as determined by the PHMSA-approved, third-party metallurgical laboratory. The release was a single event caused at an area where external corrosion had thinned the pipeline wall. There is no evidence that the pipeline leaked before the rupture. There was a telltale "fish mouth" (a split due to over-pressurization) at the release site indicating the line failed in a single event.[21]

PHMSA goes on to list numerous contributory causes, among them a significant observation, "Corrosion under insulation (CUI) cannot be prevented on insulated lines where the coating system has been compromised."[22]  This important fact should also play a major role into any decision to restart the Las Flores Pipeline System as explained in further detail in this report.  This critically important PHMSA observation should not come as a surprise to any pipeline operator.  Bottom line, Plains acquired a poorly designed set of Pipelines in the early 1990s that rendered the CP system ineffective at preventing or mitigating external corrosion on a pipeline system operating at high temperatures.  Some years after acquiring the Pipelines and after TIMP regulations were promulgated in late 2002, Plains did not implement an appropriate integrity management program to prevent the pipeline failure from external corrosion attack.  The question now is whether Sable's compliance with the Consent Decree under the approval of the OSFM relying on the capabilities of ILI tools can prevent another failure on the Pipelines?  **<u>Clearly, current ILI technology does not meet an obligation to reliably identify all forms of external corrosion most likely present on much of the Pipelines.</u>**  The CP systems required by PHMSA regulations will not be effective on most of the pipeline mileage in the Las Flores Pipeline System as previously discussed, and from my perspective there is serious doubt as to whether these poorly designed pipelines can be made as safe as new pipelines that have properly functioning cathodic protections.

Regarding the Las Flores Pipeline restart decision and related integrity assessments, it is important to understand how CP systems are supposed to work.  In layman's terms, a CP system impresses a weak current into a pipeline turning the pipeline into a cathode in an electrochemical corrosion cell on the outside of a buried pipeline, to control or reduce external corrosion.  Older nonconducting pipeline coatings such as that which exists on the Pipelines do not allow for CP current to pass through them.  The purpose of the CP system is thus to introduce current to the outer pipewall where the older coatings have been penetrated, such as with holes or tears in the outer coating.  Unfortunately, older pipeline external coatings such as the urethane coal tar outer coatings, like those on the Pipelines, are also well known to not adhere tightly to a pipeline over time, causing coating separation or disbondment.  Such disbondment can result in external

---

[21] *Ibid*, p. 14 of 21.
[22] *Ibid.,* p. 14 of 21.

Accufacts Inc. 12-20-24                                                                 Page 12 of 15

pipewall corrosion cells under the coating, generating many different forms of corrosion, especially SCC and SSC cracking in the wrong environments, that are not protected by CP.  To add to this threat of external corrosion, the Las Flores Pipeline System's external insulation traps and serves as a water conduit further increasing external corrosion as a water fed corrosion attack.  And lastly, the Polyken tape wrap installed during pipeline installation around the outside of the insulation is also well known to not be conductive, further shielding and preventing CP current from reaching the outer pipe wall.  **This is a perfect storm or combination of factors all working to render CP ineffective.** Without effective cathodic protections, the pipeline is at particularly high risk of spilling again.  To further underscore the lack of a proper integrity management program, this pipeline operates at elevated temperature that accelerates external corrosion as explained further below.  New types of pipeline coatings now allow the passage of CP current through such coating to mitigate external corrosion even if the coating disbonds from the pipeline.

## VII. High pipeline operating temperatures accelerate all forms of corrosion.

**Figure 4  Los Flores Temperature Data from DNV Line 901 Release (5/19/15) Technical Root Cause Analysis included in PHMSA Final Report.[23]**



If one is experienced in handling/refining the heavy crude oils produced offshore that feed into the Las Flores Pipeline System, this crude oil not only needs to be diluted with natural gas liquids, or NGLs, but the pipeline must be operated at high pipeline temperatures, approximately 135 °F, that also is required to reduce the blended oil viscosity to get the fluid over the main hill beyond the Sisquoc Pump Station to Pentland.  While the PHMSA Final Report mentions 135 °F as a pipeline operating temperature, Figure 4 represents a temperature graph indicting 135 °F was not unusual, but higher fluid temperature to improve the flow and capacity of the Pipelines did occur.

Chemical engineers experienced in reaction kinetics are familiar with the Arrhenius equation which indicates that chemical reaction rates, such as that for corrosion, essentially double for every 10 °C (18 °F) increase in temperature.  This means that the rate of corrosion at 140 °F is about 32

---

[23] *Ibid.,* "Figure 23, L901 Las Flores Station Temperature Data," p. 375 of 510.

Accufacts Inc. 12-20-24                                                                 Page 13 of 15

times that for a pipeline operating at 60 °F, a typical ambient soil condition.  Because of the higher viscosity of unblended offshore oil there probably is little opportunity to reduce the Las Flores Pipeline System temperature to help reduce corrosion rates on a pipeline system where the CP system is ineffective. If the Pipelines are returned to operation, all forms of external corrosion will remain a primary threat of concern for pipeline failure.

## VIII.  The Consent Decree agreement fails to require adequate IM processes to prevent another rupture of the poorly designed Pipelines.

It is important to understand that the Consent Decree is just a compromise agreement between the signature parties and may be missing important technical matters related to the Pipelines.  I find it odd that many of the technical issues discussed above were not identified or addressed in the Consent Decree.  External corrosion cracking risk was well known for many decades to be a threat of concern for pipelines exhibiting disbonded external coating where CP systems are ineffective.

