# EXHIBIT Z

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/7/2025 10:08 PM
By: Terri Chavez , Deputy

ROB BONTA
Attorney General of California
MYUNG PARK
Supervising Deputy Attorney General
MATTHEW BULLOCK (SBN 243377)
MICHAEL S. DORSI (SBN 281865)
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3802
  Fax:  (415) 703-5480
  E-mail:  Michael.Dorsi@doj.ca.gov
*Attorneys for Respondents and Defendants
Department of Forestry and Fire Protection, by and
through the Office of the State Fire Marshal, an
agency of the State of California; Daniel Berlant, in
his official capacity as State Fire Marshal*

EXEMPT FROM FILING FEES
PURSUANT TO GOVERNMENT
CODE SECTION 6103

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA BARBARA

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,**<br><br>                    **Petitioner and Plaintiff,**<br><br>v.<br><br>**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,**<br><br>                    **Respondents and Defendants,**<br><br>**SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,**<br><br>                    **Real Parties in Interest.** | Case No. 25CV02244<br><br>**RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.'S RESPONSE TO ORDER TO SHOW CAUSE RE: STAY OR PRELIMINARY INJUNCTION**<br><br>Date:          July 18, 2025<br>Time:         8:30 a.m.<br>Dept:          4<br>Judge:        Hon. Donna Geck<br><br>Trial Date:    Not Set<br>Action Filed: April 15, 2025<br><br>CONSISTENT WITH STIPULATION, THIS BRIEF AND SUPPORTING DOCUMENTS ARE FILED IN THIS MATTER AND THE RELATED CASE, NO. 25CV02247 |

1

Response to Order to Show Cause re: Stay or Preliminary Injunction (25CV02244)

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 6

BACKGROUND ......................................................................................................... 7

    I.     The Las Flores Pipeline System ............................................................ 7

    II.    The 2015 Refugio Oil Spill and Consent Decree .................................. 8

    III.   The OSFM Waivers and Petitioners' Cases........................................... 8

LEGAL STANDARDS ............................................................................................... 9

ARGUMENT ............................................................................................................ 10

    I.     The Office of the State Fire Marshal Will Prevail on the Merits Because it Acted Consistent with California Law ............................................. 10

        A.    Petitioner's CEQA Claims Lack Merit ..................................... 10

            1.    The OSFM Waivers Are Not a "Project" and Do Not Approve a Project........................................................... 10

            2.    The Existing Facilities Exemption Applies ................. 11

            3.    The Las Flores Pipeline is Analyzed in the Existing EIR............. 14

        B.    Petitioners' Procedural Claims Lack Merit .............................. 15

            1.    Petitioners' Federal Statutory Claims Fail.................. 15

            2.    CAL FIRE/OSFM Satisfied State Law Requirements ................. 17

    II.    The Equities Favor Government Action Consistent With State Law................... 19

CONCLUSION ......................................................................................................... 20

Response to Order to Show Cause re: Stay or Preliminary Injunction (25CV02244)

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Apartment Ass'n of Greater Los Angeles v. City of Los Angeles*
(2001) 90 Cal.App.4th 1162 ........................................................................................ 13

*City and County of San Francisco v. U.S. Department of Transportation*
(9th Cir. 2015) 796 F.3d 993 ...................................................................................... 16

*City of Pasadena v. State of California*
(1993) 14 Cal.App.4th 810 ......................................................................................... 12

*Committee for a Progressive Gilroy v. State Water Resources Control Board.*
(1987) 192 Cal.App.3d 847 ...............................................................................10, 12, 13

*Common Cause v. Board of Supervisors*
(1989) 49 Cal.3d 432 ................................................................................................... 9

*Craik v. County of Santa Cruz*
(2000) 81 Cal.App.4th 880 .......................................................................................... 18

*Davidon Homes v. City of San Jose*
(1997) 54 Cal.App.4th 106 .......................................................................................... 13

*Gonzaga University v. Doe*
(2002) 536 U.S. 273 .................................................................................................... 17

*In Re Midamerican Energy Co.*
(Jan. 15, 2002) 2002 WL 31155601 ........................................................................... 16

*IT Corp. v. County of Imperial*
(1983) 35 Cal.3d 63 ..................................................................................................... 9

*Lake Norconian Club Foundation v. Department of Corrections & Rehabilitation*
(2019) 39 Cal.App.5th 1044 ........................................................................................ 11

*Mae M. v. Komrosky*
(2025) 111 Cal.App.5th 198 ........................................................................................ 19

*Maryland v. King*
(2012) 567 U.S. 1301 .................................................................................................. 19

*McCoy v. Board of Retirement*
(1986) 183 Cal.App.3d 1044 ....................................................................................... 19

*Medina v. Planned Parenthood South Atlantic*
(U.S., June 26, 2025, No. 23-1275) 2025 WL 1758505 ............................................. 17

3

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Moss v. County of Humboldt*
(2008) 162 Cal.App.4th 1041 .......................................................................... 15

*New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*
(1977) 434 U.S. 1345 ...................................................................................... 19

*Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*
(8th Cir. 2008) 530 F.3d 724 .......................................................................... 20

*Santa Clara Valley Water Dist. v. San Francisco Bay Regional Water Quality Control Bd.*
(2020) 59 Cal.App.5th 199 ....................................................................... 14, 19

*Simons v. City of Los Angeles*
(1976) 63 Cal.App.3d 455 ........................................................................ 10, 11

*Smith v. Reiskin*
(N.D. Cal. Oct. 10, 2018) No. 4:18-cv-01239-JSW, 2018 WL 7820727 .............................. 20

*Southern Pacific Transportation Co. v. State Bd. of Equalization*
(1987) 191 Cal.App.3d 938 .............................................................................. 18

*Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd.*
(1994) 23 Cal.App.4th 1459 ......................................................................... 9, 19

*Tulare Lake Canal Company v. Stratford Public Utility District*
(2023) 92 Cal.App.5th 380 ................................................................................ 9

*U.S. v. Sun-Diamond Growers of California*
(1999) 526 U.S. 398 ........................................................................................ 16

*Western States Petroleum Assn. v. Superior Court*
(1995) 9 Cal.4th 559 ....................................................................................... 12

*Young v. City of Coronado*
(2017) 10 Cal.App.5th 408 ............................................................................... 18

**STATUTES**

42 U.S.C. § 1983 ................................................................................................ 17

4

## TABLE OF AUTHORITIES
### (continued)

**Page**

49 U.S.C.
§ 60118................................................................................................................ 15–16
§ 60118, subd. (c)(1)(A)....................................................................................... 16
§ 60118, subd. (c)(1)(B) ....................................................................................... 16
§ 60121.................................................................................................................. 16
§ 60121, subd. (a) ................................................................................................. 17

Code of Civil Procedure
§ 526, subd. (b)(4)............................................................................................. 9, 20
§ 1094.5, subd. (g) ................................................................................................. 9

Government Code
§§ 51010–51019.1 ................................................................................................ 17
§§ 51010–51019.1 ................................................................................................ 19
§ 51011.................................................................................................................. 17
§ 51011, subd. (b) ................................................................................................. 18
§ 51011, subd. (c) ................................................................................................. 18

Public Resources Code
§ 21005, subd. (a) ................................................................................................. 19
§ 21065, subd. (a) ............................................................................................ 10–11
§ 21080, subd. (a) ............................................................................................ 10, 11
§ 21166.................................................................................................................. 14
§ 21167.3, subd. (a).............................................................................................. 10

**REGULATIONS**

California Code of Regulations Title 14
§ 15051, subd. (b) ................................................................................................. 14
§ 15300.2............................................................................................................... 13
§ 15301............................................................................................................. 11–12
§ 15302.................................................................................................................. 13
§ 15378.................................................................................................................. 10

**OTHER AUTHORITIES**

Kostka & Zischke, Practice under the Cal. Environmental Quality Act (2d ed. 2008)
§ 4.22.................................................................................................................... 11
§ 5.77.................................................................................................................... 12

**INTRODUCTION**

California law gives the Office of the State Fire Marshal (OSFM) jurisdiction over safety standards and practices for intrastate oil pipelines. OSFM is charged with ensuring pipeline safety and authorized to impose conditions on pipeline operators to ensure safety. Among those protections are measures addressing the risks presented by corrosion. Oil pipelines often use systems called *cathodic protection* to prevent corrosion. The Las Flores Pipeline System includes just such a system. But the 2015 Refugio Oil Spill exposed that the system did not work as intended due to certain features of the pipelines and their insulation systems.

In response, on March 13, 2020, the United States of America, four agencies of the State of California including the California Department of Forestry and Fire Protection's Office of the State Fire Marshal, and the Regents of the University of California filed a complaint against and consent decree with Plains All American Pipeline, L.P., and Plains Pipeline, L.P. (collectively Plains), who at the time owned and operated the Las Flores Pipeline System. The Consent Decree awarded civil penalties and damages, and imposed rules that the pipeline owner—then Plains, now Real Parties in Interest Sable Offshore Corporation and Pacific Pipeline Company (collectively Sable)—would have to satisfy before restarting the flow of oil in the Las Flores Pipeline System. Among the provisions are requirements for Plains or its successor Sable to obtain a state waiver before restarting the flow of oil.

The term *waiver* comes from the fact that it waives the federal requirement for cathodic protection. As a practical matter, a waiver contains a new set of conditions designed to ensure protection of human health and the environment. OSFM imposed 68 conditions on pipeline CA-325A/B and 67 conditions on pipeline CA-324. (Declaration of Michael S. Dorsi, Exhibits 1 and 2 ["OSFM Waivers"].) In effect, the waivers authorize Sable to restore the Las Flores Pipeline System to use so long as it follows these additional, more stringent, conditions.

Petitioners challenged the waivers, alleging that OSFM was required to perform "subsequent environmental review" under the California Environmental Quality Act (CEQA) and follow other state and federal procedures. Petitioners' argument seeking to compel OSFM to prepare a subsequent EIR fails because (a) the Waivers are not "projects" as defined in CEQA,

6

(b) the pipelines fall within the existing facilities exemption to CEQA, and (c) the matter is fully analyzed in the existing EIR. More, OSFM acted consistent with federal and state procedures, including publishing to Regulations.gov. Rather than enforcing these rules on their own terms, it appears that Petitioners seek to expand the specific requirements into a kind of quasi-CEQA process, despite having no authority for imposing the heavy burden that would entail.

In their applications for preliminary relief, Petitioners ask this Court to substitute its judgment for the considered judgment of the elected and appointed officials of the United States and the State of California. Petitioners present this under the guise of the *equities*, which are a part of the test for preliminary injunctions. But when the executive branch acts lawfully, it suffers an irreparable injury by being prevented from carrying out its responsibilities under the law. The law in California is not a ban on oil production in the Santa Barbara Channel. The law is that Sable may operate only if it does so consistent with the legal rules and standards. Sometimes this places agencies adverse to Sable. (See *Sable Offshore Corp., et al. v. California Coastal Commission*, Case No. 25CV00974.) Other times, as here, it involves state agencies imposing restrictions on Sable. Because OSFM complied with the law when it imposed those conditions by way of state waivers, the Court should deny Petitioners' applications for preliminary relief.

## BACKGROUND

### I.    THE LAS FLORES PIPELINE SYSTEM

America's first offshore oil drilling commenced in 1896 in Santa Barbara County. Originally built on piers, drilling shifted to offshore platforms connected by undersea pipelines, which in turn connected to pipelines on shore. Among these pipeline systems are the pipelines that facilitate operation of the Santa Ynez Unit—three offshore platforms connected to an onshore pipeline system. Prior to 2015, Plains Pipeline, L.P., a subsidiary of Plains All American Pipeline, L.P., operated the onshore pipelines formerly known as Line 901 and Line 903 (now known as CA-324 and CA-325, respectively). These pipelines, collectively known as the Las Flores Pipeline System, formed a connection necessary to bring oil to market after it is brought onshore from the three offshore platforms in the Santa Ynez Unit. In January 1985, the California State Lands Commission and the United States Bureau of Land Management (BLM) published the

7

Final Environmental Impact Report (EIR) and Environmental Impact Statement (EIS)[1] covering what is now known as the Las Flores Pipeline System. BLM also published a Supplemental EIS.

## II.    THE 2015 REFUGIO OIL SPILL AND CONSENT DECREE

On May 19, 2015, Line 901 failed, resulting in the Refugio Oil Spill. Since the pipelines were deactivated in response to the Refugio Oil Spill, the Las Flores Pipeline System has remained offline. Several government agencies concluded that Plains' poor management resulted in environmental harm, and sought penalties, damages, and conditions. In response to these agencies' positions, Plains entered into a consent decree, approved by the United States District Court for the Central District of California, governing the actions that it would be required to take prior to restart of the Las Flores Pipeline System. (Dorsi Decl., Exh. 3 ["Consent Decree"] at pp. 73–74; see also p. 69 [CAL FIRE agreement to Consent Decree].) Sable, as successor in interest to Plains, is bound by the Consent Decree. (*Id*. at pp. 53–55, ¶¶ 88–92.)

The Consent Decree anticipated that, prior to restart of the Las Flores Pipeline System, Plains (now Sable) would be required to obtain state waivers for both parts of the Las Flores Pipeline System. (*Id.* at p. 80.) The parties to the Consent Decree and the District Court were fully aware of the limited effectiveness of the then-existing cathodic protection system. The Consent Decree provided that Plains agreed not to contest (and bound its successors not to contest) the inclusion of certain terms in the waivers and acknowledged that OSFM might impose additional terms. The Consent Decree contains no indication that any party to the Decree contemplated that an EIS or EIR would be required prior to carrying out any of the terms of the Decree.

## III.    THE OSFM WAIVERS AND PETITIONERS' CASES

Sable acquired the Las Flores Pipeline System and applied for waivers on April 24, 2024. CAL FIRE issued the OSFM Waivers on December 17, 2024, with the federal Pipeline and Hazardous Materials Safety Administration (PHMSA) providing its notices of non-objection to the OSFM Waivers on February 11, 2025. Petitioners filed suit on April 15, 2025, alleging, *inter alia*, that CAL FIRE was required to prepare an EIR prior to issuing the OSFM Waivers. On

---

[1] EIR is the term for California agency environmental document; EIS is the term for the analogous federal document under the National Environmental Policy Act (NEPA).

8

Monday, June 2, 2025, Petitioners gave notice that they would apply, ex parte, for a temporary restraining order (TRO). The Court held a hearing on Tuesday, June 3, 2025, and granted the TROs, setting a hearing on preliminary injunction or stay of the OSFM Waivers on July 18, 2025.

## LEGAL STANDARDS

To obtain preliminary relief, a moving party must demonstrate (1) likely success on the merits, and (2) that the interim harm that the moving party would suffer, absent an injunction, outweighs the harm the other parties would suffer from an injunction. (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69–70.) In cases concerning public rights, such as cases brought pursuant to CEQA, courts weigh not only the interests of the parties, but how the public interest would be served by granting or denying preliminary relief. (See *Tulare Lake Canal Company v. Stratford Public Utility District* (2023) 92 Cal.App.5th 380, 398.) When preliminary relief is sought against a public entity like OSFM, a more strenuous showing of irreparable injury is required because there is "a general rule against enjoining public officers or agencies from performing their duties." (*Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd.* (1994) 23 Cal.App.4th 1459, 1471.)

Petitioners seek a preliminary injunction and a stay of the OSFM Waivers. The use of injunctions is limited, and "cannot be granted . . . [t]o prevent the execution of a public statute by officers of the law for the public benefit." (Code Civ. Proc., § 526, subd. (b)(4).) Alternatively, Code of Civil Procedure section 1094.5, subdivision (g), provides that a court "may stay the operation of the administrative order . . . However, no such stay shall be imposed or continued if the court is satisfied that it is against the public interest." Unlike a preliminary injunction, which would restrain future conduct, a stay suspends the validity of past approval.

When considering preliminary remedies, "[t]he scope of available preliminary relief is necessarily limited by the scope of the relief likely to be obtained at trial on the merits." (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442.) Here, Petitioners must demonstrate that the relief they seek here is either (a) the same relief they could obtain after judgment, or (b) ancillary relief that is authorized by statute or equity (e.g., a stay to preserve the court's jurisdiction). And Public Resources Code section 21167.3, subdivision (a), compels a

9

responsible agency, in certain situations, to continue its evaluation of an applicant's submissions.

## ARGUMENT

### I.    THE OFFICE OF THE STATE FIRE MARSHAL WILL PREVAIL ON THE MERITS BECAUSE IT ACTED CONSISTENT WITH CALIFORNIA LAW

#### A.    Petitioner's CEQA Claims Lack Merit

CEQA does not compel the preparation of an EIR for the OSFM Waivers for several reasons, each outlined below. But more than the specific reasons, this case turns on what is the appropriate baseline for comparison. Petitioners' briefs frame the comparison as between the operation of the Las Flores Pipeline System and stopping that system. But this is the wrong point of comparison for a waiver that addresses an existing pipeline. Petitioners' framing is contrary to established law. Rather than comparing the use versus disuse of the Las Flores Pipeline System, the Court should compare to the pre-2015 use of the system with the use that would be allowed by the OSFM Waivers (and additional approvals by other agencies). (See, e.g., *Simons v. City of Los Angeles* (1976) 63 Cal.App.3d 455, 465 [measure was not a project because it formalized and funded prior use]; *Committee for a Progressive Gilroy v. State Water Resources Control Board.* (1987) 192 Cal.App.3d 847, 865 [project exempt because baseline was approved level of use, not immediately prior level of use].) Applying this understanding to each aspect of CEQA exemption illustrates why no EIR, subsequent or otherwise, is required with the OSFM Waivers.

#### 1.    The OSFM Waivers Are Not a "Project" and Do Not Approve a Project

CEQA imposes requirements on activities that fall within the definition of a "project." If an action (or inaction) is not a project, it does not trigger obligations under CEQA. (Pub. Resources Code, § 21080, subd (a).) "The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Cal. Code Regs., tit. 14, § 15378.) To qualify as a project, an activity must (a) be an activity undertaken by a government agency, including project authorized by a permit granted by the government, and (b) cause a direct or reasonably foreseeable change to the physical environment. (Pub. Resources Code, § 21065, subd. (a) [definition of project].) The OSFM Waivers do not satisfy the second component. This

second component addresses the underlying activity, not just a government procedure. (See *Simons v. City of Los Angeles* (1976) 63 Cal.App.3d 455, 465.)

The Court of Appeal decision in *Simons* is instructive. There, petitioners challenged a transfer of land ownership and appropriation of funds for improvements to Los Angeles Police Department firearms training facilities. Neither the change in ownership nor the expenditure and upgrade of facilities created a "project" under CEQA.[2] (Kostka & Zischke, Practice under the Cal. Environmental Quality Act (2d ed. 2008) § 4.22 [explaining that in *Simons* the Court of Appeal concluded that the challenged activity was "not a project because the amendment continued an existing use without an environmental change"].) The same is true here. The resumption of operation under the OSFM Waivers is not a project. The Waivers do not alter the physical environment—they simply authorize resumption of prior activities under specified conditions.

Petitioners' references to the considered-but-abandoned proposal to construct a new pipeline does not change this. (See EDC Br. at pp. 7:16–18, 9:18–27.) The decision not to take a proposed action cannot create a "project" under CEQA. (See *Lake Norconian Club Foundation v. Department of Corrections & Rehabilitation* (2019) 39 Cal.App.5th 1044, 1051.) The issuance of OSFM Waivers necessary for the resumption of use of the existing Las Flores Pipeline does not, by negating the construction of a new pipeline, become a project under CEQA.

Because the OSFM Waivers are not a project, no further analysis under CEQA is required and, this is the end of the inquiry. (See Pub. Resources Code, § 21080, subd (a).)

### 2. The Existing Facilities Exemption Applies

Even if the Waivers are considered a project, the existing facilities exemption, also known as the Class 1 Exemption, provides that an agency need not prepare an EIR for "the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of existing or former use." (Cal. Code Regs., tit. 14, § 15301, emphasis added.) This includes "work required to bring the [facility] up to established safety and

---

[2] In *Simons*, the Court of Appeal also concluded that even if it was a project, the existing facilities exemption applied, see Argument, Part I.A.4, *infra*, and an exemption for ballot measures, which is not applicable here, would also apply.

other standards." (*City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810, 824, *disapproved on other grounds by Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559; see also Cal. Code Regs, tit. 14, § 15301, subd. (d).) The 2018 amendment to the Class 1 Exemption made clear that an agency may "find that a project will not expand the level of use if that level is consistent with historic levels of operations." (Kostka & Zischke, Practice under the Cal. Environmental Quality Act (2d ed. 2008) § 5.77.) That is precisely the case here. The OSFM Waivers, if combined with an approved restart plan, would authorize Sable to restore the Las Flores Pipeline System to its former level of use.

This type of situation—restoring a facility to prior levels—is ordinary. The Court of Appeal's decision in *Committee for a Progressive Gilroy v. State Water Resources Control Board.* (1987) 192 Cal.App.3d 847, 865, is instructive. There, the final EIR for a wastewater treatment plant evaluated "a projected capacity of 6.4 million gallons per day . . . ." (*Id.* at p. 852.) Capacity had been reduced to 5.1 million gallons per day before the challenged orders authorized the plant to restoring part of the lost capacity. The Court explained that, for purposes of determining significance under CEQA, "[i]t is not necessary to consider . . . the magnitude of the increases from 5.15 mgd to 6.1 mgd, since the original EIR clearly considered even a larger flow than this—6.4 mgd." (*Id.* at p. 864–865; see also *City of Pasadena v. State of California*, *supra*, 14 Cal.App.4th at p. 827 [existing use did not fall within unusual circumstances exception].)

To be sure, this case involves more change than *Committee for a Progressive Gilroy*. The interim use of the Las Flores Pipeline System was zero because the system was and is not in use. But the same principle applies. The 1985 EIR analyzed the full use of the Las Flores Pipeline System. It did not set standards for the level of effectiveness of the cathodic protection system. The resumption of use of the Las Flores Pipeline System, for which the OSFM Waivers are a prerequisite, is about restoring flow to prior levels, not approving something new.[3]

_____

[3] To the extent that Petitioners view the OSFM Waivers and the resulting construction as exceeding "repair" and "maintenance," those are principally the result of other agencies' requirements (most notably the Coastal Commission). But even if it was entirely the result of OSFM Waivers, the Waivers would then fall within the Class 2 Exemption for "replacement or reconstruction of existing structures and facilities where the new structure will be located on the same site as the structure replaced and will have substantially the same purpose and capacity as
(continued…)

12

"In categorical exemption cases, where the agency establishes that the project is within an exempt class, the burden shifts to the party challenging the exemption to show that the project is not exempt because it falls within one of the exceptions listed in Guideline [Cal. Code Regs., tit. 14, §] 15300.2." (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 115; see *Apartment Ass'n of Greater Los Angeles v. City of Los Angeles* (2001) 90 Cal.App.4th 1162, 1175 ["Petitioners, not [Respondents], have the burden of proving by substantial evidence an exception to the exemption applies."].) Neither Petitioner group meaningfully addressed the categorical exemption from CEQA for existing facilities.

In the two Petitioners' briefs, there is only a brief discussion relevant to either categorical exemptions generally or the existing facilities exemption in particular. That discussion, in Center for Biological Diversity and Wishtoyo Foundation's brief, first asserts, without explanation, that restarting a pipeline does not fall within the existing facilities exemption. (CBD Br. at pp. 22:27–23:2.) This is wrong and unsupported. The brief then argues that because the project is significant, the exemption does not apply. (*Id.* at p. 23:3–13.) This is circular, and ignores the valuable guidance provided by CEQA exemptions. Many CEQA exemptions are the rubric for determining significance. Under the existing facilities exemption, the question is whether the purported project is significant *as compared to former use*. (*Committee for a Progressive Gilroy v. State Water Resources Control Bd.*, *surpa*, 192 Cal.App.3d at p. 864.) When a purported project does nothing more than restore an existing facility to former use levels, it is not significant compared to the former use level. That is the case here. The purported significant environmental impacts are not greater than they were from the pre-2015 use of the Las Flores Pipeline System. And, as Petitioners concede, that prior use was already analyzed in the 1985 EIR.

This argument should not come as a surprise to Petitioners. Their briefing demonstrates that they understand that the Las Flores Pipeline System existed prior to 2015. They are sophisticated parties, with significant CEQA litigation experience. It was their burden to make the case, in their opening brief, that either (a) the existing facilities exemption does not apply, or (b) this case falls

---

the structure replaced." (Cal. Code Regs., tit. 14, § 15302.) Aside from falling under a different exemption, the same principles would apply.

13

into an exception to the exemption. They did not do so, and the Court should not permit them to do so in their reply briefs. (See, e.g., *Santa Clara Valley Water Dist. v. San Francisco Bay Regional Water Quality Control Bd.* (2020) 59 Cal.App.5th 199, 219.)

### 3.    The Las Flores Pipeline is Analyzed in the Existing EIR

Once an EIR has been certified for a project, both lead and responsible agencies cannot require—and cannot be ordered by a court to prepare—an EIR except in conditions enumerated by statute. (Pub. Resources Code, § 21166.) Here, California's State Lands Commission and the federal Bureau of Land Management completed a joint EIR-EIS in 1985. OSFM was not just allowed, but required, to rely on that EIR.

These analyses considered cathodic protection, but did not require that the Las Flores Pipeline System use a particular form of cathodic protection. (Dorsi Decl., Exh. 4 at pp. 125, 162, 174, 347, 444, and 469–71 [1985 EIR discussions of cathodic protection].) Nor did the EIR/EIS require that cathodic protection achieve any benchmark for effectiveness. (*Ibid.*) Corrosion occurs on pipelines—even pipelines with cathodic protection systems that function as anticipated. That corrosion occurred in the Las Flores Pipeline System is not unique. The EIR acknowledged a level of risk. That a risk came to fruition does not invalidate the EIR.

Both Petitioner groups argue that in order to issue the Waivers, OSFM was required to first complete[4] a subsequent EIR (SEIR). (CBD Br. at p. 23:14–20, EDC Br. at pp. 18:5–20:24.) Petitioners agree that an SEIR is required only if (a) there are substantial changes to the project, (b) there are substantial changes to the circumstances surrounding the project, or (c) new information not known at the time of the EIR becomes available *and* indicates that significant environmental impacts were not addressed in the EIR. While Petitioners attempt to cast their arguments as relevant to all three factors, in fact their arguments are all about the third.

Petitioners attempt to frame the lack of cathodic protection as a change to the project or its circumstances. But the original cathodic protection system remains in place and is active. (See

---

[4] Petitioners' briefs suggest, but do not definitively state, that OSFM must be the agency to prepare an SEIR. (EDC Br. at p. 8:13–14, CBD Br. at p. 21:25.) This is wrong. (See Cal. Code Regs., tit. 14, § 15051, subd. (b).) Petitioners do not address why OSFM should be the lead agency. OSFM contends that there may be a better selection for lead agency, and that the Court should avoid making that determination on this Motion.

14

Dorsi Decl., Exhs. 1 & 2, at p. 2.) The circumstances are also unchanged—the Pipelines runs the same route moving the same substance. Any deterioration of the pipeline itself is not a changed circumstance compared to the original EIR because BLM and State Lands Commission completed the EIR before construction of the Las Flores Pipeline System.

The best understanding of Petitioners' argument is that the discovery that the cathodic protection system failed constitutes new information that the lead agency did not address in the EIR. For example, EDC asserts that "without effective cathodic protection, the pipeline is vulnerable to further pervasive, continuous, and progressive corrosion that was not accounted for in the 1985 EIR." (EDC Br. at p. 19:6–8.) There are two problems with this argument. First, a subsequent EIR based on new information is only required if that information illustrates new significant impacts "not discussed in the previous EIR," that the impacts will "be substantially more severe" than stated in the EIR, or that there are new feasible mitigation measures. (See *Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1058.) Here, the original EIR/EIS considered impacts like what occurred in 2015 and addressed those impacts either with mitigation or a conclusion that the impacts were unavoidable. The 2015 Refugio Oil Spill did not exceed the scope of potential impacts considered in the 1985 EIR. (See Dorsi Decl., Exh. 5 [Table 4-26 on p. 4-121 of 1985 Draft EIR].) What occurred was within the scope of what BLM and State Lands Commission considered and analyzed. (*Ibid.*) Second, the allegation that corrosion that may occur absent cathodic protection "was not accounted for in the 1985 EIR" is wrong. The EIR/EIS considered numerous risks, and did not require cathodic protection as a mitigation measure or other component of the analysis supporting the decision to approve the original project.

An EIR is not a promise that no harm will come—it is an analysis of what might occur. Here, one of the more damaging scenarios did occur. But it was not beyond the scope of what the EIR/EIS considered, and thus no SEIR is required.

## B.    Petitioners' Procedural Claims Lack Merit

### 1.    Petitioners' Federal Statutory Claims Fail

Petitioners attempt to invoke a provision of the federal Pipelines Safety Act, 49 U.S.C. § 60118, in state court. Petitioners invoking federal law in state court must take federal law as they

15

find it, not how they wish it would be. Petitioners face two problems with their federal law claim.

First, Petitioners allege that OSFM failed to follow certain procedures under a provision of the federal Pipeline Safety Act, 49 U.S.C. § 60118, subdivision (c)(1)(B). This provision addresses the interests of "an owner or operator of a pipeline facility" to apply for a waiver; there is no indication that this is a public participation statute. (49 U.S.C. § 60118, subd. (c)(1)(A).) This statute does not say that it creates public participation rights for persons wishing to provide input. Petitioners have not cited, and Respondents have not found, a court case treating this requirement as a public participation statute.[5] There is no violation of Section 60118 because this section does not authorize Petitioners to participate in the waiver process, and as a result, they suffered no legal injury. While there are other provisions of the Pipeline Safety Act that a private party may lawfully bring an action to enforce, this provision does not provide the rights that Petitioners claim. (See *U.S. v. Sun-Diamond Growers of California* (1999) 526 U.S. 398, 409 [favoring narrow interpretations of federal statutes that form part of complex regulatory schemes].)

Second, even if Petitioners' proposed participation right did exist, the citizen suit provision does not authorize review of government agencies' regulation of pipelines. In *City and County of San Francisco v. U.S. Department of Transportation* (9th Cir. 2015) 796 F.3d 993, 998, the Ninth Circuit Court of Appeals affirmed the trial court's conclusion that "while § 60121 would authorize a suit against government entities to the extent they engage in activities regulated by the [Pipeline Safety Act]—such as constructing or operating pipelines—it is not an appropriate vehicle for seeking mandamus relief regarding defendants' performance of their regulatory obligations." The Ninth Circuit observed that other statutes, including the Endangered Species Act and the Clean Air Act, "tend to include two separate citizen suit provisions: one that provides for suits alleging a violation of a statute's substantive provisions, and one that authorizes suits against the agency head for failing to perform a nondiscretionary duty. . . [but t]he latter type of

---

[5] Petitioners' only cited authority on this subject, *In Re Midamerican Energy Co.* (Jan. 15, 2002) 2002 WL 31155601, is a decision of the Iowa Utilities Board over 20 years ago. The Iowa Utilities Board did not say that a person other than the applicant must be given an opportunity to comment.  Rather, it concluded that a public notice would be "impracticable and unnecessary," and as a result provided no such notice. *Midamerican* says nothing about the right to judicial enforcement of 49 U.S.C. § 60118, subdivision (c)(1)(B). In addition, *MidAmerican* a non-binding statement by another state's regulatory agency, not a binding court decision.

16

provision, which specifically provides for mandamus relief, is conspicuously absent from the Pipeline Safety Act." (*Id.* at 999.) Congress' choice to omit a citizen suit provision not for this kind of case precludes the relief that Petitioners seek.[6] More, Section 60121, subdivision (a), instructs that a litigant "may bring a civil action in an appropriate district court of the United States . . . ." This is not a federal district court, and Petitioners have not cited any authority indicating that they may assert this claim in a state court.

Finally, Petitioners ignore the federal process that Respondents did complete. Notices, including publication on Regulations.gov, fulfilled all legal requirements. (State of California for Sable Pipeline CA-325 AB, https://www.regulations.gov/docket/PHMSA-2025-0003.) To the extent that there was any required federal procedure, Respondents complied by making public postings. No further procedure was required of OSFM under federal law.

### 2.    CAL FIRE/OSFM Satisfied State Law Requirements

Petitioners allege three errors under the Elder California Pipeline Safety Act of 1981, Government Code sections 51010–51019.1: (1) failure to provide public notice, (2) failure to include a discussion of factors considered by the State Fire Marshal, and (3) error when OSFM concluded that "the risk to public safety is slight and the probability of injury or damage remote." (EDC Br., at pp. 16:25–17:15, CDB Br., at pp. 20:9–21:12, discussing Gov. Code, § 51011.)

First, OSFM did provide public notice on www.regulations.gov. That notice is the standard practice.[7] More, CAL FIRE maintained the website *Pathways for Restarting CA-324 and CA-325*, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines, providing updates. But even if these postings failed to meet some technical requirement, it sufficed to place Petitioners on notice, as demonstrated by their submissions to OSFM. (EDC Br. at 10:18–20 [explaining submission of Kuprewicz analysis to OSFM].)

Second, the OSFM Waivers contain the requisite discussion. OSFM discussed the

---

[6] Petitioners also cannot employ 42 U.S.C. §1983 because, to employ Section 1983 to bring a claim arising under another federal statute, the statute "must display 'an unmistakable focus' on individuals like the plaintiff." (*Medina v. Planned Parenthood South Atlantic* (U.S., June 26, 2025, No. 23-1275) 2025 WL 1758505, at *6, quoting *Gonzaga University v. Doe* (2002) 536 U.S. 273, 284.) There is no "unmistakable focus" on review of agency action.

[7] Because the relevant announcement is by a state agency, not a federal agency, the practice is to post on Regulations.gov but not to publish in the Federal Register.

background and process of Sable's application and the applicable regulations before enumerating the conditions in each of the two Waivers. While these discussions are shorter than an EIR, they satisfy the requirements in Government Code section 51011, subdivision (c), to "include a discussion of those factors that the State Fire Marshal considers significant." This is not a statutory *back door* to require an EIR-level exposition; it is simply a requirement to make findings, which falls under a much more lenient standard for abbreviated documentation. (Gov. Code, § 51011, subd. (c); see *Southern Pacific Transportation Co. v. State Bd. of Equalization* (1987) 191 Cal.App.3d 938, 954 ["[A]gency findings are generally permitted considerable latitude with regard to their precision, formality, and matters reasonably implied therein."], *Craik v. County of Santa Cruz* (2000) 81 Cal.App.4th 880, 884–885 ["[F]indings need not be stated with the precision required in judicial proceedings. They may properly incorporate matters by reference and even omissions may sometimes be filled by such relevant references [to] the record . . . [T]he reviewing court must resolve reasonable doubts in favor of the administrative findings and decision."].) A brief review of the OSFM Waivers shows that they satisfy this standard.

Third, OSFM correctly concluded that "the risk to public safety is slight and the probability of injury or damage remote." (Gov. Code, § 51011, subd. (b).) OSMF explained that it "reviewed the materials provided" by Sable, analyzed those submissions, and consulted with officials at PHMSA's Engineering and Research Division. (Dorsi Decl. Exhs. 1 & 2 at p. 2.) OSFM imposed over 65 conditions on each pipeline. And in addition to Sable's proposals and its own conditions, OSFM added "PHMSA's recommended conditions into the state waiver[s]." (*Ibid*.)

But the Court need not reach a conclusion on this argument because Petitioners provided no evidence that points toward the appropriate legal standard. Petitioners incorrectly suggest that this provision creates a process for review of new evidence. That is not how review of agency decisions works. When evaluating whether agencies made the correct judgments, some decisions are unreviewable, while others are reviewed for whether the agency's decision was supported by substantial evidence. (*Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 418–419.) Still others are reviewed under independent judgment. Rather than engage in substantial evidence review, Petitioners cite to declarations that they presented to this Court, suggesting that this Court

18

has the responsibility to determine, in the first instance, whether "the risk to public safety is slight and the probability of injury or damage remote." Petitioners did not articulate the appropriate legal standard or provide evidence to support their proposed approach, and the Court should not permit them to do so for the first time in their replies. (See, e.g., *Santa Clara Valley Water Dist. v. San Francisco Bay Regional Water Quality Control Bd.* (2020) 59 Cal.App.5th 199, 219.)

More, Petitioners did not demonstrate that they were prejudiced. Petitioners asking a trial court to overturn agency decisions must show prejudicial error. (See *McCoy v. Board of Retirement* (1986) 183 Cal.App.3d 1044, 1054.) For Petitioners' CEQA claims, Public Resources Code section 21005, subdivision (a) states that "noncompliance with the information disclosure provisions . . . of [CEQA] may constitute a prejudicial abuse of discretion . . . regardless of whether a different outcome would have resulted if the public agency had complied with those provisions." But this rule does not apply to the claims arising under the Government Code. Petitioners have not cited and Respondents have not found a similar provision for the Elder California Pipeline Safety Act of 1981. (Gov. Code, §§ 51010–51019.1). If there were any procedural errors, they did not result in prejudice to Petitioners because OSFM maintained transparency with the *Pathways* website and its regulations.gov disclosures.

## II.    THE EQUITIES FAVOR GOVERNMENT ACTION CONSISTENT WITH STATE LAW

Courts generally avoid imposing injunctive relief against executive branch officials when those officials are likely to prevail on the merits because an injunction against their lawfully-assigned responsibilities is "a form of irreparable injury." (See *Mae M. v. Komrosky* (2025) 111 Cal.App.5th 198, 2025 WL 1431928, at *15 [certified for publication], citing *Maryland v. King* (2012) 567 U.S. 1301, 1303.) "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (*New Motor Vehicle Bd. of California v. Orrin W. Fox Co.* (1977) 434 U.S. 1345, 1351 [Rehnquist, J., in chambers], *see Maryland v. King*, *supra*, 567 U.S. at p. 1303 [Roberts, C.J., in chambers]; see also *Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd.* (1994) 23 Cal.App.4th 1459, 1471.). "A more rigorous standard [for preliminary injunctions against the government] 'reflects the idea that governmental policies implemented through legislation or

19

regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.'" (*Smith v. Reiskin* (N.D. Cal. Oct. 10, 2018) No. 4:18-cv-01239-JSW, 2018 WL 7820727, at \*2 [quoting *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds* (8th Cir. 2008) 530 F.3d 724, 731].) These federal court decisions are consistent with California Code of Civil Procedure, section 526, subdivision (b)(4), which states that injunctions "cannot be granted . . . [t]o prevent the execution of a public statute by officers of the law for the public benefit." Because Petitioners are unlikely to prevail on the merits, they have not satisfied this elevated burden, and the Court should deny preliminary relief.

More, imposing preliminary relief against a lawful agency action undercuts state agencies' ability to enter into agreements to protect Californians and the environment. Here, OSFM was one of four state agencies that, alongside the United States and the University of California, entered into the Consent Decree with Plains. The Consent Decree was a judicially-approved agreement that resolved anticipated litigation and required Plains to pay substantial penalties and damages and to follow specified rules. Part of that bargain was that OSFM would review conditions and, if appropriate, issue waivers to Plains or its successor. If this Court imposes injunctive relief contrary to OSFM moving forward with its lawfully-assigned responsibilities, it would undercut OSFM's ability to enter into judicially-approved settlements like the Consent Decree. That would make OSFM an unreliable partner, undermining the ability of OSFM and, by extension other agencies, to enter into such agreements in the future.

If this Court concludes that OSFM acted lawfully but Petitioners have made a showing that other equitable considerations weigh in favor of preliminary relief, the Court should nonetheless reject their request for preliminary relief. If OSFM acted lawfully, it should not be made to suffer the irreparable injury of being unable to carry out the tasks assigned to it by the Legislature. The Court should not interject itself between an agency and its lawful duties.

## CONCLUSION

Petitioners have not shown they are entitled to preliminary relief. The Court should deny their requests for a stay or preliminary injunction and discharge the Order to Show Cause.

20

Dated:  July 7, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

MICHAEL S. DORSI
Deputy Attorney General
*Attorneys for Respondents and Defendants Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California; Daniel Berlant, in his official capacity as State Fire Marshal*

LA2025400847
44686737.docx

21

Response to Order to Show Cause re: Stay or Preliminary Injunction (25CV02244)

**DECLARATION OF SERVICE**

Case Names:    **CENTER FOR BIOLOGICAL DIVERSITY, et al. v. CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al.**

Case Nos.:    **25CV02244**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter.

On July 7, 2025, I served the attached:

- **RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.'S RESPONSE TO ORDER TO SHOW CAUSE RE: STAY OR PRELIMINARY INJUNCTION**
- **DECLARATION OF MICHAEL S. DORSI IN SUPPORT OF RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.'S RESPONSE TO ORDER TO SHOW CAUSE RE: STAY OR PRELIMINARY INJUNCTION**
- **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.'S RESPONSE TO ORDER TO SHOW CAUSE RE: STAY OR PRELIMINARY INJUNCTION**

by transmitting a true copy via electronic mail addressed as follows:

| | |
|---|---|
| Linda Krop<br>lkrop@environmentaldefensecenter.org<br>Jeremy M. Frankel<br>jfrankel@environmentaldefensecenter.org<br>Tara C. Rengifo<br>trengifo@environmentaldefensecenter.org<br>ENVIRONMENTAL DEFENSE CENTER | Julie Teel Simmonds<br>jteelsimmonds@biologicaldiversity.org<br>David Pettit<br>dpettit@biologicaldiversity.org<br>Talia Nimmer<br>tnimmer@biologicaldiversity.org<br>CENTER FOR BIOLOGICAL DIVERSITY |
| Moore, DJ djmoore@paulhastings.com<br>Hanelin, Benjamin J.<br>benjaminhanelin@paulhastings.com<br>Rogers, Natalie C.<br>natalierogers@paulhastings.com<br>PAUL HASTINGS LLP | Bolender, Brooke<br>Brooke.Bolender@alston.com<br>Jeffrey Dintzer jeffrey.dintzer@alston.com<br>ALSTON & BIRD |

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on July 7, 2025 at Los Angeles, California.

| | |
|---|---|
| E. Marshall | */s/ E. Marshall* |
| Declarant | Signature |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/7/2025 10:08 PM
By: Terri Chavez , Deputy

ROB BONTA
Attorney General of California
MYUNG PARK
Supervising Deputy Attorney General
MATTHEW BULLOCK (SBN 243377)
MICHAEL S. DORSI (SBN 281865)
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3802
  Fax:  (415) 703-5480
  E-mail:  Michael.Dorsi@doj.ca.gov
*Attorneys for Respondents and Defendants
Department of Forestry and Fire Protection, by and
through the Office of the State Fire Marshal, an
agency of the State of California; Daniel Berlant, in
his official capacity as State Fire Marshal*

EXEMPT FROM FILING FEES
PURSUANT TO GOVERNMENT
CODE SECTION 6103

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA BARBARA

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,**<br><br>                     **Petitioner and Plaintiff,**<br><br>v.<br><br>**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,**<br><br>               **Respondents and Defendants,**<br><br>**SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,**<br><br>               **Real Parties in Interest.** | Case No. 25CV02244<br><br>**DECLARATION OF MICHAEL S. DORSI IN SUPPORT OF RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.'S RESPONSE TO ORDER TO SHOW CAUSE RE: STAY OR PRELIMINARY INJUNCTION**<br><br>Date:       July 18, 2025<br>Time:      8:30 a.m.<br>Dept:      4<br>Judge:    Hon. Donna Geck<br><br>Trial Date:   Not Set<br>Action Filed: April 15, 2025<br><br>CONSISTENT WITH STIPULATION, THIS DOCUMENT, INCLUDING ITS EXHIBITS, IS FILED IN THIS MATTER AND THE RELATED CASE, NO. 25CV02247 |

1

I, Michael S. Dorsi, declare:

1. I am an attorney licensed to practice before all courts of the State of California. I am a Deputy Attorney General with the California Department of Justice, Office of the Attorney General, and am counsel for Respondents California Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California; and Daniel Berland, in his official capacity as State Fire Marshal (collectively CAL FIRE/OSFM).

2. I have personal knowledge of the facts asserted in this Declaration, and if called as a witness, I could and would competently testify to these facts. For each document attached to this Declaration, I confirmed with CAL FIRE/OSFM that the documents are authentic.

3. Attached to this Declaration as Exhibits 1 and 2 are true and correct copies of the State Waivers for the Las Flores Pipeline System, pipelines CA-324 and CA-325A/B, respectively.

4. Attached to this Declaration as Exhibit 3 is a true and correct copy of the Consent Decree entered in *United States, et al. v. Plains All American Pipeline, et al.,* United States District Court for the Central District of California, Case No. 2:20-cv-02415.

5. Exhibits 1–3 are available on CAL FIRE/OSFM's website titled *Pathways for Restarting CA-324 and CA-325*, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

6. Attached to this Declaration as Exhibit 4 are true and correct copies of selected pages from the 1985 Environmental Impact Report and Environmental Impact Statement by the State Lands Commission and the Bureau of Land Management. The complete document is available at https://cosantabarbara.app.box.com/s/p07x4k8ah41vmggyvm6qr2f7eqwvgwu1/file/1857839180492. I added pagination based on the PDF page numbers to assist in locating cited pages.

7. Attached to this Declaration as Exhibit 5 are true and correct copies of selected pages from the 1985 Environmental Impact Report and Environmental Impact Statement by the State Lands Commission and the Bureau of Land Management. This excerpt addresses the risks and potential responses to oil spills, and includes Table 4-24, showing estimated volumes of potential oil spills. The complete document is available at https://cosantabarbara.app.box.com/s/p07x4k8ah41vmggyvm6qr2f7eqwvgwu1/file/18578319638

2

36. The pages included in this Exhibit can be found at pages 420–427 of the linked .pdf document.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 7th Day of July, 2025.

MICHAEL S. DORSI
DEPUTY ATTORNEY GENERAL

***

**INDEX OF EXHIBITS**

Exhibit 1:  State Waiver for CA-324

Exhibit 2:  State Waiver for CA-325A/B

Exhibit 3:  Consent Decree
*United States, et al. v. Plains All American Pipeline, et al.,*
U.S. District Court for the Central District of California, Case No. 2:20-cv-02415

Exhibit 4:  1985 Final EIR-EIS (Selected Pages)
State Lands Commission and the Bureau of Land Management

Exhibit 5:  1985 Draft EIR-EIS (Selected Pages including Table 4-24)
State Lands Commission and the Bureau of Land Management

LA2025400847
44686736.docx

3

# Exhibit 1

Exhibit 1
to Declaration of
Michael S. Dorsi
dated July 7, 2025

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



## CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324)**

Operator:   Sable Offshore Corp
            OPID# 40851
            845 Texas Avenue, # 2920
            Houston, Texas 77002

Pipeline:   OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s.  At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   b.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

**In-Line Inspection (ILI) Assessment and Frequency**

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

   a)  Dates for integrity assessment

   b)  In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 6

segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

   c) In-line inspection tool vendor(s)

   d) Required tool specifications including operational specifications and anomaly sizing tolerances

   e) Tool validation methodology

   f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

   g) Criteria used to identify locations for excavation and field verification

   h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

   a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

   b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful.  All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different.  If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a.  Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b.  Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

Docusign Envelope ID: 87148E7A-FB76-4984-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

## 180-Day Repair Conditions[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Docusign Envelope ID: 87148E7A-FB76-4884-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    a.  Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 87148E7A-FB76-4984-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 11

     b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

     c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

     a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

     b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
   a. Technical approach used for the analysis
   b. All data used and analyzed
   c. Pipe and longitudinal weld seam properties
   d. Procedures used to implement state waiver conditions

Docusign Envelope ID: 87148E7A-ED76-4884-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 13

    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
    n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
    o. Safety factors used for fatigue life and/or predicted failure pressure calculations
    p. Reassessment time interval and safety factors
    q. The date of the review
    r. Confirmation of the results by qualified technical subject matter expert(s)
    s. Approval by responsible Sable management personnel
    t. Records of additional preventive and mitigative (P&M) measures performed
    u. Reports required by this State Waiver.

**<u>Reporting</u>**

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324*. The email notification shall include, if applicable:
    a. Tool type and run date
    b. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    c. Dig sheets
    d. Field contact information for Sable
    e. Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 14

    a. Tool type
    b. Run date
    c. Summary of Conditions Report[18]
    d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324*. At a minimum, the annual report shall contain the following, if applicable:

    a. A Closure Report for the previous calendar (CY) which contains:
        i. Features that were remediated in previous CY
            1. Provide documentation for the in-the-ditch assessments and repairs
        ii. Identify features that remain to be assessed
        iii. Unity Plots for previous ILI runs
    b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
    c. The third-party ILI expert reviews in accordance with Condition 52
    d. AC and DC Interference surveys that are due in accordance with Condition 53
    e. A copy of the CGRA for prior year including:
        i. Mean corrosion growth rate for the pipeline
        ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.

63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.

64. The OSFM may order the pipeline shutdown at any time.

65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 15

failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Tuan Tran, Pipeline Safety Engineer, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Max Kieba, Engineering and Research Division, PHMSA
       Joshua Johnson, Engineering and Research Division, PHMSA

# Exhibit 2

Exhibit 2
to Declaration of
Michael S. Dorsi
dated July 7, 2025

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



## CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A/B)**

**Operator:**    Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**Pipeline:**    OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Docusign Envelope ID: 166BEEF3-241E-476E-8B10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 4

8. Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
   a. API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
   b. API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.
   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Docusign Envelope ID: 166BEFF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 5

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b.  All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.
13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.
14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours.  Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b.  All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.
15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.
16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.
17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.
18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 6

## In-Line Inspection (ILI) Assessment and Frequency

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination

20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 7

any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful.  All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.
    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.
    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.  Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 166BEFF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

Lance Yearwood
December 17, 2024
Page 13

    n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

    o. Safety factors used for fatigue life and/or predicted failure pressure calculations

    p. Reassessment time interval and safety factors

    q. The date of the review

    r. Confirmation of the results by qualified technical subject matter expert(s)

    s. Approval by responsible Sable management personnel

    t. Records of additional preventive and mitigative (P&M) measures performed

    u. Reports required by this State Waiver.

## Reporting

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification*.[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B*. The email notification shall include, if applicable:

    d. Tool type and run date

    e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

    f. Dig sheets

    g. Field contact information for Sable

    h. Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:

    i. Tool type

    j. Run date

    k. Summary of Conditions Report[18]

    l. Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B*. At a minimum, the annual report shall contain the following, if applicable:

a. A Closure Report for the previous calendar (CY) which contains:
   i. Features that were remediated in previous CY
      1. Provide documentation for the in-the-ditch assessments and repairs
   ii. Identify features that remain to be assessed
   iii. Unity Plots for previous ILI runs
b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
c. The third-party ILI expert reviews in accordance with Condition 53
d. AC and DC Interference surveys that are due in accordance with Condition 54
e. A copy of the CGRA for prior year including:
   i. Mean corrosion growth rate for the pipeline
   ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 15


Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Tuan Tran, Pipeline Safety Engineer, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Max Kieba, Engineering and Research Division, PHMSA
        Joshua Johnson, Engineering and Research Division, PHMSA

# Exhibit 3

Exhibit 3
to Declaration of
Michael S. Dorsi
dated July 7, 2025

Case 2:26-cv-05242-SVW-SSC   Document 22   Filed 05/14/26   Page 60 of 501   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 1 of 102   Page ID #:94
ID #:10285

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br> Plaintiffs, <br><br> v. <br><br> PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P., <br><br> Defendants. | Civil Action No. <br><br> 2:20-cv-02415 <br><br> **CONSENT DECREE** |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast Regional Water Quality Control Board, and California Department of Forestry and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

Case 2:26-cv-05242-GVW-SSC   Document 22-3   Filed 05/14/26   Page 62 of 501   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 3 of 102   Page ID #:96
ID #:10287

**TABLE OF CONTENTS**

I.      BACKGROUND ............................................................................... - 5 -

II.     JURISDICTION AND VENUE .......................................................... - 6 -

III.    APPLICABILITY ............................................................................ - 7 -

IV.     DEFINITIONS ................................................................................. - 7 -

V.      CIVIL PENALTIES ......................................................................... - 13 -

VI.     NATURAL RESOURCE DAMAGES ............................................... - 17 -

VII.    TRUSTEES' MANAGEMENT AND APPLICABILITY

        OF JOINT NRD FUNDS ................................................................. - 21 -

VIII.   TRUSTEES' MANAGEMENT OF RECREATIONAL

        USE FUNDS .................................................................................... - 22 -

IX.     INJUNCTIVE RELIEF ..................................................................... - 23 -

X.      CORRECTIVE ACTION ORDER ..................................................... - 27 -

XI.     STIPULATED PENALTIES .............................................................. - 27 -

XII.    FORCE MAJEURE .......................................................................... - 35 -

XIII.   DISPUTE RESOLUTION ................................................................. - 37 -

XIV.    REPORTING .................................................................................... - 39 -

XV.     CERTIFICATION ............................................................................ - 40 -

XVI.    INFORMATION COLLECTION AND RETENTION ....................... - 40 -

XVII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ........... - 43 -

XVIII.  TRANSFER AND ACQUISITION OF ASSETS .............................. - 49 -

XIX.    COSTS ............................................................................................. - 50 -

XX.     NOTICES ......................................................................................... - 51 -

XXI.    EFFECTIVE DATE .......................................................................... - 54 -

XXII.   RETENTION OF JURISDICTION ................................................... - 54 -

XXIII.  MODIFICATION ............................................................................. - 54 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

XXIV.    TERMINATION ............................................................................................- 55 -

XXV.     PUBLIC PARTICIPATION.........................................................................- 56 -

XXVI.    SIGNATORIES/SERVICE ..........................................................................- 56 -

XXVII.   INTEGRATION ...........................................................................................- 57 -

XXVIII. FINAL JUDGMENT......................................................................................- 57 -

XXIX.    26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION .................- 57 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

A.     WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline known as the Line 901 pipeline ("Line 901") owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P., (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County, California.  A portion of the oil reached the Pacific Ocean and coastal areas such as Refugio State Beach.  The Refugio Incident adversely impacted Natural Resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and the State of California ("California" or the "State").

B.     WHEREAS, cleanup actions began immediately after the Refugio Incident at the direction of a Unified Command established by the United States Coast Guard ("USCG") and the State of California Department of Fish and Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR").  The Unified Command was comprised of the United States, State agencies, the County of Santa Barbara, and Plains.

C.     WHEREAS, on May 21, 2015, the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No. 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO").  The PHMSA CAO directed Plains, among other things, to purge Line 901 and a portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota and Pentland pump stations, and to keep Line 901 and the purged sections of Line 903 shut down until the actions required by the PHMSA CAO were satisfactorily completed.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 1 -

Case 2:26-cv-05242-SVW-SSC   Document 22   Filed 05/14/26   Page 65 of 501   Page
Case 2:20-cv-02413   Document 6-1   Filed 03/13/20   Page 6 of 102   Page ID #:95
ID #:10290

D.      WHEREAS, on May 19, 2016, PHMSA issued a Failure Investigation Report, which included PHMSA's findings of the "proximate or direct" causes and the "contributing" causes of the Refugio Incident.

E.      WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs arising from the Refugio Incident.

F.      WHEREAS, CDFW incurred certain additional costs arising from the administration and civil enforcement of pollution laws, including attorneys' fees that have been reimbursed by Plains.

G.      WHEREAS, Plains represents that it has implemented and will continue to utilize an electronic tracking tool and software for maintenance activities, including those activities related to mainline valves.  The software tracks which maintenance activities are performed, who performs the activity, when prior notifications of maintenance activities by field personnel are received, when problems requiring maintenance are first discovered, and when maintenance problems are corrected.  Plains maintains a separate software program to track the training and qualifications of all maintenance personnel.

H.      WHEREAS, Plains represents that, following the Refugio Incident and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its Emergency Response Plan and Training Program, and revised and updated its Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield District Response Zone Plan") to reflect modifications resulting from the review and the incorporation of lessons learned.  As part of the revision, Plains identified the locations of culverts along the pipelines' rights-of-way and provided containment and recovery techniques for responding to spills that may occur near those culverts.  Plains provided drafts of the updated Bakersfield District Response Zone Plan to PHMSA, incorporated comments provided by PHMSA, and received approval of the revised plan from PHMSA on September 26, 2017.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 2 -

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 66 of 501   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 76 of 1029   Page ID #:100
ID #:10291

I.        WHEREAS, Plains represents that it also created a more detailed Geographic Information System ("GIS") based online Tactical Response Plan for its onshore oil pipelines in Southern California, including Line 2000 and the operational portion of Line 903, that, among other things, identifies culverts along the pipelines' rights-of-way, potential receptors and the equipment, supplies and resources that would be necessary to respond to a spill occurring at any given location along those pipelines, identifies the sources and locations for obtaining those resources, and, in some instances, establishes stored inventories of those resources in specific locations.  Plains represents that it intends to keep its Tactical Response Plan updated and available for use in drills and spill response, and that it will make the Tactical Response Plan available to the Plaintiffs upon reasonable request and as needed in connection with a drill or response to a spill.

J.        WHEREAS, Plains represents that Plains personnel responding to incidents that trigger the standup of an incident command structure ("ICS") have been provided ICS training appropriate to their responsibilities.

K.        WHEREAS, the relevant Natural Resources trustees ("Trustees") for the Refugio Incident are the United States Department of the Interior ("DOI"); United States Department of Commerce, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"); CDFW; California Department of Parks and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and The Regents of the University of California ("UC").

L.        WHEREAS, pursuant to Section 1006 of the Oil Pollution Act (''OPA''), 33 U.S.C. 2701, *et seq*., the United States and the State Trustees allege that oil from the Refugio Incident caused injuries to Natural Resources, including birds, marine mammals, shoreline and subtidal habitats, and also had an impact upon human uses of Natural Resources and other public resources. The Federal Trustees are designated pursuant to the National Contingency Plan,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 3 -

40 C.F.R. § 300.600 and Executive Order 12777.  CDFW and CDPR are designated state trustees pursuant to the National Contingency Plan, 40 C.F.R. § 300.605, and the Governor's Designation of State Natural Resource Trustees pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980.  In addition, CDFW has state natural resource trustee authority pursuant to California Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (California Government Code § 8670.1 *et seq*.).  CDPR and UC have jurisdiction over natural resources within the state park system and the UC Natural Reserve System, respectively, which are held in trust for the people of the State of California.  CSLC is a state trustee pursuant to its jurisdiction under Public Resources Code § 6301 and Civil Code § 670.

M.     WHEREAS, after the Refugio Incident, the Trustees and Defendants entered into a cooperative Natural Resource Damage Assessment process pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and independently planned and conducted a number of injury assessment activities. These activities included gathering and analyzing data and other information that the Trustees used to determine and quantify resource injuries and damages.  As a result of this process and other activities, the Trustees identified several categories of injured and damaged Natural Resources, including birds, marine mammals, and shoreline and subtidal habitats, as well as effects to human use/recreation resulting from impacts on these Natural Resources, and determined the cost to restore, rehabilitate, replace, or acquire the equivalent of injured Natural Resources.  By entering this Consent Decree, Defendants do not admit or agree that the Trustees' NRD findings and determinations are accurate.

N.     WHEREAS, due to the specific facts surrounding the Refugio Incident, including the timing, degree, and nature of the spill and the affected

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 4 -

environment, the Trustees will not seek additional damages, costs, or expenses for Natural Resources resulting from the Refugio Incident.

O.      WHEREAS, Plains agrees to reimburse costs incurred by the Trustees in connection with the NRDA through November 15, 2018, and will not reimburse costs incurred by the Trustees in connection with the NRDA after that date.

P.      WHEREAS, by entering into this Consent Decree, Plains does not admit the allegations in the Complaint filed in this action, or any liability to the Plaintiffs.

Q.      WHEREAS, on January 28, 2019, PHMSA initiated a regularly-scheduled "Integrated Inspection" of a portion of Defendants' Regulated Pipelines, as described below, and other pipeline facilities and records, pursuant to 49 U.S.C. § 60117.

R.      WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

S.      WHEREAS, the Parties agree and the Court by entering this Consent Decree finds, that this Consent Decree: (1) has been negotiated by the Parties at arm's-length and in good faith; (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws.

## I.      BACKGROUND

The United States, on behalf of PHMSA, the United States Environmental Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California Central Coast Regional Water Quality Control Board ("RWQCB"), and the California Department of Forestry and Fire Protection's - Office of the State Fire

Case 2:26-cv-05242-SVW-SSC Document 23-1 Filed 05/14/26 Page 69 of 501 Page
ID #:10294
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 10 of 102 Page ID #:1039

Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and associated regulations and orders; OPA, 33 U.S.C. §§ 2701 *et seq.*, and associated regulations and orders; the federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq.*, and associated regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, California Government Code §§ 8670.1 *et seq.* and associated regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016, 13013; California Water Code §§ 13350, 13385; and the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.* The Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks penalties, injunctive relief, and Natural Resource Damages.

NOW, THEREFORE, before the trial of any claims and without adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.    JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and 60122; and 28 U.S.C. §§ 1331, 1345, and 1355.  This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367.  To the extent the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the United States and the State Agencies have satisfied the requirement.

2.      Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws, 49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 6 -

does business in this District and the alleged claims occurred in this District.

3.      For purposes of this Consent Decree or any action to enforce this Consent Decree, Defendants consent to the Court's jurisdiction over this Consent Decree for such action and Defendants consent to venue in this judicial district. For purposes of this Consent Decree and without admission of liability, Defendants agree that the Complaint states claims upon which relief may be granted.

### III.   APPLICABILITY

4.      Subject to the terms herein, the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree.

5.      Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained for the purpose of performing work required under this Consent Decree.  Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree by specifying that contractors are obligated to perform work in compliance with this Consent Decree.

6.      In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### IV.   DEFINITIONS

7.      Terms used in this Consent Decree that are defined in the CWA, OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 7 -

Case 2:26-cv-05242-SVW-SSC   Document 23-1   Filed 05/14/26   Page 71 of 501   Page
ID #:10296
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 12 of 102   Page ID #:1059

have the meanings assigned to them in these statutes and their regulations, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Appendix A" is the set of maps that generally depict Lines 901, 903, and 2000;

"Appendix B" is the Injunctive Relief that Plains is required to perform under this Consent Decree;

"Appendix C" is intentionally left blank;

"Appendix D" is the list of remaining corrective actions from the PHMSA CAO that Plains is still required to implement under this Consent Decree.  For the terms of the PHMSA CAO, *see* https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H.html?nocache=4888#_TP_1_tab_1;

"CDFW" shall mean the California Department of Fish and Wildlife and any of its successor departments or agencies;

"CDPR" shall mean the California Department of Parks and Recreation and any of its successor departments or agencies;

"Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

"Consent Decree" shall mean this Consent Decree and all Appendices attached hereto;

"Control Room Management Plan" shall mean Plains' Control Room Management Plan, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"Control Center General Procedures" shall mean Plains' Control Center General Procedures, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"CSLC" shall mean the California State Lands Commission and any of its successor departments or agencies;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 8 -

Case 2:26-cv-05242-SVW-SSC Document 23-1 Filed 05/14/26 Page 72 of 501 Page
ID #:10297
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 73 of 102 Page ID #:1069

"Day" shall mean a calendar day unless expressly stated to be a working day. In computing any period of time under this Consent Decree, the rules set forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

"Defendants" shall mean Plains All American Pipeline, L.P. and Plains Pipeline, L.P.;

"Delivery Lines" as stated in Appendix B shall mean any pipeline that generally operates to move oil from a delivery meter on a pipeline or facility to another pipeline or facility in close proximity;

"DOI" shall mean the United States Department of the Interior, including its bureaus and agencies, and any of its successor departments or agencies;

"Elder California Pipeline Safety Act" shall mean the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXI (Effective Date);

"Federal Trustees" shall mean DOI and NOAA in their capacities as Natural Resource Trustees;

"Integrity Management Plan" or "IMP" shall mean Plains' Integrity Management Plan, dated September 2019, as delivered to PHMSA by letter dated November 19, 2019, from counsel for Defendants;

"Line 901" is Defendants' 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California, as generally depicted in Appendix A;

"Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends approximately 129 miles in length from the Gaviota Pump Station in Santa Barbara County, California to the Emidio Pump Station in Kern County,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 9 -

California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland Mile Post 114.57, as generally depicted in Appendix A;

"Line 2000" is Defendants' 20-inch diameter pipeline that extends approximately 130 miles in length and transports crude-oil produced in the outer continental shelf and the San Joaquin Valley.  Line 2000 runs from Bakersfield, California, over the Tehachapi Mountains and through the Grapevine I-5 corridor and extends to delivery locations in the Los Angeles metropolitan area, as generally depicted in Appendix A;

"Mainline pipeline" as stated in Appendix B shall mean the principal pipeline or the parallel pipeline in a given pipeline system, excluding connected lateral lines or branch lines that are used locally to deliver product either into the mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a third-party line;

"Natural Resource" and "Natural Resources" shall mean land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and/or the State or any subdivision thereof, and shall also mean the services provided by such resources to other resources or to humans;

"Natural Resource Damages" or "NRD" shall mean all damages, including restoration or rehabilitation costs, recoverable by the United States or State Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources including any services such natural resources provide, including the reasonable costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A), resulting from the Refugio Incident;

"Natural Resource Damage Assessment" or "NRDA" shall mean the process of collecting, compiling, and analyzing information, statistics, or data through prescribed methodologies to determine damages for injuries to Natural

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 10 -

Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 15 of 102   Page ID #:10299

Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio Incident;

"NRD Payment" shall mean the payment Defendants are required to pay for the Natural Resource Damages as described in Section VI (Natural Resource Damages);

"Natural Resource Trustees" or "Trustees" are those federal and state agencies or officials designated or authorized pursuant to the CWA, OPA, and/or applicable state laws to act as Trustees for the Natural Resources belonging to, managed by, controlled by, or appertaining to the United States or the State. Participating Trustees in the Natural Resource Damage Assessment and in this Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

"NOAA" shall mean the National Oceanic and Atmospheric Administration and any of its successor departments or agencies;

"Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the fund established pursuant to 26 U.S.C. § 9509, including the claim-reimbursement provisions set forth in 33 U.S.C. § 2712;

"OSFM" shall mean the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal and any of its successor departments or agencies;

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

"Parties" shall mean the Plaintiffs and Defendants, collectively;

"PHMSA" shall mean the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration and any of its successor departments or agencies;

"PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the Original CAO issued on May 21, 2015, by PHMSA, which was subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016;

"Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq*., and regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

"Plaintiffs" shall mean the United States and the State Agencies;

"Refugio Incident" shall mean the release of approximately 2,934 barrels of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California on or about May 19, 2015;

"Regulated Pipeline" shall mean any pipeline operated by Plains subject to regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div. 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

"Requests for Information" or "RFI" shall mean PHMSA's RFIs dated August 19, 2015, August 21, 2015, and September 1, 2016.  RFIs shall also refer to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

"Restore" or "Restoration" shall mean any action or combination of actions to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including Natural Resource-based recreational opportunities that were injured, lost, or destroyed as a result of the Refugio Incident;

"RWQCB" shall mean the California Central Coast Regional Water Quality Control Board and any of its successor departments or agencies;

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

"Segment" as stated in Appendix B shall mean any contiguous portion of a pipeline system for which a single hydrostatic test or ILI may be performed, as determined by Defendants;

"State Agencies" shall mean the People of the State of California, *Ex Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC.  The State Agencies do not include any entity or political subdivision of the State of California other than those agencies herein designated the "State Agencies";

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 12 -

Case 2:26-cv-05242-SVW-SSC    Document 23-1    Filed 05/14/26    Page 76 of 501   Page
ID #:10301
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 17 of 102   Page ID #:1109

"State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their capacities as Natural Resource Trustees;

"United States" shall mean the United States of America, on behalf of PHMSA, EPA, DOI, NOAA, and USCG;

"UC" shall mean The Regents of the University of California and any of its successor departments or agencies; and

"USCG" shall mean the United States Coast Guard and any of its successor departments or agencies.

## V.   CIVIL PENALTIES

A.     Within thirty (30) Days after the Effective Date, Defendants shall pay to the United States, CDFW, and RWQCB a total civil penalty of twenty-four million dollars ($24,000,000), together with interest accruing from the date on which the Consent Decree is lodged with the Court, at a rate specified in 28 U.S.C. § 1961 (the "Penalty Payment").  The Penalty Payment shall be allocated as follows:

8.     Penalty Payment to the United States (PHMSA).  For violations of the Pipeline Safety Laws alleged in the United States' Complaint, Defendants shall pay to the United States a civil penalty of fourteen million five hundred thousand dollars ($14,500,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made as follows:

a.     Thirteen million two hundred fifty thousand dollars ($13,250,000) attributed to Plains' alleged Pipeline Safety Law violations; and

b.     One million two hundred fifty thousand dollars ($1,250,000) attributed to Plains' alleged non-compliance with the RFIs.

c.     Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants by the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 13 -

Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California Western Division after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Megan Prout
> Senior Vice President
> Commercial Law and Litigation
> Plains All American Pipeline, L.P.
> 333 Clay Street, Suite 1600
> Houston, TX 77002

on behalf of Defendants. Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XX (Notices).

d. At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state the payment is for the civil penalty owed pursuant to this Consent Decree in the *United States of America and the People of the State of California v. Plains All American Pipeline, L.P., et al.*, and shall reference the Civil Action Number assigned to this case, CDCS Number, and DOJ case number 90-5-1-1-11340, to the United States in accordance with Section XX (Notices).

9. Penalty Payment to the United States (EPA) shared with CDFW and RWQCB. The Penalty Payment shall be allocated as follows:

a. As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 14 -

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

1) To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Wildlife
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money as follows: one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

2) To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 15 -

> State Water Resources Control Board
> Division of Administrative Services, ATTN: Civil
> Liability Payment
> P.O. Box 1888
> Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3)      To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division.  Such monies are to be deposited in the OSLTF.  The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8).  Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day.  Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 16 -

Case 2:26-cv-05342-SVW-SSC Document 23/13 Filed 05/14/26 of Page 80 of 501 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 21 of 102 Page ID #:1149
ID #:10305

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

and

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center
U.S. Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, D.C. 20593-7605

10.     Penalty Payment to be Paid to CDFW.  For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife.  The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California  95816-0362

The check shall reference the "Refugio Oil Spill."  CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11.     Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI.   NATURAL RESOURCE DAMAGES

12.     Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 17 -

Case 2:26-cv-05242-SVW-SSC    Document 23-1    Filed 05/14/26    Page 81 of 501   Page
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 22 of 102   Page ID #:1159
ID #:10306

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961.  The NRD Payment shall be allocated as follows:

> a.      To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment.  Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds).  Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

> > Department of the Interior
> > Natural Resource Damage Assessment and
> >      Restoration Program
> > Attention:  Restoration Fund Manager
> > 1849 "C" Street, N.W. Mail Stop 4449
> > Washington, D.C.  20240

> The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198.  DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05342-SVW-SSC    Document 23-1    Filed 05/14/26    Page 82 of 501   Page
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 23 of 102   Page ID #:1109
ID #:10307

b.      To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund.  Payment shall be made by check payable to the California Department of Parks and Recreation.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> The California Department of Parks and
>        Recreation
> Attn:  Laura Reimche, Senior Counsel
> 1416 Ninth Street, Room 1404-6
> Sacramento, California  95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund.  CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident.  CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c.      To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF.  Payment shall be made by check payable to the National Fish and Wildlife Foundation.  At the time of payment, Defendants shall simultaneously send written

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 19 -

Case 2:26-cv-05242-SVW-SSC Document 23/1 Filed 05/14/26 of Page 83 of 501 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 24 of 102 Page ID #:1179
ID #:10308

notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Game
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the California South Coast Shoreline Parks and Outdoor Recreational Use Account. The California South Coast Shoreline Parks and Outdoor Recreational Use Account shall be managed in accordance with the South Coast Shoreline Parks and Outdoor Recreational Use Account Memorandum of Agreement among the State Trustees and NFWF and shall be used by the Trustees for the purposes set forth in Section VIII (Trustees' Management of Recreational Use Funds).

d.    To UC, twenty-six thousand dollars ($26,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into Natural Reserve System Account. Payment shall be made by check payable to The Regents of the University of California. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 22   Filed 05/14/26   Page 84 of 501   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 25 of 102   Page ID #:1109
ID #:10309

The Regents of the University of California
Attn:  Michael Kisgen, Associate Director
Natural Reserve System
University of California, Office of the President
1111 Franklin Street, 6th Floor
Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account.  The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees.  The projects shall address the research, education, and outreach missions of the University of California.  UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13.     The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants.  To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII.  TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14.     DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident.  DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15.     DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 21 -

Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 26 of 102 Page ID #:10310

Subaccount, including return on investments or accrued interest, subject to the provisions of this Consent Decree.

16. The Natural Resource Trustees commit to the expenditure of the funds set forth in Paragraph 12 for the design, implementation, permitting (as necessary), monitoring, and oversight of Restoration projects and for the costs of complying with the requirements of the law to conduct a Restoration planning and implementation process. The Natural Resource Trustees will use the funds to Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including lost human use of such services, injured, lost, or destroyed as a result of the Refugio Incident and for the administration and oversight of these Restoration projects.

17. The specific projects or categories of projects will be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which public notice, opportunity for public input, and consideration of public comment will be provided. Plains shall have no responsibility nor liability for implementation of the Restoration Plan or projects relating to the Refugio Incident, including any future project costs other than the payments set forth in Section VII herein. The Trustees jointly retain the ultimate authority and responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD Subaccount to Restore Natural Resources in accordance with applicable law, this Consent Decree, and any memorandum or other agreement among them.

## VIII. TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

18. CDPR shall allocate the monies paid pursuant to Paragraph 12 for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

19. The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20. UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX. INJUNCTIVE RELIEF

21. Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22. <u>Material Changes to Plains' IMP</u>.

a. Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree. Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

1) Procedure for the Assessment of In-Line Inspection ("ILI") Results;

2) Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

3) White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 23 -

Case 2:26-cv-05242-SVW-SSC    Document 23-1    Filed 05/14/26    Page 87 of 501   Page
ID #:1249
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 28 of 102   Page ID #:10312

> 4) Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"
>
> 5) Section 11.4, "Documentation of P&M Evaluation Meetings;" and
>
> 6) Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b. At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s). In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c. In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d. In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Days.  Following the notice period specified in Subparagraphs 22.b and 22.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII.  Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

23.     Material Changes in Control Room Management Plan and Control Center General Procedures.

a.      Plains' Control Room Management Plan and Control Center General Procedures (collectively, "Control Center Plan and Procedures") shall serve as the baseline Control Center Plan and Procedures for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4, 9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0, and 500-12 of its Control Center General Procedures throughout the term of this Consent Decree without following the process set forth in this Paragraph.  For purposes of this Paragraph, the term "material change" refers to any substantive modification in the Control Center Plan and Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.      At least thirty (30) Days prior to making a material modification to the above sections of  its Control Room Management Plan and Control Center General Procedures, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 23-1    Filed 05/14/26    Page 89 of 501   Page
ID #:1299
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 30 of 102   Page ID #:10314

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

c.      In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.      In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days.  Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24.    Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals.  Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

## X.    CORRECTIVE ACTION ORDER

25.    Upon the Effective Date of this Consent Decree, the PHMSA CAO shall close and be of no further force or effect.  All outstanding terms and obligations under the PHMSA CAO as of the Effective Date and which Plains is still required to implement under this Consent Decree are set forth in Appendix D.

## XI.    STIPULATED PENALTIES

26.    Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below.  A violation includes failing to perform any obligation required by the terms of this Consent Decree according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

27.    <u>Late Payment of Civil Penalties and NRD Payment</u>.

a.    If Defendants fail to pay any portion of the Penalty Payment to the United States required under Section V (Civil Penalties) when due, Defendants shall pay to the United States a stipulated penalty of ten thousand dollars ($10,000) per Day for each Day payment is late.

b.    If Defendants fail to pay any portion of the Penalty Payment to the CDFW and/or RWQCB as required under Section V (Civil Penalties) when due, Defendants shall pay to the CDFW and/or RWQCB a stipulated penalty of ten thousand dollars ($10,000) each, as applicable, per Day for each Day payment is late.

c.    If Defendants fail to pay any portion of the NRD Payments

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 27 -

required under Section VI (Natural Resource Damages) when due, Defendants shall pay a stipulated penalty of five thousand dollars ($5,000) to the United States, and five thousand dollars ($5,000) to the State Trustees, per Day for each Day payment is late.

28. <u>Stipulated Penalties for Non-Performance of Injunctive Relief</u>. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section IX (Injunctive Relief) when due:

    a.    For failure to timely submit to OSFM the applications for State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of Appendix B;

    b.    For failure to implement the Integrity Management provisions as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix B;

    c.    For failure to timely submit to OSFM the EFRD analyses as specified in paragraphs 5.A-5.B of Appendix B;

    d.    For failure to timely submit to OSFM the risk analysis as specified in paragraph 6.A of Appendix B;

    e.    For failure to timely submit to PHMSA the modified Section 9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

    f.    For failure to timely submit to PHMSA the modified P&M Recommendation forms, as specified in paragraph 9.B of Appendix B;

    g.    For failure to timely conduct EFRD analyses for all Regulated Pipelines for which Plains has not previously conducted an EFRD analysis, as specified in paragraph 10.A of Appendix B;

Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 33 of 102 Page ID #:10317

h.      For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i.      For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j.      For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k.      For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l.      For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m.      For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n.      For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o.      For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p.      For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q.      For failure to timely conduct the surveys and update the

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 29 -

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r.      For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s.      For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t.      For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u.      For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v.      For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w.      For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x.      For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y.      The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 30 -

Case 2:26-cv-05242-SVW-SSC Document 23-1 Filed 05/14/26 Page 94 of 501 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 35 of 102 Page ID #:1269
ID #:10319

29. <u>Stipulated Penalties for Non-Compliance with Corrective Action Order Terms.</u> Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section X (Corrective Action Order) when due:

a. For operation of Line 901 in violation of paragraph 1.a of Appendix D;

b. For failure to timely submit to OSFM a Line 901 Restart Plan, as specified by paragraph 1.b of Appendix D;

c. For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 901 specified by paragraphs 1.c and 1.d of Appendix D;

d. For operation of Line 903, in violation of paragraph 1.e of Appendix D;

e. For failure to timely submit to OSFM a Line 903 Restart Plan, as specified by paragraph 1.f of Appendix D;

f. For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 903 specified by paragraphs 1.g and 1.h of Appendix D;

g. For failure to timely submit to OSFM any notification specified by paragraph 1.i of Appendix D; and

h. For failure to submit to OSFM a final Appendix D Documentation Report, as specified by paragraph 1.j of Appendix D.

i. The penalties stipulated in this Section shall accrue as follows:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30. Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31. For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32. For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33. For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34. For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

a.      Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b.      Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c.      Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d.      If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35.     For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36.     For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties).  Any

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 23-1 Filed 05/14/26 Page 97 of 501 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 38 of 102 Page ID #:1319
ID #:10322

transmittal correspondence shall state that payment is for stipulated penalties and shall identify the date of the written demand to which the payment corresponds.

37. Stipulated penalties under this Section shall begin to accrue on the Day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed, or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

38. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

39. The applicable State Agencies may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to the applicable State Agencies under this Consent Decree.

40. Stipulated penalties shall continue to accrue as provided in Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid until the following:

       a. If the dispute is resolved by agreement or by a decision of the United States or the State Agencies, as applicable, that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States or the State Agencies, as applicable, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or the State Agencies' decision.

       b. If the dispute is appealed to the Court and the Plaintiffs prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 34 -

c.      If any Party appeals the Court's decision and a Plaintiff prevails in whole or in part, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

41.     If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State Agencies from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

42.     The payment of stipulated penalties, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

43.     Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State Agencies (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offsets measures, and/or contempt) for Defendants' violation of this Consent Decree or applicable laws.

## XII.   FORCE MAJEURE

44.     "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 35 -

Case 2:26-cv-05242-SVW-SSC Document 23-1 Filed 05/14/26 Page 99 of 501 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 40 of 102 Page ID #:1339
ID #:10324

potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

45. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants first knew that the event might cause a delay. Within ten (10) Days thereafter, Defendants shall provide in writing to such Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendants shall provide with any notice the documentation that Defendants are relying on to support the claim that the delay was attributable to a Force Majeure event. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

46. If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 36 -

Plaintiffs for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation.  Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47.     If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

48.     If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XIII (Dispute Resolution), in response to Plaintiffs' determination in Paragraph 47 above, it shall do so no later than thirty (30) Days after receipt of Plaintiffs' notice.  In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 44 and 45.  If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to Plaintiffs and the Court.

## XIII.  DISPUTE RESOLUTION

49.     Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by Plaintiffs to enforce any obligation of Defendants arising under this Consent

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 37 -

Decree.

50. <u>Informal Dispute Resolution</u>. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendants send the relevant Plaintiff(s) a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement. If the parties cannot resolve a dispute by informal negotiations, then the position advanced by Plaintiffs shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Defendants invoke formal Dispute Resolution procedures as set forth below.

51. <u>Formal Dispute Resolution</u>. Defendants shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on Plaintiffs a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

52. Plaintiffs shall serve their Statement of Position within forty-five (45) Days of receipt of Defendants' Statement of Position. Plaintiffs' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Plaintiffs. Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

53. Defendants may seek judicial review of the dispute by filing with the Court and serving on the relevant Plaintiff(s), in accordance with Section XX (Notices), a motion requesting judicial resolution of the dispute. The motion

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 38 -

Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 48 of 102   Page ID #:136

must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54.    Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or by a schedule set by the Court. Defendants may file a reply memorandum to the extent permitted by the Local Rules.

55.    Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 51, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree, based on the Statements of Position, and under applicable standards of review.

56.    The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue until the final resolution of the dispute.  Payment shall be stayed pending resolution of the dispute.  If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV.  REPORTING

57.    After the Effective Date, by March 31 and September 30 of the following years until termination of this Consent Decree per Section XXIV (Termination), Defendants shall submit to the Plaintiffs in accordance with Section XX (Notices) bi-annual reports that shall describe the status of Defendants' compliance with the Consent Decree, including implementation of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

the injunctive relief requirements set forth in Appendices B and D. The report will be organized to show the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement.

## XV.  CERTIFICATION

58.    Each report submitted by Defendants under Section XIV (Reporting) shall be signed by either the Chief Executive Officer, the President, an Executive Vice President, a Senior Vice President, or General Counsel who is an authorized representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on any personal knowledge and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XVI.  INFORMATION COLLECTION AND RETENTION

59.    Plaintiffs and their representatives shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times and upon reasonable notice, upon presentation of credentials, to:

a.    monitor the progress of activities required under this Consent Decree;

b.    verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

c. obtain documentary evidence, including photographs and similar data; and

d. assess Defendants' compliance with this Consent Decree.

60. Until one (1) year after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve or deliver to Plains, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree. At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

61. This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Agencies pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

62. For any documents, records, or other information required to be submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim of business confidentiality or other protections applicable to the release of information by Plaintiffs, covering part or all of the information required to be submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2. Plains must mark the claim of confidentiality in writing on each page, and include a statement specifying the grounds for each claim of confidentiality.

63. The federal agency Plaintiffs are subject to applicable laws

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 41 -

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 105 of 501    Page
Case 2:20-cv-02415    Document 6-1    Filed 03/15/20    Page 46 of 102    Page ID #:139
ID #:10330

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq*.). If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality. In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64. For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65. State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq*.). If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records. If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66. The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only. Defendants shall produce all documents required

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 42 -

Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 47 of 102   Page ID #:140

to be produced in connection with this Consent Decree in, at Defendants' option, either native format via electronic media or secure file transfer protocol ("FTP"). Any encryption or access restriction shall be on a container level only, *i.e.*, only the electronic media or the top-level folder containing the documents shall be encrypted and Plaintiffs shall have unrestricted access to the files/folders within the electronic media or the top-level folder without need for additional decryption or access codes.  Regardless of production method or encryption, individual documents shall be produced in a manner that allows the Plaintiffs to view, print, copy, save, download, and share each document within Plaintiffs' own environment without restriction, tracking or monitoring by Defendants, or automatically generated changes to the document (*e.g.*, without entering access codes prior to each download, and without automatically generated watermarks stating the download date and time).

67.    At the conclusion of the information-retention period, Defendants shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of internal document destruction policies for documents, records, or other information subject to the requirements of Paragraph 60.

68.    [*Intentionally left blank.*]

## XVII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69.    This Consent Decree resolves the civil claims of the United States and the State Agencies for the matters alleged in the Complaint filed in this action for the Refugio Incident.

70.    Subject to the reservations of rights specified in Paragraph 71, this Consent Decree also resolves all civil and administrative penalty claims that could be brought by PHMSA, for violations of the Pipeline Safety Laws specified below that occurred on any of Defendants' Regulated Pipelines prior to January 28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of Defendants' Regulated Pipelines and other pipeline facilities began.  The specific

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

    a.    49 C.F.R. Part 194 Subpart B – Response Plans;

    b.    49 C.F.R. Part 195 Subpart B – Reporting;

    c.    49 C.F.R. Part 195 Subpart E – Pressure Testing;

    d.    49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

    e.    49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

    f.    49 C.F.R. Part 195 Subpart H – Corrosion Control;

    g.    49 C.F.R. Part 199 – Drug and Alcohol Testing; and

    h.    All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71.    The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72.    This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 49 of 102 Page ID #:142

January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. The specific Pipeline Safety Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

    a.    The Pipeline Safety Laws specified in Paragraph 70; and

    b.    California Government Code §§ 51012.3, 51013, 51013.5, 51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only), and 51018.

73. For any reportable pipeline accident, as defined in 49 C.F.R. § 195.50, occurring on or after January 28, 2019, on any of Defendants' Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA and OSFM to sue or pursue administrative or other remedies for violations (including penalties) under the Pipeline Safety Laws and the Elder California Pipeline Safety Act for such accident. Nothing in Paragraphs 70 through 72 shall be construed to limit the legal and equitable remedies of the United States or State Agencies, other than PHMSA and OSFM.

74. The United States and the State Agencies reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State Agencies to obtain penalties, injunctive relief, or other administrative or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other federal or state laws, regulations, or permit conditions, except as specified in Paragraphs 69, 70, and 72.

75. The United States reserves all legal and equitable remedies to address any imminent and substantial endangerment or threat to the public health or welfare or the environment arising at, or posed by, Defendants' operations, whether related to the violations addressed in this Consent Decree or otherwise. PHMSA further reserves the right to issue to Defendants corrective action orders pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 45 -

§ 190.236; and safety orders pursuant to 49 C.F.R. § 190.239.  The State Agencies reserve all legal and equitable remedies under California Government Code §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8, California Water Code §§ 13301, 13304, 13340, and 13386, and California Health & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating a substantial risk of an unauthorized discharge of oil into waters of the State of California, (2) a discharge of waste threatening to cause a condition of pollution or nuisance, or (3) a discharge which poses a substantial probability of harm to persons, property or natural resources.

76.     This Consent Decree also shall not be construed to in any way limit or waive the claims set forth in the case entitled *California State Lands Commission, et al. v. Plains Pipeline, L.P., et al.*, Case No. 18CV02504 (Cal. Sup. Court) and Case No. B295632 (Cal. Ct. App.).

77.     In any subsequent administrative or judicial proceeding initiated by the United States or the State Agencies for injunctive relief, civil penalties, other appropriate relief relating to Defendants' violations alleged in Plaintiffs' Complaint, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State Agencies in the subsequent proceeding should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 69, 70, and 72.

78.     This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations.  Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 46 -

commenced pursuant to any such laws, regulations, or permits, except as set forth herein.  The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

79.     This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State Agencies against any third-parties, not party to this Consent Decree, nor does it limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

80.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

81.     Plaintiffs will not submit any claim for restitution for Natural Resource Damages in *The People of the State of California v. Plains All American Pipeline, L.P.,* Case No. 1495091 (Cal. Sup. Court).

82.     By entering into this settlement, Defendants do not admit the Pipeline Safety Laws violations alleged in the Complaint or described in this Consent Decree by the United States on behalf of PHMSA; therefore, any allegations of violations of these Pipeline Safety Laws do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree.  However, the allegations of violations set forth in the Complaint may be:  (1) considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains, and (2) used for statistical purposes to identify violations that PHMSA deems as causal to an incident or to increase the consequences of an incident. Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 47 -

be considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains.

83.     By entering into this settlement, Defendants do not admit the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint; therefore, any allegations of violations of these statutes do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree.  However, the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint may be considered by the State Water Resources Control Board or Regional Water Quality Control Boards to constitute prior offenses in any future enforcement action brought by any of these agencies against Plains.

84.     Subject to the terms of this Consent Decree, no provision contained herein affects or relieves Plains of their responsibilities to comply with all applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or state laws, and the regulations and orders issued thereunder.  Subject to the terms of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of access, entry, inspection, and information-gathering or their authority to bring enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, the regulations and orders issued thereunder, or any other applicable provision of federal or state law.

85.     Defendants hereby covenant not to sue Plaintiffs for any claims related to the Refugio Incident, or response activities in connection with the Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, or any other law or regulation for acts or omissions through the date on which this Consent Decree is lodged with the Court.

86.     Defendants covenant not to sue and agree not to assert any direct or

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 48 -

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87. The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

## XVIII.   TRANSFER AND ACQUISITION OF ASSETS

88. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision.  Those provisions of Appendix B are:

> a. For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;
>
> b. For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;
>
> c. For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and
>
> d. For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer.  Defendants shall

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier. Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements. Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree. Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90. In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree. Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer. Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier. Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91. For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX.  COSTS

92. Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 50 -

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 114 of 501 Page ID #:...

Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 95 of 102 Page ID #:10339

attorneys' fees; provided, however, the United States and the State Agencies shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

## XX.  NOTICES

93.     Unless otherwise specified in this Consent Decree, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent electronically by email provided by the Parties, and addressed to all Parties as follows:

As to the United States by email:    eescdcopy.enrd@usdoj.gov
                                     Re: DJ # 90-5-1-1-11340

As to the United States by mail:     EES Case Management Unit
                                     Environment and Natural Resources
                                         Division
                                     U.S. Department of Justice
                                     P.O. Box 7611
                                     Washington, D.C.  20044-7611
                                     Re: DJ # 90-5-1-1-1130

As to PHMSA:                         James M. Pates
                                     Assistant Chief Counsel
                                         for Pipeline Safety
                                     U.S. Department of Transportation
                                     Pipeline and Hazardous Materials
                                         Safety Administration
                                     1200 New Jersey Ave. SE. E-26
                                     Washington, DC. 20590

As to EPA:                           Andrew Helmlinger
                                     Attorney Advisor
                                     U.S. EPA Region IX
                                     75 Hawthorne Street (ORC-3)
                                     San Francisco, California 94104

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 51 -

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 115 of 501   Page
ID #:10340
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 56 of 102   Page ID #:149

As to DOI:               Clare Cragan
                         U.S. Department of the Interior
                         Office of the Solicitor
                         755 Parfet St., Suite 151
                         Lakewood, Colorado 80215

As to NOAA:              National Oceanic and Atmospheric
                             Administration
                         Office of General Counsel
                         Natural Resources Section
                         ATTN:  Christopher J. Plaisted
                         501 W. Ocean Blvd, Suite 4470
                         Long Beach, California  90802

As to USCG:              Patricia V. Kingcade
                         Attorney Advisor
                         National Pollution Funds Center,
                             US Coast Guard
                         2703 Martin Luther King Jr. Ave SE
                         Washington, DC 20593-7605

As to the State Agencies:     Michael Zarro
                              Deputy Attorney General
                              Office of the Attorney General
                              Natural Resources Law Section
                              300 S. Spring St., Suite 11220
                              Los Angeles, California 90013

As to CDFW:              California Department of Fish
                             and Wildlife
                         Office of Spill Prevention and Response
                         Attn: Katherine Verrue-Slater
                         Senior Counsel
                         P.O. Box 160362
                         Sacramento, California  95816-0362

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 52 -

As to CDPR:                   California Department of Parks and
                                  Recreation
                              Attn: Laura A. Reimche, Senior Counsel
                              1416 Ninth Street, Room 1404-6
                              Sacramento, California 95814

As to CSLC:                   California State Lands Commission
                              Attn: Patrick Huber, Legal Division
                              100 Howe Avenue, Suite 100-South
                              Sacramento, California 95825

As to OSFM:                   California Department of Forestry and
                                  Fire Protection
                              Legal Services Office
                              Attn: Joshua Cleaver, Staff Counsel
                              P.O. Box 944246
                              Sacramento, California 94244-2460

As to RWQCB:                  California Central Coast Regional Water
                              Quality Control Board
                              Attn: Naomi Rubin, Attorney III
                              801 K Street
                              Sacramento, California 95814

As to UC:                     Barton Lounsbury, Senior Counsel
                              University of California
                              Office of the General Counsel
                              1111 Franklin Street, 8th Floor
                              Oakland, California  94607

As to Defendants:             Megan Prout
                              Senior Vice President
                              Commercial Law and Litigation
                              333 Clay Street, Suite 1600
                              Houston, Texas  77002

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 53 -

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California  95814

94.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI.   EFFECTIVE DATE

96.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXII.    RETENTION OF JURISDICTION

97.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

## XXIII.   MODIFICATION

98.     The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

99.     Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV.   TERMINATION

100.   After Defendants have:  (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation.  Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101.   Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement.  The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102.   If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution).  However, Defendants shall not seek Dispute Resolution of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 55 -

any dispute regarding termination until sixty (60) Days after receipt of the Plaintiffs' response to Defendants' Request for Termination.

## XXV.    PUBLIC PARTICIPATION

103.   This Consent Decree shall be lodged with the Court for a period of not fewer than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The Parties agree and acknowledge that the final approval by Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the Consent Decree and a public comment period.  Plaintiffs reserve the right to withdraw or withhold consent if the comments disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

104.   Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless Plaintiffs have notified Defendants in writing that Plaintiffs no longer support entry of the Consent Decree.

## XXVI.   SIGNATORIES/SERVICE

105.   Each undersigned representative of Defendants, the State of California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB, UC, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, PHMSA, and EPA certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

106.   This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.  For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by emailed PDF) shall have the same effect as an original.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

## XXVII. INTEGRATION

107. This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII. FINAL JUDGMENT

108. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX. 26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109. For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of _____, 20__.

_____
UNITED STATES DISTRICT JUDGE

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 57 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES OF AMERICA:

3/12/2020

Date

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
   Division U.S. Department of Justice

3/13/2020

Date

BRADLEY R. O'BRIEN
ANGELA MO
Environmental Enforcement Section
Environment and Natural Resources

           Division

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 58 -

Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 63 of 102   Page ID #:156

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

3 March 2020
Date

PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety
    Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 59 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20

Date

_____

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance
Assurance

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 60 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2/26/2020

Date

AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance
    Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 61 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

3/4/2020
Date

THOMAS M. CULLEN, JR.
Administrator
Office of Spill Prevention and Response

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 62 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

_____3/2/20_____
Date

_____Lisa Ann L. Mangat_____
LISA ANN L. MANGAT
Director
California Department of Parks
    and Recreation

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 63 -

Case 2:20-cv-02415-W-SSC Document 6-1 Filed 03/16/20 Page 68 of 102 Page ID #:10352

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

2/28/2020
Date

JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020
Date

THOMAS W. PORTER
Director
California Department of Forestry and
Fire Protection

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION:

March 2, 2020
_____
Date

JOHN ROBERTSON
Executive Officer
Central Coast Regional Water
Quality Control Board

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 66 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

3/3/20
_____
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel


_____
Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 -

Case 2:26-cv-05242-SVW-SSC    Document 23/15    Filed 05/14/26    Page 131 of 501   Page
Case 2:20-cv-02425-W    Document 6-1    Filed 03/13/20    Page 72 of 102    Page ID #:165
ID #:10356

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

_____
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

3 March 2020
Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67A -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS ALL AMERICAN PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 69 -

# APPENDIX A

## *(Set of maps that generally depict Lines 901, 903, and 2000)*

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-70-



*Appendix A – Line 901*

Scale: 1:100,000

Sheet No: 1/1

-71-



*Appendix A – Line 903*

Scale: 1:700,000

Sheet No: 1/1

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.



*Appendix A – Line 2000*

PLAINS
ALL AMERICAN
PIPELINE, L.P.

Owner:

Scale: 1:966,574

Sheet No: 1/1

# APPENDIX B

## *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1.  **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

    A.   Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901.  Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

    B.   Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

    C.   Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

    D.   Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

    E.   To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received.  Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver.  Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2.  **Replacement, Restart, or Abandonment of Lines 901 and 903:**

    A.   Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners.  Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

-75-

1. On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

    a. Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

    b. Conduct a close interval survey (CIS) and AC/DC interference survey.

    c. Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B. As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C. As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3. **Third-Party Analysis of Line 2000 ILI Data**

A. Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B. The consultant shall:

    1. Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

    2. Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

    3. Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

    4. Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

5.  Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6.  Comply with additional requirements specified in the scope of work.

C.  The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1.  The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2.  The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3.  Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4.  Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4.  **Integrity Management**

A.  For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1.  Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a.  In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

-77-

loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b.  Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c.  When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d.  Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e.  Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f.  Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g.  For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h.  Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i.  Integrate and analyze available data in its P&M process, including:

i.  Assessment data from ILI tool runs;

ii.  Dig and repair data;

4

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 143 of 501   Page
ID #:10368
Case 2:20-cv-02425   Document 6-1   Filed 03/15/20   Page 34 of 102   Page ID #:177

iii.    Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv.    Operational data, such as pressure and flow data;

v.    Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi.    Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii.    Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2.    ILI Measures

a.    <u>Initial ILI Runs</u>.  Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU).  Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data.  If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i.    All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

5

ii.  In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run.  If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

b.  <u>Subsequent ILI Runs</u>.  After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year.  Alternatively, Plains may run a UT tool each year.  If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

c.  <u>All ILI Runs</u>.  Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5.  **Valves**

A.  Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

1.  Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

2.  Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B.  Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C.  Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 86 of 102   Page ID #:173

6. **Risk Analysis**

   A. For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

      1. Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

         a. The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

         b. Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis. The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

         c. The risk analysis shall be due within one year from entry of the CD.

7. **Leak Detection**

   A. For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

   B. Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8. **Non-waiver**

   A. Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

## ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES

9. **Integrity Management**

   A. New Procedures for Interim Reviews and Assessments

7

1. Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment. If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment. Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2. Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review. Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3. Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD. If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B. Documentation for P&M Recommendations

1. Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

   a. What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

   b. The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

8

      c.     The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

2. In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

3. In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C. Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented.  Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

10. **Valves and O&M**

A. Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B. Within two years of entry of the CD, Plains shall develop and implement procedures to:

1. If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

2. Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

3. Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

4. Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C. Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

D.    For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

   1.    Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room.  Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E.    Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11.    **Leak Detection**

A.    Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

   1.    Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B.    For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C.    Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

   1.    Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D.    Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

   1.    Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

10

-84-

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E.  Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection.  The results of the meetings will be documented and shared with appropriate personnel.  The recommendations will be evaluated and documented.

F.  Instrumentation and Display

1.  To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

a.  Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

b.  Track these conditions through to resolution, including instrumentation relocation when necessary.

12.  **Control Room Management**

A.  For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

1.  Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

2.  Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

3.  Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

4.  Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

11

B.      For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C.      Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13.    **Emergency Response and Oil Spill Response Plans**

A.      California-Specific Provisions:

    1.    Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05. Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B.      Company-Wide Provisions

    1.    Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

    2.    Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response. Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

    3.    Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

12

-86-

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 151 of 501   Page
Case 2:20-cv-02425   Document 6-1   Filed 03/15/20   Page 92 of 102   Page ID #:185
ID #:10376

Plains.  Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills.  Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4.      Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter.  Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5.      Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment).  Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill.  Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6.      For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14.  **Safety Management System (SMS)**

A.      Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1.      Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173.  Plains shall direct the third party to transmit a copy of the final report to PHMSA.  Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 152 of 501 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 93 of 102 Page ID #:186
ID #:10377

B.      Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15.      **Drug and Alcohol Program**

A.      Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 153 of 501    Page
ID #:10378
Case 2:20-cv-02425    Document 6-1    Filed 03/15/20    Page 94 of 102    Page ID #:187

# APPENDIX C

## (*Intentionally left blank*)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 95 of 102   Page ID #:10379

# APPENDIX D

## *(Remaining Corrective Actions from the PHMSA CAO)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-90-

Case 2:26-cv-05242-SVW-SSC    Document 23-1    Filed 05/14/26    Page 155 of 501   Page
ID #:10380
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 96 of 102   Page ID #:189

# APPENDIX D

1.      All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

    a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

    b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. The Restart Plan shall include:

        1)    Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

        2)    Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

        3)    Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

        4)    A specific day-light restart that includes advance communications with local emergency response officials;

        5)    Master Control Room enhancements, including:

            a)  Implementation of advanced leak-detection

Case 2:20-cv-02425-WbSSC Document 6-1 Filed 03/15/20 Page 97 of 102 Page ID #:10381

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1.  Revised alarm threshold adjustments;

2.  Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6) Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7) Installation of additional safety valves as a result of Plains' EFRD evaluation;

8) Installation of additional pressure sensors as a result of Plains' surge study;

9) Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10) **Corrosion Prevention.** Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

Case 2:26-cv-05242-SVW-SSC   Document 23/15/20   Filed 05/14/26   of Page 158 of 501  Page
Case 2:20-cv-02415-VW-SSC   Document 6-1   Filed 03/15/20   Page 99 of 102   Page ID #:192
ID #:10383

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

Case 2:26-cv-05242-SVW-SSC   Document 22/13/17ed 05/14/26   Page 159 of 501   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 160 of 102   Page ID #:1939
ID #:10384

903 to the OSFM for review and approval.  Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree.  In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

    1)    Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

    2)    Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

    3)    Provisions for a daylight restart and advance communications with local emergency response officials.

g. **Line 903 Return to Service.**  After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h. **Removal of Pressure Restriction for Line 903.**  After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

    1)    The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 101 of 102   Page ID #:10385

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)      The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction.  Requests for removal of the pressure restriction may be submitted by pipeline segment.

i.  **Notifications.**  Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j.  **Reporting Requirements for Lines 901 and 903.**  If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)      The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)      Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

3)      The Appendix D Documentation Report shall include but not be limited to:

    A.   Table of Contents;

    B.   [*intentionally left blank.*]

    C.   [*intentionally left blank.*]

    D.   Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

    E.   [*intentionally left blank.*]

    F.   [*intentionally left blank.*]

    G.   Lessons learned while fulfilling the requirements of this Appendix D.

# Exhibit 4

Exhibit 4
to Declaration of
Michael S. Dorsi
dated July 7, 2025

# FINAL
# ENVIRONMENTAL IMPACT REPORT
# ENVIRONMENTAL IMPACT STATEMENT



## PROPOSED CELERON / ALL AMERICAN AND GETTY PIPELINE PROJECTS

CALIFORNIA STATE LANDS COMMISSION
AND
BUREAU OF LAND MANAGEMENT
DEPARTMENT OF THE INTERIOR

State Clearing House No. 83110902
Contract No. R-8353



A COMSAT COMPANY
ENVIRONMENTAL RESEARCH & TECHNOLOGY, INC.
ANCHORAGE · CHICAGO · CONCORD, MA · FORT COLLINS, CO
HOUSTON · LOS ANGELES · PITTSBURGH · WASHINGTON, DC

# JANUARY 1985

EIR (Exh. 4) p. 000001

EIR (Exh. 4) p. 000002

**STATE OF CALIFORNIA**                                                    **GEORGE DEUKMEJIAN,** *Governor*

## STATE LANDS COMMISSION

**KENNETH CORY,** *Controller*                                            **EXECUTIVE OFFICE**
**LEO T. McCARTHY,** *Lieutenant Governor*                                1807 - 13th Street
**JESSE R. HUFF,** *Director of Finance*                                  Sacramento, California 95814



CLAIRE T. DEDRICK
Executive Officer

December 9, 1984


TO:   ALL INTERESTED PARTIES

       Enclosed is a copy of the Finalizing Addendum for the
Environmental Impact Report/Environmental Impact Statement on
the following projects:

       Celeron/All American Pipeline Companies  propose to
construct a 1200 mile, buried pipeline to transport heated
crude oil from the Santa Barbara and Santa Maria Basins through
Emidio Station, California to McCamey, Texas.

       Getty Trading and Transportation Company proposes to
construct a 113 mile, buried pipeline to transport heated crude
oil from Gaviota, California, to Emidio Station, California.

       This addendum, combined with the Draft EIR/EIS, is the
Final EIR/EIS for these projects.

       Certification of this document is tentatively scheduled
for State Lands Commission consideration at their January 31,
1985, meeting, beginning at 10:00 a.m.  The location will be
Room 447 of the State Capitol, Sacramento, California.

       Those desiring further information on the Commission
meeting or the project should call Mary Griggs at (916)
322-0354.


                                    CLAIRE T. DEDRICK
                                    Executive Officer


EIR (Exh. 4) p. 000003

CALIFORNIA STATE LANDS COMMISSION AND
BUREAU OF LAND MANAGEMENT, DEPARTMENT OF THE INTERIOR

FINAL

ENVIRONMENTAL IMPACT REPORT/ENVIRONMENTAL IMPACT
STATEMENT FOR THE CELERON/ALL AMERICAN AND
GETTY PIPELINE PROJECTS

Prepared by

ENVIRONMENTAL RESEARCH & TECHNOLOGY, INC.

Prepared for

STATE LANDS COMMISSION AND BUREAU OF LAND MANAGEMENT

January 1985

_____
Claire Dedrick, Executive Officer, State Lands Commission

_____
Edward Hastey, California State Director, Bureau of Land Management

State Clearing House Number 83110902
Contract Number R 8353

EIR (Exh. 4) p. 000005

EIR (Exh. 4) p. 000006

COVER SHEET

CELERON/ALL AMERICAN AND GETTY PIPELINE PROJECT

() DRAFT                                                     (X) FINAL

Joint Review Panel          California State Lands Commission
                            Sacramento, CA  (CEQA Lead)

                            U.S. Department of the Interior
                              Bureau of Land Management (NEPA Lead)
                              California Desert District, Riverside, CA

                            Santa Barbara County
                              Resource Management Department
                              Santa Barbara, CA

Cooperating Agencies        U.S. Department of Agriculture
                              Forest Service

                            U.S. Department of the Interior
                              Fish and Wildlife Service

                            U.S. Department of Transportation
                              Federal Highway Administration

                            California Secretary of Environmental
                              Affairs
                              Sacramento, CA

EIS Contact
Comments on this EIR/EIS should be directed to:
    Mary Griggs
    State Lands Commission
    1807 - 13th Street
    Sacramento, California  95814
    (916) 322-0354

Dates EIR/EIS Made Available to the Public
Draft:  August 1, 1984
Final:  January 9, 1985

## ABSTRACT

The Celeron and All American Pipeline Companies propose to construct a 1,200-mile pipeline that would transport Outer Continental Shelf and other locally produced crude oils from the Santa Barbara and Santa Maria Basins through Emidio station, CA, to McCamey, TX. The 122-mile Celeron segment would extend from Las Flores, CA to Emidio, CA and the 1,084-mile All American segment would extend from Emidio, CA to McCamey, TX; both would transport heated crude oil. Getty Trading and Transportation Company (Getty) proposes to construct a 113-mile buried pipeline that would transport heated crude oil from Getty's existing

marine terminal facility at Gaviota, CA, to Emidio station, CA.  The Celeron/All American pipeline proposal and the Getty pipeline proposal are not dependent upon each other.  Both projects could be approved or either project could be approved independently of the other.

The Celeron/All American and Getty Pipeline Projects Environmental Impact Report/Environmental Impact Statement (EIR/EIS) addresses both applications to construct pipelines from the Santa Barbara coast to Emidio in Kern County.  The EIR/EIS also addresses Celeron/All American's application for a pipeline from Emidio to McCamey, Texas.

The EIR/EIS analyzes the environmental effects of the proposed pipelines; pump, heating, and delivery stations; and a tank farm through construction, operation, maintenance, and abandonment.  This report analyzes the impacts of the Celeron/All American and Getty Proposals and four routing alternatives that have been identified.  These are the Santa Maria Canyon, Desert Plan Utility Corridor, Brenda, and McCamey to Freeport Alternatives.  The Santa Maria Canyon Alternative crosses a portion of the Los Padres National Forest in Santa Barbara County; the Desert Plan Alternative is in the Mojave Desert in eastern California; the Brenda Alternative is in western Arizona near the Kofa National Wildlife Refuge; and the McCamey to Freeport Alternative extends from West Texas to the Gulf Coast.  These alternatives were identified to provide optional locations for the pipelines in sensitive areas.  The No Project Alternative is also analyzed.

The EIR/EIS has been prepared according to the requirements of the National Environmental Policy Act of 1969 (NEPA), the Council of Environmental Quality's regulations for implementing NEPA, effective July 30, 1979, and the California Environmental Quality Act (CEQA) as amended.  Based on the issues and concerns identified during the scoping process, the EIR/EIS focuses on the impacts to river crossings, access, hydrology, restoration, employment, and oil spills.

## PREFACE

The Final Environmental Impact Report/Environmental Impact Statement (FEIR/EIS) for the Celeron/All American and Getty crude oil pipeline projects has been prepared in an abbreviated format under Council on Environmental Quality regulations (40 CFR 1503.4 (3)(c). This document should be used in conjunction with, rather than in place of, the Draft EIR/EIS that was released for public review on August 1, 1984.

The FEIR/EIS contains four chapters. The first chapter (Introduction) is a summary of the pipeline projects that briefly describes the projects, areas of controversy, major impact conclusions, and the Federal preferred alternatives.

The second chapter (Consultation and Coordination) presents the results of agency and public review of the Draft EIR/EIS. Comments received at public hearings and by letter, and responses to those comments, are presented.

The third chapter (Modifications and Corrections) includes changes made to the text and tables of the DEIR/EIS. These have been made in response to public comments and are referenced to the appropriate page number in the DEIR/EIS.

The final chapter contains appendices that discuss a variety of topics. Appendix 4.1 contains an updated and modified set of the mitigation measures and agency stipulations that were presented in the DEIR/EIS. A revised list of recommended mitigation measures is also included. Appendix 4.2 presents the Biological Opinions (dealing with Federally-listed Threatened and Endangered species) prepared by the U.S. Fish and Wildlife Service and the National Marine Fisheries Service. Appendix 4.3 is a summary table dealing with the system safety aspects of the operation of each pipeline project. Appendix 4.4 presents a draft Oil Spill Contingency Plan for All American's crossing of the Colorado River at the California/Arizona border. The Draft EIR/EIS Air Quality Appendix has been revised and is included as Appendix 4.5. It contains revised modeling results based on changes in the equipment that would be used at pump/heater stations as well as additional detail on modeling assumptions and procedures. Appendix 4.6 contains a revised analysis of visual resource impacts on the Los Padres National Forest. This reanalysis, first prepared as Appendix E in the DEIR/EIS, is based on additional detail provided by the Applicants and the Forest Service on route locations and construction techniques.

Copies of the Draft EIR/EIS can be obtained by writing to the following address:

District Manager
Bureau of Land Management
1692 Spruce Street
Riverside, California  92507

i

## TABLE OF CONTENTS

| | Page |
|---|---|
| PREFACE | i |
| 1.0   SUMMARY | 1-1 |
| 1.1   Introduction | 1-1 |
| 1.2   Areas of Controversy | 1-3 |
| 1.3   Major Impact Conclusions | 1-5 |
| 1.4   Agency Preferred Alternative | 1-5 |
| 2.0   CONSULTATION AND COORDINATION | 2-1 |
| 2.1   Draft EIR/EIS Review | 2-1 |
| 2.2   Public Hearings | 2-10 |
| 2.3   Comments and Responses | 2-15 |
| 3.0   MODIFICATIONS AND CORRECTIONS | 3-1 |
| 3.1   Text and Table Revisions to the DEIR/EIS | 3-2 |
| 3.2   Additional Revisions to the DEIR/EIS | 3-10 |
| 3.3   New Material and Modifications | 3-19 |
| 4.0   APPENDICES | 4-1 |
| 4.1   Mitigation Measures, Agency Stipulations, and Recommended Mitigation Measures | 4-1 |
| 4.1.1   Mitigation Measures | 4-1 |
| 4.1.2   Additional Agency Right-of-Way Stipulations | 4-17 |
| 4.1.3   Recommended Mitigation Measures | 4-21 |
| 4.2   Biological Opinion | 4-23 |
| 4.3   System Safety | 4-52 |
| 4.4   Draft Colorado River Oil Spill Contingency Plan | 4-61 |
| 4.5   Air Quality Addendum | 4-93 |
| 4.6   Visual Resources Analysis on Los Padres National Forest | 4-174 |
| ACRONYMS AND ABBREVIATIONS | 2-18 |
| REFERENCES | |

ii

EIR (Exh. 4) p. 000010

LIST OF TABLES

| Table | | Page |
|---|---|---|
| | Impact Summary Table for the Celeron/All American Proposal | 1-7 |
| | Impact Summary Table for the Getty Proposal | 1-18 |
| | Impact Summary Table for the Santa Maria Canyon Alternative | 1-26 |
| | Impact Summary Table for the Desert Plan Utility Corridor Alternative | 1-33 |
| | Impact Summary Table for the Brenda Alternative | 1-39 |
| | Impact Summary Table for the McCamey to Freeport Alternative | 1-44 |
| 2-1 | Comment Letters | 2-15 |
| 2-8 | Summary of Significant Impacts and Hazards for the Celeron/All American and Getty Pipeline | 3-12 |
| 2-9 | Comprison of Significant Impacts and Hazards for the Celeron/All American and Getty Proposals and Alternatives | 3-15 |
| 10-2 | Sensitive Areas Along the Pipeline Routes Where Oil Spills Would Have Significant Impacts | 3-17 |
| 39-2 | Sensitive Land Uses Adjacent to Limited Access Highway Crossings Along the Proposed Pipeline Routes and Alternatives | 3-21 |
| 47-32 | Vegetation Cover Types Affected by the Proposed Pipeline Routes and Santa Maria Canyon Alternative Foxen Canyon Road to Cuyama Tie Point | 3-24 |

Appendices Tables

Appendix 4.3

| 4.3 | Summary Table for System Safety | 4-53 |
|---|---|---|

Appendix 4.4

| 1.1 | Logistical Requirements for the Vacuum Truck Technique | 4-85 |
|---|---|---|
| 2.2 | Logistical Requirements for Portable Skimmers/ Pumps | 4-88 |

EIR (Exh. 4) p. 000011

LIST OF TABLES (Continued)

| Appendices Tables | | Page |
|---|---|---|

**Appendix 4.5**

| | | |
|---|---|---|
| 2-1 | National and California Ambient Air Quality Standards | 4-96 |
| 2-2 | New Mexico Air Quality Standards | 4-97 |
| 2-3 | PSD Increment Ceilings | 4-98 |
| 2-4 | Santa Barbara County Rule 205.C Air Quality Increments | 4-98 |
| 3-1 | Summary of Relevant Santa Barbara County Air Quality Data | 4-100 |
| 3-2 | Summary of Relevant San Luis Obisbo County Air Quality Data | 4-101 |
| 3-3 | Summary of Relevant Kern County Air Quality Data | 4-102 |
| 3-4 | Summary of Relevant Air Quality Data in Southeast Desert Air Basin | 4-103 |
| 3-5 | Summary of Relevant Arizona Air Quality Data | 4-104 |
| 3-6 | Summary of Relevant New Mexico Air Quality Data | 4-105 |
| 3-7 | Summary of Relevant Texas Air Quality Data | 4-106 |
| 4-1 | Operational Parameters Used to Calculate Construction Emissions for the Proposed Getty Pipeline | 4-108 |
| 4-2 | Operational Parameters Use to Calculate Construction Emissions for the Proposed Celeron/All American Pipeline | 4-109 |
| 4-3 | Emissions Inventory for Construction Phase for the Getty and Celeron/All American Pipeline | 4-110 |
| 4-4 | Operational Parameters Used to Calculate Pump Station Emissions for the Proposed Celeron/All American Project | 4-111 |
| 4-5 | Emissions Inventory for the Operation Phase for the Getty and Celeron/All American Pipeline | 4-112 |
| 5-1 | Model Impacts Used in the ISC Model for the Construction Analysis | 4-117 |

EIR (Exh. 4) p. 000012

LIST OF TABLES (Continued)

Appendices Tables | Page
--- | ---
5-2  Model Inputs Used in the COMPLEX I Model for the Operational Analysis | 4-119
5-3  Model Inputs Used in the VALLEY Model for the Operational Analysis | 4-121
5-4  Schedule of Meteorological Inputs Used in the Cadiz Ozone Modeling | 4-123
5-5  Initial Pollutant Concentrations Used in the Reactive Modeling | 4-124
5-6  Dimensions of Cells in PLMSTAR Air Parcel | 4-125
6-1  Summary of Air Quality Impacts From the Construction of the Proposed Celeron and Getty Pipelines from Las Flores to Emidio | 4-129
6-2  Summary of Air Quality Impacts from the Operation of the Proposed Pipelines from Las Flores to Blythe | 4-131
6-3  Summary of Air Quality Impacts From the Construction of the Proposed All American Pipeline from Emidio to Blythe | 4-133
6-4  Summary of Air Quality Impacts From the Construction of the Proposed All American Pipeline From Blythe to McCamey | 4-135
6-5  Summary of Air Quality Impacts From the Operation of the Proposed All American Pipeline From Blythe to McCamey | 4-137
6-6  Predicted Ozone Concentration of Background Only and Background-Plus Project for Typical and High Initial Concentrations | 4-140

Appendix 4.6

4.6  Comparison of Alternatives | 4-179

EIR (Exh. 4) p. 000013

LIST OF MAPS

| Map | | Page |
|-----|-----|------|
| 1-1 | Regional Setting | 1-2 |
| 3.3-1 | Santa Maria Canyon Alternative | 3-23 |
| 3.3-2 | Hudson Ranch Modification | 3-26 |
| 3.3-3 | Blythe Area Modification | 3-29 |
| 3.3-4 | Guadalupe Mountains National Park Modification | 3-31 |

EIR (Exh. 4) p. 000014

# 1.0 SUMMARY

EIR (Exh. 4) p. 000015

EIR (Exh. 4) p. 000016

## 1.0  SUMMARY

### 1.1  Introduction

The Celeron/All American and Getty Pipeline Projects EIR/EIS is a joint document prepared for the California State Lands Commission (SLC); and the U.S. Department of the Interior, Bureau of Land Management (BLM). SLC is acting as lead agency pursuant to the California Environmental Quality Act (CEQA) and BLM, as lead agency pursuant to the National Environmental Policy Act (NEPA). SLC, BLM and Santa Barbara County have formed a Joint Review Panel (JRP) to direct the completion of this joint State and Federal document.

The Celeron/All American and Getty Pipeline projects are not dependent upon each other and either or both pipelines could be approved by the agencies independently of the other. Celeron/All American has applied for right-of-way permits from the BLM to cross Federal land managed by the BLM, Forest Service, Fish and Wildlife Service, Air Force, Army, and the Bureau of Reclamation, and from SLC for crossing land at the Colorado River.

Getty has applied for ROW permits from the BLM for crossing Federal lands managed by BLM and by the Los Padres National Forest (LPNF) and for a Conditional Use Permit from Santa Barbara County. Both applicants must receive U.S. Army Corps of Engineers 404 Permits and various county and local permits. Since the two proposed projects are independent of each other, authorization of the two ROW applications is not an either/or situation. Each project must be reviewed and approved or denied on its own merits.

The two pipeline projects would transport Outer Continental Shelf (OCS) and other locally produced crude oil from the Santa Barbara and Santa Maria Basins to other crude oil transportation networks that serve refiners in the San Joaquin Valley, San Francisco, Los Angeles, and Gulf Coast areas. The Celeron/All American Pipeline would transport up to 300,000 barrels per day (BPD). The 1,200-mile, 24 to 30-inch pipeline would travel from Exxon's proposed Santa Ynez Unit processing facility in Las Flores Canyon, west of Santa Barbara, California, across the Sierra Madre Mountains to the Bakersfield, California area, then to Blythe, California, and across Arizona and New Mexico to the McCamey, Texas area (Map 1-1). The Getty pipeline would transport up to 400,000 BPD in a 20 to 30-inch pipeline from Getty's proposed Consolidated Coastal Facility at Gaviota, west of Santa Barbara (and 6 miles east of Las Flores Canyon), to the Bakersfield area (about 113 miles).

The two proposals have similar proposed right-of-ways (ROW) from the coast to a terminal facility at Emidio, southwest of Bakersfield. Therefore, they are being considered in the same document. Getty's Consolidated Coastal Facility was evaluated in an EIR prepared for Santa Barbara County and released for public review in July, 1984; that document is incorporated by reference into this EIR/EIS. Exxon's facility was also evaluated in an EIS/EIR prepared for the County, released for public review in April 1984, finalized in July 1984, and is incorporated by reference into this EIR/EIS.

1-1

EIR (Exh. 4) p. 000017

## COMMENT LETTER 18 (CONTINUED)

-5-

18-51 cont. now by the McCamey to Freeport route. The reviewer will not get concerns answered otherwise. This seems to us to be a major oversight. In addition you should list specific mitigation measures to show how each Federal and state sensitive species will be protected.

18-52   52.) On page 4-143 you need the information on cultural resources now. Later is not good enough.

18-53   53.) On page 4-153 where will low permeability backfill be used. Please name sites.

18-54   54.) On page 4-154 as mentioned before measure 11 should be done for all sections of the pipeline.

18-55   55.) On page 4-156, measure 17 needs to be utilized for all major stream crossings. Spill equipment must be in place at sensitive sites and pump stations.

18-56   56.) On page 4-162 it is absurd to say no additional oil spill mitigation is needed. Surely a more specific oil spill contingency plan is needed.

18-57   57.) On page 4-174, Table 4-33 since it is not clear how you will prevent groundwater contamination we feel it is premature to say short or long-term impacts are not anticipated..

18-58   58.) On page B-33 you list state species of concern but you still say nothing about how damage to each will be mitigated.

18-59   59.) On page G-1 you say nothing here of the higher SO2, VOC, metals, and O3 levels that are expected in Houston as a result of this pipeline and loading and unloading barges and tankers. This is especially important because the entire area is nonattainment for O3 and because ship loading and unloading emissions of VOC's are not now controlled by Either TACB or EPA. In addition you need to explain how

18-60   a heavy crude oil spill, like the one that happened about a month ago - the Alvenus, will react differently than lighter crude oil spills, how easy it will be to clean-up, its effects, etc.

18-61   60.) On page G-11 you again say most of the oil will be loaded on ships and barges to be taken to refineries from Corpus to Mississippi but you do not discuss air pollution and oil spill problems.

18-62   61.) On page H-34, Table 10-2 you fail to take into account the McCamey to Freeport route and its sensitive areas.

In summary we find that this document does not give sufficient information on different types of alternative, does not explore all alternatives equally, piecemeals the project, does not look adequately at oil spill prevention and control measures, does not give adequate coverage to state and Federal species of concern and minimizing the impacts of the project on them, and does not treat the problems of air pollution at the end of the pipeline, and does not look closely at impacts on groundwater and sensitive area and how to mitigate them. Finally the statement does not address the unequal and unfair Public participation program provided Texas as compared to all other states effected. We request that this document be redrafted and brought out again for Public comment.

Sincerely,   Brandt Mannchen, Wildlife Chairperson, Lone Star Chapter, Sierra Club, 1822 Richmond #2, Houston, Texas 77098, H713-522-1489, W713-645-5316

## RESPONSE TO COMMENT LETTER 18 (CONTINUED)

18-27   Should Celeron of Texas proceed with construction of a McCamey to Freeport pipeline, they would need to complete geological studies to determine the vulnerability of the pipeline to surface faults and provide an appropriate design that would meet all Federal, state and local requirements. See Mitigation Measures 1, 2, and 3.

18-28   Slope instability is not a common failure for large diameter pipelines and documentation in the literature is limited. Thus, there are no statistics per se to estimate the frequency of this failure. The risk of such a break would be similar to other portions of the pipeline which is 0.0003 spill/mile/year for a new pipeline.

18-29   Based on your comment, text changes to page 3-123 in the DEIR/EIS are included in the Modifications and Corrections Section.

18-30   Although the risk of spills or leaks occurring is low (Section 4.2.15 of DEIR/EIS), the potential impacts from such a spill are significant. Potential aquifer contamination from oil spills or pipeline leaks would be a non-mitigable impact. Mitigation Measures 5, 6, 7, and 7a would reduce the potential impacts in identified sensitive groundwater basins by reducing the likelihood of pipeline breaks, providing for early leak detection and prompt spill response. These measures cannot, however, completely eliminate the potential for aquifer contamination.

Additional pipeline design criteria, construction procedures, and operational leak detection systems are described in Chapter 2 of the DEIR/EIS for the proposed pipelines. These are procedures used throughout the industry and are in accordance with D.O.T. regulations. They are included in the Applicants' proposals and are not listed as mitigation measures. These measures would be very effective in reducing the risk of groundwater contamination along the entire pipeline alignment. Among the procedures described in Chapter 2 are pipeline coating, hydrostatic testing, burial 4 feet below the 100-year, 24-hour storm stream scour depth, cathodic corrosion protection, welding and x-ray inspection of joints, leak detection by volumetric balance, pressure loss and flow measurements, and aerial reconnaissance during pipeline operation. All below-ground connections would be welded; there would be no flanged joints below ground.

18-31   Appropriate environmental documentation and agency approvals would be required and would consider sensitive fish, animal, and plant populations if the McCamey to Freeport Alternative is proposed by Celeron of Texas.

18-32   Golden-cheeked warblers are known to nest in the region where the pipeline could cross. Site-specific impacts and mitigation measures for this and other state-listed sensitive species would be evaluated as required.

18-33   See Mitigation Measure 30.

EIR (Exh. 4) p. 000125

# COMMENT LETTER 31

# RESPONSE TO COMMENT LETTER 31



United States Department of the Interior

GEOLOGICAL SURVEY
RESTON, VA. 22092

In Reply Refer To:
WGS-Mail Stop 423

OCT  3 1984

Ms. Mary Griggs
State Lands Commission
1807 13th Street
Sacramento, California  95814

Dear Ms. Griggs:

We have reviewed the environmental impact report/statement for the Celeron/ All American and Getty Pipeline projects and have the following comments:

31-1    The document indicates that in sensitive ground-water areas the bottom and sides of trenches will be covered with low-permeability backfill materials before the pipeline is laid (p. 4-153). We suggest that in especially sensitive situations the low-permeability materials should surround the pipeline to hinder lateral movement of contaminants from leaks or breaks in the pipe. For example, such a measure would be useful near the margins of valleys or prior to descending steep slopes into valleys where permeable materials such as alluvium can be anticipated. Other examples could be found in approaching features of high permeability in karstic terrains or when approaching a slope above a municipal water supply.

31-2    If any of the cathodic protection devices to be used (p. 2-35, 4-117) will be of the deep well type discussed by Ritchie (Ritchie, E.A., 1976, Cathodic protection wells and ground-water pollution: Ground Water, vol. 14, no. 3, p. 146-149), the statement should indicate how the aquifer(s) involved will be protected against pollutants traveling down the well annulus.

31-3    Heavy rainfall during or following an oilspill can increase greatly the infiltration rate and distance traveled by components of crude oil, particularly water-soluble components (Duffy, J.J., Mohtadi, M.F., and Peake, E., 1977, Subsurface persistence of crude oil spilled on land and its transport in groundwater: in Proceedings 1977 Oilspill Conference of American Petroleum Institute, Environmental Protection Agency, and U.S. Coast Guard, New Orleans, March 8-10, 1977, p. 475-478). This should be considered in evaluating the potential for impacts on ground water. Effects of petroleum

31-1    See response to Comment 8-1.

31-2    The cathodic protection system would be designed to minimize impacts on groundwater. The design would include a) locating the anode bed away from shallow groundwater aquifers; b) case the bore, grout between the case and the bore, and seal the annulus where an anode proceeds into a shallow groundwater aquifer; or c) install a shallowbed anode system.

31-3    These conditions have been considered in the evaluation of potential oil spills and associated impacts to groundwater as described in the DEIR/EIS. The adverse effects of taste and odor have also been addressed (page 4-35) and the broad significance criteron (page 4-34) defines any contamination of groundwater by crude oil to be a significant impact, even though toxic concentration levels might not be exceeded.

EIR (Exh. 4) p. 000162

## COMMENT LETTER 37 (CONTINUED)

## RESPONSE TO COMMENT LETTER 37 (CONTINUED)

State Lands Commission
Page - 3
October 9, 1984

37-4 In discussing the operational impacts of the pipelines, the DEIR/S could be improved by including a mitigation measure to improve or replace pipeline segments as they age and deteriorate. Mitigation should be accomplished by regular on-site visual and x-ray inspections. This would supplement the operation and maintenance plans discussed on page 2-30 et seq. and would provide additional protection from pipelines failures which occur as the facilities age. This level of protection seems warranted especially where the right-of-way traverses areas with unique environmental characteristics such as the Los Padres National Forest and lands which are part of the California Desert Conservation Area.

### Relationship of Projects to Regional Policies

Given the route location and associated facilities for the proposed Celeron/All American project, this pipeline is generally favorable when assessed in terms of regional policies. Adverse impacts on areas with regionally significant environmental resources can be mitigated. By routing OCS crude directly to the Gulf Coast, the potential policy conflicts outlined in the attached comments on the Santa Barbara OTP can be avoided.

37-5 It is ironic that the DEIR/S states that one of the reasons that the Southern California Pipeline project is not evaluated as an alternative is that it would require "inordinate amounts of analysis to consider in detail" (p. 2-40). This statement is probably very true, but provides an extremely weak rationale for not evaluating this project as an alternative. From all indications, the transportation of OCS crude, even a quantity as small as 100,000 barrels per day through existing pipelines, could have significant adverse impacts on Southern California. No analysis has been completed to verify the nature of the impacts whether positive or negative. Without this information, the Getty project cannot be evaluated relative to regional policies. Also, without this analysis it appears that this report fails to meet the mandate of the CEQA to assess all impacts within the State of California. In reviewing these comments, SCAG's Executive Committee has concluded that this report should not be finalized or certified unless this data is included in the report.

In addressing the DEIR for the Santa Barbara OTP and the findings of SCAG's OCS Task Force, SCAG's Executive Committee adopted a series of policies which are directly relevant to this DEIR/S. The policies state that pipelining is the preferred long-term transportation mode for California offshore oil; that stringent environmental requirements, including offsets and Best Available Control Technology(BACT), and other measures to prevent or mitigate potential adverse impacts disclosed in compliance with CEQA,

600 South Commonwealth Avenue · Suite 1000 · Los Angeles · California · 90005 · 213/385-1000

37-4 The two proposed pipelines would have service lives of approximately 30 years. Current construction standards are superior to those reflected in the data base used for risk assessment. The various inspections before and after the pipe is installed in the trench, hydrostatic testing, cathodic protection systems, and monitoring systems collectively suggest that these modern pipelines would be much safer than their predecessors. Regular visual inspections and cathodic protection checks would be conducted during the life of the projects since it is not possible to X-ray the pipeline once it has been buried. Faulty protection equipment or segments of pipe would be replaced as necessary. See Appendix 4.3 for a summary of System Safety.

37-5 See response to Comments 18-2, 37-1, 37-2 and 37-3. We acknowledge the possibility of an oil shipper refining OCS crude oil in the Los Angeles area. CEQA requires that when impacts cannot be reasonably ascertained or when forecasting becomes a speculative excercise, that the document shall acknowledge this fact and terminate the analysis. For the reasons cited in comments 18-2, 37-1, 37-2, 37-3 and others, a detailed analyses of impacts in Los Angeles, Gulf Coast, Kern County, and San Francisco refining areas were not performed. If other projects or specific refinery modifications are proposed, we anticipate that those proposals will be fully analyzed in accordance with the requirements of NEPA and CEQA at the appropriate time.

EIR (Exh. 4) p. 000174

# COMMENT LETTER 71

# RESPONSE TO COMMENT LETTER 71

*Southern California Edison Company*

P.O. BOX 410
100 LONG BEACH BOULEVARD
LONG BEACH, CALIFORNIA 90801

SᏟE

R. J. JULIFF
MANAGER
OF
REAL PROPERTIES DEPARTMENT

November 1, 1984

Ms. Mary Giggs
State Lands Commission
1807 - 13th Street
Sacramento, Ca  95814

Dear Ms. Giggs:

SUBJECT:  Draft - Environmental Impact Report/
          Environmental Impact Statement
          Proposed Celeron/All American and Getty
          Pipeline Projects

We have reviewed the subject EIR/EIS and have the following comments and concerns regarding the proposed pipeline project.

It is apparent that the proposed pipeline will cross Edison's rights of way and/or access roads at various locations.  It is therefore imperative that the project proponent submit development plans together with a request for our granting of the necessary land rights in order to accommodate the utilization of our rights of way.  This should be accomplished as soon as possible in order that we may review the plans to insure that construction of the pipeline will not adversely affect the operation and maintenance of our existing facilities or impair our ability to utilize the rights of way for future facilities.

In areas where the pipeline parallels existing Edison transmission lines, cathodic protection should be utilized on the pipeline due to the electromagnetic fields that often exist within approximately 500 feet of our lines.  It should also be noted at this point that it is the policy of this Company not to permit parallel encroachments within our transmission line rights of way as it is essential to maintain our rights of way in such a manner to accommodate future electric facilities.

It should also be noted that Edison plans to construct a second 500kV transmission line, parallel to our existing line extending from Palo Verde Nuclear Generating Station (Arizona) to Devers Substation (Palm Springs, CA).  We anticipate siting the future 500kV line parallel to and approximately 130 feet southerly of the existing transmission line from the Palo Verde Plant to the eastern edge of Cooper Bottom Pass.  Through the pass, the line will be located on existing double circuit towers.  From the

EIR (Exh. 4) p. 000347

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page four


Celeron/All American Pipeline.  Celeron/All American proposes to transport up to 300,000 barrels per day of oil from the Santa Barbara coast near Gaviota to McCamey, Texas.  An additional alternative may continue the pipeline to Freeport, Texas.  The 24- to 30-inch buried pipeline would be about 1,200 miles long and include 78 block and check valves, 5 pumping stations, 10 pumping and heating stations, 1 heating station, 3 delivery stations and a 20-acre tank farm at Cadiz, California.  No new roads would be required, however, utility taps would be required.

Pipeline Construction.  Construction methods will be similar for both pipelines.  Construction of the Getty pipeline would require about six months, while the Celeron/All American pipeline would require about two years.  A construction right-of-way (ROW) would be 100 feet wide for either line, except where a smaller ROW is feasible.  Permanent ROW's would be 20 feet for Getty and 50 feet for Celeron/All American.  Laying of the pipeline would progress at an average of 1.5 to 2 miles per day per "spread", slowing to about 0.5 miles per day in rough terrain.  A "spread" is each construction crew cleaning, digging, placing, and covering the pipeline.  Getty plans to use 3 spreads, and Celeron/All American plans to use 6 spreads.

Ditching would be accomplished by mechanical excavation.  In some areas, blasting will be used.  The ROW will be cleaned up after pipeline burial.  The most common methods of surface restoration are:  removal of debris, surface contouring, water control structures, surface cultivation, mulching, application of soil amendments, and replanting.

Operation and Maintenance of Pipelines.  Operation of the pipeline is primarily automated.  Maintenance of the pipelines and ROW's would include observation for construction activities in the ROW's; inspection and maintenance of cathodic protection systems; inspection of block valves; inspection of pipeline mile-post and road-crossing markers; and inspection of crossings at highways, utilities and other pipelines.  An aerial reconnaissance of the pipeline ROW's would be made at least every two weeks of the Celeron/All American pipeline, and twice weekly of the Getty pipeline.

Species Accounts

The Biological Assessment for Threatened and Endangered Species for the Proposed Celeron/All American and Getty Pipeline projects thoroughly covers the biology and ecology of the species discussed in this Opinion. Only minor discrepancies were noted by our staff, and these will be discussed where needed in the section describing effects of the action.

4-28

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures Reduce Probability | Reduce Consequences | Effectiveness |
|-------|-------------|--------------|--------------------------------------------------------|----------------------------------------|---------------------|---------------|
| Oil spill onto irrigated agricultural lands (see Tables 3-22, 3-25, and 4-5) caused by: seam failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio[1] 21 miles irrigated $6.3 \times 10^{-3}$ spills/yr (> 50 bbl) 0.19 spills during life of project (30 yrs) | Contamination of soils, reduced productivity, maximum of 16 acres affected per spill. | Minimum cover 42 inches, cathodic protection, block and check values, 3 ft minimum cover, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. Continuous manned monitoring and control of all data. | Design and construct pipeline to accommodate geologic hazards (M-1, 2, and 3). | | Earthquake-resistant design is sufficiently advanced so that these measures should prove very effective. |
| | Las Flores to Blythe[1] 50 miles irrigated $1.5 \times 10^{-2}$ spills/yr (> 50 bbl) 0.45 spills during life of project (30 yrs) | | | Pipeline location markers above ground. Buried cable or fluorescent plastic below ground just above pipeline. | | Increase awareness of pipeline location thereby reducing potential of mechanical damage occurring. |
| | Blythe to McCamey[1] 52.8 miles irrigated $1.6 \times 10^{-2}$ spills/yr (> 50 bbl) 0.48 spills during life of project (30 yrs) | | | Periodic information contact with land owner. | | Same as above. |
| | | | | Provide extra pipeline depth in areas where deep plowing or ripping could result in damage to pipeline. Depth should be at least 1 ft below maximum plow depth. | | Will reduce risk of mechanical damage. |
| | | | | | Replace contaminated soil. | Decrease loss of productivity. |
| | | | | | Monetary compensation for lost product. | Eliminate financial loss to landowner/tenant. |
| Oil spill into a stream[2] (see Tables 3-11 and 3-12) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio 11 miles $3.3 \times 10^{-3}$ spills/yr (> 50 bbl) 0.09 spill during life of project (30 yrs) | Contamination of surface water lasting up to several weeks. Loss of aquatic life up to 2 years. | Concrete casing, cathodic protection, block and check valves, 100-year scour, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan (see Appendix H). Continuous manned monitoring and control of all operational data. | Monitor pipe burial depth at stream crossings (M-5). Periodic site inspections. Design and construct pipeline to accommodate geologic hazards (M-1, 2, and 3). | | Early indication of abnormal bottom scouring. Earthquake-resistant design is sufficiently advanced so that these measures should prove very effective. |
| | Las Flores to Blythe 25 miles $7.5 \times 10^{-3}$ spills/yr (> 50 bbl) 0.23 spill during life of project (30 yrs) | | | | | |

EIR (Exh. 4) p. 000469

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures Reduce Probability | Reduce Consequences | Effectiveness |
|---|---|---|---|---|---|---|
| | Blythe to McCamey 17 miles 5.1 x $10^3$ spills/yr (>50 bbl) 0.15 spill for life of project (30 yrs) | | | | | |
| Oil spill into a sensitive ground-water basin (see Table 3-14) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio 30 miles 9.0 x $10^{-3}$ spill/yr (> 50 bbl) 0.27 spill during life of project (30 yrs) Las Flores to Blythe 42 miles 1.3 x $10^{-2}$ spill/year (> 50 bbl) 0.39 spill during life of project (30 yrs) Blythe to McCamey 395 miles 1.2 x $10^{-1}$ spill/yr (> 50 bbl) 3.60 spills during life of project (30 yrs) | Contamination of groundwater by a small leak (less than 3 BPH). | Cathodic protection, block and check valves, 3 ft minimum cover, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Design and construct pipeline to accommodate geologic hazards (M-1, 2, and 3). | Identify areas to monitor in case of spill (M-6); use low permeability backfill in sensitive areas (M-7). | It is possible to design the pipeline to survive most geohazards through the latest seismic design and engineering practices. |
| Oil spill into a sensitive stream[2] (see Table 4-6) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error | Gaviota to Emidio 1 mile 3.0 x $10^{-4}$ spills/yr (> 50 bbl) 0.01 spill during life of project (30 yrs) Las Flores to Blythe 3 miles 9.0 x $10^{-4}$ spills/yr (> 50 bbl) 0.03 spill during life of project (30 yrs) Blythe to McCamey 4 miles 1.2 x $10^{-3}$ spills/yr (> 50 bbl) 0.04 spill during life of project (30 yrs) | Game and T&E fishes could be affected for several months to 2 years (see Appendix B). | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic tesing, leak detection system, aerial surveys, spill contingency plan. | Design and construct pipeline to accomodate geologic hazards (M-1, 2, and 3). Monitor pipeline burial depths at crossings including periodic diving inspections of deep water crossings (M-S). | | It is possible to design the pipeline to survive most geohazards through the latest seismic design and engineering practices. Early indication of abnormal bottom scouring. |

EIR (Exh. 4) p. 000470

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures Reduce Probability | Mitigation Measures Reduce Consequences | Effectiveness |
|---|---|---|---|---|---|---|
| Oil spill into sensitive terrestrial habitats (see Table 4-8) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio 50 miles sensitive habitat $1.5 \times 10^{-2}$ spills/yr 0.45 spill during life of project (30 yrs) Las Flores to Blythe 314 miles sensitive habitat $9.5 \times 10^{-2}$ spills/yr ($> 50$ bbl) 2.85 spills during life of project (30 yrs) Blythe to McCamey 15 miles sensitive habitat $4.5 \times 10^{-3}$ spills/yr ($\geq 50$ bbl) 0.14 spill during life of project (30 yrs) | Destruction of T&E species and/or their habitats (see Appendix B). | Cathodic protection, block and check valves, 3 ft minimum cover, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Design and construct pipeline to accommodate geological hazards (M-1, 2, and 3). | Relocate pipeline out of sensitive habitats in the Cuyama Valley (M-15). | Eliminates potential exposure for sensitive wildlife and terrestrial habitats. |
| Oil spill into the Colorado River or Hot Springs Creek[2] caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Celeron/All American $6.0 \times 10^{-4}$ spills/yr ($> 50$ bbl) 0.02 spill during life of project (30 yrs) | Destruction of riparian habitat and possible effects on T&E species (see Appendix B); disruption of water recreational activities. | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Monitor pipe burial depths at crossings (M-5). | Oil spill booms to redirect oil to skimmers and to block entry into backwaters of the Colorado River (M-17). | For the Colorado River this will protect nearby backwaters from contamination and aid in the clean-up downstream. For Hot Springs Creek the impacts will be minimized. The methods will not be 100% effective. |
| Oil spill into a coastal stream[3] (see Table 3-11) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Celeron/All American $2.4 \times 10^{-3}$ spills/yr ($>50$ bbl) 0.07 spill during life of project (30 yrs) Getty $3.0 \times 10^{-4}$ spills/yr ($\geq 50$ bbl) 0.01 spill during life of project (30 yrs) | Oil spills could reach recreational beaches along the Gaviota coast. | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Monitor pipe burial depths at crossings (M-5). Design and construct pipeline to accommodate geological hazards (M-1, 2, and 3). | | If all designs and plans are implemented properly, oil will not reach the coastal waters and impacts to the streams will be minimized. |

4-55

EIR (Exh. 4) p. 000471

# Exhibit 5

Exhibit 5
to Declaration of
Michael S. Dorsi
dated July 7, 2025

TABLE 4-25

CURRENT AND FUTURE PROBABILITIES OF TANK FARM SPILLS

| Spill Volume (bbls) | Spills/Barrel Year of Storage | 1,500,000 bbl (3 tanks)/Barrel Year of Storage | Spills Over Life of Project (30 years) |
|---|---|---|---|
| $\geq 10$ | $2.52 \times 10^{-7}$ | $3.8 \times 10^{-1}$ | 11.4 |
| $\geq 100$ | $5.7 \times 10^{-8}$ | $8.6 \times 10^{-2}$ | 2.58 |
| $\geq 1,000$ | $4.9 \times 10^{-9}$ | $7.5 \times 10^{-3}$ | 0.225 |
| $\geq 10,000$ | 0 | 0 | 0 |

Source: OIW (1978)

The pipe would be 0.344 to 0.562-inch wall thickness for Celeron/All American and 0.5-inch wall thickness for Getty. The pipe would be buried a minimum of 3 ft deep and its location would be marked by signs to DOT standards. All stream crossings would be analyzed for 100-year scour depth and the pipeline would be buried 4 ft below that depth. In bedrock the pipe would be buried to a depth of 18 inches. A concrete coating would also be applied at underwater crossings and a double casing used at road crossings.

Before burial, the welds would be subjected to nondestructive tests including radiography (x-ray), magnetic particle inspection, and dye penetrant or ultrasonic tests. A minimum of 10 percent of the welds made by each welder each day would be radiographically inspected. Hydrostatic testing of the pipeline would be completed at a pressure 1.25 times (or greater) than the maximum operating pressures.

The corrosion protection system includes special pipe coating on the exterior and a cathodic protection system. The pipeline coating would be tested before burial. The cathodic protection system would be inspected and maintained at 6-month intervals.

Block valve and check valve systems would be installed at sensitive water crossings to minimize oil losses into streams should the pipeline fail or be damaged (see individual resource sections for discussions of oil spill impacts).

4.2.15.5    Oil Spill Contingency and Cleanup Plans.   Despite the engineering design, specifications, and safeguards built into a pipeline system, the potential for oil spills still exist and additional containment and cleanup measures must be addressed. The conceptual oil spill contingency plans reviewed for Getty and Celeron/All American incorporate procedures for responding to an oil spill. These procedures begin with personnel training, an established communications network, standard reporting system, and defined responsibilities and lines of authority.

Appendix H of this EIS/EIR contains a preliminary draft of the applicants' oil spill contingency plan. The preliminary draft oil spill contingency plan incorporates much of the general information found in

the applicants' conceptual plans. However, information that should be incorporated (by the applicants) into the final plan when final project design is complete, has been specifically identified. For example, the applicants have identified appropriate general containment and cleanup procedures (which are summarized below) but have not yet developed specific procedures for sensitive areas along the pipeline route. When final design is complete, the applicants will be required to develop specific procedures.

The actual containment and cleanup procedures adopted, after a leak has been detected and located, depend on whether the spill is in a confined (populated) or unconfined (rural) area. The first priority in a confined area is to ensure human safety, followed by appropriate containment and cleanup procedures. Containment and cleanup procedures utilized would depend on the size of the spill and surrounding terrain (flat terrain, steep slopes, depressions, streams or rivers, etc.).

On flat terrain, where oil would spread in all directions, dams or berms would be constructed around the perimeter of the spill. In steeper areas where the oil may spread by following natural drainages or water ways, the following techniques would be used to contain and divert oil:

- blocking dams
- underflow dams
- diversion dams
- overflow berms
- culvert blocking

Cleanup procedures would generally require removal of soil or other natural substrates that become contaminated with oil. The motor grader/elevating scraper technique would be used for cleanup of relatively flat areas except where trees or heavy vegetation creates difficulties. Steep slopes or uneven terrain often require a bulldozer or front-end loader for sediment removal. Excessively steep or rough terrain may be cleaned using low pressure water flushing. This technique can also be used to remove oil from vegetation. On disturbed areas, reseeding and/or replasting would be undertaken as necessary to control erosion and return the area to a stable condition.

Oil which has formed pools in natural depressions or containment areas can be picked up with vacuum trucks. In less accessible areas, portable pumps discharging into barrels can be used. Sorbents may be used to remove small pools of oil, to clean light accumulations of oil from impervious surfaces, or to complete clean up. There are two techniques involving pumping that apply to oil spill cleanup of groundwater: water flooding (floation) and pumping oily water to the surface.

4.2.15.6  Federal and State Oil Spill Response Teams. In addition to individual operator contingency plans, Federal and state contingency plans and oil spill response teams are also in effect. These governmental levels of response and their relationship to Getty and All American/Celeron contingency plans in the event of a major spill

incident is described below. The conceptual contingency plans clearly address the responsibilities, interaction, and lines of communications between the applicants response teams and Federal and State response teams (Getty 1983c).

<u>Federal Response</u>. A Federal response is comprised of several different levels of repsonse. These are the National Response Team, National Strike Force, the Regional Response Teams and at the local level, the designated On-Scene Coordinator (OSC).

The Department of Transportation, U.S. Coast Guard, is responsible for the protection of coastal waters, the Great Lakes, and for ports and harbors. As such, the U.S. Coast Guard has established strike forces and Regional Response Teams to provide this protection. The southern California coastal area is the jurisdiction of the Pacific Strike Team, based in San Francisco. Within 2 hours of notification, the Pacific Strike Team can provide at least four trained personnel to the spill site at the request of the OSC, the Coast Guard or the commanding officer of the Strike Team.

The governing contingency plan for the southern California coastal region is the Region IX Multi-Agency Oil and Hazardous Materials Pollution Contingency Plan, subregional Plan for Zone One, Southern California. Zone One is contained within the jurisdiction of the 11th Coast Guard District, the commander of which serves as the OSC for all spills and is the key Federal official onsite. The Regional Response Team is under the direction of the OSC and is composed of the following knowledgeable agency officials: The Director of Surveillance and Analysis Division of the Regional Environmental Protection Agency, Commander of the U.S. Western Air Force Reserve Region; Director of the California Office of Emergency Services; and representatives from the U.S. Corps of Engineers, the 11th Naval District, 6th U.S. Army Headquarters, U.S. Fish and Wildlife Service, and Regional oil and Gas Division of the U.S. Geological Survey.

The onshore and inland spills are under the jurisdiction of the U.S. Regional EPA. Title 40, Part 112 requires a Spill Prevention and Control and Countermeasure Plan be submitted to EPA within six months after the facility begins operation. In the Plan the OSC coordinator and supporting agencies are identified for each segment of the pipeline.

In responding to a spill incident, the OSC will encourage the responsible parties to take the initiative in correcting the problem if they are able; if they are not, the OSC will activate the Regional Response Team, Pacific Strike Team and State Response Teams, as necessary. The OSC is responsible for the adquacy of the spill response operation and will maintain surveillance over operations until completed satisfactorily. For onshore and inland spills, the cleanup is supervised by the OSC but may be executed by a private contractor.

<u>State Response</u>. The State of California Oil Spill Contingency Plan provides for a coordinated response of State agencies to an oil spill. The plan designates a State Operating Authority (SOA) who will represent the state on the Federal Regional Response Team and have the authority

to declare an oil spill emergency requiring the activation of the State Contingency Plan. A representative of the California Department of Fish and Game has been designated as the current SOA.

The State's organizational framework for response to a major spill is multi-level. A State Support Team consisting of various State Department directors will authorize the SOA and administer a standing State Inter-agency Oil Spill Committee (SIOSC). The SIOSC functions as a liaison with public and private oil pollution control organization, reviews the State Contingency Plan, and recommends research and development. The SIOSC does not, however, have any direct-line authority during an oil spill. The SOA appoints a State Agency Coordinator who will be in charge of all state agencies engaged in combating a pollution incident. These agencies comprise the State Operating Team. The State Agency Coordinator will also act in a capacity similar to that of the Federal OSC.

4.2.15.7 <u>Potential Oil Spill Effects</u>. The proposed Celeron/All American and Getty pipelines would cross a variety of ecosystems between the California coast and Texas. Along the route numerous resources are considered at risk from potential oil spill. Table 4-26 summarizes areas along the pipeline route identified by resource specialists as being sensitive to an oil spill event. Based on the locations of these sensitive areas, maximum spill size volumes were estimated for each area. Factors such as elevation, location of check valves, and system shut-off response time were considered, if available, to calculate spill volumes. The automatic shutdown system would generally reduce the amount of the spill by two to three times. Potential impacts of spills at these sensitive areas are addressed in the individual resource sections of this document. When final project design is completed, the applicants will be required to develop specific contingency and cleanup plans for these sensitive areas.

Probably the best documented case of an inland pipeline oil spill involved a pipeline rupture near Glenrock, Wyoming on April 8, 1980 (U.S. EPA 1982b). The ruptured pipeline was owned by Platte Pipe Line Company. An estimated 8,552 barrels of crude oil escaped into the North Platte River and contaminated approximately 60 miles of river from the spill site downstream to Glendo Reservoir. The North Platte River oil spill site is located in east-central Wyoming, approximately 15 miles east of Casper, Wyoming. The following is a summary of the damage caused, effectiveness of oil spill contingencies utilized, and the recovery observed.

Flow in the river at the time of the spill was 13,000 cubic feet per second (cfs), but was intentionally reduced at an upstream reservoir to 400 cfs to slow the downstream movement of oil until containment areas could be established. Flow was then gradually increased and beached oil was refloated to downstream containment areas. A total of 11 boom deployment/oil recovery points were established. At each site, 6-inch diameter polyurethane pipe was deployed at a severe angle to the current. The pipes diverted significant amounts of oil to the shore for vacuum truck recovery. By April 20, most of the recoverable oil had been removed from the river. According to Platte Pipe Line Company, of

4-120

TABLE 4-26

ESTIMATES OF POTENTIAL SPILL VOLUMES AT SENSITIVE OR POTENTIALLY HAZARDOUS
AREAS ALONG THE PIPELINE ROUTE

| | Celeron/All American (Automatic Shutdown) | | Getty (Automatic Shutdown) | |
|---|---|---|---|---|
| | (bbl) | (gal) | (bbl) | (gal) |
| Refugio Creek | 1,753 | 73,626 | NA[1] | NA |
| Gaviota Creek | 1,753 | 73,626 | 1,162 | 48,804 |
| South Branch Santa Ynez Fault[2] | 6,157 | 258,594 | 4,934 | 207,228 |
| Santa Ynez River | 3,244 | 136,248 | 2,240 | 94,080 |
| Sisquoc River | 2,620 | 110,040 | 3,120 | 131,040 |
| La Brea Creek | 1,753 | 73,626 | 2,023 | 84,966 |
| Cuyama River | 2,192 | 92,064 | 2,120 | 89,040 |
| San Luis Obispo/Kern County Line[2] | 8,370 | 351,540 | 3,160 | 132,720 |
| San Andreas Fault | 4,635 | 194,670 | 2,200 | 92,400 |
| Garlock Fault[2] | 5,465 | 229,530 | NA | NA |
| Mojave River | 3,945 | 165,690 | NA | NA |
| Colorado River | 3,506 | 147,252 | NA | NA |
| Gila River | 4,383 | 184,086 | NA | NA |
| Wild Cat Canyon Creek | 1,981 | 83,202 | NA | NA |
| Bass Canyon Creek | 3,068 | 128,856 | NA | NA |
| Rio Grande River | 2,629 | 110,418 | NA | NA |
| Pecos River | 4,821 | 202,482 | NA | NA |

Source:  Celeron/All American, and Getty

[1]Not Applicable.

[2]No valves at the crossing location.

4-121

the 8,552 barrels of oil released, approximately 6,500 barrels were recovered. The remainder evaporated or was dispersed into the environment.

The most damaging effects from this oil spill were short term and affected benthic invertebrates and terrestrial wildlife. Macroinvertebrates were almost completely destroyed and some 355 birds (mainly mallards and mergansers) and 33 mammals (primarily beaver, muskrat, and mule deer) died as a result of the spill. The invertebrates had completely recovered at most sampling ·and monitoring sites several months after the spill. No fish mortality was noted although disagreeable odors and taste occurred in some game fish species for about 2 months after the spill. Oil concentrations on the river surface exceeded the State limit of 10 milligrams/liter (mg/l) immediately after the spill (2.8 mg/l to 8,195.0 mg/l), but were below 10 mg/l within 7 days after the spill. Dissolved and/or emulsified oil in the water column never exceeded 10 mg/l.

Surveys of groundwater were conducted at 16 wells along the river system. The filtering action of sands and gravel was low and allowed oil inflow into some shallow wells (4 total) particularly the dissolved fraction. The contaminated wells were within 45 ft of the river bank, however, contamination was evident for only 24 hours. There was some oiling of the river sediment above background level (April 16) primarily near the river banks. As the river flow increased much of the oil was probably washed from the sediments. A direct correlation was found in the laboratory between water temperature and dissolved/emulsified oil.

Long-term effects of the spill included a slightly depressed muskrat population and Canada goose reproduction effort. Many nests of Canada geese were oiled, as were the eggs in all of the oiled nests. The result may have been smaller than normal brood sizes for this species in 1981.

The EPA damage assessment study demonstrated that though short-term impacts from a massive oil spill into an inland waterway can be severe, the ecosystem is resilient and can recover when aided by rapid and effective cleanup efforts. Of course, the severity and duration of the spill impacts would also depend on the nature of the spilled product and the environmental conditions prevalent at the time of the spill (e.g., temperature, river flow, etc.). Tradeoffs must often be made: in this case, when a reduction was made in the river flow rate to aid effectiveness of the oil spill booms, oil was deposited onto sediments near the river banks.

4.2.15.8 <u>Summary</u>. Assuming a 40-year project life, it is unlikely that any spills would occur for the 113-mile Getty and 122-mile Celeron pipeline segments. However, for the 1,084-mile All American segment, 4.87 spills greater than 9.5 barrels and 2.49 spills greater than 50 barrels have been projected. Any spills greater than 5 barrels would be considered significant; however, the duration and magnitude of impact and resources at risk would be dependent upon the locations of spill incidents, volumes spilled, and application of oil spill contingency measures.

4-122

Maximum possible spill volumes at stream or river crossings (given a pipeline rupture) would have significant impacts on environmental resources, but these impacts may be of short duration.

Tank farm spills greater than 100 barrels but less than 1,000 barrels would be likely to occur over an assumed 30-year life of project. However, these spills are unlikely to pose a risk to the environment due to containment within the diked and bermed tank farm area.

## 4.3  Santa Maria Canyon Alternative

### 4.3.1  Air Quality

Impacts to air quality would be the same as described for the Celeron/All American and Getty proposals.

### 4.3.2  Geology

The only potentially significant geologic hazards which may affect the Santa Maria Canyon Alternative route involve slope stability, and seismicity and faulting (see Table 4-4). As shown on Map 1-2, this route traverses areas characterized by existing slope failures or susceptible to new failures. The route crosses the Rinconada and south Cuyama faults of Quaternary age. On the basis of presently available information (Dibblee 1984, personal communication; ESA photointerpre-tation; Livingston and Associates, Moore and Taber 1979), the probability of surface rupture on these faults during the project life is judged very low.

The discussion of seismicity in section 4.2.2.1 is directly applicable to this alternative.

No other significant impacts or geologic hazards which could lead to an oil spill and consequent impacts have been identified for this alternative.

### 4.3.3  Soils

Impacts to soils would be similar to those discussed in Section 4.2.3.1. Short-term impacts would include accelerated soil erosion and deposition, decreased productivity from compaction, and increased soil slumping potential. Sensitive soil units along this alternative route are shown on Map 1-2 and are described in Table 4-5.

### 4.3.4  Surface Water

The Santa Maria Canyon Alternative would cross Tepusquet Creek and parallel the creek along a ridge on its north side. Impacts to Tepusquet Creek would include short-term sedimentation and potential oil spills. No municipal water supplies are near the proposed crossing. The likelihood of channel changes affecting the flow regime of Tepusquet Creek would be small. Impacts for crossing the Sisquoc and Cuyama Rivers would be the same as those discussed for the Celeron/All American and Getty proposals.

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
LISA L. GARCIA, SBN 301362
lisa.garcia@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone: (213) 576-1000
Facsimile: (213) 576-1100

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/7/2025 5:53 PM
By: Terri Chavez , Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERMANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,<br><br>Respondents and Defendants,<br><br>and<br><br>SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive, | Case No. 25CV02244<br><br>Assigned for all purposes to:<br><br>Hon. Donna G. Geck<br><br>**REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; DECLARATION OF GARRETT B. STANTON**<br><br>*[Filed concurrently with Notice of Demurrer and Demurrer; Proposed Order]* |

1

REAL PARTIES' REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

|  | Real Parties in Interest. | Hearing Date:<br>Time:<br>Department: | September 19, 2025<br>10:00 a.m.<br>4 |
|---|---|---|---|
|  |  | Complaint Filed:<br>Trial Date: | April 15, 2025<br>None set |

## REQUEST FOR JUDICIAL NOTICE

Pursuant to Evidence Code sections 452 and 453, Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company hereby request this Court to take judicial notice of the following document in support of Real Parties' Demurrer to Petitioners and Plaintiffs' Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief ("Demurrer").

1.      Attached hereto as **Exhibit 1** is a true and correct copy of the Letter of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-324) dated December 17, 2024.

2.      Attached hereto as **Exhibit 2** is a true and correct copy of the Letter of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-325A/B) dated December 17, 2024.

In accordance with Evidence Code section 453, Real Parties give Petitioners and Plaintiffs sufficient notice of this request to enable them to meet the request, and Real Parties have also furnished the Court with sufficient information to take judicial notice of Exhibits 1 and 2. The basis for admission of Exhibits 1 and 2 is that they constitute 'official acts' of the Office of the State Fire Marshal within the meaning of Evidence Code section 452, subdivision (c). Additionally, Exhibits 1 and 2 are subject to judicial notice on the basis that they are "not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy" as they are posted online by the State Fire Marshal and are publicly available at the website identified in the Petition: "Cal Fire posted the State Waivers on its website *Pathways for Restarting CA-324 and CA-325*, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines." (Petition, ¶ 8.)

REAL PARTIES' REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

Further, the documents attached as Exhibits 1 and 2 are relevant to the Demurrer because they are the "State Waivers" referenced and quoted from throughout the Petition, they are the subject of each of Petitioners' causes of action, and most of Petition's prayer for relief. (See Petition, generally.) Accordingly, the Court may take judicial notice of these documents.  (*See Geraci v. United Services Automobile Assn.* (1987) 188 Cal.App.3d 1245, 1248 [in ruling on a demurrer, a court may consider "not only the contents of the complaint but also matters of which judicial notice may be taken"].)

DATED:   July 3, 2025

Respectfully Submitted,
**ALSTON & BIRD**
JEFFREY D. DINTZER
LISA L. GARCIA
GARRETT B. STANTON

By: _____
Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP.**
**PACIFIC PIPELINE COMPANY**

REAL PARTIES' REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

**DECLARATION OF GARRETT B. STANTON**

I, Garrett B. Stanton, declare:

1.     I am an attorney duly licensed to practice law before all courts of the State of California and am a senior associate at Alston & Bird LLP, attorneys of record for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (hereinafter "Real Parties"). I make this declaration in support of Real Parties' Demurrer to Petitioners' and Plaintiffs' Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief (the "Demurrer"). I have personal knowledge of the facts set forth in this declaration and if called as a witness, could and would testify competently to them.

2.     Attached hereto as **Exhibit 1** is a true and correct copy of the Letter of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-324) dated December 17, 2024.

3.     Attached hereto as **Exhibit 2** is a true and correct copy of the Letter of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-325A/B) dated December 17, 2024.

2.     On June 6, 2025 at 4:54 p.m., I sent a letter to counsel for Petitioners and Plaintiffs advising of Real Parties' intent to demur to the Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief (the "Complaint") and requesting to meet and confer pursuant to Code of Civil Procedure section 430.031. A true and correct copy of this letter is attached as **Exhibit 3**.

3.     On June 11, 2025 at 3:00 p.m., I met and conferred by videoconference with counsel for Petitioners and Plaintiffs, where I detailed why Real Parties contend that Plaintiffs' and Petitioners' Complaint fails to state legally cognizable claims as to the Causes of Action the Real Parties proposed challenging via a demurrer. An agreement could not be reached resolving the objections raised in the Demurrer and Petitioners and Plaintiffs confirmed they would not amend the Complaint.

4

REAL PARTIES' REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 3rd day of July, 2025, in Los Angeles, California.

_____

GARRETT B. STANTON

REAL PARTIES' REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

# EXHIBIT 1

Docusign Envelope ID: 87418E7A-ED76-4891-96B3-BCE5F180F5D7

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                                          Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



### CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324)**

**Operator:**    Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

**Pipeline:**    OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324*.

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines*. If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

**In-Line Inspection (ILI) Assessment and Frequency**

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

    a) Dates for integrity assessment

    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.
[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Docusign Envelope ID: 87418E7A-FD76-4891-96B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 6

    segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

    c) In-line inspection tool vendor(s)

    d) Required tool specifications including operational specifications and anomaly sizing tolerances

    e) Tool validation methodology

    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

    g) Criteria used to identify locations for excavation and field verification

    h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

    a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

    b. USCD Performance Specification Requirements

        i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

        ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

        iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

        iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in §195.452(h)(4)(i) *Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

Docusign Envelope ID: 87418E7A-ED76-4891-96B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

## 180-Day Repair Conditions[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].
41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.
44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Lance Yearwood
December 17, 2024
Page 11

    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
   a. Technical approach used for the analysis
   b. All data used and analyzed
   c. Pipe and longitudinal weld seam properties
   d. Procedures used to implement state waiver conditions

Docusign Envelope ID: 87418E7A-FD76-4891-96B8-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 13

     e.  Evaluation methodology used
     f.  Models used
     g.  Direct in situ examination data
     h.  All in-line inspection tool assessments information evaluated
     i.  Pressure test data and results
     j.  All in-the-ditch assessments performed on the pipeline segments
     k.  All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
     l.  All finite element analysis results
     m.  The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
     n.  The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
     o.  Safety factors used for fatigue life and/or predicted failure pressure calculations
     p.  Reassessment time interval and safety factors
     q.  The date of the review
     r.  Confirmation of the results by qualified technical subject matter expert(s)
     s.  Approval by responsible Sable management personnel
     t.  Records of additional preventive and mitigative (P&M) measures performed
     u.  Reports required by this State Waiver.

**Reporting**

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324.* The email notification shall include, if applicable:
     a.  Tool type and run date
     b.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
     c.  Dig sheets
     d.  Field contact information for Sable
     e.  Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Docusign Envelope ID: 8741857A-FD76-4891-96B8-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 14

   a.  Tool type
   b.  Run date
   c.  Summary of Conditions Report[18]
   d.  Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324*. At a minimum, the annual report shall contain the following, if applicable:
   a.  A Closure Report for the previous calendar (CY) which contains:
       i.   Features that were remediated in previous CY
            1.  Provide documentation for the in-the-ditch assessments and repairs
       ii.  Identify features that remain to be assessed
       iii. Unity Plots for previous ILI runs
   b.  Fracture mechanics and pressure cycling analyses in accordance with Condition 48
   c.  The third-party ILI expert reviews in accordance with Condition 52
   d.  AC and DC Interference surveys that are due in accordance with Condition 53
   e.  A copy of the CGRA for prior year including:
       i.   Mean corrosion growth rate for the pipeline
       ii.  Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

**Limitations**

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 87418E7A-FD76-4891-96B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 15

failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,

James Hosler

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs


Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Tuan Tran, Pipeline Safety Engineer, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Max Kieba, Engineering and Research Division, PHMSA
        Joshua Johnson, Engineering and Research Division, PHMSA

# EXHIBIT 2

Docusign Envelope ID: 166BEFF3-211F-470F-8D10-BAFB95600F3B

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                        Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



## CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A/B)**

**Operator:**   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**Pipeline:**   OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAF895600E3B

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAF895600F53B

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

## General Conditions

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600E3B

Lance Yearwood
December 17, 2024
Page 4

8. Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
   a. API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
   b. API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.
   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]
9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.
10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines*. If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.
11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600053B

Lance Yearwood
December 17, 2024
Page 5

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.
13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.
14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.
15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.
16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.
17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.
18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Lance Yearwood
December 17, 2024
Page 6

**In-Line Inspection (ILI) Assessment and Frequency**

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination

20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAF895600F53B

Lance Yearwood
December 17, 2024
Page 7

any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

    a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

    b. USCD Performance Specification Requirements

        i. The USCD tools must have a probability of detection that is $\geq 90\%$ for axial and circumferential cracks.

        ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

        iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

        iv. The depth sizing accuracy for cracks must be $\pm 0.8$ mm for axial cracks and $\pm 1$ mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11] The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii). All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.
    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.
    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.
[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

## Integrity Management

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
   a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
   b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 166BEFF3-2115-470E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 13

      n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
      o. Safety factors used for fatigue life and/or predicted failure pressure calculations
      p. Reassessment time interval and safety factors
      q. The date of the review
      r. Confirmation of the results by qualified technical subject matter expert(s)
      s. Approval by responsible Sable management personnel
      t. Records of additional preventive and mitigative (P&M) measures performed
      u. Reports required by this State Waiver.

## Reporting

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B.* The email notification shall include, if applicable:
      d. Tool type and run date
      e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
      f. Dig sheets
      g. Field contact information for Sable
      h. Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:
      i. Tool type
      j. Run date
      k. Summary of Conditions Report[18]
      l. Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F53B

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B.* At a minimum, the annual report shall contain the following, if applicable:

a. A Closure Report for the previous calendar (CY) which contains:
  i. Features that were remediated in previous CY
      1. Provide documentation for the in-the-ditch assessments and repairs
  ii. Identify features that remain to be assessed
  iii. Unity Plots for previous ILI runs
b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
c. The third-party ILI expert reviews in accordance with Condition 53
d. AC and DC Interference surveys that are due in accordance with Condition 54
e. A copy of the CGRA for prior year including:
  i. Mean corrosion growth rate for the pipeline
  ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 15

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Tuan Tran, Pipeline Safety Engineer, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Max Kieba, Engineering and Research Division, PHMSA
        Joshua Johnson, Engineering and Research Division, PHMSA

# EXHIBIT 3

# ALSTON & BIRD

350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
213-576-1000 | Fax: 213-576-1100

**Jeffrey D. Dintzer**          Direct Dial: **213-576-1063**          Email: **jeffrey.dintzer@alston.com**

<u>**VIA E-MAIL**</u>

June 6, 2025

Linda Krop
Environmental Defense Center
906 Garden Street
Santa Barbara, CA 93101
lkrop@environmentaldefensecenter.org

Julie Teel Simmonds
Center For Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
jteelsimmonds@biologicaldiversity.org

Re:          *Center for Biological Diversity et al. v. Office of State Fire Marshall et al.*
             *Environmental Defense Center et al. v. Office of State Fire Marshall et al.*
             (Santa Barbara County Superior Court Case Nos. 25CV02244 & 25CV02247)

Dear Counsel:

We write on behalf of Real Parties in Interest Sable Offshore Corp. ("Sable") and Pacific Pipeline Company ("PPC") (collectively, "Real Parties") concerning the Operative Complaints in Case Nos. 25CV02244 and 25CV02247.

Real Parties intend to demur to the Complaints and formally request to meet and confer. Please let us know next week when you may be available to remotely meet and confer per Code of Civil Procedure section 430.31.

We look forward to your prompt response.

Very Truly Yours,

Jeffrey D. Dintzer

---

Alston & Bird LLP                                                                          www.alston.com

Atlanta | Beijing | Brussels | Century City | Charlotte | Dallas | London | Los Angeles | New York | Raleigh | San Francisco | Silicon Valley | Washington, D.C.

**PROOF OF SERVICE**

I, Isaac Walrath, declare:

I am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 55 Second Street, Suite 2100, San Francisco, CA 94105.

On July 3, 2025, I served the document(s) described as **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; DECLARATION OF GARRETT B. STANTON** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: *See* Attached Service List.

☒ BY ELECTRONIC MAIL TRANSMISSION WITH ATTACHMENT: On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

☒ [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 3, 2025, at San Francisco, California.

*/s/ Isaac Walrath*

Isaac Walrath

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>CENTER FOR BIOLOGICAL DIVERSITY<br>2100 Franklin St., Ste. 375<br>Oakland, CA 93101 | **ATTORNEYS FOR PETITIONERS**<br>CENTER FOR BIOLOGICAL DIVERSITY<br>and WISHTOYO FOUNDATION<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>        dpettit@ biologicaldiversity.org<br>        tnimmer@ biologicaldiversity.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | **ATTORNEYS FOR RESPONDENTS/ DEFENDANTS**<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal<br><br>Tel.:    (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | **ATTORNEYS FOR REAL PARTIES IN INTEREST**<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (310) 620-5879<br>Email: djmoore@paulhastings.com<br>        benjaminhanelin@paulhastings.com<br>        natalierogers@paulhastings.com |

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Telephone: (213) 576-1000
Facsimile: (213) 576-1100

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

*Attorneys for Real Parties in Interest*
*SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY*

*Additional Counsel Listed on Signature Page*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>Respondents and Defendants.<br><br>and<br><br>SABLE OFFSHORE CORP., et al.,<br><br>Real Parties in Interest. | Case No. 25CV02244 [Coordinated with Case No. 25CV02247]<br><br>Assigned for all purposes to the Honorable Judge Donna D. Geck<br><br>**REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION; DECLARATION OF JEFFREY D. DINTZER**<br><br>[Concurrently filed with [Proposed] Order; and Declaration of Michael J. Rosenfeld.]<br><br>Hearing Date:    July 18, 2025<br>Hearing Time:    10:00 a.m.<br>Department:      4<br><br>Complaint Filed:   June 3, 2025<br>Trial Date:      None set |

- 1 -
REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on July 18, 2025 at 10:00 a.m., in Department 4 of the California Superior Court for the County of Santa Barbara, Anacapa Division, located at 1100 Anacapa Street, Santa Barbara, California 93121-1107, before the honorable Donna D. Geck, Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company ("Real Parties") will and hereby do move the Court for an order striking the declaration of Richard B. Kuprewicz, which was filed in support of Center for Biological Diversity and Wishtoyo Foundation's (together, the "Petitioners") Order to Show Cause re Preliminary Injunction.

This Motion is made pursuant to Evidence Code sections 402, 801, 802, and the California Supreme Court ruling in *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 ("*Sargon*"), and is based on the following grounds:

1.      On June 2, 2025, Petitioners filed an *Ex Parte* Application for an Administrative Stay or, in the alternative, an Order to Show Cause Why a Preliminary Injunction Should Not Be Granted and Temporary Restraining Order against Defendants and Real Parties to stay the operation of the approval of State Waivers for CA-324 and CA-325A/B pending judgment of the Court.

2.      Petitioners filed the Declaration of Mr. Kuprewicz in support of their *Ex Parte* Application, which also supports their Order to Show Cause re preliminary injunction (the "Preliminary Injunction"). Mr. Kuprewicz serves as Petitioners' key witness supporting their Preliminary Injunction request, offering purported expert opinions regarding effects of corrosion on the Pipelines, including that they are "not safe to operate, even if the conditions in the Fire Marshal's State Waivers are fulfilled." The Court scheduled the hearing on the Preliminary Injunction for July 18, 2025, and Real Parties' opposition to the Preliminary Injunction is due July 7, 2025, and filed concurrently herewith.

3.      Consistent with Real Parties' right to cross-examine Mr. Kuprewicz to oppose the Preliminary Injunction, Real Parties served a deposition subpoena on Mr. Kuprewicz on June 5, 2025. Despite the Real Parties' diligence, agreements with opposing counsel, motion work, and a Court order, Mr. Kuprewicz has not, and for medical reasons, will not, be made available for deposition.

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

4.      Mr. Kuprewicz's declaration must be stricken pursuant to Evidence Code sections 402, 801, and 802, as well as the California Supreme Court's *Sargon* decision, under which trial courts have a substantial gatekeeping responsibility to exclude expert testimony that lack foundation or a reliable methodology. This Court cannot determine whether the information cited by Mr. Kuprewicz adequately supports his conclusions without cross-examination. (See *Sargon*, *supra*, 55 Cal.4th at pp. 755-767 [reciting and relying upon testimony of the expert taken by opposing counsel at deposition to support the ruling of the Court.].) Further, Mr. Kuprewicz's declaration is inadmissible under *Sargon* if his opinions are not based on a generally accepted scientific methodology or an adequate foundation. (See *ibid*.)

5.      Additionally, Real Parties have a fundamental due process right to cross-examine Mr. Kuprewicz and will be severely prejudiced if his expert declaration is admitted without any opportunity for cross-examination.  The right to confront opposing witnesses "in noncriminal proceedings is a part of procedural due process guaranteed by the Fifth Amendment and the Fourteenth Amendment to the federal Constitution." (*August v. Department of Motor Vehicles* (1968) 264 Cal.App.2d 52, 60 [finding hearing met requirements of due process where sworn statement was considered but there was no subsequent request to cross-examine the declarant]; see also Cal. Const. Art. I. § 7.) "Because it relates to the fundamental fairness of the proceedings, cross-examination is said to represent an 'absolute right,' not merely a privilege." (*Fost v. Marin County Superior Court* (2000) 80 Cal.App.4th 724, 733 [noting the rule applies in "either a criminal or a civil case" and if "a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony"].)

The Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently filed declarations of Jeffrey D. Dintzer and Michael J. Rosenfeld, the concurrently lodged [Proposed] Order, the records and documents on file in this action, and on such other evidence and argument as may properly come before the Court at the time of hearing.

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

Dated: July 7, 2025

Respectfully submitted,

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE

**FAUVER, LARGE, ARCHBALD & SPRAY LLP**
TREVOR D. LARGE

By: _____
　　　　　　Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE
COMPANY

- 4 -

**Table Of Contents**

                                                                                                    **Page**

I.      Introduction..............................................................................................................8

II.     Statement Of Facts..................................................................................................9

        A.      Petitioners Filed the Declaration of Richard B. Kuprewicz in Support of Their Preliminary Injunction Request. ..................................................................9

        B.      Real Parties Personally Served Mr. Kuprewicz With a Deposition Subpoena for Personal Appearance, and Mr. Kuprewicz Agreed to Appear. ..................................10

        C.      Nearly Two Weeks After Agreeing to His Rescheduled Deposition, Petitioners Suddenly Refused to Produce Mr. Kuprewicz for Deposition. ..................................10

        D.      Mr. Kuprewicz Is Unable to Testify Due to His Medical Condition..........................11

III.    Argument ..................................................................................................................11

        A.      Mr. Kuprewicz's Declaration Should Be Excluded Based on the Court's Substantial Gatekeeping Responsibility Under *Sargon*....................................................11

                1.      *Sargon* Requires Judicial Gatekeeping of Proffered Expert Opinions. ..................................................................................................11

                2.      The Kuprewicz Declaration Fails to Identify any Accepted Methodology. ..................................................................................13

                3.      The Kuprewicz Declaration Lacks Foundation and is Speculative. ... 15

                4.      The Expert Opinion of Michael Rosenfeld Highlights Additional Material Flaws in the Kuprewicz Declaration ..................................16

        B.      Mr. Kuprewicz's Declaration Should Be Excluded Based On His Unavailability and Real Parties' Due Process Right to Cross Examine Mr. Kuprewicz. ..................18

                1.      Fundamental Fairness Requires an Opportunity to Examine an Expert Witness.........................................................................................18

                2.      The Function of Cross-Examination is Not Served by Responsive Expert Opinions, and the Sole Remedy is Exclusion of the Kuprewicz Declaration. ..................................................................................19

IV.     Conclusion ..................................................................................................................22

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alexander v. Scripps Memorial Hospital La Jolla*
   (2018) 23 Cal.App.5th 206 ................................................................................13, 16

*August v. Department of Motor Vehicles*
   (1968) 264 Cal.App.2d 52 ........................................................................................18

*Continental Airlines. Inc. v. McDonnell Douglas Corp.*
   (1981) 216 Cal.App.3d 388 ......................................................................................15

*Fleishman v. Superior Court*
   (2002) 102 Cal.App.4th 350 .....................................................................................19

*Fost v. Marin County Superior Court*
   (2000) 80 Cal.App.4th 724 .......................................................................9, 18, 19, 21

*Fuller v. Department of Transportation*
   (2019) 38 Cal.App.5th 1034 .....................................................................................15

*Hope v. Arrowhead & Puritas Waters, Inc.*
   (1959) 174 Cal.App.2d 222 ......................................................................................20

*I-CA Enterprises. Inc. v. Palram Americas. Inc.*
   (2015) 235 Cal.App.4th 257 .....................................................................................14

*In re Crystal J.*
   (1993) 12 Cal.App.4th 407 .......................................................................................19

*In re Marriage of Swain*
   (2018) 21 Cal.App.5th 830 .......................................................................................18

*Jay v. Mahaffey*
   (2013) 218 Cal.App.4th 1522 .....................................................................................9

*Jennings v. Palomar Pomerado Health Systems, Inc.*
   (2003) 114 Cal.App.4th 1108 ...................................................................................12

*Lowery v. Kindred Healthcare Operating, Inc.*
   (2020) 49 Cal.App.5th 119 ............................................................................. passim

*Lynn v. Tatitlek Support Services, Inc.*
   (2017) 8 Cal.App.5th 1096 .......................................................................................13

*People v. Moore*
   (2011) 51 Cal.4th 386 ...............................................................................................12

- 6 -

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

*People v. Richardson*
    (2008) 43 Cal.4th 959 ..................................................................................................12

*People v. Sanchez*
    (2016) 63 Cal.4th 665 ..................................................................................................15

*People v. Wright*
    (2016) 4 Cal.App.5th 537 ........................................................................................13, 16

*Powell v. Kleinman*
    (2007) 151 Cal.App.4th 112 ..................................................................................8, 13, 16

*San Francisco Print Media Co. v. The Hearst Corp.*
    (2020) 44 Cal.App.5th 952 ....................................................................................13, 14

*Sargon Enterprises, Inc. v. University of Southern California*
    (2012) 55 Cal.4th 747 ......................................................................................... passim

**RULES**

Cal. R. Ct. 3.1306..............................................................................................................15

**STATUTES**

Code Civ. Proc., § 1872 .....................................................................................................20

Code Civ. Proc., § 2015.5 ...................................................................................................15

Evid. Code, § 1200..........................................................................................................14, 15

Evidence Code section 701 .................................................................................................19

Evidence Code, § 801 .........................................................................................................12

Evidence Code sections 801 ...............................................................................................12

Evidence Code, § 802 .........................................................................................................12

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.     INTRODUCTION

Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company ("Real Parties") ask the Court to strike the declaration of Richard B. Kuprewicz ("Kuprewicz Declaration"), which was filed June 2, 2025 in support of Petitioners Center for Biological Diversity ("Center") and Wishtoyo Foundation's ("Wishtoyo") (together, the "Petitioners") Order to Show Cause re Preliminary Injunction.

There are several reasons why the Kuprewicz Declaration should be stricken. First, it fundamentally fails the test for admissibility under *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 ("*Sargon*"), which provides that trial courts have a "substantial gatekeeping" responsibility to ***exclude*** proffered expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. (*Ibid*. at pp. 771-772.) Throughout the declaration, Mr. Kuprewicz merely recites conclusory statements drawn from his own unsworn, unpublished and non-peer-reviewed hearsay comment letters. He provides no explanation of his methodology, no substantive analysis of the factual foundation for his opinions, and no articulation of how he arrived at his conclusions. California courts have consistently held that an "expert opinion is worth no more than the reasons and facts on which it is based." (E.g., *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123.) The complete absence of supportive reasoning and information renders the Kuprewicz Declaration legally insufficient and inadmissible.

Second, the inability to cross-examine Mr. Kuprewicz constitutes a clear violation of Real Parties' due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution. Mr. Kuprewicz serves as Petitioners' key witness supporting their Preliminary Injunction request, offering purported expert opinions regarding the safety of the Pipelines. Consistent with Real Parties' right to cross-examine Mr. Kuprewicz to oppose the Preliminary Injunction, Real Parties served a deposition subpoena on Mr. Kuprewicz on June 5, 2025. Despite the Real Parties' diligence, agreements with opposing counsel, motion work, and a Court order, Mr. Kuprewicz has not, and for

- 8 -

medical reasons, will not, be made available for deposition. (See *Notice of Update Regarding Richard B. Kuprewicz*.)

The opportunity to cross-examine an expert witness is not merely a procedural formality but an "absolute right" that is essential to fundamental fairness in both criminal and civil proceedings. (*Fost v. Marin County Superior Court* (2000) 80 Cal.App.4th 724, 733.) The denial of Real Parties' right to cross-examine Mr. Kuprewicz materially prejudices their ability to challenge the basis of his opinions, test his qualifications and methodology, obtain material admissions regarding limitations or gaps in his analysis, and generally present a complete defense to the requested preliminary injunction. Courts have clearly articulated that "if a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony."[1] (*Ibid.*)

For these reasons, and those stated below, Real Parties request that the Court strike the declaration of Mr. Kuprewicz.

## II.    STATEMENT OF FACTS

### A.    Petitioners Filed the Declaration of Richard B. Kuprewicz in Support of Their Preliminary Injunction Request.

On June 2, 2025, Petitioners filed an *ex parte* Application for Stay or Order to Show Cause re Preliminary Injunction and Temporary Restraining Order. In support of their Application, Petitioners filed the Declaration of Richard B. Kuprewicz, a purported pipeline safety expert, who opined that Real Parties' pipelines cannot be safely operated and the State Waivers issued by the Office of the State Fire Marshal would not ensure the integrity and safety of the pipelines or prevent another oil spill. On June 3, 2025, the Court granted Petitioners' temporary restraining order and scheduled for July 18, 2025, an Order to Show Cause why a preliminary injunction should not issue against

---

[1]    It is of no consequence that Petitioners offered not to take the depositions of Real Parties' experts or file a "reply" declaration for Mr. Kuprewicz; assuming such a "reply" declaration is even admissible. (See, e.g., *Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1537 ["The general rule of motion practice, which applies here, is that new evidence is not permitted with reply papers."].) Real Parties were prepared to present their experts for cross examination should Petitioners have timely noticed their depositions. Real Parties never waived their constitutional rights to confront Mr. Kuprewicz with cross examination and should not have to rely upon their own experts to establish the inadmissibility of his testimony, especially when a deposition will produce admissions from the witness that his opinions proffered in his declaration are not based on any generally accepted methodology and lack an adequate foundation.

- 9 -

Defendants and Real Parties prohibiting them from proceeding with the restart and operation of the Las Flores Pipeline System.

**B.    Real Parties Personally Served Mr. Kuprewicz With a Deposition Subpoena for Personal Appearance, and Mr. Kuprewicz Agreed to Appear.**

On June 5, 2025, Real Parties personally served a Deposition Subpoena for Personal Appearance and Production of Documents on Mr. Kuprewicz for June 24, 2025, and paid witness fees of $41.00. (See Declaration of Jeffrey Dintzer ["Dintzer Decl."], ¶ 2.) On June 10, 2025, counsel for Center for Biological Diversity agreed that Mr. Kuprewicz would appear for deposition but asked that the deposition be rescheduled to a later date, taken remotely, and split into two sessions due to Mr. Kuprewicz's health issues. (*Id*. at ¶ 3.) The parties met and conferred about deposition logistics and Real Parties worked in good faith to provide accommodations for Mr. Kuprewicz's stated health issues. (*Id*. at ¶ 4.)

On June 12, 2025, all parties (including Mr. Kuprewicz's personal counsel) agreed to a July 1, 2025, deposition date, time, and location close to Mr. Kuprewicz, as well as certain accommodations for his health conditions. (*Ibid*.) On June 20, 2025, Real Parties timely served on Mr. Kuprewicz's counsel (who agreed to accept service) an Amended Deposition Subpoena for Personal Appearance and Production of Documents on Mr. Kuprewicz for July 1, 2025. (*Ibid*.)

**C.    Nearly Two Weeks After Agreeing to His Rescheduled Deposition, Petitioners Suddenly Refused to Produce Mr. Kuprewicz for Deposition.**

On June 23, 2025, nearly two weeks after the parties agreed to a rescheduled July 1, 2025 deposition and Mr. Kuprewicz' counsel had accepted service of the Amended Deposition Subpoena on his behalf, counsel for Environmental Defense Center emailed Real Parties for the first time stating that "[a]fter further consideration," they would not produce Mr. Kuprewicz for deposition, without any valid basis for their newfound position. (Dintzer Decl., ¶ 5.) Neither Petitioners nor Mr. Kuprewicz ever objected to his appearing for deposition during the meet and confer process in which all parties agreed to a new date, time, and location for Mr. Kuprewicz's deposition. (*Ibid*.) Moreover, Real Parties explained that they were entitled to cross-examine a witness whose testimony is offered in support of a preliminary injunction, and that if Mr. Kuprewicz refused to appear, they would seek monetary

- 10 -

sanctions. (*Ibid*.) On June 24, 2025, counsel for Petitioners served formal objections to the deposition. (*Ibid*.)

On the evening of June 26, 2025, roughly two business days before Mr. Kuprewicz's deposition (and over two weeks after agreeing to produce Mr. Kuprewicz for deposition), Petitioners filed a motion to quash the subpoena. On June 27, 2025, Real Parties filed an Application for Ex Parte Relief seeking an order for Mr. Kuprewicz to appear at his scheduled July 1, 2025 deposition, or in the alternative, to strike his declaration.

### D.    Mr. Kuprewicz Is Unable to Testify Due to His Medical Condition.

On Sunday June 29, 2025, Petitioners filed an opposition to Real Parties' *Ex Parte* Application and notified Real Parties for the first time that Mr. Kuprewicz had a brain mass pressing on his optic nerve. On July 1, 2025, Petitioners' counsel notified Real Parties that Mr. Kuprewicz's neurologist advised him he could not sit for a deposition due to his brain mass. Petitioners filed a *Notice of Update Regarding Richard B. Kuprewicz* stating Mr. Kuprewicz was medically unfit to sit through a deposition. As a result, Real Parties will be unable to depose Mr. Kuprewicz.

## III.    ARGUMENT

### A.    Mr. Kuprewicz's Declaration Should Be Excluded Based on the Court's Substantial Gatekeeping Responsibility Under *Sargon*.

#### 1.    *Sargon* Requires Judicial Gatekeeping of Proffered Expert Opinions.

The California Supreme Court set a clear standard that trial courts have a **gatekeeping** responsibility related to the admission of proffered expert testimony.[2] (*Sargon Enterprises, Inc. v. University of Southern California* ("*Sargon*") (2012) 55 Cal.4th 747.) *Sargon* mandates that "under

---

[2] Notably, the *Sargon* framework is not an evidence weighing function, but a circumscribed determination **on admissibility**. (*Sargon*, *supra*, 55 Cal.4th at p. 772 ["The trial court's preliminary determination whether the expert opinion is founded on sound logic *is not a decision on its persuasiveness. The court must not weigh an opinion's probative value* . . . ." (emphasis added)].) The trial court must conduct a "'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusions that the expert's general theory of technique is valid.'" (*Ibid*.) The goal "*is simply to exclude 'clearly invalid and unreliable' expert opinion*." (*Ibid*. [emphasis added])

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

Evidence Code sections 801, subdivision (b),[3] and 802,[4] the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. (*Id.* at 771-772.) An expert's opinion "may not be based 'on assumptions of fact without evidentiary support, or on speculative or conjectural factors." (*Id.* at 769-770 [internal citations omitted].) "Exclusion of expert opinions that rest on guess, surmise or conjecture is an inherent corollary to the foundational predicate for admission of the expert testimony." (*Id.* at p. 770; citing *People v. Moore* (2011) 51 Cal.4th 386, 405; *People v. Richardson* (2008) 43 Cal.4th 959, 1008; and *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.)The matter that an expert relies on must provide a reasonable basis for the particular opinion offered and cannot be based on speculation or conjecture, otherwise it is ***inadmissible***. (*Id.* at p. 770.)

Subsequent case law affirms the important role trial courts serve as gatekeepers. In *Lowery v. Kindred Healthcare Operating, Inc.* ("*Lowery*"), the Court of Appeal affirmed a trial court's exclusion of an expert declaration that ***"include[d] conclusory statements without any foundation for their reasoning."*** (*Lowery v. Kindred Healthcare Operating, Inc.*, (2020) 49 Cal.App.5th 119, 122.) The Court of Appeal found the trial court "correctly observed that [the expert] failed to provide any basis

---

3 Evidence Code, § 801 provides:

> If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:
>
> * * *
>
> (b) Based on matter (including his special knowledge, skill, experience, training, and education)    perceived by or personally known to the witness or made known to him at or before the hearing, whether    or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion  upon  the  subject  to  which  his  testimony relates, unless an expert is precluded by law from using such    matter  as  a  basis  for  his opinion.

4 Evidence Code, § 802 provides:

> A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion. The court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based.

- 12 -

for his opinions." (*Id*. at p. 124; citing *Lynn v. Tatitlek Support Services, Inc.* (2017) 8 Cal.App.5th 1096, 1115 ["The trial court may strike or dismiss an expert declaration filed in connection with a summary judgment motion when the declaration states expert opinions that are speculative [or] lack foundation."]; *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123 ["'An expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based.' [Citations.]"].)

The *Lowery* Court noted that the expert's "brief two-page declaration" provided only a "vague" description of "documented medical literature," which stands in contrast with a proper declaration that "identifies the specific medical literature and the specific contents of that literature on which he relied." (*Lowery*, *supra*, 49 Cal.App.5th at pp. 124-125; citing *San Francisco Print Media Co. v. The Hearst Corp.* (2020) 44 Cal.App.5th 952, 964 ["The plain language of Sargon dictates that a trial court exercise its gatekeeping function by considering the matter or information an expert actually relied on in reaching an opinion."]; *Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 229 ["Without at least some minimal basis, explanation, or reasoning, [medical expert's] conclusions as to causation in his May declaration had no evidentiary value."].)

Similarly, the court in *People v. Wright*, noted that "an expert's opinion cannot rest on his or her qualifications alone: 'even when the witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise. [Citation.] For example, an expert's opinion based on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors [citation], has no evidentiary value [citation] and may be excluded from evidence.'" (*People v. Wright* (2016) 4 Cal.App.5th 537, 545 ["California courts have been particularly chary of expert testimony based on assumptions that are not supported by the evidentiary record."].)

2.   The Kuprewicz Declaration Fails to Identify any Accepted Methodology.

The Kuprewicz Declaration follows this format: (1) Mr. Kuprewicz opines about his background and qualifications (¶¶ 2-6); (2) Mr. Kuprewicz attaches his own hearsay comment letter, *Evaluation of Las Flores Pipeline System Startup Proposal* (the "Evaluation Report") (¶ 7 & Exh. B); (3) Mr. Kuprewicz summarizes the conclusions set forth in the hearsay Evaluation Report, which

- 13 -

conclusions are unadorned by any explanation (¶ 8); (4) Mr. Kuprewicz attaches another self-written hearsay comment letter entitled *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart* (the "Observation Report") (¶ 9 & Exh. C); (5) Mr. Kuprewicz summarizes the conclusions "set forth in [the Observation Report]," which conclusions are unadorned by any explanation or analysis (¶ 10); and (6) Mr. Kuprewicz concludes "based on the facts I reviewed"—which facts are not identified—and his "professional analysis"— which analysis is not provided— that the Las Flores Pipeline System is not safe to operate . . . ." (¶ 11). Notably, neither the Evaluation Report nor the Observation Report can be found in the public literature, nor was either paper peer reviewed or published in any recognized scientific or engineering publication. Rather, both reports are hearsay statements submitted by Mr. Kuprewicz to the Office of State Fire Marshal as comment letters.

In performing its gatekeeping function, the trial court is directed to focus "solely on principles and methodology, and not on the conclusions they generate." (*Lowery*, *supra*, at p. 124; *see also San Francisco Print Media Co.*, *supra*, 44 Cal.App.5th at p. 962 ["the gatekeeper must focus on principles and methodology to determine whether the opinion is founded on sound logic, i.e., "whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture."].)

Here, Mr. Kuprewicz wholly fails to identify any reliable methodology in arriving at his purported conclusions. (*See generally* Kuprewicz Decl.) Instead, this Court is impliedly asked to fill the analytical gaps in Mr. Kuprewicz's analysis with the unsworn, hearsay evidence contained in the Evaluation and Observation Reports, which separately do not provide a sufficient basis for his opinions.[5] This Petitioners cannot do. The reports are prime examples of hearsay—i.e., "a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter asserted." (Evid. Code, § 1200.) The Evidence Code does not authorize expert witnesses to launder their own otherwise inadmissible hearsay statements before the trier of fact. (*I-CA Enterprises. Inc. v. Palram Americas. Inc.* (2015) 235 Cal.App.4th 257, 266 ["[T]he expert may

---

[5] Notably, Mr. Kuprewicz fails even to cite the relevant sections of his hearsay reports that support his conclusions, leaving it to the Court to sift through the reports to determine whether they reach the conclusions offered, or whether that conclusion is supported.

- 14 -

not serve as a mere conduit for the admission of otherwise inadmissible hearsay."].) An expert may *rely* on hearsay and restate on direct examination *the materials* upon which he relied; however, in doing so the expert cannot merely relay the *details* of the hearsay, which is exactly what Mr. Kuprewicz attempts to do here. (*Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1044 ["Evidence Code section 1200 bars an expert from reciting parts of a hearsay document for the truth of the matter stated. There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception."]; *Continental Airlines. Inc. v. McDonnell Douglas Corp.* (1981) 216 Cal.App.3d 388, 415.) "What an expert cannot do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*People v. Sanchez* (2016) 63 Cal.4th 665, 686.)

Setting aside the evidentiary issues, Mr. Kuprewicz also fails to explain how his conclusory opinions are supported by the Evaluation and Observation Reports, or what analysis he performed to arrive at his conclusions. Because Mr. Kuprewicz identifies no reliable methodology in support of his conclusions and is based wholly on his own hearsay statements, his opinions are based on nothing more than speculation and conjuncture and must be excluded. (*Sargon*, 55 Cal.4th at 772.)

### 3. The Kuprewicz Declaration Lacks Foundation and is Speculative.

Expert opinions based on nothing more than speculative and conclusory statements lacking foundation must be excluded. (*See Lowery*, 49 Cal.App.5th at 122.) Mr. Kuprewicz' declaration cites repeatedly to his self-written Evaluation and Observation reports. (*See* Kuperwicz Decl., ¶¶8 & 10.) However, Mr. Kuprewicz does not actually adopt the conclusions in those hearsay reports, but merely *summarizes* the opinions *stated in the reports* without any sworn testimony as to the truth of his conclusions. (Kuprewicz Decl., at ¶¶ 8 & 10.) A sworn *summary* of conclusions reached in an *unsworn* report is categorically not, and cannot serve as, a sworn affirmation under penalty of perjury that those conclusions are true and correct. (See Cal. R. Ct. 3.1306(a) ["Evidence Received at a law and motion hearing must be by declaration or request for judicial notice without testimony or cross-examination, unless the court orders otherwise for good cause shown."]; *see also* Code Civ. Proc., § 2015.5 [Requiring declarations to be "declared . . . true under penalty of perjury . . ."].)

- 15 -

Regardless, even if the summarized conclusions constituted sworn testimony (and they do not) they are still inadmissible under *Sargon* and its progeny. As in *Lowery*, Mr. Kuprewicz's declaration simply "includes conclusory statements without any foundation for their reasoning." (*Lowery*, *supra*, 49 Cal.App.5th at p. 124; see also *Powell*, *supra*, 151 Cal.App.4th at p. 123 ["'An expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based.' [Citations.]"].) Mr. Kuprewicz categorically fails to identify the facts leading to his ultimate conclusions, instead relying on summary conclusions of his own hearsay evidence, which are insufficient to support his conclusions. The most that can be said for his declaration is that he has identified his qualifications, but, as in *People v. Wright*, noted that "an expert's opinion cannot rest on his or her qualifications alone." (*Wright*, *supra,* 4 Cal.App.5th at p. 545.)

The *Sargon* framework requires that "the trial court act[] as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. (*Sargon*, *supra*, 55 Cal.4th at pp. 771-772.) Mr. Kuprewicz has not identified the bases for his opinions, only vaguely referencing the "facts [he] considered." (Kuprewicz Decl., ¶ 11.) "Without at least some minimal basis, explanation, or reasoning [Mr. Kuprewicz's] conclusions . . . ha[ve] no evidentiary value." (See *Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 229.) Mr. Kuprewicz' Declaration therefore lacks any foundation, is entirely speculative, and must be excluded. (*See Sargon*, *supra*, 55 Cal.4th at p. 770 ["exclusion of expert opinions that rest on guess, surmise or conjecture is an inherent corollary to the foundational predicate for admission of the expert testimony."].)

4. The Expert Opinion of Michael Rosenfeld Highlights Additional Material Flaws in the Kuprewicz Declaration

Even if Mr. Kuprewicz' opinions were admissible (they are not), they are insufficient to show the Pipelines are unsafe to operate because they suffer from significant factual defects. Real Parties submit in further support of this Motion the declaration of Michael J. Rosenfeld, Chief Engineer at RSI Pipeline Solutions, LLC. (Declaration of Michael J. Rosenfeld ("Rosenfeld Decl."), ¶ 3.) Mr.

- 16 -

Rosenfeld identifies many specific problems with the Kuprewicz Declaration that further reveal the factual gaps in the proffered opinions, including that Mr. Kuprewicz failed to account for:

(1) known facts about the 2015 Line 901 incident, which are essential to drawing any conclusion about the risk of a future incident (*id.,* ¶ 4.a.);

(2) known contributing factors and deficiencies related to the operation and integrity management of the former Line 901 under the previous owner and operator, which are critical differences that Mr. Kuprewicz completely ignores (*id.,* ¶ 4.b.);

(3) the substantial requirements of the Corrective Action Order (CAO) and Consent Decree (CD) issued by the Pipeline and Hazardous Materials Safety Administration (an agency within the U.S. Department of Transportation) and additional requirements imposed by the Office of the State Fire Marshall (OSFM) that correct the operational and integrity management deficiencies that were causal or contributed to the 2015 incident (*id.,* ¶ 4.c.; and

(4) other known facts that are contrary to the positions stated in Mr. Kuprewicz's opinions (*id.,* ¶ 4.d.).

Mr. Rosenfeld ultimately concludes that because of Mr. Kuprewicz's failure to account for and address these additional facts and details, Mr. Kuprewicz's opinions are unfounded, uninformed, speculative, and not based upon accepted standards of engineering practice, biased, or deceptive. (*Id.,* ¶ 5.)

As one example, Mr. Kuprewicz purports to conclude: "The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them." (Kuprewicz Decl., ¶ 10.a.) Mr. Rosenfeld points out *several* problems with just this one statement:

(1) The first is that Mr. Kuprewicz states a logical inconsistency: that "because ILI tools can miss a lot of cracks", reliance on ILI to find corrosion is misplaced. This is illogical because crack detection tools and corrosion detection tools are not the same tools and use different technologies. Corrosion tools indeed will "miss a lot of cracks" because they are not designed to detect cracks – ultrasonic crack detection tools specified for use by the OSFM in the state waiver are the appropriate tools for crack detection. ILI tools targeting corrosion on the other hand, specifically the magnetic and ultrasonic metal loss tools specified in the state waiver, are designed to detect corrosion and are effective for that purpose. Informed pipeline operators understand these differences and select the tool type(s) appropriate for the condition(s) they must manage. The OSFM state waiver specifies that magnetic and ultrasonic metal loss tools, and ultrasonic crack detection, tools be used. Neither of the

- 17 -

ultrasonic technologies were used by the prior operator. The state waiver introduces significant additional diversity to the inspection capabilities.  Industry experience has been that using multiple tool technologies and integrating the ILI data significantly improves the probability of detecting, characterizing, and sizing features of interest in the pipeline. (Rosenfeld Decl., ¶ 17.)

(2) The second is Mr. Kuprewicz states that multiple forms of corrosion are present on the pipeline(s) but does not describe the different forms of corrosion he claims are present. The Line 901 failure analysis [Ref: DNV-GL, Appendix M to PHMSA FIR] and PHMSA's incident investigation [Ref: PHMSA FIR] did not identify different forms of corrosion contributing to the failure, nor differing forms of corrosion being present on other parts of the pipeline.  Mr. Kuprewicz has not reviewed the results of field digs to investigate corrosion analysis already performed by Sable, in response to ILI, to determine what different types of corrosion are present.  His statement is entirely speculative without reviewing any factual data. (*Id*. at ¶ 18.)

(3) The third point is that Mr. Kuprewicz states that ILI is inadequate to detect some forms of corrosion though he does not state what those undetectable forms of corrosion are.  All ILI tools have lower thresholds of detectable flaw size; detection and sizing performance differ with the size and orientation of the flaws.  Taken together, the different tool technologies to be used by Sable are capable of detecting various forms of corrosion if they are present and of detectable size, including pitting corrosion, general corrosion, corrosion along or adjacent to seams, narrow axially aligned corrosion, and other forms of corrosion. Furthermore, tool performance improves with large pipe such as Lines 324 and 325 because more sensors and supporting components can be fitted in the larger circumference, and defects of concern are proportionally larger and easier to detect, compared with small pipe sizes. [Ref: Nestleroth & Rosenfeld] (*Id*. at ¶ 19.)

Mr. Rosenfeld's analysis concludes none of Mr. Kuprewicz's conclusions are adequately supported, especially his overall conclusion that the Pipelines are "not safe to operate, even if the conditions in the Fire Marshal's State Waivers are fulfilled." (*Id*. ¶ 6 [Referring to Paragraph 11 and stating: "These are pejorative statements built on an aggregation of claims made without supporting data, and which should be disregarded as nonfactual and noncredible. He has provided no data, scientific or engineering analysis, or factual evidence that supports these opinions"]; *see also id.,* ¶¶ 7-29 & 30-48.) Mr. Kuprewicz' opinions are therefore insufficient, unreliable, and must be excluded.

**B.      Mr. Kuprewicz's Declaration Should Be Excluded Based On His Unavailability and Real Parties' Due Process Right to Cross Examine Mr. Kuprewicz.**

1.      <u>Fundamental Fairness Requires an Opportunity to Examine an Expert Witness.</u>

Mr. Kuprewicz' unavailability for cross-examination serves as an independent basis to strike his declaration. The right to confront opposing witnesses "in noncriminal proceedings is a part of procedural due process guaranteed by the Fifth Amendment and the Fourteenth Amendment to the

- 18 -

federal Constitution." (*August v. Department of Motor Vehicles* (1968) 264 Cal.App.2d 52, 60 [finding hearing met requirements of due process where sworn statement was considered but there was no subsequent request to cross-examine the declarant]; see also Cal. Const. Art. I. § 7.) "Because it relates to the fundamental fairness of the proceedings, cross-examination is said to represent an 'absolute right,' not merely a privilege." (*Fost v. Marin County Superior Court* (2000) 80 Cal.App.4th 724, 733 [noting the rule applies in "either a criminal or a civil case" and if "a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony"].) Further, "[t]he lack of an opportunity to cross-examine the declarant deprives the opposing party of important evidence concerning the credibility of the declarant and the reliability of testimony in the declaration." (*In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 841-842 [relying on *Fost* and holding it was error for trial court to rely on declaration on motion for preliminary relief in family law case where declarant was not made available for cross-examination or live testimony].)

Real Parties' right to cross examine applies to the current Preliminary Injunction request. A preliminary injunction hearing requires the court to carefully weigh the evidence and decide whether the facts require such relief. (*Fleishman v. Superior Court* (2002) 102 Cal.App.4th 350, 356.) During a preliminary injunction hearing, the court evaluates the credibility of witnesses and makes factual findings on disputed evidence. (*Id*.) Parties are therefore entitled to cross-examine witnesses who submit statements in support of a preliminary injunction. (See *In re Crystal J*. (1993) 12 Cal.App.4th 407, 413 ["A meaningful hearing requires an opportunity to examine evidence and cross-examine witnesses."]; 5 California Trial Guide § 100.20 [discussing depositions are appropriate for use in pretrial proceedings "such as a motion for a preliminary injunction"].) Real Parties have a fundamental right to depose Mr. Kuprewicz, who is the key witness offering testimony in support of Petitioners' Preliminary Injunction request.

2.    The Function of Cross-Examination is Not Served by Responsive Expert Opinions, and the Sole Remedy is Exclusion of the Kuprewicz Declaration.

In their *Notice of Update* Petitioners offer a "compromise" wherein (1) Real Parties can challenge the Kuprewicz Declaration with a responsive expert declaration; (2) Petitioners will not

- 19 -

depose said responsive expert; and (3) Petitioners will not submit a declaration with their reply brief. Petitioners' proposal is insufficient.

The "compromise" is insufficient. While Real Parties submit the responsive expert declaration of Mr. Rosenfeld, it is not Real Parties' burden to do so. Petitioners bear the burden of proof on their claims and Preliminary Injunction request, which they must support with both admissible and credible evidence. Refusing cross-examination that would allow Real Parties to test the admissibility and credibility of Mr. Kuprewicz' testimony and instead requiring responsive expert testimony is a burden-shifting mechanism that lacks support in any California authority.

Evidence Code section 701 provides that "a witness testifying as an expert may be cross-examined to the same extent as any other witness and, ***in addition, may be fully cross-examined as to*** (1) his or her qualifications, (2) the subject to which his or her expert testimony relates, and (3) the matter upon which his or her opinion is based and the reasons for his or her opinion." (Emphasis added.) Courts have long opined that "[o]nce an expert offers his opinion, however, he exposes himself to the kind of inquiry which ordinarily would have no place in the cross-examination of a factual witness. The expert invites investigation into the extent of his knowledge, the reasons for his opinion including facts and other matters upon which it is based (Code Civ. Proc. § 1872), and which he took into consideration; and ***he may be 'subjected to the most rigid cross examination'*** concerning his qualifications, and his opinion and its sources." (*Hope v. Arrowhead & Puritas Waters, Inc.* (1959) 174 Cal.App.2d 222, 230, emphasis added.)

Cross-examination serves as an irreplaceable due process protection that cannot be substituted by merely allowing competing expert testimony. The ability to present contradictory expert opinions—creating a "war of experts"—falls significantly short of the constitutional safeguards afforded by rigorous cross-examination. Through effective cross-examination, defendants can systematically expose qualification deficiencies that may render an expert's testimony inadmissible, methodological flaws in the expert's analytical approach, and underlying biases that compromise the expert's objectivity and credibility.

Importantly, cross-examination provides Real Parties with a critical procedural tool that operates independently of financial constraints. Unlike the potentially prohibitive costs associated with

- 20 -

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

retaining competing expert witnesses, cross-examination enables a defendant to challenge the foundation of a plaintiff's claims directly. This distinction is crucial, as it ensures that due process protections remain accessible to all defendants, not merely those with sufficient means to engage in costly expert battles. When defendants are deprived of the opportunity to cross-examine expert witnesses, they lose an essential mechanism for testing evidence that may be dispositive to the outcome of their case, potentially rendering them unable to mount an effective defense against unsubstantiated claims.

For instance, in this case, Real Parties should have a full and fair opportunity to question Mr. Kuprewicz on all of the issues presented by his Declaration, including:

1. the method he applied in forming his opinions (or lack thereof), which is not identified in his declaration;

2. his basis for considering any applied method to be scientifically accepted, which is not identified in his declaration;

3. all the factual information he considered to form each of his opinions (including whether that collection was based on his own, independent research or selectively provided to him from any source), which is not identified in his declaration;

4. all the factual information that was not considered by him, either because it was not available or rejected by him as not reliable or convincing for any reason (including all the information considered by the County and federal court in each of their evaluations of the steps needed to permit the restart of the Pipelines), which is not identified and addressed in his declaration;

5. any prior work by Mr. Kuprewicz in which he reached similar or opposing conclusions about the safety of any pipeline (including whether he used a consistent or different methodology, or relied on similar or different types of information), none of which are identified in his declaration; and

6. any prior relationship with Petitioners and the details of that work, which could reveal sources of bias.

The answers to these questions would likely further illuminate failures within the Kuprewicz Declaration that further render his opinions entirely inadmissible or, at the very least, uncredible. The denial of Real Parties' opportunity to cross-examine Mr. Kuprewicz is prejudicial and cannot be remedied by shifting the burden to Real Parties to provide a competing expert declaration. Instead, as discussed above, if "a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony." (*Fost v. Marin County Superior Court*, *supra*, 80 Cal.App.4th at p. 733.)

- 21 -

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

IV.     **CONCLUSION**

For the foregoing reasons, Real Parties request an order striking the Kuprewicz Declaration in its entirety.


Dated: July 7, 2025                          Respectfully submitted,

                                             **ALSTON & BIRD**
                                             JEFFREY D. DINTZER
                                             GARRETT B. STANTON

                                             **PAUL HASTINGS**
                                             DUNCAN JOSEPH MOORE

                                             **FAUVER, LARGE, ARCHBALD & SPRAY LLP**
                                             TREVOR D. LARGE



                                             By: _____
                                                      Jeffrey D. Dintzer

                                             Attorneys for Real Parties in Interest
                                             SABLE OFFSHORE CORP.; PACIFIC PIPELINE
                                             COMPANY

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

## DECLARATION OF JEFFREY D. DINTZER

I, Jeffrey Dintzer, declare as follows:

1.      I am an attorney licensed to practice law before all courts in the State of California and am a partner at the law firm of Alston & Bird LLP, counsel for Real Parties in Interest Sable Offshore Corp and Pacific Pipeline Company ("Real Parties"). I make this declaration in support of Real Parties' Motion to Strike the Declaration of Richard B. Kuprewicz ("Kuprewicz" or "Kuprewicz Declaration"). I have personal knowledge of the facts stated in this declaration and, if called upon to do so, I could and would competently testify to them.

2.      On June 5, 2025, at 7:00 a.m., Real Parties personally served Mr. Kuprewicz with a Deposition Subpoena for Personal Appearance and Production of Documents and Things for June 24, 2025, at 9:00 a.m. at the Marriott, 1605 Calle Joaquin, San Luis Obispo, California 93405. At the time that Real Parties served Mr. Kuprewicz, his witness fees in the amount of $41.00 were also paid.

3.      On June 10, 2025, counsel for Center for Biological Diversity agreed that Mr. Kuprewicz would appear for deposition but asked that the deposition be rescheduled for a date during the week of June 30 through July 3, 2025. Counsel also requested that the deposition be taken remotely and split between two days due to certain health issues. On the same day, Real Parties agreed to reschedule the deposition to July 1, 2025. Between June 10 and June 11, the parties exchanged several emails related to deposition logistics.

4.      On June 12, 2025, I participated in a telephone call with Petitioners' counsel and the parties agreed that Mr. Kuprewicz would appear for deposition on July 1, 2025 at 9:00 a.m. at a Courtyard hotel located at 1605 Calle Joaquin, San Luis Obispo, CA 93405, which is a short distance from Mr. Kuprewicz's residence. Mr. Kuprewicz's personal counsel, Mr. Stolpman, who was on the telephone call, agreed to accept service of the amended deposition subpoena. It was also agreed that the deposition would be in person at the Courtyard hotel and that we would take sufficient breaks to accommodate Mr. Kuprewicz's specified health concerns, but conclude the deposition on that day. On June 20, 2025, Real Parties served Mr. Stolpman with an Amended Deposition Subpoena for Personal Appearance and Production of Documents and Things for July 1, 2025, at 9:00 a.m. at the agreed upon location.

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

5.      On June 23, 2025, counsel for Environmental Defense Center emailed Real Parties for the first time stating that "[a]fter further consideration," they would not produce Mr. Kuprewicz for deposition. We exchanged additional emails on June 23 and June 24, 2025, in which I noted that the parties already reached an agreement that the deposition would proceed on July 1, and that if Mr. Kuprewicz refused to appear, Real Parties would seek monetary sanctions. On June 24, 2025, counsel for Environmental Defense Center served formal objections to the deposition.

6.      On July 1, 2025, Petitioners' counsel notified me that Mr. Kuprewicz's neurologist advised Mr. Kuprewicz that he cannot sit for a deposition due to his brain mass. Thereafter, Petitioners filed a *Notice of Update Regarding Richard B. Kuprewicz* wherein Petitioners indicate that Mr. Kuprewicz is medically unfit to sit through a deposition. As a result, Real Parties are not able to depose Mr. Kuprewicz.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 7th day of July 2025, at Los Angeles, California.

_____

Jeffrey Dintzer

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51ˢᵗ Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) **REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION; DECLARATION OF JEFFREY D. DINTZER** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☒  BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

/s/ Josie Cisneros
Josie Cisneros

LEGAL02/46305502v6

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>CENTER FOR BIOLOGICAL DIVERSITY and<br>WISHTOYO FOUNDATION<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>        tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS<br>ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>        jfrankel@environmentaldefensecenter.org<br>        trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/ DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal<br><br>Tel.:    (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (310) 620-5879<br>Email: djmoore@paulhastings.com<br>        benjaminhanelin@paulhastings.com<br>        natalierogers@paulhastings.com |
| Trevor D. Large, Esq.<br>FAUVER, LARGE, ARCHBALD & SPRAY LLP<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (805) 966-7000<br>Email: TLarge@FLASllp.com |

LEGAL02/46305502v6

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al. | Case No. 25CV02244 |
| Petitioners and Plaintiffs, | Assigned for all purposes to: Hon. Donna D. Geck |
| v. | **DECLARATION OF MICHAEL J. ROSENFELD IN SUPPORT OF REAL PARTIES' MOTION TO STRIKE THE DECLARATION OF RICHARD B. KUPREWICZ** |
| CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et. al | |
| Respondents and Defendants. | [*Filed concurrently with Notice of Motion and Motion to Strike Declaration of Richard B. Kuprewicz; [Proposed] Order*] |
| and | |
| SABLE OFFSHORE CORP., et al. | Date:          July 18, 2025 |
| Real Parties in Interest. | Time:         10:00 AM |
| | Dept.:         4 |
| | Complaint Filed:      April 15, 2025 |
| | Trial Date:              None Set |

DECLARATION OF MICHAEL J. ROSENFELD

**Table of Contents**

I.    Introduction ...................................................................................................................... 3

II.   Conclusions ...................................................................................................................... 4

III.  Review and Interpretation of the Kuprewicz Declaration ............................................... 5

   A.    Declaration Review Process    5

   B.    Mr. Kuprewicz's Technical Issues and Opinions        5

      1.    Kuprewicz Technical Issues in Paragraph 8 ............................................................... 5
      2.    Kuprewicz Opinions in Paragraph 10 ....................................................................... 8

   C.    Positions Stated in Kuprewicz's Declaration Exhibit B        13

      1.    Section V. TIMP Regulations Are Not Working ......................................................... 14
      2.    Section VI. The Greatest Threat … Is From External Corrosion ............................... 18
      3.    Section VII. High Pipeline Operating Temperatures Accelerate All Forms of Corrosion ....... 18
      4.    Section VIII. The CD Fails to Required Adequate IM Processes to Prevent Another Rupture 19
      5.    Section IX. The Pipelines Cannot Be Made as Safe as New Pipelines .................................. 19
      6.    Section X. Conclusion ............................................................................................... 19

   D.    Positions Stated in Kuprewicz's Declaration Exhibit C        20

IV.  Exhibits .............................................................................................................................. 20

DECLARATION OF MICHAEL J. ROSENFELD

## <u>DECLARATION OF MICHAEL J. ROSENFELD</u>

I, Michael J. Rosenfeld, declare as follows:

1.       My name is Michael J. Rosenfeld and I am a mechanical engineer.  I have been engaged by Alston & Bird LLP, counsel to Sable Offshore Corp. (Sable) and Pacific Pipeline Company,[1] to provide my expert opinions as to the Declaration of Richard Kuprewicz submitted to the Superior Court of the State of California, County of Santa Barbara, in the matter of Case Nos. 25CV02244 and 25CV02247.  Below, I provide my qualifications to provide these expert opinions.  I have personal knowledge of the matters set forth in this Declaration, and if called as a witness, I could and would testify competently thereto.

## I.    <u>Introduction</u>

2.       The purpose of this report is to critically review and interpret the Declaration of Richard Kuprewicz submitted to the Superior Court of the State of California, County of Santa Barbara, in the matter of Case Nos. 25CV02244 and 25CV02247.  These cases concern the return to service of Lines 324 and 325A/B of the Las Flores Pipeline System, operated by Sable Offshore (Sable) and Pacific Pipeline Company (PPC).  I was asked to perform this review and prepare this report by Alston & Bird, LLP on behalf of Sable and PPC.

3.       I am qualified to give my professional opinion in this matter by education and experience. My current position is Chief Engineer at RSI Pipeline Solutions, LLC, a pipeline engineering consulting firm.  I am a mechanical engineer by training receiving a Bachelor of Science in Engineering from the University of Michigan in 1979, and Master of Science in Engineering from Carnegie-Mellon University in 1981.  I have been involved with petroleum and natural gas pipelines since the late 1980s.  My experience includes performing numerous metallurgical failure analyses having direct causes including but not limited to pipe seam defects, girth weld defects, corrosion of various types, stress-corrosion cracking, hydrogen assisted cracking, fatigue cracking due to the effects of cyclic pressure or vibration, and excessive loading due to geohazards.  I have also performed numerous root cause failure investigations

---

[1] Pacific Pipeline Company (PPC) is a wholly owned subsidiary of Sable Offshore Corp.  For the purpose of this declaration, references to Sable or PPC as owner/operator of the pipeline system have the same meaning and may be used interchangeably.

DECLARATION OF MICHAEL J. ROSENFELD

in which various management gaps such as inadequate specifications or procedural errors were causal. My experience also includes analysis of pipeline stresses, evaluation of pipeline fitness for service, analysis of in-line inspection (ILI) data, development of technical procedures and integrity management plans, regulatory compliance, and training in codes and standards.  I have also been principal investigator in several research projects funded by pipeline interest groups including PHMSA, ASME, API, and GRI. I also have held executive positions in pipeline safety standards development committees.  A true and correct copy of my curriculum vitae is attached hereto as **Exhibit A**.

## II.   Conclusions

4.       As will be demonstrated in the sections that follow, Mr. Kuprewicz fails to take into account:

    a)       Known facts about the 2015 Line 901 incident;

    b)       Known contributing factors and deficiencies related to the operation and integrity management of the former Line 901 under the previous owner and operator of the facility;

    c)       Requirements of the Corrective Action Order (CAO) and Consent Decree (CD) issued by the Pipeline and Hazardous Materials Safety Administration and additional requirements imposed by the Office of the State Fire Marshall (OSFM) that correct the operational and integrity management deficiencies that were causal or contributed to the 2015 incident; and

    d)       Other known facts that are contrary to the positions stated in Mr. Kuprewicz's opinions.

5.       By not accounting for these important facts Mr. Kuprewicz has set forth positions that are unfounded.  To the extent that opinions were made without relevant information, they are uninformed and speculative.  To the extent that relevant facts were knowable from information available to anyone in the public domain but were not considered or accounted for, his opinions were not based on evaluation performed to a reasonable standard of engineering practice.  To the extent that such facts were known by him and deliberately omitted, or positions were stated to the contrary, Mr. Kuprewicz's opinions are biased or deceptive.

DECLARATION OF MICHAEL J. ROSENFELD

6.       Mr. Kuprewicz concludes in Paragraph 11 of his Declaration that the Las Flores Pipeline System is not safe to operate even if it meets the OSFM state waivers.  He also states in Section X of his Exhibit B that the Las Flores Pipeline System is unusually dangerous due to its age and design flaws.  These are pejorative statements built on an aggregation of claims made without supporting data, and which should be disregarded as nonfactual and noncredible.  He has provided no data, scientific or engineering analysis, or factual evidence that supports these opinions.

**III.  Review and Interpretation of the Kuprewicz Declaration**

**A.       Declaration Review Process**

7.       This review steps through the Declaration prepared by Mr. Richard Kuprewicz and supporting Appendices point by point.  His positions are interpreted and critically evaluated to assess whether they are based on fact and science.

8.       Documents that I have reviewed and relied on in addition to Mr. Kuprewicz's Declaration are listed in the references attached hereto (See Section IV Below).

**B.       Mr. Kuprewicz's Technical Issues and Opinions**

**1.       Kuprewicz Technical Issues in Paragraph 8**

9.       Mr. Kuprewicz identified five technical issues with the proposed restart of the San Flores Pipelines in Paragraph 8 of his Declaration.  They are repeated here verbatim:

a.  The design of the Pipelines renders the federal mandated cathodic protection system, intended to help address pipeline external corrosion, ineffective.

b.  Current inline inspection (ILI) technologies cannot adequately assess all forms of external corrosion threats that most likely exist on the Pipelines.

c.  The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective cathodic protection system once the Pipelines go into operation.

d.  Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure.

e.  The poorly designed Pipelines cannot be made as safe as new pipelines.

DECLARATION OF MICHAEL J. ROSENFELD

### a.   Technical Issue (a)

10.     Mr. Kuprewicz reports that the electrical insulating nature of the thermal insulation and polyethylene tape outer wrap defeats the effectiveness of the cathodic protection (CP) system that is required by pipeline safety regulations.  This is correct, although Sable recoated repairs made during field investigations with a non-shielding coating system, so the technical issue does not apply there.  Mr. Kuprewicz did not note that the Las Flores Pipelines are not the only pipelines in the US that have shielded CP in portions of their systems.  Many thousands of miles of pipelines are also shielded from effective CP due to installation of popular external coating types (mainly polyethylene tape and extruded polyethylene) that electrically insulate the pipe from CP electrical current much as with Las Flores.  The effectiveness of CP in thousands of miles of other pipelines can be reduced or impaired for a variety of other reasons unrelated to the type of coating such as:  inadequate design, inadequate maintenance, external electrical interference from foreign pipelines or high-voltage AC power lines, shorting due to contact between the pipe and road crossing casings, or the pipeline being installed in high-resistivity soils (dry, sandy or rocky, sloped, well-drained).  CP is one of several barriers against corrosion but it is a porous barrier even where it might be expected to be effective.  It is not a panacea for corrosion protection; there are several other mitigation tools that pipeline operators use to assess internal and external corrosion so that timely repairs can be affected long before any leaks occur.  Performing ILI frequently enough to indicate and size corrosion is an important alternative risk mitigation and barrier against corrosion failure in areas of a pipeline where CP may be ineffective.

### b.   Technical issue (b)

11.     Mr. Kuprewicz reports that the ILI technologies to be used in Lines 324 and 325A/B are inadequate to detect all forms of corrosion most likely (emphasis added) to be present on the pipelines.  First, he does not state what undetectable forms of corrosion are most likely to be present.  Second, he has not considered the multiple ILI technologies specified by the OSFM state waiver that significantly enhance Sable's ability to detect virtually any type of corrosion over the single ILI technology (magnetic flux leakage, or MFL) used by the previous operator Plains.  One important technology addition is the use of ultrasonic (UT) wall thickness measurement.  Unlike MFL, UT thickness measurement is a direct physical measurement that is less affected by rate of wall change and is unaffected by the presence of

6

DECLARATION OF MICHAEL J. ROSENFELD

magnetic corrosion product. A second ILI technology to be used is the transverse-field MFL (also called circumferential MFL or MFL-C), specifically designed and configured to detect selective seam weld corrosion (SSWC) in the ERW seams (although, as will be discussed later, there is a low probability of SSWC in Line 324), as well as narrow axial external corrosion if it is present in Line 325A/B. A third ILI technology is UT crack detection, which is capable of detecting stress-corrosion cracking (SCC) colonies, although as will be discussed later there is a low probability of SCC being present. Industry experience has been that multiple tool technologies significantly increases the probability of detection of many conditions of interest in the pipeline. [Ref: Thompson, et al; Harris]

12. Corrosion management is about more than ILI detection, since detection capabilities are generally good even when an ILI tool is performing sub-optimally. Three other important enhancements specified by the OSFM state waiver, that Mr. Kuprewicz fails to account for in an apparent attempt to bias the reader of his statement, are the frequency of ILI inspections, the required ILI field validation, and run-to-run comparisons to identify changes and rates of change in the condition of the pipeline. Notably, Sable will be required to run each ILI tool type *twice per year in the first two years and annually thereafter*. This is far more often than almost any other pipeline in the US. *The current regulations call for ILI surveillance to take place once every five years.* The frequent ILI will give Sable multiple opportunities to assess the tool performance, work with the ILI vendor to regrade the results based on field findings, and multiple chances to understand the condition of the pipeline before serious corrosion can occur. The previous operator's practices in these areas were not anywhere nearly as robust.

### c.    Technical issue (c)

13. Mr. Kuprewicz is concerned about the elevated operating temperature of the pipeline causing high corrosion rates. This is a well-known phenomenon. Mr. Kuprewicz has not considered the frequent ILI and corrosion growth rate assessments required by the OSFM state waiver will make it possible to become aware of corrosion rates and corrosion growth often enough to respond with repairs on a timely basis.

### d.    Technical issue (d)

14. Mr. Kuprewicz states that segments at risk of environmental cracking are at the highest risk of failure. He is referring to SCC and apparently SSWC. As will be discussed later, these are the

---

7

least likely forms of degradation to affect the pipelines. The 2015 failure was not due to environmental cracking, no environmental cracks were observed in the investigation of that failure, and ILI tools capable of detecting these conditions will be used on a much more aggressive schedule in the future by Sable.  Mr. Kuprewicz is opining about occurrences of environmental cracking that are not and have never been identified or found by any inspection or report, as reflected in the publicly available materials relative to the 2015 failure. This is an effort to fabricate facts concerning the integrity of the Pipeline which Mr. Kuprewicz knows are baseless.

### e.    Technical issue (e)

15.    Mr. Kuprewicz asserts that the pipelines cannot be made as safe as a new pipeline.  He provides no technical information to back this statement.  The pipelines have been pressure tested to prove strength and frequently inspected using various technologies to monitor their condition.  All new pipelines become old pipelines, the question is how those pipelines are monitored and maintained.  Here the monitoring and maintenance program required by the regulators and the Consent Decree are state of the art.  Again Mr. Kuprewicz's statement with respect to the need for a new pipeline is without any foundation or justification.

### 2.    Kuprewicz Opinions in Paragraph 10

16.    Mr. Kuprewicz expressed five opinions in Paragraph 10 of his Declaration. They are repeated verbatim as follows:

a)    The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them.

b)    The proposed hydrotests are also insufficient to address certain types of corrosion or predict corrosion growth. For example, Maximum Operating Pressure ("MOP") hydrotests are not adequate to test for crack forming potential on the Pipelines.

c)    The State Waivers do not assure adequate spike hydrotesting, which is a method to address various forms of crack forming potential. The values for the spike test on Line 324 are too low for corrosion cracking screening and evaluation. Hydrotesting for Lines 325 A and B must be conducted in segments given the elevation changes.

DECLARATION OF MICHAEL J. ROSENFELD

It is unclear, however, whether the testing parameters are adequate for Line 325A due to missing information. In addition, the Waivers do not appear to require any hydrotesting for Line 325B.

d)    A key corrosion performance tracking process set in the State Waivers for the Pipelines is missing. This information, which helps identify possible corrosion "hot spots," is especially important given the history of extensive corrosion on the Pipelines.

e)    The State Waivers will not provide an equal or greater level of safety as if the Pipelines were equipped with an effective cathodic protection system to avoid pipeline failure due to external corrosion. The current design of the Pipeline renders the cathodic protection system ineffective. External corrosion on the Pipelines is exacerbated by operation of the Pipelines at elevated temperatures, which seriously increases the corrosion rate.

### a.    Opinion (a)

17.    There are multiple components of this opinion to examine. The first is that Mr. Kuprewicz states a logical inconsistency: that "because ILI tools can miss a lot of cracks", reliance on ILI to find corrosion is misplaced.  This is illogical because crack detection tools and corrosion detection tools are not the same tools and use different technologies.  Corrosion tools indeed will "miss a lot of cracks" because they are not designed to detect cracks – ultrasonic crack detection tools specified for use by the OSFM in the state waiver are the appropriate tools for crack detection. ILI tools targeting corrosion on the other hand, specifically the magnetic and ultrasonic metal loss tools specified in the state waiver, are designed to detect corrosion and are effective for that purpose.  Informed pipeline operators understand these differences and select the tool type(s) appropriate for the condition(s) they must manage.  The OSFM state waiver specifies that magnetic and ultrasonic metal loss tools, and ultrasonic crack detection, tools be used.  Neither of the ultrasonic technologies were used by the prior operator. The state waiver introduces significant additional diversity to the inspection capabilities.  Industry experience has been that using multiple tool technologies and integrating the ILI data significantly improves the probability of detecting, characterizing, and sizing features of interest in the pipeline.

DECLARATION OF MICHAEL J. ROSENFELD

18.     The second is Mr. Kuprewicz states that multiple forms of corrosion are present on the pipeline(s) but does not describe the different forms of corrosion he claims are present.  The Line 901 failure analysis [Ref: DNV-GL, Appendix M to PHMSA FIR] and PHMSA's incident investigation [Ref: PHMSA FIR] did not identify different forms of corrosion contributing to the failure, nor differing forms of corrosion being present on other parts of the pipeline.  Mr. Kuprewicz has not reviewed the results of field digs to investigate corrosion analysis already performed by Sable, in response to ILI, to determine what different types of corrosion are present.  His statement is entirely speculative without reviewing any factual data.

19.     The third point is that Mr. Kuprewicz states that ILI is inadequate to detect some forms of corrosion though he does not state what those undetectable forms of corrosion are.  All ILI tools have lower thresholds of detectable flaw size; detection and sizing performance differ with the size and orientation of the flaws.  Taken together, the different tool technologies to be used by Sable are capable of detecting various forms of corrosion if they are present and of detectable size, including pitting corrosion, general corrosion, corrosion along or adjacent to seams, narrow axially aligned corrosion, and other forms of corrosion.  Furthermore, tool performance improves with large pipe such as Lines 324 and 325 because more sensors and supporting components can be fitted in the larger circumference, and defects of concern are proportionally larger and easier to detect, compared with small pipe sizes. [Ref: Nestleroth & Rosenfeld]

### b.     Opinion (b)

20.     Mr. Kuprewicz states that the hydrotests are insufficient to address certain types of corrosion but does not state which types of corrosion are at issue. To identify all potential corrosion leaks, Sable has been required by the OSFM state waiver to significantly enhance its computational leak detection technology, an area in which the prior operator was grossly deficient.  The frequency of inspections specified by the OSFM state waiver will give multiple opportunities to identify such features versus the prior operator.

21.     Mr. Kuprewicz also states that the MOP hydrotests are not adequate to test for crack forming potential.  He seems confused about the purpose of the hydrostatic pressure tests, which is to demonstrate that no defects, whether corrosion, cracks (of any type), or other degradation is present and

having a severity significant enough to threaten the safe operation *at the time of the test,* which holds the pressure at 1.5 X MOP for a period of fifteen minutes, followed by an eight hour test at 1.25 X MOP. In other words, the purpose is to demonstrate the current condition of the pipeline is safe with a known factor of safety. Mr. Kuprewicz does not demonstrate by any rational engineering analysis why the pressure tests performed are inadequate for a plausible postulated crack growth scenario.

### c.    Opinion (c)

22.    Mr. Kuprewicz makes several statements in his Opinion (c) that merit examination. Firstly, he states that the State Waivers do not assure adequate spike hydrotesting (in Line 324), which he describes as "a method to address various forms of crack forming potential". Mr. Kuprewicz seems confused about the purpose of the spike hydrostatic test. It is a technique for mitigating stress corrosion cracking (SCC) or manufacturing defects in certain older vintage seam types having low ductility, where effective ILI for cracks is unavailable (which was the case in 1979 when the spike test concept was first proposed). [Ref: Baker Engineering & Kiefner & Assoc., TTO-6; Rosenfeld]. The test concept presumes that unknown cracks are present and recognizes that holding a crack at the near-failure point could cause damage during the test leading to failure even if the crack is not a threat at the operating pressure. The spike test is conducted by taking the pipeline to a very high pressure for a short period of time (just a few minutes is sufficient) to force any significant cracks to fail while minimizing subcritical crack growth in those that do not fail, then lowering pressure to no more than 90% of the high level to avoid further damage to surviving cracks and holding at the reduced pressure to confirm a lack of leaks. The test has nothing to do with the potential to form cracks – if conditions are favorable to cracks forming, they could form just as easily after the hydrotest is completed. Since crack detection ILI has been and will be performed, a spike test is really unnecessary. The ILI will be more sensitive than the pressure test. However, OSFM has made the spike test a condition of its state waiver for Line 324 out of an abundance of caution as the responsible regulatory authority, which is their public duty and prerogative.

23.    Related to the above point, Mr. Kuprewicz states that the spike hydrostatic test is too low for "corrosion cracking screening and evaluation". Presumably by "corrosion cracking", which is not an industry-standard term, he is referring to stress-corrosion cracking (SCC). Even though SCC cracking was not identified in the course of the Line 901 failure investigation, consistent with the PHMSA Advisory

11

DECLARATION OF MICHAEL J. ROSENFELD

Bulletin the OSFM has required an ultrasonic crack detection ILI and transverse field magnetic ILI, which together or individually can indicate the presence of SCC large enough to pose a future threat. The spike hydrostatic test to 1.5X MOP is adequate to prove the current integrity of the pipeline with a factor of safety of 1.5, and demonstrate that significant SCC that is a current threat at the MOP is not present. If less significant SCC is present, it will not be revealed by the test, though it can be expected to be revealed by the crack detection ILI.

24.    Mr. Kuprewicz notes that due to elevation changes along the route, the pipeline must be pressure tested in multiple test segments. Had Mr. Kuprewicz reviewed the hydrotest plans he would have noted that the hydrotest of the pipelines was broken up into eight different segments to conform to the elevation changes associated with the pipeline. This is a common aspect for any and all pipelines installed in anything but flat terrain and must be accounted for in the test plan. It can increase testing cost, but it is not unique to the Las Flores Valley Pipeline System, pipeline engineers understand how to test in hilly terrain, and it is not a reason to object to the testing.

25.    He also states that it is unclear whether the testing is adequate for Line 325A due to his lack of data. In that case, Mr. Kuprewicz is speculating and has no basis in fact for objecting.

### d.    Opinion (d)

26.    Mr. Kuprewicz states that a key corrosion tracking process is missing from OSFM's state waiver for identifying corrosion "hot spots". He does not describe the corrosion tracking process that is missing, nor does he define "hot spot" though presumably he means it as a localized area of corrosion having a growth rate that is greater by a vague, undefined amount than is typical of other parts of the pipeline. The OSFM state waiver requires aggressive ILI run frequencies and dig response criteria in order to produce a robust corrosion tracking process. ILI for corrosion must be performed twice annually the first 2 years and annually thereafter, which is far more frequently than every 5 years practiced with most pipelines. ILI for cracks must be performed annually, which is also far more frequent than the 5 year interval practiced with most other pipelines. Metal loss of 40% of the wall thickness or more, accounting for tool performance, must be investigated within 6 months. This is also unusually stringent and accounts for potential growth during the interval between running ILI and responding in the field. OSFM also requires a procedure for estimating corrosion growth rates from comparisons of multiple ILI runs and for

12

DECLARATION OF MICHAEL J. ROSENFELD

making projections for when each corrosion feature will attain a depth of concern. As the regulatory authority, the OSFM will have the right to review all such information at any time and perform its own analysis. OSFM's conditions appear to be designed to make it highly unlikely that a corrosion "hot spot" will go unnoticed for long.

### e.    Opinion (e)

27.    Mr. Kuprewicz objects that the OSFM state waiver will not provide the same level of safety as a pipeline with effective cathodic protection (CP), due to the characteristics of the coating system. The OSFM has taken this into consideration — performing ILI frequently enough to indicate and size corrosion is an important alternative risk mitigation and barrier against corrosion failure where CP will be ineffective. Mr. Kuprewicz provides no risk assessment showing that frequent ILI cannot offset risk due to ineffective CP.

28.    Moreover, Mr. Kuprewicz provides no risk analysis accounting for the numerous improvements and upgrades to the facility and operating practices that demonstrates that the pipeline will be inadequately safe. The OSFM, as a regulatory agency having responsibility in risk-critical subject areas, understands risk analysis and applies risk models to its decisions. Moreover, OSFM has performed extensive fact-based analysis of the pipelines at issue and has personally inspected the repairs and upgrades to the pipelines in conformance with the state waivers.

29.    Mr. Kuprewicz also objects that due to the elevated operating temperatures, corrosion rates will be "seriously increased". This was observed to be the case with the former Line 901 failure. It is an understood phenomenon and is not unique to the Las Flores Pipeline system. Other heated oil pipelines are operated in the US. The OSFM requires measures be in place to ensure the pipelines are operated safely under these conditions. The fact that the previous operator applied inadequate methods to estimate corrosion rates does not mean that it cannot be done. In fact, pipeline operators do this often, and the OSFM state waiver requires a process to do that, accounting for tool performance and measurement uncertainty.

### C.    Positions Stated in Kuprewicz's Declaration Exhibit B

30.    Mr. Kuprewicz supplements his five technical concerns in Paragraph 8 and five main opinions in Paragraph 10 with additional statements in his Declaration and Exhibits B and C. These will

13

DECLARATION OF MICHAEL J. ROSENFELD

also be critically examined.  The following discussion refers to Sections V though X from his Exhibit B "Evaluation of Las Flores Pipeline System Startup Proposal", Dec. 20, 2024.

### 1. Section V. TIMP Regulations Are Not Working

#### a. Inadequacy of TIMP Regulations

31.     Mr. Kuprewicz states that transmission integrity management planning (TIMP) regulations are not working to protect the public.  This is demonstrably false.  PHMSA's own data available to anyone with an internet connection [Ref: www.phmsa.dot.gov] shows that TIMP along with improved technology and operator focus is gradually reducing the running average incident metrics for hazardous liquid pipelines over the past 20 years:

| Reference period | Avg. Annual Incident Count | Avg. Annual Barrels Spilled | Avg. Annual Barrels Lost |
|---|---|---|---|
| 3-yr Avg (2022-2024) | 294 | 63,300 | 32,618 |
| 5-yr Avg (2020-2024) | 312 | 81,959 | 48,946 |
| 10-yr Avg (2015-2024) | 364 | 85,502 | 51,394 |
| 20-yr Avg (2005-2024) | 367 | 89,261 | 51,450 |

32.     It should be noted that approximately 80% of the reported incidents occurred within facilities such as pump stations, terminals, and tankage farms, rather than on the pipeline right-of-way, with valves and equipment being the largest component.  Those causes are not managed by a TIMP program.  Essentially, Mr. Kuprewicz's complaint is with PHMSA, not Sable, and his complaint is understood as TIMP not reducing incidents enough to suit him personally.  Mr. Kuprewicz also seems to be confusing regulatory compliance with actual safety, a common thought bias.

33.     Mr. Kuprewicz states "pipeline integrity management tools are not a substitute for proper pipeline design or effective cathodic protections. Their purpose is simply to monitor the condition of pipelines over time and identify threats to the pipeline's integrity."  This statement is biased and misleading in that it gives a very incomplete picture of the TIMP process.  TIMP is a structured approach to managing pipeline risk, consisting broadly of the following steps: 1) analyze and integrate data about the pipeline including design and operating history; 2) identify integrity threats; 3) perform risk assessment to determine consequences of failure and identify high risk locations; 4) perform an assessment of the condition of the pipeline (this is the only TIMP process step Mr. Kuprewicz acknowledges) with

14

DECLARATION OF MICHAEL J. ROSENFELD

respect to the integrity threats, prioritized by risk in accordance with the risk assessment; 4) respond to the condition assessment results with repairs prioritized by severity and location-based risk; 5) develop preventive and mitigative measures consisting of facility and procedural improvements to avoid or prevent occurrence of threats throughout the system; and 6) evaluate performance against the plan commitments, verify that risk is reduced, and identify process improvements. [Ref: API RP 1160]  The process is continually repeated.  TIMP is a complex process; not all elements work perfectly and not all operators perform equivalently, but that does not mean the process is unable to lower risk.

### b.    Hydrostatic Testing Assessments

34.    Mr. Kuprewicz states "For a pipeline experiencing certain cracking threats such as selective seam cracking (SSC) or stress corrosion cracking (SCC)—corrosion threats *that likely exist* (emphasis added) along the Las Flores Pipeline System—a subpart E hydrotest is inadequate."  This statement is incorrect on several levels.

35.    To state that something could exist, or even is likely to exist, does not mean that it has existed, does now exist, or will exist.  As will be discussed below, Mr. Kuprewicz fails to account for known factual information to support his assertion that certain conditions are likely.  In my opinion, they are unlikely.

36.    Firstly, "selective seam cracking (SSC)" is not a generally recognized condition.  Based on my subject matter knowledge, I believe that Mr. Kuprewicz is referring to "selective seam weld corrosion" (SSWC), a condition that can affect older varieties of pipe manufactured with electric resistance welded (ERW) seams or flash welded (FW) seams.  Line 324 is modern ERW seam pipe.  Extensive testing and research over the years has concluded that susceptibility to SSWC is influenced by composition of the pipe steel and other factors associated with pipe manufactured prior to 1985, the two most significant influences being carbon content greater than 0.10% and sulfur content greater than 0.007%.  According to the metallurgical failure analysis of the Line 901 failure [Ref: DNV-GL] published with PHMSA's public failure investigation report, the composition of the steel in the failure pipe and upstream and downstream pipes exhibited carbon content of 0.078-0.083% and sulfur content of 0.007%. [Ref: McMahon, et al]  The subject pipe was manufactured in 1986.  Thus susceptibility to SSWC should be very low, and in fact no SSWC was observe in the Line 901 failure investigation.  In the *unlikely* event

15

DECLARATION OF MICHAEL J. ROSENFELD

that SSWC was to occur, the transverse field magnetic ILI tool used by Sable, as required by the OSFM state waiver, was developed to detect SSWC.

37. Secondly, Mr. Kuprewicz considers SCC to be *likely*. SCC requires specific stress and environmental condition. SCC in pipelines has two forms: near-neutral-pH (NNpH) or high-pH (HPH), with differing necessary environments. [Ref: NEB Inquiry] NNpH SCC requires shielding from CP and anaerobic conditions. Although the CP-shielding conditions exist, evidently conditions were only intermittently anaerobic or favorable to NNpH SCC, resulting instead in pitting metal loss. Applied stress is also a promoting factor. While there is no theoretical lower stress at which SCC cannot occur, it is rarely observed at applied stresses below 50% Specified Minimum Yield Strength ("SMYS") absent other sources of stress such as external forces or residual stress. At the pipeline MOP of 1,003 psig, the hoop stress is 54% of SMYS. However, normal operating pressure is in the range of 250 to 600 psig, resulting in prevalent stress levels of 15-33% SMYS. At such stress levels, the driving force for SCC is weak, cracking colonies will be sparse, crack growth rates will be low, and the condition is more likely to go dormant or be overtaken by pitting during intermittent periods that are environmentally not conducive to SCC. Thus NNpH severe enough to threaten the pipeline is *unlikely*. HpH SCC has differing environmental conditions from the NNpH type. While temperatures above 100 deg F are favorable to HpH SCC, the condition only develops within a narrow range of cathodic potentials indicative of partially impaired but not shielded CP. Thus HpH SCC is also *unlikely*. The ultrasonic crack detection ILI tools specified by the OSFM state waiver are designed to detect SCC if it is present in a detectable size.

38. Thirdly, Mr. Kuprewicz states that a 49 CFR Part 195, Subpart E test to a test pressure ratio of 1.25 is "inadequate" in connection with his postulated SSWC or SCC. Any pressure test above 1.1xMOP (the maximum allowed surge condition) demonstrates the present safety of the pipeline. No test pressure proves an absence of flaws no matter how high the test pressure. The higher the test pressure, the smaller will be any undiscovered flaws that survive the test. All things being equal, larger flaws, if they can enlarge in service, grow to failure in less time than smaller flaws, so higher tests are more effective for demonstrating some positive factor of safety >1.0 for a longer period of time. But certainly if significant SSWC or SCC did exist of a size that could be caused to fail at a TPR of 1.25, the Subpart E test is adequate, and certainly the spike test required by OSFM is adequate. Later in the same paragraph

16

DECLARATION OF MICHAEL J. ROSENFELD

he states that it is not clear whether hydrotesting, if performed with be a Subpart E test or a different test to a higher pressure level.  Clearly then he lacks necessary information to form an opinion and is speculating.

39.    Mr. Kuprewicz states that "Current ILI technology cannot reliably identify if such cracking threats are present."  This is patently false, biased, and misleading.  In fact, ILI is more effective than hydrostatic testing, a point which Mr. Kuprewicz acknowledges in the very next section of this Exhibit.  The industry has for the past 25 or more years relied on ILI to detect and characterize threats such as SSWC and SCC, as well as other types of cracks such as seam fatigue cracks and pipe manufacturing defects in seams.[Ref: Krieg, et al]  Although no inspection process is perfect, ILI has proven over and over to be an effective integrity management tool.  Frequent ILI intervals with robust validation, and use of multiple tool technologies, will reduce the chances of completely missing something important.

c.    **ILI Assessments**

40.    In this section, Mr. Kuprewicz makes numerous negative statements about ILI:

- Some ILI tools are more suitable than others depending on the threat.  … Operators don't always select the ILI technology best suited to help identify threats on their system.

- The previous operator failed to share ILI tool performance data with the ILI service provider that could have enabled them to regrade the ILI more accurately.

- Some conditions can be more challenging as ILI tools have technical limitations. ILI tool vendors have limits or restrictions on tool operation to get valid results.

- Some pipeline operators make biased interpretations of the ILI data or fail to account for tool error.

41.    His point seems to be "it's complicated and has to be done right".  That applies to all 228,000 miles of hazardous liquid transmission pipelines not to mention all 298,000 miles of onshore natural gas transmission pipelines.  He has not shown through any rational, data-based analysis that it is somehow *more true* for Las Flores than any of those other systems.

17

DECLARATION OF MICHAEL J. ROSENFELD

**2.    Section VI. The Greatest Threat … Is From External Corrosion**

42.    Mr. Kuprewicz questions whether the reliance of the Consent Decree and the OSFM state waiver on ILI to manage the external corrosion threat can prevent another failure.  He points to the failure of the previous operator, Plains, to rigorously validate the performance of the ILI tools and account for the tool performance when establishing appropriate field response to conclude that "…current ILI technology does not … reliably identify all forms of external corrosion most likely present on much of the pipeline".  Mr. Kuprewicz leaps to this conclusion without recognizing several significant facts.  Firstly, Sable is not Plains, and will be held to higher standards of performance.  Secondly, different tools with differing technology will be used (most importantly, ultrasonic metal loss tools), and will be run more frequently.  Third, he does not identify what kind of corrosion will be present on much of the pipeline that he claims will be undetectable.  His position are biased and misleading, being based on pejorative sentiments intended to be alarming while ignoring important facts.

43.    Later in this section he discusses the relationship between the insulation and coating system and the inability of cathodic protection to function effectively.  As I have pointed out earlier, ineffective CP is a common occurrence for pipelines for a variety of reasons.  ILI, implemented correctly and with due understanding of its limitations, can be used to monitor the condition of the pipeline in an absence of effective CP.  Mr. Kuprewicz has not provided factual proof that ILI as specified by the OSFM state waiver cannot effectively be used for that purpose.

**3.    Section VII. High Pipeline Operating Temperatures Accelerate All Forms of Corrosion**

44.    Mr. Kuprewicz claims that due to the elevated temperatures, the corrosion rate will be 32 times faster than under normal conditions.  There is little doubt that corrosion rates will be higher than for many other pipelines that don't operate at elevated temperatures. But Mr. Kuprewicz is speculating as to the corrosion rate being 32 times faster, nevertheless the OSFM has implemented in the state waiver an accelerated detection and protection program as discussed above in my analysis of Mr. Kuprewicz's Opinion (e).  This was established by PHMSA's third party consultants.  The OSFM has specified that corrosion rates be established to assure that response times for repairs and maintenance are appropriate with a high margin of safety.

DECLARATION OF MICHAEL J. ROSENFELD

**4.    Section VIII. The CD Fails to Required Adequate IM Processes to Prevent Another Rupture**

45.    Mr. Kuprewicz complains that the Consent Decree does not address important technical issues, such as "cracking threats most likely to to exist on major segments of the pipeline". The Line 901 failure was not due to cracking, no cracking was identified in the failure investigation, and in my opinion as discussed previously, cracking is unlikely to be significant. In any case, the OSFM state waiver, which he does not discuss in this section of his Declaration, does address numerous important technical issues including requiring running crack detection ILI tools. This appears to be a deliberate omission by Mr. Kuprewicz to bias the reader.

**5.    Section IX. The Pipelines Cannot Be Made as Safe as New Pipelines**

46.    Mr. Kuprewicz summarizes the design aspects of the pipelines that contribute to corrosion occurring readily and quickly. He states that it will be impossible to return the pipeline to a corrosion-free as-new condition. Actually, all pipelines, even a newly constructed pipeline, will require condition assessment by ILI surveillance and subsequent repairs and maintenance, and will require an ongoing TIMP program to remain safe (all of which is being done on this pipeline system as per the OSFM). Almost every pipeline has some corrosion on it, even modern pipelines. Testing has shown that at the common maximum operating stress levels of 72% SMYS, it is virtually impossible for a pipeline to fail with corrosion up to 50% wall loss. Sable's planned operating pressure combined with OSFM requirements that they repair up to 40% wall losses further enhances pipeline integrity. This provides many opportunities to discover the pipeline conditions that may require repairs. Using differing ILI technologies on a frequent basis can be relied on to discover that, in my opinion and experience. Mr. Kuprewicz's opinion is based on an incomplete recognition of the facts concerning this pipeline.

**6.    Section X. Conclusion**

47.    Mr. Kuprewicz states in his Conclusion that hydrostatic testing and ILI will be ineffective to address the possible threats, and it would imprudent to rely on such assessments. He has not critically evaluated whether the specific and multiple ILI technologies specified by the OSFM state waiver are in fact inadequate and, if so, why. He also states that using the wrong ILI tools can make the risk of an oil spill orders of magnitude worse, though he has not stated why the specified ILI technology is of the wrong

19

DECLARATION OF MICHAEL J. ROSENFELD

type, nor presented a risk assessment quantifying the increased magnitude of the postulated oil spill.  He concludes that the Las Flores Pipeline System is unusually dangerous due to its age and design flaws.  This opinion was built on an aggregation of preceding claims each made without supporting data or even contrary to known or knowable facts.  As such it is nonfactual and noncredible.

**D.     Positions Stated in Kuprewicz's Declaration Exhibit C**

48.     Mr. Kuprewicz supplements the technical issues and the opinions in his Declaration with additional positions stated in his Exhibit C "Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart", February 21, 2025.  For the most part, he relies on the same erroneous positions taken without supporting data or analysis, or half-truths presented in an incomplete way to bias the reader, as have been discussed above.  Therefore, a detailed point by point evaluation of Exhibit C is already addressed in this declaration and need not be repeated here.

## IV.  Exhibits

49.     In forming the opinions stated herein, I reviewed and considered the following documents and the facts stated therein:

a.  Declaration of Richard B. Kuprewicz in Support of Petitioners' *Ex Parte* Application for Stay, Order to Show Cause and Temporary Restraining order, June 3, 2025, a true and correct copy of which is attached hereto as **Exhibit B.**

b.  US Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety, Corrective Action Order, CPF NO. 5-2015-5011H, May 21, 2015, a true and correct copy of which is attached hereto as **Exhibit C.**

c.  United States District Court, Central District of California, Civil Action NO. 2:20-cv-02415, CONSENT DECREE, Filed 03/13/20, a true and correct copy of which is attached hereto as **Exhibit D.**

d.  Department of Forestry and Fire Protection, Office of the State Fire Marshal, Letter of Decision on the state Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-324), Dec. 17, 2024, a true and correct copy of which is attached hereto as **Exhibit E.**

20

DECLARATION OF MICHAEL J. ROSENFELD

e.  Department of Forestry and Fire Protection, Office of the State Fire Marshal, Letter of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-325A/B), Dec. 17, 2024, a true and correct copy of which is attached hereto as **Exhibit F.**

f.  US Department of Transportation, Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline LP, Line 901 Crude Oil Release, May 19, 2025, Santa Barbara California", May 2016, a true and correct copy of which is attached hereto as **Exhibit G.**

g.  Norfleet, D.M., "Line 901 Release (5/19/25): Mechanical and Metallurgical Testing", DNV-GL, Final Report No. OAPUS309DNOR (PP136049), September 18, 2015, Appendix M to PHMSA FIR, a true and correct copy of which is attached hereto as **Exhibit H.**

h.  US Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Advisory Bulletin ADB 17-01, 82 FR 14106, Thursday, March 16, 2017, a true and correct copy of which is attached hereto as **Exhibit I.**

i.  Kiefner, J.F., "Defect assessment – 1: Modified equation aids integrity management", Oil & Gas Journal, Oct. 6, 2008 and "Defect assessment – 2: Modified Ln-Secant equation improves failure prediction", Oil & Gas Journal, Oct. 13, 2008, a true and correct copy of which is attached hereto as **Exhibit J.**

j.  McMahon, T.P., Amend, B., Harper, W., Bubenik, T., Evans, K., Rosenfeld, M., and Li, Y., "Evaluation of Selective Seam Weld Corrosion Susceptibility", 14th International Pipeline Conference, IPC2024-121806, Calgary, 2024, a true and correct copy of which is attached hereto as **Exhibit K.**

k.  National Energy Board, "Stress Corrosion Cracking on Canadian Oil and Gas Pipelines", Report of the Inquiry, MH-2-05, December 1996, a true and correct copy of which is attached hereto as **Exhibit L.**

l.  Michael Baker Jr. Engineering and Kiefner & Associates, Inc., "Spike Hydrostatic Test Evaluation", Final Report to Department of Transportation, Research and Special

21

DECLARATION OF MICHAEL J. ROSENFELD

Programs Administration, Office of Pipeline Safety, Technical Task Order No. 6 (TTO-6), Delivery Order DTRS56-02-D-70036, July 2004, a true and correct copy of which is attached hereto as **Exhibit M.**

m. Rosenfeld, M.J., "Hydrostatic pressure spike testing of pipelines: why and when?", Journal of Pipeline Engineering, 2013, a true and correct copy of which is attached hereto as **Exhibit N.**

n. US Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Advisory Bulletin ADB 17-01, 82 FR 14106, Thursday, March 16, 2017, a true and correct copy of which is attached hereto as **Exhibit O.**

o. Kiefner, J.F., and Vieth, P.H., "Project PR 3-805, A Modified Criterion for Evaluating the Remaining Strength of Corroded Pipe", American Gas Association, Cat. No. L51609, Dec. 22, 1989, a true and correct copy of which is attached hereto as **Exhibit P.**

p. American Petroleum Institute, "Managing System Integrity for Hazardous Liquid Pipelines", API Recommended Practice 1160, Third Edition, February 2019, a true and correct copy of which is attached hereto as **Exhibit Q.**

q. Nestleroth, J.B. and Rosenfeld, M.J., "Changes to In-Line Inspection Approaches to Consider with Changing Regulations", Pipeline Pigging and Integrity Management Conference, Houston, 2020, a true and correct copy of which is attached hereto as **Exhibit R.**

r. Harris, C. "Assessing Mechanical Damage Using Multiple Data Sets in Inline Inspection", Pipeline Technology Conference, Berlin, 2013, a true and correct copy of which is attached hereto as **Exhibit S.**

s. Thompson, R., Gardner, R., Dwyer, K., Gonzales, R., Corbett, A., Solano, G., "Pipeline Integrity Management of CSCC using multiple ILI technologies", Pipeline Pigging and Integrity Management Conference, Houston, 2021, a true and correct copy of which is attached hereto as **Exhibit T.**

t. Krieg, M., Nestleroth, J.B., Hennig, T., and Haines, H., "In-Line Inspection in Lieu of Hydrostatic Testing for Low Frequency Electric Resistance Welded Pipe", 12th

22

DECLARATION OF MICHAEL J. ROSENFELD

International Pipeline Conference, IPC2018-78522, Calgary, 2018, a true and correct copy of which is attached hereto as **Exhibit U.**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 7th day of July, 2025, in Granville, Ohio.

_____
Michael J. Rosenfeld

23

DECLARATION OF MICHAEL J. ROSENFELD

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) described as **DECLARATION OF MICHAEL J. ROSENFELD IN SUPPORT OF REAL PARTIES' MOTION TO STRIKE THE DECLARATION OF RICHARD B. ROSENFELD** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: *See* Attached Service List.

☒   BY ELECTRONIC MAIL TRANSMISSION WITH ATTACHMENT:  On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

☒   [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/Josie Cisneros*
_____

LEGAL02/46314888v2

## SERVICE LIST

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>CENTER FOR BIOLOGICAL DIVERSITY and<br>WISHTOYO FOUNDATION<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>        tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS<br>ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>        jfrankel@environmentaldefensecenter.org<br>        trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/ DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal<br><br>Tel.:    (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (310) 620-5879<br>Email: djmoore@paulhastings.com<br>        benjaminhanelin@paulhastings.com<br>        natalierogers@paulhastings.com |
| Trevor D. Large, Esq.<br>FAUVER, LARGE, ARCHBALD & SPRAY LLP<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (805) 966-7000<br>Email: TLarge@FLASllp.com |

LEGAL02/46314888v2

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 1:08 PM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et. al<br><br>Respondents and Defendants.<br><br>and<br><br>SABLE OFFSHORE CORP., et al.<br><br>Real Parties in Interest. | Case No. 25CV02244<br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br>**DECLARATION OF MICHAEL J. ROSENFELD IN SUPPORT OF REAL PARTIES' MOTION TO STRIKE THE DECLARATION OF RICHARD B. KUPREWICZ - VOLUME 1 OF 4 (EXHIBITS A-F)**<br><br>[*Filed concurrently with Notice of Motion and Motion to Strike Declaration of Richard B. Kuprewicz; [Proposed] Order*]<br>Date:          July 18, 2025<br>Time:         10:00 AM<br>Dept.:          4<br><br>Complaint Filed:          April 15, 2025<br>Trial Date:                    None Set |

1

DECLARATION OF MICHAEL J. ROSENFELD

# VOLUME 1 OF 4

# (EXHIBITS A – F)

# TO DECLARATION OF

# MICHAEL ROSENFELD

# EXHIBIT A

## **Michael J. Rosenfeld, PE**

Chief Engineer, Managing Member
RSI Pipeline Solutions, LLC
740-398-9543, mrosenfeld@rsi-ps.com
or mjrosenfeld57@gmail.com



## Summary

Experienced consultant in the subject of oil and gas pipeline fitness-for-service; pipeline integrity; pipeline design, materials, construction, and maintenance; and pipeline regulations and standards.

## Education

Bachelor of Science in Engineering – Mechanical Engineering, University of Michigan, 1979
Master of Science in Mechanical Engineering, Carnegie-Mellon University, 1981

## Areas of Competency

Pipeline defects, fitness for service assessment
Metallurgical failure analysis
Root cause failure analysis
Pipeline integrity management
Pipeline risk analysis
ASME B31.4, B31.8, B31.8S and related standards
API 1104, 1160, 1176, and related standards
49 CFR Parts 192 and 195
Pipeline design, materials, and construction
Pipeline maintenance and repair
Research and development
Training and seminars

## Work Experience

### RSI Pipeline Solutions LLC
### Chief Engineer, 2019-Present

Co-founder of RSI Pipeline Solutions LLC, 2019 and Managing Member. Providing technical services in support of the oil and gas pipeline industry in matters such as pipeline fitness for service, pipeline integrity management, pipeline failure root cause analysis, regulatory compliance, pipeline codes and standards development, research, and training. Recently completed an industry-funded landmark study on the integrity threat of pipe body hard spots in vintage line pipe.

**Kiefner Applus-RTD**
**Chief Engineer, 2012-2019**
Developed company practice for conducting root cause failure analysis. Developed process for determining the most probable grade of undocumented line pipe based on measured material strength and steel chemistry.  Developed processes for establishing the probable design pressure of undocumented pipelines. Provided expert testimony or opinions in support of litigation.

**Kiefner & Associates, Inc.**
**President, 2002-2011**
Conducted research on the effects of pressure cycle fatigue in pipelines, and the effects of pipe diameter expansion due to material yielding.  Worked with pipeline operators to improve their processes for evaluating pipeline fitness for service, risk assessment, and other integrity management practices. Effectively doubled the size of Kiefner & Associates with the addition of a dedicated material testing facility, a corrosion group, and other service areas such as geotechnical and in-line inspection analysis.

**Senior Structural Engineer, 1991-2002**
Performed stress analyses of pipelines subjected to external loadings. Developed monitoring and mitigation plans for pipelines affected by longwall mining subsidence. Performed qualifications testing of welding procedures and welder performance. Conducted research on the effects of mechanical damage on pipelines and originated the concept of evaluating severity of pipeline indentations based on strains of deformation. Authored revised allowable stress limits and revise repair requirements for ASME B31.8. Performed several dozen pipeline failure investigations.

**Battelle Memorial Institute, Senior Research Engineer, 1984-1991**
Performed stress analysis, fracture mechanics analysis, and design engineering for various industrial and military equipment applications. Patented an innovative design to reduce material usage and improve performance in a household appliance motor housing. Performed failure analysis of high-pressure piping. Conducted industry funded research on effectiveness of gas pipeline in-line inspection and on structural behavior of piping components affected by corrosion.

**EDS Nuclear / Impel Corporation, Engineer II, 1981-1984**

Performed stress analysis of nuclear power plant piping, piping supports, building structures, and electrical components for seismic and other loadings using finite element analysis and traditional calculation methods. Performed field engineering in support of plant turnovers.

## Industry Activity

Past Vice Chair, Interim Chair, ASME B31.8 Committee

Past Chair, ASME B31.8 Subgroup on Design, Materials, and Construction

Member, B31.8 Task Groups on Hydrogen and $CO_2$ pipelines

Member, ASME B31 Standards Committee

Member, ASME B31 Mechanical Design Technical Committee

Instructor, ASME Continuing Education Short Courses on ASME B31.4, B31.8, B31.8S, B31.12

Former Member at Large, ASME Board of Pressure Technology Codes and Standards

Former Member, Joint ASCE-ASME Task Group on Design of Buried Pipe

Former Member, API RP 1117 Task Force on In-Service Relocation of Pipelines, 1st Edition

Former Member, Work Group on API RP 1176 Assessment and Management of Cracking in Pipelines, 1st Edition

Former Member, Work Group on API RP 1160 Managing System Integrity for Hazardous Liquid Pipelines, 3rd Edition

International Pipeline Conference 2006, Session Chair, Mechanical Damage

International Pipeline Conference 2010, Session Chair, Structural Integrity I

ASME Fellow, awarded January 2012

ASME B31 Forever Award for Excellence in Piping Engineering, awarded September 2020

Registered Professional Engineer, State of Ohio, License No. E-55441

## Publications

Authored or coauthored over 130 published articles and public conference presentations. List available upon request.

June 2023

# EXHIBIT B

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,<br><br>    Petitioners and Plaintiffs,<br><br>  vs.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,<br><br>    Respondents and Defendants,<br><br>  and<br><br>SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,<br><br>    Real Parties in Interest. | Case No.: 25CV02247<br><br>**DECLARATION OF RICHARD B. KUPREWICZ IN SUPPORT OF PETITIONERS' EX PARTE APPLICATION FOR STAY, ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**<br><br>[*Filed concurrently with Ex Parte Application for Stay, Order to Show Cause and Temporary Restraining Order*]<br><br>Date:  June 3, 2025<br>Time:  8:30 a.m.<br>Dept.:  4<br>Judge:  Hon. Donna G. Geck<br><br>Action Filed: April 15, 2025<br>Trial: None Set |

---

1

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

**DECLARATION OF RICHARD KUPREWICZ**

I, Richard B. Kuprewicz, hereby declare as follows:

1.    I have personal knowledge of the matters set forth in this declaration and, if called as a witness, would and could testify competently thereto.

2.    I am a chemical engineer with over fifty years of experience in the energy industry. For over twenty-five years, I have worked as the president of Accufacts, Inc., which provides independent expert consulting services to assist decision makers in making informed decisions concerning oil and gas pipelines. I provide pipeline safety expertise in areas including (but not limited to): pipeline failure investigation; risk management and risk analysis; pipeline siting, construction, design, operation, and maintenance, training, and control room management, including Supervisory Control and Data Acquisition (SCADA) approaches; leak/rupture detection; integrity management; emergency and spill response; and pipeline safety regulatory development and compliance. Much of my background is grounded in conducting numerous pipeline incident investigations following pipeline rupture tragedies spanning several decades.

3.    I have developed and performed safety and risk management and analysis for chemical plants, liquefied natural gas facilities, refineries, and pipelines. I have also consulted for various local, state, and federal agencies, nonprofit organizations, and members of the public on pipeline regulation, operation, and design.

4.    For the past two decades I have been involved as a representative of the public in advancing pipeline safety regulations at the federal and various state levels. From 2004 to 2018, I served on the Technical Hazardous Liquid Pipeline Safety Standards Committee, also referred to as the Liquid Pipeline Advisory Committee (LPAC), to advise the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA) on improvements to pipeline safety regulations. After a brief hiatus, the Secretary of Transportation reappointed me in late 2024 to represent the public again on the LPAC. In the early 2000s while serving on the LPAC, I played a significant role representing the public in developing federal integrity management pipeline safety regulations for both liquid and gas transmission pipelines.[1] These regulatory approaches emulated safety process approaches

_____

[1] *See generally* 49 C.F.R. §§ 195.551-195.591, 192.901-192.951.

2

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

that I instituted and developed for the City of Bellingham, Washington, to assure that a ruptured pipeline there could be restarted and operated safely. I also served for seven years as a member of the Washington State Citizens Committee on Pipeline Safety ("CCOPS").  Positions to CCOPS are appointed by the Governor.

5.    I am an expert in oil and gas pipeline safety and risk management analysis based on my training, education, and experience. Attached as **Exhibit A** is my curriculum vitae.

6.    I have investigative expertise in the topic of various forms of seam corrosion, such as selective seam corrosion, stress corrosion cracking, and am a recognized expert in early vintage cracking having investigated pipeline ruptures associated with these types of cracking threats.

7.    I was asked by the Environmental Defense Center (EDC) and Center for Biological Diversity (CBD) to utilize my experience and expertise to evaluate safety and integrity issues regarding the proposal to restart the Las Flores Pipeline System, which includes CA-324 and CA-325A/B ("the Pipelines"). A true and correct copy of my report, titled *Evaluation of Las Flores Pipeline System Startup Proposal*, dated December 20, 2024, is attached to this declaration as **Exhibit B**.

8.    The report sets forth my opinion, based on my review of the Consent Decree and other documents, references, and regulations related to the Pipelines, including: the "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County," prepared by the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (May 2016); DNV-G Final Report, "Line 901 Release (5/15/15) Mechanical and Metallurgical Testing – Report No.: OAPUS309DNOR (PP136049)" (September 18, 2015); PHMSA – In the Matter of Plains Pipeline, LP, Respondent, "Amendment No. 1 to the Corrective Action Order – CPF No. 5-2015-5011H;" CA Code CCR 19 § 2111 – Risk Analysis (2) Pipeline Description (A); 49 CFR § 195.304 Test Pressure; and Sable's website concerning, "Sable Offshore Corp. Provides Update on Pacific Pipeline Company Operations," October 28, 2024, at: https://www.sableoffshore.com/news/news-details/2024/Sable-Offshore-Corp.-Provides-Update-on-Pacific-Pipeline-Company-Operations/default.aspx. In summary, I identified the following technical issues concerning the proposed restart of the Pipelines:

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

a.  The design of the Pipelines renders the federal mandated cathodic protection system, intended to help address pipeline external corrosion, ineffective.

b.  Current inline inspection (ILI) technologies cannot adequately assess all forms of external corrosion threats that most likely exist on the Pipelines.

c.  The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective cathodic protection system once the Pipelines go into operation.

d.  Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure.

e.  The poorly designed Pipelines cannot be made as safe as new pipelines.

9.  Following the preliminary approval of the State Waivers for the pipelines, EDC and CBD asked me to review and evaluate the Letters of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld for CA-324 and CA-325A/B ("State Waivers"). A true and correct copy of my report, titled *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart*, dated February 21, 2025, is attached to this declaration as **Exhibit C**.

10.  The report sets forth my opinion based on my review of the State Waivers and related documents, references, and regulations, including: Pacific Pipeline Company (Aka now as Sable/PPC) letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115)," July 10, 2023, p. 5 related to MFL-C February 2020 ILI run; 49 CFR § 452(h)(4)(iii)(H); PHMSA website: https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview; Plains Administrative Draft EIR, "Plains Replacement Pipeline Project," February 2022; and "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County," prepared by the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (May 2016). My opinion, as set forth in my report, is as follows:

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

a.   The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them.

b.   The proposed hydrotests are also insufficient to address certain types of corrosion or predict corrosion growth. For example, MOP hydrotests are not adequate to test for crack forming potential on the Pipelines.

c.   The State Waivers do not assure adequate spike hydrotesting, which is a method to address various forms of crack forming potential. The values for the spike test on Line 324 are too low for corrosion cracking screening and evaluation. Hydrotesting for Lines 325 A and B must be conducted in segments given the elevation changes. It is unclear, however, whether the testing parameters are adequate for Line 325A due to missing information. In addition, the Waivers do not appear to require any hydrotesting for Line 325B.

d.   A key corrosion performance tracking process set in the State Waivers for the Pipelines is missing. This information, which helps identify possible corrosion "hot spots," is especially important given the history of extensive corrosion on the Pipelines.

e.   The State Waivers will not provide an equal or greater level of safety as if the Pipelines were equipped with an effective cathodic protection system to avoid pipeline failure due to external corrosion. The current design of the Pipeline renders the cathodic protection system ineffective. External corrosion on the Pipelines is exacerbated by operation of the Pipelines at elevated temperatures, which seriously increases the corrosion rate.

11.   Based on the facts I reviewed and my professional analysis, in my opinion the Las Flores Pipeline System is not safe to operate, even if the conditions in the Fire Marshal's State Waivers are fulfilled.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 28th day of May 2025, in Nipomo, California.



Richard B. Kuprewicz

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

## Exhibit Index

*[Exhibits Supporting Declaration of Richard B. Kuprewicz in Support of Petitioners' Ex Parte Application for Stay, Order to Show Cause and Temporary Restraining Order]*

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | Curriculum vitae of Richard B. Kuprewicz | 7-16 |
| B | Evaluation of Las Flores Pipeline System Startup Proposal, dated December 20, 2024 | 17-43 |
| C | Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart, dated February 21, 2025 | 44-55 |

# Exhibit A

**Attachment 1**

## Curriculum Vitae.

# Richard B. Kuprewicz

8151 164th Ave NE
Redmond, WA   98052

**Tel: 425-802-1200 (Office)**
**E-mail: kuprewicz@comcast.net**

---

**Profile:**
As president of Accufacts Inc., I specialize in gas and liquid pipeline investigation, auditing, risk management, siting, construction, design, operation, maintenance, training, SCADA, leak detection, management review, emergency response, and regulatory development and compliance. I have consulted for various local, state and federal agencies, NGOs, the public, and pipeline industry members on pipeline regulation, operation and design, with particular emphasis on operation in unusually sensitive areas of high population density or environmental sensitivity.

---

**Employment:**

**Accufacts Inc.**                                    **1999 – Present**

Pipeline regulatory advisor, incident investigator, and expert witness on all matters related to gas and liquid pipeline siting, design, operation, maintenance, risk analysis, and management.

| | |
|---|---|
| **Position:** | President |
| **Duties:** | > Full business responsibility |
| | > Technical Expert |

**Alaska Anvil Inc.**                                    **1993 – 1999**

Engineering, procurement, and construction (EPC) oversight for various clients on oil production facilities, refining, and transportation pipeline design/operations in Alaska.

| | |
|---|---|
| **Position:** | Process Team Leader |
| **Duties:** | > Led process engineers group |
| | > Review process designs |
| | > Perform hazard analysis |
| | > HAZOP Team leader |
| | > Assure regulatory compliance in pipeline and process safety management |

**ARCO Transportation Alaska, Inc.**                  **1991 - 1993**

Oversight of Trans Alaska Pipeline System (TAPS) and other Alaska pipeline assets for Arco after the Exxon Valdez event.

| | |
|---|---|
| **Position:** | Senior Technical Advisor |
| **Duties:** | > Access to all Alaska operations with partial Arco ownership |
| | > Review, analysis of major Alaska pipeline projects |

**ARCO Transportation Co.**                           **1989 – 1991**

Responsible for strategic planning, design, government interface, and construction of new gas pipeline projects, as well as gas pipeline acquisition/conversions.

| | |
|---|---|
| **Position:** | Manager Gas Pipeline Projects |
| **Duties:** | > Project management |
| | > Oil pipeline conversion to gas transmission |
| | > New distribution pipeline installation |
| | > Full turnkey responsibility for new gas transmission pipeline, including FERC filing |

10-22-24

**Exhibits -Page 8**

**Four Corners Pipeline Co.**                                    **1985 – 1989**

Managed operations of crude oil and product pipelines/terminals/berths/tank farms operating in western U.S., including regulatory compliance, emergency and spill response, and telecommunications and SCADA organizations supporting operations.

**Position:**      Vice President and Manager of Operations
**Duties:**        > Full operational responsibility
                   > Major ship berth operations
                   > New acquisitions
                   > Several thousand miles of common carrier and private pipelines

**Arco Product CQC Kiln**                                        **1985**

Operations manager of new plant acquisition, including major cogeneration power generation, with full profit center responsibility.

**Position:**      Plant Manager
**Duties:**        > Team building of new facility that had been failing
                   > Plant design modifications and troubleshooting
                   > Setting expense and capital budgets, including key gas supply negotiations
                   > Modification of steam plant, power generation, and environmental controls

**Arco Products Co.**                                            **1981 - 1985**

Operated Refined Product Blending, Storage and Handling Tank Farms, as well as Utility and Waste Water Treatment Operations for the third largest refinery on the west coast.

**Position:**      Operations Manager of Process Services
**Duties:**        > Modernize refinery utilities and storage/blending operations
                   > Develop hydrocarbon product blends, including RFGs
                   > Modification of steam plants, power generation, and environmental controls
                   > Coordinate new major cogeneration installation, 400 MW plus

**Arco Products Co.**                                            **1977 - 1981**

Coordinated short and long-range operational and capital planning, and major expansion for two west coast refineries.

**Position:**      Manager of Refinery Planning and Evaluation
**Duties:**        > Establish monthly refinery volumetric plans
                   > Develop 5-year refinery long range plans
                   > Perform economic analysis for refinery enhancements
                   > Issue authorization for capital/expense major expenditures

**Arco Products Co.**                                            **1973 - 1977**

Operating Supervisor and Process Engineer for various major refinery complexes.

**Position:**      Operations Supervisor/Process Engineer
**Duties:**        > FCC Complex Supervisor
                   > Hydrocracker Complex Supervisor
                   > Process engineer throughout major integrated refinery improving process yield
                     and energy efficiency

10-22-24

**Qualifications:**

Served for over fifteen years as a member representing the public on the federal Technical Hazardous Liquid Pipeline Safety Standards Committee (THLPSSC), a technical committee established by Congress to advise PHMSA on pipeline safety regulations.

Committee members are appointed by the Secretary of Transportation.

Served seven years, including position as its chairman, on the Washington State Citizens Committee on Pipeline Safety (CCOPS).

Positions are appointed by the governor of the state to advise federal, state, and local governments on regulatory matters related to pipeline safety, routing, construction, operation and maintenance.

Served on Executive subcommittee advising Congress and PHMSA on a report that culminated in new federal rules concerning Distribution Integrity Management Program (DIMP) gas distribution pipeline safety regulations.

As a representative of the public, advised the Office of Pipeline Safety on proposed new liquid and gas transmission pipeline integrity management rulemaking following the pipeline tragedies in Bellingham, Washington (1999) and Carlsbad, New Mexico (2000).

Member of Control Room Management committee assisting PHMSA on development of pipeline safety Control Room Management (CRM) regulations.

Certified and experienced HAZOP Team Leader associated with process safety management and application.

**Education:**

| | |
|---|---|
| MBA (1976) | Pepperdine University, Los Angeles, CA |
| BS Chemical Engineering (1973) | University of California, Davis, CA |
| BS Chemistry (1973) | University of California, Davis, CA |

**Exhibits -Page 10**

**Publications in the Public Domain:**

1. "An Assessment of First Responder Readiness for Pipeline Emergencies in the State of Washington," prepared for the Office of the State Fire Marshall, by Hanson Engineers Inc., Elway Research Inc., and Accufacts Inc., and dated June 26, 2001.

2. "Preventing Pipeline Failures," prepared for the State of Washington Joint Legislative Audit and Review Committee ("JLARC"), by Richard B. Kuprewicz, President of Accufacts Inc., dated December 30, 2002.

3. "Pipelines - National Security and the Public's Right-to-Know," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated May 14, 2003.

4. "Preventing Pipeline Releases," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated July 22, 2003.

5. "Pipeline Integrity and Direct Assessment, A Layman's Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated November 18, 2004.

6. "Public Safety and FERC's LNG Spin, What Citizens Aren't Being Told," jointly authored by Richard B. Kuprewicz, President of Accufacts Inc., Clifford A. Goudey, Outreach Coordinator MIT Sea Grant College Program, and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated May 14, 2005.

7. "A Simple Perspective on Excess Flow Valve Effectiveness in Gas Distribution System Service Lines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated July 18, 2005.

8. "Observations on the Application of Smart Pigging on Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated September 5, 2005.

9. "The Proposed Corrib Onshore System - An Independent Analysis," prepared for the Centre for Public Inquiry by Richard B. Kuprewicz, dated October 24, 2005.

10. "Observations on Sakhalin II Transmission Pipelines," prepared for The Wild Salmon Center by Richard B. Kuprewicz, dated February 24, 2006.

11. "Increasing MAOP on U.S. Gas Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2006. This paper was also published in the June 26 and July 1, 2006 issues of the Oil & Gas Journal and in the December 2006 issue of the UK Global Pipeline Monthly magazines.

12. "An Independent Analysis of the Proposed Brunswick Pipeline Routes in Saint John, New Brunswick," prepared for the Friends of Rockwood Park, by Richard B. Kuprewicz, dated September 16, 2006.

13. "Commentary on the Risk Analysis for the Proposed Emera Brunswick Pipeline Through Saint John, NB," by Richard B. Kuprewicz, dated October 18, 2006.

14. "General Observations On the Myth of a Best International Pipeline Standard," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2007.

15. "Observations on Practical Leak Detection for Transmission Pipelines – An Experienced Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated August 30, 2007.

16. "Recommended Leak Detection Methods for the Keystone Pipeline in the Vicinity of the Fordville Aquifer," prepared for TransCanada Keystone L.P. by Richard B. Kuprewicz, President of Accufacts Inc., dated September 26, 2007.

17. "Increasing MOP on the Proposed Keystone XL 36-Inch Liquid Transmission Pipeline," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated February 6, 2009.

18. "Observations on Unified Command Drift River Fact Sheet No 1: Water Usage Options for the current Mt. Redoubt Volcano threat to the Drift River Oil Terminal," prepared for Cook Inletkeeper by Richard B. Kuprewicz, dated April 3, 2009.

19. "Observations on the Keystone XL Oil Pipeline DEIS," prepared for Plains Justice by Richard B. Kuprewicz, dated April 10, 2010.

20. "PADD III & PADD II Refinery Options for Canadian Bitumen Oil and the Keystone XL Pipeline," prepared for the Natural Resources Defense Council (NRDC), by Richard B. Kuprewicz, dated June 29, 2010.

21. "The State of Natural Gas Pipelines in Fort Worth," prepared for the Fort Worth League of Neighborhoods by Richard B. Kuprewicz, President of Accufacts Inc., and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated October, 2010.

22. "Accufacts' Independent Observations on the Chevron No. 2 Crude Oil Pipeline," prepared for the City of Salt Lake, Utah, by Richard B. Kuprewicz, dated January 30, 2011.

23. "Accufacts' Independent Analysis of New Proposed School Sites and Risks Associated with a Nearby HVL Pipeline," prepared for the Sylvania, Ohio School District, by Richard B. Kuprewicz, dated February 9, 2011.

24. "Accufacts' Report Concerning Issues Related to the 36-inch Natural Gas Pipeline and the Application of Appleview, LLC Premises:  7009 and 7010 River Road, North Bergen, NJ," prepared for the Galaxy Towers Condominium Association Inc., by Richard B. Kuprewicz, dated February 28, 2011.

25. "Prepared Testimony of Richard B. Kuprewicz Evaluating PG&E's Pipeline Safety Enhancement Plan," submitted on behalf of The Utility Reform Network (TURN), by Richard B. Kuprewicz, Accufacts Inc., dated January 31, 2012.

26. "Evaluation of the Valve Automation Component of PG&E's Safety Enhancement Plan," extracted from full testimony submitted on behalf of The Utility Reform Network (TURN), by Richard B.Kuprewicz, Accufacts Inc., dated January 31, 2012, Extracted Report issued February 20, 2012.

27. "Accufacts' Perspective on Enbridge Filing to NEB for Modifications on Line 9 Reversal Phase I Project," prepared for Equiterre Canada, by Richard B. Kuprewicz, Accufacts Inc., dated April 23, 2012.

28. "Accufacts' Evaluation of Tennessee Gas Pipeline 300 Line Expansion Projects in PA & NJ," prepared for the Delaware RiverKeeper Network, by Richard B. Kuprewicz, Accufacts Inc., dated June 27, 2012.

29. "Impact of an ONEOK NGL Pipeline Release in At-Risk Landslide and/or Sinkhole Karst Areas of Crook County, Wyoming," prepared for landowners, by Richard B. Kuprewicz, Accufacts Inc., and submitted to Crook County Commissioners, dated July 16, 2012.

30. "Impact of Processing Dilbit on the Proposed NPDES Permit for the BP Cherry Point Washington Refinery," prepared for the Puget Soundkeeper Alliance, by Richard B. Kuprewicz, Accufacts Inc., dated July 31, 2012.

31. "Analysis of SWG's Proposed Accelerated EVPP and P70VSP Replacement Plans, Public Utilities Commission of Nevada Docket Nos. 12-02019 and 12-04005," prepared for the State of Nevada Bureau of Consumer Protection, by Richard B. Kuprewicz, Accufacts Inc., dated August 17, 2012.

32. "Accufacts Inc. Most Probable Cause Findings of Three Oil Spills in Nigeria," prepared for Bohler Advocaten, by Richard B. Kuprewicz, Accufacts Inc., dated September 3, 2012.

33. "Observations on Proposed 12-inch NGL ONEOK Pipeline Route in Crook County Sensitive or Unstable Land Areas," prepared by Richard B. Kuprewicz, Accufacts Inc., dated September 13, 2012.

34. "Findings from Analysis of CEII Confidential Data Supplied to Accufacts Concerning the Millennium Pipeline Company L.L.C. Minisink Compressor Project Application to FERC, Docket No. CP11-515-000," prepared by Richard B. Kuprewicz, Accufacts Inc., for Minisink Residents for Environmental Preservation and Safety (MREPS), dated November 25, 2012.

35. "Supplemental Observations from Analysis of CEII Confidential Data Supplied to Accufacts Concerning Tennessee Gas Pipeline's Northeast Upgrade Project," prepared by Richard B. Kuprewicz, Accufacts Inc., for Delaware RiverKeeper Network, dated December 19, 2012.

36. "Report on Pipeline Safety for Enbridge's Line 9B Application to NEB," prepared by Richard B. Kuprewicz, Accufacts Inc., for Equiterre, dated August 5, 2013.

37. "Accufacts' Evaluation of Oil Spill Joint Investigation Visit Field Reporting Process for the Niger Delta Region of Nigeria," prepared by Richard B. Kuprewicz for Amnesty International, September 30, 2013.

38. "Accufacts' Expert Report on ExxonMobil Pipeline Company Silvertip Pipeline Rupture of July 1, 2011 into the Yellowstone River at the Laurel Crossing," prepared by Richard B. Kuprewicz, November 25, 2013.

39. "Accufacts Inc. Evaluation of Transco's 42-inch Skillman Loop submissions to FERC concerning the Princeton Ridge, NJ segment," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated June 26, 2014, and submitted to FERC Docket No. CP13-551.

40. Accufacts report "DTI Myersville Compressor Station and Dominion Cove Point Project Interlinks," prepared by Richard B. Kuprewicz for Earthjustice, dated August 13, 2014, and submitted to FERC Docket No. CP13-113-000.

41. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated September 3, 2014, and submitted to FERC Docket No. CP13-551.

42. Accufacts' "Evaluation of Actual Velocity Critical Issues Related to Transco's Leidy Expansion Project," prepared by Richard B. Kuprewicz for Delaware Riverkeeper Network, dated September 8, 2014, and submitted to FERC Docket No. CP13-551.

43. "Accufacts' Report to Portland Water District on the Portland – Montreal Pipeline," with Appendix, prepared by Richard B. Kuprewicz for the Portland, ME Water District, dated July 28, 1014.

44. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz and submitted to FERC Docket No. CP13-551.

45. Review of Algonquin Gas Transmission LLC's Algonquin Incremental Market ("AIM Project"), Impacting the Town of Cortlandt, NY, FERC Docket No. CP14-96-0000, Increasing System Capacity from 2.6 Billion Cubic Feet (Bcf/d) to 2.93 Bcf/d," prepared by Richard B. Kuprewicz, and dated Nov. 3, 2014.

46. Accufacts' Key Observations dated January 6, 2015 on Spectra's Recent Responses to FERC Staff's Data Request on the Algonquin Gas Transmission Proposal (aka "AIM Project"), FERC Docket No. CP 14-96-000) related to Accufacts' Nov. 3, 2014 Report and prepared by Richard B. Kuprewicz.

47. Accufacts' Report on Mariner East Project Affecting West Goshen Township, dated March 6, 2015, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

48. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing on the Proposed System Integrity Projects ("SIP") to the Mississippi Public Service Commission ("MPSC") under Docket No. 15-UN-049 ("Docket"), prepared by Richard B. Kuprewicz, dated June 12, 2015.

49. Accufacts' Report to the Shwx'owhamel First Nations and the Peters Band ("First Nations") on the Trans Mountain Expansion Project ("TMEP") filing to the Canadian NEB, prepared by Richard B. Kuprewicz, dated April 24, 2015.

50. Accufacts Report Concerning Review of Siting of Transco New Compressor and Metering Station, and Possible New Jersey Intrastate Transmission Pipeline Within the Township of Chesterfield, NJ ("Township"), to the Township of Chesterfield, NJ, dated February 18, 2016.

51. Accufacts Report, "Accufacts Expert Analysis of Humberplex Developments Inc. v. TransCanada Pipelines Limited and Enbridge Gas Distribution Inc.; Application under Section 112 of the National Energy Board Act, R.S.C. 1985, c. N-7," dated April 26, 2016, filed with the Canadian Nation Energy Board (NEB).

52. Accufacts Report, " A Review, Analysis and Comments on Engineering Critical Assessments as proposed in

**Exhibits -Page 13**

PHMSA's Proposed Rule on Safety of Gas Transmission and Gathering Pipelines," prepared for Pipeline Safety Trust by Richard B. Kuprewicz, dated May 16, 2016.

53. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing to the Mississippi Public Utilities Staff, "Accufacts Review of Atmos Spending Proposal 2017 – 2021 (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 15, 2016.

54. Accufacts Report, "Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL")," prepared for Earthjustice by Richard B. Kuprewicz, dated October 28, 2016.

55. Accufacts' Report on Mariner East 2 Expansion Project Affecting West Goshen Township, dated January 6, 2017, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

56. Accufacts Review of Puget Sound Energy's Energize Eastside Transmission project along Olympic Pipe Line's two petroleum pipelines crossing the City of Newcastle, for the City of Newcastle, WA, June 20, 2017.

57. Accufacts Review of the Draft Environmental Impact Statement for the Line 3 Pipeline Project Prepared for the Minnesota Department of Commerce, July 9, 2017, filed on behalf of Friends of the Headwaters, to Minnesota State Department of Commerce for Docket Nos. CN-14-916 & PPL-15-137.

58. Testimony of Richard B. Kuprewicz, president of Accufacts Inc., in the matter West Goshen Township and Concerned Citizens of West Goshen Township v. Sunoco Pipelines, L.P. before the Pennsylvania Public Utilities Commission, Docket No. C-2017-2589346, on July 18, 2017, on Behalf of West Goshen Township and Concerned Citizens of West Goshen Township.

59. Direct Testimony of Richard B. Kuprewicz, president of Accufacts Inc., on Behalf of Friends of the Headwaters regarding Enbridge Energy, Limited Partnership proposal to replace and reroute an existing Line 3 to the Minnesota Office of Administrative Hearings for the Minnesota Public Utilities Commission (MPUC PL-9/CN-14-916 and MPUC PL-9/PPL-15-137), September 11, 2017 and October 23, 2017.

60. Direct Testimony of Richard B. Kuprewicz On Behalf of The District of Columbia Government, before the Public Service Commission of the District of Columbia, in the matter of the merger of AltaGas Ltd. and WGL Holdings, Inc., Formal Case No. 1142, September 29, 2017.

61. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2018 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated December 4, 2017.

62. Report to Hugh A. Donaghue, Esquire, Concord Township Solicitor, "Accufacts Comments on Adelphia Project Application to FERC (Docket No. CP18-46-000) as it might impact Concord Township," dated May 30, 2018.

63. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2019 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 20, 2018.

64. Report to West Goshen Township Manager, PA, "Accufacts report on the repurposing of an existing 12-inch Sunoco pipeline segment to interconnect with the Mariner East 2 and Mariner East 2X crossing West Goshen Township," dated November 8, 2018.

65. Report to West Whiteland Township Manager, PA, "Accufacts Observations on Possible Pennsylvania State Pipeline Safety Regulations," prepared by Richard B. Kuprewicz, dated March 22, 2019.

66. Accufacts Public Comments on the Proposed Joint Settlement, BI&E v. Sunoco Pipeline L.P. ("SPLP"), Docket No. C-2018-3006534 ("Proposed Settlement"), submitted on August 15, 2019 to the Pennsylvania Public Utility Commission on the behalf of West Goshen Township as an intervener.

67. Report to West Whiteland Township Manager, Ms. Mimi Gleason, "Accufacts Perspective on Two Questions from West Whiteland's Board of Supervisors on Proposed Changes to ME 2 and ME 2X Construction/Operational Activities within West Whiteland," dated September 5, 2019."

68. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the episode on the evening of 8-5-19 at the Mariner East Boot Road Pump Station ("Event"), Boot Road, West Goshen Township, PA," dated September 16, 2019.

69. Provided direct testimony before the Arizona Corporation Commission, In the Matter of the Application of Southwest Gas Corporation for the Establishment of Just and Reasonable Rates and Charges Designed to Realize a Reasonable Rate of Return on Fair Value of the Properties of Southwest Gas Corporation Devoted to its Arizona Operations (Docket No. G-01551A-19-0055), testified on behalf of Utilities Division Arizona Corporation Commission, February 19, 2020.

70. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the Mariner East 2X Pipeline Affecting West Goshen Township," dated July 23, 2020.

71. Assisted the Commonwealth of Massachusetts, Office of the Attorney General in developing pipeline safety processes to be incorporated into the settlement agreement related to Columbia Gas' sale of Assets to Eversource following the Merrimack Valley, Massachusetts overpressure event of September 13, 2018.

72. Report to Natural Resources Defense Council, Inc., "Accufacts' Observations on the Use of Keystone XL Pipeline Pipe Exhibiting External Coating Deterioration Issues from Long Term Storage Exposure to the Elements," October 1, 2020.

73. Report to Pennsylvania Public Utilities Commission ("PAPUC"), "Accufacts Comments on Proposed Pennsylvania Intrastate Liquid Pipeline Safety Regulations," dated October 29, 2021, prepared for West Whiteland Township Board of Supervisors, West Whiteland Township, PA. Filed to PAPUC public web docket November 5, 2021 by West Whiteland Township under Reference Docket Number L-2019-3010267. Addresses suggested improvements in proposed pipeline safety rules for PA intrastate liquid transmission pipelines.

74. Submitted written testimony of Richard B. Kuprewicz on Behalf of Bay Mills Indian Community to ALJ Dennis Mack, dated December 14, 2021, in the matter of the Application of Enbridge Energy, Limited Partnership for Authority to Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac, before the State of Michigan Public Service Commission, U-20763.

75. Public presentation to New York State Indian Point Nuclear Facility Decommissioning Oversight Board on Holtec removal activities in proximity to Enbridge three Natural Gas Transmission Pipelines, March 17, 2022.

76. Report to Pipeline Safety Trust and Bold Alliance, "Accufacts' Perspectives on the State of Federal Carbon Dioxide Transmission Pipeline Safety Regulations as it Relates to Carbon Capture, Utilization, and Sequestration within the U.S.," March 23, 2022.

77. Accufacts Inc., Public Presentation for the National Academies of Science Engineering Medicine and The Transportation Research Board, "To Committee on Criteria for Installing Automatic and Remote-Controlled Shutoff Valves on Existing Gas and Hazardous Liquid Transmission Pipelines," 4/27/22.

78. Accufacts Inc, "6/13/22 Webinar to Illinois Emergency Responders, Healthcare Providers, & Local Officials on Responses to $CO_2$ Transmission Pipeline Releases," 6/13/22.

79. Accufacts Report for Pipeline Safety Trust, "Safety of Hydrogen Transportation by Gas Pipelines," 11/28/22.

80. Completed a series of testimonies related to Enbridge's Line 5 proposal to replace 2 – 20-inch diameter existing submerged pipelines currently lying across the bottom of the Straits of Mackinac with a 30-inch diameter grade X-70 pipeline, proposed to be installed in a 21-foot diameter concrete tunnel to be installed across the approximate 4-mile span of the Straits of Mackinac. Testified on Behalf of the Bay Mill Indian Community before the State of Michigan Public Service Commission, Docket U-20763, in opposition to this very poorly designed proposal/installation allowing for movement of the pipeline on rollers within the tunnel. Final testimony to the docket submitted May 19, 2023. This is the only pipeline proposal I am aware of in the world that would place a crude oil and liquid propane pipeline, especially a 30-inch diameter pipeline, within a tunnel.

81. Issued to Ms. Niroop Srivatsa, City Manager, "Accufacts Report for the City of Lafayette on the Status of the Tree Assessment Process with PG&E," indicating most of the trees identified for removal by PG&E risk management

10-22-24

**Exhibits -Page 15**

approach have nothing to do with gas pipeline safety, June 15, 2023.

82. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the Navigator Heartland Greenway LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0161, on behalf of Citizens Against Heartland Pipeline ("CAHGP"), McDonough County, Christian County and Hancock County (the "Counties") (jointly, "Citizen and County Intervenors" of "CCI"), raising serious questions as to PHMSA's recent assertions of pipeline safety jurisdiction, and underscoring the ICC's authority for pipeline siting jurisdiction of said pipeline proposal in the State of Illinois, filed June15, 2023.  Applicant has terminated their application.

83. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the WOLF Carbon Solutions US LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0475, for a certificate of authority to construct and operate a carbon dioxide pipeline and when necessary to take interest in property as provided by law of eminent domain, testifying on Behalf of Citizens Against Predatory Pipelines ("CAPP"): 1) identifying serious inadequacies in PHMSA's pipeline safety regulations, 2) explaining why the Commission should require pipeline temperature profiles 3) detailing why DNV-RP-F104 is not relevant to this filing and 4) underscoring the ICC's authority to require additional critical information from the Applicant in this matter, filed October 24, 2023.  Applicant has withdrawn their submission to the Commission.

84. Provided general summary, main observations/concerns, on "Draft Environmental Impact Statement: Otter Tail to Wilkin Carbon Dioxide Pipeline Project" submitted to Minnesota Public Utilities Commission regarding Summit Carbon Solutions, LLC proposed 28 mile long 4-inch diameter $CO_2$ liquid transmission pipeline ("Otter Tail Pipeline") within Minnesota, PUC Docket No. IP-7093/PPL-22-422, provided to Clean Up the River Environment ("CURE") on 1/29/2024.

85. Issued to EarthJustice, "Observations concerning Kern County's Draft Environmental Impact Report ("DEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated February 26, 2024, "Observations concerning Kern County's Recent Recirculated Draft Environmental Impact Report ("RDEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated July 17, 2024, and "Evaluation of Kern County Response to Comments and Final Recirculated Environmental Impact Report on the TerraVault I Carbon Capture and Storage Project, dated October 15, 2024.  The Project situated in Kern County is proposed by the California Resources Corporation to separate a portion of the pre-combustion Elk Hills field gas production, treat and inject via liquid transmission pipelines, $CO_2$ into two sequestration injection wells within the Elk Hill oil field.  The reports identify many technical gaps in filings to Kern County.

86. Issued for the Tribal Partnerships Program, "Observations on the U.S. Army Corps of Engineers Draft Environmental Assessment, Clean Water Act Section 404(b)(1) Guidelines Evaluation, and Public Interest Review (collectively referenced as "DCDD") for the Enbridge Line 5 Wisconsin Segment Relocation Project ("Project"), dated May 2024," report dated July 31, 2024 affecting the Bad River Band of the Lake Superior Tribe of Chippewa Indians reservation.

10-22-24

# Exhibit B

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Evaluation of Las Flores Pipeline System Startup Proposal*

**Prepared For**

## The Center for Biological Diversity
## &
## The Environmental Defense Center

**December 20, 2024**

Accufacts Inc. 12-20-24

## Table of Contents

I.  *Executive summary and major findings* ...............................................................*1*

II.  *Accufacts experience qualifying me as an expert in this matter.*................................*3*

III. *A brief historical perspective*...................................................................*4*

IV.  *The Las Flores Pipeline System.* ......................................................................*5*

V.  *TIMP regulations are not working to protect the public or the environment.*.........*8*

    1) Hydrotesting assessments. .................................................................. 8

    2) ILI assessments. ...............................................................................10

VI.  *The greatest threat on the Las Flores Pipeline System is from external corrosion.* ..................................................................................................... 11

VII.  *High pipeline operating temperatures accelerate all forms of corrosion.*........... 13

VIII.  *The Consent Decree agreement fails to require adequate IM processes to prevent another rupture of the poorly designed Pipelines.*...................................... 14

IX. *The poorly designed Pipelines cannot be made as safe as new pipelines.*.............. 14

X.  *Conclusion.* ..................................................................................................... 15

Accufacts Inc. 12-20-24                        i

## I.    Executive summary and major findings

Accufacts Inc. ("Accufacts") was asked to review the documents related to the Las Flores Pipeline System ("Pipelines") for possible restart.  A Consent Decree signed in March, 2020 places responsibility for approving processes related to the onshore pipeline system restart on the California Office of the State Fire Marshal, or OSFM, the agency responsible for intrastate hazardous liquid pipeline safety.[1]  The Consent Decree replaces various Corrective Action Orders issued on the Pipelines by the Pipeline and Hazardous Materials Safety Administration, or PHMSA, the federal agency responsible for pipeline safety.[2]  PHMSA is the federal agency responsible for establishing minimum pipeline safety regulations for many pipelines operating in the U.S., including intrastate hazardous liquid transmission pipelines.  States meeting certain conditions can impose pipeline safety standards for intrastate pipelines beyond PHMSA regulations as long as such state regulations are not in conflict with PHMSA regulations.  By agreement, the Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed wavier alternative measures "provide an equal or greater level of safety."[3, 4]  The Consent Decree is inadequate, missing many corrosion threats to the Pipelines that can result in rupture.

Accufacts finds that the main technical issues concerning the restart of the Pipelines are:

1. **The poorly designed pipeline system renders required federal mandated cathodic protection ("CP"), intended to help address pipeline external corrosion, ineffective.**
2. **Current inline inspection ("ILI") technologies cannot adequately allow the assessment of all forms of external corrosion threats that most likely exist on the Pipelines.**
3. **The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective CP system once the Pipelines go into operation.**
4. **Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure. The poorly designed Pipelines cannot be made as safe as new pipelines.**

---

[1] Such state responsibility is dependent on whether the state agency meets certain qualifications required by PHMSA and whether the state Legislature has granted such state authority, as California has.

[2] UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA, UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, ex rel. DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, ex rel. CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, ex rel. CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, ex rel. CALIFORNIA STATE LANDS COMMISSION, ex rel. CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARCHALL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA (Plaintiffs) v. PLAINS ALL AMERICAN PIPELINE L.P. and PLAINS PIPELINE, L.P. (Defendants), Consent Decree, Civil Action No. 2:20-cv-20415 signed March 2020 ("Consent Decree").

[3] *Ibid.,* Appendix B & Appendix D, paragraph 1.

[4] PHMSA website, " Special Permits and State Waivers Overview," at https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

Accufacts Inc. 12-20-24                                                                                         Page 1 of 15

Oil spills are catastrophic events, and operation of any pipeline carries a risk of spill. At best, good pipeline design and pipeline integrity management tools can reduce—but not eliminate—the risk. The Consent Decree is replacing incomplete integrity management ("IM") approaches implemented by Plains that failed to prevent a pipeline rupture from the poor design of the Pipelines, with another incomplete IM approach expecting a change in the outcome.

The Pipelines have been sitting shut down for over nine years at ambient temperatures without effective CP protection. While external corrosion rates in this shutdown mode are significantly reduced because of lower temperatures as discussed later in this report, **the risk of external corrosion is not eliminated**. The Consent Decree requires the OSFM to seek a waiver of the federal pipeline safety CP requirements defined under Subpart H, subject to the approval of PHMSA, to permit the Pipelines to restart.[5, 6] Complicating this matter is the incorporation of risk analysis by the state into the Consent Decree that is under the control of the pipeline operator and is not made fully public, but subject only to the "review and comment" of the OSFM. To be fair, the OSFM must meet certain state legislated risk analysis requirements that though well-meaning, are incomplete, such as, for example, how to define what a reasonable worst-case discharge is to prudently evaluate the risk of a pipeline failure.[7] This is a problem I often see abused in federal pipeline oil spill response plans that doesn't adequately capture pipeline rupture hydraulics.[8] One of the major problems with risk analysis, a determination of the likelihood of an event occurring, and why it is not codified into federal pipeline safety regulations, is that such approaches are usually not complete or representative of the true risks of a specific pipeline operation. The impacts of any pipeline failure are significant and long-lasting, causing destruction of habitats, death of wildlife, and even human fatalities. It is impossible to predict a pipeline failure, and decision-making based on the perceived probability of failure does not adequately account for the severe consequences that will ensue, particularly if those decisions fail to capture pipeline rupture hydraulics. I call this "Space Shuttle Syndrome," because, in the rush to launch the space shuttle program, NASA decisionmakers understated its true risks and dismissed well established safety culture protocols, resulting in the loss of two space shuttles and their crews and ending the space shuttle program.

The Consent Decree is placing undue responsibilities on the OSFM which might not appreciate the limits of current inline inspection technical capabilities. The Consent Decree overly relies on ILI technologies and their associated engineering critical assessments that are not capable of prudently addressing many forms of external corrosion, especially interactive forms such as Stress Corrosion Cracking, or SCC, whose time to failure is difficult, if not impossible, to predict as discussed later in this report. The current poorly designed Pipelines do not permit CP protection to mitigate external corrosion on the Pipelines that must operate at uniquely high temperatures. The required high temperatures accelerate all forms of external corrosion. New pipelines would incorporate proper design such as non-insulated pipe and newer forms of pipeline coating technology, that would permit CP to be effective in addressing external corrosion even at high temperatures to help assure pipeline safety. No pipeline waiver issued under the conditions addressed in the Consent Decree is consistent with pipeline safety nor can ensure the same level

---

[5] 49CFR§195 Subpart H - Corrosion Control.
[6] Consent Decree, Appendix B, "State Waivers for Line 901, 903 …..,".
[7] CA Code CCR 19§2111 – Risk Analysis.
[8] 49CFR§194 Response Plans for Onshore Oil Pipelines.

Accufacts Inc. 12-20-24                                                      Page 2 of 15

of safety as that associated with a prudently designed pipeline system. Neither Plains, the pipeline operator at the time of the May 19, 2015 failure, nor the new owner, Sable, designed or built the present Pipelines with their serious deficiencies, but as a pipeline operator Sable bears the ultimate responsibilities should the Pipelines fail.

## II.    Accufacts experience qualifying me as an expert in this matter.

Accufacts Inc. ("Accufacts") was asked to review the Line 901/903 pipelines, now renamed Lines CA-324/CA-325 ("Pipelines"), and related documents such as those produced by the OSFM on their website.  A Consent Decree places responsibility for approving processes related to the onshore pipeline system restart first on the OSFM, then on PHMSA.[9]  The Center for Biological Diversity and The Environmental Defense Center asked Accufacts to provide an independent evaluation of documents related to a possible restart of the Pipelines to safely move heavy oil production from offshore platforms in the Santa Barbara Channel into the Pipelines.  It should be noted that the OSFM has recently issued a waiver on PHMSA's CP obligations for the Pipelines. I have not seen the details related to OSFM's decision on the granting of such a waiver.

I am a chemical engineer with over fifty years of experience in the energy industry, including over 25 years as president of Accufacts Inc. ("Accufacts").  Accufacts provides independent expert consulting services to assist decision makers in making informed decisions concerning pipelines. Pipeline safety expertise is provided in areas including, but not limited to: pipeline failure investigation, risk management/risk analysis, siting, construction, design, operation, maintenance, training, control room management including Supervisory Control and Data Acquisition ("SCADA") approaches, leak/rupture detection, integrity management, emergency and spill response, and pipeline safety regulatory development and compliance.  Much of my background is grounded in pipeline incident investigations following numerous pipeline rupture tragedies spanning several decades.

For the past two decades I have been involved as a representative of the public, which carries special obligations to avoid a conflict of interest, in advancing pipeline safety regulations at the federal and various state levels as demonstrated by my CV that is included as Attachment 1.  For example, I played a significant role representing the public in developing integrity management federal pipeline safety regulations in the early 2000s for both liquid and gas transmission pipelines. These regulatory approaches emulated safety process approaches that I instituted and developed for the City of Bellingham, WA to assure that a ruptured pipeline there could be restarted and operated safely.  This safety process approach, identified as the Pipeline Safety Immediate Action Plan, or PSIAP, identified steps that the pipeline operator was to complete following the Bellingham rupture tragedy of June 10, 1999, before that pipeline could be permitted to safely return to service.  The PSIAP is a matter of public record compliments of Washington State's Right-to-Know laws.  PSIAP formed a template for the integrity management safety regulations developed by the Office of Pipeline Safety, which morphed into PHMSA in 2003.

---

[9] Consent Decree, Appendix B & Appendix D.

For approximately fifteen years, through the development of federal standards for Transmission Integrity Management Programs ("TIMP") for both liquid and gas integrity regulations, control room management ("CRM"), and Operator Qualification ("OQ") rulemaking efforts, to cite a few pipeline safety rulemaking efforts, I served on the Technical Hazardous Liquid Pipeline Safety Standards Committee, also referred to as the Liquid Pipeline Advisory Committee, or LPAC, to advise PHMSA on possible pipeline safety regulation advancement. After a brief hiatus of several years, I have recently been reappointed by the Secretary of Transportation to represent the public again on LPAC, which carries numerous obligations to avoid a conflict of interest. I believe I am more than qualified to comment as an expert on the various issues related to CA-324/CA-325 pipeline system possible restart.

## III.    A brief historical perspective



**Figure 1 – Overview of Pipelines**

Since the May 19, 2015 onshore pipeline rupture and oil release that spilled into the Santa Barbara Channel and beyond, the pipeline system known at the time as Lines 901/903, and offshore oil platforms feeding this system have been shut down. Lines 901/903 have recently been renumbered CA-324 and CA-325, respectively. These pipelines, which were classified as interstate pipelines at the time of the release, were ordered to be shut down and oil purged from the Pipelines and placed under nitrogen atmospheres under Corrective Action Orders instituted by PHMSA. Line 901 experienced an onshore pipeline rupture failure caused by massive external corrosion and released on the late morning of May 19, 2015 near Refugio State Beach that placed a considerable amount of oil into the sensitive waters of the Santa Barbara Channel and beyond. While the years since 2015 involved discussions for possible construction of new pipelines to replace the poorly

Accufacts Inc. 12-20-24                                                                    Page 4 of 15

designed Lines 901/903, recent activities shifting ownership of the pipelines and associated infrastructure to Sable Offshore Corp. ("Sable"), are now focused on restarting the existing pipelines under new ownership and conditions stated under a Consent Decree.

The May 19, 2015 Line 901 rupture failure occurred at approximately 4 miles (MP 4) downstream of the Las Flores Canyon Pump Station due to extensive external corrosion. The Line 901 ruptured at approximately 56 % of the maximum operating pressure ("MOP") of 1341 pounds per square inch gauge ("psig") (which is 72 % specified minimum yield strength ("SMYS")).[10] In addition, further metallurgical forensic reports attached to the PHMSA Final Report, indicate that pipeline ruptured at a pressure of 737 psig, which was 39.6% of SMYS.[11] This pipeline failed at very low stress levels, not a surprise given that the depth of the corrosion failure was 89% of the measured wall thickness, and the ILI tools significantly mis indicated the size of the corrosion threats.[12]

**Figure 2 – Overview of Pipelines route with MPs estimated**



## IV.    The Las Flores Pipeline System.

The following is based on information readily in the public domain, as demonstrated by the footnote references. Because of many variations in MP numbers in various documents, MP numbers referenced in this report should be considered approximate with slight variations that don't really impact my findings/conclusions/recommendations.

[10] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.14 of 23.
[11] DNV-G Final Report, "Line 901 Release (5/15/15) Mechanical and Metallurgical Testing, - Report No: OAPUS309DNOR (PP136049)," September 18, 2015, p. iii.
[12] *Ibid.,* "Summary of Observations," p. vi.

The Pipelines, formerly identified as Line 901/903 operated by Plains (aka Plains All American Pipeline L.P. and Plains Pipeline L.P.), represent a pipeline system of approximately 125 miles in length running from the Las Flores Canyon Pump Station (milepost 0) to the Pentland Metering (and Storage) facility (at Milepost 125.3). Figure 1 is a general overview of the Pipelines routing. CA-224 (old Line 901) that runs from the Las Flores Canyon Pump Station (Milepost 0) to the Gaviota Meter Station (Milepost 10.7). Note that I have reversed the Milepost reported in PHMSA's Final Report to follow more conventional milepost numbering, increasing from the pipeline inlet at the Las Flores Canyon Pump Station (MP 0), to the pipeline outlet of the 24-inch diameter Line 901/CA-224 pipeline, the Gaviota Metering Station (MP 10.7). CA-324 is the sole feed into the 30-inch pipeline, CA-325A. CA-325A runs from the Gaviota Metering Station to the Sisquoc pump station (MP 49.2). CA-325B, also a 30-inch diameter pipeline, runs from the Sisquoc pump station (MP 49.2) to the Pentland metering station (~MP 125.3). Figure 2 shows the general route adding approximate MP numbers following this similar MP increasing numbering all the way to Pentland.

According to the PHMSA Final Report on the 2015 rupture:

Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries. Plains' pipeline is composed of two major pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went into crude oil service in 1992 and 1991, respectively. The pipelines are coated with coal tar urethane and covered with foam insulation which in turn is covered by a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at all of the pipeline joints on Line 901 and multiple locations on Line 903. The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.

Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles downstream of the Las Flores Station. All of Line 901 crude oil throughput enters Line 903. Line 901 was manufactured of low carbon steel by Nippon Steel in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam. The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990. There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream. At Emidio Station crude oil is delivered to above-

ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.[13]

**Figure 3 - Approximate Elevation Profile - Las Flores Canyon Pump Station (MP 0) to Pentland Station (MP ~125.3)**



PHMSA provided additional information related to Line 903:

> (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). [14]

> Plains has informed PHMSA that Line 903 has insulation and shrink wrap sleeves on the girth welds similar to the Affected Pipeline {Line 901}.[15]

It is not clear from the documents produced if Line 903 insulation is also tape wrapped like Line 901, that would further shield the CP system from the Pipelines, assuring that CP is ineffective.

Figure 3 is an approximate elevation profile (approximate elevation of pipeline in feet versus pipeline milepost) for the Las Flores Pipeline System developed by the Center for Biological Diversity's Geographic Information System, or GIS, specialist using information readily available in the public domain. Pipeline elevation profiles play a critical role in understanding liquid transmission pipeline operation and risks, such as evaluating ILI runs, valve placement/actuator decisions, emergency and oil spill actions, and spill response planning. In addition, if a pipeline hydraulic profile, also referred to as a hydraulic gradient, is superimposed on an elevation profile, much information about pipeline risk can be gained. A hydraulic gradient is required of the pipeline operator under California Risk Analysis regulation.[16] A pipeline hydraulic gradient includes a plot of operating pressure versus milepost for a specified crude oil gravity and flow rate, but for this unique system, a crude oil viscosity and temperature should also be included on the

---

[13] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016, pp. 4 & 5 of 21.
[14] *Ibid.,* p. 4 of 21.
[15] PHMSA – In the Matter of Plains Pipeline, LP, Respondent, "Amendment No. 1 to the Corrective Action Order – CPF No. 5-2015-5011H," p. 2.
[16] CA Code CCR 19§2111 – Risk Analysis (2) Pipeline Description (A).

Accufacts Inc. 12-20-24                                                                                           Page 7 of 15

hydraulic gradient as these parameters seriously impact the hydraulic gradient evaluation. Such hydraulic gradient information is important in evaluating the risks of a pipeline restart program, especially on the Pipelines given their highly unique elevation profile among other factors (See Figure 3). This information is probably not likely to be made public, though a competent experienced engineer can develop an approximate hydraulic profile for a pipeline system if they understand certain crude oil blended properties and temperatures.

## V. TIMP regulations are not working to protect the public or the environment.

In the passage of the federal pipeline safety regulations setting standards for Transmission Integrity Management Programs, or TIMP, first for liquid, then gas, in 2002 and 2003, respectively, the use of performance-based approaches versus more prescriptive based regulations were agreed to as a compromise to advance important needed pipeline safety regulation in this area. Until the passage of TIMP regulations, pipeline operators were under no obligation to periodically assess the condition of their mainline pipelines. Performance-based regulation, in theory, allows a pipeline operator to choose between various alternatives that may work best for their pipeline. Prescriptive-based pipeline safety regulations historically have been imposed in federal pipeline safety regulatory efforts. Prescriptive regulations impose certain conditions that pipeline operators must, or shall, follow.

TIMP efforts for liquid pipelines define four basic approaches permitted in pipeline integrity assessment, depending on the pipeline threat that a pipeline segment might experience. Briefly, the major assessment methods most appropriate for this pipeline system are hydrostatic pressure testing ("hydrotesting") and inline inspection ("ILI") also known as smart pigging. As the Line 901 onshore oil release that flowed into sensitive waterway areas has clearly demonstrated, TIMP regulation is not working for many pipeline operators, even after the operator had run multiple ILI corrosion tool runs which I will expand on further below. Another unexpected outcome of TIMP performance-based regulation is that such less than clear regulation efforts are harder to enforce.

It's important to note that pipeline integrity management tools are not a substitute for proper pipeline design or effective cathodic protections. Their purpose is simply to monitor the condition of pipelines over time and identify threats to the pipeline's integrity.

### 1) Hydrotesting assessments.

Properly performed hydrotesting can be an important pipeline integrity assessment tool that proofs a pipeline's fitness for service to safely operate at MOP at the time of the hydrotest. Hydrotesting involves shutting down a pipeline and filling a pipeline segment with water. Proof of pipeline integrity or fitness for service testing is verified by carefully increasing water pressure with a water injection pump after air has been removed and the pipeline segment temperature stabilized. While federal pipeline safety regulations for liquid transmission pipelines define a "Subpart E" hydrotest to establish or verify maximum operating pressure, or MOP, a term having specific meaning in regulation, the regulations are not specific on important parameters to ensure a quality hydrotest that doesn't damage the pipe. Minimum hydrotest pressures are established to verify the MOP at the time of the hydrotest, with

sufficient pressure safety margin at the time of the hydrotest. A Subpart E hydrotest is a proof for fitness test that the pipeline, at the time of the test, can withstand pressures above the MOP with a certain margin of pressure safety.[17]

One important caveat is needed regarding Subpart E hydrotests, which are often called strength tests. For a pipeline experiencing certain cracking threats such as selective seam cracking (SSC) or stress corrosion cracking (SCC)—corrosion threats that likely exist along the Las Flores Pipeline System—**a subpart E hydrotest is inadequate**. Current ILI technology cannot reliably identify if such cracking threats are present. More importantly, nor can associated engineering critical assessments provide prudent evaluation of such threats due to the inability to reliably predict corrosion colonies that can interact or link together in unpredictable ways. SCC colonies can be associated with disbonded coatings such as that occurring on the Pipelines where CP current is prevented from reaching the outer pipewall steel. A much higher pressure (higher % Specified Minimum Yield Strength, or SMYS) hydrotest is warranted. A prudent risk analysis should clearly demonstrate if such external corrosion cracking threats from environmental factors are possible around the Pipelines**. I need to note that it is not clear whether hydrotesting, if performed, will be a Subpart E test or a higher % SMYS hydrotest intended to address cracking threats such as SCC**. The Consent Decree strangely makes no mention of corrosion cracking threats or hydrotesting.

While considerable discussion in the Consent Decree has focused on the use of ILI to identify possible general wall loss corrosion threats well before failure, this agreement makes no mention of other forms of corrosion related threats such as corrosion cracking SCC or SSC. These forms of corrosion cracking are very challenging to identify via ILI, and more importantly, engineering critical assessments associated with ILI to predict time to failure can be highly unreliable, given the inactive threat nature of these type of corrosion cracking threats. The corrosion cracking threats tend to fail as pipeline ruptures. It is important that the cracking threat potentials on the Pipelines be prudently addressed and proposed solution be made public and transparent.

For pipeline segments that undergo large elevation changes, like the Line 325A/B segments, the pipeline must be cut up into segments to assure hydrotesting pressure ranges do not permanently deform the pipe. Hydrotesting can be more expensive than other pipeline integrity assessments such as ILI, but there are no built-in assumptions about the quality and thoroughness of the assessment that can be mismanaged such as that which can and often does occur with ILI approaches resulting in numerous pipeline ruptures after ILI assessments, as the May 19, 2015 release has clearly demonstrated. Hydrotesting is much more reliable than other pipeline integrity assessment approaches, such as ILI, at verifying a pipeline's fitness for service at the time of the test. Hydrotesting is usually performed by contractor firms experienced and qualified to perform a proper hydrotest for specific types of threats. The Consent Decree requires certain threshold general corrosion threats if identified by ILI be remediated before restart.[18]

---

[17] 49CFR§195.304 Test pressure
[18] Consent Decree, Appendix B (4) Integrity Management.

Accufacts Inc. 12-20-24                                                     Page 9 of 15

Hydrotesting is warranted, justified, and vastly appropriate for the Pipelines which have been sitting for over nine years without effective CP.  I also need to mention that the use of nitrogen gas to idle the pipeline was meant to avoid internal corrosion attack and plays no role in preventing external corrosion attacks to keep the Pipelines in a "corrosion-free state" as mentioned by Steve Rusch, Sable's vice president of environmental and regulatory affairs.[19] The external corrosion sites experience reduced corrosion rates from the lower ambient soil temperatures as no hot oil was passing through the system, but the corrosion sites are not inactive, especially if CP systems are ineffective, such as on the Pipelines.

**2) ILI assessments.**

In the U.S.**,** ILI or smart pig tool efforts started to develop in the early 1980s depending on the threat a pipeline operator was trying to address.  ILI tools are usually multi-ton devices run inside a pipeline while the pipeline is operating to ascertain the condition of the pipeline depending on the type of threats trying to be analyzed.  Given the advancements in technology including shrinking the equipment, ultrasonic, or UT, approaches that focus on direct anomaly measurement has historically proven superior for general wall thinning corrosion evaluation to approaches using inferred software-based algorithms, such as magnetic flux leakage ("MFL") testing.  Some ILI tools are more suitable than others depending on the threat.  There is a wide spectrum of ILI tools and different technological approaches to select from depending on the type of threat trying to be reviewed.   Operators don't always select the ILI technology best suited to help identify threats on their system.  Even with the advances in tool development and approaches there can still be a wide variation as to whether a specific ILI tool or vendor can properly identify a specific pipe threat and permit it to be further properly characterized after an ILI run.  This is why pipeline operators will incorporate ILI tool tolerances and perform field verification digs to produce "unity plots" for a specific ILI run, to verify ILI vendor claims about their technology and its specific performance.  This field verification data was not shared by Plains with the ILI vendor, a serious deficiency in ILI utilization.  It is worth noting the PHMSA made it a point in their Failure Analysis of the Line 901 release, that the pipeline operator had not provided field dig verification feedback to the ILI vendor to confirm ILI capability.[20]  For example, corrosion attacks can take on many forms such as general pipewall thinning (usually the easiest to determine depending on the ILI technology), various forms of corrosion cracking such as stress corrosion cracking ("SCC"), selective seam corrosion cracking ("SSC"), and pit corrosion.  All such corrosion threats can lead to a pipeline failure and release.  Based on my experience involving investigations of liquid transmission pipeline ruptures from SCC and SSC after ILI runs, some segments of the Pipelines exhibit the potential for SCC or SSC.  Such external corrosion cracking threats are often found on pipelines with disbonded coating that are exposed to corrosion environments such as that introduced by the Pipeline's insulation.  It is incumbent on the new Pipeline operator, Sable, to demonstrate to the OSFM, and to the public and various regulatory agencies that SCC/SSC external cracking environments do not exist.

---

[19] Los Angeles Times article by Tony Briscoe, "*Plan to restart pipeline sparks anger*," Front page, October 20, 2024.
[20] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.13 of 21.

Accufacts Inc. 12-20-24                                                                                    Page 10 of 15

**Exhibits -Page 29**

Some forms of ILI technology to identify certain pipeline threats, if properly managed, can be superior to hydrotesting as they may identify some threats well before they go to failure. As too clearly demonstrated, however, in the May19, 2015 Line 901 rupture, ILI cannot address all forms of external corrosion threat that are likely to exist on the Pipelines because of their poor design, their unique high temperature operation, and ineffectiveness of CP. If a corrosion ILI tool can be utilized within the limits of the pig vendor specification (i.e., such as maintaining pig speed within the operating pipeline), and if the ILI tool run is independently field verified, some ILI tools can be a superior form of assessment for many types of pipeline threats, such as general internal and external corrosion (i.e. wall-thinning) if prudently managed. The more specialized forms of corrosion, cracking and pitting, or corrosion within dents, however, can be much more challenging as ILI tools and their related engineering critical assessments still have technical limits. ILI tool vendors place specific limitations on their various tools, and it is important that the pipeline operator follow such restrictions that can easily invalidate an ILI tool run reading or result. ILI runs in hilly terrain, such as that which exist with the Pipelines (See Figure 3) can be quite challenging for ILI tools that can easily exceed multiple tons in weight as gravity never shuts off.

In investigating numerous pipeline rupture failures after ILI tool runs, I consistently see failures on the part of the pipeline operators to perform sufficient field verification digs to determine if bias is being introduced in a specific ILI tool approach on a specific pipeline segment, for a specific pipeline threat, and that the ILI tool selected is really appropriate to identify certain pipeline threats. Some pipeline operators repeatedly fail to recognize or even consider ILI tool capabilities and tolerances, especially as ILI vendors and pipeline engineers have tried to improve technologies and assessment techniques. It is worth noting that no one markets ILI tools claiming they don't work. An important consideration in integrity management approaches is whether the right ILI technology has been selected and is being prudently utilized by the pipeline operator. It is further worth noting that while running an ILI tool is not inexpensive, the cost of running such a tool is relatively less expensive compared to the overall quality of the field integrity verification program to assure the ILI tool is doing its job for a specific type of pipeline threat, on a specific pipeline segment.

Part of the problem is that many forms of interactive external corrosion pipeline cracking threats cannot be accurately characterized to allow meaningful engineering critical assessments that are reliable. Such assumptions or inability to properly engineer and predict interactive threats introduce significant margins of error to fitness for service predictions using ILI assessments. Just doing ILI reassessments when they really aren't capable of dealing with interactive corrosion threats is an illusion of safety. Basically, performing an inappropriate ILI assessment more often is not the solution as further explained below.

## VI. The greatest threat on the Las Flores Pipeline System is from external corrosion.

It should not take a pipeline failure to identify that the greatest pipeline integrity threat on the Pipelines is from various forms of external corrosion due to poor design of these Pipelines rendering CP systems ineffective at reducing or preventing external corrosion failure.

The PHMSA Final Report stated:

**Proximate or Direct Cause**

PHMSA determined that the proximate or direct cause of the release was progressive external corrosion of the insulated 24-inch diameter steel pipeline. The corrosion occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied directly to the bare pipe, covered by foam thermal insulation with an overlying Polyken tape wrap. Water has been noted in the foam insulation at a number of digs, indicating that the integrity of the coating system had been compromised. The external corrosion was facilitated by the environment's wet/dry cycling, as determined by the PHMSA-approved, third-party metallurgical laboratory. The release was a single event caused at an area where external corrosion had thinned the pipeline wall. There is no evidence that the pipeline leaked before the rupture. There was a telltale "fish mouth" (a split due to over-pressurization) at the release site indicating the line failed in a single event.[21]

PHMSA goes on to list numerous contributory causes, among them a significant observation, "Corrosion under insulation (CUI) cannot be prevented on insulated lines where the coating system has been compromised."[22]  This important fact should also play a major role into any decision to restart the Las Flores Pipeline System as explained in further detail in this report.  This critically important PHMSA observation should not come as a surprise to any pipeline operator.  Bottom line, Plains acquired a poorly designed set of Pipelines in the early 1990s that rendered the CP system ineffective at preventing or mitigating external corrosion on a pipeline system operating at high temperatures.  Some years after acquiring the Pipelines and after TIMP regulations were promulgated in late 2002, Plains did not implement an appropriate integrity management program to prevent the pipeline failure from external corrosion attack.  The question now is whether Sable's compliance with the Consent Decree under the approval of the OSFM relying on the capabilities of ILI tools can prevent another failure on the Pipelines?  **Clearly, current ILI technology does not meet an obligation to reliably identify all forms of external corrosion most likely present on much of the Pipelines.**  The CP systems required by PHMSA regulations will not be effective on most of the pipeline mileage in the Las Flores Pipeline System as previously discussed, and from my perspective there is serious doubt as to whether these poorly designed pipelines can be made as safe as new pipelines that have properly functioning cathodic protections.

Regarding the Las Flores Pipeline restart decision and related integrity assessments, it is important to understand how CP systems are supposed to work.  In layman's terms, a CP system impresses a weak current into a pipeline turning the pipeline into a cathode in an electrochemical corrosion cell on the outside of a buried pipeline, to control or reduce external corrosion.  Older nonconducting pipeline coatings such as that which exists on the Pipelines do not allow for CP current to pass through them.  The purpose of the CP system is thus to introduce current to the outer pipewall where the older coatings have been penetrated, such as with holes or tears in the outer coating.  Unfortunately, older pipeline external coatings such as the urethane coal tar outer coatings, like those on the Pipelines, are also well known to not adhere tightly to a pipeline over time, causing coating separation or disbondment.  Such disbondment can result in external

---

[21] *Ibid*, p. 14 of 21.
[22] *Ibid.,* p. 14 of 21.

Accufacts Inc. 12-20-24                                                                                   Page 12 of 15

pipewall corrosion cells under the coating, generating many different forms of corrosion, especially SCC and SSC cracking in the wrong environments, that are not protected by CP. To add to this threat of external corrosion, the Las Flores Pipeline System's external insulation traps and serves as a water conduit further increasing external corrosion as a water fed corrosion attack. And lastly, the Polyken tape wrap installed during pipeline installation around the outside of the insulation is also well known to not be conductive, further shielding and preventing CP current from reaching the outer pipe wall. **<u>This is a perfect storm or combination of factors all working to render CP ineffective.</u>** Without effective cathodic protections, the pipeline is at particularly high risk of spilling again. To further underscore the lack of a proper integrity management program, this pipeline operates at elevated temperature that accelerates external corrosion as explained further below. New types of pipeline coatings now allow the passage of CP current through such coating to mitigate external corrosion even if the coating disbonds from the pipeline.

## VII. High pipeline operating temperatures accelerate all forms of corrosion.

**Figure 4  Los Flores Temperature Data from DNV Line 901 Release (5/19/15) Technical Root Cause Analysis included in PHMSA Final Report.[23]**



If one is experienced in handling/refining the heavy crude oils produced offshore that feed into the Las Flores Pipeline System, this crude oil not only needs to be diluted with natural gas liquids, or NGLs, but the pipeline must be operated at high pipeline temperatures, approximately 135 °F, that also is required to reduce the blended oil viscosity to get the fluid over the main hill beyond the Sisquoc Pump Station to Pentland. While the PHMSA Final Report mentions 135 °F as a pipeline operating temperature, Figure 4 represents a temperature graph indicting 135 °F was not unusual, but higher fluid temperature to improve the flow and capacity of the Pipelines did occur.

Chemical engineers experienced in reaction kinetics are familiar with the Arrhenius equation which indicates that chemical reaction rates, such as that for corrosion, essentially double for every 10 °C (18 °F) increase in temperature. This means that the rate of corrosion at 140 °F is about 32

---

[23] *Ibid.,* "Figure 23, L901 Las Flores Station Temperature Data," p. 375 of 510.

Accufacts Inc. 12-20-24                                                                                       Page 13 of 15

times that for a pipeline operating at 60 °F, a typical ambient soil condition. Because of the higher viscosity of unblended offshore oil there probably is little opportunity to reduce the Las Flores Pipeline System temperature to help reduce corrosion rates on a pipeline system where the CP system is ineffective. If the Pipelines are returned to operation, all forms of external corrosion will remain a primary threat of concern for pipeline failure.

## VIII. The Consent Decree agreement fails to require adequate IM processes to prevent another rupture of the poorly designed Pipelines.

It is important to understand that the Consent Decree is just a compromise agreement between the signature parties and may be missing important technical matters related to the Pipelines. I find it odd that many of the technical issues discussed above were not identified or addressed in the Consent Decree. External corrosion cracking risk was well known for many decades to be a threat of concern for pipelines exhibiting disbonded external coating where CP systems are ineffective.

I find it especially strange that Plains the pipeline operator at the time of the Line 901 rupture got itself into serious trouble by failing to understand that the poor design of the Pipelines could not be adequately addressed by ILI. It appears that the Consent Decree continues to foster the illusion that ILI can adequately permit assessment of corrosion risks, especially cracking threats most likely to exist on major segments of the Pipelines (see Figure 3, for example). The Consent Decree doesn't even mention corrosion cracking threats for this system operating at high temperature that exacerbates all forms of external corrosion as previously discussed.

And lastly, I would caution that the Consent Decree gives authority to the OSFM on certain pipeline safety related decisions. These OSFM decisions, however, cannot violate federal pipeline safety regulations and that I believe require a public decision process for PHMSA approval to assure any waiver meets or exceeds the level of safety had the wavier not been requested.

## IX. The poorly designed Pipelines cannot be made as safe as new pipelines.

Sable's website implies that the Pipelines will be repaired, stating "PPC undertook a comprehensive repair and maintenance program to restore the pipeline to "as-new" condition."[24] As referenced in footnote 19 above, this isn't the only time that a Sable representative has suggested the Pipelines will be restored to "as-new" condition or a "corrosion free" state. A new pipeline would be properly designed such that the federal pipeline safety regulations requiring a CP system would be effective and do its job, while allowing CP monitoring to assure the new pipelines were adequately protected from external corrosion attack by an effective CP design. A new pipeline would not be trying to utilize CP on a pipeline improperly coated, that seriously disbonds from the pipe, with a system insulated to assist in water reaching the outer pipe steel, while operating at higher temperature. All these poor design factors accelerate all forms of external corrosion including cracking. It is a misguided illusion that relying on ILI can attempt to stay ahead of pipeline failure on such a poorly designed system. A cursory review of the PHMSA Final

---

[24] See Sable's website concerning, "Sable Offshore Corp. Provides Update on Pacific Pipeline Company Operations," October 28, 2024, at: https://www.sableoffshore.com/news/news-details/2024/Sable-Offshore-Corp.-Provides-Update-on-Pacific-Pipeline-Company-Operations/default.aspx.

Report, Appendix G In-Line Inspection report will indicate that even running ILI tools, it is impossible to return Line 901 to an "as new" condition given the numerous corrosion anomalies.[25] The idea that running ILI tools should be sufficient to assure an "as-new" pipeline condition and safe operation of these poorly designed Pipelines with ineffective CP protection is a false premise, as the Pipelines are far from being in a new condition, with numerous anomalies, given their poor design approach and operating history.

## X.    Conclusion.

Given the ineffectiveness of the CP system to protect against external corrosion and the fact that the Pipelines have sat for over nine years without effective CP, and the failure of the Consent Decree to address these possible threats via proper hydrotesting and ILI, it is imprudent to expect that such limited assessment techniques can adequately protect against corrosion failure.  Poor pipeline design and using the wrong set of integrity management tools (i.e., tools that do not adequately detect and permit the prudent evaluation of the type of corrosion threats specific to a given pipeline) can make the risk of an oil spill orders of magnitude worse. The Las Flores Pipeline System is unusually dangerous given its age and inherent design flaws.

The above represents my opinions based on experience with too many pipeline rupture investigations.  I reserve the right to update this report if more relevant information is made available.

Richard B. Kuprewicz
President
Accufacts Inc.

---

[25] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara Country, California, - Appendix G In-Line Inspection Report by Lamontagne for the Oak Ridge National Laboratory" May 2016, pp. 44 – 138 of 510.

**Attachment 1**

## Curriculum Vitae.

# Richard B. Kuprewicz

**8151 164th Ave NE**
**Redmond, WA   98052**

**Tel:  425-802-1200 (Office)**
**E-mail: kuprewicz@comcast.net**

---

**Profile:**    As president of Accufacts Inc., I specialize in gas and liquid pipeline investigation, auditing, risk management, siting, construction, design, operation, maintenance, training, SCADA, leak detection, management review, emergency response, and regulatory development and compliance.  I have consulted for various local, state and federal agencies, NGOs, the public, and pipeline industry members on pipeline regulation, operation and design, with particular emphasis on operation in unusually sensitive areas of high population density or environmental sensitivity.

---

**Employment:**    **Accufacts Inc.**                              **1999 – Present**

Pipeline regulatory advisor, incident investigator, and expert witness on all matters related to gas and liquid pipeline siting, design, operation, maintenance, risk analysis, and management.

**Position:**    President
**Duties:**    > Full business responsibility
> Technical Expert

**Alaska Anvil Inc.**                              **1993 – 1999**

Engineering, procurement, and construction (EPC) oversight for various clients on oil production facilities, refining, and transportation pipeline design/operations in Alaska.

**Position:**    Process Team Leader
**Duties:**    > Led process engineers group
> Review process designs
> Perform hazard analysis
> HAZOP Team leader
> Assure regulatory compliance in pipeline and process safety management

**ARCO Transportation Alaska, Inc.**         **1991 - 1993**

Oversight of Trans Alaska Pipeline System (TAPS) and other Alaska pipeline assets for Arco after the Exxon Valdez event.

**Position:**    Senior Technical Advisor
**Duties:**    > Access to all Alaska operations with partial Arco ownership
> Review, analysis of major Alaska pipeline projects

**ARCO Transportation Co.**                     **1989 – 1991**

Responsible for strategic planning, design, government interface, and construction of new gas pipeline projects, as well as gas pipeline acquisition/conversions.

**Position:**    Manager Gas Pipeline Projects
**Duties:**    > Project management
> Oil pipeline conversion to gas transmission
> New distribution pipeline installation
> Full turnkey responsibility for new gas transmission pipeline, including FERC filing

10-22-24                                                                                                           Page 1 of 9

**Exhibits -Page 35**

**<u>Four Corners Pipeline Co.</u>**                    **1985 – 1989**

Managed operations of crude oil and product pipelines/terminals/berths/tank farms operating in western U.S., including regulatory compliance, emergency and spill response, and telecommunications and SCADA organizations supporting operations.

**Position:**      Vice President and Manager of Operations
**Duties:**          > Full operational responsibility
                          > Major ship berth operations
                          > New acquisitions
                          > Several thousand miles of common carrier and private pipelines

**<u>Arco Product CQC Kiln</u>**                    **1985**

Operations manager of new plant acquisition, including major cogeneration power generation, with full profit center responsibility.

**Position:**      Plant Manager
**Duties:**          > Team building of new facility that had been failing
                          > Plant design modifications and troubleshooting
                          > Setting expense and capital budgets, including key gas supply negotiations
                          > Modification of steam plant, power generation, and environmental controls

**<u>Arco Products Co.</u>**                    **1981 - 1985**

Operated Refined Product Blending, Storage and Handling Tank Farms, as well as Utility and Waste Water Treatment Operations for the third largest refinery on the west coast.

**Position:**      Operations Manager of Process Services
**Duties:**          > Modernize refinery utilities and storage/blending operations
                          > Develop hydrocarbon product blends, including RFGs
                          > Modification of steam plants, power generation, and environmental controls
                          > Coordinate new major cogeneration installation, 400 MW plus

**<u>Arco Products Co.</u>**                    **1977 - 1981**

Coordinated short and long-range operational and capital planning, and major expansion for two west coast refineries.

**Position:**      Manager of Refinery Planning and Evaluation
**Duties:**          > Establish monthly refinery volumetric plans
                          > Develop 5-year refinery long range plans
                          > Perform economic analysis for refinery enhancements
                          > Issue authorization for capital/expense major expenditures

**<u>Arco Products Co.</u>**                    **1973 - 1977**

Operating Supervisor and Process Engineer for various major refinery complexes.

**Position:**      Operations Supervisor/Process Engineer
**Duties:**          > FCC Complex Supervisor
                          > Hydrocracker Complex Supervisor
                          > Process engineer throughout major integrated refinery improving process yield
                              and energy efficiency

10-22-24

**Qualifications:**

Served for over fifteen years as a member representing the public on the federal Technical Hazardous Liquid Pipeline Safety Standards Committee (THLPSSC), a technical committee established by Congress to advise PHMSA on pipeline safety regulations.

Committee members are appointed by the Secretary of Transportation.

Served seven years, including position as its chairman, on the Washington State Citizens Committee on Pipeline Safety (CCOPS).

Positions are appointed by the governor of the state to advise federal, state, and local governments on regulatory matters related to pipeline safety, routing, construction, operation and maintenance.

Served on Executive subcommittee advising Congress and PHMSA on a report that culminated in new federal rules concerning Distribution Integrity Management Program (DIMP) gas distribution pipeline safety regulations.

As a representative of the public, advised the Office of Pipeline Safety on proposed new liquid and gas transmission pipeline integrity management rulemaking following the pipeline tragedies in Bellingham, Washington (1999) and Carlsbad, New Mexico (2000).

Member of Control Room Management committee assisting PHMSA on development of pipeline safety Control Room Management (CRM) regulations.

Certified and experienced HAZOP Team Leader associated with process safety management and application.

**Education:**

MBA (1976)                                   Pepperdine University, Los Angeles, CA
BS Chemical Engineering (1973)              University of California, Davis, CA
BS Chemistry (1973)                         University of California, Davis, CA

10-22-24                                                                    Page 3 of 9

**Exhibits -Page 37**

**Publications in the Public Domain:**

1. "An Assessment of First Responder Readiness for Pipeline Emergencies in the State of Washington," prepared for the Office of the State Fire Marshall, by Hanson Engineers Inc., Elway Research Inc., and Accufacts Inc., and dated June 26, 2001.

2. "Preventing Pipeline Failures," prepared for the State of Washington Joint Legislative Audit and Review Committee ("JLARC"), by Richard B. Kuprewicz, President of Accufacts Inc., dated December 30, 2002.

3. "Pipelines - National Security and the Public's Right-to-Know," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated May 14, 2003.

4. "Preventing Pipeline Releases," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated July 22, 2003.

5. "Pipeline Integrity and Direct Assessment, A Layman's Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated November 18, 2004.

6. "Public Safety and FERC's LNG Spin, What Citizens Aren't Being Told," jointly authored by Richard B. Kuprewicz, President of Accufacts Inc., Clifford A. Goudey, Outreach Coordinator MIT Sea Grant College Program, and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated May 14, 2005.

7. "A Simple Perspective on Excess Flow Valve Effectiveness in Gas Distribution System Service Lines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated July 18, 2005.

8. "Observations on the Application of Smart Pigging on Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated September 5, 2005.

9. "The Proposed Corrib Onshore System - An Independent Analysis," prepared for the Centre for Public Inquiry by Richard B. Kuprewicz, dated October 24, 2005.

10. "Observations on Sakhalin II Transmission Pipelines," prepared for The Wild Salmon Center by Richard B. Kuprewicz, dated February 24, 2006.

11. "Increasing MAOP on U.S. Gas Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2006. This paper was also published in the June 26 and July 1, 2006 issues of the Oil & Gas Journal and in the December 2006 issue of the UK Global Pipeline Monthly magazines.

12. "An Independent Analysis of the Proposed Brunswick Pipeline Routes in Saint John, New Brunswick," prepared for the Friends of Rockwood Park, by Richard B. Kuprewicz, dated September 16, 2006.

13. "Commentary on the Risk Analysis for the Proposed Emera Brunswick Pipeline Through Saint John, NB," by Richard B. Kuprewicz, dated October 18, 2006.

14. "General Observations On the Myth of a Best International Pipeline Standard," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2007.

15. "Observations on Practical Leak Detection for Transmission Pipelines – An Experienced Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated August 30, 2007.

16. "Recommended Leak Detection Methods for the Keystone Pipeline in the Vicinity of the Fordville Aquifer," prepared for TransCanada Keystone L.P. by Richard B. Kuprewicz, President of Accufacts Inc., dated September 26, 2007.

17. "Increasing MOP on the Proposed Keystone XL 36-Inch Liquid Transmission Pipeline," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated February 6, 2009.

18. "Observations on Unified Command Drift River Fact Sheet No 1: Water Usage Options for the current Mt. Redoubt Volcano threat to the Drift River Oil Terminal," prepared for Cook Inletkeeper by Richard B. Kuprewicz, dated April 3, 2009.

19. "Observations on the Keystone XL Oil Pipeline DEIS," prepared for Plains Justice by Richard B. Kuprewicz, dated April 10, 2010.

20. "PADD III & PADD II Refinery Options for Canadian Bitumen Oil and the Keystone XL Pipeline," prepared for the Natural Resources Defense Council (NRDC), by Richard B. Kuprewicz, dated June 29, 2010.

21. "The State of Natural Gas Pipelines in Fort Worth," prepared for the Fort Worth League of Neighborhoods by Richard B. Kuprewicz, President of Accufacts Inc., and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated October, 2010.

22. "Accufacts' Independent Observations on the Chevron No. 2 Crude Oil Pipeline," prepared for the City of Salt Lake, Utah, by Richard B. Kuprewicz, dated January 30, 2011.

23. "Accufacts' Independent Analysis of New Proposed School Sites and Risks Associated with a Nearby HVL Pipeline," prepared for the Sylvania, Ohio School District, by Richard B. Kuprewicz, dated February 9, 2011.

24. "Accufacts' Report Concerning Issues Related to the 36-inch Natural Gas Pipeline and the Application of Appleview, LLC Premises:  7009 and 7010 River Road, North Bergen, NJ," prepared for the Galaxy Towers Condominium Association Inc., by Richard B. Kuprewicz, dated February 28, 2011.

25. "Prepared Testimony of Richard B. Kuprewicz Evaluating PG&E's Pipeline Safety Enhancement Plan," submitted on behalf of The Utility Reform Network (TURN), by Richard B. Kuprewicz, Accufacts Inc., dated January 31, 2012.

26. "Evaluation of the Valve Automation Component of PG&E's Safety Enhancement Plan," extracted from full testimony submitted on behalf of The Utility Reform Network (TURN), by Richard B.Kuprewicz, Accufacts Inc., dated January 31, 2012, Extracted Report issued February 20, 2012.

27. "Accufacts' Perspective on Enbridge Filing to NEB for Modifications on Line 9 Reversal Phase I Project," prepared for Equiterre Canada, by Richard B. Kuprewicz, Accufacts Inc., dated April 23, 2012.

28. "Accufacts' Evaluation of Tennessee Gas Pipeline 300 Line Expansion Projects in PA & NJ," prepared for the Delaware RiverKeeper Network, by Richard B. Kuprewicz, Accufacts Inc., dated June 27, 2012.

29. "Impact of an ONEOK NGL Pipeline Release in At-Risk Landslide and/or Sinkhole Karst Areas of Crook County, Wyoming," prepared for landowners, by Richard B. Kuprewicz, Accufacts Inc., and submitted to Crook County Commissioners, dated July 16, 2012.

30. "Impact of Processing Dilbit on the Proposed NPDES Permit for the BP Cherry Point Washington Refinery," prepared for the Puget Soundkeeper Alliance, by Richard B. Kuprewicz, Accufacts Inc., dated July 31, 2012.

31. "Analysis of SWG's Proposed Accelerated EVPP and P70VSP Replacement Plans, Public Utilities Commission of Nevada Docket Nos. 12-02019 and 12-04005," prepared for the State of Nevada Bureau of Consumer Protection, by Richard B. Kuprewicz, Accufacts Inc., dated August 17, 2012.

32. "Accufacts Inc. Most Probable Cause Findings of Three Oil Spills in Nigeria," prepared for Bohler Advocaten, by Richard B. Kuprewicz, Accufacts Inc., dated September 3, 2012.

33. "Observations on Proposed 12-inch NGL ONEOK Pipeline Route in Crook County Sensitive or Unstable Land Areas," prepared by Richard B. Kuprewicz, Accufacts Inc., dated September 13, 2012.

34. "Findings from Analysis of CEII Confidential Data Supplied to Accufacts Concerning the Millennium Pipeline Company L.L.C. Minisink Compressor Project Application to FERC, Docket No. CP11-515-000," prepared by Richard B. Kuprewicz, Accufacts Inc., for Minisink Residents for Environmental Preservation and Safety (MREPS), dated November 25, 2012.

35. "Supplemental Observations from Analysis of CEII Confidential Data Supplied to Accufacts Concerning Tennessee Gas Pipeline's Northeast Upgrade Project," prepared by Richard B. Kuprewicz, Accufacts Inc., for Delaware RiverKeeper Network, dated December 19, 2012.

36. "Report on Pipeline Safety for Enbridge's Line 9B Application to NEB," prepared by Richard B. Kuprewicz, Accufacts Inc., for Equiterre, dated August 5, 2013.

37. "Accufacts' Evaluation of Oil Spill Joint Investigation Visit Field Reporting Process for the Niger Delta Region of Nigeria," prepared by Richard B. Kuprewicz for Amnesty International, September 30, 2013.

38. "Accufacts' Expert Report on ExxonMobil Pipeline Company Silvertip Pipeline Rupture of July 1, 2011 into the Yellowstone River at the Laurel Crossing," prepared by Richard B. Kuprewicz, November 25, 2013.

39. "Accufacts Inc. Evaluation of Transco's 42-inch Skillman Loop submissions to FERC concerning the Princeton Ridge, NJ segment," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated June 26, 2014, and submitted to FERC Docket No. CP13-551.

40. Accufacts report "DTI Myersville Compressor Station and Dominion Cove Point Project Interlinks," prepared by Richard B. Kuprewicz for Earthjustice, dated August 13, 2014, and submitted to FERC Docket No. CP13-113-000.

41. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated September 3, 2014, and submitted to FERC Docket No. CP13-551.

42. Accufacts' "Evaluation of Actual Velocity Critical Issues Related to Transco's Leidy Expansion Project," prepared by Richard B. Kuprewicz for Delaware Riverkeeper Network, dated September 8, 2014, and submitted to FERC Docket No. CP13-551.

43. "Accufacts' Report to Portland Water District on the Portland – Montreal Pipeline," with Appendix, prepared by Richard B. Kuprewicz for the Portland, ME Water District, dated July 28, 1014.

44. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz and submitted to FERC Docket No. CP13-551.

45. Review of Algonquin Gas Transmission LLC's Algonquin Incremental Market ("AIM Project"), Impacting the Town of Cortlandt, NY, FERC Docket No. CP14-96-0000, Increasing System Capacity from 2.6 Billion Cubic Feet (Bcf/d) to 2.93 Bcf/d," prepared by Richard B. Kuprewicz, and dated Nov. 3, 2014.

46. Accufacts' Key Observations dated January 6, 2015 on Spectra's Recent Responses to FERC Staff's Data Request on the Algonquin Gas Transmission Proposal (aka "AIM Project"), FERC Docket No. CP 14-96-000) related to Accufacts' Nov. 3, 2014 Report and prepared by Richard B. Kuprewicz.

47. Accufacts' Report on Mariner East Project Affecting West Goshen Township, dated March 6, 2015, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

48. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing on the Proposed System Integrity Projects ("SIP") to the Mississippi Public Service Commission ("MPSC") under Docket No. 15-UN-049 ("Docket"), prepared by Richard B. Kuprewicz, dated June 12, 2015.

49. Accufacts' Report to the Shwx'owhamel First Nations and the Peters Band ("First Nations") on the Trans Mountain Expansion Project ("TMEP") filing to the Canadian NEB, prepared by Richard B. Kuprewicz, dated April 24, 2015.

50. Accufacts Report Concerning Review of Siting of Transco New Compressor and Metering Station, and Possible New Jersey Intrastate Transmission Pipeline Within the Township of Chesterfield, NJ ("Township"), to the Township of Chesterfield, NJ, dated February 18, 2016.

51. Accufacts Report, "Accufacts Expert Analysis of Humberplex Developments Inc. v. TransCanada Pipelines Limited and Enbridge Gas Distribution Inc.; Application under Section 112 of the National Energy Board Act, R.S.C. 1985, c. N-7," dated April 26, 2016, filed with the Canadian Nation Energy Board (NEB).

52. Accufacts Report, " A Review, Analysis and Comments on Engineering Critical Assessments as proposed in

**Exhibits -Page 40**

PHMSA's Proposed Rule on Safety of Gas Transmission and Gathering Pipelines," prepared for Pipeline Safety Trust by Richard B. Kuprewicz, dated May 16, 2016.

53. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing to the Mississippi Public Utilities Staff, "Accufacts Review of Atmos Spending Proposal 2017 – 2021 (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 15, 2016.

54. Accufacts Report, "Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL")," prepared for Earthjustice by Richard B. Kuprewicz, dated October 28, 2016.

55. Accufacts' Report on Mariner East 2 Expansion Project Affecting West Goshen Township, dated January 6, 2017, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

56. Accufacts Review of Puget Sound Energy's Energize Eastside Transmission project along Olympic Pipe Line's two petroleum pipelines crossing the City of Newcastle, for the City of Newcastle, WA, June 20, 2017.

57. Accufacts Review of the Draft Environmental Impact Statement for the Line 3 Pipeline Project Prepared for the Minnesota Department of Commerce, July 9, 2017, filed on behalf of Friends of the Headwaters, to Minnesota State Department of Commerce for Docket Nos. CN-14-916 & PPL-15-137.

58. Testimony of Richard B. Kuprewicz, president of Accufacts Inc., in the matter West Goshen Township and Concerned Citizens of West Goshen Township v. Sunoco Pipelines, L.P. before the Pennsylvania Public Utilities Commission, Docket No. C-2017-2589346, on July 18, 2017, on Behalf of West Goshen Township and Concerned Citizens of West Goshen Township.

59. Direct Testimony of Richard B. Kuprewicz, president of Accufacts Inc., on Behalf of Friends of the Headwaters regarding Enbridge Energy, Limited Partnership proposal to replace and reroute an existing Line 3 to the Minnesota Office of Administrative Hearings for the Minnesota Public Utilities Commission (MPUC PL-9/CN-14-916 and MPUC PL-9/PPL-15-137), September 11, 2017 and October 23, 2017.

60. Direct Testimony of Richard B. Kuprewicz On Behalf of The District of Columbia Government, before the Public Service Commission of the District of Columbia, in the matter of the merger of AltaGas Ltd. and WGL Holdings, Inc., Formal Case No. 1142, September 29, 2017.

61. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2018 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated December 4, 2017.

62. Report to Hugh A. Donaghue, Esquire, Concord Township Solicitor, "Accufacts Comments on Adelphia Project Application to FERC (Docket No. CP18-46-000) as it might impact Concord Township," dated May 30, 2018.

63. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2019 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 20, 2018.

64. Report to West Goshen Township Manager, PA, "Accufacts report on the repurposing of an existing 12-inch Sunoco pipeline segment to interconnect with the Mariner East 2 and Mariner East 2X crossing West Goshen Township," dated November 8, 2018.

65. Report to West Whiteland Township Manager, PA, "Accufacts Observations on Possible Pennsylvania State Pipeline Safety Regulations," prepared by Richard B. Kuprewicz, dated March 22, 2019.

66. Accufacts Public Comments on the Proposed Joint Settlement, BI&E v. Sunoco Pipeline L.P. ("SPLP"), Docket No. C-2018-3006534 ("Proposed Settlement"), submitted on August 15, 2019 to the Pennsylvania Public Utility Commission on the behalf of West Goshen Township as an intervener.

67. Report to West Whiteland Township Manager, Ms. Mimi Gleason, "Accufacts Perspective on Two Questions from West Whiteland's Board of Supervisors on Proposed Changes to ME 2 and ME 2X Construction/Operational Activities within West Whiteland," dated September 5, 2019."

68. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the episode on the evening of 8-5-19 at the Mariner East Boot Road Pump Station ("Event"), Boot Road, West Goshen Township, PA," dated September 16, 2019.

69. Provided direct testimony before the Arizona Corporation Commission, In the Matter of the Application of Southwest Gas Corporation for the Establishment of Just and Reasonable Rates and Charges Designed to Realize a Reasonable Rate of Return on Fair Value of the Properties of Southwest Gas Corporation Devoted to its Arizona Operations (Docket No. G-01551A-19-0055), testified on behalf of Utilities Division Arizona Corporation Commission, February 19, 2020.

70. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the Mariner East 2X Pipeline Affecting West Goshen Township," dated July 23, 2020.

71. Assisted the Commonwealth of Massachusetts, Office of the Attorney General in developing pipeline safety processes to be incorporated into the settlement agreement related to Columbia Gas' sale of Assets to Eversource following the Merrimack Valley, Massachusetts overpressure event of September 13, 2018.

72. Report to Natural Resources Defense Council, Inc., "Accufacts' Observations on the Use of Keystone XL Pipeline Pipe Exhibiting External Coating Deterioration Issues from Long Term Storage Exposure to the Elements," October 1, 2020.

73. Report to Pennsylvania Public Utilities Commission ("PAPUC"), "Accufacts Comments on Proposed Pennsylvania Intrastate Liquid Pipeline Safety Regulations," dated October 29, 2021, prepared for West Whiteland Township Board of Supervisors, West Whiteland Township, PA.  Filed to PAPUC public web docket November 5, 2021 by West Whiteland Township under Reference Docket Number L-2019-3010267.   Addresses suggested improvements in proposed pipeline safety rules for PA intrastate liquid transmission pipelines.

74. Submitted written testimony of Richard B. Kuprewicz on Behalf of Bay Mills Indian Community to ALJ Dennis Mack, dated December 14, 2021, in the matter of the Application of Enbridge Energy, Limited Partnership for Authority to Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac, before the State of Michigan Public Service Commission, U-20763.

75. Public presentation to New York State Indian Point Nuclear Facility Decommissioning Oversight Board on Holtec removal activities in proximity to Enbridge three Natural Gas Transmission Pipelines, March 17, 2022.

76. Report to Pipeline Safety Trust and Bold Alliance, "Accufacts' Perspectives on the State of Federal Carbon Dioxide Transmission Pipeline Safety Regulations as it Relates to Carbon Capture, Utilization, and Sequestration within the U.S.," March 23, 2022.

77. Accufacts Inc., Public Presentation for the National Academies of Science Engineering Medicine and The Transportation Research Board, "To Committee on Criteria for Installing Automatic and Remote-Controlled Shutoff Valves on Existing Gas and Hazardous Liquid Transmission Pipelines," 4/27/22.

78. Accufacts Inc, "6/13/22 Webinar to Illinois Emergency Responders, Healthcare Providers, & Local Officials on Responses to $CO_2$ Transmission Pipeline Releases," 6/13/22.

79. Accufacts Report for Pipeline Safety Trust, "Safety of Hydrogen Transportation by Gas Pipelines," 11/28/22.

80. Completed a series of testimonies related to Enbridge's Line 5 proposal to replace 2 – 20-inch diameter existing submerged pipelines currently lying across the bottom of the Straits of Mackinac with a 30-inch diameter grade X-70 pipeline, proposed to be installed in a 21-foot diameter concrete tunnel to be installed across the approximate 4-mile span of the Straits of Mackinac.  Testified on Behalf of the Bay Mill Indian Community before the State of Michigan Public Service Commission, Docket U-20763, in opposition to this very poorly designed proposal/installation allowing for movement of the pipeline on rollers within the tunnel.  Final testimony to the docket submitted May 19, 2023.  This is the only pipeline proposal I am aware of in the world that would place a crude oil and liquid propane pipeline, especially a 30-inch diameter pipeline, within a tunnel.

81. Issued to Ms. Niroop Srivatsa, City Manager, "Accufacts Report for the City of Lafayette on the Status of the Tree Assessment Process with PG&E," indicating most of the trees identified for removal by PG&E risk management

10-22-24                                                                                                          Page 8 of 9

approach have nothing to do with gas pipeline safety, June 15, 2023.

82. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the Navigator Heartland Greenway LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0161, on behalf of Citizens Against Heartland Pipeline ("CAHGP"), McDonough County, Christian County and Hancock County (the "Counties") (jointly, "Citizen and County Intervenors" of "CCI"), raising serious questions as to PHMSA's recent assertions of pipeline safety jurisdiction, and underscoring the ICC's authority for pipeline siting jurisdiction of said pipeline proposal in the State of Illinois, filed June15, 2023.  Applicant has terminated their application.

83. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the WOLF Carbon Solutions US LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0475, for a certificate of authority to construct and operate a carbon dioxide pipeline and when necessary to take interest in property as provided by law of eminent domain, testifying on Behalf of Citizens Against Predatory Pipelines ("CAPP"): 1) identifying serious inadequacies in PHMSA's pipeline safety regulations, 2) explaining why the Commission should require pipeline temperature profiles 3) detailing why DNV-RP-F104 is not relevant to this filing and 4) underscoring the ICC's authority to require additional critical information from the Applicant in this matter, filed October 24, 2023.  Applicant has withdrawn their submission to the Commission.

84. Provided general summary, main observations/concerns, on "Draft Environmental Impact Statement: Otter Tail to Wilkin Carbon Dioxide Pipeline Project" submitted to Minnesota Public Utilities Commission regarding Summit Carbon Solutions, LLC proposed 28 mile long 4-inch diameter $CO_2$ liquid transmission pipeline ("Otter Tail Pipeline") within Minnesota, PUC Docket No. IP-7093/PPL-22-422, provided to Clean Up the River Environment ("CURE") on 1/29/2024.

85. Issued to EarthJustice, "Observations concerning Kern County's Draft Environmental Impact Report ("DEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated February 26, 2024, "Observations concerning Kern County's Recent Recirculated Draft Environmental Impact Report ("RDEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated July 17, 2024, and "Evaluation of Kern County Response to Comments and Final Recirculated Environmental Impact Report on the TerraVault I Carbon Capture and Storage Project, dated October 15, 2024.  The Project situated in Kern County is proposed by the California Resources Corporation to separate a portion of the pre-combustion Elk Hills field gas production, treat and inject via liquid transmission pipelines, $CO_2$ into two sequestration injection wells within the Elk Hill oil field.  The reports identify many technical gaps in filings to Kern County.

86. Issued for the Tribal Partnerships Program, "Observations on the U.S. Army Corps of Engineers Draft Environmental Assessment, Clean Water Act Section 404(b)(1) Guidelines Evaluation, and Public Interest Review (collectively referenced as "DCDD") for the Enbridge Line 5 Wisconsin Segment Relocation Project ("Project"), dated May 2024," report dated July 31, 2024 affecting the Bad River Band of the Lake Superior Tribe of Chippewa Indians reservation.

# Exhibit C

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart*

**Prepared For**

## The Center for Biological Diversity
## &
## The Environmental Defense Center

**February 21, 2025**

Accufacts Inc. Final

## Table of Contents

I.    *Summary*.................................................................................................................................*1*

II.    *The current installation renders the CP system ineffective.*.......................................*2*

III.    *Compliance with CP regulatory requirements is ineffective, making performance with this regulatory requirement meaningless.*..................................*3*

IV.    *This is more than simple corrosion under installation (CUI) issue.* .........................*3*

V.    *External corrosion on buried pipelines falls into four major categories.*................*4*

    1.  Pipe wall loss corrosion is generally understood to occur over larger areas of the pipe.................................................................................................................4

    2.  Cracking or crack-like corrosion is usually an environmental threat difficult to assess.....................................................................................................................4

    3.  Pitting corrosion is a special form of wall loss that is difficult to identify via ILI. ........................................................................................................................5

    4.  Corrosion within dents is a special form of dent threat..............................5

VI.    *Types of ILI technology.* ....................................................................................................*5*

    1.  General wall loss corrosion. .............................................................................5

    2.  Cracking corrosion..............................................................................................6

VII.    *What is the purpose of hydrotesting?*..............................................................................*6*

VIII.    *The illusion that corrosion growth rate can be accurately predicted needs to be explained.* .............................................................................................................................*7*

IX.    *Major state waiver deficiencies:*......................................................................................*7*

    1.  A key corrosion performance tracking process step in the state waivers for the Pipelines is missing. ..........................................................................................7

    2.  A major state waiver deficiency for Line 324. ..............................................8

    3.  Major state waiver deficiencies for Line 325A/B. .......................................9

X.    *Conclusions.* ........................................................................................................................*9*

## I.        Summary.

Accufacts Inc. ("Accufacts") was asked to provide my expert opinion on the Letters of Decision on the State Waivers for the startup of Line CA-324, CA-325A, and CA-325B ("Pipelines") made public in mid-January 2025 by the Office of the State Fire Marshal ("OSFM").[1]  This report builds on a previous Accufacts report issued on December 20, 2024.[2]  By agreement, a Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed state waiver alternative measures "provide an equal or greater level of safety."[3]  It is my understainding that PHMSA can choose to: 1) Not comment on this matter allowing the State Waiver to occur and startup to proceed, 2) Not approve the waiver preventing the startup, or 3) Impose additional requirements to assure an equal or greater level of safety to current minimum federal pipeline safety regulations occurs.

The current coating installations do not provide "limited effectiveness of the cathodic protection system," as mentioned by the Decision letters issued by the OSFM.  This I believe is a poor choice of words that understates the fact that the CP system is ineffective on most of the Pipelines' mileage.  The OSFM is thus being asked to grant a state waiver on federal pipeline safety minimum requirements intended to address external pipeline corrosion from an ineffective CP installation, while relying on hydrotesting and various forms of inline inspection, ILI or smart pigging, to avoid pipeline failure from the resulting external corrosion.

The waivers attempt to allow startup of the Pipelines relying mainly on ILI technology to identify corrosion threats before failure.  In addition, the Application by the Pipeline's operator appears to be relying on a circumferential magnetic flux leakage (MFL-C tool) approach run in February 2022 to argue for the removal of federal regulation requiring the 180 day condition for scheduling remediation of "corrosion of or along a longitudinal seam weld."[4, 5]  Our experience with MFL-C tools is that if certain parameters are not incorporated, such ILI tools can miss a lot of cracks.  I see no mention of such important conditions in the referenced letter that would demonstrate that this ILI run is reliable.  I do not see sufficient justification to waive 49CFR452(h)(4)(iii)(H) as such a waiver would not provide an equal or greater level of safety as no carbon steel pipeline, even new modern steel pipelines, are invincible to corrosion attack.

---

[1] OSFM letter to Sable/PPC Offshore Corp, "Letter of Decision on the Sate Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-324) ("Decision Letter 324") and Letter of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-325A/B) ("Decision Letter 325A/B")", dated 12/17/24.
[2] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024.
[3] PHMSA website:  https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.
[4] Pacific Pipeline Company (Aka now as Sable/PPC) letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115)," July 10, 2023, p. 5 related to MFL-C February 2020 ILI run.
[5] 49CFR452(h)(4)(iii)(H).

Accufacts Inc. Final                                                                                    Page 1 of 9

A simple plot of the type and approximate milepost location of external corrosion such as wall loss or cracking, including field as well as ILI indications along the Pipelines, will underscore how challenging the operation of the present Pipelines will be without effective CP. Such a plot will clearly demonstrate that the Pipelines are not "like new" as indicated by some recent Sable/PPC representatives. Further explanation is also warranted as to why the pipeline operator assumes there is no SCC or SSC risks associated with water on the Pipelines.

A proposal to replace the Pipelines with a new smaller diameter heated pipeline that would be uninsulated and built with modern unshielding coatings was aborted.[6] This proposal would have permitted the CP system to do its job addressing external corrosion, while complying with federal pipeline regulation.

## II.      The current installation renders the CP system ineffective.

The construction of Line 324 in the late 1980s utilized coal tar urethane coating applied to the bare steel pipeline, covered by sprayed on insulation to assure the pipeline was operated at higher temperatures. The insulation was then wrapped with a non-conductive polyethylene tape coating.[7] While there may be some confusion as to the coating installation on what is now named 325A/B, information leads us to believe this coating installation is similar on these pipelines as that on Line 324. To anyone vaguely familiar with pipeline external corrosion protection and cathodic protection ("CP") intent, this approach is a fundamental failure of design/installation reflecting much inexperience in pipelines. The polyethylene tape shields and prevents CP current from getting to the external pipeline steel, and the insulation system works to shield while increasing the likelihood of water in close proximity to the pipe, especially in areas where the coal tar coating directly on the pipeline steel has separated, or disbonded, from the pipe.[8] With such heavy shielding there is thus no way for any CP system current to ever reach the pipeline to reduce/prevent external corrosion.

With the exception of a few feet of buried pipe that has undergone repairs, replacing the existing poor design and coating installations with a few feet of dual epoxy coatings, the shielded CP system is ineffective. The various threats of external corrosion on the Pipelines are exacerbated by the elevated temperature, the potential for water to accumulate along the Pipelines via the insulation, the application of non-conducting tape wrap around the insulation, and the use of older coal tar coating directly on the pipeline that exhibits separation (aka disbondment) from the pipe steel. Disbonded coating in the wrong environments is especially conducive to cracking threats, such as SCC or SSC as discussed in this report. I have seen no convincing arguments that water environments conducive to corrosion cracking are not around or under the coating on the Pipelines.

---

[6] Plains Administrative Draft EIR, "Plains Replacement Pipeline Project," February 2022.

[7] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA"), "Failure Investigation Report Plains Pipeline LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California, May 2016, Appendix E: Corrosion Control and Pipeline Conditions, page 1 of 4.

[8] *Ibid.,* Page 3 of 21, and Mechanical and Metallurgical Testing, Photos Figure 1 through 20.

Accufacts Inc. Final                                                                        Page 2 of 9

### III.  Compliance with CP regulatory requirements is ineffective, making performance with this regulatory requirement meaningless.

The Pipelines thus have ineffective CP protection from external corrosion that is exacerbated by operation of the Pipelines at elevated temperatures, seriously increasing corrosion rate as discussed in my previous report.[9]  Attempts to gauge the effectiveness of the CP system utilizing CP performance measures identified in PHMSA regulations are meaningless in such heavily shielded installations.  Just operating the Pipeline with CP "on" to meet federal minimum regulatory requirements will not prevent external corrosion attacks that can take on various forms on the Pipelines.  It should be noted that the OSFM has required "Where the operator discovers external corrosion in combination with coating deterioration, the operator must recoat with a two-part epoxy.  Sable must recoat in accordance with their repair procedure." which does allow repair replacing with the existing installation approach, given its many shortcomings to prevent external corrosion.[10]  This requirement places the responsibility on the pipeline operator to identify when or if any, field digs should occur to confirm coating degradation.  The operator should be primarily focused on identifying environments around the pipeline that are precursors to various forms of external corrosion attack, given the many conditions related to the pipeline design/installation conducive to external corrosion attack.

It is on the limited repaired sections, measured in feet, that the CP should be effective as such short length repairs replace the poorly designed shielding original coating installations.  For the vast majority of the Pipelines mileage, however, the CP remains ineffective.  The requirements to measure CP performance stated in 49CFR§195.2 (NACE SP 0169 – 2007 edition, paragraph 6.2.2) are meaningless when heavy shielding, such as that which occurs on CA-324 and CA-325A/B, prevents CP current from reaching the pipeline.

### IV.  This is more than simple corrosion under installation (CUI) issue.

Considerable past discussions have suggested that this is a corrosion under installation (or CUI") problem implying that this is the only controlling issue.  While CUI is certainly a contributing factor, the corrosion threats go well beyond CUI.  As previously discussed, heavy shielding, the tape coating around the insulation, the vintage/type of coating directly on the Pipelines prone to disbondment, the operating temperature, and the environment around the Pipelines, work in concert to create external corrosion in its various forms.  The Consent Decree is an agreement based on the premise that higher risks of external corrosion can be mainly addressed by ILI tools.  The multiple forms of external corrosion which can occur on the Pipelines require various different approaches, beyond ILI, as discussed further in this report.

---

[9] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024, p. 13.
[10] OS OSFM letter to Sable/PPC Offshore Corp, "Decision Letter 324 and Decision Letter 325A/B")," dated 12/17/24, pp. 11 and 11 respectively.

Accufacts Inc. Final                                                      Page 3 of 9

## V.       External corrosion on buried pipelines falls into four major categories.

External corrosion on buried steel pipelines falls into four general categories:  1) wall loss or thinning of the pipe wall, 2) cracking or crack-like, 3) pitting, and 4) corrosion within dents.

1.  **Pipe wall loss corrosion is generally understood to occur over larger areas of the pipe.**

    Internal or external corrosion can cause pipe wall thinning.  Such thinning differs from pit corrosion discussed below, in that pipe wall loss thinning tends to occur over a wider area of the pipe.  Despite previous multiple ILI runs, external corrosion pipe wall loss, or thinning, was the condition that resulted in the May 19, 2015 pipeline rupture failure. External corrosion on the shielded pipe allowed general corrosion thinning of the pipeline until the pipe failed under pressure.  It should be worth noting that wall loss in excess of 0.8 wall thickness (actually 0.91) which occurred in the May 19, 2015 rupture, places the operator at great risks.  Ironically, pipe wall loss is generally one pipeline failure threat that advances in the ILI technology over recent decades was intended to address, either with ILI mag flux or ultrasonic approaches which are different technical methods.

2.  **Cracking or crack-like corrosion is usually an environmental threat difficult to assess.**

    This is associated with various forms of pipeline cracking, such as selective seam corrosion or stress corrosion cracking.  While engineers like to think they can calculate time to failure, such time to failure estimates for these forms of corrosions are hard to reliably predict.  Given the probability that such cracking, especially if in clusters, can interact with other cracks, or weaknesses in the pipe body near/at welds, makes prediction to failure highly unreliable.  Such pipe weaknesses can occur at weld heat affected zones, at girth welds, or at manufacturing related pipe seams, in unpredictable ways that can quickly negate time to failure calculation/estimates, even if cracking potential is identified.

    Sable/PPC has requested an exemption from 49CFR452(h)(4)(iii)(H) explaining this is usually a SSC threat related to earlier vintage manufacturing processes such as LF-ERW which tends to exhibit lower pipe toughness. There are other related risks to the manufacturing process of modern steels such as DSAW and HF-ERW concerning cracking potential from poor coating/ineffective CP approaches.  Because of the nature of disbonded coating in proximity to water, coating can tent at weld seams creating potential for cracking corrosion attack, such as SSC.  Even modern pipe steels are not invincible to such cracking corrosion potential, especially on pipelines operating at elevated temperatures.  Unless the operator can show why such environments don't exist, their request to be exempted from 49CFR452(h)(4)(iii)(H) should be denied.  These explanations should go well beyond a MAG-C pig run the pipeline operator has provided.

Accufacts Inc. Final                                                                                  Page 4 of 9

3. **Pitting corrosion is a special form of wall loss that is difficult to identify via ILI.**

This is the loss of pipe steel in concentrated small areas, forming localized small holes or pits, usually at girth welds, that can weaken the pipeline and cause a release. Pit corrosion identification via ILI, even newer generations of ILI tools, can be very challenging. Pit corrosion threats are usually verified via field digs or pipeline releases. While this threat can be a bona fide threat on the Pipelines that are heavily shielded rendering CP ineffective, there has been no mention that this threat has been identified.

4. **Corrosion within dents is a special form of dent threat.**

Corrosion or cracking within a dent, also known as "dents with stress concentrators" are hard to identify via ILI, and almost impossible to reliably predict time to failure. Such threats are usually identified by high-definition geometric ILI dent tools, the location around the pipeline, and field dig verification assessments. The ILI determination using high resolution caliper or geo pigs, have proven reliable at identifying dents and their location on a pipeline.

## VI.    Types of ILI technology.

Given the possible types of external corrosion on the Pipelines, I now focus on a simple high-level discussion of corrosion ILI technical approaches.

1. **General wall loss corrosion.**

After the advancement of geometric or deformation ILI technology, the next early phase of ILI use focused on general corrosion wall loss, or pipeline thinning along the axis or flow direction of the pipeline. In this field, technology split into two different approaches, magnetic flux leakage and ultrasonic. Magnetic flux leakage (or mag flux) approaches utilized software algorithms to characterize changes in magnetic flux to identify wall loss aligned in the axial, or direction of flow, usually the most insidious and common corrosion flaws for pipe. Mag flux ILIs fall into two general categories: low resolution (usually associated with earlier generation) and high resolution (usually more complex and more expensive). Mag flux technology shifted from low resolution to the more sophisticated high resolution approaches where corrosion is problematic. There are still pipelines that utilize low resolution mag flux because of cost, so care should be exercised in the application of this form of ILI on liquid pipelines. The waivers specifically require UT ILI the first two years of operation, but are moot, indicating magnetic flux ILI in the future could be allowed without clarification as to high res or low res ILI.

Ultrasonic ILI approaches use beams of ultrasonic energy to identify both external and internal corrosion wall loss. While a simplification, ultrasonic approaches are analogous to radar, where reflected energy readings are utilized to measure changes in pipe wall thickness. Originally, ultrasonic approaches, focusing on wall loss evaluation, directed UT energy directly into the pipe in the radial direction for wall thickness and resulting wall loss corrosion sizing determinations.

Accufacts Inc. Final                                                    Page 5 of 9

## 2.  Cracking corrosion.

Pipeline ruptures from cracking threats drove a need for ILI tool cracking development.  Thus, a next generation of ultrasonic ILI approaches advanced by changing the angle of the UT beam from radial into the pipe to at an angle to help spot cracks that might be developing.  This form of UT approach is identified as shear wave.  As more pipeline failures from cracking were uncovered, additional advances known as phased array ultrasonic (PAUT) have recently developed, though such measurements are currently focused on field measurement of uncovered pipeline, as ILI in this area I would categorize as still under development.

I have investigated too many pipeline ruptures that occurred after an ILI run which indicates more regulatory work is needed in ILI regulations related to applications of ILI.  No ILI vendor provides such tools claiming they will not work.  It is the pipeline operator's responsibility to ensure ILI runs meet the restrictions placed by the tool vendor (such as speed) and to verify the tool vendor's claimed capability with a proper number of field verification digs.

## VII.    What is the purpose of hydrotesting?

There are basically two types of hydrotesting mentioned in federal pipeline safety: 1) What I call a subpart E, or proof of MOP test, and 2) a crack hydrotest, what is referred to as a "spike hydrotest" that is performed at much higher test pressures as a %SMYS.  Both forms of hydrotesting are proof test, good at the time of the test, and don't characterize time dependent pipeline threats such as corrosion.

The purpose of an MOP hydrotest is to proof the fitness for service of a pipeline at the time of the test, with a certain margin of pressure safety that usually deteriorates with time.  Subpart E MOP tests are not crack integrity test.  If a pipeline system has crack forming potential an MOP test is not appropriate.

Spike hydrotests are meant to avoid pressure reversals associated with crack threats on pipelines.  Pressure reversals are where cracks remaining after MOP hydrotest tests can enlarge for various reasons to result in possible failure during operation, usually at lower pressures.  It is my experience that spike hydrotests are meant to deal with cracking threats if such a threat exists.  The performance metric for the suitability of a spike hydrotest is the range of %SMYS for the specific test segment.  For pipeline elevation changes like that associated with 325A/B, a spike hydrotest requires the pipeline be segmented to keep test pressures within reasonable ranges that don't produce permanent yielding of the pipe.  The information made public to date indicates that the previous hydrotests performed in 1986, because of elevation changes, required Line 325A to undergo hydrotesting in 9 segments and in Line 325B in 11 segments.  Unfortunately, the hydrotest segments in the public record application are identified by station number and not by approximate milepost.  Since there is usually no correlation between station number and milepost, I thus cannot evaluate whether the Decision Letter 325A/B pressure testing parameters are adequate for Line 325A.[11]  It is worth noting that the Decision Letter 325A/B makes no mention of a subpart E

---

[11] Decision Letter 325A/B, "Pressure Testing," page 5.

Accufacts Inc. Final                                                                 Page 6 of 9

hydrotest or spike hydrotest on Line 325B.  The proposed segments for hydrotests on 325A need to be identified by approximate milepost to permit evaluation as to whether the waiver requirements are appropriate.  The reasons for hydrotesting exclusion on Line 325B need to be properly justified and made public by the OSFM.

## VIII.    The illusion that corrosion growth rate can be accurately predicted needs to be explained.

One of the critical parameters that I have observed in too many pipeline rupture investigations is that ILI can be utilized to accurately predict corrosion growth rates ("CGR") to help set a critical ILI run timing, for example.  The Pipelines essentially have no effective CP, operate as a higher temperature system, contain disbonded coating, incorporate heavy shielding which prevents CP from reaching the Pipelines and operate with insulation that moves water on/near the outside of the pipe.  Such a combination of factors can provide a wide variation in types of external corrosion as well as corrosion rate estimates.  CGR estimates can be especially problematic if CGR approaches miss possible corrosion interaction threats that can considerably shorten time to failure estimates.  I advise that CGR be utilized with extreme caution given this possible variation, especially for corrosion threats that can interact, such as SCC, whose time to failure can be highly unpredictable.  Corrosion growth rate estimates can vary considerably given the various form of external corrosion, especially related to cracking in combination with its location near sensitive pipe locations such as seam or girth welds.

## IX.    Major state waiver deficiencies:

Key observation on the state waivers for the Pipelines:

1. **A key corrosion performance tracking process step in the state waivers for the Pipelines is missing.**

   While not specially required in minimum pipeline safety regulations or the waivers, a prudent pipeline operator on a pipeline system highly susceptible to corrosion will plot or graph corrosion indications by type and severity, by approximate milepost.  This is especially important on the Pipelines given their history of extensive corrosion caused by the lack of CP effectiveness, poor coating types causing disbondment or shielding, increased temperature, insulation that tends to wick water, and poor performance of ILI.  Such graphing aids a pipeline operator in understanding possible corrosion "hot spot" segments whose threats on a pipeline increase because of environmental factors that merit additional assessment, and maybe even pipeline segment replacement from a corrosion point of view.

   Care also needs to be taken that all corrosion sites are prudently evaluated for possible interactive threats, such as general wall loss in combination with cracking, or near pipe welds, such as that which can occur with cluster corrosion.  I see no mention in the Letters of Decision and waivers requiring such important corrosion tracking on the Pipelines.

Accufacts Inc. Final                                                                 Page 7 of 9

2.  **A major state waiver deficiency for Line 324.**

Given the pipeline properties stated for Line 324 (a single grade X65, 0.344 in wall thickness, 24-inch diameter, HF-ERW), I can calculate the various % SMYS for the spike (minimum and maximum test pressures, and MOP hydrotests) based on an estimated approximate elevation profile by milepost as Line 324 can be hydrotested as one segment given its limited elevation profile.

A critical condition in the OSFM Decision letter 324 is:

"12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after the spike hydrotest is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
b.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP."[12]

For the 24-inch diameter pipe, wall thickness and grade stated in the Decision Letter 324, 100% SMYS calculates to 1863 psig.  1.5 times the stated MOP of 1003 psig calculates to 1504 psig, at the highest elevation point.  Thus, the spike test at the highest elevation point as required above is likely to be the lower maximum test pressure of 1504 psig which calculates to about 81% SMYS**, a value I believe is too low for corrosion cracking screening and evaluation**.  The OSFM needs to explain why the proposed spike hydrotest of Line 324 is so low.

The bottom line is that Sable/PPCs should demonstrate whether there are environmental conditions around Line 324 that are conducive to cracking either SCC or SSC, and these conditions should go well beyond a Mag-C tool run (such as sufficient field digs to verify the ILI tool's claimed capability).  I see no such important conditions in Sable/PPCs application that instill confidence that Line 324 does not have environments favoring external cracking.  While it is true that certain pipe manufactured before 1970 is more prone to SSC, or SSWC, for various reasons, there is no modern pipe, even HF-ERW located in Line 324 or DSAW located in 325 A/B, that is invincible to such corrosion cracking threats, especially if the coating directly applied to the pipe has "tented" on the weld seam, allowing water to enter between the coating and the pipe to create a corrosion cell.  There is no carbon steel pipeline, even new modern manufactured steel pipelines, invincible to such corrosion attack.

---

[12] Decision Letter 324, "Pressure Testing," pages 4 – 5.

Accufacts Inc. Final                                                                Page 8 of 9

3. **Major state waiver deficiencies for Line 325A/B.**

Decision Letter 325 states that Line 325A and 325B is composed of 30-inch diameter of two pipe grades (X65 with a thickness of mainly 0.344 inch and X70 with a wall thickness mainly of 0.281 inches composed of DSAW, with one small segment of 0.03 miles containing HF-ERW). I used the term "mainly" as Sable's/PPC's application indicates these two lines are also largely composed of these grades with a small percentage of varying thicknesses.[13] For these two pipe grades, and thicknesses, 100 % SMYS calculates to 1490 psig for X65 and 1311 psig for X70. Since the location of the various pipe grades by approximate mileposts within CA-325A/B are not indicated, and given the dramatic elevation profiles for 325A/B the proposed hydrotest segments, if any, by milepost and elevation segments need to be made public. Without such information, I cannot calculate the % SMYS range for hydrotests given the OSFM conditions. Hydrotest segments are identified by station number which don't necessarily sync with milepost or MP.[14] **These important test segment parameters, by approximate MP, and elevation need to be made public to assure prudent hydrotesting is being required to address the possible general corrosion and cracking risks on Line 325A/B**.

It is worth noting that the OSFM does not require a MOP and spike hydrotest of 325B which has very significant elevation changes. This would suggest that Line 325B is not being evaluated by hydrotesting. The reason(s) for this decision needs to be made public.

## X.    Conclusions.

Hydrotest segments proposed for the Pipelines need to be made transparent and include approximate MP, given the major role that elevation change plays on this system. Critical parameters related to location by milepost of the varying grades and thicknesses of pipe on 325 A/B and their associated hydrotest segments need to be identified by approximate MP as well, to verify if the OSFM parameters are sufficient for the specific types of corrosion threat. The reason as to why a spike hydrotest on 324 and 325 A are limited needs to be explained, as well as to why 325B hydrotesting has not been included in either a subpart E or spike hydrotest,

The incompleteness of the waivers lead me to conclude that I cannot determine the waivers provide sufficient information to assure an equal or greater level of safety for the Pipelines had the operator had an unshielded coating design that complied with federal minimum pipeline CP protection intended to avoid pipeline failure from external corrosion.

Richard B. Kuprewicz
President
Accufacts Inc.

*Richard B Kuprewicz*

---

[13] Sable/PPC letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115). Pipeline System Background Data Attachment B of State Application Table B-3 Line Pipe Specifications," July 2023, p. 4.

[14] *Ibid*., "Table B-6 Historic Hydrotest Summary," p. 6.

# EXHIBIT C



U.S. Department
of Transportation

**Pipeline and Hazardous
Materials Safety
Administration**

MAY 2 1 2015

1200 New Jersey Avenue SE
Washington, DC  20590

<u>VIA CERTIFIED MAIL AND FAX TO: 713-646-4378</u>

Troy Valenzuela
Vice President EHS
Plains Pipeline, LP
333 Clay Street, Suite 1600
Houston, TX 77002

**Re: CPF No.  5-2015-5011H**

Dear Mr. Valenzuela:

Enclosed is a Corrective Action Order issued in the above-referenced case.  It requires Plains Pipeline, LP to take certain corrective actions with respect to Line 901 of your pipeline system that failed on May 19, 2015, near Santa Barbara, CA.  Service is being made by certified mail and facsimile.  Service of the Corrective Action Order by electronic transmission is deemed complete upon transmission and acknowledgement of receipt, or as otherwise provided under 49 C.F.R. § 190.5.  The terms and conditions of this Order are effective upon completion of service.

Thank you for your cooperation in this matter.

Sincerely,

Jeffrey D. Wiese
Associate Administrator
for Pipeline Safety

Enclosure

cc:   Ms. Linda Daugherty, Deputy Associate Administrator for Field Operations, OPS
Mr. Chris Hoidal, Director, Western Region, OPS

**U.S. DEPARTMENT OF TRANSPORTATION**
**PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION**
**OFFICE OF PIPELINE SAFETY**
**WASHINGTON, D.C. 20590**

| | |
|---|---|
| In the Matter of )<br><br>Plains Pipeline, LP, )<br><br>Respondent. ) | CPF No. 5-2015-5011H |

## CORRECTIVE ACTION ORDER

**Purpose and Background:**

This Corrective Action Order (Order) is being issued, under the authority of 49 U.S.C. § 60112, to require Plains Pipeline, LP (Plains or Respondent), to take the necessary corrective action to protect the public, property, and the environment from potential hazards associated with the recent failure on your pipeline in Santa Barbara County, California.

On May 19, 2015, a reportable accident occurred on Plains' Line 901 pipeline, resulting in the release of approximately 1700 to 2500 barrels of heavy crude oil (Failure). Line 901 is a 24-inch diameter pipeline approximately 10.6 miles in length that transports crude oil from Exxon Mobil's breakout storage tanks in Las Flores Canyon to Plains' Gaviota Pump Station. The cause of the Failure has not yet been determined. Pursuant to 49 U.S.C. § 60117, the Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS), initiated an investigation of the accident. The preliminary findings of the ongoing investigation are as follows:

**Preliminary Findings:**

- Plains Pipeline, LP (Plains), is a publicly traded master limited partnership that operates approximately 17,800 miles of crude oil and natural gas liquids pipelines and gathering systems throughout the United States, including California and Texas.[1]

- The failed pipeline is a 24-inch diameter line that transports crude oil and runs from Exxon Mobil's breakout storage tanks in Las Flores Canyon to Plains' Gaviota Pump Station, a distance of approximately 10.6 miles (Affected Pipeline). The Failure occurred near milepost 4 near Goleta, California (Failure Site).

---

[1] https://www.plainsallamerican.com/what-we-do/transportation (last accessed May 20, 2015)

CPF No. 5-2015-5011H
Page 2

- The Affected Pipeline was constructed from 1987-1990, and consists of .344 wall thickness, X-65 high frequency electric resistance welded (ERW) pipe manufactured by Nippon Steel.

- The Affected Pipeline has a Maximum Operating Pressure (MOP) of 1025 psig and the normal operating pressure is 650 psig. Plains initially reported that the line pressure was approximately 700 psig immediately prior to failure.

- The initial hydrostatic test on the Affected Pipeline was conducted in October 1990, to a pressure of 1719 psig held for 8 hours.

- The Affected Pipeline is insulated and operates at up to 120 degrees Fahrenheit. There are shrink wrap sleeves at some of the pipeline's girth welds.

- The Affected Pipeline was recently smart-pigged on May 5, 2015. Complete in-line inspection (ILI) data was collected but the operator has not yet received a formal report from the ILI vendor regarding the analysis of the data and identification of any anomalies requiring further investigation according to the Federal pipeline safety regulations.

- Previous ILIs were performed in June 2007 and July 2012. In 2007 and 2012, there were 13 and 41 excavations of ILI-identified anomalies on the pipeline, respectively. These anomalies were mostly due to external corrosion, frequently located near the pipeline's girth welds.

- The Failure was discovered by the operator on May 19, 2015 around 1:30 p.m. PST, and reported to the National Response Center (NRC Report No. 1116972) at 2:56 p.m. PST. The operator reported an estimated spill of more than 500 BBLs of crude oil in their NRC report, but stated there was limited information available at that time.

- Prior to the discovery of the Failure, the controller of Line 901 noticed anomalies in the operating pressure, shut down and isolated the line around 11:30 am PST, and called field personnel to investigate.

- Another NRC report (No. 1116950) was received by the National Response Center at 12:43 p.m. from the Santa Barbara Dispatch reporting an unknown oil sheen at Refugio Beach.

- The release occurred on the north side of the Pacific Coast Highway. The released product traveled southward through a nearby water drainage culvert approximately ¼ mile to Refugio State Beach, where the product entered the Pacific Ocean. It is estimated that product has spread several miles down the coast.

- The estimated release amount was reported to have increased to 1700 to 2500 BBLs by the Unified Command center on the afternoon of May 20th.

- Refugio State Beach and camp grounds have been closed due to the oil spill. There were no reports of injuries.

- Several areas of environmental sensitivity are located near the Failure Site, including Bell Canyon, Tecolote Canyon, the City of Gaviota, and Coal Oil Point Reserve.

- Various state and federal agencies responded to the scene, including the U.S. Coast Guard, U.S. Environmental Protection Agency, California County Office of Emergency Services, and local fire department(s). Private oil spill response organizations under contract with Plains and Exxon Mobil personnel are also responding. Clean-up operations are underway.

- The cause of the Failure is unknown and the investigation is ongoing.

**Determination of Necessity for Corrective Action Order and Right to Hearing:**

Section 60112 of Title 49, United States Code, provides for the issuance of a Corrective Action Order, after reasonable notice and the opportunity for a hearing, requiring corrective action, which may include the suspended or restricted use of a pipeline facility, physical inspection, testing, repair, replacement, or other action, as appropriate. The basis for making the determination that a pipeline facility is or would be hazardous, requiring corrective action, is set forth both in the above-referenced statute and 49 C.F.R. § 190.233, a copy of which is enclosed.

Section 60112 and the regulations promulgated thereunder provide for the issuance of a Corrective Action Order, without prior notice and opportunity for hearing, upon a finding that failure to issue the Order expeditiously would result in the likelihood of serious harm to life, property, or the environment. In such cases, an opportunity for a hearing and expedited review will be provided as soon as practicable after the issuance of the Order.

After evaluating the foregoing preliminary findings of fact, I find that continued operation of the pipeline without corrective measures is or would be hazardous to life, property, or the environment. Additionally, having considered the uncertainties as to the cause of the Failure, the location of the Failure, the material being transported, and the proximity of the pipeline to the Pacific Ocean and environmentally sensitive areas, I find that a failure to issue this Order expeditiously to require immediate corrective action would result in the likelihood of serious harm to life, property, or the environment.

Accordingly, this Corrective Action Order mandating immediate corrective action is issued without prior notice and opportunity for a hearing. The terms and conditions of this Order are effective upon receipt.

Within 10 days of receipt of this Order, Respondent may contest its issuance and obtain expedited review either by answering in writing or requesting a hearing under 49 C.F.R. § 190.211, to be held as soon as practicable under the terms of such regulation, by notifying the Associate Administrator for Pipeline Safety in writing, with a copy to the Director, Western Region, OPS (Director). If Respondent requests a hearing, it will be held telephonically or in-person in Denver, Colorado, or Washington, D.C.

**After receiving and analyzing additional data in the course of this investigation, PHMSA may identify other corrective measures that need to be taken on the Affected Pipeline or Plains' Line 903.** In that event, PHMSA will notify Respondent of any additional measures that are required and an amended Order will be issued, if necessary. To the extent consistent with safety, Respondent will be afforded notice and an opportunity for a hearing prior to the imposition of any additional corrective measures.

**Required Corrective Actions:**

Pursuant to 49 U.S.C. § 60112, I hereby order Plains to immediately take the following corrective actions for the Affected Pipeline:

1. *Shutdown.* Plains must not operate the Affected Pipeline until authorized to do so by the Director.

2. *Empty and Purge the Affected Pipeline.* Plains must empty and purge the Affected Pipeline and fill with an inert gas until Items 3 through 8 of this Order are completed. This purging must be done as soon as practicable after repairing the Failure Site, but no longer than 10 days after receipt of this Order.

   a. Plains must notify the Director and local and State responders prior to conducting the purging operations.

   b. Plains must conduct the purging operations during daylight hours and monitor the pipeline right of way continually to quickly identify and contain any releases should they occur.

3. *Review of Affected Pipeline.* Within 45 days of receipt of this Order, Plains must review the Affected Pipeline for conditions similar to those of the Failure. Plains must address any findings that require remedial measures to be implemented prior to restart. This review must include:

   a. All construction, operating and maintenance (O&M) and integrity management records, such as hydrostatic tests, root cause failure analysis of prior failures, aerial and ground patrols, corrosion protection, One Call tickets, excavations and exposed pipe records, and pipe replacements;

   b. Identification of all areas of the Affected Pipeline that have insulated pipe and girth welds with "shrink wrap" sleeves;

   c. All ILI results from the past 10 calendar years, including a followup review of the ILI vendors' raw data and analysis from pre-2015 ILI surveys and a first time review of the data from the ILI survey conducted on May 5, 2015. Determine whether any anomalies were present in the failed pipe joint and any other pipe removed near the Failure Site. Determine whether any anomalies with similar characteristics are present elsewhere on the Affected Pipeline. Plains must submit documentation of this ILI review to the Director within 45 days of receipt of this Order as follows:

      i. List all ILI tool runs, tool types, and the calendar years of the tool runs conducted on Line 901.

      ii. Provide all ILI data from the past 10 years to the Director for review by a 3rd party ILI data analyst.

    iii.    Explain the process that was used to review the past ILI results, and the process that will be used during the reevaluation.

    iv.    List and describe (type, size, wall loss, etc.) the specific locations of all ILI features from the ILI surveys conducted prior to the May 5, 2015 survey. Include the disposition of those requiring investigation per 49 CFR Part 195.452(h) or Plains's remediation criteria.

    v.    List and describe (type, size, wall loss, etc.) the specific location of all ILI features identified by the May 5, 2015 ILI survey that are present in the failed joint and other pipe removed near the Failure Site.

    vi.    List and describe (type, size, wall loss, etc.) the specific location of all ILI features identified by the May 5, 2015 ILI survey that require investigation per 49 CFR Part 195.452(h) elsewhere on the Affected Pipeline. If an ILI feature or anomaly is identified to be associated with the Failure Site, all features with similar characteristics elsewhere on the Affected Pipeline must be investigated and remediated.

4. **Records Verification.** As recommended in PHMSA Advisory Bulletin 2012-06, Plains must verify the records for the Affected Pipeline to confirm the Maximum Operating Pressure (MOP). Plains must submit documentation of this records verification to the Director within 45 days of receipt of this Order.

5. **Mechanical and Metallurgical Testing.** Within 45 days of receipt of this Order, complete mechanical and metallurgical testing and failure analysis of the failed pipe, including an analysis of soil samples and any foreign materials. Complete the testing and analysis as follows:

    a.   Document the chain-of-custody when handling and transporting the failed pipe section and other evidence from the Failure Site. The removal and protection of the failed pipe section shall be done in the presence a PHMSA representative, and all failure surfaces shall be protected from damage or contamination during removal and subsequent storage prior to testing.

    b.   Within 10 days of receipt of this Order, develop and submit the testing protocol and the proposed testing laboratory to the Director for prior approval.

    c.   Prior to beginning the mechanical and metallurgical testing, provide the Director with the scheduled date, time, and location of the testing to allow for an OPS representative to witness the testing.

    d.   Ensure the testing laboratory distributes all reports, whether draft or final, in their entirety to the Director at the same time they are made available to Plains.

6. **Root Cause Failure Analysis.** Within 60 days following receipt of this Order, complete a root cause failure analysis (RCFA) and submit a final report of this RCFA to the Director. The RCFA must be facilitated by an independent third-party acceptable to the Director and must document the decision-making process and all factors contributing to the Failure. The final report must include findings and any lessons learned and whether the findings and any lessons learned are applicable to other locations within Plains' pipeline system.

7. **Remedial Work Plan.** Within 90 days following receipt of this Order, provide a plan to the Director for his approval to investigate and remediate all actionable anomalies per 49 CFR

Part 195.452(h) and anomalies similar to those that may have led to the release at the Failure site.

8. **Restart Plan**. Prior to resuming operation of the Affected Pipeline, Plains must develop and submit a written Restart Plan to the Director for prior approval.

   a. The Restart Plan may only be requested after completion of Items 2 through 7 of this Order.

   b. The Restart Plan must also include documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual.

   c. The Restart Plan must provide for adequate patrolling of the Affected Pipeline during the restart process and must include incremental pressure increases during start-up, with each increment to be held for at least 2 hours.

   d. The Restart Plan must include sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes.

   e. The Restart Plan must specify a day-light restart and include advance communications with local emergency response officials.

   f. Once approved by the Director, the Restart Plan will be incorporated by reference into this Order.

9. **Return to Service.** After the Director approves the Restart Plan, Plains may return the Affected Pipeline to service but the operating pressure must not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Failure on May 19, 2015.

10. **Removal of Pressure Restriction**.

   a. The Director may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-failure operating pressure is justified based on a reliable engineering analysis showing that the pressure increase is safe considering all known defects, anomalies, and operating parameters of the pipeline.

   b. The Director may allow the temporary removal or modification of the pressure restrictions upon a written request from Plains demonstrating that temporary mitigative and preventive measures are implemented prior to and during the temporary removal or modification of the pressure restriction. The Director's determination will be based on the failure cause and provision of evidence that preventive and mitigative actions taken by the operator provide for the safe operation of the Affected Segment during the temporary removal or modification of the pressure restriction.

11. **Emergency Response Plan and Training Review**. Plains must review and assess the effectiveness of its emergency response plan and Bakersfield Spill Response Plan – Sequence 0107 with regards to the Failure. Include in the assessment a detailed review of the on-scene response and support activities (including timeline), coordination with all parties (including regulatory requests and proceeding with work), site security (including all phases of the response), procedures for improvements, lessons learned, and communication with the National Response Center, emergency responders, third party contractors, public officials, and internal resources. Include a review and assessment of the effectiveness of its emergency training program. Plains must amend its emergency response plan and

emergency training, if necessary, to reflect the results of this review. Documentation of this *Emergency Response Plan and Training Review* must be provided to the Director. Revisions to the Bakersfield Spill Response Plan must be submitted to the Director, Emergency Support and Security Division, for review and approval in accordance with 49 C.F.R. Part 194.

12. ***CAO Documentation Report (CDR).*** Plains must create and revise, as necessary, a Corrective Action Order Documentation Report (CDR). When Plains has concluded all the items in this Order, the company will submit the final CDR in its entirety to the Director. This will allow the Director to complete a thorough review of all actions taken by Plains according to this Order prior to approving the closure of this Order. The intent is for the CDR to summarize all activities and documentation associated with this Order in one document.

   a. The Director may approve the CDR incrementally without approving the entire CDR.

   b. Once approved by the Director, the CDR will be incorporated by reference into this Order.

   c. The CDR must include but not be limited to:

      i. Table of Contents;

      ii. Summary of the Failure and all response activities;

      iii. Summary of pipe data/properties and all prior assessments of the Affected Pipeline;

      iv. Summary of all tests, inspections, assessments, evaluations, and analysis required by this Order;

      v. Summary of the Mechanical and Metallurgical Testing, as required by this Order;

      vi. Summary of the RCFA with all root causes, as required by this Order;

      vii. Lessons learned while completing this Order;

      viii. A path forward describing specific actions Plains will take on its entire pipeline system as a result of the lessons learned from work on this Order

**Other Requirements:**

   1. ***Reporting.*** Submit monthly reports to the Director that: (1) include all available data and results of the testing and evaluations required by this Order; and (2) describe the progress of the repairs or other remedial actions being undertaken. The first report is due on June 21. The Director may change the interval for the submission of these reports.

   2. ***Documentation of Costs.*** It is requested but not required that Plains maintain documentation of the costs associated with implementation of this Order. Include in each monthly report the to-date total costs associated with: (1) preparation and revision of procedures, studies and analyses; (2) physical changes to pipeline infrastructure, including repairs, replacements and other modifications; and (3) environmental remediation, if applicable.

   3. ***Approvals.*** With respect to each submission requiring the approval of the Director, the Director may: (a) approve the submission in whole or in part; (b) approve the submission

on specified conditions; (c) modify the submission to cure any deficiencies; (d) disapprove the submission in whole or in part and direct Plains to modify the submission; or (e) any combination of the above. In the event of approval, approval upon conditions, or modification by the Director, Plains must proceed to take all actions required by the submission, as approved or modified by the Director. If the Director disapproves all or any portion of a submission, Plains must correct all deficiencies within the time specified by the Director and resubmit it for approval.

4. *Extensions of Time.* The Director may grant an extension of time for compliance with any of the terms of this Order upon a written request timely submitted and demonstrating good cause for an extension.

The actions required by this Corrective Action Order are in addition to and do not waive any requirements that apply to Respondent's pipeline system under 49 C.F.R. Part 195, under any other order issued to Respondent under authority of 49 U.S.C. § 60101, *et seq.*, or under any other provision of Federal or State law. **After receiving and analyzing additional data in the course of this investigation, PHMSA may identify other corrective measures that need to be taken on the Affected Pipeline or Plains' Line 903.**

Respondent may appeal any decision of the Director to the Associate Administrator for Pipeline Safety. Decisions of the Associate Administrator shall be final.

Be advised that all material you submit in response to this enforcement action is subject to being made publicly available. If you believe that any portion of your responsive material qualifies for confidential treatment under 5 U.S.C. 552(b), along with the complete original document you must provide a second copy of the document with the portions you believe qualify for confidential treatment redacted and an explanation of why you believe the redacted information qualifies for confidential treatment under 5 U.S.C. 552(b).

Failure to comply with this Order may result in the assessment of civil penalties and in referral to the Attorney General for appropriate relief in United States District Court pursuant to 49 U.S.C. § 60120.

In your correspondence on this matter, please refer to CPF No. 5-2015-5011H and for each document you submit, please provide a copy in electronic format whenever possible.

The terms and conditions of this Corrective Action Order are effective upon receipt.

MAY 2 1 2015

Jeffrey D. Wiese
Associate Administrator
for Pipeline Safety

Date Issued



U.S. Department
of Transportation

**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue SE
Washington, DC 20590

**JUN 0 3 2015**

**VIA CERTIFIED MAIL AND FAX TO: 713-646-4378**

Mr. Troy Valenzuela
Vice President EHS
Plains Pipeline, LP
333 Clay Street, Suite 1600
Houston, TX 77002

**Re: CPF No. 5-2015-5011H**

Dear Mr. Valenzuela:

Enclosed is Amendment No. 1 to the Corrective Action Order issued in the above-referenced case on May 21, 2015. It requires Plains Pipeline, LP to take additional corrective actions with respect to Line 901 and Line 903 of its pipeline system. Service is being made by certified mail and facsimile. Service of the Amendment to the Corrective Action Order by electronic transmission is deemed complete upon transmission and acknowledgement of receipt, or as otherwise provided under 49 C.F.R. § 190.5. The terms and conditions of this Order are effective upon completion of service.

Thank you for your continued cooperation in this matter.

Sincerely,



Jeffrey D. Wiese
Associate Administrator
for Pipeline Safety

Enclosure

cc:    Ms. Linda Daugherty, Deputy Associate Administrator for Field Operations, OPS
       Mr. Chris Hoidal, Director, Western Region, OPS

**U.S. DEPARTMENT OF TRANSPORTATION**
**PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION**
**OFFICE OF PIPELINE SAFETY**
**WASHINGTON, D.C.  20590**

|  |  |
|---|---|
| In the Matter of | ) |
|  | ) |
| Plains Pipeline, LP, | )    CPF No. 5-2015-5011H |
|  | ) |
| Respondent. | ) |
|  | ) |

## AMENDMENT NO. 1 TO THE CORRECTIVE ACTION ORDER

**Purpose and Background:**

On May 21, 2015, the Associate Administrator issued a Corrective Action Order (CAO) under the authority of 49 U.S.C. § 60112, to require Plains Pipeline, LP (Plains or Respondent), to take certain corrective actions to protect the public, property, and the environment from potential hazards associated with Line 901 (Affected Pipeline) in Santa Barbara County, California.  The CAO was issued in response to a May 19, 2015, failure on the Affected Pipeline that caused the release of approximately 1700 to 2500 barrels of heavy crude oil (Failure).  The cause of the Failure has not yet been determined.  Pursuant to 49 U.S.C. § 60117, the Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS), initiated an investigation of the accident.

**Additional Preliminary Findings:**

- The results of Plains' May 5, 2015 In-Line Inspection (ILI) survey revealed four areas on the Affected Pipeline with pipe anomalies requiring immediate investigation and remediation in accordance with 49 CFR § 195.452(h) or Plains' own criteria for investigation under its integrity management plan.  Examination and measurements of three of these areas indicated extensive external corrosion, primarily on the bottom quadrant of the pipe.  The deepest metal loss at each area, as measured by Plains non-destructive testing contractors, ranged between 54 and 74% of the original pipe wall thickness.  The anomalies were not limited to being near the girth welds, but also occurred at other locations along the length of the pipe.  The fourth area to be investigated has not yet been completed.

- The Affected Pipeline is experiencing active external corrosion, as follows:

- o Plains has reported to PHMSA that the May 5th ILI survey revealed metal loss of approximately 45% of the original wall thickness in the area of the pipe that failed on May 19.
- o PHMSA inspectors noted general external corrosion of the pipe body during field examination of the failed pipe segment.
- o The rupture characteristics at the Failure site indicate a longitudinally oriented opening approximately 6 inches in length and located in the bottom quadrant of the pipe. Third-party metallurgists in the field estimated that corrosion at the Failure site had degraded the wall thickness to an estimated 1/16 of an inch (.0625"). This thinning of the pipe wall is greater than the 45% metal loss which was indicated by the recent ILI survey.
- o PHMSA inspectors observed three repairs to the Affected Pipeline in the area near the Failure site that had been made due to external corrosion. These repairs were made after the 2012 ILI survey.

- Plains uses an impressed current cathodic protection (CP) system to protect the Affected Pipeline from external corrosion. After the Failure, PHMSA inspectors witnessed Plains measuring CP levels near the Failure site and at the three anomaly digs that were completed after May 22. The CP levels appeared to be adequate according to 49 CFR § 195.571. External corrosion with CP at this level would not be expected.

- Plains' Line 903 is a 30-inch diameter pipeline which transports crude oil 128 miles from the Gaviota Pump Station in Santa Barbara County to the Emidio Pump Station in Kern County, California.

- Plains has informed PHMSA that Line 903 has insulation and shrink wrap sleeves on the girth welds, similar to the Affected Pipeline.

- Line 903 was completely surveyed by ILI during 2013 and 2014. These ILI results revealed:
  - o The 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station was inspected on April 29, 2013, and the report was provided to Plains in June 2013. The ILI vendor reported that this segment had 99 metal loss anomalies requiring investigation.
  - o The 75-mile segment of Line 903 between Sisquoc Station and Pentland Station was inspected on June 12, 2013. The report was provided to Plains in August 2013, and a corrected report was provided in September 2013. This segment had no anomalies requiring investigation. However, the ILI vendor reported there were a number of metal loss anomalies that may indicate general corrosion.
  - o The 15-mile segment of Line 903 between Pentland Station and Emidio Station was inspected on February 19, 2014, and the report was provided to Plains in May 2014. This segment had no anomalies requiring immediate investigation. However, based on the ILI vendor report, this segment had two girth weld anomalies requiring investigation.
  - o The data collected by the ILI surveys for the different segments of Line 903 appear to be inconsistent, requiring immediate review and analysis.

- Plains voluntarily shut down Line 903 on May 19, restarted the line on May 29, and shut the line back down on May 30. Line 903 is currently shut down.

**Determination of Necessity for Amendment to the Corrective Action Order and Right to Hearing:**

Section 60112 of Title 49, United States Code, provides for the issuance of a Corrective Action Order, after reasonable notice and the opportunity for a hearing, requiring corrective action, which may include the suspended or restricted use of a pipeline facility, physical inspection, testing, repair, replacement, or other action, as appropriate. The basis for making the determination that a pipeline facility is or would be hazardous, requiring corrective action, is set forth both in the above-referenced statute and 49 C.F.R. § 190.233, a copy of which is enclosed.

Section 60112 and the regulations promulgated thereunder provide for the issuance of a Corrective Action Order, without prior notice and opportunity for hearing, upon a finding that failure to issue the Order expeditiously would result in the likelihood of serious harm to life, property, or the environment. In such cases, an opportunity for a hearing and expedited review will be provided as soon as practicable after the issuance of the Order.

After evaluating the preliminary findings in the CAO and the foregoing additional preliminary findings of fact, I find that continued operation of Line 901 and Line 903 without corrective measures is or would be hazardous to life, property, or the environment. Additionally, having considered the uncertainties as to the cause of the Failure, the location of the Failure, the similarities between the characteristics of the Affected Pipeline and Line 903, the material being transported, and the proximity of the pipelines to the Pacific Ocean and environmentally sensitive areas, I find that a failure to issue this Order expeditiously to require immediate corrective action would result in the likelihood of serious harm to life, property, or the environment.

Accordingly, this Amendment to the Corrective Action Order mandating immediate corrective action is issued without prior notice and opportunity for a hearing. The terms and conditions of this Order are effective upon receipt.

**The actions required by this Amendment No. 1 to the Corrective Action Order are in addition to the requirements that apply to Respondent's Affected Pipeline under the CAO issued on May 21, 2015.**

Within 10 days of receipt of this Amendment, Respondent may contest its issuance and obtain expedited review either by answering in writing or requesting a hearing under 49 C.F.R. § 190.211, to be held as soon as practicable under the terms of such regulation, by notifying the Associate Administrator for Pipeline Safety in writing, with a copy to the Director, Western Region, OPS (Director). If Respondent requests a hearing, it will be held telephonically or in-person in Lakewood, Colorado, or Washington, D.C.

After receiving and analyzing additional data in the course of this investigation, PHMSA may identify other corrective measures that need to be taken on the Affected Pipeline or Plains' Line 903. In that event, PHMSA will notify Respondent of any additional measures that are required

and another Amendment Order will be issued, if necessary. To the extent consistent with safety, Respondent will be afforded notice and an opportunity for a hearing prior to the imposition of any additional corrective measures.

**Required Corrective Actions:**

Pursuant to 49 U.S.C. § 60112, I hereby order Plains to immediately take the following corrective actions:

***With respect to the Affected Pipeline (Line 901):***

1. *Paragraph 3(c)(vi) of the Required Corrective Actions of the CAO is amended, in its entirety, as follows:* List and describe (type, size, wall loss, etc.) the specific location of all ILI features identified by the May 5, 2015 ILI survey elsewhere on the Affected Pipeline that require investigation according to 49 CFR § 195.452(h) or the criteria for investigation under Plains' own integrity management plan, whichever is more stringent. All ILI features and anomalies that satisfy the criteria in either 49 CFR § 195.452(h) or the criteria for investigation under Plains' integrity management plan must be investigated and remediated. Provide the Director with a report detailing the results of the investigations and remediations that have been completed, and a proposed schedule for the remaining investigations.

2. ***Non-destructive testing.*** Plains must use a third-party, American Society of Non-Destructive Testing (ASNT) Level III certified, non-destructive testing field contractor to complete a non-destructive testing analysis at the specific location of each ILI feature or anomaly that requires investigation according to 49 CFR § 195.452(h) or the criteria for investigation under Plains' own integrity management plan, whichever is more stringent. If the ILI feature or anomaly is identified as being located at a girth weld with shrink sleeves, the contractor must perform a magnetic particle inspection, or other appropriate technology, of the weld area to check for stress corrosion cracking (SCC). Provide the Director with five business days' notice of the excavation of each pipe section requiring investigation. A summary of the investigations, test results, and remediations must be included in the monthly report required by Item 12 of the CAO, and the test records must be made available for inspection by PHMSA.

***With respect to Line 903:***

3. ***Pressure Restriction.*** The operating pressure of Line 903 must not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8 hour period between April 19, 2015, and May 19, 2015. This pressure restriction must remain in effect until the Director provides written approval to resume normal operation of Line 903.

4. ***Review of Line 903.*** Within 60 days of receipt of this Amendment, Plains must review Line 903 and address any findings that require remedial measures. This review must include:

   a. All construction, operating and maintenance (O&M) and integrity management records, such as hydrostatic tests, root cause failure analysis of prior failures, aerial and ground patrols, corrosion protection, One Call tickets, excavations and exposed pipe records, and pipe replacements;

    b.  Identification of all areas of Line 903 that have insulated pipe and girth welds with shrink wrap sleeves;

    c.  List and describe (type, size, wall loss, etc.) the specific location of all ILI features identified by the most recent ILI survey that require investigation according to 49 CFR § 195.452(h) or the criteria for investigation under Plains' own integrity management plan, whichever is more stringent. All ILI features and anomalies that satisfy the criteria in either § 195.452(h) or the criteria for investigation under Plains' integrity management plan must be investigated and remediated. Provide the Director with a report detailing the results of the investigations and remediations that have been completed, and a proposed schedule for the remaining anomalies.

5.    ***ILI Data for Line 903.*** Plains must provide the following documentation of previous ILI surveys on Line 903 to the Director within 15 days of receipt of this Amendment:

    i.  List all ILI tool runs, tool types, and the calendar years of the tool runs conducted on Line 903 over the past 10 calendar years.

    ii.  Provide all ILI data from surveys of Line 903 over the past 10 calendar years to the Director for review by PHMSA's 3rd party ILI data analyst.

6.    ***Non-destructive testing.*** Plains must use a third-party, American Society of Non-Destructive Testing (ASNT) Level III certified, non-destructive testing field contractor to complete a non-destructive testing analysis at the specific location of each ILI feature or anomaly on Line 903 identified in Item 4(c) above. If the ILI feature or anomaly is identified to be at a girth weld with shrink sleeves, the contractor must perform a magnetic particle inspection, or other appropriate technology, of the weld area to check for stress corrosion cracking (SCC). Provide the Director with five business days' notice of the excavation of each pipe section requiring investigation. A summary of the investigations, test results, and remediations must be included in the monthly report required by Item 12 of the CAO, and the test records must be made available for inspection by PHMSA.

***With respect to both the Affected Pipeline and Line 903:***

7.    ***Enhanced preventive and mitigative measures.*** Plains must take additional preventive and mitigative measures on the Affected Pipeline and Line 903 while each pipeline is subject to a pressure restriction under the CAO or this Amendment. These measures must include, but are not limited to:

    a.  Patrol inspections of surface conditions of the pipeline right-of-way at intervals not exceeding one week;

    b.  Daily inspections of pump stations to identify leaks and abnormal conditions;

    c.  Establishment of pump pressure set points and use of pressure limiting devices to match the required pressure reduction;

    d.  Training of Plains field personnel regarding awareness of abnormal operating conditions that may result from the pressure reduction on the pipeline.

    e.  Plains must maintain all documentation related to the pressure restriction and preventive and mitigative measures, including all inspections, training documents, and management of change (MOC) records.

8.  ***CAO Documentation Report:*** The Corrective Action Order Documentation Report
    required under Item 12 of the CAO must include a summary of all inspections,
    assessments, evaluations, and analysis required by this Amendment No. 1 to the CAO.

The actions required by this Amendment No. 1 to the Corrective Action Order are in addition to
and do not waive any requirements that apply to Respondent's pipeline system under the CAO,
49 C.F.R. Part 195, under any other order issued to Respondent under authority of 49 U.S.C.
§ 60101, *et seq.*, or under any other provision of Federal or State law.

Respondent may appeal any decision of the Director to the Associate Administrator for Pipeline
Safety.  Decisions of the Associate Administrator shall be final.

Be advised that all material you submit in response to this enforcement action is subject to being
made publicly available.  If you believe that any portion of your responsive material qualifies for
confidential treatment under 5 U.S.C. 552(b), along with the complete original document you
must provide a second copy of the document with the portions you believe qualify for
confidential treatment redacted and an explanation of why you believe the redacted information
qualifies for confidential treatment under 5 U.S.C. 552(b).

Failure to comply with this Order may result in the assessment of civil penalties and in referral to
the Attorney General for appropriate relief in United States District Court pursuant to 49 U.S.C.
§ 60120.

In your correspondence on this matter, please refer to CPF No. 5-2015-5011H and for each
document you submit, please provide a copy in electronic format whenever possible.

The terms and conditions of this Amendment No. 1 to the Corrective Action Order are effective
upon receipt.

June 3, 2015

Jeffrey D. Wiese                              Date Issued
Associate Administrator
 for Pipeline Safety

# EXHIBIT D

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br> Plaintiffs, <br><br> v. <br><br> PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P., <br><br> Defendants. | Civil Action No. <br><br> 2:20-cv-02415 <br><br> **CONSENT DECREE** |

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 22   Filed 05/14/26   Page 369 of 501   Page
ID #:10594
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 2 of 102   Page ID #:95

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast
Regional Water Quality Control Board, and California Department of Forestry
and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and
California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 22    Filed 05/14/26    Page 370 of 501    Page
ID #:10595
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 3 of 102    Page ID #:96

**TABLE OF CONTENTS**

I.      BACKGROUND ................................................................... - 5 -

II.      JURISDICTION AND VENUE ........................................ - 6 -

III.      APPLICABILITY .............................................................. - 7 -

IV.      DEFINITIONS ................................................................... - 7 -

V.      CIVIL PENALTIES .......................................................... - 13 -

VI.      NATURAL RESOURCE DAMAGES ............................. - 17 -

VII.      TRUSTEES' MANAGEMENT AND APPLICABILITY

       OF JOINT NRD FUNDS ................................................ - 21 -

VIII.      TRUSTEES' MANAGEMENT OF RECREATIONAL

       USE FUNDS ..................................................................... - 22 -

IX.      INJUNCTIVE RELIEF .................................................... - 23 -

X.      CORRECTIVE ACTION ORDER ................................. - 27 -

XI.      STIPULATED PENALTIES ........................................... - 27 -

XII.      FORCE MAJEURE ......................................................... - 35 -

XIII.      DISPUTE RESOLUTION ............................................... - 37 -

XIV.      REPORTING .................................................................... - 39 -

XV.      CERTIFICATION ........................................................... - 40 -

XVI.      INFORMATION COLLECTION AND RETENTION ..... - 40 -

XVII.      EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ........... - 43 -

XVIII.      TRANSFER AND ACQUISITION OF ASSETS ............ - 49 -

XIX.      COSTS .............................................................................. - 50 -

XX.      NOTICES ......................................................................... - 51 -

XXI.      EFFECTIVE DATE .......................................................... - 54 -

XXII.      RETENTION OF JURISDICTION ................................. - 54 -

XXIII.      MODIFICATION .............................................................. - 54 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

XXIV.    TERMINATION ........................................................................................- 55 -

XXV.     PUBLIC PARTICIPATION........................................................................- 56 -

XXVI.    SIGNATORIES/SERVICE .........................................................................- 56 -

XXVII.   INTEGRATION ........................................................................................- 57 -

XXVIII.  FINAL JUDGMENT ..................................................................................- 57 -

XXIX.    26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION .................- 57 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

A.    WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline known as the Line 901 pipeline ("Line 901") owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P., (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County, California.  A portion of the oil reached the Pacific Ocean and coastal areas such as Refugio State Beach.  The Refugio Incident adversely impacted Natural Resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and the State of California ("California" or the "State").

B.    WHEREAS, cleanup actions began immediately after the Refugio Incident at the direction of a Unified Command established by the United States Coast Guard ("USCG") and the State of California Department of Fish and Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR").  The Unified Command was comprised of the United States, State agencies, the County of Santa Barbara, and Plains.

C.    WHEREAS, on May 21, 2015, the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No. 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO").  The PHMSA CAO directed Plains, among other things, to purge Line 901 and a portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota and Pentland pump stations, and to keep Line 901 and the purged sections of Line 903 shut down until the actions required by the PHMSA CAO were satisfactorily completed.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 1 -

Case 2:26-cv-05243-SVW-SSC    Document 22    Filed 05/14/26    Page 373 of 501    Page
ID #:10598
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 6 of 102   Page ID #:99

D.       WHEREAS, on May 19, 2016, PHMSA issued a Failure Investigation Report, which included PHMSA's findings of the "proximate or direct" causes and the "contributing" causes of the Refugio Incident.

E.       WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs arising from the Refugio Incident.

F.       WHEREAS, CDFW incurred certain additional costs arising from the administration and civil enforcement of pollution laws, including attorneys' fees that have been reimbursed by Plains.

G.       WHEREAS, Plains represents that it has implemented and will continue to utilize an electronic tracking tool and software for maintenance activities, including those activities related to mainline valves.  The software tracks which maintenance activities are performed, who performs the activity, when prior notifications of maintenance activities by field personnel are received, when problems requiring maintenance are first discovered, and when maintenance problems are corrected.  Plains maintains a separate software program to track the training and qualifications of all maintenance personnel.

H.       WHEREAS, Plains represents that, following the Refugio Incident and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its Emergency Response Plan and Training Program, and revised and updated its Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield District Response Zone Plan") to reflect modifications resulting from the review and the incorporation of lessons learned.  As part of the revision, Plains identified the locations of culverts along the pipelines' rights-of-way and provided containment and recovery techniques for responding to spills that may occur near those culverts.  Plains provided drafts of the updated Bakersfield District Response Zone Plan to PHMSA, incorporated comments provided by PHMSA, and received approval of the revised plan from PHMSA on September 26, 2017.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 22 Filed 05/14/26 Page 374 of 501 Page
ID #:10599
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 7 of 102 Page ID #:100

I.    WHEREAS, Plains represents that it also created a more detailed Geographic Information System ("GIS") based online Tactical Response Plan for its onshore oil pipelines in Southern California, including Line 2000 and the operational portion of Line 903, that, among other things, identifies culverts along the pipelines' rights-of-way, potential receptors and the equipment, supplies and resources that would be necessary to respond to a spill occurring at any given location along those pipelines, identifies the sources and locations for obtaining those resources, and, in some instances, establishes stored inventories of those resources in specific locations.  Plains represents that it intends to keep its Tactical Response Plan updated and available for use in drills and spill response, and that it will make the Tactical Response Plan available to the Plaintiffs upon reasonable request and as needed in connection with a drill or response to a spill.

J.    WHEREAS, Plains represents that Plains personnel responding to incidents that trigger the standup of an incident command structure ("ICS") have been provided ICS training appropriate to their responsibilities.

K.    WHEREAS, the relevant Natural Resources trustees ("Trustees") for the Refugio Incident are the United States Department of the Interior ("DOI"); United States Department of Commerce, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"); CDFW; California Department of Parks and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and The Regents of the University of California ("UC").

L.    WHEREAS, pursuant to Section 1006 of the Oil Pollution Act ("OPA"), 33 U.S.C. 2701, *et seq*., the United States and the State Trustees allege that oil from the Refugio Incident caused injuries to Natural Resources, including birds, marine mammals, shoreline and subtidal habitats, and also had an impact upon human uses of Natural Resources and other public resources. The Federal Trustees are designated pursuant to the National Contingency Plan,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 3 -

40 C.F.R. § 300.600 and Executive Order 12777.  CDFW and CDPR are designated state trustees pursuant to the National Contingency Plan, 40 C.F.R. § 300.605, and the Governor's Designation of State Natural Resource Trustees pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980.  In addition, CDFW has state natural resource trustee authority pursuant to California Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (California Government Code § 8670.1 *et seq.*).  CDPR and UC have jurisdiction over natural resources within the state park system and the UC Natural Reserve System, respectively, which are held in trust for the people of the State of California.  CSLC is a state trustee pursuant to its jurisdiction under Public Resources Code § 6301 and Civil Code § 670.

M.     WHEREAS, after the Refugio Incident, the Trustees and Defendants entered into a cooperative Natural Resource Damage Assessment process pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and independently planned and conducted a number of injury assessment activities. These activities included gathering and analyzing data and other information that the Trustees used to determine and quantify resource injuries and damages.  As a result of this process and other activities, the Trustees identified several categories of injured and damaged Natural Resources, including birds, marine mammals, and shoreline and subtidal habitats, as well as effects to human use/recreation resulting from impacts on these Natural Resources, and determined the cost to restore, rehabilitate, replace, or acquire the equivalent of injured Natural Resources.  By entering this Consent Decree, Defendants do not admit or agree that the Trustees' NRD findings and determinations are accurate.

N.     WHEREAS, due to the specific facts surrounding the Refugio Incident, including the timing, degree, and nature of the spill and the affected

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 4 -

environment, the Trustees will not seek additional damages, costs, or expenses for Natural Resources resulting from the Refugio Incident.

O.    WHEREAS, Plains agrees to reimburse costs incurred by the Trustees in connection with the NRDA through November 15, 2018, and will not reimburse costs incurred by the Trustees in connection with the NRDA after that date.

P.    WHEREAS, by entering into this Consent Decree, Plains does not admit the allegations in the Complaint filed in this action, or any liability to the Plaintiffs.

Q.    WHEREAS, on January 28, 2019, PHMSA initiated a regularly-scheduled "Integrated Inspection" of a portion of Defendants' Regulated Pipelines, as described below, and other pipeline facilities and records, pursuant to 49 U.S.C. § 60117.

R.    WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

S.    WHEREAS, the Parties agree and the Court by entering this Consent Decree finds, that this Consent Decree:  (1) has been negotiated by the Parties at arm's-length and in good faith; (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws.

## I.    BACKGROUND

The United States, on behalf of PHMSA, the United States Environmental Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California Central Coast Regional Water Quality Control Board ("RWQCB"), and the California Department of Forestry and Fire Protection's - Office of the State Fire

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 5 -

Case 2:26-pv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 377 of 501   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 10 of 102   Page ID #:103
ID #:10602

Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and associated regulations and orders; OPA, 33 U.S.C. §§ 2701 *et seq.*, and associated regulations and orders; the federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq.*, and associated regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, California Government Code §§ 8670.1 *et seq.* and associated regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016, 13013; California Water Code §§ 13350, 13385; and the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.* The Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks penalties, injunctive relief, and Natural Resource Damages.

NOW, THEREFORE, before the trial of any claims and without adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and 60122; and 28 U.S.C. §§ 1331, 1345, and 1355. This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367. To the extent the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the United States and the State Agencies have satisfied the requirement.

2.    Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws, 49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 6 -

does business in this District and the alleged claims occurred in this District.

3. For purposes of this Consent Decree or any action to enforce this Consent Decree, Defendants consent to the Court's jurisdiction over this Consent Decree for such action and Defendants consent to venue in this judicial district. For purposes of this Consent Decree and without admission of liability, Defendants agree that the Complaint states claims upon which relief may be granted.

## III. APPLICABILITY

4. Subject to the terms herein, the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree.

5. Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained for the purpose of performing work required under this Consent Decree. Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree by specifying that contractors are obligated to perform work in compliance with this Consent Decree.

6. In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## IV. DEFINITIONS

7. Terms used in this Consent Decree that are defined in the CWA, OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 7 -

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 379 of 501 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 12 of 102 Page ID #:105
ID #:10604

have the meanings assigned to them in these statutes and their regulations, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Appendix A" is the set of maps that generally depict Lines 901, 903, and 2000;

"Appendix B" is the Injunctive Relief that Plains is required to perform under this Consent Decree;

"Appendix C" is intentionally left blank;

"Appendix D" is the list of remaining corrective actions from the PHMSA CAO that Plains is still required to implement under this Consent Decree.  For the terms of the PHMSA CAO, *see* https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H.html?nocache=4888#_TP_1_tab_1;

"CDFW" shall mean the California Department of Fish and Wildlife and any of its successor departments or agencies;

"CDPR" shall mean the California Department of Parks and Recreation and any of its successor departments or agencies;

"Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

"Consent Decree" shall mean this Consent Decree and all Appendices attached hereto;

"Control Room Management Plan" shall mean Plains' Control Room Management Plan, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"Control Center General Procedures" shall mean Plains' Control Center General Procedures, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"CSLC" shall mean the California State Lands Commission and any of its successor departments or agencies;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 8 -

Case 2:20-cv-02425   Document 6-1   Filed 03/15/20   Page 13 of 102   Page ID #:106

"Day" shall mean a calendar day unless expressly stated to be a working day.  In computing any period of time under this Consent Decree, the rules set forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

"Defendants" shall mean Plains All American Pipeline, L.P. and Plains Pipeline, L.P.;

"Delivery Lines" as stated in Appendix B shall mean any pipeline that generally operates to move oil from a delivery meter on a pipeline or facility to another pipeline or facility in close proximity;

"DOI" shall mean the United States Department of the Interior, including its bureaus and agencies, and any of its successor departments or agencies;

"Elder California Pipeline Safety Act" shall mean the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq*.;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXI (Effective Date);

"Federal Trustees" shall mean DOI and NOAA in their capacities as Natural Resource Trustees;

"Integrity Management Plan" or "IMP" shall mean Plains' Integrity Management Plan, dated September 2019, as delivered to PHMSA by letter dated November 19, 2019, from counsel for Defendants;

"Line 901" is Defendants' 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California, as generally depicted in Appendix A;

"Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends approximately 129 miles in length from the Gaviota Pump Station in Santa Barbara County, California to the Emidio Pump Station in Kern County,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland Mile Post 114.57, as generally depicted in Appendix A;

"Line 2000" is Defendants' 20-inch diameter pipeline that extends approximately 130 miles in length and transports crude-oil produced in the outer continental shelf and the San Joaquin Valley.  Line 2000 runs from Bakersfield, California, over the Tehachapi Mountains and through the Grapevine I-5 corridor and extends to delivery locations in the Los Angeles metropolitan area, as generally depicted in Appendix A;

"Mainline pipeline" as stated in Appendix B shall mean the principal pipeline or the parallel pipeline in a given pipeline system, excluding connected lateral lines or branch lines that are used locally to deliver product either into the mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a third-party line;

"Natural Resource" and "Natural Resources" shall mean land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and/or the State or any subdivision thereof, and shall also mean the services provided by such resources to other resources or to humans;

"Natural Resource Damages" or "NRD" shall mean all damages, including restoration or rehabilitation costs, recoverable by the United States or State Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources including any services such natural resources provide, including the reasonable costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A), resulting from the Refugio Incident;

"Natural Resource Damage Assessment" or "NRDA" shall mean the process of collecting, compiling, and analyzing information, statistics, or data through prescribed methodologies to determine damages for injuries to Natural

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio Incident;

"NRD Payment" shall mean the payment Defendants are required to pay for the Natural Resource Damages as described in Section VI (Natural Resource Damages);

"Natural Resource Trustees" or "Trustees" are those federal and state agencies or officials designated or authorized pursuant to the CWA, OPA, and/or applicable state laws to act as Trustees for the Natural Resources belonging to, managed by, controlled by, or appertaining to the United States or the State. Participating Trustees in the Natural Resource Damage Assessment and in this Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

"NOAA" shall mean the National Oceanic and Atmospheric Administration and any of its successor departments or agencies;

"Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the fund established pursuant to 26 U.S.C. § 9509, including the claim-reimbursement provisions set forth in 33 U.S.C. § 2712;

"OSFM" shall mean the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal and any of its successor departments or agencies;

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

"Parties" shall mean the Plaintiffs and Defendants, collectively;

"PHMSA" shall mean the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration and any of its successor departments or agencies;

"PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the Original CAO issued on May 21, 2015, by PHMSA, which was subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 11 -

"Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq*., and regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

"Plaintiffs" shall mean the United States and the State Agencies;

"Refugio Incident" shall mean the release of approximately 2,934 barrels of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California on or about May 19, 2015;

"Regulated Pipeline" shall mean any pipeline operated by Plains subject to regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div. 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

"Requests for Information" or "RFI" shall mean PHMSA's RFIs dated August 19, 2015, August 21, 2015, and September 1, 2016.  RFIs shall also refer to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

"Restore" or "Restoration" shall mean any action or combination of actions to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including Natural Resource-based recreational opportunities that were injured, lost, or destroyed as a result of the Refugio Incident;

"RWQCB" shall mean the California Central Coast Regional Water Quality Control Board and any of its successor departments or agencies;

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

"Segment" as stated in Appendix B shall mean any contiguous portion of a pipeline system for which a single hydrostatic test or ILI may be performed, as determined by Defendants;

"State Agencies" shall mean the People of the State of California, *Ex Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC.  The State Agencies do not include any entity or political subdivision of the State of California other than those agencies herein designated the "State Agencies";

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 12 -

"State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their capacities as Natural Resource Trustees;

"United States" shall mean the United States of America, on behalf of PHMSA, EPA, DOI, NOAA, and USCG;

"UC" shall mean The Regents of the University of California and any of its successor departments or agencies; and

"USCG" shall mean the United States Coast Guard and any of its successor departments or agencies.

## V.    CIVIL PENALTIES

A.    Within thirty (30) Days after the Effective Date, Defendants shall pay to the United States, CDFW, and RWQCB a total civil penalty of twenty-four million dollars ($24,000,000), together with interest accruing from the date on which the Consent Decree is lodged with the Court, at a rate specified in 28 U.S.C. § 1961 (the "Penalty Payment"). The Penalty Payment shall be allocated as follows:

8.    Penalty Payment to the United States (PHMSA). For violations of the Pipeline Safety Laws alleged in the United States' Complaint, Defendants shall pay to the United States a civil penalty of fourteen million five hundred thousand dollars ($14,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

a.    Thirteen million two hundred fifty thousand dollars ($13,250,000) attributed to Plains' alleged Pipeline Safety Law violations; and

b.    One million two hundred fifty thousand dollars ($1,250,000) attributed to Plains' alleged non-compliance with the RFIs.

c.    Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants by the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 13 -

Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California Western Division after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Megan Prout
> Senior Vice President
> Commercial Law and Litigation
> Plains All American Pipeline, L.P.
> 333 Clay Street, Suite 1600
> Houston, TX 77002

on behalf of Defendants. Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XX (Notices).

d. At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state the payment is for the civil penalty owed pursuant to this Consent Decree in the *United States of America and the People of the State of California v. Plains All American Pipeline, L.P., et al*., and shall reference the Civil Action Number assigned to this case, CDCS Number, and DOJ case number 90-5-1-1-11340, to the United States in accordance with Section XX (Notices).

9. <u>Penalty Payment to the United States (EPA) shared with CDFW and RWQCB</u>. The Penalty Payment shall be allocated as follows:

a. As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 14 -

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made as follows:

1)      To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife.  The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn:  Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill."  CDFW shall deposit the money as follows:  one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

2)      To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 15 -

State Water Resources Control Board
Division of Administrative Services, ATTN: Civil
Liability Payment
P.O. Box 1888
Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3)      To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division.  Such monies are to be deposited in the OSLTF.  The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8).  Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day.  Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 388 of 501   Page
ID #:10613
Case 2:20-cv-02415-VW-SSC   Document 6-1   Filed 03/15/20   Page 21 of 102   Page ID #:114

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

and

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center
U.S. Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, D.C. 20593-7605

10.     Penalty Payment to be Paid to CDFW.  For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife.  The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California  95816-0362

The check shall reference the "Refugio Oil Spill."  CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11.     Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI.    NATURAL RESOURCE DAMAGES

12.     Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 17 -

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 389 of 501   Page
ID #:10614
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 22 of 102   Page ID #:115

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961.  The NRD Payment shall be allocated as follows:

      a.     To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment.  Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds).  Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

> Department of the Interior
> Natural Resource Damage Assessment and
>     Restoration Program
> Attention:  Restoration Fund Manager
> 1849 "C" Street, N.W. Mail Stop 4449
> Washington, D.C.  20240

The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198.  DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 390 of 501 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 23 of 102 Page ID #:116
ID #:10615

b.      To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund.  Payment shall be made by check payable to the California Department of Parks and Recreation.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> The California Department of Parks and
>     Recreation
> Attn:  Laura Reimche, Senior Counsel
> 1416 Ninth Street, Room 1404-6
> Sacramento, California  95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund.  CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident.  CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c.      To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF.  Payment shall be made by check payable to the National Fish and Wildlife Foundation.  At the time of payment, Defendants shall simultaneously send written

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 391 of 501 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 24 of 102 Page ID #:117
ID #:10616

notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

California Department of Fish and Game
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the California South Coast Shoreline Parks and Outdoor Recreational Use Account. The California South Coast Shoreline Parks and Outdoor Recreational Use Account shall be managed in accordance with the South Coast Shoreline Parks and Outdoor Recreational Use Account Memorandum of Agreement among the State Trustees and NFWF and shall be used by the Trustees for the purposes set forth in Section VIII (Trustees' Management of Recreational Use Funds).

d. To UC, twenty-six thousand dollars ($26,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into Natural Reserve System Account. Payment shall be made by check payable to The Regents of the University of California. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

The Regents of the University of California
Attn:  Michael Kisgen, Associate Director
Natural Reserve System
University of California, Office of the President
1111 Franklin Street, 6th Floor
Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account.  The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees.  The projects shall address the research, education, and outreach missions of the University of California.  UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13.     The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants.  To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII.   TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14.     DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident.  DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15.     DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 393 of 501 Page
ID #:10618
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 26 of 102 Page ID #:115

Subaccount, including return on investments or accrued interest, subject to the provisions of this Consent Decree.

16. The Natural Resource Trustees commit to the expenditure of the funds set forth in Paragraph 12 for the design, implementation, permitting (as necessary), monitoring, and oversight of Restoration projects and for the costs of complying with the requirements of the law to conduct a Restoration planning and implementation process. The Natural Resource Trustees will use the funds to Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including lost human use of such services, injured, lost, or destroyed as a result of the Refugio Incident and for the administration and oversight of these Restoration projects.

17. The specific projects or categories of projects will be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which public notice, opportunity for public input, and consideration of public comment will be provided. Plains shall have no responsibility nor liability for implementation of the Restoration Plan or projects relating to the Refugio Incident, including any future project costs other than the payments set forth in Section VII herein. The Trustees jointly retain the ultimate authority and responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD Subaccount to Restore Natural Resources in accordance with applicable law, this Consent Decree, and any memorandum or other agreement among them.

## VIII. TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

18. CDPR shall allocate the monies paid pursuant to Paragraph 12 for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 22 -

19.     The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20.     UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX.     INJUNCTIVE RELIEF

21.     Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22.     Material Changes to Plains' IMP.

    a.     Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

        1)     Procedure for the Assessment of In-Line Inspection ("ILI") Results;

        2)     Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

        3)     White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:20-cv-02415 Document 6-1   Filed 03/15/20   Page 28 of 102   Page ID #:121

>        4)      Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"
>
>        5)      Section 11.4, "Documentation of P&M Evaluation Meetings;" and
>
>        6)      Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.      At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c.      In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.      In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation.  The parties may mutually agree to extend the period by no more than thirty (30)

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

Case 2:20-cv-02413-SVW-SSC Document 6-1 Filed 03/15/20 Page 29 of 102 Page ID #:122

Days.  Following the notice period specified in Subparagraphs 22.b and 22.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII.  Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

23.    Material Changes in Control Room Management Plan and Control Center General Procedures.

a.    Plains' Control Room Management Plan and Control Center General Procedures (collectively, "Control Center Plan and Procedures") shall serve as the baseline Control Center Plan and Procedures for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4, 9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0, and 500-12 of its Control Center General Procedures throughout the term of this Consent Decree without following the process set forth in this Paragraph.  For purposes of this Paragraph, the term "material change" refers to any substantive modification in the Control Center Plan and Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.    At least thirty (30) Days prior to making a material modification to the above sections of  its Control Room Management Plan and Control Center General Procedures, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 25 -

Case 2:20-cv-02415  Document 6-1  Filed 03/15/20  Page 30 of 102  Page ID #:123

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

c.      In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.      In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days.  Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24.      Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals.  Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 398 of 501 Page
Case 2:20-cv-02425-VW-SSC Document 6-1 Filed 03/15/20 Page 31 of 102 Page ID #:124
ID #:10623

obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

## X.     CORRECTIVE ACTION ORDER

25.     Upon the Effective Date of this Consent Decree, the PHMSA CAO shall close and be of no further force or effect.  All outstanding terms and obligations under the PHMSA CAO as of the Effective Date and which Plains is still required to implement under this Consent Decree are set forth in Appendix D.

## XI.     STIPULATED PENALTIES

26.     Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below.  A violation includes failing to perform any obligation required by the terms of this Consent Decree according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

27.     <u>Late Payment of Civil Penalties and NRD Payment</u>.

a.     If Defendants fail to pay any portion of the Penalty Payment to the United States required under Section V (Civil Penalties) when due, Defendants shall pay to the United States a stipulated penalty of ten thousand dollars ($10,000) per Day for each Day payment is late.

b.     If Defendants fail to pay any portion of the Penalty Payment to the CDFW and/or RWQCB as required under Section V (Civil Penalties) when due, Defendants shall pay to the CDFW and/or RWQCB a stipulated penalty of ten thousand dollars ($10,000) each, as applicable, per Day for each Day payment is late.

c.     If Defendants fail to pay any portion of the NRD Payments

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 27 -

required under Section VI (Natural Resource Damages) when due, Defendants shall pay a stipulated penalty of five thousand dollars ($5,000) to the United States, and five thousand dollars ($5,000) to the State Trustees, per Day for each Day payment is late.

28. Stipulated Penalties for Non-Performance of Injunctive Relief. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section IX (Injunctive Relief) when due:

a. For failure to timely submit to OSFM the applications for State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of Appendix B;

b. For failure to implement the Integrity Management provisions as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix B;

c. For failure to timely submit to OSFM the EFRD analyses as specified in paragraphs 5.A-5.B of Appendix B;

d. For failure to timely submit to OSFM the risk analysis as specified in paragraph 6.A of Appendix B;

e. For failure to timely submit to PHMSA the modified Section 9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

f. For failure to timely submit to PHMSA the modified P&M Recommendation forms, as specified in paragraph 9.B of Appendix B;

g. For failure to timely conduct EFRD analyses for all Regulated Pipelines for which Plains has not previously conducted an EFRD analysis, as specified in paragraph 10.A of Appendix B;

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 28 -

h.      For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i.      For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j.      For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k.      For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l.      For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m.      For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n.      For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o.      For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p.      For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q.      For failure to timely conduct the surveys and update the

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 29 -

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 401 of 501    Page
Case 2:20-cv-02415   Document 6-1    Filed 03/15/20    Page 34 of 102    Page ID #:127
ID #:10626

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r.      For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s.      For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t.      For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u.      For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v.      For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w.      For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x.      For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y.      The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 30 -

29.     <u>Stipulated Penalties for Non-Compliance with Corrective Action Order Terms.</u>  Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section X (Corrective Action Order) when due:

    a.     For operation of Line 901 in violation of paragraph 1.a of Appendix D;

    b.     For failure to timely submit to OSFM a Line 901 Restart Plan, as specified by paragraph 1.b of Appendix D;

    c.     For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 901 specified by paragraphs 1.c and 1.d of Appendix D;

    d.     For operation of Line 903, in violation of paragraph 1.e of Appendix D;

    e.     For failure to timely submit to OSFM a Line 903 Restart Plan, as specified by paragraph 1.f of Appendix D;

    f.     For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 903 specified by paragraphs 1.g and 1.h of Appendix D;

    g.     For failure to timely submit to OSFM any notification specified by paragraph 1.i of Appendix D; and

    h.     For failure to submit to OSFM a final Appendix D Documentation Report, as specified by paragraph 1.j of Appendix D.

    i.     The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30.     Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31.     For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32.     For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33.     For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34.     For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 32 -

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 404 of 501   Page
ID #:10629
Case 2:20-cv-02415-VDocument 6-1   Filed 03/15/20   Page 37 of 102   Page ID #:130

a.      Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b.      Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c.      Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d.      If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35.     For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36.     For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties).  Any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 33 -

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 405 of 501    Page
ID #:10630
Case 2:20-cv-02415    Document 0-1    Filed 03/15/20    Page 38 of 102    Page ID #:131

transmittal correspondence shall state that payment is for stipulated penalties and shall identify the date of the written demand to which the payment corresponds.

37.    Stipulated penalties under this Section shall begin to accrue on the Day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed, or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

38.    The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

39.    The applicable State Agencies may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to the applicable State Agencies under this Consent Decree.

40.    Stipulated penalties shall continue to accrue as provided in Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid until the following:

a.    If the dispute is resolved by agreement or by a decision of the United States or the State Agencies, as applicable, that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States or the State Agencies, as applicable, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or the State Agencies' decision.

b.    If the dispute is appealed to the Court and the Plaintiffs prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

c.      If any Party appeals the Court's decision and a Plaintiff prevails in whole or in part, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

41.      If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State Agencies from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

42.      The payment of stipulated penalties, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

43.      Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State Agencies (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offsets measures, and/or contempt) for Defendants' violation of this Consent Decree or applicable laws.

## XII.   FORCE MAJEURE

44.      "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation.  The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 407 of 501   Page
ID #:10632
Case 2:20-cv-02415 Document 6-1   Filed 03/15/20   Page 40 of 102   Page ID #:133

potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized.  "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

45.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants first knew that the event might cause a delay.  Within ten (10) Days thereafter, Defendants shall provide in writing to such Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment.  Defendants shall provide with any notice the documentation that Defendants are relying on to support the claim that the delay was attributable to a Force Majeure event. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

46.     If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Plaintiffs for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47. If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

48. If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XIII (Dispute Resolution), in response to Plaintiffs' determination in Paragraph 47 above, it shall do so no later than thirty (30) Days after receipt of Plaintiffs' notice. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 44 and 45. If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to Plaintiffs and the Court.

## XIII. DISPUTE RESOLUTION

49. Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by Plaintiffs to enforce any obligation of Defendants arising under this Consent

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Decree.

50. <u>Informal Dispute Resolution</u>. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendants send the relevant Plaintiff(s) a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement. If the parties cannot resolve a dispute by informal negotiations, then the position advanced by Plaintiffs shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Defendants invoke formal Dispute Resolution procedures as set forth below.

51. <u>Formal Dispute Resolution</u>. Defendants shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on Plaintiffs a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

52. Plaintiffs shall serve their Statement of Position within forty-five (45) Days of receipt of Defendants' Statement of Position. Plaintiffs' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Plaintiffs. Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

53. Defendants may seek judicial review of the dispute by filing with the Court and serving on the relevant Plaintiff(s), in accordance with Section XX (Notices), a motion requesting judicial resolution of the dispute. The motion

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 410 of 501   Page
ID #:10635
Case 2:20-cv-02425   Document 6-1   Filed 03/15/20   Page 43 of 102   Page ID #:136

must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54. Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or by a schedule set by the Court. Defendants may file a reply memorandum to the extent permitted by the Local Rules.

55. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 51, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree, based on the Statements of Position, and under applicable standards of review.

56. The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue until the final resolution of the dispute. Payment shall be stayed pending resolution of the dispute. If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

### XIV. REPORTING

57. After the Effective Date, by March 31 and September 30 of the following years until termination of this Consent Decree per Section XXIV (Termination), Defendants shall submit to the Plaintiffs in accordance with Section XX (Notices) bi-annual reports that shall describe the status of Defendants' compliance with the Consent Decree, including implementation of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

the injunctive relief requirements set forth in Appendices B and D. The report will be organized to show the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement.

## XV.   CERTIFICATION

58.    Each report submitted by Defendants under Section XIV (Reporting) shall be signed by either the Chief Executive Officer, the President, an Executive Vice President, a Senior Vice President, or General Counsel who is an authorized representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on any personal knowledge and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XVI.  INFORMATION COLLECTION AND RETENTION

59.    Plaintiffs and their representatives shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times and upon reasonable notice, upon presentation of credentials, to:

    a.    monitor the progress of activities required under this Consent Decree;

    b.    verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 40 -

c.     obtain documentary evidence, including photographs and similar data; and

d.     assess Defendants' compliance with this Consent Decree.

60.     Until one (1) year after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve or deliver to Plains, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree.  At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

61.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Agencies pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

62.     For any documents, records, or other information required to be submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim of business confidentiality or other protections applicable to the release of information by Plaintiffs, covering part or all of the information required to be submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2.  Plains must mark the claim of confidentiality in writing on each page, and include a statement specifying the grounds for each claim of confidentiality.

63.     The federal agency Plaintiffs are subject to applicable laws

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 41 -

Case 2:20-cv-02413   Document 6-1   Filed 03/15/20   Page 46 of 102   Page ID #:139

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq*.).  If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality.  In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64. For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65. State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq*.).  If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records.  If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66. The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only.  Defendants shall produce all documents required

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:20-cv-02415    Document 6-1    Filed 03/15/20    Page 47 of 102    Page ID #:140

to be produced in connection with this Consent Decree in, at Defendants' option, either native format via electronic media or secure file transfer protocol ("FTP"). Any encryption or access restriction shall be on a container level only, *i.e.*, only the electronic media or the top-level folder containing the documents shall be encrypted and Plaintiffs shall have unrestricted access to the files/folders within the electronic media or the top-level folder without need for additional decryption or access codes.  Regardless of production method or encryption, individual documents shall be produced in a manner that allows the Plaintiffs to view, print, copy, save, download, and share each document within Plaintiffs' own environment without restriction, tracking or monitoring by Defendants, or automatically generated changes to the document (*e.g.*, without entering access codes prior to each download, and without automatically generated watermarks stating the download date and time).

67.    At the conclusion of the information-retention period, Defendants shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of internal document destruction policies for documents, records, or other information subject to the requirements of Paragraph 60.

68.    [*Intentionally left blank.*]

## XVII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69.    This Consent Decree resolves the civil claims of the United States and the State Agencies for the matters alleged in the Complaint filed in this action for the Refugio Incident.

70.    Subject to the reservations of rights specified in Paragraph 71, this Consent Decree also resolves all civil and administrative penalty claims that could be brought by PHMSA, for violations of the Pipeline Safety Laws specified below that occurred on any of Defendants' Regulated Pipelines prior to January 28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of Defendants' Regulated Pipelines and other pipeline facilities began.  The specific

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

    a.    49 C.F.R. Part 194 Subpart B – Response Plans;

    b.    49 C.F.R. Part 195 Subpart B – Reporting;

    c.    49 C.F.R. Part 195 Subpart E – Pressure Testing;

    d.    49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

    e.    49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

    f.    49 C.F.R. Part 195 Subpart H – Corrosion Control;

    g.    49 C.F.R. Part 199 – Drug and Alcohol Testing; and

    h.    All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71.    The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72.    This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 416 of 501   Page
Case 2:20-cv-02415-VW-SSC   Document 6-1   Filed 03/15/20   Page 49 of 102   Page ID #:142
ID #:10641

January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019.  The specific Pipeline Safety Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

        a.     The Pipeline Safety Laws specified in Paragraph 70; and

        b.     California Government Code §§ 51012.3, 51013, 51013.5, 51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only), and 51018.

73.    For any reportable pipeline accident, as defined in 49 C.F.R. § 195.50, occurring on or after January 28, 2019, on any of Defendants' Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA and OSFM to sue or pursue administrative or other remedies for violations (including penalties) under the Pipeline Safety Laws and the Elder California Pipeline Safety Act for such accident.  Nothing in Paragraphs 70 through 72 shall be construed to limit the legal and equitable remedies of the United States or State Agencies, other than PHMSA and OSFM.

74.    The United States and the State Agencies reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State Agencies to obtain penalties, injunctive relief, or other administrative or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other federal or state laws, regulations, or permit conditions, except as specified in Paragraphs 69, 70, and 72.

75.    The United States reserves all legal and equitable remedies to address any imminent and substantial endangerment or threat to the public health or welfare or the environment arising at, or posed by, Defendants' operations, whether related to the violations addressed in this Consent Decree or otherwise. PHMSA further reserves the right to issue to Defendants corrective action orders pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

§ 190.236; and safety orders pursuant to 49 C.F.R. § 190.239. The State Agencies reserve all legal and equitable remedies under California Government Code §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8, California Water Code §§ 13301, 13304, 13340, and 13386, and California Health & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating a substantial risk of an unauthorized discharge of oil into waters of the State of California, (2) a discharge of waste threatening to cause a condition of pollution or nuisance, or (3) a discharge which poses a substantial probability of harm to persons, property or natural resources.

76. This Consent Decree also shall not be construed to in any way limit or waive the claims set forth in the case entitled *California State Lands Commission, et al. v. Plains Pipeline, L.P., et al.*, Case No. 18CV02504 (Cal. Sup. Court) and Case No. B295632 (Cal. Ct. App.).

77. In any subsequent administrative or judicial proceeding initiated by the United States or the State Agencies for injunctive relief, civil penalties, other appropriate relief relating to Defendants' violations alleged in Plaintiffs' Complaint, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State Agencies in the subsequent proceeding should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 69, 70, and 72.

78. This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 46 -

commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

79. This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State Agencies against any third-parties, not party to this Consent Decree, nor does it limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

80. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

81. Plaintiffs will not submit any claim for restitution for Natural Resource Damages in *The People of the State of California v. Plains All American Pipeline, L.P.,* Case No. 1495091 (Cal. Sup. Court).

82. By entering into this settlement, Defendants do not admit the Pipeline Safety Laws violations alleged in the Complaint or described in this Consent Decree by the United States on behalf of PHMSA; therefore, any allegations of violations of these Pipeline Safety Laws do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of violations set forth in the Complaint may be: (1) considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains, and (2) used for statistical purposes to identify violations that PHMSA deems as causal to an incident or to increase the consequences of an incident. Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

be considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains.

83.     By entering into this settlement, Defendants do not admit the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint; therefore, any allegations of violations of these statutes do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree.  However, the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint may be considered by the State Water Resources Control Board or Regional Water Quality Control Boards to constitute prior offenses in any future enforcement action brought by any of these agencies against Plains.

84.     Subject to the terms of this Consent Decree, no provision contained herein affects or relieves Plains of their responsibilities to comply with all applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or state laws, and the regulations and orders issued thereunder.  Subject to the terms of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of access, entry, inspection, and information-gathering or their authority to bring enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, the regulations and orders issued thereunder, or any other applicable provision of federal or state law.

85.     Defendants hereby covenant not to sue Plaintiffs for any claims related to the Refugio Incident, or response activities in connection with the Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, or any other law or regulation for acts or omissions through the date on which this Consent Decree is lodged with the Court.

86.     Defendants covenant not to sue and agree not to assert any direct or

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 48 -

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87.     The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

## XVIII.   TRANSFER AND ACQUISITION OF ASSETS

88.     In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision.  Those provisions of Appendix B are:

        a.     For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;

        b.     For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;

        c.     For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and

        d.     For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89.     In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer.  Defendants shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 49 -

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements.  Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree.  Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90.     In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree.  Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer.  Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91.     For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX.  COSTS

92.     Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 50 -

attorneys' fees; provided, however, the United States and the State Agencies shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

**XX.   NOTICES**

93.     Unless otherwise specified in this Consent Decree, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent electronically by email provided by the Parties, and addressed to all Parties as follows:

As to the United States by email:  eescdcopy.enrd@usdoj.gov
Re: DJ # 90-5-1-1-11340

As to the United States by mail:  EES Case Management Unit
Environment and Natural Resources
   Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Re: DJ # 90-5-1-1-1130

As to PHMSA:     James M. Pates
Assistant Chief Counsel
   for Pipeline Safety
U.S. Department of Transportation
Pipeline and Hazardous Materials
   Safety Administration
1200 New Jersey Ave. SE. E-26
Washington, DC. 20590

As to EPA:     Andrew Helmlinger
Attorney Advisor
U.S. EPA Region IX
75 Hawthorne Street (ORC-3)
San Francisco, California 94104

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 423 of 501 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 56 of 102 Page ID #:149
ID #:10648

As to DOI:                              Clare Cragan
U.S. Department of the Interior
Office of the Solicitor
755 Parfet St., Suite 151
Lakewood, Colorado 80215

As to NOAA:                         National Oceanic and Atmospheric
       Administration
Office of General Counsel
Natural Resources Section
ATTN: Christopher J. Plaisted
501 W. Ocean Blvd, Suite 4470
Long Beach, California 90802

As to USCG:                         Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center,
       US Coast Guard
2703 Martin Luther King Jr. Ave SE
Washington, DC 20593-7605

As to the State Agencies:      Michael Zarro
Deputy Attorney General
Office of the Attorney General
Natural Resources Law Section
300 S. Spring St., Suite 11220
Los Angeles, California 90013

As to CDFW:                       California Department of Fish
       and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater
Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

As to CDPR:                    California Department of Parks and
                                   Recreation
                               Attn: Laura A. Reimche, Senior Counsel
                               1416 Ninth Street, Room 1404-6
                               Sacramento, California 95814

As to CSLC:                    California State Lands Commission
                               Attn: Patrick Huber, Legal Division
                               100 Howe Avenue, Suite 100-South
                               Sacramento, California 95825

As to OSFM:                    California Department of Forestry and
                                   Fire Protection
                               Legal Services Office
                               Attn: Joshua Cleaver, Staff Counsel
                               P.O. Box 944246
                               Sacramento, California 94244-2460

As to RWQCB:                   California Central Coast Regional Water
                               Quality Control Board
                               Attn: Naomi Rubin, Attorney III
                               801 K Street
                               Sacramento, California 95814

As to UC:                      Barton Lounsbury, Senior Counsel
                               University of California
                               Office of the General Counsel
                               1111 Franklin Street, 8th Floor
                               Oakland, California  94607

As to Defendants:              Megan Prout
                               Senior Vice President
                               Commercial Law and Litigation
                               333 Clay Street, Suite 1600
                               Houston, Texas  77002

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 53 -

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 425 of 501 Page
Case 2:20-cv-02425-VW Document 6-1 Filed 03/15/20 Page 58 of 102 Page ID #:151
ID #:10650

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California  95814

94. Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95. Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

### XXI.   EFFECTIVE DATE

96. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

### XXII.   RETENTION OF JURISDICTION

97. The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

### XXIII.   MODIFICATION

98. The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

99.     Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV.   TERMINATION

100.   After Defendants have:  (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation.  Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101.   Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement.  The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102.   If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution).  However, Defendants shall not seek Dispute Resolution of

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 55 -

any dispute regarding termination until sixty (60) Days after receipt of the Plaintiffs' response to Defendants' Request for Termination.

### XXV. PUBLIC PARTICIPATION

103. This Consent Decree shall be lodged with the Court for a period of not fewer than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The Parties agree and acknowledge that the final approval by Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the Consent Decree and a public comment period. Plaintiffs reserve the right to withdraw or withhold consent if the comments disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

104. Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless Plaintiffs have notified Defendants in writing that Plaintiffs no longer support entry of the Consent Decree.

### XXVI. SIGNATORIES/SERVICE

105. Each undersigned representative of Defendants, the State of California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB, UC, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, PHMSA, and EPA certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

106. This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect. For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by emailed PDF) shall have the same effect as an original.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 428 of 501 Page
ID #:10653
Case 2:20-cv-02425 Document 6-1 Filed 03/15/20 Page 61 of 102 Page ID #:154

## XXVII.   INTEGRATION

107.   This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII.      FINAL JUDGMENT

108.   Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109.   For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of _____, 20__.

_____
UNITED STATES DISTRICT JUDGE

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 57 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES OF AMERICA:

3/12/2020

Date

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
  Division U.S. Department of Justice

3/13/2020

Date

BRADLEY R. O'BRIEN
ANGELA MO
Environmental Enforcement Section
Environment and Natural Resources

Division

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 58 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

3 March 2020
Date

PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety
      Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 59 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20

Date

_____

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance
Assurance

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2/26/2020

Date

AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance
      Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 61 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

3/4/2020
Date

THOMAS M. CULLEN, JR.
Administrator
Office of Spill Prevention and Response

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 62 -

Case 2:26-cv-05242-SVW-SSC Document 203 Filed 05/14/26 Page 434 of 501 Page
Case 2:20-cv-02415 Document 1 Filed 03/13/20 Page 67 of 102 Page ID #:10659
ID #:10659

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

3/2/20
Date

*Lisa Ann L Mangat*
LISA ANN L. MANGAT
Director
California Department of Parks
and Recreation

Case 2:20-cv-02415   Document 1   Filed 03/15/20   Page 68 of 102   Page ID #:161

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

2/28/2020

Date

JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 64 -

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 436 of 501   Page
ID #:10661
Case 2:20-cv-02415   Document 0-1   Filed 03/15/20   Page 69 of 102   Page ID #:10662

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020
_____
Date

_____
THOMAS W. PORTER
Director
California Department of Forestry and
Fire Protection

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION:

March 2, 2020
_____
Date

JOHN ROBERTSON
Executive Officer
Central Coast Regional Water
    Quality Control Board

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 66 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

3/3/20
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

_____
Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

_____
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

3 March 2020
Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67A -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS ALL AMERICAN PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 68 -

Case 2:26-cv-05242-SVW-SSC   Document 223   Filed 05/14/26   Page 441 of 501   Page
Case 2:20-cv-02415-SVW-SSC   Document 1   Filed 03/16/20   Page 74 of 102   Page ID #:1674
ID #:10666

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 69 -

# APPENDIX A

# (*Set of maps that generally depict Lines 901, 903, and 2000*)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*



*Appendix A – Line 901*

Scale: 1:100,000

Sheet No:  1/1

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.



*Appendix A – Line 903*

PLAINS
ALL AMERICAN
PIPELINE, L.P.

Owner:

Scale: 1:700,000

Sheet No: 1/1



*Appendix A – Line 2000*

Scale: 1:966,574

Sheet No: 1/1

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.

# APPENDIX B

## *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-74-

Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 80 of 102   Page ID #:173

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1.  **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

    A.  Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901.  Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

    B.  Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

    C.  Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

    D.  Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

    E.  To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received.  Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver.  Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2.  **Replacement, Restart, or Abandonment of Lines 901 and 903:**

    A.  Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners.  Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

1.  On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

    a.  Test for potential AC/DC interference.  Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

    b.  Conduct a close interval survey (CIS) and AC/DC interference survey.

    c.  Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B.  As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C.  As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3.  **Third-Party Analysis of Line 2000 ILI Data**

    A.  Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

    B.  The consultant shall:

        1.  Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

        2.  Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

        3.  Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

        4.  Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

5.  Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6.  Comply with additional requirements specified in the scope of work.

C.  The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1.  The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2.  The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3.  Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4.  Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4.  **Integrity Management**

A.  For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1.  Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a.  In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

-77-

loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b.      Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c.      When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d.      Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e.      Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f.      Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g.      For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h.      Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i.      Integrate and analyze available data in its P&M process, including:

        i.      Assessment data from ILI tool runs;

        ii.     Dig and repair data;

4

-78-

Case 2:26-cv-05242-SVW-SSC    Document 223    Filed 05/14/26    Page 451 of 501   Page
ID #:10676
Case 2:20-cv-02415    Document 6-1    Filed 03/15/20    Page 84 of 102   Page ID #:177

iii.    Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv.    Operational data, such as pressure and flow data;

v.    Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi.    Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii.    Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2.    ILI Measures

a.    <u>Initial ILI Runs</u>.  Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU).  Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data.  If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i.    All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

5

-79-

ii. In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run. If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

b. <u>Subsequent ILI Runs</u>. After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year. Alternatively, Plains may run a UT tool each year. If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

c. <u>All ILI Runs</u>. Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5. **Valves**

A. Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

1. Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

2. Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B. Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C. Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 453 of 501   Page
Case 2:20-cv-02423-VBF   Document 6-1   Filed 03/15/20   Page 36 of 102   Page ID #:179
ID #:10678

6.      **Risk Analysis**

     A.      For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

         1.      Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

             a.      The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

             b.      Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis. The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

             c.      The risk analysis shall be due within one year from entry of the CD.

7.      **Leak Detection**

     A.      For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

     B.      Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8.      **Non-waiver**

     A.      Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

**ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES**

9.      **Integrity Management**

     A.      New Procedures for Interim Reviews and Assessments

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 454 of 501   Page
Case 2:20-cv-02415-VW-SSC    Document 6-1    Filed 03/15/20    Page 37 of 102   Page ID #:180
ID #:10679

1.     Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment.  If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment.  Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2.     Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review.  Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3.     Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD.  If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B.     Documentation for P&M Recommendations

1.     Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

   a.     What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

   b.     The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

8

-82-

Case 2:26-pv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 455 of 501   Page
Case 2:20-cv-02425   Document 6-1   Filed 03/15/20   Page 88 of 102   Page ID #:181
ID #:10680

       c.       The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

    2.       In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

    3.       In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C.    Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented.  Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

10.  **Valves and O&M**

A.    Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B.    Within two years of entry of the CD, Plains shall develop and implement procedures to:

    1.       If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

    2.       Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

    3.       Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

    4.       Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C.    Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

Case 2:26-cv-05242-SVW-SSC   Document 23/15/26   Filed 05/14/26   Page 456 of 501   Page
Case 2:20-cv-02413-VW-SSC   Document 6-1   Filed 03/15/20   Page 39 of 102   Page ID #:182
ID #:10681

D.      For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

         1.      Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room.  Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E.      Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11.    **Leak Detection**

A.      Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

         1.      Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B.      For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C.      Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

         1.      Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D.      Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

         1.      Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

10

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E.    Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection.  The results of the meetings will be documented and shared with appropriate personnel.  The recommendations will be evaluated and documented.

F.    Instrumentation and Display

1.    To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

a.    Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

b.    Track these conditions through to resolution, including instrumentation relocation when necessary.

12.  **Control Room Management**

A.    For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

1.    Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

2.    Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

3.    Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

4.    Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

11

B.      For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C.      Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13.   **Emergency Response and Oil Spill Response Plans**

A.      California-Specific Provisions:

1.      Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05.  Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B.      Company-Wide Provisions

1.      Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

2.      Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response.  Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

3.      Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

12

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 459 of 501   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 92 of 102   Page ID #:185
ID #:10684

Plains.  Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills.  Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4.      Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter.  Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5.      Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment).  Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill.  Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6.      For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14.   **Safety Management System (SMS)**

A.   Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1.      Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173.  Plains shall direct the third party to transmit a copy of the final report to PHMSA.  Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

B.      Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15.      **Drug and Alcohol Program**

A.      Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 461 of 501   Page
Case 2:20-cv-02425   Document 6-1   Filed 03/15/20   Page 94 of 102   Page ID #:187
ID #:10686

# APPENDIX C

# (*Intentionally left blank*)

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.
Consent Decree*

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 462 of 501   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 95 of 102   Page ID #:188
ID #:10687

# APPENDIX D

# *(Remaining Corrective Actions from the PHMSA CAO)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-90-

Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 96 of 102   Page ID #:189

# APPENDIX D

1.      All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

    a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

    b. **Restart Plan for Line 901.**  If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval.  Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree.  The Restart Plan shall include:

        1)      Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

        2)      Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

        3)      Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

        4)      A specific day-light restart that includes advance communications with local emergency response officials;

        5)      Master Control Room enhancements, including:

            a)  Implementation of advanced leak-detection

Case 2:20-cv-02415-VW-SSC Document 6-1 Filed 03/15/20 Page 97 of 102 Page ID #:190

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1. Revised alarm threshold adjustments;

2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 465 of 501 Page
ID #:10690
Case 2:20-cv-02425 Document 6-1 Filed 03/15/20 Page 98 of 102 Page ID #:191

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6)      Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7)      Installation of additional safety valves as a result of Plains' EFRD evaluation;

8)      Installation of additional pressure sensors as a result of Plains' surge study;

9)      Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM.  The tool run shall be initiated during daylight hours.  If the tool run does not collect a complete data set, the UT tool shall be promptly re-run.  A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report.  Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10)    **Corrosion Prevention.**  Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan.  Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

Case 2:20-cv-02415-V   Document 6-1   Filed 03/13/20   Page 100 of 102   Page ID #:199

903 to the OSFM for review and approval.  Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree.  In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

    1)    Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

    2)    Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

    3)    Provisions for a daylight restart and advance communications with local emergency response officials.

g.  **Line 903 Return to Service.**  After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h.  **Removal of Pressure Restriction for Line 903.**  After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

    1)    The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)      The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction.  Requests for removal of the pressure restriction may be submitted by pipeline segment.

i. **Notifications.**  Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j. **Reporting Requirements for Lines 901 and 903.**  If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)      The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)      Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 102 of 102 Page ID #:1959

3)     The Appendix D Documentation Report shall include but not be limited to:

  A.   Table of Contents;

  B.   [*intentionally left blank.*]

  C.   [*intentionally left blank.*]

  D.   Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

  E.   [*intentionally left blank.*]

  F.   [*intentionally left blank.*]

  G.   Lessons learned while fulfilling the requirements of this Appendix D.

# EXHIBIT E

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                                              Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08**

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:   LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR
LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON
THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG
A LONGITUDINAL SEAM WELD (CA-324)**

Operator:    Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

Pipeline:    OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable
Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara
County, California as described in the request of state waiver dated April 24,
2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.)*, § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Docusign Envelope ID: 87418E7A-ED76-4891-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
   b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

**In-Line Inspection (ILI) Assessment and Frequency**

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

   a) Dates for integrity assessment
   b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 6

        segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

c) In-line inspection tool vendor(s)

d) Required tool specifications including operational specifications and anomaly sizing tolerances

e) Tool validation methodology

f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

g) Criteria used to identify locations for excavation and field verification

h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

  a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

  b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different.  If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a.  Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b.  Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

## 180-Day Repair Conditions[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
   a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Lance Yearwood
December 17, 2024
Page 11

    b.  Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c.  After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.  Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    a.  Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

    b.  Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 87418E7A-ED76-4891-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 13

e. Evaluation methodology used
f. Models used
g. Direct in situ examination data
h. All in-line inspection tool assessments information evaluated
i. Pressure test data and results
j. All in-the-ditch assessments performed on the pipeline segments
k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
l. All finite element analysis results
m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
o. Safety factors used for fatigue life and/or predicted failure pressure calculations
p. Reassessment time interval and safety factors
q. The date of the review
r. Confirmation of the results by qualified technical subject matter expert(s)
s. Approval by responsible Sable management personnel
t. Records of additional preventive and mitigative (P&M) measures performed
u. Reports required by this State Waiver.

**Reporting**

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324.* The email notification shall include, if applicable:
    a. Tool type and run date
    b. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    c. Dig sheets
    d. Field contact information for Sable
    e. Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 14

      a. Tool type
      b. Run date
      c. Summary of Conditions Report[18]
      d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324*. At a minimum, the annual report shall contain the following, if applicable:

      a. A Closure Report for the previous calendar (CY) which contains:
            i. Features that were remediated in previous CY
                1. Provide documentation for the in-the-ditch assessments and repairs
            ii. Identify features that remain to be assessed
            iii. Unity Plots for previous ILI runs
      b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
      c. The third-party ILI expert reviews in accordance with Condition 52
      d. AC and DC Interference surveys that are due in accordance with Condition 53
      e. A copy of the CGRA for prior year including:
            i. Mean corrosion growth rate for the pipeline
            ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 87418E7A-ED76-4884-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 15

> failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
>
> 66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
>
> 67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Tuan Tran, Pipeline Safety Engineer, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Max Kieba, Engineering and Research Division, PHMSA
       Joshua Johnson, Engineering and Research Division, PHMSA

# EXHIBIT F

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov

## CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**  **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A/B)**

**Operator:**   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**Pipeline:**   OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

## General Conditions

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Lance Yearwood
December 17, 2024
Page 4

8.  Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
    a.  API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
    b.  API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.
    At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 5

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.

14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours.  Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.

16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.

18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 6

**In-Line Inspection (ILI) Assessment and Frequency**

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination
20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 7

> any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.
    a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.
    b. USCD Performance Specification Requirements
        i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.
        ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.
        iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.
        iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to  meet  the  tool  accuracy specification  provided  by  the  vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different.  If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a.  Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b.  Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.
    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.
    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
   a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
   b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 13

      n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

      o. Safety factors used for fatigue life and/or predicted failure pressure calculations

      p. Reassessment time interval and safety factors

      q. The date of the review

      r. Confirmation of the results by qualified technical subject matter expert(s)

      s. Approval by responsible Sable management personnel

      t. Records of additional preventive and mitigative (P&M) measures performed

      u. Reports required by this State Waiver.

## Reporting

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B*. The email notification shall include, if applicable:

      d. Tool type and run date

      e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

      f. Dig sheets

      g. Field contact information for Sable

      h. Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:

      i. Tool type

      j. Run date

      k. Summary of Conditions Report[18]

      l. Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B.* At a minimum, the annual report shall contain the following, if applicable:

    a. A Closure Report for the previous calendar (CY) which contains:
        i. Features that were remediated in previous CY
            1. Provide documentation for the in-the-ditch assessments and repairs
        ii. Identify features that remain to be assessed
        iii. Unity Plots for previous ILI runs
    b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
    c. The third-party ILI expert reviews in accordance with Condition 53
    d. AC and DC Interference surveys that are due in accordance with Condition 54
    e. A copy of the CGRA for prior year including:
        i. Mean corrosion growth rate for the pipeline
        ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## **Limitations**

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 15


Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Tuan Tran, Pipeline Safety Engineer, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Max Kieba, Engineering and Research Division, PHMSA
       Joshua Johnson, Engineering and Research Division, PHMSA