# EXHIBIT AA

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:     (213) 576-1000
Facsimile:      (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:     (310) 620-5879
Facsimile:      (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

*Additional Counsel Listed on Signature Page*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>        Petitioners and Plaintiffs,<br><br>      v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>        Respondents and Defendants,<br><br>     and<br><br>SABLE OFFSHORE CORP., et al.,<br><br>        Real Parties in Interest. | Case No. 25CV02244<br>[Coordinated with Case No. 25CV02247]<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION**<br><br>[*Filed concurrently with Declarations of Steve Rusch, Michael A. Mische, Bart Leininger, Brien Vierra, and Michael Rosenfeld; Objections to Evidence*]<br>Date:      July 18, 2025<br>Time:     10:00 AM<br>Dept.:     4<br><br>Complaint Filed:    April 15, 2025<br>Trial Date:      None set |

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ...........................................................................................................7

II.  BACKGROUND .............................................................................................................7

III. ARGUMENT...................................................................................................................9

    A.   Petitioners Have No Likelihood of Success on the Merits. .......................................10

        1.   Petitioners' Lawsuits Do Not Present a Live and Justiciable Controversy. ..................................................................................................................10

        2.   OSFM Complied with Applicable Federal Pipeline Safety Laws in Issuing the State Waivers. ...................................................................................11

        3.   OSFM Did Not Violate CEQA. ...................................................................14

    B.   Petitioners Fail to Demonstrate That They Will Suffer Irreparable Harm Absent Preliminary Relief. ......................................................................................17

        1.   The Federal Consent Decree Precludes Petitioners from Asserting That They Will Be Irreparably Harmed by the Restart of the Pipelines. ................18

        2.   Petitioners Have Not Demonstrated Significant Harm to Themselves or the Environment. ............................................................................................19

        3.   Preventing the Transport of the Supply of Oil Through the Las Flores Pipelines Will Significantly Harm Sable and the Public. ...............................20

IV.  CONCLUSION..............................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**STATE CASES**

*Butt v. State of California*
(1992) 4 Cal.4th 668 ...............................................................................................10

*Casmalia Resources, Ltd. v. County of Santa Barbara*
(1987) 195 Cal.App.3d 827 ....................................................................................17

*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.*
(1998) 60 Cal.App.4th 1053 ...................................................................................18

*City of Morgan Hill v. Bay Area Air Quality Mgmt. Dist.*
(2004) 118 Cal.App.4th 861 ...................................................................................14

*City of Vernon v. Cent. Basin Mun. Water Dist.*
(1999) 69 Cal.App.4th 508 .....................................................................................19

*Cohan v. City of Thousand Oaks*
(1994) 30 Cal.App.4th 547 .....................................................................................13

*Cohen v. Board of Supervisors*
(1985) 40 Cal.3d 277 ..............................................................................................10

*Fowler v. City of Lafayette*
(2020) 46 Cal.App.5th 360 .....................................................................................13

*Friends of Juana Briones House v. City of Palo Alto*
(2010) 190 Cal.App.4th 286 ...................................................................................15

*Galbiso v. Orosi Pub. Util. Dist.*
(2010) 182 Cal.App.4th 652 ...................................................................................13

*Gates v. Superior Court*
(1986) 178 Cal.App.3d 301 ....................................................................................18

*Hutnick v. U.S. Fiduciary & Guarantee Co.*
(1988) 47 Cal.3d 456 ..............................................................................................10

*Muzzy Ranch Co. v. Solano County Airport Land Use Com.*
(2007) 41 Cal.4th 372 .............................................................................................15

*People ex rel. Sneddon v. Torch Energy Services, Inc.*
(2002) 102 Cal.App.4th 181 ...................................................................................11

*Placer Foreclosure, Inc. v. Aflalo*
(2018) 23 Cal.App.5th 1109 ...................................................................................10

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

*San Diego Navy Broadway Complex Coalition v. City of San Diego*
  (2010) 185 Cal.App.4th 924 ...................................................................................................16

*San Lorenzo Valley Community Advocates for Responsible Educ. v. San Lorenzo Valley*
  *Unified School Dist.*
  (2006) 139 Cal.App.4th 1356 .................................................................................................16

*Sargon Enterprises, Inc. v. University of Southern California*
  (2012) 55 Cal.4th 747 ............................................................................................................19

*SB Liberty, LLC v. Isla Verde Assn., Inc.*
  (2013) 217 Cal.App.4th 272 ..................................................................................................10

*Sierra Club v. County of Sonoma*
  (2017) 11 Cal.App.5th 11 .......................................................................................................15

**FEDERAL CASES**

*City & County of San Francisco v. U.S. Dept. of Transp.*
  (9th Cir. 2015) 796 F.3d 993 .................................................................................................12

*IBP, Inc. v. Alvarez*
  (2005) 546 U.S. 21 .................................................................................................................13

*In re MidAmerican Energy Company*
  (Jan. 15, 2002) 2002 WL 31155601 ......................................................................................12

*Olympic Pipe Line Co. v. City of Seattle*
  (9th Cir. 2006) 437 F.3d 872 .................................................................................................11

*United States of America et al. v. Plains All American Pipeline, L.P. et al.,*
  Case No. 2:20-cv-02415 (C.D. Cal. Mar. 13, 2020).................................................................8

**STATE STATUTES**

Code Civ. Proc., § 464, subd. (a) ...............................................................................................10

Gov. Code, § 51010 ....................................................................................................................11

Gov. Code, § 51011 ....................................................................................................................11

Gov. Code, § 51011(b)..............................................................14Pub. Resources Code, §§ 21000 et.
  seq. ........................................................................................................................................20

Pub. Resources Code, § 21065 ...................................................................................................15

Pub. Resources Code, § 21080(b)...............................................................................................15

Pub. Resources Code, § 21108 ...................................................................................................16

Pub. Resources Code, § 21152 ...................................................................................................16

4

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

Pub. Resources Code, § 21166 ...............................................................................................16, 17

Pub. Res. Code, § 21167.2 ...........................................................................................................17

**FEDERAL STATUTES**

49 U.S.C. §§ 60101 et seq...........................................................................................................11

49 U.S.C. § 60102........................................................................................................................11

49 U.S.C. § 60104(c) ...................................................................................................................11

49 U.S.C. § 60105........................................................................................................................11

49 U.S.C. § 60112(a) ...................................................................................................................13

49 U.S.C. § 60117(p) ...................................................................................................................13

49 U.S.C. § 60118...............................................................................................................12, 13, 15, 16

49 U.S.C. § 60118(c) ...................................................................................................................11

49 U.S.C. § 60118(c)(1)(A) .........................................................................................................14

49 U.S.C. § 60118(d) ...................................................................................................................11

49 U.S.C. § 60119(a)(1)...............................................................................................................12

49 U.S.C. § 60122(a)(1)...............................................................................................................13

Federal Hazardous Liquid Pipeline Safety Act...................................................................11, 12, 13

**STATE REGULATIONS**

Cal. Code Regs., tit. 14, §§ 15000 et seq. ("Guidelines") ........................................................15

Guidelines, § 15062 ...............................................................................................................16

Guidelines, § 15125(a)(1) . ....................................................................................................16

Guidelines, § 15126.4(a)........................................................................................................20

Guidelines, § 15162 ...............................................................................................................17

Guidelines, § 15268 ...............................................................................................................15

Guidelines, § 15300.2(c).........................................................................................................16

Guidelines, § 15301 ...............................................................................................................16

Cal. Code Regs., tit. 19, § 2000 . ................................................................................................11

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

**FEDERAL REGULATIONS**

49 C.F.R. pt. 195 ............................................................................................................11

49 C.F.R. pt. 195, subpt. E..............................................................................................8

49 C.F.R. § 190.3 ...........................................................................................................13

49 C.F.R. § 190.341(d)(1)...............................................................................................12

49 C.F.R. § 190.341(d)(2)...............................................................................................13

74 Fed. Reg. 2893 ..........................................................................................................13

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

## I.  INTRODUCTION

Petitioners' applications for a preliminary injunction have no basis in law or fact.[1]

Petitioners are not likely to succeed on the merits. As detailed in Sable's demurrers and motions to strike, Petitioners' pleadings are deficient. Petitioners' lawsuits challenge the Office of State Fire Marshal's ("OSFM") December 17, 2024 approval of alternative safety requirements (the "State Waivers").  To the extent Petitioners seek to enjoin physical construction, they are too late. Sable has already completed pipeline anomaly repair work.  To the extent Petitioners seek to prevent restart of the Las Flores Pipelines ("Pipelines"), they are too early. The State Waivers do not allow oil to flow through the Pipelines. These deficiencies alone are reason to deny Petitioners' applications. Even if Petitioners' claims were timely, they would still fail.  OSFM did not violate federal pipeline safety laws or CEQA.

Petitioners also fail to identify any concrete harm stemming from OSFM's approval of the State Waivers. Instead, Petitioners allege purely speculative harms they argue could occur upon restart of the Pipelines—all of which were analyzed in the Pipelines' certified Environmental Impact Report/Environmental Impact Statement ("EIR/EIS").  On the other hand, injunctive relief will cause significant and concrete harm to Sable, the public, and the environment. Any injunctive relief that prevents restart of the Pipelines will increase California's reliance on foreign oil, thereby causing significantly higher greenhouse gas emissions and consumer gasoline prices.

The Court should deny Petitioners' requests for a preliminary injunction.

## II.  BACKGROUND

In January 1985, the California State Lands Commission and federal Bureau of Land Management certified a joint EIR/EIS for what was then known as the "Celeron Pipeline Project," which included the construction of what are now called the Las Flores Pipelines.[2] The EIR/EIS analyzed the Pipelines' construction, "operation," and "maintenance." (See Declaration of Bart Leininger ["Leininger

---

[1] Given the substantial overlap in the applications, Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") provide an identical response to both applications.

[2] Two pipelines make up the Las Flores Pipelines. One is the Las Flores Pipeline CA-324 ("Line CA-324") (previously known as Line 901), which transports crude oil approximately 10.9 miles from the Las Flores Pump Station in Las Flores Canyon to the existing Gaviota Pump Station. The other is Las Flores Pipeline CA-325 ("Line CA-325") (previously known as Line 903), which transports crude oil approximately 113.5 miles north from the Gaviota Pump Station to the existing Pentland Delivery Point in Kern County.

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

Decl."], Ex. B [Final EIR/EIS], Abstract, p. 2.[3]) In 1986, the County of Santa Barbara ("County") approved construction of the Pipelines and approved a final development plan, conditional use permit, coastal development permits, and other entitlements. (See *id.*, Ex. D [Planning Commission Action].)

On March 13, 2020, the prior owner and operator of the Pipelines entered into a federal Consent Decree with the United States and the State of California on behalf of several federal and state regulatory agencies—including OSFM—to resolve issues related to the 2015 Refugio oil spill that resulted from a leak in Line CA-324.[4] The Consent Decree imposes a series of prerequisites that the operator must satisfy before restarting the Pipelines, including "apply[ing] for a State Waiver through the OSFM" for safety enhancements to the Pipelines. (Declaration of Steve Rusch ["Rusch Decl."], Ex. N[Consent Decree], Appendix B, ¶¶ 1.A, 1.B.)

In April 2024, Sable submitted State Waiver applications to OSFM for Lines CA-324 and CA-325. (See EDC Pet., Ex. B.) In May 2024, Sable separately began anomaly[5] repair and maintenance work on the pipelines per the Consent Decree and under the County's 1986 approvals and permits that authorized ongoing pipeline maintenance. On February 12 and March 21, 2025, in response to Sable's request to address claims from the California Coastal Commission that the maintenance work was not authorized, the County confirmed that no further permits were required for Sable's anomaly repair work. (See Rusch Decl., ¶¶ 5, 40, Exs. A and O.) Sable completed the anomaly repairs and pipeline hydrotesting under OSFM supervision. (*Id.*, ¶ 11; see 49 C.F.R. Part 195, Subpart E [Pressure Testing].)

Petitioners fully participated in the State Waiver process. "Since learning of [Sable's plans to restart the pipelines], Petitioners have repeatedly put [OSFM] on notice of their concerns." (CBD Pet., ¶ 68.) For instance, on September 27, 2024, Petitioners submitted letters to OSFM as part of its review

---

[3] The EIR/EIS assumed that the Pipelines' operational life would continue until the "availability of crude oil" for use in the Pipelines was exhausted. (Leininger Decl., Ex. C [Draft EIR/EIS], at p. 2-35.)

[4] *United States of America et al. v. Plains All American Pipeline, L.P. et al.*, Case No. 2:20-cv-02415 (C.D. Cal. Mar. 13, 2020).

[5] A pipeline "anomaly" refers to a pipeline segment with some deviation from its original configuration. If an anomaly requires repair, Sable accesses the affected pipeline segment via existing roadways and rights-of-way, excavates the anomaly site, exposes the pipeline segment by removing insulation and sandblasting, repairs the affected pipeline segment, sandblasts the repaired segment, applies an epoxy coating, pipe tape, and rockguard wrap, backfills the anomaly site, and conducts final site cleanup including erosion control and revegetation work.

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

of the State Waiver applications. (See, e.g., EDC Pet., Ex. C; see also CBD Pet., ¶¶ 68-69.) As part of its public process, OSFM created a webpage devoted to Sable's plans, including the State Waivers.[6]

On December 17, 2024, OSFM granted both State Waivers and imposed over sixty separate conditions on Sable's operation of the Pipelines to reflect the enhanced regulatory standards required under the Consent Decree. (EDC Pet., Exs. F &G.) Pursuant to federal law, OSFM notified the federal Pipeline and Hazardous Materials Safety Administration ("Safety Administration") of its decision to approve the State Waivers, giving the Safety Administration an opportunity to review and object to the decision. (CBD Pet., ¶¶ 72, 78.) Upon receiving the State Waivers, the Safety Administration established a federal docket open for public comment.[7] (CBD Pet., ¶ 78.) On December 23, 2024, Petitioners submitted comment letters to the Safety Administration. (See CBD Pet., ¶¶ 73-74.) The Safety Administration reviewed the applications, the State Waivers, and all comments received and, on February 11, 2025, notified OSFM that it had no objection to its issuance of the State Waivers. (See Rusch Decl., Exs. C and D [PHMSA Letters].)

Over two months later, Petitioners filed suit challenging the State Waivers. On June 2, 2025, Petitioners applied *ex parte* for a TRO to stop any potential "harm" the State Waivers allegedly could cause. The Court granted the TRO on June 3, temporarily enjoining Sable and OSFM "from proceeding with the restart and operation of the Las Flores Pipeline System." (TRO, p. 2.)

The Consent Decree separately requires Sable to submit and obtain OSFM's approval of a written "Restart Plan" before restarting either Line CA-324 or Line CA-325. (Rusch Decl., Ex. N[Consent Decree], Appendix D, ¶¶ 1.b, 1.f.) Sable submitted a Restart Plan to OSFM on July 29, 2024. (See Rusch Decl., ¶ 3.) OSFM has taken no final action on the Restart Plan, which remains under review. (*Ibid.*)

## III.    ARGUMENT

In deciding whether to issue the preliminary injunction, the Court must weigh two interrelated factors: (1) the likelihood that the moving party will prevail on the merits at trial and (2) the *relative*

---

[6] The website is available at: https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

[7] The docket for CA-324 is available at: https://www.regulations.gov/docket/PHMSA-2025-0002. The docket for CA-325 is available at: https://www.regulations.gov/docket/PHMSA-2025-0003.

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

interim harm to the parties from issuance or non-issuance of the injunction. (*Butt v. State of California* (1992) 4 Cal.4th 668, 677-678.) The Court should balance "the respective equities of the parties." (*Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286.) The Court's determination "must be guided by a 'mix' of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to support an injunction." (*Butt*, 4 Cal.4th at p. 678.)

### A.   Petitioners Have No Likelihood of Success on the Merits.

The Court "must deny a motion for a preliminary injunction if there is no reasonable likelihood the moving party will prevail on the merits." (*SB Liberty, LLC v. Isla Verde Assn., Inc.* (2013) 217 Cal.App.4th 272, 280 [citing *Common Cause v. Bd. of Supervisors* (1989) 49 Cal.3d 432, 447].) Petitioners fail to show they are reasonably likely to prevail on the merits here. As a threshold matter, Petitioners' claims challenging the State Waivers are moot, and the injunctive relief they seek regarding the hypothetical future approval of a Restart Plan is unripe. Moreover, OSFM complied with all federal pipeline safety laws and CEQA.

### 1.   Petitioners' Lawsuits Do Not Present a Live and Justiciable Controversy.

Petitioners' lawsuits challenge OSFM's issuance of the State Waivers, but Sable already completed the anomaly repair work that Petitioners are attempting to stop through their collateral attack. As a result, Petitioners' claims are moot. (*Placer Foreclosure, Inc. v. Aflalo* (2018) 23 Cal.App.5th 1109, 1113.)

Petitioners' lawsuits also improperly seek injunctive relief "prohibiting [OSFM] and [Sable] from conducting any further activity in furtherance of the Project" (CBD Pet., Prayer for Relief, ¶ 2) and "preventing restart of the [Pipelines] under the State Waivers" (EDC Pet., Prayer for Relief, ¶ 2). However, ***the State Waivers do not control a restart of the Pipelines***. A Restart Plan must be approved before the Pipelines may restart, and none has been approved at this time. Petitioners' requests for injunctive relief are thus unripe.[8]

/ / /

/ / /

---

[8] If a Restart Plan is later approved, Petitioners must seek leave to file a supplemental pleading if they wish to challenge it. (Code Civ. Proc., § 464, subd. (a); *Hutnick v. U.S. Fiduciary & Guarantee Co.* (1988) 47 Cal.3d 456, 464, fn. 6.)

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

### 2.    OSFM Complied with Applicable Pipeline Safety Laws in Issuing the State Waivers.[9]

In addition to being unripe, Petitioners' claims also fail on the merits.

The Pipelines are subject to the federal Hazardous Liquid Pipeline Safety Act ("Pipeline Safety Act") administered by the federal Pipeline and Hazardous Materials Safety Administration ("Safety Administration"). (49 U.S.C. §§ 60101 *et seq.*)[10] The Pipeline Safety Act's singular purpose is to ensure the safe operation of hazardous liquid pipelines. (49 U.S.C. § 60102; *Olympic Pipe Line Co. v. City of Seattle* (9th Cir. 2006) 437 F.3d 872, 877.) The Safety Administration adopted detailed standards governing the design, construction, pressure testing, operation, and maintenance of hazardous liquid pipelines. (See 49 C.F.R. Part 195.)

The Act also provides that state agencies may apply to and become certified by the Safety Administration to enforce equivalent or more stringent intrastate pipeline safety regulations. (49 U.S.C. § 60105.) In California, the State Legislature vested OSFM with the "exclusive safety[,] regulatory and enforcement authority over intrastate hazardous liquid pipelines and … to implement the [Pipeline Safety Act] and federal pipeline safety regulations as to those portions of interstate pipelines located within [California]." (Gov. Code, § 51010.) OSFM adopted the Safety Administration's regulations, and the Safety Administration certified OSFM to implement the Pipeline Safety Act. (Cal. Code Regs., tit. 19, § 2000.) Like the Safety Administration, OSFM may "waive compliance with a safety standard" if the requested modification "is not inconsistent with pipeline safety." (49 U.S.C. §§ 60118(c), (d).) Any such "State Waiver" may become effective only after OSFM provides the Safety Administration with 60 days' notice and the opportunity to make a written objection to its issuance. (*Ibid*.)

In challenging OSFM's issuance of the State Waivers, Petitioners argue that OSFM can issue

---

[9] The Petitions assert violations of federal and state pipeline safety laws. Because the state pipeline safety laws are derivative of and incorporate applicable standards from federal law. (See Gov. Code, § 51011; Cal. Code Regs., tit. 19, § 2000), Petitioners' challenges to the State Waivers under state law fail for the same reasons they fail under federal law.

[10] The Pipeline Safety Act "clearly expresses the intent of Congress to fully occupy the field of oil and gas operations and interstate pipeline safety so that any state law that touches upon the area, even consistent state law, is preempted." (*People ex rel. Sneddon v. Torch Energy Services, Inc.* (2002) 102 Cal.App.4th 181, as modified (Oct. 4, 2002).) The Pipeline Safety Act is unequivocal: "A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." (49 U.S.C. § 60104(c).) The Pipeline Safety Act's preemptive effect applies to Sable's anomaly repair work.

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

waivers only "in the same way and the same extent" that the Safety Administration may waive compliance under federal regulations. (See EDC TRO App., pp. 15-16; CBD TRO App., p. 20.) Petitioners contend that OSFM was required to (1) provide public notice of and a public hearing before issuing the State Waivers, and (2) adopt a detailed statement of reasons for granting the State Waivers. Petitioners are incorrect as to both.

*Petitioners cannot maintain their procedural Pipeline Safety Act claims.* As an initial matter, "[t]he Pipeline Safety Act, by its plain language, allows only a very limited private right of action." (*City & County of San Francisco v. U.S. Dept. of Transp.* (9th Cir. 2015) 796 F.3d 993, 998 [citing 49 U.S.C. § 60121(a)(A)].) The Act "*does not authorize a mandamus-type action to compel the [relevant] Agency to perform non-discretionary regulatory duties.*" (*City & County of San Francisco*, *supra*, 796 F.3d at pp. 998-999 [emphasis added].)[11] Therefore, Petitioners are barred from pursuing a writ of mandate to compel OSFM to comply with its alleged mandatory duties under the Pipeline Safety Act, which is the relief Petitioners have sought under the Act. (See EDC Pet., ¶¶ 19, 150-166 [First through Third Causes of Action] & Prayer for Relief No. 5(c), (d); CBD Pet., ¶¶ 98, 100, 115-120 [First Cause of Action].)

*OSFM's process complied with the law.* Moreover, nothing in 49 U.S.C. section 60118 entitles members of the public, including Petitioners, to notice of and a hearing on a state waiver application pending with OSFM.[12] Although federal regulations provide that the Safety Administration "will provide notice to the public of its intent to consider the application [on the Federal Register] and invite comment" (49 C.F.R. § 190.341(d)(1)), OSFM cannot publish in the Federal Register. Nevertheless, OSFM created a special website devoted to Sable's State Waiver applications providing the public with notice while OSFM considered them.[13] OSFM also coordinated with the Safety Administration to establish publicly accessible federal dockets for the State Waivers, where members of the public could submit comments

---

[11] To the extent Petitioners claim that the Pipeline Safety Act's citizen suit provision does not apply, the only other avenue for judicial review under the Act is Section 60119, which requires a petition for review filed in a federal Court of Appeal not later than 89 days after the order is issued. (49 U.S.C. § 60119(a)(1).) The Petitions fail both requirements as they were filed in California state court 119 days after OSFM issued the State Waivers.

[12] EDC's reliance on *In re MidAmerican Energy Company* (Jan. 15, 2002) 2002 WL 31155601 is misplaced. (EDC TRO App., pp. 15-16.) There, the Iowa Utilities Board did not conclude that a person other than the applicant must be given notice and an opportunity to comment.

[13] See https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

and view information submitted to the Safety Administration.[14] Importantly, OSFM's public outreach worked—***Petitioners and others actively participated in OSFM's (and the Safety Administration's) consideration of the State Waiver applications***. Petitioners submitted letters critiquing the applications to OSFM in September 2024 before OSFM approved the State Waivers in December 2024. (See, e.g., CBD Pet., ¶ 68; EDC Pet., Ex. C.) Petitioners then submitted letters to the Safety Administration when it considered its concurrence in the State Waivers. (E.g., CBD Pet., ¶ 73.) Petitioners, therefore, have suffered no prejudice.[15] (See *Fowler v. City of Lafayette* (2020) 46 Cal.App.5th 360, 371 [requiring a showing of prejudice to set aside an agency's action]; see also *Galbiso v. Orosi Pub. Util. Dist.* (2010) 182 Cal.App.4th 652, 670-671; *Cohan v. City of Thousand Oaks* (1994) 30 Cal.App.4th 547, 556.)

Further, while public notice was provided, no formal hearing was required for OSFM to act. The use of the term "hearing" in section 60118 refers to the ***applicant's*** opportunity for hearing on its application. Where the phrase "opportunity for hearing" is used throughout the Pipeline Safety Act, it refers to the applicant's opportunity for hearing—not the general public's right. (See, e.g., 49 U.S.C. §§ 60112(a), 60117(p), 60122(a)(1).) Section 60118 should be read consistently with those provisions. (*IBP, Inc. v. Alvarez* (2005) 546 U.S. 21, 23-24 ["identical words used in different parts of the same statute are generally presumed to have the same meaning"].) Petitioners cite no authority demonstrating their or the public's entitlement to a public hearing on the State Waivers. In addition, any such "hearing" for the applicant does not refer to a formal public hearing at which testimony may be presented on the record. (See 49 C.F.R. § 190.3; see also 74 Fed. Reg. 2893 (Jan. 2009) [waivers "already involve extensive informal (technical) consultations between PHMSA and the applicant and . . . there is also an opportunity for (paper) hearing in the [waiver] process"].)

Nor does the law require OSFM to adopt a detailed statement of decision containing specific findings in support of the State Waivers. The federal regulations simply provide that a decision will be provided *to the applicant*. (See 49 C.F.R. § 190.341(d)(2) [whenever a decision is made to grant or deny an application, "***notice of the decision will be provided to the applicant***"] [emphasis added].)I In

---

[14] Docket ID PHMSA-2025-002 for CA-324 and Docket ID PHMSA-2025-003 for CA-325, on January 28, 2025, on www.Regulations.gov.

[15] Further, Petitioners do not allege that any members of the public who would have participated in OSFM's process on the State Waivers were precluded from doing so.

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

granting Sable's applications, OSFM issued detailed, 15-page State Waivers with comprehensive requirements and conditions that Sable must meet. (See EDC Pet., Exs. F & G.) The State Waivers represent OSFM's ultimate decision on the applications, including the factors supporting its decision.

***Substantial evidence supports the State Waivers' issuance.*** For the same reasons, Petitioners' claims that OSFM abused its discretion in issuing the State Waivers fail. (See CBD TRO App., p. 20; EDC TRO App., p. 15.) OSFM did not abuse its discretion in deciding to grant the State Waivers because the enhanced standards OSFM applied in its approval are as or more protective of pipeline safety than the regulations require. (49 U.S.C. § 60118(c)(1)(A); Gov. Code, § 51011(b).)

As the State Waivers explain, Sable "provided the OSFM information from the completed in-line inspections and additional data requested by [OSFM]." (EDC Pet., Exs. F & G.) OSFM's Pipeline Safety Engineers closely reviewed the information and coordinated with the Safety Administration's Engineering and Research Division throughout the process "to incorporate [the Safety Administration's] recommended conditions into the state waiver." (*Ibid*.) Thus, the State Waivers represented the culmination of OSFM's and Safety Administration staff's careful and coordinated review and consideration of Sable's applications.

After OSFM granted the State Waivers, the Safety Administration again reviewed Sable's State Waiver applications and supporting materials, and OSFM's proposed State Waivers. (Rusch Decl., Exs. C and D.) In confirming that it did not object to OSFM's issuance of the State Waivers, the Safety Administration explained that Sable "must comply with over 60 conditions," including that the pipelines "be hydrostatically tested . . . prior to putting the pipeline into operation . . . [and] inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies." (*Ibid*.) In addition, Sable must reassess the pipelines "at least every year." (*Ibid*.) Thus, substantial evidence supports OSFM's determination that Sable's requested modifications are as protective of pipeline safety as federal law requires. (See also Section III.B.2, *infra*.)

### 3.    OSFM Did Not Violate CEQA.

***The State Waivers are federal authorizations not subject to CEQA.*** CEQA does not apply to OSFM's issuance of the State Waivers because OSFM was implementing a *federal* safety program

pursuant to its delegated authority under *federal* law. (See *City of Morgan Hill v. Bay Area Air Quality Mgmt. Dist.* (2004) 118 Cal.App.4th 861, 871 ["the conclusion that the [air] permit is a federal one would seem to preclude the application of any state law such as CEQA. The [Air] District issued the permit acting on behalf of federal authorities who are not bound by state law"].) Just as the Safety Administration is not subject to CEQA in issuing a waiver under section 60118, OSFM is not subject to CEQA in implementing its federally delegated authority to modify pipeline safety standards.[16]

***The State Waivers are a safety program to which CEQA does not apply.*** Even if state law applied to OSFM's actions implementing federal law (it does not), the State Waivers are merely a program ensuring pipelines operate safely within the boundaries of established law—not a "project" that triggers CEQA review. (See CBD TRO App., p. 22; *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380 ["An activity that is not a 'project' . . . is not subject to CEQA."].) CEQA defines a "project" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect change in the environment." (Pub. Resources Code, § 21065.) A state waiver, by contrast, is an order that modifies compliance with a regulatory requirement. (49 U.S.C. § 60118). Thus, the State Waivers merely confirmed that what Sable proposed by way of pipeline protection was consistent with established federal pipeline safety standards. (See Section III.A.2, *supra*.) OSFM's determination that the State Waivers are consistent with pipeline safety standards does not have the potential to result in a physical change in the environment.[17]

Moreover, OSFM's issuance of the State Waivers is ministerial and therefore not subject to CEQA. (Pub. Resources Code, § 21080(b); Guidelines,[18] § 15268.) OSFM assessed Sable's State Waiver applications pursuant to the requirements set forth in applicable federal and state regulations. (See EDC Pet., Exs. F & G.) This is no different than a local agency's issuance of building permit or other similar permits, which are typically ministerial. A local agency may allow a deviation from applicable codes or

---

[16] To support their pipeline safety law claims, Petitioners argue that OSFM must issue waivers to "in the same way and the same extent" as the Safety Administration. (See EDC TRO App., pp. 15-16; CBD TRO App., p. 20.) While OSFM did comply with federal pipeline safety laws, consistent with Petitioners' own logic, OSFM need not undertake CEQA review in implementing those laws.

[17] If anything, Petitioners' dispute lies with the County, which approved the physical construction work on the Pipelines through the issuance of the final development plan, conditional use permit, coastal development permits, and other entitlements over 30 years ago.

[18] The CEQA Guidelines are codified at 14 Cal. Code Regs., tit. 14, §§ 15000 *et seq.*

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

impose conditions without transforming the permit into a discretionary action. (See, e.g., *Sierra Club v. County of Sonoma* (2017) 11 Cal.App.5th 11, 24-31 [issuance of erosion control permit with conditions held ministerial]; *Friends of Juana Briones House v. City of Palo Alto* (2010) 190 Cal.App.4th 286, 300 [issuance of demolition permit held ministerial].) Here, too, OSFM may allow a deviation from applicable safety regulations through a state waiver without triggering CEQA. (See 49 U.S.C. § 60118.)

***The State Waivers are categorically exempt from CEQA.***[19] Even if the State Waivers are a discretionary project triggering CEQA (see CBD TRO App., pp. 22-23; EDC TRO App., pp. 18-19), they are categorically exempt because they address an existing facility with no expansion of its former use. (Guidelines, § 15301.) The CEQA Guidelines exempt "[r]estoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety." (See *id*., subd. (d).) Here, the State Waivers do not authorize any expansion of the pipelines' capacity or the permitted volume of oil that may flow through the pipelines.[20] The State Waivers do not even authorize physical construction. They merely impose safety measures to ensure the pipelines "meet current standards of public health and safety." No unusual circumstance exists because potential harms from a pipeline rupture or spill already were analyzed under CEQA. (See *id.*, § 15300.2(c).)

***Potential environmental impacts were previously analyzed in the certified EIR/EIS.*** Although the State Waivers do nothing more than implement a federal safety program, Petitioners claim that OSFM was required to conduct additional environmental review. (See EDC TRO App., pp. 18, 20; CBD TRO App., p. 23.) Not so. "After an initial EIR is certified, CEQA establishes a presumption against additional environmental review. An agency has jurisdiction to prepare a subsequent or supplemental EIR only if the agency grants a 'discretionary' approval on the project, and certain statutorily enumerated new circumstances occur." (*San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 928 [internal citations omitted]; Pub. Resources Code, § 21166.)

Here, none of CEQA's statutory triggers for further environmental review are met. Rather,

_____

[19] "[T]here is no requirement that [an] agency put its exemption decision in writing." (*San Lorenzo Valley Community Advocates for Responsible Educ. v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1385; see Pub. Resources Code, §§ 21108, 21152; Guidelines, § 15062.)

[20] The appropriate baseline against which to address potential environmental impacts here is historic operations. (See Guidelines, § 15125(a)(1).)

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

Petitioners appear concerned with the potential environmental impacts of a future oil spill. (EDC TRO App., pp. 18, 20; CBD TRO App., p. 23.) *But the EIR/EIS—which is beyond challenge and therefore "conclusively presumed to comply with [CEQA]"—already considered and mitigated these potential impacts, among others, to the maximum extent feasible.*[21] (Pub. Res. Code, § 21167.2.)  Indeed, the Pipeline's entitlements included mitigation measures from the EIR/EIS as mandatory permit conditions. For instance, the County required "[a]utomatic block and check valves at sensitive habitat" and the implementation of an "oil spill contingency plan" to minimize the impact of a potential oil spill. (Leininger Decl., ¶ 27; *id.*, Ex. D [Planning Commission Actions] at p. 53 and Table of Celeron Class I Impacts at p. 3.)   The County specifically found that compliance with these (and other) mitigation measures, conditions of approval, and certain Oil Spill Contingency and Emergency Response Plans incorporated into the project description would *"mitigate[] as completely as possible" all "potential oil spill impacts"* and other potentially significant impacts. (*Id.* at pp. 55-56, emphasis added.)

Petitioners have not identified any Project changes, changed circumstances, or significant new information that call into question the validity of the prior EIR/EIS's analysis of potential oil spill risks and impacts. (See Pub. Resources Code, § 21166.) That a spill occurred in 2015 (the volume of which was *less* than the worst-case scenario studied in the EIR/EIS[22]) is not a new circumstance requiring further study, and the State Waivers and their robust conditions ensure that any potential oil spill in the future would be even smaller. A subsequent EIR is not required. (Guidelines, § 15162.)

### B. Petitioners Fail to Demonstrate That They Will Suffer Irreparable Harm Absent Preliminary Relief.

Petitioners fail to meet their burden of showing the harm that would result if a preliminary injunction were not granted. (*Casmalia Resources, Ltd. v. County of Santa Barbara* (1987) 195 Cal.App.3d 827, 838.) Petitioners, the public, and the environment would suffer no harm if no injunction is issued.  On the other hand, significant harm will befall Sable, the public, and the environment if the Court grants injunctive relief.

---

[21] In fact, the EIR/EIS considered potential oil spill volumes along the Pipelines far exceeding the volume of any hypothetical spill with implementation of the State Waivers. (Compare Leininger Decl., Ex. C [Draft EIR/EIS] at p. 4-121, Table 4-26 [8,370 barrels] with Rusch Decl., Ex. Q [2021 Line 901 Risk Assessment] at p. 12, Table 4.A.1 [1,980 barrels].)

[22] The 2015 oil spill discharged approximately 2,900 barrels of crude oil. (See Rusch Decl., Ex. N [Consent Decree], p. 1.)

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

### 1.    The Federal Consent Decree Precludes Petitioners from Asserting That They Will Be Irreparably Harmed by the Restart of the Pipelines.

A litigant is precluded from raising an issue already decided by a consent decree where "1) the issues decided in the prior adjudication are identical with those presented in the later action; 2) there was a final judgment on the merits in the prior action; and 3) the party against whom the plea is raised was a party or was in privity with a party to the prior adjudication." (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1065 ["*Citizens for Open Access*"].) Each of these factors are met here.

*First*, the issues resolved in the Consent Decree and raised in this action are identical. (*Citizens for Open Access*, *supra*, 60 Cal.App.4th at pp. 1068-1069 ["the application of the doctrine of res judicata depends on whether the issue in both actions is the same, not whether the issue arises in the same context."].)  Petitioners seek to prevent "great and irreparable harm to unique, irreplaceable natural resources" and "ensur[e] meaningful environmental and pipeline safety review." (EDC TRO App., p. 21; CBD TRO App., p. 19.) But the Consent Decree already resolved issues relevant to "further the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws." (Rusch Decl., Ex. N [Consent Decree], ¶¶ R, S, Appendix B.) In fact, the Consent Decree expressly contemplated the conditions of the State Waivers challenged here and outlined obligations for State Waivers and ultimately restart of the Pipelines. (*Id.*, ¶ N, § I. Background, Appendix B.)

*Second*, the Consent Decree constitutes a final judgment on the merits. (Rusch Decl., Ex. N [Consent Decree] ¶ 108; see *Citizens for Open Access*, *supra*, 60 Cal.App.4th at p. 1065 ["A judgment entered . . . by consent or stipulation, is as conclusive a . . . bar as a judgment rendered after trial."]; see also *Gates v. Superior Court* (1986) 178 Cal.App.3d 301, 311.)

*Third*, Petitioners and "the public as a whole" were adequately represented by the United States, which entered into the Consent Decree "***on behalf of . . . the People of the State of California***" and "in the public interest." (Rusch Decl., Ex. N [Consent Decree] ¶ N, § I. Background, emphasis added.) "[W]hen a party acts in a representative capacity, and as such is lawfully authorized to litigate the questions at issue for those whom he represents, they as well as he are bound by the judgment." (*Citizens for Open Access*, *supra*, 60 Cal.App.4th at p. 1072 [finding plaintiffs, "along with the public as a whole," were barred from seeking injunctive relief because they were "adequately represented by the state

18
OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

agencies vested with authority to litigate the [same] issue" in a prior action]; see *Gates v. Superior Court*, *supra*, 178 Cal.App.3d at pp. 307-308 [where a plaintiff commences an action "to determine the same matter of public interest" as a prior action, "there is identity of parties within  the requirement under the doctrine of res judicata."].)  Petitioners are therefore bound by the Consent Decree and precluded from arguing that they will suffer significant harm if injunctive relief is not granted.

### 2.    Petitioners Have Not Demonstrated Significant Harm to Themselves or the Environment.

Even if Petitioners were not precluded from arguing that they would suffer harm resulting from issuance of the State Waivers or restart of the Pipelines, Petitioners have not and cannot demonstrate any concrete harm to themselves or the environment.[23]

Petitioners' alleged harm from restart of the Pipelines (see, e.g., EDC TRO, p. 13; CBD TRO, p. 14) is ***purely speculative*** due to the additional approval Sable must obtain before the Pipelines are operational. (See *City of Vernon v. Cent. Basin Mun. Water Dist.* (1999) 69 Cal.App.4th 508, 517 ["Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative."].) As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. (EDC TRO, p. 13; EDC Pet., ¶ 88; Rusch Decl., Ex. N [Consent Decree], Appendix D, ¶ 1(b), (f).) When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks. (See *ibid.*)

Given the extensive regulatory and compliance framework governing the Pipelines, approval of the Restart Plan will ensure there will be no harm to the public (including Petitioners) or the

---

[23] As detailed in Sable's Motion to Strike Declaration of Richard B. Kuprewicz Filed in Support of OSC Re Preliminary Injunction and Objections to Evidence Submitted in Support of Order to Show Cause Re Preliminary Injunction, the evidence Petitioners rely upon is legally insufficient and inadmissible. Trial courts have a "substantial gatekeeping" responsibility to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771-772.) The Kuprewicz Declaration fails this test, providing no substantive analysis of the factual foundation for his opinions, explanation of his methodology, or articulation of how he arrived at his conclusions. These deficiencies are compounded by Petitioners' failure to produce Mr. Kuprewicz for cross-examination in violation of Sable's due process rights. The Kuprewicz Declaration is critically reviewed in the concurrently filed Declaration of Michael J. Rosenfeld ("Rosenfeld Decl."). The Declarations of Blake Kopcho, Jeffrey Miller, Tevin Schmitt, and Julie Teel Simmonds are likewise inadmissible.

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

environment. Contrary to Petitioners' assertions that OSFM "failed to even consider the impacts of the project or allow for public input" (EDC TRO, p. 21; CBD TRO, p. 18), the Pipelines underwent rigorous environmental review pursuant to NEPA and CEQA, which mandates that all significant impacts associated with a project be mitigated or avoided to the maximum extent feasible. (Pub. Resources Code, §§ 21000 *et. seq.*; Guidelines §15126.4(a); see Leininger Decl., Exs. B & C [Draft EIR/EIS and Final EIR/EIS].) The Pipelines' EIR/EIS analyzed potential impacts to environmental resources, including oil spill potential (see *id.*, Ex. B [Final EIR/EIS] at pp. 4-1 through 4-174; *id.*, Ex. C [Draft EIR/EIS] at pp. 4-1 through 4-174), and the Project's entitlements incorporated mitigation measures from the EIR/EIS (see, e.g., *id.*, Ex. D [Planning Commission Actions] at pp. 50-53, Table of Celeron Class I Impacts, Table of Celeron Class II Impacts).

The State Waivers ensure that the Pipelines comply with all applicable pipeline safety laws and that any risks would fall within the EIR/EIS's analysis.[24]  In particular, Sable integrated increased technological safety standards throughout the pipeline system, implemented heightened personnel training, completed over 200 corrosion-related excavations, installed 27 new block valves for enhanced sectional control, and built a new control center with real-time leak detection and automated shutdown capabilities. (See Declaration of Brien ["Vierra Decl."], §§ (IV)(A)(1), (IV)(A)(4).)  As a result, the Pipelines can be operated at a minimal risk to the environment. (See *id.*, § (IV)(A)(2).)

### 3. Preventing the Transport of the Supply of Oil Through the Las Flores Pipelines Will Significantly Harm Sable and the Public.

On the other hand, preventing the supply of oil from Sable's offshore production through the Pipelines to market will cause Sable and the public to suffer immense harm. If Sable's oil production cannot be supplied through the Pipelines, California will become increasingly reliant on foreign oil, resulting in significantly higher greenhouse gas and associated criteria pollutant emissions. (Leininger Decl., ¶¶ 10-19.) Because environmental justice communities are disproportionately impacted by ship, truck, and rail emissions, increasing foreign crude oil imports will create particularly harmful impacts

---

[24] The Kuprewicz Declaration incorrectly states that the Pipelines are unusually dangerous due to their age and design flaws—but this is an unfounded statement made without supporting data that should be disregarded as nonfactual and noncredible. (See Rosenfeld Decl. at ¶ 6 ["This opinion was built on an aggregation of preceding claims each made without supporting data or even contrary to known or knowable facts."].)

20

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

to these communities. (*Id.*, ¶¶ 20-21.) Additionally, the lost production from Sable's offshore platforms may exacerbate California's ongoing oil crisis, leading to higher gasoline prices, lost jobs, lost tax revenue, lost royalties, and higher prices across California's economy. (Declaration of Michael A. Mische ["Mische Decl."], ¶¶ 105-108.) Sable (as a publicly traded company), its employees and shareholders, and local and state governments (that desperately need tax revenue) also will suffer immense and irreparable economic harm. (*Id.*, ¶¶ 93, 98-99, 101, 107, 108; Rusch Decl., ¶¶ 66-72.)

Conversely, allowing Sable to transport oil to market through the Pipelines will significantly improve California's energy and economic security. (Mische Decl., ¶¶ 11-12.) Safe local oil production will serve as an economic "backbone" for California, generating an estimated **$21.5 to $41.6 million per year in combined local and state revenues**. (*Id.*, ¶¶ 10-13, 93, 106-108.) Further, the consistent addition of Sable's oil production into the California refinery system will improve the supply dynamics in the State by creating more viable and cost-effective alternatives to foreign oil supplies, resulting in savings of at least $3.28 per barrel over imported oil. (*Id.*, ¶¶ 104, 108.) It also will help stabilize consumer gasoline prices by reducing the uncertainties and insecurities related to the crude oil supplies necessary to support California's refineries in their production of combustible fuels such as gasoline, diesel and aviation, as well as asphalt and distillates used in the manufacturing of mobile phones, medical devices, and other essential products. (*Id.*, ¶ 42.)

In sum, the significant harms to Sable and the public outweigh the speculative harm alleged by Petitioners.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Petitioners' applications.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

DATED:   July 7, 2025

Respectfully submitted,

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE

**FAUVER, LARGE, ARCHBALD & SPRAY LLP**
TREVOR D. LARGE

_____
Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP.**
**PACIFIC PIPELINE COMPANY**

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On June 3, 2025, I served the document(s) **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITON TO APPLICATION FOR PRELIMINARY INJUNCTION** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☒  BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 3, 2025, at Los Angeles, California.

/s/ Josie Cisneros
Josie Cisneros

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>CENTER FOR BIOLOGICAL DIVERSITY and<br>WISHTOYO FOUNDATION<br><br>Tel.:   (510) 844-7100<br>Fax:   (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>        tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS<br>ENVIRONMENTAL DEFENSE CENTER, a<br>California non-profit corporation; GET OIL<br>OUT!, a California non-profit corporation;<br>SANTA BARBARA COUNTY ACTION<br>NETWORK, a California non-profit corporation;<br>SIERRA CLUB, a national non-profit<br>corporation; and SANTA BARBARA<br>CHANNELKEEPER, a California non-profit<br>corporation<br><br>Tel.:   (510) 844-7100<br>Fax:   (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>        jfrankel@environmentaldefensecenter.org<br>        trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/<br>DEFENDANTS<br>California Department of Forestry and Fire<br>Protection, Office of the State Fire Marshal;<br>Daniel Berlant, in his official capacity as State<br>Fire Marshal<br><br>Tel.:   (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN<br>INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:   (310) 620-5879<br>Email: djmoore@paulhastings.com<br>        benjaminhanelin@paulhastings.com<br>        natalierogers@paulhastings.com |
| Trevor D. Large, Esq.<br>FAUVER, LARGE, ARCHBALD & SPRAY<br>LLP<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN<br>INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:   (805) 966-7000<br>Email: TLarge@FLASllp.com |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
  jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
  garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et. al, <br><br> Petitioners and Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al., <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., et al., <br><br> Real Parties in Interest. | Case No. 25CV02244 <br> [Coordinated with Case No. 25CV02247] <br><br> Assigned for all purposes to: <br> Hon. Donna D. Geck <br><br> **DECLARATION OF STEVE RUSCH IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTON** <br><br> [*Filed concurrently with Opposition to Application for Preliminary Injunction; Declarations of Michael A. Mische, Bart Leininger, Brien Vierra, and Michael J. Rosenfeld*] <br><br> Date:        July 18, 2025 <br> Time:        10:00 AM <br> Dept.:       4 <br><br> Complaint Filed:        April 15, 2025 <br><br> Trial Date:        None set |

1

DECLARATION OF STEVE RUSCH

**<u>DECLARATION OF STEVE RUSCH</u>**

I, Steve Rusch, declare as follows:

1. I am the Vice President, Regulatory & Environmental Affairs of Sable Offshore Corp. ("Sable"). I have over 45 years of experience in the oil and gas industry. Before my current position with Sable, I was the Vice President, Environment, Health and Safety ("EHS") and Government Affairs at Freeport-McMoRan Oil & Gas, a Senior Staff Engineer at Exxon Mobil Corporation, and the Principal at Rusch Consulting. I have a Bachelor's Degree in Civil Engineering from the University of California at Berkeley and have been licensed by the State of California as a Professional Engineer. I make this declaration in support of Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's (collectively "Real Parties") Opposition to Application for Preliminary Injunction. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to them.

2. Sable is a publicly traded oil and gas company focused on responsibly developing the Santa Ynez Unit ("SYU") in waters offshore of Santa Barbara County, California, as well as the connected onshore Las Flores Pipelines system that includes portions that are within the Coastal Zone (collectively the SYU Pipelines and the Las Flores Pipelines are referred to as the "Pipelines").

3. As detailed below, Real Parties have completed the anomaly repair work contemplated under the December 17, 2024 "State Waivers" issued by the Office of State Fire Marshal ("OSFM"). The State Waivers do not allow oil to flow through the Las Flores Pipelines. Rather, Real Parties are required to submit and obtain OSFM's approval of a "Restart Plan" before restarting the Las Flores Pipelines. Real Parties submitted a Restart Plan to OSFM on July 29, 2024, and it remains under OSFM's review.

**<u>Acquisition And Completion of Repair and Maintenance to the Pipelines</u>**

4. I have been involved in Sable's acquisition, maintenance, and repair of the Pipelines. These assets were previously owned by Exxon Mobil Corporation ("Exxon") and Mobil Pacific Pipeline Company ("MPPC," and together with Exxon, "EM"). I am familiar with the permitting history covering Real Parties' maintenance activities to the Pipelines.

5. Real Parties began conducting repair and maintenance activities to the Las Flores

Pipelines in May 2024. These repair and maintenance activities were completed pursuant to the previously granted Coastal Development Permits ("CDPs") for the Las Flores Pipelines, which were permitted by the County of Santa Barbara under its Local Coastal Program pursuant to its delegated authority from the Coastal Commission. On February 12, 2025, after discussion with the County and providing County Staff with additional requested documentation, the County wrote Sable a letter in which it confirmed "this letter confirms that the requested anomaly repair work was contemplated, analyzed, and approved in the *existing Final Development Plan, Major Conditional Use Permit, associated Coastal Development Permits and certified EIR/EIS*." (emphasis added). A true and correct copy of the County's February 12, 2025 Correspondence to Real Parties is attached hereto as **Exhibit A**.

6. Real Parties were granted a right of entry to perform the repair and maintenance activities from the California Department of Parks and Recreation, as well as a right of entry to the Land Trust for the County of Santa Barbara. These rights of entry permitted Real Parties to complete anomaly repairs on the Las Flores Pipelines, cover the associated trenches, and complete (and pass) pressure tests on the entire line.

7. In April 2024, Sable submitted State Waiver applications to OSFM for Las Flores Pipeline Lines CA-324 and CA-325. On December 17, 2024, OSFM issued the State Waivers for Lines CA-324 and CA-325 and imposed over sixty separate conditions on Sable's operation of the Las Flores Pipelines. True and correct copies of the State Waivers are attached hereto as **Exhibits B and C**.

8. On February 11, 2025, Alan K. Mayberry, an associate administrator for pipeline safety for the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA") sent to OSFM a letter that stated, in relevant part, "[t]he OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 10.86 miles of 24-inch diameter pipeline (CA-324) between Las Flores Canyon and Gaviota, California.  The state waiver requires Sable comply

DECLARATION OF STEVE RUSCH

with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline in operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline.  Thereafter, the pipeline must be reassessed at least every year.  Pursuant to 49 USC § 60118(d), PHMSA does not object to the granting of this waiver by the OSFM for the Sable CA-324 pipeline."  A true and correct copy of PHMSA's letter dated February 11, 2025, concerning the OSFM's State Waiver for Line CA-324 of the Las Flores Pipeline is attached hereto as **Exhibit D**

9.    Also on February 11, 2025, Alan K. Mayberry, on behalf of PHMSA sent a letter to the OSFM that also indicated that PHMSA would not object to the OSFM's issuance of a State Waiver for Las Flores Pipelines Line CA-325.  It stated, in relevant part, "[t]he OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 113.56 miles of 30-inch diameter pipeline (Sable CA-325A/B) between Gaviota, Sisquoc, and Pentland, California…. Pursuant to 49 USC § 60118(d), PHMSA does not object to the granting of this waiver by the OSFM for the Sable CA-325A&B pipeline." The letter further described the measures Sable is required to undertake to operate and maintain Line CA-325, which are identical to the requirements addressed with respect to Line CA-324.  A true and correct copy of PHMSA's letter dated February 11, 2025, concerning the OSFM's state waiver for Line CA-325A/B of the Las Flores Pipelines is attached hereto as **Exhibit E**.

10.    On April 2, 2025, the OSFM issued two letters concerning PHSMA's February 11, 2025 letters describing PHSMA's decision to state it does not have any objections to the OSFM's issuance of State Waivers for Lines CA-324 and CA-325A/B.  True and correct copies of the OSFM's April 2, 2025 letters concerning PHSMA's decision to not object to the OSFM's issuance of state waivers for Lines CA-324 and CA-325A/B, are attached hereto as **Exhibits  F  and  G**, respectively.

3

DECLARATION OF STEVE RUSCH

11.     Real Parties have now completed repair and maintenance activities pursuant to existing CDPs and in conformance with the State Waivers for the Las Flores Pipelines.  Specifically, with the completion of the Gaviota State Park anomaly repairs on May 18, 2025, Sable has now completed its anomaly repair program on the Las Flores Pipelines as specified by the Consent Decree, the governing document for the restart and operations of the Las Flores Pipelines. Real Parties have also completed the safety valve installation work on the Las Flores Pipelines, as required by Assembly Bill 864, and all span remediation work on the SYU Pipelines. A true and correct copy of a map depicting Real Parties' completed and outstanding repair activities to the Las Flores Pipelines is attached hereto as **Exhibit H**.

12.     On May 15, 2025, Sable initiated the flow of oil production from six wells on Platform Harmony of the Santa Ynez Unit to Las Flores Canyon via the SYU Pipelines, at a rate of ~6,000 barrels of oil per day.  Critically, this does not consist of any oil transport through the Las Flores Pipelines.

13.     Sable tested wells on Platform Harmony throughout May 2025, and the well tests have performed consistently stronger than they did at the time of shut-in on May 19, 2015, when the Santa Ynez Unit produced approximately 45,000 barrels of oil equivalent per day.

14.     Approximately 30% of the 32 producing wells at Platform Harmony have been tested as of May 18, 2025.

15.     OSFM has not yet issued final approval to restart the flow of oil through the Las Flores Pipelines through approval of the Restart Plan.

16.     As of May 19, 2025, updated 2H25 Guidance shows up to 50,000 barrels per day of anticipated net production.

**Authorization for Pipeline Maintenance and Repair Work on the Las Flores Pipelines**

17.     The Las Flores Pipelines includes the pipeline segments CA-324 ("Line CA-324") (previously known as Line 901) and CA-325 ("Line CA-325") (previously known as Line 903) (collectively referred herein as the "Las Flores Pipelines"), portions of which are located within the coastal zone in an unincorporated area of the County.  Line CA-324 is designed to transport crude oil approximately 10.9 miles from Las Flores Pump Station in Las Flores Canyon, west along the Gaviota

4

DECLARATION OF STEVE RUSCH

Coast, to the existing Gaviota Pump Station located approximately one mile east of Gaviota State Park in Santa Barbara County.  Line CA-325 is designed to transport crude oil approximately 113.5 miles north from the Gaviota Pump Station to the Sisquoc Pump Station, then east through the Los Padres National Forest and Cuyama Valley, ultimately delivering crude oil to the existing Pentland Delivery Point in the San Joaquin Valley in Kern County. Lines CA-324 and CA-325 are located onshore and carry a maximum permitted throughput capacity of 150,000-barrels of crude oil per day and 300,000-barrels of crude oil per day, respectively.  The Celeron Pipeline Project (also referred to herein as the "Pipeline Project"), includes Lines CA-324 and CA-325.

18.    The State Lands Commission and federal Bureau of Land Management and Department of the Interior prepared a joint Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for the Pipeline Project pursuant to California Environmental Quality Act ("CEQA") and National Environmental Policy Act ("NEPA"). During the Pipeline Project's environmental review under the CEQA and NEPA, the locations of Lines CA-324 and CA-325 were identified as an environmentally superior alignment to minimize impacts to environmental resources (including topography, viewshed, watersheds, etc.). The State Lands Commission certified the EIR/EIS in January 1985. A true and correct copy of relevant excerpts from the draft EIR is attached to the concurrently filed Declaration of Bart Leininger as **Exhibit C**.  A complete version of the draft EIR is available at the following link: https://cosantabarbara.app.box.com/s/gc3vhh8ns8aiwketnq35vwbehnhre672. A true and correct copy of relevant excerpts from the final EIR is attached to the concurrently filed Declaration of Bart Leininger as **Exhibit B**.  A true and accurate copy of the final EIR is available at the following link: https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt.  Real Parties will provide full hard copies of the draft and final EIRs upon the Court's request.

19.    After reviewing the EIR/EIS, the Santa Barbara County Planning Commission made a final decision to approve the Pipeline Project FDP on February 18, 1986.  The approval was not challenged during the appeal period and the Planning Commission's approval action became final and effective.  The Planning Commission's action included the FDP (Case # 85-DP-66cz) and a Major CUP (Case # 83-CP-97cz). The FDP was required because the Pipeline Project necessitated

DECLARATION OF STEVE RUSCH

comprehensive review, and the CUP was required because the pipelines crossed environmentally sensitive habitat areas.   A true and correct copy of the FDP, approved on February 18, 1986 is attached hereto as **Exhibit I**.

20.    Consistent with the FDP approval and pursuant to the County's certified LCP, the County issued Coastal Development Permit CDP 86-CDP-189 for the Pipeline Project on July 27, 1986.   CDP 86-CDP-189 approved "[c]learing, grading and trenching activities for [the] Celeron Pipeline Project as approved by 85-DP-66cz."   The CDP incorporated "[t]he project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz."   CDP 86-CDP-189 also excluded "all activities related to pumpstations, river crossings, pipe stringing, welding, and any other activities not normally performed by the clearing, grading and trenching construction crews."   A true and correct copy of Coastal Development Permit CDP 86-CDP-189 is attached hereto as **Exhibit J**.

21.    On August 5, 1986, the County issued Coastal Development Permit CDP 86-CDP-205 for the "[r]emainder of all construction activities for the Celeron Pipeline [P]roject as approved by 85-DP-66cz."   CDP 86-CDP-205 also incorporated "[t]he project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz." A true and correct copy of Coastal Development Permit CDP 86-CDP-205 is attached hereto as **Exhibit K**.

22.    The CDPs were not appealed by any party.  The CDPs are therefore final, valid, and not subject to further appeal. Accordingly, the Conditions of Approval for the Las Flores Pipelines' FDP, CUP, and CDPs are all governed under the same Conditions of Approval found in Case #85-DP-66cz, as amended by the County.

23.    The County has amended the Conditions of Approval from time to time, and as such identifies the Conditions of Approval with reference to each of the following case numbers:  88-DPF-033 (RV01)z, 88-CP-60 (RV01), 88-DPF-25cz, 85 DP-66cz, and 88DP-25cz.  Although the County has issued separate CDPs for major pipeline improvements such as relocations and realignments since the Las Flores Pipelines' CDPs were first issued, the County has not required new or amended CDPs for routine maintenance and repair work on the Las Flores Pipelines.

DECLARATION OF STEVE RUSCH

24.     The Pipeline Project's EIR/EIS explains that its impact analysis extends through the pipelines' entire lifetime, including both pipeline "operation" and "maintenance" and specifically acknowledges that routine maintenance activities, including the anomaly repair work, would occur during the Pipelines' ongoing operation.

25.     The Pipeline Project's EIR/EIS incorporates into the Pipeline Project's project description certain Oil Spill Contingency and Emergency Response Plans. The EIR/EIS concludes that compliance with these plans would "substantially reduce the oil spill risk" and reduce significant impacts that would result from a major oil spill, including impacts related to soils, surface water, aquatic biology, and land use and recreation.  However, even with mitigation, the EIR/EIS concluded that oil spill risks would remain significant and unavoidable. Nevertheless, the County adopted a Statement of Overriding Considerations in which it concluded that compliance with these plans, identified mitigation measures, and the Conditions of Approval would "mitigate[] as completely as possible" "potential oil spill impacts" and other potentially significant impacts resulting from the Pipeline Project.  These plans (which were directly attached to the Draft EIR/EIS and were available for public review and comment) acknowledged the pipelines' ongoing inspection requirements, including by using inspection pipeline integrity gauges ("PIGs") to "measure the severity of corrosion and to inspect pipeline defects."  If required, identified pipeline defects (i.e., anomalies), once detected, would be repaired, "cleaned and recoated" or "removed and replaced," and "faulty … sections of pipe would be replaced as necessary.

26.     The Pipeline Project's EIR/EIS imposes no limitation on the number of sites where anomaly repairs may be undertaken at any one time or over the Las Flores Pipelines' lifetime, and thus, anomaly pipeline repairs contemplated under the Pipeline Project's EIR/EIS for the Las Flores Pipelines may be undertaken *where such work is necessary* at the same time or over a condensed period without constituting a new project under CEQA.

27.     Additionally, the Las Flores Pipelines' Conditions of Approval, which were incorporated by reference into the Las Flores Pipelines' FDP, CUP, and CDPs, encompassed the same operational and maintenance components of the Pipeline Project as described in the Pipeline Project's EIR/EIS.  For example, Condition J-11 acknowledges that the pipelines' right-of-way will be used for

7

DECLARATION OF STEVE RUSCH

"operational maintenance" after construction is completed. Further, Condition P-2 contemplates that the pipeline operator will conduct "regular maintenance and safety inspections," "corrosion monitoring and leak detection," and "periodic safety audits. Condition P-2 also acknowledges that federal regulations require the pipelines' operator to undertake certain repair and maintenance activities.  The County later amended this Condition in 1987 to expressly state that "[p]ermits may not be withheld or suspended due to County concerns which are under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline), with the exception of areas/issues agreed to by the permittee and the County."  Condition P-2 confirms that required repair and maintenance activities would be undertaken pursuant to the Las Flores Pipelines' Conditions of Approval, FDP, and CDPs rather than requiring new or modified permits. As described above, the County's Statement of Overriding Considerations concluded that the Pipelines operator's compliance with Condition P-2 and other Conditions of Approval would "mitigate[] as completely as possible" "potential oil spill impacts" and other potentially significant impacts resulting from the Pipeline Project. The County has amended the Conditions of Approval from time to time, and as such identifies the Conditions of Approval with reference to each of the following case numbers:  88-DPF-033 (RV01)z, 88-CP-60 (RV01), 88-DPF-25cz, 85 DP-66cz, and 88DP-25cz.  Although the County has issued separate CDPs for major pipeline improvements such as relocations and realignments since the Las Flores Pipelines' CDPs were first issued, the County has not required new or amended CDPs for the anomaly work and all of the enumerated conditions relevant to the anomaly repairs at issue and have remained unaltered.   A true and correct copy of the Conditions of Approval in effect in 1987 are attached hereto as **Exhibit L**.  A true and correct copy of the Conductions of Approval, currently in effect, are attached hereto as **Exhibit M**.

28.     The Conditions of Approval contemplate that biological impacts within the Las Flores Pipelines' operational right-of-way would be permanent, allowing for ongoing repair and maintenance activities like the anomaly repair work.  For example, Condition H-1(j) originally required the pipeline operator to develop a "plan for off-site reestablishment of oaks to mitigate impacts to oak savannahs and woodlands along the route."

29.     The County later modified this condition to require the pipeline operator to endow an

DECLARATION OF STEVE RUSCH

Alternative Oak Mitigation Program to reestablish oak savannahs and woodlands in Santa Barbara County at an off-site location to mitigate for the Project's permanent on-site oak tree impacts. Similarly, Conditions H-10 and H-11 required the pipeline operator to, after construction, replace and revegetate any disturbed catalina mariposa lily and refugio manzanita in locations "in or near" the disturbed area, but "exclusive of the operation [right-of-way]." Erosion control was the key objective for any required revegetation along the pipelines' operational right-of-way—not the long-term reestablishment of sensitive species—because it was clearly understood that the pipeline's right-of-way would continue to be disturbed by pipeline operation and maintenance. These Conditions confirm that any biological impacts along the pipelines' operational right-of-way resulting from repair and maintenance activities are within the scope of impacts previously approved by the County.

30.    The Conditions of Approval further demonstrate that repair and maintenance activities fail to trigger any of the narrow circumstances under which the Conditions of Approval would require Sable to obtain a new or modified permit. Nor do the Conditions of Approval impose any limit or require new permits based on the number of sites where anomaly repairs may be necessary or undertaken at the same time or over a condensed period. Condition A-13 provides:

> [The pipeline operator] shall obtain a new or modified permit, or authority to continue operation under the existing permit prior to undertaking any of the following activities which may, in the judgement of the County, result in significant changes to the impacts on the County. Such changes could include but not be limited to 1) major pipeline or pump station modifications; 2) major changes in pipeline throughput; 3) introduction of production to the pipeline from sources other than those described above [noted as the outer continental shelf and other locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins], and 4) introduction of a different product from any source.

30.    Real Parties' completed anomaly repair work therefore fell within the scope of approved activities contemplated by the pipelines' Conditions of Approval, and as analyzed under the Pipeline Project's EIR/EIS, to be undertaken without any subsequent or modified permit or subsequent environmental review because the work did not involve: (1) "major pipeline or pump station modifications," as such work is a standard repair and maintenance activity required by 49 C.F.R.

9

DECLARATION OF STEVE RUSCH

§ 195.452(h)(1); (2) "major changes in pipeline throughput," because such work will not alter the pipelines' capacity; (3) "introduction of production … from [new] sources"; or (4) "introduction of a different product."

**Real Parties' Repair and Maintenance Activities, and the Restart of the Pipelines Are Governed by a Framework of Consent Decree, Existing CDPs, and Federal Regulations**

31. On February 8, 1988, the Las Flores Pipelines' original proponent, the Celeron Pipeline Company of California (Celeron), and the County entered into a Settlement Agreement regarding the County's jurisdiction over certain project components. As part of the Settlement Agreement, the County agreed that it was preempted from regulating the Las Flores Pipelines' design, construction, and operation covered under 49 C.F.R. Part 195. The Settlement Agreement also creates a presumption of preemption where the activity is: (1) covered by 49 C.F.R. Part 195 (PHMSA's implementing regulations), (2) deals with the design, construction, or operation of the pipeline even if not expressly specified under 49 C.F.R. Part 195, or (3) performed a foot or more below the ground surface. The County reserved the authority, however, to confirm that the Las Flores Pipelines comply with the Conditions of Approval, allowing the County to ensure that the Las Flores Pipelines were constructed and operated consistent with the Pipeline Project's EIR/EIS and original County approvals, including the CDPs. The Settlement Agreement further details that the County lacks authority, however, to require additional permits or authorizations for any work that is expressly or impliedly covered 49 C.F.R. Part 195, related to pipeline design, construction, or operation, or is performed a foot or more below the ground surface.

32. In 2015, the California Legislature enacted Assembly Bill 864 ("AB 864"), which requires pipeline operators in environmentally sensitive areas to use best available technology including, but not limited to, "leak detection technologies, automatic shut-off systems, or remote controlled sectionalized block valves, or any combination of these technologies" to reduce the volume of potential oil spills. AB 864 charged the Office of the State Fire Marshal ("OSFM") with drafting its implementing regulations and granted OSFM the exclusive authority to enforce them.

33. On March 13, 2020, a Consent Decree was filed in a case entitled *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains*

10

DECLARATION OF STEVE RUSCH

*Pipeline, L.P.*, Case No. 2-20-cv-02415.   The Consent Decree attaches specific steps that must be undertaken to restart the Las Flores Pipelines and detailed steps to obtain OSFM approval of the Restart Plan. Pursuant to the Consent Decree, the OSFM holds authority over the restart of the Las Flores Pipelines and oversees installation and testing of the safety valves and implementation of several integrity-related improvements before resumption of production transportation through the Las Flores Pipelines may take place.  The Consent Decree was executed by representatives of the United States's Department of Justice, Environment and Natural Resources Division, PHMSA, United States EPA, United States Department of Interior, the National Oceanic and Atmospheric Administration, the National Pollution Funds Center (United States Coast Guard), California state agencies represented by the Office of Attorney General, Natural Resources Law Section, the California Department of Fish and Wildlife (Office of Spill Prevention and Response), the California Department of Parks and Recreation, the California State Lands Commission, the California Department of Forestry and Fire Protection, the California Central Coast Regional Water Quality Control Board, and the University of California.  A true and correct copy of the Consent Decree filed on March 13, 2020 is attached hereto as **Exhibit N**.

34.     In April 2021, Real Parties' predecessor-in-interest, Plains Pipeline, L.P. ("Plains"), secured approval from OSFM to retrofit the Las Flores Pipelines with 16 above-ground safety valves as required under AB 864, including seven valves in the Coastal Zone.  The proposal included both motor-operated valves ("MOVs"), which are equipped with an electrical shut-off system connected to utility lines or a solar power source, and check valves ("CHKs"), which involve an automatic shut-off system with one-way flow closure. A true and correct copy of the Risk Assessment performed by Plains Pipeline, L.P. pursuant to State Assembly Bill 864 and submitted to OSFM, dated April 1, 2021, is attached hereto as **Exhibit Q**.

35.     Like Real Parties' completed anomaly repair work, the Las Flores Pipelines' original environmental review contemplated safety valve installation work, including the installation of 15 "block and check" valves that operate in the same way as the MOVs and CHKs approved by OSFM in April 2021.

36.     In December 2021, Plains submitted applications to the County for approval to

DECLARATION OF STEVE RUSCH

complete the safety valve installation work.  As a result of litigation related to the County's review of those applications, Real Parties revised the proposal such that all safety valves would be installed underground.

37.    On August 30, 2024, Real Parties and the County also entered into a settlement agreement in litigation regarding the safety valves on the Las Flores Pipelines.  The August 30, 2024 settlement agreement addresses Real Parties' revised plan regarding proposed safety valves as well as additional surveillance and response enhancements that will be added to the Las Flores Pipelines.  In the August 30, 2024 settlement agreement, followed by a subsequent letter from the County on September 4, 2024, the County confirmed that "it does not have permit authority or jurisdiction over the sixteen (16) safety valves and their ancillary equipment because they are safety valves required by state law [AB 864], related to the operation of an interstate pipeline, and one foot or more underground. [The County] understands the [Las Flores Pipelines] remain[] subject to regulation by the Office of State Fire Marshal and that [Real Parties] will be working closely with that office on installation and testing of the safety valves, as well as implementing a number of integrity-related improvements required by that office."  As the August 30, 2024 settlement agreement also details, State law AB 864 and the OSFM require installation of safety valves on the Las Flores Pipelines before the Las Flores Pipelines may be restarted.

38.    On September 4, 2024, in light of Real Parties' revision to the proposed safety valve installation work, the County confirmed that the County "does not have permit authority or jurisdiction over the sixteen (16) safety valves and their ancillary equipment as currently proposed because they are safety valves required by state law [AB 864], related to the operation of  a Pipeline, and one foot or more underground. Because the County has delegated LCP authority under the Coastal Act, Real Parties understood the County's confirmation to extend to Coastal Act permitting as well.  Real Parties began the safety valve installation work only after receiving this confirmation that no further County authorization was required.

39.    On February 12, 2025, the County confirmed in a letter to Sable that the future and ongoing anomaly repair work conducted by Real Parties to the Las Flores Pipelines is "authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal

12

DECLARATION OF STEVE RUSCH

Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement.  Thus, no further application to or action by the County is required."  The County reached its conclusion after review of detailed descriptions, plans, and assessments provided to the County by Sable included in Zoning Clearance applications submitted to the County concerning future and ongoing anomaly repair work in the coastal zone.  The County's letter further confirms that it is "not appealable to the Planning Commission [or] Board of Supervisors."  Although Sable's Zoning Clearance applications allowed the County to confirm that ongoing and future anomaly repair work falls within the scope of the Pipeline Project's existing CDPs, the County also concluded that such work does not actually require Zoning Clearances. As the County explained, its "assessment is consistent with the type of reviews conducted by the County, both inside and outside the Coastal Zone, on a regular basis to determine whether proposed development activities fall within the scope of existing permits." Therefore, based on its review the County concluded that "no further application to or action by the County is required." This reflects a County understanding that Zoning Clearances should be used before commencing initial construction approved under a final development plan and that Zoning Clearances should not be used for each individual element of the approved development or use throughout the life of a project. Accordingly, the County offered to return the Zoning Clearance applications without taking any action on them other than confirming "that the pipeline anomaly repair work is authorized by the existing permits."  (See **Exhibit A**.)

40.     On March 6, 2025, SCS Engineers, on behalf of Real Parties, submitted "information regarding 48 anomaly repairs previously conducted on portions of the [Las Flores Pipelines] [], and in one County right-of-way…." On March 21, 2025, the County confirmed that it had "reviewed the information [Real Parties] provided and [] determined that this work fits within[] the conclusions/directives of our February 12, 2025 letter to Steve Rusch [].  No permits will be required [for the previous anomaly repair work to the Las Flores Pipelines]."  A true and correct copy of the exchange of correspondence with the County staff's regarding prior repair and maintenance work performed in 2024 is attached hereto as **Exhibit O**.

41.     On April 9, 2025, the County sent the Coastal Commission a correspondence addressing the County's determination that the repair and maintenance activities to the Las Flores

13

DECLARATION OF STEVE RUSCH

Pipelines were authorized under existing CDPs.  In its correspondence, the County noted that the Coastal Commission claimed "that the County has 'failed to provide the requested information regarding the basis for the County staff's determination.'"  The County explained, "[p]lease note that we have provided all requested documents in response to Coastal Commission inquiries[,]" and explained that "Commission staff has all the information that the County considered prior to concluding that the pipeline anomaly repair work identified in the February 12, 2025 letter is authorized by the existing permits and was analyzed in the prior environmental review."  The County's April 9, 2025 correspondence further provides that, "[t]he County did not allow activity without a permit, nor did the County take an action on a permit or development application that may be appealable to the Coastal Commission."  A true and correct copy of the County's April 9, 2025 correspondence is attached hereto as **Exhibit P**.

**Real Parties Will Suffer Irreparable Harm and Significant Economic Damage if the Preliminary Injunction is Issued**

66.     If the preliminary injunction is issued, Real Parties will be delayed in commencing the sale of oil to California refineries through the Pipelines—Pipelines which have been repaired in accordance with the requirements issued by OSFM in the State Waivers.

67.     Specifically, Real Parties have spent approximately $45 million on repair and maintenance activities occurring within the Coastal Zone through March 2025, not including the cost of repairs outside of the Coastal Zone. Real Parties are required to perform specific tasks to meet specific deadlines in order to comply with their permit requirements and obligations under federal law to thereafter conduct operations at the Pipelines, which is critical to the livelihood of Real Parties' business. If a preliminary injunction is issued, Real Parties will be delayed in commencing the sale of oil to California refineries. This will cause Real Parties to incur significant economic damages in the form of an immediate loss of net margin.

68.     Specifically, Real Parties will be forced to lose net margin of at least **_$2.5 million per day_**, totaling **_$75 million per month_**. As explained above, Sable will have the capacity to produce approximately 50,000 barrels per day at $50 net per barrel. This means that if Real Parties cannot restart and operate the Las Flores Pipelines, such idleness at the Pipelines will cause Real Parties to

14

DECLARATION OF STEVE RUSCH

lose at least ***$17.5 million in net margin per week, totaling $75 million for just one month.***

69.     Additionally, Real Parties must pay royalties to state and federal governments on this anticipated oil production, which is projected to exceed $15 million in royalties per month.

70.     Sable is a publicly traded company, and a business disruption of this magnitude would have significant effect on the value of the company. The shareholders of the company, including the numerous 401(k) plans, mutual funds, and pension that have invested in the company, will immediately lose quantifiable value as the company is forced to incur multimillion-dollar delay damages in the event enforcement of the CDO is not stayed.

71.     Real Parties' inability to complete, or any delay in, the restart and operation of the pipelines, will exacerbate California's ongoing energy crisis. Citizens of the State of California would therefore also suffer irreparable harm in the form of higher gasoline prices, lost jobs, lost tax revenues, lost royalty sharing, and increased regulatory uncertainty.

72.     On the other hand, given the extensive regulatory and compliance framework governing the Pipelines, approval of the Restart Plan will ensure there will be no harm to the public or the environment. As previously stated, Real Parties' Restart Plan remains under OSFM's review. A grant of Petitioners' preliminary injunction would therefore force Real Parties to hemorrhage at least $75 million in lost net margin and exponential losses in shareholder value to enjoin the restart of the Las Flores Pipelines, which has not yet been approved to restart.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 7, 2025, in Thousand Oaks, California.

_____
Steve Rusch

15
DECLARATION OF STEVE RUSCH

# EXHIBIT A



**Planning and Development**

Lisa Plowman, Director
Jeff Wilson, Assistant Director
Elise Dale, Assistant Director

February 12, 2025

Mr. Steve Rusch
Sable Offshore Corporation/Pacific Pipeline Corporation
12000 Calle Real
Goleta, CA 93117

*Sent via email:* srusch@sableoffshore.com

SUBJECT:     Zoning Clearance Applications - 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and 24ZCI-00096

Mr. Rusch,

On November 22, 2024 and December 6, 2024, Santa Barbara County Planning and Development received four Zoning Clearance applications for pipeline "anomaly repair work" to Lines 324 and 325a. These applications stated that they sought to permit anomaly repair work in the enclosed descriptions of work for case numbers 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and 24ZCI-00096. Sable's position is that the Zoning Clearance process meets the requirements of the County's Local Coastal Program because it is a means for the County to determine if the activities fall within an existing Coastal Development Permit or if a new Coastal Development Permit is required.

The County conducted a detailed review of pipeline permitting history and the Coastal Zoning Ordinance. Planning and Development concludes that this pipeline anomaly repair work is authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement (EIR/EIS). The County previously exercised its authority under its Local Coastal Program and delegated Coastal Act authority in approving the permits and the requested anomaly repair work is within the scope of those approved permits. (Pub. Resources Code § 30519.) The County's assessment is consistent with the type of reviews conducted by the County, both inside and outside the Coastal Zone, on a regular basis to determine whether proposed development activities fall within the scope of existing permits. Planning and Development will be returning the Zoning Clearance applications to Sable without taking action on them. Alternatively, Sable can choose to withdraw the applications.

This conclusion is related to the requested pipeline anomaly repair work in case numbers 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and 24ZCI-00096 and the information supplied with those applications and does not speak to permitting or jurisdiction on any other past or future work on or changes to the Pipeline and associated equipment.

This is not a: 1) permit exemption; 2) Director determination on the meaning or applicability of the provisions of the Coastal Zoning Ordinance; 3) decision on an application for a Coastal Development Permit; or 4) any other ground set forth in Article II Section 35-182. Rather, this letter confirms that the requested anomaly repair work was contemplated, analyzed, and approved in the existing Final Development Plan, Major Conditional Use Permit, associated Coastal Development Permits and certified EIR/EIS. Thus, no further application to or action by the County is required. This conclusion is not appealable to the Planning Commission, Board of Supervisors, or Coastal Commission and it does not require a Notice of Final Action. (Article II §§ 35-182; 35-181.4.)

Planning and Development encourages and requests that Sable continue to provide information to the County about any future anomaly repair work consistent with what was supplied in the above-referenced application. Such information will allow the County to evaluate whether particular anomaly repair work results in any different conclusions than those set forth in this letter. That information can be directed to my attention.

Sincerely,

Errin Briggs
Deputy Director, Energy, Minerals, Compliance & Cannabis Division

Enclosures:     24ZCI-00090 Description of Work
                24ZCI-00091 Description of Work
                24ZCI-00095 Description of Work
                24ZCI-00096 Description of Work

CC:             Mickey Johnson, ExxonMobil Upstream Company, via email
                mickey.d.johnson@exxonmobil.com

Sable – Anomaly Repair Work Zoning Clearance Applications

24ZC1-00090 + 91

## Zoning Clearance Applications for
## CA-324 Pipeline Routine Anomaly Repair Work – Description of Work

### Scope of Work

In order to repair an anomaly, Sable must undertake the following steps: (1) excavate the site where an anomaly was detected, including the dirt beneath the affected pipeline segment, (2) expose the pipeline segment by removing insulation and sandblasting, (3) evaluate whether a "Composite Repair"[1] or "Cut-Out Repair"[2] is required, (4) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap, (5) backfill the anomaly site, and (6) conduct final site cleanup, including revegetation activities (collectively, the "Anomaly Repair Work").

Sable previously commenced the Anomaly Repair Work in compliance with Sable's obligation under federal regulations to take "prompt action" to address pipeline anomalies. (See 49 C.F.R., § 195.452, subd. (h)(1).) On September 27, 2024, the California Coastal Commission issued Sable Notice of Violation V-9-24-0152 ("NOV") and required Sable to immediately stop all Anomaly Repair Work. In accordance with the NOV, Sable stopped undertaking the Anomaly Repair Work. On November 12, 2024, Commission staff issued Executive Director Cease and Desist Order No. ED-24-CD-02 ("EDCDO"), which required Sable to submit an Interim Restoration Plan to secure and backfill the open anomaly sites without completing the Anomaly Repair Work. Commission staff approved Sable's proposed Interim Restoration Plan on November 20, 2024 with respect to the remedial grading and BMP segment of the Interim Restoration Plan. As of November 21, 2024, Sable and Commission staff were continuing to coordinate regarding the hydroseeding segment of the plan. Consistent with the Interim Restoration Plan, each anomaly site will be backfilled and restored to original grade without completing the Anomaly Repair Work.

As such, Sable's Zoning Clearance applications seek *both*:

1. After-the-fact Zoning Clearances for the Anomaly Repair Work previously undertaken at each anomaly site identified in the applications; and
2. Zoning Clearances to complete the Anomaly Repair Work at each such anomaly site in the future (including by excavating the anomaly site again after it is backfilled and restored in compliance with the EDCDO and Interim Restoration Plan).

---

[1] A "Composite Repair" involves wrapping the exposed pipeline segment in a composite material and allowing the material to cure.
[2] A "Cut-Out Repair" involves cutting out and replacing the affected pipeline segment, welding the replaced pipeline segment in place, and X-raying the replaced pipeline segment to confirm successful replacement.

## Location

45 anomaly sites require Anomaly Repair Work.  As discussed above, these sites are located along existing pipeline CA-324 in APNs 081-140-019, 081-140-025, 081-150-002, 081-150-006, 081-150-007, 081-150-028, 081-150-032, 081-150-033, and 081-230-021.  Table 1 details each anomaly site.  Attachments C.1 and C.2 include overview and concentrated mapping depicting these sites.

Table 1.    Anomaly Sites

| Legend | |
|---|---|
| | Application #1 |
| | Application #2 |





The proposed work would utilize the existing roads to access each site.  No new roads will be constructed.

## Construction & Equipment

Excavation depth would vary for each anomaly site based on unique factors, including the number of immediately proximate anomalies and site-specific requirements.  All material will be balanced onsite, and no material will be imported or exported.  Shoring boards will be utilized to stabilize the excavation walls prior to entry.  Equipment needed to complete the Anomaly Repair Work includes the following:

- Excavator(s)
- Light and heavy-duty work trucks
- Air compressor(s)
- Welding machine(s)
- Bulldozer(s)
- Front loader(s) with back drag
- Backhoe
- Reachlift
- Water buffalo
- Water trucks

## Fire Protection
If welding is required, Sable will provide a mowed work area within a minimum of 50 feet around the welding activities and maintain a fire watch at the location with 500 gallons of

water onsite, in addition to the fire extinguisher requirements of the Office of the State Fire Marshal (OSFM) and the Santa Barbara County Fire Department (SBCFD).

**Construction Best Management Practices**

In addition to the Construction Best Management Practices (BMPs) identified in Attachments D.1 and D.2, the following BMPs will be implemented to ensure potential effects on various environmental resources are avoided:

- Define limits of disturbance including the length/width of dig excavation trench, trench soil stockpile, equipment, staging, access, vehicle parking.
- Before construction activities commence, conduct pre-construction a biological resources survey to confirm the expected limits of work and minimal impact, or ensure that a biologist is onsite the first day of construction to monitor excavation to salvage and release any wildlife encountered.
- Before construction activities commence, conduct an environmental awareness training for all onsite personnel to discuss BMPs and other potential biological resources issues. While not expected in any of the dig sites, awareness of potential occurrence of special-status species should be discussed.
- All oak tree impacts are to be avoided including no vehicles, equipment, or stockpile within the drip line of any oaks.
- Stockpiles should be in uplands and avoid any stockpile, materials storage, vehicles, equipment, etc. in any drainage features or riparian habitat.
- Topsoil (the first 6" to 12" inches) removed for the excavation should be stockpiled separately for use in restoring original contours and grade, and to promote rapid plant growth restoration.
- The open trench should be safely fenced (hog wire, orange construction fence, or similar) at the end of each workday to exclude wildlife entrapment.

**Conclusion**

Sable is committed to designing, constructing, operating and maintaining Line CA-324 and CA-325 in a safe and reliable manner, and to meeting or exceeding applicable federal, state, and local regulatory standards.

Sable – Anomaly Repair Work Zoning Clearance Applications

24 8C1-00095 °, 96

## Zoning Clearance Applications for
## CA-324 and CA-325A Pipeline Routine Anomaly Repair Work – Description of Work

### Scope of Work

In order to repair an anomaly, Sable must undertake the following steps: (1) excavate the site where an anomaly was detected, including the dirt beneath the affected pipeline segment, (2) expose the pipeline segment by removing insulation and sandblasting, (3) evaluate whether a "Composite Repair"[1] or "Cut-Out Repair"[2] is required, (4) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap, (5) backfill the anomaly site, and (6) conduct final site cleanup, including revegetation activities (collectively, the "Anomaly Repair Work").

### Location

28 anomaly sites require Anomaly Repair Work. As discussed above, these sites are located along existing pipeline CA-324 and CA-325A in APNs 081-130-068, 081-140-023, 081-150-002, 081-150-028, 081-150-032, 081-270-011, 083-590-003, 083-650-008, 083-650-009, and 083-650-011. Table 1 details each anomaly site. Attachments C.1 and C.2 include overview and concentrated mapping depicting these sites.

Table 1.    Anomaly Sites

| Legend | |
|---|---|
| | Application #1 |
| | Application #2 |



---

[1] A "Composite Repair" involves wrapping the exposed pipeline segment in a composite material and allowing the material to cure.

[2] A "Cut-Out Repair" involves cutting out and replacing the affected pipeline segment, welding the replaced pipeline segment in place, and X-raying the replaced pipeline segment to confirm successful replacement.



The proposed work would utilize the existing roads to access each site. No new roads will be constructed.

## Construction & Equipment

Excavation depth would vary for each anomaly site based on unique factors, including the number of immediately proximate anomalies and site-specific requirements. All material will be balanced onsite, and no material will be imported or exported. Shoring boards will be utilized to stabilize the excavation walls prior to entry. Equipment needed to complete the Anomaly Repair Work includes the following:

- Excavator(s)
- Light and heavy-duty work trucks
- Air compressor(s)
- Welding machine(s)
- Bulldozer(s)

---

[3] F-9 is associated with two anomaly numbers from separate investigatory tool runs but is associated with one anomaly.

- Front loader(s) with back drag
- Backhoe
- Reachlift
- Water buffalo
- Water trucks

## Fire Protection

If welding is required, Sable will provide a mowed work area within a minimum of 50 feet around the welding activities and maintain a fire watch at the location with 500 gallons of water onsite, in addition to the fire extinguisher requirements of the Office of the State Fire Marshal (OSFM) and the Santa Barbara County Fire Department (SBCFD).

## Construction Best Management Practices

In addition to the Construction Best Management Practices (BMPs) identified in Attachments D.1 and D.2, the following BMPs will be implemented to ensure potential effects on various environmental resources are avoided:

- Define limits of disturbance including the length/width of dig excavation trench, trench soil stockpile, equipment, staging, access, vehicle parking.
- Before construction activities commence, conduct pre-construction a biological resources survey to confirm the expected limits of work and minimal impact, or ensure that a biologist is onsite the first day of construction to monitor excavation to salvage and release any wildlife encountered.
- Before construction activities commence, conduct an environmental awareness training for all onsite personnel to discuss BMPs and other potential biological resources issues. While not expected in any of the dig sites, awareness of potential occurrence of special-status species should be discussed.
- All oak tree impacts are to be avoided including no vehicles, equipment, or stockpile within the drip line of any oaks.
- Stockpiles should be in uplands and avoid any stockpile, materials storage, vehicles, equipment, etc. in any drainage features or riparian habitat.
- Topsoil (the first 6" to 12" inches) removed for the excavation should be stockpiled separately for use in restoring original contours and grade, and to promote rapid plant growth restoration.
- The open trench should be safely fenced (hog wire, orange construction fence, or similar) at the end of each workday to exclude wildlife entrapment.

## Conclusion

Sable is committed to designing, constructing, operating and maintaining Line CA-324 and CA-325A in a safe and reliable manner, and to meeting or exceeding applicable federal, state, and local regulatory standards.

# EXHIBIT B

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY  Gavin Newsom, Governor

 **DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov

## CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324)**

**Operator:**   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

**Pipeline:**   OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 87148E7A-ED76-4884-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
    a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
        i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
        ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
    b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
    c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Docusign Envelope ID: 87148E7A-FB76-4884-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s.  At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   b.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

**In-Line Inspection (ILI) Assessment and Frequency**

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

   a)  Dates for integrity assessment

   b)  In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 6

        segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

    c) In-line inspection tool vendor(s)

    d) Required tool specifications including operational specifications and anomaly sizing tolerances

    e) Tool validation methodology

    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

    g) Criteria used to identify locations for excavation and field verification

    h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful.  All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

Docusign Envelope ID: 87148E7A-FB76-4984-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

**180-Day Repair Conditions[9]**

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**Corrosion Growth Rate Analysis (CGRA)**

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 87148E7A-FD76-4884-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 11

    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

## Integrity Management

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

### Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

### Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
   a. Technical approach used for the analysis
   b. All data used and analyzed
   c. Pipe and longitudinal weld seam properties
   d. Procedures used to implement state waiver conditions

Docusign Envelope ID: 87148E7A-FD76-4884-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 13

    e.  Evaluation methodology used
    f.  Models used
    g.  Direct in situ examination data
    h.  All in-line inspection tool assessments information evaluated
    i.  Pressure test data and results
    j.  All in-the-ditch assessments performed on the pipeline segments
    k.  All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l.  All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
    n.  The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
    o.  Safety factors used for fatigue life and/or predicted failure pressure calculations
    p.  Reassessment time interval and safety factors
    q.  The date of the review
    r.  Confirmation of the results by qualified technical subject matter expert(s)
    s.  Approval by responsible Sable management personnel
    t.  Records of additional preventive and mitigative (P&M) measures performed
    u.  Reports required by this State Waiver.

**<u>Reporting</u>**

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324*. The email notification shall include, if applicable:
    a.  Tool type and run date
    b.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    c.  Dig sheets
    d.  Field contact information for Sable
    e.  Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Lance Yearwood
December 17, 2024
Page 14

    a. Tool type
    b. Run date
    c. Summary of Conditions Report[18]
    d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324*. At a minimum, the annual report shall contain the following, if applicable:

    a. A Closure Report for the previous calendar (CY) which contains:
        i. Features that were remediated in previous CY
            1. Provide documentation for the in-the-ditch assessments and repairs
        ii. Identify features that remain to be assessed
        iii. Unity Plots for previous ILI runs
    b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
    c. The third-party ILI expert reviews in accordance with Condition 52
    d. AC and DC Interference surveys that are due in accordance with Condition 53
    e. A copy of the CGRA for prior year including:
        i. Mean corrosion growth rate for the pipeline
        ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 15

failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:      Doug Allen, Supervising Pipeline Safety Engineer, OSFM
         Andy Chau, Supervising Pipeline Safety Engineer, OSFM
         Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
         Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
         Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
         Tuan Tran, Pipeline Safety Engineer, OSFM
         Josh Cleaver, Staff Counsel, CAL FIRE
         Max Kieba, Engineering and Research Division, PHMSA
         Joshua Johnson, Engineering and Research Division, PHMSA

# EXHIBIT C

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



<u>**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15**</u>

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:    LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR
LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON
THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG
A LONGITUDINAL SEAM WELD (CA-325A/B)**

Operator:    Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

Pipeline:    OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of
Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa
Barbara County, San Luis Obispo County, and Kern County, California as
described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under
insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 166BEFF3-241E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

## General Conditions

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Docusign Envelope ID: 166BEFF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 4

8. Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
   a. API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
   b. API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.
   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b.  All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.

14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours.  Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b.  All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.

16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure.

18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 6

## In-Line Inspection (ILI) Assessment and Frequency

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination
20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 7

any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to  meet  the  tool  accuracy specification  provided  by  the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different.  If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a.  Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b.  Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.  Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 166BEFF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

Lance Yearwood
December 17, 2024
Page 13

    n.  The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

    o.  Safety factors used for fatigue life and/or predicted failure pressure calculations

    p.  Reassessment time interval and safety factors

    q.  The date of the review

    r.  Confirmation of the results by qualified technical subject matter expert(s)

    s.  Approval by responsible Sable management personnel

    t.  Records of additional preventive and mitigative (P&M) measures performed

    u.  Reports required by this State Waiver.

## **Reporting**

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification*.[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B*. The email notification shall include, if applicable:

    d.  Tool type and run date

    e.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

    f.  Dig sheets

    g.  Field contact information for Sable

    h.  Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:

    i.  Tool type

    j.  Run date

    k.  Summary of Conditions Report[18]

    l.  Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B*. At a minimum, the annual report shall contain the following, if applicable:
   a. A Closure Report for the previous calendar (CY) which contains:
        i. Features that were remediated in previous CY
             1. Provide documentation for the in-the-ditch assessments and repairs
        ii. Identify features that remain to be assessed
        iii. Unity Plots for previous ILI runs
   b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
   c. The third-party ILI expert reviews in accordance with Condition 53
   d. AC and DC Interference surveys that are due in accordance with Condition 54
   e. A copy of the CGRA for prior year including:
        i. Mean corrosion growth rate for the pipeline
        ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Docusign Envelope ID: 166BEFF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 15

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:  Doug Allen, Supervising Pipeline Safety Engineer, OSFM
     Andy Chau, Supervising Pipeline Safety Engineer, OSFM
     Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
     Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
     Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
     Tuan Tran, Pipeline Safety Engineer, OSFM
     Josh Cleaver, Staff Counsel, CAL FIRE
     Max Kieba, Engineering and Research Division, PHMSA
     Joshua Johnson, Engineering and Research Division, PHMSA

# EXHIBIT D



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0002**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 10.86 miles of 24-inch diameter pipeline (Sable CA-324) between Las Flores Canyon and Gaviota, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-324 pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

ALAN KRAMER MAYBERRY
Digitally signed by ALAN KRAMER MAYBERRY
Date: 2025.02.11 12:30:07 -05'00'

Alan K. Mayberry,
Associate Administrator for Pipeline Safety

# EXHIBIT E



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0003**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 113.56 miles of 30-inch diameter pipeline (Sable CA-325A/B) between Gaviota, Sisquoc, and Pentland, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-325A&B pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

ALAN KRAMER MAYBERRY
Digitally signed by ALAN KRAMER MAYBERRY
Date: 2025.02.11 12:30:44 -05'00'

Alan K. Mayberry,
Associate Administrator for Pipeline Safety

# EXHIBIT F

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



**CERTIFIED MAIL No: 9589-0710-5270-1475-5352-23**

April 2, 2025

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:** **PHMSA DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324)**

Operator:   Sable Offshore Corp
            OPID# 40851
            845 Texas Avenue, Suite 2920
            Houston, Texas 77002

Pipeline:   OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Lance Yearwood
April 2, 2025
Page 2

On December 17, 2024, the OSFM issued a Letter of Decision (LOD) which allows Sable
to manage the risk of corrosion under the insulation and requires Sable to comply with
over 60 safety conditions which were in addition to the minimum safety standards
mandated under federal and State laws.

This letter is to inform you that on February 11, 2025, the OSFM received a decision from
the Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no
objection to granting the state waiver.

Therefore, the effective date of the state waiver is **February 11, 2025**.

The state waiver is a limited-term agreement that may be revoked for non-compliance and
may continue for no more than ten (10) years from the effective date. The waiver must
follow the renewal process to allow it to be extended.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) PHMSA Letter of Decision Docket No. PHMSA-2025-0002

cc:    Wendy Collins, Division Chief, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Max Kieba, Engineering and Research Division, PHMSA

# EXHIBIT G

Docusign Envelope ID: CC4D9BFF-4953-47A8-8C4A-EC7CCA2C0F16

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                              Gavin Newsom, Governor

 

**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov

## CERTIFIED MAIL No: 9589-0710-5270-1475-5352-16

April 2, 2025

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:** **PHMSA DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A/B)**

Operator:   Sable Offshore Corp
            OPID# 40851
            845 Texas Avenue, Suite 2920
            Houston, Texas 77002

Pipeline:   OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-325 A/B.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: CC4D9BFF-4953-47A8-8C4A-EC7CCA2G9E16

Lance Yearwood
April 2, 2025
Page 2

On December 17, 2024, the OSFM issued a Letter of Decision (LOD) which allows Sable to manage the risk of corrosion under the insulation and requires Sable to comply with over 60 safety conditions which are in addition to the minimum safety standards mandated under federal and State laws.

This letter is to inform you that on February 11, 2025, the OSFM received a decision from the Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no objection to granting the state waiver.

Therefore, the effective date of the state waiver is **February 11, 2025**.

The state waiver is a limited-term agreement that may be revoked for non-compliance and may continue for no more than ten (10) years from the effective date. The waiver must follow the renewal process to allow it to be extended.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) PHMSA Letter of Decision Docket No. PHMSA-2025-0003

cc:     Wendy Collins, Division Chief, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Max Kieba, Engineering and Research Division, PHMSA

# EXHIBIT H



# EXHIBIT I

CELERON/ALL AMERICAN PIPELINE PROJECT

PLANNING COMMISSION ACTIONS

FINAL DEVELOPMENT PLAN
CONDITIONAL USE PERMIT

March 3, 1986

Santa Barbara County
Resource Management Department
Energy Division

CELERON/ALL AMERICAN PIPELINE PROJECT
FINAL DEVELOPMENT PLAN
PLANNING COMMISSION ACTIONS

Table of Contents

1. Permit Information Summary .......................... 1

2. Project Description ................................ 2

3. Planning Commission Action ........................ 2

4. Appeals Process ................................... 6

5. Permit Conditions ................................. 8
   A. General ........................................ 8
   B. Permit Review ................................. 12
   C. Management .................................... 14
   D. Air Quality ................................... 17
   E. Geology ....................................... 18
   F. Surface and Groundwater ....................... 21
   G. Aquatic Biology ............................... 23
   H. Terrestrial Biology ........................... 23
   I. Socioeconomics ................................ 29
   J. Land Use and Recreation ....................... 32
   K. Transportation ................................ 35
   L. Cultural Resources ............................ 36
   M. Visual Resources .............................. 38
   N. Noise ......................................... 39
   O. Abandonment ................................... 40
   P. Systems Safety and Reliability ................ 40
   Q. Facility Design ............................... 44

6. Findings .......................................... 46
   County Zoning Ordinances ......................... 46
   CEQA ............................................. 50
   Statement of Overriding Considerations ........... 55
   Additional Findings .............................. 56
   Impact Summary Tables ............................ 57

EXHIBIT 3

CELERON/ALL AMERICAN PIPELINE PROJECT
FINAL DEVELOPMENT PLAN
PLANNING COMMISSION ACTIONS

The Santa Barbara County Planning Commission made a final decision to approve the Celeron/All American Pipeline Project Final Development Plan on February 18, 1986.  On February 28, 1986 the Board of Supervisors appeals period expired without any appeals filed.  Therefore the Planning Commission's action on this Final Development Plan and Conditional Use Permit is final.  This package details the Commission's actions.

## 1.   PERMIT INFORMATION SUMMARY

1.1  Applicant Information

Project Title:            Celeron/All American Pipeline Project

Project Location:         Las Flores Canyon, California to Emidio, California

Supervisorial Districts:  Third, fourth, fifth

Applicant:                Celeron Pipeline Company of California

Applicant
Representative:           Mr. Ron Hinn, Vice President
                          Celeron Pipeline Company of California
                          4213 State St., P.O. Box 31029
                          Santa Barbara, CA  93130
                          805/683-5627

1.2  Case Processing Information

Celeron has filed, and the Planning Commission has acted upon, the following permit applications:

    Final Development Plan (Case # 85-DP-66cz)
        County permit for allowable projects which, because of the type, scale, or location of the development, require comprehensive review.  This permit covers all aspects of the project proposal.

    Major Conditional Use Permit (Case # 83-CP-97cz)
        County permit for permittable projects which, because of certain aspects of the proposal or of the proposed project location, require special consideration.  This permit is required because the proposed pipeline crosses Environmentally Sensitive Habitat areas.

Planning Commission Actions                                Page 2
Celeron Pipeline Final Development Plan              March 3, 1986

## 2. PROJECT DESCRIPTION

Celeron proposes to construct a 30-inch diameter, insulated welded steel
pipeline designed to transport up to a maximum of 425,000 barrels per day
(BPD) with an optimal throughput of 300,00 BPD, of Outer Continental Shelf and
other locally produced crude oils. The pipeline would extend approximately
135 miles from Las Flores Canyon to the Emidio pump station in the southern
San Joaquin Valley. Three pump stations would be constructed, one at Las
Flores Canyon, one at Gaviota, and one near the Sisquoc River in northern
Santa Barbara County. The pipeline would be buried to a minimum cover depth
of three feet throughout its length according to Department of Transportation
specifications, with increased cover depth in selected areas.

The pipeline will require a 100-foot wide construction corridor and a 50-foot
wide permanent easement. The proposed route parallels Highway 101 from Las
Flores to Gaviota, turns north at Gaviota State Park west of Highway 101 and
continues to the Sisquoc River. From the Sisquoc River the route follows
Santa Maria then Suey Canyons north toward the Cuyama River. It crosses the
river in the Western Cuyama Valley, and exits the County.

## 3. FINAL PLANNING COMMISSION ACTIONS

| Motion maker/Second | Vote | Action |
|---|---|---|
| February 13, 1986 | | |
| 1.  Wells/Hamister | 5-0 | Conceptual approval of Realignment 1, as presented in the February 6, 1986 Staff Report, including avoidance of the landslide. |
| 2.  Wells/Stillman | 5-0 | Conceptual approval of Realignment 2, as presented in the February 6, 1986 Staff Report, with the understanding that staff will work with the applicants to reduce the visual impacts along the corridor. |
| 3.  Sherman/Wells | 5-0 | Continue discussion of Realignment 3 until Tuesday February 18, 1986. |
| 4.  Wells/Hamister | 5-0 | Conceptual approval of a realignment near Realignment 4, as depicted on Page CE 004 of the January 1986 Realignment Request sheets, which follows the yellow line coming from the southern section of the map, and going across the top of the Giorgi property, and Moonshine Creek, and coming down the northern property line of |

EXHIBIT B

Planning Commission Actions                                    Page 3
Celeron Pipeline Final Development Plan              March 3, 1986

|   |   |   | Giorgi, to meet the original pipelne route, from whence it will meet Realignment 5, with the understanding that if there are any problems biologically with any minor adjustments to those corridors, or if there is any conflict between staff and Celeron on that segment, that it be brought back to the Commission for a final decision. |
|---|---|---|---|
| 5. | Wells/Sherman | 5-0 | Conceptual approval of Realignment 5, with the understanding that any landslides or environmental constraints will be mitigated by the applicant, to the satisfaction of staff. |
| 6. | Sherman/Wells | 5-0 | Conceptual approval of Realignment 6, as presented in the February 6, 1986 Staff Report. |
| 7. | Stillman/Hamister | 5-0 | Conceptual approval of Realignment 7, as presented in the February 6, 1986 Staff Report. |
| 8. | Stillman/Hamister | 5-0 | Conceptual approval of Realignment 8, as presented in the February 6, 1986 Staff Report. |
| 9. | Johnson/Stillman | 5-0 | Conceptual approval of Realignments 9 and 10, as presented in the February 6, 1986 Staff Report. |
| 10. | Johnson/Wells | 5-0 | Conceptual approval of Realignment 11, as presented in the February 6, 1986 Staff Report. |
| 11. | Johnson/Stillman | 5-0 | Conceptual approval of Realignment 12, as presented in the February 6, 1986 Staff Report, with the understanding that when the Forest Service chooses a route, the other alternative will fall away. |
| 12. | Johnson/Stillman | 5-0 | Conceptual approval of Realignment 13, as presented in the February 6, 1986 Staff Report. |
| 13. | Wells/Sherman | 5-0 | Approve the route changes conceptually approved in this hearing, with the exception of Realignment 3, and as part of the Final Development Plan approval, with the understanding that staff has discretion within the corridor analyzed in the EIR, and so long as no greater impacts arise from the alignment than the one originally approved by the Commission. |
| 14. | Sherman/Wells | 5-0 | Continue discussion of H-12, P-2, P-3, and P-5 until February 18, 1986. |

Planning Commission Actions                                    Page 4
Celeron Pipeline Final Development Plan                    March 3, 1986

15. Johnson/Wells   4-0   That Condition H-1 and County policy requires replacement of all trees removed, and that Celeron will provide more detailed information regarding the offsite tree-planting prior to land use clearance. ABSENT: Sherman

16. Wells/Hamister   4-0   That Condition H-1 be modified, and that staff return on February 18 with wording to allow the revegetation plan for Gaviota State Park to be done prior to the issuance of the Coastal Development Permit, in cooperation with the State Parks Department.

February 18, 1986 (Sherman absent)

17. Wells/Stillman   4-0   Conceptual approval of new condition M-6 as presented by staff with the unwritten understanding that ant problems with that condition can be brought before the Commission for arbitration.

18. Wells/Hamister   4-0   Conceptual approval of new conditions B-7 and B-8 as presented by staff.

19. Wells/Stillman   4-0   Conceptual approval of the February 18 revisions to conditions H-12, P-2, P-3, and P-5, with the understanding that language will be added to each of the conditions to allow adequate time for staff review.

20. Wells/Hamister   4-0   Conceptual approval of Condition C-1 with the understanding that the criteria for shut down come back to the Commission for review, and that during construction monthly EQAP reports are given to the County, and for the first three months of operation, monthly reports will be given to the County, with annual reports thereafter.

21 - 37. These motions all gave conceptual approval to the various conditions, wording changes, and submittals as recommended by staff in the February 18 staff memo (motions 21 to 28, 38), and the February 6 Staff Report (motions 29 to 37). All votes were unanimous, 4-0. The motion makers, seconds and appropriate conditions are listed below.

EXHIBIT B

Planning Commission Actions                                           Page 5
Celeron Pipeline Final Development Plan                        March 3, 1986

21. Wells/Hamister          E-1
22. Hamister/Stillman       F-1
23. Stillman/Hamister       F-5
24. Stillman/Hamister       F-8
25. Hamister/Stillman       F-11
26. Wells/Hamister          H-1; modify paragraph (j), replacing "plant" with
                            "reestablish," and approve four points in staff memo.
27. Wells/Hamister          I-2
28. Hamister/Stillman       P-9
29. Hamister/Stillman       E-4
30. Wells/Hamister          E-5
31. Wells/Stillman          E-6
32. Wells/Hamister          E-7
33. Hamister/Stillman       F-2
34. Stillman/Hamister       F-3
35. Hamister/Stillman       F-4
36. Stillman/Hamister       F-7
37. Wells/Hamister          All remaining conditions except L-1, P-10, P-11
38. Wells/Hamister          L-1

| Motion maker/Second | Vote | Action |
|---|---|---|
| 39. Wells/Stillman | 4-0 | Conceptual approval of Condition P-11, including the addition of Condition P-18, and the approval of the submittal for P-18, as outlined in the February 6 Staff Report. |
| 40. Wells/Stillman | 5-0 | Conceptual approval of Condition P-10, as modified in the discussions, including adding wording regarding the reporting provisions under C-1. |
| 41. Wells/Hamister | 5-0 | Adopt new condition B-9, as presented on the February 18 staff memo. |
| 42. Wells/Hamister | 4-0-1 | Approve the Final Development Plan as modified with the conceptual motions, and any of those items which were not specifically addressed would be as per the staff presentation; any changes not specifically made to the Preliminary Development Plan remain as originally passed. Approve the Findings and Overriding Considerations as per the February 18 memo, including the additional finding regarding "prior to start-up" condition timing. ABSTENTION: Sherman. |
| 43. Wells/Stillman | 4-0-1 | Approve the Conditional Use Permit and Findings for the Environmentally Sensitive Habitat areas. ABSTENTION: Sherman. |

Planning Commission Actions                                    Page 6
Celeron Pipeline Final Development Plan                  March 3, 1986

4.  APPEALS PROCESS

The following text is taken from the Santa Barbara County Coastal Zoning
Ordinance, Section 35-182:  Appeals.

Sec.  35-182.  Appeals.

Sec. 35-182.1. Purpose and Intent.

    The purpose of this section is to provide procedures for appeals to the
    Planning Commission and the Board of Supervisors and to establish the
    criteria for those developments that may be appealed to the State Coastal
    Commission.

Sec. 35-182.2. Appeals to the Planning Commission.

(Not applicable)
Sec.  35-182.3.  Appeals to the Board of Supervisors.

(Not applicable)


Sec. 35-182.4.  Appeals to the Coastal Commission.

1.  For developments which are subject to the appeals jurisdiction of the
    Coastal Commission under PRC Sec. 30603, appeal of an action on a Coastal
    Development Permit may be filed with the Coastal Commission provided,
    however, that local appeals have been exhausted on the County's action on
    the project permits (i.e., Development Plan, C.U.P., Special Use Permit,
    Oil and Gas Plan).

2.  In accordance with Public Resources Code Sec. 30603(a), an action taken by
    the County of Santa Barbara on a Coastal Development Permit application
    for any of the following may be appealed to the Coastal Commission.

    a.  Developments approved by the County between the sea and the first
        public road paralleling the sea or within 300 feet of the inland
        extent of any beach or of the mean high tide line of the sea where
        there is no beach, whichever is the greater distance, as indicated on
        the official County appeals zone maps.

    b.  Developments approved by the County not included within paragraph (a)
        of this section located on tidelands, submerged lands, public trust
        lands, within 100 feet of any wetland, estuary, stream, or within 300
        feet of the top of the seaward face of any coastal bluff, as
        indicated on the official County appeals zone map or as determined by
        the State Lands Commission.

EXHIBIT 3

Planning Commission Actions                                         Page 7
Celeron Pipeline Final Development Plan                        March 3, 1986

    c.    Developments approved by the County that require a Conditional Use Permit (CUP).

    d.    Any development which constitutes a major public works project or a major energy facility. The phrase, "major public works project or a major energy facility," as used in Public Resources Code Sec. 30603(a) (5) and this Article shall mean any proposed public works project or energy facility exceeding $50,000 in estimated cost of construction.

3.  Grounds of Appeal.

    a.    The grounds of appeal for any development appealable under 2.a., of this Section shall be limited to one or more of the following:

        1)  The development fails to provide adequate physical access or public or private commercial use or interferes with such uses.

        2)  The development fails to provide public views from any road or from a recreation area to, and along, the coast.

        3)  The development is not compatible with the established physical scale of the area.

        4)  The development may significantly alter existing natural landforms.

        5)  The development does not comply with shoreline erosion and geologic setback requirements.

        6)  The development is not in conformity with the Local Coastal Program.

    b.    The grounds of appeal for any development appealable under 2.b.,c., and d. of this section shall be limited to whether development is in conformity with the Local Coastal Program.

5648e

Planning Commission Actions                                    Page 6
Celeron Pipeline Final Development Plan                        March 3, 1986

5.  CELERON FINAL DEVELOPMENT PLAN CONDITIONS

A.  GENERAL

A-1.    Acceptance of this permit shall be deemed as acceptance of all final
        conditions of this permit, except that Celeron reserves the right to
        pursue any remedy for any legal violations imposed directly or
        indirectly by these permit conditions.

A-2.    Substantial failure to abide by and faithfully comply with any
        conditions for the granting of this permit shall constitute grounds
        for the modification or revocation of this permit.

A-3.    Celeron agrees as a condition of the issuance and use of this permit
        to defend at its sole expense any action brought against the County
        by a third party challenging either its decision to issue this permit
        or the manner in which the County is interpreting or enforcing the
        conditions of the permit.  Celeron will reimburse the County for any
        court costs and attorneys fees which the County may be required by a
        court to pay as a result of such action where Celeron defended or was
        control of the defense of the suit.  County may, at its sole
        discretion, participate in the defense of any such action, but such
        participation shall not relieve Celeron of its obligation under this
        condition.  County shall bear its own expenses for its participation
        in the action.

A-4.    Celeron shall make an initial deposit to a fund to permit the County
        to adequately implement and enforce the conditions imposed on Celeron
        by applicable County ordinances and/or the conditions of this permit
        if such a fund is established.  If the Board of Supervisors
        determines that a reasonable enforcement fund is needed, the Director
        of the Resource Management Department shall present to the Board of
        Supervisors and Celeron a plan for enforcement within one year from
        the effective date of this permit.  This plan shall set forth the
        staffing requirements and materials necessary for such enforcement
        and the estimated costs thereof.  This plan shall provide that all
        reasonable expenses incurred by the County or County contactors, for
        permit condition implementation, reasonable studies, and emergency
        response directly and necessarily related to enforcement of these
        permit conditions shall be reimbursed by Celeron within 30 days of
        invoicing by County.

A-5.    In the event that Celeron fails to comply with any order of the
        Administrative Officer or the Board of Supervisors issued hereunder
        or any injunction of the Superior Court, it shall be liable for a
        civil penalty for each violation to the extent imposition of such
        civil penalty is authorized by applicable laws, rules, or regulations.

        Said civil penalty shall be in addition to Celeron's obligation, if
        any, to reimburse the County of Santa Barbara (and others) for actual
        damages suffered as a result of Celeron's failure to abide by the
        conditions of this permit or the orders of the Administrative
        Officer, the Board of Supervisors, or any court of competent
        jurisdiction.

Planning Commission Actions                                      Page 9
Celeron Pipeline Final Development Plan                    March 3, 1986

A-6.    As to any condition which requires for its effective enforcement the
        inspection of construction records or records pertaining to facility
        operations, or the facilities themselves by County or its duly
        authorized agents, Celeron will make all necessary records available
        or provide access to such facilities upon reasonable notice from
        County.  County agrees to keep such information confidential where
        permitted by law and requested by Celeron in writing.

A-7.    The procedures, operating techniques, design, equipment and other
        descriptions (hereinafter procedures) described by Celeron in its
        application to the County 83-DP-25 cz, 83-CP-97 cz, and in subsequent
        clarifications and additions to that application and the Final
        Development Plan are incorporated herein as permit conditions and
        shall be required elements of the project.  Since these procedures
        were part of the project description which received environmental
        analysis, a failure to include such procedures in the actual project
        could result in significant unanticipated environmental impacts.
        Therefore, modifications of these procedures will not be permitted
        without a determination of substantial conformity or a new or
        modified permit.  The use of the property and the size, shape,
        arrangement and location of buildings, structures, walkways, parking
        areas and landscaped areas shall be in substantial conformity with
        the Approved Final Development Plan.

A-8.    In addition to the authority to enforce and secure compliance with
        the provisions of this permit under Division 12, Coastal Zoning
        Ordinance of the Santa Barbara County Code, Division 7, General
        Regulations, Article III Santa Barbara County Zoning Ordinance, the
        County Administrative Officer, or in his/her absence a designated
        appointee, may order that curtailment of activities which is required
        to protect the public health and safety.  Said action may include,
        but is not limited to, ordering temporary, partial or total facility
        shutdown.

        Such an order shall be made only in the event that the Administrative
        Officer has reasonable and probable cause to believe that continued
        unrestrained activities of permittee will likely result in or
        threaten to result in danger to public health, welfare, or safety, or
        in the environment and provided such violations can be expected to
        continue or recur unless operations are in whole or in part shut down
        or reduced pending the necessary corrections.

        Before issuing any curtailment order, the County Administrative
        Officer shall set a time for hearing and shall give written notice of
        the time and place of the hearing and of the alleged violations.
        Such notice shall be received by the person in charge of the
        operation of the facility at least 24 hours before the hearing at
        which time there will be an opportunity for all interested parties to
        present evidence regarding the alleged violations.  The notice may be
        served in person or by certified mail.

In the event the Administrative Officer, or in his/her absence the
designated appointee, determines that there is an imminent danger to
the public health and safety resulting from violations, he/she may
summarily order the necessary curtailment of activities without
hearing and such order shall be obeyed upon notice of same, whether
written or oral.  At the same time that notice of the order is
conveyed, the Administrative Officer shall set a date, time and place
for a publically noticed hearing and review of said order as soon as
possible which date shall be no later than 24 hours after such order
is issued or served.  Said hearing shall be conducted in the same
manner as a hearing on prior notice.  After such hearing, the
Administrative Officer may modify, revoke, or retain the emergency
curtailment order.

Any order of the Administrative Officer may be appealed to the Board
of Supervisors within three working days after such order is made.

If such appeal is not filed with the Board of Supervisors, the
Administrative Officer's order becomes final.  If there is an appeal,
the order of the Administrative Officer shall remain in full force
and effect until action is taken by the Board of Supervisors.  The
decision of the Board of Supervisors shall be a final Administrative
action.  Such decision shall not preclude Celeron from seeking
judicial relief.

Once Celeron has shown that the conditions of violation no longer
exist and are not reasonably likely to recur, the Administrative
Officer shall modify the curtailment order to account for such
compliance and shall entirely dissolve the order when it is shown
that all of the violations have been corrected and are not likely to
recur.

A-9      In the event that any condition contained herein is determined to be
         invalid, then all remaining conditions shall remain in force.

A-10.    In the event that any condition contained herein is determined to be
         in conflict with any other condition contained herein, then where
         principles of law do not provide to the contrary, the condition must
                   of public health and safety and natural environmental
              shall prevail to the extent feasible.

         In addition to any administrative remedies or enforcement provided
         hereunder, the County may seek and obtain temporary, preliminary, and
         permanent injunctive relief to prohibit violation of the conditions
         set forth herein or to mandate compliance with the conditions herein.

         All remedies and enforcement procedures set forth herein shall be in
         addition to any other legal or equitable remedies provided by law.

Planning Commission Actions                                    Page 11
Celeron Pipeline Final Development Plan                    March 3, 1986

A-12.    The owner and the operator of the facility shall be jointly and
         severally liable without regard to fault for all legally compensable
         damages or injuries suffered by any property or person that result from
         or arise out of any oil, water spillage, fire, explosion, odor, or air
         pollution, in any way involving oil or gas or the impurities contained
         therein or removed therefrom and which arises out of construction or
         operation of Celeron's facilities.  For the purpose of this condition,
         the "facility" shall be deemed to include all facilities described and
         approved pursuant to 83-DP-25cz, 83-CP-97cz.  This condition shall not
         inure to the benefit of any of the owners of the pipeline, including
         the United States Government.  This declaration of strict liability and
         the limitations upon it shall be governed by the applicable law of
         California on strict liability.

A-13.    All facilities constructed under this permit shall be used only for the
         shipment of a maximum volume of heated crude oil demonstrated to be
         within the design parameters of the pipeline facilities as built. The
         subject volumes will be outer continental shelf (OCS) and other locally
         produced onshore and offshore petroleum from the Santa Barbara and
         Santa Maria Basins.  Celeron shall obtain a new or modified permit, or
         authority to continue operation under the existing permit prior to
         undertaking any of the following activities which may, in the judgement
         of the County, result in significant changes to the impacts on the
         County.  Such changes could include but not be limited to: 1) major
         pipeline or pump station modifications; 2) major changes in pipeline
         throughput; 3) introduction of production to the pipeline from sources
         other than those described above; and 4) introduction of a different
         product from any source.

         Other source volumes may be transported subject to a determination of
         substantial conformity by the Planning Commission and a finding of
         facts and determination that project impacts will not be increased by
         transporting and processing those other sources.

A-14.    Celeron shall align the pipeline corridor from the coastal starting
         point to the County exit point in the western Cuyama valley according
         to the route approved by the County.  Celeron shall locate and
         construct all isolation valves as identified by the final approved
         alignment.

A-15.    Any person, firm or corporation, whether as a principal, agent,
         employee, or otherwise, found to be in violation of any provisions or
         conditions of this ordinance or permits, shall be punishable as set
         forth in the applicable section of the Coastal Zoning Ordinance, and
         Article III of the Santa Barbara County Code.

         Each and every day during any portion of which any violation of this
         Article or the rules, regulations, orders, or permits issued
         thereunder, is committed, continued, or permitted by such person, firm
         or corporation shall be deemed a separate and distinct offense.

A-16.   The Santa Barbara County Board of Supervisors in a noticed public
        hearing shall have the authority to specify or change the Santa Barbara
        County Department responsible for any conditions contained herein.

A-17.   Should circumstances, including legal or legislative action, cause the
        County to lose its authority or have its authority fundamentally
        reduced to assess fees as a method to mitigate project-related impacts,
        then other feasible mitigation measures shall be imposed which will
        substantially lessen the significant impact formerly mitigated by the
        imposition of fees.  Within six months of the County's loss of such
        authority, feasible alternative mitigation measures shall be imposed as
        replacement permit conditions.  Alternatively, the County in a noticed
        public hearing must find that no feasible mitigation measures are
        available and that the benefits of the project outweigh the significant
        environmental impacts.

A-18.   Should legal action be required by either party to enforce any rights
        in connection with this permit the prevailing party shall be entitled
        to reasonable attorney's fees and costs pursuant to Civil Code 1717.

A-19.   Unless otherwise specified, these permit conditions are intended to
        apply to Celeron during both the construction and the operation of the
        permitted facilities.


B.      PERMIT REVIEW

B-1.    Prior to initiation of construction activity (such as ROW preparation,
        river crossings or pump station construction), Celeron shall submit to
        the System Safety and Reliability Review Committee (established by
        condition P-1) relevant construction drawings and supporting text
        demonstrating compliance with the appropriate conditions.  Construction
        may not commence until County has approved this submittal.  Within 15
        days of submittal, County shall either give written notice to proceed
        with construction or indicate in writing conditions which have not been
        met.  When such conditions have been met construction approval shall be
        granted.

B-2.    If at any time County determines that these permit conditions are
        inadequate to effectively mitigate significant environmental impacts
        caused by the project, or that recent proven technological advances
        could provide substantial additional mitigation, then additional
        reasonable conditions shall be imposed to further mitigate these
        impacts.  Imposition of such conditions shall only be considered and
        imposed as part of the County's comprehensive review of the project
        conditions.  County shall conduct a comprehensive review of the project
        conditions and consider adding reasonable conditions which incorporate
        proven technological advances three years after permit issuance and at

Planning Commission Actions                                Page 13
Celeron Pipeline Final Development Plan                     March 3, 1986

appropriate intervals thereafter. A comprehensive review of conditions
which are not effectively mitigating impacts may be conducted at any
appropriate time. Upon written request of Celeron, the Board of
Supervisors shall determine whether the new condition required is
reasonable considering the economic burdens imposed and environmental
benefits to be derived.

8-3.   This permit is premised upon findings that where feasible, all
       significant environmental effects of the project identified in the
       EIR/EIS (State Clearinghouse No. 83110902), which occur in Santa
       Barbara County, will be substantially mitigated by the permit
       conditions. Prior to approval of the Final Development Plan, County
       shall review any findings that identified certain mitigation measures
       as being in the primary jurisdiction of another agency but are also
       within County's jurisdiction. County shall thereupon determine either
       (1) that such mitigation has or is being implemented by such other
       agency or (2) that such other agency and County determine such
       mitigation to be infeasible. If County determines that no other agency
       is or may be implementing such feasible mitigation measures then County
       may impose those feasible measures within its jurisdiction to mitigate
       those environmental impacts in accordance with appropriate mitigation
       measures identified by the EIS/R.

8-4.   Prior to approval of the Final Development Plan, Celeron shall develop
       and submit to the Resource Management Department for approval a plan to
       co-ordinate the placement and timing of their pipeline with SCPS's
       pipeline (or other potential proposals for use of the same corridor for
       a pipeline). Any agreements between Celeron and SCPS (or other
       applicant) necessary to implement this plan shall be subject to review
       and verification by the Resource Management Department to assure the
       purpose of the plan will be achieved. The expressed purpose of this
       co-ordination plan shall be:

       1) arrangement of simultaneous construction where practical;

       2) engineering of pipe placement within the ROW to minimize incremental
       widening of the initial construction corridor during subsequent
       pipeline projects;

       3) identification of segments where incremental widening of the ROW is
       constrained and alternative engineering techniques which may allow
       construction of subsequent pipelines (and potential limitations of
       future pipeline use of the ROW); and

       4) timing and design of revegetation plans to promote effective
       revegetation but minimize unnecessary duplication of efforts.

       Should SCPS or any other applicant abandon their pipeline project, or fail
       to submit a Final Development Plan prior to Celeron pipeline construction,
       this condition may be modified to reflect the existing situation but
       maintain the intent of this condition.

Planning Commission Actions                                      Page 14
Celeron Pipeline Final Development Plan                      March 3, 1986

B-5.    In the event that scheduling requirements among or between conditions
        in this permit (or with this permit and conditions imposed by other
        agencies) conflict with respect to timing, the Resource Management
        Department (in consultation with other agencies as appropriate) shall
        resolve such conflict.

B-6.    Applicant shall cooperate as necessary with San Luis Obispo County in
        the permitting, design, and construction of those segments of the
        pipeline which could affect Santa Barbara County.  The intent of this
        condition is to ensure that potential impacts to Santa Barbara County
        are mitigated to the maximum extent feasible by these permit
        conditions, regardless of the location of the source of the impact.

B-7.    Prior to commencing any construction activities in Santa Barbara
        County, Celeron shall obtain a letter from the Director of the
        Resource Management Department indicating that all conditions which
        require approval prior to construction, as specified by this permit,
        have been satisfied.

B-8.    Prior to start-up of the pipeline in Santa Barbara County, Celeron
        shall obtain a letter from the Director of the Resource Management
        Department indicating that all conditions which require approval
        prior to start-up, as specified by this permit, have been satisfied.

B-9.    In the event that Celeron and staff cannot reach an agreement on the
        adequacy of any submittal required by these conditions, the matter
        will be brought before the Planning Commission for resolution at the
        earliest possible date.


C.  MANAGEMENT

C-1.    Celeron shall prepare an Environmental Quality Assurance Program
        (EQAP) for Resource Management Department approval prior to the Final
        Development Plan.  This EQAP shall encompass both the construction
        and operation phases of the project, and shall describe the steps
        Celeron will take to assure compliance with these conditions.  This
        plan is intended to provide a framework for all other programs and
        plans specified by these conditions as required prior to approval of
        the Final Development Plan.  As such, it will become a comprehensive
        reference document for the County, other agencies, and the public
        regarding the Celeron project.

        This plan shall provide for the submission to the Resource Management
        Department semi-annual reports throughout construction and annual
        reports during operations.  These reports shall describe:

Planning Commission Actions                                    Page 15
Celeron Pipeline Final Development Plan                  March 3, 1986

    a)  Project status, including but not necessarily limited to:

        i)    extent to which construction has been completed,
        ii)   the rate of production/throughput during operation,
        iii)  environmental planning and implementation efforts, and
        iv)   any revised time schedules or timetables of construction
            and operation that will occur in the next one year period.

    b)  Permit condition compliance, including but not necessarily
        limited to the results of the specific mitigation requirements
        identified in these conditions.

    c)  Results and analyses of all data collection efforts being
        conducted by Celeron pursuant to these permit conditions.

The program shall include (or if separate plans exist, reference) all
plans relevant to construction and operations of the pipeline
facilities specified by these conditions.

Construction

The program shall include all plans relevant to construction activites
such as the Restoration, Erosion Control and Revegetation Plan and the
Cultural Resources Mitigation Plan.

The program shall include provisions for at least one managing
environmental coordinator with overall responsibility, and if
necessary, one onsite environmental coordinator per construction site
during the construction phase.  These coordinators shall be approved by
and be responsible to the Resource Management Department.  Celeron
shall fund the coordinator(s).  The number of coordinators necessary
shall be determined according to the amount of simultaneous
construction activity occuring in geographically separate areas.  The
responsibilities of the coordinator(s) are to include:

a)    on-site, day-to-day monitoring of construction activities;

b)    ensuring contractor knowledge of and compliance with all
      appropriate permit conditions;

c)    evaluating the adequacy of construction impact mitigations, and
      proposing improvements to the contractors, Celeron, and County;

d)    having the authority to require correction of activities observed
      to violate project environmental conditions or that represent
      unsafe or dangerous conditions, and having the ability and
      authority to secure compliance with the conditions or standards
      through the County Administrative Officer as described in
      condition A-8, if necessary;

e)  performing as contact for affected property owners and any other affected persons that wish to register observation of environmental permit violations and/or unsafe conditions, receiving any complaints, immediately contacting Celeron's onsite construction representative, verifying any such observations and developing any necessary corrective actions in consultation with Celeron's onsite construction representative;

f)  maintaining prompt and regular communication with the Resource Management Department, Public Works Department, or other appropriate County agency, and with Celeron personnel responsible for contractor performance and permit compliance.

In the event that resolution of disputes between the public and/or governmental agencies and Celeron over adherence to permit conditions is not achieved by the managing environmental coordinator, an arbitration system shall be utilized to resolve such disputes in a timely manner in order to minimize the need to halt construction activities as per conditions A-2 or A-8.

The coordinator(s) shall be thoroughly familiar with all plans and requirements set forth in the permit conditions. Prior to construction start-up, the managing coordinator shall discuss with other agency inspectors or monitoring personnel, inspection programs, areas of jurisdiction, responsibility, and define methods of avoiding disputes or construction delay due to agency disagreements.

Selection of the necessary coordinators shall be made, and the person(s) available, prior to issuance of the Coastal Development Permit and Land Use Permit.

Operations

The program shall include all plans related to operations, such as the Emergency Response Plan, Oil Spill Contingency Plan, and Landscaping Plan, as well as specific conditions not required in formal plans. It may also include any procedures not specified by these conditions but relevant to environmental protection and safety.

C-2.  Prior to issuance of the Coastal Development Permit and Land Use Permit Celeron shall provide to the Resource Management Department and the Emergency Services Coordinator the current name and position, title, address, and 24-hour phone numbers of the field agent, person in charge of the facility, and other representatives who shall receive all orders and notices, as well as all communications regarding matters of condition and permit compliance at the site and who shall have authority to implement a facility shutdown pursuant to condition A-8 in this Ordinance. There shall always be such a contact person(s) designated by the permittee. One contact person shall be available 24 hours a day during all phases of the project in order to respond to inquiries received from the County, or from anyone in case of an emergency.

EXHIBIT B

Planning Commission Actions                                            Page 17
Celeron Pipeline Final Development Plan                          March 3, 1986

       If the address or phone number of Celeron's agent should change, or the responsibility be assigned to another person or position, Celeron shall provide to the Resource Management Department the new information within seven days.

C-3.    Celeron shall furnish to the Resource Management Department copies of all County permit applications relative to the project once submitted, and of permits within 30 days of receipt by Celeron.

D.     AIR QUALITY

D-1.    Nothing contained herein shall be construed to permit a violation of any applicable air pollution law, rule, or regulation.

D-2.    Prior to initiation of construction, including grading, of any facilities approved pursuant to this Development Plan, Celeron shall obtain an Authority to Construct permit from the County Air Pollution Control District.

D-3.    Celeron agrees to implement all air pollution control procedures as required by APCD and identified in the Final Development Plan (such as water sprays to reduce construction-related fugitive dust).

D-4.    Emissions from any project component that contribute to ozone standard violations must be mitigated to the extent feasible. Effectiveness of mitigation will be confirmed by APCD.

D-5.    Deleted.

D-6.    Prior to approval of the Final Development Plan, Celeron shall submit to the Resource Management Department updated estimates of the type and size of helicopters, or other aircraft, to be used during pipeline operations for the aerial surveys of the pipeline route. The information shall also include the estimated operating schedules, frequency and duration of airport calls and other reasonable information as required by APCD. The County may require validation and updating of this information as needed. Should this information reveal significant differences between the estimated air emissions and those analyzed in the EIR/EIS, the APCD may modify air quality permit conditions as necessary to assure consistency with the Air Quality Attainment Plan and Reasonable Further Progress goals.

D-7     All facilities shall be designed, constructed, operated, and maintained, such that the facilities approved under this Development Plan shall not discharge quantities of air contaminants or other materials in violation of Section 41700 of the Health and Safety Code.

Planning Commission Actions                          Page 18
Celeron Pipeline Final Development Plan              March 3, 1986

D-8     Prior to the approval of the Final Development Plan, Celeron shall
        submit to the Director of the Resource Management Department a plan,
        approved by the APCD, which includes timing of construction, minimizing
        soil handling, and other measures to mitigate construction air quality
        impacts.  The plan shall include APCD approved analysis which
        demonstrates that local, state and federal air quality standards will
        not be violated as a result of construction activities.


E.      GEOLOGY

E-1.    Prior to the issuance of the Coastal Development Permit and Land Use
        Permit, Celeron will conduct a route-specific Geologic Investigation,
        Design, and Mitigation Program.  This program shall contain three basic
        components: 1) a detailed geologic investigation component which
        defines specific hazards, 2) an engineering design component which
        details specific engineering plans for each identified hazard along the
        route, and 3) a geohazards mitigation component which demonstrates how
        and to what extent each hazard is reduced.

        a) Detailed geologic investigation component:

            Where specific hazards have been identified or may occur along
            the pipeline route or at pump station locations, Celeron will
            conduct appropriate detailed geologic, seismic, and geotechnical
            studies to further characterize the specific geologic hazard.
            These studies will be conducted under the direction of a State of
            California registered geologist or engineering geologist and will
            be subject to approval by the Resource Management Department and
            Public Works Department.  These studies will include but not be
            limited to investigations of unstable slopes, erodable slopes,
            lurch/liquefaction susceptible substrate, surface rupture, and
            river scour characteristics (depth and lateral extent).  Methods
            of investigation shall conform to appropriate geotechnical
            techniques applicable to each specific hazard.  Draft results
            will be·subject to review by County Public Works Department and
            Flood Control Agency as appropriate prior to finialization of the
            engineering design.  The final report will be submitted with the
            final engineering design component.

        b) Engineering design component:

            Celeron shall incorporate appropriate geotechnical information
            from component a) and other applicable recommendations into final
            engineering design of pipeline construction and facilities.  This
            includes but is not restricted to:  the development of
            appropriate ground motion parameters for use in seismic design of

Planning Commission Actions                                    Page 19
Celeron Pipeline Final Development Plan                    March 3, 1986

critical structures and equipment, unstable slope construction or avoidance techniques, burial depth at all major river crossings, modification of instrumentation, or use of the dual contingency level/operating level earthquake concept, or its equivalent. The designs will be subject to review by the Department of Public Works and third party technical review as specified in Condition P-1. The final engineering design shall be approved by County Public Works and Flood Control Agency prior to the issuance of the Coastal Development Permit and Land Use Permit.

c) Geohazards mitigation component:

Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron will submit to the Resource Management Department a detailed geologic hazard mitigation report. The report will outline the hazards identified in part a) of this program and will address how engineering designs as detailed in part b) of this program reduce each specific hazard. This component will also be submitted to the Department of Public Works and Flood Control Agency and will be subject to third party review as specified in Condition P-1.

E-2.   Celeron will develop a Monitoring Program for the operations phase to be funded by Celeron and staffed as necessary with at least one State of California registered engineer, or engineering geologist, in order to evaluate any hazards identified by routine monitoring. The program will be designed to verify adequate performance or condition of the project components in hazard areas such as river and active fault crossings, and will be subject to approval of the Resource Management Department prior to issuance of the Coastal Development Permit and Land Use Permit. The monitoring program may in part be incorporated into routine aerial and ground reconnaissance.

If the monitoring indicates a potential or actual hazard, appropriate action including, but not limited to, operations curtailment and repairs, will be taken by Celeron to mitigate the hazard. Celeron will report to the Emergency Services Coordinator any potentially hazardous situations discovered during monitoring.

In the case of river crossings at the Santa Ynez, Sisquoc and Cuyama Rivers, a yearly inspection of pipeline burial depth, subject to review by the Resource Management Department and Flood Control Agency, shall be performed. At crossing of the Santa Ynez and Sisquoc Rivers where channel degradation has reduced the depth of cover to less than four feet below the 100-year scour depth, or other hazardous levels as determined by a professional engineer on the staff of or under supervision of the County Flood Control Agency, or US D.O.T. specifications, relocation or reburial of the pipeline to adequate depth will be required. At the crossing of the Cuyama River, if the inspections reveal that hazardous conditions exist, mitigations such as reconstruction or relocation of the crossing will be required as determined by a professional engineer on the staff of or under supervision of the County Flood Control Agency.

Planning Commission Actions          ·                          Page 20
Celeron Pipeline Final Development Plan                    March 3, 1986

E-3.    Inspection of the pipeline trench or trench spoil to identify any
        potential geologic hazards shall be made by a professional geologist or
        soils engineer approved by the Resource Management Department prior to
        installation of the pipeline.  If hazards not previously accounted for
        in the pipeline design are encountered, appropriate mitigation measures
        will be developed and must be instigated prior to installation of the
        pipeline.  The results of the inspection will be reported to the
        engineering geologist of the Public Works Department who will approve
        prior to, and the supervising environmental coordinator who will
        insure, application of the necessary mitigation measures.  The timing
        of such inspections shall not result in any unreasonable delays in
        installation of the pipeline.

E-4.    At all places where the pipeline crosses an active fault, according to
        the Department of Geology and Mining definitions, Celeron will place
        isolation valves on either side, or design and construct appropriate
        devices or measures which more effectively mitigate the hazard of the
        fault crossing.  Location and nature of these designs must be approved
        prior to the issuance of the Coastal Development Permit and Land Use
        Permit.

E-5.    Prior to the issuance of the Coastal Development Permit and Land Use
        Permit Celeron shall submit final Grading and Erosion Control Plans for
        the Sisquoc pump staton approved by the Department of Public Works.
        These plans shall be consistent with or based on information contained
        in the geologic investigation required in Condition E-1.

        Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall either submit Grading Erosion Control Plans for
        the Las Flores and Gaviota pump stations for approval by the Department
        of Public Works or show evidence that the plans are a part of the
        overall Grading and Erosion Control Plans for the consolidated
        processing facilities at those sites.

E-6.    Celeron shall cooperate as necessary with San Luis Obispo County in
        the permitting, design and construction of the Cuyama River crossing.

        Any pipeline crossing the Cuyama River shall be laid to a depth
        consistent with studies performed under Condition E-1 and subject to
        approval of the County Flood Control District.

E-7.    Prior to approval of the Final Development Plan, Celeron shall commit
        to the location of their south coast pump stations to the satisfaction
        of the Planning Commission.  If these stations are not within the
        boundaries of the approved Exxon, Gaviota Terminal Company, or Chevron
        facilities, Celeron shall submit grading and erosion control plans
        pursuant to Condition E-5.

Planning Commission Actions                                        Page 21
Celeron Pipeline Final Development Plan                         March 3, 1986

F.    SURFACE AND GROUNDWATER

F-1.   During construction of the pipeline across all perennial stream
       crossings, stream flows, if any, shall be diverted around construction
       areas to maintain downstream flows.  Baseline water flows shall be
       maintained in coastal streams in order to avoid adverse impacts to
       lagoon or other sensitive habitats.

F-2.   Sediment retention devices that allow continued streamflow shall be
       installed directly downstream of stream crossings during construction.

F-3.   For pipeline crossings at the following stream or river crossings:
       Tajiguas; Refugio; Gaviota; Nojoqui; Zaca; San Antonio Creeks, all
       additional perennial streams which the pipeline crosses: Santa Ynez;
       Sisquoc; and Cuyama Rivers, Celeron shall construct the buried
       pipelines during the months of low historical streamflow, in order to
       minimize erosion loss downstream and protect surface water quality.  In
       the event of low winter rainfall, earlier construction may be approved
       by Resource Management Department and County Flood Control Agency.

F-4.   No staging areas shall be permitted within riparian habitat corridors.

F-5.   During pipeline construction at stream crossings, construction
       contractors will minimize time of disturbance, narrow the construction
       ROW to the extent feasible, stabilize the disturbed areas immediately
       following construction of the crossing, and divert runoff waters around
       construction areas to maintain downstream flows.

F-6.   Deleted.

F-7.   Celeron shall install isolation valves on either side of all perennial
       stream and river crossings, including the Cuyama River, and/or as
       required by the Coastal Zoning Ordinance, unless the applicant can
       demonstrate that alternative methods will further reduce the potential
       leak impacts at the crossing site.  These locations shall be identified
       prior to the Final Development Plan.

F-8.   Prior to approval of the Final Development Plan, Celeron shall identify
       the freshwater source considered for supplying pipeline and facility
       construction activities including hydrostatic test water, and shall
       estimate the total quantity required.  Any water obtained from coastal
       or inland sources shall not significantly disrupt streamflows,
       groundwater resources, or habitat resources.  Water conserving devices
       shall be used where feasible.  Any water used during construction,
       (exclusive of hydrostatic test water), shall contain no more than 5,000
       parts per million total dissolved solids.  Disposal of hydrostatic test
       water within the County shall be according to a plan approved by the
       Regional Water Quality Control Board, or by the Flood Control Agency.
       This information shall be provided to and approved by the Resource
       Management Department as part of the Final Development Plan.

Planning Commission Actions                                    Page 22
Celeron Pipeline Final Development Plan                        March 3, 1986

F-9.    Prior to approval of the Final Development Plan, Celeron will perform
        detailed hydrogeologic investigations for the sensitive areas
        identified in the the EIR/EIS, (Table 3-14).  These investigations will
        be conducted by a State of California registered geologist or engineer
        and will include but not be limited to:

        a)    definition of groundwater depth, recharge sources, properties of
              overlying soils, hydraulic gradient, background water quality,
              and existing water uses.

        b)    inventory of existing wells from State or County Flood Control
              Agency records in an area extending down-gradient from the
              pipeline in the aquifer equal to the distance groundwater would
              move in one year at a velocity calculated from the maximum
              hydraulic conductivity of the specific aquifer, hydraulic
              gradient, and porosity.  The down-gradient sensitive area will be
              determined by a registered geologist.

        This information will be reviewed by the Resource Management Department
        and used by Celeron to formulate the Groundwater Contamination portion
        of an Oil Spill Contingency Plan, Condition P-5.  This portion of the
        Plan will include;

        a)    plans for monitoring and early detection of groundwater
              contamination, including aerial and ground surveys, pipeline
              pressure monitoring, and water sampling of strategic wells;

        b)    plans for notification of affected groundwater users, and the
              Emergency Services Coordinator;

        c)    clean-up response, reparations, restorations, and methods to
              determine and correct the contamination source; and

        d)    identification of emergency alternate water supplies.

F-10.   At the base of slopes where the ROW approaches sensitive aquifers as
        identified in the EIR/S that are at risk from oil spills and leaks, a
        dam or ditch plug will be used in the pipeline trench.  The sensitive
        areas are those where the ROW follows 1) topographic slopes toward
        basins with shallow depth to water, 2) high vertical permeabilities,
        and 3) a high degree of groundwater use as indicated by the
        hydrogeologic investigations required as per condition F-9.  These
        areas shall be identified in the Final Development Plan.

F-11.   Prior to the approval of the Final Development Plan, the System Safety
        and Reliability Committee shall review and approve submitted plans of
        all Creek and River crossings in Santa Barbara County.  Permitted
        development shall not cause or contribute to flood hazards or lead to
        the expenditure of public funds for flood control works.

Planning Commission Actions                                      Page 23
Celeron Pipeline Final Development Plan                       March 3, 1986

G.    AQUATIC BIOLOGY

G-1   Fueling and lubrication of construction equipment will not occur within
      0.25 miles of any flowing streams.  No more than 2 barrels of fuel
      shall be kept at construction sites, exclusive of pipeline construction
      equipment fuel tanks, within 0.25 miles of all perennial creeks.  As
      part of the oil spill response plan, Celeron will submit plans for
      clean-up and restoration of affected areas in the event of a
      construction fuel spill.

H.    TERRESTRIAL BIOLOGY

H-1.  Prior to issuance of the Coastal Development Permit and Land Use
      Permit, Celeron shall submit a Restoration, Erosion Control, and
      Revegetation plan for the final proposed pipeline route and the pump
      station sites.  The plan shall be submitted to the Resource Management
      Department for approval.  Once approved, the plan shall be implemented
      by Celeron.  Success of the restoration and revegetation plans shall be
      monitored by a qualified independent biologist who is in addition to
      the managing environmental coordinator (Condition C-1). The plan shall
      contain, but not be limited to, the following:

      (a)   Procedures for stockpiling and replacing topsoil, replacing and
            stabilizing backfill, such as at stream crossings, and steep or
            highly erodable slopes.  Additionally, provisions shall be made
            for recontouring to approximate the original topography.  Excess
            fill shall be disposed of off-site unless suitable arrangements
            are made with the property owner.  Excess fill shall not be
            deposited in any drainage, or on any unstable slope.

      (b)   Specific plans for control of erosion, gully formation, and
            sedimentation, including, but not limited to, sediment traps,
            check dams, diversion dikes, culverts and slope drains.  Plan
            shall identify areas with high erosion potential and the specific
            control measures for these sites.

      (c)   Procedures for containing sediment and allowing continued
            downstream flow at stream crossings, including scheduling
            construction activities during low-flow periods.

      (d)   Procedures for re-establishment of vegetation that replicates or
            is functionally equivalent to indigenous and naturalized
            communities along the alignment.  These shall include: measures
            preventing invasion and/or spread of undesired plant species;
            restoration of wildlife habitat value; and restoration of native
            plant species and communities.  Celeron shall consult with the
            County Farm Advisor and appropriate Ranch operators when
            developing procedures for revegetating areas used for cattle
            grazing and other agricultural uses;

Planning Commission Actions                                    Page 24
Celeron Pipeline Final Development Plan                    March 3, 1986

(e)    Procedures for restoration of riparian corridor stream and river banks and stream bed substrates and elevation;

(f)    Procedures for minimizing all tree removal or tree root and branch damage, such as, flagging the corridor, keeping all disturbance to no more than the 100-foot pipeline right-of-way, feathering the right-of-way edges, providing for onsite monitoring of construction by a qualified independent biologist. In addition, special procedures are required for oak woodlands since County policy requires that these trees must not be cut down if feasible. Special procedures for oaks include reducing the right-of-way to the minimum width possible and minimizing the impact to the root zone of these trees;

(g)    Procedures for replacement of native trees and large shrubs removed from the 100-foot temporary easement during construction across riparian and woodland, in particular oak woodland, habitat, with saplings of the same species propagated from materials obtained from the same area, including provision for supplemental irrigation as necessary and feasible to ensure establishment, and provisions for protection of saplings from grazing animals;

(h)    A soil conservation program, to be applied in areas of 20 percent or greater slopes along the pipeline corridor.

(i)    Procedures for incorporating landowner concerns in the plan. Any changes to the plan instigated by such concerns shall be approved by the Resource Management Department.

(j)    A plan for offsite re-establishment of oaks to mitigate impacts to oak savannahs and woodlands along the route.

The segment of the plan pertaining to Gaviota State Park shall be prepared in cooperation with the State Department of Parks and Recreation.

H-2.    One year after construction, a survey will be conducted, at Celeron's expense, to determine the actual impact caused by construction. This survey shall include aerial photography, and as appropriate color stereo and infrared photography and field studies. The report will identify areas with potential for further impact, e.g., high erosion areas, that will require immediate remedial measures. The survey shall also contain an examination of previous mitigation measures and present a list of additional feasible mitigations based on the impacts during construction and potential impacts caused by operation. Celeron and the Resource Management Department shall agree to additional feasible mitigations. This process shall be repeated as often as necessary by the Resource Management Department, but not more than annually.

Planning Commission Actions                                    Page 25
Celeron Pipeline Final Development Plan              March 3, 1986

H-3.    In those areas where trees and other habitats such as riparian areas
        and oak woodlands are to be avoided within the approved corridor,
        Celeron shall assure contractor compliance with this condition by
        marking and/or fencing those habitats.

H-4.    Additional reasonable and feasible conditions of mitigation, consistent
        with condition H-1 and to the extent necessary, shall be identified and
        observed as developed during the archaeological mitigation program
        (conditions L-1, L-2, L-3, L-6), and as identified by the managing
        environmental coordinator in consultation with Celeron's Onsite
        Construction Representative (condition C-1).

H-5.    Deleted.

H-6.    Celeron shall not use herbicides in wetland and riparian areas, and
        along the rest of the pipeline corridor during construction.

H-7.    Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall receive a permit (1603) as required from the
        California Department of Fish and Game.  This permit should include
        provisions to ensure that the proposed construction schedule will not
        interfere with reproductive activities of regionally rare or rare,
        threatened or endangered bird, amphibian, and fish species or other
        species of special concern, in those environmentally sensitive habitats
        identified in the EIR/EIS and shall submit this confirmation to the
        Resource Management Department.  If the Department of Fish and Game
        determines that the construction schedule will have an impact then
        Celeron will adhere to directives of the Department of Fish and Game
        with respect to their permit requirements.

H-8.    Deleted.

H-9.    Celeron shall minimize impacts to the population of Hoffmann's
        nightshade (Solanum xanti var. hoffmannii) found in the Gaviota Pass
        area.  Celeron shall submit plans to enhance the recovery of this
        population to the Resource Management Department for approval prior to
        issuance of the Coastal Development Permit and Land Use Permit.  These
        plans shall include provisions for removing any individual plants that
        would be affected, place them in large tubs, and replant them as near
        as possible to the original location (exclusive of the operation
        Right-of-Way) after construction; and gathering seeds prior to issuance
        of the Coastal Development Permit and Land Use Permit from the
        population of Hoffmann's nightshade located in the Gaviota Pass area
        and planting them in and near the ROW after construction.  This shall
        be done under the supervision of a biologist approved by the Resource
        Management Department and in cooperation with the California Parks
        Department; this biologist may approve modifications to these
        techniques based on season of the year and state of dormancy.

Planning Commission Actions                                    Page 26
Celeron Pipeline Final Development Plan                     March 3, 1986

H-10.   Celeron shall minimize impacts to the population of Catalina Mariposa
        lily (Calochortus catalinae) found in the Gaviota Pass area.  Celeron
        shall submit plans to enhance the recovery of this population to the
        Resource Management Department for approval prior to issuance of the
        Coastal Development Permit and Land Use Permit.  These plans shall
        include provisions for gathering of seeds from the population found in
        or near the ROW prior to construction, planting the seeds in or near
        the ROW after construction (exclusive of the operation ROW), conserving
        the upper 18-24 inches of heavy clay soil which contains the plant's
        bulb-like corms found in the vicinity of the plants prior to
        construction, and then, after construction, replacing this soil which
        holds the plants bulb-like corms.  This shall be done under the
        supervision of a biologist approved by the Resource Management
        Department and in cooperation with the California Parks Department;
        this biologist may approve modifications to these techniques based on
        season of the year and state of dormancy.

H-11.   Celeron shall minimize impacts to the population of Refugio Manzanita
        (Arcostaphylos refugioensis) found in Gaviota Pass area and affected by
        the proposed construction activities.  Celeron shall submit plans to
        enhance the recovery of this population to the Resource Management
        Department for approval prior to issuance of the Coastal Development
        Permit and Land Use Permit.  These plans shall include provisions for
        gathering seeds and taking cuttings from the population of Refugio
        Manzanita found in and adjacent to the ROW prior to construction, and
        provisions for the planting of the seeds and plants propagated from
        cuttings in the final construction alignment (exclusive of the
        operation ROW) after construction.  This shall be done under the
        supervision of a biologist approved by the Resource Management
        Department and in cooperation with the California Parks Department;
        this biologist may approve modifications to these techniques based on
        season of the year and state of dormancy.

H-12.   Celeron shall prepare a Restoration, Revegetation and Implementation
        section as part of the Oil Spill Contingency Plan (P-5).  The section
        shall be reviewed and accepted prior to start-up by the Resource
        Management Department and a biologist approved by the Resource
        Management Department.  The section shall be submitted sufficiently
        prior to Celeron's projected start-up date so as to allow reasonable
        time for staff review.  Reasonable costs of review shall be borne by
        the applicant.  The section shall contain site-specific restoration
        information for all habitat types including stream crossings,
        wetlands/lagoons, oak woodlands, grasslands, riparian zones, and other
        environmentally sensitive habitats.  The section shall be divided into
        three major areas: a) Coastal, b) Streams and Rivers and c) Terrestrial
        habitats.  Each of these sub-sections shall discuss the various
        habitats in the categories listed above.  Methods to achieve
        restoration of all affected areas to their prespill conditions shall be
        discussed.

Planning Commission Actions                                         Page 27
Celeron Pipeline Final Development Plan                          March 3, 1986

H-13.   Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall submit to the County Board of Architectural
        Review, and the Resource Management Department site-specific plans for
        landscaping of any pump station not within other required project
        vegetation screens.  This plan shall, at Celeron's expense, be reviewed
        by a qualified landscape architect and a biologist approved by the
        Resource Management Department to insure the proper plant materials and
        procedures identified in these conditions are implemented.  These plans
        shall be developed in consultation with the property owner.  The plan
        shall include:

        (a)   The specifications of any potential seed mixtures to be utilized,
              including the plant species in the mixture and the pounds of seed
              per acre to be applied;  type of mulch (fiber, chemical tackifier
              or straw);  the type and amount of fertilizer;  and any
              provisions for irrigation;

        (b)   Confirmation that all native or non-native plant materials
              proposed in the revegetation plan are compatible with indigenous
              vegetation and that none of the plans used is known to be weedy
              or invasive.  The plan shall provide for plantings that will
              screen facilities from view.  This vegetation screening shall
              also be designed to reduce nighttime lighting and noise.  Near
              chaparral or other high fire hazard areas, the seeds or seedlings
              will consist of native or non-native species, shown to contain
              fire retardant properties (such as toyon) and shown to be fast
              growing;

        (c)   The specifications for native seeds and seedlings that will have
              wildlife habitat and food value.  All perennial plants, and all
              woody plants are to be propagated from material obtained from the
              same area.  Native plant material is to be obtained from a
              revegetation contractor.  All native materials will be ordered
              from the contractor in advance of construction activities.

        (d)   Confirmation that non-native material is to be confined to
              disturbed areas immediately adjacent to structures needing visual
              screening.  Such screening is to include fast growing plants
              adequate to screen the facility from direct view;

        (e)   A detailed irrigation plan if feasible for all revegetated areas
              requiring irrigation for establishment of plant materials;

        (f)   Celeron's commitment for continual monitoring of the revegetaion
              so that weeds will be minimized.

H-14.   Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall post a bond or other security agreement approved
        by the County Counsel to ensure that all landscaping and revegetation
        programs are completed to the County's specifications.

Planning Commission Actions                                        Page 22
Celeron Pipeline Final Development Plan                          March 3, 1986

H-15.   Prior to issuing a release from the bond or other security agreement, a
        biologist and landscape architect hired by the County, at Celeron's
        expense, shall conduct a field review of all revegetated and landscaped
        areas, to insure consistency with the intent and specifications of the
        revegetation and landscape plan.  Necessary repairs or changes in
        landscaping or revegetation shall be made at Celeron's expense.

H-16.   Prior to approval of the Final Development Plan, a qualified biologist
        approved by the Resource Management Department will conduct
        site-specific field inventories for California state-listed species, as
        mandated by the intent and general provisions of Assembly Bill No.
        3309, the California Endangered Species Act.  The biologist will
        perform the surveys of the 100-foot ROW in areas suspected of having
        any of the species of special concern as identified in Appendix B Table
        B-6, DEIR/S, except for the peregrine falcon, least Bell's vireo, and
        Parish's sidalcea.  Surveys for these species will be conducted prior
        to construction.  The California Department of Fish and Game will be
        consulted concerning appropriate methods for survey as well as
        appropriate mitigation measures if these species are found on the ROW.
        Additional mitigation shall be developed and executed by Celeron based
        on these surveys if determined necessary by the Resource Management
        Department.

H-17.   Prior to issuance of the Coastal Development Permit and Land Use
        Permit, a wildlife biologist approved by the Resource Management
        Department will survey all potential raptor nesting habitats within 0.5
        miles of the pipeline, to identify active and inactive nests and
        potential perch sites cleared by ridge-top construction.  No
        construction will occur within 0.5 miles of active eyries during
        nesting season as determined by the biologist.  Construction may be
        permitted by the Resource Management Department in consultation with
        the biologist near inactive nests provided nest sites are not
        disturbed.  Where deemed necessary by the California Department of Fish
        and Game biologists, raptor perch or roost trees will be avoided and/or
        artifical roosts will be constructed on ridgelines to mitigate losses
        of such trees resulting from clearing the ROW on ridge tops.

H-18.   Celeron shall limit the width of the construction ROW through all
        riparian habitats to the extent feasible.  Celeron shall submit a plan
        indicating the location and size of the construction ROW through all
        riparian habitats.  These plans shall be approved by the Resource
        Management Department prior to the Final Development Plan.

H-19.   The construction ROW shall be routed to avoid trees to the maximum
        extent feasible.  When this is not possible, dying or diseased trees
        shall be removed preferentially over healthy trees.

EXHIBIT B

Planning Commission Actions                                    Page 29
Celeron Pipeline Final Development Plan              March 3, 1986

H-20.    Celeron shall minimize impacts to the oak woodland in the Suey Canyon
         area.  This shall be done by using existing disturbed areas and by
         narrowing the construction corridor to the extent feasible by working
         on top of the spoils pile or selectively removing spoils, selectively
         removing trees (e.g. dying, or diseased trees) and revegetating to
         enhance re-establishment of oak saplings and/or similar mitigation.

H-21.    Celeron shall align the pipeline route in the vicinity of the Los
         Alisos Creek crossing in order to minimize the amount of riparian
         habitat disrupted.


I.       SOCIOECONOMICS

I-1.     The cumulative impacts of oil and gas industry projects are expected to
         be significant to Santa Barbara County.  Therefore Celeron shall
         participate in an oil and gas industry wide monitoring and mitigation
         program to address socioeconomic impacts indentified as significant
         environmental impacts attributable to their project.  For projects such
         as pipelines, only the construction phase is expected to cause
         significant impacts, and Celeron's participation in the program shall
         be limited to that phase.  The criteria for allocating the costs of the
         monitoring and mitigation program and its mitigation requirements will
         be uniformly applied to all industry participants.

         The intent of this program is to obtain realistic information regarding
         impacts identified in the EIR/EIS, and to allow impacted jurisdictions
         to require mitigation for project-related impacts.  Mitigation of
         impacts through other planning programs, and/or through existing
         administrative infrastructure shall be taken into account.  The scope
         of this program is detailed below.  As subsequent details in the
         structure of the Program are developed by the County, such details
         shall supersede portions of this condition as appropriate.

         The purpose of the Monitoring and Mitigation Program is to accurately
         assess the impacts of the Celeron's proposed development, including
         those in the following socioeconomic areas:

         a.    Temporary housing needs, particularly demand for state and other
               park campsites, recreational vehicle parks, motel-hotel rooms and
               rental housing;

         b.    Longer term (more than one year) housing needs, particularly low
               moderate income housing needs, and associated water demands,
               south coast Santa Barbara County;

         c.    Public finance;

         d.    Transportation of workers and materials to and from the site.

At any point when the Board of Supervisors determines that the monitoring program demonstrates that previous mitigation funds paid by Celeron exceed the valuation of the impacts at issue, Celeron shall be granted a credit against any other current or future mitigation fees imposed on Celeron for this permit by the County. Celeron shall be entitled to accrued interest at the prevailing legal rate which shall continue to accrue until the credit is used.

The Monitoring and Mitigation Program will be administered and staffed by the County of Santa Barbara, Department of Regional Programs. A Technical Advisory Committee will provide assistance and input in the documentation of significant adverse impacts and proposals to mitigate these significant impacts.

The Technical Advisory Committee will be composed of: two representatives from Santa Barbara's cities appointed by the Mayor's Select Committee and repesenting north and south county interests; one representative (each) from San Luis Obispo and Santa Barbara counties; and one representative from each affected oil and gas company (to the number of representatives agreed upon). Celeron will be included in the committee until Celeron submits its resignation.

In the event of unresolved technical issues in the area of methodology and calculation of socioeconomic impacts, there shall be a Technical Arbitration Group. The Technical Arbitration Group shall be composed of three individuals without ties to either the County or Celeron, one to be selected by the County Board of Supervisors, one selected by the oil and gas company representatives and the final member selected by the first two members. All Technical Arbitration Group decisions shall be appealable upon written request to the Board of Supervisors. Subsequent details on voting procedures and conflict resolution will be proposed by the Department of Regional Programs and reviewed by the Board of Supervisors in a noticed public hearing.

Prior to approval of the Final Development Plan for this project the monitoring and mitigation program will be refined. Based on information in the EIR/EIS and on other data as appropriate, practical thresholds which trigger the necessity for mitigation will be developed and adopted by the Department of Regional Programs with input from the Technical Advisory Committee. These thresholds will recognize the normal growth incorporated in county plans, prior and existing industry activity, and the decline of the industry if no further permitting is allowed. Methodologies used to establish thresholds and impacts will be developed in consultation with the Technical Advisory Committee.

The need for mitigation will be determined when threshold levels are exceeded as shown by monitored activities and other data as appropriate. The Department of Regional Programs will recommend a mitigation action to the County Board of Supervisors. The Technical Advisory Committee will assist in making the assessment and recommendations. The monitoring and mitigation program will continue through all stages of construction.

Planning Commission Actions                                    Page 31
Celeron Pipeline Final Development Plan                   March 3, 1986

The monitoring, impact and mitigation elements of the program would be equivalent to those described in the Chevron Gaviota Project conditions, but modified as appropriate for the nature of the pipeline project.

I-2.    Prior to approval of the Final Development Plan, Celeron shall submit to the County Department of Regional Programs a plan which details how they plan to house temporary construction workers for every month of construction. This plan, to be implemented by Celeron, shall demonstrate how Celeron plans to reduce the housing impacts identified as part of the plan; e.g. exactly how much housing is needed, where it is needed and for how long; but not limited to, the following examples:

(a)    Use of existing under-utilized hotel/motel space during the months of September through May to provide for temporary living quarters for direct construction workers by month; identification of incentives to all the direct construction workers such as rent subsidies and/or shuttle service to the site.

(b)    Use of any available housing outside the South Coast area for all workers associated with the project during the summer months when visitor-serving facilities in the South Coast area are at capacity. Incentives for workers shall be identified such as rent subsidies and shuttle service for all workers commuting to the job site.

(c)    Methods to limit worker use of public campgrounds as living quarters. If it cannot be shown that the impact will be reduced from the estimate, Celeron shall make a donation to the California State Parks or to Santa Barbara County Parks for the development of new campsites to offset their worker use of campsites. The donation shall be made prior to receipt of the building permit and determined by multiplying the estimated cost per developed campsite times 15. If it is shown by the Regional Program Department and the Technical Advisory Committee that there is significant impact, the above-mentioned groups shall propose mitigation. At any point when the Board of Supervisors determines that the monitoring program demonstrates that previous mitigation funds paid by Celeron exceed the valuation of the impacts at issue, Celeron shall be granted a credit against any other current or future mitigation fees imposed on Celeron for this permit by the County. Celeron shall be entitled to accrued interest at the prevailing legal rate which shall continue to accrue until the credit is used.

Planning Commission Actions                                     Page 32
Celeron Pipeline Final Development Plan                      March 3, 1986

I-3.   The pipeline construction period will be scheduled so as not to
       coincide with peak tourist seasons within each construction area in
       Santa Barbara County, provided that this scheduling does not interfere
       with any other conditions in this permit with respect to timing, in
       particular requirements regarding construction during stream and river
       low-flow.  If such a conflict is found, than additional measures must
       be taken to provide the temporary housing needs for construction
       workers.

I-4.   Deleted.

I-5.   Celeron shall include provisions in its contractor agreements
       specifically to encourage and promote employment from local labor so
       as to reduce the impacts associated with the in-migration of workers.

I-6.   Except as otherwise provided herein, if the Socioeconomic Monitoring
       Program shows that project related revenues will not compensate for
       needed capital or operating expenditures necessary to provide
       project-related utilities and services additional mitigation will be
       required.

I-7.   In the event that state and/or federal revenue sharing legislation
       directed at distributing oil related revenues to state or local
       governments is approved or Santa Barbara County levies a tax (special
       or otherwise) on oil and/or gas processed or transported under this
       permit, then any condition herein requiring payments or other items of
       value by Celeron to Santa Barbara County or any political subdivision
       thereof shall automatically be suspended pending a review by the County
       to determine the extent, if any, which the tax, revenue sharing, or any
       of the fees imposed are duplicative or unwarranted either as to the
       level of government services provided or the level of burdens imposed
       on the public.


J.     LAND USE AND RECREATION

J-1.   Prior to construction, the entire pipeline ROW corridor shall be
       prominently staked.  All affected property owners along the pipeline
       route shall be notified in writing at least 30 days prior to the
       commencement of any pipeline construction on their property, and at
       least 15 days in advance of any deviation from the staked corridor
       which crosses their property.

J-2.   All mainline pipeline construction activities except river, perennial
       coastal stream, and ESH area crossings as specified in condition H-7,
       once started, shall proceed in a diligent and expeditious manner and
       shall be completed within nine months after the starting date, subject
       to necessary and/or unanticipated time extensions approved by County,
       in consultation with affected property owners.

Planning Commission Actions                                    Page 33
Celeron Pipeline Final Development Plan                   March 3, 1986

J-3.    Pipeline construction activities shall be limited to the period between 7 a.m. and 7 p.m., Monday through Saturday. Except for emergency services, construction activities shall not take place on Sundays, the dates generally recognized for Memorial Day, July 4, Labor Day, or any other similarly recognized holiday, unless previous arrangements have been made with the affected property owners.

J-4.    Prior to approval of the Final Development Plan, Celeron shall consult with affected property owners to develop reasonable and mutually satisfactory controls for maintaining the privacy and security of affected properties while construction is in progress.

J-5.    Unless easements have been obtained from affected property owners or unless otherwise agreed to by affected property owners, Celeron shall provide affected property owners written notice at least 48 hours prior to the start of construction on their property, which shall include:

    a)    Description of vehicles using roads on the property, including type, size, identification, proposed times of entry and departure, destinations, and the intended route to the destination. (Fire, medical, or similar emergency vehicles can enter as necessary.) Significant changes in the schedule of construction-related vehicular traffic shall be allowed within the 48-hour advance noticing subject to direct communication (e.g. telephone, personal communication) by Celeron with the affected property owners;

    b)    Description of estimated construction schedule across the property. Any blasting necessary during construction shall be noticed to all property owners within a one mile radius of the blasting area;

    c)    Description of times of limited access through and across the property, such as road closures on the property, indicating specific location, time and duration of the limited access or closure. Road closure is considered to include partial road blockage or disturbance. Suitable vehicular by-pass shall be provided during all closures;

    d)    Description of any probably hazard or other unsafe condition during the pipeline construction period, indicating the nature of the hazard, the area in which the condition will occur, and the time and duration of the activity. Celeron and its contractors shall take prompt and adequate action to correct any hazard or damage that does occur during construction, and shall provide appropriate noticing as per other parts of this condition;

Planning Commission Actions                                    Page 34
Celeron Pipeline Final Development Plan                    March 3, 1986

    e)    Description of helicopter and/or vehicle reconnaissance schedules
for pipeline maintenance, indicating times, stops, and duration.
Celeron shall establish and enforce appropriate rules for its
personnel and its contractors to assure that they will not be in
the area except when necessary to carry out construction,
inspection, repair and maintenance activities, or emergency
services;

    f)    Description of schedule for cutting any fences or similar
barriers during pipeline construction.

J-6.    Deleted.

J-7.    Unless easements have been obtained from affected property owners or
unless otherwise agreed to by affected property owners if and when
fences or other similar barriers must be cut during pipeline
construction, Celeron shall provide advance notice to the affected
property owner, and shall replace the function of the cut fence before
the cut is made to the satisfaction of the property owner, and Celeron
and its contractors shall restore all fences that have been cut, moved,
or damaged to at least their condition prior to pipeline construction,
except that gates or similar structures may be added as approved to
provide access.

J-8.    Interruption of telephone, electrical power, water or other utility
services shall be minimized to the extent feasible during the pipeline
construction period.  Celeron, or its contractors, shall contact each
property owner or the appropriate utility regarding the location of
utility lines, and all such utility line locations shall be staked by
Celeron or its contractors prior to the start of construction on the
affected property.

J-9.    During the pipeline construction period in the County, Celeron and its
contractors shall comply fully with all applicable statutes,
ordinances, rules and regulations, including traffic regulations, of
the County.

J-10.    Prior to entering upon any parcel of property for purposes of
commencing construction, Celeron shall demonstrate to the Resource
Management Department that it has obtained a right-of-way for such
parcel or otherwise has obtained the right to enter the property for
purposes of constructing the pipeline.

J-11    Following installation of the pipeline, use of the right-of-way is
restricted to operational maintenance of the pipeline except where
expressly permitted by the easement or landowner and consistent with
other regulations and conditions.

EXHIBIT B

Planning Commission Actions                                    Page 35
Celeron Pipeline Final Development Plan                    March 3, 1986

K.    TRANSPORTATION

K-1.    Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall submit to the Resource Management Department and
        the Department of Public Works, Road Division a worker transportation
        program designed to minimize traffic-related impacts. The plan shall
        identify on- and off-site parking areas, access routes, shuttle program
        to reduce number of working vehicles on and along pipeline construction
        corridor, measures to avoid traffic conflicts with residents using all
        roads affected, number of vehicles accessing the facilities sites and
        incentives for ride-pooling/van-pooling to the sites. Construction
        worker traffic and parking shall not interfere with normal and
        reasonable uses of private property or recreational areas. This
        Construction Traffic Mitigation Plan shall be submitted by Celeron and
        approved by County prior to initiation of construction. The program
        must consider both Celeron's employees and contractors.

K-2.    Any new permanent parking areas at the pump stations shall be screened
        from public view pursuant to the landscape plan approved by the Board
        of Architectural Review.

K-3.    The final engineering plans and procedures for all pipeline crossings
        of County roads must be approved prior to issuance of the Land Use
        Permit and Coastal Development Permit by the Department of Public
        Works. Notification of such approval must be submitted to the Resource
        Management Department prior to construction at the site.

K-4.    All pipeline construction activity, except ingress and egress along
        routes approved by the Resource Management Department and in
        consultation with affected property owners, shall be limited to the
        final staked right-of-way on the final approved pipeline route. Use of
        any private roads or other areas shall be allowed only after advance
        approval from the affected property owners.

K-5.    Prior to the Final Development Plan, Celeron must submit to the Public
        Works Department for approval a plan to mitigate impacts to all County
        roads which will be used during construction. This plan will include
        the type of vehicles and machinery which will traverse the roads, the
        frequency of road use for each piece of equipment and vehicle, and the
        gross vehicle weights loaded and unloaded. This includes the above
        information for trucks carrying pipe, fuel, construction supplies, or
        construction crews through the County to the construction spreads.
        This plan shall include an agreement with the County to repair any
        obvious damage to the satisfaction of the Public Works Director and any
        reasonable fees associated with eventual reconstruction caused by
        project-related damages of the public roads. Prior to drafting this
        agreement, County shall coordinate with Celeron in compiling a list of
        County roads which will be used for construction of the pipeline.
        Celeron shall demonstrate property owner (or Court) approval of private
        road maintenance plans or terms on privately owned parcels to the
        Resource Management and Public Works Department prior to entering upon
        said parcels for purposes of commencing construction.

Planning Commission Actions
Celeron Pipeline Final Development Plan

Page 36
March 3, 1986

L.    CULTURAL RESOURCES

L-1.    Prior to approval of the Final Development Plan, Celeron shall submit a
plan detailing the methods for the Phase I (walkover) and Phase II
(site importance assessment) cultural resources surveys.  In addition,
Celeron shall submit all Phase I cultural work completed to date.
These reports shall be approved by the Resource Management Department
as part of the Final Development Plan.

Prior to issuance of the Land Use Permit and Coastal Development
Permit, Celeron shall complete Phase I and Phase II cultural resource
surveys for the entire route.  The results of these surveys shall be
approved by the Resource Management Department prior to issuance of
said permits.  Celeron shall avoid to the maximum extent feasible all
known cultural resource sites along the pipeline route unless safety
(e.g. seismic or engineering practices) considerations or sensitive
biological habitats preclude avoidance.

L-2.    Prior to issuance of the Coastal Development Permit and Land Use
Permit, Celeron, in consultation with the Native American Community,
shall commence the cultural resources mitigation plan, in accordance
with CEQA Appendix K, County approved Prehistoric Archaeological
Guidelines, and section 4.1.1.11, Cultural Resources, of the EIR/EIS.
Implementation of the mitigation plan shall proceed on an expeditious
and effective schedule in order to minimize or to avoid conflicts with
other construction scheduling requirements delineated in other permit
conditions.  The main components of the mitigation plan shall include:

a)    Selection of a qualified archaeologist by the County Resource
Management Department in consultation with Native American
representatives.  The archaeologist shall be available on an
as-needed basis through the completion of pipeline construction.
The archaeologist shall be funded by Celeron and shall be
responsible to the County Resource Management Department.
Compensation shall cover all excavation, analysis, and report
preparation for all areas investigated including those found
during construction;

b)    Avoidance of known sites wherever feasible;

c)    Test excavations of known sites that cannot be avoided.  These
test excavations will assess the importance of each site
according to CEQA Appendix K criteria or other requirements and
will result in appropriate data recovery as a mitigation measure;

d)    Inclusion of Native American representatives in all field
activities.

Planning Commission Actions                                          Page 37
Celeron Pipeline Final Development Plan                         March 3, 1986

    e)    Additional sub-surface sampling (use of shovel test pits) in defined sensitive areas which will be affected by project construction to confirm the presence/absence of previously unknown (undiscovered) sites. This will include surveying of proposed construction access road areas, once identified by Celeron. Any new sites found shall be treated as per condition L-2(b,c);

    f)    Following the determination of site importance, Celeron shall inform the County of any additional plans for site avoidance. For those sites not avoided, the consulting archaeologist shall, in consultation with the Native American community, prepare site-specific mitigation (excavation/data recovery) plans; and

    g)    Implementation and completion of the field work aspects of the site-specific mitigation plans prior to construction in the vicinity of the resource.

L-3.    Prior to pipeline installation activities, Celeron shall sponsor a workshop for its pipeline contractors and Native American consultants to review and explain the mutual concerns and activities of the parties during pipeline installation work.

L-4.    During pipeline installation, a Resource Management Department approved archaeologist and Native American consultant(s) will work with the contractor during trenching to insure continued avoidance. Adequate monitors shall be provided pursuant to an agreement between the Native American representatives and Celeron, and the archaeologist retained.

L-5.    If non-burial associated cultural resource artifacts are recovered during pipeline installation (the location of such artifacts being unknown prior to installation), ownership of such artifacts shall be the option of either Celeron, the Native American Community, or the archaeological community. In recognizing the origin of the materials, the Native American Community shall have the first option for ownership. The disposition of the artifacts shall be carried out as per the approved County guidelines.

L-6.    If burials or burial associated artifacts are found during installation (that were unknown prior to excavation), and cannot be avoided because of safety considerations, there shall be no further excavation or disturbance of the site. Celeron, in conjunction with the Native American representatives and the Resource Management Department, shall adhere to the guidelines in CEQA Appendix K and the County Archaeological guidelines prior to continued construction activity in the site area.

L-7.    If the County cultural resource guidelines for Phase II are modified and approved prior to November 19, 1985, Celeron shall abide by the requirements set forth in the guidelines in place at the time of Final Development Plan approval.

Planning Commission Actions                                      Page 38
Celeron Pipeline Final Development Plan               March 3, 1986

M.     VISUAL RESOURCES

M-1.   All facility design (e.g. pump stations, landscaping and signs), shall
       be in accordance with a plan approved by the County Board of
       Architectural Review (BAR) including the criteria outlined in the
       Coastal Zoning Ordinance Section 35-87.9 and Section 35-184.  Prior to
       the issuance of the Land Use Permit and Coastal Development Permit,
       Celeron shall submit to the BAR and the Resource Management Department
       and obtain their approval of a plan demonstrating that Conditions M-2
       through M-5 are met.  For visual screening of surface equipment along
       the pipeline route, Celeron shall consult with each affected property
       owner during development of the associated landscaping plan.

M-2.   No unobstructed or unshielded beam of exterior lighting shall be
       directed towards any area outside the exterior boundaries of the
       Celeron's property or easement.  Any lighting along roadways within the
       project shall utilize low intensity, ground level, shielded fixtures.
       The plan shall demonstrate that all feasible measures have been taken
       to reduce obtrusive night lighting and glow from the pump stations.

M-3.   To the extent feasible no glare or other radiation resulting from pump
       station facilities, other than lighting fixtures constructed pursuant
       to this Development Plan shall be detectable at any point along or
       outside the required screening along exterior boundaries of the pump
       stations.

M-4.   Prior to the pipeline operation, the Gaviota pump station, visible from
       Highway 101 and the Gaviota Village, the Sisquoc pump station visible
       from public viewshed, and all above ground portions of the pipeline
       shall be painted to harmonize with the surrounding area.

M-5.   No above-surface structures except necessary pipeline markers, pump
       stations, cathodic test stations, necessary fencing, and block valves
       shall be visible along this route after the completion of pipeline
       construction.  Signs shall not detract from scenic areas or views from
       public roads to the extent feasible.

M-6.   Prior to construction, Celeron will review the feasibility of
       implementing mitigation measures and/or realignments in the Gaviota
       State Park area to avoid blasting of ridgetops and alteration of
       topography in a scenic area.  Celeron shall submit a plan to the
       Resource Management Department, for review and approval, which
       identifies the feasibility of shifting the ROW alignment to the west,
       leaving the ridge profile undisturbed.  The plan shall include an
       investigation of utilizing prefabicated pipeline bends to allow for
       alignment around ridgetops, the use of stepped benches in steep
       terrain, and the future use of such a corridor for additinal
       pipelines.

Planning Commission Actions                                     Page 39
Celeron Pipeline Final Development Plan                    March 3, 1986

N.    NOISE

N-1.    Prior to issuance of the Costal Development Permit and Land Use Permit,
Celeron shall file with the Resource Management Department a Noise
Monitoring and Control Plan which has been approved previously by the
the Department of Health Care Services and the Resource Management
Department.  The plan shall describe the best efforts Celeron shall
take to reduce the noise impacts of the project both during
construction and operation of the project.  The approved plan shall be
implemented by Celeron and shall be followed until temporarily
suspended or deemed no longer necessary by the Resource Management
Department.  The plan shall include provisions to ensure that items N-2
through N-6 below are included.

N-2.    Except for motor vehicles and motorized construction equipment, all
facilities shall be designed, constructed, operated and maintained such
that sound levels during operation do not exceed 70 dBA at or beyond
the property line or pipeline easement, as measured on the "A" weighted
scale at slow response on approved sound level measuring instruments.
Affected property owners along the pipeline route shall be notified by
Celeron at least 48 hours in advance of any planned testing or
maintenance of the line which may exceed noise standards.  The facility
shall comply with all standards established in the Noise Element of the
Comprehensive Plan and the Coastal Zoning Ordinance.  No residents,
teachers, students and staff at the Vista del Mar School, shall be
subjected to greater than a 9 dBA increment above the baseline ambient
noise level, nor greater than a 3 dBA increase in day-night sound
levels.  The best available technology, including but not limited to
muffling equipment, sound barriers, and landscaping measures shall be
used to minimize operational noise impacts.

N-3.    During the construction and operation phases, project related noise at
the Gaviota State Park, Vista del Mar School, Buellton area, or other
points which may be impacted (as determined by the Health Care Services
Director), shall be limited to 65 dBA between the hours of 7:00 a.m.
and 10:00 p.m., and 50 dBA between the hours of 10:00 p.m. and 7:00
a.m., consistent with the County Noise Element and the Coastal Zoning
Ordinance.  Blasting shall be limited to the hours between 7:00 a.m.
and 7:00 p.m. and directional charges shall be used to minimize noise.

N-4.    As determined by the Resource Management Department, noise generating
project activities (including delivery of construction equipment
through residential areas) shall be restricted between the hours of
10:00 p.m. and 7:00 a.m.  If complaints arise concerning activities
occurring during these hours, Celeron shall take additional feasible
steps to reduce the noise levels or further restrict the offending
activity.

N-5.    Prior to approval of the Final Development Plan, Celeron shall submit
        to the Director of the Resource Management Department procedures that
        Celeron will take to minimize noise impacts from helicopters, or other
        aircraft during the aerial surveys of pipeline.  The procedures, to be
        approved by the Resource Management Department, shall specify
        overflight routes to be taken to minimize noise impacts to the
        community and other feasible measures.  Celeron shall direct its
        contractors to abide by the helicopter procedures and shall take
        reasonable corrective action if complaints arise concerning the use of
        helicopters.  Subject to flight safety considerations, Celeron shall
        avoid helicopter flights over residential areas.

N-6.    All construction and operation-related equipment shall be operated and
        maintained to minimize noise generation, ground vibration, and to avoid
        interference with radio or video communications.


O.      ABANDONMENT

O-1.    Immediately following permanent shut down of the pipeline, Celeron
        shall remove abandoned pump stations and unburied portions of the
        pipeline within Santa Barbara County constructed under this permit,
        recontour the site and revegetate the site in accordance with a County
        approved revegetation plan within one year of permanent shut down.
        Celeron shall post a performance bond to insure compliance, or continue
        to pay property taxes as assessed during project operation until site
        restoration is complete, as determined by the County.


P.      SYSTEMS SAFETY AND RELIABILITY

P-1.    Celeron shall submit all appropriate pump station, valve, and pipeline
        construction and process diagrams to a System Safety and Reliability
        Committee who may employ a third-party technical review in order to
        help identify and correct possible design hazards prior to
        construction.  This review shall evaluate the pipeline design and its
        implementation of System Safety and Reliability Conditions.  The System
        Safety and Reliability Review Committee shall consist of a
        representative from the County Public Works Department, Building and
        Safety Division, the APCD, the County Fire Department, County Flood
        Control District and the Resource Management Department.  Design
        recommendations resulting from the third party review shall be
        incorporated into the approved Final Development Plan.  All reasonable
        costs associated with any review shall be borne by Celeron.  Celeron
        shall be entitled to participate fully in the review process.

Planning Commission Actions                                   Page 41
Celeron Pipeline Final Development Plan                       March 3, 1986

P-2.   Celeron shall submit a detailed safety Inspection, Maintenance and
       Quality Assurance Program for the pump stations, valves, and the
       pipeline which shall be implemented during construction and
       operations.  The Program shall include, but not be limited to,
       inspection of construction techniques, regular maintenance and safety
       inspections, periodic safety audits, corrosion monitoring and leak
       detection, inspections of all trucks carrying hazardous and/or
       flammable material.  The construction section of the Program shall be
       reviewed and approved by the System Safety and Reliability Review
       Committee and/or its consultants prior to issuance of the Coastal
       Development Permit and Land Use Permit.  The operations section of the
       Program shall be reviewed and approved by the System Safety and
       Reliability Review Committee and/or its consultants prior to start-up.
       The Program shall be submitted sufficiently prior to Celeron's
       projected start-up date so as to allow reasonable time for staff
       review.  Celeron shall implement the approved program and shall provide
       for involvement of the managing environmental coordinator (condition
       C-1), County staff or its consultants' involvement in the program.  All
       costs associated with this review process shall be borne by Celeron.

P-3.   Celeron shall submit an Emergency Response Plan detailing response
       procedures to be implemented by Celeron for accidental events affecting
       public safety and the environment.  This plan shall be based on a
       comprehensive risk analysis reviewed and approved by the System Safety
       and Reliability Committee (condition P-1).  The plan shall be reviewed
       and approved by the County Emergency Services Coordinator, the Fire
       Department, and the Resource Management Department prior to start-up.
       The Program shall be submitted sufficiently prior to Celeron's
       projected start-up date so as to allow reasonable time for staff
       review.  Celeron shall demonstrate the effectiveness of the Emergency
       Response Plan by responding to not more than one surprise drill each
       year which may be called by the County on the pump station property,
       along the pipeline route or along Highway 101.  If critical operations
       are underway, Celeron need not respond but shall explain the nature of
       the critical operations and why response is not possible.  Celeron
       shall demonstrate oil spill response capability by responding to not
       more than one surprise oil spill drill each year.

P-4.   In order to assure that County emergency response procedures adequately
       interface with the Celeron emergency response procedures, Celeron shall
       provide its reasonable pro-rata share of funds to the County, to
       develop and implement a feasible County Emergency Response Plan for oil
       and gas industry related emergencies.  As appropriate, the County shall
       request funds from other oil industry operators to aid in funding of
       the County Emergency Response Plan.  When available, the Resource
       Management Department shall provide Celeron with an estimate of the pro
       rata share of funds to be provided by Celeron and the method for
       allocating such costs among other operators.

P-5.    Celeron shall submit an Oil Spill Contingency Plan detailing cleanup procedures and restoration procedures to be employed in the event of a spill.  This plan shall be reviewed and approved by the Resource Management Department and the County Emergency Services Coordinator prior to start-up.  The Program shall be submitted sufficiently prior to Celeron's projected start-up date so as to allow reasonable time for staff review.  Procedures and techniques shall be selected to augment the Emergency Response Plan.  The intent of the Oil Spill Contingency Plan is to detail spill site restoration subsequent to emergency response which may be called by the County on the pump station property or along the pipeline route.  If critical operations are underway, Celeron need not respond but shall explain the nature of the critical operations and why response is not possible.

P-6.    Prior to approval of the Final Development Plan, Celeron shall submit to the Santa Barbara County Sheriff's Department for review and approval a site security plan.  The plan shall describe procedures to be implemented by Celeron which will prevent intentional damage to facilities which may result in environmental damage or public safety hazards.

P-7.    Celeron shall cooperate with Chevron as necessary to facilitate the establishment of a temporary County fire company until the completion of the fire station (as specified in Chevron condition P-9).  Prior to issuance of the Coastal Development Permit and Land Use Permit, the County Emergency Response Coordinator and Fire Department must be satisfied that provisions have been made to establish an operational fire company in the project area.

P-8.    Prior to approval of the Final Development Plan, Celeron shall agree to participate in a plan to be submitted to the County Fire Department by Chevron USA Inc., for the construction, manning and equipping of a fire station in the Gaviota area.  Celeron shall contribute their pro rata share of the cost of implementing this plan.  When available, the Resource Management Department shall provide Celeron with an estimate of the pro rata share of funds to be provided by Celeron and the method for allocating such costs among other operators.

P-9.    Prior to Final Development Plan, Celeron shall submit to and obtain conceptual approval from the Fire Department, a Fire Protection Plan for the pump station locations.  Final approval shall be obtained prior to start-up.  Criteria to be addressed shall be obtained from the County Fire Department.

EXHIBIT B

Planning. Commission Actions                                             Page 43
Celeron Pipeline Final Development Plan                                  March 3, 1986

P-10.   Prior to approval of the Final Development Plan, Celeron shall assess
        the feasibility of transporting liquefied petroleum gases and natural
        gas liquids, (LPGs and NGLs) through the proposed pipeline by blending
        and/or batching, considering industry-wide projected volumes and market
        destinations of the gas liquids.  Celeron shall report to the Resource
        Management Department the results of this assessment, and this
        information shall include all technological and safety constraints
        involved, amount and type of additional storage facilities needed, and
        the degree to which LPGs and NGLs produced in the area can be
        transported through Celeron's pipeline.

        Celeron shall transport the NGLs through this pipeline, to the extent
        feasible within safety and legal constraints as identified by the
        report and as requested by the users.  In addition, under the reporting
        provisions of Condition C-1, Celeron shall inform the County of the
        types and amounts of gas liquids shipped in the pipeline during
        operations.

P-11.   If the Vista del Mar School has not been relocated or is located at a
        site where it could be impacted by construction activities, prior to
        approval of the Final Development Plan, Celeron and the Board Trustees
        of the Vista Del Mar School District shall develop a reasonable and and
        mutually agreeable construction plan for the pump station site and
        pipelines adjacent to the site that will minimize construction-related
        noise, air pollution, and visual disturbance to the School during
        school hours.  Said construction plan shall include the following:

        Pipeline construction noise near the School shall be held to ambient
        noise levels or construction shall occur only when school is not in
        session; to prevent exceedance of the California one-hour NO$_2$
        standard, construction schedules must be modified to minimize
        overlapping of equipment emissions; and, during construction of the
        pipeline, activities nearest the school shall be scheduled when school
        is not in session in accordance with Condition B-5 and temporary
        barriers shall be erected around noisiest activities.  No grading for
        the Gaviota pump station shall occur during School session hours.

        In the event that any agreements contained herein cannot be reached on
        the construction plan, the Board of Supervisors shall arbitrate any
        dispute.

P-12.   Deleted.

P-13.   Celeron will design the pipeline such that entire pipeline will have
        effective control communication between the operations control center
        and all remotely activated valves.  Any break, rupture, and/or damage
        to the pipeline shall result in the orderly shutdown of the pumping
        operations, and will activate the shut off valves, if appropriate, in a
        manner which will minimize environmental damage.

Planning Commission Actions                                              Page 44
Celeron Pipeline Final Development Plan                              March 3, 1986

P-14.   During construction of the pipeline in fire sensitive areas, Celeron
        shall meet or exceed applicable guidelines and requirements set forth
        in a Watershed Fire Protection Plan provided by the combined local fire
        protection agencies, Santa Barbara County Fire, U.S. Forest Service,
        and the California Department of Forestry.  This shall include, but not
        be limited to:  modifications of welding operations, required fire
        patrolman position(s), firefighting equipment, and construction
        restrictions due to extreme fire weather.

P-15.   All facilitites, construction activities and equipment shall comply
        with National Fire Protection Assocition standards.

P-16.   Upon completion of pipeline construction, Celeron shall provide all
        jurisdictional agencies (S.B. County Fire, USFS, CDF) with at least two
        copies of maps showing the finished pipeline route and shall include
        locations accessible by fire department emergency response vehicles.
        Said maps shall be 7 1/2 minute quadrangle scale, (one inch equals
        24,000 inches), and shall represent topographical features.

P-17.   Celeron shall be subject to required fire department inspections during
        and after construction as set forth by the 1982 Uniform Fire Code and
        these conditions.

P-18.   Prior to approval of the Final Development Plan, Celeron shall
        designate alternative pipeline corridor alignments which avoid the two
        potentially impacted, proposed alternative permanent relocation school
        sites now under study by the Vista del Mar Union School District.
        These proposed alternative locations are the State Park at Las Cruces,
        and the Tajiguas Ranch property.  County shall review and approve said
        alternative alignments as part of the Final Development Plan and
        Celeron shall implement the appropriate alternative alignment depending
        on the permanent school relocation site chosen by the Vista del Mar
        School District.


Q.      FACILITY DESIGN

Q-1.    The Final Development Plan shall demonstrate compliance with Santa
        Barbara County Coastal Zoning Ordinance, and other applicable County
        Ordinances to the extent required by this permit.

Q-2.    Cost effective energy conservation techniques shall be incorporated
        into project design.

Q-3.    Celeron's facilities will be operated as a common carrier pipeline with
        access for use available on a nondiscriminatory basis.  County retains
        the right to verify that the use of the facilities is conforming with
        County policies on consolidation and to impose additional reasonable
        permit conditions where necessary to assure these policies are being
        fulfilled to the extent feasible.  The intent of this condition is to
        ensure the multi-company access of oil transportation facilities.

EXHIBIT B

Planning Commission Actions                                    Page 45
Celeron Pipeline Final Development Plan              March 3, 1986

Q-4.    Celeron shall comply with all applicable policies in Section 25 of the
        Santa Barbara County Petroleum Ordinance No. 2795.

Q-5.    Celeron shall fund a pro-rata share of the costs to bury power
        transmission lines or of using environmentally and aesthetically
        preferred poles between the Goleta Substation and Gaviota in areas
        where the County and SCE determine it is not feasible to bury the
        lines.  Celeron's pro-rata share shall be based upon an equitable
        cost-sharing formula applied to all users of the grid power consistent
        with PAC rate setting and applicable regulations.

5668e

Planning Commission Actions                                    Page 46
Celeron Pipeline Final Development Plan                    March 3, 1986

CELERON FINAL DEVELOPMENT PLAN
FINDINGS REQUIRED FOR APPROVAL

Upon approving the Preliminary Development Plan and Conditional Use Permit, the Planning Commission and Board of Supervisors adopted certain findings of approval pursuant to the County zoning ordinances and the California Environmental Quality Act. As the project has undergone no major changes since those findings were adopted, they are largely applicable to the Final Development Plan approval. The findings in this section have been modified to reflect new information and the nature of the Final Development Plan approval.

1.    Article III, County Zoning Ordinance

      The Santa Barbara County Zoning Ordinance, Article III, requires that certain findings of approval be made for all development plans, and that additional findings be made specifically for pipeline development.

1.1   Findings Required for Approval of a Development Plan - General

      A Preliminary or Final Development Plan shall be approved only if all of the following findings can be made:

      a)   That the site for the project is adequate in size, shape, location, and physical characteristics to accommodate the density and intensity of development proposed.

      The project "site" is in fact a 100-foot wide construction, 50-foot wide operations corridor covering approximately 70 miles in Santa Barbara County. The route is logical and appropriate for the transport of offshore processed crude to refineries outside of the County. The pipeline begins at Las Flores Canyon, where it will acquire processed crude from a consolidated oil processing facility, pass through the Gaviota consolidated processing facility, and traverse the environmentally preferred route out of the County. While the 100-foot construction right-of-way does encroach upon sensitive resources, the route was chosen and the project conditioned to minimize the disturbance of sensitive habitats and to restore all disturbance to the maximum feasible extent. The line will not displace any residents or structures.

      The chosen route can accommodate multiple pipelines, and has been designed to minimize the impacts of future construction in the corridor. The Celeron line will be a common-carrier, offering equitable access to all shippers.

      b)   That adverse impacts are mitigated to the maximum extent feasible.

      The construction and operation of this pipeline will have certain adverse impacts on Santa Barbara County. The California Environmental Quality Act requires that those impacts which can be feasibly lessened to a level of insignificance must be so mitigated. As detailed on the Class II Impact Summary Table, project conditions have been imposed to implement the mitigations. There are also impacts which cannot be mitigated to a level of insignificance. As required by CEQA, these impacts have also been mitigated to the maximum extent feasible by the implementation of

Planning Commission Actions                                   Page 47
Celeron Pipeline Final Development Plan              March 3, 1986

conditions, as noted on the Class I Impact Summary Table. In addition, mitigation measures which alleviate adverse but not significant impacts have been incorporated as suggested by the environmental document.

c)   That streets and highways are adequate and properly designed.

While pipeline construction will require the use of many County roads by heavy trucks and to a lesser degree, machinery, these roads should be able to accommodate this temporary increase in traffic and use without any decrease in service. Furthermore, condition K-5 requires Celeron to mitigate impacts to all County roads used during construction and to repair any obvious damage.

d)   That there are adequate public services, including but not limited to, fire protection, water supply, sewage disposal, and police protection to serve the project.

The project Environmental Impact Report does not identify any significant adverse impacts to public services due to the project. In order to help offset cumulative impacts on public services anticipated due to the increased offshore development, Celeron is required to participate in the establishment of a new County fire station in the Gaviota area (conditions P-7,8). Celeron must also adhere to the site security plan approved by the County Sheriff's Department (P-6). In addition, if project-related taxes do not compensate for needed capital or operating expenses necessary to provide for project-related utilities and services, additional mitigation will be required through the Socioeconomic Monitoring and Mitigation Program (I-1).

e)   That the project will not be detrimental to the health, safety, comfort, convenience, and general welfare of the neighborhood and will not be incompatible with the surrounding areas.

During construction, the project may inconvenience a small number of residents near Buellton and in the Gaviota area due to increased noise levels. The project has been conditioned to limit construction activities to between the hours of 7:00 a.m. and 7:00 p.m., and will only impact any given area for approximately one week. The duration of this potential inconvenience is therefore limited, and the project has been conditioned to mitigate noise impacts to the extent feasible. Although processed oil is flammable, and therefore hazardous to transport, the risks of fire and spillage have been minimized through project conditions. Therefore, neither the elevated noise level nor the risk of an accident will be detrimental to the health, safety, comfort, convenience and general welfare of the neighborhood.

Pipelines are a permitted use in all zoning districts outside of the Coastal Zone, and are compatible with surrounding areas because there are very few above-ground facilities once construction is complete. The pump stations at Sisquoc is above ground, but will not conflict with the agricultural uses which surround it. The pump station at Las Flores Canyon is compatible with the other oil and gas facilities at the site.

Planning Commission Actions                                    Page 49
Celeron Pipeline Final Development Plan                    March 3, 1986

hearings do not create any new adverse impacts.  Although there may be segments where a different alternative is less environmentally damaging, these isolated segments are infeasible because the pipeline must be continuous; each chosen segment must join to form the pipeline corridor. Overall, the route chosen is environmentally preferable to any complete alternative route, so that there are no feasible alternative routes which are less environmentally damaging.

## 2.0  County Coastal Zoning Ordinance

The Coastal Zoning Ordinance applies to all segments of the pipeline within the Coastal Zone as indicated on County maps.  The CZO requires identical findings for Development Plans and pipelines as Article III, as well as findings for a Conditional Use Permit.  As many of the findings for this section duplicate those for Article III, additional findings will be made here only where the facilities in the Coastal Zone pose special concerns or problems not applicable to the route as a whole.

2.1  Findings Required for Approval of a Development Plan - General

e)   That the project will not be detrimental to the health, safety, comfort, convenience, and general welfare of the neighborhood and will not be incompatible with the surrounding area.

During construction, the project may inconvenience a small number of residents along the south coast due to increased noise levels.  The project has been conditioned to limit construction activities to between the hours of 7:00 a.m. and 7:00 p.m., and will only impact any given area for approximately one week.  The duration of this potential inconvenience is therefore limited, and the project has been conditioned to mitigate noise impacts to the extent feasible.  Conditions N-2 and P-11 require the use of best available muffling technology to limit noise impacts to Vista del Mar school.  Although processed oil is flammable, and therefore hazardous to transport, the risks of fire and spillage have been minimized through project conditions.

f)   That the project is in conformance with the applicable provisions of the Coastal Zoning Ordinance and the Coastal Land Use Plan.

As conditioned, the project is in conformance with the applicable provisions of the Coastal Zoning Ordindnce and the Coastal Land Use Plan.

g)   That in designated rural areas the use is compatible with and subordinate to the scenic, agricultural and rural character of the area.

As mentioned above, the Gaviota pump station is surrounded by other oil and gas industry facilities.  Because the station is sited adjacent to the approved Chevron facility, it will not add to the detraction from the scenic, agricultural and rural character of the area.  The pipeline itself will be buried, so it will be compatible with the character of the area.

EXHIBIT B

Planning Commission Actions
Celeron Pipeline Final Development Plan

Page 50
March 3, 1986

2.2   Findings Required for Approval of a Development Plan - Pipelines

Identical to those for Article III.

2.3   Findings Required for Approval of a Conditional Use Permit

Findings numbered 1 through 8 in this ordinance are identical to those for Development Plans in the Coastal Zone and in Article III.

9)    That the proposed used is not inconsistent with the intent of the zone district.

Pipelines are permitted in every zoning district, but require a Major Conditional Use Permit if Environmentally Sensitive Habitats are crossed.  The line is therefore consistent with all applicable zoning districts.

3.0   California Environmental Quality Act Findings

The California Environmental Quality Act requires that any agency which approves a project with significant environmental effects identified in an EIR must make one or more findings for each of those significant effects, accompanied by a brief rationale for each finding.  The Class I Impact Summary Table describes each of the adverse significant impacts identified in the project EIR/S which are either unavoidable because no known mitigation measures or project alternatives exist, or which are only partially mitigated after implementation of the identified mitigation measures.  The Class II Impact Summary Table describes the adverse impacts which can be eliminated or reduced to a level of not significant by the implementation of mitigation measures.  The impacts, proposed mitigation measures and permit conditions are described more specifically in the Preliminary Development Plan Staff Report and are incorporated herein by reference.

Upon consideration of the evidence in the EIR/S, the evidence presented at the hearings conducted before the Planning Commission, and the Staff Reports prepared by the County Energy Division, the Planning Commission makes the following findings:

3.1   Class I Impacts

CEQA FINDING #1 :Certain impacts cannot be substantially lessened or avoided.

There are certain unavoidable significant adverse impacts associated with approval of the project.  The benefts of the project, described elsewhere in these findings, outweigh the unavoidable environmental risks.

The following findings refer to specific impacts listed in the Class I Impact Summary Table; the number in the "CEQA Findings" column on the table corresponds to the numbers below.

Planning Commission Actions                              Page 51
Celeron Pipeline Final Development Plan                  March 3, 1986


   1A.   Oil Spill Impacts

Oil spill-related impacts may still occur even after successful
implementation of the identified mitigation measures, due to natural
events and technical limitations that can hinder effective cleanup
and containment.  The risks of an unlikely oil spill, combined with
the risks of incomplete spill cleanup, are considered acceptable
because only denying the project would assure complete mitigation of
oil spill impacts.  The identified mitigation meausres represent the
best feasible techniques currently available.


   1B.   Channel Degradation

Although the pipelines are to be buried a minimum of four feet below
the maximum storm scour depth below stream channels, or other
engineering measures used, degradation of these channels may result
in increased scour depth which could expose or seriously damage
pipelines.  The applicants have been required to conduct detailed
geotechnical studies prior to issuance of the Land Use Permitn and
Coastal Development Permit in order to create acceptable mitigations
to decrease the risk of such an occurrence.  In addition, the County
has coordinated a rigorous review of the final engineering plans for
the major river crossings.  The residual risk is considered
acceptable due to the level of mitigation imposed and the need for
the pipeline to cross major rivers.


   1C.   Clearing of vegetation

Numerous sensitive plants will be removed to clear a 100-foot
right-of-way for construction vehicles; fifty feet of this
right-of-way will remain clear of larger vegetation during
operations for maintenance purposes.  The majority of the vegetation
removed will be recultivated after construction is complete.
Although it will take many years for certain types of vegetation to
regain their previous stature, this impact is nevertheless
temporary, and limited to the 100-foot ROW.  The residual impact is
considered acceptable due to the projects need for clear
construction and operation ROWs.


   1D.   Disturbance of Cultural Resources

The approved pipeline route is conditioned to avoid to the extent
feasible all known archaeological sites.  Where specific sites or
sensitive resources are unavoidable, the pipeline corridor will be
narrowed to minimize impacts.  In addition, conditions in the L
section provide for the participation of Native Amercian
representatives and the proper recording of all sites to be
disturbed.  The residual disturbance impacts, while significant to
the Native Americans, are considered acceptable since all feasible
mitigations have been employed.

Planning Commission Actions                              Page 52
Celeron Pipeline Final Development Plan              March 3, 1986

   1E.  Visual – Sisquoc Pump Station

        The Sisquoc pump station will cover approximately 5 1/2 acres on a
        grassy plain on private lands near the town of Sisquoc.  The
        facility will be visible from Foxen Canyon Road and a nearby ranch
        house.  Conditions M-1 and M-4 have been included to assure adequate
        screening of the facility.  The residual impact results primarily
        from the contrast between the existing flat grassy plain and the
        height of the necessary screening; it is acceptable because of the
        project's need for the pump station.

   1F.  Construction-related noise impacts

        Some residents along the route will experience noise levels of more
        than 60 dBA during construction.  While such levels exceed County
        standards, the duration of the elevated noise levels will be
        approximately one to two weeks at any given location.  In addition,
        construction activities will be limited to the hours of 7 a.m. to 7
        p.m.  The impacts are therefore considered acceptable because they
        are temporary and local in nature.

   1G.  Cumulative Housing Impacts

        The identified impact has been mitigated by the specified conditions
        to the extent that the project contributes to the impact.  Many of
        these conditions have been placed on other oil and gas industry
        projects approved by Santa Barbara County, and require pro-rata
        participation.  The residual impact is considered acceptable since
        denying these projects would have a worse overall effect, as stated
        in each project's Statements of Overriding Considerations.

   1H.  Impacts Outside County Jurisdiction

        Mitigation of these anticipated impacts is wholly within the
        responsibility and jurisdiction of the permitting agency(ies)
        identified in the Class I Impact Summary Table, and is not within
        the permit jurisdiction of the County.  Mitigation measures should
        be included as permit conditions in the appropriate agency's permit
        which will follow County action on this project.  Implementation of
        the mitigation measures must reduce the impact to the maximum
        feasible extent.


3.2  Class II Impacts

     The numbers in the CEQA Findings column on the Class II Impact Summary
     Table refer to findings in this section.

Planning Commission Actions                              Page 53
Celeron Pipeline Final Development Plan                March 3, 1986

CEQA FINDINGS #2 - 8: Impacts identified as Class II have
been eliminated or substantially lessened
where feasible.

The impacts identified have been eliminated or substantially lessened to
a level of insignificance through the incorporation of feasible
mitigation measures.  These measures have been incorporated as mandatory
permit conditions.

CEQA FINDING #9: Certain impacts identified as Class II can be
eliminated or substantially lessened by other
agencies with jurisdiction outside the County.

Mitigation of these anticipated impacts is wholly or partially within the
responsibility and jurisdiction of the permitting agency(ies) identified
in the Class II Impact Summary Table, and is not within the permit
jurisdiction of the County.  The identified mitigation measure should be
included as a permit condition in the appropriate agency's permit which
will follow County action on this project.  Implementation of the
mitigation measure will eliminate and reduce the impact to a level of
insignificance.

If the permitting agency with authority to require the suggested
mitigation measure does not incorporate the measure as a permit
condition, or if the mitigation measure is determined to be infeasible by
the permitting agency, then the impact will remain significant.  The
County shall reexamine these conditions after consultation with the
permitting agencies prior to final action on the permit, and will modify
the mitigatiion measures or CEQA Findings as necessary.

Those impacts which are partially within the jurisdiction of Santa
Barbara County have been mitigated to the maximum extent feasible by the
County.


3.3  Project Alternatives

The EIR/S studied a number of different route segments which could be
combined to form a pipeline to the desired destination.  Two routes were
studied as proposed projects (one for each applicant) and numerous others
were studied on a project-alternative level.  This section addresses all
routes examined in the EIR which were not chosen.

CEQA FINDING #10:  The project alternatives not chosen are either
not feasible, not environmentally preferable or
not as beneficial as the proposed project.

(a)  No-Project Alternative

The impacts presented for the Celeron proposal would be avoided by
the no-project alternative, in which no pipeline is constructed.
However, implementation of this alternative would cause additional

EXHIBIT 3

Planning Commission Actions                                    Page 54
Celeron Pipeline Final Development Plan                    March 3, 1986

impacts as a result of the expanded marine tanker traffic which
would necessarily occur without a pipeline.  Current County policy
allows the use of marine tankers to transport crude to destinations
not served by pipeline or until such a pipeline is operational.
Under the no-project alternative, virtually no destinations would be
served by pipeline, so the vast majority of locally produced crude
would be transported by tanker.

Tanker transport would have many adverse impacts, primarily in the
areas of air quality, socioeconomics and oil spill risk.  These
impacts are discussed more fully in the Getty Gaviota Consolidated
Coastal Facility FEIR (ERT, 1985), the Santa Ynez Unit/Las Flores
Canyon Development and Production Plan (SAI 1984) and the Oil
Transportation Plan EIR (ADL, WCC, 1984).

County policy favors pipelines as the primary means for transporting
crude oil, based on the relative impacts of pipelines and marine
tankering.  The environmental benefits of pipeline use outweigh the
environmental risks associated with the lack of a pipeline.

(b)  Segment alternatives

The approved pipeline right-of-way can be divided into five segments
for which alternatives were studied.  Chapter 5 of the staff report
includes a point-by-point comparison of the preferred and
alternative routes for each of these segments; that discussion is
incorporated herein by reference.  In addition, much shorter
alternatives were considered during the course of the hearings, and
the discussion of those alternatives is included in the record and
in the EIR/S addendum.  Although there may be segments where a
different alternative is less environmentally damaging, these
isolated segments are infeasible because the pipeline must be
continuous; each chosed segment must join to form the pipeline
corridor.  Overall, the route chosen is environmentally preferable
to any complete alternative route.

(c)  Buellton Alternatives

Two alternative corridors through the Buellton area were considered,
but not chosen.  These are the eastern route (existing easement) and
the McMurray Road route.  Construction of a pipeline along either of
these corridors would involve extensive disruption of commercial
areas, and would greatly inconvenience local residents.  In the case
of an accidental oil spill on either of these two routes,
contamination of the Buellton area water supply is more likely than
if a spill occurred on the westerly approved route.  In addition,
the habitats which will be disturbed on the western route are not
particularly sensitive.  The Commission therefore finds that the two
eastern routes through Buellton are more environmentally damaging
than the western route.

3.4   Benefits of the Project

The primary benefit of the project is that it will provide a means of transporting crude oil out of Santa Barbara County which is environmentally preferable to marine tankering.  This preference is supported in three recently certified environmental documents (OTP; Exxon SYU FEIR/S; Texaco (Getty) CCF FEIR), and the documentation is incorporated herein by reference.  In addition, the Overriding Considerations described in Section 3.5 below identify benefits of the project.

3.5   Statement of Overriding Considerations

CEQA FINDING 11:   The unavoidable significant impacts of the project are found to be acceptable due to overriding considerations.

We recognize the adverse significant impacts of the project represent important concerns and that they have the potential to substantially degrade the quality of the human and physical environment in parts of Santa Barbara County unless substantial mitigation measures can be implemented.  In particular, the project will cause:  the loss of many mature oaks and riparian vegetation; loss of Hoffman's Nightshade, Refugio Manzanita and Catalina Mariposa lillies; visual impacts at the Sisquoc pump station and in the Los Padres National Forest; potential disturbance to at least eight cultural resource sites; exceedances of County noise standards during construction; potential oil spills impacts; and a contribution to the housing shortage anticipated due to the cumulative effect of development.

Although mitigation measures cannot completely eliminate the above mentioned impacts, many conditions have been attached to approval to ensure that they are mitigated as completely as possible.

The County recognizes that Federal policy regarding the leasing of offshore oil requires action on the part of the County in order to minimize the adverse impacts of that leasing on the County.  In its Oil Transportation Plan, the County studied alternative methods of moving locally produced crude oil from Santa Barbara County to various refinery destinations.  The study concluded that pipelines should be the preferred means of transporting crude oil.  The primary alternative to pipelines is marine tankering.  Expanded marine transport would cause adverse significant, long-term impacts to the County in the areas of air quality, socioeconomics and oil spill risk (OTP, Exxon, SYU FEIS/R, Texaco GCCF FEIR).  The County therefore amended and changed its coastal policies to encourage the use of pipelines in an effort to minimize the overall impacts of federal offshore leasing.

Planning Commission Actions                                              Page 56
Celeron Pipeline Final Development Plan                             March 3, 1986

It is therefore the County's desire to permit pipelines which will serve local producers' refineries, thereby diverting oil from marine tankers to pipelines. The proposed project does serve appropriate refineries located in Texas. The Planning Commission finds that permitting the project will help minimize the adverse impacts of offshore production.

The Planning Commission has considered the unavoidable significant effects of the project described in Sections 3.1 and 3.2 above, and the benefits of the project described in Section 3.4 above.

The Commission finds that in balancing the projects benefits against its unavoidable environmental risks, the benefits outweigh the environmental risks. Upon due reflection and consideration we find the substantial benefits provided by the project outweigh the significant environmental impacts. In particular, we note that the pipeline will reduce the need for marine tankering of locally produced crude oil, thus satisfying County policies which favor the use of pipelines.

## 4.0  ADDITIONAL FINDINGS

The Planning Commission realizes that there are unique construction timing constraints associated with the Celeron pipeline project. In approving this Final Development Plan, several conditions with prior to start-up compliance timing were approved. The Planning Commission finds that the timing of these conditions is acceptable only because of these unique timing considerations.

EC:5521e

# EXHIBIT J

**RECEIVED**
COUNTY OF SANTA BARBARA

JUL 29 1986

RESOURCE MANAGEMENT DEPT.
ENERGY DIVISION

Coastal Devel. Permit No. __86-CDP-189__
Building Permit No. __# 114386__

<u>COASTAL DEVELOPMENT PERMIT</u>

On __July 27, 1986__, The Resource Management Department of the
County of Santa Barbara granted to __Celeron Pipeline Company of California__
this permit, VALID FOR ONE YEAR, for the development described below, subject
to the attached standard conditions, and the listed special conditions, if any.

Approved project: __Clearing, grading and trenching activities for Celeron Pipeline__
Project as approved by 85-DP-66cz, in the area described below.
Parcel # and Project Address: __Gaviota State Park (survey station #1725+40) to Gaviota__
pump station.
Special conditions: __1. The project description, pipeline route, conditions, and plans__
required pursuant to those conditions described by the approved Final Development Plan
85-DP-66cz are incorporated herein by reference as terms of this permit.

2. This permit excludes all activities relating to pumpstations, river crossings, pipe
stringing, welding, and any other activity not normally performed by the clearing,
grading and trenching construction crews.

<u>Note:</u>

1. The approval of this project <u>shall not</u> be held to permit or to be an
   approval of a violation of any provision of any County Ordinance or State
   Law.

2. Action of the Resource Management Department on this Coastal Development
   Permit shall become final after ten (10) calendar days of the approval
   date during which time an appeal may be filed in accordance with Sec.
   35-182.2 (Appeals) of the Coastal Zoning Ordinance.

*see over*

IMPORTANT:  THIS PERMIT IS NOT VALID UNLESS AND UNTIL WHITE COPY OF THE PERMIT
WITH THE SIGNED ACKNOWLEDGEMENT HAS BEEN RETURNED TO RESOURCE MANAGEMENT. PINK
COPY MUST BE POSTED IN A PROMINENT PLACE ON THE SUBJECT PROPERTY

Approved By:

_Deanne Guzman_                    _7/27/86_
(Signature)                        (Date)

Acknowledgement:  The undersigned permittee acknowledges receipt of this
permit and agrees to abide by all terms and conditions thereof.

_William S Bennett_                _7/27/86_
(Signature)                        (Date)

RESOURCE MANAGEMENT DEPARTMENT  123 E. ANAPAMU ST.  SANTA BARBARA  93101
963-7135

8146R

White-return  Yellow-file copy  Pink-post on property  Goldenrod-applicant copy

PL-114

**STANDARD CONDITIONS**

1. Notice of Receipt and Acknowledgement: The permit is not valid and construction shall not commence until a copy of the permit, signed by the permittee or authorized agent acknowledging receipt of the permit and acceptance of the terms and conditions, is returned to the Resource Management Department.

2. Expiration: If construction has not commenced, the permit will expire one year from the date on which the Resource Management Department issued the permit. Construction shall be pursued in a diligent manner and completed in a reasonable period of time. Application for extension of the permit must be made prior to the expiration date.

3. Compliance: All construction must occur in strict compliance with the proposal as set forth in the application for permit, subject to any special conditions as listed. Any deviation from the approved plans must be reviewed and approved by the staff.

4. Interpretation: Any question of intent or interpretation of any condition will be resolved by the Director of Resource Management. The permit may be assigned to any qualified person provided assignee files with the Resource Management Department an affidavit accepting all terms and conditions of the permit.

5. Terms and Conditions Run with the Land: These terms and conditions shall be perpetual, and it is the intention of the Resource Management Department and the permittee to bind all future owners and possessors of the subject property to the terms and conditions.

**WARNING**

THE ISSUANCE OF THIS LAND USE PERMIT IS SUBJECT TO APPEAL TO THE PLANNING COMMISSION/BOARD OF SUPERVISORS BY ANY INTERESTED PERSON ADVERSELY AFFECTED BY THE DECISION FOR A PERIOD OF TEN (10) CALENDAR DAYS FOLLOWING THE ISSUANCE OF THIS PERMIT. ANY CONSTRUCTION OR OTHER USE OF THIS PERMIT IS AT THE SOLE RISK AND EXPENSE OF THE APPLICANT. IN THE EVENT THAT AN APPEAL OR LAWSUIT ULTIMATELY RESULTS IN DENIAL OR RECONDITION OF THE PROJECT.

# EXHIBIT K

EXHIBIT B

Coastal Devel. Permit No. 86-CDP-205
Building Permit No. # 114386

## COASTAL DEVELOPMENT PERMIT

On  August 5, 1986                , The Resource Management Department of the
County of Santa Barbara granted to Celeron Pipeline Company of California
this permit, VALID FOR ONE YEAR, for the development described below, subject
to the attached standard conditions, and the listed special conditions, if any.

Approved project: Remainder of all construction activities for the Celeron Pipeline
project as approved by 85-DP-66cz, in the area described below.
Parcel # and Project Address: Gaviota State Park (survey station #1725+40) to the
Gaviota pump station.
Special conditions: The project description, pipeline route, conditions and plans
required pursuant to those conditions described by the approved Final Development Plan
85-DP-66cz are incorporated herein by reference as terms of this permit.

No construction activities are allowed in the area of the Refugio Manzanita until an
approved revegetation plan is obtained.

---

Note:

1. The approval of this project shall not be held to permit or to be an
   approval of a violation of any provision of any County Ordinance or State
   Law.

*See over* 2. Action of the Resource Management Department on this Coastal Development
   Permit shall become final after ten (10) calendar days of the approval
   date during which time an appeal may be filed in accordance with Sec.
   35-182.2 (Appeals) of the Coastal Zoning Ordinance.

IMPORTANT: THIS PERMIT IS NOT VALID UNLESS AND UNTIL WHITE COPY OF THE PERMIT
WITH THE SIGNED ACKNOWLEDGEMENT HAS BEEN RETURNED TO RESOURCE MANAGEMENT. PINK
COPY MUST BE POSTED IN A PROMINENT PLACE ON THE SUBJECT PROPERTY

Approved By:

_____          August 5, 1986
(Signature)                               (Date)

Acknowledgement: The undersigned permittee acknowledges receipt of this
permit and agrees to abide by all terms and conditions thereof.

William Bennett                           8/5/86
_____          _____
(Signature)                               (Date)

RESOURCE MANAGEMENT DEPARTMENT  123 E. ANAPAMU ST.  SANTA BARBARA  93101
963-7135

8146R

White-return   Yellow-applicant copy  Pink-post on property  Goldenrod-file copy

PL-114   REV. 5-86

## STANDARD CONDITIONS

1. <u>Notice of Receipt and Acknowlegement</u>: The permit is not valid and construction shall not commence until a copy of the permit, signed by the permittee or authorized agent, acknowledging receipt of the permit and acceptance of the terms and conditions, is returned to the Resource Management Department.

2. <u>Expiration</u>: If constuction has not commenced, the permit will expire one year from the date on which the Resource Management Department issued the permit. Construction shall be pursued in a diligent manner and completed in a reasonable period of time. Application for extension of the permit must be made prior to the expiration date.

3. <u>Compliance</u>: All construction must occur in strict compliance with the proposal set forth in the application for permit, subject to any special conditions as listed. Any deviation from the approved plans must be reviewed and approved by the staff.

4. <u>Interpretation</u>: Any question of intent or interpretation of any condition will be resolved by the Director of Resource Management. The permit may be assigned to any qualified person provided assignee files with the Resource Management Department an affidavit accepting all terms and conditions of the permit.

5. <u>Terms and Conditions Run with the Land</u>: These terms and conditions shall be perpetual, and it is the intention of the Resource Management Department and the permittee to bind all future owners and possessors of the subject property to the terms and conditions.

-WARNING-

THE ISSUANCE OF THIS LAND USE PERMIT IS SUBJECT TO APPEAL TO THE PLANNING COM-MISSION/BOARD OF SUPERVISORS BY ANY INTERESTED PERSON ADVERSELY AFFECTED BY THE DECISION FOR A PERIOD OF TEN (10) CALENDAR DAYS FOLLOWING THE ISSUANCE OF THIS PERMIT. ANY CONSTRUCTION OR OTHER USE OF THIS PERMIT IS AT THE SOLE RISK AND EXPENSE OF THE APPLICANT, IN THE EVENT THAT AN APPEAL OR LAWSUIT ULTI-MATELY RESULTS IN DENIAL OR RECONDITION OF THE PROJECT.

# EXHIBIT L

EXHIBIT D



# County of Santa Barbara

## RESOURCE MANAGEMENT DEPARTMENT

### Dianne Guzman, AICP, Director

November 23, 1987

Timothy J. Cohen
Celeron Pipeline Company of California
P.O. Box 31029
Santa Barbara, CA  93130

RE: Planning Commission Actions at November 23, 1987 Hearing

Dear Mr. Cohen:

At the Planning Commission hearing on November 23, 1987, the Commission approved revisions to Conditions B-1, E-1, P-1, P-2, P-3, and P-5 of Celeron's Final Development Plan (85-DP-66cz); revisions to Celeron's Environmental Quality Assurance Plan (EQAP) and to the Restoration, Erosion Control, and Revegetation Plan (including the Suey Canyon Revegetation Plan and the Offsite Oak Mitigation Plan); and a determination of substantial conformity for pipe storage on the Sisquoc Ranch until November 1989.  Specific Planning Commission actions are summarized below:

1.  Motionmaker/Second:  Johnson/Stillman

    Vote:  4-1 to approve, No:  Commissioner Wack

    Action:  Motion to approve modifications to Celeron's Final Development Plan conditions B-1, E-1, P-1, P-2, P-3, and P-5 as presented in the staff report dated November 20, 1987 and as discussed at the public hearing, with any amendments made during the hearing.

2.  Motionmaker/Second:  Johnson/Maschke

    Vote:  4-1 to approve, No:  Commissioner Wack

    Action:  Motion to approve modifications to:  the Environmental Quality Assurance Plan required by Final Development Plan Condition C-1; the Restoration, Erosion Control, and Revegetation Plan; the Suey Canyon Revegetation Plan; and the Offsite Oak Mitigation Plan required by Final Development Plan Condition H-1, as presented in the November 6 staff report, as discussed in Attachment 1 to the November 20 supplemental staff report, and as amended during the November 23, 1987 hearing.

123 E. Anapamu Street,  Santa Barbara, CA  93101
PHONE (805) 568-2000      FAX (805) 568-2522

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Letter to Tim Cohen
November 23, 1987
Page 2

3. Motionmaker/Second:  Johnson/Stillman

   Vote: ¨5-0 to approve

   Action:    Motion to approve the request for a determination of
              substantial conformity for pipe storage at the existing pipe
              storage area on the Sisquoc Ranch, adjacent to the Sisquoc
              River for a period of two years, with the understanding that
              Celeron will provide a letter acceptable to County Counsel
              specifying that Celeron will (a) retrieve any pipe, should it
              be washed away in a flood event; and, (b) repair any damage
              that may be caused by such "renegade" pipe.

4. Motionmaker/Second:  Johnson/Wack

   Vote:  5-0 to approve

   Action:    Motion to adopt the findings for approval of the Final
              Development Plan modifications, including Compliance Plan
              modifications, and the substantial conformity determination
              for temporary pipe storage as presented in the supplemental
              staff report dated November 20, 1987.


These actions by the Planning Commission are final unless appealed in writing
to the Santa Barbara County Board of Supervisors within ten (10) calendar days
of the date (November 23, 1987) of the actions by the Planning Commission.

If any portion of these actions are appealed, a filing fee of $403.00 must be
delivered to the Clerk of the Board.  To file an appeal, this letter should be
taken to the Clerk of the Board of Supervisors in order to determine that the
appeal is filed within the allowed appeals period and to collect the required
appeal fee.


Sincerely,

Albert J. McCurdy, Secretary to the Planning Commission

AJM:NLM:4102E
cc: Energy Division (Permanent File:  85-DP-66cz)
    Ken Nelson, County Counsel
    Glenn Odell, County Fire Dept.
    Phil Demery, County Flood Control District
    Peggy O'Halloran, Environmental Health Services
    Frank Breckenridge, County Public Works Dept.
    Jim Norris, County Public Works Dept.
    Jeff Harris, Division of Environmental Review

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

CELERON PIPELINE PROJECT
FINAL DEVELOPMENT PLAN CONDITIONS
November 23, 1987

A.  GENERAL

A-1.    Acceptance of this permit shall be deemed as acceptance of all final
        conditions of this permit, except that Celeron reserves the right to
        pursue any remedy for any legal violations imposed directly or
        indirectly by these permit conditions.

A-2.    Substantial failure to abide by and faithfully comply with any
        conditions for the granting of this permit shall constitute grounds
        for the modification or revocation of this permit.

A-3.    Celeron agrees as a condition of the issuance and use of this permit
        to defend at its sole expense any action brought against the County
        by a third party challenging either its decision to issue this permit
        or the manner in which the County is interpreting or enforcing the
        conditions of the permit.  Celeron will reimburse the County for any
        court costs and attorneys fees which the County may be required by a
        court to pay as a result of such action where Celeron defended or had
        control of the defense of the suit.  County may, at its sole
        discretion, participate in the defense of any such action, but such
        participation shall not relieve Celeron of its obligation under this
        condition.  County shall bear its own expenses for its participation
        in the action.

A-4.    Celeron shall make an initial deposit to a fund to permit the County
        to adequately implement and enforce the conditions imposed on Celeron
        by applicable County ordinances and/or the conditions of this permit,
        if such a fund is established.  If the Board of Supervisors
        determines that a reasonable enforcement fund is needed, the Director
        of the Resource Management Department shall present to the Board of
        Supervisors and Celeron a plan for enforcement within one year from
        the effective date of this permit.  This plan shall set forth the
        staffing requirements and materials necessary for such enforcement
        and the estimated costs thereof.  This plan shall provide that all
        reasonable expenses incurred by the County or County contactors, for
        permit condition implementation, reasonable studies, and emergency
        response directly and necessarily related to enforcement of these
        permit conditions shall be reimbursed by Celeron within 30 days of
        invoicing by County.

A-5.    In the event that Celeron fails to comply with any order of the
        Administrative Officer or the Board of Supervisors issued hereunder
        or any injunction of the Superior Court, it shall be liable for a
        civil penalty for each violation to the extent imposition of such
        civil penalty is authorized by applicable laws, rules, or regulations.

        Said civil penalty shall be in addition to Celeron's obligation, if
        any, to reimburse the County of Santa Barbara (and others) for actual

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                          Page 2
Final Development Plan Conditions                        November 23, 1987

damages suffered as a result of Celeron's failure to abide by the conditions of this permit or by the orders of the Administrative Officer, the Board of Supervisors, or any court of competent jurisdiction.

A-6.    As to any condition which requires for its effective enforcement the inspection of construction records or records pertaining to facility operations, or the facilities themselves by County or its duly authorized agents, Celeron will make all necessary records available or provide access to such facilities upon reasonable notice from County.  County agrees to keep such information confidential where permitted by law and requested by Celeron in writing.

A-7.    The procedures, operating techniques, design, equipment and other descriptions (hereinafter procedures) described by Celeron in its application to the County 83-DP-25 cz, 83-CP-97 cz, and in subsequent clarifications and additions to that application and the Final Development Plan are incorporated herein as permit conditions and shall be required elements of the project.  Since these procedures were part of the project description which received environmental analysis, a failure to include such procedures in the actual project could result in significant unanticipated environmental impacts. Therefore, modifications of these procedures will not be permitted without a determination of substantial conformity or a new or modified permit.  The use of the property and the size, shape, arrangement and location of buildings, structures, walkways, parking areas and landscaped areas shall be in substantial conformity with the approved Final Development Plan.

A-8.    In addition to the authority to enforce and secure compliance with the provisions of this permit under Division 12, Coastal Zoning Ordinance of the Santa Barbara County Code, Division 7, General Regulations, Article III Santa Barbara County Zoning Ordinance, the County Administrative Officer, or in his/her absence a designated appointee, may order that curtailment of activities which is required to protect the public health and safety.  Said action may include, but is not limited to, ordering temporary, partial or total facility shutdown.

Such an order shall be made only in the event that the Administrative Officer has reasonable and probable cause to believe that continued unrestrained activities of permittee will likely result in or threaten to result in danger to public health, welfare, or safety, or in the environment and provided such violations can be expected to continue or recur unless operations are in whole or in part shut down or reduced pending the necessary corrections.

Before issuing any curtailment order, the County Administrative Officer shall set a time for hearing and shall give written notice of the time and place of the hearing and of the alleged violations.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                              Page 3
Final Development Plan Conditions                            November 23, 1987

Such notice shall be received by the person in charge of the
operation of the facility at least 24 hours before the hearing at
which time there will be an opportunity for all concerned parties to
present evidence regarding the alleged violations.  The notice may be
served in person or by certified mail.

In the event the Administrative Officer, or in his/her absence the
designated appointee, determines that there is an imminent danger to
the public health and safety resulting from violations, he/she may
summarily order the necessary curtailment of activities without
hearing and such order shall be obeyed upon notice of same, whether
written or oral.  At the same time that notice of the order is
conveyed, the Administrative Officer shall set a date, time and place
for a publically noticed hearing and review of said order as soon as
possible which date shall be no later than 24 hours after such order
is issued or served.  Said hearing shall be conducted in the same
manner as a hearing on prior notice.  After such hearing, the
Administrative Officer may modify, revoke, or retain the emergency
curtailment order.

Any order of the Administrative Officer may be appealed to the Board
of Supervisors  within three working days after such order is made.

If such appeal is not filed with the Board of Supervisors, the
Administrative Officer's order becomes final.  If there is an appeal,
the order of the Administrative Officer shall remain in full force
and effect until action is taken by the Board of Supervisors.  The
decision of the Board of Supervsiors shall be a final Administrative
Action.  Such decision shall not preclude Celeron from seeking
judicial relief.

Once Celeron has shown that the conditions of violation no longer
exist and are not reasonably likely to recur, the Administrative
Officer shall modify the curtailment order to account for such
compliance and shall entirely dissolve the order when it is shown
that all of the violations have been corrected and are not likely to
recur.

A-9.    In the event that any condition contained herein is determined to be
        invalid, then all remaining conditions shall remain in force.

A-10.   In the event that any condition contained herein is determined to be
        in conflict with any other condition contained herein, then where
        principles of law do not provide to the contrary, the condition most
        protective of public health and safety and natural environmental
        resources shall prevail to the extent feasible.

A-11.   In addition to any administrative remedies or enforcement provided
        hereunder, the County may seek and obtain temporary, preliminary, and

Celeron Pipeline Project                                          Page 4
Final Development Plan Conditions                       November 23, 1987

permanent injunctive relief to prohibit violation of the conditions
set forth herein or to mandate compliance with the conditions herein.

All remedies and enforcement procedures set forth herein shall be in
addition to any other legal or equitable remedies provided by law.

A-12.    The owner and the operator of the facility shall be jointly and
         severally liable without regard to fault for all legally compensable
         damages or injuries suffered by any property or person that result
         from or arise out of any oil, water spillage, fire, explosion, odor,
         or air pollution, in any way involving oil or gas or the impurities
         contained therein or removed therefrom and which arises out of
         construction or operation of Celeron's facilities.  For the purpose
         of this condition, the "facility" shall be deemed to include all
         facilities described and approved pursuant to 83-DP-25cz,
         83-CP-97cz.  This condition shall not inure to the benefit of any of
         the owners of the pipeline, including the United States Government.
         This declaration of strict liability and the limitations upon it
         shall be governed by the applicable law of California on strict
         liability.

A-13.    All facilities constructed under this permit shall be used only for
         the shipment of a maximum volume of heated crude oil demonstrated to
         be within the design parameters of the pipeline facilities as built.
         The subject volumes will be outer continental shelf (OCS) and other
         locally produced onshore and offshore petroleum from the Santa
         Barbara and Santa Maria Basins.  Celeron shall obtain a new or
         modified permit, or authority to continue operation under the
         existing permit prior to undertaking any of the following activities
         which may, in the judgment of the County, result in significant
         changes to the impacts on the County.  Such changes could include but
         not be limited to: 1) major pipeline or pump station modifications;
         2) major changes in pipeline throughput; 3) introduction of
         production to the pipeline from sources other than those described
         above; and 4) introduction of a different product from any source.

         Other source volumes may be transported subject to a determination of
         substantial conformity by the Planning Commission and a finding of
         facts and determination that project impacts will not be increased by
         transporting and processing those other sources.

A-14.    Celeron shall align the pipeline corridor from the coastal starting
         point to the County exit point in the western Cuyama valley according
         to the route approved by the County.  Celeron shall locate and
         construct all isolation valves as identified by the final approved
         alignment.

A-15.    Any person, firm or corporation, whether as a principal, agent,
         employee, or otherwise, found to be in violation of any provisions or

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                       Page 5
Final Development Plan Conditions              November 23, 1987

conditions of this ordinance or permits, shall be punishable as set forth in the applicable section of the Coastal Zoning Ordinance, and Article III of the Santa Barbara County Code.

Each and every day during any portion of which any violation of this Article or the rules, regulations, orders, or permits issued thereunder, is committed, continued, or permitted by such person, firm or corporation shall be deemed a separate and distinct offense.

A-16.   The Santa Barbara County Board of Supervisors in a noticed public hearing shall have the authority to specify or change the Santa Barbara County Department responsible for any conditions contained herein.

A-17.   Should circumstances, including legal or legislative action, cause the County to lose its authority or have its authority fundamentally reduced to assess fees as a method to mitigate project-related impacts, then other feasible mitigation measures shall be imposed which will substantially lessen the significant impact formerly mitigated by the imposition of fees.  Within six months of the County's loss of such authority, feasible alternative mitigation measures shall be imposed as replacement permit conditions. Alternatively, the County in a noticed public hearing must find that no feasible mitigation measures are available and that the benefits of the project outweigh the significant environmental impacts.

A-18.   Should legal action be required by either party to enforce any rights in connection with this permit the prevailing party shall be entitled to reasonable attorney's fees and costs pursuant to Civil Code 1717.

A-19.   Unless otherwise specified, these permit conditions are intended to apply to Celeron during both the construction and the operation of the permitted facilities.


B.  PERMIT REVIEW

B-1.   Prior to initiation of construction activity (such as ROW preparation, river crossings or pump station construstion), Celeron shall submit to the System Safety and Reliability Review Committee (established by condition P-1) relevant construction drawings and supporting text demonstrating compliance with the appropriate conditions.  Construction may not commence until County has reviewed and/or approved this submittal, consistent with the SSRRC review specified in Conditions P-1 and P-2.  Within 15 days of submittal, County shall either give written notice to proceed with construction or indicate in writing conditions which have not been met.  When such conditions have been met construction approval shall be granted.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                              Page 6
Final Development Plan Conditions                          November 23, 1987

B-2.    If at any time County determines that these permit conditions are
        inadequate to effectively mitigate significant environmental impacts
        caused by the project, or that recent proven technological advances
        could provide substantial additional mitigation, then additional
        reasonable conditions shall be imposed to further mitigate these
        impacts.  Imposition of such conditions shall only be considered and
        imposed as part of the County's comprehensive review of the project
        conditions.  County shall conduct a comprehensive review of the
        project conditions and consider adding reasonable conditions which
        incorporate proven technological advances three years after permit
        issuance and at appropriate intervals thereafter.  A comprehensive
        review of conditions which are not effectively mitigating impacts may
        be conducted at any appropriate time.  Upon written request of
        Celeron, the Board of Supervisors shall determine whether the new
        condition required is reasonable considering the economic burdens
        imposed and environmental benefits to be derived.

B-3.    This permit is premised upon findings that where feasible, all
        significant environmental effects of the project identified in the
        EIR/EIS (State Clearinghouse No. 83110902), which occur in Santa
        Barbara County, will be substantially mitigated by the permit
        conditions.  Prior to approval of the Final Development Plan, County
        shall review any findings that identified certain mitigation measures
        as being in the primary jurisdiction of another agency but are also
        within County's jurisdiction.  County shall thereupon determine
        either (1) that such mitigation has or is being implemented by such
        other agency or (2) that such other agency and County determine such
        mitigation to be infeasible.  If County determines that no other
        agency is or may be implementing such feasible mitigation measures
        then County may impose those feasible measures within its
        jurisdiction to mitigate those environmental impacts in accordance
        with appropriate mitigation measures identified by the EIS/R.

B-4.    Prior to approval of the Final Development Plan, Celeron shall
        develop and submit to the Resource Management Department for approval
        a plan to co-ordinate the placement and timing of their pipeline with
        SCPS's pipeline (or other potential proposals for use of the same
        corridor for a pipeline).  Any agreements between Celeron and SCPS
        (or other applicant) necessary to implement this plan shall be
        subject to review and verification by the Resource Management
        Department to assure the purpose of the plan will be achieved.  The
        expressed purpose of this co-ordination plan shall be:

        1)  arrangement of simultaneous construction where practical;

        2)  engineering of pipe placement within the ROW to minimize
            incremental widening of the initial construction corridor
            during subsequent pipeline projects;

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                          Page 7
Final Development Plan Conditions                       November 23, 1987

3)  identification of segments where incremental widening of the ROW is constrained and alternative engineering techniques which may allow construction of subsequent pipelines (and potential limitations of future pipeline use of the ROW); and

4)  timing and design of revegetation plans to promote effective revegetation but minimize unnecessary duplication of efforts.

Should SCPS or any other applicant abandon their pipeline project, or fail to submit a Final Development Plan prior to Celeron pipeline construction, this condition may be modified to reflect the existing situation but maintain the intent of this condition.

B-5.     In the event that scheduling requirements among or between conditions in this permit (or with this permit and conditions imposed by other agencies) conflict with respect to timing, the Resource Management Department (in consultation with other agencies as appropriate) shall resolve such conflict.

B-6.     Applicant shall cooperate as necessary with San Luis Obispo County in the permitting, design, and construction of those segments of the pipeline which could affect Santa Barbara County.  The intent of this condition is to ensure that potential impacts to Santa Barbara County are mitigated to the maximum extent feasible by these permit conditions, regardless of the location of the source of the impact.

B-7.     Prior to commencing any construction activities in Santa Barbara County, Celeron shall obtain a letter from the Director of the Resource Management Department indicating that all conditions which require approval prior to construction, as specified by this permit, have been satisfied.

B-8.     Prior to start-up of the pipeline in Santa Barbara County, Celeron shall obtain a letter from the Director of the Resource Management Department indicating that all conditions which require approval prior to start-up, as specified by this permit, have been satisfied.

B-9.     In the event that Celeron and staff cannot reach an agreement on the adequacy of any submittal required by these conditions, the matter will be brought before the Planning Commission for resolution at the earliest possible date.

C.  MANAGEMENT

C-1.     Celeron shall prepare an Environmental Quality Assurance Program (EQAP) for Resource Management Department approval prior to the Final Development Plan.  This EQAP shall encompass both the construction and operation phases of the project, and shall describe the steps

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                                    Page 8
Final Development Plan Conditions                              November 23, 1987

Celeron will take to assure compliance with these conditions. This plan is intended to provide a framework for all other programs and plans specified by these conditions as required prior to approval of the Final Development Plan. As such, it will become a comprehensive reference document for the County, other agencies, and the public regarding the Celeron project.

This plan shall provide for the submission to the Resource Management Department semi-annual reports throughout construction and annual reports during operations. These reports shall describe:

a) Project status, including but not necessarily limited to:

    i)    extent to which construction has been completed,
    ii)   the rate of production/throughput during operation,
    iii)  environmental planning and implementation efforts, and
    iv)  any revised time schedules or timetables of construction and operation that will occur in the next one year period.

b) Permit condition compliance, including but not necessarily limited to the results of the specific mitigation requirements identified in these conditions.

c) Results and analyses of all data collection efforts being conducted by Celeron pursuant to these permit conditions.

The program shall include (or if separate plans exist, reference) all plans relevant to construction and operations of the pipeline facilities specified by these conditions.

Construction

The program shall include all plans relevant to construction activities such as the Restoration, Erosion Control and Revegetation Plan and the Cultural Resources Mitigation Plan.

The program shall include provisions for at least one managing environmental coordinator with overall responsibility, and if necessary, .one onsite environmental coordinator per construction site during the construction phase. These coordinators shall be approved by and be responsible to the Resource Management Department. Celeron shall fund the coordinator(s). The number of coordinators necessary shall be determined according to the amount of simultaneous construction activity occuring in geographically separate areas. The responsibilities of the coordinator(s) are to include:

a)    on-site, day-to-day monitoring of construction activities;

b)    ensuring contractor knowledge of and compliance with all appropriate permit conditions;

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                          Page 9
Final Development Plan Conditions                         November 23, 1987

c)   evaluating the adequacy of construction impact mitigations, and proposing improvements to the contractors, Celeron, and County;

d)   having the authority to require correction of activities observed to violate project environmental conditions or that represent unsafe or dangerous conditions, and having the ability and authority to secure compliance with the conditions or standards through the County Administrative Officer as described in condition A-8, if necessary;

e)   performing as contact for affected property owners and any other affected persons that wish to register observation of environmental permit violations and/or unsafe conditions, receiving any complaints, immediately contacting Celeron's onsite construction representative, verifying any such observations and developing any necessary corrective actions in consultation with Celeron's onsite construction representative;

f)   maintaining prompt and regular communication with the Resource Management Department, Public Works Department, or other appropriate County agency, and with Celeron personnel responsible for contractor performance and permit compliance.

In the event that resolution of disputes between the public and/or governmental agencies and Celeron over adherence to permit conditions is not achieved by the managing environmental coordinator, an arbitration system shall be utilized to resolve such disputes in a timely manner in order to minimize the need to halt construction activities as per conditions A-2 or A-8.

The coordinator(s) shall be thoroughly familiar with all plans and requirements set forth in the permit conditions.  Prior to construction start-up, the managing coordinator shall discuss with other agency inspectors or monitoring personnel, inspection programs, areas of jurisdiction, responsibility, and define methods of avoiding disputes or construction delay due to agency disagreements.

Selection of the necessary coordinators shall be made, and the person(s)'available, prior to issuance of the Coastal Development Permit and Land Use Permit.

Operations

The program shall include all plans related to operations, such as the Emergency Response Plan, Oil Spill Contingency Plan, and Landscaping Plan, as well as specific conditions not required in formal plans.  It may also include any procedures not specified by these conditions but relevant to environmental protection and safety.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                          Page 10
Final Development Plan Conditions                      November 23, 1987

C-2.     Prior to issuance of the Coastal Development Permit and Land Use
         Permit Celeron shall provide to the Resource Management Department
         and the Emergency Services Coordinator the current name and position,
         title, address, and 24-hour phone numbers of the field agent, person
         in charge of the facility, and other representatives who shall
         receive all orders and notices, as well as all communications
         regarding matters of condition and permit compliance at the site and
         who shall have authority to implement a facility shutdown pursuant to
         condition A-8 in this Ordinance.  There shall always be such a
         contact person(s) designated by the permittee.  One contact person
         shall be available 24 hours a day during all phases of the project in
         order to respond to inquiries received from the County, or from
         anyone in case of an emergency.

         If the address or phone number of Celeron's agent should change, or
         the responsibility be assigned to another person or position, Celeron
         shall provide to the Resource Management Department the new
         information within seven days.

C-3.     Celeron shall furnish to the Resource Management Department copies of
         all County permit applications relative to the project once
         submitted, and of permits within 30 days of receipt by Celeron.


D.  AIR QUALITY

D-1.     Nothing contained herein shall be construed to permit a violation of
         any applicable air pollution law, rule, or regulation.

D-2.     Prior to initiation of construction, including grading, of any
         facilities approved pursuant to this Development Plan, Celeron shall
         obtain an Authority to Construct permit from the County Air Pollution
         Control District.

D-3.     Celeron agrees to implement all air pollution control procedures as
         required by APCD and identified in the Final Development Plan (such
         as water sprays to reduce construction-related fugitive dust).

D-4.     Emissions from any project component that contribute to ozone
         standard violations must be mitigated to the extent feasible.
         Effectiveness of mitigation will be confirmed by APCD.

D-5.     Deleted.

D-6.     Prior to approval of the Final Development Plan, Celeron shall submit
         to the Resource Management Department updated estimates of the type
         and size of helicopters, or other aircraft, to be used during
         pipeline operations for the aerial surveys of the pipeline route.
         The information shall also include the estimated operating schedules,

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                          Page 11
Final Development Plan Conditions                        November 23, 1987

frequency and duration of airport calls and other reasonable information as required by APCD. The County may require validation and updating of this information as needed. Should this information reveal significant differences between the estimated air emissions and those analyzed in the EIR/EIS, the APCD may modify air quality permit conditions as necessary to assure consistency with the Air Quality Attainment Plan and Reasonable Further Progress goals.

D-7.    All facilities shall be designed, constructed, operated, and maintained, such that the facilities approved under this Development Plan shall not discharge quantities of air contaminants or other materials in violation of Section 41700 of the Health and Safety Code.

D-8.    Prior to the approval of the Final Development Plan, Celeron shall submit to the Director of the Resource Management Department a plan, approved by the APCD, which includes timing of construction, minimizing soil handling, and other measures to mitigate construction air quality impacts. The plan shall include APCD approved analysis which demonstrates that local, state and federal air quality standards will not be violated as a result of construction activities.

E.   GEOLOGY

E-1.    Prior to the issuance of the Coastal Development Permit and Land Use Permit, Celeron will conduct a route-specific Geologic Investigation, Design, and Mitigation Program. This program shall contain three basic components: 1) a detailed geologic investigation component which defines specific hazards, 2) an engineering design component which details specific engineering plans for each identified hazard along the route, and 3) a geohazards mitigation component which demonstrates how and to what extent each hazard is reduced.

a)  Detailed geologic investigation component:

Where specific hazards have been identified or may occur along the pipeline route or at pump station locations, Celeron will conduct appropriate detailed geologic, seismic, and geotechnical studies to further characterize the specific geologic hazard. These studies will be conducted under the direction of a State of California registered geologist or engineering geologist who will be mutually agreed to by Celeron, the Resource Management Department, the Public Works Department, and the Flood Control District. These studies will include but not be limited to investigations of unstable slopes, erodable slopes, lurch/liquefaction susceptible substrate, surface rupture, and river scour characteristics (depth and lateral extent). Methods of investigation shall conform to appropriate geotechnical techniques applicable to each specific hazard. Draft results

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                          Page 12
Final Development Plan Conditions                        November 23, 1987

will be subject to review by County Public Works Department and Flood Control Agency as appropriate prior to finialization of the engineering design. The final report will be submitted with the final engineering design component.

b)  Engineering design component:

Celeron will demonstrate that appropriate geotechnical information from component a) and other applicable recommendations are incorporated into final engineering design of pipeline construction and facilities. This includes but is not restricted to: the development of appropriate ground motion parameters for use in seismic design of critical structures and equipment, unstable slope construction or avoidance techniques, burial depth at all major river crossings, modification of instrumentation, or use of the dual contingency level/operating level earthquake concept, or its equivalent. The designs will be subject to review by the Department of Public Works and third party technical review as specified in Condition P-1.

c) Geohazards mitigation component:

Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron will submit to the Resource Management Department a detailed geologic hazard mitigation report. The report will outline the hazards identified in part a) of this program and will address how engineering designs as detailed in part b) of this program reduce each specific hazard. This component will also be submitted to the Department of Public Works and Flood Control Agency and will be subject to third party review as specified in Condition P-1.

E-2.    Celeron will develop a Monitoring Program for the operations phase to be funded by Celeron and staffed as necessary with at least one State of California registered engineer, or engineering geologist, in order to evaluate any hazards identified by routine monitoring. The program will be designed to verify adequate performance or condition of the project components in hazard areas such as river and active fault crossings, and will be subject to approval of the Resource Management Department prior to issuance of the Coastal Development Permit and Land Use Permit. The monitoring program may in part be incorporated into routine aerial and ground reconnaissance.

If the monitoring indicates a potential or actual hazard, appropriate action including, but not limited to, operations curtailment and repairs, will be taken by Celeron to mitigate the hazard. Celeron will report to the Emergency Services Coordinator any potentially hazardous situations discovered during monitoring.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                        Page 13
Final Development Plan Conditions                        November 23, 1987

In the case of river crossings at the Santa Ynez, Sisquoc and Cuyama
Rivers, a yearly inspection of pipeline burial depth, subject to
review by the Resource Management Department and Flood Control
Agency, shall be performed.  At crossings of the Santa Ynez and
Sisquoc Rivers where channel degradation has reduced the depth of
cover to less than four feet below the 100-year scour depth, or other
hazardous levels as determined by a professional engineer on the
staff of or under supervision of the County Flood Control Agency, or
US D.O.T. specifications, relocation or reburial of the pipeline to
adequate depth will be required.  At the crossing of the Cuyama
River, if the inspections reveal that hazardous conditions exist,
mitigations such as reconstruction or relocation of the crossing will
be required as determined by a professional engineer on the staff of
or under supervision of the County Flood Control Agency.

E-3.    Inspection of the pipeline trench or trench spoil to identify any
potential geologic hazards shall be made by a professional geologist
or soils engineer approved by the Resource Management Department
prior to installation of the pipeline.  If hazards not previously
accounted for in the pipeline design are encountered, appropriate
mitigation measures will be developed and must be instigated prior to
installation of the pipeline.  The results of the inspection will be
reported to the engineering geologist of the Public Works Department
who will approve prior to, and the supervising environmental
coordinator who will insure, application of the necessary mitigation
measures.  The timing of such inspections shall not result in any
unreasonable delays in installation of the pipeline.

E-4.    At all places where the pipeline crosses an active fault, according
to the Department of Geology and Mining definitions, Celeron will
place isolation valves on either side, or design and construct
appropriate devices or measures which more effectively mitigate the
hazard of the fault crossing.  Location and nature of these designs
must be approved prior to the issuance of the Coastal Development
Permit and Land Use Permit.

E-5.    Prior to the issuance of the Coastal Development Permit and Land Use
Permit, Celeron shall submit final Grading and Erosion Control Plans
for the Sisquoc pump station approved by the Department of Public
Works.  These plans shall be consistent with or based on information
contained in the geologic investigation required in Condition E-1.

Prior to issuance of the Coastal Development Permit and Land Use
Permit, Celeron shall either submit Grading and Erosion Control Plans
for the Las Flores and Gaviota pump stations for approval by the
Department of Public Works or show evidence that the plans are a part
of the overall Grading and Erosion Control Plans for the consolidated
processing facilities at those sites.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                              Page 14
Final Development Plan Conditions                          November 23, 1987

E-6.    Celeron shall cooperate as necessary with San Luis Obispo County in the permitting, design and construction of the Cuyama River crossing.

        Any pipeline crossing the Cuyama River shall be laid to a depth consistent with studies performed under Condition E-1 and subject to approval of the County Flood Control District.

E-7.    Prior to approval of the Final Development Plan, Celeron shall commit to the location of their south coast pump stations to the satisfaction of the Planning Commission.  If these stations are not within the boundaries of the approved Exxon, Gaviota Terminal Company, or Chevron facilities, Celeron shall submit grading and erosion control plans pursuant to Condition E-5.


F.  SURFACE AND GROUNDWATER

F-1.    During construction of the pipeline across all perennial stream crossings, stream flows, if any, shall be diverted around construction areas to maintain downstream flows.  Baseline water flows shall be maintained in coastal streams in order to avoid adverse impacts to lagoon or other sensitive habitats.

F-2.    Sediment retention devices that allow continued streamflow shall be installed directly downstream of stream crossings during construction.

F-3.    For pipeline crossings at the following stream or river crossings: Tajiguas; Refugio; Gaviota; Nojoqui; Zaca; San Antonio Creeks, all additional perennial streams which the pipeline crosses: Santa Ynez; Sisquoc; and Cuyama Rivers, Celeron shall construct the buried pipelines during the months of low historical streamflow, in order to minimize erosion loss downstream and protect surface water quality. In the event of low winter rainfall, earlier construction may be approved by Resource Management Department and County Flood Control Agency.

F-4.    No staging areas shall be permitted within riparian habitat corridors.

F-5.    During pipeline construction at stream crossings, construction contractors will minimize time of disturbance, narrow the construction  ROW to the extent feasible, stabilize the disturbed areas immediately following construction of the crossing, and divert runoff waters around construction areas to maintain downstream flows.

F-6.    Deleted.

F-7.    Celeron shall install isolation valves on either side of all perennial stream and river crossings, including the Cuyama River,

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project
Final Development Plan Conditions

EXHIBIT D
Page 15
November 23, 1987

and/or as required by the Coastal Zoning Ordinance, unless the applicant can demonstrate that alternative methods will further reduce the potential leak impacts at the crossing site. These locations shall be identified prior to the Final Development Plan.

F-8.    Prior to approval of the Final Development Plan, Celeron shall identify the freshwater source considered for supplying pipeline and facility construction activities including hydrostatic test water, and shall estimate the total quantity required. Any water obtained from coastal or inland sources shall not significantly disrupt streamflows, groundwater resources, or habitat resources. Water conserving devices shall be used where feasible. Any water used during construction, (exclusive of hydrostatic test water), shall contain no more than 5,000 parts per million total dissolved solids. Disposal of hydrostatic test water within the County shall be according to a plan approved by the Regional Water Quality Control Board, or by the Flood Control Agency. This information shall be provided to and approved by the Resource Management Department as part of the Final Development Plan.

F-9.    Prior to approval of the Final Development Plan, Celeron will perform detailed hydrogeologic investigations for the sensitive areas identified in the the EIR/EIS, (Table 3-14). These investigations will be conducted by a State of California registered geologist or engineer and will include but not be limited to:

   a)   definition of groundwater depth, recharge sources, properties of overlying soils, hydraulic gradient, background water quality, and existing water uses.

   b)   inventory of existing wells from State or County Flood Control Agency records in an area extending down-gradient from the pipeline in the aquifer equal to the distance groundwater would move in one year at a velocity calculated from the maximum hydraulic conductivity of the specific aquifer, hydraulic gradient, and porosity. The down-gradient sensitive area will be determined by a registered geologist.

This information will be reviewed by the Resource Management Department and used by Celeron to formulate the Groundwater Contamination portion of an Oil Spill Contingency Plan, Condition P-5. This portion of the Plan will include;

a)   plans for monitoring and early detection of groundwater contamination, including aerial and ground surveys, pipeline pressure monitoring, and water sampling of strategic wells;

b)   plans for notification of affected groundwater users, and the Emergency Services Coordinator;

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                        Page 16
Final Development Plan Conditions                        November 23, 1987

<ol type="c" start="3">
<li>clean-up response, reparations, restorations, and methods to determine and correct the contamination source; and</li>
<li>identification of emergency alternate water supplies.</li>
</ol>

F-10.    At the base of slopes where the ROW approaches sensitive aquifers as identified in the EIR/S that are at risk from oil spills and leaks, a dam or ditch plug will be used in the pipeline trench.  The sensitive areas are those where the ROW follows 1) topographic slopes toward basins with shallow depth to water, 2) high vertical permeabilities, and 3) a high degree of groundwater use as indicated by the hydrogeologic investigations required as per condition F-9.  These areas shall be identified in the Final Development Plan.

F-11.    Prior to the approval of the Final Development Plan, the System Safety and Reliability Committee shall review and approve submitted plans of all Creek and River crossings in Santa Barbara County. Permitted development shall not cause or contribute to flood hazards or lead to the expenditure of public funds for flood control works.

## G.  AQUATIC BIOLOGY

G-1.    Fueling and lubrication of construction equipment will not occur within 0.25 miles of any flowing streams.  No more than 2 barrels of fuel shall be kept at construction sites, exclusive of pipeline construction equipment fuel tanks, within 0.25 miles of all perennial creeks.  As part of the oil spill response plan, Celeron will submit plans for clean-up and restoration of affected areas in the event of a construction fuel spill.

## H.  TERRESTRIAL BIOLOGY

H-1.    Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron shall submit a Restoration, Erosion Control, and Revegetation plan for the final proposed pipeline route and the pump station sites.  The plan shall be submitted to the Resource Management Department for approval.  Once approved, the plan shall be implemented by Celeron.  Success of the restoration and revegetation plans shall be monitored by a qualified independent biologist who is in addition to the managing environmental coordinator (Condition C-1).  The plan shall contain, but not be limited to, the following:

<ol type="a">
<li>Procedures for stockpiling and replacing topsoil, replacing and stabilizing backfill, such as at stream crossings, and steep or highly erodable slopes.  Additionally, provisions shall be made for recontouring to approximate the original topography.  Excess fill shall be disposed of off-site unless suitable arrangements are made with the property owner.  Excess fill shall not be deposited in any drainage, or on any unstable slope.</li>
</ol>

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                          Page 17
Final Development Plan Conditions                       November 23, 1987

     (b)  Specific plans for control of erosion, gully formation, and sedimentation, including, but not limited to, sediment traps, check dams, diversion dikes, culverts and slope drains.  Plan shall identify areas with high erosion potential and the specific control measures for these sites.

     (c)  Procedures for containing sediment and allowing continued downstream flow at stream crossings, including scheduling construction activities during low-flow periods.

     (d)  Procedures for re-establishment of vegetation that replicates or is functionally equivalent to indigenous and naturalized communities along the alignment.  These shall include:  measures preventing invasion and/or spread of undesired plant species; restoration of wildlife habitat value; and restoration of native plant species and communities.  Celeron shall consult with the County Farm Advisor and appropriate Ranch operators when developing procedures for revegetating areas used for cattle grazing and other agricultural uses;

     (e)  Procedures for restoration of riparian corridor stream and river  banks and stream bed substrates and elevation;

     (f)  Procedures for minimizing all tree removal or tree root and branch damage, such as, flagging the corridor, keeping all disturbance to no more than the 100-foot pipeline right-of-way, feathering the right-of-way edges, providing for onsite monitoring of construction by a qualified independent biologist.  In addition, special procedures are required for oak woodlands since County policy requires that these trees must not be cut down if feasible.  Special procedures for oaks include reducing the right-of-way to the minimum width possible and minimizing the impact to the root zone of these trees;

     (g)  Procedures for replacement of native trees and large shrubs removed from the 100-foot temporary easement during construction across riparian and woodland, in particular oak woodland, habitat, with saplings of the same species propagated from materials obtained from the same area, including provision for supplemental irrigation as necessary and feasible to ensure establishment, and provisions for protection of saplings from grazing animals;

     (h)  A soil conservation program, to be applied in areas of 20 percent or greater slopes along the pipeline corridor.

     (i)  Procedures for incorporating landowner concerns in the plan. Any changes to the plan instigated by such concerns shall be approved by the Resource Management Department.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                          Page 18
Final Development Plan Conditions                        November 23, 1987

(j) A plan for offsite re-establishment of oaks to mitigate impacts to oak savannahs and woodlands along the route.

The segment of the plan pertaining to Gaviota State Park shall be prepared in cooperation with the State Department of Parks and Recreation.

H-2.    One year after construction, a survey will be conducted, at Celeron's expense, to determine the actual impact caused by construction.  This survey shall include aerial photography, and as appropriate color stereo and infrared photography and field studies.  The report will identify areas with potential for further impact, e.g., high erosion areas, that will require immediate remedial measures.  The survey shall also contain an examination of previous mitigation measures and present a list of additional feasible mitigations based on the impacts during construction and potential impacts caused by operation.  Celeron and the Resource Management Department shall agree to additional feasible mitigations.  This process shall be repeated as often as necessary by the Resource Management Department, but not more than annually.

H-3.    In those areas where trees and other habitats such as riparian areas and oak woodlands are to be avoided within the approved corridor, Celeron shall assure contractor compliance with this condition by marking and/or fencing those habitats.

H-4.    Additional reasonable and feasible conditions of mitigation, consistent with condition H-1 and to the extent necessary, shall be identified and observed as developed during the archaeological mitigation program (conditions L-1, L-2, L-3, L-6), and as identified by the managing environmental coordinator in consultation with Celeron's Onsite Construction Representative (condition C-1).

H-5.    Deleted.

H-6.    Celeron shall not use herbicides in wetland and riparian areas, and along the rest of the pipeline corridor during construction.

H-7.    Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron shall receive a permit (1603) as required from the California Department of Fish and Game.  This permit should include provisions to ensure that the proposed construction schedule will not interfere with reproductive activities of regionally rare or rare, threatened or endangered bird, amphibian, and fish species or other species of special concern, in those environmentally sensitive habitats identified in the EIR/EIS and shall submit this confirmation to the Resource Management Department.  If the Department of Fish and Game determines that the construction schedule will have an impact then Celeron will adhere to directives of the Department of Fish and Game with respect to their permit requirements.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                                    Page 19
Final Development Plan Conditions                              November 23, 1987


H-8.     Deleted.

H-9.     Celeron shall minimize impacts to the population of Hoffmann's
         nightshade (Solanum xanti var. hoffmannii) found in the Gaviota Pass
         area.  Celeron shall submit plans to enhance the recovery of this
         population to the Resource Management Department for approval prior
         to issuance of the Coastal Development Permit and Land Use Permit.
         These plans shall include provisions for removing any individual
         plants that would be affected, place them in large tubs, and replant
         them as near as possible to the original location (exclusive of the
         operation Right-of-Way) after construction; and gathering seeds prior
         to issuance of the Coastal Development Permit and Land Use Permit
         from the population of Hoffmann's nightshade located in the Gaviota
         Pass area and planting them in and near the ROW after construction.
         This shall be done under the supervision of a biologist approved by
         the Resource Management Department and in cooperation with the
         California Parks Department; this biologist may approve modifications
         to these techniques based on season of the year and state of dormancy.

H-10.    Celeron shall minimize impacts to the population of Catalina Mariposa
         lily (Calochortus catalinae) found in the Gaviota Pass area.  Celeron
         shall submit plans to enhance the recovery of this population to the
         Resource Management Department for approval prior to issuance of the
         Coastal Development Permit and Land Use Permit.  These plans shall
         include provisions for gathering of seeds from the population found
         in or near the ROW prior to construction, planting the seeds in or
         near the ROW after construction (exclusive of the operation ROW),
         conserving the upper 18-24 inches of heavy clay soil which contains
         the plant's bulb-like corms found in the vicinity of the plants prior
         to construction, and then, after construction, replacing this soil
         which holds the plants bulb-like corms.  This shall be done under the
         supervision of a biologist approved by the Resource Management
         Department and in cooperation with the California Parks Department;
         this biologist may approve modifications to these techniques based on
         season of the year and state of dormancy.

H-11.    Celeron shall minimize impacts to the population of Refugio Manzanita
         (Arctostaphylos refugioensis) found in Gaviota Pass area and affected
         by the proposed construction activities.  Celeron shall submit plans
         to enhance the recovery of this population to the Resource Management
         Department for approval prior to issuance of the Coastal Development
         Permit and Land Use Permit.  These plans shall include provisions for
         gathering seeds and taking cuttings from the population of Refugio
         Manzanita found in and adjacent to the ROW prior to construction, and
         provisions for the planting of the seeds and plants propagated from
         cuttings in the final construction alignment (exclusive of the
         operation ROW) after construction.  This shall be done under the
         supervision of a biologist approved by the Resource Management
         Department and in cooperation with the California Parks Department;

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                        Page 20
Final Development Plan Conditions                      November 23, 1987

this biologist may approve modifications to these techniques based on season of the year and state of dormancy.

H-12.     Celeron shall prepare a Restoration, Revegetation and Implementation section as part of the Oil Spill Contingency Plan (P-5). The section shall be reviewed and accepted prior to start-up by the Resource Management Department and a biologist approved by the Resource Management Department. The section shall be submitted sufficiently prior to Celeron's projected start-up date so as to allow reasonable time for staff review. Reasonable costs of review shall be borne by the applicant. The section shall contain site-specific restoration information for all habitat types including stream crossings, wetlands/lagoons, oak woodlands, grasslands, riparian zones, and other environmentally sensitive habitats. The section shall be divided into three major areas: a) Coastal, b) Streams and Rivers and c) Terrestrial habitats. Each of these sub-sections shall discuss the various habitats in the categories listed above. Methods to achieve restoration of all affected areas to their prespill conditions shall be discussed.

H-13.     Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron shall submit to the County Board of Architectural Review, and the Resource Management Department site-specific plans for landscaping of any pump station not within other required project vegetation screens. This plan shall, at Celeron's expense, be reviewed by a qualified landscape architect and a biologist approved by the Resource Management Department to insure the proper plant materials and procedures identified in these conditions are implemented. These plans shall be developed in consultation with the property owner. The plan shall include:

(a) The specifications of any potential seed mixtures to be utilized, including the plant species in the mixture and the pounds of seed per acre to be applied; type of mulch (fiber, chemical tackifier or straw); the type and amount of fertilizer; and any provisions for irrigation;

(b) Confirmation that all native or non-native plant materials proposed in the revegetation plan are compatible with indigenous vegetation and that none of the plants used is known to be weedy or invasive. The plan shall provide for plantings that will screen facilities from view. This vegetation screening shall also be designed to reduce nighttime lighting and noise. Near chaparral or other high fire hazard areas, the seeds or seedlings will consist of native or non-native species, shown to contain fire retardant properties (such as toyon) and shown to be fast growing;

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                            Page 21
Final Development Plan Conditions                         November 23, 1987

(c) The specifications for native seeds and seedlings that will have
    wildlife habitat and food value.  All perennial plants, and all
    woody plants are to be propagated from material obtained from the
    same area.  Native plant material is to be obtained from a
    revegetation contractor.  All native materials will be ordered
    from the contractor in advance of construction activities.

(d) Confirmation that non-native material is to be confined to
    disturbed areas immediately adjacent to structures needing visual
    screening.  Such screening is to include fast growing plants
    adequate to screen the facility from direct view;

(e) A detailed irrigation plan if feasible for all revegetated areas
    requiring irrigation for establishment of plant materials;

(f) Celeron's commitment for continual monitoring of the revegetaion
    so that weeds will be minimized.

H-14.    Prior to issuance of the Coastal Development Permit and Land Use
         Permit, Celeron shall post a bond or other security agreement
         approved by the County Counsel to ensure that all landscaping and
         revegetation programs are completed to the County's specifications.

H-15.    Prior to issuing a release from the bond or other security agreement,
         a biologist and landscape architect hired by the County, at Celeron's
         expense, shall conduct a field review of all revegetated and
         landscaped areas, to insure consistency with the intent and
         specifications of the revegetation and landscape plan.  Necessary
         repairs or changes in landscaping or revegetation shall be made at
         Celeron's expense.

H-16.    Prior to approval of the Final Development Plan, a qualified
         biologist approved by the Resource Management Department will conduct
         site-specific field inventories for California state-listed species,
         as mandated by the intent and general provisions of Assembly Bill No.
         3309, the California Endangered Species Act.  The biologist will
         perform the surveys of the 100-foot ROW in areas suspected of having
         any of the species of special concern as identified in Appendix B
         Table B-6, DEIR/S, except for the peregrine falcon, least Bell's
         vireo, and Parish's sidalcea.  Surveys for these species will be
         conducted prior to construction.  The California Department of Fish
         and Game will be consulted concerning appropriate methods for survey
         as well as appropriate mitigation measures if these species are found
         on the ROW.  Additional mitigation shall be developed and executed by
         Celeron based on these surveys if determined necessary by the
         Resource Management Department.

H-17.    Prior to issuance of the Coastal Development Permit and Land Use
         Permit, a wildlife biologist approved by the Resource Management

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                                      Page 22
Final Development Plan Conditions                                      November 23, 1987

Department will survey all potential raptor nesting habitats within 0.5 miles of the pipeline, to identify active and inactive nests and potential perch sites cleared by ridge-top construction. No construction will occur within 0.5 miles of active eyries during nesting season as determined by the biologist. Construction may be permitted by the Resource Management Department in consultation with the biologist near inactive nests provided nest sites are not disturbed. Where deemed necessary by the California Department of Fish and Game biologists, raptor perch or roost trees will be avoided and/or artifical roosts will be constructed on ridgelines to mitigate losses of such trees resulting from clearing the ROW on ridge tops.

H-18.    Celeron shall limit the width of the construction ROW through all riparian habitats to the extent feasible. Celeron shall submit a plan indicating the location and size of the construction ROW through all riparian habitats. These plans shall be approved by the Resource Management Department prior to the Final Development Plan.

H-19.    The construction ROW shall be routed to avoid trees to the maximum extent feasible. When this is not possible, dying or diseased trees shall be removed preferentially over healthy trees.

H-20.    Celeron shall minimize impacts to the oak woodland in the Suey Canyon area. This shall be done by using existing disturbed areas and by narrowing the construction corridor to the extent feasible by working on top of the spoils pile or selectively removing spoils, selectively removing trees (e.g. dying, or diseased trees) and revegetating to enhance re-establishment of oak saplings and/or similar mitigation.

H-21.    Celeron shall align the pipeline route in the vicinity of the Los Alisos Creek crossing in order to minimize the amount of riparian habitat disrupted.

H-22.    Prior to the issuance of the Land Use Permit, a qualified biologist approved by the Resource Management Department shall conduct a site-specific field survey for the Parish's checkermallow along the approved right-of-way in potential habitat areas in the North County. Should any individuals be found along the right-of-way, Celeron shall employ mitigation measures approved by the Resource Management Department to enhance the reestablishment of the species along the ROW (e.g., transplanting individuals).


I.  SOCIOECONOMICS

I-1.    The cumulative impacts of oil and gas industry projects are expected to be significant to Santa Barbara County. Therefore Celeron shall participate in an oil and gas industry wide monitoring and mitigation program to address socioeconomic impacts indentified as significant

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                    Page 23
Final Development Plan Conditions                    November 23, 1987

environmental impacts attributable to their project.  For projects such as pipelines, only the construction phase is expected to cause significant impacts, and Celeron's participation in the program shall be limited to that phase.  The criteria for allocating the costs of the monitoring and mitigation program and its mitigation requirements will be uniformly applied to all industry participants.

The intent of this program is to obtain realistic information regarding impacts identified in the EIR/EIS, and to allow impacted jurisdictions to require mitigation for project-related impacts. Mitigation of impacts through other planning programs, and/or through existing administrative infrastructure shall be taken into account. The scope of this program is detailed below.  As subsequent details in the structure of the Program are developed by the County, such details shall supersede portions of this condition as appropriate.

The purpose of the Monitoring and Mitigation Program is to accurately assess the impacts of the Celeron's proposed development, including those in the following socioeconomic areas:

a.   Temporary housing needs, particularly demand for state and other park campsites, recreational vehicle parks, motel-hotel rooms and rental housing;

b.   Longer term (more than one year) housing needs, particularly low and moderate income housing needs, and associated water demands, south coast Santa Barbara County;

c.   Public finance;

d.   Transportation of workers and materials to and from the site.

At any point when the Board of Supervisors determines that the monitoring program demonstrates that previous mitigation funds paid by Celeron exceed the valuation of the impacts at issue, Celeron shall be granted a credit against any other current or future mitigation fees imposed on Celeron for this permit by the County. Celeron shall be entitled to accrued interest at the prevailing legal rate which shall continue to accrue until the credit is used.

The Monitoring and Mitigation Program will be administered and staffed by the County of Santa Barbara, Department of Regional Programs.  A Technical Advisory Committee will provide assistance and input in the documentation of significant adverse impacts and proposals to mitigate these significant impacts.

The Technical Advisory Committee will be composed of:  two representatives from Santa Barbara's cities appointed by the Mayor's Select Committee and repesenting north and south county interests;

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                                    Page 24
Final Development Plan Conditions                                   November 23, 1987

one representative (each) from San Luis Obispo and Santa Barbara counties; and one representative from each affected oil and gas company (to the number of representatives agreed upon). Celeron will be included in the committee until Celeron submits its resignation.

In the event of unresolved technical issues in the area of methodology and calculation of socioeconomic impacts, there shall be a Technical Arbitration Group. The Technical Arbitration Group shall be composed of three individuals without ties to either the County or Celeron, one to be selected by the County Board of Supervisors, one selected by the oil and gas company representatives and the final member selected by the first two members. All Technical Arbitration Group decisions shall be appealable upon written request to the Board of Supervisors. Subsequent details on voting procedures and conflict resolution will be proposed by the Department of Regional Programs and reviewed by the Board of Supervisors in a noticed public hearing.

Prior to approval of the Final Development Plan for this project, the monitoring and mitigation program will be refined. Based on information in the EIR/EIS and on other data as appropriate, practical thresholds which trigger the necessity for mitigation will be developed and adopted by the Department of Regional Programs with input from the Technical Advisory Committee. These thresholds will recognize the normal growth incorporated in county plans, prior and existing industry activity, and the decline of the industry if no further permitting is allowed. Methodologies used to establish thresholds and impacts will be developed in consultation with the Technical Advisory Committee.

The need for mitigation will be determined when threshold levels are exceeded as shown by monitored activities and other data as appropriate. The Department of Regional Programs will recommend a mitigation action to the County Board of Supervisors. The Technical Advisory Committee will assist in making the assessment and recommendations. The monitoring and mitigation program will continue through all stages of construction.

The monitoring, impact and mitigation elements of the program would be equivalent to those described in the Chevron Gaviota Project conditions, but modified as appropriate for the nature of the pipeline project.

I-2.    Prior to approval of the Final Development Plan, Celeron shall submit to the County Department of Regional Programs a plan which details how they plan to house temporary construction workers for every month of construction. This plan, to be implemented by Celeron, shall demonstrate how Celeron plans to reduce the housing impacts identified as part of the plan; e.g. exactly how much housing is needed, where it is needed and for how long; but not limited to, the following examples:

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                                    Page 25
Final Development Plan Conditions                                  November 23, 1987

> (a) Use of existing under-utilized hotel/motel space during the months of September through May to provide for temporary living quarters for direct construction workers by month; identification of incentives to all the direct construction workers such as rent subsidies and/or shuttle service to the site.
>
> (b) Use of any available housing outside the South Coast area for all workers associated with the project during the summer months when visitor-serving facilities in the South Coast area are at capacity. Incentives for workers shall be identified such as rent subsidies and shuttle service for all workers commuting to the job site.
>
> (c) Methods to limit worker use of public campgrounds as living quarters. If it cannot be shown that the impact will be reduced from the estimate, Celeron shall make a donation to the California State Parks or to Santa Barbara County Parks for the development of new campsites to offset their worker use of campsites. The donation shall be made prior to receipt of the building permit and determined by multiplying the estimated cost per developed campsite times 15. If it is shown by the Regional Programs Department and the Technical Advisory Committee that there is significant impact, the above-mentioned groups shall propose mitigation. At any point when the Board of Supervisors determines that the monitoring program demonstrates that previous mitigation funds paid by Celeron exceed the valuation of the impacts at issue, Celeron shall be granted a credit against any other current or future mitigation fees imposed on Celeron for this permit by the County. Celeron shall be entitled to accrued interest at the prevailing legal rate which shall continue to accrue until the credit is used.

I-3.    The pipeline construction period will be scheduled so as not to coincide with peak tourist seasons within each construction area in Santa Barbara County, provided that this scheduling does not interfere with any other conditions in this permit with respect to timing, in particular requirements regarding construction during stream and river low-flow. If such a conflict is found, than additional measures must be taken to provide the temporary housing needs for construction workers.

I-4.    Deleted.

I-5.    Celeron shall include provisions in its contractor agreements specifically to encourage and promote employment from local labor so as to reduce the impacts associated with the in-migration of workers.

I-6.    Except as otherwise provided herein, if the Socioeconomic Monitoring Program shows that project related revenues will not compensate for needed capital or operating expenditures necessary to provide project-related utilities and services additional mitigation will be required.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                    Page 26
Final Development Plan Conditions               November 23, 1987

I-7.     In the event that state and/or federal revenue sharing legislation
         directed at distributing oil related revenues to state or local
         governments is approved or Santa Barbara County levies a tax (special
         or otherwise) on oil and/or gas processed or transported under this
         permit, then any condition herein requiring payments or other items
         of value by Celeron to Santa Barbara County or any political
         subdivision thereof shall automatically be suspended pending a review
         by the County to determine the extent, if any, which the tax, revenue
         sharing, or any of the fees imposed are duplicative or unwarranted
         either as to the level of government services provided or the level
         of burdens imposed on the public.


J.  LAND USE AND RECREATION

J-1.     Prior to construction, the entire pipeline ROW corridor shall be
         prominently staked.  All affected property owners along the pipeline
         route shall be notified in writing at least 30 days prior to the
         commencement of any pipeline construction on their property, and at
         least 15 days in advance of any deviation from the staked corridor
         which crosses their property.

J-2.     All mainline pipeline construction activities except river, perennial
         coastal stream, and ESH area crossings as specified in condition H-7,
         once started, shall proceed in a diligent and expeditious manner and
         shall be completed within nine months after the starting date,
         subject to necessary and/or unanticipated time extensions approved by
         County, in consultation with affected property owners.

J-3.     Pipeline construction activities shall be limited to the period
         between 7 a.m. and 7 p.m., Monday through Saturday.  Except for
         emergency services, construction activities shall not take place on
         Sundays, the dates generally recognized for Memorial Day, July 4,
         Labor Day, or any other similarly recognized holiday, unless previous
         arrangements have been made with the affected property owners.

J-4.     Prior to approval of the Final Development Plan, Celeron shall
         consult with affected property owners to develop reasonable and
         mutually,satisfactory controls for maintaining the privacy and
         security of affected properties while construction is in progress.

J-5.     Unless easements have been obtained from affected property owners or
         unless otherwise agreed to by affected property owners, Celeron shall
         provide affected property owners written notice at least 48 hours
         prior to the start of construction on their property, which shall
         include:

         a)  Description of vehicles using roads on the property, including
             type, size, identification, proposed times of entry and

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                              Page 27
Final Development Plan Conditions                           November 23, 1987

departure, destinations, and the intended route to the destination.  (Fire, medical, or similar emergency vehicles can enter as necessary.)  Significant changes in the schedule of construction-related vehicular traffic shall be allowed within the 48-hour advance noticing subject to direct communication (e.g. telephone, personal communication) by Celeron with the affected property owners;

b)   Description of estimated construction schedule across the property.  Any blasting necessary during construction shall be noticed to all property owners within a one mile radius of the blasting area;

c)   Description of times of limited access through and across the property, such as road closures on the property, indicating specific location, time and duration of the limited access or closure.  Road closure is considered to include partial road blockage or disturbance.  Suitable vehicular by-pass shall be provided during all closures;

d)   Description of any probably hazard or other unsafe condition during the pipeline construction period, indicating the nature of the hazard, the area in which the condition will occur, and the time and duration of the activity.  Celeron and its contractors shall take prompt and adequate action to correct any hazard or damage that does occur during construction, and shall provide appropriate noticing as per other parts of this condition;

e)   Description of helicopter and/or vehicle reconnaissance schedules for pipeline maintenance, indicating times, stops, and duration. Celeron shall establish and enforce appropriate rules for its personnel and its contractors to assure that they will not be in the area except when necessary to carry out construction, inspection, repair and maintenance activities, or emergency services;

f)   Description of schedule for cutting any fences or similar barriers during pipeline construction.

J-6.   Deleted.

J-7.   Unless easements have been obtained from affected property owners or unless otherwise agreed to by affected property owners if and when fences or other similar barriers must be cut during pipeline construction, Celeron shall provide advance notice to the affected property owner, and shall replace the function of the cut fence before the cut is made to the satisfaction of the property owner, and Celeron and its contractors shall restore all fences that have been cut, moved, or damaged to at least their condition prior to pipeline construction, except that gates or similar structures may be added as approved to provide access.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                          Page 28
Final Development Plan Conditions                          November 23, 1987

J-8.    Interruption of telephone, electrical power, water or other utility services shall be minimized to the extent feasible during the pipeline construction period.  Celeron, or its contractors, shall contact each property owner or the appropriate utility regarding the location of utility lines, and all such utility line locations shall be staked by Celeron or its contractors prior to the start of construction on the affected property.

J-9.    During the pipeline construction period in the County, Celeron and its contractors shall comply fully with all applicable statutes, ordinances, rules and regulations, including traffic regulations, of the County.

J-10.   Prior to entering upon any parcel of property for purposes of commencing construction, Celeron shall demonstrate to the Resource Management Department that it has obtained a right-of-way for such parcel or otherwise has obtained the right to enter the property for purposes of constructing the pipeline.

J-11.   Following installation of the pipeline, use of the right-of-way is restricted to operational maintenance of the pipeline except where expressly permitted by the easement or landowner and consistent with other regulations and conditions.


K.  TRANSPORTATION

K-1.    Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron shall submit to the Resource Management Department and the Department of Public Works, Road Division a worker transportation program designed to minimize traffic-related impacts. The plan shall identify on- and off-site parking areas, access routes, shuttle program to reduce number of working vehicles on and along pipeline construction corridor, measures to avoid traffic conflicts with residents using all roads affected, number of vehicles accessing the facilities sites and incentives for ride-pooling/van-pooling to the sites.  Construction worker traffic and parking shall not interfere with normal and reasonable uses of private property or recreational areas.  This Construction Traffic Mitigation Plan shall be submitted by Celeron and approved by County prior to initiation of construction.  The program must consider both Celeron's employees and contractors.

K-2.    Any new permanent parking areas at the pump stations shall be screened from public view pursuant to the landscape plan approved by the Board of Architectural Review.

K-3.    The final engineering plans and procedures for all pipeline crossings of County roads must be approved prior to issuance of the Land Use

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                                      Page 29
Final Development Plan Conditions                                   November 23, 1987

Permit and Coastal Development Permit by the Department of Public Works. Notification of such approval must be submitted to the Resource Management Department prior to construction at the site.

K-4.    All pipeline construction activity, except ingress and egress along routes approved by the Resource Management Department and in consultation with affected property owners, shall be limited to the final staked right-of-way on the final approved pipeline route. Use of any private roads or other areas shall be allowed only after advance approval from the affected property owners.

K-5.    Prior to the Final Development Plan, Celeron must submit to the Public Works Department for approval a plan to mitigate impacts to all County roads which will be used during construction. This plan will include the type of vehicles and machinery which will traverse the roads, the frequency of road use for each piece of equipment and vehicle, and the gross vehicle weights loaded and unloaded. This includes the above information for trucks carrying pipe, fuel, construction supplies, or construction crews through the County to the construction spreads. This plan shall include an agreement with the County to repair any obvious damage to the satisfaction of the Public Works Director and any reasonable fees associated with eventual reconstruction caused by project-related damages of the public roads. Prior to drafting this agreement, County shall coordinate with Celeron in compiling a list of County roads which will be used for construction of the pipeline. Celeron shall demonstrate property owner (or Court) approval of private road maintenance plans or terms on privately owned parcels to the Resource Management and Public Works Department prior to entering upon said parcels for purposes of commencing construction.

L.  CULTURAL RESOURCES

L-1.    Prior to approval of the Final Development Plan, Celeron shall submit a plan detailing the methods for the Phase I (walkover) and Phase II (site importance assessment) cultural resources surveys. In addition, Celeron shall submit all Phase I cultural work completed to date. These reports shall be approved by the Resource Management Department as part of the Final Development Plan.

Prior to issuance of the Land Use Permit and Coastal Development Permit, Celeron shall complete Phase I and Phase II cultural resource surveys for the entire route. The results of these surveys shall be approved by the Resource Management Department prior to issuance of said permits. Celeron shall avoid to the maximum extent feasible all known cultural resource sites along the pipeline route unless safety (e.g. seismic or engineering practices) considerations or sensitive biological habitats preclude avoidance.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                            Page 30
Final Development Plan Conditions                          November 23, 1987

L-2.      Prior to issuance of the Coastal Development Permit and Land Use
          Permit, Celeron, in consultation with the Native American Community,
          shall commence the cultural resources mitigation plan, in accordance
          with CEQA Appendix K, County approved Prehistoric Archaeological
          Guidelines, and section 4.1.1.11, Cultural Resources, of the
          EIR/EIS.  Implementation of the mitigation plan shall proceed on an
          expeditious and effective schedule in order to minimize or to avoid
          conflicts with other construction scheduling requirements delineated
          in other permit conditions.  The main components of the mitigation
          plan shall include:

          a)  Selection of a qualified archaeologist by the County Resource
              Management Department in consultation with Native American
              representatives.  The archaeologist shall be available on an
              as-needed basis through the completion of pipeline construction.
              The archaeologist shall be funded by Celeron and shall be
              responsible to the County Resource Management Department.
              Compensation shall cover all excavation, analysis, and report
              preparation for all areas investigated including those found
              during construction;

          b)  Avoidance of known sites wherever feasible;

          c)  Test excavations of known sites that cannot be avoided.  These
              test excavations will assess the importance of each site
              according to CEQA Appendix K criteria or other requirements and
              will result in appropriate data recovery as a mitigation measure;

          d)  Inclusion of Native American representatives in all field
              activities.

          e)  Additional sub-surface sampling (use of shovel test pits) in
              defined sensitive areas which will be affected by project
              construction to confirm the presence/absence of previously
              unknown (undiscovered) sites.  This will include surveying of
              proposed construction access road areas, once identified by
              Celeron.  Any new sites found shall be treated as per condition
              L-2(b, c);

          f)  Following the determination of site importance, Celeron shall
              inform the County of any additional plans for site avoidance.
              For those sites not avoided, the consulting archaeologist shall,
              in consultation with the Native American community, prepare
              site-specific mitigation (excavation/data recovery) plans; and

          g)  Implementation and completion of the field work aspects of the
              site-specific mitigation plans prior to construction in the
              vicinity of the resource.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                                          Page 31
Final Development Plan Conditions                                          November 23, 1987

L-3.    Prior to pipeline installation activities, Celeron shall sponsor a
        workshop for its pipeline contractors and Native American consultants
        to review and explain the mutual concerns and activities of the
        parties during pipeline installation work.

L-4.    During pipeline installation, a Resource Management Department
        approved archaeologist and Native American consultant(s) will work
        with the contractor during trenching to insure continued avoidance.
        Adequate monitors shall be provided pursuant to an agreement between
        the Native American representatives and Celeron, and the
        archaeologist retained.

L-5.    If non-burial associated cultural resource artifacts are recovered
        during pipeline installation (the location of such artifacts being
        unknown prior to installation), ownership of such artifacts shall be
        the option of either Celeron, the Native American Community, or the
        archaeological community.  In recognizing the origin of the
        materials, the Native American Community shall have the first option
        for ownership.  The disposition of the artifacts shall be carried out
        as per the approved County guidelines.

L-6.    If burials or burial associated artifacts are found during
        installation (that were unknown prior to excavation), and cannot be
        avoided because of safety considerations, there shall be no further
        excavation or disturbance of the site.  Celeron, in conjunction with
        the Native American representatives and the Resource Management
        Department, shall adhere to the guidelines in CEQA Appendix K and the
        County Archaeological guidelines prior to continued construction
        activity in the site area.

L-7.    If the County cultural resource guidelines for Phase II are modified
        and approved prior to November 19, 1985, Celeron shall abide by the
        requirements set forth in the guidelines in place at the time of
        Final Development Plan approval.


M.  VISUAL RESOURCES

M-1.    All facility design (e.g. pump stations, landscaping and signs),
        shall be·in accordance with a plan approved by the County Board of
        Architectural Review (BAR) including the criteria outlined in the
        Coastal Zoning Ordinance Section 35-87.9 and Section 35-184.  Prior
        to the issuance of the Land Use Permit and Coastal Development
        Permit, Celeron shall submit to the BAR and the Resource Management
        Department and obtain their approval of a plan demonstrating that
        Conditions M-2 through M-5 are met.  For visual screening of surface
        equipment along the pipeline route, Celeron shall consult with each
        affected property owner during development of the associated
        landscaping plan.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                                      Page 32
Final Development Plan Conditions                              November 23, 1987

M-2.     No unobstructed or unshielded beam of exterior lighting shall be
         directed towards any area outside the exterior boundaries of
         Celeron's property or easement.  Any lighting along roadways within
         the project shall utilize low intensity, ground level, shielded
         fixtures.  The plan shall demonstrate that all feasible measures have
         been taken to reduce obtrusive night lighting and glow from the pump
         stations.

M-3.     To the extent feasible no glare or other radiation resulting from
         pump station facilities, other than lighting fixtures constructed
         pursuant to this Development Plan shall be detectable at any point
         along or outside the required screening along exterior boundaries of
         the pump stations.

M-4.     Prior to the pipeline operation, the Gaviota pump station, visible
         from Highway 101 and the Gaviota Village, the Sisquoc pump station
         visible from public viewshed, and all above ground portions of the
         pipeline shall be painted to harmonize with the surrounding area.

M-5.     No above-surface structures except necessary pipeline markers, pump
         stations, cathodic test stations, necessary fencing, and block valves
         shall be visible along this route after the completion of pipeline
         construction.  Signs shall not detract from scenic areas or views
         from  public roads to the extent feasible.

M-6.     Prior to construction, Celeron will review the feasibility of
         implementing mitigation measures and/or realignments in the Gaviota
         State Park area to avoid blasting of ridgetops and alteration of
         topography in a scenic area.  Celeron shall submit a plan to the
         Resource Management Department, for review and approval, which
         identifies the feasibility of shifting the ROW alignment to the west,
         leaving the ridge profile undisturbed.  The plan shall include an
         investigation of utilizing prefabicated pipeline bends to allow for
         alignment around ridgetops, the use of stepped benches in steep
         terrain, and the future use of such a corridor for additional
         pipelines.


N.  NOISE

N-1.     Prior to issuance of the Coastal Development Permit and Land Use
         Permit, Celeron shall file with the Resource Management Department a
         Noise Monitoring and Control Plan which has been approved previously
         by the the Department of Health Care Services and the Resource
         Management Department.  The plan shall describe the best efforts
         Celeron shall take to reduce the noise impacts of the project both
         during construction and operation of the project.  The approved plan
         shall be implemented by Celeron and shall be followed until

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project
Final Development Plan Conditions

temporarily suspended or deemed no longer necessary by the Resource Management Department. The plan shall include provisions to ensure that items N-2 through N-6 below are included.

N-2.    Except for motor vehicles and motorized construction equipment, all facilities shall be designed, constructed, operated and maintained such that sound levels during operation do not exceed 70 dbA at or beyond the property line or pipeline easement, as measured on the "A" weighted scale at slow response on approved sound level measuring instruments. Affected property owners along the pipeline route shall be notified by Celeron at least 48 hours in advance of any planned testing or maintenance of the line which may exceed noise standards. The facility shall comply with all standards established in the Noise Element of the Comprehensive Plan and the Coastal Zoning Ordinance. No residents, teachers, students and staff at the Vista del Mar School shall be subjected to greater than a 9 dbA increment above the baseline ambient noise level, nor greater than a 3 dbA increase in day-night sound levels. The best available technology, including but not limited to muffling equipment, sound barriers, and landscaping measures shall be used to minimize operational noise impacts.

N-3.    During the construction and operation phases, project-related noise at the Gaviota State Park, Vista del Mar School, Buellton area, or other points which may be impacted (as determined by the Health Care Services Director), shall be minimized between the hours of 7:00 a.m. and 10:00 p.m. Prior to construction in the impacted areas, Celeron will notify all residents within 1200 feet of the pipeline that noise impacts may occur during specific construction periods. Noise shall be limited to 50 dbA between the hours of 10:00 p.m. and 7:00 a.m., consistent with the County Noise Element and the Coastal Zoning Ordinance. Blasting shall be limited to the hours between 7:00 a.m. and 7:00 p.m. and directional charges shall be used to minimize noise.

N-4.    As determined by the Resource Management Department, noise generating project activities (including delivery of construction equipment through residential areas) shall be restricted between the hours of 10:00 p.m. and 7:00 a.m. If complaints arise concerning activities occurring during these hours, Celeron shall take additional feasible steps to reduce the noise levels or further restrict the offending activity.

N-5.    Prior to approval of the Final Development Plan, Celeron shall submit to the Director of the Resource Management Department procedures that Celeron will take to minimize noise impacts from helicopters, or other aircraft during the aerial surveys of pipeline. The procedures, to be approved by the Resource Management Department, shall specify overflight routes to be taken to minimize noise impacts to the community and other feasible measures. Celeron shall direct its contractors to abide by the helicopter procedures and shall take

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                              Page 34
Final Development Plan Conditions                          November 23, 1987

reasonable corrective action if complaints arise concerning the use
of helicopters.  Subject to flight safety considerations, Celeron
shall avoid helicopter flights over residential areas.

N-6.     All construction and operation-related equipment shall be operated
         and maintained to minimize noise generation, ground vibration, and to
         avoid interference with radio or video communications.

O.   ABANDONMENT

O-1.     Immediately following permanent shut down of the pipeline, Celeron
         shall remove abandoned pump stations and unburied portions of the
         pipeline within Santa Barbara County constructed under this permit,
         recontour the site and revegetate the site in accordance with a
         County approved revegetation plan within one year of permanent shut
         down.  Celeron shall post a performance bond to insure compliance, or
         continue to pay property taxes as assessed during project operation
         until site restoration is complete, as determined by the County.

P.   SYSTEMS SAFETY AND RELIABILITY

P-1.     Celeron shall submit all appropriate pump station, valve, and
         pipeline construction and process diagrams to a System Safety and
         Reliability Review Committee (SSRRC) who may employ a third-party
         technical review in order to evaluate pipeline design and help
         identify possible design hazards prior to construction.  The System
         Safety and Reliability Review Committee shall consist of a
         representative from the County Public Works Department, the APCD, the
         County Fire Department, County Flood Control District and the
         Resource Management Department.  All reasonable costs associated with
         any County review shall be borne by Celeron.  Celeron shall be
         entitled to participate fully in the review process.  If the review
         reveals a concern, the SSRRC shall share its findings with Celeron.
         If Celeron does not agree with the findings, the County's recourse is
         with the Department of Transportation, Office of Pipeline Safety for
         areas of pipeline construction under the jurisdiction of 49 CFR Part
         195 (Transportation of Hazardous Liquids by Pipeline), with the
         exception of areas/issues agreed to by Celeron and the County.

P-2.     Celeron shall submit a detailed Safety Inspection, Maintenance and
         Quality Assurance Program for the pump stations, valves, and the
         pipeline which shall be implemented during construction and
         operations.  The Program shall include, but not be limited to,
         inspection of construction techniques, regular maintenance and safety
         inspections, periodic safety audits, corrosion monitoring and leak
         detection, inspections of all trucks carrying hazardous and/or
         flammable material.  The construction section of the Program shall be

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project
Final Development Plan Conditions

Page 35
November 23, 1987

reviewed by the System Safety and Reliability Review Committee and/or its consultants prior to issuance of the Coastal Development Permit and Land Use Permit. Celeron shall fund a full-time U.S. Department of Transportation (or designated representative) pipeline inspector during pipeline construction phase activities. The operations section of the Program shall be reviewed by the System Safety and Reliability Review Committee and/or its consultants prior to start-up. The Program shall be submitted sufficiently prior to Celeron's projected start-up date so as to allow reasonable time for staff review. All costs associated with this review process shall be borne by Celeron. Should the Committee find fault with these submissions, it will indicate its concerns to Celeron. If Celeron decides not to modify its plans to meet these concerns, the County's recourse is with the Department of Transportation, Office of Pipeline Safety for all areas under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline). In such a case, County shall timely notify DOT of review findings. Permits may not be withheld or suspended due to County concerns which are under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline), with the exception of areas/issues agreed to by Celeron and the County.

P-3.    Celeron shall submit an Emergency Response Plan detailing response procedures to be implemented by Celeron for accidental events affecting public safety and the environment. This plan shall be based on a comprehensive risk analysis reviewed by the System Safety and Reliability Committee (condition P-1). The plan shall be reviewed and approved by the County Emergency Services Coordinator, the Fire Department, and the Resource Management Department prior to start-up. Approval of the Plan shall be based on its consistency with the County's Area-Wide Oil and Gas Emergency Response Plan. The Program shall be submitted sufficiently prior to Celeron's projected start-up date so as to allow reasonable time for staff review. Celeron shall demonstrate the effectiveness of the Emergency Response Plan by responding to one emergency response drill prior to or immediately after start-up.

P-4.    In order to assure that County emergency response procedures adequately interface with the Celeron emergency response procedures, Celeron shall provide its reasonable pro-rata share of funds to the County, to develop and implement a feasible County Emergency Response Plan for oil and gas industry related emergencies. As appropriate, the County shall request funds from other oil industry operators to aid in funding of the County Emergency Response Plan. When available, the Resource Management Department shall provide Celeron with an estimate of the pro rata share of funds to be provided by Celeron and the method for allocating such costs among other operators.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                              Page 36
Final Development Plan Conditions                           November 23, 1987

P-5.      Celeron shall submit an Oil Spill Contingency Plan detailing cleanup
          procedures and restoration procedures to be employed in the event of
          a spill.  This plan shall be reviewed and approved by the Resource
          Management Department and the County Emergency Services Coordinator
          prior to start-up.  The Program shall be submitted sufficiently prior
          to Celeron's projected start-up date so as to allow reasonable time
          for staff review.  Procedures and techniques shall be selected to
          augment the Emergency Response Plan.  The intent of the Oil Spill
          Contingency Plan is to detail spill site restoration subsequent to
          emergency response.  The plan shall be approved based on its
          consistency with the intent of the condition "to detail site
          restoration subsequent to emergency response."

P-6.      Prior to approval of the Final Development Plan, Celeron shall submit
          to the Santa Barbara County Sheriff's Department for review and
          approval a site security plan.  The plan shall describe procedures to
          be implemented by Celeron which will prevent intentional damage to
          facilities which may result in environmental damage or public safety
          hazards.

P-7.      Celeron shall cooperate with Chevron as necessary to facilitate the
          establishment of a temporary County fire company until the completion
          of the fire station (as specified in Chevron condition P-9).  Prior
          to issuance of the Coastal Development Permit and Land Use Permit,
          the County Emergency Response Coordinator and Fire Department must
          be  satisfied that provisions have been made to establish an
          operational fire company in the project area.

P-8.      Prior to approval of the Final Development Plan, Celeron shall agree
          to participate in a plan to be submitted to the County Fire
          Department by Chevron USA Inc., for the construction, manning and
          equipping of a fire station in the Gaviota area.  Celeron shall
          contribute their pro rata share of the cost of implementing this
          plan.  When available, the Resource Management Department shall
          provide Celeron with an estimate of the pro rata share of funds to be
          provided by Celeron and the method for allocating such costs among
          other operators.

P-9.      Prior to Final Development Plan, Celeron shall submit to and obtain
          conceptual approval from the Fire Department, a Fire Protection Plan
          for the pump station locations.  Final approval shall be obtained
          prior to start-up.  Criteria to be addressed shall be obtained from
          the County Fire Department.

P-10.     Prior to approval of the Final Development Plan, Celeron shall assess
          the feasibility of transporting liquefied petroleum gases and natural
          gas liquids, (LPGs and NGLs) through the proposed pipeline by
          blending and/or batching, considering industry-wide projected volumes
          and market destinations of the gas liquids.  Celeron shall report to

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                                    Page 37
Final Development Plan Conditions                              November 23, 1987

the Resource Management Department the results of this assessment, and this information shall include all technological and safety constraints involved, amount and type of additional storage facilities needed, and the degree to which LPGs and NGLs produced in the area can be transported through Celeron's pipeline.

Celeron shall transport the NGLs through this pipeline, to the extent feasible within safety and legal constraints as identified by the report and as requested by the users. In addition, under the reporting provisions of Condition C-1, Celeron shall inform the County of the types and amounts of gas liquids shipped in the pipeline during operations.

P-11.   If the Vista del Mar School has not been relocated or is located at a site where it could be impacted by construction activities, prior to approval of the Final Development Plan, Celeron and the Board Trustees of the Vista Del Mar School District shall develop a reasonable and and mutually agreeable construction plan for the pump station site and pipelines adjacent to the site that will minimize construction-related noise, air pollution, and visual disturbance to the School during school hours. Said construction plan shall include the following:

Pipeline construction noise near the School shall be held to ambient noise levels or construction shall occur only when school is not in session; to prevent exceedance of the California one-hour $NO_2$ standard, construction schedules must be modified to minimize overlapping of equipment emissions; and, during construction of the pipeline, activities nearest the school shall be scheduled when school is not in session in accordance with Condition B-5 and temporary barriers shall be erected around noisiest activities. No grading for the Gaviota pump station shall occur during School session hours.

In the event that any agreements contained herein cannot be reached on the construction plan, the Board of Supervisors shall arbitrate any dispute.

P-12.   Deleted.

P-13.   Celeron will design the pipeline such that the entire pipeline will have effective control communication between the operations control center and all remotely activated valves. Any break, rupture, and/or damage to the pipeline shall result in the orderly shutdown of the pumping operations, and will activate the shut off valves, if appropriate, in a manner which will minimize environmental damage.

P-14.   During construction of the pipeline in fire sensitive areas, Celeron shall meet or exceed applicable guidelines and requirements set forth

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                                Page 38
Final Development Plan Conditions                              November 23, 1987

in a Watershed Fire Protection Plan provided by the combined local fire protection agencies, Santa Barbara County Fire, U.S. Forest Service, and the California Department of Forestry. This shall include, but not be limited to: modifications of welding operations, required fire patrolman position(s), firefighting equipment, and construction restrictions due to extreme fire weather.

P-15.   All facilities, construction activities and equipment shall comply with National Fire Protection Association standards.

P-16.   Upon completion of pipeline construction, Celeron shall provide all jurisdictional agencies (S.B. County Fire, USFS, CDF) with at least two copies of maps showing the finished pipeline route and shall include locations accessible by fire department emergency response vehicles. Said maps shall be 7 1/2 minute quadrangle scale, (one inch equals 24,000 inches), and shall represent topographical features.

P-17.   Celeron shall be subject to required fire department inspections during and after construction as set forth by the 1982 Uniform Fire Code and these conditions.

P-18.   Prior to approval of the Final Development Plan, Celeron shall designate alternative pipeline corridor alignments which avoid the two potentially impacted, proposed alternative permanent relocation school sites now under study by the Vista del Mar Union School District. These proposed alternative locations are the State Park at Las Cruces, and the Tajiguas Ranch property. County shall review and approve said alternative alignments as part of the Final Development Plan and Celeron shall implement the appropriate alternative alignment depending on the permanent school relocation site chosen by the Vista del Mar School District.

Q.  FACILITY DESIGN

Q-1.   The Final Development Plan shall demonstrate compliance with Santa Barbara County Coastal Zoning Ordinance, and other applicable County Ordinances to the extent required by this permit.

Q-2.   Cost effective energy conservation techniques shall be incorporated into project design.

Q-3.   Celeron's facilities will be operated as a common carrier pipeline with access for use available on a nondiscriminatory basis. County retains the right to verify that the use of the facilities is conforming with County policies on consolidation and to impose additional reasonable permit conditions where necessary to assure these policies are being fulfilled to the extent feasible. The intent of this condition is to ensure the multi-company access of oil transportation facilities.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                                Page 39
Final Development Plan Conditions                            November 23, 1987

Q-4.     Celeron shall comply with all applicable policies in Section 25 of
         the Santa Barbara County Petroleum Ordinance No. 2795.

Q-5.     Celeron shall fund a pro-rata share of the costs to bury power
         transmission lines or of using environmentally and aesthetically
         preferred poles between the Goleta Substation and Gaviota in areas
         where the County and SCE determine it is not feasible to bury the
         lines.  Celeron's pro-rata share shall be based upon an equitable
         cost-sharing formula applied to all users of the grid power
         consistent with PUC rate setting and applicable regulations.

4150E

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

# EXHIBIT M

# LAS FLORES PIPELINE SYSTEM
# FINAL DEVELOPMENT PLAN CONDITIONS
## 88-DPF-033 (RV01)z, 88-CP-60 (RV01)
## (88-DPF-25cz; 85-DP-66cz; 83-DP-25cz)
### December 12, 1988
### Modified May 2003
### (Modified on September 19, 2023 with the Change of Ownership, Change of Guarantor, and Change of Operator for the Las Flores Pipeline System [Lines 901/903])
### (Modified on October 30, 2024 with the Change of Guarantor and Operator to Sable Offshore Corp)

*These conditions of approval have been revised to list the new owner, guarantor, and operator, and remove all previous owners, guarantors, and operators that no longer serve such role. Text that has been added is shown in <u>underline</u>, and text that has been removed is shown in ~~strikeout~~.*

# Table of Contents

**A.    GENERAL** ........................................................................................................................... 1
   A-1.    Acceptance of Permit Conditions ........................................................................... 1
   A-2.    Grounds for Permit Modification or Revocation ................................................... 1
   A-3.    Court Costs ............................................................................................................. 1
   A-4.    Costs of Implementing and Enforcing Conditions ................................................ 2
   A-5.    Civil Penalties ....................................................................................................... 2
   A-6.    Access to Records and Facilities............................................................................ 2
   A-7.    Substantial Conformity ......................................................................................... 2
   A-8.    Authority for Curtailment ...................................................................................... 3
   A-9.    Conditions Separately Remain in Force................................................................. 3
   A-10.    Conflicts Between Conditions ............................................................................. 4
   A-11.    Injunctive Relief.................................................................................................. 4
   A-12.    Owner/Operator Liability .................................................................................... 4
   A-13.    Facility Throughput and Source Limits .............................................................. 4
   A-14.    Pipeline Alignment.............................................................................................. 4
   A-15.    Permit Violations................................................................................................. 5
   A-16.    Board of Supervisors Authority to Change County Department Responsible for Condition ........................... 5
   A-17.    Fees as Mitigation Measures .............................................................................. 5
   A-18.    Payment of Attorney's Fees and Costs ............................................................... 5
   A-19.    Applicability of Conditions to Construction and Operation ............................... 5
   A-20    Project Description .............................................................................................. 5
   A-21..................................................................................................................................... 6
   A-22..................................................................................................................................... 6
   A-23..................................................................................................................................... 6
   A-24..................................................................................................................................... 6
   A-25..................................................................................................................................... 7
   A-26..................................................................................................................................... 7
   A-27..................................................................................................................................... 7
   A-28..................................................................................................................................... 7
   A-29..................................................................................................................................... 7
   A-30..................................................................................................................................... 7
   A-31..................................................................................................................................... 8
**B.    PERMIT REVIEW**............................................................................................................ 8
   B-1.    System Safety and Reliability Review Committee (SSRRC) Review Prior to Construction................................... 8
   B-2.    Imposition of New and Comprehensive Review of Conditions.............................. 8
   B-3.    Authority to Impose Feasible Mitigations............................................................. 8
   B-4.    Coordination Plan for the Use of a Shared Pipeline Corridor ............................... 9
   B-5.    Resolution of Scheduling Conflicts Among Conditions of Approval.................... 9
   B-6.    Cooperation with San Luis Obispo County for Pipeline Permitting ..................... 9
   B-7.    P&D Authorization Prior to Construction.............................................................. 9

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page TOC 2

| | | |
|---|---|---|
| B-8. | P&D Authorization Prior to Start-Up | 9 |
| B-9. | Adequacy of Submittals to be Determined by the Planning Commission | 10 |
| **C.** | **MANAGEMENT** | **10** |
| C-1. | Environmental Quality Assurance Program (EQAP) | 10 |
| C-2. | 24-Hour Emergency Contact | 11 |
| C-3. | Provide Copies of Permits to P&D | 12 |
| **D.** | **AIR QUALITY** | **12** |
| D-1. | Statement of Scope | 12 |
| D-2. | Authority to Construct | 12 |
| D-3. | Agreement to Implement All Air Pollution Control Procedures | 12 |
| D-4. | Emissions Mitigation | 12 |
| D-5. | Deleted. | 12 |
| D-6. | Validation Information | 12 |
| D-7. | Discharge Limitations | 12 |
| D-8. | Mitigation Plan for Construction Air Quality Impacts | 13 |
| D-9. | | 13 |
| D-10. | | 13 |
| D-11. | | 13 |
| D-12. | | 13 |
| D-13. | | 13 |
| **E.** | **GEOLOGY** | **14** |
| E-1. | Geologic Investigation, Design and Mitigation Program | 14 |
| E-2. | Geologic Hazard Monitoring Program | 15 |
| E-3. | Inspection of Trench Prior to Pipeline Installation | 15 |
| E-4. | Isolation Valves at Active Fault Crossings | 15 |
| E-5. | Sisquoc Pump Station Grading and Erosion Control Plan | 16 |
| E-6. | Cooperation with San Luis Obispo County for Cuyama River Crossing | 16 |
| E-7. | South Coast Pump Stations Location | 16 |
| E-8. | Stockpiling of Earth Materials During Construction | 16 |
| E-9. | Storage of Pipe During Construction | 16 |
| E-10 | | 16 |
| E-11 | | 16 |
| E-12 | | 17 |
| E-13 | | 17 |
| **F.** | **SURFACE AND GROUNDWATER** | **17** |
| F-1. | Downstream Flows During Construction | 17 |
| F-2. | Sediment Retention Devices During Construction | 17 |
| F-3. | Stream and River Crossings During Construction | 17 |
| F-4. | Riparian Habitat Corridors During Construction | 18 |
| F-5. | Construction Contractors at Stream Crossings During Construction | 18 |
| F-6. | Deleted. | 18 |
| F-7. | Isolation Valves at Perennial Stream and River Crossings | 18 |
| F-8. | Freshwater Source During Construction | 18 |
| F-9. | Hydrogeologic Investigations for Sensitive Areas | 18 |
| F-10. | Dam and Ditch Plugs in Pipeline Trenches by Aquifers | 19 |
| F-11. | SSRRC Approval for All Creek and River Crossing Plans | 19 |
| **G.** | **AQUATIC BIOLOGY** | **19** |
| G-1. | Oil Spill Response Plan | 19 |
| G-2. | | 19 |
| G-3. | | 19 |
| **H.** | **TERRESTRIAL BIOLOGY** | **20** |
| H-1. | Restoration, Erosion Control and Revegetation Plan | 20 |
| H-2. | Impact Survey One Year After Construction | 21 |
| H-3. | Sensitive Habitat Areas | 21 |
| H-4. | Additional Mitigation | 21 |
| H-5. | Deleted. | 21 |
| H-6. | Herbicides During Construction | 21 |

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page TOC 3

H-7.      Fish and Game Permit (1603) ........................................................................... 21
H-8.      Deleted ............................................................................................................... 22
H-9.      Hoffman's Nightshade Plan ............................................................................... 22
H-10.     Catalina Mariposa Lily Plan .............................................................................. 22
H-11.     Refugio Manzanita Plan ..................................................................................... 22
H-12.     Restoration, Revegetation and Implementation Plan .......................................... 23
H-13.     Pump Station Landscaping .................................................................................. 23
H-14.     Landscaping and Revegetation Bonds ................................................................ 23
H-15.     Release of Landscaping and Revegetation Bonds .............................................. 24
H-16.     California Endangered Species Inventory ........................................................... 24
H-17.     Raptor Nesting Habitat Survey ........................................................................... 24
H-18.     Construction ROW Through Riparian Habitats .................................................. 24
H-19.     Construction ROW Designed to Avoid Trees ..................................................... 24
H-20.     Suey Canyon Oak Woodland .............................................................................. 24
H-21.     Los Alisos Creek Crossing ................................................................................. 25
H-22.     Parish's Checkermallow Field Survey ................................................................ 25
H-23.     Gaviota Tarplant Plan ......................................................................................... 25
H-24.     Restoration of Construction Work Areas ............................................................ 25
H-25. ................................................................................................................................ 25
H-26. ................................................................................................................................ 26
I.    SOCIOECONOMICS ................................................................................................ 26
    I-1.      Oil and Gas Industry-Wide Monitoring and Mitigation Program ...................... 26
    I-2.      Housing for Temporary Construction Workers ................................................... 28
    I-3.      Construction During Peak Tourist Seasons ........................................................ 28
    I-4.      Deleted ............................................................................................................... 28
    I-5.      Utlization of Local Labor ................................................................................... 28
    I-6.      Project-Related Utilities and Services ................................................................ 29
    I-7.      Distributing Oil Related Revenues ..................................................................... 29
J.    LAND USE AND RECREATION ............................................................................. 29
    J-1.      Property Owner Notification of Construction ..................................................... 29
    J-2.      Mainline Pipeline Construction Time Lines ....................................................... 29
    J-3.      Pipeline Construction Work Hours ..................................................................... 29
    J-4.      Privacy and Security of Property Owners During Construction .......................... 29
    J-5.      Property Owner Notification of Construction Within 48 Hours .......................... 30
    J-6.      Deleted ............................................................................................................... 30
    J-7.      Property Owner's Fences/Barriers During Construction ..................................... 30
    J-8.      Utility Lines and Services During Construction ................................................. 30
    J-9.      Compliance with All Applicable County Statutes, Etc. ...................................... 31
    J-10.     Proof of ROW Prior to Construction .................................................................. 31
    J-11.     Restricted Use of ROW After Construction ....................................................... 31
    J-12. ............................................................................................................................ 31
K.    TRANSPORTATION ................................................................................................ 31
    K-1.      Worker Transportation Program ......................................................................... 31
    K-2.      Permanent Parking Areas at the Pump Stations .................................................. 31
    K-3.      Engineering Plans for All Pipeline Crossings of County Roads .......................... 31
    K-4.      Pipeline Construction Activity Limited to ROW ................................................ 32
    K-5.      Mitigation Plan for Impacted County Roads ...................................................... 32
    K-6. ............................................................................................................................ 32
    K-7. ............................................................................................................................ 32
L.    CULTURAL RESOURCES ....................................................................................... 32
    L-1.      Cultural Resources Surveys Plan ........................................................................ 32
    L-2.      Cultural Resources Mitigation Plan .................................................................... 33
    L-3.      Pre-Construction Workshop with Native Americans .......................................... 33
    L-4.      Archaeologist and Native American On-Site During Construction ..................... 33
    L-5.      Ownership of Non-Burial Associated Cultural Resource Artifacts ..................... 33
    L-6.      Burial Associated Artifacts Found During Construction ..................................... 34
    L-7.      Phase II Cultural Resource Guidelines ............................................................... 34

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page TOC 4

L-8 .................................................................................................................................... 34
L-9 .................................................................................................................................... 34
L-10 .................................................................................................................................. 34
L-11 .................................................................................................................................. 35
L-12 .................................................................................................................................. 35
M.    VISUAL RESOURCES ............................................................................................. 35
M-1.    Board of Architectural Review Approval ................................................... 35
M-2.    Exterior Lighting........................................................................................ 35
M-3.    Pump Station Facilities Lighting ............................................................... 36
M-4.    Painting of Pump Stations Prior to Pipeline Operation.............................. 36
M-5.    Visibility of Above-Surface Structures ...................................................... 36
M-6.    Determination of ROW in Gaviota State Park ........................................... 36
M-7 .................................................................................................................................. 36
N.    NOISE .......................................................................................................................... 36
N-1.    Noise Monitoring and Control Plan ............................................................ 36
N-2.    Sound Levels During Operation ................................................................. 37
N-3.    Project-Related Noise During Construction................................................ 37
N-4.    Noise Generating Activities During Construction ...................................... 37
N-5.    Helicopter and Aircraft Noise ................................................................... 37
N-6.    Operation-Related Equipment Noise ......................................................... 37
N-7 .................................................................................................................................. 38
O.    ABANDONMENT ....................................................................................................... 38
O-1.    Removal of Pipeline and Pump Stations Upon Permanent Shut Down ...... 38
P.    SYSTEMS SAFETY AND RELIABILITY ................................................................ 38
P-1.    SSRRC Review of Diagrams ..................................................................... 38
P-2.    Safety Inspection, Maintenance and Quality Assurance Program .............. 38
P-3.    Emergency Response Plan .......................................................................... 39
P-4.    Funding the County Emergency Response Plan .......................................... 39
P-5.    Oil Spill Contingency Plan ........................................................................ 39
P-6.    Site Security Plan....................................................................................... 39
P-7.    Temporary County Fire Company .............................................................. 40
P-8.    Cooperation with Chevron for Gaviota Area Fire Station .......................... 40
P-9.    Fire Protection Plan for the Pump Stations ................................................ 40
P-10    Transporting LPGs and NGLs Through Pipelines ...................................... 40
P-11.    Vista del Mar School Accommodation ...................................................... 40
P-12.    Deleted........................................................................................................ 41
P-13.    Communication at the Operations Control Center and Activated Valves.... 41
P-14.    Compliance with the Watershed Fire Protection Plan ................................ 41
P-15.    Compliance with the National Fire Protection Association Standards ........ 41
P-16.    Map of Finished Pipeline Route.................................................................. 41
P-17.    Compliance with the 1982 Uniform Fire Code ........................................... 41
P-18.    Alternative Pipeline Corridor Alignments .................................................. 41
P-19.    PCB Contamination at Canada de la Huerta ............................................... 42
P-20.    Soil Tests at the Booster Pump Site ........................................................... 42
P-21.    Texaco's Emergency Access Road.............................................................. 42
P-22 ................................................................................................................................. 42
P-23 ................................................................................................................................. 42
P-24 ................................................................................................................................. 42
P-25 ................................................................................................................................. 42
P-26 ................................................................................................................................. 43
P-27 ................................................................................................................................. 43
P-28 ................................................................................................................................. 43
P-29 ................................................................................................................................. 43
P-30 ................................................................................................................................. 43
P-31 ................................................................................................................................. 43
Q.    FACILITY DESIGN ................................................................................................... 43
Q-1.    Demonstration of Compliance .................................................................... 43

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page TOC 5

Q-2.    Energy Conservation Techniques .......................................................................................... 44
Q-3.    Common Carrier Pipeline .................................................................................................... 44
Q-4.    Compliance with County Petroleum Ordinance No. 2795 ................................................... 44
Q-5.    Power Transmission Lines .................................................................................................... 44

## LAS FLORES PIPELINE SYSTEM
## FINAL DEVELOPMENT PLAN CONDITIONS
### 88-DPF-033 (RV01)z, 88-CP-60 (RV01)
### (88-DPF-25cz; 85-DP-66cz; 83-DP-25cz)
### December 12, 1988
### Modified May 2003
### (Modified on September 19, 2023 with the Change of Ownership, Change of Guarantor, and Change of Operator for the Las Flores Pipeline System [Lines 901/903])
### (Modified on October 9, 2024 with the Change of Guarantor and Operator to Sable Offshore Corp.

~~The current owner and operator of record for the Las Flores Pipeline System (previously the All American Pipeline) is Pacific Pipeline Company, referred to herein as PPC. ExxonMobil Pipeline Company (EMPCo) serves as the pipeline operator. ExxonMobil Corporation is identified as sole guarantor and carries in excess of $100 million insurance coverage, as required by the Office of Oil Spill Prevention and Response. PPC is directly wholly owned by Mobil Pacific Pipeline Company, and indirectly wholly owned by Exxon Mobil Corporation. EMPCo is directly wholly owned by Exxon Pipeline Holdings LLC, and indirectly wholly owned by ExxonMobil Corporation.~~

## A.    GENERAL

**Owner:**    Pacific Pipeline Company, a wholly owned subsidiary of Sable Offshore Corporation (Sable), is the currently listed Owner of the Las Flores Pipeline System.

**Operator:**    Sable is the currently listed Operator of the Las Flores Pipeline System.

**Guarantor:**    Sable is the currently listed Guarantor of the Las Flores Pipeline System.

### A-1.    Acceptance of Permit Conditions

Acceptance of this permit shall be deemed as acceptance of all final conditions of this permit, except that PPC reserves the right to pursue any remedy for any legal violations imposed directly or indirectly by these permit conditions.

### A-2.    Grounds for Permit Modification or Revocation

If the Planning Commission determines at a noticed public hearing that PPC is not in compliance with any permit condition*(s)*, pursuant to the provisions of Sec. 35-185 of Article II and/or Sec. 35-330 of Article III of the Santa Barbara County Code, the Planning Commission is empowered, in addition to revoking the permit pursuant to said section, to amend, alter, delete, or add conditions to this permit. *(modified by the Planning Commission on September 6, 2000)*

### A-3.    Court Costs

PPC agrees as a condition of the issuance and use of this permit to defend at its sole expense any action brought against the County by a third party challenging either its decision to issue this permit or the manner in which the County is interpreting or enforcing the conditions of the permit. PPC will reimburse the County for any court costs and attorneys fees which the County may be required by a court to pay as a result of such action where PPC defended or had control of the defense of the suit. County may, at its sole discretion, participate in the defense of any such

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 2

action, but such participation shall not relieve PPC of its obligation under this condition. County shall bear its own expenses for its participation in the action.

## A-4.  Costs of Implementing and Enforcing Conditions

The permittee shall make an initial deposit to a fund to permit the County to adequately implement and enforce the conditions imposed by this permit and applicable County ordinances and/or the conditions of this permit, if such a fund is established. If the Board of Supervisors determines that a reasonable enforcement fund is needed, the Director of the Planning and Development Department shall present to the Board of Supervisors and the permittee a plan for enforcement within one year from the effective date of this permit. This plan shall set forth the staffing requirements and materials necessary for such enforcement and the estimated costs thereof. This plan shall provide that all reasonable expenses incurred by the County or County contractors, for permit condition implementation, reasonable studies, and emergency response directly and necessarily related to enforcement of these permit conditions shall be reimbursed by PPC/Sable within 30 days of invoicing by County.

## A-5.  Civil Penalties

In the event that PPC fails to comply with any order of the Administrative Officer or the Board of Supervisors issued hereunder or any injunction of the Superior Court, it shall be liable for a civil penalty for each violation to the extent imposition of such civil penalty is authorized by applicable laws, rules, or regulations.

Said civil penalty shall be in addition to PPC's obligation, if any, to reimburse the County of Santa Barbara (and others) for actual damages suffered as a result of PPC's failure to abide by the conditions of this permit or by the orders of the Administrative Officer, the Board of Supervisors, or any court of competent jurisdiction.

## A-6.  Access to Records and Facilities

As to any condition which requires for its effective enforcement the inspection of construction records or records pertaining to facility operations, or the facilities themselves by County or its duly authorized agents, PPC will make all necessary records available or provide access to such facilities upon reasonable notice from County. County agrees to keep such information confidential where permitted by law and requested by PPC in writing.

## A-7.  Substantial Conformity

The procedures, operating techniques, design, equipment and other descriptions (hereinafter procedures) described in 83-DP-25 cz, 83-CP-97 cz, and in subsequent clarifications and additions to that application and the Final Development Plan are incorporated herein as permit conditions and shall be required elements of the project. Since these procedures were part of the project description which received environmental analysis, a failure to include such procedures in the actual project could result in significant unanticipated environmental impacts. Therefore, modifications of these procedures will not be permitted without a determination of substantial conformity or a new or modified permit. The use of the property and the size, shape, arrangement and location of buildings, structures, walkways, parking areas and landscaped areas shall be in substantial conformity with the approved Final Development Plan.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 3

## A-8.    Authority for Curtailment

In addition to the authority to enforce and secure compliance with the provisions of this permit under Division 12, Coastal Zoning Ordinance of the Santa Barbara County Code and Division 7, General Regulations, Article III Santa Barbara County Zoning Ordinance, the County Administrative Officer, or in his/her absence a designated appointee, may order that curtailment of activities which is required to protect the public health and safety.  Said action may include, but is not limited to, ordering temporary, partial or total facility shutdown.

Such an order shall be made only in the event that the Administrative Officer has reasonable and probable cause to believe that continued unrestrained activities of permittee will likely result in or threaten to result in danger to public health, welfare, or safety, or in the environment and provided such violations can be expected to continue or recur unless operations are in whole or in part shut down or reduced pending the necessary corrections.

Before issuing any curtailment order, the County Administrative Officer shall set a time for hearing and shall give written notice of the time and place of the hearing and of the alleged violations.  Such notice shall be received by the person in charge of the operation of the facility at least 24 hours before the hearing at which time there will be an opportunity for all concerned parties to present evidence regarding the alleged violations.  The notice may be served in person or by certified mail.

In the event the Administrative Officer, or in his/her absence the designated appointee, determines that there is an imminent danger to the public health and safety resulting from violations, he/she may summarily order the necessary curtailment of activities without hearing and such order shall be obeyed upon notice of same, whether written or oral.  At the same time that notice of the order is conveyed, the Administrative Officer shall set a date, time and place for a publicly noticed hearing and review of said order as soon as possible which date shall be no later than 24 hours after such order is issued or served.  Said hearing shall be conducted in the same manner as a hearing on prior notice.  After such hearing, the Administrative Officer may modify, revoke, or retain the emergency curtailment order.

Any order of the Administrative Officer may be appealed to the Board of Supervisors within three working days after such order is made.

If such appeal is not filed with the Board of Supervisors, the Administrative Officer's order becomes final.  If there is an appeal, the order of the Administrative Officer shall remain in full force and effect until action is taken by the Board of Supervisors.  The decision of the Board of Supervisors shall be a final Administrative Action.  Such decision shall not preclude ~~AAPLP~~ PPC from seeking judicial relief.

Once PPC has shown that the conditions of violation no longer exist and are not reasonably likely to recur, the Administrative Officer shall modify the curtailment order to account for such compliance and shall entirely dissolve the order when it is shown that all of the violations have been corrected and are not likely to recur.

## A-9.    Conditions Separately Remain in Force

In the event that any condition contained herein is determined to be invalid, then all remaining conditions shall remain in force.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 4

## A-10. Conflicts Between Conditions

In the event that any condition contained herein is determined to be in conflict with any other condition contained herein, then where principles of law do not provide to the contrary, the condition most protective of public health and safety and natural environmental resources shall prevail to the extent feasible.

## A-11. Injunctive Relief

In addition to any administrative remedies or enforcement provided hereunder, the County may seek and obtain temporary, preliminary, and permanent injunctive relief to prohibit violation of the conditions set forth herein or to mandate compliance with the conditions herein.

All remedies and enforcement procedures set forth herein shall be in addition to any other legal or equitable remedies provided by law.

## A-12. Owner/Operator Liability

The owner and the operator of the facility shall be jointly and severally liable without regard to fault for all legally compensable damages or injuries suffered by any property or person that result from or arise out of any oil, water spillage, fire, explosion, odor, or air pollution, in any way involving oil or gas or the impurities contained therein or removed therefrom and which arises out of construction or operation of PPC's facilities. For the purpose of this condition, the "facility" shall be deemed to include all facilities described and approved pursuant to 83-DP-25cz, 83-CP-97cz.

This condition shall not inure to the benefit of any of the owners of the pipeline, including the United States Government. This declaration of strict liability and the limitations upon it shall be governed by the applicable law of California on strict liability.

## A-13. Facility Throughput and Source Limits

All facilities constructed under this permit shall be used only for the shipment of a maximum volume of heated crude oil demonstrated to be within the design parameters of the pipeline facilities as built. The subject volumes will be outer continental shelf (OCS) and other locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins. PPC shall obtain a new or modified permit, or authority to continue operation under the existing permit prior to undertaking any of the following activities which may, in the judgment of the County, result in significant changes to the impacts on the County. Such changes could include but not be limited to: 1) major pipeline or pump station modifications; 2) major changes in pipeline throughput; 3) introduction of production to the pipeline from sources other than those described above; and 4) introduction of a different product from any source.

Other source volumes may be transported subject to a determination of substantial conformity by the Planning Commission and a finding of facts and determination that project impacts will not be increased by transporting and processing those other sources.

## A-14. Pipeline Alignment

The permittee shall align the pipeline corridor from the coastal starting point to the County exit point in the western Cuyama valley according to the route approved by the County. The permittee shall locate and construct all isolation valves as identified by the final approved alignment.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 5

### A-15. Permit Violations

Any person, firm or corporation, whether as a principal, agent, employee, or otherwise, found to be in violation of any provisions or conditions of this ordinance or permits, shall be punishable as set forth in the applicable section of the Coastal Zoning Ordinance, and Article III of the Santa Barbara County Code.

Each and every day during any portion of which any violation of this Article or the rules, regulations, orders, or permits issued thereunder, is committed, continued, or permitted by such person, firm or corporation shall be deemed a separate and distinct offense.

### A-16. Board of Supervisors Authority to Change County Department Responsible for Condition

The Santa Barbara County Board of Supervisors in a noticed public hearing shall have the authority to specify or change the Santa Barbara County Department responsible for any conditions contained herein.

### A-17. Fees as Mitigation Measures

Should circumstances, including legal or legislative action, cause the County to lose its authority or have its authority fundamentally reduced to assess fees as a method to mitigate project-related impacts, then other feasible mitigation measures shall be imposed which will substantially lessen the significant impact formerly mitigated by the imposition of fees. Within six months of the County's loss of such authority, feasible alternative mitigation measures shall be imposed as replacement permit conditions. Alternatively, the County in a noticed public hearing must find that no feasible mitigation measures are available and that the benefits of the project outweigh the significant environmental impacts.

### A-18. Payment of Attorney's Fees and Costs

Should legal action be required by either party to enforce any rights in connection with this permit the prevailing party shall be entitled to reasonable attorney's fees and costs pursuant to Civil Code 1717.

### A-19. Applicability of Conditions to Construction and Operation

Unless otherwise specified, these permit conditions are intended to apply during both the construction and the operation of the permitted facilities.

### A-20 Project Description

The Development Plan Revision (88-DP-33) and Conditional Use Permit Revision (88-CP-60) are based upon and limited to compliance with the project description and conditions of approval adopted for the Gaviota Creek Pipeline Lowering and Relocation Project, as documented in 00-ND-21 and the September 6, 2000 staff report. Any deviations from the project description, exhibits or conditions must be reviewed and approved by the County for conformity with this approval. Deviations may require approved changes to the permit and/or further environmental review. Deviations without the above described approval will constitute a violation of permit approval. The project description is summarized as follows:

- Relocate the existing Gaviota Creek pipeline crossing by re-burying the 30" crude oil pipeline at least 10 feet into bedrock immediately upstream from their existing crossing;

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 6

- Remove the existing, exposed pipeline segment in Gaviota Creek;

- Restore and revegetate the disturbed area; and

- Monitor the crossing to ensure erosion control and revegetation efforts are successful.

The grading, development, use, and maintenance of the property, the size, shape, arrangement, and location of structures, parking areas and landscape areas, and the protection and preservation of resources shall conform to the project description and the associated hearing exhibits and conditions of approval. The property and any portions thereof shall be sold, leased or financed in compliance with this project description and the approved hearing exhibits and conditions of approval hereto. All plans must be submitted for review and approval and shall be implemented as approved by the County.*(adopted by the Planning Commission on September 6, 2000)*

**A-21**

Any use authorized Conditional Use Permit Revision (88-CP-060 RV01) shall immediately cease upon expiration or revocation of this Conditional Use Permit. Any Coastal Development issued pursuant to this Conditional Use Permit shall expire upon expiration or revocation of the Conditional Use Permit. Conditional Use Permit renewals must be applied for prior to expiration of the Conditional Use Permit. *(adopted by the Planning Commission on September 6, 2000)*

**A-22**

Within 18 months after the effective date of Conditional Use Permit Revision (88-CP-060 RV01), construction and/or the use shall commence. Construction or use cannot commence until a Coastal Development Permit has been issued. Failure to commence the construction and/or use pursuant to a valid Coastal Development Permit shall render the Conditional Use Permit null and void. All time limits may be extended by the Planning Commission for good cause shown, provided a written request, including a statement of reasons for the time limit extension request is filed with Planning and Development prior to the expiration date. *(adopted by the Planning Commission on September 6, 2000)*

**A-23**

Approval of the Final Development Plan Revision (88-DP-33 RV01) shall expire five (5) years after approval by the Planning Commission, unless prior to the expiration date, substantial physical construction has been completed on the development or a time extension has been applied for by the applicant. The decisionmaker with jurisdiction over the project may, upon good cause shown, grant a time extension for one year. *(adopted by the Planning Commission on September 6, 2000)*

**A-24**

Before using any land or structure, or commencing any work pertaining to the erection, moving, alteration, enlarging, or rebuilding of any building, structure, or improvement, the applicant shall obtain a Coastal Development and Building Permit from Planning and Development. These Permits are required by ordinance and are necessary to ensure implementation of the conditions required by the Planning Commission. Before any Permit will be issued by Planning and Development, the applicant must obtain written clearance from all departments having conditions; such clearance shall indicate that the applicant has satisfied all pre-construction conditions. A form for such clearance is available from Planning and Development. *(adopted by the Planning Commission on September 6, 2000)*

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 7

**A-25**

All applicable final conditions of approval shall be printed in their entirety on applicable pages of grading/construction or building plans submitted to P&D or Building and Safety Division. These shall be graphically illustrated where feasible. *(adopted by the Planning Commission on September 6, 2000)*

**A-26**

The applicant shall ensure that the project complies with all approved plans and all project conditions including those which must be monitored after the project is built and occupied.  To accomplish this the applicant agrees to:

1. Contact the Energy Division as soon as possible after project approval to provide the name and phone number of the future contact person for the project and give estimated dates for future project activities.
2. Contact the Energy Division at least two weeks prior to commencement of construction activities to schedule an on-site pre-construction meeting with the owner, planner, other agency personnel and with key construction personnel.
3. Contact the State Parks archaeologist one week prior to commencement of any project activities on the site, including pre-construction activities.
4. Pay fees to cover full costs of consultants and staff time and monitoring (EQAP program). In the event of a dispute, the decision of the Director of P&D shall be final. *(adopted by the Planning Commission on September 6, 2000)*

**A-27**

Developer shall defend, indemnify and hold harmless the County or its agents, officers and employees from any claim, action or proceeding against the County or its agents, officers or employees, to attack, set aside, void, or annul, in whole or in part, the County's approval of the Final Development Plan Revision (88-DP-33 RV01) and Conditional Use Permit Revision (88-CP-060 RV01).  In the event that the County fails promptly to notify the applicant of any such claim, action or proceeding, or that the County fails to cooperate fully in the defense of said claim, this condition shall thereafter be of no further force or effect. *(adopted by the Planning Commission on September 6, 2000)*

**A-28**

In the event that any condition imposing a fee, exaction, dedication or other mitigation measure is challenged by the project sponsors in an action filed in a court of law or threatened to be filed therein which action is brought within the time period provided for by law, this approval shall be suspended pending dismissal of such action, the expiration of the limitation period applicable to such action, or final resolution of such action.  If any condition is invalidated by a court of law, the entire project shall be reviewed by the County and substitute conditions may be imposed. *(adopted by the Planning Commission on September 6, 2000)*

**A-29**

Within 60 days of completion of the Gaviota Creek Pipeline Lowering and Relocation project, the permittee shall submit as-built drawings to the Energy and Building and Safety Divisions. *(adopted by the Planning Commission on September 6, 2000)*

**A-30**

Within 60 days of completion of the Gaviota Creek Pipeline Lowering and Relocation project, the permittee shall revise their Operations and Maintenance Manual to reflect the changes to the pipeline.  Revisions shall be copied to the Energy and Building and Safety Divisions. *(adopted by the Planning Commission on September 6, 2000)*

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 8

**A-31**

The Gaviota Creek Pipeline Lowering and Relocation project is estimated to take a maximum of 5 weeks. If earthmoving work extends past November 1, the Energy Division shall convene a meeting between the permittee and all responsible agencies to decide on–the appropriate action. If the Planning Director determines that work cannot continue due to impacts on sensitive resources (e.g., steelhead migration, red-legged frog breeding season), or the potential for increased sedimentation and erosion, work shall be suspended.

**B.    PERMIT REVIEW**

**B-1.    System Safety and Reliability Review Committee (SSRRC) Review Prior to Construction**

Prior to initiation of construction activity (such as ROW preparation, river crossings or pump station construction), the permittee shall submit to the System Safety and Reliability Review Committee (established by condition P-1) relevant construction drawings and supporting text demonstrating compliance with the appropriate conditions. Construction may not commence until County has reviewed and/or approved this submittal, consistent with the SSRRC review specified in Conditions P-1 and P-2. Within 15 days of submittal, County shall either give written notice to proceed with construction or indicate in writing conditions which have not been met. When such conditions have been met construction approval shall be granted.

**B-2.    Imposition of New and Comprehensive Review of Conditions**

If at any time County determines that these permit conditions are inadequate to effectively mitigate significant environmental impacts caused by the project, or that recent proven technological advances could provide substantial additional mitigation, then additional reasonable conditions shall be imposed to further mitigate these impacts. Imposition of such conditions shall only be considered and imposed as part of the County's comprehensive review of the project conditions. County shall conduct a comprehensive review of the project conditions and consider adding reasonable conditions which incorporate proven technological advances three years after permit issuance and at appropriate intervals thereafter. A comprehensive review of conditions which are not effectively mitigating impacts may be conducted at any appropriate time. Upon written request of PPC, the Board of Supervisors shall determine whether the new condition required is reasonable considering the economic burdens imposed and environmental benefits to be derived.

**B-3.    Authority to Impose Feasible Mitigations**

This permit is premised upon findings that where feasible, all significant environmental effects of the project identified in the EIR/EIS (State Clearinghouse No. 83110902), which occur in Santa Barbara County, will be substantially mitigated by the permit conditions. Prior to approval of the Final Development Plan, County shall review any findings that identified certain mitigation measures as being in the primary jurisdiction of another agency but are also within County's jurisdiction. County shall thereupon determine either (1) that such mitigation has or is being implemented by such other agency or (2) that such other agency and County determine such mitigation to be infeasible. If County determines that no other agency is or may be implementing such feasible mitigation measures then County may impose those feasible measures within its jurisdiction to mitigate those environmental impacts in accordance with appropriate mitigation measures identified by the EIS/R.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 9

**B-4.    Coordination Plan for the Use of a Shared Pipeline Corridor**

Prior to approval of the Final Development Plan, the permittee shall develop and submit to the Planning and Development Department for approval a plan to co-ordinate the placement and timing of their pipeline with SCPS's pipeline (or other potential proposals for use of the same corridor for a pipeline). Any agreements between the permittee and SCPS (or other applicant) necessary to implement this plan shall be subject to review and verification by the Planning and Development Department to assure the purpose of the plan will be achieved. The expressed purpose of this co-ordination plan shall be:

1) arrangement of simultaneous construction where practical;
2) engineering of pipe placement within the ROW to minimize incremental widening of the initial construction corridor during subsequent pipeline projects;
3) identification of segments where incremental widening of the ROW is constrained and alternative engineering techniques which may allow construction of subsequent pipelines (and potential limitations of future pipeline use of the ROW); and
4) timing and design of revegetation plans to promote effective revegetation but minimize unnecessary duplication of efforts.

Should SCPS or any other applicant abandon their pipeline project, or fail to submit a Final Development Plan prior to pipeline construction, this condition may be modified to reflect the existing situation but maintain the intent of this condition.

**B-5.    Resolution of Scheduling Conflicts Among Conditions of Approval**

In the event that scheduling requirements among or between conditions in this permit (or with this permit and conditions imposed by other agencies) conflict with respect to timing, the Planning and Development Department (in consultation with other agencies as appropriate) shall resolve such conflict.

**B-6.    Cooperation with San Luis Obispo County for Pipeline Permitting**

Applicant shall cooperate as necessary with San Luis Obispo County in the permitting, design, and construction of those segments of the pipeline which could affect Santa Barbara County. The intent of this condition is to ensure that potential impacts to Santa Barbara County are mitigated to the maximum extent feasible by these permit conditions, regardless of the location of the source of the impact.

**B-7.    P&D Authorization Prior to Construction**

Prior to commencing any construction activities in Santa Barbara County, the permittee shall obtain a letter from the Director of the Planning and Development Department indicating that all conditions which require approval prior to construction, as specified by this permit, have been satisfied.

**B-8.    P&D Authorization Prior to Start-Up**

Prior to start-up of the pipeline in Santa Barbara County, the permittee shall obtain a letter from the Director of the Planning and Development Department indicating that all conditions which require approval prior to start-up, as specified by this permit, have been satisfied.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 10

**B-9.    Adequacy of Submittals to be Determined by the Planning Commission**

In the event that PPC and staff cannot reach an agreement on the adequacy of any submittal required by these conditions, the matter will be brought before the Planning Commission for resolution at the earliest possible date.

**C.    MANAGEMENT**

**C-1.    Environmental Quality Assurance Program (EQAP)**

The permittee shall prepare an Environmental Quality Assurance Program (EQAP) for Resource Management Department approval prior to the Final Development Plan. This EQAP shall encompass both the construction and operation phases of the project, and shall describe the steps the permittee will take to assure compliance with these conditions. This plan is intended to provide a framework for all other programs and plans specified by these conditions as required prior to approval of the Final Development Plan. As such, it will become a comprehensive reference document for the County, other agencies, and the public regarding the project.

This plan shall provide for the submission to the Planning and Development Department semi-annual reports throughout construction and annual reports during operations. These reports shall describe:

a)    Project status, including but not necessarily limited to:
    i)    extent to which construction has been completed,
    ii)    the rate of production/throughput during operation,
    iii)    environmental planning and implementation efforts, and
    iv)    any revised time schedules or timetables of construction and operation that will occur in the next one year period.
b)    Permit condition compliance, including but not necessarily limited to the results of the specific mitigation requirements identified in these conditions.
c)    Results and analyses of all data collection efforts being conducted pursuant to these permit conditions.

The program shall include (or if separate plans exist, reference) all plans relevant to construction and operations of the pipeline facilities specified by these conditions.

Construction

The program shall include all plans relevant to construction activities such as the Restoration, Erosion Control and Revegetation Plan and the Cultural Resources Mitigation Plan.

The program shall include provisions for at least one managing environmental coordinator with overall responsibility, and if necessary, one onsite environmental coordinator per construction site during the construction phase. These coordinators shall be approved by and be responsible to the Planning and Development Department. PPC shall fund the coordinator(s). The number of coordinators necessary shall be determined according to the amount of simultaneous construction activity occurring in geographically separate areas. The responsibilities of the coordinator(s) are to include:

a)    on-site, day-to-day monitoring of construction activities;
b)    ensuring contractor knowledge of and compliance with all appropriate permit conditions;
c)    evaluating the adequacy of construction impact mitigations, and proposing improvements to the contractors, the permittee, and County;

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 11

> d) having the authority to require correction of activities observed to violate project environmental conditions or that represent unsafe or dangerous conditions, and having the ability and authority to secure compliance with the conditions or standards through the County Administrative Officer as described in condition A-8, if necessary;
>
> e) performing as contact for affected property owners and any other affected persons that wish to register observation of environmental permit violations and/or unsafe conditions, receiving any complaints, immediately contacting the permittee's onsite construction representative, verifying any such observations and developing any necessary corrective actions in consultation with the permittee's onsite construction representative;
>
> f) maintaining prompt and regular communication with the Planning and Development Department, Public Works Department, or other appropriate County agency, and with permittee personnel responsible for contractor performance and permit compliance.

In the event that resolution of disputes between the public and/or governmental agencies and the permittee over adherence to permit conditions is not achieved by the managing environmental coordinator, an arbitration system shall be utilized to resolve such disputes in a timely manner in order to minimize the need to halt construction activities as per conditions A-2 or A-8.

The coordinator(s) shall be thoroughly familiar with all plans and requirements set forth in the permit conditions. Prior to construction start-up, the managing coordinator shall discuss with other agency inspectors or monitoring personnel, inspection programs, areas of jurisdiction, responsibility, and define methods of avoiding disputes or construction delay due to agency disagreements.

Selection of the necessary coordinators shall be made, and the person(s) available, prior to issuance of the Coastal Development Permit and Land Use Permit.

Operations

The program shall include all plans related to operations, such as the Emergency Response Plan, Oil Spill Contingency Plan, and Landscaping Plan, as well as specific conditions not required in formal plans. It may also include any procedures not specified by these conditions but relevant to environmental protection and safety. Operational Compliance Plans shall be updated as necessary to reflect any approved change of operator within six months after assuming operations in accordance with County Code Section 25B-10(a)(6).

**C-2. 24-Hour Emergency Contact**

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall provide to the Planning and Development Department and the Emergency Services Coordinator the current name and position, title, address, and 24-hour phone numbers of the field agent, person in charge of the facility, and other representatives who shall receive all orders and notices, as well as all communications regarding matters of condition and permit compliance at the site and who shall have authority to implement a facility shutdown pursuant to condition A-8 in this Ordinance.

There shall always be such a contact person(s) designated by the permittee. One contact person shall be available 24 hours a day during all phases of the project in order to respond to inquiries received from the County, or from anyone in case of an emergency.

If the address or phone number of the agent should change, or the responsibility be assigned to another person or position, PPC shall provide to the Planning and Development Department the new information within seven days.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 12

**C-3.    Provide Copies of Permits to P&D**

PPC shall furnish to the Planning and Development Department copies of all County permit applications relative to the project once submitted, and of permits within 30 days of receipt by PPC.

**D.    AIR QUALITY**

**D-1.    Statement of Scope**

Nothing contained herein shall be construed to permit a violation of any applicable air pollution law, rule, or regulation.

**D-2.    Authority to Construct**

Prior to initiation of construction, including grading, of any facilities approved pursuant to this Development Plan, the permittee shall obtain an Authority to Construct permit from the County Air Pollution Control District.

**D-3.    Agreement to Implement All Air Pollution Control Procedures**

PPC agrees to implement all air pollution control procedures as required by APCD and identified in the Final Development Plan (such as water sprays to reduce construction-related fugitive dust).

**D-4.    Emissions Mitigation**

Emissions from any project component that contribute to ozone standard violations must be mitigated to the extent feasible.  Effectiveness of mitigation will be confirmed by APCD.

**D-5.    Deleted.**

**D-6.    Validation Information**

Prior to approval of the Final Development Plan, the permittee shall submit to the Planning and Development Department updated estimates of the type and size of helicopters, or other aircraft, to be used during pipeline operations for the aerial surveys of the pipeline route.  The information shall also include the estimated operating schedules, frequency and duration of airport calls and other reasonable information as required by APCD.  The County may require validation and updating of this information as needed.  Should this information reveal significant differences between the estimated air emissions and those analyzed in the EIR/EIS, the APCD may modify air quality permit conditions as necessary to assure consistency with the Air Quality Attainment Plan and Reasonable Further Progress goals.

**D-7.    Discharge Limitations**

All facilities shall be designed, constructed, operated, and maintained, such that the facilities approved under this Development Plan shall not discharge quantities of air contaminants or other materials in violation of Section 41700 of the Health and Safety Code.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 13

**D-8.    Mitigation Plan for Construction Air Quality Impacts**

Prior to the approval of the Final Development Plan, the permittee shall submit to the Director of the Planning and Development Department a plan, approved by the APCD, which includes timing of construction, minimizing soil handling, and other measures to mitigate construction air quality impacts. The plan shall include APCD approved analysis which demonstrates that local, state and federal air quality standards will not be violated as a result of construction activities.

**D-9**

For the Gaviota Creek Pipeline Lowering and Relocation project, during clearing, grading, earth moving, excavation or transportation of cut or fill materials, water trucks or sprinkler systems are to be used to minimize dust leaving the site and to create a crust after each day's activities cease. During construction, water trucks or sprinkler systems shall be used to keep all areas of vehicle movement damp enough to prevent dust from leaving the site. At a minimum, this would include wetting down such areas in the later morning and after work is completed for the day and whenever wind exceeds 15 miles per hour. Soil stockpiled for more than two days shall be covered, kept moist or treated with soil binders to prevent dust generation. **Plan Requirements:** All requirements shall be shown on construction drawings. **Timing:** Condition shall be adhered to throughout all grading and construction periods. **MONITORING:** Planning and Development shall ensure measures are on plans. Planning and Development's EQAP monitor shall spot check and ensure compliance on-site. APCD inspectors shall respond to any nuisance complaints. *(Mitigation Measure A-1) (adopted by the Planning Commission on September 6, 2000)*

**D-10**

During construction of the Gaviota Creek Pipeline Lowering and Replacement project, use water trucks to keep all areas of vehicle movement damp enough to reduce dust from leaving the site. At a minimum, this should include wetting down such areas in the late morning and after work is completed for the day. Increased watering frequency should be required whenever the wind speed exceeds 15 mph. Reclaimed water should be used whenever possible. **Plan Requirements:** This condition shall be printed on all construction drawings. **MONITORING**: EQAP monitor to spot check in the field. *(Mitigation Measure A-2) (adopted by the Planning Commission on September 6, 2000)*

**D-11**

During the Gaviota Creek Pipeline Lowering and Replacement project, the permittee shall minimize the amount of disturbed area and ensure that on site vehicle speeds do not exceed 15 miles per hour. **Plan Requirements:** This condition shall be printed on all construction drawings. **MONITORING**: EQAP monitor to spot check in the field. *(Mitigation Measure A-3) (adopted by the Planning Commission on September 6, 2000)*

**D-12**

For the Gaviota Creek Pipeline Lowering and Replacement project, soil stockpiled for more than two days shall be covered, kept moist or treated with soil binders to prevent dust generation. Trucks transporting fill material to and from the site shall be tarped from the point of origin. **Plan Requirements:** This condition shall be printed on all construction plans. **MONITORING**: EQAP monitor to spot check in the field. *(Mitigation Measure A-4) (adopted by the Planning Commission on September 6, 2000)*

**D-13**

For the Gaviota Creek Pipeline Lowering and Replacement project, heavy-duty diesel-powered construction equipment manufactured after 1996 (with federally mandated "clean" diesel

engines) shall be utilized wherever feasible. *(Mitigation Measure A-5) (adopted by the Planning Commission on September 6, 2000)*

    a. The engine size of construction equipment shall be the minimum practical size.

    b. The number of construction equipment operating simultaneously shall be minimized through efficient management practices to ensure that the smallest practical number are operating at any one time.

    c. Construction equipment shall be maintained in tune per the manufacturer's specifications.

    d. Construction equipment operating onsite shall be equipped with two to four degree engine timing retard or precombustion chamber engines.

    e. Catalytic converters shall be installed on gasoline-powered equipment, if feasible.

    f. Diesel catalytic converters shall be installed, if available.

    g. Diesel powered equipment should be replaced by electric equipment whenever feasible.

    h. Construction worker trips should be minimized by requiring carpooling and by providing for lunch onsite.

**MONITORING:** EQAP monitor to spot check in field. *(Mitigation Measure A-5) (adopted by the Planning Commission on September 6, 2000)*

## E.    GEOLOGY

### E-1.    Geologic Investigation, Design and Mitigation Program

Prior to the issuance of the Coastal Development Permit and Land Use Permit, the permittee will conduct a route-specific Geologic Investigation, Design, and Mitigation Program. This program shall contain three basic components: 1) a detailed geologic investigation component which defines specific hazards, 2) an engineering design component which details specific engineering plans for each identified hazard along the route, and 3) a geohazards mitigation component which demonstrates how and to what extent each hazard is reduced.

    a)    Detailed geologic investigation component:
Where specific hazards have been identified or may occur along the pipeline route or at pump station locations, the permittee will conduct appropriate detailed geologic, seismic, and geotechnical studies to further characterize the specific geologic hazard. These studies will be conducted under the direction of a State of California registered geologist or engineering geologist who will be mutually agreed to by the permittee, the Planning and Development, the Public Works Department, and the Flood Control District. These studies will include but not be limited to investigations of unstable slopes, erodable slopes, lurch/liquefaction susceptible substrate, surface rupture, and river scour characteristics (depth and lateral extent). Methods of investigation shall conform to appropriate geotechnical techniques applicable to each specific hazard. Draft results will be subject to review by County Public Works Department and Flood Control Agency as appropriate prior to finalization of the engineering design. The final report will be submitted with the final engineering design component.

    b)    Engineering design component:
The permittee will demonstrate that appropriate geotechnical information from component a) and other applicable recommendations are incorporated into final engineering design of pipeline construction and facilities. This includes but is not restricted to: the development of appropriate ground motion parameters for use in seismic design of critical structures and equipment, unstable slope construction or avoidance techniques, burial depth at all major river crossings, modification of instrumentation, or use of the dual contingency level/operating level earthquake concept, or its equivalent. The designs will be subject to

> review by the Department of Public Works and third party technical review as specified in Condition P-1.

c)      Geohazards mitigation component:
Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee will submit to the Planning and Development Department a detailed geologic hazard mitigation report. The report will outline the hazards identified in part a) of this program and will address how engineering designs as detailed in part b) of this program reduce each specific hazard. This component will also be submitted to the Department of Public Works and Flood Control Agency and will be subject to third party review as specified in Condition P-1.

**E-2.    Geologic Hazard Monitoring Program**

PPC will develop a Monitoring Program for the operations phase to be funded by PPC and staffed as necessary with at least one State of California registered engineer, or engineering geologist, in order to evaluate any hazards identified by routine monitoring. The program will be designed to verify adequate performance or condition of the project components in hazard areas such as river and active fault crossings, and will be subject to approval of the Planning and Development Department prior to issuance of the Coastal Development Permit and Land Use Permit. The monitoring program may in part be incorporated into routine aerial and ground reconnaissance. If the monitoring indicates a potential or actual hazard, appropriate action including, but not limited to, operations curtailment and repairs, will be taken by PPC to mitigate the hazard. PPC will report to the Emergency Services Coordinator any potentially hazardous situations discovered during monitoring. In the case of river crossings at the Santa Ynez, Sisquoc and Cuyama Rivers, a yearly inspection of pipeline burial depth, subject to review by the Planning and Development Department and Flood Control Agency, shall be performed. At crossings of the Santa Ynez and Sisquoc Rivers where channel degradation has reduced the depth of cover to less than four feet below the 100-year scour depth, or other hazardous levels as determined by a professional engineer on the staff of or under supervision of the County Flood Control Agency, or US D.O.T. specifications, relocation or reburial of the pipeline to adequate depth will be required. At the crossing of the Cuyama River, if the inspections reveal that hazardous conditions exist, mitigations such as reconstruction or relocation of the crossing will be required as determined by a professional engineer on the staff of or under supervision of the County Flood Control Agency.

**E-3.    Inspection of Trench Prior to Pipeline Installation**

Inspection of the pipeline trench or trench spoil to identify any potential geologic hazards shall be made by a professional geologist or soils engineer approved by the Planning and Development Department prior to installation of the pipeline. If hazards not previously accounted for in the pipeline design are encountered, appropriate mitigation measures will be developed and must be instigated prior to installation of the pipeline. The results of the inspection will be reported to the engineering geologist of the Public Works Department who will approve prior to, and the supervising environmental coordinator who will insure, application of the necessary mitigation measures. The timing of such inspections shall not result in any unreasonable delays in installation of the pipeline.

**E-4.    Isolation Valves at Active Fault Crossings**

At all places where the pipeline crosses an active fault, according to the Department of Geology and Mining definitions, the permittee will place isolation valves on either side, or design and construct appropriate devices or measures which more effectively mitigate the hazard of the fault crossing. Location and nature of these designs must be approved prior to the issuance of the Coastal Development Permit and Land Use Permit.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 16

**E-5.    Sisquoc Pump Station Grading and Erosion Control Plan**

Prior to the issuance of the Coastal Development Permit and Land Use Permit, the permittee shall submit final Grading and Erosion Control Plans for the Sisquoc pump station approved by the Department of Public Works. These plans shall be consistent with or based on information contained in the geologic investigation required in Condition E-1. Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall either submit Grading and Erosion Control Plans for the Las Flores and Gaviota pump stations for approval by the Department of Public Works or show evidence that the plans are a part of the overall Grading and Erosion Control Plans for the consolidated processing facilities at those sites.

**E-6.    Cooperation with San Luis Obispo County for Cuyama River Crossing**

The permittee shall cooperate as necessary with San Luis Obispo County in the permitting, design and construction of the Cuyama River crossing. Any pipeline crossing the Cuyama River shall be laid to a depth consistent with studies performed under Condition E-1 and subject to approval of the County Flood Control District.

**E-7.    South Coast Pump Stations Location**

Prior to approval of the Final Development Plan, the permittee shall commit to the location of their south coast pump stations to the satisfaction of the Planning Commission. If these stations are not within the boundaries of the approved Exxon, Gaviota Terminal Company, or Chevron facilities, the permittee shall submit grading and erosion control plans pursuant to Condition E-5.

**E-8.    Stockpiling of Earth Materials During Construction**

Stockpiling of large volumes of earth materials in temporary (for construction only) work space areas in excess of those volumes needed locally for construction shall not occur except as approved by the Planning and Development Department. The permittee shall not stockpile materials on landslide prone slopes during the rainy season.

**E-9.    Storage of Pipe During Construction**

Storage of pipe in temporary (for construction only) extra work spaces shall not occur except as approved by the Planning and Development Department.

**E-10**

The permittee shall implement a project specific Restoration, Erosion Control and Revegetation Plan for the Gaviota Creek Pipeline Lowering and Replacement Project in order to minimize erosion. In addition, grading shall be minimized within the creek and along the creek bank and grading on slopes greater than 5:1 shall be designed to minimize surface water runoff. **Plan Requirements:** This requirement shall be noted on construction drawings prior to approval of CDP. The applicant shall notify the Energy Division at least 48 hours prior to commencement of grading. **MONITORING:** EQAP monitor shall inspect the site during grading work to verify that erosion control measures are properly implemented. *(Mitigation Measure G-1) (adopted by the Planning Commission on September 6, 2000)*

**E-11**

The permittee shall limit excavation and grading to the driest season of the year to avoid the breeding season for California red-legged frog, tidewater goby, and the Southern steelhead migration season (July 1 to November 1) for the Gaviota Creek Pipeline Lowering and Replacement project, unless granted permission by the Energy Division. All exposed graded

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 17

surfaces shall be reseeded with ground cover vegetation to minimize erosion. **Plan Requirements:** This requirement shall be noted on construction drawings. **MONITORING:** EQAP monitor shall inspect the site during grading to monitor dust generation and after grading to verify reseeding. *(Mitigation Measure G-2) (adopted by the Planning Commission on September 6, 2000)*

**E-12**

At Gaviota Creek, the permittee shall perform an as-built profile survey of the pipeline and creek bed and develop a profile drawing showing the pipeline and creek bottom. For the first two years after installation of the new pipeline crossing, the creek bed shall be surveyed each year at the end of the rainy season. After the first two years, PPC shall re-survey after every significant flood event (i.e., 100-year event or more serious), but not less than every three years. After each creek bed profile survey, the creek bed profile shall be shown on the original as-built profile survey. **Plan Requirements:** PPC shall submit surveys to Planning and Development's geologist for review and approval. **MONITORING:** Planning and Development shall review creek elevation records and site inspect as necessary. (*Mitigation Measure G-3) (adopted by the Planning Commission on September 6, 2000)*

**E-13**

At Gaviota Creek, the permittee shall visually inspect the status of restoration efforts and the erosion at the pipeline crossing at least quarterly, and as requested by State Parks or Planning and Development, after installation of the new pipeline crossing. (These surveys shall be conducted at ground level, not from the air.) **Plan Requirements:** Written inspection reports shall be submitted to the Energy Division within 30 days of the inspections and surveys. PPC shall take any necessary corrective actions required to stabilize disturbed areas, as approved by the Energy Division. **MONITORING:** EQAP monitor to periodically inspect the restoration effort. *(Mitigation Measure G-4) (adopted by the Planning Commission on September 6, 2000)*

**F.    SURFACE AND GROUNDWATER**

**F-1.    Downstream Flows During Construction**

During construction of the pipeline across all perennial stream crossings, stream flows, if any, shall be diverted around construction areas to maintain downstream flows. Baseline water flows shall be maintained in coastal streams in order to avoid adverse impacts to lagoon or other sensitive habitats.

**F-2.    Sediment Retention Devices During Construction**

Sediment retention devices that allow continued streamflow shall be installed directly downstream of stream crossings during construction.

**F-3.    Stream and River Crossings During Construction**

For pipeline crossings at the following stream or river crossings: Tajiguas; Refugio; Gaviota; Nojoqui; Zaca; San Antonio Creeks, all additional perennial streams which the pipeline crosses: Santa Ynez; Sisquoc; and Cuyama Rivers, the permittee shall construct the buried pipelines during the months of low historical streamflow, in order to minimize erosion loss downstream and protect surface water quality. In the event of low winter rainfall, earlier construction may be approved by the Planning and Development Department and County Flood Control Agency.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 18

**F-4.    Riparian Habitat Corridors During Construction**

No staging areas shall be permitted within riparian habitat corridors.

**F-5.    Construction Contractors at Stream Crossings During Construction**

During pipeline construction at stream crossings, construction contractors will minimize time of disturbance, narrow the construction ROW to the extent feasible, stabilize the disturbed areas immediately following construction of the crossing, and divert runoff waters around construction areas to maintain downstream flows.

**F-6.    Deleted.**

**F-7.    Isolation Valves at Perennial Stream and River Crossings**

The permittee shall install isolation valves on either side of all perennial stream and river crossings, including the Cuyama River, and/or as required by the Coastal Zoning Ordinance, unless the applicant can demonstrate that alternative methods will further reduce the potential leak impacts at the crossing site.  These locations shall be identified prior to the Final Development Plan.

**F-8.    Freshwater Source During Construction**

Prior to approval of the Final Development Plan, the permittee shall identify the freshwater source considered for supplying pipeline and facility construction activities including hydrostatic test water, and shall estimate the total quantity required.  Any water obtained from coastal or inland sources shall not significantly disrupt streamflows, groundwater resources, or habitat resources. Water conserving devices shall be used where feasible.  Any water used during construction, (exclusive of hydrostatic test water), shall contain no more than 5,000 parts per million total dissolved solids.  Disposal of hydrostatic test water within the County shall be according to a plan approved by the Regional Water Quality Control Board, or by the Flood Control Agency.  This information shall be provided to and approved by the Planning and Development Department as part of the Final Development Plan.

**F-9.    Hydrogeologic Investigations for Sensitive Areas**

Prior to approval of the Final Development Plan, the permittee will perform detailed hydrogeologic investigations for the sensitive areas identified in the EIR/EIS, (Table 3-14). These investigations will be conducted by a State of California registered geologist or engineer and will include but not be limited to:

a)    definition of groundwater depth, recharge sources, properties of overlying soils, hydraulic gradient, background water quality, and existing water uses.

b)    inventory of existing wells from State or County Flood Control Agency records in an area extending down-gradient from the pipeline in the aquifer equal to the distance groundwater would move in one year at a velocity calculated from the maximum hydraulic conductivity of the specific aquifer, hydraulic gradient, and porosity.  The down-gradient sensitive area will be determined by a registered geologist.

This information will be reviewed by the Planning and Development Department and used by the permittee to formulate the Groundwater Contamination portion of an Oil Spill Contingency Plan, Condition P-5.  This portion of the Plan will include;

a)    plans for monitoring and early detection of groundwater contamination, including aerial and ground surveys, pipeline pressure monitoring, and water sampling of strategic wells;

b)    plans for notification of affected groundwater users, and the Emergency Services Coordinator;

c)    clean-up response, reparations, restorations, and methods to determine and correct the contamination source; and

d)    identification of emergency alternate water supplies.

**F-10.    Dam and Ditch Plugs in Pipeline Trenches by Aquifers**

At the base of slopes where the ROW approaches sensitive aquifers as identified in the EIR/S that are at risk from oil spills and leaks, a dam or ditch plug will be used in the pipeline trench. The sensitive areas are those where the ROW follows 1) topographic slopes toward basins with shallow depth to water, 2) high vertical permeabilities, and 3) a high degree of groundwater use as indicated by the hydrogeologic investigations required as per condition F-9. These areas shall be identified in the Final Development Plan.

**F-11.    SSRRC Approval for All Creek and River Crossing Plans**

Prior to the approval of the Final Development Plan, the System Safety and Reliability Review Committee shall review and approve submitted plans of all creek and river crossings in Santa Barbara County. Permitted development shall not cause or contribute to flood hazards or lead to the expenditure of public funds for flood control works.

**G.    AQUATIC BIOLOGY**

**G-1.    Oil Spill Response Plan**

Fueling and lubrication of construction equipment will not occur within 0.25 miles of any flowing streams. No more than 2 barrels of fuel shall be kept at construction sites, exclusive of pipeline construction equipment fuel tanks, within 0.25 miles of all perennial creeks. As part of the oil spill response plan, the permittee will submit plans for clean-up and restoration of affected areas in the event of a construction fuel spill.

**G-2**

For the Gaviota Creek Pipeline Lowering and Relocation project, all construction and grading plans shall show the precise location of the environmentally sensitive habitats within the project vicinity. **Timing:** The ESH areas should be designated on all plans prior to CDP approval. **MONITORING:** Planning and Development staff to check plans. *(adopted by the Planning Commission on September 6, 2000)*

**G-3**

For the Gaviota Creek Pipeline Lowering and Relocation project, during construction, washing of concrete, paint or equipment shall occur only in areas where polluted water and materials can be contained for subsequent removal from the site. Washing shall not be allowed near sensitive biological resources. An area designated for washing functions shall be identified. **Plan Requirements:** The applicant shall designate a wash off area, acceptable to Planning and Development, on the construction drawings. **Timing:** The wash off area shall be designated on all plans prior to CDP. The washoff area shall be in place throughout construction. **MONITORING:** Planning and Development staff shall check plans prior to approval of CDP

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 20

and the EQAP monitor shall site inspect throughout the construction period to ensure proper use. *(Mitigation Measure B-2) (adopted by the Planning Commission on September 6, 2000)*

## H.    TERRESTRIAL BIOLOGY

### H-1.    Restoration, Erosion Control and Revegetation Plan

#### H-1(j) modified 12/16/92

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall submit a Restoration, Erosion Control, and Revegetation plan for the final proposed pipeline route and the pump station sites.  The plan shall be submitted to the Planning and Development Department for approval.  Once approved, the plan shall be implemented by the permittee. Success of the restoration and revegetation plans shall be monitored by a qualified independent biologist who is in addition to the managing environmental coordinator (Condition C-1).  The plan shall contain, but not be limited to, the following:

(a)    Procedures for stockpiling and replacing topsoil, replacing and stabilizing backfill, such as at stream crossings, and steep or highly erodable slopes.  Additionally, provisions shall be made for recontouring to approximate the original topography. Excess fill shall be disposed of off-site unless suitable arrangements are made with the property owner. Excess fill shall not be deposited in any drainage, or on any unstable slope.

(b)    Specific plans for control of erosion, gully formation, and sedimentation, including, but not limited to, sediment traps, check dams, diversion dikes, culverts and slope drains.  Plan shall identify areas with high erosion potential and the specific control measures for these sites.

(c)    Procedures for containing sediment and allowing continued downstream flow at stream crossings, including scheduling construction activities during low-flow periods.

(d)    Procedures for re-establishment of vegetation that replicates or is functionally equivalent to indigenous and naturalized communities along the alignment.  These shall include: measures preventing invasion and/or spread of undesired plant species; restoration of wildlife habitat value; and restoration of native plant species and communities.  The permittee shall consult with the County Farm Advisor and appropriate Ranch operators when developing procedures for revegetating areas used for cattle grazing and other agricultural uses;

(e)    Procedures for restoration of riparian corridor stream and river banks and stream bed substrates and elevation;

(f)    Procedures for minimizing all tree removal or tree root and branch damage, such as, flagging the corridor, keeping all disturbance to no more than the 100-foot pipeline right-of-way, feathering the right-of-way edges, providing for onsite monitoring of construction by a qualified independent biologist.  In addition, special procedures are required for oak woodlands since County policy requires that these trees must not be cut down if feasible.  Special procedures for oaks include reducing the right-of-way to the minimum width possible and minimizing the impact to the root zone of these trees;

(g)    Procedures for replacement of native trees and large shrubs removed from the 100-foot temporary easement during construction across riparian and woodland, in particular oak woodland, habitat, with saplings of the same species propagated from materials obtained from the same area, including provision for supplemental irrigation as necessary and feasible to ensure establishment, and provisions for protection of saplings from grazing animals;

(h)    A soil conservation program, to be applied in areas of 20 percent or greater slopes along the pipeline corridor.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 21

(i)    Procedures for incorporating landowner concerns in the plan. Any changes to the plan instigated by such concerns shall be approved by the Planning and Development Department.

(j)    The permittee shall provide an endowment in the amount of $841,000 to fund implementation of the Alternative Oak Mitigation Program to reestablish oak savannahs and woodlands in Santa Barbara County. (Modified 12/16/92)

(k)    The segment of the plan pertaining to Gaviota State Park shall be prepared in cooperation with the State Department of Parks and Recreation.

## H-2.  Impact Survey One Year After Construction

One year after construction, a survey will be conducted, at the permittee's expense, to determine the actual impact caused by construction. This survey shall include aerial photography, and as appropriate color stereo and infrared photography and field studies. The report will identify areas with potential for further impact, e.g., high erosion areas, that will require immediate remedial measures. The survey shall also contain an examination of previous mitigation measures and present a list of additional feasible mitigations based on the impacts during construction and potential impacts caused by operation. The permittee and the Planning and Development Department shall agree to additional feasible mitigations. This process shall be repeated as often as necessary by the Planning and Development Department, but not more than annually.

## H-3.  Sensitive Habitat Areas

In those areas where trees and other habitats such as riparian areas and oak woodlands are to be avoided within the approved corridor and temporary (for construction only) extra work spaces, the permittee shall assure contractor compliance with this condition by marking and/or fencing those resources. These areas include, but are not limited to, the sensitive resources identified by the permittee and depicted on the 1" = 400' color aerial print photographs provided by the permittee and the Environmentally Sensitive Habitat (ESH) areas identified by the Planning and Development Department. The permittee shall avoid disturbance to the tarplant restoration site established by Texaco on State Park property.

## H-4.  Additional Mitigation

Additional reasonable and feasible conditions of mitigation, consistent with condition H-1 and to the extent necessary, shall be identified and observed as developed during the archaeological mitigation program (conditions L-1, L-2, L-3, L-6), and as identified by the managing environmental coordinator in consultation with the permittee's Onsite Construction Representative (condition C-1).

## H-5.  Deleted.

## H-6.  Herbicides During Construction

The permittee shall not use herbicides in wetland and riparian areas, and along the rest of the pipeline corridor during construction.

## H-7.  Fish and Game Permit (1603)

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall receive a permit (1603) as required from the California Department of Fish and Game. This permit should include provisions to ensure that the proposed construction schedule will not

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 22

interfere with reproductive activities of regionally rare or rare, threatened or endangered bird, amphibian, and fish species or other species of special concern, in those environmentally sensitive habitats identified in the EIR/EIS and shall submit this confirmation to the Planning and Development Department. If the Department of Fish and Game determines that the construction schedule will have an impact then the permittee will adhere to directives of the Department of Fish and Game with respect to their permit requirements.

**H-8.   Deleted.**

**H-9.   Hoffman's Nightshade Plan**

The permittee shall minimize impacts to the population of Hoffmann's nightshade (*Solanum xanti var. hoffmannii*) found in the Gaviota Pass area. The permittee shall submit plans to enhance the recovery of this population to the Planning and Development Department for approval prior to issuance of the Coastal Development Permit and Land Use Permit.

These plans shall include provisions for removing any individual plants that would be affected, place them in large tubs, and replant them as near as possible to the original location (exclusive of the operation Right-of-Way) after construction; and gathering seeds prior to issuance of the Coastal Development Permit and Land Use Permit from the population of Hoffmann's nightshade located in the Gaviota Pass area and planting them in and near the ROW after construction. This shall be done under the supervision of a biologist approved by the Planning and Development Department and in cooperation with the California Parks Department; this biologist may approve modifications to these techniques based on season of the year and state of dormancy.

**H-10.   Catalina Mariposa Lily Plan**

The permittee shall minimize impacts to the population of Catalina Mariposa lily (*Calochortus catalinae*) found in the Gaviota Pass area. The permittee shall submit plans to enhance the recovery of this population to the Planning and Development Department for approval prior to issuance of the Coastal Development Permit and Land Use Permit. These plans shall include provisions for gathering of seeds from the population found in or near the ROW prior to construction, planting the seeds in or near the ROW after construction (exclusive of the operation ROW), conserving the upper 18-24 inches of heavy clay soil which contains the plant's bulb-like corms found in the vicinity of the plants prior to construction, and then, after construction, replacing this soil which holds the plant's bulb-like corms. This shall be done under the supervision of a biologist approved by the Planning and Development Department and in cooperation with the California Parks Department; this biologist may approve modifications to these techniques based on season of the year and state of dormancy.

**H-11.   Refugio Manzanita Plan**

The permittee shall minimize impacts to the population of Refugio Manzanita (*Arctostaphylos refugioensis*) found in Gaviota Pass area and affected by the proposed construction activities. The permittee shall submit plans to enhance the recovery of this population to the Planning and Development Department for approval prior to issuance of the Coastal Development Permit and Land Use Permit. These plans shall include provisions for gathering seeds and taking cuttings from the population of Refugio Manzanita found in and adjacent to the ROW prior to construction, and provisions for the planting of the seeds and plants propagated from cuttings in the final construction alignment (exclusive of the operation ROW) after construction. This shall be done under the supervision of a biologist approved by the Planning and Development Department and in cooperation with the California Parks Department; this biologist may approve modifications to these techniques based on season of the year and state of dormancy.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 23

## H-12.  Restoration, Revegetation and Implementation Plan

The permittee shall prepare a Restoration, Revegetation and Implementation section as part of the Oil Spill Contingency Plan (P-5).  The section shall be reviewed and accepted prior to start-up by the Planning and Development Department and a biologist approved by the Planning and Development Department.  The section shall be submitted sufficiently prior to the permittee's projected start-up date so as to allow reasonable time for staff review.  Reasonable costs of review shall be borne by the applicant.  The section shall contain site-specific restoration information for all habitat types including stream crossings, wetlands/lagoons, oak woodlands, grasslands, riparian zones, and other environmentally sensitive habitats.  The section shall be divided into three major areas: a) Coastal, b) Streams and Rivers and c) Terrestrial habitats.  Each of these sub-sections shall discuss the various habitats in the categories listed above.  Methods to achieve restoration of all affected areas to their prespill conditions shall be discussed.

## H-13.  Pump Station Landscaping

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall submit to the County Board of Architectural Review, and the Planning and Development site-specific plans for landscaping of any pump station not within other required project vegetation screens.  This plan shall, at the permittee's expense, be reviewed by a qualified landscape architect and a biologist approved by the Planning and Development Department to insure the proper plant materials and procedures identified in these conditions are implemented.  These plans shall be developed in consultation with the property owner.  The plan shall include:

(a)     The specifications of any potential seed mixtures to be utilized, including the plant species in the mixture and the pounds of seed per acre to be applied; type of mulch (fiber, chemical tackifier or straw); the type and amount of fertilizer; and any provisions for irrigation;

(b)     Confirmation that all native or non-native plant materials proposed in the revegetation plan are compatible with indigenous vegetation and that none of the plants used is known to be weedy or invasive.  The plan shall provide for plantings that will screen facilities from view.  This vegetation screening shall also be designed to reduce nighttime lighting and noise.  Near chaparral or other high fire hazard areas, the seeds or seedlings will consist of native or non-native species, shown to contain fire retardant properties (such as toyon) and shown to be fast growing;

(c)     The specifications for native seeds and seedlings that will have wildlife habitat and food value. All perennial plants, and all woody plants are to be propagated from material obtained from the same area.  Native plant material is to be obtained from a revegetation contractor. All native materials will be ordered from the contractor in advance of construction activities.

(d)     Confirmation that non-native material is to be confined to disturbed areas immediately adjacent to structures needing visual screening.  Such screening is to include fast growing plants adequate to screen the facility from direct view;

(e)     A detailed irrigation plan if feasible for all revegetated areas requiring irrigation for establishment of plant materials;

(f)     The permittee's commitment for continual monitoring of the revegetation so that weeds will be minimized.

## H-14.  Landscaping and Revegetation Bonds

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall post a bond or other security agreement approved by the County Counsel to ensure that all landscaping and revegetation programs are completed to the County's specifications.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 24

**H-15.   Release of Landscaping and Revegetation Bonds**

Prior to issuing a release from the bond or other security agreement, a biologist and landscape architect hired by the County, at the permittee's expense, shall conduct a field review of all revegetated and landscaped areas, to insure consistency with the intent and specifications of the revegetation and landscape plan.   Necessary repairs or changes in landscaping or revegetation shall be made at the permittee's expense.

**H-16.   California Endangered Species Inventory**

Prior to approval of the Final Development Plan, a qualified biologist approved by the Planning and Development Department will conduct site-specific field inventories for California state-listed species, as mandated by the intent and general provisions of Assembly Bill No. 3309, the California Endangered Species Act.  The biologist will perform the surveys of the 100-foot ROW in areas suspected of having any of the species of special concern as identified in Appendix B Table B-6, DEIR/S, except for the peregrine falcon, least Bell's vireo, and Parish's sidalcea. Surveys for these species will be conducted prior to construction.  The California Department of Fish and Game will be consulted concerning appropriate methods for survey as well as appropriate mitigation measures if these species are found on the ROW.  Additional mitigation shall be developed and executed by the permittee-based on these surveys if determined necessary by the Planning and Development Department.

**H-17.   Raptor Nesting Habitat Survey**

Prior to issuance of the Coastal Development Permit and Land Use Permit, a wildlife biologist approved by the Planning and Development Department will survey all potential raptor nesting habitats within 0.5 miles of the pipeline, to identify active and inactive nests and potential perch sites cleared by ridge-top construction.  No construction will occur within 0.5 miles of active eyries during nesting season as determined by the biologist. Construction may be permitted by the Planning and Development Department in consultation with the biologist near inactive nests provided nest sites are not disturbed.  Where deemed necessary by the California Department of Fish and Wildlife biologists, raptor perch or roost trees will be avoided and/or artificial roosts will be constructed on ridgelines to mitigate losses of such trees resulting from clearing the ROW on ridge tops.

**H-18.   Construction ROW Through Riparian Habitats**

The permittee shall limit the width of the construction ROW through all riparian habitats to the extent feasible. The permittee shall submit a plan indicating the location and size of the construction ROW through all riparian habitats.  These plans shall be approved by the Planning and Development Department prior to the Final Development Plan.

**H-19.   Construction ROW Designed to Avoid Trees**

The construction ROW shall be routed to avoid trees to the maximum extent feasible.  When this is not possible, dying or diseased trees shall be removed preferentially over healthy trees.

**H-20.   Suey Canyon Oak Woodland**

The permittee shall minimize impacts to the oak woodland in the Suey Canyon area.  This shall be done by using existing disturbed areas and by narrowing the construction corridor to the extent feasible by working on top of the spoils pile or selectively removing spoils, selectively removing

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 25

trees (e.g. dying, or diseased trees) and revegetating to enhance re-establishment of oak saplings and/or similar mitigation.

**H-21.  Los Alisos Creek Crossing**

The permittee shall align the pipeline route in the vicinity of the Los Alisos Creek crossing in order to minimize the amount of riparian habitat disrupted.

**H-22.  Parish's Checkermallow Field Survey**

Prior to the issuance of the Land Use Permit, a qualified biologist approved by the Planning and Development Department shall conduct a site-specific field survey for the Parish's checkermallow along the approved right-of-way in potential habitat areas in the North County.  Should any individuals be found along the right-of-way, the permittee shall employ mitigation measures approved by the Planning and Development Department to enhance the reestablishment of the species along the ROW (e.g., transplanting individuals).

**H-23.  Gaviota Tarplant Plan**

The permittee shall minimize impacts to the population of Gaviota tarplant (*Hemizonia increscens* ssp. *villosa*) found in the Gaviota area. The permittee shall submit a plan to enhance the recovery of this population to the Planning and Development Department for approval prior to issuance of the Coastal Development Permit. This plan shall include provisions for ensuring the preservation of the current seed crop and seed stored in topsoil (seed bank) onsite. This shall be done under the supervision of a biologist approved by the Planning and Development Department.

**H-24.  Restoration of Construction Work Areas**

Impacts to existing vegetation within the temporary (for construction only) extra work space areas shall be minimized to the extent feasible.  All disturbed areas, including temporary extra work spaces, shall be restored and revegetated pursuant to the permittee's approved Restoration, Erosion Control, and Revegetation Plan (Condition H-1).  Any grading of the temporary extra work space areas will require a separate Coastal Development Permit.

Use of the temporary (for construction only) extra work space areas on slopes greater than 30 percent shall be limited to spoil placement.  Right-of-way restoration and revegetation on slopes greater than 30 percent shall be initiated immediately upon completion of pipeline installation.

**H-25**

The permittee shall implement a project specific revegetation and restoration plan for the Gaviota Creek Pipeline Lowering and Replacement project. The plan shall include, but not be limited to the following measures:

- Landscaping in the riparian corridor shall consist of native riparian species including willow (*Salix lasiolepis, S. laevigata*), mule fat (*Baccharis salicifolia*), wild blackberry (*Rubus ursinius*), California wild rosa (*Rosa californica*) at a minimum density of 3 feet on-center. Planting stock shall be obtained from the Gaviota Creek drainage.
- The new plantings shall be irrigated as necessary to promote establishment.
- Plantings shall be fenced or otherwise protected from browsers as deemed necessary by the EQAP monitor.
- Non-native species including tree tobacco (*Nicotiana glauca*), castor bean (*Ricinus comunis*), mustard (*Brassica sp.*), star thistle (*Centaurea sp.*) shall be removed from the creek within the project area.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 26

- Upland areas disturbed by construction shall be recontoured to pre-existing conditions (to the extent feasible) and revegetated consistent with the Restoration, Erosion Control and Revegetation Plan approved for the original pipeline project.

The plan shall include pre-established performance criteria to be used in final evaluation for bond release. **Plan Requirements:** Prior to CDP approval, the applicant shall submit the revegetation and restoration plan, prepared by a Planning and Development approved biologist, to Planning and Development for review and approval. The $350,000 performance bond already in place for the original project shall cover performance security for the project. **Timing:** The plan must be approved prior to CDP approval. Revegetation and removal of non-natives shall be done so as to coincide with the onset of seasonal rainfall. **MONITORING:** Planning and Development staff shall site inspect for restoration. Maintenance shall be confirmed through site inspections. *(Mitigation Measure B- 1 and V-1) (adopted by the Planning Commission on September 6, 2000)*

**H-26**

The permittee shall comply with the mitigative provisions of the following documents:

- NMFS Biological Opinion, December 31, 1998
- USFWS Biological Opinion, January 15, 1999
- ACOE Nationwide Permit, February 22, 1999
- CDF<u>WG</u> Streambed Alteration Agreement, March 26, 1999
- NMFS Biological Opinion, May 31, 2000

These permits and mitigation measures are considered part of the project description. **Plan Requirements:** These conditions shall be printed on all construction plans. **MONITORING**: P&D staff to ensure compliance with other agency permits. EQAP monitor to spot check in the field. *(Mitigation Measure B-3) (adopted by the Planning Commission on September 6, 2000)*

**I.    SOCIOECONOMICS**

**I-1.    Oil and Gas Industry-Wide Monitoring and Mitigation Program**

The cumulative impacts of oil and gas industry projects are expected to be significant to Santa Barbara County. Therefore, the permittee shall participate in an oil and gas industry wide monitoring and mitigation program to address socioeconomic impacts identified as significant environmental impacts attributable to their project. For projects such as pipelines, only the construction phase is expected to cause significant impacts, and the permittee's participation in the program shall be limited to that phase. The criteria for allocating the costs of the monitoring and mitigation program and its mitigation requirements will be uniformly applied to all industry participants.

The intent of this program is to obtain realistic information regarding impacts identified in the EIR/EIS, and to allow impacted jurisdictions to require mitigation for project-related impacts. Mitigation of impacts through other planning programs, and/or through existing administrative infrastructure shall be taken into account. The scope of this program is detailed below. As subsequent details in the structure of the Program are developed by the County, such details shall supersede portions of this condition as appropriate.

The purpose of the Monitoring and Mitigation Program is to accurately assess the impacts of the permittee's proposed development, including those in the following socioeconomic areas:

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 27

a.    Temporary housing needs, particularly demand for state and other park campsites, recreational vehicle parks, motel-hotel rooms and rental housing;

b.    Longer term (more than one year) housing needs, particularly low and moderate income housing needs, and associated water demands, south coast Santa Barbara County;

c.    Public finance;

d.    Transportation of workers and materials to and from the site.

At any point when the Board of Supervisors determines that the monitoring program demonstrates that previous mitigation funds paid by the permittee exceed the valuation of the impacts at issue, the permittee shall be granted a credit against any other current or future mitigation fees imposed on the permittee for this permit by the County. The permittee shall be entitled to accrued interest at the prevailing legal rate which shall continue to accrue until the credit is used.

The Monitoring and Mitigation Program will be administered and staffed by the County of Santa Barbara, Department of Regional Programs. A Technical Advisory Committee will provide assistance and input in the documentation of significant adverse impacts and proposals to mitigate these significant impacts.

The Technical Advisory Committee will be composed of:  two representatives from Santa Barbara's cities appointed by the Mayor's Select Committee and representing north and south county interests; one representative (each) from San Luis Obispo and Santa Barbara counties; and one representative from each affected oil and gas company (to the number of representatives agreed upon). The permittee will be included in the committee until the permittee submits its resignation.

In the event of unresolved technical issues in the area of methodology and calculation of socioeconomic impacts, there shall be a Technical Arbitration Group.  The Technical Arbitration Group shall be composed of three individuals without ties to either the County or the permittee, one to be selected by the County Board of Supervisors, one selected by the oil and gas company representatives and the final member selected by the first two members.  All Technical Arbitration Group decisions shall be appealable upon written request to the Board of Supervisors.  Subsequent details on voting procedures and conflict resolution will be proposed by the Department of Regional Programs and reviewed by the Board of Supervisors in a noticed public hearing.

Prior to approval of the Final Development Plan for this project, the monitoring and mitigation program will be refined.  Based on information in the EIR/EIS and on other data as appropriate, practical thresholds which trigger the necessity for mitigation will be developed and adopted by the Department of Regional Programs with input from the Technical Advisory Committee.  These thresholds will recognize the normal growth incorporated in County plans, prior and existing industry activity, and the decline of the industry if no further permitting is allowed. Methodologies used to establish thresholds and impacts will be developed in consultation with the Technical Advisory Committee.

The need for mitigation will be determined when threshold levels are exceeded as shown by monitored activities and other data as appropriate.  The Department of Regional Programs will recommend a mitigation action to the County Board of Supervisors. The Technical Advisory Committee will assist in making the assessment and recommendations. The monitoring and mitigation program will continue through all stages of construction.

The monitoring, impact and mitigation elements of the program would be equivalent to those described in the Chevron Gaviota Project conditions, but modified as appropriate for the nature of the pipeline project.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 28

**I-2.    Housing for Temporary Construction Workers**

Prior to approval of the Final Development Plan, the permittee shall submit to the County Department of Regional Programs a plan which details how they plan to house temporary construction workers for every month of construction.  This plan, to be implemented by the permittee, shall demonstrate how the permittee plans to reduce the housing impacts identified as part of the plan; e.g. exactly how much housing is needed, where it is needed and for how long; but not limited to, the following examples:

(a)    Use of existing under-utilized hotel/motel space during the months of September through May to provide for temporary living quarters for direct construction workers by month; identification of incentives to all the direct construction workers such as rent subsidies and/or shuttle service to the site.

(b)    Use of any available housing outside the South Coast area for all workers associated with the project during the summer months when visitor-serving facilities in the South Coast area are at capacity.  Incentives for workers shall be identified such as rent subsidies and shuttle service for all workers commuting to the job site.

(c)    Methods to limit worker use of public campgrounds as living quarters.  If it cannot be shown that the impact will be reduced from the estimate, the permittee shall make a donation to the California State Parks or to Santa Barbara County Parks for the development of new campsites to offset their worker use of campsites.  The donation shall be made prior to receipt of the building permit and determined by multiplying the estimated cost per developed campsite times 15.  If it is shown by the Regional Programs Department and the Technical Advisory Committee that there is significant impact, the above-mentioned groups shall propose mitigation.

At any point when the Board of Supervisors determines that the monitoring program demonstrates that previous mitigation funds paid by the permittee exceed the valuation of the impacts at issue, the permittee shall be granted a credit against any other current or future mitigation fees imposed on the permittee for this permit by the County. The permittee shall be entitled to accrued interest at the prevailing legal rate which shall continue to accrue until the credit is used.

**I-3.    Construction During Peak Tourist Seasons**

The pipeline construction period will be scheduled so as not to coincide with peak tourist seasons within each construction area in Santa Barbara County, provided that this scheduling does not interfere with any other conditions in this permit with respect to timing, in particular requirements regarding construction during stream and river low-flow.  If such a conflict is found, than additional measures must be taken to provide the temporary housing needs for construction workers.

**I-4.    Deleted.**

**I-5.    Utlization of Local Labor**

The permittee shall include provisions in its contractor agreements specifically to encourage and promote employment from local labor so as to reduce the impacts associated with the in-migration of workers.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 29

**I-6.    Project-Related Utilities and Services**

Except as otherwise provided herein, if the Socioeconomic Monitoring Program shows that project-related revenues will not compensate for needed capital or operating expenditures necessary to provide project-related utilities and services additional mitigation will be required.

**I-7.    Distributing Oil Related Revenues**

In the event that state and/or federal revenue sharing legislation directed at distributing oil related revenues to state or local governments is approved or Santa Barbara County levies a tax (special or otherwise) on oil and/or gas processed or transported under this permit, then any condition herein requiring payments or other items of value by the permittee to Santa Barbara County or any political subdivision thereof shall automatically be suspended pending a review by the County to determine the extent, if any, which the tax, revenue sharing, or any of the fees imposed are duplicative or unwarranted either as to the level of government services provided or the level of burdens imposed on the public.

**J.    LAND USE AND RECREATION**

**J-1.    Property Owner Notification of Construction**

Prior to construction, the entire pipeline ROW corridor shall be prominently staked.  All affected property owners along the pipeline route shall be notified in writing at least 30 days prior to the commencement of any pipeline construction on their property, and at least 15 days in advance of any deviation from the staked corridor which crosses their property.

**J-2.    Mainline Pipeline Construction Time Lines**

All mainline pipeline construction activities except river, perennial coastal stream, and ESH area crossings as specified in condition H-7, once started, shall proceed in a diligent and expeditious manner and shall be completed within nine months after the starting date, subject to necessary and/or unanticipated time extensions approved by County, in consultation with affected property owners.

**J-3.    Pipeline Construction Work Hours**

Pipeline construction activities shall be limited to the period between 7 a.m. and 7 p.m., Monday through Saturday.  Except for emergency services, construction activities shall not take place on Sundays, the dates generally recognized for Memorial Day, July 4, Labor Day, or any other similarly recognized holiday, unless previous arrangements have been made with the affected property owners.

**J-4.    Privacy and Security of Property Owners During Construction**

Prior to approval of the Final Development Plan, the permittee shall consult with affected property owners to develop reasonable and mutually satisfactory controls for maintaining the privacy and security of affected properties while construction is in progress.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 30

**J-5.     Property Owner Notification of Construction Within 48 Hours**

Unless easements have been obtained from affected property owners or unless otherwise agreed to by affected property owners, the permittee shall provide affected property owners written notice at least 48 hours prior to the start of construction on their property, which shall include:

a)      Description of vehicles using roads on the property, including type, size, identification, proposed times of entry and departure, destinations, and the intended route to the destination.  (Fire, medical, or similar emergency vehicles can enter as necessary.) Significant changes in the schedule of construction-related vehicular traffic shall be allowed within the 48-hour advance noticing subject to direct communication (e.g. telephone, personal communication) by the permittee with the affected property owners;

b)      Description of estimated construction schedule across the property.  Any blasting necessary during construction shall be noticed to all property owners within a one mile radius of the blasting area;

c)      Description of times of limited access through and across the property, such as road closures on the property, indicating specific location, time and duration of the limited access or closure.  Road closure is considered to include partial road blockage or disturbance.  Suitable vehicular by-pass shall be provided during all closures;

d)      Description of any probable hazard or other unsafe condition during the pipeline construction period, indicating the nature of the hazard, the area in which the condition will occur, and the time and duration of the activity. The permittee and its contractors shall take prompt and adequate action to correct any hazard or damage that does occur during construction, and shall provide appropriate noticing as per other parts of this condition;

e)      Description of helicopter and/or vehicle reconnaissance schedules for pipeline maintenance, indicating times, stops, and duration. The permittee shall establish and enforce appropriate rules for its personnel and its contractors to assure that they will not be in the area except when necessary to carry out construction, inspection, repair and maintenance activities, or emergency services;

f)      Description of schedule for cutting any fences or similar barriers during pipeline construction.

**J-6.     Deleted.**

**J-7.     Property Owner's Fences/Barriers During Construction**

Unless easements have been obtained from affected property owners or unless otherwise agreed to by affected property owners if and when fences or other similar barriers must be cut during pipeline construction, the permittee shall provide advance notice to the affected property owner, and shall replace the function of the cut fence before the cut is made to the satisfaction of the property owner, and the permittee and its contractors shall restore all fences that have been cut, moved, or damaged to at least their condition prior to pipeline construction, except that gates or similar structures may be added as approved to provide access.

**J-8.     Utility Lines and Services During Construction**

Interruption of telephone, electrical power, water or other utility services shall be minimized to the extent feasible during the pipeline construction period. The permittee, or its contractors, shall contact each property owner or the appropriate utility regarding the location of utility lines, and all such utility line locations shall be staked by the permittee or its contractors prior to the start of construction on the affected property.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 31

**J-9.    Compliance with All Applicable County Statutes, Etc.**

During the pipeline construction period in the County, the permittee and its contractors shall comply fully with all applicable statutes, ordinances, rules and regulations, including traffic regulations, of the County.

**J-10.    Proof of ROW Prior to Construction**

Prior to entering upon any parcel of property for purposes of commencing construction, the permittee shall demonstrate to the Planning and Development Department that it has obtained a right-of-way for such parcel or otherwise has obtained the right to enter the property for purposes of constructing the pipeline.

**J-11.    Restricted Use of ROW After Construction**

Following installation of the pipeline, use of the right-of-way is restricted to operational maintenance of the pipeline except where expressly permitted by the easement or landowner and consistent with other regulations and conditions.

**J-12**

The permittee shall implement the sign plan approved by State Parks, and dated August 11, 2000, prior to beginning work on the Gaviota Creek Pipeline Lowering and Relocation project. **MONITORING:** EQAP monitor to check in field. *(adopted by the Planning Commission on September 6, 2000)*

**K.    TRANSPORTATION**

**K-1.    Worker Transportation Program**

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall submit to the Planning and Development Department and the Department of Public Works, Road Division a worker transportation program designed to minimize traffic-related impacts. The plan shall identify on- and off-site parking areas, access routes, shuttle program to reduce number of working vehicles on and along pipeline construction corridor, measures to avoid traffic conflicts with residents using all roads affected, number of vehicles accessing the facilities sites and incentives for ride-pooling/van-pooling to the sites. Construction worker traffic and parking shall not interfere with normal and reasonable uses of private property or recreational areas. This Construction Traffic Mitigation Plan shall be submitted by the permittee and approved by County prior to initiation of construction. The program must consider both the permittee employees and contractors.

**K-2.    Permanent Parking Areas at the Pump Stations**

Any new permanent parking areas at the pump stations shall be screened from public view pursuant to the landscape plan approved by the Board of Architectural Review.

**K-3.    Engineering Plans for All Pipeline Crossings of County Roads**

The final engineering plans and procedures for all pipeline crossings of County roads must be approved prior to issuance of the Land Use Permit and Coastal Development Permit by the Department of Public Works. Notification of such approval must be submitted to the Planning and Development Department prior to construction at the site.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 32

### K-4.    Pipeline Construction Activity Limited to ROW

All pipeline construction activity, except ingress and egress along routes approved by the Planning and Development Department and in consultation with affected property owners, shall be limited to the final staked right-of-way on the final approved pipeline route.  Use of any private roads or other areas shall be allowed only after advance approval from the affected property owners.

### K-5.    Mitigation Plan for Impacted County Roads

Prior to the Final Development Plan, the permittee must submit to the Public Works Department for approval a plan to mitigate impacts to all County roads which will be used during construction. This plan will include the type of vehicles and machinery which will traverse the roads, the frequency of road use for each piece of equipment and vehicle, and the gross vehicle weights loaded and unloaded. This includes the above information for trucks carrying pipe, fuel, construction supplies, or construction crews through the County to the construction spreads.  This plan shall include an agreement with the County to repair any obvious damage to the satisfaction of the Public Works Director and any reasonable fees associated with eventual reconstruction caused by project-related damages of the public roads. Prior to drafting this agreement, County shall coordinate with the permittee in compiling a list of County roads which will be used for construction of the pipeline. The permittee shall demonstrate property owner (or Court) approval of private road maintenance plans or terms on privately owned parcels to the Planning and Development and Public Works Department prior to entering upon said parcels for purposes of commencing construction.

### K-6

If repairs are necessary to roads used by construction equipment for the Gaviota Creek Pipeline Lowering and Relocation project, the permittee shall either complete the repairs or provide funding as determined by State Parks, County Public Works or Caltrans. **MONITORING:** EQAP monitor to visually inspect roads before and after the construction period. *(adopted by the Planning Commission on September 6, 2000)*

### K-7

The permittee shall provide workers at the access road gate and the work site to manage traffic by radio for the duration of the Gaviota Creek Pipeline Lowering and Relocation project.  The permittee shall coordinate with PAPCO/PANGL and any subcontractor normally requiring access to the site. **MONITORING:** EQAP monitor to check in field. *(adopted by the Planning Commission on September 6, 2000)*

### L.    CULTURAL RESOURCES

### L-1.    Cultural Resources Surveys Plan

Prior to approval of the Final Development Plan, the permittee shall submit a plan detailing the methods for the Phase I (walkover) and Phase II (site importance assessment) cultural resources surveys.  In addition, the permittee shall submit all Phase I cultural work completed to date.  These reports shall be approved by the Planning and Development Department as part of the Final Development Plan. Prior to issuance of the Land Use Permit and Coastal Development Permit, the permittee shall complete Phase I and Phase II cultural resource surveys for the entire route.  The results of these surveys shall be approved by the Planning and Development Department prior to issuance of said permits. The permittee shall avoid to the maximum extent feasible all known cultural resource sites along the pipeline route unless safety (e.g. seismic or engineering practices) considerations or sensitive biological habitats preclude avoidance.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated September 19, 2023 October 30, 2024
Page 33

## L-2.    Cultural Resources Mitigation Plan

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee, in consultation with the Native American Community, shall commence the cultural resources mitigation plan, in accordance with CEQA Appendix K, County approved Prehistoric Archaeological Guidelines, and section 4.1.1.11, Cultural Resources, of the EIR/EIS. Implementation of the mitigation plan shall proceed on an expeditious and effective schedule in order to minimize or to avoid conflicts with other construction scheduling requirements delineated in other permit conditions.  The main components of the mitigation plan shall include:

a)    Selection of a qualified archaeologist by the County Resource Management Department in consultation with Native American representatives.  The archaeologist shall be available on an as-needed basis through the completion of pipeline construction.  The archaeologist shall be funded by the permittee and shall be responsible to the County Planning and Development Department.  Compensation shall cover all excavation, analysis, and report preparation for all areas investigated including those found during construction;

b)    Avoidance of known sites wherever feasible;

c)    Test excavations of known sites that cannot be avoided.  These test excavations will assess the importance of each site according to CEQA Appendix K criteria or other requirements and will result in appropriate data recovery as a mitigation measure;

d)    Inclusion of Native American representatives in all field activities;

e)    Additional sub-surface sampling (use of shovel test pits) in defined sensitive areas which will be affected by project construction to confirm the presence/absence of previously unknown (undiscovered) sites.  This will include surveying of proposed construction access road areas, once identified by the permittee.  Any new sites found shall be treated as per condition L-2(b, c);

f)    Following the determination of site importance, the permittee shall inform the County of any additional plans for site avoidance.  For those sites not avoided, the consulting archaeologist shall, in consultation with the Native American community, prepare site-specific mitigation (excavation/data recovery) plans; and

g)    Implementation and completion of the field work aspects of the site-specific mitigation plans prior to construction in the vicinity of the resource.

## L-3.    Pre-Construction Workshop with Native Americans

Prior to pipeline installation activities, the permittee shall sponsor a workshop for its pipeline contractors and Native American consultants to review and explain the mutual concerns and activities of the parties during pipeline installation work.

## L-4.    Archaeologist and Native American On-Site During Construction

During pipeline installation, a Planning and Development Department approved archaeologist and Native American consultant(s) will work with the contractor during trenching to insure continued avoidance. Adequate monitors shall be provided pursuant to an agreement between the Native American representatives and the permittee, and the archaeologist retained.

## L-5.    Ownership of Non-Burial Associated Cultural Resource Artifacts

If non-burial associated cultural resource artifacts are recovered during pipeline installation (the location of such artifacts being unknown prior to installation), ownership of such artifacts shall be the option of either the permittee, the Native American Community, or the archaeological community.  In recognizing the origin of the materials, the Native American Community shall

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 34

have the first option for ownership.  The disposition of the artifacts shall be carried out as per the approved County guidelines.

**L-6.   Burial Associated Artifacts Found During Construction**

If burials or burial associated artifacts are found during installation (that were unknown prior to excavation), and cannot be avoided because of safety considerations, there shall be no further excavation or disturbance of the site. The permittee, in conjunction with the Native American representatives and the Planning and Development Department, shall adhere to the guidelines in CEQA Appendix K and the County Archaeological guidelines prior to continued construction activity in the site area.

**L-7.   Phase II Cultural Resource Guidelines**

If the County cultural resource guidelines for Phase II are modified and approved prior to November 19, 1985, the permittee shall abide by the requirements set forth in the guidelines in place at the time of Final Development Plan approval.

**L-8**

For the Gaviota Creek Pipeline Lowering and Relocation project, construction envelopes shall be restricted to those areas shown on the site plans dated 8/4/99, in order to avoid impacts to the cultural resources.  No construction, earth disturbance or construction equipment shall occur or operate outside of these areas.  Subsurface structures including septic systems and utilities and accessways including roads, driveways and utilities shall not be placed outside the envelopes.  Envelope boundaries shall be staked in the field. Prior to vegetation removal, the proposed easternmost staging area must be delineated and an archaeologist must verify that the staging area is not located over either of CA-SBA-2067/H's recorded historic adobe foundations or that adequate matting (as determined by the Gaviota State Park's archaeologist) is placed over the foundations. **Plan Requirements:** Construction envelopes shall be shown on all grading and building plans. This condition shall be noted on all final plans to describe the activities disallowed outside the approved envelopes. **Timing:** Construction drawings shall be submitted to Planning and Development prior to CDP. Envelopes shall be staked prior to start of grading or structural development. **MONITORING:** During plan check, the planner shall ensure that all construction is to occur within approved envelopes.  Staking shall be checked during pre-construction meeting. Planning and Development's EQAP monitor and planners shall inspect and photo document during all construction phases to ensure development is confined to construction envelopes and that staking remains in place during site grading and construction. *(Mitigation Measure AR-1) (adopted by the Planning Commission on September 6, 2000)*

**L-9**

At the commencement of project construction for the Gaviota Creek Pipeline Lowering and Replacement Project, the archaeological monitor shall give all workers associated with earth-disturbing procedures an orientation regarding the possibility of exposing unexpected cultural remains and directions as to what steps are to be taken if such a find is encountered. **MONITORING:** EQAP monitor to verify orientation is conducted at meeting. *(Mitigation Measure AR-2) (adopted by the Planning Commission on September 6, 2000)*

**L-10**

For the Gaviota Creek Pipeline Lowering and Replacement project, all earth disturbances including scarification and placement of fill within the archaeological site area shall be monitored by a Planning and Development-qualified archaeologist and a Native American Consultant pursuant to County Archaeological Guidelines. **Plan Requirements and Timing:**

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 35

Prior to commencing work, a contract or Letter of Commitment between the applicant and the archaeologist, consisting of a project description and scope of work, shall be prepared. The scope of work must be submitted to Planning and Development for review and comment. **MONITORING:** Planning and Development planners shall confirm monitoring by archaeologist and Planning and Development's EQAP monitor shall spot check field work. *(Mitigation Measure AR-3) (adopted by the Planning Commission on September 6, 2000)*

**L-11**

In the event archaeological remains are encountered during grading for the Gaviota Creek Pipeline Lowering and Replacement project, work shall be stopped immediately or redirected until a Planning and Development qualified archaeologist and Native American representative are retained by the applicant to evaluate the significance of the find pursuant to Phase 2 investigations of the County Archaeological Guidelines. If remains are found to be significant, they shall be subject to a Phase 3 mitigation program consistent with County Archaeological Guidelines and funded by the applicant. **Plan Requirements/Timing:** This condition shall be printed on construction drawings and submitted to Planning and Development prior to CDP. **MONITORING:** EQAP monitor shall spot check in the field. *(Mitigation Measure AR-4) (adopted by the Planning Commission on September 6, 2000)*

**L-12**

If human remains are unearthed during the Gaviota Creek Pipeline Lowering and Replacement project, State Health and Safety Code Section 7050.5 requires that no further disturbance shall occur until the County Coroner has made the necessary findings as to origin and disposition pursuant to Public Resources Code Section 5097.98. If the remains are determined to be of Native American descent, the coroner has 24 hours to notify the Native American Heritage Commission (NAHC). The NAHC will then contact the most likely descendent of the deceased Native American. **Plan Requirements/Timing:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor shall spot check in the field. *(Mitigation Measure AR-5) (adopted by the Planning Commission on September 6, 2000)*

**M.    VISUAL RESOURCES**

**M-1.    Board of Architectural Review Approval**

All facility design (e.g. pump stations, landscaping and signs), shall be in accordance with a plan approved by the County Board of Architectural Review (BAR) including the criteria outlined in the Coastal Zoning Ordinance Section 35-87.9 and Section 35-184. Prior to the issuance of the Land Use Permit and Coastal Development Permit, the permittee shall submit to the BAR and the Planning and Development Department and obtain their approval of a plan demonstrating that Conditions M-2 through M-5 are met. For visual screening of surface equipment along the pipeline route, the permittee shall consult with each affected property owner during development of the associated landscaping plan.

**M-2.    Exterior Lighting**

No unobstructed or unshielded beam of exterior lighting shall be directed towards any area outside the exterior boundaries of PPC's property or easement. Any lighting along roadways within the project shall utilize low intensity, ground level, shielded fixtures. The plan shall demonstrate that all feasible measures have been taken to reduce obtrusive night lighting and glow from the pump stations.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 36

### M-3.  Pump Station Facilities Lighting

To the extent feasible no glare or other radiation resulting from pump station facilities, other than lighting fixtures constructed pursuant to this Development Plan, shall be detectable at any point along or outside the required screening along exterior boundaries of the pump stations.

### M-4.  Painting of Pump Stations Prior to Pipeline Operation

Prior to the pipeline operation, the Gaviota pump station, visible from Highway 101 and the Gaviota Village, the Sisquoc pump station visible from public viewshed, and all above ground portions of the pipeline shall be painted to harmonize with the surrounding area.

### M-5.  Visibility of Above-Surface Structures

No above-surface structures except necessary pipeline markers, pump stations, cathodic test stations, necessary fencing, and block valves shall be visible along this route after the completion of pipeline construction.  Signs shall not detract from scenic areas or views from public roads to the extent feasible.

### M-6.  Determination of ROW in Gaviota State Park

Prior to construction, the permittee will review the feasibility of implementing mitigation measures and/or realignments in the Gaviota State Park area to avoid blasting of ridgetops and alteration of topography in a scenic area. The permittee shall submit a plan to the Planning and Development Department, for review and approval, which identifies the feasibility of shifting the ROW alignment to the west, leaving the ridge profile undisturbed.  The plan shall include an investigation of utilizing prefabricated pipeline bends to allow for alignment around ridgetops, the use of stepped benches in steep terrain, and the future use of such a corridor for additional pipelines.

### M-7

Any exterior night lighting installed on the project site for the Gaviota Creek Pipeline Lowering and Replacement project shall be of low intensity, low glare design, and shall be hooded to direct light downward onto the project site and prevent spill-over onto adjacent areas, especially U.S. Highway 101. In addition, the permittee shall consult with Caltrans on the location and type of lighting to be used to ensure it does not present a traffic hazard. **Plan Requirements and Timing:**  This requirement shall be printed on all construction drawings prior to issuance of Coastal Development Permit (CDP). The permittee shall provide Planning and Development with a letter documenting their coordination efforts with Caltrans prior to CDP. **MONITORING:** EQAP monitor to confirm no impacts from night lighting. *(Mitigation Measure V-2) (adopted by the Planning Commission on September 6, 2000)*

### N.    NOISE

### N-1.  Noise Monitoring and Control Plan

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall file with the Planning and Development Department a Noise Monitoring and Control Plan which has been approved previously by the Department of Health Care Services and the Planning and Development Department.  The plan shall describe the best efforts the permittee shall take to reduce the noise impacts of the project both during construction and operation of the project.  The approved plan shall be implemented by the permittee and shall be followed until temporarily

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 37

suspended or deemed no longer necessary by the Planning and Development Department. The plan shall include provisions to ensure that items N-2 through N-6 below are included.

**N-2.    Sound Levels During Operation**

Except for motor vehicles and motorized construction equipment, all facilities shall be designed, constructed, operated and maintained such that sound levels during operation do not exceed 70 dbA at or beyond the property line or pipeline easement, as measured on the "A" weighted scale at slow response on approved sound level measuring instruments. Affected property owners along the pipeline route shall be notified by PPC at least 48 hours in advance of any planned testing or maintenance of the line which may exceed noise standards. The facility shall comply with all standards established in the Noise Element of the Comprehensive Plan and the Coastal Zoning Ordinance. No residents, teachers, students and staff at the Vista del Mar School shall be subjected to greater than a 9 dbA increment above the baseline ambient noise level, nor greater than a 3 dbA increase in day-night sound levels. The best available technology, including but not limited to muffling equipment, sound barriers, and landscaping measures shall be used to minimize operational noise impacts.

**N-3.    Project-Related Noise During Construction**

During the construction and operation phases, project-related noise at the Gaviota State Park, Vista del Mar School, Buellton area, or other points which may be impacted (as determined by the Health Care Services Director), shall be minimized between the hours of 7:00 a.m. and 10:00 p.m. Prior to construction in the impacted areas, the permittee will notify all residents within 1200 feet of the pipeline that noise impacts may occur during specific construction periods. Noise shall be limited to 50 dbA between the hours of 10:00 p.m. and 7:00 a.m., consistent with the County Noise Element and the Coastal Zoning Ordinance. Blasting shall be limited to the hours between 7:00 a.m. and 7:00 p.m. and directional charges shall be used to minimize noise.

**N-4.    Noise Generating Activities During Construction**

As determined by the Planning and Development Department, noise generating project activities (including delivery of construction equipment through residential areas) shall be restricted between the hours of 10:00 p.m. and 7:00 a.m. If complaints arise concerning activities occurring during these hours, the permittee shall take additional feasible steps to reduce the noise levels or further restrict the offending activity.

**N-5.    Helicopter and Aircraft Noise**

Prior to approval of the Final Development Plan, the permittee shall submit to the Director of the Planning and Development Department procedures that the permittee will take to minimize noise impacts from helicopters, or other aircraft during the aerial surveys of pipeline. The procedures, to be approved by the Planning and Development Department, shall specify overflight routes to be taken to minimize noise impacts to the community and other feasible measures. The permittee shall direct its contractors to abide by the helicopter procedures and shall take reasonable corrective action if complaints arise concerning the use of helicopters. Subject to flight safety considerations, the permittee shall avoid helicopter flights over residential areas.

**N-6.    Operation-Related Equipment Noise**

All construction and operation-related equipment shall be operated and maintained to minimize noise generation, ground vibration, and to avoid interference with radio or video communications.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 38

**N-7**

For the Gaviota Creek Pipeline Lowering and Replacement project, construction activity for site preparation and for future development shall be limited to the hours between 7:00 a.m. and 5:00 p.m.  No construction shall occur on State holidays (e.g. Thanksgiving, Labor Day). Construction equipment maintenance shall be limited to the same hours. Non-noise generating construction activities are not subject to these restrictions. For the final pipeline segment tie in activities, work may continue beyond these hours as authorized by State Parks. **Plan Requirements:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor shall spot check and respond to complaints. *(Mitigation Measure N-1) (adopted by the Planning Commission on September 6, 2000)*

**O.    ABANDONMENT**

**O-1.    Removal of Pipeline and Pump Stations Upon Permanent Shut Down**

Immediately following permanent shut down of the pipeline, PPC/Sable shall remove abandoned pump stations and unburied portions of the pipeline within Santa Barbara County constructed under this permit, recontour the site and revegetate the site in accordance with a County approved revegetation plan within one year of permanent shut down. PPC/Sable shall post a performance bond to insure compliance, or continue to pay property taxes as assessed during project operation until site restoration is complete, as determined by the County.

**P.    SYSTEMS SAFETY AND RELIABILITY**

**P-1.    SSRRC Review of Diagrams**

The permittee shall submit all appropriate pump station, valve, and pipeline construction and process diagrams to a System Safety and Reliability Review Committee (SSRRC) who may employ a third-party technical review in order to evaluate pipeline design and help identify possible design hazards prior to construction. The System Safety and Reliability Review Committee shall consist of a representative from the County Public Works Department, the APCD, the County Fire Department, County Flood Control District and the Planning and Development Department. All reasonable costs associated with any County review shall be borne by the permittee.  The permittee shall be entitled to participate fully in the review process.  If the review reveals a concern, the SSRRC shall share its findings with the permittee.  If the permittee does not agree with the findings, the County's recourse is with the Department of Transportation, Office of Pipeline Safety for areas of pipeline construction under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline), with the exception of areas/issues agreed to by the permittee and the County.

**P-2.    Safety Inspection, Maintenance and Quality Assurance Program**

The permittee shall submit a detailed Safety Inspection, Maintenance and Quality Assurance Program for the pump stations, valves, and the pipeline which shall be implemented during construction and operations.  The Program shall include, but not be limited to, inspection of construction techniques, regular maintenance and safety inspections, periodic safety audits, corrosion monitoring and leak detection, inspections of all trucks carrying hazardous and/or flammable material.

The construction section of the Program shall be reviewed by the System Safety and Reliability Review Committee and/or its consultants prior to issuance of the Coastal Development Permit and Land Use Permit. The permittee shall fund a full-time U.S. Department of Transportation (or designated representative) pipeline inspector during pipeline construction phase activities.  The

operations section of the Program shall be reviewed by the System Safety and Reliability Review Committee and/or its consultants prior to start-up. The Program shall be submitted sufficiently prior to the permittee' s projected start-up date so as to allow reasonable time for staff review. All costs associated with this review process shall be borne by the permittee. Should the Committee find fault with these submissions, it will indicate its concerns to the permittee. If the permittee decides not to modify its plans to meet these concerns, the County's recourse is with the Department of Transportation, Office of Pipeline Safety for all areas under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline). In such a case, County shall timely notify DOT of review findings. Permits may not be withheld or suspended due to County concerns which are under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline), with the exception of areas/issues agreed to by the permittee and the County.

**P-3.    Emergency Response Plan**

The permittee shall submit an Emergency Response Plan detailing response procedures to be implemented by the permittee for accidental events affecting public safety and the environment. This plan shall be based on a comprehensive risk analysis reviewed by the System Safety and Reliability Committee (condition P-1). The plan shall be reviewed and approved by the County Emergency Services Coordinator, the Fire Department, and the Planning and Development Department prior to start-up. Approval of the Plan shall be based on its consistency with the County's Area-Wide Oil and Gas Emergency Response Plan. The Program shall be submitted sufficiently prior to the permittee projected start-up date so as to allow reasonable time for staff review. The permittee shall demonstrate the effectiveness of the Emergency Response Plan by responding to one emergency response drill prior to or immediately after start-up.

**P-4.    Funding the County Emergency Response Plan**

In order to assure that County emergency response procedures adequately interface with the permittee's emergency response procedures, the permittee shall provide its reasonable pro-rata share of funds to the County, to develop and implement a feasible County Emergency Response Plan for oil and gas industry related emergencies. As appropriate, the County shall request funds from other oil industry operators to aid in funding of the County Emergency Response Plan. When available, the Planning and Development Department shall provide the permittee with an estimate of the pro rata share of funds to be provided by the permittee and the method for allocating such costs among other operators.

**P-5.    Oil Spill Contingency Plan**

The permittee shall submit an Oil Spill Contingency Plan detailing cleanup procedures and restoration procedures to be employed in the event of a spill. This plan shall be reviewed and approved by the Planning and Development Department and the County Emergency Services Coordinator prior to start-up. The Program shall be submitted sufficiently prior to the permittee projected start-up date so as to allow reasonable time for staff review. Procedures and techniques shall be selected to augment the Emergency Response Plan. The intent of the Oil Spill Contingency Plan is to detail spill site restoration subsequent to emergency response. The plan shall be approved based on its consistency with the intent of the condition "to detail site restoration subsequent to emergency response."

**P-6.    Site Security Plan**

Prior to approval of the Final Development Plan, the permittee shall submit to the Santa Barbara County Sheriff's Department for review and approval a site security plan. The plan shall describe

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 40

procedures to be implemented by the permittee which will prevent intentional damage to facilities which may result in environmental damage or public safety hazards.

**P-7.    Temporary County Fire Company**

The permittee shall cooperate with Chevron as necessary to facilitate the establishment of a temporary County fire company until the completion of the fire station (as specified in Chevron condition P-9). Prior to issuance of the Coastal Development Permit and Land Use Permit, the County Emergency Response Coordinator and Fire Department must be satisfied that provisions have been made to establish an operational fire company in the project area.

**P-8.    Cooperation with Chevron for Gaviota Area Fire Station**

Prior to approval of the Final Development Plan, the permittee shall agree to participate in a plan to be submitted to the County Fire Department by Chevron USA Inc., for the construction, manning and equipping of a fire station in the Gaviota area. The permittee shall contribute their pro rata share of the cost of implementing this plan. When available, the Planning and Development Department shall provide the permittee with an estimate of the pro rata share of funds to be provided by the permittee and the method for allocating such costs among other operators.

**P-9.    Fire Protection Plan for the Pump Stations**

Prior to Final Development Plan, the permittee shall submit to and obtain conceptual approval from the Fire Department, a Fire Protection Plan for the pump station locations. Final approval shall be obtained prior to start-up. Criteria to be addressed shall be obtained from the County Fire Department.

**P-10    Transporting LPGs and NGLs Through Pipelines**

Prior to approval of the Final Development Plan, the permittee shall assess the feasibility of transporting liquefied petroleum gases and natural gas liquids, (LPGs and NGLs) through the proposed pipeline by blending and/or batching, considering industry-wide projected volumes and market destinations of the gas liquids. The permittee shall report to the Planning and Development Department the results of this assessment, and this information shall include all technological and safety constraints involved, amount and type of additional storage facilities needed, and the degree to which LPGs and NGLs produced in the area can be transported through the pipeline. PPC/Sable shall transport the NGLs through this pipeline, to the extent feasible within safety and legal constraints as identified by the report and as requested by the users. In addition, under the reporting provisions of Condition C-1, PPC shall inform the County of the types and amounts of gas liquids shipped in the pipeline during operations.

**P-11.    Vista del Mar School Accommodation**

If the Vista del Mar School has not been relocated or is located at a site where it could be impacted by construction activities, prior to approval of the Final Development Plan, the permittee and the Board Trustees of the Vista Del Mar School District shall develop a reasonable and mutually agreeable construction plan for the pump station site and pipelines adjacent to the site that will minimize construction-related noise, air pollution, and visual disturbance to the School during school hours. Said construction plan shall include the following: Pipeline construction noise near the School shall be held to ambient noise levels or construction shall occur only when school is not in session; to prevent exceedance of the California one-hour $NO_2$ standard, construction schedules must be modified to minimize overlapping of equipment emissions; and, during construction of

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 41

the pipeline, activities nearest the school shall be scheduled when school is not in session in accordance with Condition B-5 and temporary barriers shall be erected around noisiest activities. No grading for the Gaviota pump station shall occur during School session hours.

In the event that any agreements contained herein cannot be reached on the construction plan, the Board of Supervisors shall arbitrate any dispute.

**P-12.  Deleted.**

**P-13.  Communication at the Operations Control Center and Activated Valves**

The permittee will design the pipeline such that the entire pipeline will have effective control communication between the operations control center and all remotely activated valves.  Any break, rupture, and/or damage to the pipeline shall result in the orderly shutdown of the pumping operations, and will activate the shut off valves, if appropriate, in a manner which will minimize environmental damage.

**P-14.  Compliance with the Watershed Fire Protection Plan**

During construction of the pipeline in fire sensitive areas, the permittee shall meet or exceed applicable guidelines and requirements set forth in a Watershed Fire Protection Plan provided by the combined local fire protection agencies, Santa Barbara County Fire, U.S. Forest Service, and the California Department of Forestry.  This shall include, but not be limited to:  modifications of welding operations, required fire patrolman position(s), firefighting equipment, and construction restrictions due to extreme fire weather.

**P-15.  Compliance with the National Fire Protection Association Standards**

All facilities, construction activities and equipment shall comply with National Fire Protection Association standards.

**P-16.  Map of Finished Pipeline Route**

Upon completion of pipeline construction, the permittee shall provide all jurisdictional agencies (S.B. County Fire, USFS, CDF) with at least two copies of maps showing the finished pipeline route and shall include locations accessible by fire department emergency response vehicles.  Said maps shall be 7 1/2 minute quadrangle scale, (one inch equals 24,000 inches), and shall represent topographical features.

**P-17.  Compliance with the 1982 Uniform Fire Code**

The permittee shall be subject to required fire department inspections during and after construction as set forth by the 1982 Uniform Fire Code and these conditions.

**P-18.  Alternative Pipeline Corridor Alignments**

Prior to approval of the Final Development Plan, the permittee shall designate alternative pipeline corridor alignments which avoid the two potentially impacted, proposed alternative permanent relocation school sites now under study by the Vista del Mar Union School District.  These proposed alternative locations are the State Park at Las Cruces, and the Tajiguas Ranch property. County shall review and approve said alternative alignments as part of the Final Development Plan and the permittee shall implement the appropriate alternative alignment depending on the permanent school relocation site chosen by the Vista del Mar School District.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 42

### P-19. PCB Contamination at Canada de la Huerta

Prior to initiation of any pipeline construction at Canada de la Huerta, the permittee shall demonstrate to the satisfaction of Environmental Health Services that either: (1) no PCB contamination exists in the road and fill area across which the pipeline alignment is proposed; or, (2) that any PCB contamination detected has been adequately remediated. The permittee shall submit verification of Environmental Health Services' approval for construction to the Planning and Development Department prior to issuance of the Coastal Development Permit for pipeline construction in the Canada de la Huerta area.

### P-20. Soil Tests at the Booster Pump Site

To determine the potential for hazardous materials contamination, ~~AAPLP~~ the permittee shall conduct soil tests at the booster pump site prior to construction, in coordination with the County Environmental Health Services Division.

### P-21. Texaco's Emergency Access Road

The permittee shall not operate construction equipment on Texaco's emergency access road except to gain access to and from the construction site.

### P-22

The permittee shall coordinate with PAPCO/PANGL to stake their pipelines prior to any excavation work for the Gaviota Creek Pipeline Lowering and Relocation project. Also, the permittee shall stake their existing 30" crude oil line prior to any excavation work. **Plan Requirements**: This condition shall be printed on construction drawings. **MONITORING:** The EQAP monitor shall verify that the pipelines have been staked prior to construction. *(Mitigation Measure R-2) (adopted by the Planning Commission on September 6, 2000)*

### P-23

For the Gaviota Creek Pipeline Lowering and Relocation project, if necessary, equipment needed within the creekbed should access the site from the west side so as not to cross the existing oil and gas lines. **Plan Requirements:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor to verify compliance in the field. *(Mitigation Measure R-3)(adopted by the Planning Commission on September 6, 2000)*

### P-24

If any discolored or contaminated soil is encountered during construction of the Gaviota Creek Pipeline Lowering and Relocation project, the permittee shall suspend work activities in the immediate area and report to Protection Services Division (PSD) and the Energy Division immediately. PSD shall inspect the site with the permittee and shall determine the extent of the contamination. The permittee shall proceed as directed by PSD and the Energy Division should contamination be found. Such direction may include preparation of a Site Assessment and Work Plan, and site remediation if deemed necessary. **Plan Requirements:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor to verify compliance in the field. *(Mitigation Measure R-4) (adopted by the Planning Commission on September 6, 2000)*

### P-25

Portable catch basins shall be placed beneath cut points prior to and for the duration of cutting activities for the Gaviota Creek Pipeline Lowering and Relocation project. A vacuum truck shall be onsite until all pipeline drainage and repair operations are completed. **Plan Requirements:** These requirements shall be printed on construction drawings. **MONITORING:** EQAP

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 43

monitor to verify compliance in the field. *(Mitigation Measure R-5) (adopted by the Planning Commission on September 6, 2000)*

**P-26**

Following installation of the new pipeline segment at Gaviota Creek, use of the right-of –way shall be restricted to the pipeline easement. **MONITORING:** EQAP monitor to spot check in the field. *(adopted by the Planning Commission on September 6, 2000)*

**P-27**

The permittee shall, at all times during construction of the new pipeline segment at Gaviota Creek, provide onsite fire protection (water tanker, shovels and fire extinguishers). **Plan Requirements:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor to spot check in the field. *(Mitigation Measure F-1) (adopted by the Planning Commission on September 6, 2000)*

**P-28**

For the Gaviota Creek Pipeline Lowering and Replacement project, a fire watch shall be maintained for at least one half hour after completion of cutting or welding operations to detect and extinguish smoldering fires if operations occur within 10 feet of combustibles. Hot work permits and fire watch operations shall be coordinated through County Fire. **Plan Requirements:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor to monitor in the field. *(Mitigation Measure F-2) (adopted by the Planning Commission on September 6, 2000)*

**P-29**

If welding trucks are used for the Gaviota Creek Pipeline Lowering and Replacement project, the vehicles shall be inspected and a permit issued at Fire Station 18. This would ensure that all hoses are adequate, a fire extinguisher is available, and a spark arrester is installed on any motor. **Plan Requirements:** The permittee to acquire a permit from Station 18. **MONITORING:** EQAP monitor to verify permit received prior to construction. *(Mitigation Measure F-3) (adopted by the Planning Commission on September 6, 2000)*

**P-30**

The permittee shall notify the Fire Department at least 48 hours before construction may begin for the Gaviota Creek Pipeline Lowering and Replacement project. **Plan Requirements:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor to verify prior to construction. *(Mitigation Measure F-4) (adopted by the Planning Commission on September 6, 2000)*

**P-31**

The permittee shall clear vegetation 10 feet on each side of the PAPCO/PANGL vault access road, staging areas, and along access portions of the pipeline right-of-way to 6 inches prior to construction of the Gaviota Creek Pipeline Lowering and Replacement Project. Vegetation near the cultural site at the Road 28 gate shall be hand cut to avoid adverse impacts to the site. **Plan Requirements:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor to field check prior to construction. *(Mitigation Measure F-5) (adopted by the Planning Commission on September 6, 2000)*

**Q.    FACILITY DESIGN**

**Q-1.    Demonstration of Compliance**

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 44

The Final Development Plan shall demonstrate compliance with Santa Barbara County Coastal Zoning Ordinance, and other applicable County Ordinances to the extent required by this permit.

**Q-2.    Energy Conservation Techniques**

Cost effective energy conservation techniques shall be incorporated into project design.

**Q-3.    Common Carrier Pipeline**

PPC's facilities will be operated as a common carrier pipeline with access for use available on a nondiscriminatory basis.  County retains the right to verify that the use of the facilities is conforming with County policies on consolidation and to impose additional reasonable permit conditions where necessary to assure these policies are being fulfilled to the extent feasible.  The intent of this condition is to ensure the multi-company access of oil transportation facilities.

**Q-4.    Compliance with County Petroleum Ordinance No. 2795**

PPC shall comply with all applicable policies in Section 25 of the Santa Barbara County Petroleum Ordinance No. 2795.

**Q-5.    Power Transmission Lines**

The permittee shall fund a pro-rata share of the costs to bury power transmission lines or of using environmentally and aesthetically preferred poles between the Goleta Substation and Gaviota in areas where the County and SCE determine it is not feasible to bury the lines. The permittee's pro-rata share shall be based upon an equitable cost-sharing formula applied to all users of the grid power consistent with PUC rate setting and applicable regulations.

# EXHIBIT N

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br> Plaintiffs, <br><br> v. <br><br> PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P., <br><br> Defendants. | Civil Action No. <br><br> 2:20-cv-02415 <br><br> **CONSENT DECREE** |

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast
Regional Water Quality Control Board, and California Department of Forestry
and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and
California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 258 of 836   Page
ID #:10984
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 3 of 102   Page ID #:96

**TABLE OF CONTENTS**

I.      BACKGROUND ...................................................................................- 5 -

II.     JURISDICTION AND VENUE..........................................................- 6 -

III.    APPLICABILITY ................................................................................- 7 -

IV.     DEFINITIONS ....................................................................................- 7 -

V.      CIVIL PENALTIES ..........................................................................- 13 -

VI.     NATURAL RESOURCE DAMAGES ...............................................- 17 -

VII.    TRUSTEES' MANAGEMENT AND APPLICABILITY
        OF JOINT NRD FUNDS ...................................................................- 21 -

VIII.   TRUSTEES' MANAGEMENT OF RECREATIONAL
        USE FUNDS .......................................................................................- 22 -

IX.     INJUNCTIVE RELIEF ......................................................................- 23 -

X.      CORRECTIVE ACTION ORDER ....................................................- 27 -

XI.     STIPULATED PENALTIES ...............................................................- 27 -

XII.    FORCE MAJEURE............................................................................- 35 -

XIII.   DISPUTE RESOLUTION .................................................................- 37 -

XIV.    REPORTING ......................................................................................- 39 -

XV.     CERTIFICATION ..............................................................................- 40 -

XVI.    INFORMATION COLLECTION AND RETENTION......................- 40 -

XVII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ...........- 43 -

XVIII.  TRANSFER AND ACQUISITION OF ASSETS ..............................- 49 -

XIX.    COSTS................................................................................................- 50 -

XX.     NOTICES ...........................................................................................- 51 -

XXI.    EFFECTIVE DATE ...........................................................................- 54 -

XXII.   RETENTION OF JURISDICTION ...................................................- 54 -

XXIII.  MODIFICATION ...............................................................................- 54 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 259 of 836    Page
ID #:10985
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 4 of 102    Page ID #:97

XXIV.    TERMINATION .................................................................................- 55 -

XXV.    PUBLIC PARTICIPATION.............................................................- 56 -

XXVI.    SIGNATORIES/SERVICE .............................................................- 56 -

XXVII.   INTEGRATION .............................................................................- 57 -

XXVIII.  FINAL JUDGMENT ......................................................................- 57 -

XXIX.    26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION .................- 57 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

A.      WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline known as the Line 901 pipeline ("Line 901") owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P., (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County, California.  A portion of the oil reached the Pacific Ocean and coastal areas such as Refugio State Beach.  The Refugio Incident adversely impacted Natural Resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and the State of California ("California" or the "State").

B.      WHEREAS, cleanup actions began immediately after the Refugio Incident at the direction of a Unified Command established by the United States Coast Guard ("USCG") and the State of California Department of Fish and Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR").  The Unified Command was comprised of the United States, State agencies, the County of Santa Barbara, and Plains.

C.      WHEREAS, on May 21, 2015, the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No. 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO").  The PHMSA CAO directed Plains, among other things, to purge Line 901 and a portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota and Pentland pump stations, and to keep Line 901 and the purged sections of Line 903 shut down until the actions required by the PHMSA CAO were satisfactorily completed.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 1 -

D.      WHEREAS, on May 19, 2016, PHMSA issued a Failure Investigation Report, which included PHMSA's findings of the "proximate or direct" causes and the "contributing" causes of the Refugio Incident.

E.      WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs arising from the Refugio Incident.

F.      WHEREAS, CDFW incurred certain additional costs arising from the administration and civil enforcement of pollution laws, including attorneys' fees that have been reimbursed by Plains.

G.      WHEREAS, Plains represents that it has implemented and will continue to utilize an electronic tracking tool and software for maintenance activities, including those activities related to mainline valves.  The software tracks which maintenance activities are performed, who performs the activity, when prior notifications of maintenance activities by field personnel are received, when problems requiring maintenance are first discovered, and when maintenance problems are corrected.  Plains maintains a separate software program to track the training and qualifications of all maintenance personnel.

H.      WHEREAS, Plains represents that, following the Refugio Incident and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its Emergency Response Plan and Training Program, and revised and updated its Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield District Response Zone Plan") to reflect modifications resulting from the review and the incorporation of lessons learned.  As part of the revision, Plains identified the locations of culverts along the pipelines' rights-of-way and provided containment and recovery techniques for responding to spills that may occur near those culverts.  Plains provided drafts of the updated Bakersfield District Response Zone Plan to PHMSA, incorporated comments provided by PHMSA, and received approval of the revised plan from PHMSA on September 26, 2017.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 2 -

Case 2:26-cv-05242-GW-SSC   Document 23   Filed 05/14/26   Page 262 of 836   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 7 of 102   Page ID #:100
ID #:10988

I.	WHEREAS, Plains represents that it also created a more detailed Geographic Information System ("GIS") based online Tactical Response Plan for its onshore oil pipelines in Southern California, including Line 2000 and the operational portion of Line 903, that, among other things, identifies culverts along the pipelines' rights-of-way, potential receptors and the equipment, supplies and resources that would be necessary to respond to a spill occurring at any given location along those pipelines, identifies the sources and locations for obtaining those resources, and, in some instances, establishes stored inventories of those resources in specific locations.  Plains represents that it intends to keep its Tactical Response Plan updated and available for use in drills and spill response, and that it will make the Tactical Response Plan available to the Plaintiffs upon reasonable request and as needed in connection with a drill or response to a spill.

J.	WHEREAS, Plains represents that Plains personnel responding to incidents that trigger the standup of an incident command structure ("ICS") have been provided ICS training appropriate to their responsibilities.

K.	WHEREAS, the relevant Natural Resources trustees ("Trustees") for the Refugio Incident are the United States Department of the Interior ("DOI"); United States Department of Commerce, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"); CDFW; California Department of Parks and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and The Regents of the University of California ("UC").

L.	WHEREAS, pursuant to Section 1006 of the Oil Pollution Act (''OPA''), 33 U.S.C. 2701, *et seq.*, the United States and the State Trustees allege that oil from the Refugio Incident caused injuries to Natural Resources, including birds, marine mammals, shoreline and subtidal habitats, and also had an impact upon human uses of Natural Resources and other public resources. The Federal Trustees are designated pursuant to the National Contingency Plan,

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 3 -

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 263 of 836   Page
ID #:10989
Case 2:20-cv-02415 Document 6-1   Filed 03/13/20   Page 8 of 102   Page ID #:101

40 C.F.R. § 300.600 and Executive Order 12777.  CDFW and CDPR are designated state trustees pursuant to the National Contingency Plan, 40 C.F.R. § 300.605, and the Governor's Designation of State Natural Resource Trustees pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980.  In addition, CDFW has state natural resource trustee authority pursuant to California Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (California Government Code § 8670.1 *et seq.*).  CDPR and UC have jurisdiction over natural resources within the state park system and the UC Natural Reserve System, respectively, which are held in trust for the people of the State of California.  CSLC is a state trustee pursuant to its jurisdiction under Public Resources Code § 6301 and Civil Code § 670.

M.     WHEREAS, after the Refugio Incident, the Trustees and Defendants entered into a cooperative Natural Resource Damage Assessment process pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and independently planned and conducted a number of injury assessment activities. These activities included gathering and analyzing data and other information that the Trustees used to determine and quantify resource injuries and damages.  As a result of this process and other activities, the Trustees identified several categories of injured and damaged Natural Resources, including birds, marine mammals, and shoreline and subtidal habitats, as well as effects to human use/recreation resulting from impacts on these Natural Resources, and determined the cost to restore, rehabilitate, replace, or acquire the equivalent of injured Natural Resources.  By entering this Consent Decree, Defendants do not admit or agree that the Trustees' NRD findings and determinations are accurate.

N.     WHEREAS, due to the specific facts surrounding the Refugio Incident, including the timing, degree, and nature of the spill and the affected

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 4 -

environment, the Trustees will not seek additional damages, costs, or expenses for Natural Resources resulting from the Refugio Incident.

O. WHEREAS, Plains agrees to reimburse costs incurred by the Trustees in connection with the NRDA through November 15, 2018, and will not reimburse costs incurred by the Trustees in connection with the NRDA after that date.

P. WHEREAS, by entering into this Consent Decree, Plains does not admit the allegations in the Complaint filed in this action, or any liability to the Plaintiffs.

Q. WHEREAS, on January 28, 2019, PHMSA initiated a regularly-scheduled "Integrated Inspection" of a portion of Defendants' Regulated Pipelines, as described below, and other pipeline facilities and records, pursuant to 49 U.S.C. § 60117.

R. WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

S. WHEREAS, the Parties agree and the Court by entering this Consent Decree finds, that this Consent Decree: (1) has been negotiated by the Parties at arm's-length and in good faith; (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws.

## I. BACKGROUND

The United States, on behalf of PHMSA, the United States Environmental Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California Central Coast Regional Water Quality Control Board ("RWQCB"), and the California Department of Forestry and Fire Protection's - Office of the State Fire

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 265 of 836    Page
ID #:10991
Case 2:20-cv-02415  Document 6-1   Filed 03/15/20   Page 10 of 102   Page ID #:103

Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and associated regulations and orders; OPA, 33 U.S.C. §§ 2701 *et seq.*, and associated regulations and orders; the federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq.*, and associated regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, California Government Code §§ 8670.1 *et seq.* and associated regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016, 13013; California Water Code §§ 13350, 13385; and the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*  The Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks penalties, injunctive relief, and Natural Resource Damages.

NOW, THEREFORE, before the trial of any claims and without adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.    JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and 60122; and 28 U.S.C. §§ 1331, 1345, and 1355.  This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367.  To the extent the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the United States and the State Agencies have satisfied the requirement.

2.      Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws, 49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 6 -

does business in this District and the alleged claims occurred in this District.

3.      For purposes of this Consent Decree or any action to enforce this Consent Decree, Defendants consent to the Court's jurisdiction over this Consent Decree for such action and Defendants consent to venue in this judicial district. For purposes of this Consent Decree and without admission of liability, Defendants agree that the Complaint states claims upon which relief may be granted.

### III.    APPLICABILITY

4.      Subject to the terms herein, the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree.

5.      Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained for the purpose of performing work required under this Consent Decree.  Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree by specifying that contractors are obligated to perform work in compliance with this Consent Decree.

6.      In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### IV.    DEFINITIONS

7.      Terms used in this Consent Decree that are defined in the CWA, OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 7 -

have the meanings assigned to them in these statutes and their regulations, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Appendix A" is the set of maps that generally depict Lines 901, 903, and 2000;

"Appendix B" is the Injunctive Relief that Plains is required to perform under this Consent Decree;

"Appendix C" is intentionally left blank;

"Appendix D" is the list of remaining corrective actions from the PHMSA CAO that Plains is still required to implement under this Consent Decree.  For the terms of the PHMSA CAO, *see* https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H .html?nocache=4888#_TP_1_tab_1;

"CDFW" shall mean the California Department of Fish and Wildlife and any of its successor departments or agencies;

"CDPR" shall mean the California Department of Parks and Recreation and any of its successor departments or agencies;

"Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

"Consent Decree" shall mean this Consent Decree and all Appendices attached hereto;

"Control Room Management Plan" shall mean Plains' Control Room Management Plan, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"Control Center General Procedures" shall mean Plains' Control Center General Procedures, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"CSLC" shall mean the California State Lands Commission and any of its successor departments or agencies;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 8 -

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 268 of 836    Page
ID #:10994
Case 2:20-cv-02415    Document 6-1    Filed 03/15/20    Page 13 of 102    Page ID #:106

"Day" shall mean a calendar day unless expressly stated to be a working day. In computing any period of time under this Consent Decree, the rules set forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

"Defendants" shall mean Plains All American Pipeline, L.P. and Plains Pipeline, L.P.;

"Delivery Lines" as stated in Appendix B shall mean any pipeline that generally operates to move oil from a delivery meter on a pipeline or facility to another pipeline or facility in close proximity;

"DOI" shall mean the United States Department of the Interior, including its bureaus and agencies, and any of its successor departments or agencies;

"Elder California Pipeline Safety Act" shall mean the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXI (Effective Date);

"Federal Trustees" shall mean DOI and NOAA in their capacities as Natural Resource Trustees;

"Integrity Management Plan" or "IMP" shall mean Plains' Integrity Management Plan, dated September 2019, as delivered to PHMSA by letter dated November 19, 2019, from counsel for Defendants;

"Line 901" is Defendants' 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California, as generally depicted in Appendix A;

"Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends approximately 129 miles in length from the Gaviota Pump Station in Santa Barbara County, California to the Emidio Pump Station in Kern County,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 9 -

California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland Mile Post 114.57, as generally depicted in Appendix A;

"Line 2000" is Defendants' 20-inch diameter pipeline that extends approximately 130 miles in length and transports crude-oil produced in the outer continental shelf and the San Joaquin Valley. Line 2000 runs from Bakersfield, California, over the Tehachapi Mountains and through the Grapevine I-5 corridor and extends to delivery locations in the Los Angeles metropolitan area, as generally depicted in Appendix A;

"Mainline pipeline" as stated in Appendix B shall mean the principal pipeline or the parallel pipeline in a given pipeline system, excluding connected lateral lines or branch lines that are used locally to deliver product either into the mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a third-party line;

"Natural Resource" and "Natural Resources" shall mean land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and/or the State or any subdivision thereof, and shall also mean the services provided by such resources to other resources or to humans;

"Natural Resource Damages" or "NRD" shall mean all damages, including restoration or rehabilitation costs, recoverable by the United States or State Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources including any services such natural resources provide, including the reasonable costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A), resulting from the Refugio Incident;

"Natural Resource Damage Assessment" or "NRDA" shall mean the process of collecting, compiling, and analyzing information, statistics, or data through prescribed methodologies to determine damages for injuries to Natural

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio Incident;

"NRD Payment" shall mean the payment Defendants are required to pay for the Natural Resource Damages as described in Section VI (Natural Resource Damages);

"Natural Resource Trustees" or "Trustees" are those federal and state agencies or officials designated or authorized pursuant to the CWA, OPA, and/or applicable state laws to act as Trustees for the Natural Resources belonging to, managed by, controlled by, or appertaining to the United States or the State. Participating Trustees in the Natural Resource Damage Assessment and in this Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

"NOAA" shall mean the National Oceanic and Atmospheric Administration and any of its successor departments or agencies;

"Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the fund established pursuant to 26 U.S.C. § 9509, including the claim-reimbursement provisions set forth in 33 U.S.C. § 2712;

"OSFM" shall mean the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal and any of its successor departments or agencies;

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

"Parties" shall mean the Plaintiffs and Defendants, collectively;

"PHMSA" shall mean the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration and any of its successor departments or agencies;

"PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the Original CAO issued on May 21, 2015, by PHMSA, which was subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

"Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq.*, and regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

"Plaintiffs" shall mean the United States and the State Agencies;

"Refugio Incident" shall mean the release of approximately 2,934 barrels of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California on or about May 19, 2015;

"Regulated Pipeline" shall mean any pipeline operated by Plains subject to regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div. 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

"Requests for Information" or "RFI" shall mean PHMSA's RFIs dated August 19, 2015, August 21, 2015, and September 1, 2016.  RFIs shall also refer to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

"Restore" or "Restoration" shall mean any action or combination of actions to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including Natural Resource-based recreational opportunities that were injured, lost, or destroyed as a result of the Refugio Incident;

"RWQCB" shall mean the California Central Coast Regional Water Quality Control Board and any of its successor departments or agencies;

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

"Segment" as stated in Appendix B shall mean any contiguous portion of a pipeline system for which a single hydrostatic test or ILI may be performed, as determined by Defendants;

"State Agencies" shall mean the People of the State of California, *Ex Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC.  The State Agencies do not include any entity or political subdivision of the State of California other than those agencies herein designated the "State Agencies";

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 272 of 836   Page
ID #:10998
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 17 of 102   Page ID #:110

"State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their capacities as Natural Resource Trustees;

"United States" shall mean the United States of America, on behalf of PHMSA, EPA, DOI, NOAA, and USCG;

"UC" shall mean The Regents of the University of California and any of its successor departments or agencies; and

"USCG" shall mean the United States Coast Guard and any of its successor departments or agencies.

## V.     CIVIL PENALTIES

A.     Within thirty (30) Days after the Effective Date, Defendants shall pay to the United States, CDFW, and RWQCB a total civil penalty of twenty-four million dollars ($24,000,000), together with interest accruing from the date on which the Consent Decree is lodged with the Court, at a rate specified in 28 U.S.C. § 1961 (the "Penalty Payment").  The Penalty Payment shall be allocated as follows:

8.     Penalty Payment to the United States (PHMSA).  For violations of the Pipeline Safety Laws alleged in the United States' Complaint, Defendants shall pay to the United States a civil penalty of fourteen million five hundred thousand dollars ($14,500,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made as follows:

a.     Thirteen million two hundred fifty thousand dollars ($13,250,000) attributed to Plains' alleged Pipeline Safety Law violations; and

b.     One million two hundred fifty thousand dollars ($1,250,000) attributed to Plains' alleged non-compliance with the RFIs.

c.     Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants by the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 13 -

Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California Western Division after the Effective Date.  The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree.  The FLU will provide the payment instructions to:

> Megan Prout
> Senior Vice President
> Commercial Law and Litigation
> Plains All American Pipeline, L.P.
> 333 Clay Street, Suite 1600
> Houston, TX 77002

on behalf of Defendants.  Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XX (Notices).

d.      At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state the payment is for the civil penalty owed pursuant to this Consent Decree in the *United States of America and the People of the State of California v. Plains All American Pipeline, L.P., et al*., and shall reference the Civil Action Number assigned to this case, CDCS Number, and DOJ case number 90-5-1-1-11340, to the United States in accordance with Section XX (Notices).

9.      Penalty Payment to the United States (EPA) shared with CDFW and RWQCB.  The Penalty Payment shall be allocated as follows:

a.      As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 14 -

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

    1)    To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Wildlife
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money as follows: one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

    2)    To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 15 -

State Water Resources Control Board
Division of Administrative Services, ATTN: Civil
Liability Payment
P.O. Box 1888
Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3)      To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division.  Such monies are to be deposited in the OSLTF.  The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8).  Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day.  Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 16 -

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

and

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center
U.S. Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, D.C. 20593-7605

10. <u>Penalty Payment to be Paid to CDFW</u>. For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11. Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI. NATURAL RESOURCE DAMAGES

12. Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 17 -

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961. The NRD Payment shall be allocated as follows:

      a.    To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment. Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds). Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

> Department of the Interior
> Natural Resource Damage Assessment and
>     Restoration Program
> Attention: Restoration Fund Manager
> 1849 "C" Street, N.W. Mail Stop 4449
> Washington, D.C. 20240

The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198. DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 18 -

Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 23 of 102   Page ID #:116

b.    To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund.  Payment shall be made by check payable to the California Department of Parks and Recreation.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> The California Department of Parks and
>         Recreation
> Attn:  Laura Reimche, Senior Counsel
> 1416 Ninth Street, Room 1404-6
> Sacramento, California  95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund.  CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident.  CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c.    To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF.  Payment shall be made by check payable to the National Fish and Wildlife Foundation.  At the time of payment, Defendants shall simultaneously send written

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 19 -

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 279 of 836    Page
ID #:11005
Case 2:20-cv-02415    Document 6-1    Filed 03/15/20    Page 24 of 102    Page ID #:117

notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> California Department of Fish and Game
> Office of Spill Prevention and Response
> Attn:  Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California  95816-0362

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the California South Coast Shoreline Parks and Outdoor Recreational Use Account.  The California South Coast Shoreline Parks and Outdoor Recreational Use Account shall be managed in accordance with the South Coast Shoreline Parks and Outdoor Recreational Use Account Memorandum of Agreement among the State Trustees and NFWF and shall be used by the Trustees for the purposes set forth in Section VIII (Trustees' Management of Recreational Use Funds).

d.      To UC, twenty-six thousand dollars ($26,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into Natural Reserve System Account.  Payment shall be made by check payable to The Regents of the University of California.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 280 of 836    Page
ID #:11006
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 25 of 102   Page ID #:118

The Regents of the University of California
Attn:  Michael Kisgen, Associate Director
Natural Reserve System
University of California, Office of the President
1111 Franklin Street, 6th Floor
Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account.  The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees.  The projects shall address the research, education, and outreach missions of the University of California.  UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13.     The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants.  To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII.   TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14.     DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident.  DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15.     DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 21 -

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 281 of 836   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 26 of 102   Page ID #:119
ID #:11007

Subaccount, including return on investments or accrued interest, subject to the provisions of this Consent Decree.

16.     The Natural Resource Trustees commit to the expenditure of the funds set forth in Paragraph 12 for the design, implementation, permitting (as necessary), monitoring, and oversight of Restoration projects and for the costs of complying with the requirements of the law to conduct a Restoration planning and implementation process.  The Natural Resource Trustees will use the funds to Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including lost human use of such services, injured, lost, or destroyed as a result of the Refugio Incident and for the administration and oversight of these Restoration projects.

17.     The specific projects or categories of projects will be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which public notice, opportunity for public input, and consideration of public comment will be provided.  Plains shall have no responsibility nor liability for implementation of the Restoration Plan or projects relating to the Refugio Incident, including any future project costs other than the payments set forth in Section VII herein.  The Trustees jointly retain the ultimate authority and responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD Subaccount to Restore Natural Resources in accordance with applicable law, this Consent Decree, and any memorandum or other agreement among them.

## VIII.     TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

18.     CDPR shall allocate the monies paid pursuant to Paragraph 12 for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

19.     The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20.     UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX.    INJUNCTIVE RELIEF

21.     Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22.     Material Changes to Plains' IMP.

a.      Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

1)      Procedure for the Assessment of In-Line Inspection ("ILI") Results;

2)      Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

3)      White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 23 -

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 283 of 836   Page
ID #:11009
Case 2:20-cv-02415-VDW-SSC   Document 6-1   Filed 03/15/20   Page 28 of 102   Page ID #:121

4)      Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"

5)      Section 11.4, "Documentation of P&M Evaluation Meetings;" and

6)      Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.      At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c.      In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.      In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation.  The parties may mutually agree to extend the period by no more than thirty (30)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 24 -

Days.  Following the notice period specified in Subparagraphs 22.b and 22.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII.  Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

23.     Material Changes in Control Room Management Plan and Control Center General Procedures.

a.     Plains' Control Room Management Plan and Control Center General Procedures (collectively, "Control Center Plan and Procedures") shall serve as the baseline Control Center Plan and Procedures for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4, 9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0, and 500-12 of its Control Center General Procedures throughout the term of this Consent Decree without following the process set forth in this Paragraph.  For purposes of this Paragraph, the term "material change" refers to any substantive modification in the Control Center Plan and Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.     At least thirty (30) Days prior to making a material modification to the above sections of  its Control Room Management Plan and Control Center General Procedures, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 25 -

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

c.     In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.     In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days.  Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24.    Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals.  Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 26 -

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 286 of 836 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 31 of 102 Page ID #:124
ID #:11012

obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

## X.    CORRECTIVE ACTION ORDER

25.    Upon the Effective Date of this Consent Decree, the PHMSA CAO shall close and be of no further force or effect.  All outstanding terms and obligations under the PHMSA CAO as of the Effective Date and which Plains is still required to implement under this Consent Decree are set forth in Appendix D.

## XI.    STIPULATED PENALTIES

26.    Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below.  A violation includes failing to perform any obligation required by the terms of this Consent Decree according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

27.    <u>Late Payment of Civil Penalties and NRD Payment</u>.

a.    If Defendants fail to pay any portion of the Penalty Payment to the United States required under Section V (Civil Penalties) when due, Defendants shall pay to the United States a stipulated penalty of ten thousand dollars ($10,000) per Day for each Day payment is late.

b.    If Defendants fail to pay any portion of the Penalty Payment to the CDFW and/or RWQCB as required under Section V (Civil Penalties) when due, Defendants shall pay to the CDFW and/or RWQCB a stipulated penalty of ten thousand dollars ($10,000) each, as applicable, per Day for each Day payment is late.

c.    If Defendants fail to pay any portion of the NRD Payments

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 27 -

required under Section VI (Natural Resource Damages) when due, Defendants shall pay a stipulated penalty of five thousand dollars ($5,000) to the United States, and five thousand dollars ($5,000) to the State Trustees, per Day for each Day payment is late.

28. Stipulated Penalties for Non-Performance of Injunctive Relief. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section IX (Injunctive Relief) when due:

a. For failure to timely submit to OSFM the applications for State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of Appendix B;

b. For failure to implement the Integrity Management provisions as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix B;

c. For failure to timely submit to OSFM the EFRD analyses as specified in paragraphs 5.A-5.B of Appendix B;

d. For failure to timely submit to OSFM the risk analysis as specified in paragraph 6.A of Appendix B;

e. For failure to timely submit to PHMSA the modified Section 9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

f. For failure to timely submit to PHMSA the modified P&M Recommendation forms, as specified in paragraph 9.B of Appendix B;

g. For failure to timely conduct EFRD analyses for all Regulated Pipelines for which Plains has not previously conducted an EFRD analysis, as specified in paragraph 10.A of Appendix B;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 28 -

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 288 of 836 Page
Case 2:20-cv-02413-VW-SSC Document 6-1 Filed 03/15/20 Page 33 of 102 Page ID #:126
ID #:11014

h.      For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i.      For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j.      For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k.      For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l.      For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m.      For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n.      For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o.      For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p.      For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q.      For failure to timely conduct the surveys and update the

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 29 -

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r.      For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s.      For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t.      For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u.      For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v.      For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w.      For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x.      For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y.      The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 30 -

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 290 of 836 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 35 of 102 Page ID #:128
ID #:11016

29.     <u>Stipulated Penalties for Non-Compliance with Corrective Action Order Terms.</u>  Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section X (Corrective Action Order) when due:

    a.     For operation of Line 901 in violation of paragraph 1.a of Appendix D;

    b.     For failure to timely submit to OSFM a Line 901 Restart Plan, as specified by paragraph 1.b of Appendix D;

    c.     For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 901 specified by paragraphs 1.c and 1.d of Appendix D;

    d.     For operation of Line 903, in violation of paragraph 1.e of Appendix D;

    e.     For failure to timely submit to OSFM a Line 903 Restart Plan, as specified by paragraph 1.f of Appendix D;

    f.     For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 903 specified by paragraphs 1.g and 1.h of Appendix D;

    g.     For failure to timely submit to OSFM any notification specified by paragraph 1.i of Appendix D; and

    h.     For failure to submit to OSFM a final Appendix D Documentation Report, as specified by paragraph 1.j of Appendix D.

    i.     The penalties stipulated in this Section shall accrue as follows:

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 31 -

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30.     Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31.     For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32.     For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33.     For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34.     For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

a.      Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b.      Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c.      Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d.      If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35.    For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36.    For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties).  Any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 33 -

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 293 of 836   Page
ID #:11019
Case 2:20-cv-02415-SVW-SSC   Document 6-1   Filed 03/15/20   Page 38 of 102   Page ID #:131

transmittal correspondence shall state that payment is for stipulated penalties and shall identify the date of the written demand to which the payment corresponds.

37. Stipulated penalties under this Section shall begin to accrue on the Day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed, or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

38. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

39. The applicable State Agencies may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to the applicable State Agencies under this Consent Decree.

40. Stipulated penalties shall continue to accrue as provided in Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid until the following:

a. If the dispute is resolved by agreement or by a decision of the United States or the State Agencies, as applicable, that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States or the State Agencies, as applicable, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or the State Agencies' decision.

b. If the dispute is appealed to the Court and the Plaintiffs prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

c.     If any Party appeals the Court's decision and a Plaintiff prevails in whole or in part, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

41.    If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State Agencies from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

42.    The payment of stipulated penalties, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

43.    Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State Agencies (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offsets measures, and/or contempt) for Defendants' violation of this Consent Decree or applicable laws.

## XII.   FORCE MAJEURE

44.    "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation.  The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized.  "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

45.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants first knew that the event might cause a delay.  Within ten (10) Days thereafter, Defendants shall provide in writing to such Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment.  Defendants shall provide with any notice the documentation that Defendants are relying on to support the claim that the delay was attributable to a Force Majeure event. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

46.     If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 36 -

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 296 of 836   Page
ID #:11022
Case 2:20-cv-02425   Document 6-1   Filed 03/15/20   Page 41 of 102   Page ID #:134

Plaintiffs for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation.  Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47.     If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

48.     If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XIII (Dispute Resolution), in response to Plaintiffs' determination in Paragraph 47 above, it shall do so no later than thirty (30) Days after receipt of Plaintiffs' notice.  In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 44 and 45.  If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to Plaintiffs and the Court.

## XIII.  DISPUTE RESOLUTION

49.     Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by Plaintiffs to enforce any obligation of Defendants arising under this Consent

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 37 -

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 297 of 836 Page
Case 2:20-cv-02425 Document 6-1 Filed 03/15/20 Page 42 of 102 Page ID #:135
ID #:11023

Decree.

50.     Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendants send the relevant Plaintiff(s) a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement.  If the parties cannot resolve a dispute by informal negotiations, then the position advanced by Plaintiffs shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Defendants invoke formal Dispute Resolution procedures as set forth below.

51.     Formal Dispute Resolution.  Defendants shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on Plaintiffs a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

52.     Plaintiffs shall serve their Statement of Position within forty-five (45) Days of receipt of Defendants' Statement of Position.  Plaintiffs' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Plaintiffs.  Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

53.     Defendants may seek judicial review of the dispute by filing with the Court and serving on the relevant Plaintiff(s), in accordance with Section XX (Notices), a motion requesting judicial resolution of the dispute.  The motion

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:20-cv-02425 Document 0-1 Filed 03/15/20 Page 43 of 102 Page ID #:130

must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54. Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or by a schedule set by the Court. Defendants may file a reply memorandum to the extent permitted by the Local Rules.

55. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 51, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree, based on the Statements of Position, and under applicable standards of review.

56. The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue until the final resolution of the dispute. Payment shall be stayed pending resolution of the dispute. If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV. REPORTING

57. After the Effective Date, by March 31 and September 30 of the following years until termination of this Consent Decree per Section XXIV (Termination), Defendants shall submit to the Plaintiffs in accordance with Section XX (Notices) bi-annual reports that shall describe the status of Defendants' compliance with the Consent Decree, including implementation of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

the injunctive relief requirements set forth in Appendices B and D. The report will be organized to show the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement.

## XV.   CERTIFICATION

58.   Each report submitted by Defendants under Section XIV (Reporting) shall be signed by either the Chief Executive Officer, the President, an Executive Vice President, a Senior Vice President, or General Counsel who is an authorized representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on any personal knowledge and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XVI.  INFORMATION COLLECTION AND RETENTION

59.   Plaintiffs and their representatives shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times and upon reasonable notice, upon presentation of credentials, to:

a.   monitor the progress of activities required under this Consent Decree;

b.   verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

         c.     obtain documentary evidence, including photographs and similar data; and

         d.     assess Defendants' compliance with this Consent Decree.

60. Until one (1) year after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve or deliver to Plains, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree. At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

61. This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Agencies pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

62. For any documents, records, or other information required to be submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim of business confidentiality or other protections applicable to the release of information by Plaintiffs, covering part or all of the information required to be submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2. Plains must mark the claim of confidentiality in writing on each page, and include a statement specifying the grounds for each claim of confidentiality.

63. The federal agency Plaintiffs are subject to applicable laws

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 41 -

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 301 of 836    Page
ID #:11027
Case 2:20-cv-02415  Document 6-1   Filed 03/15/20   Page 46 of 102   Page ID #:139

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq*.).  If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality.  In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64.    For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65.    State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq*.).  If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records.  If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66.    The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only.  Defendants shall produce all documents required

to be produced in connection with this Consent Decree in, at Defendants' option, either native format via electronic media or secure file transfer protocol ("FTP"). Any encryption or access restriction shall be on a container level only, *i.e.*, only the electronic media or the top-level folder containing the documents shall be encrypted and Plaintiffs shall have unrestricted access to the files/folders within the electronic media or the top-level folder without need for additional decryption or access codes.  Regardless of production method or encryption, individual documents shall be produced in a manner that allows the Plaintiffs to view, print, copy, save, download, and share each document within Plaintiffs' own environment without restriction, tracking or monitoring by Defendants, or automatically generated changes to the document (*e.g.*, without entering access codes prior to each download, and without automatically generated watermarks stating the download date and time).

67. At the conclusion of the information-retention period, Defendants shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of internal document destruction policies for documents, records, or other information subject to the requirements of Paragraph 60.

68. [*Intentionally left blank.*]

## XVII.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69. This Consent Decree resolves the civil claims of the United States and the State Agencies for the matters alleged in the Complaint filed in this action for the Refugio Incident.

70. Subject to the reservations of rights specified in Paragraph 71, this Consent Decree also resolves all civil and administrative penalty claims that could be brought by PHMSA, for violations of the Pipeline Safety Laws specified below that occurred on any of Defendants' Regulated Pipelines prior to January 28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of Defendants' Regulated Pipelines and other pipeline facilities began.  The specific

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 43 -

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

      a.     49 C.F.R. Part 194 Subpart B – Response Plans;

      b.     49 C.F.R. Part 195 Subpart B – Reporting;

      c.     49 C.F.R. Part 195 Subpart E – Pressure Testing;

      d.     49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

      e.     49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

      f.     49 C.F.R. Part 195 Subpart H – Corrosion Control;

      g.     49 C.F.R. Part 199 – Drug and Alcohol Testing; and

      h.     All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71.    The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72.    This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 44 -

January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. The specific Pipeline Safety Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

     a.    The Pipeline Safety Laws specified in Paragraph 70; and

     b.    California Government Code §§ 51012.3, 51013, 51013.5, 51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only), and 51018.

73. For any reportable pipeline accident, as defined in 49 C.F.R. § 195.50, occurring on or after January 28, 2019, on any of Defendants' Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA and OSFM to sue or pursue administrative or other remedies for violations (including penalties) under the Pipeline Safety Laws and the Elder California Pipeline Safety Act for such accident. Nothing in Paragraphs 70 through 72 shall be construed to limit the legal and equitable remedies of the United States or State Agencies, other than PHMSA and OSFM.

74. The United States and the State Agencies reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State Agencies to obtain penalties, injunctive relief, or other administrative or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other federal or state laws, regulations, or permit conditions, except as specified in Paragraphs 69, 70, and 72.

75. The United States reserves all legal and equitable remedies to address any imminent and substantial endangerment or threat to the public health or welfare or the environment arising at, or posed by, Defendants' operations, whether related to the violations addressed in this Consent Decree or otherwise. PHMSA further reserves the right to issue to Defendants corrective action orders pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 45 -

§ 190.236; and safety orders pursuant to 49 C.F.R. § 190.239.  The State Agencies reserve all legal and equitable remedies under California Government Code §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8, California Water Code §§ 13301, 13304, 13340, and 13386, and California Health & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating a substantial risk of an unauthorized discharge of oil into waters of the State of California, (2) a discharge of waste threatening to cause a condition of pollution or nuisance, or (3) a discharge which poses a substantial probability of harm to persons, property or natural resources.

76.    This Consent Decree also shall not be construed to in any way limit or waive the claims set forth in the case entitled *California State Lands Commission, et al. v. Plains Pipeline, L.P., et al.*, Case No. 18CV02504 (Cal. Sup. Court) and Case No. B295632 (Cal. Ct. App.).

77.    In any subsequent administrative or judicial proceeding initiated by the United States or the State Agencies for injunctive relief, civil penalties, other appropriate relief relating to Defendants' violations alleged in Plaintiffs' Complaint, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State Agencies in the subsequent proceeding should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 69, 70, and 72.

78.    This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations.  Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 46 -

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 306 of 836   Page
ID #:11032
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 51 of 102   Page ID #:1447

commenced pursuant to any such laws, regulations, or permits, except as set forth herein.  The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

79.     This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State Agencies against any third-parties, not party to this Consent Decree, nor does it limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

80.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

81.     Plaintiffs will not submit any claim for restitution for Natural Resource Damages in *The People of the State of California v. Plains All American Pipeline, L.P.,* Case No. 1495091 (Cal. Sup. Court).

82.     By entering into this settlement, Defendants do not admit the Pipeline Safety Laws violations alleged in the Complaint or described in this Consent Decree by the United States on behalf of PHMSA; therefore, any allegations of violations of these Pipeline Safety Laws do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree.  However, the allegations of violations set forth in the Complaint may be:  (1) considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains, and (2) used for statistical purposes to identify violations that PHMSA deems as causal to an incident or to increase the consequences of an incident. Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

be considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains.

83.    By entering into this settlement, Defendants do not admit the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint; therefore, any allegations of violations of these statutes do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree.  However, the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint may be considered by the State Water Resources Control Board or Regional Water Quality Control Boards to constitute prior offenses in any future enforcement action brought by any of these agencies against Plains.

84.    Subject to the terms of this Consent Decree, no provision contained herein affects or relieves Plains of their responsibilities to comply with all applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or state laws, and the regulations and orders issued thereunder.  Subject to the terms of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of access, entry, inspection, and information-gathering or their authority to bring enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, the regulations and orders issued thereunder, or any other applicable provision of federal or state law.

85.    Defendants hereby covenant not to sue Plaintiffs for any claims related to the Refugio Incident, or response activities in connection with the Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, or any other law or regulation for acts or omissions through the date on which this Consent Decree is lodged with the Court.

86.    Defendants covenant not to sue and agree not to assert any direct or

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 48 -

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87.     The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

## XVIII.   TRANSFER AND ACQUISITION OF ASSETS

88.     In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision.  Those provisions of Appendix B are:

        a.     For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;

        b.     For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;

        c.     For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and

        d.     For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89.     In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer.  Defendants shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements.  Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree.  Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90.     In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree.  Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer.  Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91.     For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX.  COSTS

92.     Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

attorneys' fees; provided, however, the United States and the State Agencies shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

**XX.   NOTICES**

93.     Unless otherwise specified in this Consent Decree, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent electronically by email provided by the Parties, and addressed to all Parties as follows:

As to the United States by email:   eescdcopy.enrd@usdoj.gov
Re: DJ # 90-5-1-1-11340

As to the United States by mail:   EES Case Management Unit
Environment and Natural Resources
    Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Re: DJ # 90-5-1-1-1130

As to PHMSA:   James M. Pates
Assistant Chief Counsel
    for Pipeline Safety
U.S. Department of Transportation
Pipeline and Hazardous Materials
    Safety Administration
1200 New Jersey Ave. SE. E-26
Washington, DC. 20590

As to EPA:   Andrew Helmlinger
Attorney Advisor
U.S. EPA Region IX
75 Hawthorne Street (ORC-3)
San Francisco, California 94104

As to DOI:                          Clare Cragan
                                    U.S. Department of the Interior
                                    Office of the Solicitor
                                    755 Parfet St., Suite 151
                                    Lakewood, Colorado 80215

As to NOAA:                         National Oceanic and Atmospheric
                                       Administration
                                    Office of General Counsel
                                    Natural Resources Section
                                    ATTN:  Christopher J. Plaisted
                                    501 W. Ocean Blvd, Suite 4470
                                    Long Beach, California  90802

As to USCG:                         Patricia V. Kingcade
                                    Attorney Advisor
                                    National Pollution Funds Center,
                                       US Coast Guard
                                    2703 Martin Luther King Jr. Ave SE
                                    Washington, DC 20593-7605

As to the State Agencies:           Michael Zarro
                                    Deputy Attorney General
                                    Office of the Attorney General
                                    Natural Resources Law Section
                                    300 S. Spring St., Suite 11220
                                    Los Angeles, California 90013

As to CDFW:                         California Department of Fish
                                       and Wildlife
                                    Office of Spill Prevention and Response
                                    Attn: Katherine Verrue-Slater
                                    Senior Counsel
                                    P.O. Box 160362
                                    Sacramento, California  95816-0362

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 52 -

Case 2:20-cv-02425    Document 6-1    Filed 03/15/20    Page 57 of 102    Page ID #:1509

As to CDPR:                     California Department of Parks and
                                   Recreation
                                Attn: Laura A. Reimche, Senior Counsel
                                1416 Ninth Street, Room 1404-6
                                Sacramento, California 95814

As to CSLC:                     California State Lands Commission
                                Attn: Patrick Huber, Legal Division
                                100 Howe Avenue, Suite 100-South
                                Sacramento, California 95825

As to OSFM:                     California Department of Forestry and
                                   Fire Protection
                                Legal Services Office
                                Attn: Joshua Cleaver, Staff Counsel
                                P.O. Box 944246
                                Sacramento, California 94244-2460

As to RWQCB:                    California Central Coast Regional Water
                                Quality Control Board
                                Attn: Naomi Rubin, Attorney III
                                801 K Street
                                Sacramento, California 95814

As to UC:                       Barton Lounsbury, Senior Counsel
                                University of California
                                Office of the General Counsel
                                1111 Franklin Street, 8th Floor
                                Oakland, California  94607

As to Defendants:               Megan Prout
                                Senior Vice President
                                Commercial Law and Litigation
                                333 Clay Street, Suite 1600
                                Houston, Texas  77002

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 53 -

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California 95814

94.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI.     EFFECTIVE DATE

96.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXII.     RETENTION OF JURISDICTION

97.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

## XXIII.     MODIFICATION

98.     The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 314 of 836   Page
ID #:11040
Case 2:20-cv-02415-SVW-SSC   Document 6-1   Filed 03/15/20   Page 59 of 102   Page ID #:152

99.     Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV.   TERMINATION

100.   After Defendants have:  (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation.  Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101.   Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement.  The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102.   If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution).  However, Defendants shall not seek Dispute Resolution of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

any dispute regarding termination until sixty (60) Days after receipt of the Plaintiffs' response to Defendants' Request for Termination.

## XXV.    PUBLIC PARTICIPATION

103.    This Consent Decree shall be lodged with the Court for a period of not fewer than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The Parties agree and acknowledge that the final approval by Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the Consent Decree and a public comment period.  Plaintiffs reserve the right to withdraw or withhold consent if the comments disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

104.    Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless Plaintiffs have notified Defendants in writing that Plaintiffs no longer support entry of the Consent Decree.

## XXVI.   SIGNATORIES/SERVICE

105.    Each undersigned representative of Defendants, the State of California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB, UC, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, PHMSA, and EPA certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

106.    This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.  For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by emailed PDF) shall have the same effect as an original.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

## XXVII.  INTEGRATION

107.   This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII.     FINAL JUDGMENT

108.   Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109.   For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of _____, 20__.

_____
UNITED STATES DISTRICT JUDGE

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 317 of 836    Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 62 of 102   Page ID #:153
ID #:11043

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES OF AMERICA:

3/12/2020

Date

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
  Division U.S. Department of Justice

3/13/2020

Date

BRADLEY R. O'BRIEN
ANGELA MO
Environmental Enforcement Section
Environment and Natural Resources

Division

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 58 -

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 318 of 836   Page
Case 2:20-cv-02425   Document 6-1   Filed 03/15/20   Page 63 of 102   Page ID #:150
ID #:11044

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

_3 March 2020_
Date

_____
PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety
    Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 59 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20

Date

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance
Assurance

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 60 -

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 320 of 836   Page
Case 2:20-cv-02415-VDO   Document 6-1   Filed 03/16/20   Page 65 of 102   Page ID #:158
ID #:11046

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2/26/2020

Date

AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance
    Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 61 -

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 321 of 836   Page
ID #:11047
Case 2:20-cv-02415-VW   Document 8-1   Filed 03/16/20   Page 66 of 101   Page ID #:155

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

3/4/2020
Date

THOMAS M. CULLEN, JR.
Administrator
Office of Spill Prevention and Response

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 62 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

3/2/20
Date

LISA ANN L. MANGAT
Director
California Department of Parks
and Recreation

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 323 of 836   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/16/20   Page 68 of 102   Page ID #:161
ID #:11049

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

2/28/2020
Date

_____
JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 64 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020
_____
Date

_____
THOMAS W. PORTER
Director
California Department of Forestry and
Fire Protection

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 65 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION:

March 2, 2020
Date

JOHN ROBERTSON
Executive Officer
Central Coast Regional Water
    Quality Control Board

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

3/3/20
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 -

Case 2:26-cv-05242-SVW-SSC Document 23/15 Filed 05/14/26 Page 327 of 836 Page
Case 2:20-cv-02425-SVW Document 6-1 Filed 03/15/20 Page 72 of 102 Page ID #:165
ID #:11053

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

_____          _____
Date                         BARTON LOUNSBURY
                             Senior Counsel
                             Office of the General Counsel

*3 March 2020*              _____
Date                        PEGGY FIEDLER
                            Executive Director
                            UC Natural Reserve System

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67A -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS ALL AMERICAN PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 68 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 69 -

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 330 of 836   Page
ID #:11056
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 75 of 102   Page ID #:168

# APPENDIX A

## *(Set of maps that generally depict Lines 901, 903, and 2000)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*



**Appendix A – Line 901**

Scale: 1:100,000

Sheet No: 1/1

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.



Appendix A – Line 903



Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community

*Appendix A – Line 2000*

Scale: 1:966,574

Sheet No:   1/1

Owner:

**PLAINS**
ALL AMERICAN
PIPELINE, L.P.

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 334 of 836    Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 79 of 102   Page ID #:172
ID #:11060

# APPENDIX B

## *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-74-

# **APPENDIX B**

## **ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS**

1. **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

   A. Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

   B. Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

   C. Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

   D. Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

   E. To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2. **Replacement, Restart, or Abandonment of Lines 901 and 903:**

   A. Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

1. On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

   a. Test for potential AC/DC interference.  Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

   b. Conduct a close interval survey (CIS) and AC/DC interference survey.

   c. Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B. As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C. As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3. **Third-Party Analysis of Line 2000 ILI Data**

A. Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B. The consultant shall:

   1. Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

   2. Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

   3. Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

   4. Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

5. Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6. Comply with additional requirements specified in the scope of work.

C. The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1. The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2. The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3. Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4. Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4. **Integrity Management**

A. For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1. Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a. In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b.    Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c.    When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d.    Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e.    Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f.    Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g.    For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h.    Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i.    Integrate and analyze available data in its P&M process, including:

        i.    Assessment data from ILI tool runs;

        ii.    Dig and repair data;

4

iii.     Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv.     Operational data, such as pressure and flow data;

v.     Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi.     Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii.     Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2.     ILI Measures

a.     <u>Initial ILI Runs</u>. Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU). Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i.     All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

5

       ii.       In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run.  If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

     b.      <u>Subsequent ILI Runs</u>.  After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year.  Alternatively, Plains may run a UT tool each year.  If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

     c.      <u>All ILI Runs</u>.  Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5.    **<u>Valves</u>**

A.    Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

    1.    Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

    2.    Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B.    Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C.    Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 341 of 836   Page
ID #:11067
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 36 of 102   Page ID #:179

6.     **Risk Analysis**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

        1.    Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

            a.    The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

            b.    Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis.  The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

            c.    The risk analysis shall be due within one year from entry of the CD.

7.     **Leak Detection**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

    B.    Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8.     **Non-waiver**

    A.    Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

**ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES**

9.     **Integrity Management**

    A.    New Procedures for Interim Reviews and Assessments

7

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 342 of 836   Page
ID #:11068
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 87 of 102   Page ID #:180

1.     Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment.  If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment.  Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2.     Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review.  Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3.     Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD.  If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B.     Documentation for P&M Recommendations

1.     Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

     a.     What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

     b.     The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

8

     c.    The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

2. In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

3. In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C. Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented. Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

## 10. **Valves and O&M**

A. Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B. Within two years of entry of the CD, Plains shall develop and implement procedures to:

1. If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

2. Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

3. Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

4. Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C. Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 344 of 836   Page
Case 2:20-cv-02415-WPD-SSC   Document 1-1   Filed 03/15/20   Page 39 of 102   Page ID #:182
ID #:11070

D.      For all field personnel who perform maintenance on facilities, equipment, or
        devices, Plains shall provide training:

        1.      Within two years of entry of the CD, that addresses the importance of
                complying with Plains' policy requiring notification of Control Room
                personnel before beginning maintenance activities on any such facility,
                equipment, or device that could change the status of any pump, valve,
                CPM device, SCADA device, pressure or flow metering or rate that is
                monitored by the Control Room.  Plains shall include in the training a
                requirement that employees shall notify the Control Room before entering
                a facility to perform maintenance, or, if not possible, immediately after
                entering.

E.      Plains shall improve existing valve maintenance recordkeeping to include
        confirmation whether the valve has been actually operated during maintenance.

11.   **Leak Detection**

A.      Within 90 days after entry of the CD, Plains shall create and maintain a list of its
        regulated mainline pipelines, excluding gathering lines and Delivery Lines, to
        indicate which of the following three rupture-detection methods, if any, are used
        on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure
        alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

        1.      Within one year after entry of the CD, for any regulated mainline pipeline
                identified in the list created pursuant to this paragraph that does not utilize
                at least one of the three rupture detection methods, Plains shall implement
                at least one.

B.      For the term of the CD, Plains shall conduct annual training for controllers on
        attributes and benefits of various methods of leak detection, including Analog
        High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of
        Change.

C.      Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze
        and evaluate the use of accumulated deviation rolling time periods longer than 24
        hours.

        1.      Plains shall document its analysis and provide it to PHMSA for comment,
                but Plains shall maintain discretion over what actions to take, if any, and
                how to implement the results of its analysis.

D.      Within six months of entry of the CD, Plains shall have in place a written
        procedure for Selection of Leak Detection Method for its Regulated Pipelines.

        1.      Plains shall provide the Selection of Leak Detection Method procedure to
                PHMSA for comment, but Plains shall maintain discretion over and be

10

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E. Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection. The results of the meetings will be documented and shared with appropriate personnel. The recommendations will be evaluated and documented.

F. Instrumentation and Display

    1. To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

        a. Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

        b. Track these conditions through to resolution, including instrumentation relocation when necessary.

12. **Control Room Management**

A. For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

    1. Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

    2. Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

    3. Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

    4. Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

11

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 346 of 836   Page
Case 2:20-cv-02415-W   Document 6-1   Filed 03/15/20   Page 91 of 102   Page ID #:184
ID #:11072

B.     For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C.     Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13.     **Emergency Response and Oil Spill Response Plans**

A.     California-Specific Provisions:

1.     Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05. Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B.     Company-Wide Provisions

1.     Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

2.     Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response. Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

3.     Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

12

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 347 of 836   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 92 of 102   Page ID #:185
ID #:11073

Plains.  Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills.  Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4. Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures.  Plains shall provide this training annually thereafter.  Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5. Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment).  Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill.  Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6. For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14. **Safety Management System (SMS)**

A. Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1. Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173.  Plains shall direct the third party to transmit a copy of the final report to PHMSA.  Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 348 of 836   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 93 of 102   Page ID #:186
ID #:11074

B.         Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15.     **Drug and Alcohol Program**

A.         Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

Case 2:26-cv-05242-SVW-SSC   Document 23   Filed 05/14/26   Page 349 of 836   Page
Case 2:20-cv-02425   Document 6-1   Filed 03/15/20   Page 94 of 102   Page ID #:187
ID #:11075

# APPENDIX C

## *(Intentionally left blank)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 95 of 102   Page ID #:188

# APPENDIX D

# *(Remaining Corrective Actions from the PHMSA CAO)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-90-

Case 2:26-cv-05242-SVW-SSC  Document 23  Filed 05/14/26  Page 351 of 836  Page
Case 2:20-cv-02413  Document 6-1  Filed 03/15/20  Page 96 of 102  Page ID #:189
ID #:11077

# APPENDIX D

1.  All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

   a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

   b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. The Restart Plan shall include:

   1) Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

   2) Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

   3) Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

   4) A specific day-light restart that includes advance communications with local emergency response officials;

   5) Master Control Room enhancements, including:

   a) Implementation of advanced leak-detection

Case 2:26-cv-05242-SVW-SSC Document 23 Filed 05/14/26 Page 352 of 836 Page
Case 2:20-cv-02425-VB Document 6-1 Filed 03/15/20 Page 97 of 102 Page ID #:11078
ID #:11078

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1. Revised alarm threshold adjustments;

2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

Case 2:20-cv-02425-VW-SSC   Document 6-1   Filed 03/15/20   Page 98 of 102   Page ID #:11079

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6) Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7) Installation of additional safety valves as a result of Plains' EFRD evaluation;

8) Installation of additional pressure sensors as a result of Plains' surge study;

9) Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10) **Corrosion Prevention.** Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

- 3 -

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

903 to the OSFM for review and approval.  Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree.  In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1)      Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2)      Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3)      Provisions for a daylight restart and advance communications with local emergency response officials.

g. **Line 903 Return to Service.**  After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h. **Removal of Pressure Restriction for Line 903.**  After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1)      The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)      The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction.  Requests for removal of the pressure restriction may be submitted by pipeline segment.

i. **Notifications.**  Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j. **Reporting Requirements for Lines 901 and 903.**  If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)      The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)      Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

Case 2:20-cv-02415V  Document 6-1  Filed 03/13/20  Page 102 of 102  Page ID #:1939

3)    The Appendix D Documentation Report shall include but not be limited to:

    A.   Table of Contents;

    B.   [*intentionally left blank.*]

    C.   [*intentionally left blank.*]

    D.   Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

    E.   [*intentionally left blank.*]

    F.   [*intentionally left blank.*]

    G.   Lessons learned while fulfilling the requirements of this Appendix D.

# EXHIBIT O

# Niz, Kim

| **From:** | Briggs, Errin <ebriggs@countyofsb.org> |
|---|---|
| **Sent:** | Friday, March 21, 2025 10:52 AM |
| **To:** | Thompson, James; Ybarra, Jacquelynn; Plowman, Lisa |
| **Cc:** | Rusch, Steve; Yearwood, Lance; Surmeier, Patrice; Alcock, Lee; Lauren.Paull@lw.com |
| **Subject:** | RE: Sable – Completed Anomaly Repairs |
| **Attachments:** | Feb 12, 2025, Letter from Errin Briggs to Steve Rusch.pdf |

**CAUTION:** External Sender

Hi James,

Thank you for the informational package regarding anomaly repair activities completed on Line 324 in 2024.

We have reviewed the information you provided and have determined that this work fits withing the conclusions/directives of our February 12, 2025 letter to Steve Rusch (attached). No permits will be required.

Thank you for the continued cooperation on these matters, we would appreciate if you could continue to provide similar information in advance for future projects of this type.

Sincerely,



**Errin Briggs**

**Deputy Director, Energy Minerals & Compliance**

Planning & Development
County of Santa Barbara
123 E. Anapamu St.
Santa Barbara, CA 93101
805-568-2047
ebriggs@countyofsb.org
https://www.countyofsb.org/160/Planning-Development

---

**From:** Thompson, James <JSThompson@scsengineers.com>
**Sent:** Thursday, March 6, 2025 11:34 AM
**To:** Briggs, Errin <ebriggs@countyofsb.org>; Ybarra, Jacquelynn <jybarra@countyofsb.org>
**Cc:** Rusch, Steve <srusch@sableoffshore.com>; Yearwood, Lance <lyearwood@sableoffshore.com>; Surmeier, Patrice <psurmeier@sableoffshore.com>; Alcock, Lee <lalcock@sableoffshore.com>; Lauren.Paull@lw.com
**Subject:** Sable – Completed Anomaly Repairs

**Caution: This email originated from a source outside of the County of Santa Barbara. Do not click links or open attachments unless you verify the sender and know the content is safe.**

Good Morning Errin,

On behalf of Sable Offshore Corp. – Pacific Pipeline Company (Sable), SCS Engineers is providing information regarding 48 anomaly repairs previously conducted on portions of the existing pipeline CA-324 located on APNs 081-140-019, 081-140-025, 081-150-006, 081-150-028, 081-150-032, 081-150-033,

1

081-150-041, 081-150-042, 081-200-033, 081-210-047, 081-210-050, 081-210-051, 081-230-021, and in one County right-of-way not associated with an APN.

Please use the links below to download the cover letter and associated attachments. Let me know if you have any questions or comments.



**1 - Sable Completed Anomaly Cover Letter.pdf (113k)**

**Completed Anomaly - Attachments.zip (17M)**

File links in this email will be active until April 5, 2025

Thanks,
James

**James Thompson**
Project Manager

SCS ENGINEERS

316-250-1224 (cell)
661-606-6001 (office)
jsthompson@scsengineers.com

# EXHIBIT P



**Planning and Development**
Lisa Plowman, Director
Jeff Wilson, Assistant Director
Elise Dale, Assistant Director

April 9, 2025

Mr. Cassidy Teufel
Deputy Director
California Coastal Commission
455 Market Street, Suite 300
San Francisco, CA 94105
*Sent via email:* Cassidy.Teufel@Coastal.ca.gov

SUBJECT:     Sable Offshore Corp. – Authorization for Anomaly Repair Work

Dear Mr. Teufel,

The purpose of this letter is to respond to your April 7, 2025 letter to me which details your disagreement with our determinations regarding the ongoing anomaly repair work along Sable's Lines 324 and 325a located in the coastal zone.

In your April 7th letter you assert that the County has "failed to provide the requested information regarding the basis for County staff's determination." Please note that we have provided all requested documents in response to Coastal Commission inquiries.

- Initially, on September 9, 2024 and September 24, 2024, Celeron Pipeline Co. settlement-related documents were provided upon request to Cassidy Teufel, Wesley Horn and Jonathan Bishop.
- Following, in response to the Commission's request for the permit documents associated with the original construction of the pipelines, on December 10, 2024 a comprehensive set of printed permit history documents was provided to Wesley Horn in person.
- Then, a complete set of anomaly repair description documents were provided to Commission staff on February 24, 2025 in our letter to Cassidy Teufel.
- And finally, the most recent set of anomaly repair description documents were provided via email to Commission staff on March 24, 2025.

Commission staff has all of the information that the County considered prior to concluding that the pipeline anomaly repair work identified in the February 12, 2025 letter is authorized by the existing permits and was analyzed in the prior environmental review.

Sable Offshore Corp – Authorization for Anomaly Repair Work
Page 2

We understand the Coastal Commission has reached a different conclusion considering the provided documents, but the County continues to assert the dispute resolution process in Section 13569 is not applicable here because it only applies when: 1) the local government determines a project is exempt or categorically excluded; or 2) a decision on whether a proposal would be appealable to the Coastal Commission. The County did not allow activity without a permit, nor did the County take an action on a permit or development application that may be appealable to the Coastal Commission.

Best,

Lisa Plowman
Director, Planning & Development

Enclosure:    Letter from County to Cassidy Teufel dated February 12, 2025
              Letter from County to Cassidy Teufel dated February 24, 2025

# EXHIBIT Q



April 1, 2021

Andy Chau
Supervising Pipeline Safety Engineer
**State of California, Office of the State Fire Marshal**
Pipeline Safety Division
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

*Submitted via Overnight Mail and Electronically*

**Subject:  State of California Assembly Bill 864: Coastal Best Available Technology Regulation
Section 2113 Implementation Plan to Retrofit with Best Available Technology
OSFM Line ID No. 0015 (Plains Pipeline, L.P. Line 901 Las Flores to Gaviota 24")**

Dear Mr. Chau,

California Code of Regulations (CCR), Title 19, Article 7, Section 2113 requires operators of existing pipelines (located near an environmentally and ecologically sensitive area in the coastal zone) to submit a risk analysis and a plan to retrofit existing pipelines with Best Available Technology (BAT).

In compliance with Section 2113, Plains Pipeline, L.P. ("Plains") is submitting for your review, a risk analysis for the subject pipeline.  The risk analysis identifies BAT intended to limit and reduce the quantity of release in the event of a spill and describes the timetable for implementation and completion of the identified BAT plan.

If you have and questions, comments, concerns, or require additional information, please contact me at ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Sincerely,



James Buchanan
HSE Senior Regulatory Specialist

Plains Pipeline, L.P. ■ 333 Clay Street, Suite 1600, Houston, Texas 77002 ■ (713) 646-4100

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 2 of 16

Enclosures:
- Registered Agent for Service Documentation
- Outer Continental Shelf Crude Oil Safety Data Sheet
- Flow Diagrams
- Vicinity Map
- BAT Location Map
- Timetable for Implementation Gantt Chart
- Confidentiality Justification and Redacted Copy


Cc:    Cory Thornton, Plains Pipeline, L.P.
       Erol Alavi, Plains Pipeline, L.P.
       Jon Van Reet, Plains Pipeline, L.P.
       Megan Prout, Plains Pipeline, L.P.
       Ngiabi Gicuhi, Plains Pipeline, L.P.
       Wm. Dean Gore, Jr., Plains Pipeline, L.P.

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 3 of 16

## Section 2113 Implementation Plan to Retrofit with Best Available Technology

## OSFM Line ID No. 0015 (Plains Pipeline, L.P. Line 901 Las Flores to Gaviota 24")

**1. <u>Introductory Material, Certification Statement, and Confidentiality Request</u>**

a. <u>Operator Information</u>

Plains Pipeline, L.P. (Operator)          OSFM ID No. 0015
333 Clay Street, Suite 1600              Line 901 Las Flores to Gaviota 24"
Houston, Texas 77002

<u>List of contacts and contact information for persons within the operator's company, and any alternates, responsible for overseeing and conducting the risk analysis</u>



<u>Agent for Service of Process designated to receive legal documents on behalf of the operator</u>

Corporation Service Company Which Will Do Business in California as CSC-Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 4 of 16

b.  Certification Statement by an executive within the operator's management structure authorized to fully implement the risk analysis

"*I certify, to the best of my knowledge and belief, under penalty of perjury under the laws of the State of California, that the information contained in this risk analysis is true and correct and that the plan is both effective and feasible.*"

| Signature / Date | Printed Name, Title |
|---|---|
| | Patrick D. Hodgins<br>Vice President, Health, Safety & Environmental |

Certification Statement by a person within the operator's management structure with the requisite training, knowledge, and experience to review a risk analysis for accuracy, effectiveness, and feasibility

"*I certify, to the best of my knowledge and belief, under penalty of perjury under the laws of the State of California, that the information contained in this risk analysis is true and correct and that the plan is both effective and feasible.*"

| Signature / Date | Printed Name, Title |
|---|---|
| | Wm. Dean Gore, Jr., PE<br>Director, Special Projects |

c.  Confidentiality Request

The risk analysis, implementation plan, and enclosures contain confidential information exempt from disclosure under the California Public Records Act and other laws.  In accordance with 19 CCR 2119, Plains has attached 1) a document identifying the confidential information and providing legal authority for the exemptions, and 2) a complete copy of this submittal depicting the confidential information as redacted.

2. **Pipeline Description**

a.  Relevant pipeline design, construction, and operation information for OSFM Line ID No. 0015 (Line 901 Las Flores to Gaviota 24")

| | |
|---|---|
| Year of Construction: | 1990 |
| Pipeline Diameter: | 24 inches |

Plains2021C-02_0000052

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 5 of 16

| | |
|---|---|
| Length of Pipeline: | 10.8 miles from Las Flores Pump Station to Gaviota Pump Station. Flow diagrams for the Las Flores and Gaviota Pump Stations are enclosed for reference. |
| Pipe Grade: | API 5L, Grade X-60, X-65 |
| Wall Thickness: | 0.344, 0.500 inches |
| Maximum Operating Pressure (MOP): | 1,025 psig |
| Normal Operating Pressure: | 650 psig |
| Pipe Seam: | High frequency electric resistance welded (HF-ERW) long seam manufactured in 1986 by Nippon Steel in Japan. |
| Valves: | 4 valves (3 MOV, 1 check) |
| Elevations: | Las Flores: 193 feet ASL |
| | Gaviota: 201 feet ASL |
| | Low point: 28 feet ASL |
| | High point: 764 feet ASL |
| Coating: | Coal Tar Urethane |
| Insulation: | 1.5 inch thick layer of rigid urethane foam insulation and an outer polyethylene tape. |
| Operating Status: | Line was initially purged on 06/18/2015. Line was cleaned, purged, and filled with nitrogen in the summer of 2017. |
| General Condition of the Pipeline: | Last ILI – DEF/HRMFL 05/06/2015. ███████████████████ ███████████████████ ███████████████████ ███████████████████ ███████████. One external corrosion release in 2015. |
| Oil Capacity of the Pipeline: | 30,275 BBLS |

Plains2021C-02_0000053

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 6 of 16

|  |  |
|---|---|
| Product: | Crude Oil – OCS (Outer Continental Shelf); See enclosed SDS for characteristics. |
| Normal Operating Temperature: | 135 degrees Fahrenheit. |

b.  Vicinity Map

The Vicinity Map is provided as a dynamic PDF electronic document.  Layers can be turned "on" or "off" and include the following features: distance from the coastal zone, vehicular or rail crossings along the pipeline, nearby residential, commercial, or other populated areas, physical geographic features such as soil and terrain, drainage systems such as small streams and other smaller waterways, potential natural forces inherent in the area, natural and manmade barriers, and potential physical pathways between the pipeline and environmentally and ecologically sensitive areas (EESAs).

c.  Seasonal Hydrographic and Climatic Conditions

The risk analysis for Line 901 Las Flores to Gaviota 24" was completed with the inclusion of hydrographic and meteorological conditions specific to the pipeline location.  Spill modelling was conducted utilizing United States Geologic Survey (USGS) digital elevation models (DEM) topographic data and water velocity factors (during potential periodic flooding events) to simulate worst-case release scenarios.  As illustrated in the following figure, the relatively short 10.8 mile length of Line 901 lies within a coastal terrace with relatively consistent topographic and climate conditions.  The course of the pipeline is bisected by gradually undulating coastal hills and predominantly intermittent drainages which constitute the southern face of the Santa Ynez mountain range.  Average annual rainfall rates of 17.5 to 19.4 inches throughout this coastal terrace contribute to two (2) water courses, Refugio Creek and Arroyo Hondo Creek, which are capable of persistent flow throughout a majority of the year.

Plains2021C-02_0000054

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 7 of 16

**Figure 2.C.1: Regional Slope & Weather Data Map**



d.  Baseline Condition and Spill Analysis

19 CCR Section 2111(d)(4) requires the operator to conduct a spill analysis using the baseline condition of the pipeline segment.  The purpose of the spill analysis is to determine whether a release anywhere along the length of a pipeline segment could impact EESA in the Coastal Zone.  First the baseline condition of the pipeline segment must be identified with respect to leak detection system (LDS) technology, any automated shut-down technology present, and the number and location of any isolation valves and instrumentation needed to support the LDS.  Then the worst case release volume, based on the baseline condition of the pipeline segment, must be used to model the trajectory and physical extent of that release and its relationship to EESA in the Coastal Zone.

Since this entire pipeline segment lies within the boundaries of the Coastal Zone, Plains made the conservative assumption that any release from this pipeline segment will impact an EESA in the Coastal Zone.  Section 2111(d)(4) states that the spill analysis is intended to be used as the baseline for which best available technologies may be used to reduce the quantity of the release in the event of a release.  Thus, the focus of the Risk Analysis for the pipeline segment would be the evaluation of BAT additions to this

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 8 of 16

pipeline segment that would serve to reduce the quantity of release in the event of a release.

The following sections present the BAT additions proposed by Plains to reduce the quantity of release from this pipeline segment, and a Risk Analysis that compares the estimated worst case discharge for the current baseline condition of the pipeline to the BAT or retrofit condition of the pipeline with all of the proposed BAT elements installed.

3. **Proposed Best Available Technology (BAT)**

   a. Introduction to and Definition of Proposed BAT

   Plains has defined BAT for this pipeline segment as a combination of several elements working together.  These elements include:



Mr. Chau
Implementation Plan to Retrofit with BAT
Page 9 of 16



Plains2021C-02_0000057

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 10 of 16



Mr. Chau
Implementation Plan to Retrofit with BAT
Page 11 of 16

The proposed locations for each of the new valves proposed for this pipeline segment are listed in the following table and illustrated on the enclosed BAT Location Map.

**Table 3.A.1: Proposed BAT Valve Locations**

| Valve # | Type | Function | Longitude | Latitude |
|---------|------|----------|-----------|----------|
|  | | | | |

Installation of these additional control valves will shorten the segment lengths between flow control and isolation points along the pipeline segment.  This will serve to limit the volume of potential drain-down resulting from a release and thus limit the worst case release volume for this pipeline segment.

## 4. **Summary of Risk Analysis**

a. Introduction and Risk Analysis Summary

As discussed in the previous section, Plains defines BAT for this pipeline segment to be



Plains is proposing to retrofit this pipeline segment with these BAT elements to bring it into conformance with Plain's definition of BAT for this pipeline segment.

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 12 of 16

The Risk Analysis presented below compares the baseline condition of this pipeline segment with the retrofit condition of the pipeline segment after installation of all of the proposed BAT elements.  The following table summarizes the results of the Risk Analysis for these two conditions.

**Table 4.A.1: Risk Analysis Summary Table**

|  | Baseline Condition Existing L901 Las Flores to Gaviota | Retrofit with BAT Proposed L901 Las Flores to Gaviota | **Reduction** in Time/Volume Resulting from BAT Retrofit |
|---|---|---|---|
| Maximum leak detection time, hours | ███ | ███ | ███ |
| Maximum shut-down response time, hours | ███ | ███ | ███ |
| Maximum flow rate, barrels/hour | 1,450 | 1,450 | 0 |
| Drain down volume, barrels | 2,776 | 1,726 | 1,050 |
| Reasonable worst-case discharge volume, barrels | 3,622 | 1,871 | 1,750 |

b.  Risk Analysis Methodology and Findings

The following describes how each of the risk analysis metrics included in the Risk Analysis Summary Table were determined:

- *Maximum Leak Detection Time*

Maximum Leak Detection Time is defined as the time from when the pipeline release begins to when it has been detected.  Detected in this case means when the LDS employed on that pipeline segment identifies a release and notifies the operator through an alarm.

The LDS employed on this pipeline segment when it last operated was a volume balance (VB) CPM system configured to balance it with the portion of Line 903 from Plains' Gaviota Station to Plains' Pentland Station.  While VB CPM is a tried and true technology that meets pipeline safety regulations, ███████████

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 13 of 16



Plains2021C-02_0000061

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 14 of 16

- *Maximum Flow Rate*

  Maximum flow rate was determined from historical flow data and the average maximum flow rate in that pipeline segment.  This maximum flowrate was used for both Risk Analysis conditions (baseline and BAT/retrofit).

- *Worst Case Drain-Down Volume and Worst Case Discharge Volume*

  Worst Case Volume is a quantity that can be theoretically calculated at any point along a pipeline based on several parameters.  These parameters include pipe diameter and wall thickness, product flow rate and valve closure response times (including both leak detection and shut-down response times) for a worst-case volume release, pipeline elevation data, and the existence and location of valves that can act to isolate individual sections of pipe.

  The following table provides a listing of the existing valves on this pipeline segment and the valves proposed as one of the BAT elements.  The table also provides the location of each valve based on the distance from the pipeline segment origination point at Plains' Las Flores Station, the location of each valve by its latitude and longitude, the valve type, and whether it is existing or proposed.  The location and number of valves was determined through an Emergency Flow Restriction Device assessment focused on minimizing the volume of a potential release and the potential impact to the Coastal Zone.

**Table 4.B.1: Existing and Proposed Valve Locations**

| Valve # | Current Status | Type | Function | Measure Location | Longitude | Latitude |
|---------|----------------|------|----------|------------------|-----------|----------|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

The worst-case discharge volume can be calculated for any point along a pipeline segment and consists of the sum of two calculations: the volume of the initial loss occurring from the moment the release begins to the moment the isolation valves have closed, and the volume of drain down at a given point on the pipeline.  The calculation is as follows:

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 15 of 16

- DD = Drain Down Volume

- MLDT = Maximum Leak Detection Time

- MSDRT = Maximum Shut-Down Response Time

- MFR = Maximum Flow Rate

- WCD = Worst Case Discharge (bbls)

- WCD = [(MLDT + MSDRT) x MFR] + DD

For the purposes of the Risk Assessment for this pipeline segment, a guillotine failure severing the pipeline completely was assumed.  The Risk Intelligence Platform (RIPL) model was used to calculate the Worst Case Discharge Volume and Drain-Down Volume every 30 meters along each portion of the pipeline segment defined by isolation valves.  The location along each isolation portion of the pipeline segment that yielded the largest worst case volume was then noted.

The following table lists each of the isolation portions for the BAT (or retrofit) condition of the pipeline segment, the location of the beginning and end of each isolation portion measured in feet downstream of the pipeline segment origination point at Plains' Las Flores Station, and the worst case discharge volume and drain-down volume for each isolation portion.

**Table 4.B.2: Isolation Segments and Worst-Case Volumes**

| Valve # From - To | Begin Measure Feet | End Measure Feet | Drain down Volume BBLS | Worst Case Volume BBLS |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

c.  Risk Analysis Conclusions

As the Risk Analysis Summary table clearly illustrates, installation of the BAT components proposed for this pipeline segment reduces the worst case discharge volume from the baseline case.  Installation of the proposed BAT elements on this

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 16 of 16

pipeline segment reduced the baseline worst case volume of 3,622.20 bbls to 1,871.40 bbls, a 48% reduction.

This analysis assumes that Plains can secure permits and access to install the proposed valves and associated power access, instrumentation, and communication devices as well as the additional flow measurement equipment at Plains' Gaviota Station.

5. **Timetable for Implementation**

a. <u>Describe the timetable for implementation and completion of the identified BAT plan. This plan shall include key milestones and, at a minimum, consider the following: purchase of equipment, acquisition of permits, and securing qualified individuals for construction</u>

Please reference the attached Gantt chart, which provides the estimated schedule and anticipated tasks involved to implement and complete the identified BAT plan. Key milestones include receiving Office of the State Fire Marshal concurrence and acceptance of the risk analysis and supplemental implementation plan, obtaining regulatory permits and surface sites for BAT installation, procurement of BAT-related equipment, and the initiation and completion of construction to install the identified BAT. Delays in securing permits and access for BAT installation, among other factors, may result in delays to the BAT implementation schedule. Should Plains experience significant delays it will notify the Office of the State Fire Marshall. 2113(c)(2)(B).

Plains2021C-02_0000064

# Enclosures

Plains2021C-02_0000065

# Registered Agent for Service Documentation

Plains2021C-02_0000066



**Secretary of State**

**1505**

**Registered Corporate Agent for Service of Process Certificate**

(Registered Corporations ONLY)



**FILED**

Secretary of State
State of California

A0852950

Filing Number

02/10/2021

Filing Date

**IMPORTANT — Read Instructions before completing this form.**

**Filing Fee –  $30.00**

**Copy Fees –** First page $1.00; each attachment page $0.50; Certification Fee - $5.00 plus copy fees

**Who Can File?**  Any **active** corporation that is registered with the California Secretary of State can file this Form 1505 to become authorized to be a corporate agent for service of process for other business entities that are registered with the Secretary of State. To check the status of your corporation, and to ensure you are entering the **exact** name of the corporation and the **correct** 7-digit Secretary of State file number, go to BusinessSearch.sos.ca.gov.

This Space For Office Use Only

**1.   Corporate Name**   (Enter the exact name of the corporation as it is recorded with the California Secretary of State.)

CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - LAWYERS INCORPORATING SERVICE

**2.   7-Digit Secretary of State Entity Number**

C1592199

**3.   Address for Service of Process**   (Enter the **complete** street address in California of the office where any entity that named your corporation as agent for service of process may be served with process.)
Do not enter a P.O. Box or "in care of" an individual or entity.

| Street Address  - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 2710 Gateway Oaks Drive, Suite 150N | Sacramento | CA | 95833 |

**4.   Authorized Employees**   (Enter the names of all persons employed by your corporation who are authorized to accept delivery of any copy of service of process, at the address entered in Item 3 above, on any entity who has designated your corporation a as its agent for service of process. **Must** enter at least 1 person. If there are more than 3, **see Instructions**.)

| | Middle Name | Last Name | Suffix |
|---|---|---|---|
| a. First Name of Authorized Employee  See attached list | | | |
| b. First Name of Authorized Employee | | | |
| c. First Name of Authorized Employee | | | |

**5.   Statement of Consent** (Do not alter the Statement of Consent.)

This corporation consents that delivery of a copy of service of process to an authorized employee at the address designated in item 3 shall constitute delivery of any such copy to the corporation, as the agent for service of process.

**6.   Read and Sign Below**   (See Instructions. Office or title not required.  Do not use a computer generated signature.)

I am a corporate officer and am authorized to sign on behalf of the corporation.

_Jackie Smetana_

Signature

Jackie Smetana, Executive Vice President

Type or Print Name

1505 (REV 12/2020)

Plains2021C-02_0000067
2020 California Secretary of State
bizfile.sos.ca.gov

A0852950

Kaitlyn Mannix

Becky DeGeorge

Koy Saechao

Lai Saevang

Nicole Stauss

Kevin Bautista

Trudy Desbiens

Susie Vang

Catherine Webb

Roxie Taylor

Fanny Xiong

Melissa Vang

Dona Niemeyer

Melissa DeKoven

Carolyn Valle

Kaci Ransom

Kan Pen

Kelli Shortte

Annette Kuhlman

Arrielle Garcia

Brejet Stephens

Crystal Chapman

Janette Mcintyre

Jerome Suarez

Jonel Yelverton-

Reis

Kayla Vue

Laurie Tolman

Mindy Fay

Rafael Munoz

Samantha Alterman

Samantha Wiltz

Sherie Hinton

Parid Kurbini

Vivien Mitchell

Plains2021C-02_0000068



# State of California
## Secretary of State

## FOREIGN LIMITED PARTNERSHIP
## AMENDMENT TO APPLICATION FOR REGISTRATION

**A $30.00 filing fee must accompany this form.**
**IMPORTANT-- Read instructions before completing this form.**

**FILED**
In the office of the Secretary of State
of the State of California

DEC 2 9 2006

↖ This Space For Filing Use Only

| 1 | SECRETARY OF STATE FILE NUMBER |
|---|---|
| | 199832700008 |

2. NAME UNDER WHICH THIS FOREIGN LIMITED PARTNERSHIP IS CONDUCTING BUSINESS IN CALIFORNIA

PLAINS PIPELINE, L.P.

3. COMPLETE ONLY THE BOXES WHERE INFORMATION IS BEING CHANGED. ADDITIONAL PAGES MAY BE ATTACHED, IF NECESSARY. CONSULT THE INSTRUCTIONS BEFORE COMPLETING THIS FORM.

A. THE NAME UNDER WHICH THIS FOREIGN LIMITED PARTNERSHIP CONDUCTS BUSINESS IN CALIFORNIA (END NAME WITH THE WORDS "LIMITED PARTNERSHIP" OR THE ABBREVIATION "L.P.")

B. THE NAME OF THE FOREIGN LIMITED PARTNERSHIP HAS BEEN CHANGED AS FOLLOWS AND HAS BEEN RECORDED IN THE HOME STATE OR COUNTRY

| C. THE ADDRESS OF THE PRINCIPAL EXECUTIVE OFFICE | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | | | |

| D. THE ADDRESS OF THE PRINCIPAL OFFICE IN CALIFORNIA | CITY | STATE **CA** | ZIP CODE |
|---|---|---|---|
| | | | |

E. THE NAME OF THE AGENT FOR SERVICE OF PROCESS

Corporation Service Company which will do business in California as CSC-Lawyers Incorporating Service

F. ADDRESS OF THE AGENT FOR SERVICE OF PROCESS. **COMPLETE ONLY IF AN INDIVIDUAL.**

ADDRESS

| CITY | STATE **CA** - | ZIP CODE |
|---|---|---|

G. THE ADDRESS OF GENERAL PARTNER(S) (ATTACH ADDITIONAL PAGES IF NECESSARY)

NAME

ADDRESS

| CITY | STATE | ZIP CODE |
|---|---|---|

H. NAME CHANGE OF GENERAL PARTNER(S) (ATTACH ADDITIONAL PAGES IF NECESSARY)

FROM:                    TO:

I. WITHDRAWAL OF GENERAL PARTNER(S)

NAME

NAME

NAME

J. ADDED GENERAL PARTNER(S) (ATTACH ADDITIONAL PAGES IF NECESSARY)

NAME

ADDRESS

| CITY | STATE | ZIP CODE |
|---|---|---|

K. STATE OR COUNTRY OF FORMATION OF THE FOREIGN LIMITED PARTNERSHIP

L. DATE ON WHICH THE FOREIGN LIMITED PARTNERSHIP WAS FORMED

4. NUMBER OF PAGES ATTACHED (IF ANY)

5. THE FOREIGN LIMITED PARTNERSHIP NAMED ABOVE IS, AS OF THE DATE THIS AMENDMENT IS EXECUTED, AUTHORIZED TO EXERCISE ITS POWERS AND PRIVILEGES AS A LIMITED PARTNERSHIP IN ITS HOME STATE OR COUNTRY OF FORMATION.

6. I CERTIFY THAT THE STATEMENTS CONTAINED IN THIS DOCUMENT ARE TRUE AND CORRECT TO MY OWN KNOWLEDGE. I DECLARE THAT I AM THE PERSON WHO IS EXECUTING THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

| SIGNATURE OF AUTHORIZED PERSON | Tim Moore, VP on behalf of<br>TYPE OR PRINT NAME AND TITLE | 11/13/06<br>DATE |
|---|---|---|

SEC/STATE (REV. 03/2005)

Plains Marketing GP Inc. - General Partner

FORM LP-6 -- FILING FEE: $30.00
Approved by Secretary of State

Plains2021C-02_0000069

# Outer Continental Shelf Crude Oil Safety Data Sheet

Plains2021C-02_0000070

Obsolete Flags
Use per Exxon 9/20/95
BEL.
EMC
PNT.
LAB
TLJ.
BAO

## EXXON COMPANY, U.S.A.
### A DIVISION OF EXXON CORPORATION

**CRUDE OIL**

DATE ISSUED: 08/09/95
SUPERSEDES DATE: 09/22/93

## MATERIAL SAFETY DATA SHEET

EXXON COMPANY, U.S.A.    P. O. BOX 2180    HOUSTON, TEXAS 77252-2180

---

### A.  IDENTIFICATION AND EMERGENCY INFORMATION

**PRODUCT NAME**
Crude Oil

**CHEMICAL NAME**
Crude Oil

**CAS NUMBER**
8002-05-9

**PRODUCT APPEARANCE AND ODOR**
Dark Liquid
Strong hydrocarbon solvent odor

**MEDICAL EMERGENCY TELEPHONE NUMBER**
(713) 656-3424

---

### B.  COMPONENTS AND HAZARD INFORMATION

| COMPONENTS | CAS No. OF COMPONENTS | APPROXIMATE CONCENTRATION |
|---|---|---|
| Crude oil - a naturally occurring combination of hydrocarbons. It consists predominately of paraffins, cyclo-paraffins, cyclic aromatic hydrocarbons having carbon numbers greater than C1. May also contain small amounts of benzene, hydrocarbons, sulfur and oxygenated compounds. All components of this product are listed on the U. S. TSCA inventory. | 8002-05-9 | 100% |

See Section E for health and hazard information

See Section H for additional Environmental Information.

**HAZARDOUS MATERIALS IDENTIFICATION SYSTEM (HMIS)**

| Health | Flammability | Reactivity | BASIS |
|---|---|---|---|
| 1 | 3 | 0 | Recommended by Exxon |

**EXPOSURE LIMIT FOR TOTAL PRODUCT**
Not established for total product

The airborne benzene level shall not exceed 1 ppm for an 8-hour workday; 5 ppm STEL    OSHA Regulation 29 CFR 1910.1028

---

mddccr/snared/msds/crudeoil

Date Issued : 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000071

CRUDE OIL

## C.   PRIMARY ROUTES OF ENTRY AND EMERGENCY AND FIRST AID PROCEDURES

### EYE CONTACT
If hot product is splashed into eyes, flush with clear water and contact physician immediately. If splashed into eyes, flush with clear water for 15 minutes or until irritation subsides. If irritation persists, call a physician.

### SKIN CONTACT
Immediately contact a physician for treatment of thermal burns. In case of skin contact with product under other conditions, wash thoroughly with soap and water. Removal of product from skin may be aided by use of waterless hand cleaner. If product is injected into or under the skin, or into any part of the body, regardless of the appearance of the wound or its size, the individual should be evaluated immediately by a physician as a surgical emergency. Even though initial symptoms from high pressure injection may be minimal or absent, early surgical treatment within the first few hours may significantly reduce the ultimate extent of injury.

### INHALATION
If overcome by vapor, remove from exposure and call a physician immediately. If breathing is irregular or has stopped, start resuscitation; administer oxygen, if available.

### INGESTION
If ingested, DO NOT induce vomiting; call a physician immediately.

## D.   FIRE AND EXPLOSION HAZARD INFORMATION

### FLASH POINT
Less than 16°C (60°F) to greater than 93°C (200°F) PMCC

### AUTOIGNITION TEMPERATURE
Not Determined

### NATIONAL FIRE PROTECTION ASSOCIATION (NFPA) - HAZARD IDENTIFICATION

| Health | Flammability | Reactivity | BASIS |
|--------|--------------|------------|-------|
| 1 | 3 | 0 | NFPA |

### HANDLING PRECAUTIONS
Keep product away from heat sparks, pilot lights, static electricity, and open flame.

### FLAMMABLE OR EXPLOSIVE LIMITS (APPROXIMATE PERCENT BY VOLUME IN AIR)
Estimated Values: Lower Flammable Limit: 0.6%    Upper Flammable Limit: 15%

### HOT CRUDE FLASH WARNING
Studies have shown that relatively low flash point substances, such as low boiling hydrocarbons, may accumulate in the vapor space of crude tanks and bulk transport compartments. Such vapors may exhibit flammability characteristics of a significantly lower flash porduct than would be indicated by the flash test. As a precaution, keep ignition sources away from vents and openings, including prevention of accumulation of pyrophoric iron sulfide.

### EXTINGUISHING MEDIA AND FIRE FIGHTING PROCEDURES
Foam, water spray (fog), dry chemical, carbon dioxide and vaporizing liquid type extinguishing agents may all be suitable for extinguishing fires involving this type of product, depending on size or potential size of fire and circumstances related to the situation. Plan fire protection and response strategy through consultation with local fire protection authorities or appropriate specialists.

Date Issued : 8/9/95
Supersedes:  9/22/93

Plains2021C-02_0000072

CRUDE OIL

The following procedures for this type of product are based on the recommendations in the National Fire Protection Association's "Fire Protection Guide on Hazardous Materials", Tenth Edition (1991):

Use water spray, dry chemical, foam, or carbon dioxide. Water or foam may cause frothing. Use water to keep fire-exposed containers cool. Water spray may be used to flush spills away from exposures. Minimize breathing gases, vapor, fumes or decomposition products. Use supplied-air breathing equipment for enclosed or confined spaces or as otherwise needed.

NOTE: The inclusion of the phrase "water may be ineffective" is to indicate that although water can be used to cool and protect exposed material, water may not extinguish the fire unless used under favorable conditions by experienced fire fighters trained in fighting all types of flammable liquid fires.

## DECOMPOSITION PRODUCTS UNDER FIRE CONDITIONS

Fumes, smoke, carbon monoxide, aldehydes and other decomposition products. in the case of incomplete combustion.

## "EMPTY" CONTAINER WARNING

"Empty" containers retain residue (liquid and/or vapor) and can be dangerous. DO NOT PRESSURIZE, CUT, WELD, BRAZE, SOLDER, DRILL, GRIND OR EXPOSE SUCH CONTAINERS TO HEAT, FLAME, SPARKS, STATIC ELECTRICITY, OR OTHER SOURCES OF IGNITION; THEY MAY EXPLODE AND CAUSE INJURY OR DEATH. Do not attempt to clean since residue is difficult to remove. "Empty" drums should be completely drained. properly bunged and promptly returned to a drum reconditioner. All other containers should be disposed of in an environmentally safe manner and in accordance with governmental regulations. For work on tanks refer to Occupational Safety and Health Administration regulations, ANSI Z49.1, and other governmental and industrial references pertaining to cleaning, repairing, welding, or other contemplated operations.

## E.    HEALTH AND HAZARD INFORMATION

### VARIABILITY AMONG INDIVIDUALS

Health studies have shown that many petroleum hydrocarbons pose potential human  health risks which may vary from person to person. As a precaution, exposure to liquids. vapors, mists or fumes should be minimized.

### EFFECTS OF OVEREXPOSURE (SIGNS AND SYMPTOMS OF EXPOSURE)

High vapor concentrations are irritating to the eyes and the respiratory tract, may cause headaches and dizziness, are anesthetic, may cause unconsciousness. and may have other central nervous system effects including death. CAUTION: Product sometimes shipped hot; protect against burns.

### NATURE OF HAZARD AND TOXICITY INFORMATION

Skin contact with hot product may cause thermal burns. Prolonged or repeated contact with this product at warm or ambient temperatures tends to remove skin oils, possibly leading to irritation and dermatitis.

Eye contact with hot product may cause thermal burns. Contact with this product at warm or ambient termperatures may cause eye irritation but will not damage eye tissue.

This product may contain benzene, CAS #71-43-2. as a natural constituent. Benzene can cause anemia and other blood diseases, including leukemia (cancer of the blood-forming system), after prolonged or repeated exposures at high concentrations (e.g., 50-500 ppm). It has also caused fetal defects in tests on laboratory animals.

Date Issued : 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000073

Crude Oil has been shown to cause skin cancer in animal tests. In such lifetime skin painting tests the substance was applied to the shaved backs of mice at regular intervals without cleanup between applications. In view of these findings, there may be a potential risk of skin cancer in humans from prolonged and repeated skin contact with this product in the absence of good personal hygiene.

Limited studies on oils that are very active carcinogens have shown that washing the animal's skin with soap and water between applications greatly reduces tumor formation. These studies demonstrate the effectiveness of cleansing the skin after contact.

Potential risks to humans can be minimized by observing good work practices and personal hygiene procedures generally recommended for petroleum products. See Section I for recommended protection and precautions.

PRE-EXISTING MEDICAL CONDITIONS WHICH MAY BE AGGRAVATED BY EXPOSURE
Benzene - Individuals with liver disease may be more susceptible to toxic effects.
Petroleum Solvents/Petroleum Hydrocarbons - Skin contact may aggravate an existing dermatitis.

## F.    PHYSICAL DATA

THE FOLLOWING DATA ARE APPROXIMATE OR TYPICAL VALUES AND SHOULD NOT BE USED FOR PRECISE DESIGN PURPOSES

**BOILING POINT**
Gas to 550°C (1000°F +)

**VAPOR PRESSURE**
Not Available

**SPECIFIC GRAVITY ($H_2O = 1$)**
Greater than or equal to 0.7

**VAPOR DENSITY (AIR = 1)**
Not Available

**MOLECULAR WEIGHT**
Not Available

**PERCENT VOLATILE BY VOLUME**
Up to 50%

**pH**
Essentially Neutral

**EVAPORATION RATE @ ATM AND 25°C (77°F)**
(n-BUTYL ACETATE = 1)
Not Available

**POUR, CONGEALING OR MELTING POINT**
Not Available

**SOLUBILITY IN WATER**
Not Available

**VISCOSITY**
Not Available

## G.   REACTIVITY

This product is stable. Hazardous polymerization will not occur. Avoid contact with strong oxidants such as liquid chlorine, concentrated oxygen, sodium hypochlorite or calcium hypochlorite. Hot product in contact with water can cause foaming or sudden evolution of steam which could cause pressure build-up and possibly rupture a tank or vessel.

Date Issued: 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000074

## H.    ENVIRONMENTAL INFORMATION

"CLEAN WATER ACT/OIL POLLUTION ACT - This product may be classified as an oil under Section 311 of the Clean Water Act, and under the Oil Pollution Act. Discharges or spills into or leading to surface waters that cause a sheen must be reported to the National Response Center (1-800-424-8802)."

STEPS TO BE TAKEN IN CASE MATERIAL IS RELEASED OR SPILLED

Shut off and eliminate all ignition sources. Keep people away. Recover free liquid. Add sand, earth or other suitable absorbent to spill area. Minimize breathing vapors. Minimize skin contact. Ventilate confined spaces. Hot product may solidify when cooled. Keep product out of sewers and watercourses by diking or impounding. Advise authorities if product has entered or may enter sewers, watercourses, or extensive land areas.

Assure conformity with applicable governmental regulations. Continue to observe precautions for volatile, flammable vapors from absorbed material.

THE FOLLOWING INFORMATION MAY BE USEFUL IN COMPLYING WITH VARIOUS STATE AND FEDERAL LAWS AND REGULATIONS UNDER VARIOUS ENVIRONMENTAL STATUES:

REPORTABLE QUANTITY (RQ), EPA REGULATION 40 CFR 302 (CERCLA Section 102)

This product/stream is exempt from CERCLA Reporting Requirements. Refer to Clean Water Act/Oil Pollution Act.

THRESHOLD PLANNING QUANTITY (TPQ), EPA REGULATION 40 CFR 355 (SARA Sections 301-304)

No TPQ for product or any constituent greater than 1% or 0.1% (carcinogen).

TOXIC CHEMICAL RELEASE REPORTING, EPA REGULATION 40 CFR 372 (SARA Section 313)

This product may contain:

Approximately 0-1% benzene
Approximately 0-3% cumene
Approximately 0-2% cyclohexane
Approximately 0-5% ethylbenzene
Approximately 0-2% naphthalene
Approximately 10-20% toluene
Approximately 15-30% xylene

HAZARDOUS CHEMICAL REPORTING, EPA REGULATION 40 CFR 370 (SARA Sections 311-312)

EPA HAZARD CLASSIFICATION CODE:

| Acute Hazard | Chronic Hazard | Fire Hazard | Pressure Hazard | Reactive Hazard | Not Applicable |
|---|---|---|---|---|---|
| XXX | XXX | XXX | | | |

## I.    PROTECTION AND PRECAUTIONS

VENTILATION

Provide ventilation sufficient to prevent exceeding recommended exposure limit or build-up of explosive concentrations of vapor in air. Use explosion-proof equipment.

RESPIRATORY PROTECTION

Use supplied-air respiratory protection in confined or enclosed spaces, if needed.

PROTECTIVE GLOVES

Protect against hot liquid. Use chemical-resistant gloves to avoid skin contact.

Date Issued : 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000075

CRUDE OIL

**EYE PROTECTION**
Use splash goggles or face shield when eye contact may occur.

**OTHER PROTECTIVE EQUIPMENT**
Use chemical-resistant apron or other impervious clothing, if needed, to protect against hot liquid and to avoid skin contact.

**WORK PRACTICES / ENGINEERING CONTROLS**
Use explosion-proof equipment. No smoking or open lights.

**PERSONAL HYGIENE**
Minimize breathing vapor, mist or fumes. Avoid prolonged or repeated contact with skin. Remove contaminated clothing; launder or dry-clean before reuse. Remove contaminated shoes and thoroughly clean before reuse; discard if oil-soaked. Cleanse skin thoroughly after contact, before breaks and meals, and at end of work period. Product is readily removed from skin by waterless hand cleaners, followed by washing thoroughly with soap and water.

## J.   TRANSPORTATION AND OSHA RELATED LABEL INFORMATION

**TRANSPORTATION INCIDENT INFORMATION**
For further information relative to handling spills resulting from transportation incidents, refer to latest Department of Transportation Emergency Response Guidebook for Hazardous Materials Incidents (ERG).

**DOT IDENTIFICATION NUMBER**
Know the flash point for each shipment to accurately classify it into the right category.

Petroleum Crude Oil, 3, UN 1267, PG*
*PG I   - Initial Boiling Point =< 95°F (35°)
*PG II   - Initial Boiling Point > 95°F (35°), Flash Point <73°F (23°C)
*PG III - Initial Boiling Point > 95°F (35°), Flash Point ≤73°F (23°C)
        and =<141°F (60.5°C)
OR
Petroleum crude oil, combustible liquid, UN 1267, PG III
(Flash Point >141°F (60.5°F) and <200°F (93°)
OR
Not regulated if flash point = >200°F (93°)

**OSHA REQUIRED LABEL INFORMATION**
In compliance with hazard and right-to-know requirements, the following OSHA Hazard Warnings should be found on a label, bill of lading or invoice accompanying this shipment.

DANGER!

EXTREMELY FLAMMABLE

LONG-TERM, REPEATED EXPOSURE MAY CAUSE
CANCER, BLOOD AND NERVOUS SYSTEM DAMAGE

CONTAINS: BENZENE

OVEREXPOSURE MAY CAUSE EYE, SKIN OR
RESPIRATORY TRACT IRRITATION OR DAMAGE,
AND MAY CAUSE HEADACHES, DIZZINESS
OR OTHER ADVERSE NERVOUS SYSTEM
EFFECTS OR DAMAGE, INCLUDING DEATH

Date Issued : 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000076

CRUDE OIL

This information and recommendations contained herein are, to the best of Exxon's knowledge and belief, accurate and reliable as of the date issued. Exxon does not warrant or guarantee their accuracy or reliability, and Exxon shall not be liable for any loss or damage arising out of use thereof.

The information and recommendations are offered for the user's consideration and examination, and it is the user's responsibility to satisfy itself that they are suitable and complete for its particular use. If buyer repackages this product, legal counsel should be consulted to insure proper health, safety and other necessary information is included on the container.

The Environmental Information included under Section H thereof as well as the National Fire Protection Association (NFPA) ratings have been included by Exxon Company, U.S.A. in order to provide additional health and hazard classification information. The ratings recommended are based upon the criteria supplied by the developers of these rating systems, together with Exxon's interpretation of the available data.

FOR ADDITIONAL INFORMATION ON HEALTH EFFECTS CONTACT:
Director of Industrial Hygiene
Exxon Company, USA
Room 3180, Exxon Building
P. O. Box 2180
Houston, Texas 77252-2180
(713) 656-2443

Date Issued : 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000077

# Flow Diagrams

Plains2021C-02_0000078

SANTA BARBARA, CALIFORNIA
SECTION 27 – T5N – R30W

LAS FLORES
PUMP STATION
FLOW DIAGRAM

NOTES:

LAS FLORES PUMP STATION
BAKERSFIELD DISTRICT, WESTERN DIVISION

PLAINS ALL AMERICAN
PIPELINE L.P.

LAS FLORES PUMP STATION
BAKERSFIELD DISTRICT, WESTERN DIVISION
PROCESS FLOW DIAGRAM

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | JM | 09/13 | 0 | AS–BUILT PER FIELD WALKDOWN | | 09/27/13 |

| DRAWN | BP | CHECKED | JM | DRFT. APPV. | MEO |
|---|---|---|---|---|---|
| DATE | 09/27/13 | SCALE | NONE | ENGR. APPV. | |

| NAME | DATE | NAME | DATE | NAME | DATE | REV. NO. | REVISION | DATE |
|---|---|---|---|---|---|---|---|---|
| OPERATIONS | | ENGINEERING | | DRAFTING | | | | |

LSF1–D–F–1083

TITLE OF REFERENCE DRAWING          DRAWING NO.

Plains2021C-02_0000079

SANTA BARBARA, CALIFORNIA
SECTION , T5N – R30W

GAVIOTA
PUMP STATION
FLOW DIAGRAM

NOTES:

PLAINS ALL AMERICAN PIPELINE L.P.

GAVIOTA PUMP STATION
BAKERSFIELD DISTRICT, WESTERN DIVISION
PROCESS FLOW DIAGRAM

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | JM | 09/13 | O | AS–BUILT PER FIELD WALKDOWN | 09/27/13 |
| NAME | DATE | NAME | DATE | NAME | DATE | REV. NO. | REVISION | DATE |
| OPERATIONS | | ENGINEERING | | DRAFTING | | | | |

| DRAWN | BP | CHECKED | JM | DRFT. APPV. | MEO |
|---|---|---|---|---|---|
| DATE | 09/27/13 | SCALE | NONE | ENGR. APPV. | |

GVT1–D–F–1084

TITLE OF REFERENCE DRAWING

DRAWING NO.

Plains2021C-02_0000080

# Vicinity Map

Plains2021C-02_0000081



Santa Barbara

Gaviota

Las Flores

Source: Esri, Maxar, GeoEye, Earthstar Geographics, CNES/Airbus DS, USDA, USGS, AeroGRID, IGN, and the GIS User Community

0  0.15  0.3    0.6    0.9    1.2
                              Miles

**L901 LAS FLORES TO GAVIOTA - 24"**

PLAINS
ALL AMERICAN
PIPELINE, L.P.

1 in:1 miles

Sheet No.: 1/2

Plains2021C-02_0000082



**Centerline**

**Affecting Coastal Zone**

**NHDFlowline**

**Roads**

**Rail Roads**

**Affected Flowline**

Terrain Paths

Spray/Pooling Radius

CCC

EESACZ

## Landslide Susceptibility

High incidence

High susceptibility, moderate incidence

High susceptibility, low incidence

Moderate incidence

Moderate susceptibility, low incidence

Low incidence

No data

## Seismic Shaking Intensity

Extreme

Light

Moderate

Not Felt

Severe

Strong

Very Strong

Violent

## Mean Rainfall (in)

**Rainfall (in)**

11.691000 - 24.980000

25.040000 - 36.446000

36.463000 - 47.333000

47.360000 - 60.091000

60.136000 - 75.645000

75.715000 - 92.636000

92.694000 - 109.416000

109.463000 - 130.010000

130.298000 - 162.604000

163.290000 - 216.127000

| Segment: | | Owner: |
|---|---|---|
| L901 LAS FLORES TO GAVIOTA - 24" | *LEGEND* | PLAINS ALL AMERICAN PIPELINE, L.P. |
| Sheet No:   2/2 | | |

Plains2021C-02_0000083

# BAT Location Map

Plains2021C-02_0000084

| 0  1,750  3,500  7,000  10,500  14,000 Feet | | Line 901 BAT Location Map | |
|---|---|---|---|
| This user generated map has been prepared from sources considered to be reliable. However, Plains Pipeline L.P. hasfurnished this copy for information only and assumes no responsibility for the accuracy or completeness of data shown. |  | Implementation Plan | Scale: 1:75,000 |
| | | Santa Barbara, California | Sheet No: 1/1 |

M:\CA-OSFM_AB 864\L901-L903\Map Files\2021_03_22_L901_BAT_LOCATIONS2.mxd

Plains2021C-02_0000085

# Timetable for Implementation Gantt Chart

Plains2021C-02_0000086



Plains2021C-02_0000087

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On June 3, 2025, I served the document(s) **DECLARATION OF STEVE RUSCH IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTON** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☒    BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 3, 2025, at Los Angeles, California.

*/s/ Josie Cisneros*
Josie Cisneros

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>CENTER FOR BIOLOGICAL DIVERSITY and<br>WISHTOYO FOUNDATION<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>        tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS<br>ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>        jfrankel@environmentaldefensecenter.org<br>        trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/<br>DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal<br><br>Tel.:    (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (310) 620-5879<br>Email: djmoore@paulhastings.com<br>        benjaminhanelin@paulhastings.com<br>        natalierogers@paulhastings.com |
| Trevor D. Large, Esq.<br>FAUVER, LARGE, ARCHBALD & SPRAY LLP<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (805) 966-7000<br>Email: TLarge@FLASllp.com |

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
MATTHEW C. WICKERSHAM, SBN 241733
matt.wickersham@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>    Petitioners and Plaintiffs,<br><br>    v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>    Respondents and Defendants,<br><br>    and<br><br>SABLE OFFSHORE CORP., et al.,<br><br>    Real Parties in Interest. | Case No. 25CV02244<br>[Coordinated with Case No. 25CV02247]<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION**<br><br>[*Filed concurrently with Opposition to Preliminary Injunction; Declarations of Steve Rusch, Bart Leininger, Brien Vierra, and Michael J. Rosenfeld*]<br><br>Date:        July 18, 2025<br>Time:        10:00 AM<br>Dept.:        4<br><br>Complaint Filed:        April 15, 2025<br>Trial Date:        None Set |

1

# TABLE OF CONTENTS

I.      INTRODUCTION AND QUALIFICATIONS ...................................................... 6

    A.      Assignment and Scope of Work Performed....................................... 6

    B.      Qualifications and Background ......................................................... 8

    C.      Materials and Evidence Considered ................................................ 9

    D.      Compensation ................................................................................ 10

II.     SUMMARY OF CONCLUSIONS ................................................................ 10

III.    ANALYSIS ........................................................................................... 13

    A.      Understanding Petroleum .............................................................. 13

    B.      Economic Role & Impact ............................................................... 15

        i.      Global ..................................................................................... 15

        ii.     United States ........................................................................... 21

    C.      California Petroleum....................................................................... 22

        i.      Economic Contributions ......................................................... 22

        ii.     Employment............................................................................ 25

        iii.    Production............................................................................... 27

        iv.     Movement & Transportation ................................................... 31

        v.      California Consumption........................................................... 35

        vi.     California Imports.................................................................... 38

    D.      Crude Oil Pricing........................................................................... 45

        i.      Commodity Pricing & Volatility............................................. 45

        ii.     California Crude Pricing.......................................................... 49

    E.      Sable Offshore Corp. ..................................................................... 50

        i.      Sable Oil Reserves, Capacity and Platforms (wells) .............. 50

        ii.     Sable Production Operational Analysis ................................... 52

        iii.    Sable Customers and Selling Markets ..................................... 53

        iv.     Sable's Pipelines .................................................................... 54

        v.      Potential Economic Impact on State, Santa Barbara & Adjacent Counties ................................................................................... 55

        vi.     Potential Economic Implications of Sable Production on Employment and Personal Income........................................... 58

        vii.    Potential Implications of Sable Production on California Oil Prices .... 60

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

IV.    SUMMARY CONCLUSIONS ........................................................................ 61

    A.    Summary and General Conclusion ........................................................ 61

    B.    Pertinent Findings .................................................................................. 61

    C.    Key Conclusions .................................................................................... 63

**EXHIBIT A** ........................................................................................................ 66

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

# LIST OF FIGURES

Figure 1:        California Sources, Grades, & Transportation Methods for Crude Oil (2018-2024)

Figure 2:        Global Production & Consumption - Top 10 Nations (2022-2023)

Figure 3:        Comparison: Crude Oil Price to Food Price Index (1990-2018)

Figure 4:        Brent Crude & Gasoline Prices Relative to Food Staples (2019-2023)

Figure 5:        Percent Change in CA GDP to Percent Change in U.S. GDP (1982-2023)

Figure 6:        Percent Change in CA GDP to Percent Change in CA Oil Field Production (1998-2022)

Figure 7:        California: Gross Domestic Product from Oil & Gas Extraction (1998-2022)

Figure 8:        Percent of Oil Production by Top Producing U.S. State (2023)

Figure 9:        California Sees Four-Decade Decline in Crude Production

Figure 10:       Comparison: Annual Percentage Change in Oil Field Production for PADD 5 - CA and U.S. (1991-2022)

Figure 11:       Comparison: Percentage Composition of PADD 5 & CA Oil Field Production to Total U.S. Oil Field Production (1990-2022)

Figure 12:       Comparison of Product Types Per Barrel - CA to U.S.

Figure 13:       CDTFA Net Taxable Gasoline Sales by Calendar Year (2001-2024(e))

Figure 14:       Annual Percentage Change in CA Gasoline Consumption as Compared to Annual Percentage Change in Total U.S. Gasoline Consumption (1971-2022)

Figure 15:       California Alaska Oil Imports (1982-2023)

Figure 16:       California: Changes in Foreign Oil Imports, U.S. Alaska Imports & CA Filed Production (1990-2023)

Figure 17:       California Imports: Percentage Composition by Source (1982-2023)

4

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

Figure 18:      Comparison: Selected Ranking for Social, Economic & Corruption for California Oil Imports (2023/2024)

Figure 19:      Fragile States Index Ranking (Selected CA Sources of Foreign Imports)

Figure 20:      Human Rights Index

Figure 21:      World Crude Oil Prices (2008-2024)

Figure 22:      Average Brent Crude Oil Prices by Year (2015-2024)

Figure 23:      Crude Oil Prices and Key Geopolitical and Economic Events (1970-2024)

Figure 24:      California Crude Oil Cost as a Percent of Avg. Retail Gasoline Price (1999-2023)

Figure 25:      Estimated Sable Platform Production Capacity

Figure 26:      Estimated Sable Breakeven Cost of Production Comparison

Figure 27:      Sable Customers and Selling Markets

Figure 28:      Sable Pipelines and Capacities

Figure 29:      Estimated Economic Impact of Sable Production on CA State, County & Local Revenues

Figure 30:      Estimated Economic Impact of Sable Production on Employment, Wages, and Earnings

Figure 31:      Estimated Potential influence on California oil refinery prices of crude stock oil

Exhibit A:      Resume of Michael A. Mische

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

## I.    INTRODUCTION AND QUALIFICATIONS

### A.    Assignment and Scope of Work Performed

1.    I have been retained as an expert on certain aspects of the oil and gas industry for Sable Offshore Corp., a Delaware corporation, and its three offshore platforms, and Pacific Pipeline Company, a Delaware corporation ("Plaintiffs" or collectively, "Sable") with specific reference to Las Flores Pipelines CA-324 and CA-325 (collectively the "Las Flores Pipeline System") in matters regarding the Center for Biological Diversity and Wishtoyo Foundation's efforts to challenge the California Office of the State Fire Marshal's approval of modified regulatory requirements, known as "State Waivers," to Sable.[1] I have based my analysis and have formulated my conclusions and opinions on my academic and professional training and experiences, and would and could testify in court on my analysis and to these conclusions and opinions.  I make this declaration and provide the opinions stated below based upon my experience and my personal knowledge and would and could testify to the matters contained herein.

2.    The scope of work for which I was retained involved the collection, assessment, and structuring of data necessary to perform an economic analysis to determine why the production of oil from Sable's offshore platforms and use of its Las Flores Pipeline System would not irreparably harm the public and why preventing the use of the Las Flores Pipeline System to carry Sable's production to market will instead irreparably harm the citizens of California, including the residents of Santa Barbara County. In addressing the scope and performing the work of this assignment, I interrogated data and various literature and analyzed a series of pertinent issues, including but not limited to:

a.    Describing the general economic behavior of the oil and gas industry.

b.    Describing the historical and current status of oil production in the state of California.

---

[1] *Center for Biological Diversity and Wishtoyo Foundation v. California Department of Forestry and Fire Protection, et al.* (Santa Barbara Sup. Ct. April 15, 2025), Case No. 25CV02244.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

c. Describing California's in-state oil production and its dependency on foreign, non-U.S. oil sources.

d. Estimating the costs of imports of non-U.S. oil from foreign sources to California.

e. Determining the potential economic impact that the addition of Sable oil production from its three offshore platforms and the use of its Las Flores Pipeline System could potentially have on in-state oil production and overall California oil supplies.

f. Comparing the potential breakeven of Sable oil production from its three offshore platforms and the use of its Las Flores Pipeline System at variable production scale, as compared to other California in-state producers and offshore producers.

g. Determining to which markets Sable oil production from its three offshore platforms and the use of its Las Flores Pipeline System could potentially represent the most viable for Sable to sell or trade its oil.

h. Assessing the capacity and capacity utilization of each of Sable's pipelines (Line CA-324 and Line CA-325) for the transporting of oil produced by Sable's three offshore platforms to its potential markets.

i. Estimating the reserves, capacities, and long-term viability of each of Sable's platforms (wells) for oil production.

j. Comparing the total estimated aggregated GHG emissions by Sable from the production of oil from its three offshore platforms to other comparable in-state sources and to comparable non-U.S. crude oil sources, inclusive of maritime vessel transportation.

k. Estimating and describing the potential direct and indirect economic impact of oil production based on Sable's three offshore platforms and

7

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

the use of its Las Flores Pipeline System on California state revenues, and Santa Barbara, Kern, and San Luis Obispo Counties.

l.      Estimating and describing the potential direct and indirect employment impact of oil production based on Sable's three offshore platforms and the use of its Las Flores Pipeline System, on Santa Barbara, Kern, and San Luis Obispo Counties.

My work and the opinions expressed herein are restricted to the performance of this assignment and of the scope of work performed described above, and I express no opinion on any other matters that are external to the purview of this Assignment and Scope of Work Performed.

**B.      Qualifications and Background**

3.      I am an Associate Professor of Management and Professional Practice at the Marshall School of Business, University of Southern California ("USC") in Los Angeles, CA. I am currently also a Co-Founder and Chairman of the Board of Synergy Consulting Group, Inc., a management consulting firm. I hold a B.S. degree with honors in finance and economics from New York University and an MBA from Stern School of Business, New York University. I also hold an MS degree in Federal Taxation from Golden Gate University and a certification in AI from the Massachusetts Institute of Technology.

4.      I have over 40 years of experience in the management consulting industry and 28 years in higher education.  Prior to joining the USC faculty, I had two decades of experience in the management consulting industry. From 1983 to 1992, I worked at KPMG, one of the largest global accounting and consulting firms in the world, and eventually became one of the youngest consulting partners (*i.e.*, "Principals") elected in the history of KPMG. At KPMG, I was a member of the Practices & Methods Review Committee. My practice focused on, among other things, strategy and transformation, transaction management services, and innovation and advanced technologies. From 1991 to 1993, I also served as a Principal of Management Consulting Services at A.T. Kearney, one of the leading

8

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

management consulting firms in the world. From 1995 to 1997, I served as a consultant to the senior leadership of Andersen Consulting (now Accenture) for the development of several practice methodologies related to process transformation and innovation. I have served as Chairman of the Board since 1993 and CEO from 1995 through 2016 for Synergy Consulting Group, Inc. Throughout my consulting career, I have led and managed numerous consulting projects for a variety of clients in the private, public, and non-profit sectors, many of which involved benefit analysis and economic impact of strategies and strategic investments. I have consulted with a variety of industries and organizations, including Fortune 100 companies, elite management consulting firms and investment banks, national, state, and local governments, foreign governments, and heads of state and key policymakers.

5.    Since becoming a faculty member at USC in 1997, I have taught numerous MBA courses on the management consulting industry and strategic change, including, among others, The Business of Energy in the 21st Century, Strategic Innovation & Change, Management Consulting, Strategic Transformation & Renewal, Case Analysis for Consultants, Organizational Behavior, and Leading High-Performance Teams. I am also responsible for USC's Certificate in Management Consulting Program and am a senior advisor to USC Management Consulting and Strategy Club, the largest club in the MBA program. I have received the Management and Organization Department Service Excellence Award and the Marshall Golden Apple Teaching Award. I have published eight books on management, organization, and consulting and have been cited in over 300 articles, interviews, reviews, and studies. I have also served as a material or expert witness several times. My academic and research interests in the oil and gas industry span over 50 years and began in October 1973 with the Arab Oil Embargo of the United States when I was a student at New York University.

6.    A detailed list of my experience, publications, interviews, and prior expert work, including a list of my testimony in the past four years is included, as a true and correct copy, as **Exhibit A** to this report.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**C.     Materials and Evidence Considered**

7.      Addressing the objectives required extensive analysis of data and comparative analytical methods. The research involved in this work and in supporting the opinions expressed herein is widely available and includes but is not limited to verifiable sources such as the California Energy Commission, U.S. Energy Information Agency, Bloomberg, U.S. Department of Energy, Sable SEC filings, International Energy Agency, Plains All American Reports Fourth-Quarter and Full-Year 2023 Results; Announces 2024 Guidance, Oil & Gas Journal, American Petroleum Institute, the California Department of Tax and Fee Administration, the U.S. EPA, California Air Resources Board, Statista, The Federal Reserve Bank, the California Attorney General's Office, the California Legislative Analyst's Office, U.S. Department of Interior, Rystad Energy, Bureau of Labor Statistics, the U.S. Oil and Gas Association, and a number of scholarly research articles and papers.

8.      In addition to the public materials, I relied upon the evidential and supporting documents associated with this action. By example and without limitation, these materials included Sable Investor Presentation, Cultivation Cap & Eligible Business License Applicants Lists|Santa Barbara County, CA., "Oil & Gas | CA State Lands Commission" found at https://www.slc.ca.gov/oil-gas/.

**D.     Compensation**

9.      Fee and compensation arrangements for this work are based on time and materials. My hourly rate for this assignment is $1,000.00, and payment for my services does not depend in any way on the opinions that I form or on the outcome of this matter. I have no equity interests in Sable Offshore Corp. or any of its affiliates. Furthermore, I have no interests or conflicts that may be related to any other oil and gas producer or any nation-state that drives most of its income from oil and gas. Like many people who have professionally managed pension plans, including those who are members of CalPERS, one of my pension funds may own the stock of one or several petroleum or petroleum-related companies. In this regard, I may have a distant and indirect interest, but in all situations, any interests are immaterial and

10

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

are not pertinent, and do not have any influence on my work and the opinions expressed in this declaration.

## II. SUMMARY OF CONCLUSIONS

10.    Based on the data, research into prevailing literature, and my analysis, my conclusion is that the production of oil from Sable's offshore platforms and the associated use of its Las Flores Pipeline System to carry Sable's production to market will not irreparably harm the public and will instead benefit the public. For the same reasons, preventing the use of the Las Flores Pipeline System from carrying Sable's production to market would irreparably harm consumers of gasoline, diesel and other byproducts of crude oil.

11.    California is facing an energy crisis and has the highest retail gasoline and aviation fuel costs in the United States. On July 1, retail gasoline prices increased, further stressing consumers who live and work in a state with the highest housing and general cost of living. The addition of Sable's production oil from its three offshore platforms and the use of its Las Flores Pipeline System would increase in-state oil production to 360,000 barrels a day at a time when California is facing extreme uncertainty and price hikes in its fossil fuel energy sector.  The addition of Sable's production and the use of its Las Flores Pipeline System would provide the foundation energy security and price certainty. California's current in-state crude production is just about 310,000[2] barrels per day, which provides less than a quarter of the state's total daily crude demand. The remaining supply, close to 950,000 barrels, is imported from foreign nations including Ecuador, Iraq, and Saudi Arabia.[3] Raising in-state output to a 360,000 barrels a month, which could be achieved through SYU production and operation of the Las Flores Pipelines, would allow California to operate more independently

---

[2] Commission, C. E. (n.d.). Annual Oil Supply Sources To California Refineries. California Energy Commission.        https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california

[3] Commission, C. E. (n.d.-b). Foreign Sources of Crude Oil Imports to California 2020. California Energy Commission. https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

and would reduce the State's exposure to geopolitical risks and moderate exposures to spot market price hikes that adversely affect California consumers.

12. The production of oil from Sable's three offshore platforms and the use of Sable's Las Flores Pipeline System to transport its offshore production to market would have a favorable economic impact on California's overall energy situation, as well as have a favorable influence on local employment and tax revenues and consumer retail gasoline, diesel, and aviation fuel prices, and would improve and strengthen California's energy and economic security. Furthermore, the addition of Sable oil production to the market would have ancillary benefits reaching across state lines into Nevada and Arizona and would, in effect, strengthen and improve national defense readiness for U.S. military forces stationed in California, Nevada, and Arizona that are reliant on California refineries for aviation, gasoline and diesel fuels.

13. Allowing Sable to transport SYU-produced crude to market through the Las Flores Pipeline System would significantly benefit the public by serving as the economic "backbone" while navigating the economic uncertainties and risks associated dependency on non-U.S. foreign oil suppliers of energy transformation in support of California's ambitions for energy transformation.

12

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

## III.    ANALYSIS

### A.       Understanding Petroleum

14.      Petroleum is derived from crude oil. Crude oil, or simply 'crude,' is a fossil fuel and the product of millions of years of geological activity and organic decay. Oil deposits are found in the ground, either onshore or offshore, at the bottom of an ocean, lake, or river. To locate deposits, oil producers expend considerable effort and funds to explore and "discover" petroleum deposits, which are reservoirs, pockets or patches of oil, or oil fields. Once located, the oil must be extracted, usually via drilling.[4] The extracted oil is then transported via maritime vessels, pipelines, trucks, or rail tankers to a processing facility, which prepares the petroleum for refinement. The refining process turns crude oil into various products, such as gasoline, diesel fuel, aviation fuels, heating oils, and other derivatives.

15.      The standard measure for crude oil is a barrel, which contains 42 gallons or 159 liters. As a general rule and as an informal estimate, one gallon of oil produces between .47 and .67 gallons of refined gasoline. Stated differently, one barrel of oil (42 gallons) yields 17-28 gallons of gasoline. On average, a barrel of oil, once refined, will yield 45 gallons of total product or about 1.1 times the original volume.[5] Additionally, a single barrel of crude oil typically produces 138,095 Btu of energy.[6]

16.      Not all oil is alike, and there are multiple types of crude that define its quality and grade. Therefore, no two barrels of oil are exactly identical. Petroleum is characterized by its origin and its API rating.[7] A combination of factors — including geology, location,

---

[4] *Petroleum*. (n.d.). https://education.nationalgeographic.org/resource/petroleum

[5] EIA, Petroleum Supply Monthly, April 2019

[6] *Facts about Oil*. (2020). Www3.Uwsp.edu. https://www3.uwsp.edu/cnr-ap/KEEP/Documents/Activities/ Energy%20Fact%20Sheets/FactsAboutOil.pdf

[7] API Definition: According to the American Petroleum Institute, the API rating is "An arbitrary scale expressing the gravity or density of liquid petroleum products." The higher the API gravity (rating), the lighter the oil. In general, light oil crude has an API rating of 38 degrees or more. Intermediate or medium grade oil has an API gravity rating of 22 to 38 degrees. Crude oil with API ratings of 38 and above are considered heavy and extra heavy. The characterization of oil crude as "sweet" or "sour" is related to its sulfur content. See, *Table Definitions, Sources, and Explanatory Notes*. (n.d.). Www.eia.gov. https://www.eia.gov/dnav/pet/TblDefs/pet_pnp_crq_tbldef2.asp

13

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

chemistry, and climate — makes each type of oil unique, possessing specific properties that can be refined for intended uses. For example, oil found in Texas can and will be different than oil in California. The predominant method for assigning a quality rating to crude oil is "gravity" (viscosity) as defined, measured, and rated using the standard established by the American Petroleum Institute (API).[8] Crude oils that rate 35-45 on the API scale are called "light crude" and are considered the highest quality and yield the highest value products from refining. Some crude oils are "sour and heavy to extra heavy," making them more costly to produce and refine into end products. In contrast, other crudes are "sweet and light/lite," which are less expensive to refine.

17.    Crude oils rated at 15 or lower are characterized as "extra-heavy" and typically require more refining processes, are more costly to refine, and yield lower outputs. Extra heavy crudes are typically used for purposes other than gasoline, diesel, and jet fuel production. Crude oils with high sulfur content are generally referred to as "sour," while those with lower sulfur content are characterized as "sweet." Hence, in discussing oil, the term "Light sweet crude" would be used to describe an oil that has a high API rating and low sulfur content. The quality and origin of oil also influence the amounts of greenhouse emissions, as do extraction processes, transportation and distribution methods, and refining efficiencies associated with the oil and the production of end products, such as gasoline. **California generally produces, and its refineries use, heavier crudes.**

---

[8] *Oil categories*. (n.d.). https://www.api.org/products-and-services/engine-oil/eolcs-categories-and-classifications/oil-categories

14

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Figure 1**

| California Sources, Grades & Transportation Methods for Crude Oil- 2018 to 2024 | | |
|---|---|---|
| **Crude Oil Source** | **Crude Grade Characteristic** | **Transportation Method to CA** |
| **U.S. DOMESTIC** | | |
| CA- Kern | Very Heavy | Pipeline |
| CA- Midway Sunset | Very Heavy | Pipeline |
| CA- Berridge | Very Heavy | Pipeline |
| CA- San Ardo | Very Heavy | Pipeline |
| CA- Lost Hills | Light Heavy | Pipeline |
| CA- Offshore | Heavy | Pipeline |
| CA- Ventura | Light Heavy | Pipeline |
| CA- Elk Hills | Light Heavy | Pipeline |
| Alaska- North Slope | Medium | Tanker |
| Washington State | Gasoline | Tanker |
| **FOREIGN** | | |
| Canada | Heavy | Tanker & Rail |
| Ecuador | Heavy | Tanker |
| Guyana | Medium/Heavy | Tanker |
| Russia | Heavy | Tanker |
| Saudia Arbia | Heavy | Tanker |
| Iraq | Heavy | Tanker |

(Source: https://www.californiaenergyatlas.com/copy-of-crude-oil)

18.    Generally, oil produced offshore in the Santa Ynez region (Santa Barbara Channel) is heavier crude with low API gravity and consistent with other California crudes. This grade of crude is typically used by California refineries in the production of fuels. Summarized above is a representative sample of the crudes produced in California as compared to the foreign oil imported by California to meet its daily needs.

**B.    Economic Role & Impact**

**i.    Global**

19.    From heating, cooking, and lighting to the manufacturing of cellular telephones, agricultural production, electrical power generation, plastics, asphalt, concrete, medical

15

devices and pharmaceutical products, and alternative energy production, petroleum is essential to any economy and modern society. Although oil is universally known as a source of energy, petroleum is used in the manufacturing of fibers, such as polyester and nylon, certain types of medical devices, the screens that are used in monitors, televisions, cell phones, computers, cement, asphalt, wind turbines, steel, herbicides, and fertilizers.[9] Petroleum, in the form of gasoline, diesel, and aviation fuels, is essential to transportation and the movement of people, products, and food.

20.     Globally, the amount of oil in the world fluctuates based predominantly on three factors: (1) consumption (demand), (2) production from existing proven sources, and (3) the discovery of new oil sources (reserves). For example, in 1960, crude oil reserves were estimated to be around 291 billion barrels.[10] In 2023, world crude reserves were estimated to range between 1.5 to 1.73 trillion barrels of oil.[11] [12] [13]  Reserve oil is petroleum that has been discovered and properly approximated (proven) but   not yet been harvested (produced). The majority of proven reserves, around 79%, are located in OPEC member countries.[14]

21.     In 2023, around 101.81 million barrels of oil were produced globally per day.[15] For perspective, around <u>1.2 million barrels of oil are consumed on Earth per second.</u>[16] For

---

[9]     IOGP.     (2022,     October     11).     *Oil     and     gas     in     everyday     life*. https://www.iogp.org/workstreams/advocacy/oil-natgas-in-everyday-life/

[10]     Statista.     (2024,     July     23).     *Global     crude     oil     reserves     1960-2023*. https://www.statista.com/statistics/236657/global-crude-oil-reserves-since-1990/

[11] Ibid.

[12] Chen, J. (2024, July 25). Oil reserves. Investopedia. https://www.investopedia.com/terms/o/oil reserves.asp#:~:text=Oil%20reserves%20are%20an%20estimate,oil%20reserves%20in%20the%20 world.

[13] *World Oil Statistics - Worldometer*. (n.d.). https://www.worldometers.info/oil/

[14] OPEC. (2024). *OPEC : OPEC Share of World Crude Oil Reserves*. Opec.org; Organization of the Petroleum Exporting Countries. https://www.opec.org/opec_web/en/data_graphs/330.htm

[15] *Frequently Asked Questions (FAQs) - U.S. Energy Information Administration (EIA)*. (2024, April 11). Www.eia.gov. https://www.eia.gov/tools/faqs/faq.php?id=709&t=6.

[16] Calculation based on 86,400 seconds per day and 2023 consumption of 100.3 million barrels of oil a day.

16

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

2024, world production increased by around 1.2% to 103 million barrels a day.[17] According to the IEA, the energy sector, including the oil and gas industry, employs 65 million people worldwide (2019 est.), or about 2% of all global employment.[18] Oil represents the largest employment sector, with 8 million or 12% of total employment in the industry.[19] On a comparative basis, the energy sector has more highly skilled labor as a percentage of its labor force, 45%, than the overall average of all industries, which is 25% for highly skilled labor.[20]

22.     According to the U.N., in 2023, a total of 12.3 billion tons of cargo was transported using maritime vessels, which represents around 80% of all global trade.[21] [22] **Maritime tankers burn bunker (heavy oil) fuels for propulsion, airplanes burn aviation fuels, trucks are powered by diesel fuels, mass-scale agricultural production is based on fossil fuels, and over 60% of automotive transportation is reliant on fossil fuels**. Around 49% to 50% of electrical power generation in the U.S. is derived from fossil fuels.[23]

**Figure 2**

---

[17] *Frequently Asked Questions (FAQs) - U.S. Energy Information Administration (EIA)*. (2024, April 11). Www.eia.gov. https://www.eia.gov/tools/faqs/faq.php?id=709&t=6.

[18] *World Energy Employment*. (n.d.). https://iea.blob.core.windows.net/assets/a0432c97-14af-4fc7-b3bf-c409fb7e4ab8/WorldEnergyEmployment.pdf

[19] *World Energy Employment*. (n.d.). https://iea.blob.core.windows.net/assets/a0432c97-14af-4fc7-b3bf-c409fb7e4ab8/WorldEnergyEmployment.pdf

[20] *World Energy Employment*. (n.d.). https://iea.blob.core.windows.net/assets/a0432c97-14af-4fc7-b3bf-c409fb7e4ab8/WorldEnergyEmployment.pdf

[21] UNCTAD. (2024, October 22). *Review of Maritime Transport 2024*. UNCTAD. https://unctad.org/publication/review-maritime-transport-2024.

[22] statista. (2017). *Topic: Ocean Shipping*. Www.statista.com; Statista. https://www.statista.com/topics/1728/ocean-shipping/

[23] U.S. Energy Information Administration. (2024, July 15). *U.S. Energy Facts Explained*. Eia.gov; U.S. Energy Information Administration. https://www.eia.gov/energyexplained/us-energy-facts/

17

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

| 2022/23- GLOBAL PRODUCTION & CONSUMPTION- TOP 10 NATIONS | | | | | |
| WORLD PRODUCTION- 2023 | | | WORLD CONSUMPTION- 2022 | | |
| Nation | Million of Barrels per day | Percent of World Total | Nation | Million of Barrels per day | Percent of World Total |
|---|---|---|---|---|---|
| United States | 21.91 | 22% | United States | 20.01 | 20% |
| Saudi Arabia | 11.13 | 11% | China | 15.15 | 15% |
| Russia | 10.75 | 11% | India | 5.05 | 5% |
| Canada | 5.76 | 6% | Russia | 3.68 | 4% |
| China | 5.76 | 6% | Saudi Arabia | 3.65 | 4% |
| Iraq | 4.42 | 4% | Japan | 3.38 | 3% |
| Brazil | 4.28 | 4% | Brazil | 3.03 | 3% |
| United Arab Emirates | 4.16 | 4% | South Korea | 2.55 | 3% |
| Iran | 3.99 | 4% | Canada | 2.41 | 2% |
| Kuwait | 2.91 | 3% | Germany | 2.18 | 2% |
| Total Top 10 | 74.59 | 73% | Total Top 10 | 61.08 | 61% |
| **World Total-Production** | **101.81** | | **World Total-Consumption** | **99.95** | |

(Source: EIA. https://www.eia.gov/tools/faqs/faq.php?id=709&t=6)

23.    Petroleum products, such as gasoline and diesel fuels, are significant components in the determination of the cost of food production and retail grocery prices. As indicated in the Figure below, as gasoline prices increased, the cost of staples such as milk, ground beef, and sugar also increased. As was indicated during the inflationary period of 2021 to 2024, when general inflation outpaced real wages and peaked at 9.1%, and crude oil and gasoline prices peaked at a 40-year high, food prices for consumers increased.

**Figure 3**



DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

(Source: https://extension.psu.edu/fuel-ethanol-hero-or-villain#:~:text=Gasoline%20is%20not%20water%20soluble,performance%20if%20not%20dealt%20with)

24.    Crude oil prices have a casual correlation to food prices. When crude prices increase and stay elevated for protracted periods, as they were during the 2020 to 2024 period, food prices, as well as overall costs, tend to also increase. As the research literature indicates, "oil and food price volatility causes macroeconomic instability and deteriorates the living conditions, particularly in developing countries where poor people spend most of their income to buy food."[24] Thus, when the price of crude oil and its related products, such as gasoline, increases, the price increases have a regressive and disproportionate impact on lower and fixed-income groups, as well as working-class families.

25.    Longitudinal studies of the influence of crude oil on food prices indicate "statistically significant evidence in favor of the existence of a long-run causal relationship, solely running from oil prices to food prices."[25] One study calculated that a 1% increase in the crude oil price index results in food prices increasing by .08%.[26]

**Figure 4**

[24] Z. Zhang, L. Luanne, E. Cesar, W. Michael Food versus fuel: What do prices tell us? Energy Policy, 38 (1) (2010), pp. 445-451.

[25] Karakotsios, Achillefs, et al. "The Dynamic Linkages between Food Prices and Oil Prices. Does Asymmetry Matter?" *The Journal of Economic Asymmetries*, vol. 23, June 2021, p. e00203, https://doi.org/10.1016/j.jeca.2021.e00203. Accessed 9 June 2021.

[26] *Asymmetries*, vol. 23, June 2021, p. e00203, https://doi.org/10.1016/j.jeca.2021.e00203. Accessed 9 June 2021.

19

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

| BRENT CRUDE & GASOLINE PRICES RELATIVE TO FOOD STAPLES | |
| --- | --- |
| Household Expenditures on Gasoline, Energy & Utilities | 2019-23 % Change |
| **Average Price of Brent Crude Oil** | **29.08%** |
| **Average Retail Gasoline Price-** | **20.77%** |
| **Average Price for #2 Diesel Fuel- CA.** | 37.36% |
| **Average Retail Price of Gasoline- CA.** | 33.06% |
| Average Cost of Electricity- Residential Kilowatt | 23.83% |
| Average Cost of Milk - July | 41.78% |
| Average Price of Ground Beef- 1 lbs. - July | 34.26% |
| Average Cost of Butter | 12.27% |
| Average Cost of Ice Cream (.5 Gallon) | 25.05% |
| Average Cost of Sugar- Per lbs. | 107.42% |

(Source: Author)

26.    Increases in crude oil and crude oil product prices are of particular concern in California. Gasoline prices are highly correlated with crude oil prices, and in California, the costs are amplified by tight supplies and regulations. California's average retail gasoline prices, which are correlated to the price of crude oil, are routinely 40% to 50% higher than the national average. Not surprisingly, California retail gasoline prices are also considerably higher than its neighboring states. **Californians pay the highest gasoline prices in the United States**, and they went up on July 1, 2025, as a result of the state excise tax, new Low Carbon Fuel Standard, and ABX2-1, requiring refineries to maintain stock of finished gasoline, in addition to crude oil. Significantly, any disruption or interruption of crude oil supplies to the surviving California refineries will have a detrimental effect on consumer prices and a regressive and disproportionately harsh impact on lower and fixed income Californians.

27.    . At 18.9% of its 39 million inhabitants, California has the highest poverty rate in the U.S. and has 24%, or over 187,000, of the total estimated 771,500 homeless people in the U.S. [27] [28]   Furthermore, California's cost of living is around 12% than all other states,

[27] Torres, Mauricio. "New Census Data Show California Poverty Soared to Alarmingly High Levels in 2023." *California Budget and Policy Center*, 10 Sept. 2024, calbudgetcenter.org/news/new-census-data-show-california-poverty-soared-to-alarmingly-high-levels-in-2023/.

[28] Cremin, Sean. "Homelessness Hits Record High in California, Jumps Dramatically in Rest of US." *Public Policy Institute of California, 25 Mar. 2025*, www.ppic.org/blog/homelessness-hits-record-high-in-california-jumps-dramatically-in-rest-of-us/.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

making it the highest cost of living in the U.S.[29] It's not just gasoline that Californians pay a premium for. According to California's own Legislative Analyst's Office ("LAO"), greenhouse emissions policies have contributed to the second highest monthly electricity rates for residential service in the U.S.[30] For the 2019 to 2024 period, the LAO reports that residential electrical utility rates in California increased by 47%. In the Golden State, Californians monthly utility bills average $438.[31] [32]

### ii.    United States

28.    The U.S. oil and gas industry is an extensive, integral, and critical part of the U.S. economy and is vital to national defense and economic security. At $1.7 trillion, the oil and gas industry comprises around **8% of the U.S. GDP** and employs around 11.3 million people, representing 5.6% of total U.S. employment.[33] An additional 3.4 million jobs are

---

[29] Pino, Ivana. "This Map Compares the Cost of Living in Every State." *Yahoo Finance*, 28 Feb. 2025, finance.yahoo.com/personal-finance/banking/article/cost-of-living-by-state-164246058.html.

[30] Spady, A. (2025, January 8). California's "ambitious" policies to reduce greenhouse gases drive surge in electricity costs: report. *Fox Business*. https://www.foxbusiness.com/fox-news-politics/californias-policies-greenhouse-gases-electricity-surge

[31]    https://www.foxbusiness.com/fox-news-politics/californias-policies-greenhouse-gases-electricity-surge

[32] Carey, R. (n.d.). *How much does it cost to live in California? Housing, utilities, and more*. Unbiased. https://www.unbiased.com/discover/banking/what-is-the-cost-of-living-in-california#:~:text=California's%20average%20cost%20of%20living,on%20top%20of%20your%20finances.

[33] American Petroleum Institute. (2019). *Oil & Natural Gas Contribution to U.S. Economy Fact Sheet*. Api.org.    https://www.api.org/news-policy-and-issues/taxes/oil-and-natural-gas-contribution-to-us-economy-fact-sheet
See also, *New analysis: American-Made natural gas and oil drives U.S. economic recovery, Strengthens all industries*. (2021b, July 20). https://www.api.org/news-policy-and-issues/news/2021/07/20/2021-pwc-analysis

21

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

associated with oil and gas affiliated industries and businesses.[34] In the U.S., the oil and gas industry hourly wages, on average, are around 85% higher than the national average.[35]

29.    The oil and gas industry accounts for around 16% of total capital expenditures annually in the U.S.[36] In contrast, the transportation and healthcare sectors account for 5.3% and 6.3% of capital expenditures, respectively.[37] In the U.S., the EIA estimates that Americans spent around $1.0 trillion on energy, of which $503 million was related to gasoline, jet fuel, and diesel fuels in 2020, which collectively accounts for 4.8% of the U.S. GDP.[38] According to a Stanford University report, between 2020 and 2023, the global energy sector attracted around $9.8 billion in private investment in AI, with over half of that investment occurring in the United States.[39]

30.    For 2022, the EIA reports that the U.S. has proven reserves of at least 48.3 billion barrels of oil.[40] Comparatively, **the United States has the 9th largest proven oil reserves in the world**. However, U.S. technologies and the opening of previously closed areas could significantly increase U.S.- proven reserves. Based on current and planned consumption rates

[34] *New analysis: American-Made natural gas and oil drives U.S. economic recovery, Strengthens all industries*. (2021, July 20). https://www.api.org/news-policy-and-issues/news/2021/07/20/2021-pwc-analysis

[35] American Petroleum Institute. (2019). *Oil & Natural Gas Contribution to U.S. Economy Fact Sheet*. Api.org.    https://www.api.org/news-policy-and-issues/taxes/oil-and-natural-gas-contribution-to-us-economy-fact-sheet

[36] American Petroleum Institute. (2019). *Oil & Natural Gas Contribution to U.S. Economy Fact Sheet*. Api.org.    https://www.api.org/news-policy-and-issues/taxes/oil-and-natural-gas-contribution-to-us-economy-fact-sheet

[37] American Petroleum Institute. (2019). *Oil & Natural Gas Contribution to U.S. Economy Fact Sheet*. Api.org.    https://www.api.org/news-policy-and-issues/taxes/oil-and-natural-gas-contribution-to-us-economy-fact-sheet

[38] *2020 inflation-adjusted U.S. energy expenditures lowest since 2002*. (n.d.). Www.eia.gov. https://www.eia.gov/todayinenergy/detail.php?id=53620

[39] Stanford University. (2024). *The 2024 AI Index Report | Stanford HAI*. Stanford.edu. https://hai.stanford.edu/ai-index/2024-ai-index-report

[40] U.S. Energy Information Administration. (2017). *U.S. Crude Oil, Natural Gas, and Natural Gas Proved Reserves, Year-end 2017*. Eia.gov. https://www.eia.gov/naturalgas/crudeoilreserves/

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

and EIA current estimates, the U.S. has about 290 years of proven and technically recoverable oil reserves.[41]

### C.     California Petroleum
#### i.       Economic Contributions

31.     With a $3.9 trillion economy (GDP), California comprises 14% of the U.S. GDP, is the nation's largest state economy, and ranks 4th (nominal) as the largest economy globally.[42] [43]   On a per capita basis, California would be the second-largest economy in the world.[44] In dollar terms, California's GDP exceeds the GDPs of Italy, the U.K., Canada, and France.[45] For the 1982 to 2023 period, and on a percentage change basis, California's GDP outgrew that of the overall U.S. by 1.06 times.[46] As California is the largest state economy in the nation, it stands to reason that the behavior of California's state economy is highly correlated with that of the overall U.S. GDP on an annual percentage change basis.[47]

---

[41] Ier. (2022, June 22). *Global Oil and Gas proved reserves increase in 2021 - IER*. IER. https://www.instituteforenergyresearch.org/fossil-fuels/gas-and-oil/global-oil-and-gas-proved-reserves-increase-in-2021/

[42] Duan, J., & Bohn, S. (2024, October 14). *California's Economy*. Public Policy Institute of California. https://www.ppic.org/publication/californias-economy/

[43] *California is now the 4th largest economy in the world | Governor of California*. (2025, April 24). Governor of California. https://www.gov.ca.gov/2025/04/23/california-is-now-the-4th-largest-economy-in-the-world/

[44] Duan, J., & Bohn, S. (2024, October 14). *California's Economy*. Public Policy Institute of California. https://www.ppic.org/publication/californias-economy/

[45] Hughes, R. A. (2025, January 6). *If California were a country*. Bull Oak. https://bulloak.com/blog/if-california-were-a-country/

[46] Author calculation.

[47] Author calculation.

23

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Figure 5**



(Source: EIA, Fed. Reserve, author)

32.  Over the 1998 to 2023 period, although there is some similarity in movement between California's oil field production to its GDP, based on the annual percentage change, the correlation is very low (.11). The low correlation is not unexpected, as oil and gas production has become less significant over the years in California's economy, as in-state production declines.[48].

**Figure 6**



(Source: EIA, Fed. Reserve, author)

---

[48] *Gross Domestic Product: Oil and Gas Extraction (211) in California.* (2023). Stlouisfed.org. https://fred.stlouisfed.org/series/CAOILGASNGSP#

24

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

33.     For 2022, the oil and gas industry generated around **$338 billion in total economic contribution, which comprised around 8% of the Golden State's GDP**.[49] For perspective, professional, financial, and information services at $520 billion are the largest.[50] As indicated in the chart below, oil production contribution to California's GDP reached a historical peak, in absolute dollars, in 2008. Since the 2008 peak, oil production's contribution to California's GDP, in absolute dollar terms, has declined by 76%, indicating a lesser role in the State's overall economy.[51]

**Figure 7**
**California: Gross Domestic Product from Oil & Gas Extraction**



(Source: https://fred.stlouisfed.org/series/CAOILGASNGSP#)

> **ii.     Employment**

34.     Total direct employment affiliated with the oil and gas industry in California is estimated to be around **148,700, with indirect employment associated with California's oil**

---

[49] https://wspa.app.box.com/s/2v30dlvt0fbez09irhav001rw19tfh48

[50] *What is the gross domestic product (GDP) in California? | USAFacts*. (n.d.). USAFacts. https://usafacts.org/answers/what-is-the-gross-domestic-product-gdp/state/california/

[51] *Gross Domestic Product: Oil and Gas Extraction (211) in California*. (2023). Stlouisfed.org. https://fred.stlouisfed.org/series/CAOILGASNGSP#

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**and gas industry estimated to be around 536,770**.[52] Collectively, total salaries and wages of California workers and employees directly affiliated with the oil and gas industry have generated over $23 billion in personal income and over $53 billion as related to indirect personal income associated with those employed in related industries and businesses.[53] In aggregate, the oil and gas industry has generated over $47.9 billion in state and local and $16.3 billion in federal tax revenues for 2022 (collectively $64.2 billion).[54]

35.    Specifically, in California, the oil and gas industry creates and sustains premium-paying jobs across a broad spectrum of job classes, including union, non-union, professional, and skilled workers. For example, petroleum system pump operators, refinery operators, and gaugers earn, on average, $95,610, while gas and processing facility operators earn $105,000 annually.[55] In comparison, the typical wages for a construction worker in California average $44,310 annually, according to the California Department of Tax and Fee Administration (CDTFA).[56]

36.    As of December 2023, California holds around 3.1% of all U.S.-proven reserves, ranks fifth largest oil reserves in the U.S., ranks 7th in oil production among 32 oil-producing states, and is home to the Monterey Shale Reserve.[57] Comparatively, California's in-state oil production is dwarfed by Texas, North Dakota, New Mexico, and Alaska. For perspective, Texas produced almost 18 times the amount of oil than California in 2022.

---

[52] *Statewide_LAEDC_2025_factsheet-1.pdf | Powered by Box*. (2025). Box.com. https://wspa.app.box.com/s/2v30dlvt0fbez09irhav001rw19tfh48

[53] *Statewide_LAEDC_2025_factsheet-1.pdf | Powered by Box*. (2025). Box.com. https://wspa.app.box.com/s/2v30dlvt0fbez09irhav001rw19tfh48

[54] *Statewide_LAEDC_2025_factsheet-1.pdf | Powered by Box*. (2025). Box.com. https://wspa.app.box.com/s/2v30dlvt0fbez09irhav001rw19tfh48

[55] *Oil & Gas In California – Los Angeles County Economic Development Corporation*. (2025, March 16). Laedc.org. https://laedc.org/research/reports/oil-gas-in-california/

[56] *Fuel Taxes Statistics & Reports*. (n.d.). Www.cdtfa.ca.gov. https://www.cdtfa.ca.gov/taxes-and-fees/spftrpts.htm

[57] *California State Energy Profile. California Profile*. (n.d.). https://www.eia.gov/state/print.php?sid=CA#89

26

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

27

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Figure 8**



(Source: Top 11 Oil-Producing States in 2023, ROBERT RAPIER, as cited in https://oilandgaspress.com/top-11-u-s-oil-producing-states/. See also, https://www.investopedia.com/financial-edge/0511/top-6-oil-producing-states.aspx#citation-21)

### iii.    Production

37.    Once a global leader and ranking fourth in the world in oil production, today, California accounts for only around 2.5% to 2.7% of all U.S. crude production and is producing only 23.7% of its own in-state needs. California's oil production has consistently fallen since 1992. In 1992, California produced 320,888,000 barrels of oil.[58] In contrast, in 2022, California produced 124,727,000 million barrels of oil or only 39% of 1992 production. On a comparative basis for the 1990 to 2022 period, California's oil field production declined while overall U.S. oil field production grew. In 2012, the Golden State's in-state oil production was 197 million barrels a day, and California's population was 37.5 million. However, by 2022/23, with California's population at 38.95 million, in-state oil production

---

[58] California Energy Commission. (n.d.-a). *Annual oil supply sources to California refineries*. https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california

28

had fallen by 35% to 127 million barrels. Meanwhile, California imports of non-U.S. foreign oil grew by 1,102% from its historic low in 1991 of 31 million barrels to 369 million barrels its peak high in 2018.[59]

38.     Since 1990, while overall U.S. field production has increased 66%, California's field production declined 61%, and 68% decline from its peak production in 1985. From 2018, California's field production has declined 26.4%. Since 1982, California's ability to meet its demand for petroleum through in-state production has fallen from over 68% internally sourced to about 21% in 2023.

**Figure 9**



[59] Based on CEC data.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

39.    California's oil fields, production, and refineries are assigned to PADD Region 5.[60] The Petroleum Administration Defense Districts, or "PADDs," were established during World War II as a means of managing and allocating petroleum resources and production to the war effort. The structure worked so well that it has been retained for reporting purposes today. The PADD 5 region includes Alaska, Arizona, California, Hawaii, Oregon, and Washington. On an annual percentage change basis, for the 1991 to 2022 period, while U.S. oil field production increased and overall PADD 5 production moderated, California production fell.

**Figure 10**



40.    Notwithstanding the increase in California's population, GDP, and motor vehicle registrations, for the 1990 to 2022 period, PADD 5 and **California oil field production as a percentage of total U.S. production has declined due to decreased in-state field production**.

---

[60] Petroleum Administration Defense District. The PADDs were created in 1942 by Presidential Executive Order during WW-II as a method for managing petroleum resources. It is currently used to collect data and for data analysis.

30

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Figure 11**



(Source: EIA)

41.   California refineries use oil to produce a slightly different product mix and yields on a barrel-to-barrel basis compared to a "typical" barrel of oil products. Below is a chart comparing the "typical" barrel product or "slate" mix of California petroleum products to typical U.S. refineries for California in 2024.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Figure 12[61]**

| Comparison of Product Types Per Barrel-CA. to U.S. | | |
|---|---|---|
| Product Type | Typical U.S. Product Types | California Product Types |
| CA. CARB Gasoline | 0.00% | 42.40% |
| Aviation (Jet) Fuel | 9.00% | 15.30% |
| CA CARB Diesel Fuel | 25.00% | 10.00% |
| Conventional Gasoline | 45.00% | 5.20% |
| EPA Diesel Fuel | 0.00% | 5.80% |
| Other RBOB | 0.00% | 2.40% |
| Other Diesel | 0.00% | 0.20% |
| Total All Fuels | 79.00% | 81.30% |
| All Other Products | 21% | 18.70% |
| Grand Total: | 100.00% | 100.00% |

(Source: CDTFA_CEC joint report 2024 review of the gasoline in ... (n.d.-b)

42.    Significantly, the addition of Sable oil production from its three offshore platforms and the use of its existing Las Flores Pipeline System will change the supply dynamics in the State by creating not only more viable and more cost effective alternatives to non-U.S. foreign oil supplies, but will also work to help stabilize consumer gasoline prices by reducing the uncertainties and insecurities related to the crude oil supplies necessary to support California's refineries in their production of combustible fuels such as gasoline, diesel and aviation, as well as asphalt and distillates used in the manufacturing of mobile phones, medical devices, and other essential products.

### iv.    Movement & Transportation

43.    Petroleum products, such as oil and gasoline, are moved from point to point using various transportation methods, including marine vessels, barges, pipelines, rail tankers, and truck tankers. The movement of gasoline and oil is supported by storage tanks for short-term product storage.

---

[61]    CDTFA_CEC joint report 2024 review of the gasoline in ... (n.d.-b). https://seuc.senate.ca.gov/sites/seuc.senate.ca.gov/files/cdtfa_cec_joint_report_2024_review_of_the_gasoline_in_california_and_relate.pdf

32

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

44.     **California has no inbound pipelines** for petroleum or gasoline. However, the State has an extensive in-state (intrastate) network of pipelines for moving oil and gasoline from ports to refineries to distribution points (racks), as well as end-users such as airports. **California pipelines carry fuels to 60 distribution points within the state**. Proprietary pipelines are owned and operated by companies such as Crimson and PBF Logistics and were owned by Chevron and ExxonMobil. The sole private common carrier in California is Kinder Morgan.[62]   Kinder Morgan owns, has an interest in, and operates over 79,000 miles of pipelines and 139 terminals throughout the U.S.[63] For perspective, according to the U.S. Department of Transportation, the U.S. has over 2.6 million miles of installed petroleum and petroleum-related pipelines.[64]

45.     **California has two major outbound pipelines** to supply gasoline to Nevada and Arizona. California's pipeline network is composed of common carrier arteries that transport products from multiple producers and proprietary pipelines.

46.     According to the **U.S. Department of Transportation, pipelines are the safest method to transport petroleum products**.[65] A modern pipeline integrates advanced safety technologies with continuous operations to constantly monitor safety and environmental impacts. In the U.S., pipelines and pipeline operations are highly regulated and fall under the purview of various federal, state, and local agencies, including the Pipeline and Hazardous Materials Safety Administration. In California, the California Department of Conservation's Geologic Energy Management Division (CalGEM) and the California Office of the State Fire

---

[62] Schremp, G. (2016). *PADD 5 & California Transportation Fuel Overview Western Regional Emergency Fuel Coordination Meeting California Energy Commission Sacramento, CA*. https://www.naseo.org/Data/Sites/1/schremp-1.pdf

[63] *Home - Kinder Morgan*. (n.d.). Www.kindermorgan.com. https://www.kindermorgan.com

[64] *General Pipeline FAQs*. (n.d.). PHMSA. https://www.phmsa.dot.gov/faqs/general-pipeline-faqs

[65] *General Pipeline FAQs*. (n.d.). PHMSA. https://www.phmsa.dot.gov/faqs/general-pipeline-faqs

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

Marshal (OSFM) oversee oil and gas pipelines.[66] **California has the strictest standards for oil and gasoline pipeline construction, testing, and maintenance in the world**.

47.    Since California has no inbound pipelines and its in-state production has fallen considerably, nearly 100% of California's non-U.S. sourced imported oil is delivered to its refineries via maritime vessels, which are significant contributors to GHG emissions.[67] For 2023, California received 61% of its crude oil stocks from foreign sources and 16% from Alaska. Oil imports from these sources are delivered to California using maritime oil tanker vessels (limited barge).[68] Tankers that move oil among and between U.S. ports must comply with the Jones Act.[69] Passed in 1920 as the Merchant Marine Act of 1920, the Jones Act, as amended in 2006, prohibits foreign-flagged vessels from carrying cargo, including petroleum products between U.S. maritime ports in the contiguous states. Under the Jones Act, cargo, including crude oil, must be transported on U.S. flagged ships, built in the U.S. and crewed U.S. crew members. As of 2024, there are only 55 to 58 U.S. tankers that are compliant with the Jones Act and the majority, if not all, are deployed between the Gulf Coast and East Coast markets. The lack of available Jones Act compliant tankers compromises California's ability to move crude from other U.S. sources and strengthens the need for Sable production and the use of the Las Flores Pipeline System.

---

[66]  California Department of Conservation. (n.d.). *Pipelines and facilities*. https://www.conservation.ca.gov/calgem/for_operators/Pages/Facilities.aspx#:~:text=Generally%2C%20CalGEM%20regulates%20all%20pipelines,used%20for%20transportation%20to%20refineries.

[67]  California Energy Commission. (2022). *2022-07_Petroleum_Watch*. California Energy Commission. https://www.energy.ca.gov/media/7138

[68]  Commission, C. E. (n.d.). *Foreign Sources of Crude Oil Imports to California 2020*. California Energy Commission. https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports

[69]  Section 27 of the Merchant Marine Act of 1920 (P.L. 66-261). See, also: https://crsreports.congress.gov/product/pdf/R/R45725

34

LEGAL02/46287064v8

48.     California has only a minimal amount (less than 1% in 2015) of inbound oil transported using rail tankers.[70][71] In 2024, California received no inbound crude from Canada via rail but did import 468,000 barrels from North Dakota by rail tanker.[72] In the U.S., a DOT-117 certified rail tanker can hold up to 286,000 gallons or 6,809 barrels of product and must be designated with NA1993 identification.[73][74] With respect to rail transport, one of the controlling factors is the capacity of the rail tracks and routes. Rail tracks are rated for speed and weight and, therefore, have restrictions. Similar restrictions are associated with tunnels, bridges, curves, incline grades, declines, and urban areas.

49.     **California relies extensively on over-the-road tanker trucks for the local shipping** of finished gasoline products from refineries to distributors (racks) and onward for delivery to retail gasoline stations. In 2015, tanker trucks averaged approximately 4,980 deliveries per day, representing 39.84 million gallons of gasoline.[75] In California, **94% of all trucks are fueled by either diesel (67%) or gasoline (25%)**.[76]

[70] Schremp, G. & California Energy Commission. (2016). California transportation fuel overview. In *Western Regional Emergency Fuel Coordination Meeting*. https://www.naseo.org/Data/Sites/1/schremp-1.pdf

[71] Commission, C. E. (n.d.). *Foreign Sources of Crude Oil Imports to California 2020*. California Energy Commission. https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports

[72] California Energy Commission. (2024). *Crude Oil Imports By Rail*. California Energy Commission. https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california/crude

[73] *More Rail Tank Cars Meet DOT-117 Safety Standards in 2022 | Bureau of Transportation Statistics*. (2022). Bts.gov. https://www.bts.gov/newsroom/more-rail-tank-cars-meet-dot-117-safety-standards-2022

[74] *Economics of Rail versus Pipeline*. (n.d.-b). Welcome to Altex Energy. https://www.altex-energy.com/economics-of-rail-versus-pipeline/#1501828266955-2913a69d-c276

[75] Crockett, & Schremp, G. (2015). *California Transportation of Petroleum Second Northern California Refinery Safety Forum*. https://calepa.ca.gov/wp-content/uploads/sites/6/2016/10/Refinery-Documents-2015yr-Petroleum.pdf

[76] California. (n.d.). *Large Entity Fleet Reporting STATEWIDE AGGREGATED DATA*. Retrieved February 23, 2025, from https://ww2.arb.ca.gov/sites/default/files/2022-02/Large_Entity_Reporting_Aggregated_Data_ADA.pdf

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

50.   Two factors combine to make oil and fuel production a critical concern in California. First, California is virtually completely dependent on foreign, non-U.S.-sourced oil to produce its fuels. Second, California has had restrictions and is losing refinery capacity to produce fuels. The combination of these two factors is potentially fatal to the State's economic vitality, growth, and long-term security. Significantly, any disruption of this very tight and delicate balance of supply and demand could have debilitating consequences for the State.

### v.   California Consumption

51.   Gasoline, diesel, and aviation fuels are made from crude oil. California is the 2nd largest consumer of petroleum and the largest consumer of aviation fuel in the U.S.[77] In 2023, Californians consumed over 500 million barrels of oil (1.8 million per day), 13.119 billion gallons of gasoline, 3.6 billion gallons of diesel fuel, and over 216 million gallons of aviation fuel, based on CEC and CDTFA revenue data. [78] [79] [80]

52.   The largest consumer of crude oil in California is gasoline production. Diesel fuel consumption is the second largest and represents about 17% of all crude oil consumption in the Golden State.[81] Californians consume between **30 to 33 million gallons of gasoline a day and around 9.9 million gallons a day of diesel fuels**. According to the CEC, 97% of all

[77] U.S. EIA, Crude Oil Production, Annual, Thousand Barrels, 2023.

[78] California Department of Tax and Fee Administration. (n.d.-b). Fuel Taxes Division Statistics & Reports – 2010. https://www.cdtfa.ca.gov/taxes-and-fees/spftrpts10.htm

[79] California's Refinery Capacity Stretched to the Limit | California Policy Center. (2025, April 11). California Policy Center |. https://californiapolicycenter.org/californias-refinery-capacity-stretched-to-the-limit/

[80] Fuel Taxes Statistics & Reports. (n.d.). Www.cdtfa.ca.gov. https://www.cdtfa.ca.gov/taxes-and-fees/spftrpts.htm

[81] Commission, C. E. (n.d.). *Diesel Fuel Data, Facts, and Statistics*. California Energy Commission. https://www.energy.ca.gov/data-reports/energy-almanac/transportation-energy/diesel-fuel-data-facts-and-statistics

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

gasoline in California is consumed by automobiles, SUVs, and light-duty trucks.[82] The CEC further notes that "Nearly all heavy-duty trucks, delivery vehicles, buses, trains, ships, boats and barges, farm, construction and heavy-duty military vehicles and equipment have diesel engines. **Diesel is the fuel of choice because it has 12 percent more energy per gallon** than gasoline and has fuel properties that prolong engine life, making it ideal for heavy-duty vehicle applications."[83]

53.     In general, long-term oil and gasoline consumption demonstrate relative inelasticity to price. That is, price increases do not have a correspondingly equal impact on consumption as consumers and incomes adjust to higher prices over the long term. However, studies do indicate the presence of elasticity in the short-term, particularly in California.[84] The consequence of oil, gasoline, and diesel fuel price increases, as well as aviation fuels, generally results in a change in consumer behavior in other expenditure areas; that is, consumers may reduce spending on entertainment, for example, in order to compensate for higher energy costs.

54.     **Oil and gasoline consumption in California has not declined significantly over a twenty-five-year period**. Despite nearly a 100% improvement in miles per gallon due to engine and drive train efficiencies since 1975, and irrespective of California's considerable efforts to encourage and force (and 2035 mandate) the adoption of EVs and Zero Emissions Vehicles (ZEVs), California's demand for oil and gasoline have moderated only slightly over the 2001 to 2024 period. Furthermore, 2025 EV and ZEV adoption rates are significantly lower than CARB estimates and, according to recent sales figures, have slowed

---

[82] Commission, C. E. (n.d.). *California Gasoline Data, Facts, and Statistics*. California Energy Commission.                  https://www.energy.ca.gov/data-reports/energy-almanac/transportation-energy/california-gasoline-data-facts-and-statistics

[83] Commission, C. E. (n.d.). *Diesel Fuel Data, Facts, and Statistics*. California Energy Commission. https://www.energy.ca.gov/data-reports/energy-almanac/transportation-energy/diesel-fuel-data-facts-and-statistics

[84] Colina, Armando R., et al. "Estimates of Gasoline Demand Elasticity Using California Refinery Outages." SSRN Electronic Journal, 2023, https://doi.org/10.2139/ssrn.4629611.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

considerably.[85] From 2001 to 2024, overall, CDTFA reported gasoline sales had fallen 11.12 % or less than one-half of one percent per year.[86]

**Figure 13**



(Source: https://www.cdtfa.ca.gov/taxes-and-fees/spftrpts10.htm)

55.    The annual percentage change in CDTFA gasoline sales is relatively consistent. It shows only a modest annual variance of -.46% and is highly correlated to the annual percentage change in overall U.S. gasoline consumption.

---

[85]   "New ZEV Sales in California." *Www.energy.ca.gov*, www.energy.ca.gov/data-reports/energy-almanac/zero-emission-vehicle-and-infrastructure-statistics-collection/new-zev.

[86] *Fuel Taxes Division Statistics & Reports – 2020*. (2020). Ca.gov. https://www.cdtfa.ca.gov/taxes-and-fees/spftrpts20.htm

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Figure 14**



(Source: https://www.fhwa.dot.gov/policyinformation/statistics/2022/mf226.cfm)

56.    Given California's economic profile and growth rate, there is no indication that the demand for crude oil, gasoline, diesel fuels, and aviation fuels will decline significantly over the forthcoming ten-year period. Declines in fossil fuel usage are anticipated as alternative fuels are perfected and scaled, but various agencies and researchers expect the demand for oil to peak sometime between 2035 and 2055.[87] Notwithstanding the inevitable and future peak in fossil fuel production, crude oil is and will remain a vital component of any economy as it is used in so many other applications, such as asphalt and concrete.

### vi.    California Imports

57.    California is the most dependent of all fifty states on foreign, non-U.S. oil as a source for refineries to produce gasoline, diesel, and aviation fuels. Since the 1980s, California's in-state oil production has fallen, and its reliance on foreign-sourced oil increased. By 2023, California's in-state oil production was only able to supply around 23% of its needs, and its dependency on foreign-sourced oil grew by over 850%.

---

[87] Kimani, Alex. "IEA Predicts End to Oil & Gas Demand Growth before 2030." *OilPrice.com*, 18 Oct. 2024, oilprice.com/Energy/Energy-General/IEA-Predicts-End-to-Oil-Gas-Demand-Growth-Before-2030.html.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

58.    As California's in-state oil field production declined, the Golden State turned to foreign <u>petrostates</u> to meet its in-state crude demands.[88] [89]  For 2023, **60.7% of California's oil was imported from foreign sources, including the petrostates of Iraq (21.7%) and Saudi Arabia (15.7%)**. South America's Brazil and Ecuador represented the third and fourth largest sources of California import sources at 15.1% and 14.6%, respectively. Collectively, and based on CEC data, the three largest sources (Iraq, Saudi Arabia, and Brazil) represented 52.4% of all California foreign imports.[90] Middle Eastern oil from OPEC members Saudi Arabia, Iraq, and the U.A.E., in aggregate, represented 39.25% of all California oil imports for 2023.

59.    According to various independent estimates, **California ranks #1 in payments to foreign sources of oil** and pays more than $61.8 million per day, or $22.5 billion annually, based on Brent market prices, or $54.41 million a day, or $19.8 billion annually, based on WTI market prices, to foreign countries such as Iraq, U.A.E., and Saudi Arabia, and others for its oil imports.[91]

---

[88] Fox News. (2015, December 21). *Shale oil deposit a possible boon to struggling California, but state wary, enviros opposed*. https://www.foxnews.com/politics/shale-oil-deposit-a-possible-boon-to-struggling-california-but-state-wary-enviros-opposed

[89] Jones, J. (2024, March). *States With the Most Oil Reserves [2024] - Construction Coverage*. Construction Coverage. https://constructioncoverage.com/research/states-with-the-most-oil-reserves

[90] California Energy Commission. (n.d.-h). *Foreign sources of crude oil imports to California*. https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports

[91] Based on WTI and Brent crude prices as of 3/14/25, and CA. imports are reported by CEC. See also, Ed, C. (2018, October 9). *California ranks #1 in sending dollars abroad for Energy*. https://www.cfact.org/2018/10/09/california-ranks-1-in-sending-dollars-abroad-for-energy/  .  See also, *FACTS - Californians for energy independence*. (2023, July 31). Californians for Energy Independence.
  https://www.energyindependenceca.com/facts/#:~:text=California%20now%20imports%2075%25%20of,use%2C%20mostly%20from%20foreign%20countries.&text=California%20spends%20$25%20Billion%20dollars,to%20meet%20our%20energy%20needs.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

60.     In 1982, California produced 61% of its oil needs in the State.[92] Commencing in the mid-1990s, as California's imports of domestically produced oil from Alaska and in-state oil production began a long-term decline, its need for foreign-produced oil began to accelerate. While imports of non-U.S. domestically sourced oil from OPEC and other states increased by 850%, California imports of U.S. domestically produced oil from Alaska plummeted by 57.32%.[93]

**Figure 15**



(Source: https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california)

---

[92] California Energy Commission. (n.d.-a). *Annual oil supply sources to California refineries.* https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california

[93] Alaska North Slope oil field production declined but accounted for 15% of California's oil in 2021. Today, the Alaskan Pipeline operates at 20-25% of its original capacity due to lower field production. However, both field production and pipeline capacity utilization are expected to increase in 2025. See, https://www.californiaenergyatlas.com/crude-oil

41

61.     While imports from foreign sources increased, domestically sourced 'imports' from other U.S. petroleum-producing states, Alaska and California's in-state production have declined.

**Figure 16**



(Source: CEC)

62.     While imports of non-U.S. domestically sourced oil from OPEC and other states increased by 857%, California imports of U.S. domestically produced oil, predominantly supplied from Alaska, plummeted by 57.32%.[94]

---

[94] Alaska North Slope oil field production declined but accounted for 15% of California's oil in 2021. Today, the Alaskan Pipeline operates at 20-25% of its original capacity due to lower field production. However, both field production and pipeline capacity utilization are expected to increase in 2025. See, https://www.californiaenergyatlas.com/crude-oil

42

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

California Imports: Percentage Composition by Source 1982-2023

California's use of foreign oil as a % of total oil has increased 984%

California's in-state oil as a % of total oil fell 62%

California's use of U.S. Alaskan oil as a % of total oil fell 52%

**Figure 17**

(Source, CEC, EIA, and Author)

63.     Compared to all U.S. oil imports, for 2024, California has a significantly greater dependency on and a higher percentage of non-U.S. foreign oil from petrostates such as Iraq, as well as high dependency on South America's Brazil and Ecuador than the overall U.S. Since 1982, California's reliance on foreign oil imports has increased by 857%, or 20 times greater than that of the overall U.S.' importing of foreign oil.[95]

64.     **No state in the U.S. imports more foreign-sourced oil for its use than California**. In 2023, California imported 321.153 million barrels of oil from non-U.S. sources. Since 1982, California's imports of foreign oil have increased by 857%. In 2024, California imports increased slightly to 321.831 million barrels of oil, or .21%. In 2024, as

[95] Alternative Fuels Data Center: Maps and Data - U.S. Production, Consumption, and Trade of Petroleum Products. (n.d.). Afdc.energy.gov. https://afdc.energy.gov/data/10324

43

U.S. imports of foreign oil hit a thirty-year low, California imports of crude came within 13% of its thirty-year high (2018).[96]

65.     In 2024, California's mix of non-U.S. foreign imports changed due to the emergence of Guyana filed production. Iraq, which provided 68,406 barrels of oil, composed 21.26% of its non-U.S. oil imports. Brazilian oil imports increased to 20.41%, and as production scaled in Guyana, imports from that South American country increased exports to California to 50,840 barrels or 15.80% of the total 321,831 barrels of non-U.S. imported oil.[97] Additionally, throughout its history, California has also imported oil from Russia, Angola, Oman, and other national providers.[98]

66.     California's oil dependency on imports from various petrostates, such as Iraq and Saudi Arabia, as well as various other Middle Eastern sources, have both intended and unintended economic consequences and directly and indirectly support the sourcing countries' economies, governing policies and structures, political agendas, and societal initiatives. Summarized in the Figure below are some pertinent social, political, and human freedom rankings for various sources such as Transparency International and Global Finance of California crude oil imports.[99]     Iraq, which is California's largest provider of foreign in

[96] Roberts, K. (2024, August 19). *2024 U.S. oil imports from Middle East hit new record low*. Forbes. https://www.forbes.com/sites/kenroberts/2024/08/16/2024-us-oil-imports-from-middle-east-hit-new-record-low/. See also, EIA and CEC import data.

[97] California Energy Commission. (n.d.-d). *Foreign sources of crude oil imports to California*. https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports

[98] *California 2019 crude average carbon intensity up*. (2019). Green Car Congress. https://www.greencarcongress.com/2020/06/20200616-carbci.html

[99] Sources include Transparency International. (2024, September 12). 2023 *Corruption Perceptions Index: Explore the results*. Transparency.org. https://www.transparency.org/en/cpi/2023; Vásquez, I., Mcmahon, F., Murphy, R., & Schneider, G. (2023). *HUMAN FREEDOM INDEX 2023 A Global Measurement of Personal, Civil, and Economic Freedom*. https://www.cato.org/sites/cato.org/files/2023-12/human-freedom-index-2023-full-revised.pdf; *Age of conflict*. (n.d.). https://pages.eiu.com/rs/753-RIQ-438/images/Democracy-Index-2023-Final-report.pdf?version=0; Ventura, L. (2024, October 20). *Poorest Countries in the world 2024*. Global Finance Magazine. https://gfmag.com/data/economic-data/poorest-country-in-the-world/; *Human*

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

2023, is ranked 27th out of 179 as a "Fragile/Failed State Index" by the Fund for Peace. For perspective, North Korea and Rwanda rank "better." The U.S. is ranked 141st.[100]

### Figure 18

| Comparison: Selected Rankings for Social, Economic & Corruption for California Oil Imports (2023/2024) | | | | | |
|---|---|---|---|---|---|
| | Iraq | Saudia Arabia | Brazil | Ecuador | United States |
| Percent of California Total Imports | 21.70% | 15.70% | 15.10% | 14.60% | NA |
| Corruption Perception Ranking | 154 | 53 | 104 | 115 | 24 |
| Human Freedom Ranking | 156 | 157 | 70 | 72 | 17 |
| Media/Press Freedom Ranking | 169 | 166 | 82 | 110 | 55 |
| Democracy Ranking | 128 | 150 | 51 | 85 | 29 |
| Economic Freedom Ranking/Score | Not Ranked | 61.9 | 53.2 | 55 | 70.1 |
| Poorest County Ranking | 71 | 173 | 107 | 79 | 182 |
| Government Integrity | 18.3 | 43.9 | 36.9 | 34.9 | 76.4 |

### Figure 19

| FRAGILE STATES INDEX RANKING Selected CA Sources of Foreign Imports | |
|---|---|
| **California Oil Source** | **Overall Ranking Out of 179** |
| Iraq | 27 |
| Brazil | 71 |
| Ecuador | 87 |
| Saudi Arabia | 100 |
| U.S.A. | 141 |
| Note: Lower number = more unfavorable. | |

(Source: https://fragilestatesindex.org/excel/)

67.     California's sources of foreign oil rank considerably lower in terms of human rights compared to domestically available sources from the U.S., including California.

---

*rights index*. (2024, March 7). Our World in Data. https://ourworldindata.org/grapher/human-rights-index-vdem?tab=chart&country=BRA~ECU~IRQ~SAU~USA; and The Heritage Foundation. (n.d.). *Index of Economic Freedom: All Country Scores | The Heritage Foundation*. Index of Economic Freedom | the Heritage Foundation. https://www.heritage.org/index/pages/all-country-scores.

[100] Energyskeptic. (n.d.). *Peak everything, overshoot, & collapse - preservation of knowledge*. Peak Everything, Overshoot, & Collapse - Preservation of Knowledge. https://energyskeptic.com/

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Figure 20**



**D.      Crude Oil Pricing**

     **i.      Commodity Pricing & Volatility**

68.      Crude oil is a commodity, and the price of crude oil is highly volatile and subject to dramatic swings and shifts, which, in turn, influence retail gasoline and aviation and diesel fuel prices. Crude oil prices swing wildly by the day, hour, and even the minute and, as such, are notoriously difficult to predict. Any major geopolitical event, weather disruption, labor situation, maritime tanker issues, etc., influence the price of oil.

69.      As a global commodity, crude oil prices are set and traded on various international markets. Oil and gasoline pricing are very complex and subject to wide variations from day to day, even by the hour to hour, and in some instances, by the minute. The price of crude oil is primarily driven by the basic economic laws of supply and demand. When demand is strong and supply is low, the prices of oil, diesel, aviation fuels, and gasoline escalate.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

70.    As petroleum is a global commodity, its **pricing is subject to extreme volatility**. Geopolitical, domestic, political, and regulatory actions conflate the basic market powers of supply and demand. Five factors influence the spot price of oil: **1-** supply (production), **2-** demand (consumption), **3-** geo-political events, **4-** national and local government policies and regulations, and **5-** trading/financial markets. Notably, any significant disturbance to any of these influencing factors will have an impact on the price of oil and, ultimately, the price of diesel and aviation fuels, as well as retail gasoline prices.

71.    Oil is traded using long-term contracts and spot pricing in multiple markets, with the New York Mercantile (NYMEX) and Intercontinental Exchange (ICE) being predominant. Gasoline is also traded on global markets and in California on spot markets in San Francisco and Los Angeles. The trading prices of various oil types and grades are highly correlated and generally move in the same direction with similar degrees in magnitude of movement. Future oil prices are speculative and can fluctuate wildly. For example, on April 20, 2020, the price of oil fell 306% from its May 2020 futures crude contract price to a _negative_ price of $37.63 a barrel on the New York Mercantile Exchange.[101] Technically, this type of inversion between current and future prices implies that the seller would have to pay the buyer to purchase the seller's oil contract. Under those circumstances, producers have little incentive to produce more products. Illustrated in the chart below are the various crude oil prices for various grades for the 2008 to 2024 period. As indicated, oil prices in various markets tend to move in correlation with one another.

---

[101] Saefong, M. P. (2021, April 19). Oil prices went negative a year ago: Here's what traders have learned since. MarketWatch. https://www.marketwatch.com/story/oil-prices-went-negative-a-year-ago-heres-what-traders-have-learned-since-11618863839

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Figure 21**



(Source:
https://www.eia.gov/finance/markets/crudeoil/spot_prices.php#:~:text=Crude%20oil%20is%20traded%20in,that%20are%20lower%20in%20quality)

72.    As indicated, the price of crude oil swings radically from period to period. For example, in the mid-2015 period, the WTI price of crude, which is typically a bit lower than Brent, was $108 a barrel. Within about 7 months, the WTI price dropped 70% to $32 a barrel. In 2019, the average price of Brent crude was $64.30 a barrel. However, with the onset of COVID, the average price of Brent fell by almost 35% in 2020 and shot back up 141% in 2022.

**Figure 22**

48

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8



(Sources: EIA, Macrotrends, Statista, OilPrice.com)

73.     Illustrated below are oil price movements for the 1970 to 2023 period as related to major political, economic, and business events.

**Figure 23**



(Source: Author and https://www.eia.gov/finance/markets/crudeoil/spot_prices.php#:~:text=Crude%20oil%20is%20traded%20in,that%20are%20lower%20in%20quality)

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

74.     During the 1970s, the U.S. experienced two **episodic** events or oil "shocks." The first occurred in 1973, and the second was in 1978. On October 6, 1973, the Fourth Arab-Israeli war broke out between Israel and a collation of Arab nations, including Saudi Arabia, Egypt, and Syria.[102] [103]  The U.S., which had and continues to maintain formal defense alliances with Israel, supported Israel with a $2.8 billion (equivalent to $20.2 billion in 2024) defense aid package.

75.     In retaliation to the U.S. support of Israel, the Arab members of OPEC lowered oil production by 5% and initiated an oil embargo on the U.S. Overall, global oil supplies fell by 14%. Within days of the onset of hostilities, the reduction in production, and the embargo, petroleum prices surged by 71%, rising from $3.01 to $5.12 per barrel. The rapid and unexpected surge in prices dealt a severe, almost debilitating blow to the U.S. economy. Less than three months later, in December 1973, Arab member OPEC oil producers again cut production by 25% from its September levels. In reaction, the price to the U.S. for OPEC-sourced oil rocketed to $11.65 a barrel — an increase of 287% in about 90 days. What followed were gasoline shortages, price spikes, and high inflation. By March 1974, the oil embargo was formally ended by the Arab nations, but its influence on the U.S. economy lasted well into the 1980s. Recognizing its vulnerability to foreign sources and spot market prices, the U.S. Congress established the Strategic Petroleum Reserve (SPR) in December 1975.[104]

76.     Due to its high dependency on non-U.S. foreign-sourced crude oil, California is extremely vulnerable to "oil shocks," shortages, and price hikes that may be perpetrated by foreign actors. California has experienced supply shocks due to refinery closures, port disruptions, and global price surges linked to events thousands of miles away. Brent crude, which serves as the benchmark for many of these imports, tends to be more volatile than West

---

[102] The Editors of Encyclopedia Britannica. (2018). Yom Kippur War | Summary, Causes, Combatants, & Facts. In *Encyclopedia Britannica*. https://www.britannica.com/event/Yom-Kippur-War

[103] Also known as the Yom Kippur War, or Ramadan War.

[104] 42 U.S. Code § 6231 and 42 U.S. Code § 6234

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

Texas Intermediate. When California's supply is driven by international markets, price spikes happen faster and last longer.[105]

### ii.    California Crude Pricing

77.    In California, environmental factors such as earthquakes, fires, blizzards, heat, and flooding can cause disruptions in crude oil, gasoline, diesel, and aviation fuel production and distribution (transportation). Furthermore, refinery shutdowns, transitions, and decommissions adversely affect the supply of retail gasoline stocks, which rely on crude petroleum as a raw material (feedstock). When those events occur, the spot prices for crude oil stock can spike and are ultimately reflected in higher prices for retail gasoline and other fuels. The price of oil can also be further affected by events such as labor disputes and strikes involving rail and trucking, maritime terminal operational efficiencies, the supply of maritime tankers, employment rates, truck and rail transport, government lockdowns, such as COVID-19, and geopolitical events far from California.

78.    The majority of raw material in the production of gasoline is crude oil, which in California has historically averaged 48.25%.

**Figure 24**



---

[105] Johnson, J. (2025, April 18). California could lose a large chunk of its refining capacity in a year. San Francisco Chronicle. https://www.sfchronicle.com/california/article/refinery-closures-gas-prices-20279856.php

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

79.     On the West Coast, and particularly in California, refiners tend to pay slightly more for 'first purchase' crude oil than the rest of the U.S. due to low in-state production and the need to import oil from distant sources such as the Middle East.[106] [107]

### E.     Sable Offshore Corp.

### i.     Sable Oil Reserves, Capacity and Platforms (wells)

80.     According to the company's latest reserve assessments, the total net estimated contingent resources across all platforms amount to 646 million barrels of oil equivalent (MMBoe). This includes a low estimate of 179 MMBoe and a best estimate of 467 MMBoe, with the resource base comprising 86% oil, 13% gas, and 1% natural gas liquids (NGLs).[108] These figures underscore the long-term strategic value of the asset base, not only in terms of short-term output but also in terms of **reserve longevity**, development flexibility, and potential for **scalable economic impact**. With a phased restart strategy already underway and robust reserve validation, Sable's offshore system is positioned for both operational reliability and multi-decade resource contribution to California's economic future.

**Figure 25**

| Sable Platform Capacity | | | | |
|---|---|---|---|---|
| Platform | Existing Wells | Available well slots | Est. Net Production Per Day | Est. Restart Date |
| Harmony | 32 | 23-27 | 15.0-19.0 MBOE | 15-May-25 |
| Heritage | 44 | 15-17 | 19.0-23.0 MBOE | Jul-25 |
| Hondo | 26 | 10 | 6.0-8.0 MBOE | Aug-25 |

81.     Sable's offshore oil recovery infrastructure comprises three key production platforms- Harmony, Heritage, and Hondo- all part of SYU (Santa Ynez Unit). These platforms are designed for high-volume, multi-well production and together **represent one**

---

[106] *California law and refinery closure reflect ongoing challenges for the state's fuel market - U.S. Energy Information Administration (EIA)*. (n.d.). https://www.eia.gov/todayinenergy/detail.php?id=63944

[107] California Crude Oil First Purchase Price (Dollars per Barrel). Eia.gov. https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?f=M&n=PET&s=F005006__3&utm

[108] *Sable Offshore Corp. - Events & Presentations*. (2023). Sableoffshore.com. https://sableoffshore.com/events-and-presentations/default.aspx

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**of the most robust offshore systems along the California coast**. As of the second half of 2025 (2H25), Sable anticipates a total production capacity between 40,000 and 50,000 barrels of oil equivalent per day (BOE/D), with near-term output poised to rival the historical 2015 peak of 45,000 BOE/D.[109]

82.     Platform Harmony, which resumed production on May 15, 2025, includes 32 existing wells and up to 27 available well slots, targeting a 2H25 production rate of 15,000 to 19,000 BOE/D. Platform Heritage, scheduled to restart in July 2025, features 44 existing wells with 15–17 additional well slots and is expected to deliver 19,000 to 23,000 BOE/D.[110] Platform Hondo, with 26 existing wells and 10 available slots, is projected to come online in August 2025, contributing 6,000 to 8,000 BOE/D..

### ii.     Sable Production Operational Analysis

83.     Operationally, Sable is currently configured to produce between 30,000 to 35,000 barrels of crude oil daily. However, because of its multiple well capabilities, longer-term production yields could be considerably higher. In general, larger producers with 10,000 barrels a day or more in crude oil production require a realized price of $31.00 a barrel to cover fully loaded operating expenses for existing wells.[111] For perspective, the breakeven for a new drilled well ranges between $61.00 to $71.00 a barrel.

84.     Based on Sable's estimates and compared to those generated in my analysis as well as those associated with external benchmarks, Sable's operating breakeven is favorable and competitive and falls within the range of other offshore shallow-water producers. Accordingly, there is an "economic" market for Sable's production, which is cost-competitive on a comparable basis based on current and expected Brent prices.

---

[109] *Sable Offshore Corp. - Events & Presentations.* (2023). Sableoffshore.com. https://sableoffshore.com/events-and-presentations/default.aspx

[110] *Sable Offshore Corp. - Events & Presentations.* (2023). Sableoffshore.com. https://sableoffshore.com/events-and-presentations/default.aspx

[111] "Oil and Gas Activity Edges Higher; Uncertainty Rising, Costs Increase." *Dallasfed.org*, 2025, www.dallasfed.org/research/surveys/des/2025/2501#tab-questions.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Figure 26**

| Estimated Sable Breakeven Costs as Compared to CA Sources | | |
|---|---|---|
| Source | Estimated Breakeven Cost Range | Current CA Source of Oil |
| Middle East | $9.00 to $11.00 | Yes |
| South America | $7.00 to $28.00 | Yes |
| Offshore-Shallow | $37.00 to $47.00 | |
| Offshore- Deep | $43.00 to $53.00 | |
| Offshore-Shallow- Rystad | $37.00 | |
| Offshore- Deep- Rystad | $43.00 | |
| North American Shale- Rustad | $45.00 | |
| Oil Sands- Rystad | $57.00 to $75.00 | Yes- Canada |
| Sable Offshore- Estimated | $29.00 to $41.30 | |
| Note: Ranges vary based on production volumes and regulatory costs. | | |
| Sources: Various and calculated. | | |

As noted by Rystad, costs for offshore shallow shelf, as well as deepwater producers, declined around 35%. [112] Given Sable's technology, further cost reductions are possible.

### iii.    Sable Customers and Selling Markets

85.    Oil and gas producers sell their output (production) predominantly to refineries, which, in turn, create products such as gasoline, diesel, and aviation fuels and distillates. As crude oil is a global commodity, there are a number of different markets that Sable could potentially sell its production on and to. In California, there are only three major in-state refinery customers representing a combined daily capacity of around 781,000 barrels a day remaining as customers for Sable oil production. All three of these in-state refineries are **heavily dependent on non-U.S. foreign oil** as feedstock to its fuel production process and are **essential to California's economic growth and national security.**

**Figure 27**

| Sable CA. Refinery Customers | | | |
|---|---|---|---|
| Refinery | Operator | Location | Approx. Capacity (bpd) |
| Chevron | El Segundo | Southern CA | 269,000 |
| PBF Energy | Torrance | Southern CA | 149,000 |
| Marathon Petroleum | Carson/Wilmington | Southern CA | 363,000 |
| **Total Capacity** | | | **781,000** |

(Source: Statewide Economic Impacts of Resuming Production at the Santa Ynez Unit (SYU))

---

[112] *Shale project economics still reign supreme as cost of new oil production rises further*. (2024, October). Rystad Energy. https://www.rystadenergy.com/news/upstream-breakeven-shale-oil-inflation

54

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

86.     Significantly, any disruption to the crude oil feedstocks in these refineries or any unplanned interruptions to the operations of these refineries will have a detrimental impact on consumer prices. To maintain a viable operational profile, especially in consideration of increased regulatory costs and the profit restrictions imposed upon the refineries by ABX2-1, the **surviving California refineries would benefit from the security and cost advantages of additional in-state oil production**.[113]

87.     Sable's oil production will most likely be sold to refineries under long-term contracts, with pricing indexed to the Brent spot market and adjusted for sulfur content, gravity, and California location differential (typically a $2-$5/bbl. discount). As is customary with production, while some portions of Sable's production may be sold on the spot market, Sable is expected to prioritize volume stability and cash flow predictability through structured contracts long-term contracts (6–36 months) with California refineries to **help create price and volume certainty for both Sable and the California consumer**. Spot market sales, which are relatively common in the industry, would most likely cover incremental volumes or provide a hedge for price movement, especially during high and peak demand periods (e.g., summer driving season). Importantly, the **marketability of Sable crude oil is high and lively. California currently imports over 75% of its oil needs, and the decline in local production creates a significant supply gap that Sable is well-positioned to fill with minimal transportation costs and overhead**.[114]

### iv.     Sable's Pipelines

88.     Sable's offshore crude oil production is expected to enter California's intrastate pipeline and refining market, where it is particularly well-suited due to its medium-sour

---

[113] "Governor Newsom Signs Legislation to Prevent Gas Price Spikes and Save Californians Money | Governor of California." *Governor of California*, 14 Oct. 2024, www.gov.ca.gov/2024/10/14/governor-newsom-signs-legislation-to-prevent-gas-price-spikes-and-save-californians-money/.

[114] EIA. (2025). *Short-Term Energy Outlook - U.S. Energy Information Administration (EIA)*. Eia.gov. https://www.eia.gov/outlooks/steo/

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

quality. Production from the Santa Ynez Unit (SYU) is processed and delivered via the Las Flores Canyon (LFC) facility into **existing infrastructure serving major California refineries** (consumers of Sable production). The consuming refineries are linked to offshore Sable's California production via the Sable-owned Las Flores Pipeline system and connected third-party pipelines and are configured to process medium to heavy sour-grade crude like that produced from SYU and consistent with other oil fields in Kern and San Luis Obispo counties. Collectively, Sable's pipelines have a design throughput capacity of 240,000 barrels a day.

**Figure 28**

| Sable Pipelines | | | | |
|---|---|---|---|---|
| Pipeline | Known As | Design Capacity (bpd) | Estimated Utilization | Potential Daily Throughput |
| Line 324 | Line 901 | 150,000 | 85% to 100% | 127,500 to 150,000 |
| Line 325 | Line 903 | 300,000 | 85% to 100% | 255,000 to 300,00 |

89.     Lines CA-324 and CA-325 were historically used to transport Santa Ynez Unit (SYU) crude from the onshore Las Flores Canyon Processing Facility to Pentland Station south of Bakersfield and then to connected inland pipeline networks. Pending final clearance under California and federal oversight, Sable intends to open the recommissioned lines to deliver crude to the inland networks for eventual refining into fuels. If both lines are recommissioned and operated near estimated utilization, combined throughput could support ~200,000 bpd, which is more than sufficient for the combined peak output of the Hondo, Harmony, and Heritage platforms.[115] **Assuming Sable produces 31,500 to 40,000 barrels per day, Sable would comprise 10% to 15% of California's daily in-state production for 2024.**

90.     Line CA-324 (previously known as Line 901) and Line CA-325 (previously known as Line 903), collectively known as the Las Flores Pipeline System, are critical components of the oil transportation infrastructure associated with Sable's offshore assets.

---

[115] *Sable Offshore Corp. - Events & Presentations*. (2023). Sableoffshore.com. https://sableoffshore.com/events-and-presentations/default.aspx

56

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

These pipelines historically moved SYU crude from onshore Las Flores Canyon treatment facility to Pentland Station south of Bakersfield and then to connected inland California markets. Line 324 has a maximum permitted throughput capacity of 150,000 barrels per day (bpd), while Line 325 is permitted at 300,000 bpd. **The recommissioning of Sable Lines 324 and 325 would reduce the need for marine tanker transport, reduce emissions risk, and help restore a critical energy corridor within the state's coastal infrastructure network.**[116]

**v.    Potential Economic Impact on State, Santa Barbara & Adjacent Counties**

91.    Sable projects daily production of 45,000 BOE or 31,500 barrels of crude oil, with multiple scenarios modeled and developed extending to higher volumes to test potential economic impact. Assuming a stable Brent benchmark oil price of $70 per barrel, the gross revenue impact of operations can be scaled accordingly over a full year (365 days) and estimated to be $804,825,000.

92.    The analysis assumes a conservative 8% net profit margin, which reflects the high capital and operating costs associated with offshore oil production. California levies an 8.84% corporate income tax, which would apply to any taxable income generated in-state. Additionally, property taxes, estimated at $5 million annually for the Las Flores Canyon facility and related infrastructure, along with employment taxes from a workforce of roughly 340 full-time employees (averaging $118,000 per year), provide further contributions to state and local revenue.

**Figure 29**

---

[116] *Plains All American Reports Fourth-Quarter and Full-Year 2023 Results; Announces 2024 Guidance - Fri, 02/09/2024 - 08:00*. (2023). Plains All American Pipeline. https://ir.plains.com/news-releases/news-release-details/plains-all-american-reports-fourth-quarter-and-full-year-2023

57

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Sable Production & Potential Contribution to CA State & Local Revenues | | | | | | | |
|---|---|---|---|---|---|---|---|
| Daily BOE Production | Employee Count | Est. Annual Gross Revenue | Est. Net Profit | Est. Sales Tax | Est. CA. Corporate Tax | Actual Property Tax | Est. Payroll Tax | Estimated Contribution to Total State Revenue |
| 45000 | 340 | $1,314,000,000 | $105,120,000 | $4,763,250 | $9,292,608 | $5,000,000 | $2,407,200 | **$21,463,058** |
| 100000 | 758 | $2,920,000,000 | $233,600,000 | $10,585,000 | $20,650,240 | $5,000,000 | $5,363,636 | **$41,598,876** |
| 250000 | 1894 | $7,300,000,000 | $584,000,000 | $26,462,500 | $51,625,600 | $5,000,000 | $13,409,091 | **$96,497,191** |
| 500000 | 3788 | $14,600,000,000 | $1,168,000,000 | $52,925,000 | $103,251,200 | $5,000,000 | $26,818,182 | **$187,994,382** |
| 1000000 | 7576 | $29,200,000,000 | $2,336,000,000 | $105,850,000 | $206,502,400 | $5,000,000 | $53,636,364 | **$370,988,764** |

Assumes $80/BOE, 8% net margin, 7.25% sales tax on 5% taxable spend of revenue, 8.84% corporate tax, $5.0 property tax, and 6% payroll tax on $118K average salary for 550 FTEs)

(Source: author's calculation)

93. Offshore oil infrastructure, such as platforms, pipelines, and the onshore treatment facility, is subject to local property taxation, which directly contributes to county-level general funds. Sable's offshore platform operations, maintenance, and transportation via pipelines, the potential economic contributions to the local communities are substantial. The three offshore platforms are estimated to produce approximately 31,500 to 50,000 barrels per day- totaling around 11 million barrels annually of crude California oil. Assuming this level of output could potentially generate an estimated **$21.5 to $41.6 million per year in combined local and state revenues**, including sales tax, corporate tax, property tax, and payroll taxes. This includes contributions to Santa Barbara County for hosting the LFC treatment facility and onshore pipeline infrastructure, San Luis Obispo County for service logistics and marine jurisdiction, and Kern County through indirect participation in the regional energy supply chain.

94. Santa Barbara County, in particular, stands to benefit economically the most from Sable operations. Historically, oil-related revenues in the county have funded essential public services such as fire protection districts, law enforcement staffing, road maintenance, and local school districts. The return of Sable's offshore activity, coupled with the rehabilitation of pipelines and treatment facility assets, will likely help restore and expand Santa Barbara's revenue flows, enabling the county to address long-standing infrastructure gaps and growing public service needs.

95. In San Luis Obispo County, where marine service operators and support logistics for offshore operations are based, Sable's activities will contribute to business tax bases, vendor income, and contractor employment, particularly in port services, environmental

58

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

compliance, and vessel support. While Kern County may see more limited direct benefits due to its inland location, increased activity at Pentland Station as the terminus of the Las Flores Pipeline, supply chain links, such as heavy equipment vendors, staffing agencies, and technical services, could nonetheless generate income and modest revenue benefits tied to Sable's restart.

96.    The potential fiscal contributions associated with the recommissioning and operations of Sable's three platforms primarily benefit Santa Barbara County, which hosts Sable's offshore infrastructure and the LFC treatment facility; San Luis Obispo County, through its proximity to offshore jurisdiction and logistical support activities; and to a lesser extent, Kern County, which may participate indirectly through the supply chain and remote platform, processing, and pipeline support services. [117] [118]

### vi.    Potential Economic Implications of Sable Production on Employment and Personal Income

97.    The restart of offshore oil production by Sable will potentially deliver a substantial and sustained employment and income boost to the Central Coast region of California, particularly to Santa Barbara County. Sable projects a steady-state offshore workforce of approximately 220 full-time California-based employees, supported by an additional 120 steady-state contractors, collectively **totaling around 340 personnel**.

**Figure 30**

| Estimated Impact of Sable Production on Employment, Wages & Earnings | | | |
|---|---|---|---|
| **Job Type** | **Estimated Headcount** | **Avg. Salary** | **Total Payroll Impact** |
| Sable Employees (CA-based) | ~220 | $120K–$150K/year | ~$30M–$33M/year |
| Steady-State Contractors | ~120 | $90K–$110K/year (blended) | ~$10M–$13M/year |
| **Total Annual Offshore Payroll** | **~340** | | **~$40M–$46M/year** |

(Source: Calculated)

[117] *Oil & Gas | CA State Lands Commission*. (n.d.). https://www.slc.ca.gov/oil-gas/

[118] *Cultivation Cap & Eligible Business License Applicants Lists | Santa Barbara County, CA - Official Website*. (2025). Countyofsb.org. https://www.countyofsb.org/1175/Energy-Division

LEGAL02/46287064v8

98.    As indicated, wages and salaries in the oil and gas industry are higher than overall national and California averages. Based on Sable's production scale-up and estimates, the average salaries for direct employees are estimated to range between $120,000 and $150,000 per year, and indirect contractors' wages and salaries are estimated to average between $90,000 and $110,000. Collectively, the combined annual direct employee and indirect contractor payroll is estimated to potentially **range between $40 million and $46 million**.

99.    The economic ripple effect from Sable's offshore operations is potentially significant and multidimensional. The direct payroll infusion of $40M[119] annually translates into high-value job creation and regional income growth. Public sector revenues will similarly rise, supporting core community functions and offsetting fiscal pressures in counties historically tied to the energy economy. Santa Barbara County, as the principal host of offshore and treatment facility infrastructure, will be the primary recipient of both direct economic stimulus and long-term public finance benefits, while San Luis Obispo and Kern Counties will also share in employment, procurement, and service-related gains.

100.    Due to the nature of Sable's production profile, as well as its considerable operational standards, both direct and indirect jobs are high-paying, skilled positions in platform operations, marine logistics, environmental safety, and pipeline maintenance. The majority of these jobs will most likely be concentrated in Santa Barbara County, where the offshore platforms and the Las Flores Canyon (LFC) treatment facility and Las Flores Pipeline System control center are located. Many of these employees will live, spend, and pay taxes locally, contributing significantly to the region's labor income base and consumer-driven economic activity. Moreover, the presence of such high-wage positions stimulates secondary employment effects, including induced demand for housing, transportation, education, healthcare, and local services. Based on various production volumes and labor

---

[119] *Sable Offshore Corp. - Events & Presentations*. (2023). Sableoffshore.com. https://sableoffshore.com/events-and-presentations/default.aspx

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

multipliers in the energy and marine logistics sector, Sable could generate between 1,150 to 25,500 in indirect and induced (contractor and affiliated employees) employment in Santa Barbara, Kern, and San Luis Obispo counties and statewide as a result of Sable's offshore restart. The high average salaries associated with these direct roles also imply elevated household purchasing power, further driving economic multipliers in retail, hospitality, and professional services within the local economy. **Sable's activities, therefore, represent not only direct income generation but also a mechanism for broader economic revitalization, particularly in post-pandemic coastal California regions with high service-sector dependence**.

101.    Scaling from Sable's benchmark of 31,500 bpd, supported by approximately 340 direct offshore personnel, the **expansion to a 60,000-bpd production** level would support an estimated 508 to 652 direct workers, assuming a consistent ratio of 1 employee per 92 barrels produced daily. Of this projected workforce, the majority would be full-time employees concentrated in platform operations, marine logistics, environmental oversight, and pipeline maintenance. Applying industry-standard compensation levels, employees earning $120,000 to $150,000 annually with contractors averaging $90,000 to $110,000 annually, the total direct payroll would be $78.24 to $97.8 million per year. This would represent one of the largest wage-driven energy operations in California and likely the United States, injecting massive purchasing power into local economies through increased housing demand, service consumption, and tax contributions.

102.    Coastal counties such as Santa Barbara, Ventura, and San Luis Obispo would see the most immediate impact due to proximity to offshore infrastructure, marine terminals, and workforce housing demand. Meanwhile, inland counties like Kern would benefit from increased activity at Pentland Station as the terminus of the Las Flores Pipeline, expanded supply chains and service contracts tied to energy logistics, environmental services, and oilfield technology. In aggregate, Sable's production could have transformative economic implications, generating billions in direct revenue, thousands of high-wage jobs, and

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

significant fiscal resources for public infrastructure and local governments, making it one of the most economically consequential energy projects in California's modern history.

### vii.    Potential Implications of Sable Production on California Oil Prices

103.    Many factors, such as contract terms and negotiation, macroeconomic activity, work and lifestyle habits, and choice of transportation play into the demand for fuels, and prices paid for crude oil and refined products. The most significant determinant, as was so cruelly learned in the 1970s and 1980s, is petroleum supply security. California is virtually at the mercy and held captive to crude supplies from foreign petrostates and is, therefore, highly vulnerable to any disruptions in the supply chain and geopolitical events. Furthermore, California's use of foreign oil from various sources furthers the political ambitions of those nations, which may be contradictory to the interests of the U.S. and, through the constant use of maritime vessels, contributes significantly to greenhouse gas emission.

104.    Despite California's efforts, the demand for fossil fuels is not declining as quickly as CARB had projected, and in fact, has only declined 11% over a twenty-plus year period. The addition of Sable production from its three offshore platforms and the use of its two existing pipelines would have a favorable impact on California's energy needs and would help alleviate stresses associated with its dependency on foreign sources. The introduction of Sable production into the California refinery system could have a **favorable economic impact ranging between $3.283 to $3.456 a barrel** over imports, depending on the final terms of trade.

### Figure 31

| POTENTIAL INFLUENCE ON CALIFORNIA OIL REFINERY PRICES OF CRUDE STOCK OIL | | | | | | |
|---|---|---|---|---|---|---|
| Sable Production at Scale (Barrel/day) | Sable Annual Volume(In Barrels) | Share of California In-State Production | Price to Refiners (5%) ($) | Brent Discount (5%) ($) | Production-Weighted Average Price with Sable Production | Potential Savings ($) with Sable Per Barrel |
| 31500 | 11.50M | 10% | 65.65 | 62.37 | 65.33 | 3.28 |
| 40000 | 14.60M | 12% | 65.65 | 62.37 | 65.12 | 3.28 |
| 55000 | 20.08M | 15% | 65.65 | 62.37 | 65.01 | 3.28 |

(Source: Calculated)

62

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

## IV.    SUMMARY CONCLUSIONS

### A.    Summary and General Conclusion

105.    Based on the data, research into prevailing literature, and my analysis, my conclusion is that the production of oil from Sable's three offshore platforms and the associated use of its Las Flores Pipeline System to transport Sable's production to market will not irreparably harm the public.

106.    The addition of production of oil from Sable's three offshore platforms and the associated use of its Las Flores Pipeline System to transport its offshore production would benefit the public because it will have a **favorable economic impact on California's overall energy situation**, as well as have a favorable influence on local employment and tax revenues.  Furthermore, the addition of production from Sable's three offshore platforms and the use of Sable's Las Flores Pipeline System to transport its production to market would have a positive influence on consumer retail gasoline, diesel, and aviation fuel prices, would **improve and strengthen California's energy and economic security and avoid irreparable harm to consumers**.

### B.    Pertinent Findings

107.    With the continuing decline of in-state oil production, the pending permanent shutdown of two major oil refineries collectively representing the loss of 10.5 million gallons of gasoline per day, growing dependencies on non-U.S. sources for oil and, now gasoline, as well as the highest retail gasoline prices in the U.S., California is confronting a potential energy crisis.

- While overall U.S. field production has increased 66% from 1990 levels, California's field production declined 61%, and 68% decline from its peak production in 1985.

- California is the 2nd largest consumer of petroleum and the largest consumer of aviation fuel in the U.S.[120]  In 2023, Californians consumed over 500 million

---

[120] U.S. EIA, Crude Oil Production, Annual, Thousand Barrels, 2023.

63

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

barrels of oil (1.8 million per day), 13.119 billion gallons of gasoline, 3.6 billion gallons of diesel fuel, and over 216 million gallons of aviation fuel.

- Nearly 100% of California's non-U.S.-sourced imported oil is delivered to its refineries via maritime vessels, which are significant contributors to GHG emissions.

- California is highly vulnerable to oil supplies and prices of foreign providers. Since 2005, California's dependency on non-U.S. foreign oil has increased by 19.43%, while its in-state oil production has fallen by 55.22%.

- California is virtually completely dependent on maritime vessel transportation for the importing of oil from non-U.S. foreign sources.

- California's retail gasoline prices routinely average 50% greater than the U.S. national average.

- California's oil and gas industry represents around 8% of its total GDP and employs over 148,000 workers directly and over 536,000 indirectly, and generates around **$47.9 billion in state and local tax revenues for 2022**.

- Californians consume between **30 to 33 million gallons of gasoline a day and around 9.9 million gallons a day of diesel fuels. Oil and gasoline consumption in California has not declined significantly over a twenty-five-year period**.

- California oil and gasoline consumption is relatively inelastic. Since 2001, the consumption of gasoline has decreased by only 11%; total oil consumption has decreased by 22% (mostly due to the switch to renewables for power generation).

- California is highly dependent on foreign, non-U.S. oil imports to meet its demand for petroleum-based fuels and other products; California imports of foreign, non-U.S. sourced oil have increased 69%.

64

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- California's dependency on foreign oil sourced from petrostates such as Iraq, Saudi Arabia, and the U.A.E, as well as Brazil, Ecuador, and Guyana, is expected to increase in the coming years, making the State more vulnerable to geopolitical events and swings in Brent oil market prices.

- California's dependency on foreign gasoline and diesel fuels sourced from Singapore, India, Japan, South Korea, and China is expected to increase in the coming years, making the State more vulnerable to geopolitical events and disruptions in the supply chain.

## C.    Key Conclusions

108.    Based on my findings and analysis of Sable and its two existing onshore pipelines, the following conclusions are offered. The use of the Las Flores Pipeline System to carry Sable's production to market will not irreparably harm the public. **Indeed, to the contrary, as is summarized in this declaration, allowing the use of the Las Flores Pipeline System to carry Sable's production to market –would benefit the public and avoid irreparable harm to consumers** for the reasons articulated in this declaration and summarized below.

- As configured, Sable is capable of producing 30,000 to 50,000 barrels of oil per day from its three offshore platforms. At this level, Sable's production would represent approximately **10 to 15% of all California in-state production** based on 2024 levels.

- Sable's existing Las Flores Pipeline System provides adequate transportation for its offshore production.

- The addition of Sable production using its three offshore platforms and the associated use of its existing Las Flores Pipeline System, indicates that Sable would be **cost competitive** with oil sourced from land-based wells, as well as a number of foreign sources, at various production levels (scale).

65

- Sable has immediate and long-term oil reserves that, if placed into production, would create significant economic value to the state of California, as well as Santa Barbara, Kern, and San Luis Obispo counties. The potential impact of production is estimated to range between **$21.5 to $41.6 million a year** over a multi-year period depending on production scale.

- The addition of Sable production using its three offshore platforms and the associated use of its existing Las Flores Pipeline System would have a favorable impact and contribution to local employment. Based on various production volumes and labor multipliers in the energy and marine logistics sectors, Sable could generate between **340 to over 7,500** in direct employment, and between 1,150 to 25,500 in indirect (contractor and affiliated employees) employment in Santa Barbara, Kern, and San Luis Obispo counties and statewide as a result of Sable's offshore restart.

- The addition of Sable production using its three offshore platforms and the associated use of its existing Las Flores Pipeline System would **enhance California's energy security** through the use of steady-streamed California sourced oil to the remaining California refineries.

- The addition of Sable production using its three offshore platforms and the associated use of its existing Las Flores Pipeline System would introduce **more California oil into the State's refinery system.**

- **The introduction of Sable production into the California refinery system through the Las Flores Pipeline System could have a favorable economic impact ranging between $3.283 to $3.456 a barrel over imports**.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 7th day of July, 2025, in Los Angeles, California.

66

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

Michael A. Mische

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Exhibit A**

**MICHAEL A. MISCHE**
**MBA, MS, Cert-AI.**
**Associate Professor of Professional Practice**

**INTRODUCTION**

Widely quoted in the media, including, The Wall Street Journal, Business Insider, The Washington Examiner, San Jose Mercury News, The Irish Business Post, FOX News, FOX Business, KNX-LA, KFI-LA, CBS and NBC, Professor Michael A. Mische is recognized as one of the world's foremost authorities on the management consulting oil and gas industries. He has testified as an expert before the Senate, in high-profile litigation and criminal cases involving management consulting, and has been cited in over 1,100 mainstream publications, interviews, reviews, and research papers. He is highly regarded for his Management Consulting Annual Outlook Report, his published research on oil in Venezuela, and for his major publication on Bidenomics, which was the most comprehensive comparative examination of the U.S. economy for the 2019 to 2023 period, and *A Study of California Gasoline Prices* (2025) which is a fifty-year study of the price determinants in the Golden State. In 2023, Michael released his eighth book, *"CasePro: The Consultant's Critical Thinking Approach to Case Analysis,"* and is the author of seven other books, including a world-wide best-seller with co-author, the late Warren G. Bennis.

Mische joined USC in 1997 as an adjunct professor. Since 2016, Michael has been a fulltime faculty member of the Marshall School of Business, University of Southern California while maintaining an exceptionally high-profile presence as a thought leader in the consulting industry. He is the 2018 recipient of USC's Golden Apple Award for Teaching Excellence and a co-recipient of the 2019 Service Excellence Award. Mische maintains a highly active consulting profile among elite consulting firms and governments with projects spanning major consulting issues, oil & gas prices, the economy, AI in consulting, and issues related to national economic security.

**POSITIONS HELD (ACADEMIA)**

- **University of Southern California**, Marshall School of Business. Los Angeles, CA. (1997-Present).

  o Associate Professor of Professional Practice & Curriculum Leader: Management Consulting.

     o Faculty Lead for the Certificate in Strategy & Management Consulting.

     o Redesigned consulting curriculum to be more relevant and competitive with Harvard.

     o Designed & implemented a new MOR course offering, *Case Analysis for Consultants: A Critical Thinking Approach*, MOR 499, which provided for interactions between MBAs from the MOR 557 class with UGs from MOR 462.

     o Co-designed & co-teach a new MBA course offering with Prof. Shon Hiatt titled, *" MOR 599-The Business of Energy in the 21st Century."* Scheduled for Spring 2025.

68

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- o Co-designed & co-taught, with Jerry Giaquinta, a new course in 2020, (BUCO/MOR 499), a cross-cultural, project-based course; simultaneously taught via Zoom with ICU in Tokyo, Japan.

- o Redesigned and upgraded USC's Certificate in Strategy & Management Consulting. (2023).

- o Instituted a quantitative national ranking system for MBA consulting programs:

  - Helped to shift USC 2022 Ranking to 9th, compared to 2015 which was not in the Top 30.

  - Helped increase MBA placement in consulting from 16% to 30%. 2015 to 2022.

- o **USC Service Activities**

  - o Conducted recruiting bootcamps for both MBA and MS students for placement into consulting. (2023-2024).

  - o Co-hosted KPMG CEO Paul Knoop on campus for recruiting purposes. (2024).

  - o Co-leading, with Paul Adler, Deloitte Sustainability Consulting Case. (2024).

  - o Authored new Experiential Learning Center (ELC) exercise based on an actual management consulting situation. (2023).

  - o Faculty recruiter, USC Football. Speak with non-committed football recruits and their families about USC academics and the "life of a student athlete." (2022-present).

  - o Faculty Adviser, MCSC, the largest MBA student club at Marshall. (2022-present).

  - o Implemented career coaching services for MBAs with USC's Career Resources Center. (2023).

  - o Faculty coach (informal) USC Marshall MBA Black Students Case Competition Team. (2022).

  - o Co-coached (with Carl Voigt) USC Marshall Case Competition Team. (1999 – 2001).

- o **USC Teaching Awards**

  - o USC Golden Apple Teaching Award. (2018).

  - o MOR Service Award. Co-recipient. (2019).

- **USC Marshall School of Business- Teaching Responsibilities:**

  - o **MBA-Graduate**                    **Course**                    **Year**

69

| MOR 599 | The Business of Energy in the 21st Century | 2025 |
| MOR 554 | Strategy Innovation & Change | 2015- Present |
| MOR 557 | Management Consulting | 2015- Present |
| MOR 559 | Strategic Transformation & Renewal | 1997- Present |

o **Undergraduate**

| | **Course** | **Year** |
|---|---|---|
| MOR 499 | *New-* Case Analysis for Consultants | 2022, 2023 |
| MOR/BUCO 499 | Cross Cultural Collaboration- Project Based | 2020 |
| MOR 473 | Leading High-Performance Teams | 2016- Present |
| MOR 462 | Management Consulting | 2014- Present |
| BUAD 497 | Strategy- Case Based | 2014 -2016 |
| MOR 463 | Organizational Behavior | 2013- 2018 |

**POSITIONS HELD- PRIVATE SECTOR (FOR PROFIT)**

- **Synergy Consulting Group, Inc.** (1993-Present). *CEO & Chairperson of the Board*. Scottsdale, AZ and State College, PA.

  o Significant clients include United States, Kingdom of Saudi Arabia, several Fortune 50s and several Elite 8 management consulting firms.

  o Special consultant to HRH, Kingdom of Saudi Arabia. (2020-2022).

  o Special consultant to U.S. Government. (Ongoing).

  o Practice specializations include:

    ▪ Strategic Assessment & Positioning.

    ▪ Organizational Performance.

    ▪ Strategic Innovation .

    ▪ Energy Policy as Related to Oil & Gas.

- **Andersen Consulting (Accenture).** (1995-2000). *Special Consultant to Senior Practice Leadership & Management Committee of the Firm*. Chicago & Los Angeles.

  o Advisor on Global Repositioning & Practice Lines Restructuring relating to "Process Transformation."

  o Co-authored "Building Process Excellence: Lessons from the Leaders."

  o Co-developed/Contributor to the AC Reengineering & Strategic Planning Methodology.

  o Keynote Speaker: Andersen Partners & Consultants Innovation & Software Spectacular Meeting, San Antonio. (1996).

  o Designated "Associate Partner" for administrative, NDA, and confidentiality purposes.

70

- **AT Kearney.** (1991 to 1993). *Principal, Management Consulting Services.* Chicago, IL.

  o   Special Project- Internal Restructuring and Cost Reduction.

  o   Special Project- Repositioning Strategic Technology Services for Sale.

- **KPMG.**  (1983 to 1992). *Principal, Management Consulting Services.* Montvale, NJ.
  o   One of the youngest consulting partners elected in the history of the Firm.

  o   PIC & Practice responsibilities included leading/co-leading national services in:

  ▪   Strategy & Transformation Consulting.

  ▪   Transactions Management Services (M&A).

  ▪   Innovation & Advanced Technologies.

  o   Instructor, SDLC and Project Management.

  o   Co-led/managed over $58 million in direct engagement billings (Over $100 million in aggregate).

  o   Maintained one of the highest Net to Gross ratios in the firm.

  o   Member, KPMG Practices & Methods Review Committee.

  o   Member, AICPA Peer Review Committee for PwC.

**NOTABLE CONSULTING ACTIVITIES (Partial)**
- **2025.** U.S. Energy Production as Related to Oil & Gasoline Independence.
- **2024.** Lead Consultant & Expert Witness on behalf of BCG in BCG v. GameStop litigation. (2023-2024).
- **2024.** Lead Consultant. Bidenomics: Facts, Figures & Everything that Americans Should Know. (February 2024).
- **2023.** Lead Consultant. Analysis of the Implications of the Strategic Petroleum Reserve on U.S. War Readiness. Classified. (2023).
- **2023.** Analysis of California's Profit Gouging Tax. (January 2023).
- **2023.** Analysis of Biden Administration's Oil & Gas Policies. (November 2022).
- **2023.** Analysis of U. S. Oil & Gas Prices. Oil & Gas Association. Distributed to U.S. Congress. (October 2022).
- **2018-2021.** Kingdom of Saudi Arabia. Lead Advisor for the development of the strategic plan for the "Innovation Superhighway" linked to Vision 2030. https://www.vision2030.gov.sa/media/rc0b5oy1/saudi_vision203.pdf.
- **2018-2021.** Kingdom of Saudi Arabia. Appointed Senior Advisor to the Saudi Public Investment Fund (Taqnia), a $925 billion investment fund for the design and implementation of co-innovation and co-investment funding and investment selection processes and organization capable of supporting 13 different economic sectors. https://www.pif.gov.sa.

71

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- **1997.** Reengineering Government Initiative for Vice President Al Gore. (May- August 1997).

**EXPERT TESTIMONY & PANEL PARTICIPATION (Partial)**
- **2023/2024.** Expert Witness. U.S. Federal District Court. For and on behalf of BCG (Boston Consulting Group) v. GameStop. https://law.justia.com/cases/federal/district-courts/delaware/dedce/1:2022cv00363/78379/76/.
- **2024.** Opined (informal comments) on draft Senate Bill *"To prohibit conflict of interests among consulting firms that simultaneously contract with the Government of the People's Republic of China and the United States Government, and for other purposes."* https://www.hawley.senate.gov/sites/default/files/2024-02/Hawley-Time-to-Choose-Act.pdf.
- **2023.** Expert Witness. Testimony before California Senate on California Oil & Gas Price Gouging. (February 22, 2023). See, Mische at 2-hour, 3 min. mark. https://www.senate.ca.gov/media/senate-energy-utilities-communications-committee-20230222/video
- **2023.** Opined on the "Effects of a Windfall Profit Tax" on U.S. Oil & Gas Competitiveness. United States House of Representatives. Washington, D.C. (January 2023).
- **2023.** Expert Witness. Presentation before the California Foundation on The Environment and The Economy on why California gasoline prices are higher than national averages and the accretive costs of a windfall profit tax. February 10, 2023. Napa, California.
- **2023.** Moderator. "Innovation Factories, Unicorns and Competitive Positioning." Featuring Linda K. Yates, Author and CEO, Mach 49. (November 2022).
- **2023.** Expert Witness, California Senate.  "Why Are Oil & Gas Prices So High in California?" Californians Against Higher Taxes Press Conference. Carried live and covered by AP. (November 28, 2022).
- **Prior 2022 (partial).**
  - Material Witness, FARA case. Subpoenaed for and on behalf of the U.S. Government, Southern District of New York (U. S. v. Zuberi). Los Angeles, CA.
  - Subpoenaed as material witness on behalf of the U.S. Government in a political financial and foreign influence investigation (FARA).
  - Testified before United States Grand Jury, 2019/20.
  - Testimony contributed to a conviction and 12-year sentencing in a federal penitentiary on FARA violations. https://www.justice.gov/usao-cdca/pr/political-donor-sentenced-12-years-prison-lobbying-and-campaign-contribution-crimes-tax
  - Expert Witness, for and behalf of major Fortune 500. Witness in the analysis of movie theater operations as related to the Supreme Court Consent Decree of 1948, 2016/17. Los Angeles, CA.
  - Expert Witness, for and behalf of Plaintiff, Magic Chef (Owned by Berkshire Hathaway).
  - Expert Witness, for and on behalf of a Private Client. Witness in the analysis of management consulting services, project management and the application of AICPA Code of Professional Ethics as related to management advisory services, 1988. Miami, FLA.

**MEDIA COVERAGE & CITATIONS: 2022-2025** (partial list)
- Quoted or cited over **1,225** times in academic and research works (Academia.com).
- Quoted over **300** times in the media in 2022 - 2025.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- **2025.** Mische interviewed. ***Fox Business.*** *University of Southern California Professor Michael Mische explains his study on gas prices being driven up due to high taxes and policies*. (2025, April 4). https://www.foxbusiness.com/video/6370989691112.

- **2025.** Mische interviewed. ***John Kobylt Show; KFI AM 640.*** (2025, April 8). *Why Are CA Gas Prices So High?* https://kfiam640.iheart.com/featured/the-john-kobylt-show/content/2025-04-08-1119-the-john-kobylt-show-why-are-ca-gas-prices-so-high-0408/.

- **2025.** Mische quoted. ***Washington Examiner***. Faria, Z. (2025, April). *California Democrats are responsible for high gas prices*. https://www.washingtonexaminer.com/opinion/beltway-confidential/3366221/california-democrats-responsible-high-gas-prices/.

- **2025.** Mische quoted. ***California Globe***. (April 3, 2025). *California's High Gas Prices Climbing Over $5.00 Per Gallon – Again*. https://californiaglobe.com/fr/californias-high-gas-prices-climbing-over-5-00-per-gallon-again/.

- **2025.** Mische quoted. ***Business Insider.*** Thompson, P. (2025, April 8). *5 consulting contracts cut by DOGE show what government is targeting*. https://www.businessinsider.com/doge-consulting-crackdown-what-contracts-are-being-cut-2025-4.

- **2025.** Mische quoted. ***Pleasanton Weekly.*** Hunt, T. (2025, April 10). *USC study confirms state policies drive up gas prices*. https://www.pleasantonweekly.com/blogs/tim-talk/2025/04/10/usc-study-confirms-state-policies-drive-up-gas-prices/.

- **2025.** Mische quoted. ***Daily News***. Board, T. E. (2025, April 6). *Can California get real about high gas prices?* https://www.dailynews.com/2025/04/06/can-california-get-real-about-high-gas-prices/

- **2025.** Mische quoted. ***KTLA.*** Turner, A., & Sternfield, M. (2025, March 31). *Policies, not greed, driving California's sky-high gas prices, study finds*. https://ktla.com/news/california/policies-not-price-gouging-to-blame-for-californias-soaring-gas-prices-study-finds/.

- **2024.** Mische quoted. ***Washington Examiner,*** "USC estimates California fuel could rise by up to 90 cents per gallon next year." (11/20/24). https://www.washingtonexaminer.com/news/3235752/usc-estimates-california-fuel-could-rise-by-up-to-90-cents-per-gallon-next-year/.

- 2024. Mische quoted. *The Irish Business Post,* "Grant Thornton Irish Partners Mull Debt Deal in Growth Plan" (July 21, 2024). https://www.businesspost.ie/news/debt-deal-on-table-as-grant-thornton-mulls-overhaul-of-partnership-structure/.

- 2024. Mische quoted. *The Wall Street Journal,* "Consultants Are Paid to Fix Businesses. Why Can't They Fix Their Own? (March 16, 2024). https://www.wsj.com/lifestyle/careers/consultants-are-paid-to-fix-businesses-why-cant-they-fix-their-own-1ed9bb04?st=6lijni2puvf4t7s&reflink=desktopwebshare_permalink.

- 2024. Mische quoted. *Newsweek, "Californians Need $1,000 More To Pay 2025 Gas Prices."* (11/21/24). https://www.newsweek.com/california-2025-gas-prices-increase-1989321.

- 2024. Mische quoted. *Institute of Energy Research.* "California Gasoline Prices Will Skyrocket." (11/29/24). https://www.instituteforenergyresearch.org/fossil-fuels/gas-and-oil/california-gasoline-prices-will-skyrocket/.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- 2024. Mische quoted. *CBS 8, San Diego*. (11/21/24.) https://www.cbs8.com/article/news/local/california-drivers-gas-costs-2025/509-0ec7e8d0-8d2e-4540-9235-c6620628fcdb.

- **2024.** Mische quoted. *FOX 11, LA*. (11/20/24).  https://www.foxla.com/news/californians-will-pay-much-more-next-year-keep-up-2025-gas-prices-study

- **2024.** Mische interviewed. *860 AM, LA*. (12/26/24). https://860amtheanswer.com/news/regional/1f1b8870-c3bd-11ef-8dfd-d3251992d201

- 2024. Mische quoted. *Arizona Daily Sun*. "USC estimates California fuel could rise by up to $1.15 cents per gallon next year." (11/20/24). https://azdailysun.com/usc-estimates-california-fuel-could-rise-by-up-to-1-15-cents-per-gallon-next/article_7aa9d45c-a75d-11ef-aee1-df0e25f64341.html.

- **2024.** Mische quoted. *Courthouse News Services*. "California Lawmakers Consider Newsom's Oil Profit Penalty." (2/23/23). https://www.mresearch.com/wp-content/uploads/California-lawmakers-consider-Newsoms-oil-profit-penalty-plan-_-Courthouse-News-Service.pdf

- 2023. Mische quoted. *The Wall Street Journal*, "For Once, Rookie Consultants Don't Have Enough to Do." (August 4, 2023). https://www.wsj.com/articles/consultants-bain-kmpg-ernst-young-boston-consulting-bcg-recruits-layoffs-1a2629fd.

- 2023. Mische quoted. *ExtractingFact.com*, "Three Things Governor Newsom Should Learn from the Special Hearing Session." (March 14, 2023). As University of Southern California professor Michael Mische put it:  *"The fact is, we haven't proven any cases of price gouging by oil companies or refiners ... As recently as November 2022, we had a court case in the U.S. District Court in San Diego tossed out. The list goes on and on."*  https://www.extractingfact.com/news/statewide/three-things-newsom-should-learn-from-the-special-session-hearing/.

- 2022. Mische quoted. *Seattle Times*, "California Eyes Penalties for Oil Companies Big Profits." (December 4, 2022). https://www.seattletimes.com/business/california-lawmakers-to-meet-eye-big-oils-high-gas-prices/.

- 2022. Mische quoted. *San Jose Mercury News*, "Should California Tax Oil Profits." (November 29, 2022). https://www.mercurynews.com/2022/11/29/should-california-tax-oil-profits-gas-spike-hearing-sets-stage-for-contentious-debate/.

- 2022. Mische quoted. *Consumer Watchdog,* "Should California Tax Oil Profits: Gas Spike Hearing Sets Stage for Contentious Debate." (November 29, 2022). https://consumerwatchdog.org/news-story/should-california-tax-oil-profits-gas-spike-hearing-sets-stage-contentious-debate.

- 2022. Mische quoted. *East Bay Times,* on oil and gas prices in California. (November 2022). https://www.eastbaytimes.com/2022/11/29/should-california-tax-oil-profits-gas-spike-hearing-sets-stage-for-contentious-debate/.

- 2022. Mische quoted. *ArcaMax Business,* on oil and gas taxes. (November 29. 2022). https://www.arcamax.com/business/businessnews/s-2755516-p2.

- 2021. Mische quoted. *Politico*, on political pay for play. (February 2021). https://www.politico.com/news/2021/02/12/imaad-zuberi-biden-inner-circle-468816.

- 2021. Mische quoted. *Washington Examiner*, on FARA conviction. (February 2021). https://www.washingtonexaminer.com/news/donor-ties-biden-trump-clinton-obama-sentenced-12-years-prison.

**BOOKS BY MICHAEL MISCHE**

74

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- **2025.** Pending & Under Contract: *Management Consulting: Professional Practice, Responsibility & Ethics.* Target publication date August 2025.
- **2023.** *CasePro! The Consultant's Critical Thinking Approach to Case Analysis.* Author. ISBN: 978-1-7935-1400-4. (Cognella Publications, January 2023).
- **2017.** *Management Consulting: Today & Tomorrow.* Contributing Author. ISBN: 978-1-138-12428-8 (Routledge, 2017).
- **2000.** *Strategic Renewal: Becoming a High-Performance Organization.* Author. ISBN: 0-13-021919-3. (Prentice Hall, 2000). Adopted for use by 8 MBA programs.
- **1996.** *The 21st Century Organization: Reinventing Through Reengineering.* Co-Authors- Warren Bennis & Michael Mische. ISBN: 0-89384-273-7. (Jossey-Bass, 1996). Reached Top-25 on both U.S. and international best seller's list, published in 5 languages.
- **1996.** *Reengineering Systems Integration Success, Volumes 1 & 2.* Editor. ISBM: 1-8493-9952-1. (Auerbach, 1997- 1999).
- **1996.** *Step-by-Step Reengineering: The Comprehensive Guide to Process Change.* Author. ISBM: 0-8839-0476-4. (Jossey-Bass, 1996). This book was adopted by virtually every major consulting firm and has served as a foundation for many firms' proprietary methodologies. Also used by President Clinton & Vice President Al Gore in their "Reinventing Government," initiative. (1992-94). See, https://www.govexec.com/management/2013/04/what-reinvention-wrought/62836/
- Contributing author and/or editor to 3 other books (Auerbach) on process and system integration.

**PAPERS BY MICHAEL MISCHE (partial)**
- **2025.** *"A Study of California Gasoline Prices and The Potential Implications of The California Gasoline Reserve."* USC Business of Energy Transition Initiative (BET). (March 16, 2025).
- **2024.** *"Not All Oil is Created Equally: Understanding the Venezuela Petrostate."* USC Business of Energy Transition Initiative (BET). (September 2024).
- **2024.** *"Bidenomics…Facts, Figures and Everything Americans Should Know."* Co-authored with Torri Kyes. Over 40,000 reads as of September 1, 2024. (February 2024).
- **2024.** *"Is Venezuela the Answer to U.S. Oil Woes?"* USC Business of Energy Transition Initiative. (May 2024) (BET).
- **2024.** *"Understanding the Implications of Iranian Oil & U.S. Sanctions: What the Facts, Figures & Data Tell Us."* Oil & Gas Association. (April 2024).
- **2024.** *"2024 Management Consulting Annual Outlook."* Over 40,000 reads. (January 2024).
- **2024.** *"Management Consulting Annual Outlook & Firm Rankings: 2024."* Over 40,000 reads. (January 2024).
- 2023. *"The Fiction, Fallacy, Facts & Realities of California's Profit Gouging Tax."* (January 2023).
- 2023. *"When it Comes to Energy the Stupidity of Biden Administration Knows No End."* (Feb. 2023).
- 2023. *"Twenty-five Questions that all Americans Should Ask About Oil & Gas Prices."* Oil & Gas Association. (Oct. 2022).
- **Prior Papers: 1984 to 2022** (Partial List)
  - "Ranking the Top MBA Programs for Management Consulting." (2018, 2019, 2020, 2021).
  - "A Comparative Survey of Top Twenty MBA Management Consulting Programs." (2018).

75

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

o "Federal Tax Implications of Unclaimed Property," (TAF, 2014).

o "Alternative Asset Class Investments: The Case for Classic Cars." (SCG, 2013).

o "The Contagion Effect of Greek Default & It's Impact on the Eurozone: A Working Paper," (2013).

o "Innovation: The Engine of Strategic Renewal." (Accenture, 1996).

o "Symptoms of a Terminally Ill Integration Project," (Auerbach, 1997- 1999).

o "Transnational IT Architecture," (Auerbach 1997- 1999).

o "Building Process Excellence: Lessons from The Leaders." (The Economist/EIU, 1996).

o "Remedies to Wrongful Seizure: A Discussion of IRS Liens & Levies." Jerome Horvitz and Michael Mische. (Warren Gorham & Lamont, 1984.)

**EDUCATION**

• **Massachusetts Institute of Technology,** Sloan School of Management. MA. (August 2020).

   o Certificate, Executive Education Program, AI: Implications for Business Strategy.

   o Modules completed included:

      ▪ Introduction to AI

      ▪ Machine Learning in Business

      ▪ Natural Language Processing in Business

      ▪ Robotics in Business

      ▪ AI in Business and Society

      ▪ The Future of AI

• **New York University**, Stern School of Business. NY, NY. (February 1978).

   o Master of Business Administration, Finance. Minor: Management.

   o Completed both BS & MBA is less than 5 years.

   o Thesis: "Business Cycles & Capital Investment Theory." Advisor, Prof. Robert Kavesh, Chairman, NYU Economics Dept.

   o Honors Paper: "Price Level Adjusted Financial Statements." Advisor, Prof. Barbara Marino.

   o NYU Graduate Assistant to Prof. Alexander Melamid & Prof. Rolf E. Wubbles.

• **Golden Gate University**, Graduate School of Taxation.  San Francisco, CA. (June 1984)

   o Master of Science, Federal Taxation.

   o Publications: "Remedies to Wrongful Seizure." (Warren, Gorham & Lamont. 1984).

• **New York University**, Stern School of Business. NY, NY. (October 1976).

   o Bachelor of Science, with Honors in Banking & Finance.

   o Double Major: Finance & Economics.

   o Minor: Political Science (Soviet Economic System).

76

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- o Honors Thesis: "Industry Analysis of Nonferrous Metals," Advisor, Prof. Rolf E. Wubbles.

- o Five-year accelerated BS/MBA degree program (Awarded MBA at age of 23).

- o Recipient: Jules Bachman & Boris Kostelanetz Academic Scholarships - Economics.

- o Beta Gamma Sigma & Phi Alpha Kappa, national academic honors societies.

- o Student Athlete. NYU Men's Varsity Swimming Team.
- o Vice President, NYU Finance Society.
- o Member, Phi Gamma Delta.

**COMMUNITY SERVICE ACTIVITIES (Partial)**

- Active in sexual assault prevention initiatives and counseling young men. (On-going.)
- Active financial supporter, LA Catholic Good Shepard Shelter for Battered & Abused Women. (On-going).
- Active financial supporter, USC Women's Basketball. (On-going).
- Active financial supporter, Phi Gamma Delta Educational Scholarship Fund. (1980 to present).
- Passionate supporter of Title IX initiatives for women athletics. (1977-present).
- Past Member, City of Pasadena, "We Must Breathe Task Force," for police reform and underrepresented economic opportunity programs. Chaired by the late Council Member, John J. Kennedy. (2020).

**MISCELLANEOUS AWARDS (Partial)**

- "Man, of the Year," elected by the NYU Chapter. (1992).

- Nominated for "Who's Who in America." (2001, 2024).

- Nominated for "Who's Who in American Business." (2011, 2024).

- "Most Influential Graduate Brother of the Year." (2023).

**BOARD MEMBERSHIPS**

- Due to the potential for conflicts of interest and publicity, Michael restricts his for-profit board affiliations to private organizations.
- Past non-profit board affiliations include, but are not limited to:
  - o NYU-Stern, Annual Alumni Fund. Co-Chairman. (1990-91).
  - o NYU-Stern, Haskins Fund. Board Member. (1992).
  - o NYU-Stern, Dean's Advisory Board. Board Member. (1988-1992).
  - o NYU-Stern, New Building Fund Board. Fundraiser. (1990-1992).
  - o Phi Gamma Delta Educational Foundation. Board Member. (1990-1994).
  - o Gamma Phi House Corporation. Board Member. (1990-2001).

**PERSONAL INTERESTS**

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- Lifetime Member: International Fraternity of Phi Gamma Delta. Member. (1973 – present).

- Interesting Fact: Former elite-level two-sport athlete. (1969-1975).

- Passions: Classic American muscle cars, Formula 1 racing, writing, American military history, architecture, classical music, weightlifting, boxing, developing consulting talent, and PSU & USC football.

- Most notable influences: NYU Profs. Alexander Melamid, Rolf. E. Wubbels, Wassily Leontief (Nobel Recipient), & Ed Altman; KPMG Partners CEO Larry D. Horner & Hilliard M. Eure-III; my incredible athletic coaches & trainers; and most of all, my mother, Jane and father, Albert.

**LINKS**

- https://www.linkedin.com/in/michael-a-mische-987b30a/
- https://www.youtube.com/watch?v=dC5lLcSK-1I&t=13s
- https://www.youtube.com/watch?v=HvP2ELGHdjQ
- https://www.youtube.com/watch?v=2Rv7l2qhCSw&t=12s

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) described as **DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: *See* Attached Service List.

☒    BY ELECTRONIC MAIL TRANSMISSION WITH ATTACHMENT:   On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

☒    [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/ Josie Cisneros*

_____

Josie Cisneros

# SERVICE LIST

Julie Teel Simmons, Esq.
David Pettit, Esq.
Talia Nimmer, Esq.
Center for Biological Diversity
2011 Franklin Street, Suite 375
Oakland, CA 94612

ATTORNEYS FOR PETITIONERS
CENTER FOR BIOLOGICAL DIVERSITY and
WISHTOYO FOUNDATION

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: jteelsimmonds@biologicaldiversity.org
         dpettit@biologicaldiversity.org
         tnimmer@biologicaldiversity.org

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

ATTORNEYS FOR PETITIONERS
ENVIRONMENTAL DEFENSE CENTER, a
California non-profit corporation; GET OIL
OUT!, a California non-profit corporation;
SANTA BARBARA COUNTY ACTION
NETWORK, a California non-profit corporation;
SIERRA CLUB, a national non-profit
corporation; and SANTA BARBARA
CHANNELKEEPER, a California non-profit
corporation

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
         jfrankel@environmentaldefensecenter.org
         trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

ATTORNEYS FOR RESPONDENTS/
DEFENDANTS
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal;
Daniel Berlant, in his official capacity as State
Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
         benjaminhanelin@paulhastings.com
         natalierogers@paulhastings.com

Trevor D. Large, Esq.
FAUVER, LARGE, ARCHBALD & SPRAY
LLP
820 State Street, 4th Floor
Santa Barbara, CA 93101

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (805) 966-7000
Email: TLarge@FLASllp.com

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>        Petitioners and Plaintiffs,<br><br>    v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>        Respondents and Defendants,<br><br>    and<br><br>SABLE OFFSHORE CORP., et al.,<br><br>        Real Parties in Interest. | Case No. 25CV02244<br>[Coordinated with Case No. 25CV02247]<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION (VOLUME 1 OF 4)**<br><br>[*Filed concurrently with Opposition to Preliminary Injunction; Declarations of Steve Rusch, Michael A. Mische, Brien Vierra, and Michael Rosenfeld*]<br><br>Date:        July 18, 2025<br>Time:        10:00 AM<br>Dept.:        4<br><br>Complaint Filed:        April 15, 2025<br>Trial Date:        None Set |

1

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

## DECLARATION OF BART LEININGER

I, Bart Leininger, declare as follows:

### I.    Introduction

1.    My name is Bart Leininger and I am an environmental engineer.  I have been engaged by Alston & Bird LLP, counsel to Sable Offshore Corp. (Sable) and Pacific Pipeline Company,[1] to provide my expert opinions as to whether it would harm the public or the environment to allow Sable to restart and operate Pacific Pipeline Company's crude oil pipeline system, known as the "Las Flores Pipelines". Below, I provide my qualifications to provide these expert opinions.  I have personal knowledge of the matters set forth in this Declaration, and if called as a witness, I could and would testify competently thereto.

2.    It is my opinion that allowing Sable to restart and operate the Las Flores Pipelines would not harm the public or the environment.  The restart and ongoing operation of the Las Flores Pipelines would be controlled by permit terms and conditions that were developed through a rigorous California Environmental Quality Act (CEQA) review process that imposed all feasible measures to mitigate environmental harm related to the pipelines' construction and ongoing operation – including pipeline repair and maintenance activities. I have reviewed these measures and agree that they mitigate to the maximum extent possible any potential environmental risks from restarting and operating the Las Flores Pipelines, including potential oil spill risks.

3.    It is my further opinion that preventing the restart of the pipelines will materially harm the environment as a result of the undesirable consequences of the need for California to rely on foreign oil to meet consumer demand.  Safely operating the Las Flores Pipelines to deliver local Santa Ynez Unit (SYU) crude oil to market will result in a reduction in greenhouse gas (GHG) emissions that would otherwise be required to produce imported oil and transport it from foreign nations to California.

### II.    Qualifications

---

[1] Pacific Pipeline Company (PPC) is a wholly owned subsidiary of Sable Offshore Corp.  For the purpose of this declaration, references to Sable or PPC as owner/operator of the pipeline system have the same meaning and may be used interchangeably.

2

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

4.    I have worked as an environmental engineer in both industry and consulting for my entire career.  Prior to becoming a consulting engineer, I worked in various environmental permitting and compliance roles at Exxon Company U.S.A. (now under the umbrella of ExxonMobil Corporation).  I was involved in the original permitting efforts for the SYU facilities and readied the facilities for start-up in late 1993.  My responsibilities on the project varied and included air quality, land use, and water quality compliance matters.  After SYU began operations, I was promoted into a corporate environmental role serving as an air quality specialist at the company's headquarters in Houston, Texas.  Although I am not on staff at SYU today, I have continued to provide strategic environmental support to SYU over the last three decades as a consulting engineer.  My main focus has been related to air quality permitting and compliance matters.

5.    In 1996, I founded Ashworth Leininger Group (ALG), an environmental engineering and consulting company headquartered in Camarillo, California.  ALG provides environmental consulting services to a broad spectrum of clients, including government agencies, trade associations, and industry.

6.    I have advised industrial clients and government agency staff on environmental permitting and compliance matters for more than 30 years.  I have provided strategic consulting and prepared numerous analyses to support environmental reviews under CEQA and the National Environmental Policy Act (NEPA).  I specialize in air permitting and compliance matters, which include emission characterization, quantification, permitting, and compliance.  My work also includes auditing facilities to ensure compliance with federal, state, and local regulatory requirements.  My clients include manufacturing facilities, petroleum and petrochemical facilities, oil and gas development operations, renewable fuels facilities, and power generation facilities.

7.    I also provide Greenhouse Gas (GHG) verification services under the California GHG Mandatory Reporting Rule (MRR) and Low Carbon Fuel Standard (LCFS).  I hold certifications from the California Air Resources Board (CARB) as a Lead Verifier under the MRR and LCFS programs.  ALG has been an approved Verification Body under the MRR and LCFS programs since each program's inception.

3

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

8. I have testified as an expert witness in litigation and compliance matters for the Department of Justice, petroleum refineries, chemical plants, and manufacturing operations. These litigation and administrative matters have included testimony related to local, state, and federal air permitting and compliance programs.

9. I received my B.S. in Mechanical Engineering from Brigham Young University in 1989, graduating Summa Cum Laude. I received my M.B.A. from the University of California at Los Angeles in 1993. I am a registered professional engineer in the states of Florida, Louisiana, Texas, and Utah. As noted above, I am certified as a Lead Verifier under the California MRR and LCFS programs.

III. **Preventing the Supply of SYU Crude Oil to the California Market Will Harm the Public**

10. It is my opinion that it will harm the environment if Sable is not allowed to restart and operate the Las Flores Pipelines and provide increased local crude oil production to California. Sable's restart and operations would be in compliance with its ongoing regulatory obligations, which include critical protections for the environment. The safe and consistent operation of the Las Flores Pipelines will displace foreign crude oil imports that cause potential environmental harm. Below, I explain the environmental consequences of not allowing locally produced crude oil to displace foreign-based crude supplies.

A. **Air Quality Impacts**

11. Importing crude oil from foreign sources instead of producing crude locally results in significantly higher GHG emissions, and associated criteria pollutant emissions,[2] which numerous experts agree causes environmental harm. Several studies prepared by California state and county agencies support this opinion.[3]

---

[2] Criteria pollutants include nitrogen oxides (NOx), volatile organic compounds (VOC). Both of these criteria pollutants contribute to ozone pollution. Other criteria pollutants are carbon monoxide, sulfur dioxide, and particulate matter in all of its forms (PM, PM-10, PM-2.5).

[3] See LCFS Crude Oil Life Cycle Assessment prepared by the California Air Resources Boards, https://ww2.arb.ca.gov/resources/documents/lcfs-crude-oil-life-cycle-assessment (accessed 6/5/2025); Final Environmental Impact Report for SB 4, prepared by CalGEM, June 2015; Section 4.12 of the Final Environmental Impact Report for the Ventura County 2040 General Plan, prepared by County of Ventura, September 2020.

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

12. Since 2012, CARB has been calculating the Carbon Intensity (CI) of crude oils produced from various parts of the world to establish the GHG life cycle emissions from such crude oils. CI is a comparative tool that can be used to assess potential GHG emission impacts among energy choices -- the higher the CI, the greater the potential impacts from GHG emissions. CI is expressed as the mass of GHG released per unit of energy provided by the specific fuel or feedstock, such as crude oil. CARB uses the units of Megajoules (MJ) to express the energy value in the CI score.

13. According to CARB, the average CI score for all crude oil produced and transported to refineries in California is, on average, 11 to 12 grams of carbon dioxide equivalent per megajoule (g CO2e/MJ). This CI score for crude oil has remained relatively steady since CARB began calculating and tracking the CI for various crude oils in 2012. Foreign crude oils have been calculated by CARB to have a CI score around this same average value of 11 to 12 g CO2e/MJ.

14. For the three years SYU operated just prior to the pipeline shutdown in 2015 (Calendar Years 2012-2014), SYU crude had CI scores of between 2.33 and 4.27 g CO2e/MJ. These scores are significantly lower than the CI scores of foreign-based crude oils.[4] Assuming annual oil production from SYU of approximately 12 million barrels, I estimate that approximately 500,000 metric tons per year of GHG emissions are avoided by displacing imported foreign-based crudes with SYU crude.

15. The CI score and resultant GHG emissions are lower for several reasons. It is lower in part due to the methods of production employed at SYU. SYU has electrified much of its equipment used for processing. Additionally, the transportation methods for a specific crude oil affects its CI score. SYU crude has been and will be delivered via pipeline to market. Pipeline transportation is an efficient means of transporting crude oil with minimal associated GHG emissions. Foreign-based crude oil must be delivered to the California market by tanker vessels. Tanker vessels contribute to much higher emissions due to long distances traveled from around the world.

16. Emissions from pipeline transportation are significantly less than the emissions and impacts to the public from crude oil transportation by other means, such as tankers. Pumps delivering crude are largely electric with no direct combustion emissions affecting nearby communities where

---

[4] See LCFS Crude Oil Lifecycle Assessment referenced above.

5

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

the pipelines pass.  The pipelines and associated pump stations have fewer combustion sources.  Pump stations may include emergency engines and natural gas-fired heaters, which are intermittently operated.

17.    Importing foreign crude results in significantly higher pollutant emissions than delivering crude oil more efficiently via a pipeline system.  The emissions are higher because tankers delivering crude oil to California come from many distant locations across the world.  In 2022, CARB estimated that over 184 tons per day of nitrogen oxide compounds (NOx) (67,160 tons per year), and over 2.8 tons per day of particulate matter (1,022 tons per year) are emitted from Ocean-Going Vessels (OGVs) when operating within 100-nautical miles of the California coastline.[5]   Of these OGVs, tankers carrying crude oil represent a significant proportion of these pollutant emissions (~20%).  These emissions harm the public interest because NOx emissions contribute to ozone pollution, and state and federal agencies and international health organizations have found that particulate matter emissions increase health risks.[6]

18.    The negative emissions impacts of importing crude oil are supported by a 2015 Environmental Impact Report (EIR) prepared by the California Geologic Energy Management Division (CalGEM).  This EIR examined the environmental effects of oil well stimulation and development in the State of California, pursuant to Senate Bill 4 (Pavley).  In the 2015 EIR, CalGEM examined a "no project alternative."  That alternative would have disallowed all future oil well stimulation throughout the state.  This alternative has direct parallels to the SYU facilities and associated pipelines.  Both have the same consequence of curtailing production.  That is, more crude oil must be imported to California to meet demand.

19.    The 2015 EIR made the following observations relative to imports of foreign crude into the state:

--------

[5] See 2021 California Ocean-Going Vessels Emissions Inventory, California Air Resources Board, March 3, 2022.

[6] California has imposed regulations to reduce criteria pollutant, greenhouse gas, and air toxic emissions from OGVs.   In 2020, CARB promulgated "At-Berth" regulations with the aim of further reducing air pollution from vessels.  Emissions from support tugboats are regulated by the Harborcraft Rule.

6

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

• Without further development of California oil resources, foreign imports of crude oil would increase by about 15 percent;

• The increase in foreign crude oil imports via tankers would increase NOx emissions by 1,200 tons per year in the coastal waters near the South Coast/Los Angeles and San Francisco Bay Areas;

• Tanker emissions from importing foreign oil would "contribute substantially to an existing projected air quality violation" in coastal communities; and

• The emissions from marine and rail terminals engaged in transporting imported crude oil would negatively affect sensitive receptors (e.g., children, the elderly, and persons with respiratory conditions).[7]

**B.    Other Environmental Impacts**

20.    In addition to GHG and criteria pollutant emissions impacts from transporting foreign-based crude oils to California, the transportation of crude via tankers potentially causes other environmental impacts from wastewater discharges, noise pollution, and increased oil spill risk, to name a few.  The 2015 EIR, noted above, pointed to an additional impact from importing crude oil into the state.  The EIR stated that Environmental Justice (EJ) communities are disproportionately impacted from ship, truck, and rail emissions.  Increasing foreign crude oil imports would only exacerbate environmental impacts to EJ communities. [8]

21.    Given the negative environmental impacts noted above, it is my opinion that the operation of the Las Flores Pipelines, including compliance with ongoing obligations to complete repairs based on the results of regularly required inspections and other increased safety standards required by the California Office of State Fire Marshal ("OSFM"), will help avoid the potentially negative environmental consequences of imported crude oil.  Reducing environmental impacts to communities in California benefits the public.

---

[7] See Section 12.2.3 of the State's Final Environmental Impact Report for SB 4, prepared by CalGEM, June 2015. A true and correct copy of Chapter 12 of the Final Environmental Impact Report is attached hereto as **Exhibit A**.

[8] See Section 12.2.10.2 of the Final Environmental Impact Report for SB 4, prepared by CalGEM, June 2015.

7

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

## IV.    Allowing the Las Flores Pipelines to Restart Would Not Harm the Environment

22.    Finally, I have been asked to opine as to whether allowing Sable to restart and operate the Las Flores Pipelines would harm the environment.  I believe this is not the case because restarting and operating the Las Flores Pipelines in compliance with applicable federal regulations and OSFM-approved plans will maintain critical protections for the environment.  This opinion is supported by the thorough process by which the original permits were developed and issued, which included a complete environmental review prepared in compliance with both CEQA and NEPA.

23.    Prior to the issuance of the permits for what is now called the Las Flores Pipelines in the 1980s, the pipelines were subject to environmental review under CEQA and NEPA.  In January 1985, the California State Lands Commission and federal Bureau of Land Management certified the Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for what was then known as the "Celeron Pipeline Project," which included the construction of what is now called the Las Flores Pipelines.[9]  Because the validity of the EIR/EIS was not challenged, it is "conclusively presumed to comply with [CEQA]."[10]

24.    The EIR/EIS assumed that the Las Flores Pipelines' operational life would continue until the "availability of crude oil" for use in the Las Flores Pipelines was exhausted.[11]  The EIR/EIS and subsequent agency evaluations considered all aspects of the Las Flores Pipelines' project life, including the construction, operation, and maintenance/repair associated with the equipment.  In particular, the EIR/EIS evaluated potential impacts to air quality, geology, soils, surface water, groundwater, aquatic biology, terrestrial biology, socioeconomics, land use and recreation, transportation, cultural resources, visual resources, noise, system safety and reliability, and oil spill

---

[9] Reference Environmental Impact Report/Environmental Impact Statement Prepared for the Celeron All American and Getty Pipeline (SCH Number 1983110902) by the State Lands Commission, 1984.  A true and correct copy of relevant portions of the Final EIR/EIS is attached hereto as **Exhibit B**.  The complete Final EIR/EIS is available online at this link: https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt.

[10] See Pub. Resources Code, § 21167.2.

[11] See Draft EIR/EIS at p. 2-35. A true and correct copy of relevant portions of the Draft EIR/EIS is attached hereto as **Exhibit C**. The complete Draft EIR/EIS is available online at the following link: https://cosantabarbara.app.box.com/s/gc3vhh8ns8aiwketnq35vwbehnhre672.

8

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

potential.   The EIR/EIS also identified and discussed various project alternatives, including a "no project" alternative and alternative pipeline routes.  The County of Santa Barbara (County) found that "[t]he project alternatives not chosen are either not feasible, not environmentally preferable or not as beneficial as the proposed project."[12]

25.   CEQA mandates that all significant impacts associated with a project must be mitigated or avoided to the maximum extent feasible.[13] Additionally, the agency must make specific findings for each significant environmental impact identified in the EIR, accompanied by a brief rationale for each finding.[14] The County's findings in support of its project approval are set forth in the Planning Commission Actions for the Celeron Pipeline Final Development Plan (FDP), dated March 3, 1986.[15] For example, the County made many specific CEQA findings concerning construction, operation, and maintenance of the pipelines, including that "adverse impacts are mitigated to the maximum extent feasible."[16] The FDP also includes impact-specific CEQA findings, including:

    a. "The risks of an unlikely oil spill, combined with the risks of incomplete spill cleanup, are considered acceptable because only denying the project would assure complete mitigation of the oil spill impacts.

    b. "Numerous sensitive plants will be removed to clear a 100-foot right-of-way for construction vehicles; fifty feet of this right-of-way will remain clear of larger vegetation during operation for maintenance purposes. … The residual impact is considered acceptable due to the projects need for clear construction and operation ROWs."[17]

    c. "The residual disturbance impacts [to cultural resources], while significant to the

---

[12] County Planning Commission Actions (March 3, 1986), a true and correct copy of which is attached as here to as **Exhibit D**, at pp. 54-55.

[13] See Pub. Resources Code, §§ 21000 *et. seq.*; Cal Code Regs, tit. 14, §15126.4(a).

[14] Pub. Resources Code, § 21081; Cal. Code Regs, tit. 14, § 15091.

[15] See Exhibit D.

[16] *Id.* at p. 46, at 1.1.(b).

[17] *Id.* at p. 51, at 1C. Clearing Vegetation.

9

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

Native Americans, are considered acceptable since all feasible mitigations have been employed."[18]

    d. "[Certain geology, aquatic biology, and terrestrial biology i]mpacts identified as Class II have been eliminated or substantially lessened where feasible."[19]

26.     CEQA also requires the balancing of economic, legal, social, technological, or other benefits of a proposed project against any unavoidable significant environmental impacts identified in an EIR.[20] When an agency decides to approve a project notwithstanding unavoidable significant environmental impacts, it must prepare a "statement of overriding considerations" explaining its rationale. As set forth in the County's Statement of Overriding Considerations, the County found "that in balancing the project's benefits against its unavoidable environmental risks, the benefits outweigh the environmental risks."[21] In particular, the County found that "the pipeline[s] will reduce the need for marine tankering of locally produced crude oil, thus satisfying County policies which favor the use of pipelines."[22] The County's Statement of Overriding Considerations also concluded that compliance with certain Oil Spill Contingency and Emergency Response Plans incorporated into the project description, identified mitigation measures, and conditions of approval would "mitigate[] as completely as possible" all "potential oil spill impacts" and other potentially significant impacts resulting from the project.[23]

27.     The regulatory agencies with jurisdiction over the pipeline project incorporated conditions of approval based on the certified EIR/EIS's analysis and mitigation measures as mandatory permit terms and conditions applicable to the project, including activities related to maintenance and repairs. For example, to minimize the impact of a potential oil spill, the County imposed conditions requiring "[a]utomatic block and check valves at sensitive habitat" and the implementation of an "oil

---

[18] *Id.* at p. 51, at 1D. Disturbance of Cultural Resources.

[19] *Id.* at p. 53, CEQA Findings 2-8.

[20] Pub. Resources Code, § 21081; Cal. Code Regs, tit. 14, § 15093.

[21] Exhibit D at p. 56.

[22] *Ibid.*

[23] *Id.* at pp. 55-56.

10

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

spill contingency plan."[24]  Indeed, the County's Conditions of Approval were "premised upon findings that where feasible, all significant environmental effects of the project identified in the EIR/EIS [], which occur in Santa Barbara County, will be substantially mitigated by the permit conditions."[25] The regulatory agencies with jurisdiction over the operation of the Las Flores Pipelines provided oversight to ensure all permit conditions are followed to minimize potentially significant environmental impacts. This oversight will continue, and, if Sable does not fulfill its obligations under the existing permits, remedies are available to the regulatory agencies with jurisdiction to enforce compliance.

28.    It is my opinion that the compliance verification methods used by regulatory agencies (e.g., enforcement and inspection rights) provide the public assurances that all appropriate environmental mitigations are fully implemented.  The process of environmental review under CEQA, permit processing and issuance, and compliance with permit terms and conditions ensures that potential environmental harm is mitigated to the maximum extent feasible during all associated pipeline activities, including required maintenance and repair.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 7th day of July, 2025, in Camarillo, California.

_____
Bart Leininger

---

[24] *Id.* at p. 53 and Table of Celeron Class I Impacts at p. 3.

[25] *Id.* at p. 13, Condition 8-3.

11

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

# VOLUME 1 OF 4 (EXHIBIT A)

# TO DECLARATION OF BART LEININGER

# Exhibit A

# 12.    Environmental Analysis of the Alternatives

## 12.1    Introduction

EIR Section 8.1 (Description of the Alternatives, Introduction) provides the statutory background and requirements of an EIR's evaluation of alternatives to a proposed project. EIR Section 8.2 (Alternatives Evaluation Process) describes the method by which alternatives to the project were identified, and why they were or were not carried forward for evaluation in this EIR. EIR Section 8.3 (Alternatives Retained for Evaluation) describes the alternatives to the project evaluated in this EIR.

Six alternatives to the project are considered in this EIR. Table 12.1-1 identifies these alternatives and where they are described and evaluated within this EIR.

**Table 12.1-1. Location of EIR Alternatives Descriptions and Impact Evaluations**

| Alternative | Alternative Description (EIR Section) | Alternative Impact Evaluation (EIR Section) |
|---|---|---|
| No Future Well Stimulation Treatments Alternative (Alternative 1) | 8.3.1 | 12.2 |
| No Future Well Stimulation Treatments Outside of Existing Oil and Gas Field Boundaries Alternative (Alternative 2) | 8.3.2 | 12.3 |
| Well Pad Consolidation Alternative (Alternative 3) | 8.3.3 | 12.4 |
| Urbanized Area Protection Alternative (Alternative 4) | 8.3.4 | 12.5 |
| Active Fault Zone Restrictions Alternative (Alternative 5) | 8.3.5 | 12.6 |
| No Project Alternative (Alternative 6) | 8.3.6 | 12.7 |

The six alternatives have been evaluated in less detail than the project. However, consistent with CEQA case law and State CEQA Guidelines Section 15126.6(d), the analysis of the alternatives includes sufficient information about each one of them to allow for a meaningful evaluation and comparison with the project. A comparison of the effects of all of the alternatives is provided in EIR Chapter 14 (Comparison of the Alternatives). Additionally, the discussion of each alternative includes some consideration of the extent to which the alternative meets the project objectives, which are presented in EIR Section 7.2 (Project Objectives).

For each subject evaluated, the analysis of the alternatives relies on the same impact criteria used for analysis of the project itself. (See EIR Chapters 10 (Programmatic Level Analysis of the Project) and 11 (Programmatic Level Analysis of Specific Oil and Gas Fields).) To reduce redundancy, the technical parameters related to these impact criteria are not repeated here. Similarly, for the purposes of calibrating the potential impacts of each alternative, the same impact significance classification system used for the project has been applied to the alternatives, as follows:

- **Class I: Significant and Unavoidable Impact.** Class I impacts are significant adverse environmental effects that cannot be mitigated to a level of less than significant through the application of feasible mitigation measures.

- **Class II: Less Than Significant Impact With Mitigation Incorporated.** Class II Impacts are significant adverse environmental effects that can be reduced to a level of less than significant with the application of feasible mitigation measures.

- **Class III: Less Than Significant Impact.** Class III impacts are adverse environmental effects that have been determined to be comparatively minor in the sense that they do not meet or exceed the subject-specific criteria established to gauge significance.

Analysis of Oil and Gas Well Stimulation Treatments in California
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

■ **Class IV: No Impact.** Class IV impacts do not have any adverse or beneficial environmental effects.

■ **Class V: Beneficial Impact.** Class V impacts result in favorable environmental effects.

In addition, the same regulatory setting and existing conditions (i.e., "Affected Environment") have been applied to each of the subjects evaluated in the alternatives analysis. To avoid repetition these descriptions are not duplicated here. Please refer to EIR Chapters 10 (Programmatic Level Analysis of the Project) and 11 (Programmatic Level Analysis of Specific Oil and Gas Fields) for these descriptions.

For each alternative's subject-specific evaluation, programmatic effects are identified first to parallel EIR Chapter 10 (Programmatic Level Analysis of the Project), followed by a programmatic level analysis of the Wilmington, Inglewood, and Sespe Oil and Gas Fields (Study Regions 1 and 2) to mirror EIR Chapter 11 (Programmatic Level Analysis of Specific Oil and Gas Fields).

At the end of each alternative's evaluation there is a summary table of all impacts identified and their significance. Additionally, each table includes a listing of the mitigation measures that have been applied to each impact that has been identified as significant and unavoidable (Class I) and mitigable to a level of less than significant (Class II).

## 12.2    No Future Well Stimulation Treatments Alternative (Alternative 1)

The No Future Well Stimulation Treatments Alternative (Alternative 1) would prohibit all current well stimulation activities and prohibit future use of well stimulation treatments anywhere within the State on lands that are under State jurisdiction. This alternative would not apply to lands solely under federal or tribal jurisdiction, unless appropriate interagency agreements were either revised or put into effect regarding well stimulation treatments. A full description of Alternative 1 is provided in EIR Chapter 8 (Description of the Alternatives). The environmental baseline and impact criteria used for the analysis of this alternative are the same as those described in EIR Chapters 10 and 11. Potential impacts on federal or tribal lands due to proposed future well stimulation treatments would be the same as those described in EIR Chapter 10, and are not discussed further in this analysis of Alternative 1. Development on federal and tribal lands would be subject to the permitting and environmental review requirements of the federal or tribal government, as well as to applicable laws and regulations. This analysis is focused on lands that are not under federal or tribal jurisdiction and authority, though impacts to lands not under State jurisdiction are briefly discussed in the sections below.

To be implemented, Alternative 1 would require new legislation to amend or repeal PRC Section 3106(b), which currently authorizes well stimulation treatments, and 3160(b), which was enacted as part of Senate Bill 4. The new legislation would need to specify that all current or future well stimulation treatments were prohibited. A law to this effect would need to be considered and enacted by the Legislature and signed by the Governor. Typically, an alternative that requires independent legislative action is not considered in an EIR because it is legally infeasible for the Lead Agency to pursue the alternative under current law. Nonetheless, because of the interest expressed by many members of the public in understanding the potential consequences of either a moratorium or ban on well stimulation, this EIR considers such an alternative in order to examine how a moratorium or ban on well stimulation treatments would affect oil production in California and what would be the environmental benefits and impacts of implementing this alternative. For such an outcome to occur, however, action by the California Legislature would be necessary.

Under the No Future Well Stimulation Alternative, the direct impacts associated with well stimulation activities would not occur, either inside or outside of existing oil and gas fields. Prohibiting well stimulation reasonably could be expected to result in indirect effects. Various scenarios could occur. Under one scenario, some existing oil and gas fields could become economically unviable without well stimulation because they would not have a rate of production sufficient to justify their continued operation. In this case, some existing fields would be abandoned or shut in. Under a second scenario, owners/operators of existing oil and gas fields may drill more wells than otherwise would have been the case, and increase the intensity of operations such as enhanced recovery, to maintain production levels and compensate for the loss of prospective additional production that would have occurred had well stimulation treatments been used. Under a third scenario, the amount of oil and gas production foregone because of a ban on well stimulation treatments could require importation of an offsetting amount of oil and gas resources from either domestic or foreign supplies, or both. Such supplies typically would be imported either by ship (e.g., from Alaska, Saudi Arabia or Iraq) or by train (e.g., from North Dakota). The assumptions inherent in these indirect effects scenarios are described in EIR Section 8.3.1. The following analysis is focused on both the direct and indirect effects of implementing Alternative 1.

In addition to an analysis of the alternative itself, the analysis of Alternative 1 highlights how impacts under this alternative would be different from impacts under the project. Where no difference is specifically noted, the significance of impacts under the alternative are the same as the impacts under the project.

## 12.2.1    Aesthetics

### 12.2.1.1    Introduction

This section provides an evaluation of the potential impacts to visual resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.1 (Aesthetics) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.1 (Aesthetics). For the purposes of this analysis please refer to EIR Sections 10.1.2 and 11.1.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.1.3 and 11.1.3 for a description of the affected environment for visual resources (as applicable at either a study region or field-specific scale), and EIR Section 10.1.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.1.2    Programmatic Level Analysis of the Project

If Alternative 1 were implemented, stimulation treatments would cease to be performed on any oil and gas wells under state jurisdiction in California. Consequently, visual impacts associated with well stimulation would not occur on lands under state jurisdiction. This would be true in all six study regions. Any potential hydrocarbon production that would have resulted from stimulation treatments would not occur.

Alternative 1 avoids direct impacts associated with well stimulation because existing wells would not be stimulated and new wells that would require stimulation to produce oil would not be drilled. However, given continuing demand for oil, prohibiting well stimulation would have direct and indirect effects of a different sort. A ban could lead to abandonment of wells and fields that become uneconomical in the absence of well stimulation, potentially increasing the amount of conventional well drilling and the use of enhanced recovery techniques in existing fields and requiring the importation of increased quantities of oil from foreign or other domestic sources to meet demand. Activity as some fields could decrease or cease, while increasing at other fields. Importation of more oil would result in direct and indirect impacts from transportation by tanker and rail, and subsequent handling, particularly in Los Angeles, Long Beach, and the San Francisco Bay Area, where extensive refining facilities are located.

| Impact AES-1    Substantially adversely affect scenic vistas |
| --- |

Under this alternative, any ground disturbance or clearing associated with well stimulation would not occur in areas under State jurisdiction. Equipment, material, and vehicles would not be assembled at a well pad in preparation for well stimulation. Consequently, prohibiting well stimulation would result in no alteration to existing scenic vistas and there would be no impact attributed to well stimulation (Class IV).

Some oil and gas fields may be abandoned because of a lack of sufficient production from unstimulated wells; this would result in wells being abandoned or shut in. Depending on local regulations, equipment may or may not be required to be removed and the landscape restored. Overall, abandonment and removals would be a positive visual effect if the field is within a scenic vista and the site is restored (Class V). Without restoration, the visual environment would be similar to existing conditions at the field, with roads, pipes, and tanks abandoned in place. Essentially, this would perpetuate the existing visual conditions but facilities would age and deteriorate, but this would be a less than significant impact (Class III) as compared to the existing conditions of the site.

If, as a result of not being permitted to stimulate wells, owner/operators increased drilling and the use of enhanced recovery activities in areas under State jurisdiction, this would increase the density of well heads, pumps, and pipes in the oil and gas field. Similarly, the density of apparatus in fields on federal and tribal lands could also increase if stimulation activities increase on those lands under this alternative. However, given the density of existing activities, this would not be expected to significantly alter the existing scenic vista, which is already affected by the presence of the field. The impact would be less than significant (Class III).

To meet demand, the potential supply of oil foregone by not allowing well stimulation in California would have to be made up by importing oil from foreign or domestic U.S. sources. This would increase deliveries of imported crude oil, natural gas, or petroleum products to refineries. This increase would be achieved by increasing the number of oilers, tanker trucks, or rail cars arriving at these destinations, and/or by increasing the volume of oil and gas delivered via pipeline, if line capacity were available. The movement of additional vessels, tankers, and railcars would present a short-term visual impact to a viewer as these modes of transportation passed by, but this would be a transient effect and would be less than significant in terms of impact on vistas (Class III). Any construction or expansion of terminals to accommodate deliveries could have an adverse effect on vistas at the locality where this would occur. Depending on local visual conditions, this impact could range from significant and unmitigable (Class I) to less than significant (Class III).

By comparison, under the project, Impact AES-1 could be Class III at existing fields. In the absence of well stimulation, impacts outside of existing fields identified for the project would not occur. Because of the potential need for new or expanded terminals specifically to handle increase imports to address the shortfall of oil, Alternative I could create significant impacts in the viewsheds where facilities would locate. A site-specific analysis would be required to confirm the level of impact, which could range from Class I to Class III.

| **Impact AES-2    Substantially alter or damage scenic resources** |
| :-- |

If new areas outside of existing oil and gas fields are not explored and developed for hydrocarbon recovery, impacts on scenic resources would not occur and there would be no impact (Class IV).

As described for Impact AES-1, if any existing fields are abandoned due to uneconomic productivity, equipment could be removed and the landscape restored to some degree. The degree of equipment removal and site restoration would be subject to local regulations that apply, if any. Removal and restoration would ameliorate existing adverse impacts that might exist with regard to scenic resources and this would be a beneficial impact (Class V). However, if site restoration is not required or is limited, visual conditions would remain similar to those already existing at the locality, which would be less than significant (Class III).

The indirect effects described for increased drilling and activity at existing fields lands under State, federal or tribal government jurisdiction, and from increased imports, would be as described above for Impact AES-1 and would be less than significant (Class III) in most cases, except at some localities, such as at and near new or expanded terminals, where the impact could range from significant and unmitigable (Class I) to less than significant (Class III) if new or expanded facilities are needed.

By comparison, Impact AES-2 could be Class III under the project in existing fields and Class I or II in new areas. However, the project did not require expanded or new terminals for imports, which could be the case under Alternative 1.

---

| **Impact AES-3** | **Substantially degrade the existing visual character or quality of a site and its surroundings** |
| --- | --- |

If new areas outside of existing oil and gas fields are not explored and developed for hydrocarbon recovery, impacts on the existing visual character or quality of a site and its surrounding would not occur, resulting in no impact (Class IV).

At existing fields, field abandonment and restoration would improve the visual character of the site (Class V), assuming that local regulations required equipment removal and site restoration. In the absence of such requirements, the site would remain visually similar to existing conditions, and abandonment would have a less than significant on visual character or quality (Class III). Increasing activity within the field would not likely be noticeably different from existing conditions and would not lead to a substantial degradation of the existing character of the location. This would be a less than significant impact (Class III). Increased deliveries to refineries of imported oil would somewhat increase ship, road, and rail traffic, but this would not substantially degrade the visual character of the routes used, as rail and road systems already exist and already carry traffic. This would be a less than significant impact (Class III). However, at some localities, such as at and near new or expanded terminals, the impact could range from significant and unmitigable (Class I) to less than significant (Class III).

By comparison, Impact AES-3 could be Class III under the project in existing fields and Class I or II in new areas.

---

| **Impact AES-4** | **Create new sources of substantial light and glare** |
| --- | --- |

With a prohibition on well stimulation, few new areas outside of existing oil and gas fields are likely to be explored and developed for hydrocarbon recovery. The absence of these activities would avoid conditions in which there could be new sources of substantial light and glare; this would result in no impact (Class IV).

Field abandonment would not create new sources of light and glare, except to the extent they occurred during decommission and site restoration. The impact would be less than significant (Class III).

Increasing drilling activity at an existing field would increase the number of drill rigs and vehicles on site during the year. This would potentially create additional sources of light and glare, similar in nature to those already occurring. If well drilling were to increase substantially, the frequency and duration of working rigs being present at a field would increase, increasing the number of nighttime hours when rigs would be operating. This could increase the number of nighttime hours in which lighted rigs are visible from offsite. However, any potential sources of light and glare at a site would be present for a limited time and would be removed at the conclusion of the operation. Therefore, increased activities at existing fields would present a less than substantial new source of light and glare. The impact would be less than significant impact (Class III).

Increased deliveries to refineries of imported oil would increase ship, road, and rail traffic, but this traffic would occur along routes already used for deliveries and any viewer light and glare that could result would be transitory. This would be a less than significant impact (Class III). However, at some localities, such as at and near new or expanded terminals, the impact from light and glare could range from significant and unmitigable (Class I) to less than significant (Class III), depending on site conditions and viewer locations.

By comparison, Impact AES-4 could be Class III under the project in existing fields and Class I or II in new areas.

### 12.2.1.3    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

The programmatic discussion for direct and indirect impacts provided in EIR Section 12.2.1.2 above would apply to visual resources associated with the Wilmington, Inglewood, and Sespe Oil and Gas Fields because Alternative 1 would eliminate the presence of vehicles and equipment associated with stimulation work.

### 12.2.1.4    Impact Significance Summary

None of the potential impacts to visual resources identified for the project would occur, as there would be no stimulation activity undertaken. At existing fields, field abandonment and restoration would improve the visual character of the site (Class V), assuming that local regulations required equipment removal and site restoration. There would be secondary impacts attributable to any abandonment of fields, increase in activity at fields, or increase in ship, rail, and tank truck traffic delivering imported oil and gas. Impacts would vary from no impact (Class IV) to less than significant (Class III). However, if increased imports required expanded or new terminals, this could range from a significant unmitigable impact on visual resources at an affected locality (Class I) to a less than significant impact (Class III), depending on site-specific conditions and circumstances.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the adverse indirect effects of Alternative 1, though these strategies would in most instances have to imposed or implemented by agencies other than DOGGR, as most of the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.2    Agriculture and Forestry Resources

### 12.2.2.1    Introduction

This section provides an evaluation of the potential impacts to agricultural and forestry resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.2 (Agricultural and Forestry Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.2 (Agricultural and Forestry Resources). For the purposes of this analysis please refer to EIR Sections 10.2.2 and 11.2.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.2.3 and 11.2.3 for a description of the affected environment for agricultural and forestry resources (as applicable at either a study region or field-specific scale), and EIR Section 10.2.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.2.2    Programmatic Level Analysis of the Project

Alternative 1, which would ban well stimulation on lands under State jurisdiction, would directly reduce overall impacts on agricultural and forestry resources as compared to the project, which would allow stimulation statewide. There would be no impacts related to construction of new well pads and associated facilities for projects dependent on well stimulation treatments. There also would be none of the

potential impacts on agricultural water quality or water supplies that could occur under the project, but there would be greater indirect impacts from additional conventional wells.

The indirect impacts to agriculture and forestry resources associated with Alternative 1 would have beneficial and potentially significant effects when viewed programmatically. Although oil and gas operations can be compatible with agriculture and forest land, any abandonment of oil and gas wells would remove potential operational conflicts and allow additional land to be used for agriculture or forest land (Class V). On the other hand, owners/operators of existing oil and gas fields may drill more wells and increase the intensity of operations to maintain production levels and compensate for the loss of prospective additional production that would have occurred by using well stimulation treatments. Wells could also be developed in new areas, but would be prohibited from using well stimulation, except on lands under federal or tribal jurisdiction. This could result in the following indirect impacts to agricultural or forest lands, which would be similar to the analysis and impact conclusions in EIR Section 10.2 (Agriculture and Forestry Resources):

■ **Impact AGF-1.** Convert a substantial amount of Prime Farmland, Unique Farmland, or Farmland of statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use

■ **Impact AGF-2.** Conflict with existing zoning for agricultural use or with Williamson Act contracts

■ **Impact AGF-3.** Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production

■ **Impact AGF-4.** Result in the loss of forest land or conversion of forest land to non-forest use

■ **Impact AGF-5.** Directly or indirectly impair the use of agricultural land or forest land

Similar to the discussion in EIR Section 10.2, implementation of the following or more stringent mitigation measures for the drilling of wells on new well pads located in agricultural or forest lands would reduce all of the aforementioned impacts related to agriculture and forest land to a less than significant level (Class II). While impacts to agriculture and forest land would be less than significant with mitigation applied under both the project and Alternative 1, increased conventional drilling and enhanced recovery that may occur under Alternative 1 as a result of banning well stimulation treatments would result is an increased level of impacts than under the project. While more severe, these would still be less than significant with mitigation (Class II). There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. The relevant model mitigation measures include the following:

MM AGF-1a     **Minimize Impacts to Important Farmland.** (Full text in EIR Section 10.2.5.)

MM AGF-1b     **Develop an Agricultural Resources Protection Plan.** (Full text in EIR Section 10.2.5.)

MM AGF-1c     **Compensate for Loss of Important Farmland.** (Full text in EIR Section 10.2.5.)

MM AGF-2a     **Ensure Compatibility with Agricultural Zoning.** (Full text in EIR Section 10.2.5.)

MM AGF-2b     **Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts.** (Full text in EIR Section 10.2.5.)

**MM AGF-3a**     **Ensure Compatibility with Zoning for Forest and Timberland.** (Full text in EIR Section 10.2.5.)

**MM AGF-4a**     **Minimize Impacts to Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AGF-4b**     **Develop a Forest Land Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-4c**     **Compensate for Loss of Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AQ-2c**      **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

**MM BIOT-2a**    **Prevent Hazards to Fish and Wildlife.** (Full text in EIR Section 10.4.5.)

**MM HAZ-1a**     **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Dis-charges of Dangerous Fluids and Other Potentially Dangerous Materials**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ (Full text in EIR Section 10.13.5.)

**MM GW-4b**      **Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments**~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~. (Full text in EIR Section 10.14.5.)

**MM SWR-1a**     **Require Stormwater Pollution Prevention Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-2a**     **Implement Erosion Control Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-3a**     **Ensure Adequate Water Availability.** (Full text in EIR Section 10. 15.5.)

**MM TR-1a**      **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

## 12.2.2.3    Programmatic Level Analysis of Specific Oil and Gas Fields

The No Future Well Stimulation Treatments Alternative would reduce overall impacts on agricultural and forestry resources as compared to the project.

***Wilmington Oil and Gas Field***

There would be no impacts under this alternative because there is no forested land or designated Farm-land within the Wilmington Oil and Gas Field (Class IV).

***Inglewood Oil and Gas Field***

The Inglewood Oil and Gas Field does not contain any mapped farmland so no direct or indirect impacts would occur to agriculture (Impacts AGR-1 and AGF-2) (Class IV). Likewise, The Inglewood Oil and Gas Field is not zoned for forest land or timberland, therefore, Impact AGF-3 would not occur (Class IV).

---

**Impact AGF-4    Result in the loss of forest land or conversion of forest land to non-forest use**

---

There are 7.6 acres of forest land within a 0.25-mile buffer surrounding the Inglewood Oil and Gas Field. This forest land would not be directly impacted construction of new well pads and associated facilities for projects dependent on well stimulation treatments (Class V).

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 508 of 836   Page
ID #:11234
Analysis of Oil and Gas Well Stimulation Treatments in California
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

However, a greater number of wells may be drilled to replace lost production that might otherwise have been available with well stimulation. Depending on well locations, this could result in a loss of forest lands within the Inglewood Oil and Gas Field buffer area. There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. With the implementation of the mitigation measures similar to those described in EIR Section 10.2 (Agriculture and Forestry Resources), it is anticipated that the majority of potential environmental impacts, including conversion of forest land to a non-forest use, would be reduced to a less than significant level, and therefore, associated impacts to agricultural or forest land would likewise be less than significant (Class II). The relevant model mitigation measures include the following:

**MM AGF-4a**    **Minimize Impacts to Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AGF-4b**    **Develop a Forest Land Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-4c**    **Compensate for Loss of Forest Land.** (Full text in EIR Section 10.2.5.)

---

**Impact AGF-5**    **Directly or indirectly impair the use of agricultural land or forest land**

---

The Inglewood Oil and Gas Field does not contain any farmland, but it does have forest land within its 0.25-mile buffer area that could be directly or indirectly adversely affected (see also Impact AGF-4). If a greater number of wells are drilled to replace lost production, and depending on the well locations, this could impair the use of the forest lands within the field buffer area.

There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. With the implementation of the mitigation measures similar to those described in EIR Section 10.2 (Agriculture and Forestry Resources), it is anticipated that the majority of potential environmental impacts, including conversion of forest land to a non-forest use, would be reduced to a less than significant level, and therefore, associated impacts to use of forest land would likewise be less than significant (Class II).

The relevant model mitigation measures include the following:

**MM AGF-1a**    **Minimize Impacts to Important Farmland.** (Full text in EIR Section 10.2.5.)

**MM AGF-1b**    **Develop an Agricultural Resources Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-4a**    **Minimize Impacts to Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AGF-4b**    **Develop a Forest Land Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AQ-2c**    **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

**MM BIOT-2a**    **Prevent Hazards to Fish and Wildlife.** (Full text in EIR Section 10.4.5.)

**MM HAZ-1a**    <u>**Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**</u>~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities,~~

~~Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ (Full text in EIR Section 10.13.5.)

**MM GW-4b**    **Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u>~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~.** (Full text in EIR Section 10.14.5.)

**MM SWR-1a**    **Require Stormwater Pollution Prevention Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-2a**    **Implement Erosion Control Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-3a**    **Ensure Adequate Water Availability.** (Full text in EIR Section 10.15.5.)

**MM TR-1a**    **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

*Sespe Oil and Gas Field*

| | |
|---|---|
| **Impact AGF-1** | **Convert Prime Farmland, Unique Farmland, or Farmland of statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use** |

The No Future Well Stimulation Treatments Alternative would likely reduce overall direct impacts on agricultural and forestry resources within the portion of the Sespe Oil and Gas Field under State jurisdiction. There would be no impacts related to construction of new well pads and associated facilities for projects dependent on well stimulation treatments. There would also be none of the potential impacts on agricultural water quality or water supplies that could occur under the project (Class IV).

However, there are 73 acres of FMMP-designated Farmland of Local Importance and 3,724 acres of Grazing Land located throughout the field. If a greater number of wells are drilled to replace lost production that could have resulted from well stimulation treatments, or if operators increase drilling and stimulation activities on the portion of the field that is under federal jurisdiction, depending on well locations, these wells could convert Grazing Land or Farmland of Local Importance to a non-agricultural use. There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. With the implementation of the mitigation measures similar to those described in EIR Section 11.2.5.3 (Agriculture and Forestry Resources, Study Region 2: Sespe Oil and Gas Field), impacts associated with the conversion of agricultural land to a non-agricultural use would be reduced to a less than significant level (Class II). The relevant model mitigation measures include the following:

**MM AGF-1a**    **Minimize Impacts to Important Farmland.** (Full text in EIR Section 10.2.5.)

**MM AGF-1b**    **Develop an Agricultural Resources Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-1c**    **Compensate for Loss of Important Farmland.** (Full text in EIR Section 10.2.5.)

---

| **Impact AGF-2** | **Conflict with existing zoning for agricultural use or Williamson Act contracts** |
|---|---|

Under the Los Padres National Forest Plan, the portion of the Sespe Oil and Gas Field under federal control is designated for oil and gas exploration. Therefore, there would be no conflict with existing agricultural zoning or an equivalent designation. Lands under County jurisdiction are zoned as Open Space, subject to conditional use permit requirements and the Non-Coastal Zone Ordinance, which has oil and gas standards.

There are 594 acres of Non-Prime Williamson Act lands located throughout the field (the Williamson Act does not apply to federal lands). If a greater number of wells are drilled to replace lost production, depending on well locations, these wells could conflict with existing Williamson Act contracts. There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. With the implementation of a mitigation measure similar to Mitigation Measure AGF-2b, drilling of these new wells would be compatible with Williamson Act contracts, or the Williamson Act contracts would be terminated before those activities are initiated. Therefore, impacts related to Williamson Act conflicts would be less than significant (Class II).

**MM AGF-2b** **Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts.** (Full text in EIR Section 10.2.5.)

| **Impact AGF-3** | **Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production** |
|---|---|

Under the Los Padres National Forest Plan, the Sespe Oil and Gas Field is designated for oil and gas exploration. Lands under County jurisdiction are zoned as Open Space, subject to conditional use permit requirements and the Non-Coastal Zone Ordinance, which has oil and gas standards. Therefore, there would be no conflict with existing forestry zoning (Class IV).

| **Impact AGF-4** | **Result in the loss of forest land or conversion of forest land to non-forest use** |
|---|---|

The No Future Well Stimulation Treatments Alternative would reduce overall direct impacts on forestry resources within the Sespe Oil and Gas Field because there would be no impacts related to construction of new well pads and associated facilities for projects dependent on well stimulation treatments (Class IV). However, there is forest land located throughout the field. If a greater number of wells are drilled to replace production that may have derived from stimulation had it been allowed, these wells could convert forest land to a non-forest use, depending on their location.

There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. With the implementation of the mitigation measures similar to those described in EIR Section 11.2.5.3 (Agriculture and Forestry Resources, Study Region 2: Sespe Oil and Gas Field), conversion of forest land to a non-forest use would be reduced to a less than significant level (Class II). The relevant model mitigation measures include the following:

**MM AGF-4a**  **Minimize Impacts to Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AGF-4b**  **Develop a Forest Land Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-4c**  **Compensate for Loss of Forest Land.** (Full text in EIR Section 10.2.5.)

| Impact AGF-5 | Directly or indirectly impair the use of agricultural land or forest land |
|---|---|

Any direct or indirect impacts to agriculture or forestry resources related to new wells drilled and stimulated or well stimulation treatments in areas under State jurisdiction would not occur (Class IV). However, if a greater number of wells are drilled to replace lost production and depending on the location of these wells, project activities adversely affect surrounding forest land or agricultural land. Direct impacts would include conversion of timberland or agricultural land to non-timber or non-agricultural use (covered under Impact AGF-1); mortality or injury of livestock animals; interference with agricultural or timber operations; and disturbance of livestock animals or damage to crops or timber trees from noise, dust, or accidental releases of hazardous materials. Indirect impacts may include effects from erosion, sedimentation, introduction of invasive exotic species, or increased competition for water resources.

There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. With the implementation of the mitigation measures similar to those described in EIR Section 11.2.5.3 (Agriculture and Forestry Resources, Study Region 3: Sespe Oil and Gas Field), direct or indirect impacts that would impair the use of agriculture or forestry resources would be less than significant (Class II). The relevant model mitigation measures include the following:

**MM AGF-1a**  **Minimize Impacts to Important Farmland.** (Full text above.)

**MM AGF-1b**  **Develop an Agricultural Resources Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-4a**  **Minimize Impacts to Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AGF-4b**  **Develop a Forest Land Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AQ-2c**  **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

**MM BIOT-2a**  **Prevent Hazards to Fish and Wildlife.** (Full text in EIR Section 10.4.5.)

**MM HAZ-1a**  **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~. (Full text in EIR Section 10.13.5.)

**MM GW-4b**  **Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments**~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~. (Full text in EIR Section 10.14.5.)

**MM SWR-1a**  **Require Stormwater Pollution Prevention Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-2a**    **Implement Erosion Control Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-3a**    **Ensure Adequate Water Availability.** (Full text in EIR Section 10.15.5.)

**MM TR-1a**    **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

### 12.2.2.4    Impact Significance Summary

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.3    Air Quality

### 12.2.3.1    Introduction

This section provides an evaluation of the potential impacts to air quality associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.3 (Air Quality) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.3 (Air Quality). For the purposes of this analysis please refer to EIR Sections 10.3.2 and 11.3.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.3.3 and 11.3.3 for a description of the affected environment for air quality (as applicable at either a study region or field-specific scale), and EIR Section 10.3.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.3.2    Programmatic Level Analysis of the Project

| Impact AQ-1    Conflict with or obstruct implementation of an applicable air quality plan |
| --- |

By halting well stimulation activities in areas under State jurisdiction, this alternative would restrict future oil and gas activity in California. This would avoid emissions that otherwise would occur during well stimulation treatments in areas under State jurisdiction, and it would also lead to a decrease in California oil production. To replace the decrease in California production, an additional 57 million barrels of crude per year would need to be supplied from fields outside of California (EIR Section 8.3.1), which currently supply about 380 million barrels annually (ARB, 2014c). The replacement supply would cause California import receipts to increase by about 15 percent. This would increase the activity of tanker ships delivering Alaskan and foreign oil to California via ports and marine terminals in Los Angeles, Long Beach, and the San Francisco Bay Area, and it would increase the activity of rail trains hauling crude oil primarily from North Dakota and Canada. In-state emissions from oil and gas production could occur at lower levels; however, these lowered emissions would be offset by increasing levels of emissions from tanker ships and locomotives delivering crude to California and from terminal facilities necessary to offload and handle the imports. The vast majority (more than 95 percent) of California's crude oil imports arrive by marine vessels at proprietary marine terminals in Los Angeles, Long Beach, and the San Francisco Bay Area. Emissions from ocean-going vessels that visit California seaports are subject to emissions control requirements and low-sulfur fuel requirements, when operating near the coast; and newer locomotive engines are subject to emission standards, and fuel requirements provide some level of control over these sources. Tanker vessels, as a subset of ocean-going vessels, produce about 22 tons NOx per average day according to the statewide inventory (ARB, 2013a). For tanker vessels, an increase of 15 percent could add over 3 tons NOx per day statewide or about 1,200 tons NOx per year, primarily in the coastal waters leading to the South Coast and San Francisco Bay Area air basins. The resulting levels of NOx and other emissions from tanker ships, locomotives, and terminal facilities would remain at levels potentially inconsistent with the forecasts of air quality plans, resulting in a potential conflict with

local air quality plans. Each local air district, especially SCAQMD and BAAQMD, would need to assess the potential growth in activity and emissions from ocean-going vessels and trains to ensure that these mobile sources are accurately reflected in inventories.

Mitigation identified for the project would need to be either replaced or adapted for the increased emissions from marine vessels and trains that import oil and gas and for new facilities to deliver imports (Mitigation Measure AQ-1a, Improve Air Quality Planning Inventories and Local Control Measures). Mitigation regarding well stimulation treatments would not be applicable (Mitigation Measure AQ-1b. Improve the Methodologies and Emission Factors Used in Inventory Development). The mobile sources and facilities that handle imports fall under the jurisdiction of the ARB, local air districts, and counties and cities with land use authority, and these agencies would need to identify any necessary mitigation. Because DOGGR cannot require local air districts to update planning inventories or establish specific rules for sources related to oil and gas importation, this impact would be a Class I: Significant and Unavoidable Impact.

Alternative 1 is worse than the project for Air Quality impacts. Increased levels of emissions would occur from tanker ships and locomotives delivering crude to California and from terminal facilities necessary to offload and handle the imports (Class I). Indirect impacts associated with additional conventional wells and abandonment activities could also cause growth in emissions due to an increase the intensity of operations to make up for lost production.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the adverse indirect effects of Alternative 1, though these strategies would in most instances have to imposed or implemented by agencies other than DOGGR, as most of the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. DOGGR's relevant model mitigation measure in this context is the following:

MM AQ-1a     **Improve Air Quality Planning Inventories and Local Control Measures.** (Full text in EIR Section 10.3.5.)

| Impact AQ-2 | **Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation** |
|---|---|

The increased levels of criteria air pollutant emissions caused by tanker ships, rail transport, and terminals for offloading crude may exceed general mass-based emission thresholds of a local air district. Mitigation regarding well stimulation treatments would not be applicable (Mitigation Measure AQ-2a, Reduce Hydrocarbon Emissions from Well Stimulation Treatments). Mitigation similar to that identified for the project would need to be developed or adapted for mobile sources and facilities that import oil and gas to reduce emissions from marine and rail terminals (Mitigation Measure AQ-2b, Reduce Emissions from Portable Equipment and Mobile Sources; AQ-2c, Reduce Emissions from Dust-causing Activities). The mobile sources and facilities that handle imports fall under the jurisdiction of the ARB, local air districts, and counties and cities with land use authority, and these agencies would need to identify any necessary mitigation. Because DOGGR cannot be certain that the degree of mitigation would reduce emissions to levels that would not exceed local air district thresholds, this impact would be a Class I: Significant and Unavoidable Impact.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the adverse indirect effects of Alternative 1, though these strategies would in most instances have to imposed or implemented by agencies other than DOGGR, as most of the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. DOGGR's relevant model mitigation measures in this context include the following:

**MM AQ-2b**    **Reduce Emissions from Portable Equipment and Mobile Sources.** (Full text in EIR Section 10.3.5.)

**MM AQ-2c**    **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

| Impact AQ-3    Expose sensitive receptors to substantial pollutant concentrations |
|---|

Emissions from marine and rail terminals would have the potential to expose sensitive receptors to substantial pollutant concentrations depending on local conditions. Mitigation similar to that identified for the project would need to be developed or adapted for mobile sources and facilities that import oil and gas to reduce the levels of TACs from marine and rail terminals. Because DOGGR cannot be certain that feasible mitigation would subject the facilities to sufficient controls so that activities would not expose sensitive receptors to substantial pollutant concentrations, this is a Class I: Significant and Unavoidable Impact. DOGGR's relevant model mitigation measures in this context include the following:

**MM AQ-3a**    **Comply with Local Air District Protocols Relating to the Preparation of ~~Prepare~~ a Health Risk Assessment and Implement Emission Controls.** (Full text in EIR Section 10.3.5.)

**MM AQ-3b**    **Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility.** (Full text in EIR Section 10.3.5.)

| Impact AQ-4    Create objectionable odors affecting a substantial number of people |
|---|

Emissions from marine and rail terminals would have the potential to create objectionable odors depending on local conditions. Mitigation similar to that identified for the project would need to be developed or adapted for mobile sources and facilities that import oil and gas to reduce potential odor impacts from marine and rail terminals. Because site-specific conditions may result in occasionally unavoidable odor annoyances and universal implementation of odor minimization strategies would not be certain, this impact would be a Class I: Significant and Unavoidable Impact. DOGGR's relevant model mitigation measures in this context include the following:

**MM AQ-4a**    **Prepare and Implement an Odor Minimization Plan.** (Full text in EIR Section 10.3.5.)

**MM AQ-4b**    **Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility.** (Full text in EIR Section 10.3.5.)

### 12.2.3.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in the existing Wilmington, Inglewood, or Sespe fields. Therefore, emissions associated with well stimulation treatments would not occur. The indirect effects of additional conventional wells and abandonment activities could also increase the intensity of operations at these fields to make up for lost pro-

duction, within the limits of existing entitlements. As a result, oil and gas production emissions would continue as in the setting or be reduced somewhat (Class III).

### 12.2.3.4    Impact Significance Summary

Alternative 1 is worse than the project for Air Quality impacts. Although emissions related to well stimulation treatments would be avoided, emission increases would occur due to crude transport and offloading or an increase in the intensity of operations in fields to maintain production levels. Emissions associated with these indirect effects would cause air quality impacts described above.

## 12.2.4    Biological Resources: Terrestrial Environment

### 12.2.4.1    Introduction

This section provides an evaluation of the potential impacts to terrestrial biological resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.4 (Biological Resources–Terrestrial Environment) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.4 (Biological Resources–Terrestrial Environment). For the purposes of this analysis please refer to EIR Sections 10.4.2 and 11.4.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.4.3 and 11.4.3 for a description of the affected environment for biological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.4.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.4.2    Programmatic Level Analysis of the Project

Under the No Future Well Stimulation Practices Alternative no surface or subsurface disturbances associated with well stimulation treatments would occur in areas under State jurisdiction. Therefore, no direct impacts from stimulation activities to biological resources would occur within or outside of existing oil and gas fields that are under State jurisdiction (Class IV).

Special-status biological resources may be found within existing oil and gas fields, but tend to be more abundant elsewhere. There is a potential for adverse impacts from oil and gas production both within and outside of existing fields, even without well stimulation treatments. Most of the potential impacts to terrestrial biological resources described in EIR Section 10.4 result from land use alterations and other surface impacts of oil and gas production. These impacts may result from well siting, drilling, and operation, regardless whether well stimulation treatments are applied.

There are greater indirect temporary and permanent impacts of additional conventional wells. But there are reduced operational impacts from well abandonment.

Indirect impacts to terrestrial biological resources associated with Alternative 1 would be potentially significant when viewed programmatically. In particular, potential increases in well drilling to maintain production levels would impact biological resources, possibly to a greater extent than similar production levels obtained through well stimulation, due to greater number of wells and consequent surface disturbance. Alternately, if existing wells or entire oil and gas fields are abandoned, current operation impacts of those facilities to biological resources would be reduced. However, at the programmatic level of analysis, it is not possible to know precisely the location, extent and particular characteristics of the impacts to these resources. Either the abandonment of existing oil and gas fields per existing State, federal, and local regulatory requirements for site restoration, or the drilling and operation of new wells

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 516 of 836   Page ID #:11242

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

would be expected to cause substantial surface and subsurface disturbances that would create impacts that may be significant and unavoidable (Class I). This would apply to biological resources impact criteria BIOT-1 through BIOT-6 and BIOT-10, below. In contrast, Impact BIOT-8 and Impact BIOT-9 are Class II impacts under the project.

- Impact BIOT-1. Substantially reduce the habitat of a fish or wildlife species

- Impact BIOT-2. Cause a fish or wildlife population to drop below self-sustaining levels

- Impact BIOT-3. Substantially reduce the number or restrict the range of an endangered, rare, or threatened species

- Impact BIOT-4. Have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special-status species in local or regional plans, policies, or regulations, or by CDFW or USFWS

- Impact BIOT-5. Have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations, or by CDFW or USFWS

- Impact BIOT-6. Have a substantial adverse effect on federally protected wetlands as defined by Section 404, of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means

- Impact BIOT-7. Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites

- Impact BIOT-8. Conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance

- Impact BIOT-9. Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan

- Impact BIOT-10. Contribute to global climate change and consequent impacts to biodiversity

There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. Mitigation measures similar to Mitigation Measures BIOT-1a through BIOT-9a (adapted for applicability for projects other than well stimulation activities) would reduce impacts, but would not necessarily reduce impacts to a less than significant level. Additional mitigation measures or other conditions may be required under other regulatory programs including but not limited to CESA, ESA, state and federal regulation of waters of the State and waters of the U.S.

**MM BIOT-1a**    **Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat.** (Full text in EIR Section 10.4.5.)

**MM BIOT-1b**    **Minimize Impacts to Native Vegetation and Habitat.** (Full text in EIR Section 10.4.5.)

**MM BIOT-1c**    **Replace or Offset Loss of Sensitive Habitat.** (Full text in EIR Section 10.4.5.)

**MM BIOT-2a**    **Prevent Hazards to Fish and Wildlife.** (Full text in EIR Section 10.4.5.)

**MM BIOT-3a**  **Minimize and Mitigate Impacts to Special-status Fish and Wildlife.** (Full text in EIR Section 10.4.5.)

**MM BIOT-3b**  **Minimize and Mitigate Impacts to Special-status Plants.** (Full text in EIR Section 10.4.5.)

**MM BIOT-4a**  **Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS.** (Full text in EIR Section 10.4.5.)

**MM BIOT-4b**  **Minimize Impacts to Protected Birds.** (Full text in EIR Section 10.4.5.)

**MM BIOT-6a**  **Protect Jurisdictional Waters.** (Full text in EIR Section 10.4.5.)

**MM BIOT-7a**  **Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement.** (Full text in EIR Section 10.4.5.)

**MM BIOT-8a**  **Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans.** (Full text in EIR Section 10.4.5.)

**MM BIOT-9a**  **Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans.** (Full text in EIR Section 10.4.5.)

**MM AQ-2a**  **Reduce Hydrocarbon Emissions from Well Stimulation Treatments.** (Full text in EIR Section 10.3.5.)

**MM AQ-2b**  **Reduce Emissions from Portable Equipment and Mobile Sources.** (Full text in EIR Section 10.3.5.)

**MM AQ-2c**  **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

**MM GHG-1a**  **Prevent Methane Emissions from Associated Gas and Casinghead Gas.** (Full text in EIR Section 10.12.5.)

**MM GHG-1b**  **Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies.** (Full text in EIR Section 10.12.5.)

**MM HAZ-1a**  **<u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u>~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~.** (Full text in EIR Section 10.13.5.)

**MM GW-1a**  **Use Alternative Water Sources <u>to the Extent Feasible</u>.** (Full text in EIR Section 10.14.5.)

**MM GW-1b**  **<u>Minimize Groundwater Impacts</u>~~Prepare a Third-Party Technical Report to Analyze Overdraft Impacts~~.** (Full text in EIR Section 10.14.5.)

**<u>MM GW-4a</u>**  **<u>Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation.</u>** (Full text in EIR Section 10.14.5.)

**MM GW-4b**  **Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u>~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~.** (Full text in EIR Section 10.14.5.)

**MM SWR-1a**     **Require Stormwater Pollution Prevention Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-1b**     **Surface Water Protection.** (Full text in EIR Section 10.15.5.)

~~**MM SWR-1c**     **Protect Surface Water Reservoirs.** (Full text in EIR Section 10.15.5.)~~

**MM SWR-2a**     **Implement Erosion Control Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-3a**     **Ensure Adequate Water Availability.** (Full text in EIR Section 10.15.5.)

**MM TR-1a**     **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

### 12.2.4.3    Programmatic Level Analysis of Specific Oil and Gas Fields

The programmatic level analysis contained in EIR Chapter 10 for terrestrial biological resources addresses the same impact criteria referenced above. The restriction[1] of well stimulation treatments in the Wilmington, Inglewood, and Sespe Oil and Gas Fields would result in no direct impacts of well stimulation activities to biological resources (Class IV). Indirect impacts (described above) to biological resources would largely affect surface resources, in much the same manner as described for the impacts of the project. Thus, the indirect effects of Alternative 1 to biological resources in California could be reduced by Mitigation Measures BIOT-1a through BIOT-9a or by similar measures imposed by approving agencies other than DOGGR with respect to projects that do not involve well stimulation or oil and gas development. However, these impacts would be Class II for the Wilmington and Inglewood Oil and Gas Fields. The Sespe Oil and Gas Field (in contrast with the Wilmington field) contains extensive natural habitat areas, and is surrounded by additional important habitat areas. For the Sespe Oil and Gas Field, impacts may be Class I even with the implementation of recommended mitigation. Within the Sespe field, Mitigation Measures BIOT-2b and BIOT-2c would also apply:

**MM BIOT-2b**     **California Condor Protection Measures.** (Full text in EIR Section 10.4.5.)

**MM BIOT-2c**     **Nelson's Bighorn Sheep Protection Measures.** (Full text in EIR Section 10.4.5.)

### 12.2.4.4    Impact Significance Summary

Alternative 1 would reduce the potential direct impacts to terrestrial biological resources in all study regions at the programmatic level because there would be no surface or subsurface disturbances associated with well stimulation in areas under State jurisdiction. However, indirect effects associated with either existing oil and gas field abandonment or intensified well drilling and production would be potentially significant and unavoidable (Class I). Mitigation measures similar to Mitigation Measures BIOT-1a through BIOT-9a listed above would reduce these effects but cannot guarantee they would be entirely avoided.

Direct impacts in the Wilmington, Inglewood, and Sespe Oil and Gas Fields also would be reduced under Alternative 1. However, indirect biological resources effects of either existing oil and gas field abandonment or intensified well drilling and production, or stimulation on the portions of the Sespe field under federal jurisdiction, would be potentially significant and unavoidable (Class I) in all three fields, particularly in the Sespe field due to greater extent of sensitive biological resources.

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

---

[1]    Parts of the Sespe field are under federal jurisdiction, where stimulation activities may be allowed.

## 12.2.5    Biological Resources: Coastal and Marine Environment

### 12.2.5.1    Introduction

This section provides an evaluation of the potential impacts to coast and marine biological resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.5 (Biological Resources–Coastal and Marine Environment) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.5 (Biological Resources–Coastal and Marine Environment). For the purposes of this analysis please refer to EIR Sections 10.5.2 and 11.5.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.5.3 and 11.5.3 for a description of the affected environment for biological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.5.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.5.2    Programmatic Level Analysis of the Project

This Programmatic Level Analysis of Impacts focuses on specific impacts to coastal and marine biological resources from Alternative 1 (No Future Well Stimulation Practices). Under this alternative, program-level impacts are discussed (if applicable) and potential mitigation measures developed.

■ **Impact BIOCM-1:** Substantially affect any species identified as a candidate, sensitive, or special status species or their habitat

■ **Impact BIOCM-2:** Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites

■ **Impact BIOCM-3:** Have a substantial adverse effect on federally protected wetlands as defined by Section 404 of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means

Under Alternative 1, well stimulation activities would not be conducted in any coastal or marine areas under State jurisdiction. There would be no direct impacts to coastal and marine biological resources, including sensitive habitats and species at offshore facilities in Study Region 1 because no well stimulation activities would occur (Class IV) in State waters and tidelands. Moreover, no additional barge trips would be required to transport well stimulation equipment to the THUMS Islands, so there would be no potential for an accidental spill due to increased well stimulation vessel traffic in the vicinity of the THUMS Islands or offshore platform. In addition, migratory routes for biological resources would not be affected. There could be some indirect impacts on coastal and marine resources from intensification of oil and gas drilling that would not utilize well stimulation techniques, or from increased stimulation activities in federal waters. However, with the implementation of current regulations, indirect impacts would be less than significant (Class III).

### 12.2.5.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in the portion of the Wilmington field that is under State jurisdiction. Therefore, potential impacts to coastal and marine biological resources associated with well stimulation treatments, such as removal as a result of HDD operations would not occur, and no mitigation measures would be required (Class IV). There could be some indirect impacts on coastal and marine resources from intensification of oil and gas

drilling. With the implementation of current regulations, indirect impacts would be less than significant (Class III).

### 12.2.5.4    Impact Significance Summary

Direct impacts for Impacts BIOCM-1, BIOCM-2, and BIOCM-3 would be Class IV. Indirect impacts from potential intensification of oil and gas development that does not involve well stimulation activities would be Class III.

## 12.2.6    Coastal Processes and Marine Water Quality

### 12.2.6.1    Introduction

This section provides an evaluation of the potential impacts to coastal processes and marine water quality associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.6 (Coastal Processes and Marine Water Quality) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.6 (Coastal Processes and Marine Water Quality). For the purposes of this analysis please refer to EIR Sections 10.6.2 and 11.6.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.6.3 and 11.6.3 for a description of the affected environment for coastal processes and marine water quality (as applicable at either a study region or field-specific scale), and EIR Section 10.6.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.6.2    Programmatic Level Analysis of the Project

Under the No Future Well Stimulation Treatments Alternative there would be no direct impacts from well stimulation treatments (Class IV) in areas under State jurisdiction.

However, there may be indirect impacts from intensification of oil and gas drilling. ~~Alternative 1 reduces direct risk of tsunami, but there remain indirect tsunami risks from conventional offshore well drilling or an increase in well stimulation on waters under federal management.~~ Indirect impacts could ~~also~~ result in hydrocarbon spills due to the additional conventional wells and increased importation of oil by ship.

Impacts addressed for coastal processes and marine water quality are:

- **Impact CPMWQ-1:** Change marine water chemical composition with respect to known hazardous substances; or the measured water temperature, salinity, conductivity, or turbidity

- **Impact CPMWQ-2:** Change the velocity or direction of ocean currents

- **Impact CPMWQ-3:** Change the velocity or direction of coastal and ocean winds

- **Impact CPMWQ-4:** Change the direction, size, or period of ocean waves

- **Impact CPMWQ-5:** Increase the risk of tsunamis

While the exact nature of the indirect impacts is unknown and would be based on market conditions, indirect impacts may be Class II for water quality (Impact CPMWQ-1), and ocean currents (Impact CPMWQ-2)~~, and tsunami risk (Impact CPMWQ-5)~~. This is because Alternative 1 would have no effect on conventional well drilling, and many of the projects currently proposed but not yet implemented involve horizontal or "slant" drilling from an onshore base to an offshore field. Therefore, there is still potential for indirect impacts to marine water quality (from accidents and leaks), and marine currents (from shore

protection structures to protect land-side assets), ~~and an increase to the risk of tsunami (due to subsidence of the ocean floor as offshore fields are tapped)~~. Due to the potential for increased importation of oil by ship, hydrocarbon spills could also occur.

There are potentially feasible and effective strategies for mitigating the adverse indirect effects of Alternative 1 to less than significant (Class II), though these strategies would in most instances have to imposed or implemented by agencies other than DOGGR, as most of the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. DOGGR's relevant model mitigation measures in this context include the following:

**MM CPMWQ-1a    Protect Marine Water Quality.** (Full text in EIR Section 10.6.5.)

**MM CPMWQ-2a    Prepare and Implement Marine Current Plan.** (Full text in EIR Section 10.6.5.)

~~**MM CPMWQ-5a    Conduct Offshore Geotechnical and Tsunami Investigation.** (Full text in EIR Section 10.6.5.)~~

~~**MM CPMWQ-5b    Modify the Drilling of Disposal Wells Offshore or Near Shore.** (Full text in EIR Section 10.6.5.)~~

As with the project, the impacts related to ocean winds (Impact CPMWQ-3) would be Class III, and impacts related to ocean waves (Impact CPMWQ-4) would be Class IV.

### 12.2.6.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Since the Inglewood and Sespe Oil and Gas Fields are inland and well away from the coast, the analysis of the alternative on Coastal Processes and Marine Water Quality does not apply and no further discussion of these fields appears in this section.

***Wilmington Oil and Gas Fields***

The programmatic discussion for indirect impacts provided in EIR Section 12.2.6.2, above, would apply to coastal processes and marine water quality associated with the Wilmington Oil and Gas Field because Alternative 1 would have no effect on conventional well drilling, and between 80 to 100 conventional wells could be drilled on any given year. Impacts from new wells for which well stimulation would not occur could range from less than significant with mitigation (Class II) to no impact (Class IV). Mitigation would have to be imposed through mechanisms other than well stimulation treatment permits.

### 12.2.6.4    Impact Significance Summary

Direct impacts from Alternative 1 would be reduced for all study regions. However, indirect impacts may occur from intensified drilling and production activities that do not involve well stimulation, or in areas under state or tribal jurisdiction. ~~The severity of these impacts is unknown and difficult to quantify, because some of the impacts of the project (e.g. tsunami risk) are also difficult to quantify.~~ But impacts from Alternative 1 would likely be similar to a general order of magnitude to those of the project.

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.7    Commercial and Recreational Fishing

### 12.2.7.1    Introduction

This section provides an evaluation of the potential impacts to commercial and recreational fishing associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.7 (Commercial and Recreational Fishing) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.7 (Commercial and Recreational Fishing). For the purposes of this analysis please refer to EIR Sections 10.7.2 and 11.7.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.7.3 and 11.7.3 for a description of the affected environment for commercial and recreational fishing (as applicable at either a study region or field-specific scale), and EIR Section 10.7.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.7.2    Programmatic Level Analysis of the Project

This Programmatic Level Analysis of Impacts focuses on specific impacts to commercial and recreational fishing from Alternative 1 (No Future Well Stimulation Practices). Under this alternative, program-level impacts are discussed (if applicable) and potential mitigation measures developed.

■ **Impact CRF-1:** Cause long-term exclusion of important commercial and recreational fishing areas.

■ **Impact CRF-2:** Result in substantial loss of total catch to commercial and recreational fishing industries.

Under Alternative 1, well stimulation activities would not be conducted for wells under state jurisdiction. There would be no direct interference or displacement of commercial or recreational fishing activity (Class IV) in State waters and tidelands. Because well stimulation would not occur in State waters or tidelands, no accidental spills would be likely as a result of vessel collision due to increased barge traffic from transporting well stimulation equipment to the THUMS Islands or offshore platforms. No long-term exclusions from important fishing grounds or substantial loss in commercial or recreational catch would occur. There could be some indirect impacts on commercial and recreational fishing resources from intensification of oil and gas drilling that would not utilize well stimulation techniques. With the implementation of current regulations (existing Title 14 regulations and the existing State and federal regulations, as described in EIR Section 10.6.2) and DOGGR's proposed permanent regulations (Sections 1782, 1783.1, 1784.1 and 1784.2, 1785 as described in EIR Section 2.2.2), indirect impacts would be less than significant (Class III).

### 12.2.7.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in the portions of the Wilmington field under State jurisdiction. Therefore, potential direct impacts to commercial or recreational fishing associated with well stimulation treatments, such as temporary displacement from small fishing grounds on shore or near offshore platforms would not occur, and no mitigation measures would be required (Class IV). There could be some indirect impacts on commercial and recreational fishing resources from intensification of oil and gas drilling that would not utilize well stimulation techniques, or in waters under federal jurisdiction. With the implementation of current regulations (existing Title 14 regulations and the existing State and federal regulations, as described in EIR Section 10.6.2) and DOGGR's proposed permanent regulations (Sections 1782, 1783.1, 1784.1 and 1784.2, 1785 as described in EIR Section 2.2.2), indirect impacts would be less than significant (Class III).

### 12.2.7.4    Impact Significance Summary

Direct impacts for Impacts CRF-1 and CRF-2 would be Class IV. Indirect impacts from potential intensification of oil and gas development that does not involve well stimulation activities would be Class III.

## 12.2.8    Cultural Resources

### 12.2.8.1    Introduction

This section provides an evaluation of the potential impacts to cultural resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.8 (Cultural Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.8 (Cultural Resources). For the purposes of this analysis please refer to EIR Sections 10.8.2 and 11.8.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.8.3 and 11.8.3 for a description of the affected environment for cultural resources (as applicable at either a study region or field-specific scale), and EIR Section 10.8.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.8.2    Programmatic Level Analysis of the Project

For the purposes of this analysis, the following impacts are addressed:

■ **Impact CUL-1:** Affect historic-era archaeological and built-environment resources

■ **Impact CUL-2:** Affect prehistoric resources

■ **Impact CUL-3:** Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony

■ **Impact CUL-4:** Affect cultural landscapes

Under the No Future Well Stimulation Practices Alternative no surface or subsurface disturbances associated with well stimulation treatments would occur in areas under State jurisdiction. Therefore, no direct impacts to cultural resources would occur on State jurisdiction lands within or outside of existing oil and gas fields (Class IV).

The indirect impacts to cultural resources associated with Alternative 1 would have a potentially significant effect when viewed programmatically. Should the lack of well stimulation treatments cause additional new conventional wells to be drilled and operated to compensate for lost production, either within or outside of existing oil and gas fields, or cause increased stimulation activities on lands under federal or tribal jurisdiction, corresponding surface and subsurface disturbances to cultural resources could occur. At a programmatic level of analysis, it is not possible to know precisely the location, extent and particular characteristics of the impacts to these resources. Impacts could, however, be significant and unavoidable (Class I) at a site-specific scale.

There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. Mitigation measures similar to Measures CUL-1a through CUL-1j, as listed below, would reduce these effects but cannot guarantee they would be entirely avoided.

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 524 of 836   Page
ID #:11250
Analysis of Oil and Gas Well Stimulation Treatments in California
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

**MM CUL-1a**    ~~Inventory~~ **Require Information and Evaluate Cultural Resources.** (Full text in EIR Section 10.8.5.)

**MM CUL-1b**    **Complete Native American Coordination.** (Full text in EIR Section 10.8.5.)

**MM CUL-1c**    **Prepare and Implement Cultural Resources Management and Treatment Plan.** (Full text in EIR Section 10.8.5.)

**MM CUL-1d**    **Prepare Plan for the Inadvertent Discovery of Human Remains.** (Full text in EIR Section 10.8.5.)

**MM CUL-1e**    **Provide Cultural Resources Specialist with the Authority to Halt Well Stimulation Activities.** (Full text in EIR Section 10.8.5.)

**MM CUL-1f**    **Conduct a Cultural Resources Worker Environmental Awareness Program.** (Full text in EIR Section 10.8.5.)

**MM CUL-1g**    **Monitor Earth Disturbing Activities for Cultural Resources.** (Full text in EIR Section 10.8.5.)

**MM CUL-1h**    **Provide Native American Monitors during Earth Disturbing Activities.** (Full text in EIR Section 10.8.5.)

**MM CUL-1i**    **Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities.** (Full text in EIR Section 10.8.5.)

**MM CUL-1j**    **Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities.** (Full text in EIR Section 10.8.5.)

The scale of oil and gas development, the constraints imposed by other environmental resources, and the possibility that some buried resources would remain unidentified until ground disturbance begins makes avoidance of all significant effects unlikely. Therefore, Impacts CUL-1 through CUL-4 would remain significant and unavoidable (Class I).

### 12.2.8.3    Programmatic Level Analysis of Specific Oil and Gas Fields

While Alternative 1 would likely reduce overall impacts to cultural resources outside of existing oil and gas fields, this alternative may result in increased conventional oil and gas development within existing fields. Therefore cultural resources within existing fields may be subject to increased impacts when compared to the project. The potential increase in development may also increase the indirect impacts to cultural resources. Overall, impacts are still considered significant and unavoidable (Class I).

***Wilmington Oil and Gas Field***

The elimination of well stimulation treatments in the portions of the Wilmington Oil and Gas Field that are under State jurisdiction would result in no direct impacts to cultural resources (Class IV) because there would be no surface or subsurface disturbances associated with such treatments. However, it is possible that to accommodate for the oil and gas production lost from well stimulation treatments, additional new conventional wells could be constructed and operated, or additional stimulation projects could occur on lands under federal jurisdiction. For this scenario, site-specific mitigation measures, imposed through a mechanism other than a well stimulation treatment permit, would have to be developed after a full inventory of the cultural resources present within the field is complete. Mitigation measures similar to Mitigation Measures CUL-1a through CUL-1j, as listed above in EIR Section 12.2.8.1,

would likely reduce some of these effects to less than significant (Class II), but cannot guarantee they would be entirely avoided. Indirect impacts to cultural resources are therefore considered significant and unavoidable (Class I).

### Inglewood Oil and Gas Field

Based upon available information, there are at least 15 previously recorded resources within a one-half mile radius of the Inglewood Oil and Gas Field. Additionally, seven other possible historic resources have been noted in existing documentation but not recorded. Oil activity in the Inglewood Oil and Gas Field has been constant since 1924 and oil infrastructure and equipment older than 50 years old are considered potentially eligible as historic-era resources as well. As noted above, the elimination of well stimulation treatments in areas under State jurisdiction in this field would result in no direct impacts to cultural resources (Class IV). However, if the field is drilled more intensively to maintain production throughput without well stimulation treatments, or if the federal portion of the field is more intensely drilled and stimulated, construction, operation and/or stimulation of the additional wells would be expected to result in the same indirect effects as noted above. It is likely that some of these indirect impacts could potentially be mitigated to a level of less than significant (Class II) with implementation of mitigation measures similar to Mitigation Measures CUL-1a through CUL-1j, as listed above, through a mechanism other than a well stimulation treatment permit; however, the possibility that some buried resources would remain unidentified until ground disturbance begins makes avoidance of all significant effects unlikely. Therefore, this impact would remain significant and unavoidable (Class I).

### Sespe Oil and Gas Field

The cultural resources impact conclusions and mitigation measures for Alternative 1 in the Sespe Oil and Gas Field would be the same as those identified for the Wilmington and Inglewood Oil and Gas Fields, as addressed above. No direct impacts specific to well stimulation treatments would occur on lands under state jurisdiction (Class IV); however, indirect effects could be significant and unavoidable (Class I). Mitigation based on Mitigation Measures CUL-1a through CUL-1j, as listed above in EIR Section 12.2.8.1, would likely reduce some of these effects to less than significant, but cannot guarantee they would be entirely avoided without site-specific information and a cultural resources inventory. Indirect impacts to cultural resources are therefore considered significant and unavoidable (Class I).

## 12.2.8.4    Impact Significance Summary

Alternative 1 would reduce the potential direct impacts to cultural resources at the programmatic level analysis for the Wilmington, Inglewood, and Sespe Oil and Gas Fields because there would be no surface or subsurface disturbances associated with well stimulation in areas under State jurisdiction. However, indirect effects associated with the disturbances from intensified well drilling and production and/or stimulation (for federal lands and waters) would be considered significant and unavoidable (Class I). Mitigation measures similar to Measures CUL-1a through CUL-1j, as listed above in EIR Section 12.2.8.1, would reduce these effects but cannot guarantee they would be entirely avoided. Impacts are considered significant and unavoidable (Class I).

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.9    Paleontological Resources

### 12.2.9.1    Introduction

This section provides an evaluation of the potential impacts to paleontological resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.9 (Paleontological Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.9 (Paleontological Resources). For the purposes of this analysis please refer to EIR Sections 10.9.2 and 11.9.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.9.3 and 11.9.3 for a description of the affected environment for paleontological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.9.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.9.2    Programmatic Level Analysis of the Project

The No Future Well Stimulation Treatments Alternative (Alternative 1) would prohibit all future well stimulation activities in areas under State jurisdiction. For the purposes of this analysis, the following impact is addressed:

■ **Impact PALEO-1:** Destroy or disturb surface or near-surface significant paleontological resources

Table 10.9-8 in EIR Section 10.9 provides a summary table of the geologic units in each study region that have the potential to bear significant paleontological resources.

Under the No Future Well Stimulation Treatments Alternative, no new ground disturbing activities associated with well stimulation treatments would occur in areas under State jurisdiction, and thus no direct impacts to paleontological resources would occur (Class IV). However, within existing oil and gas fields, earth disturbing activities associated with either abandonment or subsequent restoration of a field, or the increased drilling or stimulation (on lands under federal or tribal jurisdiction) of new wells would potentially adversely affect paleontological resources.

There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. Implementation of measures similar to Mitigation Measures PALEO-1a through PALEO-1h, as listed below and detailed in EIR Section 10.9, would be expected to reduce these impacts to less than significant (Class II), because the mitigation measures would allow for the recovery, preparation, analysis, and curation of the paleontological resources that may be made available for future scientific studies, which may result in important taphonomic, taxonomic, phylogenetic, paleoecologic, stratigraphic, or biochronological discovery.

**MM PALEO-1a**    ~~Inventory~~ Require Information and Evaluate Paleontological Resources. (Full text in EIR Section 10.9.5.)

**MM PALEO-1b**    Develop Paleontological Resource Mitigation Plan. (Full text in EIR Section 10.9.5.)

**MM PALEO-1c**    Retain Qualified Paleontological Resources Staff. (Full text in EIR Section 10.9.5.)

**MM PALEO-1d**    Conduct a Paleontological Resources Worker Environmental Awareness Program. (Full text in EIR Section 10.9.5.)

**MM PALEO-1e  Monitor Earth Disturbing Activities for Paleontological Resources.** (Full text in EIR Section 10.9.5.)

**MM PALEO-1f  Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities.** (Full text in EIR Section 10.9.5.)

**MM PALEO-1g  Paleontological Resources Report for the Monitoring of Earth Disturbing Activities.** (Full text in EIR Section 10.9.5.)

**MM PALEO-1h Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities.** (Full text in EIR Section 10.9.5.)

### 12.2.9.3    Programmatic Level Analysis of Specific Oil and Gas Fields

*Wilmington Oil and Gas Field*

Published geologic maps indicate the Wilmington field is underlain by three sedimentary rock units of Pleistocene to Holocene age. Museum records contained eight previously recorded vertebrate localities directly within project boundaries, which were recovered from the Early Pleistocene age San Pedro Formation and Quaternary older deposits. In addition, museum records indicated that at least 23 vertebrate fossil localities have been recorded nearby. These localities were discovered from within the San Pedro Formation and Pleistocene age Quaternary alluvial deposits, including the Palos Verdes Sand. Portions of the Wilmington field are determined to have a paleontological resource potential (i.e., sensitivity) ranging from low to high. However, under Alternative 1 no new ground disturbing activities associated with well stimulation would occur in areas under State jurisdiction and therefore no direct impacts to paleontological resources would occur in those areas (Class IV). If, though, the field was to be more intensively drilled to make up for production lost from no future well stimulation, or if stimulation activities increased in waters under federal jurisdiction, implementation of measures similar to Mitigation Measures PALEO-1a through PALEO-1h would be necessary to reduce impacts to less than significant (Class II).

*Inglewood Oil and Gas Field*

Much of the Inglewood Oil and Gas Field is underlain at depth by geologic units proven to yield significant paleontological resources, and the likelihood to encounter them at shallow depths ranges between low to high, depending on the location of earth disturbing activities. As with the programmatic level analysis of the project, within the Inglewood field implementation of Alternative 1 would preclude any future earth disturbances associated with well stimulation and thus no direct impacts would occur (Class IV) under Impact PALEO-1. However, if the field is drilled more intensively to maintain existing production rates in lieu of well stimulation treatments, the construction and operation of the additional wells would be expected to result in the same indirect effects as noted above. With application of measures similar to Mitigation Measures PALEO-1a through PALEO-1h, as listed in EIR Section 12.2.9.2, impacts would be less than significant (Class II).

*Sespe Oil and Gas Field*

Published geologic maps indicate that the Sespe field is underlain by 11 sedimentary rock units of Eocene to Holocene age. Museum records contained one previously recorded vertebrate locality directly within project boundaries, which was recovered from the early Miocene age Vaqueros Formation. In addition, museum records indicated that at least 33 vertebrate fossil localities have been recorded nearby. These localities were discovered within the Coldwater, Sespe, Rincon, and Monterey Formations, as well as deposits of Quaternary older alluvium. As a result of this study, portions of the Sespe

field are determined to have a paleontological resource potential (i.e., sensitivity) ranging from low to very high. However, under Alternative 1 no new ground disturbing activities associated with well stimulation would occur in areas under State jurisdiction and therefore no direct impacts to paleontological resources would occur in those areas (Class IV). Conversely, if additional new wells, beyond those currently considered for probable future production (see EIR Chapter 7), were drilled to make up for production lost from no future well stimulation, or if stimulation activities increased on the portions of the field under federal jurisdiction, implementation of measures similar to Mitigation Measures PALEO-1a through PALEO-1h would be necessary to reduce impacts to less than significant (Class II).

### 12.2.9.4    Impact Significance Summary

The No Future Well Stimulation Treatments Alternative would reduce potential direct and adverse impacts to paleontological resources in all study regions because there would be no earth disturbing activities associated with well stimulation treatments in areas under State jurisdiction (Class IV). However, if this alternative caused the abandonment of existing oil and gas fields, an increase in their production via newly drilled wells, or increased stimulation activities on lands under federal or tribal jurisdiction, the associated earth disturbing activities would be expected to cause adverse impacts to paleontological resources. These impacts could be mitigated to a level of less than significant (Class II) with implementation of Mitigation Measures similar to PALEO-1a through PALEO-1h.

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.10    Environmental Justice

### 12.2.10.1  Introduction

This section provides an evaluation of the potential impacts to environmental justice associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.10 (Environmental Justice) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.10 (Environmental Justice). For the purposes of this analysis please refer to EIR Sections 10.10.2 and 11.10.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.10.3 and 11.10.3 for a description of the affected environment for environmental justice (as applicable at either a study region or field-specific scale), and EIR Section 10.10.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.10.2  Programmatic Level Analysis of the Project

Alternative 1 would prohibit all current and future well stimulation activities in areas under State jurisdiction. As a result, there would be no potential for the well stimulation treatment impacts to occur that would disproportionately affect minority or low-income populations that would be in the vicinity of oil and gas well stimulation activities in areas under State jurisdiction. No direct environmental justice impacts would occur in those areas.

Prohibiting well stimulation could result in some fields having low production levels being abandoned. To make up for potential production foregone from not conducting well stimulation, some existing fields could increase their amount of convention drilling and production, and additional oil and gas imports from out of state could occur or increased stimulation activities could occur on lands under federal or tribal jurisdiction. Field abandonment would not adversely affect populations of concern. Increasing the

density of wells in an existing field and increasing enhanced recovery activities could increase impacts to nearby populations. However, the increased level of activity would be expected to not be substantial, because wells in existing fields typically are already spaced to effectively recover reserves and new wells would likely locate on or between existing pads. In which case, the impact of additional activity would have less than significant impacts for nearby populations, which would translate there being no environmental justice impact.

There would be potential indirect impacts from additional conventional wells drilled to compensate for lost production, but some existing wells would also be abandoned. And there would be potentially significant and unmitigable indirect impacts associated with transport of oil by rail, which would increase in the absence of well stimulation being used in California. Increased ship, rail, and truck traffic hauling imported oil and gas to refineries would increase traffic through communities located on existing transportation corridors. The increased rail traffic would increase use of rail corridors between the source fields and California refineries. Although not analyzed, communities along these lines maybe disproportionately comprised of minority and low-income populations. Affected communities would be affected by the diesel emissions coming from all of these trains and from risk of upset. Increased rail imports of oil likely would increase the risk of accidents and leaks occurring in these communities. This is a significant new environmental justice impact when compared to the project. Unlike the project, strategies could not be developed and implemented by DOGGR to address ship, rail, and truck traffic hauling imported oil and gas to refineries. These refinery facilities and transportation infrastructure and routes are already in place and thus cannot be sited differently or in ways to avoid disproportionate impacts to minority or low-income populations. DOGGR would have no authority over what is transported and by what means.

### 12.2.10.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Under this alternative, no well stimulation treatments would occur in areas under State jurisdiction that would disproportionately affect minority or low-income populations adjacent to the Wilmington, Inglewood, or Sespe Oil and Gas Fields. No environmental justice impacts would occur in the immediate area, either because there would be no stimulation activities in areas under State jurisdiction, or because there are no residents living near the portions of the Wilmington or Sespe fields that are under federal jurisdiction.

### 12.2.10.4   Impact Significance Summary

As discussed, there would be no potential for well stimulation treatments and any environmental affects to occur disproportionately within areas containing minority or low-income populations under Alternative 1. However, in response to prohibiting well stimulation, oil imports by ship, rail, and truck are likely to increase substantially, creating an adverse impact in communities through which transportation corridors pass carrying oil would pass. In particular, populations living in close proximity to rail lines maybe minority or low income people. This would be a significant impact and no mitigation is identified that would make it less than significant.

## 12.2.11   Geology, Soils and Mineral Resources

### 12.2.11.1   Introduction

This section provides an evaluation of the potential impacts to geology, soils and mineral resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.11 (Geology, Soils and Mineral

Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.11 (Geology, Soils and Mineral Resources). For the purposes of this analysis please refer to EIR Sections 10.11.2 and 11.11.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.11.3 and 11.11.3 for a description of the affected environment for geology, soils and mineral resources (as applicable at either a study region or field-specific scale), and EIR Section 10.11.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.11.2  Programmatic Level Analysis of the Project

Alternative 1 would prohibit all future well stimulation activities in areas under State jurisdiction, as described in EIR Chapter 7 (Description of the Project). This alternative would require new legislation to revise or repeal PRC Sections 3106(b) and 3160(b), which currently authorize well stimulation treatments. The new legislation would need to specify that, as of its effective date, all future well stimulation treatments would not allowable in areas under State jurisdiction.

This alternative could cause the following indirect effects, abandonment of existing oil and gas fields or otherwise an increase in the intensity of an existing oil and gas field's production, or an increase in stimulation activities on lands under federal or tribal jurisdiction. This alternative could also cause an increase in activities associated with the importation of oil and gas products.

> **Impact GEO-1   Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure**

Under this alternative, there would be no activities associated with well stimulation in areas under State jurisdiction so it would not expose people or structures to potential effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure. No impact would occur (Class IV). If existing oil and gas fields are abandoned, this would have no impact associated with exposing people or structures to ruptures of a known fault, seismically induced groundshaking, and/or ground failure. An increase in the intensity of an existing oil and gas field production or stimulation (on lands under federal or tribal jurisdiction), or an increase in activities associated with the importation of oil and gas products, could require new infrastructure and could result in impacts similar to those described in EIR Section 10.11.5 (Impact Analysis and Mitigation Measures) because existing oil and gas field production areas are crossed by active faults and near seismically active areas. Infrastructure required for the import of oil and gas would similarly be required to cross areas that are seismically active given the large number of active faults in California, described in EIR Section 10.11.3 (Affected Environment). See EIR Figures 10.11-4, 10.11-16, and 10.11-22 for the regional faults and 10.21-2 for the location of Class I rail lines and rail terminals.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the adverse indirect effects of Alternative 1, though these strategies would in most instances have to imposed or implemented by agencies other than DOGGR, as most of the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. Standard regulations and mitigation measures similar to Mitigation Measures GEO-1a, GEO-1b, and GEO-1f provided in EIR Section 10.11.5 (Impact Analysis and Mitigation Measures) would reduce this impact to less than significant (Class II). Rupture of a known fault or seismically induced groundshaking could also result in oil or nat-

ural gas spills or upsets, and is addressed in EIR Section 12.2.21 (Risk of Upset/Public and Worker Safety).

**MM GEO-1a**    **Avoid Active Fault~~s~~ ~~Zones~~ if Necessary.** (Full text in EIR Section 10.11.5.)

**MM GEO-1b**    **Implement an Appropriate Setback if Necessary.** (Full text in EIR Section 10.11.5.)

**MM GEO-1c~~f~~**    **Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan.** (Full text in EIR Section 10.11.5.)

| Impact GEO-2 | Result in substantial soil erosion or the loss of topsoil |
|---|---|

Under this alternative, there would be no activities associated with well stimulation in areas under State jurisdiction so it would not result in substantial soil erosion of the loss of topsoil in those areas. No impact would occur (Class IV). Any of the potential indirect effects of this alternative are likely to require additional ground disturbing activities, either during closure of an existing oil and gas field, when drilling new oil wells to increase existing oil and gas field's production, when drilling and/or stimulating additional new oil wells on federal lands, or if an increase in importation of oil and gas products is such that it required additional rail or port facilities. Disturbed areas will have a relatively high potential for erosion and loss of topsoil. Existing regulation, in particular the NPDES Stormwater program would be required for any construction sites one acre or larger (including smaller sites that are part of a larger common plan of development). This program includes provisions to control runoff and minimize soil erosion for any construction sites one acre or larger. However, where sites are smaller than one acre, erosion or loss of topsoil could still occur. Mitigation similar to Mitigation Measure SWR-1a (Require Stormwater Pollution Prevention Plan) would reduce the effects to less than significant in such instances (Class II).

**MM SWR-1a**    **Require Stormwater Pollution Prevention Plan if Necessary.** (Full text in EIR Section 10.11.5.)

| Impact GEO-3 | Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse |
|---|---|

Under this alternative, there would be no activities associated with well stimulation in areas under State jurisdiction, so no impact would occur in those areas as a result of stimulation-related infrastructure being located on an unstable geologic unit or soil. If existing oil and gas fields are abandoned due to this alternative, this would have no impact associated with unstable units or soil (Class IV). Removal of infrastructure would occur over a short time frame and the risk of a landslide, lateral spreading, subsidence, or collapse during such a short time frame is low. An increase in the intensity of an existing oil and gas field production, an increase in well stimulation on federally managed lands, or an increase in activities associated with the importation of oil and gas products could require new infrastructure such as new ports and railroad facilities and could result in impacts similar to those described in EIR Section 10.11.5 (Impact Analysis and Mitigation Measures) for this impact because existing oil and gas field production areas include areas where there is landslide risk, or risk of subsidence or collapse, described in EIR Section 10.11.3 (Affected Environment). Standard regulations and mitigation measures similar to Mitigation Measure GEO-3a provided in EIR Section 10.11.5 (Impact Analysis and Mitigation Measures) would reduce this impact to less than significant (Class II). Landslides, lateral spreading, subsidence, or collapse of soil could result in oil or natural gas spills or upsets, addressed in EIR Section 12.2.21 (Risk of Upset/Public and Worker Safety).

**MM GEO-3a**    **Prepare Geotechnical Report if Necessary.** (Full text in EIR Section 10.11.5.)

Analysis of Oil and Gas Well Stimulation Treatments in California
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

---

| **Impact GEO-4    Be located on expansive soil creating substantial risks to life or property** |

Under this alternative, there would be no activities associated with well stimulation in areas under State jurisdiction, so no stimulation infrastructure would be located on expansive soil and no direct impact would occur in those areas (Class IV). Indirect effects caused by the alternative would be unlikely to create a substantial risk to life or property from being located on expansive soil. This is because the well owner/operators and owner/operators of the infrastructure associated with the importation of oil and gas products would have already taken into consideration the soil within their fields or where the importation infrastructure is located. The owner/operators would have either avoided expansive and unstable soils or included this consideration into the engineering of the projects to reduce risk to their investment. This impact is adverse but less than significant (Class III).

| **Impact GEO-5    Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems** |

A moratorium on well stimulation activities in areas under State jurisdiction, including the indirect effects of this alternative, would not allow or result in the construction of septic tanks or other non-portable waste disposal systems. Therefore, the alternative would have no impact on soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems (Class IV).

| **Impact GEO-6    Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan** |

Under this alternative, there would be no activities associated with well stimulation in areas under State jurisdiction, so no direct impact would result in the loss of non-fuel mineral resources (Class IV). Indirect effects resulting from this alternative would be unlikely to create a substantial loss of non-fuel minerals because they would not eliminate a large amount of land available for mineral recovery. This impact is adverse but less than significant (Class III).

However, the impacts to oil and gas resources would be significant and unmitigable. This alternative would result in the loss of an estimated 25 percent of the current oil and gas production and a loss of all future production from the Monterey Formation and its plays. At this time, there is no method of reaching this known mineral resource other than by use of hydraulic fracturing. Due to the large percentage of loss of known oil and gas resources, indirect impacts under this alternative would be significant and unmitigable for loss of oil and gas resources (Class I). In contrast, Impact GEO-6 is Class III under the project.

This alternative would have no impact to geothermal resources (Class IV).

| **Impact GEO-7    Cause an induced seismic event including ground shaking and ground failure** |

Under this alternative, there would be no activities associated with well stimulation in areas under State jurisdiction, so no impact would occur in those areas due to induced seismic events (Class IV). Neither abandonment of existing oil and gas fields nor an increase in activities associated with the importation of oil and gas products would cause induced seismic events. An increase in the intensity of an existing oil and gas field production could result in an induced seismic event due to an increase in fluid injection for disposal of wastewater. However, injection wells in areas under State jurisdiction are regulated by DOGGR and the main features of DOGGR's Underground Injection Control program include permitting, inspection, enforcement, mechanical integrity testing, plugging and abandonment oversight, data management, and public outreach. Similar regulation applies to injection wells on federal and tribal lands. Because the

---

underground injection wells are already being used for oil and gas production and are already regulated by DOGGR or the applicable federal agency, the risk of an induced seismic event due to the increase in intensity of existing oil and gas field production is considered adverse but less than significant (Class III).

### 12.2.11.3  Programmatic Level Analysis of Specific Oil and Gas Fields

For the programmatic level analysis for the Wilmington, Inglewood, and Sespe Oil and Gas Fields, see EIR Section 11.11 (Geology, Soils, and Mineral Resources) which addresses Impacts GEO-1 through GEO-7.

***Wilmington Oil and Gas Field***

The potential impacts and mitigation measures presented in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures) apply to the Wilmington Oil and Gas Field, with the exception of Impact GEO-1, Impact GEO-3, and Impact GEO-6.

| Impact GEO-1 | Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure |
|---|---|

Under Alternative 1, all activities associated with well stimulation practices would be prohibited in areas under State jurisdiction. Therefore, the impacts described in EIR Section 11.11.5.1 (Study Region 1: Wilmington Oil and Gas Field) would not occur in those areas.

It cannot be predicted if any portion of the Wilmington Oil and Gas Field would be abandoned if well stimulation were prohibited; however, abandonment of all existing facilities, equipment and activities would require the removal of some infrastructure and closure of the field and would not expose people or structures to adverse effects due to seismic events. An increase in the intensity of existing operations within the field to accommodate for the loss of production associated with well stimulation would result in some additional infrastructure at the field and associated risk of impacts due to seismic concerns and loss of soil due to ground disturbance. Because there are no active faults that cross the Wilmington field, the probability of damage from surface fault rupture is not considered to be likely. Mitigation measures modeled on Mitigation Measures GEO-1a, GE0-1b, GEO-1c, and GEO-1e would not be required. Impacts caused by ground shaking, including lurching or cracking of the ground surface as a result of nearby seismic events is possible and mitigation measures similar to Mitigation Measures GEO-1d and GEO-1f would be recommended to reduce the impacts to less than significant (Class II).

Increased importation of oil and gas as a specific function of reduced production of the field would not be expected to occur given overall oil and gas production rates of the State. No impacts would occur (Class IV).

| Impact GEO-3 | Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse |
|---|---|

Under Alternative 1, all activities associated with well stimulation practices would be prohibited in areas under State jurisdiction. Therefore, the impacts described in EIR Section 11.11.5.1 (Study Region 1: Wilmington Oil and Gas Field) would not occur in those areas.

It cannot be predicted if the Wilmington Oil and Gas Field would be abandoned if well stimulation were prohibited; however, abandonment of all existing facilities, equipment and activities would require the removal of some infrastructure and closure of the field and would not result in impacts due to unstable geologic units or soil. An increase in the intensity of existing operations within the field to accommodate for the loss of production associated with well stimulation would result in some additional infrastructure

at the field and associated risk of impacts due to seismic concerns and loss of soil due to ground distur-bance. Because the risk of landsliding is considered low for the Wilmington Oil and Gas Field, there would be no indirect impacts caused by landslides. However, a mitigation measure modeled on Mitiga-tion Measure GEO-3a would be required to address lateral spreading, subsidence, or collapse at this field (Class II).

| | |
|---|---|
| **Impact GEO-6** | **Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan.** |

As mentioned in EIR Section 11.11.3.1 (Study Region 1: Wilmington Oil and Gas Field), the potential for loss of mineral deposits due to further development of the study area is considered low (Class III). How-ever, this alternative would reduce the amount of known oil and gas resource that could be extracted from the field. Given overall oil and gas production rates of the State, loss of this known resource would be adverse but less than significant (Class III).

### Inglewood Oil and Gas Field

Under Alternative 1 all activities associated with well stimulation practices would be prohibited in areas under State jurisdiction. Therefore, the impacts described in EIR Section 11.11.5 (Impact Analysis and Mitigation Measures) for the Inglewood Oil and Gas Field would not occur. The potential impacts and mitigation measures presented in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures) apply to the Inglewood Oil and Gas Field, with the exception of Impact GEO-1 and Impact GEO-3.

It cannot be predicted if the Inglewood Oil and Gas Field would be abandoned if well stimulation were prohibited; however, abandonment of all existing facilities, equipment and activities would require the removal of some infrastructure and closure of the field. Impacts of these activities would be the same as described for the programmatic level analysis. An increase in the intensity of existing operations within the field to accommodate for the loss of production associated with well stimulation would result in some additional infrastructure at the field and associated risk of impacts due to seismic concerns and loss of soil due to ground disturbance. Impacts of these activities would be the same as described for the project analysis.

The potential impacts and mitigation measures similar to those presented in EIR Section 12.2.11.2 (Pro-grammatic Level Analysis of Impacts and Mitigation Measures) apply to the Inglewood Oil and Gas Field, with the exception of Impact GEO-1, Impact GEO-3, and Impact GEO-6.

| | |
|---|---|
| **Impact GEO-1** | **Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure** |

Under Alternative 1, all activities associated with well stimulation practices would be prohibited in areas under State jurisdiction. Therefore, the impacts described in EIR Section 11.11.5.2 (Study Region 1: Inglewood Oil and Gas Field) would not occur.

It cannot be predicted if the Inglewood Oil and Gas Field would be abandoned if well stimulation were prohibited; however, abandonment of all existing facilities, equipment and activities would require the removal of some infrastructure and closure of the field and would not expose people or structure to adverse effects due to seismic events. An increase in the intensity of existing operations within the field to accommodate for the loss of production associated with well stimulation would result in some addi-tional infrastructure at the field and associated risk of impacts due to seismic concerns and loss of soil

due to ground disturbance. Because there are no active faults that cross the Wilmington field, the probability of damage from surface fault rupture is not considered to be likely. Mitigation measures similar to Mitigation Measures GEO-1a, GE0-1b, GEO-1c, and GEO-1e would not be required. Impacts caused by ground shaking, including lurching or cracking of the ground surface as a result of nearby seismic events is possible and mitigation measures similar to Mitigation Measures GEO-1d and GEO-1f would be recommended to reduce the impacts to less than significant (Class II).

Increased importation of oil and gas as a specific function of reduced production of the field would not be expected to occur given overall oil and gas production rates of the State. No impacts would occur (Class IV).

| **Impact GEO-3** | **Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse** |
|---|---|

Under Alternative 1, all activities associated with well stimulation practices would be prohibited in areas under State jurisdiction. Therefore, the impacts described in EIR Section 11.11.5.1 (Study Region 1: Inglewood Oil and Gas Field) would not occur.

It cannot be predicted if the Inglewood Oil and Gas Field would be abandoned if well stimulation were prohibited; however, abandonment of all existing facilities, equipment and activities would require the removal of some infrastructure and closure of the field and would not result in impacts due to unstable geologic units or soil. An increase in the intensity of existing operations within the field to accommodate for the loss of production associated with well stimulation would result in some additional infrastructure at the field and associated risk of impacts due to seismic concerns and loss of soil due to ground disturbance. Because the risk of landsliding is considered low for the Inglewood Oil and Gas Field, there would be no indirect impacts caused by landslides. However, a mitigation measure similar to Mitigation Measure GEO-3a would be required to address lateral spreading, subsidence, or collapse at this field (Class II).

| **Impact GEO-6** | **Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan.** |
|---|---|

As mentioned in EIR Section 11.11.3.2 (Study Region 1: Inglewood Oil and Gas Field), the potential for loss of mineral deposits due to further development of the study area is considered low (Class III). However, this alternative would reduce the amount of known oil and gas resource that could be extracted from the field. Given overall oil and gas production rates of the State, loss of this known resource would be adverse but less than significant (Class III).

### Sespe Oil and Gas Field

The potential impacts and mitigation measures presented in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures) apply to the Sespe Oil and Gas Field, with the exception of Impact GEO-1 and Impact GEO-3.

| **Impact GEO-1** | **Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure** |
|---|---|

Under Alternative 1, all activities associated with well stimulation practices would be prohibited in areas under State jurisdiction. Therefore, the impacts described in EIR Section 11.11.5.3 (Study Region 2: Sespe Oil and Gas Field) would not occur in those areas.

It cannot be predicted if any portion of the Sespe Oil and Gas Field would be abandoned if well stimulation were prohibited; however, abandonment of all existing facilities, equipment and activities would require the removal of some infrastructure and closure of the field. If Sespe Oil and Gas Field were not abandoned, there may be an increase in the intensity of existing operations within the field to accommodate for the loss of production associated with well stimulation. This would result in some additional infrastructure at the field and associated risk of impacts due to seismic concerns and loss of soil due to ground disturbance. Portions of the field have known faults and are located within a State of California Earthquake Fault Zone. Mitigation measures similar to Mitigation Measures GEO-1a, GEO-1b, and GEO-1c would be required. Impacts caused by ground shaking, including lurching or cracking of the ground surface as a result of nearby seismic events is possible and measures similar to Mitigation Measures GEO-1d, GEO-1e, and GEO-1f would be recommended to reduce the impacts to less than significant (Class II).

Increased importation of oil and gas as a specific function of reduced production of the field would not be expected to occur given overall oil and gas production rates of the State. No impacts would occur (Class IV).

| Impact GEO-3 | Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse |

Under Alternative 1, all activities associated with well stimulation practices would be prohibited in areas under State jurisdiction. Therefore, the impacts described in EIR Section 11.11.5.3 (Study Region 3: Sespe Oil and Gas Field) would not occur in those areas.

It cannot be predicted if the Sespe Oil and Gas Field would be abandoned if well stimulation were prohibited; however, abandonment of all existing facilities, equipment and activities would require the removal of some infrastructure and closure of the field. An increase in the intensity of existing operations within the field to accommodate for the loss of production associated with well stimulation would result in some additional infrastructure at the field and associated risk of impacts due to seismic concerns and loss of soil due to ground disturbance. The Ventura County General Plan policies pertain to natural hazards including landslides and other seismic risks. The Ventura County policies require geotechnical and geologic investigations to address the natural hazards. Owner/operators would be required to design their projects consistent with the applicable guidelines. As such, the impacts would be adverse but less than significant (Class III).

### 12.2.11.4  Impact Significance Summary

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.12  Greenhouse Gas Emissions

### 12.2.12.1  Introduction

This section provides an evaluation of the potential impacts to greenhouse gas emissions associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.12 (Greenhouse Gas Emissions) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.12 (Greenhouse Gas Emissions). For the purposes of this analysis please refer to EIR Sections 10.12.2 and 11.12.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific

scale), EIR Sections 10.12.3 and 11.12.3 for a description of the affected environment for greenhouse gas emissions (as applicable at either a study region or field-specific scale), and EIR Section 10.12.4 for details regarding the impact methodology and significance criteria that have been used.

## 12.2.12.2  Programmatic Level Analysis of the Project

| **Impact GHG-1** | **Generate greenhouse gas emissions that may have a significant impact on the environment** |
|---|---|

This alternative would restrict future oil and gas activity by halting well stimulation activities in areas under State jurisdiction. This would avoid GHG emissions that occur in areas under State jurisdiction as a result of oil and natural gas production made possible by well stimulation, and it would also lead to a decrease in California oil production. Therefore, there would be no direct impacts (Class IV). But there are greater indirect impacts from increased oil and gas imports that cause significant and unavoidable GHG emissions from out-of-state oil and gas producers (Class I). There are also indirect impacts associated with additional conventional wells and abandonment activities, or stimulation activities on lands under federal or tribal jurisdiction, to make up for lost production.

Under this alternative, an additional 57 million barrels of crude per year would need to be supplied from fields outside of California (EIR Section 8.3.1), which currently supply about 380 million barrels annually (ARB, 2014c). Oil and natural gas producers outside of California would need to increase production in response, and this would increase GHG emissions from the oil and gas industry outside of California.

Sources of GHG at oil and gas fields outside of California are not subject to California's regulatory setting (EIR Section 10.12.2), which ensures that GHG sources in the business of oil and gas production in California are subject to multiple programs aimed at reducing GHG. Emissions of GHG that occur at a point of oil and gas extraction outside of California are not subject to the Cap-and-Trade Program, and by increasing the activity of oil and gas extraction outside of California, this alternative would cause increased GHG from sources that are not required to offset the GHG to comply with California's cap, resulting in an overall net increase in GHG emissions compared with both existing conditions and the project. Although the oil and gas extraction and associated GHG emissions would occur outside California, California would continue to experience the adverse environmental effects of global climate change driven by GHG emissions worldwide. This impact would occur from GHG sources that are not covered by California's regulatory setting and outside of the potential control of DOGGR to feasibly mitigate. As a result of increasing GHG emissions from sources beyond California's control, no feasible mitigation would be available. This alternative would increase GHG emissions from sources that could not be prevented, reduced, offset, or otherwise mitigated by DOGGR or another California agency tasked with reducing GHG emissions. The GHG emissions increase would cause a potentially significant impact on the environment, and because these emissions would occur beyond California's control, Impact GHG-1 would be Class I: Significant and Unavoidable.

Some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. DOGGR's relevant model mitigation measures in this context include the following:

**MM AQ-2b**     **Reduce Emissions from Portable Equipment and Mobile Sources.** (Full text in EIR Section 10.3.5.)

**MM GHG-1a**   **Prevent Methane Emissions from Associated Gas and Casinghead Gas.** (Full text in EIR Section 10.12.5.)

---

| **Impact GHG-2** | **Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases** |
|---|---|

Because this alternative would cause some future oil and gas production to be lost, California end users of oil and gas would need to rely on a replacement supply. Using a replacement crude supply could result in an incremental change in life-cycle GHG emissions of California's crude supply, which could be an increase or decrease depending the carbon intensity of the replacement supply. The carbon intensity for production and transport of an average unit of crude oil used in California (about 11.4 g CO2e/MJ) is lower than that of an average crude produced in California (12.9 g CO2e/MJ) (ARB, 2012). Life-cycle GHG from the production and transport of 57 million barrels of crude at the average carbon intensity for crude produced in California are around 4,600,000 MTCO2e, and depending on the field-specific factors of the replacement supply imported, life-cycle GHG for the same amount of average supply used in California is around 4,100,000 MTCO2e. Although this implies that replacing in-state production with average imports could incrementally reduce life-cycle GHG emissions, all crude produced for use in California is subject to the LCFS, regardless of the location of the supply.

Despite the greater average carbon intensity of crude oil produced in California compared with oil produced in places that would export their oil to California, an increase in imports into California would still result in an overall net increase in GHG emissions compared with both existing conditions and the project. This is alternative could conflict with California's existing programs to reduce GHG because in-state production is not only subject to the LCFS but also subject to the Cap-and-Trade Program. These programs require oil and gas production to operate within an overall statewide cap, which is lowered over time. The Cap-and-Trade Program limits in-state GHG emissions to ensure that the AB 32 goals will be achieved and the statewide emission target of 431 MMTCO2e by 2020 will not be exceeded (ARB, 2007; ARB, 2014b). Producers of the replacement supply of oil and gas under this alternative if outside of California would not be subject to California's statewide GHG cap. Out-of-state oil and gas producers create GHG emissions during extraction that are uncovered and not limited by the Cap-and-Trade Program. These emissions will not be captured by California's cap, but would be in addition to it. As a result, in addition to total statewide emissions of 431 MMTCO2e by 2020 allowed by the Cap-and-Trade Program, this alternative would also increase GHG from out-of-state crude oil recovery and transport activities by around 4.1 MMTCO2e, depending on the replacement supply. The ARB is directed to take steps to "minimize leakage" in implementing AB 32 regulations [HSC Section 38562(b)(8))], and this alternative would conflict with that requirement by potentially offsetting an in-state reduction of GHG emissions with an increase in GHG emissions outside the state. By increasing these uncovered emissions at sources that are beyond the control of California's regulations and any recommended mitigation, this alternative would conflict with California's programs aimed at reducing GHG, and Impact GHG-2 would be would be Class I: Significant and Unavoidable.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the adverse indirect effects of Alternative 1, though these strategies would in most instances have to imposed or implemented by agencies other than DOGGR, as most of the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. DOGGR's relevant model mitigation measures in this context include the following:

**MM AQ-2b**    **Reduce Emissions from Portable Equipment and Mobile Sources.** (Full text in EIR Section 10.3.5.)

**MM GHG-1a**    **Prevent Methane Emissions from Associated Gas and Casinghead Gas.** (Full text in EIR Section 10.12.5.)

### 12.2.12.3  Programmatic Level Analysis of Specific Oil and Gas Fields

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in the portions of the existing Wilmington, Inglewood, or Sespe fields that are under State jurisdiction. Therefore, emissions associated with well stimulation treatments would not occur in those areas. The indirect effects of additional conventional wells and abandonment activities could also increase the intensity of operations at these fields to make up for lost production, within the limits of existing entitlements. As a result, oil and gas production emissions would continue as in the setting (Class III).

### 12.2.12.4  Impact Significance Summary

Alternative 1 is worse than the project for GHG impacts. Indirect impacts from increased oil and gas imports would cause significant and unavoidable GHG emissions from out-of-state oil and gas producers that could not be prevented, reduced, offset, or otherwise mitigated by DOGGR or another California agency tasked with reducing GHG emissions. Although emissions related to well stimulation treatments would be avoided, emission increases would occur due to an increase in crude transport and offloading, including GHG emissions from increased oil and gas production outside of California, or an increase in the intensity of operations in fields to maintain production levels. These indirect effects would cause impacts due to increasing greenhouse gas emissions as described above.

## 12.2.13  Hazards and Hazardous Materials

### 12.2.13.1  Introduction

This section provides an evaluation of the potential impacts to hazards and hazardous materials associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.13 (Hazards and Hazardous Materials) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.13 (Hazards and Hazardous Materials). For the purposes of this analysis please refer to EIR Sections 10.13.2 and 11.13.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.13.3 and 11.13.3 for a description of the affected environment for hazards and hazardous materials (as applicable at either a study region or field-specific scale), and EIR Section 10.13.4 for details regarding the impact methodology and significance criteria that have been used.

As summarized in EIR Section 10.13.6, impacts from hazardous materials associated with well stimulation treatments were determined to be potentially significant. However, the impacts analysis indicated that with the incorporation of existing and proposed regulations, the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. This includes the mitigation measure identified specifically for Hazards and Hazardous Waste in EIR Section 10.13.5 as well as measures developed for other affected environmental resources, including air quality (10.3), biological resources (10.4), geology and soils (10.11), groundwater resources (10.14), surface water resources (10.15), and risk of upset/public and worker safety (10.21).

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 540 of 836   Page ID #:11266
Analysis of Oil and Gas Well Stimulation Treatments in California
12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES

The mitigation measures in EIR Section 10.13.5, which are summarized on Table 10.13-12, focus on spill/leak prevention by including a comprehensive Spill Contingency Plan and, at DOGGR's discretion, may also require a physical containment barrier for site pads to prevent any spills that do occur from reaching site soils or groundwater. The mitigation measure from EIR Section 10.13.5 reduces the project impacts from hazards and hazardous materials to a less than significant level.

### 12.2.13.2  Programmatic Level Analysis of the Project

> **Impact HAZ-1    Release hazardous materials into the environment from a spill or leak**

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in California on land under State jurisdiction. Therefore, hazards and hazardous materials associated with well stimulation treatments would have no impact on any of the study regions, and mitigation measures would not be necessary (Class IV).

Alternative 1 eliminates direct impacts from well stimulation activities and all associated hazardous materials. Hydrocarbon spills could still occur with indirect impacts of additional conventional wells.

If some fields are abandoned because of low production in the absence of stimulation, wells would be shut in or abandoned and equipment removed. Some spills could occur during this activity, but the sites would be cleaned up and restored in accordance with DOGGR, DTSC, and other agency requirements. This would be a beneficial outcome with regard to the presence of hazards and hazardous materials (Class V).

Should a ban on well stimulation occur, some owner/operators may increase the number of new conventional wells in a field and intensify use of enhanced recovery techniques; similarly, some may increase stimulation activities on lands under federal or tribal jurisdiction. This could lead to additional spills; however, these would be similar in nature to existing spills and leaks that may occur in a field and would be addressed through DOGGR, DTSC and Regional Water Board requirements such as hazardous materials management and response plans. Consequently, increased activity would have a less than significant impact on hazardous material events (Class III) in the area of a well stimulation.

Increased transport of imported oil to refineries to offset supplies that would not materialize through well stimulation would increase the opportunities for spills or accidents. In addition, hazardous materials would not be transported to and from a well stimulation site. These situations are addressed in EIR Sections 12.2.21 (Risk of Upset/Public and Worker Safety) and 12.2.23 (Transportation and Traffic). Increased ship, rail, and truck traffic hauling imported oil and gas to refineries would increase traffic through communities located on traffic corridors. Rail traffic importing oil to the State would increase use of rail corridors between the source fields and California refineries. This would greatly increase the amount of oil hauled on these lines. Therefore, it is likely that increased rail imports of oil would increase the risk of accidents and leaks. This would be a significant impact (Class I) and no mitigation is identified that would make it less than significant. In contrast Impact HAZ-1 would be Class II under the project because mitigation measures would reduce impacts of released hazardous materials from well stimulation into the environment from a spill or leak to a less than significant level.

### 12.2.13.3  Programmatic Level Analysis of Specific Oil and Gas Fields

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in the portions of the Wilmington, Inglewood or Sespe Oil and Gas Fields that are under State jurisdiction. Therefore, hazards and hazardous materials associated with well stimulation treatments would have no impact in those areas. The absence of well stimulation materials would be a beneficial

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 541 of 836   Page ID #:11267

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

outcome (Class V) in the vicinity of the fields. Some owner/operators may increase the number of new conventional wells in a field and intensify use of enhanced recovery techniques, and some may increase stimulation activities on lands under federal or tribal jurisdiction. This could lead to additional spills; however, these would be similar in nature to existing spills and leaks that may occur in a field and would be addressed through applicable regulatory requirements. Consequently, increased activity would have a less than significant impact on hazardous material events (Class III) in the area of a well stimulation.

However, elsewhere in the State, an increase in oil imports by rail to make up for production lost because of a prohibition on well stimulation would increase rail tank car traffic along rail lines. Communities along railroad lines would be adversely affected by the rail traffic and any accidents or leaks that may occur. This would be a significant impact (Class I) that could not be mitigated.

### 12.2.13.4   Impact Significance Summary

The No Future Well Stimulation Treatments Alternative would result in no impact for the Programmatic Level Analysis of the Project and the Programmatic Level Analysis of Specific Oil and Gas Fields. The absence of well stimulation materials would be a beneficial outcome (Class V) in the vicinity of fields. However, increased rail tank car traffic to import oil to the state would have a significant impact along the rail corridors (Class I).

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.14   Groundwater Resources

### 12.2.14.1   Introduction

This section provides an evaluation of the potential impacts to groundwater resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.14 (Groundwater Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.14 (Groundwater Resources). For the purposes of this analysis please refer to EIR Sections 10.14.2 and 11.14.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.14.3 and 11.14.3 for a description of the affected environment for groundwater resources (as applicable at either a study region or field-specific scale), and EIR Section 10.14.4 for details regarding the impact methodology and significance criteria that have been used.

As summarized in EIR Section 10.14.6, impacts from well stimulation treatments were determined to be potentially significant to groundwater quantity and groundwater quality. Further analysis indicated that the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures, which are summarized on Table 10.14-20, focus on preventing exacerbation of groundwater overdraft or subsidence, maintaining existing use of water supply wells, and mitigating possible pathways that might allow well stimulation fluids including gas to reach Protected Water.

Analysis of Oil and Gas Well Stimulation Treatments in California
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

## 12.2.14.2  Programmatic Level Analysis of the Project

| Impact GW-1 | Cause or contribute to overdraft conditions |
|---|---|

Under Alternative 1, well stimulation would not occur in areas under State jurisdiction; therefore, water that would be used in well stimulation in those areas would not be required and the potential for well stimulation to contribute to groundwater overdraft in critically impacted groundwater basins would not occur. There would be no impact (Class IV).

If some oil and gas fields are abandoned because of a lack of sufficient production, this would result in wells being abandoned or shut, equipment being removed, and land surfaces restored. This would not affect critically impacted groundwater basins (Class IV).

If owner/operators increased drilling and enhanced recovery activities in existing fields, or increased stimulation activities on lands under federal or tribal jurisdiction, this would increase the amount of water used. Compared to stimulation throughout the state, this well drilling and stimulation would require substantially reduced amounts of water, which would come from existing sources and could include recycled water. The impact would be less than significant (Class III). However, if there were increased well stimulation on tribal or federally managed lands, this would increase the amount of water used at those locations. Impacts on tribal or federally managed lands would be the same as those of the project (Class II with mitigation).

Importing oil from foreign or domestic sources would increase deliveries of crude oil, natural gas, or petroleum products to refineries, increasing the number of oilers, tanker trucks, or rail cars to these destinations, or increase the volume of oil and gas delivered via pipeline, if line capacity is available. This would not affect critically impacted California groundwater basins because it would not result in additional pumping (Class IV).

In contrast, Impact GW-1 is Class II under the project.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the potential adverse indirect effects of Alternative 1 on groundwater under federal or tribal lands, though any such strategy would have to be imposed by the federal or tribal government. DOGGR's relevant <u>revised</u> model mitigation measure in this context is the following:

**MM GW-1a    Use Alternative Water Sources <u>to the Extent Feasible</u>.** (Full text in EIR Section 10.14.5.)

| Impact GW-2 | Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water |
|---|---|

If some oil and gas fields are abandoned because of a lack of sufficient production, this would result in wells being abandoned or shut, equipment being removed, and land surfaces restored. This would require little if any groundwater and would have no impact (Class IV).

Should owner/operators increase drilling and enhanced recovery activities at existing fields to compensate for not being able to use well stimulation, this could lead to a local increase in groundwater use. However, the amount of water used would represent only a marginal increase over current use and would be less than significant (Class III). If this alternative led to increased well stimulation on federal or tribal lands, this would require more water use and impacts at these locations would be similar to those of the project (Class II with mitigation).

If oil and gas imports increase to compensate for any foregone production due to a prohibition on well stimulation, this would not affect critically impacted groundwater basins because it would not result in additional pumping (Class IV).

In contrast, Impact GW-2 is Class II under the project.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the potential adverse indirect effects of Alternative 1 on groundwater under federal lands, though any such strategy would have to be imposed by the federal government. DOGGR's relevant <u>revised</u> model mitigation measure in this context is the following:

**MM GW-1b2a    Minimize Groundwater Impacts**~~Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping~~. (Full text in EIR Section 10.14.5.)

| Impact GW-3 | Adversely impact groundwater quality through surface spills or leaks during well stimulation |
|---|---|

Under Alternative 1, chemicals used in well stimulation would not be used. As a result, the potential for well stimulation to introduce well stimulation fluids into Protected Water would not occur. This would be a beneficial outcome (Class IV).

Impact GW-3 is specific to a spill or leak of stimulation treatment fluids or products that can enter the protected groundwater zone of a formation. In the absence of stimulation activity, this possibility would not arise. There would be no impact on protected groundwater from stimulation fluids or products under three scenarios: abandoning an oil and gas field; increasing activity in a field; or increasing oil imports (Class IV). If the alternative led to an increase in stimulation activities on federally managed lands, this would result in a similar impact as with the project because similar chemicals would be used. The locations where this could occur would be limited compared with the project, but the impact would remain Class II on federal lands.

In contrast, Impact GW-3 is Class II under the project.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the potential adverse indirect effects of Alternative 1 on groundwater quality under federal lands, though any such strategy would have to be imposed by the federal government. DOGGR's relevant model mitigation measure <u>(as amended)</u> in this context is the following:

**MM HAZ-1a    Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~. (Full text in EIR Section 10.14.5.)

| Impact GW-4 | Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals |
|---|---|

If well stimulation fluids are not introduced into wells or fractures, they would not be available in the environment to bypass non-existent or ineffective well seals that may exist in a field. There would be no impact, as there would be no stimulation fluids introduced into the field (Class IV).

Abandoning a field, increasing activity in a field, or increasing imports of oil would have no impact on whether stimulation fluids could migrate through annular spaces since additional stimulation fluids would not be used. There would be no migration of stimulation fluids caused by any of these three scenarios (Class IV). If the alternative led to an increase in stimulation activities on federally managed lands, this would result in a similar impact as with the project because similar stimulation fluids or formation fluids could migrate through non-existent or ineffective annular well seals. The locations where this could occur would be limited compared with the project, but the impact would remain Class II on federal lands.

In contrast, Impact GW-4 is Class II under the project.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the potential adverse indirect effects of Alternative 1 on groundwater under federal lands, though any such strategy would have to be imposed by the federal government. DOGGR's relevant <u>revised</u> model mitigation measures in this context are the following:

**MM GW-4a**      **Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation.** (Full text in EIR Section 10.14.5.)

**MM GW-4b**      **Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u>~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~.** (Full text in EIR Section 10.14.5.)

**MM GW-4c**      **Install Methane Sensors on Wells ~~in the ADSA~~<u>Subject to Well Stimulation Treatments</u>.** (Full text in EIR Section 10.14.5.)

---

| **Impact GW-5** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells** |
|---|---|

---

The absence of well stimulation fluids as a result of Alternative 1 being implemented would mean that any damaged or improperly abandoned wells located in the vicinity of a well that would have been a candidate for stimulation would not become pathways for well stimulation fluid to reach Protected Water. This would be a positive outcome (Class IV).

Abandoning a field, increasing activity in a field, or increasing imports of oil would have no impact on whether stimulation fluids could migrate to Protected Water through damaged or improperly abandoned wells. There would be no migration of stimulation fluids caused by any of the three scenarios (Class IV). If the alternative led to an increase in stimulation activities on federally managed lands, this would result in a similar impact as with the project because similar stimulation fluids or formation fluids could migrate through damaged or improperly abandoned wells. The locations where this could occur would be limited compared with the project, but the impact would remain Class II on federal lands.

In contrast, Impact GW-5 is Class II under the project.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the potential adverse indirect effects of Alternative 1 on groundwater quality under federal lands, though any such strategy would have to be imposed by the federal government. DOGGR's relevant <u>revised</u> model mitigation measure in this context is the following:

**MM GW-5a**      **Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate.** (Full text in EIR Section 10.14.5.)

| **Impact GW-6** | **Improper disposal of flowback in injection wells could potentially impact groundwater quality** |
|---|---|

In the absence of well stimulation, there would be no disposal of flowback associated with well stimulation unless this alternative resulted in an increase in stimulation activities on federal lands where such actions were not prohibited. On federal lands, impacts would be the same as for the project (Class II with mitigation). Off of federal land, there would be no impact (Class IV). There are potentially feasible and effective strategies for mitigating, at least to some degree, the potential adverse indirect effects of Alternative 1 on groundwater quality under federal lands, though any such strategy would have to be imposed by the federal government. DOGGR's relevant <u>revised</u> model mitigation measure in this context is the following:

**MM GW-6a**   **Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater**~~Install a Cement Seal across Protected Groundwater~~**.** (Full text in EIR Section 10.14.5.)

| **Impact GW-7** | **Inability to identify specific impacts to groundwater quality from well stimulation activities** |
|---|---|

In the absence of well stimulation, there would be no injected fluids and, therefore, no need to use tracers to identify whether a stimulation fluid has migrated. There would be no impact (Class IV).

Impact GW-7 is specific to stimulation treatment fluids or products that could migrate to undesired locations. In the absence of stimulation activity, there would be no injection of stimulation fluids or products under Alternative 1 except on federally managed lands. If this alternative led to an increase in stimulation on federal lands, impacts would be the same as for the project (Class II with mitigation). On lands not under federal management, there would be no impact (Class IV).

In contrast, Impact GW-7 is Class II under the project.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the potential adverse indirect effects of Alternative 1 on groundwater quality under federal lands, though any such strategy would have to be imposed by the federal government. DOGGR's relevant <u>revised</u> model mitigation measure in this context is the following:

**MM GW-7a**   **Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment.** (Full text in EIR Section 10.14.5.)

### 12.2.14.3  Programmatic Level Analysis of Specific Oil and Gas Fields

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in the portions of the Wilmington, Inglewood or Sespe Oil and Gas Fields that are under State jurisdiction. Therefore, potential impacts associated with well stimulation treatments on groundwater resources would not occur at these fields (Class IV). Portions of the Wilmington and Sespe Oil and Gas Fields are under federal jurisdiction; well stimulation treatments could continue within those locations. Impacts caused by well stimulation at the Wilmington and Sespe fields would be the same as described in EIR Section 11.

### 12.2.14.4  Impact Significance Summary

The No Future Well Stimulation Treatments Alternative would result in no impact on groundwater resources under both the Programmatic project and the Programmatic Specific Oil and Gas Fields Analyses.

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.15  Surface Water Resources

### 12.2.15.1  Introduction

This section provides an evaluation of the potential impacts to surface water resources associated with Alternative 1. This evaluation is based on the same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.15 (Surface Water Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.15 (Surface Water Resources). For the purposes of this analysis please refer to EIR Sections 10.15.2 and 11.15.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.15.3 and 11.15.3 for a description of the affected environment for surface water resources (as applicable at either a study region or field-specific scale), and EIR Section 10.15.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.15.2  Programmatic Level Analysis of the Project

Under Alternative 1, well stimulation treatments would not occur in areas under State jurisdiction, and there would be no new wells constructed for the purpose of hydraulic fracturing or acid well stimulation treatment in those areas. Under this alternative, none of the impacts associated with hydraulic fracturing and acid well stimulation treatments, and the construction of new oil and gas wells intended for stimulation, would occur in areas under State jurisdiction in any of the study regions.

| Impact SWR-1 | Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality |
|---|---|

Under Alternative 1, existing wells in areas under State jurisdiction would continue in operation using existing conventional drilling and operation methods. However, no stimulation activities would occur, eliminating any risk of violations of water quality standards as a result of stimulation. Existing regulations applicable to existing wells would continue to protect water quality as described in EIR Section 10.15.5 through reporting, best management practices, and clean-up requirements. This alternative would have no direct impact on surface water quality (Class IV).

If fields are abandoned, non-stimulation field activity increased, or oil imports increased as a result of prohibiting stimulation, these outcomes could have an effect on water quality if they lead to spills or discharges. However, all the activities associated with these scenarios are managed and regulated under existing programs designed to address spill prevention, erosion control, site clean-up, and material disposal. These regulatory programs are the same or similar to those described in EIR Chapter 7, EIR Chapter 2, and EIR Section 10.15 and are assumed to be in place and followed. Therefore, while these scenarios could increase somewhat the chance of an upset or accident, applicable existing requirements and protocols would make the impact overall less than significant (III) for similar reasons as described in EIR Section 10.15.5. However, if Alternative 1 leads to increased well stimulation activities on federally

managed land, this impact on federal land would be similar to that of the project, described in EIR Section 10.15.5 and would likely require mitigation to reduce the impacts to less than significant (Class II). The impact would occur on a more limited acreage than under the project.

In contrast, Impact SWR-1 is Class II under the project.

| Impact SWR-2 | Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site |
|---|---|

Erosion and siltation impacts to surface water as a result of well stimulation would not occur under Alternative 1. Potential impacts to existing drainages through activities related to well stimulation are principally associated with the construction of new wells for the purpose of well stimulation, and these wells would not be constructed. No existing wells would be subject to stimulation. Existing regulations would continue to protect surface waters. With a prohibition on stimulation, there would be no impact to drainage patterns resulting in substantial erosion or siltation (Class IV).

Field abandonment and an increase in imported oil would not substantially affect existing drainage patterns. Increased drilling of conventional wells and other activities at a field could potentially affect existing drainage patterns. However, owner/operators would be unlikely to alter the course of a stream or river to drill additional wells, which could be spudded in areas outside of drainageways. Therefore, there would be no impact under the three scenarios (Class IV). However, if Alternative 1 leads to increased well stimulation activities on federally managed land, this impact on federal land would be similar to that of the project, described in EIR Section 10.15.5 and would likely require mitigation to reduce the impacts to less than significant (Class II).

In contrast, Impact SWR-2 is Class II under the project.

| Impact SWR-3 | Substantially diminish surface water quantity |
|---|---|

Surface water would have been used for well stimulation, but under this alternative that use would not occur. This alternative would result in no impact on surface water quality (Class IV).

If fields are abandoned, field activity increased, or oil imports increased as a result of prohibiting stimulation, they would require little or no water. Therefore, no impact would occur resulting in a diminution of the quantity of surface water in a water body (Class IV). However, if Alternative 1 leads to increased well stimulation activities on federally managed land, this impact on federal land would be similar to that of the project, described in EIR Section 10.15.5 and would likely require mitigation to reduce the impacts to less than significant (Class II).

In contrast, Impact SWR-3 is Class II under the project.

| Impact SWR-4 | Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding. |
|---|---|

In the absence of any stimulation activities, wells developed for stimulation would not be developed and existing wells would not be stimulated. No project-related flood hazard would be created. Portions of existing fields would remain in floodplains, as described in EIR Section 10.15.4, but this is an existing, non-project condition. There would be no impact on flood hazards (Class IV).

Three of the indirect scenarios, abandonment of fields, and increase in conventional oil drilling, and an increase in oil imports that could result from implementing Alternative 1 would not require altering drainage patterns in such a way that flood-related risks would be increased. Therefore, there would be no impact with regard to floods under all three scenarios (Class IV). However, if Alternative 1 leads to increased well stimulation activities on federally managed land, this impact on federal land would be similar to that of the project, described in EIR Section 10.15.5 and would likely require mitigation to reduce the impacts to less than significant (Class II).

In contrast, Impact SWR-4 is Class II under the project.

### 12.2.15.3   Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur on the portions of the Wilmington, Inglewood, or Sespe Oil and Gas Fields that are under State jurisdiction. Therefore, no impact on surface water resources in from well stimulation would occur in those areas (Class IV). If banning well stimulation leads to an increase in construction of new convention wells, or increased stimulation activities on lands under federal jurisdiction, there could be a potential increase in effects on water quality, erosion, and siltation. Additional drilling would increase the amount of water required by the fields and would likely require new pads and associated earthwork. There also could be an increase in water use for enhanced recovery, such a steam or water flooding. However, the amount of water used would not increase dramatically compared to current use and as a proportion of water use in general in the region, development of well pads and associated work would be subject to existing regulations and impact control requirements. Therefore, increased conventional activity in Wilmington and Sespe Oil and Gas Fields, or increased stimulation activities in the portions of those fields that are under federal jurisdiction, would have a less than significant impact (Class III).

### 12.2.15.4   Impact Significance Summary

The No Future Well Stimulation Treatments Alternative would result in no impact to surface water resources for the programmatic level analysis.

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.16   Land Use and Planning

### 12.2.16.1   Introduction

This section provides an evaluation of the potential impacts to land use and planning associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.16 (Land Use and Planning) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.16 (Land Use and Planning). For the purposes of this analysis please refer to EIR Sections 10.16.2 and 11.16.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.16.3 and 11.16.3 for a description of the affected environment for land use and planning (as applicable at either a study region or field-specific scale), and EIR Section 10.16.4 for details regarding the impact methodology and significance criteria that have been used.

## 12.2.16.2  Programmatic Level Analysis of the Project

Alternative 1 would prohibit all future well stimulation activities in areas under State jurisdiction, as described in EIR Chapter 7 (Description of the Project). Therefore, there would be no disruptions to existing and permitted land uses from well stimulation activities in those areas. But there are indirect impacts associated with additional conventional wells, or increased stimulation activities on lands under federal or tribal jurisdiction; also, indirect impacts of well abandonment may free up areas of existing oil and gas wells for other uses. Prohibiting well stimulation in areas under State jurisdiction would require importing oil from other sources to meet demand, thus increasing ship, rail, and tanker truck traffic to the State from the foreign and domestic suppliers. It is assumed that imports would be transported by way of existing transportation routes and no new rail lines or roads would be required, except locally at any new or expanded terminals that might be developed to handle the imports.

This alternative would require new legislation to revise or repeal PRC Sections 3106(b) and 3160(b), which currently authorize well stimulation treatments. The new legislation would need to specify that all current or future well stimulation treatments are not allowable in areas under State jurisdiction.

| **Impact LU-1** | **Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses** |
|---|---|

Implementation of Alternative 1 would prohibit all current and future well stimulation activities in areas under State jurisdiction, which would decrease the amount of oil and gas produced in California as compared to allowing well stimulation in those areas. Under this alternative there would be no direct activities associated with well stimulation and thus no related disruptions that would preclude or diminish an existing or permitted land use or diminish the function of land uses. No impacts would occur (Class IV).

However, this alternative could both decrease activity at some existing fields through the abandonment of oil and gas fields that become unproductive, or increase the intensity of activities an existing oil and gas field where additional conventional wells are developed and/or enhanced recovery methods are employed or their use increased, or if stimulation activities increase on lands under federal or tribal jurisdiction. Because these activities are within existing fields, they would have less than significant impacts (Class III) on surrounding land uses. Prohibiting well stimulation would cause an increase in activities associated with the importation of oil and gas products into the State. Increased importation would be along existing transportation routes; with regard to land uses, this would be primarily rail and highway routes. The volume of traffic passing any point along a route may be substantially greater than current conditions, but this would depend on the volume of the imports. Absent detailed information on specific routes and nearby land uses, it is not feasible to determine the degree of impact. In some situations the volume of traffic on the route could disrupt traffic and site access (e.g., at rail crossings) or create increased noise, air quality emissions, and other conditions that could diminish a land use's function. In this situations theses impacts would be significant and unavoidable and their effect on land use and planning would significant and unavoidable (Class I).

Therefore, under Alternative 1, for Impact LU-1, direct impacts would be avoided at potential well stimulation locations by prohibiting the practice in areas under State jurisdiction (Class IV). Impacts resulting from the prohibition could be less than significant (Class III) at existing fields where increased levels of conventional drilling and enhanced recovery occur, or where stimulation activities are increased on lands under federal or tribal jurisdiction. Along transportation corridors impacts could be significant and unavoidable (Class I) at some locations, depending on the volume of imports and the nature and location of land uses near the transportation corridor.

Under the project well stimulation would be allowed and certain significant and unavoidable impacts could occur to some resources (see EIR Sections 10.1 (Aesthetics); 10.3 (Air Quality); 10.13 (Hazards and Hazardous Materials); 10.17 (Noise and Vibration); 10.21 (Risk of Upset/Public and Worker Safety); and 10.22 (Transportation and Traffic). In turn, these impacts could have significant and unavoidable impacts on land use by precluding certain uses or diminishing the function of certain land uses. Therefore, the impact to Land Use is consider significant and unavoidable (Class I) for the project.

| Impact LU-2 | Physically divide an established community |
|---|---|

Under the No Future Well Stimulation Treatments Alternative all activities associated with hydraulic fracturing, acid fracturing, and acid matrix treatments would be prohibited in areas under State jurisdiction. Therefore, there would be no physical mechanism or action attributed to well stimulation that could divide an established community. No impacts would occur (Class IV). This alternative could cause some existing oil and gas fields to be abandoned and others to increase the intensity of production activities. It also could increase the importation of oil and gas resources into the State. The abandonment of an existing oil and gas field would not physically divide or alter an established community. An increase in the intensity of an existing oil and gas field would be assumed to occur within its existing boundaries and therefore would not have the potential to physically divide an existing community. Increased importation would be assumed to use existing infrastructure and thus would not have the potential to physically divide an established community. No impacts would occur (Class IV). If new or expanded terminals are required to handle increased imports, these likely would be extension of existing facilities or be located near existing refineries or in existing rail yards. Whether this would physically divide and established community is unknown in the absence of a specific proposal. However, such facilities typically would be located in existing industrial areas or adjacent to industrial facilities, and would not divide an existing community.

With regard to well stimulation, Impact LU-2 is Class III under the project and Class IV under Alternative 1.

| Impact LU-3 | Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect |
|---|---|

As discussed in EIR Section 10.16 (Land Use and Planning), two permits are usually required to drill a well on private land in California. The well owner/operator typically needs to obtain a drilling permit from DOGGR and a Conditional Use Permit (or similar discretionary land use permit) from the local land use authority (i.e., a city or county), although some jurisdictions, such as Kern County, allow well drilling on a ministerial basis. However, because implementation of Alternative 1 would prohibit all future well stimulation activities in areas under State jurisdiction, compliance with the existing land use plans, policies and regulations that are in place for oil drilling would be required, and there would be no need to analyze whether well stimulation complies with applicable land use plans, policies or regulations. Increased stimulation activities in areas under federal or tribal jurisdiction would also be subject to a regulatory process with similar requirements. Therefore, there would be no impact under Impact LU-2 (Class IV).

In contrast, Impact LU-3 is less than significant with mitigation (Class II) under the project.

### 12.2.16.3  Programmatic Level Analysis of Specific Oil and Gas Fields

The discussion provided in EIR Section 12.2.16.2 for Impacts LU-1 through LU-3 also applies to the Wilmington, Inglewood, and Sespe Oil and Gas Fields, because implementation of Alternative 1 would prohibit all future well stimulation treatment activities in areas under State jurisdiction, including in existing fields, while stimulation would remain allowable on lands under federal or tribal jurisdiction.

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

| Impact LU-1 | Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses |
|---|---|

With well stimulation prohibited in areas under State jurisdiction, no direct impacts would occur (Class IV).

| Impact LU-2 | Physically divide and established community. |
|---|---|

The discussion and conclusions for Impact LU-2 provided in EIR Section 12.2.16.2 would be the same for the Wilmington, Inglewood, and Sespe Oil and Gas Fields. At a State, regional and local level no impacts would occur (Class IV).

| Impact LU-3 | Conflict with applicable land use plans, policies, programs, ordinances or other land sue regulations adopted for the purpose of avoiding or mitigating an environmental effect |
|---|---|

While implementation of Alternative 1 would prohibit all future well stimulation activities in areas under State jurisdiction, compliance with the existing land use plans, policies and regulations that are in place for oil drilling would be required. However, there would be no need to analyze whether well stimulation complies with applicable land use plans, policies or regulations. Therefore, there would be no impact under this criterion for the Wilmington, Inglewood, and Sespe Oil and Gas Fields (Class IV).

### 12.2.16.4  Impact Significance Summary

Land use and planning impacts associated with the No Future Well Stimulation Treatments Alternative would range from no direct impact (Class IV) to significant and unavoidable indirect impacts (Class I) due to disruptions, such as increased traffic, that would potentially occur if the production lost from well stimulation treatments caused an increase in the intensity of production in existing oil and gas fields and greater imports. No mitigation measures specific to land use and planning have been identified to reduce these indirect effects to a level of less than significant.

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.17  Noise and Vibration

### 12.2.17.1  Introduction

This section provides an evaluation of the potential impacts to noise and vibration associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.17 (Noise and Vibration) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.17 (Noise and Vibration). For the purposes of this analysis please refer to EIR Sections 10.17.2 and 11.17.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.17.3

and 11.17.3 for a description of the affected environment for noise and vibration (as applicable at either a study region or field-specific scale), and EIR Section 10.17.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.17.2  Programmatic Level Analysis of the Project

Under Alternative 1, direct noise impacts from well stimulation activities in areas under State jurisdiction would be avoided (Class IV). But there are indirect impacts associated with additional conventional wells drilled to make up for lost production, or increased stimulation activities in areas under federal or tribal jurisdiction, and there is the potential for well abandonment when wells become uneconomical. Pressure to increase shipping to make up for loss production would increase noise levels along railroad routes and at ports due to increased import volumes. Vibration from well stimulation would be eliminated and direct vibration impacts would be Class V.

| Impact NOI-1 | Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels |
|---|---|

| Impact NOI-2 | Cause exposure of persons to or generation of excessive groundborne vibration |
|---|---|

Since this alternative includes no well stimulation treatments in areas under State jurisdiction, no noise or vibration impacts will occur in those areas as a result of that activity, and no mitigation measures would be required. Thus Impacts NOI-1 and NOI-2 are Class IV under circumstances where there are no well stimulation activities.

In all regions where well stimulation treatments are occurring, the resulting noise and vibration impact would be beneficial since noise and vibration caused by well stimulation treatments would be eliminated (Class V).

As noted in EIR Section 8.3.1, a number of indirect effects could occur depending upon market and field conditions.

1. **Additional Drilling on Lands under Federal Jurisdiction.** Because well stimulation in areas under State jurisdiction would be prohibited, it is likely that some additional drilling and stimulation on federal lands would occur. The noise created by drilling a well would be similar to that occurring within these fields; however, under this scenario more wells could be drilled per year to make up for lost production. The close proximity of these new wells to noise sensitive receivers could result in noise impacts. Drilling operations within approximately 1,000 feet of a noise sensitive land use would result in Ldn levels exceeding 70 dBA. Drill rig noise mitigation can be implemented to reduce the Ldn 70 dBA impact zone to approximately 100-foot radius (Class II).

   To mitigate impacts of this kind, the federal government would need to impose a mitigation measure similar to Mitigation Measure NOI-1a:

**MM NOI-1a      Control Noise Levels near Sensitive Land Uses.** (Full text in EIR Section 10.17.5.)

2. **Well Abandonment.** Some existing oil and gas fields could become economically unviable because, without well stimulation, they would not have a rate of production sufficient to justify their continued operation. In this case, some existing fields could be abandoned if they become uneconomical and noise from these wells would cease (Class V).

3. **Increased Shipping via Rail and Tanker Ships.** The increased shipping via rail and tanker ships would result in some increase in noise and vibration along the railroad routes and at the ports due to increased traffic volume. A doubling of total rail, truck, or shipping traffic would result in a 3 dB increase in noise emission from these shipping modes, and it is unlikely that the increased oil shipping would double the total rail and port activity in California and the United States. In some cases where existing noise levels at noise sensitive receivers adjacent to these modes of shipping are at the level of significance or greater as defined by the agency with jurisdiction, the impacts may result in Class II or Class I impacts. The agency with jurisdiction over these activities would ensure they abide by existing regulations, apply the appropriate mitigation and thereby reducing the effects. The resulting impacts (Impacts NOI-1 and NOI-2) would be less than significant (Class III) in most situations but higher levels of impact (Class II or Class I) for Impact NOI-1 are possible depending upon the proximity of the noise sensitive receiver and the existing ambient noise. Quantifying how additional oil would make up the shortfall due to a ban on stimulations is not possible as it would be dictated by market conditions. Since vibration is evaluated on a maximum value, no increase in impact from vibration would occur (Class IV) unless rail, highway or terminal demands required expanded the existing infrastructure and these facilities moved closer to noise sensitive receivers. In this case impacts could vary from no impact (Class IV) to significant (Class I).

In contrast, Impact NOI-1 is Class II and NOI-2 is Class IV under the project.

### 12.2.17.3  Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in the portions of the Wilmington, Inglewood, or Sespe fields that are under State jurisdiction. Therefore, noise and vibration associated with well stimulation treatments would not occur in those areas, and no mitigation measures would be required (Class IV). Where well stimulation treatments presently occur or are planned, the resulting impact under Alternative 2 would be beneficial since noise and vibration from well stimulation treatments would be eliminated (Class V).

Indirect effects as described above would also apply to the Wilmington, Inglewood, and Sespe Oil and Gas Fields.

### 12.2.17.4  Impact Significance Summary

Potential noise and vibration impacts related to well stimulation treatments would be avoided under this alternative; however, indirect noise and vibration may occur from crude transport and offloading or an increase in the intensity of operations in fields to maintain production levels. The agency with jurisdiction over these activities would ensure they abide by existing regulations, reducing the effects and impacts would vary from no impact (Class IV) to less than significant with mitigation (Class II). Since vibration is evaluated on a maximum value, no increase in impact from vibration would occur (Class IV) unless rail, highway or terminal demands required expanded the existing infrastructure and these facilities moved closer to noise sensitive receivers. In this case impacts could vary from no impact (Class IV) to significant (Class I). The agency with jurisdiction over these activities would ensure they abide by existing regulations, reducing the effects to Less Than Significant Impact With Mitigation (Class II).

## 12.2.18   Population and Housing

### 12.2.18.1   Introduction

This section provides an evaluation of the potential impacts to population and housing associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.18 (Population and Housing) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.18 (Population and Housing). For the purposes of this analysis please refer to EIR Sections 10.18.2 and 11.18.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.18.3 and 11.18.3 for a description of the affected environment for population and housing (as applicable at either a study region or field-specific scale), and EIR Section 10.18.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.18.2   Programmatic Level Analysis of the Project

Alternative 1 would prohibit all future well stimulation activities in areas under State jurisdiction after the date of enactment of any required new legislation. Alternative 1 would not generate any potential for population increases or residential displacements from well stimulations. There are indirect impacts associated with additional conventional wells and abandonment activities to make up for lost production.

As a result, no additional employees would be required for well stimulations and there would be no potential for temporary or permanent population growth from well stimulations (Impact POP-1, Induce substantial population growth) or displacement of housing (Impact POP-2, Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere). If owners/operators of existing oil and gas fields propose to increase the intensity of a field's operations to compensate for the production that would be lost through the inability to apply well stimulation treatments, then there could be a minimal indirect impact. However, it is assumed that existing workers/contractors at active oil and gas fields would be sufficient for such an increase. Under this scenario, Impacts POP-1 and POP-2 are considered Class III. Impacts on population and housing under Alternative 1 would be less when compared to the project because Alternative 1 would not bring workers or new wells into areas outside existing oil and gas fields.

### 12.2.18.3   Programmatic Level Analysis of Specific Oil and Gas Fields

It is assumed production at the Wilmington, Inglewood, and Sespe Oil and Gas Fields would continue to decline if well stimulation treatments do not occur. There would be no potential for employment for well stimulation treatments that would induce population growth or result in housing displacement within the three fields. These fields likely would develop additional conventional wells to compensate for resources not recovered through well stimulations, if the field operator found additional wells could extract more oil and gas. If additional conventional wells are drilled in the fields, any net increase in drilling would not likely result in a substantial increase in employees at the field. Drilling and stimulation activities could also increase in areas under federal or tribal jurisdiction to compensate for lost production. Similar to the discussion above under the programmatic level analysis and in EIR Section 11.18 (Population and Housing), it is assumed that existing workers/contractors at active oil and gas fields would be sufficient for such an increase in conventional well drilling or stimulation projects. Therefore, impacts POP-1 (Induce substantial population growth) and POP-2 (Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere) related to population and housing would be less than significant at both fields and no mitigation is required (Class III).

### 12.2.18.4  Impact Significance Summary

As discussed, there would be no potential for well stimulation treatments to generate temporary or permanent population growth or displace housing under Alternative 1. Any indirect population growth from increased drilling of conventional wells without stimulation would be less than significant (Class III).

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.19   Public Services

### 12.2.19.1  Introduction

This section provides an evaluation of the potential impacts to public services associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.19 (Public Services) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.19 (Public Services). For the purposes of this analysis please refer to EIR Sections 10.19.2 and 11.19.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.19.3 and 11.19.3 for a description of the affected environment for public services (as applicable at either a study region or field-specific scale), and EIR Section 10.19.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.19.2  Programmatic Level Analysis of the Project

| Impact PUB-1 | Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools |
|---|---|

Alternative 1 would not generate any potential for population increases or increased demands to public service providers from well stimulations. But there are indirect impacts associated with additional conventional wells to compensate for potential production lost through the prohibition of well stimulation. Alternative 1 indirectly reduces the need for public services in areas of well abandonment.

The need for new or expanded public services, including applicable performance objectives and service ratios, is strongly influenced by population levels. As analyzed within EIR Section 12.2.18 (Population and Housing), Alternative 1 would not directly generate growth from new employment. Because there would be no potential for well stimulation activities to affect existing public service levels or performance objectives, no impacts would occur (Class IV).

However, if owners/operators of existing oil and gas fields propose to drill more wells outside of existing fields and/or increase the intensity of a field's operations to compensate for the potential production that would be lost by not allowing well stimulation treatments in areas under State jurisdiction, then there could be indirect public services impacts. In particular, increased ship, rail, and truck traffic hauling imported oil and gas to refineries would likely occur under Alternative 1, including an increase use of rail corridors between the source fields and California refineries. This would greatly increase the amount of oil hauled on these lines and could result in increased emergency service calls in the event of an accident or spill. This is a significant new public services impact when compared to the project, which was found to be less than significant with the incorporation of mitigation (Class II). Unlike the project, mitigation cannot be included at this time to offset use of ship, rail, and truck traffic hauling imported oil and gas to refineries as more detailed information would be required.

### 12.2.19.3  Programmatic Level Analysis of Specific Oil and Gas Fields

It is assumed production at the Wilmington, Inglewood, and Sespe fields would decline if well stimulation treatments were prohibited in areas under State jurisdiction. There would be no potential for well stimulation treatments to induce population growth. If more conventional wells that do not require stimulation are drilled in these fields, or if stimulation activities increase in areas under federal jurisdiction, then any net increase in drilling would likely not result in a substantial increase in employees at the field, which could impact public service ratios in the areas. As noted in the discussion in EIR Section 11.19 (Public Services), impacts to existing public service levels or performance objectives for those providers serving the fields would be less than significant with mitigation (Class II) under the project. Under Alternative 1, they would be minor and would be less than significant (Class III).

### 12.2.19.4  Impact Significance Summary

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.20  Recreation

### 12.2.20.1  Introduction

This section provides an evaluation of the potential impacts to recreation associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.20 (Recreation) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.20 (Recreation). For the purposes of this analysis please refer to EIR Sections 10.20.2 and 11.20.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.20.3 and 11.20.3 for a description of the affected environment for recreation (as applicable at either a study region or field-specific scale), and EIR Section 10.20.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.20.2  Programmatic Level Analysis of the Project

Alternative 1 would prohibit all future well stimulation activities in areas under State jurisdiction, as described in EIR Chapter 7 (Description of the Project). Under Alternative 1, there would be no physical deterioration of recreational resources from well stimulation activities and no disruptions to designated recreation areas from well stimulation activities in or near areas under State jurisdiction. But there would be indirect impacts associated with additional conventional wells or increased stimulation activities in areas under federal or tribal jurisdiction, and indirect impacts of well abandonment, which may allow areas of existing oil and gas wells to be converted to a recreational use.

This alternative would require new legislation to revise PRC Section 3106(b), which currently authorizes well stimulation treatments in areas under State jurisdiction. The new legislation would need to specify that all future well stimulation treatments are prohibited.

| **Impact REC-1** | ~~Increase the usage of recreation areas or facilities which would r~~Result in the physical deterioration of recreational resources |

Under Impact REC-1, impacts would occur if future operations would lead to increased use of existing neighborhood and regional parks or other recreational facilities such that substantial physical deterioration of the facility would occur or be accelerated. This type of impact would typically occur when a

project induces population growth, such as a new housing development or a large business that would require new employees, which would then increase the use of nearby recreation areas. However, implementation of Alternative 1 would prohibit all future well stimulation activities in in areas under State jurisdiction. Therefore, the level of employment for oil and gas workers would likely decrease rather than increase under this alternative. Based on this assumption, Alternative 1 would not induce any population growth that could cause an increase or subsequent deterioration of recreational resources. No direct impacts would occur (Class IV). The abandonment of an existing field could cause a slight reduction in a local population that would correspond to lost employment. Intensifying the production of an existing oil and gas field would likely be accomplished by that operation's existing employee base and subcontractors and thus would not be expected to increase the local population. Therefore, no indirect impacts related to the deterioration of recreation facilities would occur (Class IV) under Alternative 1. For the project, Impact REC-1 is Class III.

| **Impact REC-2** | **Cause disruptions in designated recreation areas** |
|---|---|

For the purpose of this EIR, recreation areas are considered sensitive receptors as they tend to be areas where children are present, and depending on the available facilities, they can be used for intense physical activities. In addition, recreation users often value the recreation experience based on the quality of the surrounding (i.e., lack of industrial activities, natural spaces, low noise levels, high scenic quality, etc.). As shown in Figures 10.20-1 through 10.20-3, there are existing oil fields within and adjacent to established recreation areas throughout the State. Well stimulation treatments may cause disruptions to these recreation areas. However, implementation of Alternative 1 would prohibit future well stimulation activities in areas under State jurisdiction. As a result, there would be no direct activities or disruptions to designated recreation areas. No Impacts would occur (Class IV). As with Impact REC-1, the abandonment of an existing field could cause a slight reduction in a local population that would correspond to lost employment. Intensifying the production of an existing oil and gas field would likely be accomplished by that operation's existing employee base and subcontractors and thus would not be expected to increase the local population. Therefore, no indirect impacts related to the disruption of a designated recreation area would occur (Class IV) under Alternative 1. For the project, Impact REC-2 is Class II.

### 12.2.20.3  Programmatic Level Analysis of Specific Oil and Gas Fields

The programmatic impact discussion provided in EIR Section 12.2.20.2 would also apply to recreational facilities and resources associated with the Wilmington, Inglewood, and Sespe Oil and Gas Fields because no well stimulation treatments would be allowed in areas under State jurisdiction; thus there would be no substantive increase in the local or regional population that could trigger the overuse and deterioration of recreational resources or otherwise disrupt them. No impacts would occur (Class IV).

### 12.2.20.4  Impact Significance Summary

No direct or indirect impacts related to recreational facilities and opportunities would occur under the No Future Well Stimulation Treatments Alternative (Class IV).

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.21   Risk of Upset/Public and Worker Safety

### 12.2.21.1  Introduction

This section provides an evaluation of the potential impacts for risk of upset/public and worker safety associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.21 (Risk of Upset/Public and Worker Safety) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.21 (Risk of Upset/Public and Worker Safety). For the purposes of this analysis please refer to EIR Sections 10.21.2 and 11.21.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.21.3 and 11.21.3 for a description of the affected environment for risk of upset/public and worker safety (as applicable at either a study region or field-specific scale), and EIR Section 10.21.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.21.2  Programmatic Level Analysis of the Project

| Impact RSK-1 | Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases |
|---|---|

Increased rail deliveries of crude oil to California could increase the potential for accidents and releases. With the decrease in oil production from the implementation of restricting or banning well stimulation treatments, imports of crude oil by rail could occur and increase. The risk of accidents will be most substantial in areas that are projected to have the most rail traffic (Study Regions 1, 4, 5, and 6). A discussion of potentially affected areas is presented in EIR Sections 10.21.3.8 and 10.21.4.1.

This impact is considered a significant and unavoidable impact that could not be mitigated to a level of less than significant through the application of feasible mitigation measures. Implementation of recommended Mitigation Measures RSK-1a through 1h would be appropriate to decrease the risk of crude oil transport and reasonably foreseeable accidents and releases. Because DOGGR cannot require other agencies to implement suggested mitigation, Impact RSK-1 would be a Class I: Significant and Unavoidable Impact.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the adverse indirect safety effects of Alternative 1, though these strategies would have to imposed or implemented by agencies other than DOGGR, as the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. DOGGR's relevant model mitigation measures in this context include the following:

**MM RSK-1a**     **Increase the Number of CPUC Rail Inspectors.** (Full text in EIR Section 10.21.5.)

**MM RSK-1b**     **Expedite the Phase-out of Older Tank Cars.** (Full text in EIR Section 10.21.5.)

**MM RSK-1c**     **Implement New Accident Prevention Technology.** (Full text in EIR Section 10.21.5.)

**MM RSK-1d**     **Monitor and Enforce New Speed Limits.** (Full text in EIR Section 10.21.5.)

**MM RSK-1e**     **Monitor the Implementation of Trackside Safety Technology.** (Full text in EIR Section 10.21.5.)

**MM RSK-1f**     **Improve Emergency Preparedness and Response Programs.** (Full text in EIR Section 10.21.5.)

**MM RSK-1g**     **Provide Real-Time Shipment Information to Emergency Responders.** (Full text in EIR Section 10.21.5.)

**MM RSK-1h**     **Provide Additional Accident and Injury Data to the State.** (Full text in EIR Section 10.21.5.)

In summary, there are greater impacts under Alternative 1 than under the project from increased oil and gas imports with significant and unavoidable hazard due to crude imports by rail (Class I). Thus, Impact RSK-1 would be Class I. There are also indirect impacts associated with additional conventional wells, and for increased stimulation activities in areas under federal or tribal jurisdiction. However, Alternative 1 avoids impacts on workers during well stimulation treatments in areas under State jurisdiction, and impacts due to proppant deliveries, silica exposure, and overpressure events would be avoided.

Impacts RSK-2 through RSK-7 are the same as under the project. Thus, Impac~~ts RSK-2 and~~ RSK-6 ~~are~~is Class I. Impacts <u>RSK-2,</u> RSK-4, RSK-5, and RSK-7 are Class II. Impact RSK-3 is Class III.

### *Study Region 1*

Since all well stimulation treatment activities in areas under State jurisdiction would be eliminated for this alternative, risks to oil workers performing support activities for oil and gas operations, such as hydraulic fracturing, would be eliminated in those areas. Indirect impacts from intensified activity at existing oil and gas fields to compensate for loss of production could occur, but would be minor compared to allowing stimulation statewide.

The number of accidents from increased crude oil rail imports may increase with crude oil shipments to Long Beach, Vernon, Bakersfield-Kern Oil, and Carson. The number of accidents projected for this study region would increase from one accident per year (approximately 25 over 25 years) for the project to four per year (approximately 100 for 25 years) for Alternative 1, based on the increased rail traffic that would result in more train miles, and therefore, potentially more accidents. These accidents are expected to be minor and could include trespassers instead of rail to rail or rail to highway interactions.

### *Study Region 2*

No additional recordable injuries to oil workers are forecast under this alternative for this study region. An accident is not likely in this region given the comparatively small of rail traffic compared to the other regions (Table 10.21-5).Study Region 3

### *Study Region 3*

The risk of upset in Study Region 3 for this alternative is similar to that of Study Region 2. An accident is not likely in this region given the comparatively small of rail traffic compared to the other regions (Table 10.21-5).

### *Study Region 4*

Study Region 4 would have the biggest reduction in oil worker accidents under this alternative. Under the assumptions in EIR Section 10.21.3.7, this study region would be impacted by rail crude oil imports with the construction of the Alon crude facility and the completion of the Plains All America facility. Risks relating to hydraulic fracturing activities would be eliminated, including rail impacts from proppant

deliveries to Bakersfield. Using the average annual crude oil import volume from 2015 to 2040 (75 million barrels/year instead of 15 million barrels per year for the project), the number of accidents projected for this region would increase from one accident per year (approximately 25 for 25 years) for the project case to four per year (approximately 100 for 25 years) for Alternative 1. These accidents are expected to be minor and could include trespassers instead of rail to rail or rail to highway interactions.

### Study Region 5

Similar to Study Region 4, this study region would be affected by rail crude oil imports with rail shipments through Study Region 5 to the Alon crude facility and the Plains All America facility. Using the average annual crude oil import volume from 2015 to 2040 for this alternative, the number of rail accidents projected for this region would increase from one accident per year for the project (approximately 25 for 25 years) to three per year (approximately 75 over 25 years) for Alternative 1. These accidents are expected to be minor and could include trespassers instead of rail to rail or rail to highway interactions.

### Study Region 6

Under this alternative, there would be significant rail traffic in Study Region 6 by importing crude oil. Using the assumptions in EIR Section 10.21.3.7, significant numbers of crude oil rail cars would travel through this study region enroute to Bakersfield and Santa Maria. Also, increased operation of the Richmond Kinder Morgan facility, and the potential for Benicia and Pittsburg to be operational was assumed. Using the average annual crude oil import volume from 2015 to 2040, the number of accidents projected for this region would increase from one accident per year for the project case (approximately 25 over 25 years) to four per year (approximately 100 over 25 years) for Alternative 1 from crude oil.

## 12.2.21.3  Programmatic Level Analysis of Specific Oil and Gas Fields

### Wilmington Oil and Gas Field

Since all well stimulation treatment activities would be eliminated in areas under State jurisdiction, risks to oil workers from these activities would be limited. Drilling would still continue, but an estimated 25 percent of the wells would be not be drilled. Therefore, there would be an estimated 25 percent reduction in number of accidents to extraction workers for the project compared to those for Alternative 1 (Class V).

### Inglewood Oil and Gas Field

Well stimulation treatments would not occur at Inglewood Oil and Gas Field under Alternative 1. In the absence of these activities, impacts related to risk of upset and safety would continue as in the setting (Class III), and the mitigation identified for the project would not be required at Inglewood.

### Sespe Oil and Gas Field

Risks to oil workers from well stimulation treatment activities would be eliminated in areas under State jurisdiction. Since all wells drilled at Sespe are forecasted to involve treatments, drilling would be expected to be curtailed at this field, though stimulation activities could increase in areas under federal jurisdiction (Class V).

### 12.2.21.4  Impact Significance Summary

As this alternative would halt all future well stimulation activities in areas under State jurisdiction, risks from hydraulic fracturing activities would be reduced. Overall, Alternative 1 would result in a reduction in accidents to workers when compared to the project case. The estimated number of accidents to workers would decrease from 85 for the project case to 61 for Alternative 1.

Foreign imports of crude oil by ship are expected to decline, but could maintain their levels if hydraulic fracturing was banned and additional supplies are needed. There could be additional risk of accidental release; however, the release rate is 2.1 barrels/billion barrel miles (API, 2009). Therefore maintaining current import levels by ship would not add any significant risk for Alternative 1.

However, this alternative would require the largest amount of imported oil by rail to compensate from the lost production. To compensate for the reduced supply, crude oil imports by rail are projected to substantially increase to make up for the crude oil supply reductions. This alternative will pose the greatest risk of accident from rail transport. Based on Table 10.21-16, which shows the greatest number of potential rail accidents an average forecast of 15 rail accidents per year for all study regions (375 over 25 years) compared to four accidents per year (100 over 25 years) for the project for all study regions.

With the increase in rail traffic, an increased likelihood of accidental crude oil releases would occur. As EIR Section 10.21.4.1 discusses, the average crude oil release rate for 2011 through 2013 was 3.6 releases of crude oil per million barrels of crude oil imported by rail. If Alternative 1 is implemented, there could potentially approximately 270 crude oil releases per year by rail cars.

As discussed in EIR Section 10.21.4.1, most of the known releases listed on the California Office of Emergency Services (CalOES) Historical HazMat Spill Notifications website (CalOES, 2014) were from faulty mechanical equipment or human error and were often vapor or liquid that did not reach the ground. Only about 30 percent of releases that reached the ground were greater than 5 gallons. Some of the causes of the releases were unknown, but no derailments or other accidents were noted.

## 12.2.22  Transportation and Traffic

### 12.2.22.1  Introduction

This section provides an evaluation of the potential impacts to transportation and traffic associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.22 (Transportation and Traffic) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.22 (Transportation and Traffic). For the purposes of this analysis please refer to EIR Sections 10.22.2 and 11.22.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.22.3 and 11.22.3 for a description of the affected environment for transportation and traffic (as applicable at either a study region or field-specific scale), and EIR Section 10.22.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.22.2  Programmatic Level Analysis of the Project

| Impact TR-1      Generate additional truck traffic and disrupt traffic operations |
|---|

The No Future Well Stimulation Treatments Alternative (Alternative 1) would halt all current and future well stimulation activities in areas under State jurisdiction. Approximately 25 percent of wells in California are hydraulically fractured. Therefore, traffic that is currently generated by well stimulation activ-

ities would be reduced and no new traffic would be generated due to future well stimulation activities. In order to meet current oil demand, this restriction would potentially lead to more oil import from foreign countries and Alaska. Increased oil import would add to traffic in terms of ships and rail and a limited number of truck trips. Any additional conventional wells that do not require stimulation would also add truck trips, but the number of truck trips per conventional well is less than for a well that is both drilled and stimulated, so there would be a net reduction in truck traffic under Alternative 1. This overall reduction in truck traffic would reduce existing roadway traffic and improve the level of service (LOS) on local roadways, which would be a beneficial programmatic level impact (Class V).

With no hydraulic fracturing is allowed, developers may choose to increase development of conventional wells outside of existing oil and gas fields. A substantial increase in drilling activities outside of existing oil and gas fields would add additional truck traffic in those areas. Although there would be an overall net reduction in the number of truck trips under this alternative, on a site-specific basis there could be an increase in roadway traffic that could impact LOS. Fewer truck trips would be required for drilling a conventional well than for drilling and stimulating a deeper new well that could require transport of up 5-10 million gallons of water to the site. Therefore, indirect operational LOS traffic impacts would be less than significant (Class III).

In contrast, Impact TR-1 is Class II under the project.

| **Impact TR-2** | **Inadvertently damage road rights-of-way** |
|---|---|

Depending on the capacity and availability of oil and gas production infrastructure in place, trucks would still be needed to transport some oil to refineries, which are located in the Los Angeles, Bakersfield and San Francisco Bay areas. The refineries are located nearby to major roadways that are designed to handle heavy trucks. With an overall reduced number of truck trips and a concentration of trips on major roadways under this alternative, impacts from the deterioration of roadway pavement on a programmatic level would be reduced as well (Class V).

If substantial increased drilling without stimulation activities occur outside existing oil and gas fields near rural communities, or if stimulation activities increase in areas under federal or tribal jurisdiction, then on a site-specific basis the condition of some rural roadways may be adversely affected by increased truck traffic.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the adverse indirect effects of Alternative 1, though these strategies would in most instances have to imposed or implemented by agencies other than DOGGR, as most of the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. Implementation of a mitigation measure such as Mitigation Measure TR-2a (Repair Roadway Damage) is recommended to ensure that roadways would be restored to original or near-original condition and undertaken in a timely manner, in consultation with and to the satisfaction of the city or county with jurisdiction over affected roadways, the local transportation agency, and/or Caltrans, as appropriate. With the implementation of a measure modeled on Mitigation Measure TR-2a, any potential indirect impacts to roadway pavement would be reduced to a less than significant level (Class II).

**MM TR-2a    Repair Roadway Damage.** (Full text in EIR Section 10.22.5.)

| Impact TR-3 | Cause traffic safety hazards for vehicles, bicyclists, and pedestrians |
|---|---|

As discussed under Impact TR-1 (Generate additional truck traffic and disrupt traffic operations), there would be a net reduction in truck traffic and an improvement in the level of service (LOS) on local roadways with Alternative 1. As a result, the potential for traffic safety hazards for vehicles, bicyclists, and pedestrians would likewise be reduced from the baseline conditions due to an improvement in traffic operations (Class V).

Indirect impacts to LOS from any increased drilling without stimulation, or increased stimulation in areas under federal or tribal jurisdiction, would be less than significant (see Impact TR-1) and thus the potential for indirect traffic safety hazards for vehicles, bicyclists, and pedestrians would be less than significant as well (Class III).

In contrast, Impact TR-3 is Class II under the project.

| Impact TR-4 | Transport hazardous materials |
|---|---|

Since this alternative involves a ban on existing and future well stimulation treatments in areas under State jurisdiction, accidents from truck traffic and associated traffic hazards (Impact TR-4, Transport hazardous materials) would decrease due to improved LOS on roadways. In addition, less chemical additives associated with well stimulation treatments would be transported by tanker truck. However, Alternative 1 would still require the transport of hydrocarbon product due to increased oil imports. Any hazardous materials would be transported in accordance to State and federal regulations. In addition, the Hazardous Materials Transportation Act requires that carriers report accidental releases of hazardous materials to the Department of Transportation at the earliest practical moment. Regardless, the transportation of hydrocarbon product poses a potential for fires and spills. An accidental spill of hydrocarbon product on a roadway could potentially create a safety hazard and traffic delays for other motorists. Implementation of a mitigation measure similar to Mitigation Measure TR-4a (Know Spill Prevention Procedures) would not be feasible to implement given the large number of oil transport companies, none of which is regulated by DOGGR. Therefore, although potential traffic hazard impacts would be reduced compared to the project, the potential for an accidental spill that could cause a roadway hazard would be a significant and unmitigable traffic hazard impact under Alternative 1 (Class I).

| Impact TR-5 | Change air traffic patterns |
|---|---|

New drilling of deeper wells to be stimulated would not be allowed in areas under State jurisdiction, so there would a reduced potential for drill rigs or other equipment to cause a potential hazard to airspace navigation or affect air traffic patterns. In addition, due to a decline in oil and gas production in California, there may be an associated reduced potential for oil and gas development and stimulation to interfere with air traffic patterns than under the existing baseline conditions (Class V).

On a site-specific basis, the drilling of new wells may trigger FAA air space hazard notification requirements for the drill rig in the vicinity of an airport. Assuming the owner/operator would submit Form 7460-1, as necessary, and comply with any FAA-required hazard markers or lighting, impacts to air traffic patterns would be less than significant (Class III).

| Impact TR-6 | Temporarily interfere with emergency response |
|---|---|

As discussed under Impact TR-1 (Generate additional truck traffic and disrupt traffic operations), there would be a net reduction in truck traffic and an improvement in the LOS on local roadways with Alterna-

tive 1. As a result, interference with emergency response would likewise be programmatically reduced from the baseline conditions due to an improvement in traffic operations (Class V).

Indirect impacts to LOS from any increased drilling without stimulation would be less than significant (see Impact TR-1) and thus interference with emergency response would be less than significant as well (Class III).

In contrast, Impact TR-6 is Class II under the project.

### 12.2.22.3  Programmatic Level Analysis of Specific Oil and Gas Fields

The No Future Well Stimulation Treatments Alternative would reduce overall impacts on transportation and traffic as compared to the project and to existing baseline conditions at the Wilmington, Inglewood, and Sespe Oil and Gas Fields. Under Alternative 1, even if some additional conventional wells are drilled and not stimulated, production at the fields would decline. Thus there would be a reduction in vehicle trips generated within the field study areas. Impacts would be similar to the programmatic level analysis described in EIR Section 12.2.22.2 for Impacts TR-1 (Generate additional truck traffic and disrupt traffic operations), TR-2 (Inadvertently damage road rights-of-way), TR-3 (Cause traffic safety hazards for vehicles, bicyclists, and pedestrians), and TR-6 (Temporarily interfere with emergency response).

With no well stimulation treatment activities allowed in the portions of the Wilmington, Inglewood, and Sespe fields that are under State jurisdiction, and with a corresponding reduction in oil and gas production at the fields, there would be reduced transport of chemical additives associated with well stimulation or hydrocarbon product to or from the fields. However, elsewhere in the State, trucks would still be needed to transport some oil to the refineries, which are located in the Los Angeles, Bakersfield and San Francisco Bay areas. An explosion or an accidental spill of hydrocarbon product on a roadway could potentially create a safety hazard and traffic delays for other motorists. Implementation of a measure such as Mitigation Measure TR-4a (Know Spill Prevention Procedures) discussed in EIR Section 10.22 (Transportation and Traffic) would not be feasible to implement given the number of oil transport companies, none of which would be regulated by DOGGR. Therefore, although potential traffic hazard impacts would be reduced compared to the project, the potential for an accidental spill that could cause a roadway hazard would be a significant and unmitigable traffic hazard impact under Alternative 1 (Class I).

Given a reduction of production and of the drilling of new deeper wells with taller drill rigs at the Wilmington and Inglewood fields, there would be corresponding reduced potential for oil and gas development and stimulation at the field to interfere with air traffic patterns at nearby airports (Impact TR-5, Change air traffic patterns) (Class V).

There are no airports in the vicinity of the Sespe field so there would be no impacts to air traffic patterns (Class IV).

### 12.2.22.4  Impact Significance Summary

All direct impacts to transportation and traffic would be beneficial (Class V), except the potential for traffic hazards related to the transport of hazardous materials would remain significant and unmitigable (Class I).

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion.

## 12.2.23   Utilities and Service Systems

### 12.2.23.1  Introduction

This section provides an evaluation of the potential impacts to utilities and service systems associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.23 (Utilities and Service Systems) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.23 (Utilities and Service Systems). For the purposes of this analysis please refer to EIR Sections 10.23.2 and 11.23.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.23.3 and 11.23.3 for a description of the affected environment for utilities and service systems (as applicable at either a study region or field-specific scale), and EIR Section 10.23.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.23.2  Programmatic Level Analysis of the Project

The need for new or expanded utilities and service systems is influenced by population levels and the needs of individual projects. As analyzed in EIR Section 12.2.18 (Population and Housing), Alternative 1 would not generate new employment leading to new related to drilling of wells to be stimulated or well stimulation activities.

Alternative 1 eliminates the potential for population increases or increased demands for utilities and services that could potentially result from conducting well stimulation treatments, which would be prohibited. But there are indirect impacts associated with drilling of additional conventional wells to make up for lost production, as further discussed below. Alternative 1 indirectly reduces need for utilities in areas of well abandonment. This is a decrease in potential impacts when compared to the project.

Alternative 1 would require new legislation to revise or repeal PRC Sections 3106(b) and 3160(b) to prohibit all future well stimulation activities after the date of the enactment of such legislation. With a prohibition on well stimulation treatments, the utility and service requirements of well stimulation would not occur. There would be no potential for well stimulation activities to generate wastewater or solid waste or affect the capacity levels of municipal wastewater treatment plants or solid waste facilities. Loss of access to the petroleum resources that may have derived from well stimulation would be made up for by importing oil from outside the state. Increased ship, rail, and truck traffic hauling imported oil and gas to refineries likely would occur under Alternative 1, including an increase use of rail corridors between the source fields and California refineries. This could lead to a need for expanded or new terminals and yards to handle the imports. Except for security and safety lighting, such facilities have relatively minimal demands for electric power and would generate relatively small amounts of solid waste. They would not be expected to create a high demand for natural gas service wastewater disposal beyond what is needed to heat buildings and service sanitary requirements of the few buildings associated with terminals. Existing facilities (assumed to be adequately served by existing utilities and service systems) and any new or expanded facilities (assumed to be in near-refinery locations with adequate services and with adequate capacity) would not require new or expanded utilities or service systems. If owners/operators of existing oil and gas fields propose to drill increased numbers of conventional wells and increase the intensity of a field's operations overall to compensate to some degree for the production that would be lost if well stimulation treatments are banned, there could be an increase in utility and service system demands. However, with banning of well stimulation, some uneconomical wells likely would be abandoned or shut in. Overall, any increase in conventional well drilling is not anticipated to be dramatic, and there would be minimal indirect less than significant (Class III) impacts to the capacities of

existing utilities and service systems, as discussed in EIR Section 10.23 (Utilities and Service Systems) for the following impacts:

- **Impact UTL-1:** Adversely affect utilities and service systems due to population growth from project-related development

- **Impact UTL-2:** Require new or expanded electrical or natural gas infrastructure

- **Impact UTL-3:** Exceed existing municipal wastewater treatment provider capacities

- **Impact UTL-4:** Exceed permitted solid waste capacity of landfills

By comparison, the project impacts are Class III (less than significant) for the first two impacts, and Class II (less than significant with mitigation) for the last two impacts. For Alternative 1, all four impacts are Class III (less than significant).

### 12.2.23.3  Programmatic Level Analysis of Specific Oil and Gas Fields

It is assumed that production at the Wilmington, Inglewood, and Sespe Oil and Gas Fields would decline in the future, with or without well stimulation treatments. If additional conventional wells are drilled to compensate for not being allowed to stimulate wells under Alternative 1, this may contribute to slowing the decline in production, but would not increase production overall compared to existing and past production. Under Alternative 1, because well stimulation treatments would be banned in areas under State jurisdiction, there would be no potential for them to affect existing utilities, including the capacities of electricity or natural gas providers, municipal wastewater treatment providers, or existing landfills.

As discussed under the programmatic level analysis of these fields presented in EIR Section 11.23, under the project, which would permit well stimulation, impacts to utilities and service systems from these three fields would be less than significant (Class III) for Impacts UTL-1 and 2 and less than significant with mitigation (Class II) for Impacts UTL-3 and UTL-4.

Under Alternative 1, in the absence of being able to use well stimulation, operators would be unlikely to develop many wells in the Monterey Formation or complete wells in conditions where well stimulation would be required to make a well economically productive. Therefore, future demand for utilities and wastewater treatment would be expected to be similar to existing demand. The utilities and service system demands for the Wilmington, Inglewood, and Sespe Oil and Gas Fields would be less than significant (Class III), as they essentially would continue existing baseline conditions and modes of operation.

### 12.2.23.4  Impact Significance Summary

As discussed, there would be no potential for well stimulation treatments to affect existing utility service capacities or require the need for new or expanded facilities under Alternative 1. Any indirect population growth that could affect public services from increased drilling of conventional wells without stimulation would be less than significant (Class III).

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.24  Impact Summary Table for Alternative 1

Table 12.2.24-1 provides a summary of impacts and recommended mitigation measures for the project and specific oil and gas files for all issue areas under Alternative 1.

## Programmatic Level Analysis of the Project

Under Alternative 1, the direct impacts associated with well stimulation activities would not occur, either inside or outside of existing oil and gas fields.

However, this prohibition would result in a new significant and unmitigable (Class I) impact from the loss of known mineral (oil and gas) resources in the Monterey Formation and its plays (Impact GEO-6: Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan).

In addition, prohibiting well stimulation reasonably could result in indirect effects. As discussed in EIR Section 8.3.1 (No Future Well Stimulation Treatments Alternative), approximately 25 percent of drilled oil wells in California use hydraulic fracturing. A loss of 25 percent of the California-produced oil would require an additional 57 million barrels per year be purchased produced from another source. Under one scenario, some existing oil and gas fields could become economically unviable because, without well stimulation, they would not have a rate of production sufficient to justify their continued operation. In this case, some existing fields would be abandoned. Under a second scenario, owners/operators of existing oil and gas fields may drill more wells and increase the intensity of operations to maintain production levels and compensate for the loss of prospective additional production that would have occurred by using well stimulation treatments. Under a third scenario, the oil and gas production foregone through a lack of well stimulation treatments could require importation of offsetting oil and gas resources from either domestic or foreign supplies, or both.

The additional importation of oil and gas would create much greater significant and unmitigable (Class I) impacts to greenhouse gas emissions compared to the project.

Alternative 1 would also create new significant and unmitigable (Class I) impacts to:

- Risk of upset/public health and worker safety (Impact RSK-1: Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases) and

- Environmental justice (Impact EJ-1: Significant impacts would disproportionately affect minority or low-income populations).

In summary, Alternative 1 would be worse than the project for the following issue areas: Aesthetics, Agriculture and Forestry Resources, Air Quality, Biological Resources–Terrestrial Environments, Cultural, Environmental Justice, Geology, Greenhouse Gas Emissions, and Risk.

Alternative 1 would be better than the project for the following issue areas: Biological Resources–Coastal Marine Environments, Coastal and Marine Processes and Water Quality, Fishing, Hazardous Materials, Groundwater, Surface Water, Land Use, Noise, Population and Housing, Public Services, Recreation, Transportation and Traffic, and Utilities.

Environmental impacts related to oil and gas production to make up for lost production (approximately 57 million barrels per year) would still occur, but they would be transferred out of the State where mitigation measures similar to those included in this EIR may not be implemented.

## Programmatic Level Analysis of Specific Oil and Gas Fields

The Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields. Alternative 1 would prohibit all future well stimulation treatments within existing fields, which would eliminate all direct environmental impacts, including all surface and subsurface disturbances, associated with well stimulation activities. Although additional conventional wells would likely be drilled to make up for lost production, some wells may also be abandoned within the fields, which would partially offset this indirect impact.

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **AESTHETICS** | | | | |
| Impact AES-1. Substantially adversely affect scenic vistas. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. |
| Impact AES-2. Substantially alter or damage scenic resources. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. |
| Impact AES-3. Substantially degrade the existing visual character or quality of a site and its surroundings. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. |
| Impact AES-4. Create new sources of substantial light and glare. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. |
| **AGRICULTURE AND FORESTRY RESOURCES** | | | | |
| Impact AGF-1. Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use | Class IV (Direct) Class V and II (Indirect) AGF-1a: Minimize Impacts to Important Farmland AGF-1b: Develop an Agricultural Resources Protection Plan AGF-1c: Compensate for Loss of Important Farmland | Class IV None required. | Class IV None required. | Class II and IV AGF-1a: Minimize Impacts to Important Farmland AGF-1b: Develop an Agricultural Resources Protection Plan AGF-1c: Compensate for Loss of Important Farmland |
| Impact AGF-2. Conflict with existing zoning for agricultural use or with Williamson Act contracts | Class IV (Direct) Class V and II (Indirect) AGF-2a: Ensure Compatibility with Agricultural Zoning AGF-2b: Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts | Class IV None required. | Class IV None required. | Class II AGF-2b: Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact AGF-3. Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production | Class IV (Direct)<br>Class V and II (Indirect)<br>AGF-3a: Ensure Compatibility with Zoning for Forest and Timberland | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. |
| Impact AGF-4. Result in the loss of forest land or conversion of forest land to non-forest use | Class IV (Direct)<br>Class V and II (Indirect)<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land | Class IV<br>None required. | Class II<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land | Class II and IV<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact AGF-5. Directly or indirectly impair the use of agricultural land or forest land | Class IV (Direct)<br>Class V and II (Indirect)<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~<br>GW-4b Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments~~a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ | Class IV<br>None required. | Class II<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>BIOT-2a: Protect Jurisdictional Waters<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~<br>GW-4b Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments~~a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ | Class IV and II<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>BIOT-2a: Protect Jurisdictional Waters<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~<br>GW-4b Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments~~a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact AGF-5, *continued* | SWR-1a: Require Stormwater Pollution Prevention Plan<br><br>SWR-2a: Implement Erosion Control Plan<br><br>SWR-3a: Ensure Adequate Water Availability<br><br>TR-1a: Prepare Traffic Plan | | SWR-1a: Require Stormwater Pollution Prevention Plan<br><br>SWR-2a: Implement Erosion Control Plan<br><br>SWR-3a: Ensure Adequate Water Availability<br><br>TR-1a: Prepare Traffic Plan | SWR-1a: Require Stormwater Pollution Prevention Plan<br><br>SWR-2a: Implement Erosion Control Plan<br><br>SWR-3a: Ensure Adequate Water Availability<br><br>TR-1a: Prepare Traffic Plan |
| **AIR QUALITY** | | | | |
| Impact AQ-1. Conflict with or obstruct implementation of an applicable air quality plan | Class I (Indirect)<br>AQ-1a: Improve Air Quality Planning Inventories and Local Control Measures | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact AQ-2. Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation | Class I (Indirect)<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>AQ-2c: Reduce Emissions from Dust-Causing Activities | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact AQ-3. Expose sensitive receptors to substantial pollutant concentrations | Class I (Indirect)<br>AQ-3a: <u>Comply with Local Air District Protocols Relating to the Preparation of</u>~~Prepare~~ a Health Risk Assessment and Implement Emission Controls<br>AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact AQ-4. Create objectionable odors affecting a substantial number of people | Class I (Indirect)<br>AQ-4a: Prepare and Implement an Odor Minimization Plan<br>AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| **BIOLOGICAL RESOURCES – TERRESTRIAL ENVIRONMENT** | | | | |
| Impact BIOT-1. Substantially reduce the habitat of a fish or wildlife species | Class IV (Direct)<br>Class I (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class IV (Direct)<br>Class II (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class IV (Direct)<br>Class I (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class IV (Direct)<br>Class I (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-2. Cause a fish or wildlife population to drop below self-sustaining levels | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) |
| | Class I (Indirect) | Class II (Indirect) | Class I (Indirect) | Class I (Indirect) |
| | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat |
| | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat |
| | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife |
| | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-2b: California Condor Protection Measures |
| | BIOT-4b: Minimize Impacts to Protected Birds | BIOT-4b: Minimize Impacts to Protected Birds | BIOT-4b: Minimize Impacts to Protected Birds | BIOT-2c: Nelson's Bighorn Sheep Protection Measures |
| | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife |
| | GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation | GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation | GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation | BIOT-4b: Minimize Impacts to Protected Birds |
| | GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments | GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments | GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement |
| | HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials | HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials | HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials | GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation |
| | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan | GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments |
| | SWR-2a: Implement Erosion Control Plan | SWR-2a: Implement Erosion Control Plan | SWR-2a: Implement Erosion Control Plan | HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials |
| | | | | SWR-1a: Require Stormwater Pollution Prevention Plan |
| | | | | SWR-2a: Implement Erosion Control Plan |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-3. Substantially reduce the number or restrict the range of an endangered, rare, or threatened species | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) |
| | Class I (Indirect) | Class II (Indirect) | Class I (Indirect) | Class I (Indirect) |
| | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat |
| | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat |
| | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife |
| | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife |
| | BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants | BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants | BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants | BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants |
| | BIOT-4b: Minimize Impacts to Protected Birds | BIOT-4b: Minimize Impacts to Protected Birds | BIOT-4b: Minimize Impacts to Protected Birds | BIOT-4b: Minimize Impacts to Protected Birds |
| | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement |
| | AQ-2c: Reduce Emissions from Dust-Causing Activities | AQ-2c: Reduce Emissions from Dust-Causing Activities | AQ-2c: Reduce Emissions from Dust-Causing Activities | AQ-2c: Reduce Emissions from Dust-Causing Activities |
| | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-4. Have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special-status species in local or regional plans, policies, or regulations, or by CDFW or USFWS | Class IV (Direct)<br>Class I (Indirect)<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class IV (Direct)<br>Class II (Indirect)<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class IV (Direct)<br>Class I (Indirect)<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class IV (Direct)<br>Class I (Indirect)<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-5. Have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations, or by CDFW or USFWS | Class IV (Direct)<br>Class I (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class IV (Direct)<br>Class II (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class IV (Direct)<br>Class I (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class IV (Direct)<br>Class I (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | **Wilmington** | **Inglewood** | **Sespe** |
| Impact BIOT-6. Have a substantial adverse effect on federally protected wetlands as defined by Section 404, of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) |
| | Class I (Indirect) | Class II (Indirect) | Class I (Indirect) | Class I (Indirect) |
| | BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat | BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat | BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat | BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat |
| | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat |
| | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat |
| | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife |
| | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife |
| | BIOT-6a: Protect Jurisdictional Waters | BIOT-6a: Protect Jurisdictional Waters | BIOT-6a: Protect Jurisdictional Waters | BIOT-6a: Protect Jurisdictional Waters |
| | <u>GW-1a: Use Alternative Water Sources to the Extent Feasible</u> | <u>GW-1a: Use Alternative Water Sources to the Extent Feasible</u> | <u>GW-1a: Use Alternative Water Sources to the Extent Feasible</u> | <u>GW-1a: Use Alternative Water Sources to the Extent Feasible</u> |
| | <u>GW-1b: Minimize Groundwater Impacts</u> | <u>GW-1b: Minimize Groundwater Impacts</u> | <u>GW-1b: Minimize Groundwater Impacts</u> | <u>GW-1b: Minimize Groundwater Impacts</u> |
| | <u>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation</u> | <u>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation</u> | <u>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation</u> | <u>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation</u> |
| | GW-4b Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ | GW-4b Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ | GW-4b Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ | GW-4b Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ |
| | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan |
| | <u>SWR-1b: Surface Water Protection</u> | <u>SWR-1b: Surface Water Protection</u> | <u>SWR-1b: Surface Water Protection</u> | <u>SWR-1b: Surface Water Protection</u> |
| | SWR-2a: Implement Erosion Control Plan | SWR-2a: Implement Erosion Control Plan | SWR-2a: Implement Erosion Control Plan | SWR-2a: Implement Erosion Control Plan |
| | SWR-3a: Ensure Adequate Water Availability | SWR-3a: Ensure Adequate Water Availability | SWR-3a: Ensure Adequate Water Availability | SWR-3a: Ensure Adequate Water Availability |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-7. Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites | Class IV (Direct) Class I (Indirect) BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class IV (Direct) Class III (Indirect) BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class IV (Direct) Class III (Indirect) BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class IV (Direct) Class I (Indirect) BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement |
| Impact BIOT-8. Conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance | Class IV (Direct) Class I (Indirect) BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Class IV (Direct) Class II (Indirect) BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Class IV (Direct) Class III (Indirect) BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Class IV (Direct) Class II (Indirect) BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans |
| Impact BIOT-9. Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan | Class IV (Direct) Class I (Indirect) BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Class IV (Direct) Class II (Indirect) BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Class IV (Direct) Class III (Indirect) BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Class IV (Direct) Class II (Indirect) BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans |
| Impact BIOT-10. Contribute to global climate change and consequent impacts to biodiversity | Class IV (Direct) Class I (Indirect) AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class IV (Direct) Class II (Indirect) AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class IV (Direct) Class II (Indirect) AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class IV (Direct) Class II (Indirect) AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1**[1]

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **BIOLOGICAL RESOURCES – COASTAL AND MARINE ENVIRONMENT** | | | | |
| Impact BIOCM-1. Substantially affect rare, threatened, or endangered coastal/marine species or their habitat | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. | Not applicable | Not applicable |
| Impact BIOCM-2. Interfere with migration or movement of coastal/marine fish or wildlife | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. | Not applicable | Not applicable |
| Impact BIOCM-3. Result in substantial loss or alteration of coastal/marine habitat | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. | Not applicable | Not applicable |
| Impact BIOCM-4. Substantially disrupt or affect local coastal/marine biological communities or habitats | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. | Not applicable | Not applicable |
| **COASTAL PROCESSES AND MARINE WATER QUALITY** | | | | |
| Impact CPMWQ-1. Change marine water chemical composition with respect to known hazardous substances; or the measured water temperature, salinity, conductivity, or turbidity | Class II CPMWQ-1a: Protect Marine Water Quality | Class IV (Direct) Class II (Indirect) CPMWQ-1a: Protect Marine Water Quality | Not applicable | Not applicable |
| Impact CPMWQ-2. Change the velocity or direction of ocean currents | Class II CPMWQ-2a: Prepare and Implement Marine Current Plan | Class IV (Direct) Class II (Indirect) CPMWQ-2a: Prepare and Implement Marine Current Plan | Not applicable | Not applicable |
| Impact CPMWQ-3. Change the velocity or direction of coastal and ocean winds | Class III None required. | Class IV (Direct) Class III (Indirect) None required. | Not applicable | Not applicable |
| Impact CPMWQ-4. Change the direction, size, or period of ocean waves | Class IV (Direct and Indirect) None required. | Class IV (Direct and Indirect) None required. | Not applicable | Not applicable |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CPMWQ-5. Increase the risk of a tsunami | Class IV (Direct) Class III (Indirect) ~~CPMWQ-5a: Conduct Offshore Geotechnical and Tsunami Investigation~~ ~~CPMWQ-5b: Modify the Drilling of Disposal Wells Offshore or Near-Shore~~None required. | Class IV (Direct) Class III (Indirect) ~~CPMWQ-5a: Conduct Offshore Geotechnical and Tsunami Investigation~~ ~~CPMWQ-5b: Modify the Drilling of Disposal Wells Offshore or Near-Shore~~None required. | Not applicable | Not applicable |
| **COMMERCIAL AND RECREATIONAL FISHING** | | | | |
| Impact CRF-1. Cause long-term exclusion of important commercial and recreational fishing areas | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. | Not applicable | Not applicable |
| Impact CRF-2. Result in substantial economic losses to local commercial and recreational fishing industries | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. | Not applicable | Not applicable |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **CULTURAL RESOURCES** | | | | |
| Impact CUL-1. Affect historic-era archaeological and built-environment resources | Class IV (Direct) <br> Class I (Indirect) <br> CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources <br> CUL-1b: Complete Native American Coordination <br> CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan <br> CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains <br> CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities <br> CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program <br> CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources <br> CUL-1h: Provide Native American Monitors during Earth Disturbing Activities <br> CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities <br> CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Class IV (Direct) <br> Class I (Indirect) <br> CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources <br> CUL-1b: Complete Native American Coordination <br> CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan <br> CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains <br> CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities <br> CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program <br> CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources <br> CUL-1h: Provide Native American Monitors during Earth Disturbing Activities <br> CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities <br> CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Class IV (Direct) <br> Class I (Indirect) <br> CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources <br> CUL-1b: Complete Native American Coordination <br> CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan <br> CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains <br> CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities <br> CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program <br> CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources <br> CUL-1h: Provide Native American Monitors during Earth Disturbing Activities <br> CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities <br> CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Class IV (Direct) <br> Class I (Indirect) <br> CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources <br> CUL-1b: Complete Native American Coordination <br> CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan <br> CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains <br> CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities <br> CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program <br> CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources <br> CUL-1h: Provide Native American Monitors during Earth Disturbing Activities <br> CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities <br> CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CUL-2. Affect prehistoric resources | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) |
| | Class I (Indirect) | Class I (Indirect) | Class I (Indirect) | Class I (Indirect) |
| | CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources |
| | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination |
| | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan |
| | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains |
| | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Well Stimulation Activities |
| | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program |
| | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources |
| | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities |
| | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities |
| | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Well Stimulation Activities |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CUL-3. Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony. | Class IV (Direct)<br>Class I (Indirect)<br>CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Class IV (Direct)<br>Class I (Indirect)<br>CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Class IV (Direct)<br>Class I (Indirect)<br>CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Class IV (Direct)<br>Class I (Indirect)<br>CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CUL-4. Affect cultural landscapes. | Class IV (Direct)<br>Class I (Indirect)<br>CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Class IV (Direct)<br>Class I (Indirect)<br>CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Class IV (Direct)<br>Class I (Indirect)<br>CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Class IV (Direct)<br>Class I (Indirect)<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **PALEONTOLOGICAL RESOURCES** | | | | |
| Impact PALEO-1. Well stimulation treatments would destroy or disturb surface or near-surface significant paleontological resources | Class IV (Direct) Class II (Indirect) PALEO-1a: Require Information ~~Inventory~~ and Evaluate Paleontological Resources PALEO-1b: Develop Paleontological Resource Mitigation Plan PALEO-1c: Retain Qualified Paleontological Resources Staff PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Class IV (Direct) Class II (Indirect) PALEO-1a: Require Information ~~Inventory~~ and Evaluate Paleontological Resources PALEO-1b: Develop Paleontological Resource Mitigation Plan PALEO-1c: Retain Qualified Paleontological Resources Staff PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Class IV (Direct) Class II (Indirect) PALEO-1a: Require Information ~~Inventory~~ and Evaluate Paleontological Resources PALEO-1b: Develop Paleontological Resource Mitigation Plan PALEO-1c: Retain Qualified Paleontological Resources Staff PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Well Earth Disturbing Activities PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Class IV (Direct) Class II (Indirect) PALEO-1a: Require Information ~~Inventory~~ and Evaluate Paleontological Resources PALEO-1b: Develop Paleontological Resource Mitigation Plan PALEO-1c: Retain Qualified Paleontological Resources Staff PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities |
| **ENVIRONMENTAL JUSTICE** | | | | |
| Impact EJ-1. Significant impacts would disproportionately affect minority or low-income populations | Unknown, possibly Class I (Indirect) EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Unknown, possibly Class I (Indirect) EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Unknown, possibly Class I (Indirect) EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Unknown, possibly Class I (Indirect) EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Wilmington | Inglewood | Sespe |
|---|---|---|---|---|
| | | **Specific Oil and Gas Fields** | | |
| **GEOLOGY, SOILS AND MINERAL RESOURCES** | | | | |
| Impact GEO-1. Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure | Class IV (Direct)<br>Class II (Indirect)<br>GEO-1a: Avoid Active Faults ~~Zones~~ if Necessary<br>GEO-1b: Implement an Appropriate Setback if Necessary<br>GEO-1ef: Include ~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Class IV (Direct)<br>Class II and IV (Indirect)<br>GEO-1d: Implement Industry Accepted Practices<br>GEO-1ef: Include ~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Class IV (Direct)<br>Class II (Indirect)<br>GEO-1d: Implement Industry Accepted Practices<br>GEO-1ef: Include ~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Class IV (Direct)<br>Class II and IV (Indirect)<br>GEO-1d: Implement Industry Accepted Practices<br>GEO-1e: Conduct Ground Monitoring<br>GEO-1ef: Include ~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan |
| Impact GEO-2. Result in substantial soil erosion or the loss of topsoil | Class IV (Direct)<br>Class II (Indirect)<br>SWR-1a: Require Stormwater Pollution Prevention Plan | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Class IV (Direct)<br>Class III (Indirect)<br>None required. |
| Impact GEO-3. Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse | Class IV (Direct)<br>Class II (Indirect)<br>GEO-3a: Prepare Geotechnical Report if Necessary | Class IV (Direct)<br>Class II (Indirect)<br>GEO-3a: Prepare Geotechnical Report if Necessary | Class IV (Direct)<br>Class II (Indirect)<br>GEO-3a: Prepare Geotechnical Report if Necessary | Class III<br>None required. |
| Impact GEO-4. Be located on expansive soil creating substantial risks to life or property | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Class IV (Direct)<br>Class III (Indirect)<br>None required. |
| Impact GEO-5. Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. |
| Impact GEO-6. Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan | Class IV (Direct)<br>Class I (loss of fossil fuels) (Indirect)<br>Class III (loss of non-fuel resources) (Indirect)<br>None available. | Class III<br>None required. | Class III<br>None required. | Class IV (Direct)<br>Class I (loss of fossil fuels) (Indirect)<br>Class III (loss of non-fuel resources) (Indirect)<br>None available. |
| Impact GEO-7. Cause an induced seismic event including ground shaking and ground failure | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Class IV (Direct)<br>Class III (Indirect)<br>None required. |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **GREENHOUSE GAS EMISSIONS** | | | | |
| Impact GHG-1. Generate greenhouse gas emissions that may have a significant impact on the environment | Class IV (Direct) Class I (Indirect) AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas | Class III None required. | Class III None required. | Class III None required. |
| Impact GHG-2. Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases | Class I AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas | Class III None required. | Class III None required. | Class III None required. |
| **HAZARDS AND HAZARDOUS MATERIALS** | | | | |
| Impact HAZ-1. Hazardous materials associated with well stimulation fluids could be released to the environment from a spill or leak | Class IV and V (Direct) Class I and III (Indirect) None available. | Class V (Direct) Class I and III (Indirect) None available. | Class V (Direct) Class I and III (Indirect) None available. | Class V (Direct) Class I and III (Indirect) None available. |
| **GROUNDWATER RESOURCES** | | | | |
| Impact GW-1. Contribute to overdraft conditions in critically impacted groundwater basins | Class II (federal lands), III, and IV GW-1a: Use Alternative Water Sources to the Extent Feasible | Class II (federal lands), III, and IV GW-1a: Use Alternative Water Sources to the Extent Feasible | Class IV None required. | Class II (federal lands), III, and IV GW-1a: Use Alternative Water Sources to the Extend Feasible |
| Impact GW-2. Lower groundwater levels through pumping, resulting in subsidence or impacts to nearby water wells | Class II (federal lands), III, and IV GW-1b2a: Minimize Groundwater ImpactsPrepare a Third Party Technical Report to Analyze Local Impacts of Pumping | Class II (federal lands), III, and IV GW-1b2a: Minimize Groundwater ImpactsPrepare a Third Party Technical Report to Analyze Local Impacts of Pumping. | Class IV None required. | Class II (federal lands), III, and IV GW-1b2a: Minimize Groundwater ImpactsPrepare a Third Party Technical Report to Analyze Local Impacts of Pumping |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact GW-3. Water quality in the Protected Water zone is adversely affected through surface spill or leak during well stimulation treatment | Class II (federal lands)<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices | Class II (federal lands)<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices. | Class IV<br>None required. | Class II (federal lands)<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices. |
| Impact GW-4. Non-existent or ineffective well seals in annular space resulting in migration of fluids | Class II (federal lands) and IV<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin<br>GW-4c: Install Methane Sensors on Wells Subject to Well Stimulation Treatments. | Class II (federal lands) and IV<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation.<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin<br>GW-4c: Install Methane Sensors on Wells in the ADSA Subject to Well Stimulation Treatments. | Class IV<br>None required. | Class II (federal lands) and IV<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation.<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin<br>GW-4c: Install Methane Sensors on Wells in the ADSA Subject to Well Stimulation Treatments. |
| Impact GW-5. Fluids introduced to Protected Water through damaged or improperly abandoned wells within area of influence of new well. | Class II (federal lands) and IV<br>GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate | Class II (federal lands) and IV<br>GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate. | Class IV<br>None required. | Class II (federal lands) and IV<br>GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate. |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact GW-6. Improper Disposal of Flowback in Injection Wells could potentially impact groundwater quality ~~Inability to identify whether any observed adverse effects in groundwater are from well stimulation activity~~. | Class II (federal lands) and IV GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater~~Install a Cement Seal across Protected Groundwater~~ | Class II (federal lands) and IV GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater~~Install a Cement Seal across Protected Groundwater~~. | Class IV None required. | Class II (federal lands) and IV GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater~~Install a Cement Seal across Protected Groundwater~~. |
| Impact GW-7 Inability to identify specific impacts to groundwater quality from well stimulation activities. | Class II (federal lands) and IV GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment | Class II (federal lands) and IV GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment. | Class IV None required. | Class II (federal lands) and IV GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment. |
| **SURFACE WATER RESOURCES** | | | | |
| Impact SWR-1. Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality. | Class IV (Direct) Class II (federal lands) and III (Indirect) SWR-1a: Require Stormwater Pollution Prevention Plan SWR-1b: Surface Water Protection SWR-1c~~b~~: Provide Adequate Flood Protection SWR-1d~~c~~: Protect Surface Water Reservoirs BIOT-2a: Prevent Hazards to Fish and Wildlife | Class III (federal lands) and IV None required. | Class IV None required. | Class III (federal lands) and IV None required. |
| Impact SWR-2. Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site. | Class IV (Direct) Class II (federal lands) and IV (Indirect) SWR-2a: Implement Erosion Control Plan | Class III (federal lands) and IV None required. | Class IV None required. | Class III (federal lands) and IV None required. |
| Impact SWR-3. Substantially diminish surface water quantity. | Class IV (Direct) Class II (federal lands) and IV (Indirect) SWR-3a: Ensure Adequate Water Availability. | Class III (federal lands) and IV None required. | Class IV None required. | Class III (federal lands) and IV None required. |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact SWR-4. Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding. | Class IV (Direct) Class II (federal lands) and IV (Indirect) SWR-1cb: Provide Adequate Flood Protection | Class III (federal lands) and IV None required. | Class IV None required. | Class III (federal lands) and IV None required. |
| **LAND USE AND PLANNING** | | | | |
| Impact LU-1. Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses. | Class IV (Direct) Class I or III (Indirect) None available for impacts associated with Risk of Upset/Public and Worker Safety | Class IV (Direct) Class I or III (Indirect) None available for impacts associated with Risk of Upset/Public and Worker Safety | Class IV (Direct) Class I or III (Indirect) None available for impacts associated with Risk of Upset/Public and Worker Safety | Class IV (Direct) Class I or III (Indirect) None available for impacts associated with Risk of Upset/Public and Worker Safety |
| Impact LU-2. Physically divide an established community. | Class IV None required. | Class IV None required. | Class IV None required. | Class IV None required. |
| Impact LU-3. Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. | Class IV None required. | Class IV None required. | Class IV None required. | Class IV None required. |
| **NOISE AND VIBRATION** | | | | |
| Impact NOI-1. Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels | Class IV and V (Direct) Class II (federal lands) and V (Indirect) NOI-1a: Control Noise Levels near Sensitive Land Uses NOI-1b: Control Noise Levels from Well Drilling Near Noise Sensitive Land Uses | Class IV and V (Direct) Class II (federal lands) and V (Indirect) NOI-1a: Control Noise Levels near Sensitive Land Uses NOI-1b: Control Noise Levels from Well Drilling Near Noise Sensitive Land Uses | Class IV and V (Direct) Class II (federal lands) and V (Indirect) NOI-1a: Control Noise Levels near Sensitive Land Uses NOI-1b: Control Noise Levels from Well Drilling Near Noise Sensitive Land Uses | Class IV and V (Direct) Class II (federal lands) and V (Indirect) NOI-1a: Control Noise Levels near Sensitive Land Uses NOI-1b: Control Noise Levels from Well Drilling Near Noise Sensitive Land Uses |
| Impact NOI-2. Cause exposure of persons to or generation of excessive groundborne vibration | Class IV and V (Direct) Class II and V (Indirect) Mitigation may be required if new infrastructure is closer to noise sensitive receivers. | Class IV and V (Direct) Class II and V (Indirect) Mitigation may be required if new infrastructure is closer to noise sensitive receivers | Class IV and V (Direct) Class II and V (Indirect) Mitigation may be required if new infrastructure is closer to noise sensitive receivers | Class IV and V (Direct) Class II and V (Indirect) Mitigation may be required if new infrastructure is closer to noise sensitive receivers |
| **POPULATION AND HOUSING** | | | | |
| Impact POP-1. Induce substantial population growth | Class III None required. | Class III None required. | Class III None required. | Class III None required. |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact POP-2. Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| **PUBLIC SERVICES** | | | | |
| Impact PUB-1. Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools | Class IV (Direct)<br>Class II (Indirect)<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation | Class III<br>None required | Class III<br>None required | Class III<br>None required |
| **RECREATION** | | | | |
| Impact REC-1. ~~Well stimulation treatment activities would increase the usage of recreation areas or facilities which would r~~Result in the physical deterioration of recreational resources | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. |
| Impact REC-2. ~~Well stimulation treatment activities would c~~Cause disruptions in designated recreation areas | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. |
| **RISK OF UPSET / PUBLIC AND WORKER SAFETY** | | | | |
| Impact RSK-1. Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases | Class I<br>RSK-1a: Increase the Number of CPUC Rail Inspectors<br>RSK-1b: Expedite the Phase-out of Older Tank Cars<br>RSK-1c: Implement New Accident Prevention Technology<br>RSK-1d: Monitor and Enforce New Speed Limits<br>RSK-1e: Monitor the Implementation of Trackside Safety Technology<br>RSK-1f: Improve Emergency Preparedness and Response Programs<br>RSK-1g: Provide Real-Time Shipment Information to Emergency Responders<br>RSK-1h: Provide Additional Accident and Injury Data to the State | Class V | Class III<br>None required. | Class V |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact RSK-2. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental release hazardous materials due to a hose leak or connection leak while pumping well stimulation treatment fluids | Class II<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2a~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2b~~d~~: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System~~<br>RSK-2c~~f~~: Ensure Mechanical Integrity Through Compliance with Permanent Program ~~Complies with~~ Regulation | Class V | Class III<br>None required. | Class V |
| Impact RSK-3. Substantially increase the potential for major oil spills due to ship groundings and collisions | Class III<br>None required. | Class V | Class III<br>None required. | Class V |
| Impact RSK-4. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental pressure changes during flowback activity caused by blocked pump discharge, sudden change in downhole condition, or human error | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | Class V | Class III<br>None required. | Class V |
| Impact RSK-5. Generate risks to public safety by causing a flammable atmosphere in the flowback tank | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | Class V | Class III<br>None required. | Class V |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact RSK-6. Increase risks to public safety by exposing the public to accidental crude oil or produced gas releases from pipelines | Class I <br> RSK-6a: Increase Inspection of Mechanical Integrity <br> RSK-6b: Improve Leak Detection Capability <br> RSK-6c: Reduce Mainline Valve SpacingNone available. | Class V | Class III <br> None required. | Class V |
| Impact RSK-7. Expose workers and public to hazardous levels of airborne silica during the use of proppant | Class II <br> RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System <br> RSK-7b: Reduce Emissions from Dust-Causing Activities | Class V | Class III <br> None required. | Class V |
| **TRANSPORTATION AND TRAFFIC** | | | | |
| Impact TR-1. Generate additional truck traffic and disrupt traffic operations | Class V (Direct) <br> Class III (Indirect) <br> None required. | Class V (Direct) <br> Class III (Indirect) <br> None required. | Class V (Direct) <br> Class III (Indirect) <br> None required. | Class V (Direct) <br> Class III (Indirect) <br> None required. |
| Impact TR-2. Inadvertently damage road rights-of-way | Class V (Direct) <br> Class II (Indirect) <br> TR-2a: Repair Roadway Damage | Class V (Direct) <br> Class II (Indirect) <br> TR-2a: Repair Roadway Damage | Class V (Direct) <br> Class II (Indirect) <br> TR-2a: Repair Roadway Damage | Class V (Direct) <br> Class II (Indirect) <br> TR-2a: Repair Roadway Damage |
| Impact TR-3. Cause traffic safety hazards for vehicles, bicyclists, and pedestrians | Class V (Direct) <br> Class III (Indirect) <br> None required. | Class V (Direct) <br> Class III (Indirect) <br> None required. | Class V (Direct) <br> Class III (Indirect) <br> None required. | Class V (Direct) <br> Class III (Indirect) <br> None required. |
| Impact TR-4. Transport hazardous materials | Class I | Class I | Class I | Class I |
| Impact TR-5. Change air traffic patterns | Class V (Direct) <br> Class III (Indirect) <br> None required. | Class V <br> None required. | Class V <br> None required. | Class IV <br> None required. |
| Impact TR-6. Temporarily interfere with emergency response | Class V (Direct) <br> Class III (Indirect) <br> None required. | Class V (Direct) <br> Class III (Indirect) <br> None required. | Class V (Direct) <br> Class III (Indirect) <br> None required. | Class V (Direct) <br> Class III (Indirect) <br> None required. |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **UTILITIES AND SERVICE SYSTEMS** | | | | |
| Impact UTL-1. Adversely affect utilities and service systems due to population growth from project-related development | Class III None required. | Class III None required. | Class III None required. | Class III None required. |
| Impact UTL-2. Require new or expanded electrical or natural gas infrastructure | Class III None required. | Class III None required. | Class III None required. | Class III None required. |
| Impact UTL-3. Exceed existing municipal wastewater treatment provider capacities | Class III None required. | Class III None required. | Class III None required. | Class III None required. |
| Impact UTL-4. Exceed permitted solid waste capacity of landfills | Class III None required. | Class III None required. | Class III None required. | Class III None required. |

1 - Mitigation measures recommended herein are addressed at indirect impacts not caused by well stimulation. The identified measures thus are only model measures that could be followed, likely with some modification, in connection with approvals of other projects contributing to indirect effects.

## 12.3    No Future Well Stimulation Practices Outside of Existing Oil and Gas Field Boundaries (Alternative 2)

Under the No Future Well Stimulation Practices Outside of Existing Oil and Gas Boundaries (Alternative 2), no hydraulic fracturing, acid fracturing, or acid matrix stimulation treatments would be permitted in areas under State jurisdiction outside of the boundaries of existing oil and gas fields and their buffer areas, as shown in Figures 5-4, 5-6, and 5-8. While Alternative 2 would prohibit well stimulation in areas outside of existing fields and their buffers, it would not prohibit conventional oil and gas exploration and development in these areas. ~~Under this alternative, the project standards for resource protection (see EIR Section 7.5) would not be implemented.~~

As with Alternative 1, this alternative assumes that any action taken by the State to restrict or limit well stimulation activities would not be applicable in areas under federal or tribal jurisdiction. Any activity that is currently allowed in areas under federal or tribal jurisdiction would continue to be allowed, and could increase, stay the same, or decrease in intensity. The current permitting and environmental review processes applicable to stimulation activities in areas under federal and tribal jurisdiction would continue to apply to new well stimulation projects in those areas, and therefore impacts are assumed to be mitigated as appropriate and feasible. The analysis below for this alternative focuses only on activities in areas under State jurisdiction, and includes the assumption that the analysis of effects in areas under federal or tribal jurisdiction would be the same as with Alternative 1. Therefore, effects in areas under federal or tribal jurisdiction are not considered in the analysis of this alternative.

This alternative would require new legislation to revise PRC Sections 3106(b) and 3160(b), which currently authorize well stimulation treatments in the State without any requirement that such activities only occur within established fields. The probable fields where future well stimulations treatments are likely to occur under Alternative 2 are in Study Regions 1, 2, and 4. In Study Region 1, well stimulation treatments would likely occur only at existing oil fields even without new legislation; therefore, there would be no loss of potential production in Study Region 1 due to implementation of this alternative. In Study Regions 2 and 4, a portion of the anticipated well stimulation would occur within existing oil and gas fields; however, it is possible that some new wells outside of existing fields would be prohibited from using well stimulation. Because of this, some potential oil and gas resources would not be accessed with implementation of this alternative. It is not possible to quantify the precise amount of oil and gas resources that could go untapped. However, because well stimulation would be allowed within existing oil and gas fields and their buffers, the amount of resource left untapped would be less than under a Statewide ban imposed by the No Future Well Stimulation Treatments Alternative (Alternative 1). As a consequence, the amount of oil that would need to be imported to offset any production foregone would be less than under Alternative 1; therefore, the indirect effects of Alternative 2 would be less than under Alternative 1.

In addition to an analysis of the alternative itself, the analysis of Alternative 2 highlights how impacts under this alternative would be different from impacts under the project. Where no difference is specifically noted, the significance of impacts under the alternative are the same as the impacts under the project.

## 12.3.1    Aesthetics

### 12.3.1.1    Introduction

This section provides an evaluation of the potential impacts to visual resources associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.1 (Aesthetics) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.1 (Aesthetics). For the purposes of this analysis please refer to EIR Sections 10.1.2 and 11.1.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.1.3 and 11.1.3 for a description of the affected environment for visual resources (as applicable at either a study region or field-specific scale), and EIR Section 10.1.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.1.2    Programmatic Level Analysis of the Project

Under Alternative 2, use of well stimulation technologies would be limited to wells in existing fields; wells outside of existing fields in areas under State jurisdiction would be prohibited from using stimulation technologies. As a result, the visual impacts identified for well stimulation would occur only in existing fields. Under Alternative 2, direct impacts are reduced because wells requiring stimulation to produce would not be drilled outside of existing fields. In general, Alternative 2 eliminates potential impacts associated with well stimulation in areas outside of existing fields. However, wells could still be developed in these areas, but well stimulation would be prohibited. Prohibiting well stimulation in these areas would have other direct and indirect effects. It could increase conventional well drilling and the use of enhanced recovery techniques in existing fields and require the increased importation of oil from foreign or other domestic sources to meet demand. This could increase the intensity of activity at some fields. Importation of additional oil would result in direct and indirect impacts from transportation by tanker and rail, particularly in Los Angeles, Long Beach, and the San Francisco Bay Area, where extensive refining facilities are located.

For areas outside of existing oil and gas fields, Alternative 2 would be similar to Alternative 1, with stimulation prohibited. Inside of existing fields, Alternative 2 would be similar to the project, with stimulation permitted under existing and proposed regulations. This would be true in all six study regions. The out-of-field well stimulation prohibition under Alternative 2 would reduce the geographic areas where the visual impacts from stimulation activities would occur. Procedures and impact mitigation measures applicable to the project in areas outside of existing fields would not need to be implemented.

In Study Region 1, well stimulation treatments likely would occur only at existing oil fields, so there would be no loss of potential production resulting from prohibiting stimulation outside of existing fields as compared to the project. In Study Regions 2, 3, and 4, well stimulation would occur within existing oil and gas fields as well; however, development of wells in areas outside of existing fields would be less likely if stimulation is prohibited there. This would translate to loss of potential oil and gas reserves that may have been recovered had stimulation occurred. The prohibition on out-of-field stimulation also could cause indirect effects such as increasing the intensity of activities in existing oil and gas fields. Overall, Alternative 2 also could result in a reduction in in-state production and an increase in importation of oil and gas supplies and products from out of state as compared to the project. Because well stimulation would still be allowed in existing oil and gas fields, potential lost future production would be less under Alternative 2 than under the No Future Well Stimulation Treatments Alternative (Alternative 1), which would ban well stimulation statewide.

| Impact AES-1    Substantially adversely affect scenic vistas |
|---|

Under this alternative, any ground disturbance or clearing associated with well stimulation and the mobilization of equipment, material, vehicles, and crews would occur only in existing fields and their buffers. Prohibiting well stimulation outside of existing fields would result in no alteration to existing scenic vistas in these locations and there would be no impact (Class IV) outside of fields.

In the analysis of the project (see EIR Section 10.1, Aesthetics) it was determined that well stimulation activity in an existing field would have a less than significant impact (Class III). This is because well stimulation is a temporary short-term activity, typically does not require earthwork or vegetation removal, and at the conclusion of the operation the site would be left largely unchanged from pre-stimulation conditions. If the prohibition on stimulation work occurring outside of existing fields leads to an increase of such activity within an existing field, this would be a nominal change in the visual environment and would be a less than significant impact as well (Class III).

Banning well stimulation in areas where well stimulation could lead to recovery oil resources would result in such potential supplies not being available to meet demand. To meet demand, imports of oil would be required to offset the lack of these unrecovered resources. Enroute ship, truck, and rail shipments could adversely affect scenic vistas as they pass by, but this would be a transitory effect and would be considered less than significant (Class III). However, if the volume of imports were such that expanded or new terminals would be required at refineries or transfer points, this could adversely affect the localities where the terminals are located. Depending on local conditions, this could result in impacts to scenic vistas ranging from significant and unmitigable (Class I) to less than significant (Class III). By comparison, Impact AES-1 could be Class III under the project in existing fields and, depending on circumstances, Class I or II outside of existing fields.

| Impact AES-2    Substantially alter or damage scenic resources |
|---|

With stimulation banned outside of existing fields, new areas likely would see little oil and gas development activity. This level of activity would likely result in no substantial alteration or damage occurring to scenic resources. With the level of drilling outside of existing fields substantially less if well stimulation were banned, it is expected that scenic resources could be readily avoided and no impact not occur (Class IV). But, because these impacts are site-specific, depending on the location, impacts could range from significant and unmitigable (Class I) to less than significant (Class III).

The indirect effects described for increased drilling and activity at existing fields and from increased imports would be as described above for Impact AES-1 and would be less than significant (Class III). If expanded or new terminals would be required for increased imports, potential impacts on scenic resources could range from significant and unmitigable (Class I) to less than significant with mitigation (Class II).

By comparison, Impact AES-2 could be Class III under the project. However, the project did not require expanded or new terminals for imports, which could be the case under Alternative 2.

| Impact AES-3    Substantially degrade the existing visual character or quality of a site and its surroundings |
|---|

If areas outside of existing oil and gas fields are not explored and developed for hydrocarbon recovery, impacts on the existing visual character or quality of a site and its surrounding would not occur, resulting in no impact (Class IV). At existing fields, equipment, materials, and vehicles would be mobilized to a well pad to conduct stimulation work. As noted, this well stimulation is a short-term activity and the site

is left essentially as it appeared prior to stimulation. Consequently, well stimulation activity in an existing field would have a less than significant impact (Class III).

If the inability to conduct well stimulation elsewhere led to increasing activity within a field, this would not likely be noticeably different from existing conditions and would not lead to a substantial degradation of the existing character of the location. This would be a less than significant impact (Class III). Increased deliveries to refineries of imported oil would somewhat increase ship, road, and rail traffic, but this would not substantially degrade the visual character of the routes used or the refinery vicinity, as rail and road systems already exist and already carry traffic. This would be a less than significant impact (Class III). However, at localities near any new or expanded terminals that may be required by increased imports, the impact on the visual character or quality of a site could range from significant and unmitigable (Class I) to less than significant (Class III).

By comparison, Impact AES-3 could be Class III under the project.

| **Impact AES-4    Create new sources of substantial light and glare** |

With a prohibition on well stimulation outside of existing fields, few new areas outside of existing oil and gas fields are likely to be explored and developed for hydrocarbon recovery. The absence of these activities would avoid conditions under which there could be new sources of substantial light and glare; there would be no impact (Class IV). Within existing fields, vehicles and equipment used during a stimulation job could result in reflected light and glare. This would be from surfaces such as windshields or unpainted stainless steel tankers, if on site. The distance between off-site viewers and the work site, the need for the sun angle and to reflective surface to align in a way that directs light to a viewer, and the infrequency with which stimulation would occur result in this being a less than significant impact (Class III).

Increasing drilling and stimulation activity at an existing field would increase the number of drill rigs and vehicles on site. This would potentially create additional sources of light and glare, similar in nature to those already occurring. If well drilling were to increase substantially, the frequency and duration of working rigs being present at a field would increase, increasing the number of nighttime hours when rigs would be operating. This could increase the number of nighttime hours in which lighted rigs are visible from offsite. However, any potential sources of light and glare at a site would be present for a limited time and would be removed at the conclusion of the operation. Therefore, increased activities at existing fields would present a less than substantial new source of light and glare. The impact would be less than significant impact (Class III).

If increased imports required expansion or development of terminals, this would introduce additional or new sources of light and glare at those locations. With mitigation measures such as those recommended in Chapter 10 for Aesthetics, these impacts would be less than significant with mitigation (Class II).

By comparison, Impact AES-4 could be Class III under the project. However, the analysis of the project did not consider a need for new or expanded terminals, whose impact from light and glare would be less than significant with mitigation (Class II).

### 12.3.1.3    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

The programmatic discussion for direct and indirect impacts provided in EIR Section 12.3.1.2 above would apply to visual resources associated with the Wilmington, Inglewood, and Sespe Oil and Gas Fields because

Alternative 2 would allow stimulation work in existing fields, which would include the presence of vehicles and equipment associated with stimulation work.

### 12.3.1.4    Impact Significance Summary

None of the potential impacts to visual resources identified for the project would occur outside of existing oil and gas fields. Within existing fields, stimulation activities are temporary and leave a site similar to how it appeared before the work was conducted. The potential direct impacts in a field vary from less than significant (Class III) to no impact (Class IV).

However, there would be a secondary impact attributable increases in activity at fields, or increases in ship, rail, and tank truck traffic delivering imported oil and gas. Impacts would vary from no impact (Class IV) to less than significant (Class III).

At localities near any new or expanded terminals that may be required by increased imports, the impact on the visual character or quality of a site could range from significant and unmitigable (Class I) to less than significant (Class III).

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. For indirect effects of this alternative not associated with well stimulation treatment (e.g., those caused by increased importation of oil into California by tanker or rail), the mitigation measures proposed herein do not apply directly, but provide models that could be followed during project approval processes for various kinds of projects causing or contributing to indirect effects.

## 12.3.2    Agriculture and Forestry Resources

### 12.3.2.1    Introduction

This section provides an evaluation of the potential impacts to agriculture and forestry resources associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.2 (Agriculture and Forestry Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.2 (Agriculture and Forestry Resources). For the purposes of this analysis please refer to EIR Sections 10.2.2 and 11.2.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.2.3 and 11.2.3 for a description of the affected environment for agriculture and forestry resources (as applicable at either a study region or field-specific scale), and EIR Section 10.2.4 for details regarding the impact methodology and significance criteria that have been used.

~~Under this alternative the project standards for resource protection (see EIR Section 7.5) would not be implemented, which would result in greater indirect impacts on agricultural and forestry resources (Impact AGF-5, Directly or indirectly impair the use of agricultural land or forest land). Without the Water Recycling Standards, there would be an increase in competition for agricultural water supplies, because less water would be recycled. In addition, the potential for contamination of agricultural water supplies would be increased without implementation the Surface Water Protection Standards and Groundwater Protection Standards.~~

### 12.3.2.2    Programmatic Level Analysis of the Project

By prohibiting well stimulation treatments in areas outside of existing fields and their buffers, while allowing treatments inside these areas, there would likely be some loss of oil and gas reserves under Alternative 2 compared with the project. This would be because out-of-field areas in the Monterey For-

mation would not be developed and brought into production. This could cause indirect effects, including an increase in the intensity of production at existing oil and gas fields, as well as an increase in activities associated with the importation of oil and gas products. However, because well stimulation would be allowed within existing oil and gas fields, potential lost future production would be less than would be the case under the No Future Well Stimulation Treatments Alternative (Alternative 1) but more than under the project.

Under Alternative 2, impacts outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.2 (Programmatic Level Analysis of Impacts and Mitigation Measures, Agriculture and Forestry Resources) for Impacts AGR-1 through AGF-5. No direct impacts would occur (Class IV) and indirect impacts would be both beneficial in areas where fewer agriculture and forestry resources would be affected (Class V), or potentially significant if additional conventional wells are drilled as a result of not using well stimulation techniques in areas outside of existing fields and their buffers. Implementation of the mitigation measures below would reduce all impacts to a less than significant level (Class II). Where mitigation would be imposed on oil and gas drilling operations outside of existing oil and gas fields, the measures developed in this EIR would have to be adapted to project approvals other than well stimulation treatment permits.

Under Alternative 2, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.2 (Agriculture and Forestry Resources). As explained in that section, implementation of the mitigation measures below would reduce all impacts to a less than significant level (Class II). However, were conventional well drilling and enhanced recovery to occur more extensively in existing fields, the severity of impacts would be greater under Alternative 2 than under the project, even though the impacts remain Class II. Where impacts are the result of intensified drilling rather than well stimulation, the mitigation measures set forth below would have to be adapted to project approvals other than well stimulation treatment permits. This would not apply at Wilmington Oil and Gas Field, where there are no agricultural or forest lands, and would apply only nominally at Inglewood Oil and Gas Field, where forest resources are located in a part of the field buffer. Applicable mitigation measures include:

**MM AGF-1a**    **Minimize Impacts to Important Farmland.** (Full text in EIR Section 10.2.5.)

**MM AGF-1b**    **Develop an Agricultural Resources Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-1c**    **Compensate for Loss of Important Farmland.** (Full text in EIR Section 10.2.5.)

**MM AGF-2a**    **Ensure Compatibility with Agricultural Zoning.** (Full text in EIR Section 10.2.5.)

**MM AGF-2b**    **Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts.** (Full text in EIR Section 10.2.5.)

**MM AGF-3a**    **Ensure Compatibility with Zoning for Forest and Timberland.** (Full text in EIR Section 10.2.5.)

**MM AGF-4a**    **Minimize Impacts to Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AGF-4b**    **Develop a Forest Land Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-4c**    **Compensate for Loss of Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AQ-2c**    **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

**MM BIOT-2a**    **Prevent Hazards to Fish and Wildlife.** (Full text in EIR Section 10.4.5.)

**MM HAZ-1a** **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ (Full text in EIR Section 10.13.5.)

**MM GW-4b** **Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments**~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin.~~ (Full text in EIR Section 10.14.5.)

**MM SWR-1a** **Require Stormwater Pollution Prevention Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-2a** **Implement Erosion Control Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-3a** **Ensure Adequate Water Availability.** (Full text in EIR Section 10.15.5.)

**MM TR-1a** **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

### 12.3.2.3    Programmatic Level Analysis of Specific Oil and Gas Fields

#### 12.3.2.3.1    *Wilmington Oil and Gas Field*

Because the Wilmington Oil and Gas Field is an existing field, well stimulation activities would be allowed.

#### *Inglewood Oil and Gas Field*

The Inglewood Oil and Gas Field does not contain any mapped farmland, so no direct or indirect impacts would occur to agriculture (Impacts AGR-1 and AGF-2)(Class IV). Likewise, the Inglewood Oil and Gas Field is not zoned for forest land or timberland, therefore, Impact AGF-3 would not occur (Class IV).

Because the Inglewood Oil and Gas Field is an existing field, well stimulation activities would be allowed and there are 7.6 acres of forest land within a 0.25-mile buffer surrounding the field. Impacts associated with stimulation activities for the Inglewood Oil and Gas Field for Alternative 2 would be the same as those described in EIR Section 10.2 (Agriculture and Forestry Resources) for Impacts AGF-4 (Result in the loss of forest land or conversion of forest land to non-forest use) and AGF-5 (Directly or indirectly impair the use of agricultural land or forest land). Implementation of Mitigation Measures AGF-4a, AGF-4b, AGF-4c, AQ-2c, BIO-2a, HAZ-1a, GW-4b, SWR-1a, SWR-2a, SWR-3a, and TR-1a would reduce the majority of potential environmental impacts, including conversion of forest land to a non-forest use, to a less than significant level through resource protection measures and compensation (Class II).

#### 12.3.2.3.2    *Sespe Oil and Gas Field*

Because the Sespe Oil and Gas Field is an existing field, well stimulation activities would be allowed. It is expected the level of drilling and stimulation would be similar or slightly greater than what would occur under the project, because other oil and gas areas that require well stimulation for production would no longer be available to developers. Therefore, the Alternative 2 would not reduce impacts on agricultural and forestry resources within the Sespe Oil and Gas Field. There would be impacts related to construction of new well pads and associated facilities for projects dependent on well stimulation treatments. There would also be potential impacts on agricultural water quality or water supplies. See EIR Section 11.2 (Agriculture and Forestry Resources) for a detailed discussion.

#### 12.3.2.4    Impact Significance Summary

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts are the result of intensified drilling rather than well stimulation, the mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.3    Air Quality

### 12.3.3.1    Introduction

This section provides an evaluation of the potential impacts to air quality associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.3 (Air Quality) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.3 (Air Quality). For the purposes of this analysis please refer to EIR Sections 10.3.2 and 11.3.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.3.3 and 11.3.3 for a description of the affected environment for air quality (as applicable at either a study region or field-specific scale), and EIR Section 10.3.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.3.2    Programmatic Level Analysis of Impacts and Mitigation Measures

| Impact AQ-1     Conflict with or obstruct implementation of an applicable air quality plan |
| --- |

This alternative would restrict future oil and gas activity by halting well stimulation activities except for within existing oil and gas fields. This would avoid the emissions during well stimulation treatments that could otherwise occur outside of existing fields, and it would also lead to a decrease in California oil production. This could lead to fewer indirect impacts of new conventional wells and less well abandonment than Alternative 1, as existing fields could use well stimulation treatments.

The decrease in California production is not quantifiable (EIR Section 8.3.2). The replacement supply would increase the activity of tanker ships delivering foreign oil to California via ports and marine terminals in Los Angeles, Long Beach, and the San Francisco Bay Area, and it would increase the activity of rail trains hauling crude oil primarily from North Dakota and Canada. In-state emissions from oil and gas production would could occur at lower levels; however, these emissions would be offset by increasing levels of emissions from tanker ships and locomotives delivering crude to California and from terminal facilities necessary to offload and handle the imports. The resulting levels of emissions from tanker ships, locomotives, and terminal facilities in Alternative 2 would remain at levels potentially inconsistent with the forecasts of air quality plans, as with the project, resulting in a potential conflict with local air quality plans. Each local air district, especially SCAQMD and BAAQMD, would need to assess the potential growth in activity and emissions from ocean-going vessels and trains to ensure that these mobile sources are accurately reflected in inventories.

Mitigation identified for the project would apply to well stimulation treatments within existing fields, and comparable mitigation would also need to be developed or adapted for the increased emissions marine vessels and trains that import oil and gas and for new facilities to deliver imports. The mobile sources and facilities that handle imports fall under the jurisdiction of the ARB, local air districts, and counties and cities with land use authority, and these agencies would need to identify any necessary mitigation. Because DOGGR cannot require local air districts to update planning inventories or establish specific rules for sources related to oil and gas importation, this impact would be a Class I: Significant and Unavoidable Impact.

Alternative 2 is worse than the project for Air Quality impacts. Increased levels of emissions would occur from tanker ships and locomotives delivering crude to California and from terminal facilities necessary to offload and handle the imports (Class I). Fewer indirect impacts would be associated with new conventional wells and abandonment activities than in Alternative 1.

**MM AQ-1a**     **Improve Air Quality Planning Inventories and Local Control Measures.** (Full text in EIR Section 10.3.5.)

**MM AQ-1b**     **Improve the Methodologies and Emission Factors Used in Inventory Development.** (Full text in EIR Section 10.3.5.)

| | |
|---|---|
| **Impact AQ-2** | **Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation** |

The increased levels of criteria air pollutant emissions caused by tanker ships, rail transport, and terminals for offloading crude may exceed general mass-based emission thresholds of a local air district. Mitigation regarding well stimulation treatments would be applicable within existing fields, and comparable mitigation would also need to be developed or adapted for mobile sources and facilities that import oil and gas to reduce emissions from marine and rail terminals. The mobile sources and facilities that handle imports fall under the jurisdiction of the ARB, local air districts, and counties and cities with land use authority, and these agencies would need to identify any necessary mitigation. Because DOGGR cannot be certain that the degree of mitigation would reduce emissions to levels that would not exceed local air district thresholds, this impact would be a Class I: Significant and Unavoidable Impact.

**MM AQ-2a**     **Reduce Hydrocarbon Emissions from Well Stimulation Treatments.** (Full text in EIR Section 10.3.5.)

**MM AQ-2b**     **Reduce Emissions from Portable Equipment and Mobile Sources.** (Full text in EIR Section 10.3.5.)

**MM AQ-2c**     **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

| | |
|---|---|
| **Impact AQ-3** | **Expose sensitive receptors to substantial pollutant concentrations** |

Emissions from marine and rail terminals would have the potential to expose sensitive receptors to substantial pollutant concentrations depending on site-specific conditions. Mitigation identified for well stimulation treatments would be applicable, and comparable mitigation would also need to be developed or adapted for mobile sources and facilities that import oil and gas to reduce the levels of TACs from marine and rail terminals. Because DOGGR cannot be certain that feasible mitigation would need to subject the sources to sufficient controls so that activities would not expose sensitive receptors to substantial pollutant concentrations. However, because there is no way of knowing how marine and rail terminals would implement the mitigation, this impact would remain Class I: Significant and Unavoidable.

**MM AQ-3a**     **Comply with Local Air District Protocols Relating to the Preparation of** ~~**Prepare a**~~ **Health Risk Assessment and Implement Emission Controls.** (Full text in EIR Section 10.3.5.)

**MM AQ-3b**     **Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility.** (Full text in EIR Section 10.3.5.)

| Impact AQ-4 | Create objectionable odors affecting a substantial number of people |
|---|---|

Emissions from marine and rail terminals would have the potential to create objectionable odors depending on site-specific conditions. Mitigation identified for well stimulation treatments would be applicable, and comparable mitigation would also need to be developed or adapted for mobile sources and facilities that important oil and gas to reduce potential odor impacts from marine and rail terminals. Because site-specific conditions may result in occasionally unavoidable odor annoyances and universal implementation of odor minimization strategies would not be certain, this impact would be a Class I: Significant and Unavoidable Impact.

**MM AQ-4a**      **Prepare and Implement an Odor Minimization Plan.** (Full text in EIR Section 10.3.5.)

**MM AQ-4b**      **Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility.** (Full text in EIR Section 10.3.5.)

### 12.3.3.3     Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 2, these existing fields would be subject to the same potential impacts and mitigation measures as described for the project (EIR Section 11.3.5). Emissions associated with existing well stimulation treatments at the Wilmington and Sespe would occur at a similar or slightly reduced level and would be within the level of activity assumed by the air quality plan. New well stimulation treatments at the Inglewood Oil and Gas Field would be subject to the same potential air quality impacts and would require the same mitigation measures as described for the project (EIR Section 11.3.5). Because each new well stimulation treatment operation creates "new" emissions, which could be potentially significant, mitigation would be necessary. Although Impact AQ-1 would be a Class III: Less Than Significant Impact, the remaining air quality impacts would occur as shown in EIR Section 10.3.5 (Impacts Common to All Study Regions). Mitigation measures identified for Impact AQ-2, Impact AQ-3, and Impact AQ-4 would be applicable within each field, and the resulting impacts after implementing mitigation would be significant and unavoidable (Class I).

### 12.3.3.4     Impact Significance Summary

Alternative 2 is worse than the project for Air Quality impacts. Although some emissions related to well stimulation treatments would be avoided outside of existing fields, emission increases would occur due to crude transport and offloading. Each of the air quality impacts due to well stimulation treatments would be as described for the project, although new areas would limited. Additional emission increases would occur due to crude importation or an increase in the intensity of operations in fields to maintain production levels. Emissions associated with these indirect effects would cause air quality impacts described above.

## 12.3.4     Biological Resources: Terrestrial Environment

### 12.3.4.1     Introduction

This section provides an evaluation of the potential impacts to terrestrial biological resources associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.4 (Biological Resources: Terrestrial Environment) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.4 (Biological Resources–Terrestrial Environment). For the purposes of this analysis please refer to EIR Sections 10.4.2 and 11.4.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.4.3 and 11.4.3 for a description of the affected

environment for terrestrial biological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.4.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, compared to the project, there would be the potential for an increase in oil and gas development and associated well stimulation in biologically sensitive areas, slightly greater habitat loss without setbacks from perennial surface water, an increase in water usage that could affect fish and wildlife habitat (due to less water recycling), and an increase in the potential for contamination of water supplies that could affect biological resources.~~

### 12.3.4.2    Programmatic Level Analysis of the Project

Under Alternative 2, direct impacts within existing oil and gas fields would be the same as under the project. Indirect impacts would be similar to, but less than, indirect impacts under Alternative 1. Impact criteria and mitigation measures for Alternative 2 are the same as those listed in EIR Section 12.2.4 for Alternative 1.

Special-status biological resources may be found within existing oil and gas fields, but tend to be more abundant elsewhere. There is a potential for adverse impacts from oil and gas production both within and outside of existing fields, even without well stimulation treatments. Most of the potential impacts to terrestrial biological resources result from land use alterations and other surface impacts of oil and gas production. These impacts may result from well siting, drilling, and operation, regardless whether well stimulation treatments are applied. Depending on specific locations of future well stimulation activities within or outside existing oil and gas fields, the potential impacts to biological resources may be significant and unavoidable. Depending on specific locations of future well stimulation activities, even with these activities located on consolidated well pads, the potential impacts to biological resources may range from Class I (significant and unavoidable) to Class III (less than significant). Due to the unknown locations of future well stimulation activities, this analysis presumes a "reasonable worst case" level of statewide impacts from well stimulation, which generally are Class I or Class II. However, Alternative 2 would substantially reduce the expected overall impacts of well stimulation activities statewide by limiting those activities to existing oil and gas fields. Future well stimulation would not occur outside the existing fields; thus the overall direct effects to biological resources would more limited than under the project.

Under Alternative 2, both direct and indirect impacts to biological resources may be significant and unavoidable (Class I). This would apply to all the biological resources impact criteria BIOT-1 through BIOT-6 (addressing impacts to plants, fish, and wildlife and their habitats and natural communities) and BIOT-10 (greenhouse gas effects and consequent impacts to biological resources) below. In contrast, Impacts BIOT-8 and BIOT-9 (addressing conflicts with conservation policies and planning) are Class II impacts under this alternative (and under the project). Where the projects causing indirect effects do not require well stimulation treatment permits, similar measures would have to be imposed on other types of project approvals.

Mitigation Measures BIOT-1a through BIOT-9a would reduce these impacts, but some impacts may remain significant even after mitigation. <u>Mitigation Measures GW-1a, GW-1b, GW-4a, GW-4b, SWR-1a, SWR-2a and SWR-3a</u> ~~Additional mitigation measures~~ or other conditions may be required under other regulatory programs including but not limited to CESA, ESA, state and federal regulation of waters of the State and waters of the U.S.

### 12.3.4.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 2, well stimulation treatments within existing oil and gas fields, including the Wilmington, Inglewood, and Sespe fields would be permitted, subject to DOGGR regulation. The impacts and mitigation measures for the Wilmington, Inglewood, and Sespe fields would be the same as described in EIR Section 11.4. Several impacts that would remain Class I for the presumed "reasonable worst case." Potential "reasonable worst-case" impacts to biological resources would be Class I for Impacts BIOT-1 through BIOT-6 and BIOT-7 (Sespe field only); Class II for Impacts BIOT-8 and BIOT-9; and Class III for Impacts BIOT-7 (for the Wilmington and Inglewood fields) and BIOT-10 (as they would be under the project). The indirect impacts described in Alternative 1 would be reduced under Alternative 2. Impacts would be reduced by Mitigation Measures BIOT-1a through BIOT-9a. Additional mitigation measures or other conditions may be required under other regulatory programs.

### 12.3.4.4    Impact Significance Summary

Alternative 2 would reduce the potential direct impacts to terrestrial biological resources in all study regions outside of existing oil and gas fields compared with the project. Within existing oil and gas fields, impacts would be essentially the same as those of the project. Under Alternative 2 there may be some indirect impacts associated with either existing oil and gas field abandonment or intensified well drilling and production that would be considered significant and unavoidable. Programmatic Impacts may still be significant even with the implementation of recommended mitigation (Class I). As with Alternative 1, some impacts to the Inglewood Oil and Gas Field and the Sespe Oil and Gas Field would also be Class I. Some Impacts to the Wilmington Oil and Gas Field would be Class II.

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts are the result of intensified drilling rather than well stimulation, the mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.5    Biological Resources: Coastal and Marine Environment

### 12.3.5.1    Introduction

This section provides an evaluation of the potential impacts to marine biological resources associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.5 (Biological Resources: Coastal and Marine Environment). For the purposes of this analysis please refer to EIR Sections 10.5.2 and 11.5.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.5.3 and 11.5.3 for a description of the affected environment for marine biological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.5.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, well stimulation activities would potentially be allowed in Marine Protected Areas, as well as closer to waterways, which would increase the potential for spills to enter waterways and impact water quality and associated marine biological resources.~~

### 12.3.5.2    Programmatic Level Analysis of Impacts and Mitigation Measures

Under Alternative 2, there are potential impacts to coastal and marine biological resources could occur due to accidental spill or well stimulation activities, but such impacts would be limited to existing oil and gas boundaries.

Offshore well stimulation activities in Study Region 1 are mainly from the THUMS Islands and offshore platforms. Horizontal directional drilling (HDD) activities associated with well stimulation could affect some marine resources within the sediment, such as polycheate worms, by crushing them during drilling operations, but these species are high in abundance and widespread. In addition, there would be an increase in barge trips to transport hydraulic fracturing equipment to the THUMS Islands, so there could be an increase in the potential for accidental spills from a collision due to increased vessel traffic in the vicinity of the THUMS Islands. However, with the implementation of current regulations (existing Title 14 regulations and the existing State and federal regulations, as described in EIR Section 10.6.2) and DOGGR's proposed permanent regulations (Sections 1782, 1783.1, 1784.1 and 1784.2, 1785 as described in EIR Section 2.2.2), these impacts would be less than significant (Class III). Indirect impacts related to intensification of oil and gas activities without well stimulation would also be Class III, but would be reduced compared with Alternative 1.

### 12.3.5.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Impacts for the Wilmington Oil and Gas Field would be the same as described above for general coastal and marine impacts of Alternative 2.

### 12.3.5.4    Impact Significance Summary

Under Alternative 2, direct impacts would only potentially occur within existing oil and gas fields, compared to Alternative 1 (No Future Well Stimulation Treatments), where no impacts would occur due to no well stimulation activity. The types of indirect impacts described under Alternative 1 would be reduced, but may still occur. Both direct and indirect impacts would be Class III.

## 12.3.6    Coastal Processes and Marine Water Quality

### 12.3.6.1    Introduction

This section provides an evaluation of the potential impacts to coastal processes and marine water quality associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.6 (Coastal Processes and Marine Water Quality). For the purposes of this analysis please refer to EIR Sections 10.6.2 and 11.6.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.6.3 and 11.6.3 for a description of the affected environment for coastal processes and marine water quality (as applicable at either a study region or field-specific scale), and EIR Section 10.6.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, well stimulation activities would potentially be allowed in Marine Protected Areas, as well as closer to waterways, which would increase the potential for spills to enter waterways and impact marine water quality.~~

### 12.3.6.2    Programmatic Level Analysis of the Project

Under the No Future Well Stimulation Treatments Outside Existing Oil and Gas Fields Alternative, direct impacts within existing oil and gas fields would be the same as those of the project. Outside of existing oil and gas fields there may be indirect impacts from intensification of oil and gas drilling that does not use well stimulation and an intensification of impacts due to transportation of imported petroleum by ship.

Under Alternative 2, there is no risk of impacts from well stimulation activities outside of existing fields. But hydrocarbon spills could still occur with indirect impacts of additional conventional wells. ~~Tsunami risks resulting from intensified conventional wells would also accrue.~~ Impacts are the same as for the project.

The impacts addressed for coastal processes and marine water quality are:

■ **Impact CPMWQ-1:** Change marine water chemical composition with respect to known hazardous sub-stances; or the measured water temperature, salinity, conductivity, or turbidity

■ **Impact CPMWQ-2:** Change the velocity or direction of ocean currents

■ **Impact CPMWQ-3:** Change the velocity or direction of coastal and ocean winds

■ **Impact CPMWQ-4:** Change the direction, size, or period of ocean waves

■ **Impact CPMWQ-5:** Increase the risk of tsunamis

Direct and indirect impacts would be roughly similar to those discussed for the project in EIR Section 10.6.5. These impacts were Class II for water quality (Impact CPMWQ-1), and ocean currents (Impact CPMWQ-2), ~~and tsunami risk (Impact CPMWQ-5)~~ with the implementation of recommended mitigation (listed in EIR Section 10.6.5). The potential severity of impacts under Alternative 2 is the same as with the project. However, because Alternative 2 mandates that new projects originate only from existing boundaries, and offshore petroleum fields in Southern California are known to be in a state of produc-tion decline, the implication is that fewer petroleum operations in the future would take place offshore under this alternative. With fewer operations offshore, the likelihood and quantities of impacts to coastal and marine waters would decrease. Therefore, Alternative 2 would have fewer impacts to coastal pro-cesses and marine water quality compared with the project. However, the predicted intensification of non-fracturing projects and of imports would still occur, and therefore it is likely more impacts would occur inland away from the coast.

Like the project, Alternative 2 Impacts related to ocean winds (Impact CPMWQ-3) would be Class III, and impacts related to ocean waves (Impact CPMWQ-4) would be Class IV, as discussed in EIR Section 10.6.5. ~~Impacts related to tsunami risk are difficult to quantify, as explained in EIR Section 10.6.5. Since some offshore operations not involving well stimulation would continue under Alternative 2, the risk of tsunami damage would still be present, and as explained in EIR Section 10.6.5, it would be very difficult to assess or compare this risk numerically. The risk is estimated to be less for Alternative 2 than for the project, but because of the difficulties in trying to quantify this risk, the impact conclusion is the same as for the project.~~

### 12.3.6.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields and well stimulation activities would be allowed at these wells under Alternative 2. It is expected the level of drilling and stimulation would be similar or slightly greater than what would occur under the project. Because other oil and gas areas outside of existing fields that would require well stimulation for production would no longer be

available to developers, there could be an increase in drilling and stimulation in existing fields. As mature fields, the number of new wells under Alternative 2 would not be expected to increase dramatically over existing levels of activity.

Since the Inglewood and Sespe Oil and Gas Fields are inland and well away from the coast, the analysis of the alternative on coastal processes and marine water quality does not apply. Impacts to coastal processes and marine water quality at the Wilmington Oil and Gas Field would be the same as for the project, see EIR Section 11.6.5.

### 12.3.6.4    Impact Significance Summary

Direct impacts from Alternative 1 would be reduced outside of existing oil and gas fields compared with the project. Within existing oil and gas fields, direct impacts would the same as for the project. Indirect impacts triggered by possible intensification of drilling and production activities that do not involve well stimulation outside of existing oil and gas fields, including transportation impacts resulting from intensified imports, would be less than, but similar to, those of Alternative 1.

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts are the result of projects other than well stimulation, the mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.7    Commercial and Recreational Fishing

### 12.3.7.1    Introduction

This section provides an evaluation of the potential impacts to commercial and recreational fishing associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.7 (Commercial and Recreational Fishing). For the purposes of this analysis please refer to EIR Sections 10.7.2 and 11.7.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.7.3 and 11.7.3 for a description of the affected environment for commercial and recreational fishing (as applicable at either a study region or field-specific scale), and EIR Section 10.7.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, well stimulation activities would potentially be allowed in Marine Protected Areas, as well as closer to waterways, which would increase the potential for spills to enter waterways and impact water quality and fisheries.~~

### 12.3.7.2    Programmatic Level Analysis of Impacts and Mitigation Measures

Under Alternative 2, well stimulation actions would continue to be conducted at existing oil and gas facilities, including offshore platforms located in State waters. As described in EIR Section 10.5.5, HDD techniques would be used for well stimulation and some interference with commercial and recreation al fishing could occur. For example, some recreational anglers could be temporarily precluded from shore fishing by the HDD staging location. In addition, because well stimulation at the THUMS Islands would require adding more barge traffic to transport equipment and personnel, the chance of an accidental spill as a result of a vessel collision may be increased. However, safety protocols in the Ports within Study Region 1 are in place to prevent an accidental collision and subsequent spills from occurring. DOGGR's proposed regulations also address these potential impacts (i.e., Sections 1782, 1783.1, 1784.1 and

1784.2, 1785 as described in EIR Section 2.2.2). Therefore, under Alternative 2, no direct significant impacts would occur to commercial or recreational fishing in Study Region 1 (Class III). Indirect impacts related to intensification of oil and gas activities without well stimulation would also be Class III, but would be reduced compared with Alternative 1.

In Study Regions 2 and 3, well stimulation activities could displace recreational anglers from accessing a small portion of shore-based fishing grounds, as well as areas near offshore platforms. The impact of the activities could last hours to days with a temporary and localized effect over a discrete area and the amount of available areas to fish is considerable compared to the small excluded fishing area. Therefore, under Alternative 2, no direct significant impacts would occur to commercial or recreational fishing in Study Region 2 (Class III).

### 12.3.7.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Impacts for the Wilmington Oil and Gas Field would be the same as described above for general recreational and commercial fishing impacts of Alternative 2.

### 12.3.7.4    Impact Significance Summary

Direct and indirect impacts would be Class III.

## 12.3.8    Cultural Resources

### 12.3.8.1    Introduction

This section provides an evaluation of the potential impacts to cultural resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.8 (Cultural Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.8 (Cultural Resources). For the purposes of this analysis please refer to EIR Sections 10.8.2 and 11.8.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.8.3 and 11.8.3 for a description of the affected environment for cultural resources (as applicable at either a study region or field-specific scale), and EIR Section 10.8.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.8.2    Programmatic Level Analysis of the Project

For purposes of this analysis the following impacts are addressed:

■ **Impact CUL-1:** Affect historic-era archaeological and built-environment resources

■ **Impact CUL-2:** Affect prehistoric resources

■ **Impact CUL-3:** Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony

■ **Impact CUL-4:** Affect cultural landscapes

Under Alternative 2 potential surface and subsurface disturbances associated with well stimulation treatments would be limited to existing oil and gas fields and their buffer areas. Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would be expected to reduce these effects, but cannot guarantee that they would be entirely avoided. Where similar impacts would be the result of new drilling activities outside existing fields

rather than well stimulation within existing fields, these measures would have to be adapted to project approvals other than well stimulation treatment permits. The scale of oil and gas development within existing fields, the constraints imposed by other environmental resources, and the possibility that some buried resources would remain unidentified until ground disturbance begins, makes avoidance of all significant effects unlikely. Therefore, these impacts would be considered significant and unavoidable (Class I). It is noted, however, that the geographic extent of these impacts would be substantially lessened in comparison to the project. The number of cultural resources affected by Alternative 2 would likely be fewer than for the project, due to the reduced geographic extent of surface and subsurface disturbances.

~~While the footprint of Alternative 2 is smaller than that of the project in areas that are likely to be sensitive for cultural resources, Alternative 2 does not incorporate the project standards for Resource Protection (see EIR Section 7.5 (Description of the Project, project standards for Resource Protection)) that restrict well stimulation activities from operating near surface water or critical habitats. Thus, it could potentially increase impacts to cultural resources inside of existing oil and gas fields (see Appendix F).~~

### 12.3.8.3    Programmatic Level Analysis of Specific Oil and Gas Fields

While Alternative 2 would likely reduce impacts to cultural resources outside of existing oil and gas fields, this alternative may result in increased development with existing fields. Therefore cultural resources within existing fields may be subject to increased impacts when compared to the project.

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

The cultural resources associated with the Wilmington, Inglewood, and Sespe Oil and Gas Fields are detailed in EIR Section 11.8 (Cultural Resources). Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 11.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would likely reduce these effects to less than significant but cannot guarantee they would be entirely avoided. Therefore, impacts to cultural resources are considered significant and unavoidable (Class I).

### 12.3.8.4    Impact Significance Summary

Alternative 2 would reduce the potential impacts to cultural resources in all study regions because the overall footprint of well stimulation disturbances would be reduced in comparison to the project. Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures) and EIR Section 11.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), or similar measures adapted to approvals other than well stimulation treatment permits, would reduce these effects, but cannot guarantee they would be entirely avoided. Potential impacts are therefore considered significant and unavoidable (Class I).

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.3.9    Paleontological Resources

### 12.3.9.1    Introduction

This section provides an evaluation of the potential impacts to visual resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.9 (Paleontological Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.9 (Paleontological Resources). For the

purposes of this analysis please refer to EIR Sections 10.9.2 and 11.9.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.9.3 and 11.9.3 for a description of the affected environment for paleontological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.9.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.9.2    Programmatic Level Analysis of the Project

The impact criterion applicable to Alternative 2 is:

■ **Impact PALEO-1:** Destroy or disturb surface or near-surface significant paleontological resources

Table 10.9-8 in EIR Section 10.9 provides a summary table of the geologic units in each study region that have the potential to bear significant paleontological resources.

Under Alternative 2, no new ground disturbing would occur in areas of the State that do not already have disturbances associated with oil and gas development. Therefore, the geographic extent of potential impacts to paleontological resources would be substantially lessened in comparison to the project, and the risk of adverse impacts would be correspondingly reduced. Within existing oil and gas fields, new earth disturbing associated with oil and gas well stimulation treatments would have the potential to impact paleontological resources; however, Alternative 2 reduces the overall amount of ground disturbance that could result in Class II impacts to paleontological resources. Implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9.2 (No Future Well Stimulation Practices Alternative (Alternative 1), programmatic level analysis for paleontological resources) and detailed in EIR Section 10.9.5 would be expected to reduce Impact PALEO-1 to less than significant (Class II) because the mitigation measures would allow for the recovery, preparation, analysis, and curation of the paleontological resources that may be made available for future scientific studies, which may result in important taphonomic, taxonomic, phylogenetic, paleoecologic, stratigraphic, or biochronological discovery. Where similar impacts would be the result of new drilling activities either inside or outside existing fields rather than well stimulation within existing fields, these measures would have to be adapted to project approvals other than well stimulation treatment permits.

### 12.3.9.3    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington and Sespe Oil and Gas Fields***

Paleontological resources associated with the Wilmington and Sespe Oil and Gas Fields are summarized in EIR Section 12.2.9.2 (No Future Well Stimulation Treatments Alternative, Paleontological Resources). Portions of both fields have been determined to have a paleontological resource potential (i.e., sensitivity) ranging from low to high, and the likelihood of impacting scientifically significant vertebrate fossils is therefore high. However, with implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9.2 (No Future Well Stimulation Practices Alternative (Alternative 1)) and detailed in EIR Section 10.9.5, impacts would be less than significant (Class II).

***Inglewood Oil and Gas Field***

Much of the Inglewood Field is underlain at depth by geologic units with a proven potential to yield significant paleontological resources, and the likelihood to encounter significant fossils at relatively shallow depth as a result of Alternative 2 would be low to high, contingent on the location of ground disturbing activities. Under Alternative 2, future well stimulation treatments within the field's boundaries and its buffer areas would be continue to be allowed and there would be a continued risk of adverse impacts.

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 613 of 836   Page ID #:11339

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

With application of Mitigation Measures PALEO-1a through PALEO-1h, impacts would be less than significant (Class II).

### 12.3.9.4    Impact Significance Summary

The No Future Well Stimulation Practices Outside of Existing Oil and Gas Field Boundaries Alternative would reduce the potential impacts to paleontological resources in all study regions because the overall footprint of well stimulation earth disturbances would be reduced compared to the project. Any new ground disturbances related to future oil and gas well stimulation treatments that would result in adverse impacts to paleontological resources in existing oil and gas fields would be less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h, as detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures). For similar impacts occurring either outside or inside existing fields due to new drilling activities, similar measures would have to be adapted to approvals other than well stimulation treatment permits.

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.3.10    Environmental Justice

### 12.3.10.1    Introduction

This section provides an evaluation of the potential impacts to environmental justice associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.10 (Environmental Justice) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.10 (Environmental Justice). For the purposes of this analysis please refer to EIR Sections 10.10.2 and 11.10.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.10.3 and 11.10.3 for a description of the affected environment for environmental justice (as applicable at either a study region or field-specific scale), and EIR Section 10.10.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.10.2    Programmatic Level Analysis of the Project

Alternative 2 would prohibit well stimulation in areas outside of existing fields and a buffer area immediately around them. This would eliminate possible environmental justice impacts related to well stimulation impacts in areas with minority or low-income populations of concern are located in areas outside of existing fields. However, well stimulation treatments would continue to be allowed within existing oil and gas fields. Therefore, the potential would exist for impacts from well stimulations to disproportionately affect minority or low-income populations living in or adjacent to existing fields. This would be similar to the project.

At existing fields, the project would not introduce new types of environmental impacts not already occurring from current well drilling, extraction, and stimulation treatments. However, Alternative 2 would concentrate and increase the number of wells stimulated within existing oil fields that may contain a disproportionate number of minority or low-income populations living adjacent.

Should a disproportionate amount of well stimulation activities occur adjacent to minority or low-income populations and if these activities result in significant environmental impacts, environmental justice impacts could be significant and unavoidable. The likelihood of this occurring is unknown at this time. Therefore, the potential for environmental justice impacts from well stimulation occurring within the

field remains, and Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) is proposed for Alternative 2. The implementation of Mitigation Measure EJ-1a would allow DOGGR and/or the local jurisdiction to track the locations of well stimulation applications and identify whether there are significant impacts and whether these are disproportionately falling on populations of concern.

**MM EJ-1a      Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments.** (Full text in EIR Section 10.10.5.)

Limiting well stimulation to existing fields may result in less oil and gas being produced in-state, as existing reserves dwindle. To make up for potential production foregone by not conducting well stimulation, some existing fields could increase their amount of conventional drilling and production, and additional oil and gas imports from out of state would occur. Field abandonment would not adversely affect populations of concern. Increasing the density of wells in an existing field and increasing enhanced recovery activities could increase impacts to nearby populations. However, the increased level of activity would not be expected to be substantial, because wells in existing fields typically are already spaced to effectively recover reserves and new wells would be expected to be located on or between existing pads.

Increased ship, rail, and truck traffic hauling imported oil and gas to refineries would increase traffic through communities located on transportation corridors. In particular, the increased rail traffic would increase use of rail corridors between the source fields and California refineries. There are potentially significant indirect impacts associated with transport of oil by rail. Communities along these may be disproportionately comprised of minority and low-income populations. It is likely that increased rail imports of oil would increase the risk of accidents and leaks occurring in these communities. This would be a significant impact and no mitigation is identified that would make it less than significant. This is a significant new environmental justice impact when compared to the project. Unlike the project, mitigation could not be included to avoid siting of ship, rail, and truck traffic hauling imported oil and gas to refineries. These refinery facilities and transportation infrastructure are already in place and thus cannot be sited differently or in ways to avoid disproportionate impacts to minority or low-income. DOGGR would have no authority over transportation corridors and what is shipped on them or by what means.

### 12.3.10.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 2, well stimulation would be allowed in Wilmington, Inglewood, and Sespe Oil and Gas Fields. Because the location of all future well stimulation is not known, the potential for environmental justice impacts from well stimulation occurring within the field remains, and Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) would apply. Implementation of this measure, in conjunction with other mitigation measures identified in this EIR, would reduce the environmental justice impact if there is any.

### 12.3.10.4   Impact Significance Summary

Alternative 2 would eliminate only any possible environmental justice impacts related to siting new oil and gas fields in areas outside of existing fields. Environmental justice impacts could occur at and in the vicinity of existing fields and could be significant. However, implementation Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) would apply, providing DOGGR a means to collect data and assess the environmental justice implications of well stimulation projects. However, in response to prohibiting well stimulation, oil imports by rail are likely to increase substantially, creating an adverse impact in communities through which rail lines carrying oil would pass. Populations living in close proximity to rail lines may be disproportionately minority or

low income. This would be a significant impact and no mitigation is identified that would make it less than significant.

## 12.3.11   Geology, Soils and Mineral Resources

### 12.3.11.1   Introduction

This section provides an evaluation of the potential impacts to geology, soils and mineral resources associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.11 (Geology, Soils and Mineral Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.11 (Geology, Soils and Mineral Resources). For the purposes of this analysis please refer to EIR Sections 10.11.2 and 11.11.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.11.3 and 11.11.3 for a description of the affected environment for geology, soils and mineral resources (as applicable at either a study region or field-specific scale), and EIR Section 10.11.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.11.2   Programmatic Level Analysis of the Project

Alternative 2 would prohibit all future well stimulation activities outside of existing oil and gas boundaries. This alternative would require new legislation to revise PRC Sections 3106(b) and 3160(b), which currently authorize well stimulation treatments without limiting the activity to existing fields. The new legislation would need to specify that all current or future well stimulation treatments outside of existing oil and gas boundaries are not allowable.

In Study Region 1, well stimulation treatments would likely only occur at existing oil fields, so there would be no loss of production in Study Region 1. In Study Regions 2 and 4, a portion of the well stimulation would occur within existing oil and gas fields; however, it is possible that some new wells outside of existing fields would be prohibited from using well stimulation. There would likely be some loss of oil and gas reserves due to implementation of this alternative. This could cause indirect effects, including abandonment of existing oil and gas fields or otherwise an increase in the intensity of an existing oil and gas field's production. This alternative could also cause an increase in activities associated with the importation of oil and gas products. However, because well stimulation would still be allowable within existing oil and gas fields, potential lost future production would not be anticipated to be as great as under the No Future Well Stimulation Treatments Alternative (Alternative 1).

| Impact GEO-1 | Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure |
| --- | --- |

Under this alternative, direct impacts associated with well stimulation outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures), no impact would occur (Class IV). While the indirect effects caused by this alternative would be reduced, there would still be a potential abandonment of oil and gas fields, an increase in the intensity of an existing oil and gas field production, or an increase in the importation of oil and gas. An increase in the intensity of an existing oil and gas field production or an increase in activities associated with the importation of oil and gas products could require new infrastructure and could result in impacts similar to those described in EIR Section 10.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures) because existing oil and gas field production areas are crossed by active faults and near seismically active areas. Infrastructure required for

the import of oil and gas would similarly be required to cross areas that are seismically active given the large number of active faults in California, described in EIR Section 10.11.3 (Geology, Soils, and Mineral Resources, Affected Environment). See EIR Figures 10.11-4, 10.11-16, and 10.11-22 for the regional faults and 10.21-2 for the location of Class I rail lines and rail terminals. Standard regulations and Mitigation Measures GEO-1a, GEO-1b, and GEO-1f provided in EIR Section 10.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures) would reduce this impact to less than significant (Class II). Where indirect impacts are the result of projects not involving well stimulation treatment, these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits. Rupture of a known fault or seismically induced groundshaking could also result in oil or natural gas spills or upsets, addressed in EIR Section 12.3.21 (Risk of Upset/Public and Worker Safety).

Under this alternative, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures). Impact GEO-1 would be less than significant with implementation of Mitigation Measures GEO-1a through GEO-1f (Class II).

**MM GEO-1a**      **Avoid Active Fault~~s Zones~~s if Necessary.** (Full text in EIR Section 10.11.5.)

**MM GEO-1b**      **Implement an Appropriate Setback if Necessary.** (Full text in EIR Section 10.11.5.)

**MM GEO-1e~~f~~**      **Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan.** (Full text in EIR Section 10.11.5.)

---

**Impact GEO-2      Result in substantial soil erosion or the loss of topsoil**

---

Under this alternative, direct impacts associated with well stimulation outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures), no impact would occur (Class IV). While the indirect effects caused by this alternative would be reduced, there would still be a potential abandonment of oil and gas fields, an increase in the intensity of an existing oil and gas field production, or an increase in the importation of oil and gas. The indirect effects are also described in EIR Section 12.2.11.2 and would result in less than significant impacts (Class III).

Under this alternative, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures). Because of the existing requirements of the NPDES Stormwater Program, the impact would be less than significant for any construction sites one acre or larger. However, where sites are smaller than one acre, erosion or loss of topsoil could still occur. Mitigation Measure SWR-1a (Require Stormwater Pollution Prevention Plan) would reduce the effects to less than significant in such instances (Class II).

**MM SWR-1a      Require Stormwater Pollution Prevention Plan.** (Full text in EIR Section 10.11.5.)

---

**Impact GEO-3      Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse**

---

Under this alternative, direct impacts associated with well stimulation outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures), no impact would occur (Class IV). While the indirect effects caused by this alternative would be reduced, there would still be a potential abandonment of oil and gas fields, an increase in the intensity of an existing oil and gas field production, or an increase in

the importation of oil and gas. The indirect effects are also described in EIR Section 12.2.11.2 and would result in less than significant impacts with mitigation (Class II).

Under this alternatives, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures). The impact would be less than significant with implementation of Mitigation Measure GEO-3a (Class II).

**MM GEO-3a**     **Prepare Geotechnical Report if Necessary.** (Full text in EIR Section 10.11.5.)

| Impact GEO-4   Be located on expansive soil creating substantial risks to life or property |
|---|

Under this alternative, direct impacts associated with well stimulation outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures), no impact would occur (Class IV). While the indirect effects caused by this alternative would be reduced, there would still be a potential abandonment of oil and gas fields, an increase in the intensity of an existing oil and gas field production, or an increase in the importation of oil and gas. The indirect effects are also described in EIR Section 12.2.11.2 and would result in less than significant impacts (Class III).

Under this alternatives, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures). The impact would be less than significant (Class III).

| Impact GEO-5   Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems |
|---|

Neither a moratorium on well stimulation activities, including the indirect effects, nor a well stimulation program would allow or result in the construction of septic tanks or other non-portable waste disposal systems. Therefore, the alternative would have no impact on soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems (Class IV, No Impact).

| Impact GEO-6   Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan |
|---|

Under this alternative, direct impacts outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures). There would be no direct impacts to known non-fuel minerals (Class IV). However, direct impacts to oil and gas resources would result in a substantial loss resulting in a significant and unmitigable impact (Class I).

While the indirect effects caused by this alternative would be reduced, there would still be a potential abandonment of oil and gas fields, an increase in the intensity of an existing oil and gas field production, or an increase in the importation of oil and gas. The indirect effects are also described in EIR Section 12.2.11.2 and would result in less than significant impacts (Class III).

Under this alternative, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.11.5 (Geology Soils, and Mineral Resources, Impact Analysis and Mitigation Measures). The impact would be less than significant (Class III).

---

**Impact GEO-7    Cause an induced seismic event including ground shaking and ground failure**

---

Under this alternative, direct impacts outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures), no impact would occur (Class IV). While the indirect effects caused by this alternative would be reduced, there would still be a potential abandonment of oil and gas fields, an increase in the intensity of an existing oil and gas field production, or an increase in the importation of oil and gas. An increase in the intensity of an existing oil and gas field production could result in an induced seismic event due to an increase in fluid injection for disposal of wastewater. However, injection wells are regulated by DOGGR and the main features of DOGGR's Underground Injection Control program include permitting, inspection, enforcement, mechanical integrity testing, plugging and abandonment oversight, data management, and public outreach. Because the underground injection wells are already being used for oil and gas production and are already regulated by DOGGR, the risk of an induced seismic event due to the increase in intensity of existing oil and gas field production is considered adverse but less than significant (Class III).

Under this alternative, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.11.5 (Geology Soils, and Mineral Resources, Impact Analysis and Mitigation Measures). The impact would be less than significant (Class III).

## 12.3.11.3   Programmatic Level Analysis of Specific Oil and Gas Fields

For specific oil and gas fields, Impacts GEO-1 through GEO-7 under Alternative 2 are the same as those described in EIR Section 11.11 (Geology, Soils, and Mineral Resources).

### Wilmington Oil and Gas Field

Because the Wilmington Oil and Gas Field is an existing field, well stimulation activities would be allowed. Therefore impacts associated with stimulation activities for the Wilmington Oil and Gas Field for Alternative 2 would be the same as those described in EIR Section 11.11.5.1 (Geology Soils, and Mineral Resources, Impact Analysis and Mitigation Measures: Study Region 1 Wilmington Oil and Gas Field).

### Inglewood Oil and Gas Field

Because the Inglewood Oil and Gas Field is an existing field, well stimulation activities would be allowed. Therefore impacts associated with stimulation activities for the Inglewood Oil and Gas Field for Alternative 2 would be the same as those described in EIR Section 11.11.5.2 (Geology Soils, and Mineral Resources, Impact Analysis and Mitigation Measures: Study Region 1: Inglewood Oil and Gas Field).

### Sespe Oil and Gas Field

Because the Sespe Oil and Gas Field is an existing field, well stimulation activities would be allowed. Therefore impacts associated with stimulation activities for the Sespe Oil and Gas Field for Alternative 2 would be the same as those described in EIR Section 11.11.5.3 (Geology Soils, and Mineral Resources, Impact Analysis and Mitigation Measures: Study Region 2: Sespe Oil and Gas Field).

## 12.3.11.4   Impact Significance Summary

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where such measures would be imposed on projects that do not involve well stimulation treatment, the measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.12  Greenhouse Gas Emissions

### 12.3.12.1  Introduction

This section provides an evaluation of the potential impacts to greenhouse gas emissions associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.12 (Greenhouse Gas Emissions) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.12 (Greenhouse Gas Emissions). For the purposes of this analysis please refer to EIR Sections 10.12.2 and 11.12.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.12.3 and 11.12.3 for a description of the affected environment for greenhouse gas emissions (as applicable at either a study region or field-specific scale), and EIR Section 10.12.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.12.2  Programmatic Level Analysis of Impacts and Mitigation Measures

| Impact GHG-1 | Generate greenhouse gas emissions that may have a significant impact on the environment |
|---|---|

This alternative would restrict future oil and gas activity by halting well stimulation activities except for within existing oil and gas fields. This could lead to fewer indirect impacts of new conventional wells and less well abandonment than Alternative 1, as existing fields could use well stimulation treatments. To the extent that this alternative would cause an increase in activity to produce or transport a replacement supply, the emissions of GHG that occur as a result of oil and gas extraction or transport for the replacement supply would be likely to occur outside of California. This alternative could increase GHG from sources that are not covered by California's regulatory setting and outside of the potential control of DOGGR to feasibly mitigate, resulting in an overall net increase in GHG emissions compared with both existing conditions and the project. As a result of increasing GHG emissions from sources beyond California's control, no feasible mitigation would be available for GHG emissions due to the replacement supply. This alternative would increase GHG emissions from sources that could not be prevented, reduced, offset, or otherwise mitigated by DOGGR or another California agency tasked with reducing GHG emissions. The GHG emissions increase would cause a potentially significant impact on the environment, and because a portion of these emissions would occur beyond the control of recommended mitigation, Impact GHG-1 would be Class I: Significant and Unavoidable. Mitigation identified for well stimulation treatments would apply, as recommended for the project (EIR Section 10.12.5). For well stimulation treatments occurring under this alternative, the following mitigation measures apply.

**MM GHG-1a**   **Prevent Methane Emissions from Associated Gas and Casinghead Gas.** (Full text in EIR Section 10.12.5.)

**MM GHG-1b**   **Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies.** (Full text in EIR Section 10.12.5.)

**MM GHG-1c**   **Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide.** (Full text in EIR Section 10.12.5.)

| Impact GHG-2 | Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases |
|---|---|

Because this alternative would cause some future oil and gas production to be lost, California end users of oil and gas would need to rely on a replacement supply. Using a replacement crude supply could

result in an incremental change in life-cycle GHG emissions of California's crude supply, which could be an increase or decrease depending the carbon intensity of the replacement supply. <u>Despite the greater average carbon intensity of crude oil produced in California compared with oil produced in places that would export their oil to California, an increase in imports into California would still result in an overall net increase in GHG emissions compared with both existing conditions and the project.</u> Although all crude produced for use in California is subject to the LCFS, regardless of the location of the supply, out-of-state oil and gas producers create GHG emissions during extraction that are uncovered and not limited by the Cap-and-Trade Program. <u>The Cap-and-Trade Program limits in-state GHG emissions to ensure that the AB 32 goals will be achieved and the statewide emission target of 431 MMTCO2e by 2020 will not be exceeded (ARB, 2007; ARB, 2014b). Producers of the replacement supply of oil and gas under this alternative if outside of California would not be subject to California's statewide GHG cap. Out-of-state oil and gas producers create GHG emissions during extraction that are uncovered and not limited by the Cap-and-Trade Program. These emissions will not be captured by California's cap, but would be in addition to it. As a result, in addition to total statewide emissions of 431 MMTCO2e by 2020 allowed by the Cap-and-Trade Program, this alternative would also increase GHG from out-of-state crude oil recovery and transport activities by some amount less than 4.1 MMTCO2e, depending on the replacement supply. The ARB is directed to take steps to "minimize leakage" in implementing AB 32 regulations [HSC Section 38562(b)(8))], and this alternative would conflict with that requirement by potentially offsetting an in-state reduction of GHG emissions with an increase in GHG emissions outside the state.</u> By increasing these uncovered emissions at sources that are beyond the control of <u>California's regulations and any</u> recommended mitigation, this alternative would conflict with California's programs aimed at reducing GHG, and Impact GHG-2 would be Class I: Significant and Unavoidable. Mitigation identified for well stimulation treatments would apply, as recommended for the project (EIR Section 10.12.5).

**MM AQ-2a**      **Reduce Hydrocarbon Emissions from Well Stimulation Treatments.** (Full text in EIR Section 10.3.5.)

**MM AQ-2b**      **Reduce Emissions from Portable Equipment and Mobile Sources.** (Full text in EIR Section 10.3.5.)

**MM GHG-1a**      **Prevent Methane Emissions from Associated Gas and Casinghead Gas.** (Full text in EIR Section 10.12.5.)

**MM GHG-2a**      **Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program.** (Full text in EIR Section 10.12.5.)

### 12.3.12.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 2, well stimulation treatments would occur in the Wilmington and Sespe fields as expected under the project. Therefore, as described in EIR Section 11.12.5, GHG emissions associated with well stimulation treatments at Wilmington and Sespe would continue, and the extent of Impact GHG-1 is uncertain, ranging from a less than significant impact (Class III) to a significant, unavoidable impact (Class I). New well stimulation treatments at the Inglewood Oil and Gas Field would be subject to the same potential impacts (Class I) and would require the same mitigation measures as described for the project (EIR Section 11.12.5).

### 12.3.12.4   Impact Significance Summary

Alternative 2 is worse than the project for GHG impacts. Indirect impacts from increased oil and gas imports would cause significant and unavoidable GHG emissions from out-of-state oil and gas producers

that could not be prevented, reduced, offset, or otherwise mitigated by DOGGR or another California agency tasked with reducing GHG emissions. Although some emissions related to well stimulation treatments would be avoided, emission increases would occur due to an increase in crude transport and off-loading. Each of the GHG impacts due to well stimulation treatments would be as described for the project. Additional GHG emission increases would occur due to crude importation, including GHG emissions from increased oil and gas production outside of California, or from an increase in the intensity of operations in fields to maintain production levels. Emission increases associated with these indirect effects would cause impacts due to increasing GHG emissions as described above.

## 12.3.13  Hazards and Hazardous Materials

### 12.3.13.1  Introduction

This section provides an evaluation of the potential impacts to hazards and hazardous materials associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.13 (Hazards and Hazardous Materials) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.13 (Hazards and Hazardous Materials). For the purposes of this analysis please refer to EIR Sections 10.13.2 and 11.13.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.13.3 and 11.13.3 for a description of the affected environment for hazards and hazardous materials (as applicable at either a study region or field-specific scale), and EIR Section 10.13.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.13.2  Programmatic Level Analysis of the Project

| Impact HAZ-1    Release hazardous materials into the environment from a spill or leak |
| --- |

Alternative 2 would prohibit well stimulation treatments outside of existing oil and gas fields. This would result in fewer well stimulation treatments because the practice would be prohibited in some regions where fields do not currently exist. Thus, Alternative 2 may result in less exposure of hazardous substances in new geographic areas.

However, impacts would remain potentially significant for well stimulation treatments within existing fields. The impacts and associated mitigation measures for the programmatic level analysis would apply in existing fields under Alternative 2. They would not apply outside of existing fields, as there would be no well stimulation treatments outside of existing fields. As stated in the description of Alternative 2 (EIR Section 8.3.2), well stimulation treatments in Study Region 1 are expected to occur only in existing fields. Accordingly, Alternative 2 is not expected to affect Study Region 1 conditions. In other areas with Monterey Formation (Study Regions 2 through 5) or Monterey Formation plays (Study Regions 2, 3, and 4), the impacts under Alternative 2 would be similar.

As discussed in EIR Section 10.13.5 (Hazards and Hazardous Waste), if a well stimulation fluid release were to occur, it is difficult to anticipate the fate of the released chemicals in the environment because many individual chemical compounds within well stimulation fluids lack sufficient mobility and toxicity information. California drinking water maximum contaminant levels (MCLs) do not exist for many of the chemicals known to be used in hydraulic fracturing. Available data indicate that many hydraulic fracturing chemical compounds are either highly soluble or miscible in water and/or have densities greater than water. Certain constituent mixtures are considered either proprietary or are described only as chemical classes, hindering a more complete understanding of potential transport/fate of some fluid constituents.

In addition, some chemicals may be transformed (degraded) by hydrolysis and, in some cases, degradation ("daughter") products are not known. Daughter products may be more hazardous than the parent chemicals.

Given these conditions, impacts from a spill or release could be significant. Therefore a mitigation measure is proposed.

**MM HAZ-1a** **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ (Full text in EIR Section 10.13.5.)

Mitigation Measure HAZ-1a (as amended) is recommended to be required at any well stimulation occurring at an existing field. Additional discussion of the mitigation measure is found in EIR Section 10.13.5. Because stimulation would not occur outside of existing fields under this alternative, the measure would not apply outside of fields. Where similar impacts would be the result of new drilling activities outside or inside existing fields rather than well stimulation within existing fields, these measures would have to be adapted to project approvals other than well stimulation treatment permits.

Protective measures for prevention of spills or releases of hazardous materials are provided in both existing and proposed regulations. A summary of the key measures in the proposed SB 4 Well Stimulation Treatment Regulations is provided in EIR Section 10.13.5. Collectively, with implementation of MM HAZ-1a~~inclusion of a barrier for all production facilities, regardless of the amount of time they are in place,~~ and ~~with~~ surface water management, and implementation/enforcement of all of the existing and proposed regulations regarding the transport, handling, storage, conveyance, and management of hazardous materials, including the Spill Contingency Plan, which accounts for spills that may occur at pipes, valves, or supply lines, the impact of well stimulation materials on the environment in the event of a release is considered less than significant with mitigation (Class II). The project impacts are also less than significant with mitigation (Class II) but Alternative 2 may have a slight advantage by resulting in less exposure of hazardous substances to new geographic areas.

### 12.3.13.3   Programmatic Level Analysis of Specific Oil and Gas Fields

As summarized in EIR Section 11.13.6 and Table 11.13-1, impacts from hazards and hazardous materials associated with well stimulation treatments were determined to be potentially significant. However, the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. In addition to the mitigation measure in the Programmatic Level Analysis, additional mitigation measures were added for Wilmington, Inglewood, and Sespe Oil and Gas Fields, as summarized in Table 11.13-1. With mitigation, the impact under Alternative 2 would be less than significant (Class II).

### 12.3.13.4   Impact Significance Summary

Based on the programmatic level analysis of the project and the programmatic level analysis of specific oil and gas fields, impacts from Alternative 2 are considered to be the same at all existing oil and gas fields: less than significant with mitigation (Class II).

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where such measures would be imposed on projects that do not involve

well stimulation treatment, the measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.14  Groundwater Resources

### 12.3.14.1  Introduction

This section provides an evaluation of the potential impacts to groundwater resources associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.14 (Groundwater Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.14 (Groundwater Resources). For the purposes of this analysis please refer to EIR Sections 10.14.2 and 11.14.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.14.3 and 11.14.3 for a description of the affected environment for groundwater resources (as applicable at either a study region or field-specific scale), and EIR Section 10.14.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative, which would result in greater potential for use of groundwater with no water recycling standards in place, and less protection of both groundwater resources as well as surface water resources that could recharge groundwater.~~

As summarized in Draft EIR Section 10.14.6, impacts from well stimulation treatments were determined to be potentially significant to groundwater quantity and groundwater quality. Further analysis indicated that with appropriate mitigation measures the significant impacts could be mitigated to a less than significant level. The mitigation measures, which are summarized on Table 10.14-20, focus on preventing exacerbation of groundwater overdraft or subsidence, maintaining existing use of water supply wells, and mitigating possible pathways that might allow well stimulation fluids including gas to reach protected groundwater.

### 12.3.14.2  Programmatic Level Analysis of the Project

Alternative 2 would prohibit well stimulation treatments outside of existing oil and gas fields but would allow them within existing fields. This alternative would result in fewer well stimulation treatments overall, because they would be prohibited in many regions, including the Monterey Formation and Monterey plays located outside of existing oil and gas fields. However, impacts to groundwater quantity and quality would remain potentially significant for well stimulation treatments conducted in existing fields unless mitigated. Stimulation activity in existing fields would have the same impacts as discussed in EIR Section 10.14.5 for the Programmatic Level Analysis of the Project in all study regions. These are briefly summarized below, with proposed mitigation. Except where noted, the full text of the mitigation measures is found in EIR Section 10.14.5 (Groundwater Resources, Impact Analysis and Mitigation Measures).

| Impact GW-1    Cause or contribute to overdraft conditions |
| --- |

The potential exists for water to be taken from groundwater basins for use in well stimulation that could cause or contribute to overdraft conditions at existing oil fields. This would be a significant impact. Two revised mitigation measures would address this impact. With implementation of these revised mitigation measures, Impact GW-1 would be reduced to a less than significant level (Class II).

If the implementation of Alternative 2 leads to field abandonments, or increased importing of oil, these indirect impacts would be expected to have no impact on groundwater (Class IV).

Impact GW-1 is also Class II under the project but the impacted geographic area would be less in Alternative 2.

**MM GW-1a**     **Use Alternative Water Sources <u>to the Extent Feasible.</u>** (Full text in EIR Section 10.14.5.)

**MM GW-1b**     **Minimize Groundwater Impacts**~~Prepare a Third-Party Technical Report to Analyze Overdraft Impacts.~~ (Full text in EIR Section 10.14.5.)

---

| **Impact GW-2** | **Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water** |
|---|---|

Depending on geologic conditions, groundwater pumping could result in land subsidence at existing oil and gas fields. It could also interfere with nearby water wells, including lowering the water level in the well to a point that they no longer function as intended. These would be significant impacts, which would be addressed by the recommended <u>revised</u> mitigation measure below. With implementation of this <u>revised</u> mitigation measure, Impact GW-2 would be reduced to a less than significant level (Class II).

If the implementation of Alternative 2 leads to field abandonments, or increased importing of oil, these indirect impacts would be expected to have no impact on water wells or subsidence (Class IV).

Impact GW-2 is also Class II under the project but the impacted geographic area would be less in Alternative 2.

**MM GW-<u>1b</u>~~2a~~**   **Minimize Groundwater Impacts**~~Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping~~. (Full text in EIR Section 10.14.5.)

---

| **Impact GW-3** | **Adversely impact groundwater quality through surface spills or leaks during well stimulation** |
|---|---|

Well stimulation could result in a spill on the work site or a leak that could allow the stimulation fluids or material to reach the protected groundwater zone under a site. This would occur at existing oil and gas fields and would be a significant impact. The <u>revised</u> mitigation measure proposed in Hazards and Hazardous Waste would address this impact. The full description of this <u>revised</u> mitigation measure is found in <u>Draft</u> EIR Section 10.13.5. With implementation of this mitigation measure, Impact GW-3 would be reduced to a less than significant level (Class II).

If the implementation of Alternative 2 leads to field abandonments, or increased importing of oil, these indirect impacts would be expected to have no impact on protected groundwater (Class IV).

Impact GW-3 is also Class II under the project but the impacted geographic area would be less in Alternative 2.

**MM HAZ-1a**     **<u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u>**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~. (Full text in EIR Section 10.13.5.)

| **Impact GW-4** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals** |

Some wells in existing oil and gas fields have non-existent or ineffective well seals, particularly if they are old or were improperly abandoned. This situation could result in the migration of stimulation fluids including gas through these pathways into protected groundwater. To address this significant impact, three <u>revised</u> mitigation measures are identified. With implementation of these <u>revised</u> mitigation measures, Impact GW-4 would be reduced to a less than significant level (Class II).

If the implementation of Alternative 2 leads to field abandonments, or increased importing of oil, these indirect impacts would be expected to have no impact on existing wells (Class IV).

Impact GW-4 is also Class II under the project but the impacted geographic area would be less in Alternative 2.

**MM GW-4a**    **Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation Treatment.** (Full text in EIR Section 10.14.5.)

**MM GW-4b**    **Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments**~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin.~~ (Full text in EIR Section 10.14.5.)

**MM GW-4c**    **Install Methane Sensors on Wells** ~~in the ADSA~~**Subject to Well Stimulation Treatments.** (Full text in EIR Section 10.14.5.)

| **Impact GW-5** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells** |

Some existing and abandoned wells in oil and gas fields may have damaged, non-existent, or ineffective well seals. This could create pathways for stimulation fluids injected in one well to migrate into protected groundwater by way of the annular space in another well within the zone of influence of the stimulated well. This would be a significant impact. To address this, a <u>revised</u> mitigation measure is proposed. With implementation of this <u>revised</u> mitigation measure, Impact GW-5 would be reduced to a less than significant level (Class II).

If the implementation of Alternative 2 leads to field abandonments, or increased importing of oil, these indirect impacts would be expected to have no impact on existing wells (Class IV).

Impact GW-5 is also Class II under the project but the impacted geographic area would be less in Alternative 2.

**MM GW-5a**    **Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate.** (Full text in EIR Section 10.14.5.)

| **Impact GW-6** | **Improper disposal of flowback in injection wells could potentially impact groundwater quality** |

Class II injection wells are required under the UIC program regulations to have an isolating cement seal above the injection zone as well as a minimum 100-foot seal across the base of the fresh water zone. If injected flowback water migrates to protected groundwater, this would be a significant impact. To address this, a <u>revised</u> mitigation measure is proposed. With implementation of this <u>revised</u> mitigation measure, Impact GW-6 would be reduced to a less than significant level (Class II).

If the implementation of Alternative 2 leads to field abandonments, or increased importing of oil, these indirect impacts would be expected to have no impact on existing wells (Class IV).

In contrast, Impact GW-6 is Class II under the project but the impacted geographic area would be less in Alternative 2.

**MM GW-6a**      **Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater**~~Install a Cement Seal across Protected Groundwater.~~ (Full text in EIR Section 10.14.5.)

| Impact GW-7 | Inability to identify specific impacts to groundwater quality from well stimulation activities |
|---|---|

Many chemicals and compounds can be introduced to groundwater by various pathways. The origin of these materials is difficult to ascertain under many circumstances. Groundwater monitoring may identify a chemical or compound, but would be unable to identify its source. If well stimulation fluids reach protected groundwater, this would be a significant impact. To ensure that stimulation fluids can be more readily distinguished from other compounds that may be naturally occurring or have been introduced into the groundwater, a _revised_ mitigation measure is proposed to address this. With implementation of this _revised_ mitigation measure, Impact GW-~~6~~7 would be reduced to a less than significant level (Class II).

Impact GW-7 is also Class II under the project but the impacted geographic area would be less in Alternative 2.

If the implementation of Alternative 2 leads to field abandonments, or increased importing of oil, these indirect impacts would be expected to have no impact to groundwater (Class IV).

**MM GW-7a**      **Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment.** (Full text in EIR Section 10.14.5.)

### 12.3.14.3   Programmatic Level Analysis of Specific Oil and Gas Fields

As summarized in EIR Section 11.13.6, impacts on groundwater resources associated with well stimulation treatments were determined to be potentially significant. However, the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures for the onshore and offshore Wilmington, Inglewood, and Sespe Oil and Gas Fields are presented in EIR Section 11.14.5 and summarized on Table 11.14-5. With mitigation, the impact under Alternative 2 would be less than significant (Class II).

### 12.3.14.4   Impact Significance Summary

Based on the analysis of the project and the programmatic level analysis of specific oil and gas fields, impacts on groundwater resources from Alternative 2 are considered to be the same at all existing oil and gas fields, less than significant with mitigation (Class II).

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where such measures would be imposed on projects that do not involve well stimulation treatment, the measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.15   Surface Water Resources

### 12.3.15.1   Introduction

This section provides an evaluation of the potential impacts to surface water resources associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.15 (Surface Water Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.15 (Surface Water Resources). For the purposes of this analysis please refer to EIR Sections 10.15.2 and 11.15.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.15.3 and 11.15.3 for a description of the affected environment for surface water resources (as applicable at either a study region or field-specific scale), and EIR Section 10.15.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, there would be a greater potential for use of surface water without water recycling standards in place, as well as an increase in potential impacts to waterbodies and streams without implementation of habitat protection standards or a buffer requirement from perennial waters.~~

As summarized in EIR Section 10.15.6, impacts from well stimulation treatments were determined to be potentially significant to surface water. Further analysis indicated that with appropriate mitigation measures the significant impacts could be mitigated to a less than significant level.

### 12.3.15.2   Programmatic Level Analysis of the Project

Under Alternative 2, hydraulic fracturing and acid well stimulation treatments would occur only within existing oil and gas fields and on lands under federal or tribal management. Impacts to surface water from well stimulation would not occur in areas outside of existing fields because well stimulation itself would not be permitted in those areas. A number of impacts have been identified as significant. These can be mitigated to a less than significant level with implementation of mitigation measures. These impacts and mitigation measures are described below. The impacts are summarized here and discussed in detail in EIR Section 10.15.5. The full text of mitigation measures for surface water impacts is provided in EIR Section 10.15.5 as well.

| | |
|---|---|
| **Impact SWR-1** | **Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality** |

Water quality impacts could be significant if they would introduce pollutants to surface waters sufficient to violate waste discharge requirements outlined in RWQCB regional Basin Plans, damage beneficial uses of surface water, or introduce pollutants into designated impaired water bodies. Projects with land disturbance greater than one acre are required to prepare a Stormwater Pollution Prevention Plan. Because stimulation fluids may contain chemicals and compounds that would have adverse effects on surface water, to reduce the potential impact of a release of stimulation fluids or chemicals that could be mobilized by runoff to reach surface water, three mitigation measures are proposed. These are discussed in detail in EIR Section 10.15.5.

Mitigation Measure SWR-1a would apply to all well stimulation jobs, regardless of the amount of ground disturbed. If a stimulation project is in an area where it would be at risk of flooding, SWR-1b would be required. SWR-1c would prohibit well stimulation in watersheds draining to municipal water supply reservoirs, except with approval of DOGGR and the reservoir's operating agency.

With implementation of these mitigation measures, the Impact SWR-1 would be less than significant (Class II). The project would also result in a Class II impact.

**MM SWR-1a**     **Require Stormwater Pollution Prevention Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-1b**     **Surface Water Protection.** (Full text in EIR Section 10.15.5.)

**MM SWR-1~~b~~c**     **Provide Adequate Flood Protection.** (Full text in EIR Section 10.15.5.)

**MM SWR-1~~c~~d**     **Protect Surface Water Reservoirs.** (Full text in EIR Section 10.15.5.)

| | |
|---|---|
| **Impact SWR-2** | **Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site** |

If a new well is drilled in an existing field for the purposes of well stimulation, and the drilling of the well requires substantially altering existing drainage or the course of a stream or river, the activity could result in a significant impact to surface water. This would be addressed by the adoption of a mitigation measure.

An erosion control plan would identify appropriate erosion and siltation management structures and measures and their long-term inspection, maintenance, and operation. With implementation of this measure, the this impact would be less than significant (Class II). The project would also result in a Class II impact.

**MM SWR-2a**     **Implement Erosion Control Plan.** (Full text in EIR Section 10.15.5.)

| | |
|---|---|
| **Impact SWR-3** | **Substantially diminish surface water quantity** |

Use of surface water in well stimulation could diminish the amount of surface water in waterbodies, including streams and rivers, as well as increase competition for diminishing water supplies. This could be a significant impact. To address this, Mitigation Measure SWR-3a (Ensure Adequate Water Availability) is required.

By adopting a mitigation measure ensuring adequate water availability used for well stimulation to sources where the withdrawal would not adversely affect water supplies or cause the need for new infrastructure, this impact would be reduced to a less than significant level (Class II). The project would also result in a Class II impact.

**MM SWR-3a**     **Ensure Adequate Water Availability.** (Full text in EIR Section 10.15.5.)

| | |
|---|---|
| **Impact SWR-4** | **Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding.** |

There is a potential to increase the rate or volume of surface runoff through clearing and grading for new wells, access roads and other infrastructure. This could lead to flooding of nearby properties down gradient. This could be a significant impact. To address this hazard, a mitigation measure is required.

With Mitigation Measure SWR-1b in place, flood hazard impacts are less than significant (Class II). The project would also result in a Class II impact.

**MM SWR-1~~c~~b**     **Provide Adequate Flood Protection.** (Full text in EIR Section 10.15.5.)

### 12.3.15.3   Programmatic Level Analysis of Specific Oil and Gas Fields

*Wilmington, Inglewood, and Sespe Oil and Gas Fields*

Because the Wilmington, Inglewood, and Sespe Oil and Gas Field is an existing field, well stimulation activities would be allowed. Therefore impacts associated with stimulation activities for these fields for Alternative 2 would be the same as those described in EIR Section 11.11.5.

As discussed in EIR Section 11.15.5 and summarized in EIR Section 11.15.6, impacts to surface water resources associated with well stimulation treatments were determined to be potentially significant. However, the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures for Wilmington, Inglewood, and Sespe Oil and Gas Fields are the same as for the Programmatic Level Analysis. With implementation of these measures, the impact to surface water under Alternative 2 would be less than significant (Class II).

### 12.3.15.4   Impact Significance Summary

Based on the programmatic level analysis of surface water resources, impacts from Alternative 2 are considered to be the same at all existing oil and gas fields, less than significant with mitigation (Class II).

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.16   Land Use and Planning

### 12.3.16.1   Introduction

This section provides an evaluation of the potential impacts to land use and planning associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.16 (Land Use and Planning) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.16 (Land Use and Planning). For the purposes of this analysis please refer to EIR Sections 10.16.2 and 11.16.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.16.3 and 11.16.3 for a description of the affected environment for land use and planning (as applicable at either a study region or field-specific scale), and EIR Section 10.16.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.16.2   Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 2 would prohibit any future stimulation treatments outside of the existing oil and gas field boundaries and their buffer areas. Therefore, the geographic extent of the impacts associated with this alternative would be limited to existing fields and their buffers, substantially less area than under the project.

| Impact LU-1 | Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses |
|---|---|

For Impact LU-1, implementation of Alternative 2 would result in the same type of impacts as discussed under the project for existing and permitted land uses surrounding existing oil and gas fields (see EIR Section 10.16.5 (Land Use and Planning, Impact Analysis and Mitigation Measures)).

Under Alternative 2 potential disruptions related to well stimulation would affect only existing or permitted land uses that are currently in the vicinity of an existing oil or gas field. Therefore, because the project would allow well stimulation statewide, the potential for disruptions would be more widespread under the project in comparison to Alternative 2. However, because some impacts associated with Risk of Upset and Public and Worker Safety cannot be mitigated to a level of less than significant, and these can adversely affect land uses and their functions, these impacts could would be considered to have corresponding significant and unavoidable impact (Class I) for Impact LU-1 as well.

| Impact LU-2 | Physically divide an established community |
|---|---|

For Impact LU-2, the activities associated with Alternative 2 would be limited to existing oil and gas fields and their buffer areas. Although there are existing communities in or in close proximity to some existing fields, impacts from well stimulation treatments would be similar to those for the project~~, with Mitigation Measure LU-2a (Ensure That Established and Planned Communities Are Not Divided) being implemented~~. Therefore, Impact LU-2 is Class II<u>I</u> under both Alternative 2 and the project. The geographic extent of potential impacts to established communities would be substantially less in comparison to the project because future well stimulation activities would be limited to existing oil and gas fields.

| Impact LU-3 | Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect |
|---|---|

For Impact LU-3, the impact under Alternative 2 would be the same for the project because agency coordination required for the project also would be required under Alternative 2. This is spelled out by the proposed permanent regulations, SB 4, and the mitigation measures set forth in this EIR to avoid potential impacts and conflicts with any established, designated, or planned land use areas on federal, State, or locally regulated lands. With this level of coordination and the implementation of the mitigation measures specified in this EIR, impacts related to conflicts with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect would be less than significant with implementation of the mitigation measures contained in the EIR (Class II). Impacts under both the project and Alternative 2 would be Class II, but impacts would be less widespread under the alternative, which would limit stimulation to existing fields.

### 12.3.16.3   Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington and Inglewood Oil and Gas Fields***

For Impact LU-1, the impact discussion provided for the programmatic level analysis in EIR Section 12.3.16.2 also applies to the Wilmington and Inglewood Oil and Gas Fields. Both fields are in urban settings, and well stimulation in these existing fields would be allowed under both the project and Alternative 2. Under the project well stimulation would be allowed and certain significant and unavoidable impacts could occur to some resources (see EIR Section 10.21 (Risk of Upset/Public and Worker Safety)).

In turn, these impacts could have significant and unavoidable impacts on land use by precluding certain uses or diminishing the function of certain land uses. Therefore, the impact to Land Use is considered significant and unavoidable (Class I) for the project and for Alternative 2.

For Impact LU-2, impacts from well stimulation treatments in the Wilmington and Inglewood Oil and Gas Fields would be the same as under the project with application of Mitigation Measure LU-2a.

For Impact LU-3, the impact under Alternative 2 would be the same for the project because agency coordination required for the project also would be required under Alternative 2. This is spelled out by the proposed permanent regulations, SB 4, and the mitigation measures set forth in this EIR to avoid potential conflicts with any established, designated, or planned land uses. With this level of coordination and implementation of the mitigation measures specified in this EIR, impacts related to conflicts with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect would be less than significant with implementation of the mitigation measures contained in the EIR (Class II).

### Sespe Oil and Gas Field

Under Impact LU-1, the activities involved with well stimulation treatment activities could result in the same types of potential disruptions to existing land uses as outlined under the programmatic level analysis contained in EIR Section 12.3.16.2. However, within the Sespe Oil and Gas Field, potential disruptions to existing land uses from well stimulation treatments would be unlikely due to field's the mountainous terrain and isolation. Therefore, this impact would be less than significant (Class III). The Neighbor Notification requirements specified by the proposed permanent regulations would apply, but no further land use mitigation measures would be necessary.

Under Impact LU-2, the Sespe Oil and Gas Field would not physically divide an established community for the same reasons as provided for the Wilmington and Inglewood Oil and Gas Fields, above. No impact would occur (Class IV).

For Impact LU-3, impacts from Alternative 2 would the same as outlined for the Wilmington and Inglewood Oil and Gas Fields. Impacts related to conflicts with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect would be less than significant with implementation of the mitigation measures contained in the EIR (Class II).

## 12.3.16.4   Impact Significance Summary

Implementation of the No Future Well Stimulation Practices Outside of Existing Oil and Gas Field Boundaries Alternative would result in a significant and unavoidable impact (Class I) programmatically as well as for the Inglewood and Wilmington Oil and Gas Fields because not all potentially adverse conditions (such as risk of upset and public and worker safety impacts) that could affect existing land uses can be mitigated to less than significant. The impacts are thus significant and unavoidable (Class I). This impact is considered less than significant (Class III) for the Sespe Oil and Gas Field due to its isolated location. Implementation of Alternative 2 would have no impact (Class IV) on an established community by physically dividing it. Implementation of Alternative 2 would not conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect with implementation of the mitigation measures contained in the EIR (Class II).

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.17  Noise and Vibration

### 12.3.17.1  Introduction

This section provides an evaluation of the potential impacts to noise and vibration associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.17 (Noise and Vibration) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.17 (Noise and Vibration). For the purposes of this analysis please refer to EIR Sections 10.17.2 and 11.17.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.17.3 and 11.17.3 for a description of the affected environment for noise and vibration (as applicable at either a study region or field-specific scale), and EIR Section 10.17.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.17.2  Programmatic Level Analysis of the Project

| Impact NOI-1 | Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels |
|---|---|

Since this alternative includes well stimulation treatments, noise and vibration impacts would occur as described in EIR Section 10.17. Noise mitigation would be required, as with the project. In all regions, Impact NOI-1 within existing fields would be less than significant with mitigation incorporation (Class II), and Impact NOI-2 would be less than significant with mitigation (Class III). Limiting the area of well stimulation reduces the population potentially exposed to noise from well stimulation. Noise impacts outside the buffer areas will be reduced from Class II next to the buffer area to Class IV at further distances. This compares to the project that allows well stimulation in all areas not prohibited by other agreements (Class II).

The prohibition on out-of-field stimulation could cause indirect effects, as described for Alternative 2, including abandoning of some existing marginal oil and gas fields, increasing the intensity of activities in other existing oil and gas fields and increase the importation of oil and gas products from out of state. However, because well stimulation would still be allowable within existing oil and gas fields, potential lost future production would not be anticipated to be as great as under the project. As a consequence, the indirect effects would largely be diminished under Alternative 2. Impact NOI-1 from increasing intensity of activities would be less than significant with mitigation incorporated (Class II).

**MM NOI-1a    Control Noise Levels near Sensitive Land Uses.** (Full text in EIR Section 10.17.5.)

As with Alternative 1, indirect noise and vibration may occur from increase crude transport and offloading or an increase in the intensity of operations in fields to maintain production levels. The agency with jurisdiction over these activities would ensure they abide by existing regulations, reducing the effects and impacts would vary from no impact (Class IV) to less than significant with mitigation (Class II) as described under Alternative 1.

| Impact NOI-2    Cause exposure of persons to or generation of excessive groundborne vibration |
| --- |

Since vibration is evaluated on a maximum value, no increase in impact from vibration would occur (Class IV) unless rail, highway or terminal demands required expanded the existing infrastructure and these facilities moved closer to noise sensitive receivers. In this case impacts could vary from no impact (Class IV) to significant (Class I). The agency with jurisdiction over these activities would ensure they abide by existing regulations, reducing the effects to Less Than Significant Impact With Mitigation (Class II).

### 12.3.17.3   Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Since this alternative includes well stimulation treatments in these fields, noise and vibration impacts would occur as described in EIR Section 11.17. Noise mitigation would be required in all existing fields where well stimulation treatments would occur in Alternative 2. As with the project, Impact NOI–1 would be less than significant with implementation of mitigation (Class II) and vibration levels (Impact NOI-2) would be less than significant (Class III).

As described above, prohibition on out-of-field stimulation could cause indirect effects, as described for Alternative 1, including abandoning of some existing marginal oil and gas fields, increasing the intensity of activities in other existing oil and gas fields and increase the importation of oil and gas products from out of state. Impact NOI–1 would vary from no impact (Class IV) to less than significant with mitigation (Class II). Likewise, Impact NOI–2 would vary from no impact (Class IV) to less than significant with mitigation (Class II).

### 12.3.17.4   Impact Significance Summary

Based on the project and specific oil and gas field programmatic level analysis of noise and vibration, impacts from Alternative 2 would be the same as under the project at all existing oil and gas fields. Areas outside the buffer areas will have reduced impacts due to prohibition of stimulation outside the buffer areas. Indirect noise impacts may arise from increased shipping to make up for potential loss in production as a result of this prohibition.

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.18   Population and Housing

### 12.3.18.1   Introduction

This section provides an evaluation of the potential impacts to population and housing associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.18 (Population and Housing) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.18 (Population and Housing). For the purposes of this analysis please refer to EIR Sections 10.18.2 and 11.18.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.18.3 and 11.18.3 for a description of the affected environment for population and housing (as applic-

able at either a study region or field-specific scale), and EIR Section 10.18.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.18.2   Programmatic Level Analysis of Impacts and Mitigation Measures

There likely would be some loss of potential oil and gas reserves with implementation of this alternative. This could cause indirect effects, including abandonment of some existing oil and gas fields and an increase in an existing oil and gas field's production through increased conventional drilling and use of enhanced recovery techniques, as well as an increase in the importation of oil and gas. However, because well stimulation still would be allowed within existing oil and gas fields, the loss of potential future production would not be as great as under the No Future Well Stimulation Treatments Alternative (Alternative 1).

Under Alternative 2, impacts outside of existing oil and gas fields would be the same as described for Alternative 1 because well stimulation would be prohibited in both alternatives. Under Alternative 2, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.18 (Population and Housing).

Indirectly, to compensate for potential production not realized, Alternative 2 could increase the number of well abandonments, the numbers of wells drilled and stimulated within existing fields, and/or the number of new wells drilled but not stimulated outside of existing fields. Since well stimulation only would occur in existing fields, the need for well stimulations elsewhere would not exist and existing employees are expected to perform the required stimulation treatments. Any temporary worker in-migration to the area due to increased drilling would have the greatest impact on population within smaller communities. However, overall worker in-migration is expected to be nominal in comparison to the planned growth and the overall population of areas serving existing fields. Impacts from population growth (Impact POP-1) would be less than significant (Class III). Impacts under Alternative 2 would be less than under the project because Alternative 2 would not bring workers into areas outside of areas serving existing oil and gas fields.

It is unlikely that residential relocations, if any, associated with Alternative 2 would necessitate construction of new housing (Impact POP-2). Therefore, any necessary relocations of housing or persons associated with Alternative 2 activities would be less than significant and would not necessitate the construction of new housing elsewhere (Class III). Impacts under Alternative 2 would be less than under the project because Alternative 2 would not result in extensive numbers of new wells in areas outside existing oil and gas fields.

### 12.3.18.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. It is expected the level of drilling and stimulation would be similar or slightly greater than what would occur under the project, because other potential oil and gas areas that require well stimulation for production (such as in the Monterey Formation and plays) would no longer be available. The impacts associated with well stimulation treatment activities for the three fields for Alternative 2 would be similar to those described in EIR Section 11.18 (Population and Housing).

#### 12.3.18.4   Impact Significance Summary

Overall, worker in-migration from Alternative 2 is expected to be nominal in comparison to the already anticipated growth and overall existing population in areas serving existing fields. There would be no potential for housing displacement from well stimulations under Alternative 2 within communities adjacent to existing oil and gas fields.

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

### 12.3.19   Public Services

#### 12.3.19.1   Introduction

This section provides an evaluation of the potential impacts to public services associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.19 (Public Services) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.19 (Public Services). For the purposes of this analysis please refer to EIR Sections 10.19.2 and 11.19.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.19.3 and 11.19.3 for a description of the affected environment for public services (as applicable at either a study region or field-specific scale), and EIR Section 10.19.4 for details regarding the impact methodology and significance criteria that have been used.

#### 12.3.19.2   Programmatic Level Analysis of Impacts and Mitigation Measures

| Impact PUB-1 | Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools |
|---|---|

Under Alternative 2, impacts outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.19 (Programmatic Level Analysis of Impacts and Mitigation Measures, Public Services). Under Alternative 2, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.19 (Public Services). Increased ship, rail, and truck traffic hauling imported oil and gas to refineries would likely occur under Alternative 2, including an increase use of rail corridors between the source fields and California refineries. This would greatly increase the amount of oil hauled on these lines and could result in increased emergency service calls in the event of an accident or spill. This is a significant new public services impact when compared to the project, which was found to be less than significant with the incorporation of mitigation (Class II). Unlike the project, mitigation could not be included at this time to offset use of ship, rail, and truck traffic hauling imported oil and gas to refineries as more detailed information would be required.

Indirectly, this alternative could increase well abandonment, the numbers of wells drilled and stimulated within existing fields, and/or the number of new wells drilled but not stimulated outside of existing fields to make up for lost production. The need for new or expanded public services, including applicable performance objectives and service ratios, is strongly influenced by population levels and needs of indi-

vidual well sites. As discussed within EIR Section 12.3.18 (Population and Housing), Alternative 2 would not have significant population growth and in most areas any growth would be nominal. Since well stimulation would occur only in existing fields, existing employees are expected to perform well stimulation treatments. It is assumed the public service providers serving existing fields would have adequate levels to continue serving existing fields.

Implementation of Mitigation Measure PUB-1a (Assess Public Service Ratios and Ensure Adequate Compensation) is proposed as part of Alternative 2 and would require DOGGR to coordinate with the applicable local land use agency to determine whether new well development and stimulations at existing fields would place a burden on public services, and ensure that appropriate compensation is provided to the local agency through its local land use permit(s). With implementation of this measure, Impact PUB-1 (Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools) would be less than significant (Class II). Impacts would be less than compared to the project because Alternative 2 would allow well stimulation in existing oil and gas fields which are already served by public service providers, while the project would allow well stimulation statewide, including areas where public services may be adversely affected., Overall, impacts could be increased when compared to the project due to the increased import of oil and gas and the resulting potential need for increased emergency response services.

**MM PUB-1a    Assess Public Service Ratios and Ensure Adequate Compensation.** (Full text in EIR Section 10.19.5.)

### 12.3.19.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. It is expected the level of drilling and stimulation within these three fields would be similar or slightly greater at the fields than what would occur under the project, because other potential oil and gas areas that would require well stimulation for production would no longer be available to developers.

### 12.3.19.4   Impact Significance Summary

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.20   Recreation

### 12.3.20.1   Introduction

This section provides an evaluation of the potential impacts to recreation associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.20 (Recreation) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.20 (Recreation). For the purposes of this analysis please refer to EIR Sections 10.20.2 and 11.20.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.20.3 and 11.20.3 for a description of the affected environment for recreation (as applicable at either a study region or field-specific

scale), and EIR Section 10.20.4 for details regarding the impact methodology and significance criteria that have been used.

~~Without implementation of project standards for resource protection under this alternative, oil and gas development and associated well stimulation may occur in open space areas and areas near water resources used for recreation.~~

### 12.3.20.2    Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 2 would prohibit any future stimulation treatments except for within the existing oil and gas field boundaries and their buffer areas. This alternative would require new legislation to revise PRC Sections 3106(b) and 3160(b), which currently authorize well stimulation treatments but do not limit the activity to existing fields. The new legislation would need to specify that future well stimulation treatments would be limited to existing oil and gas field boundaries and their buffer areas.

Under Impact REC-1, impacts would occur if new well stimulation treatments would increase the use of existing neighborhood and regional parks or other recreational facilities such that substantial physical deterioration of the facility would occur or be accelerated. This type of impact would typically occur when a project induces population growth, such as a new housing development or a large business that would require new employees, which would then increase the usage of nearby recreation areas.

Under Alternative 2 there would be no appreciable loss of existing oil and gas production due to this alternative. Therefore, the impacts under Alternative 2 would be the same as those of the project, under which there would be little if any in-migration from new workers compared to the existing populations. Similarly, any increased use of existing recreational areas or facilities as a result of new employment for well stimulation treatments would be minimal when considering the numerous recreation opportunities within each study region. As such, Impact REC-1 would be less than significant under Alternative 2 (Class III).

As discussed in EIR Section 10.20.5 (Recreation), recreation areas can be considered sensitive receptors as they tend to be areas where children are present, and depending on the available facilities, they can be used for intense physical activities. As shown in Figures 10.20-1 through 10.20-3, there are existing oil fields within or adjacent to established recreation areas. Under Alternative 2 the effects associated with Impact LU-2 would be the similar to those provided for the analysis of the project, which states that well stimulation treatments may cause disruptions to the recreation areas described above in the affected environment, which would diminish the recreation experience. However, under Alternative 2, potential disruptions would affect only the recreation areas that are currently in the vicinity of existing oil or gas fields. Under the project, potential disruptions could occur also occur as a result of new wells or fields; so the potential for disruptions would be greater under the project in comparison to Alternative 2.

The potential disturbances to recreational resources are listed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures). Each of the potential disruptions types are discussed in detail in EIR Sections 10.1 (Aesthetics), 10.3 (Air Quality), 10.6 (Coastal Processes and Marine Water Quality), 10.7 (Commercial and Recreational Fishing), 10.13 (Hazards and Hazardous Materials), 10.15 (Surface Water Resources), 10.16 (Land Use and Planning), 10.17 (Noise and Vibration), 10.21 (Risk of Upset/Public and Worker Safety), and 10.22 (Transportation and Traffic).

Mitigation Measures REC-2a and REC-2b, as summarized in EIR Section 12.2.20.2 (No Future Well Stimulation Practices Alternative [Alternative 1], programmatic level analysis for recreation) and detailed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures), specifically address coordination and notification requirements that would provide communities with advanced notice of potential

disruptions to affected recreation areas (refer to EIR Section 10.20.5 for the full text of these mitigation measures). These notification measures are intended to help ensure the public can have sufficient warning in order to make other arrangements for their recreation activities. With implementation of these measures, Impact REC-2 would be less than significant (Class II) under alternative 2, which is similar to the impact under the project.).

**MM REC-2a**    **Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas.** (Full text in EIR Section 10.20.5.)

**MM REC-2b**    **Provide Noticing of Closures and Identify Alternative Recreation Areas.** (Full text in EIR Section 10.20.5.)

### 12.3.20.3   Programmatic Level Analysis of Specific Oil and Gas Fields

For Impact REC-1, and as discussed in the setting for the Wilmington and Inglewood Oil and Gas Fields (EIR Section 11.20.3, Recreation), the Wilmington and Inglewood fields are located within a high-density urban area, and numerous regional and local recreation areas surround it. As well stimulation already occurs in this area, it is unlikely that well stimulation treatments would increase the use of existing neighborhood and regional parks or other recreational facilities such that substantial physical deterioration of facilities would occur or be accelerated. This type of impact would typically occur when a project induces population growth, such as a new housing development or a large business that would require new employees. This is not the case for the Wilmington and Inglewood fields, which consists of existing oil and gas operators that currently employ permanent staff.

Implementation of Alternative 2 would prohibit any future stimulation treatments except for within the existing oil and gas field boundaries and their buffer areas. In Study Region 1, well stimulation treatments would be likely only at existing oil fields so there would be no loss in resource due to this alternative, which means oil development activities within the Wilmington and Inglewood fields would continue. Therefore, the impacts under Alternative 2 would be the same as those of the project, the impact analysis for which states that any in-migration from new workers due to well stimulation activities would be nominal compared to the existing population surrounding the Wilmington field. Similarly, the increased use of existing recreational areas or facilities as a result of new employment for well stimulation treatments would be nominal in considering the numerous recreation opportunities within and surrounding the Wilmington and Inglewood fields. As such, Impact REC-1 would be less than significant under Alternative 2 (Class III).

Under Impact REC-2, disruptions to recreation areas could occur in areas where active oil and gas fields are close to designated recreation areas or facilities. Alternative 2 would prohibit any future stimulation treatments except for within the existing oil and gas field boundaries and their buffer areas. In Study Region 1, well stimulation treatments would be likely only at existing oil fields so there would be no loss in resource due to this alternative. It is assumed that oil development in the Wilmington and Inglewood fields could increase under this alternative, but not so much as to change the recreation impacts of the project. As such, well stimulation treatments may cause disruptions to these recreation areas, which would diminish the recreation experience. Potential types of disturbances to recreational resources may include aesthetics, air quality, coastal processes and marine water quality, commercial and recreational fishing, hazards and hazardous materials, surface water resources), land use and planning, noise and vibration, risk of upset, and transportation and traffic). The mitigation measures provided for these issue areas would minimize potential impacts to recreational resources to the maximum extent feasible.

Mitigation Measures REC-2a and REC-2b, as summarized above in EIR Section 12.3.20.2 and detailed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures), specifically address coordination and notification requirements that would provide the community with advanced notice of potential disruptions to affected recreation areas and provide alternative recreation opportunities. These notification measures are intended to help ensure the public can have sufficient warning in order to make other arrangements for their recreation activities. With implementation of these measures, Impact REC-2 would be less than significant under Alternative 2 (Class II).

***Sespe Oil and Gas Field***

Within Study Region 2 a portion of well stimulation treatments would occur within existing oil fields; however, it is possible that some new wells outside of existing fields would be proposed, and these would prohibited from using well stimulation. Because of this, there would likely be some loss of oil reserves due to implementation of this alternative. It is not possible at this time to quantify the precise amount of oil resources that would be lost.

In regard to Impact REC-1, considering there would likely be a decline in oil development in Study Region 2, and possibly within the Sespe Oil and Gas Field, the level of employment for oil and gas workers would likely decrease rather than increase under this alternative. Based on this assumption, Alternative 2 would not include population growth and there would be ~~no~~ little impact to recreational resources under Impact REC-1 (Class ~~IV~~III).

~~Under Impact REC-2, despite the possible decline in oil development in Study Region 2 and in the Sespe field, there would still be the potential for disruptions as a result of well stimulation treatments within existing oil and gas fields. As such, the same impact analysis would apply as provided for the Wilmington and Inglewood Oil and Gas Fields. Mitigation Measures REC-2a and REC-2b specifically address coordination and notification requirements that would provide the community with advanced notice of potential disruptions to affected recreation areas (refer to EIR Section 10.20.5 for the full text of these mitigation measures). These notification measures are intended to help ensure the public can have sufficient warning in order to make other arrangements for their recreation activities. With implementation of these measures, Impact REC-2 would be less than significant under Alternative 2 (Class II)~~ The majority of the trails are 5 miles north of the Sespe field, but the closest trail, Alder Creek, is approximately one mile north of the northern boundary of the Sespe field. The potential disruptions to recreation users from well stimulation treatments would likely be concealed or less obvious due to the mountainous terrain within the Sespe field. In addition, considering the majority of the surrounding trails are five miles north of the Sespe field, the potential disruptions would affect only recreation users at the south end of the Alder Creek Trail. However, these impacts would be temporary. Therefore, this Impact REC-2 would be less than significant (Class III).

## 12.3.20.4   Impact Significance Summary

Implementation of the No Future Well Stimulation Practices Outside of Existing Oil and Gas Field Boundaries Alternative would result in less than significant impacts (Class III) as related to Impact REC-1 for the programmatic level analysis and the Wilmington, ~~and~~ Inglewood, and Sespe Oil and Gas Fields~~, and no impact (Class IV) for the Sespe Oil and Gas Field~~. As related to Impact REC-2, Alternative 2 would result in impacts that can be mitigated to a level of less than significant with implementation of Mitigation Measures REC-2a and REC-2b, as summarized above in EIR Section 12.3.20.2 and detailed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures), for both the programmatic level analysis and the analyses for the Wilmington and, Inglewood, ~~and Sespe~~ Oil and Gas Fields. For Sespe Oil and Gas Field, the impact would be less than significant (Class III).

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.21   Risk of Upset/Public and Worker Safety

### 12.3.21.1   Introduction

This section provides an evaluation of the potential impacts to risk of upset/public and worker safety associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.21 (Risk of Upset/Public and Worker Safety) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.21 (Risk of Upset/Public and Worker Safety). For the purposes of this analysis please refer to EIR Sections 10.21.2 and 11.21.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.21.3 and 11.21.3 for a description of the affected environment for risk of upset/public and worker safety (as applicable at either a study region or field-specific scale), and EIR Section 10.21.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.21.2   Programmatic Level Analysis of the Project

| Impact RSK-1 | Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases |
|---|---|

With the decrease in oil production from the implementation of restricting or banning well stimulation treatments, imports of crude oil by rail will most likely occur and increase. The risk of accidents will be most substantial in areas that have existing and potential rail terminals for importing crude oil (Study Regions 1, 4, and 6) and regions through which the crude oil travels (Study Region 5). Potentially impacted areas are discussed in EIR Section 10.21.3.8 and the potential for accidents in different regions is discussed in EIR Section 10.21.4.1.

This impact is considered a significant and unavoidable impact that could not be mitigated to a level of less than significant through the application of feasible mitigation measures. Implementation of recommended Mitigation Measures RSK-1a through RSK-1h would be appropriate to decrease the frequency of crude oil transport and reasonably foreseeable accidents and releases. Because DOGGR cannot require other agencies to implement suggested mitigation, Impact RSK-1 would be a Class I: Significant and Unavoidable Impact.

**MM RSK-1a**      **Increase the Number of CPUC Rail Inspectors.** (Full text in EIR Section 10.21.5.)

**MM RSK-1b**      **Expedite the Phase-out of Older Tank Cars.** (Full text in EIR Section 10.21.5.)

**MM RSK-1c**      **Implement New Accident Prevention Technology.** (Full text in EIR Section 10.21.5.)

**MM RSK-1d**      **Monitor and Enforce New Speed Limits.** (Full text in EIR Section 10.21.5.)

**MM RSK-1e**      **Monitor the Implementation of Trackside Safety Technology.** (Full text in EIR Section 10.21.5.)

**MM RSK-1f**    **Improve Emergency Preparedness and Response Programs.** (Full text in EIR Section 10.21.5.)

**MM RSK-1g**    **Provide Real-Time Shipment Information to Emergency Responders.** (Full text in EIR Section 10.21.5.)

**MM RSK-1h**    **Provide Additional Accident and Injury Data to the State.** (Full text in EIR Section 10.21.5.)

Impacts RSK-2 through RSK-7 are the same as under the project. Thus, Impacts RSK-2 and RSK-6 areis Class I. Impacts RSK-2, RSK-4, RSK-5, and RSK-7 are Class II. Impact RSK-3 is Class III.

### *Study Region 1*

A reduction in well stimulation treatment activities would be enacted under this alternative. Since this alternative will not apply to the Inglewood and Wilmington fields, a change in the worker accident rate when compared to the project case is not expected.

To determine the number of accidents for each alternative, crude oil by rail projections from 2015-2040 were used as a basis to estimate the number of rail cars. The maximum annual amount of 110 million barrels per year in Alternative 1 was used as a baseline to develop the crude oil rail accident rates (see EIR Section 10.21.3.8). For each alternative, the average crude oil import rate over 25 years was used as a basis to estimate the accident rate.

Table 10.21-14 has been used to define the average crude oil import rate for Alternative 1. The average of the domestic crude oil supply corresponds to 75 million barrels per year.

Table 10.21-16 provides an estimate of the maximum projected annual number of accidents based on the mean crude oil imports. Thus, the accident rate estimated for Alternative 1 would be reduced based on the ratio between the maximum (110 million bbl/yr) and the average (75 bbl/yr) imports. The accident rates for the other alternatives were estimated by the reduction in rail crude oil imports that would be offset by California production with hydraulically fractured wells.

A 30 percent increase of crude oil production from the No project case (Alternative 6) was assumed for Alternative 2 to make up for lost production from hydraulically fractured wells. The difference between the maximum average (75 million bbl/yr) and the No project case (8.5 million bbl/yr) is 66.5 bbl/yr. 30 percent of this number was added to the No project case to arrive at 28 million bbl/yr. This number was used to scale the number of accidents from the maximum presented on Table 10.21-16. As stated in EIR Section 10.21.4.1, given the relatively very low number of derailments compared to the number of shipments of oil in the U.S. since 2005, the occurrence of a major rail accident is expected to be very low and nearly all of the potential accidents that may occur are expected to be minor.

The number of accidents from increased crude oil rail imports may rise with crude oil shipments to Long Beach, Vernon, and Carson. A discussion of crude oil routes is presented in EIR Section 10.21.3.8. Crude rail traffic may travel by way of the Tehachapi Pass through Bakersfield, or from the east (Texas), before heading to the metro Los Angeles area. Using the methodology stated above, the number of accidents projected for this region would remain about equal at one accident per year (25 accidents in 25 years), since there is a relatively small difference between the project (15 million bbl/yr) and Alternative 2 (28 million bbl/yr) volume compared to the maximum volume (75 million bbl/yr).

The volume of proppant is proportional to the number of wells hydraulically fractured, which in turn will require more rail cars. The maximum number of accidents corresponding to the highest volume of

proppant is shown in Table 10.21-15. Since the number of wells for Alternative 2 is approximately 30 percent less than that of the maximum case, the number of accidents is approximately 30 percent less as well. The Regions at higher risk for accidents are Regions 1 and 4, with a lesser potential in Regions 5 and 6.

Proppant is sent by rail into Bakersfield in Study Region 4 and can travel through the western portion of this study region enroute. Six rail accidents for 2015-2040 are forecast for this region based on the FRA accident rates for Class I railroads from 2011-2013 (FRA, 2014). This is a slight reduction from seven accidents for the project case for the same period.

***Study Region 2***

The level of well stimulation treatment activities in Study Region 2 is very small, and no increase in the injury rate is forecast for Study Region 2.

No rail facilities are expected to be constructed in this region. The small segment of rail that could be used enroute to Region 1 terminals (see Figure 10.21-3) is not expected to pose a significant risk of an accident in this Region. Proppant is sent by rail into Bakersfield in Study Region 4 and these shipments do not travel through this region. Therefore there is no expected additional rail risk in Study Region 2.

***Study Region 3***

Study Region 3 is expected to maintain the same recordable injury rate as the project case. Proppant is sent by rail into Bakersfield in Study Region 4. Given the comparatively smaller amount of rail traffic to a potential terminal in Santa Maria compared to other Regions, the potential for an accident is not forecasted for this Region using the volume of crude oil in this scenario.

***Study Region 4***

Study Region 4 would have a smaller increase in the number of in oil worker recordable injuries from the limitation on well stimulation treatments. The number of recordable injuries to oil workers would reduce from an additional 73 per year for the project compared to 60 per year for Alternative 2.

Under the assumptions in EIR Section 10.21.3.7, this study region would be impacted by rail crude oil imports with the construction of the Alon crude facility and the increase to the full capacity of the Plains All America facility. Proppant will be shipped and offloaded in Bakersfield, which can increase the risk of accidents. Using the average annual crude oil import volume from 2015 to 2040 for this alternative, the number of accidents projected for this region would increase from one accidents per year (25 over 25 years) for the project to two per year (50 over 25 years) from crude oil shipments. Four additional accidents for the 25-year period are forecast from proppant deliveries compared to five over the same period for the project case.

Since this Region has the largest number of wells, it will have the most truck traffic. The vehicle traffic included both trucks and passenger vehicles. As demonstrated in EIR Section 10.21.3.10, the majority of vehicles are passenger cars for site workers. Tables 10.21-7 through 10.21-9 in EIR Section 10.21.3.10 detail the assumptions on the number of vehicles and roundtrip miles. The estimate was built up using the number of wells for each alternative. The number of miles over 25 years (in millions) was applied to accident rates for truck and passenger vehicles from National Highway Traffic Safety Administration (NHTSA) data for California averaged from 2007-2009. (NHTSA, 2014), The accident rate for trucks was eight accidents per 100 million vehicle miles traveled. The passenger car accident rate was 172 accidents per 100 million vehicle miles traveled. For Alternative 2, there were 403 vehicle accidents predicted in Region 4, 390 of which were passenger vehicles.

### Study Region 5

The increase in oil worker recordable injuries is expected to be the same for both the project case and Alternative 2 in Study Region 5. Similar to Study Region 4, this study region would be affected by rail crude oil imports through Study Region 5 to the Alon Crude facility and the Plains All America facility. Using the average annual crude oil import volume from 2015 to 2040, the number of rail accidents projected for this region would remain the same compared to the project case at one accident per year (25 over 25 years. Proppant is expected to be shipped from Wisconsin that could pass through this study region. Two accidents are forecast to occur because of proppant shipments through this study region for both the project case and Alternative 2 over the 25-year period.

### Study Region 6

No well stimulation treatment activities or drilling are projected in Study Region 6. Therefore, there is no impact on the injury rate to oil workers. Similar to Study Region 4, this study region would be impacted by rail crude oil imports with shipments through Study Region 6 to the proposed Alon crude facility and the Plains All America facility, or to the proposed Santa Maria facility. There is also potential for shipments to the Benicia and Pittsburg facilities if they are built. Crude oil could pass through Sacramento enroute to these facilities. Using the average annual crude oil import volume from 2015 to 2040, the number of accidents projected for this region would increase from one accident per year (25 over 25 years) for the project case to approximately two per year (50 for 25 years) for Alternative 2. Proppant is expected to be shipped from Wisconsin that could pass through this study region. One accident is forecast to occur because of proppant shipments through this study region over the period from 2015-2040 for Alternative 2 and two for the project case.

## 12.3.21.3  Programmatic Level Analysis of Specific Oil and Gas Fields

### Wilmington Oil and Gas Field

As stated in the introduction for this section, there are no anticipated impacts from Alternative 2 on activities in the Wilmington field. Therefore the recordable injury rate from well stimulation treatment and production activities is expected to be similar to that for the project (EIR Section 11.21). No impacts from increased rail traffic or truck traffic are anticipated for Wilmington. The train accident rates from the Federal Railroad Association (FRA) are based on millions of train miles. The truck and NHTSA (National Highway Traffic Safety Administration) accident rates are based on 100 million truck miles. Therefore, forecasting accidents within a field is applicable only to a larger, regional area.

### Inglewood Oil and Gas Field

Well stimulation treatments would occur at Inglewood Oil and Gas Field under Alternative 2 as they would for the project (EIR Section 11~~10~~.21). As a result, the mitigation identified for the project <u>within Inglewood</u> would apply <u>for Alternative 2</u> within Inglewood.

### Sespe Oil and Gas Field

Similar to the Wilmington Oil and Gas Field, there are no anticipated impacts from Alternative 2 on activities in the Sespe field. Therefore the injury rate from well stimulation treatment and production activities is expected to be similar to that for the project (EIR Section 11.21). No impacts from increased truck traffic are anticipated for Sespe. The accident rates are based on millions of train miles or 100 million truck miles and that magnitude of travel is applicable only to an analysis of effects in a larger region.

### 12.3.21.4    Impact Significance Summary

Risks from crude oil production activities would be reduced when compared with the project case, but the difference would be notable only in Study Region 4. Overall, Alternative 2 would result in a reduction in injuries to workers and truck accidents when compared to the project case. Truck and passenger car accidents would decrease from 530 for the project to 413 for Alternative 2 over 25 years. The vast majority of these accidents would be from passenger vehicles.

As with Alternative 1, there will be an increase in crude oil rail accidents (Impact RSK-1) from approximately four per year (100 for 25 years) for the project case to six per year (150 for 25 years) for Alternative 2. In addition, there may be accidents from proppant deliveries by rail, but at a reduced rate from the project case. The forecast for rail accidents from proppant deliveries over 25 years is 13 compared to 16 for the project case.

Aside from Impact RSK-1 regarding transport of imported crude, each of the remaining impacts related to risk of upset and safety would be as described for the project.

## 12.3.22    Transportation and Traffic

### 12.3.22.1    Introduction

This section provides an evaluation of the potential impacts to transportation and traffic associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.22 (Transportation and Traffic) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.22 (Transportation and Traffic). For the purposes of this analysis please refer to EIR Sections 10.22.2 and 11.22.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.22.3 and 11.22.3 for a description of the affected environment for transportation and traffic (as applicable at either a study region or field-specific scale), and EIR Section 10.22.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.22.2    Programmatic Level Analysis of Impacts and Mitigation Measures

| Impact TR-1      Generate additional truck traffic and disrupt traffic operations |
| --- |

Because well stimulation would occur only within existing fields, there would also be an overall direct reduction in truck trips. Within existing oil and gas fields, the total number of trips generated per well due to well stimulation and associated traffic impacts would be the same as those described in EIR Section 10.22 (Transportation and Traffic). Direct impacts outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.22 (No Future Well Stimulation Practices Alternative, Transportation and Traffic). Combined together there would be an overall reduction of truck trips. Therefore, direct impacts to transportation and traffic (Impacts TR-1 through TR-6) would be beneficial overall on a programmatic level (Class V), except the potential for traffic hazards related to the transport of hazardous materials would remain significant and unmitigable (Class I), as discussed in EIR Section 12.2.22.

| Impact TR-2      Inadvertently damage road rights-of-way |
| --- |

Under the indirect effects scenario for Alternative 2 (EIR Section 8.3.2), any increased drilling without stimulation to make up for lost production would also add truck trips. Although the net number of truck trips is expected to be reduced under Alternative 2, if substantial increased drilling and well production

activities occur outside existing oil and gas fields near rural communities, then on a site-specific basis the condition of some rural roadways may be adversely affected. Implementation of Mitigation Measure TR-2a (Repair Roadway Damage) is recommended to ensure that roadways would be restored to original or near-original condition and undertaken in a timely manner, in consultation with and to the satisfaction of city or county with jurisdiction over affected roadways, the local transportation agency, and/or Caltrans, as appropriate. With the implementation of Mitigation Measure TR-2a, Impact TR-2 (any potential indirect impacts to roadway pavement) would be reduced to a less than significant level (Class II).

**MM TR-2a** **Repair Roadway Damage.** (Full text in EIR Section 10.22.5.)

| Impact TR-3 | Cause traffic safety hazards for vehicles, bicyclists, and pedestrians |
|---|---|

Indirect traffic impacts to level of service (LOS) of local roadways (Impact TR-1), bicyclists and pedestrians (Impact TR-3), and interference with emergency response (Impact TR-6) would all be less than significant (Class III), as discussed under Alternative 1 (EIR Section 12.2.22). In contrast Impacts TR-1, TR-3, and TR-6 are Class II under the project.

| Impact TR-4 | Transport hazardous materials |
|---|---|

The potential for traffic hazards related to the transport of hazardous materials would be significant and unmitigable, even with implementation of Mitigation Measure TR-4a for well stimulation treatments within existing fields. This measure would ensure that truck drivers transporting chemical additives are aware of the emergency spill procedures, but the possibility remains that significant and unmitigable roadway hazard impacts could still occur during an accidental spill, so Impact TR-4 would be significant and unavoidable (Class I).

**MM TR-4a** **Know Spill Prevention Measures.** (Full text in EIR Section 10.22.5.)

| Impact TR-5 | Change air traffic patterns |
|---|---|

On a site-specific basis, the drilling of new wells, especially deeper wells to be stimulated within existing fields, may trigger FAA air space hazard notification requirements for the drill rig in the vicinity of an airport. Assuming the owner/operator would submit Form 7460-1, as necessary, and comply with any required hazard markers or lighting, Impact TR-5 (Change air traffic patterns) would be less than significant (Class III).

### 12.3.22.3  Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. It is expected the level of drilling and stimulation would be similar or slightly greater than what would occur under the project, because other oil and gas areas that require well stimulation for production would no longer be available to developers. The impacts associated with well stimulation treatment activities for the two fields for Alternative 2 would be similar to those described in EIR Section 11.22 (Transportation and Traffic).

### 12.3.22.4  Impact Significance Summary

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

Analysis of Oil and Gas Well Stimulation Treatments in California
12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES

## 12.3.23   Utilities and Service Systems

### 12.3.23.1   Introduction

This section provides an evaluation of the potential impacts to utilities and service systems associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.23 (Utilities and Service Systems) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.23 (Utilities and Service Systems). For the purposes of this analysis please refer to EIR Sections 10.23.2 and 11.23.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.23.3 and 11.23.3 for a description of the affected environment for utilities and service systems (as applicable at either a study region or field-specific scale), and EIR Section 10.23.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.23.2   Programmatic Level Analysis of the Project

Alternative 2 represents an intermediate level of well stimulation between the project, which would allow stimulation anywhere in the state, and Alternative 1, which would prohibit well stimulation activities anywhere in the state. Alternative 2 would prohibit any future stimulation treatments outside of existing oil and gas field boundaries and their buffer areas, but allow such treatments within existing fields and their buffers.

Therefore, potential impacts from any electrical or natural gas interconnections that would have been required for wells drilled outside of existing fields with the intent of stimulating them would not be required, and any solid waste and wastewater disposal needs associated with these types of wells would be avoided. Wells could still be drilled outside of existing fields, but they could not be stimulated. Loss of access to the petroleum resources that may have derived from well stimulation activities outside of existing fields would be made up for by importing oil from outside the state. Increased ship, rail, and truck traffic hauling imported oil and gas to refineries likely would occur under Alternative 2, including an increase use of rail corridors between the source fields and California refineries. As with Alternative 1, this could lead to a need for expanded or new terminals and yards to handle the imports. Except for security and safety lighting, such facilities have relatively minimal demands for electric power and would generate relatively small amounts of solid waste. They would not be expected to create a high demand for natural gas service or wastewater disposal beyond what is needed to heat buildings and service sanitary requirements of the few buildings associated with terminals. Indirectly this alternative could increase well abandonment, the numbers of wells drilled and stimulated within existing fields, and/or the number of new conventional wells drilled but not stimulated outside of existing fields to make up for lost production. The need for new or expanded utilities and service systems is strongly influenced by population levels and the interconnection needs of individual well sites. As discussed within EIR Section 12.3.18 (Population and Housing), Alternative 2 would not have significant population growth and in most areas any growth would be nominal and could be handled by the capacity of existing utilities and service providers.

Four impacts were identified for utilities and services:

- **Impact UTL-1:** Adversely affect utilities and service systems due to population growth from project-related development

- **Impact UTL-2:** Require new or expanded electrical or natural gas infrastructure

- **Impact UTL-3:** Exceed existing municipal wastewater treatment provider capacities

- **Impact UTL-4:** Exceed permitted solid waste capacity of landfills

Under Alternative 2, because no well stimulation would occur outside of existing fields, Impacts UTL-1 through UTL-4 in these areas would be the same as described for Alternative 1 in EIR Section 12.2.23 (Programmatic Level Analysis of Impacts and Mitigation Measures, Utilities and Service Systems). Impacts associated with stimulation activities within existing oil and gas fields and their buffers would be the same as those described for the project in EIR Section 10.23 (Utilities and Service Systems). To ensure all utilities and service systems would have adequate capacities under Alternative 2, Mitigation Measures UTL-3a and UTL-4a also are proposed for Alternative 2. With the inclusion of these two mitigation measures, impacts UTL-1 and UTL-2 would be Class II and impacts UTL-3 and UTL-4 would be Class III in existing fields. Outside of existing fields, these impacts would be Class III, less than significant.

Utility and service impacts under Alternative 2 would be slightly decreased as compared to the project because Alternative 2 would not bring workers or stimulation activities into areas outside existing oil and gas fields, and the existing fields are already served by utilities and service systems.

**MM UTL-3a**       **Assess Wastewater Quality and Ensure Adequate Compensation to Municipal and Private Wastewater Treatment Plants.** (Full text in EIR Section 10.23.5.)

**MM UTL-4a**       **Assess Non-Hazardous Solid Waste Generation and Ensure Adequate Compensation to Municipal and Private Solid Waste Facilities.** (Full text in EIR Section 10.23.5.)

### 12.3.23.3    Programmatic Level Analysis of Specific Oil and Gas Fields

The Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields and well stimulation activities would be allowed under Alternative 2. It is expected the level of drilling and stimulation would be similar or slightly greater than what would occur under the project. Because other oil and gas areas outside of existing fields that would require well stimulation for production would no longer be available to developers, there could be an increase in drilling and stimulation in existing fields. Because these are mature oil and gas fields, the number of new wells under Alternative 2 would not be expected to increase dramatically over existing levels of activity. The impacts associated with well stimulation treatment activities for these three fields under Alternative 2 would be less than significant (Class III) for Impacts UTL-1 and UTL-2 and less than significant with mitigation (Class II) for Impacts UTL-3 and UTL-4. This is similar the significance of impacts described for the project in EIR Section 11.23 (Utilities and Service Systems).

### 12.3.23.4    Impact Significance Summary

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.24    Impact Summary Table for Alternative 2

Table 12.3.24-1 provides a summary of impacts and recommended mitigation measures for the project and specific oil and gas files for all issue areas under Alternative 2.

**Programmatic Level Analysis of the Project**

Under Alternative 2 all environmental impacts associated with well stimulation activities at locations outside of existing fields would be eliminated. Impacts within fields would still occur, but they would be

localized largely to disturbed well pad areas, and fields would already have established water and oil and gas production infrastructure in place.

Additional wells may still be developed and stimulated within existing fields, which would reduce the need to drill new conventional wells or import oil and gas from out of State compared to Alternative 1. There might also be new drilling, though without well stimulation, in areas outside existing oil and gas fields in order to make up for the lack of well stimulation opportunities outside existing fields. These indirect effects would be less severe, though, than those that would occur under Alternative 1 (No Future Well Stimulation). Therefore, indirect environmental impacts would be reduced compared to those described under Alternative 1 above.

However, because many of the mature oil fields in California are in decline and Alternative 2 would prohibit developing new fields that require well stimulation, there would be some loss of oil reserves and production due to implementation of this alternative, which would result in similar indirect impacts to Alternative 1. In addition, the prohibition of well stimulation treatments outside of existing fields would result in a new significant and unmitigable (Class I) impact from the loss of known mineral (oil and gas) resources in the Monterey Formation and its plays (Impact GEO-6).

In summary, Alternative 2 would be worse than the project for the following issue areas: Air Quality, Environmental Justice, Geology, Greenhouse Gas Emissions, and Risk.

Alternative 2 would be better than the project for the following issue areas: Aesthetics, Agriculture and Forestry Resources, Biological Resources–Terrestrial Environments, Biological Resources–Coastal Marine Environments, Coastal and Marine Processes and Water Quality, Fishing, Cultural Resources, Paleontological Resources, Hazardous Materials, Groundwater, Surface Water, Land Use, Noise, Population and Housing, Public Services, Recreation, Transportation and Traffic, and Utilities.

### Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. Therefore, impacts associated with well stimulation activities at the fields would be the same as those described for the project.

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **AESTHETICS** | | | | |
| Impact AES-1. Substantially adversely affect scenic vistas. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. |
| Impact AES-2. Substantially alter or damage scenic resources. | Class I, II, III, or IV (Direct) Class III (Indirect) Class I or II for new or expanded terminals. None available for new or expanded terminals. | Class I, II, III, or IV (Direct) Class III (Indirect) Class I or II for new or expanded terminals. None available for new or expanded terminals. | Class I, II, III, or IV (Direct) Class III (Indirect) Class I or II for new or expanded terminals. None available for new or expanded terminals. | Class I, II, III, or IV (Direct) Class III (Indirect) Class I or II for new or expanded terminals. None available for new or expanded terminals. |
| Impact AES-3. Substantially degrade the existing visual character or quality of a site and its surroundings. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. |
| Impact AES-4. Create new sources of substantial light and glare. | Class III or IV (Direct) Class III (Indirect) Class II for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class II for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class II for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class II for new or expanded terminals. None available for new or expanded terminals. |
| **AGRICULTURE AND FORESTRY RESOURCES** | | | | |
| Impact AGF-1. Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use | Class IV (Direct) Class II or V (Indirect) AGF-1a: Minimize Impacts to Important Farmland AGF-1b: Develop an Agricultural Resources Protection Plan AGF-1c: Compensate for Loss of Important Farmland | Class IV None required. | Class IV None required. | Class II AGF-1a: Minimize Impacts to Important Farmland AGF-1b: Develop an Agricultural Resources Protection Plan AGF-1c: Compensate for Loss of Important Farmland |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact AGF-2. Conflict with existing zoning for agricultural use or with Williamson Act contracts | Class IV (Direct)<br>Class II or V (Indirect)<br>AGF-2a: Ensure Compatibility with Agricultural Zoning<br>AGF-2b: Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts | Class IV<br>None required. | Class IV<br>None required. | Class II<br>AGF-2b: Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts |
| Impact AGF-3. Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production | Class IV (Direct)<br>Class II or V (Indirect)<br>AGF-3a: Ensure Compatibility with Zoning for Forest and Timberland | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. |
| Impact AGF-4. Result in the loss of forest land or conversion of forest land to non-forest use | Class IV (Direct)<br>Class II or V (Indirect)<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land | Class IV<br>None required. | Class II<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land | Class II<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land |
| Impact AGF-5. Directly or indirectly impair the use of agricultural land or forest land | Class IV (Direct)<br>Class II or V (Indirect)<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u> ~~Provide a Physical~~ | Class IV<br>None required. | Class II<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u>~~Provide a Physical Barrier on the Ground Surface at the Site~~ | Class II<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u>~~Provide a Physical Barrier on the Ground Surface at the Site~~ |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| | ~~Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ SWR-1a: Require Stormwater Pollution Prevention Plan SWR-2a: Implement Erosion Control Plan SWR-3a: Ensure Adequate Water Availability TR-1a: Prepare Traffic Plan | | ~~Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ SWR-1a: Require Stormwater Pollution Prevention Plan SWR-2a: Implement Erosion Control Plan SWR-3a: Ensure Adequate Water Availability TR-1a: Prepare Traffic Plan | ~~Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ SWR-1a: Require Stormwater Pollution Prevention Plan SWR-2a: Implement Erosion Control Plan SWR-3a: Ensure Adequate Water Availability TR-1a: Prepare Traffic Plan |
| **AIR QUALITY** | | | | |
| Impact AQ-1. Conflict with or obstruct implementation of an applicable air quality plan | Class I (Indirect) AQ-1a: Improve Air Quality Planning Inventories and Local Control Measures AQ-1b: Improve the Methodologies and Emission Factors Used in Inventory Development | Class III None required. | Class III None required. | Class III None required. |
| Impact AQ-2. Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation | Class I (Indirect) AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources AQ-2c: Reduce Emissions from Dust-Causing Activities | Class I AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources AQ-2c: Reduce Emissions from Dust-Causing Activities | Class I AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources AQ-2c: Reduce Emissions from Dust-Causing Activities | Class I AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources AQ-2c: Reduce Emissions from Dust-Causing Activities |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact AQ-3. Expose sensitive receptors to substantial pollutant concentrations | Class I (Indirect) AQ-3a: Comply with Local Air District Protocols Relating to the Preparation of Prepare a Health Risk Assessment and Implement Emission Controls AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility | Class I AQ-3a: Comply with Local Air District Protocols Relating to the Preparation of Prepare a Health Risk Assessment and Implement Emission Controls AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility | Class I AQ-3a: Comply with Local Air District Protocols Relating to the Preparation of Prepare a Health Risk Assessment and Implement Emission Controls AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility | Class I AQ-3a: Comply with Local Air District Protocols Relating to the Preparation of Prepare a Health Risk Assessment and Implement Emission Controls AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility |
| Impact AQ-4. Create objectionable odors affecting a substantial number of people | Class I (Indirect) AQ-4a: Prepare and Implement an Odor Minimization Plan AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility | Class I AQ-4a: Prepare and Implement an Odor Minimization Plan AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility | Class I AQ-4a: Prepare and Implement an Odor Minimization Plan AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility | Class I AQ-4a: Prepare and Implement an Odor Minimization Plan AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility |
| **BIOLOGICAL RESOURCES – TERRESTRIAL ENVIRONMENT** | | | | |
| Impact BIOT-1. Substantially reduce the habitat of a fish or wildlife species | Class I BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat BIOT-1b: Minimize Impacts to Native Vegetation and Habitat BIOT-1c: Replace or Offset Loss of Sensitive Habitat AQ-2c: Reduce Emissions from Dust-Causing Activities SWR-1a: Require Stormwater Pollution Prevention Plan SWR-2a: Implement Erosion Control Plan SWR-3a: Ensure Adequate Water Availability | Class I BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat BIOT-1b: Minimize Impacts to Native Vegetation and Habitat BIOT-1c: Replace or Offset Loss of Sensitive Habitat AQ-2c: Reduce Emissions from Dust-Causing Activities SWR-1a: Require Stormwater Pollution Prevention Plan SWR-2a: Implement Erosion Control Plan SWR-3a: Ensure Adequate Water Availability | Class I BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat BIOT-1b: Minimize Impacts to Native Vegetation and Habitat BIOT-1c: Replace or Offset Loss of Sensitive Habitat AQ-2c: Reduce Emissions from Dust-Causing Activities SWR-1a: Require Stormwater Pollution Prevention Plan SWR-2a: Implement Erosion Control Plan SWR-3a: Ensure Adequate Water Availability | Class I BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat BIOT-1b: Minimize Impacts to Native Vegetation and Habitat BIOT-1c: Replace or Offset Loss of Sensitive Habitat AQ-2c: Reduce Emissions from Dust-Causing Activities SWR-1a: Require Stormwater Pollution Prevention Plan SWR-2a: Implement Erosion Control Plan SWR-3a: Ensure Adequate Water Availability |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-2. Cause a fish or wildlife population to drop below self-sustaining levels | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-2b: California Condor Protection Measures<br>BIOT-2c: Nelson's Bighorn Sheep Protection Measures<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-3. Substantially reduce the number or restrict the range of an endangered, rare, or threatened species | Class I<br><br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br><br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br><br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br><br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br><br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br><br>BIOT-4b: Minimize Impacts to Protected Birds<br><br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br><br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br><br>SWR-1a: Require Stormwater Pollution Prevention Plan | Class I<br><br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br><br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br><br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br><br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br><br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br><br>BIOT-4b: Minimize Impacts to Protected Birds<br><br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br><br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br><br>SWR-1a: Require Stormwater Pollution Prevention Plan | Class I<br><br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br><br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br><br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br><br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br><br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br><br>BIOT-4b: Minimize Impacts to Protected Birds<br><br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br><br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br><br>SWR-1a: Require Stormwater Pollution Prevention Plan | Class I<br><br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br><br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br><br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br><br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br><br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br><br>BIOT-4b: Minimize Impacts to Protected Birds<br><br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br><br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br><br>SWR-1a: Require Stormwater Pollution Prevention Plan |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| | | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| Impact | Project | Wilmington | Inglewood | Sespe |
| Impact BIOT-4. Have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special-status species in local or regional plans, policies, or regulations, or by CDFW or USFWS | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-5. Have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations, or by CDFW or USFWS | Class I<br><br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br><br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br><br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br><br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br><br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br><br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><br>SWR-1b: Surface Water Protection<br><br>SWR-2a: Implement Erosion Control Plan<br><br>SWR-3a: Ensure Adequate Water Availability | Class I<br><br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br><br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br><br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br><br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br><br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br><br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><br>SWR-1b: Surface Water Protection<br><br>SWR-2a: Implement Erosion Control Plan<br><br>SWR-3a: Ensure Adequate Water Availability | Class I<br><br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br><br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br><br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br><br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br><br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br><br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><br>SWR-1b: Surface Water Protection<br><br>SWR-2a: Implement Erosion Control Plan<br><br>SWR-3a: Ensure Adequate Water Availability | Class I<br><br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br><br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br><br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br><br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br><br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br><br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><br>SWR-1b: Surface Water Protection<br><br>SWR-2a: Implement Erosion Control Plan<br><br>SWR-3a: Ensure Adequate Water Availability |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-6. Have a substantial adverse effect on federally protected wetlands as defined by Section 404, of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-6a: Protect Jurisdictional Waters<br><u>GW-1a: Use Alternative Water Sources to the Extent Feasible</u><br><u>GW-1b: Minimize Groundwater Impacts</u><br>GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> <s>Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin</s><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><u>SWR-1b: Surface Water Protection</u><br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a<u>:</u> Ensure Adequate Water Availability | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-6a: Protect Jurisdictional Waters<br><u>GW-1a: Use Alternative Water Sources to the Extent Feasible</u><br><u>GW-1b: Minimize Groundwater Impacts</u><br>GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> <s>Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin</s><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><u>SWR-1b: Surface Water Protection</u><br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-6a: Protect Jurisdictional Waters<br><u>GW-1a: Use Alternative Water Sources to the Extent Feasible</u><br><u>GW-1b: Minimize Groundwater Impacts</u><br>GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> <s>Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin</s><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><u>SWR-1b: Surface Water Protection</u><br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-6a: Protect Jurisdictional Waters<br><u>GW-1a: Use Alternative Water Sources to the Extent Feasible</u><br><u>GW-1b: Minimize Groundwater Impacts</u><br>GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> <s>Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin</s><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><u>SWR-1b: Surface Water Protection</u><br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability |
| Impact BIOT-7. Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites | Class I<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class III<br>None required. | Class III<br>None required. | Class I<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement |
| Impact BIOT-8. Conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance | Class II<br>BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Class II<br>BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Class II<br>BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Class II<br>BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-9. Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan | Class II<br>BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Class II<br>BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Class II<br>BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Class II<br>BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans |
| Impact BIOT-10. Contribute to global climate change and consequent impacts to biodiversity | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program |
| **BIOLOGICAL RESOURCES – COASTAL AND MARINE ENVIRONMENT** | | | | |
| Impact BIOCM-1. Substantially affect rare, threatened, or endangered coastal/marine species or their habitat | Class III<br>None required. | Class III<br>None required. | Not applicable. | Not applicable. |
| Impact BIOCM-2. Interfere with migration or movement of coastal/marine fish or wildlife | Class III<br>None required. | Class III<br>None required. | Not applicable. | Not applicable. |
| Impact BIOCM-3. Result in substantial loss or alteration of coastal/marine habitat | Class III<br>None required. | Class III<br>None required. | Not applicable. | Not applicable. |
| Impact BIOCM-4. Substantially disrupt or affect local coastal/marine biological communities or habitats | Class III<br>None required. | Class III<br>None required. | Not applicable. | Not applicable. |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| **COASTAL PROCESSES AND MARINE WATER QUALITY** | | | | |
| Impact CPMWQ-1. Change marine water chemical composition with respect to known hazardous substances; or the measured water temperature, salinity, conductivity, or turbidity | Class II<br>CPMWQ-1a: Protect Marine Water Quality | Class II<br>CPMWQ-1a: Protect Marine Water Quality | Not applicable. | Not applicable. |
| Impact CPMWQ-2. Change the velocity or direction of ocean currents | Class II<br>CPMWQ-2a: Prepare and Implement Marine Current Plan | Class II<br>CPMWQ-2a: Prepare and Implement Marine Current Plan | Not applicable. | Not applicable. |
| Impact CPMWQ-3. Change the velocity or direction of coastal and ocean winds | Class III<br>None required. | Class III<br>None required. | Not applicable. | Not applicable. |
| Impact CPMWQ-4. Change the direction, size, or period of ocean waves | Class IV<br>None required. | Class IV<br>None required. | Not applicable. | Not applicable. |
| Impact CPMWQ-5. Increase the risk of a tsunami | Class III<br>~~CPMWQ 5a: Conduct Offshore Geotechnical and Tsunami Investigation~~<br>~~CPMWQ 5b: Modify the Drilling of Disposal Wells Offshore or Near-Shore~~None Required. | Class III<br>~~CPMWQ 5a: Conduct Offshore Geotechnical and Tsunami Investigation~~<br>~~CPMWQ 5b: Modify the Drilling of Disposal Wells Offshore or Near-Shore~~None Required. | Not applicable. | Not applicable. |
| **COMMERCIAL AND RECREATIONAL FISHING** | | | | |
| Impact CRF-1. Cause long-term exclusion of important commercial and recreational fishing areas | Class III<br>None required. | Class III<br>None required. | Not applicable. | Not applicable. |
| Impact CRF-2. Result in substantial economic losses to local commercial and recreational fishing industries | Class III<br>None required. | Class III<br>None required. | Not applicable. | Not applicable. |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **CULTURAL RESOURCES** | | | | |
| Impact CUL-1. Affect historic-era archaeological and built-environment resources | Class I | Class I | Class I | Class I |
| | CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ Require Information ~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ Require Information ~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ Require Information ~~Inventory~~ and Evaluate Cultural Resources |
| | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination |
| | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan |
| | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains |
| | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities |
| | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program |
| | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources |
| | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities |
| | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities |
| | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CUL-2. Affect prehistoric resources | Class I | Class I | Class I | Class I |
| | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources |
| | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination |
| | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan |
| | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains |
| | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities |
| | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program |
| | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources |
| | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities |
| | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities |
| | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CUL-3. Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony. | Class I | Class I | Class I | Class I |
| | CUL-1a: ~~Require Information~~ ~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ ~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ ~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ ~~Inventory~~ and Evaluate Cultural Resources |
| | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination |
| | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan |
| | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains |
| | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities |
| | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program |
| | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources |
| | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities |
| | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities |
| | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| | | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| Impact | Project | Wilmington | Inglewood | Sespe |
| Impact CUL-4. Affect cultural landscapes. | Class I | Class I | Class I | Class I |
| | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources |
| | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination |
| | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan |
| | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains |
| | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities |
| | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program |
| | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources |
| | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities |
| | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities |
| | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **PALEONTOLOGICAL RESOURCES** | | | | |
| Impact PALEO-1. Well stimulation treatments would destroy or disturb surface or near-surface significant paleontological resources | Class II<br>PALEO-1a: ~~Require Information Inventory~~ and Evaluate Paleontological Resources<br>PALEO-1b: Develop Paleontological Resource Mitigation Plan<br>PALEO-1c: Retain Qualified Paleontological Resources Staff<br>PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program<br>PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources<br>PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities<br>PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities<br>PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Class II<br>PALEO-1a: ~~Require Information Inventory~~ and Evaluate Paleontological Resources<br>PALEO-1b: Develop Paleontological Resource Mitigation Plan<br>PALEO-1c: Retain Qualified Paleontological Resources Staff<br>PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program<br>PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources<br>PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities<br>PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities<br>PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Class II<br>PALEO-1a: ~~Require Information Inventory~~ and Evaluate Paleontological Resources<br>PALEO-1b: Develop Paleontological Resource Mitigation Plan<br>PALEO-1c: Retain Qualified Paleontological Resources Staff<br>PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program<br>PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources<br>PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities<br>PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities<br>PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Class II<br>PALEO-1a: ~~Require Information Inventory~~ and Evaluate Paleontological Resources<br>PALEO-1b: Develop Paleontological Resource Mitigation Plan<br>PALEO-1c: Retain Qualified Paleontological Resources Staff<br>PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program<br>PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources<br>PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities<br>PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities<br>PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities |
| **ENVIRONMENTAL JUSTICE** | | | | |
| Impact EJ-1. Significant impacts would disproportionately affect minority or low-income populations | Unknown, possibly Class I (Indirect)<br>EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Unknown, possibly Class I (Indirect)<br>EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Unknown, possibly Class I (Indirect)<br>EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Unknown, possibly Class I (Indirect)<br>EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | **Wilmington** | **Inglewood** | **Sespe** |
| **GEOLOGY, SOILS AND MINERAL RESOURCES** | | | | |
| Impact GEO-1. Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure | Class IV (Direct)<br>Class II<br>GEO-1a: Avoid Active Faults ~~Zones~~if Necessary<br>GEO-1b: Implement an Appropriate Setback if Necessary<br>GEO-1ef: Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Class II<br>GEO-1b: Implement an Appropriate Setback if Necessary<br>~~GEO-1c: Limit the Number of Hydraulically Fractured Wells~~<br>GEO-1cd: Implement Industry Accepted Practices<br>GEO-1de: Conduct Ground Monitoring<br>GEO-1ef: Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Class II<br>GEO-1a: Avoid Active Faults ~~Zones~~ if Necessary<br>GEO-1b: Implement an Appropriate Setback if Necessary<br>~~GEO-1c: Limit the Number of Hydraulically Fractured Wells~~<br>GEO-1cd: Implement Industry Accepted Practices<br>GEO-1de: Conduct Ground Monitoring<br>GEO-1ef: Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Class II<br>GEO-1a: Avoid Active Faults ~~Zones~~ if Necessary<br>GEO-1b: Implement an Appropriate Setback if Necessary<br>~~GEO-1c: Limit the Number of Hydraulically Fractured Wells~~<br>GEO-1cd: Implement Industry Accepted Practices<br>GEO-1ef: Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan |
| Impact GEO-2. Result in substantial soil erosion or the loss of topsoil | Class IV outside of existing fields (Direct)<br>Class II within existing fields (Direct)<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>Class III (Indirect) | Class II<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Class II<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Class II<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan |
| Impact GEO-3. Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse | Class IV outside of existing fields (Direct)<br>Class II within existing fields (Direct)<br>GEO-3a: Prepare Geotechnical Report if Necessary Class III (Indirect) | Class II<br>GEO-3a: Prepare Geotechnical Report if Necessary | Class II<br>GEO-3a: Prepare Geotechnical Report if Necessary | Class II<br>GEO-3a: Prepare Geotechnical Report if Necessary |
| Impact GEO-4. Be located on expansive soil creating substantial risks to life or property | Class IV outside of existing fields (Direct)<br>Class III within existing fields (Direct)<br>Class III (Indirect)<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact GEO-5. Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. |
| Impact GEO-6. Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan | Class IV (loss of non-fuel resources) (Direct)<br>Class I (loss of fossil fuels) (Direct)<br>Class III (Indirect)<br>None available. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact GEO-7. Cause an induced seismic event including ground shaking and ground failure | Class IV (Direct) Class III (Indirect) None required. | Class III None required. | Class III None required. | Class III None required. |
| **GREENHOUSE GAS EMISSIONS** | | | | |
| Impact GHG-1. Generate greenhouse gas emissions that may have a significant impact on the environment | Class I GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide | Class I GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide | Class I GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide. | Class I GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) strategies GHG-1c. Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide. |
| Impact GHG-2. Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases | Class I AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class III None required. | Class I AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas. GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class III None required. |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| **HAZARDS AND HAZARDOUS MATERIALS** | | | | |
| Impact HAZ-1. Hazardous materials associated with well stimulation fluids could be released to the environment from a spill or leak | Class II HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices | Class II HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices

HAZ-1b: Require the Operator to Conduct an Annual Inventory of Its Well Stimulation Equipment and Report of the Aged Infrastructure and Its Likelihood of Failure Leading to Spills or Leaks to DOGGR | Class II HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices

HAZ-1b: Require the Operator to Conduct an Annual Inventory of Its Well Stimulation Equipment and Report of the Aged Infrastructure and Its Likelihood of Failure Leading to Spills or Leaks to DOGGR | Class II HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices

HAZ-1b: Require the Operator to Conduct an Annual Inventory of Its Well Stimulation Equipment and Report of the Aged Infrastructure and Its Likelihood of Failure Leading to Spills or Leaks to DOGGR |
| **GROUNDWATER RESOURCES** | | | | |
| Impact GW-1. Contribute to overdraft conditions in critically impacted groundwater basins | Class II (Direct) Class IV (Indirect) GW-1a: Use Alternative Water Sources to the Extent Feasible GW-1b: Minimize Groundwater Impacts Prepare a Third Party Technical Report to Analyze Overdraft Impacts | Class II GW-1a: Use Alternative Water Sources to the Extent Feasible GW-1b: Minimize Groundwater Impacts Prepare a Third Party Technical Report to Analyze Overdraft Impacts | Class II GW-1a: Use Alternative Water Sources to the Extent Feasible GW-1b: Minimize Groundwater Impacts Prepare a Third Party Technical Report to Analyze Overdraft Impacts | Class III None required |
| Impact GW-2. Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water | Class II (Direct) Class IV (Indirect) GW-2a1b: Minimize Groundwater Impacts: Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping | Class II GW-2a1b: Minimize Groundwater Impacts: Prepare a Third Party Technical Report to Analyze Local Impacts of Pumping | Class II GW-2a1b: Minimize Groundwater Impacts: Prepare a Third Party Technical Report to Analyze Local Impacts of Pumping | Class III None required |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact GW-3. Adversely impact groundwater quality through surface spills or leaks during well stimulation | Class II (Direct) Class IV (Indirect) HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u> ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Class II HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u> ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Class II HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u> ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Class II HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u> ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ |
| Impact GW-4. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals. | Class II (Direct) Class IV (Indirect) GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ GW-4c: Install Methane Sensors on Wells ~~in the ADSA~~<u>Subject to Well Stimulation Treatments</u> | Class II GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ GW-4c: Install Methane Sensors on Wells ~~in the ADSA~~<u>Subject to Well Stimulation Treatments</u> | Class II GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ GW-4c: Install Methane Sensors on Wells ~~in the ADSA~~<u>Subject to Well Stimulation Treatments</u> | Class II GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ GW-4c: Install Methane Sensors on Wells ~~in the ADSA~~<u>Subject to Well Stimulation Treatments</u> |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact GW-5. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells. | Class II (Direct) Class IV (Indirect) GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate | Class II GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate | Class II GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate | Class II GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate |
| Impact GW-6: Improper disposal of flowback in injection wells could potentially impact groundwater quality. | Class II (Direct) Class IV (Indirect) GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater ~~Install a Cement Seal across Protected Groundwater~~ | Class II GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater ~~Install a Cement Seal across Protected Groundwater~~ | Class II GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater ~~Install a Cement Seal across Protected Groundwater~~ | Class II GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater ~~Install a Cement Seal across Protected Groundwater~~ |
| Impact GW-7. Inability to identify whether any observed adverse effects in groundwater are from well stimulation activity. | Class II (Direct) Class IV (Indirect) GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment | Class II GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment | Class II GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment | Class II GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment |
| **SURFACE WATER RESOURCES** | | | | |
| Impact SWR-1. Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality. | Class II SWR-1a: Require Stormwater Pollution Prevention Plan SWR-1b: Surface Water Protection SWR-1~~b~~c: Provide Adequate Flood Protection SWR-1~~c~~d: Protect Surface Water Reservoirs | Class II SWR-1a: Require Stormwater Pollution Prevention Plan SWR-1b: Surface Water Protection SWR-1~~b~~c: Provide Adequate Flood Protection SWR-1~~c~~d: Protect Surface Water Reservoirs | Class II SWR-1a: Require Stormwater Pollution Prevention Plan SWR-1b: Surface Water Protection SWR-1~~b~~c: Provide Adequate Flood Protection SWR-1~~c~~d: Protect Surface Water Reservoirs | Class II SWR-1a: Require Stormwater Pollution Prevention Plan SWR-1b: Surface Water Protection SWR-1~~b~~c: Provide Adequate Flood Protection SWR-1~~c~~d: Protect Surface Water Reservoirs ~~SWR-1d: Protect Surface Water~~ |
| Impact SWR-2. Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site. | Class II SWR-2a: Implement Erosion Control Plan | Class II SWR-2a: Implement Erosion Control Plan | Class II SWR-2a: Implement Erosion Control Plan | Class II SWR-2a: Implement Erosion Control Plan ~~SWR-1d: Protect Surface Water~~ |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact SWR-3. Substantially diminish surface water quantity. | Class II<br>SWR-3a: Ensure Adequate Water Availability | Class II<br>SWR-3a: Ensure Adequate Water Availability | Class II<br>SWR-3a: Ensure Adequate Water Availability | Class II<br>SWR-3a: Ensure Adequate Water Availability |
| Impact SWR-4. Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding. | Class II<br>SWR-1~~b~~c: Provide Adequate Flood Protection | Class II<br>SWR-1~~b~~c: Provide Adequate Flood Protection | Class II<br>SWR-1~~b~~c: Provide Adequate Flood Protection | Class II<br>SWR-1~~b~~c: Provide Adequate Flood Protection |
| **LAND USE AND PLANNING** | | | | |
| Impact LU-1. Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses. | Class I<br>None available for impacts associated with Risk of Upset/Public and Worker Safety | Class I<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u> ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~<br>HAZ-1b: Require the Operator to Conduct an Annual Inventory of Its Well Stimulation Equipment and Report of the Aged Infrastructure and Its Likelihood of Failure Leading to Spills or Leaks to DOGGR<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2<u>a</u>~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2<u>b</u>~~d~~: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided~~ | Class I<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u> ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~<br>HAZ-1b: Require the Operator to Conduct an Annual Inventory of Its Well Stimulation Equipment and Report of the Aged Infrastructure and Its Likelihood of Failure Leading to Spills or Leaks to DOGGR<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2<u>a</u>~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2<u>b</u>~~d~~: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided~~ | Class III<br>None required. |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| | | with a Protective Outer Shell or a Double Containment Storage System | with a Protective Outer Shell or a Double Containment Storage System | |
| | | RSK-2c̶f̶: Ensure Mechanical Integrity Through Compliance with Permanent Program Complies with Regulation | RSK-2c̶f̶: Ensure Mechanical Integrity Through Compliance with Permanent Program Complies with Regulation | |
| | | RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | |
| Impact LU-1, *continued* | | RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities | RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities | |
| | | RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents | RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents | |
| | | RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | |
| | | RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System | RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System | |
| | | RSK-7b: Reduce Emissions from Dust-Causing Activities | RSK-7b: Reduce Emissions from Dust-Causing Activities | |
| Impact LU-2. Physically divide an established community. | Class II̶I | Class I̶I̶IV | Class I̶I̶IV | Class IV |
| | None required.L̶U̶ 2̶a̶:̶ E̶n̶s̶u̶r̶e̶ T̶h̶a̶t̶ E̶s̶t̶a̶b̶l̶i̶s̶h̶e̶d̶ a̶n̶d̶ P̶l̶a̶n̶n̶e̶d̶ C̶o̶m̶m̶u̶n̶i̶t̶i̶e̶s̶ A̶r̶e̶ N̶o̶t̶ D̶i̶v̶i̶d̶e̶d̶ | None required.L̶U̶ 2̶a̶:̶ E̶n̶s̶u̶r̶e̶ T̶h̶a̶t̶ E̶s̶t̶a̶b̶l̶i̶s̶h̶e̶d̶ a̶n̶d̶ P̶l̶a̶n̶n̶e̶d̶ C̶o̶m̶m̶u̶n̶i̶t̶i̶e̶s̶ A̶r̶e̶ N̶o̶t̶ D̶i̶v̶i̶d̶e̶d̶ | None required.L̶U̶ 2̶a̶:̶ E̶n̶s̶u̶r̶e̶ T̶h̶a̶t̶ E̶s̶t̶a̶b̶l̶i̶s̶h̶e̶d̶ a̶n̶d̶ P̶l̶a̶n̶n̶e̶d̶ C̶o̶m̶m̶u̶n̶i̶t̶i̶e̶s̶ A̶r̶e̶ N̶o̶t̶ D̶i̶v̶i̶d̶e̶d̶ | None required. |
| Impact LU-3. Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. | Class II | Class II | Class II | Class II |
| | SB 4 regulation requiring "Neighbor Notification" (Section 1783.2) | SB 4 regulation requiring "Neighbor Notification" (Section 1783.2) | SB 4 regulation requiring "Neighbor Notification" (Section 1783.2) | SB 4 regulation requiring "Neighbor Notification" (Section 1783.2) |
| | All mitigation measures prescribed in this EIR | All mitigation measures prescribed in this EIR | All mitigation measures prescribed in this EIR | All mitigation measures prescribed in this EIR |
| **NOISE AND VIBRATION** | | | | |
| Impact NOI-1. Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels | Class II (Direct) | Class II (Direct) | Class II (Direct) | Class II (Direct) |
| | Class II to Class IV (Indirect) | Class II to Class IV (Indirect) | Class II to Class IV (Indirect) | Class II to Class IV (Indirect) |
| | NOI-1a: Control Noise Levels near Sensitive Land Uses | NOI-1a: Control Noise Levels near Sensitive Land Uses | NOI-1a: Control Noise Levels near Sensitive Land Uses | NOI-1a: Control Noise Levels near Sensitive Land Uses |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact NOI-2. Cause exposure of persons to or generation of excessive groundborne vibration | Class IV (Direct)<br>Class I to IV (Indirect)<br>Mitigation may be required if new infrastructure is closer to noise sensitive receivers | Class III (Direct)<br>Class II to IV (Indirect)<br>Mitigation may be required if new infrastructure is closer to noise sensitive receivers | Class III (Direct)<br>Class II to IV (Indirect)<br>Mitigation may be required if new infrastructure is closer to noise sensitive receivers | Class III (Direct)<br>Class II to IV (Indirect)<br>Mitigation may be required if new infrastructure is closer to noise sensitive receivers |
| **POPULATION AND HOUSING** | | | | |
| Impact POP-1. Induce substantial population growth | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact POP-2. Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| **PUBLIC SERVICES** | | | | |
| Impact PUB-1. Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools | Class II<br>PUB 1a: Assess Public Service Ratios and Ensure Adequate Compensation | Class II<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices<br>HAZ-1b: Require the Operator to Conduct an Annual Inventory of its Well Stimulation Equipment and Report of the Aged Infrastructure and its Likelihood of Failure Leading to Spills or Leaks to DOGGR<br>TR-1a: Prepare Traffic Plan | Class II<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices<br>HAZ-1b: Require the Operator to Conduct an Annual Inventory of its Well Stimulation Equipment and Report of the Aged Infrastructure and its Likelihood of Failure Leading to Spills or Leaks to DOGGR<br>TR-1a: Prepare Traffic Plan | Class II<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices<br>HAZ-1b: Require the Operator to Conduct an Annual Inventory of its Well Stimulation Equipment and Report of the Aged Infrastructure and its Likelihood of Failure Leading to Spills or Leaks to DOGGR<br>TR-1a: Prepare Traffic Plan |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| | | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| Impact | Project | Wilmington | Inglewood | Sespe |
| **RECREATION** | | | | |
| Impact REC-1. ~~Well stimulation treatment activities would increase the usage of recreation areas or facilities which would r~~Result in the physical deterioration of recreational resources | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III~~IV~~<br>None required. |
| Impact REC-2. ~~Well stimulation treatment activities would c~~Cause disruptions in designated recreation areas | Class II<br>REC-2a: Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas<br>REC-2b: Provide Noticing of Closures and Identify Alternative Recreation Areas | Class II<br>REC-2a: Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas<br>REC-2b: Provide Noticing of Closures and Identify Alternative Recreation Areas<br>~~SWR-1a: Require Stormwater Pollution Prevention Plan~~<br>SWR-1b: Surface Water Protection<br>~~SWR-1b: Provide Adequate Flood Protection~~<br>~~SWR-1c: Protect Surface Water Reservoirs~~<br>~~SWR 2a: Implement Erosion Control Plan~~<br>~~SWR-3a: Ensure Adequate Water Availability~~<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Class II<br>REC-2a: Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas<br>REC-2b: Provide Noticing of Closures and Identify Alternative Recreation Areas<br>~~SWR-1a: Require Stormwater Pollution Prevention Plan~~<br>SWR-1b: Surface Water Protection<br>~~SWR-1b: Provide Adequate Flood Protection~~<br>~~SWR-1c: Protect Surface Water Reservoirs~~<br>~~SWR 2a: Implement Erosion Control Plan~~<br>~~SWR-3a: Ensure Adequate Water Availability~~<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Class III<br>None required~~REC-2a: Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas~~<br>~~REC-2b: Provide Noticing of Closures and Identify Alternative Recreation Areas~~<br>~~SWR-1a: Require Stormwater Pollution Prevention Plan~~<br>~~SWR-1b: Surface Water Protection~~<br>~~SWR-1b: Provide Adequate Flood Protection~~<br>~~SWR-1c: Protect Surface Water Reservoirs~~<br>~~SWR 2a: Implement Erosion Control Plan~~<br>~~SWR-3a: Ensure Adequate Water Availability~~ |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2**[1]

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact REC-2. continued | | HAZ-1b: Require Operator to Conduct an Annual Inventory of its Well Stimulation Equipment and Report of the Aged Infrastructure and its Likelihood of Failure Leading to Spills or Leaks to DOGGR | HAZ-1b: Require Operator to Conduct an Annual Inventory of its Well Stimulation Equipment and Report of the Aged Infrastructure and its Likelihood of Failure Leading to Spills or Leaks to DOGGR | HAZ-1b: Require Operator to Conduct an Annual Inventory of its Well Stimulation Equipment and Report of the Aged Infrastructure and its Likelihood of Failure Leading to Spills or Leaks to DOGGR |
| | | RSK-2a: Conduct a Reactive Hazard Assessment (RHA) | RSK-2a: Conduct a Reactive Hazard Assessment (RHA) | RSK-2a: Conduct a Reactive Hazard Assessment (RHA) |
| | | RSK-2b: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals | RSK-2b: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals | RSK-2b: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals |
| | | RSK-2c: Install an Upgraded SCADA System | RSK-2c: Install an Upgraded SCADA System | RSK-2c: Install an Upgraded SCADA System |
| | | RSK 2d: Conduct a Facility Siting Study | RSK 2d: Conduct a Facility Siting Study | RSK 2d: Conduct a Facility Siting Study |
| | | RSK 2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System | RSK 2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System | RSK 2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System |
| | | RSK 2f: Ensure Mechanical Integrity Program Complies with Regulation | RSK 2f: Ensure Mechanical Integrity Program Complies with Regulation | RSK 2f: Ensure Mechanical Integrity Program Complies with Regulation |
| | | RSK 4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | RSK 4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | RSK 4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks |
| | | RSK 5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities | RSK 5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities | RSK 5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities |
| | | RSK 5b: Verify the Need of Installation of Flame Arresters on the Tank Vents | RSK 5b: Verify the Need of Installation of Flame Arresters on the Tank Vents | RSK 5b: Verify the Need of Installation of Flame Arresters on the Tank Vents |
| Impact REC-2. continued | | RSK 5c: Prepare and Implement a Control of Ignition Sources Plan | RSK 5c: Prepare and Implement a Control of Ignition Sources Plan | RSK 5c: Prepare and Implement a Control of Ignition Sources Plan |
| | | RSK 7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) | RSK 7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) | RSK 7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) |
| | | RSK 7b: Reduce Emissions from Dust Causing Activities | RSK 7b: Reduce Emissions from Dust Causing Activities | RSK 7b: Reduce Emissions from Dust Causing Activities |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **RISK OF UPSET / PUBLIC AND WORKER SAFETY** | | | | |
| Impact RSK-1. Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases | Class I<br>RSK-1a: Increase the Number of CPUC Rail Inspectors<br>RSK-1b: Expedite the Phase-out of Older Tank Cars<br>RSK-1c: Implement New Accident Prevention Technology<br>RSK-1d: Monitor and Enforce New Speed Limits<br>RSK-1e: Monitor the Implementation of Trackside Safety Technology<br>RSK-1f: Improve Emergency Preparedness and Response Programs<br>RSK-1g: Provide Real-Time Shipment Information to Emergency Responders<br>RSK-1h: Provide Additional Accident and Injury Data to the State | Class I<br>RSK-1a: Increase the Number of CPUC Rail Inspectors<br>RSK-1b: Expedite the Phase-out of Older Tank Cars<br>RSK-1c: Implement New Accident Prevention Technology<br>RSK-1d: Monitor and Enforce New Speed Limits<br>RSK-1e: Monitor the Implementation of Trackside Safety Technology<br>RSK-1f: Improve Emergency Preparedness and Response Programs<br>RSK-1g: Provide Real-Time Shipment Information to Emergency Responders<br>RSK-1h: Provide Additional Accident and Injury Data to the State | Class V~~I~~<br>None required<br>~~RSK-1a: Increase the Number of CPUC Rail Inspectors~~<br>~~RSK-1b: Expedite the Phase-out of Older Tank Cars~~<br>~~RSK-1c: Implement New Accident Prevention Technology~~<br>~~RSK-1d: Monitor and Enforce New Speed Limits~~<br>~~RSK-1e: Monitor the Implementation of Trackside Safety Technology~~<br>~~RSK-1f: Improve Emergency Preparedness and Response Programs~~<br>~~RSK-1g: Provide Real-Time Shipment Information to Emergency Responders~~<br>~~RSK-1h: Provide Additional Accident and Injury Data to the State~~ | Class I<br>RSK-1a: Increase the Number of CPUC Rail Inspectors<br>RSK-1b: Expedite the Phase-out of Older Tank Cars<br>RSK-1c: Implement New Accident Prevention Technology<br>RSK-1d: Monitor and Enforce New Speed Limits<br>RSK-1e: Monitor the Implementation of Trackside Safety Technology<br>RSK-1f: Improve Emergency Preparedness and Response Programs<br>RSK-1g: Provide Real-Time Shipment Information to Emergency Responders<br>RSK-1h: Provide Additional Accident and Injury Data to the State |
| Impact RSK-2. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental release hazardous materials due to a hose leak or connection leak while pumping well stimulation treatment fluids | Class II<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2a~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2b~~d~~: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System~~<br>RSK-2c~~f~~: Ensure Mechanical Integrity Through Compliance with Permanent ~~Program Complies with~~ Regulation | Class II<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2a~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2b~~d~~: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System~~<br>RSK-2c~~f~~: Ensure Mechanical Integrity Through Compliance with Permanent ~~Program Complies with~~ Regulation | Class II<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2a~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2b~~d~~: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System~~<br>RSK-2c~~f~~: Ensure Mechanical Integrity Through Compliance with Permanent ~~Program Complies with~~ Regulation | Class II<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2a~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2b~~d~~: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System~~<br>RSK-2c~~f~~: Ensure Mechanical Integrity Through Compliance with Permanent ~~Program Complies with~~ Regulation |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Wilmington | Inglewood | Sespe |
|---|---|---|---|---|
| | | **Specific Oil and Gas Fields** | | |
| Impact RSK-3. Substantially increase the potential for major oil spills due to ship groundings and collisions | Class III<br>None required. | Class III<br>None required. | Class IV~~I~~<br>None required. | Class IV~~I~~<br>None required. |
| Impact RSK-4. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental pressure changes during flowback activity caused by blocked pump discharge, sudden change in downhole condition, or human error | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks |
| Impact RSK-5. Generate risks to public safety by causing a flammable atmosphere in the flowback tank | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan |
| Impact RSK-6. Increase risks to public safety by exposing the public to accidental crude oil or produced gas releases from pipelines | Class I<br>~~None available.~~RSK-6a: Increase Inspection of Mechanical Integrity<br>RSK-6b: Improve Leak Detection Capability<br>RSK-6c: Reduce Mainline Valve Spacing | Class I<br>RSK-6a: Increase Inspection of Mechanical Integrity<br>RSK-6b: Improve Leak Detection Capability<br>RSK-6c: Reduce Mainline Valve Spacing ~~None available.~~ | Class I<br>RSK-6a: Increase Inspection of Mechanical Integrity<br>RSK-6b: Improve Leak Detection Capability<br>RSK-6c: Reduce Mainline Valve Spacing ~~None available.~~ | Class I<br>RSK-6a: Increase Inspection of Mechanical Integrity<br>RSK-6b: Improve Leak Detection Capability<br>RSK-6c: Reduce Mainline Valve Spacing ~~None available.~~ |
| Impact RSK-7. Expose workers and public to hazardous levels of airborne silica during the use of proppant | Class II<br>RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System<br>RSK-7b: Reduce Emissions from Dust-Causing Activities | Class II<br>RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System<br>RSK-7b: Reduce Emissions from Dust-Causing Activities | Class II<br>RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System<br>RSK-7b: Reduce Emissions from Dust-Causing Activities | Class II<br>RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System<br>RSK-7b: Reduce Emissions from Dust-Causing Activities |
| **TRANSPORTATION AND TRAFFIC** | | | | |
| Impact TR-1. Generate additional truck traffic and disrupt traffic operations | Class I (transport of hazardous materials) or V<br>None available. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact TR-2. Inadvertently damage road rights-of-way | Class II<br>TR-2a: Repair Roadway Damage | Class III<br>None required. | Class III<br>None required. | Class II in the City of Fillmore<br>TR-2a: Repair Roadway Damage |
| Impact TR-3. Cause traffic safety hazards for vehicles, bicyclists, and pedestrians | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact TR-4. Transport hazardous materials | Class I<br>TR-4a: Know Spill Prevention Measures | Class I<br>TR-4a: Know Spill Prevention Measures | Class I<br>TR-4a: Know Spill Prevention Measures | Class I<br>TR-4a: Know Spill Prevention Measures |
| Impact TR-5. Change air traffic patterns | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. | Class IV<br>None required. |
| Impact TR-6. Temporarily interfere with emergency response | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| **UTILITIES AND SERVICE SYSTEMS** | | | | |
| Impact UTL-1. Adversely affect utilities and service systems due to population growth from Project-related development | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact UTL-2. Require new or expanded electrical or natural gas infrastructure | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact UTL-3. Exceed existing municipal wastewater treatment provider capacities | Class IV (Direct)<br>Class II (Indirect)<br>UTL-3a: Assess Wastewater Quality and Ensure Adequate ~~Compensation to~~Capacity to Process Wastewater at Municipal and Private Wastewater Treatment Plants | Class II<br>UTL-3a: Assess Wastewater Quality and Ensure Adequate Capacity to Process Wastewater at ~~Compensation to~~ Municipal and Private Wastewater Treatment Plants | Class II<br>UTL-3a: Assess Wastewater Quality and Ensure Adequate Capacity to Process Wastewater at ~~Compensation to~~ Municipal and Private Wastewater Treatment Plants | Class II<br>UTL-3a: Assess Wastewater Quality and Ensure Adequate Capacity to Process Wastewater at ~~Compensation to~~ Municipal and Private Wastewater Treatment Plants |
| Impact UTL-4. Exceed permitted solid waste capacity of landfills | Class IV (Direct)<br>Class II (Indirect)<br>UTL-4a: Assess Non-Hazardous Solid Waste Generation and Ensure Adequate ~~Compensation to~~Capacity to Accept Solid Waste at Municipal and Private Solid Waste Facilities | Class II<br>UTL-4a: Assess Non-Hazardous Solid Waste Generation and Ensure Adequate Capacity to Accept Solid Waste at ~~Compensation to~~Municipal and Private Solid Waste Facilities | Class II<br>UTL-4a: Assess Non-Hazardous Solid Waste Generation and Ensure Adequate Capacity to Accept Solid Waste at ~~Compensation to~~Municipal and Private Solid Waste Facilities. | Class II<br>UTL-4a: Assess Non-Hazardous Solid Waste Generation and Ensure Adequate Capacity to Accept Solid Waste at ~~Compensation to~~Municipal and Private Solid Waste Facilities. |

1 - Mitigation measures recommended herein are addressed to well stimulation treatment activities, but sometimes are also relevant to indirect impacts not caused by well stimulation but by other activities (e.g., increased drilling either within or outside of existing oil and gas fields). In the latter situation, the identified measures thus are only model measures that could be followed, likely with some modification, in connection with approvals of other projects contributing to indirect effects.

## 12.4    Well Pad Consolidation Alternative (Alternative 3)

The Well Pad Consolidation Alternative (Alternative 3) is to reduce the amount of land used for drilling in new areas of the State opened up by well stimulation technologies. It would not limit the amount of well stimulation in the future. This alternative has been developed primarily for consideration by local and State agencies with jurisdiction over sensitive surface resources, and would not be implemented by DOGGR by itself. As applied in particular counties and incorporated cities, this alternative would likely require local legislative actions amending existing general plans and zoning, and possibly grading ordinances. ~~Under this alternative the project standards for resource protection (see EIR Section 7.5) would not be implemented.~~ EIR Section 8.3.3 provides the details of this alternative.

As with Alternative 1, this alternative assumes that any action taken by the State to restrict or limit well stimulation activities would not be applicable in areas under federal or tribal jurisdiction. Any activity that is currently allowed in areas under federal or tribal jurisdiction would continue to be allowed, and could increase, stay the same, or decrease in intensity. The current permitting and environmental review processes applicable to stimulation activities in areas under federal and tribal jurisdiction would continue to apply to new well stimulation projects in those areas, and therefore impacts are assumed to be mitigated as appropriate and feasible. The analysis below for this alternative focuses only on activities in areas under State jurisdiction, and includes the assumption that the analysis of effects in areas under federal or tribal jurisdiction would be the same as with Alternative 1. Therefore, effects in areas under federal or tribal jurisdiction are not considered in the analysis of this alternative.

The Well Pad Consolidation Alternative would apply primarily outside of existing oil and gas fields, in areas where resources would potentially become recoverable due to advances in well stimulation technologies and increased understanding of California's geology. The goal of the Well Pad Consolidation Alternative is to reduce the amount of land used for drilling in new areas that may be opened to oil and gas development by well stimulation technologies. It would not limit the amount of well stimulation in the future, but would try to minimize surface impacts by minimizing the number of separate drilling pads needed to conduct multiple drilling operations. For existing fields, it is anticipated that most future drilling would rely on existing roads and pads, therefore substantially negating the need for or benefit of consolidation.

This alternative has been developed primarily for consideration by local and State agencies having jurisdiction over land development and sensitive surface resources, and would not be implemented by DOGGR by itself. However, as part of this alternative, DOGGR could develop Field Rules specific to an oil and gas field with the goal of reducing the disturbance footprint associated with well drilling and stimulation. If applied in particular counties and incorporated cities, this alternative could require local legislative actions amending existing general plans and zoning, and possibly grading and other ordinances. In order to allow wells to be drilled less than 150 feet apart; however, legislative action might be necessary to modify the current language of PRC Section 3606. That statute generally provides, in pertinent part, that "where a parcel of land contains one acre or more and where all or substantially all of the surface of such parcel of land is unavailable for the surface location of oil or gas wells, *there may be drilled or produced not more than one well into each acre of such parcel of land*[.]" In applying the statute as currently written, uncertainty is created by the need to show, before more than one well per acre can be permitted, that, within a parcel considered for drilling, "substantially all of the surface of the land is unavailable for surface location" of wells. Absent legislative clarification or modification of this requirement, disputes over its meaning in particular circumstances could create challenges for local agencies seeking to implement this alternative in a form that permits more than one well per acre.

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 679 of 836    Page
ID #:11405
Analysis of Oil and Gas Well Stimulation Treatments in California
12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES

At the State level, the primary agency involved would be the Department of Fish and Wildlife, which has authority over actions affecting the bed and banks of water bodies and over the incidental take of endangered and threatened species. Regional Water Quality Control Boards would also be concerned about potential water quality impacts, and the State Historic Preservation Officer and the Native American Heritage Commission would be interested in possible impacts to cultural resources. At the federal level, the USACE could be involved in the issuance of dredge and fill (404) permits for wetlands or other aquatic features subject to federal jurisdiction. (Wet features beyond federal jurisdiction would be subject to state regulation by Regional Water Quality Control Boards.) The U.S. Fish and Wildlife Service would work with the USACE to ensure compliance with the federal Endangered Species Act or could approve habitat conservation plans (HCPs) proposed by entities or persons other than federal agencies.

Under this alternative, ground disturbance for exploratory wells would be limited to the minimum feasible amounts. If exploratory wells do not identify future viable resources, ground disturbance would be rehabilitated to pre-disturbance conditions, as feasible.

The Well Pad Consolidation Alternative would require well owners/operators to use multi-well pads (i.e., individual pads that serve multiple wells) to recover oil and gas resources, thereby reducing the number of pads needed. Horizontal drilling would be preferable whenever feasible to allow additional wells to be reached from one access point. This alternative also would require well owners/operators to use existing infrastructure wherever possible, in particular existing access roads. In areas outside of existing fields where new infrastructure would be needed, well owners/operators would be required to share access roads to the greatest extent feasible, minimize the ground disturbance during construction, and rehabilitate temporary ground disturbance to pre-disturbance conditions.

In addition to an analysis of the alternative itself, the analysis of Alternative 2 highlights how impacts under this alternative would be different from impacts under the project. Where no difference is specifically noted, the significance of impacts under the alternative are the same as the impacts under the project.

## 12.4.1    Aesthetics

### 12.4.1.1    Introduction

This section provides an evaluation of the potential impacts to visual resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.1 (Aesthetics) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.1 (Aesthetics). For the purposes of this analysis please refer to EIR Sections 10.1.2 and 11.1.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.1.3 and 11.1.3 for a description of the affected environment for visual resources (as applicable at either a study region or field-specific scale), and EIR Section 10.1.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.1.2    Programmatic Level Analysis of the Project

Increasingly, multiple wells are being completed from a single well pad. While drill rigs required for directional drilling are larger than rigs required for conventional drilling, they are present only for the several months needed to complete the well. Because of their height, they would be visible from a greater distance, but given the relatively short time a rig would be at a site, this is a less than significant impact. Pads supporting multiple wells typically are larger than pads for single wells; however, there

would be fewer pads needed in a field to achieve the same level of resource recovery from the target formations. Fewer pads also would reduce the number of access roads or spur roads in a field. Overall, this alternative would reduce land disturbance by clustering wells at fewer location and by reducing access road requirements.

In locations outside of existing fields, development of new wells for stimulation could be a significant impact. Depending on site location, amount and type of existing development, distance from viewer, view duration, and other factors affecting visibility and visual quality, this impact would be reduced to less than significant with mitigation (Class II) or would remain significant (Class I). The full text of mitigation measures is found in EIR Section 10.1.5. Where impacts could result from projects not involving well stimulation treatment, these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

| Impact AES-1    Substantially adversely affect scenic vistas |
|---|

Well stimulation itself is a short duration, temporary activity and typically does not require earthwork or vegetation removal. At the conclusion of the operation the site would be left largely unchanged from pre-stimulation conditions. Creation of new fields in new areas would require development of access roads and well pads, use of drill rigs, delivery of materials (drill pipe, drilling mud, well casing, cement, and other materials), installation of pumps and piping, and development of storage tanks and production facilities. Under the project, more well pads would be developed as compared to Alternative 3, which requires consolidation of pads. The requirement to consolidate wells in new fields would reduce the number of pads and likely result in them being farther apart. This would reduce the number of access roads and spurs to pads as well. Overall, under Alternative 3, well consolidation would result in less impact to vistas in areas outside of existing fields as compared to the project, where consolidation would not be required. However, depending on local conditions, if the new field is visible to a vantage point from which a scenic vista is observed, the impact could be significant even with well pad consolidation. Implementation of Mitigation Measures AES-1a and AES-1b, or similar measures by agencies having jurisdiction over land site surface alterations and facility development, would reduce the severity of the impact.

**MM AES-1a** **Prepare and Implement a Site Plan to Reduce Visual Impacts.** (Full text in EIR Section 10.1.5.)

**MM AES-1b** **Minimize Lighting Visibility Offsite.** (Full text in EIR Section 10.1.5.)

Because of the wide variability in California's visual landscapes, a project-specific analysis would be required to determine if these or similar measures would reduce a particular project's impact to a less than significant level with mitigation (Class II) or if the impact would remain significant (Class I).

| Impact AES-2    Substantially alter or damage scenic resources |
|---|

Scenic resources include scenic highways, notable rock formations, historic structures, noteworthy trees, and similar elements.

In new fields, well pads, access roads, and infrastructure would need to be developed. If there are scenic resources at or near the site, these could be altered or damaged or their value substantially diminished even with well pad consolidation. Implementation of Mitigation Measure AES-1a, or a similar measure by agencies having jurisdiction, would reduce the severity of the impact.

**MM AES-1a** **Prepare and Implement a Site Plan to Reduce Visual Impacts.** (Full text in EIR Section 10.1.5.)

As with Impact AES-1 on vistas, consolidation of wells in new areas under Alternative 3 would reduce the impact on scenic resources as compared to the project, where consolidation is not required. However, a project-specific analysis would be required to determine if these or similar measures would reduce the impact to a less than significant level with mitigation (Class II) or if the impact would remain significant (Class I).

| **Impact AES-3** | **Substantially degrade the existing visual character or quality of a site and its surroundings** |
|---|---|

The visual character or quality of a site represents a composite impression of a site as perceived by an observer. Equipment, vehicles, and materials used during well stimulation work would likely introduce colors, forms, and lines that contrast with existing conditions at and around the site, degrading the visual character and quality of the site. Depending on viewer location, these introduced elements could block views, further contributing to the adverse visual change.

In new oil and gas fields, the infrastructure associated with an oil and gas field would have to be developed, introducing visual changes in the existing character of the site and locality. The impact could be significant. Implementation of Mitigation Measures AES-1a and AES-1b, or similar measures by agencies having jurisdiction, would reduce the severity of the impact.

**MM AES-1a** **Prepare and Implement a Site Plan to Reduce Visual Impacts <u>to Sensitive Receptors</u>.** (Full text in EIR Section 10.1.5.)

**MM AES-1b** **Minimize Lighting Visibility Offsite.** (Full text in EIR Section 10.1.5.)

By reducing the number of pads, increasing their spacing, and reducing the number of access and spur roads, consolidation of wells in new areas under Alternative 3 would reduce impacts on the existing visual character of an area as compared to the project, where consolidation would not be required. However, because of the wide variability in existing visual environments, a project-specific analysis would be required to determine if these or similar measures would reduce the impact to a less than significant level with mitigation (Class II) or if the impact would remain significant (Class I).

| **Impact AES-4** | **Create new sources of substantial light and glare** |
|---|---|

Night work during well stimulation would be unusual because a stimulation typically is a short duration activity and can be stopped between stimulations. If it night work did occur, temporary lighting would be required for safety during the night hours. During the day, equipment or vehicles with reflective surfaces, such as stainless steel tanks or windshields, can create glare as seen from various vantage points as the sun transits the sky or as vehicles move.

In new fields, if stimulation proves successful and wells are economically viable, infrastructure would be developed and operated. This would introduce new light sources into an area. For example, once underway, well drilling typically is a 24-hour operation, with derricks and nearby work areas lit during the night for safety. If a field is established, the presence of wells, pipelines, tank farms and other necessary facilities and equipment may require night lighting for safety and security, although this would be limited. During the day, glare could be created by reflected light off of vehicle windshields or any highly reflective surface. Implementation of Mitigation Measures AES-1a and AES-1b, or similar measures by agencies having jurisdiction, would reduce the severity of the impact.

**MM AES-1a**    **Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors.** (Full text in EIR Section 10.1.5.)

**MM AES-1b**    **Minimize Lighting Visibility Offsite.** (Full text in EIR Section 10.1.5.)

By reducing the number of pads and increasing their spacing, consolidation of wells in new areas under Alternative 3 would reduce impacts from light and glare as compared to the project, where consolidation would not be required. A project-specific analysis would be required to determine if these or similar measures would reduce the impact to a less than significant level with mitigation (Class II) or if the impact would remain significant (Class I).

### 12.4.1.3    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Alternative 3 would cause consolidation of wells in new fields, but would not have an effect on existing fields such as the Wilmington, Inglewood, and Sespe Oil and Gas Fields, which are largely developed and where consolidation opportunities are limited.

Well stimulation in the Wilmington Oil and Gas Field is anticipated to be limited to the THUMS artificial islands off Long Beach. This already represents a consolidation of wells and adoption of an alternative that requires multiple wells be developed from a well pad would not apply. Onshore, wells in the Wilmington field are drilled from available locations, which are limited, given the high level of development in the Los Angeles-Long Beach area and applicable local regulations. Impacts of stimulation under Alternative 3 would be less than significant (Class III).

Under the Baldwin Hills Community Standards, Inglewood Oil and Gas Field would minimize impacts and be required to meet certain standards. This would encourage the consolidation of wells if this would achieve the same level of resource recover as wells scattered on individual pads. With implementation of the Community Standards requirements, impacts of stimulation under Alternative 3 would be less than significant (Class III).

In the Sespe Oil and Gas Field, the cost of preparing well pads in the rugged terrain encourages the development of multiple wells from single pads. Likewise, the topography constrains the ability to create new access roads. As a result, wells have tended to be clustered. In addition, restrictions on surface development on federal lands within the field have encouraged the use of directional drilling to access resources. This is expected to be the situation going into the future as well. Therefore, this alternative is likely to have little effect on how the field is developed and maintained, since the range of alternative approaches is limited by existing land use constraints, ownership, and topography. Impacts of stimulation under Alternative 3 would be less than significant (Class III).

### 12.4.1.4    Impact Significance Summary

Under Alternative 3, similar potential impacts similar to those identified for the project would occur to visual resources at existing fields. Consolidation of wells on fewer pads in new fields would reduce the amount of ground disturbance, but industrial visual elements would still be introduced into the landscape. The significance of the changes in the visual landscape would depend on the location of the field and the vantage points from which it would be visible. These can be determined only after a field is discovered and development plans prepared. Therefore, the same mitigation measures as recommended for the project would apply to Alternative 3.

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from projects not involving well stimulation treatment, these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.2    Agriculture and Forestry Resources

### 12.4.2.1    Introduction

This section provides an evaluation of the potential impacts to agriculture and forestry resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.2 (Agriculture and Forestry Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.2 (Agriculture and Forestry Resources). For the purposes of this analysis please refer to EIR Sections 10.2.2 and 11.2.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.2.3 and 11.2.3 for a description of the affected environment for agriculture and forestry resources (as applicable at either a study region or field-specific scale), and EIR Section 10.2.4 for details regarding the impact methodology and significance criteria that have been used.

~~Under this alternative the project standards for resource protection (see EIR Section 7.5) would not be implemented, which would result in greater indirect impacts on agricultural and forestry resources (Impact AGF-5, Directly or indirectly impair the use of agricultural land or forest land). Without the Water Recycling Standards, there would be an increase in competition for agricultural water supplies, because less water would be recycled. In addition, the potential for contamination of agricultural water supplies would be increased without implementation the Surface Water Protection Standards and Groundwater Protection Standards.~~

### 12.4.2.2    Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 3 would apply primarily to areas outside of existing oil and gas fields and their buffers, with the goal of reducing the amount of land used for drilling in new areas opened by well stimulation techniques. Therefore, Alternative 3 would reduce overall impacts on agricultural and forestry resources. There would be reduced impacts related to construction of new well pads and associated facilities for projects dependent on well stimulation treatments by reducing the extent of disturbance and the amount of land occupied.

Although overall impacts would be reduced, on a site-specific basic there could still be the following potential impacts to agriculture and forest land if either is present at the location of a new well pad:

- **Impact AGF-1.** Convert Prime Farmland, Unique Farmland, or Farmland of statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use

- **Impact AGF-2.** Conflict with existing zoning for agricultural use or with Williamson Act contracts

- **Impact AGF-3.** Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production

- **Impact AGF-4.** Result in the loss of forest land or conversion of forest land to non-forest use

- **Impact AGF-5.** Directly or indirectly impair the use of agricultural land or forest land

As explained in EIR Section 10.2 (Agriculture and Forestry Resources), implementation of the mitigation measures below or equally or more stringent measures by the local Lead Agency would reduce all Agriculture and Forestry Resources impacts to a less than significant level (Class II). While impacts under the project and Alternative 3 would be Class II, they would be somewhat less severe under Alternative 3 because well pad consolidation would result in less land disturbance.

**MM AGF-1a**    **Minimize Impacts to Important Farmland.** (Full text in EIR Section 10.2.5.)

**MM AGF-1b**    **Develop an Agricultural Resources Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-1c**    **Compensate for Loss of Important Farmland.** (Full text in EIR Section 10.2.5.)

**MM AGF-4a**    **Minimize Impacts to Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AGF-4b**    **Develop a Forest Land Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-4c**    **Compensate for Loss of Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AQ-2c**    **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

**MM BIOT-2a**    **Prevent Hazards to Fish and Wildlife.** (Full text in EIR Section 10.4.5.)

**MM HAZ-1a**    <u>**Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**</u>~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~. (Full text in EIR Section 10.13.5.)

**MM GW-4b**    <u>**Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments**</u>~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~. (Full text in EIR Section 10.14.5.)

### 12.4.2.3    Programmatic Level Analysis of Specific Oil and Gas Fields

The Well Pad Consolidation Alternative would mainly reduce impacts outside of existing fields. However, it could be used in existing fields and their buffers. Project-level impacts would be essentially the same as discussed in EIR Section 11.2 (Agriculture and Forestry Resources).

***Wilmington Oil and Gas Field***

There would be no impacts under this alternative or under the project because there is no forested land or designated Farmland within the Wilmington Oil and Gas Field (Class IV).

***Inglewood Oil and Gas Field***

The Inglewood Oil and Gas Field does not contain any mapped farmland so no direct or indirect impacts would occur to agriculture (Impacts AGR-1 and AGF-2 [Class IV]). Likewise, The Inglewood Oil and Gas Field is not zoned for forest land or timberland, therefore, Impact AGF-3 would not occur (Class IV).

Because the Inglewood Oil and Gas Field is an existing field, it is anticipated that most future drilling would use existing roads and pads. However, there are 7.6 acres of forest land within a 0.25-mile buffer surrounding the Inglewood field. Impacts associated with stimulation activities for the Inglewood Oil and

Gas Field for Alternative 3 would be the same as those described in EIR Section 10.2 (Agriculture and Forestry Resources) for Impacts AGF-4 (Result in the loss of forest land or conversion of forest land to non-forest use) and AGF-5 (Directly or indirectly impair the use of agricultural land or forest land). Implementation of Mitigation Measures AGF-4a, AGF-4b, AGF-4c,AQ-2c, and BIO2a would reduce the majority of potential environmental impacts, including conversion of forest land to a non-forest use, to a less than significant level through resource protection measures and compensation (Class II).

***Sespe Oil and Gas Field***

The Well Pad Consolidation Alternative would not substantially reduce impacts on agricultural and forestry resources within the Sespe Oil and Gas Field. Although it is anticipated that most future drilling would use existing roads and pads, there would be impacts related to construction of new well pads and associated facilities for projects dependent on well stimulation treatments. There would also be potential impacts on agricultural water quality or water supplies. See EIR Section 11.2 for a detailed discussion (Agriculture and Forestry Resources).

### 12.4.2.4    Impact Significance Summary

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.3    Air Quality

### 12.4.3.1    Introduction

This section provides an evaluation of the potential impacts to air quality associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.3 (Air Quality) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.3 (Air Quality). For the purposes of this analysis please refer to EIR Sections 10.3.2 and 11.3.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.3.3 and 11.3.3 for a description of the affected environment for air quality (as applicable at either a study region or field-specific scale), and EIR Section 10.3.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.3.2    Programmatic Level Analysis of Impacts and Mitigation Measures

| Impact AQ-1 | Conflict with or obstruct implementation of an applicable air quality plan |
|---|---|

| Impact AQ-2 | Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation |
|---|---|

| Impact AQ-3 | Expose sensitive receptors to substantial pollutant concentrations |
|---|---|

| Impact AQ-4    Create objectionable odors affecting a substantial number of people |
|---|

This alternative would restrict future oil and gas activity in certain areas and would facilitate sharing of ancillary infrastructure, like access roads, to minimize ground disturbance. The Well Pad Consolidation Alternative would not limit the amount of well stimulation in the future, but would try to minimize surface impacts by minimizing the number of separate drilling pads needed to conduct multiple drilling operations. Therefore, the intensification of traditional drilling and the importation of oil expected under Alternatives 1 and 2 would not occur under this alternative.

Because using existing infrastructure where possible and minimizing ground disturbance would avoid some sources of dust and other emissions, emissions would occur at similar or slightly reduced levels when compared with the project. Emissions from oil and gas activity could occur at levels exceeding the forecasts of air quality plans, as they would with the project, which may cause a potential conflict with local air quality plans.

The levels of criteria air pollutant emissions caused by equipment and sources typical of well stimulation treatments, hauling product by truck, and new well drilling would be similar to those described for the project and may exceed general mass-based emission thresholds of a local air district. This alternative would retain the potential to expose sensitive receptors to substantial pollutant concentrations and create objectionable odors as with the project. Although some sources of emissions may be avoided, each of the air quality impacts would be as described for the project, and the mitigation identified for the project (EIR Section 10.3.5) would be applicable.

### 12.4.3.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 3, these existing fields would be subject to the same potential impacts and mitigation measures as described for programmatic level analyses of the project (EIR Section 11.3.5). Emissions associated with existing well stimulation treatments at the Wilmington and Sespe would occur at a similar or slightly reduced level and would be within the level of activity assumed by the air quality plan. New emissions at the Inglewood Oil and Gas Field under this alternative would be subject to the same potential air quality impacts and mitigation measures as described for the project (EIR Section 11.3.5). Because each new well stimulation treatment operation creates "new" emissions, which could be potentially significant, mitigation would be necessary. Although Impact AQ-1 would be a Class III: Less Than Significant Impact, the remaining air quality impacts would occur as shown in EIR Section 10.3.5 (Impacts Common to All Study Regions). Mitigation measures identified for Impact AQ-2, Impact AQ-3, and Impact AQ-4 would be applicable within each field, and the resulting impacts after implementing mitigation would be significant and unavoidable (Class I).

### 12.4.3.4    Impact Significance Summary

Although some emissions related to well stimulation treatments would be avoided under Alternative 3, emissions from oil and gas activity would occur at levels comparable to those of the project. Each of the air quality impacts due to well stimulation treatments would be as described for the project. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.3 for air quality effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.4    Biological Resources: Terrestrial Environment

### 12.4.4.1    Introduction

This section provides an evaluation of the potential impacts to terrestrial biological resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.4 (Biological Resources: Terrestrial Environment) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.4 (Biological Resources–Terrestrial Environment). For the purposes of this analysis please refer to EIR Sections 10.4.2 and 11.4.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.4.3 and 11.4.3 for a description of the affected environment for terrestrial biology (as applicable at either a study region or field-specific scale), and EIR Section 10.4.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, compared to the project, there would be the potential for an increase in oil and gas development and associated well stimulation in biologically sensitive areas, slightly greater habitat loss without setbacks from perennial surface water, an increase in water usage that could affect fish and wildlife habitat (due to less water recycling), and an increase in the potential for contamination of water supplies that could affect biological resources.~~

### 12.4.4.2    Programmatic Level Analysis of the Project

Alternative 3, the Well Pad Consolidation Alternative, would generally reduce overall impacts to terrestrial biological resources, but the actual reduction cannot be quantified. Alternative 3 would reduce and consolidate overall acreage of surface disturbance from well stimulation technology. This would reduce impacts to native vegetation and habitat, jurisdictional waters of the State and waters of the U.S., and special-status plants, fish, and wildlife using that habitat or surrounding areas. Well pad consolidation also would generally reduce impacts to fish and wildlife movement and biological connectivity by reducing the number of disturbed areas, although individual disturbance sites may be larger.

The impacts to terrestrial biological resources under Alternative 3 would be reduced in overall extent, but the impacts themselves, and where they would occur, would be similar to those described in EIR Sections 10.4 and 11.4. Depending on specific locations of future well stimulation activities, even with these activities located on consolidated well pads, the potential impacts to biological resources may range from Class I (significant and unavoidable) to Class III (less than significant). Due to the unknown locations of future well stimulation activities, this analysis presumes the "reasonable worst case" statewide impacts of well stimulation, which generally are Class I or Class II. However, Alternative 3 could substantially reduce the expected overall impacts of well stimulation activities statewide, by consolidating those activities.

Under Alternative 3, impacts to biological resources may be significant and unavoidable (Class I). This would apply to all the biological resources impact criteria BIOT-1 through BIOT-6 (addressing impacts to plants, fish, and wildlife and their habitats and natural communities) and BIOT-10 (greenhouse gas effects and consequent impacts to biological resources), below. In contrast, Impacts BIOT-8 and BIOT-9 (addressing conflicts with conservation policies and planning) are Class II impacts under the this alternative (and under the project).

Mitigation Measures BIOT-1a through BIOT-9a would reduce these impacts, but some impacts may remain significant even after mitigation. <u>Mitigation Measures GW-1a, GW-1b, GW-4a, GW-4b, SWR-1a, SWR-2a and SWR-3a</u> ~~Additional mitigation measures~~ or other conditions may be required under other regulatory programs including but not limited to CESA, ESA, state and federal regulation of waters of the State and waters of the U.S. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.4 for effects on terrestrial biological resources would have to be adapted to project approvals other than well stimulation treatment permits.

### 12.4.4.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Although the Well Pad Consolidation Alternative would be primarily aimed at reducing surface impacts in new oil and gas fields outside existing fields, the Alternative could also reduce the footprints of future well drilling and well stimulation treatment operations in the Wilmington, Inglewood, and Sespe Oil and Gas Fields. The actual extent of reduction cannot be quantified. In qualitative terms, the potential loss or degradation of terrestrial biological resources would be as described in EIR Section 11.4, and would be dependent on season and location of any particular production activity (i.e., site preparation, drilling, and ancillary activities), and generally may range from Class I to Class III. The likely extent of oil and gas production in biologically sensitive areas would probably be reduced under Alternative 3, but the impacts themselves, and where they occur, would be similar to those described in EIR Section 11.4. The mitigation measures in EIR Section 11.4 would be applicable to these well-stimulation treatment projects, and could be adapted to projects directly involving exploration and drilling rather than well stimulation. While the extent of impacts may be reduced, the categories for each biological resource impact within the Wilmington, Inglewood, and Sespe Oil and Gas Fields would be unchanged from the project, including several that would remain Class I for the presumed "reasonable worst case." Potential "reasonable worst-case" impacts to biological resources would be Class I for Impacts BIOT-1 through BIOT-6 and BIOT-7 (Sespe field only); Class II for Impacts BIOT-8 and BIOT-9; and Class III for Impacts BIOT-7 (for the Wilmington and Inglewood fields) and BIOT-10 (as they would be under the project).

### 12.4.4.4    Impact Significance Summary

Under Alternative 3 (Well Pad Consolidation), impacts to biological resources would generally be reduced compared with the project. However, the magnitude of reduced impacts cannot be determined, so significance conclusions would remain the same as those for the project.

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.4 for effects on terrestrial biological resources would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.5    Biological Resources: Coastal and Marine Environment

Alternative 3 (Well Pad Consolidation) does not apply to coastal and marine biological resources. Impacts would be the same as those of the project.

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.4.6    Coastal Processes and Marine Water Quality

Alternative 3 (Well Pad Consolidation) does not apply to coastal processes and marine water quality. Impacts would be the same as those of the project.

## 12.4.7    Commercial and Recreational Fishing

Alternative 3 (Well Pad Consolidation) does not apply to commercial and recreational fishing. Impacts would be the same as those of the project.

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.4.8    Cultural Resources

### 12.4.8.1    Introduction

This section provides an evaluation of the potential impacts to cultural resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.8 (Cultural Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.8 (Cultural Resources). For the purposes of this analysis please refer to EIR Sections 10.8.2 and 11.8.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.8.3 and 11.8.3 for a description of the affected environment for cultural resources (as applicable at either a study region or field-specific scale), and EIR Section 10.8.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.8.2    Programmatic Level Analysis of the Project

For the purposes of this analysis, the following impacts are addressed:

- **Impact CUL-1:** Affect historic-era archaeological and built-environment resources

- **Impact CUL-2:** Affect prehistoric resources

- **Impact CUL-3:** Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony

- **Impact CUL-4:** Affect cultural landscapes

Under Alternative 3, the geographic extent of impacts to cultural resources would be substantially lessened in comparison to the project, and the risk of adverse impacts to cultural resources would be correspondingly reduced. At a programmatic level of analysis, it is not possible to know precisely the location, extent and particular characteristics of potential impacts to these resources.

Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would reduce these effects but cannot guarantee they would be entirely avoided. Therefore, cultural resources impacts would remain significant and unavoidable (Class I). Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.8 for cultural resource effects would have to be adapted to project approvals other than well stimulation treatment permits.

The area of disturbance associated with Alternative 3 would be smaller than that of the project, including areas that are likely to be sensitive for cultural resources. ~~However, Alternative 3 does not incorporate the project standards for Resource Protection (see EIR Section 7.5 (Description of the Project, project standards for Resource Protection)) that restrict well stimulation activities from operating near surface water or critical habitats. Thus, while Alternative 3 would likely impact a smaller number of cultural resources, it would impact a larger number of other types of cultural resources associated with the project's protected areas (see Appendix F).~~

### 12.4.8.3    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling and well stimulation activities would use existing roads and pads to the greatest extent possible. Impacts within fields would be the same as what is described in EIR Section 11.8 (Cultural Resources). Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 11.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would likely reduce these effects to less than significant but cannot guarantee they would be entirely avoided. Therefore, impacts to cultural resources are considered significant and unavoidable (Class I).

### 12.4.8.4    Impact Significance Summary

Alternative 3 would reduce the potential impacts to cultural resources in all study regions because the overall footprint of well stimulation disturbances would be reduced in comparison to the project. Implementation of Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures) and EIR Section 11.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would reduce these effects, but cannot guarantee they would be entirely avoided. Potential impacts are therefore considered significant and unavoidable (Class I).

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where such measures would be imposed on projects that do not involve well stimulation treatment, the measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.9    Paleontological Resources

### 12.4.9.1    Introduction

This section provides an evaluation of the potential impacts to paleontological resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.9 (Paleontological Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.9 (Paleontological Resources). For the purposes of this analysis please refer to EIR Sections 10.9.2 and 11.9.2 for relevant State, federal, and local regulations and standards (as Applicable at either a study region or field-specific scale), EIR Sections 10.9.3 and 11.9.3 for a description of the affected environment for paleontological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.9.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.9.2    Programmatic Level Analysis of the Project

For the purposes of this analysis, the following impact is addressed:

■ **Impact PALEO-1:** Destroy or disturb surface or near-surface significant paleontological resources

Table 10.9-8 in EIR Section 10.9 provides a summary table of the geologic units in each study region that have the potential to bear significant paleontological resources. Alternative 3 reduces the overall amount of ground disturbing activities that could result in Class II impacts to paleontological resources.

The Well Pad Consolidation Alternative would reduce the amount of land used for drilling in new areas of the State that could be developed with the advancement of new well stimulation technologies. This alternative would reduce the overall amount of new ground disturbance in a number of ways, including setting limitations on the width of new access roads to no more than 25 feet, utilizing multi-well pads, and using existing infrastructure such as existing access roads. Therefore, the geographic extent of potential impacts to paleontological resources would be substantially lessened in comparison to the project, and thus the risk of adverse impacts would be correspondingly reduced. Implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9.2 (No Future Well Stimulation Treatments Alternative (Alternative 1)) and detailed in EIR Section 10.9.5 Paleontological Resources, Impact Analysis and Mitigation Measures) would be expected to reduce Impact PALEO-1 to less than significant (Class II) because the mitigation measures would allow for the recovery, preparation, analysis, and curation of the paleontological resources that may be made available for future scientific studies, which may result in important taphonomic, taxonomic, phylogenetic, paleoecologic, stratigraphic, or biochronological discovery. ~~However, in those areas where earth disturbing activities could occur, Alternative 3 would not provide for the project's standards for resource protection, and thus would be expected to result in a greater overall number of impacts to paleontological resources in comparison to the project. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.9 for paleontological effects would have to be adapted to project approvals other than well stimulation treatment permits.~~

### 12.4.9.3    Programmatic Level Analysis of Specific Oil and Gas Fields

*Wilmington and Sespe Oil and Gas Fields*

Portions of the Wilmington and Sespe Oil and Gas Fields have paleontological resources potential (i.e., sensitivity) ranging from low to high (Wilmington) and very high (Sespe) and the likelihood of impacting scientifically significant vertebrate fossils is high. Because the Wilmington and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling and well stimulation activities would use existing roads and pads to the greatest extent possible. However, this is an assumption of the programmatic level analysis for these two fields. Therefore, potential impacts within the fields would be the same as what is described in EIR Section 11.9 (Paleontological Resources). Potential impacts would be mitigable to a level of less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9 (No Future Well Stimulation Treatments Alternative (Alternative 1)) and detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures).

*Inglewood Oil and Gas Field*

Because the Inglewood Oil and Gas Field is an existing field, it is anticipated that most future drilling and well stimulation activities would use existing roads and pads to the greatest extent possible. Impacts within the field would be the same as what is described in EIR Section 10.9 (Paleontological Resources). Potential impacts would be mitigable to a level of less than significant (Class II) with implementation of

Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9 (No Future Well Stimulation Treatments Alternative (Alternative 1)) and detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures).

~~Within these three fields, the Well Pad Consolidation Alternative could result in greater earth disturbing activities in comparison to the project because no standards for resource protection would be implemented. Therefore, Alternative 3 would have the potential to disturb a greater overall number of paleontological resources in comparison to the project.~~

### 12.4.9.4    Impact Significance Summary

At a programmatic level of analysis, the Well Pad Consolidation Alternative would reduce the potential impacts to paleontological resources in all study regions because the overall construction footprint associated with well stimulation treatments would be reduced when compared to the project. However, any new ground disturbances related to future oil and gas well stimulation treatments that would result in adverse impacts to paleontological resources would be less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h, as defined in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures). Site-specific impacts would also be less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h. ~~However, because no standards for resource protection would apply, in those areas where ground disturbing activities could occur under Alternative 3, the overall number of impacts to paleontological resources at a site-specific level would be anticipated to be greater in comparison to the project.~~

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where such measures would be imposed on projects that do not involve well stimulation treatment, the measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.10   Environmental Justice

### 12.4.10.1   Introduction

This section provides an evaluation of the potential impacts to environmental justice associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.10 (Environmental Justice) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.10 (Environmental Justice). For the purposes of this analysis please refer to EIR Sections 10.10.2 and 11.10.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.10.3 and 11.10.3 for a description of the affected environment for environmental justice (as applicable at either a study region or field-specific scale), and EIR Section 10.10.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.10.2   Programmatic Level Analysis of the Project

Under Alternative 3, wells in areas outside of existing fields would be required to be consolidated on pads. This would reduce the amount of disturbance overall in areas outside of existing fields, but likely would have minimal effect in existing fields. The goal of Alternative 3 is to reduce the amount of land used for drilling in new areas opened up by well stimulation technologies by consolidating well sites. Therefore, Alternative 3 would apply primarily to areas outside of existing oil and gas fields that would

potentially become recoverable due to advances in well stimulation technologies, most notably within the Monterey Formation and plays.

When compared to the project, Alternative 3 has the potential for both increasing and decreasing environmental justice issues. While it would reduce the total area possibly developed, should the selected new concentrated development areas be located adjacent to disproportionate numbers of minority or low-income populations, environmental justice impacts would be increased. Because of this uncertainty, Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) is proposed for Alternative 3. The location of all future well stimulation is not known. Therefore, the potential for environmental justice impacts from well stimulation occurring remains, and Mitigation Measure EJ-1a would apply throughout all study regions, including existing fields. The implementation of Mitigation Measure EJ-1a would allow DOGGR and/or the local jurisdiction to track the locations of well stimulation applications and develop strategies to address environmental justice issues should the arise. Implementation of this measure, in conjunction with other mitigation measures identified in this EIR, would reduce the environmental justice impact, but the degree to which this would occur cannot be determined at a programmatic level. It would require data on specific well locations, their impacts, and the location of affected populations.

**MM EJ-1a**    **Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments.** (Full text in EIR Section 10.10.5.)

### 12.4.10.3  Programmatic Level Analysis of Specific Oil and Gas Fields

At Wilmington, Inglewood, and Sespe Oil and Gas Fields, the location of most well pads is established, so Alternative 3 would have little effect. However, given that the location of future well stimulations is unknown, the potential for environmental justice impacts from well stimulation occurring remains, and Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) would apply. This would allow DOGGR or local authorities to consider what additional actions it may require or take. Implementation of this measure, in conjunction with other mitigation measures identified in this EIR, would reduce the environmental justice impact.

### 12.4.10.4  Impact Significance Summary

Alternative 3 has the potential for creating potential environmental justice issues should selected new well stimulation areas be clustered and located adjacent to disproportionate numbers of minority or low-income populations. Alternative 3 would require mitigation similar to Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) would apply and would reduce the environmental justice impact. Where this measure would be imposed on projects that do not involve well stimulation treatment, the measure would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.11  Geology, Soils and Mineral Resources

### 12.4.11.1  Introduction

This section provides an evaluation of the potential impacts to geology, soils and mineral resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.11 (Geology, Soils and Mineral Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.11 (Geology, Soils and Mineral Resources). For the purposes of this analysis please refer to EIR Sections

10.11.2 and 11.11.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.11.3 and 11.11.3 for a description of the affected environment for geology, soils and mineral resources (as applicable at either a study region or field-specific scale), and EIR Section 10.11.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.11.2   Programmatic Level Analysis of the Project

This alternative would restrict future oil and gas activity in certain areas and would facilitate sharing of ancillary infrastructure, like access roads, to minimize ground disturbance. This alternative is similar to the project, but reduces ground disturbance and associated erosion and soil impacts.

Minimizing ground disturbance would reduce Impact GEO-2 (Result in substantial soil erosion or the loss of topsoil), Impact GEO-3 (Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse), and Impact GEO-4 (Be located on expansive soil creating substantial risks to life or property) because some of the soil erosion or unstable and expansive soils would not be impacted. However, the overall reduction of ground disturbance would not be such as to reduce these impacts beyond their current significance levels (Class II, Class II, and Class III respectively). This is because, even with an overall reduction of ground disturbance, the potential for soil erosion, unstable units, and expansive soils to result in impacts still occurs and would require mitigation to be reduced to less than significant (for Impacts GEO-2 and GEO-3).

All other impacts associated with geology, soils, and mineral resources would remain the same as with the project described in EIR Section 10.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures). Thus, GEO-1 is Class II, GEO-5 is Class IV, GEO-6 is Class III or Class I, and GEO-7 is Class III.

### 12.4.11.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Geology, soils, and mineral resources settings for Study Regions 1 and 2 are discussed in EIR Section 11.11.3. Impacts and mitigation measures are discussed in EIR Section 11.11.5.

***Study Region 1: Wilmington and Inglewood Oil and Gas Field and Study Region 2: Sespe Oil and Gas Field***

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling would use existing roads and pads and would require minimal new ground disturbance, therefore negating the need for or benefit of consolidation. Impacts would be as described for the Programmatic Level Analysis, see EIR Section 11.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures).

### 12.4.11.4   Impact Significance Summary

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where such measures would be imposed on projects that do not involve well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.12   Greenhouse Gas Emissions

### 12.4.12.1   Introduction

This section provides an evaluation of the potential impacts to greenhouse gas emissions associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.12 (Greenhouse Gas Emissions) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.12 (Greenhouse Gas Emissions). For the purposes of this analysis please refer to EIR Sections 10.12.2 and 11.12.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.12.3 and 11.12.3 for a description of the affected environment for greenhouse gas emissions (as applicable at either a study region or field-specific scale), and EIR Section 10.12.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.12.2   Programmatic Level Analysis of Impacts and Mitigation Measures

This alternative would not involve a change in the amount of potential oil and gas production in California. California end users of oil and gas would continue to rely on the established supply as in the baseline. There would be no change in life-cycle GHG emissions of California's crude supply because the supply itself would not change. Each of the GHG impacts would be as described for the project (EIR Section 10.12.5). Mitigation identified for well stimulation treatments would apply, as recommended for the project.

### 12.4.12.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 3, well stimulation treatments would occur in the Wilmington and Sespe fields as expected under the project. Therefore, as described in EIR Section 11.12.5, GHG emissions associated with well stimulation treatments at Wilmington and Sespe would continue, and the extent of Impact GHG-1 is uncertain, ranging from a less than significant impact (Class III) to a significant, unavoidable impact (Class I). New well stimulation treatments at the Inglewood Oil and Gas Field would be subject to the same potential impacts (Class I) and would require the same mitigation measures as described for the project (EIR Section 11.12.5).

### 12.4.12.4   Impact Significance Summary

Some emissions related to well stimulation treatments would be limited by consolidating activities at well pads. However, each of the GHG impacts due to well stimulation treatments would be as described for the project. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.12 for effects related to greenhouse gas emissions would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.13   Hazards and Hazardous Materials

### 12.4.13.1   Introduction

This section provides an evaluation of the potential impacts to hazards and hazardous materials associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.13 (Hazards and Hazardous Materials) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.13 (Hazards

and Hazardous Materials). For the purposes of this analysis please refer to EIR Sections 10.13.2 and 11.13.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.13.3 and 11.13.3 for a description of the affected environment for hazards and hazardous materials (as applicable at either a study region or field-specific scale), and EIR Section 10.13.4 for details regarding the impact methodology and significance criteria that have been used.

## 12.4.13.2   Programmatic Level Analysis of the Project

The Well Pad Consolidation Alternative (Alternative 3) would apply primarily to areas outside of existing oil and gas fields and would require operators to have multiple wells on each well pad. Well pad consolidation may increase the number of horizontal wells, which could tend to consolidate hazardous chemical use to fewer sites, but increase the volume of this material at individual well pads. The key mitigation measure for hazards and hazardous materials impacts is involves preparation and implementation of a spill contingency plan, which, at DOGGR discretion, may include a requirement for the installation of a surface barrier between the ground and piping or flow lines that transmit pressurized well stimulation fluids (including hazardous materials). This mitigation measure covers equipment for which secondary containment is not currently required by existing regulations. Further, by being able to conduct multiple well stimulation activities from the same surface well pad, investments in permanent spill prevention systems such as a surface barrier (e.g., pavement) may be more cost effective and potentially more reliable than temporary barriers.

---

**Impact HAZ-1    Release hazardous materials into the environment from a spill or leak**

---

Alternative 3 would consolidate stimulation treatments to fewer, larger pads from which multiple wells would be drilled. This would occur in areas outside of existing fields. Alternative 3 may support investment in infrastructure to better contain hazardous substances.

However, hazards and hazardous materials impacts would remain potentially significant for well stimulation treatments even with pad consolidation. As discussed in EIR Section 10.13.5 (Hazards and Hazardous Materials, Impact Analysis and Mitigation Measures), it is difficult to anticipate the fate of the released chemicals in the environment because many individual chemical compounds within well stimulation fluids lack sufficient mobility and toxicity information. Available data indicate that many hydraulic fracturing chemical compounds are either highly soluble or miscible in water and/or have densities greater than water. Some chemicals may be transformed (degraded) by hydrolysis and, in some cases, degradation ("daughter") products are not known. Daughter products may be more hazardous than the parent chemicals.

Given these conditions, impacts from a spill or release could be significant. Therefore a revised mitigation measure is proposed.

**MM HAZ-1a    Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials** ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ (Full text in EIR Section 10.13.5.)

Revised Mitigation Measure HAZ-1a is recommended to be required at any well stimulation occurring inside or outside of an existing field. Additional discussion of the mitigation measure is found in Draft EIR Section 10.13.5.

Protective measures for prevention of spills or releases of hazardous materials are provided in both existing and proposed regulations. A summary of the key measures in the proposed SB 4 Well Stimulation Treatment Regulations is provided in EIR Section 10.13.5. Collectively, with implementation of revised MM HAZ-1a~~with inclusion of a barrier for all production facilities, regardless of the amount of time they are in place, and with~~ and surface water management, and implementation/enforcement of all of the existing and proposed regulations regarding the transport, handling, storage, conveyance, and management of hazardous materials, including the Spill Contingency Plan, which accounts for spills that may occur at pipes, valves, or supply lines, the impact of well stimulation materials on the environment in the event of a release, is considered less than significant with mitigation (Class II). Impact HAZ-1 is also Class II under the project, but Alternative 3 has a slight advantage by supporting investment in infrastructure that better contains hazardous substances.

### 12.4.13.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling would use existing roads and pads and the overall number of well stimulation treatments within the fields would be the same as for the project. As summarized in EIR Section 11.13.10, impacts from hazards and hazardous materials associated with well stimulation treatments were determined to be potentially significant. However, the significant impacts could be mitigated to a less than significant level with appropriate revised mitigation measures. In addition to the mitigation measure in the Programmatic Level Analysis, additional mitigation measures were added for onshore and offshore Wilmington, Inglewood, and Sespe Oil and Gas Fields, as summarized in Table 11.13-1. With mitigation, the impact under Alternative 3 would be less than significant (Class II).

### 12.4.13.4    Impact Significance Summary

Based on the programmatic level analysis of the project and programmatic level analysis of specific oil and gas fields, impacts from Alternative 3 are considered to be less than significant with mitigation (Class II).

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the revised mitigation measures developed in EIR Section 10.13 for effects related to hazards and hazardous materials would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.14    Groundwater Resources

### 12.4.14.1    Introduction

This section provides an evaluation of the potential impacts to groundwater resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.14 (Groundwater Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.14 (Groundwater Resources). For the purposes of this analysis please refer to EIR Sections 10.14.2 and 11.14.2 for relevant State, fed-

eral, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.14.3 and 11.14.3 for a description of the affected environment for groundwater resources (as applicable at either a study region or field-specific scale), and EIR Section 10.14.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative, which would result in greater potential for use of groundwater with no water recycling standards in place, and less protection of both groundwater resources as well as surface water resources that could recharge groundwater.~~

### 12.4.14.2   Programmatic Level Analysis of the Project

The Well Pad Consolidation Alternative would apply primarily to areas outside of existing oil and gas fields. This alternative would result in a preference for horizontal drilling to allow additional wells to be reached from one access point. As described in EIR Section 10.14.5, horizontal wells require more water for hydraulic fracturing than vertical wells, due to a larger number of stimulation stages per well. Therefore, this alternative may increase the quantity of water used for hydraulic fracturing. However, Alternative 3 impacts to groundwater quantity would also be mitigated through the revised mitigation measures associated with the project. Alternative 3 would not change the water quality impacts described in EIR Section 10.14.5. Groundwater quantity and quality impacts would be mitigated to a less than significant level by incorporating the revised mitigation measures identified below and summarized in Table 10.14-20.

Well pad consolidation could have some potential benefits for implementation of a mitigation measure proposed for preventing surface spills or leaks from impacting groundwater. The mitigation measure addresses equipment that is not currently included in the secondary containment regulations. By being able to conduct multiple well stimulation activities from the same surface well pad, investments in permanent spill prevention systems such as a surface barrier (e.g., pavement) may be more cost effective and potentially more reliable.

The impacts identified below (Impacts GW-1, GW-2, GW-3, GW-4, GW-5, GW-6, GW-7), with application of the indicated revised mitigation measures, would be reduced to a less than significant level for each impact (Class II) in all study regions. Where such measures would be imposed on projects that do not involve well stimulation treatment, the measures would have to be adapted to project approvals other than well stimulation treatment permits. The project would result in the same levels of impacts (Class II).

| Impact GW-1    Cause or contribute to overdraft conditions |
| --- |

With implementation of these revised mitigation measures, Impact GW-1 would be reduced to a less than significant level (Class II). Impact GW-1 is also Class II under the project; however, Alternative 3 may result in more horizontal wells that require more groundwater than the project.

**MM GW-1a**    **Use Alternative Water Sources to the Extent Feasible.** (Full text in EIR Section 10.14.5.)

**MM GW-1b**    **Minimize Groundwater~~Prepare a Third-Party Technical Report to Analyze Overdraft~~ Impacts.** (Full text in EIR Section 10.14.5.)

Analysis of Oil and Gas Well Stimulation Treatments in California
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

---

| | |
|---|---|
| **Impact GW-2** | **Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water** |

Depending on geologic conditions, groundwater pumping could result in land subsidence. It could also interfere with nearby water wells, including lowering the water level in the well to a point that they no longer function as intended. These would be significant impacts, which would be addressed by the recommended <u>revised</u> mitigation measure below. With implementation of this <u>revised</u> mitigation measure, Impact GW-2 would be reduced to a less than significant level (Class II). Impact GW-2 is also Class II under the project.

**MM GW-<u>1b</u>2a**    <u>Minimize Groundwater Impacts</u>~~Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping.~~ (Full text in EIR Section 10.14.5.)

| | |
|---|---|
| **Impact GW-3** | **Adversely impact groundwater quality from surface spills or leaks during well stimulation** |

Well stimulation could result in a spill on the work site or a leak that could allow the stimulation fluids or material to reach the protected water zone under a site. This would be a significant impact. The <u>revised</u> mitigation measures proposed in Hazards and Hazardous Waste would address this impact. The full description of this mitigation measure is found in EIR Section 10.13.5. With implementation of this <u>revised</u> mitigation measure, Impact GW-3 would be reduced to a less than significant level (Class II). Impact GW-3 is also Class II under the project.

**MM HAZ-1a**    <u>**Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**</u>~~**Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices**~~. (Full text in EIR Section 10.13.5.)

| | |
|---|---|
| **Impact GW-4** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals** |

Some wells in existing oil and gas fields may have non-existent or ineffective well seals, particularly if they are old or were improperly abandoned. This situation could result in the migration of stimulation fluids including gas through these pathways into protected water. To address this significant impact, three <u>revised</u> mitigation measures are identified. With implementation of these <u>revised</u> mitigation measures, Impact GW-4 would be reduced to a less than significant level (Class II). Impact GW-4 is also Class II under the project.

**MM GW-4a**    **Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation.** (Full text in EIR Section 10.14.5.)

**MM GW-4b**    <u>**Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments**</u>~~**Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin**~~. (Full text in EIR Section 10.14.5.)

**MM GW-4c**    **Install Methane Sensors on Wells** ~~**in the ADSA**~~<u>**Subject to Well Stimulation Treatments**</u>. (Full text in EIR Section 10.14.5.)

---

**Final EIR**                12.4-22                **June 2015**

| Impact GW-5 | Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells |
|---|---|

Some existing and abandoned wells in oil and gas fields may have damaged, non-existent, or ineffective well seals. This could create pathways for stimulation fluids injected in one well to migrate into Protected Water by way of the annular space in another well within the zone of influence of the stimulated well. This would be a significant impact. To address this, a revised mitigation measure is proposed. With implementation of this revised mitigation measure, Impact GW-5 would be reduced to a less than significant level (Class II). Impact GW-5 is also Class II under the project.

**MM GW-5a** **Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate.** (Full text in EIR Section 10.14.5.)

| Impact GW-6 | Improper disposal of flowback in injection wells could potentially impact groundwater quality |
|---|---|

Class II injection wells are required under the UIC program regulations to have an isolating cement seal above the injection zone as well as a minimum 100-foot seal across the base of the fresh water zone. If injected flowback water migrates to Protected Water, this would be a significant impact. To address this, a revised mitigation measure is proposed. With implementation of this revised mitigation measure, Impact GW-6 would be reduced to a less than significant level (Class II). Impact GW-6 is also Class II under the project.

**MM GW-6a** **Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater**~~Install a Cement Seal across Protected Groundwater~~**.** (Full text in EIR Section 10.14.5.)

| Impact GW-7 | Inability to identify specific impacts to groundwater quality from well stimulation activities |
|---|---|

Many chemicals and compounds can be introduced to groundwater by various pathways. The origin of these materials is difficult to ascertain under many circumstances. Groundwater monitoring may identify a chemical or compound, but would be unable to identify its source. If well stimulation fluids reach Protected Water, this would be a significant impact. To ensure that stimulation fluids can be more readily distinguished from other compounds that may be naturally occurring or have been introduced into the groundwater, a revised mitigation measure is proposed to address this. With implementation of this revised mitigation measure, Impact GW-7 would be reduced to a less than significant level (Class II). Impact GW-7 is also Class II under the project.

**MM GW-7a** **Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment.** (Full text in EIR Section 10.14.5.)

### 12.4.14.3 Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are already used for oil and gas drilling and well-stimulation, much of the required ancillary infrastructure addressed by this impact already exists and would be used for new oil wells and stimulation activities reducing the effectiveness of this alternative. The mitigation measures for onshore and offshore Wilmington, Inglewood, and Sespe Oil and Gas Fields are presented in EIR Section 11.14.5 and summarized on Table 11.14-5. With mitigation, the impact under Alternative 2 would be less than significant (Class II).

### 12.4.14.4   Impact Significance Summary

Revised ~~M~~mitigation measures proposed in the program-level analyses remain appropriate for the conditions associated with Alternative 3. With implementation of identified <u>revised</u> mitigation, these impacts would be reduced to less than significant (Class II).

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding <u>revised</u> mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the <u>revised</u> mitigation measures developed in EIR Section 10.14 for groundwater effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.15   Surface Water Resources

### 12.4.15.1   Introduction

This section provides an evaluation of the potential impacts to surface water resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.15 (Surface Water Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.15 (Surface Water Resources). For the purposes of this analysis please refer to EIR Sections 10.15.2 and 11.15.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.15.3 and 11.15.3 for a description of the affected environment for surface water resources (as applicable at either a study region or field-specific scale), and EIR Section 10.15.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, there would be a greater potential for use of surface water without water recycling standards in place, as well as an increase in potential impacts to waterbodies and streams without implementation of habitat protection standards or a buffer requirement from perennial waters.~~

As summarized in EIR Section 10.15.6, impacts from well stimulation treatments were determined to be potentially significant to surface water. Further analysis indicated that with appropriate mitigation measures the significant impacts could be mitigated to a less than significant level.

All of the water quality impacts described in EIR Section 10.15.4 would still occur, but the magnitude would be reduced due to the smaller construction area and fewer well pads. The reduced construction footprint would allow less opportunity for construction-related contaminants to reach surface waters. Flood hazard impacts would be the same as described in EIR Sections 10.15.4 and 10.15.4.1, but the potential would be reduced due to the smaller construction area and fewer well pads providing fewer opportunities for this impact to occur.

### 12.4.15.2   Programmatic Level Analysis of the Project

Under Alternative 3, consolidation of well pads would lead to less ground disturbance and would make it easier to manage impacts to surface water, as there would be fewer pads overall. Alternative 3 reduces the area of new wells and associated erosion and sedimentation impacts. Although the impacts would be reduced, because new wells and well stimulation would still occur, the same impacts as with the project would occur. The impacts are listed in EIR Section 12.2.15.2. Applicable mitigation measures would reduce the impacts to less than significant (Class II) as they would for the project. The applicable

mitigation measures are listed in EIR Section 12.2.15.2. Where such measures would be imposed on projects that do not involve well stimulation treatment, the measures would have to be adapted to project approvals other than well stimulation treatment permits.

### 12.4.15.3   Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

As discussed in EIR Section 11.15.5 and summarized in EIR Section 11.15.6, impacts to surface water resources associated with well stimulation treatments were determined to be potentially significant. However, the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures for Wilmington, Inglewood, and Sespe Oil and Gas Fields are the same as for the project. With implementation of these measures, the impact to surface water under Alternative 3 would be less than significant (Class II).

### 12.4.15.4   Impact Significance Summary

Based on the programmatic level analysis of surface water resources, impacts from Alternative 3 are considered to be the same at all existing oil and gas fields, less than significant with mitigation (Class II).

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.3 for air quality effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.16   Land Use and Planning

### 12.4.16.1   Introduction

This section provides an evaluation of the potential impacts to land use and planning associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.16 (Land Use and Planning) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.16 (Land Use and Planning). For the purposes of this analysis please refer to EIR Sections 10.16.2 and 11.16.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.16.3 and 11.16.3 for a description of the affected environment for land use and planning (as applicable at either a study region or field-specific scale), and EIR Section 10.16.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.16.2   Programmatic Level Analysis of Impacts and Mitigation Measures

The goal of Alternative 3 is to reduce the amount of land used for drilling and well stimulation in areas outside of existing fields. Alternative 3 applies primarily outside of existing oil and gas fields in areas where oil and gas could potentially become recoverable due to advances in well stimulation technologies, most notably within the boundary of the Monterey Formation and plays. This alternative would require developing multiple wells from a single pad rather than individual pads being used for one or two wells.

For Impact LU-1 (Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses), the consolidation of wells on fewer pads under Alternative 3 would result in a decreased potential for land disturbances in areas outside of existing oil and gas fields as compared to the project. Nonetheless, well stimulation activities could still result in disruptions to surrounding land uses. Section 1783.2 of the proposed permanent regulations explicitly define "Neighbor Notification" requirements, which include the radius for property owner notifications, the information that is to be provided, and the timing and methods of the notifications. Although the "Neighbor Notification" requirements would be effective at minimizing potential conflicts with existing land uses, because of the other resource-specific impacts that cannot be mitigation to a level of less than significant, significant impacts that can affect land uses would remain.

These impacts are from across a variety of resource impact topics, as analyzed in detail in EIR Sections 10.1 (Aesthetics), 10.3 (Air Quality), 10.13 (Hazards and Hazardous Materials), 10.17 (Noise and Vibration), 10.21 (Risk of Upset/Public and Worker Safety), and 10.22 (Transportation and Traffic).

Under Alternative 3, potential disruptions could affect a wide variety of land use settings, ranging from remote and undeveloped areas to rural areas to and suburban and highly urbanized areas. In comparison to the project, the consolidation required under Alternative 3 would reduce potential surface disturbances and related disruptions; however, some of the impacts associated with them cannot be mitigated to less than significant and would remain significant and unavoidable (Class I); therefore, their corresponding effects on land use and planning would be Class I.

For Impact LU-2 (Physically divide an established community), the Well Pad Consolidation Alternative would reduce future land disturbances associated with well stimulation and thus would be expected have less severe impacts in those areas where existing communities occur. ~~With application of Mitigation Measure LU-2a,~~ Impact LU-2 would be less than significant (Class I~~I~~II) for both the project and Alternative ~~2~~3. However, in comparison to the project, this impact would be less severe under Alternative 3 because well consolidation would be required under the alternative, but not required under the project.

~~**MM LU-2a     Ensure That Established and Planned Communities Are Not Divided.** (Full text in EIR Section 10.16.5.)~~

Impact LU-3 addresses potential conflicts with applicable land use plans, policies, programs, ordinances and other regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. As noted in EIR Section 10.16 (Land Use and Planning), a consistency analysis of the activities associated with well stimulation treatments outside of existing oil and gas fields involves the review and assessment of applicable local agency plans, policies and regulations, which is not possible to complete at the statewide/programmatic level of analysis given the extensive number of jurisdictions affected, the extent of oil and gas regulations of each jurisdiction, the vast array of potential conditions that would be imposed on projects based on specific jurisdictions conditional use permit application processes, the fact that land use and zoning regulation implementation is the legal responsibility of local jurisdictions, and the fact that this EIR is required by law to be completed within a very limited time period that cannot accommodate such an extensive effort. Nonetheless, the impact analysis under the project found that the ~~information and~~ mitigation measures set forth in this EIR would reduce potential conflicts with any established, designated, or planned land use areas on federal, State, or locally regulated lands to a less than significant level (Class II). Alternative 3, to which all of the EIR's mitigation measures would apply, would be Class II as well.

### 12.4.16.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Although intended for well development outside of existing fields, the consolidation requirements of Alternative 3 could be used inside existing oil and gas fields. It is anticipated that most future drilling in existing fields would use existing pads and roads to the maximum extent feasible, thereby minimizing new ground disturbances. With increased use of directional drilling, development of multiple wells from a single pad is becoming increasingly common and used in existing fields where it is feasible and economically prudent. As the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing uses, impacts would be less than significant for Impacts LU-1 and LU-3 (Class III), and none for Impact LU-2 (Class IV) under Alternative 3.

### 12.4.16.4    Impact Significance Summary

At a programmatic level of analysis for the project, Alternative 3 (Well Pad Consolidation) would still result in significant and unavoidable impacts (Class I) related to Impact LU-1, less than significant with mitigation (II) for Impact LU-2, and less than significant impact (Class III) for Impact LU-3.

At a programmatic level of analysis for specific fields, the Well Pad Consolidation Alternative would result in less than significant impacts (Class III) for Impacts LU-1 and LU-3 and no impact (Class IV) for Impact LU-2.

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.16 for land use effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.17    Noise and Vibration

### 12.4.17.1    Introduction

This section provides an evaluation of the potential impacts to noise and vibration associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.17 (Noise and Vibration) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.17 (Noise and Vibration). For the purposes of this analysis please refer to EIR Sections 10.17.2 and 11.17.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.17.3 and 11.17.3 for a description of the affected environment for noise and vibration (as applicable at either a study region or field-specific scale), and EIR Section 10.17.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.17.2    Programmatic Level Analysis of the Project

| Impact NOI-1 | Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels |
|---|---|

Since this alternative includes well stimulation treatments, noise and vibration impacts would occur as described in EIR Section 10.17. Consolidating multiple wells on individual pads under Alternative 3 could result in shorter mobilization and demobilization times. However, the duration of actual activity at the well pad would increase to accommodate the multiple number of wells. Consequently, duration of the noise impacts would increase as a result of simultaneous activity at each well pad.

Noise mitigation would be required, as with the project. In all regions the resulting impact would be less than significant with mitigation incorporated (Class II).

Impact NOI-2 would be less than significant (Class III).

**MM NOI-1a      Control Noise Levels near Sensitive Land Uses.** (Full text in EIR Section 10.17.5.)

| **Impact NOI-2    Cause exposure of persons to or generation of excessive groundborne vibration** |
|---|

As with the project, Impact NOI-2 would be less than significant (Class III).

Although the duration of well stimulation on a well pad may increase, the noise and vibration levels and impacts would be the same as the project and Impact NOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

### 12.4.17.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Since this alternative includes well stimulation treatments, noise and vibration impacts will occur as described in EIR Section 11.17. Noise mitigation would be required.

*Wilmington Oil and Gas Field*

Although the duration of well stimulation on a well pad may increase, the noise levels and impacts would be the same as the project and Impact NOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

*Inglewood Oil and Gas Field*

Because the Inglewood field is adjacent to residential areas and other urban land uses including sensitive receptors, Impact NOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

*Sespe Oil and Gas Field*

Although the duration of well stimulation on a well pad may increase, the noise levels and impacts would be the same as the project and Impact NOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

### 12.4.17.4   Impact Significance Summary

Based on the programmatic level analysis of noise and vibration for the project and for specific oil and gas fields, impacts from Alternative 3 would be the same as under the project except at limited outside of existing oil and gas fields.

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.17 for noise and vibration effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.18    Population and Housing

### 12.4.18.1    Introduction

This section provides an evaluation of the potential impacts to population and housing associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.18 (Population and Housing) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.18 (Population and Housing). For the purposes of this analysis please refer to EIR Sections 10.18.2 and 11.18.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.18.3 and 11.18.3 for a description of the affected environment for population and housing (as applicable at either a study region or field-specific scale), and EIR Section 10.18.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.18.2    Programmatic Level Analysis of Impacts and Mitigation Measures

The goal of Alternative 3 is to use well consolidation to reduce the amount of land used for drilling in new areas that may be developed through the use of well stimulation technologies. Alternative 3 would apply primarily to areas outside of existing oil and gas fields and likely would have a minimal effect on the overall number of well stimulation treatments being performed.

Alternative 3 would require a similar number of new employees as the project. Alternative 3 has the potential to result in fewer, but somewhat larger, well pads to accommodate multiple wells. This would not appreciably affect the number of employees needed. Therefore, while some worker in-migration is expected to occur, population increases are expected to be less than significant (Impact POP-1 [Class III]), as described in EIR Section 10.18 (Population and Housing), with impacts being similar for the project and Alternative 3.

As with the project, it is unlikely that any residential relocation (Impact POP-2) would be associated with Alternative 3 that would necessitate construction of new housing. Therefore, any necessary relocations of housing or persons associated with Alternative 3 activities would be less than significant and would not necessitate the construction of new housing elsewhere (Class III), as with the project.

### 12.4.18.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling would already use existing roads and pads, so Alternative 3 would be similar to the project. Likewise, the overall level of well stimulation treatments within the fields would be the same as for the project. Impacts would be similar to what is described in EIR Section 11.21 (Population and Housing).

While some in-migration is possible, any population increase would be nominal in comparison to the total population and planned growth of the communities serving the Wilmington, Inglewood, and Sespe fields. Less than significant population growth impacts would occur (Class III). There would be no expected need for housing displacement from well stimulations within the communities adjacent to the Wilmington, Inglewood, or Sespe fields under Alternative 3. No impacts related to housing displacement (Impact POP-2) would occur (Class IV).

### 12.4.18.4    Impact Significance Summary

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion.

## 12.4.19   Public Services

### 12.4.19.1   Introduction

This section provides an evaluation of the potential impacts to public services associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.19 (Public Services) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.19 (Public Services). For the purposes of this analysis please refer to EIR Sections 10.19.2 and 11.19.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.19.3 and 11.19.3 for a description of the affected environment for public services (as applicable at either a study region or field-specific scale), and EIR Section 10.19.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.19.2   Programmatic Level Analysis of Impacts and Mitigation Measures

The goal of Alternative 3 is to reduce the amount of land used by consolidating well sites in new areas opened up by well stimulation technologies. Alternative 3 would apply primarily to areas outside of existing oil and gas fields that would potentially become recoverable due to advances in well stimulation technologies and it would not affect the overall number of well stimulation treatments being performed.

The need for new or expanded public services, including applicable performance objectives and service ratios, is strongly influenced by population levels. As discussed within EIR Section 12.4.18 (Population and Housing), Alternative 3 has a small potential for increasing population in-migration impacts. Consolidation of wells does not reduce the number of wells or employees, and is not expected to alter the level of services required as compared to the project, which would not require consolidation.

Implementation of Mitigation Measure PUB-1a (Assess Public Service Ratios and Ensure Adequate Compensation) is proposed as part of Alternative 3 and would require DOGGR to coordinate with the applicable local land use agency to determine whether new well development and stimulations would place a burden on public services, and ensure that appropriate compensation is provided to the local agency through its local land use permit(s). With implementation of this measure, Impact PUB-1 (Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools) would be less than significant (Class II), which would be the same as the project.

**MM PUB-1a**    **Assess Public Service Ratios and Ensure Adequate Compensation.** (Full text in EIR Section 10.19.5.)

### 12.4.19.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling would use existing roads and pads and the overall number of well stimulation treatments within the fields would be the same as for the project. Impacts would be the same as what is described in EIR Section 11.19 (Public Services). While some limited new demand to public services providers may occur from well stimulations within the fields (Impact PUB-1), any demand increases to public service providers is expected to be less than significant (Class III).

### 12.4.19.4    Impact Significance Summary

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.19 for public service effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.20    Recreation

### 12.4.20.1    Introduction

This section provides an evaluation of the potential impacts to recreation associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.20 (Recreation) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.20 (Recreation). For the purposes of this analysis please refer to EIR Sections 10.20.2 and 11.20.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.20.3 and 11.20.3 for a description of the affected environment for recreation (as applicable at either a study region or field-specific scale), and EIR Section 10.20.4 for details regarding the impact methodology and significance criteria that have been used.

~~Without implementation of project standards for resource protection under this alternative, oil and gas development and associated well stimulation may occur in open space areas and areas near water resources used for recreation.~~

### 12.4.20.2    Programmatic Level Analysis of Impacts and Mitigation Measures

The goal of Alternative 3 is to reduce the amount of land used for drilling in new areas opened up by well stimulation technologies by consolidating well sites. Alternative 3 would apply primarily to areas outside of existing oil and gas fields that would potentially become recoverable due to advances in well stimulation technologies, most notably within the boundaries of the Monterey Formation and its plays. However, this alternative would necessitate concentrating new wells together.

As stated in EIR Section 8.3.3, the Well Pad Consolidation Alternative would not limit the amount of well stimulation in the future. Therefore, Alternative 3 would likely result in the same level of well stimulation activities as discussed under the project. As such, well stimulation treatments would likely result in some minor growth from new employment; however, any in-migration from new workers would be nominal compared to the existing populations. Similarly, the increased use of existing recreational areas or facilities as a result of new employment for well stimulation treatments would be minimal when considering the numerous recreation opportunities within Study Regions 1 through 6, as shown in Figures 10.20.1 through 10.20-3.

As such, Impact REC-1 would be less than significant under Alternative 3 (Class III). Impact REC-1 is related to the increase in usage of recreation areas or facilities which would result in the physical deterioration of recreational resources.

Impact REC-2 addresses disruptions in designated recreation areas. For the purpose of this EIR, recreation areas are considered sensitive receptors as they tend to be areas where children are present, and depending on the available facilities, they can be used for intense physical activities. In addition, recrea-

tion users often value the recreation experience based on the quality of the surrounding (i.e., lack of industrial activities, natural spaces, low noise levels, high scenic quality, etc.). Potential disruptions to recreational resources are listed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures). Alternative 3 would apply primarily to areas outside of existing oil and gas fields that would potentially become developed for oil and gas recovery due to advances in well stimulation technologies. The goal of Alternative 3 is to reduce the amount of land used for drilling in new areas. Therefore, in comparison to the project, Alternative 3 would decrease the potential for disturbances to recreation areas located outside of existing oil and gas fields.

Each of the potential disruption types is discussed in detail in the EIR Sections 10.1 (Aesthetics), 10.3 (Air Quality), 10.6 (Coastal Processes and Marine Water Quality), 10.7 (Commercial and Recreational Fishing), 10.13 (Hazards and Hazardous Materials), 10.15 (Surface Water Resources), 10.16 (Land Use and Planning), 10.17 (Noise and Vibration), 10.21 (Risk of Upset/Public and Worker Safety), and 10.22 (Transportation and Traffic). The mitigation measures provided in these sections would also effectively mitigate potential impacts to recreational resources to the maximum extent feasible.

Mitigation Measures REC-2a and REC-2b, as detailed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures) specifically address the coordination and notification requirements that would provide communities with advanced notice of potential disruptions to affected recreation areas. These notification measures are intended to help ensure the public can have sufficient warning in order to make other arrangements for their recreation activities. With implementation of these measures, Impact REC-2 would be less than significant under Alternative 3 (Class II). Under the project, Impact REC-2 is also Class II; however, as noted above, the potential for disturbances to recreation areas would decrease somewhat under Alternative 3 because somewhat less land would be disturbed.

### 12.4.20.3   Programmatic Level Analysis of Specific Oil and Gas Fields

As stated in EIR Section 8.3.3, some of the consolidation requirements could be used inside existing oil and gas fields; however, it is anticipated that most future drilling in existing fields would use existing roads and pads to the maximum extent, thereby minimizing new ground disturbances and negating the need for or benefit of consolidation. As the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, Impacts REC-1 and REC-2 would be less than significant under Alternative 3 (Class III).

### 12.4.20.4   Impact Significance Summary

At a programmatic level of analysis, Alternative 3 would result in less than significant impacts (Class III) as related to Impact REC-1 and impacts that are mitigable to a level of less than significant (Class II) regarding Impact REC-2. At a project level of analysis, the Well Pad Consolidation Alternative would result in impacts that are less than significant (Class III).

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.20 for recreational effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.21   Risk of Upset/Public and Worker Safety

### 12.4.21.1   Introduction

This section provides an evaluation of the potential impacts for risk of upset/public and worker safety associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.21 (Risk of Upset/Public and Worker Safety) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.21 (Risk of Upset/Public and Worker Safety). For the purposes of this analysis please refer to EIR Sections 10.21.2 and 11.21.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.21.3 and 11.21.3 for a description of the affected environment for risk of upset/public and worker safety (as applicable at either a study region or field-specific scale), and EIR Section 10.21.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.21.2   Programmatic Level Analysis of the Project

| Impact RSK-1 | Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases |
|---|---|

Under this alternative there would not be a reduction in well stimulation treatment activities. Therefore, the forecast number of accidents for Alternative 3 is the same as the project case.

Alternative 3 and the project case will have lower annual average projected crude oil imports compared to Alternatives 1 and 2, and imports of crude oil by rail will occur under Alternative 3 as with the project case. The number of accidents projected for this region is four accidents per year (approximately 100 over 25 years). The number of accidents is based on the train miles traveled, which is directly related to the volume of crude imported. Since volume of imported crude oil is approximately 25 percent of highest import case (Alternative 1, Table 10.21-16), the number of accidents is approximately 25 percent of those on that Table. Study regions that may be at slightly greater risk of a rail accident include Regions 1, 4, 5, and 6. Given the relatively very low number of derailments compared to the number of shipments of oil, the occurrence of a major accident is expected to be very low.

Regardless, this impact is considered a significant and unavoidable impact that could not be mitigated to a level of less than significant through the application of feasible mitigation measures. Implementation of recommended Mitigation Measures RSK-1a through RSK-1h would be appropriate to decrease the frequency of crude oil transport and reasonably foreseeable accidents and releases. Because DOGGR cannot require other agencies to implement the suggested mitigations, Impact RSK-1 would be a Class I: Significant and Unavoidable Impact.

**MM RSK-1a**      **Increase the Number of CPUC Rail Inspectors.** (Full text in EIR Section 10.21.5.)

**MM RSK-1b**      **Expedite the Phase-out of Older Tank Cars.** (Full text in EIR Section 10.21.5.)

**MM RSK-1c**      **Implement New Accident Prevention Technology.** (Full text in EIR Section 10.21.5.)

**MM RSK-1d**      **Monitor and Enforce New Speed Limits.** (Full text in EIR Section 10.21.5.)

**MM RSK-1e**      **Monitor the Implementation of Trackside Safety Technology.** (Full text in EIR Section 10.21.5.)

**MM RSK-1f**    **Improve Emergency Preparedness and Response Programs.** (Full text in EIR Section 10.21.5.)

**MM RSK-1g**    **Provide Real-Time Shipment Information to Emergency Responders.** (Full text in EIR Section 10.21.5.)

**MM RSK-1h**    **Provide Additional Accident and Injury Data to the State.** (Full text in EIR Section 10.21.5.)

### 12.4.21.3   Programmatic Level Analysis of Specific Oil and Gas Fields

**Wilmington Oil and Gas Field.** The recordable injury rate from well stimulation treatment and drilling activities is expected to be similar to that for the project. No impacts from increased rail traffic or truck traffic are anticipated for Wilmington. The impacts and mitigation identified for the project would apply within Wilmington.

**Inglewood Oil and Gas Field.** The recordable injury rate from well stimulation treatment and drilling activities is expected to be similar to that for the project. No impacts from increased rail traffic or truck traffic are anticipated for Inglewood. The impacts and mitigation identified for the project would apply within Inglewood.

**Sespe Oil and Gas Field.** The recordable injury rate from well stimulation treatment and drilling activities is expected to be similar to that for the project. No impacts from increased rail traffic or truck traffic are anticipated for Sespe. The impacts and mitigation identified for the project would apply within Sespe.

### 12.4.21.4   Impact Significance Summary

Overall, Alternative 3 is projected to have a truck accident rate and an oil worker injury rate similar to those for the project.

The crude oil rail accident rate for Alternative 3 is approximately four per year (100 over 25 years), as with the project case. In addition, there may be accidents from proppant deliveries by rail at a rate of 16 over 25 years, as with the project case. The volume of proppant is proportional to the number of wells hydraulically fractured, which in turn will require more rail cars. The maximum number of accidents corresponding to the highest volume of proppant is shown in Table 10.21-15. Since the number of wells for Alternative 3 is approximately 10 percent less than that of the maximum case, the number of accidents is approximately 10 percent less as well. The Regions at higher risk for accidents are Regions 1 and 4, with a lesser potential in Regions 5 and 6.

Because this alternative does not reduce the level of well stimulation treatment activities, from a risk standpoint, there is no substantial difference between this alternative and the project case. Therefore, the degree of risk of upset for Alternative 3 is the same as the project case.

Impacts RSK-2 through RSK-7 are the same as under the project. Thus, Impact~~s RSK-2 and~~ RSK-6 ~~are~~is Class I. Impacts RSK-2~~3~~, RSK-4, RSK-5 and RSK-7 are Class II, and impact RSK-3 is Class III.

## 12.4.22   Transportation and Traffic

### 12.4.22.1   Introduction

This section provides an evaluation of the potential impacts to transportation and traffic associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic

evaluation of the project addressed in EIR Section 10.22 (Transportation and Traffic) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.22 (Transportation and Traffic). For the purposes of this analysis please refer to EIR Sections 10.22.2 and 11.22.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.22.3 and 11.22.3 for a description of the affected environment for transportation and traffic (as applicable at either a study region or field-specific scale), and EIR Section 10.22.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.22.2  Programmatic Level Analysis of the Project

The Well Pad Consolidation Alternative would reduce the amount of land used for drilling in the new areas opened up by well stimulation technologies. This alternative would require field developers to use well pads and access roads more efficiently, thus reducing the distance vehicles would need to travel between sites. The overall number of trips generated by Well Pad Consolidation Alternative would be similar to those of the project, though the average trip would be shorter, and therefore impacts to transportation and traffic would be reduced compared to the project.

However, with consolidation of sites, traffic would be more concentrated in certain areas, which could potentially affect the level of service on local roadways (LOS), damage roadways, and increase the potential for traffic hazards. As with the project (see EIR Section 10.22, Transportation and Traffic), in areas of new oil and gas well development and stimulation outside of existing oil and gas fields, Mitigation Measure TR-1a is recommended to ensure that any roadways that may exceed an established LOS standard as a result of the project would be identified and traffic controls would be implemented through a Traffic Plan (Impact TR-1). Implementation of Mitigation Measure TR-1a would reduce Impact TR-1 to less than significant (Class II).

Implementation of Mitigation Measure TR-2a (Repair Roadway Damage) is recommended to ensure that roadways would be restored to original or near-original condition and undertaken in a timely manner, in consultation with and to the satisfaction of the city or county with jurisdiction over affected roadways, the local transportation agency, and/or Caltrans, as appropriate (Impact TR-2 [Class II]).

Implementation of the measures in the Traffic Plan required by Mitigation Measure TR-1a would also ensure that project activities would not impact access or movement of emergency service vehicles (Impact TR-6) or create traffic safety hazards for pedestrians, bicyclists or other vehicles (Impact TR-3 [Class II]).

However, the potential for traffic hazards related to the transport and potential spill of hazardous materials would be significant and unmitigable, even with implementation of Mitigation Measure TR-4a, which ensures that truck drivers are aware of the emergency spill procedures (Class I).

On a site-specific basis, the drilling of new wells, especially deeper wells to be stimulated, may trigger FAA air space hazard notification requirements for the drill rig if located in the vicinity of an airport. Assuming the owner/operator would submit Form 7460-1, as necessary, and comply with any FAA-required hazard markers or lighting, Impact TR-5 (Change air traffic patterns) would be less than significant (Class III).

**MM TR-1a**      **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

**MM TR-2a**      **Repair Roadway Damage.** (Full text in EIR Section 10.22.5.)

**MM TR-4a**      **Know Spill Prevention Measures.** (Full text in EIR Section 10.22.5.)

### 12.4.22.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling would already use existing roads and pads. The overall level of well stimulation treatments within the fields would be the same as for the project, with similar number of truck trips per stimulation project, but the average trip would be shorter. Impacts would be similar but reduced compared to what is described in EIR Section 11.22 (Transportation and Traffic).

### 12.4.22.4   Impact Significance Summary

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.22 for transportation-related effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.23   Utilities and Service Systems

### 12.4.23.1   Introduction

This section provides an evaluation of the potential impacts to utilities and service systems associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.23 (Utilities and Service Systems) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.23 (Utilities and Service Systems). For the purposes of this analysis please refer to EIR Sections 10.23.2 and 11.23.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.23.3 and 11.23.3 for a description of the affected environment for utilities and service systems (as applicable at either a study region or field-specific scale), and EIR Section 10.23.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.23.2   Programmatic Level Analysis of the Project

The goal of Alternative 3 is to reduce the amount of land used per well by consolidating wells in new areas opened up by well stimulation technologies to fewer pads. Therefore, Alternative 3 would apply primarily to areas outside of existing oil and gas fields that would potentially become developed as oil and gas fields through use of well stimulation technologies. The extension of utilities to such areas might in some instances be necessary in order for oil and gas production to proceed. Alternative 3 would not affect the overall number of well stimulation treatments being performed or the number of wells drilled, but would co-locate more wells at individual sites. Wells developed at such sites would use directional drilling (as compared to straight vertical drilling) to reach target areas. As a result, well drilling and stimulation sites might be larger than conventional sites, but there would be fewer of them.

Four impacts were identified for utilities and services:

- **Impact UTL-1:** Adversely affect utilities and service systems due to population growth from project-related development

- **Impact UTL-2:** Require new or expanded electrical or natural gas infrastructure

- **Impact UTL-3:** Exceed existing municipal wastewater treatment provider capacities

- **Impact UTL-4:** Exceed permitted solid waste capacity of landfills

The need for new or expanded utilities and service systems is strongly influenced by population levels. As discussed within EIR Section 12.4.18 (Population and Housing), Alternative 3 has a similar potential as the project for increasing population in-migration impacts because, while the alternative would encourage concentrating well sites together as compared to the project, it would not reduce the number of wells or stimulations. In general, minor population growth from any new employment that might occur would have a less than significant impacts to utility and service systems, including their existing and projected capacities (Impact UTL-1).

Alternative 3 reduces somewhat new electrical or gas infrastructure required to serve new wells and fields created through well stimulation outside of existing oil and gas field boundaries by consolidating wells nearer to one another. This would allow new wells to share any new natural gas and electricity connections required to serve the consolidated pad, thus reducing potential environmental impacts from constructing new infrastructure. This is a decrease in potential impacts when compared to the project. Outside of existing fields, Alternative 3 would reduce potential impacts from electrical and natural gas interconnections by consolidating new well sites. This would allow for consolidated wells to use the same primary interconnection lines, though in some instances facilities might have to be extended to new oil and gas production areas, subject to rules favoring the use of existing rights-of-way and requiring the minimization of environmental impacts. Impacts would be less than significant (Impact UTL-2). The electricity providers are assumed to have sufficient capacity to serve any well stimulation needs. Consolidating new wells that would be developed outside of existing oil and gas fields would not increase potential impacts from wastewater and solid waste generation when compared to the project as this alternative would only result in fewer but larger pads in a new field. Impacts would be potentially significant but less than significant with mitigation (Impacts UTL-3 and UTL-4).

To ensure all utilities and service systems would have adequate capacities under Alternative 3, Mitigation Measures UTL-3a and UTL-4a are also proposed for Alternative 3. With the inclusion of these measures, impacts UTL-1 and UTL-2 would be Class III and impacts UTL-3 and UTL-4 would be Class II. Impacts on utilities and service systems would be similar for both the project and Alternative 3, because the number of wells drilled and stimulated would be similar.

**MM UTL-3a**      **Assess Wastewater Quality and Ensure Adequate Compensation to Municipal and Private Wastewater Treatment Plants.** (Full text in EIR Section 10.23.5.)

**MM UTL-4a**      **Assess Non-Hazardous Solid Waste Generation and Ensure Adequate Compensation to Municipal and Private Solid Waste Facilities.** (Full text in in EIR Section 10.23.5.)

### 12.4.23.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling here would use existing roads and pads, and there would be little opportunity for well consolidation given the developed nature of the existing fields. Therefore, Alternative 3 would have minimal effect on the overall level of drilling and well stimulation treatments as compared to the project and impacts related to utilities and service systems (Impacts UTL-1 through UTL-4) would be the same for these three fields, as described in EIR Section 11.23 (Utilities and Service Systems). Impacts related to utilities and service systems at the fields would be less than significant (Class III) for Impacts UTL-1 and UTL-2 and less than significant with mitigation (Class II) for Impacts UTL-3 and UTL-4.

### 12.4.23.4   Impact Significance Summary

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well

stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.23 for effects relating to utilities and service systems would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.24   Impact Summary Table for Alternative 3

Table 12.4.24-1 provides a summary of impacts and recommended mitigation measures for the project and specific oil and gas files for all issue areas under Alternative 3.

**Programmatic Level Analysis of the Project**

Under the Well Pad Consolidation Alternative, the consolidation of wells would generally reduce ground disturbance in comparison to the project. The level of oil and gas production in the State would remain the same as for the project.

When compared to the project, Alternative 3 would reduce impacts to geology, soils and mineral resources, agriculture and forestry resources, cultural resources, paleontological resources, terrestrial biological resources, hazards and hazardous materials, groundwater resources, surface water resources, land use and planning, recreation, and utilities and service systems.

Due to the consolidation of well sites, which would concentrate certain impacts into a smaller geographic area, Alternative 3 would not be preferred to the project aesthetics, environmental justice, noise and vibration, population and housing, public services or transportation and traffic.

Alternative 3 would be similar to the project for all other issue areas and it would not create any new significant and unmitigable (Class I) impacts.

**Programmatic Level Analysis of Specific Oil and Gas Fields**

Alternative 3 would be similar to the project, but would reduce impacts to specific resources. Ground disturbance and associated impacts would be reduced through well consolidation under Alternative 3; however, this impact is not expected to be substantial because existing fields already have disturbed well pad areas and established access roads and water and oil and gas production infrastructure in place.

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **AESTHETICS** | | |
| Impact AES-1. Substantially adversely affect scenic vistas. | New well pad: Class I or Class II; Existing well pad: Class III AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-2. Substantially alter or damage scenic resources. | New well pad: Class I or Class II; Existing well pad: Class III AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors | Same as those listed in Table 11.1-1 |
| Impact AES-3. Substantially degrade the existing visual character or quality of a site and its surroundings. | New well pad Class I or Class II; Existing well pad: Class III AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-4. Create new sources of substantial light and glare. | New well pad: Class I or Class II; Existing well pad: Class III AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| **AGRICULTURE AND FORESTRY RESOURCES** | | |
| Impact AGF-1. Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use | Class II AGF-1a: Minimize Impacts to Important Farmland AGF-1b: Develop an Agricultural Resources Protection Plan AGF-1c: Compensate for Loss of Important Farmland | Same as those listed in Table 11.2-1 |
| Impact AGF-2. Conflict with existing zoning for agricultural use or with Williamson Act contracts | Class II AGF-2a: Ensure Compatibility with Agricultural Zoning AGF-2b: Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts | Same as those listed in Table 11.2-1 |
| Impact AGF-3. Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production | Class II AGF-3a: Ensure Compatibility with Zoning for Forest and Timberland | Same as those listed in Table 11.2-1 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact AGF-4. Result in the loss of forest land or conversion of forest land to non-forest use | Class II on forest land<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land | Same as those listed in Table 11.2-1 |
| Impact AGF-5. Directly or indirectly impair the use of agricultural land or forest land | Class II for well stimulation activities on or within 1,500 feet of agricultural or forest land<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u><s>Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices</s><br>GW-4b: Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u><s>Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin</s><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Adequate Water Availability<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.2-1 |
| **AIR QUALITY** | | |
| Impact AQ-1. Conflict with or obstruct implementation of an applicable air quality plan | Class I (Statewide)<br>Class III (in SCAQMD)<br>AQ-1a: Improve Air Quality Planning Inventories and Local Control Measures<br>AQ-1b: Improve the Methodologies and Emission Factors Used in Inventory Development | Same as those listed in Table 11.3-1 |
| Impact AQ-2. Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>AQ-2c: Reduce Emissions from Dust-Causing Activities | Same as those listed in Table 11.3-1 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact AQ-3. Expose sensitive receptors to substantial pollutant concentrations | Class I<br>AQ-3a: <u>Comply with Local Air District Protocols Relating to the Preparation of:</u>~~Prepare~~ a Health Risk Assessment and Implement Emission Controls<br>AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility | Same as those listed in Table 11.3-1 |
| Impact AQ-4. Create objectionable odors affecting a substantial number of people | Class I<br>AQ-4a: Prepare and Implement an Odor Minimization Plan<br>AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility | Same as those listed in Table 11.3-1 |
| **BIOLOGICAL RESOURCES – TERRESTRIAL ENVIRONMENT** | | |
| Impact BIOT-1. Substantially reduce the habitat of a fish or wildlife species | Class I, II or III<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |
| Impact BIOT-2. Cause a fish or wildlife population to drop below self-sustaining levels | Class I, II or III<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br><u>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation</u><br><u>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u><br><u>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u><br><u>SWR-1a: Require Stormwater Pollution Prevention Plan</u><br><u>SWR-2a: Implement Erosion Control Plan</u> | Same as those listed in Table 11.4-8 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-3. Substantially reduce the number or restrict the range of an endangered, rare, or threatened species | Class I, II or III<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br><u>AQ-2c: Reduce Emissions from Dust-Causing Activities</u><br><u>SWR 1a: Require Stormwater Pollution Prevention Plan</u> | Same as those listed in Table 11.4-8 |
| Impact BIOT-4. Have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special-status species in local or regional plans, policies, or regulations, or by CDFW or USFWS | Class I, II or III<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Same as those listed in Table 11.4-8 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-5. Have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations, or by CDFW or USFWS | Class I, II or III<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |
| Impact BIOT-6. Have a substantial adverse effect on federally protected wetlands as defined by Section 404, of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means | Class I, II or III<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-6a: Protect Jurisdictional Waters<br>GW-1a: Use Alternative Water Sources to the Extent Feasible<br>GW-1b: Minimize Groundwater Impacts<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-7. Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites | Class II or III<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Same as those listed in Table 11.4-8 |
| Impact BIOT-8. Conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance | Class II or III<br>BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Same as those listed in Table 11.4-8 |
| Impact BIOT-9. Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan | Class II or III<br>BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Same as those listed in Table 11.4-8 |
| Impact BIOT-10. Contribute to global climate change and consequent impacts to biodiversity | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Same as those listed in Table 11.4-8 |
| **CULTURAL RESOURCES** | | |
| Impact CUL-1. Affect historic-era archaeological and built-environment resources | Class I or II if cultural landscapes are present<br>Class III or Class IV if cultural landscapes are not considered significant or are not present<br>CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact CUL-2. Affect prehistoric resources | Class I or II if cultural landscapes are present<br>Class III or Class IV if cultural landscapes are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |
| Impact CUL-3. Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony. | Class I or II if cultural landscapes are present<br>Class III or Class IV if cultural landscapes are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact CUL-4. Affect cultural landscapes. | Class I or II if cultural landscapes are present<br>Class III or Class IV if cultural landscapes are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |
| **PALEONTOLOGICAL RESOURCES** | | |
| Impact PALEO-1. Well stimulation treatments would destroy or disturb surface or near-surface significant paleontological resources | Class II if fossil bearing geologic units are present<br>Class IV if no fossil bearing units are present<br>PALEO-1a: Require Information ~~Inventory~~ and Evaluate Paleontological Resources<br>PALEO-1b: Develop Paleontological Resource Mitigation Plan<br>PALEO-1c: Retain Qualified Paleontological Resources Staff<br>PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program<br>PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources<br>PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities<br>PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities | Same as those listed in Table 11.9-4 |
| **ENVIRONMENTAL JUSTICE** | | |
| Impact EJ-1. Significant impacts would disproportionately affect minority or low-income populations | Unknown, possibly Class I (Indirect)<br>EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Same as those listed in Table 11.10-4 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **GEOLOGY, SOILS, AND MINERAL RESOURCES** | | |
| Impact GEO-1. Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure | Class II<br>GEO-1a: Avoid Active Faults ~~Zones~~if Necessary<br>GEO-1b: Implement an Appropriate Setback if Necessary<br>~~GEO-1c: Limit the Number of Hydraulically Fractured Wells~~<br>GEO-1d~~e~~: Conduct Ground Monitoring<br>GEO-1e~~f~~: Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Same as those listed in Table 11.11-4 |
| Impact GEO-2. Result in substantial soil erosion or the loss of topsoil | Class III<br>None required | Same as those listed in Table 11.11-4 |
| Impact GEO-3. Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse | Class II<br>GEO-3a: Prepare Geotechnical Report if Necessary | Same as those listed in Table 11.11-4 |
| Impact GEO-4. Be located on expansive soil creating substantial risks to life or property | Class III<br>None required | Same as those listed in Table 11.11-4 |
| Impact GEO-5. Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems | Class IV<br>None required | Same as those listed in Table 11.11-4 |
| Impact GEO-6. Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan | Class III in most instances; Class I in some instances<br>None available | Same as those listed in Table 11.11-4 |
| Impact GEO-7. Cause an induced seismic event including ground shaking and ground failure | Class III<br>None required | Same as those listed in Table 11.11-4 |
| **GREENHOUSE GAS EMISSIONS** | | |
| Impact GHG-1. Generate greenhouse gas emissions that may have a significant impact on the environment | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide | Same as those listed in Table 11.12-1 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact GHG-2. Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Same as those listed in Table 11.12-1 |
| **HAZARDS AND HAZARDOUS MATERIALS** | | |
| Impact HAZ-1. Hazardous materials associated with well stimulation fluids could be released to the environment from a spill or leak | Class II<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u><s>Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices</s> | Same as those listed in Table 11.13-1 |
| **GROUNDWATER RESOURCES** | | |
| Impact GW-1. Cause or contribute to overdraft conditions | Class II<br>GW-1a: Use Alternative Water Sources <u>to the Extent Feasible</u><br>GW-1b: <u>Minimize Groundwater Impacts</u><s>Prepare a Third-Party Technical Report to Analyze Overdraft Impacts</s> | Same as those listed in Table 11.14-6 |
| Impact GW-2. Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water | Class II<br>GW-1<u>b</u><s>2</s>a: <u>Minimize Groundwater Impacts</u> <s>Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping</s> | Same as those listed in Table 11.14-6 |
| Impact GW-3. Adversely impact groundwater quality from surface spills or leaks during well stimulation | Class II<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u><s>Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices</s> | Same as those listed in Table 11.14-6 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact GW-4. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals | Class II<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>GW-4c: Install Methane Sensors on Wells in the ADSA Subject to Well Stimulation Treatments | Same as those listed in Table 11.14-6 |
| Impact GW-5. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells | Class II<br>GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate | Same as those listed in Table 11.14-6 |
| Impact GW-6. Improper disposal of flowback in injection wells could potentially impact groundwater quality | Class II<br>GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater Install a Cement Seal across Protected Groundwater | Same as those listed in Table 11.14-6 |
| Impact GW-7: Inability to identify specific impacts to groundwater quality from well stimulation activities | GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment | Same as those listed in Table 11.14-6 |
| **SURFACE WATER RESOURCES** | | |
| Impact SWR-1. Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality. | Class II<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-1bc: Provide Adequate Flood Protection<br>SWR-1cd: Protect Surface Water Reservoirs | Same as those listed in Table 11.15-1 |
| Impact SWR-2. Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site. | Class II<br>SWR-2a: Implement Erosion Control Plan | Same as those listed in Table 11.15-1 |
| Impact SWR-3. Substantially diminish surface water quantity. | Class II<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.15-1 |
| Impact SWR-4. Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding. | Class II<br>SWR-1bc: Provide Adequate Flood Protection | Same as those listed in Table 11.15-1 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **LAND USE AND PLANNING** | | |
| Impact LU-1. Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses. | Class I<br>None available for impacts associated with Risk of Upset/Public and Worker Safety | Same as those listed in Table 11.16-3 |
| Impact LU-2. Physically divide an established community. | Class III<br>None required LU-2a: Ensure That Established and Planned Communities Are Not Divided | Same as those listed in Table 11.16-3 |
| Impact LU-3. Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. | Class III<br>All mitigation measures prescribed in this EIR None required | Same as those listed in Table 11.16-3 |
| **NOISE AND VIBRATION** | | |
| Impact NOI-1. Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels | Class II<br>NOI-1a: Control Noise Levels near Sensitive Land Uses | Same as those listed in Table 11.17-10 |
| Impact NOI-2. Cause exposure of persons to or generation of excessive groundborne vibration | Class III<br>None required | Same as those listed in Table 11.17-10 |
| **POPULATION AND HOUSING** | | |
| Impact POP-1. Induce substantial population growth | Class III<br>None required | Same as those listed in Table 11.18-4 |
| Impact POP-2. Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere | Class III<br>None required | Same as those listed in Table 11.18-4 |
| **PUBLIC SERVICES** | | |
| Impact PUB-1. Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools | Class II outside of existing oil and gas fields where 10 or more wells are drilled by a single applicant within 1 square mile;<br>Otherwise, Class III<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.19-4 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **RECREATION** | | |
| Impact REC-1. ~~Well stimulation treatment activities would increase the usage of recreation areas or facilities which would r~~Result in the physical deterioration of recreational resources | Class III<br>None required | Same as those listed in Table 11.20-3 |
| Impact REC-2. ~~Well stimulation treatment activities would c~~Cause disruptions in designated recreation areas | Class II<br>REC-2a: Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas<br>REC-2b: Provide Noticing of Closures and Identify Alternative Recreation Areas | Same as those listed in Table 11.20-3 |
| **RISK OF UPSET / PUBLIC AND WORKER SAFETY** | | |
| Impact RSK-1. Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases | Class I<br>RSK-1a: Increase the Number of CPUC Rail Inspectors<br>RSK-1b: Expedite the Phase-out of Older Tank Cars<br>RSK-1c: Implement New Accident Prevention Technology<br>RSK-1d: Monitor and Enforce New Speed Limits<br>RSK-1e: Monitor the Implementation of Trackside Safety Technology<br>RSK-1f: Improve Emergency Preparedness and Response Programs<br>RSK-1g: Provide Real-Time Shipment Information to Emergency Responders<br>RSK-1h: Provide Additional Accident and Injury Data to the State | Same as those listed in Table 11.21-1 |
| Impact RSK-2. Create a hazard to the public<u>, workers,</u> or environment through a reasonably foreseeable accidental release hazardous materials due to a hose leak or connection leak while pumping well stimulation treatment fluids | Class II<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2<u>a</u>~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2<u>b</u>~~d~~: Conduct a Facility Siting Study <u>or Quantitative Risk Assessment</u><br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System~~<br>RSK-2<u>c</u>~~f~~: Ensure Mechanical Integrity <u>Through Compliance with Permanent</u> ~~Program Complies with~~ Regulation | Same as those listed in Table 11.21-1 |
| Impact RSK-3. Substantially increase the potential for major oil spills due to ship groundings and collisions | Class III<br>None required | Same as those listed in Table 11.21-1 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact RSK-4. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental pressure changes during flowback activity caused by blocked pump discharge, sudden change in downhole condition, or human error | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | Same as those listed in Table 11.21-1 |
| Impact RSK-5. Generate risks to public safety by causing a flammable atmosphere in the flowback tank | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | Same as those listed in Table 11.21-1 |
| Impact RSK-6. Increase risks to public safety by exposing the public to accidental crude oil or produced gas releases from pipelines | Class I<br>RSK-6a: Increase Inspection of Mechanical Integrity<br>RSK-6b: Improve Leak Detection Capability<br>RSK-6c: Reduce Mainline Valve Spacing None available | Same as those listed in Table 11.21-1 |
| Impact RSK-7. Expose workers and public to hazardous levels of airborne silica during the use of proppant | Class II<br>RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System<br>RSK-7b: Reduce Emissions from Dust-Causing Activities | Same as those listed in Table 11.21-1 |
| **TRANSPORTATION AND TRAFFIC** | | |
| Impact TR-1. Generate additional truck traffic and disrupt traffic operations | Class III for project activities in Study Region 6 and for existing fields<br>Class II outside of existing oil and gas fields in Study Regions 1–5 where 10 or more wells are drilled by a single applicant within 1 square mile<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.22-9 |
| Impact TR-2. Inadvertently damage road rights-of-way | Class III for project activities in Study Region 6 and in existing oil and gas fields<br>Class II outside of existing oil and gas fields in Study Regions 1–5 where 10 or more wells are drilled by a single applicant within 1 square mile<br>TR-2a: Repair Roadway Damage | Same as those listed in Table 11.22-9 |
| Impact TR-3. Cause traffic safety hazards for vehicles, bicyclists, and pedestrians | Class III for project activities in Study Region 6 and for existing fields<br>Class II outside of existing oil and gas fields in Study Regions 1–5 where 10 or more wells are drilled by a single applicant within 1 square mile<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.22-9 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact TR-4. Transport hazardous materials | Class I<br>TR-4a: Know Spill Prevention Measures | Same as those listed in Table 11.22-9 |
| Impact TR-5. Change air traffic patterns | Class IV if no airports are nearby<br>Class III if FAA notification under 14 CFR-77 is required<br>None required | Same as those listed in Table 11.22-9 |
| Impact TR-6. Temporarily interfere with emergency response | Class II<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation | Same as those listed in Table 11.22-9 |
| **UTILITIES AND SERVICE SYSTEMS** | | |
| Impact UTL-1. Adversely affect utilities and service systems due to population growth from Project-related development | Class II<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation | Same as those listed in Table 11.23-6 |
| Impact UTL-2. Require new or expanded electrical or natural gas infrastructure | Class III<br>None required | Same as those listed in Table 11.23-6 |
| Impact UTL-3. Exceed existing municipal wastewater treatment provider capacities | Class III<br>None required | Same as those listed in Table 11.23-6 |
| Impact UTL-4. Exceed permitted solid waste capacity of landfills | Class III<br>None required | Same as those listed in Table 11.23-6 |

1 - Mitigation measures recommended herein are addressed to well stimulation treatment activities, but sometimes are also relevant to indirect impacts not caused by well stimulation but by other activities (e.g., new oil and gas drilling activities on consolidated well pads outside existing oil and gas fields). In the latter situation, the identified measures thus are only model measures that could be followed, likely with some modification, in connection with approvals of other projects.

## 12.5    Urbanized Area Protection Alternative (Alternative 4)

The Urbanized Area Protection Alternative (Alternative 4) would prohibit future oil and gas well drilling for the purposes of well stimulation within the boundaries of any established Urbanized Area that is not included within an existing oil and gas field boundary or its buffer area. Urbanized Areas are those areas with a population over 50,000 as defined by the U.S. Census Bureau using 2010 estimated Census populations. This alternative would apply only to areas outside of existing oil and gas fields.

As with Alternative 1, this alternative assumes that any action taken by the State to restrict or limit well stimulation activities would not be applicable in areas under federal or tribal jurisdiction. Any activity that is currently allowed in areas under federal or tribal jurisdiction would continue to be allowed, and could increase, stay the same or decrease in intensity. The current permitting and environmental review processes applicable to stimulation activities in areas under federal and tribal jurisdiction would continue to apply to new well stimulation projects in those areas, and therefore impacts are assumed to be mitigated as appropriate and feasible. The analysis below for this alternative focuses only on activities in areas under State jurisdiction, and includes the assumption that the analysis of effects in areas under federal or tribal jurisdiction would be the same as with Alternative 1. Therefore, effects in areas under federal or tribal jurisdiction are not considered further in the analysis of this alternative.

This alternative has been developed primarily for consideration by local agencies and would not be implemented by DOGGR by itself. As applied in particular counties and incorporated cities, this alternative would likely require local legislative actions such as amendments to existing general plans and zoning ordinances and possibly grading and other ordinances.

It is likely that an undetermined amount of oil and gas resources that might have been accessed would not be accessed with implementation of this alternative. However, the majority of the Monterey Formation and plays are outside of the Urbanized Areas affected by this alternative. Therefore, most of the Monterey Formation's hydrocarbon resources could still be accessed under this alternative.

In addition to an analysis of the alternative itself, the analysis of Alternative 4 highlights how impacts under this alternative would be different from impacts under the project. Where no difference is specifically noted, the significance of impacts under the alternative are the same as the impacts under the project.

### 12.5.1    Aesthetics

#### 12.5.1.1    Introduction

This section provides an evaluation of the potential impacts to visual resources associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.1 (Aesthetics) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.1 (Aesthetics). For the purposes of this analysis please refer to EIR Sections 10.1.2 and 11.1.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.1.3 and 11.1.3 for a description of the affected environment for visual resources (as applicable at either a study region or field-specific scale), and EIR Section 10.1.4 for details regarding the impact methodology and significance criteria that have been used.

## 12.5.1.2    Programmatic Level Analysis of the Project

The Urbanized Area Protection Alternative would prohibit well drilling outside of established oil and gas fields with the intention of conducting well stimulation in defined Urbanized Areas. This would reduce the amount of land potentially available for oil and gas development in areas outside of existing fields. With the exception of Los Angeles and Orange Counties (in Study Region 1), few Urbanized Areas occur in areas identified as Monterey Formation or plays. In Study Region 1, prohibiting well stimulation outside of existing fields in Urbanized Areas would place the formation and play located here off limits except to the extent it is accessed from existing fields. This would have minimal effect on visual resources, as the area is extensively built out and any oil and gas development in new areas would have to conform to existing land use requirements and would likely be screened. In any event, oil and gas work would not be a significant visual change from the already altered state of the environment as compared to natural conditions.

Under Alternative 4, Urbanized Areas in Study Regions 2 through 6 would not be developed for oil and gas recovery if well stimulation were a necessary part of the development process. However, much of the land area in these regions would remain available for conventional oil and gas activities without well stimulation. In particular, areas identified as oil and gas plays would remain available over much of their extent. A slight reduction in the overall area available for potential oil and gas development could result is less land disturbance overall, reducing visual impacts. In areas where development would occur, mitigation measures as described in EIR Section 10.1.5 likely would be required.

Overall, visual impacts would be similar to those under the project. By not allowing wells requiring stimulation to be located in Urbanized Areas, and there would have a somewhat smaller number of viewers than would be the case for developed in Urbanized Areas. However, as noted, few Monterey plays are in Urbanized Areas except in Study Region 2, and in this region well stimulations would be in existing fields, which would be allowed under this alternative. All impacts identified in EIR Sections 10.1 and 11.1 would occur under Alternative 4 and the same mitigation measures would apply as for the project. In areas outside of existing fields, impacts would be either significant (Class I) or less than significant with mitigation (Class II), depending on the actual location of the oil and gas activity and its visual setting. This is similar to impacts under the project for areas outside of existing oil and gas fields.

## 12.5.1.3    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

This alternative applies only to areas outside of existing fields, and would not apply to Wilmington, Inglewood, and Sespe Oil and Gas Fields. However, mitigation measures as described for the project would apply.

## 12.5.1.4    Impact Significance Summary

Prohibiting well stimulation in Urbanized Areas outside of existing fields would not have a substantial effect on the visual environment, as extensive areas would remain available for exploration and development. Overall, visual impacts would be similar to those of the project, and similar mitigation would apply.

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.2    Agriculture and Forestry Resources

### 12.5.2.1    Introduction

This section provides an evaluation of the potential impacts to agriculture and forestry resources associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.2 (Agriculture and Forestry Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.2 (Agriculture and Forestry Resources). For the purposes of this analysis please refer to EIR Sections 10.2.2 and 11.2.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.2.3 and 11.2.3 for a description of the affected environment for agriculture and forestry resources (as applicable at either a study region or field-specific scale), and EIR Section 10.2.4 for details regarding the impact methodology and significance criteria that have been used.

~~Under this alternative the project standards for resource protection (see EIR Section 7.5) would not be implemented, which would result in greater indirect impacts on agricultural and forestry resources (Impact AGF-5, Directly or indirectly impair the use of agricultural land or forest land). Without the Water Recycling Standards, there would be an increase in competition for agricultural water supplies, because less water would be recycled. In addition, the potential for contamination of agricultural water supplies would be increased without implementation the Surface Water Protection Standards and Groundwater Protection Standards.~~

### 12.5.2.2    Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 4 (Urbanized Area Protection) would prohibit well stimulation treatments being used in Urbanized Areas outside of existing oil and gas fields. Agriculture and forestry resources are generally not located within Urbanized Areas; therefore, Alternative 4 would not reduce or substantially change the following impacts to agriculture and forestry:

- **Impact AGF-1.** Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use

- **Impact AGF-2.** Conflict with existing zoning for agricultural use or with Williamson Act contracts

- **Impact AGF-3.** Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production

- **Impact AGF-4.** Result in the loss of forest land or conversion of forest land to non-forest use

- **Impact AGF-5.** Directly or indirectly impair the use of agricultural land or forest land

Although some areas would be limited, much of the area outside of existing fields would remain available for stimulation activities, and this alternative would minimally impact future oil and gas production. Impacts on agricultural and forestry resources would be the same as under the project (see EIR Section 10.2, Agriculture and Forestry Resources).

### 12.5.2.3    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington Oil and Gas Field***

There would be no impacts under Alternative 4, because there is no forested land or designated Farmland within the Wilmington Oil and Gas Field.

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

*Inglewood Oil and Gas Field*

The Inglewood field does not contain any mapped farmland so no direct or indirect impacts would occur to agriculture (Impacts AGR-1 and AGF-2)(Class IV). Likewise, The Inglewood Oil and Gas Field is not zoned for forest land or timberland, therefore, Impact AGF-3 would not occur (Class IV).

Because the Inglewood Oil and Gas Field is an existing field, well stimulation activities would be allowed. Therefore, impacts associated with stimulation activities for the Inglewood Oil and Gas Field for Alternative 4 (Impacts AGF-4 and AGF-5) would be the same as those described in EIR Section 11.2 (Agriculture and Forestry Resources).

*Sespe Oil and Gas Field*

Because the Sespe Oil and Gas Field is an existing field, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Sespe field for Alternative 4 would be the same as those described in EIR Section 11.2 (Agriculture and Forestry Resources).

### 12.5.2.4    Impact Significance Summary

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.3    Air Quality

### 12.5.3.1    Introduction

This section provides an evaluation of the potential impacts to air quality associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.3 (Air Quality) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.3 (Air Quality). For the purposes of this analysis please refer to EIR Sections 10.3.2 and 11.3.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.3.3 and 11.3.3 for a description of the affected environment for air quality (as applicable at either a study region or field-specific scale), and EIR Section 10.3.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.3.2    Programmatic Level Analysis of Impacts and Mitigation Measures

This alternative would limit future oil and gas activity within established Urbanized Areas (population over 50,000). Although some areas outside of existing oil and gas fields would not be available for well stimulation treatments, areas outside of existing fields and outside of Urbanized Areas would be available, including areas that may contain rural residences or other non-urban land uses that are sensitive to air quality such as schools. Therefore, the intensification of traditional drilling and the increased importation of oil expected under Alternatives 1 and 2 would not occur under this alternative.

Emissions from oil and gas production would occur at similar or slightly reduced levels, and sources would be less likely to cause substantial pollutant concentrations in Urbanize Areas. Well stimulation treatment activities would be farther from population centers and outside of Urbanized Areas. Emissions from oil and gas activity could occur at levels exceeding the forecasts of air quality plans, as they would with the project, which may cause a potential conflict with local air quality plans.

The levels of criteria air pollutant emissions caused by equipment and sources typical of well stimulation treatments, hauling product by truck, and new well drilling may exceed general mass-based emission thresholds of a local air district. Near existing fields and outside of Urbanized Areas, this alternative would retain the potential to expose sensitive receptors to substantial pollutant concentrations and create objectionable odors, as with the project.

Although localized air quality impacts in Urbanized Areas may be reduced, each of the air quality impacts would be as described for the project, and the mitigation identified for the project (EIR Section 10.3) would be applicable. This alternative would avoid some air quality impacts from future oil and gas well drilling near Urbanized Areas, but the impacts of well stimulation treatments in existing fields would remain unchanged by this alternative.

With the implementation of mitigation measures, air quality impacts would be Class I under the project. With the implementation of mitigation measures, air quality impacts would remain Class I under Alternative 4.

### 12.5.3.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 4, these existing fields would be subject to the same potential impacts and mitigation measures as described for the project (EIR Section 11.3.5). Because each new well stimulation treatment operation creates "new" emissions, which could be potentially significant, mitigation would be necessary. Although Impact AQ-1 would be a Class III: Less Than Significant Impact, the remaining air quality impacts would occur as shown under Impacts Common to All Study Regions (EIR Section 10.3.5). Mitigation measures identified for Impact AQ-2, Impact AQ-3, and Impact AQ-4 would be applicable within each field, and the resulting impacts after implementing mitigation would be significant and unavoidable (Class I).

### 12.5.3.4    Impact Significance Summary

Although emissions and activities related to well stimulation treatments would be limited near Urbanized Areas under Alternative 4, emissions from oil and gas activity would occur at levels comparable to those of the project and non-urban areas would experience the same impacts as with the project. Each of the air quality impacts due to well stimulation treatments would be as described for the project.

## 12.5.4    Biological Resources: Terrestrial Environment

### 12.5.4.1    Introduction

This section provides an evaluation of the potential impacts to terrestrial biological resources associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.4 (Biological Resources: Terrestrial Environment) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.4 (Biological Resources: Terrestrial Environment). For the purposes of this analysis please refer to EIR Sections 10.4.2 and 11.4.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.4.3 and 11.4.3 for a description of the affected environment for terrestrial biological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.4.4 for details regarding the impact methodology and significance criteria that have been used.

Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, compared to the project, there would be the potential for an increase in oil and

~~gas development and associated well stimulation in biologically sensitive areas, slightly greater habitat loss without setbacks from perennial surface water, an increase in water usage that could affect fish and wildlife habitat (due to less water recycling), and an increase in the potential for contamination of water supplies that could affect biological resources.~~

### 12.5.4.2    Programmatic Level Analysis of the Project

Alternative 4 would exclude oil and gas drilling for the purpose of well stimulation within the boundaries of established Urbanized Areas and outside existing oil and gas fields. This alternative could reduce impacts to terrestrial biological resources, but the actual reduction cannot be quantified. In general, Urbanized Areas support fewer special-status biological resources than other areas. Oil and gas production in Urbanized Areas is often within industrial areas, rather than native habitats. However, in some jurisdictions, oil and gas resources may be present in natural open space areas supporting significant biological resources. To the extent that Alternative 4 may reduce potential impacts to natural open space within Urbanized Areas, its impacts to biological resources would be reduced from the project. Depending on specific locations of future well stimulation activities, the potential impacts to biological resources may range from Class I (significant and unavoidable) to Class III (less than significant). Due to the unknown locations of future well stimulation activities, this analysis presumes the "reasonable worst case" statewide impacts of well stimulation, which generally are Class I or Class II.

The majority of adverse biological resource impacts from well stimulation are expected to take place outside established Urbanized Areas, and thus would not be reduced under this alternative. Under Alternative 4, impacts to biological resources may be significant and unavoidable (Class I). This would apply to all the biological resources impact criteria BIOT-1 through BIOT-6 (addressing impacts to plants, fish, and wildlife and their habitats and natural communities) and BIOT-10 (greenhouse gas effects and consequent impacts to biological resources), below. In contrast, Impacts BIOT-8 and BIOT-9 (addressing conflicts with conservation policies and planning) are Class II impacts under the this alternative (and under the project).

### 12.5.4.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Alternative 4 would not apply to existing oil and gas fields, and thus would allow well stimulation activities in the Wilmington, Inglewood, and Sespe Oil and Gas Fields. Potential impacts to terrestrial biological resources in the Wilmington, Inglewood, and Sespe Oil and Gas Fields would be as described in EIR Section 11.4. Potential "reasonable worst-case" impacts to biological resources would be Class I for Impacts BIOT-1 through BIOT-6 and BIOT-7 (Sespe field only); Class II for Impacts BIOT-8 and BIOT-9; and Class III for Impacts BIOT-7 (for the Wilmington and Inglewood fields) and BIOT-10 (as they would be under the project).

### 12.5.4.4    Impact Significance Summary

Under Alternative 4 (Urbanized Area Protection) some impacts to habitat in Urbanized Areas may be reduced. However, overall impacts in all study regions would be essentially the same as the project, given that the Alternative permits well stimulation in more biologically sensitive rural areas outside Urbanized Areas.

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.5    Biological Resources: Coastal and Marine Environment

Alternative 4 (Urbanized Area Protection) does not apply to coastal and marine biological resources. Impacts would be the same as those of the project.

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.6    Coastal Processes and Marine Water Quality

Alternative 4 (Urbanized Area Protection) does not apply to coastal processes and marine water quality. Impacts would be the same as those of the project.

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.7    Commercial and Recreational Fishing

Alternative 4 (Urbanized Area Protection) does not apply to commercial and recreational fishing. Impacts would be the same as those of the project.

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.8    Cultural Resources

This section provides an evaluation of the potential impacts to cultural resources associated with Alternative 4 (Urbanized Area Protection). This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.8 (Cultural Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.8 (Cultural Resources). For the purposes of this analysis please refer to EIR Sections 10.8.2 and 11.8.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.8.3 and 11.8.3 for a description of the affected environment for cultural resources (as applicable at either a study region or field-specific scale), and EIR Section 10.8.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.8.1    Programmatic Level Analysis of the Project

For the purposes of this analysis, the following impacts are addressed:

- **Impact CUL-1:** Affect historic-era archaeological and built-environment resources

- **Impact CUL-2:** Affect prehistoric resources

- **Impact CUL-3:** Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony

- **Impact CUL-4:** Affect cultural landscapes

Under Alternative 4, the geographic extent of impacts to cultural resources would be lessened within Urbanized Areas in comparison to the project, and the risk of adverse impacts to cultural resources in these areas would be correspondingly reduced. At a programmatic level of analysis, it is not possible to know precisely the location, extent and particular characteristics of potential impacts to these

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 738 of 836   Page
ID #:11464
Analysis of Oil and Gas Well Stimulation Treatments in California
12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES

resources. The Alternative permits well stimulation treatments in more sensitive rural areas outside Urbanized Areas, where cultural resources would remain subject to impacts from treatment-related activities.

Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would reduce these effects, but cannot guarantee they would be entirely avoided. Therefore, cultural resources impacts would remain significant and unavoidable (Class I).

The area of disturbance associated with Alternative 4 would be smaller than that of the project, including areas that are likely to be sensitive for cultural resources. ~~However, Alternative 4 does not incorporate the project standards for Resource Protection (see EIR Section 7.5, project standards for Resource Protection), which restrict well stimulation activities from operating near surface water or critical habitats. Thus, while Alternative 4 would likely impact a smaller number of cultural resources, it would impact a larger number of other types of cultural resources associated with the project's protected areas (see Appendix F).~~

### 12.5.8.2    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling and well stimulation activities would use existing roads and pads to the greatest extent possible. Impacts within fields would be the same as what is described in EIR Section 11.8 (Cultural Resources). Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 11.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would likely reduce these effects to less than significant but cannot guarantee they would be entirely avoided. Therefore, impacts to cultural resources are considered significant and unavoidable (Class I).

### 12.5.8.3    Impact Significance Summary

Alternative 4 would reduce the potential impacts to cultural resources in all study regions because the overall footprint of well stimulation disturbances would be reduced in comparison to the project within Urbanized Areas. Implementation of Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures) and EIR Section 11.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would reduce these effects, but cannot guarantee they would be entirely avoided. Potential impacts are therefore considered significant and unavoidable (Class I).

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.9    Paleontological Resources

### 12.5.9.1    Introduction

This section provides an evaluation of the potential impacts to visual resources associated with Alternative 4 (Urbanized Area Protection). This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.9 (Paleontological Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.9 (Paleontological Resources). For the purposes of this analysis please refer to EIR Sections 10.9.2 and 11.9.2 for rel-

evant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.9.3 and 11.9.3 for a description of the affected environment for paleontological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.9.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.9.2    Programmatic Level Analysis of the Project

For the purposes of this analysis, the following impact is addressed:

■ **Impact PALEO-1:** Destroy or disturb surface or near-surface significant paleontological resources

Table 10.9-8 in EIR Section 10.9 provides a summary table of the geologic units in each study region that have the potential to bear significant paleontological resources. Alternative 4 reduces the overall amount of ground disturbing activities that could result in Class II impacts to paleontological resources.

The Urbanized Area Protection Alternative would reduce the amount of land used for drilling in new areas of the State that could be developed with the advancement of new well stimulation technologies. Therefore, the geographic extent of potential impacts to paleontological resources would be lessened in comparison to the project, and thus the risk of adverse impacts would be correspondingly reduced. Implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9.2 (No Future Well Stimulation Treatments Alternative (Alternative 1)) and detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures) would be expected to reduce Impact PALEO-1 to less than significant (Class II) because the mitigation measures would allow for the recovery, preparation, analysis, and curation of the paleontological resources that may be made available for future scientific studies, which may result in important taphonomic, taxonomic, phylogenetic, paleoecologic, stratigraphic, or biochronological discovery. ~~However, in those areas where earth disturbing activities could occur, including sensitive areas outside Urbanized Areas, Alternative 4 would not provide for the project's standards for resource protection, and thus would be expected to result in a greater overall number of impacts to paleontological resources in comparison to the project.~~

### 12.5.9.3    Specific Oil and Gas Fields: Programmatic Level Analysis of Impacts and Mitigation Measures

*Wilmington and Sespe Oil and Gas Fields*

Portions of the Wilmington and Sespe Oil and Gas Fields have paleontological resources potential (i.e., sensitivity) ranging from low to high (Wilmington) and very high (Sespe) and the likelihood of impacting scientifically significant vertebrate fossils is high. Because the Wilmington and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling and well stimulation activities would use existing roads and pads to the greatest extent possible. Therefore, potential impacts within the fields would be the same as what is described in EIR Section 11.9 (Paleontological Resources). Potential impacts would be mitigable to a level of less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9 (No Future Well Stimulation Treatments Alternative (Alternative 1)) and detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures).

*Inglewood Oil and Gas Field*

Because the Inglewood Oil and Gas Field is an existing field, it is anticipated that most future drilling and well stimulation activities would use existing roads and pads to the greatest extent possible. Impacts within the field would be the same as what is described in EIR Section 10.9 (Paleontological Resources).

Potential impacts would be mitigable to a level of less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9 (No Future Well Stimulation Treatments Alternative (Alternative 1)) and detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures).

~~Within these three fields, the Urbanized Area Protection Alternative could result in greater earth disturbing activities in comparison to the project because no standards for resource protection would be implemented. Therefore, Alternative 4 would have the potential to disturb a greater overall number of paleontological resources in comparison to the project.~~

### 12.5.9.4    Impact Significance Summary

At a programmatic level of analysis, the Urbanized Area Protection Alternative would reduce the potential impacts to paleontological resources in all study regions because the overall construction footprint associated with well stimulation treatments would be reduced within Urbanized Areas when compared to the project. Moreover, any new ground disturbances related to future oil and gas well stimulation treatments that would result in adverse impacts to paleontological resources would be less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h, as defined in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures). Site-specific impacts would also be less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h. ~~However, because no standards for resource protection would apply, in those areas where ground disturbing activities could occur under Alternative 4, including sensitive rural areas outside Urbanized Areas, the overall number of impacts to paleontological resources at a site-specific level would be anticipated to be approximately the same in comparison to the project.~~

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.10   Environmental Justice

### 12.5.10.1   Introduction

This section provides an evaluation of the potential impacts to environmental justice associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.10 (Environmental Justice) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.10 (Environmental Justice). For the purposes of this analysis please refer to EIR Sections 10.10.2 and 11.10.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.10.3 and 11.10.3 for a description of the affected environment for environmental justice (as applicable at either a study region or field-specific scale), and EIR Section 10.10.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.10.2   Programmatic Level Analysis of the Project

Alternative 4 would ban well stimulation in Urbanized Areas that are not already within an oil and gas field or buffer. It would not prohibit conventional oil and gas activity in Urbanized Areas. New wells requiring stimulation would be located outside of Urbanized Areas, so wells would be farther from population centers. This would reduce the potential to affect populations of concern for experiencing disproportionate significant impacts.

While this alternative would reduce potential impacts in Urbanized Areas, it would have no effect in and around existing fields. Because the amount of land designated as Urbanized Areas over the Monterey Formation and plays is limited, this alternative would have a similar potential as the project to affect minority and low-income populations. As with the project, because of uncertainty, Alternative 4 still would require implementation of Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments). However, this would have to be a local requirement, as DOGGR would not be implementing Alternative 4. Because CEQA does not require an analysis of environmental justice, it would be at the discretion of local authorities whether to implement this or a similar measure.

The location of all future well stimulation activity is not known and the protection of certain Urbanized Areas would not change the potential for impacts from well stimulation itself. The potential for environmental justice impacts from well stimulation occurring remains, and Mitigation Measure EJ-1a is proposed for Alternative 4 to the extent that DOGGR will be issuing well stimulation treatment permits for areas not put off-limits by local governments within their Urbanized Areas. The implementation of Mitigation Measure EJ-1a would allow DOGGR to track the locations of well stimulation applications and assess its impacts on environmental justice, and to devise strategies to address these impacts should they arise. Impacts would be reduced somewhat when compared to those of the project, as well stimulations would not be located within Urbanized Areas. However, this is a relatively small area compared to the area available in California for potential oil and gas well development and stimulation.

**MM EJ-1a**     **Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments.** (Full text in EIR Section 10.10.5.)

### 12.5.10.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Alternative 4 would not apply at Wilmington, Inglewood, or Sespe Oil and Gas Fields, as they are existing fields and this alternative would apply only in areas outside of existing fields.

### 12.5.10.4   Impact Significance Summary

Alternative 4 would have a minor effect in reducing the area where well stimulation could occur. This alternative would not be implemented by DOGGR. It could be considered by local jurisdictions where their authority applies. However, other impacts associated with well stimulation would remain both in and outside of existing fields, and Alternative 4 would require mitigation similar to Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) would apply and would reduce the environmental justice impact.

## 12.5.11   Geology, Soils and Mineral Resources

### 12.5.11.1   Introduction

This section provides an evaluation of the potential impacts to geology, soils and mineral resources associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.11 (Geology, Soils and Mineral Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.11 (Geology, Soils and Mineral Resources). For the purposes of this analysis please refer to EIR Sections 10.11.2 and 11.11.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.11.3 and 11.11.3 for a description of the affected environment for geology, soils and mineral resources (as applicable at either a study region or

field-specific scale), and EIR Section 10.11.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.11.2  Programmatic Level Analysis of the Project

This alternative would limit future oil and gas activity within established Urbanized Areas (population over 50,000) if they are not within existing oil and gas fields. Some areas outside of existing oil and gas fields would not be available for well stimulation treatments, in particular areas near the greater Los Angeles region, Bakersfield, Modesto, greater Bay Area region, and the greater Sacramento region. Areas outside of Urbanized areas would be available for well stimulation activities, including many rural towns and residences. Although some areas would be limited, much of the area outside of existing fields would remain available for stimulation activities, and this alternative would minimally impact future oil and gas production. Impacts associated with geology, soils, and mineral resources would remain the same as with the project, described in EIR Section 10.11 (Geology, Soils, and Mineral Resources), although confined to a slightly reduced area.

### 12.5.11.3  Programmatic Level Analysis of Specific Oil and Gas Fields

Geology, soils and mineral resources settings for Study Regions 1 and 2 are discussed in EIR Section 11.11.3. Impacts and mitigation measures are discussed in EIR Section 11.11.5.

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed and would not be limited by the Urbanized Areas restriction. Therefore, impacts associated with stimulation activities for the Wilmington, Inglewood, and Sespe Oil and Gas Fields for Alternative 4 would be the same as those described in EIR Section 11.11.5.1 (Impact Analysis and Mitigation Measures: Study Region 1 Wilmington Oil and Gas Field) and EIR Section 11.11.5.2 (Impact Analysis and Mitigation Measures: Study Region 1 Inglewood Oil and Gas Field) and in EIR Section 11.11.5.3 (Impact Analysis and Mitigation Measures: Study Region 2 Sespe Oil and Gas Field), with the exceptions noted in those Chapters.

### 12.5.11.4  Impact Significance Summary

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.12  Greenhouse Gas Emissions

### 12.5.12.1  Introduction

This section provides an evaluation of the potential impacts to greenhouse gas emissions associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.12 (Greenhouse Gas Emissions) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.12 (Greenhouse Gas Emissions). For the purposes of this analysis please refer to EIR Sections 10.12.2 and 11.12.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.12.3 and 11.12.3 for a description of the affected environment for greenhouse gas emissions (as applicable at either a study region or field-specific scale), and EIR Section 10.12.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.12.2  Programmatic Level Analysis of Impacts and Mitigation Measures

This alternative would not involve a change in the amount of potential oil and gas production in California. California end users of oil and gas would continue to rely on the established supply as in the baseline. There would be no change in life-cycle GHG emissions of California's crude supply because the supply itself would not change. Each of the GHG impacts would be as described for the project (EIR Section 10.12.5). Mitigation identified for well stimulation treatments would apply, as recommended for the project.

### 12.5.12.3  Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 4, well stimulation treatments would occur in the Wilmington and Sespe Oil and Gas Fields as expected under the project. Therefore, as described in EIR Section 11.12.5, GHG emissions associated with well stimulation treatments at Wilmington and Sespe would continue, and the extent of Impact GHG-1 is uncertain, ranging from a less than significant impact (Class III) to a significant, unavoidable impact (Class I). New well stimulation treatments at the Inglewood Oil and Gas Field would be subject to the same potential GHG impacts (Class I) and would require the same mitigation measures as described for the project (EIR Section 11.12.5).

### 12.5.12.4  Impact Significance Summary

Some emissions related to well stimulation treatments would be limited near Urbanized Areas, However, each of the GHG impacts due to well stimulation treatments would be as described for the project.

## 12.5.13  Hazards and Hazardous Materials

### 12.5.13.1  Introduction

This section provides an evaluation of the potential impacts for hazards and hazardous materials associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.13 (Hazards and Hazardous Materials) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.13 (Hazards and Hazardous Materials). For the purposes of this analysis please refer to EIR Sections 10.13.2 and 11.13.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.13.3 and 11.13.3 for a description of the affected environment for hazards and hazardous materials (as applicable at either a study region or field-specific scale), and EIR Section 10.13.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.13.2  Programmatic Level Analysis of the Project

As stated in EIR Section 8.3.4, extensive area outside of Urbanized Areas would remain available for exploration and development. All impacts identified for the use of hazardous materials would still occur under this alternative, as it would affect only the location of some wells and would not affect activities associated with well stimulation itself.

| Impact HAZ-1    Release hazardous materials into the environment from a spill or leak |
| --- |

In general, Alternative 4 would apply to all the Urbanized Areas in the study regions within the State. Study Region 1 is highly urbanized, but also has extensive oil and gas fields, and the prohibition on well stimulation in Urbanized Areas under Alternative 4 would not apply in existing fields.

Hazards and hazardous materials impacts would remain potentially significant for well stimulation treatments in existing oil and gas fields. As discussed in EIR Section 10.13.5, it is difficult to anticipate the fate of the released chemicals in the environment because many individual chemical compounds within well stimulation fluids lack sufficient mobility and toxicity information. Available data indicate that many hydraulic fracturing chemical compounds are either highly soluble or miscible in water and/or have densities greater than water. Some chemicals may be transformed (degraded) by hydrolysis and, in some cases, degradation ("daughter") products are not known. Daughter products may be more hazardous than the parent chemicals.

Given these conditions, impacts from a spill or release could be significant. Therefore a mitigation measure is proposed.

**MM HAZ-1a**    **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials** ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~. (Full text in EIR Section 10.13.5.)

Revised Mitigation Measure HAZ-1a is recommended to be required at any well stimulation occurring in existing oil and gas fields. Additional discussion of the mitigation measure is found in EIR Section 10.13.5.

Protective measures for prevention of spills or releases of hazardous materials are provided in both existing and proposed regulations. A summary of the key measures in the proposed SB 4 Well Stimulation Treatment Regulations is provided in EIR Section 10.13.5. Collectively, with implementation of revised MM HAZ-1a ~~with inclusion of a barrier for all production facilities, regardless of the amount of time they are in place, and with~~ and surface water management, and implementation/enforcement of all of the existing and proposed regulations regarding the transport, handling, storage, conveyance, and management of hazardous materials, including the Spill Contingency Plan, which accounts for spills that may occur at pipes, valves, or supply lines, the impact of well stimulation materials on the environment in the event of a release, is considered less than significant with mitigation (Class II).

Therefore, the Programmatic level impacts and mitigation that apply to the project apply to Alternative 4. Impacts for Alternative 4 would be reduced to less than significant with implementation of revised Mitigation Measure HAZ-1a (Class II). Impact HAZ-1 would also be Class II under the project.

### 12.5.13.3    Programmatic Level Analysis of Specific Oil and Gas Fields

This alternative applies only to areas outside of existing fields, and would not apply to Wilmington, Inglewood, and Sespe Oil and Gas Fields.

### 12.5.13.4    Impact Significance Summary

Prohibiting well stimulation in Urbanized Areas would not have a substantial effect on the impacts from hazards and hazardous materials, as extensive areas would remain available for exploration and development. Overall, impacts would be similar to those of the project, and similar mitigation would apply.

Section 12.5.24 (Summary of Impacts and Mitigation Measures for Alternative 4), Table 12.5.24-1, lists by resource all impacts and mitigation measures applicable to Alternative 4.

## 12.5.14   Groundwater Resources

### 12.5.14.1   Introduction

This section provides an evaluation of the potential impacts to groundwater resources associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.14 (Groundwater Resources). For the purposes of this analysis please refer to EIR Sections 10.14.2 and 11.14.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.14.3 and 11.14.3 for a description of the affected environment for groundwater resources (as applicable at either a study region or field-specific scale), and EIR Section 10.14.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative, which would result in greater potential for use of groundwater with no water recycling standards in place, and less protection of both groundwater resources as well as surface water resources that could recharge groundwater.~~

As summarized in EIR Section 10.14.6, impacts from well stimulation treatments were determined to be potentially significant to both the quantity and quality of groundwater. Further analysis indicated that the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures, which are summarized on Table 10.14-20, focus on preventing exacerbation of groundwater overdraft or subsidence, maintaining existing use of water supply wells, and mitigating possible pathways that might allow well stimulation fluids including gas to reach protected groundwater.

### 12.5.14.2   Programmatic Level Analysis of the Project

As stated in EIR Section 8.4.2, the Urbanized Area Protection Alternative would prohibit well stimulation treatments within Urbanized Areas outside of existing oil and gas fields. This alternative would lead to a decrease in areas outside of existing fields where well stimulation could occur. Thus, Alternative 4 reduces area within which mitigation measures are required.

However, impacts to groundwater quantity and quality would remain potentially significant outside of Urbanized Areas, because well stimulation treatments may occur in the future in the available areas.

Impacts and mitigation that would continue to apply under Alternative 4 are listed below.

| Impact GW-1    Cause or contribute to overdraft conditions |
|---|

Because the alternative would allow for well stimulation outside of Urbanized Areas, it would cause or contribute to overdraft conditions as described in EIR Section 10.14.5. With implementation of these mitigation measures, Impact GW-1 would be reduced to a less than significant level (Class II). Impact GW-1 is also Class II under the project but there would be fewer locations where this impact could occur under the alternative.

**MM GW-1a**     **Use Alternative Water Sources <u>to the Extent Feasible.</u>** (Full text in EIR Section 10.14.5.)

**MM GW-1b**     **<u>Minimize Groundwater Impacts</u> ~~Prepare a Third Party Technical Report to Analyze Overdraft Impacts.~~** (Full text in EIR Section 10.14.5.)

| Impact GW-2 | Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water |
|---|---|

Depending on geologic conditions, groundwater pumping could result in land subsidence. It could also interfere with nearby water wells, including lowering the water level in the well to a point that they no longer function as intended. These would be significant impacts, which would be addressed by the recommended mitigation measure below. With implementation of this mitigation measure, Impact GW-2 would be reduced to a less than significant level (Class II). Impact GW-2 is also Class II under the project, but there would be fewer locations where this impact could occur under the alternative.

**MM GW-1b2a** **Minimize Groundwater Impacts**~~Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping.~~ (Full text in EIR Section 10.14.5.)

| Impact GW-3 | Adversely impact groundwater quality from surface spills or leaks during well stimulation |
|---|---|

The full description of this mitigation measure is found in EIR Section 10.13.5. With implementation of this revised mitigation measure, Impact GW-3 would be reduced to a less than significant level (Class II). Impact GW-3 is also Class II under the project but there would be fewer locations where this impact could occur under the alternative.

**MM HAZ-1a** **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ (Full text in EIR Section 10.13.5.)

| Impact GW-4 | Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals |
|---|---|

Some wells in existing oil and gas fields may have non-existent or ineffective well seals, particularly if they are old or were improperly abandoned. This situation could result in the migration of stimulation fluids including gas through these pathways into protected groundwater. To address this significant impact, three revised mitigation measures are identified. With implementation of these revised mitigation measures, Impact GW-4 would be reduced to a less than significant level (Class II). Impact GW-4 is also Class II under the project but there would be fewer locations where this impact could occur under the alternative.

**MM GW-4a** **Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation.** (Full text in EIR Section 10.14.5.)

**MM GW-4b** **Install a Well Seal across Protected Groundwater for New Wells Subject to Well Stimulation Treatments.**~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin.~~ (Full text in EIR Section 10.14.5.)

**MM GW-4c** **Install Methane Sensors on Wells** ~~in the ADSA~~**Subject to Well Stimulation Treatments.** (Full text in EIR Section 10.14.5.)

| **Impact GW-5** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells** |
|---|---|

Some existing and abandoned wells in oil and gas fields may have damaged, non-existent, or ineffective well seals. This could create pathways for stimulation fluids injected in one well to migrate into protected groundwater by way of the annular space in another well within the zone of influence of the stimulated well. This would be a significant impact. To address this, a revised mitigation measure is proposed. With implementation of this revised mitigation measure, Impact GW-5 would be reduced to a less than significant level (Class II). Impact GW-5 is also Class II under the project.

**MM GW-5a    Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate.** (Full text in EIR Section 10.14.5.)

| **Impact GW-6** | **Improper disposal of flowback in injection wells could potentially impact groundwater quality** |
|---|---|

Class II injection wells are required under the UIC program regulations to have an isolating cement seal above the injection zone as well as a minimum 100-foot seal across the base of the fresh water zone. If injected flowback water migrates to protected groundwater, this would be a significant impact. To address this, a mitigation measure is proposed. With implementation of this revised mitigation measure, Impact GW-6 would be reduced to a less than significant level (Class II). Impact GW-6 is Class II under the project.

**MM GW-6a    Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater~~Install a Cement Seal across Protected Groundwater~~.** (Full text in EIR Section 10.14.5.)

| **Impact GW-7** | **Inability to identify specific impacts to groundwater quality from well stimulation activities** |
|---|---|

Many chemicals and compounds can be introduced to groundwater by various pathways. The origin of these materials is difficult to ascertain under many circumstances. Groundwater monitoring may identify a chemical or compound, but would be unable to identify its source. If well stimulation fluids reach protected groundwater, this would be a significant impact. To ensure that stimulation fluids can be more readily distinguished from other compounds that may be naturally occurring or have been introduced into the groundwater, a revised mitigation measure is proposed to address this. With implementation of this revised mitigation measure, Impact GW-7 would be reduced to a less than significant level (Class II). Impact GW-7 is also Class II under the project.

**MM GW-7a    Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment.** (Full text in EIR Section 10.14.5.)

### 12.5.14.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed and would not be limited by the Urbanized Areas restriction. Therefore, impacts associated with stimulation activities for the Wilmington, Inglewood, and Sespe Oil and Gas Fields for Alternative 4 would be the same as those described in EIR Section 11.14.5.1 (Impact Analysis and Mitigation Measures: Study Region 1 Wilmington Oil and Gas Field) and EIR Section 11.14.5.2 (Impact Analysis and Mitigation Measures: Study Region 1 Inglewood Oil and Gas Field) and in EIR Section 11.14.5.3 (Impact Analysis and Mitigation Measures: Study Region 2 Sespe Oil and Gas Field)~~.~~

#### 12.5.14.4    Impact Significance Summary

Prohibiting well stimulation in Urbanized Areas would not have a substantial effect on reducing impacts to groundwater, as extensive areas would remain available for exploration and development. Overall, impacts would be similar to those of the project, and similar mitigation would apply.

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

### 12.5.15    Surface Water Resources

#### 12.5.15.1    Introduction

This section provides an evaluation of the potential impacts to surface water resources associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.15 (Surface Water Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.15 (Surface Water Resources). For the purposes of this analysis please refer to EIR Sections 10.15.2 and 11.15.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.15.3 and 11.15.3 for a description of the affected environment for surface water resources (as applicable at either a study region or field-specific scale), and EIR Section 10.15.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, there would be a greater potential for use of surface water without water recycling standards in place, as well as an increase in potential impacts to waterbodies and streams without implementation of habitat protection standards or a buffer requirement from perennial waters.~~

#### 12.5.15.2    Programmatic Level Analysis of the Project

Alternative 4 applies only to well stimulation in Urbanized Areas and does not prohibit other conventional oil and gas-related activities from occurring within these areas. Similarly, Alternative 4 would continue to allow well stimulation outside Urbanized Areas. For these reasons, Alternative 4 would have similar impacts to surface water quality and quantity as the project. These impacts and mitigation measures needed are listed in EIR Section 10.15.

With implementation of the identified mitigation measures, these impacts to surface water would be less than significant (Class II).

#### 12.5.15.3    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Alternative 4 does not apply to existing fields. Under this alternative, activities on these fields would occur as described for the oil fields described EIR Section 11.15.5 and summarized in EIR Section 11.15.6, in which impacts to surface water resources associated with well stimulation treatments were determined to be potentially significant. However, the significant impacts would be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures for Wilmington, Inglewood, and Sespe Oil and Gas Fields would be the same as for the project. With implementation of these measures, the impact to surface water under Alternative 4 would be less than significant (Class II).

#### 12.5.15.4    Impact Significance Summary

Based on the programmatic level analysis of surface water resources, impacts from Alternative 4 are considered to be the same, less than significant with mitigation (Class II).

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

### 12.5.16    Land Use and Planning

#### 12.5.16.1    Introduction

This section provides an evaluation of the potential impacts to land use and planning associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.16 (Land Use and Planning). For the purposes of this analysis please refer to EIR Sections 10.16.2 and 11.16.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.16.3 and 11.16.3 for a description of the affected environment for land use and planning (as applicable at either a study region or field-specific scale), and EIR Section 10.16.4 for details regarding the impact methodology and significance criteria that have been used.

#### 12.5.16.2    Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 4 would prohibit future oil and gas well drilling for the purposes of stimulation within the boundaries of established Urbanized Areas, but would allow it Urbanized Areas within existing oil and gas field boundaries and their buffer areas. In comparison to the project, well stimulation treatment activities under Alternative 4 would be outside of certain defined population centers.

Urbanized Areas are areas with a population over 50,000 as defined by the U.S. Census Bureau. Figures 8-7 through 8-9 illustrate the Urbanized Areas within each study region. Because this alternative would apply only to areas outside of existing oil and gas fields, the Inglewood, Sespe, and Wilmington Oil and Gas Fields are not part of this alternative.

Impact LU-1 addresses potential disruptions and preclusions to existing and permitted land uses. In comparison to the project, Alternative 4 would result in a decrease of land disturbances inside of Urbanized Areas. It would apply to wells drilled with the intent of stimulating them, but not to all oil and gas wells. Well stimulation activities would still result in disruptions to land uses outside of these areas, as listed in EIR Section 10.16.5 (Land Use and Planning, Impact Analysis and Mitigation Measures). These potential disruptions that also relate to land use and planning are analyzed in detail in EIR Section 10.21 (Risk of Upset/Public and Worker Safety).

Alternative 4 would reduce potential surface disturbances and related disruptions specific Urbanized Areas, which are a relatively small portion of the Monterey Formation and plays. While prohibited in these Urbanized Areas, impacts that would still occur in other areas under the alternative and many cannot be mitigated to less than significant. Therefore, as with the project, corresponding effects to risk of upset and public and worker safety on land use and planning would also be considered significant and unavoidable (Class I) under Alternative 4.

Section 1783.2 of the ~~proposed~~ permanent regulations explicitly define the "Neighbor Notification" requirements, which include the radius for property owner notifications, the information that is to be provided, and the timing and methods of the notifications. Although the "Neighbor Notification"

requirements would be effective at minimizing potential conflicts with existing land uses, because of the other resource-specific impact that cannot be mitigation to a level of less than significant, Impact LU-1 (impacts related to land use disruption) would also be significant and unavoidable (Class I). Although Impact LU-1 is also a Class I impact under the project, these impacts under Alternative 4 would be less severe because well stimulation treatment activities would be located farther from population centers and existing residential land uses.

For Impact LU-2, Alternative 4 would reduce future land disturbances associated with well stimulation in Urbanized Areas outside of existing fields. ~~However, outside of these specific areas this alternative would apply to an established or planned community that may be found in a rural area. With implementation of Mitigation Measure LU-2a,~~ Impact LU-2 (impacts related to the physical division of an established community) within these areas would be less than significant (Class III) for the alternative. Impact LU-2 is also Class III under the project.

**~~MM LU-2a~~        ~~Ensure That Established and Planned Communities Are Not Divided.~~** ~~(Full text in EIR Section 10.16.5.)~~

Impact LU-3 addresses potential conflicts with applicable land use plans, policies, programs, ordinances and other regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. As noted in EIR Section 10.16 (Land Use and Planning), a consistency analysis of the activities associated with well stimulation treatments outside of existing oil and gas fields involves the review and assessment of applicable local agency plans, policies and regulations, which is not possible to complete at the statewide/programmatic level of analysis given the extensive number of jurisdictions affected, the extent of oil and gas regulations of each jurisdiction, the vast array of potential conditions that would be imposed on projects based on specific jurisdictions conditional use permit application processes, the fact that land use and zoning regulation implementation is the legal responsibility of local jurisdictions, and the fact that this EIR is required by law to be completed within a very limited time period that cannot accommodate such an extensive effort. Nonetheless, the impact analysis under the project found that the information and mitigation measures set forth in this EIR would reduce potential conflicts with any established, designated, or planned land use areas on federal, State, or locally regulated lands to a less than significant level (Class II). Alternative 4, to which all of the EIR's mitigation measures would apply, would be Class II as well.

### 12.5.16.3   Programmatic Level Analysis of Specific Oil and Gas Fields

As referenced above, Alternative 4 only applies to areas outside of existing oil and gas fields; therefore, the Wilmington, Inglewood, and Sespe Oil and Gas Fields are not part of this alternative. Mitigation measures applicable to the project would apply, however.

### 12.5.16.4   Impact Significance Summary

Alternative 4 would reduce the geographic extent of potential land use impacts within Urbanized Areas, which would be considered a net benefit. However, outside of these areas land use impacts at a programmatic level of analysis would still be the same as for the project. Significant and unavoidable impacts related to Impact LU-1 would occur (Class I). Effects related to Impact LU-2 and Impact LU-2 would be mitigable to a level of less than significant (Class II).

## 12.5.17  Noise and Vibration

### 12.5.17.1  Introduction

This section provides an evaluation of the potential impacts to noise and vibration associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.17 (Noise and Vibration) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.17 (Noise and Vibration). For the purposes of this analysis please refer to EIR Sections 10.17.2 and 11.17.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.17.3 and 11.17.3 for a description of the affected environment for noise and vibration (as applicable at either a study region or field-specific scale), and EIR Section 10.17.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.17.2  Programmatic Level Analysis of the Project

Since this alternative includes well stimulation treatments, noise and vibration impacts would occur as described in EIR Section 10.17. Noise mitigation would be required, as with the project. Well stimulation treatment activities would be farther from noise sensitive receptors in and near urbanized areas. But residences outside urbanized areas would be impacted as in the project.

In all regions, with the implementation of mitigation measures in EIR Section 10.17, Impact NOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

#### 12.5.17.2.1  Study Region 1

The active oil and gas fields and the Monterey Formation and its plays overlap Urbanized Areas for much of Study Region 1. This alternative would greatly reduce the number of well pads that would be candidates for well stimulation treatments outside the existing oil and gas field boundaries and buffer areas and within the urbanized areas. As a result the potential for noise impacts to residential land uses in urbanized areas with population of over 50,000 would be reduced. However, areas outside these urbanized areas and areas where active oil and gas fields overlap the urbanized areas will experience the same noise and vibration impacts as described in EIR Section 10.17.

Impacts NOI-1 and NOI-2 would be the same as for the project.

#### 12.5.17.2.2  Study Region 2

The active oil and gas fields and the Monterey Formation and its plays overlap or are adjacent to Urbanized Areas for some of Study Region 2. This alternative would reduce the areas that would be candidates for well stimulation treatments outside the existing oil and gas field boundaries and buffer areas and within the urbanized areas. As a result, the potential for noise impacts to residential land uses would be reduced in urbanized areas with population of over 50,000. However, areas outside these urbanized areas and areas where active oil and gas fields overlap the urbanized areas will experience the same noise and vibration impacts as for the project, described in EIR Section 10.17.

Impacts NOI-1 and NOI-2 within active oil and gas fields (both inside and outside Urbanized Areas) and areas outside Urbanized Areas would be the same as for the project. Only areas within Urbanized Areas and not within active oil and gas fields would be potentially benefited by implementation of Alternative 4.

### 12.5.17.2.3   Study Region 3

Active oil and gas fields and the Monterey Formation and its plays overlap or are adjacent to Urbanized Areas for some of Study Region 3. This alternative would reduce the areas that would be candidates for well stimulation treatments outside the existing oil and gas field boundaries and buffer areas and within the urbanized areas. As a result, the potential for noise impacts to residential land uses would be reduced in urbanized areas with population of over 50,000. However, areas outside these urbanized areas and areas where active oil and gas fields overlap the urbanized areas will experience the same noise and vibration impacts as for the project, described in EIR Section 10.17.

Impacts NOI-1 and NOI-2 within active oil and gas fields (both inside and outside Urbanized Areas) and areas outside Urbanized Areas would be the same as for the project. Only areas within Urbanized Areas and not within active oil and gas fields would be potentially benefited by implementation of Alternative 4.

### 12.5.17.2.4   Study Region 4

Active oil and gas fields and the Monterey Formation and its plays overlap or are adjacent to Urbanized Areas for some of Study Region 4. This alternative would reduce the areas that would be candidates for well stimulation treatments outside the existing oil and gas field boundaries and buffer areas and within the urbanized areas. Existing wells in and around Bakersfield would continue to be candidates for well stimulation treatments. Areas outside these urbanized areas and areas where active oil and gas fields overlap the urbanized areas will remain candidates for well stimulation. Only urbanized areas that do not have existing active oil and gas fields would be protected under this alternative. As a result, the potential for noise impacts to residential land uses would be reduced. However, areas outside these urbanized areas and areas where active oil and gas fields overlap the urbanized areas will experience the same noise and vibration impacts as for the project, described in EIR Section 10.17.

Impacts NOI-1 and NOI-2 within active oil and gas fields (both inside and outside Urbanized Areas) and areas outside Urbanized Areas would be the same as for the project. Only areas within Urbanized Areas and not within active oil and gas fields would be potentially benefited by implementation of Alternative 4.

### 12.5.17.2.5   Study Region 5

Active oil and gas fields and the Monterey Formation and its plays overlap or are adjacent to a few Urbanized Areas in Study Region 5. This alternative would reduce the areas that would be candidates for well stimulation treatments outside the existing oil and gas field boundaries and buffer areas and within the Urbanized Areas. As a result, the potential for noise impacts to residential land uses would be reduced. However, areas outside these Urbanized Areas and areas where active oil and gas fields over-lap the Urbanized Areas will experience the same noise and vibration impacts as for the project, described in EIR Section 10.17.

Impacts NOI-1 and NOI-2 within active oil and gas fields (both inside and outside Urbanized Areas) and areas outside Urbanized Areas would be the same as for the project. Only areas within Urbanized Areas and not within active oil and gas fields would be potentially benefited by implementation of Alternative 4.

### 12.5.17.2.6   Study Region 6

Active oil and gas fields overlap or are adjacent to a few Urbanized Areas in Study Region 6. This alterna-tive would reduce the areas that would be candidates for well stimulation treatments outside the exist-ing oil and gas field boundaries and buffer areas and within urbanized areas with population of over 50,000. As a result the potential for noise impacts to residential land uses would be reduced. However,

areas outside these urbanized areas and areas where active oil and gas fields overlap the urbanized areas will experience the same noise and vibration impacts as for the project, described in EIR Section 10.17.

Impacts NOI-1 and NOI-2 within active oil and gas fields (both inside and outside Urbanized Areas) and areas outside Urbanized Areas would be the same as for the project. Only areas within Urbanized Areas and not within active oil and gas fields would be potentially benefited by implementation of Alternative 4.

### 12.5.17.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Since this alternative includes well stimulation treatments, noise and vibration impacts will occur as described in EIR Section 11.17. Noise mitigation would be required. Only areas within Urbanized Areas and not within active oil and gas fields would be potentially benefited by implementation of Alternative 4.

#### 12.5.17.3.1   *Wilmington Oil and Gas Field*

The active oil and gas wells in the Wilmington Oil and Gas Field occur within Urbanized Areas or urban buffer areas. This alternative would not reduce the number of well pads that would be candidates for well stimulation treatments in this field. As a result, the potential for noise and vibration impacts to residential land uses would not be reduced significantly and would be as with the project. Impact MOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

#### 12.5.17.3.2   *Inglewood Oil and Gas Field*

Because the Inglewood field is adjacent to residential areas and other urban land uses including sensitive receptors, Impact NOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

#### 12.5.17.3.3   *Sespe Oil and Gas Field*

The active oil and gas wells in the Sespe Oil and Gas Field are outside Urbanized Areas. As a result, the potential for noise and vibration impacts to residential land uses is unchanged and remains low, as with the project. Impacts NOI-1 and NOI-2 for stimulation of future wells within active oil and gas fields and for areas beyond active oil and gas fields and outside Urbanized Areas would be the same as for the project. Impact NOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

### 12.5.17.4   Impact Significance Summary

Based on the programmatic level analyses of noise and vibration for the project and for specific oil and gas fields, impacts from Alternative 4 would be the same as under the project, except as limited for future drilling near Urbanized Areas. Although the potential for noise impacts to residential land uses within Urbanized Areas would be reduced, there remains the potential for isolated residents outside urbanized areas to be adversely affected by noise from well stimulation treatment activities, and Impacts NOI-1 and NOI-2 would be the same as for the project for noise sensitive land uses bordering and within active oil and gas fields.

## 12.5.18   Population and Housing

### 12.5.18.1   Introduction

This section provides an evaluation of the potential impacts to population and housing associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.18 (Population and Housing) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.18 (Population and Housing). For the purposes of this analysis please refer to EIR Sections 10.18.2 and 11.18.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.18.3 and 11.18.3 for a description of the affected environment for population and housing (as applicable at either a study region or field-specific scale), and EIR Section 10.18.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.18.2   Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 4 would prohibit well stimulations from being conducted in established Urbanized Areas (those with a population over 50,000) where these areas are outside of existing fields and their buffers. Although some areas would be off limits for wells requiring stimulation, much of the area outside of existing fields would remain available for well stimulation activities.

The Monterey Formation and its plays contain a number of large communities with significant existing population and planned growth (see Figure 5-9 and EIR Section 10.18, Population and Housing). The exclusion of stimulation work from Urbanized Areas may result in a somewhat increased the level of drilling and stimulation that would occur elsewhere. However, because there are numerous existing cities and towns throughout each study region, this is not anticipated to greatly increase the population and to create a "boom and bust" condition, in which the in-migration of temporary workers can occur at a level that overwhelms a community. The oil and gas industry is well established in California and workers frequently live in one area and commute to work sites. During well drilling, some crew members may temporarily relocate to be near the drill site. Stimulation work itself is a short-term activity occurring over a matter of days or a few weeks and workers would not relocate. It is expected that any temporarily relocating workers would use hotels or long-stay accommodations, if needed. Impact POP-1 would be a less than significant impact (Class III), with impacts increased only somewhat when compared to the project is additional drilling occurred in rural areas under Alternative 4 that would bring workers into rural areas outside existing oil and gas fields.

When compared to the project, it is possible that prohibiting well stimulations within designated Urbanized Areas with populations greater than 50,000 persons outside of existing fields could reduce the potential for housing and resident displacement. This is due to new wells being located in less dense and populated areas. Should any residential displacement occur under Alternative 4, it is unlikely to necessitate construction of new housing in any of the study regions. Therefore, any necessary relocations of housing or persons associated with Alternative 4 activities (Impact POP-2) would be less than significant and would not necessitate the construction of new housing elsewhere (Class III), with impacts decreased somewhat when compared to the project because Alternative 4 would prohibit well stimulations in Urbanized Areas, where the potential for residential relocations is greater.

### 12.5.18.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe fields for Alternative 4 would be the same as those described in EIR Section 11.18 (Population and Housing).

### 12.5.18.4   Impact Significance Summary

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.19   Public Services

### 12.5.19.1   Introduction

This section provides an evaluation of the potential impacts to public services associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.19 (Public Services) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.19 (Public Services). For the purposes of this analysis please refer to EIR Sections 10.19.2 and 11.19.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.19.3 and 11.19.3 for a description of the affected environment for public services (as applicable at either a study region or field-specific scale), and EIR Section 10.19.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.19.2   Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 4 is intended to reduce potential well stimulation impacts to designated Urbanized Areas (those with a population over 50,000) outside of existing oil and gas fields. Although some areas would be off limits for wells requiring stimulation, much of the area outside of existing fields would remain available for well stimulation activities.

| Impact PUB-1 | Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools |
|---|---|

The need for new or expanded public services, including applicable performance objectives and service ratios, is strongly influenced by population levels. As discussed in EIR Section 12.5.18 (Population and Housing), Alternative 4 has some potential for increasing population in-migration impacts.

The primary public service providers by study region are listed in EIR Section 10.19 (Public Services). Because new wells developed for stimulation would not be allowed in Urbanized Areas outside of existing fields, there could be a slight increase in wells developed in areas outside of Urbanized Areas. However, the amount of Urbanized Area land meeting this criterion is only a small part of the area underlain by the Monterey Formation and plays.

Implementation of Mitigation Measure PUB-1a (Assess Public Service Ratios and Ensure Adequate Compensation) is proposed as part of Alternative 4, and would require DOGGR to coordinate with the applicable local land use agency to determine whether new well development and stimulations would place a burden on public services, and to ensure that appropriate compensation is provided to the local agency.

With implementation of this measure, Impact PUB-1 (Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools) would be less than significant (Class II). Impacts on public services would be nearly the same under the project and Alternative 4.

**MM PUB-1a    Assess Public Service Ratios and Ensure Adequate Compensation.** (Full text in EIR Section 10.19.5.)

### 12.5.19.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Field are existing fields, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe fields for Alternative 4 would be the same as those described in EIR Section 11.19 (Public Services).

### 12.5.19.4   Impact Significance Summary

As discussed, the potential for impacts to public service providers under Alternative 4 would be similar or identical to that provided for the project.

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.20   Recreation

### 12.5.20.1   Introduction

This section provides an evaluation of the potential impacts to recreation associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.20 (Recreation) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.20 (Recreation). For the purposes of this analysis please refer to EIR Sections 10.20.2 and 11.20.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.20.3 and 11.20.3 for a description of the affected environment for recreation (as applicable at either a study region or field-specific scale), and EIR Section 10.20.4 for details regarding the impact methodology and significance criteria that have been used.

~~Without implementation of project standards for resource protection under this alternative, oil and gas development and associated well stimulation may occur in open space areas and areas near water resources used for recreation.~~

### 12.5.20.2   Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 4 would not allow future oil and gas well drilling for the purposes of stimulation outside of existing oil and gas fields boundaries and their buffer areas within the boundaries of an designated Urbanized Areas. Because well stimulation treatment activities would be outside of Urbanized Areas, Alternative 4 may put well stimulation activities closer to recreational open space areas.

Urbanized Areas are areas with a population over 50,000 and are defined by the U.S. Census Bureau 2010 estimated Census populations. Figures 8-1 through 8-3 illustrate the Urbanized Areas within each study region. Because this alternative would apply only to areas outside of existing oil and gas fields, the Inglewood, Sespe, and Wilmington Oil and Gas Fields are not part of this alternative.

This alternative has been developed primarily for consideration by local agencies and would not be implemented by DOGGR itself. As applied in particular counties and incorporated cities, this alternative would likely require local legislative actions amending existing general plans and zoning and possibly grading ordinances.

Implementation of Alternative 4 would not allow future oil and gas well drilling for the purposes of stimulation outside of existing oil and gas field boundaries and their buffer areas within the boundaries of established Urbanized Areas. The analysis for the project focuses on areas where the existing oil and gas fields are located. As illustrated in Figures 10.20-1 through 10.20-3, there are numerous recreational areas outside of Urbanized Areas. Under Alternative 4, it is possible that prohibitions on well stimulate treatments in Urbanized Areas could trigger increased well stimulation activities outside of their boundaries. However, any in-migration from new workers in these areas would be nominal compared to the existing populations. Similarly, the increased use of existing recreational areas or facilities as a result of new employment for well stimulation treatments would be nominal in considering the numerous recreation opportunities within the State. As such, Impact REC-1 would be less than significant (Class III).

Impact REC-2 addresses disruptions in designated recreation areas. For the purpose of this EIR, recreation areas are considered sensitive receptors as they tend to be areas where children are present, and depending on the available facilities, they can be used for intense physical activities. In addition, recreation users often value the recreation experience based on the quality of the surrounding (i.e., lack of industrial activities, natural spaces, low noise levels, high scenic quality, etc.). Potential types of disruptions to recreational resources are listed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures). Alternative 4 would require that well stimulation treatment activities be located farther from population centers and existing land uses. Therefore, in comparison to the project, Alternative 4 would decrease the potential for disturbances to local recreation facilities and areas found in Urbanized Areas. However, the potential for disturbance to large federal, state and regional recreation areas that are located outside of Urbanized Areas would be the same as for the project.

Each of the potential disruption types is discussed in detail in the EIR Sections 10.1 (Aesthetics), 10.3 (Air Quality), 10.6 (Coastal Processes and Marine Water Quality), 10.7 (Commercial and Recreational Fishing), 10.13 (Hazards and Hazardous Materials), 10.15 (Surface Water Resources), 10.16 (Land Use and Planning), 10.17 (Noise and Vibration), 10.21 (Risk of Upset/Public and Worker Safety), and 10.22 (Transportation and Traffic). The mitigation measures provided in these sections would also effectively mitigate potential impacts to recreational resources to the maximum extent feasible.

Mitigation Measures REC-2a and REC-2b, detailed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures), would reduce effects associated with Impact REC-2 to a level of less than significant (Class II). Under the project, Impact REC-2 is also Class II; however, as noted above, the potential for disturbances to local recreation facilities and areas within Urbanized Areas would decrease under Alternative 4.

### 12.5.20.3   Programmatic Level Analysis of Specific Oil and Gas Fields

As referenced above, Alternative 4 only applies to areas outside of existing oil and gas fields; therefore, the Wilmington, Inglewood, and Sespe Oil and Gas Fields are not considered as part of this alternative.

### 12.5.20.4   Impact Significance Summary

At a programmatic level of analysis, the impacts associated with Alternative 4 would be less than significant for Impact REC-1 (Class III) and mitigable to a level of less than significant for Impact REC-2 (Class II). Mitigation Measures REC-2a and REC-2b, as summarized in EIR Section 12.2.20.2 (No Future Well Stimu-

lation Practices Alternative [Alternative 1], programmatic level analysis for recreation) and detailed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures).

## 12.5.21  Risk of Upset/Public and Worker Safety

### 12.5.21.1  Introduction

This section provides an evaluation of the potential impacts for risk of upset/public and worker safety associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.21 (Risk of Upset/Public and Worker Safety) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.21 (Risk of Upset/Public and Worker Safety). For the purposes of this analysis please refer to EIR Sections 10.21.2 and 11.21.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.21.3 and 11.21.3 for a description of the affected environment for risk of upset/public and worker safety (as applicable at either a study region or field-specific scale), and EIR Section 10.21.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.21.2  Programmatic Level Analysis of the Project

Under this alternative, there would be no substantial reduction in well stimulation treatment activities. Therefore, the forecast number of accidents for Alternative 4 is approximately the same as for the project case. However, well stimulation activities would be outside of Urbanized Areas and farther from sensitive receptors. The remainder of impacts from well stimulation activities occur as in the project.

Alternative 4 and the project case will have lower annual average projected crude oil imports compared to Alternatives 1 and 2, and imports of crude oil by rail will occur under Alternative 4 the same as with the project case.

With the implementation of mitigation measures (if any) from EIR Section 10.21, Impacts RSK-1, ~~RSK-2,~~ and RSK-6 are ~~all~~ Class I under the project and under Alternative 4; Impacts RSK-2, RSK-4, RSK-5, and RSK-7 are all Class II under the project and under Alternative 4; Impact RSK-3 is Class III. ~~With the implementation of mitigation measures, Impacts RSK 1, RSK 2, and RSK 6 would be Class I under Alternative 4; Impacts RSK-4, RSK-5, and RSK-7 are all Class II under Alternative 4; Impact RSK-3 is Class III.~~

### 12.5.21.3  Programmatic Level Analysis of Specific Oil and Gas Fields

#### 12.5.21.3.1  Wilmington Oil and Gas Field

The recordable injury rate from well stimulation treatment and drilling activities is expected to be similar to that for the project. No impacts from increased rail traffic or truck traffic are anticipated for Wilmington Oil and Gas Field. The impacts and mitigation identified for the project would apply within the field.

#### 12.5.21.3.2  Inglewood Oil and Gas Field

Well stimulation treatments would occur at Inglewood Oil and Gas Field under Alternative 4 as they would for the project. As a result, the mitigation identified for the project would apply within Inglewood.

### *12.5.21.3.3 Sespe Oil and Gas Field*

No accidents are expected from well stimulation treatment activities in Sespe Oil and Gas Field. No impacts from increased truck traffic are anticipated for Sespe. The impacts and mitigation identified for the project would apply within the field.

### 12.5.21.4   Impact Significance Summary

Overall Alternative 4 is projected to have a truck accident rate and an oil worker injury rate similar to those for the project.

The crude oil rail accident rate for Alternative 4 is approximately four per year (100 over 25 years) as with the project case. The number of accidents is based on the train miles traveled, which is directly related to the volume of crude imported. Since volume of imported crude oil is approximately 25 percent of highest import case (Alternative 1, Table 10.21-16), the number of accidents is approximately 25 percent of those on that Table. Study regions that may be at slightly greater risk of a rail accident include Study Regions 1, 4, 5, and 6. Given the relatively very number of derailments compared to the number of shipments of oil, the occurrence of a major accident is expected to be very low and nearly all of the potential accidents that may occur are expected to be minor.

In addition, there may be accidents from proppant deliveries by rail at a rate of 16 over 25 years, as with the project case. The volume of proppant is proportional to the number of wells hydraulically fractured, which in turn will require more rail cars. The maximum number of accidents corresponding to the highest volume of proppant is shown in Table 10.21-15. Since the number of wells for Alternative 4 is approximately 10 percent less than that of the maximum case, the number of accidents is approximately 10 percent less as well. The Regions at higher risk for accidents are Regions 1 and 4, with a lesser potential in Regions 5 and 6.

Truck traffic from drilling activities and hydraulic fracturing activities is estimated at approximately 8 million truck miles from 2015-2040 with a forecast of one accident for Alternative 4 and the project case. The total passenger accidents forecast from 297 million vehicle miles traveled is 511. Since the project and Alternative 4 have approximately 10 percent less wells to be hydraulically fractured than the maximum case on Table 10.21-18, the number of accidents also decreases by approximately the same amount. Almost all of the impact will be in Region 4.

Each of the impacts related to risk of upset and safety would be as described for the project, although the consequences of accidents may be slightly reduced because well stimulation activities would be outside of Urbanized Areas and farther from sensitive receptors.

## 12.5.22   Transportation and Traffic

### 12.5.22.1   Introduction

This section provides an evaluation of the potential impacts to transportation and traffic associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.22 (Transportation and Traffic) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.22 (Transportation and Traffic). For the purposes of this analysis please refer to EIR Sections 10.22.2 and 11.22.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.22.3 and 11.22.3 for a description of the affected environment for transportation and

traffic (as applicable at either a study region or field-specific scale), and EIR Section 10.22.4 for details regarding the impact methodology and significance criteria that have been used.

The transportation and traffic regulatory setting, affected environment, methodology, and impact criteria for Alternative 4 are the same as those presented in EIR Section 10.22 (Transportation and Traffic) and EIR Section 11.22 (Transportation and Traffic). Transportation and traffic analysis for alternatives are based on the number of trips generated by per well and the total number of the wells, which would be the same as for the project.

### 12.5.22.2   Programmatic Level Analysis of the Project

This alternative would prevent future oil and gas exploratory, stimulation and production activity within established Urbanized Areas (population over 50,000) if they are not within existing oil and gas fields. Well stimulation treatments would not be allowed in some areas outside of existing oil and gas fields, particularly in areas near the greater Los Angeles region, Bakersfield, Modesto, greater Bay Area region, and the greater Sacramento region. Areas outside of Urbanized Areas would be available for well stimulation activities, including many rural areas and smaller towns. Although well stimulation in some areas would be limited, much of the area outside of existing fields would remain available for stimulation activities, and this alternative would minimally affect future oil and gas production.

Under Alternative 4, well stimulation treatment activities would be farther from population centers and on more rural roadways that could be subject to pavement damage from truck trips. But these rural roads would have less existing traffic compared to those in Urbanized Areas. As with the project and all alternatives, traffic safety hazard impacts from the transport of hazardous materials (Impact TR-4) is significant and unmitigable (Class I).

Metropolitan areas and cities in general experience greater congestion than rural areas. Restricting well drilling and stimulation activity in Urbanized Areas would alleviate traffic operation impacts associated with well sites located in cities. However, haul routes may still cross within urbanized areas and the overall number of trips generated per well in Alternative 4 would remain same as for the project. The average trip length for development or stimulation of a rural well would depend on the availability of water nearby, but would likely also be similar to that for urban wells. Therefore, traffic impacts (Impacts TR-1 through TR-6) and recommended mitigation measures below would be essentially identical to those of the project (see EIR Section 10.22). Impacts TR-1, TR-2, TR-3, and TR-6 would all be Class II. Impact TR-5 would be Class III. And Impact TR-4 would be Class I.

**MM TR-1a**      **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

**MM TR-2a**      **Repair Roadway Damage.** (Full text in EIR Section 10.22.5.)

**MM TR-4a**      **Know Spill Prevention Measures.** (Full text in EIR Section 10.22.5.)

### 12.5.22.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Wilmington and Sespe fields for Alternative 4 would be the same as those described in EIR Section 11.22 (Transportation and Traffic).

#### 12.5.22.4   Impact Significance Summary

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

### 12.5.23   Utilities and Service Systems

#### 12.5.23.1   Introduction

This section provides an evaluation of the potential impacts to utilities and service systems associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.23 (Utilities and Service Systems) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.23 (Utilities and Service Systems). For the purposes of this analysis please refer to EIR Sections 10.23.2 and 11.23.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.23.3 and 11.23.3 for a description of the affected environment for utilities and service systems (as applicable at either a study region or field-specific scale), and EIR Section 10.23.4 for details regarding the impact methodology and significance criteria that have been used.

#### 12.5.23.2   Programmatic Level Analysis of the Project

Alternative 4 is intended to reduce potential well stimulation impacts to established Urbanized Areas (those with a population over 50,000) outside of existing oil and gas fields. The need for new or expanded utilities and service systems is strongly influenced by population levels. As discussed within EIR Section 12.4.18 (Population and Housing), Alternative 4 has the potential for increasing population in-migration impacts because it would site wells outside urbanized areas with higher population levels when compared to the project. In general, however, minor population growth from new employment would have a less than significant impacts to utility and service systems, including their existing and projected capacities. These impacts would be less than significant (Impact UTL-1).

Under Alternative 4, there is an increased potential for new electrical/gas infrastructure and demands to wastewater treatment providers to serve new wells outside of existing fields because this alternative requires well stimulation to occur only within more rural areas or existing fields. Assuming a similar number of wells would be developed under Alternative 4 and the project, restricting well development in Urban Areas would simply displace some well drilling from within Urban Areas outside of existing fields to nearby areas outside of the urban designation. In general, this alternative would not substantially increase potential impacts of utilities when compared to those of the project. Providers of electricity and natural gas are assumed to have sufficient supplies to meet demand, though the extension of utilities to rural areas might in some instances be necessary in order for oil and gas production to proceed. These extensions would be subject to rules favoring the use of existing rights-of-way and requiring the minimization of environmental impacts. Outside of existing fields, Alternative 4 thus would not substantially increase potential impacts from electrical and natural gas interconnections by requiring new well sites to be developed outside protected urbanized areas. Impacts would not be significant. (Impact UTL-2). Requiring new wells to be developed outside of urbanized areas would not increase potential project impacts from wastewater and solid waste generation when compared to the project as areas outside of Urban Areas would still be served by wastewater and solid waste facilities. Impact would be potentially significant, but less than significant after mitigation (Impacts UTL-3 and UTL-4).

Case 2:26-cv-05242-SVW-SSC    Document 23    Filed 05/14/26    Page 762 of 836   Page
ID #:11488
Analysis of Oil and Gas Well Stimulation Treatments in California
12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES

To ensure all utilities and service systems would have adequate capacities under Alternative 4, Mitigation Measures UTL-3a and UTL-4a are also proposed for Alternative 4. With the inclusion of these measures, impacts UTL-1 and UTL-2 are Class III and impact UTL-3 and UTL-4 are Class II.

MM UTL-3a    **Assess Wastewater Quality and Ensure Adequate Compensation to Municipal and Private Wastewater Treatment Plants.** (Full text in EIR Section 10.23.5.)

MM UTL-4a    **Assess Non-Hazardous Solid Waste Generation and Ensure Adequate Compensation to Municipal and Private Solid Waste Facilities.** (Full text in EIR Section 10.23.5.)

### 12.5.23.3  Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe fields for Alternative 4 would be the same as those described in EIR Section 11.23 (Utilities and Service Systems).

### 12.5.23.4  Impact Significance Summary

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.24  Impact Summary Table for Alternative 4

Table 12.5.24-1 provides a summary of impacts and recommended mitigation measures for the project and specific oil and gas files for all issue areas under Alternative 4.

**Programmatic Level Analysis of the Project**

The Urbanized Area Protection Alternative would not allow future oil and gas well drilling for the purposes of stimulation outside of existing oil and gas fields' boundaries and their buffer areas within the boundaries of an established Urbanized Area. Given the amount of land outside of urbanized areas that would be available for well stimulation treatments, the overall levels of oil and gas production and ground disturbance would be similar to those of the project. By restricting well stimulation treatments in the vicinity of population centers and sensitive receptors, Alternative 4 would be better than the project for the following impacts: aesthetics, air quality, environmental justice, hazards and hazardous materials, groundwater resources, land use and planning, noise and vibration, and risk of upset/public and worker safety.

Although the extent of the Monterey Formation is somewhat unknown, should well development not be allowed in these urban areas and instead be pushed into smaller cities and communities, depending on (i) site-specific geologic conditions, (ii) the level of well development, and (iii) the availability of nearby transient lodging, the potential for population in-migration would be greater, although it would still be less than significant (Class III). Similarly, Alternative 4 would also have greater (Class II) impacts than the project for public services, recreation, transportation and traffic, and utilities and service systems. Alternative 4 would be similar to the project for all other issue areas.

**Programmatic Level Analysis of Specific Oil and Gas Fields**

Alternative 4 does not apply to existing fields. Because the Inglewood Oil and Gas Field, Wilmington Oil and Gas Field, and Sespe Oil and Gas Field are existing fields, well stimulation activities would be allowed. Therefore, impacts associated with well stimulation activities at the fields would be the same as those described for the project.

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **AESTHETICS** | | |
| Impact AES-1. Substantially adversely affect scenic vistas. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-2. Substantially alter or damage scenic resources. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-3. Substantially degrade the existing visual character or quality of a site and its surroundings. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-4. Create new sources of substantial light and glare. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| **AGRICULTURE AND FORESTRY RESOURCES** | | |
| Impact AGF-1. Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use | Class II on or adjacent to Important Farmland<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-1c: Compensate for Loss of Important Farmland | Same as those listed in Table 11.2-1 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact AGF-2. Conflict with existing zoning for agricultural use or with Williamson Act contracts | Class II on land zoned for agricultural use or enrolled in Williamson Act contracts<br>AGF-2a: Ensure Compatibility with Agricultural Zoning<br>AGF-2b: Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts | Same as those listed in Table 11.2-1 |
| Impact AGF-3. Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production | Class II on land zoned as forestland, timberland, or Timberland Production<br>AGF-3a: Ensure Compatibility with Zoning for Forest and Timberland | Same as those listed in Table 11.2-1 |
| Impact AGF-4. Result in the loss of forest land or conversion of forest land to non-forest use | Class II on forest land<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land | Same as those listed in Table 11.2-1 |
| Impact AGF-5. Directly or indirectly impair the use of agricultural land or forest land | Class II for well stimulation activities on or within 1,500 feet of agricultural or forest land<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u>~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~<br>GW-4b: Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u>~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.2-1 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **AIR QUALITY** | | |
| Impact AQ-1. Conflict with or obstruct implementation of an applicable air quality plan | Class I (Statewide)<br>Class III (in SCAQMD)<br>AQ-1a: Improve Air Quality Planning Inventories and Local Control Measures<br>AQ-1b: Improve the Methodologies and Emission Factors Used in Inventory Development | Same as those listed in Table 11.3-1 |
| Impact AQ-2. Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>AQ-2c: Reduce Emissions from Dust-Causing Activities | Same as those listed in Table 11.3-1 |
| Impact AQ-3. Expose sensitive receptors to substantial pollutant concentrations | Class I<br>AQ-3a: <u>Comply with Local Air District Protocols Relating to the Preparation of:</u>~~Prepare~~ a Health Risk Assessment and Implement Emission Controls<br>AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility | Same as those listed in Table 11.3-1 |
| Impact AQ-4. Create objectionable odors affecting a substantial number of people | Class I<br>AQ-4a: Prepare and Implement an Odor Minimization Plan<br>AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility | Same as those listed in Table 11.3-1 |
| **BIOLOGICAL RESOURCES – TERRESTRIAL ENVIRONMENT** | | |
| Impact BIOT-1. Substantially reduce the habitat of a fish or wildlife species | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-2. Cause a fish or wildlife population to drop below self-sustaining levels | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Same as those listed in Table 11.4-8 |
| Impact BIOT-3. Substantially reduce the number or restrict the range of an endangered, rare, or threatened species | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan | Same as those listed in Table 11.4-8 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-4. Have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special-status species in local or regional plans, policies, or regulations, or by CDFW or USFWS | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Same as those listed in Table 11.4-8 |
| Impact BIOT-5. Have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations, or by CDFW or USFWS | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-6. Have a substantial adverse effect on federally protected wetlands as defined by Section 404, of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-6a: Protect Jurisdictional Waters<br><u>GW-1a: Use Alternative Water Sources to the Extent Feasible</u><br><u>GW-1b: Minimize Groundwater Impacts</u><br><u>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation</u><br>GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u><s>Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin</s><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><u>SWR-1b: Surface Water Protection</u><br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |
| Impact BIOT-7. Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites | Class I<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Same as those listed in Table 11.4-8 |
| Impact BIOT-8. Conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance | Class II<br>BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Same as those listed in Table 11.4-8 |
| Impact BIOT-9. Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan | Class II<br>BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Same as those listed in Table 11.4-8 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-10. Contribute to global climate change and consequent impacts to biodiversity | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Same as those listed in Table 11.4-8 |
| **CULTURAL RESOURCES** | | |
| Impact CUL-1. Affect historic-era archaeological and built-environment resources | Class I or Class II if historic or built-environment resources are present<br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact CUL-2. Affect prehistoric resources | Class I or Class II if historic or built-environment resources are present<br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present<br>CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |
| Impact CUL-3. Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony. | Class I or Class II if historic or built-environment resources are present<br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact CUL-4. Affect cultural landscapes. | Class I or Class II if historic or built-environment resources are present<br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |
| **PALEONTOLOGICAL RESOURCES** | | |
| Impact PALEO-1. Well stimulation treatments would destroy or disturb surface or near-surface significant paleontological resources | Class II if fossil bearing geologic units are present<br>Class IV if no fossil bearing units are present<br>PALEO-1a: Require Information and Evaluate Paleontological Resources<br>PALEO-1b: Develop Paleontological Resource Mitigation Plan<br>PALEO-1c: Retain Qualified Paleontological Resources Staff<br>PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program<br>PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources<br>PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities<br>PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities<br>PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.9-4 |
| **ENVIRONMENTAL JUSTICE** | | |
| Impact EJ-1. Significant impacts would disproportionately affect minority or low-income populations | Unknown, possibly Class I<br>EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Same as those listed in Table 11.10-4 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **GEOLOGY, SOILS AND MINERAL RESOURCES** | | |
| Impact GEO-1. Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure | Class II<br>GEO-1a: Avoid Active Faults Zones if Necessary<br>GEO-1b: Implement an Appropriate Setback if Necessary<br>GEO-1c: Limit the Number of Hydraulically Fractured Wells<br>GEO-1cd: Implement Industry Accepted Practices<br>GEO-1de: Conduct Ground Monitoring<br>GEO-1ef: Prepare Include an Earthquake Response Plan with the Spill Contingency Plan | Same as those listed in Table 11.11-4 |
| Impact GEO-2. Result in substantial soil erosion or the loss of topsoil | Class II<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Same as those listed in Table 11.11-4 |
| Impact GEO-3. Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse | Class II<br>GEO-3a: Prepare Geotechnical Report if Necessary | Same as those listed in Table 11.11-4 |
| Impact GEO-4. Be located on expansive soil creating substantial risks to life or property | Class III<br>None required | Same as those listed in Table 11.11-4 |
| Impact GEO-5. Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems | Class IV<br>None required | Same as those listed in Table 11.11-4 |
| Impact GEO-6. Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan | Class III in most instances; Class I in some instances<br>None available | Same as those listed in Table 11.11-4 |
| Impact GEO-7. Cause an induced seismic event including ground shaking and ground failure | Class III<br>None required | Same as those listed in Table 11.11-4 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **GREENHOUSE GAS EMISSIONS** | | |
| Impact GHG-1. Generate greenhouse gas emissions that may have a significant impact on the environment | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide | Same as those listed in Table 11.12-1 |
| Impact GHG-2. Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Same as those listed in Table 11.12-1 |
| **HAZARDS AND HAZARDOUS MATERIALS** | | |
| Impact HAZ-1. Release hazardous materials into the environment from a spill or leak | Class II<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u>~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Same as those listed in Table 11.13-1 |
| **GROUNDWATER RESOURCES** | | |
| Impact GW-1. Cause or contribute to overdraft conditions | Class II<br>GW-1a: Use Alternative Water Sources <u>to the Extent Feasible</u><br>GW-1b: <u>Minimize Groundwater Impacts</u>~~Prepare a Third-Party Technical Report to Analyze Overdraft Impacts~~ | Same as those listed in Table 11.14-6 |
| Impact GW-2. Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water | Class II<br>GW-<u>1b</u>~~2a~~: <u>Minimize Groundwater Impacts</u>~~Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping~~ | Same as those listed in Table 11.14-6 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact GW-3. Adversely impact groundwater quality from surface spills or leaks during well stimulation | Class II<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u>~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Same as those listed in Table 11.14-6 |
| Impact GW-4. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals | Class II<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: <u>Install a Well Seal across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u>~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>GW-4c: Install Methane Sensors on Wells ~~in the ADSA~~<u>Subject to Well Stimulation Treatments</u> | Same as those listed in Table 11.14-6 |
| Impact GW-5. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells | Class II<br>GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate | Same as those listed in Table 11.14-6 |
| Impact GW-6. Improper disposal of flowback in injection wells could potentially impact groundwater quality | Class II<br>GW-6a: <u>Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater</u>~~Install a Cement Seal across Protected Groundwater~~ | Same as those listed in Table 11.14-6 |
| Impact GW-7. Inability to identify specific impacts to groundwater quality from well stimulation activities | Class II<br>GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment | Same as those listed in Table 11.14-6 |
| **SURFACE WATER RESOURCES** | | |
| Impact SWR-1. Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality. | Class II<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: <u>Surface Water Protection</u><br>SWR-1~~b~~<u>c</u>: Provide Adequate Flood Protection<br>SWR-1~~c~~<u>d</u>: Protect Surface Water Reservoirs<br>BIOT-2a: Prevent Hazards to Fish and Wildlife | Same as those listed in Table 11.15-1 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact SWR-2. Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site. | Class II<br>SWR-2a: Implement Erosion Control Plan | Same as those listed in Table 11.15-1 |
| Impact SWR-3. Substantially diminish surface water quantity. | Class II<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.15-1 |
| Impact SWR-4. Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding. | Class II<br>SWR-1~~b~~c: Provide Adequate Flood Protection | Same as those listed in Table 11.15-1 |
| **LAND USE AND PLANNING** | | |
| Impact LU-1. Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses. | Class I<br>None available for impacts associated with Risk of Upset/Public and Worker Safety | Same as those listed in Table 11.16-3 |
| Impact LU-2. Physically divide an established community. | Class III<br>None Required~~LU 2a: Ensure That Established and Planned Communities Are Not Divided~~ | Same as those listed in Table 11.16-3 |
| Impact LU-3. Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. | Class II<br>SB 4 regulation requiring "Neighbor Notification" (Section 1783.2)<br>All mitigation measures prescribed in this EIR | Same as those listed in Table 11.16-3 |
| **NOISE AND VIBRATION** | | |
| Impact NOI-1. Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels | Class II<br>NOI-1a: Control Noise Levels near Sensitive Land Uses | Same as those listed in Table 11.17-10 |
| Impact NOI-2. Cause exposure of persons to or generation of excessive groundborne vibration | Class III<br>None required | Same as those listed in Table 11.17-10 |
| **POPULATION AND HOUSING** | | |
| Impact POP-1. Induce substantial population growth | Class III<br>None required | Same as those listed in Table 11.18-4 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact POP-2. Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere | Class III<br>None required | Same as those listed in Table 11.18-4 |
| **PUBLIC SERVICES** | | |
| Impact PUB-1. Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools | Class II<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation | Same as those listed in Table 11.19-4 |
| **RECREATION** | | |
| Impact REC-1. ~~Well stimulation treatment activities would increase the usage of recreation areas or facilities which would r~~Result in the physical deterioration of recreational resources | Class III<br>None required | Same as those listed in Table 11.20-3 |
| Impact REC-2. ~~Well stimulation treatment activities would c~~Cause disruptions in designated recreation areas | Class II<br>REC-2a: Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas<br>REC-2b: Provide Noticing of Closures and Identify Alternative Recreation Areas | Same as those listed in Table 11.20-3 |
| **RISK OF UPSET / PUBLIC AND WORKER SAFETY** | | |
| Impact RSK-1. Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases | Class I<br>RSK-1a: Increase the Number of CPUC Rail Inspectors<br>RSK-1b: Expedite the Phase-out of Older Tank Cars<br>RSK-1c: Implement New Accident Prevention Technology<br>RSK-1d: Monitor and Enforce New Speed Limits<br>RSK-1e: Monitor the Implementation of Trackside Safety Technology<br>RSK-1f: Improve Emergency Preparedness and Response Programs<br>RSK-1g: Provide Real-Time Shipment Information to Emergency Responders<br>RSK-1h: Provide Additional Accident and Injury Data to the State | Same as those listed in Table 11.21-1 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact RSK-2. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental release hazardous materials due to a hose leak or connection leak while pumping well stimulation treatment fluids | Class II<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2a~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2b~~d~~: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System~~<br>RSK-2c~~f~~: Ensure Mechanical Integrity Through Compliance with Permanent ~~Program Complies with~~ Regulation | Same as those listed in Table 11.21-1 |
| Impact RSK-3. Substantially increase the potential for major oil spills due to ship groundings and collisions | Class III<br>None required | Same as those listed in Table 11.21-1 |
| Impact RSK-4. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental pressure changes during flowback activity caused by blocked pump discharge, sudden change in downhole condition, or human error | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | Same as those listed in Table 11.21-1 |
| Impact RSK-5. Generate risks to public safety by causing a flammable atmosphere in the flowback tank | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | Same as those listed in Table 11.21-1 |
| Impact RSK-6. Increase risks to public safety by exposing the public to accidental crude oil or produced gas releases from pipelines | Class I<br>RSK-6a: Increase Inspection of Mechanical Integrity<br>RSK-6b: Improve Leak Detection Capability<br>RSK-6c: Reduce Mainline Valve Spacing ~~None available~~ | Same as those listed in Table 11.21-1 |
| Impact RSK-7. Expose workers and public to hazardous levels of airborne silica during the use of proppant | Class II<br>RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System<br>RSK-7b: Reduce Emissions from Dust-Causing Activities | Same as those listed in Table 11.21-1 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **TRANSPORTATION AND TRAFFIC** | | |
| Impact TR-1. Generate additional truck traffic and disrupt traffic operations | Class III for project activities in Study Region 6 and for existing fields<br>Class II outside of existing oil and gas fields in Study Regions 1-5 where 10 or more wells are drilled by a single applicant within one square mile<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.22-9 |
| Impact TR-2. Inadvertently damage road rights-of-way | Class III for project activities in Study Region 6 and in existing oil and gas fields<br>Class II outside of existing oil and gas fields in Study Regions 1-5 where 10 or more wells are drilled by a single applicant within one square mile<br>TR-2a: Repair Roadway Damage | Same as those listed in Table 11.22-9 |
| Impact TR-3. Cause traffic safety hazards for vehicles, bicyclists, and pedestrians | Class III for project activities in Study Region 6 and for existing fields<br>Class II outside of existing oil and gas fields in Study Regions 1-5 where 10 or more wells are drilled by a single applicant within one square mile<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.22-9 |
| Impact TR-4. Transport hazardous materials | Class I<br>TR-4a: Know Spill Prevention Measures | Same as those listed in Table 11.22-9 |
| Impact TR-5. Change air traffic patterns | Class IV if no airports are nearby<br>Class III if FAA notification under 14 CFR 77 is required<br>None required | Same as those listed in Table 11.22-9 |
| Impact TR-6. Temporarily interfere with emergency response | Class III for project activities in Study Region 6 and for existing fields<br>Class II in Study Regions 1-5 outside of existing oil and gas fields where 10 or more wells are drilled by a single applicant within one square mile<br>TR-1a: Prepare Traffic Plan<br>TR-2a: Repair Roadway Damage<br>TR-4a: Know Spill Prevention Measures | Same as those listed in Table 11.22-9 |
| **UTILITIES AND SERVICE SYSTEMS** | | |
| Impact UTL-1. Adversely affect utilities and service systems due to population growth from Project-related development | Class III<br>None required | Same as those listed in Table 11.23-6 |
| Impact UTL-2. Require new or expanded electrical or natural gas infrastructure | Class III<br>None required | Same as those listed in Table 11.23-6 |

12.5-48

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact UTL-3. Exceed existing municipal wastewater treatment provider capacities | Class II<br><br>UTL-3a: Assess Wastewater Quality and Ensure Adequate ~~Compensation to~~Capacity to Process Wastewater at Municipal and Private Wastewater Treatment Plants | Same as those listed in Table 11.23-6 |
| Impact UTL-4. Exceed permitted solid waste capacity of landfills | Class II<br><br>UTL-4a: Assess Non-Hazardous Solid Waste Generation and Ensure Adequate ~~Compensation to~~Capacity Accept Solid Waste at Municipal and Private Solid Waste Facilities | Same as those listed in Table 11.23-6 |

## 12.6    Active Fault Zone Restrictions Alternative (Alternative 5)

The Active Fault Zone Restrictions Alternative (Alternative 5) would prohibit future oil and gas well stimulation treatments within the earthquake study zone boundaries of a known active earthquake faults occurring outside of existing oil and gas field boundaries and their buffer areas. Earthquake fault zones are delineated on the most recent Alquist-Priolo Earthquake Fault Zoning Map issued by the State Geologist, or are otherwise based on other substantial evidence of a known fault. As shown in Figures 8-4 through 8-6, portions of all of the study regions would be excluded from stimulation treatments under this alternative.

Cities, counties, and State agencies use the Earthquake Fault Zones maps in planning and controlling new or renewed construction. This alternative would be implemented by local governments, which would modify their general plans, zoning codes, and other planning documents to exclude well stimulation treatment activities from within the Earthquake Fault Zones.

As with Alternative 1, this alternative assumes that any action taken by the State to restrict or limit well stimulation activities would not be applicable in areas under federal or tribal jurisdiction. Any activity that is currently allowed in areas under federal or tribal jurisdiction would continue to be allowed, and could increase, stay the same or decrease in intensity. The current permitting and environmental review processes applicable to stimulation activities in areas under federal and tribal jurisdiction would continue to apply to new well stimulation projects in those areas, and therefore impacts are assumed to be mitigated as appropriate and feasible. The analysis below for this alternative focuses only on activities in areas under State jurisdiction, and includes the assumption that the analysis of effects in areas under federal or tribal jurisdiction would be the same as with Alternative 1. Therefore, effects in areas under federal or tribal jurisdiction are not considered further in the analysis of this alternative.

Alternative 5 is similar to Alternative 4 in that both would excluded well stimulation treatments from specific geographic areas. In particular, Alternative 5 would exclude well stimulation treatments from mapped fault zones, but this prohibition would not apply to existing fields or their buffers. As a result of implementing Alternative 5, limited areas outside of the existing oil and gas fields would not be available for well stimulation. Fault zones are relatively narrow linear features and much of a region would remain available; therefore, this alternative is likely to minimally impact the use of well stimulation techniques and future oil and gas production.

In addition to an analysis of the alternative itself, the analysis of Alternative 5 highlights how impacts under this alternative would be different from impacts under the project. Where no difference is specifically noted, the significance of impacts under the alternative are the same as the impacts under the project.

### 12.6.1    Aesthetics

#### 12.6.1.1    Introduction

This section provides an evaluation of the potential impacts to visual resources associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.1 (Aesthetics) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.1 (Aesthetics). For the purposes of this analysis please refer to EIR Sections 10.1.2 and 11.1.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.1.3 and 11.1.3 for a description of the affected environment for visual resources (as applicable at either a study region or field-specific scale), and EIR Section 10.1.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.1.2    Programmatic Level Analysis of the Project

Banning well stimulation on wells falling within the boundaries of active faults outside of existing fields would nominally reduce the area within which stimulation activities could occur, but this would be a minor reduction and would have little or no effect on visual impacts resulting from oil and gas development. Overall, the amount of land disturbance would not be reduced and visual impacts would not be reduced. Mitigation measures as described in EIR Section 10.1.5 likely would still be required outside of the fault zones in most circumstances. In the absence of specific project sites and known vantage points from which a new field would be viewed, it is not possible to determine if impacts, even with mitigation, would be less than significant (Class II) or significant and unmitigable (Class I). A determination would need to be made on a case-by-case basis. This is true in all six study regions. Impacts under Alternative 5 would be similar to those for the project in areas outside of existing fields.

### 12.6.1.3    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

This alternative would apply only to areas outside of existing oil and gas fields; therefore, it would not apply at the Wilmington, Inglewood, and Sespe Oil and Gas Fields.

### 12.6.1.4    Impact Significance Summary

The areas of identified active faults are limited and follow the linear fault traces. Prohibiting oil and gas wells in these mapped areas may nominally alter what would have been the configuration of a field, but this would have little effect on reducing overall changes introduced into the visual environment. The visual impact of this alternative would be similar that for the project and similar mitigation would be required.

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.2    Agriculture and Forestry Resources

### 12.6.2.1    Introduction

This section provides an evaluation of the potential impacts to agriculture and forestry resources associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.2 (Agriculture and Forestry Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.2 (Agriculture and Forestry Resources). For the purposes of this analysis please refer to EIR Sections 10.2.2 and 11.2.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.2.3 and 11.2.3 for a description of the affected environment for agriculture and forestry resources (as applicable at either a study region or field-specific scale), and EIR Section 10.2.4 for details regarding the impact methodology and significance criteria that have been used.

~~Under this alternative, the project standards for resource protection (see EIR Section 7.5) would not be implemented, which would result in greater indirect impacts on agricultural and forestry resources (Impact AGF-5, Directly or indirectly impair the use of agricultural land or forest land). Without the Water Recycling Standards, there would be an increase in competition for agricultural water supplies, because less water would be recycled. In addition, the potential for contamination of agricultural water supplies would be increased without implementation the Surface Water Protection Standards and Groundwater Protection Standards.~~

### 12.6.2.2    Programmatic Level Analysis of Impacts and Mitigation Measures

As shown on Figures 8-10 through 8-12, portions of all the study regions would be excluded from stimulation treatments under Alternative 5. Therefore, Alternative 5 would reduce overall impacts on agricultural and forestry resources only where Important Farmland and forest land overlap with active fault zones outside established oil and gas fields and their buffer zones. In these areas, there would be reduced impacts related to construction of new well pads and associated facilities for projects dependent on well stimulation treatments; however, potential impacts (Impacts AGF-1 through AGF-5) would still occur if there is agriculture or forest land present at a well site outside of an active fault zone. In all other areas, impacts and recommended mitigation measures would be similar to those for the project, as described in EIR Section 10.2 (Agriculture and Forestry Resources).

### 12.6.2.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation treatment activities would be allowed under this alternative. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe Oil and Gas Fields for Alternative 5 would be the same as those described in EIR Section 11.2 (Agriculture and Forestry Resources).

### 12.6.2.4    Impact Significance Summary

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.3    Air Quality

### 12.6.3.1    Introduction

This section provides an evaluation of the potential impacts to air quality associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.3 (Air Quality) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.3 (Air Quality). For the purposes of this analysis please refer to EIR Sections 10.3.2 and 11.3.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.3.3 and 11.3.3 for a description of the affected environment for air quality (as applicable at either a study region or field-specific scale), and EIR Section 10.3.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.3.2    Programmatic Level Analysis of Impacts and Mitigation Measures

Active Fault Zone Restrictions Alternative (Alternative 5) would restrict future oil and gas activity in certain zones. Although some areas in fault zones would not be available for well stimulation treatments, abundant areas outside of fault zones would still be available. Therefore, the intensification of traditional drilling and the increased importation of oil expected under Alternatives 1 and 2 would not occur under this alternative.

Emissions from oil and gas production would occur at similar or slightly reduced levels. Emissions from oil and gas activity could occur at levels exceeding the forecasts of air quality plans, as they would with the project, which may cause a potential conflict with local air quality plans. The levels of criteria air pollutant emissions caused by equipment and sources typical of well stimulation treatments, hauling product by truck, and new well drilling may exceed general mass-based emission thresholds of a local air

district. This alternative would retain the potential to expose sensitive receptors to substantial pollutant concentrations and create objectionable odors as with the project. Although emissions and activities would be limited in some areas, each of the air quality impacts would be as described for the project, and the mitigation identified for the project (EIR Section 10.3) would be applicable.

### 12.6.3.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 5, these existing fields would be subject to the same potential impacts and mitigation measures as described for the project (EIR Section 11.3.5). Because each new well stimulation treatment operation creates "new" emissions, which could be potentially significant, mitigation would be necessary. Although Impact AQ-1 would be a Class III: Less Than Significant Impact, the remaining air quality impacts would occur as shown under Impacts Common to All Study Regions (EIR Section 10.3.5). Mitigation measures identified for Impact AQ-2, Impact AQ-3, and Impact AQ-4 would be applicable within each field, and the resulting impacts after implementing mitigation would be significant and unavoidable (Class I).

### 12.6.3.4    Impact Significance Summary

Although emissions and activities related to well stimulation treatments would be limited in some areas under Alternative 5, emissions from oil and gas activity would occur at levels comparable to those of the project. Each of the air quality impacts due to well stimulation treatments would be as described for the project.

## 12.6.4    Biological Resources: Terrestrial Environment

### 12.6.4.1    Introduction

This section provides an evaluation of the potential impacts to terrestrial biological resources associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.4 (Biological Resources: Terrestrial Environment) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.4 (Biological Resources: Terrestrial Environment). For the purposes of this analysis please refer to EIR Sections 10.4.2 and 11.4.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.4.3 and 11.4.3 for a description of the affected environment for terrestrial biological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.4.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, compared to the project, there would be the potential for an increase in oil and gas development and associated well stimulation in biologically sensitive areas, slightly greater habitat loss without setbacks from perennial surface water, an increase in water usage that could affect fish and wildlife habitat (due to less water recycling), and an increase in the potential for contamination of water supplies that could affect biological resources.~~

### 12.6.4.2    Programmatic Level Analysis of the Project

Alternative 5 would exclude well stimulation within the special studies zone boundaries of known earthquake faults and outside existing oil and gas fields. This alternative could reduce impacts to terrestrial biological resources, but the actual reduction cannot be quantified. Statewide, special studies zones provide habitats that are comparable to other lands, ranging from urbanized and industrial land uses to nat-

ural open space. Outside of special studies zones, the impacts to terrestrial biological resources would be the same as described in EIR Section 10.4. To the extent that Alternative 5 may reduce potential impacts to natural open space within the study zones, its impacts to biological resources would be reduced from the project. Depending on specific locations of future well stimulation activities, the potential impacts to biological resources may range from Class I (significant and unavoidable) to Class III (less than significant). Due to the unknown locations of future well stimulation activities, this analysis presumes the "reasonable worst case" statewide impacts of well stimulation, which generally are Class I or Class II.

Under Alternative 5, impacts to biological resources may be significant and unavoidable (Class I). This would apply to all the biological resources impact criteria BIOT-1 through BIOT-6 (addressing impacts to plants, fish, and wildlife and their habitats and natural communities) and BIOT-10 (greenhouse gas effects and consequent impacts to biological resources), below. In contrast, Impacts BIOT-8 and BIOT-9 (addressing conflicts with conservation policies and planning) are Class II impacts under the this alternative (and under the project).

### 12.6.4.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Alternative 5 would not apply to existing oil and gas fields, and thus would not exclude well stimulation treatments in the Wilmington, Inglewood, or Sespe Oil and Gas Fields. Potential impacts to terrestrial biological resources in each field would be as described in EIR Section 11.4. Potential "reasonable worst-case" impacts to biological resources would be Class I for Impacts BIOT-1 through BIOT-6 and BIOT-7 (Sespe field only); Class II for Impacts BIOT-8 and BIOT-9; and Class III for Impacts BIOT-7 (for the Wilmington and Inglewood fields) and BIOT-10 (as they would be under the project).

### 12.6.4.4    Impact Significance Summary

Alternative 5 (Active Fault Zone Restrictions) may reduce some impacts to biological resources within special studies zones, but would not affect biological resources impacts outside of these areas. Impacts would be essentially the same as those of the project.

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.5    Biological Resources: Coastal and Marine Environment

Alternative 5 (Active Fault Zone Restrictions) may place limited areas off limits for well stimulation in the coastal area. Impacts would be the same as those of the project (Class III).

Please refer to Table 12.6.24-1 for a summary of impacts by each impact criterion.

## 12.6.6    Coastal Processes and Marine Water Quality

### 12.6.6.1    Introduction

This section provides an evaluation of the potential impacts to coastal processes and marine water quality associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.6 (Coastal Processes and Marine Water Quality). For the purposes of this analysis please refer to EIR Sections 10.6.2 and 11.6.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.6.3 and 11.6.3 for a description of the affected environ-

ment for coastal processes and marine water quality (as applicable at either a study region or field-specific scale), and EIR Section 10.6.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, well stimulation activities would potentially be allowed in Marine Protected Areas, as well as closer to waterways, which would increase the potential for spills to enter waterways and impact marine water quality.~~

### 12.6.6.2    Programmatic Level Analysis of the Project

~~Alternative 5 may reduce the risk of well stimulation activities triggering seismic activity onshore, but, for several reasons, may not affect the risk of tsunamis. Fault Zones offshore, generally speaking, are less well-mapped, well-known and characterized than fault zones onshore (Legg et.al., 2001). Although researchers are capable of mapping earthquake faults even in deep water, it is more difficult, uncertain, and expensive than mapping them on land. As discussed in EIR Section 10.6.3, areas of "perched" sediment underwater, and other geologic risks such as subsidence associated with removal of petroleum product, would also have to be investigated and geologically analyzed. Until these factors are thoroughly investigated and analyzed for all areas near well stimulation treatments — a very expensive and lengthy investigation — there will remain a risk, however small, that a minor seismic event could trigger a disproportionately large tsunami, as discussed in that earlier Section.~~

~~The California Seafloor Mapping project could eventually assist in mapping and reducing these factors of tsunami risk (see USGS, 2014). However, at present the project is charting only bathymetry, not earthquake faults or perched sediment. Therefore, the~~P~~p~~rogrammatic impacts of Alternative 5 would be essentially the same as those for the project. Alternative 5 may further reduce the risk of well stimulation activities triggering seismic activity offshore, but since this risk is already considered low (Class III), it would neither be superior nor inferior to the project in this respect. See EIR Section 12.2.6.2 for a list of the impacts and mitigation measures.

### 12.6.6.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Because this alternative would apply only to areas outside of existing oil and gas fields, the Inglewood, Sespe, and Wilmington oil and gas fields are not part of this alternative.

### 12.6.6.4    Impact Significance Summary

Compared with the project, this alternative does not implicate any of the impact criteria for coastal processes except for Impact CPMWQ-5 (Increase the risk of tsunami). As discussed above, Alternative 5 would not substantially affect this impact. Therefore, impact classifications would be the same as those for the project.

Please refer to Table 12.6.24-1 for a summary of impacts by each impact criterion.

## 12.6.7    Commercial and Recreational Fishing

Alternative 5 (Active Fault Zone Restrictions) does not vary from the project in a way that affects commercial and recreational fishing. Impacts would be the same as those of the project (Class III).

Please refer to Table 12.6.24-1 for a summary of impacts by each impact criterion.

## 12.6.8     Cultural Resources

### 12.6.8.1     Introduction

This section provides an evaluation of the potential impacts to cultural resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.8 (Cultural Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.8 (Cultural Resources). For the purposes of this analysis please refer to EIR Sections 10.8.2 and 11.8.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.8.3 and 11.8.3 for a description of the affected environment for cultural resources (as applicable at either a study region or field-specific scale), and EIR Section 10.8.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.8.2     Programmatic Level Analysis of the Project

For the purposes of this analysis, the following impacts are addressed:

■ **Impact CUL-1:** Affect historic-era archaeological and built-environment resources

■ **Impact CUL-2:** Affect prehistoric resources

■ **Impact CUL-3:** Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony

■ **Impact CUL-4:** Affect cultural landscapes

Alternative 5 would prohibit future oil and gas well stimulation treatments outside of existing oil and gas field boundaries and their buffer areas within the special studies zone boundaries of a known active earthquake fault. Portions of all the study regions would be excluded from stimulation treatments under this alternative.

Due to restrictions in Alternative 5 on the geographic extent of future well stimulation disturbances, this alternative would reduce potential site-specific disturbances to cultural resources. However, conventional well activity may increase under Alternative 5, and thus impacts to cultural resources at a programmatic level of analysis would likely be similar to those of the project.

Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would likely reduce these effects but cannot guarantee they would be entirely avoided. Therefore, impacts would remain significant and unavoidable (Class I).

### 12.6.8.3     Programmatic Level Analysis of Specific Oil and Gas Fields

Alternative 5 does not apply to existing oil and gas fields; therefore it does not apply to the Wilmington, Inglewood, and Sespe Oil and Gas Fields.

### 12.6.8.4     Impact Significance Summary

Alternative 5 would reduce the potential impacts to cultural resources in all study regions at the programmatic level because the geographic extent of potential effect would be somewhat reduced. ~~However, outside of active fault zones, impacts to cultural resources would be expected to increase in comparison to the project because the Standards for Resource Protection included within the project but not the alternative would not be implemented.~~ Mitigation Measures CUL-1a through CUL-1j, as detailed

in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures) and EIR Section 11.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures) would reduce these effects, but cannot guarantee they would be entirely avoided. Potential impacts are therefore considered significant and unavoidable (Class I).

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.9    Paleontological Resources

### 12.6.9.1    Introduction

This section provides an evaluation of the potential impacts to paleontological resources associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.9 (Paleontological Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.9 (Paleontological Resources). For the purposes of this analysis please refer to EIR Sections 10.9.2 and 11.9.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.9.3 and 11.9.3 for a description of the affected environment for paleontological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.9.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.9.2    Programmatic Level Analysis of Impacts and Mitigation Measures

For the purposes of this analysis, the following impact is evaluated:

■ **Impact PALEO-1:** Destroy or disturb significant surface or near-surface paleontological resources

Alternative 5 would reduce somewhat the amount of land used for used for well stimulation treatments. Therefore, the geographic extent of potential impacts to paleontological resources would be less in comparison to the project, and the risk of adverse impacts would be correspondingly reduced, which would be considered a net benefit. However, the potential to unearth paleontological resources outside of active fault zones would still remain. Implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9.2 (No Future Well Stimulation Practices Alternative (Alternative 1), and detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures) would be expected to reduce these impacts to less than significant (Class II), because the mitigation measures would allow for the recovery, preparation, analysis, and curation of the paleontological resources that may be made available for future scientific studies, which may result in important taphonomic, taxonomic, phylogenetic, paleoecologic, stratigraphic, or biochronological discovery. ~~Additionally, under Alternative 5 the project's standards for resource protection would not be applied. As a consequence, in those areas where well stimulation could still occur, it would be expected that the total number of paleontological resources impacted would be greater than what would occur with the project because there could be a greater total area of ground disturbance.~~

### 12.6.9.3    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Alternative 5 only applies to areas outside of existing oil and gas fields; therefore, the Wilmington, Inglewood, and Sespe Oil and Gas Fields are not considered.

### 12.6.9.4    Impact Significance Summary

The Active Fault Zone Restrictions Alternative would reduce somewhat the potential impacts to paleontological resources in all study regions because the overall footprint of well stimulation activities would be restricted. Implementation of Mitigation Measures PALEO-1a through PALEO-1h, as detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures), would be expected to reduce these impacts to less than significant (Class II).

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.10    Environmental Justice

### 12.6.10.1    Introduction

This section provides an evaluation of the potential impacts to environmental justice associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.10 (Environmental Justice) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.10 (Environmental Justice). For the purposes of this analysis please refer to EIR Sections 10.10.2 and 11.10.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.10.3 and 11.10.3 for a description of the affected environment for environmental justice (as applicable at either a study region or field-specific scale), and EIR Section 10.10.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.10.2    Programmatic Level Analysis of the Project

Alternative 5 would apply only to areas outside of existing oil and gas fields and would require owner/operators to avoid active fault zone areas when drilling wells for the purpose of performing stimulation. Because mapped fault zones are long linear features with a fairly narrow width, not siting well stimulations in active fault zones would only marginally reduce land available for exploration and development using well stimulation.

While this alternative would reduce potential impacts in fault zones in new areas, such as the Monterey Formation and plays, it would not affect lands in and around existing fields. Because the amount of land that is in both a fault zone and the Monterey Formation and plays is limited, this alternative would have a similar potential as the project to affect minority and low-income populations. As with the project, Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) is proposed for Alternative 5.

The location of all future well stimulation is not known and the prohibition of drilling in fault zones would not change the potential for impacts from well stimulation itself. The potential for environmental justice impacts from well stimulation occurring remains, and Mitigation Measure EJ-1a would apply throughout all study regions. The implementation of Mitigation Measure EJ-1a would allow DOGGR to track the locations of well stimulation applications and develop appropriate strategies to address environmental justice issues should they arise. Impacts would be slightly reduced when compared to the project as well stimulations would not be located within active fault zones, thus reducing any potential impacts to adjacent communities from performing well stimulations within an active fault zone.

**MM EJ-1a        Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments.** (Full text in EIR Section 10.10.5.)

### 12.6.10.3  Programmatic Level Analysis of Specific Oil and Gas Fields

Alternative 5 would not apply at Wilmington, Inglewood, or Sespe Oil and Gas Fields.

### 12.6.10.4  Impact Significance Summary

Alternative 5 would have a minor effect in reducing the area wherein well stimulation could occur. However, other impacts associated with well stimulation would remain both in and outside of existing fields, and Alternative 5 would require mitigation similar to Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments), which would address the environmental justice impact.

## 12.6.11  Geology, Soils and Mineral Resources

### 12.6.11.1  Introduction

This section provides an evaluation of the potential impacts to geology, soils and mineral resources associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.11 (Geology, Soils and Mineral Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.11 (Geology, Soils and Mineral Resources). For the purposes of this analysis please refer to EIR Sections 10.11.2 and 11.11.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.11.3 and 11.11.3 for a description of the affected environment for geology, soils and mineral resources (as applicable at either a study region or field-specific scale), and EIR Section 10.11.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.11.2  Programmatic Level Analysis of the Project

Excluding stimulation activities to areas outside of existing oil and gas fields that are not within active fault zones would reduce Impact GEO-1 (Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure) and Impact GEO-3 (Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse) because new stimulation activities would not be located on known faults so rupture of a fault would not occur. Seismically induced groundshaking, ground failure, landslide, lateral spreading, subsidence, or collapse may be reduced somewhat because of the added distance to a fault. Due to the seismic nature of California, and because stimulation activities could still occur in proximity to a fault, the alternative would not reduce the impacts beyond their current significance levels (Class II for both impacts). Mitigation Measure GEO-1a would not be required because active fault zones would already be avoided. However, Mitigation Measures GEO-1b, GEO-1c, GEO-1d, and GEO-1e, and GEO-1f still would be required to reduce the impact, in particular to require a setback from the fault zones and to limit the number of wells that can be hydraulically fractured simultaneously if they are within a certain distance of fault zone. All other impacts associated with geology, soils, and mineral resources would remain the same as with the project described in EIR Section 10.11.5 (Impact Analysis and Mitigation Measures).

### 12.6.11.3  Programmatic Level Analysis of Specific Oil and Gas Fields

The Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields; therefore, well stimulation activities would be allowed, and this alternative would not apply. Impacts associated with stimulation activities for the fields for Alternative 5 would be the same as those described in EIR Section 11.11.5.1

(Impact Analysis and Mitigation Measures: Study Region 1 Wilmington Oil and Gas Field), EIR Section 11.11.5.2 (Impact Analysis and Mitigation Measures: Study Region 1 Inglewood Oil and Gas Field) and in EIR Section 11.11.5.3 (Impact Analysis and Mitigation Measures: Study Region 2 Sespe Oil and Gas Field).

### 12.6.11.4   Impact Significance Summary

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.12   Greenhouse Gas Emissions

### 12.6.12.1   Introduction

This section provides an evaluation of the potential impacts to greenhouse gas emissions associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.12 (Greenhouse Gas Emissions) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.12 (Greenhouse Gas Emissions). For the purposes of this analysis please refer to EIR Sections 10.12.2 and 11.12.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.12.3 and 11.12.3 for a description of the affected environment for greenhouse gas emissions (as applicable at either a study region or field-specific scale), and EIR Section 10.12.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.12.2   Programmatic Level Analysis of Impacts and Mitigation Measures

This alternative would not involve a change in the amount of potential oil and gas production in California. California end users of oil and gas would continue to rely on the established supply as in the baseline. There would be no change in life-cycle GHG emissions of California's crude supply because the supply itself would not change. Each of the GHG impacts would be as described for the project (EIR Section 10.12.5). Mitigation identified for well stimulation treatments would apply, as recommended for the project.

### 12.6.12.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 5, well stimulation treatments would occur in the Wilmington and Sespe Oil and Gas Fields as expected under the project. Therefore, as described in EIR Section 11.12, GHG emissions associated with well stimulation treatments at Wilmington and Sespe would continue, and the extent of Impact GHG-1 is uncertain, ranging from a less than significant impact (Class III) to a significant, unavoidable impact (Class I). The new well stimulation treatments at the Inglewood Oil and Gas Field would result in the same potential GHG impacts and would require the same mitigation measures as described for the project at Inglewood (EIR Section 11.12.5).

### 12.6.12.4   Impact Significance Summary

Some emissions related to well stimulation treatments would be avoided. However, each of the GHG impacts due to well stimulation treatments would be as described for the project.

## 12.6.13   Hazards and Hazardous Materials

### 12.6.13.1   Introduction

This section provides an evaluation of the potential impacts for hazards and hazardous materials associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.13 (Hazards and Hazardous Materials) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.13 (Hazards and Hazardous Materials). For the purposes of this analysis please refer to EIR Sections 10.13.2 and 11.13.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.13.3 and 11.13.3 for a description of the affected environment for hazards and hazardous materials (as applicable at either a study region or field-specific scale), and EIR Section 10.13.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.13.2   Programmatic Level Analysis of the Project

As stated in EIR Section 8.3.5, the Active Fault Zone Restrictions Alternative would restrict future well stimulation treatments outside of existing oil and gas field boundaries and their buffer areas within the special studies zone boundaries of a known active earthquake fault. This alternative somewhat reduces the area in which surface equipment containing hazardous substances could be damaged from seismic events. Hazards and hazardous materials impacts would remain potentially significant outside of these restricted zones, where well stimulation treatments may occur in the future.

| **Impact HAZ-1    Release hazardous materials into the environment from a spill or leak** |
|---|

Seismic events have the potential to damage drums, tanks and pipework that hold well stimulation fluids. This alternative is more protective than the project by restricting future well stimulation treatments near known active earthquake faults. However, drums, tanks, and pipework outside of a special studies zone can still potentially be damaged by a seismic event within the special studies zone. Given these conditions, impacts from a spill or release could be significant. Therefore a mitigation measure is proposed.

**MM HAZ-1a**    **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ (Full text in EIR Section 10.13.5.)

Protective measures for prevention of spills or releases of hazardous materials are provided in both existing and proposed regulations. A summary of the key measures in the proposed SB 4 Well Stimulation Treatment Regulations is provided in EIR Section 10.13.5. Collectively, ~~with inclusion of a barrier for all production facilities, regardless of the amount of time they are in place, and~~with implementation of the revised MM HAZ-1a ~~with~~ and surface water management, and implementation/enforcement of all of the existing and proposed regulations regarding the transport, handling, storage, conveyance, and management of hazardous materials, including the Spill Contingency Plan, which accounts for spills that may occur at pipes, valves, or supply lines, the impact of well stimulation materials on the environment in the event of a release, is considered less than significant with mitigation (Class II).

With the implementation of mitigation measures summarized on Table 10.13-11, Impact HAZ-1 under Alternative 5 would be less than significant with mitigation (Class II) in all study regions. Impact HAZ-1 is also Class II under the project. Alternative 5 would slightly reduce the area in which surface equipment containing hazardous substances could be damaged from seismic events.

### 12.6.13.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 5, well stimulation treatments would occur in the Wilmington, Inglewood, and Sespe Oil and Gas Fields as under the project. Therefore, the impacts and mitigation described in EIR Sections 11.13.3.1, 11.13.3.2, and 11.13.3.3 for these fields would apply. With mitigation, the impact from hazards and hazardous materials would be less than significant (Class II).

### 12.6.13.4   Impact Significance Summary

Prohibiting well stimulation within the earthquake study zone boundaries of a known active earthquake fault outside of existing oil and gas field boundaries and their buffer areas would not have a substantial effect on the impacts from hazards and hazardous materials, as extensive areas would remain available for exploration and development. Overall, impacts would be similar to those of the project, and similar mitigation would apply.

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.14   Groundwater Resources

### 12.6.14.1   Introduction

This section provides an evaluation of the potential impacts to groundwater resources associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.14 (Groundwater Resources). For the purposes of this analysis please refer to EIR Sections 10.14.2 and 11.14.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.14.3 and 11.14.3 for a description of the affected environment for groundwater resources (as applicable at either a study region or field-specific scale), and EIR Section 10.14.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative, which would result in greater potential for use of groundwater with no water recycling standards in place, and less protection of both groundwater resources as well as surface water resources that could recharge groundwater.~~

As summarized in EIR Section 10.14.6, impacts from well stimulation treatments were determined to be potentially significant to groundwater quantity and groundwater quality. Further analysis indicated that the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures, which are summarized on Table 10.14-20, focus on preventing exacerbation of groundwater overdraft or subsidence, maintaining existing use of water supply wells, and mitigating possible pathways that might allow well stimulation fluids including gas to reach protected groundwater.

### 12.6.14.2   Programmatic Level Analysis of the Project

As stated in EIR Section 8.7.5, the Active Fault Zone Restrictions Alternative would restrict future well stimulation treatments near known active earthquake faults outside of existing oil and gas field boundaries and their buffer areas. This alternative reduces the area in which well casings may be damaged by an earthquake. Impacts to groundwater quantity and quality would remain potentially significant where well stimulation treatments may occur in the future outside of these restricted zones.

As noted in EIR Sections 10.14.5 and 11.14.5.1, even small seismic events can damage well casings and seals. This alternative is more protective than the project by restricting future well stimulation treatments near known active earthquake faults. However, well casings outside of these areas, as well as within existing fields, can still potentially be damaged by a seismic event. Therefore, the mitigation measures for the project would still be required under this alternative. With mitigation, the alternative and the project would have essentially the same groundwater impacts resulting from seismic events.

---

| **Impact GW-1** | **Cause or contribute to overdraft conditions** |
|---|---|

While this alternative would reduce some of the areas where well stimulation could occur, it would still allow for stimulation activities throughout much of Study Areas 1 through 6. With implementation of these mitigation measures, Impact GW-1 would be reduced to a less than significant level (Class II). Impact GW-1 is also Class II under the project.

**MM GW-1a**    **Use Alternative Water Sources.** (Full text in EIR Section 10.14.5.)

**MM GW-1b**    **~~Prepare a Third-Party Technical Report to Analyze Overdraft Impacts~~<u>Minimize Groundwater Impacts</u>.** (Full text in EIR Section 10.14.5.)

---

| **Impact GW-2** | **Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water** |
|---|---|

Depending on geologic conditions, groundwater pumping could result in land subsidence. It could also interfere with nearby water wells, including lowering the water level in the well to a point that they no longer function as intended. These would be significant impacts, which would be addressed by the recommended mitigation measure below. With implementation of this mitigation measure, Impact GW-2 would be reduced to a less than significant level (Class II). Impact GW-2 is also Class II under the project.

**MM GW-2a**    **~~Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping~~<u>Minimize Groundwater Impacts</u>.** (Full text in EIR Section 10.14.5.)

---

| **Impact GW-3** | **Adversely impact groundwater quality through surface spills or leaks during well stimulation** |
|---|---|

The full description of this mitigation measure is found in EIR Section 10.13.5. With implementation of this <u>revised</u> mitigation measure, Impact GW-3 would be reduced to a less than significant level (Class II). Impact GW-3 is also Class II under the project.

**MM HAZ-1a**    **<u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u>~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~.** (Full text in EIR Section 10.13.5.)

---

| **Impact GW-4** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals** |
| --- | --- |

Some wells in existing oil and gas fields may have non-existent or ineffective well seals, particularly if they are old or were improperly abandoned. This situation could result in the migration of stimulation fluids, including gas through these pathways into protected groundwater. To address this significant impact, three revised mitigation measures are identified. With implementation of these revised mitigation measures, Impact GW-4 would be reduced to a less than significant level (Class II). Impact GW-4 is also Class II under the project.

**MM GW-4a**     **Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation.** (Full text in EIR Section 10.14.5.)

**MM GW-4b**     **Install a Well Seal across Protected Groundwater for New Wells Subject to Well Stimulation Treatments**~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~**.** (Full text in EIR Section 10.14.5.)

**MM GW-4c**     **Install Methane Sensors on Wells Subject to Well Stimulation Treatments**~~in the ADSA~~**.** (Full text in EIR Section 10.14.5.)

---

| **Impact GW-5** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells** |
| --- | --- |

Some existing and abandoned wells in oil and gas fields may have damaged, non-existent, or ineffective well seals. This could create pathways for stimulation fluids injected in one well to migrate into protected groundwater by way of the annular space in another well within the zone of influence of the stimulated well. This would be a significant impact. To address this, a revised mitigation measure is proposed. With implementation of this revised mitigation measure, Impact GW-5 would be reduced to a less than significant level (Class II). Impact GW-5 is also Class II under the project.

**MM GW-5a**     **Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate.** (Full text in EIR Section 10.14.5.)

---

| **Impact GW-6** | **Improper disposal of flowback in injection wells could potentially impact groundwater quality** |
| --- | --- |

Class II injection wells are required under the UIC program regulations to have an isolating cement seal above the injection zone as well as a minimum 100-foot seal across the base of the fresh water zone. If injected flowback water migrates to protected groundwater, this would be a significant impact. To address this, a revised mitigation measure is proposed. With implementation of this revised mitigation measure, Impact GW-6 would be reduced to a less than significant level (Class II). Impact GW-6 is also Class II under the project.

**MM GW-6a**     **Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater**~~Install a Cement Seal across Protected Groundwater~~**.** (Full text in EIR Section 10.14.5.)

> **Impact GW-7    Inability to identify specific impacts to groundwater quality from well stimulation activities**

Many chemicals and compounds can be introduced to groundwater by various pathways. The origin of these materials is difficult to ascertain under many circumstances. Groundwater monitoring may identify a chemical or compound, but would be unable to identify its source. If well stimulation fluids reach protected groundwater, this would be a significant impact. To ensure that stimulation fluids can be more readily distinguished from other compounds that may be naturally occurring or have been introduced into the groundwater, a <u>revised</u> mitigation measure is proposed to address this. With implementation of this <u>revised</u> mitigation measure, Impact GW-7 would be reduced to a less than significant level (Class II). Impact GW-7 is also Class II under the project.

**MM GW-7a    Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment.** (Full text in EIR Section 10.14.5.)

### 12.6.14.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed and would not be limited by the active fault zone restriction. Therefore, impacts associated with stimulation activities for the Wilmington, Inglewood, and Sespe Oil and Gas Fields for Alternative 4 would be the same as those described in EIR Section 11.14.5.1 (Impact Analysis and Mitigation Measures: Study Region 1 Wilmington Oil and Gas Field) and EIR Section 11.14.5.2 (Impact Analysis and Mitigation Measures: Study Region 1 Inglewood Oil and Gas Field) and in EIR Section 11.14.5.3 (Impact Analysis and Mitigation Measures: Study Region 2 Sespe Oil and Gas Field).

### 12.6.14.4   Impact Significance Summary

The areas around identified active faults are limited and follow linear fault traces. Prohibiting oil and gas well stimulation in these mapped areas may nominally alter what would have been the configuration of a future field, but this would have little effect on reducing overall changes exploration and development would introduce with regard to impacts on groundwater. The effects on groundwater of this alternative would be similar to those for the project and similar mitigation would be required.

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.15   Surface Water Resources

### 12.6.15.1   Introduction

This section provides an evaluation of the potential impacts to surface water resources associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.15 (Surface Water Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.15 (Surface Water Resources). For the purposes of this analysis please refer to EIR Sections 10.15.2 and 11.15.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.15.3 and 11.15.3 for a description of the affected environment for surface water resources (as applicable at either a study region or field-specific scale), and EIR Section 10.15.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this~~ ~~alternative. Therefore, there would be a greater potential for use of surface water without water~~ ~~recycling standards in place, as well as an increase in potential impacts to waterbodies and streams~~ ~~without implementation of habitat protection standards or a buffer requirement from perennial waters.~~

Alternative 5 would prohibit well stimulation from occurring in proximity to known faults outside of existing oil and gas fields. As summarized in EIR Section 10.15.6, impacts from well stimulation treatments were determined to be potentially significant to surface water. All of the water quality impacts described in EIR Section 10.15.4 would still occur under Alternative 5, except in the restricted area around active faults. With this exception, impacts under Alternative 5 would be similar to impacts for the project. Flood hazard impacts would be the same as described in EIR Sections 10.15.4 and 10.15.4.1, except that stimulation the area around active faults occurring outside of existing fields.

### 12.6.15.2   Programmatic Level Analysis of the Project

Alternative 5 applies only to well stimulation near active faults occurring outside of existing oil and gas fields. It does not prohibit other conventional oil and gas-related activities from occurring within these areas. Nor does it prohibit well stimulation outside of known fault zones. Although the impacts would be located on reduced acreage, because new wells and well stimulation would still occur, the same impacts as with the project would occur. The impacts are listed in EIR Section 12.2.15.2. The same mitigation measures identified for the project would also apply under Alternative 5, and would reduce the impacts to less than significant (Class II).

### 12.6.15.3   Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Alternative 5 does not apply to existing fields. Under this alternative, activities would occur as described for the project, in which impacts to surface water resources associated with well stimulation treatments were determined to be potentially significant. However, the significant impacts would be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures for Wilmington, Inglewood, and Sespe Oil and Gas Fields are the same as described in EIR Section 10.12.5. With implementation of these measures, the impact to surface water under Alternative 5 would be less than significant (Class II).

### 12.6.15.4   Impact Significance Summary

Based on the programmatic level analysis of surface water resources, impacts from Alternative 5 are considered to be the same, less than significant with mitigation (Class II).

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.16   Land Use and Planning

### 12.6.16.1   Introduction

This section provides an evaluation of the potential impacts to land use and planning associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.16 (Land Use and Planning) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.16 (Land Use and Planning). For the

purposes of this analysis please refer to EIR Sections 10.16.2 and 11.16.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.16.3 and 11.16.3 for a description of the affected environment for land use and planning (as applicable at either a study region or field-specific scale), and EIR Section 10.16.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.16.2   Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 5 would restrict future oil and gas well stimulation treatments outside of existing oil and gas field boundaries and their buffer areas within the special studies zone boundaries of a known active earthquake fault.

Under this alternative, the effects of Impacts LU-1, LU-2 and LU-3 would be similar to those of the Urbanized Area Protection Alternative (Alternative 4) as described in EIR Section 12.5.16 because it would partially restrict future well stimulation activities only in certain areas of the State, depending on actions by local governments. Figures 8-10 through 8-12 illustrate those areas of the State within fault zone mapping. Relatively little land would fall under this restriction, as compared to the extent of the Monterey Formation and plays and existing oil and gas fields. Impact LU-1 would be significant and unavoidable (Class I), ~~and~~ Impact LU-2 <u>would be less than significant (Class III),</u> and Impact LU-3 would be mitigable to a level of less than significant (Class II). Overall, the level of impacts would be similar to those for the project; however, implementation of development restrictions near active fault zones (Alternative 5) would limit potential for disruptions to land uses in those areas. Therefore, impacts to land use would be slightly less under Alternative 5 in comparison to the project.

### 12.6.16.3   Programmatic Level Analysis of Specific Oil and Gas Fields

As referenced above, Alternative 5 only applies to areas outside of existing oil and gas fields; therefore, the Wilmington, Inglewood, and Sespe Oil and Gas Fields are not part of this alternative.

### 12.6.16.4   Impact Significance Summary

Alternative 5 would reduce the geographic extent of potential land use impacts within Urbanized Areas, which would be considered a net benefit. However, outside of these areas land use impacts at a programmatic level of analysis would still be the same as for the project. Significant and unavoidable impacts related to Impact LU-1 would occur (Class I). Effects related to Impact LU-2 and Impact LU-3 would be mitigable to a level of less than significant (Class II).

## 12.6.17   Noise and Vibration

### 12.6.17.1   Introduction

This section provides an evaluation of the potential impacts to noise and vibration associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.17 (Noise and Vibration) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.17 (Noise and Vibration). For the purposes of this analysis please refer to EIR Sections 10.17.2 and 11.17.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.17.3 and 11.17.3 for a description of the affected environment for noise and vibration (as applicable at either a study region or field-specific scale), and EIR Section 10.17.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.17.2   Programmatic Level Analysis of the Project

Two impacts have been identified for noise and vibration: Impact NOI-1: Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels; and Impact NOI-2: Cause exposure of persons to or generation of excessive groundborne vibration.

Since this alternative includes well stimulation treatments, noise and vibration impacts would occur as described in EIR Section 10.17. Small portions within each region would be excluded from well stimulation treatments under this alternative. As such, the potential for additional population exposed to noise and vibration may increase if well pads are located nearer residential communities so as to avoid areas of a known active earthquake fault. Noise mitigation would be required, as with the project. In all regions the resulting impact would be Class II: Less Than Significant Impact With Mitigation Incorporated, and Impact NOI-2 would be a Class III: Less Than Significant Impact.

**MM NOI-1a      Control Noise Levels near Sensitive Land Uses.** (Full text in EIR Section 10.17.5.)

### 12.6.17.3   Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Since this alternative includes well stimulation treatments, noise and vibration impacts would occur as described in EIR Section 11.17. Noise mitigation would be required. In all existing fields where well stimulation treatments would occur in Alternative 5, noise levels (Impact NOI-1) would be Class II: Less Than Significant Impact With Mitigation Incorporated, and vibration levels (Impact NOI-2) would be a Class III: Less Than Significant Impact.

### 12.6.17.4   Impact Significance Summary

Based on the programmatic level analysis of noise and vibration for the project and for specific oil and gas fields, impacts from Alternative 5 would be the same as under the project except as well stimulation activities may be limited near active fault zones.

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.18   Population and Housing

### 12.6.18.1   Introduction

This section provides an evaluation of the potential impacts to population and housing associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.18 (Population and Housing) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.18 (Population and Housing). For the purposes of this analysis please refer to EIR Sections 10.18.2 and 11.18.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.18.3 and 11.18.3 for a description of the affected environment for visual resources (as applicable at either a study region or field-specific scale), and EIR Section 10.18.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.18.2    Programmatic Level Analysis of Impacts and Mitigation Measures

As shown on Figures 8-4 through 8-6, active fault zones are found in portions of all the study regions. Under Alternative 5, these mapped areas would be excluded from stimulation treatments in areas outside of existing oil and gas fields. Although use of some areas would be prohibited for well stimulation work, much of the area outside of existing fields would be available, and this alternative would minimally impact future oil production and the number of well stimulation treatments.

When compared to the project, Alternative 5 would require a similar number of employees; and the locations of well development on a programmatic level would not be substantially different than under the project. Overall population and housing impacts (Impacts POP-1 and POP-2) under Alternative 5 would be similar to those for the project, as described in EIR Section 10.18 (Population and Housing).

### 12.6.18.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe fields for Alternative 5 would be the same as those described in EIR Section 11.18 (Population and Housing).

### 12.6.18.4    Impact Significance Summary

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.19    Public Services

### 12.6.19.1    Introduction

This section provides an evaluation of the potential impacts to public services associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.19 (Public Services) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.19 (Public Services). For the purposes of this analysis please refer to EIR Sections 10.19.2 and 11.19.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.19.3 and 11.19.3 for a description of the affected environment for public services (as applicable at either a study region or field-specific scale), and EIR Section 10.19.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.19.2    Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 5 would apply only to areas outside of existing oil and gas fields, and it would require new wells and stimulation activities to occur outside of mapped active fault zone areas. This would be a localized impact and is not expected to affect public service providers serving existing oil and gas fields as compared to the project.

The need for new or expanded public services, including applicable performance objectives and service ratios, is strongly influenced by population levels, as well as the needs of wells sites and well stimulation activities. Implementation of Mitigation Measure PUB-1a (Assess Public Service Ratios and Ensure Adequate Compensation) is proposed as part of Alternative 5 and would require DOGGR to coordinate with the applicable local land use agency to determine whether new well development and stimulations

would place a burden on public services, and ensure that appropriate compensation is provided to the local agency. With implementation of this measure, Impact PUB-1 (Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools) would be less than significant (Class II). The siting of well stimulations outside fault zones would reduce potential emergency service calls should a well be upset during a seismic event. This level of change is not expected to result in any discernible need for services between Alternative 5 and the project; they would have similar impacts overall.

**MM PUB-1a**     **Assess Public Service Ratios and Ensure Adequate Compensation.** (Full text in EIR Section 10.19.5.)

### 12.6.19.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe fields for Alternative 5 would be the same as those described in EIR Section 11.19 (Public Services).

### 12.6.19.4   Impact Significance Summary

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.20   Recreation

### 12.6.20.1   Introduction

This section provides an evaluation of the potential impacts to recreation associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.20 (Recreation) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.20 (Recreation). For the purposes of this analysis please refer to EIR Sections 10.20.2 and 11.20.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.20.3 and 11.20.3 for a description of the affected environment for recreation (as applicable at either a study region or field-specific scale), and EIR Section 10.20.4 for details regarding the impact methodology and significance criteria that have been used.

~~Without implementation of project standards for resource protection under this alternative, oil and gas development and associated well stimulation may occur in open space areas and areas near water resources used for recreation.~~

### 12.6.20.2   Programmatic Level Analysis of the Project

Alternative 5 would restrict future oil and gas well stimulation treatments outside of existing oil and gas field boundaries and their buffer areas within the special studies zone boundaries of a known active earthquake fault.

Figures 8-10 through 8-12 illustrate those areas of the State that would not be developed for the purposes of well stimulating activities. These areas are limited in extent and would not likely reduce the overall level of development of wells using well stimulation. Impact REC-1 would be less than significant (Class III), and Impact REC-2 would be less than significant with mitigation (Class II). Overall the level of

impacts would be similar that of the project; however, implementation of development restrictions near active fault zones (Alternative 5) would limit potential for disruptions to any recreation areas that may occur in the vicinity of a restricted area. Therefore, in comparison to the project, impacts to recreation areas would be slightly less under Alternative 5.

### 12.6.20.3    Programmatic Level Analysis of Specific Oil and Gas Fields

As referenced above, Alternative 5 only applies to areas outside of existing oil and gas fields; therefore, the Wilmington, Inglewood, and Sespe Oil and Gas Fields are not considered as part of this alternative.

### 12.6.20.4    Impact Significance Summary

At a programmatic level of analysis, the impacts associated with Alternative 5 would be less than significant for Impact REC-1 (Class III) and less than significant with mitigation for Impact REC-2 (Class II). Mitigation Measures REC-2a and REC-2b, as summarized in EIR Section 12.2.20.2 (No Future Well Stimulation Practices Alternative [Alternative 1]) and detailed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures).

## 12.6.21    Risk of Upset/Public and Worker Safety

### 12.6.21.1    Introduction

This section provides an evaluation of the potential impacts for risk of public upset/public and worker safety associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.21 (Risk of Upset/Public and Worker Safety) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.21 (Risk of Upset/Public and Worker Safety). For the purposes of this analysis please refer to EIR Sections 10.21.2 and 11.21.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.21.3 and 11.21.3 for a description of the affected environment for risk of public upset/public and worker safety (as applicable at either a study region or field-specific scale), and EIR Section 10.21.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.21.2    Programmatic Level Analysis of the Project

Under this alternative, there would not be a reduction in well stimulation treatment activities. Therefore, the forecast number of accidents for Alternative 5 is the same as the project case.

Alternative 5 and the project case will have lower annual average projected crude oil imports compared to Alternatives 1 and 2. The number of accidents projected for this region is four accidents per year (approximately 100 over 25 years). The number of accidents is based on the train miles traveled, which is directly related to the volume of crude imported. Since volume of imported crude oil is approximately 25 percent of highest import case (Alternative 1, Table 10.21-16), the number of accidents is approximately 25 percent of those on that Table. Study regions that may be at slightly greater risk of a rail accident include Study Regions 1, 4, 5, and 6. Given the relatively very low frequency of the number of derailments compared to the number of shipments of oil, the occurrence of a major accident is expected to be very low.

### 12.6.21.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Alternative 5 would not apply to the Wilmington, Inglewood, and Sespe Oil and Gas Fields as they are existing fields.

### 12.6.21.4   Impact Significance Summary

Each of the impacts related to risk of upset and safety for Alternative 5 would be as described for the project.

The crude oil rail accident rate for Alternative 5 is approximately four per year (100 over 25 years), as with the project case. In addition, there may be accidents from proppant deliveries by rail at a rate of 16 over 25 years, as with the project case. The volume of proppant is proportional to the number of wells hydraulically fractured, which in turn will require more rail cars. The maximum number of accidents corresponding to the highest volume of proppant is shown in Table 10.21-15. Since the number of wells for Alternative 5 is approximately 10 percent less than that of the maximum case, the number of accidents is approximately 10 percent less as well. The Regions at higher risk for accidents are Regions 1 and 4, with a lesser potential in Regions 5 and 6.

## 12.6.22   Transportation and Traffic

### 12.6.22.1   Introduction

This section provides an evaluation of the potential impacts to transportation and traffic associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.22 (Transportation and Traffic) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.22 (Transportation and Traffic). For the purposes of this analysis please refer to EIR Sections 10.22.2 and 11.22.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.22.3 and 11.22.3 for a description of the affected environment for transportation and traffic (as applicable at either a study region or field-specific scale), and EIR Section 10.22.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.22.2   Programmatic Level Analysis of the Project

Alternative 5 would apply only to areas outside of existing oil and gas fields and haul routes would not be restricted. Although oil and gas development would be restricted in areas within active fault zones, much of the area outside of existing fields would still be available, and this alternative would minimally affect future oil production and the number of well stimulation treatments.

Therefore, the number of trips generated per well and the number of wells in Alternative 5 would be similar to that for the project. Likewise, associated traffic impacts (TR-1 through TR-6) and recommended mitigation measures below would remain same as for the project (see EIR Section 10.22, Transportation and Traffic).

**MM TR-1a**      **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

**MM TR-2a**      **Repair Roadway Damage.** (Full text in EIR Section 10.22.5.)

**MM TR-4a**      **Know Spill Prevention Measures.** (Full text in EIR Section 10.22.5.)

### 12.6.22.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington and Sespe Oil and Gas Fields are existing fields, well stimulation activities would continue to be allowed. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe fields for Alternative 5 would be the same as those described in EIR Section 11.22 (Transportation and Traffic).

#### 12.6.22.4    Impact Significance Summary

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

### 12.6.23    Utilities and Service Systems

#### 12.6.23.1    Introduction

This section provides an evaluation of the potential impacts to utilities and service systems associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.23 (Utilities and Service Systems) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.23 (Utilities and Service Systems). For the purposes of this analysis please refer to EIR Sections 10.23.2 and 11.23.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.23.3 and 11.23.3 for a description of the affected environment for utilities and service systems (as applicable at either a study region or field-specific scale), and EIR Section 10.23.4 for details regarding the impact methodology and significance criteria that have been used.

#### 12.6.23.2    Programmatic Level Analysis of the Project

Alternative 5 would apply only to areas outside of existing oil and gas fields, and would require new wells and stimulation activities to locate outside of active fault zone areas. Mapped active fault zones represent a small fraction of the Monterey Formation and plays. Therefore, the potential for impacts to utilities and service systems serving existing oil and gas fields would be similar or identical to that of the project (see EIR Section 10.23, Utilities and Service Systems).

Although activities in some areas would be banned, most of the area outside of existing fields would not be restricted, and this alternative would minimally impact future oil production and the number of well stimulation treatments. The need for new or expanded utilities and service systems is strongly influenced by population levels. As discussed within EIR Section 12.9.18 (Population and Housing), Alternative 5 has the potential to slightly increase population in-migration with future well stimulation treatments in smaller communities, because there would be somewhat less land available for new well sites and wells may be consolidated. In general, however, minor population growth from new employment would have a less than significant impacts to utility and service systems, including their existing and projected capacities (Impact UTL-1).

Avoiding active fault zone areas could result in some clustering of new wells that would be developed outside of existing oil and gas fields. Similar to Alternative 3 (Well Pad Consolidation), Alternative 5 reduces new electrical or gas infrastructure required to serve new wells/fields created through well stimulation outside of existing oil and gas field boundaries by consolidating well sites near one another. This would allow new wells to share any new natural gas and electricity connections, thus reducing potential environmental impacts from constructing new infrastructure. This is a minor decrease in impacts when compared to those of the project. Outside of existing fields, Alternative 5 would reduce potential impacts from electrical and natural gas interconnections by consolidating new well sites developed outside of existing fields. This would allow for consolidated wells to use the same primary interconnection lines (Impact UTL-2). The potential clustering of wells to avoid active fault zone areas would not increase potential impacts from wastewater (Impact UTL-3) and solid waste (Impact UTL-4) generation when compared to the project. Faults are linear features. Mapped faults may have a long

linear extent but are not exceptionally wide; therefore, wells would be banned in a relatively small extent of any area of drilling interest.

To ensure all utilities and service systems would have adequate capacities under Alternative 5, Mitigation Measures UTL-3a and UTL-4a are also proposed. With the inclusion of these measures, Impacts UTL-1 and UTL-2 are Class III and impact UTL-3 and UTL-4 are Class II.

**MM UTL-3a**    **Assess Wastewater Quality and Ensure Adequate Compensation to Municipal and Private Wastewater Treatment Plants.** (Full text in EIR Section 10.23.5.)

**MM UTL-4a**    **Assess Non-Hazardous Solid Waste Generation and Ensure Adequate Compensation to Municipal and Private Solid Waste Facilities.** (Full text in EIR Section 10.23.5.)

### 12.6.23.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe fields for Alternative 5 would be the same as those described in EIR Section 11.23 (Utilities and Service Systems).

### 12.6.23.4   Impact Significance Summary

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.24   Impact Summary Table for Alternative 5

Table 12.6.24-1 provides a summary of impacts and recommended mitigation measures for the project and specific oil and gas files for all issue areas under Alternative 5.

**Programmatic Level Analysis of the Project**

The Active Fault Zone Restrictions Alternative would restrict future oil and gas well stimulation treatments outside of existing oil and gas field boundaries and their buffer areas within the earthquake study zone boundaries of a known active earthquake fault. While some areas outside of the existing oil and gas fields would not be available for well stimulation, given the remaining area available for oil and gas development and well stimulation within the State, this alternative would minimally impact future oil and gas production or ground disturbance compared to the project. Alternative 5 would be largely similar to the project for most issue areas. However, because it would locate the wellbore, well site equipment, and stimulation activities farther from an active fault zone, there would be a reduced potential for impacts to hazards and hazardous materials and groundwater resources as a result of a seismic event, which are both less than significant impacts for the project with the implementation of mitigation (Class II). Compared to the project, Alternative 5 would also result in reduced impacts to Environmental Justice. Alternative 5 would not create any new significant and unmitigable (Class I) impacts.

**Programmatic Level Analysis of Specific Oil and Gas Fields**

Alternative 5 does not apply to existing fields. Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. Therefore, impacts associated with well stimulation activities at the fields would be the same as those described for the project.

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **AESTHETICS** | | |
| Impact AES-1. Substantially adversely affect scenic vistas. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-2. Substantially alter or damage scenic resources. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-3. Substantially degrade the existing visual character or quality of a site and its surroundings. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-4. Create new sources of substantial light and glare. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| **AGRICULTURE AND FORESTRY RESOURCES** | | |
| Impact AGF-1. Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use | Class II on or adjacent to Important Farmland<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-1c: Compensate for Loss of Important Farmland | Same as those listed in Table 11.2-1 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact AGF-2. Conflict with existing zoning for agricultural use or with Williamson Act contracts | Class II on land zoned for agricultural use or enrolled in Williamson Act contracts<br>AGF-2a: Ensure Compatibility with Agricultural Zoning<br>AGF-2b: Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts | Same as those listed in Table 11.2-1 |
| Impact AGF-3. Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production | Class II on land zoned as forestland, timberland, or Timberland Production<br>AGF-3a: Ensure Compatibility with Zoning for Forest and Timberland | Same as those listed in Table 11.2-1 |
| Impact AGF-4. Result in the loss of forest land or conversion of forest land to non-forest use | Class II on forest land<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land | Same as those listed in Table 11.2-1 |
| Impact AGF-5. Directly or indirectly impair the use of agricultural land or forest land | Class II for well stimulation activities on or within 1,500 feet of agricultural or forest land<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u><s>Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices</s><br>GW-4b: Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u><s>Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin</s><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.2-1 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **AIR QUALITY** | | |
| Impact AQ-1. Conflict with or obstruct implementation of an applicable air quality plan | Class I (Statewide)<br>Class III (in SCAQMD)<br>AQ-1a: Improve Air Quality Planning Inventories and Local Control Measures<br>AQ-1b: Improve the Methodologies and Emission Factors Used in Inventory Development | Same as those listed in Table 11.3-1 |
| Impact AQ-2. Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>AQ-2c: Reduce Emissions from Dust-Causing Activities | Same as those listed in Table 11.3-1 |
| Impact AQ-3. Expose sensitive receptors to substantial pollutant concentrations | Class I<br>AQ-3a: <u>Comply with Local Air District Protocols Relating to the Preparation of</u>~~Prepare~~ a Health Risk Assessment and Implement Emission Controls<br>AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility | Same as those listed in Table 11.3-1 |
| Impact AQ-4. Create objectionable odors affecting a substantial number of people | Class I<br>AQ-4a: Prepare and Implement an Odor Minimization Plan<br>AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility | Same as those listed in Table 11.3-1 |
| **BIOLOGICAL RESOURCES – TERRESTRIAL ENVIRONMENT** | | |
| Impact BIOT-1. Substantially reduce the habitat of a fish or wildlife species | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-2. Cause a fish or wildlife population to drop below self-sustaining levels | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Same as those listed in Table 11.4-8 |
| Impact BIOT-3. Substantially reduce the number or restrict the range of an endangered, rare, or threatened species | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan | Same as those listed in Table 11.4-8 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-4. Have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special-status species in local or regional plans, policies, or regulations, or by CDFW or USFWS | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Same as those listed in Table 11.4-8 |
| Impact BIOT-5. Have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations, or by CDFW or USFWS | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-6. Have a substantial adverse effect on federally protected wetlands as defined by Section 404, of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-6a: Protect Jurisdictional Waters<br>GW-1a: Use Alternative Water Sources to the Extent Feasible<br>GW-1b: Minimize Groundwater Impacts<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |
| Impact BIOT-7. Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites | Class I<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Same as those listed in Table 11.4-8 |
| Impact BIOT-8. Conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance | Class II<br>BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Same as those listed in Table 11.4-8 |
| Impact BIOT-9. Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan | Class II<br>BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Same as those listed in Table 11.4-8 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-10. Contribute to global climate change and consequent impacts to biodiversity | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Same as those listed in Table 11.4-8 |
| **BIOLOGICAL RESOURCES – COASTAL AND MARINE ENVIRONMENT** | | |
| Impact BIOCM-1. Substantially affect rare, threatened, or endangered coastal/marine species or their habitat | Class III<br>None required | Wilmington: Same as those listed in Table 11.5-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| Impact BIOCM-2. Interfere with migration or movement of coastal/marine fish or wildlife | Class III<br>None required | Wilmington: Same as those listed in Table 11.5-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| Impact BIOCM-3. Result in substantial loss or alteration of coastal/marine habitat | Class III<br>None required | Wilmington: Same as those listed in Table 11.5-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| Impact BIOCM-4. Substantially disrupt or affect local coastal/marine biological communities or habitats | Class III<br>None required | Wilmington: Same as those listed in Table 11.5-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| **COASTAL PROCESSES AND MARINE WATER QUALITY** | | |
| Impact CPMWQ-1. Change marine water chemical composition with respect to known hazardous substances; or the measured water temperature, salinity, conductivity, or turbidity | Class II<br>CPMWQ-1a: Protect Marine Water Quality | Wilmington: Same as those listed in Table 11.6-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact CPMWQ-2. Change the velocity or direction of ocean currents | Class II<br>CPMWQ-2a: Prepare and Implement Marine Current Plan | Wilmington: Same as those listed in Table 11.6-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| Impact CPMWQ-3. Change the velocity or direction of coastal and ocean winds | Class III<br>None required | Wilmington: Same as those listed in Table 11.6-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| Impact CPMWQ-4. Change the direction, size, or period of ocean waves | Class IV<br>None required | Wilmington: Same as those listed in Table 11.6-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| Impact CPMWQ-5. Increase the risk of a tsunami | Class III<br>None required<br>~~CPMWQ-5a: Conduct Offshore Geotechnical and Tsunami Investigation~~<br>~~CPMWQ-5b: Modify the Drilling of Disposal Wells Offshore or Near-Shore~~ | Wilmington: Same as those listed in Table 11.6-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| **COMMERCIAL AND RECREATIONAL FISHING** | | |
| Impact CRF-1. Cause long-term exclusion of important commercial and recreational fishing areas | Class III<br>None required | Wilmington: Same as those listed in Table 11.7-4<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| Impact CRF-2. Result in substantial economic losses to local commercial and recreational fishing industries | Class III<br>None required | Wilmington: Same as those listed in Table 11.7-4<br>Inglewood: Not applicable<br>Sespe: Not applicable |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **CULTURAL RESOURCES** | | |
| Impact CUL-1. Affect historic-era archaeological and built-environment resources | Class I or Class II if historic or built-environment resources are present<br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |
| Impact CUL-2. Affect prehistoric resources | Class I or Class II if prehistoric resources are present<br>Class III or Class IV if prehistoric resources are present are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact CUL-3. Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony. | Class I or II if human remains or cultural items are present<br>Class III or Class IV if cultural items are not considered significant or are not present<br>Class IV if human remains are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |
| Impact CUL-4. Affect cultural landscapes. | Class I or II if cultural landscapes are present<br>Class III or Class IV if cultural landscapes are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **PALEONTOLOGICAL RESOURCES** | | |
| Impact PALEO-1. Well stimulation treatments would destroy or disturb surface or near-surface significant paleontological resources | Class II if fossil bearing geologic units are present<br>Class IV if no fossil bearing units are present<br>PALEO-1a: Require Information ~~Inventory~~ and Evaluate Paleontological Resources<br>PALEO-1b: Develop Paleontological Resource Mitigation Plan<br>PALEO-1c: Retain Qualified Paleontological Resources Staff<br>PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program<br>PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources<br>PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities<br>PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities<br>PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.9-4 |
| **ENVIRONMENTAL JUSTICE** | | |
| Impact EJ-1. Significant impacts would disproportionately affect minority or low-income populations | Unknown, possibly Class I<br>EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Same as those listed in Table 11.10-4 |
| **GEOLOGY, SOILS, AND MINERAL RESOURCES** | | |
| Impact GEO-1. Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure | Class II<br>GEO-1a: Avoid Active Faults if Necessary<br>GEO-1b: Implement an Appropriate Setback if Necessary<br>~~GEO-1c: Limit the Number of Hydraulically Fractured Wells~~<br>GEO-1c~~d~~: Implement Industry Accepted Practices<br>GEO-1d~~e~~: Conduct Ground Monitoring<br>GEO-1e~~f~~: Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Same as those listed in Table 11.11-4 |
| Impact GEO-2. Result in substantial soil erosion or the loss of topsoil | Class II<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Same as those listed in Table 11.11-4 |
| Impact GEO-3. Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse | Class II<br>GEO-3a: Prepare Geotechnical Report if Necessary | Same as those listed in Table 11.11-4 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact GEO-4. Be located on expansive soil creating substantial risks to life or property | Class III<br>None required | Same as those listed in Table 11.11-4 |
| Impact GEO-5. Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems | Class IV<br>None required | Same as those listed in Table 11.11-4 |
| Impact GEO-6. Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan | Class III in most instances; Class I in some instances<br>None available | Same as those listed in Table 11.11-4 |
| Impact GEO-7. Cause an induced seismic event including ground shaking and ground failure | Class III<br>None required | Same as those listed in Table 11.11-4 |
| **GREENHOUSE GAS EMISSIONS** | | |
| Impact GHG-1. Generate greenhouse gas emissions that may have a significant impact on the environment | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide | Same as those listed in Table 11.12-1 |
| Impact GHG-2. Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Same as those listed in Table 11.12-1 |
| **HAZARDS AND HAZARDOUS MATERIALS** | | |
| Impact HAZ-1. Release hazardous materials into the environment from a spill or leak | Class II<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Same as those listed in Table 11.13-1 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **GROUNDWATER RESOURCES** | | |
| Impact GW-1. Cause or contribute to overdraft conditions | Class II<br>GW-1a: Use Alternative Water Sources<br>GW-1b: Prepare a Third-Party Technical Report to Analyze Overdraft Impacts | Same as those listed in Table 11.14-6 |
| Impact GW-2. Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water | Class II<br>GW-2a: Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping | Same as those listed in Table 11.14-6 |
| Impact GW-3. Adversely impact groundwater quality through surface spills or leaks during well stimulation | Class II<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u><s>Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices</s> | Same as those listed in Table 11.14-6 |
| Impact GW-4. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals | Class II<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u><s>Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin</s><br>GW-4c: Install Methane Sensors on Wells in the ADSA | Same as those listed in Table 11.14-6 |
| Impact GW-5. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells | Class II<br>GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate | Same as those listed in Table 11.14-6 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact GW-6: Improper disposal of flowback in injection wells could potentially impact groundwater quality | Class II<br>GW-6a: Install a Cement Seal across Protected Groundwater | Same as those listed in Table 11.14-6 |
| Impact GW-7. Inability to identify specific impacts to groundwater quality from well stimulation activities. | Class II<br>GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment | Same as those listed in Table 11.14-6 |
| **SURFACE WATER RESOURCES** | | |
| Impact SWR-1. Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality. | Class II<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-1bc: Provide Adequate Flood Protection<br>SWR-1cd: Protect Surface Water Reservoirs<br>BIOT-2a: Prevent Hazards to Fish and Wildlife | Same as those listed in Table 11.15-1 |
| Impact SWR-2. Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site. | Class II<br>SWR-2a: Implement Erosion Control Plan | Same as those listed in Table 11.15-1 |
| Impact SWR-3. Substantially diminish surface water quantity. | Class II<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.15-1 |
| Impact SWR-4. Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding. | Class II<br>SWR-1bc: Provide Adequate Flood Protection | Same as those listed in Table 11.15-1 |
| **LAND USE AND PLANNING** | | |
| Impact LU-1. Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses. | Class I<br>None available for impacts associated with Risk of Upset/Public and Worker Safety | Same as those listed in Table 11.16-3 |
| Impact LU-2. Physically divide an established community. | Class III<br>None required LU-2a: Ensure That Established and Planned Communities Are Not Divided | Same as those listed in Table 11.16-3 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact LU-3. Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. | Class II<br>SB 4 regulation requiring "Neighbor Notification" (Section 1783.2)<br>All mitigation measures prescribed in this EIR | Same as those listed in Table 11.16-3 |
| **NOISE AND VIBRATION** | | |
| Impact NOI-1. Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels | Class II<br>NOI-1a: Control Noise Levels near Sensitive Land Uses | Same as those listed in Table 11.17-10 |
| Impact NOI-2. Cause exposure of persons to or generation of excessive groundborne vibration | Class III<br>None required | Same as those listed in Table 11.17-10 |
| **POPULATION AND HOUSING** | | |
| Impact POP-1. Induce substantial population growth | Class III<br>None required | Same as those listed in Table 11.18-4 |
| Impact POP-2. Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere | Class III<br>None required | Same as those listed in Table 11.18-4 |
| **PUBLIC SERVICES** | | |
| Impact PUB-1. Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools | Class II<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation | Same as those listed in Table 11.19-4 |
| **RECREATION** | | |
| Impact REC-1. ~~Well stimulation treatment activities would increase the usage of recreation areas or facilities which would r~~Result in the physical deterioration of recreational resources | Class III<br>None required | Same as those listed in Table 11.20-3 |
| Impact REC-2. ~~Well stimulation treatment activities would c~~Cause disruptions in designated recreation areas | Class II<br>REC-2a: Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas<br>REC-2b: Provide Noticing of Closures and Identify Alternative Recreation Areas | Same as those listed in Table 11.20-3 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **RISK OF UPSET / PUBLIC AND WORKER SAFETY** | | |
| Impact RSK-1. Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases | Class I<br>RSK-1a: Increase the Number of CPUC Rail Inspectors<br>RSK-1b: Expedite the Phase-out of Older Tank Cars<br>RSK-1c: Implement New Accident Prevention Technology<br>RSK-1d: Monitor and Enforce New Speed Limits<br>RSK-1e: Monitor the Implementation of Trackside Safety Technology<br>RSK-1f: Improve Emergency Preparedness and Response Programs<br>RSK-1g: Provide Real-Time Shipment Information to Emergency Responders<br>RSK-1h: Provide Additional Accident and Injury Data to the State | Same as those listed in Table 11.21-1 |
| Impact RSK-2. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental release hazardous materials due to a hose leak or connection leak while pumping well stimulation treatment fluids | Class II<br>RSK-2a: Conduct a Reactive Hazard Assessment (RHA)<br>RSK-2ab: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>RSK-2c: Install an Upgraded SCADA System<br>RSK-2bd: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System<br>RSK-2cf: Ensure Mechanical Integrity Through Compliance with Permanent Program Complies with Regulation | Same as those listed in Table 11.21-1 |
| Impact RSK-3. Substantially increase the potential for major oil spills due to ship groundings and collisions | Class III<br>None required | Same as those listed in Table 11.21-1 |
| Impact RSK-4. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental pressure changes during flowback activity caused by blocked pump discharge, sudden change in downhole condition, or human error | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | Same as those listed in Table 11.21-1 |
| Impact RSK-5. Generate risks to public safety by causing a flammable atmosphere in the flowback tank | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | Same as those listed in Table 11.21-1 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact RSK-6. Increase risks to public safety by exposing the public to accidental crude oil or produced gas releases from pipelines | Class I<br>RSK-6a: Increase Inspection of Mechanical Integrity<br>RSK-6b: Improve Leak Detection Capability<br>RSK-6c: Reduce Mainline Valve Spacing None available | Same as those listed in Table 11.21-1 |
| Impact RSK-7. Expose workers and public to hazardous levels of airborne silica during the use of proppant | Class II<br>RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System<br>RSK-7b: Reduce Emissions from Dust-Causing Activities | Same as those listed in Table 11.21-1 |
| **TRANSPORTATION AND TRAFFIC** | | |
| Impact TR-1. Generate additional truck traffic and disrupt traffic operations | Class III for project activities in Study Region 6 and for existing fields<br>Class II outside of existing oil and gas fields in Study Regions 1-5 where 10 or more wells are drilled by a single applicant within one square mile<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.22-9 |
| Impact TR-2. Inadvertently damage road rights-of-way | Class III for project activities in Study Region 6 and in existing oil and gas fields<br>Class II outside of existing oil and gas fields in Study Regions 1-5 where 10 or more wells are drilled by a single applicant within one square mile<br>TR-2a: Repair Roadway Damage | Same as those listed in Table 11.22-9 |
| Impact TR-3. Cause traffic safety hazards for vehicles, bicyclists, and pedestrians | Class III for project activities in Study Region 6 and for existing fields<br>Class II outside of existing oil and gas fields in Study Regions 1-5 where 10 or more wells are drilled by a single applicant within one square mile<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.22-9 |
| Impact TR-4. Transport hazardous materials | Class I<br>TR-4a: Know Spill Prevention Measures | Same as those listed in Table 11.22-9 |
| Impact TR-5. Change air traffic patterns | Class IV if no airports are nearby<br>Class III if FAA notification under 14 CFR 77 is required<br>None required | Same as those listed in Table 11.22-9 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact TR-6. Temporarily interfere with emergency response | Class III for project activities in Study Region 6 and for existing fields<br>Class II in Study Regions 1-5 outside of existing oil and gas fields where 10 or more wells are drilled by a single applicant within one square mile<br>TR-1a: Prepare Traffic Plan<br>TR-2a: Repair Roadway Damage<br>TR-4a: Know Spill Prevention Measures | Same as those listed in Table 11.22-9 |
| **UTILITIES AND SERVICE SYSTEMS** | | |
| Impact UTL-1. Adversely affect utilities and service systems due to population growth from Project-related development | Class III<br>None required | Same as those listed in Table 11.23-6 |
| Impact UTL-2. Require new or expanded electrical or natural gas infrastructure | Class III<br>None required | Same as those listed in Table 11.23-6 |
| Impact UTL-3. Exceed existing municipal wastewater treatment provider capacities | Class II<br>UTL-3a: Assess Wastewater Quality and Ensure Adequate ~~Compensation to~~Capacity to Process Wastewater at Municipal and Private Wastewater Treatment Plants | Same as those listed in Table 11.23-6 |
| Impact UTL-4. Exceed permitted solid waste capacity of landfills | Class II<br>UTL-4a: Assess Non-Hazardous Solid Waste Generation and Ensure Adequate ~~Compensation to~~Capacity to Accept Solid Waste at Municipal and Private Solid Waste Facilities | Same as those listed in Table 11.23-6 |

## 12.7    No Project Alternative (Alternative 6)

EIRs are required to include a "No Project Alternative," which must "discuss the existing conditions at the time the notice of preparation is published, …as well as what would be reasonably expected to occur in the foreseeable future if the project were not approved, based on current plans and consistent with available infrastructure and community services" (State CEQA Guidelines Section 15162.6 (e)(2)). Typically, "[w]hen the project is the revision of an existing land use or regulatory plan, policy or ongoing operation, the 'no project' alternative will be the continuation of the existing plan, policy or operation into the future" (State CEQA Guidelines Section 15126.6(e)(3)(A)).

For this EIR, the No Project Alternative (Alternative 6) assumes that the proposed permanent regulations regarding well stimulation adopted on or before January 1, 2015, will be enforced without amendment, and that the proposed mitigation measures identified for the project in this EIR ~~and the project standards for water recycling, habitat protection, surface water protection, and groundwater protection (see EIR Section 5.5.1)~~ would not be adopted or implemented. In other words, well stimulation treatments would be allowed and would be subject to requirements in DOGGR's proposed permanent regulations or existing requirements imposed by other state and local agencies, but specific measures identified in the EIR to address various impacts would not be implemented.

In addition to an analysis of the No Project Alternative itself, the analysis of Alternative 6 highlights how impacts under the No Project Alternative would differ from impacts under the project. Where no difference is specifically noted, the significance of impacts under the alternative are the same as the impacts under the project.

### 12.7.1    Introduction

The No Project Alternative (Alternative 6) assumes that the permanent regulations adopted on or before January 1, 2015, will be left in place without supplements or amendments and no additional measures to reduce the environmental effects of well stimulation treatments will be adopted.

PRC Section 3161(b)(3)(A), which had been signed into law in a slightly different form at the time the Notice of Preparation was published, states that DOGGR is required to conduct:

> "an environmental impact report (EIR) pursuant to the California Environmental Quality Act (Division 13 (commencing with Section 21000)), to provide the public with detailed information regarding any potential environmental impacts of well stimulation in the state."

The No Project Alternative assumes that this EIR is finalized, because it is required by law. However, because Senate Bill 4 requires an analysis of "well stimulation in the state" as opposed to any specific proposed project, there is no express requirement that DOGGR or other agencies adopt any feasible mitigation measures identified in the EIR for identified significant environmental effects. Therefore, the No Project Alternative assumes a scenario in which this EIR's proposed mitigation measures would not be adopted or implemented. For those activities over which they have jurisdiction, local authorities could and should impose measures that address significant impacts of their own approval actions; however, it is unknown whether and what measures would be imposed. Therefore, to be conservative, the No Project Alternative assumes no additional local measures would be imposed.

## 12.7.2    Analysis of Impacts and Mitigation Measures

For all issue areas analyzed in the EIR, the type of impacts under the No Project Alternative would be similar to those identified, in the absence of mitigation, in the programmatic level analysis in EIR Sections 10.1 through 10.23 for the project and in EIR Sections 11.1 through 11.23 for the existing Wilmington, Inglewood, and Sespe Oil and Gas Fields.

Feasible mitigation measures that would lessen the impacts of the project are available and are identified throughout EIR Chapters 10 and 11. Impacts that were identified for the project as being significant and unmitigable (Class I), less than significant (Class III), no impact (Class IV), or beneficial (Class V) would remain the same under the No Project Alternative.

The key difference between the project and the No Project Alternative is that under the No Project Alternative the mitigation measures identified for significant project impacts would not be implemented. In the absence of mitigation, impacts identified as less than significant with mitigation (Class II) for the project would become significant and unmitigated (Class I).

As shown in Table 12.7.3-1, there would be numerous significant impacts under the No Project Alternative. These include significant and unmitigable impacts (Class I) that would occur under both the project and the No Project Alterative and significant impacts for which mitigation is not adopted under the No Project Alternative (but which would apply to the project). Some impacts may be double counted because they are considered in more than one resource topic (e.g., Transportation and Risk).

## 12.7.3    Impact Summary Table for Alternative 6

Table 12.7.3-1 provides a summary of impacts for the project and specific oil and gas fields for all issue areas under Alternative 6.

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| **AESTHETICS** | | | | |
| Impact AES-1. Substantially adversely affect scenic vistas. | Class III in existing fields; Class I in new areas | Class III | Class III | Class III |
| Impact AES-2. Substantially alter or damage scenic resources. | Class III in existing fields; Class I in new areas | Class III | Class III | Class III |
| Impact AES-3. Substantially degrade the existing visual character or quality of a site and its surroundings. | Class III in existing fields; Class I in new areas | Class III | Class III | Class III |
| Impact AES-4. Create new sources of substantial light and glare. | Class III in existing fields; Class I in new areas | Class III | Class III | Class III |
| **AGRICULTURE AND FORESTRY RESOURCES** | | | | |
| Impact AGF-1. Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use | Class I on or adjacent to Important Farmland | Class IV | Class IV | Class I |
| Impact AGF-2. Conflict with existing zoning for agricultural use or with Williamson Act contracts | Class I on land zoned for agricultural use or enrolled in Williamson Act contracts | Class IV | Class IV | Class I |
| Impact AGF-3. Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production | Class I on land zoned as forestland, timberland, or Timberland Production | Class IV | Class IV | Class IV |
| Impact AGF-4. Result in the loss of forest land or conversion of forest land to non-forest use | Class I on forest land | Class IV | Class I | Class I |
| Impact AGF-5. Directly or indirectly impair the use of agricultural land or forest land | Class I for well stimulation activities on or within 1,500 feet of agricultural or forest land | Class IV | Class I for well stimulation activities on or within 1,500 feet of forest land | Class I |
| **AIR QUALITY** | | | | |
| Impact AQ-1. Conflict with or obstruct implementation of an applicable air quality plan | Class I (Statewide) Class III (in SCAQMD) | Class III | Class III | Class III |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact AQ-2. Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation | Class I | Class I | Class I | Class I |
| Impact AQ-3. Expose sensitive receptors to substantial pollutant concentrations | Class I | Class I | Class I | Class I |
| Impact AQ-4. Create objectionable odors affecting a substantial number of people | Class I | Class I | Class I | Class I |
| **BIOLOGICAL RESOURCES – TERRESTRIAL ENVIRONMENT** | | | | |
| Impact BIOT-1: Substantially reduce the habitat of a fish or wildlife species | Class I or III | Class I or III | Class I or III | Class I or III |
| Impact BIOT-2: Cause a fish or wildlife population to drop below self-sustaining levels | Class I or III | Class I or III | Class I or III | Class I or III |
| Impact BIOT-3: Substantially reduce the number or restrict the range of an endangered, rare, or threatened species | Class I or III | Class I or III | Class I or III | Class I or III |
| Impact BIOT-4: Have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special-status species in local or regional plans, policies, or regulations, or by CDFW or USFWS | Class I or III | Class I or III | Class I or III | Class I or III |
| Impact BIOT-5: Have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations, or by CDFW or USFWS | Class I or III | Class I or III | Class I or III | Class I or III |
| Impact BIOT-6: Have a substantial adverse effect on federally protected wetlands as defined by Section 404, of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means | Class I or III | Class I or III | Class I or III | Class I or III |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-7: Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites | Class I or III | Class III | Class III | Class I or III |
| Impact BIOT-8: Conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance | Class I or III | Class I or III | Class III | Class I or III |
| Impact BIOT-9: Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan | Class I or III | Class I or III | Class I or III | Class I or III |
| Impact BIOT-10: Contribute to global climate change and consequent impacts to biodiversity | Class I | Class I or III | Class I or III | Class I or III |
| **BIOLOGICAL RESOURCES – COASTAL AND MARINE ENVIRONMENT** | | | | |
| Impact BIOCM-1. Substantially affect rare, threatened, or endangered coastal/marine species or their habitat | Class III | Class III | N/A | N/A |
| Impact: BIOCM-2. Interfere with migration or movement of coastal/marine fish or wildlife | Class III | Class III | N/A | N/A |
| Impact BIOCM-3. Result in substantial loss or alteration of coastal/marine habitat | Class III | Class III | N/A | N/A |
| Impact BIOCM-4. Substantially disrupt or affect local coastal/marine biological communities or habitats | Class III | Class III | N/A | N/A |
| **COASTAL PROCESSES AND MARINE WATER QUALITY** | | | N/A | N/A |
| Impact CPMWQ-1. Change marine water chemical composition with respect to known hazardous substances; or the measured water temperature, salinity, conductivity, or turbidity | Class I | Class I | N/A | N/A |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CPMWQ-2. Change the velocity or direction of ocean currents | Class I | Class I | N/A | N/A |
| Impact CPMWQ-3. Change the velocity or direction of coastal and ocean winds | Class III | Class III | N/A | N/A |
| Impact CPMWQ-4. Change the direction, size, or period of ocean waves | Class IV | Class IV | N/A | N/A |
| Impact CPMWQ-5. Increase the risk of a tsunami | Class III | Class III | N/A | N/A |
| **COMMERCIAL AND RECREATIONAL FISHING** | | | | |
| Impact CRF-1. Cause long-term exclusion of important commercial and recreational fishing areas | Class III | Class III | N/A | N/A |
| Impact CRF-2. Result in substantial economic losses to local commercial and recreational fishing industries | Class III | Class III | N/A | N/A |
| **CULTURAL RESOURCES** | | | | |
| Impact CUL-1. Affect historic-era archaeological and built-environment resources | Class I if historic or built-environment resources are present<br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present | Class I if historic or built-environment resources are present;<br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present | Class I if historic or built-environment resources are present;<br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present | Class I if historic or built-environment resources are present;<br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present |
| Impact CUL-2. Affect prehistoric resources | Class I if prehistoric resources are present<br>Class III or Class IV if prehistoric resources are not considered significant or are not present | Class I if prehistoric resources are present;<br>Class III or Class IV if prehistoric resources are not considered significant or are not present | Class I if prehistoric resources are present;<br>Class III or Class IV if prehistoric resources are not considered significant or are not present | Class I if prehistoric resources are present;<br>Class III or Class IV if prehistoric resources are not considered significant or are not present |
| Impact CUL-3. Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony. | Class I if human remains or cultural items are present<br>Class III or Class IV if cultural items are not considered significant or are not present<br>Class IV if human remains are not present | Class I if human remains or cultural items are present;<br>Class III or Class IV if cultural items are not considered significant or are not present<br>Class IV if human remains are not present | Class I if human remains or cultural items are present;<br>Class III or Class IV if cultural items are not considered significant or are not present<br>Class IV if human remains are not present | Class I if human remains or cultural items are present;<br>Class III or Class IV if cultural items are not considered significant or are not present<br>Class IV if human remains are not present |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CUL-4. Affect cultural landscapes. | Class I if cultural landscapes are present Class III or Class IV if cultural landscapes are not considered significant or are not present | Class I if cultural landscapes are present; Class III or Class IV if cultural landscapes are not considered significant or are not present | Class I if cultural landscapes are present; Class III or Class IV if cultural landscapes are not considered significant or are not present | Class I if cultural landscapes are present; Class III or Class IV if cultural landscapes are not considered significant or are not present |
| **PALEONTOLOGICAL RESOURCES** | | | | |
| Impact PALEO-1. Well stimulation treatments would destroy or disturb surface or near-surface significant paleontological resources | Class I if fossil bearing geologic units are present | Class I if fossil bearing geologic units are present; Class IV if no fossil bearing units are present | Class I if fossil bearing geologic units are present; Class IV if no fossil bearing units are present | Class I if fossil bearing geologic units are present; Class IV if no fossil bearing units are present |
| **ENVIRONMENTAL JUSTICE** | | | | |
| Impact EJ-1. Significant impacts would disproportionately affect minority or low-income populations | Unknown | Unknown | Unknown | Unknown |
| **GEOLOGY, SOILS AND MINERAL RESOURCES** | | | | |
| Impact GEO-1. Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure | Class I | Class I | Class I | Class I |
| Impact GEO-2. Result in substantial soil erosion or the loss of topsoil | Class I | Class I | Class I | Class I |
| Impact GEO-3. Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse | Class I | Class III | Class III | Class I |
| Impact GEO-4. Be located on expansive soil creating substantial risks to life or property | Class III | Class III | Class III | Class III |
| Impact GEO-5. Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems | Class IV | Class IV | Class IV | Class IV |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact GEO-6. Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan | Class I or III | Class III | Class III | Class III |
| Impact GEO-7. Cause an induced seismic event including ground shaking and ground failure | Class III | Class III | Class III | Class III |
| **GREENHOUSE GAS EMISSIONS** | | | | |
| Impact GHG-1. Generate greenhouse gas emissions that may have a significant impact on the environment | Class I | Class I | Class I | Class I |
| Impact GHG-2. Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases | Class I | Class III | Class I | Class III |
| **HAZARDS AND HAZARDOUS MATERIALS** | | | | |
| Impact HAZ-1. Release Hhazardous materials ~~associated with well stimulation fluids could be released~~ into the environment from a spill or leak | Class I | Class I | Class I | Class I |
| **GROUNDWATER RESOURCES** | | | | |
| Impact GW-1. Cause or contribute to overdraft conditions | Class I | Class I | Class I | Class III |
| Impact GW-2. Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water | Class I | Class I | Class I | Class III |
| Impact GW-3. Adversely impact groundwater quality through surface spills or leaks during well stimulation | Class I | Class I | Class I | Class I |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact GW-4. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals | Class I | Class I | Class I | Class I |
| Impact GW-5. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells | Class I | Class I | Class I | Class I |
| Impact GW-6. Improper disposal of flowback in injection wells could potentially impact groundwater quality | Class I | Class I | Class I | Class I |
| Impact GW-7: Inability to identify specific impacts to groundwater quality from well stimulation activities | Class I | Class I | Class I | Class I |
| **SURFACE WATER RESOURCES** | | | | |
| Impact SWR-1. Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality. | Class I | Class I | Class I | Class I |
| Impact SWR-2. Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site. | Class I | Class I | Class I | Class I |
| Impact SWR-3. Substantially diminish surface water quantity. | Class I | Class I | Class I | Class I |
| Impact SWR-4. Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding. | Class I | Class I | Class I | Class I |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| **LAND USE AND PLANNING** | | | | |
| Impact LU-1. Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses. | Class I | Class I | Class I | Class III |
| Impact LU-2. Physically divide an established community. | Class III | Class IV | Class IV | Class IV |
| Impact LU-3. Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. | Class I | Class I | Class I | Class I |
| **NOISE AND VIBRATION** | | | | |
| Impact NOI-1. Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels | Class I | Class I | Class I | Class I |
| Impact NOI-2. Cause exposure of persons to or generation of excessive groundborne vibration | Class III | Class III | Class III | Class III |
| **POPULATION AND HOUSING** | | | | |
| Impact POP-1. Induce substantial population growth | Class III | Class III | Class III | Class III |
| Impact POP-2. Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere | Class I | Class IV | Class III | Class III |
| **PUBLIC SERVICES** | | | | |
| Impact PUB-1. Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools | Class I for Increased Need for Fire or Police Services Due to Project Activities  Class III for Increased Need for Public Services Due to Population Growth | Class I | Class I | Class I |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **RECREATION** | | | | |
| Impact REC-1. ~~Well stimulation treatment activities would increase the usage of recreation areas or facilities which would r~~Result in the physical deterioration of recreational resources | Class III | Class III | Class III | Class III |
| Impact REC-2. ~~Well stimulation treatment activities would c~~Cause disruptions in designated recreation areas | Class I | Class I | Class I | Class III |
| **RISK OF UPSET / PUBLIC AND WORKER SAFETY** | | | | |
| Impact RSK-1. Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases | Class I | Class I | Class I | Class I |
| Impact RSK-2. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental release hazardous materials due to a hose leak or connection leak while pumping well stimulation treatment fluids | Class I | Class I | Class I | Class I |
| Impact RSK-3. Substantially increase the potential for major oil spills due to ship groundings and collisions | Class III | Class III | Class III | Class III |
| Impact RSK-4. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental pressure changes during flowback activity caused by blocked pump discharge, sudden change in downhole condition, or human error | Class I | Class I | Class I | Class I |
| Impact RSK-5. Generate risks to public safety by causing a flammable atmosphere in the flowback tank | Class I | Class I | Class I | Class I |
| Impact RSK-6. Substantially increase risks to public safety by exposing the public to accidental crude oil or produced gas releases from pipelines | Class I | Class I | Class I | Class I |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact RSK-7. Expose workers and public to hazardous levels of airborne silica during the use of proppant | Class I | Class I | Class I | Class I |
| **TRANSPORTATION AND TRAFFIC** | | | | |
| Impact TR-1. Generate additional truck traffic and disrupt traffic operations | Class I outside of existing fields in Study Regions 1-5 where 10 or more wells are drilled by a single applicant within 1 square mile<br>Class III in existing fields and Study Region 6 | Class III | Class III | Class III |
| Impact TR-2. Inadvertently damage road rights-of-way | Class I (as above for TR-1)<br>Class III (as above for TR-1) | Class III | Class III | Class I in City of Fillmore |
| Impact TR-3. Cause traffic safety hazards for vehicles, bicyclists, and pedestrians | Class I (as above for TR-1)<br>Class III (as above for TR-1) | Class III | Class III | Class III |
| Impact TR-4. Transport hazardous materials | Class I | Class I | Class I | Class I |
| Impact TR-5. Change air traffic patterns | Class IV if no airports nearby | Class III | Class III | Class IV |
| Impact TR-6. Temporarily interfere with emergency response | Class I (as above for TR-1)<br>Class III (as above for TR-1) | Class III | Class III | Class III |
| **UTILITIES AND SERVICE SYSTEMS** | | | | |
| Impact UTL-1. Adversely affect utilities and service systems due to population growth from project-related development | Class III | Class III | Class III | Class III |
| Impact UTL-2. Require new or expanded electrical or natural gas infrastructure | Class III | Class III | Class III | Class III |
| Impact UTL-3. Exceed existing municipal wastewater treatment provider capacities | Class I | Class I | Class I | Class I |
| Impact UTL-4. Exceed permitted solid waste capacity of landfills | Class I | Class I | Class I | Class I |

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) described as **DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION (VOL. 1 OF 4)** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: *See* Attached Service List.

☒      BY ELECTRONIC MAIL TRANSMISSION WITH ATTACHMENT: On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

☒      [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/Josie Cisneros*

_____
Josie Cisneros

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>        tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS<br>ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>        jfrankel@environmentaldefensecenter.org<br>        trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/<br>DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal<br><br>Tel.:    (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (310) 620-5879<br>Email: djmoore@paulhastings.com<br>        benjaminhanelin@paulhastings.com<br>        natalierogers@paulhastings.com |
| Trevor D. Large, Esq.<br>FAUVER, LARGE, ARCHBALD & SPRAY LLP<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (805) 966-7000<br>Email: TLarge@FLASllp.com |