# EXHIBIT BB

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Petitioners and Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al., <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., et al., <br><br> Real Parties in Interest. | Case No. 25CV02244 <br> [Coordinated with Case No. 25CV02247] <br><br> Assigned for all purposes to: <br> Hon. Donna D. Geck <br><br> **DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION (VOL. 2 OF 4)** <br><br> [*Filed concurrently with Opposition to Preliminary Injunction; Declarations of Steve Rusch, Michael A. Mische, Brien Vierra, and Michael Rosenfeld*] <br><br> Date:         July 18, 2025 <br> Time:        10:00 AM <br> Dept.:        4 <br><br> Complaint Filed:        April 15, 2025 <br> Trial Date:                None Set |

1

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

# VOLUME 2 OF 4 (EXHIBIT B)

# TO DECLARATION OF BART LEININGER

# Exhibit B

# FINAL
# ENVIRONMENTAL IMPACT REPORT
# ENVIRONMENTAL IMPACT STATEMENT



# PROPOSED CELERON / ALL AMERICAN AND GETTY PIPELINE PROJECTS

## CALIFORNIA STATE LANDS COMMISSION
### AND
## BUREAU OF LAND MANAGEMENT
## DEPARTMENT OF THE INTERIOR

State Clearing House No. 83110902
Contract No. R-8353



## ERT

A COMSAT COMPANY
ENVIRONMENTAL RESEARCH & TECHNOLOGY, INC.
ANCHORAGE · CHICAGO · CONCORD, MA · FORT COLLINS, CO
HOUSTON · LOS ANGELES · PITTSBURGH · WASHINGTON, DC

# JANUARY 1985

## COVER SHEET

### CELERON/ALL AMERICAN AND GETTY PIPELINE PROJECT

() DRAFT                                                (X) FINAL

Joint Review Panel

California State Lands Commission
Sacramento, CA   (CEQA Lead)

U.S. Department of the Interior
Bureau of Land Management (NEPA Lead)
California Desert District, Riverside, CA

Santa Barbara County
Resource Management Department
Santa Barbara, CA

Cooperating Agencies

U.S. Department of Agriculture
Forest Service

U.S. Department of the Interior
Fish and Wildlife Service

U.S. Department of Transportation
Federal Highway Administration

California Secretary of Environmental
Affairs
Sacramento, CA

EIS Contact
Comments on this EIR/EIS should be directed to:
    Mary Griggs
    State Lands Commission
    1807 - 13th Street
    Sacramento, California  95814
    (916) 322-0354

Dates EIR/EIS Made Available to the Public
Draft:  August 1, 1984
Final:   January 9, 1985

## ABSTRACT

The Celeron and All American Pipeline Companies propose to construct a 1,200-mile pipeline that would transport Outer Continental Shelf and other locally produced crude oils from the Santa Barbara and Santa Maria Basins through Emidio station, CA, to McCamey, TX.  The 122-mile Celeron segment would extend from Las Flores, CA to Emidio, CA and the 1,084-mile All American segment would extend from Emidio, CA to McCamey, TX; both would transport heated crude oil.  Getty Trading and Transportation Company (Getty) proposes to construct a 113-mile buried pipeline that would transport heated crude oil from Getty's existing

marine terminal facility at Gaviota, CA, to Emidio station, CA. The Celeron/All American pipeline proposal and the Getty pipeline proposal are not dependent upon each other. Both projects could be approved or either project could be approved independently of the other.

The Celeron/All American and Getty Pipeline Projects Environmental Impact Report/Environmental Impact Statement (EIR/EIS) addresses both applications to construct pipelines from the Santa Barbara coast to Emidio in Kern County. The EIR/EIS also addresses Celeron/All American's application for a pipeline from Emidio to McCamey, Texas.

The EIR/EIS analyzes the environmental effects of the proposed pipelines; pump, heating, and delivery stations; and a tank farm through construction, operation, maintenance, and abandonment. This report analyzes the impacts of the Celeron/All American and Getty Proposals and four routing alternatives that have been identified. These are the Santa Maria Canyon, Desert Plan Utility Corridor, Brenda, and McCamey to Freeport Alternatives. The Santa Maria Canyon Alternative crosses a portion of the Los Padres National Forest in Santa Barbara County; the Desert Plan Alternative is in the Mojave Desert in eastern California; the Brenda Alternative is in western Arizona near the Kofa National Wildlife Refuge; and the McCamey to Freeport Alternative extends from West Texas to the Gulf Coast. These alternatives were identified to provide optional locations for the pipelines in sensitive areas. The No Project Alternative is also analyzed.

The EIR/EIS has been prepared according to the requirements of the National Environmental Policy Act of 1969 (NEPA), the Council of Environmental Quality's regulations for implementing NEPA, effective July 30, 1979, and the California Environmental Quality Act (CEQA) as amended. Based on the issues and concerns identified during the scoping process, the EIR/EIS focuses on the impacts to river crossings, access, hydrology, restoration, employment, and oil spills.

# 4.0 APPENDICES

## APPENDIX 4.1

### MITIGATION MEASURES, AGENCY STIPULATIONS, AND RECOMMENDED MITIGATION MEASURES

#### 4.1.1  Mitigation Measures

The following mitigation measures have been developed to mitigate the significant impacts that were identified in Chapter 4 of the Draft EIR/EIS.  Since the draft, mitigation measures have modified based on agency and public comments; however, the numbering system used in the draft has been retained.  Where impacts were deemed to be not significant, no mitigation measures were developed.  The measures contained in this section have been committed to by the California State Lands Commission, BLM, Forest Service, and Santa Barbara County, and these agencies will be responsible for their enforcement.  Thus, the mitigation measures will not be just suggestions but will be specific requirements of both Getty and Celeron/All American as part of their ROW grants or permits.  As noted in several of the following measures, the federal authorized officer will direct the detailed implementation of certain measures.

In addition to the mitigation measures contained in this EIS, the BLM will attach standard and special ROW stipulations to its ROW grant (see Section 4.1.2).  These stipulations will contain generic measures that are applied to all ROWs as well as site-specific measures whose need may be identified at the time the pipeline centerline is surveyed. The required surveys for cultural resources and protected animals, for example, will likely identify the need for site-specific stipulations.

Federal agencies (BLM, Forest Service, FWS, and Department of Defense) can consider impacts on Federal and private land.  Reasonable mitigation measures can be enforced on Federal land, but authority is limited on private land.  The California State Lands Commission in its role as CEQA lead agency has identified Recommended Mitigation Measures in Section 4.1.3 of this document which reduce significant impacts.  At the time that the Commission certifies the document it will determine the appropriate public agency responsible for implementation of such measures pursuant to the California Environmental Quality Act, Section 15091.  The California State Lands Commission has no direct enforcement authority other than on state-owned lands; however, it can require certain measures as a condition of the permit it will issue and rely on other state agencies, such as the Department of Fish and Game, to enforce these conditions.  Mitigation measures and stipulations contained in the conditional use permit issued by Santa Barbara and other Counties will be required and enforceable on private land as well as public land.

4.1.1.1  Air Quality  (none required)

4.1.1.2  Geology

Measure 1:   Appropriately detailed geologic, seismologic, and geotechnical studies will be conducted to identify and characterize geologic hazards and to provide information for design of earthwork and foundations along the pipeline route and at pump and heater stations, tank farms, and delivery stations.

For much of the pipeline alignment, a reconnaissance-level geologic study will be sufficient to identify those areas, if any, requiring more detailed investigation.   The scope of the reconnaissance-level study will vary with the degree of potential geologic hazards identified in Sections 4.2.2, 4.3.2, 4.4.2, 4.5.2, and 4.6.2 of the DEIR/EIS.   For those portions of the proposed alignment adjacent to an existing pipeline, a review of maintenance problems or structural failures related to ground conditions may be sufficient.   If necessary, this review should be supplemented by examination of aerial photographs or aerial reconnaissance.   For new portions of the routes, the reconnaissance studies should include literature review and interpretation of stereo aerial photos, if available.   Aerial reconnaissance could be substituted where photos are unavailable.

Specific geologic hazard areas identified during the reconnaissance studies may require further investigation.   This may involve aerial reconnaissance, ground reconnaissance/mapping, and/or some subsurface exploration (drilling, text pits).   At pump and heater stations, tank farms, and delivery stations, a program of standard geotechnical exploration and design will be performed.

Effectiveness:   Such studies are standard for major civil structures and will identify with an acceptable degree of completeness existing signficant geologic and seismologic hazards such as landslides, subsidence scarps and fissures, karstic sinkholes, Holocene faults, and areas susceptible to liquefaction.   Special attention to further evaluating potential for damaging movement on the Quaternary faults listed on Tables 3-3 and 3-5 in the DEIS/EIR, particularly the South Cuyama and White Wolf Faults, will result in appropriate treatment of these crossings, if required (see Measure 3).   Areas with moderate to high potential for future development of geologic hazards will be identified.

Application:   This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Measure 1-A:  Geologic hazards identified and characterized as a result of Measure 1 will be dealt with by specific mitigation which may involve avoidance by re-routing, remedial earthwork, or special structural or foundation design.   In some cases, a program of surveillance and/or monitoring will be established to verify adequate performance (e.g., at a crossing of an inactive landslide), or warn of developing hazards (e.g., in proximity to an active karst feature or a slope judged susceptible to failure during an extremely wet year).

4-2

Recommendations and design criteria for earthwork and foundations will be developed by pump and heater stations, tank farms, delivery stations, and selected pipeline segments (e.g., fault crossings, major river crossings, etc.).

Effectiveness: These mitigation measures are standard and are very effective, being based on adequate investigations as specified in Measure 1. The particular measure selected to accommodate a geologic hazard or geotechnical condition will be site and problem specific, further enchancing the effectiveness of the measure.

Application: This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Measure 2: Appropriate ground motion parameters will be developed for use in seismic design of critical structures and equipment, including pumps, valves, piping, communications systems, and instrumentation. Use of the dual contingency level/operating level earthquake concept, or equivalent, is recommended.

The development of seismic design parameters will involve the following elements:

- selection and characterization of significant potential seismic sources (active faults, unassociated earthquakes, etc.), including evaluation of the magnitude of contingency and operating level earthquakes.

- estimation of attenuated ground motions at sites from each potential source.

- assessment of the likelihood of experiencing the design earthquakes and resulting site ground motions (at least in terms of defining the contingency and operating level earthquakes).

The estimated site ground motions will then be used in structural design of critical elements (see Section 4.2.14 in the DEIR/EIS).

Effectiveness: Appropriate seismic design, especially for the Las Flores to Blythe portion of the route, will minimize the potential for serious damage leading to oil spillage as a result of strong ground shaking. Earthquake-resistant design is sufficiently advanced so that this measure should prove very effective.

Application: This measure will be applied to the Celeron/All American and Getty facilities and all alternatives within California. Studies to determine the need for such measures along the remainder of the route will be conducted as part of Measure 1.

Measure 3:  Special geologic/seismologic studies will be conducted to characterize potential surface offset at the South Branch Santa Ynez, San Andreas, and Garlock faults, and appropriate crossings will be designed.  Similar studies will be conducted for any other faults that show evidence of Holocene offset (within approximately the last 11,000 years) at the pipeline crossing.

Effectiveness:  Adequate historical and geologic data exist to characterize an appropriate design fault offset event for the San Andreas Fault.  Some field study may be necessary to delineate the limits of the zone across which movement could occur.  Historical data are less abundant for the South Branch Santa Ynez and Garlock faults, but geologic data and comparison to other similar known active faults provide a basis for developing design events.  Again, some field study may be required.  Having selected an appropriate offset, design techniques are available to minimize the potential for pipe rupture and/or to minimize the amount of oil spillage if a rupture occurs. These include:

- Pipe burial in V-shaped ditch with loose backfill.

- Use of extra-strength steel pipe.

- Placement of block valves on either side of fault in conjunction with seismic detection.

- Construction of earth dike to contain spillage; use of earthen or synthetic liner in holding basin.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and alternatives at crossings of Holocene faults.

### 4.1.1.3  Soils  (none required)

### 4.1.1.4  Surface Water

Measure 4:  During pipeline construction at stream crossings, construction contractors will minimize time of disturbance and area disturbed, stabilize disturbed areas promptly, and divert runoff waters into settlement areas prior to discharge into a watercourse.  Where construction activities are necessary in the channel, particularly La Brea Creek, the channel will be disturbed as little as possible and for as short a time as possible.

Effectiveness:  An increase in sediment loadings during construction of stream crossings is unavoidable.  Application of this measure will minimize the impact of construction at stream crossings.

Application:  The measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

<u>Measure 5</u>:  Pipeline operators will check the pipeline burial depth yearly at major crossings identified in this report.  At crossings where channel degradation has reduced the depth of fill to less than the 100-year scour depth, reburial of the pipeline to the proper depth will be required.

<u>Effectiveness</u>:  The burial depth of 4 ft below the scour of the 100-year, 24-hour storm runoff event is required by DOT regulations. This requirement minimizes the chances of possible pipeline breaks during large runoff events.  Some of the major streams crossed by the pipeline have been disturbed and the channels are degrading in the vicinity of the pipeline crossing.  Maintaining deep enough pipeline burial is important to minimizing the risk of an oil spill.

<u>Application</u>:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

### 4.1.1.5  <u>Groundwater</u>

<u>Measure 6</u>:  Detailed hydrogeologic investigations will be conducted for each sensitive area along the alignment as indicated in Table 3-14. These investigations will include definition of groundwater depth, recharge sources, properties of overlying soils, hydraulic gradient, background water quality, and existing water uses.  Existing wells will be inventoried in an area extending hydrogeologically down gradient from the pipeline for 2 miles or for a distance downgradient in the aquifer equal to the distance groundwater would move in one-year at a velocity (V) calculated from the maximum hydraulic conductivity (K) of the specific aquifer, hydraulic gradient (i), and porosity ($\Phi$).  The formula for this calculation is $V = \frac{Ki}{\Phi}$.  For example, if K = 1000 ft/day, i = 25 ft/mile, and $\Phi$ = 25 percent, then V = 19 ft/day or 1.3 miles per year.  This information will be used to formulate an Oil Spill Contingency Plan that will include plans for monitoring and early detection of groundwater contamination, notification of affected groundwater users and appropriate governmental agencies, site-specific cleanup and response, and identification of emergency alternate water supplies.

<u>Effectiveness</u>:  These hydrogeologic investigations and contingency plans will make appropriate information available in sensitive areas to allow for early detection and response to spills or leaks rather than attempting to get this information after a spill has occurred.  This is particularly important in populated areas where groundwater is extensively used for municipal or domestic supplies.

<u>Application</u>:  This measure will be applied to sensitive groundwater basins along the Celeron/All American and Getty proposals and all alternatives.

<u>Measure 7</u>:  Low permeability backfill will be used in the bottom and sides of 20-ft sections of pipeline trench where the ROW approaches sensitive aquifers that are at risk from oil spills and leaks.  This measure will be implemented at each side of selected sensitive areas

where the ROW follows topographic slopes toward basins with shallow depth to water, high vertical permeabilities, and a high degree of groundwater use as indicated by hydrogeologic investigations performed in Measure 6 above.

Effectiveness:  This method of trench backfill will force leaking oil to the surface rather than permitting lateral or downward seepage along the trench downslope toward alluvial aquifers.  This will facilitate early leak detection and simplify cleanup procedures.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

### 4.1.1.6  Aquatic Biology

Measure 8:  Fueling and lubrication of construction equipment will not occur within 0.25 miles of streams.  No more than 2 barrels of fuel (about 84 gallons) should be kept at construction sites within 0.5 mile of sensitive streams (Table 4-6).  Equipment will be periodically checked for leakage to avoid spills.  If a spill does occur, it should be reported to the Authorized Officer immediately.

Effectiveness:  Refueling away from streams and periodic maintenance should reduce the risk of construction-related spills.

Application:  The measure would be applied to the Celeron/All American and Getty proposals and all alternatives.

### 4.1.1.7  Terrestrial Biology

Measure 9:  Development will avoid, to the maximum extent possible, disturbance to sensitive and valuable plant communities including riparian areas, oak woodlands, Coulter pine, live oaks, Joshua tree woodlands, desert dunes, and ironwood washes.  Locations to be avoided will be determined by the land owner, land manager, or applicable regulatory agency.  The construction ROW will be reduced to 50-ft wide in these sensitive communities.  The land owner, land manager, or regulatory agency may reduce the construction ROW in specific locations to minimize impacts to other sensitive plant or wildlife communities. Staging areas will not be located in sensitive communities.

Effectiveness:  Avoiding and minimizing disturbance to sensitive areas and unique plant communities will minimize loss of vegetation and wildlife habitat by 50 percent.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Mitigation Measure 9-A:  Clearing of vegetation and wildlife habitat in riparian and oak woodland communities (in the Las Padres National Forest) will be minimized by:

- Using the existing La Brea Canyon Road to the greatest extent practical to minimize clearing,

- Limiting the maximum construction ROW to 50 feet for <u>both</u> pipelines,

- Not cutting trees greater than 6 inches dbh (diameter at breast height) without prior authorization by the Forest Service.

- Including native riparian zone species for revegetation to encourage regeneration and restoration of wildlife habitat.

<u>Effectiveness</u>: Avoidance of large trees and construction of both pipelines in one 50-foot ROW will minimize loss of vegetation and wildlife habitat by at least 50 percent. Some clearing of riparian habitat will still occur and disturbance during construction will discourage use of the area by wildlife.

<u>Application</u>: This measure will be applied to the Celeron/All American and Getty proposals and all alternatives across the Los Padres National Forest.

<u>Measure 10</u>: During construction in creosote scrub and alkali scrub areas of the desert, ROW clearing will be limited to trimming or crushing whenever possible. The new ROW will be located immediately adjacent to existing disturbance, especially roads.

<u>Effectiveness</u>: This measure will limit the amount of shrub vegetation disturbed and reduce erosion. By not disturbing the root system, many crushed or clipped shrubs will resprout and revegetate the ROW more quickly. This will reduce soil erosion and speed re-establishment of wildlife habitat.

<u>Application</u>: This measure will be applied to the desert portions of the Celeron/All American proposal, the Desert Plan, and Brenda Alternatives.

<u>Measure 11</u>: During construction in desert areas, some of the cleared or clipped vegetation will be piled in small thickets off the ROW (where acceptable to the landowner or land manager) to provide cover for displaced animals.

<u>Effectiveness</u>: Providing cover for displaced small mammals and reptiles, especially small desert tortoise, will decrease heat stress and minimize exposure to predators.

<u>Application</u>: This measure will be applied to the desert portions of the Celeron/All American proposal, the Desert Plan, and Brenda Alternatives.

Measure 12:   Vehicle operation off the ROW by construction workers will be prohibited except where specified by the landowner or land management agency.

Effectiveness:   Limiting vehicle use off the ROW will minimize the risk of impacting livestock, wildlife habitat, small mammals, reptiles, and important or sensitive vegetation in surrounding habitats.  This will be especially important in desert dune areas and in desert bighorn sheep range.

Application:   This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Measure 13:   During construction the open pipeline trench will be limited to 0.5 mile in desert bighorn sheep areas or areas where the pipeline could limit wildlife access to water, such as in La Brea Canyon in California, and Hot Springs Creek in Arizona.  Skip sections or temporary bridges across the pipeline trench will also be used if more than 0.5 mile of trench must remain open for an extended period. Backfilling of the trench, especially at skip sections, will be a gentle grade to allow escape of animals from the trench.

Effectiveness:   This will minimize impacts caused by water stress and disruption of movement patterns.  Not all animals are accustomed to crossing skip sections, however it will provide an opportunity for wildlife (like deer and coyotes) accustomed to human presence to cross the pipeline trench.

Application:   This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Measure 14:   A competent wildlife biologist will survey all potential raptor nesting habitat within 0.5 mile of the pipeline prior to construction.  Active and inactive nests will be identified.  No construction will occur within 0.5 mile of active eyries during the nesting season (generally between March 15 to July 15, site-specific timing constraints may vary based on biologist recommendations). Construction will be permitted near inactive nests; however, no nest sites will be disturbed.  Potential perch sites cleaned by ridge-top construction will also be identified by the Applicants.  Where deemed necessary by local California Fish and Game biologists, raptor perch or roost trees will be avoided and/or artificial roosts will be constructed on ridgelines to mitigate losses of such trees resulting from clearing the ROW on ridgetops.

Effectiveness:   This measure will prevent nest abandonment resulting from pipeline construction and minimize loss of perch sites. It will also help provide flexibility for construction scheduling.

Application:   This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

4-8

Measure 15:   Blunt-nosed leopard lizard and San Joaquin kit fox habitat in the Cuyama and San Joaquin Valleys will be evaluated.  Where suitable habitat occurs, attempts to relocate the pipeline (primarily to agricultural lands) will be considered.  In habitat that must be affected, the construction disturbance on the ROW will be limited to 50 ft or less.  If kit fox dens are found in the ROW, the pipeline ROW will be altered 100 feet to miss dens.  Revegetation plans will include measures to encourage re-establishment of suitable habitat.  In addition, all measures included in Appendix 4.2 will apply to the Celeron route in T11N, R24W, Sections 18, 7, 8 and 9 (about 3.2 miles for blunt-nosed leopard lizard habitat); T10N, R24W, Sections 9, 4, 3, and 34, and T11N, R24W, Sections 27, 26, 23, 24, 13, 18, 7, 8, and 9 (about 10 miles for San Joaquin kit fox habitat).

Along the Getty route, the measures will apply from Milepost 94 to 103 for San Joaquin kit fox habitat, and from milepost 100 to 103 for blunt-nosed leopard lizard habitat.

Effectiveness:   Avoiding leopard lizard and kit fox habitat will be the most effective measure of ensuring that these animals are not affected.  Where construction must occur in their habitat, some lizards will still be impacted by vehicles and trenching equipment; however, the population may be able to survive the loss of a few individuals if the habitat is restored and land use practices on the ROW do not change.  Avoiding kit fox dens will minimize significant impacts to kit fox; however, kit fox will still be displaced to other areas as a result of construction and operation activities.  Minimizing the construction ROW width will minimize loss of blunt-noise leopard lizard habitat by 50 percent.  Moving the pipeline to agricultural areas will impact crop lands, resulting in a trade-off of impacts.  Impacts to croplands can be minimized by seasonal restrictions and double trenching techniques.

Application:   This measure would apply to the Celeron/All American and Getty proposals.

## Mitigation Measure 15A:

For California state-listed species, site-specific field inventories should be conducted prior to construction.  This requirement will be consistent with the intent and general provisions of Assembly Bill No. 3309, the California Endangered Species Act which will become effective January 1, 1985.

A qualified biologist will survey the Applicants' 50- and 100-foot ROWs in areas suspected of having threatened and endangered state-listed species.  Potential areas where these species may occur were identified in Appendix B of the DEIR/EIS.  The California Fish and Game Department will be consulted concerning appropriate methods for survey as well as appropriate mitigation measures if these species are found on the ROW.

Effectiveness:   This measure will eliminate significant impacts to state-listed species.

Application: This measure will apply to the Getty and Celeron/All American proposals, the Santa Maria Canyon, and the Desert Plan Alternatives.

Measure 16: All construction across desert tortoise habitat will occur between October and March when tortoises are hibernating. A desert tortoise expert will be present during construction. Any active desert tortoises will be removed from the construction ROW ahead of construction equipment and moved to habitat within 100 yds of the capture site. Burrows within the ROW will be carefully opened using hand tools and hibernating tortoises removed. Injured tortoises will be turned over to the Department of Fish and Game. Adequate funds for costs involved in rehabilitating injured tortoises and returning them to their home sites (within 100 yds of capture site) will be paid by the applicant.

Effectiveness: Injuries and deaths of tortoises will be minimized if construction occurs when tortoises are inactive (i.e., only tortoises hibernating right on the ROW would be impacted). Removal of active tortoises from the construction area will ensure survival of these individuals. Burrows can be successfully constructed with hand tools and plywood (Berry 1984, personal communication).

Application: This measure would apply to the Celeron/All American proposal, the Desert Plan, and Brenda Alternative.

Measure 17: Oil spill booms will be located as near as possible to the man-made wetlands downstream of the Colorado River crossing. In the event of a spill these booms would be used to prevent oil from entering backwater wetlands from the river, or reaching Yuma clapper rail habitat 20 miles downstream.

Effectiveness: Booms have been used effectively for many years in containing oil and directing it to areas for cleanup. Locating booms near the crossing will minimize response time and minimize the possibility of oil reaching sensitive habitats (such as Cibola and Imperial NWR and Yuma clapper rail habitat) downstream.

Application: This measure will be applied to the Celeron/All American proposal.

Measure 18: No construction will be allowed in the Copper Bottom Pass area during January to March (lambing) and May to October (water stress) periods. Barriers to block unauthorized access along the ROW will be erected by the applicant in consultation with BLM. Any effects on bighorn sheep water resources will be mitigated through avoidance or construction of new wells, or collectors.

Effectiveness: This measure will reduce impacts on bighorn sheep in the Dome Rock Mountains, but will not be completely effective because pipeline maintenance and access into this remote area would eventually disturb bighorns.

4-10

Application:  This measure will be applied to the Celeron/All American proposal.


Measure 19:  No pipeline construction in the Kofa NWR will be allowed during bighorn use of the migratory corridors.  Avoidance periods and formal restrictions will be determined by FWS.

Effectiveness:  This measure will not limit existing disturbance because the route through the NWR follows an existing pipeline, transmission line, and access road.  It will eliminate impacts related directly to disturbance of bighorn sheep due to pipeline construction activity.

Application:  This measure will be applied to the Celeron/All American proposal.


Measure 20:  At the Muleshoe Ranch Preserve, construction will occur between August 30 and April 1.  Revegetation will be in accordance with plans determined by the Nature Conservancy, BLM, and Forest Service.  The ROW will utilize the existing El Paso ROW to the extent possible.  Large sycamores in Bass Canyon will not be removed.

Effectiveness:  Seasonal construction restrictions (i.e., no activity during the April to August nesting season) will prevent nest abandonment by nesting raptors resulting from construction activity. Reseeding with native vegetation and minimizing impacts to riparian communities will decrease impacts on wildlife and wildlife habitat.

Application:  This measure will be applied to the Celeron/All American proposal.


Measure 21:  Where the pipeline ROW follows the existing El Paso Natural Gas ROW or other existing ROWs, the old ROW will be used as part of the construction ROW and new disturbance will be limited to the area needed for trenching and stockpiling backfill.

Effectiveness:  Using the existing ROW for construction will minimize the total area cleared, wildlife habitat lost, and area to be revegetated.  Using the existing ROW would significantly minimize the total acres disturbed.

Application:  This measure will be applied to the Celeron/All American proposal.

### 4.1.1.8  Socioeconomics

Measure 22:  The pipeline construction period will be scheduled so as not to coincide with peak tourist seasons.  The areas affected by tourism include:  Santa Barbara County Coastal Area - June thru August; recreation areas in the LPNF - August thru November; Colorado River Crossing area, California - April thru September; Quartzsite, Arizona - November thru April.

Effectiveness:  This action will minimize competition for temporary housing and camping sites between tourists and construction workers.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and the Brenda Alternative.

Measure 23:  Between Barstow and Blythe, and Blythe and Phoenix, workers will be accommodated in areas where housing is available, and transportation to and from the job site will be provided.

Effectiveness:  This measure will centralize the impact on housing demand in areas that have sufficient resources to accommodate the construction work force.

Application:  This measure will be applied to the Celeron/All American proposal, the Desert Plan, and Brenda Alternative.

Measure 24:  Temporary accommodations for construction workers, such as mobile home units equipped with bunkbed and trailers providing kitchen facilities and leisure activities such as television, will be provided at locations where housing is limited (eastern California, and western Arizona).

Effectiveness:  This action will reduce conflicting demands for limited temporary housing between construction workers, tourists, and other travelers.  It will also reduce commuting distances in areas where little or no temporary housing is available near the pipeline corridor.

Application:  This measure will be applied to the Celeron/All American proposal, the Desert Plan, and Brenda Alternatives.

### 4.1.1.9  Land Use and Recreation

Measure 25:  After construction has been completed motorized vehicle access to public lands crossed by the ROW will be restricted on federal lands (as requested by the agency) by gates or other barriers.

Effectiveness:  This measure will enhance revegetation efforts and limit the proliferation of spur roads in sensitive resource areas. Agency regulations limit development of new roads in these areas.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Measure 27:  The All American Pipeline ROW will be moved from the west side to the east side of the dirt road that forms the Palen to McCoy WSA boundary from milepost 260 to milepost 270.

Effectiveness:  This measure would remove the ROW from within the boundary of the WSA and ensure compliance with WSA Interim Management Policy.

Application:  This measure will be applied to the Celeron/All American proposal.

Measure 28:  Within the section from Las Flores to Emidio, the Celeron and Getty Pipelines will be constructed within the same ROW as designated by the Authorized Officer.  This could be accomplished by phasing of construction, and laying one pipe as close as practicable from the ROW edge and then later placing the next pipeline as close as practicable from the other side of the ROW, resulting in a minimum distance between pipe centers.

Effectiveness:  This measure would reduce by one half the amount of disturbance and land use impacts associated with construction of two pipelines.

Application:  This measure would apply to whatever ROW is found to be preferred.

Measure 29:  Important historic areas and structures will be avoided at Patton's Camp ACEC.

Effectiveness:  Impacts to protected areas will be avoided.

Application:  This measure will apply to the Desert Plan Alternative.

4.1.1.10  Transportation  (none required)

4.1.1.11  Cultural Resources

Measure 30:  Mitigation of adverse impacts to cultural resources will occur in the following manner:

Prior to construction an intensive (100%) cultural resource survey will be conducted on all affected Federal land surfaces that have not previously been surveyed.  Survey on non-Federal lands will be conducted as specified by the Authorized Officer after consultaton with the State Historic Preservation Officer (SHPO) in all states.  During the survey, information will be gathered on all newly discovered and previously recorded archaeological sites to determine their potential eligibility to the National Register of Historic Places.  Limited testing of some sites may be necessary in order to determine their eligibility.  Sites located on non-Federal lands in California will be evaluated using criteria defined in CEQA Appendix K.  Following the survey, an inventory report will be prepared and submitted to the Authorized Officer for review and comment.  The report will contain the results of the inventory, and all sites will be evaluated for potential eligibility to the National Register.  Justifications will be given for the rationale. The report will include a proposed mitigation plan for all sites that are considered to be potentially eligible for inclusion on the National Register.  The mitigation plan may include avoidance of sites, data collection, site-specific control of access and construction, monitoring recommendations, and salvage excavation.

Based on the above mitigation plan, the Authorized Officer will submit a treatment plan to the SHPO in each state and to the Advisory Council on Historic Preservation. Following the consultation period, the treatment plan will be implemented. All field work must be completed before construction can begin in a given area. Monitoring will be implemented during construction where required by the treatment plan.

Any sites located during construction or as the result of monitoring will be evaluated and a treatment plan will be developed as needed.

Contact will be maintained with appropriate Native American groups to determine the nature and extent of concerns regarding specific cultural resources. Native Americans will participate in data recovery consistent with federal agency requirements and where appropriate, with tribal policies.

Effectiveness: Cultural resources will be protected wherever prudent and feasible. These actions and Section 106 Consultation will ensure that the effects of the pipeline construction and operation on cultural resources are fully considered as required by law.

Application: This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

### 4.1.1.12 Visual Resources

Measure 31: The Gaviota pump station, Sisquoc pump station, Essex pump station and tank farm, and Tom Mix pump station will be screened with native shrubs and trees and/or naturalized masses of evergreen shrubs and trees as is appropriate for location and climatic conditions.

Effectiveness: The placement of trees and shrubs between the facility and existing sensitive receptors will eliminate the intrusive character of the facility. The FVC for all locations where such screening is proposed is indicated below.

Celeron Segment:

- Gaviota pump station - to screen from US 101 and the Gaviota Store and Restaurant (FVC II).

- Sisquoc pump station at La Brea Canyon - to screen from Foxen Canyon Road and La Brea Canyon Road (FVC II).

All American Segment:

- Twelve-Gauge Lake pump station - to screen from Highway 58 (FVC IV).

- Tom Mix pump station - to screen from US 89 (FVC III).

Desert Plan Alternative:

• Essex pump station and tank farm - to screen from US 66 (FVC IV).

Application: This measure will be applied to the Celeron/All American proposal and Desert Plan Alternative.


Measure 32: In the pipeline segments on the LPNF, the Applicants will utilize a 50-ft wide construction corridor, protect existing large diameter trees, feather the edges of the cleared ROW, and reseed cleared areas as determined by the Authorized Officer.

Effectiveness: The smaller construction corridor will provide selective protection for large trees in forested areas. Feathering the edges of the clearing will soften and partially disguise the visual impact resulting from cutting a path through the trees and brush. The effectiveness of this measure will depend on the pre-project visual condition of the specific site: areas previously characterized as "untouched landscape" (EVC I) or "unnoticed alterations" (EVC II) will be deteriorated to the category of "minor visual disturbance" (FVC III). Areas of existing visual disturbance ranging from minor to drastic can all be restored to "major visual disturbance" (FVC V) by scalloping edges of vegetative clearings.

Application: This measure will be applied to the Celeron/All American and Getty proposals and the Santa Maria Canyon Alternative.


Measure 33: The La Paz heating/pumping station will be moved 1,500 ft to the east behind topographic screening.

Effectiveness: Relocation of the proposed facility will allow for natural topographic screening thereby improving the future visual condition from the "visual disturbance" (FVC IV) to "unnoticed alterations" (FVC II).

Application: This measure will be applied to the Celeron/All American proposal.

### 4.1.1.13 Noise

Because of the short duration of constructed impacts in any one area (2 weeks or less), limiting construction to daytime hours (as described in the Project Description), and the low probability of accomplishing effective mitigation of high noise levels associated with construction activities, mitigation beyond the standard requirements for use of equipment mufflers and similar OSHA requirements is not considered to be warranted.

4-15

<u>Measure 34</u>:   The Gaviota pump station(s) will be shielded from Vista del Mar Union School by a noise barrier, such as a berm or structural enclosure.

<u>Effectiveness</u>:   The barrier will be designed and built to reduce project operation related noise below the 60 dBA significance threshold of the school.

<u>Application</u>:   This measure will apply to any pump station built by Celeron/All American or Getty within 1,500 ft of the Vista del Mar Union School.

4.1.1.14  <u>Oil Spills</u> (none required)

## 4.1.2  Additional Agency Right-of-Way Stipulations

In addition to the mitigation measures presented in Section 4.1.1, various agencies will require stipulations as part of their right-of-way (ROW) grants.  While these stipulations are not designed to mitigate specific significant impacts, they will function to reduce the overall impacts of the project.  Listed below are the stipulations that have been identified by the affected agencies at the time the Final EIR/EIS was published.  Additional stipulations will be developed as the environmental review process progresses, and these will be incorporated into the final ROW grants.

### General

a) Compaction of back-filled material will be required on all refuge lands.  (FWS).

b) Pipe depth will be a minimum of 4 ft below the surface on the Kofa National Wildlife Refuge (NWR) and constructed so that future use of the area by heavy equipment will not require further modification of the landscape.  (FWS).

### Aquatic Biology

a) Staging areas for stream crossing equipment will be located outside of the stream's riparian zone to minimize the amount of sediment entering streams and to reduce disturbance to riparian vegetation.  A maximum construction ROW of 50 ft will be used in riparian areas to reduce disturbance.  (Forest Service, BLM, and FWS).

b) Stream bank and bottom protection measures including rip-rapping, upland storage of excavated riverbed materials, importing clean backfill, natural backfilling, and revegetation will be evaluated by the Authorized Officer and implemented on a case-by-case basis.  These techniques will reduce the construction related sediment load to the stream and minimize alterations of important aquatic habitats. (Forest Service, BLM, and FWS).

c) Construction activities will be timed to avoid spawning periods of important fish species (Appendix B, Table B-2). Construction of stream crossings during low flow will minimize habitat degradation by reducing the amount of suspended solids and turbidity.  Avoidance of critical fish spawning periods will eliminate potential impacts to eggs and juveniles, which are considered the most sensitive life stages.  (Forest Service, BLM, and FWS).

d) As requested by Arizona Game and Fish and enforced by BLM, a check valve will be added to the pipeline on the downstream side of Centennial Wash, Arizona.  The check valve would minimize the effects of a possible oil spill resulting from a flood event.

4-17

### Terrestrial Biology

a)  If possible, no sensitive plants will be removed or affected by the ROW on the Kofa NWR. (FWS).

    Such plants will be fully protected and avoided during construction; sensitive plants will be transplanted only if it is impossible to avoid them. (FWS).

b)  No desert tortoise mortalities will be accepted due to pipeline construction or operation on the Kofa NWR. (FWS).

c)  Surface disturbance will be kept to an absolute minimum on the Kofa NWR. All terrain will be restored to original grade after construction. Unnecessary blading of desert pavement will not be performed. (FWS).

d)  Harrowing or discing will be used along the disturbed areas of the Mojave Desert. Revegetation will not be attempted because of extremely low levels of precipitation. (BLM).

d)  Federal, state, and county laws and regulations pertaining to sensitive vegetation and wildlife (i.e., T&E species, game species) will be posted in conspicuous places at the job site and included in pipeline contractor's contract. (BLM).

### Soils

a)  Construction activities will avoid or minimize disturbances to sensitive soil units as determined by the authorized officer. Sensitive soils are characterized by major potential problems associated with erosion control and revegetation (i.e., steep slopes, slump-prone areas, shallow soils, highly saline-alkaline soils, sand dunes). (BLM and Forest Service).

b)  Construction activities will not occur on fragile soils during periods of high or saturated soils moisture conditions. (BLM and Forest Service).

c)  Vehicle travel routes on the Kofa NWR will be watered down during construction to prevent movement of soil by vehicles, wind, etc. All disturbed areas will be restored to original grade with rocks replaced in a natural-appearing way. Improvements will be made to minimize soil erosion. (FWS).

d)  Construction activities will not occur from March through May in the Mojave Desert in order to minimize wind erosion. (BLM).

### Land Use and Recreation

a)  The disturbed area of the Pacific Crest National Scenic Trail will be reconstructed following construction and rehabilitation of the pipeline ROW. (BLM).

4-18

## Transportation

The following stipulations will be required within the State of California and will be enforced by Caltrans.

a) Pipelines parallel to a highway should be placed, where possible, outside the State highway ROW. Longitudinal encroachments within a freeway ROW are permitted only under special circumstances, primarily where no feasible alternative exists.

b) Transverse lines should preferably cross a highway at right angles.

c) Encroachment permits will be needed wherever the pipelines cross the State highway ROW. At these locations the project Applicants may have to present satisfactory evidence of surveys for archaeologically and botanically sensitive resources.

d) The inside diameter of casings for pipeline crossings should exceed the outside diameter of the pipeline by 4 inches.

e) This project falls in the category of a "high risk" facility (over 6 inches in diameter and over 60 psig operating pressures) and will be governed by Caltrans' "Policy on High and Low Risk Underground Facilities". The Caltrans ROW Utility Department must be notified of all high risk installations.

f) Detailed plans depicting the exact locations of crossings, with permit applications for the anticipated pipeline, should be submitted a minimum of four months ahead of construction. This would allow for field review and approval of site and crossing elevations.

## System Safety and Reliability

a) At the Cadiz tank farm, an automated, foam solution, fire extinguisher system for the seal area of each tank will be installed. The system should provide sufficient foam (about 310 gallons) and water (about 10,000 gallons) to extinguish a seal fire on one tank. (California SLC).

b) At the Cadiz tank farm, a redundant sensor and control system to prevent overfilling of the oil tanks will be installed. Overfilling is a primary contributor to tank fires. (California SLC).

c) At the Cadiz tank farm, a tank roof sensor will be installed on all tanks to detect a jammed roof. (California SLC).

d)  At stations with gas-fired turbines and Waste Heat Recovery Units (WHRU), there will be extended purging of both units with interlocks to prevent starting before purging is complete. At stations without turbines, gas-fired heaters will also have extended purging before starting (i.e. all pump stations with natural gas supply). (California SLC).

e)  Explosions are caused by leaks coupled with an ignition source. Pumps are equipped with seal leak detectors that will stop a unit if a leak is detected. Other leaks will be reduced by checking valve stem packing during regular visits to the site. (California SLC).

f)  Extra pipeline burial depth will be provided in areas where deep plowing or ripping could result in damage to the pipeline. Depth will be at least 1 ft below maximum plow depth in these areas. (California SLC).

g)  In agricultural areas, pipeline location markers will be placed above ground and buried cable or fluorescent plastic, below ground just above the pipeline to mark the pipelines location. (California SLC).

h)  Irrigated agricultural land owners will be periodically contacted and provided information to increase and maintain awareness of the pipeline to reduce the probability of pipeline rupture through plowing, ripping, or excavation. (California, SLC).

i)  In the event of an oil spill onto irrigated agricultural lands, contaminated soil will be replaced and monetary compensation will be made for any lost production. (California SLC).

### 4.1.3  Recommended Mitigation Measures

The following mitigation measures have been suggested to further minimize impacts to rare species and sensitive plant and animal communities.

<u>Recommended Mitigation Measure 1</u>:

The Applicants should prepare site-specific Construction and Use Plans that describe by construction spread:

- specific centerline location;

- specific construction techniques including proposed erosion control measures such as use of water bars, sedimentation ponds, and straw bales;

- disposal plans for excess backfill;

- revegetation techniques including mulching, fertilizing, and seed mixtures.

In sensitive habitats such as riparian areas, oak woodlands, desert washes, and rare species habitat, the Applicants will work with local state Fish and Game and U.S. Fish and Wildlife Service personnel in determining use of measures to minimize impacts on wildlife.

These measures may include but are not limited to:

- development of water sources,

- location of trench skip sections,

- avoidance of raptor nest and perch trees,

- location of ORV signs and barriers

- minimize loss of mature trees,

- prepare seed mixtures that provide food and/or cover for wildlife.

<u>Effectiveness</u>:  Site-specific planning with local agencies interested in protecting wildlife resources (primarily sensitive habitat) will minimize impacts on the resource and help the Applicants and authorizing officers understand the terms of the ROW grant.

<u>Application</u>:  This measure will apply to the Getty and Celeron/All American proposal and all alternatives.

Recommended Mitigation Measure 2:

No guns or dogs should be allowed on the ROW.

Effectiveness:  Eliminating guns and dogs from the ROW will discourage indiscriminate shooting and harassment of game and nongame wildlife.

Application:  This measure will apply to the Getty and Celeron/ All American proposals and all alternatives.

Recommended Mitigation Measure 3:

The Applicants should provide basic educational materials concerning wildlife laws and regulations as well as the required mitigation measures designed to minimize impacts.

Effectiveness:  Posting laws and regulations and educating field crews on the intent of mitigation measures will at least eliminate the violators's excuse for ignorance of the law or ROW grant provisions.

Application:  This measure will apply to the Getty and Celeron/ All American proposals and all alternatives.

Recommended Mitigation Measure 4:

The Applicants should work with BLM and Arizona Game and Fish biologists in evaluating potential opportunities to minimize impacts to bighorn sheep, such as developing water sources in other parts of their habitat to encourage movement away from disturbed areas, and ORV access points.

Effectiveness:  Although Mitigation Measure 18 requires replacement of affected water resources, developing new water resources away from development may reduce future man/bighorn conflicts especially in areas where ORV use is difficult to control.

Application:  This measure should apply to the All American proposal and the Brenda Alternative.

4-22

APPENDIX 4.2

U.S. Fish and Wildlife Service and National Marine Fisheries Service
Biological Opinion Regarding Federally Protected
Threatened and Endangered Species


and


Recommended Actions and Measures
to Minimize Impacts
(Excerpts from the Biological Assessment)

# Biological Opinion



**United States**
**Department of the Interior**

**Fish and Wildlife Service**
Lloyd 500 Building, Suite 1692
500 N.E. Multnomah Street
Portland, Oregon 97232

In Reply Refer To:           Your Reference:
AFA-SE                       1-RO-84-F-62

November 23, 1984

Memorandum

TO:       State Director, Bureau of Land Management,
          2800 Cottage Way, Sacramento, California 95825

FROM:     Acting Regional Director, Fish and Wildlife Service, Portland, OR
          (AFA-SE)

SUBJECT:  Formal Endangered Species Act Consultation on the Getty and
          Celeron/All American Pipelines (1-RO-84-F-62)


This responds to your August 23, 1984, request which was clarified by your
November 21, 1984 letter for formal consultation pursuant to Section 7(a)
of the Endangered Species Act of 1973, as amended, on the proposed
Celeron/All American and Getty oil pipeline projects.  The Celeron/All
American pipeline would transport oil from Gaviota, California to McCamey,
Texas.  The Getty pipeline would transport oil from Gaviota to Emidio,
California.  The two pipeline projects are independent of each other,
and either one or both could be approved.  Therefore, we will render one
Opinion for both projects.

The Bureau of Land Management (BLM) is the lead Federal agency for
issuing a right-of-way grant across all Federal lands.  Hence, the
Bureau will be the lead agency in the Section 7 formal consultation
process pursuant to Interagency Cooperation Regulations for Section 7
consultation.

Your consultation request was accompanied by The Threatened and
Endangered Species Biological Assessment for the Celeron/All American
and Getty Pipeline Projects prepared for BLM by Environmental Research
and Technology, Inc.  This document identifies the following listed
species that may be affected by the two pipelines:  the endangered blunt-nosed
leopard lizard (Gambelia silus), the endangered Yuma clapper rail (Rallus
longirostris yumanensis), the endangered American peregrine falcon (Falco
peregrinus anatum), the endangered bald eagle (Haliaeetus leucocephalus),
the endangered California condor (Gymnogyps californianus), and the endangered
San Joaquin kit fox (Vulpes macrotis muctica).

The Biological Assessment also discusses impacts to the proposed threatened
Thornber's fishook cactus (Mammiliaria thornberi).

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page two

Based on review of the Biological Assessment and draft EIS, we have determined that the bald eagle will not be affected by the proposed projects. Therefore, the bald eagle will not be discussed further in this Opinion.

The two pipelines are not independent from the expansion of the Getty marine terminal at Gaviota. However, the impacts of the marine terminal expansion and associated increase in oil tanker traffic will not be addressed in this Biological Opinion as stipulated in your November 21, 1984 letter. Since BLM does not have authority for regulating this part of the project. The affect of terminal expansion and increased tanker traffic should be addressed in future consultation with the Corps of Engineers (COE) which is responsible for permitting development in navigable waters. Thus the following species will not be addressed in the Opinion: Salt marsh bird's beak (Cordylanthus maritimus), California least tern (Sterna antillarum (=albifrons) browni), California brown pelican (Pelecanus occidentalis californicus), light footed clapper rail (Rallus longirostris levipes), or souther sea otter (Enhydralutris nereis).

The Biological Assessment, the August 1984 draft Environmental Impact Statement on the subject projects, communications with your staff and consultant, and information in our files provide the basis for this consultation.

Summary of Biological Opinion

Based on our review of the following information, the project's Biological Assessment and draft EIS, and information in our files, it is our Biological Opinion that the proposed Getty and Celeron/All American pipelines are not likely to jeopardize the continued existence of the blunt-nosed leopard lizard, Yuma clapper rail, American peregrine falcon, California condor, or San Joaquin kit fox or result in the destruction or adverse modification of critical habitat. Terms and conditions required to reduce the incidental take of listed species and recommendations to promote the conservation of listed species are given.

Section 7 of the ESA does not require formal consultation on the possible effects of a Federal action on a species that is proposed for listing as endangered or threatened since proposed species are not protected by the ESA of 1973, as amended. For proposed species, you must confer when you determine your actions may jeopardize the continued existence of the species. We stress consideration of proposed species because they may become listed during later planning or construction phases of a project. As such, the determination of jeopardy or non-jeopardy to such species will not be addressed in this biological opinion.

State Director, Bureau of Land Management, Sacramento, CA  1-RO-84-F-62
Page three

Project Descriptions

Both the Getty and Celeron/All American pipelines would transport crude
oil produced in the Outer Continental Shelf and other locally produced
oil from the Santa Barbára and Santa Maria basins.  The projects would
link into existing oil pipeline transportation systems.  The purpose of
both projects is to transport oil to refineries that have the necessary
capability and capacity to refine heavy crude oil.  A complete
description of these projects is given in Appendix B of the Biological
Assessment and in the draft EIS.

Getty Project.  Getty Trading and Transportation Company proposes to
transport up to 400,000 barrels per day of oil in a buried pipeline from
Getty's existing pump station at Emidio, California.  The 20 to 30-inch
pipeline would cover a distance of about 113 miles and include 17 block
and check valves, 2 to 3 pump stations, and a delivery station at
Emidio.  No new roads would be required.  However, several utility taps
would be needed.

The Getty pipeline is part of Getty's proposed Gaviota Consolidated
Coastal Facility.  The two projects have no independent utility.  The
project would include the pipeline, and crude oil storage facilities.  The
purpose is to receive, store and distribute crude oil produced in the
Santa Barbara Channel and Santa Maria Basin.  Oil stored at the facility
could be transported to refineries either by tankers through the marine
terminal or by the Getty pipeline.

Currently, Getty has an existing marine terminal at Gaviota.  The proposal
is to modify the existing facility with a new consolidated facility.  The
project has the following features that are germane to this consultation
(taken from the Biological Assessment):

   --   A phased development of crude oil storage facilities with
        ultimate tank capacities of approximately 2.74 million bbl to
        support the existing marine terminal and the crude oil pipeline
        to the San Joaquin Valley.

   --   A pipeline connection from Gaviota to the San Joaquin Valley
        refinery/transportation network with a crude oil throughput in
        the range of 100,000 to 400,000 BPD.

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page four

Celeron/All American Pipeline.  Celeron/All American proposes to
transport up to 300,000 barrels per day of oil from the Santa Barbara
coast near Gaviota to McCamey, Texas.  An additional alternative may
continue the pipeline to Freeport, Texas.  The 24- to 30-inch buried
pipeline would be about 1,200 miles long and include 78 block and check
valves, 5 pumping stations, 10 pumping and heating stations, 1 heating
station, 3 delivery stations and a 20-acre tank farm at Cadiz,
California.  No new roads would be required, however, utility taps would
be required.

Pipeline Construction.  Construction methods will be similar for both
pipelines.  Construction of the Getty pipeline would require about six
months, while the Celeron/All American pipeline would require about two
years.  A construction right-of-way (ROW) would be 100 feet wide for
either line, except where a smaller ROW is feasible.  Permanent ROW's
would be 20 feet for Getty and 50 feet for Celeron/All American.  Laying
of the pipeline would progress at an average of 1.5 to 2 miles per day
per "spread", slowing to about 0.5 miles per day in rough terrain.  A
"spread" is each construction crew cleaning, digging, placing, and
covering the pipeline.  Getty plans to use 3 spreads, and Celeron/All
American plans to use 6 spreads.

Ditching would be accomplished by mechanical excavation.  In some areas,
blasting will be used.  The ROW will be cleaned up after pipeline
burial.  The most common methods of surface restoration are:  removal of
debris, surface contouring, water control structures, surface
cultivation, mulching, application of soil amendments, and replanting.

Operation and Maintenance of Pipelines.  Operation of the pipeline is
primarily automated.  Maintenance of the pipelines and ROW's would
include observation for construction activities in the ROW's; inspection
and maintenance of cathodic protection systems; inspection of block
valves; inspection of pipeline mile-post and road-crossing markers; and
inspection of crossings at highways, utilities and other pipelines.  An
aerial reconnaissance of the pipeline ROW's would be made at least every
two weeks of the Celeron/All American pipeline, and twice weekly of the
Getty pipeline.

Species Accounts

The Biological Assessment for Threatened and Endangered Species for the
Proposed Celeron/All American and Getty Pipeline projects thoroughly
covers the biology and ecology of the species discussed in this Opinion.
Only minor discrepancies were noted by our staff, and these will be
discussed where needed in the section describing effects of the action.

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page five

Associated Effects of Future Federal Actions.  As previously recognized, there will be direct and indirect impacts to threatened and endangered species in the coastal ecosystems should the marine terminal be expanded. The actual degree of effect is unknown because of the lack of information on the oil spill risks associated with anticipated increase in tanker traffic along the coast.  Any future Section 7 consultation request by the responsible agency permitting an expansion of the terminal will have to provide a risk analysis of increased tanker traffic so that we can adequately assess the impacts.

Blunt-nosed leopard lizard (BNLL).  The Biological Assessment presents a reasonable analysis of project effects on leopard lizards.  The pipeline skirts what we consider to be the southern edge of BNLL range.  The question of hybrid lizards arises in the Cuyama Valley, but has never received sufficient scientific study to resolve specific ranges of pure BNLL and hybrids (or overlaps thereof).

Trenching and other construction activities result in the loss of individual BNLL (including eggs and young) and the rodent burrows in which they seek shelter.  Traffic is likely to cause road kill, but it is difficult, if not impossible, to reduce this factor through any reasonable means.  These impacts are most likely in the Cuyama Valley and from the foothills to the Highway 166 junction near Pentland, California, for an estimated disturbance of 63 - 84 acres of BNLL Habitat (Biological Assessment).

The alignment along Highway 166 is probably the least damaging route alignment for BNLL although it is not uncommon to see leopard lizards at the road edge.

Disturbances from pipeline trenching and backfilling are not the most significant threats to BNLL in the south San Joaquin Valley.  Pipeline projects offer very minimal long term adverse impacts to BNLL. Minimizing the ROW width to 50 feet through BNLL habitats through the Cuyama Valley and near Pentland at elevations below about 2000 feet, as suggested in the Biological Assessment, is a reasonable recommendation that we believe will reduce impacts to BNLL.

Yuma clapper rail (YCR).  Habitat for the Yuma clapper rail occurs in the marshes of the Colorado River and some habitat would be lost due to construction of the river crossing for the pipeline.  These effects would not be significant since there is very little habitat present in that area and the disturbance would not be permanent.

Of far greater potential adverse impact is the possibility of an oil spill into the Colorado River.  The Biological Assessment provides several proposed actions to minimize these impacts, notably contingency plans, storage of booms and other containment devices and changing water

4-29

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page six

flow rates.  The Fish and Wildlife Service (FWS) concurs with these measures to protect the marsh habitat of the rails.  Oil that gets into the river could easily destroy many acres of essential rail nesting areas and may necessitate removal of the vegetation to adequately remove the oil, thus destroying rail habitat for a longer period of time.

American peregrine falcon (APF).  Peregrine falcons could be impacted by the proposed projects by the loss of foraging habitat or by disturbance to nesting falcons.  Peregrine falcons feed almost exclusively on birds that they catch in flight.  Prey species range in size from swifts and hummingbirds to gulls.  Generally they feed on shorebirds, jays, woodpeckers, mourning doves and pigeons.  The territories of hunting peregrine falcons may cover large expanses of landscape.  The hunting territory of a male peregrine tracked during a breeding season in Alaska was determined to be 120 square miles (White 1974).  A female peregrine, which was followed by radio-telemetry during the period when she was feeding small young, frequently ranged within 3.12 miles of her nest, but occasionally traveled as far as 11.5 miles (Enderson et al. 1977).  Since peregrines forage over such a large area, and are capable of obtaining a wide variety of prey, the loss of habitat due to pipeline construction should be minor and primarily temporary.

Although peregrine falcons tend to be fairly tolerant of human activities, prolonged disturbances near nest sites during the critical nesting period from about February 1 through August 1 may lead to a loss of productivity and/or site abandonment.  Photographers, rock climbers, construction, and timber harvest, are examples of disturbances that, if in close proximity to a nest site, can lead to interference with incubation or parental care.  Short-term disturbances such as explosions also may lead to a loss of productivity.  Cade (1960) observed several instances where incubating peregrines were startled and bolted off the nest, kicking eggs out of the scrape in the process.

Currently, peregrines are not nesting at Gaviota Pass.  If, however, they do begin breeding prior to the construction of the pipelines, then disturbances from construction could impact nesting success.

California condor (CC).  Condors could be impacted by the proposed projects due to the temporary loss of foraging habitat, the disturbance of foraging activities during construction, and the disturbance of aircraft flights for ROW surveillance after construction.  Much of the pipeline routes from Gaviota to near Tehachapi are within the condor range.  Hence, condors may fly over the construction sites anywhere within their range.  Flying condors show little fear of humans and will often fly close to investigate a person who may be on top of a ridge or

4-30

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page seven


mountain, or in an open area.  In some places, the pipeline routes are close to flight corridors, especially where these routes cross ridges or foothill grasslands.  Condors fly sometimes at low altitude along the Sierra Madre Mountains where the pipelines may cross.  Another area where condors may fly low over the route is where it crosses the Tejon Ranch critical habitat near Cummings Mountain.  In such situations, condors can be vulnerable to shooting.

The condor requires fairly open grassland habitat for feeding.  This ensures easy takeoff and approach, and makes food finding easier for this species that apparently depends on sight rather than smell for locating its food.  The condor eats only dead animals.  Historically, these probably included deer, elk, pronghorn, whales, sea lions, and smaller mammals.  Because of availability, dead cattle are now the primary food source, but other animals are eaten when present.

The foothills of southwestern Kern County and eastern San Luis Obispo County have been the most important condor foraging area in recent years. Virtually the entire population concentrates in the area during the late summer and fall months, particularly on Hudson and Snedden ranches in the Bitter Creek drainage.  A portion of the population feeds there all year, including 2 or 3 nesting pairs.

Construction of the pipeline from where it leaves the Cuyama Valley floor to where it drops to the San Joaquin Valley floor near Maricopa could render portions of this important condor foraging habitat unusable during the period of construction.   The proposed alignment of the Celeron/All American pipeline follows Highway 166 more closely than the Getty route.  Since the highway is a permanent disturbance, the Celeron/All American should merely introduce more activity in an area where condors are already accustomed to activity.

Since the Getty route crosses foraging habitat that is less frequently disturbed by ongoing activity, its construction could have a greater impact to condors.  In either case, the disturbance due to construction will be relatively short term.

Some information is available on condor response to aircraft.  Wilbur (1978) reported that two condors flushed from a roost tree when a fixed-wing airplane passed within 1,000 feet of them.  Sibley (1969) observed a pair of courting condors on a tree whose activities were temporarily interrupted whenever aircraft flew over.  He felt that condors may equate the sound of the aircraft to that of an approaching vehicle.  Condors in flight appear to react to aircraft in a manner

State Director, Bureau of Land Management, Sacramento, CA  1-RO-84-F-62
Page eight

similar to their behavior towards large soaring birds.  Sibley (1969) reports that condors ignore gliders below or to their side, but react violently to one approaching from above.  He also reports that pilots claim condors sometimes will fly towards an approaching helicopter.  The effects on fixed-wing aircraft activity related to pipeline inspection should be minimal since these flights will only occur in areas where condors are flying or feeding.  Implementation of the recommendations in the Biological Assessment should insure that project impacts are minimal.

San Joaquin kit fox (SJKF).  As for BNLL, the pipeline routes traverse the very southern edge of currently recognized SJKF range.  Trenching is the most serious threat to the species due to loss of dens.  No information is presented in the Biological Assessment as to likely losses of dens.  Some dens were located along the ROW during field reviews (Biological Assessment) although no quantitative estimate of impacts to the species is presented, or even possible at this stage.

In general, impacts from pipeline construction will not be significant over the long term, provided that den losses are few.  In this regard we endorse the recommendation in the Biological Assessment that the ROW be surveyed after it is staked and prior to construction.  If SJKF dens, or even suspected dens, are located, the ROW should be relocated at least 100 feet from the den to avoid destruction.  This action is the most workable recommendation possible and if followed, can eliminate significant project impacts to kit fox.

Cumulative Effects

Cumulative effects are those impacts of future State and private actions which are reasonably certain to occur prior to completion of the subject Federal action.  A non-Federal action is "reasonably certain" to occur if the action requires the approval of a State or local resource or land use control agency, and such agencies have approved the action, and the project is ready to proceed.

Cummulative effects for this opinion are limited to species found along the pipelines.  Coastal ecosystem listed species will be considered in a future Biological Opinion.  We know of no such State or private actions that should be considered in the evaluation to listed species found along the pipelines.

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page nine

## Biological Opinion

This Biological Opinion is limited to only the pipeline.  Based on our review of the above information, the project's Biological Assessment and draft EIS, and information in our files, it is our Biological Opinion that the proposed Getty project and Celeron/All American pipelines are not likely to jeopardize the continued existence of the BNLL, YCR, APF, CC, or SJKF, or result in the destruction or adverse modification of critical habitat.

## Incidental Take

Section 9 of the ESA prohibits any taking (harm, harassment, mortality, etc.) of listed species without specific exemption.  Under the terms of Section 7(b)(4)iii and 7(O)(2), taking that is incidental to and not intended as part of the agency action (in this case, providing rights-of-way for the Getty and Celeron/All American pipelines) is not considered taking within the bounds of the Act provided that such taking is in compliance with the terms and conditions of this Biological Opinion.

Along the ROW, trenching and other construction activities may result in the loss of all BNLL when the ROW crosses BNLL habitat (63-84 acres). Construction traffic is likely to cause road kills of BNLL but it is impossible to assess the numbers.  The SJKF probably can avoid the construction area and some individual foxes have tolerated construction noise and disturbances at natal den sites until forced to move.  Thus, SJKF may be harassed but none should be killed due to construction.  However, SJKF den sites may be lost.  The chances of oil spill from the pipeline along the Colorado River would be approximately 1 in 2,000 years.  A spill of as much as 3,506 bbl of oil could enter the river and reach the Cibola or Imperial NWR.  Some oil would enter rail habitat.  If the spill occurred during nesting season when there are eggs or flightless young from 2 to 14 YCR could be impacted.  However, it is anticipated that the oil can be contained before it reaches these nesting areas in the Cibola or Imperial NWR.  No YCR are known to nest between the pipeline crossing and Cibola NWR but rails may wander through the area.  APF and CC currently only forage in the area and because of high mobility none should be taken incidentally from construction activities.

As such we have determined that the impacts of incidental take on the species in question are:  BNLL-all individuals within the 100 foot ROW, none outside the ROW; YCR-one; CC-zero; SJKF-zero; and APF-zero.

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page ten


To minimize such incidental take we specify the following reasonable and prudent measures:

1.    To control a spill from a pipeline break in the Colorado River, the applicant shall develop an oil spill contingency plan in consultation with the BLM and the Service.

2.    Insure that, prior to construction, a competent zoological survey shall be undertaken of the ROW and adjacent areas of disturbance for the presence of APF and SJKF.  If APFs are determined to be nesting within ½ mile of the ROW, then "spread" construction within this ½ mile radius shall not occur between February 1 and July 1.  If SJKF dens are located within the ROW, subject dens shall be avoided by at least 100 feet.

We hereby establish such terms and conditions on incidental take:

1.    If more than the specified level of incidental take identified above for BNLL, YCR, CC, SJKF, and APF (all of those inhabitaing the ROW – none outside, 1, 0, 0, or 0 respectively) occurs, BLM shall require that the causitive action of such take cease immediately, and shall initiate consultation to reevaluate the incidental take impacts.

2.    All dead or injured individuals of any endangered or threatened species shall be retrieved for scientific purposes and turned over to the California Department of Fish and Game.

3.    The Project Officer, BLM, shall immediately telephone the Sacramento Endangered Species Office if incidental take occurs as a result of the project and prepare a written report to include date, location, and circumstances surrounding the taking and the disposition of the individual(s) taken.  Written and telephone reports should be directed to Project Leader, USFWS, Sacramento Endangered Species Office, 2800 Cottage Way, Room E-1823, Sacramento, CA 95825 (916- 484-4935).

These terms and conditions constitute reasonable and prudent measures that are considered to be necessary or appropriate to minimize the impacts of incidental take discussed in this opinion.

Conservation Recommendations

To assist you in exercising your responsibilities under Sections 2(c) and 7(a)(1) which directs Federal agencies to utilize their authorities in furtherance of the conservation of endangered and threatened species, we recommend that BLM:

4-34

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page eleven

1)   Require the applicants to use the Santa Maria Canyon route
     alternative.  This alternative route does not cross the Sierra
     Madre Ridge.  Therefore, there is less chance of disturbance
     to low flying condors using the ridge as a flyway.

2)   Require that the Getty pipeline route follow the Celeron/All
     American route near Hudson Ranch.  The Celeron route follows
     Highway 166 more closely and will likely cause less disturbance
     to foraging condors during construction.

3)   Reduce the size of the construction right-of-way in sensitive
     habitats to the extent possible, particularly in the Cuyama
     Valley, Santa Barbara County, and Kern County, California.

4)   Adopt all recommendations to minimize impacts listed in the
     Biological Assessment (See Sections 3.5.6, 3.7.6, 3.8.6, 3.9.6,
     and 3.10.6).  We believe these measures are reasonable and
     implementable.

5)   Insure that, prior to construction, a competent botanical
     survey of the ROW be conducted to determine the presence of
     and impacts to Thornber's fishook cactus.  If the species is
     found to be impacted, the project should be modified in these
     areas to minimize the impacts.

6)   Prior to construction, the BLM should provide the FWS the
     opportunity to review and provide comments on any ROW grants
     or temporary use permits issued for the proposed projects.
     Specifically, this Service should be involved in formulating
     stipulations for the protection of threatened and endangered
     species during construction, operation, maintenance and
     abandonment of the pipeline.

This concludes formal consultation on this project.  If the proposal is
significantly modified in a manner not discussed above, or if new information
becomes available on listed species, or impacts to listed species changes,
or should new species be listed which are not addressed in this opinion,
reinitiation of the consultation should be considered.

For additional information regarding these issues, please call Mr. Gail
Kobetich, Project Leader of our Sacramento Endangered Species Office, at
916-484-4935 or FTS 468-4935.  We thank the BLM and ERT staff for their
assistance in this consultation process.

4-35

Attachment

## Literature Cited

Cade, T. J.  1960.  Ecology of the peregrine falcon and gyrfalcon populations in Alaska.  Univ. of Calif. Publ. in Zool., Berkeley. 63:151-290.

Enderson, J. H., J. Craig, and W. Burnham.  1977.  Peregrines in the Rocky Mountains:  status, biological assessment and management. Presented at the Raptor Research Foundation 1977 annual meeting. Tempe, Arizona.

Sibley, F.C.  1969.  Effects of the Sespe Creek project on the California condor.  U.S. Fish and Wildlife Service, Patuxent Wildlife Research Center, Laurel, Maryland.  19 pp.

Siniff, D.B., T.D. Williams, A.M. Johnson, and D.L. Garshelis.  1982. Experiments on the response of sea otters (Enhydra lutris) to oil contamination.  Biological Conservation 23:261-272.

White, C. M.  1974.  Hunting range of a breeding peregrine falcon on the Sugavanirktok River.  Unpublished report.  Brigham Young University, Provo, Utah.

Wilbur, S. R.  1978.  The California condor, 1966-1976:  a look at its past and future.  U.S. Fish and Wildlife Service, North American Fauna No. 72.

Williams, T.D.  1978.  Chemical Immobilization, Baseline Hematological Parameters and Oil Contamination in the sea otter.  Final Report to U.S. Marine Mammal Commission in Fulfillment of Contract MM7AD094. Report No. MMC-77/06.  U.S. Department of Commerce, National Technical Information Service PB-283 969.  27 p.

**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
Washington, D.C. 20235

NOV. 23 1984

| | To | | Initial | Date |
|---|---|---|---|---|
| F/M412 | PSC | | | |
| | ASD | ⌷ | | |
| | ADMIN | | | |
| | RES | 3 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Action by | 3 | | | |
| Surname by | | | | |
| Return to | | | | |

Mr. Ed Hastey
State Director
Bureau of Land Management
California State Office
2800 Cottage Way
Sacramento, California 95825

Dear Mr. Hastey:

Enclosed are the Biological Opinion and Statement Regarding Incidental Taking prepared by the National Marine Fisheries Service (NMFS) pursuant to Section 7 of the Endangered Species Act of 1973 (ESA) concerning the impacts of the proposed Celleron/All American and Getty Pipeline Projects near Santa Barbara, California on endangered whales and threatened and endangered sea turtles.

The NMFS has received a petition to list the Guadalupe fur seal (Arctocephalus townsendi) as an endangered species and a petition to list the northern fur seal (Callorhinus ursinus) as a threatened species under the ESA. The NMFS has determined that these petitions present substantial information indicating that the petitioned listings may be warranted, and has initiated a review of these species' status. Based upon the findings of these reviews, a determination will be made as to the appropriateness of proposing either of these species for listing. Section 7(a)(4) of the ESA requires Federal agencies to confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any species proposed for listing. While the Guadalupe fur seal and the northern fur seal have not yet been proposed for listing, we believe that these species should be considered during this consultation to avoid future complications and delays. Therefore, with the concurrence of your staff, we have included our conclusions on the impacts of the proposed pipelines to Guadalupe and northern fur seals in an Appendix to the enclosed Biological Opinion. Any recommended protective measures offered with respect to these species are contingent upon listing.

Based on our review of the available information on the proposed activities and on the biology and ecology of endangered and threatened species in the area, we have determined that the proposed activities are not likely to jeopardize the continued existence of any endangered or threatened species. New information on the timing, location, and nature of proposed activities should be reviewed by the Bureau of Land Management on a case-by-case basis to determine if additional consultation pursuant to Section 7 is required.

Consultation must be reinitiated if there is subsequent modification to the proposed action, if a species other than the Guadalupe or northern fur



4-37

seal is subsequently listed or proposed for listing, if critical habitat is designated in the area covered by your program, or if new information reveals impacts of identified activities that may affect listed species.

The enclosed Biological Opinion in no way permits the taking of endangered whales. Such taking, unless properly permitted, is prohibited under Section 9 of the ESA and under Section 102 of the Marine Mammal Protection Act (MMPA). Section 17 of the ESA states that unless otherwise provided, no provision of the ESA shall take precedence over any more restrictive provision of the MMPA. Under Section 101(a)(3)(B) of the MMPA, the taking of depleted species of marine mammals can be permitted only for scientific purposes. Therefore, the appended statement concerning incidental taking of endangered species pursuant to Section 7(b)(4) of the ESA does not include whales.

No sea turtle mortality has been reported incidental to offshore oil and gas development or associated land based activities off California, and we do not anticipate any. Therefore, we have not provided an estimate, pursuant to Section 7(b)(4), of an acceptable level of mortality. Our appended statement concerning incidental taking contains the following conditions: any mortality of sea turtles due to activities associated with this project must be reported to the Southwest Regional Office as soon as practical, and that your State Office staff cooperate with the Southwest Region staff in reviewing the circumstances to determine if measures need to be developed to prevent or mitigate additional mortality.

I look forward to continued cooperation during future consultations.

Sincerely,

William G. Gordon
Assistant Administrator
for Fisheries

Enclosure

4-38

Endangered Species Act
Section 7 Consultation - Biological Opinion

AGENCY:  Bureau of Land Management

ACTIVITY:  Proposed Celleron/All American and Getty Pipeline Projects

CONSULTATION CONDUCTED BY:  National Marine Fisheries Service

DATE OF ISSUANCE: _____

BACKGROUND:  On September 20, 1984, the Bureau of Land Management (BLM) requested initiation of formal consultation on a proposed plan for construction of the Celleron/All American and Getty Pipelines and an associated marine terminal at Gaviota, California.  The purpose of this consultation is to consider potential impacts of the proposed activities on endangered whales and threatened and endangered sea turtles.  In addition, we have incorporated into an Appendix, information concerning two candidates for listing, the Guadalupe fur seal and northern fur seal.

Complete, updated reviews of listed species' biology and potential impacts due to the construction and operation of a marine terminal and associated pipelines at Gaviota and Los Flores Canyon were included in the Biological Opinions issued for oil and gas development and production activities in the Point Arguello field (May 31, 1984) and Santa Ynez Unit (March 7, 1984) respectively.  The conclusions reached in those opinions remain valid and are incorporated into this opinion by reference (NMFS, 1984a,b).

This opinion is based on information acquired through consultation with BLM, information in the Biological Assessment prepared for the project, and a review of published and unpublished information.

PROPOSED ACTIVITY:  Celleron/All American and Getty Oil each have proposed pipeline projects to transport oil from offshore Gaviota, California through a marine terminal, into a consolidated coastal facility, and overland pipelines to processing areas.  The Celleron/All American pipeline would transport up to 300,000 barrels per day (BPD).  The 1,200 mile, 24 to 30 inch pipeline would travel from the area west of Santa Barbara, California, across the Sierra Madre Mountains to the Bakersfield area, then to Blythe, and across Arizona and New Mexico to the Midland, Texas area.  One alternative of this route would extend this pipeline to Freeport, on the Gulf coast of Texas.  The Getty pipeline would transport up to 400,000 BPD in a 20 to 30 inch pipeline from the area west of Santa Barbara to the Bakersfield area (about 113 miles).

Getty Trading and Transportation Company (Getty) has submitted an application to Santa Barbara County for construction and operation of a consolidated coastal facility at Gaviota, California.  The Gaviota site is on

the coastline of the Santa Barbara Channel, 31 miles west of downtown Santa Barbara. Getty's consolidated coastal facility is proposed to serve all of the offshore oil and gas producers in the western Santa Barbara Channel and the Santa Maria Basin, accepting oil from nearby proposed oil treatment plants, marine tankers, and tank trucks.

Under the Proposed Project, Getty would replace the existing Gaviota marine terminal with a new consolidated coastal facility with the following characteristics:

°   A phased marine terminal expansion at the present location with an initial throughput capacity of 200,000 barrels per day (BPD) and the ability to handle one marine tanker between 30,000 and 300,000 dead weight tons (DWT).

°   A supply and crew base designed to support peak offshore exploration, development, and production needs with a supply and crew boat pier, onshore storage, warehouses, offices, parking, and logistical and communications support.

°   A phased development of crude oil storage facilities with ultimate tank capacities of approximately 2.74 million bbl to support the marine terminal and the crude oil pipeline to the San Joaquin Valley.

°   A pipeline connection from Gaviota to the San Joaquin Valley refinery/transportation network with a crude oil throughput in the range of 100,000 to 400,000 BPD.

°   A maximum buildout capacity, should market conditions support it, of marine terminal throughput capacity of 400,000 BPD. Two mooring systems would allow two tankers to load simultaneously.

### Status of Species Considered in this Opinion

| Common Name | Scientific Name | Status |
|---|---|---|
| Gray whale | Eschrichtius robustus | Endangered |
| Right whale | Eubalaena glacialis | Endangered |
| Blue whale | Balaenoptera musculus | Endangered |
| Fin whale | B. physalus | Endangered |
| Sei whale | B. borealis | Endangered |
| Humpback whale | Megaptera novaeangliae | Endangered |
| Sperm whale | Physeter catodon | Endangered |
| Green sea turtle | Chelonia mydas | Endangered |
| Leatherback sea turtle | Dermochelys coriacea | Endangered |
| Pacific Ridley sea turtle | Lepidochelys olivacea | Endangered |
| Loggerhead sea turtle | Caretta caretta | Threatened |

BIOLOGICAL INFORMATION: Basic information pertaining to the population levels and trends, migration patterns, and behavior of the seven cetacean and four sea turtle species listed as endangered or threatened is contained in the Biological Opinions issued for the development and production activities of

4-40

the Santa Ynez Unit on March 7, 1984, (NMFS, 1984a) and the Pt. Arguello field on May 31, 1984 (NMFS, 1984b).  That information is incorporated herein by reference.

ASSESSMENT OF IMPACTS:  Impacts to listed species could originate from two aspects of the proposed project:  (1) events associated with the placement and operation of the marine terminal and consolidated onshore facility or (2) from oil spilled from the rupture of an onshore pipeline with subsequent marine contamination.

The NMFS assessed the potential for impacts to listed species from construction and operation of a marine terminal and associated pipelines proposed to be located at Gaviota in the Biological Opinion issued for the Point Arguello field (NMFS, 1984b).  The discussion and conclusions reached in that opinion remain valid and are incorporated herein by reference.

Listed marine species could be affected by oil spilled from a major pipeline rupture at a coastal stream crossing, provided the spill could not be contained onshore.  The Biological Assessment (BA) for the proposed project, prepared under contract for BLM, states that "the probability of an oil spill is very low;  0.0013 yr/mi or less than one chance in 2,000 years."  (BLM, 1984)  The BA states

> "it is not probable that a spill will occur at
> a stream crossing in the life of the project.
> It is also unlikely a spill would occur when
> whales were in the project area or reach distant
> offshore areas" (BLM 1984).

In general, the conclusions of research completed to date indicate that whales are likely to suffer only minor impacts if they contact oil spills and that they are likely to recover from those effects.  In some cases, conclusions have been based on calculations and theories that are presently unverified and we believe that they should be interpreted conservatively. However, the fact that no marine mammal mortalities were reported during the Ixtoc spill (Hooper, 1981) or the 1969 Santa Barbara spill (Brownell, 1971) tends to support these conclusions.

CONCLUSIONS:

Cetaceans other than gray whales.

Based on our assessments of impacts for this and previous projects in the vicinity (NMFS, 1984a,b), the wide distributions and broad migration corridors of the North Pacific populations of right, blue, fin, sei, humpback, and sperm whales, and the fact that only a small portion of any population is likely to be in the project area, the NMFS concludes that the activities associated with the proposed Celleron/All American pipeline project are not likely to jeopardize the continued existence of these species.

4-41

Gray whales.

The gray whale population may experience impacts from the construction and operation of the marine terminal (NMFS, 1984a,b) or from oil spilled into the marine environment due to an onshore pipeline rupture. However, due to the extremely low probability of such an event, the distance offshore and seasonality of the gray whale migration, and the persistent increase in the gray whale population, despite ongoing oil and gas activities we conclude that the potential impacts of activities associated with the proposed Celleron/All American pipeline project are not likely to jeopardize the continued existence of the gray whale.

Cumulative effects: In view of the relatively restricted migration patterns of gray whales, and the extensive Outer Continental Shelf (OCS) development that is scheduled to take place within the range of the gray whale in the next five years (NMFS, 1984a,b), we are concerned that the cumulative effects of these activities may have adverse impacts on the gray whale population. Since information on the cumulative effects on the gray whale from OCS activities throughout its range is sparse, we are unable to identify a threshold of OCS activities that would result in significant impacts to the gray whale population. We believe that sufficient information is available to conclude that current levels of offshore and associated onshore OCS activities, are below these critical thresholds. We expect that impacts associated with the proposed pipelines and associated activities also will be below these thresholds, but this does not release involved agencies from their responsibility to continue to investigate cumulative effects from all OCS activities, including those of other agencies, or of Canada and Mexico, to ensure that they are not likely to jeopardize, collectively, the continued existence of the gray whale population.

Sea turtles.

The NMFS also concludes that these activities are not likely to jeopardize the continued existence of any listed sea turtle population because most individuals generally are distributed in warm tropical or subtropical waters far to the south of the project area (NMFS, 1984a,b). Only a few individuals have been encountered in the colder temperate waters off California; these are probably vagrants at the extreme northern limits of their ranges.

RECOMMENDATIONS: The recommendations made in the Biological Opinion for the Santa Ynez Unit (NMFS, 1984a) relating to listed species remain valid and are incorporated herein by reference. One of these recommendations that warrants particular attention is repeated below.

We recommend that the BLM instruct Getty that any blasting for offshore pipeline placement or marine terminal construction should be limited to periods when gray whales are not observed in the vicinity of the project. Most of the eastern north Pacific population of gray whales migrate through the project area twice annually. In this area, the southern migration occurs from mid-December through mid-February and the return migration occurs from

5

early February through April. Limiting blasting to periods when gray whales
are not present will reduce the potential for adverse effects associated with
startle responses or direct physical injury that could occur due to the
detonation of an explosive charge.

REINITIATION OF CONSULTATION:  Consultation must be reinitiated if (1) new
information reveals additional impacts of the identified activity not
considered in this Opinion that may affect listed species or their habitat,
(2) the proposed activities are modified in a manner not considered herein, or
(3) a new species (other than the Guadalupe or northern fur seal) is listed or
critical habitat is designated that may be affected by the proposed
activity.  The NMFS suggests that the agencies involved in this consultation
continue to discuss the information concerning future OCS activities so that,
if needed, consultation can be reinitiated in a timely manner.  This in no way
would preclude any involved agency from making an independent determination of
the need for reinitiating consultation.

4-43

STATEMENT REGARDING INCIDENTAL TAKING PURSUANT TO
SECTION 7(b)(4) OF THE
ENDANGERED SPECIES ACT OF 1973, AS AMENDED

Section 7(b)(4) of the ESA requires that when an agency action is found to be consistent with Section 7(a)(2) the NMFS will issue a statement specifying the impact of incidental taking of endangered species, providing reasonable and prudent measures that are necessary to minimize impacts, and setting forth the terms and conditions with which the action agency must comply in order to implement the reasonable and prudent measures.

No sea turtle mortality has been reported incidental to OCS activities off California, and we do not anticipate any mortalities incidental to the proposed activity.  As a condition of this statement, if a sea turtle is killed as a result of an interaction with activities associated with construction and operation of the marine terminal or the onshore pipeline, the incident must be reported to the Director, Southwest Region, NMFS as soon after the taking as possible, and the Southwest Region will cooperate with the California State Office, BLM in the review of the incident to determine the need for developing mitigation measures and assess the need for reinitiating consultation.

Any marine mammal population listed pursuant to the ESA is considered depleted under the Marine Mammal Protection Act of 1972 (MMPA).  According to Section 17 of the ESA, no provision of the ESA is to take precedence over a more restrictive, conflicting provision of the MMPA.  The MMPA is more restrictive than the ESA because the MMPA prohibits taking from depleted stocks except for scientific research.  Therefore, Section 7(b)(4) of the ESA is not applicable to endangered whale populations and no statement specifying impact is provided.

Appendix
Potential Impacts on the Northern and Guadalupe Fur Seals

BACKGROUND:  The National Marine Fisheries Service (NMFS) has accepted petitions to list the northern fur seal (Callorhinus ursinus) as a threatened species and to list the Guadalupe fur seal (Arctocephalus townsendi) as an endangered species pursuant to the Endangered Species Act (ESA).  The NMFS is currently undertaking status reviews of these species to determine whether or not they should be listed under the ESA, and anticipates making decisions on these proposed actions in early 1985 and late 1984, respectively.  Section 7(a)(4) of the ESA requires Federal agencies to confer with NMFS on agency actions likely to jeopardize the continued existence of any species proposed for listing.  While neither of these candidate species has been proposed for listing, the NMFS and Bureau of Land Management (BLM) agreed to consider them in the conference process for the proposed Celleron/All American and Getty pipeline projects (telephone conversation between D. Seagars, NMFS and Bill Haigh, BLM, October 4, 1984).  Early consideration of these species through conferences could provide for protection from potential impacts of proposed projects and potentially eliminate the need to reinitiate consultation should either of these species be listed.  Any recommended protective measures offered in this Appendix are contingent upon listing.  We have incorporated information made available during our October 4, 1984, conference concerning these species.

Status of Species Considered by this Appendix

| Common Name | Scientific Name | Status |
|---|---|---|
| Northern fur seal | Callorhinus ursinus | Candidate |
| Guadalupe fur seal | Arctocephalus townsendi | Candidate |

BIOLOGICAL INFORMATION:  Basic information pertaining to the population levels and trends, migration patterns, behavior, and sensitivity to oil spills is contained in an Appendix to the Biological Opinion issued for the development and production activities of the Point Arguello field on May 31, 1984 (NMFS, 1984b).  That information is incorporated herein by reference.

POTENTIAL IMPACTS:  Potential impacts to northern and Guadalupe fur seals could occur as a result of contact with oil spilled from the offshore marine terminal, the onshore consolidated facility, or an uncontained onshore pipeline rupture.

Impact from oil spills.  The potential impacts to northern fur seals from contact with spilled oil were described by Kooyman, Gentry, and McAllister (1976).  Although this study examined only the northern fur seal, the results are applicable to both species as the thick pelage of fur seals constitutes the principal element of their thermoregulatory mechanism, a system that carefully regulates heat loss to the cold, surrounding environment.  The authors found that a light oiling of about 30 percent of the pelt surface resulted in a 1.5 fold increase in the metabolic rate of seals in water.

While the study could not verify that death would inevitably follow such contact, it did predict that the health of oiled individuals was in serious jeopardy because the stress of greatly increased metabolic rates generally leads to death by disease or starvation.

Overwintering northern fur seals are widely dispersed far offshore and well west and south of the project area.  During the summer breeding season, northern fur seals concentrate on the breeding grounds in the western North Pacific, the Pribilofs, and at San Miguel Island.  In the event that an oil spill contacts San Miguel Island during this breeding period, approximately 4,000 northern fur seals could be adversely impacted.  However, there is only a very remote probability that a spill from this project would contact the island.

Little specific information is available concerning at-sea distribution of Guadalupe fur seals.  We believe that the few individuals present in the Southern California Bight are most likely to occur far to the south of the project area, such as around haulouts on the far western Channel Islands and over the more southern offshore ridges and continental slope.  There is only a remote probability that a spill associated with this project would reach the island regions.

CONCLUSIONS:  We conclude that the proposed activities are not likely to jeopardize the continued existence of the northern fur seal because:  there is only a remote probabilty of an oil spill; the majority of the population is located well to the south of the project area; fur seals are widely dispersed and far offshore when pelagically overwintering; and that portion of the population present on San Miguel Island during the spring and summer breeding season constitutes less than 0.2 percent of the total world population.  We further conclude that the proposed activities are not likely to jeopardize the continued existence of the Guadalupe fur seal because the majority of the population is located on or near Guadalupe Island.  Only a few non-breeding individuals occur in the Southern California Bight and the chance that they would be contacted or otherwise disturbed by an oil spill is low.

4-47

## REFERENCES

BLM, 1984. Biological assessment, threatened and endangered species. Proposed Celleron/All American and Getty pipeline projects. Prepared by Environmental Research and Technology, Inc.

Brownell, R.L. Jr., 1971. Whales, dolphins, and oil pollution. In: Biological and oceanographical survey of the Santa Barbara Channel oil spill, 1964-1970. (D. Stranghan, ed.). Vol. I. Biology and bacteriology, p. 255-276. Allan Hancock Found., Univ. So. Calif., Los Angeles, CA.

Hooper, C.H. 1981. The Ixtoc Oil Spill: the federal scientific response. NOAA Special Report. 201 pp.

Kooyman, G.L., R.L. Gentry, W.B. McAllister. 1976. The physiological impact of oil on pinnipeds. Processed Rept. 23. Northwest and Alaska Fisheries Center, NMFS, NOAA, Seattle, WA.

NMFS. 1984a. Biological opinion for development and production of the Santa Ynez Unit, offshore California. 34 pp.

NMFS. 1984b. Biological opinion for development and production of oil and gas offshore California between Point Arguello and Point Conception. 22 pp.

Excerpts from Biological Assessment

The following actions and measures to minimize impacts to federally-listed Threatened or Endangered species that could be affected by the proposed pipeline projects are proposed by the BLM and recommended by FWS. These measures were taken from the Biological Assessment (Sections 3.5.6, 3.7.6, 3.8.6, 3.9.6, 3.10.6) submitted by BLM to the FWS in August 1984.

American Peregrine Falcon

The proposed project should have no immediate significant impact on peregrine falcons in the Gaviota area. Peregrines occur at Gaviota Pass and the mouth of Gaviota Creek from March through July. Construction impacts would be insignificant if construction between the Gaviota tank farm and an area 2 mi west of Gaviota Pass occurred between late July and late February. This would reduce potential impacts to faclons foraging at the mouth of Gaviota Creek and birds attempting to establish nesting territories at Gaviota Pass. Cooperation between oil companies in the future concerning scheduling of construction, joint use of similar facilities, and restricting shore facilities to smaller geographic locations would greatly reduce any cumulative impacts.

California Condor

- The ROW will be routed to avoid crossing the Hudson Ranch to the degree possible in order to minimize future conflicts with any special management plans.

- The ROW will parallel Highway 166 and other existing roads to the degree possible in order to minimize disturbance in condor foraging areas.

- No guns will be allowed on the construction spread in condor essential habitat. This measure can be added to pipeline contractor contracts by the Applicants (Celeron/All American and Getty).

- Blasting in the Cummings Mountain area will use small charges and debris blankets to muffle and minimize noise levels.

- Aerial flight reconnaissances will approach on line with the ROW and remain on the ROW over condor essential habitat.

- The pilot responsible for the aerial reconnaissance of the ROW will consult with the National Audubon Society's condor research pilot concerning avoidance measures and flying techniques to avoid condor collisions.

- Oil spill contingency plans will include notifying FWS in the event of a spill in essential habitat.

- The applicants will review site specific revegetation plans for the Hudson Ranch area with FWS.

4-49

- If construction of either pipeline is delayed, the applicants will consult with FWS concerning timing of construction to avoid potential conflicts with the condor captive-release program.

San Joaquin Kit Fox

In order to minimize the effects of construction and operation of the proposed pipelines on the San Joaquin Kit fox and its habitat the following recommendations are made:

- The ROW will be surveyed between the upper Cuyama Valley and Pentland (about 50 miles) immediately prior to construction. Any kit fox den sites on the ROW will be flagged and the ROW moved at least 100 ft to avoid the den site.

- The ROW will be revegetated with native species to encourage reestablishment of habitat.

- No ORV use will be allowed off the ROW during construction.

- Where the ROW crosses existing roads, locked gates will be erected to discourage ORV use after construction.

- Pipeline company personnel driving the ROW for inspection will not be allowed off the ROW except as specified by the land owner or land manager.

Blunt-nosed Leopard Lizard

In order to minimize the effects of construction and operation of the proposed pipelines on the Blunt-nosed leopard lizard and its habitat, the following recommendations are made:

- The construction ROW will be limited to 50 ft (where feasible) in BNLL habitat near Maricopa; this will reduce habitat loss by about 20 ac to about 40 ac.

- No ORV use will be allowed off the ROW during construction. This will minimize road kills and destruction of habitat.

- No dumping of trash or waste oils will occur in sandy washes or in other suitable habitats.

- The ROW will be revegetated with native species to encourage reestablishment of habitat and to discourage weed invasion.

- Where the ROW crosses existing roads, locked gates will be erected to discourage ORV use after construction.

- Pipeline personnel driving the ROW for inspection will not be allowed off the ROW except as specified by the land owner or land manager.

Yuma Clapper Rail

No proposed alternative actions are recommended for protection of the YCR. However, several conservation measures are recommended to reduce the potential for impact due to oil spills and construction. Spill contingency plans should be established for the Colorado River crossing to reduce impacts to rail habitat if a spill occurs. Boom devices and cleanup equipment should be stored at important rail habitats (e.g., Cibola National Wildlife Refuge-Colorado River backwater area). If a rupture occurs, crews could quickly move these booms into place. A system should be devised to alert upstream dam operators to reduce flows immediately if a pipeline rupture occurs.

APPENDIX 4.3
SYSTEM SAFETY

The following table provides a summary of the major oil spill and system safety issues and concerns related to the Getty and Celeron/All American Pipeline Projects. Column 1 of the table describes a series of events that are viewed as having some type of impact on the environment if the event were to occur. Also included below each event listed are the possible causes of such an event.

Column 2 presents the probability that the event would occur, based on historical accident rate data throughout the industry.

Column 3 describes the environmental consequences that may result if the event took place. A "worst-case" approach was taken when describing these environmental consequences.

Column 4 provides a summary of various design specifications that the Applicants have incorporated into their projects that would reduce the probability of an event occurring and/or would reduce the environmental consequences if an event had in fact occurred. More detailed information is cross referenced to Appendices H and I and Chapter 2 of the DEIR/EIS.

Sub-columns 5 and 6, Mitigation Measures, summarize mitigation measures and stipulations presented in the Final EIR that would further reduce the probability or consequences resulting from an event. Cross references are provided for locating detailed descriptions of the mitigation measures within the FEIR document.

Finally, the last column in the table evaluates the effectiveness of design specifications and mitigation measures.

4-52

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures Reduce Probability | Reduce Consequences | Effectiveness |
|---|---|---|---|---|---|---|
| Oil spill onto irrigated agricultural lands (see Tables 3-22, 3-25, and 4-5) caused by: seam failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio[1] 21 miles irrigated $6.3 \times 10^{-3}$ spills/yr ($\geq$ 50 bbl) 0.19 spills during life of project (30 yrs)<br><br>Las Flores to Blythe[1] 50 miles irrigated $1.5 \times 10^{-2}$ spills/yr ($\geq$ 50 bbl) 0.45 spills during life of project (30 yrs)<br><br>Blythe to McCamey[1] 52.8 miles irrigated $1.6 \times 10^{-2}$ spills/yr ($\geq$ 50 bbl) 0.48 spills during life of project (30 yrs) | Contamination of soils, reduced productivity, maximum of 16 acres affected per spill. | Minimum cover 42 inches, cathodic protection, block and check values, 3 ft minimum cover, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. Continuous manned monitoring and control of all data. | Design and construct pipeline to accommodate geologic hazards (M-1, 2, and 3).<br><br>Pipeline location markers above ground. Buried cable or fluorescent plastic below ground just above pipeline.<br><br>Periodic information contact with land owner.<br><br>Provide extra pipeline depth in areas where deep plowing or ripping could result in damage to pipeline. Depth should be at least 1 ft below maximum plow depth. | | Earthquake-resistant design is sufficiently advanced so that these measures should prove very effective.<br><br>Increase awareness of pipeline location thereby reducing potential of mechanical damage occurring.<br><br>Same as above.<br><br>Will reduce risk of mechanical damage. |
| | | | | | Replace contaminated soil. | Decrease loss of productivity. |
| | | | | | Monetary compensation for lost product. | Eliminate financial loss to landowner/tenant. |
| Oil spill into a stream[2] (see Tables 3-11 and 3-12) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio 11 miles $3.3 \times 10^{-3}$ spills/yr ($\geq$ 50 bbl) 0.09 spill during life of project (30 yrs)<br><br>Las Flores to Blythe 25 miles $7.5 \times 10^{-3}$ spills/yr ($\geq$ 50 bbl) 0.23 spill during life of project (30 yrs) | Contamination of surface water lasting up to several weeks. Loss of aquatic life up to 2 years. | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan (see Appendix H). Continuous manned monitoring and control of all operational data. | Monitor pipe burial depth at stream crossings (M-5). Periodic site inspections. Design and construct pipeline to accommodate geologic hazards (M-1, 2, and 3). | | Early indication of abnormal bottom scouring. Earthquake-resistant design is sufficiently advanced so that these measures should prove very effective. |

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures Reduce Probability | Reduce Consequences | Effectiveness |
|---|---|---|---|---|---|---|
| | Blythe to McCamey 17 miles $5.1 \times 10^3$ spills/yr (>50 bbl) 0.15 spill for life of project (30 yrs) | | | | | |
| Oil spill into a sensitive ground-water basin (see Table 3-14) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio 30 miles $9.0 \times 10^{-3}$ spill/yr (> 50 bbl) 0.27 spill during life of project (30 yrs) Las Flores to Blythe 42 miles $1.3 \times 10^{-2}$ spill/year (> 50 bbl) 0.39 spill during life of project (30 yrs) Blythe to McCamey 395 miles $1.2 \times 10^1$ spill/yr (> 50 bbl) 3.60 spills during life of project (30 yrs) | Contamination of groundwater by a small leak (less than 3 BPH). | Cathodic protection, block and check valves, 3 ft minimum cover, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Design and construct pipeline to accommodate geologic hazards (M-1, 2, and 3). | Identify areas to monitor in case of spill (M-6); use low permeability backfill in sensitive areas (M-7). | It is possible to design the pipeline to survive most geohazards through the latest seismic design and engineering practices. |
| Oil spill into a sensitive stream[2] (see Table 4-6) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error | Gaviota to Emidio 1 mile $3.0 \times 10^{-4}$ spills/yr (> 50 bbl) 0.01 spill during life of project (30 yrs) Las Flores to Blythe 3 miles $9.0 \times 10^{-4}$ spills/yr (> 50 bbl) 0.03 spill during life of project (30 yrs) Blythe to McCamey 4 miles $1.2 \times 10^{-3}$ spills/yr (> 50 bbl) 0.04 spill during life of project (30 yrs) | Game and T&E fishes could be affected for several months to 2 years (see Appendix B). | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic tesing, leak detection system, aerial surveys, spill contingency plan. | Design and construct pipeline to accomodate geologic hazards (M-1, 2, and 3). Monitor pipeline burial depths at crossings including periodic diving inspections of deep water crossings (M-S). | | It is possible to design the pipeline to survive most geohazards through the latest seismic design and engineering practices. Early indication of abnormal bottom scouring. |

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures Reduce Probability | Mitigation Measures Reduce Consequences | Effectiveness |
|---|---|---|---|---|---|---|
| Oil spill into sensitive terrestrial habitats (see Table 4-8) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio 50 miles sensitive habitat 1.5 x 10$^{-2}$ spills/yr 0.45 spill during life of project (30 yrs)  Las Flores to Blythe 314 miles sensitive habitat 9.5 x 10$^{-2}$ spills/yr (> 50 bbl) 2.85 spills during life of project (30 yrs)  Blythe to McCamey 15 miles sensitive habitat 4.5 x 10$^{-3}$ spills/yr (> 50 bbl) 0.14 spill during life of project (30 yrs) | Destruction of T&E species and/or their habitats (see Appendix B). | Cathodic protection, block and check valves, 3 ft minimum cover, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Design and construct pipeline to accommodate geological hazards (M-1, 2, and 3). | Relocate pipeline out of sensitive habitats in the Cuyama Valley (M-15). | Eliminates potential exposure for sensitive wildlife and terrestrial habitats. |
| Oil spill into the Colorado River or Hot Springs Creek[2] caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Celeron/All American 6.0 x 10$^{-4}$ spills/yr (> 50 bbl) 0.02 spill during life of project (30 yrs) | Destruction of riparian habitat and possible effects on T&E species (see Appendix B); disruption of water recreational activities. | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Monitor pipe burial depths at crossings (M-5). | Oil spill booms to redirect oil to skimmers and to block entry into backwaters of the Colorado River (M-17). | For the Colorado River this will protect nearby backwaters from contamination and aid in the clean-up downstream. For Hot Springs Creek the impacts will be minimized. The methods will not be 100% effective. |
| Oil spill into a coastal stream[3] (see Table 3-11) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Celeron/All American 2.4 x 10$^{-3}$ spills/yr (>50 bbl) 0.07 spill during life of project (30 yrs)  Getty 3.0 x 10$^{-4}$ spills/yr (> 50 bbl) 0.01 spill during life of project (30 yrs) | Oil spills could reach recreational beaches along the Gaviota coast. | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Monitor pipe burial depths at crossings (M-5).  Design and construct pipeline to accommodate geological hazards (M-1, 2, and 3). | | If all designs and plans are implemented properly, oil will not reach the coastal waters and impacts to the streams will be minimized. |

4-55

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|---|---|---|---|---|---|---|
| | | | | Reduce Probability | Reduce Consequences | |
| Oil spill at the Cadiz tank farm (Celeron/All American) caused by: faulty valves overfilling tanks natural causes. | Spills per Year<br><br>≥  10 bbl  3.8 x 10⁻¹<br>≥  100 bbl 8.6 x 10⁻²<br>≥ 1,000 bbl 7.5 x 10⁻³<br><br>Spills During Life of Project<br><br>≥    10 bbl     11.4<br>≥   100 bbl      2.6<br>≥ 1,000 bbl      0.2 | Oil would be con- tained by the dike system surrounding each storage tank. | Leak detection system, automatic overflow alarm system, contain- ment dikes for 125 percent of tank capa- city, spill contingency plan. | Redundant sensor and control system to prevent tank overfilling (p J-2). | | No spilled oil would be released beyond the diked containment area, reducing environmental consequences. Sensors would reduce the probability of overflowing tanks. |
| Fire/explosion at a pump station with natural gas supply caused by: leak with an ignition source. | 3.8 x 10⁻³ fire/ explosion per year[4] 0.11 fire/explosion during life of project | Possible damage to structures and injury to people Possible source of wildfire. | Block and bypass valves on both sides of sta- tion, fuel gas shut- down system, onsite fire fighting equip- ment, 2-way radios in vehicles, station monitoring system including smoke detectors and fire sensors, remote data integration and station control system, automa- tic station shutdown system, local-reset lockout system, emergen- cy helicopter access to stations, fire protec- tion plan, fire fighting training and fire drills, cleared and fenced land around pump station. | At stations with gas- fired turbines and, Waste Heat Recovery Units (WHRU), there will be extended purging of both units with interlocks to prevent starting before purging is complete. At stations without turbines, gas- fired heaters will also have extended purging before starting. | | Will effectively reduce the probability of explosion/fire. None of the proposed stations are close enough to dwellings or common areas for non-pipeline employees to be damaged. |

4-56

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures Reduce Probability | Reduce Consequences | Effectiveness |
|---|---|---|---|---|---|---|
| Fire/explosion at a pump station without gas supply caused by: leak with an ignition source. | $3.8 \times 10^{-3}$ fire/ explosion per year[4] 0.11 fire/explosion during life of project | Possible damage to structures and injury to people. Possible wild-fire source | Block and bypass valves on both sides of station, onsite fire fighting equipment, 2-way radios in vehicles, station monitoring system including smoke detectors and fire sensors, remote data integration and station control system, automatic station shut-down system, local-reset lockout system, emergency helicopter access to stations, fire protection plan, fire fighting training and fire drills, cleared and fenced land around pump station. | Explosions are caused by leaks coupled with an ignition source. Pumps are equipped with seal leak detectors that will stop unit if leak detected. Other leaks will be reduced by checking valve stem packing during regular visits to the site. | | Will effectively reduce the probability of explosion/fire. No human receptors or dwellings near proposed pump stations (except employees). |

4-57

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|---|---|---|---|---|---|---|
| | | | | Reduce Probability | Reduce Consequences | |
| Fire/explosion at the Cadiz tank farm caused by: personnel error equipment failure natural disaster fire outside facility externally caused fire (i.e., airplane crashes, sabotage, etc.). | See Note 5 | Possible damage to structures and injury to people. Possible source of wild fire. | Block and bypass valves on both sides of station, fuel gas shut-down system, onsite fire fighting equip-ment, 2-way radios in vehicles, station monitoring system including smoke detectors and fire sensors, remote data integration and station control system, automa-tic station shutdown system, local-reset lockout system, emergen-cy helicopter access to stations, fire protec-tion plan, fire fighting training and fire drills, cleared and fenced land around tank farm, automatic overflow alarm system, open-top floating roof tanks, integrated tank farm control center. | Redundant sensor and control system to prevent tank overfilling (p J-2). | Automated foam extinguisher system for tank seal fires (p J-2). | Would reduce the proba-bility of fire/explosion and reduce consequences if either should occur. If an event does occur, the proper authorities on control and containment would be notified. The system would not control a fire if a tank started by an airplane crash or sabotage. The system would prevent additional oil from flowing into the affected area. |
| | | | | Tank roof sensor to detect jammed roof. | | Provides immediate knowledge of potential vapor build-up that could lead to an explosion. |

4-58

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|---|---|---|---|---|---|---|
| | | | | Reduce Probability | Reduce Consequences | |
| Loss of power at a pump station with natural gas supply. | Cannot be predicted, no statistical data base. | No direct environmental consequences. | UPS (Uninterruptable Power Supply) System at pump stations for monitoring equipment (RTUs). | | | Will prevent system shutdown due to loss of power. The other pump stations will maintain flow until the down station is repaired. |
| Loss of power at a pump station without natural gas supply. Transmission line down or power plant down. | Cannot be predicted, no statistical data base. | No direct environmental consequences. | UPS System at pump stations for monitoring equipment (RTUs). | | | Will prevent system shutdown due to loss of power. The other pump stations will maintain flow until the down pumps are repaired. |
| Loss of power at the Cadiz tank farm. Transmission line down or power plant down. | Cannot be predicted, no statistical data base. | No direct environmental consequences. | UPS System at pump stations for monitoring equipment (RTUs). | | | Will prevent system shutdown due to loss of power. Oil will bypass tank farm. |
| Loss of communications to/from a pump station with natural gas supply. Telephone lines or microwave system failure because of human error, sabatage, storm, system breakdown. | Cannot be predicted, no statistical data base. | Station would continue to run as long as preset limits are not exceeded. Maintenance personnel would be dispatched to correct problem. | Station controls designed for unattended fail-safe operation. | | | Will prevent system shutdown due to loss of communications. |
| Loss of communications to/from a pump station without natural gas supply. Telephone lines or microwave system failure because of human error, sabatage, storm, system breakdown. | Cannot be predicted, no statistical data base. | Station would continue to run as long as preset limits are not exceeded. Maintenance personnel would be dispatched to correct problem. | Station controls designed for unattended fail-safe operation. | | | Will prevent system shutdown due to loss of communications. |

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|---|---|---|---|---|---|---|
| | | | | Reduce Probability | Reduce Consequences | |
| Loss of communication to/from Cadiz tank farm. Telephone lines or microwave system failure because of human error, sabotage, storm, system breakdown. | Cannot be predicted, no statistical data base. | Station would continue to run as long as preset limits are not exceeded. Maintenance personnel would be dispatched to correct problem. | Station controls designed for unattended fail-safe operation. | | | Will prevent system shutdown due to loss of communications. |

Note 1: Gaviota to Emidio = Getty pipeline; Las Flores to Blythe = Celeron/All American pipeline in California; Blythe to McCamey = Celeron/All American pipeline in Arizona, New Mexico, and Texas.

Note 2: Assumes spill would occur within one-half mile of a stream.

Note 3: Assumes a spill occurring anywhere within the 10-mile coastal segment would reach a coastal stream.

Note 4: Source: OIW, September 1979.

Note 5:

Fire/Explosion Damage Magnitude

| | | |
|---|---|---|
| > $ 1,000 | $1.6 \times 10^{-2}$ per year | (0.48 fires in 30 years) |
| $ 1,000 - $ 10,000 | $6.9 \times 10^{-3}$ per year | (0.21 fires in 30 years) |
| $ 10,000 - $ 100,000 | $3.4 \times 10^{-3}$ per year | (0.10 fires in 30 years) |
| $ 100,000 - $ 500,000 | $4.4 \times 10^{-3}$ per year | (0.13 fires in 30 years) |
| Over - $ 500,000 | $9.4 \times 10^{-4}$ per year | (0.03 fires in 30 years) |

Source: OIW, September 1979

Note 6: Oil fire emissions (lb/bbl)

| | |
|---|---|
| $SO_2$ (assumes 5% sulfur) | 30.6 |
| CO | 16.5 |
| Hydrocarbons | 16.5 |
| Particulates | 3.3 |
| $NO_x$ | 1.1 |

## APPENDIX 4.4

## COLORADO RIVER OIL SPILL CONTINGENCY PLAN

### Introduction

The following <u>Draft</u> Oil Spill Contingency Plan for the Colorado River is presented here as a guide for the preparation of a finalized site-specific oil spill contingency plan. Additional information that should be incorporated into a final plan includes:

- Individual names and phone numbers of persons within federal, state, and local governments that are to be contacted.

- Names, phone numbers, and job description of the operator's personnel who would be responsible for coordinating cleanup efforts.

- Lists of local contractors who may be called upon to assist in containment or cleanup.

- Agencies and persons <u>upstream</u> of the spill site who may be called upon to reduce water deliveries from impounded/ controlled areas (e.g., Parker Reservoir).

Selection of equipment location, staging areas, booming locations, diversion areas, etc. was based on examination of topographic maps, sensitive resources identified in the EIR, and logistical analysis. The following aerial photos were also used to develop the draft contingency plan, and provide the rationale for some of the "logistical" site selections.



PHOTO 1

STAGING AREA AND BOAT LAUNCH JUST NORTH OF THE PROPOSED PIPELINE CROSSING.



PHOTO 2

SPILL CONTROL SITE NUMBER 1, APPROXIMATELY 1 MILE BELOW THE PROPOSED PIPELINE CROSSING



PHOTO 3

SPILL CONTROL SITE NUMBER 2 SHOWING LOCATION OF DIVERSION BOOM: APPROXIMATELY 2.5 MILES BELOW THE PROPOSED PIPELINE CROSSING. AS CAN BE SEEN IN THIS PHOTO, THE WETLANDS ON EITHER SIDE OF THE RIVER WOULD BE PROTECTED FROM SPILLED OIL BY THE LEVEES.



PHOTO 4

SPILL CONTROL SITES 3 AND 4, APPROXIMATELY 5 MILES BELOW THE PROPOSED PIPELINE CROSSING.

DRAFT

Colorado Oil Spill Contingency Plan

The operator shall have its Immediate Response Team on location of a spill (leak) within 1-2 hours of notification. Immediately upon receiving notification of a potential spill, the Pipeline Dispatcher will alert the International Boundary and Water Commission, Vic Vickers of the Arizona Department of Emergency Services, and _____. The operator proposes to locate sufficient spill containment equipment at its LaPaz Pump Station, approximately 9 miles east of the Colorado River crossing.

A full line rupture at the center of the Colorado River crossing would release approximately 3,506 (maximum) barrels of oil. The river, depending upon the amount of water being released from upstream dams and local precipitation, travels at rates between 2 and 6 feet per second. It will take a spill between 1 and 14 hours to reach the location of these actions. Based upon an on-site assessment, the operator's District Superintendent will either contain the spill with booms at locations SCS-1, SCS-2, and SCS-4 or initiate additional actions at SCS-5, SCS-6, and SCS-7.

4-64

**AREA**  Colorado River          **COUNTY**  Riverside Co., CA  **MAP REF.**  A-1,A-2, B

Yuma Co.,  AZ

**MAXIMUM SPILL SIZE**    3506 bbl

**NEAREST EQUIPMENT SITE**  La Paz pump station (approximately 9 miles from the location of the river crossing)

## SPILL CONTROL RECOMMENDATIONS

| LOCATION | RESPONSE | | REMARKS |
|---|---|---|---|
| | HIGH FLOW | LOW FLOW | |
| SCS-1 | B,C | B,D | 300ft booms high flow, 100ft booms low flow |
| SCS-2 | A | A | |
| SCS-3 | B,C | B,D | |
| SCS-4 | B,C | B,D | |
| SCS-5 | B,C | B,D | |
| SCS-6 | B,C | B,D | |
| SCS-7 | B,C | B,D | |

## SPECIAL FEATURES/SPILL CONTROL PROCEDURES

o  Boom deployment may be aided by use of existing bridge structures (SCS-5,6)
o  River velocity during moderate to peak flow may preclude effective booming. During lower flow periods bury boom skirt on banks and bars.

## ENVIRONMENTAL INVENTORY REFERENCE

Cleanup Techniques 1,2,3 ,4

WATER CROSSING/HYDROLOGIC CHARACTERISTICS

| Max. Discharge | Min. Discharge | Ave. Discharge |
|---|---|---|
| 39,900 cfs (August 17, 1983) | 1060 cfs (November 25, 1972) | 7,586 cfs |



Map A−I. Colorado River Oil Spill Contingency Plan−−Logistics and Deployment

Map A-2 Colorado River

**Oil Spill Contingency Plan--Logistics and Deployment**



Map B Colorado River

Oil Spill Contingency Plan--Logistics and Deployment

## RESPONSE MAP KEY

### FACILITIES

 Pipeline Location
(terrestrial showing mileposts)

 Block Value

 Check Valve

 Pump Station

 Equipment Location

### ENVIRONMENTAL FACTORS

 Overland Oil Flow Direction

 Access (vehicular, unimproved, boat launch)

 Helicopter Landing Site

### RESPONSE ACTIONS

 Special Feature or
Spill Control Procedure

SCS-1　Spill Control/Containment
Site Number

 Suggested Boom Locations

 Possible Staging Area

4-69

# OIL SPILL CONTAINMENT

A.  River Diversion Booming

Use.  Booms are deployed on rivers at an angle to divert oil away from environmentally sensitive areas when currents are too great for containment.

Limitations.  Accessibility, implementation time, currents over 2 knots, and water depths less than 1 foot below bottom of boom skirt.

General Instructions.  Anchor one end of the boom to the shoreline just upstream of the area to be protected.  Tow free end by boat to a point which angles the boom downstream and towards the opposite shore. Optimum deployment angle is dependent on the current speed and the length and type of boom used.  The angle must be smaller in strong currents speed and the length and type of boom used.  The angle must be smaller in strong currents than in weak currents.  The same relation is true with regard to boom length.  If the spill is large or continuing, the boom should be anchored in place at the optimum angle.  Figure A-1 illustrates this technique.

Equipment Required.  Boat, anchors, and hand tools.

Maintenance.  Periodically check boom for leakage and adjust angle if necessary.  Also check boom for broken, deflated, or submerged sections and anchor points for security.

Cleanup.  Contaminated shorelines can be cleaned by techniques discussed in 3. Sorbent Recovery.

Variations.  If the area to be protected is large, additional diversion booms may be deployed downstream in the same manner.



**Figure A.1   RIVER DIVERSION BOOMING**

B.  River Containment Booming

Use.  Booms are deployed at an angle across a waterway to contain oil floating downstream for subsequent recovery.

Limitations.  Accessibility, implementation time, currents in excess of 2 knots, and water depths less than 1 foot below bottom of boom skirt.

General Instructions.  Anchor one boom end to the shoreline and use a boat or winch to pull the free end across the river and anchor it slightly upstream.  The optimum deployment angle depends on current velocity, boom length, and boom stability.  As currents and boom length increase the deployment angle decreases.  The boom may be anchored in several places to improve stability.  Figure B.1 shows cross sections of three stable booms and their optimum deployment angles under different current speeds.

Recover oil from downstream end of boom by skimming, pumping, or with vacuum trucks.  A containment pit dug into the shoreline aids containment and recovery (see Figure B.2).

Equipment Required.  Boat or winch, anchors, backhoe (to dig containment pit), and hand tools.

Maintenance.  Periodically check boom for leakage and adjust angle if necessary.  Also check boom for twisted, damaged, or submerged sections and anchors for security.

Cleanup.  Remaining sheens are recovered with sorbents.  Shorelines are cleaned using techniques described in 3. Sorbent Recovery, and booms are removed.

Variations.  For wide rivers, deploy booms from each side with one slightly downstream of the other.  Anchor the free ends to overlap somewhat past mid-stream.  If sufficient boom is unavailable, deploy a single boom from the side of the river with the heaviest concentration of oil or from the outside shore of a bend in the river where oil concentrates naturally.  Both variations are shown in Figure B.3.

4-73



Figure B.I   CROSS SECTIONS OF 3 HIGH-STABILITY BOOM TYPES AND OPTIMUM DEPLOYMENT ANGLES UNDER VARIOUS CURRENTS



**Figure B.2   RIVER CONTAINMENT BOOMING**



**Figure B.3  WIDE RIVER CONTAINMENT BOOMING**

C.  Cascading Booming

Use.  A series of booms deployed in a cascading formation are used to direct oil to the shore for recovery on rivers where currents are too strong for standard containment booming.

Limitations.  Accessibility, implementation time, currents over 2.5 knots, and soft stream bottoms.

General Instructions.  Tow lead boom to opposite shore or some point mid-stream and anchor at an angle to the current.  Deploy a second boom such that the leading end is anchored 25 to 30 feet downstream and somewhat overlapping the trailing end of the lead boom and angled toward the shoreline.  Successive booms are deployed in the same manner until the shoreline is reached.  Oil diverted to this point is recovered by skimming, pumping, or with vacuum trucks.  A containment pit can be dug into the river bank to assist recovery.  This technique is illustrated in Figure C.1.  Optimum boom deployment angel decreases as currents and boom length increases unless several anchor points are utilized along the boom.

Equipment Required.  Deployment boat, anchors, backhoe (to dig containment pit), and hand tools.

Maintenance.  Periodically check boom for leakage and adjust deployment angle if necessary.  Also check boom for damaged, twisted, or submerged sections and anchors for security.

Cleanup.  Remaining sheens are recovered with sorbents, shorelines are cleaned using techniques described in 3. Sorbent Recovery, and boom are removed.

Variations.  If booms are unavailable or water is too shallow, berms may be constructed with streambed or nearsite materials in the same cascading configuration (see Figure C.2).  Typically, cascading can utilize existing stream bed bars.

Current direction

Amount of
deflection

Oil recovery

Shoreline

Figure C.1  PLACEMENT CONFIGURATION OF 3 LENGTHS OF BOOM
(cascading deflection booms)



**Figure C.2  CASCADING BERMING**

D.  **Blocking Dam**

**Use**.  Dams are constructed across streambeds, ditches, or other dry drainage courses to block and contain any flowing oil.

**Limitations**.  Accessibility, implementation time, adequate storage behind dam, flowing water, and availability of construction materials.

**General Instructions**.  Dam location should have high banks on upstream side with dam well keyed into banks.

Construct dam with on/near site earthen materials, sandbags, plywood sheets, or any material that blocks flow (Figure D.1).  Excavate earthen materials from upstream side to increase storage capacity.  Oil is recovered from behind the dam by pumping or vacuum trucks.

**Equipment Required**.  Bulldozer, front-end loader, backhoe, or hand tools.

**Maintenance**.  Periodically check dam for leaks, structural integrity, and excessive oil buildup.

**Cleanup**.  Recover remaining oil concentrations or sheens with sorbents, remove or treat contaminated sediments, and dismantle dam or replace earthen materials to excavation site.

**Variations**.  Containment area behind dam can be water flooded to limit oil penetration into sediments.



**Figure D.1  SANDBAG BLOCKING DAM**

# OIL SPILL CLEANUP TECHNIQUES

1.  <u>Vacuum Trucks</u>

<u>Objectives</u>.  To recover oil from land and water surfaces by using suction generated by the vacuum truck to draw oil from concentrated areas into the truck for transport to reprocessing or disposal facilities.

<u>Limitations</u>.  Access to spill site, high viscosity oils, thinness of oil concentration, and heavy debris.

<u>General Instructions</u>.  Position truck adjacent to area of heaviest oil concentration such as behind booms, berms, trenches, sumps, etc. Suction hose nozzle is placed in the oil and maneuvered manually until recovery becomes inefficient.  Light sheens should be recovered with sorbents.  Screens should be fitted over nozzle to prevent ingestion of sediments or debris.  When recovering oil on water, a duck bill or manta ray type skimmer head should be attached to the suction nozzle.  This technique is illustrated in Figure 1.1.

<u>Logistics</u>.  The primary logistical requirements for the vacuum truck techniques are given in Table 1.1.

<u>Variations</u>.  Vacuum truck may be left onsite with recovered oil pumped periodically to tank trucks (can improve turn-around time in some cases, and vacuum truck acts as a primary oil-water separator).



**Figure I.I   VACUUM TRUCK OIL RECOVERY**

TABLE 1.1

LOGISTICAL REQUIREMENTS FOR THE VACUUM TRUCK TECHNIQUE

| | Typical Suction Rate for Pooled Oil | Typical Suction Rate for Oil on Water | Fill Time for 110-Barrel Truck |
|---|---|---|---|
| **Equipment** | | | |
| • Vacuum truck w/3" suction hose | 100 gpm (75% oil) | 50 gpm (5% oil) | 3/4 hr @ 100 gpm 1 1/2 hr 50 gpm |
| • Number of vacuum trucks required | Dependent on quantity of oil and number of pools present | Dependent on quantity of oil and number of recovery sites. Also on oil/water ratio. | |

Personnel - 1 person per suction hose and 1 to 2 persons for manual skimming and concentrating of oil, and 1 supervisor.

| Support | Range of Capacities |
|---|---|
| • Vacuum truck 6" suction hose 4" suction hose 3" suction hose | • 6 to 140 barrel @ 42 gallons/barrel 700 to 800-900 gpm max.[a] 500 to 600 pgm max.[a] 300 to 400 gpm max.[a] |
| • Devices for concentrating oil on water | • Booms, skimming boards, low-pressure water hoses |

Access requirements - heavy equipment

[a]Intake completely submerged, drawing water with little or no suction lift.

4-85

2.  <u>Portable Skimmers/Pumps</u>

<u>Objectives</u>.  To recover small to moderate concentrations of oil from terrestrial or aquatic areas, where larger equipment cannot be brought in.

<u>Limitations</u>.  Accessibility, high viscosity oils, sheens, adequate means of storage or disposal, and adverse environmental conditions (excessive wave heights or currents).

<u>General Instructions</u>.  Position the skimmer or pump suction hose in the area of heaviest oil concentration behind booms, berms, trenches, etc., or where water currents will drive the oil to the skimmer or hose intake.  Continually reposition the intake into area of thickest oil concentration.  Duck bill type skimmer heads should be fitted to suction hose for aquatic spills or screens for terrestrial spills.  Pump recovered oil to a temporary storage facility such as a tank truck, 55-gallon drums, pillow tanks, or lined pit.  This technique is illustrated in Figure 2.1.

When using portable skimmers in shallow water a hole may have to be excavated in the bottom of the shallow waterway if the skimmer draft is greater than the water depth.  Oil can now be herded or forced to the skimmer location by low pressure water flushing or by deploying a boom around a floating slick and pulling it to the floating skimmer.

<u>Logistics</u>.  The primary logistical requirements for using portable skimmers or pumps are given in Table 2.1.

<u>Variations</u>.  Portable skimmers can also be deployed from boats to recover open water spills contained by booms.  Skimmer is operated as described previously and may be used with a floating bladder tank for oil storage as illustrated in Figure 2.2.  Portable endless rope skimmers have particular application in shallow water areas such as wetlands or creeks.  A typical configuration is shown in Figure 2.3.



Figure 2.1   OIL RECOVERY USING PORTABLE PUMP,
SKIMMER HEAD, AND TANK TRUCK

TABLE 2.2

LOGISTICAL REQUIREMENTS FOR PORTABLE SKIMMERS/PUMPS

| Logistics | Typical Recovery Rate for Thick Oil Layer (2 mm) | Typical Recovery Rate for Thin Oil Layer (.1 mm) |
|---|---|---|
| **Equipment** | | |
| • High capacity trash pump w/3" suction hose | 75 gpm (50% oil) | 50 gpm (5% oil) |
| • Portable wier skimmer | _____ | _____ |
| • Portable disc skimmer | _____ | _____ |
| • Number of pumps or skimmers | Dependent upon quantity of oil and rate of introduction to skimmer or pump. | |

**Personnel** – 1 person per pump suction hose, 1 to 2 persons for skimming and concentrating of oil, and 1 supervisor.

| Support | | Range of Capacities |
|---|---|---|
| • Vacuum truck | | 6 to 140 barrels |
| • Tank truck | | 20 to 160 barrels |
| • 3" Suction hose | | 300 to 400 gpm max. |
| • Pillow tanks | | 2 to 2,500 barrels |



Figure 2.2  CONTAINED OIL SKIMMING
WITH PORTABLE SKIMMER



Figure 2.3  ENDLESS ROPE SKIMMER

3.   Sorbent Recovery

Objectives.  To recover small quantities of oil from terrestrial or aquatic areas, especially films or sheens remaining after skimming or pumping operations have been completed.

Limitations.   Solidified or highly weathered oil, recovery and disposal of oiled sorbents, and possible interference by granular sorbents may be difficult to control on water surface collecting agents, if used simultaneously.

General Instructions.  Place sorbents directly on the oil and turn continually until completely oiled.  Put oiled sorbents in plastic bags or leak proof containers and replace with clean ones.  Inert substrates can be wiped clean with sorbent pads or sheets.  Sorbent sweeps or booms may be pulled between two boats across aquatic areas or anchored across slow moving streams to recover sheens.

Logistics.  The logistical requirements are heavily dependent on the type and degree of oil contamination and therefore cannot be accurately quantified prior to a spill.  Some of the basic equipment and materials required for sorbent recovery are pitchforks, rakes, shovels, boats (if needed), and plastic bags, drums, debris boxes, or other leakproof containers.

Variations.  Sorbents can be placed on the ground in areas of heavy spill activities to prevent contamination of facilities, paths, work areas, etc.

4.  Soil Removal

In cases where oils have penetrated the soil, excavation may be the only means for removing the contamination and preparing the area for restoration.

No standard instructions can be given regarding soil removal. This is a costly procedure with environmental damaging potential and must be confined to the smallest possible area. However, any soil contaminated will require removal.

Any area undergoing substrate removal will require restoration. A preliminary step prior to attempting restoration procedures involves returning the substrate surface to its original elevation.

## APPENDIX 4.5

## AIR QUALITY ADDENDUM

### 1.0 Introduction

This addendum replaces Section 4.2.1 and Appendix A of the Draft EIR/EIS. Air quality related comments on the DEIR/EIS that were not addressed in the Response to Comments are addressed herein. The general feeling of the reviewers of the DEIR/EIS was that more backup information was needed. This addendum provides that information.

The air quality modeling results have also been updated to reflect changes in the design of the Celeron/All American Pipeline since the preparation of the DEIR/EIS. The principal design change is for the Cadiz pump/heater station and tank farm. The current plan calls for five 300,000 bbl tanks rather than three 500,000 bbl tanks. The number of valves has been reduced from about 320 to about 140. Additionally, current plans call for the pumps at Cadiz to be natural gas turbine driven rather than electric. The other important change is that new emission factors are now being used for the natural gas heaters and gas turbine pump/heaters. These emission factors, based on manufacturer's specifications, are lower than those used in the DEIR/EIS.

4-94

## 2.0 APPLICABLE AIR QUALITY STANDARDS AND REGULATIONS

The National Ambient Air Quality Standards (NAAQS) and the California Ambient Air Quality Standards are shown in Table 2-1. State ambient air quality standards in Arizona and Texas are identical to the NAAQS. The New Mexico ambient standards, which differ from the NAAQS, are shown in Table 2-2.

The Federal Prevention of Significant Deterioration (PSD) increments for $SO_2$ and TSP are shown in Table 2-3. The newly adopted air quality increments for Santa Barbara County are shown in Table 2-4.

It is also relevant to note that the San Bernardino County Air Pollution Control District's New Source Review Rule (Regulation XIII) applies to any new source or modification to an existing source that would result in a net emission increase of any air contaminant of 250 lbs/day (except CO, which is 750 lbs/day).

TABLE 2-1

(REVISED DEIR/EIS TABLE A-1)

NATIONAL AND CALIFORNIA AMBIENT AIR QUALITY STANDARDS

| Pollutant | Averaging Time | California Standards[1,3,6] | National Standards[2] Primary[3,4] | National Standards[2] Secondary[3,5] |
|---|---|---|---|---|
| $O_3$ | 1-hour | 0.10 ppm (200 µg/m³) | 235 µg/m³ (0.12 ppm) | Same as Primary |
| CO | 8-hour | 9 ppm (10 mg/m³) | 10 mg/m³ (9 ppm) | Same as Primary |
| | 1-hour | 20 ppm (23 mg/m³) | 40 mg/m³ (35 ppm) | Same as Primary |
| $NO_2$ | Annual average | NS[7] | 100 µg/m³ (0.05 ppm) | Same as Primary |
| | 1-hour | 0.25 ppm (470 µg/m³) | NS | NS |
| $SO_2$ | Annual average | NS | 80 µg/m³ (0.03 ppm) | NS |
| | 24-hour | 0.05 ppm[8] (131 µg/m³) | 365 µg/m³ (0.14 ppm) | NS |
| | 3-hour | NS | NS | 1,300 µg/m³ |
| | 1-hour | 0.5 ppm (1,310 µg/m³) | NS | NS |
| TSP | Annual Geometric mean | 60 µg/m³ (30 µg/m³) | 75 µg/m³ | 60 µg/m³ |
| (PM10) | 24-hour | 100 µg/m³ (50 µg/m³) | 260 µg/m³ | 150 µg/m³ |
| Sulfates | 24-hour | 25 µg/m³ | NS | NS |
| Lead | 30-day | 1.5 µg/m³ | NS | NS |

TABLE 2-1

(REVISED DEIR/EIS TABLE A-1  CONTINUED)

| Pollutant | Averaging Time | California Standards[1,3,6] | National Standards[2] Primary[3,4] | National Standards[2] Secondary[3,5] |
|---|---|---|---|---|
| | Calendar quarter | NS | 1.5 $\mu g/m^3$ | NS |
| $H_2S$ | 1-hour | 0.03 ppm (42 $\mu g/m^3$) | NS | NS |
| Ethylene | 8-hour 1-hour | 0.1 ppm 0.5 ppm | NS | NS |
| Visibility-Reducing Particles | One observation | In sufficient amounts to reduce the prevailing visibility to less than 70 percent | | |

Source:  California Air Quality Data, Summary of Air Quality Data Gaseous and Particulate Pollutant, Annual Summary, Vol XII, 1980.

[1]California standards, other than CO, $SO_2$ (1-hour), and PM10, are values that are not to be equaled or exceeded. The CO, $SO_2$ (1-hour), and PM10 standards are not to be exceeded.  PMID represent particulate matter less than 10$\mu$ in diameter.

[2]National standards, other than those based on annual averages or annual geometric means, are not to be exceeded more than once per year.

[3]Concentration is in units in which it was promulgated.  Equivalent units given in parentheses are based upon a reference temperature of 25°C and a reference pressure of 760 mm of mercury.  All measurements of air quality are to be corrected to a reference temperature of 25°C and a reference pressure of 760 mm Hg (1,013.2 millibars).  In this table, ppm refers to ppm by volume, or micromoles of pollutant/mole of gas.

[4]The levels of air quality necessary, with an adequate margin of safety, to protect public health.  Each state must attain the primary standards no later than 3 years after the state implementation plan is approved by EPA.

[5]The levels of air quality necessary to protect the public welfare from any known or anticipated adverse effects of a pollutant.  Each state must attain the secondary standards within a "reasonable time" after the implementation plan is approved by the EPA.

[6]Prevailing visibility is defined as the greatest visibility attained or surpassed around at least half of the horizon circle, but not necessarily in continous sectors.

[7]NS = No Standard

[8]This state standard is violated if there is also a simultaneous violation of the state 1-hour oxidant standard or the state 24-hour suspended particulate matter standards.

TABLE 2-2

(REVISED DEIR/EIS TABLE A-2)

NEW MEXICO AIR QUALITY STANDARDS

| | New Mexico Standard | Federal Standards Primary | Secondary |
|---|---|---|---|
| **TSP** | | | |
| 24-hour average | 150 µg/m³ | 260 µg/m³ | 150 µg/m³ |
| Annual geometric mean | 60 µg/m³ | 74 µg/m³ | 60 µg/m³ |
| **$SO_2$** | | | |
| 24-hour average | 0.10 ppm (260 µg/m³) | 0.14 ppm | NS |
| Annual arithmetic mean | 0.02 ppm (52 µg/m³) | 0.03 ppm | NS |
| 3-hour average | NS[1] | NS | 0.50 ppm |
| **CO** | | | |
| 8-hour average | 8.7 ppm (9.7 mg/m³) | 9 ppm | 9 ppm |
| 1-hour average | 13.1 ppm (14.5 mg/m³) | 35 ppm | 35 ppm |
| **$O_3$** | | | |
| 1-hour average | 0.06 ppm (120 (µg/m³) | 0.12 ppm | 0.12 ppm |
| **$NO_2$** | | | |
| 24-hour average | 0.10 ppm (200 µg/m³) | NS | NS |
| Annual arithmetic mean | 0.05 ppm (100 µg/m³) | 0.05 ppm | 0.05 ppm |
| **Lead** | | | |
| Calendar quarterly Arithmetic average | NS | 1.50 µg/m³ | NS |

Source:  Air Quality Bureau Annual Report, State of New Mexicio Health and Environmental Department, Environmental Improvement Division, 1981-1982.

[1]NS = No Standard

TABLE 2-3

(REVISED DEIR/EIS TABLE A-3)

PSD INCREMENT CEILINGS

($\mu g/m^3$)

| Pollutant and Averaging Time | Area Classification | |
| --- | --- | --- |
| | Class I | Class II |
| $SO_2$ | | |
| Annual | 2 | 20 |
| 24-hour | 5 | 91 |
| 3-hour | 25 | 512 |
| TSP | | |
| Annual | 5 | 19 |
| 24-hour | 10 | 37 |

Source:   EPA 40 CFR 52.21


TABLE 2-4

(REVISED DEIR/EIS TABLE A-4)

SANTA BARBARA COUNTY RULE 205.C AIR QUALITY INCREMENTS

| | Maximum Allowable Increase ($\mu g/m^3$) | | Baseline Date | Air Quality Standard |
| --- | --- | --- | --- | --- |
| | Class I | Class II | | |
| CO: | | | | |
| 8-hour maximum | 200 | 2,500 | 1/1/84 | 10,000 |
| 1-hour maximum | 800 | 10,000 | | 40,000 |
| $NO_2$: | | | | |
| Annual Arithmetic Mean | 2 | 25 | 1/1/84 | 100 |
| 1-hour maximum | 10 | 100 | | 470 |
| Reactive Organic Compounds | | | | |
| 3-hour maximum | 3 | 40 | 1/1/84 | 160 |
| Particulate Matter 10: | | | | |
| 24-hour maximum | 2 | 12 | 1/1/84 | 50 |

Source:   Santa Barbara County Air Pollution Control District, Air
Quality Rules and Regulations, 1984.

4-98

## 3.0 BASELINE AIR QUALITY

The relevant air quality data for 1980, 1981, and 1982 for Santa Barbara County, San Luis Obispo County, Kern County, and the Southeast Desert Air Basin of California are summarized in Tables 3-1, 3-2, 3-3, and 3-4, respectively. The stations shown are those nearest the pipeline route. Similar data for Arizona, New Mexico, and Texas are given in Tables 3-5, 3-6, and 3-7, respectively.

In assembling this data, preference was given to stations with relatively complete data during the 3-year period. If additional data were used to establish the background pollutant concentration at a specific point along the pipeline for use in comparing predicted total concentrations to standards, the specific data are identified in Section 6.0 of this addendum.

TABLE 3-1

(REVISED DEIR/EIS TABLE A-5 )

SUMMARY OF RELEVANT SANTA BARBARA COUNTY AIR QUALITY DATA

| Station | Year | $O_3$ (ppm) Maximum 1-Hour | $O_3$ (ppm) Mean Daily Maximum 1-Hour | $NO_2$ ($\mu g/m^3$) Maximum 1-Hour | $NO_2$ ($\mu g/m^3$) Annual Average | $SO_2$ ($\mu g/m^3$) Maximum 1-Hour | $SO_2$ ($\mu g/m^3$) Annual Average | TSP ($\mu g/m^3$) Maximum 24-Hour | TSP ($\mu g/m^3$) Annual Geometric Mean |
|---|---|---|---|---|---|---|---|---|---|
| El Capitan | 1980 | 0.12 | 0.061 | NA[1] | NA | 26 | 0 | 302* | 103 |
| | 1981 | 0.11 | 0.056 | NA | NA | 26 | 0 | 295 | 98 |
| | 1982 | 0.15 | 0.052 | NA | NA | 26 | 0 | 202 | 84 |
| Santa Ynez | 1980 | 0.09 | 0.039 | NA | NA | NA | NA | NA | NA |
| | 1981 | 0.11 | 0.048 | NA | NA | NA | NA | NA | NA |
| | 1982 | 0.11 | 0.053 | NA | NA | NA | NA | NA | NA |
| Santa Maria | 1980 | 0.09[2] | 0.044 | NA | NA | 183 | 5 | 293[4] | 98 |
| | 1981 | 0.10[2] | 0.043 | 75[3] | 17 | 183 | 5 | 416[4] | 92 |
| | 1982 | 0.10[5] | 0.031 | 94[3] | 17 | 314 | 3 | 260[4] | 65 |
| Maricopa | 1981 | NA | NA | NA | NA | NA | NA | 187 | 64 |
| | 1982 | NA | NA | NA | NA | NA | NA | 106 | 27 |

Source:  California Air Quality Data Summary of Air Quality Data Gaseous and Particulate Pollutants, Annual Summary, Vols. XII-XIV, 1980-1982.

Sampling Stations:

[1]Not Available

[2]East Main

[3]Glacier

[4]Library

[5]McClelland

*See note in Section 3.2.1.2 regarding El Capitan TSP.

TABLE 3-2

SUMMARY OF RELEVANT SAN LUIS OBISPO COUNTY AIR QUALITY DATA

| Station | Year | $O_3$ (ppm) | | $NO_2$ ($\mu g/m^3$) | | $SO_2$ ($\mu g/m^3$) | | TSP ($\mu g/m^3$) | |
|---|---|---|---|---|---|---|---|---|---|
| | | Maximum 1-Hour | Mean Daily Maximum 1-Hour | Maximum 1-Hour | Annual Average | Maximum 1-Hour | Annual Average | Maximum 24-Hour | Annual Geometric Mean |
| Nipomo | 1980 | 0.10 | 0.044 | 188 | 17 | 445 | 10 | 139 | 59 |
| | 1981 | 0.10 | 0.041 | 94 | 23 | 707 | 10 | 135 | 56 |
| | 1982 | 0.10 | 0.043 | 75 | 17 | 210 | 5 | 90 | 43 |

Source:   California Air Quality Data Summary of Air Quality Data Gaseous and Particulate Pollutants, Annual Summary, Vols. XII-XIV, 1980-1982.

4-101

TABLE 3-3

(REVISED DEIR/EIS TABLE A-6)

SUMMARY OF RELEVANT KERN COUNTY AIR QUALITY DATA

| Station | Year | $O_3$ (ppm) Maximum 1-Hour | $O_3$ (ppm) Mean Daily Maximum 1-Hour | $NO_2$ ($\mu g/m^3$) Maximum 1-Hour | $NO_2$ ($\mu g/m^3$) Annual Average | $SO_2$ ($\mu g/m$) Maximum 1-Hour | $SO_2$ ($\mu g/m$) Annual Average | TSP ($\mu g/m^3$) Maximum 24-Hour | TSP ($\mu g/m^3$) Annual Geometric Mean | CO ($mg/m^3$) Maximum 1-Hour | CO ($mg/m^3$) Maximum 8-Hour |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bakersfield | 1980 | 0.17[1] | 0.057 | 244 | 68 | 498 | 29 | 470[1] | 143 | 19 | 14.1 |
| | 1981 | 0.18[2] | 0.069 | 301 | 64 | 655 | 26 | 405[1] | 135 | 16 | 11.6 |
| 1982 | | 0.18[2] | 0.058 | 0.11[1] | 207 | 56 | 236 | 16 | 250[1] | 116 | 16 | 12.9 |
| Taft | 1980 | NA[3] | NA | NA | NA | NA | NA | 287 | 146 | NA | NA |
| | 1981 | NA | NA | NA | NA | NA | NA | 411 | 112 | NA | NA |
| | 1982 | NA | NA | NA | NA | NA | NA | 278 | 88 | NA | NA |

Source:   California Air Quality Data Summary of Air Quality Data Gaseous and Particulate Pollutants, Annual Summary, Vols. XII-XIV, 1980-1982.

Sampling Stations:

[1]Chester

[2]Edison

[3]Not Available

TABLE 3-4

(REVISED DEIR/EIS TABLE A-7)

SUMMARY OF RELEVANT AIR QUALITY DATA IN SOUTHEAST DESERT AIR BASIN

| Station | Year | $O_3$ (ppm) | | $NO_2$ ($\mu g/m^3$) | | TSP ($\mu g/m^3$) | | CO ($mg/m^3$) | |
| | | Maximum 1-Hour | Mean Daily Maximum 1-Hour | Maximum 1-Hour | Annual Average | Maximum 24-Hour | Annual Geometric Mean | Maximum 1-Hour | Maximum 8-Hour |
|---|---|---|---|---|---|---|---|---|---|
| Barstow | 1980 | 0.19 | 0.057 | 226 | 49 | 224 | 71 | 7 | 5.6 |
| | 1981 | 0.16 | 0.063 | 564 | 47 | 300 | 71 | 7 | 2.4 |
| | 1982 | 0.16 | 0.056 | 376 | 47 | 116 | 46 | 6 | 3.8 |
| Twentynine Palms | 1980 | 0.12 | 0.051 | NA[1] | NA | 244 | 50 | 9 | 8.9 |
| | 1981 | 0.15 | 0.060 | NA | NA | 160 | 53 | 9 | 8.4 |
| | 1982 | 0.13 | 0.062 | NA | NA | 96 | 41 | 3 | 2.1 |
| Boron | 1980 | NA | NA | NA | NA | 426 | 73 | NA | NA |
| | 1981 | NA | NA | NA | NA | 129 | 52 | NA | NA |
| | 1982 | NA | NA | NA | NA | 140 | 43 | NA | NA |
| Mojave | 1980 | NA | NA | NA | NA | 195 | 73 | NA | NA |
| | 1981 | NA | NA | NA | NA | 213 | 66 | NA | NA |
| | 1982 | NA | NA | NA | NA | 186 | 68 | NA | NA |

Source:  California Air Quality Data Summary of Air Quality Data Gaseous and Particulate Pollutants, Annual Summary, Vols. XII-XIV, 1980-1982.

[1]Not Available

TABLE 3-5

(REVISED DEIR/EIS TABLE A-8)

SUMMARY OF RELEVANT ARIZONA AIR QUALITY DATA

| Station | Year | $O_3$ (ppm) Maximum 1-Hour | $NO_2$ ($\mu g/m^3$) Maximum 24-Hour[1] | $NO_2$ ($\mu g/m^3$) Annual Average | $SO_2$ ($\mu g/m^3$) Maximum 24-Hour | $SO_2$ ($\mu g/m^3$) Annual Average | TSP ($\mu g/m^3$) Maximum 24-Hour | TSP ($\mu g/m^3$) Annual Average | CO ($mg/m^3$) Maximum 1-Hour | CO ($mg/m^3$) Maximum 8-Hour |
|---|---|---|---|---|---|---|---|---|---|---|
| Buckeye (Phoenix)[2] | 1980 | 0.06 (0.12) | (324) | (75) | 16 | 3 | 600 | 127 | (18.3) | (10.3) |
| | 1981 | (0.16) | (176) | (75) | 14 | 2 | 409 | 127 | (19.4) | (11.4) |
| | 1982 | (0.11) | (141) | (67) | 11 | 1 | 196 | 96 | (18.3) | (11.4) |
| Coolidge | 1980 | 0.07 | 86 | 10 | 22 | 1 | 220 | 87 | NA | NA |
| | 1981 | NA[3] | 40 | 13 | 74 | 4 | 253 | 92 | NA | NA |
| | 1982 | NA | 28 | 16 | 49 | 4 | 185 | 76 | NA | NA |
| Maricopa | 1980 | 0.05 | 94 | 10 | NA | NA | 219 | 55 | 6 | 1 |
| | ±1981 | NA | 33 | 7 | 17 | 2 | 155 | 54 | 16 | 9 |
| | 1982 | NA | 19 | 7 | 32 | 3 | 110 | 54 | NA | NA |
| Willcox | 1980 | NA | 27 | 18 | 24 | 13 | 160 | 44 | NA | NA |
| | 1981 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| | 1982 | NA | NA | NA | NA | NA | NA | NA | NA | NA |

Source:  1982 Air Quality Control for Arizona, Arizona Department of Health Services 1982.

[1]For information only.  Arizona does not have a 24-hour $NO_2$ standard.

[2]The Phoenix E. Monroe station $NO_2$ and S. Central Station $O_3$ and CO concentrations are given in brackets.

[3]Not Available

TABLE 3-6

(REVISED DEIR/EIS TABLE A-9)

SUMMARY OF RELEVANT NEW MEXICO AIR QUALITY DATA

| Station | Year | $O_3$ (ppm) Maximum 1-Hour | $NO_2$ ($\mu g/m^3$) Maximum 24-Hour | Annual Average | $SO_2$ ($\mu g/m^3$) Maximum 24-Hour | Annual Average | TSP ($\mu g/m^3$) Maximum 24-Hour | Annual Geometric Mean | CO ($mg/m^3$) Maximum 1-Hour | Maximum 8-Hour |
|---|---|---|---|---|---|---|---|---|---|---|
| Lordbury | 1980 | NA[1] | 56 | 19 | 26 | 0 | 200 | 56 | NA | NA |
| | 1981 | NA | 38 | 19 | 26 | 0 | 110 | 62 | NA | NA |
| | 1982 | NA | 38 | 19 | 26 | 0 | 193 | 55 | NA | NA |
| Denning | 1980 | NA | 56 | 38 | 0 | 0 | 178 | 70 | NA | NA |
| | 1981 | NA | 38 | 38 | 26 | 0 | 134 | 70 | NA | NA |
| | 1982 | NA | 38 | 19 | 26 | 0 | 262 | 60 | NA | NA |
| Anthony | 1980 | (0.10)[2] | 56 | 19 | 0 | 0 | 391 | 114 | (13.0) | (6.3) |
| | 1981 | (0.14) | 75 | 19 | 26 | 0 | 470 | 122 | NA | NA |
| | 1982 | (0.10) | 38 | 19 | 26 | 0 | 369 | 107 | NA | NA |

Source:  Air Quality Bureau Annual Report, State of New Mexico Health and Environmental Department, Environmental Improvement Division 1981-1982.

[1]Not Available

[2]()Las Cruces station (#6W) substituted for CO, La Union station (#60) for ozone.

4-105

TABLE 3-7

(REVISED DEIR/EIS TABLE A-10)

SUMMARY OF RELEVANT TEXAS AIR QUALITY DATA

| Station | Year | $O_3$ (ppm) Maximum 1-Hour | $NO_2$ ($\mu g/m^3$) Maximum 24-Hour | $NO_2$ ($\mu g/m^3$) Annual Average | $SO_2$ ($\mu g/m^3$) Maximum 24-Hour | $SO_2$ ($\mu g/m^3$) Annual Average | TSP ($\mu g/m^3$) Maximum 24-Hour | TSP ($\mu g/m^3$) Annual Geometric Mean | CO ($mg/m^3$) Maximum 1-Hour | CO ($mg/m^3$) Maximum 8-Hour |
|---|---|---|---|---|---|---|---|---|---|---|
| Odessa | 1980 | 0.11 | NS[1] | 19 | 26 | 0 | 201 | 58 | 20.9 | 10.8 |
| | 1981 | 0.10 | NS | 19 | 0 | 0 | 250 | 59 | 18.6 | 5.8 |
| | 1982 | 0.13 | NS | 19 | 26 | 0 | 402 | 71 | 6.3 | NA |
| San Antonio | 1980 | 0.12 | NS | 38 | 26 | 0 | 188 | 98 | 21.2 | 11.6 |
| | 1981 | 0.14 | NS | 38 | 26 | 0 | 143 | 76 | 20.4 | 9.0 |
| | 1982 | 0.14 | NS | 19 | 26 | 0 | 217 | 112 | 15.9 | 9.0 |

Sources:  Summary of Total Suspended Particulate Data, Texas Air Control Board 1980-1982.
Summary of Total Gaseous Pollutant Data Taxes Air Control Board 1980-1982.

[1]No standard in Texas.

[2]Not Available.

## 4.0 DEVELOPMENT OF PROJECT EMISSION ESTIMATES

The emissions inventory was developed for the construction and operational phases of the Getty and Celeron/All American pipelines. Input data to the emission estimations were suppled by Getty and All American. Emissions were calculated from manufacturer's specifications and emission factors from AP-42 and California Air Resources Board (CARB). The following sections provide the methods used to calculate the emissions for each phase.

### 4.1 Construction Emissions

Construction emissions were calculated for a pipeline spread that would construct a portion of the pipeline. It was assumed that Getty would use three spreads to construct its pipeline and Celeron/All American would use five spreads for its construction. Since each spread was identical, construction emissions were calculated for one spread and were assumed to be the same for the other spreads. Pollutants were projected in our typical pipeline spread to be emitted from several types of sources. These include: emissions from heavy-duty construction equipment, secondary emissions from passenger vehicles for transportation of workers to the site, dust and smoke from bush clearing and burning, and fugitive dust from the disturbed areas along the ROW. Tables 4-1 and 4-2 provide the parameters and emission factors used in the calculations of the Getty and Celeron/All American construction emissions, respectively. Table 4-3 shows the estimated emissions per spread using the information provided by Getty and Celeron/All American and emission factors from AP-42 and CARB vehicle emission factors.

### 4.2 Operational Emissions

Operational emissions consisted of the pollutants being emitted from natural gas-fired heaters and/or compressors from several pumping stations along the pipeline route; evaporative and fugitive hydrocarbon losses from valves, flanges and seals; and evaporative losses from the oil storage tank farm in Cadiz, California.

### Heaters and Compressors

$NO_x$, HC, and CO emission estimates for the heaters and compressors were based upon manufacturers specifications for the heating requirement at each station. $SO_2$ and TSP emissions were based upon emission factors found in AP-42, Section 1.4. These emission factors were 0.6 lb/MMSCF and 10.0 lb/MMSCF, respectively. The conversion factor of 1,000 BTU/SCF was used to determine the amount of fuel used based upon the heat requirements at each pumping station. The operational characteristics for the heaters/compressors at each pump station are shown in Table 4-4. Table 4-5 presents the emissions for each pump station along the proposed route.

4-107

TABLE 4-1

OPERATIONAL PARAMETERS USED TO CALCULATE CONSTRUCTION EMISSIONS
FOR THE PROPOSED GETTY PIPELINE

| Source Type[1] | Number of[1] Equipment | Operational[1] Parameter | Construction Parameters (per spread) | | | | | Units |
| | | | Emission Factors[1] | | | | | |
| | | | CO | HC | $NO_x$ | $SO_2$ | PM | |
|---|---|---|---|---|---|---|---|---|
| Tractors[2] | 21 @ 105 HP | 7.2 hrs/day | 2.39 | 0.69 | 9.08 | 0.85 | 0.69 | gm/HP-hr |
| Bulldozers[2] | 6 @ 200 HP | 7.2 hrs/day | 1.83 | 0.57 | 12.5 | ,0.87 | 0.41 | gm/HP-hr |
| Heavy Duty Gasoline Vehicles[2] | 10 @ 50 HP | 7.2 hrs/day | 198.0 | 6.49 | 4.79 | 0.26 | 0.30 | gm/HP-hr |
| Light Duty Gasoline Vehicles[3] | 16 | 68 mi/day | 12.25 | 1.3 | 2.44 | 0.13 | 0.35 | gm/mi |
| Miscellaneous Equipment - Diesel[2] | 3 @ 250 HP | 7.2 hrs/day | 2.82 | 1.04 | 14.8 | 0.93 | 0.90 | gm/HP-hr |
| Miscellaneous Equipment - Gasoline[2] | 8 @ 85 HP | 7.2 hrs/day | 198.0 | 6.49 | 4.79 | 0.26 | 0.30 | gm/HP-hr |
| Graders[2] | 6 @ 135 HP | 7.2 hrs/day | 2.19 | 0.49 | 10.5 | 0.87 | 0.63 | gm/HP-hr |
| Secondary Vehicle Emissions[3] | 129 | 68 mi/day | 12.25 | 1.3 | 2.44 | 0.13 | 0.35 | gm/mi |
| Burning (Weeds)[4] | 9.1 acres | 3.2 tons/acre | 85 | 12 | NA | NA | 15 | lb/ton |
| Disturbed Areas[5] | 9.1 acres | NA[6] | NA | NA | 1.2 | NA | NA | ton/acre-mos. |

[1]Source:  Getty Permit Application.

[2]Emission Factor:  AP-42, Sec. 3.2.7.2.

[3]Emission Factor:  Composite Emission Factors (45 mph); light duty passenger vehicles, cars, 1979.

[4]Emission Factor:  AP-42, Sec. 2.4.3.

[5]Emission Factor:  AP-42, Sec. 3.2.7.2.

[6]Not Applicable

TABLE 4-2

OPERATIONAL PARAMETERS USED TO CALCULATE CONSTRUCTION EMISSIONS
FOR THE PROPOSED CELERON/ALL AMERICAN PIPELINE

| Source Type[1] | Number of[1] Equipment | Operational[1] Parameter | $CO$ | $HC$ | $NO_x$ | $SO_2$ | $PM$ | Units |
|---|---|---|---|---|---|---|---|---|
| | | | | Emission Factors[2] | | | | |
| Tractors | 28 | 10 hrs/day | 0.386 | 0.110 | 1.47 | 0.137 | 0.112 | lb/hr |
| Farm Tractors | 22 | 10 hrs/day | 0.355 | 0.172 | 0.996 | 0.093 | 0.136 | lb/hr |
| Heavy Duty Diesel Vehicles | 57 | 108.4 mi/day | 28.7 | 4.6 | 20.9 | 2.8 | 1.3 | gm/mi |
| Heavy Duty Gasoline Vehicles | 5 | 108.4 mi/day | 188 | 19.4 | 12.5 | NA[3] | NA | gm/mi |
| Light Duty Gasoline Vehicles | 28 | 108.4 mi/day | 42.8 | 6.5 | 5.3 | NA | NA | gm/mi |
| Miscellaneous Equipment – Diesel | 18 | 10 hrs.day | 0.414 | 0.157 | 2.27 | 0.143 | 0.133 | lb/hr |
| Miscellaneous Equipment – Gasoline | 33 | 10 hrs/day | 17.0 | 0.728 | 0.412 | 0.023 | 0.026 | lb/hr |
| Graders | 2 | 10 hrs/day | 0.215 | 0.054 | 1.05 | 0.086 | 0.061 | lb/hr |
| Secondary Vehicle Emissions | 335 | 22 mi/day | 29.8 | 4.7 | 8.0 | 0.23 | 0.60 | gm/mi |
| Burning (Weeds) | 18.18 acres | 3.2 tons/acre | 85 | 12 | NA | NA | 15 | lb/ton |
| Disturbed Areas | 18.18 acres | NA | NA | NA | 1.2 | NA | NA | ton/acre-mo. |

[1]Source: All American Pipeline Company.

[2]AP-42, Secs. 2.4.3, 3.1.1.1, 3.1.4.2, 3.1.4.3, 3.1.5.1, 3.1.5.2, 3.2.6.2, 3.2.7.2, 11.2.4.3.

[3]Not Applicable

TABLE 4-3

EMISSIONS INVENTORY FOR CONSTRUCTION PHASE FOR THE
GETTY AND CELERON/ALL AMERICAN PIPELINE

| | Emissions (lb/day) | | | | |
|---|---|---|---|---|---|
| | $NO_x$ | $SO_2$ | TSP | CO | HC |
| **PIPELINE CONSTRUCTION[1]** | | | | | |
| **Celeron/All American** | | | | | |
| Tractors | 630.7 | 58.9 | 61.3 | 186.2 | 68.6 |
| Graders | 21.0 | 1.7 | 1.2 | 4.3 | 1.1 |
| Misc. Equipment-Diesel | 408.6 | 25.7 | 25.0 | 74.5 | 28.3 |
| Misc. Equipment-Gasoline | 136.0 | 7.6 | 8.6 | 5,610.0 | 240.2 |
| Heavy Duty Diesel Vehicles | 284.7 | 38.1 | 17.7 | 390.9 | 62.7 |
| Heavy Duty Gasoline Vehicles | 14.9 | 0.0 | 0.0 | 224.6 | 23.2 |
| Light Duty Gasoline Vehicles | 35.5 | 0.0 | 0.0 | 286.4 | 43.5 |
| Secondary Vehicle Emissions | 130.0 | 3.7 | 9.7 | 484.2 | 76.4 |
| Weed Burning | 0.0 | 0.0 | 872.7 | 4,945.5 | 698.2 |
| Wind Erosion | 0.0 | 0.0 | 1,454.5 | 0.0 | 0.0 |
| TOTAL | 1,661.4 | 135.7 | 2,450.7 | 9,206.6 | 1,242.20 |
| **Getty** | | | | | |
| Tractors | 273.0 | 25.2 | 21.0 | 71.4 | 21.0 |
| Bulldozers | 204.0 | 14.4 | 6.6 | 30.0 | 9.0 |
| Heavy Duty Gasoline Vehicles | 32.0 | 2.1 | 2.4 | 1,340.0 | 44.0 |
| Light Duty Gasoline Vehicles | 4.8 | 0.3 | 0.6 | 25.6 | 3.2 |
| Misc. Equipment-Diesel | 150.9 | 9.6 | 9.3 | 28.8 | 10.5 |
| Misc. Equipment-Gasoline | 44.0 | 2.8 | 3.2 | 1,829.6 | 60.0 |
| Graders | 115.8 | 9.6 | 6.6 | 24.0 | 5.4 |
| Secondary Vehicle Emissions | 40.5 | 2.2 | 5.0 | 202.8 | 21.5 |
| Weed Burning | | | 436.8 | 2,475.2 | 349.4 |
| Disturbed Areas | 0.0 | 0.0 | 727.2 | 0.0 | 0.0 |
| TOTAL | 865.0 | 66.2 | 1,218.7 | 6,027.4 | 524.0 |

Source:  Emission Factors = AP-42, Sec. 2.4, Sec. 3.1, Sec. 3.2, and
Sec. 11.2.

TABLE 4-4

OPERATIONAL PARAMETERS USED TO CALCULATE PUMP STATION EMISSIONS
FOR THE PROPOSED CELERON/ALL AMERICAN PROJECT

| Pump Station | Number of Heaters | Number of Pump Seals | Number of Valves-Flanges | Heat Requirement (MMBTU/hr) | Throughput (BPD) |
|---|---|---|---|---|---|
| Cuyama | 1 | 2 | 30 | 51.5 | 300,000 |
| Emidio[2] | 0 | 4 | 35 | 0 | 230,000 |
| Tejon | 0 | 4 | 30 | 0 | 230,000 |
| Twelve-Gauge | 2 | 4 | 30 | 52.7 | 230,000 |
| Cadiz[3] | 2 | 4 | 138 | 75.9 | 300,000 |
| La Paz[3] | 2 | 4 | 40 | 75.3 | 300,000 |
| Gila[3] | 2 | 4 | 40 | 86.1 | 300,000 |
| Coolidge[3] | 2 | 4 | 40 | 68.1 | 300,000 |
| Tom Mix[4] | 2 | 4 | 40 | 0 | 300,000 |
| Hot Springs[3] | 2 | 4 | 40 | 75.9 | 300,000 |
| Lordsburg | 2 | 4 | 40 | 90.7 | 300,000 |
| Anthony | 2 | 4 | 40 | 88.2 | 300,000 |
| Salt Flats | 2 | 4 | 40 | 83.1 | 300,000 |
| Wink | 2 | 4 | 54 | 89.9 | 300,000 |
| McCamey | 0 | 0 | 54 | 0 | 300,000 |

[1]$NO_x$ emission estimates were manufacturer's specifications, G.C. Branch Co., Tulsa, Oklahoma, July, 1984.  $SO_2$ emissions were calculated using AP-42, Sec. 1.4-1; 0.6 lb-$SO_2$/$10^6$ SCF and 1000 BTU/scf; TSP emissions were calculated using AP-42, Sec. 1.4-1; 10 lb-TSP/$10^6$ scf and 1000 Btu/scf; HC emissions for pump seals were calculated using AP-42, Sec. 9.1.2; 3 lb-HC/seal-day; HC emissions for valves and flanges were calculated using AP-42, Sec. 9.1.2; 0.15 lb/valve-day.

[2]Two heaters will be in place at Emidio and will be used in the start-up (low throughput) phase.  However, once the actual throughput approaches the maximum throughput consistently, these heaters will not be used.

[3]Heaters and compressors will be combined in a waste heat recovery process.

[4]Compressors only.

4-111

TABLE 4-5

EMISSIONS INVENTORY FOR THE OPERATION PHASE
FOR THE GETTY AND CELERON/ALL AMERICAN PIPELINE

| | Emissions (lb/day) | | | | |
| | $NO_x^1$ | $SO_2^2$ | $TSP^2$ | $CO^1$ | $HC^{1,3}$ |
|---|---|---|---|---|---|
| **PIPELINE OPERATION** | | | | | |
| | | | | | |
| **Las Flores - Emidio** | | | | | |
| Cuyama Pumping Station | | | | | |
|   Heaters | 192.0 | 0.6 | 1.1 | 48.0 | 8.0 |
|   Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| | | | | | |
| **Emidio - Blythe** | | | | | |
| Emidio Pump Station | | | | | |
|   Heaters | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
|   Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 17.3 |
| | | | | | |
| Tejon Pump Station | | | | | |
|   Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 16.5 |
| | | | | | |
| Twelve-Gauge Pump Station | | | | | |
|   Heaters | 197.3 | 0.8 | 12.6 | 0.0 | 0.0 |
|   Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 16.5 |
| | | | | | |
| Cadiz Pump Station | | | | | |
|   Heaters-Compressors | 480.4 | 1.1 | 18.2 | 0.0 | 0.0 |
|   Tanks | 0.0 | 0.0 | 0.0 | 0.0 | 75.0 |
|   Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 32.7 |
| | | | | | |
| **Blythe - McCamey** | | | | | |
| La Paz Pump Station | | | | | |
|   Heaters-Compressors | 480.0 | 1.1 | 18.1 | 0.0 | 0.0 |
|   Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| | | | | | |
| Gila Pump Station | | | | | |
|   Heaters-Compressors | 483.4 | 1.2 | 20.7 | 0.0 | 0.0 |
|   Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| | | | | | |
| Coolidge Pump Station | | | | | |
|   Heaters-Compressors | 481.4 | 1.0 | 16.3 | 0.0 | 0.0 |
|   Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| | | | | | |
| Tom Mix Pump Station | | | | | |
|   Compressors | 479.6 | 0.0 | 0.0 | 168.4 | 48.9 |
|   Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |

TABLE 4-5 (continued)

EMISSIONS INVENTORY FOR THE OPERATION PHASE
FOR THE GETTY AND CELERON/ALL AMERICAN PIPELINE

| | Emissions (lb/day) | | | | |
|---|---|---|---|---|---|
| | $NO_x^1$ | $SO_2^2$ | $TSP^2$ | $CO^1$ | $HC^{1,3}$ |
| Hot Springs Pump Station | | | | | |
| Heaters-Compressors | 477.6 | 1.1 | 18.2 | 0.0 | 0.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| Lordsburg Pump Station | | | | | |
| Heaters | 185.2 | 1.3 | 21.8 | 0.0 | 0.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| Anthony Pump Station | | | | | |
| Heaters | 232.3 | 1.3 | 21.2 | 0.0 | 0.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| Salt Flats Pump Station | | | | | |
| Heaters | 173.2 | 1.2 | 19.7 | 0.0 | 0.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| Wink Pump Station | | | | | |
| Heaters | 236.7 | 1.3 | 21.6 | 0.0 | 0.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 20.1 |
| McCamey Delivery Station | | | | | |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 8.1 |

Source:  [1]$NO_x$, HC, CO Heater/Compressor Emissions- Manufacturer's Specification, The G.C. Broach Co., Tulsa, Oklahoma, July 1984.

Source:  [2]$SO_2$ and TSP Emissions-AP-42, Sec. 1.4-1.

Source:  [3]Fugitive HC Emissions-AP-42, Sec. 9.1.2.

4-113

Valves, Flanges, and Pump Seals

Evaporative HC emissions are emitted due to leaks from miscellaneous valves, flanges, and seals. AP-42 emission factors of 0.15 lb/day-valve (for valves and flanges) and 3.0 lb/day-seal (for pump seals) were used to calculate the fugitive HC losses due to these sources at each pump station. Table 4-4 gives the number of valves and flanges at each site. It is assumed that 6 pump seals would be installed at each pump station. The fugitive emissions are given in Table 4-5 and are broken down for each station.

Oil Storage Tanks

The hydrocarbon emissions from the crude oil storage tanks at Cadiz, shown in Table 4-5, were determined as the sum of the standing storage loss, $L_s$, and the working loss, $L_w$. The standing storage loss was calculated from the formula (AP-42, Supplement 12)

$$L_s = K_s V^N P^* D M_v K_c E_f$$

where,

Ks = seal factor = 0.2 [lb-mole]/[ft(mph)$^N$ yr]

V = average wind speed at tank site = 10 mph
(mean of annual averages for Daggett and Rice)

N = seal-related wind speed experiment = 1.0

P* = vapor pressure function = 0.160
(assume product true vapor pressure of 7.0 psia)

D = tank diameter = 183 ft

$M_v$ = average vapor molecular weight = 50 lb/lb mole

$K_c$ = product factor = 0.4

$E_f$ = secondary seal factor = 0.25 (tank and seal in good condition)

The annual standing storage loss thus calculated is 293 lbs/year per tank; the 5-tank total is, therefore, 0.7 tons/year (4 lbs/day). The working loss was calculated from the formula

$$L_w = \frac{0.943 \, QCW}{D}$$

where,

Q = annual throughput = 300,000 x 365 barrels

C = drainage factor = 0.0060 bbl/1,000 ft$^2$

W = density of the crude oil = 7.67 lb/gal

D = tank diameter = 183 ft

4-114

The working loss is 5,190 lbs/year tank; the 5-tank total is 13 tons/year (71 lb/day).

### Relief Tank

The plan for both the Getty pipeline and Celeron/All-American pipeline is to have a relief tank at Emidio to handle temporary and infrequent surges in the pipeline pressure, such as would result after the closing of a block valve (before the pumps shut down). As a worst case, it is estimated that one day per year it would be necessary to divert 5,000 bbl of oil into the relief tank. Since it is necesssary that the tank be able to fill quickly, a fixed-roof tank without an internal floater is best suited to this application. However, the HC emissions resulting from a worst-case surge, though short term in nature ($\leq 1$ hour), can be sizable for a fixed-roof tank. The emission factor for the working losses from a fixed-roof tank is calculated from the formula (AP-42, Supplement 12):

$$L_w = 0.024 \, M_v P K_N K_c$$

where,

$M_v$ = molecular weight of the vapor = 50 lb/lb-mole

$P$ = true vapor pressure of the crude oil  7.0 psia

$K_N$ = turnover factor = 1.0

$K_c$ = crude oil factor = 0.84

The resulting emission factor is 7.1 lbs/1000 gals. Therefore, the working loss for a 5,000 bbl surge is 1,490 lbs of HC. It should be stressed that such a release does not occur during normal pipeline operation and represents a worst-case estimate.

## 5.0 MODELING METHODOLOGY

### 5.1 Nonreactive Modeling

In order to calculate maximum project concentrations from the construction phase of the pipeline, the Industrial Source Complex (ISC) model was used. This model was selected because of its ability to simulate a line source, which is most appropriate for the construction phase. The construction emissions were assumed to be distributed over a 5-mile by 100-ft rectangle. Receptors were assumed to be placed along the pipeline length every 100 meters downwind from the line source. Only short-term concentrations were calculated since construction occurs for a relatively short period of time at any location. One-hour average concentrations were calculated using the ISC model for two meteorological conditions. Table 5-1 shows the model inputs used in the calculations. Since the construction workers would be working 10-hour days (during daylight hours), it was assumed (worst case) that a maximum of 1 hour would occur during stable, low wind speed conditions. Thus, maximum 1-hour concentrations were derived from the results of the ISC model for the stable case (stability class F). However, since the stable condition could occur only during the first hour of construction each day, the remaining hours would probably be unstable to neutral. Under worst-case conditions, it was assumed that the remainder of the hours would be neutral. (Neutral, low wind speed conditions could occur during cloudy conditions.) Thus, maximum 3- and 8-hour average concentrations were calculated by allowing 1 hour of stable conditions and having the remainder of the hours be neutral stability and light wind speeds. Maximum 24-hour concentrations were computed assuming 1 hour of stable conditions and 9 hours of neutral conditions. The remaining 14 hours would have no effect on the 24-hour average concentrations, due to the planned 10-hour workday.

For the operational phase, the Environmental Protection Agency (EPA) PTPLU and VALLEY models were used to determine the maximum project concentrations at each pump station. The PTPLU model was used to model flat-terrain, short-term situations. The VALLEY model was used for complex terrain, short-term scenarios and annual average modeling.

In the near-field and in relatively smooth terrain, the PTPLU model was used to calculate maximum short-term concentrations from the operation of the proposed pipeline. Since no source orientations have been finalized, all point sources at each station were conservatively assumed to be omitted from a single location. For each pumping/heating station, 1-hour concentrations were computed for a series of meteorological conditions in order to determine the 1-hour maximum concentration. The worst-case, 3-hour concentration was conservatively determined by allowing the 1-hour concentration to persist for 3 hours. Maximum 8-hour concentrations were calculated for three scenarios. First, the maximum 1-hour concentration during unstable conditions was assumed to persist for 4 hours in the worst-case direction. The remaining hours were assumed to be from a direction that would have no effect on the maximum concentration. Secondly, the maximum 1-hour neutral stability concentration was allowed to persist for 8 hours. Thirdly, the maximum 1-hour concentration during stable conditions persisted for 6 hours with the remaining hours having no effect. The

4-116

TABLE 5-1

MODEL INPUTS USED IN THE ISC MODEL FOR

CONSTRUCTION ANALYSIS

Volume Source Data[1]

| | |
|---|---|
| Length | = 30.5 m |
| Width | = 30.5 m |
| Height | = 10.0 m |
| Elevation | = 0.0 m |
| Temperature | = 293.0°K (ambient) |
| Emission Rate[2] | = 1 g/sec |

Meteorological Data

| | |
|---|---|
| Wind Direction | = 0° |
| Wind Speed | = 1.0 m/sec |
| Mixing Height | = 10,000 m |
| Temperature | = 293.0°K |
| Stability | = 4,6 |

Source:  ERT

[1]Source data represent data for a single box.  Using a series of those boxes next to each other would then represent a line source.  As suggested in the ISC Manual, 132 boxes would be required to represent a 5-mile line source.

[2]Concentrations for each pollutant would be computed by using the ratio of the actual emissions (Table 4-3) to the generic emission rate (1 g/sec).

4-117

maximum concentration derived from these three scenarios was assumed to be worst case. The maximum 24-hour concentration was determined using the same technique as in the 8-hour determination, with one exception. Neutral conditions were allowed to persist for 12 hours rather than 8 hours. As in the construction phase, maximum background values in the vicinity of each pumping station were obtained to determine total ambient concentrations. Table 5-2 presents the inputs used to model the short-term worst-case impacts.

The VALLEY model was used to compute maximum short-term concentrations in complex terrain and annual concentrations. Short-term concentrations were modeled assuming stable conditions and allowing the plume to impact on surrounding high terrain. These results were then compared with the PTPLU results to determine maximum short-term concentrations. Table 5-3 displays the model inputs used in the VALLEY modeling analysis. Due to the paucity of summarized wind data near the pump stations, annual modeling was performed for three locations along the pipeline route that would represent the worst case impacts. Daggett, Tucson, and El Paso Star windroses were used as input into the VALLEY model along with the source emissions from Cadiz, Hot Springs, and Anthony stations, respectively, to determine maximum annual project concentrations. It should be noted that the sector-averaging VALLEY model is appropriate for determining annual average concentrations from a windrose because the wind direction data are reported on a 16-point compass system, i.e., in 22.5° sectors. Therefore, by using sector averaging one only assumes that on an annual basis the wind blows with equal frequency from all directions within each sector.

## 5.2 Reactive Modeling

ERT's PLMSTAR model was used to assess the impact of the reactive pollutant emissions from the proposed Cadiz pumping/heating station and tank farm on the ozone levels in the Southeast Desert Air Basin. The PLMSTAR trajectory model is described in Attachment I of this addendum. The emission rates for HC and $NO_x$ from the proposed Cadiz facility are given in Section 4.3 above. These rates were used in the photochemical modeling with one exception. The rate of standing storage loss of HC from the tanks was adjusted down to correspond to the wind speed of the modeling scenario (i.e., 1 m/s) that is lower than the annual average wind speed. This results in HC emissions of 105 lbs/day to go along with the operational $NO_x$ emissions of 480 lbs/day.

Simulations were made for one trajectory, with meteorological conditions conducive to high ozone concentrations. The meteorological inputs were developed from data available from past studies in the high desert area of California [e.g., SCE (1979), Hovind (1968)]. The assumed date was June 21, the summer solstice. Wind speeds were assumed to be light when the parcel passes over the Cadiz site, heading toward the northeast. It was assumed that the only significant emissions into the parcel were due to the proposed Cadiz facility; therefore, there is actually no directional dependence to the simulation inputs.

TABLE 5-2

MODEL INPUTS USED IN THE PTPLU MODEL FOR

OPERATIONAL ANALYSIS

| Source Data | Heaters |
|---|---|
| Stack Height (m) | 9.1 |
| Stack Diameter (m) | 1.1 |
| Stack Velocity (m/sec) | 6.9 |
| Stack Temperature ($^\circ$K) | 450.0 |
| Emission Rate (g/sec)[1] | 1.0 |

| Stability | Wind Speed (m/sec) | Temperature ($^\circ$K) | Wind Direction (degrees) | Mixing Height (meters) |
|---|---|---|---|---|
| 1 | 0.5 | 293 | 180 | 400 |
| 1 | 0.8 | 293 | 180 | 400 |
| 1 | 1.0 | 293 | 180 | 400 |
| 1 | 1.5 | 293 | 180 | 400 |
| 1 | 2.0 | 293 | 180 | 400 |
| 1 | 2.5 | 293 | 180 | 400 |
| 1 | 3.0 | 293 | 180 | 400 |
| 2 | 0.5 | 293 | 180 | 400 |
| 2 | 0.8 | 293 | 180 | 400 |
| 2 | 1.0 | 293 | 180 | 400 |
| 2 | 1.5 | 293 | 180 | 400 |
| 2 | 2.0 | 293 | 180 | 400 |
| 2 | 2.5 | 293 | 180 | 400 |
| 2 | 3.0 | 293 | 180 | 400 |
| 2 | 4.0 | 293 | 180 | 400 |
| 2 | 5.0 | 293 | 180 | 400 |
| 3 | 2.0 | 293 | 180 | 400 |
| 3 | 2.5 | 293 | 180 | 400 |
| 3 | 3.0 | 293 | 180 | 400 |
| 3 | 4.0 | 293 | 180 | 400 |
| 3 | 5.0 | 293 | 180 | 400 |
| 3 | 5.0 | 293 | 180 | 400 |
| 3 | 7.0 | 293 | 180 | 400 |
| 3 | 10.0 | 293 | 180 | 400 |
| 4 | 0.5 | 293 | 180 | 400 |
| 4 | 0.8 | 293 | 180 | 400 |
| 4 | 1.0 | 293 | 180 | 400 |
| 4 | 1.5 | 293 | 180 | 400 |
| 4 | 2.0 | 293 | 180 | 400 |
| 4 | 2.5 | 293 | 180 | 400 |
| 4 | 3.0 | 293 | 180 | 400 |
| 4 | 4.0 | 293 | 180 | 400 |
| 4 | 5.0 | 293 | 180 | 400 |
| 4 | 7.0 | 293 | 180 | 400 |
| 4 | 10.0 | 293 | 180 | 400 |

TABLE 5-2 (CONTINUED)

| Stability | Wind Speed (m/sec) | Temperature (°K) | Wind Direction (degrees) | Mixing Height (meters) |
|---|---|---|---|---|
| 4 | 12.0 | 293 | 180 | 400 |
| 4 | 15.0 | 293 | 180 | 400 |
| 5 | 2.0 | 293 | 180 | 400 |
| 5 | 2.5 | 293 | 180 | 400 |
| 5 | 3.0 | 293 | 180 | 400 |
| 5 | 4.0 | 293 | 180 | 400 |
| 5 | 5.0 | 293 | 180 | 400 |
| 6 | 2.0 | 293 | 180 | 400 |
| 6 | 2.5 | 293 | 180 | 400 |
| 6 | 3.0 | 293 | 180 | 400 |
| 6 | 4.0 | 293 | 180 | 400 |
| 6 | 5.0 | 293 | 180 | 400 |

Source:   ERT

[1]See note 2, Table 5-1.

## TABLE 5-3

### MODEL INPUTS USED IN THE VALLEY MODEL FOR OPERATIONAL ANALYSIS

| Source Data | Heaters |
|---|---|
| Stack Height (m) | 9.1 |
| Stack Diameter (m) | 1.1 |
| Stack Velocity (m/sec) | 6.9 |
| Stack Temperature ($^\circ$K) | 450.0 |
| Emission Rate (g/sec)[1] | 1.0 |

| Meteorological Data | Stability | Wind Speed (m/sec) | Temperature ($^\circ$K) | Wind Direction (degrees) | Mixing Height (meters) |
|---|---|---|---|---|---|
| | 6 | 2.5 | 293 | 180 | 10,000 |

Source:  ERT

[1]See note 2, Table 5-1.

The meteorological inputs along the trajectory are summarized in Table 5-4. Clear sky conditions were assumed for the simulation. Deposition velocities of about 0.25 cm/sec were used for ozone only.

The initial concentrations used in the simulations are shown in Table 5-5. The concentrations are based on measurements taken at Cadiz beginning in September 1984. The hydrocarbon speciation is based on gas chromatograph (GC) analysis of a grab sample taken in October at Cadiz. The reactive hydrocarbons (RHC) concentration of that sample was 213 ppb C; this was assumed to be a typical ozone season value. As an estimate of high initial conditions, an RHC concentration of 50 percent higher (320 ppb C) was assumed; the speciation by class was assumed to be the same.

The dimensions of the "wall-of-cells" air parcel are given in Table 5-6. The pump/heater $NO_x$ emissions and the fugitive HC emissions (storage tanks, pump seals, valves, etc.) are introduced into the center column of the air parcel. The pump/heater emissions, due to their considerable plume rise, are introduced into the second row of cells, whereas the fugitive emissions are added in the first (lowest) row. The pollutants are emitted into the parcel shortly after 0600 PST.

## 5.3 Visibility

A Level-1 visibility screening analysis (Latimer and Ireson 1980) was performed to assess the impact of operation-phase impacts of the proposed All American pipeline on visibility at Edwards Air Force Base in California. This is a simple calculation procedure designed for EPA to identify emission sources that have little potential for adversely affecting visibility in a Class I area. According to normal regulatory policy, if a source "passes" the Level-1 tests, it would not be likely to cause adverse visibility impairment and further analysis is considered unnecessary.

The Level-1 visibility screening analysis is designed to evaluate two types of potential visibility impairment that can be caused by pollutant plumes from emission sources. The pollutants of concern in these analyses are $SO_2$, $NO_x$, and PM. The first type of impairment which is caused principally by $NO_2$ gas formed from $NO_x$ emissions, is discoloration of a bright horizon sky caused by a dark plume. The other type of adverse effect is a bright plume observed against a dark terrain viewing background. This effect is caused principally by particle emissions and sulfate aerosol formed from $SO_2$ emissions.

The Level-1 analysis consists of calculating three contrast parameters, defined as follows:

$C_1$ = plume contrast against the sky

$C_2$ = plume contrast against the terrain

$C_3$ = change in sky/terrain contrast caused by primary and secondary aerosol.

4-122

TABLE 5-4

SCHEDULE OF METEOROLOGICAL INPUTS USED IN THE
CADIZ OZONE MODELING

| Time (PST) | Wind Speed (m/s) | Mixing Height (m) | Stability Class |
|---|---|---|---|
| 6 | 1.0 | 50 | B |
| 7 | 1.0 | 70 | B |
| 8 | 1.0 | 120 | B |
| 9 | 1.0 | 200 | B |
| 10 | 1.0 | 310 | A |
| 11 | 1.0 | 590 | A |
| 12 | 1.0 | 730 | A |
| 13 | 1.0 | 870 | A |
| 14 | 1.0 | 960 | B |
| 15 | 1.0 | 1,000 | B |
| 16 | 1.0 | 1,000 | B |
| 17 | 1.0 | 1,000 | B |
| 18 | 1.0 | 1,000 | B |

Source:  ERT

## TABLE 5-5

### INITIAL POLLUTANT CONCENTRATIONS (ppb) USED IN THE REACTIVE MODELING

| Species | Typical | High |
|---|---|---|
| NO | 1 | 1 |
| $NO_2$ | 4 | 6 |
| $O_3$ | 40 | 40 |
| CO | 20 | 20 |
| Formaldehyde (HCHO) | 6.4 | 9.6 |
| Other Aldehydes (ALD2) | 2.1 | 3.2 |
| >$C_3$ Alkanes (ALKA) | 33.1 | 49.7 |
| Ethylene (ETHE) | 0.05 | 0.075 |
| Terminal Alkenes (PRPE) | 0.73 | 1.10 |
| Internal Alkenes (BUTE) | 0.79 | 1.19 |
| Monoalkyl Benzenes (TOLU) | 4.2 | 6.3 |
| Di- and Tri-alkyl Benzenes (XYLE) | 1.25 | 1.88 |

Source:   ERT

**TABLE 5-6**

**DIMENSIONS OF CELLS IN PLMSTAR AIR PARCEL**

| Row No. [1] | Height, width (m) Column No. | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 5 | 500, 4,000 | 500, 2,500 | 500, 1,000 | 500, 500 | 500, 1,000 | 500, 2,500 | 500, 4,000 |
| 4 | 250, 4,000 | 250, 2,500 | 250, 1,000 | 250, 500 | 250, 1,000 | 250, 2,500 | 250, 4,000 |
| 3 | 150, 4,000 | 150, 2,500 | 150, 1,000 | 150, 500 | 150, 1,000 | 150, 2,500 | 150, 4,000 |
| 2 | 50, 4,000 | 50, 2,500 | 50, 1,000 | 50, 500 | 50, 1,000 | 50, 2,500 | 50, 4,000 |
| 1 | 50, 4,000 | 50, 2,500 | 50, 1,000 | 50, 500 | 50, 1,000 | 50, 2,500 | 50, 4,000 |

[1]Row 1 is the lowest (surface-based) cell.

The analysis requires as input only the $SO_2$, $NO_x$, and PM emission rates of the source in question and the distance of the source from the area of interest. If the absolute values for any of the three calculated indices exceed 0.10, then further analysis is recommended. If the absolute values of all indices are below 0.10, then no significant visibility degradation is expected.

The emission rates for the Twelve-Gauge Lake Heat Station for $NO_x$, $SO_2$, and TSP are 197.3, 0.8, and 12.6 lbs/day, respectively. The heat station is approximately 15 miles east of Edwards. The results of the analysis are presented in Section 6.3.

## 6.0  RESULTS OF IMPACT ASSESSMENT

This section presents the air quality impacts from the proposed Celeron/All American and Getty pipelines due to the construction and operation of the pipeline, pumping stations, and delivery stations. During each phase, various pollutants would be emitted into the atmosphere including sulfur dioxide ($SO_2$), oxides of nitrogen ($NO_x$), total suspended particulates (TSP), carbon monoxide (CO), and hydrocarbons (HC). Maximum concentrations of $NO_2$, TSP, CO, and $O_3$ were estimated to determine air quality impacts resulting from the Celeron/All American and Getty proposals.

The analytical techniques used to generate the results (Section 5) varied slightly depending upon averaging time, location, and operation being modeled. These variations necessitated the use of several models. Due to the lack of available data near the proposed pipeline route, assumed worst-case scenarios were developed for the short-term (24 hours or less) averaging times.

The project emissions were compared with applicable Federal, state, and county emissions thresholds (e.g., New Source Review), and project emission control devices were evaluated in terms of applicable BACT and LAER requirements. Air quality modeling using EPA-approved models was performed for sources emitting pollutants in excess of the significance thresholds. The modeling results were then compared with allowable pollutant concentrations as specified in county, state, and Federal ambient standards and increments, including those for Class I areas.

Air quality impacts were judged significant or not significant based on regulatory standards, and the best professional judgement of the resource specialists. The National Ambient Air Quality Standards (NAAQS), and the ambient air quality standards for California, Arizona, New Mexico, and Texas are all important benchmarks for significant impacts. Primary and secondary NAAQS and state standards have been issued for $SO_2$, $NO_2$, TSP, CO, ozone ($O_3$), and HC. These standards are summarized in Section 2. Primary standards are designed to protect public health, while secondary standards are designed to protect public welfare. Annual average standards are never to be exceeded. Short-term standards (24 hours or less) cannot be exceeded more than once per year, except in California and New Mexico where no standards can be exceeded.

New large pollutant sources in attainment areas (areas where the NAAQS are met) are also subject to prevention of significant deterioration (PSD) review. PSD regulations further control pollutant emissions by allowing the maximum predicted concentrations from a new major source and any other nearby previously permitted PSD sources to be a fraction of the NAAQS. PSD regulations in California, Arizona, New Mexico, and Texas establish air quality increments for $SO_2$ and TSP that restrict deterioration by major sources. The applicable $SO_2$ and TSP PSD increments are shown in Section 2. The PSD increments are much smaller than corresponding NAAQS and state standards; therefore, the increments are often more limiting in determining the size of new projects that may be built. Since no new emission sources would be located in Santa Barbara County, Santa Barbara Air Pollution Control District PSD regulations, which are stricter, would not apply.

The amount of deterioration by new sources is determined by the classification of the area. Presently, the entire area surrounding the proposed projects is designated as PSD Class II, which allows for moderate air quality deterioration. Little air quality deterioration is allowed in PSD Class I areas. The closest existing Class I areas are the Guadelupe Mountains National Park (Texas) located within 2.5 miles of the All American pipeline route, and the San Rafael Wilderness (California) located approximately 8.5 miles east of Getty's proposed Sisquoc pump station. The PSD increments apply not only to routinely operating sources such as the pump stations and tank farms, but also to temporary sources located near Class I areas [40 CFR 52.21(i)(6)]. Examples of temporary sources in the Celeron/All American and Getty proposals would include the construction of the pump stations and pipelines. No significant air quality impacts in Class I areas have been predicted by modeling results.

The following sections summarize the predicted maximum air quality impacts for reactive ($O_3$ formation) and non-reactive pollutants from the proposed construction and operational activities and compare the impacts to applicable significance criteria. The results are described for each pollutant for the construction phase of the pipeline as well as the operational phase of the pump/heater stations.

## 6.1 Non-Reactive Impacts

This section summarizes the air quality impacts for $NO_2$, $SO_2$, TSP, and CO from the construction and operational activities and compares the impacts to applicable significance criteria. Due to the lack of PM-10 data and because no estimation method has been developed to adjust TSP emissions and short-term background concentrations to PM-10, TSP concentrations were compared only to the Federal primary and secondary standards in California. The results are described for each of the pipeline segments and include the maximum concentrations for each pollutant due to the construction of the pipeline as well as the operational phase of the pump/heater stations.

### 6.1.1 Las Flores to Emidio

#### Construction

The Getty and Celeron construction emissions (Table 4-3) were used to determine maximum $NO_2$, $SO_2$, TSP, and CO impacts due to the construction of this segment of the pipelines. Since these sources are mobile in nature, the Industrial Source Complex (ISC) model described in Section 5 was used. The maximum 1-hour concentrations occurred within 500 meters of the construction activities while the maximum multi-hour concentrations occurred within 200 meters of the construction site. Table 6-1 presents the summary of worst-case impacts resulting from the construction of the Celeron and Getty pipelines. As seen from the table, the project contributions are very low (less than 3 percent of the standards for all pollutants from Celeron and less than 2 percent from Getty). However, the existing background concentrations violate the California 1-hour $SO_2$ standard and the federal 24-hour TSP secondary standard.

TABLE 4-1

SUMMARY OF AIR QUALITY IMPACTS FROM THE CONSTRUCTION OF THE PROPOSED CELERON
AND GETTY PIPELINES FROM LAS FLORES TO EMIDIO

| Pollutant | Maximum Project Concentration ($\mu g/m^3$) | Maximum Background[1] Concentration ($\mu g/m^3$) | Background Monitoring Site/ Distance Away (mi) | Total Ambient Concentration ($\mu g/m^3$) | California/Federal[2] Standard ($\mu g/m^3$) |
|---|---|---|---|---|---|
| **Celeron** | | | | | |
| $SO_2$ | | | | | |
| 1-Hour | 0.6 | 655 | Bakersfield/20 | 655.6 | 655/NA[3] |
| 3-Hour | 0.6 | 262 | Bakersfield/20 | 262.6 | NA/1300 |
| 24-Hour | 0.2 | 125/100 | Bakersfield/20 | 125.2/100.2 | 131/365 |
| $NO_2$ | | | | | |
| 1-Hour | 7.3 | 301 | Bakersfield/20 | 308.3 | 470/NA |
| TSP | | | | | |
| 24-Hour | 4.3 | 244 | Taft/10 | 248.3 | NA/260-150 |
| $CO^4$ | | | | | |
| 1-Hour | 0.0 | NA | NA | NA | NA |
| 8-Hour | 0.0 | NA | NA | NA | NA |
| **Getty** | | | | | |
| $SO_2$ | | | | | |
| 1-Hour | 0.3 | 655/NA | Bakersfield/20 | 655.3 | 655/NA |
| 3-Hour | 0.3 | NA/262 | Bakersfield/20 | 262.3 | NA/1300 |
| 24-Hour | 0.1 | 125/100 | Bakersfield/20 | 125.1/100.1 | 131/365 |
| $NO_2$ | | | | | |
| 1-Hour | 3.8 | 301 | Bakersfield/20 | 304.8 | 470/NA |
| TSP | | | | | |
| 24-Hour | 2.2 | 244 | Taft/10 | 246.2 | NA/260-150 |
| $CO^4$ | | | | | |
| 1-Hour | 0.0 | NA | NA | NA | NA |
| 8-Hour | 0.0 | NA | NA | NA | NA |

[1]When two values are shown, the first value is the maximum background concentration for comparison to the California Standard.  The second value is highest second-highest concentration for comparison to the federal short-term standard.

[2]Values separated by a "-" represent the federal primary and secondary standard.

[3]Not Applicable

[4]Carbon monoxide concentrations are shown in $mg/m^3$.

The maximum 1-hour background value for $SO_2$ (located in Bakersfield) is equal to the California 1-hour $SO_2$ standard (655 µg/m³, respectively). In addition, Bakersfield (the closest $SO_2$ monitor to this segment of the pipeline) is located in a highly urbanized area, approximately 25 miles away. Thus, the background concentration along the pipeline route is expected to be considerably less, and therefore, the pipeline construction would not be expected to cause a violation.

The background concentration also violates the Federal TSP (24-hour) secondary standard. The contribution from the construction emissions would account for less than 2 percent of the ambient concentration. In addition, since the emissions from construction activities are temporary and transient in nature, EPA (Diggs 1984, and Harper 1984) and county permitting agencies (Goff 1984, and Stroman 1984) believe that no significant long-term or permanent impacts would occur.

The maximum 24-hour TSP and the 3-hour $SO_2$ concentrations are estimated to be less than 1 µg/m³ at the San Rafael Wilderness which is the nearest Class I area (located approximately 8.5 miles from the pipeline). Thus no significant impacts are expected in the Class I area.

## Operation

The operation of the initial pipeline segment from Las Flores to Emidio would consist of three pumping stations. All of the pump stations would be operated by electric-powered pumps. Only the pump station at Cuyama would have natural gas-fired oil heaters to meet possible heating requirements. The emissions from the Cuyama pump station can be found in Table 4-5. Due to the source configuration, maximum impacts from the PTPLU model (described in Section 5) were predicted within 100 meters of the source. Table 6-2 summarizes the impacts from the Cuyama station.

Similar to the situation during pipeline construction, the maximum 1-hour background value for $SO_2$ (located in Bakersfield, the nearest $SO_2$ monitor to the Cuyama pump station) is equal to the California 1-hour $SO_2$ standard (655 µg/m³), which is a violation. However, the maximum project contribution from Cuyama is less than one-tenth of 1 percent of the total ambient concentration (655.2 µg/m³). In addition, Bakersfield is located in a highly urbanized area, more than 50 miles away. Again, the background concentration near Cuyama is expected to be considerably less, and therefore, the pipeline operation would not be expected to cause a violation.

The background concentration also violates the Federal TSP (24-hour) secondary standard. The contribution from the Cuyama pump emissions would account for less than 1 percent of the ambient concentration. Thus, considering this along with discussions of the respective background values (above), no significant impacts are expected to occur from the operation of the pump/heater station at Cuyama (Ronyecz, 1984).

TABLE 6-2

SUMMARY OF AIR QUALITY IMPACTS FROM THE OPERATON OF THE
PROPOSED PIPELINES FROM LAS FLORES TO BLYTHE

| Pollutant | Maximum Project Concentration ($\mu g/m^3$) | Maximum Background[1] Concentration ($\mu g/m^3$) | Background Monitoring Site/ Distance Away (mi) | Total Ambient Concentration ($\mu g/m^3$) | California/Federal[2] Standard ($\mu g/m^3$) |
|---|---|---|---|---|---|
| **LAS FLORES TO EMIDIO (Getty)** | | | | | |
| <u>Cuyama</u> | | | | | |
| $SO_2$ | | | | | |
| 1-Hour | 0.2 | 655 | Bakersfield/30 | 655.2 | 655/NA[3] |
| 3-Hour | 0.2 | 262 | Bakersfield/30 | 262.2 | NA/1300 |
| 24-Hour | 0.1 | 125/100 | Bakersfield/30 | 125.1/100.1 | 131/365 |
| $NO_2$ | | | | | |
| 1-Hour | 66.1 | 301 | Bakersfield/30 | 367.1 | 470/NA |
| TSP | | | | | |
| 24-Hour | 0.4 | 187/170 | Maricopa/10 | 187.4/170.4 | NA/260-150 |
| $CO$[4] | | | | | |
| 1-Hour | 0.0 | NA | NA | NA | NA |
| 8-Hour | 0.0 | NA | NA | NA | NA |
| **EMIDIO TO BLYTHE (All American)** | | | | | |
| <u>Twelve-Gauge</u> | | | | | |
| $SO_2$ | | | | | |
| 1-Hour | 0.3 | 78 | Trona/60 | 78.3 | 655/NA |
| 3-Hour | 0.3 | 52 | Trona/60 | 52.3 | NA/1300 |
| 24-Hour | 0.1 | 26/26 | Trona/60 | 26.1/26.1 | 131/365 |
| $NO_2$ | | | | | |
| 1-Hour | 68.0 | 564 | Barstow/12 | 632.0 | 470/NA |
| TSP | | | | | |
| 24-Hour | 1.1 | 161 | Barstow/12 | 162.1 | NA/260-150 |
| **EMIDIO TO BLYTHE (All American)** | | | | | |
| <u>Cadiz</u> | | | | | |
| $SO_2$ | | | | | |
| 1-Hour | 0.4 | 78 | Trona/150 | 78.4 | 655/NA |
| 8-Hour | 0.4 | 52 | Trona/150 | 52.4 | NA/1300 |
| 24-Hour | 0.1 | 26/26 | Trona/150 | 26.1/26/1 | 131/365 |
| Annual | 0.0 | NA | NA | NA | NA |
| $NO_2$ | | | | | |
| 1-Hour | 165.4 | 56[5] | Cadiz/8 | 211.4 | 470/NA |
| Annual | 10.5 | 48.9 | Barstow/110 | 59.4 | 100/100 |
| TSP | | | | | |
| 24-Hour | 1.6 | 109 | Twentynine Palms/45 | 110.6 | NA/260-150 |
| Annual | 0.4 | 70.9 | Twentynine Palms/45 | 71.3 | NA/75-60 |

[1] When two values are shown, the first value is the maximum background concentration for comparison to the California Standard.  The second value is highest second-highest concentration for comparison to the federal short-term standard.

[2] Values separated by a "-" represent the federal primary and secondary standard.

[3] Not Applicable

[4] Carbon monoxide concentrations are shown in $mg/m^3$.

[5] No representative data available; maximum background concentration was taken from on-site monitoring program data which started September 8, 1984.

### 6.1.2  Emidio to Blythe

#### Construction

The All American construction emissions for this segment, found in Table 4-3, were used to determine maximum impacts due to the construction activities. As in the previous section, maximum 1-hour concentrations occurred within 500 meters of the construction activities while the maximum multi-hour concentrations occurred within 200 meters of the construction site. Table 6-3 presents the summary of worst-case impacts resulting from the construction of the All American pipeline. Again the project contributions are very low (less than 3 percent of the standards for all pollutants). However, existing background concentrations again violate the California 1-hour $NO_2$ standard and the federal 24-hour TSP primary and secondary standards.

The maximum 1-hour background value for $NO_2$ (located in Barstow) is 564 $\mu g/m^3$ and exceeds the California 1-hour $NO_2$ standard (470 $\mu g/m^3$) by 20 percent. However, the maximum project contribution from All American is less than 2 percent of the total ambient concentrations (571.3 $\mu g/m^3$). In addition, this standard has only been violated once in a three-year period (1980 through 1982) in Barstow, and since the construction period of the pipeline through this area is very short (10 to 14 days), the likelihood of the maximum background concentration occurring simultaneously with the construction phase through Barstow is small. Thus, the background concentration is expected to be considerably less during the construction phase, and therefore, the pipeline construction impact would not be significant.

The Federal TSP (24-hour) background concentration (at Boron) violates the Federal primary and secondary standards. Although the value is 423.3 $\mu g/m^3$, the contribution from the construction emissions would account for less than 1 percent of the ambient concentration. Also, since the emissions from construction activities are temporary and transient in nature, the Southeast Desert Air Pollution Control District would not consider either the TSP or $NO_x$ concentrations as significant impacts (Hubbard 1984). The short-term increase in TSP along the ROW is also not expected to significantly decrease visibility in the area around Edwards Air Force Base.

#### Operation

The operation of the 294-mile pipeline segment from Emidio to Blythe would consist of four pumping/heating stations as well as an oil storage facility at Cadiz. Except at Cadiz, electric-powered pumping would be used between Emidio and Blythe; thus only emissions from natural gas-fired oil heaters at the Twelve-Gauge Lake station and fugitive HC emissions from pump seals and valves would be generated. At Cadiz, natural gas-fired turbine pumps and heaters would be in operation along with the oil storage facility. The operational emissions can be found in Table 4-5.

## TABLE 6-3

### SUMMARY OF AIR QUALITY IMPACTS FROM THE CONSTRUCTION OF THE PROPOSED ALL AMERICAN PIPELINE FROM EMIDIO TO BLYTHE

| Pollutant | Maximum Project Concentration ($\mu g/m^3$) | Maximum Background[1] Concentration ($\mu g/m^3$) | Background Monitoring Site/ Distance Away (mi) | Total Ambient Concentration ($\mu g/m^3$) | California/Federal[2] Standard ($\mu g/m^3$) |
|---|---|---|---|---|---|
| **EMIDIO TO BLYTHE** | | | | | |
| **$SO_2$** | | | | | |
| 1-Hour | 0.1 | 78 | Trona/60 | 78.6 | 655/NA[3] |
| 3-Hour | 0.6 | 52 | Trona/60 | 52.6 | NA/1300 |
| 24-Hour | 0.2 | 26/26 | Trona/60 | 26.2/26.2 | 131/365 |
| **$NO_2$** | | | | | |
| 1-Hour | 7.3 | 564 | Barstow/1 | 571.3 | 470/NA |
| **TSP** | | | | | |
| 24-Hour | 4.3 | 419 | Boron/1 | 423.3 | NA/260-150 |
| **CO[4]** | | | | | |
| 1-Hour | 0.0 | NA | NA | NA | NA |
| 8-Hour | 0.0 | NA | NA | NA | NA |

[1]When two values are shown, the first value is the maximum background concentration for comparison to the California Standard.  The second value is highest second-highest concentration for comparison to the federal short-term standard.

[2]Values separated by a "-" represent the federal primary and secondary standard.

[3]Not Applicable

[4]Carbon monoxide concentrations are shown in $mg/m^3$.

Due to the source configuration, maximum impacts from the PTPLU model (described in Section 5) were predicted within 100 meters of the source. Table 6-2 summarizes the impacts from Emidio to Blythe. Due to limited representative wind data for each site, annual modeling was performed only at Cadiz, which is expected to have maximum impacts. The nearest maximum background values exceed the California 1-hour $NO_2$ standard and the Federal TSP (24-hour) and annual secondary standard.

The maximum 1-hour $NO_2$ backgound concentration measured in Barstow was 564 $\mu g/m^3$ (0.3 ppm) and was the only violation of the 1-hour standard in the three-year period (1980-1982). This indicates that the meteorological conditions associated with this unusually high value are extremely rare. In addition, the predicted maximum concentration from the project alone would not be the same meteorological conditions that generated the maximum background concentrations. Typically, high background $NO_2$ concentrations are associated with light wind speeds (less than 2 m/s) and low mixing heights. However, the meteorological condition associated with the maximum project concentrations were 10 m/s and a relative high mixing height. Maximum project concentrations from 2 m/s wind speeds (or less) range from 15 $\mu g/m^3$ to 25 $\mu g/m^3$, which is only 3 to 5 percent of the California 1-hour $NO_2$ standard.

Furthermore, the predicted project concentration is actually $NO_x$ rather than $NO_2$. A sufficient amount of $O_3$ would be necessary to convert the $NO_x$ to $NO_2$. For the worst case concentration (165.4 $\mu g/m^3$), the $O_3$ concentration would need to be 0.08 ppm. Although the ambient $O_3$ concentration is missing for the same day at Barstow, a nearby station (Lancaster) had a similar $NO_2$ peak 2 days earlier. The maximum $NO_2$ concentration was 0.22 ppm while the daily maximum 1-hour $O_3$ concentration was 0.04 ppm. Even though the hourly data was not readily available, the $O_3$ concentration during the peak $NO_2$ hour was most likely less than the maximum concentration of 0.04 ppm for the day, since peak hour $NO_2$ concentrations and peak $O_3$ concentrations usually do not occur simultaneously. Thus, a high project concentration would not be likely to occur during a peak $NO_2$ background episode.

The maximum TSP background values (161 $\mu g/m^3$ for 24-hour and 70 $\mu g/m^3$ for annual) barely exceeded the national 24-hour and annual secondary standards of 150 $\mu g/m^3$ and 60 $\mu g/m^3$, respectively. However, the maximum project contributions of 1.1 $\mu g/m^3$ and 0.4 $\mu g/m^3$ are less than 1 percent of the secondary standards. Thus no significant impacts are expected to occur.

6.1.3  Blythe to McCamey

Construction

The All American construction emissions for this segment can be found in Table 4-3. These values were used to determine maximum impacts due to the construction activities. As in the previous sections, maximum 1-hour concentrations occurred within 500 meters of the construction activities while the maximum multi-hour concentrations occurred within 200 meters of the construction site. Table 6-4 presents the summary of worst-case impacts resulting from the construction of the

4-134

TABLE 6-4

SUMMARY OF AIR QUALITY IMPACTS FROM THE CONSTRUCTION OF THE PROPOSED ALL AMERICAN
PIPELINE FROM BLYTHE TO McCAMEY

| Pollutant | Maximum Project Concentration ($\mu g/m^3$) | Maximum Background[1] Concentration ($\mu g/m^3$) | Background Monitoring Site/ Distance Away (mi) | Total Ambient Concentration ($\mu g/m^3$) | State/Federal[2] Standard ($\mu g/m^3$) |
|---|---|---|---|---|---|
| **Arizona** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.6 | 3518 | San Manuel/2 | 3518.6 | 1300 |
| 24-Hour | 0.2 | 360 | San Manuel/2 | 360.2 | 365 |
| TSP | | | | | |
| 24-Hour | 4.3 | 151 | Coolidge/4 | 155.3 | 260-150 |
| $CO^3$ | | | | | |
| 1-Hour | 0.0 | NA[4] | NA | NA | NA |
| 8-Hour | 0.0 | NA | NA | NA | NA |
| **New Mexico** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.6 | 1022 | Ft. Bayard/6 | 1022.6 | NA/1300 |
| 24-Hour | 0.2 | 314/183 | Ft. Bayard/6 | 314.2/183.2 | 262/365 |
| $NO_2$ | | | | | |
| 24-Hour | 2.9 | 75.2 | Lordsburg/1 | 78.1 | 188/NA |
| TSP | | | | | |
| 24-Hour | 4.3 | 470.364 | Anthony/1 | 474.3/364.3 | 150/260-150 |
| $CO^3$ | | | | | |
| 1-Hour | 0.0 | NA | NA | NA | NA |
| 8-Hour | 0.0 | NA | NA | NA | NA |
| **Texas** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.6 | 1179 | El Paso/30 | 1179.6 | 1300 |
| 24-Hour | 0.2 | 314 | El Paso/30 | 314.2 | 260-150 |
| TSP | | | | | |
| 24-Hour | 4.3 | 197 | El Paso/30 | 201.3 | 260-150 |
| $CO^3$ | | | | | |
| 1-Hour | 0.0 | NA | NA | NA | NA |
| 8-Hour | 0.0 | NA | NA | NA | NA |

[1]When two values are shown, the first value is the maximum background concentration for comparison to the New Mexico Standard.  The second value is highest second-highest concentration for comparison to the federal short-term standard.

[2]When only one value is shown, the state and federal standards are the same.  Values separated by a "-" represent the federal primary and secondary standard.

[3]Carbon monoxide concentrations are shown in $mg/m^3$.

[4]Not Applicable

4-135

All American pipeline. Again the project contributions are very low (less than 3 percent of the standards for all pollutants). However, the existing background concentrations violate the New Mexico 24-hour TSP standard, the Federal 3-hour $SO_2$ standard in Arizona, and the Federal 24-hour TSP standards in Arizona, New Mexico, and Texas.

The maximum 3-hour $SO_2$ background concentration near the pipeline construction segment in Arizona is 3518 $\mu g/m^3$ (located near San Manuel). This value is nearly 3 times the federal and state standard of 1300 $\mu g/m^3$. The maximum 3-hour project concentration, however, is only 0.6 $\mu g/m^3$, which is less than one-tenth of 1 percent of the Federal standard.

The appropriate TSP (24-hour) background concentrations violate the Federal primary and secondary standards in all three states as well as the New Mexico state standard. Although the total ambient concentrations range from 474.3 $\mu g/m^3$ in New Mexico to 155.3 $\mu g/m^3$ in Arizona, the project contribution is less than 3 percent of the total. In addition, since the construction emissions are temporary and transient, it is highly unlikely that worst case construction concentrations would occur simultaneously with the maximum background conditions. The New Mexico Health and Environment Department (Dhawan, 1984), the Arizona Department of Health Services (Leverock, 1984), and the Texas Air Control Board (Willis, 1984) were contacted and agreed that the predicted project concentrations would not constitute significant impacts. The maximum 24-hour TSP concentration is estimated to be 2.8 $\mu g/m^3$ at the nearest point of the Guadalupe Mountains National Park in Texas. Thus no significant impacts are expected in the Class I area.

### Operation

The operation of the final pipeline segment from Blythe to McCamey would consist of nine pumping/heating stations located through Arizona, New Mexico, and Texas. Except in Arizona, electric-powered pumping would be used between Blythe and McCamey; thus, only emissions from natural gas-fired oil heaters would be generated. In Arizona, natural gas-fired turbine pumps and heaters would be in operation. The operational emissions for one heater station can be found in Table 4-5.

Again, maximum impacts from the PTPLU model (described in Section 5) were predicted within 100 meters of the source. Table 6-5 summarizes the impacts from Blythe to McCamey. Due to limited representative wind data for each site, annual modeling was performed only at Hot Springs, Arizona, and Anthony, New Mexico, which were expected to have maximum impacts. From Table 6-5, the closest maximum background values exceed the Federal 24-hour and annual TSP secondary standards in all three states, as well as the New Mexico and Federal primary 24-hour and annual TSP standards. Although the total ambient 24-hour concentrations range from 471.9 $\mu g/m^3$ in New Mexico to 152.4 $\mu g/m^3$ in Arizona, the project contribution is less than 1 percent of any total ambient concentration. The annual contributions are also less than 1 percent of the total ambient concentrations in Arizona, New Mexico, and Texas. Thus no significant impact is expected to occur.

4-136

TABLE 6-5

SUMMARY OF AIR QUALITY IMPACTS FROM THE OPERATION OF THE PROPOSED
ALL AMERICAN PIPELINE FROM BYLTHE TO MCCAMEY

| Pollutant | Maximum Project Concentration ($\mu g/m^3$) | Maximum Background[1] Concentration ($\mu g/m^3$) | Background Monitoring Site/ Distance Away (mi) | Total Ambient Concentration ($\mu g/m^3$) | State/Federal[2] Standard ($\mu g/m^3$) |
|---|---|---|---|---|---|
| **ARIZONA** | | | | | |
| **LaPaz** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.4 | 148 | Phoenix/135 | 148.4 | 1300 |
| 24-Hour | 0.1 | 105 | Phoenix/135 | 105.1 | 365 |
| TSP | | | | | |
| 24-Hour | 1.6 | 228 | Phoenix/135 | 229.6 | 260-150 |
| **Gila** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.4 | 148 | Phoenix/45 | 148.4 | 1300 |
| 24-Hour | 0.1 | 105 | Phoenix/45 | 105.1 | 365 |
| TSP | | | | | |
| 24-Hour | 1.8 | 228 | Phoenix/45 | 229.8 | 260-150 |
| **Coolidge** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.3 | 148 | Coolidge/9 | 148.3 | 1300 |
| 24-Hour | 0.1 | 49 | Coolidge/9 | 49.1 | 365 |
| TSP | | | | | |
| 24-Hour | 1.4 | 151 | Coolidge/9 | 152.4 | 260-150 |
| **Hot Springs** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.4 | 191 | Tucson/50 | 191.4 | 1300 |
| 24-Hour | 0.1 | 49 | Tucson/50 | 49.1 | 365 |
| Annual | 0.0 | NA[3] | NA | NA | NA |
| $NO_2$ | | | | | |
| Annual | 6.3 | 68 | Tucson/50 | 74.3 | 100 |
| TSP | | | | | |
| 24-Hour | 1.6 | 141 | Tucson/50 | 142.6 | 260-150 |
| Annual | 0.2 | 62 | Tucson/50 | 62.2 | 75-60 |
| **TEXAS** | | | | | |
| **Wink** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.4 | 132 | Odessa/A5 | 132.4 | 1300 |
| 24-Hour | 0.1 | 26 | Odessa/45 | 26.1 | 365 |
| TSP | | | | | |
| 24-Hour | 1.9 | 231 | Odessa/45 | 232.9 | 260-150 |
| **NEW MEXICO** | | | | | |
| **Lordsburg** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.4 | 1022 | Ft. Bayard/35 | 1022.4 | NA/1300 |
| 24-Hour | 0.1 | 26/26 | Lordsburg/3 | 26.1/26.1 | 262/365 |

TABLE 6-5 (CONTINUED)

| Pollutant | Maximum Protect Concentration ($\mu g/m^3$) | Maximum Background[1] Concentration ($\mu g/m^3$) | Background Monitoring Site/ Distance Away (mi) | Total Ambient Concentration ($\mu g/m^3$) | California/Federal[2] Standard ($\mu g/m^3$) |
|---|---|---|---|---|---|
| $NO_2$ | | | | | |
| 24-Hour | 15.9 | 56 | Lordsburg/3 | 71.9 | 188/NA |
| | | | | | |
| TSP | | | | | |
| 24-Hour | 1.9 | 200/134 | Lordsburg/3 | 201.9/135.9 | 150/260-150 |
| | | | | | |
| Anthony | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.4 | 288 | Anthony/3 | 288.4 | NA/1300 |
| 24-Hour | 0.1 | 26/26 | Anthony/3 | 26.1/26.1 | 262/365 |
| Annual | 0.0 | NA | NA | NA | NA |
| | | | | | |
| $NO_2$ | | | | | |
| 24-Hour | 20.0 | 75 | Anthony/3 | 95.0 | 188/NA |
| Annual | 2.2 | 19 | Anthony/3 | 21.2 | 100/100 |
| | | | | | |
| TSP | | | | | |
| 24-Hour | 1.9 | 470/364 | Anthony/3 | 471.9/365.9 | 150/260-150 |
| Annual | 0.2 | 122 | Anthony/3 | 122.2 | 60/75-60 |
| | | | | | |
| TEXAS | | | | | |
| | | | | | |
| Salt Flats | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.4 | 1,179 | El Paso/85 | 1179.4 | 1300 |
| 24-Hour | 0.1 | 314 | El Paso/85 | 314.1 | 365 |
| | | | | | |
| TSP | | | | | |
| 24-Hour | 1.7 | 197 | El Paso/85 | 198.7 | 260-150 |

[1]When two values are shown, the first value is the maximum background concentration for comparison to the New Mexico Standard.  The second value is highest second-highest concentration for comparison to the federal short-term standard.

[2]When only one value is shown, the state and federal standards are the same.  Values separated by a "-" represent the federal primary and secondary standard.

[3]Not Applicable

## 6.2 Reactive Modeling

The results of the reactive modeling are given in Table 6-6, which shows the predicted ozone concentration versus time for the background and for background-plus-project for the typical and high initial concentration cases. In the typical initial concentration case, the background achieves an ozone concentration of 0.107 ppm, which is somewhat lower than the maximum one-hour average concentration of 0.117 ppm measured in the Cadiz area by SCE in 1979. For the high initial concentration case, the background achieves a maximum ozone level of 0.120 ppm, which equals the Federal one-hour standard.

With the project emissions included, the maximum ozone concentration predicted for the typical initial concentration case is 0.109 ppm, which is only 0.002 ppm above the corresponding baseline value. Similarly, with a value of 0.122 ppm, the maximum plus project predicted ozone concentration in the high initial concentration case is also only 0.002 ppm higher than the maximum in the corresponding baseline simulation.

Although the maximum predicted plus-project ozone concentration is only 0.002 ppm higher than the maximum predicted baseline ozone concentration, it should be pointed out that incremental difference between the plus-project and the background-only concentrations is as large as 0.008 ppm for the typical initial condition case and 0.010 ppm for the high initial condition case. This maximum incremental impact occurs at 1000 PST and is only seen in the three center columns of the wall-of-cells air parcel.

The reactive modeling indicates that the emissions from the proposed pump/heater station and tank farm at Cadiz would not cause a significant impact beyond travel times of about six hours. In the near field, the project is not expected to contribute appreciably to any violations of the Federal one-hour ozone standard and is not expected to cause additional violations of the state one-hour ozone standard.

## 6.3 Visibility

The results of the Level-1 screening analysis indicate that there would not be any significant visibility impact at Edwards Air Force Base due to the operation of the Twelve-Gauge Lake Heater Station. The values of the three contrast parameters described in Section 5.3 are as follows:

$$C_1 = -0.0017$$

$$C_2 = 0.0007$$

$$C_3 = 0.0000$$

The absolute values of $C_1$, $C_2$, and $C_3$ are well below the 0.1 significance limit.

TABLE 6-6

PREDICTED OZONE CONCENTRATION (ppm) OF BACKGROUND ONLY AND
BACKGROUND-PLUS PROJECT FOR TYPICAL AND HIGH INITIAL
CONCENTATIONS

| Time<br>(PST) | Typical Initial Conditions | | High Initial Conditions | |
|---|---|---|---|---|
| | Background | Plus-Project | Background | Plus-Project |
| 0600 | 0.040 | 0.040 | 0.040 | 0.040 |
| 0630 | 0.040 | 0.040 | 0.042 | 0.042 |
| 0700 | 0.042 | 0.042 | 0.045 | 0.045 |
| 0730 | 0.048 | 0.041 | 0.054 | 0.047 |
| 0800 | 0.054 | 0.046 | 0.063 | 0.055 |
| 0830 | 0.062 | 0.057 | 0.073 | 0.070 |
| 0900 | 0.070 | 0.069 | 0.083 | 0.085 |
| 0930 | 0.076 | 0.080 | 0.090 | 0.097 |
| 1000 | 0.080 | 0.088 | 0.095 | 0.105 |
| 1030 | 0.085 | 0.091 | 0.100 | 0.108 |
| 1100 | 0.089 | 0.094 | 1.104 | 0.110 |
| 1130 | 0.091 | 0.096 | 0.107 | 0.112 |
| 1200 | 0.093 | 0.098 | 0.109 | 0.114 |
| 1230 | 0.095 | 0.100 | 0.111 | 0.115 |
| 1300 | 0.098 | 0.101 | 0.114 | 0.117 |
| 1330 | 0.100 | 0.102 | 0.115 | 0.118 |
| 1400 | 0.101 | 0.104 | 0.116 | 0.119 |
| 1430 | 0.102 | 0.105 | 0.117 | 0.120 |
| 1500 | 0.104 | 0.106 | 0.118 | 0.120 |
| 1530 | 0.105 | 0.107 | 0.119 | 0.121 |
| 1600 | 0.106 | 0.108 | 0.119 | 0.121 |
| 1630 | 0.106 | 0.108 | 0.120 | 0.122 |
| 1700 | 0.107 | 0.109 | 0.120 | 0.122 |
| 1730 | 0.107 | 0.109 | 0.120 | 0.122 |
| 1800 | 0.107 | 0.109 | 0.120 | 0.121 |

Source:   ERT

## 7.0 SUMMARY

### 7.1 Summary of Results

#### 7.1.1 Nonreactive Pollutants

#### Construction

The pipeline ROW passes through several areas where violations of state and/or Federal air quality standards have occurred in the past few years. There is, therefore, no way to positively ensure that pipeline construction emissions would not contribute, albeit in a small way, to future violations. It can only be said that 1) the pipeline construction emissions are "temporary and transient" in nature and, therefore, would not impact any single area longer than a period of several weeks; 2) the magnitude of construction-related impacts is very small relative to the background concentrations; and 3) the best available background concentrations are generally unrepresentative of the pipeline ROW because the monitors are located considerable distances away ($\geq 20$ miles) and/or in a more industrial/urbanized area. Therefore, the construction-related emissions are expected to have no significant long-term air quality impacts.

#### Operation

The operation-phase emissions of TSP, $SO_2$, and CO are sufficiently small that no significant impacts are expected, even though in a few cases the best available background data indicate that violations of state and/or Federal air quality standards have occurred in the general vicinity of some of the pump/heater stations. The $NO_x$ emissions, however, are considerable at many of the pipeline pump stations. Nevertheless, the $NO_x$ emissions threaten only one $NO_2$ standard (1-hour California) at one location (Barstow, where a single violation occurred during the 1980-82 baseline period). As indicated in Section 6.2, the meteorological conditions for which the high project-related impact was predicted are different from those associated with regional $NO_2$ buildup. Also, Barstow is 12 miles west of the Twelve-Gauge Lake Heater Station, and the maximum predicted project impact occurred within 200 meters of the source. For these reasons, the Twelve-Gauge Lake Heater Station is not expected to cause future violations of the California one-hour average $NO_2$ standard. Therefore, no significant $NO_2$ impacts would be expected from either the Getty or the Celeron/All American proposals.

#### 7.1.2 Reactive Pollutants

The application of the PLMSTAR photochemical trajectory model to a conservative set of modeling conditions indicates that the operation phase emissions from the proposed pump/heater station and tank farm at Cadiz would not result in future violations of the Federal ozone standard and would not cause any additional future violations of the state ozone standard.

4-141

### 7.1.3 Visibility

No significant degradation of visibility at the Edwards Air Force Base is expected as a result of operation-phase emissions from the nearby Twelve-Gauge Lake Heater Station.

### 7.2 Mitigation

As summarized above and shown in Section 6.0, the Getty and Celeron/All American projects are expected to cause no long-term significant air quality impacts. Therefore, no mitigation measures would be required.

# REFERENCES

Dhawan, R.  1984.  New Mexico Health and Environmental Department. Environmental Improvement Division, Santa Fe.  June 6, 1984. Personal communication with Dan Kringel, ERT.

Diggs, T.  1984.  Environmental Protection Agency, Revion VIII, San Francisco, California.  June 7, 1984.  Personal communication with Dan Kringel, ERT.

Goff, T.  1984.  Kern County Air Pollution Control District, Kern County, California.  June 7, 1984.  Personal communication with Dan Kringel, ERT.

Harper, M.  1984.  Environmental Protection Agency, Region X, Dallas, Texas.  June 7, 1984.  Personal communication with Dan Kringel, ERT.

Hovind, Einar L.  1968.  Meteorological analysis of SCE Mohave Power Plant site.  Report No. 15-10, North American Weather Consultants for Southern California Edison.

Hubbard, O.  1984.  Southeast Desert Air Pollution Control District, San Bernardino, California.  June 6, 1984.  Personal communication with Dan Kringel, ERT.

Latimer, D. A. and R. G. Ireson.  1980.  Workbook for estimating visibility impairment.  Report No. EPA-450/4-80-031.  U.S. Environmental Protection Agency, Research Triangle Park, North Carolina.

Leverock, A.  1984.  Arizona Department of Health Services, Phoenix. June 6, 1984.  Personal communication with Dan Kringel, ERT.

Ronyecz, A.  1984.  San Luis Opispo Air Pollution Control District, San Luis Obispo, California.  June 8, 1984.  Personal communication with Dan Kringel, ERT.

Southern California Edison Co. (SCE).  1979.  Notice of Intention.  Cal Coal Project, submitted to California Energy Commission by Southern California Edison Company, Rosemead, California.

Stroman, C.  1984.  Santa Barbara County Air Pollution Control District, Santa Barbara, California.  June 7, 1984.  Personal communication with Dan Kringel, ERT.

Willis, D.  1984.  Texas Air Control Board, Austin.  May 24, 1984. Personal communication with Dan Kringel, ERT.

# ATTACHMENT I
## PLMSTAR MODEL DESCRIPTION

PLMSTAR MODEL DESCRIPTION

### I.1  Conceptual Formulation

In PLMSTAR (Godden and Lurmann 1983), the Lagrangian modeling concept is applied to a moving wall of computational cells. The wall is advected along a trajectory by the mean horizontal winds at a user-selected elevation that is usually selected to coincide with major point source plume centerline elevations. Backward or forward trajectories are determined by interpolation from a divergence-free, three-dimensional wind field (generated hourly). Lateral and vertical diffusion, photochemistry, and entrainment of emissions along the trajectory are accounted for in each cell. In addition, dry deposition removal processes are included in the surface cells. The extent of the wall in the crosswind and vertical directions is held fixed during a simulation; however, individual cells have different dimensions, as shown in Figure I-1, in order to maximize resolution of the individual point source plume(s) under consideration.

In the Lagrangian framework (i.e., moving in the x-direction with wind speed u), the governing conservation of mass equation for PLMSTAR reduces to:

$$\frac{\partial C_i}{\partial t} = \frac{\partial}{\partial y} K_y \frac{\partial C_i}{\partial y} + \frac{\partial}{\partial z} K_z \frac{\partial C_i}{\partial z} + R_i + S_i + D_i \qquad (I-1)$$

Where:  $C_i$ = concentration of the $i^{th}$ species,

$K_y$, $K_z$ = eddy diffusivity coefficients in the crosswind (y) and vertical (z) directions,

$R_i$ = rate of chemical transformation of the $i^{th}$ species,

$S_i$ = rate of emissions of the $i^{th}$ species, and

$D_i$ = rate of deposition of the $i^{th}$ species.

This equation is solved numerically in PLMSTAR to provide concentration-versus-time profiles for each species in each cell along the trajectory.

This formulation represents the most complete form of the Lagrangian equation. Yet in simplifying the equation to this point, it is assumed that vertical and horizontal wind shear is small. This

4-145



Figure I-1.   Front view of typical PLMSTAR computation cell
configuration (not to scale).

typically is not true at night or in the daytime under stagnation conditions. Hence, to ensure that the model is applied under conditions for which the Lagrangian concept is valid, one of PLMSTAR's algorithms calculates the wind speed and direction shear when interpolating trajectories from the three-dimensional wind field. A warning message is printed if conditions of excessive shear are encountered.

The alternative to this formulation is an Eulerian model which can account for wind shear and multi-day pollutant accumulation. These are significant advantages. However, Eulerian photochemical models are far more expensive computationally, and are generally applied without sufficient spatial resolution to address plume dispersion and chemistry in the detail possible in a Lagrangian model. Both modeling concepts have utility: the Lagrangian framework is effective for assessing maximum impacts from individual source clusters, and the Eulerian concept is useful for investigation of multi-day regional impacts. In addition, a Lagrangian model such as PLMSTAR could be incorporated into a Eulerian model to provide subgrid resolution of major point source plumes.

## I .2  Overview of Data Processing Procedures

The PLMSTAR model consists of five processing modules to assemble data needed to solve Equation I-1 and one module to execute the solution. The six processing modules are:

- MIXMOD   - Dispersion Characterization Module;

- WINDMOD  - Wind field Generator,

- TRAJMOD  - Trajectory and Meteorological Data Schedule Generator,

- AREASORC - Area Source Emissions Module,

- TALSORC  - Point Source Emissions Module, and

- SOLMOD   - Numerical Integration/Solution Module.

The inputs, outputs, and data transfers between modules are illustrated in Figure I-2.

4-147



Figure I-2.   PLMSTAR Data Processing Diagram.

Before describing the essential function of the modules, it is important to point out the approach used in PLMSTAR to generate meteorological and emission inputs along a trajectory. The selected approach involves first establishing the regional fields of parameters and reviewing the fields for reasonableness and consistency, and, second, calculating the specific conditions along the trajectory.

The first module executed is the MIXMOD. MIXMOD utilizes surface data for winds, roughness heights, temperature, cloud cover or incoming solar radiation, and vertical temperature profiles or user specified mixing heights to generate hourly fields of $K_y$ and $K_z$ coefficients, deposition velocities, vertically averaged temperatures, stability class, and inversion heights and temperature gradients. WINDMOD utilizes vertical stability profiles provided by MIXMOD and surface wind data, elevated wind data, and topographic data to compute hourly three-dimensional divergence-free wind fields. Given the output from WINDMOD and MIXMOD and user inputs for start location and advection level, TRAJMOD interpolates backward or forward trajectories. (The user may also input predetermined trajectories.) TRAJMOD then assembles all other schedules of meteorological parameters along the trajectories. The two emission modules are then executed to compile the regional inventories and retrieve schedules of trajectory-specific emissions rates for all 14 emission species. Lastly, user-supplied initial and background pollutant concentrations are combined with the meteorological outputs from TRAJMOD and the emission schedules to allow SOLMOD to compute the time profiles of concentration along the trajectory. The background concentrations may be updated at any time along the trajectory; between specified updates, the background concentraitons are updated internally through integration of chemistry.

## I.3.  Meteorological Formulations

### I.3.1 Vertical Diffusivities

In the unstable planetary boundary layer (PBL) over land, the following formulations for vertical eddy diffusivity ($K_z$) were adopted for PLMSTAR:

$$K_z \;=\; 1.35\, ku_* z \;(1 - 9\tfrac{z}{L})^{1/2}, \; z \le L \;; \qquad (\text{I-2a})$$

$$=\; Bku_* z \;(-\tfrac{z}{L})^{1/3}, \qquad L \;\le\; z \;\le\; 0.1\, z_i \;; \qquad (\text{I-2b})$$

$$=\; A\, w_* z \;(1 - \tfrac{z}{z_i}) \;,\; 0.1\, z_i \le z \le z_i \qquad (\text{I-2c})$$

where $k$ is the von Karman constant (= 0.4); $u_*$ is the surface friction velocity; $z$ is the height above ground; $L$ is the Monin-Obukhov length; $z_i$ is the height of the PBL; and $w_*$ is the convective velocity scale. Equation I-2a is the familiar surface layer formulation, $K_z = ku_* \, z/\phi_m$, with the Businger et al. (1971) representation of the nondimensional wind shear $\phi_m$. Equation I-2b was suggested by Venkatram (1981). A value of 2 is used for the coefficient B to match Equation I-2b with Equation I-2a at $z = L$. Equation I-2c was suggested by Wyngaard (1981). By equating I-2b and I-2c at $z = 0.1z_i$, a value of 0.25 was determined for the coefficient A.

For the stable over land PBL, the $K_z$ formulation of Brost and Wyngaard (1978) was adopted:

$$K_z \;=\; ku_* z \;(1 - \tfrac{z}{z_i})^{3/2} / (0.74 + 4.7\tfrac{z}{L}) \qquad (\text{I-3})$$

Above the PBL an arbitrarily small value of 0.01 m²/s is assigned to $K_z$ for both stable and unstable boundary layers.

During stable conditions, the PBL height, $z_i$, is determined from the commonly used formulation suggested by Zilitinkevich (1972):

$$z_i \;=\; C\,(u_* \tfrac{L}{f})^{1/2} \qquad (\text{I-4})$$

A value of 0.4 is used for C after Brost and Wyngaard (1978). During unstable conditions the inversion height is assumed to represent the PBL height. The inversion height is determined from hourly temperature profiles or by interpolation from periodic (i.e., about every six hours) vertical temperature profiles and hourly surface temperatures. A mechanical mixing height is also calculated during unstable conditions using Equation I-4 with L = 50. This value serves as the minimum PBL

4-150

height when the convective PBL is very shallow. As an option in MIXMOD, an externally-determined schedule of PBL height, e.g., from acoustic sounder data, may also be input and used.

Micrometeorological variables, L, $u_*$, and $w_*$ were determined as follows. For unstable conditions, $u_*$ is determined from wind speed and surface roughness ($z_o$) as suggested by Wang and Chen (1980). The Monin-Obukhov length is given by:

$$L \equiv \;=\; u_*^3 T/(gkQ_o) \tag{I-5}$$

where T is temperature, g is the acceleration of gravity, and $Q_o$ is the surface kinematic heat flux, determined as reported by Briggs (1975):

$$Q_o \;=\; AS_I \tag{I-6}$$

where $S_I$ is incoming solar radiation and A is a function of ground cover that varies from 0.25 for a crop canopy to 0.55 for a dry surface. The convective velocity scale is given by:

$$w_* \;=\; (g\, Q_o\, z_i/T)^{1/3} \tag{I-7}$$

For stable conditions, $u_*$ is determined from wind speed and surface roughness, and L is determined by:

$$L \;=\; 1.1 \times 10^3\, u_*^2 \tag{I-8}$$

as suggested by Venkatram (1980).

In the marine boundary layer of height $z_m$, the vertical eddy diffisivities, $K_z$, are determined as follows:

$$K_z \;=\; \frac{ku_* z}{\phi_h(\frac{z}{L})}, \text{ for } z \leq 0.1\, z, \tag{I-9a}$$

$$K_z \;=\; \frac{ku_* z}{\phi_h(\frac{z}{L})} \cdot \frac{(1 - \frac{z}{z_m})}{0.9}, \text{ for } 0.1\, z_m < z < z_m. \tag{I-9b}$$

$$K_z \;=\; 0.01 \text{ m}^2/\text{sec, for } z \geq z_m. \tag{I-9c}$$

In the above equations, k is the von Karmann constant (= 0.4), $u_*$ is the friction velocity, z is the height above the surface, L is the Monin-

Obukhov length, and $\phi_h$ is the non-dimensional surface layer temperature gradient. The above formulation for $z > 0.1\ z_m$ includes a rolloff function so that values of $K_z$ will be very small at the top of the marine boundary layer. The forms of $\phi_h$ are taken from Businger et al. (1971).

Overwater, Monin-Obukhov length, L, is determined from the wind speed (u) and vertical potential temperature ($\theta_v$) at 10 m above the water surface and the vertical potential temperature ($\theta_{vs}$) of the water surface, using a modified form of the Schacher et al. (1982) technique.

$$L = \frac{\theta_v\ C_{uN}}{0.141} \cdot \frac{u^2}{\theta_v - \theta_{vs}} \qquad (I\text{-}10)$$

$C_{uN}$ is the neutral momentum drag coefficient which in turn is a function of 10 m wind speed as follows (Kondo 1975):

| 10 m Wind Speed (m/sec) | $C_{uN}$ |
|---|---|
| 0.1 - 2.2 | $1.08\ u - 0.15\ \cdot\ 10^{-3}$ |
| 2.2 - 5.0 | $(0.77 + 0.086u)\ \cdot\ 10^{-3}$ |
| 5 - 8 | $(0.87 + 0.067u)\ \cdot\ 10^{-3}$ |
| 8 - 25 | $(1.2\ + 0.025u)\ \cdot\ 10^{-3}$ |

The friction velocity, $u_*$, is determined from wind speed, surface roughness, and stability:

$$u_* = \frac{k\ \cdot\ u}{\ln \frac{z}{z_o} - \psi_m \frac{z}{L}} \qquad (I\text{-}11)$$

where $z_o$ is the roughness height and $\psi_m$ is the diabatic correction to the netural logarithmic wind profile. These terms are evaluated as follows:

$$z_o = 2.0\ \cdot\ 10^{-6}\ u^{2.5}\ (m/s) \qquad (I\text{-}12)$$

$$\psi_m\ (\tfrac{z}{L} < o) = 2\ \ln\ (\frac{1 + \phi_m^{-1}}{2}) + \ln\ (\frac{1 + \phi_m^{-2}}{2}) - 2\ \tan^{-1}\ (\phi_m^{-1} + \tfrac{\pi}{2})\ \ (I\text{-}13a)$$

4-152

$$\psi_m \left(\frac{z}{L} \geq 0\right) = -4.7 \frac{z}{L}$$

$$\psi_m \left(\frac{z}{L} \geq 0\right) = \left(1 - 15 \frac{z}{L}\right)^{-1/4} \tag{I-13b}$$

The above relationship for $z_o$ is valid only for wind speeds at 10 m (Hosker 1974).

### I.3.2    Horizontal Diffusivities

The horizontal diffusivity, $K_y$, can be determined by two methods in PLMSTAR. First, $K_y$ can be determined as a function of $K_z$. That is:

$$K_y = r K_z \tag{I-14}$$

where r is a stability dependent coefficient that has the values shown in Table I-1. This calculation is performed in MIXMOD.

Alternatively, $K_y$ may be determined as a function of $\sigma_y$:

$$K_y = \frac{1}{2} \frac{d\sigma_y^2}{dt} \tag{I-15}$$

where t is time along a trajectory. This is calculated in TRAJMOD. Over land, the Brookhaven National Laboratory (Smith, 1968) curves are used to determine the horizontal diffusion parameter $\sigma_y$. That is,

$$\sigma_y = a x^b \tag{I-16}$$

where a and b are stability-dependent coefficients and x is distance along the trajectory. The values of a and b used for rural and urban applications are given in Table I-2. A separate value of $\sigma_y$, and therefore $K_y$, is determined for each vertical layer of the model and is a function of the weighted stability of the layer. To evaluate $\sigma_y$ overwater, the following equation is used:

$$\sigma_y = i_y \times S_y(x) \tag{I-17}$$

TABLE  I-1

RATIO OF $K_y$ to $K_z$ USED IN MIXMOD

| Stability (Class) | $K_y/K_z$[1] |
|---|---|
| Very unstable (A or 1) | 1.00 |
| Unstable (B or 2) | 1.05 |
| Slightly Unstable (C or 3) | 1.10 |
| Neutral (D or 4) | 1.45 |
| Slightly Stable (E or 5) | 1.70 |
| Stable (F or 6) | 2.00 |
| Very Stable (G or 7) | 2.00 |

[1]These ratios were symthesized from ratios of $\sigma_y$ to $\sigma_z$ (at 10 km) from the Brookhaven curves (Smith 1968) and from the ratios of $K_y$ to $K_z$ employed in the IMPACT grid model (Fabrick et al. 1977).

## TABLE  I-2

### COEFFICIENTS USED TO CALCULATE
### $\sigma_y$ FOR RURAL AND URBAN SETTINGS

| Stability (Class) | Rural | | Urban | |
|---|---|---|---|---|
| | a | b | a | b |
| Very unstable (A or 1) | 0.40 | 0.91 | 0.40 | 0.91 |
| Unstable (B or 2) | 0.36 | 0.86 | 0.40 | 0.91 |
| Slightly unstable (C or 3) | 0.32 | 0.78 | 0.36 | 0.86 |
| Neutral (D or 4) | 0.32 | 0.78 | 0.32 | 0.78 |
| Slightly stable (E or 5) | 0.31 | 0.71 | 0.32 | 0.78 |
| Stable (E or 6) | 0.31 | 0.71 | 0.31 | 0.71 |
| Very stable (G or 7) | 0.31 | 0.71 | 0.31 | 0.71 |

where $x$ is the distance downwind from the point source, $i_y$ is the horizontal turbulence intensity, and $S_y$ is a function of $x$, such that (Cramer et al. 1964):

$$S_y(x) = \frac{x}{x_o}^{-0.1} \quad \text{for } x_o = 1 \text{ m.} \tag{I-18}$$

Values of $i_y$ v are calculated from the relationship (Hanna 1981):

$$i_y = (u_{*/u}) F_y (z_m/L) \tag{I-19}$$

where (Panofsky et al. 1977):

$$F_y = 1.7, \frac{z_m}{L} > 0 \tag{I-20a}$$

$$F_y = (4.9 - 0.5 \frac{z_m}{L})^{1/3}, \frac{z_m}{L} < 0. \tag{I-20b}$$

The surface stability used in the calculation of $K_y$ over land may be determined by either the Pasquill (1961) or Turner (1964) method. Stability aloft is determined by lapse rate as presented in U.S. Nuclear Regulatory Commission (1972).  Over  water,  stability  category  is determined from $L$ and using the Golder (1971) nomograph as analytically approximated by Shir and Shieh (1974).

It should be noted that the calculation of $K_y$ from the rate of change of $\sigma_y$ is the recommended procedure for applications involving major point source emissions.  The option for calculating $K_y$ from $K_z$ is recommended for applications involving area source emissions only.  For applications involving both point and area source emission, the former method is recommended primarily because of short-comings of the latter method.   The physical processes that govern horizontal and vertical dispersion are not identical, so in general, the assumption of proportionality between $K_y$ and $K_z$ is a poor one.  Vertical mixing is inhibited by the ground from below and by stable layers aloft, whereas lateral dispersion has no corresponding restrictions.  Therefore, except in cases of unlimited mixing, the values of $K_y$ determined from $K_z$ are probably unrealistically small.  It also should be pointed out that when $K_y$ coefficients are calculated from $\sigma_y$, they are keyed to one particular source location.  Since $K_y$ values for a point source increase with

4-156

travel distance downwind, the $K_y$ values determined in this manner may overestimate dispersion from point sources encountered at significant distances downwind of the primary source locations.

### I.3.3 Surface Deposition

Deposition velocity is determined in PLMSTAR's MIXMOD module. Specifically, the deposition velocity for $SO_2$ is calculated using the approach suggested by Wesely and Hicks (1977). The deposition velocity is assumed to be the inverse sum of a series of resistances to transfer:

$$V_d = (r_a + r_s + r_c)^{-1} \qquad\qquad (I-21)$$

where $r_a$ is the aerodynamic resistance, $r_s$ is the surface resistance, and $r_c$ is the canopy stomatal resistance.

The Wesely and Hicks parameterization of Equation I-21 is

$$V_d = ku_* [\ln (z/z_o) + 2.6 + ku_* r_c - \psi_c]^{-1} \qquad (I-22)$$

where $\psi_c$ is the diabatic correction. Wesely and Hicks indicated the range of $r_c$ is from $0$ s cm$^{-1}$ to about $2$ s cm$^{-1}$ and used $0.7$ s cm$^{-1}$ for a surface of actively growing dry vegetation.

A simplified approach has been adopted for the deposition velocities of other species: their deposition velocities are assumed to be proportional to the deposition velocity for $SO_2$. $SO_2$ has been chosen as the baseline species because more canopy resistance data is available for it than other species and because its canopy resistance is generally small. Given the sparsity of resistance data for other gases and the difficulty in extrapolating the data to the composite of surfaces present in the real world, this approach is justified. The proportionality factors for the deposition velocities of $O_3$, $NO_2$, PAN, $SO_4^=$, and $HNO_3$ to the $SO_2$ deposition velocity are shown in Table I-3. Dry deposition of gases with large canopy resistances such as NO, CO, and reactive hydrocarbons is ignored since its effect on pollutant concentrations on the mesoscale is very small.

4-157

TABLE I-3

COEFFICIENTS APPLIED TO $SO_2$ DEPOSITION VELOCITIES

FOR TREATMENT OF OTHER POLLUTANTS

| Species | Coefficient |
|---------|-------------|
| $O_3$ | 0.35 (1) |
| $NO_2$ | 0.7 (1) |
| PAN | 0.25 (2) |
| $SO_4^=$ | 0.5 (3) |
| $HNO_3$ | 1.0 (3) |

(1)  Hill and Chamberlain, 1976.
(2)  Garland and Penkett, 1976.
(3)  Hicks, 1976.

### I.3.4 Interpolation Procedures in MIXMOD

As indicated in Section I.2, the MIXMOD module of PLMSTAR produces gridded fields of quantities (mixing coefficients, deposition velocities, etc.) that are used as input to other PLMSTAR Modules. To facilitate the accurate representation of sudden changes in surface characteristics, the interpolation routine was formulated to allow the specification of barriers to interpolation. With this feature, only parameters calculated at points on the same side of a specified barrier of a particular grid square are used in interpolating a value for that grid square. The result is that an abrupt change in gridded parameter values can be achieved at a coastline, for example, with representative over water values on one side of the barrier and over land values on the other.

### I.4 Wind Field Generation

WINDMOD is a diagnostic wind model capable of generating a three-dimensional, nondivergent wind field from a set of input wind measurements. The model is applicable to both moderately complex and flat terrain situation. The objective analysis procedure implemented in WINDMOD has been conceptually adapted from the scheme described by Goodin, McRae and Seinfeld (1980), but WINDMOD's treatment of the input data differs somewhat from that of Goodin et al. (1980).

The wind field algorithm consists of three basic steps. As a starting point, the modeling grid location and dimensions must be selected by the user. Once the grid geometry has been established, the input wind measurements are interpolated to obtain initial values at each grid point and the surface field is adjusted for topographic effects. The final step adjusts the interpolated flow field iteratively to reduce the anomalous divergence to an acceptable level.

### I.5. Trajectory Generation

The trajectory generation module TRAJMOD works as follows. Starting from an initial position and time, the TRAJMOD calculates a wind vector interpolated (using inverse-distance-squared weighting) from the four closest grid points of a wind field to obtain the position of

the air parcel at either a previous or subsequent time. The backward calculations require an iterative loop wherein the upwind position from which to interpolate the prior hour's wind data is sought. This process generally converges in two or three iterations. The feature which distinguishes the TRAJMOD procedures from other models is that the user can select the elevation in a three-dimensional wind field for which to generate the trajectory. The wind vector is interpolated to the center of the selected model air parcel layer.

Another feature of TRAJMOD is that at specific time intervals it calculates the mean wind vector for each vertical layer of the air parcel. It also interpolates wind components (u, v, w) to all cells in the wall. The corresponding wind speeds and directions can be printed out for each trajectory segment to enable the user to assess the degree of horizontal and vertical shear in the wind field along the trajectory. Also a warning message is printed when TRAJMOD finds a wind vector for a particular cell which differs by more than a factor of 2 in speed or ±90° in direction from the average wind vector for the parcel.

TRAJMOD generates a new set of wind vectors at time intervals that are dependent on the wind speed. This occurs because the air parcel travel distance must be limited to approximately one grid square length in each interval to ensure that the wind field for the selected elevation is properly represented by the trajectory.

TRAJMOD also interpolates other data, such as $K_z$ and $K_y$, along the trajectory for use by the TALSORC and SOLMOD modules of PLMSTAR.

## I.6   The Emissions Processing Program

Two separate computer programs, AREASORC and TALSORC, were developed to perform the emissions inventory bookkeeping for PLMSTAR. The programs are suitable for compilation of urban emission inventories as well as less complex rural inventories. Two basic functions are performed by each program:  (1) compilation of the spatially and temporally resolved regional emissions inventory, and (2) calculation of emission rate schedules along specific trajectories.

Inputs to the programs for the regional inventory consist of daily THC, $NO_x$, $SO_x$, and CO emission rates by category and grid square for

AREASORC, and by category and UTM coordinates for TALSORC. Each area source category and individual point source is keyed to user specified profiles for diurnal (i.e., hour-by-hour) emission rate variation, THC partitioning (to 8 RHC classes), $NO_x$ partitioning (to NO and $NO_2$), and $SO_x$ partitioning (to $SO_2$ and $SO_4^=$). In addition, each point source requires stack height, effluent temperature, and effluent flow rate data, as well as meteorological data along the trajectory.

Once AREASORC has compiled the regional inventory, the trajectory data and the wall-of-cell geometry are input. From this data, it generates area source emission schedules for each surface cell within the wall of cells along the trajectory. Similarly, TALSORC calculates point source emissions entrained into cells of the moving wall based on the time increment for the wall to pass the source at the prevailing wind speed. The plume rise of each source passed on the trajectory is calculated (Briggs 1969, 1975) from the stack parameters and meteorology (i.e., wind speed, stability, inversion height, inversion temperature gradient, and ambient temperature) within the parcel at the time of passing. Point source emissions may be entrained at any point along the trajectory, so that one may examine urban trajectories where plumes from major point sources passed early in the trajectory may interact with other major point source plumes entrained later in the day. Also, the wall of cells approach allows entrainment of emissions from sources located 5 to 10 kilometers from the trajectory centerline in the cross-wind direction.

### I.7  Chemical Mechanism

A somewhat condensed version of the ERT photochemical reaction mechanism (Atkinson et al. 1982) is incorporated in PLMSTAR to account for chemical transformations in $RHC/NO_x/SO_x/air$ mixtures. This mechanism was developed in 1980 concurrently with a survey of kinetic and mechanistic data for photochemical reactions performed for EPA (Atkinson and Lloyd 1980).

The mechanism, shown in Table I-4, incorporates the inorganic and organic reactions believed to be important in smog formation. Many reactions in the mechanism represent the condensation of multiple reactions into one rate-limiting reaction. Organic precursor species

## TABLE I-4

### THE CONDENSED ERT PHOTOCHEMICAL MECHANISM

| Reaction | Rate Constant (ppm min units) |
|---|---|
| **Inorganics** | |
| 1. $NO_2 + h\nu \xrightarrow{O_2} NO + O_3$ | radiation dependent |
| 2. $NO + O_3 \rightarrow NO_2 + O_2$ | $1.0 \times 10^6 \, T^{-1} \, e^{-1450/T}$ |
| 3. $O_3 + h\nu \rightarrow 2 \, OH$ | $\beta_1 k_1 \times 7.5 \times 10^{-6} \, [H_2O]$ |
| 4. $OH + NO \overset{M}{\rightleftharpoons} HONO$ | $8.7 \times 10^8 \, T^{-2}$ |
| 5. $OH + NO_2 \overset{M}{\rightleftharpoons} HNO_3$ | $1.5 \times 10^9 \, T^{-2}$ |
| 6. $HONO + h\nu \rightarrow OH + NO$ | radiation dependent |
| 7. $HO_2 + NO \rightarrow OH + NO_2$ | $3.7 \times 10^6 \, T^{-1}$ |
| 8. $HO_2 + NO_2 \overset{M}{\rightleftharpoons} HO_2NO_2$ | $1.5 \times 10^8 \, T^{-2}$ |
| 9. $HO_2NO_2 \overset{M}{\rightleftharpoons} HO_2 + NO_2$ | $7.8 \times 10^{-15} \, e^{-10420/T}$ |
| 10. $HO_2 + HO_2 \rightarrow H_2O_2 + O_2$ | $3.4 \times 10^4 \, T^{-1} \, e^{1100/T}$ |
| 11. $HO_2 + HO_2 + H_2O \rightarrow H_2O_2 + O_2 + H_2O$ | $5.8 \times 10^{-5} \, T^{-2} \, e^{5800/T}$ |
| 12. $OH + CO \xrightarrow{O_2} HO_2$ | $1.3 \times 10^5 \, T^{-1}$ |
| 13. $NO_2 + O_3 \rightarrow NO_3$ | $5.3 \times 10^4 \, T^{-1} \, e^{-2450/T}$ |
| 14. $NO + NO_3 \rightarrow 2NO_2$ | $8.4 \times 10^6 \, T^{-1}$ |
| 15. $NO_2 + NO_3 \overset{M}{\rightleftharpoons} N_2O_5$ | $3.1 \times 10^7 \, T^{-1} \, e^{-1100/T}$ |
| 16. $N_2O_5 \overset{M}{\rightleftharpoons} NO_2 + NO_3$ | $3.5 \times 10^{18} \, e^{-12280/T}$ |
| 17. $N_2O_5 + H_2O \rightarrow 2 \, HNO_3$ | $1.33 \times 10^{-3} \, T^{-1}$ |
| 18. $NO_3 + h\nu \rightarrow 0.3 \, NO + 0.7 \, NO_2 + 0.7 \, O_3$ | radiation dependent |
| 19. $OH + O_3 \rightarrow HO_2$ | $7.0 \times 10^5 \, T^{-1} \, e^{-940/T}$ |
| 20. $HO_2 + O_3 \rightarrow OH$ | $4.8 \times 10^3 \, T^{-1} \, e^{-580/T}$ |

TABLE I-4    (CONTINUED)

| Reaction | Rate Constant (ppm min units) |
|---|---|

**Formaldehyde**

21. $HCHO + h\nu \xrightarrow{O_2} HO_2 + HO_2 + CO$ — radiation dependent

22. $HCHO + h\nu \rightarrow CO + H_2$ — radiation dependent

23. $OH + HCHO \xrightarrow{O_2} HO_2 + CO$ — $4.4 \times 10^6 \, T^{-1}$

**Acetaldehyde**

24. $CH_3CHO + h\nu \xrightarrow{O_2} CH_3O_2 + HO_2 + CO$ — radiation dependent

25. $OH + CH_3CHO \xrightarrow{O_2} CH_3CO_3$ — $3.0 \times 10^6 \, T^{-1} \, e^{250/T}$

26. $CH_3CO_3 + NO_2 \rightarrow PAN$ — $2.1 \times 10^6 \, T^{-1}$

27. $PAN \rightarrow CH_3CO_3 + NO_2$ — $1.2 \times 10^{18} \, e^{-13543/T}$

28. $CH_3CO_3 + NO \xrightarrow{O_2} NO_2 + CH_3O_2$ — $3.1 \times 10^6 \, T^{-1}$

29. $CH_3O_2 + NO \rightarrow HCHO + HO_2 + NO_2$ — $3.1 \times 10^6 \, T^{-1}$

**Alkanes**

30. $OH + Alkane \rightarrow AO_2$ — $6.6 \times 10^6 \, T^{-1} \, e^{-400/T}$

31. $AO_2 + NO \rightarrow - .8 \, NO + 1.7 \, NO_2 + .9 \, HO_2$ — $3.1 \times 10^6 \, T^{-1}$
$+ .4 \, CH_3CHO + .45 \, MEK$
$+ .3 \, CH_3COCH_3$

32. $OH + MEK \xrightarrow{O_2} - NO + NO_2 + CH_3CHO$ — $4.4 \times 10^6 \, T^{-1} \, e^{-330/T}$
$+ CH_3CO_3$

33. $MEK + h\nu \rightarrow CH_3CO_3 + C_2H_5O_2$ — radiation dependent

34. $C_2H_5O_2 + NO \rightarrow NO_2 + CH_3CHO + HO_2$ — $3.1 \times 10^6 \, T^{-1}$

**Alkenes**

35. $OH + Ethene \xrightarrow{O_2} 2HCHO + NO_2 - NO + HO_2$ — $9.7 \times 10^5 \, T^{-1} \, e^{380/T}$

36. $OH + Propene \xrightarrow{O_2} HCHO + CH_3CHO + HO_2$ — $1.8 \times 10^6 \, T^{-1} \, e^{540/T}$
$+ NO_2 - NO$

37. $OH + Butene \xrightarrow{O_2} 1.8 \, CH_3CHO + 0.9 \, NO_2$ — $5.0 \times 10^6 \, T^{-1} \, e^{540/T}$
$+ 0.9 \, HO_2 - NO$

4-163

## TABLE I-4 (CONTINUED)

| Reaction | Rate Constant (ppm min units) |
|---|---|

**Alkenes (continued)**

38. $O_3$ + Ethene → HCHO + 0.4 $\overset{.}{C}H_2\overset{.}{O}_2$ + 0.4 CO + 0.12 $HO_2$     $4.2 \times 10^3\ T^{-1}\ e^{-2560/T}$

39. $O_3$ + Propene → 0.5 HCHO + 0.5 $CH_3CHO$ + 0.2 $\overset{.}{C}H_2\overset{.}{O}_2$ + 0.2 $CH_3\overset{.}{C}H\overset{.}{O}\overset{.}{O}$ + 0.3 CO + 0.2 $HO_2$ + 0.1 OH + 0.2 $CH_3O_2$     $3.1 \times 10^3\ T^{-1}\ e^{-1900/T}$

40. $O_3$ + Butenes → $CH_3CHO$ + 0.4 $CH_3\overset{.}{C}HO\overset{.}{O}$ + 0.3 $HO_2$ + 0.2 OH + 0.45 $CH_3O_2$ + 0.2 CO     $3.3 \times 10^3\ T^{-1}\ e^{-1050/T}$

41. $\overset{.}{C}H_2\overset{.}{O}_2$ + NO → HCHO + $NO_2$     $3.1 \times 10^3\ T^{-1}$

42. $\overset{.}{C}H_2\overset{.}{O}_2$ + $NO_2$ → HCHO + $NO_3$     $3.1 \times 10^5\ T^{-1}$

43. $\overset{.}{C}H_2\overset{.}{O}_2$ + $H_2O$ → Product     $1.5\ T^{-1}$

44. $CH_3\overset{.}{C}H\overset{.}{O}\overset{.}{O}$ + NO → $CH_3CHO$ + $NO_2$     $3.1 \times 10^6\ T^{-1}$

45. $CH_3\overset{.}{C}H\overset{.}{O}\overset{.}{O}$ + $NO_2$ → $CH_3CHO$ + $NO_3$     $3.1 \times 10^5\ T^{-1}$

46. $CH_3\overset{.}{C}H\overset{.}{O}\overset{.}{O}$ + $H_2O$ → Product     $1.5\ T^{-1}$

**Aromatics**

47. OH + Toluene → 0.15 $ARO_2$ + 0.20 Cresol + 0.20 $HO_2$ + 0.65 ADD     $2.7 \times 10^6\ T^{-1}$

48. OH + Xylene → 0.25 Cresol + 0.25 $HO_2$ + 0.75 ADD     $7.9 \times 10^6\ T^{-1}$

49. ADD + NO → 0.75 $NO_2$ + 0.75 $HO_2$ + 0.75 DIAL + $\alpha_1$ $(CHO)_2$ + $\alpha_2$ $CH_3COCHO$     $3.1 \times 10^6\ T^{-1}$

50. OH + DIAL → El     $1.3 \times 10^7\ T^{-1}$

51. EL + $NO_2$ → El $NO_2$     $2.1 \times 10^6\ T^{-1}$

TABLE I-4 (CONTINUED)

| Reaction | Rate Constant (ppm min units) |
|---|---|

**Aromatics (continued)**

52. $EL\ NO_2 \rightarrow E1 + NO_2$ — $1.2 \times 10^{18}\ e^{-13543/T}$

53. $E1 + NO \rightarrow 3\ NO_2\ -2\ NO + \alpha_3\ HO_2$ — $3.1 \times 10^6\ T^{-1}$
$+ \alpha_3(CHO)_2 + \alpha_4\ CH_3CO_3 + \alpha_4$
$CH_3COCHO + \alpha_3\ CO$

54. $OH + (CHO)_2 \xrightarrow{O_2} HO_2 + CO$ — $8.8 \times 10^6\ T^{-1}$

55. $(CHO)_2 + h\nu \rightarrow HCHO + CO$ — radiation dependent

56. $OH + CH_3COCHO \xrightarrow{O_2} CH_3CO_3 + CO$ — $6.6 \times 10^6\ T^{-1}$

57. $CH_3COCHO + h\nu \xrightarrow{O_2} CH_3CO + HO_2 + CO$ — radiation dependent

58. $OH + Cresol \rightarrow -NO + .75\ NO_2$ — $1.9 \times 10^7\ T^{-1}$
$+ .75\ HO_2 + .75\ DIAL$

59. $NO_3 + Cresol \rightarrow -\ NO_2 + HNO_3$ — $k = 6.6 \times 10^6\ T^{-1}$

**$SO_x$**

60. $SO_2 + OH \xrightarrow{M} SO_4^=$ — $1.5 \times 10^{13}\ T^{-4}$

61. $SO_2 + \dot{C}H_2\dot{O}_2 \rightarrow HCHO + SO_4^=$ — $3 \times 10^4\ T^{-1}$

62. $SO_2 + CH_3\dot{C}HOO \rightarrow CH_3CHO + SO_4^=$ — $3 \times 10^4\ T^{-1}$

**Notes**

$\alpha_1 = .075\ k_{48}\ [xylene]/(k_{47}\ [toluene] + k_{49}\ [xylene])$

$\alpha_2 = .75 - \alpha_1$

$\alpha_3 = k_{47}\ [toluene] + .5\ k_{48}\ [xylene]/(k_{47}\ [toluene] + k_{48}\ [xylene])$

$\alpha_4 = 1 - \alpha_3$

$HNO_3$ is the total inorganic nitrate (e.g., the sum of $HNO_3$ (g) and $NH_4NO_3$ aerosol).

are partitioned into reactivity classes in the mechanism to minimize the number of chemical species and reactions. However, there is less "lumping" of HC species in this mechanism than in other mechanisms typically used in photochemical models. The rational for the partitioning of the organics is based on differences in OH rate constants, $O_3$ rate constants (for alkenes), reaction products, and photolytic reaction rates (for oxygenated HC). Based on our analysis, the full mechanism, which includes slowly reacting organics, requires 13 classes and the condensed mechanism, which excludes slowly reacting organics and treats $\geq C_3$ aldehydes and ketones as acetaldehydes, requires eight classes, as shown in Table I-5. The elimination of propane, benzene and acetone as well as the less refined treatment of aldehydes and ketones in the condensed mechanism results in very small differences (<3%) in maximum ozone and $NO_2$ in one-day simulations (Atkinson et al. 1982).

The mechanism was tested against smog chamber irradiations of individual $HC/NO_x$ and surrogate urban $HC/NO_x$ mixtures from the University of California, Riverside's evacuable and all-glass chambers (Pitts, and Grosjean 1978; Pitts, et al. 1979; Carter, et al. 1979; Atkinson, et al. 1978). Additional testing was performed on irradiations of $RHC/NO_x/SO_x/air$ mixture from the Battelle chamber (Miller 1978) to assess the model's performance with respect to sulfate. Further testing on individual $HC/NO_x$ mixtures was performed using the University of North Carolina's outdoor smog chamber data (Jefferies, 1981; Lloyd et al. 1982). The mechanism was found to predict $NO_x$ and HC decay rates accurately and peak $NO_2$, $O_3$, PAN, and $SO_4^=$ within ± 20% over a broad range of $HC/NO_x$ ratios and concentrations. In particular, the mechanism is believed to more accurately simulate the aromatic and alkene oxidation processes than previous mechanisms. The growing proportion of aromatic hydrocarbons in urban areas (Grosjean et al. 1981) makes it very important to predict aromatic hydrocarbon photooxidation as accurately as possible.

For all chemical reactions with rates that vary significantly with temperature, the updated mechanism accounts for this effect. This feature represents an important advancement over previous mechanisms. As shown in Hendry et al. (1977, 1978), the chemistry of nitrogen oxides

## TABLE I-5

### HYDROCARBON CLASSES IN THE CHEMICAL MECHANISM

| Compound Group | Hydrocarbon Class Number | |
| --- | --- | --- |
| | Full Mechanism | Condensed Mechanism |
| Methane | 0* | 0 |
| Ethane | 0 | 0 |
| Propane | 1 | 0 |
| $\geq C_4$ Alkanes | 2 | 1 |
| Ethene | 3 | 2 |
| Propene and Other Terminal Alkenes | 4 | 3 |
| Butene and Other Internal Alkenes | 5 | 4 |
| Benzene | 6 | 0 |
| Toluene and Other Monoalkylbenzenes | 7 | 5 |
| Xylene and Other Di- and Tri-alkylbenzenes | 8 | 6 |
| Formaldehyde | 9 | 7 |
| Acetaldehyde | 10 | 8 |
| $\geq C_3$ Aldehydes | 11 | 8 |
| Acetone | 12 | 0 |
| Methylethylketone and Other Ketones | 13 | 8 |

*Class 0 is nonreactive

is particularly sensitive to temperature variations. This model feature is obviously important for application in areas that have significant diurnal variations in temperature.

### I.8    Solution of Governing Equations

The solution module (SOLMOD) assembles all the trajectory-specific input data, performs integration of the governing differential equations to obtain concentrations at successive times and locations, and updates the data used in the equations from temporal schedules. The inputs required by SOLMOD, in addition to those provided by the meteorological and emissions preprocessors, are the initial pollutant concentrations in the parcel and initial background concentrations. If desired, the background concentrations can be externally updated at any time during a sumulation. Here, background concentrations refer to the pollutant concentrations specified at the lateral boundaries of the parcel that are used in the horizontal diffusion calculation. Photochemical models are generally quite sensitive to the initial and background values, so these must be specified carefully.

The numerical integration of Equation I-1 is accomplished by splitting the equation into three equations solved sequentially. Thus, the problem is reduced to the solution of

$$\frac{\partial c}{\partial t} = \frac{\partial}{\partial y} \left( K_y \frac{\partial c}{\partial y} \right) \quad \text{for lateral diffusion,} \qquad \text{(I-23a)}$$

$$\frac{\partial c}{\partial t} = \frac{\partial}{\partial z} K_z \frac{\partial c}{\partial z} \quad \text{for vertical diffusion, and} \qquad \text{(I-23b)}$$

$$\frac{\partial c}{\partial t} = R + S + D \quad \text{for chemistry, emissions, and dry deposition.} \qquad \text{(I-23c)}$$

Splitting the problem in this manner allows one to employ numerical integration techniques appropriate for each type of equation. Integration of the lateral and vertical diffusion equations is accomplished using finite difference approximations. For small and moderate size eddy diffusivity coefficient (K), the Crank-Nicolson approximation (Crank and Nicolson 1947) is employed. For large mixing

coefficients, a fully implicit time integration technique, which over-comes the small time step limitation of the Crank-Nicolson method at large values of K without sacrificing accuracy, is used. The ordinary differential equations for chemistry, emissions, and deposition are integrated by a linear multi-step predictor-corrector scheme developed by Young and Boris (1977). When accompanied by an error control/time step selection procedure suitable for photochemical systems, this algorithm is several times more efficient than Gear-type algorithms (used in ELSTAR, EKMA, etc.) at comparable accuracy levels.

The complete solution for concentrations at time $t + \Delta t$, starting at time t, is produced by integrating, in order,

1) lateral diffusion from t to $(t + \Delta t/2)$,
2) vertical diffusion from t to $(t + \Delta t/2)$,
3) chemistry, emissions, and deposition from t to $(t + \Delta t)$,
4) vertical diffusion from $(t + \Delta t/2)$ to $(t + \Delta t)$, and
5) lateral diffusion from $(t + \Delta t/2)$ to $(t + \Delta t)$.

Ordering the individual time steps in this manner allows the model to perform the integration of the chemistry for longer periods than in conventional time splitting techniques (i.e., lateral diffusion, vertical diffusion and chemistry for $\Delta t/2$). This improves the overall computational efficiency of the model without loss of accuracy (McRae 1981). Within a given integration cycle of length $\Delta t/2$ or $\Delta t$, each solver takes one or more steps (usually more) to generate a solution at the specified output time. Nevertheless, the integration cycle size $(\Delta t)$ is kept small (10 to 20 minutes) to prevent numerical artifacts of times splitting.

# REFERENCES FOR ATTACHMENT I

Atkinson, R. and A. C. Lloyd. 1980. Evaluation of Kinetic and Mechanistic Data for Photochemical Swag Chamber Modeling, ERT Document No. P-A040, Environmental Research and Technology, Inc., Westlake Village, California.

Atkinson, R., A. C. Lloyd and L. Winges. 1982. An Updated Chemical Mechanism for Hydrocarbon/$NO_x$/$SO_x$ Photooxidation Suitable for Inclusion in Atmospheric Simulation Models. Atmos. Environ., 16, 1341-1355.

Atkinson, R., W. P. L. Carter, K. R. Darnall, A. M. Winer and J. N. Pitts, Jr. 1980. A Smog Chamber and Modeling Study of the Gas-Phase $NO_x$-air Photooxidation of Toluene and the Cresols. Int. J. Chem. Kinet., 12, 779-836.

Briggs, G. A. 1969. Plume Rise. USAFEC Critical Review Series, TID-25075, Clearinghouse for Federal Scientific and Technical Information.

Briggs, G. A. 1975. Plume Rise Predictions, In Lectures on Air Pollution and Environmental Impact Analyses, 59-105. American Meteorlogical Society, Boston, Massachusetts.

Brost, R. A. and J. C. Wyngaard. 1978. A model study of the stably stratified planetary boundary layer. J. Atmos. Sci., 35, 1427-1440.

Businger, J. A., J. C. Wyngaard, Y. Izumi and E. F. Bradley. 1971. "Flux-profile Relationships in the Atmospheric Surface Layer", J. Atmos. Sci., 28, 181-189.

Carter, W. P. L., A. C. Lloyd, J. L Sprung, and J. N. Pitts, Jr. 1979. Computer modelings of smog chamber data: progress in validation of a detailed mechanism for the photooxidation of propene and n-butane in photochemical smog. Int. J. Chem. Kinet., 11, 45-101.

Cramer, H. E., G. M. DeSanto, K. R. Dumbauld, P. Morgenstern and R. N. Swanson. 1964. Meteorological Prediction Techniques and Data System, GCA Tech. Rep. No. 64-3-G.

Crank, J. and P. Nicolson. 1947. A Practical Method for Numerical Evaluation of Solutions of Partial Differential Equations of the Heat-Conduction Type, Proceedings of the Cambridge Philosophical Society, 43, No. 50, 50-67.

Godden, D. and F. Lurmann. 1983. Development of the PLMSTAR Model and Its Application to Ozone Episode Conditions in the South Coast Air Basin. ERT Document No. P-A702-200, Environmental Research & Technology, Inc., Westlake Village, CA.

REFERENCES (CONTINUED)

Golden, D. 1972. Relations Among Stability Parameters in the Surface Layer, Boundary Layer Meteorology 3, 47-58.

Goodin, W. R., G. J. McRae and J. H. Seinfeld. 1980. An objective analysis technqiue for constructing three-dimensional urban-scale wind fields. J. Appl. Meteorol., 19, 98-108.

Grosjean, D., R. Countess, K. Fung, K. Ganesan, A. Lloyd and F. Lurmann. 1981. Deriving EKMA Isopleths from Experimental Data: The Los Angeles Captive Air Study, Presented at the EKMA Workshop, December 15-17, EPA-ESRL, Research Triangle Park, North Carolina.

Hanna, S. R. 1981. Turbulent Energy and Lagrangian Time Scales in the Planetary Boundary Layer. Fifth Symposium on Turbulence, Diffusion, and Air Pollution, American Meteorological Society, Boston, Massachusetts.

Hendry, D. G. and R. A. Kenley. 1977. Generation of peroxy radicals from peroxy nitrate ($RO_2$ $NO_2$). Decomposition of peroxyacyl nitrates. J. Am. Chem. Soc., 99, 3198-3199.

Hendry, D. G., A. C. Baldwin, J. R. Barker and D. M. Golden. 1978. Computer Modeling of Simulated Photochemical Smog, EPA-600/3-78-059. U.S. Environmental Protection Agency, Research Triangle Park, North Carolina.

Hosker, R. P. 1974. A Comparison of Estimation Procedures for Overwater Plume Dispersion. Proceedings of the Symposium on Atmospheric Diffusion and Air Pollution, American Meterological Society, Boston, MA.

Jefferies, H. 1981. Personal Communication of smog chamber data from University of North Carolina Outdoor Chamber.

Kondo, J. 1975. Air-Sea Bulk Transfer Conditions in Diabatic Conditions, Bound. Lay. Meteorol., 9:91-112.

Lloyd, A. C., R. A. Atkinson, F. W. Lurmann and B. Nitta. 1982. Modeling Potential Ozone Impacts From Natural Hydrocarbons, Part I: Development and Testing of a Chemical Mechanism for the Photo-oxidation of Isoprene and $\alpha$_Pinene Under Ambient Conditions. (in press).

McRae, G. J. 1981. Mathematical Modeling of Photochemical Air Pollution, Ph.D. Thesis California Institute of Technology, Pasadena, California.

Miller, D. F. 1978. Precursor effects on $SO_2$ oxidation. Atmos. Environ. 12, 273-280.

Panofsky, H. A., H. Tennekes, D. H. Lenschow and J. C. Wyngaard. 1977. The Characteristics of Turbulent Velocity Components in the Surface Layer Under Convective Conditions, Bound. Lay. Meteorol., 11-: 355-361.

4-172

REFERENCES (CONTINUED)

Pasquill, F. 1961. The Estimation of the Dispersion of Windborne Materials. Meteorol. Mag., 90, 33-49.

Pitts, J. N. and D. Grosjean. 1978. Detailed Characterization of Gaseous and Size-resolved Particulate Pollutants at a South Coast Air Basin Smog Receptor Site. Report to California Air Resources Board on Contract No. ARB-5-384 and A6-171-30. Statewide Air Pollution Research Center, Riverside, California.

Pitts, J. N., Jr., K. Darnall, W. P. L. Carter, A. M. Winer and R. Atkinson. 1979. Mechanisms of Photochemical Reactions in Urban Air. Final Report, EPA-600/3-79-110, November.

Schacher, G. E., K. C. Davidson and C. W. Fairall. 1982. Atmospheric Marine Boundary Layer Convective Mixing Velocities in the California Coastal Region, Atmos. Environ., 16, 1183-1192.

Shir, C. C. and L. J. Shieh. 1974. A Generalized Urban Air Pollution Model and Its Application to the Study of the $SO_2$ Distributions in the St. Louis Metropolitan Area, J. Appl. Meteorol, 13, 185-204.

Smith, M. E. 1968. Recommended Guide for the Prediction of Dispersion From Airborne Effluents, Amer. Soc. Mech. Engineers.

Turner, D. B. 1964. A Diffusion Model for an Urban Area. J. Appl. Meteorological 3, 83-91.

U.S. Nuclear Regulatory Commission. 1972. Regulatory Guide 1.23: Onsite Meteorological Programs.

Venkatram, A. 1980. Estimation of turbulence velocity scales in the stable and the unstable boundary layer for dispersion applications. In Eleventh NATO-CCMS International Technical Meetings on Air Pollution Modeling and Its Application. 54-64.

Venkatram, A. 1981. Personal communication. Environmental Research & Technology, Inc., Concord, Massachusetts.

Wang, I. T. and P. C. Chen. 1980. Estimations of Heat and Momentum Fluxes Near the Ground. 2nd Joint Conf. on Applications of Air Poll. Meteorology, 764-769, American Meteorological Society, Boston, Massachusetts.

Wesely, M. L. and B. B. Hicks. 1977. Some Factors That Affect the Deposition Rates of Sulfur Dioxide and Similar Gases on Vegetation. J. Air Poll. Control Assoc., 27, 1110-1116.

Wyngaard, J. C. 1981. Wind shear in the baroclinic convective PBL. In Fifth Symposium on Turbulence, Diffusion, and Air Pollution, 78-79. American Meteorological Society, Boston, Massachusetts.

## REFERENCES (CONTINUED)

Young, T. R. and J. P. Boris.  1977.  A Numerical Technique for Solving Stiff Ordinary Differential Equations Associated with the Chemical Kinetics of Reactive Flow Problems.  J Phys. Chemic, 81, 25.

Zilitinkevich, S. A.  1972.  On the determination of the height of the Ekman boundary layer.  Boundary Layer Meteorol., 3, 141-145.

APPENDIX 4.6

VISUAL RESOURCES ANALYSIS ON

LOS PADRES NATIONAL FOREST
(Revision of Appendix E in the DEIR/EIS)

INTRODUCTION

Impacts of pipeline construction and operation on visual resources are of particular concern in the Las Padres National Forest (LPNF).  The following analysis of the differences in impacts among the routing alternatives is limited to the segments of the alternatives on LPNF. The following are definitions of the visual classifications used in this discussion:

- Variety Class - A particular level of visual variety or diversity of landscape character.
  - A = Distinctive
  - B = Common
  - C = Minimal.

- Sensitivity Level - A particular degree or measure of viewer interest in the scenic qualities of the landscape.
  - 1 = Highest concern
  - 2 = Average concern
  - 3 = Lowest concern or seldom seen.

- Viewing Distance - Areas of landscapes denoted by specified distances from the observer.  Used as a form of reference in which to discuss landscape characteristics or activities.
  - Fg = Foreground, 0 to 0.5 mile
  - Mg = Middleground, 0.25 to 5 miles
  - Bg = Background, 3 or more miles.

- Visual Quality Objective (FS VQO) - A desired level of excellence based on physical and sociological characteristics of an area. Refers to acceptable alteration of the landscape (see Table 3-28).

- Visual Absorption Capability (VAC) - The ability of a landscape to absorb a human activity or facility without significantly altering the natural appearance.
  - H = High
  - M = Moderate
  - L = Low.

- Existing Visual Condition (EVC) - The current state of naturalness or alteration that exists at a particular site or landscape area (see Table 3-28).

- Future Visual Condition (FVC) A prediction of the expected future state of the landscape as it would appear after the Celeron/All American or Getty proposals were implemented (see Table 3-28).

4-174

CELERON PROPOSAL

Affected Environment

The Celeron route in La Brea Canyon would affect a total of 184 acres of land within the LPNF. Landscape variety is common (variety Class B) and typical of the Coastal Mountain Ranges within 73 percent of the corridor. The remainder of the corridor contains landscape variety that is minimal (variety Class C). Ninety-three percent of the corridor is visible from the La Brea Canyon Road and other travelways that contain significant numbers of aesthetically concerned viewers and is classified as high in sensitivity (sensitivity level 1). Approximately 85 percent of this route is viewed from critical viewing distance zones (foreground and middleground).

Approximately 18 percent of this corridor is presently untouched by human activities. Human activities remain subordinate to the natural landscape on 23 percent of the corridor (EVC Classes II & III) and dominate the natural landscape on the remaining 59 percent (EVC Classes IV and V).

The relative ability of the landscape to absorb pipeline development without loss of its natural character is low on approximately 85 percent of this route.

Under current Forest management direction, approximately 89 percent of the corridor is managed, as a minimum, to meet the Retention and Partial Retention visual quality objectives (VQOs). The remainder of the corridor is managed to meet the modification and maximum modification VQOs. Presently, these objectives are met on only 34 percent of the corridor due primarily to the impacts associated with the La Brea Canyon Road and fuel break construction.

Environmental Consequences

Development of the pipeline under the Celeron proposal would result in visual disturbances that would appear dominant over the natural landscape (visual condition Classes IV and V) on approximately 89 percent of the corridor. Pipeline activities would remain visually subordinate to the natural landscape on the remainder of the corridor.

Existing visual conditions would decline on approximately 39 percent of the corridor. Pipeline activities would not be consistent with LPNF visual quality objectives on approximately 89 percent of the corridor (a significant impact). Present VQO achievement levels would decline by 68 percent under this alternative.

GETTY PROPOSAL

Affected Environment

The Getty route in La Brea Canyon would affect a total of 92 acres of land within the LPNF. Landscape variety is common or typical of that found within the coastal mountains of southern California on 73 percent

4-175

of the corridor. The remainder of the corridor contains minimal landscape variety. Ninety-six percent of the corridor is visible from the La Brea Canyon Road and other travelways that are classified as high in sensitivity to the viewing public. Approximately 92 percent of the corridor is viewed from critical viewing distance zones (Fg & Mg).

Virtually the entire corridor has been disturbed by human activities. These disturbances remain visually subordinate to the natural landscape (EVC Classes I, II and III) on 31 percent of the corridor and are visually dominant on the remainder.

The relative ability of the landscape to absorb pipeline development activities without loss of natural character is low on 61 percent of the corridor, moderate on 37 percent, and high on 2 percent.

Under current Forest management direction, approximately 92 percent of the corridor is managed to meet, as a minumum, the Retention and Partial Retention VQOs. The remainder of the corridor is managed to meet the Modification and Maximum Modification VQOs. Presently these VQOs are met on approximately 17 percent of the corridor due to impacts associated with the La Brea Canyon Road and fuel break construction activities.

## Environmental Consequences

Development of the pipeline under the Getty proposal would result in visual disturbances that would dominate the natural landscape (visual condition Classes IV and V) on 92 percent of the corridor. Pipeline activities would remain visually subordinate to the natural landscape on the remainder of the corridor.

Existing visual conditions would decline on approximately 30 percent of the corridor. Pipeline activities would not be consistent with the Forest's inventoried visual quality objectives on approximately 92 percent of the corridor (a significant impact). Present VQO achievement levels would decline by approximately 54 percent.

## SANTA MARIA CANYON ALTERNATIVE A

### Affected Environment

Santa Maria Canyon Alternative A would affect approximately 50 acres of land within the LPNF. Landscape variety is unique or distinctive (variety Class A) on approximately 7 percent of the corridor. Landscape variety is common or typical of that found within the coastal mountains of southern California on 78 percent of the land, and there is minimal variety on the remainder of the corridor. Approximately 58 percent of the corridor is visible from State Highway 166 at critical viewing distance zones. The remainder of the corridor is seldom seen by the public.

Approximately 46 percent of the corridor is untouched by human activities. On the remainder of the corridor, disturbances from human

activities remain visually subordinate to the natural landscape on approximately 44 percent of the corridor and are visually dominant on the remaining 10 percent.

The relative ability of the landscape to absorb pipeline activities without loss of natural character (VAC) is low on approximately 64 percent of the corridor and moderate on the remaining 36 percent.

Under current Forest management direction, approximately 58 percent of the corridor is managed, as a minimum, to meet the Retention and Partial Retention VQOs. The remainder of the corridor is managed to meet the modification VQO. Presently these objectives are met on approximately 84 percent of the corridor. Underachievement of VQOs on the remainder of the corridor is due to impacts associated with Highway 166 cuts and fills.

## Environmental Consequences

Development of the pipeline under Santa Maria Canyon Alternative A would result in visual disturbances that would appear dominant over the natural landscape on approximately 24 percent of the corridor. Pipeline activities on the remainder of the corridor would remain visually subordinate to the natural landscape.

Existing visual conditions would decline on approximately 52 percent of the corridor. Pipeline activities would not be consistent with LPNF visual quality objectives on approximately 35 percent of the corridor (a significant impact). This under achievement would occur mostly within those portions of the corridor that are highly visible from Highway 166. Present VQO achievement levels would decline by 19 percent under this alternative.

## SANTA MARIA CANYON ALTERNATIVE B

## Affected Environment

Santa Maria Alternative B would affect approximately 29 acres of land within the LPNF. Landscape variety is common or typical of that found in the coastal mountains on 56 percent of the corridor, with minimal variety on the remaining 44 percent. Approximately 60 percent of the corridor is visible from State Highway 166 and the Sierra Madre Road of critical viewing distance zones. The remaining 40 percent of the corridor is seldom seen by the public.

Approximately 10 percent of the corridor is untouched by human activities. On 76 percent of the corridor, existing roads and fuelbreaks are unnoticed alterations. Only in the Sierra Madre Mountains are existing conditions noticeable, where fuelbreaks are visually dominant on 14 percent of the corridor.

The relative ability of the landscape to absorb pipeline activities without loss of natural character (VAC) is low on approximately 79 percent of the corridor and moderate on 21 percent.

4-177

Under current Forest management direction, approximately 60 percent of the corridor is managed, as a minimum, to meet the Retention and Partial Retention VQOs. The remainder of the corridor is managed to meet the modification VQO. Presently these objectives are met on approximately 86 percent of the corridor. Underachievement of VQOs on the remainder of the corridor is due to impacts associated with the existing fuelbreak on the Sierra Madre Mountains.

## Environmental Consequences

Development of the pipeline under Santa Maria Canyon Alternative B would remain visually subordinate to the natural landscape. The corridor utilizes existing fuelbreaks and roads and would not be evident.

Existing visual conditions would not decline if this pipeline were constructed. Pipeline activities would be consistent with LPNF visual quality objectives on 100 percent of the corridor and would not be noticeable from high sensitivity travel routes. Present VQO achievement levels would not decline under this alternative.

## COMPARISON AND EVALUATION OF ALTERNATIVES

Table 4.6 summarizes some of the differences among the routing alternatives. The visual quality index provides a measure of the overall visual quality that would result under each alternative. The index is a product of variety classes and future visual conditions. Highest possible visual quality (all acres = Variety Class A and Visual Condition Class I) would be indicated by an index of 100. The lowest possible visual quality would be indicated by an index of zero (all acres = variety Class C and visual condition Class VI). According to the calculations, the Santa Maria Canyon Alternative A would produce the highest overall visual quality index among the alternatives, and the Getty La Brea proposal would produce the lowest.

Existing visual conditions are significantly lower because of existing fuel breaks and roads preferred along the Celeron and Getty proposals. However, the pipeline development would offer little potential for enhancement or rehabilitation of visual resources in these corridors due to the large scale of the pipeline development proposals. The highly scenic, small scale character of La Brea Canyon, in particular, would undergo major changes in its existing natural character if one or both pipelines were constructed.

The Santa Maria Canyon Alternative B would have significantly higher future visual conditions and VQO achievement levels, would affect fewer acres of National Forest land, and would offer greater potential for concealing the pipeline development from public view than either the Celeron or Getty La Brea proposals, or Santa Maria Canyon Alternative A.

TABLE 4.6

COMPARISON OF ALTERNATIVES

| | Celeron Proposal | Getty Proposal | Santa Maria Canyon Alternative A | Santa Maria Canyon Alternative B |
|---|---|---|---|---|
| **Future Visual Conditions** | | | | |
| Condition Class I | 0 | 0 | 0 | 0 |
| Condition Class II | 5 percent | 4 percent | 57 percent | 86 |
| Condition Class III | 6 percent | 4 percent | 19 percent | 0 |
| Condition Class IV | 34 percent | 35 percent | 0 | 0 |
| Condition Class V | 55 percent | 57 percent | 24 percent | 14 |
| Condition Class VI | 0 | 0 | 0 | 0 |
| | | | | |
| Decline in Existing Visual Conditions | 39 percent | 30 percent | 52 percent | 10 |
| VQO Achievement Levels | 11 percent | 8 percent | 65 percent | 86 |
| Visual Quality Index | 28.32 | 27.71 | 47.87 | 35.80 |

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) described as **DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION (VOL. 2 OF 4)** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: *See* Attached Service List.

☒ BY ELECTRONIC MAIL TRANSMISSION WITH ATTACHMENT: On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

☒ [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/Josie Cisneros*

Josie Cisneros

**SERVICE LIST**

Julie Teel Simmons, Esq.
David Pettit, Esq.
Talia Nimmer, Esq.
Center for Biological Diversity
2011 Franklin Street, Suite 375
Oakland, CA 94612

ATTORNEYS FOR PETITIONERS
CENTER FOR BIOLOGICAL DIVERSITY and
WISHTOYO FOUNDATION

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: jteelsimmonds@biologicaldiversity.org
dpettit@biologicaldiversity.org
        tnimmer@biologicaldiversity.org

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

ATTORNEYS FOR PETITIONERS
ENVIRONMENTAL DEFENSE CENTER, a
California non-profit corporation; GET OIL
OUT!, a California non-profit corporation;
SANTA BARBARA COUNTY ACTION
NETWORK, a California non-profit corporation;
SIERRA CLUB, a national non-profit
corporation; and SANTA BARBARA
CHANNELKEEPER, a California non-profit
corporation

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
        jfrankel@environmentaldefensecenter.org
        trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

ATTORNEYS FOR RESPONDENTS/
DEFENDANTS
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal;
Daniel Berlant, in his official capacity as State
Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
        benjaminhanelin@paulhastings.com
        natalierogers@paulhastings.com

Trevor D. Large, Esq.
FAUVER, LARGE, ARCHBALD & SPRAY
LLP
820 State Street, 4th Floor
Santa Barbara, CA 93101

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (805) 966-7000
Email: TLarge@FLASllp.com

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:  (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>Respondents and Defendants,<br><br>and<br><br>SABLE OFFSHORE CORP., et al.,<br><br>Real Parties in Interest. | Case No. 25CV02244<br>[Coordinated with Case No. 25CV02247]<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION (VOL. 3 OF 4)**<br><br>[*Filed concurrently with Opposition to Preliminary Injunction; Declarations of Steve Rusch, Michael A. Mische, Brien Vierra, and Michael Rosenfeld*]<br><br>Date:        July 18, 2025<br>Time:        10:00 AM<br>Dept.:        4<br><br>Complaint Filed:        April 15, 2025<br>Trial Date:        None Set |

1

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

# VOLUME 3 OF 4 (EXHIBIT C PART 1) TO DECLARATION OF BART LEININGER

# Exhibit C

# DRAFT
# ENVIRONMENTAL IMPACT REPORT
# ENVIRONMENTAL IMPACT STATEMENT



# PROPOSED CELERON / ALL AMERICAN AND GETTY PIPELINE PROJECTS

## CALIFORNIA STATE LANDS COMMISSION
### AND
## BUREAU OF LAND MANAGEMENT
## DEPARTMENT OF THE INTERIOR

State Clearing House No. 83110902
Contract No. R-8353



A COMSAT COMPANY
ENVIRONMENTAL RESEARCH & TECHNOLOGY, INC.
ANCHORAGE · CHICAGO · CONCORD, MA · FORT COLLINS, CO
HOUSTON · LOS ANGELES · PITTSBURGH · WASHINGTON, DC

# AUGUST 1984

Access roads to the pump stations would be maintained in such a way as to provide access for maintenance personnel at all times. The permanent 20-ft ROW would be the major access to the pipeline. Pipeline block valves would be fenced with chain link fences with locked gates. The valves would also be independently locked to prevent unauthorized operation. Block valve sites would be kept clear of woody vegetation. If road access to pump stations or block valves was prevented due to extremely wet or other road conditions as specified by the land managing agency, routine and emergency access would be provided by helicopter.

An oil spill contingency plan would be developed for Getty's proposed pipeline system. This plan would provide detailed information on oil spill response techniques and procedures to be followed. This plan must be approved by the Environmental Protection Agency, State of California, and other authorities prior to the startup of the pipeline system. Appendix H summarizes the format and contents for the required oil spill contingency plan.

## 2.2.5 Abandonment

The project life of the pipeline systems would depend on the availability of crude oil. Should additional supplies become available, the life of the facilities and/or their capacities could be extended beyond the projected 30-year life of the project. Insufficient availability of crude oil or other economic situations could make operation of the pipeline system infeasible beyond the 30-year project life and could result in the abandonment and disposal of all or portions of the system. The abandonment procedures used would be subject to appropriate existing local, state, and Federal regulations.

Crude oil remaining in the system would be drained to the tank farms. Removal of the crude oil from the pipeline would be accomplished by displacing it with water obtained from existing sources along the route. Water would be delivered to oil-water separators before discharge. Equipment would be disconnected, sealed, secured, and possibly removed for salvage. Storage tanks at the tank farms would be dismantled and salvaged.

If warranted by salvage value, pipe would be removed, otherwise it would be abandoned in place. Removing and salvaging the pipe and block valves would be similar to construction activities but with a simplified work scope. Some sections of pipeline, such as river or road crossings, would not be removed. The ends of the pipeline on both sides of such a crossing would be sealed, covered with soil, and the ROW restored. If it were economically infeasible to salvage the pipeline, it could be purged of petroleum and filled with an inert substance such as nitrogen gas or water and left buried. The pipeline cathodic protection system would be disconnected and removed.

Mainline pumps and motors would be disconnected and either stored or removed for other uses. Before the pump stations were abandoned, all

# 4.0  ENVIRONMENTAL CONSEQUENCES

## 4.0  ENVIRONMENTAL CONSEQUENCES

### 4.1  Introduction

Chapter 4 presents a discussion of the environmental consequences that would result from implementation of the Celeron/All American and Getty proposals or the alternatives. In keeping with the directive of the National Environmental Policy Act (NEPA) and California Environmental Quality Act (CEQA), the chapter focuses on impacts that are considered significant; criteria used to establish significance are stated at the beginning of each analysis. Where these criteria were exceeded, impacts were deemed "significant". In many cases, anticipated impacts were compared to the significance criteria and found to be "not significant". The general approach followed throughout the chapter is to briefly describe the range of impacts that would occur and then provide a detailed discussion of those impacts that are considered significant. Exceptions were made, however, when a question of potentially significant impact was identified as an issue in the scoping process, by an agency, or in the impact analysis process, and more detailed discussions were included in the EIR/EIS.

On the Las Flores to Emidio segment, the impacts associated with the Celeron and Getty proposals have been analyzed separately. Impacts that would result from the construction and operation of both projects have also been presented where appropriate. For certain disciplines, the impacts associated with either or both projects would be the same, while for other disciplines, the combined impacts of both projects would be greater than either project analyzed separately. Getty and Celeron/All American representatives were interviewed concerning construction procedures and scheduling, and it was determined to be highly unlikely for Getty and Celeron construction crews to work "side by side". Therefore, it was assumed that construction activities for the two projects would be separated in time and/or space.

Based on this assumption, it was determined that disciplines such as air quality, surface water, aquatic biology, socioeconomics, transportation, and noise would not experience combined impacts. Other disciplines such as soils, terrestrial biology, land use and recreation, cultural resources, visual resources, and oil spill potential would have additive impacts from the construction of both projects. Impacts to geology and groundwater would be essentially the same for either or both projects. Combined impacts from the Celeron and Getty proposals are discussed at the end of the Las Flores to Emidio section for each affected discipline.

### 4.2  Celeron/All American and Getty Proposals

#### 4.2.1  Air Quality

The Celeron/All American and Getty proposals would consist of pipeline construction and pump station and delivery station operations that would emit various air pollutants including sulfur dioxide ($SO_2$), oxides of nitrogen ($NO_x$), total suspended particulates (TSP), carbon monoxide (CO), and hydrocarbons (HC). Maximum concentrations for these

pollutants were estimated to determine air quality impacts resulting from the Celeron/All American and Getty proposals. During the construction phase, air quality impacts were based upon pipeline construction on one spread from Las Flores to Emidio for either Getty or Celeron and 5 spreads working simultaneously from Emidio to McCamey.

The analytical techniques used to generate the results (see Appendix A) varied slightly depending upon averaging time, location, and operation being modeled. These variations necessitated the use of several models. Due to the lack of available data near the proposed pipeline route, assumed worst-case scenarios were developed for the short-term (24 hours or less) averaging times.

The project emissions were compared with applicable Federal, state, and county emissions thresholds (e.g., New Source Review), and project emission control devices were evaluated in terms of applicable BACT and LAER requirements. Air quality modeling using EPA approved models was performed for sources emitting pollutants in excess of the significance thresholds. The modeling results were then compared with allowable pollutant concentrations as specified in county, state, and Federal ambient standards and increments, including those for Class I areas.

Air quality impacts were judged significant or not significant based on regulatory standards, and best professional judgement of resource specialists. The National Ambient Air Quality Standards (NAAQS), and the ambient air quality standards for California, Arizona, New Mexico, and Texas are all important benchmarks for significant impacts. Primary and secondary NAAQS and state standards have been issued for $SO_2$, $NO_2$, TSP, CO, ozone ($O_3$), and HC. These standards are summarized in Appendix A. Primary standards are designed to protect public health, while secondary standards are designed to protect public welfare. Annual average standards are never to be exceeded. Short-term standards (24 hours or less) cannot be exceeded more than once per year, except in California where no standards can be exceeded.

New large pollutant sources in attainment areas (areas where the NAAQS are met) are also subject to prevention of significant deterioration (PSD) review. PSD regulations further control pollutant emissions by allowing the maximum predicted concentrations from a new major source and any other nearby previously permitted PSD sources to be a fraction of the NAAGS. PSD regulations in California, Arizona, New Mexico, and Texas establish air quality increments for $SO_2$ and TSP that restrict deterioration by major sources. The applicable $SO_2$ and TSP PSD increments are shown in Appendix A, Table A-3. The PSD increments are much smaller than corresponding NAAQS and state standards; therefore, the increments are often more limiting in determining the size of new projects that may be built. Since no new emission sources would be located in Santa Barbara County, Santa Barbara Air Pollution Control District PSD regulations, which are stricter, would not apply.

The amount of deterioration by new sources is determined by the classification of the area. Presently, the entire area surrounding the proposed projects is designated as PSD Class II, which allows for moderate air quality deterioration. Little air quality deterioration is

allowed in PSD Class I areas. The closest existing Class I areas are the Guadelupe Mountains National Park (Texas) located within 650 yards of the pipeline, and the San Rafael Wilderness (California) located approximately 8.5 miles east of the proposed Sisquoc pump station. The PSD increments in Appendix A (Table A-3) apply not only to routinely operating sources such as the pump stations and tank farms, but also to temporary sources located near Class I areas [40 CFR 52.21(i)(6)]. Examples of temporary sources in the Celeron/All American and Getty proposals would include the construction of the pump stations and pipelines. No significant air quality impacts in Class I areas have been predicted by modeling results.

The following sections summarize the predicted maximum air quality impacts from the proposed construction and operational activities and compare the impacts to applicable significance criteria. The results are described for each of the pipeline segments and include the maximum concentrations for each pollutant for the construction phase of the pipeline as well as the operational phase of the pump stations.

### 4.2.1.1  Las Flores to Emidio

Construction. The construction emissions inventory for this segment is summarized in Appendix A, Table A-11. A detailed discussion of the emissions inventory associated with total pipeline construction is also contained in Appendix A. The primary sources of emissions during construction for all segments of the pipeline would be heavy-duty vehicular traffic. CO emissions would be emitted in the largest quantities during construction followed by $NO_x$, HC, TSP, and $SO_2$ emissions.

Maximum modeled impacts occurred within 200 yards of the construction activities on all pipeline segments analyzed. The methodology used in the modeling for the construction phase can be found in Appendix A. The summary of maximum worst-case short-term impacts resulting from the construction of the Celeron/All American and Getty pipelines is found in Table 4-1. The pollutants for which violations are predicted are CO and TSP for both celeron and Getty. All other ambient pollutant concentrations would be within appropriate California and Federal standards. It should be noted that the background concentration for the CO (8-hour) violates both state and Federal standards and the construction contribution is only 1 percent of the total concentration. Also the closest ambient CO monitoring station was located near Bakersfield, where the major contributor is automobile exhaust from major traffic routes. Thus, the background value at the pipeline construction site is expected to be much less. No significant impact would occur.

The appropriate TSP (24-hour) background concentrations violate the California standard and the Federal secondary standard. The contribution from the construction emissions would account for only 2 percent of the California ambient value and 4 percent of the Federal concentration. Moreover, the meteorological conditions which produce the maximum background concentration (relatively high wind speeds) were

TABLE 4-1

SUMMARY OF AIR QUALITY IMPACTS FROM THE CONSTRUCTION OF THE CELERON/
ALL AMERICAN AND GETTY PROPOSED PIPELINES
FROM LAS FLORES TO EMIDIO

| Pollutant | Maximum Project Concentration ($\mu g/m^3$) | Maximum[1] Background Concentration ($\mu g/m^3$) | Total Ambient Concentration ($\mu g/m^3$) | California/ Federal Standard ($\mu g/m^3$) |
|---|---|---|---|---|
| **Celeron/All American** | | | | |
| SO$_2$ | | | | |
| 1-hour | 4.8 | 653 | 657.8 | 1,310/-- |
| 3-hour | 4.8 | 653 | 657.8 | --/1,300 |
| 24-hour | 1.2 | 125 | 126.2 | 131/365 |
| NO$_2$ | | | | |
| 1-hour | 59.3 | 320 | 379.3 | 470/-- |
| TSP | | | | |
| 24-hour | 9.8 | 411/244 | 421/254 | 100/260 |
| CO | | | | |
| 1-hour | 236 | 19,295 | 19,531 | 23,000/40,000 |
| 8-hour | 177 | 13,961 | 14,138 | 10,000/10,000 |
| **Getty** | | | | |
| SO$_2$ | | | | |
| 1-hour | 6.3 | 653 | 659.3 | 1,310/-- |
| 3-hour | 6.3 | 653 | 659.3 | --/1,300 |
| 24-hour | 1.6 | 125 | 126.6 | 131/365 |
| NO$_2$ | | | | |
| 1-hour | 52.2 | 320 | 372.2 | 470/-- |
| TSP | | | | |
| 24-hour | 7.6 | 411/244 | 419/252 | 100/260 |
| CO | | | | |
| 1-hour | 100.8 | 19,295 | 19,396 | 23,000/40,000 |
| 8-hour | 83.1 | 13,961 | 14,044 | 10,000/10,000 |

Source: ERT

[1]For comparison with CAAQS, highest concentration in 1980-1982 period is used. For comparison with NAAQS, highest of the second highest concentrations in 1980-1982 is used.

not the conditions which produced the maximum computed concentration (low wind speed and stable conditions). Therefore, maximum construction and maximum background concentration are not expected to occur simultaneously. Also since the construction emissions would be temporary and transient, EPA (Diggs 1984, and Harper 1984, personal communications) and county, permitting agencies (Goff 1984, and Stroman 1984, personal communications) believe that no significant long-term or permanent impacts would occur.

The maximum 24-hour TSP concentration is estimated to be 1 $\mu g/m^3$ at the San Rafael Wilderness which is the nearest Class I area (located approximately 8.5 miles from the pipeline). The maximum 3-hour $SO_2$ concentration is less than 1 $\mu g/m^3$ at the nearest point of the wilderness. Thus no significant impacts are expected in the Class I area.

Operation. The operation of the pipeline segments from Las Flores to Emidio would consist of three pump stations, one of which could contain oil heaters (Getty's Cuyama pump station). Since electric-powered pumping would be used, the only emissions would be from the natural gas-fired oil heaters at Cuyama. Details for the emissions inventory can be found in Appendix A. Since natural gas would be used for oil heating, the majority of emissions would be $NO_x$; CO and HC would also be emitted with only a trace of TSP and $SO_2$ emissions. Due to the source configurations, maximum modeled impacts occurred approximately 100 yards from the source. The summary of maximum projected impacts can be found on Table 4-2. Ambient concentrations of TSP and CO are predicted to violate the 24-hour California TSP standard and the 8-hour state and Federal CO standards. However, this project contribution is less than one-tenth of 1 percent of this total concentration. This, combined with the discussion of the respective background values above, no significant impacts are expected to occur from the operation of the pump/heater station at Cuyama (Ronyecz 1984, personal communication).

### 4.2.1.2 Emidio to Blythe

Construction. The construction emissions inventory for this segment of the pipeline is summarized in Appendix A. The summary of maximum worst-case short-term impacts resulting from the construction of the proposed pipeline in eastern California are found in Table 4-3. The only pollutants for which violations are predicted are $NO_2$ and TSP. All other ambient pollutant concentrations were within appropriate California and Federal standards. It should be noted that the background concentrations for both $NO_2$ (1 hour) and TSP (24-hour) violate applicable standards. The construction contribution would account for less than 10 percent of the total $NO_2$ concentration and 3 percent of the total TSP concentration. However, since the construction emissions are temporary and transient, the Southeast Desert Air Pollution Control District would not consider the $NO_x$ and TSP concentrations as significant impacts (Hubbard 1984, personal communication). The short-term increase in TSP along the ROW is also not expected to significantly decrease visibility in the area around Edwards Air Force Base.

TABLE 4-2

SUMMARY OF AIR QUALITY IMPACTS FROM THE OPERATION OF THE

PROPOSED PIPELINES FROM LAS FLORES TO McCAMEY

| Pollutant | Maximum Project Concentration ($\mu g/m^3$) | Maximum[1] Background Concentration ($\mu g/m^3$) | Total Ambient Concentration ($\mu g/m^3$) | State[2]/ Federal Standard ($\mu g/m^3$) |
|---|---|---|---|---|
| **Las Flores to Emidio** (Getty)[3] | | | | |
| $SO_2$ | | | | |
| 1-hour | 0.08 | 653 | 653 | 1,310/-- |
| 3-hour | 0.18 | 653 | 653 | --/1,300 |
| 24-hour | 0.03 | 125 | 125 | 131/365 |
| $NO_2$ | | | | |
| 1-hour | 32.6 | 320 | 352.6 | 470/-- |
| TSP | | | | |
| 24-hour | 0.1 | 187/170 | 187/170 | 100/260 |
| CO | | | | |
| 1-hour | 21.9 | 19,295 | 19,317 | 23,000/40,000 |
| 8-hour | 10.9 | 13,961 | 13,972 | 10,000/10,000 |
| **Emidio to Blythe** (Celeron/All American) | | | | |
| $SO_2$ | | | | |
| 1-hour | 0.13 | 78 | 78.3 | 1,310/-- |
| 3-hour | 0.3 | 78 | 78.3 | --/1,300 |
| 24-hour | 0.05 | 26 | 26.0 | 131/365 |
| $NO_2$ | | | | |
| 1-hour | 54.7 | 564 | 619 | 470/-- |
| TSP | | | | |
| 24-hour | 0.1 | 300/179 | 300/179 | 100/260 |
| CO | | | | |
| 1-hour | 21.9 | 6,810 | 6,832 | 23,000/40,000 |
| 8-hour | 10.9 | 5,562 | 5,573 | 10,000/10,000 |
| **Blythe to McCamey** (Celeron/All American) | | | | |
| $SO_2$ | | | | |
| 3-hour | 0.97 | 1,175 | 1,176 | --/1,300 |
| 24-hour | 0.41 | 339 | 339 | --/365 |

TABLE 4-2 (CONTINUED)

| Pollutant | Maximum Project Concentration ($\mu g/m^3$) | Maximum[1] Background Concentration ($\mu g/m^3$) | Total Ambient Concentration ($\mu g/m^3$) | State[2]/ Federal Standard ($\mu g/m^3$) |
|---|---|---|---|---|
| NO$_2$ | | | | |
| Annual | 7.1 | 16 | 23.1 | 100/100 |
| TSP | | | | |
| 24-hour | 0.1 | 451 | 451 | 150/260 |
| CO | | | | |
| 1-hour | 108.0 | 17,025 | 17,133 | 14,500/40,000 |
| 8-hour | 97.1 | 10,000 | 10,097 | 9,700/10,000 |

Source:   ERT

[1] For comparison with CAAQS, highest concentration in 1980-1982 period is used.  For comparison with NAAQS, highest of the second highest concentrations in 1980-1982 is used.

[2] California standards for Las Flores to Blythe and New Mexico standards for Blythe to McCamey.

[3] No heaters would be required by Celeron/All American along this segment.

TABLE 4-3

SUMMARY OF AIR QUALITY IMPACTS FROM CONSTRUCTION OF THE PROPOSED
PIPELINE FROM EMIDIO TO BLYTHE AND THE BLYTHE TO McCAMEY

| Pollutant | Maximum Project Concentration ($\mu g/m^3$) | Maximum[1] Background Concentration ($\mu g/m^3$) | Total Ambient Concentration ($\mu g/m^3$) | State[2]/ Federal Standard ($\mu g/m^3$). |
|---|---|---|---|---|
| **Emidio to Blythe** | | | | |
| $SO_2$ | | | | |
| 1-hour | 4.8 | 78 | 82.8 | 1,310/-- |
| 3-hour | 4.8 | 78 | 82.8 | --/1,300 |
| 24-hour | 1.2 | 26 | 27.2 | 131/365 |
| $NO_2$ | | | | |
| 1-hour | 59.3 | 564 | 623 | 470/-- |
| TSP | | | | |
| 24-hour | 9.8 | 426/419 | 435.8/428.8 | 100/260 |
| CO | | | | |
| 1-hour | 236 | 6,810 | 7,046 | 23,000/40,000 |
| 8-hour | 177.0 | 5,562 | 5,739 | 10,000/10,000 |
| **Blythe to McCamey** | | | | |
| $SO_2$ | | | | |
| 3-hour | 6.3 | 3,518 | 3,523 | --/1,300 |
| 24-hour | 1.6 | 514 | 515.2 | 260/365 |
| $NO_2$ | | | | |
| 24-hour | 52.2 | 60 | 119.3 | 200/-- |
| TSP | | | | |
| 24-hour | 7.6 | 364 | 371.6 | 150/260 |
| CO | | | | |
| 1-hour | 100.8 | 17,025 | 17,126 | 14,500/40,000 |
| 8-hour | 83.1 | 10,000 | 10,083 | 9,700/10,000 |

Source: ERT

[1]For comparison with CAAQS, highest concentration in 1980-1982 period
is used. For comparison with NAAQS, highest of the second highest
concentrations in 1980-1982 is used.

[2]California standards for Emidio to Blythe and New Mexico standards
for Blythe to McCamey.

Operation.  The operation of the 294-mile pipeline segment from Emidio to Blythe would consist of four pumping/heating stations as well as an oil storage facility at Cadiz.  Since electric-powered pumping would be used between Emidio and Blythe, only emissions from natural gas-fired oil heaters would be generated, with the exception of the tank farm at Cadiz.  Hydrocarbon emissions would be emitted by the loading and unloading of oil at this storage facility.  Details for the emissions inventory can be found in Appendix A.  Since natural gas would be used for oil heating, the majority of emissions would be $NO_x$;  CO and HC would also be emitted with only a trace of TSP and $SO_2$ emissions.

Due to the source configurations, maximum modeled impacts occurred approximately 100 yards from the source.  The summary of maximum projected impacts can be found on Table 4-2.  The only pollutant for which a violation is predicted is $NO_2$.  This violation would occur at the Twelve-Gauge Lake pump station.  The operation contribution of $NO_2$ would account for less than 9 percent of the total ambient concentration.  It should be noted that the background concentration for $NO_2$ (1-hour) exceeds the applicable California standards.  Only one background violation has occurred in 1980 through 1982 indicating a very infrequent combination of events.  Thus, the occurrence of $NO_2$ background violations during the operation phase in the Barstow area would be very infrequent.  Due to the size of the pump station and its location relative to the monitoring site (approximately 12 miles), no significant impact is expected (Hubbard 1984 personal communication).  No modeling for annual concentrations was performed since the maximum 24-hour $NO_2$ concentration of 15.3 $\mu g/m^3$ was well below the Federal annual standard of 100 $\mu g/m^3$.

No appreciable air quality impacts from $SO_2$, CO, or TSP would be generated from the operation of pump stations from Emidio to Blythe.  Maximum project concentrations for $SO_2$ and TSP for all averaging times were well below 1 $\mu g/m^3$.  The maximum predicted 1 and 8-hour CO concentrations for CO were 21.9 $\mu g/m^3$ and 10.9 $\mu g/m^3$, respectively.  These are less than 1/10 of 1 percent of their respective California standards.

The San Bernardino County New Source Rule would not be in effect because the emissions of hydrocarbons at the Cadiz tank farm would be less than 250 lbs/day (see Appendix A, Table A-11).  Therefore, it was not deemed necessary to perform modeling to address the effect of these emissions on ozone concentration and significant impacts are not anticipated.

#### 4.2.1.3  Blythe to McCamey

Construction.  The construction emissions inventory for each spread is summarized in Appendix A.  The summary of maximum short-term impacts resulting from the construction of the proposed pipeline is found in Table 4-3.  High background concentrations, in violation of New Mexico and Federal standards, produced predicted violations for $SO_2$, CO, and TSP.

As in the prior pipeline construction analyses, the contribution of the construction emissions from the Celeron/All American pipeline accounted for less than 1 percent of the total $SO_2$ concentration, 2 percent of the total CO concentration, and 3 percent of the total TSP concentration. The nearest ambient CO monitoring station was located in Las Cruces, nearly 20 miles away. Since the major contributors of CO emissions are automobiles, the maximum background values at the pipeline are expected to be much less. Since the construction emissions for $SO_2$, CO, and TSP would occur for only a short time in any one area, it again would be unlikely to have the maximum ambient concentrations and maximum construction concentrations occur simultaneously. In addition, since the construction emissions are temporary and transient, the New Mexico Health and Environment Department would not consider the $SO_2$, CO, and TSP concentrations as significant impacts (Dhawan 1984, personal communication). The Arizona Department of Health Services (Leverock 1984, personal communication) and Texas Air Control Board (Willis 1984, personal communication) were also contacted and are of the opinion that predicted project concentrations would not constitute significant impacts. The maximum 24-hour TSP concentration is estimated to be 5.0 $\mu g/m^3$ at the Guadelupe Mountains National Park which is the nearest Class I area (located approximately 650 yards from the pipeline). The maximum 3-hour $SO_2$ concentration is 2.5 $\mu g/m^3$ at the nearest point of the national park. Thus no significant impacts are expected in the Class I area.

Operation. The operation of the final pipeline segment from Blythe to McCamey would consist of nine pumping/heating stations located through Arizona, New Mexico, and Texas. Since natural gas-fired turbine pumps would be used in Arizona, maximum emission concentrations would occur at the Gila and Coolidge pump stations. Summarized emissions are in Appendix A, Table A-11. Again, the majority of emissions would be $NO_x$ from the natural gas firing of the turbines and heaters. CO and HC would also be emitted with only a trace of TSP and $SO_2$ emissions.

Due to the source configurations, maximum modeled impacts occurred approximately 100 yards from the source. The summary of maximum projected concentrations can be found on Table 4-2. The maximum predicted annual $NO_2$ concentration at the Gila and Coolidge pump stations of 23.1 $\mu g/m^3$ would be well under the standard of 100 $\mu g/m^3$. Again, no significant air quality impacts from $SO_2$, CO, or TSP would be generated from the operation of pump stations from Blythe to McCamey. Maximum project concentrations for $SO_2$ and TSP for all averaging times were below 1 $\mu g/m^3$. The maximum predicted 1 and 8-hour CO concentrations were 108 and 97.1, respectively. These are less than 1 percent of their respective New Mexico and Federal standards.

Summary. Based on air quality modeling some violations of applicable air quality standards would occur from pipeline construction or operation. Violations would occur because the pipeline would cross areas where baseline conditions already exceed standards for certain pollutants; however, the pipelines' contributions to total ambient concentrations would be less than 10 percent for all pollutants. In addition, all of the Federal and state permitting offices contacted were of the opinion that no significant impacts would occur during the

construction phase, due to the transient nature of the emission sources, and during the operational phase, due to the relatively low emissions from the pumping stations.

## 4.2.2  Geology

The impacts discussed for geology include both geologic hazards and impacts of the project on the geologic environment.  Geologic hazards are summarized in Table 4-4 and are located on Map 1-2.  Geologic hazards and impacts are classified as significant or not significant based on the degree of impact as measured against scientific and social (or human) criteria.  The following conditions along the pipeline ROW would be considered significant:

### Geologic Hazards

- Slope instability or unstable cuts-and-fills leading to damage or failure of the pipeline.  Significance criteria include conditions ranging from those which lead, at least, to a requirement for special maintenance in order to prevent possible damage to or failure of the pipeline, to those involving such severe landslide conditions that the pipeline should be rerouted in order to avoid them.

- Surface fault rupture leading to damage or failure of the pipeline.  Significance criteria are based on the level of probability indicated by historical precedent and paleoseismologic evidence, that fault movement leading to damage or failure of the pipeline would occur at a fault crossing by the pipeline.  In general, faults with historical records of surface offset of more than a few inches, such as the San Andreas fault, are of greatest significance.  Ancient bedrock faults are not significant with regard to any potential for surface rupture.

- Earthquake-induced strong vibratory ground motion capable of damaging the pipeline directly.  In general, only very strong near-field ground motion could affect the pipeline itself.  Ancillary facilities such as· pumping and heating stations and oil-holding transfer tanks are more sensitive and could be significantly damaged by ground motion from earthquakes originating at intermediate distances, depending on design parameters and foundation conditions.  The effects of low-amplitude long-period ground motion from distant earthquakes would not be significant.

- Secondary seismic effects, especially earthquake-induced ground failure, including liquefaction of water-saturated granular alluvial soil.  Significance is based on the potential for ground failure resulting in damage to or failure of the pipeline or of any critical ancillary facility.

- Subsidence or grade collapse resulting in enough elevation change to affect pipeline grade and elevation of pumping stations.

21—78571                                4-11

TABLE 4-4

GEOLOGIC HAZARDS ALONG THE CELERON/ALL AMERICAN AND GETTY PIPELINE ROUTES

| Map Code | Applicant[1] | Location | Geologic Hazard |
|---|---|---|---|
| G1 | C/A, G | Gaviota Gorge approximately 3/4 mile south of intersection Highways 1 and 101 | Surface fault rupture |
| G2 | C/A, G | Cañada de Las Cruces approximately 1/2 mile north of intersection of Highways 1 and 101. | Landsliding |
| G3 | C/A, G | Cañada de Las Cruces approximately 1 mile north of intersection of Highways 1 and 101. | Landsliding |
| G4 | C/A, G | Cañada de Las Cruces approximately 2 miles north of intersection of Highways 1 and 101. | Landsliding |
| G5 | G | Nojoqui Canyon approximately 3/4 mile north of Live Oak Ranch | Landsliding |
| G6 | G/A, G | Santa Ynez River/Zaca Creek floodplains from confluence of Nojoqui Creek to confluence of Cañada Botella (approximately 4 miles). | Liquefaction/lurching |
| G7 | G | Zaca Creek about 1/2 mile south of confluence of Cañada Botella | Landsliding |
| G8 | C/A | Sisquoc River floodplain and channel | Liquefaction/lurching |
| G9 | G | Sisquoc River floodplain and channel | Landsliding |
| G10 | C/A | La Brea Creek approximately 1½ miles downstream of confluence of North and South Forks La Brea Creek | Landsliding |
| G11 | C/A, G | La Brea Canyon immediately downstream of confluence of North and South Forks La Brea Creek | Landsliding |

TABLE 4-4 (CONTINUED)

| Map Code | Applicant[1] | Location | Geologic Hazard |
|----------|-----------|----------|-----------------|
| G12 | C/A, G | Sierra Madre Mountains from about 2½ miles north of confluence of North and South Forks La Brea Creek to about 1 mile northeast of Treplett Mountain | Landsliding |
| G13 | SM | Sisquoc River floodplain and channel | Liquefaction/lurching |
| G14 | SM | On slope west of quarry near confluence of Suey Canyon with Tepusquet Canyon | Landsliding |
| G15 | SM | Suey Canyon approximately 2½ miles upstream of confluence with Tepusquet Canyon | Landsliding |
| G16 | SM | Suey Canyon divide about 1-3/4 miles east-northeast of Las Coches Mountains | Landsliding |
| G17 | SM | Cuyama River Gorge from Buckhorn Canyon to approximately 1 mile northeast of Glines Canyon | Landsliding |
| G18 | SM | West end of Cuyama Valley approximately 1/2 mile south of mouth of Cuyama River Gorge | Landsliding |
| G19 | SM | West end of Cuyama Valley from river crossing for approximately 4 miles east | Liquefaction/lurching |
| G20 | C/A, G | East half of Cuyama Valley from Bates Canyon to about 1 mile east of intersection of Highways 166 and 33 (approximately 18 miles) | Liquefaction/lurching |
| G21 | C/A, G | San Emigdio Mountains approximately 4 miles northeast of intersection of Highways 166 and 33 | Surface fault rupture |
| G22 | C/A, G | Southern San Joaquin Valley from approximately 4 miles southeast of Maricopa to approximately 5 miles east-northeast of Wheeler Ridge (approximately 42 miles) | Liquefaction/lurching |

TABLE 4-4 (CONTINUED)

| Map Code | Applicant[1] | Location | Geologic Hazard |
|---|---|---|---|
| G23 | C/A | Tejon Creek Valley (approximately 1 mile) | Liquefaction/lurching |
| G24 | C/A | Cummings Valley, Brite Valley and westernmost Tehachapi Valley (approximately 4 miles) | Liquefaction/lurching |
| G25 | C/A | Oak Creek Pass approximately 6 miles due west of Mojave | Surface fault rupture |
| G26 | C/A | Mojave River floodplain and channel at Barstow (approximately 2 miles) | Liquefaction/lurching |
| G27 | C/A | Palo Verde Valley from Mesaville to Blythe and from Nicholls to Blythe, and Colorado River floodplain and channel (approximately 10 miles total) | Liquefaction/lurching |
| G28 | C/A | Gila River floodplain and channel | Liquefaction/lurching |
| G29 | C/A | Coolidge area, from Randolph for approximately 14 miles southeast | Subsidence |
| G30 | C/A | San Pedro River floodplain and channel | Liquefaction/lurching |
| G31 | C/A | Sulphur Springs Valley approximately 6 miles northwest of Willcox (approximately 6 miles) | Subsidence |
| G32 | C/A | San Simon Valley about 4 miles southeast of Bowie (approximately 8 miles) | Subsidence |
| G33 | C/A | Rio Grande River floodplain and channel (approximately 8 miles) | Liquefaction/lurching |
| G34 | C/A | Delaware Basin from Delaware River crossing for approximately 23 miles to east | Solution collapse |
| G35 | C/A | Pecos River floodplain and channel | Liquefaction/lurching |

[1]C/A = Celeron/All American          G = Getty          SM = Santa Maria Canyon Alternative

- Secondary effects of subsidence, especially those resulting in sharp elevation changes or loss of support that could result in damage to or failure of the pipeline or of any critical ancillary facility.

- Debris flow effects including dislodging, burial, or severe damage to the pipeline or any critical ancillary facility.

### Impacts on Geologic Environment

- Existence of paleontological resources or unique geologic features or outcrops.

- Active mining operations or proposed mineral/energy development requiring avoidance by the pipeline.

- Presence of federally controlled mineral resources which would be precluded from future development by the pipeline or ancillary facilities.

- Large scale topographic alterations resulting in significant related impacts (visual degradation, soil erosion, drainage alteration, etc.)

### 4.2.2.1  Las Flores to Emidio

Geology and Physiography.  Excavation and grading associated with construction of the pipeline and pump stations would result in temporary (construction period) and permanent changes in topography, and in minor disturbance of geologic units.  However, the anticipated scale of grading operations associated with trench excavation and backfill, and cuts and fills at pump stations, would be minor.  Thus, no significant impacts to the geology and physiography would occur.

Seismicity and Faulting.  There are a number of hazards associated with the active seismotectonic environment traversed from Las Flores to Emidio.  These can be subdivided into two major categories:  strong ground shaking and surface fault rupture.  Strong ground shaking can result in one of several secondary seismic effects including: liquefaction, lurching or spreading, compaction, and slope instability. These various seismically related hazards are discussed in the following section in terms of the potential for serious damage to project facilities leading to oil spillage.  The oil spill impacts are discussed for each resource that could be affected in their respective sections.

The likelihood of moderate to locally very strong ground shaking must be regarded as relatively high during the design life of the pipeline and ancillary facilities.  The Las Flores to Emidio segment lies within Zones 3 and 4 of the UBC Seismic Risk Map (International Conference of Building Officials 1983).  These zones are characterized as having the potential for major damage with Modified Mercalli intensities of VII and higher.  Zone 4 is determined by the proximity to certain major fault systems.  Algermissen et al. (1982) predict a 10 percent probability of horizontal accelerations in rock ranging from

0.40 to 0.65g (see glossary) during any 50-year period in this region (see Map 4-1). Greensfelder (1974) estimates maximum credible rock accelerations of about 0.5g.

As a general rule, ground shaking will be most severe close to the fault on which the earthquake occurs. Faults with the highest probability of producing damaging earthquakes include the San Andreas east of Cuyama and the Santa Ynez near Gaviota Gorge. Seismic zonation taking this effect into account is presented for Santa Barbara County and adjacent areas to the northeast by Livingston and Associates/Moore and Taber (1979).

The potential effects of strong shaking depend largely on the characteristics of the various project facilities. The buried pipeline would be least sensitive to vibratory shaking because it is flexible enough to deform with the surrounding soil. Above-ground facilities, would be much more susceptible to vibratory damage. In general, the low pump station buildings would be relatively resistant to damage. However, the pumps, piping, and valves could be subject to amplified vibrations leading to failure.

In terms of potential hazard to the pipeline, secondary seismic effects triggered by strong ground shaking are often more serious than the shaking itself. Soil liquefaction, lurching or spreading, and dynamic compaction are related phenomena which may occur in unconsolidated (loose), saturated soils subjected to moderate to strong ground shaking. Areas along the alignment judged susceptible to these types of behavior are shown on Map 1-2. The most susceptible areas include the young sandy alluvial deposits of the Santa Ynez, Sisquoc, and Cuyama Rivers. Young alluvial fan deposits flanking the eastern portion of the Cuyama Valley and in the southern San Joaquin Valley are susceptible where they are saturated near surface (due to irrigation or shallow groundwater) and sufficiently loose. Buwalda and St. Amand (1955) document areas near the pipeline alignment in the vicinity of Mettler that underwent this type of failure during the 1952 Kern County earthquake. It is important to understand that portions of the routes within the delineated areas may be safe from liquefaction-related hazards, while local areas outside them may be susceptible. Detailed studies, as recommended in Section 4.10, are required to refine the areas subject to these hazards.

The loss of ground support or ground movement resulting from liquefaction-related behavior could lead to no effect, bending, or rupture of a buried pipe, depending on specific site conditions. Rupture would only occur if a large deflection of the pipe occurred. In general, the longer the zone of ground deformation, the more serious the results. The more localized the effects, the better the strong steel pipe is able to resist the resulting stresses.

Moderate to strong ground shaking can trigger renewed movement or enlargement of existing landslides and induce new failures on susceptible slopes. In this situation the pipelines could be lifted and sheared. The likelihood of rupture would be governed by the amount of

Numbers indicate the maximum acceleration (in % of 1g) with a 90% probability of not being exceeded during any 50-year period.

Source: DOI/USGS Open-file Report No. 82-1033

**MAP 4-1 SEISMIC HAZARD MAP**

offset, the ability of the pipeline to stretch (amount of "free play" or "slack") and the nature of the surrounding material (e.g. rock would be more likely to shear the pipe by uplift than unconsolidated material. The risk of these types of failures and their potential effects on the pipeline are discussed in the following section on slope stability.

The last important seismic hazard involves surface fault rupture. Although it is difficult to quantify the probability of surface fault rupture, it is generally accepted that the more recently a fault has moved, the more likely it is to move again in any given period of time in the future.  The State of California has identified certain faults which are judged sufficiently capable of surface rupture in the short term (tens of years) that they deserve special study and design before human-occupancy structures can be built in their vicinity [California Divison of Mines and Geology (CDMG) 1976a].  Among other criteria, evidence of Holocene offset is sufficient to cause a fault to be zoned. Some workers have suggested that the probability of a fault moving in any given year is roughly one divided by the number of years since it last moved [Engineering Decision Analysis Company (EDAC) 1979; Jack R. Benjamin and Associates (JBA) 1980].  Using this model, there is something like a 1 in 100 chance of a historically active fault moving, but less than about a 1 in 10,000 chance for offset on a pre-Holocene fault in any given year.

Of the geologically young (Quaternary-age) faults listed on Table 3-3 only the San Andreas (shown on Map 1-2) is zoned by the CDMG at the crossings of the applicants' proposed routes.  Although not zoned, there is sufficient evidence to regard the South Branch Santa Ynez fault as having a probability of offset during the pipeline life on the order of, or greater than, 1 in 10,000 per year.  The probability of surface rupture on the other Quaternary faults from Las Flores to Emidio is uncertain, but judged by the EIR team to be quite low.

Surface offset of the San Andreas fault during a large earthquake is judged sufficiently probable to require specific mitigation as described in Section 4.10.  Movement would likely be horizontal with the ground on the southwest side of the fault moving northwest relative to the opposite side of the fault (i.e., right-lateral offset).  The amount of movement is difficult to predict, but could be as much as 10 to 30 ft based on past behavior (Sieh 1978).  Without special design provisions, this amount of offset would almost certainly result in rupture of the pipeline with oil spillage and the resultant impacts (see Section 4.2.15).  Much smaller offset would be expected on the South Branch Santa Ynez fault due to its significantly shorter length and its structural character as a splay of a larger fault.

Slope Stability.  Impacts associated with slope instability would result from rupture of the pipelines.  Areas of existing slope instability which may pose a threat to the integrity of the pipelines are shown on Map 1-2.  Landslides of various types and sizes exist on or near the routes in these areas.  Continued movement of active slides, or reactivation of dormant slides due to intense rainfall, seismic shaking, construction grading, or other natural or manmade causes could result in failures leading to oil spills.  Failure mechanisms might include

shearing of the pipeline due to differential movement of the ground, loss of support due to movement of soil from beneath the pipe, or crushing of the pipe by overriding soil and/or rock. It is also possible, if not somewhat more likely, that slope failures would develop progressively so that repair to a damaged or threatened portion of the pipeline could be made before rupture occurred. In areas characterized by existing landslides the risk of continuing or renewed slope failure must be regarded as relatively high.

In addition to reactivating existing slides, new natural landsliding may occur in similar geologic units on slopes subjected to destabilizing conditions. This would include enlargement of existing slides, as well as separate new slides. The main factors which could lead to new natural instability would be undercutting slopes by erosion, excessive rainfall, and seismic shaking, acting either separately or together. The risk of these types of failures is judged moderate for enlargement of existing slides, and moderate to low for completely new natural slides along the applicants' proposed routes. Areas within the Sierra Madre Mountains underlain by severely fractured and shattered sandstone and shale are most susceptible to new failures (see Map 1-2).

Landslides associated with permanent cut and fill slopes created during grading operations could result in structural failure of the pipe. Instability of temporary construction slopes or trench excavations, while important to safety and constructability, would not trigger impacts related to oil spillage. Impacts associated with temporarily increased sedimentation could result from instability of either permanent or temporary slopes (see discussion in Section 4.2.3). Proper geotechnical design would result in relatively low risk of these types of failures.

Subsidence. The risk of significant impacts due to subsidence-related failure of the pipeline, pump stations, or storage facilities is low. Major historic subsidence in the Maricopa-Mettler area has been essentially eliminated. Renewed subsidence could occur if groundwater overdraft were permitted in the future. Subsidence associated with deeper oil and gas withdrawals is monitored and controlled by the California Division of Oil and Gas and should not pose any threat to the project facilities.

Paleontology. It is possible that well preserved fossils would be encountered in trench excavations in geologic units which are known to be highly fossiliferous at other localities. The likelihood of exposing unique specimens of great paleontologic significance is, however, thought to be low. The requirements in California and Federal statutes, including a paleontological survey of highly fossiliferous areas crossed by the proposed ROW, would help minimize potential adverse impacts to any significant paleontologic resources.

Unique Geologic Features. No significant impacts to unique geologic features are anticipated.

4-19

<u>Mineral/Petroleum Resources</u>.  No significant adverse impacts to mineral or petroleum resources would occur in this portion of the route. The volume of sand and gravel which might be excluded from possible future extraction at the Santa Ynez and Sisquoc River crossings would be insignificant in comparison to the total resource in the immediate area. The presence of existing large-scale diatomite quarries in nearby Lompoc make it unlikely that the privately owned deposit traversed by the applicants' routes would be developed in the foreseeable future.  If this deposit is eventually developed, the pipelines would not significantly reduce the recovery of the mineral.  The pipelines would have no significant impact on oil and gas extraction in the operating fields traversed.

### 4.2.2.2  <u>Emidio to Blythe</u>

<u>Geology and Physiography</u>.  Impacts would be the same as described in Section 4.2.2.1.

<u>Seismicity and Faulting</u>.  Much of the background discussion of seismicity and faulting in Section 4.2.2.1 has application to this section.  The following paragraphs discuss specific aspects of the topic applicable to the applicant's proposed route from Emido to Blythe.

In general, the level of hazard due to strong ground shaking is present, but to a somewhat lesser degree than from Las Flores to Emidio. The UBC zoning is the same (Zones 3 and 4), but Greensfelder (1974) estimates maximum credible accelerations of less than 0.2g southeast of about Amboy, as opposed to 0.4 to 0.5g to the west.  East of Mojave, Algermissen et al. (1982) anticipate only 0.1 to 0.2g as the maximum acceleration with a 90 percent probability of not being exceeded during any 50 year period (see Map 4-1).  Thus, at least from Amboy to Blythe, hazards from shaking can be regarded as low to moderate.  As a general rule, ground shaking will be most intense near the White Wolf or Garlock faults, which are the most likely sources of damaging earthquakes.

Secondary seismic effects would be most likely to occur in those portions of the upland valleys of the Tehachapi Mountains locally underlain by sandy alluvium which is saturated near the ground surface due to irrigation or along drainage courses or streams (see Map 1-2). The alluvial deposits of the Mojave River and the Palo Verde Valley near Blythe would also be susceptible (see Map 1-2), but to a lesser degree due to the less intense shaking anticipated.  Due to infrequent saturation and generally favorable drainage characteristics, sandy deposits along the remainder of the route would be unlikely to experience potentially damaging secondary effects.

Slope instability triggered by strong ground shaking may occur locally on the steeper flanks of the Tehachapi Mountains with the effects noted in the following section on slope stability.  The remainder of the route to Blythe would not be seriously threatened by this hazard.

Of the Quaternary faults listed on Table 3-3, the only one considered reasonably capable of sufficiently large surface offset to rupture an unprotected pipeline would be the Garlock Fault west of Mojave (see Map 1-2). This fault is zoned by the State of California (CDMG 1976f) and may have undergone up to 6 inches of offset in response to the 1952 Kern County earthquake (Buwalda and St. Amand 1955). Although the probability of surface rupture is less on the Garlock than the San Andreas due to the formers lack of major historical seismicity and offset, the amount of offset resulting from a maximum credible earthquake on the Garlock fault could exceed 10 to 20 ft. Surface fault rupture did not occur on the White Wolf fault in the vicinity of the pipeline crossing during the 1952 magnitude 7.7 earthquake. Since that size earthquake is regarded as a maximum credible event for the White Wolf fault (Greensfelder 1974), it is very unlikely that surface faulting will occur at the pipeline crossing during the project life. Although portions of this fault to the northeast and southwest are zoned, geologic data (even following the 1952 earthquake) are not present to allow extending the surface fault rupture hazard zone through the pipeline crossing area (CDMG 1976,c,d,e).

There have been reports of Holocene and historic surface rupture on several faults in the central Mojave Desert (Beebey and Hill 1975; Keaton and Keaton 1977; Hawkins and McNey 1979; Hill et al. 1980). Although none of these faults would be crossed by the route, they have similar geologic characteristics to, and occur within the same seismotectonic environment as, the Quaternary faults without Holocene offset in Table 3-3. Available evidence suggests that relatively little, if any, serious damage would have been sustained by a steel pipeline as a result of the reported fault movements.

Slope Stability. The risk of damage leading to oil spillage from natural slope instability is very low due to the generally favorable climatic, geologic, and geomorphic conditions in this portion of the applicants' proposed route. Potential damage due to erosion and sedimentation triggered by flooding is discussed in Section 4.2.3.

Grading at pump stations in this segment should result in relatively low cut and fill slopes. Such slopes would pose very little, if any, hazard to project facilities. Instability of temporary construction slopes or trench excavations, while important to safety and constructability, would not lead to oil spillage and resultant impacts.

Volcanism. The risk of serious damage to the pipeline from renewed volcanic activity in the Pisgah and/or Amboy volcanic fields (see Map 1-2) is judged to be very low on currently available information, including very recent studies of the generally similar Cima volcanics to the north.

Paleontology. It is possible that well preserved megafossils would be encountered in trench excavations in certain of the geologic units traversed. However, the likelihood of exposing unique specimens of great paleontologic significance is unknown. The requirements in California and Federal statutes for protection of important

4-21

paleontologic resources, including a paleontological survey of highly fossiliferons areas crossed by the proposed ROW, would help minimize any potential adverse impact.

Mineral/Petroleum Resources.    No significant adverse impacts to current development or planned extraction of mineral or petroleum resources are anticipated.  The route does not traverse properties of Proposed Mineral Producers or Highly Probable Production Areas identified by the BLM (1982), nor the proposed SCE solar pond project on Danby Lake (Hayes 1984, personal communication).

As summarized on Table 3-6, the route does cross leasable mineral resource areas on Federal land.  There is some possibility that future mineral development utilizing surface mining techniques could encroach on the pipeline ROW.  If necessary, re-routing or re-design of a portion of the pipeline could be implemented to provide access to federally-controlled mineral resources.

### 4.2.2.3  Blythe to McCamey

Geology and Physiography.  Impacts would be the same as discussed in Section 4.2.2.1.

Seismicity and Faulting.  As discussed for the Sohio Project (BLM 1976 pp. 2-10 of 101, 3-25 to 30) and supporting documents (ERT 1976 pp. 2A.3-50 & 53), there is a relatively low risk of serious damage to the pipeline or ancillary facilities due to seismic effects from Blythe to McCamey.  Areas which could experience some slope instability or secondary seismic effects (particularly liquefaction) in a major earthquake are shown on Map 1-2.

Slope Stability.  The risk of serious damage to the pipeline or ancillary facilities from slope instability from Blythe to McCamey is judged negligible.  The depth of burial of the pipeline in mountainous areas would prevent significant damage in the unlikely event of moderate to large rockfalls from the slopes above the alignment.

Subsidence.  Subsidence due to fluid withdrawal is occurring along the applicant's proposed route at several locations in Arizona (see Map 1-2).  Surface effects include subtle changes in grade over relatively long distances (up to miles), and scarps and fissures in more localized areas.  Vertical offsets up to several feet high and fissures up to several feet wide and 100 or more feet deep have been reported (BLM 1976, pp. 3-24 & 25).

Although fissures and ground surface offsets of the type described may expose short sections of the pipeline over time, the strength of steel pipe is sufficient to prevent rupture until the problem can be corrected during routine maintenance.  The changes in grade over longer distances are so slight that no adverse effect on the pipeline would occur.  Fissuring and offsets directly beneath rigid structures such as the pump or heater stations, valves, or other appurtenant facilities could result in more significant damage due to cracking or tilting, if the condition was not discovered early on.

Karstic Terrain.  An area in west Texas delineated on Map 1-2 is locally characterized by the presence of sinkholes.  These are surface depressions formed by solution and collapse of underlying soluble rock.  These features may subside gradually over hundreds to thousands of years, or abruptly when the underlying solution cavern reaches a critical size.  In the latter case, scarps from inches to many feet high can form over a short period of time.

Possible damage from karstic collapse is generally similar to that associated with subsidence.  As for subsidence, the most effective strategies are avoidance of known or suspected sinkholes and frequent surveillance for signs of incipient failure.

Volcanism.  The risk of damage to the pipeline leading to oil spillage from volcanism is judged negligible along the Blythe to McCamey route (Mullineaux 1976).

Paleontology.  It is possible that well preserved megafossils would be encountered in trench excavations in certain of the geologic units traversed.  However, the likelihood of exposing unique specimens of great paleontologic significance is judged very low.  The paleontologic resource protection requirements in Federal statutes should minimize any potential adverse impact.

Unique Geologic Features.  No impact to unique geologic features is anticipated.

Mineral/Petroleum Resources.  The only potentially significant impact on mineral resources would involve major spillage of oil into open sand and gravel pits and quarries adjacent to the alignment [see discussion for the Sohio Project (BLM 1976 p. 3-20)].  The likelihood of such an occurrence appears very remote as discussed in Section 4.2.15.

No other significant adverse impacts to mineral or petroleum resources would occur in this portion of the route.  The volume of sand and gravel which might be excluded from possible future extraction at major river crossings is insignificant in comparison to the total resource in immediately adjacent areas.  The same is true of undeveloped sulfur and potash salt deposits in Texas.  The pipeline would have no significant impact on oil and gas extraction in the operating fields traversed.

4.2.2.4  Summary.  No significant impacts to geologic and physiographic features would occur during construction or operation of the pipeline.  Although no significant impacts are expected to occur in regard to other geological actions, certain hazards and risks are identified for seismicity and faulting and slope stability.  Of these, high risks would be associated with surface rupture of the San Andreas fault, and slope failures in existing slide areas.  There is a moderate risk of liquefaction-related failures, particularly at major river crossings along the Las Flores to Emidio segment.  Pump and heater/pump stations, and valves would potentially be affected by subsidence from fluid withdrawal or karstic collapse.

### 4.2.3 Soils

The impacts discussed for soils are classified as significant or not significant based on the degree of impact as measured against scientific criteria. The criteria that follow are derived from regulatory standards, research information, and/or standards based on best professional judgement of resource specialists.

- Impacts to soils would be considered significant if increased erosion rates or reduction of soil productivity resulting from project activities would prevent successful rehabilitation (the process of applying mechanical and/or revegetation techniques to limit soil loss to preconstruction levels on disturbed sites) and eventual vegetation regeneration (re-establishment of pre-existing vegetation composition, density, and cover). Evaluations of successful rehabilitation are based on whether soils having severe rehabilitation constraints would stabilize with respect to erosion from all causes to near preconstruction conditions within one year following application of proposed plans and compliance with Federal stipulations for erosion control and revegetation.

#### 4.2.3.1 Potential Impacts to Soils

Construction. With the application of the mechanical erosion control and revegetation techniques presented in the project description and site-specific techniques that will be developed as part of the Construction and Use (CU) Plan impacts to soils resulting from construction activities would not be significant. Impacts resulting from construction activities would include:

- accelerated soil erosion and deposition,

- decreased productivity from compaction and horizon mixing, and

- increased soil slumping potential.

Accelerated soil erosion in the form of sheet, rills, and gullies could result from the removal of vegetative cover, especially on moderately steep to steep slopes occurring along major portions of the route. Compaction by heavy equipment would reduce the infiltration rate and water-holding capacity of the soils, increase runoff and erosion, and adversely affect revegetation success. Horizon mixing could create chemical (salinity) and physical (compaction, difficult seedbed preparation) problems, except in irrigated cropland areas where soils would be segregated. Horizon mixing could redistribute subsurface salts into the surface layers, adversely affecting productivity. Disturbances to steep, clayey soils predisposes these areas to soil slumping which results in increased erosion, revegetation problems, and pipeline instability.

Operation. Significant adverse impacts to soils would result from oil pipeline leaks and ruptures. Contamination of soils would result in increased microbial activity and decreased water uptake and infiltration

rates (Rowell 1975). Oil spills may adversely affect soil structure and consequently render the soils more susceptible to erosion (Ellis and Adams 1961). Soil productivity would be reduced within a spill area and result in a temporary decrease in vegetation production levels. The size and duration of soil impacts due to oil spills would be dictated by the extent of the spill, infiltration depth of the oil, soil characteristics, local topography, and type of vegetative cover.

Impacts from oil spills would be small in magnitude because of the limited ability of spilled oil to disperse over large areas of land. An oil spill of 15,000 barrels would likely contaminate less than 16 acres of land, based on MacKay and Mohtadi's (1975) study of 53 oil spills in Alberta, Canada, in which estimates were based on shallow soils (8 inches deep). Since most of the soils along the pipeline route are deeper than 8 inches, the maximum area disturbed by an oil spill would probably be less than 16 acres, but could be greater in extremely shallow soils on steep slopes.

Agricultural areas would be the most sensitive to oil spill impacts. The impacts in these areas would be soil contamination and subsequent loss of production. Depending on the depth of oil penetration and climatic conditions, reclamation of oil-damaged soils can take from 1 to many years following contamination (Rowell 1975, Plice 1948). Oil spill-related impacts to soils would be minimized to the extent possible. Since reclamation practices can be feasibly implemented in agricultural areas, reclamation of agricultural lands would most likely occur more quickly than in native plant communities.

Abandonment. Pipeline removal would create impacts similar to those resulting from construction. No additional impacts to soils would occur if the pipeline was abandoned in place.

### 4.2.3.2 Las Flores to Emidio

Adverse impacts resulting from construction activities would include accelerated soil erosion and deposition, decreased productivity, and increased soil slumping potential. Soil loss from water and wind erosion and ravelling would be accelerated by construction, especially on the steep mountainous areas of Gaviota Pass, Los Padres National Forest (LPNF), and along the flood-prone Cuyama Valley. The irrigated croplands of southwestern Kern County would be especially prone to compaction and horizon mixing problems. Increased soil slumping potential would result from construction particularly in the clayey soils common to the coastal area (Las Flores to Gaviota Pass).

Sensitive soil units for special consideration in the detailed CU plan along the Las Flores to Emidio route are described in Table 4-5 and shown on Map 1-2, Sheets 2 and 3. These areas are sensitive based on the following characteristics which are major potential problems associated with erosion control and revegetation:

- Steep slopes (e.g., Gaviota Pass area and LPNF)

4-25

- Irrigated cropland (e.g., southwestern Kern County)

- Flood-prone areas (e.g., Cuyama Valley)

- Clayey and high shrink-swell areas (e.g., Las Flores to Gaviota Pass)

- Serpentine soils (e.g., LPNF)

Significant short-term (one to two years) impacts would result from oil pipeline leaks and ruptures. The agricultural lands of southwestern Kern County and the Cuyama Valley would be the most sensitive to oil spills. The clayey soils of the coastal area are prone to slumping and shrink-swell conditions which can create instability problems for the pipeline; however, these conditions would not be caused by pipeline construction.

### 4.2.3.3  Emidio to Blythe

Adverse impacts resulting from construction activities would include accelerated soil erosion and deposition, and decreased productivity from compaction and horizon mixing. Soil loss from water erosion would be accelerated by construction especially on the steep slopes of the Tehachapi Mountains and along the flood-prone drainages feeding into the Tehachapi Valley. Construction activities would accelerate soil loss by wind erosion along the Mojave Desert where frequent strong winds occur. Chemical (salinity) and physical (compaction) problems in agricultural soils would result from construction in southwestern Kern County and floodplains of the Mojave and Colorado Rivers.

Sensitive soil units along the Emidio to Blythe route are described in Table 4-5 and shown on Map 1-2, Sheets 3, 4, and 5. These areas are sensitive based on the following characteristics which are major potential problems associated with erosion control and revegetation:

- Steep slopes, shallow soils (i.e., Tehachapi Mountains)

- Irrigated cropland (i.e., southwestern Kern County, Barstow, and Blythe)

- Flood-prone areas (i.e., Tehachapi Valley, Mojave, and Colorado Rivers)

Significant short-term ( one to two years) impacts would result from oil pipeline leaks and ruptures as discussed in Section 4.2.3.1. The agricultural lands of southwestern Kern County, Barstow, and Blythe would be the most sensitive to oil spills.

4.2.3.4    Blythe to McCamey. Adverse impacts resulting from construction would be accelerated soil erosion and deposition and decreased productivity from compaction and horizon mixing. Although the majority of this route crosses level to gently sloping terrain, the steep slopes of isolated mountains (i.e., Kofa, Winchester) would

TABLE 4-5

MAJOR SENSITIVE SOIL UNITS

| Map Code | Location | Sensitive Characteristics | Significant Risks | Representative Soil Series |
|---|---|---|---|---|
| **Celeron/All American and Getty** | | | | |
| **California** | | | | |
| S1 | Las Flores to Gaviota Pass | Steep slopes, clayey textures | Water erosion, soil slumping, high shrink-swell | Ayar, Capitan, Diablo |
| S2 | Gaviota Pass to south of Santa Ynez River | Steep slopes, depth to rock,[1] clayey textures | Water erosion, revegetation, soil slumping | Los Osos, Linne, Diablo, Gaviota, sedimentary rockland |
| S3 | North of Zaca Creek and Dry Creek confluence | Steep slopes, depth to rock[1] | Water erosion and revegetation | Santa Lucia |
| S4 | South of Sisquoc River to LPNF boundary | Steep slopes, depth to rock,[1] clayey textures | Water erosion, revegetation, soil slumping | Lopez, Los Osos |
| S5 | LPNF | Steep slopes, depth to rock,[1] occasional flooding (La Brea Creek), serpentine soils | Water and wind erosion, ravelling and deposition, revegetation, some soil slumping | Los Osos, Millerton, Millsholm, Serpentine soils |
| S6 | Cuyama Valley | Strongly saline some irrigated cropland subject to flooding | Revegetation, horizon mixing, water erosion and deposition, compaction | Stutzville<br><br>Metz, Cobbly alluvial land |
| S7 | Emigdio Mtns. | Steep slopes | Water erosion | NA[2] |
| S8 | San Joaquin Valley (southwestern Kern Co.) | Salinity, perched water table in irrigated croplands | Mixing of surface and subsurface soils leading to salinity problems at surface, compaction | Arvin, Hesperia |
| **Celeron/All American** | | | | |
| S9 | Tehachapi Mtns | Very steep slopes, depth to rock[1] | Water erosion, revegetation | Arujo, Friant, Tunis, Chanac-badland complex |
| S10 | Tehachapi Valley (Water, Blackburn, Mendleburu, Antelope Canyons) | Subject to flooding | Water erosion and deposition | NA |
| S11 | Mojave River floodplain | Subject to flooding, irrigated croplands | Water erosion and deposition, compaction, horizon mixing | Villa, Victorville |

TABLE 4-5 (CONTINUED)

| Map Code | Location | Sensitive Characteristics | Significant Risks | Representative Soil Series |
|---|---|---|---|---|
| S12 | East of Tehachapi Mtns. to west of Blythe (Mojave Desert) | Coarse-textured surface layer saline/alkaline, clayey textures | Wind erosion, compaction<br><br>Flash flood potential - water erosion, wind erosion | Cajon, Manet<br><br>Bousic, playas, desert pavement |
| S12W | East of Tehachapi Mtns. to west of Blythe (Mojave Desert) | Fine-textured soils | Susceptible to high wind erosion | Dunes, sand covered fans, dry lake beds |
| S13 | Old Woman Mtns. (Desert Alternative) | Steep slopes | Water erosion | NA |
| S14 | Blythe vicinity | Perched water table in irrigated croplands, subject to flooding | Mixing of sandy topsoils and clay subsoils will create physical problems (compaction, puddling) | Meloland Carrizo |
| **Arizona** | | | | |
| S15 | Colorado River | Subject to flooding | Water erosion and deposition, compaction | Gilman, Antho, Vint |
| S16 | Kofa Mtns., Dome Rock Mtns. | Steep slopes, depth to rock[1] | Water erosion, revegetation | Lomitas and Cherioni |
| S17 | Eagletail Mtns. | Steep slopes, depth to rock[1] | Water erosion, revegetation | Lomitas and Cherioni |
| S18 | Harquahala Plain (Centennial Wash) | Subject to flooding, agricultural lands | Water erosion and deposition, compaction, horizon mixing | Gilman, Antho, Vint |
| S19 | Gila River near Gillespie Dam | Subject to flooding, agricultural lands | Water erosion and deposition, compaction, horizon mixing | Gilman, Antho, Vint |
| S20 | Between Randolph and Rainbow Valley | subject to flooding, agricultural lands | water erosion and deposition, compaction, horizon mixing | Gilman, Antho, Vint |
| S21 | North of Tortolita Mtns. and E. of Picacho Mtns. | Subject to flooding | Water erosion and deposition, compaction | Gilman, Antho, Vint |
| S22 | Santa Catalina Mtns. near Oracle | Moderately steep to steep slopes | Water erosion, revegetation | Caralampi, Latene, Nickel, House Mountain |

4-28

TABLE 4-5 (CONTINUED)

| Map Code | Location | Sensitive Characteristics | Significant Risks | Representative Soil Series |
|---|---|---|---|---|
| S23 | Winchester and Dos Cabazos Mtns. | Steep slopes, depth to rock[1] | Water erosion, revegetation | Faraway, Luzena |
| S24 | North of Wilcox Dry Lakebed | Sodic/saline | Water and wind erosion, revegetation | Gothard, Crot |
| S25 | East of San Simon | Steep slopes, depth to bedrock[1] | Water erosion, revegetation | House Mountain, Nickel |
| **New Mexico** | | | | |
| S26 | Animas Valley | Alkalinity | Revegetation | Hondale, Mimbres |
| S27 | Deming area and north of Florida Mtn. | Agricultural lands | Horizon mixing, compaction | NA |
| S28 | East of Florida Mtns. and west of Aden | Coarse-textured surface layer | Wind erosion | Pintura |
| S29 | Doña Ana County between Aden and Chamberina | Coarse-textured surface layer | Wind erosion | Cacique, Pintura |
| S30 | Rio Grande River | Subject to flooding irrigated cropland | Water erosion and deposition, compaction, horizon mixing | Gila, Vinton |
| **Texas** | | | | |
| S31 | West of Hueco Mtns. and east of Newman | Coarse-textured surface layer | Wind erosion | Hueco, Wink |
| S32 | Salt Basin - west of Guadalupe Mtns. | Alkalinity | Revegetation, flooding | Holloman, Reeves, Hoban |
| S33 | Pecos River | Subject to flooding | Water erosion and deposition, compaction | Gila |
| S34 | Between Pecos River and Kermit | Coarse-textured surface layer | Wind erosion | Wichett, Pyote |

Source:  ERT

[1]Depth to rock less than 20 inches.

[2]Not Applicable

present accelerated water erosion problems as a result of construction activities. Construction would result in accelerated wind erosion especially in those soils with coarse-textured surface layers and in the saline/alkaline soils of fine textures (playas). Compaction and soil horizon mixing impacts from construction activities would decrease soil productivity, especially in agricultural areas.

Sensitive soil units along the Blythe to McCamey pipeline route are described in Table 4-5 and shown on Map 1-2, Sheets 5 through 12. These areas are considered sensitive based on the following characteristics which are major potential problems associated with erosion control and revegetation:

- Steep slopes, shallow soils (i.e., Kofa and Winchester Mountains)

- Irrigated cropland (i.e., Gila, Rio Grande Rivers)

- Flood-prone areas (i.e., Colorado, Gila, Pecos, Rio Grande Rivers)

- Saline/alkaline areas (i.e., Animas Valley, Wilcox Playa, Salt Basin)

Significant short-term (one to two years) impacts would result in the event of an oil spill as discussed in Section 4.2.3.1. The major croplands of Rainbow Valley and Deming, and along the Gila and Rio Grande Rivers would be the most sensitive to oil pipeline leaks and ruptures.

4.2.3.5 Summary. Impacts to soils would occur as a result of construction and operation of the proposed pipeline. These include accelerated soil erosion, decreased productivity from compaction and horizon mixing, and increased soil slumping potential. With Celeron/All American's and Getty's execution of sound mechanical erosion control and revegetation techniques, impacts on soil productivity from construction would not be significant. Significant short-term soil impacts including reduced soil productivity, increased soil susceptibility to erosion, and decreased water uptake and infiltration rates would result if oil spills occur (see Section 4.2.3.1).

4.2.4 Surface Water

Impacts to surface water would be considered significant if:

- Water quality was degraded to the point that it did not meet all existing state and Federal standards.

- The quantity or quality of discharges from streams were modified by water withdrawals, instream construction, or accidental contamination (e.g., oil spills) to the extent that water used by established users (e.g., public water supplies and irrigation) is measureably reduced; critical aquatic habitats support reduced fish populations; or the water quality is in violation of state water quality criteria.

- Channel geometry or gradients were altered sufficiently to produce undesirable effects such as aggradation, degradation, or sidecutting.

- Any permanent above-ground facilities were constructed within the 100-year flood plain (consistent with Executive Order 11988).

- Sedimentation downstream of pipeline crossings affects the operation of irrigation water control structures.

#### 4.2.4.1  Potential Impacts on Surface Water

Construction.    Potential  significant  impacts  of  pipeline construction would be increased sediment yield from areas disturbed during construction and localized channel aggradation/degradation.  USFS Best Management Practices will be implemented on National Forest lands to reduce sediment yield.

Construction earthwork near the stream channel would create the potential for soil erosion and the subsequent increase of sediment loads in the stream.  Construction activities in the stream channel would create the potential for additional sediment in the stream and changes in channel geometry.  Geometry changes (reduction in the cross sectional area of the channel) would be significant because the result can be reduction in the ability of the channel to convey commonly occurring discharges.  Aggradation or degradation of the channel may also occur.

A decrease in water quality would be expected due to a major increase in sediment loads during pipeline construction.  The increase in sediment loads would be temporary and decrease to preconstruction levels within a short time (up to two weeks) after construction is completed.  No significant impacts to stream water quality or irrigation water control structures are expected.

Construction of above ground structures within the 100-year flood plain is not planned at this time.  Significant impacts are not anticipated.

Impacts to surface water resources caused by the discharge of hydrostatic test water are not expected to be significant.  The water would be tested and treated before it is released.  The water would be released in a controlled manner such that natural waterways would not be degraded.

Other possible impacts due to construction activities would be spills of lubricating oils or equipment fuels.  Impacts due to spills of this nature would be of small areal extent but significant, particularly if the spill occurred in a small watercourse.

Operation.    The most significant impact on surface water would result from crude oil spilled into a watercourse from a pipeline leak or rupture.  A spill resulting from a small leak may involve as much as 500 barrels of oil before being detected.  The amount of oil involved in a

large spill would be the volume in the pipeline between the break and the nearest block and check valves on either side. The amount of oil which would flow through the line until the safety equipment shut the pipeline down must also be included. Oil spill volume estimates for sensitive streams range from 1,750 to 4,800 barrels (Table 4-26). Small streams would be temporarily overwhelmed by this quantity of oil and larger streams would carry the oil many miles downstream.

Water quality would be degraded by more volatile fractions of the oil going into solution. Depending on the flow regime at the time of the spill, oil could be incorporated into the sediment or the stream bottom so that some oil would be released after the spill was originally cleaned up (EPA 1982b). Duration of the water quality impacts would probably be only a few weeks after the oil was cleaned up, particularly on larger streams with a large enough flow to dilute oil remaining after cleanup. Water polluted with crude oil would be unsuitable for domestic or irrigation use.

The pipeline could also be affected by scour and natural channel geometry changes over its operational life. During large flow events, the moving water could move large quantities of bed material (scour) and uncover the pipeline. This is undesirable not only because the possibility exists that a pipeline break may occur (only on the largest streams), but also because the pipe may act as a dam, catching trash and flooding surrounding areas. Activities changing the geometry of the stream channel up or downstream from a pipeline crossing may eventually cause a change at the crossing. An example of this would be gravel mining in the channel in the vicinity of a crossing. Removal of mined material could cause activation of the channel upstream or downstream from the mined area as the stream moves material to establish a new average bed gradient. The bed at the pipeline crossing may be raised or lowered. If the bed were lowered, the pipeline could be uncovered.

Abandonment. If the pipeline were removed at the end of its service life, impacts would be similar to those described under construction. If the pipeline were purged of all oil and contaminants and simply abandoned, there would be no effect in a stable channel. If the channel begins to degrade, there is a possibility that the pipeline may be uncovered and affect the flow regime of the stream by catching sediment and trash.

4.2.4.2 Las Flores to Emidio. The following is a summary of expected impacts to the major streams crossed by this section of the pipeline.

- Santa Ynez River - Construction would occur during a short period of time during low flow. Sediment loading in the river would be increased during construction and for a few days afterward. No significant impacts due to construction are expected. When the pipeline is in normal operation no significant impacts would be expected. A pipeline rupture at or near the stream crossing would release oil into the stream. The release of oil into the stream and resulting degradation of water quality would be considered a significant impact.

Since irrigation water and municipal water supply for Buellton comes from wells, no immediate impact on these supplies would be expected from a spill into the Santa Ynez River, although groundwater pollution may result from an oil spill (Ahlroth 1984, personnal communication). If the pipeline were buried 4 ft below the 100-year scour depth it is unlikely that any single runoff event would disturb the pipeline. Degradation of the channel is evident in the reach where the pipeline would be buried and it is possible that the pipeline could be disturbed during its operational life. The disturbance of the line would increase the likelihood of a rupture or change in channel conveyance, both significant impacts.

● Sisquoc River - The impacts on the Sisquoc River would be essentially the same as those on the Santa Ynez River with the following exceptions. There are no municipal water supplies in the vicinity of and downstream from the pipeline crossing on the Sisquoc River although alluvial wells along the river are used for irrigation and individual residences. The release of oil into the stream would degrade water quality and be considered a significant impact. Gravel mining in the Sisquoc River channel downstream of the proposed pipeline crossing has resulted in continuing channel degradation. This degradation would increase the difficulty of burying the pipeline deep enough so that it would not be disturbed during its operational lifetime. Disturbance of the pipeline could result in a significant impact.

● La Brea Creek - Significant impacts to La Brea Creek would result from construction of the pipeline in La Brea Canyon. The canyon is narrow and winding, and the pipeline would have to cross the creek several times. The amount of disturbance to the stream channel could be large enough to change channel geometry and activate the channel. Sediment loadings would remain elevated until the channel reached a new average gradient. Both the change in channel geometry and elevated long-term sediment delivery would be significant impacts. Impacts relating to pipeline operation would be similar to the Santa Ynez River.

● Cuyama River - Impacts to the Cuyama River would be similar to those described for the Santa Ynez River with the exception that the channel is agrading instead of degrading. Thus, uncovering the pipeline due to channel cutting would not be a problem.

4.2.4.3 Emidio to Blythe. Few natural streams would be crossed by this segment of the pipeline; impacts to streams crossed would be similar to the Santa Ynez River. An oil spill into the Mojave River when flowing water is present would be a significant impact. The California and Los Angeles Aqueducts would be crossed in this segment. No impacts due to construction are expected on these structures. Since these waterways are municipal water supplies, any oil leakage into the aqueducts would be considered a significant impact.

4-33

4.2.4.4  <u>Blythe to McCamey</u>.  Impacts to the rivers crossed along this segment would be similar to those for the Santa Ynez River. Construction of the pipeline across the Colorado River at Blythe would be more difficult then other crossings proposed.  Laying the pipeline would require about six weeks.  Once construction was completed. Elevated sediment levels caused by construction activities would decline rapidly to preconstruction levels.  No changes in channel geometrics would be expected and effects of sediment generated during construction would extend only a short distance downstream.

4.2.4.5  <u>Summary</u>.  Significant surface water impacts would occur during operation.  Flooding and scour are not expected be significant impacts because the pipeline would be built to DOT regulations. However, channel degradation which uncovers the pipeline resulting in a pipeline break would cause a significant impact.  A pipeline rupture would cause surface water contamination by the release of crude oil. The probability of these occurrences is very low (see Section 4.2.15). Only a small quantity of oil is needed to contaminate a water supply, and a spill into a stream would likely be quickly detected.  Major spills could be cleaned up quickly.  Any spill poses a significant short-term impact, but long-term impacts would not be significant.

4.2.5  Groundwater

Impacts to groundwater resources would be considered significant if:

- Potentiometric heads or gradients of aquifers were altered enough to adversely affect established water uses.  The magnitude of changes required to produce adverse effects would vary with specific aquifers and water users.

- Water quality within any aquifer zone was degraded by introduction of oil or other pollutants.

4.2.5.1  <u>Potential Groundwater Impacts</u>.  Impacts to groundwater could occur during construction, operation, and abandonment of the proposed pipeline.  Shallow water-table aquifers are most susceptible to contamination.  Deep aquifers are less likely to be affected because of the presence of relatively impermeable overlying layers in the case of confined aquifers, or great thicknesses of unsaturated sediment overlying deep water-table aquifers.  No significant changes in potentiometric heads or gradients are expected to occur.

Sensitive areas of groundwater basins were selected based upon depth to groundwater and degree of groundwater use.  These areas are described and identified on Table 3-14 and Map 1-2.  The most important of the sensitive areas would be those aquifers used for public supplies, with very shallow depths to water and highly permeable soils and aquifer materials.  These highly sensitive areas include the Santa Ynez River at Buellton, Mojave River at Barstow, and Rio Grande Valley near El Paso. Significant impacts may occur outside of the identified sensitive areas, but would affect aquifers of limited extent with relatively few groundwater users.

Groundwater impacts are expected to be limited to the groundwater regime in the vicinity of the pipeline and hydraulically down gradient within the affected aquifer. In the event of a spill into surface water, the oil could be carried down stream for a considerable distance before it is contained, however groundwater would not be substantially affected in downsteram aquifers if spill containment is prompt because the oil would tend to float on top of the water surface due to its lower density. A recent major oil spill which occurred on the North Platte River demonstrates this conclusion (Long 1982).

Construction. During excavation and burial of the pipeline, disruption of shallow aquifers may occur temporarily. Very localized dewatering and increased turbidity impacts would be negligible. Effects would go unnoticed except in wells immediately adjacent to the pipelines.

Hydrostatic testing of the pipeline may introduce contaminants to aquifers in the event of leakage. These contaminants could include oil and grease, rust, metal fragments and welding slag, and bacteriacides added to test water. Effects would be localized and short term since any detected leaks would be located and repaired. Disposal of hydrostatic test water would include treatment to meet NPDES permit stipulations and be at an approved disposal location.

Operation. During operation of the pipeline, significant groundwater impacts would occur only in the case of a leak or rupture of the pipeline. The probabilities of a rupture occurring are very low, as discussed in Section 4.2.15.

Relatively small amounts of oil dissolved in water could cause taste and odor problems. Concentrations of 0.1 part per million (ppm) could make water undesirable for drinking. Danger to human health from drinking oil-contaminated water is usually not a major problem because chronic toxicity concentrations are well above the levels of unpalatable taste and odor. Hydrocarbon-contaminated water would also cause adverse impacts where groundwater is used for irrigation, livestock, and industrial uses.

Leaks in the pipeline have higher probabilities of occurrence than major rupture, and smaller leaks (less than 3 BPH) may go undetected by the SCADA system for days or weeks until the leak is detected by visual observation at the surface. For these reasons, smaller leaks pose a more probable threat of significant impact to groundwater than major spills or ruptures.

Large spills, ruptures, or detectable leaks are less probable in terms of potential groundwater contamination because in these instances the pipeline valves would be closed immediately and the defect repaired. Because of the viscous nature of crude oil, nearly all of the spilled product could be cleaned up by removal of visibly contaminated soil near the surface. If cleanup efforts were prompt, very little oil would have an opportunity to seep to the water table.

Movement of oil through soils and aquifer systems would depend upon viscosity of the oil, soil and aquifer permeability, and depth and hydraulic gradient of the water table. Since the typical Santa Barbara crude oil is over 1,500 times more viscous than water at 68° F, the rate of oil movement through soils and aquifers would be proportionally slower than that of water. Where the depth to the groundwater table is great, oil may be immobilized by processes of absorption and adsorption before reaching the water table.

In most sedimentary deposits, materials of variable permeability are deposited in horizontal layers or bedding. The effects of bedding upon the vertical seepage of oil through unsaturated soils are important because permeability can be much greater in the horizontal direction than vertically. This would tend to make the oil spread laterally, thus allowing more oil to be immobilized before the seepage front reached the water table than would occur in a homogeneous, non-layered soil.

If oil from a pipeline rupture, spill, or leak were to reach the water table, then oil would float on top of the water table because of the lower density of the oil and the relative immiscibility of the two fluids. The oil would tend to spread out over the water table surface and flow downgradient in the same direction as the water, but at a much slower rate of flow. Some fractions of the crude oil would be water soluble. These soluble fractions would mix with and move at the same rate as groundwater until they became immobilized by soil particles, were biochemically degraded, left the groundwater regime as volatile gases, or were discharged with contaminated water to wells or springs.

Because of the slow movement of crude oil through soil and aquifer materials, the effects of groundwater contamination can be long term in comparison to oil spills in surface waters. Cleanup of contaminated groundwaters is expensive, time consuming, and sometimes uncertain because of complex geologic conditions. Oil immobilized by soil absorption may be remobilized by percolating recharge water or seasonally rising groundwater tables. Remobilization could occur by processes of displacement of oil from soil pore spaces and dissolution of the soluble fraction of the crude oil.

In addition to water quality problems associated with oil contamination of groundwater, hazards of fire and explosion are also possible. Occurrence of these impacts would be less probable than leaks or spills. This impact would be limited to developed areas where explosive gases or liquids could accumulate in wells, basements, or excavations. For explosive gases to accumulate, a confining layer of impervious soil or pavement must overlie the body of escaped crude oil.

Abandonment. Upon abandonment, oil would be removed from the pipeline by displacement with water. The water would then be treated to remove oil and to meet applicable discharge regulations. If reasonable precautions were used, abandonment would have negligible impacts on groundwater.

4.2.5.2   <u>Las Flores to Emidio</u>.   In the event of an oil spill or leak, groundwater quality could be significantly degraded in one of four sensitive groundwater basins along this segment of the applicants' proposed pipeline alignment.   These sensitive basins include the Santa Ynez, San Antonio, Sisquoc River, and Cuyama Valley groundwater basins. These basins have minimum depths to water of less than 10 ft locally and have high to moderate degrees of groundwater development.   Most significant is the Santa Ynez River Valley because of the proximity of numerous domestic and public water supplies to the pipeline crossing.

The applicants' alignments differ slightly as proposed by Getty and Celeron/All American.   The Getty alignment crosses the Santa Ynez River upstream from Buellton and proceeds north along Zaca Creek.   This alignment would impact a greater number of wells in the event of an oil spill or leak than Celeron's crossing downstream from Buellton. Additionally, the Getty alignment would add approximately 3 miles to the length of pipeline through the San Antonio Creek Basin.   This would mean a total of 7 miles for Getty's and 4 miles for Celeron's alignment through this sensitive groundwater basin.

4.2.5.3   <u>Emidio to Blythe</u>.   Most of this pipeline segment would not be significantly affected by the Celeron/All American proposal.   One sensitive area exists on the Mojave River groundwater basin at Barstow. Shallow depths to groundwater and a high degree of groundwater use for municipal, irrigation, and industrial supplies indicate that oil leaks or spills would be significant in terms of water quality degradation in this area.

4.2.5.4   <u>Blythe to McCamey</u>.   Significant groundwater quality degradation could occur in the event of pipeline leaks or spills in ten sensitive groundwater basins that are crossed by the proposed pipeline in this segment.   The crossing of Rio Grande Valley is probably the most sensitive of these areas because of the shallow water table and high degree of use for municipal and irrigation supplies.   Other sensitive basins include Centennial, LaPosa, Lower Santa Cruz, San Pedro, Sulfur Springs Valley, San Simon, Animas/ Lordsburg Valleys, Mimbres Valley, and Pecos River Valley.

4.2.5.5   <u>Summary of Groundwater Impacts</u>.   Significant groundwater impacts could occur primarily during operation of the pipeline.   Impacts would include groundwater contamination by introduction of crude oil which would occur only in the event of pipeline leaks, ruptures, or spills.   Although the probability of these events is low (see Section 4.2.15), their occurrence may be significant in terms of groundwater impacts.   The greatest potential for groundwater problems is associated with small undetected leaks in the pipeline.   This is due to the larger probability of occurrence, relatively small amount of oil needed to contaminate a water supply, the long lasting effects of such a leak, and the difficulty of aquifer decontamination.   Major spills, ruptures, and detectable leaks could probably be cleaned up before significant ground-water contamination results and have lower probabilities of occurrence than smaller leaks.

4.2.6  Aquatic Biology

Impacts to aquatic resources were classified as significant or insignificant based on scientific criteria.  The criteria were derived from regulatory standards, research information, and standards based on best professional judgement of resource specialists.  Impacts were considered significant if:

- Critical habitat for important fish species of recreational and/or threatened and endangered status is affected by increased sedimentation or removal during construction on a long-term basis (greater than one year or one life cycle);

- A major oil spill affects a large portion of important spawning or rearing areas of important fish (game fish, threatened or endangered species, or native non-game fish);

- A major oil spill is toxic to a large portion of important permanent resident fish populations (temporary residents could be replaced during future high water periods);

- A major oil spill occurs in a small stream or backwater areas of a larger stream.

Impacts to fish and other aquatic communities from construction and operation of the pipeline at stream crossings would vary depending upon the time of year, physical characteristics of the stream (e.g. substrate, flow, channel configuration), and type of fishery present.  The following discussion describes the general nature of the impacts that would result from the construction and operation phases of the project.  Specific significant impacts then are described for particular stream crossings in each pipeline segment.

4.2.6.1  Potential Impacts to Aquatic Resources

Construction.  The types and magnitudes of impacts resulting from construction would be similar for the Celeron/All American and Getty proposals.  Primary impacts on the aquatic environment resulting from construction activities during low flow in the summer include substrate removal, increased sedimentation, and habitat alteration.  The effects of these primary impacts on aquatic biota include:  reductions in plant (algae and macrophytes) and benthic macroinvertebrate abundance, and displacement and possible reduction in resident fish populations (Reed 1977; Robinson 1979; Murphy et al. 1981).  Reductions in the fish population would result if important spawning or juvenile rearing areas were covered by increased sediment or removed from the stream.  The impacts would be short term in duration, generally less than one year or one life cycle for fish and several months for other aquatic communities.  Sediments deposited downstream from the crossing site would be resuspended, along with naturally occurring sediment, during the next period of high discharge (usually in the winter).  The removal of riparian vegetation would not significantly affect permanent fish populations, since it is not the dominant cover type along any stream.  In summary, no significant impacts would occur in streams as a result of increased sedimentation and minor habitat alteration.

A possible concern during construction would be a fuel or lubricant spill in the vicinity of a stream. However, the volume of fuel spilled should be relatively small (less than 40 gallons) which reduces the risk to aquatic organisms. If a spill does reach a stream containing important fish species (Table 4-6), significant impacts could occur due to direct toxicity or damage to important habitat. The extent of damage and duration would depend upon the volume of fuel or lubricant reaching the stream, physical characteristics of the stream, sensitivity of organisms present, and time of year. The effects of a fuel or lubricant spill on aquatic communities would be generally similar to operational spills and therefore, these are addressed in the operation section. In general, the types and magnitude of impacts would be similar for the Celeron/All American and Getty proposals on the Las Flores to Emidio segment. The only notable difference is that the Celeron/All American proposal crosses and could represent potential significant impacts to important fish species in Refugio Creek.

Other potential construction impacts evaluated but considered to be insignificant include the effects of altered flows resulting from hydrostatic testing and increases in fishing pressure. Because water for hydrostatic testing would be obtained from the California Aqueduct, the potential loss of fish habitat (mostly adult) in this concrete-lined channel is considered to be insignificant. Similarly, any increase in fishing during construction, either legal or illegal, would be confined to several weeks and thus, it would not remove a significant quantity of game fish.

Operation. The major concern during the operation of the pipeline would be an oil spill near or at stream crossings. Although the probability of occurrence (0.04-0.2 spills/year), use of automatic block valves and check valves, and oil contingency plans (see Section 4.2.14) indicate a low oil spill risk; if a spill occurred, impacts could be significant. The level of impact to aquatic resources in terms of duration and length of stream reach affected would depend upon the size of the spill, time of year, physical characteristics of the stream (e.g., bottom substrate, flow, channel configuration), cleanup and control techniques, and susceptibility of the dominant or important aquatic organisms to oil. Spills in small streams would likely be more persistent in their negative effects. After the oil has degraded, aquatic communities would be able to return to prespill conditions by recolonization from unaffected areas. The recovery period is usually several months for benthic macroinvertebrates and several months to two years for fish (Cheremisinoff and Morresi 1977). Studies on a crude oil spill in the North Platte River near Glenrock, Wyoming showed that benthic macroinvertebrates were almost totally destroyed but no fish mortalities were observed (EPA 1982b). However, fish flesh did exhibit disagreeable odor and taste for about two months after the spill. Oil concentrations on the river surface ranged from 2.8 to 8,195 milligrams per liter (mg/l) immediately after the spill but were below 10 mg/l after 7 days. Dissolved and emulsified oil in the water column never exceeded 10 mg/l. The study also showed that benthic macroinvertebrate communities recovered at most sites after two months.

TABLE 4-6

STREAMS WHERE A MAJOR OIL SPILL COULD MEASURABLY AFFECT

IMPORTANT[1] PERMANENT RESIDENT FISH POPULATIONS

| Pipeline Segment (Stream/State) | Species Potentially Affected | Map Code[2] | Sheet Number[2] |
|---|---|---|---|
| **Las Flores to Emidio** | | | |
| Refugio Creek/CA | Rainbow trout Threespine stickleback | A1 | 2 |
| Gaviota Creek/CA | Rainbow trout Prickly sculpin Tidewater goby* | A2 | 2 |
| **Emidio to Blythe** | | | |
| Colorado River/CA & AZ | Black crappie Bluegill Channel catfish Green sunfish Flathead catfish Largemouth bass Razorback sucker* Redear sunfish Striped bass White crappie Yellow bullhead | A3 | 6 |
| **Blythe to McCamey** | | | |
| Gila River/AZ | Bluegill Channel catfish Largemouth bass | A4 | 7 |
| Hot Springs Canyon and Bass Canyon Creeks, Muleshoe Ranch Preserve/AZ | Gila chub* Longfin dace Speckled dace Desert sucker Sonora sucker | A5 | 8 |
| Rio Grande River/NM | Bluegill Channel catfish Flathead catfish Largemouth bass Mexican tetra* Rainbow trout | A6 | 10 |

4-40

TABLE 4-6

| Pipeline Segment (Stream/State) | Species Potentially Affected | Map Code[2] | Sheet Number[2] |
|---|---|---|---|
| Pecos River/TX | Bluegill<br>Channel catfish<br>Fathead catfish<br>Largemouth bass<br>White bass | A7 | 11 |

Source:  ERT

[1]Important species defined as game fish, threatened or endangered*, or native non-game fish (Refugio, Gaviota, Bass Canyon, and Hot Springs Canyon Creeks only)

[2]Map code and sheet number in Map 1-2.

Toxicity studies using water-soluble fractions in crude oil have shown that salmonids, striped bass, and slimy sculpin are quite sensitive, while channel catfish and bluegill appear to be tolerant (Table 4-7). Although these studies only deal with some of the species occurring in the study area, they still help to identify sensitive species or families of fish.

4.2.6.2   Las Flores to Emidio. Significant impacts would occur during the operation of the pipeline as a result of a major oil spill or leak. The only notable difference in potential impacts in the event of an oil spill would be exhibited in Celeron's proposed segment between Las Flores and San Onofre Creeks. Both Getty's and Celeron's proposals would cross Gaviota Creek, while only the Celeron proposal would cross the other coastal streams. Considering the significance criteria, important permanent resident fish populations could be measurably affected in Refugio and Gaviota Creeks. Fish species that could be affected are listed in Table 4-6. Fish populations should recover within several months to about two years, depending upon the extent of damage to eggs and juveniles. The only exception would be the possible total loss of the tidewater goby population if the oil spill occurred in toxic concentrations in the winter when only about 100 fish were present.

A major oil spill into any of the coastal streams between Las Flores Canyon and Gaviota also could measurably affect nearshore marine communities. Benthic macroinvertebrates, surface-feeding fish, and shorebirds would be the most sensitive species in nearshore marine areas (Cheremisinoff and Morresi 1977).

Pipeline construction would cause temporary increased sedimentation and minor habitat alteration in all streams. As a result of these changes, there would be temporary reductions in plant and macroinvertebrate abundance in all streams, and possible displacement or reduction in fish numbers in Refugio, Tajiguas, and Gaviota Creeks. These impacts would be considered insignificant because of their short-term duration of several months. No unique or critical tidewater goby habitat would be altered during construction Appendix B, Table B-2. In addition, since steelhead and rainbow trout spawning would occur in the winter and spring, respectively, increased sedimentation in the summer would not impact these species.

4.2.6.3   Emidio to Blythe. As a result of a major oil spill, important fish populations would be significantly affected in the Colorado River (Table 4-6). Considering the available information on oil toxicity to fish (Table 4-7), striped bass could be the most susceptible species. Considering the large volume of water in the Colorado River, impacts would only be critical in the backwater areas located about 0.25 mile below the proposed crossing.

Construction-related impacts would be similar to those described above. No unique or critical razorback sucker habitat would be altered during construction (Table B-2).

4-42

TABLE 4-7

ACUTE TOXICITIES OF WATER-SOLUBLE COMPOUNDS

IN CRUDE OIL FOR JUVENILE FISH

(in mg/l)

| Species | Total Water-Soluble Fractions | Benzene | Naphthalene | Toluene | Literature Source |
|---|---|---|---|---|---|
| Cutthroat trout | 0.52 | NA[1] | NA | NA | Woodward et al. (1981) |
| Coho salmon, sockeye salmon | 0.5 | NA | NA | NA | Morrow (1974) |
| Anadromous salmonids | 1.25-1.79 | NA | NA | NA | Moles et al. (1979) |
| Striped bass | 2.0-11.0 | 5.1 | NA | 6.3 | Benville and Korn (1977); EPA (1980 a,c) |
| Slimy sculpin | 3.0 | NA | NA | NA | Moles et al. (1979) |
| Threespine stickleback | >6.89 | NA | NA | NA | Moles et al. (1979) |
| Bluegill | No mortality at 1:9 mixture (oil:water) | 22.5 | NA | 12.7, 24.0 | EPA (1980 a,c) Mitchell and Bennett (1972) |
| Channel catfish | No mortality at 1:9 mixture (oil:water) | NA | NA | NA | Mitchell and Bennett (1972) |
| Rainbow trout | NA | 5.3 | 2.3 | NA | EPA (1980 a,b) |
| Mosquitofish | NA | 386.0 | 150.0 | NA | EPA (1980 a,b) |

[1]NA = Data not available.

4.2.6.4 <u>Blythe to McCamey</u>. A major oil spill would significantly affect important resident fish populations in the Colorado, Gila, Rio Grande, and Pecos Rivers, and Bass Canyon and Hot Springs Canyon Creeks in the Muleshoe Ranch Preserve (Table 4-6). Fish populations would recover within several months to about two years in all streams except those in the Muleshoe Ranch Preserve. If the oil spill affected a major portion of the Gila chub population in these streams, the recovery time could be longer than two years.

Construction impacts would be similar to those described above. No unique or critical Mexican tetra or Gila chub habitat would be altered during construction (Table B-2).

4.2.6.5 <u>Summary</u>. As a result of pipeline construction, aquatic biota would be exposed to temporary increased sedimentation and habitat alteration. Adverse impacts associated with these changes would include reductions in plant and macroinvertebrate abundance, and displacement or reductions in resident fish populations. These impacts would be considered insignificant because of their short-term duration of less than one year. Potential significant impacts to aquatic organisms could occur during construction as a result of fuel or lubricant spills.

Although the oil spill risk is low, significant adverse impacts to aquatic resources could occur during operation of the pipelines as a result of a major oil spill or leak. The level of impact to aquatic communities would depend upon the size of the spill, time of year, physical characteristics of the stream, cleanup and control techniques, and susceptibility of dominant or important aquatic organisms to oil. Sensitive streams would be those that contain fish considered to be important game fish, threatened or endangered, or native species in coastal streams or the Muleshoe Ranch Preserve. Except for streams containing threatened or endangered fish species, populations would recover within several months. Nearshore marine communities also could be adversely affected by a major spill into any of the coastal streams between Las Flores Canyon and Gaviota Creek, California. Freshwater communities that could be significantly affected are the Colorado, Gila, Rio Grande, and Pecos Rivers, and streams in the Muleshoe Ranch Preserve.

In conclusion, the types and magnitude of impacts resulting from construction related or operational spills would be similar for the Celeron/All American and Getty proposals. The only notable difference is that the Celeron/All American proposal segment could represent potential significant impacts to aquatic resources in Refugio Creek and nearshore marine communities between Las Flores and San Onofre Creeks in the event of a major oil spill.

4.2.7 Terrestrial Biology

The impacts discussed for terrestrial biology are classified as significant or not significant based on the degree of impact as measured against scientific and social (or human) criteria. The criteria that follow are derived from regulatory standards, research information, and/or standards based on best professional judgement of resource specialists.

- Loss of vegetation productivity resulting from removal of cover and surface disturbance would be considered significant if: 1) following construction specifications revegetated areas would not have adequate ground cover to control soil erosion at preconstruction levels, and 2) would not have adequate cover of species which have a utility in the post-disturbance land use. In other words, species making up the revegetated area can not be dominated by noxious weeds and the area must be able to support future land uses such as grazing, agricultural development, or wildlife habitat.

- Loss of riparian zone vegetation, live oaks, rare cactus, wetlands, or other communities or plant species considered to be rare, unique, or sensitive by Federal, state, or local agencies would be considered significant. (This is consistent with Executive Order 11990, Protection of Wetlands, May 24, 1977).

- Impacts to vegetation resulting from operational emissions would be considered significant if emissions exceed injury thresholds (i.e. cause visible injury) for sensitive vegetation (Argonne National Laboratory 1980).

- Impacts to sensitive wildlife would be considered significant if critical ranges or habitats (e.g., wintering areas, lambing grounds, migratory routes, dens, breeding grounds, nests) are affected during the season of use.

- Impacts to federally listed threatened or endangered species would be considered significant if the Biological Assessment required under Section 7 of the Endangered Species Act determines that a species is in a "may affect" category. The BLM is currently preparing a Biological Assessment, potential "may affect" relationships are discussed in the DEIS. Fish and Wildlife's Biological Opinion will be included in the FEIS.

### 4.2.7.1 Potential Impact to Terrestrial Resources

Construction. The construction procedures include the use of up to a 100-ft wide ROW for Celeron/All American and a 50-ft wide ROW for Getty used for trenching, stock-piling backfill, pipe assembly, and equipment movement. Some plants would be completely removed by trenching, clearing, and crushing and others may be damaged but survive. Construction of the pipeline would result in the direct removal of plants and death or displacement of animals in the ROW. Small mammals, amphibians, and some reptiles with limited mobility would be killed by habitat clearing, earth removal, digging, and equipment movement. Local populations (in the ROW) would decrease for the short term. Animals should re-invade the area following reclamation and natural revegetation processes. Since most of these species have high reproductive potential and are common in surrounding habitats, loss of individual plants and animals would generally not be considered a significant impact, except in the Mojave Desert where natural revegetation could take up to 70

years and where federally listed endangered species were affected. Where construction would affect threatened, endangered, or sensitive species, impacts would be considered significant.

Larger mammals, birds, and some reptiles would be able to avoid the construction area, impacts to these animals are expected to be minimal. Noise and general human disturbance would preclude most larger animals from the construction area for the duration of construction. The cleared ROW may temporarily provide a barrier to normal movement patterns and "fragment" habitat in previously undisturbed areas. Displacement of animals is generally not considered a significant impact; however, impacts would be significant if construction displaced animals in critical habitats or at a critical time of the year (bighorn sheep lambing areas or in the nesting season).

Increased use of vehicles and the presence of man in previously remote areas would increase the risk of wildlife harassment, illegal hunting, and removal of sensitive or commercially valuable plant species like cactus.

Operation. Oil spills could kill vegetation and result in erosion and loss of wildlife habitat. Spills over 50 acres would be unlikely; the worst-case spill on the Celeron/All American or Getty route would release about 15,000 barrels and cover about 16 acres (see Soil 4.2.3.1 Operation Impacts ). Impacts to vegetation or wildlife could be significant or insignificant on a regional basis depending upon the size, time, and location of a spill. Impacts could be significant if the oil contaminated a rare plant or animal species or its habitat. Spills would be more serious in wooded areas, on steep slopes, or in wetlands because cleanup would be difficult, regeneration time would be longer than for other areas, and high value wildlife habitat could be affected, especially wetlands.

Terrestrial plant communities could be directly and indirectly affected by oil spills. Oil in the soil can reduce the availability of water to plants and cause plant mortality due to direct oil contact (Hutchinson et al. 1974). Direct contact of oil with the plants can cause loss of foliage, reduced photosynthesis, reduced nutrient levels, reduced flower and seed production, and toxic effects on cells (Hutchinson et al. 1974). In areas where plants have been killed by oil at a dosage of 0.1 to 0.9 gallons per square yard, two to three years may be required before plant life can become re-established (Schwendinger 1968). Indirect impacts can result from clean-up efforts such as burning, clearing of oiled vegetation, or removal of topsoil. Plant regeneration is best on well drained soils. Impacts to trees and shrubs can be less severe if root systems are oil-free and well aerated. Impacts of oil when deciduous plants are in leaf are generally more severe than when they are dormant.

Direct impacts to terrestrial wildlife (e.g., land mammals, birds) would be minimal because of the small size of the affected area and the mobility of these species. Indirect impacts to habitat could be more serious, although not usually significant on a regional basis. Information on effects of oil on soils and vegetation is well documented

in temperate climes; however little information is available on the direct impacts of spills on wildlife, especially in desert climes. The timing (season), species of wildlife involved, and volume of the spill would determine the magnitude of the impacts to terrestrial resources; spills in waterways are generally more severe than spills on land. No discussion of oil spill effects on terrestrial ecosystems in desert climes have been reported in recent literature based on a computer data base literature search conducted in June 1984. In general, spills in freshwater systems pose greater threats to terrestrial wildlife than on land spills. Two examples of large spills in freshwater systems are documented for Sagavanirktok River and the North Platte River. At Prudhoe Bay, a 2,000-barrel oil spill occurred in and along the Sagavanirktok River, killing some vegetation and oiling some birds and foxes. No dead wildlife was found and new vegetation along the river began to grow in 10 days (Anderson 1983). However, a 8,552-gallon oil spill on the North Platte River in Wyoming caused the death of 335 birds (mainly waterfowl) and 33 mammals (primarily beaver and muskrat) (EPA 1983).

Waterbirds (e.g., marshbirds, waterfowl) and aquatic mammals such as muskrat and beaver can be directly affected by an oil spill through 1) physical contact with oil, 2) ingestion of oil, or 3) through loss of food or habitat. Birds with oiled plumage can get so waterlogged they cannot fly and may drown (Nelson-Smith 1972). Oiled aquatic mammals can lose water-shedding qualities in their fur, resulting in death from exposure. Waterfowl can ingest oil through preening, resulting in loss of appetite, sickness, and death from a combination of starvation and exposure (Hartung 1967). Poor hatching success may also result when eggs are incubated by oiled birds (Hartung 1965). If a food source or essential habitat is impacted by oil, waterbirds may die or become weak attempting to find alternate food or habitat (Nelson-Smith 1972).

Operation of the pipeline, primarily because of increased ORV access, would increase the risk of wildlife harassment, illegal hunting, and removal of commercial plant species (cactus) in remote areas. Operational maintenance may slightly increase the risk of fire in desert grasslands and chaparral, but would also aid in fire suppression in chaparral and wooded areas where the ROW could function as a fuel break and allow access to remote areas for fire prevention. No adverse impacts to vegetation and wildlife are expected from air emissions from construction equipment, dust, pump stations and tank farms.

Abandonment. Several options are possible for pipeline abandonment (see Chapter 2). The option resulting in the most impact to vegetation and wildlife would be the removal or salvage of pipe. For this option, pipe would be removed at all locations except stream crossings and major pipe bends. The expected impacts from abandonment would be similar to construction impacts but generally less severe. Digging up the buried pipe would disturb revegetated ground cover on the ROW. The ground cover would most likely be comprised of grass and/or shrub species. Given the small area removed by trenching to remove pipe, loss of vegetative productivity would be minimal. Some loss of small mammals may result from clearing, and larger animals would be displaced and disturbed by increased human activity on the ROW. These impacts are not considered to be significant.

4.2.7.2 <u>Las Flores to Emidio</u>. This segment covers 122 miles along the Celeron/All American proposed route and 113 miles along the Getty proposed route. Both ROWs follow the same route except across the LPNF (Map 1-2). Getty's proposed ROW across the forest would be 50 ft, while Celeron/All American's would be 100 ft wide. Construction along both routes would impact primarily grasslands and desert scrubland. Both pipeline routes would remove small areas of riparian woodlands (0.5 acre) at coastal stream crossings. The Getty route would affect about 34 acres of riparian woodlands and the Celeron/All American route would affect about 62 acres, with most of the disturbance occurring in La Brea Canyon. This is because the Celeron/All American route would follow a chaparral ridge top across the Forest, while Getty's route would follow the stream course. Construction in stream bottoms would remove live oak trees estimated to be 100 or more years old (G. Smith 1984, personal communication). Live oak are protected in Santa Barbara County and limiting the number of individual trees affected would be necessary. Loss of mature riparian woodlands in La Brea Canyon is considered a significant impact. Table 4-8 summarizes significantly impacted resources along the proposed routes.

Both routes would affect oak woodland communities (Table 3-18). Oak woodlands removed by construction could take up to 70 years to regenerate, assuming natural conditions encourage seedling survival (Smith G. 1984, personal communication). In this area, where grazing is common, seedlings may never become established without special protection, and oak woodlands would likely be replaced by grasslands. Loss of about 138 and 88 acres of oak woodlands would be a long-term impact of the Celeron/All American and Getty proposals.

Pump station construction at Las Flores, Gaviota, and Sisquoc would remove eight acres of grassland, this would not be a significant impact. Construction of Getty's Cuyama pump station would remove about another 5 acres of grassland. This area is not considered to be potential habitat for the San Joaquin kit fox, San Joaquin antelope squirrel, giant kangaroo rat, and the blunt-nosed leopard lizard (Lidburg 1984, personal communication).

Construction of a new 12-mile (Celeron) or 13.5-mile (Getty) 115-kV line to the Sisquoc pump stations would permanently remove about 1.0 acre of grassland, chaparral and agricultural land (vineyards). Oak woodlands and riparian woodlands would not be affected. Construction disturbance would be minimized by using existing roads and the pipeline ROW for constructing the transmission line.

Three plant species (Hoffman's nightshade, Refugio manzanita, and Catalina mariposa), considered to be rare in California (Table 4-8), were found in the Gaviota Pass area along or near Getty's proposed route (WESTEC 1983). Hoffman's nightshade has colonized disturbed habitat along the existing gas line, and according to California Native Plant Society (1980) it is rare, but not in danger of extinction. The Catalina mariposa is also not endangered and is increasing or stable in California (WESTEC 1983). The Refugio manzanita is listed as rare and endangered and is only found in Santa Barbara County in Gaviota and Refugio Pass. Loss of these individuals along Getty's proposed route would be a significant impact.

TABLE 4-8

VEGETATION, WILDLIFE, OR SENSITIVE PLANT COMMUNITIES SIGNIFICANTLY AFFECTED BY CONSTRUCTION

AND OPERATION OF THE PROPOSED PIPELINES

| Map Code | Sensitive Resource | Location | Status/Description |
|---|---|---|---|
| T1 | Refugio manzanita | Gaviota and Refugio Pass – Santa Barbara Co., CA | CNPS[2] Rare and endangered, species of concern; undisturbed chapparral 400-600 feet elevation |
| T2 | Live oak, riparian vegetation | La Brea & Tepusquet Canyons, CA | Protected by Santa Barbara Co. ordinance; floodplain woodlands |
| T3 | Giant kangaroo rat | Cuyama Valley, CA | CA Fish & Game, endangered; alkali scrubland |
| T4 | Blunt-nosed leopard lizard | Cuyama Valley, CA | Federally listed endangered species; CA Dept. Fish & Game, endangered; alkali scrubland, sinks, sandy loam soils |
| T5 | San Joaquin antelope squirrel | Cuyama Valley, CA | CA Fish & Game, rare; dry, sparsely vegetated, loamy soils |
| T-6 | Comanche layia | Tejon Hills, Kern Co., CA | Federal candidate species, CNPS species of concern; moist benches, valley grasslands |
| T-7 | Calico monkey flower | Tejon Ranch, Kern Co., CA | CNPS species of concern; granite rock outcrops |
| T8 | Joshua tree woodland | Double Mtn., east to Kramer, CA | Protected by Kern Co.; desert slopes and mesas |
| T-9 | Desert tortoise | Mojave Desert (Barstow to Blythe), CA and Kofa National | Federal candidate species; BLM sensitive species; |
| T-13 | Desert tortoise | | |

TABLE 4-8 (CONTINUED)

| Map Code | Sensitive Resource | Location | Status/Description |
|---|---|---|---|
| T-14 | Desert tortoise | Wildlife Refuge | AZ, Group 3; desert and semi-desert grassland |
| T-10 | Barstow woolly sunflower | Barstow Area near Iron Mtn., and East of Barstow, Kern Co., CA | Federal candidate species, CNPS species of concern; sandy and rocky places |
| T-11 | Barstow woolly sunflower | | |
| T-12 | Crucifixion thorn | Southern Mojave Desert, Kern Co., CA | CNPS species of concern; dry gravelly places |
| T-15 | Desert dune communities | Rice Valley, South of Highway 62 near Rice, Riverside Co., CA | BLM sensitive community |
| T-16 | Ironwood washes | Rice to Blythe, Riverside Co., CA | BLM sensitive community |
| T-17 | Desert bighorn sheep | Dome Rock Mts., Kofa National Wildlife Refuge, AZ | Forest Service & BLM, Sensitive; AZ, Group 3; desert mountains |
| T-18 | Muleshoe Ranch Nature Preserve (black hawk, gray hawk, zone-tailed hawk, northern beardless tyrannulet) | Hooker Hot Springs area, south of Coronado Forest, Cochise Co., AZ | AZ Nature Conservancy Nature Preserve, managed primarily for unique vegetation, birds and fish. AZ, Groups 2 and 3; black hawk, gray hawk, zone-tailed hawk, northern beardless tyrannulet |
| T-19 | Gypsum Dunes Nature Preserve | Near Salt Flats, TX south of Guadalupe National Park | TX Nature Conservancy Nature Preserve; unique dune community |

Source:  ERT

[1]Corresponds to number listed on Map 1-2

[2]California Native Plant Society

4-50

A worst-case oil spill along this segment of pipeline would affect 16 acres for the Celeron or the Getty proposal.  This assumes a worst-case spill of 15,000 barrels and the spill occurred on level terrain.  A spill at a perennial stream crossing could affect several acres of riparian vegetation in perennial streams like the Cuyama, Santa Ynez, or Sisquoc Rivers and La Brea Creek.  A spill in any perennial stream is considered a significant impact.

If an oil spill occurred in a perennial coastal stream (see Section 3.2.6.1 for a description of coastal streams) it could possibly reach the coast, oiling the beach and off shore marine habitats (see Section 4.2.6.2).

Riparian vegetation, especially along Cañada del Refugio, Arroyo Hondo, Zaca Creek, and Cañada de las Alisos could also be affected by a spill.  Impacts would vary depending on the location, season, and volume of oil spilled.  Oiled trees and large shrubs would likely survive oiling, while herbaceous vegetation would not.  The risk of an oil spill (0.04-0.2 spills/year) is very low.

Construction would temporarily disturb and remove 2,242 acres of wildlife habitat.  Vehicle use off the ROW could also result in the loss or damage to sensitive plant communities and wildlife habitat adjacent or near the ROW.  Increased human presence could disturb larger wildlife and change normal movement patterns.  Increased access into previously undisturbed areas could result in increased illegal hunting of big game, and other violations of wildlife laws.  The open trench along La Brea Creek could prevent wildlife (especially big game) from reaching water.  Given the short-term nature of construction these impacts are considered to be temporary, small in magnitude, and not significant along this pipeline segment.

Raptors nesting near or on the pipeline ROW could abandon nests if construction occurred during the nesting season.  This would result in nest failures, and lowered population numbers for at least one season, a significant impact.

The Celeron/All American and Getty proposals would impact sensitive wildlife habitat in the Cuyama Valley (Map 1-2).  Three federally listed endangered species (blunt-nosed leopard lizard, San Joaquin kit fox, and California condor) and two state-listed species (San Joaquin antelope squirrel and giant kangaroo rat) have been observed or are known to occur in the Cuyama Valley (WESTEC 1983).

The blunt-nosed leopard lizard, San Joaquin antelope squirrel, and giant kangaroo rat, which are less mobile than larger animals and are burrowing species, would be affected in the ROW by pipeline construction in alkali scrubland.  About 26 miles of alkali scrubland occur along the pipeline routes in Kern and San Luis Obispo County.  Insufficient data are available to evaluate the number of individual lizards, squirrels, and kangaroo rats potentially lost during construction.  These species would be expected to reinvade the area if natural vegetation becomes reestablished.  An oil spill in this habitat would kill an unknown

4-51

number of individuals (as much as 16 acres of habitat could be affected). Individual losses of these species would be a significant impact.

The San Joaquin kit fox has been reported along Highway 166 and also occurs in alkali scrubland habitat along both pipeline routes. Kit fox would be temporarily displaced during pipeline construction activities. If an occupied natal den was disturbed by trenching or affected by an oil spill, loss of pups and reduced population numbers would result, a significant impact. However, given the small area affected by pipeline construction or the area potentially affected by an oil spill, and general lack of fox sign along the pipeline, the risk of impacting kit fox or a kit fox den is considered to be minimal.

Pipeline construction and operation is not expected to significantly impact condors. If condors are present during construction, impacts would be short-term and temporary. Condors may be temporarily displaced to avoid disturbance, but no critical habitats (e.g., roost sites) would be affected. It is not known how much human or ground disturbance condors will tolerate in their foraging areas before moving to other areas. Since the pipeline would not affect land use patterns, especially sheep grazing activities, it is considered unlikely that condors would avoid the essential habitat areas crossed by the pipeline. Likewise, an oil spill would probably not permanently affect foraging condors. The pipeline would cross, but would not significantly impact portions of the San Joaquin Valley in areas that may be purchased for management as condor habitat.

4.2.7.3  Emidio to Blythe. This route segment is 294 miles long; most of the route follows existing corridors. Construction would remove desert scrubland comprised of creosote-bursage communities. The pump station at Tejon would require removal of 5.5 acres of desert grassland. The Twelve-Gauge Lake pump station and the tank storage facilities at Cadiz would remove another 25.5 acres of desert scrubland for the life of the project. Construction of a new 20-mile 70-kV or 115-kV power line to the Tejon pump station would remove an additional 2.4 acres of agricultural land and 0.8 acres of grassland for the life of the project. This loss of grasslands would not significantly affect wildlife. The potential for raptor electrocution is considered to be minimal since 115-kV lines have adequate conductor spacing to protect raptors (Olendorff et al. 1981). If a new 70-kV line was constructed, it would conform to recent raptor protection guidelines.

Construction of the new powerline and gas line to the Cadiz tank farm would disturb about 90 acres of desert scrubland. The 20-ft construction and access trail along the powerline would not revegetate for several years. Therefore, this loss of 90 acres would be a long-term loss of vegetative productivity. Desert tortoise could be killed by clearing of the ROW or injured by construction equipment working on the ROW. Any losses of individual tortoise is considered a significant impact. Desert bighorn would not be significantly affected by construction or operation since they occur at higher elevations away from the proposed routes.

No significant impacts would result from construction or operation of power lines in New Mexico and Texas.

The route crosses 213 miles of desert scrubland including 2.7 miles of alkali sink across Danby Lake. No revegetation is planned for the Mojave Desert, reestablishment of natural vegetation and wildlife habitat would rely on natural reinvasion and regeneration. Studies of pipelines and other corridor developments in the Mojave Desert indicate natural revegetation may take up to 70 years (Lathrop and Archbold 1980). Loss of about 2,580 acres of desert scrubland communities would be a long-term unavoidable impact of the Celeron/All American proposal. Since disturbed areas would not have cover or a utility in the post-disturbance land use, this would also be a significant impact.

Joshua tree woodlands occur along the pipeline and are protected in Kern County. Some individual Joshua trees would be removed by grading and trenching equipment. Losses would be minimized since the proposed route follows an existing pipeline and highway in this segment. Construction in stabilized dune communities could cause increased erosion and changes in dune movement patterns, resulting in lost habitat for specialized small desert mammals and reptiles. Maintenance traffic and recreational ORV use would also increase habitat destruction and erosion in these sensitive communities. Construction across ironwood washes would remove 100-ft sections of these communities along the edges of the washes. Loss of these sensitive plant communities (Joshua trees, dunes, and ironwood washes) would be considered a significant impact.

Individuals of four species of sensitive plants would be removed by pipeline construction (Table 4-8). Two of these species, the Comanche layia and Barstow woolly sunflower, are candidates for Federal listing. The Calico monkey flower and crucifixion thorn are species of state concern. Inadequate data are available to confirm the presence of other rare species on the ROW. Loss of individual sensitive or rare species would be a significant impact.

Desert tortoise would be vulnerable to disturbance when they are underground during their winter hibernation period between October and March, during daily estivation periods, and during surface movements in the spring (Berry 1984, personal communication). Surface movements usually begin in late March or early April. Hibernating or estivating tortoises could be crushed by the trenchers, buried by back-filling equipment, or die from injuries or exposure to predators. Active tortoise could also be killed by falling in the open pipeline trench, or being crushed by equipment clearing vegetation or moving pipe. Using an average density of 50 tortoises per square mile across 250 miles of 100-ft ROW, about 230 tortoises could be killed.

During operation of the pipeline an oil spill could also kill tortoise in their burrows, although the estimated area affected would only be 16 acres. Assuming an average density of 50 tortoises per square mile, 1 tortoise would be affected by an oil spill. Increased access, poaching, and ORV use could also impact tortoise. Loss of individual tortoises would be significant because of their low reproductive rates and time needed to reach maturity.

4-53

The Tehachapi slender salamander and red-legged frog have been reported in the Tehachapi Mountains and could be affected by pipeline construction or operational oil spills. These two species are reported to occur on a private ranch; access on this private land was not possible and site specific verification of these species or their habitats along the pipeline ROW was not completed.

The Mojave ground squirrel occurs in desert scrubland habitats. Given the small area of habitat affected relative to the squirrels distribution and its ability to reproduce, impacts should be short term with no changes in local or regional populations.

The pipeline route passes near desert bighorn sheep habitat near Cadiz, but construction is not expected to affect sheep since the route follows the desert valley floor below elevations used by bighorn sheep. Golden eagle nest near the Killbeck Hills and prairie falcon nests occur on or near the pipeline at Daggett and Newberry Springs (Rado 1984, personnal communication). Construction during the breeding season could cause nest abandonment, resulting in lowered reproductive success for one season. Impacts to nesting birds during the breeding season would be considered significant.

At Blythe, California the pipeline would cross the Colorado River. About 2.4 acres of riparian vegetation and open water habitat would be removed or disturbed during construction. Most of the extensive man-made wetlands are 1,000 to 1,500 ft downstream of the proposed crossing. Loss of riparian wetlands (primarily willows and salt cedar) from construction would be short term, and reinvasion of shrubs would occur within one to three years. Of greater concern is the potential for an oil spill at the Colorado River crossing. A pipeline rupture at the crossing could release about 3,506 barrels of oil (see Oil Spill Potential and Effects, Section 4.2.15). Given the proximity of the downstream wetlands, it is likely this area would be contaminated by oil in the event of an accidental spill. The magnitude of the impact would depend on the volume of oil released, the flow in the river, and the season. At low flow conditions, backwater areas, including most of the wetlands, are separated from the river and would not be oiled. At higher flows the mouth of these areas could be affected as well as several miles of riparian vegetation downstream.

If a spill occurred at the Colorado River during winter, up to 1,200 waterfowl could be affected (Celantano 1984, personal communication). Oiled birds would likely die from exposure, increased stress, or ingestion of oil. If the spill occurred during the breeding season, nesting waterfowl and marsh birds would be adversely affected. Oiled adults and eggs would likely not survive, resulting in reduced population levels.

If a spill was not immediately contained, it is possible oil could reach Cibola and Imperial NWRs, 20 miles downstream of the Colorado River crossing. The Yuma clapper rail (a federally-listed endangered species) occurs in wetlands within these refuges. Loss of individual clapper rail or their habitat would be considered a significant impact.

An oil spill in the Colorado River in any season would be considered a significant impact. However, given the low probability of any spill along the route and the even lower probability of a spill at any given 1,000-ft water crossing (1 spill in 5,000 years), the risk of a spill is very low.

4.2.7.4  <u>Blythe to McCamey</u>.  Along this 790-mile pipeline segment, construction would remove primarily desert scrubland, creosote bush scrub, desert cactus scrub, and desert grassland communities. Additional detail on the impacts along this pipeline segment are included in the Sohio EIS (BLM 1976).  Construction in these wildlife habitats would temporarily displace large more mobile species and displace or kill small mammals and reptiles, this is not considered a significant impact.

Commercially valuable cactus occur along the route in native Sonoran Desert, especially across LaPaz, Maricopa, Pinal, and Pima Counties (Countryman 1984, personal communication).  Cactus would be salvaged where practical, and the loss of commercially valuable species would be minimized.

Construction in Copper Bottom Pass in the Dome Rock Mountains of Arizona during the bighorn sheep lambing season and near existing watering holes in the summer could result in significant impacts.  Sheep would be temporarily displaced to other areas and possibly prevented from reaching water, resulting in potentially lowered population numbers.

No lambing areas or watering holes would be directly disturbed by construction in the Kofa NWR, although construction immediately following the lambing season could disrupt movement of ewes and lambs. Recent data from bighorn sheep monitoring studies indicate the Livingston Hills may be important habitat for bighorn sheep using the northern portions of the Refuge (Haderlie 1984, personal communication). Rams move to and from rutting grounds on Black Mesa via the Cave Creek drainage in the Plumosa Mountains during fall; construction could disrupt ram movements.  Construction would temporarily remove about 303 acres of wildlife habitat, the two desert bighorn corridors are considered critical wildlife habitat.  This area also has relatively high densities of desert tortoise (Burge 1980), and several species of cacti which are protected in Arizona.

Bighorn sheep tolerate disturbance (such as construction workers, noise, and motor vehicles) differently depending on the intensity of their exposure to these activities and their past experience (Graham 1980).  It has been demonstrated that bighorn prefer to remain in one home area all year if conditions allow them to, often within a radius of 20 miles of their home water supply.  Exhaustion of a water supply is probably the most frequent cause for moving (Welles and Welles 1961). No watering holes occur on or near the route in the Kofa Refuge and construction would not interrupt normal movement patterns across the corridors for water.  Normal movement after lambing and during the rut could be altered for up to two weeks.  Impacts would be minimal if construction occurred in the summer or winter, when no sheep would be using the migration corridors.

4-55

Although much of the riparian zone along the San Pedro River supports dense riparian communities, riparian vegetation is lacking where the pipeline crosses the river. The pipeline would parallel an existing pipeline across the river.

In Cochise County, Arizona near the Hot Springs Pump Station, the pipeline would cross the Muleshoe Ranch Nature Preserve managed by the Arizona Nature Conservancy. The preserve has a unique mixed broadleaf riparian communities in Bass Canyon, Double R Canyon, and Hot Springs Canyon (Weaver 1984, personal communication). These riparian communities are now rare in the Southwestern U.S. and provide nesting habitat for rare species like the black hawk, zone-tailed hawk, gray hawk, and northern beardless tyrannulet (Bill 1984, personal communication). The Celeron/All American proposal would follow the existing El Paso Natural Gas Pipeline through the preserve. Based on the aerial photo alignments, construction would not remove any additional riparian areas within the Muleshoe Preserve. If construction occurred during the breeding season (approximately May through July), human presence may cause nest abandonment, a potentially significant impact. In the event of an oil spill, oil could reach Hot Springs Creek via the many arroyos crossed by the pipeline. An oil spill into the riparian zone along Hot Springs Creek would likely kill herbaceous vegetation and could affect trees if oil reached the root zones. An oil spill in Hot Springs Creek would be a significant impact.

The block valve at Wildcat Canyon Creek and check valves proposed at Wildcat Canyon and Bass Canyon Creeks and at the Hot Springs Pump Station will significantly reduce the volume of oil that would be released in the event of an oil spill.

In New Mexico the pipeline would cross sensitive habitats near Lordsburg and in the Franklin Mountains near Anthony. The Chiricauhua leopard frog, a species of special concern, may occur on the Lordsburg Playa. It is unlikely that pipeline construction would affect this species since the pipeline does not affect any wetland habitats in this area.

Several species of protected plants and animals, including the federally endangered Sneed's pincushion cactus, occur near the pipeline at Anthony Gap in the Franklin Mountains. Several individual cactus populations were known to occur in this area in 1978 (New Mexico Natural Heritage Data Base 1984). Loss of individual cactus from trenching or crushing by construction equipment, or from an oil spill, would be considered a significant impact. Field investigations in May 1984 found hybrid individuals (C. sneedi x C. strobiliformis) of the Sneed's pincushion cactus near but not in the ROW at the Anthony Gap area. No individuals would be affected by the current alignment.

Pipeline construction at Gypsum Dunes Preserve would temporarily disturb dunes, removing vegetation and displacing or killing animals. Construction across the dunes may temporarily change dune movement patterns. Given the small area of disturbance and that the proposed ROW would follow an existing pipeline ROW, impacts to vegetation and wildlife would be considered minimal, and not significant. Construction

4-56

and operation of the pipeline should not significantly alter future management plans or use of the Preserve by the public.

4.2.7.5  Summary.  Significant impacts to terrestrial resources would result from both construction and operation of the pipeline. Construction would remove about 200 acres of the following sensitive plant communities; riparian woodlands, live oaks, ironwood washes, and dune communities.  About 220 acres of oak woodlands would be removed for the life of the project.  About 2,580 acres of desert scrubland in the Mojave Desert would be disturbed; 50 to 80 years would be needed for natural regeneration of vegetation.  Individual plants and/or populations of seven sensitive plant species would be affected by construction.

The blunt-nosed leopard lizard and the San Joaquin kit fox, both federally listed endangered species, would be impacted by pipeline construction and accidental oil spills in the Cuyama Valley and southwestern San Joaquin Valley.  Five other species of threatened, endangered, or sensitive wildlife would also be affected including, the San Joaquin antelope squirrel, Mojave ground squirrel, giant kangaroo rat, desert tortoise, and desert bighorn sheep.  The desert tortoise would be the species most significantly affected by construction.

Operation of the pipeline could result in accidental oil spills in sensitive plant and animal communities; up to 16 acres could be affected by a single spill.  An oil spill at the Colorado River could affect large areas of wetlands and several hundred waterfowl and possibly reach wetlands in Cibola and Imperial NWRs 20 miles downstream.  Yuma clapper rail (a federally-listed endangered species) could be affected by an oil spill reaching these wetlands.

Construction and operation of the pipeline would affect three important natural area preserves:  Kofa NWR managed by FWS (bighorn sheep), Muleshoe Ranch Preserve managed by the Arizona Nature Conservancy in Cooperation with the Forest Service (nesting raptors), and Gypsum Dunes Preserve managed by Texas Nature Conservancy (desert dune communities).

4.2.8  Socioeconomics

Impacts to socioeconomics would be considered significant if they would exceed the following criteria:

- Demand for temporary housing exceeded the existing supply when project-related needs are combined with 5-year average occupancy rates during the scheduled construction season.

- Permanent demand on other infrastructure was greater than 25 percent of the current level of demand; temporary demand exhausted the excess capacity in the areas where the crews would live.

- Change in local tax bases of greater than 10 percent.

4-57

- The change in area population is 10 percent or more in any one year or the change in population composition (race, age, sex or ethnicity) is greater than 10 percent for a period of two or more years.

- Shifts in the contributions among sectors to total regional or local employment are 10 percent or more for any given sector for a period of one or more years.

- Adequate housing accomodations are not available within a commuting distance of 170 miles roundtrip.

The local and non-local composition of the construction work force were determined through assessing local skilled and unskilled labor force availability, and reviewing literature such as the Pipeline Construction Worker Profile (Mountain West 1979) and various EISs prepared for other pipeline projects. A local worker is identified as a worker who is able to communte to and from his permanent place of residence on a daily basis. A non-local worker is identified as a worker who has moved into the construction area for the duration of the project. Affected communities were identified along each pipeline spread based on commuting distance, access, driving time, and housing availability. The following regional analysis inventories temporary accommodations and major services and facilities, and provides a description of the revenue sources to the counties potentially affected by the construction of the pipeline.

### 4.2.8.1 Las Flores to Emidio

#### Getty

#### Construction

Three pipeline spreads of 56 workers each would construct the 113-mile Getty pipeline. In addition to pipeline construction, two to three pump stations, requiring 20 workers per pump station, would be built. Unlike the pipeline workers who move along the route at a rate of 1 to 2 miles/day, the pump station construction force would generally stay in one location for a period of six months. The potential peak construction work force would total 252 workers, assuming three pump stations are constructed, three block and check valve crews are employed, and the three spreads would be constructed simultaneously.

Based on the existing labor force in Santa Barbara, San Luis Obispo, and Kern Counties, it is assumed that local resources would provide 50 percent of the construction work force; the remaining 50 percent would come from non-local labor pools. Since there are no radical shifts in employment among sectors and the construction period is of a short duration, no significant employment impacts would occur, based on the significance criteria. The estimated average daily wage would be $186 per worker. Previous studies conclude that the adverse social and economic impacts of pipeline construction are minimal because of the quick pace and short duration of the construction schedule. The number of construction workers would be very small relative to the

regional population. The largest population increase that could occur would be no greater than 0.04 percent in the San Luis Obispo area. The change in population is less than 10 percent and therefore does not represent a significant impact based on the significance criteria.

Increased spending in the local areas would result in increased retail sales to merchants, as well as increased sales tax to local taxing jurisdictions. If it is assumed that a non-local worker spends 37 percent of his gross earning on local expenditures, $69 per non-local worker per day would be expended locally. The overall impact of these expenditures would be positive.

In addition to construction worker local expenditures, other income generated by pipeline construction would include local material purchases and wages paid to the construction work force and Getty staff. It is assumed that the contractor would purchase as many materials as possible locally. These expenditures would include tools, fuel, oil, parts, and repairs. Smaller communities would benefit from fuel sales and repair expenditures. These expenditures cannot be quantified due to lack of information. See Table C-2 for construction workforce expenditure estimates.

None of the Getty work force spreads would be large enough to place a permanent demand greater than 25 percent of the current level of demand on local services such as police, medical facilities, fire or educational services; nor would the construction population cause any detrimental effects to community social well-being due to the temporary nature of the construction period and the low visibility of the project. No significant impact on the existing infrastructure would occur based on the significance criteria.

Because construction would be short in duration, housing preferences would be of a temporary nature. It is generally accepted that pipeline workers prefer to stay in accommodations closest to the pipeline. Based on literature reviewed and personal interviews with pipeline contractors, it is assumed that housing for the non-local pipeline work force would be divided as follows:

|  | Housed (%) | Total Non-Local Getty Workers Per Spread |
|---|---|---|
| Motel/Hotels | 42 | 18 |
| Rental Units | 26 | 11 |
| Recreational Vehicle Campers | 28 | 12 |
| Other | 4 | 1 |
| TOTAL | 100 | 42 |

The one potential effect of the Getty pipeline workers on housing would be competition with travelers and recreationists for temporary accommodations. If construction would occur during the peak tourist season, the impact on tourist accommodations would be greater than if construction occurred during the off-season. Peak tourist season on the coast is summer and in the LPNF August through November. In any case, no significant impact would be experienced based on the significance

24—78571

criteria for temporary housing. The small number of non-local construction workers could be housed adequately by the existing supply of rental housing and temporary accommodations.

Construction demand for rental housing would be less than 0.2 percent of the vacant housing within the communities along the construction route. Even though there would be sufficient accommodations to house construction workers, commuting distances may average 100 miles per day at certain points in the LPNF. Table 4-9 shows communities that can provide housing along the route.

### Operation

The Getty pipeline would permanently employ five people to maintain and operate the system. Operating headquarters would be located at the Consolidated Coastal Facility near Gaviota, California. This small work force would cause no significant socioeconomic ramifications.

The anticipated project-related assessed valuations for the first year of operations are compared with 1982 county-wide assessed valuation in Table 4-10. Each county would benefit from the increased tax base. Tax revenues have not been estimated because of the variability of tax rates. The most significant increase in the tax base, attributed to the Getty pipeline and facilities, would occur in Santa Barbara County, where total assessed valuation would increase by 0.5 percent. This increase is less than 10 percent and therefore does not represent a significant impact.

### Celeron/All American

### Construction

One spread of 279 workers would construct the Celeron segment of the pipeline. In addition to pipeline construction, 3 pump stations requiring 20 workers per station, and 3 river crossings requiring 50 workers, would be constructed. Unlike the pipeline workers who move along the route at a rate of 1 to 2 miles/day, the pump station workers would stay in one location for a period of 6 months, and the river crossing crews would require up to 6 weeks in one location. The peak construction work force would total 397 workers.

An estimated 10 construction workers would be required to construct 12 miles of 115-kV transmission line needed for the Sisquoc pump station. Transmission line construction would occur within a 12-month period. Due to the short duration of the construction period, the small workforce, and the sequential nature of the construction process, no significant impacts are anticipated from transmission line construction.

Local and non-local labor force has been estimated for this spread based on skilled and unskilled labor availability in Santa Barbara, San Luis Obispo, and Kern Counties. The California labor force has a fairly large contract construction employment sector and has trained and experienced pipeline workers in counties from which the labor force would be drawn. The labor force is assumed to comprise 50 percent local

4-60

TABLE 4-9

COMMUNITIES WITHIN COMMUTING DISTANCE OF PIPELINE CONSTRUCTION[1]

| Construction Pipeline Spread | Communities with Accommodations within 20 Miles of Pipeline | Overnight Rooms | Recreational Vehicles Sites | Recreational Vehicles Parks | Communities with Accommodations within 20-60 Miles of Pipeline | Overnight Rooms | Recreational Vehicles Sites | Recreational Vehicles Parks |
|---|---|---|---|---|---|---|---|---|
| 1 | Buellton, Solvang, Santa Ynez, Las Olivas, Bullard | 1,074 | 883 | 6 | Santa Barbara | 3,537 | 1,735* | 17 |
| | Santa Maria | 966 | NA[2] | 4 | | | | |
| | Lompoc | 313 | 0 | 0 | | | | |
| | Bakersfield | 4,266 | NA | 8 | | | | |
| 2 | Bakersfield | 4,266 | NA | 8 | | | | |
| | Boron, Tehachapi, | 822 | 110 | 2 | Victorville | 608 | NA | 4 |
| | Taft, Mojave, Rosamond, Other | 163 | NA | NA | Apple Valley | 200+ | NA | 1 |
| | Barstow | 825 | NA | 6 | Adelanto | 31 | NA | 1 |
| | Amboy | 34 | NA | NA | Needles | 650 | 220 | 4 |
| | Blythe | 488 | 2,081 | 25 | | | | |
| 3 | Blythe | 488 | 2,081 | 25 | Parker | NA | 98 | 1 |
| | Ehrenberg | 40 | 0 | 0 | Chandler | 211 | NA | NA |
| | Quartzsite | 30 | 4-5,000 | NA | Phoenix Area | 11,414 | 552 | 3 |
| | Gila Bend | 130 | NA | NA | | | | |
| | Goodyear | 238 | NA | NA | Tempe/Mesa | 2,123 | 6,307 | 9 |
| | Litchfield Park | 224 | NA | NA | Scottsdale | 5,389 | 0 | 0 |
| | Glendale | 82 | NA | NA | Apache Junction | 126 | 2,089 | 4 |
| | Casa Grande | 363 | 62 | 15 | | | | |
| | Coolidge | 37 | NA | NA | | | | |
| 4 | Coolidge | 37 | NA | NA | Tucson | 7,490+ | 2,540 | NA |
| | Florence | NA | 867 | 1 | Benson | 50 | 23+ | 4 |
| | Eloy | 435 | 209 | 5 | Kearney | 45 | NA | NA |
| | Orade | 12 | NA | NA | Safford | NA | 24 | NA |
| | Mamouth | 15 | NA | NA | | | | |
| | Winkleman | NA | 6 | 1 | | | | |

TABLE 4-9 (CONTINUED)

| Construction Pipeline Spread | Communities with Accommodations within 20 Miles of Pipeline | Overnight Rooms | Recreational Vehicles | | Communities with Accommodations within 20-60 Miles of Pipeline | Overnight Rooms | Recreational Vehicles | |
|---|---|---|---|---|---|---|---|---|
| | | | Sites | Parks | | | Sites | Parks |
| 4 | Hayden | 15 | NA | NA | | | | |
| | Willcox | 324 | NA | 6 | | | | |
| | Lordsburg | 300 | 70 | 4 | | | | |
| 5 | Lordsburg | 300 | 70 | 4 | Silver City | 336 | NA | 1 |
| | Deming | 570 | 394 | 11 | | | | |
| | Las Cruces | 1,463 | NA | 3 | | | | |
| | El Paso | 5,624 | 534 | 13 | | | | |
| 6 | Kermit | 120 | 12 | 1 | Sierra Blanco | 76 | 2 | |
| | Monahans | 197 | 25 | 1 | Van Horn | 500 | 17 | 7 |
| | Crane | 20 | 5 | 1 | Pecos | 634 | 25 | 1 |
| | McCamey | 74 | NA | NA | Odessa/Midland | 3,102 | 145 | 2 |
| | Rankin | 25 | Some | 1 | Fort Stockton | 715 | 50+ | 6 |
| | | | | | Carlsbad, NM | 1,230 | NA | 5 |

Source:  ERT

[1]Number of overnight accommodations, recreational vehicles sites and parks are best estimates from available information sources.

[2]Not Available

*Countywide.

TABLE 4-10

PROJECT-RELATED CONTRIBUTIONS TO TAX BASE, GETTY

| County | Miles | Estimated Valuation of Pipeline and Facilities (thousands $) | 1982 Assessed Valuation (thousands $) | Pipeline % of Total Countywide Assessed Valuation | 1982 Countywide Tax Receipts (thousands $) |
|---|---|---|---|---|---|
| Santa Barbara | 57 | 45,886 | 8,958,231 | 0.51 | $97,853 |
| San Luis Obispo | 31 | 20,233 | 5,029,639 | 0.40 | 57,984 |
| Kern | 26 | 17,969 | 20,953,827 | 0.08 | 223,704 |

Source: California Board of Equalization

labor and 50 percent non-local labor.  Since there are no shifts in employment among sectors and the construction period is of a short duration, no significant employment impacts would occur, based on the significance criteria.

Because of the short duration of pipeline construction for this spread, estimated at 6 months, it is assumed that only 15 percent of the total non-local work force would bring their families.  Based on information from the Pipeline Construction Workers and Community Impact Survey's Report, completed in 1979, only 0.3 dependents per worker are estimated for each spread.

Impacts discussed in the Getty pipeline section would also apply to the Celeron pipeline.

Because the Celeron segment would consist of a large peak construction work force, it would be expected that retail sales and sales tax receipts in local communities would be higher than for Getty.  Workforce expenditure estimates are shown in the appendix, Table C-1.  Temporary housing demand would also be higher than Getty.  Housing for the non-local pipeline work force would be divided as follows:

|  | Housed (%) | Total Non-Local Celeron Workers |
|---|---|---|
| Motel/Hotels | 42 | 84 |
| Rental Units | 26 | 52 |
| Recreational Vehicle Campers | 28 | 56 |
| Other | 4 | 8 |
| Total | 100 | 200 |

As compared to the Getty work force, approximately 73 additional pipeline workers would require housing.  However, demand for temporary housing will not exceed the existing supply, therefore no significant impact will occur based on the significance criteria.

The combined effects of the construction and operation phase of the Getty and Celeron pipelines between Las Flores and Emidio are summarized below:

|  | Total Construction Work Force | Estimated Assessed Valuation of Pipeline & Facilities (thousands $) | % of County-wide Assessed Valuations for 3-County Area |
|---|---|---|---|
| Getty | 252 | 84,088 | 0.24 |
| Celeron | 397 | 86,485 | 0.25 |
| TOTAL |  | 170,573 | 0.49 |

4-64

4.2.8.2 Emidio to McCamey. Five spreads of 335 workers each would construct the 1,084-mile All American segment of the pipeline. Total work force required for each spread, including pump stations, valve workers, tank farm, and river crossings, range from 453 to 528 workers. These numbers represent peak work force. In each spread the pump station workers would generally stay in one location for 6 months. The tank farm construction force would require 75 workers for a period of 8 months and major river crossing construction would require between 50 to 75 workers (per river) for a period of approximately 6 weeks.

An estimated total of 65 construction workers would be required to complete sections of new transmission line along the route between Emidio and McCamey. Each section would average between 5 to 15 workers. Most sections are less than 10 miles long, except for the Cadiz line, which would be 37 miles long. Transmission line construction would occur within a period of 4 to 12 months. Due to the short duration of the construction period, the small work force, and the sequential nature of the construction process, no significant impacts are anticipated. If power to the Tejon pump station was provided by the existing 330 kV line adjacent to the site, a new substation would have to be constructed. Construction worker requirements would be similar to those for a transmission line.

Local and non-local labor force has been estimated for each spread based on skilled and unskilled labor availability in each of the pipeline spread regions. The five spreads are represented by the following: #2 - Emidio to Blythe; #3 - Blythe to Coolidge; #4 - Coolidge to Lordsburg; #5 - Lordsburg to Salt Flats; #6 - Salt Flats to McCamey. Both the California and Texas labor forces have a fairly large contract construction employment sector and have trained and experienced pipeline workers in counties from which the labor force would be drawn. The labor force is assumed to comprise 50 percent local labor and 50 percent non-local labor in spreads 2, and 6. In spreads 3, 4, and 5, local labor would represent 30 percent of the labor force, non-local 70 percent. Table C-1 in the appendix shows the breakdown on local and non-local workforce, time schedule, lodging requirements, and estimated worker expenditures for each spread. Since there are no radical shifts in employment among sectors and the construction period is of a short duration, no significant employment impacts would occur, based on the significance criteria. This includes the Indian reservations in Arizona that would be near the proposed pipeline ROW.

Because of the short duration of pipeline construction for any one spread, ranging from 3 to 8 months, it is assumed that only 15 percent of the total non-local work force would bring their families. Based on information from the Pipeline Construction Workers and Community Impact Survey's Report, completed in 1979, only 0.3 dependents per worker are estimated for each spread.

The number of construction workers would be very small relative to the regional population. The largest population increases would occur in New Mexico and Texas, along those portions of the route that are sparsely populated. The greatest increase in population from temporary settlement of construction workers would occur in the following locations: Upton County, Texas, 6.3 percent; Crane County, Texas, 6.1

percent; Hidalgo County, New Mexico, 6.1 percent; and Luna County, New Mexico 2.5 percent. The population influx would be of short duration, less than one year and population change is less than 10 percent, therefore no significant population will occur.

Applying the significance criteria outlined previously, no significant impacts from change in area population would be experienced anywhere along the pipeline. The total non-local population would not cause a significant long-term demand greater than 25 percent of the existing demand to any public or private infrastructure along the route, including police, medical facilities, fire or educational services. There would be no significant impact on employment along any of pipeline spreads because of the short duration of the construction period. Temporary impacts could occur on stretches of the line that are sparsely populated, such as Hidalgo, Luna, and Doña Ana Counties in New Mexico, and all of the rural counties in western Texas. The intensity of these short-term employment impacts would be dependent on the location of the construction contractor and where he hires the majority of his work force. The largest increase (0.2 percent) in total employment on any one spread would occur in New Mexico and western Texas.

Pipeline workers would be scheduled to work a six-day work week ten hours per day. Information supplied by Celeron estimates the average daily wage at $186 per worker.

Retail sales and sales tax would increase throughout the pipeline service communities. Income would be generated in two areas: income generated by the construction work force and Celeron/All American staff in the form of lodging, food, retail sales, and fuel; and income generated by the contractor for materials purchased in the local economy such as tools, fuel, parts and repairs where available. These purchases are not quantifiable for the most part, and therefore cannot be allocated to specific communities along the route. No multiplier effect would occur due to the short duration of the project in any one area.

The non-local work force living in rental housing is estimated to expend up to 37 percent of gross salary on local expenditures. These expenditures would increase income for local businesses and tax revenues for local communities.

Because construction progress would be rapid (1.5 miles per day), housing preferences are of a temporary nature. It is difficult to determine which communities would be most affected due to personal preferences for accomodations; some pipeline workers may prefer to travel extra miles per day in order to be located in a larger town with better accommodations and services, others may not. Based on literature reviewed and personal conversations with pipeline contractors, the breakdown on housing for the non-local pipeline workers is shown in Table C-1 in the Socioeconomic Appendix.

Housing problems would occur along the Celeron/All American pipeline route. Table 4-9 identifies communities with accommodations within commuting distances of the pipeline route. It also shows the total number of overnight rooms and recreational vehicle sites in the

area.  If all accommodations within each spread are tallied, there would be more than adequate accommodations for the construction workers.  If each spread is divided into segments that represent reasonable commuting distances, there are a number of areas where housing availability would be lower.  The two major areas of impact would be between Barstow and Blythe, California, and El Paso and Pecos, Texas.

Total mileage between Barstow and Blythe is approximately 240 miles.  The only lodging between these two points is in Amboy, which has 34 units.  Self-contained recreational vehicles would be able to stay close to the construction location, but total demand for both rental units and motels would total 169 units.  Because of the lodging limitations, this stretch would require very long distance commutes. Needles, California is approximately 60 miles east of Cadiz, which is located halfway between Barstow and Blythe.  Needles has adequate accommodations for the construction workforce.  There are approximately 650 motel units and 220 R.V. sites available in Needles.  The Cadiz tank farm construction workforce could temporarily locate in Needles and commute 120 miles daily to and from Cadiz.  Blythe, California, which is located at the eastern end of spread 2, has limited overnight accommodations; there are currently a total of 488 rooms.  If all non-local construction workers who prefer motel accommodations stayed in Blythe, 21 percent of the units would be occupied.  Blythe is an important service center for Colorado River recreationists and experiences high occupancy rates during peak tourist season from April through September.  Construction worker demand would conflict with tourist demand.  Rental housing would also be impacted if all workers who prefer to rent units would locate in Blythe.  The demand by construction workers for rental units would potentially occupy 31 percent of all vacant units.

Another area of potential impact to housing would be along spread #6 between El Paso and Pecos.  The stretch of pipeline that runs from El Paso through Loving County north of Pecos is approximately 184 miles long.  There are no overnight accommodations between these two points. Self-contained recreational vehicles would be able to camp along the route, but approximately 150 workers would be required to commute long distances daily.  In general, western Texas provides few motel accommodations.  The smaller towns closest to the pipeline, which do have accommodations, could experience 100 percent occupancies during the period of time construction workers would be in the area.  This would inconvenience travelers who expected to stay in those locations overnight.  Based on the significance criteria, significant impacts will occur at some points along these two stretches of pipeline due to lack of adequate temporary accommodations within a commuting distance of 170 miles round-trip.

Operation

The Celeron/All American pipeline would permanently employ 49 people to maintain and operate the system.  Operating headquarters would be located in Midland, Texas.  Maintenance crews would be located at different points along the length of the pipeline.  This small work force would have no significant socioeconomic impact on any region along the pipeline.

4-67

The anticipated first-year project assessed valuations for each county traversed are compared with existing county-wide tax bases in Table 4-11. Anticipated assessed valuations for new transmission line sections along the route are shown in Table 4-12. Each county would benefit from the increased tax base. Tax revenues have not been estimated because of variability of tax rates from year to year. The most significant increase in the total tax base, attributed to the Celeron/All American line and facilities would occur in Hudspeth County, Texas, where total 1982 assessed valuation would increase by 13.5 percent. This is the only area which experiences a change in the local tax base greater than 10 percent which is considered a significant impact.

4.2.8.3 <u>Summary</u>. Applying the significance criteria outlined previously, no significant impact from changes in area population, employment, or demands on public services and facilities would be experienced. Five-year average occupancy rates for temporary housing along the proposed pipeline route are not available, therefore, potential significant impacts on housing cannot be quantified. It is assumed that short-term adverse impacts on housing would occur along sparsely populated segments of the pipeline.

Significant impacts due to lack of temporary housing within commuting distance would be experienced in two areas along the pipeline route; points between Barstow and Blythe and points between El Paso and Pecos, Texas. The 1982 Hudspeth County tax base would increase by 13.5 percent with the proposed pipeline.

4.2.9  Land Use and Recreation

The land use and recreation criteria used to determine significance are based on regulations and plans, existing and future land uses, and their compatibility with the proposed developments. Impacts would be considered significant if:

- Proposed development is neither compatible nor consistent with land use plans, regulations, or controls adopted by local, state, or Federal governments.

- Agricultural land conversion due to the Celeron/All American and Getty proposals or alternatives results in a reduction of 1 percent or more of the county agricultural land base.

- Long-term trends in urban growth patterns are altered.

- Total recreation demand in the study area increases by 10 percent or more over baseline conditions.

- Developed recreational facilities, state or national parks, or wildlife refuges have 5 percent or more of their land area permanently altered.

- The quality of recreational activities is decreased because of decreases in game population, increased demand, or any other reason.

TABLE 4-11

PIPELINE CONTRIBUTION TO COUNTY TAX BASE, CELERON/ALL AMERICAN

| State/County | Length of Line (miles) | Estimated Taxable Assessed Valuation of Pipeline (thousands $) | 1982 Total Countywide Assessed Valuation (thousands $) | | Pipeline Percentage of Total Countywide Assessed Valuation (%) | | 1982 Countywide Tax Receipts (thousands $) |
|---|---|---|---|---|---|---|---|
| California[1] | | | | | | | |
| Santa Barbara | 63.5 | 50,500 | 8,958,231 | | .53 | | 97,853 |
| San Luis Obispo | 31.5 | 20,760 | 5,029,639 | | .42 | | 57,984 |
| Kern | 110.1 | 65,478 | 20,953,827 | | .31 | | 223,704 |
| San Bernardino | 157.7 | 94,835 | 19,950,620 | | .48 | | 242,312 |
| Riverside | 30.1 | 14,886 | 18,567,137 | | .08 | | 217,465 |
| Arizona | | | Primary[3] | Secondary[3] | Primary | Secondary | |
| La Paz/Yuma[2] | 72.9 | 18,860 | 267,153 | 284,180 | 7.3 | 6.6 | 4,028 |
| Maricopa | 66.5 | 17,698 | 5,257,522 | 6,034,315 | 0.3 | 0.3 | 415,214 |
| Pinal | 69.6 | 19,395 | 305,816 | 317,682 | 6.3 | 6.1 | 39,294 |
| Pima | 12.0 | 2,180 | 1,777,879 | 2,059,636 | 0.12 | 0.1 | 196,084 |
| Cochise | 75.2 | 19,278 | 259,329 | 271,153 | 7.2 | 7.1 | 22,067 |
| New Mexico | | | | | | | |
| Hidalgo | 22 | 1,275 | 89,222 | | 1.4 | | 2,060 |
| Grant | 18.2 | 318 | 143,160 | | 0.2 | | 4,748 |
| Luna | 41.7 | 729 | 66,268 | | 1.1 | | 1,638 |
| Doña Ana | 45 | 1,677 | 348,824 | | 0.48 | | 7,152 |

TABLE 4-11 (CONTINUED)

| State/County | Length of Line (miles) | Estimated Taxable Assessed Valuation of Pipeline (thousands $) | 1982 Total Countywide Assessed Valuation (thousands $) | Pipeline Percentage of Total Countywide Assessed Valuation (%) | 1982 Countywide Tax Receipts (thousands $) |
|---|---|---|---|---|---|
| Texas | | | | | |
| El Paso | 28 | 13,370 | 15,288,040[4] | .09 | 75,613[5] |
| Hudspeth | 63.3 | 33,051 | 243,858 | 13.5 | 1,157 |
| Culberson | 54.9 | 26,215 | 694,437 | 3.8 | 2,671 |
| Reeves | 14.4 | 6,876 | 1,327,418 | 0.52 | 9,056 |
| Loving | 26.9 | 12,845 | 1,173,427 | 1.09 | 2,122[6] |
| Winkler | 18.3 | 12,683 | 2,249,452 | 0.56 | 6,728[6] |
| Ward | 19.5 | 9,311 | 2,532,420 | 0.37 | 13,841 |
| Crane | 40.8 | 20,602 | 4,312,487 | 0.48 | 7,686 |
| Upton | 7.1 | 4,510 | 1,395,496 | 0.32 | 5,846 |

[1]California has recently begun to levy a ROW tax; the estimated valuation corresponding to this tax is not included.

[2]La Paz County did not incorporate until January 1983.

[3]Arizona operates under two distinct valuation bases for levying ad valorem property taxes:  limited property value and full cash value.

[4]1982 Assessed Valuations include assessments for school districts traversed by the pipeline and county assessments.

[5]1982 tax receipts include tax levies for school districts traversed by the pipeline and total county levies.

[6]The Winkler and Loving school districts have consolidated.  For estimation purposes, tax receipts for the district have been distributed 50 percent to Loving County and 50 percent to Winkler County.

TABLE 4-12

TRANSMISSION LINE CONTRIBUTION TO COUNTY TAX BASE

CELERON/ALL AMERICAN

| State/County | Length of Line | Estimated Taxable A.V. of Transmission Line (thousands $)[1] | 1982 Countywide A.V. (thousands $) | Estimated Transmission Line Percentage of Total Countywide A.V. (%) |
|---|---|---|---|---|
| California | | | | |
| Santa Barbara | 12 | 1,166 | 8,958,231 | .01 |
| Kern | 20.5 | 1,991 | 20,953,827 | .009 |
| San Bernardino | <1 | 1,026 | 19,950,620 | .005 |
| Riverside | 37 | 7,400 | 18,567,137 | .04 |
| New Mexico | | | | |
| Hidalgo | 8 | 619 | 89,222 | .69 |
| Doña Ana | <1.4 | 182 | 348,824 | .05 |
| Texas | | | | |
| Hudspeth | <1 | 1,556 | 243,858 | .64 |
| Winkler | <1 | 1,943 | 2,249,452 | .09 |

[1]Assessed valuations are estimated based on the following formula:  construction costs minus depreciation (35-year straight line  method) times an assessment ratio when appropriate.  Source for transmission line construction costs:  John Oveson, All American Pipeline Company; Chuck Peterson, Marmac Engineering.

- Existing wilderness areas or areas currently under consideration for wilderness [Wilderness Study Areas (WSAs) or Further Planning Areas (FPAs)] are directly or indirectly or impacted by pipeline construction or operation.

- The quality of the experience of wilderness area users is affected by increased use demand (10 percent or greater) or degradation of air quality, water quality, flora, or fauna.

- Pipeline ROWs provide uncontrolled access to sensitive areas that were previously inaccessible.

- The danger of forest and range fires is increased by construction activities starting a fire or impeding access of fire equipment.

The following analysis is divided into project effects on land use, compatibility with land use regulations and plans, and impacts on recreation facilities and use.

### 4.2.9.1  Las Flores to Emidio

Land Use.  Along the Santa Barbara south coast the greatest potential for impacts would be associated with agricultural and recreational land uses and the Vista del Mar School.  The route from Las Flores to Gaviota passes through limited areas of avocado orchards and other irrigated cropland (Table 4-13).  Agricultural lands disturbed by construction would represent less than 1 percent of the irrigated cropland in the county.  Santa Barbara County, through its zoning ordinances, prohibits high-density residential development along the coast west of Goleta.  The pipelines, therefore, would not be expected to have any significant effects on future residential development along the coast.

TABLE 4-13

CONSTRUCTION DISTURBANCE BY LAND USE GETTY AND CELERON PIPELINES (acres)

| Feature | Rangeland | Shrubland & Woodland | Irrigated Agriculture | Dryland Agriculture | Commerical Industrial | Commercial Residential | Other |
|---|---|---|---|---|---|---|---|
| Getty Pipline[1] | 384 | 218 | 128 | 16 | 15 | 4 | 15 |
| Pumping and Heat Station | 6 | | | | | | |
| Celeron Pipeline[2] | 792 | 361 | 251 | 12 | 32 | 9 | 16 |
| Pumping and Heat Station[3] | 9 | | | | | | |
| Grand Total | 1,247 | 618 | 501 | 24 | 61 | 18 | 46 |

Source:  ERT
[1]For Getty, 99 miles of the ROW would be 50 ft wide and 14 miles of the ROW would be 100 ft wide.
[2]ROW width would be 100 ft
[3]Actual acreage is 8.5 acres, rounded to 9.

The Celeron pipeline segment would cross over the eastern boundary of Gaviota State Park about 0.3 mile inland, cross under US 101, and ascend Gaviota Pass about 0.6 mile from the northern portion of the Fremont-Foxen Historical Marker Rest Area (Table 4-14).  Getty's route would be within an existing ROW and would be adjacent to the southern part of this rest area.  As described later, the Getty routing would temporarily disrupt use of this recreational facility.

TABLE 4-14

THE LOCATION AND TYPE OF SENSITIVE LAND USES

| Map Code | Location | Sensitive Characteristics | Potential Problems |
|---|---|---|---|
| CELERON/ALL AMERICAN AND GETTY | | | |
| California | | | |
| L1 | 2 miles east of Corral Canyon | El Capitan State Park | Disruption of park activities |
| L2 | 2.5 miles west of Corral Canyon | Refugio State Park | Disruption of park activities |
| L3 | Adjacent to Gaviota Pump Station | Vista del Mar School | Disruption of school activities |
| L4 | 4 miles west of Gaviota | Gaviota State Park | Disruption of park activities |
| L5 | 8 miles northwest of Gaviota | Gaviota Pass Rest Area | Disruption of recreation activities |
| L6 | Town of Buellton | Residential development | Disruption of residential activity |
| L7 | 13 miles north of Buellton 12 miles west of New Cuyama | LPNF | Disruption of recreation and grazing activities Wilderness impacts. |
| L8 | LPNF | Horseshoe Springs Further Planning Area | Impacts to recreation areas and Horseshoe Springs Further Planning Area (FPA) |
| L9 | LPNF | Miranda Pine FPA | Impacts to the FPA |
| L10 | LPNF | La Brea FPA | Impacts to the FPA |
| L11 | LPNF | Spoon Canyon FPA | Impacts to the FPA |

TABLE 4-14 (CONTINUED)

| Map Code | Location | Sensitive Characteristics | Potential Problems |
|----------|----------|---------------------------|--------------------|
| CELERON/ALL AMERICAN | | | |
| L12 | Tehachapi Pass | Pacific Crest National Scenic Trail | Disruption of recreation activities |
| L13 | Cummings Valley | Residential Area | Disruption of residential activities |
| L14 | West of Barstow | Edwards Air Force Base | Disruption of base activities |
| L15 | Town of Barstow | Residential areas | Disruption of residential activity |
| L16 | North of Desert Center | Patton Camp ACEC | Impacts to historic area |
| L17 | North of Desert Center | Coxcomb WSA | Impacts to WSA |
| L18 | Colorado River south of Blythe | Recreational use of river | Impacts of recreation activities |
| Arizona | | | |
| L19 | East of Blythe | Kofa NWR | Conflicts with refuge management plans |
| L20 | North of Kofa Refuge | New Water Mountains WSA | Impacts to WSA |
| L21 | East of Kofa Refuge | Little Horn Mtns. WSA | Impacts to WSA |
| L22 | East of Kofa Refuge | Eagletail Mtns. WSA | Impacts to WSA |
| L23 | South of Buckeye | North Maricopa Mtns. WSA | Impacts to WSA |

4-74

TABLE 4-14 (CONTINUED)

| Map Code | Location | Sensitive Characteristics | Potential Problems |
|---|---|---|---|
| **New Mexico** | | | |
| L24 | Town of Lordsburg | Residential area | Disruption of residential activities |
| L25 | Town of Reming | Residential area | Disruption of residential activities |
| **Texas** | | | |
| L26 | Northwest of El Paso | Ft. Bliss Military Reservation | Disruption of base activities |
| L27 | East of El Paso | Guadalupe Mtn. National Park | Disruption of recreation activities |
| L28 | East of El Paso | Hueco Tanks State Park | Disruption of recreation activities |
| L29 | Town of Wink | Residential area | Disruption of residential activity |
| L30 | Town of Monahans | Residential area | Disruption of residential activity |

Source:   ERT

4-75

The Celeron route traverses the Santa Ynez Valley west of the community of Buellton and the Getty route goes east of US 101.   Both routes cross substantial areas of irrigated cropland that would have farming interrupted for up to one season.   Northeast of Buellton the routes would pass through limited areas of vineyards that would have long-term loss of production because of long regeneration times.   Land owners would be compensated for this loss of revenue.

Before reaching Emidio the pipeline would pass through irrigated cropland in San Luis Obispo and Kern Counties.   Pipeline construction would disturb less than 1 percent of each countys' total cropland acreage; the loss in production would be one growing season or less. The possible exception would be if nut, citrus or vine crops were removed.   The land owners would be compensated for any losses.

The transmission line options supplying power to the Sisquoc pump stations would not result in significant adverse land use impacts because they would not cross any residential, agricultural land, or areas of high scenic value.

The pipeline ROW passes through mountainous coastal and inland areas that are susceptible to forest and range fires.   Pipeline construction and operation may slightly increase the risk of fire starts in chaparral and wooded areas; however, where the ROW would function as a fuel break, access for fire suppresion purposes would be enhanced.   On National Forest land a fire plan would be developed to reduce the risk of forest fires during construction and operation.   For all areas, major roads would not be closed by construction, allowing normal access for fire suppression equipment.

Land Use Regulations and Plans.   The siting and design of the pipelines would be consistent with adopted land use regulations and plans, with the following exceptions:

Santa Barbara County, Local Coastal Plan - the proposed project is not consistent with the following Coastal Plan policies.

Policy 6-14 - the Celeron and Getty routes would cross Gaviota Creek, an environmentally sensitive habitat area.

Policy 6-17 - pipeline alignment generally avoids known important recreation, habitat, and archaeological areas.   The only possible exceptions would be after the pipeline enters Gaviota State Park. The Celeron route goes through a low-use area of the park, is screened from most of the park uses, and may be consistent with this policy.   The Getty ROW would impact the US 101 Roadside Rest Area and for this reason it may not be consistent with this policy.

In many areas both the Celeron and Getty pipelines would parallel each other to form a 150-ft wide ROW corridor.   Disturbance to land use, especially in Gaviota State Park, environmentally sensitive habitat areas, and La Brea Canyon could be reduced if both lines were constructed in the same ROW.   This would be consistent with existing county and Forest Service land use regulations.

4-76

San Luis Obispo County:  The proposed pipeline would cross a flood hazard area.  A development plan would be required for construction approval.

California Department of Park and Recreation:  The Celeron pipeline segment would be within a new ROW in Gaviota State Park while the Getty pipeline would parallel an existing ROW through the Park.  Proponents would need to secure an easement and follow stipulations issued by the California Department of Parks and Recreation.  Alignment of the pipeline avoids unique and or high recreation use areas shown in the Gaviota Park Plan.

Los Padres National Forest:  The Getty route up La Brea Creek would pass through two Forest Service FPAs.  Celeron's ROW would cross the same two FPAs and one additional study area.  Pipeline construction would result in significant adverse effects on wilderness characteristics of the Horseshoe Springs and Spoor Canyon FPAs because of reductions in their integrity, natural appearance, and opportunities for solitude.  The other FPAs would not be significantly affected because the proposed pipeline ROW has already been disturbed and noise impacts would be of a short duration.  See Appendix D for a detailed analysis of impacts to these FPAs.  Future utilities could be accommodated within the cleared ROW through the use of special construction techniques.  Approval of a ROW and any stipulations would be contained in the EIS Record of Decision.

<u>Recreation Facilities and Use</u>.  Alignment of the Celeron and Getty pipelines would avoid disturbance to El Capitan and Refugio State Parks.  Indirectly, Refugio could be affected by pipeline construction workers competing with recreationists for limited campsites, especially during the summer high use period when all sites are normally full (Preec 1984, personal communication).  View corridors would not be crossed.

The Celeron ROW through Gaviota State Park crosses under the beach access road and Gaviota Creek floodplain before ascending through relatively low use portions of the park.  This route would not significantly affect recreation use, as long as the beach access road remains passable during construction.  Revegetation of the ROW to reduce visual impact would be performed.

Getty's route passes adjacent to a segment of the roadside rest area for northeastern bound traffic on US 101 at Gaviota Pass.  Some disruption of activity at the rest area would occur during construction.  Extensive earth moving would be required through exposed rock outcrops that are visible from the rest area and highway.  This part of the ROW would present short-term adverse effects during construction because of the disruption of activities at the popular rest area and a long-term effect because of ROW visual disturbances.

La Brea Canyon is a moderately used recreation activity corridor with four Forest Service campgrounds.  Three of the campgrounds would be directly affected by construction.  Even after these campgrounds are restored, the clearing of large oak and sycamore trees would result in a drastic visual change in the area.  This would significantly reduce the

canyon's recreational appeal and use in the long term. Removal of a portion of the isolated stand of Colter pine near Miranda Pine Campground would be a significant change in the aesthetic quality of the campground.

### 4.2.9.2  Emidio to Blythe

Land Use.  The greatest potential for adverse impacts from pipeline construction exists in areas with agricultural, residential, and recreational land uses.  A total of 352 acres of irrigated cropland would be crossed by the proposed route and pump stations (Table 4-13). Within the affected counties, disturbance to irrigated cropland would not be considered significant because it represents less than a 1 percent reduction in any county's agricultural base.  Although the disruption to farming activities would be for a short duration during construction, it may result in delays in some planting or harvesting, depending on the time of construction and layout of the field.  Land owners would be compensated for losses.

Rangeland would be the dominant land use crossed by the pipeline, making up 83 percent of disturbance (Table 4-15).  Temporary gates and other measures would be erected to prevent livestock escape.  Grazing land affected during construction represents a very small percentage of available land and after restoration is complete, grazing would again be possible.

TABLE 4-15

CONSTRUCTION DISTURBANCE BY LAND USE AND BY STATE ALL AMERICAN PIPELINE[1]

(Acres)

| State | Rangeland | Woodland | Irrigated Agriculture | Dryland Agriculture | Commercial/ Industrial | Residential | Other |
|---|---|---|---|---|---|---|---|
| Pipeline | | | | | | | |
| California | 2,939 | 45 | 352 | 21 | 103 | 53 | 51 |
| Arizona | 3,590 | 84 | 495 | 22 | 29 | 25 | 0 |
| New Mexico | 1,538 | 0 | 146 | 33 | 66 | 0 | 114 |
| Texas | 3,312 | 0 | 0 | 16 | 51 | 6 | 76 |
| | | | | | | | |
| Pumping and Heat Stations | | | | | | | |
| California | 17 | 0 | 6 | 0 | 0 | 0 | 0 |
| Arizona | 28 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 11 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas | 11 | 0 | 0 | 0 | 11 | 0 | 0 |
| | | | | | | | |
| TOTAL Project | 11,446 | 129 | 999 | 81 | 260 | 74 | 241 |
| GRAND TOTAL | | | | | | | 13,230 |

Source:  ERT

[1]Assumes a ROW width of 100 ft.

Areas of concentrated residential land use along the ROW are found primarily in Kern County within the Cummings Valley, San Bernardino County within unincorporated areas north of Barstow, and Riverside County in the Town of Blythe.  Other segments of the route are undeveloped open space land or have only scattered residential units.

For homes within about 0.5 mile, noise and visual impacts would be significant but of short duration (between 1 and 2 days maximum). See the Noise and Visual Sections for more detailed information.

Since the All American Pipeline segment parallels existing pipelines, it would not create any new ROWs going through or adjacent to any urbanized areas. Consequently, significant long-term impacts to urban growth patterns would not occur.

Sensitive recreational land uses are located primarily in the California Desert, and at the Colorado River crossing. See the following Recreation subsection for more detailed information on potential recreation impacts.

No significant impacts are expected from the Tejon pump station transmission line because it would be within the proposed pipeline ROW and would disturb only a small amount of irrigated agricultural land (2.4 acres) and grassland (0.8 acre). After construction a portion of this cropland would be reclaimed. Construction and operation of the transmission line to the Cadiz pump station would present no significant land use impacts. A total of 90 acres would be disturbed by this line, primarily for the 20-ft access trail. The proposed route would not impair the wilderness characteristics of WSAs 299 or 300.

The pipeline route would pass through areas where, depending on the time of year and weather conditions, forest and range fire potential is very high, especially the Tehachapi Mountains. Potential impacts from pipeline construction on fire danger for these segments would be similar to those described for the Getty and Celeron pipelines.

Land Use Regulations and Plans. The proposed pipeline route would generally be consistent with land use regulations and plans. Beginning with county plans, the following discussion describes potential conflicts with specific provisions of land use plans.

Developers of residential and other projects in California are able to file Specific Development Plans (SDPs), depicting the design and layout of their developments, with the county planning department. An SDP has legal status similar to a county master plan. Several residential subdivisions crossed by the pipeline have filed SDPs in the Cummings Valley, Kern County. An amendment to the SDP may need to be filed by the pipeline proponent, depending on an interpretation of the SDP by the county planning office (Kielty 1984, personal communication). Such an interpretation has not been made by Kern County at this time.

Within San Bernardino County, the Joint Utilities Management Program (JUMP) imposes siting and design criteria and a siting and approval process. Of primary concern in the JUMP is that "new pipeline corridors should be consolidated with existing pipeline or electrical transmission line corridors except where there are technical or overload constraints or where there are social, aesthetic, significant economic, or other overriding concerns." The All American ROW generally parallels existing roads, railroads, and pipelines in the county, and therefore, is consistent with the intent of the JUMP. Final approval of the ROW would, however, be required from the county.

The proposed route is inconsistent with the utility corridors identified in the Riverside County Comprehensive General Plan. Present utility corridors are defined in an "advisory" context and can be administratively modified by the Planning Department without requiring formal amendment. No action would be taken until BLM modifies the utility corridors of the California Desert Conservation Plan and All American formally requests a modification to the Riverside County Comprehensive General Plan (McCall 1984, personal communication).

The BLM California Desert Conservation Area Plan (BLM 1980c) lists approved utility corridors for pipelines and electric transmission lines. Even though the All American pipeline route through the desert parallels existing highway, railroad, or pipeline ROWs, a large segment of the proposed route is not within a designated BLM utility corridor and is inconsistent with the Plan provisions. Project proponents have submitted ROW applications to the BLM and this EIR/EIS will serve to amend the Plan. The Palen-McCoy WSA would be crossed by about 8 miles of the proposed route. This location will have a significant adverse impact on the WSA (see Appendix D for a detailed discussion).

Edwards Air Force Base would be crossed by 2.6 miles of the pipeline ROW. Special stipulations to protect environmental features or avoid conflicts with base operations may be required (Yonkers 1984, personal communication). The ROW would not cross the Twentynine Palms Marine Corps Base or the Marine Corps Nebo Supply Base.

<u>Recreational Facilities and Use</u>. Recreation demand generated by the construction work force is not expected to have significant adverse impacts on regional recreation resources along the route because the 335-man crew for each spread would be a very small percentage of the recreation users in any region. For example, the California Desert receives several million visitors per year (BLM 1980c). Potential conflicts would occur when construction takes place during peak use seasons and where there is a shortage of campsites or motel rooms (see the Socioeconomic Section). Under these circumstances workers would be competing with recreationists for limited temporary housing.

Pipeline construction should have only a short-term effect (1 to 2 days) on use of the Pacific Crest National Scenic Trail near Tehachapi Pass. In the California Desert it would pass through public lands that are popular with ORV users but it avoids areas classified as "open" for cross country travel. Impacts from project construction would be short term and would only present a nuisance rather than a significant impact to ORV recreationists, since ORV users are limited to existing roads or trails, detours or road closure signs would be erected at road crossings, and construction would progress at an average of 1.5 to 2 miles per day. Major access roads would not be closed to traffic. There would be adequate space to accommodate ORV use and pipeline construction.

The ROW would provide access to some areas not now accessible by motor vehicle. This new access could, however, result in the proliferation of spur roads and impacts to fragile resources. New spur roads would be in conflict with BLM recreation management policy that seeks to

restrict ORV use to the adequate number of existing roads and trails (BLM 1980c). This is considered a significant adverse impact, unless access is controlled or limited.

Completion of the Colorado river crossing would require a total of about six weeks. The two days required to pass the pipe across the river would result in detours and minor delays in recreational use at that point on the river by fishermen, boaters, and water skiers. Boats travel up and down the river from launch sites around the town of Blythe, including Mayflower County Park and the Blythe Marina located about 0.5 mile upstream of the crossing. If construction were to occur during the peak use season (April through August), especially on or near holidays or spring weekends, the degree of disruption would increase substantially. If, however, construction were completed during the lowest use period (November through January), impacts would be minor.

Fishing for catfish and bass is popular year round at the Colorado River crossing. As described in the Aquatics Section, impacts to recreational fishing from pipeline construction would not be significant. Oil spill impacts could taint fish for several months and render the fish undesirable for eating.

### 4.2.9.3  Blythe to McCamey

Land Use. The greatest potential for adverse impacts from pipeline construction would be in areas with agricultural, residential, and recreational land uses. A total of 641 acres of irrigated cropland would be crossed by the proposed route and pump stations. Within the affected counties, disturbance to irrigated cropland would be as high as 281 acres in Pinal County, Arizona. This effect would not be considered significant because it represent less than a 1 percent reduction in the county agricultural base. No other county would have more than 1 percent of their cropland disturbed by the project. Although the disruption to farming activities would be for a short duration during construction, it may result in delays in some planting or harvesting, depending on the time of construction and layout of the field. Land owners would be compensated for losses.

Rangeland would be the dominant land use crossed by the pipeline, making up 88 percent of disturbance. Temporary gates and other measures would be erected to prevent livestock escape. Grazing land affected during construction would represent a very small percentage of available land and after restoration is complete, grazing would again be possible.

Areas of concentrated residential use would be limited to Lordsburg and Deming, New Mexico, and Monahan, Texas. Other segments of the route are open space land or only have scattered residences. Construction of a new ROW corridor could have potentially long-term effects on urban growth patterns. Since the Celeron/All American pipeline parallels existing pipelines it would not create any new ROWs going through or adjacent to any urbanized areas. No significant long-term impacts to urban growth patterns would occur.

No significant impacts are expected from the Lordsburg, Anthony, Salt Flats and Wink transmission lines because construction would not affect sensitive land uses in the area.

<u>Land Use Regulations and Plans</u>.    The proposed pipeline route generally is consistent with land use regulations and plans.  Beginnning with county plans the following discussion describes potential conflicts with specific provisions of land use plans.

The pipeline route proposes to cross the Kofa NWR, Arizona.  FWS policy encourages the siting of industrial facilities outside of a refuge if possible.  The Regional Director of the FWS will need to determine if the project is compatible with refuge operations.

The proposed pipeline would be adjacent to an existing El Paso Natural Gas Company pipeline through Fort Bliss Military Reservation in Texas.  Once a required cultural resources survey of the ROW and other stipulations have been completed, the proposed project would be consistent with U.S. Army requirements (DeGarmo 1984, personal communication).

<u>Recreational Facilities and Use</u>.  Recreation demand generated by the construction work force is not expected to have significant adverse impacts on regional recreation resources along the route.

Pipeline construction would affect 25 miles of the Kofa NWR.  This represents less than a 1 percent disturbance to the 660,000-acre refuge. The greatest impacts to recreationists using the commonly travelled road along the existing pipeline would last about 16 days (assuming a 1.5-mile per day construction rate, with additional time needed for ROW preparation, cleanup, and restoration).  This road has a large amount of recreation use, compared to other parts of the refuge, because of the easy 2-wheel-drive access it provides (Haderlie 1984, personal communications).  Long-term impacts to recreation, including aesthetic impacts, are expected to be minimal because the pipeline would be buried and would parallel an existing gas pipeline and 500-kV transmission line.

The existing El Paso pipeline ROW forms the northern border of three BLM wilderness study areas east of the refuge.  As proposed the All American Pipeline would be to the north of the existing ROW and would be located outside the WSAs.  BLM management policy in regard to WSAs does not permit any new ROWs (BLM 1981).  Construction and operation would not result in adverse effects on the wilderness character of the WSAs because the area's naturalness, solitude, or unique features would be basically unchanged.  See Appendix D for a detailed discussion of potential effects on wilderness character.

There are no other major local, state, or national recreation areas that would be impacted by the remainder of the pipeline route. Recreation use over the remaining sections in Arizona, New Mexico, and Texas is generally dispersed and should not be adversely affected by the proposed pipeline.

4.2.9.4 <u>Summary</u>.  In summary, the Celeron/All American and Getty proposals would not be consistent with land use policies prohibiting disturbance of recreation areas and environmentally sensitive habitats in Santa Barbara County.  The corridors would cross several areas designated for FPAs in the LPNF.  Significant impact to recreation resource in La Brea canyon would occur.  The proposals would also provide new access, in some cases, to previously inaccessible sensitive areas.  The All American segment in the San Bernardino and Riverside Counties would require modification of county plans and the BLM California Desert Conservation Area Plan because it is not consistent with the designated utility corridors.  Palen-McCoy WSA would be crossed by the proposed route.  The FWS must also make a determination of consistency for the crossing of the Kofa NWR.  Finally, the quality of recreation experiences at some recreation areas would be adversely affected by visual changes from ROW clearing.

4.2.10  Transportation

The dominant potential transportation impact associated with the proposed project involves the disruption of traffic on roadways to be crossed by the pipeline.  Disruption of traffic flows would be considered significant if:

- The traffic increase, particularly over the long term, would cause an instability of traffic flow, noticeable congestion, and/or a substantial increase in average travel time.

- Traffic delays are incurred due to pipeline construction of more than 60 minutes (on minor arterials) during low-use periods and more than 30 minutes on principal arterials and major collectors.

- There would be any permanent impact to roads or rail networks, other pipeline systems, or electrical power transmission systems.

- Emergency access to any portion of the pipeline corridor would be precluded by pipeline construction.

4.2.10.1 <u>Impacts to Transportation</u>.  The Celeron/All American and Getty pipelines from Las Flores to Emidio would cross essentially the same highways and be accessed by the same roadways.  The impacts on transportation for both the construction and operation of these two portions of the pipeline would therefore be similar.

The proposed pipeline route from Las Flores to McCamey, Texas would cross 61 state and Federal roadways and numerous minor roadways (both public and private) throughout the states of California, Arizona, New Mexico, and Texas.  The crossing of these roadways would be undertaken by boring and installing the pipeline underneath the road ROW.  As a general rule, traffic flow on these roadways would not be interrupted.  Construction activities may occur within the road ROW but are planned to not interrupt the flow of the roadway itself.  No state or Federal roadways would be subject to any interruption of traffic flow or control of traffic.

4-83

Some minor county or Forest Service roads may require control of a minimal amount of traffic (i.e., proper signing, barriers, or flagmen). However, temporary access across or around roadways where service would be interrupted would be provided; there would be some congestion in these areas of temporary disruption for 1 or 2 days. Emergency access would be provided under these conditions. Impacts of increased access to National Forest, NWR, and public (BLM) lands are discussed under Land Use and Recreation and in Appendix D.

Slowly moving heavy construction equipment would be moved to the ROW via major highways along the pipeline route. Once the pipeline ROW is accessed, the construction equipment would be restricted to movement along the pipeline ROW; there after, the only potential for interruption of traffic flow would occur at highway crossings as the equipment moves from one side of the roadway to the other. During the movement of the heavy equipment on and over highways, some congestion would occur. This would result from the need to stop traffic to allow for the crossing of heavy equipment as well as the need to reduce traffic speeds of cars following the heavy equipment along the roadways. Precautions including flashing lights, flagmen, and signing would be taken to ensure that safe operations within the highway ROW would occur. These interruptions would occur infrequently, about once every 20 days, and be of short duration (several hours).

During the construction phase construction workers would need to access the pipeline ROW daily through the use of the local roadway network. The construction workers would travel by private automobile (assume one construction worker per vehicle) to the nearest access point to the construction area. Vehicles would be parked along the pipeline ROW away from public roadways. On an average day a maximum of 335 construction workers (Getty and Celeron combined or maximum All American spread) would access the pipeline ROW via the nearest major roadway to the construction site resulting in an estimated 335 auto movements. The construction workers are expected to commute to the site during the hours from 6:30 to 7:30 a.m. and 4:30 to 5:30 p.m., times that correspond typically to the beginning and end of the morning and evening peak hours, respectively. During these times, additional congestion on access roadways is expected to occur, however, this congestion for a brief period in the morning and evening hours would take place on any single roadway for only an average 20-day period. At the end of this period, the spread would have moved to a point along the line close to another access road. Typically the access points to the pipeline would occur on state and Federal roadways in rural areas. The congestion would occur only for a short duration and generally in rural, lightly populated areas.

The addition of 20 operation personnel at McCamey, Texas would not impact transportation.

4.2.10.2  Summary.  In summary, the transportation effects of the Celeron/All American and Getty proposals would not be considered significant. All contributions to traffic congestion would be minor and of short duration. Traffic delays would be minimal because all major highway crossings would be tunneled without cutting the travel surface

and equipment crossings would be carefully monitored and controlled. There would be no permanent impact to major transportation or utility networks.  Finally, access would be maintained on existing roads at all times during construction, thus maintaining emergency access throughout the development of the project.

## 4.2.11  Cultural Resources

The criteria for evaluating cultural resources on Federal lands and lands impacted by federally funded or licensed projects are the eligibility criteria of the National Register of Historic Places, 36 CFR 60.4 (revised November 1981).  The criteria apply to resources (historic and prehistoric sites) significant at the national, regional, state, and local levels.  Adverse effects on resources that produce direct or indirect impacts (36 CFR 800.3) are considered for sites listed on the National Register of Historic Places or which meet the criteria of eligibility.

For purposes of the California Environmental Quality Act (CEQA), the criteria for evaluating cultural resources on state and private lands in California are significance criteria listed in Appendix K of the California Administrative Code, Title 14 Natural Resources, Division 6, Resources Agency.  Effects which cause damage to cultural resources are considered for sites which meet these criteria.

Federal agencies cannot authorize federally licensed projects without prior compliance with Section 106 of the National Historic Preservation Act.  This involves consultation with the State Historic Preservation Office (SHPO) and the Advisory Council on Historic Preservation to determine the existence and significance of cultural resources sites and the development of procedures to mitigate adverse effects.  The information provided in this section is intended for use in the consideration of various project alternatives.  Prior to authorization of the start of pipeline construction activities, all Federal lands will be subjected to a complete (Class III) inventory and an evaluation of cultural resources and project effects in consultation with the affected SHPOs and the Advisory Council.

Cultural resources impacted by the Celeron/All American and Getty proposals include archaeological and historical sites that are located in areas which would be directly or indirectly affected by project construction and facilities operation.  Sites located within the pipeline ROW would be exposed to potential direct and indirect impacts while sites located outside the ROW would be exposed to potential indirect impacts only.

Direct impacts would result from actual surface disturbance of a site's spatial configurations or stratigraphy during a facility's construction or use.  In this case construction and maintenance activities described in Section 2.2 would disturb or destroy cultural resources, including clearing and grading, ditching, hauling and stringing, pipe placement, and backfilling.  Disturbances by project-related vehicular activity would also occur within the project ROW and along access roads.

Indirect impacts refer to the increased potential for site disturbances due to a general intensification of land use activities in the area surrounding cultural sites. The construction or improvement of roads for project implementation purposes would make previously recorded sites in the surrounding project area more accessible. Many cultural resources have undergone varying amounts of previous disturbance due to non-professional excavation and the search for collectable items.

Two major difficulties are involved with assessing impacts to cultural resources. First, not all portions of the pipeline route have been surveyed, so not all cultural sites that may exist within and adjacent to the ROW have been identified. Secondly, many known sites have not been evaluated as to their eligibility for National Register designation. For these reasons, cultural resource impact assessment at the time an EIS is prepared is usually incomplete. To rectify this acknowledged shortcoming, the land management agencies (BLM, Forest Service, FWS, and DOD) will develop a formal compliance plan for the mitigation of potential impacts to cultural resources for all aspects of the Celeron/All American and Getty proposals. This plan will include the identification of cultural resources that may be impacted by the projects, submittal of information on potentially significant resources to the SHPO for evaluation of significance; consultation with the Advisory Council on Historic Preservation on the effects of the projects on significant resources; and implementation of a cultural resources mitigation program. The compliance plan will include a plan for additional surveys and data collection for all proposed areas of disturbance. More detail on the compliance plan is contained under mitigation measures at the end of this chapter.

It should be noted that Fort Bliss (Texas) has a programmatic agreement with the Texas SHPO involving a formal historic preservation plan. This plan has been reviewed and approved by the Advisory Council. All survey and mitigation plans pertaining to the pipeline on Fort Bliss will be performed in accordance with the programmatic agreement.

The process of formally evaluating cultural resources using regulatory criteria is often a complex, expensive, and time-consuming process, involving several phased procedures. It should be noted that all cultural resources can make contributions to archaeological and historical research. Various levels of data collection ranging from professional site recordation to complex data recovery programs, are possible depending upon the extent and significance of a cultural resource. However, site evaluation and data collection and cultural resource disturbances can be limited if cultural resource sites can be avoided during detailed project design and final ROW selection.

No ethnographic sites along the pipeline ROWs have been identified to date by any Native American groups; however, impacts to unknown sites could still occur, and potential impacts will be evaluated as sites are identified. Potentially significant historic and archaeological sites which have been identified for each segment of the pipeline routes are described in the following paragraphs.

4.2.11.1 <u>Las Flores to Emidio</u>. Thirteen of the 72 known cultural resource locations identified within 0.5 mile of the proposed Celeron route would be within the ROW. These sites include five campsites, three villages (at least one with a burial area), one bedrock mortar, two rock shelters, and two historic sites. Sixteen of the 49 sites within 0.5 mile of the proposed Getty route would be within the ROW. These include 2 villages, 5 campsites, 2 bedrock mortars, 2 rock shelters, 4 historic sites, and 1 site of unknown description. No sites along this segment are listed on the National Register, however, two villages, one bedrock mortar site, and one historic site are considered eligible for inclusion; other sites require additional evaluation procedures. Thus, a significant impact to cultural resources could occur from pipeline construction.

4.2.11.2 <u>Emidio to Blythe</u>. Ten of the 86 known sites identified with 0.5 mile of the pipeline are located within the ROW of the proposed Celeron/All American pipeline. Two sites within the pipeline route are considered eligible for the National Register and others require additional evaluation procedures. Thus, a significant impact to these sites could occur from pipeline construction.

4.2.11.3 <u>Blythe to McCamey</u>. Thirty-four of the 144 known sites identified for Arizona within 0.5 mile of the Celeron/All American pipeline are located directly within the pipeline ROW. Although some sites have been evaluated others require additional evaluation procedures. One site within the ROW is considered to be eligible for the National Register. Thus, a significant impact to cultural resources could occur from pipeline construction.

Five of the 43 known cultural resource locations identified for the New Mexico segment of the pipeline are located directly within the pipeline ROW. None of the five sites have been determined to be eligible for nomination to the National Register at this time, although further survey and evaluation procedures are necessary. Significant impacts could occur.

In Texas, 5 of the 182 known cultural resource sites are located directly within the pipeline ROW. Only one site along the pipeline ROW (Huero Tanks State Park) is located within a National Register District. Five sites located directly within the proposed ROW are to be evaluated for eligibility. Currently no sites on the route are on the National Register.

4.2.11.4 <u>Summary</u>. In summary, at least 8 cultural resource sites along the Celeron/All American ROW and 4 sites along the Getty ROW are considered by the recorders to be eligible for listing on the National Register. In all states, further survey and evaluation procedures will be conducted prior to construction to determine National Register eligibility and the nature of applicable mitigation measures.

4.2.12  Visual Resources

Visual resources significance criteria based on both Forest Service and BLM impact assessment methodologies are presented below, followed by

a discussion of the visual effects for each segment of the Celeron/All American and Getty proposals. Impacts to visual resources caused by individual project facilities would be considered significant if:

- A proposed facility would not meet existing BLM Visual Resource Management Class Objectives or Forest Service Visual Quality Objectives for an area.

Impacts to visual resources caused by the combined effects of the project would be considered significant if:

- The visible area would change in overall character to a more impacted Visual Condition Type than presently exists, as seen from fixed viewpoints, based on BLM and Forest Service objectives, e.g., Existing Visual Condition is Type III and Future Visual Condition is Type IV.

The pipeline ROW would generally not be visually evident to people from nearby highways, roadside rest areas, parks, or recreation areas. Examination of various existing underground pipelines, which the Celeron/All American and Getty proposals would parallel, indicated that they would not be visually evident from nearby travel routes or use areas.

One area of exception to the above generalization is where the Celeron and Getty pipelines would cross the LPNF in Santa Barbara County. Here the ROW clearing would be visually evident from nearby roads and campgrounds. Clearing of mature live oaks and sycamores in La Brea Canyon, plus ROW clearing through uniform brushfields on the Sierra Madre Mountains, would create significant visual impacts. Elsewhere, as the pipelines would cross the LPNF in existing fire breaks, there would not be significant changes from existing to future visual conditions. Both existing and future visual conditions would not generally meet Forest Service visual quality objectives for the affected areas on the LPNF.

Except for those areas in the LPNF and a short segment near Tejon, California, the Celeron/All American pipeline would traverse mainly flat agricultural or desert lands. These areas have been discussed in detail in the Sohio DEIS (BLM 1976, p. 2-675). Where the pipeline traverses gentle slopes (less than 5 percent slope), observation of the pipeline scar would be limited laterally from 0.25 to 0.5 mile. Traversal of steeper slopes (over 5 percent slope) would expose the pipeline scar to potential observation from the surrounding landscape. Portions of Celeron/All American's proposed project involving aboveground facilities, such as pump stations and power line extensions would have greater exposure to observation from the surrounding landscape than the buried pipeline. Based on observations along Celeron/All American's proposed route, impacts from ROW clearing are not expected to be significant.

Tables 4-16 through 4-18 present a visual resources analysis of those impacts that would be created as a result of the construction of the above-ground facilities from California to Texas, and Table 4-19

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) described as **DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION (VOL. 3 OF 4)** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: *See* Attached Service List.

☒    BY ELECTRONIC MAIL TRANSMISSION WITH ATTACHMENT:  On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

☒    [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/Josie Cisneros*

Josie Cisneros

**SERVICE LIST**

Julie Teel Simmons, Esq.
David Pettit, Esq.
Talia Nimmer, Esq.
Center for Biological Diversity
2011 Franklin Street, Suite 375
Oakland, CA 94612

ATTORNEYS FOR PETITIONERS
CENTER FOR BIOLOGICAL DIVERSITY and
WISHTOYO FOUNDATION

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: jteelsimmonds@biologicaldiversity.org
dpettit@biologicaldiversity.org
        tnimmer@biologicaldiversity.org

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

ATTORNEYS FOR PETITIONERS
ENVIRONMENTAL DEFENSE CENTER, a
California non-profit corporation; GET OIL
OUT!, a California non-profit corporation;
SANTA BARBARA COUNTY ACTION
NETWORK, a California non-profit corporation;
SIERRA CLUB, a national non-profit
corporation; and SANTA BARBARA
CHANNELKEEPER, a California non-profit
corporation

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
        jfrankel@environmentaldefensecenter.org
        trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

ATTORNEYS FOR RESPONDENTS/
DEFENDANTS
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal;
Daniel Berlant, in his official capacity as State
Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
        benjaminhanelin@paulhastings.com
        natalierogers@paulhastings.com

Trevor D. Large, Esq.
FAUVER, LARGE, ARCHBALD & SPRAY
LLP
820 State Street, 4th Floor
Santa Barbara, CA 93101

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (805) 966-7000
Email: TLarge@FLASllp.com