# EXHIBIT CC

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | Case No. 25CV02244 |
| Petitioners and Plaintiffs, | [Coordinated with Case No. 25CV02247] |
| v. | Assigned for all purposes to: Hon. Donna D. Geck |
| CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al., | **DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION (VOL. 4 OF 4)** |
| Respondents and Defendants, | |
| and | [*Filed concurrently with Opposition to Preliminary Injunction; Declarations of Steve Rusch, Michael A. Mische, Brien Vierra, and Michael Rosenfeld*] |
| SABLE OFFSHORE CORP., et al., | |
| Real Parties in Interest. | Date:          July 18, 2025 |
| | Time:         10:00 AM |
| | Dept.:         4 |
| | Complaint Filed:      April 15, 2025 |
| | Trial Date:           None Set |

1

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

# VOLUME 4 OF 4 (EXHIBITS C PART 2 & D) TO DECLARATION OF BART LEININGER

# Exhibit C
# (Part 2)

TABLE 4-16

VISUAL IMPACTS:   LAS FLORES TO EMIDIO

| Site or Facility | Existing Visual Condition | Future Visual Condition | VQO (Forest Service) | Significant Impact |
|---|---|---|---|---|
| Celeron: Las Flores Pump Station | II | II | NA[1] | No |
| Celeron and Getty:  Gaviota Pump Station | II | VI | NA | Yes |
| Celeron: Santa Ynez River Crossing | V | V | NA | No |
| Getty:  Santa Ynez River Crossing | V | V | NA | No |
| Celeron: Sisquoc Pump Station | II | IV | NA | Yes |
| Getty:  Sisquoc Pump Station | II | II | NA | No |
| Getty:  Cuyama River Crossing | IV | IV | NA | No |
| Celeron:  Cuyama River Crossing | IV | IV | NA | No |
| Both Getty's and Celeron's Cuyama River Crossings | IV | IV | NA | No |
| Getty:  Cuyama Pump Station | III | IV | NA | Yes |
| Getty and Celeron: California Aqueduct Crossing | V | V | NA | No |
| Celeron and Getty: Emidio Delivery Station | VI | VI | NA | No |

Source:   ACT

[1] Not Applicable

4-89

TABLE 4-17

VISUAL IMPACTS:  EMIDIO TO BLYTHE

| Site or Facility | Existing Visual Condition | Future Visual Condition | VMC (BLM) | Significant Impact |
|---|---|---|---|---|
| All American: Emidio Heating/ Pumping Station | VI | VI | NA[1] | No |
| Tejon Pumping Station | II | II | NA | No |
| Twelve Gauge Lake Pumping Station | IV | V | IV | Yes |
| Mojave River Crossing | VI | VI | NA | No |
| Cadiz Tank Farm, Heating/ Pumping Station | IV | VI | III | Yes |

Source:  ACT

[1]Not Applicable

TABLE 4-18

VISUAL IMPACTS:  BLYTHE TO McCAMEY

| Site or Facility | Existing Visual Condition | Future Visual Condition | VMC (BLM) | Significant Impact |
|---|---|---|---|---|
| Colorado River Crossing | V | V | NA[1] | No |
| La Paz Heating/ Pumping Station | IV | V | III | Yes |
| Gila River Crossing | V | V | NA | No |
| Gila Heating/ Pumping Station | IV | IV | IV | No |
| Coolidge Heating/ Pumping Station | IV | IV | NA | No |
| Tom Mix Pumping Station | III | IV | NA | Yes |
| San Pedro River Crossing | III | III | NA | No |
| Hot Springs Heating/Pumping Station | IV | IV | NA | No |
| Lordsburg Heating/ Pumping Station | IV | IV | NA | No |
| Rio Grande River Crossing | V | V | NA | No |
| Anthony Heating/ Pumping Station | II | II | IV | No |
| Salt Flats Heating/Pumping Station | IV | IV | NA | No |
| Delaware River Crossing | IV | IV | NA | No |
| Pecos River Crossing | V | V | NA | No |

Source:  ACT

[1]Not Applicable

4-91

TABLE 4-19

VISUAL IMPACTS

PIPELINE RIGHT-OF-WAY ON LOS PADRES NATIONAL FOREST

| Site or Facility | Existing Visual Condition | Future Visual Condition | VQO (Forest Service) | Significant Impact |
|---|---|---|---|---|
| La Brea Canyon | III | V | Retention | Yes |
| (Both Celeron/All | IV | IV | | Yes |
| American and Getty | | | | |
| proposals) | | | | |
| | | | | |
| Ridgetop between | II | IV | Retention, Partial | Yes |
| Bear and La Brea | III | V | Retention, Modifi- | Yes |
| Canyons (Celeron/ | IV | V | cation | Yes |
| | V | V | | Yes |
| All American) | I | IV | Retention, Partial | Yes |
| | | | Retention, Modifi- | |
| | | | cation | |
| | | | | |
| North Fork | III | V | Retention, Partial | Yes |
| La Brea Creek and | IV | IV | Retention | Yes |
| Smith Canyon (Getty) | V | V | | Yes |
| | | | | |
| Treplett Mountain | V | V | Retention, Partial | Yes |
| area (Both Celeron/ | | | Retention | |
| All American and | V | V | Partial Retention | Yes |
| Getty proposals) | V | V | Partial Retention | Yes |
| | | | | |
| Miranda Pine | V | V | Retention | Yes |
| Mountain area | | | | |
| (Both Celeron/All | II | III | Partial Retention, | Yes |
| American and Getty | III | V | Modification, Maximum | Yes |
| proposals) | | | Modification | |

Source:   ACT

presents the analysis for the pipeline ROW as it crosses the LPNF in California. Additional detail on visual impacts within the LPNF can be found in Appendix E. Visual resource attributes assessed include Existing Visual Conditions (EVC) of the landscape, the Future Visual Condition (FVC) of the overall landscape after construction, and the Visual Quality Objective (VQO) or Visual Management Class (VMC) where applicable to either Forest Service or BLM standards.

In addition to the pumping/heating/delivery stations displayed in the above tables, visual impacts would also occur due to the extension of overhead electrical service to three pump stations: Sisquoc, Tejon and Cadiz. At each of these sites, slight visual impacts would occur due to the placement of 69 to 115 kV lines on wooden pole "H" frames. The poles would be either light tan or light green in color, depending on the preservative treatment used. The visual impacts of such a utility are generally acceptable unless the area is unroaded/ undeveloped, has high scenic value, or has high visual sensitivity. Given the settings for the proposed transmission lines, significant impacts are not anticipated.

The transmission line serving Sisquoc pump station (Celeron/ All American and Getty) could be located along one of three separate alignments. First, it could follow the pipeline route from Sisquoc pump station to US 101, then follow US 101 and Zaca Canyon Road to the Zaca Substation. Visual sensitivity is high along US 101, and the existing and future visual condition would be a minor visual disturbance (EVC = FVC = III). Second, the transmission line could proceed due west from the Sisquoc pump station along the Cat Canyon route, tying into an existing power line about 4 miles away. The existing and future visual conditions would be minor visual disturbances (EVC = FVC = III). Third, the transmission line could follow the proposed Santa Maria Canyon Alternative from the Cuyama River, approximately 12 miles south and east to the Sisquoc pump station. This connection is the greatest length and traverses woodlands, pastures and agricultural areas. The existing and future visual conditions would remain at minor visual disturbances (EVC = FVC = III). The visual sensitivity is moderate to low along this proposed alignment.

The Tejon pump station (Celeron/All American) would be served by a similar transmission line following the proposed pipeline from Emidio pump station. An area of visual sensitivity is along US 166, where there are existing overhead utility lines. This proposal would not affect the scenic/visual resources viewed from US 166, US 99, or I-5, where intensive agricultural uses and highways predominate the landscape character (EVC = FVC = V).

The Cadiz tank farm (Celeron/All American) would be served by a transmission line starting at Camino Substation near I-40 and following the existing Four Corners Pipeline Corridor to the tank farm site. This line would be about 37 miles long, and would lie entirely within existing utility corridors. The overhead line would be slightly visible from I-40 near Camino, but not visible from I-40 or US 66 for most of its length. The future visual condition would be minor visual disturbance (EVC = FVC = III) in an area of moderate to low scenic quality and low visual sensitivity.

Figures 4-1 through 4-6 are a series of three sets of "Before" and "After" pictures that respectively represent EVCs and a simulation of expected FVCs at three of the most visually sensitive pipeline locations crossing the LPNF (see Map 4-2). Table 4-20 summarizes the visual impacts associated with the above-ground facilities of the Celeron/All American and Getty proposals. As indicated on Tables 4-16 and 4-19, there would be five areas along the Las Flores to Emidio portion of the proposed routes where significant visual impacts would occur. Three would be associated with pump stations and the other two would be the Celeron/All American and Getty routes through the LPNF.

Between Emidio and Blythe (All American), two areas of significant impact were identified, a pump station and the Cadiz tank farm. Two proposed pump stations between Blythe and McCamey were also identified as significant visual impacts. A total of 7 significant impacts were identified for the Celeron/All American proposal and 3 significant impacts for the Getty proposal.

## 4.2.13  Noise

The impacts discussed for noise are classified as significant or not significant based on the degree of impact as measured against scientific and social (or human) criteria. The criteria that follow are derived from regulatory standards, research information, and/or standards based on best professional judgement of resource specialists. Noise impacts would be considered significant if:

- Adopted state or local standards would be exceeded, or

- Estimated noise emissions would exceed a day-night average sound pressure level ($L_{dn}$) of 60 dBA at the nearest noise sensitive receptor (California Office of Noise Control).

The more stringent standard was used for evaluation in all states.

### 4.2.13.1  Las Flores to Emidio

Construction. Noise effects from construction of both the Celeron/All American and Getty pipeline would be a function of the noise generated by construction equipment, the location and sensitivity of nearby land uses, and the timing and duration of the noise generating activities. Construction activities would, of course, occur throughout the length of the pipeline corridor. Machinery employed for a typical spread is itemized in Table 2-7. A typical noise generation profile for pipeline construction activity is illustrated in Appendix F.

The Las Flores to Emidio corridor segment contains numerous land uses that would be classified as noise-sensitive receptors (Table 3-23), including the Vista del Mar school at Gaviota; state parks; residential subdivisions, notably at Buellton; and numerous individual residences scattered along and sometimes adjacent to the proposed ROW corridor. The closest of these to the construction activity would be several residences that are located within 100 to 500 ft of the proposed pipeline, notably at Buellton.



**FIGURE 4-1    TYPICAL VIEW FROM LA BREA CANYON ROAD. EVC = III**



**FIGURE 4-2    PIPELINE THROUGH LA BREA CANYON AS VIEWED FROM LA BREA CANYON ROAD. FVC = V**

4-95



**FIGURE 4-3      TREPLETT MOUNTAIN AND MIRANDA PINE MOUNTAIN AS VIEWED FROM SIERRA MADRE ROAD. EVC = V&VI**



**FIGURE 4-4      PIPELINE CROSSING FROM TREPLETT MOUNTAIN TO MIRANDA PINE MOUNTAIN AS VIEWED FROM SIERRA MADRE ROAD. FVC = V&VI**



**FIGURE 4-5  SIERRA MADRE MOUNTAIN FRONT AND THE CUYAMA VALLEY, AS VIEWED FROM HIGHWAY 166. EVC = I&III**



**FIGURE 4-6  PIPELINE CROSSING SIERRA MADRE MOUNTAINS FROM MIRANDA PINE MOUNTAIN TO THE CUYAMA VALLEY, AS VIEWED FROM HIGHWAY 166. FVC = I&V**

SANTA MARIA CANYON
ALTERNATIVE

166

166

CELERON AND
GETTY PROPOSALS

C

MIRANDA PINE RD.

PINE RD.

SIERRA MADRE RD.

B

CELERON

GETTY

COLSON CANYON RD.

A

LOS PADRES
NATIONAL FOREST BOUNDARY

LA BREA CANYON RD.

CELERON AND
GETTY PROPOSALS

N

1    0    1    2    3
MILES

A - View point for figures 4-1 & 4-2
B - View point for figures 4-3 & 4-4
C - View point for figures 4-5 & 4-6

**MAP 4-2 VIEW POINTS FOR IMPACT ANALYSIS ON LOS PADRES NATIONAL FOREST**

4-98

TABLE 4-20

SUMMARY OF VISUAL IMPACTS ASSOCIATED WITH THE CELERON/ALL AMERICAN AND

GETTY PIPELINE PROPOSALS

| Site or Facility | Magnitude of Effects | Duration of Effects | Significant Impacts | Comments |
|---|---|---|---|---|
| Heating/Pumping Stations | Low | Long-term | Yes at some sites | Most stations would blend in or meet visual objectives. They would be permanent facilities. |
| Delivery Stations and Tank Farms (All American only) | High | Long-term | Yes | Most tank farms would be very visually evident, and would be permanent. |
| River Crossings | Low | Short-term | No | River crossing would be underground, and would be unnoticed after revegetation by fast-growing riparian plants. |
| Aqueduct Crossing | Low | Long-term | No | Aqueduct crossing above-ground would be evident, but not objectionable. |
| LPNF: Pipeline Corridors | High | Long-term | Yes | 100 ft. wide clearing would almost totally clear the canyon of trees. It would probably take 100± years to re-establish the large tree character which currently exists. Chaparral would become re-established in 5 to 10 years to the extent that visual impacts from ROW clearing would be greatly reduced. |

Source:   ACT

Applying the construction noise generation profile to the proposed corridor indicates that the nearest homes would be subject to pipeline construction noise levels in excess of 75 dBA. More than 100 homes between Las Flores and Emidio could be subject to construction noise levels of 60 dBA or greater, depending on detailed site conditions. This would be considered a significant impact.

Application of the final considerations of timing and duration, however, greatly reduces the significance of these noise effects on the homes and other sensitive receptors. Pipeline construction activities would take place only during the daytime, not during the more sensitive nighttime hours from 10:00 pm to 7:00 am when background noise is lower and most people sleep. In addition, the entire construction operation, from clearing and grading to cleanup and restoration, would move past a given location on the corridor in less than two weeks time.

Operations. Noise effects from operation of the proposed pipeline would be geographically isolated to the vicinity of the pump and heater stations. Using worst-case terrain assumptions of flat terrain with no barrier effects and no equipment directivity effects, pump station, noise emissions were modeled (see Appendix F). The results for the Las Flores to Emidio corridor segment indicate the only sensitive receptors that could be within a 60 dBA or greater pump station noise contour (and thus significantly impacted) would be the Vista del Mar school near the Gaviota station. Actual noise impact levels would depend on the placement of the pump station on the site and other site design features. A more detailed analysis of the composite noise effects of the proposed pipeline and other petroleum development facilities at Gaviota is included in the Getty Gaviota Consolidated Coastal Facility Draft EIR (ERT 1984). This analysis indicates that, although the noise levels at the school would be approximately 73 dBA, the increment added by the petroleum development activity would be a barely discernable 3 dBA. Most of the noise is already existing due to traffic on US 101. Although the incremental increase in noise caused by the pump station would be small and barely noticeable, it would be considered significant because the ambient conditions already exceed the 60 dBA significance criterion.

### 4.2.13.2  Emidio to Blythe

Construction. The Emidio to Blythe corridor segment contains numerous noise-sensitive land uses. Most are residences clustered in small communities along the corridor, including the towns of North Edwards, Desert Lake, Boron, Kramer Junction, and the City of Barstow. In addition, the proposed corridor passes near the California State Women's Prison and several unincorporated residential subdivisions and scattered individual residences.

Application of the construction noise generation profile indicates that numerous residences mostly in the communities listed above would be exposed to project-related construction noise levels of 60 to 65 dBA but that only a few would be subject to noise levels exceeding 65 dBA. This would be a significant impact.

The key consideration for construction noise effects along the Emidio to Blythe corridor segment, as for the Las Flores to Emidio segment, is that the noise effects would be short-lived and limited to the daytime hours of 7:00 am to 5:00 pm.

Operations. No noise sensitive land uses have been identified within the 60 dBA noise contour of any of the pump or heater stations along the Emidio to Blythe corridor segment.

### 4.2.13.3  Blythe to McCamey

Construction. The Blythe to McCamey corridor segment contains relatively few noise sensitive receptors for its more than 700-mile length. The key considerations are residential communities both incorporated and unincorporated. There are very few scattered individual residences near this segment of the corridor. The full list of identified sensitive receptors is included in Table 3-26. The most notable among them are residential developments in Pinal County, Arizona; the communities of Lordsburg and Deming, New Mexico; and the communities of Wink, Monahans, Crane, and McCamey, Texas, all of which have residential land uses very near the proposed pipeline corridor.

Application of the construction noise generation profile indicates that several residences are near enough to the proposed corridor that project-related construction noise could exceed 75 dBA during peak periods. Numerous other residences would fall inside the 60 dBA construction noise contour. This would be a significant impact. The Maricopa Indian Reservation would be the closest reservation to the proposed pipeline route (approximately 1 mile) and would not be subjected to significant noise levels because the 60 dBA noise contour extends only about 2,500 ft from the ROW.

As for the corridor segments discussed previously, a key consideration is that high project-related noise levels at sensitive receptors would be short-lived and limited to daytime hours (7:00 am to 5:00 pm).

Operations. No noise-sensitive land uses have been identified within the 60 dBA noise contour of any of the proposed pump or pump/heater stations along the Blythe to McCamey corridor segment.

4.2.13.4 Summary. Noise levels from construction activities would exceed the 60 dBA significance threshold at several residential locations along all three segments of the proposed pipeline corridor. The impacts would be limited to the daytime hours and would last for less than two weeks. It is assumed that proper mufflers would be used on all construction equipment and OSHA standards would be adhered to for the protection of workers. This combination would minimize the construction noise impacts to the degree possible considering the short duration of the adverse impacts plus the difficulty and low likelihood of success of further reducing noise emissions from transient construction activities. Noise levels from operation of the proposed pipeline would not exceed significance thresholds at any identified sensitive receptor except the Vista del Mar School near the Gaviota pump station.

## 4.2.14  System Safety and Reliability

The system safety and reliability analysis of potential adverse impacts from the Celeron/All American and Getty proposals is based upon a review of design specifications and project construction and operations procedures.  These documents were reviewed relative to compliance with pertinent regulations and industry standards.  The following significance criteria for impact analysis are based on accepted industry practice in the design and operation of hydrocarbon processing and transportation facilities.  Any one of the following conditions would result in a significanct adverse impact.

- Non-compliance with any applicable design code or regulation.

- Non-conformance to National Fire Protection Association (NFPA) standards at any location.

- Inadequate pressure relief and disposal system design criteria.

- Operating policies concerning security, leak detection, spill containment, or fire protection that do not conform to generally accepted industry practices.

There are three phases a project goes through between its conception and operation.  These phases along with major tasks within each phase are shown below.  As can be seen the Celeron/All American and Getty proposals are in Phase II which means final engineering design has not started.  This fact requires that many items discussed in the system safety section be reviewed only in a general manner.  Resulting mitigation measures may actually represent measures which would be covered in the final design when it is completed.

Phase I - Preliminary Design and Permit Application Preparation

- Select the pipeline route

- Develop a preliminary cost estimate based on preliminary project design

- Prepare project proposal documents for public agencies

Phase II - Permit Processing

- File for applicable permits

- Prepare EIR/EIS

Phase III - Final Design and Construction

- Once permits are forthcoming, begin detailed engineering by all disciplines

- Obtain ROW and/or ROW options

- Complete final design

- Review final design

- Receive final construction permits

- Construct pipeline, pump stations, and tank farm

- Review and inspect construction

The following discussions are by project component, facility, or procedure. Table 4-21 lists all the codes and standards applicable to the projects and notes if Celeron/All American and Getty would conform to the code or standard. After evaluation of each project application's specific components, facility, or procedure for these proposed plans, a conclusion is presented relative to potential impacts.

4.2.14.1    Pipeline and Tank Farm Design with Applicable Codes and Standards. Table 4-21 provides the principal facilities involved in the proposed pipeline projects and the codes and standards to which those facilities would be designed and constructed. Many important standards and specifications not listed are incorporated into the listed codes by reference. Getty and Celeron/All American have indicated that all applicable codes, standards, and regulations would be followed. The following discussions briefly summarize the analyses and rational for the presence or absence of impacts.

Seismic Design Criteria. Pipeline loads resulting from seismic activity fall into three categories:

- Loads resulting from ground acceleration and consequent response spectra of the pipeline

- Differential motion at surface faults

- A combination of the two categories above

Getty and Celeron/All American plan to evaluate every active fault to determine the effects of seismic activity on the pipeline (also refer to Section 4.2.2). Specific designs would then be developed to accommodate the expected effects of seismic activity. The designs would conform to the applicable stress criteria of American National Standards Institute (ANSI) B31.4. Design criteria would include, but not be limited to, internal design pressure, surge pressure, test pressure, vacuum, fluid inertia loads, temperature, external pressure (including overburden), and differential movement due to surface fault displacement, local liquefaction, or other loss of support.

There is a possibility that during the design process the projected seismic activity of a fault would be so large that there is no reasonable design solution. If this problem develops, the applicants have proposed to install control measures such as block and/or check

Table  4-21

## APPLICABLE CODES AND STANDARDS

| | ANSI B31.3 | ANSI B31.4 | API 650 | API 1104 | API 6D | NFPA 30 | NEC | EARTH QUAKE DESIGN | 49 CFR 195 | UBC FOR ZONE | ANSI A58.1 | AISC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pipeline | | C,A,G | | C,A,G | | | | C,A,G | C,A,G | | | |
| Pipeline Valves | | | | | C,A,G | | | | | | | |
| Pipeline Valve Locations | | C,A,G | | | | | | | C,A,G | | | |
| Hydrostatic Testing | | C,A,G | | | | | | | C,A,G | | | |
| Pumps | | | | | | | | | C,A,G | | | |
| Pump Station Piping | | C,A,G | | C,A,G | | | | | | | | |
| Pump Station Valves | | | | | C,A,G | | | | | | | |
| Tank Farm Piping | | A | | A | | | | | | | | |
| Tank Farm Valves | | | | | A | | | | | | | |
| Tank Farm Layout | | A | | | | | | A | | | | |
| Pump Station Layout | | C,A,G | | | | C,A,G | C,A,G | | | | | |
| Storage Tanks | | A | A | | | A | | A | | | | |
| Corrosion | | C,A,G | | | | | | | C,A,G | | | |
| Pressure Relief | | C,A,G | | | | | | | C,A,G | | | |
| Cathodic Protection | | C,A,G | | | | | | | C,A,G | | | |
| Security | | C,A,G | | | | | | | C,A,G | | | |
| Heaters | A | | | | | | | | | A | A | A |
| Scraper Launch & Rec. | | C,A,G | | | | | | | C,A,G | C,A,G | | |
| Structures & Buildings | | | | | | | | C,A,G | | C,A,G | C,A,G | C,A,G |

Index to Table

C-        Celeron Pipeline Company of California
A-        All American Pipeline Company
G-        Getty Trading and Transportation Company

Codes and Standards where only All American complies do not apply to Celeron or Getty due to their not having a tank farm or heaters.

<u>American National Standards Institute (ANSI) B31.3</u> Petroleum Refinery Piping

Prescribes minimum requirements for materials, design, fabrication, assembly, test and inspection of petroleum refinery pressure and vacuum systems.  Covers all piping within the property limits of a refinery, loading terminal, bulk plant, compounding plant or refinery tank farm.

<u>ANSI B31.4</u>  Liquid Petroleum Transportation Piping System

Prescribes minimum requirements for piping transporting liquid petroleum such as crude oil, condensate, natural gasoline, natural gas liquids, and liquid petroleum products between producers lease facilities, tank farms, gas processing plants, refineries, stations, terminals and other delivery and receiving points.

Table 4-21    (Continued)

American Petroleum Institute (API) 650 Welded Steel Tanks for Oil Storage

Specification covers material, design, fabrication, erection and testing requirements for vertical cylindrical above-ground, closed and open-top, welded steel storage tanks, for internal pressures approximating atmospheric. Appendix E of the code provides detailed procedures for designing for earthquake effects.

API 1104 Standard for Welding Pipelines and Related Facilities

Covers welding of piping used in compression, pumping and transmission of crude petroleum, petroleum products and fuel gases, and to applicable distribution systems. Also details qualification, testing and inspection of piping welds, including radiographic procedures.

API 6D Specification for Pipeline Valves

Specification covers material, design, fabrication, assembly and testing requirements for valves intended for service in petroleum, petroleum product, and natural gas pipelines.

National Fire Protection Association (NFPA) 30 Flammable & Combustible Liquids Code

Prescribes minimum standards of design and operation of equipment and facilities employed in the storage, handling and processing of flammable and combustible liquids.

Title 49, Code of Federal Regulations (49CFR) Transportation

The governing Code for the U.S. Department of Transportation, parent organization of the Office of Pipeline Safety. Parts 192 and 195 of the regulation relate to gas and oil piping respectively, and outline the minimum requirements for, materials, design, fabrication, assembly, construction, operation, inspection, testing and maintenance of pipelines transporting or storing hazardous gases and/or petroleum and allied products.

Uniform Building Codes (UBC) (Intern'l. Conf. of the Bldg. Offices)

Sets forth minimum standards for materials, design and construction of buildings and appurtenant structures. Has no intrinsic authority, but is generally incorporated into local building regulations which do have force of law. Section 73 prescribes procedures for wind and earthquake design.

ANSI A58.1 Minimum Design Loads for Buildings and other Structures

Similar to Section 23 of the Uniform Building Code, but provides more detailed procedures for wind and snow load design. Earthquake design procedures are virtually identical to UBC.

American Institute of Steel Construction (AISC)

The AISC publishes a number of specifications and recommended practices, the most notable of which are:

- Specification for the Design, Fabrication and Erection of Structural Steel for Buildings

- AISC Code of Standard Practice

- Specification for Structural Points Using ASTM A325 or A490 Bolts

These specifications are updated at regular intervals and are frequently incorporated into law by reference. AISC standards have been accepted as definitive by the steel industry and the engineering profession for many years.

Earthquake Design

This column is intended to show the intent of Getty, Celeron, and All American to evaluate every active fault crossing. This evaluation would be used in designing for the motions, forces, and resultant stresses generated by predicted fault activity along the pipeline right of way.

valves to minimize the volume of oil spilled from a failure. No violations of codes or standards were noted.

Corrosion Design Criteria and Corrosion Control Procedures. Protection of a pipeline from corrosion is of critical importance to the environment as well as the pipeline operator. Pitting of the pipeline can occur due to chemical reaction between the soil and the carbon steel pipe if it is not adequately protected. This pitting would eventually reduce the strength of the pipe sufficiently to cause a break and allow an oil leak. Therefore, Getty and Celeron/All American intend to wrap the pipelines in accordance with applicable regulations. Additionally, cathodic protection would be installed as required within 12 months of the pipeline installation dependent upon soil and chemical conditions. Corrosion control test stations would be installed with which to test the integrity of the corrosion protection. This is all in accordance with 49CFR-195.

Due to the low inlet concentrations of $H_2S$ (less than 15 ppm) and water allowed by the pipeline companies, internal corrosion is not anticipated to be a problem. During final design, detailed metallurgical studies would be conducted to confirm initial conclusions.

Pressure Relief and Relief Liquid Disposal System. Emergency shutdowns, valve closures, and other phenomena can cause the pressure in the pipeline to suddenly increase. This pressure must be relieved or the pipe could potentially burst. ANSI B31.4 guides the design of pressure relief systems. All applicants have incorporated pressure relief provisions into their respective pipelines as follows:

- Getty - pressure relief valves and disposal system at their terminus in the San Joaquin Valley.

- Celeron/All American - pressure relief valves and above-ground relief tanks at stations where elevation differences dictate (such as Emidio) as well as additional pressure relief devices and tankage as required at Cadiz, California and Wink, Texas.

On the basis of available information, the preliminary design appears adequate. Details and exact locations would be worked out during the final design phase of the project.

Control Logic and Soundness of Design for Leak Detection System. Getty and Celeron/All American have proposed to use a leak detection system using the volume balance method in conjunction with a mathematical pipeline model. This is a widely used and accepted method for leak detection in pipelines. Careful consideration must be given by all three companies to the setting of pipeline condition monitoring frequency and the short and long-term volume balance calculation periods. The short-term period is used to detect large leaks and the long-term period is used to detect small leaks. The response to the leak detection system is addressed in Section 4.2.15.

The supervisory control systems proposed, of which the leak detection system is a part, would have totally redundant computers and

peripheral equipment and would be equipped with uninterruptible power supplies. Additionally, all of the remote terminal units would be equipped with stand-by power. The proposed systems are considered to be state of the art for the petroleum industry.

Fire Control System. Getty and Celeron/All American have proposed fire control systems for the pump stations that are consistent with unmanned pump stations throughout the oil industry (see Appendix I for additional detail). The systems consist of fire extinguishers and heat sensors (fire detectors). The fire extinguishers would be available for use if company staff are in the station during the fire. The heat sensors would activate the automatic shutdown system for the pump station and alarm system. After the pump station is shut down, pipeline personnel would be required to travel to the station and investigate the situation before it can be restarted, since the design requires that restart from a shut-in condition can only be performed at the station.

The storage facility at Cadiz would have no fire protection system in addition to the equipment provided with the adjacent pump station (see Appendix I for additional detail). Floating roof oil storage tanks designed, installed, and maintained in conformance with Chapter 2 of NFPA 30 do not require fire protection. NFPA 30, Flammable and Combustible Liquids Codes, does require that the distance between the proposed storage tanks and the property line which is or can be built upon, be at least 175 ft. The proposed spacing is approximately 115 ft. Due to the small potential that anything else would ever be built at Cadiz, the apparent non-compliance with the code would not be considered significant.

All of the pipeline alignments and pump station locations have been selected to minimize impacts on human receptors. Pump stations to be installed at Emidio and Wink, while located near existing oil-related facilities, would be sited to conform with separation requirements of NFPA 30. The ROW is located sufficient distance from sensitive existing facilities such as schools, hospitals, and densely populated areas as to provide no significant impact during construction or operation.

Oil Spill Control Systems. Each applicant has included a series of block and check valves for control of the loss of oil in the event of a leak or rupture. Automated block valves are included at each pump station and at the Cadiz tank farm. Getty has also proposed automated block valves upstream (relative to oil side flow) of sensitive stream crossings and a check valve on the downstream side. Celeron/All American has a similar system and includes automatic block valves at sensitive locations. Current industry technology and standards are proposed by the Applicants.

4.2.14.2  Operating Procedures

Security Policies. The security systems proposed by Getty for their pump stations and pipeline block valves are as follows:

- 6-ft chain link fences topped with anticlimb barbed wire.

- Gates would be locked when station is unattended.

- A perimeter alarm system would be installed around pump stations which would sound a local alarm and an alert to the dispatcher. The dispatcher would then notify local law enforcement officers and company personnel.

- If access to the pump station is by private road, the gates at the road entrance would be locked at all times.

- The pipeline block valves would be padlocked independently of the fence gate lock.

Security for the pipeline itself would be provided by aerial reconnaissance at intervals not exceeding two weeks. This is in accordance with Section 451.5(a) of ANSI B31.4 to which the pipeline is constructed. Ground reconnaissance would be used by Celeron/All American to supplement the aerial reconnaissance only if the aerial reconnaissance indicates a need for it. The proposed security measures are typical for modern pipelines. Getty has increased it surveillance and included two aerial surveys per week plus one ground reconnaissance per year which is more intensive than DOT regulation and at the top of industry standards.

The security policies proposed by Celeron/All American for their pump stations are the same as for Getty. Pipeline block valves would be protected by a two-rail fence constructed of 2-inch pipe and would be padlocked. Policies proposed for the oil storage facility at Cadiz are the same as for pump stations.

Leak Detection Staff Procedures. Getty has proposed a detailed set of procedures to be followed in the event of a detected leak. These procedures define exactly who would be contacted and when. Different responses are designated for different potential events. The procedures provide clear responsibilities and lines of authority for the leak response team. These procedures are consistent with those used throughout the oil industry and appear to be adequate for handling any spills that may occur.

The Celeron/All American proposed procedures, although not as detailed, cover the same topics. Both projects are designed to be in accordance with EPA Regulation, Title 40, Article 112.

Fire Protection Staff Training and Procedures. Getty and Celeron/All American have all proposed fire protection staff training and procedures which are consistent with those typically used throughout the oil industry. Training would consist of classroom training on the extinguishment of fires with emphasis on oil fires. Hands-on training would also be given in the use of extinguishers and fire-fighting equipment. Management personnel would attend oil fire-fighting school at either the Western Oil and Gas Association school in Reno, Nevada or the Texas A&M school in College Station (Bryan), Texas. Historically, the training received at oil fire fighting schools have been a key

element in the operation of a safe petroleum facility.  Coordination procedures would also be developed, as per state law, between the local fire departments and the pipeline companies.

   4.2.14.2  <u>Summary</u>.  The review of the safety aspects of the proposed Celeron/All American and Getty applications indicates that the intent of the applicants is to build projects which comply with all applicable codes, regulations, standards, and generally accepted industry practices.  For this stage of design plans, the applications are in compliance with codes, regulations, and industry standards.

## 4.2.15  Oil Spill Potential and Effects

   The purpose of this assessment is to describe the risks and consequences of possible oil spills associated with the proposed projects.  Quantification of these risks and impacts requires: 1) estimates of the probability of an accident leading to an oil spill and possible spill magnitudes; 2) a description of exposure of potentially sensitive target areas to spilled oil; and 3) an assessment of the adequacy of proposed oil spill countermeasures to minimize the likelihood or severity of a spill, and emergency contingency plans to mitigate the impacts of a spill.

   The major assumptions that underlie the oil spill risk analysis include the following:

   • Past accident frequencies can be used to predict future accident frequencies.

   • Accidents are statistically independent and random and are sufficiently uncommon (especially major spills) that their probabilities may be described through a statistical relationship called a Poisson distribution.

   • Although it is not feasible to assess the risks of all foreseeable types and circumstances of oil spill incidents, the ranges of possible impacts can be estimated from analysis of selected individual oil spill scenarios.

   The impacts discussed for oil spill potential are classified as significant or not significant based on the degree of impact to sensitive resources.  The criteria that follow are derived from regulatory standards, research information, and/or the best professional judgement of resource specialists.

   • Oil spills are considered significant for any pipeline rupture or for any leak greater than 5 barrels.

   • During construction, any spills of fuels or lubricating oils into an active water course would be considered significant.

   4.2.15.1  <u>Historical Data</u>.  The available historical data for pipeline oil spills have been analyzed by various investigators in terms

of different "exposure variables".  In the present context, an "exposure variable" is a measureable (or countable) physical quantity which bears some direct and preferably simple connection to the production or transportation of oil, and which can be related to the statistical probability of an oil spill.  The exposure variables most commonly used to describe the risk of an oil spill from pipeline operations are:

- volume of oil handled, e.g., the probability of a spill is described in terms of number of spills per billion barrels provided or handled; and

- miles of pipeline operational per year, e.g., the probability of a pipeline spill is described in terms of number of spills per mile of pipeline operating per year.

Different investigators have emphasized one or another of these exposure variables according to the information they now have or expect to have available for risk prediction.  In the discussion below, historical accident statistics are presented using several exposure variables.  Where possible, specific information about the Celeron/All American and Getty projects are utilized in estimating spill probabilities (i.e., pipeline mile length and age).  Based on the conclusions of OIW (1978), this study selected pipeline mileage as the best exposure variable.  This variable allows an evaluation of all the available data for risk estimation.

4.2.15.2  <u>Pipeline Statistics</u>.  Table 4-22 shows the cause of U.S. pipeline accidents over the 5-year period from 1971 to 1975 (U.S. EPA 1982a).  As shown, pipeline faults, including defective pipe and corrosion, accounted for 56 percent of the spills and 53 percent of the volume spilled.  Internal corrosion is the largest cause of a spill due to pipeline fault and this is more characteristics of older pipelines which were constructed of different materials and did not have the cathodic protection systems proposed by Celeron/All American and Getty.  However, the spill size associated with corrosion is substantially smaller than a spill resulting from seam failure, the second largest source of pipeline fault spills.  In the category of impact damage, equipment impact is the largest cause of spills.  The largest volume of oil spilled is also attributed to equipment impacts.  The pipeline would be marked to DOT standards and with the state-of-the-art leak detection systems and automated block valves, damage from spills should be minimized.

Researchers for the Las Flores Marine Terminal Design Project found that the historical rate of oil spills from onshore pipelines has been estimated by numerous studies using pipeline mile-years as an exposure variable.  The Oceanographic Institute of Washington (OIW 1978) calculated spill rates based on U.S. Coast Guard Pollution Incident Reporting System (USCG PIRS) data for the period 1973-1977.  During this period, 1,580 spills >2.4 barrels (100 gallons) in size were recorded for a cumulative total of 728,000 mile-years of pipeline.  The inferred rate of spillage is $2.2 \times 10^3$ spills >2.4 barrels per pipeline mile-year.  The size distribution of oil spills stemming from accidents

TABLE 4-22

CAUSES OF PIPELINE OIL SPILLS BASED ON HISTORICAL U.S. STATISTICS[1]

| Cause | Percent of Spills | Percent Volume Spilled |
|---|---|---|
| **Defective Pipe** | | |
| Seam Failure | 12 | 25 |
| Weld Failure | 4 | 6 |
| Other | 1 | 4 |
| **Corrosion** | | |
| Internal | 31 | 12 |
| External | 8 | 6 |
| **Impact Damage** | | |
| Equipment Impact[2] | 31[2] | 26[2] |
| Excavation Equipment | 3 | 7 |
| **Non-Impact Damage** | | |
| Natural Causes[3] | 4 | 7 |
| Flow Control Error | 2 | 3 |
| Other Failure | 1 | 3 |
| **Other** | 3 | 1 |
| **TOTAL** | 100 | 100 |

[1]Source:  U.S. EPA 1982a

[2]This includes data for all pipelines, and equipment impact includes anchor dragging.

[3]"Natural causes" classification would include damage from earthquake.  Only 4 percent of spills occur from natural causes, which would include landslides, flood, etc., which may have been triggered by earthquake.  Data summaries by U.S. EPA (1982a) do not specifically break out earthquake related spills into a separate category.

to onshore pipelines has been evaluated by OIW and is shown in Table 4-23.  It must be noted that these figures are based on a U.S. pipeline nationwide average diameter of 10 inches.

TABLE 4-23

LAND PIPELINE SPILL SIZE DISTRIBUTIONS

| Spill Magnitude (barrels) | Number | Percent of Total Number | Volume (barrels) | Percent of Total Volume |
|---|---|---|---|---|
| 2.4-10 | 582 | 36.8 | 3,682 | 1.0 |
| 11-100 | 754 | 47.7 | 30,298 | 8.2 |
| 101-1,000 | 198 | 12.5 | 63,562 | 17.3 |
| 1,001-10,000 | 41 | 2.6 | 147,541 | 40.1 |
| 10,001-100,000 | 5 | 0.3 | 123,091 | 33.4 |
| TOTAL | 1,580 | 100.0 | 368,174 | 100.0 |

Source:  U.S. Coast Guard Pollution Incident Reporting System (OIW 1978).

Note:    Includes only spills or 2.4 barrels or more between 1973 and 1977.

U.S. EPA (1982a) reports the historical oil spill rate for pipelines as $1.3 \times 10^3$ spills per mile-year.  This spill rate refers to a "reference pipeline" that is 10 inches in diameter and 25 years old. The reference line is buried 3 feet deep and has corrosion protection.

Pipeline spill rates are known to vary as a function of age and size.  Figure 4-7 shows the mean spill size and line diameter for pipeline accidents reported to the Office of Pipeline Safety and Operations (OPSO) 1971-1975.  For 30 to 34-inch pipelines the mean spill size is around 6,000 barrels.  Mastandrea (1983) determined potential spill predictions specifically for the proposed Getty pipeline. Specifications in the Non Destructive Evaluation model included diameter, length, throughput, age, elevation, pressure, pump shutdown time, valve spacing and closure times, and spill prevention and counter-measures.

Since the Getty pipeline would be a new line and would be inspected prior to initial use, it is expected that the incidents of spills exceeding 50 barrels would be 0.04 spills per year or considerably below the national average of 0.2 spills per year ($1.76 \times 10^3$ spills/mile-year).  However, spill frequency is expected to reach the nationwide average in about 30 years with an annual incidence of spills of 0.2 per year ($1.6 \times 10^3$ spills/mile-year) along the 113 miles of pipeline



Source: Mastandrea 1982

NOTE: 1. Number adjacent to data point denotes number of spills making up mean.
2. Number in parentheses indicates pipe diameters in inches used in average.

**FIGURE 4-7   MEAN SPILL SIZE AND PIPE DIAMETER FOR ACCIDENTS REPORTED TO OPSO, 1971-1975**

(Mastandrea 1982).  Mastandrea's analysis is very conservative when the new pipeline design systems and materials are considered.  The Celeron/All American and Getty pipeline systems should not experience the corrosion problems which account for 39 percent of current spills. The quality assurance procedures for weld inspection and for the hydrostatic pressure testing will reduce the defective pipe incidents which account for 16 percent of the current spills.  Table 4-24 also provides a summary of the expected incidence of spills exceeding 9.5 barrels and 50 barrels for the proposed Getty and Celeron/All American pipelines.

4.2.15.3    Statistics for Onshore Storage Facilities.    The researchers for the Las Flores Marine Terminal Design Project found a historical rate of oil spills from onshore crude oil storage facilities has been estimated by OIW (1978) using storage volume (barrel-years) as the exposure variable.  The rate is based on the USCG PIRS data base covering the period 1973-1976.  During this period, there were 176 spills reported and a cumulative total of $6.98 \times 10^8$ barrel-years of oil stored.  This yields an average rate of about $2.52 \times 10^{-7}$ spills/barrel-year of storage.  The rate applies to spills >2.4 barrels in size.  A spill size frequency distribution of onshore storage facility spills was developed by OIW (1978) based on 176 incidents in the USCG PIRS data base.  The fraction of spills exceeding a specific volume is shown below.

### Volume Distribution on Onshore Storage

| Facility Spills[1]<br>Spill Volume in Barrels | Fraction of Spills<br>in this Size Class[2] |
|:---:|:---:|
| >10 | 0.642 |
| >100 | 0.148 |
| >1,000 | 0.011 |
| >10,000 | 0 |

[1]Estimates based on Table IV-2 of OIW 1978

[2]Fractions apply to the class of spills >2.4 barrels in size

Table 4-25 summarizes the estimated spill volume frequencies for Celeron/All American's proposed Cadiz tank farm which consists of three 500,000 barrel tanks.  Over the 30-year life of the project, estimated spills include 11.4 spills equal or greater than 10 barrels, 2.58 spills equal or greater than 100 barrels, and 0.225 spills equal or greater than 1,000 barrels (i.e., approximately 1 spill in 133 years greater or equal to 1,000 barrels).

4.2.15.4   Pipeline Spill Prevention.   Pipeline safety measures proposed by Getty and Celeron/All American include both leak avoidance and leak detection measures.  Leak avoidance measures include careful material and system design, adequate depth of burial, hydrostatic pressure testing, corrosion prevention and inspection, and block valve systems.  Complete descriptions of proposed spill prevention measures and maintenance procedures are presented in Section 2.2.

TABLE 4-24

CURRENT AND FUTURE PROBABILITIES OF SPILLS USED AS A BASIS FOR

AN "OVER LIFE OF PROJECT" ASSESSMENT

| Assumptions | Celeron Segment | Getty[1] | All American Segment |
|---|---|---|---|
| Diameter | 30-inch | 20- to 30-inch | 30-inch |
| Volume | 300,000 BPD | 400,000 BPD | 300,000 BPD |
| Length | 122 miles | 113 miles | 1,084 miles |
| Pipeline Life | 30-40 years | 30-40 years | 30-40 years |

Spill Incidents[2] (New pipeline 1984)

Spills greater than 50 bbl

| | | | |
|---|---|---|---|
| - Overall length of pipeline | 0.04 | 0.04 | 0.325 |
| - Each mile | 0.0003 | 0.0003 | 0.0003 |

Spills greater than 9.5 bbl

| | | | |
|---|---|---|---|
| - Overall length of pipeline | 0.08 | 0.08 | 0.758 |
| - Each mile | 0.0007 | 0.0007 | 0.0007 |

Spill Incidents (Pipeline 20 years old)

Spills greater than 50 bbl

| | | | |
|---|---|---|---|
| - Overall length of pipeline | 0.11 | 0.11 | 0.97 |
| - Each mile | 0.0009 | 0.0009 | 0.0009 |

Spills greater than 9.5 bbl

| | | | |
|---|---|---|---|
| - Overall length of pipeline | 0.22 | 0.22 | 1.95 |
| - Each mile | 0.0018 | 0.0018 | 0.0018 |

TABLE 4-24 (CONTINUED)

| Assumptions | Celeron | Getty[1] | All American |
|---|---|---|---|
| Spill Incidents (Pipeline 40 years old) | | | |
| Spills greater than 50 bbl | | | |
|   - Overall length of pipeline | 0.27 | 0.27 | 2.49 |
|   - Each mile | 0.0023 | 0.0023 | 0.0023 |
| Spills greater than 9.5 bbl | | | |
|   - Overall length of pipeline | 0.54 | 0.54 | 4.87 |
|   - Each mile | 0.0045 | 0.0045 | 0.0045 |

NOTES:

[1]Calculated specifically for the Getty pipeline by Mastandrea 1983; assumed 30 inch pipeline, 120 miles long.

[2]Other spill rates reported in the literature include:

| Probability | Source |
|---|---|
| 0.0022 spills/pipeline mile-year | OIW 1978; USCG PIRS data 1973-1977, spill greater than 2.4 bbl; all pipeline sizes and ages |
| 0.0013 spills/pipeline mile-year | U.S. EPA 1982a; 10-inch diameter pipeline 25 years old |
| 0.00176 spills/pipeline mile-year | National average - reported by Mastandrea 1983 |

TABLE 4-25

CURRENT AND FUTURE PROBABILITIES OF TANK FARM SPILLS

| Spill Volume (bbls) | Spills/Barrel Year of Storage | 1,500,000 bbl (3 tanks)/Barrel Year of Storage | Spills Over Life of Project (30 years) |
|---|---|---|---|
| $\geq 10$ | $2.52 \times 10^{-7}$ | $3.8 \times 10^{-1}$ | 11.4 |
| $\geq 100$ | $5.7 \times 10^{-8}$ | $8.6 \times 10^{-2}$ | 2.58 |
| $\geq 1,000$ | $4.9 \times 10^{-9}$ | $7.5 \times 10^{-3}$ | 0.225 |
| $\geq 10,000$ | 0 | 0 | 0 |

Source: OIW (1978)

The pipe would be 0.344 to 0.562-inch wall thickness for Celeron/All American and 0.5-inch wall thickness for Getty. The pipe would be buried a minimum of 3 ft deep and its location would be marked by signs to DOT standards. All stream crossings would be analyzed for 100-year scour depth and the pipeline would be buried 4 ft below that depth. In bedrock the pipe would be buried to a depth of 18 inches. A concrete coating would also be applied at underwater crossings and a double casing used at road crossings.

Before burial, the welds would be subjected to nondestructive tests including radiography (x-ray), magnetic particle inspection, and dye penetrant or ultrasonic tests. A minimum of 10 percent of the welds made by each welder each day would be radiographically inspected. Hydrostatic testing of the pipeline would be completed at a pressure 1.25 times (or greater) than the maximum operating pressures.

The corrosion protection system includes special pipe coating on the exterior and a cathodic protection system. The pipeline coating would be tested before burial. The cathodic protection system would be inspected and maintained at 6-month intervals.

Block valve and check valve systems would be installed at sensitive water crossings to minimize oil losses into streams should the pipeline fail or be damaged (see individual resource sections for discussions of oil spill impacts).

4.2.15.5    Oil Spill Contingency and Cleanup Plans.    Despite the engineering design, specifications, and safeguards built into a pipeline system, the potential for oil spills still exist and additional containment and cleanup measures must be addressed. The conceptual oil spill contingency plans reviewed for Getty and Celeron/All American incorporate procedures for responding to an oil spill. These procedures begin with personnel training, an established communications network, standard reporting system, and defined responsibilities and lines of authority.

Appendix H of this EIS/EIR contains a preliminary draft of the applicants' oil spill contingency plan. The preliminary draft oil spill contingency plan incorporates much of the general information found in

4-117

the applicants' conceptual plans. However, information that should be incorporated (by the applicants) into the final plan when final project design is complete, has been specifically identified. For example, the applicants have identified appropriate general containment and cleanup procedures (which are summarized below) but have not yet developed specific procedures for sensitive areas along the pipeline route. When final design is complete, the applicants will be required to develop specific procedures.

The actual containment and cleanup procedures adopted, after a leak has been detected and located, depend on whether the spill is in a confined (populated) or unconfined (rural) area. The first priority in a confined area is to ensure human safety, followed by appropriate containment and cleanup procedures. Containment and cleanup procedures utilized would depend on the size of the spill and surrounding terrain (flat terrain, steep slopes, depressions, streams or rivers, etc.).

On flat terrain, where oil would spread in all directions, dams or berms would be constructed around the perimeter of the spill. In steeper areas where the oil may spread by following natural drainages or water ways, the following techniques would be used to contain and divert oil:

- blocking dams
- underflow dams
- diversion dams
- overflow berms
- culvert blocking

Cleanup procedures would generally require removal of soil or other natural substrates that become contaminated with oil. The motor grader/ elevating scraper technique would be used for cleanup of relatively flat areas except where trees or heavy vegetation creates difficulties. Steep slopes or uneven terrain often require a bulldozer or front-end loader for sediment removal. Excessively steep or rough terrain may be cleaned using low pressure water flushing. This technique can also be used to remove oil from vegetation. On disturbed areas, reseeding and/or replasting would be undertaken as necessary to control erosion and return the area to a stable condition.

Oil which has formed pools in natural depressions or containment areas can be picked up with vacuum trucks. In less accessible areas, portable pumps discharging into barrels can be used. Sorbents may be used to remove small pools of oil, to clean light accumulations of oil from impervious surfaces, or to complete clean up. There are two techniques involving pumping that apply to oil spill cleanup of groundwater: water flooding (floation) and pumping oily water to the surface.

4.2.15.6 Federal and State Oil Spill Response Teams. In addition to individual operator contingency plans, Federal and state contingency plans and oil spill response teams are also in effect. These governmental levels of response and their relationship to Getty and All American/Celeron contingency plans in the event of a major spill

incident is described below. The conceptual contingency plans clearly address the responsibilities, interaction, and lines of communications between the applicants response teams and Federal and State response teams (Getty 1983c).

Federal Response. A Federal response is comprised of several different levels of repsonse. These are the National Response Team, National Strike Force, the Regional Response Teams and at the local level, the designated On-Scene Coordinator (OSC).

The Department of Transportation, U.S. Coast Guard, is responsible for the protection of coastal waters, the Great Lakes, and for ports and harbors. As such, the U.S. Coast Guard has established strike forces and Regional Response Teams to provide this protection. The southern California coastal area is the jurisdiction of the Pacific Strike Team, based in San Francisco. Within 2 hours of notification, the Pacific Strike Team can provide at least four trained personnel to the spill site at the request of the OSC, the Coast Guard or the commanding officer of the Strike Team.

The governing contingency plan for the southern California coastal region is the Region IX Multi-Agency Oil and Hazardous Materials Pollution Contingency Plan, subregional Plan for Zone One, Southern California. Zone One is contained within the jurisdiction of the 11th Coast Guard District, the commander of which serves as the OSC for all spills and is the key Federal official onsite. The Regional Response Team is under the direction of the OSC and is composed of the following knowledgeable agency officials: The Director of Surveillance and Analysis Division of the Regional Environmental Protection Agency, Commander of the U.S. Western Air Force Reserve Region; Director of the California Office of Emergency Services; and representatives from the U.S. Corps of Engineers, the 11th Naval District, 6th U.S. Army Headquarters, U.S. Fish and Wildlife Service, and Regional oil and Gas Division of the U.S. Geological Survey.

The onshore and inland spills are under the jurisdiction of the U.S. Regional EPA. Title 40, Part 112 requires a Spill Prevention and Control and Countermeasure Plan be submitted to EPA within six months after the facility begins operation. In the Plan the OSC coordinator and supporting agencies are identified for each segment of the pipeline.

In responding to a spill incident, the OSC will encourage the responsible parties to take the initiative in correcting the problem if they are able; if they are not, the OSC will activate the Regional Response Team, Pacific Strike Team and State Response Teams, as necessary. The OSC is responsible for the adquacy of the spill response operation and will maintain surveillance over operations until completed satisfactorily. For onshore and inland spills, the cleanup is supervised by the OSC but may be executed by a private contractor.

State Response. The State of California Oil Spill Contingency Plan provides for a coordinated response of State agencies to an oil spill. The plan designates a State Operating Authority (SOA) who will represent the state on the Federal Regional Response Team and have the authority

to declare an oil spill emergency requiring the activation of the State Contingency Plan.  A representative of the California Department of Fish and Game has been designated as the current SOA.

The State's organizational framework for response to a major spill is multi-level.  A State Support Team consisting of various State Department directors will authorize the SOA and administer a standing State Inter-agency Oil Spill Committee (SIOSC).  The SIOSC functions as a liaison with public and private oil pollution control organization, reviews the State Contingency Plan, and recommends research and development.  The SIOSC does not, however, have any direct-line authority during an oil spill.  The SOA appoints a State Agency Coordinator who will be in charge of all state agencies engaged in combating a pollution incident.  These agencies comprise the State Operating Team.  The State Agency Coordinator will also act in a capacity similar to that of the Federal OSC.

4.2.15.7  Potential Oil Spill Effects.  The proposed Celeron/All American and Getty pipelines would cross a variety of ecosystems between the California coast and Texas.  Along the route numerous resources are considered at risk from potential oil spill.  Table 4-26 summarizes areas along the pipeline route identified by resource specialists as being sensitive to an oil spill event.  Based on the locations of these sensitive areas, maximum spill size volumes were estimated for each area.  Factors such as elevation, location of check valves, and system shut-off response time were considered, if available, to calculate spill volumes.  The automatic shutdown system would generally reduce the amount of the spill by two to three times.  Potential impacts of spills at these sensitive areas are addressed in the individual resource sections of this document.  When final project design is completed, the applicants will be required to develop specific contingency and cleanup plans for these sensitive areas.

Probably the best documented case of an inland pipeline oil spill involved a pipeline rupture near Glenrock, Wyoming on April 8, 1980 (U.S. EPA 1982b).  The ruptured pipeline was owned by Platte Pipe Line Company.  An estimated 8,552 barrels of crude oil escaped into the North Platte River and contaminated approximately 60 miles of river from the spill site downstream to Glendo Reservoir.  The North Platte River oil spill site is located in east-central Wyoming, approximately 15 miles east of Casper, Wyoming.  The following is a summary of the damage caused, effectiveness of oil spill contingencies utilized, and the recovery observed.

Flow in the river at the time of the spill was 13,000 cubic feet per second (cfs), but was intentionally reduced at an upstream reservoir to 400 cfs to slow the downstream movement of oil until containment areas could be established.  Flow was then gradually increased and beached oil was refloated to downstream containment areas.  A total of 11 boom deployment/oil recovery points were established.  At each site, 6-inch diameter polyurethane pipe was deployed at a severe angle to the current.  The pipes diverted significant amounts of oil to the shore for vacuum truck recovery.  By April 20, most of the recoverable oil had been removed from the river.  According to Platte Pipe Line Company, of

TABLE 4-26

ESTIMATES OF POTENTIAL SPILL VOLUMES AT SENSITIVE OR POTENTIALLY HAZARDOUS
AREAS ALONG THE PIPELINE ROUTE

| | Celeron/All American (Automatic Shutdown) | | Getty (Automatic Shutdown) | |
|---|---|---|---|---|
| | (bbl) | (gal) | (bbl) | (gal) |
| Refugio Creek | 1,753 | 73,626 | NA[1] | NA |
| Gaviota Creek | 1,753 | 73,626 | 1,162 | 48,804 |
| South Branch Santa Ynez Fault[2] | 6,157 | 258,594 | 4,934 | 207,228 |
| Santa Ynez River | 3,244 | 136,248 | 2,240 | 94,080 |
| Sisquoc River | 2,620 | 110,040 | 3,120 | 131,040 |
| La Brea Creek | 1,753 | 73,626 | 2,023 | 84,966 |
| Cuyama River | 2,192 | 92,064 | 2,120 | 89,040 |
| San Luis Obispo/Kern County Line[2] | 8,370 | 351,540 | 3,160 | 132,720 |
| San Andreas Fault | 4,635 | 194,670 | 2,200 | 92,400 |
| Garlock Fault[2] | 5,465 | 229,530 | NA | NA |
| Mojave River | 3,945 | 165,690 | NA | NA |
| Colorado River | 3,506 | 147,252 | NA | NA |
| Gila River | 4,383 | 184,086 | NA | NA |
| Wild Cat Canyon Creek | 1,981 | 83,202 | NA | NA |
| Bass Canyon Creek | 3,068 | 128,856 | NA | NA |
| Rio Grande River | 2,629 | 110,418 | NA | NA |
| Pecos River | 4,821 | 202,482 | NA | NA |

Source:  Celeron/All American, and Getty

[1]Not Applicable.

[2]No valves at the crossing location.

the 8,552 barrels of oil released, approximately 6,500 barrels were recovered. The remainder evaporated or was dispersed into the environment.

The most damaging effects from this oil spill were short term and affected benthic invertebrates and terrestrial wildlife. Macroinvertebrates were almost completely destroyed and some 355 birds (mainly mallards and mergansers) and 33 mammals (primarily beaver, muskrat, and mule deer) died as a result of the spill. The invertebrates had completely recovered at most sampling and monitoring sites several months after the spill. No fish mortality was noted although disagreeable odors and taste occurred in some game fish species for about 2 months after the spill. Oil concentrations on the river surface exceeded the State limit of 10 milligrams/liter (mg/l) immediately after the spill (2.8 mg/l to 8,195.0 mg/l), but were below 10 mg/l within 7 days after the spill. Dissolved and/or emulsified oil in the water column never exceeded 10 mg/l.

Surveys of groundwater were conducted at 16 wells along the river system. The filtering action of sands and gravel was low and allowed oil inflow into some shallow wells (4 total) particularly the dissolved fraction. The contaminated wells were within 45 ft of the river bank, however, contamination was evident for only 24 hours. There was some oiling of the river sediment above background level (April 16) primarily near the river banks. As the river flow increased much of the oil was probably washed from the sediments. A direct correlation was found in the laboratory between water temperature and dissolved/emulsified oil.

Long-term effects of the spill included a slightly depressed muskrat population and Canada goose reproduction effort. Many nests of Canada geese were oiled, as were the eggs in all of the oiled nests. The result may have been smaller than normal brood sizes for this species in 1981.

The EPA damage assessment study demonstrated that though short-term impacts from a massive oil spill into an inland waterway can be severe, the ecosystem is resilient and can recover when aided by rapid and effective cleanup efforts. Of course, the severity and duration of the spill impacts would also depend on the nature of the spilled product and the environmental conditions prevalent at the time of the spill (e.g., temperature, river flow, etc.). Tradeoffs must often be made: in this case, when a reduction was made in the river flow rate to aid effectiveness of the oil spill booms, oil was deposited onto sediments near the river banks.

4.2.15.8 Summary. Assuming a 40-year project life, it is unlikely that any spills would occur for the 113-mile Getty and 122-mile Celeron pipeline segments. However, for the 1,084-mile All American segment, 4.87 spills greater than 9.5 barrels and 2.49 spills greater than 50 barrels have been projected. Any spills greater than 5 barrels would be considered significant; however, the duration and magnitude of impact and resources at risk would be dependent upon the locations of spill incidents, volumes spilled, and application of oil spill contingency measures.

Maximum possible spill volumes at stream or river crossings (given a pipeline rupture) would have significant impacts on environmental resources, but these impacts may be of short duration.

Tank farm spills greater than 100 barrels but less than 1,000 barrels would be likely to occur over an assumed 30-year life of project. However, these spills are unlikely to pose a risk to the environment due to containment within the diked and bermed tank farm area.

## 4.3  Santa Maria Canyon Alternative

### 4.3.1  Air Quality

Impacts to air quality would be the same as described for the Celeron/All American and Getty proposals.

### 4.3.2  Geology

The only potentially significant geologic hazards which may affect the Santa Maria Canyon Alternative route involve slope stability, and seismicity and faulting (see Table 4-4). As shown on Map 1-2, this route traverses areas characterized by existing slope failures or susceptible to new failures. The route crosses the Rinconada and south Cuyama faults of Quaternary age. On the basis of presently available information (Dibblee 1984, personal communication; ESA photointerpretation; Livingston and Associates, Moore and Taber 1979), the probability of surface rupture on these faults during the project life is judged very low.

The discussion of seismicity in section 4.2.2.1 is directly applicable to this alternative.

No other significant impacts or geologic hazards which could lead to an oil spill and consequent impacts have been identified for this alternative.

### 4.3.3  Soils

Impacts to soils would be similar to those discussed in Section 4.2.3.1. Short-term impacts would include accelerated soil erosion and deposition, decreased productivity from compaction, and increased soil slumping potential. Sensitive soil units along this alternative route are shown on Map 1-2 and are described in Table 4-5.

### 4.3.4  Surface Water

The Santa Maria Canyon Alternative would cross Tepusquet Creek and parallel the creek along a ridge on its north side. Impacts to Tepusquet Creek would include short-term sedimentation and potential oil spills. No municipal water supplies are near the proposed crossing. The likelihood of channel changes affecting the flow regime of Tepusquet Creek would be small. Impacts for crossing the Sisquoc and Cuyama Rivers would be the same as those discussed for the Celeron/All American and Getty proposals.

### 4.3.5  Groundwater

The Santa Maria Canyon Alternative would cross Tepusquet Creek near the mouth of Tepusquet Canyon.  Tepusquet Canyon is not listed as a sensitive groundwater area (see Table 3-14) because of limited aquifer extent and low degree of groundwater usage down gradient from the pipeline crossing.  The sensitive area of the Sisquoc River would be increased from 1.5 miles (Getty and Celeron proposals) to 2 miles for the Santa Maria Canyon Alternative to account for crossing Tepusquet Creek near its confluence with the Sisquoc River.

Approximately 7 miles of pipeline would be added to western Cuyama Valley in the Santa Maria Canyon Alternative.  This change in alignment would not be significant because the western part of the Cuyama Valley is cut into bedrock and is not an aquifer.

### 4.3.6  Aquatic Biology

Impacts on aquatic resources in Tepusquet Creek would be similar to those described for the Getty and Celeron proposals.  Since no important fish species occur in Tepusquet Creek, impacts would not be significant.

### 4.3.7  Terrestrial Biology

Impacts to vegetation and wildlife along this alternative route would be similar to those described for the Celeron/All American and Getty proposals (see Table 2-9).  Loss of wildlife habitat and individual small mammals would be short term and would not affect local or regional populations.  Losses of vegetative productivity would be short term (less than five years) for all communities except the riparian and oak woodlands.

About 126 acres of oak woodland, mixed with chaparral primarily in Suey Canyon, would be removed by clearing for pipeline construction.  Assuming natural regeneration would allow oaks to become established on the ROW, up to 70 years would be necessary for oaks to reach similar size and density (G. Smith 1984, personal communication).  Loss of the oak woodlands is considered a long-term impact.

About 19 acres of riparian woodlands would be removed by pipeline construction.  Loss of any riparian vegetation would be considered significant because this community is scarce in California.  Most of the affected riparian vegetation occurs along Tepusquet Creek.  The Santa Maria Canyon route has good access and room for construction to avoid riparian vegetation and mature live oaks.  The Sisquoc River crossing is devoid of riparian vegetation, and construction would not have a significant impact on terrestrial resources.

Pipeline construction would temporarily impact a small area (about 5 percent) of the key turkey habitat slated for turkey reintroductions; impacts would not be expected to be significant.  If construction occurred during the nesting season for prairie falcons and golden eagles, human presence could cause nest abandonment and reproductive failure for birds nesting on cliff faces near the route.  This would be considered a significant impact.

### 4.3.8  Socioeconomics

The impacts resulting from the Santa Maria Canyon Alternative would include an increase in the tax base of Santa Barbara and San Luis Obispo Counties. Table 4-27 shows the estimated valuation of the line, 1982 assessed valuation, and the percent increase. This does not represent a significant impact. No additional socioeconomic impacts would result from this alternative.

### 4.3.9  Land Use and Recreation

Agricultural and residential land uses along this alternative route, concentrated in Tepusquet Canyon, (see Table 3-23) would not be significantly impacted. Beyond Tepusquet Canyon the route passes through open space land and a 4.5-mile section of the LPNF. There are no sensitive land uses along this segment. Recreation use of the corridor is minimal and the routing avoids any FPAs. Future utilities could be accommodated within the cleared ROW through the use of special construction techniques.

### 4.3.10  Transportation

From a transportation analysis standpoint, the impacts of this alternative would be the same as those previously described for the Celeron/All American and Getty proposals. This alternative would cross the same federal and state highways as the Proposed Project and would be accessed in the same manner.

### 4.3.11  Cultural Resources

Three of the 14 sites identified within 0.5 mile of the Santa Maria Canyon Alternative route are located within the pipeline ROW. No sites along this route are listed on the National Register of Historic Places. However, further evaluation of some cultural resources is necessary to determine their significance. Thus, significant impacts to cultural resources could occur from pipeline construction.

### 4.3.12  Visual Resources

A visual resources analysis of those impacts that would result from the construction of a pipeline along the Santa Maria Canyon Alternative is presented below. The pipeline would be located on the ridge west of Tepusquet Canyon and would not be visible from Tepusquet Canyon Road. Where the pipeline crosses grassland and oak woodland, it would generally not be visible following construction and restoration. However, where chaparral is removed for pipeline construction, a scar would be visible until shrubs reinvade the ROW. The visual impacts associated with the pipeline as it crosses the LPNF (see Table 4-19) would be of high magnitude, long-term, and significant. Additional detail on impacts expected within the Forest is contained in Appendix E.

### 4.3.13  Noise

Noise impacts would be similar to those discussed for the Celeron/ All American and Getty proposals. A few residences near Tepusquet Creek

TABLE 4-27

PIPELINE CONTRIBUTIONS TO TAX BASE

| County | Miles | Estimated Valuation of Pipeline and Facilities (thousands $) | 1982 Assessed Valuation (thousands $) | Pipeline % of Total Countywide Assessed Valuation | 1982 Countywide Tax Receipts (thousands $) |
|---|---|---|---|---|---|
| Santa Maria Canyon Alternative (Getty) | | | | | |
| Santa Barbara | 38.5 | 25,373 | 8,958,231 | 0.28 | 97,853 |
| Desert Plan Utility Corridor Alternative | | | | | |
| San Bernardino | 112 | 71,344 | 19,950,620 | 0.04 | 242,312 |
| Riverside | 79 | 38,826 | 18,567,137 | 0.02 | 217,465 |
| Brenda Alternative | | | | | |
| La Paz/Yuma | 63 | 11,447 | 259,329 (primary) 284,180 (secondary) | 4.4 (primary) 4.0 (secondary) | 4,028 |

Source:   ERT

| Site | Existing Visual Condition | Future Visual Condition | VQO (FS) | Significant Impact |
|---|---|---|---|---|
| On ridgetop and midslopes east of Cuyama River | I | III | Partial Retention | Yes |
| | I | V | Partial Retention | Yes |
| | III | III | Partial Retention | No |
| | III | V | Partial Retention | Yes |
| | V | V | Modification | Yes |
| At Highway 166 | V | V | Retention | No |
| | VI | VI | Retention | No |
| Crossing western tip of Sierra Madre Mountain | I | V | Partial Retention, Retention | Yes |
| Crossing Sierra Madre Road | V | V | Retention | Yes |
| Cuyama River Crossing (outside LPNF) | III | III | NA[1] | No |

[1]Not Applicable

and the Cuyama River would be subjected to elevated noise levels during pipeline construction. This would be a short-term significant impact.

### 4.3.14  Oil Spill Potential and Effects

This alternative would not change the expected incidence of spills from the Celeron/All American and Getty proposals (Section 4.2.15).

### 4.4  Desert Plan Utility Corridor Alternative

### 4.4.1  Air Quality

Emissions and air quality impacts resulting from operation of the Essex pump station would be the same as described for the Cadiz tank farm in Section 4.2.1.2 (also see Air Quality Appendix A, Table A-11). The maximum 24-hour TSP concentration is estimated to be 4.2 $\mu g/m^3$ at the Joshua Tree National Monument which is the nearest Class I area (located approximately 1 mile from the pipeline). The maximum 3-hour $SO_2$ concentration is 2.1 $\mu g/m^3$ at the nearest point of the national monument. Thus, no significant impacts are expected in the Class I area.

## 4.4.2  Geology

The discussion of impacts and geologic hazards in Section 4.2.2.2 is applicable to the this alternative route.  In regard to the known mineral resources and possible future mineral development discussed in Section 3.4.2, implementation of local re-routing or re-design would allow access to federally-controlled resources.

## 4.4.3  Soils

Impacts to soils would be comparable to those described for the Mojave Desert in Section 4.2.3.  Major impacts would include accelerated soil erosion and deposition, and decreased productivity from compaction. Sensitive soil units along this alternative pipeline are shown on Map 1-2 and outlined in Table 4-5.

## 4.4.4  Surface Water

Impacts to surface water would be the same as described for the Celeron/All American proposal.  No other major water courses would be crossed by this alternative.  No additional surface water impacts would be expected.

## 4.4.5  Groundwater

This alternative would not be significant in terms of groundwater impacts because of large depths to groundwater, poor water quality, and very limited groundwater development in these basins.  Impacts would be similar to those described for the Celeron/All American proposal.

## 4.4.6  Aquatic Biology

Impacts to aquatic resources in the intermittent streams crossed by the Desert Plan Utility Corridor Alternative would be similar to those described in the Celeron/All American Proposal.  Because no important fish species occur in these streams, impacts would not be significant.

## 4.4.7  Terrestrial Biology

Impacts along this alternative route would be very similar to those described for the Celeron/All American proposal.  Both routes follow the desert floor along existing corridors and have similar resources. Primary impacts include removal of creosote scrub communities (2,350 acres), potential disturbance to nesting raptors, and direct or indirect loss of individual desert tortoise.  This alternative would also remove 100-ft sections of ironwood and paloverde in desert washes.

Significant impacts to desert bighorn sheep would be considered unlikely since they use habitats in mountainous areas at higher elevations than those potentially affected by the pipeline.  Although the route would cross historical migration routes for bighorn, these routes are very large and are used only when bighorn are forced to move to new areas as a result of environmental stress (e.g., drought, overpopulation).  Given the short period of time necessary for construction through these areas (less than a month), it is unlikely

migrating bighorn sheep would be encountered.  Many of these corridors already contain existing paved roads and human activity which present more of a barrier to sheep movement than short-term pipeline construction (Foreman 1984, personal communication).

The Desert Plan Alternative could impact a population of California ditaxis (a federal candidate species) in the Ford Dry Lake area.  These areas, because of their small size, could easily be avoided by centerline adjustments.  The Chuckwalla Valley Dune Thicket ACEC is on the south side of I-10 near Desert Center and could be impacted.  This is very important habitat for mule deer and resident breeding birds.

## 4.4.8  Socioeconomics

The impacts resulting from the Desert Plan Alternative would include an increase in the tax base of San Bernardino and Riverside Counties.  Table 4-27 shows the estimated valuation of 191 miles of pipeline, one electric pump station with heater, one delivery station, and one tank farm; 1982 assessed valuation, and the percent increase. This does not represent a significant impact.

Housing impacts for this alternative are similar to the proposed route for the first half of the pipeline construction.  The second half of the pipeline is within close proximity of I-10 and within commuting distance of several service communities.

## 4.4.9  Land Use and Recreation

This alternative would generally avoid irrigated cropland and residential areas.  Potential conflicts with these sensitive land uses are minimal, except in the Blythe area where irrigated cropland and scattered rural residences are located.  Urban growth patterns would not be permanently altered.  No developed recreation facilities or unique recreation resources would be affected by the alignment.

The proposed ROW is within a utility corridor designated by the BLM in their Desert Conservation Area Plan.  This corridor is also consistent with the San Bernardino County Joint Utilities Management Plan and utility corridors identified in the Riverside County Comprehensive Plan.

Approximately 2.3 miles of the Coxcomb Mountains BLM WSA would be crossed by this alternative.  There is an existing electric transmission line parallel to the proposed pipeline ROW that delineates the BLM utility corridor.  The major effect of a pipeline on the WSA would be from construction of a new access roadway.  See Appendix D for a detailed description of potential effects on the WSA.  Current BLM management policy does not permit establishment of a new ROW in a WSA, therefore, it is considered a significant impact.

Near Granite Pass the ROW passes adjacent to a BLM ACEC known as Patton's Camp.  If structures were avoided, the ROW should not present significant adverse effects.  The proposed ROW would cross the corner of the Alligator Rock ACEC near Desert Center (see Map D-2).  This areas' unique archaeological resources would not be disturbed by the project.

The Chuckwalla Valley Dune Thicket ACEC is located about 10 miles west of Blythe to the south of I-10. This area, as described in Section 4.4.7, will not be significantly affected by the proposed ROW.

### 4.4.10  Transportation

The Desert Plan Alternative would parallel existing pipelines and electric transmission lines. This alternative would cross the same federal and state highways as the proposed pipeline, except that I-10 would be crossed an additional time to the west of Blythe, California. The impacts to transportation would be the same as the Celeron/All American proposal except for this additional crossing of I-10.

### 4.4.11  Cultural Resources

Three of the 21 sites identified along the Desert Plan Utility Corridor alternative route are located within the pipeline ROW. One historic site has been nominated to the National Register with final determination still pending. Two other sites within the pipeline ROW are considered to be eligible for inclusion. Since the sites mentioned above are currently considered eligible for the National Register, disturbance by pipeline construction would represent a significant impact to cultural resources.

### 4.4.12  Visual Resources

A visual resources analysis of those impacts that would result from the construction of a pipeline along the Desert Plan Alternative are summarized below. Impacts of a transmission line to the Essex Tank Farm would be the same as those discussed for the proposed tank farm (the same route would be utilized) and would not be significant.

| Site or Facility | Existing Visual Condition | Future Visual Condition | VMC(BLM) | Significant Impact |
|---|---|---|---|---|
| Essex Tank Farm and Heating/Pumping Station | IV | VI | IV | Yes |

### 4.4.13  Noise

No significant noise impacts have been identified for the Desert Plan Alternative because there are no sensitive receptors near the route.

### 4.4.14  Oil Spill Potential and Effects

The Desert Plan Utility Corridor Alternative would have a probability of a spill of 0.35 spills per year (new pipeline and spill greater than 50 barrels) and 2.68 spills per year (pipeline 40 years old and spill greater than 50 barrels).

## 4.5  Brenda Alternative

### 4.5.1  Air Quality

Impacts to air quality would be the same as discussed for the Celeron/All American proposal.

### 4.5.2  Geology

.No significant impacts, or geologic hazards which could cause an oil spill and the resulting impacts, would be anticipated on the Brenda Alternative route.

### 4.5.3  Soils

Impacts to soils would be similar to those discussed in Section 4.2.3.  Major impacts would include accelerated soil erosion and deposition, and decreased productivity from compaction.  Sensitive soil units along this alternative route are shown on Map 1-2 and described in Table 4-5.

### 4.5.4  Surface Water

No major water courses would be crossed by this alternative, so surface water impacts would not be expected.

### 4.5.5  Groundwater

Potential for significant groundwater impacts would increase slightly with this alternative.  Crossing of the sensitive La Posa groundwater basin would increase from approximately 10 miles along the proposed route, to 12 miles for the Brenda Alternative.

### 4.5.6  Aquatic Biology

Because no perennial or larger intermittent streams are located along the Brenda Alternative route, there would be no impacts on aquatic resources.

### 4.5.7  Terrestrial Biology

The Brenda Alternative route segment is 63 miles long and parallels existing pipeline ROW for about 60 percent of its length.  This alternative would affect similar resources as the proposed route including commercial cactus, desert tortoise, and desert bighorn sheep. Commercial cactus species would be removed and salvaged as described for the Celeron/All American proposal and impacts would not be considered significant.  Impacts to wildlife would be similar to those described for the Celeron/All American proposal with the exception of impacts to desert bighorn sheep.  The Brenda Alternative route would not cross any migration corridors, watering holes, or lambing areas.  However, it would come within one-quarter mile of the Lazarus tank lambing ground north of Interstate 10.  Construction blasting through the Plumosa Pass area could adversely affect lambing ewes if construction occurred during

4-131

the lambing season. Construction is not expected to adversely affect sheep at Lazarus tank about 2 miles from the proposed route. Interstate Highway 10 is currently a major barrier to sheep movement in the Plumosa Mountains, therefore, a pipeline following the interstate should not affect sheep movements. The route passes near the Black Mesa rutting grounds, but impacts should not be significant because the route does not occur on the actual grounds and considerable elevation differences exist between the route and the rutting areas.

### 4.5.8  Socioeconomics

The impacts resulting from the Brenda Alternative include an increase in the tax base of La Paz County, Arizona. Table 4-27 shows the estimated valuation of the line, 1982 assessed valuation, and the percent increase. This does not represent a significant impact. No additional socioeconomic impacts would result from the Brenda Alternative.

### 4.5.9  Land Use and Recreation

No agricultural or residential land uses occur along this alternative. The Kofa NWR and New Water Mountains WSA #125 would not be crossed by this alternative. No significant impacts are projected to occur.

### 4.5.10  Transportation

This alternative would have the same impacts on transportation systems as the Celeron/All American proposal, with the exceptions of two crossings of I-10 east of Quartzsite. These crossings would cause no change in traffic flow along I-10.

### 4.5.11  Cultural Resources

Three known sites are located directly within the proposed ROW; however, none of these sites are considered to be eligible for the National Register. However, additional sites may exist which are significant, and thus, significant impacts to cultural resources could occur along this route.

### 4.5.12  Visual Resources

There would be no major above-ground facilities or major river crossings in the Brenda Alternative. Only block valves, which would not have a significant visual effect, would be present. Therefore, the visual environment of the Brenda Alternative would not be significantly affected by the Celeron/All American proposal.

### 4.5.13  Noise

Noise impacts would be similar to those discussed for the Celeron/ All American proposal with the exception that residences on the south end of Quartzsite would be subjected to elevated noise levels during pipeline construction. This would be a short-term significant impact.

4-132

### 4.5.14  Oil Spill Potential and Effects

The probability of a spill with the Brenda Alternative would be essentially the same as for the Celeron/All American proposal.

### 4.6  McCamey to Freeport Alternative

#### 4.6.1  Air Quality

Air quality impacts for the McCamey to Freeport Alternative would be similar to those described for the Blythe to McCamey segment of the Celeron/All American proposal.  The summary of maximum short-term impacts resulting from the construction of the alternative pipeline is found in Table 4-28.  High background concentrations, in violation of Texas and federal standards, produced predicted violations for CO.  As in the prior pipeline construction analyses, the contribution of the construction emissions from this alternative would account for less than 1 percent of the total CO concentration.  The nearest ambient CO monitoring station is located in San Antonio, nearly 30 miles away. Since the major contributors of CO emissions are automobiles, the maximum background values at the pipeline are expected to be much less. Since the construction emissions for CO would occur for only a short time in any one area, it again would be unlikely to have the maximum ambient concentrations and maximum construction concentrations occur simultanteously.  In addition, since the construction emissions are temporary and transient, the Texas Air Control Board would not consider the CO concentrations as significant impacts (Willis 1984, personal communication).

The operation of the McCamey to Freeport Alternative would consist of five pumping/heating stations.  The majority of emissions would be $NO_x$ from the natural gas firing of the heaters.  CO and HC would also be emitted with only a trace of TSP and $SO_2$ emissions.  Due to the source configurations, maximum modeled impacts occurred approximately 100 yards from the source.  The summary of maximum projected concentrations can be found on Table 4-28.  The maximum predicted annual $NO_2$ concentration at the pump stations of 46 $\mu g/m^3$ would be well under the standard of 100 $\mu g/m^3$.  Again, no significant air quality impacts from CO, $SO_2$, or TSP would be generated from the operation of pump stations along this alternative.  Maximum project concentrations for $SO_2$ and TSP for all averaging times were below 1 $\mu g/m^3$.  The maximum predicted 1 and 8-hour CO concentrations were 21.9 and 10.9, respectively.  These are 0.1 percent or less of their respective Texas and federal standards.

#### 4.6.2  Geology

Geology and Physiography.  Impacts would generally be the same as discussed in Section 4.2.2.1 for the Celeron/All American proposal. Some areas of extensive cuts and fills may be encountered on the Edwards Plateau where widening of the existing ROW may be necessary.

Seismicity and Faulting.  There is relatively low risk of seismic or fault activity during the life of the project along this alternative

4-133

TABLE 4-28

SUMMARY OF AIR QUALITY IMPACTS FROM CONSTRUCTION AND OPERATION

McCAMEY TO FREEPORT ALTERNATIVE

| Pollutant | Maximum Project Concentration ($\mu g/m^3$) | Maximum Background Concentration ($\mu g/m^3$) | Total Ambient Concentration ($\mu g/m^3$) | Texas/ Federal Standard ($\mu g/m^3$) |
|---|---|---|---|---|
| Construction | | | | |
| $SO_2$ | | | | |
| 24-hour | 1.6 | 27 | 28.6 | 365 |
| TSP | | | | |
| 24-hour | 7.6 | 217 | 224.6 | 260 |
| CO | | | | |
| 1-hour | 100.8 | 22,000 | 22,101 | 40,000 |
| 8-hour | 83.1 | 12,000 | 12,083 | 10,000 |
| Operation | | | | |
| $SO_2$ | | | | |
| 24-hour | 0.05 | 27 | 27 | 365 |
| $NO_2$ | | | | |
| Annual | 7.1[1] | 39 | 46 | 100 |
| TSP | | | | |
| 24-hour | 0.1 | 217 | 217 | 260 |
| CO | | | | |
| 1-hour | 21.9 | 22,000 | 22,022 | 40,000 |
| 8-hour | 10.9 | 12,000 | 12,011 | 10,000 |

Source:   ERT

[1]Based on worst-case concentration between Blythe and McCamey. Concentrations between McCamey and Freeport are expected to be similar.

route.  The potential for fault re-activation due to oil field pumping in the coastal plain is unknown.

Slope Stability.  It is assumed that the existing ROW paralleled by this alternative has been stabilized; however, there is some risk of slope instability along the route, particularly in the Balcones Fault Zone, characterized by steep terrain.  The depth of pipeline burial and utilization of erosion control measures should minimize these risks.

Subsidence.  Subsidence due to fluids withdrawal may occur along portions of the Gulf Coastal Plain.  Although ground surface offsets may expose short sections of the pipeline over time, the strength of steel pipe is sufficient to prevent rupture until the problem can be corrected during routine maintenance.  In general, the changes in grade over the coastal plain are such that adverse effects on the pipeline are not anticipated.  Offsets directly beneath rigid facility structures at the pump stations could result in more serious damage if not discovered early on during maintenance checks.

Karstic Terrain.  Potential effects on the pipeline from karstic terrain on the Edwards Plateau are similar to those discussed in Section 4.2.2.3 for the Celeron/All American proposal.

Paleontology.  Potential effects to paleontological resources from McCamey to Freeport are similar to those discussed under Section 4.2.2.3 for the Blythe to McCamey segment.

Mineral/Petroleum Resources.  Potential effects to mineral or petroleum resources for the McCamey to Freeport portion are similar to those discussed in Section 4.2.2.3 for the Blythe to McCamey segment.

4.6.3  Soils

Impacts to soils resulting from construction activities would include accelerated soil erosion and deposition, and decreased productivity from compaction and horizon mixing.  With the implementation of measures contained in the CU plan, these impacts are not expected to be significant.  Soil loss from water erosion would be accelerated by construction especially in the steeper slopes of the Edwards Plateau area.  Compaction and soil horizon mixing impacts from construction activities would decrease soil productivity, especially in the irrigated cropland areas characterized by clayey textures and wetness.  The predominance of shallow soils, high shrink-swell soils, and highly productive irrigated croplands make the soils along the entire McCamey to Freeport route sensitive.

Sensitive soil units along the McCamey to Freeport pipeline route are described in Table 4-29.  These areas are considered sensitive based on the following characteristics which are major potential problems associated with erosion control and revegetation.

- Irrigated cropland (e.g., Brazoria, Wharton, Colorado, Lavaca and Fort Bend Counties of the Texas rice belt area).

Case 2:26-cv-05242-SVW-SSC    Document 25    Filed 05/14/26    Page 52 of 703   Page ID #:11900

TABLE 4-29

MAJOR SENSITIVE SOIL UNITS, McCAMEY TO FREEPORT

| Symbol | Location | Sensitive Characteristics | Significant Risks | Representative Soil Series |
|---|---|---|---|---|
| S35 | Edwards Plateau (Pecos to Comal Counties) | Depth to rock, slope, stoniness, high shrink-swell potential | Revegetation, water erosion | Tarrant, Tobosa, Ector |
| S36 | Blackland Prairie and Claypan Area (Guadalupe to Lavaca Counties) | High shrink-swell potential, wetness | Revegetation, compaction | Houston Black, Burleson, Crockett, Lufkin, Axtell |
| S37 | Coast Prairie (Colorado to Brazoria Counties) | High shrink-swell potential, wetness, irrigated cropland, occasional flooding | Revegetation, compaction, disruption of highly productive rice cropland (Texas Rice Belt) | Katy, Clodine, Norwood, Pledger |

Source:  ERT

- Shallow soils, steep slopes (e.g., Edwards Plateau area).

- Claying, high shrink-swell areas (e.g., Comal, Guadalupe, Lavaca, Colorado, Wharton, Fort Bend, Brazoria Counties).

Significant short-term (one to two years) impacts would result from oil pipeline leaks and ruptures. The agricultural lands of Brazoria, Wharton, Colorado, Lavaca, and Fort Bend Counties would be the most sensitive to oil spills. The clayey soils of Canal, Guadalupe, Lavaca, Colorado, Wharton, Fort Bend, and Brazoria Counties are prone to high shrink-swell conditions which could create revegetation and pipeline instability problems.

## 4.6.4  Surface Water

Potential significant impacts to surface water resulting from the construction and operation of this alternative would be similar to those discussed under the Proposed Project.

## 4.6.5  Groundwater

Along the 280 miles of sensitive groundwater basins crossed by the alternative pipeline route, significant impacts could occur in the event of oil spills or leaks during operation of the pipeline. The most highly sensitive area is where the pipeline crosses the recharge zone of the Edwards limestone aquifer west of New Braunfels. In open fractures and solution cavities in limestone, contaminants can move much faster and for greater distances than in porous aquifers. This means that contamination from a point source may affect a greater area but also that the aquifer would be purged of contaminants in a shorter time than for a porous aquifer.

Impacts similar to those described for the proposed project would result from oil spill or leaks in the sensitive groundwater basins along the remainder of the route. Aquifer units include porous bedrock, fractured bedrock, stream alluvium, and coastal plain sediments.

## 4.6.6  Aquatic Biology

Construction. Primary impacts on the aquatic environment resulting from construction activities during low flow in the summer would be similar to those described for the Celeron/All American proposal. These include substrate removal, increased sedimentation, and habitat alteration. These impacts would result in temporary reductions in plant (algae and macrophytes) and benthic macroinvertebrate abundance, and displacement and possible reduction in resident fish populations, but are not expected to be significant. No critical fountain darter or San Marcos gambusia habitat would be altered during construction. Sufficient information is not available to determine whether critical habitats for Rio Grande darter, river darter, proserpine shiner, or blue sucker would be altered during construction. The river darter would appear to be less affected by increased sedimentation during construction activities than other darters, since they are relatively tolerant of turbidity (Appendix B, Table B-2).

One possible concern during construction would be a gasoline fuel or lubricant spill in the vicinity of a stream.  The potential effects on aquatic organisms associated with this impact are discussed in Section 4.2.6.1.

Operation.  Impacts on aquatic resources associated with operation of the alternative pipeline would be similar to those discussed for the Celeron/All American proposal.  A major oil spill would significantly affect important resident fish populations in the Pecos, South Llano, Guadalupe, San Marcos, Plum, Lavaca, Navidad, Colorado, and Brazos Rivers.  Since the proposed alternative crosses the San Marcos River downstream from critical habitat for the fountain darter and San Marcos gambusia, no impacts are expected on these fish populations.  Sufficient information is not available to determine whether critical habitat for Rio Grande darter, river darter, proserpine shiner, or blue sucker would be altered as a result of an oil spill.

A major oil spill in the San Bernard, Colorado, or Brazos Rivers could measurably affect nearshore marine communities in the Gulf of Mexico.  Of particular importance are the intertidal invertebrates including shrimp (pink, brown and white), oysters, and blue crab.  The most sensitive period of development would be the larval stage which occurs in brackish and nearshore marine environments.

## 4.6.7  Terrestrial Biology

The proposed pipeline route from McCamey to Freeport crosses many of the major geographic areas and vegetative communities in Texas. These habitats support a diversity of birds, mammals, amphibians, and reptiles.  General impacts are expected to be similar to those discussed for the proposed project.  Much of the proposed alternative pipeline follows existing corridors, and additional construction impacts in these areas are not expected to be significant.  Oil spills in these areas could adversely affect local vegetation; most wildlife would not be affected except for species not mobile enough to escape (amphibians, snakes, small mammals).

The proposed pipeline would require new construction in some areas, and limited habitat modification is expected.  These modifications should not be significant in the shrub savannah habitats from McCamey to Comal Counties since the habitat is very common or from Comal to Lavaca County where agricultural lands are common.  Sensitive habitats which could be significantly affected include wetland habitats in southeastern Texas and riparian vegetation along the major streams and rivers crossed by the pipeline.

Although actual construction impacts at streams, rivers, and wetlands can be kept to a minimum and mitigated by reclamation, operational impacts (oil spills) could significantly affect wetland and other aquatic habitats.  These impacts would affect plant and animal communities at the spill location and downstream for several miles.

The proposed pipeline crosses four major rivers in east Texas (Navidad, Colorado, Brazos, San Bernard).  All pipeline crossings are

within 55 miles of the coast and major accidental oil spills could potentially affect estuarine systems. Wetland communities between the crossings and the coast could also be affected. This region contains significant wetland habitats and supports millions of ducks, geese, and waterbirds, primarily in the winter. A major spill on a river crossing or near a major wetland during winter could adversely affect these species by oiling, decreased survivability of eggs and young, and reductions in food supplies.

Oil from a spill at a river crossing at one of these rivers would potentially reach the coast. The coastal areas also support many wildlife species, including waterfowl, shorebirds, passerines, raptors, terrestrial mammals, marine mammals, and sea turtles. These salt water and estuarine systems are not expected to support any major population of marine mammals or sea turtles, and impacts even from a major spill should not be significant. Marine mammals are known to avoid oil spills.

It is not known at this time if any federal or state threatened or endangered species would be adversely affected by construction or operation of this alternative. Federally listed species will be evaluated in the Biological Assessment (see Appendix B).

## 4.6.8 Socioeconomics

Two spreads of 335 workers each would construct the approximate 460-mile section of pipeline. Total work force per spread including pump stations would be approximately 385. River crossings would require an additional 30 to 50 workers per crossing for a 6-week period. An estimated eight major river crossings would be constructed. Assuming all pump stations and two river crossings are being constructed simultaneously with the pipeline, peak work force is estimated at 850 workers. It is projected that 60 percent of the work force would be local due to the skilled and unskilled labor availability in the major urban centers of Odessa, Midland, Austin, San Angelo, Houston, San Antonio, and Galveston. The total of these labor forces is over 2.3 million with umemployment rates averaging between 3.9 percent in Austin and 9.9 percent in Galveston. Because of the short duration of pipeline construction, it is assumed that only 15 percent of the total non-local work force would bring their families.

The number of workers would be small relative to the regional population. The largest population increases, less than 5 percent, would occur in Kimble and Crockett Counties. Because of the short duration of the construction period no significant impacts to area employment would occur.

Retail sales and sales taxes are expected to increase throughout the pipeline service communities. The non-local work force is expected to expend up to 37 percent of gross salary on local expenditures. The impact of these expenditures would be positive.

Adequate temporary housing for pipeline workers is available throughout the pipeline route. The section between McCamey and

Kerrville is more sparsely populated than between Kerrville and Freeport; nevertheless as seen in Table 4-30, adequate motel accommodations exist along this stretch.

Based on the significance criteria outlined in Section 4.2.8., no significant impacts would occur due to this alternative.

Operations. The impacts resulting from operation of this alternative would include an increase in the tax base of all counties traversed by the pipeline. Percentage increases would range from 0.12 percent in Crockett County to 6.4 percent in Kimble County. No county would experience a significant impact due to increased valuations. Table 4-31 shows the estimated valuation of 458 miles of pipeline, 1982 assessed valuations, and the percentage increase to the tax base.

4.6.9  Land Use

The greatest potential for adverse impacts from pipeline construction would be in agricultural areas. There are only scattered farm houses or small communities adjacent to the proposed ROW, so impacts to residential land uses would not be significant and only of short duration (1 or 2 days). Within the affected counties, disturbance to irrigated or dryland agricultural land is not considered significant, because disturbance would be less then one percent of any county's agricultural base. The productive rice growing area around Wharton would be the most sensitive area. Although the disruption of farming activities would be for a short duration during construction, it may result in delays in some planting or harvesting, depending on time of construction and layout of the field. Land owners would be compensated for losses.

Temporary gates and other measures would be erected to prevent livestock escape in rangeland areas. After restoration is complete, grazing would again be possible. Only a very small percentage (less than 1 percent) of rangeland in any county would be disturbed. No significant adverse effects on grazing are expected.

The pipeline location is consistent with applicable state and county regulations. Final route selection would be negotiated with private land owners. Road crossings would require easements from the affected jurisdiction but these would be secured from the county commissioners court prior to construction.

No adverse effects would occur to designated recreation areas. Construction would create some disturbance of private lands used for deer or waterfowl hunting, but this would not affect this popular recreation activity or any other recreational opportunity. Potential oil spills could affect sport fin and shell fish (see Aquatic Biology) and public beaches. The resources near the mouths of the Colorado, San Bernard, and Brazos Rivers would be most vulnerable.

4.6.10  Transportation

The McCamey to Freeport Alternative would generate transportation impacts very similar to those described in section 4.2.10, except for

4-140

TABLE 4-30

COMMUNITIES WITH ACCOMMODATIONS WITHIN COMMUTING

DISTANCE OF THE PIPELINE ROUTE

McCAMEY TO FREEPORT

| County | Overnight Rooms[1] | Recreational Vehicle Parks[2] | | Overnight Rooms[1] | Recreational Vehicle Parks[2] |
|---|---|---|---|---|---|
| Iraan | NA[3] | 1 | Altair | 35 | NA |
| Ft. Stockton | 711 | 0 | Eagle Lake | 59 | NA |
| Crockett | NA | 1 | El Campo | 107 | NA |
| Ozona | 216 | NA | Wharton | 109 | NA |
| Sonora | 155 | NA | Freeport | 141 | NA |
| Junction | 146 | 2 | Lake Jackson | 262 | NA |
| Kerrville | 663 | 2 | West Columbia | 127 | NA |
| Fredricksburg | 318 | 2 | Yorktown | 30 | NA |
| Boerne | 125 | 1 | Rosenberg | 249 | NA |
| New Braunfels | 1,036 | 9 | San Angelo | 1797 | 7 |
| Seguin | 289 | 1 | San Marcos | NA | 1 |
| Lockhart | 51 | 1 | Austin | 7419 | 4 |
| Luling | 103 | NA | San Antonio | NA | 4 |
| Gonzales | 136 | 1 | | | |
| Hallettsville | 116 | 1 | | | |
| Shiner | 8 | NA | | | |
| Yoakum | 67 | NA | | | |

Sources:

[1] 4th Quarter. 1983 Hotel Tax Accounts, Comptroller: State of Texas.

[2] Limited data are available on numbers of campsites. Numbers of parks represent Texas public campgrounds and Texas Association of Campground Owners sites. Texas state parks are not included in this list but are abundant throughout the stretch between Kerrville and Freeport.

[3] Not Applicable

4-141

TABLE 4-31

PIPELINE CONTRIBUTIONS TO COUNTY TAX BASE, McCAMEY TO FREEPORT, TEXAS

| County | Total miles | Estimated Valuation of Pipeline & Facilities (thousands $) | Estimated 1982 Assessed Valuation of Counties Traversed (thousands $) | Pipeline Percent of Countywide Valuation (percent) | 1982 Countywide Tax Receipts (thousands $) |
|---|---|---|---|---|---|
| Upton[1] | 5 | 5,213 | 1,395,496 | 0.37 | 5,846 |
| Pecos | 32 | 15,280 | 13,021,000 | 0.12 | 10,524 |
| Crockett | 57 | 27,219 | 1,309,000 | 2.1 | 7,249 |
| Sutton | 51 | 27,178 | 1,127,000 | 2.4 | 4,455 |
| Kimble | 35 | 16,713 | 261,000 | 6.4 | 1,077 |
| Kerr | 24 | 14,285 | 1,373,000 | 1.0 | 5,682 |
| Gillespie | 15 | 7,163 | 454,000 | 1.6 | 1,135 |
| Kendall | 28 | 13,370 | 808,000 | 1.7 | 3,247 |
| Comal | 25 | 14,763 | 1,295,000 | 1.1 | 5,093 |
| Guadalupe | 24 | 11,460 | 1,855,000 | 0.62 | 14,197 |
| Caldwell | 16 | 7,640 | 793,000 | 0.96 | 4,741 |
| Gonzales | 20 | 9,550 | 477,000 | 2.0 | 1,520 |
| Lavaca | 29 | 13,848 | 846,000 | 1.6 | 3,346 |
| Colorado[1] | 18 | 11,420 | 632,000 | 1.8 | 1,971 |
| Wharton | 35 | 16,713 | 2,103,000 | 0.79 | 14,769 |
| Brazoria | 44 | 21,010 | 11,325,000 | 0.19 | 43,496 |

Source:  ERT

[1]Pump station location.

4-142

location.  Highways affected would be those listed in Table 3-43.  As for the other alternatives, the transportation effects would not be considered significant.

### 4.6.11 Cultural Resources

It is not possible to assess impacts to specific cultural resource sites due to the absence of site-specific survey work along a specific ROW; however, based on the survey work that has been done to date in the general area, impacts to sites that would be eligible for inclusion on the National Register is likely.  Prior to construction along the McCamey to Freeport Alternative route, Class I and Class III surveys would be undertaken and the procedures outlines in the compliance plan discussed earlier would be implemented.  These activities would be expected to minimize, but possibly not avoid, all significant impacts to cultural resources.

### 4.6.12 Visual Resources

Since the McCamey to Freeport Alternative would parallel existing pipelines for the majority of it length, visual impacts from construction along the pipeline ROW are not expected to be significant. Impacts from the pump stations could be significant depending on the final location of the stations.

### 4.6.13 Noise

Noise impacts for this alternative would be similar to those reported in Section 4.2.13.  For areas where sensitive receptors would be within approximately 2,500 ft of construction activity (without intervening terrain barriers), construction noise would exceed the 60 dBA significance threshold.  This would be a short-term significant impact.

Operations noise impacts would not be significant unless a pump/heater station were sited within approximately 1,300 ft of a sensitive receptor (see Appendix F, Table F-1).

### 4.6.14 System Safety and Reliability

There are no design specifications or project construction and operation procedures that are specific to the McCamey to Freeport Alternative.  However, the applicant has indicated that these would be essentially identical to the Celeron/All American proposal documents. On this basis, all of the comments pertaining to Celeron/All American Pipeline and Tank Farm Design with Applicable Codes and Standards, Seismic Design Criteria, Corrosion Design Criteria and Corrosion Control Procedures, Pressure Relief and Relief Liquid Disposal System, Control Logic and Soundness of Design for Leak Detection System, Fire Control System, Oil Spill Control System, Operating Procedures, Security Policies, Leak Detection Staff Procedures, and Fire Protection Staff Training and Procedures would apply to this alternative.  The only additional item would be in the Pressure Relief and Relief Liquid Disposal System where additional pressure relief devices and tankage

would be required at Freeport.  Therefore, it appears that the intent of the applicant is to build a project that would comply with all applicable codes, regulations, standards, and generally accepted industry practices.  The Freeport Terminal is currently in operation and should meet all applicable codes, regulations, standards, and generally accepted industry practices.

### 4.6.15  Oil Spill Potential and Effects

Current and future probabilities of oil spills from pipeline failure are summarized in Table 4-32 for the 460-mile McCamey to Freeport Alternative.  For this alternative, it is expected that the incidents of spills exceeding 50 barrels would be 0.14 spill per year. At 20 and 40 years, the spill rate is estimated to be 0.41 and 1.06 per year, respectively, for spills greater than 50 barrels.

The soils, aquatic and terrestrial biology, and land use sections summarize areas along the pipeline route identified by resource specialists as being sensitive to an oil spill event.  Since final route alignment, elevations, and check valve placement have not been determined by the applicant, potential site-specific oil spill volumes cannot be estimated for these sensitive areas.  In order for resource specialists to evaluate potential impacts, a worst-case spill volume of 15,000 barrels is assumed for each sensitive area.  This may be considered a very conservative estimate since final pipeline design information would most likely indicate much smaller potential oil spill volumes at these locations.

### 4.7  Single Pipeline Alternative

A possible alternative to the Celeron/All American and Getty proposals would be the construction of a single pipeline from Las Flores to Emidio.  The Single Pipeline Alternative would have essentially the same impacts as the Getty proposal for most resource areas.  Compared to implementing both proposals most construction-related impacts would be the same or smaller in magnitude.  Impacts resulting from oil spills would potentially be much smaller.

Assuming a single 400,000 BPD pipeline were constructed, the total socioeconomic impacts identified for the Celeron/All American and Getty proposals would be cut approximately in half.  This suggests that estimated short-term retail sales and sales tax receipts and long-term ad valorem tax revenues would be reduced by approximately 50 percent. The demand for overnight lodging during construction would also be reduced, resulting in lower displacement of tourists or travelers. However, impacts in these areas for the Las Flores to Emidio segment were not predicted to be significant for the Celeron/All American and Getty proposals.

The potential for oil spills and resulting volumes of oil released would be similar for either a single pipeline or two parallel pipelines from Las Flores to Emidio, except under certain conditions and circumstances.  With two parallel pipelines, the potential for both pipelines rupturing or leaking at the same time and location is highly

TABLE 4-32

CURRENT AND FUTURE PROBABILITIES OF SPILLS USED AS A BASIS FOR

AN "OVER LIFE OF PROJECT" ASSESSMENT, McCAMEY TO FREEPORT

| Assumptions | McCamey to Freeport Alternative |
|---|---|
| Diameter | 30-inch |
| Volume | 300,000 BPD |
| Length | 460 miles |
| Pipeline Life | 30-40 years |
| **Spill Incidents[1] (New pipeline 1984)** | |
| Spills greater than 50 bbl | |
| - Overall length of pipeline | 0.14 |
| - Each mile | 0.0003 |
| Spills greater than 9.5 bbl | |
| - Overall length of pipeline | 0.32 |
| - Each mile | 0.0007 |
| **Spill Incidents (Pipeline 20 years old)** | |
| Spills greater than 50 bbl | |
| - Overall length of pipeline | 0.41 |
| - Each mile | 0.0009 |
| Spills greater than 9.5 bbl | |
| - Overall length of pipeline | 0.83 |
| - Each mile | 0.0018 |
| **Spill Incidents (Pipeline 40 years old)** | |
| Spills greater than 50 bbl | |
| - Overall length of pipeline | 1.06 |
| - Each mile | 0.0023 |
| Spills greater than 9.5 bbl | |
| - Overall length of pipeline | 2.07 |
| - Each mile | 0.0045 |

[1]Other spill rates reported in the literature include:

| Probability | Source |
|---|---|
| 0.0022 spills/pipeline mile-year | OIW 1978; USCG PIRS data 1973-1977, spill greater than 2.4 bbl; all pipeline sizes and ages |
| 0.0013 spills/pipeline mile-year | EPA 1982a; 10-inch diameter pipeline 25 years old |
| 0.00176 spills/pipeline mile-year | National average - reported by Mastandrea 1983 |

unlikely except at stream crossings (where flood scour associated with channel degradation could rupture both lines simultaneously) or at the South Branch Santa Ynez, and San Andres Fault crossings (where earthquake movement could also rupture both lines simultaneously). With a single 400,000 BPD capacity pipeline (similar to the proposed Getty pipeline), an event at the South Branch Santa Ynez or San Andres Faults or any heavily scoured stream crossing would release 2,100 to 3,200 barrels of oil. Table 4-26 in Section 4.2.15 summarizes estimated spill volumes for the single Getty pipeline at the South Branch Santa Ynez and San Andreas Faults and at select stream crossings.

The Single Pipeline Alternative would require the same size construction ROW (100 ft maximum) as the Celeron or Getty proposals. Although the construction period would be reduced, impacts to surface resources would be essentially the same. Potential impacts from oil spills would have similar probabilities, but the volumes of oil that could be released during an earthquake or major flood would be less. With a single, 400,000-BPD capacity pipeline similar to Getty's, a catastrophic oil spill event would release about half the volume that would result from two pipelines rupturing (see Oil Spill Potential). Significant impacts to soils, surface water, aquatic biology, and terrestrial biology would still occur (depending on location), but the areal extent of the spill and duration of significant impacts would be less.

## 4.8  No Project Alternative

Under the No Project Alternative, required permits would not be issued and the proposed Getty and Celeron/All American pipelines would not be constructed. In the existing timeframe, the only other viable means of transporting the anticipated volumes of OCS crude oil from the Santa Barbara region would be by oil tankers to PADD V or PADD III coastal refineries or by pipeline to Los Angeles. The Getty Gaviota Marine Terminal Application (1983) estimates a marine terminal throughput of 150,000 to 300,000 BPD and the LFT Application (SAI 1983) estimates a throughput of 175,000 to 350,000 BPD. Assuming a peak production of about 500,000 BPD of OCS crude (ADL 1984) and that only one of these marine terminals is constructed, an excess of 150,000 to 350,000 BPD of oil would occur and require transport by additional tankers or other pipelines. The Los Angeles refineries with major retrofits could conceptually accept about 200,000 BPD through a pipeline. This would leave a surplus of up to 150,000 BPD for transport by additional tankers. If all 500,000 BPD were shipped by tanker [assuming 50,000 DWT tankers and 320,000 barrels per tanker (ADL 1984)] about 2 tanker trips per day would be required.

The impacts presented for the Celeron/All American and Getty proposals along the proposed pipeline routes would be avoided by the No Project Alternative; however, additional impacts would occur in Santa Barbara County as a result of the expanded marine terminals and increased marine tanker traffic. These impacts would occur primarily in the areas of air quality, socioeconomics, and oil spills and are discussed in the following paragraphs.

4-146

Increased reliance on tankers for transport of OCS crude oil would require development of expanded marine terminal facilities in the Santa Barbara south coast area, with corresponding increases in the emissions of air pollutants. The principal sources of such emissions include combustion of fuel oil by tankers visiting the terminal, fugitive hydrocarbon emissions during loading, and combustion emissions from support vessels in the terminal area. In general the emissions associated with tanker crude oil loading facilities are substantially greater than those that would result for equivalent transport by pipeline. Issues of potential concern with regard to marine terminal emissions include compliance with federal and state ambient air quality standards and PSD increments, odors, and visual impacts of tanker stack plumes. Details on the air quality impacts of marine terminals can be found in the Getty Gaviota Consolidated Coastal Facility Draft EIR (ERT 1984, pp 4-2 through 4-16) and the Oil Transportation Plan DEIR (1984, pp 7-1 through 7-25).

The socioeconomic effects that would result from not implementing the Celeron/All American and Getty proposals would be most evident with respect to two areas:  county-wide tax bases and transient housing. These impacts occur to varying degrees relative to the pipeline location (county) and facility to be constructed (tank farm vs. pipeline).  If the Getty and Celeron/All American pipeline projects were not constructed, there would be no increase in county-wide tax bases.  The impact would be no increase in ad valorem property tax revenues in the long term, and fewer sales tax receipts from pipeline company, contractor, and construction worker purchases in the short term. Existing demand for permanent housing, overnight accommodations, and camping sites would remain the same without project construction. Displacement of tourists or travelers caused by the construction work force lodging requirements in communities along the pipeline route would not occur.

Socioeconomic impacts from construction and operation of expanded marine terminal facilities required for the No Project Alternative would affect the following areas:  employment, housing, recreation, and public services such as electrical, water and sewer, fire, and police.  These effects would be primarily in the Santa Barbara region.  Beneficial impacts would include increased ad valorem and sales tax revenues. Other impacts could be experienced with the greater probability of oil spills.  The Santa Barbara County south coast is a very important tourist, commercial fishing, and kelp harvesting area which contribute significantly to the economic well-being of the region.  If an oil spill did occur, significant negative economic impacts would be experienced in the coastal region.  For more information on socioeconomic impacts associated with marine terminals, refer to the Getty Gaviota Consolidated Coastal Facility Draft EIR (ERT 1984, pp 4-48 through 4-58)).

Associated with the increased tanker traffic along the Santa Barbara coast would be an increase in risk of oil spill, fire, and explosion.  In the event of a large oil spill due to operational accidents, tanker collision, or tanker grounding, there would be a potential for significant impacts upon sensitive marine fish and mammals

and on recreational areas. The No Project Alternative would increase tanker traffic by 1 percent over existing levels and by 1 to 6 percent over projected levels. The risks for tanker accidents and resulting oil spill impacts have been addressed in detail in the Getty Gaviota Consolidated Coastal Facility Draft EIR (ERT 1984, pp 4-77· through 4-93), revised DEIS/DEIR for the Santa Ynez/Las Flores Canyon Development and Production Plan (SAI 1983, pp 6-210 and 6-211) and the Oil Transportation Plan DEIR (1984, pp 7-26 through 7-31).

## 4.9  Cumulative Impacts

The interrelated projects presented in Chapter 2, along with the Celeron/All American and Getty pipeline projects, were analyzed for cumulative impacts. The only measureable cumulative impact that would result from these projects would be in the area of socioeconomics. The employment requirements, housing needs, transportation needs, income earned by construction workers, and increased tax benefits would be interrelated. During the 6-month construction period, the Getty pipeline project would employ up to 126 local and 126 non-local construction employees and would generate about $281,232 per week in wages. During the construction phase the project would increase the tax base by about 0.51 percent in Santa Barbara County. The Celeron/All American pipeline project would employ up to 198 local and 199 non-local construction employees and would generate about $443,052 per week in wages. This project would increase the tax base by about 0.53 percent in Santa Barbara County. No long term employment impacts would be experienced due to the small operations and maintenance work force. Peak employment levels for the interrelated projects on a regional basis are projected to exceed 77,000 workers in 1988. Personal income gains are projected to be over $1.5 billion for this period. Getty and Celeron/All American combined represent less than 1 percent of the total peak employment and because of the short period of construction, the payroll generated would be less than a 0.1 percent. These increments are important but not significant.

Cumulative housing impacts would be significant. There would be short-term impacts during construction for the Getty and/or Celeron/All American projects alone, and these impacts would be increased by the interrelated projects which would have much larger impacts on housing. The variations in actual construction schedules may moderate but not eliminate the shortage in worker housing.

The All American Pipeline and the PACTEX Pipeline and Southern California Edison (SCE) new Palo Verde-Devers transmission line could result in cumulative impacts to wildlife and land use where these facilities are proposed to cross the Kofa NWR. These projects would be constructed in the same general location; thus, three new corridors could compound the changes created by the existing El Paso Gas Pipeline and Palo Verde-Devers 500-Kv Transmission Line. The worst-case impact scenario would assume that each project would be constructed on a separate ROW. Assuming the ROWs would parallel the existing disturbance across 26 miles of the NWR; a corridor up to 700 ft wide could be created across the Refuge and a total of 2,206 acres of habitat could be disturbed. This wide a corridor would likely utilize the entire area

available for pipelines and transmission lines since either side of the existing ROWs consists of wilderness study areas. However if stipulations require the three pipelines to be located in the existing El Paso Gas ROW disturbance could be reduced to an estimated 350-ft wide corridor for a total disturbance of 1,050 acres.

Construction of all three proposed projects would result in the loss of wildlife habitat and adversely affect visual quality and recreational activities in the Refuge. The construction of future pipelines and transmission lines would also adversely affect desert bighorn sheep if construction occurred when sheep were using the migration corridors (April-May and September-October) or lambing (March-May). After construction, bighorn sheep may continue to avoid the disturbed area; recent studies indicate bighorn sheep currently exhibit a behavioral aversion to crossing under the existing transmission lines (L. Smith 1984, personal communication). It is not known why sheep avoid this area; it may be a combination of factors including disturbed habitat, visual obtrusion caused by the towers, traffic along the gas pipeline access road, and the occasional "buzzing" of transmission line conductors. The U.S. Fish and Wildlife Service (FWS) has expressed concern that a wider corridor could create a barrier to sheep movement (Haderlie 1984, personal communication). Interstate 10 has already cut off the movement of sheep through the Plumosa Mountains. Recent studies also indicate the Livingston Hills may be important habitat for the survival of sheep using surrounding areas. FWS plans to close the Crystal Hills campground in an effort to minimize current disturbance in the area.

In conclusion, if future pipelines were constructed in the same ROW as the existing El Paso Gas Pipeline, cumulative impacts would be significantly reduced. However, since the new transmission line would require a minimum of 130 ft of clearance from the centerline of the existing transmission line, some cumulative impacts from a new transmission line would be expected.

## 4.10  Mitigation Measures

The following mitigation measures have been developed to mitigate the significant impacts that were identified earlier in this chapter. Where impacts were deemed to be not significant, no mitigation measures were developed. The measures contained in this section have been committed to by the California State Lands Commission, BLM, Forest Service, and Santa Barbara County, and these agencies will be responsible for their enforcement. Thus, the mitigation measures will not be just suggestions but will be specific requirements of both Getty and Celeron/All American as part of their ROW grants or permits. As noted in several of the following measures, the federal authorized officer will direct the detailed implementation of certain measures.

In addition to the mitigation measures contained in this EIS, the BLM, FWS, and Forest Service will attach standard and special ROW stipulations to their ROW grants (see Appendix J for a preliminary list of special ROW stipulations). These stipulations will contain generic measures that are applied to all ROWs as well as site-specific measures

4-149

whose need may be identified at the time the pipeline centerline is surveyed. The required surveys for cultural resources and protected animals, for example, will likely identify the need for site-specific stipulations.

Federal agencies (BLM, Forest Service, FWS, and Department of Defense) can enforce mitigation measures and stipulations on Federal lands and private lands that are affected as a result of a Federal action. The California State Lands Commission has no direct enforcement authority other than on state-owned lands; however, it can require certain measures as a condition of the permit it will issue and rely on other state agencies, such as the Department of Fish and Game, to enforce these conditions. Mitigation measures and stipulations contained in the conditional use permit issued by Santa Barbara and other Counties will be required and enforceable on private land as well as public land.

## 4.10.1 Air Quality (none required)

## 4.10.2 Geology

**Measure 1**: Appropriately detailed geologic, seismologic, and geotechnical studies will be conducted to identify and characterize geologic hazards and to design earthwork and foundations along the pipeline route and at pump and heater stations, tank farms, and delivery stations.

**Effectiveness**: These types of studies will identify existing geologic and seismologic hazards such as landslides, subsidence scarps and fissures, karstic sinkholes, Holocene faults, and areas susceptible to liquefaction that can either be avoided by relatively minor re-routing, or accomodated by remedial earthwork or special structural design. Special attention should be given to further evaluating potential for damaging movement on the Quaternary faults listed on Tables 3-3 and 3-5, particularly the South Cuyama and White Wolf. Areas with moderate to high potential for future development of geologic hazards will be identified so that an appropriate program of surveillance and monitoring can be established, if necessary. Recommendations and design criteria for earthwork and foundations will be developed to accomodate site-specific conditions.

**Application**: This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

**Measure 2**: Appropriate ground motion parameters will be developed for use in seismic design of critical structures and equipment, including pumps, valves, piping, communications systems, and instrumentation. Use of the dual Contingency Level/Operating Level Earthquake concept, or equivalent, is recommended.

**Effectiveness**: Appropriate seismic design, especially for the Las Flores to Blythe portion of the route, will minimize the potential for serious damage leading to oil spillage as a result of strong ground

shaking. Earthquake-resistant design is sufficiently advanced so that this measure should prove very effective.

Application: This measure will be applied to the Celeron/All American and Getty facilities and all alternatives within California. Studies to determine the need for such measures along the remainder of the route will be conducted as part of measure 1, Section 4.10.2.

Measure 3: Special geologic/seismologic studies will be conducted to characterize potential surface offset at the South Branch Santa Ynez, San Andreas, and Garlock faults, and appropriate crossings will be designed. Similar studies will be conducted for any other faults that show evidence of Holocene offset (within approximately the last 11,000 years) at the pipeline crossing.

Effectiveness: Adequate historical and geologic data exist to characterize an appropriate design fault offset event for the San Andreas. Some field study may be necessary to delineate the limits of the zone across which movement could occur. Historical data are less abundant for the South Branch Santa Ynez and Garlock faults, but geologic data and comparison to other similar known active faults provide a basis for developing design events. Again, some field study may be required. Having selected an appropriate offset, design techniques are available to minimize the potential for pipe rupture and/or to minimize the amount of oil spillage if a rupture occurs. These include:

- Pipe burial in V-shaped ditch with loose backfill.

- Placement of pipe on ground surface with loose soil cover.

- Placement of oil pipe within larger diameter expendable pipe.

- Use of extra-strength steel pipe.

- Placement of seismically triggered block valves on either side of fault.

- Construction of earth dike to contain spillage; use of earthen or synthetic liner in holding basin.

Application: This measure will be applied to the Celeron/All American and Getty proposals and alternatives at crossings of Holocene faults.

4.10.3  Soils  (none required)

4.10.4  Surface Water

Measure 4: During pipeline construction at stream crossings, construction contractors will minimize time of disturbance and area disturbed, stabilize disturbed areas promptly, and divert runoff waters into settlement areas prior to discharge into a watercourse. Where

4-151

construction activities are necessary in the channel, particularly La Brea Creek, the channel will be disturbed as little as possible and for as short a time as possible.

Effectiveness: An increase in sediment loadings during construction of stream crossings is unavoidable. Application of this measure will minimize the impact of construction at stream crossings.

Application: The measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Measure 5: Pipeline operators will check the pipeline burial depth yearly at major crossings identified in this report. At crossings where channel degradation has reduced the depth of fill to less than the 100-year scour depth, reburial of the pipeline to the proper depth will be required.

Effectiveness: The burial depth of 4 ft below the scour of the 100-year, 24-hour storm runoff event is required by DOT regulations. This requirement minimizes the chances of possible pipeline breaks during large runoff events. Some of the major streams crossed by the pipeline have been disturbed and the channels are degrading in the vicinity of the pipeline crossing. Maintaining deep enough pipeline burial is important to minimizing the risk of an oil spill.

Application: This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

4.10.5 Groundwater

Measure 6: Detailed hydrogeologic investigations will be conducted for each sensitive area along the alignment as indicated in Table 3-14. These investigations will include definition of groundwater depth, recharge sources, properties of overlying soils, hydraulic gradient, background water quality, and existing water uses. Existing wells will be inventoried in an area extending hydrogeologically down gradient from the pipeline for a minimum distance of 2 miles. This information will be used to formulate an Oil Spill Contingency and Response Plan that will include plans for monitoring and early detection of groundwater contamination, notification of affected groundwater users and appropriate governmental agencies, site-specific cleanup and response, and identification of emergency alternate water supplies. Hydrogeologic investigations will also be used to define specific areas that will require mitigation measures in the design and construction of the pipeline.

Effectiveness: These hydrogeologic investigations and contingency plans will make appropriate information available in sensitive areas to allow for early detection and response to spills or leaks rather than attempting to get this information after a spill has occurred. This is particularly important in populated areas where groundwater is extensively used for municipal or domestic supplies.

4-152

<u>Application</u>:   This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

<u>Measure 7</u>:   Low permeability backfill will be used in the bottom and sides of pipeline trenches where the alignment crosses sensitive aquifers which are at risk from oil spills and leaks.  This measure will be implemented in selected sensitive areas where shallow depth to water, high vertical permeabilities, and a high degree of groundwater use are indicated by hydrogeologic investigations performed in Measure 1 above.

<u>Effectiveness</u>:   This method of trench backfill will force leaking oil to the surface rather than permitting downward seepage.  This will facilitate early leak detection and simplify cleanup procedures.

<u>Application</u>:   This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

### 4.10.6  Aquatic Biology

<u>Measure 8</u>:   Fueling and lubrication of construction equipment will not occur within 0.25 miles of streams.  No more than 2 barrels of fuel (about 84 gallons) should be kept at construction sites within 0.5 mile of sensitive streams (Table 4-6).  Equipment will be periodically checked for leakage to avoid spills.  If a spill does occur, it should be reported to the Authorized Officer immediately.

<u>Effectiveness</u>:   Refueling away from streams and periodic maintenance should reduce the risk of construction-related spills.

<u>Application</u>:   The measure would be applied to the Celeron/All American and Getty proposals and all alternatives.

### 4.10.7  Terrestrial Biology

<u>Measure 9</u>:   Development will avoid disturbance to sensitive and valuable plant communities including riparian areas, oak woodlands, Coulter pine, live oaks, Joshua tree woodlands, desert dunes, and ironwood washes.  Locations to be avoided will be determined by the landowner, land manager or applicable regulatory agency.  The construction ROW will be reduced to 50-ft wide at riparian and desert wash crossings.  Staging areas will not be located in sensitive communities.  The landowner, land manager or regulatory agency may reduce the construction ROW in specific locations to minimize impacts to other sensitive plant or wildlife communities.

<u>Effectiveness</u>:   Avoiding and minimizing disturbance to sensitive areas and unique plant communities will minimize loss of vegetation and wildlife habitat by 50 percent.

<u>Application</u>:   This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Measure 10:  During construction in creosote scrub and alkali scrub areas of the desert, ROW clearing will be limited to trimming or crushing whenever possible.  The new ROW will be located immediately adjacent to existing disturbance, especially roads.

Effectiveness:  This measure will limit the amount of shrub vegetation disturbed and reduce erosion.  By not disturbing the root system, many crushed or clipped shrubs will resprout and revegetate the ROW more quickly, reducing soil erosion and speed re-establishment of wildlife habitat.

Application:  This measure will be applied to the desert portions of the Celeron/All American proposal, the Desert Plan, and Brenda Alternatives.

Measure 11:  During construction in desert areas, some of the cleared or clipped vegetation will be piled in small thickets off the ROW (where acceptable to the landowner or land manager) to provide cover for displaced animals.

Effectiveness:  Providing cover for displaced small mammals and reptiles, especially small desert tortoise, will decrease heat stress and minimize exposure to predators.

Application:  This measure will be applied to the desert portions of the Celeron/All American proposal, the Desert Plan, and Brenda Alternatives.

Measure 12:  Vehicle operation off the ROW by construction workers will be prohibited except where specified by the landowner or land management agency.

Effectiveness:  Limiting vehicle use off the ROW will minimize the risk of impacting livestock, wildlife habitat, small mammals, reptiles, and important or sensitive vegetation in surrounding habitats.  This will be especially important in desert dune areas and in desert bighorn sheep range.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Measure 13:  During construction the open pipeline trench will be limited to 0.5 mile in desert bighorn sheep areas or areas where the pipeline could limit wildlife access to water, such as in La Brea Canyon in California, and Hot Springs Creek in Arizona.  Skip sections or temporary bridges across the pipeline trench will also be used if more than 0.5 mile of trench must remain open for an extended period.

Effectiveness:  This will minimize impacts caused by water stress and disruption of movement patterns.  Not all animals are accustomed to crossing skip sections, however it will provide an opportunity for

wildlife (like deer and coyotes) accustomed to human presence to cross the pipeline trench.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Measure 14:  A competent wildlife biologist will survey all potential raptor nesting habitat within 0.5 mile of the pipeline prior to construction.  Active and inactive nests will be identified.  No construction will occur within 0.5 mile of active eyries during the nesting season (March 15 to July 15).  Construction will be permitted near inactive nests; however, no nest sites will be disturbed.

Effectiveness:  This measure will prevent nest abandonment resulting from pipeline construction.  It will also help provide flexibility for construction scheduling.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Measure 15:  Blunt-nosed leopard lizard and San Joaquin kit fox habitat in the Cuyama Valley will be evaluated.  Where suitable habitat occurs, attempts to relocate the pipeline (primarily to agricultural lands) will be considered.  In habitat that must be affected, the construction disturbance on the ROW will be limited to 50 ft or less. If kit fox dens are found in the ROW, the pipeline ROW will be altered to miss dens; no construction will be allowed during the pupping season. Revegetation plans will include measures to encourage re-establishment of suitable habitat.

Effectiveness:  Avoiding leopard lizard and kit fox habitat will be the most effective measure of ensuring that these animals are not affected.  Where construction must occur in their habitat, some lizards will still be impacted by vehicles and trenching equipment; however, the population may be able to survive the loss of a few individuals if the habitat is restored and land use practices on the ROW do not change. The timing constraint will minimize losses of individual kit foxes during trenching.  Kit fox will still be displaced to other areas as a result of construction and operation activities.  Minimizing the construction ROW width would minimize loss of habitat by 50 percent. Moving the pipeline to agricultural areas will impact crop lands, resulting in a trade-off of impacts.  Impacts to croplands can be minimized by seasonal restrictions and double trenching techniques.

Application:  This measure would apply to the Celeron/All American and Getty proposals.

Measure 16:  Pipeline construction across desert tortoise habitat will occur between October and March when tortoises are hibernating.  A desert tortoise expert will be present during construction.  Any active desert tortoises will be removed from the construction ROW ahead of construction equipment and moved to habitat within 100 yds of the

30—78571

capture site. Burrows within the ROW will be carefully opened using hand tools and hibernating tortoises removed. Tortoises unearthed by the trencher will be removed to an artifical burrow within 100 yds of the capture site. Injured tortoises will be turned over to the Department of Fish and Game. Adequate funds for costs involved in rehabilitating injured tortoises and returning them to their home sites (within 100 yds of capture site) will be paid by the applicant.

Effectiveness: Injuries and deaths of tortoises will be minimized if construction occurs when tortoises are inactive (i.e., only tortoises hibernating right on the ROW would be impacted). Removal of active tortoises from the construction area will ensure survival of these individuals. Burrows can be successfully constructed with hand tools and plywood (Berry 1984, personal communication).

Application: This measure would apply to the Celeron/All American proposal, the Desert Plan, and Brenda Alternative.

Measure 17: Oil spill booms will be located as near as possible to the man-made wetlands downstream of the Colorado River crossing. In the event of a spill these booms would be used to prevent oil from entering backwater wetlands from the river, or reaching Yuma clapper rail habitat 20 miles downstream.

Effectiveness: Booms have been used effectively for many years in containing oil and directing it to areas for cleanup. Locating booms near the crossing will minimize response time and minimize the possibility of oil reaching sensitive habitats (such as Cibola and Imperial NWR and Yuma clapper rail habitat) downstream.

Application: This measure will be applied to the Celeron/All American proposal and the McCamey to Freeport Alternative.

Measure 18: No construction will be allowed in the Copper Bottom Pass area during January to March (lambing) and May to October (water stress) periods. No construction will be allowed in the Plumosa Pass area during the January to March lambing period. Any effects on bighorn sheep water resources will be mitigated through avoidance or construction of new wells, or collectors.

Effectiveness: This measure will reduce impacts on bighorn sheep in the Dome Rock Mountains, but will not be completely effective because pipeline maintenance and access into this remote area would eventually disturb bighorns. This measure will eliminate disturbance impacts on lambing bighorn in the Plumosa Pass area.

Application: This measure will be applied to the Celeron/All American proposal.

Measure 19: No pipeline construction in the Kofa NWR will be allowed during bighorn use of the migratory corridors. Avoidance periods and formal restrictions will be determined by FWS.

Effectiveness: This measure will not limit existing disturbance because the route through the NWR follows an existing pipeline, transmission line, and access road. It will eliminate impacts related directly to disturbance of bighorn sheep due to pipeline construction activity.

Application: This measure will be applied to the Celeron/All American proposal.

Measure 20: At the Muleshoe Ranch Preserve, construction will occur between August 30 and April 1. Revegetation will be in accordance with plans determined by the Nature Conservancy, BLM, and Forest Service. The ROW will utilize the existing El Paso ROW to the extent possible. Large sycamores in Bass Canyon will not be removed.

Effectiveness: Seasonal construction restrictions (i.e., no activity during the April to August nesting season) will prevent nest abandonment by nesting raptors resulting from construction activity. Reseeding with native vegetation and minimizing impacts to riparian communities will decrease impacts on wildlife and wildlife habitat.

Application: This measure will be applied to the Celeron/All American proposal.

Measure 21: Where the pipeline ROW follows the existing El Paso Natural Gas ROW or other existing ROWs, the old ROW will be used as part of the construction ROW and new disturbance will be limited to the area needed for trenching and stockpiling backfill.

Effectiveness: Using the existing ROW for construction will minimize the total area cleared, wildlife habitat lost, and area to be revegetated. Using the existing ROW would significantly minimize the total acres disturbed.

Application: This measure will be applied to the Celeron/All American proposal.

4.10.8  Socioeconomics

Measure 22: The pipeline construction period will be scheduled so as not to coincide with peak tourist seasons. The areas affected by tourism include: Santa Barbara County Coastal Area - June thru August; LPNF - August thru November; Blythe, California - April thru September; Quartzsite, Arizona - November thru April.

Effectiveness: This action will minimize competition for temporary housing and camping sites between tourists and construction workers.

Application: This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Measure 23:  Between Barstow and Blythe, Blythe and Phoenix, and El Paso and Odessa, workers will be accommodated in areas where housing is available, and transportation to and from the job site will be provided.

Effectiveness:  This measure will centralize the impact on housing demand in areas that have sufficient resources to accommodate the construction work force.

Application:  This measure will be applied to the Celeron/All American proposal, the Desert Plan, and Brenda Alternative.

Measure 24:  Temporary accommodations for construction workers will be provided at locations where housing is limited (eastern California, western Arizona and west Texas).

Effectiveness:  This action will reduce conflicting demands for limited temporary housing between construction workers, tourists, and other travelers.  It will also reduce commuting distances in areas where little or no temporary housing is available near the pipeline corridor.

Application:  This measure will be applied to the Celeron/All American proposal, the Desert Plan, and Brenda Alternatives.

4.10.9  Land Use and Recreation

Measure 25:  After construction has been completed motorized vehicle access to public lands crossed by the ROW will be restricted on federal lands (as requested by the agency) by gates or other barriers.

Effectiveness:  This measure will enhance revegetation efforts and limit the proliferation of spur roads in sensitive resource areas. Agency regulations limit development of new roads in these areas.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Measure 26:  Celeron/All American will formally request modification of the designated utility corridors from Riverside County.

Effectiveness:  This measure will bring the ROW into compliance with the county's plans.

Application:  This will be applied to the Celeron/All American proposal.

Measure 27:  The All American Pipeline ROW will be moved from the west side to the east side of the dirt road that forms the Palen to McCoy WSA boundary from milepost 260 to milepost 270.

Effectiveness:  This measure would remove the ROW from within the boundary of the WSA and ensure compliance with WSA Interim Management Policy.

Application:   This measure will be applied to the Celeron/All American proposal.

Measure 28:   Within the section from Las Flores to Emidio, the Celeron and Getty Pipelines will be constructed within the same ROW as designated by the Authorized Officer.  This could be accomplished by phasing of construction, and laying one pipe as close as practicable from the ROW edge and then later placing the next pipeline as close as practicable from the other side of the ROW, resulting in a minimum distance between pipe centers.

Effectiveness:  This measure would reduce by one half the amount of disturbance and land use impacts associated with construction of two pipelines.

Application:  This measure would apply to whatever ROW is found to be preferred.

Measure 29:   Important historic areas and structures will be avoided at Patton's Camp ACEC.

Effectiveness:  Impacts to protected areas will be avoided.

Application:   This measure will apply to the Desert Plan Alternative.

4.10.10  Transportation  (none required)

4.10.11  Cultural Resources

Measure 30:   Cultural resources mitigation will result from the implementation of a detailed compliance plan that will be developed by the land management agencies, in consultation with the SHPO, prior to the start of pipeline construction.  A typical compliance plan would include the following items:

- An intensive cultural resource survey of unsurveyed portions of the proposed pipeline route will be undertaken to include a 200-ft wide corridor centered on the proposed ROW centerline, and along any new or upgraded facilities access roads.  All cultural resources will be recorded and evaluated given the existing conditions and artifactual arrangements.

- Further evaluation may be necessary in some cases to determine site extent, integrity, and significance.  A test program will be implemented to determine whether further data recovery is necessary in lieu of site avoidance, applying eligibility criteria for the National Register and significance criteria defined in CEQA Appendix K.

- Site-specific mitigation measures will be developed for all cultural resources as required.  Mitigation may not be required for all sites.  Avoidance by project design is

4-159

preferable, in most cases, however further data recovery may be necessary to negate impacts.  Data recovery programs will be designed to reflect the individual research potential of a resource and contemporary scientific expectations.

- Data recovery programs will be undertaken prior to project groundbreaking; field work will be completed prior to construction.  Data recovery programs will include analysis and reporting of findings.

- Archaeological monitoring during ground disturbing construction activities may be necessary in various sensitive areas or where survey procedures were hampered by terrain and vegetation.  These will be defined during evaluation procedures.

- Contact will be maintained with appropriate Native American groups to determine the nature and extent of concerns regarding specific cultural resources.  Native Americans will participate in test and data recovery programs commensurate with tribal policies and federal agency requirements.

Effectiveness:  The cultural resources compliance plan will ensure that the effects of pipeline construction and operation on cultural resources is fully considered as required by law.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

4.10.12  Visual Resources

Measure 31:  The Gaviota pump station, Sisquoc pump station, Essex pump station and tank farm, and Tom Mix pump station will be screened with native shrubs and trees and/or naturalized masses of evergreen shrubs and trees as is appropriate for location and climatic conditions.

Effectiveness:  The placement of trees and shrubs between the facility and existing sensitive receptors will eliminate the intrusive character of the facility.  The FVC for all locations where such screening is proposed is indicated below.

Getty:

- Gaviota pump station - to screen from US 101, Vista del Mar Union School, and the Gaviota Store and Restaurant (FVC II)

- Cuyama pump station - to screen from Highway 166 (FVC III).

Celeron Segment:

- Gaviota pump station - to screen from US 101 and the Gaviota Store and Restaurant (FVC II).

- Sisquoc pump station at La Brea Canyon - to screen from Foxen Canyon Road and La Brea Canyon Road (FVC II).

All American Segment:

- Twelve-Gauge Lake pump station - to screen from Highway 58 (FVC IV).

- Tom Mix pump station - to screen from US 89 (FVC III).

Desert Plan Alternative:

- Essex pump station and tank farm - to screen from US 66 (FVC IV).

Application:  This measure will be applied to the Celeron/All American and Getty proposals and Desert Plan Alternative.

Measure 32:  For the pipeline segments on the LPNF, in La Brea Canyon, and on Miranda Pine Mountain, Celeron will utilize a 50-ft wide construction corridor, protect existing large diameter trees, feather the edges of the cleared ROW, and reseed cleared areas with native species, as determined by the Authorized Officer.

Effectiveness:  The smaller construction corridor will provide selective protection for large trees in forested areas.  Feathering the edges of the clearing will soften and partially disguise the visual impact resulting from cutting a path through the trees.  The effectiveness of this measure will depend on the pre-project visual condition of the specific site:  areas previously characterized as "untouched landscape" (EVC I) or "unnoticed alterations" (EVC II) will be deteriorated to the category of "minor visual disturbance" (FVC III). Areas of existing visual disturbance ranging from minor to drastic can all be restored to "major visual disturbance" (FVC V) by scalloping edges of vegetative clearings.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and the Santa Maria Canyon Alternative.

Measure 33:  The La Paz heating/pumping station will be moved 1,500 ft to the east behind topographic screening.

Effectiveness:  Relocation of the proposed facility will allow for natural topographic screening thereby improving the future visual condition from the "visual disturbance" (FVC IV) to "unnoticed alterations" (FVC II).

Application:  This measure will be applied to the Celeron/All American proposal.

### 4.10.13  Noise

Because of the short duration of constructed impacts in any one area (2 weeks or less), limiting construction to daytime hours (as described in the Project Description), and the low probability of accomplishing effective mitigation of high noise levels associated with construction activities, mitigation beyond the standard requirements for use of equipment mufflers and similar OSHA requirements is not considered to be warranted.

Measure 34:  The Gaviota pump station(s) will be shielded from Vista del Mar Union School by a noise barrier, such as a berm or structural enclosure.

Effectiveness:  The barrier will be designed and built to reduce project operation related noise below the 60 dBA significance threshold of the school.

Application:  This measure will apply to any pump station built by Celeron/All American or Getty within 1,500 ft of the Vista del Mar Union School.

### 4.10.14  Oil Spills (none required)

### 4.11  Unavoidable Adverse Impacts

Implementation of the mitigation measures presented above that have been committed to by the California State Lands Commission, BLM, Santa Barbara County, and the Forest Service would reduce the impacts associated with the Celeron/All American and Getty proposals and the routing alternatives.  Those significant impacts that would remain following mitigation (i.e., unavoidable adverse impacts) are described below for each proposal and alternative.

### Celeron/All American and Getty Proposals

Air Quality

- No significant impacts.

Geology

- No significant impacts (geologic hazards and risks are described in Chapter 4).

Soils

- Major oil spills or leaks would contaminate soil affecting erosion rates, water uptake, and productivity.  The following agricultural lands would be most sensitive to oil spills: southwestern Kern County and Cuyama Valley (Celeron and Getty routes, Las Flores to Emidio segment); Barstow and Blythe (All American route, Emidio to Blythe segment); and Deming Rainbow

4-162

Valley, Gila River Valley, and Rio Grande Valley (All American route, Blythe to McCamey segment).

### Surface Water

- Major oil spills or leaks would degrade water quality below federal and state standards. Impacts would occur at and downstream from any stream crossing (Celeron/All American and Getty routes).

- Alteration of channel geometry would cause degradation in La Brea Creek during and after construction (Getty route, Las Flores to Emidio segment).

- Channel degradation could result in exposure of the pipeline and increase the possibility of an oil spill (Celeron and Getty routes, Las Flores to Emidio segment).

### Groundwater

- Major oil spills or leaks would degrade water quality below federal and state standards. Sensitive groundwater basins include the Santa Ynez, Sisquoc, Cuyama, and San Antonio (Celeron and Getty routes, Las Flores to Emidio segment); Mojave River at Barstow (All American route, Emidio to Blythe segment); and La Posa, Centennial Area, Lower Santa Cruz, San Pedro River, Sulphur Springs Valley, San Simon, Animas/Lordsburg, Mimbres Valley, Rio Grande Valley, and Pecos River Valley (All American route, Blythe to McCamey segment).

### Aquatic Biology

- Major oil spills or leaks would degrade water quality and aquatic habitats and exceed toxic levels for some early life stages of important fish species. Important permanent fish populations could be measurably affected in Refugio Creek (Celeron route) and Gaviota Creek (Celeron and Getty routes) in the Celeron and Getty Las Flores to Emidio segment; the Colorado River (All American route, Emidio to Blythe segment); and Bass Canyon Creek, Hot Springs Creek, Colorado, Gila, Rio Grande, and Pecos Rivers (All American route, Blythe to McCamey segment).

- Major oil spills or leaks in coastal streams along the Celeron route (Las Flores Canyon to Gaviota Creek) and Getty route at Gaviota Creek could adversely affect nearshore marine communities and affect the endangered tidewater goby in Gaviota Creek.

### Terrestrial Biology:

- Loss of 34 acres of live oaks and riparian habitat in La Brea Canyon during construction for the Getty route (Las Flores to Emidio segment); and 31 acres of live oak and riparian habitat along the Celeron/All American route.

4-163

- Loss of individuals of three rare plant species (Hoffman's nightshade, Refugio manzanita, and Catalina mariposa) during construction in Gaviota Pass (Getty route, Las Flores to Emidio segment).

- Loss of individuals of four sensitive plant species (Barstow woolly sunflower, Comanche layia, Calico monkey flower, and Crucifixion thorn) would be removed during construction (All American route, Emidio to Blythe segment).

- Loss of 1,425 acres of Mojave desert creosote scrubland and habitat for up to 70 years (All American route, Emidio to Blythe segment).

- Loss of 88 acres and 138 acres of oak woodland along the Getty and Celeron/All American pipeline routes, Las Flores to Emidio segment.

- Loss of San Joaquin kit fox, blunt-nosed leopard lizard, San Joaquin antelope squirrel, and giant kangaroo rat habitat in the Cuyama Valley during construction (Celeron and Getty routes, Las Flores to Emidio segment).

- Up to 230 desert tortoises (a federal candidate threatened animal) would be killed and their habitat affected by pipeline construction across the Mojave Desert (All American route, Emidio to Blythe segment).

- Disturbance during construction to desert bighorn sheep lambing and watering in Dome Rock Mountains (All American route, Blythe to McCamey segment).

- Major oil spills or leaks could remove sensitive wildlife habitat for the following species: blunt-nosed leopard lizard, San Joaquin antelope squirrel, and giant kangaroo rat in the Cuyama Valley (Celeron and Getty routes, Las Flores to Emidio segment); Mojave ground squirrel and Tehachapi slender salamander in the Tehachapi Mountains (All American route, Emidio to Blythe segment), and waterfowl and Yuma clapper rail in wetlands below the Colorado River crossing (All American route, Emidio to Blythe segment).

Socioeconomics

- No significant impacts.

Land Use and Recreation

- The pipelines may not be in conformance with the Santa Barbara County Local Coastal Plan, and would not be in conformance with the Riverside County Comprehensive Plan; and BLM California Desert Conservation Area Plan (All American route, Emidio to Blythe segment).

- Crossing the Kofa NWR may be judged incompatible with refuge plans (All American route, Blythe to McCamey segment).

- Quality of recreational activities would decrease during construction in the following areas:  Gaviota Pass Roadside Rest area (Getty route, Las Flores to Emidio segment); La Brea Canyon (Celeron and Getty routes, Las Flores to Emidio segment); Kofa NWR (All American route, Blythe to McCamey segment).

- Three (Celeron) or two (Getty) FPAs (Rare II) would be affected in the LPNF (Celeron and Getty routes, Las Flores to Emidio segment).

- Major spills into coastal streams from Las Flores to Gaviota Creek would significantly affect beaches and water-oriented recreational opportunities (Celeron and Getty routes, Las Flores to Emidio segment).  Other important water sport recreation areas include the Colorado, Gila, Rio Grande, and Pecos Rivers (All American route, Blythe to McCamey segment).

Transportation

- No significant impacts.

Cultural Resources

- Implementation of the cultural resources compliance plan would avoid most significant adverse impacts to cultural resources; however, it may not be possible to mitigate all impacts. National Register eligible sites identfied during the Class III survey would be avoided wherever possible.  Where such sites can not be avoided and must be salvaged, a certain amount of cultural resources information would be unavoidably lost.  Additionally, impacts to Native American concerns are often difficult to mitigate and may be unavoidable.  A final determination of unavoidable adverse impacts to cultural resources would not be made until after the Class III survey has been completed and site-specific mitigation measures have been developed (Celeron/All American and Getty routes).

Scenic/Visual Resources

- Significant visual changes along the pipeline corridors in LPNF (Celeron and Getty routes, Las Flores to Emidio segment).

- Significant visual changes at the Twelve-Gauge Lake pump station site and the Cadiz tank farm site (All American route, Emidio to Blythe segment).

Noise

- Estimated noise emissions would exceed a day-night average sound pressure level of 60 dBA (California standard) during construction at the following locations:  Vista del Mar school

at Gaviota, Buellton, and individual residences (Celeron and Getty routes, Las Flores to Emidio segment); North Edwards, Desert Lake, Boron, Kramer Junction, Barstow, California State Women's Prison, and scattered subdivisions and residences (All American route, Emidio to Blythe segment); and residential areas in Pinal County, Arizona; Lordsburg and Deming, New Mexico; and Wink, Monahans, Crane, and McCamey, Texas (All American route, Blythe to McCamey segment).

- No significant noise impacts would occur during operation.

System Safety and Reliability

- The Celeron/All American and Getty proposals comply with all applicable codes, regulations, standards, and generally accepted industry practices.

Oil Spill Potential:

- Probabilities of spills greater than 50 barrels for a new pipeline would be 0.04 spills/year for the Celeron and Getty (Las Flores to Emidio) segments, and 0.33 spills/year for the All American segment; (overall length probability of 0.0003 spills/ year/pipeline mile for all segments).

- Probabilities of spills greater than 9.5 barrels for new pipeline would be 0.08 spills/year for the Celeron and Getty (Las Flores to Emidio) segments, and 0.76 spills/year for the All American segment; (overall length probability of 0.0007 spills/year/pipeline mile for all segments).

- Probabilities of spills greater than 50 barrels for 20-year old pipeline would be 0.11 spills/year for the Celeron and Getty (Las Flores to Emidio segments), and 0.98 spills/year for the All American segment; (overall length probability of 0.0009 spills/year/pipeline mile for all segments).

- Probabilities of spills greater than 9.5 barrels for 20-year old pipeline would be 0.22 spills/year for the Celeron and Getty (Las Flores to Emidio) segments, and 1.95 spills/year for the All American segment; (overall length probability of 0.0018 spills/year/pipeline mile for all segments).

- Probabilities of spills greater than 50 barrels for 40-year old pipeline would be 0.28 spills/year for the Celeron and Getty (Las Flores to Emidio segments), and 2.49 spills/year for the All American segment; (overall length probability of 0.0023 spills/year/pipeline mile for all segments).

- Probabilities of spills greater than 9.5 barrels for 40-year old pipeline would be 0.54 spills/year for the Celeron and Getty (Las Flores to Emidio segments), and 4.88 spills/year for the All American segment; (overall length); probability of 0.0045 spills/year/pipeline mile for all routes).

- Probabilities of tank farm spills during the 30-year life of project would be 11.4 spills equal to or greater than 10 barrels, 2.58 spills equal to or greater than 100 barrels, and 0.225 spills equal to or greater than 1,000 barrels (All American route, Emidio to Blythe segment).

## Santa Maria Canyon Alternative

### Air Quality

- No significant impacts.

### Geology

- No significant impacts (geologic hazards and risks are described in Chapter 4).

### Soils

- Major oil spills or leaks would contaminate soil affecting erosion rates, water uptake, and productivity. Small areas of agricultural lands, located primarily in the Sisquoc Valley, would be the most sensitive soils.

### Surface Water

- Major oil spills or leaks would degrade water quality below federal and state standards. Impacts would occur at and downstream from any stream crossing.

### Groundwater

- No significant impacts.

### Aquatic Biology

- No significant impacts.

### Terrestrial Biology

- Loss of about 63 acres of oak woodlands along Getty's route (50-ft ROW) and 126 acres along the Celeron/All American route (100-ft ROW) during construction.

- Loss of about 10 acres of riparian vegetation along Tepusquet Creek along Getty's pipeline route (50-ft ROW), and 10 acres along Celeron/All American's route (assuming 50-ft ROW as mitigation).

### Socioeconomics

- No significant impacts.

Land Use and Recreation

- No significant impacts.

Transportation

- No significant impacts.

Cultural Resources

- See the Celeron/All American and Getty proposals.

Visual Resources

- Significant visual changes would occur in LPNF because of clearing.

Noise

- Estimated noise emissions would exceed a day-night average sound pressure level of 60 dBA during construction near residences along the Sisquoc River, at the mouth of Tepusquet Canyon, and along the Cuyama River.

System Safety and Reliability

- No significant impacts.

Oil Spill Potential

- Probabilities of oil spills would be similar to values estimated for the Celeron and Getty proposals (Las Flores to Emidio segment).

Desert Plan Utility Corridor Alternative

Air Quality

- No significant impacts.

Geology

- No significant impacts (geologic hazards and risks described in Chapter 4).

Soils

- Major oil spills or leaks would contaminate soil affecting erosion rates, water untake, and productivity. No agricultural lands occur along this route.

Surface Water

- Since no perennial streams would be crossed, no significant impacts are expected to occur.

Groundwater

- No significant impacts.

Aquatic Biology

- No significant impacts.

Terrestrial Biology

- Loss of individual desert tortoises in the Fenner-Chemhuevi Valley.

- Loss of 2,350 acres of creosote scrubland and wildlife habitat for up to 70 years.

Socioeconomics

- No significant impacts.

Land Use and Recreation

- The corridor crosses the BLM Coxcomb Mountains WSA.

- ROW would provide access to a BLM Area of Critical Environmental Concern near Granite Pass.

Transportation

- No significant impacts.

Cultural Resources

- See the Celeron/All American and Getty proposals.

Visual Resources

- No unavoidable significant impacts.

Noise

- No significant impacts.

System Safety and Reliability

- No significant impacts.

Oil Spill Potential

- Probabilities of spills greater than 50 barrels would be 0.06 spills/year for a new pipeline, 0.17 spills/year for a 20-year old pipeline, and 0.44 spills/year for a 40-year old pipeline.

- Probabilities of tank farm spills during the 30-year life of project would be 11.4 spills equal to or greater than 10 barrels, 2.58 spills equal to or greater than 100 barrels, and 0.225 spills equal to or greater than 1,000 barrels.

Brenda Alternative

Air Quality

- No significant impacts.

Geology

- No significant impacts.

Soils

- Major oil spills or leaks would contaminate soil affecting erosion rates, water uptake, and productivity. No agricultural lands occur along this route.

Surface Water

- No significant impacts.

Groundwater

- A sensitive groundwater basin (La Posa) south of Quartzsite would be crossed and could be affected by a major oil spill or leak.

Aquatic Biology

- No significant impacts.

Terrestrial Biology

- No significant impacts.

Socioeconomics

- No significant impacts.

Land Use and Recreation

- No significant impacts.

Transportation

- No significant impacts.

Cultural Resources

- See the Celeron/All American and Getty proposals.

4-170

Visual Resources

- No significant impacts.

Noise

- Estimated noise emissions would exceed a day-night average sound pressure level of 60 dBA during construction near residences south of Quartzsite.

System Safety and Reliability

- No significant impacts.

Oil Spill Potential

- Probabilities of spills would be similar to values estimated for All American's proposal.

McCamey to Freeport Alternative

Air Quality

- No significant impacts.

Geology

- No significant impacts (geologic hazards and risks are described in Chapter 4).

Soils

- Major oil spills or leaks would contaminate soil affecting erosion rates, water uptake, and productivity. Agricultural lands along the eastern portion of the alternative would be most sensitive to oil spills.

Surface Water

- Major oil spills or leaks would degrade water quality below federal and state standards. Impacts would occur at and downstream from any stream crossing.

Groundwater

- Major oil spills or leaks would degrade water quality below federal and state standards. Sensitive groundwater basins occur on the Edwards Plateau and the Gulf Coastal Plain.

Aquatic Biology

- Major oil spills or leaks would degrade water quality and aquatic habitats and exceed toxic levels for some early life stages of important freshwater, brackish water, and saltwater

invertebrate and fish species.   Important species include shrimp, oysters and blue crabs.   Seventeen perennial streams that could contain sensitive fish species would be crossed by the alternative.

Terrestrial Biology

- Major oil spills or leaks in riparian or wetland areas would significantly impact both terrestrial and aquatic species and their habitats.

Socioeconomics

- No significant impacts with the exception of potential oil spill impacts on commercial fisheries, especially shrimp.

Land Use and Recreation

- Potential oil spill impacts on sport fin and shell fish and public beaches

Transportation

- No significant impacts

Cultural Resources

- See the Celeron/All American and Getty proposals.

Visual Resources

- No significant impacts.

Noise

- Estimated noise emissions would exceed a day-night average sound pressure level of 60 dBA during construction near residences along the alternative pipeline route.

Systems Safety and Reliability

- No significant impacts.

Oil Spill Potential

- Probabilities of spills greater than 50 barrels would be 0.14 spills/year for a new pipeline, 0.41 spills/year for a 10-year old pipeline, and 1.06 spills/year for a 40-year oil pipeline.

4.12  Relationship Between Local Short-Term Uses of Man's Environment and the Maintenance and Enhancement of Long-Term Productivity

Short term is defined as the construction period of the Celeron/All American and Getty projects plus one year for ROW rehabilitation.   Long term is defined as the remaining life of the project through abandonment

and reclamation. Following completion of project construction and rehabilitation of the ROWs, no significant decreases in the productivity of the project area are expected.

Many of the significant impacts associated with the Celeron/All American and Getty pipelines would be short term and would cease to be significant following ROW rehabilitation. A summary of short-term and long-term impacts is presented in Tables 4-33 and 4-34.

## 4.13 Irreversible/Irretrievable Commitment of Resources

Construction and operation of the Celeron/All American and Getty Pipeline Projects and all alternatives could result in either the irreversible or irretrievable commitment of certain resources. An irreversible commitment of a resource is one which cannot be changed once it occurs; an irretrievable commitment means that the resource cannot be recovered or reused. Irreversible and irretrievable impacts are summarized in Table 4-33 and 4-34. No resources will be over committed by the construction on operation of either project.

## 4.14 Growth-Inducing Impacts of the Project

Due to the character of the Celeron/All American and Getty pipeline projects, the size of the work force, and the short-term duration of project construction, no significant growth-inducing impacts are foreseen. Adequate housing and public facilities and services are currently available to accommodate the construction and operations work force along the majority of the pipeline route. Temporary impacts would not be significant enough to require major capital improvements, which might induce growth in an area.

The Celeron/All American pipeline would allow the transportation of Alaskan crude oil to eastern refineries; however, this is not expected to induce the growth of these refineries as unused refining capacity currently exists. Similarly, the construction of a new refinery in the Phoenix area (the Provident refinery) has been discussed for several years. The Celeron/All American pipeline would be approximately 30 miles south of Phoenix and could serve as a source of crude oil for such a refinery. However, the existing oversupply of refining capacity in the Gulf states and the large capital investment involved makes the construction of a new refinery unlikely. Thus, growth-inducing impacts are not anticipated at this time.

TABLE 4-33

SHORT-TERM AND LONG-TERM IMPACTS RESULTING FROM THE
CELERON/ALL AMERICAN PROPOSAL OR ALTERNATIVES

| Resource | Irreversible Impacts | Irretrievable Impacts | Relationship of Short-Term Use of Environment and Long-Term Productivity |
|---|---|---|---|
| Air Quality | no | no | The project would not significantly deteriorate existing air quality in the project area. |
| Geology | no | no | No significant short-term or long-term impacts are anticipated. |
| Soils | no | no | During construction there would be short-term losses of soil due to erosion; no significant long-term impacts to soils are anticipated. |
| Surface Water | no | no | There would be short-term impacts to surface water during construction; no significant long-term impacts are anticipated. |
| Groundwater | no | no | No significant short-term or long-term impacts are anticipated |
| Aquatic Biology | no | no | Short-term impacts such as substrate removal, increased sedimentation, and habitat alteration would occur during construction; no significant long-term impacts are anticipated. |
| Terrestrial Biology | no | yes | The losses of live oak trees and up to 230 desert tortoises would be irretrievable.  All vegetation types crossed by the pipeline would suffer short-term impacts.  Oak woodlands and desert scrubland would not regenerate within the life of the project (30 years) and would suffer long-term impacts. |
| Socioeconomics | no | no | In the short-term, construction of the project would provide direct employment for 1,954 workers in 1985 and result in increased spending in local areas.

Temporary housing demand would exceed supply in certain areas during pipeline construction.  In the long-term, operations would employ 49 workers and increased property tax revenues would be realized by the counties crossed by the pipeline. |
| Land Use and Recreation | yes | yes | Short-term disruptions of agriculture and recreation activities would occur.  These losses would be irretrievable.  Long-term degradation of wilderness values would occur in the FPAs and WSAs crossed by the proposed pipeline or alternatives.  This degradation would be irreversible. |
| Transportation | no | no | There would be no significant short-term or long-term impacts to transportation. |
| Cultural Resources | yes | yes | Additional information gained during project-related surveys for cultural resource sites would contribute to knowledge of the area's history.  Disturbance of cultural resource sites could result in the permanent loss of data. |
| Visual Resources | no | yes | Short-term impacts to visual resources would occur during construction of the pipeline and the pump stations.  Long-term impacts would occur in the PNF, at the Cadiz pump station/tank farm site, and at the Twelve-Gauge Lake pump station. |
| Noise | no | no | Short-term noise impacts would occur to nearby residences during pipeline construction.  There would be no significant long-term impacts. |

4-174

TABLE 4-33 (CONTINUED)

| Resource | Irreversible Impacts | Irretrievable Impacts | Relationship of Short-Term Use of Environment and Long-Term Productivity |
|---|---|---|---|
| Oil Spills | yes[1] | yes[1] | A major oil spill could potentially occur during pipeline operation.  Effects to sensitive resources could last from a few months to several years. |

[1]In the event of a major oil spill, an irreversible and/or irretrievable commitment of resources could occur to the following resources:  soils, surface water, groundwater, aquatic biology, terrestrial biology, and land use and recreation.

4-175

TABLE 4-18

SHORT-TERM AND LONG-TERM IMPACTS RESULTING FROM THE

GETTY PROPOSAL OR ALTERNATIVES

| Resource | Irreversible Impacts | Irretrievable Impacts | Relationship of Short-Term Use of Environment and Long-Term Productivity |
|---|---|---|---|
| Air Quality | no | no | The project would not significantly deteriorate existing air quality in the project area. |
| Geology | no | no | No significant short-term or long-term impacts are anticipated. |
| Soils | no | no | During construction there would be short-term losses of soil due to erosion; no significant long-term impacts to soils are anticipated. |
| Surface Water | yes | yes | There would be short-term impacts to surface water during construction. Construction in La Brea Canyon would disturb a large part of the La Brea Creek stream channel. The stream would probably not recover within the life of the project. |
| Groundwater | no | no | No significant short-term or long-term impacts are anticipated |
| Aquatic Biology | no | no | Short-term impacts such as substrate removal, increased sedimentation, and habitat alteration would occur during construction; no significant long-term impacts are anticipated. |
| Terrestrial Biology | no | yes | The loss of live oak trees would be irretrievable. All vegetation types crossed by the pipeline would suffer short-term impacts. Oak woodlands would not regenerate within the life of the project (30 years) and would suffer long-term impacts. |
| Socioeconomics | no | no | In the short-term, construction of the project would provide direct employment for 168 workers in 1985 and result in increased spending in local areas.<br><br>In the long-term, operations would employ 5 workers and increased property tax revenues would be realized by the counties crossed by the pipeline. |
| Land Use and Recreation | yes | yes | Short-term disruptions of agriculture and recreation activities would occur. These losses would be irretrievable. Long-term degradation of wilderness values would occur in the FPAs crossed by the pipeline. This degradation would be irreversible. |
| Transportation | no | no | There would be no significant short-term or long-term impacts to transportation. |
| Cultural Resources | yes | yes | Additional information gained during project-related surveys for cultural resource sites would contribute to knowledge of the area's history. Disturbance of cultural resource sites could result in the permanent loss of data. |
| Visual Resources | no | yes | Short-term impacts to visual resources would occur during construction of the pipeline. Long-term impacts would occur in the PNF. |
| Noise | no | no | Short-term noise impacts would occur to nearby residences during pipeline construction. There would be no significant long-term impacts. |

4-176

TABLE 4-34 (CONTINUED)

| Resource | Irreversible Impacts | Irretrievable Impacts | Relationship of Short-Term Use of Environment and Long-Term Productivity |
|----------|---------------------|----------------------|--------------------------------------------------------------------------|
| Oil Spills | yes[1] | yes[1] | A major oil spill could potentially occur during pipeline operation. Effects to sensitive resources could last from a few months to several years. |

[1]In the event of a major oil spill, an irreversible and/or irretrievable commitment of resources could occur to the following resources: soils, surface water, groundwater, aquatic biology, terrestrial biology, and land use and recreation.

4-177

# Exhibit D

CELERON/ALL AMERICAN PIPELINE PROJECT

PLANNING COMMISSION ACTIONS

FINAL DEVELOPMENT PLAN
CONDITIONAL USE PERMIT

March 3, 1986

Santa Barbara County
Resource Management Department
Energy Division

Exhibit 49

Exhibit 49

CELERON/ALL AMERICAN PIPELINE PROJECT
FINAL DEVELOPMENT PLAN
PLANNING COMMISSION ACTIONS

Table of Contents

1. Permit Information Summary                                   1

2. Project Description                                          2

3. Planning Commission Action                                   2

4. Appeals Process                                             6

5. Permit Conditions                                           8
   A. General                                                  8
   B. Permit Review                                           12
   C. Management                                              14
   D. Air Quality                                             17
   E. Geology                                                 18
   F. Surface and Groundwater                                 21
   G. Aquatic Biology                                         23
   H. Terrestrial Biology                                     23
   I. Socioeconomics                                          29
   J. Land Use and Recreation                                 32
   K. Transportation                                          35
   L. Cultural Resources                                      36
   M. Visual Resources                                        38
   N. Noise                                                   39
   O. Abandonment                                             40
   P. Systems Safety and Reliability                          40
   Q. Facility Design                                         44

6. Findings                                                   46
      County Zoning Ordinances                                46
      CEQA                                                    50
      Statement of Overriding Considerations                  55
      Additional Findings                                     56
      Impact Summary Tables                                   57

Exhibit 49

Exhibit 49

CELERON/ALL AMERICAN PIPELINE PROJECT
FINAL DEVELOPMENT PLAN
PLANNING COMMISSION ACTIONS


The Santa Barbara County Planning Commission made a final decision to approve the Celeron/All American Pipeline Project Final Development Plan on February 18, 1986.  On February 28, 1986 the Board of Supervisors appeals period expired without any appeals filed.  Therefore the Planning Commission's action on this Final Development Plan and Conditional Use Permit is final.  This package details the Commission's actions.


1.   PERMIT INFORMATION SUMMARY

1.1  Applicant Information

Project Title:            Celeron/All American Pipeline Project

Project Location:         Las Flores Canyon, California to Emidio, California

Supervisorial Districts:  Third, fourth, fifth

Applicant:                Celeron Pipeline Company of California

Applicant
Representative:           Mr. Ron Hinn, Vice President
                          Celeron Pipeline Company of California
                          4213 State St., P.O. Box 31029
                          Santa Barbara, CA  93130
                          805/683-5627


1.2  Case Processing Information

Celeron has filed, and the Planning Commission has acted upon, the following permit applications:

    Final Development Plan (Case # 85-DP-66cz)
        County permit for allowable projects which, because of the type, scale, or location of the development, require comprehensive review.  This permit covers all aspects of the project proposal.

    Major Conditional Use Permit (Case # 83-CP-97cz)
        County permit for permittable projects which, because of certain aspects of the proposal or of the proposed project location, require special consideration.  This permit is required because the proposed pipeline crosses Environmentally Sensitive Habitat areas.


Exhibit 49

Planning Commission Actions                                    Page 2
Celeron Pipeline Final Development Plan              March 3, 1986

## 2. PROJECT DESCRIPTION

Celeron proposes to construct a 30-inch diameter, insulated welded steel pipeline designed to transport up to a maximum of 425,000 barrels per day (BPD) with an optimal throughput of 300,00 BPD, of Outer Continental Shelf and other locally produced crude oils. The pipeline would extend approximately 135 miles from Las Flores Canyon to the Emidio pump station in the southern San Joaquin Valley. Three pump stations would be constructed, one at Las Flores Canyon, one at Gaviota, and one near the Sisquoc River in northern Santa Barbara County. The pipeline would be buried to a minimum cover depth of three feet throughout its length according to Department of Transportation specifications, with increased cover depth in selected areas.

The pipeline will require a 100-foot wide construction corridor and a 50-foot wide permanent easement. The proposed route parallels Highway 101 from Las Flores to Gaviota, turns north at Gaviota State Park west of Highway 101 and continues to the Sisquoc River. From the Sisquoc River the route follows Santa Maria then Suey Canyons north toward the Cuyama River. It crosses the river in the Western Cuyama Valley, and exits the County.

## 3. FINAL PLANNING COMMISSION ACTIONS

| Motion maker/Second | Vote | Action |
|---|---|---|
| **February 13, 1986** | | |
| 1. Wells/Hamister | 5-0 | Conceptual approval of Realignment 1, as presented in the February 6, 1986 Staff Report, including avoidance of the landslide. |
| 2. Wells/Stillman | 5-0 | Conceptual approval of Realignment 2, as presented in the February 6, 1986 Staff Report, with the understanding that staff will work with the applicants to reduce the visual impacts along the corridor. |
| 3. Sherman/Wells | 5-0 | Continue discussion of Realignment 3 until Tuesday February 18, 1986. |
| 4. Wells/Hamister | 5-0 | Conceptual approval of a realignment near Realignment 4, as depicted on Page CE 004 of the January 1986 Realignment Request sheets, which follows the yellow line coming from the southern section of the map, and going across the top of the Giorgi property, and Moonshine Creek, and coming down the northern property line of |

Exhibit 49

Planning Commission Actions                                          Page 3
Celeron Pipeline Final Development Plan                       March 3, 1986

Giorgi, to meet the original pipelne route, from whence it will meet Realignment 5, with the understanding that if there are any problems biologically with any minor adjustments to those corridors, or if there is any conflict between staff and Celeron on that segment, that it be brought back to the Commission for a final decision.

5. Wells/Sherman     5-0     Conceptual approval of Realignment 5, with the understanding that any landslides or environmental constraints will be mitigated by the applicant, to the satisfaction of staff.

6. Sherman/Wells     5-0     Conceptual approval of Realignment 6, as presented in the February 6, 1986 Staff Report.

7. Stillman/Hamister   5-0     Conceptual approval of Realignment 7, as presented in the February 6, 1986 Staff Report.

8. Stillman/Hamister   5-0     Conceptual approval of Realignment 8, as presented in the February 6, 1986 Staff Report.

9. Johnson/Stillman   5-0     Conceptual approval of Realignments 9 and 10, as presented in the February 6, 1986 Staff Report.

10. Johnson/Wells     5-0     Conceptual approval of Realignment 11, as presented in the February 6, 1986 Staff Report.

11. Johnson/Stillman   5-0     Conceptual approval of Realignment 12, as presented in the February 6, 1986 Staff Report, with the understanding that when the Forest Service chooses a route, the other alternative will fall away.

12. Johnson/Stillman   5-0     Conceptual approval of Realignment 13, as presented in the February 6, 1986 Staff Report.

13. Wells/Sherman     5-0     Approve the route changes conceptually approved in this hearing, with the exception of Realignment 3, and as part of the Final Development Plan approval, with the understanding that staff has discretion within the corridor analyzed in the EIR, and so long as no greater impacts arise from the alignment than the one originally approved by the Commission.

14. Sherman/Wells     5-0     Continue discussion of H-12, P-2, P-3, and P-5 until February 18, 1986.

Exhibit 49

Planning Commission Actions                                                    Page 4
Celeron Pipeline Final Development Plan                                 March 3, 1986

15. Johnson/Wells      4-0     That Condition H-1 and County policy requires
                               replacement of all trees removed, and that
                               Celeron will provide more detailed information
                               regarding the offsite tree-planting prior to
                               land use clearance.  ABSENT: Sherman

16. Wells/Hamister     4-0     That Condition H-1 be modified, and that staff
                               return on February 18 with wording to allow the
                               revegetation plan for Gaviota State Park to be
                               done prior to the issuance of the Coastal
                               Development Permit, in cooperation with the
                               State Parks Department.

February 18, 1986 (Sherman absent)

17. Wells/Stillman     4-0     Conceptual approval of new condition M-6 as
                               presented by staff with the unwritten
                               understanding that ant problems with that
                               condition can be brought before the Commission
                               for arbitration.

18. Wells/Hamister     4-0     Conceptual approval of new conditions B-7 and
                               B-8 as presented by staff.

19. Wells/Stillman     4-0     Conceptual approval of the February 18 revisions
                               to conditions H-12, P-2, P-3, and P-5, with the
                               understanding that language will be added to
                               each of the conditions to allow adequate time
                               for staff review.

20. Wells/Hamister     4-0     Conceptual approval of Condition C-1 with the
                               understanding that the criteria for shut down
                               come back to the Commission for review, and that
                               during construction monthly EQAP reports are
                               given to the County, and for the first three
                               months of operation, monthly reports will be
                               given to the County, with annual reports
                               thereafter.

21 - 37. These motions all gave conceptual approval to the various conditions,
         wording changes, and submittals as recommended by staff in the
         February 18 staff memo (motions 21 to 28, 38), and the February 6
         Staff Report (motions 29 to 37).  All votes were unanimous, 4-0.  The
         motion makers, seconds and appropriate conditions are listed below.

Exhibit 49

Planning Commission Actions                                              Page 5
Celeron Pipeline Final Development Plan                              March 3, 1986

21. Wells/Hamister        E-1
22. Hamister/Stillman     F-1
23. Stillman/Hamister     F-5
24. Stillman/Hamister     F-8
25. Hamister/Stillman     F-11
26. Wells/Hamister        H-1; modify paragraph (j), replacing "plant" with
                          "reestablish," and approve four points in staff memo.
27. Wells/Hamister        I-2
28. Hamister/Stillman     P-9
29. Hamister/Stillman     E-4
30. Wells/Hamister        E-5
31. Wells/Stillman        E-6
32. Wells/Hamister        E-7
33. Hamister/Stillman     F-2
34. Stillman/Hamister     F-3
35. Hamister/Stillman     F-4
36. Stillman/Hamister     F-7
37. Wells/Hamister        All remaining conditions except L-1, P-10, P-11
38. Wells/Hamister        L-1

| Motion maker/Second | Vote | Action |
|---|---|---|
| 39. Wells/Stillman | 4-0 | Conceptual approval of Condition P-11, including the addition of Condition P-18, and the approval of the submittal for P-18, as outlined in the February 6 Staff Report. |
| 40. Wells/Stillman | 5-0 | Conceptual approval of Condition P-10, as modified in the discussions, including adding wording regarding the reporting provisions under C-1. |
| 41. Wells/Hamister | 5-0 | Adopt new condition B-9, as presented on the February 18 staff memo. |
| 42. Wells/Hamister | 4-0-1 | Approve the Final Development Plan as modified with the conceptual motions, and any of those items which were not specifically addressed would be as per the staff presentation; any changes not specifically made to the Preliminary Development Plan remain as originally passed. Approve the Findings and Overriding Considerations as per the February 18 memo, including the additional finding regarding "prior to start-up" condition timing. ABSTENTION: Sherman. |
| 43. Wells/Stillman | 4-0-1 | Approve the Conditional Use Permit and Findings for the Environmentally Sensitive Habitat areas.  ABSTENTION: Sherman. |

Exhibit 49

Planning Commission Actions                                                 Page 6
Celeron Pipeline Final Development Plan                              March 3, 1986

4.  APPEALS PROCESS

The following text is taken from the Santa Barbara County Coastal Zoning
Ordinance, Section 35-182:  Appeals.

Sec.  35-182.  Appeals.

Sec. 35-182.1. Purpose and Intent.

    The purpose of this section is to provide procedures for appeals to the
    Planning Commission and the Board of Supervisors and to establish the
    criteria for those developments that may be appealed to the State Coastal
    Commission.

Sec. 35-182.2. Appeals to the Planning Commission.

(Not applicable)
Sec.  35-182.3.  Appeals to the Board of Supervisors.

(Not applicable)


Sec. 35-182.4.  Appeals to the Coastal Commission.

1.  For developments which are subject to the appeals jurisdiction of the
    Coastal Commission under PRC Sec. 30603, appeal of an action on a Coastal
    Development Permit may be filed with the Coastal Commission provided,
    however, that local appeals have been exhausted on the County's action on
    the project permits (i.e., Development Plan, C.U.P., Special Use Permit,
    Oil and Gas Plan).

2.  In accordance with Public Resources Code Sec. 30603(a), an action taken by
    the County of Santa Barbara on a Coastal Development Permit application
    for any of the following may be appealed to the Coastal Commission.

    a.  Developments approved by the County between the sea and the first
        public road paralleling the sea or within 300 feet of the inland
        extent of any beach or of the mean high tide line of the sea where
        there is no beach, whichever is the greater distance, as indicated on
        the official County appeals zone maps.

    b.  Developments approved by the County not included within paragraph (a)
        of this section located on tidelands, submerged lands, public trust
        lands, within 100 feet of any wetland, estuary, stream, or within 300
        feet of the top of the seaward face of any coastal bluff, as
        indicated on the official County appeals zone map or as determined by
        the State Lands Commission.

Exhibit 49

    c.   Developments approved by the County that require a Conditional Use Permit (CUP).

    d.   Any development which constitutes a major public works project or a major energy facility. The phrase, "major public works project or a major energy facility," as used in Public Resources Code Sec. 30603(a) (5) and this Article shall mean any proposed public works project or energy facility exceeding $50,000 in estimated cost of construction.

3.  Grounds of Appeal.

    a.   The grounds of appeal for any development appealable under 2.a., of this Section shall be limited to one or more of the following:

        1)   The development fails to provide adequate physical access or public or private commercial use or interferes with such uses.

        2)   The development fails to provide public views from any road or from a recreation area to, and along, the coast.

        3)   The development is not compatible with the established physical scale of the area.

        4)   The development may significantly alter existing natural landforms.

        5)   The development does not comply with shoreline erosion and geologic setback requirements.

        6)   The development is not in conformity with the Local Coastal Program.

    b.   The grounds of appeal for any development appealable under 2.b.,c., and d. of this section shall be limited to whether development is in conformity with the Local Coastal Program.

5648e

Exhibit 49

5.    CELERON FINAL DEVELOPMENT PLAN CONDITIONS

A.    GENERAL

A-1.    Acceptance of this permit shall be deemed as acceptance of all final conditions of this permit, except that Celeron reserves the right to pursue any remedy for any legal violations imposed directly or indirectly by these permit conditions.

A-2.    Substantial failure to abide by and faithfully comply with any conditions for the granting of this permit shall constitute grounds for the modification or revocation of this permit.

A-3.    Celeron agrees as a condition of the issuance and use of this permit to defend at its sole expense any action brought against the County by a third party challenging either its decision to issue this permit or the manner in which the County is interpreting or enforcing the conditions of the permit.  Celeron will reimburse the County for any court costs and attorneys fees which the County may be required by a court to pay as a result of such action where Celeron defended or had control of the defense of the suit.  County may, at its sole discretion, participate in the defense of any such action, but such participation shall not relieve Celeron of its obligation under this condition.  County shall bear its own expenses for its participation in the action.

A-4.    Celeron shall make an initial deposit to a fund to permit the County to adequately implement and enforce the conditions imposed on Celeron by applicable County ordinances and/or the conditions of this permit, if such a fund is established.  If the Board of Supervisors determines that a reasonable enforcement fund is needed, the Director of the Resource Management Department shall present to the Board of Supervisors and Celeron a plan for enforcement within one year from the effective date of this permit.  This plan shall set forth the staffing requirements and materials necessary for such enforcement and the estimated costs thereof.  This plan shall provide that all reasonable expenses incurred by the County or County contactors, for permit condition implementation, reasonable studies, and emergency response directly and necessarily related to enforcement of these permit conditions shall be reimbursed by Celeron within 30 days of invoicing by County.

A-5.    In the event that Celeron fails to comply with any order of the Administrative Officer or the Board of Supervisors issued hereunder or any injunction of the Superior Court, it shall be liable for a civil penalty for each violation to the extent imposition of such civil penalty is authorized by applicable laws, rules, or regulations.

        Said civil penalty shall be in addition to Celeron's obligation, if any, to reimburse the County of Santa Barbara (and others) for actual damages suffered as a result of Celeron's failure to abide by the conditions of this permit or by the orders of the Administrative Officer, the Board of Supervisors, or any court of competent jurisdiction.

Exhibit 49

A-6.        As to any condition which requires for its effective enforcement the
            inspection of construction records or records pertaining to facility
            operations, or the facilities themselves by County or its duly
            authorized agents, Celeron will make all necessary records available
            or provide access to such facilities upon reasonable notice from
            County.  County agrees to keep such information confidential where
            permitted by law and requested by Celeron in writing.

A-7.        The procedures, operating techniques, design, equipment and other
            descriptions (hereinafter procedures) described by Celeron in its
            application to the County 83-DP-25 cz, 83-CP-97 cz, and in subsequent
            clarifications and additions to that application and the Final
            Development Plan are incorporated herein as permit conditions and
            shall be required elements of the project.  Since these procedures
            were part of the project description which received environmental
            analysis, a failure to include such procedures in the actual project
            could result in significant unanticipated environmental impacts.
            Therefore, modifications of these procedures will not be permitted
            without a determination of substantial conformity or a new or
            modified permit.  The use of the property and the size, shape,
            arrangement and location of buildings, structures, walkways, parking
            areas and landscaped areas shall be in substantial conformity with
            the approved Final Development Plan.

A-8.        In addition to the authority to enforce and secure compliance with
            the provisions of this permit under Division 12, Coastal Zoning
            Ordinance of the Santa Barbara County Code, Division 7, General
            Regulations, Article III Santa Barbara County Zoning Ordinance, the
            County Administrative Officer, or in his/her absence a designated
            appointee, may order that curtailment of activities which is required
            to protect the public health and safety.  Said action may include,
            but is not limited to, ordering temporary, partial or total facility
            shutdown.

            Such an order shall be made only in the event that the Administrative
            Officer has reasonable and probable cause to believe that continued
            unrestrained activities of permittee will likely result in or
            threaten to result in danger to public health, welfare, or safety, or
            in the environment and provided such violations can be expected to
            continue or recur unless operations are in whole or in part shut down
            or reduced pending the necessary corrections.

            Before issuing any curtailment order, the County Administrative
            Officer shall set a time for hearing and shall give written notice of
            the time and place of the hearing and of the alleged violations.
            Such notice shall be received by the person in charge of the
            operation of the facility at least 24 hours before the hearing at
            which time there will be an opportunity for all concerned parties to
            present evidence regarding the alleged violations.  The notice may be
            served in person or by certified mail.

Exhibit 49

In the event the Administrative Officer, or in his/her absence the designated appointee, determines that there is an imminent danger to the public health and safety resulting from violations, he/she may summarily order the necessary curtailment of activities without hearing and such order shall be obeyed upon notice of same, whether written or oral.  At the same time that notice of the order is conveyed, the Administrative Officer shall set a date, time and place for a publically noticed hearing and review of said order as soon as possible which date shall be no later than 24 hours after such order is issued or served.  Said hearing shall be conducted in the same manner as a hearing on prior notice.  After such hearing, the Administrative Officer may modify, revoke, or retain the emergency curtailment order.

Any order of the Administrative Officer may be appealed to the Board of Supervisors  within three working days after such order is made.

If such appeal is not filed with the Board of Supervisors, the Administrative Officer's order becomes final.  If there is an appeal, the order of the Administrative Officer shall remain in full force and effect until action is taken by the Board of Supervisors.  The decision of the Board of Supervsiors shall be a final Administrative Action.  Such decision shall not preclude Celeron from seeking judicial relief.

Once Celeron has shown that the conditions of violation no longer exist and are not reasonably likely to recur, the Administrative Officer shall modify the curtailment order to account for such compliance and shall entirely dissolve the order when it is shown that all of the violations have been corrected and are not likely to recur.

A-9.      In the event that any condition contained herein is determined to be invalid, then all remaining conditions shall remain in force.

A-10.     In the event that any condition contained herein is determined to be in conflict with any other condition contained herein, then where principles of law do not provide to the contrary, the condition most protective of public health and safety and natural environmental resources shall prevail to the extent feasible.

A-11.     In addition to any administrative remedies or enforcement provided hereunder, the County may seek and obtain temporary, preliminary, and permanent injunctive relief to prohibit violation of the conditions set forth herein or to mandate compliance with the conditions herein.

          All remedies and enforcement procedures set forth herein shall be in addition to any other legal or equitable remedies provided by law.

Exhibit 49

4-12.   The owner and the operator of the facility shall be jointly and
        severally liable without regard to fault for all legally compensable
        damages or injuries suffered by any property or person that result from
        or arise out of any oil, water spillage, fire, explosion, odor, or air
        pollution, in any way involving oil or gas or the impurities contained
        therein or removed therefrom and which arises out of construction or
        operation of Celeron's facilities.  For the purpose of this condition,
        the "facility" shall be deemed to include all facilities described and
        approved pursuant to 83-DP-25cz, 83-CP-97cz.  This condition shall not
        inure to the benefit of any of the owners of the pipeline, including
        the United States Government.  This declaration of strict liability and
        the limitations upon it shall be governed by the applicable law of
        California on strict liability.

A-13.   All facilities constructed under this permit shall be used only for the
        shipment of a maximum volume of heated crude oil demonstrated to be
        within the design parameters of the pipeline facilities as built. The
        subject volumes will be outer continental shelf (OCS) and other locally
        produced onshore and offshore petroleum from the Santa Barbara and
        Santa Maria Basins.  Celeron shall obtain a new or modified permit, or
        authority to continue operation under the existing permit prior to
        undertaking any of the following activities which may, in the judgement
        of the County, result in significant changes to the impacts on the
        County.  Such changes could include but not be limited to: 1) major
        pipeline or pump station modifications; 2) major changes in pipeline
        throughput; 3) introduction of production to the pipeline from sources
        other than those described above; and 4) introduction of a different
        product from any source.

        Other source volumes may be transported subject to a determination of
        substantial conformity by the Planning Commission and a finding of
        facts and determination that project impacts will not be increased by
        transporting and processing those other sources.

A-14.   Celeron shall align the pipeline corridor from the coastal starting
        point to the County exit point in the western Cuyama valley according
        to the route approved by the County.  Celeron shall locate and
        construct all isolation  valves as identified by the final approved
        alignment.

A-15.   Any person, firm or corporation, whether as a principal, agent,
        employee, or otherwise, found to be in violation of any provisions or
        conditions of this ordinance or permits, shall be punishable as set
        forth in the applicable section of the Coastal Zoning Ordinance, and
        Article III of the Santa Barbara County Code.

        Each and every day during any portion of which any violation of this
        Article or the rules, regulations, orders, or permits issued
        thereunder, is committed, continued, or permitted by such person, firm
        or corporation shall be deemed a separate and distinct offense.

Exhibit 49

A-16.    The Santa Barbara County Board of Supervisors in a noticed public
hearing shall have the authority to specify or change the Santa Barbara
County Department responsible for any conditions contained herein.

A-17.    Should circumstances, including legal or legislative action, cause the
County to lose its authority or have its authority fundamentally
reduced to assess fees as a method to mitigate project-related impacts,
then other feasible mitigation measures shall be imposed which will
substantially lessen the significant impact formerly mitigated by the
imposition of fees.  Within six months of the County's loss of such
authority, feasible alternative mitigation measures shall be imposed as
replacement permit conditions.  Alternatively, the County in a noticed
public hearing must find that no feasible mitigation measures are
available and that the benefits of the project outweigh the significant
environmental impacts.

A-18.    Should legal action be required by either party to enforce any rights
in connection with this permit the prevailing party shall be entitled
to reasonable attorney's fees and costs pursuant to Civil Code 1717.

A-19.    Unless otherwise specified, these permit conditions are intended to
apply to Celeron during both the construction and the operation of the
permitted facilities.


B.    PERMIT REVIEW

B-1.    Prior to initiation of construction activity (such as ROW preparation,
river crossings or pump station construction), Celeron shall submit to
the System Safety and Reliability Review Committee (established by
condition P-1) relevant construction drawings and supporting text
demonstrating compliance with the appropriate conditions.  Construction
may not commence until County has approved this submittal.  Within 15
days of submittal, County shall either give written notice to proceed
with construction or indicate in writing conditions which have not been
met.  When such conditions have been met construction approval shall be
granted.

B-2.    If at any time County determines that these permit conditions are
inadequate to effectively mitigate significant environmental impacts
caused by the project, or that recent proven technological advances
could provide substantial additional mitigation, then additional
reasonable conditions shall be imposed to further mitigate these
impacts.  Imposition of such conditions shall only be considered and
imposed as part of the County's comprehensive review of the project
conditions.  County shall conduct a comprehensive review of the project
conditions and consider adding reasonable conditions which incorporate
proven technological advances three years after permit issuance and at

Exhibit 49

appropriate intervals thereafter.  A comprehensive review of conditions which are not effectively mitigating impacts may be conducted at any appropriate time.  Upon written request of Celeron, the Board of Supervisors shall determine whether the new condition required is reasonable considering the economic burdens imposed and environmental benefits to be derived.

8-3.    This permit is premised upon findings that where feasible, all significant environmental effects of the project identified in the EIR/EIS (State Clearinghouse No. 83110902), which occur in Santa Barbara County, will be substantially mitigated by the permit conditions.  Prior to approval of the Final Development Plan, County shall review any findings that identified certain mitigation measures as being in the primary jurisdiction of another agency but are also within County's jurisdiction.  County shall thereupon determine either (1) that such mitigation has or is being implemented by such other agency or (2) that such other agency and County determine such mitigation to be infeasible.  If County determines that no other agency is or may be implementing such feasible mitigation measures then County may impose those feasible measures within its jurisdiction to mitigate those environmental impacts in accordance with appropriate mitigation measures identified by the EIS/R.

8-4.    Prior to approval of the Final Development Plan, Celeron shall develop and submit to the Resource Management Department for approval a plan to co-ordinate the placement and timing of their pipeline with SCPS's pipeline (or other potential proposals for use of the same corridor for a pipeline).  Any agreements between Celeron and SCPS (or other applicant) necessary to implement this plan shall be subject to review and verification by the Resource Management Department to assure the purpose of the plan will be achieved.  The expressed purpose of this co-ordination plan shall be:

1) arrangement of simultaneous construction where practical;

2) engineering of pipe placement within the ROW to minimize incremental widening of the initial construction corridor during subsequent pipeline projects;

3) identification of segments where incremental widening of the ROW is constrained and alternative engineering techniques which may allow construction of subsequent pipelines (and potential limitations of future pipeline use of the ROW); and

4) timing and design of revegetation plans to promote effective revegetation but minimize unnecessary duplication of efforts.

Should SCPS or any other applicant abandon their pipeline project, or fail to submit a Final Development Plan prior to Celeron pipeline construction, this condition may be modified to reflect the existing situation but maintain the intent of this condition.

Exhibit 49

Planning Commission Actions                                        Page 14
Celeron Pipeline Final Development Plan                      March 3, 1986

B-5.     In the event that scheduling requirements among or between conditions
         in this permit (or with this permit and conditions imposed by other
         agencies) conflict with respect to timing, the Resource Management
         Department (in consultation with other agencies as appropriate) shall
         resolve such conflict.

B-6.     Applicant shall cooperate as necessary with San Luis Obispo County in
         the permitting, design, and construction of those segments of the
         pipeline which could affect Santa Barbara County.  The intent of this
         condition is to ensure that potential impacts to Santa Barbara County
         are mitigated to the maximum extent feasible by these permit
         conditions, regardless of the location of the source of the impact.

B-7.     Prior to commencing any construction activities in Santa Barbara
         County, Celeron shall obtain a letter from the Director of the
         Resource Management Department indicating that all conditions which
         require approval prior to construction, as specified by this permit,
         have been satisfied.

B-8.     Prior to start-up of the pipeline in Santa Barbara County, Celeron
         shall obtain a letter from the Director of the Resource Management
         Department indicating that all conditions which require approval
         prior to start-up, as specified by this permit, have been satisfied.

B-9.     In the event that Celeron and staff cannot reach an agreement on the
         adequacy of any submittal required by these conditions, the matter
         will be brought before the Planning Commission for resolution at the
         earliest possible date.


C.   MANAGEMENT

C-1.     Celeron shall prepare an Environmental Quality Assurance Program
         (EQAP) for Resource Management Department approval prior to the Final
         Development Plan.  This EQAP shall encompass both the construction
         and operation phases of the project, and shall describe the steps
         Celeron will take to assure compliance with these conditions.  This
         plan is intended to provide a framework for all other programs and
         plans specified by these conditions as required prior to approval of
         the Final Development Plan.  As such, it will become a comprehensive
         reference document for the County, other agencies, and the public
         regarding the Celeron project.

         This plan shall provide for the submission to the Resource Management
         Department semi-annual reports throughout construction and annual
         reports during operations.  These reports shall describe:

Exhibit 49

Planning Commission Actions                                           Page 15
Celeron Pipeline Final Development Plan                          March 3, 1986

    a)  Project status, including but not necessarily limited to:

        i)    extent to which construction has been completed,
        ii)   the rate of production/throughput during operation,
        iii)  environmental planning and implementation efforts, and
        iv)   any revised time schedules or timetables of construction
              and operation that will occur in the next one year period.

    b)  Permit condition compliance, including but not necessarily
        limited to the results of the specific mitigation requirements
        identified in these conditions.

    c)  Results and analyses of all data collection efforts being
        conducted by Celeron pursuant to these permit conditions.

    The program shall include (or if separate plans exist, reference) all
    plans relevant to construction and operations of the pipeline
    facilities specified by these conditions.

Construction

The program shall include all plans relevant to construction activites
such as the Restoration, Erosion Control and Revegetation Plan and the
Cultural Resources Mitigation Plan.

The program shall include provisions for at least one managing
environmental coordinator with overall responsibility, and if
necessary, one onsite environmental coordinator per construction site
during the construction phase.  These coordinators shall be approved by
and be responsible to the Resource Management Department.  Celeron
shall fund the coordinator(s).  The number of coordinators necessary
shall be determined according to the amount of simultaneous
construction activity occuring in geographically separate areas.  The
responsibilities of the coordinator(s) are to include:

a)  on-site, day-to-day monitoring of construction activities;

b)  ensuring contractor knowledge of and compliance with all
    appropriate permit conditions;

c)  evaluating the adequacy of construction impact mitigations, and
    proposing improvements to the contractors, Celeron, and County;

d)  having the authority to require correction of activities observed
    to violate project environmental conditions or that represent
    unsafe or dangerous conditions, and having the ability and
    authority to secure compliance with the conditions or standards
    through the County Administrative Officer as described in
    condition A-8, if necessary;

Exhibit 49

Planning Commission Actions                                    Page 15
Celeron Pipeline Final Development Plan                     March 3, 1986

    e)    performing as contact for affected property owners and any other
affected persons that wish to register observation of
environmental permit violations and/or unsafe conditions,
receiving any complaints, immediately contacting Celeron's onsite
construction representative, verifying any such observations and
developing any necessary corrective actions in consultation with
Celeron's onsite construction representative;

    f)    maintaining prompt and regular communication with the Resource
Management Department, Public Works Department, or other
appropriate County agency, and with Celeron personnel responsible
for contractor performance and permit compliance.

In the event that resolution of disputes between the public and/or
governmental agencies and Celeron over adherence to permit conditions
is not achieved by the managing environmental coordinator, an
arbitration system shall be utilized to resolve such disputes in a
timely manner in order to minimize the need to halt construction
activities as per conditions A-2 or A-8.

The coordinator(s) shall be thoroughly familiar with all plans and
requirements set forth in the permit conditions.  Prior to construction
start-up, the managing coordinator shall discuss with other agency
inspectors or monitoring personnel, inspection programs, areas of
jurisdiction, responsibility, and define methods of avoiding disputes
or construction delay due to agency disagreements.

Selection of the necessary coordinators shall be made, and the
person(s) available, prior to issuance of the Coastal Development
Permit and Land Use Permit.

Operations

The program shall include all plans related to operations, such as the
Emergency Response Plan, Oil Spill Contingency Plan, and Landscaping
Plan, as well as specific conditions not required in formal plans.  It
may also include any procedures not specified by these conditions but
relevant to environmental protection and safety.

C-2.    Prior to issuance of the Coastal Development Permit and Land Use Permit
Celeron shall provide to the Resource Management Department and the
Emergency Services Coordinator the current name and position, title,
address, and 24-hour phone numbers of the field agent, person in charge
of the facility, and other representatives who shall receive all orders
and notices, as well as all communications regarding matters of
condition and permit compliance at the site and who shall have
authority to implement a facility shutdown pursuant to condition A-8 in
this Ordinance.  There shall always be such a contact person(s)
designated by the permittee.  One contact person shall be available 24
hours a day during all phases of the project in order to respond to
inquiries received from the County, or from anyone in case of an
emergency.

Exhibit 49

If the address or phone number of Celeron's agent should change, or the responsibility be assigned to another person or position, Celeron shall provide to the Resource Management Department the new information within seven days.

C-3.    Celeron shall furnish to the Resource Management Department copies of all County permit applications relative to the project once submitted, and of permits within 30 days of receipt by Celeron.


D.    AIR QUALITY

D-1.    Nothing contained herein shall be construed to permit a violation of any applicable air pollution law, rule, or regulation.

D-2.    Prior to initiation of construction, including grading, of any facilities approved pursuant to this Development Plan, Celeron shall obtain an Authority to Construct permit from the County Air Pollution Control District.

D-3.    Celeron agrees to implement all air pollution control procedures as required by APCD and identified in the Final Development Plan (such as water sprays to reduce construction-related fugitive dust).

D-4.    Emissions from any project component that contribute to ozone standard violations must be mitigated to the extent feasible.  Effectiveness of mitigation will be confirmed by APCD.

D-5.    Deleted.

D-6.    Prior to approval of the Final Development Plan, Celeron shall submit to the Resource Management Department updated estimates of the type and size of helicopters, or other aircraft, to be used during pipeline operations for the aerial surveys of the pipeline route.  The information shall also include the estimated operating schedules, frequency and duration of airport calls and other reasonable information as required by APCD.  The County may require validation and updating of this information as needed.  Should this information reveal significant differences between the estimated air emissions and those analyzed in the EIR/EIS, the APCD may modify air quality permit conditions as necessary to assure consistency with the Air Quality Attainment Plan and Reasonable Further Progress goals.

D-7.    All facilities shall be designed, constructed, operated, and maintained, such that the facilities approved under this Development Plan shall not discharge quantities of air contaminants or other materials in violation of Section 41700 of the Health and Safety Code.

Exhibit 49

D-9    Prior to the approval of the Final Development Plan, Celeron shall
       submit to the Director of the Resource Management Department a plan,
       approved by the APCD, which includes timing of construction, minimizing
       soil handling, and other measures to mitigate construction air quality
       impacts.  The plan shall include APCD approved analysis which
       demonstrates that local, state and federal air quality standards will
       not be violated as a result of construction activities.


E.     GEOLOGY

E-1.   Prior to the issuance of the Coastal Development Permit and Land Use
       Permit, Celeron will conduct a route-specific Geologic Investigation,
       Design, and Mitigation Program.  This program shall contain three basic
       components: 1) a detailed geologic investigation component which
       defines specific hazards, 2) an engineering design component which
       details specific engineering plans for each identified hazard along the
       route, and 3) a geohazards mitigation component which demonstrates how
       and to what extent each hazard is reduced.

       a) Detailed geologic investigation component:

              Where specific hazards have been identified or may occur along
              the pipeline route or at pump station locations, Celeron will
              conduct appropriate detailed geologic, seismic, and geotechnical
              studies to further characterize the specific geologic hazard.
              These studies will be conducted under the direction of a State of
              California registered geologist or engineering geologist and will
              be subject to approval by the Resource Management Department and
              Public Works Department.  These studies will include but not be
              limited to investigations of unstable slopes, erodable slopes,
              lurch/liquefaction susceptible substrate, surface rupture, and
              river scour characteristics (depth and lateral extent).  Methods
              of investigation shall conform to appropriate geotechnical
              techniques applicable to each specific hazard.  Draft results
              will be subject to review by County Public Works Department and
              Flood Control Agency as appropriate prior to finialization of the
              engineering design.  The final report will be submitted with the
              final engineering design component.

       b) Engineering design component:

              Celeron shall incorporate appropriate geotechnical information
              from component a) and other applicable recommendations into final
              engineering design of pipeline construction and facilities.  This
              includes but is not restricted to:  the development of
              appropriate ground motion parameters for use in seismic design of

Exhibit 49

critical structures and equipment, unstable slope construction or avoidance techniques, burial depth at all major river crossings, modification of instrumentation, or use of the dual contingency level/operating level earthquake concept, or its equivalent. The designs will be subject to review by the Department of Public Works and third party technical review as specified in Condition P-1. The final engineering design shall be approved by County Public Works and Flood Control Agency prior to the issuance of the Coastal Development Permit and Land Use Permit.

c) Geohazards mitigation component:

Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron will submit to the Resource Management Department a detailed geologic hazard mitigation report. The report will outline the hazards identified in part a) of this program and will address how engineering designs as detailed in part b) of this program reduce each specific hazard. This component will also be submitted to the Department of Public Works and Flood Control Agency and will be subject to third party review as specified in Condition P-1.

E-2.  Celeron will develop a Monitoring Program for the operations phase to be funded by Celeron and staffed as necessary with at least one State of California registered engineer, or engineering geologist, in order to evaluate any hazards identified by routine monitoring. The program will be designed to verify adequate performance or condition of the project components in hazard areas such as river and active fault crossings, and will be subject to approval of the Resource Management Department prior to issuance of the Coastal Development Permit and Land Use Permit. The monitoring program may in part be incorporated into routine aerial and ground reconnaissance.

If the monitoring indicates a potential or actual hazard, appropriate action including, but not limited to, operations curtailment and repairs, will be taken by Celeron to mitigate the hazard. Celeron will report to the Emergency Services Coordinator any potentially hazardous situations discovered during monitoring.

In the case of river crossings at the Santa Ynez, Sisquoc and Cuyama Rivers, a yearly inspection of pipeline burial depth, subject to review by the Resource Management Department and Flood Control Agency, shall be performed. At crossing of the Santa Ynez and Sisquoc Rivers where channel degradation has reduced the depth of cover to less than four feet below the 100-year scour depth, or other hazardous levels as determined by a professional engineer on the staff of or under supervision of the County Flood Control Agency, or US D.O.T. specifications, relocation or reburial of the pipeline to adequate depth will be required. At the crossing of the Cuyama River, if the inspections reveal that hazardous conditions exist, mitigations such as reconstruction or relocation of the crossing will be required as determined by a professional engineer on the staff of or under supervision of the County Flood Control Agency.

Exhibit 49

E-3.    Inspection of the pipeline trench or trench spoil to identify any
        potential geologic hazards shall be made by a professional geologist or
        soils engineer approved by the Resource Management Department prior to
        installation of the pipeline.  If hazards not previously accounted for
        in the pipeline design are encountered, appropriate mitigation measures
        will be developed and must be instigated prior to installation of the
        pipeline.  The results of the inspection will be reported to the
        engineering geologist of the Public Works Department who will approve
        prior to, and the supervising environmental coordinator who will
        insure, application of the necessary mitigation measures.  The timing
        of such inspections shall not result in any unreasonable delays in
        installation of the pipeline.

E-4.    At all places where the pipeline crosses an active fault, according to
        the Department of Geology and Mining definitions, Celeron will place
        isolation valves on either side, or design and construct appropriate
        devices or measures which more effectively mitigate the hazard of the
        fault crossing.  Location and nature of these designs must be approved
        prior to the issuance of the Coastal Development Permit and Land Use
        Permit.

E-5.    Prior to the issuance of the Coastal Development Permit and Land Use
        Permit Celeron shall submit final Grading and Erosion Control Plans for
        the Sisquoc pump staton approved by the Department of Public Works.
        These plans shall be consistent with or based on information contained
        in the geologic investigation required in Condition E-1.

        Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall either submit Grading Erosion Control Plans for
        the Las Flores and Gaviota pump stations for approval by the Department
        of Public Works or show evidence that the plans are a part of the
        overall Grading and Erosion Control Plans for the consolidated
        processing facilities at those sites.

E-6.    Celeron shall cooperate as necessary with San Luis Obispo County in
        the permitting, design and construction of the Cuyama River crossing.

        Any pipeline crossing the Cuyama River shall be laid to a depth
        consistent with studies performed under Condition E-1 and subject to
        approval of the County Flood Control District.

E-7.    Prior to approval of the Final Development Plan, Celeron shall commit
        to the location of their south coast pump stations to the satisfaction
        of the Planning Commission.  If these stations are not within the
        boundaries of the approved Exxon, Gaviota Terminal Company, or Chevron
        facilities, Celeron shall submit grading and erosion control plans
        pursuant to Condition E-5.

Exhibit 49

Planning Commission Actions                                           Page 21
Celeron Pipeline Final Development Plan                          March 3, 1986

F.    SURFACE AND GROUNDWATER

F-1.   During construction of the pipeline across all perennial stream
       crossings, stream flows, if any, shall be diverted around construction
       areas to maintain downstream flows.  Baseline water flows shall be
       maintained in coastal streams in order to avoid adverse impacts to
       lagoon or other sensitive habitats.

F-2.   Sediment retention devices that allow continued streamflow shall be
       installed directly downstream of stream crossings during construction.

F-3.   For pipeline crossings at the following stream or river crossings:
       Tajiguas; Refugio; Gaviota; Nojoqui; Zaca; San Antonio Creeks, all
       additional perennial streams which the pipeline crosses: Santa Ynez;
       Sisquoc; and Cuyama Rivers, Celeron shall construct the buried
       pipelines during the months of low historical streamflow, in order to
       minimize erosion loss downstream and protect surface water quality.  In
       the event of low winter rainfall, earlier construction may be approved
       by Resource Management Department and County Flood Control Agency.

F-4.   No staging areas shall be permitted within riparian habitat corridors.

F-5.   During pipeline construction at stream crossings, construction
       contractors will minimize time of disturbance, narrow the construction
       ROW to the extent feasible, stabilize the disturbed areas immediately
       following construction of the crossing, and divert runoff waters around
       construction areas to maintain downstream flows.

F-6.   Deleted.

F-7.   Celeron shall install isolation valves on either side of all perennial
       stream and river crossings, including the Cuyama River, and/or as
       required by the Coastal Zoning Ordinance, unless the applicant can
       demonstrate that alternative methods will further reduce the potential
       leak impacts at the crossing site.  These locations shall be identified
       prior to the Final Development Plan.

F-8.   Prior to approval of the Final Development Plan, Celeron shall identify
       the freshwater source considered for supplying pipeline and facility
       construction activities including hydrostatic test water, and shall
       estimate the total quantity required.  Any water obtained from coastal
       or inland sources shall not significantly disrupt streamflows,
       groundwater resources, or habitat resources.  Water conserving devices
       shall be used where feasible.  Any water used during construction,
       (exclusive of hydrostatic test water), shall contain no more than 5,000
       parts per million total dissolved solids.  Disposal of hydrostatic test
       water within the County shall be according to a plan approved by the
       Regional Water Quality Control Board, or by the Flood Control Agency.
       This information shall be provided to and approved by the Resource
       Management Department as part of the Final Development Plan.

Exhibit 49

Planning Commission Actions                                          Page 22
Celeron Pipeline Final Development Plan                         March 3, 1986

F-9.     Prior to approval of the Final Development Plan, Celeron will perform
         detailed hydrogeologic investigations for the sensitive areas
         identified in the the EIR/EIS, (Table 3-14).  These investigations will
         be conducted by a State of California registered geologist or engineer
         and will include but not be limited to:

         a)    definition of groundwater depth, recharge sources, properties of
               overlying soils, hydraulic gradient, background water quality,
               and existing water uses.

         b)    inventory of existing wells from State or County Flood Control
               Agency records in an area extending down-gradient from the
               pipeline in the aquifer equal to the distance groundwater would
               move in one year at a velocity calculated from the maximum
               hydraulic conductivity of the specific aquifer, hydraulic
               gradient, and porosity.  The down-gradient sensitive area will be
               determined by a registered geologist.

         This information will be reviewed by the Resource Management Department
         and used by Celeron to formulate the Groundwater Contamination portion
         of an Oil Spill Contingency Plan, Condition P-5.  This portion of the
         Plan will include;

         a)    plans for monitoring and early detection of groundwater
               contamination, including aerial and ground surveys, pipeline
               pressure monitoring, and water sampling of strategic wells;

         b)    plans for notification of affected groundwater users, and the
               Emergency Services Coordinator;

         c)    clean-up response, reparations, restorations, and methods to
               determine and correct the contamination source; and

         d)    identification of emergency alternate water supplies.

F-10.    At the base of slopes where the ROW approaches sensitive aquifers as
         identified in the EIR/S that are at risk from oil spills and leaks, a
         dam or ditch plug will be used in the pipeline trench.  The sensitive
         areas are those where the ROW follows 1) topographic slopes toward
         basins with shallow depth to water, 2) high vertical permeabilities,
         and 3) a high degree of groundwater use as indicated by the
         hydrogeologic investigations required as per condition F-9.  These
         areas shall be identified in the Final Development Plan.

F-11.    Prior to the approval of the Final Development Plan, the System Safety
         and Reliability Committee shall review and approve submitted plans of
         all Creek and River crossings in Santa Barbara County.  Permitted
         development shall not cause or contribute to flood hazards or lead to
         the expenditure of public funds for flood control works.

Exhibit 49

G.    AQUATIC BIOLOGY

G-1   Fueling and lubrication of construction equipment will not occur within
      0.25 miles of any flowing streams.  No more than 2 barrels of fuel
      shall be kept at construction sites, exclusive of pipeline construction
      equipment fuel tanks, within 0.25 miles of all perennial creeks.  As
      part of the oil spill response plan, Celeron will submit plans for
      clean-up and restoration of affected areas in the event of a
      construction fuel spill.


H.    TERRESTRIAL BIOLOGY

H-1.  Prior to issuance of the Coastal Development Permit and Land Use
      Permit, Celeron shall submit a Restoration, Erosion Control, and
      Revegetation plan for the final proposed pipeline route and the pump
      station sites.  The plan shall be submitted to the Resource Management
      Department for approval.  Once approved, the plan shall be implemented
      by Celeron.  Success of the restoration and revegetation plans shall be
      monitored by a qualified independent biologist who is in addition to
      the managing environmental coordinator (Condition C-1). The plan shall
      contain, but not be limited to, the following:

      (a)   Procedures for stockpiling and replacing topsoil, replacing and
            stabilizing backfill, such as at stream crossings, and steep or
            highly erodable slopes.  Additionally, provisions shall be made
            for recontouring to approximate the original topography.  Excess
            fill shall be disposed of off-site unless suitable arrangements
            are made with the property owner.  Excess fill shall not be
            deposited in any drainage, or on any unstable slope.

      (b)   Specific plans for control of erosion, gully formation, and
            sedimentation, including, but not limited to, sediment traps,
            check dams, diversion dikes, culverts and slope drains.  Plan
            shall identify areas with high erosion potential and the specific
            control measures for these sites.

      (c)   Procedures for containing sediment and allowing continued
            downstream flow at stream crossings, including scheduling
            construction activities during low-flow periods.

      (d)   Procedures for re-establishment of vegetation that replicates or
            is functionally equivalent to indigenous and naturalized
            communities along the alignment.  These shall include: measures
            preventing invasion and/or spread of undesired plant species;
            restoration of wildlife habitat value; and restoration of native
            plant species and communities.  Celeron shall consult with the
            County Farm Advisor and appropriate Ranch operators when
            developing procedures for revegetating areas used for cattle
            grazing and other agricultural uses;

Exhibit 49

(e)     Procedures for restoration of riparian corridor stream and river banks and stream bed substrates and elevation;

(f)     Procedures for minimizing all tree removal or tree root and branch damage, such as, flagging the corridor, keeping all disturbance to no more than the 100-foot pipeline right-of-way, feathering the right-of-way edges, providing for onsite monitoring of construction by a qualified independent biologist. In addition, special procedures are required for oak woodlands since County policy requires that these trees must not be cut down if feasible. Special procedures for oaks include reducing the right-of-way to the minimum width possible and minimizing the impact to the root zone of these trees;

(g)     Procedures for replacement of native trees and large shrubs removed from the 100-foot temporary easement during construction across riparian and woodland, in particular oak woodland, habitat, with saplings of the same species propagated from materials obtained from the same area, including provision for supplemental irrigation as necessary and feasible to ensure establishment, and provisions for protection of saplings from grazing animals;

(h)     A soil conservation program, to be applied in areas of 20 percent or greater slopes along the pipeline corridor.

(i)     Procedures for incorporating landowner concerns in the plan. Any changes to the plan instigated by such concerns shall be approved by the Resource Management Department.

(j)     A plan for offsite re-establishment of oaks to mitigate impacts to oak savannahs and woodlands along the route.

The segment of the plan pertaining to Gaviota State Park shall be prepared in cooperation with the State Department of Parks and Recreation.

H-2.    One year after construction, a survey will be conducted, at Celeron's expense, to determine the actual impact caused by construction. This survey shall include aerial photography, and as appropriate color stereo and infrared photography and field studies. The report will identify areas with potential for further impact, e.g., high erosion areas, that will require immediate remedial measures. The survey shall also contain an examination of previous mitigation measures and present a list of additional feasible mitigations based on the impacts during construction and potential impacts caused by operation. Celeron and the Resource Management Department shall agree to additional feasible mitigations. This process shall be repeated as often as necessary by the Resource Management Department, but not more than annually.

Exhibit 49

H-3.    In those areas where trees and other habitats such as riparian areas
        and oak woodlands are to be avoided within the approved corridor,
        Celeron shall assure contractor compliance with this condition by
        marking and/or fencing those habitats.

H-4.    Additional reasonable and feasible conditions of mitigation, consistent
        with condition H-1 and to the extent necessary, shall be identified and
        observed as developed during the archaeological mitigation program
        (conditions L-1, L-2, L-3, L-6), and as identified by the managing
        environmental coordinator in consultation with Celeron's Onsite
        Construction Representative (condition C-1).

H-5.    Deleted.

H-6.    Celeron shall not use herbicides in wetland and riparian areas, and
        along the rest of the pipeline corridor during construction.

H-7.    Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall receive a permit (1603) as required from the
        California Department of Fish and Game.  This permit should include
        provisions to ensure that the proposed construction schedule will not
        interfere with reproductive activities of regionally rare or rare,
        threatened or endangered bird, amphibian, and fish species or other
        species of special concern, in those environmentally sensitive habitats
        identified in the EIR/EIS and shall submit this confirmation to the
        Resource Management Department.  If the Department of Fish and Game
        determines that the construction schedule will have an impact then
        Celeron will adhere to directives of the Department of Fish and Game
        with respect to their permit requirements.

H-8.    Deleted.

H-9.    Celeron shall minimize impacts to the population of Hoffmann's
        nightshade (Solanum xanti var. hoffmannii) found in the Gaviota Pass
        area.  Celeron shall submit plans to enhance the recovery of this
        population to the Resource Management Department for approval prior to
        issuance of the Coastal Development Permit and Land Use Permit.  These
        plans shall include provisions for removing any individual plants that
        would be affected, place them in large tubs, and replant them as near
        as possible to the original location (exclusive of the operation
        Right-of-Way) after construction; and gathering seeds prior to issuance
        of the Coastal Development Permit and Land Use Permit from the
        population of Hoffmann's nightshade located in the Gaviota Pass area
        and planting them in and near the ROW after construction.  This shall
        be done under the supervision of a biologist approved by the Resource
        Management Department and in cooperation with the California Parks
        Department; this biologist may approve modifications to these
        techniques based on season of the year and state of dormancy.

Exhibit 49

Planning Commission Actions                                                Page 26
Celeron Pipeline Final Development Plan                              March 3, 1986

H-10.   Celeron shall minimize impacts to the population of Catalina Mariposa
        lily (Calochortus catalinae) found in the Gaviota Pass area. Celeron
        shall submit plans to enhance the recovery of this population to the
        Resource Management Department for approval prior to issuance of the
        Coastal Development Permit and Land Use Permit. These plans shall
        include provisions for gathering of seeds from the population found in
        or near the ROW prior to construction, planting the seeds in or near
        the ROW after construction (exclusive of the operation ROW), conserving
        the upper 19-24 inches of heavy clay soil which contains the plant's
        bulb-like corms found in the vicinity of the plants prior to
        construction, and then, after construction, replacing this soil which
        holds the plants bulb-like corms. This shall be done under the
        supervision of a biologist approved by the Resource Management
        Department and in cooperation with the California Parks Department;
        this biologist may approve modifications to these techniques based on
        season of the year and state of dormancy.

H-11.   Celeron shall minimize impacts to the population of Refugio Manzanita
        (Arctostaphylos refugioensis) found in Gaviota Pass area and affected by
        the proposed construction activities. Celeron shall submit plans to
        enhance the recovery of this population to the Resource Management
        Department for approval prior to issuance of the Coastal Development
        Permit and Land Use Permit. These plans shall include provisions for
        gathering seeds and taking cuttings from the population of Refugio
        Manzanita found in and adjacent to the ROW prior to construction, and
        provisions for the planting of the seeds and plants propagated from
        cuttings in the final construction alignment (exclusive of the
        operation ROW) after construction. This shall be done under the
        supervision of a biologist approved by the Resource Management
        Department and in cooperation with the California Parks Department;
        this biologist may approve modifications to these techniques based on
        season of the year and state of dormancy.

H-12.   Celeron shall prepare a Restoration, Revegetation and Implementation
        section as part of the Oil Spill Contingency Plan (P-5). The section
        shall be reviewed and accepted prior to start-up by the Resource
        Management Department and a biologist approved by the Resource
        Management Department. The section shall be submitted sufficiently
        prior to Celeron's projected start-up date so as to allow reasonable
        time for staff review. Reasonable costs of review shall be borne by
        the applicant. The section shall contain site-specific restoration
        information for all habitat types including stream crossings,
        wetlands/lagoons, oak woodlands, grasslands, riparian zones, and other
        environmentally sensitive habitats. The section shall be divided into
        three major areas: a) Coastal, b) Streams and Rivers and c) Terrestrial
        habitats. Each of these sub-sections shall discuss the various
        habitats in the categories listed above. Methods to achieve
        restoration of all affected areas to their prespill conditions shall be
        discussed.

Exhibit 49

H-13.   Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall submit to the County Board of Architectural
        Review, and the Resource Management Department site-specific plans for
        landscaping of any pump station not within other required project
        vegetation screens. This plan shall, at Celeron's expense, be reviewed
        by a qualified landscape architect and a biologist approved by the
        Resource Management Department to insure the proper plant materials and
        procedures identified in these conditions are implemented. These plans
        shall be developed in consultation with the property owner. The plan
        shall include:

        (a)    The specifications of any potential seed mixtures to be utilized,
               including the plant species in the mixture and the pounds of seed
               per acre to be applied; type of mulch (fiber, chemical tackifier
               or straw); the type and amount of fertilizer; and any
               provisions for irrigation;

        (b)    Confirmation that all native or non-native plant materials
               proposed in the revegetation plan are compatible with indigenous
               vegetation and that none of the plans used is known to be weedy
               or invasive. The plan shall provide for plantings that will
               screen facilities from view. This vegetation screening shall
               also be designed to reduce nighttime lighting and noise. Near
               chaparral or other high fire hazard areas, the seeds or seedlings
               will consist of native or non-native species, shown to contain
               fire retardant properties (such as toyon) and shown to be fast
               growing;

        (c)    The specifications for native seeds and seedlings that will have
               wildlife habitat and food value. All perennial plants, and all
               woody plants are to be propagated from material obtained from the
               same area. Native plant material is to be obtained from a
               revegetation contractor. All native materials will be ordered
               from the contractor in advance of construction activities.

        (d)    Confirmation that non-native material is to be confined to
               disturbed areas immediately adjacent to structures needing visual
               screening. Such screening is to include fast growing plants
               adequate to screen the facility from direct view;

        (e)    A detailed irrigation plan if feasible for all revegetated areas
               requiring irrigation for establishment of plant materials;

        (f)    Celeron's commitment for continual monitoring of the revegetaion
               so that weeds will be minimized.

H-14.   Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall post a bond or other security agreement approved
        by the County Counsel to ensure that all landscaping and revegetation
        programs are completed to the County's specifications.

Exhibit 49

Planning Commission Actions                                          Page 28
Celeron Pipeline Final Development Plan                          March 3, 1986

H-15.   Prior to issuing a release from the bond or other security agreement, a
        biologist and landscape architect hired by the County, at Celeron's
        expense, shall conduct a field review of all revegetated and landscaped
        areas, to insure consistency with the intent and specifications of the
        revegetation and landscape plan.  Necessary repairs or changes in
        landscaping or revegetation shall be made at Celeron's expense.

H-16.   Prior to approval of the Final Development Plan, a qualified biologist
        approved by the Resource Management Department will conduct
        site-specific field inventories for California state-listed species, as
        mandated by the intent and general provisions of Assembly Bill No.
        3309, the California Endangered Species Act.  The biologist will
        perform the surveys of the 100-foot ROW in areas suspected of having
        any of the species of special concern as identified in Appendix B Table
        B-6, DEIR/S, except for the peregrine falcon, least Bell's vireo, and
        Parish's sidalcea.  Surveys for these species will be conducted prior
        to construction.  The California Department of Fish and Game will be
        consulted concerning appropriate methods for survey as well as
        appropriate mitigation measures if these species are found on the ROW.
        Additional mitigation shall be developed and executed by Celeron based
        on these surveys if determined necessary by the Resource Management
        Department.

H-17.   Prior to issuance of the Coastal Development Permit and Land Use
        Permit, a wildlife biologist approved by the Resource Management
        Department will survey all potential raptor nesting habitats within 0.5
        miles of the pipeline, to identify active and inactive nests and
        potential perch sites cleared by ridge-top construction.  No
        construction will occur within 0.5 miles of active eyries during
        nesting season as determined by the biologist.  Construction may be
        permitted by the Resource Management Department in consultation with
        the biologist near inactive nests provided nest sites are not
        disturbed.  Where deemed necessary by the California Department of Fish
        and Game biologists, raptor perch or roost trees will be avoided and/or
        artifical roosts will be constructed on ridgelines to mitigate losses
        of such trees resulting from clearing the ROW on ridge tops.

H-18.   Celeron shall limit the width of the construction ROW through all
        riparian habitats to the extent feasible.  Celeron shall submit a plan
        indicating the location and size of the construction ROW through all
        riparian habitats.  These plans shall be approved by the Resource
        Management Department prior to the Final Development Plan.

H-19.   The construction ROW shall be routed to avoid trees to the maximum
        extent feasible.  When this is not possible, dying or diseased trees
        shall be removed preferentially over healthy trees.

Exhibit 49

Planning Commission Actions                                    Page 29
Celeron Pipeline Final Development Plan              March 3, 1986

H-20.   Celeron shall minimize impacts to the oak woodland in the Suey Canyon
        area.  This shall be done by using existing disturbed areas and by
        narrowing the construction corridor to the extent feasible by working
        on top of the spoils pile or selectively removing spoils, selectively
        removing trees (e.g. dying, or diseased trees) and revegetating to
        enhance re-establishment of oak saplings and/or similar mitigation.

H-21.   Celeron shall align the pipeline route in the vicinity of the Los
        Alisos Creek crossing in order to minimize the amount of riparian
        habitat disrupted.


I.      SOCIOECONOMICS

I-1.    The cumulative impacts of oil and gas industry projects are expected to
        be significant to Santa Barbara County.  Therefore Celeron shall
        participate in an oil and gas industry wide monitoring and mitigation
        program to address socioeconomic impacts indentified as significant
        environmental impacts attributable to their project.  For projects such
        as pipelines, only the construction phase is expected to cause
        significant impacts, and Celeron's participation in the program shall
        be limited to that phase.  The criteria for allocating the costs of the
        monitoring and mitigation program and its mitigation requirements will
        be uniformly applied to all industry participants.

        The intent of this program is to obtain realistic information regarding
        impacts identified in the EIR/EIS, and to allow impacted jurisdictions
        to require mitigation for project-related impacts.  Mitigation of
        impacts through other planning programs, and/or through existing
        administrative infrastructure shall be taken into account.  The scope
        of this program is detailed below.  As subsequent details in the
        structure of the Program are developed by the County, such details
        shall supersede portions of this condition as appropriate.

        The purpose of the Monitoring and Mitigation Program is to accurately
        assess the impacts of the Celeron's proposed development, including
        those in the following socioeconomic areas:

        a.      Temporary housing needs, particularly demand for state and other
                park campsites, recreational vehicle parks, motel-hotel rooms and
                rental housing;

        b.      Longer term (more than one year) housing needs, particularly low
                moderate income housing needs, and associated water demands,
                south coast Santa Barbara County;

        c.      Public finance;

        d.      Transportation of workers and materials to and from the site.

Exhibit 49

At any point when the Board of Supervisors determines that the monitoring program demonstrates that previous mitigation funds paid by Celeron exceed the valuation of the impacts at issue, Celeron shall be granted a credit against any other current or future mitigation fees imposed on Celeron for this permit by the County. Celeron shall be entitled to accrued interest at the prevailing legal rate which shall continue to accrue until the credit is used.

The Monitoring and Mitigation Program will be administered and staffed by the County of Santa Barbara, Department of Regional Programs. A Technical Advisory Committee will provide assistance and input in the documentation of significant adverse impacts and proposals to mitigate these significant impacts.

The Technical Advisory Committee will be composed of: two representatives from Santa Barbara's cities appointed by the Mayor's Select Committee and repesenting north and south county interests; one representative (each) from San Luis Obispo and Santa Barbara counties; and one representative from each affected oil and gas company (to the number of representatives agreed upon). Celeron will be included in the committee until Celeron submits its resignation.

In the event of unresolved technical issues in the area of methodology and calculation of socioeconomic impacts, there shall be a Technical Arbitration Group. The Technical Arbitration Group shall be composed of three individuals without ties to either the County or Celeron, one to be selected by the County Board of Supervisors, one selected by the oil and gas company representatives and the final member selected by the first two members. All Technical Arbitration Group decisions shall be appealable upon written request to the Board of Supervisors. Subsequent details on voting procedures and conflict resolution will be proposed by the Department of Regional Programs and reviewed by the Board of Supervisors in a noticed public hearing.

Prior to approval of the Final Development Plan for this project the monitoring and mitigation program will be refined. Based on information in the EIR/EIS and on other data as appropriate, practical thresholds which trigger the necessity for mitigation will be developed and adopted by the Department of Regional Programs with input from the Technical Advisory Committee. These thresholds will recognize the normal growth incorporated in county plans, prior and existing industry activity, and the decline of the industry if no further permitting is allowed. Methodologies used to establish thresholds and impacts will be developed in consultation with the Technical Advisory Committee.

The need for mitigation will be determined when threshold levels are exceeded as shown by monitored activities and other data as appropriate. The Department of Regional Programs will recommend a mitigation action to the County Board of Supervisors. The Technical Advisory Committee will assist in making the assessment and recommendations. The monitoring and mitigation program will continue through all stages of construction.

Exhibit 49

The monitoring, impact and mitigation elements of the program would be equivalent to those described in the Chevron Gaviota Project conditions, but modified as appropriate for the nature of the pipeline project.

I-2.    Prior to approval of the Final Development Plan, Celeron shall submit to the County Department of Regional Programs a plan which details how they plan to house temporary construction workers for every month of construction.  This plan, to be implemented by Celeron, shall demonstrate how Celeron plans to reduce the housing impacts identified as part of the plan; e.g. exactly how much housing is needed, where it is needed and for how long; but not limited to, the following examples:

(a)    Use of existing under-utilized hotel/motel space during the months of September through May to provide for temporary living quarters for direct construction workers by month; identification of incentives to all the direct construction workers such as rent subsidies and/or shuttle service to the site.

(b)    Use of any available housing outside the South Coast area for all workers associated with the project during the summer months when visitor-serving facilities in the South Coast area are at capacity.  Incentives for workers shall be identified such as rent subsidies and shuttle service for all workers commuting to the job site.

(c)    Methods to limit worker use of public campgrounds as living quarters.  If it cannot be shown that the impact will be reduced from the estimate, Celeron shall make a donation to the California State Parks or to Santa Barbara County Parks for the development of new campsites to offset their worker use of campsites.  The donation shall be made prior to receipt of the building permit and determined by multiplying the estimated cost per developed campsite times 15.  If it is shown by the Regional Program Department and the Technical Advisory Committee that there is significant impact, the above-mentioned groups shall **propose mitigation.  At any point when the Board of Supervisors determines that the monitoring** program demonstrates that previous **mitigation funds paid by Celeron exceed the valuation of the impacts at issue,** Celeron shall be granted a credit against any other current or future mitigation fees imposed on Celeron for this permit by the County.  Celeron shall be entitled to accrued interest at the prevailing legal rate which shall continue to accrue until the credit is used.

Exhibit 49

I-3.    The pipeline construction period will be scheduled so as not to coincide with peak tourist seasons within each construction area in Santa Barbara County, provided that this scheduling does not interfere with any other conditions in this permit with respect to timing, in particular requirements regarding construction during stream and river low-flow.  If such a conflict is found, than additional measures must be taken to provide the temporary housing needs for construction workers.

I-4.    Deleted.

I-5.    Celeron shall include provisions in its contractor agreements specifically to encourage and promote employment from local labor so as to reduce the impacts associated with the in-migration of workers.

I-6.    Except as otherwise provided herein, if the Socioeconomic Monitoring Program shows that project related revenues will not compensate for needed capital or operating expenditures necessary to provide project-related utilities and services additional mitigation will be required.

I-7.    In the event that state and/or federal revenue sharing legislation directed at distributing oil related revenues to state or local governments is approved or Santa Barbara County levies a tax (special or otherwise) on oil and/or gas processed or transported under this permit, then any condition herein requiring payments or other items of value by Celeron to Santa Barbara County or any political subdivision thereof shall automatically be suspended pending a review by the County to determine the extent, if any, which the tax, revenue sharing, or any of the fees imposed are duplicative or unwarranted either as to the level of government services provided or the level of burdens imposed on the public.

J.    LAND USE AND RECREATION

J-1.    Prior to construction, the entire pipeline ROW corridor shall be prominently staked.  All affected property owners along the pipeline route shall be notified in writing at least 30 days prior to the commencement of any pipeline construction on their property, and at least 15 days in advance of any deviation from the staked corridor which crosses their property.

J-2.    All mainline pipeline construction activities except river, perennial coastal stream, and ESH area crossings as specified in condition H-7, once started, shall proceed in a diligent and expeditious manner and shall be completed within nine months after the starting date, subject to necessary and/or unanticipated time extensions approved by County, in consultation with affected property owners.

Exhibit 49

J-3.    Pipeline construction activities shall be limited to the period between
7 a.m. and 7 p.m., Monday through Saturday.  Except for emergency
services, construction activities shall not take place on Sundays, the
dates generally recognized for Memorial Day, July 4, Labor Day, or any
other similarly recognized holiday, unless previous arrangements have
been made with the affected property owners.

J-4.    Prior to approval of the Final Development Plan, Celeron shall consult
with affected property owners to develop reasonable and mutually
satisfactory controls for maintaining the privacy and security of
affected properties while construction is in progress.

J-5.    Unless easements have been obtained from affected property owners or
unless otherwise agreed to by affected property owners, Celeron shall
provide affected property owners written notice at least 48 hours prior
to the start of construction on their property, which shall include:

a)      Description of vehicles using roads on the property, including
type, size, identification, proposed times of entry and
departure, destinations, and the intended route to the
destination.  (Fire, medical, or similar emergency vehicles can
enter as necessary.)  Significant changes in the schedule  of
construction-related vehicular traffic shall be allowed within
the 48-hour advance noticing subject to direct communication
(e.g. telephone, personal communication) by Celeron with the
affected property owners;

b)      Description of estimated construction schedule across the
property.  Any blasting necessary during construction shall be
noticed to all property owners within a one mile radius of the
blasting area;

c)      Description of times of limited access through and across the
property, such as road closures on the property, indicating
specific location, time and duration of the limited access or
closure.  Road closure is considered to include partial road
blockage or disturbance.  Suitable vehicular by-pass shall be
provided during all closures;

d)      Description of any probably hazard or other unsafe condition
during the pipeline construction period, indicating the nature of
the hazard, the area in which the condition will occur, and the
time and duration of the activity.  Celeron and its contractors
shall take prompt and adequate action to correct any hazard or
damage that does occur during construction, and shall provide
appropriate noticing as per other parts of this condition;

Exhibit 49

e)    Description of helicopter and/or vehicle reconnaissance schedules for pipeline maintenance, indicating times, stops, and duration. Celeron shall establish and enforce appropriate rules for its personnel and its contractors to assure that they will not be in the area except when necessary to carry out construction, inspection, repair and maintenance activities, or emergency services;

f)    Description of schedule for cutting any fences or similar barriers during pipeline construction.

J-6.    Deleted.

J-7.    Unless easements have been obtained from affected property owners or unless otherwise agreed to by affected property owners if and when fences or other similar barriers must be cut during pipeline construction, Celeron shall provide advance notice to the affected property owner, and shall replace the function of the cut fence before the cut is made to the satisfaction of the property owner, and Celeron and its contractors shall restore all fences that have been cut, moved, or damaged to at least their condition prior to pipeline construction, except that gates or similar structures may be added as approved to provide access.

J-8.    Interruption of telephone, electrical power, water or other utility services shall be minimized to the extent feasible  during the pipeline construction period.  Celeron, or its contractors, shall contact each property owner or the appropriate utility regarding the location of utility lines, and all such utility line locations shall be staked by Celeron or its contractors prior to the start of construction on the affected property.

J-9.    During the pipeline construction period in the County, Celeron and its contractors shall comply fully with all applicable statutes, ordinances, rules and regulations, including traffic regulations, of the County.

J-10.    Prior to entering upon any parcel of property for purposes of commencing construction, Celeron shall demonstrate to the Resource Management Department that it has obtained a right-of-way for such parcel or otherwise has obtained the right to enter the property for purposes of constructing the pipeline.

J-11    Following installation of the pipeline, use of the right-of-way is restricted to operational maintenance of the  pipeline except where expressly permitted by the easement or landowner and consistent with other regulations and conditions.

Exhibit 49

K.    TRANSPORTATION

K-1.    Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall submit to the Resource Management Department and
        the Department of Public Works, Road Division a worker transportation
        program designed to minimize traffic-related impacts.  The plan shall
        identify on- and off-site parking areas, access routes, shuttle program
        to reduce number of working vehicles on and along pipeline construction
        corridor, measures to avoid traffic conflicts with residents using all
        roads affected, number of vehicles accessing the facilities sites and
        incentives for ride-pooling/van-pooling to the sites.  Construction
        worker traffic and parking shall not interfere with normal and
        reasonable uses of private property or recreational areas.  This
        Construction Traffic Mitigation Plan shall be submitted by Celeron and
        approved by County prior to initiation of construction.  The program
        must consider both Celeron's employees and contractors.

K-2.    Any new permanent parking areas at the pump stations shall be screened
        from public view pursuant to the landscape plan approved by the Board
        of Architectural Review.

K-3.    The final engineering plans and procedures for all pipeline crossings
        of County roads must be approved prior to issuance of the Land Use
        Permit and Coastal Development Permit by the Department of Public
        Works.  Notification of such approval must be submitted to the Resource
        Management Department prior to construction at the site.

K-4.    All pipeline construction activity, except ingress and egress along
        routes approved by the Resource Management Department and in
        consultation with affected property owners, shall be limited to the
        final staked right-of-way on the final approved pipeline route.  Use of
        any private roads or other areas shall be allowed only after advance
        approval from the affected property owners.

K-5.    Prior to the Final Development Plan, Celeron must submit to the Public
        Works Department for approval a plan to mitigate impacts to all County
        roads which will be used during construction.  This plan will include
        the type of vehicles and machinery which will traverse the roads, the
        frequency of road use for each piece of equipment and vehicle, and the
        gross vehicle weights loaded and unloaded.  This includes the above
        information for trucks carrying pipe, fuel, construction supplies, or
        construction crews through the County to the construction spreads.
        This plan shall include an agreement with the County to repair any
        obvious damage to the satisfaction of the Public Works Director and any
        reasonable fees associated with eventual reconstruction caused by
        project-related damages of the public roads.  Prior to drafting this
        agreement, County shall coordinate with Celeron in compiling a list of
        County roads which will be used for construction of the pipeline.
        Celeron shall demonstrate property owner (or Court) approval of private
        road maintenance plans or terms on privately owned parcels to the
        Resource Management and Public Works Department prior to entering upon
        said parcels for purposes of commencing construction.

Exhibit 49

L.   CULTURAL RESOURCES

L-1.   Prior to approval of the Final Development Plan, Celeron shall submit a
       plan detailing the methods for the Phase I (walkover) and Phase II
       (site importance assessment) cultural resources surveys.  In addition,
       Celeron shall submit all Phase I cultural work completed to date.
       These reports shall be approved by the Resource Management Department
       as part of the Final Development Plan.

       Prior to issuance of the Land Use Permit and Coastal Development
       Permit, Celeron shall complete Phase I and Phase II cultural resource
       surveys for the entire route.  The results of these surveys shall be
       approved by the Resource Management Department prior to issuance of
       said permits.  Celeron shall avoid to the maximum extent feasible all
       known cultural resource sites along the pipeline route unless safety
       (e.g. seismic or engineering practices) considerations or sensitive
       biological habitats preclude avoidance.

L-2.   Prior to issuance of the Coastal Development Permit and Land Use
       Permit, Celeron, in consultation with the Native American Community,
       shall commence the cultural resources mitigation plan, in accordance
       with CEQA Appendix K, County approved Prehistoric Archaeological
       Guidelines, and section 4.1.1.11, Cultural Resources, of the EIR/EIS.
       Implementation of the mitigation plan shall proceed on an expeditious
       and effective schedule in order to minimize or to avoid conflicts with
       other construction scheduling requirements delineated in other permit
       conditions.  The main components of the mitigation plan shall include:

       a)   Selection of a qualified archaeologist by the County Resource
            Management Department in consultation with Native American
            representatives.  The archaeologist shall be available on an
            as-needed basis through the completion of pipeline construction.
            The archaeologist shall be funded by Celeron and shall be
            responsible to the County Resource Management Department.
            Compensation shall cover all excavation, analysis, and report
            preparation for all areas investigated including those found
            during construction;

       b)   Avoidance of known sites wherever feasible;

       c)   Test excavations of known sites that cannot be avoided.  These
            test excavations will assess the importance of each site
            according to CEQA Appendix K criteria or other requirements and
            will result in appropriate data recovery as a mitigation measure;

       d)   Inclusion of Native American representatives in all field
            activities.

Exhibit 49

e)     Additional sub-surface sampling (use of shovel test pits) in defined sensitive areas which will be affected by project construction to confirm the presence/absence of previously unknown (undiscovered) sites.  This will include surveying of proposed construction access road areas, once identified by Celeron.  Any new sites found shall be treated as per condition L-2(b,c);

f)     Following the determination of site importance, Celeron shall inform the County of any additional plans for site avoidance. For those sites not avoided, the consulting archaeologist shall, in consultation with the Native American community, prepare site-specific mitigation (excavation/data recovery) plans; and

g)     Implementation and completion of the field work aspects of the site-specific mitigation plans prior to construction in the vicinity of the resource.

L-3.    Prior to pipeline installation activities, Celeron shall sponsor a workshop for its pipeline contractors and Native American consultants to review and explain the mutual concerns and activities of the parties during pipeline installation work.

L-4.    During pipeline installation, a Resource Management Department approved archaeologist and  Native American consultant(s) will work with the contractor during trenching to insure continued avoidance.  Adequate monitors shall be provided pursuant to an agreement between the Native American representatives and Celeron, and the archaeologist retained.

L-5.    If non-burial associated cultural resource artifacts are recovered during pipeline installation (the location of such artifacts being unknown prior to installation), ownership of such artifacts shall be the option of either Celeron, the Native American Community, or the archaeological community.  In recognizing the origin of the materials, the Native American Community shall have the first option for ownership.  The disposition of the artifacts shall be carried out as per the approved County guidelines.

L-6.    If burials or burial associated artifacts are found during installation (that were unknown prior to excavation), and cannot be avoided because of safety considerations, there shall be no further excavation or disturbance of the site.  Celeron, in conjunction with the Native American representatives and the Resource Management Department, shall adhere to the guidelines in CEQA Appendix K and the County Archaeological guidelines prior to continued construction activity in the site area.

L-7.    If the County cultural resource guidelines for Phase II are modified and approved prior to November 19, 1985, Celeron shall abide by the requirements set forth in the guidelines in place at the time of Final Development Plan approval.

Exhibit 49

Planning Commission Actions                                     Page 38
Celeron Pipeline Final Development Plan                      March 3, 1986

M.      VISUAL RESOURCES

M-1.    All facility design (e.g. pump stations, landscaping and signs), shall
        be in accordance with a plan approved by the County Board of
        Architectural Review (BAR) including the criteria outlined in the
        Coastal Zoning Ordinance Section 35-87.9 and Section 35-184.  Prior to
        the issuance of the Land Use Permit and Coastal Development Permit,
        Celeron shall submit to the BAR and the Resource Management Department
        and obtain their approval of a plan demonstrating that Conditions M-2
        through M-5 are met.  For visual screening of surface equipment along
        the pipeline route, Celeron shall consult with each affected property
        owner during development of the associated landscaping plan.

M-2.    No unobstructed or unshielded beam of exterior lighting shall be
        directed towards any area outside the exterior boundaries of the
        Celeron's property or easement.  Any lighting along roadways within the
        project shall utilize low intensity, ground level, shielded fixtures.
        The plan shall demonstrate that all feasible measures have been taken
        to reduce obtrusive night lighting and glow from the pump stations.

M-3.    To the extent feasible no glare or other radiation resulting from pump
        station facilities, other than lighting fixtures constructed pursuant
        to this Development Plan shall be detectable at any point along or
        outside the required screening along exterior boundaries of the pump
        stations.

M-4.    Prior to the pipeline operation, the Gaviota pump station, visible from
        Highway 101 and the Gaviota Village, the Sisquoc pump station visible
        from public viewshed, and all above ground portions of the pipeline
        shall be painted to harmonize with the surrounding area.

M-5.    No above-surface structures except necessary pipeline markers, pump
        stations, cathodic test stations, necessary fencing, and block valves
        shall be visible along this route after the completion of pipeline
        construction.  Signs shall not detract from scenic areas or views from
        public roads to the extent feasible.

M-6.    Prior to construction, Celeron will review the feasibility of
        implementing mitigation measures and/or realignments in the Gaviota
        State Park area to avoid blasting of ridgetops and alteration of
        topography in a scenic area.  Celeron shall submit a plan to the
        Resource Management Department, for review and approval, which
        identifies the feasibility of shifting the ROW alignment to the west,
        leaving the ridge profile undisturbed.  The plan shall include an
        investigation of utilizing prefabicated pipeline bends to allow for
        alignment around ridgetops, the use of stepped benches in steep
        terrain, and the future use of such a corridor for additinal
        pipelines.

Exhibit 49

Planning Commission Actions                                          Page 39
Celeron Pipeline Final Development Plan                         March 3, 1986

N.      NOISE

N-1.    Prior to issuance of the Costal Development Permit and Land Use Permit, Celeron shall file with the Resource Management Department a Noise Monitoring and Control Plan which has been approved previously by the the Department of Health Care Services and the Resource Management Department.  The plan shall describe the best efforts Celeron shall take to reduce the noise impacts of the project both during construction and operation of the project.  The approved plan shall be implemented by Celeron and shall be followed until temporarily suspended or deemed no longer necessary by the Resource Management Department.  The plan shall include provisions to ensure that items N-2 through N-6 below are included.

N-2.    Except for motor vehicles and motorized construction equipment, all facilities shall be designed, constructed, operated and maintained such that sound levels during operation do not exceed 70 dbA at or beyond the property line or pipeline easement, as measured on the "A" weighted scale at slow response on approved sound level measuring instruments. Affected property owners along the pipeline route shall be notified by Celeron at least 48 hours in advance of any planned testing or maintenance of the line which may exceed noise standards.  The facility shall comply with all standards established in the Noise Element of the Comprehensive Plan and the Coastal Zoning Ordinance.  No residents, teachers, students and staff at the Vista del Mar School, shall be subjected to greater than a 9 dbA increment above the baseline ambient noise level, nor greater than a 3 dbA increase in day-night sound levels.  The best available technology, including but not limited to muffling equipment, sound barriers, and landscaping measures shall be used to minimize operational noise impacts.

N-3.    During the construction and operation phases, project related noise at the Gaviota State Park, Vista del Mar School, Buellton area, or other points which may be impacted (as determined by the Health Care Services Director), shall be limited to 65 dbA between the hours of 7:00 a.m. and 10:00 p.m., and 50 dbA between the hours of 10:00 p.m. and 7:00 a.m., consistent with the County Noise Element and the Coastal Zoning Ordinance.  Blasting shall be limited to the hours between 7:00 a.m. and 7:00 p.m. and directional charges shall be used to minimize noise.

N-4.    As determined by the Resource Management Department, noise generating project activities (including delivery of construction equipment through residential areas) shall be restricted between the hours of 10:00 p.m. and 7:00 a.m.  If complaints arise concerning activities occurring during these hours, Celeron shall take additional feasible steps to reduce the noise levels or further restrict the offending activity.

Exhibit 49

Planning Commission Actions                                    Page 40
Celeron Pipeline Final Development Plan                  March 3, 1986

N-5.   Prior to approval of the Final Development Plan, Celeron shall submit
       to the Director of the Resource Management Department procedures that
       Celeron will take to minimize noise impacts from helicopters, or other
       aircraft during the aerial surveys of pipeline.  The procedures, to be
       approved by the Resource Management Department, shall specify
       overflight routes to be taken to minimize noise impacts to the
       community and other feasible measures.  Celeron shall direct its
       contractors to abide by the helicopter procedures and shall take
       reasonable corrective action if complaints arise concerning the use of
       helicopters.  Subject to flight safety considerations, Celeron shall
       avoid helicopter flights over residential areas.

N-6.   All construction and operation-related equipment shall be operated and
       maintained to minimize noise generation, ground vibration, and to avoid
       interference with radio or video communications.


O.     ABANDONMENT

O-1.   Immediately following permanent shut down of the pipeline, Celeron
       shall remove abandoned pump stations and unburied portions of the
       pipeline within Santa Barbara County constructed under this permit,
       recontour the site and revegetate the site in accordance with a County
       approved revegetation plan within one year of permanent shut down.
       Celeron shall post a performance bond to insure compliance, or continue
       to pay property taxes as assessed during project operation until site
       restoration is complete, as determined by the County.


P.     SYSTEMS SAFETY AND RELIABILITY

P-1.   Celeron shall submit all appropriate pump station, valve, and pipeline
       construction and process diagrams to a System Safety and Reliability
       Committee who may employ a third-party technical review in order to
       help identify and correct possible design hazards prior to
       construction.  This review shall evaluate the pipeline design and its
       implementation of System Safety and Reliability Conditions.  The System
       Safety and Reliability Review Committee shall consist of a
       representative from the County Public Works Department, Building and
       Safety Division, the APCD, the County Fire Department, County Flood
       Control District and the Resource Management Department.  Design
       recommendations resulting from the third party review shall be
       incorporated into the approved Final Development Plan.  All reasonable
       costs associated with any review shall be borne by Celeron.  Celeron
       shall be entitled to participate fully in the review process.

Exhibit 49

P-2.    Celeron shall submit a detailed safety Inspection, Maintenance and
        Quality Assurance Program for the pump stations, valves, and the
        pipeline which shall be implemented during construction and
        operations.  The Program shall include, but not be limited to,
        inspection of construction techniques, regular maintenance and safety
        inspections, periodic safety audits, corrosion monitoring and leak
        detection, inspections of all trucks carrying hazardous and/or
        flammable material.  The construction section of the Program shall be
        reviewed and approved by the System Safety and Reliability Review
        Committee and/or its consultants prior to issuance of the Coastal
        Development Permit and Land Use Permit.  The operations section of the
        Program shall be reviewed and approved by the System Safety and
        Reliability Review Committee and/or its consultants prior to start-up.
        The Program shall be submitted sufficiently prior to Celeron's
        projected start-up date so as to allow reasonable time for staff
        review.  Celeron shall implement the approved program and shall provide
        for involvement of the managing environmental coordinator (condition
        C-1), County staff or its consultants' involvement in the program.  All
        costs associated with this review process shall be borne by Celeron.

P-3.    Celeron shall submit an Emergency Response Plan detailing response
        procedures to be implemented by Celeron for accidental events affecting
        public safety and the environment.  This plan shall be based on a
        comprehensive risk analysis reviewed and approved by the System Safety
        and Reliability Committee (condition P-1).  The plan shall be reviewed
        and approved by the County Emergency Services Coordinator, the Fire
        Department, and the Resource Management Department prior to start-up.
        The Program shall be submitted sufficiently prior to Celeron's
        projected start-up date so as to allow reasonable time for staff
        review.  Celeron shall demonstrate the effectiveness of the Emergency
        Response Plan by responding to not more than one surprise drill each
        year which may be called by the County on the pump station property,
        along the pipeline route or along Highway 101.  If critical operations
        are underway, Celeron need not respond but shall explain the nature of
        the critical operations and why response is not possible.  Celeron
        shall demonstrate oil spill response capability by responding to not
        more than one surprise oil spill drill each year.

P-4.    In order to assure that County emergency response procedures adequately
        interface with the Celeron emergency response procedures, Celeron shall
        provide its reasonable pro-rata share of funds to the County, to
        develop and implement a feasible County Emergency Response Plan for oil
        and gas industry related emergencies.  As appropriate, the County shall
        request funds from other oil industry operators to aid in funding of
        the County Emergency Response Plan.  When available, the Resource
        Management Department shall provide Celeron with an estimate of the pro
        rata share of funds to be provided by Celeron and the method for
        allocating such costs among other operators.

Exhibit 49

Planning Commission Actions                                          Page 42
Celeron Pipeline Final Development Plan                         March 3, 1986

P-5.    Celeron shall submit an Oil Spill Contingency Plan detailing cleanup
        procedures and restoration procedures to be employed in the event of a
        spill.  This plan shall be reviewed and approved by the Resource
        Management Department and the County Emergency Services Coordinator
        prior to start-up.  The Program shall be submitted sufficiently prior
        to Celeron's projected start-up date so as to allow reasonable time for
        staff review.  Procedures and techniques shall be selected to augment
        the Emergency Response Plan.  The intent of the Oil Spill Contingency
        Plan is to detail spill site restoration subsequent to emergency
        response which may be called by the County on the pump station property
        or along the pipeline route.  If critical operations are underway,
        Celeron need not respond but shall explain the nature of the critical
        operations and why response is not possible.

P-6.    Prior to approval of the Final Development Plan, Celeron shall submit
        to the Santa Barbara County Sheriff's Department for review and
        approval a site security plan.  The plan shall describe procedures to
        be implemented by Celeron which will prevent intentional damage to
        facilities which may result in environmental damage or public safety
        hazards.

P-7.    Celeron shall cooperate with Chevron as necessary to facilitate the
        establishment of a temporary County fire company until the completion
        of the fire station (as specified in Chevron condition P-9).  Prior to
        issuance of the Coastal Development Permit and Land Use Permit, the
        County Emergency Response Coordinator and Fire Department must be
        satisfied that provisions have been made to establish an operational
        fire company in the project area.

P-8.    Prior to approval of the Final Development Plan, Celeron shall agree to
        participate in a plan to be submitted to the County Fire Department by
        Chevron USA Inc., for the construction, manning and equipping of a fire
        station in the Gaviota area.  Celeron shall contribute their pro rata
        share of the cost of implementing this plan.  When available, the
        Resource Management Department shall provide Celeron with an estimate
        of the pro rate share of funds to be provided by Celeron and the method
        for allocating such costs among other operators.

P-9.    Prior to Final Development Plan, Celeron shall submit to and obtain
        conceptual approval from the Fire Department, a Fire Protection Plan
        for the pump station locations.  Final approval shall be obtained prior
        to start-up.  Criteria to be addressed shall be obtained from the
        County Fire Department.

Exhibit 49

P-10.  Prior to approval of the Final Development Plan, Celeron shall assess
       the feasibility of transporting liquefied petroleum gases and natural
       gas liquids, (LPGs and NGLs) through the proposed pipeline by blending
       and/or batching, considering industry-wide projected volumes and market
       destinations of the gas liquids.  Celeron shall report to the Resource
       Management Department the results of this assessment, and this
       information shall include all technological and safety constraints
       involved, amount and type of additional storage facilities needed, and
       the degree to which LPGs and NGLs produced in the area can be
       transported through Celeron's pipeline.

       Celeron shall transport the NGLs through this pipeline, to the extent
       feasible within safety and legal constraints as identified by the
       report and as requested by the users.  In addition, under the reporting
       provisions of Condition C-1, Celeron shall inform the County of the
       types and amounts of gas liquids shipped in the pipeline during
       operations.

P-11.  If the Vista del Mar School has not been relocated or is located at a
       site where it could be impacted by construction activities, prior to
       approval of the Final Development Plan, Celeron and the Board Trustees
       of the Vista Del Mar School District shall develop a reasonable and and
       mutually agreeable construction plan for the pump station site and
       pipelines adjacent to the site that will minimize construction-related
       noise, air pollution, and visual disturbance to the School during
       school hours.  Said construction plan shall include the following:

       Pipeline construction noise near the School shall be held to ambient
       noise levels or construction shall occur only when school is not in
       session; to prevent exceedance of the California one-hour $NO_2$
       standard, construction schedules must be modified to minimize
       overlapping of equipment emissions; and, during construction of the
       pipeline, activities nearest the school shall be scheduled when school
       is not in session in accordance with Condition B-5 and temporary
       barriers shall be erected around noisiest activities.  No grading for
       the Gaviota pump station shall occur during School session hours.

       In the event that any agreements contained herein cannot be reached on
       the construction plan, the Board of Supervisors shall arbitrate any
       dispute.

P-12.  Deleted.

P-13.  Celeron will design the pipeline such that entire pipeline will have
       effective control communication between the operations control center
       and all remotely activated valves.  Any break, rupture, and/or damage
       to the pipeline shall result in the orderly shutdown of the pumping
       operations, and will activate the shut off valves, if appropriate, in a
       manner which will minimize environmental damage.

Exhibit 49

Planning Commission Actions                                  Page 44
Celeron Pipeline Final Development Plan                    March 3, 1986

P-14.   During construction of the pipeline in fire sensitive areas, Celeron
        shall meet or exceed applicable guidelines and requirements set forth
        in a Watershed Fire Protection Plan provided by the combined local fire
        protection agencies, Santa Barbara County Fire, U.S. Forest Service,
        and the California Department of Forestry.  This shall include, but not
        be limited to:  modifications of welding operations, required fire
        patrolman position(s), firefighting equipment, and construction
        restrictions due to extreme fire weather.

P-15.   All facilitites, construction activities and equipment shall comply
        with National Fire Protection Association standards.

P-16.   Upon completion of pipeline construction, Celeron shall provide all
        jurisdictional agencies (S.B. County Fire, USFS, CDF) with at least two
        copies of maps showing the finished pipeline route and shall include
        locations accessible by fire department emergency response vehicles.
        Said maps shall be 7 1/2 minute quadrangle scale, (one inch equals
        24,000 inches), and shall represent topographical features.

P-17.   Celeron shall be subject to required fire department inspections during
        and after construction as set forth by the 1982 Uniform Fire Code and
        these conditions.

P-18.   Prior to approval of the Final Development Plan, Celeron shall
        designate alternative pipeline corridor alignments which avoid the two
        potentially impacted, proposed alternative permanent relocation school
        sites now under study by the Vista del Mar Union School District.
        These proposed alternative locations are the State Park at Las Cruces,
        and the Tajiguas Ranch property.  County shall review and approve said
        alternative alignments as part of the Final Development Plan and
        Celeron shall implement the appropriate alternative alignment depending
        on the permanent school relocation site chosen by the Vista del Mar
        School District.


Q.      FACILITY DESIGN

Q-1.    The Final Development Plan shall demonstrate compliance with Santa
        Barbara County Coastal Zoning Ordinance, and other applicable County
        Ordinances to the extent required by this permit.

Q-2.    Cost effective energy conservation techniques shall be incorporated
        into project design.

Q-3.    Celeron's facilities will be operated as a common carrier pipeline with
        access for use available on a nondiscriminatory basis.  County retains
        the right to verify that the use of the facilities is conforming with
        County policies on consolidation and to impose additional reasonable
        permit conditions where necessary to assure these policies are being
        fulfilled to the extent feasible.  The intent of this condition is to
        ensure the multi-company access of oil transportation facilities.

Exhibit 49

Q-4.   Celeron shall comply with all applicable policies in Section 25 of the Santa Barbara County Petroleum Ordinance No. 2795.

Q-5.   Celeron shall fund a pro-rata share of the costs to bury power transmission lines or of using environmentally and aesthetically preferred poles between the Goleta Substation and Gaviota in areas where the County and SCE determine it is not feasible to bury the lines.  Celeron's pro-rata share shall be based upon an equitable cost-sharing formula applied to all users of the grid power consistent with PAC rate setting and applicable regulations.

5668e

Exhibit 49

Planning Commission Actions                                    Page 46
Celeron Pipeline Final Development Plan                     March 3, 1986

CELERON FINAL DEVELOPMENT PLAN
FINDINGS REQUIRED FOR APPROVAL

Upon approving the Preliminary Development Plan and Conditional Use Permit,
the Planning Commission and Board of Supervisors adopted certain findings of
approval pursuant to the County zoning ordinances and the California
Environmental Quality Act. As the project has undergone no major changes
since those findings were adopted, they are largely applicable to the Final
Development Plan approval. The findings in this section have been modified to
reflect new information and the nature of the Final Development Plan approval.

1.    Article III, County Zoning Ordinance

      The Santa Barbara County Zoning Ordinance, Article III, requires that
      certain findings of approval be made for all development plans, and that
      additional findings be made specifically for pipeline development.

1.1   Findings Required for Approval of a Development Plan - General

      A Preliminary or Final Development Plan shall be approved only if all of
      the following findings can be made:

      a)    **That the site for the project is adequate in size, shape, location,
            and physical characteristics to accommodate the density and
            intensity of development proposed.**

      The project "site" is in fact a 100-foot wide construction, 50-foot wide
      operations corridor covering approximately 70 miles in Santa Barbara
      County. The route is logical and appropriate for the transport of
      offshore processed crude to refineries outside of the County. The
      pipeline begins at Las Flores Canyon, where it will acquire processed
      crude from a consolidated oil processing facility, pass through the
      Gaviota consolidated processing facility, and traverse the
      environmentally preferred route out of the County. While the 100-foot
      construction right-of-way does encroach upon sensitive resources, the
      route was chosen and the project conditioned to minimize the disturbance
      of sensitive habitats and to restore all disturbance to the maximum
      feasible extent. The line will not displace any residents or structures.

      The chosen route can accommodate multiple pipelines, and has been
      designed to minimize the impacts of future construction in the corridor.
      The Celeron line will be a common-carrier, offering equitable access to
      all shippers.

      b)    **That adverse impacts are mitigated to the maximum extent feasible.**

      The construction and operation of this pipeline will have certain adverse
      impacts on Santa Barbara County. The California Environmental Quality
      Act requires that those impacts which can be feasibly lessened to a level
      of insignificance must be so mitigated. As detailed on the Class II
      Impact Summary Table, project conditions have been imposed to implement
      the mitigations. There are also impacts which cannot be mitigated to a
      level of insignificance. As required by CEQA, these impacts have also
      been mitigated to the maximum extent feasible by the implementation of

Exhibit 49

conditions, as noted on the Class I Impact Summary Table. In addition, mitigation measures which alleviate adverse but not significant impacts have been incorporated as suggested by the environmental document.

c)   That streets and highways are adequate and properly designed.

While pipeline construction will require the use of many County roads by heavy trucks and to a lesser degree, machinery, these roads should be able to accommodate this temporary increase in traffic and use without any decrease in service. Furthermore, condition K-5 requires Celeron to mitigate impacts to all County roads used during construction and to repair any obvious damage.

d)   That there are adequate public services, including but not limited to, fire protection, water supply, sewage disposal, and police protection to serve the project.

The project Environmental Impact Report does not identify any significant adverse impacts to public services due to the project. In order to help offset cumulative impacts on public services anticipated due to the increased offshore development, Celeron is required to participate in the establishment of a new County fire station in the Gaviota area (conditions P-7,8). Celeron must also adhere to the site security plan approved by the County Sheriff's Department (P-6). In addition, if project-related taxes do not compensate for needed capital or operating expenses necessary to provide for project-related utilities and services, additional mitigation will be required through the Socioeconomic Monitoring and Mitigation Program (I-1).

e)   That the project will not be detrimental to the health, safety, comfort, convenience, and general welfare of the neighborhood and will not be incompatible with the surrounding areas.

During construction, the project may inconvenience a small number of residents near Buellton and in the Gaviota area due to increased noise levels. The project has been conditioned to limit construction activities to between the hours of 7:00 a.m. and 7:00 p.m., and will only impact any given area for approximately one week. The duration of this potential inconvenience is therefore limited, and the project has been conditioned to mitigate noise impacts to the extent feasible. Although processed oil is flammable, and therefore hazardous to transport, the risks of fire and spillage have been minimized through project conditions. Therefore, neither the elevated noise level nor the risk of an accident will be detrimental to the health, safety, comfort, convenience and general welfare of the neighborhood.

Pipelines are a permitted use in all zoning districts outside of the Coastal Zone, and are compatible with surrounding areas because there are very few above-ground facilities once construction is complete. The pump stations at Sisquoc is above ground, but will not conflict with the agricultural uses which surround it. The pump station at Las Flores Canyon is compatible with the other oil and gas facilities at the site.

Exhibit 49

Planning Commission Actions                                         Page 48
Celeron Pipeline Final Development Plan                      March 3, 1986

f)   That the project is in conformance with the applicable provisions
     of Article III and the Comprehensive Plan.

The project, as mitigated, is not in conformance with Section
35-290.5(2)(e) of Article III.  This ordinance states that the facilities
should be designed and housed such that the noise generated by the
facilities, as measured at the property boundaries, shall be equal to or
below the existing noise level of the surrounding area.  The Sisquoc pump
station will not meet this standard, but will not affect any sensitive
receptors.  As the Article specifies that this development standard may
be applied at the discretion of the Planning Commission, it may be
appropriate to apply this discretion to this project.

As conditioned, the project does conform with all other applicable
provisions of Article III and the Comprehensive Plan.

g)   That in designated rural areas the use is compatible with and
     subordinate to the scenic and rural character of the area.

The Sisquoc pump station is in a designated rural area.  While there are
no industrial facilities in the immediate vicinity, the facility will
have vegetative screening.  In addition, the station is not so large as
to become a dominating use, or to change the scenic and rural character
of the area as a whole.  The construction of the pipeline will cause a
scar across the landscape, but again it will not be a dominating
feature.  Although the movement of crude oil is not compatible with the
rural and scenic character of the area, the pipeline will be buried and
thus the rural and scenic character will not be altered.

h)   That the project does not conflict with any easements required for
     public access through, or public use of a portion of the property.

The project does not conflict with any easements for public access
through, or public use of the property as the entire length of the
pipeline is buried and the pump stations are situated in areas not
generally used by the public.

1.2  Findings Required for Approval of a Development Plan -- Pipelines

     That there are no feasible alternate routes for the pipeline
     corridor that are less environmentally damaging.

In approving the Preliminary Development Plan route, the Planning
Commission considered the proposed routes of two different applicants, as
well as a number of alternatives.  Rather than approving a particular
applicant's route, the Commission chose the most environmentally
preferred route by combining those of the two applicants.  The
modifications to the route approved in the Final Development Plan

Exhibit 49

hearings do not create any new adverse impacts.  Although there may be segments where a different alternative is less environmentally damaging, these isolated segments are infeasible because the pipeline must be continuous; each chosen segment must join to form the pipeline corridor. Overall, the route chosen is environmentally preferable to any complete alternative route, so that there are no feasible alternative routes which are less environmentally damaging.

2.0  County Coastal Zoning Ordinance

The Coastal Zoning Ordinance applies to all segments of the pipeline within the Coastal Zone as indicated on County maps.  The CZO requires identical findings for Development Plans and pipelines as Article III, as well as findings for a Conditional Use Permit.  As many of the findings for this section duplicate those for Article III, additional findings will be made here only where the facilities in the Coastal Zone pose special concerns or problems not applicable to the route as a whole.

2.1  Findings Required for Approval of a Development Plan - General

e)   That the project will not be detrimental to the health, safety, comfort, convenience, and general welfare of the neighborhood and will not be incompatible with the surrounding area.

During construction, the project may inconvenience a small number of residents along the south coast due to increased noise levels.  The project has been conditioned to limit construction activities to between the hours of 7:00 a.m. and 7:00 p.m., and will only impact any given area for approximately one week.  The duration of this potential inconvenience is therefore limited, and the project has been conditioned to mitigate noise impacts to the extent feasible.  Conditions N-2 and P-11 require the use of best available muffling technology to limit noise impacts to Vista del Mar school.  Although processed oil is flammable, and therefore hazardous to transport, the risks of fire and spillage have been minimized through project conditions.

f)   That the project is in conformance with the applicable provisions of the Coastal Zoning Ordinance and the Coastal Land Use Plan.

As conditioned, the project is in conformance with the applicable provisions of the Coastal Zoning Ordinance and the Coastal Land Use Plan.

g)   That in designated rural areas the use is compatible with and subordinate to the scenic, agricultural and rural character of the area.

As mentioned above, the Gaviota pump station is surrounded by other oil and gas industry facilities.  Because the station is sited adjacent to the approved Chevron facility, it will not add to the detraction from the scenic, agricultural and rural character of the area.  The pipeline itself will be buried, so it will be compatible with the character of the area.

Exhibit 49

2.2   Findings Required for Approval of a Development Plan - Pipelines

      Identical to those for Article III.

2.3   Findings Required for Approval of a Conditional Use Permit

      Findings numbered 1 through 8 in this ordinance are identical to those
      for Development Plans in the Coastal Zone and in Article III.

      9)    That the proposed used is not inconsistent with the intent of the
            zone district.

      Pipelines are permitted in every zoning district, but require a Major
      Conditional Use Permit if Environmentally Sensitive Habitats are
      crossed.  The line is therefore consistent with all applicable zoning
      districts.

3.0   California Environmental Quality Act Findings

      The California Environmental Quality Act requires that any agency which
      approves a project with significant environmental effects identified in
      an EIR must make one or more findings for each of those significant
      effects, accompanied by a brief rationale for each finding.  The Class I
      Impact Summary Table describes each of the adverse significant impacts
      identified in the project EIR/S which are either unavoidable because no
      known mitigation measures or project alternatives exist, or which are
      only partially mitigated after implementation of the identified
      mitigation measures.  The Class II Impact Summary Table describes the
      adverse impacts which can be eliminated or reduced to a level of not
      significant by the implementation of mitigation measures.  The impacts,
      proposed mitigation measures and permit conditions are described more
      specifically in the Preliminary Development Plan Staff Report and are
      incorporated herein by reference.

      Upon consideration of the evidence in the EIR/S, the evidence presented
      at the hearings conducted before the Planning Commission, and the Staff
      Reports prepared by the County Energy Division, the Planning Commission
      makes the following findings:

3.1   Class I Impacts

            CEQA FINDING #1 :Certain impacts cannot be substantially lessened
                            or avoided.

      There are certain unavoidable significant adverse impacts associated with
      approval of the project.  The benefts of the project, described elsewhere
      in these findings, outweigh the unavoidable environmental risks.

      The following findings refer to specific impacts listed in the Class I
      Impact Summary Table; the number in the "CEQA Findings" column on the
      table corresponds to the numbers below.

Exhibit 49

### 1A.  Oil Spill Impacts

Oil spill-related impacts may still occur even after successful implementation of the identified mitigation measures, due to natural events and technical limitations that can hinder effective cleanup and containment.  The risks of an unlikely oil spill, combined with the risks of incomplete spill cleanup, are considered acceptable because only denying the project would assure complete mitigation of oil spill impacts.  The identified mitigation meausres represent the best feasible techniques currently available.

### 1B.  Channel Degradation

Although the pipelines are to be buried a minimum of four feet below the maximum storm scour depth below stream channels, or other engineering measures used, degradation of these channels may result in increased scour depth which could expose or seriously damage pipelines.  The applicants have been required to conduct detailed geotechnical studies prior to issuance of the Land Use Permitn and Coastal Development Permit in order to create acceptable mitigations to decrease the risk of such an occurrence.  In addition, the County has coordinated a rigorous review of the final engineering plans for the major river crossings.  The residual risk is considered acceptable due to the level of mitigation imposed and the need for the pipeline to cross major rivers.

### 1C.  Clearing of vegetation

Numerous sensitive plants will be removed to clear a 100-foot right-of-way for construction vehicles; fifty feet of this right-of-way will remain clear of larger vegetation during operations for maintenance purposes.  The majority of the vegetation removed will be recultivated after construction is complete.  Although it will take many years for certain types of vegetation to regain their previous stature, this impact is nevertheless temporary, and limited to the 100-foot ROW.  The residual impact is considered acceptable due to the projects need for clear construction and operation ROWs.

### 1D.  Disturbance of Cultural Resources

The approved pipeline route is conditioned to avoid to the extent feasible all known archaeological sites.  Where specific sites or sensitive resources are unavoidable, the pipeline corridor will be narrowed to minimize impacts.  In addition, conditions in the L section provide for the participation of Native Amercian representatives and the proper recording of all sites to be disturbed.  The residual disturbance impacts, while significant to the Native Americans, are considered acceptable since all feasible mitigations have been employed.

Exhibit 49

1E.   Visual - Sisquoc Pump Station

The Sisquoc pump station will cover approximately 5 1/2 acres on a grassy plain on private lands near the town of Sisquoc.  The facility will be visible from Foxen Canyon Road and a nearby ranch house.  Conditions M-1 and M-4 have been included to assure adequate screening of the facility.  The residual impact results primarily from the contrast between the existing flat grassy plain and the height of the necessary screening; it is acceptable because of the project's need for the pump station.

1F.   Construction-related noise impacts

Some residents along the route will experience noise levels of more than 60 dBA during construction.  While such levels exceed County standards, the duration of the elevated noise levels will be approximately one to two weeks at any given location.  In addition, construction activities will be limited to the hours of 7 a.m. to 7 p.m.  The impacts are therefore considered acceptable because they are temporary and local in nature.

1G.   Cumulative Housing Impacts

The identified impact has been mitigated by the specified conditions to the extent that the project contributes to the impact.  Many of these conditions have been placed on other oil and gas industry projects approved by Santa Barbara County, and require pro-rata participation.  The residual impact is considered acceptable since denying these projects would have a worse overall effect, as stated in each project's Statements of Overriding Considerations.

1H.   Impacts Outside County Jurisdiction

Mitigation of these anticipated impacts is wholly within the responsibility and jurisdiction of the permitting agency(ies) identified in the Class I Impact Summary Table, and is not within the permit jurisdiction of the County.  Mitigation measures should be included as permit conditions in the appropriate agency's permit which will follow County action on this project.  Implementation of the mitigation measures must reduce the impact to the maximum feasible extent.


3.2  Class II Impacts

The numbers in the CEQA Findings column on the Class II Impact Summary Table refer to findings in this section.

Exhibit 49

> CEQA FINDINGS #2 - 8: Impacts identified as Class II have
> been eliminated or substantially lessened
> where feasible.

The impacts identified have been eliminated or substantially lessened to
a level of insignificance through the incorporation of feasible
mitigation measures. These measures have been incorporated as mandatory
permit conditions.

> CEQA FINDING #9: Certain impacts identified as Class II can be
> eliminated or substantially lessened by other
> agencies with jurisdiction outside the County.

Mitigation of these anticipated impacts is wholly or partially within the
responsibility and jurisdiction of the permitting agency(ies) identified
in the Class II Impact Summary Table, and is not within the permit
jurisdiction of the County. The identified mitigation measure should be
included as a permit condition in the appropriate agency's permit which
will follow County action on this project. Implementation of the
mitigation measure will eliminate and reduce the impact to a level of
insignificance.

If the permitting agency with authority to require the suggested
mitigation measure does not incorporate the measure as a permit
condition, or if the mitigation measure is determined to be infeasible by
the permitting agency, then the impact will remain significant. The
County shall reexamine these conditions after consultation with the
permitting agencies prior to final action on the permit, and will modify
the mitigatiion measures or CEQA Findings as necessary.

Those impacts which are partially within the jurisdiction of Santa
Barbara County have been mitigated to the maximum extent feasible by the
County.

3.3   Project Alternatives

The EIR/S studied a number of different route segments which could be
combined to form a pipeline to the desired destination. Two routes were
studied as proposed projects (one for each applicant) and numerous others
were studied on a project-alternative level. This section addresses all
routes examined in the EIR which were not chosen.

> CEQA FINDING #10:  The project alternatives not chosen are either
> not feasible, not environmentally preferable or
> not as beneficial as the proposed project.

(a)  No-Project Alternative

The impacts presented for the Celeron proposal would be avoided by
the no-project alternative, in which no pipeline is constructed.
However, implementation of this alternative would cause additional

Exhibit 49

impacts as a result of the expanded marine tanker traffic which
would necessarily occur without a pipeline.  Current County policy
allows the use of marine tankers to transport crude to destinations
not served by pipeline or until such a pipeline is operational.
Under the no-project alternative, virtually no destinations would be
served by pipeline, so the vast majority of locally produced crude
would be transported by tanker.

Tanker transport would have many adverse impacts, primarily in the
areas of air quality, socioeconomics and oil spill risk.  These
impacts are discussed more fully in the Getty Gaviota Consolidated
Coastal Facility FEIR (ERT, 1985), the Santa Ynez Unit/Las Flores
Canyon Development and Production Plan (SAI 1984) and the Oil
Transportation Plan EIR (ADL, WCC, 1984).

County policy favors pipelines as the primary means for transporting
crude oil, based on the relative impacts of pipelines and marine
tankering.  The environmental benefits of pipeline use outweigh the
environmental risks associated with the lack of a pipeline.

(b)   Segment alternatives

The approved pipeline right-of-way can be divided into five segments
for which alternatives were studied.  Chapter 5 of the staff report
includes a point-by-point comparison of the preferred and
alternative routes for each of these segments; that discussion is
incorporated herein by reference.  In addition, much shorter
alternatives were considered during the course of the hearings, and
the discussion of those alternatives is included in the record and
in the EIR/S addendum.  Although there may be segments where a
different alternative is less environmentally damaging, these
isolated segments are infeasible because the pipeline must be
continuous; each chosed segment must join to form the pipeline
corridor.  Overall, the route chosen is environmentally preferable
to any complete alternative route.

(c)   Buellton Alternatives

Two alternative corridors through the Buellton area were considered,
but not chosen.  These are the eastern route (existing easement) and
the McMurray Road route.  Construction of a pipeline along either of
these corridors would involve extensive disruption of commercial
areas, and would greatly inconvenience local residents.  In the case
of an accidental oil spill on either of these two routes,
contamination of the Buellton area water supply is more likely than
if a spill occurred on the westerly approved route.  In addition,
the habitats which will be disturbed on the western route are not
particularly sensitive.  The Commission therefore finds that the two
eastern routes through Buellton are more environmentally damaging
than the western route.

Exhibit 49

Planning Commission Actions                                          Page 55
Celeron Pipeline Final Development Plan                        March 3, 1986

3.4   Benefits of the Project

      The primary benefit of the project is that it will provide a means of
      transporting crude oil out of Santa Barbara County which is
      environmentally preferable to marine tankering.  This preference is
      supported in three recently certified environmental documents (OTP; Exxon
      SYU FEIR/S; Texaco (Getty) CCF FEIR), and the documentation is
      incorporated herein by reference.  In addition, the Overriding
      Considerations described in Section 3.5 below identify benefits of the
      project.

3.5   Statement of Overriding Considerations

               CEQA FINDING 11:  **The unavoidable significant impacts of the
                                 project are found to be acceptable due to
                                 overriding considerations.**

      We recognize the adverse significant impacts of the project represent
      important concerns and that they have the potential to substantially
      degrade the quality of the human and physical environment in parts of
      Santa Barbara County unless substantial mitigation measures can be
      implemented.  In particular, the project will cause:  the loss of many
      mature oaks and riparian vegetation; loss of Hoffman's Nightshade,
      Refugio Manzanita and Catalina Mariposa lillies; visual impacts at the
      Sisquoc pump station and in the Los Padres National Forest; potential
      disturbance to at least eight cultural resource sites; exceedances of
      County noise standards during construction; potential oil spills impacts;
      and a contribution to the housing shortage anticipated due to the
      cumulative effect of development.

      Although mitigation measures cannot completely eliminate the above
      mentioned impacts, many conditions have been attached to approval to
      ensure that they are mitigated as completely as possible.

      The County recognizes that Federal policy regarding the leasing of
      offshore oil requires action on the part of the County in order to
      minimize the adverse impacts of that leasing on the County.  In its Oil
      Transportation Plan, the County studied alternative methods of moving
      locally produced crude oil from Santa Barbara County to various refinery
      destinations.  The study concluded that pipelines should be the preferred
      means of transporting crude oil.  The primary alternative to pipelines is
      marine tankering.  Expanded marine transport would cause adverse
      significant, long-term impacts to the County in the areas of air quality,
      socioeconomics and oil spill risk (OTP, Exxon, SYU FEIS/R, Texaco GCCF
      FEIR).  The County therefore amended and changed its coastal policies to
      encourage the use of pipelines in an effort to minimize the overall
      impacts of federal offshore leasing.

Exhibit 49

It is therefore the County's desire to permit pipelines which will serve local producers' refineries, thereby diverting oil from marine tankers to pipelines. The proposed project does serve appropriate refineries located in Texas. The Planning Commission finds that permitting the project will help minimize the adverse impacts of offshore production.

The Planning Commission has considered the unavoidable significant effects of the project described in Sections 3.1 and 3.2 above, and the benefits of the project described in Section 3.4 above.

The Commission finds that in balancing the projects benefits against its unavoidable environmental risks, the benefits outweigh the environmental risks. Upon due reflection and consideration we find the substantial benefits provided by the project outweigh the significant environmental impacts. In particular, we note that the pipeline will reduce the need for marine tankering of locally produced crude oil, thus satisfying County policies which favor the use of pipelines.

## 4.0  ADDITIONAL FINDINGS

The Planning Commission realizes that there are unique construction timing constraints associated with the Celeron pipeline project. In approving this Final Development Plan, several conditions with prior to start-up compliance timing were approved. The Planning Commission finds that the timing of these conditions is acceptable only because of these unique timing considerations.

EC:6521e

Exhibit 49

CELERON CLASS I SIGNIFICANT ENVIRONMENTAL IMPACTS WHICH CANNOT BE TOTALLY MITIGATED
(Impacts which must be addressed in a "Statement of Overriding Considerations"
if the project is approved (Section 15093, State EIR Guidelines))

| Source | Description of Impact | Partial Mitigation Measures | FINDINGS County Conditions (Other Agency Jurisdictions) | CEQA Findings |
|---|---|---|---|---|
| | | SOILS | | |
| Project-related accident | 1. Oil spill impacts on sensitive soils in agricultural lands of Cuyama Valley | Automatic block and check valves and oil spill contingency plan | F-7, P-5 | 1A |
| | | SURFACE WATER | | |
| Operation | 1. Channel degradation could result in exposure of the pipeline and increase the possibility of an oil spill | Check pipeline burial depth yearly at major crossings; rebury if needed | C-2. | 1B |
| Project-related accident | 2. Major oil spills or leaks would degrade water quality | Automatic block and check valves and oil spill contingency plan | F-7, P-5, (USFS), (DPR) | 1A |
| | | GROUNDWATER | | |
| Project-related accident | 1. Potential degradation of groundwater quality resulting from an oil spill in a sensitive groundwater basin | Hydrogeologic investigations to identify sensitive areas; oil spill contingency plan; low permeability backfill in selected trench segments near sensitive aquifers | F-9, F-10, P-5 P-14 (USFS), (DPR) | 1A |

Exhibit 49

CELERON CLASS I IMPACTS

| Source | Description of Impact | Partial Mitigation Measures | FINDINGS County Conditions (Other Agency Jurisdictions) | CEQA Findings |
|---|---|---|---|---|
| **AQUATIC BIOLOGY** | | | | |
| Project-related accident | 1. Potential reductions in diversity and abundance of fish species in Refugio and Gaviota Creeks due to a major oil spill | Automatic block and check valves and oil spill contingency plan | F-7, P-5, H-12 (DPR) | 1A |
| Project-related accident | 2. Potential reductions in diversity and abundance of intertidal invertebrates, surface-feeding fish, and shorebirds in nearshore marine areas due to a major oil spill in coastal streams between Las Flores Canyon and Gaviota | Automatic block and check valves and oil spill contingency plan | F-7, P-5, H-12 (DFG, DPR) | 1A |
| **TERRESTRIAL BIOLOGY** | | | | |
| Construction | 1. Loss of riparian and oak woodlands | Avoid when possible; reduce right-of-way to 50 feet; avoid all large trees; selectively remove trees; restoration by removing spoils; particularly sensitive areas | H-1, H-3, H-18, H-19, H-20, H-21 (DPR, USFS) | 1C |
| Construction | 2. Loss of individual blunt-nosed leopard lizard and kit fox and their habitats | Avoid habitats when possible; reduce right-of-way to 50 feet within these habitats; revegetate to reestablish suitable habitat | (S.L.O. County) (Kern County) | 1H |
| Construction | 3. Loss of Hoffman's nightshade, Refugio manzanita, and Catalina mariposa lily | Avoid when possible; reestablish according to special restoration plan | H-1, H-9, H-10, H-11 | 1C |

Exhibit 49

CELERON CLASS 1 IMPACTS

| Source | Description of Impact | Partial Mitigation Measures | FINDINGS County Conditions (Other Agency Jurisdictions) | CEQA Findings |
|---|---|---|---|---|
| Operation | 1. Oil spill | Automatic block and check valves at sensitive habitats; oil spill contingency plan | F-7, P-5 | 1A |

LAND USE

| Source | Description of Impact | Partial Mitigation Measures | County Conditions (Other Agency Jurisdictions) | CEQA Findings |
|---|---|---|---|---|
| Construction | 1. Right-of-way disturbance within Gaviota State Park | Reduce right-of-way; avoid large trees; revegetation | H-1, H-3, H-1B, H-19, (DPR) | 1H |
| Project-related accident | 1. Major oil spill into coastal streams would affect beaches and water-oriented recreational opportunities | Automatic block and check valves and oil spill contingency plan | P-5, H-12, F-7 (DPR) | 1A |

CULTURAL RESOURCES

| Source | Description of Impact | Partial Mitigation Measures | County Conditions (Other Agency Jurisdictions) | CEQA Findings |
|---|---|---|---|---|
| Construction | 1. Potential disturbance to at least 8 sites eligible for listing on National Register | Intensive cultural resource survey; minimize or avoid disturbance of sites | L-1 through L-7 (USFS) | 1D |

VISUAL RESOURCES

| Source | Description of Impact | Partial Mitigation Measures | County Conditions (Other Agency Jurisdictions) | CEQA Findings |
|---|---|---|---|---|
| Construction and Operation | 1. Visual change along pipeline right-of-way in Los Padres National Forest and at pump station sites | Minimize construction corridor; Avoid large diameter trees; feather edges of cleared right of way; revegetate | H-1, H-3 (USFS) | 1E |

Exhibit 49

CELERON CLASS 1 IMPACTS

| Source | Description of Impact | Partial Mitigation Measures | FINDINGS County Conditions (Other Agency Jurisdictions) | CEQA Findings |
|---|---|---|---|---|
| | | **NOISE** | | |
| Construction | 1. Construction noise would exceed 60 dBA at some residences along the pipeline right-of-way | None practical | N-1 through N-4, N-6 | 1F |
| | | **SOCIOECONOMICS** | | |
| Cumulative | 1. Cumulative demand for worker housing will cause shortages | Vary construction schedules | I-1, I-2, I-5 | 1G |

2321e

Exhibit 49

CELERON CLASS II: SIGNIFICANT ENVIRONMENTAL IMPACTS WHICH CAN BE MITIGATED
(Findings requiring mitigation or that measures are infeasible must
be made if the project is approved (Section 15091, State EIR Guidelines))

| | | | FINDINGS | |
| | | | County Conditions | |
| Source | Description of Impact | Mitigation Measures | (Other Agency Jurisdictions) | CEQA Findings |
| --- | --- | --- | --- | --- |
| | | GEOLOGY | | |
| Operation | 1. Potential hazards and risks to pipeline due to possible surface rupture of the South Branch Santa Ynez fault | Detailed geologic, seismologic, and geotechnical studies to identify hazards and supply information from safety design | E-1 | 2 |
| | | Mitigate identified hazards by re-routing remedial earthwork, or special design. As needed specialized monitoring program. | E-1, E-2 | |
| | | Determine appropriate ground motion parameters and use them in specialized structural design. | E-1 | |
| | | Special geologic seismologic studies to characterize potential surface offsets and design appropriate crossings. | E-1 | |
| Operation | 2. Potential hazards and risks to pipeline due to slope failures in existing slide areas | Same as (1) above | E-1 (USFS, DPR) | 3, 9 |
| Operation | 3. Potential hazards and risks due to liquefaction-related failures near the river crossings | Same as (1) above; use of heavier pipe at these locations | E-1 (DFG) | 4, 9 |

Exhibit 49

Page 2 of 2

CELERON CLASS II IMPACTS

| Source | Description of Impact | Mitigation Measures | FINDINGS County Conditions (Other Agency Jurisdictions) | CEQA Findings |
|---|---|---|---|---|
| | | **AQUATIC BIOLOGY** | | |
| Construction | 1. Potential reductions in diversity and abundance of important fish species in in Gaviota Creek due to fuel or lubricant spills. | No fueling and lubrication of equipment within 0.25 miles of streams; no more than two barrels of fuel stored at construction sites within 0.5 miles of sensitive streams | G-1 (DPR) | 6,9 |
| | | **TERRESTRIAL BIOLOGY** | | |
| Construction | 1. Construction vehicle use off right-of-way affecting wild-life and sensitive plants or communities | Prohibit vehicle use off right-of-way except where specified by landowner or management agency | N-4 (USFS, DPR) | 6,9 |
| Construction | 2. Construction activity causes raptor nest abandonment | Identify raptor nesting habitat within 0.5 miles of the pipeline; no construction within 0.5 miles of a nest during nesting season; no disturbance of any nest site; avoid raptor perch or roost trees and/or construct articifical roosts | N-17 (USFS, DPR) | 7 |

Exhibit 49

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) described as **DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION (VOL. 4 OF 4)** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: *See* Attached Service List.

☒    BY ELECTRONIC MAIL TRANSMISSION WITH ATTACHMENT:  On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

☒    [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/Josie Cisneros*

Josie Cisneros

**SERVICE LIST**

Julie Teel Simmons, Esq.
David Pettit, Esq.
Talia Nimmer, Esq.
Center for Biological Diversity
2011 Franklin Street, Suite 375
Oakland, CA 94612

ATTORNEYS FOR PETITIONERS
CENTER FOR BIOLOGICAL DIVERSITY and
WISHTOYO FOUNDATION

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: jteelsimmonds@biologicaldiversity.org
dpettit@biologicaldiversity.org
       tnimmer@biologicaldiversity.org

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

ATTORNEYS FOR PETITIONERS
ENVIRONMENTAL DEFENSE CENTER, a
California non-profit corporation; GET OIL
OUT!, a California non-profit corporation;
SANTA BARBARA COUNTY ACTION
NETWORK, a California non-profit corporation;
SIERRA CLUB, a national non-profit
corporation; and SANTA BARBARA
CHANNELKEEPER, a California non-profit
corporation

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
       jfrankel@environmentaldefensecenter.org
       trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

ATTORNEYS FOR RESPONDENTS/
DEFENDANTS
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal;
Daniel Berlant, in his official capacity as State
Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
      benjaminhanelin@paulhastings.com
      natalierogers@paulhastings.com

Trevor D. Large, Esq.
FAUVER, LARGE, ARCHBALD & SPRAY
LLP
820 State Street, 4th Floor
Santa Barbara, CA 93101

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (805) 966-7000
Email: TLarge@FLASllp.com

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
MATTHEW C. WICKERSHAM, SBN 241733
matt.wickersham@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>        Petitioners and Plaintiffs,<br><br>    v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>        Respondents and Defendants,<br><br>    and<br><br>SABLE OFFSHORE CORP., et al.,<br><br>        Real Parties in Interest. | Case No. 25CV02244<br>[Coordinated with Case No. 25CV02247]<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION**<br><br>[*Filed concurrently with Opposition to Preliminary Injunction; Declarations of Michael A. Mische, Michael J. Rosenfeld, Steve Rusch, and Bart Leininger*]<br><br>Date:        July 18, 2025<br>Time:        10:00 AM<br>Dept.:        4<br><br>Complaint Filed:        April 15, 2025<br>Trial Date:                None Set |

1

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.    INTRODUCTION AND QUALIFICATIONS ........................................................5

    A.    Assignment and Scope of Work Performed................................................5

    B.    Qualifications and Background .................................................................5

    C.    Materials and Evidence Considered .........................................................5

    D.    Compensation .......................................................................................6

II.    SUMMARY OF OPINIONS ........................................................................7

    A.    In my opinion, the Pipelines have been inspected, repaired, coated and tested per the Consent Decree (CD), State Waivers, State Regulations, PHMSA Regulations, and PHMSA Waiver Approvals. ...............................................7

    B.    In my opinion, the Las Flores Pipeline System was built to industry standards at the time of construction and adheres to the standards in place today. .....................................7

    C.    In my opinion, the Pipelines can be operated and maintained in a safe manner based on the inspection requirements outlined in the State Waiver conditions as well as PHMSA Advisory Bulletin (ADB-2016-04). .............................7

    D.    In my opinion, the information provided in the Declaration of Richard B. Kuprewicz for Case No, 25CV02247 is misleading, overgeneralized or inaccurate. .............................7

III.    BACKGROUND .......................................................................................8

IV.    ANALYSIS..............................................................................................9

    A.    In my opinion, the Pipelines have been inspected, repaired, coated and tested per the Consent Decree (CD), State Waivers, State Regulations, PHMSA Regulations, and PHMSA Waiver Approvals. ...............................................9

    B.    In my opinion, the Las Flores Pipeline System was built to industry standards at the time of construction and adheres to the standards in place today. ...................................14

    C.    In my opinion, the Pipelines can be operated and maintained in a safe manner based on the inspection

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

requirements outlined in the State Waiver conditions as well as PHMSA Advisory Bulletin (ADB-2016-04). ........................... 17

D.      In my opinion, the information provided in the Declaration of Richard B. Kuprewicz for Case No, 25CV02247 is misleading, overgeneralized or inaccurate. ........................................ 47

Appendix A – Consent Decree Table – Summary with Status to Article I, II, and Appendix D of Case 2:20-CV-02415 ............................................................................... 63

Appendix B – CA-324 State Waiver Summary with Status ....................................................... 98

Appendix C – CA-325A and CA-325B State Waiver Summary with Status ................... 126

Exhibit A - CV ............................................................................................... 150

Exhibit B – Consent Decree ...................................................................... 151

Exhibit C – CA-324 State Waiver ............................................................. 152

Exhibit D – CA-325A and CA-325B State Waiver ................................ 153

Exhibit E - Docket No. PHMSA-2025-0002 letter responding to Office of the State Fire Marshal granting a waiver to Sable for CA-324 Pipeline ...................................... 154

Exhibit F - Docket No. PHMSA-2025-0002 letter responding to Office of the State Fire Marshal granting a waiver to Sable for CA-325A/B Pipeline ................................ 155

Exhibit G – AVEVA Product Datasheet – Pipeline Operations for Liquids........................ 156

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

## LIST OF FIGURES

Figure 1:          Pacific Pipeline System – Block Flow Diagram

Figure 2:          ILI Tool Example

Figure 3:          ILI Tool Example – Illustration inside of pipe

Figure 4:          ILI Tool Example – Illustration inside of pipe

Figure 5:          Composite Sleeve Repair

Figure 6:          Type B Sleeve Repair

Figure 7:          Pipe Removal

Figure 8:          Pipe Installation with EFRD

Figure 9:          Example of Coating Repair – Prior to coating

Figure 10:        Example of Coating Repair – After coating

## LIST OF TABLES

Table 1:          PHMSA Findings and Sable Response

Table 2:          Las Flores Pipeline Information

Table 3:          Distance Between Flow Meters - Reduction

Table 4:          Valve Installations

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

## I.    INTRODUCTION AND QUALIFICATIONS

### A.    Assignment and Scope of Work Performed

1.    I, Brien Vierra, am a professional engineer with FJ Technologies, Inc. I have been retained to provide an opinion on the fitness for service of the Las Flores Pipeline system, which is owned by Pacific Pipeline Company and operated by Sable Offshore Corp ("the Pipelines"). The Pipelines are designed to transport crude oil from Las Flores Canyon (Santa Barbara County) to Pentland Station (Kern County), where crude oil is transported by other carriers to the end user. The lines are known as CA-324 (10.86 miles of 24-inch pipe, Las Flores to Gaviota), CA-325A (38.72 miles of 30-inch pipe, Gaviota to Sisquoc) and CA-325B (74.85 miles of 30-inch pipe, Sisquoc to Pentland).

### B.    Qualifications and Background

2.    I have over 35 years of experience in the pipeline industry, and I established my consulting company in 1997. I have worked in several capacities from permitting and design of cross country pipelines, pressure vessel modifications, permitting and design of process and pumping facilities, design and installation of directional drill crossings, field construction observation, project management, project design, hydraulic analysis, pipe stress analysis (Caesar II/Coade), vessel design/fatigue analysis (Compress/Codeware), risk analysis, tank, vessel and pipeline internal/external inspection analysis, preparation of weld procedures and conceptual planning. I have a Bachelor's Degree in Mechanical Engineering Technology from California Polytechnic State University, San Luis Obispo and have been licensed by the State of California as a Professional Engineer.

### C.    Materials and Evidence Considered

3.    To form the below Opinions, I relied on direct field observations obtained by personally observing work being completed in compliance with State and Federal requirements, and I reviewed the following documents:

   a.  Design documents both historical and current, as described below;

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

b. Hydrostatic Spike Test Reports and Hydrotest Strength Reports, as described below;

c. Corrosion Under Insulation Plan per State Waivers and Consent Decree, as described below;

d. Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, entered in Case No. 2:20-cv-02415, filed on March 13, 2020 and attached as Exhibit B;

e. State Waiver for CA-324 issued by Department of Forestry and Fire Protection, Office of the State Fire Marshal issued December 17, 2024, attached as Exhibit C;

f. State Waiver for CA-325A/B issued by Department of Forestry and Fire Protection, Office of the State Fire Marshal issued December 17, 2024, attached as Exhibit D;

g. U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) Docket No. PHMSA-2025-0002 letter responding to Office of the State Fire Marshal granting a waiver to Sable in which PHMSA states "Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-324 pipeline," dated February 11, 2025 and signed by Alan K. Mayberry, Associate Administrator for Pipeline Safety, attached as Exhibit E; and

h. U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) Docket No. PHMSA-2025-0003 letter responding to Office of the State Fire Marshal granting a waiver to Sable in which PHMSA states "Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-325A/B pipeline," dated February 11, 2025 and signed by Alan K. Mayberry, Associate Administrator for Pipeline Safety, attached as Exhibit F.

**D.    Compensation**

6

4.     I have been compensated at a rate of $150 per hour.

II.     **SUMMARY OF OPINIONS**

A.     **In my opinion, the Pipelines have been inspected, repaired, coated and tested per the Consent Decree (CD), State Waivers, State Regulations, PHMSA Regulations, and PHMSA Waiver Approvals.**

B.     **In my opinion, the Las Flores Pipeline System was built to industry standards at the time of construction and adheres to the standards in place today.**

C.     **In my opinion, the Pipelines can be operated and maintained in a safe manner based on the inspection requirements outlined in the State Waiver conditions as well as PHMSA Advisory Bulletin (ADB-2016-04).**

D.     **In my opinion, the information provided in the Declaration of Richard B. Kuprewicz for Case No, 25CV02247 is misleading, overgeneralized or inaccurate.**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

### III.    BACKGROUND

1.    In May 2016, PHMSA issued a Failure Investigation Report on the Plains Pipeline LP (Plains) Line 901 Crude Oil Release that occurred on May 19, 2015.[1]

The Executive Summary reads as follows:

At approximately 10:55 a.m. Pacific Daylight Time (PDT) on May 19, 2015, the Plains Pipeline, LP (Plains), Line 901 pipeline in Santa Barbara County, CA, ruptured, resulting in the release of approximately 2,934 barrels (bbl.) of heavy crude oil. An estimated 500 bbl. of crude oil entered the Pacific Ocean. Line 901 is a 24-inch diameter buried, insulated pipeline which extends approximately 10.7 miles in length and transports heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station. On May 21, 2015, the Pipeline and Hazardous Materials Safety Administration (PHMSA), a regulatory agency within the U.S. Department of Transportation, issued a Corrective Action Order (CAO) that required the operator to shut down Line 901. Concurrent with the issuance and implementation of the CAO, PHMSA conducted an investigation to identify causal factors that contributed to the occurrence and size of the crude oil release. As the failure investigation progressed, the CAO was amended to address additional safety concerns that were identified. On June 18, 2015, Line 901 was purged and filled with inert nitrogen to enhance safety during the investigation and development of a remedial action plan. No fatalities or injuries occurred as a result of this rupture and release. The spill resulted in substantial damage to natural habitats and wildlife.

PHMSA's findings indicate that the proximate or direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. PHMSA's investigation identified numerous contributory causes of the rupture, including:

1) Ineffective protection against external corrosion of the pipeline

---

[1] https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf. The lines at the time of the release were under federal jurisdiction (see 49 CFR Part 195) because they were considered interstate pipelines. As part of the Consent Decree signed by Plains in 2020, Lines CA-324, CA-325A and CA-325B (formerly Lines 901 and 903) are now under the regulatory oversight of the Office of the State Fire Marshal (OSFM).

8

•       The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.

•       The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.

2) Failure by Plains to detect and mitigate the corrosion

•       The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

3) Lack of timely detection of and response to the rupture

•       The pipeline supervisory control and data acquisition (SCADA) system did not have safety-related alarms established at values sufficient to alert the control room staff to the release at this location.

•       Control room staff did not detect the abnormal conditions in regards to the release as they occurred. This resulted in a delayed shutdown of the pipeline.

•       The pipeline controller restarted the Line 901 pipeline after the release occurred.

•       The pipeline's leak detection system lacked instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it was operating or shut down.

•       Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as alarms.

The consequences of the spill were additionally aggravated by an oil spill response plan that did not identify the culvert near the release site as a spill pathway to the Pacific Ocean.

This report contains factual information and analysis regarding the events leading up to the release, information collected during PHMSA's failure investigation to date, and the technical analysis of that information known at the time of the completion of this report. PHMSA used this information to mandate remedial measures on Line 901, Line 903, and associated stations and tankage. PHMSA will also use the information to determine whether violations of the federal pipeline safety regulations occurred.

IV.   ANALYSIS

A.      **In my opinion, the Pipelines have been inspected, repaired, coated and tested per the Consent Decree (CD), State Waivers, State Regulations, PHMSA Regulations, and PHMSA Waiver Approvals.**

9

1. Sable has completed over 200 repairs, installed over twenty-seven new valves, installed a new control center with Real Time Transient Modelling (RTTM) for leak detection with automated shutdowns, and implemented several procedures and processes to ensure the lines are safe to operate.

2. The Pipelines can be operated at a minimal risk to the environment due to the increased safety items that Sable has integrated into the pipeline system both technologically and training of personnel in conjunction with the significant Federal and State mitigation requirements.

3. In addition to other State and Federal regulations, OSFM has issued specific Waivers with which Sable is required to comply with prior to restart and during operations.

4. Sable acquired lines CA-324, CA-325A and CA-325B in early 2024, and they began making repairs as soon as doing so was allowed. In response to the PHMSA findings, the Consent Decree, and the State Waivers, Sable has completed all of the following items:

| PHMSA FINDING | CHANGES COMPLETED BY SABLE |
|---|---|
| 1) Ineffective protection against external corrosion of the pipeline | Sable has completed over 200 repairs to remove or repair areas of corrosion that were reported by the latest ILI tool runs that were 40% or greater. Two ILI tools were run through CA-324 and one tool through CA-325A and 325B. |
| • The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion. | |
| • The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system. | As per the State Waiver, Sable will continue inspecting the lines at routine time intervals for metal loss, twice annually for first 2 years of operation. Sable will utilize techniques |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | |
|---|---|
| | such as ultrasonic wall thickness for wall loss detection, quantification of data, and ultrasonic shear wave for crack detection. Data analysis will take into consideration tool tolerance, growth rate, and mitigation techniques to enhance the probability of success in effectively mitigating any external corrosion that occurs on the lines. |
| 2) Failure by Plains to detect and mitigate the corrosion<br><br>• The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately. | In 2022 and 2023, additional ILI tools were ran through CA-324 and CA-325A/B to characterize the extent and depth of the external corrosion accurately. Sable based their repair program on these new tool runs as well as field review of actual conditions during the repair process.<br><br>Sable is currently planning the next ILI tool runs through the system within the first seven days of steady state operation in which the State Waiver Conditions require that Sable account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used as well as demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If |

11

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.  In addition, under condition 28, prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013). |
|---|---|
| 3) Lack of timely detection of and response to the rupture<br><br>• The pipeline supervisory control and data acquisition (SCADA) system did not have safety-related alarms established at values sufficient to alert the control room staff to the release at this location.<br><br>• Control room staff did not detect the abnormal conditions in regards to the release as they occurred. This resulted in a delayed shutdown of the pipeline.<br><br>• The pipeline controller restarted the Line 901 pipeline after the release occurred.<br><br>• The pipeline's leak detection system lacked instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it was operating or shut down.<br><br>• Control room staff training lacked formalized and succinct requirements, including emergency | Sable has taken comprehensive steps to enhance its pipeline monitoring, detection, and emergency response capabilities. These improvements are designed to prevent a recurrence of the incident and ensure the highest standards of operational safety. Key actions include:<br>•  Enhanced Detection Infrastructure -<br><br>New meters have been installed at Gaviota and Sisquoc, along with additional meters at Las Flores and Pentland. These upgrades, combined with improved pressure and temperature monitoring, significantly increase detection capabilities across all pipeline segments.<br><br>•  Advanced SCADA and Alarm Systems -<br><br>A new SCADA system has been deployed, featuring safety-related alarms calibrated to detect abnormal operating conditions. These alarms are designed to alert control room staff promptly and can automatically initiate a system shutdown using a Real-Time Transient Model (RTTM) for rapid response. |

12

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | |
|---|---|
| shutdown and leak detection system functions such as alarms. | • SCADA Simulator for Realistic Training - <br><br> A comprehensive SCADA simulator has been developed to replicate the CA-324, CA-325A, and CA-325B pipeline segments. This simulator is used to train controllers in leak recognition, emergency response, and operational procedures under realistic conditions, significantly improving preparedness and decision-making. <br><br> • Targeted Training, Procedures, and Empowered Safety Culture – <br><br> Sable is implementing specialized training programs focused on the specific circumstances of the previous release. These include formalized protocols for emergency shutdowns, alarm response, and use of the leak detection system. In addition, the company has fostered a safety culture that empowers controllers to act decisively—prioritizing safety and enabling them to initiate shutdowns based on their training and judgment without hesitation. <br><br> • Revised Restart Protocols – <br><br> Sable is incorporating standard operating procedures to prohibit pipeline restarts following any suspected release until a full assessment is completed. This ensures that safety is prioritized over operational continuity and that no restart occurs without a verified safe operating condition. <br><br> In my opinion, these measures reflect Sable's commitment to continuous improvement, environmental stewardship, and the safety of its operations. <br><br> • See section 5.a.5) SCADA and Appendix E for additional details on the |

13

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | |
|---|---|
| | RTTM system as well as other items to enhance the capabilities of the systems. |

**Table 1 – Sable Response to Findings**

**B.** **In my opinion, the Las Flores Pipeline System was built to industry standards at the time of construction and adheres to the standards in place today.**

1.     The Pipelines can be operated at a minimal risk to the environment due to the increased safety items that Sable has integrated into the pipeline system both technologically and training of personnel in conjunction with the significant Federal and State mitigation requirements.

2.     Installation Construction Specifications - Table 2 below provides a summary of the basic system design:

| | CA-324: Las Flores Canyon to Gaviota | CA-325A: Gaviota to Sisquoc | CA-325B: Sisquoc to Pentland |
|---|---|---|---|
| *Year of Construction:* | 1990 | 1986 | 1986 |
| *Pipeline Diameter:* | 24 inches | 30 inches | 30 inches |
| *Length of Pipeline:* | 10.8 miles from Las Flores Pump Canyon Station to Gaviota Station. Flow diagrams for the Las Flores Canyon and Gaviota Stations are enclosed for reference in | 38.7 miles in length from Gaviota Station to Sisquoc Pump Station. Flow diagrams for the Gaviota and Sisquoc Stations are enclosed for reference in | 74.8 miles in length from Sisquoc Pump Station to Pentland Station. Flow diagrams for the Sisquoc and Pentland Stations are enclosed for reference in |

14

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

|  | CA-324: Las Flores Canyon to Gaviota | CA-325A: Gaviota to Sisquoc | CA-325B: Sisquoc to Pentland |
|---|---|---|---|
|  | *Attachment A – Flow Diagrams.* | *Attachment A – Flow Diagrams.* | *Attachment A – Flow Diagrams.* |
| *Predominant Pipe Grade:* | API 5L, Grade X-65 | API 5L, Grade X-65, X-70 | API 5L, Grade X-65, X-70 |
| *Predominant Wall Thickness:* | 0.344 inches | 0.281, 0.344 inches | 0.281, 0.344, 0.375, 0.438 inches |
| *Maximum Operating Pressure (MOP):* | 1003 psig at low point | 1000 psig at low point | 1292 psig at low point up to CHK 37, then 1170 PSIG at low point between CHK 37 to Pentland |
| *Normal Operating Pressure (NOP):* | 250 to 600 psig | 500 to 650 psig | 940 to 1150 psig |
| *Pipe Seam:* | High frequency electric resistance welded (HF-ERW) manufactured in 1985 and 1986. | Double submerged arc welded (DSAW) manufactured between 1984 and 1986. | Double submerged arc welded (DSAW) manufactured between 1984 and 1986. |
| *Existing and New Valves:* | 4 valves (3 MOV, 1 check) <br><br> 7 new valves (6 MOV, 1 Check) | 8 valves (5 MOV, 3 check) <br><br> 6 new valves (4 MOV, 2 Check) | 8 valves (4 MOV, 3 check, 1 manual) <br><br> 14 new valves (4 MOV, 10 check) |

15

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

|  | CA-324: Las Flores Canyon to Gaviota | CA-325A: Gaviota to Sisquoc | CA-325B: Sisquoc to Pentland |
|---|---|---|---|
| *Elevations:* | Las Flores: 193 feet ASL<br><br>Gaviota: 201 feet ASL<br><br>Low point: 28 feet ASL<br><br>High point: 764 feet ASL | Gaviota: 192 feet ASL<br><br>Sisquoc: 832 feet ASL<br><br>Low point: 42 feet ASL<br><br>High point: 1,425 feet ASL | Sisquoc: 895 feet ASL<br><br>Pentland: 694 feet ASL<br><br>Low point: 668 feet ASL<br><br>High Point: 3,004 feet ASL |
| *Original Coating:* | Coal Tar Urethane | Coal Tar Urethane | Coal Tar Urethane |
| *Insulation:* | 1.5-inch-thick layer of rigid urethane foam insulation and an outer polyethylene tape.<br><br>Replacement pipe and repairs coated with RD6 tape wrap system or Denso 7200 Protal | 1.5-inch-thick layer of rigid urethane foam insulation and an outer polyethylene tape.<br><br>Replacement pipe and repairs coated with RD6 tape wrap system or Denso 7200 Protal | 1.5-inch-thick layer of rigid urethane foam insulation and an outer polyethylene tape.<br><br>Replacement pipe and repairs coated with RD6 tape wrap system or Denso 7200 Protal |
| *General Condition of the Pipeline:* | The pipeline has been repaired as well as hydrotested per the State Waiver Requirements. The pipeline will be in compliance with all integrity | The pipeline has been repaired as well as hydrotested per the State Waiver Requirements. The pipeline will be in compliance with all integrity | The pipeline has been repaired as well as hydrotested per the State Waiver Requirements. The pipeline will be in compliance with all integrity |

16

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | CA-324: Las Flores Canyon to Gaviota | CA-325A: Gaviota to Sisquoc | CA-325B: Sisquoc to Pentland |
|---|---|---|---|
| | requirements set forth by the Consent Decree, State Waiver, and applicable regulations prior to recommissioning. | requirements set forth by the Consent Decree, State Waiver, and applicable regulations prior to recommissioning. | requirements set forth by the Consent Decree, State Waiver, and applicable regulations prior to recommissioning. |
| *Linefill Capacity in barrels (bbls):* | 30,263 | 171,216.5 | 328,832.5 |
| *Operating Temperature:* | The maximum operating temperature of this segment is 140°F. The system is expected to operate between 60°F and 130°F during steady state operation. | The maximum operating temperature of this segment is 125°F. The system is expected to operate between 60°F and 125°F during steady state operation. | The maximum operating temperature of this segment is 110°F. The system is expected to operate between 60°F and 110°F during steady state operation. |

**Table 2 – Las Flores Pipeline Information**

C.  **In my opinion, the Pipelines can be operated and maintained in a safe manner based on the inspection requirements outlined in the State Waiver conditions as well as PHMSA Advisory Bulletin (ADB-2016-04).**

1.  **Hydraulic Design per OSFM and PHMSA**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

i.    The hydraulic reports reviewed show the pipeline will operate below the maximum operating pressures established during the hydrotesting of the pipeline segments, and the temperatures will be below the maximum levels set by the OSFM State Waivers, which means that the Pipelines will be operating more safely than industry standards today.

2.  **Supervisory Control and Data Acquisition System (SCADA) System Design**

i.    The CPM – Computational Pipeline Monitoring system that Sable is implementing is "State of the Art," meaning that it incorporates all of the latest requirements for Leak Detection Systems (LDS) as outlined in API RP 1130 (American Petroleum Institute,) and implements rigid training requirements for all controllers. Additional details of the system are described below.

3.  **RTTM – Real Time Transient Modeling leak detection system**

i.    PPC has installed a new control center with an enhanced leak detection system using Real Time Transient Model Computational Pipeline Monitoring ("RTTM CPM") for the entire Las Flores Pipeline system integrated into the Supervisory Control and Data Acquisition ("SCADA") system and Operations Control Center ("OCC"), located in Santa Maria, CA. RTTM CPM will enable the shortest release detection time, thereby, minimizing release volume compared to other LDS technologies.

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

ii.   RTTM CPM systems are recognized in the midstream industry as an effective Leak Detection System (LDS) in terms of sensitivity, accuracy, reliability, and robustness, and the operational aspects of CA-324 and CA-325A/B make RTTM CPM a feasible LDS.  RTTM CPM provides the greatest degree of protection of the LDS technologies available.

iii.  Here, the RTTM CPM will be configured with multiple balance periods from short (5 minutes) to long (>1 day) to limit the quantity of release over a range of potential release rates from small to large.  RTTM CPM is used extensively in similar liquid pipeline applications around the world with multiple reputable applications available on the market to implement.  RTTM CPM is compatible with the geographic conditions along the Las Flores Pipeline System, particularly the elevation profile, and maintains the ability to accurately model and maintain detection, even during abnormal operating conditions.

iv.  RTTM CPM is compatible with the SCADA, measurement, and communications technology in use on this pipeline segment.  RTTM CPM systems also maintain roughly equal performance from end to end of the pipeline regardless of operating pressure so long as the fluid in the line is kept in the liquid state, which is ensured by PPC operating procedures.

v.   By employing RTTM CPM, the system here will be more sensitive due to its advanced capabilities to model line-pack and consider hydraulic

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

gradient sensitivities compared to the previous system used by the previous owner.  In particular, it will react much faster (lower leak detection time) to large rate releases characterized by rapid depressurization of the pipeline due to its higher sensitivity and ability to anticipate how the pipeline system hydraulics should behave versus reality.

vi.    Installing RTTM CPM on CA-324 and CA-325A/B will limit the volume of a release by detecting the event and alerting PPC's OCC to initiate response, including pipeline shut down.  By using multiple balance periods, the system will respond appropriately to different release rates, alerting high-rate releases (rupture scenarios) very quickly with the capability to tie-in automatic commanded actions within the application, while still being sensitive enough to detect low-rate releases. Lastly, RTTM CPM fidelity will benefit from the corroborative effect of multiple field instruments, as detailed further in item 2 below.

vii.    PPC has installed additional pressure and temperature transmitters at existing and new motor-operated valve ("MOV") sites, as required for RTTM CPM LDS, to achieve reliable detection within performance standards.  Generally, this will consist of installation of pressure and temperature sensors on both the upstream and downstream sides of MOV sites.  Data from these sensors will be transmitted via SCADA to PPC's OCC and to the RTTM CPM.

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

viii.    Additional pressure transmitters for surveillance will limit the volume of release because they will confer advanced capability to model pipeline volumes and consider changes in hydraulic sensitivities, thereby alerting PPC's control center to initiate response to abnormal operating conditions, including pipeline shut down. While analog point analysis can identify full line ruptures very quickly and alert the OCC to an anomalous event, it does not support an accepted performance estimation methodology and, as a result, the performance may vary with position along the line.  Nonetheless, analog point analysis via pressure and temperature transmitters have been included in the leak detection deployment for this line.

ix.    Installation of additional pressure instruments coupled with RTTM CPM, as described above, meet or exceed all criteria in 19 CCR § 2110.

x.    PPC has installed new flow meters at all of the stations in which Gaviota Station and Sisquoc Station did not have meters before. The additional meters will help to increase detection resolution of the LDS by providing flow data via SCADA to PPC's OCC.  These will work in conjunction with RTTM CPM and existing flow meters.  A map showing the location of the new and existing flow meters is shown below in figure 1.

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



**Figure 1**

| 10. **Distance Between Flow Meters used for Surveillance** | **Baseline Condition, *miles*** | **New Plan, *miles*** | **Reduction in Distance, %** |
|---|---|---|---|
| CA-324 | 124.4 | 10.9 | 91% |
| CA-325A | 124.4 | 38.7 | 69% |
| CA-325B | 124.4 | 74.8 | 40% |

**Table 3: Distance Between Flow Meters**

xi.    PPC has installed an automatic shutoff system ("ASOS") that will automatically initiate a pump shutdown sequence along with

commanding MOV closures on the pipeline segment, upon receipt of a rupture alarm without human intervention.

a. The ASOS will safely shut off and isolate the pipeline system in response to identified alarm criteria, specifically a rupture alarm, from either the RTTM CPM system or other rupture detection systems deployed on the pipeline. The ASOS will consist of a sequence program using local Programmable Logic Controllers ("PLCs") and SCADA software that will automatically de-energize the pumping equipment and initiate remote closure of MOVs to isolate the pipeline in response to the alarm condition. This includes automated closure of new and retrofitted MOVs as well as existing MOVs. The sequence will also be available for activation by the OCC controller to rapidly shut off the system any time the controller questions the integrity of the Pipelines.

b. For ASOS to be effective, it requires reliable communications equipment and specialized logic programs to shutoff consistently and in a manner that maintains static leak detection and line pack in the event of a false alarm, as the ASOS will be unique to the particular pipeline operating parameters and physical characteristics. Technology advancements within the last decade have made a retrofit implementation on a hydraulically complex system such as the Las Flores Pipeline possible, with step changes in site-to-site satellite communications and quicker data transmittal protocols.

c. PPC has installed redundant communications (two modes of communications) to each of the stations as well as the valve sites to meet the quicker communication requirements. ASOS will provide

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

the greatest degree of protection by not only reducing shutoff response time, but by supplementing human response with automation.

**4. The Consent Decree – Compliance**

i.  The Consent Decree between Plains Pipeline, L.P. and the United States of America and the People of the State of California, Case No. 2:20-cv-02415, filed on March 13, 2020 requires Plains or Sable to comply with nineteen (19) conditions in Article 1, twenty-six (26) conditions in Article 2 and ten (10) conditions in Appendix D.

ii.  These conditions vary in length and breadth in which have several sub-requirements or conditions. A majority of these conditions are caried over to the State Waivers for CA-324, CA-325A and CA-325B to ensure compliance. Sable has complied with, is in the process of complying with, or is prepared to comply with all of the Consent Decree conditions.

iii.  I have reviewed or been involved with a majority of the items required prior to operation of which in my opinion have met, meet or will meet the conditions outlined in the Consent Decree. Specifically, I was personally engaged with Sable staff and OSFM during the repair program in identifying anomalies and determining, with OSFM approval, methods of appropriate repair.

**5. State Waiver CA-324 - Compliance**

i.  The CA-324 State Waivers have sixty-seven (67) conditions. Twelve (12) of those conditions also carry subsections.

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

ii.    Sable has met, is in the process of meeting, or will be required to meet, all the State Waiver conditions per the OSFM.

iii.    I have reviewed or been involved with a majority of the items required prior to operation of which in my opinion have met or meet the conditions outlined in the Waiver. Specifically, I was personally engaged with Sable staff and OSFM during the repair program in identifying anomalies and determining, with OSFM approval, methods of appropriate repair.

iv.    The items required during operations will be an ongoing compliance requirement per the terms of the waiver.

6.  **State Waiver CA-325 – Compliance**

i.    The CA-325A/B State Waivers have sixty-eight (68) conditions. Sixteen (16) of those conditions also carry subsections.

ii.    Sable has met, is in the process of meeting, or will be required to meet, all of the State Waiver conditions per the OSFM.

iii.    I have reviewed or been involved with a majority of the items required prior to operation of which in my opinion have met or meet the conditions outlined in the Waiver. Specifically, I was personally engaged with Sable staff and OSFM during the repair program in identifying anomalies and determining, with OSFM approval, methods of appropriate repair. The items required during operations will be an ongoing compliance requirement per the terms of the waiver.

7.  **PHMSA Approval of State Waivers - Compliance**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

i.    U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) Docket No. PHMSA-2025-0002 wrote letter in response to Office of the State Fire Marshal granting a waiver to Sable.

ii.    In this letter, PHMSA stated that, "[p]ursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-324 pipeline." The referenced waiver will allow Sable to manage the risk of corrosion. The letter also specifically explains the following:

The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-325A&B pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

iii.    Sable has successfully completed the "spike" hydrotest as well as the "Strength" Hydrotest and is in the process of planning the ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tool runs which they will complete as soon as steady state operation of the pipeline is achieved.

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**8. In-Line Inspection - Compliance with Consent Decree**

i.   Sable utilized Inline Inspection Reports from 2022 and 2023 as well as historical data to establish the minimum number of pipeline repairs required per the Consent Decree.

ii.  During the repair process, if additional anomalies were found in the area of exposed pipe, they were also repaired, in addition to the identified anomaly even though they did not meet the repair criteria threshold.

iii. Examples of various In Line Inspection (ILI) tools commonly called "pigs." These are only examples and not photos of the tools used.



**Figure 2 – ILI tool**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



**Figure 3 – ILI tool inside of pipe**



**Figure 4 – ILI tool illustration inside of pipe**

9. **Repair & Hydrotest - Compliance with Consent Decree & State Waivers**

i.    Sable has performed over 200 pipeline repairs from composite repairs to type B weld sleeves to complete pipe replacements in the last year.

ii.   Each repair has been documented and inspected per OSFM & PHMSA requirements.

i.   Examples of each repair type are shown below:



**Figure 5 – Composite Sleeve Repair**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



**Repair System Definition:**

The ASME PCC-2 Article 401 and ISO 42817 each defined a "Repair System" as a combination or function of the following elements. The Repair System definition for the A+ Wrap™ repair system is provided according to this definition as follows:

| Repair System Element | A+ Wrap System Definition |
|---|---|
| Substrate | Carbon Steel |
| Surface Preparation | Preferred: NACE 2 / SSPC-SP10 near white metal blast<br>Minimum: SSPC-SP 11 – power tool clean to bare metal |
| Load Transfer Material | EPN-101 or EPN-242 or ESN-202 |
| Primer | PPR-220 or PPR-290 |
| Composite Wrap (saturated in factory) | FEB-530 Fiberglass<br>with<br>SPU-210 Moisture-cured Urethane Resin |
| Application Method | Per Detailed Installation Guide – Offset, Spiral, Layer-over-Layer (i.e., straight/weld wraps), and "Brick Stack" options |
| Curing Protocol | Approximately 24 hours at 75°F (24°C) |

CSNRI Composite repair sleeves were used by Sable on CA-324 and CA-325A/B repairs in which the CSNRI repair definition is shown below:



**Figure 6 – Type B Sleeve (Welded)**

A Type B sleeve is comprised of two pieces of steel rolled to fit the outside of the existing pipe. The two sleeves are fit up tight over the pipe then the longitudinal welds are made. Once the longitudinal welds are completed,

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

the one end fillet weld is completed, then the last end fillet weld is completed to create a "pressure containing" repair.



**Figure 7 – Pipe Removal**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



**Figure 8 – Pipe Installation with EFRD**

Process of starting a repair to completion of repair shown in Photos 1 through 11 below.



DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Photo 1 - Excavation with spotter**



**Photo 2 – Pipe Stripped of Insulation after Excavation**



**Photo 3 – Pipe Blasted and Ready for Evaluation**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY
INJUNCTION



**Photo 4 – Cutout Repair Complete with Markings and Inspection Data**



**Photo 5 – Pipeline Repair – Composite A+ Wrap**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



**Photo 6 – Pipeline Repair – Composite A+ Wrap Cured and Initial Coating**



**Photo 7 – Coating Inspection using a Holiday Detector "jeep"**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



**Photo 8 – A+ Wrap with final wrap post-final coating inspection prior to backfill**



DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Photo 9 – Backfill operation with rock guard applied to pipe to protect coating**



**Photo 10 – Final Grading prior to revegetation with Pipeline Marker per 49 CFR 192.707**



DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Photo 11 – Final Grading with revegetation and erosion control in place**



**Photo 12 – Final Grading with vegetation started and erosion control in place**

10. **Existing Mainline Valve Replacements and New Valve Installations**

   i.  A total of forty-seven (47) valves have been replaced, serviced or installed along the pipeline route with twenty-seven (27) of them being new. A full description of the valves is shown in Table 4 below.

   ii. The installation of the new valves has allowed the lines to be split into smaller segments thus minimizing potential drain down as well as provided additional monitoring along the line.

| Valve ID | Description |
|---|---|
| MOV-109C - LFC | MOV - Existing - Replaced |
| 324-MOV1 | MOV-New |
| 324-MOV2 | MOV-New |
| 324-MOV3-Refugio | MOV -Existing - Replaced |
| 324-CHK4-Refugio | Chec - Replaced |

38

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | |
|---|---|
| 324-MOV5 | MO  -New |
| 324-CHK6 | Check - New |
| 324-MOV7 | MOV - New |
| 324-MOV8 | MOV - New |
| 324-MOV9 | MOV - New |
| MOV-208C - Gav | MOV - Existing - Replaced |
| MOV-209C - Gav | MOV - Existing - Replaced |
| 325A-MOV10-GC | MOV - Existing - Replaced |
| 325A-CHK11-GC | Check - Existing |
| 325A-CHK12 | Check - New |
| 325A-MOV13 | MOV - New |
| 325A-MOV14-SYR | MOV - Existing - Replaced |
| 325A-CHK15-SYR | Check - Existing |
| 325A-MOV16 | MOV - New |
| 325A-CHK17 | Check - New |
| 325A-MOV18 | MOV - New |
| 325A-MOV19 | MOV - New |
| 325A-MOV20 - SR | MOV - Existing - Replaced |
| 325A-CHK21-SR | Check - Existing |
| MOV-408C - Sisq | MOV - Existing - Replaced |
| MOV-409C - Sisq | MOV - Existing - Replaced |
| 325B-CHK22 | Check - New |
| 325B-MOV23 | MOV - New |
| 325B-CHK24-PCC | Check - Existing |
| 325B-CHK25 | Check - New |
| 325B-MOV26-CR | MOV-Existing |
| 325B-CHK27-CR | Check - Existing |
| 325B-MOV28 | Valve - Existing Rep. MOV |
| 325B-CHK29 | Check - New |
| 325B-CHK30 | Check - New |
| 325B-CHK31 | Check - New |
| 325B-CHK32-SER | Check - Existing - Replaced |
| 325B-CHK33 | Check - New |
| 325B-CHK34 | Check - New |
| 325B-CHK35 | Check - New |
| 325B-CHK36 | Check - New |
| 325B-CHK37 | Check - New |
| 325B-MOV38-SA | MOV - Existing |
| 325B-MOV39-SA | New |
| 325B-MOV40-SA | New |
| 325B-MV41 -Pent | Valve - Replaced |
| MOV4A08C - Pent | MOV-Existing - Replaced |

**Table 4 – Valve Installations**

39

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

## 11. Coating Repair Details

i.  Specifications for the various repairs were reviewed in which the following details are provided as an example of how the coating was repaired or replaced:

Appendix A:   Coating Guideline for Insulated Pipe

Step 1:   Prepare bare steel section to SSPC SP-10 Near White Metal Blast. Bare steel shall be prepared up to existing coal tar primer.

Step 2:   Adjacent coal tar primer shall be SSPC SP-7 Brush Blasted to be exposed for a minimum of two (2) inches from adjoining polyurethane foam. Exposed coal tar primer shall be tightly adhered per SSPC SP-2 Hand Tool Cleaning. Tightly adhered is defined as "cannot be removed by scraping with a dull putty knife".

Step 3:   Bevel polyurethane foam at a minimum 1:1 slope to allow for proper transition of pipe wrap.

Step 4:   Perform SSPC SP-7 brush blast of beveled polyurethane foam and minimum six (6) inches of existing polyethylene tape. Can be done with SSPC SP-2 or SSPC SP-3 if hand or power tooling is more practical.



Image-1 Insulated Pipe Example

**Figure 9 – Example of Coating Repair Methodology
Prior to Coating from Sable Specifications**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

Application Sequence
1. Apply high solids epoxy to prepared bare steel.
   a. High solids shall be applied over 100% of bare steel. Epoxy should not overlap existing coal tar primer, but should be as close as practical.
2. Allow high solids epoxy cure to minimum recoat window. See Denso Protol 7200 Technical Data Sheet for more information.
3. Apply Polyguard RD-6™ over the entire existing coating interface.
   a. High solids epoxy, polyurethane foam, and polyethylene tape. Approx. 18" per side.
   b. See Polyguard RD-6™ Technical Data Sheet for more information. See visual on next page.
4. Apply Polyguard SP-6™ Outer Wrap over Polyguard RD-6™.
   a. Polyguard SP-6™ Outerwrap should extend to a ¼" from end of Polyguard RD-6™..
   b. See Polyguard SP-6™ Technical Data Sheet for more information
   c. See Polyguard 606 Filler Compound for irregular shapes as well as for application information



Image-2 Insulated Pipe Example with tape wrap

**Figure 10 – Example of Coating Repair Methodology
from Sable Specifications**
Reference also Photo 8 above regarding final installation prior to back fill.

**12. Hydrostatic Spike Test Reports and Hydrotest Strength Reports**

i.    The pipeline system was broken up into eight (8) test segments. Hydrostatic and spike test values provide confidence well in excess of the expected operating pressures and provides confidence that failure is unlikely to occur between ILI runs, particularly with the much-shortened ILI timing set forth by OSFM (twice per year for the first 2 years).

ii.   With the successful hydrotest and spike tests on 324 and 325A as well as the successful hydrotest of 325B, Sable has demonstrated that the

41

repaired pipelines have the required integrity needed to operate without failure.

iii.    A copy of OSFM Report CA-324 (Test ID#25-07317) is pasted in below as reference to one of the eight completed tests.

**Clear Form**



OFFICE OF THE STATE FIRE MARSHAL
PIPELINE SAFETY DIVISION
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

Appendix D  – Test Results Form HYD-3
Revision Date: 04/2020

### HYDROSTATIC TEST RESULTS/ PIPELINE DATA

| Test Date: | | CSFM Test ID # | |
|---|---|---|---|
| 05/12/2025 | | 25-07317 | |
| **Pipeline Operator:** | | **Independent Testing Firm:** | |
| Sable Offshore Corp/Pacific Pipeline Company | | Milbar Hydro-Test Inc. | |

**Type of Test and Pipeline Identification (description, line number, name, pre-tested pipe, etc.)**

☐1 Year ☐2 Year ☐3 Year ☑5 Year ☐IMP (Part 195.452)☐OSFM High Risk☐ Pre-tested pipe
☐New Construction☐ Relocation ☐Facility (includes: Valves, Receivers, In-plant Piping)

Comment: Testing Segment #1 from MP 0 to MP 10.87 (324-Sta. 0+00 (Lat. 34.478972, Long. -120.041829) to Sta. 573+75 (Lat. 34.476017, Lat. -120.198202). Test pressures shown are for the low point in the line and need to be adjusted for the test site. MOP at the low point in CA-324 is 1003 psig.

**Pipeline Location (mile post, street, station, etc.)**

| From: | Sta. 0+00 (Lat. 34.478972, Long. -120.041829) | | |
|---|---|---|---|
| To: | Sta. 573+75 (Lat. 34.476017, Lat. -120.198202) | | |
| CSFM  Line ID#: | 0015 CA-324 -- 0445A -- Pacific Pipeline Company | | |
| **Product Normally Transported:** | Crude Oil | | |
| **Test Medium :** | ☑Water | ☐Other (Specify) | |

| Location of Deadweight Tester: * | | | Deadweight Elevation (ft):* | |
|---|---|---|---|---|
| 12000 Calle Real, Goleta, CA (Lat. 34.478972, Long. -120.041829) | | | 223 | |
| **Elevation of Pipeline** | **High Point (ft):*** | 817' | **Low Point (ft):*** | 12' |
| **Test Pressure** | **High Point (psig):*** | 1166 - Spike \| 916 - Test | **Low Point (psig):*** | 1514 - Spike \| 1264 - Test |
| **Maximum Operating Pressure (psig):*** | | MOP at the low point in CA-324 is 1003 psig. | | |

### PIPE DATA

| Pipe O.D. (in.) | Wall Thickness (in.) | Specification & Grade (SMYS) | Length of test segment (ft) | Volume (Barrels) |
|---|---|---|---|---|
| 24" | .344 | X-65 | 57,375' | ~30,000 |
| 2" | .218 | GRD. B | 28.5' | |
| 4" | .237 | Grd. B | 3' | |
| 12" | .375 | X-52 | 14.5' | |
| 20" | .500 | X-52 | 41.5' | |
| | | | | |
| | | | | |

### TEST EQUIPMENT

| Make of Deadweight Tester | | Serial # | Date Last Calibrated |
|---|---|---|---|
| Chandler | | 6106 | 03/06/2025 |
| **Make of Pressure Chart Recorder (1) / Gauge (2)** | | **Serial #** | **Date Last Calibrated** |
| 1) Recorder: | SignalFire | 004199 | 12/18/2024 |
| 2) Gauge: | SignalFire | 004199 | 12/18/2024 |
| **Make of Temperature Recorder (1) / Gauge (2)** | | **Serial #** | **Date Last Calibrated** |
| 1) Recorder: | SignalFire | 004199, 004175, 004327 | 12/18/2024 |
| 2) Gauge: | SignalFire | 004191 | 12/18/2024 |
| **GPS** | **Beginning Location:** | **Ending Location:** | |
| Latitude: | 34.478972 | 34.476017 | |
| Longitude: | -120.041829 | -120.198202 | |

* N/A is not acceptable in these fields.

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| TEST DATA FOR CSFM TEST ID # | | | | | | | 25-07317 |
| Date | Time | Dead weight (psig) | Chart Pressure (psig) | Pipe Wall Temp. °F | Ambient Temp °F | Test Medium Change (+) Add/ (-) Drain (Gal.) | Comments |
|---|---|---|---|---|---|---|---|
| 5/12/25 | 5:09AM | 401 | 400 | 65 | 59 | | Start Pump |
| 5/12/25 | 5:12 | 418 | 400 | 65 | 59 | | Stop Pump |
| 5/12/25 | 5:25 | 417 | 400 | 65 | 58 | | Start Pump |
| 5/12/25 | 5:56 | 710 | 700 | 65 | 58 | | Leak Check |
| 5/12/25 | 6:46 | 708 | 700 | 65.4 | 58 | | Start Pump |
| 5/12/25 | 7:09 | 1000 | 1000 | 65.4 | 60 | | Leak Check |
| 5/12/25 | 7:26 | 1000 | 1000 | 65.4 | 60 | | Start Pump |
| 5/12/25 | 7:36 | 1130 | 1125 | 65.4 | 61 | | Start Plot |
| 5/12/25 | 7:59 | 1423 | 1420 | 65.4 | 61 | | Stop Plot |
| 5/12/25 | 8:05 | 1423 | 1420 | 65.4 | 62 | | On Spike Test |
| 5/12/25 | 8:10 | 1423 | 1420 | 65.4 | 63 | | |
| 5/12/25 | 8:15 | 1423 | 1420 | 65.4 | 62 | | |
| 5/12/25 | 8:20 | 1423 | 1420 | 65.4 | 63 | | Off Spike Test |
| 5/12/25 | 8:25 | 1423 | 1420 | 65.5 | 63 | | Bleed to Strength Test |
| 5/12/25 | 8:39 | 1173 | 1165 | 65.5 | 65 | | Stop Bleed |
| 5/12/25 | 8:45 | 1173 | 1165 | 65.5 | 65 | | |
| 5/12/25 | 9:00 | 1173 | 1165 | 65.5 | 68 | | On Test |
| 5/12/25 | 9:15 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 9:30 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 9:45 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 10:00 | 1173 | 1165 | 65.5 | 74 | | |
| 5/12/25 | 10:15 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 10:30 | 1173 | 1165 | 65.5 | 72 | | |
| 5/12/25 | 10:45 | 1173 | 1165 | 65.5 | 68 | | |
| 5/12/25 | 11:00 | 1173 | 1165 | 65.5 | 68 | | |
| 5/12/25 | 11:15 | 1173 | 1165 | 65.5 | 71 | | |
| 5/12/25 | 11:30 | 1173 | 1165 | 65.5 | 70 | | |
| 5/12/25 | 11:45 | 1173 | 1165 | 65.5 | 71 | | |
| 5/12/25 | 12:00PM | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 12:15 | 1173 | 1165 | 65.5 | 74 | | |
| 5/12/25 | 12:30 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 12:45 | 1173 | 1165 | 65.5 | 74 | | |
| 5/12/25 | 1:00 | 1173 | 1165 | 65.5 | 74 | | |
| 5/12/25 | 1:15 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 1:30 | 1173 | 1165 | 65.5 | 74 | | |
| 5/12/25 | 1:45 | 1173 | 1165 | 65.5 | 74 | | |
| 5/12/25 | 2:00 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 2:15 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 2:30 | 1173 | 1165 | 65.5 | 74 | | |
| 5/12/25 | 2:45 | 1173 | 1165 | 65.4 | 73 | | |
| 5/12/25 | 3:00 | 1173 | 1165 | 65.5 | 73 | | |
| Net Change: | | | | | | | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| TEST DATA FOR CSFM TEST ID # | | | | | | 25-07317 | |
|---|---|---|---|---|---|---|---|
| Date | Time | Dead weight (psig) | Chart Pressure (psig) | Pipe Wall Temp. °F | Ambient Temp °F | Test Medium Change (+) Add/ (-) Drain (Gal.) | Comments |
| 5/12/25 | 3:15PM | 1173 | 1165 | 65.5 | 72 | | |
| 5/12/25 | 3:30 | 1172 | 1165 | 65.4 | 73 | | |
| 5/12/25 | 3:45 | 1172 | 1165 | 65.4 | 74 | | |
| 5/12/25 | 4:00 | 1172 | 1165 | 65.4 | 73 | | |
| 5/12/25 | 4:15 | 1172 | 1165 | 65.4 | 72 | | |
| 5/12/25 | 4:30 | 1172 | 1165 | 65.4 | 73 | | |
| 5/12/25 | 4:45 | 1172 | 1165 | 65.4 | 72 | | |
| 5/12/25 | 5:00 | 1172 | 1165 | 65.4 | 73 | | Off Test |
| 5/12/25 | 5:15 | 1172 | 1165 | 65.4 | 71 | | |
| 5/12/25 | 5:24 | 1172 | 1165 | 65.4 | 70 | | Depressure |
| 5/12/2025 | 5:50 | 0 | 0 | | | | |
| Net Change: | | | | | | | |

## 13. Direct Field Observations

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

i. During the field repairs and replacements, FJ Technologies, Inc. provided construction observation services periodically on an as needed basis. During all field observations, the field crews completing the work as well as all of the Non-Destructive Testing (NDT) crews provided full access to the sites and were following all repair/replacement requirements outlined and provided by Sable.

**14. Corrosion Under Insulation Plan per State Waivers and Consent Decree**

i. Sable has submitted a plan to the OSFM to address the Corrosion Under Insulation (CUI).

ii. Cathodic protection systems have been found to have reduced effectiveness on insulated pipelines like the Las Flores Pipeline.

iii. However, in 2006 the National Association of Corrosion Engineers ("NACE") issued a technical committee report that highlighted how to manage the reduced effectiveness with the following recommended. This report explained that, "[w]hen practical, the thermally insulated metallic surfaces need to be inspected at routine time intervals for metal loss (e.g., an internal pipeline inspection tool could be used)."

iv. This is the approach mandated within the current OSFM waiver documents, with an emphasis that the shortened intervals (twice annually for first 2 years of operation), techniques (Ultrasonic wall thickness for wall loss detection and quantification and Ultrasonic shear wave for crack detection and quantification) data analysis (consideration of tool

tolerance and growth rate) and mitigation techniques enhance the probability of success in effectively mitigating any external corrosion that occurs on the lines.

v.  PHMSA has also provided guidance [Docket No. PHMSA-2016-0071, ADB-2016-04] such as the following:

Taking other special precautions if an operator suspects that adequate cathodic protection cannot be provided due to shielding resulting from insulated coatings that have become disbonded. Such precautions may include:

1. More frequent reassessments; (Waiver requires two ILI runs per year)
2. Usage of the appropriate assessment tools for all threats including stress corrosion cracking; (At least one of the ILI tools has to be a "crack" detection tool)
3. Coordination of data from the appropriate ILI technologies;
4. More stringent repair criteria targeted at CUI or corrosion under disbonded coatings for insulated and buried pipelines;
5. Usage of a leak detection system with instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it is operating or shut down. To this point Sable has installed new metering at each station to monitor flow and line pack along with pressure and temperature monitoring at each valve site. Sable has also installed a RTTM CPM leak detection system to detect changes in the system then alarm or shutdown in the event there is an abnormal condition.
6. Valve spacing to limit any possible spill volumes with remotely operated valves and pressure monitoring at the valves. (Sable has installed seven new remotely operated block valves on Line 324, four new remotely operated block valves and two new check valves on Line 325A and  four new remotely operated block valves and  ten new check valves on Line 325B as per Sable's Best Available Technology (BAT) plan (Compliance with AB864)
7. (3) Advanced ILI data analysis techniques to account for the potential growth of CUI, including interaction criteria for anomaly assessment.
8. (4) ILI data, subsequent analysis of the data, and pipeline excavations that:

---

46

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

    a. Confirm the accuracy of the ILI data to characterize the extent and depth of the external corrosion and ILI tolerances and unity charts;

    b. Follow the ILI guidelines of API Standard 1163, "In-Line Inspection Systems Qualification Standard" 2nd edition, April 2013, (API Std. 1163) for ILI assessments;

    c. Use additional or more frequent reassessment intervals and confirmations when the insulated and buried pipeline external coating shields the pipeline from CP, retains moisture on insulated coating systems, and operates at higher operating temperatures; and

    d. Assess and mitigate operational and environmental conditions in shielded and insulated coatings that lead to excessive corrosion growth rates, pipe steel cracking, and all other threats." (Sable has implemented procedures to include subsequent analysis of the data to confirm accuracy of the ILI data as well as increased frequency of assessments)

    e. In addition to the above, an operator's operating and maintenance processes and procedures should be reviewed and updated at least annually, unless operational inspections for integrity warrant shorter review periods." (End of Guidance data pulled from Docket No. PHMSA-2016-0071, ADB-2016-04)

    vi. Sable follows this guidance as required, just as Sable does with all of the foregoing.

**D.  In my opinion, the information provided in the Declaration of Richard B. Kuprewicz for Case No, 25CV02247 is misleading, overgeneralized or inaccurate.**

1. Mr. Kuprewicz has not taken into account the Consent Decree, State Waivers, PHMSA Guidance Documents for ineffective cathodic protection, or the work that Sable has completed to date.

2. The Center for Biological Diversity & The Environmental Defense Center asked Accufacts Inc. ("Accufacts" or "Richard B Kuprewicz") to review documents related to the Las Flores Pipeline System for possible restart. In response, Mr.

---

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

Kuprewicz prepared a report called "Evaluation of Las Flores Pipeline System Startup Proposal," dated December 20, 2024.

3. The Center for Biological Diversity & The Environmental Defense Center also asked Mr. Kuprewicz to provide an opinion on the Letters of Decision on the State Waivers for the startup of Line CA-324, CA-325A and CA-325B.

4. In response, Mr. Kuprewicz prepared a report called "Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart," dated February 21, 2024.

5. Both of these documents were then incorporated into Mr. Kuprewicz's Declaration, which dated June 3, 2025.

6. I have reviewed the above and formed the opinion that Mr. Kuprewicz's reports and Declaration are misleading and inaccurate.

7. Exhibit A of the Declaration is Mr. Kuprewicz's Curriculum Vitae. Exhibit B is a report prepared by Mr. Kuprewicz titled "Evaluation of Las Flores Pipeline System Startup Proposal, (Dec. 20, 2024)." Exhibit C is a report prepared by Mr. Kuprewicz titled "Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart (Feb. 21, 2025)."

8. All of the reports were prepared for "The Center for Biological Diversity" and "The Environmental Defense Center."

9. Point-by-point rebuttals to Mr. Kuprewicz's statements follow below. The statements within the body of the declaration are shown in the center column with

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

its reference point shown in the left column and my opinion/response is shown in the right column. It should be noted that declarations provided, are pulled directly from the reports, so my opinion applies to both the declaration document and the reports prepared by Mr. Kuprewicz.

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| Page 3, Line 27, Item 8.a. | The design of the Pipelines renders the federal mandated cathodic protection system, intended to help address pipeline external corrosion, ineffective. | The Las Flores Pipeline System was built to industry standards at the time of construction and adheres to the standards today. Cathodic protection systems, however, have been found to have reduced effectiveness on insulated pipelines like the Las Flores Pipeline. However, in 2006 the National Association of Corrosion Engineers, "NACE," issued a technical committee report that highlighted how to manage the reduced effectiveness with the following recommended, as follows:<br><br>"When practical, the thermally insulated metallic surfaces need to be inspected at routine time intervals for metal loss (e.g., an internal pipeline inspection tool could be used)."<br><br>This is the approach mandated within the current OSFM waiver documents, with an emphasis that the shortened intervals (twice annually for first 2 years of operation), techniques (Ultrasonic wall thickness for wall loss detection and quantification and |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | Ultrasonic shear wave for crack detection and quantification) data analysis (consideration of tool tolerance and growth rate) and mitigation techniques enhance the probability of success in effectively mitigating any external corrosion that occurs on the lines. PHMSA has also provided guidance [Docket No. PHMSA-2016-0071] such as:<br><br>"Taking other special precautions if an operator suspects that adequate cathodic protection cannot be provided due to shielding resulting from insulated coatings that have become disbonded. Such precautions may include:<br>- More frequent reassessments; (Waiver requires two ILI runs per year)<br>- Usage of the appropriate assessment tools for all threats including stress corrosion cracking; (At least one of the ILI tools has to be a "crack" detection tool)<br>- Coordination of data from the appropriate ILI technologies;<br>- More stringent repair criteria targeted at CUI or corrosion under disbonded coatings for insulated and buried pipelines; |

50

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | - Usage of a leak detection system with instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it is operating or shut down. (To this point, Sable has installed new metering at each station to monitor flow and line pack along with pressure and temperature monitoring at each valve site. Sable has also installed a RTTM CPM leak detection system to detect changes in the system then alarm or shutdown in the event there is an abnormal condition.) <br> - Valve spacing to limit any possible spill volumes with remotely operated valves and pressure monitoring at the valves. (Sable has installed seven new remotely operated block valves on Line 324, four new remotely operated block valves and two new check valves on Line 325A and four new remotely operated block valves and ten new check valves on Line 325B as per Sable's Best Available |

51

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | Technology (BAT) plan (Compliance with AB864) - Advanced ILI data analysis techniques to account for the potential growth of CUI, including interaction criteria for anomaly assessment. - ILI data, subsequent analysis of the data, and pipeline excavations that:     - Confirm the accuracy of the ILI data to characterize the extent and depth of the external corrosion and ILI tolerances and unity charts;     - Follow the ILI guidelines of API Standard 1163, "In-Line Inspection Systems Qualification Standard" 2nd edition, April 2013, (API Std. 1163) for ILI assessments; - Use additional or more frequent reassessment intervals and confirmations when the insulated and buried pipeline external coating, shields the pipeline from CP, retains moisture on insulated coating |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY
INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
|  |  | systems, and operates at higher operating temperatures; and<br>- Assess and mitigate operational and environmental conditions in shielded and insulated coatings that lead to excessive corrosion growth rates, pipe steel cracking, and all other threats." (Sable has implemented procedures to include subsequent analysis of the data to confirm accuracy of the ILI data as well as increased frequency of assessments). |
| Page 4, Line 1, Item 8.b. | Current inline inspection (ILI) technologies cannot adequately assess all forms of external corrosion threats that most likely exist on the Pipelines. | This statement is wholly inaccurate; there are multiple ILI tools available within the industry that are suited to measure different potential defects depending on the tool that is run due to the difference in measurement techniques.<br><br>No single ILI tool can detect all potential defects and as such the selection of ILI tools must include a technical evaluation of the most appropriate tool based on the potential anomalies to be identified. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | Circumferential Magnetic Flux (C-MFL) tools can be used to determine wall loss defects but are not as reliable as Ultrasonic Shear Wave tools to detect potential cracks. Prior to 2015 the Las Flores Pipeline only had MFL ILI tool runs compared to the specified Ultrasonic ILI tools specified in the OSFM waivers.<br><br>The ILI tool selection recommendations are based on the corrosion/cracking mechanisms per CFR Title 49 Subtitle B Chapter I Subchapter D Part 195.452.C.(1).(i).(A). The waivers granted by OSFM further define the tool detection and sizing limitations for the tools used to detect and quantify corrosion and cracks including requiring different types of ILI tools to be run within short time intervals to ensure all potential defects can be identified accurately.<br><br>Furthermore, they apply conservative tool tolerances in the related repair criteria to ensure that potential repairs can be addressed well before reaching potential failure points. |
| Page 4, Line 3, Item 8.c. | The high operating temperatures needed to reduce the viscosity of the heavy crude oil | This statement is an overgeneralization of the impact of temperature on the external corrosion rate. The relationship is not linear. |

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective cathodic protection system once the Pipelines go into operation. | Corrosion rates generally hold to an Arrhenius relationship governing the effect of chemical reactions due to temperature changes. This statement could only be shown to be true after determining the macroscopic reaction-specific parameters in the Arrhenius equation which has not been presented. |
| Page 4, Line 6, Item 8.d. | Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure. | Previous C-MFL and Ultrasonic Shear Wave ILI tools have showed no indication of cracking in the pipeline. While Sable would agree that cracking consequences are higher than wall loss for external corrosion, the probability of cracking related failures is quite low in these pipelines. |
| Page 4, Line 8, Item 8.e. | The poorly designed Pipelines cannot be made as safe as new pipelines. | This statement is not only misleading; it is inaccurate. Due to the OSFM waiver conditions, the Las Flores Pipeline System will be operated safer compared to any new pipeline operated in accordance with normal industry standards. Industry and regulatory standards require immediate repair at 80% wall loss. At the growth rates reported in the PHMSA failure analysis of the Refugio spill, a corrosion rate of approximately 16 mils per year (MPY) was observed. Repairing at 25% wall loss for the .344" wall CA- |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | 324, accelerates the repair by approximately 11 years based on OSFM requirements compared to industry standards. Any potential defects that could exist in the Las Flores Pipeline System will be identified faster due to increased ILI frequency and repaired sooner due to more stringent repair requirements. |
| Page 4, Line 26, Item 10.a. | The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them. | Response - This statement is wholly inaccurate; there are multiple ILI tools available within the industry that are suited to measure different potential defects depending on the tool that is run due to the difference in measurement techniques. No single ILI tool can detect all potential defects and as such the selection of ILI tools must include a technical evaluation of the most appropriate tool based on the potential anomalies to be identified. Circumferential Magnetic Flux (C-MFL) tools can be used to determine wall loss defects but are not as reliable as Ultrasonic Shear Wave tools to detect potential cracks. Prior to 2015 the Las Flores Pipeline only had MFL ILI tool runs compared to the specified Ultrasonic ILI tools specified in the OSFM waivers.<br><br>The ILI tool selection recommendations are based on the |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | corrosion/cracking mechanisms per CFR Title 49 Subtitle B Chapter I Subchapter D Part 195.452.C.(1).(i).(A). The waivers granted by OSFM further define the tool detection and sizing limitations for the tools used to detect and quantify corrosion and cracks including requiring different types of ILI tools to be run within short time intervals to ensure all potential defects can be identified accurately.<br><br>Furthermore, they apply conservative tool tolerances in the related repair criteria to ensure that potential repairs can be addressed well before reaching potential failure points. |
| Page 5, Line 1, Item 10.b. | The proposed hydrotests are also insufficient to address certain types of corrosion or predict corrosion growth. For example, MOP hydrotests are not adequate to test for crack forming potential on the Pipelines. | This statement is misleading, performing hydrotests never directly detect corrosion—in effect, they use stress generated within the pipe to ensure that potentially damaged areas will not fail at the hydrostatic or spike test pressures. If corrosion exists within the pipeline that weakens its ability to contain pressure below the Maximum Allowable Operating Pressure (MAOP) the hydrotest will fail indicating the pipeline is no longer fit for service.<br><br>With hydrostatic and spike test values well in excess of the expected |

57

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | operating pressures, it provides confidence that failure is unlikely to occur between ILI runs, particularly with the much-shortened ILI timing set forth by OSFM.<br><br>With the successful hydrotest and spike tests on 324 and 325A as well as the successful hydrotest of 325B, Sable has demonstrated that the repaired pipelines have the required integrity needed to operate without failure |
| Page 5, Line 4, Item 10.c. | The State Waivers do not assure adequate spike hydrotesting, which is a method to address various forms of crack forming potential. The values for the spike test on Line 324 are too low for corrosion cracking screening and evaluation. Hydrotesting for Lines 325 A and B must be conducted in segments given the elevation changes. It is unclear, however, whether the testing parameters are adequate for Line | State Waivers for Line 324 (line items 12 through 17) and Line 325A/325B (line items 12 through 18) provide specific language as to pressure testing the pipeline segments as well as utilizing an OSFM approved independent testing firm to certify the tests. All testing per the State Waivers and 49 C.F.R., Part 195 Subpart E – Pressure Testing was successfully completed. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | 325A due to missing information. In addition, the Waivers do not appear to require any hydrotesting for Line 325B. | |
| Page 5, Line 11, Item 10.d. | A key corrosion performance tracking process set in the State Waivers for the Pipelines is missing. This information, which helps identify possible corrosion "hot spots," is especially important given the history of extensive corrosion on the Pipelines. | State Waivers for Line 324 (line items 18 through 28) and Line 325A/325B (line items 19 through 29) provide specific language as to In-Line Inspection (ILI) Assessment and Frequency. Under condition 27 and 28 (line 324) or 28 and 29 (line 325A/B): 28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within $+10\%$ accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | over-calling or under-calling, the remaining ILI features must be re-graded accordingly.<br><br>29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).<br><br>Following receipt of the final report, additional validation exercises are identified by the Pipeline Integrity Manager and NDE is applied to prove up these areas. Another unity plot is generated in accordance with a Level II or III assessment in API 1163. Following this second validation of the tool run, corrosion growth estimation is performed in accordance with PRCI's PR-331-063525, "PRCI EC 1-2: Development of Detailed Procedures for Comparing Successive ILI Runs to Establish Corrosion Growth Rates". The Corrosion Growth Rate Analysis (CGRA) procedures include data matching methods to analyze data from successive ILI's, methodologies for growth rate |

60

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | calculations and take into consideration any potential errors from comparing ILI data. |
| Page 5, Line 15, Item 10.e. | The State Waivers will not provide an equal or greater level of safety as if the Pipelines were equipped with an effective cathodic protection system to avoid pipeline failure due to external corrosion. The current design of the Pipeline renders the cathodic protection system ineffective. External corrosion on the Pipelines is exacerbated by operation of the Pipelines at elevated temperatures, which seriously increases the corrosion rate. | No single corrosion mitigation technique (cathodic protection, chemical treatment, materials selection, etc.) results in a comprehensive elimination of corrosion risk individually. Because of this, in all pipelines operated world-wide a number of mitigation techniques must be used. Relying solely on cathodic protection will not protect pipelines under all conditions, pipeline operators must validate the effectiveness of the corrosion control methodology via inspection, direct assessment, corrosion modelling, etc. The OSFM took account of the elevated operating temperatures when developing the waiver conditions. |
| Exhibits - Page 32, first Paragraph, line 8 and 9 (Exhibit C) | "Without effective cathodic protections, the pipeline is at particularly high risk of spilling again. (Kuprewicz Decl., ¶¶ 8, 10.) | Per the reasons discussed above, this statement is both misleading and not accurate. The risk of leakage from the Las Flores Pipeline System will be dramatically reduced due the OSFM waiver conditions compared to its prior operation under normal |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | industry and regulatory standards. While corrosion is unavoidable in any pipeline, the conservative and comprehensive approach that the OSFM waiver conditions specify in responding to inspection results will result in an extremely low probability of leakage from the Las Flores Pipeline System. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Appendix A – Consent Decree Table – Summary with Status to Article I, II, and Appendix D of Case 2:20-CV-02415**

| Consent Decree (Case 2:20-CV-02415) | | |
|---|---|---|
| **Article I – California Specific Provisions (Case 2:20-CV-02415)** | | |
| **Item #** | **Consent Decree Wording** | **Sable Status** |
| **1.** | **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):** | |
| A. | Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901. | Sable has acknowledged the requirement of this waiver and taken all necessary steps to secure it, including coordination with OSFM and PHMSA. The applicable waiver was granted following the appropriate agency process, and Sable understands that no further approvals are outstanding with respect to Line 901's cathodic protection. |
| B. | Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903. | Sable has similarly obtained the requisite State Waiver for non-operational segments of Line 903 through coordination with the relevant oversight agencies. Sable understands that no further approvals are outstanding with respect to Line 903's cathodic protection. |
| C. | Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the | This requirement pertains solely to infrastructure operated by Plains and does not implicate any portion of the Pipelines at issue here. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | currently operational segment of Line 903 from Pentland to Emidio. | |
| D. | Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000. | This requirement pertains solely to infrastructure operated by Plains and does not implicate any portion of the Pipelines at issue here. |
| E. | To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD. | Sable has acknowledged and complied with this condition. |
| **2.** | **Replacement, Restart, or Abandonment of Lines 901 and 903:** | |
| A. | Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of | Sable has acknowledged this condition but does not presently plan to pursue replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of way, and any other rights necessary for replacement is the sole responsibility of Plains. | |
| 1. | On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s): | Refer to above. |
| a. | Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines. | Refer to above. |
| b. | Conduct a close interval survey (CIS) and AC/DC interference survey. | Refer to above. |
| c. | Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations. | Refer to above. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| B. | As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law. | Sable has acknowledged and complied with this condition. |
| C. | As an alternative to replacement or restart of Line 901 and segments of Line 903<br><br>from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any<br><br>segments in accordance with all applicable laws and regulations. | Sable has acknowledged this condition but does not presently plan to pursue abandonment of any sections of CA-324 or CA-325A/B. |
| 3. | **Third-Party Analysis of Line 2000 ILI Data** | Because this line is not part of the Sable system, Sable takes no position on the corresponding requirement. |
| | Conditions of text omitted being they only apply to Line 2000 which is not part of the Sable System | |
| 4. | **Integrity Management** | Sable has acknowledged the requirement of an Integrity Management Plan and it is available for inspection and comment by OSFM. |
| A. | For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines): | Refer to above. |
| 1. | Plains shall implement the following measures and amend its IMP, as needed, to include the requirements | Refer to above. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | of this section for the applicable lines: | |
| a. | In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM). | Sable has acknowledged and complied with this condition. |
| b. | Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called. | Sable has acknowledged and complied with this condition. |
| c. | When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools; | Sable has acknowledged and complied with this condition. |
| d. | Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance; | Sable has acknowledged and complied with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| e. | Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy; | Sable has acknowledged and complied with this condition. |
| f. | Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance; | Sable has acknowledged and will comply with this condition. |
| g. | For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade; | Sable has acknowledged and complied with this condition. |
| h. | Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, rerun the ILI tool to cover the area of failure; | Sable has acknowledged and will comply with this condition as necessary. |
| i. | Integrate and analyze available data in its P&M process, including: | Sable has acknowledged and complied with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| i. | Assessment data from ILI tool runs; | Refer to above |
|---|---|---|
| ii. | Dig and repair data; | Refer to above |
| iii. | Corrosion data, such as survey results, chemical treatments, and cleaning-pig results; | Refer to above |
| iv. | Operational data, such as pressure and flow data; | Refer to above |
| v. | Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans; | Refer to above |
| vi. | Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results; | Refer to above |
| vii. | Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government | Refer to above |

69

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume. | |
| 2. | ILI Measures | |
| a. | Initial ILI Runs. Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU). Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability). | Sable has acknowledged and complied with this condition. |
| i. | All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents. | Sable has acknowledged and will comply with this condition as necessary. |
| ii. | In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool | Sable has acknowledged and complied with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

Case 2:26-cv-05242-SVW-SSC Document 25 Filed 05/14/26 Page 233 of 703 Page ID #:12081

| | | | |
|---|---|---|---|
| | | run. If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run. | |
| | b. | Subsequent ILI Runs. After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year. Alternatively, Plains may run a UT tool each year. If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year. | Sable has acknowledged and complied with this condition. |
| | c. | All ILI Runs. Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains. | Sable has acknowledged and complied with this condition. |
| **5.** | | **Valves** | |
| | A. | Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of: | Sable has acknowledged and complied with this condition. |

71

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| 1. | Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size. | Refer to above |
| 2. | Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds). | Refer to above |
| B. | Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD. | Refer to above |
| C. | Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures. | Sable has acknowledged and complied with this condition. |
| **6.** | **Risk Analysis** | |
| A. | For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines): | Plains completed item prior to Sable ownership. |
| 1. | Plains shall submit a risk analysis under proposed regulation 19 CCR§ 2111(c) to OSFM (dated January 17, | Refer to above |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations. | |
| a. | The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c). | Refer to above |
| b. | Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis. The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq. | Refer to above |
| c. | The risk analysis shall be due within one year from entry of the CD. | Refer to above |
| **7.** | **Leak Detection** | |
| A. | For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130. | Sable has acknowledged and complied with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| B. | Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information. | Sable has acknowledged and is complying with this condition. |
| 8. | **Non-waiver** | |
| A. | Nothing in this CD shall excuse Plains from otherwise complying with the AB864 regulations when they are promulgated. | Sable has acknowledged and complied with this condition. |
| **ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES (Case 2:20-CV-02415)** | | |
| 9. | **Integrity Management** | |
| A. | New Procedures for Interim Reviews and Assessments | Sable has an approved IMP plan in place and will update as needed to comply with the CD and State Waivers. |
| 1. | Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide<br><br>for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that | Refer to above. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

|  | | |
|---|---|---|
| | could significantly impact already-identified threats<br><br>or create new threats for that segment. If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment. Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be<br><br>included in the information analysis conducted under 49 CFR §195.452(g). | |
| 2. | Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review. Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP. | Refer to above. |
| 3. | Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD. If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be | Refer to above. |

75

| | | |
|---|---|---|
| | completed within 18 months from entry of the CD. | |
| B. | Documentation for P&M Recommendations | Refer to above. |
| 1. | Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum: | Refer to above. |
| a. | What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.); | Refer to above. |
| b. | The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and | Refer to above. |
| c. | The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern. | Refer to above. |
| 2. | In the new forms for the Interim Review procedure described in | Refer to above. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures. | |
| 3. | In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date." | Refer to above. |
| C. | Tracking of P&M Measures<br><br>Plains shall document P&M measures recommended but not implemented. Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l). | Refer to above. |
| **10.** | **Valves and O&M** | |
| A. | Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis. | This requirement pertains solely to other infrastructure operated by Plains and does not implicate any portion of the Pipelines at issue here. |
| B. | Within two years of entry of the CD, Plains shall develop and implement procedures to: | |

77

| 1. | If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues. | Sable has acknowledged and complied with this condition. |
|---|---|---|
| 2. | Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times. | Sable has acknowledged and complied with this condition. |
| 3. | Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room. | Sable has acknowledged and will comply with this condition as necessary. |
| 4. | Verify that personnel assigned to operator qualification tasks for valve maintenance are qualified to perform those tasks. | Sable has acknowledged and complied with this condition. |
| C. | Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable. | Sable has acknowledged and complied with this condition. |
| D. | For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training: | Sable has acknowledged and complied with this condition. |
| 1. | Within two years of entry of the CD, that addresses the importance of complying with Plains' policy | Sable has acknowledged and is in compliance with this condition. |

78

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room. Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering. | |
| E. | Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance. | Sable has acknowledged and complied with this condition. |
| **11.** | **Leak Detection** | |
| A. | Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm. | Sable has acknowledged and complied with this condition. |
| 1. | Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does | This condition is specific to the Plains system at the time of the CD. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

|  | | |
|---|---|---|
|  | not utilize at least one of the three rupture detection methods, Plains shall implement at least one. | |
| B. | For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change. | Sable has acknowledged and complied with this condition. |
| C. | Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours. | Sable has acknowledged and complied with this condition. |
| 1. | Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis. | Sable has acknowledged and will comply with this condition as required. |
| D. | Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines. | This condition is specific to the Plains system at the time of the CD. |
| 1. | Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be responsible for the final content and implementation of the Selection of Leak Detection Method procedure. | This condition is specific to the Plains system at the time of the CD. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| E. | Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection. The results of the meetings will be documented and shared with appropriate personnel. The recommendations will be evaluated and documented. | This condition is specific to the Plains system at the time of the CD. |
|---|---|---|
| F. | Instrumentation and Display | |
| 1. | To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations: | This condition is specific to the Plains system at the time of the CD. |
| a. | Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities. | This condition is specific to the Plains system at the time of the CD. |
| b. | Track these conditions through to resolution, including instrumentation relocation when necessary. | This condition is specific to the Plains system at the time of the CD. |
| **12.** | **Control Room Management** | |

| A. | For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall: | Sable has acknowledged this condition, which will completed prior to operation. |
|---|---|---|
| 1. | Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors; | Refer to above. |
| 2. | Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration; | Refer to above. |
| 3. | Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and | Refer to above. |
| 4. | Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names). | Refer to above. |
| B. | For Line 2000, within six months after entry of  the CD, Plains shall confirm to the OSFM that all Alarm | This is a Plains specific condition and does not apply to CA-324, CA-325A/B |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | Descriptors on the control console are accurate. | |
| C. | Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD. | This is a Plains specific condition and does not apply to CA-324, CA-325A/B |
| **13.** | **Emergency Response and Oil Spill Response Plans** | |
| A. | California-Specific Provisions: | |
| 1. | Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05. Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill. | Sable has an Integrated Contingency Plan that has been approved by CA OSPR. |
| B. | Company-Wide Provisions | |
| 1. | Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at | Sable has acknowledged and complied with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts. | |
| 2. | Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response. Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request. | Sable has acknowledged and complied with this condition. |
| 3. | Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' | Sable has acknowledged and complied with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of Plains. Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills. Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein. | |
| 4. | Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter. Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request. | Sable has acknowledged and complied with this condition. |
| 5. | Plains shall notify PHMSA (and, for California Lines, California OSPR | Sable has acknowledged and is in compliance with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment). Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill. Plains shall include lessons learned in such after action reports and shall consider such lessons learned for incorporation into future drills or exercises. | |
| 6. | For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel. | Sable has acknowledged and will comply with this condition as necessary. |
| **14.** | **Safety Management System (SMS)** | |
| A. | Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)). | This is a Plains specific condition. |
| 1. | Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS | This is a Plains specific condition. |

86

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | to API RP 1173. Plains shall direct the third party to transmit a copy of the final report to PHMSA. Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD. | |
| B. | Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173. | This is a Plains specific condition. |
| **15.** | **Drug and Alcohol Program** | |
| A. | Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in | Sable has acknowledged and complied with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time. | |
|---|---|---|
| **Appendix D – Remaining Corrective Actions from PHMSA CAO (Case 2:20-CV-02415)** | | |
| 1. | All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM. | Sable has acknowledged and complied with this condition. |
| a. | Line 901 Shutdown. Plains shall not operate Line 901 until authorized to do so by the OSFM. | Sable has acknowledged and will comply with this condition when necessary. |
| b. | Restart Plan for Line 901. If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this | Sable has acknowledged and is complying with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | Consent Decree. The Restart Plan shall include: | |
|---|---|---|
| 1) | Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual; | Sable has acknowledged and is complying with this condition. |
| 2) | Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two<br><br>hours; | Sable has acknowledged and is complying with this condition. |
| 3) | Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; | Sable has acknowledged and is complying with this condition. |
| 4) | A specific day-light restart that includes advance communications with local emergency response officials; | Sable has acknowledged and is complying with this condition. |
| 5) | Master Control Room enhancements, including:<br><br>a) Implementation of advanced leak-detection capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include: | Sable has acknowledged and is complying with this condition. |

89

| | |
|---|---|
| 1. Revised alarm threshold adjustments;<br><br>2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;<br><br>b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;<br><br>c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;<br><br>d) Implementation of emergency shutdown<br><br>programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;<br><br>e) Development and implementation of training | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | associated with the emergency shutdown programming described above; and<br><br>f) Provision of additional controller training that incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident. | |
| 6) | Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes; | Sable has acknowledged and complied with this condition. |
| 7) | Installation of additional safety valves as a result of Plains' EFRD evaluation; | Sable has acknowledged and complied with this condition. |
| 8) | Installation of additional pressure sensors as a result of Plains' surge study; | Sable has acknowledged and complied with this condition. |
| 9) | Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall | Sable has acknowledged and is complying with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

|  |  |  |
|---|---|---|
|  | be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and |  |
| 10) | Corrosion Prevention. Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, <br><br> in any Restart Plan. Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in <br><br> CAO Amendment No. 3, Section 2(a)-(c). | A Corrosion Under Insulation plan (CUI) has been submitted to the OSFM, which is part of the State Waivers. |
| c. | Return to Service of Line 901. After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the <br><br> actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015. | Sable has acknowledged and will comply with this condition. |
| d. | Removal of Pressure Restriction of Line 901. The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that | Sable has acknowledged and will comply with this condition. |

92

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | | |
|---|---|---|---|
| | | the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction. | |
| e. | | Line 903 Shutdown. After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM. | Sable has acknowledged and complied with this condition. |
| f. | | Restart Plan for Line 903. If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line 903 to the OSFM | Sable has acknowledged and is complying with this condition. |

93

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | | |
|---|---|---|---|
| | for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference<br><br>into this Consent Decree. In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:<br><br>1) Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two<br><br>hours;<br><br>2) Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and<br><br>3) Provisions for a daylight restart and advance<br><br>communications with local emergency response officials. | |
| g. | Line 903 Return to Service. After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating<br><br>pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments). | |
| h. | Removal of Pressure Restriction for Line 903. After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903. | Sable has acknowledged and will comply with this condition. |
| 1) | The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. | Sable has acknowledged and will comply with this condition. |
| 2) | The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction. Requests for | Sable has acknowledged and is complying with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

|  | | |
|---|---|---|
|  | removal of the pressure restriction may be submitted by pipeline segment. | |
| i. | Notifications. Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates. | Sable has acknowledged and will comply with this condition. |
| j. | Reporting Requirements for Lines 901 and 903. If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval. | Sable has acknowledged and will comply with this condition. |
| 1) | The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety. | Sable has acknowledged this condition. |
| 2) | Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree. | Sable has acknowledged this condition. |
| 3) | The Appendix D Documentation Report shall include but not be limited to:<br><br>A. Table of Contents;<br><br>B. [intentionally left blank.]<br><br>C. [intentionally left blank.]<br><br>D. Summary of all tests, inspections, assessments, evaluations, and | Sable has acknowledged this requirement. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | analysis to the extent required under this Appendix D;<br><br>E. [intentionally left blank.]<br><br>F. [intentionally left blank.]<br><br>G. Lessons learned while fulfilling the requirements of this Appendix D. | |
| | | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Appendix B – CA-324 State Waiver Summary with Status**

| CA-324 State Waiver Summary Chart | |
|---|---|
| Date of Letter: | 12/17/24 |
| Subject: | LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324) |
| Pipeline: | OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024 |

| Item | State Waiver Condition | Sable Status |
|---|---|---|
| **General Conditions** | | |
| 1 | The pipeline can only be used to transport crude oil as stated in the application. | Sable has acknowledged and will comply with this condition. |
| 2 | The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig). | Sable has acknowledged and will comply with this condition. |
| 3 | The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours. | Sable has acknowledged and will comply with this condition. |
| 4 | Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver. | Sable has acknowledged and will comply with this condition. |
| 5 | This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the | Sable has acknowledged this condition. |

98

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | Elder California Pipeline Safety Act of 1981 other than contained herein. | |
| 6 | This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415). | Sable has acknowledged this condition. |
| 7 | In-line inspection must include:<br><br>a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:<br><br>i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.<br><br>ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.<br><br>b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).<br><br>c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI. | Sable has acknowledged and is complying with this condition. |
| 8 | Prior to placing CA-324 in operation, Sable must perform | Sable has acknowledged and is in |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2] | compliance with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 9 | All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions. | Sable has acknowledged and complied with this condition. |
| 10 | Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G Manual for Determining the Remaining Strength of Corroded Pipelines. If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch | Sable has acknowledged and complied with this condition. |

| | | |
|---|---|---|
| | (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1. | |
| 11 | Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324. | Sable has acknowledged and will comply with this condition as necessary. |
| **Pressure Testing** | | |
| 12 | Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324: | Sable has acknowledged and complied with this condition. |
| | a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss. | Sable has acknowledged and complied with this condition. |
| | b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP. | Sable has acknowledged and complied with this condition. |
| 13 | Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the | Sable has acknowledged and complied with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | state waiver pipeline segments at a minimum of 1.25 times the MOP. | |
| 14 | Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM. | Sable has acknowledged and complied with this condition. |
| 15 | Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies. | Sable has acknowledged and complied with this condition. |
| 16 | Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov | Sable has acknowledged and complied with this condition. |
| 17 | Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated. | Sable has acknowledged and complied with this condition. |
| **In-Line Inspection (ILI) Assessment and Frequency** | | |

103

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 18 | At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information: | Sable has acknowledged and will comply with this condition. |
|---|---|---|
| | a) Dates for integrity assessment | |
| | b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications | |
| | c) In-line inspection tool vendor(s) | |
| | d) Required tool specifications including operational specifications and anomaly sizing tolerances | |
| | e) Tool validation methodology | |
| | f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications | |
| | g) Criteria used to identify locations for excavation and field verification | |
| | h) Non-destructive examination | |

104

| 19 | Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance. | Sable has acknowledged and will comply with this condition. |
|---|---|---|
| 20 | Metal Loss Tool(s)<br><br>a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days. | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU). | |
| 21 | Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval. | Sable has acknowledged and will comply with this condition. |

| | | |
|---|---|---|
| | a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks. | |
| | b. USCD Performance Specification Requirements | |
| | i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks. | |
| | ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material. | |
| | iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld. | |
| | iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks. | |
| 22 | Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM. | Sable has acknowledged and will comply with this condition. |
| 23 | Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range. | |
| 24 | All ILI tool runs must obtain the Test ID from the OSFM prior to run. | Sable has acknowledged and will comply with this condition. |
| 25 | Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance. | Sable has acknowledged and will comply with this condition. |
| 26 | Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable. | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 27 | Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly. | Sable has acknowledged and will comply with this condition. |
|---|---|---|
| 28 | Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013). | Sable has acknowledged and will comply with this condition. |
| **Discovery of Condition** | | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 29 | The discovery date must be within 180 days of any ILI tool run for each type of ILI tool. | Sable has acknowledged and will comply with this condition as necessary. |
|---|---|---|
| **Immediate Repair Conditions** | | |
| 30 | A crack or crack-like anomaly that meets any of the following criteria: | Sable has acknowledged and will comply with this condition as necessary. |
| | a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness. | |
| | b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1. | |
| 31 | Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP. | Sable has acknowledged and will comply with this condition as necessary. |
| 32 | Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8] | Sable has acknowledged and will comply with this condition as necessary. |
| **180-Day Repair Conditions[9]** | | |
| 33 | A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP. | Sable has acknowledged and will comply with this condition as necessary. |
| 34 | Internal or external metal loss anomalies where the remaining strength of pipe shows a | Sable has acknowledged and will |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | predicted failure pressure less than 1.5 times the MOP. | comply with this condition as necessary. |
|---|---|---|---|
| 35 | | All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth. | Sable has acknowledged and will comply with this condition as necessary. |
| 36 | | For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline. | Sable has acknowledged and will comply with this condition as necessary. |
| **Corrosion Growth Rate Analysis (CGRA)** | | | |
| 37 | | Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11] The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates. | Sable has acknowledged and will comply with this condition. |
| 38 | | The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | for growth rate calculations and errors from comparing ILI data. | |
| 39 | Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss. | Sable has acknowledged and will comply with this condition. |
| 40 | When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13]. | Sable has acknowledged and will comply with this condition. |
| 41 | All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI. | Sable has acknowledged and will comply with this condition. |
| **Pressure Reduction** | | |
| 42 | If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired. | Sable has acknowledged and will comply with this condition as necessary. |
| **In Field Direct Examination of Pipe** | | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 43 | Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths. | Sable has acknowledged and will comply with this condition as necessary. |
|----|----|----|
| 44 | Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies: | Sable has acknowledged and will comply with this condition as necessary. |
| | a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld. | |
| | b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5. | |
| | c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. | |
| 45 | Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. | Sable has acknowledged and will comply with this condition as necessary. |
| 46 | Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16] | Sable has acknowledged and is complying with this condition. |
| 47 | All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap. | Sable has acknowledged and is complying. |
| **Integrity Management** | | |

114

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 48 | A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools. | Sable has acknowledged and is complying with this condition. |
|---|---|---|
| | a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1). | |
| | b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2). | |
| 49 | Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called. | Sable has acknowledged and is complying with this condition. |
| 50 | When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s). | Sable has acknowledged and is complying with this condition. |
| 51 | Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations | Sable has acknowledged and is complying with this condition. |

115

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned. | |
| 52 | Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected. | Sable has acknowledged and is complying with this condition. |
| 53 | Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert. | Sable has acknowledged and is complying with this condition. |
| **Data Requirements for Predicted Failure Analysis** | | |

116

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 54 | Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses. | Sable has acknowledged and is complying with this condition. |
|---|---|---|
| 55 | The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records. | Sable has acknowledged and is complying with this condition. |
| **Recordkeeping** | | |
| 56 | Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days. | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 57 | Sable must maintain the following records: | Sable has acknowledged and will comply with this condition. |
|---|---|---|
| | a. Technical approach used for the analysis | |
| | b. All data used and analyzed | |
| | c. Pipe and longitudinal weld seam properties | |
| | d. Procedures used to implement state waiver conditions | |
| | e. Evaluation methodology used | |
| | f. Models used | |
| | g. Direct in situ examination data | |
| | h. All in-line inspection tool assessments information evaluated | |
| | i. Pressure test data and results | |
| | j. All in-the-ditch assessments performed on the pipeline segments | |
| | k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results | |
| | l. All finite element analysis results | |
| | m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology | |
| | n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods | |

118

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | o. Safety factors used for fatigue life and/or predicted failure pressure calculations | |
| | p. Reassessment time interval and safety factors | |
| | q. The date of the review | |
| | r. Confirmation of the results by qualified technical subject matter expert(s) | |
| | s. Approval by responsible Sable management personnel | |
| | t. Records of additional preventive and mitigative (P&M) measures performed | |
| | u. Reports required by this State Waiver. | |
| **Reporting** | | |
| 58 | Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17] | Sable has acknowledged and will comply with this condition as necessary. |
| 59 | An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324.* The email notification shall include, if applicable: | Sable has acknowledged and will comply with this condition. |
| | a. Tool type and run date | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | b. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type) | |
| | c. Dig sheets | |
| | d. Field contact information for Sable | |
| | e. Time and location of the field evaluation and repair. | |
| 60 | Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include: | Sable has acknowledged and will comply with this condition. |
| | a. Tool type | |
| | b. Run date | |
| | c.  Summary of Conditions Report[18] | |
| | d. Final Vendor Report and Pipe Tally | |
| 61 | Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, Subject: OSFM State Waiver – Annual Report CA-324. At a minimum, the annual report shall contain the following, if applicable: | Sable has acknowledged and will comply with this condition. |

120

| | | |
|---|---|---|
| | a. A Closure Report for the previous calendar (CY) which contains: | |
| | i. Features that were remediated in previous CY | |
| | 1. Provide documentation for the in-the-ditch assessments and repairs | |
| | ii. Identify features that remain to be assessed | |
| | iii. Unity Plots for previous ILI runs | |
| | b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48 | |
| | c. The third-party ILI expert reviews in accordance with Condition 52 | |
| | d. AC and DC Interference surveys that are due in accordance with Condition 53 | |
| | e. A copy of the CGRA for prior year including: | |
| | i. Mean corrosion growth rate for the pipeline | |
| | ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy) | |
| **Limitations** | | |
| 62 | This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a | Sable has acknowledged and will comply with this condition as necessary. |

| | justification for continuation of the waiver. | |
|---|---|---|
| 63 | Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements. | Sable has acknowledged this condition. |
| 64 | The OSFM may order the pipeline shutdown at any time. | Sable has acknowledged this condition. |
| 65 | The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver. | Sable has acknowledged this condition. |
| 66 | In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail. | Sable has acknowledged this condition. |
| 67 | If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event | Sable has acknowledged this condition. |

122

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | |
|---|---|
| | of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver. |
| **Footnotes:** | 1 The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam. |
| | 2 Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline. |
| | 3 In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements. |
| | 4 Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified. |
| | 5 Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval. |
| | 6 A minimum of four (4) independent direct examination excavations must be used for unity plots. |
| | 7 The criteria outlined in the state waiver is supplemental to the requirements set forth in §195.452(h)(4)(i) Immediate repair conditions and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method. |
| | 8 Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area. |
| | 9 The criteria outlined in the state waiver is supplemental to the requirements set forth in §195.452(h)(4)(iii) 180-day conditions and does not relieve Sable from complying with §195.452(h)(4)(iii). All 180-day repair conditions must be remediated with a permanent repair method. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | |
|---|---|
| | 10 For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM. |
| | 11 At a minimum, Sable must include signal matching between ILI data sets. |
| | 12 If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets. |
| | 13 Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value. |
| | 14 Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs. |
| | 15 Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing. |
| | 16 The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver. |
| | 17 This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations. |
| | 18 The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

|  | Reports, Closure Report and Annual Reports if information provided is not deemed sufficient. |
|--|----------------------------------------------------------------------------------------------|

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Appendix C – CA-325A and CA-325B State Waiver Summary with Status**

| CA-325A/B State Waiver Summary Chart | | |
|---|---|---|
| Date of Letter: | 12/17/24 | |
| Subject : | LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A/B) | |
| Pipeline: | OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024 | |
| **Item** | **State Waiver Condition** | **Sable Status** |
| **General Conditions** | | |
| 1 | The pipeline can only be used to transport crude oil as stated in the application. | Sable has acknowledged and is in compliance with this condition. |
| 2 | The maximum operating pressure (MOP) cannot exceed: a. 1000 pounds per square inch gauge (psig) for CA-325A. b. 1292 pounds per square inch gauge (psig) for CA-325B. | Sable has acknowledged and is in compliance with this condition. |
| 3 | The maximum operating temperature of the crude oil that transports must not exceed: a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota Station to monitor the temperature of CA-325A/B at this facility. b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A at Sisquoc Station to monitor the temperature of CA-325A/B at this facility. | Sable has acknowledged and is in compliance with this condition. |
| 4 | Prior to startup, Sable must develop and implement procedures for the conditions and | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | requirements described in the state waiver. | |
| 5 | This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein. | Sable has acknowledged this condition. |
| 6 | This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415). | Sable has acknowledged this condition. |
| 7 | In-line inspection must include: | Sable has acknowledged and is complying with this condition. |
| | a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows: | |
| | i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. | |
| | General corrosion means uniform or gradually varying loss of wall thickness over an area. | |
| | b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI). | |
| | c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI. | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 8 | Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:<br>a. API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.<br>b. API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.<br><br>At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts. | Sable has acknowledged and is in compliance with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 9 | All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions. | Sable has acknowledged and is in compliance with this condition. |
| --- | --- | --- |
| 10 | Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G Manual for Determining the Remaining Strength of Corroded Pipelines. If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw | Sable has acknowledged this condition, is in compliance with it, and will comply in the future as necessary. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | evaluation method ASME FFS-1/API 579-1. | |
|---|---|---|
| 11 | Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B. | Sable has acknowledged and will comply with this condition. |
| **Pressure Testing** | | |
| 12 | Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A: | Sable has acknowledged and is in compliance with this condition. |
| | a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss. | Sable has acknowledged and is in compliance with this condition. |
| | b. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP. | Sable has acknowledged and is in compliance with this condition. |
| 13 | Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment CA-325A at a minimum of 1.25 times the MOP. | Sable has acknowledged and is in compliance with this condition. |
| 14 | Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the | Sable has acknowledged and is in compliance with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | state waiver pipeline segment CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B: | |
| | a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss. | Sable has acknowledged and is in compliance with this condition. |
| | b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP. | Sable has acknowledged and is in compliance with this condition. |
| 15 | Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM. | Sable has acknowledged and is in compliance with this condition. |
| 16 | Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies. | Sable has acknowledged and is in compliance with this condition. |
| 17 | Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov Subject: OSFM State Waiver - Hydrotest Failure. | Sable has acknowledged and is in compliance with this condition. |

131

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 18 | Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated. | Sable has acknowledged and is in compliance with this condition. |
|---|---|---|
| **In-Line Inspection (ILI) Assessment and Frequency** | | |
| 19 | At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information: | Sable has acknowledged and will comply with this condition. |
| | a) Dates for integrity assessment | |
| | b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications | |
| | c) In-line inspection tool vendor(s) | |
| | d) Required tool specifications including operational specifications and anomaly sizing tolerances | |
| | e) Tool validation methodology | |
| | f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external | |

132

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | corrosion, cracks, and crack-like indications | |
| | g) Criteria used to identify locations for excavation and field verification | |
| | h) Non-destructive examination | |
| 20 | Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance. | Sable has acknowledged and will comply with this condition. |
| 21 | Metal Loss Tool(s) | Sable has acknowledged and will comply with this condition. |
| | a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days. | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If, any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU). | |
| 22 | Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval. | Sable has acknowledged and will comply with this condition. |
| | a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks. | |
| | b. USCD Performance Specification Requirements | |

134

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks. | |
| | ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material. | |
| | iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld. | |
| | iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks. | |
| 23 | Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM. | Sable has acknowledged and is in compliance with this condition. |
| 24 | Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range. | Sable has acknowledged this condition and will comply as necessary. |
| 25 | All ILI tool runs must obtain the Test ID from the OSFM prior to run. | Sable has acknowledged and will comply with this condition. |

135

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 26 | Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance. | Sable has acknowledged and will comply with this condition. |
|---|---|---|
| 27 | Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable. | Sable has acknowledged and will comply with this condition. |
| 28 | Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly. | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 29 | Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013). | Sable has acknowledged and will comply with this condition. |
|---|---|---|
| **Discovery of Condition** | | |
| 30 | The discovery date must be within 180 days of any ILI tool run for each type of ILI tool. | Sable has acknowledged this condition and will comply as necessary. |
| **Immediate Repair Conditions**[7] | | |
| 31 | A crack or crack-like anomaly that meets any of the following criteria:<br>a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.<br>b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1. | Sable has acknowledged this condition and will comply as necessary. |
| 32 | Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP. | Sable has acknowledged this condition and will comply as necessary. |
| 33 | Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP. | Sable has acknowledged this condition and will comply as necessary. |
| **180-Day Repair Conditions**[9] | | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 34 | A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP. | Sable has acknowledged this condition and will comply as necessary. |
|---|---|---|
| 35 | Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP. | Sable has acknowledged this condition and will comply as necessary. |
| 36 | All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth. | Sable has acknowledged this condition and will comply as necessary. |
| 37 | For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline. | Sable has acknowledged this condition and will comply as necessary. |
| **Corrosion Growth Rate Analysis (CGRA)** | | |
| 38 | Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11] The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates. | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 39 | The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data. | Sable has acknowledged and will comply with this condition. |
|---|---|---|
| 40 | Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss. | Sable has acknowledged and will comply with this condition. |
| 41 | When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13]. | Sable has acknowledged and will comply with this condition. |
| 42 | All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI. | Sable has acknowledged and will comply with this condition. |
| **Pressure Reduction** | | |
| 43 | If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired. | Sable has acknowledged this condition and will comply as necessary. |
| **In Field Direct Examination of Pipe** | | |
| 44 | Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection | Sable has acknowledged this condition and will comply as necessary. |

139

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths. | |
| 45 | Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies: | Sable has acknowledged this condition and will comply as necessary. |
| | a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld. | |
| | b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5. | |
| | c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. | |
| 46 | Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack | Sable has acknowledged this condition and will comply as necessary. |

140

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. | |
| 47 | Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure. | Sable has acknowledged and complied with this condition, and will comply in the future as necessary. |
| 48 | All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap. | Sable has acknowledged and complied with this condition. |
| **Integrity Management** | | |
| 49 | A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools. | Sable has acknowledged and complied with this condition, and will comply in the future as necessary. |
| | a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1). | |

| | | |
|---|---|---|
| | b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2). | |
| 50 | Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called. | Sable has acknowledged and is complying with this condition. |
| 51 | When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s). | Sable has acknowledged and complied with this condition, and will comply in the future as necessary. |
| 52 | Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned. | Sable has acknowledged and is complying with this condition. |
| 53 | Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party | Sable has acknowledged and is complying with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | expert must be approved by the OSFM prior to being selected. | |
| 54 | Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert. | Sable has acknowledged and is complying with this condition. |
| **Data Requirements for Predicted Failure Analysis** | | |
| 55 | Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses. | Sable has acknowledged and is complying with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 56 | The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records. | Sable has acknowledged and is complying with this condition. |
|---|---|---|
| **Recordkeeping** | | |
| 57 | Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days. | Sable has acknowledged and will comply with this condition as necessary. |
| 58 | Sable must maintain the following records:<br><br>a. Technical approach used for the analysis<br><br>b. All data used and analyzed<br><br>c. Pipe and longitudinal weld seam properties<br><br>d. Procedures used to implement state waiver conditions<br><br>e. Evaluation methodology used<br><br>f. Models used<br><br>g. Direct in situ examination data<br><br>h. All in-line inspection tool assessments information evaluated<br><br>i. Pressure test data and results<br><br>j. All in-the-ditch assessments performed on the pipeline segments | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results | |
| | l. All finite element analysis results | |
| | m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology | |
| | n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods | |
| | o. Safety factors used for fatigue life and/or predicted failure pressure calculations | |
| | p. Reassessment time interval and safety factors | |
| | q. The date of the review | |
| | r. Confirmation of the results by qualified technical subject matter expert(s) | |
| | s. Approval by responsible Sable management personnel | |
| | t. Records of additional preventive and mitigative (P&M) measures performed | |
| | u. Reports required by this State Waiver. | |
| **Reporting** | | |
| 59 | Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17] | Sable has acknowledged and will comply with this condition as necessary. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 60 | An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324.* The email notification shall include, if applicable: | Sable has acknowledged and will comply with this condition. |
| | d. Tool type and run date | |
| | e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type) | |
| | f. Dig sheets | |
| | g. Field contact information for Sable | |
| | h. Time and location of the field evaluation and repair. | |
| 61 | Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov , *Subject: OSFM State Waiver – Summary of Conditions CA-325A/B* and include: | Sable has acknowledged and will comply with this condition. |
| | i. Tool type | |
| | j. Run date | |
| | k.  Summary of Conditions Report[18] | |
| | l. Final Vendor Report and Pipe Tally | |
| 62 | Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-325A/B*. At a minimum, the annual report shall | Sable has acknowledged and will comply with this condition as necessary. |

146

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | contain the following, if applicable: | |
|---|---|---|
| | a. A Closure Report for the previous calendar (CY) which contains: | |
| | i. Features that were remediated in previous CY | |
| | 1. Provide documentation for the in-the-ditch assessments and repairs | |
| | ii. Identify features that remain to be assessed | |
| | iii. Unity Plots for previous ILI runs | |
| | b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49 | |
| | c. The third-party ILI expert reviews in accordance with Condition 53 | |
| | d. AC and DC Interference surveys that are due in accordance with Condition 54 | |
| | e. A copy of the CGRA for prior year including: | |
| | i. Mean corrosion growth rate for the pipeline | |
| | Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy) | |
| **Limitations** | | |
| 63 | This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a | Sable has acknowledged and will comply with this condition as necessary. |

147

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | justification for continuation of the waiver. | |
|---|---|---|---|
| 64 | | Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements. | Sable has acknowledged and will comply with this condition as necessary. |
| 65 | | The OSFM may order the pipeline shutdown at any time. | Sable has acknowledged this condition. |
| 66 | | The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver. | Sable has acknowledged this condition. |
| 67 | | In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail. | Sable has acknowledged this condition. |
| 68 | | If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver. | Sable has acknowledged this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 7th day of July, 2025, in Los Angeles, California.


FJ Technologies, Inc.

Brien Vierra, President

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Exhibit A - CV**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



## *Statement of Services and Qualifications*

FJ Technologies is a full service consulting firm serving the pipeline, telecommunications and petroleum industries. The company received its corporation status in the State of California and is based in Atascadero, CA.

FJ Technologies, Inc. offers a full range of services specializing in the following areas:

- Project Management

- Technical Support (drafting, exhibit drawings, graphics,)

- Design Services (hydraulics, piping, directional drill, facility layout, stress analysis, etc.)

- Mechanical Engineering (Civil and Structural Engineering provided through partnering program)

- Construction Observation and Management

- Consulting

- Conceptual Planning

- Procurement

### Experience Summary

Mr. Vierra is registered mechanical engineer in the State of California and has over 32 years of experience in the petroleum industry. His experience includes a diverse area such as; permitting and design of cross country pipelines, pressure vessel modifications, permitting and design of process and pumping facilities, design and installation of directional drill crossings, field construction monitoring, project management, project design, hydraulic analysis, pipe stress analysis (Caesar II/Coade), vessel design/fatigue analysis (Compress/Codeware), risk analysis, tank, vessel and pipeline internal/external inspection analysis, preparation of weld procedures and conceptual planning.

### Representative Experience

*4.1 mile Natural Gas Pipeline Project with High Pressure Meter Stations and Facilities - California*

Involved in the planning, engineering, installation and operation of a new 10-inch natural gas pipeline to transport natural gas from an existing major supplier to the end user. This project included facility design, pipeline design, facility tie-ins, pig launching and receiving traps, material specifications, material inspections, bid specifications, procurement and field construction support.

*Pipeline Directional Drill Project - Alaska*

P. O. Box 926
Atascadero, CA 93423
805-235-7943 Phone/ 805-460-9123 FAX

*TECHNOLOGIES, INC.*

## *Statement of Services and Qualifications*

Provide permitting assistance, engineering, design, specifications and tie-in procedures for a 20-inch crude oil pipeline relocation. The design involved a 5600 foot directional drill through muskeg and moraine material in the Kenai Burrough of Alaska.

*1.2 Mile Products Pipeline - California*

Involved in the planning, engineering, installation of a new 16" products pipeline to transport jet fuel from an existing major supplier to the end user. This project included pipeline design, a 5,200 foot directional drill, pig launcher and receiver facilities, facility tie-ins, material specifications, bid specifications and field construction support.

*Pipeline Repair/Replacement Project - Alaska*

Provide engineering design, project management and hydraulic analysis to retrofit existing 30-inch tanker loading lines for internally inspecting the two lines. The project involved revising the existing onshore piping and platform piping. The onshore piping required a new pig trap design with the offshore piping requiring extensive piping modifications to allow temporary pipe spools to be installed. A review and analysis of the internal inspection report was performed, then recommendations for further investigation/repairs were provided.

*Pipeline Repair/Replacement Project - Alaska*

Provide engineering design, specifications, bid preparation, project management and construction support to replace one mile of 20-inch pipe via two directional drills and repair 30 other sites via standard open cut methods.  All construction work was conducted during winter conditions which required building over 18 miles of ice roads to access the sites.

*Pipeline Close Interval Survey - Alaska*

Perform close interval surveys (pipe to soil) for 41.5 miles of 20-inch pipeline and 2.5 miles of 12-inch pipe. Survey included providing a written report discussing potential areas of concern with graphical printout of survey.

*Relocation of two 8-Inch Pipelines Across Highway 101 - California*

This project involved installing two directional drilled casings under Highway 101 as well as the nearby creek. Mr. Vierra provided engineering and permitting services to facilitate the construction of the pipeline replacement. Permitting services included Caltrans Encroachment permit, San Luis Obispo County Encroachment permit, DFG Streambed Alteration Permit, Army Corp. of Engineer Permit and RWQCB Permit.

*23 mile Pipeline and Facility Design Project - Louisiana*

Involved the planning, engineering, installation and operation of 23 miles of 6" pipe to transport crude oil from Offshore Louisiana to tie-in with an existing pipe system. Project included facility design, three directionally drilled crossings, offshore pipelaying in approximately 45 feet of water, inshore pipelaying through marsh and tying in pipeline to existing system. Responsibilities included complete project management, environmental compliance, material acquisition, contracts, permitting, acquisition of right of way, overall final design, training of personnel for operations and startup troubleshooting. Total overall cost of the project was approximately $7.5 MM.

 *TECHNOLOGIES, INC.*

## *Statement of Services and Qualifications*

*10.2 mile Pipeline Project with High Pressure Meter Stations and Facilities - California*
> Project involved preparing and submitting permit requests to Santa Barbara County and various other agencies. Overseeing the planning, engineering, environmental review of the project with various consultants and field construction. Writing of several manuals for Operations, Emergency Response, Oil Spill Response, Environmental Manuals, Etc.. Designated on-site engineer during construction and startup. Total overall cost of the project was approximately $7.2 MM.

*20-inch Pipeline Replacement Project – Alaska*
> This project involved installing approximately 1800 feet of 20-inch pipe via a directional drilled crossing under a river where the old pipe had been damaged. Mr. Vierra provided preliminary engineering, directional drill layout and permitting services as well as construction support during the installation of the pipe replacement. Once the project was complete as-built drawings were provided to the client.

*Crude & Product Storage Tank Retrofits – Alaska, California, Illinois, Louisiana, and Texas*
> Projects performed involved preparing specifications for cleaning, coating, installing double bottoms, and performing API 653 inspections. Additional work to complete tank repairs involved preparation of procedures to repair tank floors, replace nozzles not in compliance with API 650/653 and verification of weld procedures.

*1.2-mile Transmission Line Renewal - California:*
> Mr. Vierra was the project manager responsible for overseeing this 1.2-mile, 12-inch steel oil transmission line renewal through the main business district of a beach community.  He prepared preliminary hydraulic calculations, as well as hired and managed outside engineering, environmental and risk analysis consultants.  Mr. Vierra worked with consultants and agencies to obtain permits and agency approvals from the City, Department of Fish and Game, and the Regional Water Quality Control Board. Construction costs on the project were approximately $1 million.

*3.5-mile Transmission Line Replacement - California:*
> Mr. Vierra was the project manager responsible for overseeing the replacement of a 3.5-mile section of two, 8 inch-steel oil transmission lines located near the town of Santa Margarita.  These lines were located adjacent to a perennial stream and crossed it in four locations.  Each of these crossings required permit approval by the Army Corps of Engineers, RWQCB and the Department of Fish and Game. The project involved preparing engineering packages, environmental documents (archaeological and biological), permit packages, field monitoring for compliance and updating of response plans.  Construction costs on the project were approximately $1.5 million.

*Heating, Separating & Pumping Facility Retrofit and Upgrade - California*
> Install new 8.9 MM BTU Burners in existing heater treaters for compliance with new NOx and SOx emission requirements. Source test equipment and demonstrate compliance with regulating agency. Work involved replacing heat exchanger's with updated more efficient models. Install new water shipping pumps capable of handling higher flow rates and injection pressures.

 *TECHNOLOGIES, INC.*

## *Statement of Services and Qualifications*

*Crude and Product Pipeline Installation, Operation and Relocation Work – Alaska, California, Illinois, Louisiana, and Texas*

Work involved modifying existing operations, troubleshooting mechanical/electrical problems, pipeline tie-ins, writing of procedures, compliance plans, directional drilling plans, response plans and project specifications. Field engineering and installation of various pieces of equipment. Hydrotesting of lines for DOT and State Fire Marshall compliance. Running of internal inspection tools on various pipeline's to determine remaining wall thickness and operational safety of the entire system.

*Corrosion Control and Repair of CP System at VAFB*

Mr. Vierra reviewed site data and prepared design drawings/specifications/cost benefit analysis to repair an existing cathodic protection system as well as control existing surface corrosion on various pieces of equipment subject to a harsh environment.

## Education

**Colorado School of Mines**, Golden, CO
*Economic Evaluation and Investment Decision Methods Certificate - September, 1996*

**California Polytechnic State University**, San Luis Obispo, CA
*Bachelor of Science in Mechanical Engineering Technology - June, 1990*

- Registered Professional Engineer (Lic. # M 32330 California)
- Incident Command System. Emergency Management Training
- Fire Protection Training Academy. University of Nevada-Reno
- Confined Space Entry Supervisor
- Hazard Analysis Training Course
- Hazmat 40 Hour Training Certified May 1995, Refresher Oct. 1997
- Threatened and Endangered Species Preliminary Survey Protocols Training Class, LFR - 1999
- Storm Water Regulations, Erosion and Sediment Control Training Class, RWQCB - 2000

For additional information contact Brien Vierra at 805-235-7943.

**Exhibit B – Consent Decree**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 318 of 703   Page
ID #:12166
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 1 of 102   Page ID #:94

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>      Plaintiffs,<br><br>            v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>      Defendants. | Civil Action No.<br><br>2:20-cv-02415<br><br>**CONSENT DECREE** |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 25    Filed 05/14/26    Page 319 of 703    Page
ID #:12167
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 2 of 102   Page ID #:95

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast
Regional Water Quality Control Board, and California Department of Forestry
and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and
California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

## TABLE OF CONTENTS

I.      BACKGROUND ............................................................................- 5 -

II.    JURISDICTION AND VENUE.......................................................- 6 -

III.   APPLICABILITY .........................................................................- 7 -

IV.   DEFINITIONS ............................................................................- 7 -

V.    CIVIL PENALTIES ...................................................................- 13 -

VI.   NATURAL RESOURCE DAMAGES ............................................- 17 -

VII.  TRUSTEES' MANAGEMENT AND APPLICABILITY

        OF JOINT NRD FUNDS ...........................................................- 21 -

VIII. TRUSTEES' MANAGEMENT OF RECREATIONAL

        USE FUNDS ..........................................................................- 22 -

IX.   INJUNCTIVE RELIEF ..............................................................- 23 -

X.    CORRECTIVE ACTION ORDER .................................................- 27 -

XI.   STIPULATED PENALTIES .........................................................- 27 -

XII.  FORCE MAJEURE...................................................................- 35 -

XIII. DISPUTE RESOLUTION ...........................................................- 37 -

XIV. REPORTING ...........................................................................- 39 -

XV.  CERTIFICATION ......................................................................- 40 -

XVI. INFORMATION COLLECTION AND RETENTION......................- 40 -

XVII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ...........- 43 -

XVIII. TRANSFER AND ACQUISITION OF ASSETS .............................- 49 -

XIX. COSTS...................................................................................- 50 -

XX.  NOTICES ...............................................................................- 51 -

XXI. EFFECTIVE DATE ..................................................................- 54 -

XXII. RETENTION OF JURISDICTION ...............................................- 54 -

XXIII. MODIFICATION ......................................................................- 54 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 321 of 703   Page
ID #:12169
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 4 of 102   Page ID #:97

XXIV.    TERMINATION ..................................................................................- 55 -

XXV.     PUBLIC PARTICIPATION.................................................................- 56 -

XXVI.    SIGNATORIES/SERVICE ................................................................- 56 -

XXVII.   INTEGRATION ................................................................................- 57 -

XXVIII.  FINAL JUDGMENT ........................................................................- 57 -

XXIX.    26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION .................- 57 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 322 of 703   Page
ID #:12170
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 5 of 102   Page ID #:98

A.      WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline known as the Line 901 pipeline ("Line 901") owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P., (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County, California.  A portion of the oil reached the Pacific Ocean and coastal areas such as Refugio State Beach.  The Refugio Incident adversely impacted Natural Resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and the State of California ("California" or the "State").

B.      WHEREAS, cleanup actions began immediately after the Refugio Incident at the direction of a Unified Command established by the United States Coast Guard ("USCG") and the State of California Department of Fish and Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR").  The Unified Command was comprised of the United States, State agencies, the County of Santa Barbara, and Plains.

C.      WHEREAS, on May 21, 2015, the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No. 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO").  The PHMSA CAO directed Plains, among other things, to purge Line 901 and a portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota and Pentland pump stations, and to keep Line 901 and the purged sections of Line 903 shut down until the actions required by the PHMSA CAO were satisfactorily completed.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 323 of 703   Page
ID #:12171
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 6 of 102   Page ID #:99

D.      WHEREAS, on May 19, 2016, PHMSA issued a Failure Investigation Report, which included PHMSA's findings of the "proximate or direct" causes and the "contributing" causes of the Refugio Incident.

E.      WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs arising from the Refugio Incident.

F.      WHEREAS, CDFW incurred certain additional costs arising from the administration and civil enforcement of pollution laws, including attorneys' fees that have been reimbursed by Plains.

G.      WHEREAS, Plains represents that it has implemented and will continue to utilize an electronic tracking tool and software for maintenance activities, including those activities related to mainline valves.  The software tracks which maintenance activities are performed, who performs the activity, when prior notifications of maintenance activities by field personnel are received, when problems requiring maintenance are first discovered, and when maintenance problems are corrected.  Plains maintains a separate software program to track the training and qualifications of all maintenance personnel.

H.      WHEREAS, Plains represents that, following the Refugio Incident and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its Emergency Response Plan and Training Program, and revised and updated its Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield District Response Zone Plan") to reflect modifications resulting from the review and the incorporation of lessons learned.  As part of the revision, Plains identified the locations of culverts along the pipelines' rights-of-way and provided containment and recovery techniques for responding to spills that may occur near those culverts.  Plains provided drafts of the updated Bakersfield District Response Zone Plan to PHMSA, incorporated comments provided by PHMSA, and received approval of the revised plan from PHMSA on September 26, 2017.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

I.    WHEREAS, Plains represents that it also created a more detailed Geographic Information System ("GIS") based online Tactical Response Plan for its onshore oil pipelines in Southern California, including Line 2000 and the operational portion of Line 903, that, among other things, identifies culverts along the pipelines' rights-of-way, potential receptors and the equipment, supplies and resources that would be necessary to respond to a spill occurring at any given location along those pipelines, identifies the sources and locations for obtaining those resources, and, in some instances, establishes stored inventories of those resources in specific locations.  Plains represents that it intends to keep its Tactical Response Plan updated and available for use in drills and spill response, and that it will make the Tactical Response Plan available to the Plaintiffs upon reasonable request and as needed in connection with a drill or response to a spill.

J.    WHEREAS, Plains represents that Plains personnel responding to incidents that trigger the standup of an incident command structure ("ICS") have been provided ICS training appropriate to their responsibilities.

K.    WHEREAS, the relevant Natural Resources trustees ("Trustees") for the Refugio Incident are the United States Department of the Interior ("DOI"); United States Department of Commerce, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"); CDFW; California Department of Parks and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and The Regents of the University of California ("UC").

L.    WHEREAS, pursuant to Section 1006 of the Oil Pollution Act (''OPA''), 33 U.S.C. 2701, *et seq*., the United States and the State Trustees allege that oil from the Refugio Incident caused injuries to Natural Resources, including birds, marine mammals, shoreline and subtidal habitats, and also had an impact upon human uses of Natural Resources and other public resources. The Federal Trustees are designated pursuant to the National Contingency Plan,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 3 -

40 C.F.R. § 300.600 and Executive Order 12777.  CDFW and CDPR are designated state trustees pursuant to the National Contingency Plan, 40 C.F.R. § 300.605, and the Governor's Designation of State Natural Resource Trustees pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980.  In addition, CDFW has state natural resource trustee authority pursuant to California Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (California Government Code § 8670.1 *et seq.*).  CDPR and UC have jurisdiction over natural resources within the state park system and the UC Natural Reserve System, respectively, which are held in trust for the people of the State of California.  CSLC is a state trustee pursuant to its jurisdiction under Public Resources Code § 6301 and Civil Code § 670.

M.    WHEREAS, after the Refugio Incident, the Trustees and Defendants entered into a cooperative Natural Resource Damage Assessment process pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and independently planned and conducted a number of injury assessment activities.  These activities included gathering and analyzing data and other information that the Trustees used to determine and quantify resource injuries and damages.  As a result of this process and other activities, the Trustees identified several categories of injured and damaged Natural Resources, including birds, marine mammals, and shoreline and subtidal habitats, as well as effects to human use/recreation resulting from impacts on these Natural Resources, and determined the cost to restore, rehabilitate, replace, or acquire the equivalent of injured Natural Resources.  By entering this Consent Decree, Defendants do not admit or agree that the Trustees' NRD findings and determinations are accurate.

N.    WHEREAS, due to the specific facts surrounding the Refugio Incident, including the timing, degree, and nature of the spill and the affected

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 4 -

Case 2:26-cv-05242-GW-SSC Document 25 Filed 05/14/26 Page 326 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 9 of 102 Page ID #:102
ID #:12174

environment, the Trustees will not seek additional damages, costs, or expenses for Natural Resources resulting from the Refugio Incident.

O. WHEREAS, Plains agrees to reimburse costs incurred by the Trustees in connection with the NRDA through November 15, 2018, and will not reimburse costs incurred by the Trustees in connection with the NRDA after that date.

P. WHEREAS, by entering into this Consent Decree, Plains does not admit the allegations in the Complaint filed in this action, or any liability to the Plaintiffs.

Q. WHEREAS, on January 28, 2019, PHMSA initiated a regularly-scheduled "Integrated Inspection" of a portion of Defendants' Regulated Pipelines, as described below, and other pipeline facilities and records, pursuant to 49 U.S.C. § 60117.

R. WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

S. WHEREAS, the Parties agree and the Court by entering this Consent Decree finds, that this Consent Decree: (1) has been negotiated by the Parties at arm's-length and in good faith; (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws.

## I. BACKGROUND

The United States, on behalf of PHMSA, the United States Environmental Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California Central Coast Regional Water Quality Control Board ("RWQCB"), and the California Department of Forestry and Fire Protection's - Office of the State Fire

Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and associated regulations and orders; OPA, 33 U.S.C. §§ 2701 *et seq.*, and associated regulations and orders; the federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq.*, and associated regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, California Government Code §§ 8670.1 *et seq.* and associated regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016, 13013; California Water Code §§ 13350, 13385; and the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.* The Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks penalties, injunctive relief, and Natural Resource Damages.

NOW, THEREFORE, before the trial of any claims and without adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and 60122; and 28 U.S.C. §§ 1331, 1345, and 1355. This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367. To the extent the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the United States and the State Agencies have satisfied the requirement.

2.    Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws, 49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 6 -

does business in this District and the alleged claims occurred in this District.

3. For purposes of this Consent Decree or any action to enforce this Consent Decree, Defendants consent to the Court's jurisdiction over this Consent Decree for such action and Defendants consent to venue in this judicial district. For purposes of this Consent Decree and without admission of liability, Defendants agree that the Complaint states claims upon which relief may be granted.

### III.   APPLICABILITY

4. Subject to the terms herein, the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree.

5. Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained for the purpose of performing work required under this Consent Decree.  Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree by specifying that contractors are obligated to perform work in compliance with this Consent Decree.

6. In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### IV.   DEFINITIONS

7. Terms used in this Consent Decree that are defined in the CWA, OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 7 -

have the meanings assigned to them in these statutes and their regulations, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Appendix A" is the set of maps that generally depict Lines 901, 903, and 2000;

"Appendix B" is the Injunctive Relief that Plains is required to perform under this Consent Decree;

"Appendix C" is intentionally left blank;

"Appendix D" is the list of remaining corrective actions from the PHMSA CAO that Plains is still required to implement under this Consent Decree.  For the terms of the PHMSA CAO, *see* https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H .html?nocache=4888#_TP_1_tab_1;

"CDFW" shall mean the California Department of Fish and Wildlife and any of its successor departments or agencies;

"CDPR" shall mean the California Department of Parks and Recreation and any of its successor departments or agencies;

"Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

"Consent Decree" shall mean this Consent Decree and all Appendices attached hereto;

"Control Room Management Plan" shall mean Plains' Control Room Management Plan, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"Control Center General Procedures" shall mean Plains' Control Center General Procedures, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"CSLC" shall mean the California State Lands Commission and any of its successor departments or agencies;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 8 -

"Day" shall mean a calendar day unless expressly stated to be a working day.  In computing any period of time under this Consent Decree, the rules set forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

"Defendants" shall mean Plains All American Pipeline, L.P. and Plains Pipeline, L.P.;

"Delivery Lines" as stated in Appendix B shall mean any pipeline that generally operates to move oil from a delivery meter on a pipeline or facility to another pipeline or facility in close proximity;

"DOI" shall mean the United States Department of the Interior, including its bureaus and agencies, and any of its successor departments or agencies;

"Elder California Pipeline Safety Act" shall mean the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXI (Effective Date);

"Federal Trustees" shall mean DOI and NOAA in their capacities as Natural Resource Trustees;

"Integrity Management Plan" or "IMP" shall mean Plains' Integrity Management Plan, dated September 2019, as delivered to PHMSA by letter dated November 19, 2019, from counsel for Defendants;

"Line 901" is Defendants' 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California, as generally depicted in Appendix A;

"Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends approximately 129 miles in length from the Gaviota Pump Station in Santa Barbara County, California to the Emidio Pump Station in Kern County,

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 9 -

California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland Mile Post 114.57, as generally depicted in Appendix A;

"Line 2000" is Defendants' 20-inch diameter pipeline that extends approximately 130 miles in length and transports crude-oil produced in the outer continental shelf and the San Joaquin Valley. Line 2000 runs from Bakersfield, California, over the Tehachapi Mountains and through the Grapevine I-5 corridor and extends to delivery locations in the Los Angeles metropolitan area, as generally depicted in Appendix A;

"Mainline pipeline" as stated in Appendix B shall mean the principal pipeline or the parallel pipeline in a given pipeline system, excluding connected lateral lines or branch lines that are used locally to deliver product either into the mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a third-party line;

"Natural Resource" and "Natural Resources" shall mean land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and/or the State or any subdivision thereof, and shall also mean the services provided by such resources to other resources or to humans;

"Natural Resource Damages" or "NRD" shall mean all damages, including restoration or rehabilitation costs, recoverable by the United States or State Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources including any services such natural resources provide, including the reasonable costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A), resulting from the Refugio Incident;

"Natural Resource Damage Assessment" or "NRDA" shall mean the process of collecting, compiling, and analyzing information, statistics, or data through prescribed methodologies to determine damages for injuries to Natural

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 10 -

Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio Incident;

"NRD Payment" shall mean the payment Defendants are required to pay for the Natural Resource Damages as described in Section VI (Natural Resource Damages);

"Natural Resource Trustees" or "Trustees" are those federal and state agencies or officials designated or authorized pursuant to the CWA, OPA, and/or applicable state laws to act as Trustees for the Natural Resources belonging to, managed by, controlled by, or appertaining to the United States or the State. Participating Trustees in the Natural Resource Damage Assessment and in this Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

"NOAA" shall mean the National Oceanic and Atmospheric Administration and any of its successor departments or agencies;

"Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the fund established pursuant to 26 U.S.C. § 9509, including the claim-reimbursement provisions set forth in 33 U.S.C. § 2712;

"OSFM" shall mean the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal and any of its successor departments or agencies;

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

"Parties" shall mean the Plaintiffs and Defendants, collectively;

"PHMSA" shall mean the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration and any of its successor departments or agencies;

"PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the Original CAO issued on May 21, 2015, by PHMSA, which was subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 11 -

"Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq.*, and regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

"Plaintiffs" shall mean the United States and the State Agencies;

"Refugio Incident" shall mean the release of approximately 2,934 barrels of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California on or about May 19, 2015;

"Regulated Pipeline" shall mean any pipeline operated by Plains subject to regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div. 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

"Requests for Information" or "RFI" shall mean PHMSA's RFIs dated August 19, 2015, August 21, 2015, and September 1, 2016.  RFIs shall also refer to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

"Restore" or "Restoration" shall mean any action or combination of actions to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including Natural Resource-based recreational opportunities that were injured, lost, or destroyed as a result of the Refugio Incident;

"RWQCB" shall mean the California Central Coast Regional Water Quality Control Board and any of its successor departments or agencies;

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

"Segment" as stated in Appendix B shall mean any contiguous portion of a pipeline system for which a single hydrostatic test or ILI may be performed, as determined by Defendants;

"State Agencies" shall mean the People of the State of California, *Ex Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC.  The State Agencies do not include any entity or political subdivision of the State of California other than those agencies herein designated the "State Agencies";

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

"State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their capacities as Natural Resource Trustees;

"United States" shall mean the United States of America, on behalf of PHMSA, EPA, DOI, NOAA, and USCG;

"UC" shall mean The Regents of the University of California and any of its successor departments or agencies; and

"USCG" shall mean the United States Coast Guard and any of its successor departments or agencies.

## V.    CIVIL PENALTIES

A.    Within thirty (30) Days after the Effective Date, Defendants shall pay to the United States, CDFW, and RWQCB a total civil penalty of twenty-four million dollars ($24,000,000), together with interest accruing from the date on which the Consent Decree is lodged with the Court, at a rate specified in 28 U.S.C. § 1961 (the "Penalty Payment").  The Penalty Payment shall be allocated as follows:

8.    Penalty Payment to the United States (PHMSA).  For violations of the Pipeline Safety Laws alleged in the United States' Complaint, Defendants shall pay to the United States a civil penalty of fourteen million five hundred thousand dollars ($14,500,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made as follows:

a.    Thirteen million two hundred fifty thousand dollars ($13,250,000) attributed to Plains' alleged Pipeline Safety Law violations; and

b.    One million two hundred fifty thousand dollars ($1,250,000) attributed to Plains' alleged non-compliance with the RFIs.

c.    Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants by the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 13 -

Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California Western Division after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Megan Prout
> Senior Vice President
> Commercial Law and Litigation
> Plains All American Pipeline, L.P.
> 333 Clay Street, Suite 1600
> Houston, TX 77002

on behalf of Defendants. Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XX (Notices).

d. At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state the payment is for the civil penalty owed pursuant to this Consent Decree in the *United States of America and the People of the State of California v. Plains All American Pipeline, L.P., et al.*, and shall reference the Civil Action Number assigned to this case, CDCS Number, and DOJ case number 90-5-1-1-11340, to the United States in accordance with Section XX (Notices).

9. Penalty Payment to the United States (EPA) shared with CDFW and RWQCB. The Penalty Payment shall be allocated as follows:

a. As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 14 -

Case 2:26-cv-05242-SVW-SSC    Document 25-1    Filed 05/14/26    Page 336 of 703    Page
ID #:12184
Case 2:20-cv-02415 Document 6-1    Filed 03/15/20    Page 19 of 102    Page ID #:112

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

1) To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money as follows: one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

2) To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 15 -

State Water Resources Control Board
Division of Administrative Services, ATTN: Civil
Liability Payment
P.O. Box 1888
Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3)      To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division.  Such monies are to be deposited in the OSLTF.  The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8).  Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day.  Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 16 -

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

and

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center
U.S. Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, D.C. 20593-7605

10.     Penalty Payment to be Paid to CDFW.  For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife.  The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California  95816-0362

The check shall reference the "Refugio Oil Spill."  CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11.     Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI.    NATURAL RESOURCE DAMAGES

12.     Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 17 -

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961.  The NRD Payment shall be allocated as follows:

a.      To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment.  Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds).  Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

> Department of the Interior
> Natural Resource Damage Assessment and
>     Restoration Program
> Attention:  Restoration Fund Manager
> 1849 "C" Street, N.W. Mail Stop 4449
> Washington, D.C.  20240

The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198.  DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 18 -

b. To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund. Payment shall be made by check payable to the California Department of Parks and Recreation. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

> The California Department of Parks and
> Recreation
> Attn: Laura Reimche, Senior Counsel
> 1416 Ninth Street, Room 1404-6
> Sacramento, California 95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund. CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident. CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c. To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF. Payment shall be made by check payable to the National Fish and Wildlife Foundation. At the time of payment, Defendants shall simultaneously send written

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 19 -

notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Game
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the California South Coast Shoreline Parks and Outdoor Recreational Use Account. The California South Coast Shoreline Parks and Outdoor Recreational Use Account shall be managed in accordance with the South Coast Shoreline Parks and Outdoor Recreational Use Account Memorandum of Agreement among the State Trustees and NFWF and shall be used by the Trustees for the purposes set forth in Section VIII (Trustees' Management of Recreational Use Funds).

d.     To UC, twenty-six thousand dollars ($26,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into Natural Reserve System Account. Payment shall be made by check payable to The Regents of the University of California. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 342 of 703   Page
ID #:12190
Case 2:20-cv-02425   Document 6-1   Filed 03/15/20   Page 25 of 102   Page ID #:118

> The Regents of the University of California
> Attn:  Michael Kisgen, Associate Director
> Natural Reserve System
> University of California, Office of the President
> 1111 Franklin Street, 6th Floor
> Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account.  The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees.  The projects shall address the research, education, and outreach missions of the University of California.  UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13.     The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants.  To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII.   TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14.     DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident.  DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15.     DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 21 -

Subaccount, including return on investments or accrued interest, subject to the provisions of this Consent Decree.

16. The Natural Resource Trustees commit to the expenditure of the funds set forth in Paragraph 12 for the design, implementation, permitting (as necessary), monitoring, and oversight of Restoration projects and for the costs of complying with the requirements of the law to conduct a Restoration planning and implementation process. The Natural Resource Trustees will use the funds to Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including lost human use of such services, injured, lost, or destroyed as a result of the Refugio Incident and for the administration and oversight of these Restoration projects.

17. The specific projects or categories of projects will be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which public notice, opportunity for public input, and consideration of public comment will be provided. Plains shall have no responsibility nor liability for implementation of the Restoration Plan or projects relating to the Refugio Incident, including any future project costs other than the payments set forth in Section VII herein. The Trustees jointly retain the ultimate authority and responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD Subaccount to Restore Natural Resources in accordance with applicable law, this Consent Decree, and any memorandum or other agreement among them.

## VIII. TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

18. CDPR shall allocate the monies paid pursuant to Paragraph 12 for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

19.     The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20.     UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX.     INJUNCTIVE RELIEF

21.     Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22.     Material Changes to Plains' IMP.

a.     Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

1)     Procedure for the Assessment of In-Line Inspection ("ILI") Results;

2)     Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

3)     White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 23 -

Case 2:26-cv-05242-SVW-SSC Document 25 Filed 05/14/26 Page 345 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 28 of 102 Page ID #:121
ID #:12193

4)     Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"

5)     Section 11.4, "Documentation of P&M Evaluation Meetings;" and

6)     Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.     At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s). In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c.     In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.     In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 24 -

Days.  Following the notice period specified in Subparagraphs 22.b and 22.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII.  Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

23.     Material Changes in Control Room Management Plan and Control Center General Procedures.

a.     Plains' Control Room Management Plan and Control Center General Procedures (collectively, "Control Center Plan and Procedures") shall serve as the baseline Control Center Plan and Procedures for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4, 9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0, and 500-12 of its Control Center General Procedures throughout the term of this Consent Decree without following the process set forth in this Paragraph.  For purposes of this Paragraph, the term "material change" refers to any substantive modification in the Control Center Plan and Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.     At least thirty (30) Days prior to making a material modification to the above sections of  its Control Room Management Plan and Control Center General Procedures, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 25 -

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

c.      In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.      In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days.  Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24.    Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals.  Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

## X.    CORRECTIVE ACTION ORDER

25.    Upon the Effective Date of this Consent Decree, the PHMSA CAO shall close and be of no further force or effect.  All outstanding terms and obligations under the PHMSA CAO as of the Effective Date and which Plains is still required to implement under this Consent Decree are set forth in Appendix D.

## XI.    STIPULATED PENALTIES

26.    Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below.  A violation includes failing to perform any obligation required by the terms of this Consent Decree according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

27.    <u>Late Payment of Civil Penalties and NRD Payment</u>.

a.    If Defendants fail to pay any portion of the Penalty Payment to the United States required under Section V (Civil Penalties) when due, Defendants shall pay to the United States a stipulated penalty of ten thousand dollars ($10,000) per Day for each Day payment is late.

b.    If Defendants fail to pay any portion of the Penalty Payment to the CDFW and/or RWQCB as required under Section V (Civil Penalties) when due, Defendants shall pay to the CDFW and/or RWQCB a stipulated penalty of ten thousand dollars ($10,000) each, as applicable, per Day for each Day payment is late.

c.    If Defendants fail to pay any portion of the NRD Payments

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 27 -

required under Section VI (Natural Resource Damages) when due, Defendants shall pay a stipulated penalty of five thousand dollars ($5,000) to the United States, and five thousand dollars ($5,000) to the State Trustees, per Day for each Day payment is late.

28. <u>Stipulated Penalties for Non-Performance of Injunctive Relief</u>. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section IX (Injunctive Relief) when due:

a. For failure to timely submit to OSFM the applications for State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of Appendix B;

b. For failure to implement the Integrity Management provisions as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix B;

c. For failure to timely submit to OSFM the EFRD analyses as specified in paragraphs 5.A-5.B of Appendix B;

d. For failure to timely submit to OSFM the risk analysis as specified in paragraph 6.A of Appendix B;

e. For failure to timely submit to PHMSA the modified Section 9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

f. For failure to timely submit to PHMSA the modified P&M Recommendation forms, as specified in paragraph 9.B of Appendix B;

g. For failure to timely conduct EFRD analyses for all Regulated Pipelines for which Plains has not previously conducted an EFRD analysis, as specified in paragraph 10.A of Appendix B;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 28 -

h.      For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i.      For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j.      For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k.      For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l.      For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m.      For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n.      For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o.      For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p.      For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q.      For failure to timely conduct the surveys and update the

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 29 -

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r. For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s. For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t. For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u. For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v. For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w. For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x. For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y. The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 30 -

29. <u>Stipulated Penalties for Non-Compliance with Corrective Action Order Terms.</u> Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section X (Corrective Action Order) when due:

a. For operation of Line 901 in violation of paragraph 1.a of Appendix D;

b. For failure to timely submit to OSFM a Line 901 Restart Plan, as specified by paragraph 1.b of Appendix D;

c. For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 901 specified by paragraphs 1.c and 1.d of Appendix D;

d. For operation of Line 903, in violation of paragraph 1.e of Appendix D;

e. For failure to timely submit to OSFM a Line 903 Restart Plan, as specified by paragraph 1.f of Appendix D;

f. For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 903 specified by paragraphs 1.g and 1.h of Appendix D;

g. For failure to timely submit to OSFM any notification specified by paragraph 1.i of Appendix D; and

h. For failure to submit to OSFM a final Appendix D Documentation Report, as specified by paragraph 1.j of Appendix D.

i. The penalties stipulated in this Section shall accrue as follows:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30.     Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31.     For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32.     For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33.     For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34.     For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 32 -

Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 37 of 102 Page ID #:12202

a.      Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b.      Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c.      Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d.      If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35.     For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36.     For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties).  Any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

transmittal correspondence shall state that payment is for stipulated penalties and shall identify the date of the written demand to which the payment corresponds.

37. Stipulated penalties under this Section shall begin to accrue on the Day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed, or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

38. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

39. The applicable State Agencies may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to the applicable State Agencies under this Consent Decree.

40. Stipulated penalties shall continue to accrue as provided in Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid until the following:

    a. If the dispute is resolved by agreement or by a decision of the United States or the State Agencies, as applicable, that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States or the State Agencies, as applicable, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or the State Agencies' decision.

    b. If the dispute is appealed to the Court and the Plaintiffs prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 34 -

c.     If any Party appeals the Court's decision and a Plaintiff prevails in whole or in part, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

41.     If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State Agencies from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

42.     The payment of stipulated penalties, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

43.     Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State Agencies (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offsets measures, and/or contempt) for Defendants' violation of this Consent Decree or applicable laws.

## XII.   FORCE MAJEURE

44.     "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation.  The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized.  "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

45.    If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants first knew that the event might cause a delay.  Within ten (10) Days thereafter, Defendants shall provide in writing to such Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment.  Defendants shall provide with any notice the documentation that Defendants are relying on to support the claim that the delay was attributable to a Force Majeure event.  Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.  Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

46.    If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Plaintiffs for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47. If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

48. If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XIII (Dispute Resolution), in response to Plaintiffs' determination in Paragraph 47 above, it shall do so no later than thirty (30) Days after receipt of Plaintiffs' notice. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 44 and 45. If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to Plaintiffs and the Court.

## XIII. DISPUTE RESOLUTION

49. Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by Plaintiffs to enforce any obligation of Defendants arising under this Consent

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 37 -

Case 2:26-cv-05242-SVW-SSC Document 25 Filed 05/14/26 Page 359 of 703 Page
Case 2:20-cv-02425 Document 6-1 Filed 03/15/20 Page 42 of 102 Page ID #:135
ID #:12207

Decree.

50. <u>Informal Dispute Resolution</u>. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendants send the relevant Plaintiff(s) a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement. If the parties cannot resolve a dispute by informal negotiations, then the position advanced by Plaintiffs shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Defendants invoke formal Dispute Resolution procedures as set forth below.

51. <u>Formal Dispute Resolution</u>. Defendants shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on Plaintiffs a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

52. Plaintiffs shall serve their Statement of Position within forty-five (45) Days of receipt of Defendants' Statement of Position. Plaintiffs' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Plaintiffs. Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

53. Defendants may seek judicial review of the dispute by filing with the Court and serving on the relevant Plaintiff(s), in accordance with Section XX (Notices), a motion requesting judicial resolution of the dispute. The motion

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 38 -

must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54. Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or by a schedule set by the Court. Defendants may file a reply memorandum to the extent permitted by the Local Rules.

55. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 51, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree, based on the Statements of Position, and under applicable standards of review.

56. The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue until the final resolution of the dispute. Payment shall be stayed pending resolution of the dispute. If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV.  REPORTING

57. After the Effective Date, by March 31 and September 30 of the following years until termination of this Consent Decree per Section XXIV (Termination), Defendants shall submit to the Plaintiffs in accordance with Section XX (Notices) bi-annual reports that shall describe the status of Defendants' compliance with the Consent Decree, including implementation of

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

the injunctive relief requirements set forth in Appendices B and D.  The report will be organized to show the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement.

## XV.   CERTIFICATION

58.    Each report submitted by Defendants under Section XIV (Reporting) shall be signed by either the Chief Executive Officer, the President, an Executive Vice President, a Senior Vice President, or General Counsel who is an authorized representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on any personal knowledge and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XVI.  INFORMATION COLLECTION AND RETENTION

59.    Plaintiffs and their representatives shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times and upon reasonable notice, upon presentation of credentials, to:

    a.    monitor the progress of activities required under this Consent Decree;

    b.    verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 40 -

Case 2:26-cv-05242-SVW-SSC Document 25 Filed 05/14/26 Page 362 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 45 of 102 Page ID #:138
ID #:12210

    c.     obtain documentary evidence, including photographs and similar data; and

    d.     assess Defendants' compliance with this Consent Decree.

60.    Until one (1) year after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve or deliver to Plains, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree. At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

61.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Agencies pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

62.    For any documents, records, or other information required to be submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim of business confidentiality or other protections applicable to the release of information by Plaintiffs, covering part or all of the information required to be submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2. Plains must mark the claim of confidentiality in writing on each page, and include a statement specifying the grounds for each claim of confidentiality.

63.    The federal agency Plaintiffs are subject to applicable laws

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq*.). If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality. In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64. For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65. State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq*.). If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records. If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66. The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only. Defendants shall produce all documents required

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 42 -

to be produced in connection with this Consent Decree in, at Defendants' option, either native format via electronic media or secure file transfer protocol ("FTP"). Any encryption or access restriction shall be on a container level only, *i.e.*, only the electronic media or the top-level folder containing the documents shall be encrypted and Plaintiffs shall have unrestricted access to the files/folders within the electronic media or the top-level folder without need for additional decryption or access codes. Regardless of production method or encryption, individual documents shall be produced in a manner that allows the Plaintiffs to view, print, copy, save, download, and share each document within Plaintiffs' own environment without restriction, tracking or monitoring by Defendants, or automatically generated changes to the document (*e.g.*, without entering access codes prior to each download, and without automatically generated watermarks stating the download date and time).

67. At the conclusion of the information-retention period, Defendants shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of internal document destruction policies for documents, records, or other information subject to the requirements of Paragraph 60.

68. [*Intentionally left blank.*]

## XVII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69. This Consent Decree resolves the civil claims of the United States and the State Agencies for the matters alleged in the Complaint filed in this action for the Refugio Incident.

70. Subject to the reservations of rights specified in Paragraph 71, this Consent Decree also resolves all civil and administrative penalty claims that could be brought by PHMSA, for violations of the Pipeline Safety Laws specified below that occurred on any of Defendants' Regulated Pipelines prior to January 28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of Defendants' Regulated Pipelines and other pipeline facilities began. The specific

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:20-cv-02425 Document 0-1 Filed 03/15/20 Page 48 of 102 Page ID #:141

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

      a.     49 C.F.R. Part 194 Subpart B – Response Plans;

      b.     49 C.F.R. Part 195 Subpart B – Reporting;

      c.     49 C.F.R. Part 195 Subpart E – Pressure Testing;

      d.     49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

      e.     49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

      f.     49 C.F.R. Part 195 Subpart H – Corrosion Control;

      g.     49 C.F.R. Part 199 – Drug and Alcohol Testing; and

      h.     All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71.    The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72.    This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 49 of 102   Page ID #:12214

January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019.  The specific Pipeline Safety Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

    a.    The Pipeline Safety Laws specified in Paragraph 70; and

    b.    California Government Code §§ 51012.3, 51013, 51013.5, 51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only), and 51018.

73.    For any reportable pipeline accident, as defined in 49 C.F.R. § 195.50, occurring on or after January 28, 2019, on any of Defendants' Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA and OSFM to sue or pursue administrative or other remedies for violations (including penalties) under the Pipeline Safety Laws and the Elder California Pipeline Safety Act for such accident.  Nothing in Paragraphs 70 through 72 shall be construed to limit the legal and equitable remedies of the United States or State Agencies, other than PHMSA and OSFM.

74.    The United States and the State Agencies reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State Agencies to obtain penalties, injunctive relief, or other administrative or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other federal or state laws, regulations, or permit conditions, except as specified in Paragraphs 69, 70, and 72.

75.    The United States reserves all legal and equitable remedies to address any imminent and substantial endangerment or threat to the public health or welfare or the environment arising at, or posed by, Defendants' operations, whether related to the violations addressed in this Consent Decree or otherwise. PHMSA further reserves the right to issue to Defendants corrective action orders pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 45 -

§ 190.236; and safety orders pursuant to 49 C.F.R. § 190.239.  The State Agencies reserve all legal and equitable remedies under California Government Code §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8, California Water Code §§ 13301, 13304, 13340, and 13386, and California Health & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating a substantial risk of an unauthorized discharge of oil into waters of the State of California, (2) a discharge of waste threatening to cause a condition of pollution or nuisance, or (3) a discharge which poses a substantial probability of harm to persons, property or natural resources.

76.    This Consent Decree also shall not be construed to in any way limit or waive the claims set forth in the case entitled *California State Lands Commission, et al. v. Plains Pipeline, L.P., et al.*, Case No. 18CV02504 (Cal. Sup. Court) and Case No. B295632 (Cal. Ct. App.).

77.    In any subsequent administrative or judicial proceeding initiated by the United States or the State Agencies for injunctive relief, civil penalties, other appropriate relief relating to Defendants' violations alleged in Plaintiffs' Complaint, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State Agencies in the subsequent proceeding should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 69, 70, and 72.

78.    This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations.  Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 46 -

commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

79.     This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State Agencies against any third-parties, not party to this Consent Decree, nor does it limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

80.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

81.     Plaintiffs will not submit any claim for restitution for Natural Resource Damages in *The People of the State of California v. Plains All American Pipeline, L.P.,* Case No. 1495091 (Cal. Sup. Court).

82.     By entering into this settlement, Defendants do not admit the Pipeline Safety Laws violations alleged in the Complaint or described in this Consent Decree by the United States on behalf of PHMSA; therefore, any allegations of violations of these Pipeline Safety Laws do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of violations set forth in the Complaint may be:  (1) considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains, and (2) used for statistical purposes to identify violations that PHMSA deems as causal to an incident or to increase the consequences of an incident. Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 47 -

Case 2:26-cv-05242-SVW-SSC Document 25 Filed 05/14/26 Page 369 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 52 of 102 Page ID #:145
ID #:12217

be considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains.

83. By entering into this settlement, Defendants do not admit the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint; therefore, any allegations of violations of these statutes do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint may be considered by the State Water Resources Control Board or Regional Water Quality Control Boards to constitute prior offenses in any future enforcement action brought by any of these agencies against Plains.

84. Subject to the terms of this Consent Decree, no provision contained herein affects or relieves Plains of their responsibilities to comply with all applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or state laws, and the regulations and orders issued thereunder. Subject to the terms of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of access, entry, inspection, and information-gathering or their authority to bring enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, the regulations and orders issued thereunder, or any other applicable provision of federal or state law.

85. Defendants hereby covenant not to sue Plaintiffs for any claims related to the Refugio Incident, or response activities in connection with the Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, or any other law or regulation for acts or omissions through the date on which this Consent Decree is lodged with the Court.

86. Defendants covenant not to sue and agree not to assert any direct or

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC  Document 25  Filed 05/14/26  Page 370 of 703  Page
Case 2:20-cv-02425  Document 6-1  Filed 03/15/20  Page 53 of 102  Page ID #:146
ID #:12218

indirect claim for reimbursement related to the Refugio Incident from the OSLTF
or pursuant to any other provision of law.

87.     The United States reserves the right to seek reimbursement from
Defendants for claims relating to the Refugio Incident paid after the date on
which the Consent Decree is lodged with the Court from the OSLTF pursuant to
33 U.S.C. § 2712.

**XVIII.   TRANSFER AND ACQUISITION OF ASSETS**

88.     In the event Defendants sell or transfer ownership of or operating
responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901
or 903, Defendants will obtain from the transferee an agreement to be bound by
those provisions of this Consent Decree and Appendices B and D that are
specifically applicable to the asset(s) acquired, unless Defendants have already
completed the required action or unless OSFM agrees to relieve the transferee of
the obligations of any otherwise applicable provision.  Those provisions of
Appendix B are:

> a.      For existing but non-operational segments of Lines 901 and
> 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of
> Appendix B;
> b.      For the operational segment of Line 903 from Pentland to
> Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;
> c.      For any lines built to replace Lines 901 or 903, paragraphs
> 2.A.1, 5, 7.B, 12.A of Appendix B; and
> d.      For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of
> Appendix B.

89.     In the event Defendants sell or transfer ownership of or operating
responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901
or 903, Defendants shall provide a copy of this Consent Decree to the prospective
transferee at least fourteen (14) Days prior to such transfer.  Defendants shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 49 -

Case 2:26-cv-05242-SVW-SSC Document 253/15/ Filed 05/14/26 Page 371 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 54 of 102 Page ID #:147
ID #:12219

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier. Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements. Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree. Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90.     In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree. Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer. Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier. Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91.     For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX.  COSTS

92.     Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 50 -

attorneys' fees; provided, however, the United States and the State Agencies shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

## XX. NOTICES

93.     Unless otherwise specified in this Consent Decree, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent electronically by email provided by the Parties, and addressed to all Parties as follows:

As to the United States by email:    eescdcopy.enrd@usdoj.gov
                                     Re: DJ # 90-5-1-1-11340

As to the United States by mail:     EES Case Management Unit
                                     Environment and Natural Resources
                                        Division
                                     U.S. Department of Justice
                                     P.O. Box 7611
                                     Washington, D.C.  20044-7611
                                     Re: DJ # 90-5-1-1-1130

As to PHMSA:                         James M. Pates
                                     Assistant Chief Counsel
                                        for Pipeline Safety
                                     U.S. Department of Transportation
                                     Pipeline and Hazardous Materials
                                        Safety Administration
                                     1200 New Jersey Ave. SE. E-26
                                     Washington, DC. 20590

As to EPA:                           Andrew Helmlinger
                                     Attorney Advisor
                                     U.S. EPA Region IX
                                     75 Hawthorne Street (ORC-3)
                                     San Francisco, California 94104

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

As to DOI:                          Clare Cragan
                                    U.S. Department of the Interior
                                    Office of the Solicitor
                                    755 Parfet St., Suite 151
                                    Lakewood, Colorado 80215

As to NOAA:                         National Oceanic and Atmospheric
                                        Administration
                                    Office of General Counsel
                                    Natural Resources Section
                                    ATTN:  Christopher J. Plaisted
                                    501 W. Ocean Blvd, Suite 4470
                                    Long Beach, California  90802

As to USCG:                         Patricia V. Kingcade
                                    Attorney Advisor
                                    National Pollution Funds Center,
                                        US Coast Guard
                                    2703 Martin Luther King Jr. Ave SE
                                    Washington, DC 20593-7605

As to the State Agencies:           Michael Zarro
                                    Deputy Attorney General
                                    Office of the Attorney General
                                    Natural Resources Law Section
                                    300 S. Spring St., Suite 11220
                                    Los Angeles, California 90013

As to CDFW:                         California Department of Fish
                                        and Wildlife
                                    Office of Spill Prevention and Response
                                    Attn: Katherine Verrue-Slater
                                    Senior Counsel
                                    P.O. Box 160362
                                    Sacramento, California  95816-0362

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 52 -

Case 2:26-cv-05242-SVW-SSC    Document 25-1    Filed 05/14/26    Page 374 of 703   Page
ID #:12222
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 57 of 102   Page ID #:1509

As to CDPR:                    California Department of Parks and
                                    Recreation
                               Attn: Laura A. Reimche, Senior Counsel
                               1416 Ninth Street, Room 1404-6
                               Sacramento, California 95814


As to CSLC:                    California State Lands Commission
                               Attn: Patrick Huber, Legal Division
                               100 Howe Avenue, Suite 100-South
                               Sacramento, California 95825


As to OSFM:                    California Department of Forestry and
                                    Fire Protection
                               Legal Services Office
                               Attn: Joshua Cleaver, Staff Counsel
                               P.O. Box 944246
                               Sacramento, California 94244-2460


As to RWQCB:                   California Central Coast Regional Water
                               Quality Control Board
                               Attn: Naomi Rubin, Attorney III
                               801 K Street
                               Sacramento, California 95814


As to UC:                      Barton Lounsbury, Senior Counsel
                               University of California
                               Office of the General Counsel
                               1111 Franklin Street, 8th Floor
                               Oakland, California  94607


As to Defendants:              Megan Prout
                               Senior Vice President
                               Commercial Law and Litigation
                               333 Clay Street, Suite 1600
                               Houston, Texas  77002


*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 53 -

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California  95814

94.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI.    EFFECTIVE DATE

96.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXII.    RETENTION OF JURISDICTION

97.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

## XXIII.    MODIFICATION

98.    The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 54 -

Case 2:26-cv-05242-SVW-SSC Document 253/15/20 Filed 05/14/26 Page 376 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 59 of 102 Page ID #:152
ID #:12224

99.    Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV.   TERMINATION

100.   After Defendants have:  (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation.  Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101.   Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement.  The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102.   If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution).  However, Defendants shall not seek Dispute Resolution of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 55 -

any dispute regarding termination until sixty (60) Days after receipt of the Plaintiffs' response to Defendants' Request for Termination.

## XXV.    PUBLIC PARTICIPATION

103.    This Consent Decree shall be lodged with the Court for a period of not fewer than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The Parties agree and acknowledge that the final approval by Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the Consent Decree and a public comment period.  Plaintiffs reserve the right to withdraw or withhold consent if the comments disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

104.    Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless Plaintiffs have notified Defendants in writing that Plaintiffs no longer support entry of the Consent Decree.

## XXVI.    SIGNATORIES/SERVICE

105.    Each undersigned representative of Defendants, the State of California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB, UC, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, PHMSA, and EPA certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

106.    This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.  For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by emailed PDF) shall have the same effect as an original.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

## XXVII.  INTEGRATION

107.   This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII.    FINAL JUDGMENT

108.   Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109.   For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of _____, 20__.

_____
UNITED STATES DISTRICT JUDGE

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 57 -

Case 2:26-cv-05242-SVW-SSC    Document 253    Filed 05/14/26    Page 379 of 703    Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 62 of 102   Page ID #:155
ID #:12227

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES OF AMERICA:

3/12/2020

Date

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
   Division U.S. Department of Justice

3/13/2020

Date

BRADLEY R. O'BRIEN
ANGELA MO
Environmental Enforcement Section
Environment and Natural Resources

Division

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 58 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

31 March 2020

Date

PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety
    Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 59 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20

Date

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance
Assurance

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 60 -

Case 2:26-cv-05242-SVW-SSC    Document 253    Filed 05/14/26    Page 382 of 703    Page
Case 2:20-cv-02415-VWDocument 6-1   Filed 03/16/20   Page 65 of 102   Page ID #:158
ID #:12230

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2/26/2020
_____
Date

_____
AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance
    Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 61 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

3/4/2020
Date

THOMAS M. CULLEN, JR.
Administrator
Office of Spill Prevention and Response

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

_____3/2/20_____
Date

_____Lisa Ann L. Mangat_____
LISA ANN L. MANGAT
Director
California Department of Parks
and Recreation

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 63 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

_2/28/2020_
Date

_____
JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 64 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020
_____
Date

_____
THOMAS W. PORTER
Director
California Department of Forestry and
Fire Protection

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 65 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION:

March 2, 2020
_____
Date

_____
JOHN ROBERTSON
Executive Officer
Central Coast Regional Water
        Quality Control Board

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 66 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

3/3/20
_____
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel


_____
Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

_____
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

3 March 2020
Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67A -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS ALL AMERICAN PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 68 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 69 -

Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 75 of 102   Page ID #:168

# APPENDIX A

## *(Set of maps that generally depict Lines 901, 903, and 2000)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*



*Appendix A – Line 901*

Scale: 1:100,000

Sheet No: 1/1

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.



*Appendix A – Line 903*



*Appendix A – Line 2000*

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.

Scale:  1:966,574

Sheet No:    1/1

Case 2:26-cv-05242-SVW-SSC    Document 25    Filed 05/14/26    Page 396 of 703    Page
Case 2:20-cv-02415    Document 6-1    Filed 03/15/20    Page 79 of 102    Page ID #:1729
ID #:12244

# APPENDIX B

## *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-74-

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1.    **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

    A.    Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901.  Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

    B.    Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

    C.    Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

    D.    Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

    E.    To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received.  Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver.  Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2.    **Replacement, Restart, or Abandonment of Lines 901 and 903:**

    A.    Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners.  Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

-75-

Case 2:20-cv-02415-SVW-SSC   Document 6-1   Filed 03/15/20   Page 81 of 102   Page ID #:174

1.    On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

    a.    Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

    b.    Conduct a close interval survey (CIS) and AC/DC interference survey.

    c.    Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B.    As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C.    As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3.    **Third-Party Analysis of Line 2000 ILI Data**

A.    Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B.    The consultant shall:

    1.    Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

    2.    Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

    3.    Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

    4.    Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

Case 2:26-cv-05242-SVW-SSC    Document 253/15    Filed 05/14/26    Page 399 of 703   Page
Case 2:20-cv-02415-W    Document 6-1    Filed 03/15/20    Page 82 of 102    Page ID #:175
ID #:12247

5. Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6. Comply with additional requirements specified in the scope of work.

C. The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1. The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2. The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3. Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4. Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4. **Integrity Management**

A. For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1. Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a. In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

-77-

loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b. Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c. When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d. Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e. Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f. Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g. For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i. Integrate and analyze available data in its P&M process, including:

    i. Assessment data from ILI tool runs;

    ii. Dig and repair data;

4

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 401 of 703   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 34 of 102   Page ID #:17
ID #:12249

iii.    Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv.    Operational data, such as pressure and flow data;

v.    Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi.    Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii.    Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2.    ILI Measures

a.    <u>Initial ILI Runs</u>.  Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU).  Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data.  If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i.    All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

5

ii.  In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run.  If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

b.  <u>Subsequent ILI Runs</u>.  After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year.  Alternatively, Plains may run a UT tool each year.  If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

c.  <u>All ILI Runs</u>.  Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5.  **<u>Valves</u>**

A.  Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

1.  Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

2.  Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B.  Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C.  Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

Case 2:26-cv-05242-SVW-SSC   Document 253/15/20   Filed 05/14/26   Page 403 of 703   Page
Case 2:20-cv-02415 Document 6-1   Filed 03/15/20   Page 96 of 102   Page ID #:179
ID #:12251

6. **Risk Analysis**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

        1.    Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

            a.    The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

            b.    Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis.  The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

            c.    The risk analysis shall be due within one year from entry of the CD.

7. **Leak Detection**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

    B.    Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8. **Non-waiver**

    A.    Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

## ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES

9. **Integrity Management**

    A.    New Procedures for Interim Reviews and Assessments

7

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 404 of 703   Page
Case 2:20-cv-02425-VW-SSC   Document 6-1   Filed 03/15/20   Page 87 of 102   Page ID #:180
ID #:12252

1.   Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment.  If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment.  Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2.   Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review.  Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3.   Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD.  If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B.   Documentation for P&M Recommendations

1.   Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

a.   What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

b.   The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

8

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 405 of 703   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 38 of 102   Page ID #:181
ID #:12253

    c.    The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

    2.    In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

    3.    In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C.    Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented. Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

10.   **Valves and O&M**

A.    Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B.    Within two years of entry of the CD, Plains shall develop and implement procedures to:

    1.    If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

    2.    Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

    3.    Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

    4.    Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C.    Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

Case 2:26-cv-05242-SVW-SSC    Document 25    Filed 05/14/26    Page 406 of 703   Page
ID #:12254
Case 2:20-cv-02425-WDK-SSC    Document 6-1    Filed 03/15/20    Page 89 of 102    Page ID #:182

D.      For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

            1.      Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room.  Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E.      Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11.    **Leak Detection**

A.      Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

            1.      Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B.      For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C.      Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

            1.      Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D.      Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

            1.      Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

10

Case 2:26-cv-05242-SVW-SSC   Document 253/15/20   Filed 05/14/26   Page 407 of 703   Page
ID #:12255
Case 2:20-cv-02425-VW-SSC   Document 6-1   Filed 03/15/20   Page 90 of 102   Page ID #:183

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E.   Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection.  The results of the meetings will be documented and shared with appropriate personnel.  The recommendations will be evaluated and documented.

F.   Instrumentation and Display

1.   To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

a.   Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

b.   Track these conditions through to resolution, including instrumentation relocation when necessary.

12.   **Control Room Management**

A.   For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

1.   Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

2.   Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

3.   Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

4.   Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

11

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 408 of 703   Page
ID #:12256
Case 2:20-cv-02415-WSSC   Document 6-1   Filed 03/15/20   Page 91 of 102   Page ID #:184

B.      For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C.      Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13.     **Emergency Response and Oil Spill Response Plans**

A.      California-Specific Provisions:

1.     Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05.  Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B.      Company-Wide Provisions

1.     Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

2.     Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response.  Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

3.     Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

12

Plains. Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills. Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4. Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter. Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5. Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment). Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill. Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6. For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14. **Safety Management System (SMS)**

A. Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1. Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173. Plains shall direct the third party to transmit a copy of the final report to PHMSA. Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

B.      Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15.    **Drug and Alcohol Program**

A.      Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors.  Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures.  Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 411 of 703   Page
Case 2:20-cv-02425   Document 6-1   Filed 03/15/20   Page 94 of 102   Page ID #:187
ID #:12259

# APPENDIX C

## (*Intentionally left blank*)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 412 of 703   Page
Case 2:20-cv-02413   Document 6-1   Filed 03/15/20   Page 95 of 102   Page ID #:188
ID #:12260

# APPENDIX D

*(Remaining Corrective Actions from the PHMSA CAO)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-90-

Case 2:26-cv-05242-SVW-SSC   Document 253/15/20   Filed 05/14/26   Page 413 of 703   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 96 of 102   Page ID #:189
ID #:12261

# APPENDIX D

1.      All outstanding corrective actions in PHMSA's closed Corrective
Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into
this Consent Decree, as outlined below, and subject to the sole regulatory oversight
of the OSFM.

   a. **Line 901 Shutdown.** Plains shall not operate Line 901 until
      authorized to do so by the OSFM.

   b. **Restart Plan for Line 901.**  If Plains seeks to restart Line 901,
      Plains shall develop and submit, at least 60 days in advance of a
      scheduled restart, a written Restart Plan for Line 901 to the
      OSFM for review and approval.  Once approved by the OSFM,
      the Restart Plan shall be incorporated by reference into this
      Consent Decree.  The Restart Plan shall include:

      1)    Documentation of the completion of all mandated
      actions, and a management of change plan to ensure that all
      procedural modifications are incorporated into Plains'
      operations and maintenance procedures manual;

      2)    Provisions for adequate patrolling of Line 901 during the
      restart process and shall include incremental pressure increases
      during start-up, with each increment to be held for at least two
      hours;

      3)    Sufficient surveillance of the pipeline during each
      pressure increment to ensure that no leaks are present when
      operation of the line resumes;

      4)    A specific day-light restart that includes advance
      communications with local emergency response officials;

      5)    Master Control Room enhancements, including:

         a) Implementation of advanced leak-detection

- 1 -
-91-

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1. Revised alarm threshold adjustments;

2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

Case 2:26-cv-05242-SVW-SSC Document 253/15/20 Filed 05/14/26 Page 415 of 703 Page
Case 2:20-cv-02415 Document 1 Filed 03/15/20 Page 98 of 102 Page ID #:191
ID #:12263

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6)      Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7)      Installation of additional safety valves as a result of Plains' EFRD evaluation;

8)      Installation of additional pressure sensors as a result of Plains' surge study;

9)      Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM.  The tool run shall be initiated during daylight hours.  If the tool run does not collect a complete data set, the UT tool shall be promptly re-run.  A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report.  Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10)    **Corrosion Prevention.**  Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan.  Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 416 of 703   Page
ID #:12264
Case 2:20-cv-02425-VW-SSC   Document 6-1   Filed 03/15/20   Page 99 of 102   Page ID #:192

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

903 to the OSFM for review and approval.  Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree.  In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1)      Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2)      Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3)      Provisions for a daylight restart and advance communications with local emergency response officials.

g. **Line 903 Return to Service.**  After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h. **Removal of Pressure Restriction for Line 903.**  After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1)      The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2) The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction. Requests for removal of the pressure restriction may be submitted by pipeline segment.

i. **Notifications.** Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j. **Reporting Requirements for Lines 901 and 903.** If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1) The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2) Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

3)     The Appendix D Documentation Report shall include but not be limited to:

    A.   Table of Contents;

    B.   [*intentionally left blank.*]

    C.   [*intentionally left blank.*]

    D.   Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

    E.   [*intentionally left blank.*]

    F.   [*intentionally left blank.*]

    G.   Lessons learned while fulfilling the requirements of this Appendix D.

**Exhibit C – CA-324 State Waiver**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                                        Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



<u>**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08**</u>

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:   LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR
LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON
THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG
A LONGITUDINAL SEAM WELD (CA-324)**

Operator:   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

Pipeline:   OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable
Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara
County, California as described in the request of state waiver dated April 24,
2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Lance Yearwood
December 17, 2024
Page 2


Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

## General Conditions

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s.  At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

b.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

**In-Line Inspection (ILI) Assessment and Frequency**

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

a)  Dates for integrity assessment

b)  In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 6

       segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

   c) In-line inspection tool vendor(s)

   d) Required tool specifications including operational specifications and anomaly sizing tolerances

   e) Tool validation methodology

   f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

   g) Criteria used to identify locations for excavation and field verification

   h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

   a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

   b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful.  All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

       i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

       ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

       iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

       iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different.  If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   a.  Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Lance Yearwood
December 17, 2024
Page 11

    b.  Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c.  After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    a.  Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

    b.  Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
   a. Technical approach used for the analysis
   b. All data used and analyzed
   c. Pipe and longitudinal weld seam properties
   d. Procedures used to implement state waiver conditions

Lance Yearwood
December 17, 2024
Page 13

> e. Evaluation methodology used
> f. Models used
> g. Direct in situ examination data
> h. All in-line inspection tool assessments information evaluated
> i. Pressure test data and results
> j. All in-the-ditch assessments performed on the pipeline segments
> k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
> l. All finite element analysis results
> m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
> n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
> o. Safety factors used for fatigue life and/or predicted failure pressure calculations
> p. Reassessment time interval and safety factors
> q. The date of the review
> r. Confirmation of the results by qualified technical subject matter expert(s)
> s. Approval by responsible Sable management personnel
> t. Records of additional preventive and mitigative (P&M) measures performed
> u. Reports required by this State Waiver.

## **Reporting**

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324*. The email notification shall include, if applicable:
    a. Tool type and run date
    b. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    c. Dig sheets
    d. Field contact information for Sable
    e. Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Lance Yearwood
December 17, 2024
Page 14

       a. Tool type
       b. Run date
       c. Summary of Conditions Report[18]
       d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324.* At a minimum, the annual report shall contain the following, if applicable:

    a. A Closure Report for the previous calendar (CY) which contains:
       i. Features that were remediated in previous CY
         1. Provide documentation for the in-the-ditch assessments and repairs
       ii. Identify features that remain to be assessed
       iii. Unity Plots for previous ILI runs
    b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
    c. The third-party ILI expert reviews in accordance with Condition 52
    d. AC and DC Interference surveys that are due in accordance with Condition 53
    e. A copy of the CGRA for prior year including:
       i. Mean corrosion growth rate for the pipeline
       ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.

63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.

64. The OSFM may order the pipeline shutdown at any time.

65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Lance Yearwood
December 17, 2024
Page 15

failure to comply with this state waiver. The terms and conditions of any
compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry
standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets
covered by the state waiver, Sable must provide the OSFM written notice of the
change within 30 days of the consummation date. In the event of such transfer,
the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline
Safety Engineer at (916) 212-8891.


Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs


Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Tuan Tran, Pipeline Safety Engineer, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Max Kieba, Engineering and Research Division, PHMSA
        Joshua Johnson, Engineering and Research Division, PHMSA

**Exhibit D – CA-325A and CA-325B State Waiver**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                          Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



## CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**  **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A/B)**

Operator:    Sable Offshore Corp
             OPID# 40851
             845 Texas Avenue, Suite 2920
             Houston, Texas 77002

Pipeline:    OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

## General Conditions

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Lance Yearwood
December 17, 2024
Page 4

8.  Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
    a.  API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
    b.  API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.
    At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5


## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.
13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.
14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours.  Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.
15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.
16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.
17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.
18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Lance Yearwood
December 17, 2024
Page 6

### In-Line Inspection (ILI) Assessment and Frequency

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination
20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 7

any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to  meet  the  tool  accuracy specification  provided  by  the  vendor  (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different.  If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.  Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

## Integrity Management

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
   a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
   b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.
56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.
58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 13

    n.  The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

    o.  Safety factors used for fatigue life and/or predicted failure pressure calculations

    p.  Reassessment time interval and safety factors

    q.  The date of the review

    r.  Confirmation of the results by qualified technical subject matter expert(s)

    s.  Approval by responsible Sable management personnel

    t.  Records of additional preventive and mitigative (P&M) measures performed

    u.  Reports required by this State Waiver.

## Reporting

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B.* The email notification shall include, if applicable:
    d.  Tool type and run date
    e.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    f.  Dig sheets
    g.  Field contact information for Sable
    h.  Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:
    i.  Tool type
    j.  Run date
    k.  Summary of Conditions Report[18]
    l.  Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B.* At a minimum, the annual report shall contain the following, if applicable:

a. A Closure Report for the previous calendar (CY) which contains:
   i. Features that were remediated in previous CY
      1. Provide documentation for the in-the-ditch assessments and repairs
   ii. Identify features that remain to be assessed
   iii. Unity Plots for previous ILI runs
b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
c. The third-party ILI expert reviews in accordance with Condition 53
d. AC and DC Interference surveys that are due in accordance with Condition 54
e. A copy of the CGRA for prior year including:
   i. Mean corrosion growth rate for the pipeline
   ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 15


Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Tuan Tran, Pipeline Safety Engineer, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Max Kieba, Engineering and Research Division, PHMSA
       Joshua Johnson, Engineering and Research Division, PHMSA

**Exhibit E - Docket No. PHMSA-2025-0002 letter responding to Office of the State Fire Marshal granting a waiver to Sable for CA-324 Pipeline**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



**U.S. Department
of Transportation
Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0002**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 10.86 miles of 24-inch diameter pipeline (Sable CA-324) between Las Flores Canyon and Gaviota, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-324 pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

Alan K. Mayberry,
Associate Administrator for Pipeline
Safety

**PHMSA-2025-0002 – California Office of the State Fire Marshall**          **Page 2 of 2**

**Exhibit F - Docket No. PHMSA-2025-0002 letter responding to Office of the State Fire Marshal granting a waiver to Sable for CA-325A/B Pipeline**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0003**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and
Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL
FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal
Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will
allow Sable to manage the risk of corrosion under insulation that may occur as a result of
inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation
and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree
between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State
of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and
remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 113.56 miles of 30-inch diameter
pipeline (Sable CA-325A/B) between Gaviota, Sisquoc, and Pentland, California. The state
waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically
tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline
be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack
detection in-line inspection tools capable of assessing seam integrity and detecting corrosion,
deformation, and cracking-type anomalies within seven days of achieving initial steady state
operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-325A&B pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

Alan K. Mayberry,
Associate Administrator for Pipeline
Safety

**Exhibit G – AVEVA Product Datasheet – Pipeline Operations for Liquids**

AVEVA is part of the new control system and is providing the tools/software for the RTTM LDS system. The below brochures provide a glimpse of what the software/system will provide.

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



PRODUCT DATASHEET

# AVEVA™ Pipeline Operations for Liquids

### Powerful tools for real-time operations of any pipeline

AVEVA Pipeline Operations for Liquids provides everything needed to efficiently manage real-time pipeline operations using both non-simulation and simulation-based applications.

To say the least, it's a challenge to move petroleum liquids through miles of pipeline; you need to optimize schedules, power usage, staffing, and other critical factors. Even the most skilled personnel require sophisticated tools to front-end their efforts. Where can you find the robust, flexible solutions you need to do the job?

AVEVA offers a broad range of software available for crude oil, refined products, and natural gas pipeline engineering, as well as operational, measurement, and business processes. AVEVA suite of pipeline applications is used by many of the largest operators in the industry in North, Latin, and South America; Western and Eastern Europe; Asia; the Middle East; North Africa; and Australia. All applications are rich, robust, and flexible – and can be cost-effectively integrated into existing corporate IT infrastructures to provide highly accessible information.

### Focus on your business

AVEVA Pipeline Operations for Liquids provides comprehensive tools to maximize operational efficiency and the bottom line. We enable you to make decisions in real time for a competitive advantage that can improve every aspect of your business. To meet your unique needs, the applications are available à la carte or are easily combined to provide a robust, integrated system.

AVEVA Pipeline Operations for Liquids neatly organizes major portions of your business into functional areas that are drawn into a powerful, centralized platform. Each application runs on well-known operating systems and provides an industry-leading combination of proven functionality, flexibility, redundancy, historical record keeping, enterprise integration, and assured security to ensure consistent performance.

### Non-simulation-based applications

AVEVA Pipeline Operations for Liquids is a comprehensive set of tools for real-time management of scheduling and measurement. Using a standards-based open architecture, it is easily adopted to meet your unique needs.

- Pipeline Operations determines net metered volumes and flow rates for each point of measurement in the pipeline system using API calculations as part of its Virtual Flow Computer functionality.

- Pipeline Operations provides the ability to store, view, and edit pending, active, and completed tickets as part of its Batch Transfer Management functionality.

- Pipeline Operations calculates net and gross volumes of fluid within tanks based on telemetered tank levels as part of its tank management functionality.

- Other functionalities for pump management, product transfer, line blockage and action sequence are also available as part of Pipeline Operations.

### Simulation-based applications

AVEVA Pipeline Operations for Liquids is a transient pipeline modeling and simulation system for gas and liquids pipelines. It is the most technologically advanced and dependable pipeline simulation system in the industry. AVEVA Pipeline Operations for Liquids optimizes management of your pipeline operations for greater efficiency, effectiveness, and an improved bottom line.

Use Pipeline Operations simulation-based capabilities to create simple or advanced pipeline environment simulations to aid a plethora of functionality.

- Pipeline Operations calculates and displays a number of hydraulic profiles in real time, e.g. pressure, head, flow, density, viscosity, diameter, etc. along the pipeline.

- Pipeline Operations tracks the movement and predicts the estimated time of arrival for products, batches, scrapers (pigs), transmix, quality, and anomalies through a pipeline system.

- Pipeline Operations calculates the inventory either very accurately using the advanced real-time transient model or using API 2005 standards for changes in volume due to temperature and pressure.

### An integrated approach

AVEVA Pipeline Operations for Liquids is one of the offerings based upon a common advanced application development environment for building advanced software applications for the pipeline industry. This allows Pipeline Operations to have common configuration tools, common database, common pipeline model connectivity, and common runtime environment with other offerings from AVEVA creating a unique integrated solution.

### An easy choice to make

Leading energy companies worldwide can attest to the power and proven performance of AVEVA systems. In North America alone, AVEVA systems manage over 60 percent of all hydrocarbon movements. Choose the industry leader – AVEVA's AVEVA Pipeline Operations for Liquids.



© 2020 AVEVA Group plc and its subsidiaries. All rights reserved.
AVEVA and the AVEVA logo are a trademark or registered trademark of AVEVA Group plc in the U.S. and other countries.
All product names mentioned are the trademarks of their respective holders.

aveva.com



PRODUCT DATASHEET

# AVEVA™ Pipeline Integrity Monitor

## Tools to prevent, detect, and mitigate pipeline commodity releases

AVEVA Pipeline Integrity Monitor offers pipeline companies a holistic view toward preventing, detecting, and mitigating the impact of commodity releases.

Oil and gas pipelines are considered critical assets of economic development for any country and the pipeline companies operating the pipelines are generally required to ensure the safety of the population and environment where these pipelines runeither due to regulatory compliance or internal company policies.

Additionally, unauthorized and dangerous extractions (theft) in the middle of the pipeline are not uncommon in some parts of the world. In these cases, leak detection is not strictly about protecting the environment and pipeline property, but includes protection of the safety of the thieves themselves.

### Focus on pipeline integrity

As a result of the above complexities, pipeline companies are putting a greater emphasis on utilizing pipeline integrity management. The purpose of pipeline integrity management is to ensure that pipelines do not cause harm to people or the environment, while at the same time provide reliable and secure service to pipeline operators and customers. Pipeline Integrity can coarsely be divided into preventing the leak from occurring, detecting the leak if it occurs, and mitigating the impact of the leak after it has occurred. AVEVA Pipeline Integrity Monitor is perfectly positioned to assist pipeline operators in this respect.

### Prevent it from occurring

AVEVA Pipeline Integrity Monitor assists the pipeline operator with preventive features like over/ under pressure detection analysis.

### Mitigate the impact

AVEVA Pipeline Integrity Monitor assists the pipeline operator with impact assessment analysis tools like giving an estimate as to the amount of volume lost and performing a location analysis.

### Detect it

AVEVA Pipeline Integrity Monitor offers a number of methodologies for detecting a leak:

- Computational Pipeline Monitoring (CPM) based around Real-Time. Transient Model methodology as outlined in API RP 1130.

- CPM based around Volume Balance methodology as outlined in API RP 1130.

- CPM based around Compensated Volume Balance methodology as outlined in API RP 1130.

- Rate of Change (ROC) and Rate of Change Combination (ROCC) monitoring for rupture detection.

- Pressure loss leak detection for pinhole (theft) or rupture detection dependent on implementation.

- Shut-in detection taking into account pressure and temperature changes in a closed off section.

- Additionally, AVEVA Pipeline Integrity Monitor has the following functionality available:

  - Dynamic thresholds allow thresholds to be automatically raised and lowered due to activities being performed physically on the pipeline.

  - Leak location capability is available either based to nearest milepost or to identified operating section.

  - Intelligent voting mechanism (alarm layer) for analyzing output from various leak detection methodologies to consolidate to one leak/ no leak alarm.



### An integrated approach

AVEVA Pipeline Integrity Monitor is one of the offerings based upon a common advanced application development environment for building advanced simulation software applications for the pipeline industry. This allows AVEVA Pipeline Integrity Monitor to have common configuration tools, common database, common pipeline common pipeline model connectivity, and common runtime environment with other offerings from AVEVA creating a unique integrated solution.

### Trust the experts with the large customer base

AVEVA has been designing leak detection systems for pipelines for 20+ years and is recognized in the industry as experts in their field. During this time it has become apparent that there is no one leak detection methodology that fits every pipeline, there is no one-size-fits-all; each pipeline should be evaluated independently and recommendations made accordingly. AVEVA Pipeline Integrity Monitor continues the trend of providing leak detection fit for purpose while allowing the customer to take a holistic view of the why, where, and when associated with pipeline commodity releases.

To learn more, please contact your AVEVA representative or visit us online at aveva.com



© 2020 AVEVA Group plc and its subsidiaries. All rights reserved.
AVEVA and the AVEVA logo are a trademark or registered trademark of AVEVA Group plc in the U.S. and other countries.
All product names mentioned are the trademarks of their respective holders.

aveva.com

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

July 7, 2025, I served the document(s) described as **DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: *See* Attached Service List.

BY ELECTRONIC MAIL TRANSMISSION WITH ATTACHMENT:  On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

[State]   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/ Josie Cisneros*

Josie Cisneros

## SERVICE LIST

Julie Teel Simmons, Esq.
David Pettit, Esq.
Talia Nimmer, Esq.
Center for Biological Diversity
2011 Franklin Street, Suite 375
Oakland, CA 94612

ATTORNEYS FOR PETITIONERS
CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: jteelsimmonds@biologicaldiversity.org
          dpettit@biologicaldiversity.org
          tnimmer@biologicaldiversity.org

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

ATTORNEYS FOR PETITIONERS
ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
          jfrankel@environmentaldefensecenter.org
          trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

ATTORNEYS FOR RESPONDENTS/ DEFENDANTS
California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

ATTORNEYS FOR REAL PARTIES IN INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
          benjaminhanelin@paulhastings.com
          natalierogers@paulhastings.com

Trevor D. Large, Esq.
FAUVER, LARGE, ARCHBALD & SPRAY LLP
820 State Street, 4th Floor
Santa Barbara, CA 93101

ATTORNEYS FOR REAL PARTIES IN INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (805) 966-7000
Email: TLarge@FLASllp.com

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:  (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Petitioners and Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al., <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., et al., <br><br> Real Parties in Interest. | Case No. 25CV02244 <br> [Coordinated with Case No. 25CV02247] <br><br> Assigned for all purposes to: <br> Hon. Donna D. Geck <br><br> **DECLARATION OF MICHAEL J. ROSENFELD IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTON (VOL. 1 OF 4)** <br><br> [*Filed concurrently with Opposition to Application for Preliminary Injunction; Declarations of Michael A. Mische, Bart Leininger, Brien Vierra, and Steve Rusch*] <br> Date:        July 18, 2025 <br> Time:        10:00 AM <br> Dept.:        4 <br><br> Complaint Filed:        April 15, 2025 <br> Trial Date:        None Set |

1

DECLARATION OF MICHAEL J. ROSENFELD

**Table of Contents**

I.    Introduction ................................................................................................................3

II.   Conclusions ...............................................................................................................4

III.  Review and Interpretation of the Kuprewicz Declaration ...........................................5

   A.    Declaration Review Process   5

   B.    Mr. Kuprewicz's Technical Issues and Opinions       5

      1.    Kuprewicz Technical Issues in Paragraph 8 ............................................. 5
      2.    Kuprewicz Opinions in Paragraph 10 ...................................................... 8

   C.    Positions Stated in Kuprewicz's Declaration Exhibit B       13

      1.    Section V. TIMP Regulations Are Not Working........................................ 14
      2.    Section VI. The Greatest Threat … Is From External Corrosion ............................................. 18
      3.    Section VII. High Pipeline Operating Temperatures Accelerate All Forms of Corrosion ....... 18
      4.    Section VIII. The CD Fails to Required Adequate IM Processes to Prevent Another Rupture 19
      5.    Section IX. The Pipelines Cannot Be Made as Safe as New Pipelines ................................... 19
      6.    Section X. Conclusion ........................................................................... 19

   D.    Positions Stated in Kuprewicz's Declaration Exhibit C       20

IV.  Exhibits................................................................................................................20

DECLARATION OF MICHAEL J. ROSENFELD

## DECLARATION OF MICHAEL J. ROSENFELD

I, Michael J. Rosenfeld, declare as follows:

1.  My name is Michael J. Rosenfeld and I am a mechanical engineer. I have been engaged by Alston & Bird LLP, counsel to Sable Offshore Corp. (Sable) and Pacific Pipeline Company,[1] to provide my expert opinions as to the Declaration of Richard Kuprewicz submitted to the Superior Court of the State of California, County of Santa Barbara, in the matter of Case Nos. 25CV02244 and 25CV02247. Below, I provide my qualifications to provide these expert opinions. I have personal knowledge of the matters set forth in this Declaration, and if called as a witness, I could and would testify competently thereto.

### I.    Introduction

2.  The purpose of this report is to critically review and interpret the Declaration of Richard Kuprewicz submitted to the Superior Court of the State of California, County of Santa Barbara, in the matter of Case Nos. 25CV02244 and 25CV02247. These cases concern the return to service of Lines 324 and 325A/B of the Las Flores Pipeline System, operated by Sable Offshore (Sable) and Pacific Pipeline Company (PPC). I was asked to perform this review and prepare this report by Alston & Bird, LLP on behalf of Sable and PPC.

3.  I am qualified to give my professional opinion in this matter by education and experience. My current position is Chief Engineer at RSI Pipeline Solutions, LLC, a pipeline engineering consulting firm. I am a mechanical engineer by training receiving a Bachelor of Science in Engineering from the University of Michigan in 1979, and Master of Science in Engineering from Carnegie-Mellon University in 1981. I have been involved with petroleum and natural gas pipelines since the late 1980s. My experience includes performing numerous metallurgical failure analyses having direct causes including but not limited to pipe seam defects, girth weld defects, corrosion of various types, stress-corrosion cracking, hydrogen assisted cracking, fatigue cracking due to the effects of cyclic pressure or vibration, and excessive loading due to geohazards. I have also performed numerous root cause failure investigations

---

[1] Pacific Pipeline Company (PPC) is a wholly owned subsidiary of Sable Offshore Corp. For the purpose of this declaration, references to Sable or PPC as owner/operator of the pipeline system have the same meaning and may be used interchangeably.

DECLARATION OF MICHAEL J. ROSENFELD

in which various management gaps such as inadequate specifications or procedural errors were causal. My experience also includes analysis of pipeline stresses, evaluation of pipeline fitness for service, analysis of in-line inspection (ILI) data, development of technical procedures and integrity management plans, regulatory compliance, and training in codes and standards. I have also been principal investigator in several research projects funded by pipeline interest groups including PHMSA, ASME, API, and GRI. I also have held executive positions in pipeline safety standards development committees. A true and correct copy of my curriculum vitae is attached hereto as **Exhibit A**.

## II.  <u>Conclusions</u>

4.    As will be demonstrated in the sections that follow, Mr. Kuprewicz fails to take into account:

a)    Known facts about the 2015 Line 901 incident;

b)    Known contributing factors and deficiencies related to the operation and integrity management of the former Line 901 under the previous owner and operator of the facility;

c)    Requirements of the Corrective Action Order (CAO) and Consent Decree (CD) issued by the Pipeline and Hazardous Materials Safety Administration and additional requirements imposed by the Office of the State Fire Marshall (OSFM) that correct the operational and integrity management deficiencies that were causal or contributed to the 2015 incident; and

d)    Other known facts that are contrary to the positions stated in Mr. Kuprewicz's opinions.

5.    By not accounting for these important facts Mr. Kuprewicz has set forth positions that are unfounded. To the extent that opinions were made without relevant information, they are uninformed and speculative. To the extent that relevant facts were knowable from information available to anyone in the public domain but were not considered or accounted for, his opinions were not based on evaluation performed to a reasonable standard of engineering practice. To the extent that such facts were known by him and deliberately omitted, or positions were stated to the contrary, Mr. Kuprewicz's opinions are biased or deceptive.

DECLARATION OF MICHAEL J. ROSENFELD

6.      Mr. Kuprewicz concludes in Paragraph 11 of his Declaration that the Las Flores Pipeline System is not safe to operate even if it meets the OSFM state waivers.  He also states in Section X of his Exhibit B that the Las Flores Pipeline System is unusually dangerous due to its age and design flaws. These are pejorative statements built on an aggregation of claims made without supporting data, and which should be disregarded as nonfactual and noncredible.  He has provided no data, scientific or engineering analysis, or factual evidence that supports these opinions.

**III.  Review and Interpretation of the Kuprewicz Declaration**

**A.      Declaration Review Process**

7.      This review steps through the Declaration prepared by Mr. Richard Kuprewicz and supporting Appendices point by point.  His positions are interpreted and critically evaluated to assess whether they are based on fact and science.

8.      Documents that I have reviewed and relied on in addition to Mr. Kuprewicz's Declaration are listed in the references attached hereto (See Section IV Below).

**B.      Mr. Kuprewicz's Technical Issues and Opinions**

**1.      Kuprewicz Technical Issues in Paragraph 8**

9.      Mr. Kuprewicz identified five technical issues with the proposed restart of the San Flores Pipelines in Paragraph 8 of his Declaration.  They are repeated here verbatim:

a.  The design of the Pipelines renders the federal mandated cathodic protection system, intended to help address pipeline external corrosion, ineffective.

b.  Current inline inspection (ILI) technologies cannot adequately assess all forms of external corrosion threats that most likely exist on the Pipelines.

c.  The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective cathodic protection system once the Pipelines go into operation.

d.  Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure.

e.  The poorly designed Pipelines cannot be made as safe as new pipelines.

5

DECLARATION OF MICHAEL J. ROSENFELD

### a.    Technical Issue (a)

10.    Mr. Kuprewicz reports that the electrical insulating nature of the thermal insulation and polyethylene tape outer wrap defeats the effectiveness of the cathodic protection (CP) system that is required by pipeline safety regulations.  This is correct, although Sable recoated repairs made during field investigations with a non-shielding coating system, so the technical issue does not apply there.  Mr. Kuprewicz did not note that the Las Flores Pipelines are not the only pipelines in the US that have shielded CP in portions of their systems.  Many thousands of miles of pipelines are also shielded from effective CP due to installation of popular external coating types (mainly polyethylene tape and extruded polyethylene) that electrically insulate the pipe from CP electrical current much as with Las Flores.  The effectiveness of CP in thousands of miles of other pipelines can be reduced or impaired for a variety of other reasons unrelated to the type of coating such as:  inadequate design, inadequate maintenance, external electrical interference from foreign pipelines or high-voltage AC power lines, shorting due to contact between the pipe and road crossing casings, or the pipeline being installed in high-resistivity soils (dry, sandy or rocky, sloped, well-drained).  CP is one of several barriers against corrosion but it is a porous barrier even where it might be expected to be effective.  It is not a panacea for corrosion protection; there are several other mitigation tools that pipeline operators use to assess internal and external corrosion so that timely repairs can be affected long before any leaks occur.  Performing ILI frequently enough to indicate and size corrosion is an important alternative risk mitigation and barrier against corrosion failure in areas of a pipeline where CP may be ineffective.

### b.    Technical issue (b)

11.    Mr. Kuprewicz reports that the ILI technologies to be used in Lines 324 and 325A/B are inadequate to detect all forms of corrosion most likely (emphasis added) to be present on the pipelines.  First, he does not state what undetectable forms of corrosion are most likely to be present.  Second, he has not considered the multiple ILI technologies specified by the OSFM state waiver that significantly enhance Sable's ability to detect virtually any type of corrosion over the single ILI technology (magnetic flux leakage, or MFL) used by the previous operator Plains.  One important technology addition is the use of ultrasonic (UT) wall thickness measurement.  Unlike MFL, UT thickness measurement is a direct physical measurement that is less affected by rate of wall change and is unaffected by the presence of

DECLARATION OF MICHAEL J. ROSENFELD

magnetic corrosion product.  A second ILI technology to be used is the transverse-field MFL (also called circumferential MFL or MFL-C), specifically designed and configured to detect selective seam weld corrosion (SSWC) in the ERW seams (although, as will be discussed later, there is a low probability of SSWC in Line 324), as well as narrow axial external corrosion if it is present in Line 325A/B.  A third ILI technology is UT crack detection, which is capable of detecting stress-corrosion cracking (SCC) colonies, although as will be discussed later there is a low probability of SCC being present.  Industry experience has been that multiple tool technologies significantly increases the probability of detection of many conditions of interest in the pipeline. [Ref: Thompson, et al; Harris]

12.    Corrosion management is about more than ILI detection, since detection capabilities are generally good even when an ILI tool is performing sub-optimally.  Three other important enhancements specified by the OSFM state waiver, that Mr. Kuprewicz fails to account for in an apparent attempt to bias the reader of his statement, are the frequency of ILI inspections, the required ILI field validation, and run-to-run comparisons to identify changes and rates of change in the condition of the pipeline.  Notably, Sable will be required to run each ILI tool type *twice per year in the first two years and annually thereafter*. This is far more often than almost any other pipeline in the US.  *The current regulations call for ILI surveillance to take place once every five years.* The frequent ILI will give Sable multiple opportunities to assess the tool performance, work with the ILI vendor to regrade the results based on field findings, and multiple chances to understand the condition of the pipeline before serious corrosion can occur.  The previous operator's practices in these areas were not anywhere nearly as robust.

### c.    Technical issue (c)

13.    Mr. Kuprewicz is concerned about the elevated operating temperature of the pipeline causing high corrosion rates.  This is a well-known phenomenon.  Mr. Kuprewicz has not considered the frequent ILI and corrosion growth rate assessments required by the OSFM state waiver will make it possible to become aware of corrosion rates and corrosion growth often enough to respond with repairs on a timely basis.

### d.    Technical issue (d)

14.    Mr. Kuprewicz states that segments at risk of environmental cracking are at the highest risk of failure.  He is referring to SCC and apparently SSWC.  As will be discussed later, these are the

7

DECLARATION OF MICHAEL J. ROSENFELD

least likely forms of degradation to affect the pipelines. The 2015 failure was not due to environmental cracking, no environmental cracks were observed in the investigation of that failure, and ILI tools capable of detecting these conditions will be used on a much more aggressive schedule in the future by Sable.  Mr. Kuprewicz is opining about occurrences of environmental cracking that are not and have never been identified or found by any inspection or report, as reflected in the publicly available materials relative to the 2015 failure. This is an effort to fabricate facts concerning the integrity of the Pipeline which Mr. Kuprewicz knows are baseless.

### e.    Technical issue (e)

15.    Mr. Kuprewicz asserts that the pipelines cannot be made as safe as a new pipeline.  He provides no technical information to back this statement.  The pipelines have been pressure tested to prove strength and frequently inspected using various technologies to monitor their condition.  All new pipelines become old pipelines, the question is how those pipelines are monitored and maintained.  Here the monitoring and maintenance program required by the regulators and the Consent Decree are state of the art.  Again Mr. Kuprewicz's statement with respect to the need for a new pipeline is without any foundation or justification.

### 2.    Kuprewicz Opinions in Paragraph 10

16.    Mr. Kuprewicz expressed five opinions in Paragraph 10 of his Declaration. They are repeated verbatim as follows:

a)    The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them.

b)    The proposed hydrotests are also insufficient to address certain types of corrosion or predict corrosion growth. For example, Maximum Operating Pressure ("MOP") hydrotests are not adequate to test for crack forming potential on the Pipelines.

c)    The State Waivers do not assure adequate spike hydrotesting, which is a method to address various forms of crack forming potential. The values for the spike test on Line 324 are too low for corrosion cracking screening and evaluation. Hydrotesting for Lines 325 A and B must be conducted in segments given the elevation changes.

8

DECLARATION OF MICHAEL J. ROSENFELD

It is unclear, however, whether the testing parameters are adequate for Line 325A due to missing information. In addition, the Waivers do not appear to require any hydrotesting for Line 325B.

d)    A key corrosion performance tracking process set in the State Waivers for the Pipelines is missing. This information, which helps identify possible corrosion "hot spots," is especially important given the history of extensive corrosion on the Pipelines.

e)    The State Waivers will not provide an equal or greater level of safety as if the Pipelines were equipped with an effective cathodic protection system to avoid pipeline failure due to external corrosion. The current design of the Pipeline renders the cathodic protection system ineffective. External corrosion on the Pipelines is exacerbated by operation of the Pipelines at elevated temperatures, which seriously increases the corrosion rate.

### a.    Opinion (a)

17.    There are multiple components of this opinion to examine. The first is that Mr. Kuprewicz states a logical inconsistency: that "because ILI tools can miss a lot of cracks", reliance on ILI to find corrosion is misplaced.  This is illogical because crack detection tools and corrosion detection tools are not the same tools and use different technologies.  Corrosion tools indeed will "miss a lot of cracks" because they are not designed to detect cracks – ultrasonic crack detection tools specified for use by the OSFM in the state waiver are the appropriate tools for crack detection. ILI tools targeting corrosion on the other hand, specifically the magnetic and ultrasonic metal loss tools specified in the state waiver, are designed to detect corrosion and are effective for that purpose.  Informed pipeline operators understand these differences and select the tool type(s) appropriate for the condition(s) they must manage.  The OSFM state waiver specifies that magnetic and ultrasonic metal loss tools, and ultrasonic crack detection, tools be used.  Neither of the ultrasonic technologies were used by the prior operator. The state waiver introduces significant additional diversity to the inspection capabilities.  Industry experience has been that using multiple tool technologies and integrating the ILI data significantly improves the probability of detecting, characterizing, and sizing features of interest in the pipeline.

9

DECLARATION OF MICHAEL J. ROSENFELD

18.    The second is Mr. Kuprewicz states that multiple forms of corrosion are present on the pipeline(s) but does not describe the different forms of corrosion he claims are present.  The Line 901 failure analysis [Ref: DNV-GL, Appendix M to PHMSA FIR] and PHMSA's incident investigation [Ref: PHMSA FIR] did not identify different forms of corrosion contributing to the failure, nor differing forms of corrosion being present on other parts of the pipeline.  Mr. Kuprewicz has not reviewed the results of field digs to investigate corrosion analysis already performed by Sable, in response to ILI, to determine what different types of corrosion are present.  His statement is entirely speculative without reviewing any factual data.

19.    The third point is that Mr. Kuprewicz states that ILI is inadequate to detect some forms of corrosion though he does not state what those undetectable forms of corrosion are.  All ILI tools have lower thresholds of detectable flaw size; detection and sizing performance differ with the size and orientation of the flaws.  Taken together, the different tool technologies to be used by Sable are capable of detecting various forms of corrosion if they are present and of detectable size, including pitting corrosion, general corrosion, corrosion along or adjacent to seams, narrow axially aligned corrosion, and other forms of corrosion.  Furthermore, tool performance improves with large pipe such as Lines 324 and 325 because more sensors and supporting components can be fitted in the larger circumference, and defects of concern are proportionally larger and easier to detect, compared with small pipe sizes. [Ref: Nestleroth & Rosenfeld]

### b.    Opinion (b)

20.    Mr. Kuprewicz states that the hydrotests are insufficient to address certain types of corrosion but does not state which types of corrosion are at issue. To identify all potential corrosion leaks, Sable has been required by the OSFM state waiver to significantly enhance its computational leak detection technology, an area in which the prior operator was grossly deficient.  The frequency of inspections specified by the OSFM state waiver will give multiple opportunities to identify such features versus the prior operator.

21.    Mr. Kuprewicz also states that the MOP hydrotests are not adequate to test for crack forming potential.  He seems confused about the purpose of the hydrostatic pressure tests, which is to demonstrate that no defects, whether corrosion, cracks (of any type), or other degradation is present and

DECLARATION OF MICHAEL J. ROSENFELD

having a severity significant enough to threaten the safe operation *at the time of the test,* which holds the pressure at 1.5 X MOP for a period of fifteen minutes, followed by an eight hour test at 1.25 X MOP. In other words, the purpose is to demonstrate the current condition of the pipeline is safe with a known factor of safety. Mr. Kuprewicz does not demonstrate by any rational engineering analysis why the pressure tests performed are inadequate for a plausible postulated crack growth scenario.

### c.    Opinion (c)

22.    Mr. Kuprewicz makes several statements in his Opinion (c) that merit examination. Firstly, he states that the State Waivers do not assure adequate spike hydrotesting (in Line 324), which he describes as "a method to address various forms of crack forming potential". Mr. Kuprewicz seems confused about the purpose of the spike hydrostatic test. It is a technique for mitigating stress corrosion cracking (SCC) or manufacturing defects in certain older vintage seam types having low ductility, where effective ILI for cracks is unavailable (which was the case in 1979 when the spike test concept was first proposed). [Ref: Baker Engineering & Kiefner & Assoc., TTO-6; Rosenfeld]. The test concept presumes that unknown cracks are present and recognizes that holding a crack at the near-failure point could cause damage during the test leading to failure even if the crack is not a threat at the operating pressure. The spike test is conducted by taking the pipeline to a very high pressure for a short period of time (just a few minutes is sufficient) to force any significant cracks to fail while minimizing subcritical crack growth in those that do not fail, then lowering pressure to no more than 90% of the high level to avoid further damage to surviving cracks and holding at the reduced pressure to confirm a lack of leaks. The test has nothing to do with the potential to form cracks – if conditions are favorable to cracks forming, they could form just as easily after the hydrotest is completed. Since crack detection ILI has been and will be performed, a spike test is really unnecessary. The ILI will be more sensitive than the pressure test. However, OSFM has made the spike test a condition of its state waiver for Line 324 out of an abundance of caution as the responsible regulatory authority, which is their public duty and prerogative.

23.    Related to the above point, Mr. Kuprewicz states that the spike hydrostatic test is too low for "corrosion cracking screening and evaluation". Presumably by "corrosion cracking", which is not an industry-standard term, he is referring to stress-corrosion cracking (SCC). Even though SCC cracking was not identified in the course of the Line 901 failure investigation, consistent with the PHMSA Advisory

DECLARATION OF MICHAEL J. ROSENFELD

Bulletin the OSFM has required an ultrasonic crack detection ILI and transverse field magnetic ILI, which together or individually can indicate the presence of SCC large enough to pose a future threat. The spike hydrostatic test to 1.5X MOP is adequate to prove the current integrity of the pipeline with a factor of safety of 1.5, and demonstrate that significant SCC that is a current threat at the MOP is not present. If less significant SCC is present, it will not be revealed by the test, though it can be expected to be revealed by the crack detection ILI.

24.     Mr. Kuprewicz notes that due to elevation changes along the route, the pipeline must be pressure tested in multiple test segments. Had Mr. Kuprewicz reviewed the hydrotest plans he would have noted that the hydrotest of the pipelines was broken up into eight different segments to conform to the elevation changes associated with the pipeline. This is a common aspect for any and all pipelines installed in anything but flat terrain and must be accounted for in the test plan. It can increase testing cost, but it is not unique to the Las Flores Valley Pipeline System, pipeline engineers understand how to test in hilly terrain, and it is not a reason to object to the testing.

25.     He also states that it is unclear whether the testing is adequate for Line 325A due to his lack of data. In that case, Mr. Kuprewicz is speculating and has no basis in fact for objecting.

### d.     Opinion (d)

26.     Mr. Kuprewicz states that a key corrosion tracking process is missing from OSFM's state waiver for identifying corrosion "hot spots". He does not describe the corrosion tracking process that is missing, nor does he define "hot spot" though presumably he means it as a localized area of corrosion having a growth rate that is greater by a vague, undefined amount than is typical of other parts of the pipeline. The OSFM state waiver requires aggressive ILI run frequencies and dig response criteria in order to produce a robust corrosion tracking process. ILI for corrosion must be performed twice annually the first 2 years and annually thereafter, which is far more frequently than every 5 years practiced with most pipelines. ILI for cracks must be performed annually, which is also far more frequent than the 5 year interval practiced with most other pipelines. Metal loss of 40% of the wall thickness or more, accounting for tool performance, must be investigated within 6 months. This is also unusually stringent and accounts for potential growth during the interval between running ILI and responding in the field. OSFM also requires a procedure for estimating corrosion growth rates from comparisons of multiple ILI runs and for

12

DECLARATION OF MICHAEL J. ROSENFELD

making projections for when each corrosion feature will attain a depth of concern. As the regulatory authority, the OSFM will have the right to review all such information at any time and perform its own analysis. OSFM's conditions appear to be designed to make it highly unlikely that a corrosion "hot spot" will go unnoticed for long.

### e.  Opinion (e)

27.  Mr. Kuprewicz objects that the OSFM state waiver will not provide the same level of safety as a pipeline with effective cathodic protection (CP), due to the characteristics of the coating system. The OSFM has taken this into consideration — performing ILI frequently enough to indicate and size corrosion is an important alternative risk mitigation and barrier against corrosion failure where CP will be ineffective. Mr. Kuprewicz provides no risk assessment showing that frequent ILI cannot offset risk due to ineffective CP.

28.  Moreover, Mr. Kuprewicz provides no risk analysis accounting for the numerous improvements and upgrades to the facility and operating practices that demonstrates that the pipeline will be inadequately safe. The OSFM, as a regulatory agency having responsibility in risk-critical subject areas, understands risk analysis and applies risk models to its decisions. Moreover, OSFM has performed extensive fact-based analysis of the pipelines at issue and has personally inspected the repairs and upgrades to the pipelines in conformance with the state waivers.

29.  Mr. Kuprewicz also objects that due to the elevated operating temperatures, corrosion rates will be "seriously increased". This was observed to be the case with the former Line 901 failure. It is an understood phenomenon and is not unique to the Las Flores Pipeline system. Other heated oil pipelines are operated in the US. The OSFM requires measures be in place to ensure the pipelines are operated safely under these conditions. The fact that the previous operator applied inadequate methods to estimate corrosion rates does not mean that it cannot be done. In fact, pipeline operators do this often, and the OSFM state waiver requires a process to do that, accounting for tool performance and measurement uncertainty.

### C.  Positions Stated in Kuprewicz's Declaration Exhibit B

30.  Mr. Kuprewicz supplements his five technical concerns in Paragraph 8 and five main opinions in Paragraph 10 with additional statements in his Declaration and Exhibits B and C. These will

13

DECLARATION OF MICHAEL J. ROSENFELD

also be critically examined.  The following discussion refers to Sections V though X from his Exhibit B "Evaluation of Las Flores Pipeline System Startup Proposal", Dec. 20, 2024.

### 1.     Section V. TIMP Regulations Are Not Working

#### a.     Inadequacy of TIMP Regulations

31.     Mr. Kuprewicz states that transmission integrity management planning (TIMP) regulations are not working to protect the public.  This is demonstrably false.  PHMSA's own data available to anyone with an internet connection [Ref: www.phmsa.dot.gov] shows that TIMP along with improved technology and operator focus is gradually reducing the running average incident metrics for hazardous liquid pipelines over the past 20 years:

| Reference period | Avg. Annual Incident Count | Avg. Annual Barrels Spilled | Avg. Annual Barrels Lost |
|---|---|---|---|
| 3-yr Avg (2022-2024) | 294 | 63,300 | 32,618 |
| 5-yr Avg (2020-2024) | 312 | 81,959 | 48,946 |
| 10-yr Avg (2015-2024) | 364 | 85,502 | 51,394 |
| 20-yr Avg (2005-2024) | 367 | 89,261 | 51,450 |

32.     It should be noted that approximately 80% of the reported incidents occurred within facilities such as pump stations, terminals, and tankage farms, rather than on the pipeline right-of-way, with valves and equipment being the largest component.  Those causes are not managed by a TIMP program.  Essentially, Mr. Kuprewicz's complaint is with PHMSA, not Sable, and his complaint is understood as TIMP not reducing incidents enough to suit him personally.  Mr. Kuprewicz also seems to be confusing regulatory compliance with actual safety, a common thought bias.

33.     Mr. Kuprewicz states "pipeline integrity management tools are not a substitute for proper pipeline design or effective cathodic protections. Their purpose is simply to monitor the condition of pipelines over time and identify threats to the pipeline's integrity."  This statement is biased and misleading in that it gives a very incomplete picture of the TIMP process.  TIMP is a structured approach to managing pipeline risk, consisting broadly of the following steps: 1) analyze and integrate data about the pipeline including design and operating history; 2) identify integrity threats; 3) perform risk assessment to determine consequences of failure and identify high risk locations; 4) perform an assessment of the condition of the pipeline (this is the only TIMP process step Mr. Kuprewicz acknowledges) with

14

DECLARATION OF MICHAEL J. ROSENFELD

respect to the integrity threats, prioritized by risk in accordance with the risk assessment; 4) respond to the condition assessment results with repairs prioritized by severity and location-based risk; 5) develop preventive and mitigative measures consisting of facility and procedural improvements to avoid or prevent occurrence of threats throughout the system; and 6) evaluate performance against the plan commitments, verify that risk is reduced, and identify process improvements. [Ref: API RP 1160]  The process is continually repeated.  TIMP is a complex process; not all elements work perfectly and not all operators perform equivalently, but that does not mean the process is unable to lower risk.

### b.    Hydrostatic Testing Assessments

34.    Mr. Kuprewicz states "For a pipeline experiencing certain cracking threats such as selective seam cracking (SSC) or stress corrosion cracking (SCC)—corrosion threats *that likely exist* (emphasis added) along the Las Flores Pipeline System—a subpart E hydrotest is inadequate."  This statement is incorrect on several levels.

35.    To state that something could exist, or even is likely to exist, does not mean that it has existed, does now exist, or will exist.  As will be discussed below, Mr. Kuprewicz fails to account for known factual information to support his assertion that certain conditions are likely.  In my opinion, they are unlikely.

36.    Firstly, "selective seam cracking (SSC)" is not a generally recognized condition.  Based on my subject matter knowledge, I believe that Mr. Kuprewicz is referring to "selective seam weld corrosion" (SSWC), a condition that can affect older varieties of pipe manufactured with electric resistance welded (ERW) seams or flash welded (FW) seams.  Line 324 is modern ERW seam pipe.  Extensive testing and research over the years has concluded that susceptibility to SSWC is influenced by composition of the pipe steel and other factors associated with pipe manufactured prior to 1985, the two most significant influences being carbon content greater than 0.10% and sulfur content greater than 0.007%.  According to the metallurgical failure analysis of the Line 901 failure [Ref: DNV-GL] published with PHMSA's public failure investigation report, the composition of the steel in the failure pipe and upstream and downstream pipes exhibited carbon content of 0.078-0.083% and sulfur content of 0.007%. [Ref: McMahon, et al]  The subject pipe was manufactured in 1986.  Thus susceptibility to SSWC should be very low, and in fact no SSWC was observe in the Line 901 failure investigation.  In the *unlikely* event

15

DECLARATION OF MICHAEL J. ROSENFELD

that SSWC was to occur, the transverse field magnetic ILI tool used by Sable, as required by the OSFM state waiver, was developed to detect SSWC.

37.    Secondly, Mr. Kuprewicz considers SCC to be *likely*.  SCC requires specific stress and environmental condition.  SCC in pipelines has two forms: near-neutral-pH (NNpH) or high-pH (HPH), with differing necessary environments. [Ref: NEB Inquiry]  NNpH SCC requires shielding from CP and anaerobic conditions.  Although the CP-shielding conditions exist, evidently conditions were only intermittently anaerobic or favorable to NNpH SCC, resulting instead in pitting metal loss.  Applied stress is also a promoting factor.  While there is no theoretical lower stress at which SCC cannot occur, it is rarely observed at applied stresses below 50% Specified Minimum Yield Strength ("SMYS") absent other sources of stress such as external forces or residual stress.  At the pipeline MOP of 1,003 psig, the hoop stress is 54% of SMYS.  However, normal operating pressure is in the range of 250 to 600 psig, resulting in prevalent stress levels of 15-33% SMYS.  At such stress levels, the driving force for SCC is weak, cracking colonies will be sparse, crack growth rates will be low, and the condition is more likely to go dormant or be overtaken by pitting during intermittent periods that are environmentally not conducive to SCC.  Thus NNpH severe enough to threaten the pipeline is *unlikely*.  HpH SCC has differing environmental conditions from the NNpH type.  While temperatures above 100 deg F are favorable to HpH SCC, the condition only develops within a narrow range of cathodic potentials indicative of partially impaired but not shielded CP.  Thus HpH SCC is also *unlikely*.  The ultrasonic crack detection ILI tools specified by the OSFM state waiver are designed to detect SCC if it is present in a detectable size.

38.    Thirdly, Mr. Kuprewicz states that a 49 CFR Part 195, Subpart E test to a test pressure ratio of 1.25 is "inadequate" in connection with his postulated SSWC or SCC.  Any pressure test above 1.1xMOP (the maximum allowed surge condition) demonstrates the present safety of the pipeline.  No test pressure proves an absence of flaws no matter how high the test pressure.  The higher the test pressure, the smaller will be any undiscovered flaws that survive the test.  All things being equal, larger flaws, if they can enlarge in service, grow to failure in less time than smaller flaws, so higher tests are more effective for demonstrating some positive factor of safety >1.0 for a longer period of time.  But certainly if significant SSWC or SCC did exist of a size that could be caused to fail at a TPR of 1.25, the Subpart E test is adequate, and certainly the spike test required by OSFM is adequate.  Later in the same paragraph

DECLARATION OF MICHAEL J. ROSENFELD

he states that it is not clear whether hydrotesting, if performed with be a Subpart E test or a different test to a higher pressure level.  Clearly then he lacks necessary information to form an opinion and is speculating.

39.  Mr. Kuprewicz states that "Current ILI technology cannot reliably identify if such cracking threats are present."  This is patently false, biased, and misleading.  In fact, ILI is more effective than hydrostatic testing, a point which Mr. Kuprewicz acknowledges in the very next section of this Exhibit.  The industry has for the past 25 or more years relied on ILI to detect and characterize threats such as SSWC and SCC, as well as other types of cracks such as seam fatigue cracks and pipe manufacturing defects in seams.[Ref: Krieg, et al]  Although no inspection process is perfect, ILI has proven over and over to be an effective integrity management tool.  Frequent ILI intervals with robust validation, and use of multiple tool technologies, will reduce the chances of completely missing something important.

### c.    ILI Assessments

40.  In this section, Mr. Kuprewicz makes numerous negative statements about ILI:

- Some ILI tools are more suitable than others depending on the threat. … Operators don't always select the ILI technology best suited to help identify threats on their system.
- The previous operator failed to share ILI tool performance data with the ILI service provider that could have enabled them to regrade the ILI more accurately.
- Some conditions can be more challenging as ILI tools have technical limitations.  ILI tool vendors have limits or restrictions on tool operation to get valid results.
- Some pipeline operators make biased interpretations of the ILI data or fail to account for tool error.

41.  His point seems to be "it's complicated and has to be done right".  That applies to all 228,000 miles of hazardous liquid transmission pipelines not to mention all 298,000 miles of onshore natural gas transmission pipelines.  He has not shown through any rational, data-based analysis that it is somehow *more true* for Las Flores than any of those other systems.

17

DECLARATION OF MICHAEL J. ROSENFELD

**2.      Section VI. The Greatest Threat … Is From External Corrosion**

42.      Mr. Kuprewicz questions whether the reliance of the Consent Decree and the OSFM state waiver on ILI to manage the external corrosion threat can prevent another failure.  He points to the failure of the previous operator, Plains, to rigorously validate the performance of the ILI tools and account for the tool performance when establishing appropriate field response to conclude that "…current ILI technology does not … reliably identify all forms of external corrosion most likely present on much of the pipeline".  Mr. Kuprewicz leaps to this conclusion without recognizing several significant facts.  Firstly, Sable is not Plains, and will be held to higher standards of performance.  Secondly, different tools with differing technology will be used (most importantly, ultrasonic metal loss tools), and will be run more frequently.  Third, he does not identify what kind of corrosion will be present on much of the pipeline that he claims will be undetectable.  His position are biased and misleading, being based on pejorative sentiments intended to be alarming while ignoring important facts.

43.      Later in this section he discusses the relationship between the insulation and coating system and the inability of cathodic protection to function effectively.  As I have pointed out earlier, ineffective CP is a common occurrence for pipelines for a variety of reasons.  ILI, implemented correctly and with due understanding of its limitations, can be used to monitor the condition of the pipeline in an absence of effective CP.  Mr. Kuprewicz has not provided factual proof that ILI as specified by the OSFM state waiver cannot effectively be used for that purpose.

**3.      Section VII. High Pipeline Operating Temperatures Accelerate All Forms of Corrosion**

44.      Mr. Kuprewicz claims that due to the elevated temperatures, the corrosion rate will be 32 times faster than under normal conditions.  There is little doubt that corrosion rates will be higher than for many other pipelines that don't operate at elevated temperatures. But Mr. Kuprewicz is speculating as to the corrosion rate being 32 times faster, nevertheless the OSFM has implemented in the state waiver an accelerated detection and protection program as discussed above in my analysis of Mr. Kuprewicz's Opinion (e).  This was established by PHMSA's third party consultants.  The OSFM has specified that corrosion rates be established to assure that response times for repairs and maintenance are appropriate with a high margin of safety.

DECLARATION OF MICHAEL J. ROSENFELD

### 4. Section VIII. The CD Fails to Required Adequate IM Processes to Prevent Another Rupture

45.    Mr. Kuprewicz complains that the Consent Decree does not address important technical issues, such as "cracking threats most likely to to exist on major segments of the pipeline". The Line 901 failure was not due to cracking, no cracking was identified in the failure investigation, and in my opinion as discussed previously, cracking is unlikely to be significant. In any case, the OSFM state waiver, which he does not discuss in this section of his Declaration, does address numerous important technical issues including requiring running crack detection ILI tools. This appears to be a deliberate omission by Mr. Kuprewicz to bias the reader.

### 5. Section IX. The Pipelines Cannot Be Made as Safe as New Pipelines

46.    Mr. Kuprewicz summarizes the design aspects of the pipelines that contribute to corrosion occurring readily and quickly. He states that it will be impossible to return the pipeline to a corrosion-free as-new condition. Actually, all pipelines, even a newly constructed pipeline, will require condition assessment by ILI surveillance and subsequent repairs and maintenance, and will require an ongoing TIMP program to remain safe (all of which is being done on this pipeline system as per the OSFM). Almost every pipeline has some corrosion on it, even modern pipelines. Testing has shown that at the common maximum operating stress levels of 72% SMYS, it is virtually impossible for a pipeline to fail with corrosion up to 50% wall loss. Sable's planned operating pressure combined with OSFM requirements that they repair up to 40% wall losses further enhances pipeline integrity. This provides many opportunities to discover the pipeline conditions that may require repairs. Using differing ILI technologies on a frequent basis can be relied on to discover that, in my opinion and experience. Mr. Kuprewicz's opinion is based on an incomplete recognition of the facts concerning this pipeline.

### 6. Section X. Conclusion

47.    Mr. Kuprewicz states in his Conclusion that hydrostatic testing and ILI will be ineffective to address the possible threats, and it would imprudent to rely on such assessments. He has not critically evaluated whether the specific and multiple ILI technologies specified by the OSFM state waiver are in fact inadequate and, if so, why. He also states that using the wrong ILI tools can make the risk of an oil spill orders of magnitude worse, though he has not stated why the specified ILI technology is of the wrong

19

DECLARATION OF MICHAEL J. ROSENFELD

type, nor presented a risk assessment quantifying the increased magnitude of the postulated oil spill. He concludes that the Las Flores Pipeline System is unusually dangerous due to its age and design flaws. This opinion was built on an aggregation of preceding claims each made without supporting data or even contrary to known or knowable facts. As such it is nonfactual and noncredible.

### D.    Positions Stated in Kuprewicz's Declaration Exhibit C

48.    Mr. Kuprewicz supplements the technical issues and the opinions in his Declaration with additional positions stated in his Exhibit C "Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart", February 21, 2025. For the most part, he relies on the same erroneous positions taken without supporting data or analysis, or half-truths presented in an incomplete way to bias the reader, as have been discussed above. Therefore, a detailed point by point evaluation of Exhibit C is already addressed in this declaration and need not be repeated here.

## IV.  Exhibits

49.    In forming the opinions stated herein, I reviewed and considered the following documents and the facts stated therein:

a.    Declaration of Richard B. Kuprewicz in Support of Petitioners' *Ex Parte* Application for Stay, Order to Show Cause and Temporary Restraining order, June 3, 2025, a true and correct copy of which is attached hereto as **Exhibit B.**

b.    US Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety, Corrective Action Order, CPF NO. 5-2015-5011H, May 21, 2015, a true and correct copy of which is attached hereto as **Exhibit C.**

c.    United States District Court, Central District of California, Civil Action NO. 2:20-cv-02415, CONSENT DECREE, Filed 03/13/20, a true and correct copy of which is attached hereto as **Exhibit D.**

d.    Department of Forestry and Fire Protection, Office of the State Fire Marshal, Letter of Decision on the state Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-324), Dec. 17, 2024, a true and correct copy of which is attached hereto as **Exhibit E.**

20

DECLARATION OF MICHAEL J. ROSENFELD

e. Department of Forestry and Fire Protection, Office of the State Fire Marshal, Letter of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-325A/B), Dec. 17, 2024, a true and correct copy of which is attached hereto as **Exhibit F.**

f. US Department of Transportation, Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline LP, Line 901 Crude Oil Release, May 19, 2025, Santa Barbara California", May 2016, a true and correct copy of which is attached hereto as **Exhibit G.**

g. Norfleet, D.M., "Line 901 Release (5/19/25): Mechanical and Metallurgical Testing", DNV-GL, Final Report No. OAPUS309DNOR (PP136049), September 18, 2015, Appendix M to PHMSA FIR, a true and correct copy of which is attached hereto as **Exhibit H.**

h. US Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Advisory Bulletin ADB 17-01, 82 FR 14106, Thursday, March 16, 2017, a true and correct copy of which is attached hereto as **Exhibit I.**

i. Kiefner, J.F., "Defect assessment – 1: Modified equation aids integrity management", Oil & Gas Journal, Oct. 6, 2008 and "Defect assessment – 2: Modified Ln-Secant equation improves failure prediction", Oil & Gas Journal, Oct. 13, 2008, a true and correct copy of which is attached hereto as **Exhibit J.**

j. McMahon, T.P., Amend, B., Harper, W., Bubenik, T., Evans, K., Rosenfeld, M., and Li, Y., "Evaluation of Selective Seam Weld Corrosion Susceptibility", 14th International Pipeline Conference, IPC2024-121806, Calgary, 2024, a true and correct copy of which is attached hereto as **Exhibit K.**

k. National Energy Board, "Stress Corrosion Cracking on Canadian Oil and Gas Pipelines", Report of the Inquiry, MH-2-05, December 1996, a true and correct copy of which is attached hereto as **Exhibit L.**

l. Michael Baker Jr. Engineering and Kiefner & Associates, Inc., "Spike Hydrostatic Test Evaluation", Final Report to Department of Transportation, Research and Special

21

DECLARATION OF MICHAEL J. ROSENFELD

Programs Administration, Office of Pipeline Safety, Technical Task Order No. 6 (TTO-6), Delivery Order DTRS56-02-D-70036, July 2004, a true and correct copy of which is attached hereto as **Exhibit M.**

m. Rosenfeld, M.J., "Hydrostatic pressure spike testing of pipelines: why and when?", Journal of Pipeline Engineering, 2013, a true and correct copy of which is attached hereto as **Exhibit N.**

n. US Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Advisory Bulletin ADB 17-01, 82 FR 14106, Thursday, March 16, 2017, a true and correct copy of which is attached hereto as **Exhibit O.**

o. Kiefner, J.F., and Vieth, P.H., "Project PR 3-805, A Modified Criterion for Evaluating the Remaining Strength of Corroded Pipe", American Gas Association, Cat. No. L51609, Dec. 22, 1989, a true and correct copy of which is attached hereto as **Exhibit P.**

p. American Petroleum Institute, "Managing System Integrity for Hazardous Liquid Pipelines", API Recommended Practice 1160, Third Edition, February 2019, a true and correct copy of which is attached hereto as **Exhibit Q.**

q. Nestleroth, J.B. and Rosenfeld, M.J., "Changes to In-Line Inspection Approaches to Consider with Changing Regulations", Pipeline Pigging and Integrity Management Conference, Houston, 2020, a true and correct copy of which is attached hereto as **Exhibit R.**

r. Harris, C. "Assessing Mechanical Damage Using Multiple Data Sets in Inline Inspection", Pipeline Technology Conference, Berlin, 2013, a true and correct copy of which is attached hereto as **Exhibit S.**

s. Thompson, R., Gardner, R., Dwyer, K., Gonzales, R., Corbett, A., Solano, G., "Pipeline Integrity Management of CSCC using multiple ILI technologies", Pipeline Pigging and Integrity Management Conference, Houston, 2021, a true and correct copy of which is attached hereto as **Exhibit T.**

t. Krieg, M., Nestleroth, J.B., Hennig, T., and Haines, H., "In-Line Inspection in Lieu of Hydrostatic Testing for Low Frequency Electric Resistance Welded Pipe", 12th

DECLARATION OF MICHAEL J. ROSENFELD

International Pipeline Conference, IPC2018-78522, Calgary, 2018, a true and correct copy of which is attached hereto as **Exhibit U.**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 7th day of July, 2025, in Granville, Ohio.

Michael J. Rosenfeld

23

DECLARATION OF MICHAEL J. ROSENFELD

# VOLUME 1 OF 4

# (EXHIBITS A – F)

# TO DECLARATION OF MICHAEL ROSENFELD

# EXHIBIT A

## **Michael J. Rosenfeld, PE**

Chief Engineer, Managing Member
RSI Pipeline Solutions, LLC
740-398-9543, mrosenfeld@rsi-ps.com
or mjrosenfeld57@gmail.com



## Summary

Experienced consultant in the subject of oil and gas pipeline fitness-for-service; pipeline integrity; pipeline design, materials, construction, and maintenance; and pipeline regulations and standards.

## Education

Bachelor of Science in Engineering – Mechanical Engineering, University of Michigan, 1979
Master of Science in Mechanical Engineering, Carnegie-Mellon University, 1981

## Areas of Competency

Pipeline defects, fitness for service assessment
Metallurgical failure analysis
Root cause failure analysis
Pipeline integrity management
Pipeline risk analysis
ASME B31.4, B31.8, B31.8S and related standards
API 1104, 1160, 1176, and related standards
49 CFR Parts 192 and 195
Pipeline design, materials, and construction
Pipeline maintenance and repair
Research and development
Training and seminars

## Work Experience

### RSI Pipeline Solutions LLC
### Chief Engineer, 2019-Present

Co-founder of RSI Pipeline Solutions LLC, 2019 and Managing Member.  Providing technical services in support of the oil and gas pipeline industry in matters such as pipeline fitness for service, pipeline integrity management, pipeline failure root cause analysis, regulatory compliance, pipeline codes and standards development, research, and training.  Recently completed an industry-funded landmark study on the integrity threat of pipe body hard spots in vintage line pipe.

**Kiefner Applus-RTD**
**Chief Engineer, 2012-2019**
Developed company practice for conducting root cause failure analysis. Developed process for determining the most probable grade of undocumented line pipe based on measured material strength and steel chemistry.  Developed processes for establishing the probable design pressure of undocumented pipelines. Provided expert testimony or opinions in support of litigation.

**Kiefner & Associates, Inc.**
**President, 2002-2011**
Conducted research on the effects of pressure cycle fatigue in pipelines, and the effects of pipe diameter expansion due to material yielding.  Worked with pipeline operators to improve their processes for evaluating pipeline fitness for service, risk assessment, and other integrity management practices. Effectively doubled the size of Kiefner & Associates with the addition of a dedicated material testing facility, a corrosion group, and other service areas such as geotechnical and in-line inspection analysis.

**Senior Structural Engineer, 1991-2002**
Performed stress analyses of pipelines subjected to external loadings. Developed monitoring and mitigation plans for pipelines affected by longwall mining subsidence. Performed qualifications testing of welding procedures and welder performance. Conducted research on the effects of mechanical damage on pipelines and originated the concept of evaluating severity of pipeline indentations based on strains of deformation. Authored revised allowable stress limits and revise repair requirements for ASME B31.8. Performed several dozen pipeline failure investigations.

**Battelle Memorial Institute, Senior Research Engineer, 1984-1991**
Performed stress analysis, fracture mechanics analysis, and design engineering for various industrial and military equipment applications. Patented an innovative design to reduce material usage and improve performance in a household appliance motor housing. Performed failure analysis of high-pressure piping. Conducted industry funded research on effectiveness of gas pipeline in-line inspection and on structural behavior of piping components affected by corrosion.

**EDS Nuclear / Impel Corporation, Engineer II, 1981-1984**

Performed stress analysis of nuclear power plant piping, piping supports, building structures, and electrical components for seismic and other loadings using finite element analysis and traditional calculation methods. Performed field engineering in support of plant turnovers.

## Industry Activity

Past Vice Chair, Interim Chair, ASME B31.8 Committee

Past Chair, ASME B31.8 Subgroup on Design, Materials, and Construction

Member, B31.8 Task Groups on Hydrogen and $CO_2$ pipelines

Member, ASME B31 Standards Committee

Member, ASME B31 Mechanical Design Technical Committee

Instructor, ASME Continuing Education Short Courses on ASME B31.4, B31.8, B31.8S, B31.12

Former Member at Large, ASME Board of Pressure Technology Codes and Standards

Former Member, Joint ASCE-ASME Task Group on Design of Buried Pipe

Former Member, API RP 1117 Task Force on In-Service Relocation of Pipelines, 1st Edition

Former Member, Work Group on API RP 1176 Assessment and Management of Cracking in Pipelines, 1st Edition

Former Member, Work Group on API RP 1160 Managing System Integrity for Hazardous Liquid Pipelines, 3rd Edition

International Pipeline Conference 2006, Session Chair, Mechanical Damage

International Pipeline Conference 2010, Session Chair, Structural Integrity I

ASME Fellow, awarded January 2012

ASME B31 Forever Award for Excellence in Piping Engineering, awarded September 2020

Registered Professional Engineer, State of Ohio, License No. E-55441

## Publications

Authored or coauthored over 130 published articles and public conference presentations. List available upon request.

June 2023

# EXHIBIT B

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br> Real Parties in Interest. | Case No.: 25CV02247 <br><br> **DECLARATION OF RICHARD B. KUPREWICZ IN SUPPORT OF PETITIONERS' EX PARTE APPLICATION FOR STAY, ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER** <br><br> [*Filed concurrently with Ex Parte Application for Stay, Order to Show Cause and Temporary Restraining Order*] <br><br> Date:    June 3, 2025 <br> Time:    8:30 a.m. <br> Dept.:    4 <br> Judge:   Hon. Donna G. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

1

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

**DECLARATION OF RICHARD KUPREWICZ**

I, Richard B. Kuprewicz, hereby declare as follows:

1.    I have personal knowledge of the matters set forth in this declaration and, if called as a witness, would and could testify competently thereto.

2.    I am a chemical engineer with over fifty years of experience in the energy industry. For over twenty-five years, I have worked as the president of Accufacts, Inc., which provides independent expert consulting services to assist decision makers in making informed decisions concerning oil and gas pipelines. I provide pipeline safety expertise in areas including (but not limited to): pipeline failure investigation; risk management and risk analysis; pipeline siting, construction, design, operation, and maintenance, training, and control room management, including Supervisory Control and Data Acquisition (SCADA) approaches; leak/rupture detection; integrity management; emergency and spill response; and pipeline safety regulatory development and compliance. Much of my background is grounded in conducting numerous pipeline incident investigations following pipeline rupture tragedies spanning several decades.

3.    I have developed and performed safety and risk management and analysis for chemical plants, liquefied natural gas facilities, refineries, and pipelines. I have also consulted for various local, state, and federal agencies, nonprofit organizations, and members of the public on pipeline regulation, operation, and design.

4.    For the past two decades I have been involved as a representative of the public in advancing pipeline safety regulations at the federal and various state levels. From 2004 to 2018, I served on the Technical Hazardous Liquid Pipeline Safety Standards Committee, also referred to as the Liquid Pipeline Advisory Committee (LPAC), to advise the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA) on improvements to pipeline safety regulations. After a brief hiatus, the Secretary of Transportation reappointed me in late 2024 to represent the public again on the LPAC. In the early 2000s while serving on the LPAC, I played a significant role representing the public in developing federal integrity management pipeline safety regulations for both liquid and gas transmission pipelines.[1] These regulatory approaches emulated safety process approaches

[1] *See generally* 49 C.F.R. §§ 195.551-195.591, 192.901-192.951.

---

2

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

that I instituted and developed for the City of Bellingham, Washington, to assure that a ruptured pipeline there could be restarted and operated safely. I also served for seven years as a member of the Washington State Citizens Committee on Pipeline Safety ("CCOPS").  Positions to CCOPS are appointed by the Governor.

5.      I am an expert in oil and gas pipeline safety and risk management analysis based on my training, education, and experience. Attached as **Exhibit A** is my curriculum vitae.

6.      I have investigative expertise in the topic of various forms of seam corrosion, such as selective seam corrosion, stress corrosion cracking, and am a recognized expert in early vintage cracking having investigated pipeline ruptures associated with these types of cracking threats.

7.      I was asked by the Environmental Defense Center (EDC) and Center for Biological Diversity (CBD) to utilize my experience and expertise to evaluate safety and integrity issues regarding the proposal to restart the Las Flores Pipeline System, which includes CA-324 and CA-325A/B ("the Pipelines"). A true and correct copy of my report, titled *Evaluation of Las Flores Pipeline System Startup Proposal*, dated December 20, 2024, is attached to this declaration as **Exhibit B**.

8.      The report sets forth my opinion, based on my review of the Consent Decree and other documents, references, and regulations related to the Pipelines, including: the "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County," prepared by the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (May 2016); DNV-G Final Report, "Line 901 Release (5/15/15) Mechanical and Metallurgical Testing – Report No.: OAPUS309DNOR (PP136049)" (September 18, 2015); PHMSA – In the Matter of Plains Pipeline, LP, Respondent, "Amendment No. 1 to the Corrective Action Order – CPF No. 5-2015-5011H;" CA Code CCR 19 § 2111 – Risk Analysis (2) Pipeline Description (A); 49 CFR § 195.304 Test Pressure; and Sable's website concerning, "Sable Offshore Corp. Provides Update on Pacific Pipeline Company Operations," October 28, 2024, at: https://www.sableoffshore.com/news/news-details/2024/Sable-Offshore-Corp.-Provides-Update-on-Pacific-Pipeline-Company-Operations/default.aspx. In summary, I identified the following technical issues concerning the proposed restart of the Pipelines:

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

a.   The design of the Pipelines renders the federal mandated cathodic protection system, intended to help address pipeline external corrosion, ineffective.

b.   Current inline inspection (ILI) technologies cannot adequately assess all forms of external corrosion threats that most likely exist on the Pipelines.

c.   The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective cathodic protection system once the Pipelines go into operation.

d.   Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure.

e.   The poorly designed Pipelines cannot be made as safe as new pipelines.

9.    Following the preliminary approval of the State Waivers for the pipelines, EDC and CBD asked me to review and evaluate the Letters of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld for CA-324 and CA-325A/B ("State Waivers"). A true and correct copy of my report, titled *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart*, dated February 21, 2025, is attached to this declaration as **Exhibit C**.

10.    The report sets forth my opinion based on my review of the State Waivers and related documents, references, and regulations, including: Pacific Pipeline Company (Aka now as Sable/PPC) letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115)," July 10, 2023, p. 5 related to MFL-C February 2020 ILI run; 49 CFR § 452(h)(4)(iii)(H); PHMSA website: https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview; Plains Administrative Draft EIR, "Plains Replacement Pipeline Project," February 2022; and "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County," prepared by the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (May 2016). My opinion, as set forth in my report, is as follows:

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

a.  The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them.

b.  The proposed hydrotests are also insufficient to address certain types of corrosion or predict corrosion growth. For example, MOP hydrotests are not adequate to test for crack forming potential on the Pipelines.

c.  The State Waivers do not assure adequate spike hydrotesting, which is a method to address various forms of crack forming potential. The values for the spike test on Line 324 are too low for corrosion cracking screening and evaluation. Hydrotesting for Lines 325 A and B must be conducted in segments given the elevation changes. It is unclear, however, whether the testing parameters are adequate for Line 325A due to missing information. In addition, the Waivers do not appear to require any hydrotesting for Line 325B.

d.  A key corrosion performance tracking process set in the State Waivers for the Pipelines is missing. This information, which helps identify possible corrosion "hot spots," is especially important given the history of extensive corrosion on the Pipelines.

e.  The State Waivers will not provide an equal or greater level of safety as if the Pipelines were equipped with an effective cathodic protection system to avoid pipeline failure due to external corrosion. The current design of the Pipeline renders the cathodic protection system ineffective. External corrosion on the Pipelines is exacerbated by operation of the Pipelines at elevated temperatures, which seriously increases the corrosion rate.

11.  Based on the facts I reviewed and my professional analysis, in my opinion the Las Flores Pipeline System is not safe to operate, even if the conditions in the Fire Marshal's State Waivers are fulfilled.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 28th day of May 2025, in Nipomo, California.



Richard B. Kuprewicz

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

## Exhibit Index

*[Exhibits Supporting Declaration of Richard B. Kuprewicz in Support of Petitioners' Ex Parte Application for Stay, Order to Show Cause and Temporary Restraining Order]*

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | Curriculum vitae of Richard B. Kuprewicz | 7-16 |
| B | Evaluation of Las Flores Pipeline System Startup Proposal, dated December 20, 2024 | 17-43 |
| C | Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart, dated February 21, 2025 | 44-55 |

# Exhibit A

## Curriculum Vitae.

# Richard B. Kuprewicz

8151 164th Ave NE
Redmond, WA   98052

Tel:  425-802-1200 (Office)
E-mail: kuprewicz@comcast.net

---

**Profile:**    As president of Accufacts Inc., I specialize in gas and liquid pipeline investigation, auditing, risk management, siting, construction, design, operation, maintenance, training, SCADA, leak detection, management review, emergency response, and regulatory development and compliance.  I have consulted for various local, state and federal agencies, NGOs, the public, and pipeline industry members on pipeline regulation, operation and design, with particular emphasis on operation in unusually sensitive areas of high population density or environmental sensitivity.

---

**Employment:**    **Accufacts Inc.**                          **1999 – Present**

Pipeline regulatory advisor, incident investigator, and expert witness on all matters related to gas and liquid pipeline siting, design, operation, maintenance, risk analysis, and management.

| | |
|---|---|
| **Position:** | President |
| **Duties:** | > Full business responsibility |
| | > Technical Expert |

**Alaska Anvil Inc.**                          **1993 – 1999**

Engineering, procurement, and construction (EPC) oversight for various clients on oil production facilities, refining, and transportation pipeline design/operations in Alaska.

| | |
|---|---|
| **Position:** | Process Team Leader |
| **Duties:** | > Led process engineers group |
| | > Review process designs |
| | > Perform hazard analysis |
| | > HAZOP Team leader |
| | > Assure regulatory compliance in pipeline and process safety management |

**ARCO Transportation Alaska, Inc.**            **1991 - 1993**

Oversight of Trans Alaska Pipeline System (TAPS) and other Alaska pipeline assets for Arco after the Exxon Valdez event.

| | |
|---|---|
| **Position:** | Senior Technical Advisor |
| **Duties:** | > Access to all Alaska operations with partial Arco ownership |
| | > Review, analysis of major Alaska pipeline projects |

**ARCO Transportation Co.**                    **1989 – 1991**

Responsible for strategic planning, design, government interface, and construction of new gas pipeline projects, as well as gas pipeline acquisition/conversions.

| | |
|---|---|
| **Position:** | Manager Gas Pipeline Projects |
| **Duties:** | > Project management |
| | > Oil pipeline conversion to gas transmission |
| | > New distribution pipeline installation |
| | > Full turnkey responsibility for new gas transmission pipeline, including FERC filing |

**Four Corners Pipeline Co.**                    **1985 – 1989**

Managed operations of crude oil and product pipelines/terminals/berths/tank farms operating in western U.S., including regulatory compliance, emergency and spill response, and telecommunications and SCADA organizations supporting operations.

**Position:**   Vice President and Manager of Operations
**Duties:**      > Full operational responsibility
                 > Major ship berth operations
                 > New acquisitions
                 > Several thousand miles of common carrier and private pipelines

**Arco Product CQC Kiln**                    **1985**

Operations manager of new plant acquisition, including major cogeneration power generation, with full profit center responsibility.

**Position:**   Plant Manager
**Duties:**      > Team building of new facility that had been failing
                 > Plant design modifications and troubleshooting
                 > Setting expense and capital budgets, including key gas supply negotiations
                 > Modification of steam plant, power generation, and environmental controls

**Arco Products Co.**                    **1981 - 1985**

Operated Refined Product Blending, Storage and Handling Tank Farms, as well as Utility and Waste Water Treatment Operations for the third largest refinery on the west coast.

**Position:**   Operations Manager of Process Services
**Duties:**      > Modernize refinery utilities and storage/blending operations
                 > Develop hydrocarbon product blends, including RFGs
                 > Modification of steam plants, power generation, and environmental controls
                 > Coordinate new major cogeneration installation, 400 MW plus

**Arco Products Co.**                    **1977 - 1981**

Coordinated short and long-range operational and capital planning, and major expansion for two west coast refineries.

**Position:**   Manager of Refinery Planning and Evaluation
**Duties:**      > Establish monthly refinery volumetric plans
                 > Develop 5-year refinery long range plans
                 > Perform economic analysis for refinery enhancements
                 > Issue authorization for capital/expense major expenditures

**Arco Products Co.**                    **1973 - 1977**

Operating Supervisor and Process Engineer for various major refinery complexes.

**Position:**   Operations Supervisor/Process Engineer
**Duties:**      > FCC Complex Supervisor
                 > Hydrocracker Complex Supervisor
                 > Process engineer throughout major integrated refinery improving process yield and energy efficiency

10-22-24

**Qualifications:**

Served for over fifteen years as a member representing the public on the federal Technical Hazardous Liquid Pipeline Safety Standards Committee (THLPSSC), a technical committee established by Congress to advise PHMSA on pipeline safety regulations.
Committee members are appointed by the Secretary of Transportation.

Served seven years, including position as its chairman, on the Washington State Citizens Committee on Pipeline Safety (CCOPS).
Positions are appointed by the governor of the state to advise federal, state, and local governments on regulatory matters related to pipeline safety, routing, construction, operation and maintenance.

Served on Executive subcommittee advising Congress and PHMSA on a report that culminated in new federal rules concerning Distribution Integrity Management Program (DIMP) gas distribution pipeline safety regulations.

As a representative of the public, advised the Office of Pipeline Safety on proposed new liquid and gas transmission pipeline integrity management rulemaking following the pipeline tragedies in Bellingham, Washington (1999) and Carlsbad, New Mexico (2000).

Member of Control Room Management committee assisting PHMSA on development of pipeline safety Control Room Management (CRM) regulations.

Certified and experienced HAZOP Team Leader associated with process safety management and application.

**Education:**

| | |
|---|---|
| MBA (1976) | Pepperdine University, Los Angeles, CA |
| BS Chemical Engineering (1973) | University of California, Davis, CA |
| BS Chemistry (1973) | University of California, Davis, CA |

10-22-24

**Publications in the Public Domain:**

1. "An Assessment of First Responder Readiness for Pipeline Emergencies in the State of Washington," prepared for the Office of the State Fire Marshall, by Hanson Engineers Inc., Elway Research Inc., and Accufacts Inc., and dated June 26, 2001.

2. "Preventing Pipeline Failures," prepared for the State of Washington Joint Legislative Audit and Review Committee ("JLARC"), by Richard B. Kuprewicz, President of Accufacts Inc., dated December 30, 2002.

3. "Pipelines - National Security and the Public's Right-to-Know," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated May 14, 2003.

4. "Preventing Pipeline Releases," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated July 22, 2003.

5. "Pipeline Integrity and Direct Assessment, A Layman's Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated November 18, 2004.

6. "Public Safety and FERC's LNG Spin, What Citizens Aren't Being Told," jointly authored by Richard B. Kuprewicz, President of Accufacts Inc., Clifford A. Goudey, Outreach Coordinator MIT Sea Grant College Program, and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated May 14, 2005.

7. "A Simple Perspective on Excess Flow Valve Effectiveness in Gas Distribution System Service Lines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated July 18, 2005.

8. "Observations on the Application of Smart Pigging on Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated September 5, 2005.

9. "The Proposed Corrib Onshore System - An Independent Analysis," prepared for the Centre for Public Inquiry by Richard B. Kuprewicz, dated October 24, 2005.

10. "Observations on Sakhalin II Transmission Pipelines," prepared for The Wild Salmon Center by Richard B. Kuprewicz, dated February 24, 2006.

11. "Increasing MAOP on U.S. Gas Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2006. This paper was also published in the June 26 and July 1, 2006 issues of the Oil & Gas Journal and in the December 2006 issue of the UK Global Pipeline Monthly magazines.

12. "An Independent Analysis of the Proposed Brunswick Pipeline Routes in Saint John, New Brunswick," prepared for the Friends of Rockwood Park, by Richard B. Kuprewicz, dated September 16, 2006.

13. "Commentary on the Risk Analysis for the Proposed Emera Brunswick Pipeline Through Saint John, NB," by Richard B. Kuprewicz, dated October 18, 2006.

14. "General Observations On the Myth of a Best International Pipeline Standard," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2007.

15. "Observations on Practical Leak Detection for Transmission Pipelines – An Experienced Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated August 30, 2007.

16. "Recommended Leak Detection Methods for the Keystone Pipeline in the Vicinity of the Fordville Aquifer," prepared for TransCanada Keystone L.P. by Richard B. Kuprewicz, President of Accufacts Inc., dated September 26, 2007.

17. "Increasing MOP on the Proposed Keystone XL 36-Inch Liquid Transmission Pipeline," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated February 6, 2009.

18. "Observations on Unified Command Drift River Fact Sheet No 1: Water Usage Options for the current Mt. Redoubt Volcano threat to the Drift River Oil Terminal," prepared for Cook Inletkeeper by Richard B. Kuprewicz, dated April 3, 2009.

19. "Observations on the Keystone XL Oil Pipeline DEIS," prepared for Plains Justice by Richard B. Kuprewicz, dated April 10, 2010.

20. "PADD III & PADD II Refinery Options for Canadian Bitumen Oil and the Keystone XL Pipeline," prepared for the Natural Resources Defense Council (NRDC), by Richard B. Kuprewicz, dated June 29, 2010.

21. "The State of Natural Gas Pipelines in Fort Worth," prepared for the Fort Worth League of Neighborhoods by Richard B. Kuprewicz, President of Accufacts Inc., and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated October, 2010.

22. "Accufacts' Independent Observations on the Chevron No. 2 Crude Oil Pipeline," prepared for the City of Salt Lake, Utah, by Richard B. Kuprewicz, dated January 30, 2011.

23. "Accufacts' Independent Analysis of New Proposed School Sites and Risks Associated with a Nearby HVL Pipeline," prepared for the Sylvania, Ohio School District, by Richard B. Kuprewicz, dated February 9, 2011.

24. "Accufacts' Report Concerning Issues Related to the 36-inch Natural Gas Pipeline and the Application of Appleview, LLC Premises:  7009 and 7010 River Road, North Bergen, NJ," prepared for the Galaxy Towers Condominium Association Inc., by Richard B. Kuprewicz, dated February 28, 2011.

25. "Prepared Testimony of Richard B. Kuprewicz Evaluating PG&E's Pipeline Safety Enhancement Plan," submitted on behalf of The Utility Reform Network (TURN), by Richard B. Kuprewicz, Accufacts Inc., dated January 31, 2012.

26. "Evaluation of the Valve Automation Component of PG&E's Safety Enhancement Plan," extracted from full testimony submitted on behalf of The Utility Reform Network (TURN), by Richard B.Kuprewicz, Accufacts Inc., dated January 31, 2012, Extracted Report issued February 20, 2012.

27. "Accufacts' Perspective on Enbridge Filing to NEB for Modifications on Line 9 Reversal Phase I Project," prepared for Equiterre Canada, by Richard B. Kuprewicz, Accufacts Inc., dated April 23, 2012.

28. "Accufacts' Evaluation of Tennessee Gas Pipeline 300 Line Expansion Projects in PA & NJ," prepared for the Delaware RiverKeeper Network, by Richard B. Kuprewicz, Accufacts Inc., dated June 27, 2012.

29. "Impact of an ONEOK NGL Pipeline Release in At-Risk Landslide and/or Sinkhole Karst Areas of Crook County, Wyoming," prepared for landowners, by Richard B. Kuprewicz, Accufacts Inc., and submitted to Crook County Commissioners, dated July 16, 2012.

30. "Impact of Processing Dilbit on the Proposed NPDES Permit for the BP Cherry Point Washington Refinery," prepared for the Puget Soundkeeper Alliance, by Richard B. Kuprewicz, Accufacts Inc., dated July 31, 2012.

31. "Analysis of SWG's Proposed Accelerated EVPP and P70VSP Replacement Plans, Public Utilities Commission of Nevada Docket Nos. 12-02019 and 12-04005," prepared for the State of Nevada Bureau of Consumer Protection, by Richard B. Kuprewicz, Accufacts Inc., dated August 17, 2012.

32. "Accufacts Inc. Most Probable Cause Findings of Three Oil Spills in Nigeria," prepared for Bohler Advocaten, by Richard B. Kuprewicz, Accufacts Inc., dated September 3, 2012.

33. "Observations on Proposed 12-inch NGL ONEOK Pipeline Route in Crook County Sensitive or Unstable Land Areas," prepared by Richard B. Kuprewicz, Accufacts Inc., dated September 13, 2012.

34. "Findings from Analysis of CEII Confidential Data Supplied to Accufacts Concerning the Millennium Pipeline Company L.L.C. Minisink Compressor Project Application to FERC, Docket No. CP11-515-000," prepared by Richard B. Kuprewicz, Accufacts Inc., for Minisink Residents for Environmental Preservation and Safety (MREPS), dated November 25, 2012.

35. "Supplemental Observations from Analysis of CEII Confidential Data Supplied to Accufacts Concerning Tennessee Gas Pipeline's Northeast Upgrade Project," prepared by Richard B. Kuprewicz, Accufacts Inc., for Delaware RiverKeeper Network, dated December 19, 2012.

36. "Report on Pipeline Safety for Enbridge's Line 9B Application to NEB," prepared by Richard B. Kuprewicz, Accufacts Inc., for Equiterre, dated August 5, 2013.

37. "Accufacts' Evaluation of Oil Spill Joint Investigation Visit Field Reporting Process for the Niger Delta Region of Nigeria," prepared by Richard B. Kuprewicz for Amnesty International, September 30, 2013.

38. "Accufacts' Expert Report on ExxonMobil Pipeline Company Silvertip Pipeline Rupture of July 1, 2011 into the Yellowstone River at the Laurel Crossing," prepared by Richard B. Kuprewicz, November 25, 2013.

39. "Accufacts Inc. Evaluation of Transco's 42-inch Skillman Loop submissions to FERC concerning the Princeton Ridge, NJ segment," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated June 26, 2014, and submitted to FERC Docket No. CP13-551.

40. Accufacts report "DTI Myersville Compressor Station and Dominion Cove Point Project Interlinks," prepared by Richard B. Kuprewicz for Earthjustice, dated August 13, 2014, and submitted to FERC Docket No. CP13-113-000.

41. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated September 3, 2014, and submitted to FERC Docket No. CP13-551.

42. Accufacts' "Evaluation of Actual Velocity Critical Issues Related to Transco's Leidy Expansion Project," prepared by Richard B. Kuprewicz for Delaware Riverkeeper Network, dated September 8, 2014, and submitted to FERC Docket No. CP13-551.

43. "Accufacts' Report to Portland Water District on the Portland – Montreal Pipeline," with Appendix, prepared by Richard B. Kuprewicz for the Portland, ME Water District, dated July 28, 1014.

44. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz and submitted to FERC Docket No. CP13-551.

45. Review of Algonquin Gas Transmission LLC's Algonquin Incremental Market ("AIM Project"), Impacting the Town of Cortlandt, NY, FERC Docket No. CP14-96-0000, Increasing System Capacity from 2.6 Billion Cubic Feet (Bcf/d) to 2.93 Bcf/d," prepared by Richard B. Kuprewicz, and dated Nov. 3, 2014.

46. Accufacts' Key Observations dated January 6, 2015 on Spectra's Recent Responses to FERC Staff's Data Request on the Algonquin Gas Transmission Proposal (aka "AIM Project"), FERC Docket No. CP 14-96-000) related to Accufacts' Nov. 3, 2014 Report and prepared by Richard B. Kuprewicz.

47. Accufacts' Report on Mariner East Project Affecting West Goshen Township, dated March 6, 2015, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

48. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing on the Proposed System Integrity Projects ("SIP") to the Mississippi Public Service Commission ("MPSC") under Docket No. 15-UN-049 ("Docket"), prepared by Richard B. Kuprewicz, dated June 12, 2015.

49. Accufacts' Report to the Shwx'owhamel First Nations and the Peters Band ("First Nations") on the Trans Mountain Expansion Project ("TMEP") filing to the Canadian NEB, prepared by Richard B. Kuprewicz, dated April 24, 2015.

50. Accufacts Report Concerning Review of Siting of Transco New Compressor and Metering Station, and Possible New Jersey Intrastate Transmission Pipeline Within the Township of Chesterfield, NJ ("Township"), to the Township of Chesterfield, NJ, dated February 18, 2016.

51. Accufacts Report, "Accufacts Expert Analysis of Humberplex Developments Inc. v. TransCanada Pipelines Limited and Enbridge Gas Distribution Inc.; Application under Section 112 of the National Energy Board Act, R.S.C. 1985, c. N-7," dated April 26, 2016, filed with the Canadian Nation Energy Board (NEB).

52. Accufacts Report, " A Review, Analysis and Comments on Engineering Critical Assessments as proposed in

PHMSA's Proposed Rule on Safety of Gas Transmission and Gathering Pipelines," prepared for Pipeline Safety Trust by Richard B. Kuprewicz, dated May 16, 2016.

53. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing to the Mississippi Public Utilities Staff, "Accufacts Review of Atmos Spending Proposal 2017 – 2021 (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 15, 2016.

54. Accufacts Report, "Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL")," prepared for Earthjustice by Richard B. Kuprewicz, dated October 28, 2016.

55. Accufacts' Report on Mariner East 2 Expansion Project Affecting West Goshen Township, dated January 6, 2017, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

56. Accufacts Review of Puget Sound Energy's Energize Eastside Transmission project along Olympic Pipe Line's two petroleum pipelines crossing the City of Newcastle, for the City of Newcastle, WA, June 20, 2017.

57. Accufacts Review of the Draft Environmental Impact Statement for the Line 3 Pipeline Project Prepared for the Minnesota Department of Commerce, July 9, 2017, filed on behalf of Friends of the Headwaters, to Minnesota State Department of Commerce for Docket Nos. CN-14-916 & PPL-15-137.

58. Testimony of Richard B. Kuprewicz, president of Accufacts Inc., in the matter West Goshen Township and Concerned Citizens of West Goshen Township v. Sunoco Pipelines, L.P. before the Pennsylvania Public Utilities Commission, Docket No. C-2017-2589346, on July 18, 2017, on Behalf of West Goshen Township and Concerned Citizens of West Goshen Township.

59. Direct Testimony of Richard B. Kuprewicz, president of Accufacts Inc., on Behalf of Friends of the Headwaters regarding Enbridge Energy, Limited Partnership proposal to replace and reroute an existing Line 3 to the Minnesota Office of Administrative Hearings for the Minnesota Public Utilities Commission (MPUC PL-9/CN-14-916 and MPUC PL-9/PPL-15-137), September 11, 2017 and October 23, 2017.

60. Direct Testimony of Richard B. Kuprewicz On Behalf of The District of Columbia Government, before the Public Service Commission of the District of Columbia, in the matter of the merger of AltaGas Ltd. and WGL Holdings, Inc., Formal Case No. 1142, September 29, 2017.

61. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2018 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated December 4, 2017.

62. Report to Hugh A. Donaghue, Esquire, Concord Township Solicitor, "Accufacts Comments on Adelphia Project Application to FERC (Docket No. CP18-46-000) as it might impact Concord Township," dated May 30, 2018.

63. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2019 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 20, 2018.

64. Report to West Goshen Township Manager, PA, "Accufacts report on the repurposing of an existing 12-inch Sunoco pipeline segment to interconnect with the Mariner East 2 and Mariner East 2X crossing West Goshen Township," dated November 8, 2018.

65. Report to West Whiteland Township Manager, PA, "Accufacts Observations on Possible Pennsylvania State Pipeline Safety Regulations," prepared by Richard B. Kuprewicz, dated March 22, 2019.

66. Accufacts Public Comments on the Proposed Joint Settlement, BI&E v. Sunoco Pipeline L.P. ("SPLP"), Docket No. C-2018-3006534 ("Proposed Settlement"), submitted on August 15, 2019 to the Pennsylvania Public Utility Commission on the behalf of West Goshen Township as an intervener.

67. Report to West Whiteland Township Manager, Ms. Mimi Gleason, "Accufacts Perspective on Two Questions from West Whiteland's Board of Supervisors on Proposed Changes to ME 2 and ME 2X Construction/Operational Activities within West Whiteland," dated September 5, 2019."

10-22-24

68. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the episode on the evening of 8-5-19 at the Mariner East Boot Road Pump Station ("Event"), Boot Road, West Goshen Township, PA," dated September 16, 2019.

69. Provided direct testimony before the Arizona Corporation Commission, In the Matter of the Application of Southwest Gas Corporation for the Establishment of Just and Reasonable Rates and Charges Designed to Realize a Reasonable Rate of Return on Fair Value of the Properties of Southwest Gas Corporation Devoted to its Arizona Operations (Docket No. G-01551A-19-0055), testified on behalf of Utilities Division Arizona Corporation Commission, February 19, 2020.

70. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the Mariner East 2X Pipeline Affecting West Goshen Township," dated July 23, 2020.

71. Assisted the Commonwealth of Massachusetts, Office of the Attorney General in developing pipeline safety processes to be incorporated into the settlement agreement related to Columbia Gas' sale of Assets to Eversource following the Merrimack Valley, Massachusetts overpressure event of September 13, 2018.

72. Report to Natural Resources Defense Council, Inc., "Accufacts' Observations on the Use of Keystone XL Pipeline Pipe Exhibiting External Coating Deterioration Issues from Long Term Storage Exposure to the Elements," October 1, 2020.

73. Report to Pennsylvania Public Utilities Commission ("PAPUC"), "Accufacts Comments on Proposed Pennsylvania Intrastate Liquid Pipeline Safety Regulations," dated October 29, 2021, prepared for West Whiteland Township Board of Supervisors, West Whiteland Township, PA. Filed to PAPUC public web docket November 5, 2021 by West Whiteland Township under Reference Docket Number L-2019-3010267. Addresses suggested improvements in proposed pipeline safety rules for PA intrastate liquid transmission pipelines.

74. Submitted written testimony of Richard B. Kuprewicz on Behalf of Bay Mills Indian Community to ALJ Dennis Mack, dated December 14, 2021, in the matter of the Application of Enbridge Energy, Limited Partnership for Authority to Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac, before the State of Michigan Public Service Commission, U-20763.

75. Public presentation to New York State Indian Point Nuclear Facility Decommissioning Oversight Board on Holtec removal activities in proximity to Enbridge three Natural Gas Transmission Pipelines, March 17, 2022.

76. Report to Pipeline Safety Trust and Bold Alliance, "Accufacts' Perspectives on the State of Federal Carbon Dioxide Transmission Pipeline Safety Regulations as it Relates to Carbon Capture, Utilization, and Sequestration within the U.S.," March 23, 2022.

77. Accufacts Inc., Public Presentation for the National Academies of Science Engineering Medicine and The Transportation Research Board, "To Committee on Criteria for Installing Automatic and Remote-Controlled Shutoff Valves on Existing Gas and Hazardous Liquid Transmission Pipelines," 4/27/22.

78. Accufacts Inc, "6/13/22 Webinar to Illinois Emergency Responders, Healthcare Providers, & Local Officials on Responses to $CO_2$ Transmission Pipeline Releases," 6/13/22.

79. Accufacts Report for Pipeline Safety Trust, "Safety of Hydrogen Transportation by Gas Pipelines," 11/28/22.

80. Completed a series of testimonies related to Enbridge's Line 5 proposal to replace 2 – 20-inch diameter existing submerged pipelines currently lying across the bottom of the Straits of Mackinac with a 30-inch diameter grade X-70 pipeline, proposed to be installed in a 21-foot diameter concrete tunnel to be installed across the approximate 4-mile span of the Straits of Mackinac. Testified on Behalf of the Bay Mill Indian Community before the State of Michigan Public Service Commission, Docket U-20763, in opposition to this very poorly designed proposal/installation allowing for movement of the pipeline on rollers within the tunnel. Final testimony to the docket submitted May 19, 2023. This is the only pipeline proposal I am aware of in the world that would place a crude oil and liquid propane pipeline, especially a 30-inch diameter pipeline, within a tunnel.

81. Issued to Ms. Niroop Srivatsa, City Manager, "Accufacts Report for the City of Lafayette on the Status of the Tree Assessment Process with PG&E," indicating most of the trees identified for removal by PG&E risk management

10-22-24                                                                                                          Page 8 of 9

approach have nothing to do with gas pipeline safety, June 15, 2023.

82. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the Navigator Heartland Greenway LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0161, on behalf of Citizens Against Heartland Pipeline ("CAHGP"), McDonough County, Christian County and Hancock County (the "Counties") (jointly, "Citizen and County Intervenors" of "CCI"), raising serious questions as to PHMSA's recent assertions of pipeline safety jurisdiction, and underscoring the ICC's authority for pipeline siting jurisdiction of said pipeline proposal in the State of Illinois, filed June15, 2023.  Applicant has terminated their application.

83. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the WOLF Carbon Solutions US LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0475, for a certificate of authority to construct and operate a carbon dioxide pipeline and when necessary to take interest in property as provided by law of eminent domain, testifying on Behalf of Citizens Against Predatory Pipelines ("CAPP"): 1) identifying serious inadequacies in PHMSA's pipeline safety regulations, 2) explaining why the Commission should require pipeline temperature profiles 3) detailing why DNV-RP-F104 is not relevant to this filing and 4) underscoring the ICC's authority to require additional critical information from the Applicant in this matter, filed October 24, 2023.  Applicant has withdrawn their submission to the Commission.

84. Provided general summary, main observations/concerns, on "Draft Environmental Impact Statement: Otter Tail to Wilkin Carbon Dioxide Pipeline Project" submitted to Minnesota Public Utilities Commission regarding Summit Carbon Solutions, LLC proposed 28 mile long 4-inch diameter $CO_2$ liquid transmission pipeline ("Otter Tail Pipeline") within Minnesota, PUC Docket No. IP-7093/PPL-22-422, provided to Clean Up the River Environment ("CURE") on 1/29/2024.

85. Issued to EarthJustice, "Observations concerning Kern County's Draft Environmental Impact Report ("DEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated February 26, 2024, "Observations concerning Kern County's Recent Recirculated Draft Environmental Impact Report ("RDEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated July 17, 2024, and "Evaluation of Kern County Response to Comments and Final Recirculated Environmental Impact Report on the TerraVault I Carbon Capture and Storage Project, dated October 15, 2024.  The Project situated in Kern County is proposed by the California Resources Corporation to separate a portion of the pre-combustion Elk Hills field gas production, treat and inject via liquid transmission pipelines, $CO_2$ into two sequestration injection wells within the Elk Hill oil field.  The reports identify many technical gaps in filings to Kern County.

86. Issued for the Tribal Partnerships Program, "Observations on the U.S. Army Corps of Engineers Draft Environmental Assessment, Clean Water Act Section 404(b)(1) Guidelines Evaluation, and Public Interest Review (collectively referenced as "DCDD") for the Enbridge Line 5 Wisconsin Segment Relocation Project ("Project"), dated May 2024," report dated July 31, 2024 affecting the Bad River Band of the Lake Superior Tribe of Chippewa Indians reservation.

10-22-24

**Exhibits -Page 16**

# Exhibit B

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Evaluation of Las Flores Pipeline System Startup Proposal*

**Prepared For**

# The Center for Biological Diversity
# &
# The Environmental Defense Center

**December 20, 2024**

Accufacts Inc. 12-20-24

## Table of Contents

I.    *Executive summary and major findings* ...............................................................*1*

II.   *Accufacts experience qualifying me as an expert in this matter.*................................*3*

III.  *A brief historical perspective*........................................................................*4*

IV.   *The Las Flores Pipeline System.* ....................................................................*5*

V.    *TIMP regulations are not working to protect the public or the environment.* .........*8*

    1) **Hydrotesting assessments.** ...................................................................... **8**

    2) **ILI assessments.** ...........................................................................**10**

VI.   *The greatest threat on the Las Flores Pipeline System is from external corrosion.* ...................................................................................... **11**

VII.  *High pipeline operating temperatures accelerate all forms of corrosion.*........... *13*

VIII. *The Consent Decree agreement fails to require adequate IM processes to prevent another rupture of the poorly designed Pipelines.*...................................... *14*

IX.   *The poorly designed Pipelines cannot be made as safe as new pipelines.*.............. *14*

X.    *Conclusion.* ...................................................................................... *15*

Accufacts Inc. 12-20-24                                                                                     i

## I.    Executive summary and major findings

Accufacts Inc. ("Accufacts") was asked to review the documents related to the Las Flores Pipeline System ("Pipelines") for possible restart.  A Consent Decree signed in March, 2020 places responsibility for approving processes related to the onshore pipeline system restart on the California Office of the State Fire Marshal, or OSFM, the agency responsible for intrastate hazardous liquid pipeline safety.[1]  The Consent Decree replaces various Corrective Action Orders issued on the Pipelines by the Pipeline and Hazardous Materials Safety Administration, or PHMSA, the federal agency responsible for pipeline safety.[2]  PHMSA is the federal agency responsible for establishing minimum pipeline safety regulations for many pipelines operating in the U.S., including intrastate hazardous liquid transmission pipelines.  States meeting certain conditions can impose pipeline safety standards for intrastate pipelines beyond PHMSA regulations as long as such state regulations are not in conflict with PHMSA regulations.  By agreement, the Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed wavier alternative measures "provide an equal or greater level of safety."[3, 4]  The Consent Decree is inadequate, missing many corrosion threats to the Pipelines that can result in rupture.

Accufacts finds that the main technical issues concerning the restart of the Pipelines are:

1.  **The poorly designed pipeline system renders required federal mandated cathodic protection ("CP"), intended to help address pipeline external corrosion, ineffective.**
2.  **Current inline inspection ("ILI") technologies cannot adequately allow the assessment of all forms of external corrosion threats that most likely exist on the Pipelines.**
3.  **The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective CP system once the Pipelines go into operation.**
4.  **Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure. The poorly designed Pipelines cannot be made as safe as new pipelines.**

---

[1] Such state responsibility is dependent on whether the state agency meets certain qualifications required by PHMSA and whether the state Legislature has granted such state authority, as California has.

[2] UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA, UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, ex rel. DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, ex rel. CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, ex rel. CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, ex rel. CALIFORNIA STATE LANDS COMMISSION, ex rel. CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARCHALL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA (Plaintiffs) v. PLAINS ALL AMERICAN PIPELINE L.P. and PLAINS PIPELINE, L.P. (Defendants), Consent Decree, Civil Action No. 2:20-cv-20415 signed March 2020 ("Consent Decree").

[3] *Ibid.,* Appendix B & Appendix D, paragraph 1.

[4] PHMSA website, " Special Permits and State Waivers Overview," at https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

Accufacts Inc. 12-20-24                                                                 Page 1 of 15

Oil spills are catastrophic events, and operation of any pipeline carries a risk of spill. At best, good pipeline design and pipeline integrity management tools can reduce—but not eliminate—the risk. The Consent Decree is replacing incomplete integrity management ("IM") approaches implemented by Plains that failed to prevent a pipeline rupture from the poor design of the Pipelines, with another incomplete IM approach expecting a change in the outcome.

The Pipelines have been sitting shut down for over nine years at ambient temperatures without effective CP protection. While external corrosion rates in this shutdown mode are significantly reduced because of lower temperatures as discussed later in this report, **the risk of external corrosion is not eliminated**. The Consent Decree requires the OSFM to seek a waiver of the federal pipeline safety CP requirements defined under Subpart H, subject to the approval of PHMSA, to permit the Pipelines to restart.[5, 6] Complicating this matter is the incorporation of risk analysis by the state into the Consent Decree that is under the control of the pipeline operator and is not made fully public, but subject only to the "review and comment" of the OSFM. To be fair, the OSFM must meet certain state legislated risk analysis requirements that though well-meaning, are incomplete, such as, for example, how to define what a reasonable worst-case discharge is to prudently evaluate the risk of a pipeline failure.[7] This is a problem I often see abused in federal pipeline oil spill response plans that doesn't adequately capture pipeline rupture hydraulics.[8] One of the major problems with risk analysis, a determination of the likelihood of an event occurring, and why it is not codified into federal pipeline safety regulations, is that such approaches are usually not complete or representative of the true risks of a specific pipeline operation. The impacts of any pipeline failure are significant and long-lasting, causing destruction of habitats, death of wildlife, and even human fatalities. It is impossible to predict a pipeline failure, and decision-making based on the perceived probability of failure does not adequately account for the severe consequences that will ensue, particularly if those decisions fail to capture pipeline rupture hydraulics. I call this "Space Shuttle Syndrome," because, in the rush to launch the space shuttle program, NASA decisionmakers understated its true risks and dismissed well established safety culture protocols, resulting in the loss of two space shuttles and their crews and ending the space shuttle program.

The Consent Decree is placing undue responsibilities on the OSFM which might not appreciate the limits of current inline inspection technical capabilities. The Consent Decree overly relies on ILI technologies and their associated engineering critical assessments that are not capable of prudently addressing many forms of external corrosion, especially interactive forms such as Stress Corrosion Cracking, or SCC, whose time to failure is difficult, if not impossible, to predict as discussed later in this report. The current poorly designed Pipelines do not permit CP protection to mitigate external corrosion on the Pipelines that must operate at uniquely high temperatures. The required high temperatures accelerate all forms of external corrosion. New pipelines would incorporate proper design such as non-insulated pipe and newer forms of pipeline coating technology, that would permit CP to be effective in addressing external corrosion even at high temperatures to help assure pipeline safety. No pipeline waiver issued under the conditions addressed in the Consent Decree is consistent with pipeline safety nor can ensure the same level

---

[5] 49CFR§195 Subpart H - Corrosion Control.
[6] Consent Decree, Appendix B, "State Waivers for Line 901, 903 …..,".
[7] CA Code CCR 19§2111 – Risk Analysis.
[8] 49CFR§194 Response Plans for Onshore Oil Pipelines.

Accufacts Inc. 12-20-24    Page 2 of 15

of safety as that associated with a prudently designed pipeline system. Neither Plains, the pipeline operator at the time of the May 19, 2015 failure, nor the new owner, Sable, designed or built the present Pipelines with their serious deficiencies, but as a pipeline operator Sable bears the ultimate responsibilities should the Pipelines fail.

## II.    Accufacts experience qualifying me as an expert in this matter.

Accufacts Inc. ("Accufacts") was asked to review the Line 901/903 pipelines, now renamed Lines CA-324/CA-325 ("Pipelines"), and related documents such as those produced by the OSFM on their website.  A Consent Decree places responsibility for approving processes related to the onshore pipeline system restart first on the OSFM, then on PHMSA.[9]  The Center for Biological Diversity and The Environmental Defense Center asked Accufacts to provide an independent evaluation of documents related to a possible restart of the Pipelines to safely move heavy oil production from offshore platforms in the Santa Barbara Channel into the Pipelines.  It should be noted that the OSFM has recently issued a waiver on PHMSA's CP obligations for the Pipelines. I have not seen the details related to OSFM's decision on the granting of such a waiver.

I am a chemical engineer with over fifty years of experience in the energy industry, including over 25 years as president of Accufacts Inc. ("Accufacts").  Accufacts provides independent expert consulting services to assist decision makers in making informed decisions concerning pipelines. Pipeline safety expertise is provided in areas including, but not limited to: pipeline failure investigation, risk management/risk analysis, siting, construction, design, operation, maintenance, training, control room management including Supervisory Control and Data Acquisition ("SCADA") approaches, leak/rupture detection, integrity management, emergency and spill response, and pipeline safety regulatory development and compliance.  Much of my background is grounded in pipeline incident investigations following numerous pipeline rupture tragedies spanning several decades.

For the past two decades I have been involved as a representative of the public, which carries special obligations to avoid a conflict of interest, in advancing pipeline safety regulations at the federal and various state levels as demonstrated by my CV that is included as Attachment 1.  For example, I played a significant role representing the public in developing integrity management federal pipeline safety regulations in the early 2000s for both liquid and gas transmission pipelines. These regulatory approaches emulated safety process approaches that I instituted and developed for the City of Bellingham, WA to assure that a ruptured pipeline there could be restarted and operated safely.  This safety process approach, identified as the Pipeline Safety Immediate Action Plan, or PSIAP, identified steps that the pipeline operator was to complete following the Bellingham rupture tragedy of June 10, 1999, before that pipeline could be permitted to safely return to service.  The PSIAP is a matter of public record compliments of Washington State's Right-to-Know laws.  PSIAP formed a template for the integrity management safety regulations developed by the Office of Pipeline Safety, which morphed into PHMSA in 2003.

---

[9] Consent Decree, Appendix B & Appendix D.

Accufacts Inc. 12-20-24                                                                    Page 3 of 15

For approximately fifteen years, through the development of federal standards for Transmission Integrity Management Programs ("TIMP") for both liquid and gas integrity regulations, control room management ("CRM"), and Operator Qualification ("OQ") rulemaking efforts, to cite a few pipeline safety rulemaking efforts, I served on the Technical Hazardous Liquid Pipeline Safety Standards Committee, also referred to as the Liquid Pipeline Advisory Committee, or LPAC, to advise PHMSA on possible pipeline safety regulation advancement.  After a brief hiatus of several years, I have recently been reappointed by the Secretary of Transportation to represent the public again on LPAC, which carries numerous obligations to avoid a conflict of interest.  I believe I am more than qualified to comment as an expert on the various issues related to CA-324/CA-325 pipeline system possible restart.

## III.    A brief historical perspective



**Figure 1 – Overview of Pipelines**

Since the May 19, 2015 onshore pipeline rupture and oil release that spilled into the Santa Barbara Channel and beyond, the pipeline system known at the time as Lines 901/903, and offshore oil platforms feeding this system have been shut down.  Lines 901/903 have recently been renumbered CA-324 and CA-325, respectively.  These pipelines, which were classified as interstate pipelines at the time of the release, were ordered to be shut down and oil purged from the Pipelines and placed under nitrogen atmospheres under Corrective Action Orders instituted by PHMSA.  Line 901 experienced an onshore pipeline rupture failure caused by massive external corrosion and released on the late morning of May 19, 2015 near Refugio State Beach that placed a considerable amount of oil into the sensitive waters of the Santa Barbara Channel and beyond.  While the years since 2015 involved discussions for possible construction of new pipelines to replace the poorly

Accufacts Inc. 12-20-24                                                                           Page 4 of 15

designed Lines 901/903, recent activities shifting ownership of the pipelines and associated infrastructure to Sable Offshore Corp. ("Sable"), are now focused on restarting the existing pipelines under new ownership and conditions stated under a Consent Decree.

The May 19, 2015 Line 901 rupture failure occurred at approximately 4 miles (MP 4) downstream of the Las Flores Canyon Pump Station due to extensive external corrosion.  The Line 901 ruptured at approximately 56 % of the maximum operating pressure ("MOP") of 1341 pounds per square inch gauge ("psig") (which is 72 % specified minimum yield strength ("SMYS")).[10]  In addition, further metallurgical forensic reports attached to the PHMSA Final Report, indicate that pipeline ruptured at a pressure of 737 psig, which was 39.6% of SMYS.[11]  This pipeline failed at very low stress levels, not a surprise given that the depth of the corrosion failure was 89% of the measured wall thickness, and the ILI tools significantly mis indicated the size of the corrosion threats.[12]

**Figure 2 – Overview of Pipelines route with MPs estimated**



## IV.   The Las Flores Pipeline System.

The following is based on information readily in the public domain, as demonstrated by the footnote references.  Because of many variations in MP numbers in various documents, MP numbers referenced in this report should be considered approximate with slight variations that don't really impact my findings/conclusions/recommendations.

---

[10] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.14 of 23.
[11] DNV-G Final Report, "Line 901 Release (5/15/15) Mechanical and Metallurgical Testing, - Report No: OAPUS309DNOR (PP136049)," September 18, 2015, p. iii.
[12] *Ibid.,* "Summary of Observations," p. vi.

Accufacts Inc. 12-20-24                                                Page 5 of 15

The Pipelines, formerly identified as Line 901/903 operated by Plains (aka Plains All American Pipeline L.P. and Plains Pipeline L.P.), represent a pipeline system of approximately 125 miles in length running from the Las Flores Canyon Pump Station (milepost 0) to the Pentland Metering (and Storage) facility (at Milepost 125.3).  Figure 1 is a general overview of the Pipelines routing.  CA-224 (old Line 901) that runs from the Las Flores Canyon Pump Station (Milepost 0) to the Gaviota Meter Station (Milepost 10.7).  Note that I have reversed the Milepost reported in PHMSA's Final Report to follow more conventional milepost numbering, increasing from the pipeline inlet at the Las Flores Canyon Pump Station (MP 0), to the pipeline outlet of the 24-inch diameter Line 901/CA-224 pipeline, the Gaviota Metering Station (MP 10.7).  CA-324 is the sole feed into the 30-inch pipeline, CA-325A.  CA-325A runs from the Gaviota Metering Station to the Sisquoc pump station (MP 49.2).  CA-325B, also a 30-inch diameter pipeline, runs from the Sisquoc pump station (MP 49.2) to the Pentland metering station (~MP 125.3).  Figure 2 shows the general route adding approximate MP numbers following this similar MP increasing numbering all the way to Pentland.

According to the PHMSA Final Report on the 2015 rupture:

Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries. Plains' pipeline is composed of two major pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went into crude oil service in 1992 and 1991, respectively. The pipelines are coated with coal tar urethane and covered with foam insulation which in turn is covered by a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at all of the pipeline joints on Line 901 and multiple locations on Line 903. The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.

Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles downstream of the Las Flores Station. All of Line 901 crude oil throughput enters Line 903. Line 901 was manufactured of low carbon steel by Nippon Steel in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam. The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990.  There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream. At Emidio Station crude oil is delivered to above-

Accufacts Inc. 12-20-24                                                    Page 6 of 15

ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.[13]

**Figure 3 - Approximate Elevation Profile - Las Flores Canyon Pump Station (MP 0) to Pentland Station (MP ~125.3)**



PHMSA provided additional information related to Line 903:

> (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). [14]

> Plains has informed PHMSA that Line 903 has insulation and shrink wrap sleeves on the girth welds similar to the Affected Pipeline {Line 901}.[15]

It is not clear from the documents produced if Line 903 insulation is also tape wrapped like Line 901, that would further shield the CP system from the Pipelines, assuring that CP is ineffective.

Figure 3 is an approximate elevation profile (approximate elevation of pipeline in feet versus pipeline milepost) for the Las Flores Pipeline System developed by the Center for Biological Diversity's Geographic Information System, or GIS, specialist using information readily available in the public domain. Pipeline elevation profiles play a critical role in understanding liquid transmission pipeline operation and risks, such as evaluating ILI runs, valve placement/actuator decisions, emergency and oil spill actions, and spill response planning. In addition, if a pipeline hydraulic profile, also referred to as a hydraulic gradient, is superimposed on an elevation profile, much information about pipeline risk can be gained. A hydraulic gradient is required of the pipeline operator under California Risk Analysis regulation.[16] A pipeline hydraulic gradient includes a plot of operating pressure versus milepost for a specified crude oil gravity and flow rate, but for this unique system, a crude oil viscosity and temperature should also be included on the

---

[13] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016, pp. 4 & 5 of 21.
[14] *Ibid.,* p. 4 of 21.
[15] PHMSA – In the Matter of Plains Pipeline, LP, Respondent, "Amendment No. 1 to the Corrective Action Order – CPF No. 5-2015-5011H," p. 2.
[16] CA Code CCR 19§2111 – Risk Analysis (2) Pipeline Description (A).

Accufacts Inc. 12-20-24                                                          Page 7 of 15

hydraulic gradient as these parameters seriously impact the hydraulic gradient evaluation. Such hydraulic gradient information is important in evaluating the risks of a pipeline restart program, especially on the Pipelines given their highly unique elevation profile among other factors (See Figure 3). This information is probably not likely to be made public, though a competent experienced engineer can develop an approximate hydraulic profile for a pipeline system if they understand certain crude oil blended properties and temperatures.

## V.   TIMP regulations are not working to protect the public or the environment.

In the passage of the federal pipeline safety regulations setting standards for Transmission Integrity Management Programs, or TIMP, first for liquid, then gas, in 2002 and 2003, respectively, the use of performance-based approaches versus more prescriptive based regulations were agreed to as a compromise to advance important needed pipeline safety regulation in this area. Until the passage of TIMP regulations, pipeline operators were under no obligation to periodically assess the condition of their mainline pipelines. Performance-based regulation, in theory, allows a pipeline operator to choose between various alternatives that may work best for their pipeline. Prescriptive-based pipeline safety regulations historically have been imposed in federal pipeline safety regulatory efforts. Prescriptive regulations impose certain conditions that pipeline operators must, or shall, follow.

TIMP efforts for liquid pipelines define four basic approaches permitted in pipeline integrity assessment, depending on the pipeline threat that a pipeline segment might experience. Briefly, the major assessment methods most appropriate for this pipeline system are hydrostatic pressure testing ("hydrotesting") and inline inspection ("ILI") also known as smart pigging. As the Line 901 onshore oil release that flowed into sensitive waterway areas has clearly demonstrated, TIMP regulation is not working for many pipeline operators, even after the operator had run multiple ILI corrosion tool runs which I will expand on further below. Another unexpected outcome of TIMP performance-based regulation is that such less than clear regulation efforts are harder to enforce.

It's important to note that pipeline integrity management tools are not a substitute for proper pipeline design or effective cathodic protections. Their purpose is simply to monitor the condition of pipelines over time and identify threats to the pipeline's integrity.

### 1) Hydrotesting assessments.

Properly performed hydrotesting can be an important pipeline integrity assessment tool that proofs a pipeline's fitness for service to safely operate at MOP at the time of the hydrotest. Hydrotesting involves shutting down a pipeline and filling a pipeline segment with water. Proof of pipeline integrity or fitness for service testing is verified by carefully increasing water pressure with a water injection pump after air has been removed and the pipeline segment temperature stabilized. While federal pipeline safety regulations for liquid transmission pipelines define a "Subpart E" hydrotest to establish or verify maximum operating pressure, or MOP, a term having specific meaning in regulation, the regulations are not specific on important parameters to ensure a quality hydrotest that doesn't damage the pipe. Minimum hydrotest pressures are established to verify the MOP at the time of the hydrotest, with

Accufacts Inc. 12-20-24                                              Page 8 of 15

sufficient pressure safety margin at the time of the hydrotest. A Subpart E hydrotest is a proof for fitness test that the pipeline, at the time of the test, can withstand pressures above the MOP with a certain margin of pressure safety.[17]

One important caveat is needed regarding Subpart E hydrotests, which are often called strength tests. For a pipeline experiencing certain cracking threats such as selective seam cracking (SSC) or stress corrosion cracking (SCC)—corrosion threats that likely exist along the Las Flores Pipeline System—**a subpart E hydrotest is inadequate**. Current ILI technology cannot reliably identify if such cracking threats are present. More importantly, nor can associated engineering critical assessments provide prudent evaluation of such threats due to the inability to reliably predict corrosion colonies that can interact or link together in unpredictable ways. SCC colonies can be associated with disbonded coatings such as that occurring on the Pipelines where CP current is prevented from reaching the outer pipewall steel. A much higher pressure (higher % Specified Minimum Yield Strength, or SMYS) hydrotest is warranted. A prudent risk analysis should clearly demonstrate if such external corrosion cracking threats from environmental factors are possible around the Pipelines**. I need to note that it is not clear whether hydrotesting, if performed, will be a Subpart E test or a higher % SMYS hydrotest intended to address cracking threats such as SCC**. The Consent Decree strangely makes no mention of corrosion cracking threats or hydrotesting.

While considerable discussion in the Consent Decree has focused on the use of ILI to identify possible general wall loss corrosion threats well before failure, this agreement makes no mention of other forms of corrosion related threats such as corrosion cracking SCC or SSC. These forms of corrosion cracking are very challenging to identify via ILI, and more importantly, engineering critical assessments associated with ILI to predict time to failure can be highly unreliable, given the inactive threat nature of these type of corrosion cracking threats. The corrosion cracking threats tend to fail as pipeline ruptures. It is important that the cracking threat potentials on the Pipelines be prudently addressed and proposed solution be made public and transparent.

For pipeline segments that undergo large elevation changes, like the Line 325A/B segments, the pipeline must be cut up into segments to assure hydrotesting pressure ranges do not permanently deform the pipe. Hydrotesting can be more expensive than other pipeline integrity assessments such as ILI, but there are no built-in assumptions about the quality and thoroughness of the assessment that can be mismanaged such as that which can and often does occur with ILI approaches resulting in numerous pipeline ruptures after ILI assessments, as the May 19, 2015 release has clearly demonstrated. Hydrotesting is much more reliable than other pipeline integrity assessment approaches, such as ILI, at verifying a pipeline's fitness for service at the time of the test. Hydrotesting is usually performed by contractor firms experienced and qualified to perform a proper hydrotest for specific types of threats. The Consent Decree requires certain threshold general corrosion threats if identified by ILI be remediated before restart.[18]

---

[17] 49CFR§195.304 Test pressure
[18] Consent Decree, Appendix B (4) Integrity Management.

Accufacts Inc. 12-20-24                                                                 Page 9 of 15

Hydrotesting is warranted, justified, and vastly appropriate for the Pipelines which have been sitting for over nine years without effective CP.  I also need to mention that the use of nitrogen gas to idle the pipeline was meant to avoid internal corrosion attack and plays no role in preventing external corrosion attacks to keep the Pipelines in a "corrosion-free state" as mentioned by Steve Rusch, Sable's vice president of environmental and regulatory affairs.[19]  The external corrosion sites experience reduced corrosion rates from the lower ambient soil temperatures as no hot oil was passing through the system, but the corrosion sites are not inactive, especially if CP systems are ineffective, such as on the Pipelines.

**2) ILI assessments.**

In the U.S.**,** ILI or smart pig tool efforts started to develop in the early 1980s depending on the threat a pipeline operator was trying to address.  ILI tools are usually multi-ton devices run inside a pipeline while the pipeline is operating to ascertain the condition of the pipeline depending on the type of threats trying to be analyzed.  Given the advancements in technology including shrinking the equipment, ultrasonic, or UT, approaches that focus on direct anomaly measurement has historically proven superior for general wall thinning corrosion evaluation to approaches using inferred software-based algorithms, such as magnetic flux leakage ("MFL") testing.  Some ILI tools are more suitable than others depending on the threat.  There is a wide spectrum of ILI tools and different technological approaches to select from depending on the type of threat trying to be reviewed.   Operators don't always select the ILI technology best suited to help identify threats on their system.  Even with the advances in tool development and approaches there can still be a wide variation as to whether a specific ILI tool or vendor can properly identify a specific pipe threat and permit it to be further properly characterized after an ILI run.  This is why pipeline operators will incorporate ILI tool tolerances and perform field verification digs to produce "unity plots" for a specific ILI run, to verify ILI vendor claims about their technology and its specific performance.  This field verification data was not shared by Plains with the ILI vendor, a serious deficiency in ILI utilization.  It is worth noting the PHMSA made it a point in their Failure Analysis of the Line 901 release, that the pipeline operator had not provided field dig verification feedback to the ILI vendor to confirm ILI capability.[20]  For example, corrosion attacks can take on many forms such as general pipewall thinning (usually the easiest to determine depending on the ILI technology), various forms of corrosion cracking such as stress corrosion cracking ("SCC"), selective seam corrosion cracking ("SSC"), and pit corrosion.  All such corrosion threats can lead to a pipeline failure and release.  Based on my experience involving investigations of liquid transmission pipeline ruptures from SCC and SSC after ILI runs, some segments of the Pipelines exhibit the potential for SCC or SSC.  Such external corrosion cracking threats are often found on pipelines with disbonded coating that are exposed to corrosion environments such as that introduced by the Pipeline's insulation.  It is incumbent on the new Pipeline operator, Sable, to demonstrate to the OSFM, and to the public and various regulatory agencies that SCC/SSC external cracking environments do not exist.

---

[19] Los Angeles Times article by Tony Briscoe, "*Plan to restart pipeline sparks anger*," Front page, October 20, 2024.
[20] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.13 of 21.

Accufacts Inc. 12-20-24                                                                                    Page 10 of 15

Some forms of ILI technology to identify certain pipeline threats, if properly managed, can be superior to hydrotesting as they may identify some threats well before they go to failure.  As too clearly demonstrated, however, in the May19, 2015 Line 901 rupture, ILI cannot address all forms of external corrosion threat that are likely to exist on the Pipelines because of their poor design, their unique high temperature operation, and ineffectiveness of CP.  If a corrosion ILI tool can be utilized within the limits of the pig vendor specification (i.e., such as maintaining pig speed within the operating pipeline), and if the ILI tool run is independently field verified, some ILI tools can be a superior form of assessment for many types of pipeline threats, such as general internal and external corrosion (i.e. wall-thinning) if prudently managed.  The more specialized forms of corrosion, cracking and pitting, or corrosion within dents, however, can be much more challenging as ILI tools and their related engineering critical assessments still have technical limits.  ILI tool vendors place specific limitations on their various tools, and it is important that the pipeline operator follow such restrictions that can easily invalidate an ILI tool run reading or result.  ILI runs in hilly terrain, such as that which exist with the Pipelines (See Figure 3) can be quite challenging for ILI tools that can easily exceed multiple tons in weight as gravity never shuts off.

In investigating numerous pipeline rupture failures after ILI tool runs, I consistently see failures on the part of the pipeline operators to perform sufficient field verification digs to determine if bias is being introduced in a specific ILI tool approach on a specific pipeline segment, for a specific pipeline threat, and that the ILI tool selected is really appropriate to identify certain pipeline threats.  Some pipeline operators repeatedly fail to recognize or even consider ILI tool capabilities and tolerances, especially as ILI vendors and pipeline engineers have tried to improve technologies and assessment techniques.  It is worth noting that no one markets ILI tools claiming they don't work.  An important consideration in integrity management approaches is whether the right ILI technology has been selected and is being prudently utilized by the pipeline operator.  It is further worth noting that while running an ILI tool is not inexpensive, the cost of running such a tool is relatively less expensive compared to the overall quality of the field integrity verification program to assure the ILI tool is doing its job for a specific type of pipeline threat, on a specific pipeline segment.

Part of the problem is that many forms of interactive external corrosion pipeline cracking threats cannot be accurately characterized to allow meaningful engineering critical assessments that are reliable.  Such assumptions or inability to properly engineer and predict interactive threats introduce significant margins of error to fitness for service predictions using ILI assessments.  Just doing ILI reassessments when they really aren't capable of dealing with interactive corrosion threats is an illusion of safety.  Basically, performing an inappropriate ILI assessment more often is not the solution as further explained below.

## VI.  The greatest threat on the Las Flores Pipeline System is from external corrosion.

It should not take a pipeline failure to identify that the greatest pipeline integrity threat on the Pipelines is from various forms of external corrosion due to poor design of these Pipelines rendering CP systems ineffective at reducing or preventing external corrosion failure.

Accufacts Inc. 12-20-24                                                         Page 11 of 15

The PHMSA Final Report stated:

**Proximate or Direct Cause**

PHMSA determined that the proximate or direct cause of the release was progressive external corrosion of the insulated 24-inch diameter steel pipeline. The corrosion occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied directly to the bare pipe, covered by foam thermal insulation with an overlying Polyken tape wrap. Water has been noted in the foam insulation at a number of digs, indicating that the integrity of the coating system had been compromised. The external corrosion was facilitated by the environment's wet/dry cycling, as determined by the PHMSA-approved, third-party metallurgical laboratory. The release was a single event caused at an area where external corrosion had thinned the pipeline wall. There is no evidence that the pipeline leaked before the rupture. There was a telltale "fish mouth" (a split due to over-pressurization) at the release site indicating the line failed in a single event.[21]

PHMSA goes on to list numerous contributory causes, among them a significant observation, "Corrosion under insulation (CUI) cannot be prevented on insulated lines where the coating system has been compromised."[22] This important fact should also play a major role into any decision to restart the Las Flores Pipeline System as explained in further detail in this report. This critically important PHMSA observation should not come as a surprise to any pipeline operator. Bottom line, Plains acquired a poorly designed set of Pipelines in the early 1990s that rendered the CP system ineffective at preventing or mitigating external corrosion on a pipeline system operating at high temperatures. Some years after acquiring the Pipelines and after TIMP regulations were promulgated in late 2002, Plains did not implement an appropriate integrity management program to prevent the pipeline failure from external corrosion attack. The question now is whether Sable's compliance with the Consent Decree under the approval of the OSFM relying on the capabilities of ILI tools can prevent another failure on the Pipelines? **Clearly, current ILI technology does not meet an obligation to reliably identify all forms of external corrosion most likely present on much of the Pipelines.** The CP systems required by PHMSA regulations will not be effective on most of the pipeline mileage in the Las Flores Pipeline System as previously discussed, and from my perspective there is serious doubt as to whether these poorly designed pipelines can be made as safe as new pipelines that have properly functioning cathodic protections.

Regarding the Las Flores Pipeline restart decision and related integrity assessments, it is important to understand how CP systems are supposed to work. In layman's terms, a CP system impresses a weak current into a pipeline turning the pipeline into a cathode in an electrochemical corrosion cell on the outside of a buried pipeline, to control or reduce external corrosion. Older nonconducting pipeline coatings such as that which exists on the Pipelines do not allow for CP current to pass through them. The purpose of the CP system is thus to introduce current to the outer pipewall where the older coatings have been penetrated, such as with holes or tears in the outer coating. Unfortunately, older pipeline external coatings such as the urethane coal tar outer coatings, like those on the Pipelines, are also well known to not adhere tightly to a pipeline over time, causing coating separation or disbondment. Such disbondment can result in external

---

[21] *Ibid*, p. 14 of 21.
[22] *Ibid.,* p. 14 of 21.

Accufacts Inc. 12-20-24                                                                                    Page 12 of 15

pipewall corrosion cells under the coating, generating many different forms of corrosion, especially SCC and SSC cracking in the wrong environments, that are not protected by CP. To add to this threat of external corrosion, the Las Flores Pipeline System's external insulation traps and serves as a water conduit further increasing external corrosion as a water fed corrosion attack. And lastly, the Polyken tape wrap installed during pipeline installation around the outside of the insulation is also well known to not be conductive, further shielding and preventing CP current from reaching the outer pipe wall. **This is a perfect storm or combination of factors all working to render CP ineffective.** Without effective cathodic protections, the pipeline is at particularly high risk of spilling again. To further underscore the lack of a proper integrity management program, this pipeline operates at elevated temperature that accelerates external corrosion as explained further below. New types of pipeline coatings now allow the passage of CP current through such coating to mitigate external corrosion even if the coating disbonds from the pipeline.

## VII. High pipeline operating temperatures accelerate all forms of corrosion.

**Figure 4  Los Flores Temperature Data from DNV Line 901 Release (5/19/15) Technical Root Cause Analysis included in PHMSA Final Report.[23]**



If one is experienced in handling/refining the heavy crude oils produced offshore that feed into the Las Flores Pipeline System, this crude oil not only needs to be diluted with natural gas liquids, or NGLs, but the pipeline must be operated at high pipeline temperatures, approximately 135 °F, that also is required to reduce the blended oil viscosity to get the fluid over the main hill beyond the Sisquoc Pump Station to Pentland. While the PHMSA Final Report mentions 135 °F as a pipeline operating temperature, Figure 4 represents a temperature graph indicting 135 °F was not unusual, but higher fluid temperature to improve the flow and capacity of the Pipelines did occur.

Chemical engineers experienced in reaction kinetics are familiar with the Arrhenius equation which indicates that chemical reaction rates, such as that for corrosion, essentially double for every 10 °C (18 °F) increase in temperature. This means that the rate of corrosion at 140 °F is about 32

---

[23] *Ibid.,* "Figure 23, L901 Las Flores Station Temperature Data," p. 375 of 510.

Accufacts Inc. 12-20-24                                                                 Page 13 of 15

times that for a pipeline operating at 60 °F, a typical ambient soil condition.  Because of the higher viscosity of unblended offshore oil there probably is little opportunity to reduce the Las Flores Pipeline System temperature to help reduce corrosion rates on a pipeline system where the CP system is ineffective. If the Pipelines are returned to operation, all forms of external corrosion will remain a primary threat of concern for pipeline failure.

## VIII.  The Consent Decree agreement fails to require adequate IM processes to prevent another rupture of the poorly designed Pipelines.

It is important to understand that the Consent Decree is just a compromise agreement between the signature parties and may be missing important technical matters related to the Pipelines.  I find it odd that many of the technical issues discussed above were not identified or addressed in the Consent Decree.  External corrosion cracking risk was well known for many decades to be a threat of concern for pipelines exhibiting disbonded external coating where CP systems are ineffective.

I find it especially strange that Plains the pipeline operator at the time of the Line 901 rupture got itself into serious trouble by failing to understand that the poor design of the Pipelines could not be adequately addressed by ILI.  It appears that the Consent Decree continues to foster the illusion that ILI can adequately permit assessment of corrosion risks, especially cracking threats most likely to exist on major segments of the Pipelines (see Figure 3, for example).  The Consent Decree doesn't even mention corrosion cracking threats for this system operating at high temperature that exacerbates all forms of external corrosion as previously discussed.

And lastly, I would caution that the Consent Decree gives authority to the OSFM on certain pipeline safety related decisions. These OSFM decisions, however, cannot violate federal pipeline safety regulations and that I believe require a public decision process for PHMSA approval to assure any waiver meets or exceeds the level of safety had the wavier not been requested.

## IX.  The poorly designed Pipelines cannot be made as safe as new pipelines.

Sable's website implies that the Pipelines will be repaired, stating "PPC undertook a comprehensive repair and maintenance program to restore the pipeline to "as-new" condition."[24] As referenced in footnote 19 above, this isn't the only time that a Sable representative has suggested the Pipelines will be restored to "as-new" condition or a "corrosion free" state.  A new pipeline would be properly designed such that the federal pipeline safety regulations requiring a CP system would be effective and do its job, while allowing CP monitoring to assure the new pipelines were adequately protected from external corrosion attack by an effective CP design.  A new pipeline would not be trying to utilize CP on a pipeline improperly coated, that seriously disbonds from the pipe, with a system insulated to assist in water reaching the outer pipe steel, while operating at higher temperature.  All these poor design factors accelerate all forms of external corrosion including cracking.  It is a misguided illusion that relying on ILI can attempt to stay ahead of pipeline failure on such a poorly designed system.  A cursory review of the PHMSA Final

---

[24] See Sable's website concerning, "Sable Offshore Corp. Provides Update on Pacific Pipeline Company Operations," October 28, 2024, at: https://www.sableoffshore.com/news/news-details/2024/Sable-Offshore-Corp.-Provides-Update-on-Pacific-Pipeline-Company-Operations/default.aspx.

Accufacts Inc. 12-20-24                                                                           Page 14 of 15

**Exhibits -Page 33**

Report, Appendix G In-Line Inspection report will indicate that even running ILI tools, it is impossible to return Line 901 to an "as new" condition given the numerous corrosion anomalies.[25] The idea that running ILI tools should be sufficient to assure an "as-new" pipeline condition and safe operation of these poorly designed Pipelines with ineffective CP protection is a false premise, as the Pipelines are far from being in a new condition, with numerous anomalies, given their poor design approach and operating history.

## X.    Conclusion.

Given the ineffectiveness of the CP system to protect against external corrosion and the fact that the Pipelines have sat for over nine years without effective CP, and the failure of the Consent Decree to address these possible threats via proper hydrotesting and ILI, it is imprudent to expect that such limited assessment techniques can adequately protect against corrosion failure.  Poor pipeline design and using the wrong set of integrity management tools (i.e., tools that do not adequately detect and permit the prudent evaluation of the type of corrosion threats specific to a given pipeline) can make the risk of an oil spill orders of magnitude worse. The Las Flores Pipeline System is unusually dangerous given its age and inherent design flaws.

The above represents my opinions based on experience with too many pipeline rupture investigations.  I reserve the right to update this report if more relevant information is made available.

Richard B. Kuprewicz
President
Accufacts Inc.

---

[25] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara Country, California, - Appendix G In-Line Inspection Report by Lamontagne for the Oak Ridge National Laboratory" May 2016, pp. 44 – 138 of 510.

**Attachment 1**

## Curriculum Vitae.

# Richard B. Kuprewicz

**8151 164th Ave NE**
**Redmond, WA   98052**

**Tel:  425-802-1200 (Office)**
**E-mail: kuprewicz@comcast.net**

---

**Profile:**    As president of Accufacts Inc., I specialize in gas and liquid pipeline investigation, auditing, risk management, siting, construction, design, operation, maintenance, training, SCADA, leak detection, management review, emergency response, and regulatory development and compliance.  I have consulted for various local, state and federal agencies, NGOs, the public, and pipeline industry members on pipeline regulation, operation and design, with particular emphasis on operation in unusually sensitive areas of high population density or environmental sensitivity.

---

**Employment:**    **Accufacts Inc.**                                        **1999 – Present**

Pipeline regulatory advisor, incident investigator, and expert witness on all matters related to gas and liquid pipeline siting, design, operation, maintenance, risk analysis, and management.

**Position:**    President
**Duties:**    > Full business responsibility
> Technical Expert

**Alaska Anvil Inc.**                                        **1993 – 1999**

Engineering, procurement, and construction (EPC) oversight for various clients on oil production facilities, refining, and transportation pipeline design/operations in Alaska.

**Position:**    Process Team Leader
**Duties:**    > Led process engineers group
> Review process designs
> Perform hazard analysis
> HAZOP Team leader
> Assure regulatory compliance in pipeline and process safety management

**ARCO Transportation Alaska, Inc.**              **1991 - 1993**

Oversight of Trans Alaska Pipeline System (TAPS) and other Alaska pipeline assets for Arco after the Exxon Valdez event.

**Position:**    Senior Technical Advisor
**Duties:**    > Access to all Alaska operations with partial Arco ownership
> Review, analysis of major Alaska pipeline projects

**ARCO Transportation Co.**                              **1989 – 1991**

Responsible for strategic planning, design, government interface, and construction of new gas pipeline projects, as well as gas pipeline acquisition/conversions.

**Position:**    Manager Gas Pipeline Projects
**Duties:**    > Project management
> Oil pipeline conversion to gas transmission
> New distribution pipeline installation
> Full turnkey responsibility for new gas transmission pipeline, including FERC filing

10-22-24                                                                                      Page 1 of 9

**Exhibits -Page 35**

**Four Corners Pipeline Co.**                              **1985 – 1989**

Managed operations of crude oil and product pipelines/terminals/berths/tank farms operating in western U.S., including regulatory compliance, emergency and spill response, and telecommunications and SCADA organizations supporting operations.

**Position:**      Vice President and Manager of Operations
**Duties:**        > Full operational responsibility
                   > Major ship berth operations
                   > New acquisitions
                   > Several thousand miles of common carrier and private pipelines

**Arco Product CQC Kiln**                                  **1985**

Operations manager of new plant acquisition, including major cogeneration power generation, with full profit center responsibility.

**Position:**      Plant Manager
**Duties:**        > Team building of new facility that had been failing
                   > Plant design modifications and troubleshooting
                   > Setting expense and capital budgets, including key gas supply negotiations
                   > Modification of steam plant, power generation, and environmental controls

**Arco Products Co.**                                      **1981 - 1985**

Operated Refined Product Blending, Storage and Handling Tank Farms, as well as Utility and Waste Water Treatment Operations for the third largest refinery on the west coast.

**Position:**      Operations Manager of Process Services
**Duties:**        > Modernize refinery utilities and storage/blending operations
                   > Develop hydrocarbon product blends, including RFGs
                   > Modification of steam plants, power generation, and environmental controls
                   > Coordinate new major cogeneration installation, 400 MW plus

**Arco Products Co.**                                      **1977 - 1981**

Coordinated short and long-range operational and capital planning, and major expansion for two west coast refineries.

**Position:**      Manager of Refinery Planning and Evaluation
**Duties:**        > Establish monthly refinery volumetric plans
                   > Develop 5-year refinery long range plans
                   > Perform economic analysis for refinery enhancements
                   > Issue authorization for capital/expense major expenditures

**Arco Products Co.**                                      **1973 - 1977**

Operating Supervisor and Process Engineer for various major refinery complexes.

**Position:**      Operations Supervisor/Process Engineer
**Duties:**        > FCC Complex Supervisor
                   > Hydrocracker Complex Supervisor
                   > Process engineer throughout major integrated refinery improving process yield
                     and energy efficiency

10-22-24

**Qualifications:**

Served for over fifteen years as a member representing the public on the federal Technical Hazardous Liquid Pipeline Safety Standards Committee (THLPSSC), a technical committee established by Congress to advise PHMSA on pipeline safety regulations.
Committee members are appointed by the Secretary of Transportation.

Served seven years, including position as its chairman, on the Washington State Citizens Committee on Pipeline Safety (CCOPS).
Positions are appointed by the governor of the state to advise federal, state, and local governments on regulatory matters related to pipeline safety, routing, construction, operation and maintenance.

Served on Executive subcommittee advising Congress and PHMSA on a report that culminated in new federal rules concerning Distribution Integrity Management Program (DIMP) gas distribution pipeline safety regulations.

As a representative of the public, advised the Office of Pipeline Safety on proposed new liquid and gas transmission pipeline integrity management rulemaking following the pipeline tragedies in Bellingham, Washington (1999) and Carlsbad, New Mexico (2000).

Member of Control Room Management committee assisting PHMSA on development of pipeline safety Control Room Management (CRM) regulations.

Certified and experienced HAZOP Team Leader associated with process safety management and application.

**Education:**

| | |
|---|---|
| MBA (1976) | Pepperdine University, Los Angeles, CA |
| BS Chemical Engineering (1973) | University of California, Davis, CA |
| BS Chemistry (1973) | University of California, Davis, CA |

**Publications in the Public Domain:**

1. "An Assessment of First Responder Readiness for Pipeline Emergencies in the State of Washington," prepared for the Office of the State Fire Marshall, by Hanson Engineers Inc., Elway Research Inc., and Accufacts Inc., and dated June 26, 2001.

2. "Preventing Pipeline Failures," prepared for the State of Washington Joint Legislative Audit and Review Committee ("JLARC"), by Richard B. Kuprewicz, President of Accufacts Inc., dated December 30, 2002.

3. "Pipelines - National Security and the Public's Right-to-Know," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated May 14, 2003.

4. "Preventing Pipeline Releases," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated July 22, 2003.

5. "Pipeline Integrity and Direct Assessment, A Layman's Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated November 18, 2004.

6. "Public Safety and FERC's LNG Spin, What Citizens Aren't Being Told," jointly authored by Richard B. Kuprewicz, President of Accufacts Inc., Clifford A. Goudey, Outreach Coordinator MIT Sea Grant College Program, and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated May 14, 2005.

7. "A Simple Perspective on Excess Flow Valve Effectiveness in Gas Distribution System Service Lines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated July 18, 2005.

8. "Observations on the Application of Smart Pigging on Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated September 5, 2005.

9. "The Proposed Corrib Onshore System - An Independent Analysis," prepared for the Centre for Public Inquiry by Richard B. Kuprewicz, dated October 24, 2005.

10. "Observations on Sakhalin II Transmission Pipelines," prepared for The Wild Salmon Center by Richard B. Kuprewicz, dated February 24, 2006.

11. "Increasing MAOP on U.S. Gas Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2006. This paper was also published in the June 26 and July 1, 2006 issues of the Oil & Gas Journal and in the December 2006 issue of the UK Global Pipeline Monthly magazines.

12. "An Independent Analysis of the Proposed Brunswick Pipeline Routes in Saint John, New Brunswick," prepared for the Friends of Rockwood Park, by Richard B. Kuprewicz, dated September 16, 2006.

13. "Commentary on the Risk Analysis for the Proposed Emera Brunswick Pipeline Through Saint John, NB," by Richard B. Kuprewicz, dated October 18, 2006.

14. "General Observations On the Myth of a Best International Pipeline Standard," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2007.

15. "Observations on Practical Leak Detection for Transmission Pipelines – An Experienced Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated August 30, 2007.

16. "Recommended Leak Detection Methods for the Keystone Pipeline in the Vicinity of the Fordville Aquifer," prepared for TransCanada Keystone L.P. by Richard B. Kuprewicz, President of Accufacts Inc., dated September 26, 2007.

17. "Increasing MOP on the Proposed Keystone XL 36-Inch Liquid Transmission Pipeline," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated February 6, 2009.

18. "Observations on Unified Command Drift River Fact Sheet No 1: Water Usage Options for the current Mt. Redoubt Volcano threat to the Drift River Oil Terminal," prepared for Cook Inletkeeper by Richard B. Kuprewicz, dated April 3, 2009.

19. "Observations on the Keystone XL Oil Pipeline DEIS," prepared for Plains Justice by Richard B. Kuprewicz, dated April 10, 2010.

20. "PADD III & PADD II Refinery Options for Canadian Bitumen Oil and the Keystone XL Pipeline," prepared for the Natural Resources Defense Council (NRDC), by Richard B. Kuprewicz, dated June 29, 2010.

21. "The State of Natural Gas Pipelines in Fort Worth," prepared for the Fort Worth League of Neighborhoods by Richard B. Kuprewicz, President of Accufacts Inc., and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated October, 2010.

22. "Accufacts' Independent Observations on the Chevron No. 2 Crude Oil Pipeline," prepared for the City of Salt Lake, Utah, by Richard B. Kuprewicz, dated January 30, 2011.

23. "Accufacts' Independent Analysis of New Proposed School Sites and Risks Associated with a Nearby HVL Pipeline," prepared for the Sylvania, Ohio School District, by Richard B. Kuprewicz, dated February 9, 2011.

24. "Accufacts' Report Concerning Issues Related to the 36-inch Natural Gas Pipeline and the Application of Appleview, LLC Premises:  7009 and 7010 River Road, North Bergen, NJ," prepared for the Galaxy Towers Condominium Association Inc., by Richard B. Kuprewicz, dated February 28, 2011.

25. "Prepared Testimony of Richard B. Kuprewicz Evaluating PG&E's Pipeline Safety Enhancement Plan," submitted on behalf of The Utility Reform Network (TURN), by Richard B. Kuprewicz, Accufacts Inc., dated January 31, 2012.

26. "Evaluation of the Valve Automation Component of PG&E's Safety Enhancement Plan," extracted from full testimony submitted on behalf of The Utility Reform Network (TURN), by Richard B.Kuprewicz, Accufacts Inc., dated January 31, 2012, Extracted Report issued February 20, 2012.

27. "Accufacts' Perspective on Enbridge Filing to NEB for Modifications on Line 9 Reversal Phase I Project," prepared for Equiterre Canada, by Richard B. Kuprewicz, Accufacts Inc., dated April 23, 2012.

28. "Accufacts' Evaluation of Tennessee Gas Pipeline 300 Line Expansion Projects in PA & NJ," prepared for the Delaware RiverKeeper Network, by Richard B. Kuprewicz, Accufacts Inc., dated June 27, 2012.

29. "Impact of an ONEOK NGL Pipeline Release in At-Risk Landslide and/or Sinkhole Karst Areas of Crook County, Wyoming," prepared for landowners, by Richard B. Kuprewicz, Accufacts Inc., and submitted to Crook County Commissioners, dated July 16, 2012.

30. "Impact of Processing Dilbit on the Proposed NPDES Permit for the BP Cherry Point Washington Refinery," prepared for the Puget Soundkeeper Alliance, by Richard B. Kuprewicz, Accufacts Inc., dated July 31, 2012.

31. "Analysis of SWG's Proposed Accelerated EVPP and P70VSP Replacement Plans, Public Utilities Commission of Nevada Docket Nos. 12-02019 and 12-04005," prepared for the State of Nevada Bureau of Consumer Protection, by Richard B. Kuprewicz, Accufacts Inc., dated August 17, 2012.

32. "Accufacts Inc. Most Probable Cause Findings of Three Oil Spills in Nigeria," prepared for Bohler Advocaten, by Richard B. Kuprewicz, Accufacts Inc., dated September 3, 2012.

33. "Observations on Proposed 12-inch NGL ONEOK Pipeline Route in Crook County Sensitive or Unstable Land Areas," prepared by Richard B. Kuprewicz, Accufacts Inc., dated September 13, 2012.

34. "Findings from Analysis of CEII Confidential Data Supplied to Accufacts Concerning the Millennium Pipeline Company L.L.C. Minisink Compressor Project Application to FERC, Docket No. CP11-515-000," prepared by Richard B. Kuprewicz, Accufacts Inc., for Minisink Residents for Environmental Preservation and Safety (MREPS), dated November 25, 2012.

35. "Supplemental Observations from Analysis of CEII Confidential Data Supplied to Accufacts Concerning Tennessee Gas Pipeline's Northeast Upgrade Project," prepared by Richard B. Kuprewicz, Accufacts Inc., for Delaware RiverKeeper Network, dated December 19, 2012.

36. "Report on Pipeline Safety for Enbridge's Line 9B Application to NEB," prepared by Richard B. Kuprewicz, Accufacts Inc., for Equiterre, dated August 5, 2013.

37. "Accufacts' Evaluation of Oil Spill Joint Investigation Visit Field Reporting Process for the Niger Delta Region of Nigeria," prepared by Richard B. Kuprewicz for Amnesty International, September 30, 2013.

38. "Accufacts' Expert Report on ExxonMobil Pipeline Company Silvertip Pipeline Rupture of July 1, 2011 into the Yellowstone River at the Laurel Crossing," prepared by Richard B. Kuprewicz, November 25, 2013.

39. "Accufacts Inc. Evaluation of Transco's 42-inch Skillman Loop submissions to FERC concerning the Princeton Ridge, NJ segment," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated June 26, 2014, and submitted to FERC Docket No. CP13-551.

40. Accufacts report "DTI Myersville Compressor Station and Dominion Cove Point Project Interlinks," prepared by Richard B. Kuprewicz for Earthjustice, dated August 13, 2014, and submitted to FERC Docket No. CP13-113-000.

41. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated September 3, 2014, and submitted to FERC Docket No. CP13-551.

42. Accufacts' "Evaluation of Actual Velocity Critical Issues Related to Transco's Leidy Expansion Project," prepared by Richard B. Kuprewicz for Delaware Riverkeeper Network, dated September 8, 2014, and submitted to FERC Docket No. CP13-551.

43. "Accufacts' Report to Portland Water District on the Portland – Montreal Pipeline," with Appendix, prepared by Richard B. Kuprewicz for the Portland, ME Water District, dated July 28, 1014.

44. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz and submitted to FERC Docket No. CP13-551.

45. Review of Algonquin Gas Transmission LLC's Algonquin Incremental Market ("AIM Project"), Impacting the Town of Cortlandt, NY, FERC Docket No. CP14-96-0000, Increasing System Capacity from 2.6 Billion Cubic Feet (Bcf/d) to 2.93 Bcf/d," prepared by Richard B. Kuprewicz, and dated Nov. 3, 2014.

46. Accufacts' Key Observations dated January 6, 2015 on Spectra's Recent Responses to FERC Staff's Data Request on the Algonquin Gas Transmission Proposal (aka "AIM Project"), FERC Docket No. CP 14-96-000) related to Accufacts' Nov. 3, 2014 Report and prepared by Richard B. Kuprewicz.

47. Accufacts' Report on Mariner East Project Affecting West Goshen Township, dated March 6, 2015, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

48. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing on the Proposed System Integrity Projects ("SIP") to the Mississippi Public Service Commission ("MPSC") under Docket No. 15-UN-049 ("Docket"), prepared by Richard B. Kuprewicz, dated June 12, 2015.

49. Accufacts' Report to the Shwx'owhamel First Nations and the Peters Band ("First Nations") on the Trans Mountain Expansion Project ("TMEP") filing to the Canadian NEB, prepared by Richard B. Kuprewicz, dated April 24, 2015.

50. Accufacts Report Concerning Review of Siting of Transco New Compressor and Metering Station, and Possible New Jersey Intrastate Transmission Pipeline Within the Township of Chesterfield, NJ ("Township"), to the Township of Chesterfield, NJ, dated February 18, 2016.

51. Accufacts Report, "Accufacts Expert Analysis of Humberplex Developments Inc. v. TransCanada Pipelines Limited and Enbridge Gas Distribution Inc.; Application under Section 112 of the National Energy Board Act, R.S.C. 1985, c. N-7," dated April 26, 2016, filed with the Canadian Nation Energy Board (NEB).

52. Accufacts Report, " A Review, Analysis and Comments on Engineering Critical Assessments as proposed in

PHMSA's Proposed Rule on Safety of Gas Transmission and Gathering Pipelines," prepared for Pipeline Safety Trust by Richard B. Kuprewicz, dated May 16, 2016.

53. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing to the Mississippi Public Utilities Staff, "Accufacts Review of Atmos Spending Proposal 2017 – 2021 (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 15, 2016.

54. Accufacts Report, "Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL")," prepared for Earthjustice by Richard B. Kuprewicz, dated October 28, 2016.

55. Accufacts' Report on Mariner East 2 Expansion Project Affecting West Goshen Township, dated January 6, 2017, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

56. Accufacts Review of Puget Sound Energy's Energize Eastside Transmission project along Olympic Pipe Line's two petroleum pipelines crossing the City of Newcastle, for the City of Newcastle, WA, June 20, 2017.

57. Accufacts Review of the Draft Environmental Impact Statement for the Line 3 Pipeline Project Prepared for the Minnesota Department of Commerce, July 9, 2017, filed on behalf of Friends of the Headwaters, to Minnesota State Department of Commerce for Docket Nos. CN-14-916 & PPL-15-137.

58. Testimony of Richard B. Kuprewicz, president of Accufacts Inc., in the matter West Goshen Township and Concerned Citizens of West Goshen Township v. Sunoco Pipelines, L.P. before the Pennsylvania Public Utilities Commission, Docket No. C-2017-2589346, on July 18, 2017, on Behalf of West Goshen Township and Concerned Citizens of West Goshen Township.

59. Direct Testimony of Richard B. Kuprewicz, president of Accufacts Inc., on Behalf of Friends of the Headwaters regarding Enbridge Energy, Limited Partnership proposal to replace and reroute an existing Line 3 to the Minnesota Office of Administrative Hearings for the Minnesota Public Utilities Commission (MPUC PL-9/CN-14-916 and MPUC PL-9/PPL-15-137), September 11, 2017 and October 23, 2017.

60. Direct Testimony of Richard B. Kuprewicz On Behalf of The District of Columbia Government, before the Public Service Commission of the District of Columbia, in the matter of the merger of AltaGas Ltd. and WGL Holdings, Inc., Formal Case No. 1142, September 29, 2017.

61. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2018 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated December 4, 2017.

62. Report to Hugh A. Donaghue, Esquire, Concord Township Solicitor, "Accufacts Comments on Adelphia Project Application to FERC (Docket No. CP18-46-000) as it might impact Concord Township," dated May 30, 2018.

63. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2019 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 20, 2018.

64. Report to West Goshen Township Manager, PA, "Accufacts report on the repurposing of an existing 12-inch Sunoco pipeline segment to interconnect with the Mariner East 2 and Mariner East 2X crossing West Goshen Township," dated November 8, 2018.

65. Report to West Whiteland Township Manager, PA, "Accufacts Observations on Possible Pennsylvania State Pipeline Safety Regulations," prepared by Richard B. Kuprewicz, dated March 22, 2019.

66. Accufacts Public Comments on the Proposed Joint Settlement, BI&E v. Sunoco Pipeline L.P. ("SPLP"), Docket No. C-2018-3006534 ("Proposed Settlement"), submitted on August 15, 2019 to the Pennsylvania Public Utility Commission on the behalf of West Goshen Township as an intervener.

67. Report to West Whiteland Township Manager, Ms. Mimi Gleason, "Accufacts Perspective on Two Questions from West Whiteland's Board of Supervisors on Proposed Changes to ME 2 and ME 2X Construction/Operational Activities within West Whiteland," dated September 5, 2019."

68. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the episode on the evening of 8-5-19 at the Mariner East Boot Road Pump Station ("Event"), Boot Road, West Goshen Township, PA," dated September 16, 2019.

69. Provided direct testimony before the Arizona Corporation Commission, In the Matter of the Application of Southwest Gas Corporation for the Establishment of Just and Reasonable Rates and Charges Designed to Realize a Reasonable Rate of Return on Fair Value of the Properties of Southwest Gas Corporation Devoted to its Arizona Operations (Docket No. G-01551A-19-0055), testified on behalf of Utilities Division Arizona Corporation Commission, February 19, 2020.

70. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the Mariner East 2X Pipeline Affecting West Goshen Township," dated July 23, 2020.

71. Assisted the Commonwealth of Massachusetts, Office of the Attorney General in developing pipeline safety processes to be incorporated into the settlement agreement related to Columbia Gas' sale of Assets to Eversource following the Merrimack Valley, Massachusetts overpressure event of September 13, 2018.

72. Report to Natural Resources Defense Council, Inc., "Accufacts' Observations on the Use of Keystone XL Pipeline Pipe Exhibiting External Coating Deterioration Issues from Long Term Storage Exposure to the Elements," October 1, 2020.

73. Report to Pennsylvania Public Utilities Commission ("PAPUC"), "Accufacts Comments on Proposed Pennsylvania Intrastate Liquid Pipeline Safety Regulations," dated October 29, 2021, prepared for West Whiteland Township Board of Supervisors, West Whiteland Township, PA.  Filed to PAPUC public web docket November 5, 2021 by West Whiteland Township under Reference Docket Number L-2019-3010267.  Addresses suggested improvements in proposed pipeline safety rules for PA intrastate liquid transmission pipelines.

74. Submitted written testimony of Richard B. Kuprewicz on Behalf of Bay Mills Indian Community to ALJ Dennis Mack, dated December 14, 2021, in the matter of the Application of Enbridge Energy, Limited Partnership for Authority to Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac, before the State of Michigan Public Service Commission, U-20763.

75. Public presentation to New York State Indian Point Nuclear Facility Decommissioning Oversight Board on Holtec removal activities in proximity to Enbridge three Natural Gas Transmission Pipelines, March 17, 2022.

76. Report to Pipeline Safety Trust and Bold Alliance, "Accufacts' Perspectives on the State of Federal Carbon Dioxide Transmission Pipeline Safety Regulations as it Relates to Carbon Capture, Utilization, and Sequestration within the U.S.," March 23, 2022.

77. Accufacts Inc., Public Presentation for the National Academies of Science Engineering Medicine and The Transportation Research Board, "To Committee on Criteria for Installing Automatic and Remote-Controlled Shutoff Valves on Existing Gas and Hazardous Liquid Transmission Pipelines," 4/27/22.

78. Accufacts Inc, "6/13/22 Webinar to Illinois Emergency Responders, Healthcare Providers, & Local Officials on Responses to $CO_2$ Transmission Pipeline Releases," 6/13/22.

79. Accufacts Report for Pipeline Safety Trust, "Safety of Hydrogen Transportation by Gas Pipelines," 11/28/22.

80. Completed a series of testimonies related to Enbridge's Line 5 proposal to replace 2 – 20-inch diameter existing submerged pipelines currently lying across the bottom of the Straits of Mackinac with a 30-inch diameter grade X-70 pipeline, proposed to be installed in a 21-foot diameter concrete tunnel to be installed across the approximate 4-mile span of the Straits of Mackinac.  Testified on Behalf of the Bay Mill Indian Community before the State of Michigan Public Service Commission, Docket U-20763, in opposition to this very poorly designed proposal/installation allowing for movement of the pipeline on rollers within the tunnel.  Final testimony to the docket submitted May 19, 2023.  This is the only pipeline proposal I am aware of in the world that would place a crude oil and liquid propane pipeline, especially a 30-inch diameter pipeline, within a tunnel.

81. Issued to Ms. Niroop Srivatsa, City Manager, "Accufacts Report for the City of Lafayette on the Status of the Tree Assessment Process with PG&E," indicating most of the trees identified for removal by PG&E risk management

10-22-24                                                                                                                          Page 8 of 9

**Exhibits -Page 42**

approach have nothing to do with gas pipeline safety, June 15, 2023.

82. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the Navigator Heartland Greenway LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0161, on behalf of Citizens Against Heartland Pipeline ("CAHGP"), McDonough County, Christian County and Hancock County (the "Counties") (jointly, "Citizen and County Intervenors" of "CCI"), raising serious questions as to PHMSA's recent assertions of pipeline safety jurisdiction, and underscoring the ICC's authority for pipeline siting jurisdiction of said pipeline proposal in the State of Illinois, filed June15, 2023.  Applicant has terminated their application.

83. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the WOLF Carbon Solutions US LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0475, for a certificate of authority to construct and operate a carbon dioxide pipeline and when necessary to take interest in property as provided by law of eminent domain, testifying on Behalf of Citizens Against Predatory Pipelines ("CAPP"): 1) identifying serious inadequacies in PHMSA's pipeline safety regulations, 2) explaining why the Commission should require pipeline temperature profiles 3) detailing why DNV-RP-F104 is not relevant to this filing and 4) underscoring the ICC's authority to require additional critical information from the Applicant in this matter, filed October 24, 2023.  Applicant has withdrawn their submission to the Commission.

84. Provided general summary, main observations/concerns, on "Draft Environmental Impact Statement: Otter Tail to Wilkin Carbon Dioxide Pipeline Project" submitted to Minnesota Public Utilities Commission regarding Summit Carbon Solutions, LLC proposed 28 mile long 4-inch diameter $CO_2$ liquid transmission pipeline ("Otter Tail Pipeline") within Minnesota, PUC Docket No. IP-7093/PPL-22-422, provided to Clean Up the River Environment ("CURE") on 1/29/2024.

85. Issued to EarthJustice, "Observations concerning Kern County's Draft Environmental Impact Report ("DEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated February 26, 2024, "Observations concerning Kern County's Recent Recirculated Draft Environmental Impact Report ("RDEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated July 17, 2024, and "Evaluation of Kern County Response to Comments and Final Recirculated Environmental Impact Report on the TerraVault I Carbon Capture and Storage Project, dated October 15, 2024.  The Project situated in Kern County is proposed by the California Resources Corporation to separate a portion of the pre-combustion Elk Hills field gas production, treat and inject via liquid transmission pipelines, $CO_2$ into two sequestration injection wells within the Elk Hill oil field.  The reports identify many technical gaps in filings to Kern County.

86. Issued for the Tribal Partnerships Program, "Observations on the U.S. Army Corps of Engineers Draft Environmental Assessment, Clean Water Act Section 404(b)(1) Guidelines Evaluation, and Public Interest Review (collectively referenced as "DCDD") for the Enbridge Line 5 Wisconsin Segment Relocation Project ("Project"), dated May 2024," report dated July 31, 2024 affecting the Bad River Band of the Lake Superior Tribe of Chippewa Indians reservation.

# Exhibit C

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart*

**Prepared For**

## The Center for Biological Diversity
## &
## The Environmental Defense Center

**February 21, 2025**

Accufacts Inc. Final

## Table of Contents

I.      *Summary*.................................................................................................................*1*

II.     *The current installation renders the CP system ineffective.*......................................*2*

III.    *Compliance with CP regulatory requirements is ineffective, making performance with this regulatory requirement meaningless.*...................................*3*

IV.     *This is more than simple corrosion under installation (CUI) issue.* .........................*3*

V.      *External corrosion on buried pipelines falls into four major categories.*...............*4*

    1.  **Pipe wall loss corrosion is generally understood to occur over larger areas of the pipe.**..............................................................................................................4

    2.  **Cracking or crack-like corrosion is usually an environmental threat difficult to assess.**...............................................................................................................4

    3.  **Pitting corrosion is a special form of wall loss that is difficult to identify via ILI.**..............................................................................................................................5

    4.  **Corrosion within dents is a special form of dent threat.**..............................5

VI.     *Types of ILI technology.* ..........................................................................................*5*

    1.  **General wall loss corrosion.** ............................................................................5

    2.  **Cracking corrosion.**.........................................................................................6

VII.    *What is the purpose of hydrotesting?*.....................................................................*6*

VIII.   *The illusion that corrosion growth rate can be accurately predicted needs to be explained.* ...............................................................................................................*7*

IX.     *Major state waiver deficiencies:*..............................................................................*7*

    1.  **A key corrosion performance tracking process step in the state waivers for the Pipelines is missing.** ........................................................................................7

    2.  **A major state waiver deficiency for Line 324.** ..............................................8

    3.  **Major state waiver deficiencies for Line 325A/B.** .......................................9

X.      *Conclusions.* ............................................................................................................*9*

Accufacts Inc. Final                                                                                    i

## I.    Summary.

Accufacts Inc. ("Accufacts") was asked to provide my expert opinion on the Letters of Decision on the State Waivers for the startup of Line CA-324, CA-325A, and CA-325B ("Pipelines") made public in mid-January 2025 by the Office of the State Fire Marshal ("OSFM").[1]  This report builds on a previous Accufacts report issued on December 20, 2024."[2]  By agreement, a Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed state waiver alternative measures "provide an equal or greater level of safety."[3]  It is my understainding that PHMSA can choose to: 1) Not comment on this matter allowing the State Waiver to occur and startup to proceed, 2) Not approve the waiver preventing the startup, or 3) Impose additional requirements to assure an equal or greater level of safety to current minimum federal pipeline safety regulations occurs.

The current coating installations do not provide "limited effectiveness of the cathodic protection system," as mentioned by the Decision letters issued by the OSFM.  This I believe is a poor choice of words that understates the fact that the CP system is ineffective on most of the Pipelines' mileage.  The OSFM is thus being asked to grant a state waiver on federal pipeline safety minimum requirements intended to address external pipeline corrosion from an ineffective CP installation, while relying on hydrotesting and various forms of inline inspection, ILI or smart pigging, to avoid pipeline failure from the resulting external corrosion.

The waivers attempt to allow startup of the Pipelines relying mainly on ILI technology to identify corrosion threats before failure.  In addition, the Application by the Pipeline's operator appears to be relying on a circumferential magnetic flux leakage (MFL-C tool) approach run in February 2022 to argue for the removal of federal regulation requiring the 180 day condition for scheduling remediation of "corrosion of or along a longitudinal seam weld."[4, 5]  Our experience with MFL-C tools is that if certain parameters are not incorporated, such ILI tools can miss a lot of cracks.  I see no mention of such important conditions in the referenced letter that would demonstrate that this ILI run is reliable.  I do not see sufficient justification to waive 49CFR452(h)(4)(iii)(H) as such a waiver would not provide an equal or greater level of safety as no carbon steel pipeline, even new modern steel pipelines, are invincible to corrosion attack.

---

[1] OSFM letter to Sable/PPC Offshore Corp, "Letter of Decision on the Sate Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-324) ("Decision Letter 324") and Letter of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-325A/B) ("Decision Letter 325A/B")", dated 12/17/24.

[2] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024.

[3] PHMSA website: https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

[4] Pacific Pipeline Company (Aka now as Sable/PPC) letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115)," July 10, 2023, p. 5 related to MFL-C February 2020 ILI run.

[5] 49CFR452(h)(4)(iii)(H).

Accufacts Inc. Final                                                                         Page 1 of 9

A simple plot of the type and approximate milepost location of external corrosion such as wall loss or cracking, including field as well as ILI indications along the Pipelines, will underscore how challenging the operation of the present Pipelines will be without effective CP.  Such a plot will clearly demonstrate that the Pipelines are not "like new" as indicated by some recent Sable/PPC representatives.  Further explanation is also warranted as to why the pipeline operator assumes there is no SCC or SSC risks associated with water on the Pipelines.

A proposal to replace the Pipelines with a new smaller diameter heated pipeline that would be uninsulated and built with modern unshielding coatings was aborted.[6]  This proposal would have permitted the CP system to do its job addressing external corrosion, while complying with federal pipeline regulation.

## II.     The current installation renders the CP system ineffective.

The construction of Line 324 in the late 1980s utilized coal tar urethane coating applied to the bare steel pipeline, covered by sprayed on insulation to assure the pipeline was operated at higher temperatures.  The insulation was then wrapped with a non-conductive polyethylene tape coating.[7] While there may be some confusion as to the coating installation on what is now named 325A/B, information leads us to believe this coating installation is similar on these pipelines as that on Line 324.   To anyone vaguely familiar with pipeline external corrosion protection and cathodic protection ("CP") intent, this approach is a fundamental failure of design/installation reflecting much inexperience in pipelines.  The polyethylene tape shields and prevents CP current from getting to the external pipeline steel, and the insulation system works to shield while increasing the likelihood of water in close proximity to the pipe, especially in areas where the coal tar coating directly on the pipeline steel has separated, or disbonded, from the pipe.[8]  With such heavy shielding there is thus no way for any CP system current to ever reach the pipeline to reduce/prevent external corrosion.

With the exception of a few feet of buried pipe that has undergone repairs, replacing the existing poor design and coating installations with a few feet of dual epoxy coatings, the shielded CP system is ineffective.  The various threats of external corrosion on the Pipelines are exacerbated by the elevated temperature, the potential for water to accumulate along the Pipelines via the insulation, the application of non-conducting tape wrap around the insulation, and the use of older coal tar coating directly on the pipeline that exhibits separation (aka disbondment) from the pipe steel.  Disbonded coating in the wrong environments is especially conducive to cracking threats, such as SCC or SSC as discussed in this report.  I have seen no convincing arguments that water environments conducive to corrosion cracking are not around or under the coating on the Pipelines.

---

[6] Plains Administrative Draft EIR, "Plains Replacement Pipeline Project," February 2022.

[7] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA"), "Failure Investigation Report Plains Pipeline LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California, May 2016, Appendix E: Corrosion Control and Pipeline Conditions, page 1 of 4.

[8] *Ibid.,* Page 3 of 21, and Mechanical and Metallurgical Testing, Photos Figure 1 through 20.

Accufacts Inc. Final                                                                                          Page 2 of 9

## III.    Compliance with CP regulatory requirements is ineffective, making performance with this regulatory requirement meaningless.

The Pipelines thus have ineffective CP protection from external corrosion that is exacerbated by operation of the Pipelines at elevated temperatures, seriously increasing corrosion rate as discussed in my previous report.[9]   Attempts to gauge the effectiveness of the CP system utilizing CP performance measures identified in PHMSA regulations are meaningless in such heavily shielded installations.   Just operating the Pipeline with CP "on" to meet federal minimum regulatory requirements will not prevent external corrosion attacks that can take on various forms on the Pipelines.  It should be noted that the OSFM has required "Where the operator discovers external corrosion in combination with coating deterioration, the operator must recoat with a two-part epoxy.  Sable must recoat in accordance with their repair procedure." which does allow repair replacing with the existing installation approach, given its many shortcomings to prevent external corrosion.[10]   This requirement places the responsibility on the pipeline operator to identify when or if any, field digs should occur to confirm coating degradation.  The operator should be primarily focused on identifying environments around the pipeline that are precursors to various forms of external corrosion attack, given the many conditions related to the pipeline design/installation conducive to external corrosion attack.

It is on the limited repaired sections, measured in feet, that the CP should be effective as such short length repairs replace the poorly designed shielding original coating installations.  For the vast majority of the Pipelines mileage, however, the CP remains ineffective.  The requirements to measure CP performance stated in 49CFR§195.2 (NACE SP 0169 – 2007 edition, paragraph 6.2.2) are meaningless when heavy shielding, such as that which occurs on CA-324 and CA-325A/B, prevents CP current from reaching the pipeline.

## IV.    This is more than simple corrosion under installation (CUI) issue.

Considerable past discussions have suggested that this is a corrosion under installation (or CUI") problem implying that this is the only controlling issue.  While CUI is certainly a contributing factor, the corrosion threats go well beyond CUI.  As previously discussed, heavy shielding, the tape coating around the insulation, the vintage/type of coating directly on the Pipelines prone to disbondment, the operating temperature, and the environment around the Pipelines, work in concert to create external corrosion in its various forms.  The Consent Decree is an agreement based on the premise that higher risks of external corrosion can be mainly addressed by ILI tools. The multiple forms of external corrosion which can occur on the Pipelines require various different approaches, beyond ILI, as discussed further in this report.

---

[9] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024, p. 13.
[10] OS OSFM letter to Sable/PPC Offshore Corp, "Decision Letter 324 and Decision Letter 325A/B")," dated 12/17/24, pp. 11 and 11 respectively.

Accufacts Inc. Final                                                                                    Page 3 of 9

# V.    External corrosion on buried pipelines falls into four major categories.

External corrosion on buried steel pipelines falls into four general categories:  1) wall loss or thinning of the pipe wall, 2) cracking or crack-like, 3) pitting, and 4) corrosion within dents.

1. **Pipe wall loss corrosion is generally understood to occur over larger areas of the pipe.**

   Internal or external corrosion can cause pipe wall thinning.  Such thinning differs from pit corrosion discussed below, in that pipe wall loss thinning tends to occur over a wider area of the pipe.  Despite previous multiple ILI runs, external corrosion pipe wall loss, or thinning, was the condition that resulted in the May 19, 2015 pipeline rupture failure. External corrosion on the shielded pipe allowed general corrosion thinning of the pipeline until the pipe failed under pressure.  It should be worth noting that wall loss in excess of 0.8 wall thickness (actually 0.91) which occurred in the May 19, 2015 rupture, places the operator at great risks.  Ironically, pipe wall loss is generally one pipeline failure threat that advances in the ILI technology over recent decades was intended to address, either with ILI mag flux or ultrasonic approaches which are different technical methods.

2. **Cracking or crack-like corrosion is usually an environmental threat difficult to assess.**

   This is associated with various forms of pipeline cracking, such as selective seam corrosion or stress corrosion cracking.  While engineers like to think they can calculate time to failure, such time to failure estimates for these forms of corrosions are hard to reliably predict.  Given the probability that such cracking, especially if in clusters, can interact with other cracks, or weaknesses in the pipe body near/at welds, makes prediction to failure highly unreliable.  Such pipe weaknesses can occur at weld heat affected zones, at girth welds, or at manufacturing related pipe seams, in unpredictable ways that can quickly negate time to failure calculation/estimates, even if cracking potential is identified.

   Sable/PPC has requested an exemption from 49CFR452(h)(4)(iii)(H) explaining this is usually a SSC threat related to earlier vintage manufacturing processes such as LF-ERW which tends to exhibit lower pipe toughness. There are other related risks to the manufacturing process of modern steels such as DSAW and HF-ERW concerning cracking potential from poor coating/ineffective CP approaches.  Because of the nature of disbonded coating in proximity to water, coating can tent at weld seams creating potential for cracking corrosion attack, such as SSC.  Even modern pipe steels are not invincible to such cracking corrosion potential, especially on pipelines operating at elevated temperatures.  Unless the operator can show why such environments don't exist, their request to be exempted from 49CFR452(h)(4)(iii)(H) should be denied.  These explanations should go well beyond a MAG-C pig run the pipeline operator has provided.

3. **Pitting corrosion is a special form of wall loss that is difficult to identify via ILI.**

This is the loss of pipe steel in concentrated small areas, forming localized small holes or pits, usually at girth welds, that can weaken the pipeline and cause a release. Pit corrosion identification via ILI, even newer generations of ILI tools, can be very challenging. Pit corrosion threats are usually verified via field digs or pipeline releases. While this threat can be a bona fide threat on the Pipelines that are heavily shielded rendering CP ineffective, there has been no mention that this threat has been identified.

4. **Corrosion within dents is a special form of dent threat.**

Corrosion or cracking within a dent, also known as "dents with stress concentrators" are hard to identify via ILI, and almost impossible to reliably predict time to failure. Such threats are usually identified by high-definition geometric ILI dent tools, the location around the pipeline, and field dig verification assessments. The ILI determination using high resolution caliper or geo pigs, have proven reliable at identifying dents and their location on a pipeline.

## VI.    Types of ILI technology.

Given the possible types of external corrosion on the Pipelines, I now focus on a simple high-level discussion of corrosion ILI technical approaches.

1. **General wall loss corrosion.**

After the advancement of geometric or deformation ILI technology, the next early phase of ILI use focused on general corrosion wall loss, or pipeline thinning along the axis or flow direction of the pipeline. In this field, technology split into two different approaches, magnetic flux leakage and ultrasonic. Magnetic flux leakage (or mag flux) approaches utilized software algorithms to characterize changes in magnetic flux to identify wall loss aligned in the axial, or direction of flow, usually the most insidious and common corrosion flaws for pipe. Mag flux ILIs fall into two general categories: low resolution (usually associated with earlier generation) and high resolution (usually more complex and more expensive). Mag flux technology shifted from low resolution to the more sophisticated high resolution approaches where corrosion is problematic. There are still pipelines that utilize low resolution mag flux because of cost, so care should be exercised in the application of this form of ILI on liquid pipelines. The waivers specifically require UT ILI the first two years of operation, but are moot, indicating magnetic flux ILI in the future could be allowed without clarification as to high res or low res ILI.

Ultrasonic ILI approaches use beams of ultrasonic energy to identify both external and internal corrosion wall loss. While a simplification, ultrasonic approaches are analogous to radar, where reflected energy readings are utilized to measure changes in pipe wall thickness. Originally, ultrasonic approaches, focusing on wall loss evaluation, directed UT energy directly into the pipe in the radial direction for wall thickness and resulting wall loss corrosion sizing determinations.

Accufacts Inc. Final                                                                Page 5 of 9

**2. Cracking corrosion.**

Pipeline ruptures from cracking threats drove a need for ILI tool cracking development. Thus, a next generation of ultrasonic ILI approaches advanced by changing the angle of the UT beam from radial into the pipe to at an angle to help spot cracks that might be developing. This form of UT approach is identified as shear wave. As more pipeline failures from cracking were uncovered, additional advances known as phased array ultrasonic (PAUT) have recently developed, though such measurements are currently focused on field measurement of uncovered pipeline, as ILI in this area I would categorize as still under development.

I have investigated too many pipeline ruptures that occurred after an ILI run which indicates more regulatory work is needed in ILI regulations related to applications of ILI. No ILI vendor provides such tools claiming they will not work. It is the pipeline operator's responsibility to ensure ILI runs meet the restrictions placed by the tool vendor (such as speed) and to verify the tool vendor's claimed capability with a proper number of field verification digs.

## VII.    What is the purpose of hydrotesting?

There are basically two types of hydrotesting mentioned in federal pipeline safety: 1) What I call a subpart E, or proof of MOP test, and 2) a crack hydrotest, what is referred to as a "spike hydrotest" that is performed at much higher test pressures as a %SMYS. Both forms of hydrotesting are proof test, good at the time of the test, and don't characterize time dependent pipeline threats such as corrosion.

The purpose of an MOP hydrotest is to proof the fitness for service of a pipeline at the time of the test, with a certain margin of pressure safety that usually deteriorates with time. Subpart E MOP tests are not crack integrity test. If a pipeline system has crack forming potential an MOP test is not appropriate.

Spike hydrotests are meant to avoid pressure reversals associated with crack threats on pipelines. Pressure reversals are where cracks remaining after MOP hydrotest tests can enlarge for various reasons to result in possible failure during operation, usually at lower pressures. It is my experience that spike hydrotests are meant to deal with cracking threats if such a threat exists. The performance metric for the suitability of a spike hydrotest is the range of %SMYS for the specific test segment. For pipeline elevation changes like that associated with 325A/B, a spike hydrotest requires the pipeline be segmented to keep test pressures within reasonable ranges that don't produce permanent yielding of the pipe. The information made public to date indicates that the previous hydrotests performed in 1986, because of elevation changes, required Line 325A to undergo hydrotesting in 9 segments and in Line 325B in 11 segments. Unfortunately, the hydrotest segments in the public record application are identified by station number and not by approximate milepost. Since there is usually no correlation between station number and milepost, I thus cannot evaluate whether the Decision Letter 325A/B pressure testing parameters are adequate for Line 325A.[11] It is worth noting that the Decision Letter 325A/B makes no mention of a subpart E

---

[11] Decision Letter 325A/B, "Pressure Testing," page 5.

Accufacts Inc. Final                                                                      Page 6 of 9

hydrotest or spike hydrotest on Line 325B.  The proposed segments for hydrotests on 325A need to be identified by approximate milepost to permit evaluation as to whether the waiver requirements are appropriate.  The reasons for hydrotesting exclusion on Line 325B need to be properly justified and made public by the OSFM.

## VIII.   The illusion that corrosion growth rate can be accurately predicted needs to be explained.

One of the critical parameters that I have observed in too many pipeline rupture investigations is that ILI can be utilized to accurately predict corrosion growth rates ("CGR") to help set a critical ILI run timing, for example.  The Pipelines essentially have no effective CP, operate as a higher temperature system, contain disbonded coating, incorporate heavy shielding which prevents CP from reaching the Pipelines and operate with insulation that moves water on/near the outside of the pipe.  Such a combination of factors can provide a wide variation in types of external corrosion as well as corrosion rate estimates.  CGR estimates can be especially problematic if CGR approaches miss possible corrosion interaction threats that can considerably shorten time to failure estimates.  I advise that CGR be utilized with extreme caution given this possible variation, especially for corrosion threats that can interact, such as SCC, whose time to failure can be highly unpredictable.  Corrosion growth rate estimates can vary considerably given the various form of external corrosion, especially related to cracking in combination with its location near sensitive pipe locations such as seam or girth welds.

## IX.   Major state waiver deficiencies:

Key observation on the state waivers for the Pipelines:

1. **A key corrosion performance tracking process step in the state waivers for the Pipelines is missing.**

   While not specially required in minimum pipeline safety regulations or the waivers, a prudent pipeline operator on a pipeline system highly susceptible to corrosion will plot or graph corrosion indications by type and severity, by approximate milepost.  This is especially important on the Pipelines given their history of extensive corrosion caused by the lack of CP effectiveness, poor coating types causing disbondment or shielding, increased temperature, insulation that tends to wick water, and poor performance of ILI.  Such graphing aids a pipeline operator in understanding possible corrosion "hot spot" segments whose threats on a pipeline increase because of environmental factors that merit additional assessment, and maybe even pipeline segment replacement from a corrosion point of view.

   Care also needs to be taken that all corrosion sites are prudently evaluated for possible interactive threats, such as general wall loss in combination with cracking, or near pipe welds, such as that which can occur with cluster corrosion.  I see no mention in the Letters of Decision and waivers requiring such important corrosion tracking on the Pipelines.

Accufacts Inc. Final                                                                 Page 7 of 9

## 2. A major state waiver deficiency for Line 324.

Given the pipeline properties stated for Line 324 (a single grade X65, 0.344 in wall thickness, 24-inch diameter, HF-ERW), I can calculate the various % SMYS for the spike (minimum and maximum test pressures, and MOP hydrotests) based on an estimated approximate elevation profile by milepost as Line 324 can be hydrotested as one segment given its limited elevation profile.

A critical condition in the OSFM Decision letter 324 is:

"12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after the spike hydrotest is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP."[12]

For the 24-inch diameter pipe, wall thickness and grade stated in the Decision Letter 324, 100% SMYS calculates to 1863 psig.  1.5 times the stated MOP of 1003 psig calculates to 1504 psig, at the highest elevation point.  Thus, the spike test at the highest elevation point as required above is likely to be the lower maximum test pressure of 1504 psig which calculates to about 81% SMYS, **a value I believe is too low for corrosion cracking screening and evaluation**.  The OSFM needs to explain why the proposed spike hydrotest of Line 324 is so low.

The bottom line is that Sable/PPCs should demonstrate whether there are environmental conditions around Line 324 that are conducive to cracking either SCC or SSC, and these conditions should go well beyond a Mag-C tool run (such as sufficient field digs to verify the ILI tool's claimed capability).  I see no such important conditions in Sable/PPCs application that instill confidence that Line 324 does not have environments favoring external cracking.  While it is true that certain pipe manufactured before 1970 is more prone to SSC, or SSWC, for various reasons, there is no modern pipe, even HF-ERW located in Line 324 or DSAW located in 325 A/B, that is invincible to such corrosion cracking threats, especially if the coating directly applied to the pipe has "tented" on the weld seam, allowing water to enter between the coating and the pipe to create a corrosion cell.  There is no carbon steel pipeline, even new modern manufactured steel pipelines, invincible to such corrosion attack.

---

[12] Decision Letter 324, "Pressure Testing," pages 4 – 5.

Accufacts Inc. Final                                                                 Page 8 of 9

3.  **Major state waiver deficiencies for Line 325A/B.**

Decision Letter 325 states that Line 325A and 325B is composed of 30-inch diameter of two pipe grades (X65 with a thickness of mainly 0.344 inch and X70 with a wall thickness mainly of 0.281 inches composed of DSAW, with one small segment of 0.03 miles containing HF-ERW). I used the term "mainly" as Sable's/PPC's application indicates these two lines are also largely composed of these grades with a small percentage of varying thicknesses.[13] For these two pipe grades, and thicknesses, 100 % SMYS calculates to 1490 psig for X65 and 1311 psig for X70. Since the location of the various pipe grades by approximate mileposts within CA-325A/B are not indicated, and given the dramatic elevation profiles for 325A/B the proposed hydrotest segments, if any, by milepost and elevation segments need to be made public. Without such information, I cannot calculate the % SMYS range for hydrotests given the OSFM conditions. Hydrotest segments are identified by station number which don't necessarily sync with milepost or MP.[14] **These important test segment parameters, by approximate MP, and elevation need to be made public to assure prudent hydrotesting is being required to address the possible general corrosion and cracking risks on Line 325A/B.**

It is worth noting that the OSFM does not require a MOP and spike hydrotest of 325B which has very significant elevation changes. This would suggest that Line 325B is not being evaluated by hydrotesting. The reason(s) for this decision needs to be made public.

## X.    Conclusions.

Hydrotest segments proposed for the Pipelines need to be made transparent and include approximate MP, given the major role that elevation change plays on this system. Critical parameters related to location by milepost of the varying grades and thicknesses of pipe on 325 A/B and their associated hydrotest segments need to be identified by approximate MP as well, to verify if the OSFM parameters are sufficient for the specific types of corrosion threat. The reason as to why a spike hydrotest on 324 and 325 A are limited needs to be explained, as well as to why 325B hydrotesting has not been included in either a subpart E or spike hydrotest,

The incompleteness of the waivers lead me to conclude that I cannot determine the waivers provide sufficient information to assure an equal or greater level of safety for the Pipelines had the operator had an unshielded coating design that complied with federal minimum pipeline CP protection intended to avoid pipeline failure from external corrosion.

Richard B. Kuprewicz
President
Accufacts Inc.

*Richard B Kuprewicz*

---

[13] Sable/PPC letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115). Pipeline System Background Data Attachment B of State Application Table B-3 Line Pipe Specifications," July 2023, p. 4.

[14] *Ibid*., "Table B-6 Historic Hydrotest Summary," p. 6.

Accufacts Inc. Final                                                                                    Page 9 of 9

# EXHIBIT C



U.S. Department
of Transportation

**Pipeline and Hazardous
Materials Safety
Administration**

MAY 2 1 2015

1200 New Jersey Avenue SE
Washington, DC 20590

<u>**VIA CERTIFIED MAIL AND FAX TO: 713-646-4378**</u>

Troy Valenzuela
Vice President EHS
Plains Pipeline, LP
333 Clay Street, Suite 1600
Houston, TX 77002

**Re: CPF No. 5-2015-5011H**

Dear Mr. Valenzuela:

Enclosed is a Corrective Action Order issued in the above-referenced case. It requires Plains Pipeline, LP to take certain corrective actions with respect to Line 901 of your pipeline system that failed on May 19, 2015, near Santa Barbara, CA. Service is being made by certified mail and facsimile. Service of the Corrective Action Order by electronic transmission is deemed complete upon transmission and acknowledgement of receipt, or as otherwise provided under 49 C.F.R. § 190.5. The terms and conditions of this Order are effective upon completion of service.

Thank you for your cooperation in this matter.

Sincerely,

Jeffrey D. Wiese
Associate Administrator
for Pipeline Safety

Enclosure

cc:   Ms. Linda Daugherty, Deputy Associate Administrator for Field Operations, OPS
Mr. Chris Hoidal, Director, Western Region, OPS

**U.S. DEPARTMENT OF TRANSPORTATION**
**PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION**
**OFFICE OF PIPELINE SAFETY**
**WASHINGTON, D.C.  20590**

|  |  |
|---|---|
| In the Matter of )<br><br>)<br>Plains Pipeline, LP, )<br>)<br>Respondent. )<br>) | CPF No. 5-2015-5011H |

**CORRECTIVE ACTION ORDER**

**Purpose and Background:**

This Corrective Action Order (Order) is being issued, under the authority of 49 U.S.C. § 60112, to require Plains Pipeline, LP (Plains or Respondent), to take the necessary corrective action to protect the public, property, and the environment from potential hazards associated with the recent failure on your pipeline in Santa Barbara County, California.

On May 19, 2015, a reportable accident occurred on Plains' Line 901 pipeline, resulting in the release of approximately 1700 to 2500 barrels of heavy crude oil (Failure).  Line 901 is a 24-inch diameter pipeline approximately 10.6 miles in length that transports crude oil from Exxon Mobil's breakout storage tanks in Las Flores Canyon to Plains' Gaviota Pump Station.  The cause of the Failure has not yet been determined.  Pursuant to 49 U.S.C. § 60117, the Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS), initiated an investigation of the accident.  The preliminary findings of the ongoing investigation are as follows:

**Preliminary Findings:**

- Plains Pipeline, LP (Plains), is a publicly traded master limited partnership that operates approximately 17,800 miles of crude oil and natural gas liquids pipelines and gathering systems throughout the United States, including California and Texas.[1]

- The failed pipeline is a 24-inch diameter line that transports crude oil and runs from Exxon Mobil's breakout storage tanks in Las Flores Canyon to Plains' Gaviota Pump Station, a distance of approximately 10.6 miles (Affected Pipeline). The Failure occurred near milepost 4 near Goleta, California (Failure Site).

---

[1]  https://www.plainsallamerican.com/what-we-do/transportation (last accessed May 20, 2015)

CPF No. 5-2015-5011H
Page 2

- The Affected Pipeline was constructed from 1987-1990, and consists of .344 wall thickness, X-65 high frequency electric resistance welded (ERW) pipe manufactured by Nippon Steel.

- The Affected Pipeline has a Maximum Operating Pressure (MOP) of 1025 psig and the normal operating pressure is 650 psig. Plains initially reported that the line pressure was approximately 700 psig immediately prior to failure.

- The initial hydrostatic test on the Affected Pipeline was conducted in October 1990, to a pressure of 1719 psig held for 8 hours.

- The Affected Pipeline is insulated and operates at up to 120 degrees Fahrenheit. There are shrink wrap sleeves at some of the pipeline's girth welds.

- The Affected Pipeline was recently smart-pigged on May 5, 2015. Complete in-line inspection (ILI) data was collected but the operator has not yet received a formal report from the ILI vendor regarding the analysis of the data and identification of any anomalies requiring further investigation according to the Federal pipeline safety regulations.

- Previous ILIs were performed in June 2007 and July 2012. In 2007 and 2012, there were 13 and 41 excavations of ILI-identified anomalies on the pipeline, respectively. These anomalies were mostly due to external corrosion, frequently located near the pipeline's girth welds.

- The Failure was discovered by the operator on May 19, 2015 around 1:30 p.m. PST, and reported to the National Response Center (NRC Report No. 1116972) at 2:56 p.m. PST. The operator reported an estimated spill of more than 500 BBLs of crude oil in their NRC report, but stated there was limited information available at that time.

- Prior to the discovery of the Failure, the controller of Line 901 noticed anomalies in the operating pressure, shut down and isolated the line around 11:30 am PST, and called field personnel to investigate.

- Another NRC report (No. 1116950) was received by the National Response Center at 12:43 p.m. from the Santa Barbara Dispatch reporting an unknown oil sheen at Refugio Beach.

- The release occurred on the north side of the Pacific Coast Highway. The released product traveled southward through a nearby water drainage culvert approximately ¼ mile to Refugio State Beach, where the product entered the Pacific Ocean. It is estimated that product has spread several miles down the coast.

- The estimated release amount was reported to have increased to 1700 to 2500 BBLs by the Unified Command center on the afternoon of May 20th.

- Refugio State Beach and camp grounds have been closed due to the oil spill. There were no reports of injuries.

- Several areas of environmental sensitivity are located near the Failure Site, including Bell Canyon, Tecolote Canyon, the City of Gaviota, and Coal Oil Point Reserve.

- Various state and federal agencies responded to the scene, including the U.S. Coast Guard, U.S. Environmental Protection Agency, California County Office of Emergency Services, and local fire department(s). Private oil spill response organizations under contract with Plains and Exxon Mobil personnel are also responding. Clean-up operations are underway.

- The cause of the Failure is unknown and the investigation is ongoing.

**Determination of Necessity for Corrective Action Order and Right to Hearing:**

Section 60112 of Title 49, United States Code, provides for the issuance of a Corrective Action Order, after reasonable notice and the opportunity for a hearing, requiring corrective action, which may include the suspended or restricted use of a pipeline facility, physical inspection, testing, repair, replacement, or other action, as appropriate. The basis for making the determination that a pipeline facility is or would be hazardous, requiring corrective action, is set forth both in the above-referenced statute and 49 C.F.R. § 190.233, a copy of which is enclosed.

Section 60112 and the regulations promulgated thereunder provide for the issuance of a Corrective Action Order, without prior notice and opportunity for hearing, upon a finding that failure to issue the Order expeditiously would result in the likelihood of serious harm to life, property, or the environment. In such cases, an opportunity for a hearing and expedited review will be provided as soon as practicable after the issuance of the Order.

After evaluating the foregoing preliminary findings of fact, I find that continued operation of the pipeline without corrective measures is or would be hazardous to life, property, or the environment. Additionally, having considered the uncertainties as to the cause of the Failure, the location of the Failure, the material being transported, and the proximity of the pipeline to the Pacific Ocean and environmentally sensitive areas, I find that a failure to issue this Order expeditiously to require immediate corrective action would result in the likelihood of serious harm to life, property, or the environment.

Accordingly, this Corrective Action Order mandating immediate corrective action is issued without prior notice and opportunity for a hearing. The terms and conditions of this Order are effective upon receipt.

Within 10 days of receipt of this Order, Respondent may contest its issuance and obtain expedited review either by answering in writing or requesting a hearing under 49 C.F.R. § 190.211, to be held as soon as practicable under the terms of such regulation, by notifying the Associate Administrator for Pipeline Safety in writing, with a copy to the Director, Western Region, OPS (Director). If Respondent requests a hearing, it will be held telephonically or in-person in Denver, Colorado, or Washington, D.C.

**After receiving and analyzing additional data in the course of this investigation, PHMSA may identify other corrective measures that need to be taken on the Affected Pipeline or Plains' Line 903.** In that event, PHMSA will notify Respondent of any additional measures that are required and an amended Order will be issued, if necessary. To the extent consistent with safety, Respondent will be afforded notice and an opportunity for a hearing prior to the imposition of any additional corrective measures.

**Required Corrective Actions:**

Pursuant to 49 U.S.C. § 60112, I hereby order Plains to immediately take the following corrective actions for the Affected Pipeline:

1. *Shutdown.* Plains must not operate the Affected Pipeline until authorized to do so by the Director.

2. *Empty and Purge the Affected Pipeline.* Plains must empty and purge the Affected Pipeline and fill with an inert gas until Items 3 through 8 of this Order are completed. This purging must be done as soon as practicable after repairing the Failure Site, but no longer than 10 days after receipt of this Order.

   a. Plains must notify the Director and local and State responders prior to conducting the purging operations.

   b. Plains must conduct the purging operations during daylight hours and monitor the pipeline right of way continually to quickly identify and contain any releases should they occur.

3. *Review of Affected Pipeline.* Within 45 days of receipt of this Order, Plains must review the Affected Pipeline for conditions similar to those of the Failure. Plains must address any findings that require remedial measures to be implemented prior to restart. This review must include:

   a. All construction, operating and maintenance (O&M) and integrity management records, such as hydrostatic tests, root cause failure analysis of prior failures, aerial and ground patrols, corrosion protection, One Call tickets, excavations and exposed pipe records, and pipe replacements;

   b. Identification of all areas of the Affected Pipeline that have insulated pipe and girth welds with "shrink wrap" sleeves;

   c. All ILI results from the past 10 calendar years, including a followup review of the ILI vendors' raw data and analysis from pre-2015 ILI surveys and a first time review of the data from the ILI survey conducted on May 5, 2015. Determine whether any anomalies were present in the failed pipe joint and any other pipe removed near the Failure Site. Determine whether any anomalies with similar characteristics are present elsewhere on the Affected Pipeline. Plains must submit documentation of this ILI review to the Director within 45 days of receipt of this Order as follows:

      i. List all ILI tool runs, tool types, and the calendar years of the tool runs conducted on Line 901.

      ii. Provide all ILI data from the past 10 years to the Director for review by a 3rd party ILI data analyst.

iii.  Explain the process that was used to review the past ILI results, and the process that will be used during the reevaluation.

iv.  List and describe (type, size, wall loss, etc.) the specific locations of all ILI features from the ILI surveys conducted prior to the May 5, 2015 survey. Include the disposition of those requiring investigation per 49 CFR Part 195.452(h) or Plains's remediation criteria.

v.  List and describe (type, size, wall loss, etc.) the specific location of all ILI features identified by the May 5, 2015 ILI survey that are present in the failed joint and other pipe removed near the Failure Site.

vi.  List and describe (type, size, wall loss, etc.) the specific location of all ILI features identified by the May 5, 2015 ILI survey that require investigation per 49 CFR Part 195.452(h) elsewhere on the Affected Pipeline. If an ILI feature or anomaly is identified to be associated with the Failure Site, all features with similar characteristics elsewhere on the Affected Pipeline must be investigated and remediated.

4. **Records Verification.** As recommended in PHMSA Advisory Bulletin 2012-06, Plains must verify the records for the Affected Pipeline to confirm the Maximum Operating Pressure (MOP). Plains must submit documentation of this records verification to the Director within 45 days of receipt of this Order.

5. **Mechanical and Metallurgical Testing.** Within 45 days of receipt of this Order, complete mechanical and metallurgical testing and failure analysis of the failed pipe, including an analysis of soil samples and any foreign materials. Complete the testing and analysis as follows:

   a. Document the chain-of-custody when handling and transporting the failed pipe section and other evidence from the Failure Site. The removal and protection of the failed pipe section shall be done in the presence a PHMSA representative, and all failure surfaces shall be protected from damage or contamination during removal and subsequent storage prior to testing.

   b. Within 10 days of receipt of this Order, develop and submit the testing protocol and the proposed testing laboratory to the Director for prior approval.

   c. Prior to beginning the mechanical and metallurgical testing, provide the Director with the scheduled date, time, and location of the testing to allow for an OPS representative to witness the testing.

   d. Ensure the testing laboratory distributes all reports, whether draft or final, in their entirety to the Director at the same time they are made available to Plains.

6. **Root Cause Failure Analysis.** Within 60 days following receipt of this Order, complete a root cause failure analysis (RCFA) and submit a final report of this RCFA to the Director. The RCFA must be facilitated by an independent third-party acceptable to the Director and must document the decision-making process and all factors contributing to the Failure. The final report must include findings and any lessons learned and whether the findings and any lessons learned are applicable to other locations within Plains' pipeline system.

7. **Remedial Work Plan.** Within 90 days following receipt of this Order, provide a plan to the Director for his approval to investigate and remediate all actionable anomalies per 49 CFR

Part 195.452(h) and anomalies similar to those that may have led to the release at the Failure site.

8. ***Restart Plan***. Prior to resuming operation of the Affected Pipeline, Plains must develop and submit a written Restart Plan to the Director for prior approval.

   a. The Restart Plan may only be requested after completion of Items 2 through 7 of this Order.

   b. The Restart Plan must also include documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual.

   c. The Restart Plan must provide for adequate patrolling of the Affected Pipeline during the restart process and must include incremental pressure increases during start-up, with each increment to be held for at least 2 hours.

   d. The Restart Plan must include sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes.

   e. The Restart Plan must specify a day-light restart and include advance communications with local emergency response officials.

   f. Once approved by the Director, the Restart Plan will be incorporated by reference into this Order.

9. ***Return to Service.*** After the Director approves the Restart Plan, Plains may return the Affected Pipeline to service but the operating pressure must not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Failure on May 19, 2015.

10. ***Removal of Pressure Restriction.***

   a. The Director may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-failure operating pressure is justified based on a reliable engineering analysis showing that the pressure increase is safe considering all known defects, anomalies, and operating parameters of the pipeline.

   b. The Director may allow the temporary removal or modification of the pressure restrictions upon a written request from Plains demonstrating that temporary mitigative and preventive measures are implemented prior to and during the temporary removal or modification of the pressure restriction. The Director's determination will be based on the failure cause and provision of evidence that preventive and mitigative actions taken by the operator provide for the safe operation of the Affected Segment during the temporary removal or modification of the pressure restriction.

11. ***Emergency Response Plan and Training Review***. Plains must review and assess the effectiveness of its emergency response plan and Bakersfield Spill Response Plan – Sequence 0107 with regards to the Failure. Include in the assessment a detailed review of the on-scene response and support activities (including timeline), coordination with all parties (including regulatory requests and proceeding with work), site security (including all phases of the response), procedures for improvements, lessons learned, and communication with the National Response Center, emergency responders, third party contractors, public officials, and internal resources. Include a review and assessment of the effectiveness of its emergency training program. Plains must amend its emergency response plan and

emergency training, if necessary, to reflect the results of this review. Documentation of this *Emergency Response Plan and Training Review* must be provided to the Director. Revisions to the Bakersfield Spill Response Plan must be submitted to the Director, Emergency Support and Security Division, for review and approval in accordance with 49 C.F.R. Part 194.

12. ***CAO Documentation Report (CDR).*** Plains must create and revise, as necessary, a Corrective Action Order Documentation Report (CDR). When Plains has concluded all the items in this Order, the company will submit the final CDR in its entirety to the Director. This will allow the Director to complete a thorough review of all actions taken by Plains according to this Order prior to approving the closure of this Order. The intent is for the CDR to summarize all activities and documentation associated with this Order in one document.

   a. The Director may approve the CDR incrementally without approving the entire CDR.

   b. Once approved by the Director, the CDR will be incorporated by reference into this Order.

   c. The CDR must include but not be limited to:

      i. Table of Contents;

      ii. Summary of the Failure and all response activities;

      iii. Summary of pipe data/properties and all prior assessments of the Affected Pipeline;

      iv. Summary of all tests, inspections, assessments, evaluations, and analysis required by this Order;

      v. Summary of the Mechanical and Metallurgical Testing, as required by this Order;

      vi. Summary of the RCFA with all root causes, as required by this Order;

      vii. Lessons learned while completing this Order;

      viii. A path forward describing specific actions Plains will take on its entire pipeline system as a result of the lessons learned from work on this Order

**Other Requirements:**

1. ***Reporting.*** Submit monthly reports to the Director that: (1) include all available data and results of the testing and evaluations required by this Order; and (2) describe the progress of the repairs or other remedial actions being undertaken. The first report is due on June 21. The Director may change the interval for the submission of these reports.

2. ***Documentation of Costs.*** It is requested but not required that Plains maintain documentation of the costs associated with implementation of this Order. Include in each monthly report the to-date total costs associated with: (1) preparation and revision of procedures, studies and analyses; (2) physical changes to pipeline infrastructure, including repairs, replacements and other modifications; and (3) environmental remediation, if applicable.

3. ***Approvals.*** With respect to each submission requiring the approval of the Director, the Director may: (a) approve the submission in whole or in part; (b) approve the submission

on specified conditions; (c) modify the submission to cure any deficiencies; (d) disapprove the submission in whole or in part and direct Plains to modify the submission; or (e) any combination of the above. In the event of approval, approval upon conditions, or modification by the Director, Plains must proceed to take all actions required by the submission, as approved or modified by the Director. If the Director disapproves all or any portion of a submission, Plains must correct all deficiencies within the time specified by the Director and resubmit it for approval.

4. ***Extensions of Time.*** The Director may grant an extension of time for compliance with any of the terms of this Order upon a written request timely submitted and demonstrating good cause for an extension.

The actions required by this Corrective Action Order are in addition to and do not waive any requirements that apply to Respondent's pipeline system under 49 C.F.R. Part 195, under any other order issued to Respondent under authority of 49 U.S.C. § 60101, *et seq.*, or under any other provision of Federal or State law. **After receiving and analyzing additional data in the course of this investigation, PHMSA may identify other corrective measures that need to be taken on the Affected Pipeline or Plains' Line 903.**

Respondent may appeal any decision of the Director to the Associate Administrator for Pipeline Safety. Decisions of the Associate Administrator shall be final.

Be advised that all material you submit in response to this enforcement action is subject to being made publicly available. If you believe that any portion of your responsive material qualifies for confidential treatment under 5 U.S.C. 552(b), along with the complete original document you must provide a second copy of the document with the portions you believe qualify for confidential treatment redacted and an explanation of why you believe the redacted information qualifies for confidential treatment under 5 U.S.C. 552(b).

Failure to comply with this Order may result in the assessment of civil penalties and in referral to the Attorney General for appropriate relief in United States District Court pursuant to 49 U.S.C. § 60120.

In your correspondence on this matter, please refer to CPF No. 5-2015-5011H and for each document you submit, please provide a copy in electronic format whenever possible.

The terms and conditions of this Corrective Action Order are effective upon receipt.

MAY 2 1 2015

Jeffrey D. Wiese
Associate Administrator
for Pipeline Safety

Date Issued



U.S. Department
of Transportation

**Pipeline and Hazardous
Materials Safety
Administration**

JUN 0 3 2015

1200 New Jersey Avenue SE
Washington, DC 20590

**VIA CERTIFIED MAIL AND FAX TO: 713-646-4378**

Mr. Troy Valenzuela
Vice President EHS
Plains Pipeline, LP
333 Clay Street, Suite 1600
Houston, TX 77002

**Re: CPF No. 5-2015-5011H**

Dear Mr. Valenzuela:

Enclosed is Amendment No. 1 to the Corrective Action Order issued in the above-referenced
case on May 21, 2015. It requires Plains Pipeline, LP to take additional corrective actions with
respect to Line 901 and Line 903 of its pipeline system. Service is being made by certified mail
and facsimile. Service of the Amendment to the Corrective Action Order by electronic
transmission is deemed complete upon transmission and acknowledgement of receipt, or as
otherwise provided under 49 C.F.R. § 190.5. The terms and conditions of this Order are
effective upon completion of service.

Thank you for your continued cooperation in this matter.

Sincerely,



Jeffrey D. Wiese
Associate Administrator
for Pipeline Safety

Enclosure

cc:    Ms. Linda Daugherty, Deputy Associate Administrator for Field Operations, OPS
       Mr. Chris Hoidal, Director, Western Region, OPS

**U.S. DEPARTMENT OF TRANSPORTATION**
**PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION**
**OFFICE OF PIPELINE SAFETY**
**WASHINGTON, D.C.  20590**

|  |  |
|---|---|
| In the Matter of | ) |
|  | ) |
| Plains Pipeline, LP, | )   **CPF No. 5-2015-5011H** |
|  | ) |
| Respondent. | ) |

---

### AMENDMENT NO. 1 TO THE CORRECTIVE ACTION ORDER

**Purpose and Background:**

On May 21, 2015, the Associate Administrator issued a Corrective Action Order (CAO) under the authority of 49 U.S.C. § 60112, to require Plains Pipeline, LP (Plains or Respondent), to take certain corrective actions to protect the public, property, and the environment from potential hazards associated with Line 901 (Affected Pipeline) in Santa Barbara County, California.  The CAO was issued in response to a May 19, 2015, failure on the Affected Pipeline that caused the release of approximately 1700 to 2500 barrels of heavy crude oil (Failure).  The cause of the Failure has not yet been determined.  Pursuant to 49 U.S.C. § 60117, the Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS), initiated an investigation of the accident.

**Additional Preliminary Findings:**

- The results of Plains' May 5, 2015 In-Line Inspection (ILI) survey revealed four areas on the Affected Pipeline with pipe anomalies requiring immediate investigation and remediation in accordance with 49 CFR § 195.452(h) or Plains' own criteria for investigation under its integrity management plan.  Examination and measurements of three of these areas indicated extensive external corrosion, primarily on the bottom quadrant of the pipe.  The deepest metal loss at each area, as measured by Plains non-destructive testing contractors, ranged between 54 and 74% of the original pipe wall thickness.  The anomalies were not limited to being near the girth welds, but also occurred at other locations along the length of the pipe.  The fourth area to be investigated has not yet been completed.

- The Affected Pipeline is experiencing active external corrosion, as follows:

- o Plains has reported to PHMSA that the May 5th ILI survey revealed metal loss of approximately 45% of the original wall thickness in the area of the pipe that failed on May 19.
- o PHMSA inspectors noted general external corrosion of the pipe body during field examination of the failed pipe segment.
- o The rupture characteristics at the Failure site indicate a longitudinally oriented opening approximately 6 inches in length and located in the bottom quadrant of the pipe. Third-party metallurgists in the field estimated that corrosion at the Failure site had degraded the wall thickness to an estimated 1/16 of an inch (.0625"). This thinning of the pipe wall is greater than the 45% metal loss which was indicated by the recent ILI survey.
- o PHMSA inspectors observed three repairs to the Affected Pipeline in the area near the Failure site that had been made due to external corrosion. These repairs were made after the 2012 ILI survey.

- Plains uses an impressed current cathodic protection (CP) system to protect the Affected Pipeline from external corrosion. After the Failure, PHMSA inspectors witnessed Plains measuring CP levels near the Failure site and at the three anomaly digs that were completed after May 22. The CP levels appeared to be adequate according to 49 CFR § 195.571. External corrosion with CP at this level would not be expected.

- Plains' Line 903 is a 30-inch diameter pipeline which transports crude oil 128 miles from the Gaviota Pump Station in Santa Barbara County to the Emidio Pump Station in Kern County, California.

- Plains has informed PHMSA that Line 903 has insulation and shrink wrap sleeves on the girth welds, similar to the Affected Pipeline.

- Line 903 was completely surveyed by ILI during 2013 and 2014. These ILI results revealed:
  - o The 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station was inspected on April 29, 2013, and the report was provided to Plains in June 2013. The ILI vendor reported that this segment had 99 metal loss anomalies requiring investigation.
  - o The 75-mile segment of Line 903 between Sisquoc Station and Pentland Station was inspected on June 12, 2013. The report was provided to Plains in August 2013, and a corrected report was provided in September 2013. This segment had no anomalies requiring investigation. However, the ILI vendor reported there were a number of metal loss anomalies that may indicate general corrosion.
  - o The 15-mile segment of Line 903 between Pentland Station and Emidio Station was inspected on February 19, 2014, and the report was provided to Plains in May 2014. This segment had no anomalies requiring immediate investigation. However, based on the ILI vendor report, this segment had two girth weld anomalies requiring investigation.
  - o The data collected by the ILI surveys for the different segments of Line 903 appear to be inconsistent, requiring immediate review and analysis.

- Plains voluntarily shut down Line 903 on May 19, restarted the line on May 29, and shut the line back down on May 30. Line 903 is currently shut down.

**Determination of Necessity for Amendment to the Corrective Action Order and Right to Hearing:**

Section 60112 of Title 49, United States Code, provides for the issuance of a Corrective Action Order, after reasonable notice and the opportunity for a hearing, requiring corrective action, which may include the suspended or restricted use of a pipeline facility, physical inspection, testing, repair, replacement, or other action, as appropriate. The basis for making the determination that a pipeline facility is or would be hazardous, requiring corrective action, is set forth both in the above-referenced statute and 49 C.F.R. § 190.233, a copy of which is enclosed.

Section 60112 and the regulations promulgated thereunder provide for the issuance of a Corrective Action Order, without prior notice and opportunity for hearing, upon a finding that failure to issue the Order expeditiously would result in the likelihood of serious harm to life, property, or the environment. In such cases, an opportunity for a hearing and expedited review will be provided as soon as practicable after the issuance of the Order.

After evaluating the preliminary findings in the CAO and the foregoing additional preliminary findings of fact, I find that continued operation of Line 901 and Line 903 without corrective measures is or would be hazardous to life, property, or the environment. Additionally, having considered the uncertainties as to the cause of the Failure, the location of the Failure, the similarities between the characteristics of the Affected Pipeline and Line 903, the material being transported, and the proximity of the pipelines to the Pacific Ocean and environmentally sensitive areas, I find that a failure to issue this Order expeditiously to require immediate corrective action would result in the likelihood of serious harm to life, property, or the environment.

Accordingly, this Amendment to the Corrective Action Order mandating immediate corrective action is issued without prior notice and opportunity for a hearing. The terms and conditions of this Order are effective upon receipt.

**The actions required by this Amendment No. 1 to the Corrective Action Order are in addition to the requirements that apply to Respondent's Affected Pipeline under the CAO issued on May 21, 2015.**

Within 10 days of receipt of this Amendment, Respondent may contest its issuance and obtain expedited review either by answering in writing or requesting a hearing under 49 C.F.R. § 190.211, to be held as soon as practicable under the terms of such regulation, by notifying the Associate Administrator for Pipeline Safety in writing, with a copy to the Director, Western Region, OPS (Director). If Respondent requests a hearing, it will be held telephonically or in-person in Lakewood, Colorado, or Washington, D.C.

After receiving and analyzing additional data in the course of this investigation, PHMSA may identify other corrective measures that need to be taken on the Affected Pipeline or Plains' Line 903. In that event, PHMSA will notify Respondent of any additional measures that are required

and another Amendment Order will be issued, if necessary. To the extent consistent with safety, Respondent will be afforded notice and an opportunity for a hearing prior to the imposition of any additional corrective measures.

**Required Corrective Actions:**

Pursuant to 49 U.S.C. § 60112, I hereby order Plains to immediately take the following corrective actions:

***With respect to the Affected Pipeline (Line 901):***

1. *Paragraph 3(c)(vi) of the Required Corrective Actions of the CAO is amended, in its entirety, as follows:* List and describe (type, size, wall loss, etc.) the specific location of all ILI features identified by the May 5, 2015 ILI survey elsewhere on the Affected Pipeline that require investigation according to 49 CFR § 195.452(h) or the criteria for investigation under Plains' own integrity management plan, whichever is more stringent. All ILI features and anomalies that satisfy the criteria in either 49 CFR § 195.452(h) or the criteria for investigation under Plains' integrity management plan must be investigated and remediated. Provide the Director with a report detailing the results of the investigations and remediations that have been completed, and a proposed schedule for the remaining investigations.

2. ***Non-destructive testing.*** Plains must use a third-party, American Society of Non-Destructive Testing (ASNT) Level III certified, non-destructive testing field contractor to complete a non-destructive testing analysis at the specific location of each ILI feature or anomaly that requires investigation according to 49 CFR § 195.452(h) or the criteria for investigation under Plains' own integrity management plan, whichever is more stringent. If the ILI feature or anomaly is identified as being located at a girth weld with shrink sleeves, the contractor must perform a magnetic particle inspection, or other appropriate technology, of the weld area to check for stress corrosion cracking (SCC). Provide the Director with five business days' notice of the excavation of each pipe section requiring investigation. A summary of the investigations, test results, and remediations must be included in the monthly report required by Item 12 of the CAO, and the test records must be made available for inspection by PHMSA.

***With respect to Line 903:***

3. ***Pressure Restriction.*** The operating pressure of Line 903 must not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8 hour period between April 19, 2015, and May 19, 2015. This pressure restriction must remain in effect until the Director provides written approval to resume normal operation of Line 903.

4. ***Review of Line 903.*** Within 60 days of receipt of this Amendment, Plains must review Line 903 and address any findings that require remedial measures. This review must include:

   a. All construction, operating and maintenance (O&M) and integrity management records, such as hydrostatic tests, root cause failure analysis of prior failures, aerial and ground patrols, corrosion protection, One Call tickets, excavations and exposed pipe records, and pipe replacements;

   b.  Identification of all areas of Line 903 that have insulated pipe and girth welds with shrink wrap sleeves;

   c.  List and describe (type, size, wall loss, etc.) the specific location of all ILI features identified by the most recent ILI survey that require investigation according to 49 CFR § 195.452(h) or the criteria for investigation under Plains' own integrity management plan, whichever is more stringent. All ILI features and anomalies that satisfy the criteria in either § 195.452(h) or the criteria for investigation under Plains' integrity management plan must be investigated and remediated. Provide the Director with a report detailing the results of the investigations and remediations that have been completed, and a proposed schedule for the remaining anomalies.

5.   *ILI Data for Line 903.* Plains must provide the following documentation of previous ILI surveys on Line 903 to the Director within 15 days of receipt of this Amendment:

   i.  List all ILI tool runs, tool types, and the calendar years of the tool runs conducted on Line 903 over the past 10 calendar years.

   ii.  Provide all ILI data from surveys of Line 903 over the past 10 calendar years to the Director for review by PHMSA's 3rd party ILI data analyst.

6.   *Non-destructive testing.* Plains must use a third-party, American Society of Non-Destructive Testing (ASNT) Level III certified, non-destructive testing field contractor to complete a non-destructive testing analysis at the specific location of each ILI feature or anomaly on Line 903 identified in Item 4(c) above. If the ILI feature or anomaly is identified to be at a girth weld with shrink sleeves, the contractor must perform a magnetic particle inspection, or other appropriate technology, of the weld area to check for stress corrosion cracking (SCC). Provide the Director with five business days' notice of the excavation of each pipe section requiring investigation. A summary of the investigations, test results, and remediations must be included in the monthly report required by Item 12 of the CAO, and the test records must be made available for inspection by PHMSA.

**With respect to both the Affected Pipeline and Line 903:**

7.   *Enhanced preventive and mitigative measures.* Plains must take additional preventive and mitigative measures on the Affected Pipeline and Line 903 while each pipeline is subject to a pressure restriction under the CAO or this Amendment. These measures must include, but are not limited to:

   a.  Patrol inspections of surface conditions of the pipeline right-of-way at intervals not exceeding one week;

   b.  Daily inspections of pump stations to identify leaks and abnormal conditions;

   c.  Establishment of pump pressure set points and use of pressure limiting devices to match the required pressure reduction;

   d.  Training of Plains field personnel regarding awareness of abnormal operating conditions that may result from the pressure reduction on the pipeline.

   e.  Plains must maintain all documentation related to the pressure restriction and preventive and mitigative measures, including all inspections, training documents, and management of change (MOC) records.

8.   ***CAO Documentation Report:*** The Corrective Action Order Documentation Report required under Item 12 of the CAO must include a summary of all inspections, assessments, evaluations, and analysis required by this Amendment No. 1 to the CAO.

The actions required by this Amendment No. 1 to the Corrective Action Order are in addition to and do not waive any requirements that apply to Respondent's pipeline system under the CAO, 49 C.F.R. Part 195, under any other order issued to Respondent under authority of 49 U.S.C. § 60101, *et seq.*, or under any other provision of Federal or State law.

Respondent may appeal any decision of the Director to the Associate Administrator for Pipeline Safety. Decisions of the Associate Administrator shall be final.

Be advised that all material you submit in response to this enforcement action is subject to being made publicly available. If you believe that any portion of your responsive material qualifies for confidential treatment under 5 U.S.C. 552(b), along with the complete original document you must provide a second copy of the document with the portions you believe qualify for confidential treatment redacted and an explanation of why you believe the redacted information qualifies for confidential treatment under 5 U.S.C. 552(b).

Failure to comply with this Order may result in the assessment of civil penalties and in referral to the Attorney General for appropriate relief in United States District Court pursuant to 49 U.S.C. § 60120.

In your correspondence on this matter, please refer to CPF No. 5-2015-5011H and for each document you submit, please provide a copy in electronic format whenever possible.

The terms and conditions of this Amendment No. 1 to the Corrective Action Order are effective upon receipt.

June 3, 2015

Jeffrey D. Wiese                                              Date Issued
Associate Administrator
 for Pipeline Safety

# EXHIBIT D

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>　　　　　Plaintiffs,<br><br>　　　　v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>　　　　　Defendants. | Civil Action No.<br><br>2:20-cv-02415<br><br>**CONSENT DECREE** |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 569 of 703   Page
ID #:12417
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 2 of 102   Page ID #:95

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast Regional Water Quality Control Board, and California Department of Forestry and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 25    Filed 05/14/26    Page 570 of 703   Page
ID #:12418
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 3 of 102   Page ID #:96

**TABLE OF CONTENTS**

I.      BACKGROUND ...................................................................................- 5 -

II.     JURISDICTION AND VENUE..........................................................- 6 -

III.    APPLICABILITY ...............................................................................- 7 -

IV.     DEFINITIONS ....................................................................................- 7 -

V.      CIVIL PENALTIES ..........................................................................- 13 -

VI.     NATURAL RESOURCE DAMAGES ...............................................- 17 -

VII.    TRUSTEES' MANAGEMENT AND APPLICABILITY
        OF JOINT NRD FUNDS ..................................................................- 21 -

VIII.   TRUSTEES' MANAGEMENT OF RECREATIONAL
        USE FUNDS .....................................................................................- 22 -

IX.     INJUNCTIVE RELIEF .....................................................................- 23 -

X.      CORRECTIVE ACTION ORDER ....................................................- 27 -

XI.     STIPULATED PENALTIES ..............................................................- 27 -

XII.    FORCE MAJEURE............................................................................- 35 -

XIII.   DISPUTE RESOLUTION ..................................................................- 37 -

XIV.    REPORTING......................................................................................- 39 -

XV.     CERTIFICATION ..............................................................................- 40 -

XVI.    INFORMATION COLLECTION AND RETENTION.......................- 40 -

XVII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ............- 43 -

XVIII.  TRANSFER AND ACQUISITION OF ASSETS ..............................- 49 -

XIX.    COSTS................................................................................................- 50 -

XX.     NOTICES ...........................................................................................- 51 -

XXI.    EFFECTIVE DATE ...........................................................................- 54 -

XXII.   RETENTION OF JURISDICTION ....................................................- 54 -

XXIII.  MODIFICATION ...............................................................................- 54 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

XXIV.    TERMINATION .................................................................................- 55 -

XXV.    PUBLIC PARTICIPATION.............................................................- 56 -

XXVI.    SIGNATORIES/SERVICE ..............................................................- 56 -

XXVII.    INTEGRATION .................................................................................- 57 -

XXVIII.  FINAL JUDGMENT .........................................................................- 57 -

XXIX.    26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION .................- 57 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- ii -

A.    WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline known as the Line 901 pipeline ("Line 901") owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P., (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County, California.  A portion of the oil reached the Pacific Ocean and coastal areas such as Refugio State Beach.  The Refugio Incident adversely impacted Natural Resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and the State of California ("California" or the "State").

B.    WHEREAS, cleanup actions began immediately after the Refugio Incident at the direction of a Unified Command established by the United States Coast Guard ("USCG") and the State of California Department of Fish and Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR").  The Unified Command was comprised of the United States, State agencies, the County of Santa Barbara, and Plains.

C.    WHEREAS, on May 21, 2015, the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No. 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO").  The PHMSA CAO directed Plains, among other things, to purge Line 901 and a portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota and Pentland pump stations, and to keep Line 901 and the purged sections of Line 903 shut down until the actions required by the PHMSA CAO were satisfactorily completed.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 1 -

Case 2:26-cv-05242-SVW-SSC    Document 25    Filed 05/14/26    Page 573 of 703    Page
ID #:12421
Case 2:20-cv-02415-V-Document 6-1    Filed 03/13/20    Page 6 of 102    Page ID #:99
ID #:12421

D.      WHEREAS, on May 19, 2016, PHMSA issued a Failure Investigation Report, which included PHMSA's findings of the "proximate or direct" causes and the "contributing" causes of the Refugio Incident.

E.      WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs arising from the Refugio Incident.

F.      WHEREAS, CDFW incurred certain additional costs arising from the administration and civil enforcement of pollution laws, including attorneys' fees that have been reimbursed by Plains.

G.      WHEREAS, Plains represents that it has implemented and will continue to utilize an electronic tracking tool and software for maintenance activities, including those activities related to mainline valves.  The software tracks which maintenance activities are performed, who performs the activity, when prior notifications of maintenance activities by field personnel are received, when problems requiring maintenance are first discovered, and when maintenance problems are corrected.  Plains maintains a separate software program to track the training and qualifications of all maintenance personnel.

H.      WHEREAS, Plains represents that, following the Refugio Incident and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its Emergency Response Plan and Training Program, and revised and updated its Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield District Response Zone Plan") to reflect modifications resulting from the review and the incorporation of lessons learned.  As part of the revision, Plains identified the locations of culverts along the pipelines' rights-of-way and provided containment and recovery techniques for responding to spills that may occur near those culverts.  Plains provided drafts of the updated Bakersfield District Response Zone Plan to PHMSA, incorporated comments provided by PHMSA, and received approval of the revised plan from PHMSA on September 26, 2017.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

I.      WHEREAS, Plains represents that it also created a more detailed Geographic Information System ("GIS") based online Tactical Response Plan for its onshore oil pipelines in Southern California, including Line 2000 and the operational portion of Line 903, that, among other things, identifies culverts along the pipelines' rights-of-way, potential receptors and the equipment, supplies and resources that would be necessary to respond to a spill occurring at any given location along those pipelines, identifies the sources and locations for obtaining those resources, and, in some instances, establishes stored inventories of those resources in specific locations.  Plains represents that it intends to keep its Tactical Response Plan updated and available for use in drills and spill response, and that it will make the Tactical Response Plan available to the Plaintiffs upon reasonable request and as needed in connection with a drill or response to a spill.

J.      WHEREAS, Plains represents that Plains personnel responding to incidents that trigger the standup of an incident command structure ("ICS") have been provided ICS training appropriate to their responsibilities.

K.      WHEREAS, the relevant Natural Resources trustees ("Trustees") for the Refugio Incident are the United States Department of the Interior ("DOI"); United States Department of Commerce, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"); CDFW; California Department of Parks and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and The Regents of the University of California ("UC").

L.      WHEREAS, pursuant to Section 1006 of the Oil Pollution Act (''OPA''), 33 U.S.C. 2701, *et seq.*, the United States and the State Trustees allege that oil from the Refugio Incident caused injuries to Natural Resources, including birds, marine mammals, shoreline and subtidal habitats, and also had an impact upon human uses of Natural Resources and other public resources. The Federal Trustees are designated pursuant to the National Contingency Plan,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 3 -

Case 2:26-cv-05242-GW-SSC    Document 25    Filed 05/14/26    Page 575 of 703   Page
ID #:12423
Case 2:20-cv-02415  Document 6-1   Filed 03/13/20   Page 8 of 102   Page ID #:101

40 C.F.R. § 300.600 and Executive Order 12777.  CDFW and CDPR are designated state trustees pursuant to the National Contingency Plan, 40 C.F.R. § 300.605, and the Governor's Designation of State Natural Resource Trustees pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980.  In addition, CDFW has state natural resource trustee authority pursuant to California Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (California Government Code § 8670.1 *et seq*.).  CDPR and UC have jurisdiction over natural resources within the state park system and the UC Natural Reserve System, respectively, which are held in trust for the people of the State of California.  CSLC is a state trustee pursuant to its jurisdiction under Public Resources Code § 6301 and Civil Code § 670.

M.     WHEREAS, after the Refugio Incident, the Trustees and Defendants entered into a cooperative Natural Resource Damage Assessment process pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and independently planned and conducted a number of injury assessment activities. These activities included gathering and analyzing data and other information that the Trustees used to determine and quantify resource injuries and damages.  As a result of this process and other activities, the Trustees identified several categories of injured and damaged Natural Resources, including birds, marine mammals, and shoreline and subtidal habitats, as well as effects to human use/recreation resulting from impacts on these Natural Resources, and determined the cost to restore, rehabilitate, replace, or acquire the equivalent of injured Natural Resources.  By entering this Consent Decree, Defendants do not admit or agree that the Trustees' NRD findings and determinations are accurate.

N.     WHEREAS, due to the specific facts surrounding the Refugio Incident, including the timing, degree, and nature of the spill and the affected

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 4 -

Case 2:26-cv-05242-GW-SSC   Document 25   Filed 05/14/26   Page 576 of 703   Page
ID #:12424
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 9 of 102   Page ID #:102

environment, the Trustees will not seek additional damages, costs, or expenses for Natural Resources resulting from the Refugio Incident.

O.      WHEREAS, Plains agrees to reimburse costs incurred by the Trustees in connection with the NRDA through November 15, 2018, and will not reimburse costs incurred by the Trustees in connection with the NRDA after that date.

P.      WHEREAS, by entering into this Consent Decree, Plains does not admit the allegations in the Complaint filed in this action, or any liability to the Plaintiffs.

Q.      WHEREAS, on January 28, 2019, PHMSA initiated a regularly-scheduled "Integrated Inspection" of a portion of Defendants' Regulated Pipelines, as described below, and other pipeline facilities and records, pursuant to 49 U.S.C. § 60117.

R.      WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

S.      WHEREAS, the Parties agree and the Court by entering this Consent Decree finds, that this Consent Decree:  (1) has been negotiated by the Parties at arm's-length and in good faith; (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws.

## I.      BACKGROUND

The United States, on behalf of PHMSA, the United States Environmental Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California Central Coast Regional Water Quality Control Board ("RWQCB"), and the California Department of Forestry and Fire Protection's - Office of the State Fire

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 253/15/26   Filed 05/14/26   Page 577 of 703   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 10 of 102   Page ID #:103
ID #:12425

Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and associated regulations and orders; OPA, 33 U.S.C. §§ 2701 *et seq.*, and associated regulations and orders; the federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq.*, and associated regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, California Government Code §§ 8670.1 *et seq.* and associated regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016, 13013; California Water Code §§ 13350, 13385; and the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.* The Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks penalties, injunctive relief, and Natural Resource Damages.

NOW, THEREFORE, before the trial of any claims and without adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.     JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and 60122; and 28 U.S.C. §§ 1331, 1345, and 1355. This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367. To the extent the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the United States and the State Agencies have satisfied the requirement.

2.      Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws, 49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 6 -

Case 2:26-pv-05242-SVW-SSC Document 253/15/26 Filed 05/14/26 of Page 578 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 11 of 102 Page ID #:104
ID #:12426

does business in this District and the alleged claims occurred in this District.

3.      For purposes of this Consent Decree or any action to enforce this Consent Decree, Defendants consent to the Court's jurisdiction over this Consent Decree for such action and Defendants consent to venue in this judicial district. For purposes of this Consent Decree and without admission of liability, Defendants agree that the Complaint states claims upon which relief may be granted.

### III.    APPLICABILITY

4.      Subject to the terms herein, the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree.

5.      Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained for the purpose of performing work required under this Consent Decree.  Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree by specifying that contractors are obligated to perform work in compliance with this Consent Decree.

6.      In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### IV.    DEFINITIONS

7.      Terms used in this Consent Decree that are defined in the CWA, OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 7 -

Case 2:26-cv-05242-SVW-SSC    Document 253/15 Filed 05/14/26    Page 579 of 703   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 12 of 102   Page ID #:105
ID #:12427

have the meanings assigned to them in these statutes and their regulations, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Appendix A" is the set of maps that generally depict Lines 901, 903, and 2000;

"Appendix B" is the Injunctive Relief that Plains is required to perform under this Consent Decree;

"Appendix C" is intentionally left blank;

"Appendix D" is the list of remaining corrective actions from the PHMSA CAO that Plains is still required to implement under this Consent Decree.  For the terms of the PHMSA CAO, *see* https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H.html?nocache=4888#_TP_1_tab_1;

"CDFW" shall mean the California Department of Fish and Wildlife and any of its successor departments or agencies;

"CDPR" shall mean the California Department of Parks and Recreation and any of its successor departments or agencies;

"Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

"Consent Decree" shall mean this Consent Decree and all Appendices attached hereto;

"Control Room Management Plan" shall mean Plains' Control Room Management Plan, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"Control Center General Procedures" shall mean Plains' Control Center General Procedures, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"CSLC" shall mean the California State Lands Commission and any of its successor departments or agencies;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 8 -

Case 2:26-cv-05242-SVW-SSC    Document 253/15/26    Filed 05/14/26    Page 580 of 703   Page
Case 2:20-cv-02415   Document 6-1    Filed 03/15/20    Page 13 of 102    Page ID #:106
ID #:12428

"Day" shall mean a calendar day unless expressly stated to be a working day.  In computing any period of time under this Consent Decree, the rules set forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

"Defendants" shall mean Plains All American Pipeline, L.P. and Plains Pipeline, L.P.;

"Delivery Lines" as stated in Appendix B shall mean any pipeline that generally operates to move oil from a delivery meter on a pipeline or facility to another pipeline or facility in close proximity;

"DOI" shall mean the United States Department of the Interior, including its bureaus and agencies, and any of its successor departments or agencies;

"Elder California Pipeline Safety Act" shall mean the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXI (Effective Date);

"Federal Trustees" shall mean DOI and NOAA in their capacities as Natural Resource Trustees;

"Integrity Management Plan" or "IMP" shall mean Plains' Integrity Management Plan, dated September 2019, as delivered to PHMSA by letter dated November 19, 2019, from counsel for Defendants;

"Line 901" is Defendants' 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California, as generally depicted in Appendix A;

"Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends approximately 129 miles in length from the Gaviota Pump Station in Santa Barbara County, California to the Emidio Pump Station in Kern County,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 253/15/26 Filed 05/14/26 Page 581 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 14 of 102 Page ID #:107
ID #:12429

California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland Mile Post 114.57, as generally depicted in Appendix A;

"Line 2000" is Defendants' 20-inch diameter pipeline that extends approximately 130 miles in length and transports crude-oil produced in the outer continental shelf and the San Joaquin Valley. Line 2000 runs from Bakersfield, California, over the Tehachapi Mountains and through the Grapevine I-5 corridor and extends to delivery locations in the Los Angeles metropolitan area, as generally depicted in Appendix A;

"Mainline pipeline" as stated in Appendix B shall mean the principal pipeline or the parallel pipeline in a given pipeline system, excluding connected lateral lines or branch lines that are used locally to deliver product either into the mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a third-party line;

"Natural Resource" and "Natural Resources" shall mean land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and/or the State or any subdivision thereof, and shall also mean the services provided by such resources to other resources or to humans;

"Natural Resource Damages" or "NRD" shall mean all damages, including restoration or rehabilitation costs, recoverable by the United States or State Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources including any services such natural resources provide, including the reasonable costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A), resulting from the Refugio Incident;

"Natural Resource Damage Assessment" or "NRDA" shall mean the process of collecting, compiling, and analyzing information, statistics, or data through prescribed methodologies to determine damages for injuries to Natural

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 10 -

Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio Incident;

"NRD Payment" shall mean the payment Defendants are required to pay for the Natural Resource Damages as described in Section VI (Natural Resource Damages);

"Natural Resource Trustees" or "Trustees" are those federal and state agencies or officials designated or authorized pursuant to the CWA, OPA, and/or applicable state laws to act as Trustees for the Natural Resources belonging to, managed by, controlled by, or appertaining to the United States or the State. Participating Trustees in the Natural Resource Damage Assessment and in this Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

"NOAA" shall mean the National Oceanic and Atmospheric Administration and any of its successor departments or agencies;

"Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the fund established pursuant to 26 U.S.C. § 9509, including the claim-reimbursement provisions set forth in 33 U.S.C. § 2712;

"OSFM" shall mean the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal and any of its successor departments or agencies;

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

"Parties" shall mean the Plaintiffs and Defendants, collectively;

"PHMSA" shall mean the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration and any of its successor departments or agencies;

"PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the Original CAO issued on May 21, 2015, by PHMSA, which was subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016;

Case 2:26-cv-05242-SVW-SSC Document 253/15/26 Filed 05/14/26 Page 583 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 16 of 102 Page ID #:109
ID #:12431

"Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq.*, and regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

"Plaintiffs" shall mean the United States and the State Agencies;

"Refugio Incident" shall mean the release of approximately 2,934 barrels of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California on or about May 19, 2015;

"Regulated Pipeline" shall mean any pipeline operated by Plains subject to regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div. 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

"Requests for Information" or "RFI" shall mean PHMSA's RFIs dated August 19, 2015, August 21, 2015, and September 1, 2016. RFIs shall also refer to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

"Restore" or "Restoration" shall mean any action or combination of actions to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including Natural Resource-based recreational opportunities that were injured, lost, or destroyed as a result of the Refugio Incident;

"RWQCB" shall mean the California Central Coast Regional Water Quality Control Board and any of its successor departments or agencies;

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

"Segment" as stated in Appendix B shall mean any contiguous portion of a pipeline system for which a single hydrostatic test or ILI may be performed, as determined by Defendants;

"State Agencies" shall mean the People of the State of California, *Ex Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC. The State Agencies do not include any entity or political subdivision of the State of California other than those agencies herein designated the "State Agencies";

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 12 -

"State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their capacities as Natural Resource Trustees;

"United States" shall mean the United States of America, on behalf of PHMSA, EPA, DOI, NOAA, and USCG;

"UC" shall mean The Regents of the University of California and any of its successor departments or agencies; and

"USCG" shall mean the United States Coast Guard and any of its successor departments or agencies.

## V.    CIVIL PENALTIES

A.    Within thirty (30) Days after the Effective Date, Defendants shall pay to the United States, CDFW, and RWQCB a total civil penalty of twenty-four million dollars ($24,000,000), together with interest accruing from the date on which the Consent Decree is lodged with the Court, at a rate specified in 28 U.S.C. § 1961 (the "Penalty Payment"). The Penalty Payment shall be allocated as follows:

8.    Penalty Payment to the United States (PHMSA). For violations of the Pipeline Safety Laws alleged in the United States' Complaint, Defendants shall pay to the United States a civil penalty of fourteen million five hundred thousand dollars ($14,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

a.    Thirteen million two hundred fifty thousand dollars ($13,250,000) attributed to Plains' alleged Pipeline Safety Law violations; and

b.    One million two hundred fifty thousand dollars ($1,250,000) attributed to Plains' alleged non-compliance with the RFIs.

c.    Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants by the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 13 -

Case 2:26-cv-05242-SVW-SSC Document 25 Filed 05/14/26 Page 585 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 18 of 102 Page ID #:11
ID #:12433

Financial Litigation Unit ("FLU") of the United States Attorney's
Office for the Central District of California Western Division after
the Effective Date.  The payment instructions provided by the FLU
will include a Consolidated Debt Collection System ("CDCS")
number, which Defendants shall use to identify all payments
required to be made in accordance with this Consent Decree.  The
FLU will provide the payment instructions to:

> Megan Prout
> Senior Vice President
> Commercial Law and Litigation
> Plains All American Pipeline, L.P.
> 333 Clay Street, Suite 1600
> Houston, TX 77002

on behalf of Defendants.  Defendants may change the individual to
receive payment instructions on their behalf by providing written
notice of such change to the United States in accordance with
Section XX (Notices).

d.      At the time of payment, Defendants shall send a copy of the
EFT authorization form and the EFT transaction record, together
with a transmittal letter, which shall state the payment is for the civil
penalty owed pursuant to this Consent Decree in the *United States of
America and the People of the State of California v. Plains All
American Pipeline, L.P., et al.*, and shall reference the Civil Action
Number assigned to this case, CDCS Number, and DOJ case number
90-5-1-1-11340, to the United States in accordance with Section XX
(Notices).

9.      Penalty Payment to the United States (EPA) shared with CDFW and
RWQCB.  The Penalty Payment shall be allocated as follows:

a.      As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 14 -

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made as follows:

1)     To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife.  The check shall be sent by overnight or certified mail to:

> California Department of Fish and Wildlife
> Office of Spill Prevention and Response
> Attn:  Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill."  CDFW shall deposit the money as follows:  one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

2)     To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 15 -

State Water Resources Control Board
Division of Administrative Services, ATTN: Civil Liability Payment
P.O. Box 1888
Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3)      To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division.  Such monies are to be deposited in the OSLTF.  The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8).  Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day.  Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 16 -

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

and

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center
U.S. Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, D.C. 20593-7605

10.     Penalty Payment to be Paid to CDFW.  For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife.  The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California  95816-0362

The check shall reference the "Refugio Oil Spill."  CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11.     Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI.    NATURAL RESOURCE DAMAGES

12.     Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 17 -

Case 2:26-cv-05242-SVW-SSC Document 253/15 Filed 05/14/26 Page 589 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 22 of 102 Page ID #:115
ID #:12437

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961. The NRD Payment shall be allocated as follows:

a. To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment. Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds). Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

> Department of the Interior
> Natural Resource Damage Assessment and
>     Restoration Program
> Attention: Restoration Fund Manager
> 1849 "C" Street, N.W. Mail Stop 4449
> Washington, D.C. 20240

The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198. DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

b.     To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund.  Payment shall be made by check payable to the California Department of Parks and Recreation.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> The California Department of Parks and
>         Recreation
> Attn:  Laura Reimche, Senior Counsel
> 1416 Ninth Street, Room 1404-6
> Sacramento, California  95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund.  CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident.  CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c.     To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF.  Payment shall be made by check payable to the National Fish and Wildlife Foundation.  At the time of payment, Defendants shall simultaneously send written

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 19 -

Case 2:26-cv-05242-SVW-SSC Document 253/15/20 Filed 05/14/26 Page 591 of 703 Page
Case 2:20-cv-02413 Document 6-1 Filed 03/15/20 Page 24 of 102 Page ID #:117
ID #:12439

notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Game
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the California South Coast Shoreline Parks and Outdoor Recreational Use Account. The California South Coast Shoreline Parks and Outdoor Recreational Use Account shall be managed in accordance with the South Coast Shoreline Parks and Outdoor Recreational Use Account Memorandum of Agreement among the State Trustees and NFWF and shall be used by the Trustees for the purposes set forth in Section VIII (Trustees' Management of Recreational Use Funds).

d. To UC, twenty-six thousand dollars ($26,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into Natural Reserve System Account. Payment shall be made by check payable to The Regents of the University of California. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

The Regents of the University of California
Attn:  Michael Kisgen, Associate Director
Natural Reserve System
University of California, Office of the President
1111 Franklin Street, 6th Floor
Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account.  The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees.  The projects shall address the research, education, and outreach missions of the University of California.  UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13.     The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants.  To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII.   TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14.     DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident.  DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15.     DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 21 -

Case 2:26-cv-05242-SVW-SSC    Document 25    Filed 05/14/26    Page 593 of 703    Page
ID #:12441
Case 2:20-cv-02425    Document 6-1    Filed 03/15/20    Page 26 of 102    Page ID #:119

Subaccount, including return on investments or accrued interest, subject to the provisions of this Consent Decree.

16. The Natural Resource Trustees commit to the expenditure of the funds set forth in Paragraph 12 for the design, implementation, permitting (as necessary), monitoring, and oversight of Restoration projects and for the costs of complying with the requirements of the law to conduct a Restoration planning and implementation process. The Natural Resource Trustees will use the funds to Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including lost human use of such services, injured, lost, or destroyed as a result of the Refugio Incident and for the administration and oversight of these Restoration projects.

17. The specific projects or categories of projects will be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which public notice, opportunity for public input, and consideration of public comment will be provided. Plains shall have no responsibility nor liability for implementation of the Restoration Plan or projects relating to the Refugio Incident, including any future project costs other than the payments set forth in Section VII herein. The Trustees jointly retain the ultimate authority and responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD Subaccount to Restore Natural Resources in accordance with applicable law, this Consent Decree, and any memorandum or other agreement among them.

## VIII.    TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

18. CDPR shall allocate the monies paid pursuant to Paragraph 12 for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 22 -

Case 2:26-cv-05242-SVW-SSC   Document 253/15 Filed 05/14/26   Page 594 of 703   Page
Case 2:20-cv-02413 Document 0-1 Filed 03/15/20 Page 27 of 102 Page ID #:120
ID #:12442

19.     The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20.     UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX.    INJUNCTIVE RELIEF

21.     Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22.     <u>Material Changes to Plains' IMP</u>.

a.      Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

1)      Procedure for the Assessment of In-Line Inspection ("ILI") Results;

2)      Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

3)      White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 23 -

Case 2:26-cv-05242-SVW-SSC Document 25 Filed 05/14/26 Page 595 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 28 of 102 Page ID #:121
ID #:12443

4) Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"

5) Section 11.4, "Documentation of P&M Evaluation Meetings;" and

6) Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b. At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c. In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d. In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation.  The parties may mutually agree to extend the period by no more than thirty (30)

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 24 -

Days.  Following the notice period specified in Subparagraphs 22.b and 22.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII.  Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

23.     Material Changes in Control Room Management Plan and Control Center General Procedures.

a.     Plains' Control Room Management Plan and Control Center General Procedures (collectively, "Control Center Plan and Procedures") shall serve as the baseline Control Center Plan and Procedures for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4, 9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0, and 500-12 of its Control Center General Procedures throughout the term of this Consent Decree without following the process set forth in this Paragraph.  For purposes of this Paragraph, the term "material change" refers to any substantive modification in the Control Center Plan and Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.     At least thirty (30) Days prior to making a material modification to the above sections of  its Control Room Management Plan and Control Center General Procedures, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 25 -

Case 2:26-cv-05242-SVW-SSC Document 253/15/20 Filed 05/14/26 Page 597 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 30 of 102 Page ID #:123
ID #:12445

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

    c.     In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

    d.     In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days. Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved. If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24. Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals. Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

## X.    CORRECTIVE ACTION ORDER

25.    Upon the Effective Date of this Consent Decree, the PHMSA CAO shall close and be of no further force or effect.  All outstanding terms and obligations under the PHMSA CAO as of the Effective Date and which Plains is still required to implement under this Consent Decree are set forth in Appendix D.

## XI.    STIPULATED PENALTIES

26.    Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below.  A violation includes failing to perform any obligation required by the terms of this Consent Decree according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

27.    Late Payment of Civil Penalties and NRD Payment.

a.    If Defendants fail to pay any portion of the Penalty Payment to the United States required under Section V (Civil Penalties) when due, Defendants shall pay to the United States a stipulated penalty of ten thousand dollars ($10,000) per Day for each Day payment is late.

b.    If Defendants fail to pay any portion of the Penalty Payment to the CDFW and/or RWQCB as required under Section V (Civil Penalties) when due, Defendants shall pay to the CDFW and/or RWQCB a stipulated penalty of ten thousand dollars ($10,000) each, as applicable, per Day for each Day payment is late.

c.    If Defendants fail to pay any portion of the NRD Payments

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 27 -

required under Section VI (Natural Resource Damages) when due, Defendants shall pay a stipulated penalty of five thousand dollars ($5,000) to the United States, and five thousand dollars ($5,000) to the State Trustees, per Day for each Day payment is late.

28. Stipulated Penalties for Non-Performance of Injunctive Relief. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section IX (Injunctive Relief) when due:

a. For failure to timely submit to OSFM the applications for State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of Appendix B;

b. For failure to implement the Integrity Management provisions as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix B;

c. For failure to timely submit to OSFM the EFRD analyses as specified in paragraphs 5.A-5.B of Appendix B;

d. For failure to timely submit to OSFM the risk analysis as specified in paragraph 6.A of Appendix B;

e. For failure to timely submit to PHMSA the modified Section 9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

f. For failure to timely submit to PHMSA the modified P&M Recommendation forms, as specified in paragraph 9.B of Appendix B;

g. For failure to timely conduct EFRD analyses for all Regulated Pipelines for which Plains has not previously conducted an EFRD analysis, as specified in paragraph 10.A of Appendix B;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 28 -

Case 2:26-cv-05242-SVW-SSC Document 253/15/20 Filed 05/14/26 of Page 600 of 703 Page
Case 2:20-cv-02413 Document 6-1 Filed 03/15/20 Page 33 of 102 Page ID #:126
ID #:12448

h.     For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i.     For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j.     For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k.     For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l.     For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m.     For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n.     For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o.     For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p.     For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q.     For failure to timely conduct the surveys and update the

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r.    For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s.    For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t.    For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u.    For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v.    For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w.    For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x.    For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y.    The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 30 -

29.     Stipulated Penalties for Non-Compliance with Corrective Action Order Terms.  Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section X (Corrective Action Order) when due:

> a.     For operation of Line 901 in violation of paragraph 1.a of Appendix D;
>
> b.     For failure to timely submit to OSFM a Line 901 Restart Plan, as specified by paragraph 1.b of Appendix D;
>
> c.     For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 901 specified by paragraphs 1.c and 1.d of Appendix D;
>
> d.     For operation of Line 903, in violation of paragraph 1.e of Appendix D;
>
> e.     For failure to timely submit to OSFM a Line 903 Restart Plan, as specified by paragraph 1.f of Appendix D;
>
> f.     For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 903 specified by paragraphs 1.g and 1.h of Appendix D;
>
> g.     For failure to timely submit to OSFM any notification specified by paragraph 1.i of Appendix D; and
>
> h.     For failure to submit to OSFM a final Appendix D Documentation Report, as specified by paragraph 1.j of Appendix D.
>
> i.     The penalties stipulated in this Section shall accrue as follows:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 31 -

Case 2:26-cv-05242-SVW-SSC Document 25 Filed 05/14/26 Page 603 of 703 Page
ID #:12451
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 36 of 102 Page ID #:129

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30. Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31. For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32. For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33. For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34. For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 253/15/26    Filed 05/14/26    Page 604 of 703   Page
Case 2:20-cv-02413-V Document 6-1 Filed 03/15/20  Page 37 of 102  Page ID #:130
ID #:12452

a.      Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b.      Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c.      Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d.      If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35.     For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36.     For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties).  Any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 33 -

Case 2:26-cv-05242-SVW-SSC Document 25 Filed 05/14/26 Page 605 of 703 Page
Case 2:20-cv-02425 Document 6-1 Filed 03/15/20 Page 38 of 102 Page ID #:131
ID #:12453

transmittal correspondence shall state that payment is for stipulated penalties and shall identify the date of the written demand to which the payment corresponds.

37. Stipulated penalties under this Section shall begin to accrue on the Day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed, or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

38. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

39. The applicable State Agencies may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to the applicable State Agencies under this Consent Decree.

40. Stipulated penalties shall continue to accrue as provided in Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid until the following:

    a. If the dispute is resolved by agreement or by a decision of the United States or the State Agencies, as applicable, that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States or the State Agencies, as applicable, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or the State Agencies' decision.

    b. If the dispute is appealed to the Court and the Plaintiffs prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

c.      If any Party appeals the Court's decision and a Plaintiff prevails in whole or in part, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

41.      If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State Agencies from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

42.      The payment of stipulated penalties, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

43.      Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State Agencies (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offsets measures, and/or contempt) for Defendants' violation of this Consent Decree or applicable laws.

## XII.   FORCE MAJEURE

44.      "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized.  "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

45.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants first knew that the event might cause a delay.  Within ten (10) Days thereafter, Defendants shall provide in writing to such Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment.  Defendants shall provide with any notice the documentation that Defendants are relying on to support the claim that the delay was attributable to a Force Majeure event. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

46.     If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 36 -

Plaintiffs for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47. If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

48. If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XIII (Dispute Resolution), in response to Plaintiffs' determination in Paragraph 47 above, it shall do so no later than thirty (30) Days after receipt of Plaintiffs' notice. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 44 and 45. If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to Plaintiffs and the Court.

## XIII. DISPUTE RESOLUTION

49. Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by Plaintiffs to enforce any obligation of Defendants arising under this Consent

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 37 -

Case 2:26-cv-05242-SVW-SSC Document 253/15/26 Filed 05/14/26 of Page 609 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 42 of 102 Page ID #:135
ID #:12457

Decree.

50. <u>Informal Dispute Resolution</u>. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendants send the relevant Plaintiff(s) a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement. If the parties cannot resolve a dispute by informal negotiations, then the position advanced by Plaintiffs shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Defendants invoke formal Dispute Resolution procedures as set forth below.

51. <u>Formal Dispute Resolution</u>. Defendants shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on Plaintiffs a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

52. Plaintiffs shall serve their Statement of Position within forty-five (45) Days of receipt of Defendants' Statement of Position. Plaintiffs' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Plaintiffs. Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

53. Defendants may seek judicial review of the dispute by filing with the Court and serving on the relevant Plaintiff(s), in accordance with Section XX (Notices), a motion requesting judicial resolution of the dispute. The motion

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 25    Filed 05/14/26    Page 610 of 703   Page
ID #:12458
Case 2:20-cv-02415   Document 6-1    Filed 03/15/20    Page 43 of 102   Page ID #:136

must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54.     Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or by a schedule set by the Court. Defendants may file a reply memorandum to the extent permitted by the Local Rules.

55.     Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 51, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree, based on the Statements of Position, and under applicable standards of review.

56.     The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue until the final resolution of the dispute.  Payment shall be stayed pending resolution of the dispute.  If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV.  REPORTING

57.     After the Effective Date, by March 31 and September 30 of the following years until termination of this Consent Decree per Section XXIV (Termination), Defendants shall submit to the Plaintiffs in accordance with Section XX (Notices) bi-annual reports that shall describe the status of Defendants' compliance with the Consent Decree, including implementation of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 253/15/26 Filed 05/14/26 of Page 611 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 44 of 102 Page ID #:137
ID #:12459

the injunctive relief requirements set forth in Appendices B and D. The report will be organized to show the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement.

## XV.   CERTIFICATION

58.    Each report submitted by Defendants under Section XIV (Reporting) shall be signed by either the Chief Executive Officer, the President, an Executive Vice President, a Senior Vice President, or General Counsel who is an authorized representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on any personal knowledge and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XVI.  INFORMATION COLLECTION AND RETENTION

59.    Plaintiffs and their representatives shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times and upon reasonable notice, upon presentation of credentials, to:

   a.    monitor the progress of activities required under this Consent Decree;

   b.    verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 253   Filed 05/14/26   Page 612 of 703   Page
Case 2:20-cv-02415-SVW-SSC   Document 60-1   Filed 03/15/20   Page 45 of 102   Page ID #:138
ID #:12460

c.    obtain documentary evidence, including photographs and similar data; and

d.    assess Defendants' compliance with this Consent Decree.

60.    Until one (1) year after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve or deliver to Plains, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree.  At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

61.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Agencies pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

62.    For any documents, records, or other information required to be submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim of business confidentiality or other protections applicable to the release of information by Plaintiffs, covering part or all of the information required to be submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2.  Plains must mark the claim of confidentiality in writing on each page, and include a statement specifying the grounds for each claim of confidentiality.

63.    The federal agency Plaintiffs are subject to applicable laws

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 41 -

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq*.). If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality. In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64. For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65. State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq*.). If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records. If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66. The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only. Defendants shall produce all documents required

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 42 -

to be produced in connection with this Consent Decree in, at Defendants' option, either native format via electronic media or secure file transfer protocol ("FTP"). Any encryption or access restriction shall be on a container level only, *i.e.*, only the electronic media or the top-level folder containing the documents shall be encrypted and Plaintiffs shall have unrestricted access to the files/folders within the electronic media or the top-level folder without need for additional decryption or access codes. Regardless of production method or encryption, individual documents shall be produced in a manner that allows the Plaintiffs to view, print, copy, save, download, and share each document within Plaintiffs' own environment without restriction, tracking or monitoring by Defendants, or automatically generated changes to the document (*e.g.*, without entering access codes prior to each download, and without automatically generated watermarks stating the download date and time).

67. At the conclusion of the information-retention period, Defendants shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of internal document destruction policies for documents, records, or other information subject to the requirements of Paragraph 60.

68. [*Intentionally left blank.*]

## XVII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69. This Consent Decree resolves the civil claims of the United States and the State Agencies for the matters alleged in the Complaint filed in this action for the Refugio Incident.

70. Subject to the reservations of rights specified in Paragraph 71, this Consent Decree also resolves all civil and administrative penalty claims that could be brought by PHMSA, for violations of the Pipeline Safety Laws specified below that occurred on any of Defendants' Regulated Pipelines prior to January 28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of Defendants' Regulated Pipelines and other pipeline facilities began. The specific

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 615 of 703   Page
ID #:12463
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 48 of 102   Page ID #:141

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

      a.     49 C.F.R. Part 194 Subpart B – Response Plans;

      b.     49 C.F.R. Part 195 Subpart B – Reporting;

      c.     49 C.F.R. Part 195 Subpart E – Pressure Testing;

      d.     49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

      e.     49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

      f.     49 C.F.R. Part 195 Subpart H – Corrosion Control;

      g.     49 C.F.R. Part 199 – Drug and Alcohol Testing; and

      h.     All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71.    The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72.    This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

Case 2:26-cv-05242-SVW-SSC    Document 25    Filed 05/14/26    Page 616 of 703    Page
Case 2:20-cv-02413-VW-SSC    Document 6-1    Filed 03/15/20    Page 49 of 102    Page ID #:142
ID #:12464

January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019.  The specific Pipeline Safety Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

> a.     The Pipeline Safety Laws specified in Paragraph 70; and

> b.     California Government Code §§ 51012.3, 51013, 51013.5, 51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only), and 51018.

73.     For any reportable pipeline accident, as defined in 49 C.F.R. § 195.50, occurring on or after January 28, 2019, on any of Defendants' Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA and OSFM to sue or pursue administrative or other remedies for violations (including penalties) under the Pipeline Safety Laws and the Elder California Pipeline Safety Act for such accident.  Nothing in Paragraphs 70 through 72 shall be construed to limit the legal and equitable remedies of the United States or State Agencies, other than PHMSA and OSFM.

74.     The United States and the State Agencies reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State Agencies to obtain penalties, injunctive relief, or other administrative or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other federal or state laws, regulations, or permit conditions, except as specified in Paragraphs 69, 70, and 72.

75.     The United States reserves all legal and equitable remedies to address any imminent and substantial endangerment or threat to the public health or welfare or the environment arising at, or posed by, Defendants' operations, whether related to the violations addressed in this Consent Decree or otherwise. PHMSA further reserves the right to issue to Defendants corrective action orders pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

§ 190.236; and safety orders pursuant to 49 C.F.R. § 190.239. The State Agencies reserve all legal and equitable remedies under California Government Code §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8, California Water Code §§ 13301, 13304, 13340, and 13386, and California Health & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating a substantial risk of an unauthorized discharge of oil into waters of the State of California, (2) a discharge of waste threatening to cause a condition of pollution or nuisance, or (3) a discharge which poses a substantial probability of harm to persons, property or natural resources.

76. This Consent Decree also shall not be construed to in any way limit or waive the claims set forth in the case entitled *California State Lands Commission, et al. v. Plains Pipeline, L.P., et al.*, Case No. 18CV02504 (Cal. Sup. Court) and Case No. B295632 (Cal. Ct. App.).

77. In any subsequent administrative or judicial proceeding initiated by the United States or the State Agencies for injunctive relief, civil penalties, other appropriate relief relating to Defendants' violations alleged in Plaintiffs' Complaint, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State Agencies in the subsequent proceeding should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 69, 70, and 72.

78. This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 253/15/20   Filed 05/14/26   Page 618 of 703   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 51 of 102   Page ID #:144
ID #:12466

commenced pursuant to any such laws, regulations, or permits, except as set forth herein.  The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

79.     This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State Agencies against any third-parties, not party to this Consent Decree, nor does it limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

80.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

81.     Plaintiffs will not submit any claim for restitution for Natural Resource Damages in *The People of the State of California v. Plains All American Pipeline, L.P.,* Case No. 1495091 (Cal. Sup. Court).

82.     By entering into this settlement, Defendants do not admit the Pipeline Safety Laws violations alleged in the Complaint or described in this Consent Decree by the United States on behalf of PHMSA; therefore, any allegations of violations of these Pipeline Safety Laws do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree.  However, the allegations of violations set forth in the Complaint may be:  (1) considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains, and (2) used for statistical purposes to identify violations that PHMSA deems as causal to an incident or to increase the consequences of an incident. Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 619 of 703   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 52 of 102   Page ID #:145
ID #:12467

be considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains.

83.     By entering into this settlement, Defendants do not admit the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint; therefore, any allegations of violations of these statutes do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree.  However, the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint may be considered by the State Water Resources Control Board or Regional Water Quality Control Boards to constitute prior offenses in any future enforcement action brought by any of these agencies against Plains.

84.     Subject to the terms of this Consent Decree, no provision contained herein affects or relieves Plains of their responsibilities to comply with all applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or state laws, and the regulations and orders issued thereunder.  Subject to the terms of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of access, entry, inspection, and information-gathering or their authority to bring enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, the regulations and orders issued thereunder, or any other applicable provision of federal or state law.

85.     Defendants hereby covenant not to sue Plaintiffs for any claims related to the Refugio Incident, or response activities in connection with the Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, or any other law or regulation for acts or omissions through the date on which this Consent Decree is lodged with the Court.

86.     Defendants covenant not to sue and agree not to assert any direct or

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 48 -

Case 2:26-cv-05242-SVW-SSC   Document 253/15/20   Filed 05/14/26   Page 620 of 703   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 53 of 102   Page ID #:146
ID #:12468

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87.     The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

## XVIII.   TRANSFER AND ACQUISITION OF ASSETS

88.     In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision.  Those provisions of Appendix B are:

> a.     For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;

> b.     For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;

> c.     For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and

> d.     For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89.     In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer.  Defendants shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 253/15/20 Filed 05/14/26 Page 621 of 703 Page
Case 2:20-cv-02425-VW-SSC Document 0-1 Filed 03/15/20 Page 54 of 102 Page ID #:147
ID #:12469

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier. Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements. Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree. Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90. In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree. Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer. Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier. Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91. For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX. COSTS

92. Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 622 of 703   Page
Case 2:20-cv-02415-SVW-SSC   Document 6-1   Filed 03/15/20   Page 55 of 102   Page ID #:148
ID #:12470

attorneys' fees; provided, however, the United States and the State Agencies shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

## XX.   NOTICES

93.     Unless otherwise specified in this Consent Decree, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent electronically by email provided by the Parties, and addressed to all Parties as follows:

As to the United States by email:   eescdcopy.enrd@usdoj.gov
Re: DJ # 90-5-1-1-11340

As to the United States by mail:   EES Case Management Unit
Environment and Natural Resources
    Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Re: DJ # 90-5-1-1-1130

As to PHMSA:   James M. Pates
Assistant Chief Counsel
    for Pipeline Safety
U.S. Department of Transportation
Pipeline and Hazardous Materials
    Safety Administration
1200 New Jersey Ave. SE. E-26
Washington, DC. 20590

As to EPA:   Andrew Helmlinger
Attorney Advisor
U.S. EPA Region IX
75 Hawthorne Street (ORC-3)
San Francisco, California 94104

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 51 -

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 623 of 703   Page
ID #:12471
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 56 of 102   Page ID #:149

As to DOI:                    Clare Cragan
                              U.S. Department of the Interior
                              Office of the Solicitor
                              755 Parfet St., Suite 151
                              Lakewood, Colorado 80215

As to NOAA:                   National Oceanic and Atmospheric
                                 Administration
                              Office of General Counsel
                              Natural Resources Section
                              ATTN:  Christopher J. Plaisted
                              501 W. Ocean Blvd, Suite 4470
                              Long Beach, California  90802

As to USCG:                   Patricia V. Kingcade
                              Attorney Advisor
                              National Pollution Funds Center,
                                 US Coast Guard
                              2703 Martin Luther King Jr. Ave SE
                              Washington, DC 20593-7605

As to the State Agencies:     Michael Zarro
                              Deputy Attorney General
                              Office of the Attorney General
                              Natural Resources Law Section
                              300 S. Spring St., Suite 11220
                              Los Angeles, California 90013

As to CDFW:                   California Department of Fish
                                 and Wildlife
                              Office of Spill Prevention and Response
                              Attn: Katherine Verrue-Slater
                              Senior Counsel
                              P.O. Box 160362
                              Sacramento, California  95816-0362

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 25-1 Filed 05/14/26 Page 624 of 703 Page
ID #:15079
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 57 of 102 Page ID #:12472

As to CDPR:      California Department of Parks and
            Recreation
            Attn: Laura A. Reimche, Senior Counsel
            1416 Ninth Street, Room 1404-6
            Sacramento, California 95814

As to CSLC:      California State Lands Commission
            Attn: Patrick Huber, Legal Division
            100 Howe Avenue, Suite 100-South
            Sacramento, California 95825

As to OSFM:      California Department of Forestry and
            Fire Protection
            Legal Services Office
            Attn: Joshua Cleaver, Staff Counsel
            P.O. Box 944246
            Sacramento, California 94244-2460

As to RWQCB:     California Central Coast Regional Water
            Quality Control Board
            Attn: Naomi Rubin, Attorney III
            801 K Street
            Sacramento, California 95814

As to UC:       Barton Lounsbury, Senior Counsel
            University of California
            Office of the General Counsel
            1111 Franklin Street, 8th Floor
            Oakland, California 94607

As to Defendants:    Megan Prout
            Senior Vice President
            Commercial Law and Litigation
            333 Clay Street, Suite 1600
            Houston, Texas 77002

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 53 -

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California  95814

94.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI.    EFFECTIVE DATE

96.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXII.    RETENTION OF JURISDICTION

97.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

## XXIII.    MODIFICATION

98.    The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 54 -

Case 2:26-cv-05242-SVW-SSC Document 25-1 Filed 05/14/26 Page 626 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 59 of 102 Page ID #:152
ID #:12474

99.    Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV.   TERMINATION

100.   After Defendants have:  (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation.  Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101.   Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement.  The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102.   If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution).  However, Defendants shall not seek Dispute Resolution of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 25 Filed 05/14/26 Page 627 of 703 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 60 of 102 Page ID #:153
ID #:12475

any dispute regarding termination until sixty (60) Days after receipt of the Plaintiffs' response to Defendants' Request for Termination.

## XXV. PUBLIC PARTICIPATION

103. This Consent Decree shall be lodged with the Court for a period of not fewer than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The Parties agree and acknowledge that the final approval by Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the Consent Decree and a public comment period. Plaintiffs reserve the right to withdraw or withhold consent if the comments disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

104. Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless Plaintiffs have notified Defendants in writing that Plaintiffs no longer support entry of the Consent Decree.

## XXVI. SIGNATORIES/SERVICE

105. Each undersigned representative of Defendants, the State of California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB, UC, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, PHMSA, and EPA certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

106. This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect. For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by emailed PDF) shall have the same effect as an original.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

## XXVII.  INTEGRATION

107.   This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII.    FINAL JUDGMENT

108.   Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109.   For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of _____, 20__.


_____
UNITED STATES DISTRICT JUDGE


*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 57 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES OF AMERICA:

3/12/2020

Date

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
    Division U.S. Department of Justice

3/13/2020

Date

BRADLEY R. O'BRIEN
ANGELA MO
Environmental Enforcement Section
Environment and Natural Resources

Division

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 58 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

3 March 2020
Date

PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety
      Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 59 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20                                    _Susan Parker Bodine_
Date                                       SUSAN PARKER BODINE
                                           Assistant Administrator
                                           Office of Enforcement and Compliance
                                                     Assurance

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2/26/2020
_____
Date

_____
AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance
Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

3/4/2020
Date

THOMAS M. CULLEN, JR.
Administrator
Office of Spill Prevention and Response

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 62 -

Case 2:26-cv-05242-SVW-SSC   Document 253   Filed 05/14/26   Page 634 of 703   Page
Case 2:20-cv-02423-SVW-SSC   Document 1   Filed 03/16/20   Page 67 of 102   Page ID #:169 Page
ID #:12482

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

_____ 3/2/20 _____                      _Lisa Ann L. Mangat_ _____
Date                                    LISA ANN L. MANGAT
                                        Director
                                        California Department of Parks
                                            and Recreation

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 63 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

2/28/2020
Date

JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 64 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020
Date

THOMAS W. PORTER
Director
California Department of Forestry and
Fire Protection

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION:

March 2, 2020
Date

JOHN ROBERTSON
Executive Officer
Central Coast Regional Water
          Quality Control Board

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 66 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

3/3/20
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

_____
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

*3 March 2020*
Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 A -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS ALL AMERICAN PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 68 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 69 -

# APPENDIX A

## *(Set of maps that generally depict Lines 901, 903, and 2000)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*



Appendix A – Line 901

Scale:  1:100,000

Sheet No:   1/1



Appendix A – Line 903

Scale: 1:700,000

Sheet No: 1/1

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.

Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community.



# APPENDIX B

# *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-74-

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1.  **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

    A.  Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

    B.  Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

    C.  Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

    D.  Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

    E.  To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2.  **Replacement, Restart, or Abandonment of Lines 901 and 903:**

    A.  Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

Case 2:26-cv-05242-SVW-SSC   Document 253   Filed 05/14/26   Page 648 of 703   Page
ID #:12496
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 81 of 102   Page ID #:174

1.    On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

    a.    Test for potential AC/DC interference.  Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

    b.    Conduct a close interval survey (CIS) and AC/DC interference survey.

    c.    Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B.    As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C.    As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3.    **Third-Party Analysis of Line 2000 ILI Data**

A.    Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B.    The consultant shall:

    1.    Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

    2.    Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

    3.    Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

    4.    Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

5. Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6. Comply with additional requirements specified in the scope of work.

C. The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1. The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2. The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3. Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4. Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4. **Integrity Management**

A. For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1. Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a. In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

-77-

loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b. Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c. When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d. Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e. Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f. Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g. For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i. Integrate and analyze available data in its P&M process, including:

    i. Assessment data from ILI tool runs;

    ii. Dig and repair data;

4

iii.     Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv.     Operational data, such as pressure and flow data;

v.     Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi.     Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii.     Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2.     ILI Measures

a.     <u>Initial ILI Runs</u>.  Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU).  Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data.  If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i.     All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

5

Case 2:26-cv-05242-SVW-SSC Document 253-1 Filed 05/14/26 Page 652 of 703 Page
Case 2:20-cv-02423 Document 6-1 Filed 03/15/20 Page 85 of 102 Page ID #:178
ID #:12500

      ii.     In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run.  If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

    b.    <u>Subsequent ILI Runs</u>.  After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year.  Alternatively, Plains may run a UT tool each year.  If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

    c.    <u>All ILI Runs</u>.  Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

## 5.  **Valves**

A.    Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

    1.    Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

    2.    Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B.    Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C.    Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

Case 2:26-cv-05242-SVW-SSC Document 253/15/20 Filed 05/14/26 Page 653 of 703 Page
Case 2:20-cv-02413 Document 6-1 Filed 03/15/20 Page 36 of 102 Page ID #:179
ID #:12501

6. **Risk Analysis**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

        1.    Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

            a.    The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

            b.    Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis. The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

            c.    The risk analysis shall be due within one year from entry of the CD.

7. **Leak Detection**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

    B.    Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8. **Non-waiver**

    A.    Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

## ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES

9. **Integrity Management**

    A.    New Procedures for Interim Reviews and Assessments

7

Case 2:20-cv-02425-WSC   Document 0-1   Filed 03/15/20   Page 37 of 102   Page ID #:180

1.  Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment.  If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment.  Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2.  Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review.  Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3.  Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD.  If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B.  Documentation for P&M Recommendations

1.  Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

    a.  What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

    b.  The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

8

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 655 of 703   Page
ID #:12503
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 38 of 102   Page ID #:181

  c. The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

 2. In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

 3. In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C. Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented.  Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

10. **Valves and O&M**

A. Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B. Within two years of entry of the CD, Plains shall develop and implement procedures to:

 1. If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

 2. Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

 3. Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

 4. Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C. Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 656 of 703   Page
Case 2:20-cv-02413-WDSSC   Document 6-1   Filed 03/15/20   Page 39 of 102   Page ID #:182
ID #:12504

D.   For all field personnel who perform maintenance on facilities, equipment, or
devices, Plains shall provide training:

1.   Within two years of entry of the CD, that addresses the importance of
complying with Plains' policy requiring notification of Control Room
personnel before beginning maintenance activities on any such facility,
equipment, or device that could change the status of any pump, valve,
CPM device, SCADA device, pressure or flow metering or rate that is
monitored by the Control Room.  Plains shall include in the training a
requirement that employees shall notify the Control Room before entering
a facility to perform maintenance, or, if not possible, immediately after
entering.

E.   Plains shall improve existing valve maintenance recordkeeping to include
confirmation whether the valve has been actually operated during maintenance.

11.   **Leak Detection**

A.   Within 90 days after entry of the CD, Plains shall create and maintain a list of its
regulated mainline pipelines, excluding gathering lines and Delivery Lines, to
indicate which of the following three rupture-detection methods, if any, are used
on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure
alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

1.   Within one year after entry of the CD, for any regulated mainline pipeline
identified in the list created pursuant to this paragraph that does not utilize
at least one of the three rupture detection methods, Plains shall implement
at least one.

B.   For the term of the CD, Plains shall conduct annual training for controllers on
attributes and benefits of various methods of leak detection, including Analog
High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of
Change.

C.   Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze
and evaluate the use of accumulated deviation rolling time periods longer than 24
hours.

1.   Plains shall document its analysis and provide it to PHMSA for comment,
but Plains shall maintain discretion over what actions to take, if any, and
how to implement the results of its analysis.

D.   Within six months of entry of the CD, Plains shall have in place a written
procedure for Selection of Leak Detection Method for its Regulated Pipelines.

1.   Plains shall provide the Selection of Leak Detection Method procedure to
PHMSA for comment, but Plains shall maintain discretion over and be

10

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E.  Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection.  The results of the meetings will be documented and shared with appropriate personnel.  The recommendations will be evaluated and documented.

F.  Instrumentation and Display

1.  To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

a.  Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

b.  Track these conditions through to resolution, including instrumentation relocation when necessary.

12.  **Control Room Management**

A.  For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

1.  Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

2.  Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

3.  Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

4.  Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

11

Case 2:26-cv-05242-SVW-SSC   Document 25   Filed 05/14/26   Page 658 of 703   Page
Case 2:20-cv-02413-W-DocumentP-6-1   Filed 03/15/20   Page 91 of 102   Page ID #:184
ID #:12506

B.     For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C.     Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13.    **Emergency Response and Oil Spill Response Plans**

A.     California-Specific Provisions:

1.     Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05.  Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B.     Company-Wide Provisions

1.     Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

2.     Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response.  Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

3.     Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

12

-86-

Plains.  Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills.  Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4.  Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures.  Plains shall provide this training annually thereafter.  Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5.  Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment).  Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill.  Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6.  For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14.  **Safety Management System (SMS)**

A.  Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1.  Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173.  Plains shall direct the third party to transmit a copy of the final report to PHMSA.  Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

B.        Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15.     **Drug and Alcohol Program**

A.        Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors.  Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures.  Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

# APPENDIX C

## (*Intentionally left blank*)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

# APPENDIX D

# *(Remaining Corrective Actions from the PHMSA CAO)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-90-

Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 96 of 102 Page ID #:185

## <u>APPENDIX D</u>

1.      All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

      a.  **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

      b.  **Restart Plan for Line 901.** If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. The Restart Plan shall include:

        1)    Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

        2)    Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

        3)    Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

        4)    A specific day-light restart that includes advance communications with local emergency response officials;

        5)    Master Control Room enhancements, including:

          a)  Implementation of advanced leak-detection

Case 2:26-cv-05242-SVW-SSC Document 253/15/20 Filed 05/14/26 Page 664 of 703 Page
Case 2:20-cv-02415 Document 1-1 Filed 03/15/20 Page 97 of 102 Page ID #:1909
ID #:12512

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1.  Revised alarm threshold adjustments;

2.  Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b)  Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c)  Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d)  Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e)  Development and implementation of training associated with the emergency shutdown programming described above; and

f)  Provision of additional controller training that

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6)  Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7)  Installation of additional safety valves as a result of Plains' EFRD evaluation;

8)  Installation of additional pressure sensors as a result of Plains' surge study;

9)  Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM.  The tool run shall be initiated during daylight hours.  If the tool run does not collect a complete data set, the UT tool shall be promptly re-run.  A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report.  Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10)  **Corrosion Prevention.**  Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan.  Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

903 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1) Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2) Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3) Provisions for a daylight restart and advance communications with local emergency response officials.

g. **Line 903 Return to Service.** After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h. **Removal of Pressure Restriction for Line 903.** After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1) The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)      The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction.  Requests for removal of the pressure restriction may be submitted by pipeline segment.

i.  **Notifications.**  Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j.  **Reporting Requirements for Lines 901 and 903.**  If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)      The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)      Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

Case 2:20-cv-02415V   Document 6-1   Filed 03/13/20   Page 102 of 102   Page ID #:12517

3)      The Appendix D Documentation Report shall include but not be limited to:

  A.  Table of Contents;

  B.  [*intentionally left blank.*]

  C.  [*intentionally left blank.*]

  D.  Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

  E.  [*intentionally left blank.*]

  F.  [*intentionally left blank.*]

  G.  Lessons learned while fulfilling the requirements of this Appendix D.

# EXHIBIT E

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



## CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR
LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON
THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG
A LONGITUDINAL SEAM WELD (CA-324)**

**Operator:**   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

**Pipeline:**   OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable
Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara
County, California as described in the request of state waiver dated April 24,
2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s.  At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   b.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at
PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

**In-Line Inspection (ILI) Assessment and Frequency**

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to
PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

   a)  Dates for integrity assessment

   b)  In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 6

segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

c) In-line inspection tool vendor(s)

d) Required tool specifications including operational specifications and anomaly sizing tolerances

e) Tool validation methodology

f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

g) Criteria used to identify locations for excavation and field verification

h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful.  All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

    a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

    b. USCD Performance Specification Requirements

        i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

        ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

        iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

        iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

**Discovery of Condition**

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

**Immediate Repair Conditions[7]**

30. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

**180-Day Repair Conditions**[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**Corrosion Growth Rate Analysis (CGRA)**

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Docusign Envelope ID: 87418E7A-FD76-4891-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Lance Yearwood
December 17, 2024
Page 11

    b.  Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c.  After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.  Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    a.  Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

    b.  Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 87418E7A-ED76-4891-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions

Lance Yearwood
December 17, 2024
Page 13

 e. Evaluation methodology used
 f. Models used
 g. Direct in situ examination data
 h. All in-line inspection tool assessments information evaluated
 i. Pressure test data and results
 j. All in-the-ditch assessments performed on the pipeline segments
 k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
 l. All finite element analysis results
 m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
 n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
 o. Safety factors used for fatigue life and/or predicted failure pressure calculations
 p. Reassessment time interval and safety factors
 q. The date of the review
 r. Confirmation of the results by qualified technical subject matter expert(s)
 s. Approval by responsible Sable management personnel
 t. Records of additional preventive and mitigative (P&M) measures performed
 u. Reports required by this State Waiver.

## **Reporting**

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324*. The email notification shall include, if applicable:
 a. Tool type and run date
 b. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
 c. Dig sheets
 d. Field contact information for Sable
 e. Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 14

        a. Tool type
        b. Run date
        c. Summary of Conditions Report[18]
        d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324*. At a minimum, the annual report shall contain the following, if applicable:

    a. A Closure Report for the previous calendar (CY) which contains:
        i. Features that were remediated in previous CY
            1. Provide documentation for the in-the-ditch assessments and repairs
        ii. Identify features that remain to be assessed
        iii. Unity Plots for previous ILI runs
    b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
    c. The third-party ILI expert reviews in accordance with Condition 52
    d. AC and DC Interference surveys that are due in accordance with Condition 53
    e. A copy of the CGRA for prior year including:
        i. Mean corrosion growth rate for the pipeline
        ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## **Limitations**

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 15

failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Tuan Tran, Pipeline Safety Engineer, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Max Kieba, Engineering and Research Division, PHMSA
        Joshua Johnson, Engineering and Research Division, PHMSA

# EXHIBIT F

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                                                     Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



<u>**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15**</u>

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**  **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A/B)**

Operator:    Sable Offshore Corp
             OPID# 40851
             845 Texas Avenue, Suite 2920
             Houston, Texas 77002

Pipeline:    OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

## General Conditions

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Lance Yearwood
December 17, 2024
Page 4

8.  Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
    a.  API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
    b.  API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.
    At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]
9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.
10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.
11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 5

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.

14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours.  Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.

16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.

18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 6

## In-Line Inspection (ILI) Assessment and Frequency

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

    a) Dates for integrity assessment

    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

    c) In-line inspection tool vendor(s)

    d) Required tool specifications including operational specifications and anomaly sizing tolerances

    e) Tool validation methodology

    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

    g) Criteria used to identify locations for excavation and field verification

    h) Non-destructive examination

20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

21. Metal Loss Tool(s)

    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 7

> any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

    a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

    b. USCD Performance Specification Requirements

        i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

        ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

        iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

        iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

**Discovery of Condition**

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

**Immediate Repair Conditions[7]**

31. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 9

**180-Day Repair Conditions**[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**Corrosion Growth Rate Analysis (CGRA)**

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   a.  Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

   b.  Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

   c.  After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

**Data Requirements for Predicted Failure Analysis**

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

**Recordkeeping**

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 13

n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
o. Safety factors used for fatigue life and/or predicted failure pressure calculations
p. Reassessment time interval and safety factors
q. The date of the review
r. Confirmation of the results by qualified technical subject matter expert(s)
s. Approval by responsible Sable management personnel
t. Records of additional preventive and mitigative (P&M) measures performed
u. Reports required by this State Waiver.

**Reporting**

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification*.[17]
60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B*. The email notification shall include, if applicable:
    d. Tool type and run date
    e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    f. Dig sheets
    g. Field contact information for Sable
    h. Time and location of the field evaluation and repair.
61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:
    i. Tool type
    j. Run date
    k. Summary of Conditions Report[18]
    l. Final Vendor Report and Pipe Tally
62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B*. At a minimum, the annual report shall contain the following, if applicable:

   a. A Closure Report for the previous calendar (CY) which contains:
       i. Features that were remediated in previous CY
          1. Provide documentation for the in-the-ditch assessments and repairs
       ii. Identify features that remain to be assessed
       iii. Unity Plots for previous ILI runs
   b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
   c. The third-party ILI expert reviews in accordance with Condition 53
   d. AC and DC Interference surveys that are due in accordance with Condition 54
   e. A copy of the CGRA for prior year including:
       i. Mean corrosion growth rate for the pipeline
       ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## **Limitations**

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 15


Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Tuan Tran, Pipeline Safety Engineer, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Max Kieba, Engineering and Research Division, PHMSA
        Joshua Johnson, Engineering and Research Division, PHMSA

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) described as **DECLARATION OF MICHAEL J. ROSENFELD IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTON (VOL. 1 OF 4)** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: *See* Attached Service List.

☒    BY ELECTRONIC MAIL TRANSMISSION WITH ATTACHMENT:  On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

☒    [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/Josie Cisneros*
_____

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>CENTER FOR BIOLOGICAL DIVERSITY and<br>WISHTOYO FOUNDATION<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>          tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS<br>ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>          jfrankel@environmentaldefensecenter.org<br>          trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/ DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal<br><br>Tel.:    (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (310) 620-5879<br>Email: djmoore@paulhastings.com<br>          benjaminhanelin@paulhastings.com<br>          natalierogers@paulhastings.com |
| Trevor D. Large, Esq.<br>FAUVER, LARGE, ARCHBALD & SPRAY LLP<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (805) 966-7000<br>Email: TLarge@FLASllp.com |