I find it especially strange that Plains the pipeline operator at the time of the Line 901 rupture got itself into serious trouble by failing to understand that the poor design of the Pipelines could not be adequately addressed by ILI.  It appears that the Consent Decree continues to foster the illusion that ILI can adequately permit assessment of corrosion risks, especially cracking threats most likely to exist on major segments of the Pipelines (see Figure 3, for example).  The Consent Decree doesn't even mention corrosion cracking threats for this system operating at high temperature that exacerbates all forms of external corrosion as previously discussed.

And lastly, I would caution that the Consent Decree gives authority to the OSFM on certain pipeline safety related decisions. These OSFM decisions, however, cannot violate federal pipeline safety regulations and that I believe require a public decision process for PHMSA approval to assure any waiver meets or exceeds the level of safety had the wavier not been requested.

## IX.  The poorly designed Pipelines cannot be made as safe as new pipelines.

Sable's website implies that the Pipelines will be repaired, stating "PPC undertook a comprehensive repair and maintenance program to restore the pipeline to "as-new" condition."[24]  As referenced in footnote 19 above, this isn't the only time that a Sable representative has suggested the Pipelines will be restored to "as-new" condition or a "corrosion free" state.  A new pipeline would be properly designed such that the federal pipeline safety regulations requiring a CP system would be effective and do its job, while allowing CP monitoring to assure the new pipelines were adequately protected from external corrosion attack by an effective CP design.  A new pipeline would not be trying to utilize CP on a pipeline improperly coated, that seriously disbonds from the pipe, with a system insulated to assist in water reaching the outer pipe steel, while operating at higher temperature.  All these poor design factors accelerate all forms of external corrosion including cracking.  It is a misguided illusion that relying on ILI can attempt to stay ahead of pipeline failure on such a poorly designed system.  A cursory review of the PHMSA Final

---

[24] See Sable's website concerning, "Sable Offshore Corp. Provides Update on Pacific Pipeline Company Operations," October 28, 2024, at: https://www.sableoffshore.com/news/news-details/2024/Sable-Offshore-Corp.-Provides-Update-on-Pacific-Pipeline-Company-Operations/default.aspx.

Accufacts Inc. 12-20-24                                                    Page 14 of 15

Report, Appendix G In-Line Inspection report will indicate that even running ILI tools, it is impossible to return Line 901 to an "as new" condition given the numerous corrosion anomalies.[25] The idea that running ILI tools should be sufficient to assure an "as-new" pipeline condition and safe operation of these poorly designed Pipelines with ineffective CP protection is a false premise, as the Pipelines are far from being in a new condition, with numerous anomalies, given their poor design approach and operating history.

## X.    Conclusion.

Given the ineffectiveness of the CP system to protect against external corrosion and the fact that the Pipelines have sat for over nine years without effective CP, and the failure of the Consent Decree to address these possible threats via proper hydrotesting and ILI, it is imprudent to expect that such limited assessment techniques can adequately protect against corrosion failure.  Poor pipeline design and using the wrong set of integrity management tools (i.e., tools that do not adequately detect and permit the prudent evaluation of the type of corrosion threats specific to a given pipeline) can make the risk of an oil spill orders of magnitude worse. The Las Flores Pipeline System is unusually dangerous given its age and inherent design flaws.

The above represents my opinions based on experience with too many pipeline rupture investigations.  I reserve the right to update this report if more relevant information is made available.

Richard B. Kuprewicz
President
Accufacts Inc.

---

[25] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara Country, California, - Appendix G In-Line Inspection Report by Lamontagne for the Oak Ridge National Laboratory" May 2016, pp. 44 – 138 of 510.

Accufacts Inc. 12-20-24                                                    Page 15 of 15

# EXHIBIT C

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart*

**Prepared For**

# The Center for Biological Diversity
# &
# The Environmental Defense Center

**February 21, 2025**

Accufacts Inc. Final

## Table of Contents

I.      Summary..................................................................................................................1

II.     The current installation renders the CP system ineffective........................................2

III.    Compliance with CP regulatory requirements is ineffective, making performance with this regulatory requirement meaningless....................................3

IV.     This is more than simple corrosion under installation (CUI) issue. ..........................3

V.      External corrosion on buried pipelines falls into four major categories.................4

    1.  Pipe wall loss corrosion is generally understood to occur over larger areas of the pipe..................................................................................................................4

    2.  Cracking or crack-like corrosion is usually an environmental threat difficult to assess.................................................................................................................4

    3.  Pitting corrosion is a special form of wall loss that is difficult to identify via ILI. ...................................................................................................................5

    4.  Corrosion within dents is a special form of dent threat............................................5

VI.     Types of ILI technology. .......................................................................................5

    1.  General wall loss corrosion. ...........................................................................5

    2.  Cracking corrosion........................................................................................6

VII.    What is the purpose of hydrotesting?......................................................................6

VIII.   The illusion that corrosion growth rate can be accurately predicted needs to be explained. ................................................................................................................7

IX.     Major state waiver deficiencies:............................................................................7

    1.  A key corrosion performance tracking process step in the state waivers for the Pipelines is missing. .......................................................................................7

    2.  A major state waiver deficiency for Line 324. ................................................8

    3.  Major state waiver deficiencies for Line 325A/B. ...........................................9

X.      Conclusions. .........................................................................................................9

Accufacts Inc. Final                                                                                          i

## I.      Summary.

Accufacts Inc. ("Accufacts") was asked to provide my expert opinion on the Letters of Decision on the State Waivers for the startup of Line CA-324, CA-325A, and CA-325B ("Pipelines") made public in mid-January 2025 by the Office of the State Fire Marshal ("OSFM").[1]  This report builds on a previous Accufacts report issued on December 20, 2024."[2]  By agreement, a Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed state waiver alternative measures "provide an equal or greater level of safety."[3]  It is my understanding that PHMSA can choose to: 1) Not comment on this matter allowing the State Waiver to occur and startup to proceed, 2) Not approve the waiver preventing the startup, or 3) Impose additional requirements to assure an equal or greater level of safety to current minimum federal pipeline safety regulations occurs.

The current coating installations do not provide "limited effectiveness of the cathodic protection system," as mentioned by the Decision letters issued by the OSFM.  This I believe is a poor choice of words that understates the fact that the CP system is ineffective on most of the Pipelines' mileage.  The OSFM is thus being asked to grant a state waiver on federal pipeline safety minimum requirements intended to address external pipeline corrosion from an ineffective CP installation, while relying on hydrotesting and various forms of inline inspection, ILI or smart pigging, to avoid pipeline failure from the resulting external corrosion.

The waivers attempt to allow startup of the Pipelines relying mainly on ILI technology to identify corrosion threats before failure.  In addition, the Application by the Pipeline's operator appears to be relying on a circumferential magnetic flux leakage (MFL-C tool) approach run in February 2022 to argue for the removal of federal regulation requiring the 180 day condition for scheduling remediation of "corrosion of or along a longitudinal seam weld."[4, 5]  Our experience with MFL-C tools is that if certain parameters are not incorporated, such ILI tools can miss a lot of cracks.  I see no mention of such important conditions in the referenced letter that would demonstrate that this ILI run is reliable.  I do not see sufficient justification to waive 49CFR452(h)(4)(iii)(H) as such a waiver would not provide an equal or greater level of safety as no carbon steel pipeline, even new modern steel pipelines, are invincible to corrosion attack.

---

[1] OSFM letter to Sable/PPC Offshore Corp, "Letter of Decision on the Sate Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-324) ("Decision Letter 324") and Letter of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-325A/B) ("Decision Letter 325A/B")", dated 12/17/24.

[2] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024.

[3] PHMSA website: https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

[4] Pacific Pipeline Company (Aka now as Sable/PPC) letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115)," July 10, 2023, p. 5 related to MFL-C February 2020 ILI run.

[5] 49CFR452(h)(4)(iii)(H).

Accufacts Inc. Final                                                                                      Page 1 of 9

A simple plot of the type and approximate milepost location of external corrosion such as wall loss or cracking, including field as well as ILI indications along the Pipelines, will underscore how challenging the operation of the present Pipelines will be without effective CP. Such a plot will clearly demonstrate that the Pipelines are not "like new" as indicated by some recent Sable/PPC representatives. Further explanation is also warranted as to why the pipeline operator assumes there is no SCC or SSC risks associated with water on the Pipelines.

A proposal to replace the Pipelines with a new smaller diameter heated pipeline that would be uninsulated and built with modern unshielding coatings was aborted.[6] This proposal would have permitted the CP system to do its job addressing external corrosion, while complying with federal pipeline regulation.

## II.    The current installation renders the CP system ineffective.

The construction of Line 324 in the late 1980s utilized coal tar urethane coating applied to the bare steel pipeline, covered by sprayed on insulation to assure the pipeline was operated at higher temperatures. The insulation was then wrapped with a non-conductive polyethylene tape coating.[7] While there may be some confusion as to the coating installation on what is now named 325A/B, information leads us to believe this coating installation is similar on these pipelines as that on Line 324. To anyone vaguely familiar with pipeline external corrosion protection and cathodic protection ("CP") intent, this approach is a fundamental failure of design/installation reflecting much inexperience in pipelines. The polyethylene tape shields and prevents CP current from getting to the external pipeline steel, and the insulation system works to shield while increasing the likelihood of water in close proximity to the pipe, especially in areas where the coal tar coating directly on the pipeline steel has separated, or disbonded, from the pipe.[8] With such heavy shielding there is thus no way for any CP system current to ever reach the pipeline to reduce/prevent external corrosion.

With the exception of a few feet of buried pipe that has undergone repairs, replacing the existing poor design and coating installations with a few feet of dual epoxy coatings, the shielded CP system is ineffective. The various threats of external corrosion on the Pipelines are exacerbated by the elevated temperature, the potential for water to accumulate along the Pipelines via the insulation, the application of non-conducting tape wrap around the insulation, and the use of older coal tar coating directly on the pipeline that exhibits separation (aka disbondment) from the pipe steel. Disbonded coating in the wrong environments is especially conducive to cracking threats, such as SCC or SSC as discussed in this report. I have seen no convincing arguments that water environments conducive to corrosion cracking are not around or under the coating on the Pipelines.

---

[6] Plains Administrative Draft EIR, "Plains Replacement Pipeline Project," February 2022.

[7] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA"), "Failure Investigation Report Plains Pipeline LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California, May 2016, Appendix E: Corrosion Control and Pipeline Conditions, page 1 of 4.

[8] *Ibid.,* Page 3 of 21, and Mechanical and Metallurgical Testing, Photos Figure 1 through 20.

Accufacts Inc. Final                                                      Page 2 of 9

### III.    Compliance with CP regulatory requirements is ineffective, making performance with this regulatory requirement meaningless.

The Pipelines thus have ineffective CP protection from external corrosion that is exacerbated by operation of the Pipelines at elevated temperatures, seriously increasing corrosion rate as discussed in my previous report.[9]  Attempts to gauge the effectiveness of the CP system utilizing CP performance measures identified in PHMSA regulations are meaningless in such heavily shielded installations.  Just operating the Pipeline with CP "on" to meet federal minimum regulatory requirements will not prevent external corrosion attacks that can take on various forms on the Pipelines.  It should be noted that the OSFM has required "Where the operator discovers external corrosion in combination with coating deterioration, the operator must recoat with a two-part epoxy.  Sable must recoat in accordance with their repair procedure." which does allow repair replacing with the existing installation approach, given its many shortcomings to prevent external corrosion.[10]  This requirement places the responsibility on the pipeline operator to identify when or if any, field digs should occur to confirm coating degradation.  The operator should be primarily focused on identifying environments around the pipeline that are precursors to various forms of external corrosion attack, given the many conditions related to the pipeline design/installation conducive to external corrosion attack.

It is on the limited repaired sections, measured in feet, that the CP should be effective as such short length repairs replace the poorly designed shielding original coating installations.  For the vast majority of the Pipelines mileage, however, the CP remains ineffective.  The requirements to measure CP performance stated in 49CFR§195.2 (NACE SP 0169 – 2007 edition, paragraph 6.2.2) are meaningless when heavy shielding, such as that which occurs on CA-324 and CA-325A/B, prevents CP current from reaching the pipeline.

### IV.    This is more than simple corrosion under installation (CUI) issue.

Considerable past discussions have suggested that this is a corrosion under installation (or CUI") problem implying that this is the only controlling issue.  While CUI is certainly a contributing factor, the corrosion threats go well beyond CUI.  As previously discussed, heavy shielding, the tape coating around the insulation, the vintage/type of coating directly on the Pipelines prone to disbondment, the operating temperature, and the environment around the Pipelines, work in concert to create external corrosion in its various forms.  The Consent Decree is an agreement based on the premise that higher risks of external corrosion can be mainly addressed by ILI tools.  The multiple forms of external corrosion which can occur on the Pipelines require various different approaches, beyond ILI, as discussed further in this report.

---

[9] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024, p. 13.
[10] OS OSFM letter to Sable/PPC Offshore Corp, "Decision Letter 324 and Decision Letter 325A/B")," dated 12/17/24, pp. 11 and 11 respectively.

Accufacts Inc. Final                                                                                              Page 3 of 9

## V.    External corrosion on buried pipelines falls into four major categories.

External corrosion on buried steel pipelines falls into four general categories:  1) wall loss or thinning of the pipe wall, 2) cracking or crack-like, 3) pitting, and 4) corrosion within dents.

1. **Pipe wall loss corrosion is generally understood to occur over larger areas of the pipe.**

   Internal or external corrosion can cause pipe wall thinning.  Such thinning differs from pit corrosion discussed below, in that pipe wall loss thinning tends to occur over a wider area of the pipe.  Despite previous multiple ILI runs, external corrosion pipe wall loss, or thinning, was the condition that resulted in the May 19, 2015 pipeline rupture failure.  External corrosion on the shielded pipe allowed general corrosion thinning of the pipeline until the pipe failed under pressure.  It should be worth noting that wall loss in excess of 0.8 wall thickness (actually 0.91) which occurred in the May 19, 2015 rupture, places the operator at great risks.  Ironically, pipe wall loss is generally one pipeline failure threat that advances in the ILI technology over recent decades was intended to address, either with ILI mag flux or ultrasonic approaches which are different technical methods.

2. **Cracking or crack-like corrosion is usually an environmental threat difficult to assess.**

   This is associated with various forms of pipeline cracking, such as selective seam corrosion or stress corrosion cracking.  While engineers like to think they can calculate time to failure, such time to failure estimates for these forms of corrosions are hard to reliably predict.  Given the probability that such cracking, especially if in clusters, can interact with other cracks, or weaknesses in the pipe body near/at welds, makes prediction to failure highly unreliable.  Such pipe weaknesses can occur at weld heat affected zones, at girth welds, or at manufacturing related pipe seams, in unpredictable ways that can quickly negate time to failure calculation/estimates, even if cracking potential is identified.

   Sable/PPC has requested an exemption from 49CFR452(h)(4)(iii)(H) explaining this is usually a SSC threat related to earlier vintage manufacturing processes such as LF-ERW which tends to exhibit lower pipe toughness. There are other related risks to the manufacturing process of modern steels such as DSAW and HF-ERW concerning cracking potential from poor coating/ineffective CP approaches.  Because of the nature of disbonded coating in proximity to water, coating can tent at weld seams creating potential for cracking corrosion attack, such as SSC.  Even modern pipe steels are not invincible to such cracking corrosion potential, especially on pipelines operating at elevated temperatures.  Unless the operator can show why such environments don't exist, their request to be exempted from 49CFR452(h)(4)(iii)(H) should be denied.  These explanations should go well beyond a MAG-C pig run the pipeline operator has provided.

Accufacts Inc. Final                                                                                        Page 4 of 9

3.  **Pitting corrosion is a special form of wall loss that is difficult to identify via ILI.**

This is the loss of pipe steel in concentrated small areas, forming localized small holes or pits, usually at girth welds, that can weaken the pipeline and cause a release. Pit corrosion identification via ILI, even newer generations of ILI tools, can be very challenging. Pit corrosion threats are usually verified via field digs or pipeline releases. While this threat can be a bona fide threat on the Pipelines that are heavily shielded rendering CP ineffective, there has been no mention that this threat has been identified.

4.  **Corrosion within dents is a special form of dent threat.**

Corrosion or cracking within a dent, also known as "dents with stress concentrators" are hard to identify via ILI, and almost impossible to reliably predict time to failure. Such threats are usually identified by high-definition geometric ILI dent tools, the location around the pipeline, and field dig verification assessments. The ILI determination using high resolution caliper or geo pigs, have proven reliable at identifying dents and their location on a pipeline.

# VI.    Types of ILI technology.

Given the possible types of external corrosion on the Pipelines, I now focus on a simple high-level discussion of corrosion ILI technical approaches.

1.  **General wall loss corrosion.**

After the advancement of geometric or deformation ILI technology, the next early phase of ILI use focused on general corrosion wall loss, or pipeline thinning along the axis or flow direction of the pipeline. In this field, technology split into two different approaches, magnetic flux leakage and ultrasonic. Magnetic flux leakage (or mag flux) approaches utilized software algorithms to characterize changes in magnetic flux to identify wall loss aligned in the axial, or direction of flow, usually the most insidious and common corrosion flaws for pipe. Mag flux ILIs fall into two general categories: low resolution (usually associated with earlier generation) and high resolution (usually more complex and more expensive). Mag flux technology shifted from low resolution to the more sophisticated high resolution approaches where corrosion is problematic. There are still pipelines that utilize low resolution mag flux because of cost, so care should be exercised in the application of this form of ILI on liquid pipelines. The waivers specifically require UT ILI the first two years of operation, but are moot, indicating magnetic flux ILI in the future could be allowed without clarification as to high res or low res ILI.

Ultrasonic ILI approaches use beams of ultrasonic energy to identify both external and internal corrosion wall loss. While a simplification, ultrasonic approaches are analogous to radar, where reflected energy readings are utilized to measure changes in pipe wall thickness. Originally, ultrasonic approaches, focusing on wall loss evaluation, directed UT energy directly into the pipe in the radial direction for wall thickness and resulting wall loss corrosion sizing determinations.

Accufacts Inc. Final                                                         Page 5 of 9

2. **Cracking corrosion.**

Pipeline ruptures from cracking threats drove a need for ILI tool cracking development. Thus, a next generation of ultrasonic ILI approaches advanced by changing the angle of the UT beam from radial into the pipe to at an angle to help spot cracks that might be developing. This form of UT approach is identified as shear wave. As more pipeline failures from cracking were uncovered, additional advances known as phased array ultrasonic (PAUT) have recently developed, though such measurements are currently focused on field measurement of uncovered pipeline, as ILI in this area I would categorize as still under development.

I have investigated too many pipeline ruptures that occurred after an ILI run which indicates more regulatory work is needed in ILI regulations related to applications of ILI. No ILI vendor provides such tools claiming they will not work. It is the pipeline operator's responsibility to ensure ILI runs meet the restrictions placed by the tool vendor (such as speed) and to verify the tool vendor's claimed capability with a proper number of field verification digs.

## VII.    What is the purpose of hydrotesting?

There are basically two types of hydrotesting mentioned in federal pipeline safety: 1) What I call a subpart E, or proof of MOP test, and 2) a crack hydrotest, what is referred to as a "spike hydrotest" that is performed at much higher test pressures as a %SMYS. Both forms of hydrotesting are proof test, good at the time of the test, and don't characterize time dependent pipeline threats such as corrosion.

The purpose of an MOP hydrotest is to proof the fitness for service of a pipeline at the time of the test, with a certain margin of pressure safety that usually deteriorates with time. Subpart E MOP tests are not crack integrity test. If a pipeline system has crack forming potential an MOP test is not appropriate.

Spike hydrotests are meant to avoid pressure reversals associated with crack threats on pipelines. Pressure reversals are where cracks remaining after MOP hydrotest tests can enlarge for various reasons to result in possible failure during operation, usually at lower pressures. It is my experience that spike hydrotests are meant to deal with cracking threats if such a threat exists. The performance metric for the suitability of a spike hydrotest is the range of %SMYS for the specific test segment. For pipeline elevation changes like that associated with 325A/B, a spike hydrotest requires the pipeline be segmented to keep test pressures within reasonable ranges that don't produce permanent yielding of the pipe. The information made public to date indicates that the previous hydrotests performed in 1986, because of elevation changes, required Line 325A to undergo hydrotesting in 9 segments and in Line 325B in 11 segments. Unfortunately, the hydrotest segments in the public record application are identified by station number and not by approximate milepost. Since there is usually no correlation between station number and milepost, I thus cannot evaluate whether the Decision Letter 325A/B pressure testing parameters are adequate for Line 325A.[11] It is worth noting that the Decision Letter 325A/B makes no mention of a subpart E

---

[11] Decision Letter 325A/B, "Pressure Testing," page 5.

Accufacts Inc. Final                                                            Page 6 of 9

hydrotest or spike hydrotest on Line 325B.  The proposed segments for hydrotests on 325A need to be identified by approximate milepost to permit evaluation as to whether the waiver requirements are appropriate.  The reasons for hydrotesting exclusion on Line 325B need to be properly justified and made public by the OSFM.

## VIII.    The illusion that corrosion growth rate can be accurately predicted needs to be explained.

One of the critical parameters that I have observed in too many pipeline rupture investigations is that ILI can be utilized to accurately predict corrosion growth rates ("CGR") to help set a critical ILI run timing, for example.  The Pipelines essentially have no effective CP, operate as a higher temperature system, contain disbonded coating, incorporate heavy shielding which prevents CP from reaching the Pipelines and operate with insulation that moves water on/near the outside of the pipe.  Such a combination of factors can provide a wide variation in types of external corrosion as well as corrosion rate estimates.  CGR estimates can be especially problematic if CGR approaches miss possible corrosion interaction threats that can considerably shorten time to failure estimates.  I advise that CGR be utilized with extreme caution given this possible variation, especially for corrosion threats that can interact, such as SCC, whose time to failure can be highly unpredictable.  Corrosion growth rate estimates can vary considerably given the various form of external corrosion, especially related to cracking in combination with its location near sensitive pipe locations such as seam or girth welds.

## IX.    Major state waiver deficiencies:

Key observation on the state waivers for the Pipelines:

1. **A key corrosion performance tracking process step in the state waivers for the Pipelines is missing.**

   While not specially required in minimum pipeline safety regulations or the waivers, a prudent pipeline operator on a pipeline system highly susceptible to corrosion will plot or graph corrosion indications by type and severity, by approximate milepost.  This is especially important on the Pipelines given their history of extensive corrosion caused by the lack of CP effectiveness, poor coating types causing disbondment or shielding, increased temperature, insulation that tends to wick water, and poor performance of ILI.  Such graphing aids a pipeline operator in understanding possible corrosion "hot spot" segments whose threats on a pipeline increase because of environmental factors that merit additional assessment, and maybe even pipeline segment replacement from a corrosion point of view.

   Care also needs to be taken that all corrosion sites are prudently evaluated for possible interactive threats, such as general wall loss in combination with cracking, or near pipe welds, such as that which can occur with cluster corrosion.  I see no mention in the Letters of Decision and waivers requiring such important corrosion tracking on the Pipelines.

Accufacts Inc. Final                                                                                    Page 7 of 9

## 2. A major state waiver deficiency for Line 324.

Given the pipeline properties stated for Line 324 (a single grade X65, 0.344 in wall thickness, 24-inch diameter, HF-ERW), I can calculate the various % SMYS for the spike (minimum and maximum test pressures, and MOP hydrotests) based on an estimated approximate elevation profile by milepost as Line 324 can be hydrotested as one segment given its limited elevation profile.

A critical condition in the OSFM Decision letter 324 is:

> "12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after the spike hydrotest is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:
>
> a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
> b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP."[12]

For the 24-inch diameter pipe, wall thickness and grade stated in the Decision Letter 324, 100% SMYS calculates to 1863 psig.  1.5 times the stated MOP of 1003 psig calculates to 1504 psig, at the highest elevation point.  Thus, the spike test at the highest elevation point as required above is likely to be the lower maximum test pressure of 1504 psig which calculates to about 81% SMYS, **a value I believe is too low for corrosion cracking screening and evaluation**.  The OSFM needs to explain why the proposed spike hydrotest of Line 324 is so low.

The bottom line is that Sable/PPCs should demonstrate whether there are environmental conditions around Line 324 that are conducive to cracking either SCC or SSC, and these conditions should go well beyond a Mag-C tool run (such as sufficient field digs to verify the ILI tool's claimed capability).  I see no such important conditions in Sable/PPCs application that instill confidence that Line 324 does not have environments favoring external cracking.  While it is true that certain pipe manufactured before 1970 is more prone to SSC, or SSWC, for various reasons, there is no modern pipe, even HF-ERW located in Line 324 or DSAW located in 325 A/B, that is invincible to such corrosion cracking threats, especially if the coating directly applied to the pipe has "tented" on the weld seam, allowing water to enter between the coating and the pipe to create a corrosion cell.  There is no carbon steel pipeline, even new modern manufactured steel pipelines, invincible to such corrosion attack.

---

[12] Decision Letter 324, "Pressure Testing," pages 4 – 5.

Accufacts Inc. Final                                                                                   Page 8 of 9

**3. Major state waiver deficiencies for Line 325A/B.**

Decision Letter 325 states that Line 325A and 325B is composed of 30-inch diameter of two pipe grades (X65 with a thickness of mainly 0.344 inch and X70 with a wall thickness mainly of 0.281 inches composed of DSAW, with one small segment of 0.03 miles containing HF-ERW). I used the term "mainly" as Sable's/PPC's application indicates these two lines are also largely composed of these grades with a small percentage of varying thicknesses.[13] For these two pipe grades, and thicknesses, 100 % SMYS calculates to 1490 psig for X65 and 1311 psig for X70. Since the location of the various pipe grades by approximate mileposts within CA-325A/B are not indicated, and given the dramatic elevation profiles for 325A/B the proposed hydrotest segments, if any, by milepost and elevation segments need to be made public. Without such information, I cannot calculate the % SMYS range for hydrotests given the OSFM conditions. Hydrotest segments are identified by station number which don't necessarily sync with milepost or MP.[14] **These important test segment parameters, by approximate MP, and elevation need to be made public to assure prudent hydrotesting is being required to address the possible general corrosion and cracking risks on Line 325A/B**.

It is worth noting that the OSFM does not require a MOP and spike hydrotest of 325B which has very significant elevation changes. This would suggest that Line 325B is not being evaluated by hydrotesting. The reason(s) for this decision needs to be made public.

## X.    Conclusions.

Hydrotest segments proposed for the Pipelines need to be made transparent and include approximate MP, given the major role that elevation change plays on this system. Critical parameters related to location by milepost of the varying grades and thicknesses of pipe on 325 A/B and their associated hydrotest segments need to be identified by approximate MP as well, to verify if the OSFM parameters are sufficient for the specific types of corrosion threat. The reason as to why a spike hydrotest on 324 and 325 A are limited needs to be explained, as well as to why 325B hydrotesting has not been included in either a subpart E or spike hydrotest,

The incompleteness of the waivers lead me to conclude that I cannot determine the waivers provide sufficient information to assure an equal or greater level of safety for the Pipelines had the operator had an unshielded coating design that complied with federal minimum pipeline CP protection intended to avoid pipeline failure from external corrosion.

Richard B. Kuprewicz
President
Accufacts Inc.

*Richard B Kuprewicz*

---

[13] Sable/PPC letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115). Pipeline System Background Data Attachment B of State Application Table B-3 Line Pipe Specifications," July 2023, p. 4.

[14] *Ibid*., "Table B-6 Historic Hydrotest Summary," p. 6.

Accufacts Inc. Final                                              Page 9 of 9

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/2/2025 8:00 AM
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological
Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**
**SOUTH COUNTY REGION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive, <br><br> Respondents/Defendants. <br><br> ───────────────────── <br><br> SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive, <br><br> Real Parties in Interest. | Case No.: 25CV02244 <br><br> **DECLARATION OF KARA CLAUSER IN SUPPORT OF PETITIONERS' *EX PARTE* APPLICATION FOR AN ADMINISTRATIVE STAY OR, IN THE ALTERNATIVE, AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED AND TEMPORARY RESTRAINING ORDER** <br><br> Date: June 3, 2025 <br> Time: 8:30 a.m. <br> Dept: 4 <br> Judge: Hon. Donna D. Geck <br><br> [Action Filed: April 15, 2025] |

1

**DECLARATION OF KARA CLAUSER**

I, Kara Clauser, declare as follows:

1.      I submit this declaration in support of Petitioners Center for Biological Diversity and Wishtoyo Foundation's Ex Parte Application for an administrative stay or, in the alternative, an order to show cause why a preliminary injunction should not be issued and a temporary restraining order. I have personal knowledge of the statements in this declaration, and I could and would competently testify to these matters if called as a witness.

2.      I am a Geographic Information System (GIS) specialist at the Center for Biological Diversity (Center), and I have worked in this capacity for over 8 years. I hold a Bachelor of Science from the University of Arizona in Ecology and Evolutionary Biology and a Master of Science from the University of Arizona in Geographic Information Systems Technology. I have training in several GIS software applications and have over 9 years of experience in GIS analysis and cartography.

3.      I prepared the maps, attached as Exhibits 1 through 6 to this Declaration, depicting the Las Flores Pipeline of the Santa Ynez Unit (SYU) Pipeline System with important environmental resources, as provided in more detail below.

4.      To prepare the maps, I used ArcGIS Pro version 3.3.1 from Environmental Systems Research Institute (ESRI), using the Projected Coordinate System NAD1983 (2011) State Plane California V FIPS 0405 (Meters). To map the Las Flores Pipeline, I downloaded a California Active Pipelines shapefile from Koordinates.com at https://koordinates.com/layer/96036-california-active-pipelines/. Koordinates.com is a centralized GIS data and management cloud sharing site. This layer was uploaded on September 4, 2018, with the source data cited at: https://services.gis.ca.gov:443/ArcGIS/rest/services/Economy/Active_Pipelines/MapServer/0. This source layer has since been removed from the State of California Government's ArcGIS REST Services Directory. Additionally, I georeferenced Figure 1. Project Vicinity Map from the Notice of Preparation, available at https://files.ceqanet.opr.ca.gov/170616-2/attachment/kMgGnx0tQr16ZTEvxK9MMeqNrLQO9Zgzm79wtnPIiz9ypKehMDgvTH0hm3te5DOx4NMf_ebkpJow0wNe0, which I used to confirm the accuracy of the pipeline shapefile.

DECLARATION OF KARA CLAUSER ISO PETITIONERS' *EX PARTE* APPLICATION

5.      Attached to this Declaration as Exhibit 1 is a true and correct copy of a map I created showing federally and state-listed threatened and endangered species in proximity to the Las Flores Pipeline.  I downloaded the GIS data describing critical habitat from the U.S. Fish & Wildlife Service (FWS) website at https://ecos.fws.gov/ecp/report/table/critical-habitat.html, as well as from the National Marine Fisheries Service (NMFS) website at https://noaa.maps.arcgis.com/home/item.html?id=f66c1e33f91d480db7d1b1c1336223c3.  I downloaded the GIS data describing California Natural Diversity Database Occurrences from the California Department of Fish and Wildlife website at https://apps.wildlife.ca.gov/cnddb-subscriptions/downloads. This dataset requires a subscription, and was downloaded on March 27th, 2025. To create the map, I used ESRI's "Select by Location" tool, to select FWS critical habitat, NMFS critical habitat, and CNDDB records that directly overlap the pipeline. The CNDDB records were further refined by querying for only Federally Endangered (FE), Federally Threatened (FT), Federally Proposed Threatened (FPT), State Endangered (SE), State Threatened (ST), or State Candidate Endangered (SCE). Additionally, I added CNDDB records for the Southwestern willow flycatcher (FE,SE), despite not overlapping the pipeline directly.

6.      Attached to this Declaration as Exhibit 2 is a true and correct copy of a map I created showing hydrography information in proximity to the Las Flores Pipeline. I downloaded the GIS data describing hydrography from the USGS National Hydrography Dataset Plus High Resolution ArcGIS Living Atlas of the World website at https://services.arcgis.com/P3ePLMYs2RVChkJx/arcgis/rest/services/NHDPlus_High_Resolution_9March2023_view/FeatureServer.  This dataset was queried to display only Feature Codes 46006: Stream/River: Hydrographic Category = Perennial, 46003: Stream/River: Hydrographic Category = Intermittent, and 46007: Stream/River: Hydrographic Category = Ephemeral.

7.      Attached to this Declaration as Exhibit 3 is a true and correct copy of a map I created showing quaternary faults in proximity to the Las Flores Pipeline. I downloaded the GIS data describing quaternary faults from the United States Geological Survey (USGS) at https://www.usgs.gov/programs/earthquake-hazards/faults.

3

DECLARATION OF KARA CLAUSER ISO PETITIONERS' *EX PARTE* APPLICATION

8.      Attached to this Declaration as Exhibit 4 is a true and correct copy of a map I created showing elevation information for mile markers along the Las Flores Pipeline. I downloaded the GIS data describing elevation from the USGS National Map (v2.0) website at https://apps.nationalmap.gov/downloader/. From this website, I downloaded four 1/3 arc-second Digital Elevation Models (DEMs) of the area overlapping the pipeline: USGS_13_n35w121_20210301.tif, USGS_13_n35w120_20240207.tif, USGS_13_n36w120_20240207.tif, and USGS_13_n36w121_20240207.tif. I used the Geoprocessing Tool "Mosaic to New Raster" to combine these four DEMs into one mosaic DEM. To create mile markers, I utilized the "Generate Points Along Lines" Geoprocessing Tool, with the distance field set to one US Survey Mile and Z Values set to "enabled". I utilized the Geoprocessing Tool "Update Feature Z", with the input features set to the Mile Marker point layer, and the Input Surface set to the mosaic DEM. In the Mile Marker point layer, I created an attribute field for Elevation in meters, and used the "Calculate Geometry Attributes" tool for the property "Point z-coordinate". I multiplied these values by 3.28084 to convert meters to feet. The resulting field contained elevation in feet at each mile marker, which I used to symbolize the points in the resulting map using graduated colors.

9.      Attached to this Declaration as Exhibit 5 is a true and correct copy of a map I created showing wildfire information in proximity to the Las Flores Pipeline. I downloaded the GIS data describing wildfire perimeters from the California Department of Forestry and Fire Protection (CALFIRE) website at https://www.fire.ca.gov/what-we-do/fire-resource-assessment-program/fire-perimeters. This layer was queried to display only wildfire perimeters from 2015 to present. I downloaded the GIS data describing State and Local Responsibility Area Fire Hazard Severity Zones at the CALFIRE website at https://osfm.fire.ca.gov/what-we-do/community-wildfire-preparedness-and-mitigation/fire-hazard-severity-zones. These data were downloaded on May 20th, 2025.

10.      Attached to this Declaration as Exhibit 6 is a true and correct copy of a map I created showing land ownership in proximity to Las Flores National Pipeline. I downloaded the GIS data describing land ownership from the Bureau of Land Management (BLM) Geospatial Business Platform website at https://gbp-blm-egis.hub.arcgis.com/datasets/6bf2e737c59d4111be92420ee5ab0b46/about. I downloaded additional GIS data from the USGS Protected Area Database (PAD-US 4.0) website at

DECLARATION OF KARA CLAUSER ISO PETITIONERS' *EX PARTE* APPLICATION

https://www.usgs.gov/programs/gap-analysis-project/science/pad-us-data-download. The PAD-US layer was used to create labels of the following protected areas near the pipeline: Gaviota State Park, Los Padres National Forest, Carrizo Plain Ecological Reserve, Carrizo Plain National Monument, Bitter Creek National Wildlife Refuge, Refugio State Beach, and El Capitán State Beach.

11.    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my personal knowledge, information, and belief.

Executed on May 27, 2025

_____

Kara Clauser

DECLARATION OF KARA CLAUSER ISO PETITIONERS' EX PARTE APPLICATION

**INDEX OF EXHIBITS**
**Declaration of Kara Clauser**

| Exhibit No. | Description | Page No. |
|---|---|---|
| Exhibit 1 | Map showing habitat for federally and state-listed threatened and endangered species | 8 |
| Exhibit 2 | Map showing hydrography information | 10 |
| Exhibit 3 | Map of quaternary faults | 12 |
| Exhibit 4 | Map showing elevation information | 14 |
| Exhibit 5 | Map showing wildfire information | 16 |
| Exhibit 6 | Land ownership map | 18 |

# Exhibit 1

Declaration of Kara Clauser



# Exhibit 2

Declaration of Kara Clauser



Legend

— Las Flores Pipeline

— Ephemeral/Intermittent Stream

— Perennial Stream

0   2   4   8 Miles

Data Sources: State of California, USGS National Hydrography Dataset Plus

# Exhibit 3

Declaration of Kara Clauser



**Legend**

― Las Flores Pipeline

― Quaternary fault

Data Sources: State of California, USGS Quaternary Fault & Fold Database of the United States

Clauser Declaration
Page 12

# Exhibit 4

Declaration of Kara Clauser



Legend

— Las Flores Pipeline

**Mile Marker Elevation**

- ≤ 500 feet
- 500 -1,000 feet
- 1,000 - 1,500 feet
- 1,500 - 2,000 feet
- 2,000 - 2,500 feet
- ≥ 2,500 feet

0  2  4  8 Miles

Data Sources: State of California, U.S.G.S 1/3 arcsecond DEM

# Exhibit 5

Declaration of Kara Clauser



Data Sources: State of California, California Department of Forestry and Fire Protection (CALFIRE)

**Legend**

⎯ Las Flores Pipeline

▨ Wildfire Perimeters 2015 - 2025

Fire Hazard Severity Zones in Local Responsibility Areas

■ Very High

■ High

■ Moderate

Fire Hazard Severity Zones in State Responsibility Areas

▨ Very High

▨ High

▨ Moderate

0  2  4  8 Miles

# **Exhibit 6**

Declaration of Kara Clauser

**Legend**

— Las Flores Pipeline

**Land Ownership**
- Tribal
- Bureau of Land Management
- U.S. Fish & Wildlife Service
- Local Government
- State
- U.S. Bureau of Reclamation
- U.S. Forest Service
- Private/Unknown

0   2   4        8 Miles

Data Sources: State of California, BLM Surface Management Agency, USGS PAD-US 4.0