# EXHIBIT DD

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
DarreE. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Petitioners and Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al., <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., et al., <br><br> Real Parties in Interest. | Case No. 25CV02244 <br> [Coordinated with Case No. 25CV02247] <br><br> Assigned for all purposes to: <br> Hon. Donna D. Geck <br><br> **DECLARATION OF MICHAEL J. ROSENFELD IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTON (VOL. 4 OF 4)** <br><br> [*Filed concurrently with Opposition to Application for Preliminary Injunction; Declarations of Michael A. Mische, Bart Leininger, Brien Vierra, and Steve Rusch*] <br> Date:        July 18, 2025 <br> Time:        10:00 AM <br> Dept.:        4 <br><br> Complaint Filed:        April 15, 2025 <br> Trial Date:        None Set |

1

DECLARATION OF MICHAEL J. ROSENFELD

# VOLUME 4 OF 4

# (EXHIBITS I – U)

# TO DECLARATION OF

# MICHAEL ROSENFELD

# EXHIBIT I

like to know that they reached the facility, please enclose a stamped, self-addressed postcard or envelope.

We will consider all comments and materials received during the comment period. FMCSA may issue a final determination any time after the close of the comment period.

## V. Viewing Comments and Documents

To view comments, as well as any documents mentioned in this preamble, go to *http://www.regulations.gov* and in the search box insert the docket number FMCSA–2016–0315 and click "Search." Next, click "Open Docket Folder" and you will find all documents and comments related to this notice.

Issued on: March 9, 2017.

**Larry W. Minor,**

*Associate Administrator for Policy.*

[FR Doc. 2017–05256 Filed 3–15–17; 8:45 am]

**BILLING CODE 4910–EX–P**

---

## DEPARTMENT OF TRANSPORTATION

### Pipeline and Hazardous Materials Safety Administration

[Docket No. PHMSA–2016–0131]

### Pipeline Safety: Deactivation of Threats

**AGENCY:** Pipeline and Hazardous Materials Safety Administration (PHMSA), DOT.

**ACTION:** Notice; issuance of advisory bulletin.

**SUMMARY:** PHMSA is issuing this Advisory Bulletin to inform owners and operators of gas transmission pipelines that PHMSA has developed guidance on threat identification and the minimum criteria for deactivation of threats, as established by a previously issued rule. This Advisory Bulletin also provides guidance to gas transmission pipeline operators regarding documenting their rationale of analyses, justifications, determinations, and decisions related to threat deactivation.

**FOR FURTHER INFORMATION CONTACT:** Allan Beshore by phone at (816) 329–3811 or email at *allan.beshore@dot.gov*. All materials in this docket may be accessed electronically at *http://www.regulations.gov*. Information about PHMSA may be found at *http://www.phmsa.dot.gov*.

**SUPPLEMENTARY INFORMATION:**

## I. Background

A critical element in an integrity management (IM) program is the identification of threats to pipeline integrity. As required by section 192.911(c), an IM program must contain "[a]n identification of threats to each covered pipeline segment, which must include data integration and a risk assessment. An operator must use the threat identification and risk assessment to prioritize covered segments for assessment (section 192.917) and to evaluate the merits of additional preventive measures and mitigative measures (section 192.935) for each covered segment." Further requirements detailed in section 192.921(a) state, "[a]n operator must select the [assessment] method or methods best suited to address the threats identified to the covered segment." The threats to a particular pipeline segment dictate the type of assessments the operator must perform to fulfill the requirements of section 192.921(a).

According to the Standard established by the American Society of Mechanical Engineers (ASME), ASME B31.8S–2004, Section 2.2, an operator must consider nine individual threat categories as part of an IM program. As stated by ASME B31.8S–2004, Section 5.10, an IM program should provide criteria for eliminating a threat from consideration during a risk assessment; however, 49 CFR part 192—Subpart O does not include provisions for the permanent elimination of threats. An operator, therefore, must continually consider all threats in the evaluation of their IM program through periodic reviews and assessments, as required by section 192.937.

PHMSA acknowledges that threats may be categorized as active, requiring an integrity assessment, or inactive, meaning that during a specific assessment cycle the threat does not trigger an integrity assessment, per section 192.921(a). Operators, however, must understand that threats to a pipeline are not static, but vary over time. Changes in threats can occur suddenly, as in the case of catastrophic outside forces like hurricanes, earthquakes, or down-slope land movements, or they can be gradual changes, such as the introduction of new wet-production gas sources into a previously dry gas environment. Issues may also develop into active threats over time, such as coating degradation that allows stress corrosion cracking or external corrosion to develop. In other cases, threats may become inactive over time due to pipeline replacement programs, the implementation of effective preventative actions, or other improvements to systems.

The periodic review required by section 192.937 for a mature IM plan must include the re-analysis of the nine threat categories to determine status changes for active or inactive threats. An operator must continually monitor operations and maintenance (O&M) and other activities, integrating relevant information during a threat analysis that might indicate a change in the status of a threat. Some operators inappropriately label threats as inactive after they are eliminated from consideration during prior reviews and assessments, ignoring the continuous supply of new information provided during routine O&M activities.

Some operators have opted to eliminate threats from consideration based on a lack of data, including missing, incomplete, or unsubstantiated data. Using insufficient data to eliminate a threat is not technically justified and is contrary to the guidance in ASME B31.8S–2004, Appendices A1–A9. Each of these appendices includes language that states, "[w]here the operator is missing data, conservative assumptions shall be used when performing the risk assessment or, alternatively, the segment shall be prioritized higher." Additionally, section 192.947(d) requires that operators maintain, "[d]ocuments to support any decision, analysis and process developed and used to implement and evaluate each element of the baseline assessment plan and integrity management program." Section 192.947(d) further states, "[d]ocuments include those developed and used in support of any identification, calculation, amendment, modification, justification, deviation and determination made, and any action taken to implement and evaluate any of the program elements."

PHMSA provides the following guidance for determining the active or inactive status of the nine threat categories, with the understanding that the status of a threat will change over time:

*Time-Dependent Threats*

1. External Corrosion

For steel pipelines, the threat of external corrosion may never be eliminated.

2. Internal Corrosion

An operator should consider the past operational history of the pipeline, including, but not limited to: Upset conditions, gas monitoring (including partial-pressure analysis), bacterial culture tests, flow direction and rates, gas sources, solid and liquid analyses, critical angles and liquid holdup points, pigging and other cleaning history, the presence of internal coatings, chemical

treatments, and internal pipeline inspection reports.

After consideration of operational history and supporting documentation, the threat of internal corrosion may be deemed inactive if:

i. It can be demonstrated that a corrosive gas is not being transported, per section 192.475(a);

ii. In-line inspection data confirms that a corrosive environment does not exist within the pipeline; or

iii. Application of internal corrosion direct assessment (ICDA) demonstrates that there is no internal corrosion occurring at the most likely locations, and is accompanied by sufficient documentation to demonstrate the assumptions used with the ICDA model (normally dry gas with occasional upsets) are valid for the pipeline's entire operating history.

The threat of internal corrosion should be considered active if:

i. Production, storage, or non-pipeline-quality gas was transported at any time during the history of the pipeline;

ii. The pipeline has been converted from another type of service that is susceptible to internal corrosion;

iii. Unmonitored or inoperative drips, siphons, dead legs, or other liquid holdup points are present anywhere in the pipeline;

iv. There is evidence that liquids from drips, siphons, dead legs, or other liquid holdup points are present anywhere in the pipeline;

v. Pipe inspection reports, as required by section 192.475(b), indicate evidence of internal corrosion; or

vi. The operator does not have a complete pipeline operating history.

3. Stress Corrosion Cracking

The threat of stress corrosion cracking (SCC) should always be considered active. The operator must continually inspect the pipeline for the presence of SCC during pipeline examination, as required by section 192.459.

*Static or Stable Threats*

4. Manufacturing

There is substantial guidance provided in the original Gas Transmission IM protocols (*e.g.* Protocol C.01 Threat Identification), part 192—subpart O, ASME B31.8S–2004, and the PHMSA Gas Transmission IM FAQs (*e.g.*, 219, 220, 221, and 231) regarding the deactivation of manufacturing threats for a segment for any given assessment cycle. Some of this guidance includes FAQ 219 (manufacturing and construction (M&C) defects when subpart J tested), FAQ 220 (M&C defects

when never subpart J tested), and FAQ 231 (5-year operating history).

Additionally, section 192.917(e)(3) provides guidance for determining when a manufacturing threat is active. Section 192.917(e)(3) states, "[i]f any of the following changes occur in the covered segment, an operator must prioritize the covered segment as a high-risk segment for the baseline assessment or a subsequent reassessment.

i. Operating pressure increases above the maximum operating pressure experienced during the preceding five years;

ii. MAOP increases; or

iii. The stresses leading to cyclic fatigue increase."

5. Construction

There is substantial guidance provided in the original Gas Transmission IM protocols, part 192—subpart O, ASME B31.8S–2004, and the PHMSA Gas Transmission IM FAQs regarding deactivation of construction threats for a segment for any given assessment cycle. Some of this guidance includes FAQ 219 (M&C defects when subpart J tested), FAQ 220 (M&C defects when never subpart J tested), and FAQ 231 (5-year operating history).

Section 192.917(e)(3) provides guidance for determining when a construction threat is active, stating, "[i]f any of the following changes occur in the covered segment, an operator must prioritize the covered segment as a high-risk segment for the baseline assessment or a subsequent reassessment:

i. Operating pressure increases above the maximum operating pressure experienced during the preceding five years;

ii. MAOP increases; or

iii. The stresses leading to cyclic fatigue increase."

6. Equipment

An equipment threat is defined in ASME B31.8S–2004, Appendix A6.1, as pressure control equipment, relief equipment, gaskets, O-rings, seal/pump packing, or any equipment other than pipe and pipe components. The equipment threat may be inactive depending on an operator's history and review of the records, as required by sections 192.613, 192.617, 192.603, 192.605, 192.739, and 192.743. Operating history, failures, and abnormal operations records should be evaluated by integrity personnel to assist in determining trends and issues that may not be recognized by local or other operations personnel.

As identified in ASME B31.8S–2004, Appendix A6.4, assessments for

equipment threats are normally conducted during maintenance activities, per the requirements of the O&M procedures. Monitoring the data from operating history and failures is essential for identifying trends related to this threat. Communication between O&M and integrity personnel is a key component to integrating this threat, as well as the potential increased risk that it poses to pipeline segments, into risk assessments.

Preventative measures and mitigative measures are an important factor in maintaining the inactive status of equipment threats. For example, recognizing a system-wide problem with set point drift in a particular regulator may necessitate a shorter maintenance cycle or the replacement of the in-service regulators impacted by this problem.

*Time Independent Threats*

7. Third-Party Damage

The third-party threat should never be considered inactive.

8. Incorrect Operations

Incorrect operations are defined in ASME B31.8S–2004, Appendix A8.1, as incorrect operating procedures or failure to follow a procedure. This threat should always be considered active.

9. Weather-Related and Outside Forces

Weather-related and outside forces are defined in ASME B31.8S–2004, Appendix A9.1, as earth movement, heavy rains or floods, cold weather and lightning, or events that may cause pipe to be susceptible to extreme loading. This threat should always be considered active.

*Cyclic Fatigue*

In addition to the nine threats referenced in ASME B31.8S–2004, § 192.917(e)(2) states, "[a]n operator must evaluate whether cyclic fatigue or other loading condition (including ground movement, suspension bridge condition) could lead to a failure or a deformation, including a dent or gouge, or other defect in the covered segment. An evaluation must assume the presence of threats in the covered segment that could be exacerbated by cyclic fatigue. An operator must use the results from the evaluation together with the criteria used to evaluate the significance of this threat to the covered segment to prioritize the integrity baseline assessment or reassessment."

Cyclic fatigue is a concern because it is a threat that interacts with all other threats. Interactive threats are two or more threats acting on a pipeline or pipeline segment that increase the

probability of failure to a level significantly greater than the effects of the individual threats acting alone. In order to manage cyclic fatigue, therefore, operators must have system-specific data applicable to their unique operating environment to justify the inactive status of the cyclic fatigue threat. A system-wide or generic study of cyclic fatigue may be used by an operator as long as the operator documents why the study is applicable to the segment-specific conditions.

## II. Advisory Bulletin (ADB–2017–01)

*To:* Owners and Operators of Natural Gas Transmission Pipelines
*Subject:* Deactivation of Threats

*Advisory:* The threats identified in ASME B31.8S–2004 may be considered active or inactive, but are never permanently eliminated. ASME B31.8S–2004, Appendix A, identifies the information an operator must collect and analyze for threats, which must demonstrate an individual threat is not acting on the pipe before an operator can properly declare the threat inactive for each assessment period. A threat must be considered active if any data required by Appendix A is missing, as lack of data indicating the existence of a threat is not acceptable justification for considering the threat inactive. Documents to support the determination of an inactive threat status must be maintained, as per the requirements of § 192.947(d). An operator does not need to assess a threat for the current assessment cycle if that threat is properly deemed inactive. When conditions warrant a review or new information becomes available during the required § 192.937 evaluation operators are required to examine each applicable threat to determine its active or inactive status.

Issued in Washington, DC, on March 9, 2017, under authority delegated in 49 CFR 1.97.

**Alan K. Mayberry,**
*Associate Administrator for Pipeline Safety.*
[FR Doc. 2017–05262 Filed 3–15–17; 8:45 am]
**BILLING CODE 4910–60–P**

## DEPARTMENT OF THE TREASURY

### Comptroller of the Currency

### Agency Information Collection Activities: Information Collection Renewal; Submission for OMB Review; Financial Management Policies—Interest Rate Risk

**AGENCY:** Office of the Comptroller of the Currency (OCC), Treasury.

**ACTION:** Notice and request for comment.

**SUMMARY:** The OCC, as part of its continuing effort to reduce paperwork and respondent burden, invites the general public and other Federal agencies to take this opportunity to comment on a continuing information collection as required by the Paperwork Reduction Act of 1995 (PRA).

In accordance with the requirements of the PRA, the OCC may not conduct or sponsor, and the respondent is not required to respond to, an information collection unless it displays a currently valid Office of Management and Budget (OMB) control number.

The OCC is soliciting comment concerning renewal of its information collection titled, "Financial Management Policies—Interest Rate Risk." The OCC also is giving notice that it has sent the collection to OMB for review.

**DATES:** Comments must be submitted on or before April 17, 2017.

**ADDRESSES:** Because paper mail in the Washington, DC area and at the OCC is subject to delay, commenters are encouraged to submit comments by email, if possible. Comments may be sent to: Legislative and Regulatory Activities Division, Office of the Comptroller of the Currency, Attention: 1557–0299, 400 7th Street SW., Suite 3E–218, Mail Stop 9W–11, Washington, DC 20219. In addition, comments may be sent by fax to (571) 465–4326 or by electronic mail to *prainfo@occ.treas.gov.* You may personally inspect and photocopy comments at the OCC, 400 7th Street SW., Washington, DC 20219. For security reasons, the OCC requires that visitors make an appointment to inspect comments. You may do so by calling (202) 649–6700 or, for persons who are deaf or hard of hearing, TTY, (202) 649–5597. Upon arrival, visitors will be required to present valid government-issued photo identification and submit to security screening in order to inspect and photocopy comments.

All comments received, including attachments and other supporting materials, are part of the public record and subject to public disclosure. Do not include any information in your comment or supporting materials that you consider confidential or inappropriate for public disclosure.

Additionally, please send a copy of your comments by mail to: OCC Desk Officer, 1557–0299, U.S. Office of Management and Budget, 725 17th Street NW., #10235, Washington, DC 20503 or by email to *oira submission@omb.eop.gov.*

**FOR FURTHER INFORMATION CONTACT:** Shaquita Merritt, OCC Clearance Officer, (202) 649–5490 or, for persons who are deaf or hard of hearing, TTY, (202) 649–5597, Legislative and Regulatory Activities Division, Office of the Comptroller of the Currency, 400 7th Street SW., Washington, DC 20219.

**SUPPLEMENTARY INFORMATION:** Under the PRA (44 U.S.C. 3501–3520), Federal agencies must obtain approval from OMB for each collection of information that they conduct or sponsor. The term "collection of information" is defined in 44 U.S.C. 3502(3) and 5 CFR 1320.3(c) and includes agency requests or requirements that members of the public submit reports, keep records, or provide information to a third party. The OCC requests that OMB extend approval of the following information collection.

*Title:* Financial Management Policies—Interest Rate Risk.

*OMB Control No.:* 1557–0299.

*Type of Review:* Regular.

*Affected Public:* Businesses or other for-profit.

*Frequency of Response:* On occasion.

*Burden Estimate:*

*Estimated Number of Respondents:* 372.

*Estimated Annual Burden:* 14,880.

*Description:* This information collection covers the recordkeeping burden for maintaining data in accordance with OCC's regulation on interest rate risk procedures for Federal savings associations, 12 CFR 163.176. The purpose of the regulation is to ensure that Federal savings associations are managing their exposure to interest rate risk appropriately. To comply with this reporting requirement, institutions need to maintain sufficient records to document how their interest rate risk exposure is monitored and managed internally.

*Comments:* The OCC issued a notice for 60 days of comment on December 27, 2016, 81 FR 95302. The OCC received one comment from an individual. The commenter stated that the OCC should rescind 12 CFR 163.176 or, if the OCC determines that it is important and should not be removed, it should be amended to also apply to national banks. The commenter stated that, while interest rate risk exposure at one time was different for savings associations and commercial banks, today there is no difference and the two charter types should be subject to similar regulation. The commenter also stated that the regulation is outdated and unnecessary and should be rescinded, citing several OCC bulletins that the commenter claims state expectations for interest rate risk

# EXHIBIT J

Case 2:26-cv-05242-SVW-SSC    Document 26    Filed 05/14/26    Page 9 of 1309    Page ID #:12560

# TRANSPORTATION

## DEFECT ASSESSMENT—1

# Modified equation aids integrity management

John F. Kiefner
Kiefner & Associates
Worthington, Ohio

A modified Ln-Sec equation should replace the original Ln-Sec equation for all grades of pipe through X80 with full-size Charpy energies of 15 ft-lb and higher. This first part of two articles reviews development of the original Ln-Sec equation and examines its shortcomings.

The concluding article (next week) will present a modified Ln-Sec equation and explain how it improves the original.

## Background

Bill Maxey conceived the Ln-Sec equation, also known as the NG-18 Surface Flaw equation, at Battelle in the late 1960s while conducting research on failures in pressurized pipes and pipelines. He first developed a surface flaw equation empirically curve-fit to the results of burst tests on stainless steel nuclear power piping. He subsequently found that a theoretical equation developed by E.S. Folias satisfactorily accounted for the effect of axial flaw length in his empirical equation.[1]

In attempting to apply his surface flaw equation to carbon steel pipes such as those used in natural gas pipelines, Maxey found the Dugdale model for crack opening displacement in the form of an Ln-Secant function presented a reasonable means of correcting for reduced failure pressures associated with pipe materials of suboptimal toughness.

The Ln-Secant-corrected equation eventually became known as the NG-18 Surface Flaw equation because most validating full-scale pipe tests were sponsored by the NG-18 Line Pipe Research Committee of the American Gas Association (the forerunner of PRCI).

The Ln-Sec equation is still highly regarded as a method for predicting failure pressure for axially-oriented surface flaws in pipelines despite the development of other quite-satisfactory methods (PAFFC, CorLas, and API RP 579). The simplicity of the Ln-Sec equation and its validation by numerous full-scale experiments probably account for its continued use despite known limitations.

This article introduces a modification to the Ln-Sec equation eliminating the main limitation of the original equation: its tendency to underestimate failure pressures of long, shallow defects. The original equation had severe limits regarding remaining life predictions for crack-like defects in materials with suboptimal toughness. The modified version, however, satisfactorily overcomes this limitation, allowing it to be used with confidence for both remaining life assessments and failure stress predictions.

Equation 1 gives satisfactory predictions of failure stress for axial surface flaws in extremely tough materials such as stainless steel, and for blunt axial flaws in carbon steel materials such as corrosion-caused metal loss irrespective of toughness. It provides the basis for most equations used by the pipeline industry to evaluate the remaining strength of corroded pipe (B31G, Modified B31G, RSTRENG, API RP 579 Level I assessment for locally-thinned areas, and DNV RP F101).

Full-scale testing of line pipe materials containing crack-like flaws, however, showed that Equation 1 tended to overestimate the hoop stress at failure, especially for large-diameter pipe (24-42 in. OD). The degree of overestimation correlated with the Charpy V-notch upper shelf energies of the materials.

## EQUATIONS

$$\frac{\sigma_{fs}}{\sigma} = \frac{A_o - A}{A_o - A\left(\frac{1}{M_T}\right)} \tag{1}$$

$$\frac{12\frac{CVN}{A}E\pi}{8c\sigma^2} = \left[\ln \sec\left(\frac{\pi M_T \sigma_{ft}}{2\sigma}\right)\right] \tag{2}$$

$$M_T = \left(1 + 1.255\frac{c_2}{Rt} - 0.0135\frac{c^4}{R^2t^2}\right)^{\frac{1}{2}} \tag{3}$$

$$\frac{12\frac{CVN}{A_c}E\pi}{8c\sigma^2} = \left[\ln \sec\left(\frac{\pi M_P \sigma_{fs}}{2\sigma}\right)\right] \tag{4}$$

$$M_P = \left[\frac{1 - \left(\frac{A}{A_o}\right)\left(\frac{1}{M_T}\right)}{1 - \left(\frac{A}{A_o}\right)}\right] \tag{5}$$

where:
CVN = the upper shelf energy as determined from tests of Charpy V-notch impact specimens (ft-lb).
$A_c$ = the cross-sectional area of the Charpy specimen used (sq in.)
(The constant 12 in Equations 2 and 4 reconciles mixed units where the Charpy impact energy is in ft-lb and all other terms are consistent with inch units. The constant 12 is not a fundamental part of the relationships given by Equations 2 and 4.)

$$\sigma_{fs} = \left(\frac{\sigma}{M_P}\right)\left(\frac{2}{\pi}\right)\cos^{-1}\left(e^{-x}\right) \tag{6}$$

Where:
$$x = \left(\frac{12\frac{CVN}{A}E\pi}{8c\sigma^2}\right)$$
$$\sigma = \sigma_{ys} + 10,000 \text{ psi} \tag{7}$$

## Original Ln-Sec

Acting on the observation that Equation 1 tended to give less and less accurate predictions as the level of Charpy energy of the material decreased, Maxey postulated Charpy upper-shelf energy should be proportional to the ductile fracture resistance of a material with suboptimal toughness. He showed the Charpy energy of a carbon steel pipe material to be roughly equal to the strain energy release rate of crack formation, G, which Irwin had shown to equal $K_{Ic}^2/E$, where $K_{Ic}$ is the plane strain fracture toughness and E is the elastic modulus of the material.

Maxey further postulated Equation 1 could be corrected for materials that failed in a ductile manner but which exhibited suboptimal toughness by means of the Dugdale model.[2] The Dugdale model embodies a Ln-Secant functional representation of crack-tip opening displacement for a material exhibiting plastic strain at the tips of flaws before fracturing. Combining the concepts of Charpy energy, the Dugdale model, and Equation 1 yielded two failure criteria, one for through-wall flaws (Equations 2-3) and one for surface flaws (Equations 4-5).

Equation 6 shows σfs, the predicted hoop stress at failure for a surface flaw.

Maxey's review of full-scale test data showed the most appropriate value of flow stress for line pipe material as described by Equation 7.

He also suggested a three-term Folias factor (Equation 3) be used as it is less conservative than the original Folias factor. Equations 2 and 4 became known as the Ln-Sec equations and are often also referred to as the NG-18 Surface Flaw equations.[3]

Validation for line pipe materials involved burst tests of 35 end-capped pipes containing longitudinally oriented uniform-depth V-shaped notches of various lengths and depth-to-thickness ratios.

The 35 materials' exhibited ⅔-size Charpy upper-shelf energy levels ranging from 10 ft-lb to 34 ft-lb (full-size equivalents of 15 ft-lb to 51 ft-lb).[3]

### FAILURE PRESSURE COMPARISON, ORIGINAL LN-SEC EQUATION

Fig. 1



### FAILURE VS. DEFECT SIZE, 1,000 FT-LB CHARPY ENERGY

Fig. 2



The material's grade ranged from X52 through X65, with actual yield strengths of 55,000-73,900 psi. Fig. 1 shows the correlation between predicted and actual failure pressures for the 35 experiments.

One experiment, with a notch-depth-to-WT ratio of 0.25, deserves particular attention due to its implications regarding use of the original Ln-Sec Equation with shallow defects. This was the only experiment in which the notch had such a low depth-WT ratio. The other experiments involved notches

## TRANSPORTATION

### FAILURE VS. DEFECT SIZE, 25 FT-LB CHARPY ENERGY

Fig. 3



OD = 12.750 in.   WT = 0.300 in.   SMYS = 52,000 psi
Charpy v-notch energy = 25 ft-lb   CVN area = 0.124 sq in.

Burst pressure = 2,918 psig
100% SMYS pressure = 2,447 psig
72% SMYS pressure = 1,762 psig
Ruptures
Leaks

Depth-WT ratio: 0, 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7, 0.8, 0.9

Pressure, psi / Flaw length, in.

Regression fitting the data including this result yields an $R^2$ value of 0.92. Excluding the one shallow-flaw experiment, however, changes the $R^2$ to 0.96, suggesting the original Ln-Sec Equation tends to give excessively conservative predictions for failure stress of shallow flaws.

The lack of additional shallow-flaw results and early use of this equation for predicting failure pressure led this deficiency to be regarded as unimportant. Because of little interest in shallow flaws not posing an imminent threat to the integrity of a pipeline at normal operating stresses, the inaccuracy of the model for shallow flaws was not viewed as a detriment, nor did much incentive exist to perform expensive burst tests of pipe samples with shallow flaws.

shallow flaws becomes important,

with depth-WT ratios of 0.38-0.92. The failure pressure of the pipe with

the 0.25-ratio flaw stands as an outlier (Fig. 1).

the flaws surviving a hydrostatic test or remaining undetected by in-line inspection are relatively shallow. Equation 4 becomes particularly problematic in cases involving line pipe materials with suboptimal toughness.

### Additional testing

Additional full-scale tests have followed publication of these data. Three tests conducted on X80 material[4] and two on X100 material[5] hold particular interest. The X80 data fit the original correlation but one of the X100 results does not.

The model overestimates the failure pressure for one of the X100 tests. The X100 test which appears to fit the trend involved a shallow-defect test (depth-WT = 0.2), prompting expectations the original Ln-Sec Equation would underestimate the failure pressure. At the 100,000-psi strength level, however, the use of yield strength plus 10,000 psi for flow stress was inappropriate and could have contributed to the unexpected result by causing the flow stress to be higher than the ultimate tensile strength of the material.

Even when replotted with ultimate tensile strength as flow stress, however, one point still lies above the trendline of the original data and the other would as well if not for representing a shallow-flaw experiment.

The nature of the shallow-flaw deficiency emerges most clearly by comparing Fig. 2 with Fig. 3. Fig. 2 shows rectangular surface flaws with depth-WT ratios of 0.1-0.9 for a 12.75-in. OD, 0.3-in. WT, X52 pipe material with 1,000 ft-lb or higher full-size Charpy V-notch upper shelf energy.

This level of Charpy energy stands well beyond any level expected for actual line pipe material, showing that, for a material of optimum toughness, failure pressure level for any given defect is independent of toughness, depending instead entirely on flow-stress, and therefore, predictable by means of Maxey's surface flaw equation (Equation 1). The inverse Ln-Secant correction for a 1,000 ft-lb material is essentially $\pi/2$, reducing Equation 6 to Equation 1.

Fig. 3 shows a set of curves for pipe material with the same geometry and same grade steel shown in Fig. 2 but exhibiting a full-size Charpy upper shelf energy of 25 ft-lb.

Predicted failure pressures for the 25 ft-lb material are in all cases less than those predicted for the 1,000 ft-lb material. The fact the depth-WT = 0 curve does not coincide with the burst pressure of a defect-free pipe (labeled burst pressure = 2,918 psig) makes Equation 4's problem clear.

Logic suggests the pipe should fail at its burst pressure for a zero-depth defect. The original Ln-Sec equation, however, allows correction for any

## Working close to severe marine environment?

**use OSNA 10®** – corrosion resistant and easy to fabricate Copper Nickel (CuNi) alloy for seawater piping systems (pipes and fittings) www.kme-marine-applications.com

**use OSNALINE®** – easily installed, external protected remote control lines for hydraulic systems www.kme-tube-bundles.com

KME Germany AG & Co. KG _ Osnabrück _ Germany
Business Unit Marine Applications _ Phone +49-541-321-30 11 _ Fax +49-541-321-30 20
info-maritime@kme.com _ www.marine-applications.com
Business Unit OSNALINE® Tube Bundles _ Phone +49-541-321-32 03 _ Fax +49-541-321-34 49
info-osnaline@kme.com _ www.kme-tube-bundles.com

**ADIPEC, Abu Dhabi**
**03.11. – 06.11.2008**
**Hall 11 booth H16* H17**

**OSEA, Singapore**
**02.12. – 05.12.2008**
**Booth 4Q2 – 06**

# TRANSPORTATION

nonzero defect length even though the defect depth is zero. The lack of perceived threat from such deficiencies has allowed it to be largely ignored, despite general recognition of the original equation's limitations. Fig. 1 shows a good fit for experiments with depth-to-thickness ratios of 0.38 or more; defects that would pose a potential threat to the integrity of a pipeline at operating stress levels.

The original Ln-Sec equation gives conservative estimations of failure pressure, but its use with materials having suboptimal toughness can result in underestimation of the depths of defects that could survive such pressure, potentially leading to overestimation of remaining life in a remaining-life assessment.

Fig. 3 shows such a circumstance, suggesting an 11-in. long flaw with essentially zero depth would barely survive a hydrostatic test to 100% of SMYS and yielding the absurd conclusion that a test to 100% of SMYS ensures the pipe is free of defects longer than 11 in. In reality, however, the incorrectness of the shallow-flaw curves prevents use of the original Ln-Sec equation for remaining-life assessments of materials with less-than-optimum toughness. ✦

## References

1. Folias, E.S., "The Stresses in a Cylindrical Shell Containing an Axial Crack," Aerospace Research Laboratories, ARL 64-174, October 1964.

2. Dugdale, D.S., "Yielding in Steel Sheets Containing Slits," Journal of the Mechanics and Physics of Solids, Vol. 8, pp. 100-104, 1960.

3. Kiefner, J.F., Maxey, W.A., Eiber, R.J., and Duffy, A.R., "Failure Stress Levels of Flaws in Pressurized Cylinders," Progress in Flaw Growth and Fracture Toughness Testing, ASTM STP 536, American Society for Testing and Materials, pp. 461-481, 1973.

4. Kubo, T., Shiwaku, T., Kondo, J., Miyazaki, H., and Kawaguchi, Y., "Proposal of Modified Specimen for Chevron Notch Drop Weight Tear Test," Eighth Symposium on Line Pipe Research, Pipeline Research Committee, American Gas Association, Houston, Sept. 26-29, 1993.

5. Demofonti, G., Mannucci, G., Barsanti, L., Spinelli, C.M., and Hillenbrand, H.G., "Fracture Behavior and Defect Evaluation of Large Diameter, HLSA Steels, Very High Pressure Linepipes," Vol. 1, Proceedings of the Third International Pipeline Conference, American Society of Mechanical Engineers, pp. 537-545, Calgary, Oct. 1-5, 2000.

*The author*

John F. Kiefner (jkiefner@columbus.rr.com) is a senior advisor at Kiefner & Associates, a firm he founded in 1990. Although officially retired, he still works part-time for the company. During his 40-year career, Kiefner has specialized in developing and using analytical methods for assessing pipeline integrity and in conducting research on pipeline material behavior and pipeline defects and repair methods. Kiefner received his BS and MS degrees in civil engineering from Purdue University in West Lafayette, Ind., and his PhD from the University of Illinois in Champaign-Urbana, Ill. He is a registered professional engineer in Ohio and a member of ASME.

## Correction

In the article "Natural gas pipeline profits surge; oil flat," by Christopher E. Smith, Tables 4 and 7 (OGJ, Sept. 1, 2008, p. 58 and 62) contained errors. Below are corrected versions of the affected portions of each table. The corresponding data have also been updated in the OGJ Energy Database.

## US PIPELINE COSTS, ESTIMATED

Table 4

| Size, in. Location[1] | Length, miles | Material | Labor | Misc.[2] | ROW & damages | Total | $/mile |
|---|---|---|---|---|---|---|---|
| Total projects—land | 898.66 | $939,860,184 | $1,208,148,741 | $752,538,319 | $139,070,285 | $3,039,617,529 | $3,382,389 |
| TOTAL—ALL PROJECTS | 898.66 | $939,860,184 | $1,208,148,741 | $752,538,319 | $139,070,285 | $3,039,617,529 | $3,382,389 |

## US PIPELINE COSTS: ESTIMATED VS. ACTUAL, 2007-08[1]

Table 7

| Size, in. Location[1] | Length, miles | Materials | Labor | Misc.[2] | ROW & damages | Total | $/mile |
|---|---|---|---|---|---|---|---|
| Subtotal offshore, miles Estimated | 22.33 | $19,636,632 | $108,669,458 | $66,128,710 | $2,428,700 | $196,863,500 | $12,227,547 |
| Total land and offshore, miles Estimated | 1,019.73 | $652,227,937 | $701,406,438 | $597,881,281 | $106,653,794 | $2,058,169,450 | $2,030,955 |

Case 2:26-cv-05242-SVW-SSC Document 26 Filed 05/14/26 Page 14 of 1309 Page ID #:12565

# TRANSPORTATION

## DEFECT ASSESSMENT— Conclusion

# Modified Ln-Secant equation improves failure prediction

John F. Kiefner
Kiefner & Associates
Worthington, Ohio

Limitations in the original Ln-Sec equation prompted development of a modified equation better suited thru the original equation for remaining life assessments. The modified Ln-Sec equation described in this concluding article slightly improves the failure stress prediction capability of the original. Even when including two poorly-fitting points, the modified Ln-Sec equation shows better correlation with the database of 35 full-scale experiments than the original Ln-Sec equation.

Excluding the X100 experiments yields an average ratio of actual failure stress to predicted failure stress of 1.10, with a standard deviation of 0.13. This ratio would likely exceed 0.84 in 97.5% of cases and the two poorly fitting points should be discounted.

Similar experiments appear to fit the modified model. Because it eliminates the shallow-flaw limitations of the original equation, the modified Ln-Sec equation can perform remaining life assessments for materials with sub-optimal toughness and establish flaw size following a hydrostatic pressure test in any line pipe material in common usage.

## Modified equation

The usefulness of a closed-form solution for predicting defect failure pressures in pipes makes it worth having a modified Ln-Sec equation which avoids the deficiency described in Part 1 of this article. Developing an improved Ln-Sec equation would seem to entail altering the original equation so the ln-sec correction becomes defect-depth dependent. When the depth of the defect is zero, the correction should converge to a value of $\pi/2$.

Equation 1 is the original Lu-Sec equation. If corrected properly for a defect of zero depth, Equation 1 would default to Equation 2, and the predicted failure pressure for any length of zero-depth defect would be the burst pressure of the pipe. For depth-to-thickness ratios greater than zero, the inverse Ln-Sec correction should decrease from a value of $\pi/2$ at depth-WT = 0, causing only small corrections to defects with depth-WT ratios greater than 0.4.

Equation 3 would seem to do this, yielding the predicted hoop stress at failure.

Comparing the modified Ln-Sec equation to the set of full-scale experi-





**FAILURE PRESSURE COMPARISON, MODIFIED LN-SEC** — Fig. 1

$y = 0.924x - 0.328$
$R^2 = 0.940$

Predicted failure stress, 1,000 lb/sq in.
Actual failure stress, 1,000 lb/sq in.

Data that fit poorly

◇ Data, 1973 paper
■ X80 data, 8th Symposium
▣ X100 data, IPC 2000
□ X100 data, with UTS for flow stress
— Linear plot, 1973 paper

ments used to validate the original model demonstrates its validity.

Fig. 1 shows this comparison, presenting the data reanalyzed with the modified Ln-Sec equation. Its plot has a higher R2 ratio than the plot based on the original Ln-Sec equation (0.94 vs. 0.92) and the point corresponding to the test with a notch depth-WT of 0.25 has moved much closer to the trend line (OGJ, Oct. 6, 2008, p. 78).

Points for two of the reanalyzed tests, however, moved away from the trend line on the nonconservative side. They had the lowest Charpy energies in the entire data set (about 15 ft-lb full-size-equivalent). But this may not explain their poor fit. A number of other points representing low-Charpy-energy materials fit well.

The ratios of actual-to-predicted failure stress for the two poorly fitting points measure 0.75 and 0.84. The ratios of actual-to-predicted failure stress for the other tests range from 0.88 to 1.44. Without the two poorly fitting points and the one X100 experiment, the minimum measures 0.94. These two poorly fitting points should not invalidate the modified Ln-Sec equation given that the rest of the data except for the X100 material show good correlation between predicted and actual failure stresses.

## Remaining-life assessments

The modified Ln-Sec equation can calculate remaining life for longitudinally oriented defects. The method applies to corrosion, stress corrosion cracking, or any defect-growth mechanism for which growth can reasonably be assumed to be linear with time

and can be estimated with reasonable certainty.

The method also can apply to growth by pressure-cycle-induced fatigue. This growth, however, is nonlinear with time and requires continuing reassessment of failure stresses as cycles accumulate. A discussion of the evaluation of pressure-cycle-fatigue-crack growth lies beyond the scope of this article.

Fig. 2 shows relationships generated for 12.75-in. OD, 0.25-in WT, X52 material, assuming the material has a 15 ft-lb upper shelf Charpy energy (full-size equivalent).

The remaining defect life equals the time it takes for a defect barely surviving integrity assessment to grow to a size causing the pipe to fail at operating pressure. Representing a defect barely surviving integrity assessment as having a failure pressure of 100% SMYS is reasonable. Any larger defects would have failed in a hydrostatic test to that level or been repaired if detected by

in-line inspection. If operating pressure corresponds to 72% SMYS, then the remaining life of the defect corresponds to the time it takes for a 28% reduction in failure pressure.

Fig. 2 shows the 100% SMYS pressure level as a horizontal line at 2,039 psig and the operating pressure as a horizontal line at 1,440 psig. If one assumes a given defect will grow only in depth, not length, then the vertical distance between these two horizontal lines represents the amount of growth in depth corresponding to the remaining life of the defect.

A 10-in. long defect intersects the horizontal line representing the test pressure of 2,039 psig at a depth-WT of 0.12. The horizontal line representing an operating pressure of 1,440 psig intersects a vertical line drawn at 10 in. on the length axis at a depth-WT ration of 0.36.

An arrow on Fig. 2 shows this growth. The growth of this defect equals 24% of the 0.25-in. wall thick-

## REMAINING LIFE CALCULATIONS, MODIFIED LN-SEC



Fig. 2

OD = 12.750 in.   WT = 0.250 in.   SMYS = 52,000 psi   Charpy v-notch energy = 15 ft-lb   CVN area = 0.124 sq in.
Burst pressure = 2,431 psig

100% SMYS pressure = 2,039 psig

Maximum operating pressure = 1,440 psig

Growth

Ruptures

Leaks

## TIME TO FAILURE, MODIFIED LN-SEC EQUATION

| Defect length, in. | WT, in. | Depth-WT ratio | | | Growth, in. | Years-to-failure, 6 mil/year |
|---|---|---|---|---|---|---|
| | | Initial | Final | Change | | |
| 10 | 0.25 | 0.12 | 0.36 | 0.24 | 0.06 | 10 |
| 8 | 0.25 | 0.14 | 0.38 | 0.24 | 0.06 | 10 |
| 6 | 0.25 | 0.16 | 0.42 | 0.26 | 0.065 | 11 |
| 4 | 0.25 | 0.22 | 0.53 | 0.31 | 0.0775 | 13 |
| 2 | 0.25 | 0.42 | 0.73 | 0.31 | 0.0775 | 13 |



**Why just tell them you're an expert when you can show them?**

OIL&GAS JOURNAL

Article reprints are a low-cost, credible way to promote your business or technology.

For more information contact Sherry Humphrey at 918.832.9379 or sherryh@pennwell.com.

## EQUATIONS



$$\sigma_{fs} = \left(\frac{\sigma}{M_P}\right)\left(\frac{2}{\pi}\right)\cos^{-1}(e^{-x}) \tag{1}$$

Where:

$$x = \left(\frac{12\frac{CVN}{A_c}E\pi}{8c\sigma^2}\right)$$

$$\frac{\sigma_{fs}}{\sigma} = \frac{A_0 - A}{A_0 - A\left(\frac{1}{M_T}\right)} \tag{2}$$

$$\sigma_{fs} = \left(\frac{\sigma}{M_P}\right)\cos^{-1}(e^{-x})/(\cos^{-1}(e^{-y})) \tag{3}$$

Where:

$$x = \left(\frac{12\frac{CVN}{A_c}E\pi}{8c\sigma^2}\right)$$

$$y = \left(\frac{12\frac{CVN}{A_c}E\pi}{8c\sigma^2}\right)\left(1 - \left(\frac{d}{t}\right)^{0.8}\right)^{-1}$$

ness, or 0.06 in. If the defect grows at a rate of 6 mils/year (0.006 in./year), 60 mils of growth would take 10 years, the remaining life of the defect.

Repeating this process for defects of other lengths (2 in., 4 in., 6 in., etc.) yields the times to failure shown in the accompanying table. Remaining life stands as practically independent of defect length for defects longer than $\sqrt{Dt}$ and integrity assessment to 100% SMYS guarantees about 10 years. A prudent operator will, of course, prevent the remaining life from running out, instead scheduling remediation. A widely accepted practice suggests remediation when half the remaining life has expired, assuring a safety factor on remaining life of 2. ✦

---

# Equipment/Software/Literature

## New software suite aids sesimic computing efficiency

Newly released CUDA 2.0, the latest version of C language programming environment for graphics processing units, enables software developers to tap into the massively parallel architecture of the GPU for the acceleration of complex computational problems.

This latest production release of the CUDA software suite includes support for 32 and 64-bit Windows Vista and Mac OS X as well as 3D textures and hardware interpolation to increase the efficiency of seismic computing.

Also included in CUDA 2.0 is an Adobe Photoshop plug-in example for PC and Mac versions of the software. The example allows developers to design plug-ins that move the most compute-intensive functions of Adobe Photoshop to the GPU, such as filtering and image manipulation. The plug-in is available as source code so developers can easily develop advanced filters and imaging techniques that are available directly within Adobe Photoshop.

CUDA 2.0 also features additional source code examples and new compiler optimizations.

Source: **Nvidia Corp.,** 2701 San Tomas Expressway, Santa Clara, CA 95050.

## New flow computer, transmitter for gas operations

Two new products are designed for the transmission and production of natural gas—the AutoPILOT PRO (see photo) flow computer and the AutoMITTER PRO smart multivariable transmitter for gas measurement. The AutoPILOT PRO offers a combination of flexibility, durability, and measurement accuracy, while the AutoMITTER PRO easily integrates with the entire line of this firm's gas flow computers.



AutoPILOT PRO gas flow computer is scalable from a single run measurement application to multiple runs with full station control, enabling a single platform to be utilized and expanded as needed. Once configured, the AutoPILOT PRO automatically performs tasks that typically need to be programmed, including flow calculations, alarms, and I/O sampling. Engineered to use minimal power, the new flow computer's design also requires less monitoring and maintenance. Its advanced plunger lift algorithms have proven to increase production, the firm says.

The new AutoMITTER PRO integrates with the AutoPILOT PRO. Its new three-in-one design measures differential pressure, static pressure, and temperature, eliminating the need for separate transducers.

The AutoMITTER PRO seamlessly integrates into the AutoPILOT PRO motherboard, eliminating the need for an external card. High-accuracy measurement is suited for applications that are more sensitive to varying temperatures, such as ultrasonic measurement.

Source: **Thermo Fisher Scientific Inc.,** 81 Wyman St., Waltham, MA 02454.

# EXHIBIT K

Case 2:26-cv-05242-SVW-SSC    Document 26    Filed 05/14/26    Page 18 of 1309   Page ID #:12569

**Proceedings of the 2024 14th International Pipeline Conference**
**IPC2024**
**September 23-27, 2024, Calgary, Alberta, Canada**

## IPC2024-121806

# EVALUATION OF SELECTIVE SEAM WELD CORROSION SUSCEPTIBILITY

**Tara Podnar McMahan**
DNV
Columbus, OH

**Bill Amend**
RSI Pipeline Solutions
New Albany, OH

**Dr. William Harper**
DNV
Columbus, OH

**Dr. Thomas Bubenik**
DNV
Columbus, OH

**Kenneth Evans**
DNV
Columbus, OH

**Michael Rosenfeld**
RSI Pipeline Solutions
New Albany, OH

**Yanping Li**
Enbridge
Edmonton, AB

## ABSTRACT

*Selective seam weld corrosion (SSWC) in autogenous welds is characterized by accelerated corrosion of or near the bondline which results in a groove-like feature that often coincides with shallower corrosion that can extend beyond the width of the longitudinal seam. Historically, SSWC has been referred to as "grooving corrosion", "knife-line attack", or "trench-like corrosion". In 2021, the Pipeline Research Council International, Inc. (PRCI) funded a project, PRCI Project EC-2-12, to evaluate SSWC as a threat to gas and liquid pipeline systems. The project included a literature review of key parameters influencing the likelihood of SSWC within a particular type of pipe over others, benchmarking of the key parameters using industry experience and data, and the development of a susceptibility process for the threat of SSWC within gas and liquid pipeline segments.*

*From the literature review, a summary of hypothesized influencing parameters was compiled and those considered more strongly and consistently indicative of susceptibility were identified as key parameters (e.g., longitudinal seam weld type, chemical composition of the plate material, and evidence of a post-weld heat treatment, etc.). The key parameters were then benchmarked against pipeline industry data from confidential as well as public sources. Industry data were collected for line pipe known to be susceptible to the threat of SSWC (i.e., SSWC has been identified within it through direct examination and/or metallurgical analysis). Additionally, mill test reports for line pipe manufactured prior to 1990 and historical line pipe manufacturing specifications that could indicate typical manufacturing practices of the time were collected and compiled.*

*As a result of the benchmarking effort, some key parameters were confirmed, and others were dismissed if industry data indicated it was unlikely they could be relied upon to determine susceptibility to the threat of SSWC individually or in concert with other parameters. Key parameters that were confirmed as reliable through industry benchmarking and considered readily accessible to most pipeline operators were leveraged in the development of a susceptibility framework.*

*The following paper details the sources identified as a result of a comprehensive literature review, the SSWC susceptibility parameters with industry consensus, the SSWC susceptibility parameters determined to be reliable as a result of a benchmarking study, and a SSWC susceptibility framework that can be used to categorize and prioritize segments for a baseline assessment relative to the threat of SSWC.*

Keywords: Selective seam weld corrosion, susceptibility, threat determination.

## NOMENCLATURE

| | |
|---|---|
| $\alpha$ | Grooving ratio (GR) |
| $d_1$ | Depth of the groove |
| $d_2$ | Depth of the base metal corrosion |
| $t$ | Original wall thickness |

## 1. BACKGROUND & INTRODUCTION

Selective seam weld corrosion (SSWC) in autogenous welds is characterized by accelerated corrosion of or near the bond-line which results in a groove-like feature that often coincides with shallower corrosion that can extend beyond the width of the longitudinal seam. Historically, SSWC has been referred to as "grooving corrosion", "knife-line attack", or "trench-like corrosion". In 2021, the Pipeline Research Council International, Inc. (PRCI) funded a project, PRCI Project EC-2-12, to evaluate SSWC as a threat to gas and liquid pipeline systems. The project included a literature review of key parameters influencing the likelihood of SSWC within a

© 2024 by ASME

particular type of pipe over others, benchmarking of the key parameters using industry experience and data, and the development of a susceptibility process for the threat of SSWC within gas and liquid pipeline segments.

This paper summarizes work conducted to investigate the threat of SSWC, its susceptibility parameters, and a framework that could be used to categorize and prioritize segments for baseline assessment relative to the threat of SSWC. Overall, the objectives of the project were:

(1)  Defining the threat of SSWC,
(2)  Understanding key parameters and indicators of SSWC susceptible line pipe,
(3)  Understanding industry leading methodologies for determining SSWC susceptibility,
(4)  Developing guidelines for determining susceptibility.

The work conducted for PRCI Project EC-2-12 is part of a broader scope to address the gaps in industry knowledge relative to the threat of SSWC (NDE-4-13[A], IM-3-03, EC-2-13, and NDE-2-15).

The herein described evaluation of SSWC susceptibility included the three following primary components.  Each component is further detailed in the subsequent sections.

- Literature Review
- Industry Data Collection and Benchmarking
- Susceptibility Framework

This paper is organized in a manner that first presents the threat of SSWC and  its hypothesized susceptibility parameters followed by a benchmarking study of the identified susceptibility parameters. Subsequently, it discusses a SSWC susceptibility framework that could be used to categorize and prioritize populations of line pipe for baseline assessment.

## 2.  LITERATURE REVIEW

More than 40 references were identified and reviewed, including the three applicable research compendiums offered through PRCI [1] [2] [3], for the purpose of conducting a literature review of published resources related to the threat of SSWC.

### 2.1 General Description of SSWC

Different references broadly agree that SSWC in autogenous welds is characterized by accelerated corrosion of or near the bondline [4] [5] resulting in a groove-like feature, often in conjunction with shallower corrosion that can extend beyond the limits of the seam [4]. Williams [5] notes that SSWC most frequently occurs through the center of the carbon-depleted band present at the bondline. Some references, including Kato et. al. [6], have also referred to it as "grooving corrosion" or "knife-line attack", or "trench-like" corrosion" although pipeline literature, such as Popov et. al. [7], also refers to an unrelated form of bottom-of-the-line corrosion, often remote from long seams, as "grooving corrosion".

According to Rosenfeld et. al. [8], once established, SSWC can extend by other mechanisms, including microbially induced

corrosion (MIC) tunneling or stress corrosion cracking (SCC). Occasionally, the SSWC initiates at the site of a pre-existing manufacturing flaw on the seam, resulting in a very deep, tight groove [4] and/or ruptures at low operating pressure. Leis et. al. [9] described a failure related to outside surface SSWC coupled with intermittent hook cracking and fractures with very little apparent ductility.

The severity of SSWC is generally expressed as a "grooving ratio" or GR in which the GR is calculated as a ratio of the depth of the groove to the depth of the adjacent base metal corrosion, as provided in Figure 1. The measurement of $d_2$ is taken as close to the groove as practical to ensure the depths compared for the GR are from corrosion that likely initiated at the same time. A GR equal to or less than 1.0 generally indicates the bondline is not corroding at a faster rate and is not deeper than corrosion of the base material (i.e., no preferential corrosion of the seam and it is not SSWC). A GR greater than 2 is sometimes used as an arbitrary threshold for susceptibility to SSWC, although GRs between 1 and 2 still indicate some preferential corrosion of the autogenous seam weld [10] [11] [12]. Common GR values are between 2 and 4 [14], although higher GR values have been found. High GRs are associated with relatively slow base metal corrosion rates. [12] [13] While GR does not follow a log-normal distribution, 1/GR does follow a log-normal distribution, with the 50th percentile GR = 2.2 and the 90th percentile value = 5. [13]



$$\alpha = \frac{d_1}{d_2}$$

**FIGURE 1:** IDEALIZED DEPICTION OF METAL LOSS MEASUREMENTS RELEVANT TO THE DETERMINATION OF GR (ALPHA) FROM MASAMURA ET. AL. [15]

SSWC can occur on either the internal or external surface of the pipe and the groove can either be wide or narrow [16]. The groove can be long or short along the pipe axis [16], with 95% of the grooves being contained within the limits of the surrounding metal loss [13].

Grooving ratios are mainly useful in laboratory tests designed to compare the performance of different steels or different treatments of the same steel.  Measurement of GR in field environments is more problematic since different locations on the pipe surface can begin corroding at different times (unlike corrosion in lab tests). It was observed by the reviewers that none of the references provided guidance regarding what metal loss depth should be used to represent the corrosion of the base metal remote from the seam. For example, assume the corrosion within one or two inches from the seam is 0.10t deep, corrosion pitting three or more inches away from the seam is 0.25t deep and the groove at the electric resistance weld (ERW) seam is 0.30t deep. Without clear industry guidance, the same instance of SSWC could be characterized in different ways and

                                    © 2024 by ASME

measured to have a GR that could range from 3 (i.e., 0.30/0.10) to 1.2 (i.e., 0.30/0.25). Figure 2 is a depiction of a practical measure of $d_1$ and $d_2$ in which the metal loss with the shallower depth immediately adjacent of the groove is taken as a reasonable and likely measure ($d_2$) of the corrosion growth relative to the groove ($d_1$).



**FIGURE 2:** PRACTICAL DETERMINATION OF THE GROOVING RATIO

## 2.2 Mechanism of SSWC

Groeneveld et. al. [17] notes that "There was no single variable related to the chemical composition of the steel, welding process, or post-weld heat treatment that controlled the susceptibility of the weld to selective seam-weld corrosion" and that longitudinal seam welds that were immune to SSWC:

- Were produced from steels with low sulfur and carbon contents,
- Had been treated for inclusion shape control,
- Had been welded using HF-ERW rather than DC-ERW or LF-ERW, and
- Had been post weld normalized.

However, the report also noted that not every pipe that had those characteristics was immune to SSWC.

Most published descriptions of the mechanism of SSWC involve a discussion of the significant role of sulfur and related manganese sulfide inclusions (MnS) in the steel [18] [11] [19] [20] [16] [21] [6] [22] [23] [24]. The sulfur-related discussions often include descriptions of how elongated inclusions that are normally parallel to the pipe surface are deflected toward the internal or external surfaces as the seam area is plastically compressed (upset) during the seam fusion process, and the concentration of inclusions and related sulfur-rich areas around the inclusions can become an order of magnitude higher relative to the steel remote from the longitudinal seam weld.

Subsequent removal of the excess flash on the internal and external surfaces exposes the corrosion-susceptible inclusions to the potentially corrosive environment [18] [19] [16]. As the sulfur-rich areas surrounding the inclusions corrode, the pH in the micro-pits causes dissolution of the MnS inclusions and enlargement of the pits, accelerated by the creation of HS and S ions [18].

According to Leis et. al. [23], "Of the mechanisms posed, sulfur enrichment and sulfide inclusions leading to localized

corrosion in the weldment seem to have the greatest merit and the largest body of supporting evidence." The significant role of sulfur in the SSWC mechanism has led to the reduction of sulfur content and/or modification of sulfur-rich inclusions to be proposed as a method of improving the SSWC resistance of steels.

A second common theme in discussions of the mechanism includes the electrochemical potential differences among the metal remote from the seam, the seam fusion line, and the seam HAZ, although there are some differences in conclusions among different researchers. El-Sayed [25] claims that minor changes in the alloy content of the steel at the seam results in the bondline becoming anodic to the base metal and the small anode/large cathode area results in rapid corrosion along the bondline. Reference to weld regions being anodic to remote areas is also made by Heitman et. al. [10], Ritchie [11], Rosenfeld [16], Kato et. al. [6], Rosen [26], Luo et. al. [27], and Howell [28]. Yan et. al. [29] describes "…large differences in the electrochemical properties of the weld bond, the base metal, and the HAZ, which was the main cause of grooving corrosion". Eiber et. al. [30] states that the reason for the corrosion is the difference in metallurgical structure at the weld and that the most susceptible microstructure is at the bondline.

Beavers et. al. [31] acknowledges that differences in corrosion potential between the seam and the base metal have been cited in other sources as the cause of SSWC, but the testing described in their work indicated that no significant differences in potential exist. Instead, it was concluded that the SSWC must be the result of differences in corrosion kinetics.

## 2.3 Potentially Influential Parameters

As a result of the literature, several potentially influential parameters to the susceptibility of line pipe to the threat of SSWC were identified. The following sub-sections detail the more commonly cited parameters.

### 2.3.1 Effects of Longitudinal Seam Weld Manufacturing Variants

Weld zone corrosion has been observed in fabrication welds and longitudinal seam welds made by ERW, electric flash weld (EFW), and in seams and other welds made by various arc welding processes that include the addition of filler metal (e.g., submerged arc welded [SAW] longitudinal seams and shielded metal arc welding [SMAW] fabrication welds). SSWC, as used in the context of this paper, refers more specifically to selective corrosion of ERW and EFW longitudinal seams.

With respect to SSWC, more references describe effects of variants in the ERW process than effects of variants in other types of welds. Some references discuss differences in SSWC susceptibility and the consequences of SSWC specifically in terms of the original manufacturing process variant, i.e., direct current (DC) vs. low frequency (LF) vs. high frequency (HF) ERW longitudinal seams. There are some small differences in conclusions among the various authors, although there was broad agreement, including Ritchie [11] and Rosenfeld [32], that none of the three processes confered immunity to SSWC.

                                    © 2024 by ASME

Groenveld et. al. [33] stated that LF-ERW and EFW pipe are more susceptible than HF-ERW but noted that the LF-ERW and EFW pipe are not as commonly given a beneficial normalizing heat treatment.

Kiefner et. al. [34] observed that fewer failures by SSWC have been reported for LF-ERW than for HF-ERW, but that HF-ERW often has better resistance to cracks because of the greater toughness that accompanies more common use of normalizing and improvements in steel composition. Early vintage HF-ERW may still be susceptible to laminations and inclusions prior to significant improvements in steel manufacturing that included significant reductions in sulfur content that occurred more commonly by the early 1980s. Therefore, differences could be attributable to the effects of heat treatment rather than the longitudinal seam fusion process.

Ritchie [11] concluded that susceptibility is not influenced by longitudinal seam welding heat input but noted the effects of post weld heat treatment (PWHT). Longitudinal seam weld heat treatment practices have evolved over time, as have the seam fusion methods. However, the longitudinal seam weld heat treatment requirements and common practices are more related to pipe vintage, grade, and manufacturing specification than to whether the pipe was manufactured using DC, LF, or HF technologies. Rosenfeld [32] also pointed out that the generally better bondline quality of HF-ERW relative to DC-ERW or LF-ERW could reduce the relative susceptibility, although high sulfur steels commonly associated with SSWC continued to be used in the early HF-ERW era.

From the standpoint of susceptibility to failure upon the formation of a groove at the bondline, Rosenfeld et. al. [35] noted that the increased ductility of HF-ERW seams relative to other ERW seam formation processes means that the HF-ERW seams may tolerate larger flaws, although low stress failures could still occur if the groove is large.

While not explicitly discussed in the reviewed references, EFW longitudinal seams share many metallurgical characteristics with ERW seams in terms of localized large differences in microstructures in the weld zone compared to the base metal, but EFW seams derive some benefit from the increased thickness at the seam resulting from the fact that the flash is not entirely trimmed off as it normally is on ERW seams. As a result, the initial stages of grooving only eliminate the flash rather than reduce the nominal wall thickness.

### 2.3.2 Influence of Steel Composition

The effects of alloying have been broadly summarized in some references by noting, for example, that "Susceptibility has been observed to decrease with reduced sulfur content, reduced carbon content, increased PWHT temperature, increased calcium content, increased copper content, and additions of rare earth elements." [16].

In a few cases, the reported observations or test results appear to be contrary to those of other references. For example, Ritchie [11] noted that the tested range of chromium (0.6-0.7%) had no consistent beneficial effects, while El-Sayed [25] and Kato et. al. [6] mentioned benefits of chromium. Ritchie [11]

also indicates expected benefits of niobium since it stabilizes sulfides, but Kato et. al. [6] noted no effect of niobium in corrosion of autogenous welds. Lee et. al. [36] conflicts with El-Sayed [25], Ritchie [11], and Anon [37] when it reported detrimental effects of 1% nickel, although El-Sayed [25], Ritchie [11], and Anon [37] did not specify beneficial ranges of nickel. Groeneveld et. al. [17] also reported that the one steel that included intentional additions of nickel had a GR of 1.59. Note that 1% nickel and 0.6-0.7% chromium are both higher amounts than what is often found in pipeline steels.

Recognition of the effects of steel composition on SSWC resistance has led to the development of at least one steel with composition optimized for a combination of SSWC resistance and mechanical properties as described in patent application by Baoshan Iron and Steel Co. Ltd [38]. However, other sources indicate that composition alone is not entirely responsible for susceptibility to or severity of SSWC. Rosenfeld et. al. [8] concluded the following attributes are often associated with SSWC:

- C>0.1%,
- S> 0.005%,
- Cu<0.3%,
- Ca<0.002%,
- seam heat treat<850°C (1562°F),
- vintage <1985

### 2.3.3 Influence of Heat Treatment Procedures

In general, the references broadly agree that longitudinal seam weld heat treatment influences susceptibility to SSWC, with relatively minor differences being apparent in the observations and conclusions of the different authors. Williams [5] states that the susceptibility of the ERW seam to SSWC is affected by PWHT, but that heat treatment to temperatures above the upper critical temperature (i.e., production of 100% austenite) did not eliminate susceptibility to SSWC. He concluded that heat treatment alone cannot prevent SSWC. Orth et. al. [24] states that "When correctly performed and controlled, normalizing eliminates martensitic microstructures formed by the high cooling rates associated with the ERW processes, thereby improving weld line toughness.", but also cites work performed by others that showed that normalizing "…does not necessarily return mechanical properties to that of the parent material before welding." Normalizing is a heat treatment for ferrous alloys that includes heating above the upper critical temperature to produce austenite, then cooling in air to produce a relatively homogenous microstructure of ferrite and iron carbides (usually present as ferrite+pearlite). The objective of this heat treatment is to enhance toughness by refining the grain size. Cooling rates from normalizing temperatures can be controlled to optimize toughness by muti-step normalizing followed by water quenching once the pipe has air cooled to about 482°C (900°F), with the ductility of ferrite+pearlite microstructures being inversely proportional to the cooling rate [24].

4

© 2024 by ASME

The effect of seam heating on the characteristics of MnS inclusions in the longitudinal seam area was cited as one reason for the improved performance of seams subjected to heat treatment [10] [18] [15] [11] [6]. The selected heat treatment temperature was often found to have a noticeable effect on susceptibility to SSWC. Specifically, higher temperatures are more beneficial by improving the diffusion process to minimize small, localized differences in the chemical composition of the steel, especially immediately around MnS inclusions [21]. However, Orth et. al. [24] states that the temperature at the outer diameter must be held below 982°C (1800°F) to prevent excessive grain growth. Ritchie [11] opines that the degree of normalization (typically conducted at temperatures of greater than about 870°C, (~1600°F) is "…likely a main factor in determining susceptibility to SSWC". Ritchie [11] differs from some other references (examples, [10] [18] [25] [21] [6]) by stating that the common temperatures and durations of heat treatment do *not* likely affect distribution of sulfur within the weld zone. In comparison, the minimum heat treatment requirements of API 5L and 5LX are summarized below:

- 5LX and 5L 1966 and before: no heat treatment required
- 5LX 14th ed and 5L 22nd ed. (1967): 1000°F (538°C) or elimination of untempered martensite
- 5L 38th edition (1990):
  o Grades X42 and lower: elimination of untempered martensite
  o Grades higher than X42: 1000°F (538°C)
- 5L 41st edition (1995):
  o X42 and lower: heat treat to eliminate untempered martensite
  o Grades higher than X42: normalized unless agreed upon
- 5L 42nd edition (2000)
  o PSL1: same as 41st edition
  o PSL2: all grades normalized unless otherwise agreed upon

Besides modification of inclusions and microstructure, heat treatment was found to have a beneficial effect on SSWC by reducing residual stress [11] [6] and minimizing microstructural differences between the longitudinal seam and base metal [11].

### 2.3.4 Influence of Pipe Manufacturer

Rosenfeld [32] tabulated the occurrence of SSWC, as shown in Figure 3. However, there was no corresponding data for the miles of pipe per manufacturer, so the occurrence of SSWC is not normalized on a per mile basis. Limitations of existing data make it impossible to normalize the frequency of occurrences on a per mile basis. The primary application and value of Figure 3 is to illustrate that SSWC has been observed in pipe made by several different manufacturers, but the data does not allow conclusions to be made about whether pipe from one manufacturer is more susceptible than pipe from other sources.



**FIGURE 3:** OCCURRENCES OF SSWC FOR DIFFERENT PIPE MANUFACTURERS [32][1]

### 2.3.5 Influence of Pipe Vintage

Tandon et. al. [39] references work by Kiefner and Kolovich, which reported that 100% of SSWC failures occurred in pre-1970 pipes, and Mittelstadt et. al. [40] states that the threat of SSWC in post-1970 ERW "…while not zero, is essentially so for pipe installed since the advent of high frequency process."

In a study conducted of inspection data for one pipeline operator's system, the frequency of occurrence of SSWC normalized by the amount of ERW pipe installed in each year peaked with 1963 vintage pipe, although the relative occurrence was also somewhat high for pipe made between the mid-1950s and mid-1960s [32]. The study of that operator's pipe included installation dates from the 1930s through about 1980. The study concluded that the occurrence of SSWC and low stress ruptures correlate with the occurrence of internal and especially external corrosion frequency while also correlating with historical improvements in longitudinal seam weld quality. The same study showed that the proportional rate of SSWC occurrence divided by the proportion of total pipe miles actually peaks for pipe manufactured in the 1940s when data representing many different pipeline operators in the US is considered. Rosenfeld [32] concluded that the increased occurrence of SSWC in older pipe was related to the following:

- Early pipe had the least effective external coatings, therefore, corrosion was more likely,
- API 5L imposed improved nondestructive examination and longitudinal seam weld heat treatment in 1967 and 1968,
- Industry moved away from open hearth to basic oxygen steel making and demand for high strength pipe led to reduced sulfur contents in steel by 1980,
- Improved toughness in modern ERW pipe can tolerate larger seam weld flaws.

Rosenfeld et. al. concluded that ERW pipe manufactured before 1985 should be considered susceptible to SSWC because of the carbon and sulfur contents allowed by the specifications

---

[1] Note: the number of occurrences is not normalized on a per mile basis.

    © 2024 by ASME

until that time [16]. Beneficial amounts of calcium were not commonly found in ERW pipe steel until about 1990, and beneficial amounts of copper have never been consistently added [16].

## 3. BENCHMARKING OF MOST LIKELY INFLUENTIAL FACTORS

As detailed in the literature review (Section 2), there are a number of potential influential parameters for a line pipe to be susceptible to the threat of SSWC; however, four relatively consistent susceptibility factors were identified:

- Sulfur and carbon contents
- Steel manufacturing practices that treat for inclusion shape control
- Pipe welding processes of EFW, ERW-DC, ERW-LF, and ERW-HF (i.e., vintage)
- Post weld heat treatment

Industry data, in the form of anonymous operator contributions, as well as publicly available data, was collected to benchmark the factors identified as potentially key to susceptibility to the threat of SSWC and determine which factors, if any, could be confirmed with industry experience. Data collection efforts and benchmarking of the susceptibility factors are detailed in the following sub-sections.

### 3.1 Data and Information Collection

The data sets used in the analyses described herein include one population with pipe known to be susceptible to SSWC and a second population of pipe with unknown susceptibility. Use of pipe with unknown susceptibility is not ideal; however, data and information for pipe known not to be susceptible is not yet readily available to the industry. For the purpose of this paper, known susceptibility is defined as line pipe in which SSWC has been identified through non-destructive examination techniques or metallurgical analysis.

#### *3.1.1 Operator Provided Data and Information*

Nine industry contributors provided pipe characteristic information (e.g., physical characteristics, pipe chemistry, seam type, vintage, etc.) for line pipe in which SSWC has been identified (i.e., line pipe known to be susceptible to the threat of SSWC). They also provided (to the extent possible, mill test reports for any line pipe (i.e., line pipe for which the susceptibility to SSWC is unknown) manufactured prior to 1990[2] and any historical line pipe manufacturing specifications that could indicate typical manufacturing practices of the time (i.e., post weld heat treatment temperatures and durations).

As expected, not all information for line pipe with known susceptibility was available from all data sources; however, most sources contained pipe characteristics information,

vintage and/or manufacturer, and seam type; therefore, these parameters served as the focus of the benchmarking effort.

#### *3.1.2 Publicly Available Data and Information*

The information and data was also sought from publicly available sources. More than 40 instances of line pipe within which SSWC was identified and data were gathered from deliverables produced as a result of the PHMSA 2014/2015 ERW Study [41] [42]. Additionally, chemistry information and basic pipeline characteristic information were extracted for more than 100 line pipe samples (with unknown susceptibility to SSWC) published as a result of an industry project completed in 2016 [43].

The incident data published by PHMSA from 1986 to the present for hazardous liquid pipelines and from 1984 to present for gas transmission pipeline segments was also mined for relevant information. Data pertaining to incidents specifically attributed to SSWC by the pipeline operator was extracted and compiled for analysis [44] [45] [46] [47] [48] [49].

### 3.2 Chemistry Data and Analysis of Industry Data[3]

Chemistry results were compiled for more than 7,000 samples provided in the form of mill test reports (check and ladle results), metallurgical analyses, and a previous PRCI project [43]. They represent samples taken from a heat of line pipe at the mill or a joint of pipe that was metallurgically examined. Mill test reports comprise approximately 97% of the records containing chemistry results. Most records contained carbon, manganese, phosphorus, and sulfur contents. Other constituents such as those used for microalloying and with the potential of reducing susceptibility to SSWC (e.g., calcium and copper) were rarely included in the provided documentation.

A high-level review of data trends for the constituents of interest as a function of vintage is provided below:

- Both carbon and sulfur contents peaked in the late 1940s and early 1950s, respectively, with steady declines in measured values over time. Additionally of note, sulfur contents generally followed the required maximums specified in API 5L as did the carbon contents after about 1970.
- Copper contents vary and likely were used by manufacturers as part of their microalloying methodologies and strategies. Not until the 44th Edition (2007) of API 5L [50] were limits on copper content introduced.
- Calcium contents were minimal until around 2000 when the data provided indicate, at least for two line pipe manufacturers, there was a significant increase in calcium. This is not inconsistent with the findings of the literature which indicated calcium was more commonly found in ERW pipe steel after about 1990.

---

[2] Mill test reports were not limited to autogenous welds because steel plate (i.e., pipe body) chemistry trends were considered agnostic to the seam weld type.

[3] It should be noted that chemistry information was available for 28, or ~4%, of the 707 instances of susceptible line pipe in which SSWC was reported; therefore, the consideration of pipe chemistry on susceptibility could not be analyzed beyond the analyses offered in Section 3.2.

© 2024 by ASME

The following sub-sections include an analysis of chemistries measured for line pipe with known unknown susceptibility to the threat of SSWC.

### 3.2.1 Chemistry Constituent Analysis

More than 7,000 data points were collected of line pipe carbon, sulfur, copper, and calcium contents for pipe with unknown susceptibility to SSWC. Additionally, contents were available for 25 line pipe samples within known susceptibility to the threat of SSWC. The following paragraphs compare the chemistry constituents of the line pipe with known and unknown susceptibility to the threat of SSWC. The analysis is not necessarily an indictment of the validity of each constituent's role in susceptibility, but rather a determination if its role is evident in readily available data of today.

Figure 4 is a plot of carbon content data with carbon content data measured from line pipe with known susceptibility to the threat of SSWC indicated as red, closed circles. A two-sample t-test and a confidence interval analysis were performed to determine if there is a statistically significant difference in the data sets. As is evident in Figure 4, the two data sets were not determined to have a statistically significant difference. The lack of statistically significant difference indicates that, while carbon content is understood from the literature review to be a key factor in SSWC susceptibility, it alone cannot be used to determine whether pipe is susceptible to SSWC.

Figure 5 is a plot of sulfur content data for line pipe with known and unknown susceptibility to the threat of SSWC. As provided in Figure 5, susceptible pipe has a range of sulfur contents between approximately 0.01% and 0.04%, and there is considerable overlap between the data for susceptible line pipe relative to all the other samples compiled. A two-sample t-test and confidence interval analysis were performed to determine if there is a statistically significant difference between the sulfur content data sets with known and unknown susceptibility. The data indicates a statistically significant difference between the data sets. However, unexpectedly, the line pipe with known susceptibility to SSWC has a lower sulfur content mean than that of the data set with unknown susceptibility which is opposite of the pipeline industry's understanding of the role of sulfur in SSWC susceptibility. The relatively lower sulfur contents of susceptible line pipe indicates that, while the literature review suggests that higher sulfur content is a key factor in susceptibility, it alone is not sufficient to identify SSWC susceptibility for the data sets analyzed.

Figure 6 is a plot of the copper content. A two-sample t-test and a confidence interval analysis were performed to determine if there is a statistically significant difference between the copper content data sets with known and unknown susceptibility. A P-value of 0.01 was calculated and determined to be less than the 95% confidence threshold value (0.05) indicating a statistically significant difference. From the data analyzed, it is concluded that copper content could potentially be used as indicative of susceptibility to SSWC; however, as provided in Figure 6, a threshold above which susceptibility is likely is inconclusive from the data analyzed.



**FIGURE 4:** PLOT OF THE CARBON CONTENT OF SUSCEPTIBLE LINE PIPE TO THE THREAT OF SSWC RELATIVE TO CARBON CONTENTS OF LINE PIPE WITH UNKNOWN SUSCEPTIBILITY AS A FUNCTION OF THE YEAR THE LINE PIPE WAS MANUFACTURED



**FIGURE 5:** PLOT OF THE SULFUR CONTENT OF SUSCEPTIBLE LINE PIPE TO THE THREAT OF SSWC RELATIVE TO SULFUR CONTENTS OF LINE PIPE WITH UNKNOWN SUSCEPTIBILITY AS A FUNCTION OF THE YEAR THE LINE PIPE WAS MANUFACTURED

© 2024 by ASME



**FIGURE 6:** PLOT OF THE COPPER CONTENT OF LINE PIPE SUSCEPTIBLE TO THE THREAT OF SSWC RELATIVE TO COPPER CONTENTS OF LINE PIPE WITH UNKNOWN SUSCEPTIBILITY AS A FUNCTION OF THE YEAR THE LINE PIPE WAS MANUFACTURED

Calcium content is a relatively modern data set and was not available in most of the mill test reports reviewed. Data collection efforts yielded 82 measured values for line pipe with unknown susceptibility and 10 measured values for line pipe with known susceptibility to the threat of SSWC. Figure 7 is a plot of the calcium content data with calcium contents measured from line pipe with known susceptibility to SSWC indicated with red, closed triangles. A two-sample t-test and confidence interval analysis were performed to determine if there is a statistically significant difference between the calcium content data sets with known and unknown susceptibility. A P-value of 0 was calculated and determined to be significantly lower than the threshold of 0.05 (for 95% confidence) which indicates a statistically significant difference in values between the line pipe with known and unknown susceptibility to the threat of SSWC. Note, however, that the data points near year 2000 may have significantly skewed the results. The statistical difference is consistent with the known role of calcium as an inclusion shape control factor that reduces the susceptibility of the longitudinal seam weld to the threat of SSWC; therefore, calcium content was confirmed as an indication of reduced susceptibility. Accessibility to this information for vintage pipe; however, is anticipated to be limited.



**FIGURE 7:** PLOT OF THE CALCIUM CONTENT OF LINE PIPE SUSCEPTIBLE TO THE THREAT OF SSWC RELATIVE TO CALCIUM CONTENTS OF LINE PIPE WITH UNKNOWN SUSCEPTIBILITY AS A FUNCTION OF THE YEAR THE LINE PIPE WAS MANUFACTURED

### 3.3 Post Weld Heat Treatment Information and Review

As previously mentioned, it is known that a fully normalizing post-weld heat treatment can minimize the susceptibility of a longitudinal seam to the threat of SSWC. Post-weld heat treatments became a requirement for ERW pipe of API 5L and 5LX in the 1967 editions [51] [52] of the standards and in 1969 for EFW pipe.[4] However, the effectiveness of the heat treatment at this time varied significantly among pipe manufacturers. API 5L and API 5LX included a progression in post-weld heat treatment requirements over time, requiring full normalization or heat treatment to eliminate untempered martensite by 1995. Therefore, it is considered reasonable that line pipe manufactured after 1995 likely received a normalizing post-weld heat treatment and, hence, when combined with concurrent improvements in steel composition, is unlikely to be susceptible to SSWC. Line pipe manufactured between 1967 and 1995 likely had some post-weld heat treatment. If appropriate hardness measurements near the bondline indicate the pipe was normalized, it is unlikely to be susceptible to SSWC. Finally, line pipe manufactured before 1967 should be reviewed on a case-by-case basis and likely does not have an effective post-weld heat treatment unless there is evidence to the contrary.

---

[4] It should be noted that the heat treatment requirements described are not applicable to pipe made to ASTM specifications.

8                                                                          © 2024 by ASME

## 3.4 Other Parameters

### 3.4.1 Line Pipe Manufacturer

A summary of the other common attributes of the susceptible line pipe provided by industry collaborators is provided in Table 1. The table also includes the number of instances per mile for each pipe type across the various operator's systems who provided data. As provided in Table 1, the data suggests that SSWC has been identified a number of times across a number of different manufacturers.[5]

**TABLE 1:** SUMMARY OF THE ATTRIBUTES OF THE LINE PIPE FOR WHICH SSWC WAS REPORTED

| Manufacturer | Year of Manufacture | Seam Type | No. of Instances of SSWC Reported | Normalized Instances (per mile) |
|---|---|---|---|---|
| American Steel | 1970s | ERW-HF | 3 | 0.13 |
| A.O. Smith | 1930s | EFW | 109 | 0.05 |
|  | 1940s | EFW | 117 |  |
|  | 1950s | EFW | 177 |  |
|  | 1960s | EFW | 99 |  |
|  | Unknown | EFW | 94 |  |
| Interprovincial | 1970s | ERW-HF | 1 | 0.03 |
| Jones & Laughlin | 1960s | ERW-LF | 2 | 0.01 |
| Kaiser Steel | 1950s | ERW-LF | 1 | 0.00 |
| Lone Star Steel | 1950s | ERW-LF | 1 | 0.37 |
|  | 1960s | ERW-LF | 18 |  |
| Republic | 1940s | ERW-LF | 5 | 0.02 |
|  | 1950s | ERW-LF | 1 |  |
|  | 1970s | ERW-HF | 3 |  |
| U.S. Steel | 1960s | ERW-HF | 1 | 0.00 |
|  | 1970s | ERW-HF | 1 |  |
| Unknown | 1930s | ERW-LF | 4 | N/A |
|  | 1950s | ERW (unknown type)[6] | 6 |  |
|  |  | ERW-LF | 13 |  |
|  | 1960s | ERW (unknown type) | 11 |  |
|  |  | Unknown | 1 |  |
|  | 1970s | ERW (unknown type) | 10 |  |
|  |  | ERW-LF | 1 |  |
|  | 1980s | ERW (unknown type) | 4 |  |
|  |  | ERW-HF | 2 |  |
|  | Unknown | ERW (unknown type) | 3 |  |
|  |  | ERW-HF | 1 |  |
| Youngstown Sheet & Tube Company | 1940s | ERW-DC | 3 | 0.01 |
|  | 1950s | ERW-DC | 13 |  |
|  | 1960s | ERW-DC | 1 |  |
|  | 1970s | ERW-DC | 1 |  |
|  | **Total** |  | **707** |  |

As previously mentioned, industry data was collected from industry collaboration partners and analyzed. Data from publicly available sources on instances of SSWC and the characteristics of the line pipe containing the defect were used to contextualize the industry provided data. Figure 8 is a comparison of the proportion of the incidents and reported susceptibility for each line pipe manufacturer as a function of data set. As provided in Figure 8, the proportion of the instances of SSWC identified within the operator data for A.O. Smith line pipe does not carry through in the publicly available data. Of note is another manufacturer, Youngstown Sheet & Tube, with a relatively significant portion of the susceptible pipe in the publicly available data set but its significance is not observed in the operator data set.



**FIGURE 8:** COMPARISON OF THE PROPORTION OF THE INCIDENTS AND REPORTED SUSCEPTIBILITY FOR EACH LINE PIPE MANUFACTURER AS A FUNCTION OF DATA SET

### 3.4.2 Longitudinal Seam Weld Type

Table 2 is a comparison of the instances for each longitudinal seam weld type as a function of source data. As provided in Table 2, and with the exception of EFW and ERW (unknown type) seam types, the number of instances from each data set roughly follow one another. Line pipe with ERW-LF seams has more than double the number of instances of both ERW-DC and ERW-HF seams with ERW-HF having the least instances (i.e., potentially less likely to be susceptible). Line pipe with ERW-DC longitudinal seams counts more instances than the remaining seam types (i.e., ERW-HF and unknown).

---

[5] It should also be noted that this contains an inherent bias to one operator, as they provided substantially more data, approximately 96% of the instances of susceptible line pipe data, than all other operators.

[6] While reported as unknown, considering the line pipe's vintage, it is likely they were manufactured with low frequency ERW seams.

© 2024 by ASME

**TABLE 2:** SUMMARY OF THE PERCENT OF OPERATOR PROVIDED AND PHMSA REPORTED SSWC SUSCEPTIBLE LINE PIPE AS A FUNCTION OF LONGITUDINAL SEAM WELD TYPE

| Longitudinal Seam Type | No. of SSWC Instances | | |
|---|---|---|---|
| | Publicly Available Information | Operator Provided Data | Total |
| EFW | 5 | 594 | **599** |
| ERW (unknown type) | 3 | 34 | **37** |
| ERW-DC | 20 | 18 | **38** |
| ERW-HF | 7 | 12 | **19** |
| ERW-LF | 42 | 46 | **88** |
| Unknown | 2 | 1 | **3** |
| **Total** | **79** | **707** | |

*3.4.3 Line Pipe Vintage*

Figure 9 is an overview of the number of SSWC instances as a function of year of manufacture. The number of instances of SSWC peaks for line pipe manufactured in the 1950s and, as provided in Figure 9, 95% of the SSWC incidents captured through publicly available and operator data occurred within line pipe manufactured prior to 1970. More specifically, for the operator provided data, 95% of the instances of SSWC were identified in line pipe manufactured prior to 1967 and 96% of the instances of reported SSWC in the publicly available data were identified within line pipe manufactured prior to 1969. This trend is consistent with an overall decreasing trend in seam-related failures experienced by the industry starting in the 1960s. Leis et. al. [41] attributes the overall decrease to "improved processes and controls in production, as for example sliding contact coupled with automated process controllers. It also appears to reflect the broader use of in-mill inspection technology, and improvements to that technology to achieve more consistent seam quality in the outbound product."

**3.5 Conclusions of Benchmarking Analysis**

Based upon the results of the benchmarking analysis, the following conclusions were drawn in support of a susceptibility determination framework for the threat of SSWC:

- While the data indicates a disproportionate number of instances for some manufacturers, normalizing efforts indicate these manufacturers likely represent a significant portion of the line pipe from which the data was sampled. It is also noted that instances of SSWC were reported across more than 10 manufacturers. Additionally, the number of instances can be deceiving if not normalized based upon the length of pipe within the respective systems and normalization was only possible for the operator provided data. The comparison of SSWC instances among different manufacturers is further complicated by the differences in long term effectiveness of corrosion control measures (i.e., external coatings and cathodic protection). Line pipe with less effective coatings or inconsistent

cathodic protection are more likely to have instances of SSWC than the same pipe with more effective corrosion control measures. Based upon analysis of the manufacturer data, there is insufficient data available to reasonably assign a higher susceptibility factor to one or more manufacturers over others.

- Based upon seam type and the data compiled, it stands to reason that line pipe with ERW (unknown type), ERW-LF, and ERW-DC longitudinal seams likely have a higher susceptibility than others. ERW-HF could be considered less susceptible if manufactured in 1970 or after.

- 95% of the SSWC incidents captured through publicly available and operator data occurred within line pipe manufactured prior to 1970. Based upon these data, it is considered reasonable to assign line pipe manufactured prior to 1970 a higher susceptibility factor for the threat of SSWC.



**FIGURE 9:** HISTOGRAM OF THE VINTAGES OF PIPE IN WHICH SSWC HAS BEEN REPORTED

**4. PARAMETER INTEGRATION USING MACHINE LEARNING**

The previous sections reviewed pipeline characteristics and attributes, relative to the threat of SSWC, in isolation for the purpose of better understanding the threat, and it was determined that no one characteristic or attribute predicts susceptibility with a high level of certainty. Recognizing that a combination of chemical constituents and/or attributes could be used to correlate (i.e., predict) susceptibility of line pipe to the threat of SSWC, tree-based machine learning models were employed. Limited data availability (e.g., post weld heat

10                                    © 2024 by ASME

treatment) and the lack of the samples known to be not susceptible to SSWC significantly limited the potential for machine learning trees to be able to predict susceptibility from individual and/or combinations of constituents and characteristics; however, simulations and cases were run to determine if any correlations, even if weak, could be drawn from the data compiled. The following conclusions are based on the tree-based machine learning models:

- From the initial analyses, carbon and sulfur content cannot be used by themselves as indicators of SSWC susceptibility, but copper and calcium might be useful. Carbon and sulfur may be indirectly included in the machine learning models because vintage is an important variable, and vintage is correlated with carbon and sulfur contents. On the other hand, the machine learning models did not confirm that copper and calcium are important predictors of susceptibility.
- Post weld heat treatments is assumed to be at least somewhat beneficial in mitigating SSWC susceptibility, but the data used were insufficient to demonstrate this effect. Similar to carbon and sulfur contents, a post weld heat treatment may be indirectly included in the machine learning models because vintage, which is correlated with post weld heat treatment, is important.
- Pre 1970s pipe has a much higher likelihood of being susceptible than later pipe. Similarly, ERW-HF longitudinal seams appear to be less susceptible.
- Instances of SSWC have been identified across more than 10 manufacturers. Further there were 91 instances of SSWC in which the manufacturer was unknown.
- The machine learning models indicate the most important parameters in determining susceptibility are (in order of importance) seam weld type, vintage, and manufacturer, with seam type and vintage being the dominant factors. Other parameters, such as calcium and copper contents, could be important but there were not enough data to analyze.

## 5. FRAMEWORK FOR PIPELINE SEGMENT SUSCEPTIBILITY DETERMINATION AND ASSESSMENT PRIORITIZATION

From the literature review (Section 2) and the benchmarking exercises (Section 3 and Section 4), susceptibility to the threat of SSWC was determined not to be attributed to a single characteristic, but rather when a handful of influencing factors coincide. A framework for pipeline segment susceptibility determination and baseline assessment prioritization was developed based upon the identified susceptibility parameters, their accessibility as data by the pipeline industry, and the extent to which they could be benchmarked with industry data as summarized in Table 3.

The susceptibility framework was structured around four prioritization categories as described below and is intended for use for pipeline segments that have not yet been assessed for the threat of SSWC:

- High-High Priority – Segments within this categorization have a known and significant threat of SSWC and should have a baseline assessment, using an appropriate methodology, performed as soon as practical.
- High Priority – Segments within this categorization have a known threat of SSWC or have all the characteristics of line pipe in which SSWC is typically found and should have a baseline assessment, using an appropriate methodology, performed as soon as practical but not to exceed 3 years of its susceptibility determination.[7]
- Medium Priority – SSWC has not been identified within the segments in this categorization, but they have some characteristics associated with the threat of SSWC. These pipeline segments should be monitored for SSWC.
- Low Priority – Segments within the categorization are not expected to be susceptible to the threat of SSWC but should be evaluated for susceptibility on a routine basis and using this process or equivalent.

The suggested framework first considers the line pipe population's experience with the threat of SSWC: whether it has been identified within the population and the extent (i.e., severity) at which it was found. Those that have experienced an in-service failure or a pressure test failure are categorized as High-High priority and are recommended for a baseline assessment as soon as practical. Those pipeline segments in which SSWC has been identified but not through an in-service or pressure test failure are categorized as High priority and are recommended for a baseline assessment as soon as practical but not to exceed 3 years of its susceptibility determination.

Next, the suggested framework evaluates the likelihood of an environment conducive to corrosion attack (i.e., breakdown of corrosion control barriers) at the location of the longitudinal seam welds by considering the most recent metal loss in-line inspection (ILI) survey, coating type and condition, and cathodic protection effectiveness. Those populations with conclusive evidence of effective corrosion control measures at the seam locations are categorized as Low priority and should be re-evaluated for susceptibility on a routine basis. If evidence of effective corrosion control measures at the seam locations is not conclusive, line pipe characteristics should then be considered.

---

[7] The three year not-to-exceed timeframe is based upon operator experience with incorporating an off-cycle, but not urgent, baseline assessment within an existing continual assessment plan.

© 2024 by ASME

**TABLE 3:** SUMMARY OF THE PARAMETERS RELIED UPON FOR SUSCEPTIBILITY FRAMEWORK.

| Para-meter | | Brief Overview | Con-firmed[8] | Data[9] | Include-ed | Rationale for Inclusion |
|---|---|---|---|---|---|---|
| Longitudinal Seam Weld Manufacturing Variants | | • ERW-DC, ERW-LF, ERW-HF (less than others), EFW potentially susceptible | Yes | H[10] | Yes | • Note 1 |
| Steel Composition | C | • Lower C, improves resistance | No | H | Yes | • Note 1 <br> • Note 2 |
| | Ca | • Shape control, reduced susceptibility | Yes | M[11] | Yes | • Note 1 <br> • Note 2 |
| | Cu | • Inclusions control, reduce susceptibility | Yes | M | No | • Note 3 |
| | S | • Higher S content increases susceptibility | No | H | Yes | • Note 1 <br> • Note 2 |
| | | Carbon > 0.1%, Sulfur > 0.005%, Copper < 0.3%, and Calcium < 0.002%, Pipe < 1985 | Yes | M | Yes | • Note 1 |
| Post Weld Heat Treatment | | • Fully normalizing PWHT, minimize susceptibility | No | L[12] | Yes | • Note 1 <br> • Note 4 <br> • Note 5 |
| Corrosive Environ-ment | | • Corrosion required for SSWC to occur | No | H | Yes | • Note 5 |
| Pipe Manufacturer | | • SSWC observed in line pipe of several different manufacturers | Yes | H | No | • Note 6 |
| Pipe Vintage | | • Less effective external coatings in early years <br> • API 5L improved NDE and PWHT in 1967 and 1968, <br> • Improved steel making by 1980 <br> • Improved toughness | Yes | High | Yes | • Potentially redundant with other attributes being considered |

Note 1: Consensus in literature
Note 2: Susceptibility threshold defined in literature
Note 3: Insufficient data to define susceptibility threshold
Note 4: Data can be collected
Note 5: Significant influence
Note 6: Normalization of data required before application

Finally, within the suggested framework, an evaluation of the line pipe characteristics is performed to determine if the line pipe is likely or unlikely to experience preferential attack of the longitudinal seam weld bondlines. It is suggested that if the line pipe population was manufactured in 1995 or later, it be categorized as Low priority and re-evaluated for susceptibility

---

[8] Confirmed through benchmarking study
[9] Data accessibility
[10] High (H)
[11] Moderate (M)
[12] Low (L)

on a routine basis. Pipe populations manufactured prior to 1995 with a susceptible pipe chemistry, no evidence of a normalized seam, and an ERW-HF seam are categorized as Medium priority and monitored for susceptibility through opportunistic measures such as a thorough in-ditch seam examination program and/or a training program that ensures when SSWC is directly examined it is properly identified and the appropriate information is collected. Pipe populations manufactured prior to 1995 but after 1970 and with evidence of a normalized longitudinal seam are also generally categorized as Low priority and should be re-evaluated for susceptibility on a routine basis.

Through implementation of the suggested framework, pipeline segments that have not been baseline assessed for the threat of SSWC can be categorized based upon their likelihood of experiencing SSWC and prioritized for baseline assessment, as determined appropriate.

## 6. RECOMMENDATIONS

The benchmarking effort performed, as well as operator inquiries, revealed that data and information for line pipe known not to be susceptible to the threat of SSWC (i.e., found through non-destructive examination techniques or metallurgical analysis to have corrosion of the seam but an absence of preferential attack) is an industry gap. The need to collect and/or develop this information is a conclusion of this work. It is recommended that future work consider the collection and analysis of line pipe known not to be susceptible to the threat of SSWC. The available information will also likely vary; however, the amount of data is likely substantial. It is thought this information can be mined from historical corrosion excavations as well as historical metallurgical analyses. Additionally, the industry could begin to collect and digitize this information through revisions in excavation documentation requirements. Additionally, and generally speaking, it is concluded that the industry is challenged by a paucity of defensible data from which conclusive determinations can be made. It is recommended that detailed data on longitudinal seam metallurgy and composition be aggressively pursued for all ERW line pipe samples removed from operator for the purpose of characterizing the composition, microstructures, hardness, etc. and comparing those to the remote base metal.

The susceptibility framework presented as a result of this work was based upon industry research, benchmarked characteristics of line pipe determined to be susceptible to the threat of SSWC, and data accessibility. It is recommended that future work be considered to further benchmark and calibrate the process with pipeline segments known to be susceptible.

## ACKNOWLEDGEMENTS

DNV would like to thank the PRCI EC-2-12 project team for its support as well as technical input.

     © 2024 by ASME

## REFERENCES

[1] Pipeline Research Council International. Weld Seam Corrosion Compendium. s.l. : Pipeline Research Council International, 2021. PR-000-21COMP-R09.

[2] ERW Pipe Compendium. s.l. : Pipeline Research Council International, 2020. PR-000-20COMP-R09.

[3] *Pipeline Cracking Compendium.* s.l. : Pipeline Research Council International, 2020. PR-000-20COMP-R08.

[4] Kiefner & Associates, Inc. Physical Performance and Inspection Objectives for Novel Techniques to Inspect Non-Piggable Pipelines. s.l. : Pipeline Research Council International, 2004. L52125.

[5] Williams, D.N. Effects of Postweld Heat Treatment on Selective Corrosion and Ductility of Welds in ERW Pipe. s.l. : Pipeline Research Council International, 1985. NR198507.

[6] Effect of Aloying Elements on Grooving Corrosion Resistace of ERW Steel Pipe. Kato, C., Otoguro, Y. and Kado, S. 9, s.l. : Corrosion Engineering, 1974, Vol. 23.

[7] *Study of Factors Enabling Initiation and Behavior of Grooving Corrosion.* Popov, G., et al. s.l. : Corrosion in the Oil & Gas Industry 2019 Web of Conferences, 2019. 121,03004.

[8] *Presentation on Addressing Long Seam Weld Anomalies in Vintage ERW-EFW-DC Pipelines.* Rosenfeld, M and Kiefner, J. s.l. : Pipeline Crack Forum, 2019.

[9] Leis, B.N., et al. *Guidelines for Assessing Corrosion Associated with Girth and Long-Seam Welds.* s.l. : Pipeline Research Council International, 2004. L52009.

[10] *ERW Line Pipe: The Effect of Welding and Annealing on the Properties, Microstructure, and Corrosion Resistance.* Heitman, W.E., Southwick, P.D. and Pausic, F. HSLA Steels Technology and Applications, s.l. : ASM International, 1984.

[11] Ritchie, P.R.C. *The Susceptibility of Electric Resistance Welded Line Pipe Steel to Selective Seam Weld Corrosion.* s.l. : M.S. Degree Thesis, The Ohio State Univerity, 2020.

[12] Rosenfeld, M.J. *Survey of ERW Pipe Selective Corrosion Grooving Attributes - Part 2.*

[13] Rosenfeld, M. SSWC Summary Presentation. s.l. : Unpublished.

[14] Kiefner, J.F. and Kolovich, K.M. *ERW and Flash Seam Weld Failures.* s.l. : Pipeline and Hazardous Safety Administration - Research and Development Program, 2012. DTPH56-11-T-000003L.

[15] *Grooving Corrosion of Electric Resistance Welded Steel Pipe in Water: Case Histories and Effects of Alloying Elements.* Masamura, K. and Matsushima, I. Toronto : NACE Corrosion, 1981.

[16] Rosenfeld, M.J. Survey of ERW Pipe Selective Corrosion Grooving Attributes - Part 1.

[17] Groeneveld, T.P., Davis, G.O. and Williams, D.N. *Susceptibility of Resistance Welded, Flash Welded, and Induction Welded Pipe to Selective Seam-Weld Corrosion.* s.l. : Pipeline Research Council International, 1991. NR199103.

[18] *Grooving Corrosion in Electric Resistance Welded Steel Pipe in Sea Water.* Kato, C., et al. s.l. : Corrosion Science, 1978, Vol. 18.

[19] Lukezich, S.J. *Susceptibility of Modern ERW Pipe to Selective Weld Seam Corrosion in Wet Environments.* s.l. : Pipeline Research Council International, 1998. L51775.

[20] Brossia, S. *Task 3.4 - Input to Report: Implications for Recommendation P-09-1.* s.l. : U.S. D.O.T., 2013. DTPH56-11-T-000003L.

[21] Pantelis, D.I. and Tsiourva, T.E. Corrosion of Weldments. *Trends in Oil and Gas Corrosion Research and Technologies.* 2017.

[22] *CO2 Corrosion and Grooving Corrosion Behavior of the ERW Joint of the Q125 Grade Tube Steel.* Wang, L.D., et al. 10, s.l. : Journal of Iron and Steel Research International, 2015, Vol. 22.

[23] Leis, B.N., et al. *Final Summary Report and Recommendations for the Comprehensive Study to Understand Longitudinal ERW Seam Failures- Phase One.* s.l. : U.S. D.O.T., 2023. DTPH56-11-T-000003L.

[24] Orth, J.J., et al. *Toughness Specifications of ERW Bond Lines for Line Pipe Applications.* s.l. : Pipeline Research Council International, 1999. L41042.

[25] *Grooving Corrosion of Seam Welded Oil Pipelines.* El-Sayed, M.H. 2, s.l. : Case Studies in Engineering Failure Analysis, 2014, Vol. 2.

[26] ROSEN. Selective Seam Weld Corrosion - Managing the Threat. [Online]

[27] *Identification of the Selective Corrosion Existing at the Seam Weld of Electric Resistance-Welded Pipes.* Luo, S.J. and Wang, R. 2014 : Corrosion Science, Vol. 87.

[28] *Under-deposit Corrosion at Weld Seams in Carbon Steel Piping.* Howell, A.G. New Orleans : NACE Corrosion Conference, 1997.

[29] *Study on Grooving Corrosion Behavior of QT800 Coiled Tubing.* Yan, F., et al. s.l. : AIP Advances, 2021, Vol. 11. 045013.

[30] Eiber, R.J, et al. *Types of Pipe Defects.* s.l. : Pipeline Research Council International, 1968. NR196801.

[31] *Development of Selective Seam Weld Corrosion Test Method.* Beavers, J.A., Brossia, C.S. and Denzine, R.A. s.l. : International Pipeline Conference Proceedings, 2014. IPC 2014-33562.

[32] *A Risk Model for Selective Corrosion of ERW Seam Pipe.* Rosenfeld, M. Chicago : AGA Transmission Workshop, 2013.

[33] *Evaluations of the Susceptibilities of Electric-Welded Pipe to Selective Seam-Weld Corrosion.* Groenveld, T.P., Davis, G.O. and Williams, D.N. Paris : European Pipeline Research Group - Joint Technical Meeting on Line Pipe Research, 1991. Paper No. 14.

[34] Kiefner, J.F., et al. *Gap Analysis and Review of NTSB Report PAR 09-01.* s.l. : Pipeline Research Council International, 2011. PR-218-103706-R03.

[35] *Study of Pipelines that Ruptured While Operating at a Hoop Stress Below 30% SMYS.* Rosenfeld, M. and Fassett, R. Houston : Clarion Pigging and Pipeline Integrity Management Conference, 2013.

© 2024 by ASME

[36] *Preferential Weld Corrosion: Microstructure and Composition.* Lee, C.M., Bond, S. and Woolin, P. Houston : NACE International, 2005.

[37] Anon. Preferential Corrosion in Electric Resistance Welded Pipe. [Online] https://www.twi-global.com/technical-knowledge/faqs/faq-what-are-the-causes-of-and-solutions-to-preferential-weld-corrosion-in-electric-resistance-welded-steel-pipe.

[38] Baoshan Iron and Steel Co Ltd. Grooving Corrosion Resistant High Strength Steel for ERW Soldering Sleeve, Sleeve and Production Method. [Online] 2007. https://patents.google.com/patent/CN101353766B/en.

[39] Tandon, S., Gao, M. and Krishnamurthy, R. *Methodology for Assessing Seam Weld Anomalies Using In-Line Inspection Data.* s.l. : Pipeline Research Council International, 2019. PR-328-163605-R01.

[40] Mittelstadt, B. and Vieth, P. *Industry Critical Review PHMSA Comprehensive Study to Understand Longitudinal ERW Seam Failures.* s.l. : Pipeline Research Council International, 2017. PR-430-133757-R01.

[41] Battelle Memorial Institute. *Battelle's Experience with ERW and Flash Weld Seam Failures: Causes and Implications.* s.l. : United States, Department of Transportation, 2012. DTPH56-11-T-000003.

[42] Kiefner & Associates, Inc. *ERW and Flash Weld Seam Failures.* 2012. Final Report No. 12-139.

[43] *In The Ditch Non-Destructive Mechanical Property Measurement for Vintage Low Toughness Pipe.* s.l. : Pipeline Research Council International, 2016. PR-214-123734-R01.

[44] Hazardous Liquid Accident Data - January 2010 to the Present. [Online] Pipeline and Hazardous Material Safety Administration (PHMSA). https://www.phmsa.dot.gov/data-and-statistics/pipeline/distribution-transmission-gathering-lng-and-liquid-accident-and-incident-data.

[45] Hazardous Liquid Accident Data - January 2022 to December 2009. [Online] Pipeline and Hazardous Material Safety Administration (PHMSA). https://www.phmsa.dot.gov/data-and-statistics/pipeline/distribution-transmission-gathering-lng-and-liquid-accident-and-incident-data.

[46] Hazardous Liquid Accident Data - 1986 to January 2022. [Online] Pipeline and Hazardous Materials Safety Administration (PHMSA). https://www.phmsa.dot.gov/data-and-statistics/pipeline/distribution-transmission-gathering-lng-and-liquid-accident-and-incident-data.

[47] Gas Transmission & Gathering Incident Data - January 2010 to Present. [Online] Pipeline and Hazardous Material Safety Administration. https://www.phmsa.dot.gov/data-and-statistics/pipeline/distribution-transmission-gathering-lng-and-liquid-accident-and-incident-data.

[48] Gas Transmission & Gathering Incident Data - January 2002 to December 2009. [Online] Pipeline and Hazardous Material Safety Administration (PHMSA). https://www.phmsa.dot.gov/data-and-statistics/pipeline/distribution-transmission-gathering-lng-and-liquid-accident-and-incident-data.

[49] Gas Transmission & Gathering Incident Data – mid 1984 to 2001. [Online] Pipeline and Hazardous Material Safety Administration. https://www.phmsa.dot.gov/data-and-statistics/pipeline/distribution-transmission-gathering-lng-and-liquid-accident-and-incident-data.

[50] *Specification for Line Pipe.* s.l. : The American Petroleum Institute (API), 2008. ANSI / API Specification 5L, ISO 3183:2007.

[51] *Specification for Line Pipe.* s.l. : The American Petroleum Institute (API), 1967. API 5L - 1967.

[52] *The American Petroleum Institute (API).* s.l. : The American Petroleum Institute (API), 1967. API 5LX - 1967.

14                                                   © 2024 by ASME

# EXHIBIT L



 National Energy Board

Office national de l'énergie

R E P O R T   O F   T H E   I N Q U I R Y

## *Stress Corrosion Cracking*

## *on Canadian Oil and*

## *Gas Pipelines*





DECEMBER 1996 MH-2-95



National Energy Board

# Public Inquiry Concerning Stress Corrosion Cracking on Canadian Oil and Gas Pipelines

MH-2-95

REPORT OF THE INQUIRY

November 1996

© Her Majesty the Queen in Right of Canada 1996 as represented by the National Energy Board

Cat. No. NE23-58/1996E
ISBN 0-662-25246-2

This report is published separately in both official languages.

**Copies are available on request from:**
Regulatory Support Office
National Energy Board
311 Sixth Avenue S.W.
Calgary, Alberta
T2P 3H2
(403) 292-4800

**For pick-up at the NEB office:**
Library
Ground Floor

Printed in Canada

© Sa Majesté la Reine du Chef du Canada 1996 représenté par l'Office national de l'énergie

No de cat. NE23-58/1996F
ISBN 0-662-81679-X

Ce rapport est publié séparément dans les deux langues officielles.

**Exemplaires disponibles sur demande auprès du :**
Bureau du soutien à la réglementation
Office national de l'énergie
311, sixième avenue s.-o.
Calgary (Alberta)
T2P 3H2
(403) 292-4800

**En personne, au bureau de l'Office :**
Bibliothèque
Rez-de-chaussée

Imprimé au Canada



*This publication is printed on paper containing recovered waste.*

# Table of Contents

Letter of Transmittal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    vii

Summary and Recommendations . . . . . . . . . . . . . . . . . . . . . . . .    ix

Abbreviations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    xix

1.    Pipelines in Canada  . . . . . . . . . . . . . . . . . . . . . . . . .    1

    1.0    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1
    1.1    Pipeline safety in Canada . . . . . . . . . . . . . . . . . . . . . .    3
    1.2    The safety role of the National Energy Board  . . . . . . . . .    4
    1.3    The investigative role of the Transportation
        Safety Board of Canada. . . . . . . . . . . . . . . . . . . . . . . .    4
    1.4    The role of the Canadian Standards Association  . . . . . .    5

2.    An Inquiry into Stress Corrosion Cracking . . . . . . . . . . . . .    7

    2.0    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7
    2.1    The NEB's 1993 Inquiry . . . . . . . . . . . . . . . . . . . . . . . .    8
    2.2    Events following 1993 Inquiry . . . . . . . . . . . . . . . . . . . .    9
    2.3    The NEB's 1995 Inquiry . . . . . . . . . . . . . . . . . . . . . . . .    10
        2.3.1    Consultations with the public . . . . . . . . . . . . . . . .    12
        2.3.2    Technical information meetings . . . . . . . . . . . . . .    12
        2.3.3    Public hearing  . . . . . . . . . . . . . . . . . . . . . . . . .    13

3.    Understanding Stress Corrosion Cracking . . . . . . . . . . . . .    15

    3.0    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15
    3.1    Environmentally assisted cracking. . . . . . . . . . . . . . . . .    15
    3.2    Near-neutral pH and high pH SCC in pipelines . . . . . . . .    15
        3.2.1    High pH SCC . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16
        3.2.2    Near-neutral pH SCC . . . . . . . . . . . . . . . . . . . . . .    17
        3.2.3    High pH versus near-neutral pH
              SCC crack characteristics . . . . . . . . . . . . . . . . . . .    18
    3.3    The conditions for SCC . . . . . . . . . . . . . . . . . . . . . . . .    20
    3.4    Potent environment  . . . . . . . . . . . . . . . . . . . . . . . . .    21
        3.4.1    Pipeline coating types . . . . . . . . . . . . . . . . . . . . .    21
        3.4.2    Soils . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27
    3.5    Susceptible pipe  . . . . . . . . . . . . . . . . . . . . . . . . . . .    30
        3.5.1    Pipe manufacture . . . . . . . . . . . . . . . . . . . . . . . .    30

| 3.5.2 | Pipe yield strength | 31 |
| 3.5.3 | Plastic deformation characteristics | 31 |
| 3.5.4 | Steel cleanliness | 33 |
| 3.5.5 | Steel composition | 33 |
| 3.5.6 | Pipe surface conditions | 33 |
| 3.5.7 | Pipe temperature | 34 |
| 3.6 | Stress | 34 |
| 3.6.1 | Stresses in pipelines | 34 |
| 3.6.2 | Stress in pipe during operation | 36 |
| 3.6.3 | Field experience: the effect of stress | 41 |
| 3.6.4 | Stress level effects on crack initiation and growth | 41 |
| 3.7 | Conclusions | 52 |
| 3.7.1 | Environment | 52 |
| 3.7.2 | Material | 53 |
| 3.7.3 | Stress | 53 |
| | *Recommendations 3-1 and 3-2* | 54 |
| **4.** | **Prevention, Detection and Mitigation** | 55 |
| 4.0 | Introduction | 55 |
| 4.1 | Coatings | 55 |
| 4.1.1 | Coatings for new pipelines | 56 |
| 4.1.2 | Recoating existing pipelines | 58 |
| 4.1.3 | Conclusions | 59 |
| | *Recommendation 4-1* | 60 |
| 4.2 | Predictive models | 60 |
| 4.2.1 | Development of a predictive model | 60 |
| 4.2.2 | Effectiveness of predictive models | 63 |
| 4.2.3 | Conclusions | 64 |
| | *Recommendations 4-2 and 4-3* | 64 |
| 4.3 | Investigative excavations and repairs | 65 |
| 4.3.1 | Investigative excavations | 65 |
| 4.3.2 | Repair of SCC-affected pipe | 67 |
| 4.3.3 | Conclusions | 68 |
| 4.4 | In-line inspection | 69 |
| 4.4.1 | In-line tools | 69 |
| 4.4.2 | Crack detection ILI technology | 70 |
| 4.4.3 | Challenges | 73 |
| 4.4.4 | Conclusions | 76 |
| | *Recommendation 4-4* | 76 |
| 4.5 | Pressure reduction | 77 |
| 4.5.1 | Pipelines with effective coatings | 77 |
| 4.5.2 | Pipelines without effective coatings | 77 |

4.5.3    Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

            *Recommendation 4-5* . . . . . . . . . . . . . . . . . . . . . . . 80

4.6    Hydrostatic retesting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

      4.6.1    Effectiveness at preventing service failures . . . . . 81

      4.6.2    Removal of near-critical cracks . . . . . . . . . . . . . . 82

      4.6.3    Safe retest interval. . . . . . . . . . . . . . . . . . . . . . . . 82

      4.6.4    Long-term integrity . . . . . . . . . . . . . . . . . . . . . . . 85

      4.6.5    Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

            *Recommendations 4-6 and 4-7* . . . . . . . . . . . . . . 88

4.7    Selective pipe replacements . . . . . . . . . . . . . . . . . . . . . . . 89

      4.7.1    Pipe replacement length . . . . . . . . . . . . . . . . . . . 89

      4.7.2    Modelling of hazards and consequences . . . . . . . 90

      4.7.3    Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

            *Recommendation 4-8* . . . . . . . . . . . . . . . . . . . . . . . 92

**5.    Community Issues** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

5.0    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

5.1    Design requirements for pipelines . . . . . . . . . . . . . . . . . . 93

      5.1.1    Pipe wall thickness requirements . . . . . . . . . . . . 93

      5.1.2    Buffer zones. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

      5.1.3    Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

5.2    Emergency preparedness and response . . . . . . . . . . . . . 97

      5.2.1    Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

            *Recommendation 5-1* . . . . . . . . . . . . . . . . . . . . . . . 99

5.3    Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

      5.3.1    Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

            *Recommendation 5-2* . . . . . . . . . . . . . . . . . . . . . . . 100

**6.    Looking Forward** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

6.0    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

6.1    Experience with SCC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

      6.1.1    The extent of SCC in Canada . . . . . . . . . . . . . . . 101

      6.1.2    Failure history in Canada . . . . . . . . . . . . . . . . . . 102

      6.1.3    Costs associated with failures. . . . . . . . . . . . . . . 105

      6.1.4    Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

6.2    SCC management programs:  current practices . . . . . . . 106

6.3    Standardized approach to SCC management . . . . . . . . . 107

      6.3.1    Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

            *Recommendations 6-1, 6-2, 6-3, 6-4, 6-5, 6-6,*

            *6-7, 6-8 and 6-9* . . . . . . . . . . . . . . . . . . . . . . . . . . 112

6.4    SCC database. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

      6.4.1    Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

            *Recommendations 6-10, 6-11 and 6-12.* . . . . . . . . 114

6.5     Research into SCC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  115
        6.5.1  Areas for further SCC research . . . . . . . . . . . . . .  117
        6.5.2  Initiatives to promote coordination among
               researchers  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  117
        6.5.3  Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  117
               *Recommendations 6-13 and 6-14* . . . . . . . . . . . .  119
6.6     Follow-up to the Inquiry . . . . . . . . . . . . . . . . . . . . . . . .  119
        6.6.1  Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  119
               *Recommendation 6-15* . . . . . . . . . . . . . . . . . . . . .  120

## Appendices

I       Terms of Reference . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  121
II      List of Issues  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  123
III     Definition of "Significant" SCC . . . . . . . . . . . . . . . . . . . . .  133
IV      Assessment of Failure Criteria . . . . . . . . . . . . . . . . . . . . .  135
V       Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  141

**Endnotes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  147

## List of Tables

3.1     Characteristics of high pH and near-neutral pH
        SCC in pipelines. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
3.2     Maximum allowable operating stress in various
        class locations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37
4.1     Description of significant terrain conditions for
        polyethylene tape coated pipelines  . . . . . . . . . . . . . . . . .   62
4.2     Description of significant terrain conditions for
        asphalt coated pipelines . . . . . . . . . . . . . . . . . . . . . . . . . .   62
4.3     Examples of in-line inspection tools currently
        under development or being tested . . . . . . . . . . . . . . . . . .   72
6.1     History of SCC failures in Canada. . . . . . . . . . . . . . . . . . .  102
6.2     Current SCC management practices of
        CEPA members companies. . . . . . . . . . . . . . . . . . . . . . . .  107
6.3     Current and future CEPA SCC research  . . . . . . . . . . . . . . .  116

## List of Figures

1.1     Major natural gas pipelines in Canada. . . . . . . . . . . . . . . . .    1
1.2     Major oil and products pipelines in Canada. . . . . . . . . . . . .    2
1.3     Age of transmission pipelines in Canada. . . . . . . . . . . . . . .    2
1.4     Edmonton tank farm . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3
2.1     SCC pipeline failure site: Lowther, Ontario, August 1985 . . .    8
2.2     SCC pipeline failure site: Rapid City, Manitoba, July 1995. . .   10
2.3     Chronology of SCC events in Canada. . . . . . . . . . . . . . . . . .   11

| 2.4 | Location of community surveys . . . . . . . . . . . . . . . . . . . . . . | 12 |
|------|---------------------------------------------------------------------|----|
| 3.1 | Metallographic section high pH SCC . . . . . . . . . . . . . . . . . . | 19 |
| 3.2 | Metallographic section near-neutral pH SCC . . . . . . . . . . . . | 19 |
| 3.3 | Three conditions necessary for SCC. . . . . . . . . . . . . . . . . . . | 20 |
| 3.4 | Distribution of SCC failures with type of coating. . . . . . . . . . | 22 |
| 3.5 | Distribution of SCC failures with year of pipe installation . . | 22 |
| 3.6 | Tape wrapping machine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 |
| 3.7 | Overview of predominant pipe coatings in Canada . . . . . . . | 23 |
| 3.8 | Colony of SCC cracks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |
| 3.9 | Areas of near-neutral pH SCC formation . . . . . . . . . . . . . . . | 25 |
| 3.10 | Polyethylene tape coating in poor condition due to wrinkling . . . . . . . . . . . . . . . . . . . . . . . . . . | 25 |
| 3.11 | SCC cracks along and at the toe of longitudinal seam weld . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 |
| 3.12 | SCC cracks under spiral polyethylene tape overlap. . . . . . . . | 26 |
| 3.13 | Virginia Hills, Alberta 1.1 km pipe replacement section: variation of soil redox potential with distance . . . . . . . . . . . | 28 |
| 3.14 | SCC crack formation at base of corrosion pit . . . . . . . . . . . . | 35 |
| 3.15 | Stresses in pipelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 |
| 3.16 | A 20-day pressure profile for a liquids pipeline . . . . . . . . . . . | 38 |
| 3.17 | Number of "significant" colonies detected per metre of pipe inspected for line 100-2 (TransCanada) . . . . . . . . . . . . . . . . | 42 |
| 3.18 | Maximum crack depths of "significant" SCC detected on line 100-2 (TransCanada) . . . . . . . . . . . . . . . . . | 43 |
| 3.19 | Number of "insignificant" SCC colonies detected per metre of pipe inspected for line 100-2 (TransCanada) . . . . . . . . . . . | 44 |
| 3.20 | Simulated cracking patterns versus maximum pressure . . . | 44 |
| 3.21 | Near-neutral pH SCC growth rates as a function of stress amplitude and maximum stress for an X65 steel in TransCanada's 36 inch pipeline . . . . . . . . . . . . . . . . . . . . . . | 46 |
| 3.22 | Crack growth rate distribution from crack growth studies at various load levels (NRTC) . . . . . . . . . . . | 47 |
| 3.23 | SCC 'life' model for a crack that would grow to failure . . . . | 48 |
| 3.24 | Means analysis of estimated depth (per cent wall) versus pressure range (Mobil) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 49 |
| 3.25 | Coalescence of several cracks . . . . . . . . . . . . . . . . . . . . . . . . | 50 |
| 3.26 | Cracks approaching coalescence . . . . . . . . . . . . . . . . . . . . . . | 50 |
| 4.1 | Effectiveness of predictive models . . . . . . . . . . . . . . . . . . . . | 63 |
| 4.2 | Effectiveness of predictive models developed by 5 CEPA member companies . . . . . . . . . . . . . . . . . . . . . . . . . . | 63 |
| 4.3 | Soil probe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 64 |
| 4.4 | Investigative excavation . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 65 |

4.5     Magnetic particle inspection. . . . . . . . . . . . . . . . . . . . . . . . . .    66
4.6     Grinding out SCC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    67
4.7     Full-encirclement reinforcing sleeve . . . . . . . . . . . . . . . . . .    68
4.8     Pig receiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    69
4.9     British Gas SCC pig being removed from a receiver . . . . . . .    70
4.10    Schematic of a crack detection tool (Pipetronix) . . . . . . . . . .    71
4.11    Photo of a crack detection tool. . . . . . . . . . . . . . . . . . . . . . .    73
4.12    Pressure vs. critical crack size . . . . . . . . . . . . . . . . . . . . . . .    82
4.13    Crack size vs. time. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    83
4.14    Cross section of a stress corrosion crack after hydrostatic
        testing and one year of service. . . . . . . . . . . . . . . . . . . . . . .    86
4.15    Selective pipe replacement . . . . . . . . . . . . . . . . . . . . . . . . . .    89
4.16    Thermal flux as a function of distance for a 914 mm gas
        pipeline operating at 6 200 kPa . . . . . . . . . . . . . . . . . . . . . .    90
4.17    Effects of thermal flux and exposure time on people . . . . . .    91
5.1     Urban and rural pipeline rights-of-way . . . . . . . . . . . . . . . .    94
5.2     Pipeline failure site:
        Williamstown, Ontario, October 1994 . . . . . . . . . . . . . . . . .    98
6.1     Causes of service ruptures experienced by CEPA member
        companies:  1985 - 1995 . . . . . . . . . . . . . . . . . . . . . . . . . . . .    101
6.2     Distribution of SCC failures. . . . . . . . . . . . . . . . . . . . . . . . .    102
6.3     SCC failures:  by type of pipeline . . . . . . . . . . . . . . . . . . . . .    104
6.4     Location of SCC failures on natural gas pipelines . . . . . . . .    104
6.5     Location of SCC failures on liquids pipelines. . . . . . . . . . . .    105
6.6     CEPA member companies:  O&M expenditures on
        pipeline integrity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    106
6.7     CEPA's basic SCC management program . . . . . . . . . . . . . . . .    109
6.8     Summary of research expenditures into SCC . . . . . . . . . . . .    115
IV.1    Predicted vs. actual failure stress levels for
        various failure criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    136
IV.2(a) Log-secant failure criterion. . . . . . . . . . . . . . . . . . . . . . . . . .    137
IV.2(b) CANMET failure criterion . . . . . . . . . . . . . . . . . . . . . . . . . . .    137
IV.2(c) Pipe Axial Flaw Failure Criterion . . . . . . . . . . . . . . . . . . . . .    137
IV.2(d) CorLAS™ failure criterion . . . . . . . . . . . . . . . . . . . . . . . . . . .    137
IV.3    Critical crack size at hydrostatic test pressure and at
        maximum operating pressure. . . . . . . . . . . . . . . . . . . . . . . . .    138



National Energy Board                                    Office national de l'énergie

November 22, 1996

Mr. R. Priddle
Chairman
National Energy Board

Dear Mr. Priddle:

We have completed the public inquiry into stress corrosion cracking on Canadian oil and gas pipelines in accordance with the Board's terms of reference of 6 September 1995.

We are now pleased to make our report to the Board pursuant to section 15 of the *National Energy Board Act*. In accordance with the terms of reference, this report is also being made available to the public.

We trust that the Board will find that we have fulfilled our mandate and we respectfully request that the Board accept the report and act on the recommendations contained in it.

Yours truly,

K.W. Vollman
Presiding Member

A. Côté-Verhaaf
Member

R. Illing
Member

# Summary and Recommendations

Twenty-seven recommendations to promote public safety on Canada's buried oil and gas pipelines are presented in this report. They result from a series of findings of an extensive National Energy Board (Board) public inquiry into the problem of near-neutral pH stress corrosion cracking (SCC). The Inquiry was conducted by three members of the Board. This is our report.

### Why this Inquiry?

The occurrence of SCC on Canadian pipelines is a serious matter. Concern about SCC on the TransCanada PipeLines Limited (TransCanada) system led to the Board conducting an earlier inquiry in 1993. From that Inquiry, the Board concluded that the SCC situation was being managed appropriately by the affected pipeline companies considering the extent of the problem as then seen.

However, there were two more major ruptures and fires on the TransCanada system in February and July 1995, the last one at a location where it was not believed that SCC could occur.

These two pipeline failures, together with further evidence of the more widespread nature of SCC and awareness that research was producing new insights into SCC, led the Board to initiate this Inquiry in August 1995.

The Inquiry has been far-reaching across Canadian pipelines and has extended to other countries to take advantage of experience and expertise there. This Inquiry is the first comprehensive one in the world on SCC and the results, as well as providing valuable scientific and technical data that relate to the Canadian situation, could be of interest and use outside Canada.

### What is SCC?

Stress corrosion cracking on pipelines begins when small cracks develop on the outside surface of the buried pipeline. These cracks are initially not visible to the eye and are most commonly found in "colonies", with all of the cracks positioned in the same direction. Over a period of years, these individual cracks may lengthen and deepen and the cracks within a colony may join together to form longer cracks. Since SCC develops slowly, it can exist on pipelines for many years without causing problems. But if a crack becomes large enough, eventually the pipeline will fail and will either leak or rupture.

**Industry's experience with SCC**

Since 1977, SCC has caused 22 pipeline failures in Canada. These failures include 12 ruptures and 10 leaks on both natural gas and liquids pipeline systems. Most of the SCC-related failures occurred since 1985 on pipelines that were coated with polyethylene tape and installed between 1968 and 1973.

**Our understanding of SCC**

Although there is much research still to be done to fully understand SCC, the evidence indicates that SCC initiates as a result of the complex interaction of three conditions:

- a potent environment at the pipe surface,
- a susceptible pipe material, and
- a tensile stress.

All three conditions must be present for SCC to occur.

A number of soil and groundwater properties play a role in producing a potent environment at the pipe surface. In order for SCC to initiate, there must be a breakdown in the pipe coating and the cathodic protection.

Any commonly used pipeline steel was found to be susceptible to SCC. However, we found the Youngstown-manufactured pipe on a portion of the TransCanada system in southern Ontario to be particularly susceptible to SCC.

The operating pressure of the pipeline is normally the principal contributor to tensile stress. Field data and laboratory data indicate that stress has an effect on initiation and possibly on the growth rate of cracks. Fluctuations in stress levels and the rate of change of these stresses also play a role. However, we found that, in spite of considerable research, the available information on the contribution of stress to SCC is limited and sometimes conflicting.

In fact, research has not determined a threshold stress below which cracks will not initiate and grow to failure.

Finally, we believe that the three conditions necessary for "significant" SCC co-exist only on a small portion of the pipeline systems in Canada. For example, TransCanada has estimated that less than four percent of its system is susceptible to "significant" SCC.

**Can the SCC problem be dealt with?**

The short answer is yes.

It is important to define the problem as primarily existing on pipelines which were constructed in the 1960s and 1970s using polyethylene tape as a protective coating. This coating has tended to separate (disbond) from the pipeline and allow moisture to contact the pipeline. Because polyethylene tape is an insulator, it shields the pipe steel from cathodic protection current, even if it disbonds.

Knowing which pipelines are most susceptible to SCC makes attacking the problem, if not simple, at least definable.  The problem is being systematically addressed on the most affected pipelines, and major programs to find and eliminate it are underway, but more remains to be done.

For newer pipelines, the use of  different coatings (primarily fusion bonded epoxy) continues to demonstrate great effectiveness in preventing the initiation of SCC as long as both the pipe sections and the field welds connecting those sections employ similarly effective coatings.

The SCC problem can be expected to be significantly reduced and even eliminated as polyethylene tape-coated pipe is systematically investigated and SCC is found and removed.  It will, though, take time and money.

**What has been done?**

This Inquiry has found that Canadian pipeline companies are taking SCC very seriously and are collaborating in research efforts and in the exchange of information on the management of the problem.

In total, the 13 members of the Canadian Energy Pipeline Association (CEPA) planned to spend $4.8 million on SCC research and over $30 million on pipeline maintenance related to SCC in 1996. TransCanada alone has spent $202 million on its SCC management program since 1985.  These efforts have resulted in considerable progress in the search for the answers to SCC.  Effective tools have been developed which, when used in a systematic manner, will reduce the possibility of a failure due to SCC.

Pipeline companies are making progress in checking their pipeline systems for SCC.  However, given the extent of the pipeline network in Canada and the different rates at which individual companies are able to check their systems, we cannot say that all the SCC that exists on Canadian pipelines has been found.

**What needs to be done?**

We know that SCC remains a serious concern for the pipeline industry and for us as regulators.  Since SCC is a time-dependent process, without proper attention, it will worsen and be the cause of more pipeline failures.  We believe that a comprehensive approach to the SCC problem includes:

- implementation of an SCC management program by each pipeline company;
- changes to the design of pipelines;
- continued research;
- establishment of an SCC database;
- improved emergency response practices; and
- continued information sharing.

**Appropriate operating pressures**

In looking at the elements of an effective SCC management program, we also considered whether a reduction in operating pressure would be an effective way to deal with SCC on existing pipelines.  As there is no clear evidence of a threshold level of pressure below which SCC will not initiate and grow, a pressure reduction will not prevent failures and will be very costly.  We find that there are other measures which are more systematic, efficient and effective in mitigating SCC and thereby promoting public safety.  Therefore, we believe that a general reduction in pressure would not be a logical or effective response to the SCC problem.

However, as decreasing the pressure in a pipeline means a larger defect will be required before failure, pressure reduction should be considered as a temporary measure for sections of a pipeline system where there is a threat of imminent failure.  Reduced operating pressure can also be used effectively in combination with other mitigative measures, as part of an effective SCC management program.

**SCC management program**

The most effective method of addressing the issue of SCC would be through company-specific SCC management programs which require the systematic application to specific pipelines of the knowledge and best practices already developed across the industry.

The objective of the programs would be to identify areas where SCC may be found, to find it and then deal with it.  Detection can be done through investigative excavations based on predictive models or by hydrostatic retesting.  Emerging technology such as advanced in-line inspection tools will also assist in detecting SCC.

**Design changes**

When a reliable crack detection tool becomes available, it can be used to provide a company with more complete and accurate information on the condition of its pipeline.  The ability of a pipeline to accommodate the passage of in-line inspection devices significantly facilitates the maintenance of the integrity of that pipeline, not only with respect to SCC, but with most integrity issues.  We therefore recommend that new pipelines be designed to allow the passage of in-line inspection tools.

Effective protective coatings play a fundamental role in the prevention of SCC.  Several pipeline coatings have demonstrated effective protection against SCC in the long-term.  However, some newer coatings have not yet demonstrated their long-term performance. We therefore recommend that standard tests be developed and field and laboratory studies be done to verify whether these coatings will continue to perform over the life of the pipeline.

## Research

It is essential to continue research into SCC.  Many of the basic questions on initiation and growth of SCC have not yet been answered. As well, there is a need to continue to develop effective mitigative measures to deal with SCC.  Most notably, the refinement of SCC in-line inspection tools would significantly improve the industry's ability to detect and manage SCC.

## A database on SCC

We are of the view that the careful collection and analysis of field experience is very important in understanding SCC.  An industry-wide database on SCC is essential, primarily because it will help to identify those combinations of environmental and operating conditions that most influence the initiation and growth of SCC.

## Emergency response practices

We believe that people living and working near pipelines should have a better understanding of what to do in the event of a pipeline failure.  Clearly, the primary responsibility for communication on pipeline safety rests with the pipeline companies that operate the systems.  In consultations with communities, NEB representatives heard residents and first responder organizations express a need for more and better information about emergency procedures and – particularly for first responders – for training.  In addition, they heard suggestions for changes to the NEB's own field practices.

## Information sharing

We discovered that, although the Inquiry did not set out to serve as a forum for information-sharing, participants had the opportunity to learn about the work others were doing.  It is important that this information-sharing process continues.

## Recommendations

While the scope of the Inquiry is necessarily limited to those facilities which the National Energy Board regulates, much relevant information was provided by non-jurisdictional companies, (mainly) via CEPA, some of whose members are subject to provincial jurisdiction. We have taken careful account of this information and have displayed elements of it in our report, particularly in tabular form.  We feel that this has enabled us to report comprehensively on the SCC problem as a Canada-wide phenomenon and has of course contributed valuably to the development of our recommendations which, however, relate solely to those companies which are subject to the Board's jurisdiction.

As a result of having considered all of the information presented to us over the course of the Inquiry, we recommend the following:

### SCC management program

While a number of SCC management programs (for example, TransCanada's) are well underway, we **recommend**:

- that the Board require each pipeline company to develop and implement an SCC management program by 30 June 1997 *(Recommendation 6-1, p. 112)*;

- that the Board require SCC management programs to identify the accountability for the implementation of the program *(Recommendation 6-2, p. 112)*;

- that the Board require SCC management programs to provide for the review of the company's entire system and for regular updating *(Recommendation 6-3, p. 112)*;

- that the Board require SCC management programs to consider the consequences and the probabilities of a failure when establishing priorities for investigative, mitigative and preventive activities *(Recommendation 6-4, p. 112)*;

- that the Board require that SCC management programs contain three principal components:

  a) determination of pipeline susceptibility to SCC and active monitoring of pipelines believed to be susceptible to SCC;

  b) required mitigation, if "significant" SCC is found, and clear identification of the criteria a company must consider in deciding among mitigative options; and

  c) recording and sharing of information on susceptible pipelines *(Recommendation 6-5, p. 112)*;

- that the Board require companies to report immediately to the Board any finding of "significant" SCC and any immediate mitigative actions taken and to develop and submit a plan detailing the specific mitigative measures to be implemented and a schedule of implementation *(Recommendation 6-6, p. 112)*;

- that, as part of its ongoing monitoring activities, the Board audit the documentation of SCC management programs *(Recommendation 6-7, p. 113)*;

- that the Board request that CEPA continue

development of its Recommended Practices Manual and file it with the Board by 31 March 1997 *(Recommendation 6-8, p. 113);*

- that the Board request that CEPA develop procedures for the detection and mitigation of circumferential SCC and include them in future versions of the Recommended Practices Manual *(Recommendation 6-9, p. 113);*

- that, if there is reason to believe that sections of a pipeline may be susceptible to SCC, the Board require the pipeline company to develop a predictive model to identify and prioritize sites for an investigative excavation program *(Recommendation 4-2, p. 64);*

- that the Board request that CEPA develop sampling criteria for verifying the accuracy of predictive models *(Recommendation 4-3, p. 65);*

- that the Board require that, where a hydrostatic retest program forms part of an SCC management program, it be properly designed for the particular pipeline under consideration.   The design should take into account factors such as the material and geometric properties of the pipe, the operating history of the pipeline, its future operating conditions, and field and laboratory data on crack sizes and crack growth.  Where reliable data are not available, conservative assumptions should be made *(Recommendation 4-6, p. 88);*

- that the Board request that the CSA Technical Committee on Oil and Gas Industry Pipeline Systems:

a)  incorporate, in the next edition of CSA Z662 Oil and Gas Pipeline Systems standard, requirements for hydrostatic retesting as an option for maintaining pipeline integrity; and

b)  amend the current pressure testing requirements of the standard in light of the findings from the recent studies on hydrostatic testing *(Recommendation 4-7, p. 88);*

- that the Board request that CEPA:

a)  continue the development and verification of models that predict the hazards and consequences associated with pipeline failures for different service fluids; and

b)  develop criteria for determining safe distances from the effects of pipeline failures *(Recommendation 4-8, p. 92);*

---

*STRESS CORROSION CRACKING*                                                      *xv*

- that the Board require that pressure reduction be included as part of all SCC management programs and considered for use:

  a) in combination with investigative excavations and other mitigative measures such as hydrostatic retesting and in-line inspection; and

  b) as a temporary measure where there is a threat of imminent failure, in which case it should be maintained until the integrity of the pipeline is re-established *(Recommendation 4-5, p. 80)*; and

- that the Board require pipeline companies to examine ERW pipe manufactured by Youngstown Sheet and Tube located in SCC susceptible soils for evidence of SCC *(Recommendation 3-1, p. 54)*.

### Design changes

We **recommend**:

- that the Board require that new large diameter transmission pipelines be designed and constructed to accommodate the passage of in-line inspection tools *(Recommendation 4-4, p. 76);* and

- that the Board request that the CSA Technical Committee on Oil and Gas Industry Pipeline Systems, the pipeline industry and coating manufacturers coordinate efforts to:

  a) develop standard tests, where none currently exist, that determine whether a coating will meet the performance criteria set out in the CSA Z662-94 standard over the anticipated service life of a pipeline;

  b) incorporate those tests in the appropriate CSA standards; and

  c) conduct objective studies based on those tests to demonstrate the long-term performance of the different types of coatings currently available for pipelines *(Recommendation 4-1, p. 60)*.

### Research

We **recommend**:

- that the Board request that CEPA continue its SCC research program and expand the program to include SCC experts from other industries and a wider range of disciplines *(Recommendation 6-13, p. 119);*

- that the Board request an annual status report from CEPA on SCC research activities highlighting

accomplishments for the year and plans for future research, indicating priorities, time lines and funding levels. *(Recommendation 6-14, p. 119);* and

- that the Board request that CEPA provide, by 30 June 1997, an analysis of the extent to which the areas of incomplete research identified in this report are addressed in the current SCC research program and the merits and implications of expanding this program to cover these areas *(Recommendation 3-2, p. 54).*

### SCC database

We **recommend**:

- that the Board request that CEPA continue to develop and maintain a database on SCC that is compatible with other international initiatives and that CEPA encourage the participation of non-member pipeline companies *(Recommendation 6-10, p. 114);*
- that the Board require pipeline companies to provide SCC-related data to the CEPA SCC database as they acquire it *(Recommendation 6-11, p. 115);* and
- that the Board request that CEPA provide the results of the first data trend analyses to the Board as proposed including any additional trends analyses requested by the Board.  As well, we recommend that other interested parties (for example, researchers and the public) be given the opportunity to identify the particular trends analyses that they require *(Recommendation 6-12, p. 115).*

### Emergency response practices

We **recommend**:

- that, as part of its ongoing monitoring activities, the Board review companies' emergency response practices to ensure that adequate training is provided to first responder organizations and that appropriate information is provided to the communities on the proper procedures to follow in the event of pipeline emergencies *(Recommendation 5-1, p. 99);* and
- that the Board expand the scope of its accident investigation program to include community relations and emergency response related issues *(Recommendation 5-2, p. 100).*

**Information sharing**

We **recommend**:

- that the Board request that CEPA and other industry organizations create opportunities, through conferences and workshops, for the continued sharing of information among industry, researchers, regulatory agencies and the public about SCC field experience and research developments *(Recommendation 6-15, p. 120).*

# Abbreviations

| | |
|---|---|
| Act | National Energy Board Act |
| AB | Alberta |
| AEC | Alberta Energy Company Ltd. |
| AEUB | Alberta Energy and Utilities Board |
| AGA | American Gas Association |
| ANG | Alberta Natural Gas Company Ltd |
| $a_o$ | critical crack size at maximum operating pressure |
| AS | Australian Standard |
| ASME | American Society of Mechanical Engineers |
| $a_T$ | critical crack size at test pressure |
| Board | National Energy Board |
| BC | British Columbia |
| $^{\circ}C$ | degree Celsius |
| CANMET | Canadian Centre for Mineral and Energy Technology |
| CAPP | Canadian Association of Petroleum Producers |
| CEPA | Canadian Energy Pipeline Association |
| CGA | Canadian Gas Association |
| CGHAZ | coarse-grained heat-affected zone |
| $CO_2$ | carbon dioxide |
| Cochin | Cochin Pipe Lines Ltd. |
| CP | cathodic protection |
| CSA | Canadian Standards Association |
| CSA Z662 | CSA standard Z662-94, Oil and Gas Pipeline Systems |
| D | diameter |
| DSAW | double submerged arc weld |
| EAC | environmentally assisted cracking |
| ERW | electric resistance weld |
| EWIV | Elastic Wave Inspection Vehicle |
| FBE | fusion bonded epoxy |
| FPL | Foothills Pipe Lines Ltd. |
| GRI | Gas Research Institute |
| HAZ | heat affected zone |

| | |
|---|---|
| HIC | hydrogen induced cracking |
| HVP | high vapour pressure |
| INGAA | Interstate Natural Gas Association of America |
| ILI | in-line inspection |
| IPL | Interprovincial Pipe Line Inc. |
| km | kilometre |
| kPa | kilopascal |
| ksi | thousand pounds per square inch |
| kW/m² | kilowatt per square metre |
| LVP | low vapour pressure |
| m | metre |
| MB | Manitoba |
| MFL | magnetic flux leakage |
| MIACC | Major Industrial Accidents Council of Canada |
| mm | millimetre |
| mm/s | millimetres per second |
| mm/yr | millimetres per year |
| MMcfd | million cubic feet per day |
| MOP | maximum operating pressure |
| MPa | megapascal |
| MPa√m | megapascal square root metre |
| MPI | magnetic particle inspection |
| mV Cu/CuSO4 | millivolts potential to reference copper/copper sulfate half cell |
| NDE | nondestructive examination |
| NDT | nondestructive testing |
| NEB | National Energy Board |
| NOVA | NOVA Gas Transmission Ltd. |
| NPS | nominal pipe size (in inches) |
| NRTC | Novacor Research & Technology Corp. |
| NUL | Northwestern Utilities Limited |
| O & M | operation and maintenance |
| ON | Ontario |
| OPLA | Ontario Pipeline Landowners Association |
| P | pressure |
| PAFFC | Pipe Axial Flaw Failure Criterion |
| PE | polyethylene |
| pH | measure of the acidity or alkalinity of a substance |

| | |
|---|---|
| PRASC | Pipeline Risk Assessment Steering Committee |
| PRC*I* | Pipeline Research Council *I*nternational (previously PRC) |
| psi | pounds per square inch |
| PTC | Petroleum Transmission Company |
| $P_T$ | test pressure |
| SCC | stress corrosion cracking |
| SK | Saskatchewan |
| SMYS | specified minimum yield strength |
| SRB | sulfate reducing bacteria |
| t | wall thickness or time |
| TCPL or TransCanada | TransCanada PipeLines Limited |
| TGL | TransGas Limited |
| TMPL or Trans Mountain | Trans Mountain Pipe Line Company Ltd. |
| TNPI | Trans-Northern Pipeline Inc. |
| TSB | Transportation Safety Board of Canada |
| TQM | Trans Québec and Maritimes Pipeline |
| TÜV | TÜV Rheinland |
| U.K. | United Kingdom |
| U.S. or United States | United States of America |
| WEI or Westcoast | Westcoast Energy Inc. |
| Youngstown | Youngstown Sheet and Tube |
| Δ | delta (change in value) |
| μm | micrometre (1 million μm = 1 metre) |
| s | hoop stress |

# Chapter One

## Pipelines in Canada

### 1.0  Introduction

The purpose of this Chapter is to provide general background information on oil and gas pipelines in Canada and to describe those national organizations which have a role in promoting pipeline safety. In subsequent chapters, we describe the considerations which led to this Inquiry, what we learned about stress corrosion cracking (SCC) and our conclusions about what needs to be done to address the SCC problem.

There are more than 540 000 kilometres (340,000 miles) of buried oil and gas pipelines throughout the country.  They vary in size from 25 mm (1 inch) diameter plastic gas distribution lines to 1 219 mm (48 inch) diameter oil and gas transmission pipelines.  These pipelines carry hydrocarbons in either gas or liquid form including natural gas, crude oil, high vapour pressure products such as propane and refined products such as gasoline or jet fuel.

**Figure 1.1**
**Major natural gas pipelines in Canada**



**Figure 1.2**
**Major oil and products pipelines in Canada**



**Figure 1.3**
**Age of transmission pipelines in Canada**



Source: Endnote [1]

Pipelines are an efficient way to transport these products. Natural gas is moved through a continuous network of connected pipelines from gas fields located mainly in Western Canada to markets throughout Canada and the U.S. In its journey across the country, natural gas is compressed to as high as 8 700 kPa (1,260 psi) and moved in high-pressure steel transmission pipelines. When the gas reaches the community where it is to be used, it is distributed directly to customers through low-pressure pipelines. Crude oil is also produced mainly in Western Canada and shipped by pipeline to refineries across the continent (Figure 1.4).

Energy production and transportation are very important to the Canadian economy. Nearly two-thirds of Canada's energy supply moves through pipelines and virtually all oil and gas exports – worth $15 billion in 1995 – are carried by pipeline.

The routes for most of Canada's high-pressure pipelines were determined in the 1950s when the major pipeline systems were established. Most of this original pipe remains in service today. However, the pipeline companies have steadily increased the capacity of their systems by adding compressor stations, pumping stations and newer lines, many of which run parallel to the original pipelines.

## 1.1  Pipeline safety in Canada

Pipeline safety is an important issue because the products transported through pipelines are hazardous substances.  There is always the chance that a pipeline could leak or rupture and a pipeline failure can have serious consequences for people living or working close by and for the environment.  When a high-pressure natural gas pipeline breaks, an enormous amount of energy is released as the compressed gas expands.  The escaping gas can ignite and cause extensive damage.  When a pipeline carrying liquid hydrocarbons fails, the leaking contents can cause extensive environmental damage.  Some of these liquids, like gasoline or jet fuel, can ignite and burn.  The failure of a pipeline carrying propane or other high vapour pressure (HVP) products can produce a vapour cloud that can explode.

Despite the potential for serious accidents, the safety record of Canada's high-pressure pipelines has been good over their 40-year plus history.  There are typically 30 to 40 failures each year on pipelines regulated by the NEB, most of them leaks, rather than ruptures.  Since 1959, when the NEB was established, there has been only one death to a member of the general public resulting from the failure of a pipeline under NEB jurisdiction.  That death occurred in 1985 when a drainage tile plow ruptured a gas pipeline.

A number of safety issues arise from pipeline construction and operation.  These include everything from how pipelines are installed and operated, to the safety practices of people who work around pipelines, to issues like the one that concerns us here: stress corrosion cracking.  The safety of pipelines is the result of continuous attention paid to these issues by several organizations.  The pipeline industry has primary responsibility for pipeline safety and has in many ways taken

**Figure 1.4**
**Edmonton tank farm**



Edmonton is the commencement of two of Canada's major oil pipelines:  IPL going east and TMPL going west.

**THE NEB'S SAFETY ROLE**…

Section 48 of the NEB Act states, in part:

*48(1) To promote safety of operation of a pipeline, the Board may order the company to repair, reconstruct or alter part of the pipeline and may direct that, until the work is done, that part of the pipeline not be used or be used in accordance with such terms and conditions as the Board may specify.*

*(2) The Board may, with the approval of the Governor in Council, make regulations governing the design, construction, operation and abandonment of a pipeline and providing for the protection of property and the environment and the safety of the public and of the company's employees in the construction, operation and abandonment of a pipeline.*

the lead in dealing with safety issues. In addition, three national organizations play different but complementary roles in pipeline safety.

## 1.2 The safety role of the National Energy Board

The NEB regulates any pipeline in Canada that crosses either provincial or international borders. The Board regulates about 40 000 kilometres (25,000 miles) of pipelines. The remaining pipelines are regulated by the province or territory within which the pipeline operates.

Generally, the pipelines regulated by the NEB are the large-diameter high-pressure transmission pipelines. For example, the NEB regulates two of the country's largest natural gas transmission pipeline systems: TransCanada PipeLines Limited (TransCanada) and Westcoast Energy Inc. (Westcoast). It also regulates the two largest liquids pipeline systems: Interprovincial Pipe Line Inc. (IPL) and Trans Mountain Pipe Line Company Ltd. (TMPL). In addition, it regulates over 60 smaller pipeline systems.

The NEB regulates many aspects of pipelines. It approves new pipeline construction, approves tolls paid to transport the oil or natural gas through the pipeline, ensures that all shippers have fair access and establishes the rules or regulations for the design, construction, operation and abandonment of pipelines.

The Board has set minimum technical requirements through the Onshore Pipeline Regulations. Occasionally, the NEB has used its authority to order pipeline companies to temporarily reduce operating pressure or to take other steps to ensure safe operation.

The NEB also has the authority to investigate or inquire into any accident involving a pipeline that it regulates. If, as a result of an investigation, the Board determines that there are safety concerns, it may order pipeline companies to take remedial action or it may make recommendations about how similar accidents might be prevented in the future. In some cases, the NEB may also make findings as to the cause of the accident and the factors that may have contributed to it.

## 1.3 The investigative role of the Transportation Safety Board of Canada

The Transportation Safety Board of Canada (TSB) has a mandate to advance safety for transportation modes under federal jurisdiction, including pipelines. It does this by, among other things, conducting independent investigations and, if necessary, public inquiries into transportation accidents in order to make findings as to their cause and contributing factors. When the TSB investigates a pipeline accident, the NEB is not permitted to investigate any matter related to the accident that is being investigated by the TSB.

## 1.4   The role of the Canadian Standards Association

The Canadian Standards Association (CSA) is a non-profit, independent, private-sector organization.  It serves the public, governments and business as a forum for national consensus in the development of standards for many activities and products.  Many CSA standards have been incorporated into provincial and federal laws.  For example, the NEB's Onshore Pipeline Regulations require pipeline companies to comply with CSA standard Z662-94 Oil and Gas Pipeline Systems (CSA Z662).  This standard was developed by committees representing the pipeline industry, product manufacturers and regulatory authorities, including the NEB and provincial regulators.

CSA Z662 describes in detail the technical requirements for pipeline systems, including how they must be designed, what materials may be used, how they may be installed and joined, how pressure tests are to be done, what methods are acceptable to control corrosion, and how the pipeline system is to be operated and maintained.

Many companies treat the CSA standards as minimum require-ments and develop their own corporate standards that go beyond these requirements.

# Chapter Two

## An Inquiry into Stress Corrosion Cracking

### 2.0   Introduction

The previous chapter described the basic structure of the pipeline industry and the roles of the different organizations involved in pipeline safety.  This chapter describes how stress corrosion cracking became an issue for the Board and a subject for an inquiry.

Stress corrosion cracking on pipelines begins when small cracks develop on the outside surface of the buried pipe. These cracks are initially not visible to the eye and are most commonly found in "colonies", with all of the cracks positioned in the same direction.  Over a period of years, these individual cracks may lengthen and deepen and the cracks within a colony may join together to form longer cracks.  Since SCC develops slowly, it can exist on pipelines for many years without causing problems.  If a crack becomes large enough, the pipeline will eventually fail and either leak or rupture.

Stress corrosion cracking is not a problem unique to Canadian pipelines.  SCC has been recognized as a cause of pipeline failures in countries around the world.  Pipelines in Australia, Iran, Iraq, Italy, Pakistan, Saudi Arabia, the former Soviet Union and the United States have also been affected by SCC.

SCC is not the only problem that causes pipeline failures and threatens public safety.  Pipelines have suffered the effects of general corrosion and have been damaged or ruptured when people have hit them accidentally while digging.  Earth movements such as slides have also damaged buried pipelines.  However, the pipeline industry has been dealing with these causes for a long time and has a good understanding of how to manage them.  By contrast, the industry and the research community are still learning about SCC, particularly about the type of SCC which occurs on Canadian pipelines.

Our awareness of SCC on the Canadian pipelines we regulate began in 1985.  TransCanada had three failures on the Northern Ontario portion of its pipeline between March 1985 and March 1986 (e.g., Figure 2.1).  These failures were attributed to stress corrosion cracking and were considered at the time to be the first evidence of SCC in Canada although subsequently it was determined that SCC had been detected on other pipelines in the 1970s.  The type of SCC which caused these failures was different from the "high pH" SCC that had been found on other pipelines in the world.  At the time, this new form was called "low pH" SCC.  More recently, and more correctly, this form of SCC has

**Figure 2.1**
**SCC pipeline failure site:  Lowther, Ontario, August 1985**



been referred to as "near-neutral pH" SCC.   (The differences between high pH and near-neutral pH SCC are explained in Chapter 3.)

In response to these early failures, TransCanada initiated a program in 1985 entitled the "Pipeline Maintenance Program".  The purpose of the program was to investigate the SCC problem on the TransCanada system and find a solution to it.  The program included several detection methods which are now used by several companies and which are discussed in Chapter 4.  The TransCanada program also focused considerable research efforts on near-neutral pH SCC initiation and growth.

## 2.1   The NEB's 1993 Inquiry

TransCanada experienced its fourth and fifth SCC-related pipeline ruptures in December 1991 near Cardinal, Ontario, and in July 1992 near Tunis, Ontario.  Following its investigation of these failures, the TSB issued three interim recommendations in November 1992 to the NEB through the Minister of Energy, Mines and Resources [1].

In response to these recommendations, the NEB decided in December 1992 that holding an inquiry would be the best way to develop a response to the TSB as well as examining TransCanada's Pipeline Maintenance Program.  The Inquiry was initiated under Board Order MHW-1-92 [2] and took place in early 1993, through a written process.  A total of 47 parties participated in the Inquiry, commenting on the TSB recommendations and responding to a list of questions about SCC.  As well, the NEB asked all pipeline companies that it regulated to report any SCC found on their systems.

---

**TSB 1992 RECOMMENDATIONS:**

*The National Energy Board ensure that the internal pressure in all federally regulated natural gas pipelines, where stress corrosion cracks have been found or are likely to exist, is below the threshold level for the origin or propagation of stress corrosion cracking; (P92-01)*

*The National Energy Board, in collaboration with industry, develop improved methods for detecting and specific directions for repairing stress corrosion cracks; and (P92-02)*

*The National Energy Board, in collaboration with provincial authorities and in consultation with industry, develop a set of operating restrictions to be applied industry-wide where stress corrosion cracking is suspected to exist in natural gas pipelines.  (P92-03)*

Source:  Endnote [1]

---

*REPORT OF THE INQUIRY*

In August 1993, the NEB issued its report on the MHW-1-92 Inquiry.  In the report, the NEB responded to the TSB recommendations. The NEB concluded that [3]:

> *…restrictions on operating conditions are not a practical solution to problems caused by the* [near-neutral pH] *form of SCC found to date in Canadian pipelines.  The evidence confirms that it is not currently possible to determine the threshold level for either initiation or propagation of* [near-neutral pH] *SCC.  Imposition of arbitrary operating restrictions would not result in any quantifiable improvement in safety and would have substantial negative effects on producers and consumers of natural gas.*

The NEB concluded that *"…SCC is not a widespread problem in Canada, and that where SCC exists on federally-regulated pipelines, the problem is being managed in a responsible fashion."* [4]  The NEB went on to say, however, that *"…due to the site-specific nature of the problem and the difficulties in detecting the many small cracks typical of SCC, it is possible that SCC exists and remains undetected on some of these pipeline systems."* [5]  Consequently, the NEB encouraged all companies under its jurisdiction *"…to carefully review the TransCanada experience with respect to SCC, and to examine their own systems for SCC when opportunities occur while carrying out other inspection, repair or maintenance activities."* [6]

The Board also found that TransCanada had expended *"…an appropriate level of effort and resources in the continuing development and implementation of its Pipeline Maintenance Program to address the safety risk posed by SCC."* [7]  The NEB supported TransCanada's proposal to perform hydrostatic retests more frequently and to replace any pipeline sections which were susceptible to SCC and which were near homes and populated areas.  The Board also said it would *"…continue to follow future developments with respect to SCC research and detection and repair techniques and will be prepared to institute such measures as necessary to ensure public safety."* [8]

## 2.2   Events following 1993 Inquiry

Following the MHW-1-92 Inquiry, the NEB asked all pipeline companies it regulated to report on whether they had found any SCC in the investigations they had since carried out.  Several companies said they had examined portions of their systems using techniques similar to those used by TransCanada.  They reported that they found some SCC but that it was not severe.

Meanwhile, research into SCC was progressing.  More was being learned about near-neutral pH SCC than had been known at the time of the MHW-1-92 Inquiry and more was being learned from the field, where stress corrosion cracking was being detected on a growing number of pipelines.

Then, TransCanada experienced its sixth and seventh ruptures due to SCC within six months of each other.  In February 1995, not far from Vermilion Bay in Northern Ontario, SCC caused a pipeline failure and the escaping gas ignited.  This section of pipe had been identified as being susceptible to SCC and had been hydrostatically retested as part of the company's ongoing Pipeline Maintenance Program several years earlier.  In fact, the pipeline was scheduled for a retest when it failed.  Following the failure, TransCanada tested other similar sections which had not been recently retested.

In July 1995, SCC caused a rupture on TransCanada's pipeline near Rapid City, Manitoba, resulting in a major explosion (Figure 2.2).  Until that time, TransCanada had conducted a number of investigative digs in Western Canada and had not found any evidence of significant SCC on its system west of Winnipeg.  As a result, TransCanada had focused its Pipeline Maintenance Program on its system east of Winnipeg.  The Rapid City failure occurred downstream from a compressor station on a short section of pipe that was hand-wrapped with protective tape.  (The remainder of the section was protected with a different type of coating considered effective against SCC.)  However, in light of the amount of information that had been accumulating about SCC since the previous Inquiry, the Rapid City incident served to heighten concerns about what now seemed to be a widespread presence of SCC.

## 2.3   The NEB's 1995 Inquiry

In August 1995, the Board responded to these heightened concerns by initiating a wide-ranging public inquiry into SCC.  (The Terms of Reference of the Inquiry can be found in Appendix I.)

**Figure 2.2**
**SCC pipeline failure site:  Rapid City, Manitoba, July 1995**



**Figure 2.3**
**Chronology of SCC events in Canada**



Three Board members, Kenneth W. Vollman, Anita Côté-Verhaaf and Roy Illing, were authorized to form a panel, carry out the Inquiry and report their findings to the Board.

On September 20, 1995, the Inquiry Panel invited public participation in the Inquiry and issued "Directions on Procedure" and a preliminary list of issues to be addressed by the Inquiry.

One of the first tasks was to seek as much information about SCC as was available in order to gain a full understanding of the complexities of SCC. We wanted to use this Inquiry to create as complete a record as we could: one that would be balanced and that would include a broad range of experiences, research and views. We wanted to hear from people living near pipelines, research scientists and other experts, pipeline companies, industry associations and other regulatory agencies. The Preliminary List of Issues was used to guide discussions with these groups in a series of consultations and technical information meetings held between September 1995 and February 1996.

### 2.3.1 Consultations with the public

Clearly those people who live closest to pipelines face the most immediate effects of a pipeline failure. We were very sensitive to the effects of SCC failures on those people and specifically sought to obtain their views. As one of the first steps, NEB representatives and consultants met with residents and municipal officials in Rapid City, Manitoba, and Vermilion Bay, Williamstown and Cardinal, Ontario (Figure 2.4). These were locations where pipeline failures had occurred. NEB staff also met with representatives of the Ontario Pipeline Landowners Association (OPLA), a group of landowners based in southern Ontario, which had expressed an interest in the Inquiry. These meetings were recorded and summarized in reports. The concerns of landowners, nearby residents, local emergency response officials and local public officials were incorporated into the revised List of Issues, where our mandate permitted. We also committed to provide feedback to these communities following the Inquiry, as the communities had requested.

### 2.3.2 Technical information meetings

In late 1995 and early 1996, we held technical meetings to gather firsthand information about SCC and the issues surrounding it. We met with the following:

**Figure 2.4**
**Location of community surveys**



*Pipeline operators and industry associations:*

- TransCanada, NOVA Gas Transmission Ltd. (NGTL) and Mobil Oil Canada Ltd., the operator of Rainbow Pipe Lines Co. Ltd. (Rainbow), discussed their SCC experiences.

- The Canadian Energy Pipeline Association (CEPA) provided information on the experience of their member companies.

- The Interstate Natural Gas Association of America (INGAA) discussed the experience of their member pipeline companies.

*Consulting and manufacturing firms:*

- Camrose Pipe Company, a pipe manufacturer and Shaw Pipe Protection, a division of Shaw Industries Ltd., a pipeline coating manufacturer.

- British Gas plc (British Gas) and Pipetronix Ltd. (Pipetronix), leading developers of internal inspection tools for detecting cracks on pipelines.

- J.E. Marr Associates (Canada) Ltd., a company specializing in developing models to predict where SCC might occur and in carrying out field investigations for SCC.

*Government agencies:*

- The TSB and the Alberta Energy and Utilities Board (AEUB), the latter being responsible for regulating oil and gas pipelines under the jurisdiction of the province of Alberta.

*Researchers:*

- Battelle Memorial Institute (Battelle), Cortest Columbus Technologies, Inc. (Cortest), The Canadian Centre for Mineral and Energy Technology (CANMET) and Novacor Research Technology Corporation (NRTC).

- Pre-eminent SCC expert Dr. R.N. Parkins (Parkins), University of Newcastle-Upon-Tyne, England.

### 2.3.3 Public hearing

The next phase of the Inquiry was the public hearing.  On December 6, 1995, we issued "Supplementary Directions on Procedure" and a revised List of Issues for the public hearing.

This revised List of Issues comprised six general topics:

- the extent and severity of SCC on oil and gas pipelines in Canada;

- the status of research into SCC on buried pipelines;

---

- the detection of SCC on buried pipelines;

- the mitigative measures for SCC on buried pipelines;

- prevention of initiation of SCC on buried pipelines; and

- the safety of the public and of company employees and the protection of the environment and property.

The complete List of Issues is included in Appendix II.

The public hearing portion of the Inquiry was held from April 15th to 23rd, 1996 in Calgary, Alberta, to examine witnesses and hear evidence of parties. All participants were invited to prepare written submissions based on the List of Issues. Parties submitted final argument in writing.

The following groups were active in the public hearing: British Gas, the Canadian Association of Petroleum Producers (CAPP), the Canadian Gas Association (CGA), CEPA, TransCanada and OPLA. A number of individual pipeline companies participated through the industry associations. As well, other participants including landowners, various individuals and organizations submitted letters of comment.

CEPA, which is made up of thirteen of the larger pipeline operators in Canada, played a major role in the Inquiry on behalf of its members. CEPA presented a large amount of technical data and called upon key witnesses, some from outside Canada, to respond to questions in the Inquiry. CEPA indicated its intention to play a key role in the follow-up to the Inquiry. Consequently, we have directed a number of our recommendations to CEPA.

The following chapters describe what we learned about SCC and how we used that knowledge to develop our recommendations.

# Chapter Three

## Understanding Stress Corrosion Cracking

### 3.0   Introduction

In this chapter, we discuss what we have learned about how SCC initiates and grows.  We set out our understanding of environmentally assisted cracking and the differences between near-neutral pH SCC which is found in Canada and high pH SCC.  We also explain what is known about the three conditions which are necessary for SCC to initiate and grow.

### 3.1   Environmentally assisted cracking

SCC is a form of "environmentally assisted cracking" or EAC.  This is the generic term that describes all types of cracking in pipelines where the surrounding environment, the pipe material and stress act together to reduce the strength or load-carrying capacity of a pipe.

In a sense, the different types of EAC are the result of a chemistry problem and a physics problem working together.  The specific circumstances under which each type will occur are unique.  When steel comes into contact with water, the minerals and gases in the water at the pipe surface create cells that attack the steel.  This chemical or electrochemical reaction is corrosion and, in other situations, would typically create general pipe wall thinning or pits in the steel.  But stress is part of the EAC equation and, in some types of EAC, stress and corrosion work together to weaken the pipe.

Other types of EAC have also been found in other industries.  Boilers have developed caustic cracking, nuclear reactor carbon steel coolant piping systems have developed stress corrosion cracking and stainless steel piping in ammonia units in chemical plants have cracked, as have down-hole pipes in sour oil wells.

### 3.2   Near-neutral pH and high pH SCC in pipelines

We know of two types of SCC that cause failures on pipelines. They are referred to as near-neutral pH and high pH SCC and the names refer to the degree to which the environment in contact with the pipe surface is acidic or alkaline.

The SCC on Canadian pipelines has all been of the near-neutral pH type, so our focus is on how that form of SCC develops.  However, the conditions that produce near-neutral pH SCC are better understood if they can be compared with the conditions which produce high pH SCC.  The following description of how high pH SCC starts and then

---

**Close relations: other types of environmentally assisted cracking (EAC)**

Some other examples of different types of EAC include corrosion fatigue, hydrogen-induced cracking (HIC) and hydrogen embrittlement.  The following are examples of the effects of environment and loading which produce these types of cracking.

- A pipe in seawater with slowly applied cycles of loading will not crack due to stress corrosion cracking but it will develop corrosion fatigue cracks if enough cycles of loading are applied.

- A pipe in a carbonic acid environment (near-neutral pH), in the absence of an applied cathodic potential, will crack due to stress corrosion cracking when subjected to slowly applied cycles of loading, e.g., less than one cycle per day.  If the loading frequency is increased to hundreds of load cycles per day, corrosion fatigue cracks can develop.  If the loading frequency is increased further,  fatigue cracks can develop since the time in contact with the environment is too short for the environment to have an effect. (The difference is in the amount of time the environment is in contact with the steel during the tensile loading portion of the cycle.)

---

**pH facts**…

    Soil and water can be acidic, neutral or alkaline, and the degree of acidity or alkalinity is measured on a pH scale that ranges from 0 (most acidic) to 14 (most alkaline).  Tap water is typically pH 7, which is neutral.

grows will provide a context for the discussion of near-neutral pH SCC which follows.

### 3.2.1 High pH SCC

    Although pipelines are coated for protection against corrosion when they are put into the ground, there is always the risk that the steel pipe could become exposed to the surrounding environment.  The pipe would then be vulnerable to corrosion.  Since corrosion is an electrochemical reaction, an electric current is passed through the soil to the pipe to effectively prevent corrosion.  This process of applying a voltage to the pipe through the soil gives the pipeline a cathodic potential and is referred to as cathodic protection.

    High pH SCC occurs only in a relatively narrow cathodic potential range in the presence of a carbonate/ bicarbonate environment and at a pH greater than 9.  In the cathodic potential range and environment required for high pH SCC, a protective film forms on the steel surface [1].  This film is a thin oxide layer that forms from the electrochemical reaction that takes place.

    If the protective film on the pipe surface is not broken, SCC cannot start because the film acts as a barrier between the pipe surface and the environment.  But if the steel is subjected to a strain that stretches the metal until it is permanently deformed, the film, being brittle, will crack and bare metal will be exposed to the environment.

**Table 3.1**
**Characteristics of high pH and near-neutral pH SCC in pipelines**

| Factor | Near-neutral pH SCC (Non-classical) | High pH SCC (Classical) |
|---|---|---|
| Location | • 65  per cent occurred between the compressor station and the 1st downstream block valve (distances between valves are typically 16 to 30 km)<br>• 12  per cent occurred between the 1st and 2nd valves<br>• 5  per cent  occurred between the 2nd and 3rd valves<br>• 18  per cent occurred downstream of the third valve<br>• SCC associated with specific terrain conditions, alternate wet-dry soils, and soils that tend to disbond or damage coatings | • Typically within 20 km downstream of compressor station<br>• Number of failures falls markedly with increased distance from compressor and lower pipe temperature<br>• SCC associated with specific terrain conditions, alternate wet-dry soils, and soils that tend to disbond or damage coatings |
| Temperature | • No apparent correlation with temperature of pipe<br>• Appear to occur in the colder climates where $CO_2$ concentration in groundwater is higher | • Growth rate decreases exponentially with temperature decrease |
| Associated Electrolyte | • Dilute bicarbonate solution with a neutral pH in the range of 5.5 to 7.5 | • Concentrated carbonate-bicarbonate solution with an alkaline pH greater than 9.3 |
| Electrochemical Potential | • At free corrosion potential:  -760 to -790 mV ($Cu/CuSO_4$)<br>• Cathodic protection does not reach pipe surface at SCC sites | • -600 to -750 mV ($Cu/CuSO_4$)<br>• Cathodic protection is effective to achieve these potentials |
| Crack Path and Morphology | • Primarily transgranular (across the steel grains)<br>• Wide cracks with evidence of substantial corrosion of crack side wall | • Primarily intergranular (between the steel grains)<br>• Narrow, tight cracks with no evidence of secondary corrosion of the crack wall |

Source:   Adapted from endnote [2]

This process of rupturing the film to expose the metal is what creates the opportunity for SCC to initiate.

The deforming type of strain described is called a "plastic" strain. Once the plastic strain decreases to an "elastic" level, a strain that does not permanently deform the pipe, the protective film forms over the newly exposed steel, re-establishing the protective barrier.  Then crack growth stops.  For a crack to start growing again, the film must be cracked by plastic strain deformation at the crack tip.  This cyclical process shows that cracks can start and stop growing depending on the level of stress or strain on the steel.  Since it takes time for the film to form, the cracks can grow only if the rate of plastic deformation occurs more quickly than the rate at which the film forms.  Consequently,  the strain rate, which is related to the rate at which the pressure in the pipe changes, is a condition that determines crack growth in high pH SCC.  It is important to note that the level of stress or strain at a particular location on a pipe may differ from the level of stress or strain on the pipeline as a whole.

### 3.2.2 Near-neutral pH SCC

Research into high pH SCC has been in progress for more than 30 years; however, there are only about ten years of research into near-neutral pH SCC.  Because of the differences between the two types of cracking, the research is generally not transferable.  Consequently, additional knowledge must be developed about near-neutral pH SCC. The characteristics of near-neutral pH and high pH SCC are compared in Table 3.1.

Several researchers have established leadership in SCC research and some of these scientists made presentations to the Inquiry.  Parkins cautioned that the way in which near-neutral pH SCC initiates and then develops is not yet completely understood, and so what we report here should be taken in that light [3].  In his submission, Parkins discussed how dissolution and hydrogen are believed to be factors in the growth of near-neutral pH SCC [4]:

> *We are far from having a reliable, quantifiable theory or model for near-neutral pH SCC.  I have suggested that the mechanism of crack growth involves dissolution and the ingress of hydrogen into the steel, the hydrogen facilitating crack growth by promoting reduced ductility.  While it is clear from evidence of corrosion on the sides of cracks, developed in service or laboratory tests, that dissolution occurs within crack enclaves, it is doubtful that growth can be accounted for entirely in terms of a dissolution process.  That is because at high stresses or strains observed growth rates are markedly greater than can be accounted for by rates of dissolution in* [near-neutral] *pH environments.  However, the evidence in support of hydrogen playing a role in the overall growth process is circumstantial rather than direct.*

Parkins [5] indicated that the factors contributing to the development of near-neutral pH cracking would appear to include the following:

1. Cracks are probably initiated at pits on the steel surface wherein a localized environment is generated that has a pH low enough to produce atomic hydrogen in the pit.

2. The presence of carbon dioxide in the groundwater assists in creating near-neutral pH levels.

3. Some of the discharged atomic hydrogen enters the steel, degrading the mechanical properties locally so that cracks are initiated or grown by a combination of dissolution and hydrogen-embrittlement.

4. Continuing anodic dissolution in the crack is necessary for crack growth, assisted by hydrogen entry into the steel.

5. The plastic stress level necessary to produce cracking may not be related solely to fracturing the embrittled steel. It may also contribute by rupturing the protective film, allowing hydrogen to reach and then penetrate the steel.

Thus, Parkins [6] is of the view that near-neutral pH SCC crack growth involves dissolution and hydrogen, and he is supported in that view by Leis [7], Wilmott and Jack [8], Lambert and Plumtree [9] and Beavers [10].

### 3.2.3 High pH versus near-neutral pH SCC crack characteristics

One difference between high pH and near-neutral pH SCC is the way in which the cracks grow. Figures 3.1 and 3.2 show metallographic sections through high and near-neutral pH SCC cracks respectively. High pH SCC generally produces intergranular cracking, where the cracks grow around or between the grains in the steel. These cracks are very tight, narrow cracks. The cracks generally produced by near-neutral pH SCC are different. They are generally transgranular, where the cracks follow a path across or through the grains. The side walls of the cracks corrode and the cracks appear much wider than high pH SCC cracks. However, the crack generally becomes narrower as the crack deepens.

The difference in the crack path (intergranular versus transgranular) is the result of the different effects of the environments and the susceptibility of the steel. In high pH SCC, the grain boundaries are more susceptible to dissolution than the grains themselves and so that is where the cracks form. Parkins showed that transgranular cracking can also occur in high pH SCC when the cracks become relatively deep or are subjected to relatively high stress levels or high fluctuating stresses [11]. The significance of this is that the presence of a transgranular crack by itself is not enough to be certain that a crack is near-neutral pH SCC.

**Figure 3.1**
**Metallographic section high pH SCC**

(Magnified 250 times)



Courtesy of R.J. Eiber

**Figure 3.2**
**Metallographic section near-neutral pH SCC**

(Magnified 250 times)



Courtesy of R.J. Eiber

---

## 3.3   The conditions for SCC

As we have noted, each type of EAC, including SCC, develops under its own unique and individual set of conditions.  This Inquiry studied in detail the specific conditions in which near-neutral pH SCC developed in a specific type of pipeline related environment.  We know that three conditions are necessary for stress corrosion cracking to occur:

- a potent environment at the pipe surface,

- a susceptible pipe material, and

- a tensile stress.

This concept is shown graphically in Figure 3.3.

The key point is that all three conditions must be present in order for cracking to occur.  If any one of these three conditions can be eliminated or reduced to a point where cracking will not occur, then SCC can be prevented.  For example, in many cases, if the environment is only mildly corrosive but there is no source of stress or susceptible pipe material, the corrosion will not be significant enough to affect the integrity of a pipeline.  Similarly, if the environmental conditions are more corrosive and if there is a source of stress, but the metal pipe is well enough protected, SCC cannot initiate.

**Figure 3.3**
**Three conditions necessary for SCC**



We will now take a detailed look at the unique aspects of these three conditions that lead to the development of SCC.

## 3.4   Potent environment

The conditions at the pipe surface are referred to as the environment.  This environment may be isolated from the surrounding soil by the pipe coating and the conditions at the pipe surface may be different from those in the surrounding soil.  Laboratory research and field experience have given us considerable insights into the environment which gives rise to near-neutral pH SCC.  Researchers have learned that the environment covers a range of chemical species that allow near-neutral pH SCC to develop.  SCC has been found in environments with low concentrations of carbonic acid and bicarbonate ions with the presence of other species, including chloride, sulphate and nitrate ions.  Since this range of environments all produce SCC, it can be expected that the environment found at SCC sites will vary [12].

The carbonic acid results from carbon dioxide ($CO_2$) in the soil combining with groundwater:  the lower the groundwater temperature, the higher the solubility of $CO_2$; the higher the $CO_2$ level, the lower the pH, with the range being near-neutral, 5.5 to 7.5.  The carbonic-acid environments measured in the field where SCC has been found have been relatively dilute and, therefore, not strongly corrosive [13].

The environment for near-neutral pH SCC can only develop after damage to or disbondment of the pipe coating and in the absence of the cathodic current which is used to control corrosion.  If the cathodic current reaches the pipe surface in the presence of groundwater with low levels of $CO_2$, a carbonate/bicarbonate environment will form with a pH in the range of 9 to 13 and near-neutral pH SCC will not occur. However, some types of pipe coating, when disbonded, act as a barrier to cathodic protection.  Also, the high resistivity of the soil may prevent the cathodic current from reaching the pipe surface.  In these instances, if groundwater and $CO_2$ are present at the pipe surface, a carbonic acid environment forms, with a pH in the range of 5.5 to 7.5, the range associated with near-neutral pH SCC.

In summary, the four factors controlling the formation of the potent environment for the initiation of near-neutral pH SCC are type and condition of coating, soil, temperature and cathodic current level.

### 3.4.1 Pipeline coating types

Over the years, pipelines have been protectively coated with several different materials and we have learned that the type of coating on the pipe has an effect on the formation of a near-neutral pH SCC environment.  The reason is that the characteristics of the coating materials are different and one may be more prone than another to disbonding (where the coating comes away from the pipe but does not

**Figure 3.4**
**Distribution of SCC failures with type of coating**



Source: Endnote [14]

**Figure 3.5**
**Distribution of SCC failures with year of pipe installation**



Source: Endnote [14]

break) or to forming "holidays" (where there are breaks or gaps in the coating). While polyethylene tape was predominately used from the early 1960s to the early 1980s, a high percentage of the failures have occurred on pipelines coated with polyethylene tape and installed from 1968 to 1973 (Figures 3.4, 3.5). It is important to note that, to date, there have been no reported instances of SCC on pipe coated with either extruded polyethylene or fusion bonded epoxy (FBE)[14]. Some of these coatings have been in place for over 20 years.

The types of coatings used in the industry have evolved over the years. Figure 3.7 provides an overview of the predominant pipe coating types used in Canada over the past 60 years. Some of these coatings continue to be applied to pipelines today.

- In the 1950s and 1960s, coal tar or asphalt coatings were commonly applied in the field. Occasionally, they were applied at the pipe mill in the 1970s and 1980s.

- In the mid-1950s, extruded polyethylene coatings applied at the mill were introduced. They have been used since that time, primarily on small diameter pipes.

- From the early 1960s to the early 1980s, polyethylene (PE) tape coatings, either single or double wrap, were field-applied (Figure 3.6). Since the mid-1980s, the tape-wrap system has been improved. Better bonding compounds (mastics) mean that the newer tapes are less likely to disbond at the pipe surface. Now, if there is any disbondment, the tape separates from the mastic. Since the mastic remains on the pipe surface, the pipe remains protected.

**Figure 3.6**
**Tape wrapping machine**



Courtesy of Petroleum Communication Foundation/NOVA

*REPORT OF THE INQUIRY*

**Figure 3.7**
**Overview of predominant pipe coatings in Canada**



Source:  Endnote [15]

- In the early 1970s, mill-applied fusion bonded epoxy coatings were introduced and have been increasingly used on large diameter lines since that time.  They are now the most commonly used type of coating [15].

Typically, coal tar, asphalt, extruded polyethylene coatings and polyethylene tape coatings were applied to pipe that had been wire brushed or scraped to remove loose dirt and rust.  The FBE coated pipes were grit-blasted or sand-blasted before being coated.  This removed most of the mill scale present on the pipe surface and improved bonding. For mill-applied coatings, the pipe ends were left bare and the girth welds which join the pipes together were coated in the field using a different material, typically, polyethylene tape, heat shrink sleeves or liquid epoxy. Characteristics of each of the main coating types are now discussed.

**Asphalt and coal tar coating.**  These coatings are relatively thick at 2 to 4 mm and can be relatively brittle.  Unless the pipe surface was adequately prepared, these coatings may have bonded poorly to the steel.  Soil stresses tend to make these coatings prone to disbondment and holidays while a pipeline is in operation.  When they disbond, these coatings tend to become saturated with moisture and conduct cathodic current in the disbonded area, thus protecting the pipe.  Near-neutral pH SCC has occurred on pipes coated with asphalt or coal tar coatings only when the soil has been so highly resistive that the cathodic current has not been able to reach the pipe surface.  On asphalt coated pipe, the SCC cracks have no preferential locations but may occur wherever the coating is disbonded or a holiday exists.  SCC on asphalt coated pipes has a similar surface appearance to the colony of cracks in Figure 3.8.

**Over-the-ditch polyethylene tape coating.**  These tapes are spirally wrapped around the pipe with an 18 to 50 mm overlap.  These coatings are prone to disbondment because of tenting that occurs between the pipe surface and the tape along the ridge created by the longitudinal weld reinforcement (Figure 3.9).  A second area of potential disbondment occurs where the tape is overlapped to achieve a bond

---

*STRESS CORROSION CRACKING*                                                      *23*

**Figure 3.8**
**Colony of SCC cracks**



Courtesy of R.J. Eiber

between successive wraps of tape.  When polyethylene tapes disbond, they allow moisture to penetrate under the coating.  Because of the high electrical insulating properties of the polyethylene tape and the long path under the disbonded tape, the cathodic current being applied through the soil cannot reach the pipe surface to prevent corrosion.  Consequently, a  potent environment may exist which will contribute to the formation of near-neutral pH SCC.

This coating type is a significant factor in the occurrence of SCC, as 73 per cent of failures caused by near-neutral pH SCC have occurred on polyethylene tape coated pipe (Figure 3.4).  CEPA indicates that SCC has been found approximately four times as often on pipe coated with polyethylene tape as on asphalt and coal tar enamel coated pipe.  The problems with polyethylene tapes are even more evident when coating types are compared for the average number of SCC colonies found per metre of pipe.  Single-wrapped polyethylene tape coated pipe had five times as many SCC colonies per metre as asphalt/coal tar coated pipe. Double-wrapped polyethylene tape coated pipe had nine times as many colonies per metre as asphalt/coal tar coated pipe [16].

Figure 3.9 illustrates the regions where near-neutral pH SCC typically occurs on the exterior surface of a pipe coated with polyethylene tape and the types of crack patterns (longitudinal and circumferential) that occur.  Figure 3.11 shows a photograph of cracks that formed on a polyethylene tape coated pipe in the tenting region of the double submerged arc weld (DSAW) and adjacent to it.  The cracks tend to occur at or near the toe of the seam weld because stress is concentrated at this location and this is an area where groundwater has ease of access.  Cracks also form in the body of the pipe in areas where

**Figure 3.9**
**Areas of near-neutral pH SCC formation**



**Figure 3.10**
**Polyethylene tape coating in poor condition due to wrinkling**



the coating has been damaged (e.g., Figure 3.10) or where a disbond has formed along the spiral tape overlap, as shown in Figure 3.12. Since the cracks form only in areas where the coating is damaged or disbonded, they typically form in isolated "colonies" which contain a number of cracks. Figure 3.8 shows an isolated colony of cracks that formed in an area of polyethylene tape disbondment.

**Figure 3.11**
**SCC cracks along and at the toe of longitudinal seam weld**



Courtesy of R.J. Eiber

**Figure 3.12**
**SCC cracks under spiral polyethylene tape overlap**



Courtesy of R.J. Eiber

**Fusion bonded epoxy coating.**  These coatings are generally resistant to disbonding.  When they do disbond, they act like the asphalt coatings in that they become saturated with moisture and allow the cathodic protection current to reach the pipe, preventing the formation of the near-neutral pH SCC environment.  No SCC has been found under these coatings to date.

**Extruded polyethylene coating.**  These coatings have been used primarily on smaller diameter pipes, those less than 508 millimetres (20 inches) in diameter.  The coatings are relatively thick

*26*                                                                                    *REPORT OF THE INQUIRY*

and tough, making it difficult for holidays to develop.  Even punctures from mechanical damage or handling are unlikely.  No SCC has been found under these coatings.

### 3.4.2 Soils

There are several factors relating to soils that influence the formation of the near-neutral pH SCC environment.  These are soil type, drainage, topography, $CO_2$, temperature, electrical conductivity and the use of inhibitors.

**Soil type.**  The soil type affects the performance of a coating, particularly polyethylene tape.  Bluish-coloured clays hold moisture and create soil stresses which contribute to the disbondment of polyethylene tape coatings, setting up one of the conditions necessary for near-neutral pH SCC.  Rocks can create holidays in coatings, allowing groundwater to come in contact with the pipe surface.

**Soil drainage.**  The amount of moisture in the soil also affects the formation of a near-neutral pH SCC environment.  Poorly drained or imperfectly drained soils provide a supply of moisture.  Areas that have a constantly-high moisture level do not seem to be as likely to produce near-neutral pH SCC environments as those where the moisture level varies.  These drainage types also determine whether the soils are reducing (anaerobic) or oxidizing (aerobic).  An anaerobic soil is believed to be necessary to create the near-neutral pH SCC environment [17].  In anaerobic soil conditions, sulphate reducing bacteria (SRB) may form and reduce sulphate in the soil to sulphide. When water reaches the pipe surface and the corrosion reaction begins, atomic hydrogen is created.  It needs oxygen to become molecular or gaseous hydrogen, but the sulphide is a poison that prevents the atomic hydrogen from forming molecular hydrogen.  In molecular form, the hydrogen would not be able to penetrate the pipe and would leave the pipe surface.  Instead, the sulphide allows the atomic hydrogen to penetrate the pipe.  As Parkins pointed out, the effect of the hydrogen is to embrittle the steel at the tip of a crack, making it easier for a crack to grow.  The contribution of anaerobic bacteria to near-neutral pH SCC has been evaluated but no conclusion about their role has been reached [18].

The soil's oxidizing-reducing ability can be measured and is referred to as its redox potential.  The redox potential indicates whether a soil is aerobic (positive potential) or anaerobic (negative potential). The question this raises is whether the redox potential could be another soil characteristic that identifies SCC-susceptible soil areas.  Wilmott published a paper [19] in 1996 in which negative measurements of the soil's redox potential (anaerobic soil) generally appeared to correlate with the occurrence of near-neutral pH SCC on the pipeline segment. Figure 3.13 plots the redox potential against distance and shows a similar outcome:  that the in-service and test failures occurred where

**Figure 3.13**
**Virginia Hills, Alberta 1.1 km pipe replacement section: variation of soil redox potential with distance**



Source: Endnote [19]

the potential is negative (anaerobic). However, the correlation is not precise since at distances of 741 and 751 metres the redox potential is positive, indicating aerobic soil conditions. Yet failures due to near-neutral pH SCC still occurred at those distances under hydrostatic retesting. These results are interesting and this is an area where additional research could provide more answers.

**Soil topography.** Closely allied with soil drainage is the topography of the land. Near-neutral pH SCC appears to be associated with depressions in the landscape, at the base of hills or near streams, where the groundwater either flows along the pipeline or across it. Flowing water may help to maintain the near-neutral pH environment by supplying additional $CO_2$ to the electrolytic solution in the disbonded area at the pipe surface.

**$CO_2$ level and soil/pipe temperature.** While high pH SCC growth depends very much on soil or pipe temperature (they are generally the same along a pipeline), laboratory and field data have not shown a similar correlation for near-neutral pH SCC. Parkins carried out slow strain rate tests but the results showed no significant differences for crack growth rates at temperatures of 5°C and 45°C [20].

On natural gas transmission pipelines, the temperature of the gas and the pipe is as high as 40°C on leaving a compressor station and it cools as the gas moves downstream.  On TransCanada's system, only one-third of its service and hydrostatic retest failures have occurred within 16 km downstream of a compressor station, where the temperature of the gas is high.  In field excavations carried out on the TransCanada and NGTL systems, near-neutral SCC has been found more than 30 km downstream of compressor stations where the temperature of the gas would be lower.  Near-neutral pH SCC has also been found on the NGTL system at a location where the soil temperature surrounding the pipe was in the region of 10°C or lower [21].

Beavers suggests that the absence of a correlation between higher soil temperatures and near-neutral pH SCC may result from the increasing solubility of $CO_2$ in water at lower temperatures [22].  As more $CO_2$ dissolves in groundwater, the ability of the cathodic protection system to raise the pH at the pipe surface is greatly reduced.  If this idea is correct, it could mean that the environment for near-neutral pH SCC is more likely to develop at lower temperatures because of the higher potential concentration of $CO_2$.  Beavers suggests a higher concentration of $CO_2$ may be one reason why the near-neutral pH environments appear to form in the colder climates, such as those in Canada and the former Soviet Union.  This is a possibility that has not been completely explored and additional research may provide us with a better understanding of the factors controlling the formation of the near-neutral pH SCC environment.

**Cathodic protection current.**  Near-neutral pH SCC develops where cathodic protection current cannot penetrate under or through the coating to reach the steel pipe.  For polyethylene tape coated pipe, the cathodic protection cannot reach further than a few centimetres from the tenting or holiday in the coating because of the shielding effects of the disbonded tape.  It might seem reasonable to try increasing the cathodic protection current with the hope that it might reach further into the disbonded area.  However, that is impractical since these areas can be a metre long or more.  In these circumstances, a significant portion of the exposed pipe is susceptible to SCC.  As a result, it does not appear that higher cathodic protection potentials will help prevent the growth of SCC on tape coated pipelines.  In fact, CEPA and NRTC have suggested that a higher cathodic protection current could lead to more disbondment on tape coated systems.  However, NRTC has considered another alternative.  Preliminary studies by NRTC on pulsed cathodic protection indicate that pulsing can penetrate more deeply into a disbonded area than can conventional cathodic protection systems [23].  Depending on the size of the disbonded area, pulsed cathodic protection may help to control near-neutral pH SCC.  This is also an area that should be researched further.

**Steel properties**…

Within a certain range of loads, steel has an "elastic" property which allows it to deform (extend) under load and then return to its original shape when the load is removed.  The limit of load which keeps steel in its elastic range is termed the "elastic limit" (proportional limit).

Beyond the elastic limit, steel begins to deform permanently or "plastically" at increasing rates under load to a point called the "yield strength" which is the maximum limit of useable stress.  Pipelines are designed to maintain loads below a "specified minimum yield strength" (SMYS).

If loading continues beyond the yield point, steel will continue to deform and eventually break apart or fracture.  The fracture is termed "ductile" if the steel tears apart slowly and stretches (plastic deformation).  In contrast, a failure is termed "brittle" if the steel breaks apart quickly with little sign of deformation.  In pipeline terms, brittle fracture in a natural gas pipeline can result in a pipe rupture which extends over a considerable distance (hundreds of metres) whereas a ductile failure is usually contained within two pipe joints (25 metres).  Modern pipeline steels have the ductile properties to prevent a brittle type of failure.

On asphalt coated pipelines, near-neutral pH SCC occurs in sandy well-drained soils where adequate levels of cathodic protection are difficult to achieve because there is little moisture to help conduct the current through the soil.  This is an area where research may provide alternative ways to drive the cathodic current though high-resistivity soil.

**Inhibitors.**  Researchers studying high pH SCC are considering whether inhibitors could be added to soils or coatings to prevent high pH SCC.  However, no studies have been conducted to consider a similar possibility for preventing near-neutral pH SCC from initiating.  Parkins stated [24]:

> *I am not aware of any work relating to the incorporation of inhibitors into organic coatings to control* [near-neutral] *pH SCC, although such studies have been conducted in relation to the high pH form.  That work showed that sodium chromate or phosphate were capable of inhibiting intergranular cracking when present in sufficient amounts and it would be surprising if similar inhibitive substances could not be found for* [near-neutral] *pH SCC.*

What the field studies relating to high pH SCC showed was that the inhibitors – chromates, phosphates and silicates – leached out of the soil within a few years and so the declining levels of the inhibitors limited their effectiveness to a relatively short time [25][26].

## 3.5   Susceptible pipe

In addition to a potent environment, a susceptible pipe material is another necessary condition in the development of near-neutral pH SCC.  In this regard, the data from pipeline failures caused by SCC showed that near-neutral pH SCC had developed on a wide variety of pipe.  Pipe failures occurred on pipe in which diameters ranged from 114 to 1067 mm, wall thicknesses ranged from 3.2 to 9.4 mm and grades varied from 241 MPa (35 ksi) to 448 MPa (65 ksi).  Both electric resistance welded (ERW) and DSAW pipe were involved in SCC-related failures.

Researchers and scientists have considered a number of pipe characteristics and qualities to determine if they are possibly related to the susceptibility of pipe to near-neutral pH SCC.  These factors include the pipe manufacturing process, type of steel, grade of steel, cleanliness of the steel (presence or absence of impurities or inclusions), steel composition, plastic deformation characteristics of the steel (cyclic-softening characteristics), steel temperature and pipe surface condition.

### 3.5.1 Pipe manufacture

With one exception, near-neutral pH SCC does not appear to be associated with a particular pipe manufacturing method or manufacturer.  The exception is the ERW longitudinal seam pipe manufactured in the

1950s by Youngstown Sheet and Tube (Youngstown) which was used on the TransCanada system in southern Ontario [27].  The weld seam of this pipe seems to have a lower resistance to near-neutral pH SCC than the base metal.  The reason for this lower resistance of the weld area is unknown at this time but may be related to the low fracture toughness of this region, pits and arc burns associated with this manufacturer's ERW weld or a higher-than-normal residual stress [28].  It should be noted that TransCanada has implemented a special mitigative program to replace Youngstown pipe in close proximity to dwellings and to hydrostatically retest the Youngstown pipe every four years.

Beavers [29], in examining grade 448 MPa (65 ksi) samples taken from the TransCanada system, noted that the coarse-grained heat-affected zone (CGHAZ) adjacent to the DSAW is significantly more susceptible to cracking than the base material in the near-neutral pH environment.  The average crack velocities are about 30 per cent higher in the CGHAZ than in the base metal.  Whether this is an isolated condition on the TransCanada pipe or whether all CGHAZs will exhibit greater susceptibility is unknown and is an area for further investigation.

### 3.5.2 Pipe yield strength

No one has conducted a detailed assessment of the susceptibility of different steels to the initiation and growth of near-neutral pH SCC. Steel is often referred to by its grade which is linked to its yield strength. Pipe grades from 241 MPa (35 ksi) to 483 MPa (70 ksi) from a range of manufacturers have been found to be susceptible to near-neutral pH SCC.  Researchers studying high pH SCC have found no correlation between the range of mechanical strengths observed in failed pipes and SCC susceptibility [30].  It is likely that, as research into near-neutral pH SCC is carried out, the same conclusion will be drawn since plasticity on the pipe surface or at a crack tip is the primary factor that causes SCC initiation.  Higher strength steels may be more susceptible to SCC and/or hydrogen embrittlement which might make the SCC problem worse.  It is known that if a higher strength pipe is substituted for a lower strength pipe with the same diameter and operating pressure, the critical flaw tolerance of the pipe will decrease due to the reduced wall thickness.

### 3.5.3 Plastic deformation characteristics

Localized microplastic deformation (permanent elongation) is necessary for the initiation and growth of near-neutral pH SCC cracks. Consequently, the conditions that produce localized microplasticity (low plastic strain or deformation levels in local areas) either on the pipe surface or at a crack tip are necessary for SCC crack initiation or growth. Normally, the strains that would produce this localized microplastic

deformation do not occur at stress levels below the proportional limit of the steel.  In most line pipes, the proportional limit is in the range of 85 to 95 per cent of the yield stress of the steel.  However, the proportional limit may increase almost to the yield stress on pipelines that have been subjected to high-pressure hydrostatic retests.  Consequently, high-pressure hydrostatic retests may be beneficial in making a pipe more resistant to SCC.

Two situations cause localized microplastic deformation at stress levels below the proportional limit of the steel.  In one situation, the surface layer of the pipe wall thickness can deform before the bulk of the wall thickness [31] and, secondly, cyclic-loading can cause steels to exhibit microplastic strains at nominal stress levels where plastic strains would not be expected [32].  Leis has shown that the surface layer of a pipe can plastically deform more easily than the bulk of the material beneath it.  Since the outside surface of the wall thickness is a free surface (a surface with one side not constrained by metal, just air), it can plastically deform at lower stress levels than the mid-portion of the wall thickness.  This suggests that it is possible to initiate a crack because of pipe surface plasticity.  At lower stress levels, the crack may grow until it reaches a depth where microplasticity can no longer occur because of the change in the stress state in the interior of the pipe wall thickness compared to the surface layer and the crack growth stops.  At higher stress levels, the crack may continue to grow to the point where the pipe fails.

Cyclic-softening is a phenomenon in which the application of stress cycles or pressure cycles at maximum stress levels below the yield stress causes the steel to exhibit local microplastic deformation (strains) after a period of load cycles.  The steel may then behave elastically for a number of cycles and then again exhibit plastic deformation for a number of load cycles.  It is not known how many of these regions of plastic strains will be exhibited by a steel.  However, the phenomenon has been exhibited by pipe steels of the type involved in the near-neutral pH SCC failures [33].  This partially explains why it takes a number of years of service before an SCC crack initiates.  Basically, the steel has to be subjected to enough pressure cycles that it softens to the point where microplastic strains are created on the pipe surface.

Leis is of the view that the propensity for cyclic-softening is a function of the steel's microstructure.  Limited research suggests that bainitic microstructures generally have less tendency to soften than the ferrite-pearlite microstructures of pipe that is currently in service.

The procedure for changing the cyclic-softening characteristics of an existing pipeline steel is unknown.  It has been suggested that it might be possible to modify the softening characteristics through high pressure hydrostatic retests but currently no information is available to indicate whether this is feasible.  Research is incomplete with regard to the cyclic softening behaviour of pipe steels.

### 3.5.4 Steel cleanliness

Surkov reports that a relationship has been observed between susceptibility to SCC and the length of non-metallic inclusions in the steel (particles of foreign material such as manganese sulfides) [34]. A threshold for crack initiation was found which indicated that if the length of surface defects which are governed by the length of non-metallic inclusions were smaller than 200-250 μm, longitudinal cracks would not form.

CANMET conducted limited research into inclusion length [35]. It took samples from five pipes with significant cracking and five samples with non-significant cracking and examined inclusion lengths. It concluded that a difference may exist between the average length of "light or thin" inclusions found in "cracked" and "uncracked" samples, with the uncracked pipes having longer inclusions than the cracked samples. The effect of material properties, including the role of non-metallic inclusions on the initiation of SCC, will be studied in a research program initiated by CEPA in the summer of 1996.

The British Gas in-line inspection tool results have indicated that, in TransCanada pipe that has experienced SCC, there is a higher number of non-metallic inclusions at the longitudinal weld seam (the original edge of the plate) than in the body of the pipe. This may partially explain why cracks tend to be found near the seam weld.

### 3.5.5 Steel composition

No studies have been conducted to look for a relationship between steel composition and near-neutral pH SCC susceptibility. However, studies have been conducted on steel alloys to evaluate its resistance to high pH SCC. The results showed that adding chromium, nickel and molybdenum to steel in amounts of between two to six per cent improved the resistance to high pH SCC. However, additions at such high levels made the steel prohibitively expensive to produce [36]. This could be another area for further research.

### 3.5.6 Pipe surface conditions

Parkins performed a number of cyclic load crack initiation experiments and found that the surface condition of the pipe was important in contributing to the initiation [37]:

> In all of my work involving cyclic loading one of the test surfaces corresponded to the outer surface of the pipe from which the specimens were cut, that surface having been water blasted after removal of the pipe from the ground. The opposite side of the specimen was carefully polished and that surface very rarely produced any indications of crack initiation, and certainly not of growth beyond 20 μm, while when deeper cracks were produced they invariably were from

*the surface corresponding to the outer surface of the pipe. That outer surface was covered with very shallow, overlapping pits, although the water blasting had removed most of any corrosion products that probably were present when the pipe was excavated. Those pits would give some small degree of stress concentration, although I doubt that provides a full explanation for the different cracking propensities of the outer pipe and polished surfaces. More probable is it that pits provide a means of localizing composition and pH changes from the bulk solution, a phenomenon well known to occur with pits and other geometrical discontinuities in the presence of some environments.*

Parkins' laboratory data suggest that at stress levels above the yield stress, the threshold stress (the point at which cracks would initiate and grow to failure) on a smooth, clean surface is different than on a surface similar to that of a pipe after years of service. Only in the presence of pits could he initiate cracks that would continue to grow (Figure 3.14).

 The presence of mill scale on the pipe surface has been found to contribute to the formation of high pH SCC and would be expected to be a factor in near-neutral pH SCC as well. This is another area where the research is not complete.

### 3.5.7 Pipe temperature

Because soil temperature and pipe temperature are considered to be the same, pipe temperature was included in an earlier discussion. (See Section 3.4.2, $CO_2$ level and soil/pipe temperature.)

## 3.6   Stress

As noted in Section 2.1, the issue of a pipeline's internal pressure and its effect on SCC was raised by the TSB after the 1991 and 1992 incidents on the TransCanada system. Considerable research has been conducted since that time and in ongoing. A summary of the evidence and our conclusions follow.

### 3.6.1 Stresses in pipelines

Stress is the "load" per unit area within the pipe wall. A buried pipeline is subjected to stress of different types and from different sources. The pipeline's contents are under pressure and that is normally the greatest source of stress on the pipe wall. The soil that surrounds the pipe can move and is another source of stress. Pipe manufacturing processes, such as welding, can create stresses which are termed "residual" stresses. These are just a few examples. We will be discussing these and other sources of stress.

**Figure 3.14**
**SCC crack formation at base of corrosion pit**
(Magnified 150 times)



Courtesy of R.J. Eiber

The stresses in a pipe exist in two directions: around the pipe's circumference (referred to as circumferential stress) and lengthwise along the axis of the pipe (referred to as longitudinal or axial stress). Cracks occur perpendicular to the direction of the stress.  Longitudinal (axial) cracks are found in areas of high circumferential stress and circumferential (transverse) cracks are found in areas of high axial stress (Figure 3.15).

- Circumferential stress in the pipe has several sources:

    1) circumferential stress due to internal operating pressure (hoop stress), usually the highest stress component in the pipe;

    2) residual stress in the pipe created during pipe manufacture;

    3) bending stresses that result when an oval or out-of-round pipe is subjected to internal pressure;

    4) local stresses at the edge of double-submerged arc welds or associated with mechanical gouges, corrosion pits and other areas where stress is concentrated;

    5) secondary stresses that may cause the pipe to go out-of-round, such as soil settlement or land slides; and

    6) stresses due to temperature differences through the thickness of the pipe wall.

---

**Figure 3.15**
**Stresses in pipelines**



P = Pressure

- Longitudinal (axial) stress in the pipe also has several sources:

    1) internal operating pressure (the operating pressure causes a longitudinal stress which is one-third to one-half the circumferential stress);

    2) secondary stresses that can bend the pipe and introduce high longitudinal stresses, such as soil settlement or landslides; and

    3) stresses due to temperature changes along the axis of the pipeline.

### 3.6.2 Stress in pipe during operation

The stress at any point in the pipe steel is the combined effect of all forms of circumferential and longitudinal stresses. In this section, each of these components will be defined and their influence discussed.

**Internal operating pressure.** Pipelines operate at various pressures. Typical large-diameter transmission pipelines operate at maximum pressures up to 8 700 kPa (1,260 psi). The circumferential stress caused by the operating pressure (P), also termed hoop stress (s), is affected by the diameter of the pipe (D) and the wall thickness (t) and can be calculated by the following mathematical expression referred to as Barlow's formula:

$$s = \frac{P\ D}{}$$

Since the internal operating pressure is usually the largest contributor to stress, it is common in the industry to express the stress in the pipe wall in terms of the hoop stress as calculated by Barlow's

formula as a percentage of the specified minimum yield strength (SMYS) of the pipe steel.  However, manufacturers generally produce pipe which has an actual yield strength which is higher than the SMYS.  The actual yield strength can be 10 to 30 per cent higher than the SMYS.  Therefore a pipeline that is operating at 72 per cent SMYS may only reach 60 per cent of the actual yield strength of the pipe.

The CSA Z662 standard sets the maximum allowable hoop stress depending on where the pipeline is located and the surrounding dwelling density.  The standard sets out four class locations based on the dwelling density.  The Class 1 location is generally a sparsely inhabited region or rural area.  To be classified as a Class 1 location, there must be ten or fewer dwellings within an area extending 200 m on each side of the pipeline and running any continuous 1.6 km distance along the pipeline.  On natural gas pipelines, the maximum allowable hoop or operating stress ranges from 80 to 44 per cent SMYS depending on the density of dwellings (Table 3.2).  For example, 80 per cent SMYS is the maximum hoop stress allowed in a Class 1 location.  The maximum allowable hoop stress governs the wall thickness of the pipe for a given grade (SMYS).  For gas pipelines and pipelines which carry high vapour pressure (HVP) products such as propane, the maximum allowable hoop stress as a percentage of material strength decreases in populated areas and near roads.

Currently, regulations in many other countries limit the maximum hoop stress to 72 per cent SMYS [38].  There are a few pipelines in the U.S. that operated at higher stress levels before the U.S. Department of Transportation issued Part 192 of the Code of Federal Regulations in 1968.  These pipelines continue to operate at stress levels up to 85 per cent SMYS under a grandfather clause to the existing regulations.  In the Australian Code, AS 2885, there is a provision for stress levels over 72 per cent SMYS, but the complete line must be tested at a pressure greater than 100 per cent SMYS before it can operate above 72 per cent

### Table 3.2
### Maximum allowable operating stress in various class locations[1]

| Class Location[2] | Description[3] | Maximum Operating Stress[4] (% of SMYS) | | | |
|---|---|---|---|---|---|
| | | Natural Gas | Sour Gas | HVP | LVP |
| 1 | < 10 dwellings | 80 | 72 | 80 | 80 |
| 2 | 10 - 46 dwellings or designated areas | 72 | 60 | 64 | 80 |
| 3 | > 46 dwellings | 56 | 50 | 64 | 80 |
| 4 | buildings 4 storeys or more | 44 | 40 | 64 | 80 |

1  excerpt from CSA Z662-94 Oil & Gas Pipeline Systems

2  based upon a class location area which extends 200 m on both sides of the centre line of any continuous 1.6 km length of pipeline

3  Z662-94 clause 4.3.2 contains full description

4  maximum operating stress may be lower due to the hydrostatic testing pressure and other factors such as proximity to roads, railways, etc.

SMYS. However, to our knowledge, there are no lines in Australia operating in excess of 72 per cent SMYS.

The internal pressure in a pipeline continually changes or fluctuates. In a gas line it is affected by the rate at which the gas is injected into the system and withdrawn by downstream deliveries. Often these rates are not controllable by the pipeline operator. In liquid pipelines the pressure fluctuates more widely since it is affected by the turning on and off of pumps and any changes in the density of the fluid being pumped.

Figure 3.16 presents a 20-day pressure profile for a liquids pipeline. The pressure profile for a gas pipeline would not fluctuate as much and the fluctuation would occur over longer periods of time. As Figure 3.16 shows, the maximum pressures vary throughout the period, depending on the flow rate. In order to fully characterize the operating pressure of a pipeline and, therefore, stress, three factors have to be considered:

- the pressure level or maximum operating pressure applied;

- the range in which the pressure fluctuates (which in Figure 3.16 is from 1 250 kPa (181 psi) to about 5 750 kPa (833 psi) and the minimum pressure is 22 per cent of the maximum operating pressure); and

**Figure 3.16**
**A 20-day pressure profile for a liquids pipeline**



Source: Adapted from endnote [39]

- the rate of the pressure changes (almost instant change in some cases, or change over several days, in others).

Typically, on gas pipelines, the minimum pressure is in the range of 85 per cent of the maximum operating pressure. Stress levels in pipelines therefore fluctuate daily, weekly, monthly and yearly. The stress fluctuation is commonly referred to in terms of an R-ratio, which is the ratio of the minimum to the maximum stress in a circumferential direction.

**Residual stress.** When flat steel plate is formed into pipe, "residual stresses" are introduced into the pipe. The level of residual stress depends on the manufacturing process used to produce the pipe. For example, DSAW pipe is rolled into a tube, welded lengthwise and then pressurized with water to expand the pipe and make it round. This expansion process reduces the residual stress in the pipe. By contrast, ERW pipes and small diameter flash-welded pipes (typically less than 508 mm in diameter) are generally not expanded and so they can have higher residual stress levels. Seamless pipe (normally small diameter pipe), because it is hot-formed, receives the equivalent of a thermal stress relief and the residual stress tends to be relatively low. The residual stress in a pipe can also be reduced by the application of a high-pressure hydrostatic test before being placed in service. The higher the test pressure, 105 to 110 per cent SMYS, for example, the lower the residual stress.

Parkins stated that [40]:

*It is known that operating pipelines can contain residual stresses that may be at least as high as about 25 per cent of the yield stress of the material and those may influence cracking behaviour, not least in view of the fact that the vast majority of SCC failures in a wide variety of materials and environments involved with various engineering structures* [other than pipelines] *are due to residual rather than operating stresses.*

There have been no systematic studies of residual stress levels in relation to SCC in line pipe or on the distribution of the residual stresses in the axial or circumferential direction. Based on the statement by Parkins, however, and the information obtained from the Camrose Pipe Company [41], the production process may introduce maximum residual stresses up to 25 per cent of the yield stress in the finished pipe.

Researchers are still uncertain about the influence of residual stresses on the initiation and growth of near-neutral pH SCC. But it is known that in other industries, residual stress can elevate stress levels in localized areas to the point where SCC is initiated. Consequently, it seems reasonable to think that residual stress should be minimized. It may be possible to thermally stress-relieve the pipe when it is being manu-factured to reduce the residual stress level. This approach would have

to be examined to make sure the fracture toughness or yield strength properties of the steel pipe would not be adversely affected.  Alternatively, increased expansion during pipe manufacture might be used to mechanically reduce the residual stress.  High-pressure hydrostatic tests will reduce residual stress on existing pipelines but the residual stresses cannot be completely eliminated.

**Bending or out-of-roundness stress.**  Another factor that affects the circumferential stress level in a pipe is the roundness of the pipe.  If a pipe is out-of-round, local bending stresses result when internal pressure forces the pipe to become round.  This creates a bending stress through the pipe wall thickness and raises the hoop pressure stress on the outer pipe surface.  In forming DSAW pipe, the longitudinal edges of the pipe are formed or crimped before they are welded together.  If the pipe edges are not accurately formed or are offset radially from each other after welding, localized bending stresses are created, which add to the hoop pressure stresses.

**Local stress intensifiers on the pipe surface.**  Any irregularity in the surface of the pipe can be a source of stress concentration.  Where surface damage, dents or corrosion pits are found, stress levels in the circumferential and axial directions on the surface of the pipe are higher than on the rest of the pipe.  Surface damage such as gouges, grooves or dents can be caused by construction equipment or improper backfill material.  Pits can be produced by carbonic acid, a weak acid that is the near-neutral pH SCC electrolyte.  Once a pit is initiated, it will tend to further acidify the environment and increase the local stress.  The pipe wall thickness may also be reduced by corrosion or a gouge which will locally elevate the stress in the pipe wall and contribute to the conditions that allow SCC to initiate.

**Secondary stresses.**  These stresses can occur in either the circumferential or longitudinal direction.  They are most commonly caused by soil movement such as land slides and settlement or by the physical weight of the soil above the pipe (overburden).  The level of these stresses is generally unknown and difficult to predict; however, depending on soil movement, they can be quite low or they can be high enough to cause the pipe to fail.

**Temperature stresses.**  Temperature differences through the pipe wall thickness can cause localized circumferential bending stresses.  These stresses are generally not a problem on pipelines, as the pipe wall is thin enough that there is no difference in temperature between the outer surface and the bulk, or thickness, of the pipe.

**Longitudinal (axial) stresses.**  In addition to circumferential stress, pipelines in operation experience stress which acts in the axial direction.

The pressure of the contents in the pipe also causes a stress in the axial direction of a pipeline which is a percentage of the hoop stress.

For example, when a pipeline is completely buried and restrained from longitudinal movement by the soil, the axial stress is 28 per cent of the hoop stress.  When the pipeline is not completely restrained against longitudinal movement, the axial stress can be as high as 50 per cent of the hoop stress.

Temperature changes along the length of a line can cause axial temperature stresses, but again, these tend to be minor.

### 3.6.3 Field experience: the effect of stress

The effects of these types of pipeline stresses became clear when reviewing the field data gathered at the time of each pipeline failure.  Of the 22 service failures that have occurred on pipelines in Canada, 16 of these failures (73 per cent) involved axial cracks, indicating that the circumferential stresses controlled the failure.  At the time of the failures, the hoop stresses varied between 46 and 77 per cent of the pipe's SMYS.  The remaining six failures involved circumferential (transverse) cracks indicating that the axial stress controlled those failures.

In all but one of the 16 failures, external factors increased the stress levels in the localized areas where the SCC was found.  Corrosion, gouges or stress concentrations from the toe of the weld seam raised the local stress above the hoop stress levels derived from Barlow's formula [42].  Consequently, the level of stress that was actually experienced by the pipe and caused the failure is not known.

The six circumferential (transverse) crack failures occurred at hoop stress levels of 53 to 67 per cent SMYS but these values do not help to explain the failures, since as discussed above, the hoop stress is parallel to the crack direction.  The longitudinal stress, which is perpendicular to a circumferential crack, was responsible for these failures.  At the time of failure, the longitudinal stress caused by soil movement or secondary stresses was unknown but it was likely the predominant stress.

While none of CEPA's member companies have found "significant" SCC in Class 2 and 3 pipeline locations, they did acknowledge that the potential may exist for it to be found there [43].  CEPA suggested that the standard wall pipe used in Class 1 locations is more susceptible to SCC because it operates at higher stress levels than pipe in other class locations [44].

### 3.6.4 Stress level effects on crack initiation and growth

In this section we summarize the information collected on how the stress in the pipeline (the level of stress, fluctuations in the stress level and pressure fluctuation rate) affects the initiation and growth of SCC cracks.

Most research into near-neutral pH SCC has focused on how SCC grows than on how it initiates. However, field data are providing evidence of trends in both initiation and growth [45].

**SCC crack initiation.** One of the goals of conducting research on crack initiation is to find a threshold stress level below which cracks will not develop. However, the research community has not agreed to a single definition of threshold stress. Parkins [46] defines the threshold stress as being the stress above which cracks initiate and grow to failure. Other researchers have proposed that a given crack growth rate be used to define a threshold stress, while still others have proposed that the stress level that will grow a crack to a specific depth should define threshold stress.

At this time, Parkins' work provides the only laboratory data on threshold stress levels for near-neutral pH SCC initiation [47]. He found that on a sample of grade 448 MPa (65 ksi) steel taken from the TransCanada system, he could grow cracks at a stress level of 69 per cent SMYS with an R value of 0.5, but not at lower stress levels. Similarly, he could grow cracks at a stress level of 72 per cent SMYS with an R value of 0.85, but not below that level. He cautioned that these data are limited and need to be replicated to have validity. Parkins further cautioned that applying a single threshold stress value over the entire length of a pipeline may be unwise [48].

CEPA and several researchers also commented on the effect of stress on crack initiation:

- CEPA indicated that *"…at lower stress levels associated with heavy wall pipe locations, the probability of SCC initiation is reduced and those colonies that do initiate contain fewer cracks and are more widely spaced than those observed on standard wall pipe at higher stress levels."* [49]

- CEPA stated *"It is likely that such a value* [threshold stress] *exists, however, it is likely to* [be] *so low as not to be of practical engineering value."* [50]

- Leis indicated *"…lower stresses can be expected to reduce the nucleation of SCC."* [51]

- Beavers stated *"…I do not believe that there is a 'threshold stress' below which SCC cannot initiate. Stress corrosion cracks will initiate in the pipe if the environmental conditions are conducive to cracking because of the presence of residual stresses and pre-existing defects that act as stress raisers."* [52]

Field data also indicated that initiation is affected by stress caused by internal operating pressure:

- TransCanada has not detected "significant" SCC in Class 2 or 3 locations through investigative excavations, hydrostatic retesting or SCC in-line inspection [53]. Pipe in Class 2 and

**Figure 3.17**

**Number of "significant" colonies detected per metre of pipe inspected for line 100-2 (TransCanada)**



Source: Adapted from endnote [55]

3 locations in the gas transmission industry is typically designed to operate below 60 per cent SMYS [54].

- Evidence presented by TransCanada suggests that the extent and severity of SCC increases where stress levels due to the internal operating pressures are higher.  Figure 3.17 shows the relationship between the number of "significant" SCC colonies found per metre of pipe inspected and the stress level in per cent SMYS for TransCanada line 100-2 (914 x 9.1 mm, grade 448 MPa pipe).  The figure shows a drop in the number of colonies from 0.014 to 0.0005 per metre inspected as the stress drops from 75 to 67 per cent SMYS.  However, there is a second peak at 66 per cent SMYS that is not understood.  TransCanada notes, on the basis of Figure 3.17, that the incidence of SCC drops significantly at stress levels below 70 per cent SMYS [56]. This same trend appears in Figure 3.18, which shows the relationship between crack depth and stress level for the same data presented in Figure 3.17.  Figure 3.19 shows the relationship between the number of "insignificant" colonies found by TransCanada and stress level.  It should be noted that the numbers are significantly higher – approximately 40 times higher – than in Figure 3.17, as indicated by the vertical scale.  Also, the number of "insignificant" colonies does not appear to be related to the hoop stress level.

- The seven in-service ruptures that TransCanada has experienced have all occurred where normal operating

**Figure 3.18**
**Maximum crack depths of "significant" SCC detected on line 100-2 (TransCanada)**



Source:  Endnote [57]

**Figure 3.19**
**Number of "insignificant" SCC colonies detected per metre of pipe inspected for line 100-2 (TransCanada)**



Source: Adapted from endnote [58]

hoop stress levels based on the internal operating pressure were more than 70 per cent SMYS [59].

**SCC crack number.** The maximum stress determines the number of cracks that initiate. The higher the stress level, the more cracks there will be and the closer they will be spaced. Leis presents data supporting the relationship between crack spacing and maximum operating pressure. His model predicts that at higher stress levels, more cracks will be present and they will be closer together (Figure 3.20).

**SCC crack growth.** The effect of stress on crack growth is important for three reasons. It determines whether there is a threshold stress level below which cracks will not grow, whether increasing the stress in a pipeline causes cracks to grow faster and how often hydrostatic retests should be scheduled.

**Figure 3.20**
**Simulated cracking patterns versus maximum pressure**



A. 70% of maximum operating pressure

B. 80% of maximum operating pressure

C. 90% of maximum operating pressure

Source: Endnote [60]

Cracks grow in two ways. They increase in length and depth due to dissolution and hydrogen embrittlement. They also grow when several cracks join together and create a significantly longer crack.

The effect of stress level by itself has not been evaluated in the research conducted to date. The research conducted has involved stress level and stress fluctuations together.

Beavers indicated that [61]:

*In constant displacement rate testing and ongoing cyclic load testing for TCPL, we have only observed cracking where dynamic loading conditions are present. No evidence of crack growth has been found under constant load or constant displacement conditions.*

His comment points out the importance of the question of pressure fluctuations. While Parkins [62] agrees with this statement, Wilmott [63] suggests that further research is needed to define the role of pressure fluctuations on crack growth. For example, in laboratory bending tests, he was able to make existing field SCC cracks grow longer at stresses from 40 to 100 per cent SMYS where load was essentially constant, that is, where R-ratios (stress fluctuations) were 0.98. But preliminary research at CANMET and The University of Waterloo shows that pressure fluctuations are necessary for cracks to occur with near-neutral pH SCC. When CANMET carried out a full-scale test, no crack growth was found under static load conditions (when load was held constant), even at stress levels as high as 80 per cent of actual yield strength [64].

While looking at the effects of stress levels and stress fluctuations separately would be helpful, the available research data do not permit this. The most complete set of laboratory data is available from Parkins and is shown in Figure 3.21. Parkins conducted laboratory tests on smooth-sided specimens in an NS4 environment (a weak carbonic acid environment found in the field and used for a broad range of laboratory testing). Parkins tested X65 (grade 448 MPa) steel in a stress range from 52 ksi (80 per cent SMYS) to 70 ksi (108 per cent SMYS) with R-ratios of 0.5, 0.70 and 0.85. He found a direct relationship between maximum stress and an increased crack growth rate for the lower R-ratios, 0.5 and 0.7. At an R-value of 0.85, which is typical of gas pipeline operations, he found no effect of stress level on the measured crack growth rates. Conversely, at lower R-values such as 0.5, which is more typical of oil pipelines, there is a definite relationship between stress level and an increased growth rate.

Parkins commented that at each stress level and R-ratio (the highest curve in Figure 3.21), the highest crack velocity values for individual specimens are more representative of actual service failure times than those represented by the average data for R of 0.85 which should be typical of a gas transmission pipeline. One problem with this data set is that it starts at 80 per cent SMYS and examines higher stress

**Figure 3.21**

**Near-neutral pH SCC growth rates as a function of stress amplitude and maximum stress for an X65 steel in TransCanada's 36 inch pipeline**



Source: Endnote [65]

levels but does not explore the trend at lower stress levels. Parkins was unable to initiate cracks which grow to failure at stresses below about 70 per cent SMYS.

Laboratory research conducted by Wilmott at NRTC shows that *"...for small shallow SCC cracks the rate of elongation is independent of the applied load from 40 per cent to 100 per cent SMYS."* Figure 3.22 presents the Wilmott data for 40, 70 and 100 per cent SMYS stress levels with a 0.98 R-ratio. This research measured crack growth rates based on increases in the surface length of a pre-existing SCC service crack (stress corrosion cracked pipe was used for the samples) in a bending test. The crack growth measurements are twice the increase in length for a single crack tip. The relationship between the changes in crack length reported by Wilmott and the changes in crack depth reported by Parkins is unknown. These results indicate that the crack growth rates appear to be similar at 40, 70 and 100 per cent SMYS. However, the results are widely scattered: the crack growth rates range from 0.2 to 2.8 x $10^{-9}$ mm/s at all three stress levels.

CEPA's position is that *"Crack growth can occur by a combination of continued initiation of new cracks, extension of existing ones, and coalescence with nearby cracks. At normal operating stress levels, growth rates appear to be essentially independent of maximum stress and R-value*

*REPORT OF THE INQUIRY*

**Figure 3.22**
**Crack growth rate distribution from crack growth studies at various load levels (NRTC)**



Source: Endnote [66]

*and is instead, controlled by environment."* [67]  However, several researchers indicated that they expect to find crack growth rates related to stress level, as indicated by the following comments:

- Parkins referred to his laboratory research work on the effects of stress fluctuations (R-value) and maximum stress on crack growth rates (Figure 3.21).  He prefaced his work by stating [68]:

    *It is to be expected that increase in the maximum stress and /or decrease in R value will be more likely to promote the formation of deeper cracks.*

    It should be noted, however, that Parkins' work was carried out at stress levels significantly above those found in operating pipelines, so it is difficult to define a trend for typical operating stress levels.

- Parkins further indicated [69]:

    *So far as attempting to control the incidence of SCC by control of the stressing conditions on pipelines is concerned, since I believe there are threshold conditions, at stresses that probably depend on the environmental conditions, the steel*

---

*STRESS CORROSION CRACKING*                                                                              47

*involved and the stressing conditions, it follows that, in principle, SCC growth can be avoided by such approaches.  The difficulty in applying that approach to control at present is that there are virtually no laboratory data upon which to base the choice of conditions to be applied in the field.*

- Leis notes that reducing pressure or pressure fluctuations in order to reduce stress in a pipeline with SCC will not stop cracking.  However, it may marginally reduce the rate of crack growth.  Leis states that [70]:

    *Difficulties remain in assessing the extent of this rate reduction in that laboratory data do not reflect field conditions.*

- The role of stress on crack growth is also discussed by Beavers [71]:

    *I believe that it would be safe to assume that the probability of crack initiation and subsequent cracking velocity both would decrease with decreasing applied stress.*

- Analysis of the data from TransCanada's investigative excavations indicates that crack depth increases at higher stress levels  (Figure 3.18).  TransCanada attributes this finding to higher loading rates at locations near compressor stations rather than higher stress levels [72].

- The analysis of the seven SCC ruptures on the TransCanada system indicates the maximum crack growth rate for gas

**Figure 3.23**
**SCC 'life' model for a crack that would grow to failure**



Source:  Endnote [74]

*REPORT OF THE INQUIRY*

pipelines is in the vicinity of 2 x 10$^{-8}$ mm/s (0.63 mm/yr) [73]. This growth rate represents a time-averaged value, i.e., from Stage 1 to Stage 4 (Figure 3.23), not an absolute value, since crack growth is essentially governed by chance, where there are periods of rapid crack growth interspersed with periods of dormancy [75]. Growth rates vary with the steel microstructure: thus, growth rates are some 30 per cent higher in the heat affected zone (HAZ) next to pipe welds [76] and growth can stop when cracks encounter pearlitic bands in the steel microstructure [77].

- Krishnamurthy presented in Figure 3.24 the means comparison between crack depth and the ranges in the pipeline operating pressure. He noted that [79]:

  *The pressure ranges 600 and 800 [psi] exhibit significantly (80 per cent confidence) larger crack depths as compared to 200 and 400 [psi]. This may imply an increased propensity for cracking at higher pressures. However, when pressure varies from 400 to 600 [psi], the crack depths are significantly (80 per cent confidence) larger than when the pressure is between 600 and 800 [psi]. Additionally, parameters such as crack length, and colony size were also evaluated as a function of pressure, and no such trends were evident. The implication of such data, is that despite a limited relationship to operating pressure, there are perhaps other factors influencing the cracking.*

**Figure 3.24**
**Means analysis of estimated depth (per cent wall) versus pressure range (Mobil)**



Source: Endnote [78]

---

**Effect of crack coalescence on crack growth.** Crack coalescence is another factor affecting crack growth rates. Crack coalescence is the result of individual cracks joining together at the crack tips to form longer cracks (Figures 3.25, 3.26). CEPA states that [80]:

**Figure 3.25**
**Coalescence of several cracks**



Source: Endnote [1]

**Figure 3.26**
**Cracks approaching coalescence**



Source: Endnote [11]

*REPORT OF THE INQUIRY*

*If cracks nucleate in close proximity to one-another, as* [is] *suggested could occur at higher operating stresses, then crack growth could be dominated by the coalescence of collinear cracks.*

Coalescence can occur throughout the SCC life cycle (Figure 3.23). Depending on the size of the crack, either environmental or mechanical forces will cause the cracks to grow during Stage 3. In Stage 4 of growth, coalescence occurs by tearing [81], where mechanical loading has a stronger effect in producing crack growth [82]. The presence of coalescence throughout the life cycle was disputed by Beavers in that he has found no evidence of coalescence late in the life of a pipeline, from the analysis of ruptured specimens [83].

Research at NRTC has shown that the geometry of the SCC colony is important in determining whether cracks will coalesce and grow to failure. Colonies of cracks which are long in the longitudinal direction but narrow in the circumferential direction present more of a threat to pipeline integrity than colonies of cracks that are about as long as they are wide. In long, narrow colonies, individual cracks that are aligned head to tail can link up and can lead to rupture. But in colonies of cracks which are equally long and wide, growth occurs primarily on the edge of the colony [84]. Cracks located deep within these colonies shield each other from stress and become dormant [85].

The cracks in colonies will be closer together or further apart and so the crack spacing may be described as being either "sparse" or "dense". Leis uses a circumferential spacing equal to 20 per cent of the wall thickness between cracks as the distinguishing criterion between sparse and dense. Cracks circumferentially spaced closer than 20 per cent of the wall thickness tend to go dormant, whereas cracks spaced further apart (at distances greater than 20 per cent of the wall thickness) can continue to grow [86]. This information shows that crack coalescence is a possible influence on crack growth but, as the various researchers have stated, there is no predictive model which has been developed that allows us to define the influence of coalescence on crack growth. Here again, the research in this area is incomplete.

**Effect of rate of pressure change rate on crack initiation and crack growth.** Very little research has been conducted on the effect of the rate of pressure change or strain rate (which is how the pressure rate affects the pipe steel) on crack initiation and growth. In its work to develop a model of crack growth rate, the University of Waterloo conducted a series of experiments using a bending test fixture in which the loading rate was varied from 40 to 400 to 5 000 cycles per day with three R-ratios, 0.50, 0.82 and 0.90. In each set of data, the maximum stress intensity was held in the range of 34 to 38 MPa√m. This is analogous to keeping the crack driving force at the crack tip at the same level. The results indicate that the slower frequencies gave

faster per-cycle growth rates.  This was because, at low frequencies, crack growth per cycle was higher since there was more time for the environment to interact with the crack, increasing the growth rate [87].

A further indication of the significance of the rate of loading was provided by Beavers [88].  He indicated that he thought the appropriate crack driving force parameter was the J integral since this factor considers crack tip plasticity and plasticity appears to be related to the cracking process.  (The J integral or stress intensity factor K, as defined in fracture mechanics, is a function of crack size, the stress acting on the crack and the structural geometry of the crack.) Recent results have modified Beavers' thinking because the constant displacement rate testing has shown that the rate of change of J with time must also be incorporated in a crack driving force parameter.  This is an area where the research is incomplete.

## 3.7    Conclusions

Although there is much research to be done to better understand near-neutral pH SCC, we know that three conditions are required to act together for SCC to form:

- a potent environment at the pipe surface,

- a susceptible pipe material, and

- a tensile stress.

The findings with regard to these three factors are discussed below.

### 3.7.1  Environment

The environment at the pipe surface is affected by four factors: the type and condition of coating, soil, temperature and cathodic current level.  All occurrences of SCC involve both failure of the coating (disbondment or holiday formation) and the lack of cathodic protection of the pipe surface.  Without cathodic protection, the environment at the pipe surface, which is influenced by soil conditions and chemistry as well as temperature, can cause the initiation of near-neutral pH SCC.

We found that research into the environment conducive to SCC is incomplete in the following areas:

- the relationship between anaerobic soil conditions and the occurrence of near-neutral pH SCC;

- a means to drive cathodic current under disbonded tape coating to prevent formation of the near-neutral pH environment;

- alternative ways to drive the cathodic current through high resistivity soil to the pipe surface; and

- the role of sulfides produced from sulfate-reducing bacteria, which act as a poison for the atomic hydrogen created by the environment.

### 3.7.2 Material

There does not appear to be a correlation between near-neutral pH SCC and pipe composition, grade, manufacturer or manufacturing process.  With one exception, all of the steels examined have indicated a comparable susceptibility to near-neutral pH SCC.  The exception was the ERW pipe manufactured by Youngstown.  The ERW seam area of Youngstown pipe has been found to exhibit a lower resistance to near-neutral pH SCC formation than the base metal.

We found that research into pipe materials is incomplete in the following areas:

- the susceptibility of high strength steels to SCC and/or hydrogen embrittlement and the tolerance of high strength steels to SCC and other defects;

- the susceptibility of the coarse-grained heat-affected zone to cracking, relative to the base material in the near-neutral pH environment;

- the role of cyclic-softening in controlling the formation of plasticity on the surface of a pipe and the feasibility of altering the cyclic-softening characteristics of steel through hydrostatic retesting procedures;

- the relationship between the incidence of SCC and the number and size of non-metallic inclusions; and

- the relationship between the condition of the pipe surface and the threshold stress level for the initiation of SCC.

### 3.7.3 Stress

Field data and laboratory data indicate that stress has an effect on initiation and possibly on the growth rate of near-neutral pH SCC.  We also found that pressure fluctuations and strain-rates have an effect on crack growth as identified by laboratory data.  However, we found that the available information is limited and conflicting.

While field data show a significant reduction in the incidence of SCC below a hoop stress caused by pressure of 70 per cent SMYS, research has not found a threshold stress below which cracks will not grow to failure.  Some evidence suggests that the threshold stress level and the level of pressure fluctuations are interrelated and that the threshold may vary along the length of the pipeline.  The evidence indicates that the total stress on a pipeline should be considered.  The hoop stress caused by the internal pressure is only one component of total stress.  In almost all pipeline failures associated with SCC, local stress intensifiers such as corrosion, gouges or stress concentrations at the toe of the weld seam have been present.

We found that research into stress is incomplete in the following areas:

- the role of stress level, stress fluctuations and strain rate, individually and in combination, at realistic operating stress levels, on the initiation and growth of SCC;

- the R-ratio (daily, weekly, monthly or yearly) which controls the SCC behaviour of gas and liquid pipelines;.

- the role of crack coalescence in crack growth; and

- understanding of residual stress in the initiation and growth of SCC and possible ways of reducing or minimizing the level of residual stress in pipelines.

**Recommendation**

3-1    We **recommend** that the Board require pipeline companies to examine ERW pipe manufactured by Youngstown Sheet and Tube located in SCC susceptible soils for evidence of SCC.

3-2    We **recommend** that the Board request that CEPA provide, by 30 June 1997, an analysis of the extent to which the areas of incomplete research identified in this report are addressed in the current SCC research program and the merits and implications of expanding this program to cover these areas.

# Chapter Four

## Prevention, Detection and Mitigation

### 4.0  Introduction

Our understanding of how near-neutral pH SCC initiates and grows was set out in Chapter 3.  Pipeline companies, industry groups and researchers have looked for ways to prevent, detect or remove SCC before it grows to the point where an in-service pipeline failure results.  In the previous Inquiry, the Board evaluated the effectiveness of different ways to prevent service failures caused by near-neutral pH SCC.  The mitigative measures evaluated included hydrostatic retesting, reduction of operating pressure, selective pipe replacement and investigative excavations and repairs.

Since that Inquiry, these and other techniques have been used and there is now more experience with them and more information about their effectiveness.  In addition, research has improved the understanding of the principles underlying these techniques.  Taking into account this experience and improved understanding, we evaluated these and other measures for the prevention, detection and mitigation of the effects of near-neutral pH SCC.

The measures discussed in this chapter are:

- coatings,
- predictive models,
- investigative excavations and repairs,
- in-line inspection,
- pressure reduction,
- hydrostatic retesting, and
- selective pipe replacement.

Each was evaluated on the basis of its effectiveness in preventing service failures or in minimizing the consequences of service failures.

### 4.1  Coatings

The corrosion control system for a buried pipeline consists of two parts: the external coating on the pipeline and the cathodic protection system.  The primary purpose of the coating is to protect the pipe surface from its external environment.  In the event that the coating disbonds from the pipe, the cathodic protection system is designed to protect the pipe from corrosion.

As discussed in Chapter 3, the occurrence of near-neutral pH SCC on Canadian pipelines has been largely due to the failure of polyethylene tape coatings which were applied to pipelines installed between 1968 and 1973.  Clearly, these coatings did not have the properties needed to provide long-term protection against SCC.

In the Inquiry, different types of coating systems were evaluated in terms of their ability to protect the pipe surface over the life of the pipeline.  The use of coating systems for new pipelines and the recoating of existing pipelines are discussed in this section.

### 4.1.1 Coatings for new pipelines

CEPA stated that *"…*[the] *most viable way of reducing SCC initiation on new pipelines is through the use of high-performance coatings in conjunction with effective cathodic protection."* [1]  CEPA considers that fusion bonded epoxy, urethanes, liquid epoxies, extruded polyethylene and multi-layer coatings are high-performance coatings.

CEPA identified three criteria for assessing the effectiveness of a coating in preventing SCC [2].  They relate to the ability of the coating to:

- prevent the environment/electrolyte which causes SCC from contacting the pipeline steel surface (i.e., remain bonded to the pipe);

- allow the passage of CP current which prevents the initiation of SCC should the coating fail; and

- alter the pipe surface during the coating application so that it is less susceptible to SCC initiation.

In respect of the first criterion, if the coating does not disbond from the pipe, the environment necessary for SCC initiation or growth cannot develop at the pipe surface and SCC is effectively prevented.  Good, long-term bonding strength in a coating is therefore important for SCC-susceptible pipe.

However, over the service life of most coatings, some disbondment will likely occur.  When it does, the pipeline's cathodic protection system acts as a back-up against near-neutral pH SCC.  As noted by Beavers and Thompson [3], in order for the CP system to be able to protect the pipeline, the coating material must conduct CP current when disbondment occurs.

The first two criteria are recognized in CSA Z662, which requires that coatings have the following properties [4]:

*9.2.8.1    Properties*

*Coatings shall*

*a)  electrically isolate the external surfaces of the piping from the environment;*

---

b) *have sufficient adhesion to effectively resist underfilm migration of moisture;*

c) *be sufficiently ductile to resist cracking;*

d) *have sufficient strength or otherwise be protected to resist damage due to soil stress and normal handling;*

e) *be compatible with cathodic protection;*

f) *resist deterioration due to the environment and service temperature; and*

g) *where plant applied, comply with the requirements of the appropriate CSA Z245 standard, where one exists.*

Coatings that meet the performance criteria set out in the CSA standard would therefore meet the first two criteria identified by CEPA for preventing SCC.  However, although Clause 9.2.8.1(f) of the standard suggests that these properties should be maintained over the service life of the pipeline, there is no specific requirement to demonstrate the long-term performance of the coating.

With respect to the third criterion, laboratory and field tests conducted by the PRC*I* indicate that grit blasting a pipe surface renders it more resistant to SCC initiation [5].  When grit blasting is used to clean the pipe surface prior to coating application, it removes the majority of the mill scale and changes the residual stress condition of the steel surface, thereby minimizing initiation sites for SCC.

Coating systems that meet all three criteria are effective in preventing SCC.  Fusion bonded epoxy, urethanes and liquid epoxy coatings meet all three criteria.  The long-term performance of these coatings attests to this effectiveness.  CEPA states that FBE coatings have been in use for over 25 years and there have been no reported incidents of SCC, even on pipelines in locations known to cause SCC; and liquid epoxies and urethanes have been in use for over 13 years, with similar success [6].

However, a coating system does not have to meet all three criteria to be effective in preventing SCC.  Extruded polyethylene coatings applied according to CSA Z245.21-M92 meet only the first and third criteria.  CEPA notes, however, that in over 20 years of experience with this type of coating, there have been no reported cases of SCC [7].  Thus, there is evidence of proven long-term performance in preventing SCC.

Multi-layer and composite coatings are relatively new types of coatings.  Multi-layer coatings consist of an inner layer of FBE and an adhesive layer followed by an outer polyolefin layer.  Composite coatings are a version of a multi-layer coating with inner FBE and outer polyethylene layers but the adhesive is replaced with a graded layer of FBE and modified polyethylene.  CEPA notes that the potential for

tenting across a raised weld remains a concern for multi-layer coatings that are extruded [8]. Since these coatings are relatively new, their long-term effectiveness in preventing SCC is unknown. Until that effectiveness has been demonstrated (e.g., through experience or accelerated laboratory tests), careful consideration is needed before using these coatings for SCC-susceptible pipelines. If SCC does occur over the life of the pipeline, costly mitigative measures may become necessary.

According to CEPA, bituminous enamel coatings (asphalt and coal tar) meet the first criterion, but may not meet the other two [9]. However, as discussed in Chapter 3, unless the pipe surface is adequately prepared, these coatings may be prone to disbondment due to soil stresses. Near-neutral pH SCC has occurred on pipelines with these coatings in high resistivity soils, where the CP current was unable to reach the pipe surface.

Modern polyethylene tape coatings have improved bonding strength and damage-resistance compared to the earlier versions associated with most of the SCC on Canadian pipelines. However, they still shield the pipe from CP current when they disbond and the pipe surface preparation process does not result in added resistance to SCC initiation. The long-term effectiveness of modern tape coatings in preventing SCC is unknown. Therefore, careful consideration is needed before using them for SCC-susceptible pipelines.

It should be noted that girth weld coatings are applied in the field after the pipe joints have been welded together. The effectiveness of girth weld coatings is as important as the coating on the main body of the pipe in terms of preventing SCC initiation and growth and should meet the same three criteria.

### 4.1.2 Recoating existing pipelines

The principal reason for considering the recoating of long sections of a pipeline is the failure of its existing coating system. Pipelines that may require recoating are those with coating types that have historically contributed to the development of SCC by disbonding from the pipe and shielding the exposed steel surface from cathodic protection current.

Recoating long sections of a pipeline involves excavation of the pipeline, removal of the old coating, preparation of the pipe surface and application of the new coating. These operations depend on the type of the replacement coating that is to be used.

Not all coatings that are available for new lines can be used to recoat an existing pipeline. CEPA stated that, currently, pipeline recoating can be done using either conventional single or double-wrap tape systems, or liquid epoxy and urethane coatings [10].

TransCanada indicated that, before recoating long sections of a pipeline, the integrity of the pipeline must be demonstrated to ensure

that there are no near-critical flaws on the pipeline [11].  This would normally be done with a hydrostatic retest.

CEPA indicated that, in most cases, projects involving the recoating of long sections of pipeline have not been economical [12].  Recoating costs can vary from 50 per cent of the cost of a new line to more than the total cost of a new line [13].  The costs vary considerably because there are numerous variables inherent in a recoating operation including specific terrain conditions, soil types, type of coating to be removed and the type of rehabilitation coating.  There are also the costs to assess pipe integrity and possibly perform pipe repairs, as well as the costs associated with service interruptions.

TransCanada indicated that recoating costs are currently under study [14].  The company indicated that it plans to conduct a coating rehabilitation project to assess the feasibility of recoating long distances of pipeline using the latest technology [15].

### 4.1.3 Conclusions

The use of effective pipe coatings is the most practical way of preventing SCC on new pipelines or when recoating existing pipelines. We believe that the three criteria identified by CEPA provide a sound basis for choosing an effective coating.

Our concerns relate to the absence of standard tests to determine whether a coating will meet these criteria over the expected service life of the pipeline.

We consider that effective coatings are those that meet all three criteria or have proven long-term performance in preventing SCC.  We believe that the use of effective coatings, combined with adequate levels of cathodic protection, has already gone a long way to preventing the initiation of SCC on pipelines brought into service in the last two decades, and will continue to do so in the future.  Whenever possible, coatings with demonstrated effectiveness should be used for coating new lines, including girth welds, and for recoating existing lines.

We consider that fusion bonded epoxy, urethanes, liquid epoxy and extruded polyethylene coatings have established their effectiveness in protecting pipelines from SCC.

Careful consideration is required before deciding to use any other type of coating on SCC-susceptible pipelines, if they do not meet the criteria discussed above and their long-term performance has not been demonstrated.  If other coatings are used and SCC occurs over the life of the pipeline, costly mitigative measures may become necessary.

Finally, we consider it mandatory that, before a section of pipeline is recoated, its integrity must be demonstrated.

**Recommendation**

4-1    We **recommend** that the Board request that the CSA Technical Committee on Oil and Gas Industry Pipeline Systems, the pipeline industry and coating manufacturers coordinate efforts to:

    a)    develop standard tests, where none currently exist, that determine whether a coating will meet the performance criteria set out in the CSA Z662-94 standard over the anticipated service life of a pipeline;

    b)    incorporate those tests in the appropriate CSA standards; and

    c)    conduct objective studies based on those tests to demonstrate the long-term performance of the different types of coatings currently available for pipelines.

## 4.2    Predictive models

Predictive models are intended to identify and rank those areas along a pipeline system that are the most likely to have "significant" SCC based on the various factors which are known to contribute to susceptibility to SCC.  (The definition of "significant" SCC is discussed in section 4.3.1.)  These factors include:

- the type of coating,
- the year of pipeline installation,
- the operating history of the pipeline, and
- the terrain conditions (soil type, drainage and topography).

By themselves, predictive models neither directly prevent service failures due to SCC nor do they reduce the consequences of such failures.  However, by identifying those locations where SCC is most likely to occur, a predictive model allows a company to direct its investigative excavations and other mitigative activities to where they will have the most effect.

This section discusses the development of a predictive model, the effectiveness of such models and how they can be used to manage an SCC-susceptible pipeline.

### 4.2.1 Development of a predictive model

The information collected by TransCanada during its investigative excavations in the late 1980s suggested that the occurrence of "significant" SCC on a pipeline was strongly related to the terrain conditions surrounding the pipe where there was the potential for pipe coatings to have disbonded.  Based on this observation, TransCanada

employed J.E. Marr Associates (Canada) Ltd. in 1992 to develop a predictive model for SCC susceptibility.

Several other pipeline companies have since developed predictive models for SCC susceptibility. In most cases, these models have been based on the methodology developed by TransCanada and J.E. Marr Associates (Canada) Ltd. [16]. At the time of the Inquiry, six CEPA member companies were using predictive models to assess the SCC-susceptibility of their systems, or portions thereof, and five other member companies were developing predictive models [17]. As well, one CAPP member has used a predictive model [18].

The data collected by various CEPA members have identified seven specific sets of terrain conditions associated with "significant" SCC on polyethylene tape coated pipelines. Another four specific sets of terrain conditions have been identified with "significant" SCC on asphalt coated pipelines. These 11 sets of terrain conditions are referred to as "significant terrain conditions" [19] and are outlined in Tables 4.1 and 4.2. It is important to note that the presence of these terrain conditions along a pipeline system means only that the environmental conditions may exist for "significant" SCC to develop. If any of the other conditions necessary for SCC initiation and growth (e.g., coating disbondment, susceptible pipe material and stress) are not present, SCC will not develop at that location.

In general, the first step in the development of a predictive model is to review the background information for a specific pipeline. The data will include, among other things, the pipeline's operating history, its coating type and its year of construction. The more current and complete the available pipeline data, the better the initial model.

The second step is to get information about the existing terrain conditions along the system. Aerial photos and soil surveys are used here. The pipeline data are then correlated with the actual terrain conditions to form a database. Finally, the gathered information is cross-referenced with the "significant terrain conditions" known to promote SCC [20].

Areas along the pipeline system are then identified as being susceptible or non-susceptible to SCC. Areas identified as susceptible to SCC can also be ranked as to their relative susceptibility.

As investigative excavations are carried out in these areas, the presence or absence of SCC and specific details on the terrain conditions are recorded. The information collected is then used to verify and enhance the predictive model. As more excavations are performed, the model is further refined and its accuracy improves.

While the information on terrain conditions known to promote SCC susceptibility may be applied to all pipelines in the same area, a predictive model can be used only for the pipeline for which it was developed. That is because the data about each pipeline – its coating, its year of construction, its operating history – may be quite unique and

**Table 4.1**

**Description of significant terrain conditions for polyethylene tape coated pipelines**

| Soil environment description | Topography | Drainage |
|---|---|---|
| Clay bottom creeks and streams (generally <5 m in width) | | |
| Lacustrine (clayey to silty, fine textured soils) | inclined<br>level<br>undulating | very poor |
| Lacustrine (clayey to silty, fine textured soils) | inclined<br>level<br>undulating<br>depressional | poor |
| Organic soils (>1 m in depth) overlaying glaciofluvial (sandy and/or gravel textured soils) | level<br>depressional | very poor |
| Organic soils (>1 m in depth) overlaying lacustrine (clayey to silty, fine textured soils) | level<br>depressional | very poor |
| Moraine tills (variable soil texture - sand, gravel, silt and clay with a stone content >1%) | inclined to level<br>level<br>undulating<br>ridged<br>depressional | very poor<br>poor<br>imperfect to poor |
| Moraine tills (variable soil texture - sand, gravel, silt and clay with a stone content >1%) | inclined | poor<br>imperfect to poor |

Source:  Endnote [19]

**Table 4.2**

**Description of significant terrain conditions for asphalt coated pipelines**

| Soil environment description | Topography | Drainage |
|---|---|---|
| Bedrock and shale limestone (<1 m of soil cover over bedrock or shale limestone) | inclined<br>level<br>undulating<br>ridged | well drained |
| Glaciofluvial (sandy and/or gravel textured soils) | inclined<br>level<br>undulating<br>ridged | well drained |
| Moraine tills (sandy soil texture with a stone content > 1%) | inclined<br>level<br>undulating<br>ridged | well drained |
| Sites which do not meet the <850 mV "off" criteria used in the Close Pipe to Soil Corrosion Survey (exclusive of the three sets of terrain conditions discussed above) | | |

Source:  Endnote [19]

*REPORT OF THE INQUIRY*

this data is an important part of the predictive model. Consequently, assumptions should not be made about SCC susceptibility on one pipeline system on the basis of a predictive model developed for another system.

**Cost.** The cost of developing a predictive model will differ for every pipeline company, depending on the availability of the information required for the database. For example, the cost will be higher if the original pipeline construction documentation is not available. CEPA provided the following estimated costs for developing a predictive model [21]:

| | |
|---|---|
| Pipeline database development | $80/kilometre |
| Investigative excavations | $1000/metre |
| Model verification | $120/kilometre |
| Model refinement | $25/kilometre |

As the estimates show, the long-term costs of maintaining a predictive model will depend primarily on the number of excavations performed.

### 4.2.2 Effectiveness of predictive models

At the time of the Inquiry, CEPA member companies, primarily TransCanada, had completed 1,920 investigative excavations that included inspection for SCC. As shown in Figure 4.1, about 45 per cent of these excavations were selected using a predictive model and SCC was found at 44 per cent of those sites. When the inspections were carried out during routine maintenance activities, SCC was found at only four per cent of the sites.

This substantial increase in the amount of SCC found using predictive models demonstrates the effectiveness of predictive models in finding SCC. The data also demonstrate that relying on SCC investigations during routine maintenance activities may give misleading results in respect of a pipeline system's susceptibility to SCC.

Figure 4.2 provides a graphical representation of the effectiveness of predictive models developed by five CEPA member companies. Excavations were conducted at sites associated with "significant terrain conditions" and "non-significant terrain conditions". As the data show, SCC was detected two times more frequently at sites with "significant terrain conditions" than those with "non-significant terrain conditions". Also, while some "insignificant" SCC was detected at sites with "non-significant terrain conditions", no "significant" SCC was detected at those sites. These results indicate that the SCC predictive models developed by five CEPA member companies have been effective in identifying sites where SCC may be present.

The models' effectiveness will depend on their accuracy for predicting sites susceptible to "significant" SCC. That accuracy will depend in large measure on the quality and reliability of the data used to develop the model. In this connection there are currently no developed

**Figure 4.1
Effectiveness of predictive models**



☐ Excavations performed for other reasons (no SCC detected)

■ Excavation performed for other reasons (SCC detected)

☐ Excavations selected with a predictive model (no SCC detected)

▨ Excavations selected with a predictive model (SCC detected)

Source: Based on data from endnote [22]

**Figure 4.2
Effectiveness of predictive models developed by 5 CEPA member companies**



☐ No SCC found

▨ Insignificant SCC found

■ Significant SCC found

Source: Based on data from endnote [23]

**Figure 4.3**
**Soil probe**



Courtesy of NOVA

sampling criteria for companies to assist them in determining the appropriate number of excavations to verify a model's accuracy.

**Soil probe.**  To increase the effectiveness of detecting SCC, several companies have been using a soil probe during their investigative excavations.  The NOVAProbe®, developed by NGTL and NRTC, measures a number of soil characteristics active in the development of pipeline corrosion without requiring excavation.  As the probe does not disturb the soil around the pipeline, the accuracy of selecting sites for SCC inspection improves, since additional information about the soil characteristics at pipe depth can be used along with information on site topography, soil type and drainage.

As shown in Figure 4.3, the NOVAProbe® incorporates several sensors in a single probe tip.  In the field, the probe is pushed to the desired depth to measure the soil resistivity, redox potential, temperature and pipe-to-soil potential [24].  Because of heavy demand for the NOVAProbe®, NRTC has organized an industry consortium to make it more readily available to pipeline companies.

The information collected by the NOVAProbe® is also being incorporated into the CEPA SCC database (discussed in Chapter 6) to further determine if there are any correlations between the soil characteristics measured and the presence or absence of SCC.

### 4.2.3 Conclusions

We consider that predictive models can be effective in identifying and ranking areas along a pipeline that are susceptible to SCC, provided that:

- reliable pipe data and terrain information are used; and
- the predictive model is verified and continually enhanced as data from excavations become available.

By identifying those locations along a pipeline where SCC is most likely to occur, a predictive model enhances the effectiveness of other mitigative measures in preventing service failures or reducing the consequences of such failures.

When prioritizing susceptible areas for mitigation, it is important that the consequences of potential service failures be considered so that the risk due to SCC failures may be minimized.

### Recommendations

4-2    We **recommend** that, if there is reason to believe that sections of a pipeline may be susceptible to SCC, the Board require the pipeline company to develop a predictive model to identify and prioritize sites for an investigative excavation program.

4-3     We **recommend** that the Board request that CEPA develop sampling criteria for verifying the accuracy of predictive models.

## 4.3     Investigative excavations and repairs

If SCC is detected before it grows to a critical size, repairs can be made and the risk of a service failure can be eliminated.  One way of detecting SCC is by excavating around the pipe and inspecting it section by section.  To be effective at preventing service failures due to SCC, however, the repair method must restore the integrity of the pipeline and eliminate the conditions necessary for further SCC growth.

### 4.3.1 Investigative excavations

Pipeline companies excavate around portions of their pipelines (Figure 4.4) as part of routine maintenance and these excavations create an opportunity to investigate for SCC.  Companies can also conduct excavations specifically to look for SCC at locations selected on the basis of information from predictive models or in-line inspection.  However, while predictive models are designed to identify locations that are most likely to have "significant" SCC, they are not able to distinguish those locations with near-critical cracks.

With respect to SCC-specific investigative excavations, CEPA stated that it is *"… not technically possible, at this time, to eliminate all potential for SCC failures on a pipeline on the basis of investigative excavations alone unless discretely susceptible locations are known to exist in isolated sections along the pipeline."* [25]

**CEPA Recommended Guidelines.**  To assist its members in developing and implementing SCC investigative programs, CEPA has produced a manual of Recommended Guidelines which provides information on site selection, excavation procedures and inspection techniques [26].  These guidelines are specific to longitudinal near-neutral pH SCC and were written as a working document based on industry experience.  An overview of the investigative excavation process, as detailed in CEPA's Recommended Guidelines, is outlined in the following paragraphs.

Before and during excavation, information about the terrain conditions at the site is documented.  Terrain conditions include soil type, drainage and topography.  Samples of soil and groundwater should be collected, as well, to further develop an understanding of the environmental parameters associated with SCC.

Following excavation, the pipe coating is examined for any disbondment or other damage.  Normally, all areas of coating disbondment should be inspected for SCC.  If liquid (electrolyte) is found beneath the pipe coating as it is being removed, a litmus paper pH reading is taken.  Measurement of the pH in the field is very important

**Figure 4.4**
**Investigative excavation**



since ongoing chemical reactions within the sample can alter the pH prior to laboratory analysis.  Nevertheless, subsequent laboratory measurements of pH for the same electrolyte can provide useful information about the processes associated with SCC.

As the pipe coating is removed, the presence of any corrosion deposits should be noted.  It is important that a corrosion deposit be accurately identified.  Combined with other specific environmental conditions, certain corrosion deposits are strongly related to either the presence or absence of SCC and provide information about the environment beneath the disbonded coatings.

To prepare the pipe for SCC inspection, the pipe surface must be cleaned and dried so that any SCC present can be reliably detected.  Currently, high-pressure water blasting and walnut shell blasting are the only field-proven ways to clean the pipe surface for SCC inspection.  Both methods remove the pipe's coating and primer, as well as any corrosion deposits or mill scale found on the pipe surface.  However, the pipe cleaning process must be done carefully since mechanical damage to the pipe surface could result in SCC colonies being masked or misinterpreted.

After the surface has been prepared, the pipe is inspected for SCC using magnetic particle inspection (MPI) techniques (see Figure 4.5).  The skill of the technician in recognizing SCC is a critical factor during this inspection process.  It is essential that all SCC colonies present be identified correctly and then documented.  The documentation should include, among other things, an assessment of the severity of the SCC detected.

**Criteria for assessing the severity of SCC.**  SCC will be more advanced in some cases than in others.  In order to be able to provide a consistent measure of the severity of SCC when it is found, TransCanada developed a set of definitions, or criteria, which classify the severity of

**Figure 4.5**
**Magnetic particle inspection**



Courtesy of TCPL

SCC colonies as either "significant" or "insignificant". These definitions take into account the colony's length and depth and the pipe's geometric and mechanical properties. A colony is "significant" if the deepest crack is greater than 10 per cent of the pipe wall thickness and the total length of the colony exceeds a crack length that would likely fail under a pressure test at 110 per cent of the pipe's SMYS [27]. SCC colonies that do not meet the "significant" criterion are classified as structurally "insignificant" [28].

It should be noted that SCC colonies that are classified as "significant" are not necessarily an immediate threat to the integrity of the pipeline. The criterion is deliberately conservative so that the pipeline company has adequate time to plan and implement remedial action before a crack grows to a critical size.

To properly evaluate the severity of an SCC colony, its depth and length must be accurately determined. These dimensions are then compared to a critical crack size calculated for that segment of pipe to assess if the pipe's integrity is threatened.

From the experience gained after grinding several hundred colonies, some CEPA member companies have developed a correlation between the length and depth of "insignificant" cracks. In this way, the depth of an "insignificant" crack can be estimated from its length [29]. However, the only way of accurately measuring the depth of SCC is through successive grindings with repeated wall thickness readings, combined with MPI, to confirm the continuing presence or removal of the colony [30].

### 4.3.2 Repair of SCC-affected pipe

The primary objective of any pipeline repair is to restore the integrity of the pipeline. This is generally achieved by removing any defects of a size that may fail in service. In the case of SCC-susceptible pipelines, another equally important objective is to eliminate the possibility of future SCC growth. This second objective is achieved through the application of a coating that will effectively eliminate the conditions necessary for SCC growth.

Once SCC has been detected and classified, a decision must be made as to which colonies can be left in the pipeline and which ones need to be removed. In making this decision, the company must review each SCC colony and take into account the pipe material, the pipeline configuration and location, the pipeline's operating characteristics and the extent of the cracking [31].

As a minimum, companies must meet the requirements of CSA Z662. That standard considers pipe body cracks to be unacceptable defects that must be removed, unless an engineering assessment determines that they are no threat to the pipe's integrity. Thus, if the nature and extent of stress corrosion cracks do not threaten pipeline

**Figure 4.6
Grinding out SCC**



Courtesy of TCPL

**Figure 4.7
Full-encirclement reinforcing sleeve**



Courtesy of PLIDCO

integrity, it is usually acceptable to make no repair, other than to replace the coating with a type of coating which will prevent further growth.

If the SCC must be removed from the pipe, the company has a number of choices.  Currently, the repair methods allowed by CSA Z662 for cracks include cut-outs, grinding and grinding combined with the use of a full-encirclement reinforcing sleeve.  Several additional repair methods may be included in the next edition of CSA Z662.  Additional repair methods proposed by CEPA include pressure containment sleeves for cracks in the pipe body or mill seam welds and fibreglass reinforcement and steel reinforcement repair sleeves for metal loss in the pipe body [32].

The currently allowable repair methods have different advantages and disadvantages.  When a cut-out is done, the pipe is cut all the way through on both sides of the damage and the cylindrical section of pipe containing the damage is taken out.  A new segment of pipe is welded in its place.  The advantage of a cut-out is that the damaged pipe is completely replaced, so the risk of a service failure due to SCC is eliminated.  However, the pipeline must be shut down until the repair is completed.  Sometimes, a complete shut-down is not practical and this constraint often governs the decision between pipe replacement and other repair options.

Grinding out cracks is done with a hand file or a power tool, as shown in Figure 4.6.  Grinding is an effective repair method, but only if the stress-concentrating effect of the defect is eliminated, all damaged or excessively hard material is removed and the amount and distribution of metal removed does not significantly reduce the pressure-carrying capacity of the pipe [33].

When grinding out results in a metal loss exceeding that allowed by CSA Z662, a full-encirclement reinforcing sleeve can be used to restore the structural integrity of the pipe.  As shown in Figure 4.7, full-encirclement reinforcing sleeves consist of two halves of a cylinder that are placed around the damaged area of the pipe and subsequently joined by welding the side seams.  However, for these sleeves to be effective as permanent repairs for SCC-affected pipe, the non-welded ends of the sleeve must be sealed onto the pipe to prevent water from getting in between the pipe and the sleeve.

As discussed in Section 4.1, the coating used in a repair must effectively eliminate the conditions necessary for SCC growth.

### 4.3.3 Conclusions

On pipelines where "significant" SCC exists, investigative excavations and repairs cannot be fully relied on to prevent all service failures due to SCC until there is a reliable site selection process for locating near-critical SCC flaws.

We are concerned that SCC may not be detected unless effective nondestructive inspection techniques are used by qualified technicians.

Also, the repair method chosen must restore the integrity of the pipeline and eliminate the conditions necessary for further SCC growth.

Only coatings that have been proven effective in protecting pipelines from SCC should be used for repairs.

## 4.4   In-line inspection

For many years, in-line tools have been employed for the inspection and maintenance of pipelines.  These tools, commonly referred to by the pipeline industry as "pigs", travel inside the pipeline with the flowing product and perform various functions.

As a mitigative measure against SCC, the objective of in-line inspection (ILI) is to detect stress corrosion cracks and collect enough information so that a decision can be made as to whether a crack needs to be repaired.

This section discusses in-line tools with particular focus on, crack detection ILI technology and the challenges in the development and use of such technology.

### 4.4.1 In-line tools

In-line tools can be classified as utility pigs or instrumented pigs. Utility pigs perform strictly operation and maintenance functions (e.g., cleaning, batching, gauging).  They contain no instruments.  On the other hand, instrumented pigs, also known as "intelligent" or "smart" pigs, may contain various sensors, sophisticated electronics, onboard computers and recording devices that collect data which are later analyzed to reveal information about the condition of the pipeline.

**Figure 4.8**
**Pig receiver**



---

There are two types of instrumented pigs: configuration pigs and ILI pigs.  Configuration pigs use onboard sensors to determine either the configuration of the inner surface or the shape and location of the pipeline.  They are designed to provide information on the geometry and dimensions of the pipeline.  On the other hand, ILI pigs apply nondestructive examination (NDE) methods to the pipe wall in order to detect conditions of the pipe wall that may affect the integrity of the pipeline.

Pigs are placed in and taken out of the pipe using launchers and receivers (see Figures 4.8 and 4.9).  These devices usually allow pigging while the pipeline remains in service or "on-line".  When on-line pigging is not possible, pigging can sometimes still be done "off-line" by taking the line out of service, temporarily adding a portable pig launcher and receiver, running a pig then putting the line back into service.

In-line inspection tools have been successfully used in pipelines for over 30 years.  In 1965, the first magnetic flux leakage (MFL) ILI tool was introduced in the United States.  This tool was used to detect general corrosion in pipelines.  Since that time, MFL tools have been refined and are now routinely used to detect metal loss due to corrosion.  Another NDE technique, ultrasonics, has been successfully adapted for ILI for the detection of corrosion.  More recently, this technique has also been adapted for ILI for the detection of cracks.

### 4.4.2 Crack detection ILI technology

The Inquiry showed that detection of SCC using special in-line inspection tools has considerable potential.

**Figure 4.9**
**British Gas SCC pig being removed from a receiver**



Crack detection ILI tools are designed to detect longitudinal cracks, including SCC, and provide information on their dimensions. With a reliable and accurate crack detection tool, such information can be used to locate critical and near-critical cracks so that they may be repaired. By providing information on the location, extent and severity of SCC on a pipeline, better decisions can be made regarding maintenance activities.

Crack detection tools use ultrasonic technology, which has been successfully used for many years to find cracks in a variety of other industrial applications. Ultrasonic waves are transmitted via transducers into the pipe wall. These waves are reflected when they encounter discontinuities (such as cracks) and a portion of their energy is reflected back as an ultrasonic signal. This signal is then processed and recorded for later analysis.

Examples of crack detection tools that are currently available or under development are illustrated in Figures 4.10 and 4.11. Table 4.3 summarizes some of the technical characteristics of these tools.

Currently, the evolution of crack detection ILI is at a stage where tools have been developed and are being offered for commercial use. In respect of the British Gas Elastic Wave Inspection Vehicle (EWIV) Mark II, TransCanada stated [35]:

> The crack detection capabilities of the current EWIV (Mark II) have been proven on TransCanada's Line 100-2 as well as on other pipe systems. However, the data analysis techniques utilized to discriminate between injurious crack-like defects and non-injurious inclusions have limited the progress of the tool on specific pipeline steels with high reflector populations...

Generally, results so far are promising in that the tools are finding cracks and the technology for distinguishing them from non-injurious

**Figure 4.10**
**Schematic of a crack detection tool (Pipetronix)**



Source: Adapted from endnote [34]

**Table 4.3**
**Examples of in-line inspection tools currently under development or being tested**

| Company | Pipetronix Ltd. | British Gas plc | | |
|---|---|---|---|---|
| Tool | UltraScan CD | MARK II | Interim MARK III | MARK III |
| Development stage / Date available | Advanced / Currently available [a] | Advanced / Currently available [a] | In development / End of 1996 [a] | In development / End of 1998 [a] |
| Technology | Ultrasonic / requires liquid couplant between the transducers and the pipe wall [d] | Ultrasonic / uses liquid-filled wheels to achieve coupling between the transducers and the pipe wall [i] | Ultrasonic / uses liquid-filled wheels to achieve coupling between the transducers and the pipe wall [i] | Ultrasonic / uses liquid-filled wheels to achieve coupling between the transducers and the pipe wall [i] |
| Runs in liquid lines? | Yes - uses product in the line as coupling agent [d] | Yes [b] | Yes [b] | Yes [b] |
| Runs in gas lines? | Yes - requires a liquid slug [d] | Yes [b] | Yes [b] | Yes [b] |
| Previous inspections | In Europe, liquid and gas pipelines [g] | In Canada and the US, liquid and gas pipelines [b] | — | — |
| Target size of SCC flaws that the tool must detect | 30 mm length; 2 mm depth [f] | 50 mm length; 1.5 mm depth [k] | 50 mm length; 1.5 mm depth [k] | 50 mm length; 1.25 mm depth [h] |
| Maximum inspection speed | 1 m/s [d] | 2 m/s [j] | 2 m/s [j] | 3.6 m/s [j] |
| Maximum inspection range | 100 km [c] | 45 km [j] | 60 km [j] | 150 km [j] |
| Nominal size(s) of tools | 610 mm (24") [d] | 914 mm (36") [j] | 914 mm (36") [j] | 610 mm (24") & 1067 mm (42") [j] |
| Sizes of pipe that the tool can inspect with proper conversion kit | The 610 mm (24") tool can be modified to cover 508 mm (20") to 762 mm (30") lines; In the second quarter of 1996, Pipetronix planned to release a tool that would cover pipe sizes ranging from 1016 mm (40") to 1422 mm (56") [d] | The 914 mm (36") tool can cover 813 mm (32") to 914 mm (36") lines [j] | The 914 mm (36") tool can cover 813 mm (32") to 914 mm (36") lines [h] | The 610 mm (24") tool can be modified to cover 508 mm (20") to 762 mm (30") lines; the 1066 mm (42") tool can cover 813 mm (32") to 1219 mm (48") lines (subject to conversion kits' availability) [h] |
| Other features / comments | German TÜV certified this tool as a replacement for hydrostatic retesting [e] | Has some ability to detect disbonded coating [l] | Will have more sensors than Mark II [j]; will have some ability to detect disbonded coating [l] | Gas bypass capability for gas line inspection / New electronics / Enhancement of the ability to detect disbonded coating [m] |

References for the table

[a]  CEPA Submission, Vol. 1, Issue 3, pp 2 & 9.
[b]  CEPA Submission, Vol. 1, Issue 3, pp 3-5.
[c]  CEPA Submission, Vol. 2, Appendix D, Tab 11, p 3.
[d]  CEPA Submission, Vol. 2, Appendix D, Tab 11, p 5.
[e]  CEPA Submission, Vol. 2, Appendix D, Tab 11, p 6.
[f]  CEPA Submission, Vol. 2, Appendix D, Tab 11, p 7.
[g]  CEPA Submission, Vol. 2, Appendix D, Tab 11, p 9.

[h]  CEPA Submission, Vol. 2, Appendix E.
[i]  British Gas Submission, Part B, p 3.
[j]  British Gas Submission, Part B, p 7.
[k]  British Gas Submission, Part B, p 11.
[l]  MH-2-95 Hearing Transcript, 19 April 1996, p 597, line 27.
[m]  MH-2-95 Hearing Transcript, 19 April 1996, p 593, line 10.

features is improving.  It is expected that this will lead to newer generations of crack detection tools with enhanced capabilities in the near future.

Once a tool is available with proven reliability for detecting critical and near-critical cracks and the ability to distinguish between cracks and non-injurious features, it will greatly enhance a company's ability to maintain the integrity of a pipeline that is susceptible to SCC, or to any other cracking mechanism.  The company will know with much greater certainty where repairs are necessary, rather than having to rely only on predictive models or hydrostatic retests.  Better decisions can be made regarding the need for other mitigative action (e.g., recoating, selective replacement) and down-time will be reduced.

CEPA stated that crack detection tools, as they further develop, may be used to monitor crack initiation and growth, validate and enhance predictive soils models for use in non-piggable pipeline sections and possibly find areas where coatings have disbonded [36].

### 4.4.3 Challenges

While we are hopeful that crack detection ILI tools will evolve to a level of reliability comparable to that of hydrostatic retests in finding near-critical longitudinal cracks like SCC, we also recognize that there are challenges ahead for the industry and the manufacturers of these devices.  These are some of the major challenges:

**Technical challenges.**  An ILI tool must survive a 60 to 150 km journey through a buried pipeline without its sensors and sensitive electronics being damaged.  To detect cracks, the sensors of the tools have to inspect the complete volume of metal in the pipe wall over long pipeline sections.  Achieving this level of performance is not easy.

In order for the ultrasonic energy to be efficiently transmitted from the transducers to the pipe wall and back, the transducers must be coupled to the pipe.  This is achieved by placing a liquid between the transducers and the pipe wall.  In pipelines transporting liquid products, the product itself is used as a couplant.  For gas lines, the ILI tool must

**Figure 4.11**
**Photo of a crack detection tool**



Courtesy of British Gas

> **CSA Z662-94, Oil and Gas Pipeline Systems**
> **4.3.1.5**
>
> Consideration shall be given to designing pipeline systems to accommodate the use of internal inspection devices; items to be considered may include the location and sizing of scraper barrels, full opening mainline block valves, bend radii, and scraper guide bars.

either be in a slug of liquid or, as with the British Gas tool, have ultrasonic transducers coupled to the pipe through liquid contained in wheels that ride on the inside surface of the pipe. The use of a slug of liquid, usually water, challenges gas pipeline operators to deal with significant operational problems, because the line has to be taken out of service and, after pigging, the water must be removed and disposed of. The British Gas tool, however, eliminates this problem.

After the inspection, the pig is taken out of the line and the information storage package is removed for validation and preliminary analysis. After the data are checked in the field for quality and to determine whether any equipment failures occurred, it is sent to the ILI tool manufacturer for processing and detailed interpretation. The ILI data interpretation consists of many distinct stages, ranging from data reconstruction to final sizing of the defects that will ultimately be recommended for excavation. The processing of the data is carried out by specialists using specially developed computer software. They review the information and look for patterns which may represent a crack. This process can take some months to complete before the final results are delivered.

The interpretation of the inspection data and its dependence on human skills is the most critical and challenging part of the crack detection process, as cracks and other non-injurious metallurgical features present in the steel must be reliably distinguished from one another and defects must be sized and ranked. Generally, the smaller the size of crack that needs to be detected, the greater the likelihood of a "false-call" (a non-injurious feature interpreted as a crack). British Gas indicated that, according to laboratory experience and field trials, the *"… defects which have approached the dimensions likely to lead to pipeline rupture have always been detected by the system. A more pertinent question is whether the procedures used to analyze the data lead to accurate recognition of these flaws."* [37] ILI tool developers are currently investing a lot of effort into the improvement of data analysis techniques in order to better discriminate cracks from non-injurious features.

**Ability of major Canadian pipelines to accommodate ILI tools.** This is a challenge in that not all pipelines can accommodate in-line tools. Many older pipelines in particular fall into this category. Various features of pipelines (types of valves, bend radii, multiple wall thicknesses, different pipe diameters) can restrict the passage of pigs. While some of these lines can be modified to accommodate internal tools, the costs may be very high.

Many pipeline systems in Canada were constructed before ILI tools were developed. As a result, the original designs did not take into account the need to provide for in-line inspection. Currently, CSA Z662 requires that internal inspection capability be considered in the design of new pipelines.

The total length of pipeline owned by CEPA member companies in Canada is 55 000 km, of which 40 per cent (22 000 km) is smaller than 508 mm (20 inches) in diameter.  CEPA indicated that, for the foreseeable future, crack detection tools will be targeted at pipelines 508 mm in diameter and larger [38].  Of the 33 000 km of pipelines 508 mm or larger in diameter, about 15 000 km are currently capable of accommodating on-line inspection, while some 18 000 km would require modifications (i.e., installation of launcher/receiver traps and valve replacements) before being able to be inspected on-line.  The cost of these modifications is estimated to be about $270 million.  Of the total 55 000 km of pipeline, a small percentage is not adaptable for internal inspection, and other detection methods would be required [39].

TransCanada indicated that it has begun a multi-year program for the installation of pig launchers and receivers on high-risk portions of its pipeline system where these facilities do not already exist and will ensure that all new lines will be constructed to allow the passage of ILI tools [40].  In addition, TransCanada will run magnetic flux leakage and crack detection pigs off-line through the high risk sections of its system that cannot currently accommodate on-line pigging [41].

TransCanada forecast that, by the end of 1996, over 3 450 km of pipe on its system would be able to accommodate on-line inspection [42].  TransCanada further stated that, with the exception of the Youngstown portion of line 100-1, all SCC-susceptible lines on its system are capable of accommodating an in-line inspection tool [43].

**Industry commitment to tool development.**  CEPA stated that significant progress has been made in the development of crack detection tools since 1993 [44].  It also indicated that pipeline companies have supported the development of ILI tools for the detection of cracks by making financial commitments to research and by providing operational experience to the tool developers [45].  CEPA is encouraging the development of different ILI tools so that its members may benefit from having access to a wide range of technologies [46].

CEPA, PRC*I*, GRI and British Gas are funding ($7.4 million between 1996 and 1998) a new generation of crack detection ILI tools being developed by British Gas [47].  An interim 914 mm (36 inch) tool is forecast to be available by the end of 1996, while 610 mm (24 inch) and 1066 mm (42 inch) tools are expected to be available by the end of 1998.  With the appropriate conversion kit, these tools could be modified to fit pipelines ranging from 508 mm (20 inches) to 1219 mm (48 inches) in diameter.

TransCanada foresees crack detection tools becoming an effective substitute for hydrostatic retesting.  During 1996 and 1997, TransCanada will be carrying out tests using a British Gas crack detection ILI tool in order to qualify it as an alternative for hydrostatic retesting.  Several sections of pipeline will be pigged and, after the resulting crack

indications are investigated and repaired, hydrostatic retests will be done to determine if the tool missed any near-critical defects [48].

**Cost.**  Some preparation of the pipeline is required before an ILI tool can be run through the pipe.  The line must be cleaned and checked to make sure there are no obstructions in the pipeline.  There is a cost associated with these preparations, as there is with the actual inspection.

In order to accurately inspect the pipeline for defects, the speed of smart pigs must be maintained within a specific range.  For pigging liquid lines, pipeline operators do not have to significantly reduce throughput, because the average speed of liquid flow is low.  For gas pipelines, since the average flow rate is much higher than in liquid lines, operators must considerably reduce throughput, which adds significant costs to the in-line inspection operation.  In order to overcome this, British Gas is currently developing gas bypass systems which will allow a portion of the flow to go through the inspection tool, thereby reducing the loss of throughput.  This loss of throughput can be further reduced by pigging pipelines during off-peak periods of operation.

TransCanada believes that if ILI tools prove to be reliable, they will be cost-competitive with other SCC detection techniques such as investigative excavations and hydrostatic retesting [49].

### 4.4.4 Conclusions

While we are encouraged by the commitments, efforts and progress made by pipeline companies and crack detection tool developers, we find that crack detection ILI technology has not yet fully proven its capability to reliably detect critical and near-critical cracks and distinguish them from non-injurious features and thus be used as a substitute for hydrostatic retesting.

Assuming a reliable crack detection tool becomes available, it could be used to provide a company with accurate information on the condition of its pipeline.  Such information will allow for better decisions regarding the need for mitigative action and significantly enhance the effectiveness of other mitigative measures in preventing service failures or reducing the consequences of such failures.

The ability of a pipeline to accommodate the passage of in-line inspection tools significantly facilitates the maintenance of the integrity of that pipeline, not only with respect to SCC, but with most integrity issues.

**Recommendation**

4-4     We **recommend** that the Board require that new large diameter transmission pipelines be designed and constructed to accommodate the passage of in-line inspection tools.

## 4.5    Pressure reduction

A critical area of examination in the Inquiry was the possibility of managing SCC by limiting or reducing operating pressure.  The issue of pressure reduction is important because, as discussed in Chapter 3, the operating pressure of a pipeline is generally the primary source of circumferential stress in the pipe and stress is one of the three conditions necessary for SCC.

The effects of stress reduction on crack initiation and crack growth were discussed in detail in Chapter 3.  The relationship between stress and critical crack size is discussed in Section 4.6 on hydrostatic retesting.  The general findings are summarized below:

**Crack initiation.**  Lower stress levels cause fewer cracks to initiate.  However, a threshold stress level below which near-neutral pH SCC will not initiate has not yet been determined.

**Crack growth.**  It is not known whether changes in stress levels, within the normal range of operating stress levels for pipelines, affect crack growth rate.  As with crack initiation, a threshold stress level below which near-neutral pH SCC will stop growing has not yet been determined.

**Critical crack size.**  When operating stresses are reduced, it takes a larger crack to produce a pipeline failure (Figure 4.12).  And since it will take more time for a crack to grow to that larger critical size, the safe operating life of the pipeline before the failure of SCC and other longitudinal flaws is increased.

Where relevant, these specific effects of stress reduction are discussed below for pipelines with and without effective coatings.

### 4.5.1 Pipelines with effective coatings

As discussed in Section 4.1, the use of effective coatings such as FBE can prevent the initiation of SCC.  If no stress corrosion cracks initiate, the effects of stress reduction on crack growth and critical crack size become irrelevant.  There will not be any service failures due to SCC.  Thus, for existing or new pipelines that have effective coatings, a reduction in operating stress would not be of any benefit.

### 4.5.2 Pipelines without effective coatings

For pipelines without effective coatings, the occurrence of SCC depends in large part on the performance of the coating.  If the coating does not disbond, SCC will not occur and stress reduction will not be necessary.  Where coatings disbond, SCC may be a concern.  As noted earlier, lower stress levels cause fewer cracks to initiate.  The fewer cracks there are, the less likely they are to coalesce and the longer it will take for them to grow to a critical size.  However, since the relationship between stress and crack growth rate has not been established, it is difficult to quantify any benefit that might be derived from a reduction in the operating stress of a pipeline in terms of its effect on crack growth.

It is, though, known that a larger critical crack size would be required to produce a failure.  Service failures due to SCC would therefore be delayed and possibly reduced in number.

However, unless the operating pressure is set below the level needed to produce the minimum stress for crack initiation or for crack growth, there can be no assurance that service failures will not eventually occur.  Such threshold values have not yet been determined and may be too low to be used for practical purposes.  Therefore, other measures such as hydrostatic retesting would still be required to eliminate SCC related service failures, although not as frequently as if the operating stress were higher.  Rather than lowering the operating stress on the pipeline, a company could achieve the same result - eliminate SCC related service failures - by retesting more frequently.  In the long-term, the only benefit from the reduction in stress would be the cost savings from reducing the frequency of testing.

Such savings would likely be much less than the cost of a sustained lowering of the operating pressure on pipelines.  CEPA estimated the cost of limiting gas pipeline operating pressure to 72 per cent SMYS to be in excess of $1 billion for the replacement of 500 MMcfd of lost capacity at the Alberta/Saskatchewan border [51].  In its evidence, CGA also stated [52]:

> *If the TransCanada PipeLines (TCPL) system was derated to 72% SMYS, LDCs* [Local Distribution Companies] *would be unable to deliver all the gas required by their firm customers.  A peak day shortfall of about 140 MMcfd would be created in Ontario and Quebec.  Derating to 64% SMYS would create a peak day shortfall of about 480 MMcfd to firm customers.  Interconnect pipelines to Eastern Canada are insufficient to meet these requirements.  A loss of deliverability of this magnitude would have severe social, safety and economic impact on Eastern Canada.*

Until such time as replacement capacity is in place, there would be significantly less gas flowing to Eastern Canadian and U.S. markets and the cost of transporting that gas would be higher.

Regardless of the effect of stress reduction on crack initiation and growth, there is no question that, when operating stresses are reduced, it requires a larger crack to cause a pipeline failure (Figure 4.12).  And since it will take more time for a crack to grow to that larger critical size, the safe operating life of the pipeline against the failure of SCC and other longitudinal flaws is increased.  As an example, calculations of critical crack size based on the CorLas™ model showed that reducing the operating stress from 77 to 64 per cent SMYS for a particular pipeline would extend the time to failure by some 25 months [53].  When used together with a hydrostatic retesting program or an in-line

inspection program, stress reduction would reduce the required frequency of retesting or inspection.

However, as a long-term mitigative measure, a reduction in operating stress will not prevent service failures, it would only delay them. Stress reduction is therefore not supported as an effective permanent mitigative measure for SCC-affected pipelines.

However, the effect of stress reduction on critical crack size suggests it should be considered as a temporary measure for sections of a pipeline system where there is a threat of imminent failure. For example, when a failure occurs on a section of a pipeline, the rupture may indicate that the company's integrity management program is inadequate for that section and that future failures may occur in that vicinity. In such a case, the operating stress should be reduced until the integrity of the section can be re-established. Similarly, where an investigation shows that a section contains near-critical SCC, the pressure in the line should be reduced until a hydrostatic retest is carried out to remove those defects.

Where a company decides that a hydrostatic retesting program is necessary because the integrity of sections of the pipeline system is in question, a reduction of the operating stress would be desirable. Until every affected section of a pipeline system has been retested at the required test frequency, there may be a threat of imminent failure and it may be appropriate to lower the operating stress in those sections. The amount of the reduction will depend on how quickly all sections can be tested.

### 4.5.3 Conclusions

For existing or new pipelines with effective coatings, a reduction in operating stress will not be of any benefit in terms of preventing service failures due to SCC, since SCC is not likely to occur.

For pipelines without effective coatings, we believe that a general reduction in allowable operating pressure would not be a logical or effective response to the SCC problem. Three basic factors support this conclusion:

- In terms of preventing service failures, the benefits, if any, from the consequent lowering of pressure cannot be determined from the available research and field information. Pressure reduction does not remove existing cracks, which may grow to failure.

- The potent environment necessary for SCC exists at only certain locations along a pipeline. Our findings in this respect are set out in Section 3.4. Consequently, a general reduction in pressure would be a very inefficient mitigative approach and would restrict pipeline capacity with severe operational, economic and social consequences.

- We find that there are a number of other measures, as described elsewhere in this Chapter, which are more systematic, efficient and effective in mitigating SCC and thereby enhancing public safety.

We believe that pressure reduction can be effective as a temporary measure to ensure safety while other detection and repair measures are implemented.  The basis for this conclusion is that a lowering of pressure increases the size to which a crack can grow before failure occurs.

**Recommendation**

4-5     We **recommend** that the Board require that pressure reduction be included as part of all SCC management programs and considered for use:

a)   in combination with investigative excavations and other mitigative measures such as hydrostatic retesting and in-line inspection; and

b)   as a temporary measure where there is a threat of imminent failure, in which case it should be maintained until the integrity of the pipeline is re-established.

## 4.6   Hydrostatic retesting

Pressure testing is widely used in the pipeline industry to demonstrate the structural integrity of a pipeline and to establish a safe operating pressure for it.  Various pipeline codes and standards, including CSA Z662, require a pipeline to be able to sustain a pressure greater than its intended operating pressure.  Regulatory authorities generally require a pipeline to undergo a successful pressure test before they will grant an operating permit or licence for a newly constructed pipeline.

Water is most commonly used as the pressure test medium, in which case the test is referred to as a hydrostatic test.  A section of pipeline is filled with water and then the water pressure is raised above the level at which the pipeline is intended to operate.  The pressure is held for a prescribed amount of time and the test is considered successful when the pipeline is able to sustain the test pressure for that time period.  A successful hydrostatic test is an assurance that the pipeline is safe to operate at its regular operating pressure.  Its structural integrity has been demonstrated.

There can be reasons to use a hydrostatic test other than when a pipeline is first put into service.  If one failure or a series of similar failures were to occur on an operating pipeline, a hydrostatic retest

could be used to check the structural integrity of the pipeline. The retest would help determine if the pipeline is fit for continued operation.

However, if a pipeline has defects that grow over time, such as stress corrosion cracks, a successful retest gives an assurance that the pipeline can be operated safely for a limited time only. In other words, the pipeline will be safe to operate only until the defects grow to that size where they may cause the pipeline to fail. If the defects grow to that critical point, the pipeline could fail while it is in service. Before that point is reached, another hydrostatic retest should be conducted. Consequently, for defects that develop over time, it may be necessary to conduct hydrostatic retests over the remaining life of the pipeline. When they are used in this way, hydrostatic retests are considered a mitigative measure for pipelines that have SCC. Hydrostatic retesting eliminates major defects that may cause a failure in service and validates the structural integrity of the pipeline at the test pressure level.

In the previous Inquiry, the Board was concerned that hydrostatic retests may themselves have long-term effects that are harmful to the integrity of a pipeline. The Board expressed the concern that the growth of cracks at the high stresses reached during hydrostatic retesting was not fully understood; in particular, that the hydrostatic retest itself might cause some defects to grow but not fail during the retest. In the current Inquiry, the Panel reviewed the evidence pertaining to these concerns and evaluated the effectiveness of hydrostatic retesting in preventing service failures caused by SCC, immediately following a retest and in the long-term.

### 4.6.1 Effectiveness at preventing service failures

While a hydrostatic retesting program may offer an effective mitigation tool for SCC susceptible pipelines, it can also cause significant operational difficulties because the line must be taken out of service for some time. Much has to be done to prepare for and conduct a hydrostatic test. Test heads must be installed and enough water to fill and pressurize the test section must be available. During the test, the time needed to find small leaks contributes to the down-time, as does repairing and cleaning up after any leaks or breaks. After the test, the water may have to be treated before it can be disposed of. Finally, the line must be emptied of water and put back into service.

In addition, hydrostatic retesting can be costly. For the duration of the test, the pipeline is out of service. The indirect costs associated with loss of throughput will depend on the operational flexibility of a system. In addition, there are the direct costs of the test, which, according to CEPA, are approximately $26 000 per kilometre ($780 000 for a 30 kilometre valve section), with repairs costing $75 000 per defect, for a 1067 mm (42 inch) diameter line [54]. These costs are incurred each time a retest is conducted.

**Figure 4.12**
**Pressure vs. critical crack size**



Crack Size

$P_T$ = hydrostatic test pressure
MOP = maximum operating pressure
$a_T$ = critical crack size at $P_T$
$a_O$ = critical crack size at MOP
$a_O - a_T$ = margin of safety for crack growth after test

CEPA identified two purposes for hydrostatic retests in the management of the integrity of SCC-affected pipelines [55]:

1. *To remove cracks which are approaching dimensions that would fail in-service in the near term, and*

2. *To provide a safety margin against in-service failure for surviving sub-critical cracks until the next test.*

In addition to these objectives, a hydrostatic retesting program should also maintain the long-term integrity of the pipeline by minimizing subcritical crack growth and pipe yielding during each test.

The effectiveness of hydrostatic retesting in meeting these three objectives, and hence in preventing service failures, is discussed in the following sections.

### 4.6.2 Removal of near-critical cracks

Laboratory research and decades of field experience have proven that hydrostatic tests effectively remove longitudinal defects from pipelines and that the higher the test pressure, the smaller the defects that remain (e.g., [56], [57], [58]).  By testing the pipeline at a pressure higher than the maximum operating pressure, defects that might lead to failure in service are removed, as the higher test pressure will force them to the critical failure stage.  Consequently, the defects that remain in the pipeline after a hydrostatic test are smaller than the critical size for failure at the operating pressure (Figure 4.12).

While hydrostatic testing is effective in removing longitudinal cracks, it is important to note that it is not always effective in removing defects that are oriented along the circumference of the pipe.  As discussed in Chapter 3, internal pressure causes a stress in the longitudinal direction that is about one-third to one-half the circumferential stress.  Since it is the longitudinal stress that acts on circumferential cracks, the stress from a hydrostatic test on a circumferential crack will not normally be high enough to cause a failure.  Consequently, hydrostatic retesting is not an effective mitigative measure against failures caused by circumferential SCC.

### 4.6.3 Safe retest interval

Following the initial SCC failures on the TransCanada system, hydrostatic retest frequencies were selected on the basis of field experience.  For example, from 1986 to 1992, the retest frequency for TransCanada's line 100-2 in Northern Ontario was 2 to 3 years based on recommendations from Battelle Memorial Institute [59].  This was a conservative retest interval that was likely based on field experience with high pH SCC in the U.S.  If the valve section passed on the first hydrostatic retest, the interval was increased to 4 to 5 years.

Given the significant increase in the understanding of crack growth and crack growth rates for near-neutral pH SCC since that time,

a more analytical approach can be used to determine a safe hydrostatic retest interval. As will be discussed below, this analytical approach for determining a safe retest interval will rely on establishing an appropriate failure criterion and validated crack growth rate for the specific pipeline under consideration.

Figure 4.13 shows the relationship between crack size and time. At the end of a hydrostatic retest, small non-critical cracks will remain. Over time, these cracks may grow and, if their growth goes unchecked, the largest could eventually cause a failure while the pipe is in service. The key is to find and remove the large cracks before they cause a failure in service, meaning that the pipeline must be hydrostatically retested again before a crack reaches the critical size. The margin of safety after a hydrostatic retest is determined by the difference between the size of crack that will fail at the operating pressure of the pipeline and the size of crack that remains after the retest. The greater the difference between the test pressure and the maximum operating pressure, the greater the difference between these two crack sizes and the greater the margin for growth before a failure occurs in service.

CEPA stated that [60]:

*The hydrotest interval is determined based on three considerations:*

- *the size of the surviving flaws from the previous hydrotest,*

- *the crack growth rate and the growth process, and*

- *an appropriate failure criterion.*

The failure criterion establishes sets of data that represent the sizes of surviving flaws (or, conversely, the critical crack sizes) at the hydrostatic test pressure and at the operating pressure. The sets of data represent two curves of critical crack sizes for the two pressure levels (e.g., see Figure IV.3, Appendix IV). As noted by TransCanada [61], *"The difference between these curves represents the amount a defect must increase to go from surviving a hydrostatic retest to becoming critical at operating pressures."* Since the data generated depend on the failure criterion used, it is critical that the failure criterion be appropriate for the particular pipeline.

With respect to crack growth rates, values have been estimated from laboratory experiments and field data. In order that a safe hydrostatic retest interval may be determined, it is critical that the crack growth rate be valid for the particular pipeline.

The selection of an appropriate failure criterion and a validated crack growth rate are discussed in more detail below.

**Failure criterion.** In order to determine the margin for crack growth between hydrostatic retests, the size of a crack that can survive a hydrostatic test and the size of a crack that will fail at the maximum operating pressure should be known with reasonable certainty. Leis cautions that *"... failure criteria that are conservative inherently with*

**Figure 4.13**
**Crack size vs. time**



$a_T$ = critical crack size at hydrostatic test pressure

$a_O$ = critical crack size at maximum operating pressure

$a_O - a_T$ = margin of safety for crack growth after test

$t$ = time required for crack of size $a_T$ to grow to $a_O$

At the end of a hydrostatic test, the largest remaining crack is $a_T$. In order that a crack of size $a_T$ does not fail in service, the pipeline must be tested before time t has elapsed. The difference between $a_O$ and $a_T$ is a measure of the margin of safety for crack growth. As may be seen from Figure 4.12, the larger the difference between the test pressure $P_T$ and MOP, the larger the margin of safety between $a_O$ and $a_T$.

---

*respect to predicted failure pressure can be quite nonconservative in applications to estimate the size of flaws that remain in the pipeline...."* [62]

Failure criteria are generally intended to predict safe, or conservative, operating pressure levels for known defect sizes; i.e., they tend to under-estimate the pressure at which a known defect will fail. However, when calculating the safe interval between retests, the test pressure is known and the critical defect size is inferred from that pressure. A failure criterion that under-estimates failure pressure will, in turn, under-estimate the critical crack size for the test pressure. If the critical crack size at the test pressure is under-estimated, the remaining margin for crack growth during service is over-estimated. Consequently, the safe operating interval between tests is over-estimated. It is important therefore to be aware of the level of conservatism associated with the application of a failure criterion. As stated by CEPA [63], *"Using an approach that is overly conservative can lead to problems in assessing the remaining life and making decisions on appropriate mitigative actions."*

Another concern with failure criteria is the inconsistency of the results. It is difficult to rely on a failure criterion whose application results in levels of conservatism that vary over a wide range of values. Over-conservatism and inconsistency could result in over-estimating the safe operating interval between hydrostatic retests.

In order to evaluate the conservatism and consistency of the various failure criteria discussed in the course of the public hearing, CEPA provided failure pressure calculations for 14 crack sizes and compared the predicted values to the observed failure pressures [64]. The details of the analysis are included in Appendix IV. The results indicate that the application of the various failure criteria can yield very conservative and sometimes inconsistent results.

As noted in Appendix IV, the predictive capability of a failure criterion improves if the criterion is appropriate for the particular situation under consideration. The assumptions underlying a failure criterion, as well as the data used to verify the criterion, must be applicable to the situation under analysis.

Once a failure criterion has been selected, the critical crack sizes at the test pressure and at the operating pressure can be determined. Generally, the assumption of an infinite crack length will result in conservative estimates of hydrostatic retest intervals.

**Crack growth rate.** Once the margin for crack growth has been calculated, it is a simple matter to divide it by the crack growth rate to determine the safe operating interval between retests. However, selecting an appropriate value for crack growth rate is not an easy process. Published laboratory data indicate that crack growth rates can vary from $10^{-9}$ mm/s (.03 mm/yr) to $10^{-6}$ mm/s (30 mm/yr) and suggest that SCC growth is characterized by periods of dormancy and rapid growth [65].

CEPA's position is that a time-averaged growth rate can be developed for a pipeline and used in the calculation of a safe retest interval and recommends $2x10^{-8}$ mm/s (0.6 mm/yr) as a conservative value [66].  However, this value may not be applicable to all pipelines.  It is important to understand how the value of $2x10^{-8}$ mm/s has been arrived at.  This value represents the maximum time-averaged crack growth rate observed on line 100-2 of TransCanada's pipeline system and was derived from measurements of crack growth from failure investigations [67].  It would therefore apply to pipeline systems whose environment, metallurgy and operating conditions are similar to line 100-2.

If the conditions for a particular pipeline were not similar to those of TransCanada's line 100-2, the use of $2x10^{-8}$ mm/s may be inappropriate and additional safety factors may be necessary for the calculation of a safe retest interval.  For example, if the normal stress fluctuations on a particular pipeline were considerably higher than those on the TCPL system, the use of the value of $2x10^{-8}$ mm/s for crack growth could over-estimate the safe operating life before the next retest.

CEPA recommends that, if a different growth rate has been validated for a specific pipeline, that value should be considered for use.  However, such validation is not easily achieved.  As noted earlier, laboratory data can vary over a wide range.  Field data would be preferable, but are not as easy to obtain.  In the case of TransCanada, field investigations of actual failures were required over many years of operation.  It may be difficult to arrive at a reliable and validated crack growth rate for some pipelines and conservative assumptions may become necessary.  This situation will require a careful analysis by individual pipeline companies.

### 4.6.4 Long-term integrity

The third objective of a hydrostatic retesting program is to maintain the long-term integrity of the pipeline.  The Inquiry examined two concerns about the effects of repeated hydrostatic testing on the long-term integrity of a pipeline: the permanent expansion of the pipe as a result of repeated hydrostatic retesting at stress levels above the pipe's yield strength; and the continued growth of subcritical cracks.

**Pipe expansion.**  Pressure testing at stresses at or above SMYS can result in permanent expansion of the pipe.  If this expansion becomes excessive, the integrity of the pipeline could be reduced.  Permanent expansion in a joint of pipe could occur if the hoop stress produced by the test pressure exceeds the actual yield strength of that joint.  For most pipelines, however, the mechanical properties and dimensional tolerances of the pipe are such that excessive expansion is unlikely, even with high pressure tests.

CEPA states that pressurizing a test section up to 110 per cent SMYS would not result in any significant permanent expansion of the pipe and would therefore not affect the future integrity of the pipeline.

---

**Figure 4.14**

**Cross-section of a stress corrosion crack after hydrostatic testing and one year of service**



Source:  Endnote [50]

Historical data on high pressure tests have not indicated any excessive expansion, which supports CEPA's position.  However, to ensure that any localized expansion is avoided, high pressure tests should be closely monitored using a pressure-volume plot.

**Growth of subcritical cracks.**  The concern with the growth of subcritical cracks is that a hydrostatic retest might cause some cracks to grow but not fail during the test, and that the number of near-critical cracks may gradually grow with repeated hydrostatic retests and reduce the long-term integrity of the pipeline system.

CEPA's position is that, during a hydrostatic retest, shallow cracks are unlikely to grow; growth would be confined to cracks approaching 50 per cent of the wall thickness, but they would not grow beyond the critical size [68].  In its submission, CEPA refers to studies that support the position that shallow cracks do not exhibit any crack tip changes during a hydrostatic retest [69] and that deeper cracks that survive the test have blunted ends with associated plastic deformation, which forms a residual compressive stress zone at the crack tip [70].  As a result, the crack will have to either travel through the compressive stress zone at a slower rate, or, as indicated in Figure 4.14, travel around the zone by forking out around it (bifurcation).  Either way, crack growth is slowed down until the crack has travelled past the compressive stress zone.

Additional studies by TransCanada support CEPA's position.  A TransCanada study on the effect of repeated hydrostatic tests on flaws in ERW pipe (Youngstown) showed that any crack growth resulting from the tests was insignificant [71].  As well, TransCanada pointed to the decreasing trend in test failures on subsequent retests as proof that hydrostatic retesting does not adversely affect the long-term integrity of a pipeline [72].

A related study that provides additional insight into the behaviour of cracks during a hydrostatic test is the AGA NG-18 Report No. 194 [73], which is a study of ductile flaw growth as a function of various hydrostatic test parameters, pipe and flaw geometric properties, material properties and hydrostatic test conditions.  CEPA stated that this report validates a testing procedure that maximizes the removal of near-critical cracks and minimizes damage to the pipeline [74].

A key finding of the NG-18 Report No. 194 is that a maximum test pressure level between 100 and 110 per cent SMYS appears to provide a good balance between removing large flaws that might cause failure in service and producing growth only in a relatively few near-critical flaws.  As well, the study found that a maximum pressure hold time of one hour is a good upper limit, as it causes a very high percentage of the near-critical flaws to fail, while still minimizing the growth of the remaining flaw population.  On this basis, CEPA recommended a one-hour high pressure test between 100 and 110 per cent SMYS, followed by a leak test at no more than 90 per cent of the peak test pressure [75].  The NG-

18 Report No. 194 indicates that there should be minimal flaw growth at this reduced pressure during the leak test.

Another key finding of the study is that a given test pressure will cause growth in only a limited range of flaw sizes below those it causes to fail.  At one extreme are the smallest cracks, those that fall outside the low end of this range.  They will not experience any growth at the test pressure.  At the other extreme, the very deep cracks that fall outside the high end of the range will fail either due to immediate crack growth as the pressure is raised, or to time-dependent creep growth during the hold period of the test.  In between the two extremes of very small and very large crack sizes are the cracks that will grow by stable tearing, but not fail.  The study found that the higher the test pressure, the narrower the range of these flaw sizes that will grow but not fail.

While CEPA is recommending the same test scenario for all pipelines, we are concerned that the scenario, as recommended in the NG-18 Report No. 194, was developed specifically for gas transmission lines operating at or near 72 per cent SMYS, with daily pressure cycles of 10 per cent of the maximum operating pressure.  The scenario may not be appropriate for liquid pipelines or even other gas pipelines where operating conditions are significantly different.  The study was also based on submerged-arc welded pipe in grades X52 to X70 with yield-to-ultimate ratios less than 0.90 and so the results may not apply to pipes with significantly different material properties.

The study indicates that pipelines that may have SCC can be hydrostatically retested without causing significant subcritical crack growth, as long as the test is properly designed for the particular pipeline under consideration.  The appropriate test scenario may differ from pipeline to pipeline, depending on the material properties and specifications of the pipe, as well as the operating conditions of the pipeline.  It is therefore important that pipeline companies make sure that the assumptions and data from the study apply to their own systems before adopting the conclusions and recommendations of the AGA NG-18 Report No. 194.

### 4.6.5 Conclusions

We believe that, where it has been determined that there is a reasonable risk of service failures due to SCC over a long section of a pipeline, hydrostatic retesting is currently the only reliable way to prove the integrity of the pipeline for continued operation.

A hydrostatic retesting program can effectively prevent service failures resulting from longitudinal SCC provided:

- the hydrostatic retest removes all cracks whose length and depth are approaching the critical point where they could cause a failure under normal operating conditions;

---

- the interval between retests is less than the time required for any crack that remains after a retest to grow to critical size; and

- the retest does not reduce the long-term integrity of the pipeline by causing permanent expansion and substantial subcritical crack growth.

Determination of a safe retest interval depends on establishing an appropriate failure criterion and validated crack growth rate for the specific pipeline under consideration.  We consider that, where a crack growth rate has not been validated for a pipeline, conservative values for crack growth rate should be assumed when calculating a hydrostatic retest interval.

Unless there are reliable historical data on typical crack dimensions at failure, the minimum margin of safety for crack growth after a retest should be used to arrive at a conservative value for a safe retest interval.

Subcritical crack growth can be minimized during a hydrostatic retest provided the test pressures and test durations are appropriate for the particular pipeline under consideration.

We note that hydrostatic retesting is not currently addressed in the CSA Z662 standard as an option for maintaining pipeline integrity, and that the findings from recent studies on hydrostatic testing (e.g., AGA NG-18 Report No. 194) are not reflected in the current requirements of that standard.

**Recommendations**

4-6    We **recommend** that the Board require that, where a hydrostatic retest program forms part of an SCC management program, it be properly designed for the particular pipeline under consideration.  The design should take into account factors such as the material and geometric properties of the pipe, the operating history of the pipeline, its future operating conditions and field and laboratory data on crack sizes and crack growth.  Where reliable data are not available, conservative assumptions should be made.

4-7    We **recommend** that the Board request that the CSA Technical Committee on Oil and Gas Industry Pipeline Systems:

a)    incorporate, in the next edition of the CSA Z662 Oil and Gas Pipeline Systems standard, requirements for hydrostatic retesting as an option for maintaining pipeline integrity; and

(b) amend the current pressure testing requirements of the standard in light of the findings from recent studies on hydrostatic testing.

## 4.7   Selective pipe replacements

Selective or proximity pipe replacements involve replacing sections of the pipeline that are susceptible to "significant" SCC, where those sections are close to critical locations along the pipeline route. Critical locations may include: dwelling units, roads, railways, places of public assembly, sensitive environmental areas and sites of special significance to people.

Selective pipe replacements lead to service interruptions and are very costly.  For example, it costs about $1400 per metre to replace 508 mm (20 inch) diameter pipe and approximately $3200 per metre to replace 914 mm (36 inch) diameter pipe [76].  CEPA stated that selective pipe replacements *"...are a repair option that would apply to SCC-susceptible areas only where other mitigative measures are determined to be unacceptable."* [77]

### 4.7.1 Pipe replacement length

When sections of a pipeline are considered for selective replacement, a sufficient length of pipe must be replaced (Figure 4.15) so that the critical locations are protected from the consequences of a failure.  In order to determine how much pipe should be replaced, it is important to be able to predict the potential hazards associated with a

**Figure 4.15**
**Selective pipe replacement**



---

pipeline failure and the consequences that would arise from such hazards.

CEPA stated that *"…the appropriate distance criterion* [for selective replacements] *depends heavily on the service fluid being transported, but in all cases will aim to minimize the probability that identified consequences will accrue to people, property or environmental resources."* [78]  For example, in the event of a fire resulting from the failure of a natural gas pipeline, residents of dwellings in close proximity to the pipeline should be protected.  This would involve replacing a sufficient length of pipe such that any failure due to SCC on the original pipe will be far enough away from the dwelling units so as not to harm the residents.

### 4.7.2 Modelling of hazards and consequences

For oil and gas pipelines, the severity of the consequences of a pipe rupture is related to the diameter and operating pressure of the pipeline, the type of hydrocarbon involved and the size of the release.

In order to determine the effects of a hazard due to a failure, the characteristics of the release and its immediate and contingent effects must first be estimated using various types of models and then the consequences of such a release on people and property must be predicted and analyzed.  The complexity of such models will vary depending on the hydrocarbon involved and the conditions under which it is released.  For example, the models used to study the release and consequences of toxic sour gas are substantially different than the ones used for crude oil.

When estimating the consequences of a natural gas pipeline rupture which has ignited, it is necessary first to model the characteristics of the fire and the associated thermal radiation (heat) resulting from the fire and then to assess the effects of the thermal radiation on people and property.  Based on such models, adverse effects on people and property can be estimated as a function of distance and then a "safe" distance can be established, beyond which no harmful consequences would occur [79].

Figure 4.16 shows one example of the predicted thermal flux as a function of distance for a 914 mm (36 inch) natural gas pipeline operating at a pressure of 6 200 kPa (900 psi) [80].  The gas supply is assumed to have been shut off immediately after the rupture and the released gas is assumed to have caught fire 30 seconds after rupture.  Since the gas supply is shut off, the gas flow rate escaping from the pipe will decrease with time and the thermal flux will also vary with time.  In this figure, each curve represents a "snapshot" in time, showing the thermal flux resulting from the fire as a function of distance from the pipeline.  The curves show that the thermal flux decreases with both time and distance from the pipeline.

**Figure 4.16**

**Thermal flux as a function of distance for a 914 mm gas pipeline operating at 6200 kPa**



Source:  Adapted from endnote [80]

*REPORT OF THE INQUIRY*

Once the thermal flux curves are determined, the effects of thermal radiation on people and structures must be predicted and analyzed.  The effects of heat on people depends on the thermal flux and the duration of exposure.  Figure 4.17 shows the relationship between thermal flux and exposure time corresponding to different effects on people.  We can see that very high levels of intense heat will produce a high probability of fatality within a short period.

A level of thermal radiation corresponding to a particular effect is then selected as the criterion for calculating selective pipe replacement distances.  For example, in 1992, for the calculation of the selective pipe replacement distances for the SCC-susceptible portions of lines 100-1 and 100-2, TransCanada used piloted wood ignition as the criterion for determining a safe distance from the fire [82].  The piloted wood ignition criterion is the intensity of thermal radiation that is required to ignite wood, assuming that a small pilot flame is near its surface.

CEPA indicated that its member companies have not yet reached a consensus on the appropriate distance criterion for selective pipe replacements [83].

CEPA further indicated that one of the disadvantages of selective pipe replacements is *"...the lack of availability of accurate consequence models, which may vary according to the service fluids."* [84]  Since the proximity replacement distances are determined by modelling the hazards associated with pipeline ruptures and their effects on people, property and environment, it is essential that pipeline operators have access to a variety of accurate models.

### 4.7.3 Conclusions

Selective pipe replacement is an effective means of preventing service failures due to SCC in the replacement section.  Provided the replacement distances are properly established, selective pipe replacements are highly effective in minimizing the consequences of service failures on people, property and environment.  As previously discussed, the most important factor in the prevention of SCC in the replacement pipe is the application of an effective coating.

It is important that reliable and accurate hazard and consequence models for different service fluids be developed, verified and made available.  In the absence of such models, empirical field data from previous failures should be used.

We consider it important that the pipeline industry agree on the appropriate criteria for determining safe distances from the effects of a pipeline failure.

**Figure 4.17**
**Effects of thermal flux and exposure time on people**





For example fluxes over 60 kW/m² are associated with a 50 per cent lethality level in 10 seconds or less of exposure.

Source:  Adapted from endnote [81]

**Recommendation**

4-8    We **recommend** that the Board request that CEPA:

a) continue the development and verification of models that predict the hazards and consequences associated with pipeline failures for different service fluids; and

b) develop criteria for determining safe distances from the effects of pipeline failures.

# Chapter Five

## Community Issues

### 5.0   Introduction

The previous chapters have focused on the very technical aspects of SCC: what it is, the tools we currently use to deal with it and the tools that may be available in the future.  This chapter is intended to provide a different perspective: the point of view of the people who live and work near pipelines.

We received reports from four public consultations with communities along the TransCanada system and from a meeting with the Ontario Pipeline Landowners Association (OPLA) held in the fall of 1995. The reports gave details of the discussions at the meetings.

The issues raised by the communities and by OPLA that were relevant to the Inquiry fell into three general areas:

- design requirements for pipelines,

- emergency preparedness and response activities, and

- communications between the communities and the pipeline companies and between communities and the National Energy Board.

In addition, some local residents raised a number of concerns about subjects such as intervenor funding and land use compensation that this Inquiry could not deal with because these topics were outside of its mandate.  However, we are aware that these concerns are being considered in other forums.

### 5.1   Design requirements for pipelines

Two pipeline design issues of particular concern to communities were raised at the Inquiry: the minimum wall thickness of pipelines in rural areas, and separation distances or buffer zones between pipelines and the buildings and houses nearby.

### 5.1.1 Pipe wall thickness requirements

OPLA [1], as well as individual landowners in rural areas, noted that pipelines located in rural areas could be operated at higher stress levels than those in urban areas and, consequently, the pipelines in rural areas did not have to be as thick.  The difference in wall thickness requirements was considered a safety concern in that the regulations that govern pipelines do not give people in rural areas the same protection as people living in urban areas.

**Figure 5.1**
**Urban and rural pipeline rights-of-way**



*...in urban areas, mechanical damage of pipelines resulting from development activities becomes a dominant concern; additional thickness is the most effective defense against incidents arising from this cause.* - CEPA

Source:  Endnote [2]

Photos Courtesy of TCPL

As discussed in Chapter 3 (Table 3.2), the CSA Z662 standard, which has been incorporated into the Board's pipeline regulations, sets the maximum allowable stress level of a pipeline. These levels are based on the class location of a pipeline, which is generally a measure of the population density in the immediate vicinity of the pipeline. As the population density increases, the maximum allowable stress level of the pipeline is reduced.

In order to lower the stress on a pipeline, a company may lower the operating pressure, use higher strength pipe or use thicker wall pipe. The company will generally choose the latter.

The requirement for lower operating stresses in areas where there are more people is a common approach in pipeline standards in the U.S., Europe and elsewhere around the world. However, limitations on operating stresses represent just one of many safety provisions in the CSA standard. The standard sets out minimum requirements for the design, material selection, construction, pressure testing and operating and maintenance practices. All of these factors need to be taken into account when assessing the safety of a pipeline.

In addition to meeting (and often exceeding) the minimum requirements of the CSA standard, pipeline companies generally implement maintenance practices that further enhance the long-term integrity of their systems. As pipelines age, it becomes increasingly important that companies ensure the safety of their facilities. The SCC management program discussed in Chapter 6 is intended to maintain the long-term integrity of pipelines affected by SCC. That program is designed to prioritize monitoring and mitigative activities on the basis of susceptibility to "significant" SCC. Consequently, pipes in Class 1 locations would be expected to have a higher priority for monitoring and mitigation than thicker wall pipe.

### 5.1.2 Buffer zones

People at the community meetings raised a second concern relating to pipeline design requirements. They questioned whether there should be a separation distance, or buffer zone, between pipelines and nearby buildings and houses. No such requirement is currently in place in the CSA Z662 standard, nor in the Board's Onshore Pipeline Regulations.

Creating a buffer zone would be an effective way of reducing the risk associated with a gas pipeline failure because there is less danger farther away from a failure. One method of creating a buffer zone is to put restrictions on how the land near the pipeline may be used. For example, land use close to a pipeline may be limited to low-density industrial use or parkland. But residential housing, shopping centres and other high-exposure areas would not be allowed within a certain distance from the pipeline. How far that would actually be would depend on the likely consequences of a pipeline failure. For example,

> *In general, pipeline companies do not own their rights-of-way. They simply have the right to build the pipeline and to operate it and to maintain it.*
>
> *The acquisition of the land for an effective buffer zone, together with the need to, if you will, sterilize it for all time, would be, I suggest, quite impracticable in the current environment.* - B. Rothwell, CEPA
>
> Source: Endnote [3]

**Emergency Procedures**

The following requirements are specified in the Board's Onshore Pipeline Regulations:

49.(1) The emergency procedures referred to in paragraph 48(1)(l) shall include

(a) a statement of the scope of application of the emergency procedures;

(b) a detailed description of the facilities to which the emergency procedures apply, including

    (i) the location of and means of access to the facilities, and

    (ii) the number and size of the pipelines involved;

(c) a description of the pressure, flow rate and other normal operating conditions of the pipeline;

(d) the procedures for the documentation of emergencies;

(e) the instructions and warnings to be given to persons reporting an emergency;

(f) the initial action to be taken on discovery of an emergency;

(g) the names and telephone numbers of company personnel or departments to be contacted in the case of an emergency and the respective responsibilities of the personnel or departments;

(h) the names and telephone numbers of public services and other agencies that might have to be contacted in the case of an emergency;

(Continued on page 97)

---

the consequences might depend, at least partly, on the size of the pipe and its operating pressure.  The size of the buffer zone for a gas pipeline would be determined by looking at such factors.

In its submission [4], CEPA stated:

*...it is not considered that the general adoption of wider buffer zones would offer a viable means of minimizing the consequences of operational failures resulting from SCC.  The establishment of buffer zones for new pipelines would, in all probability, make land acquisition impracticable.  The retroactive imposition of buffer zones to existing pipelines would require major re-zoning initiatives, including the removal of existing buildings, or pipeline re-routing.*

A task force is currently working on developing guidelines for land use planning near pipelines.  The membership of the Major Industrial Accidents Council of Canada (MIACC) Pipeline Task Force is made up of municipal planners, academics and representatives from pipeline companies and regulatory agencies, including the NEB and the Alberta Energy and Utilities Board (AEUB).  The principal objectives of the guidelines are to raise the awareness regarding the issue of land use around pipelines and to facilitate communication and negotiation between pipeline companies and communities on a case-by-case basis.

### 5.1.3 Conclusions

**Pipe wall thickness.**  We believe that the recommendation we make in Chapter 6 requiring that pipeline companies have a comprehensive SCC management program will ensure that companies continually review their pipeline systems and satisfy themselves, the regulatory authorities and the public that SCC is being effectively addressed on their systems.

The safety of a pipeline depends on many factors, including pipeline design, material selection, testing, construction practices and operating and maintenance practices.  The safety of a pipeline cannot be measured on the basis of a single factor such as operating stress or wall thickness.

If our recommendation that pipeline companies be required to have a comprehensive SCC management program is adopted, we do not believe that changes to the CSA standards in respect of limitations on operating stresses or wall thickness requirements will be necessary.

**Buffer zones.**  Based on the information examined during the Inquiry, we conclude that the application of buffer zones for all pipelines would not be practicable, especially if applied retroactively to existing pipelines.  While we are not recommending the general application of buffer zones as a means of addressing the SCC problem, we believe that buffer zones can be effectively used in many cases to improve public safety.

---

We believe that the issue of land use around pipelines would be best resolved through improved communication and negotiation between pipeline companies and communities on a case-by-case basis.

## 5.2   Emergency preparedness and response

The results of the Inquiry's community consultations showed, in general, that individual residents, local emergency responders and communities felt that they could be better informed and better trained to deal with emergencies.  People expected pipeline companies to play a significant role in preparing communities for an emergency.

In this regard, the Board's Onshore Pipeline Regulations require pipeline companies to develop emergency procedures for their pipeline systems and to update them regularly, in consultation with local police, fire departments and other response agencies.  All company employees who may be involved in an emergency response are required by the Regulations to receive appropriate training.

However, in many cases, local residents are the first people at the scene of a pipeline failure.  Local emergency responders like the police or fire departments usually arrive next.  They provide site control until pipeline company personnel arrive and, if necessary, assist in evacuations or rescues.  Generally, pipeline companies have programs in place to familiarize local emergency responders with the pipeline and the commodity it carries.  They also promote a coordinated response to emergencies.  But beyond this familiarization, local emergency responders typically receive no other formal training from the pipeline companies.  Emergency responders are expected to take it upon themselves to be prepared to respond.  It is important to note that in most of the communities along pipeline rights-of-way, fire departments consist of volunteers.

The consequences of a failure are aggravated if information to the landowners and individual residents and training for the responders are inadequate.  In Williamstown, for example, the TransCanada pipe ruptured and released a large amount of gas, although the gas did not ignite.  Some emergency responders and landowners were uncertain about what the proper emergency procedures were for that situation.  During the community consultations, responders said they were unsure if they would know what to do if a similar event happened again.  Not all responders knew whether people should be evacuated, whether the electricity should be shut off, whether telephones could be safely used or what distance from the pipeline would be considered safe.  Many residents living near the pipeline were also uncertain about the proper procedures to follow.

In general, residents, emergency response agencies and community officials all wanted additional information, training and emergency response coordination with the pipeline company.  Even in

(i) the plans for co-operation with appropriate public agencies during an emergency;

(j) a description of the types and locations of available emergency equipment and, in the case of HVP pipelines, a description of the types and locations of portable emergency shut-off devices;

(k) the procedures to be followed at the site of the emergency;

(l) the safety precautions to be taken during an emergency, including

(i) the handling of the fluid transported by the pipeline,

(ii) the isolation and shut-off procedures for stations of the pipeline, and

(iii) the methods for monitoring the hazard level at the site;

(m) a list of the environmentally sensitive areas that would require special attention during an emergency;

(n) contingency plans for the immediate protection of the environment; and

(o) evacuation procedures.

49.(2) A company that operates a pipeline shall update the pipeline's operating and maintenance manuals in respect of the plans and procedures referred to in paragraphs (1)(i) and (1)(o) on a regular basis in conjunction with the appropriate authorities.

the Rapid City and Vermilion Bay communities, where people were generally satisfied with the response by the local emergency responders and TransCanada, many of those surveyed said they needed more training and information.

TransCanada stated during the Inquiry that it had implemented changes to its emergency response policies and practices [5].  The company has developed a brochure that provides basic information to residents living along the right-of-way on what to do in the case of a pipeline emergency on the TransCanada system.

TransCanada contacts local emergency response agencies more frequently than it used to.  Instead of visiting these groups once every four years, the company now makes annual visits.  The company has also developed a brochure for first responders that outlines the latter's responsibilities during a pipeline emergency.  In addition, the company is developing a training video to be distributed to any first response agency that may have to respond to an emergency on the TransCanada system.  For the communities themselves, TransCanada will be ensuring that public officials are informed of the presence of pipeline facilities within their communities, the hazards those facilities pose, the possible consequences of a failure and the need for coordinated planning with emergency responders.

In another initiative, TransCanada and the Regional Municipality of Hamilton-Wentworth in Ontario are working together to create a planning framework that individual communities could use to develop their own emergency response plans.  The resulting framework was to be completed in mid-1996 and will be used to develop similar coordinated response plans in each of the approximately 320

**Figure 5.2**
**Pipeline failure site:  Williamstown, Ontario, October 1994**



---

*REPORT OF THE INQUIRY*

municipalities in which TransCanada has facilities.  The project will improve the coordination of TransCanada's emergency response efforts with those of large emergency response organizations.

TransCanada's work in this area may be valuable to other pipeline companies facing similar issues.

### 5.2.1 Conclusions

We believe that pipeline companies must have effective procedures and policies in place that address emergency preparedness and response for their systems.  Such procedures and policies should address the preparedness and involvement of residents, the local communities and the emergency responders along the pipeline system. These groups must be fully informed and it is the company's responsibility to provide the appropriate information.

### Recommendation

5-1    We **recommend** that, as part of its ongoing monitoring activities, the Board review companies' emergency response practices to ensure that adequate training is provided to first responder organizations and that appropriate information is provided to the communities on the proper procedures to follow in the event of pipeline emergencies.

## 5.3 Communications

Following failures on its system, TransCanada has sometimes held open house sessions in the affected communities.  The Inquiry's consultations and discussions revealed people's discontent with the format of those sessions.  People suggested that a formal presentation by the company, followed by an open question-and-answer period, would be more effective than the one-on-one discussion format that TransCanada normally used.  They wanted to hear what their neighbours had experienced and know that all residents were getting the same message.  Responses from all of the communities showed that open houses or similar community meetings held after pipeline failures should provide an open question-and-answer period.

Also, many people felt that their questions had not been adequately answered by the company.  For example, a year after the failure in the Williamstown area, some people still had not received answers to their questions about the cause of the accident and what they should do to protect themselves in the event of another accident.

At the hearing, TransCanada acknowledged people's concerns about its open house sessions and undertook to improve its public awareness and emergency preparedness programs.  In its Closing

> *Pipeline landowners have been held in isolation from each other in many cases in the past.  The open house approach has been frustrating in most instances for landowners because individual landowners usually do not have sufficient knowledge to ask significant questions.  However, by having landowners together at a specific time and place, landowners automatically pool their knowledge and concerns. - OPLA*
>
> Source:  Endnote [7]

Statement to the Inquiry [6], TransCanada made the following commitments:

> *TransCanada is currently reviewing its public awareness and first responder programs and will enhance them;*
>
> *A landowner/tenant survey and community interest groups will be utilized to obtain feedback from the public on improvements to individual emergency response information and guidance and modes of communication to enhance both;*
>
> *Open House formats will be reviewed and enhanced based on discussions with community officials; and*
>
> *TransCanada will participate in post inquiry community meetings at various locations along the pipeline system.*

In addition to the desire for increased communication with pipeline companies, the communities surveyed also expressed the need for the Board to take a higher profile and to include community issues as part of its accident investigation program.

### 5.3.1 Conclusions

We consider the Inquiry to have focused needed attention on this critical area of post-accident communication.  We believe that this is an area where the Board should take a more active role.

### Recommendation

5-2    We **recommend** that the Board expand the scope of its accident investigation program to include community relations and emergency response related issues.

# Chapter Six

## Looking Forward

### 6.0   Introduction

In this chapter we discuss what we have learned about the extent of SCC in Canada and what companies are currently doing about managing the SCC problem. Then we move forward to discuss what steps should be taken to address the SCC problem, both on a company by company basis and as industry-wide initiatives.

### 6.1   Experience with SCC

Since 1977, near-neutral pH SCC has caused 22 pipeline failures in Canada.  SCC is not solely a concern in Canada, as there have been many more failures around the world.  The United States has experienced more failures than Canada, although most of these were caused by high pH SCC and occurred over a longer period of time. INGAA reported that the frequency of SCC failures in the U.S. has markedly declined over the past few decades [1].  Outside of North America, the former Soviet Union has a failure history with near-neutral pH SCC similar to that in Canada and pipeline systems in Australia, Iran, Iraq, Italy, Pakistan, and Saudi Arabia have also been affected by SCC [2].

Although SCC in Canada has resulted in pipeline failures, SCC is only one potential threat to pipeline integrity and public safety.  As Figure 6.1 illustrates, SCC accounted for 17 per cent of the 48 in-service ruptures experienced by CEPA member companies between 1985 and 1995.  CEPA indicated that when pipeline leaks are included in the statistics, SCC caused an even smaller percentage of pipeline failures. General corrosion, contact damage and geotechnical damage all caused more ruptures than SCC.  However, the pipeline industry has been dealing with these other causes for a much longer period of time than it has been with SCC.  Experience has provided a better understanding of how to reduce the risk of failure from other causes, whereas SCC has yet to be fully understood by the pipeline industry and the research community.  Because of this, SCC remains a serious concern to the pipeline industry in Canada.

#### 6.1.1 The extent of SCC in Canada

The evidence indicated that, of the 11 CEPA member companies which have undertaken investigative programs, eight have found SCC on their systems.  The majority of the SCC found has been

**Figure 6.1**
**Causes of service ruptures experienced by CEPA member companies:  1985-1995**



Other (16%)
General Corrosion (25%)
SCC (17%)
Contact Damage (23%) (contact by earth moving equipment, etc.)
Geotechnical (19%) (landslides, etc.)

Source:  Endnote [3]

**Figure 6.2**
**Distribution of SCC failures**



5-Year Rolling Average

"insignificant". A few companies have developed an estimate of how much of their system is susceptible. For example, through the use of a detailed predictive model and an extensive excavation program, TransCanada estimates that 3.6 per cent of its system is potentially susceptible to "significant" SCC [4].

### 6.1.2 Failure history in Canada

The 22 pipeline failures caused by SCC in Canada include 12 ruptures and 10 leaks on both natural gas and liquids pipeline systems [5]. In particular, eight of the 22 failures occurred on the TransCanada system between 1985 and 1995. Seven of these failures were ruptures. NOVA and Northwestern Utilities Limited each had three failures. In all, ten different companies have experienced SCC failures. A summary of the 22 failures is provided in Table 6.1. The geographic locations of the failures are shown in Figures 6.4 and 6.5 for both gas and liquids pipeline systems.

There does not seem to be a clear pattern in the number of SCC failures over the past ten years. As Figure 6.2 shows, the occurrence of SCC failures reached a high of four failures in 1990. However, a five-year rolling historical average shows an increase from 1989 to 1995 from an average of under one failure per year to two failures per year.

**Table 6.1**
**History of SCC failures in Canada**

| Year of Failure | Company | Type of Failure | Product Released | Pipe Diameter mm (inches) | Type of Coating | Year of Installation | Cause of Failure | Operating Stress Level (as % SMYS) |
|---|---|---|---|---|---|---|---|---|
| 1977 | NOVA Gas Transmission Ltd. | Leak | Natural Gas | 914 (36) | Polyethylene tape | 1969 | Circumferential SCC due to axial loading | 63% |
| 1979 | Rimbey Pipe Line Co. Ltd. | Leak | HVP (propane) | 219 (8) | Coal tar epoxy | 1961 | SCC associated with multiple severe gouges | 58% |
| 1985 | TransCanada PipeLines Ltd. | Rupture | Natural Gas | 914 (36) | Asphalt | 1972 | SCC associated with minor scratches/ gouges | 71% |
| 1985 | TransCanada PipeLines Ltd. | Rupture | Natural Gas | 914 (36) | Polyethylene tape | 1972 | SCC at toe of DSAW long seam weld | 76% |
| 1986 | TransCanada PipeLines Ltd. | Rupture | Natural Gas | 914 (36) | Polyethylene tape | 1973 | SCC at toe of DSAW long seam weld | 70% |
| 1989 | TransCanada PipeLines Ltd. | Leak | Natural Gas | 914 (36) | Asphalt | 1968 | SCC on pipe body under mastic repair | 71% |
| 1989 | Northwestern Utilities Ltd. | Leak | Natural Gas | 219 (8) | Polyethylene tape | 1970 | Circumferential SCC | 58% |

| Year of Failure | Company | Type of Failure | Product Released | Pipe Diameter mm (inches) | Type of Coating | Year of Installation | Cause of Failure | Operating Stress Level (as % SMYS) |
|---|---|---|---|---|---|---|---|---|
| 1990 | NOVA Gas Transmission Ltd. | Leak | Natural Gas | 168 (6) | Polyethylene tape | 1969 | Circumferential SCC due to axial loading | 53% |
| 1990 | Northwestern Utilities Ltd. | Leak | Natural Gas | 291 (8) | Polyethylene tape | 1970 | Circumferential SCC | 53% |
| 1990 | Northwestern Utilities Ltd. | Leak | Natural Gas | 219 (8) | Polyethylene tape | 1970 | Circumferential SCC | 53% |
| 1990 | Amoco Canada Petroleum Company Ltd. | Leak | Crude Oil | 101 (4) | Polyethylene tape | 1965 | SCC in ERW long seam weld | 46% |
| 1991 | TransCanada PipeLines Ltd. | Rupture | Natural Gas | 508 (20) | Coal tar | 1957 | SCC in ERW long seam weld | 71% |
| 1992 | TransCanada PipeLines Ltd. | Rupture | Natural Gas | 914 (36) | Polyethylene tape | 1972 | SCC at toe of DSAW long seam weld | 77% |
| 1992 | Imperial Oil | Leak | Water | 101 (4) | Foamed glass insulation | 1988 | SCC/general corrosion on water injection riser | 50% |
| 1993 | Rainbow Pipe Lines Co. Ltd. | Rupture | Crude Oil | 610 (24) | Polyethylene tape | 1968 | SCC associated with linear general corrosion | 61% |
| 1993 | Rainbow Pipe Lines Co. Ltd. | Rupture | Crude Oil | 610 (24) | Polyethylene tape | 1968 | SCC associated with linear general corrosion | 72% |
| 1993 | Federated Pipe Lines Ltd. | Leak | NGL | 406 (16) | Shrink sleeve over yellow jacket | 1970 | Circumferential SCC | 67% |
| 1994 | NOVA Gas Transmission Ltd. | Rupture | Natural Gas | 219 (8) | Polyethylene tape | 1970 | SCC associated with linear corrosion | 60% |
| 1995 | TransCanada PipeLines Ltd. | Rupture | Natural Gas | 914 (36) | Polyethylene tape | 1972 | SCC at toe of DSAW long seam weld | 74% |
| 1995 | TransCanada PipeLines Ltd. | Rupture | Natural Gas | 1067 (42) | Polyethylene tape | 1968 | SCC at toe of DSAW long seam weld | 77% |
| 1995 | Pacific Northern Gas Ltd. | Rupture | Natural Gas | 273 (10) | Polyethylene tape | 1968-69 | SCC associated with general corrosion | 71% |
| 1996 | Interprovincial Pipe Line Inc. | Rupture | Crude Oil | 864 (34) | Polyethylene tape | 1968 | SCC associated with linear corrosion | 70% |

Source: Endnote [5]

**Figure 6.3**
**SCC failures: by type of pipeline**



Other (14%)
(Water, HVP, NGL)

Oil and
Liquids
Pipelines
(18%)

Natural
Gas Pipelines
(68%)

Sixty-eight per cent of the SCC failures occurred on natural gas transmission pipelines (Figure 6.3). However, the evidence provided at the Inquiry does not give a clear understanding as to why more gas pipelines than liquids pipelines have been affected by near-neutral pH SCC. Contributing factors may include the greater length of gas pipelines operating at higher stress levels and the greater length of gas transmission pipelines that were installed when polyethylene tape coated pipe was commonly used (Figure 1.3). For example, among CEPA member companies, the total length of polyethylene tape coated pipe in gas pipeline systems is four times that in liquids pipeline systems [6].

The Inquiry reviewed the 22 failures and looked for correlations between the incidence of SCC and type of coating, pipeline age, manufacturing process and operating stress level. These correlations have been discussed in detail in Chapter 3. In summary, most of the failures occurred on pipelines that were coated with polyethylene tape and installed between 1968 and 1973. The operating hoop stresses associated with the 22 failures varied between 46 and 77 per cent of the pipe's SMYS. In almost all cases, however, there were external factors such as external corrosion and minor gouges which increased the stress levels at the failure area. With one exception, no correlation was found

**Figure 6.4**
**Location of SCC failures on natural gas pipelines**



**Figure 6.5**
**Location of SCC failures on liquids pipelines**



between near-neutral pH SCC and pipe grade, pipe manufacturer or manufacturing process. The exception was Youngstown pipe on a portion of the TransCanada system.

### 6.1.3 Costs associated with failures

The direct costs associated with a pipeline failure include the cost of pipeline repair, property restoration and product lost during the incident. Evidence submitted to the Inquiry indicated that the average direct cost of a rupture on a large diameter natural gas pipeline is approximately $1.5 million; for a leak, the average direct cost is estimated at $150 000 [7]. Indirect costs are harder to quantify. These may include the impacts on the affected communities, loss of system throughput, potential loss of market share by shippers and addressing concerns over the reliability of the pipeline system.

### 6.1.4 Conclusions

In the first public Inquiry into SCC in 1993, the Board concluded that SCC was not a widespread problem on Canadian pipeline systems. Since that time, however, there have been eight additional failures due to SCC in Canada, three of which occurred on Board regulated pipelines.

---

Four companies have experienced their first SCC related failures. Also since the first Inquiry, SCC has caused more failures on liquids pipelines as well as gas pipelines and a number of companies have detected SCC on their systems for the first time.

Since SCC develops over time, it is a problem that can only become more serious if no action is taken to deal with it.

Based on the evidence presented in the Inquiry, we believe that SCC remains a serious concern for the pipeline industry. Without proper attention, it will inevitably be the cause of more pipeline failures. However, the pipeline industry is aggressively addressing the situation.

## 6.2   SCC management programs: current practices

We learned what companies are doing to deal with the problem of SCC on their systems. CEPA described its members' current situation as falling into one of three categories:

- companies that have not found any SCC on their systems (some of these companies have looked for SCC while others were planning to make initial assessments of their systems);

- companies that have found some SCC on their systems and have begun to monitor it; and

- companies that have implemented SCC mitigation programs on portions of their systems.

Table 6.2 summarizes what CEPA member companies are doing about SCC. However, the evidence presented at the Inquiry indicates that companies do not take a standardized approach in the management of SCC.

CEPA reported that four companies are conducting, or have plans to conduct, initial assessments of the SCC on their systems. These companies have not experienced an SCC related failure and have not found any SCC on any part of their systems.

Seven companies have found some "insignificant" SCC on portions of their systems. Although the extent of the SCC monitoring program differs from company to company, these companies generally apply the same monitoring, assessment and inspection techniques as those companies that have not found SCC.

Two CEPA member companies, NOVA and TransCanada, have had ruptures on their systems and have implemented SCC mitigation programs. TransCanada's program includes hydrostatic retesting of sections of the pipeline and replacement of pipe where there is a possible risk to people living near the right-of-way. NOVA has also conducted hydrostatic retests on portions of its pipeline affected by SCC.

In the spring of 1996, IPL experienced a pipeline failure that was caused by SCC associated with general corrosion [8].

In Figure 6.6, we present the costs of CEPA member companies' operation and maintenance (O&M) activities related to SCC versus

**Figure 6.6**
**CEPA member companies:  O&M expenditures on pipeline integrity**



O&M related to safety and integrity issues other than SCC

O&M related to SCC issues

Source: Endnote [9]

*REPORT OF THE INQUIRY*

**Table 6.2**
**Current SCC management practices of CEPA member companies**

| Company | System Length km (miles) | SCC Failure Experience | Predictive Model Developed | Investigative Excavations Conducted | SCC Found (Severity) | Hydro-static Retests | Proximity Replace-ments | In-Line Inspection Capability (% of System) |
|---|---|---|---|---|---|---|---|---|
| Alberta Energy Company Ltd. | 1 100 (660) | No | No | Yes | Significant | No | No | 100 |
| Alberta Natural Gas Company Ltd | 177 (106) | No | Yes | Yes | Insignificant | No | No | 99 |
| Canadian Western Natural Gas Company Ltd. | 2 560 (1,536) | No | Developing | No | N/A | No | No | 0 |
| Foothills Pipe Lines Ltd. | 927 (556) | No | Yes | Yes | Insignificant | No | No | 83 |
| Interprovincial Pipe Line Inc. | 8 197 (4,918) | Yes | Developing | Yes | Insignificant | Yes | No | 90 |
| Northwestern Utilities Limited | 3 839 (2,303) | Yes | Developing | Yes | No | Yes | No | 1 |
| NOVA Gas Transmission Ltd. | 20 271 (12,162) | Yes | Yes | Yes | Insignificant | Yes | Yes | 14 |
| TransCanada PipeLines | 14 000 (8,400) | Yes | Yes | Yes | Significant | Yes | Yes | 17 |
| TransGas Limited | 13 160 (7,896) | No | Developing | Yes | No | Yes | No | 0 |
| Trans Mountain Pipe Line Company Ltd. | 1 309 (785) | No | Yes | Yes | Insignificant | No | No | 100 |
| Trans - Northern Pipelines Inc. | 876 (525) | No | No | Yes | No | No | No | 100 |
| Trans Québec and Maritimes Pipeline Inc. | 339 (203) | No | Developing | No | N/A | No | No | 90 |
| Westcoast Energy Inc. | 5 158 (3,094) | No | Yes | Yes | Significant | Yes | Yes | 95 |

activities related to other safety and integrity issues.  Such issues may be associated with corrosion monitoring, surveys, repairs and upgrades, staff training and public awareness campaigns.

For 1995 and 1996, SCC related activities account respectively for 28 per cent and 25 per cent of O&M costs of the total safety and integrity issues dealt with by CEPA member companies.

## 6.3   Standardized approach to SCC management

CEPA suggested that standard approaches to SCC management by all companies would facilitate the sharing of experiences and

*STRESS CORROSION CRACKING REPORT*                                                    *107*

knowledge among companies.  CEPA has developed a framework, as illustrated in Figure 6.7, for a common basic SCC management program [10].  The SCC program has not been developed in more detail beyond this basic framework.  Every member company has committed to following this program, although some companies may decide to enhance the basic process.

The CEPA SCC management program starts by requiring companies to make an initial assessment to determine whether portions of their systems are susceptible to SCC.  If any section is thought to be susceptible, the company would then be required to perform field investigations to look for SCC.  These investigations could be done either in conjunction with other maintenance activities, or as part of a program to excavate sites similar to others where SCC had been found.

If SCC is found but not considered "significant", the company would continue to monitor the section of pipe from time to time.  The period of the reassessment would be based upon the estimated crack growth rate on the section.

In the event that "significant" SCC is detected, the company would estimate the consequences of an SCC failure and, using this information, establish priorities for remedial action.

Then a mitigation method would be selected.  If the SCC is not extensive, a fairly limited approach such as sleeving or selective pipe replacement might be in order.  If the SCC is more extensive, a more elaborate program might be appropriate.  Hydrostatic retesting might be required or, perhaps, more extensive replacement of the pipe or pipe coating.  CEPA suggested that the choice would be made on the basis of how well each option provided a viable, long-term management solution to SCC with a minimum disruption to service [11].

CEPA plans to support this SCC management program with guidelines or a manual of recommended practices, specifically for longitudinal near-neutral pH SCC.  The Recommended Practices Manual will reflect the current best practices of the CEPA companies that have experienced SCC.  Although CEPA members have committed to following the basic SCC management program, CEPA does not intend to make the recommended practices mandatory for its members.

At the time of the hearing, the development of CEPA's recommended practices was still in the early stages and only one of several sections had been completed: the section dealing with an assessment of existing pipelines for SCC susceptibility.  Other sections still to be completed will cover topics such as the design of new pipelines, SCC inspection methods, procedures and criteria for assessing SCC, data collection, and mitigation and repair techniques.  This last section is scheduled for completion in March 1997.  CEPA plans to update the manual periodically.

CEPA has offered to share the recommended practices with non-CEPA member companies when they are completed.

**Figure 6.7**
**CEPA's basic SCC management program**



Source: Endnote [10]

---

### 6.3.1 Conclusions

We believe that an SCC management program is essential for companies to adequately address the issue of SCC and that it should be mandatory that all NEB-regulated companies develop an SCC management program.

An SCC management program would entail the systematic application to specific pipelines of knowledge and best practices already developed across the industry. The objective of the program would be to identify areas where SCC may be found and then deal with it.

Since each pipeline system has unique physical characteristics and an individual construction and operational history, an effective program would vary from company to company. However, we believe it is necessary to establish generally applicable basic practices so that these programs will be comprehensive and consistent in approach.

We are pleased to see CEPA propose a framework for SCC management programs. This is an important initiative because the element of standardization should allow better communication among companies, regulatory authorities and the public.

The completion of the Recommended Practices Manual should be a priority for CEPA. We would expect that the recommended practices which will reflect the best practices of CEPA member companies will be of great benefit to the industry, particularly those companies operating smaller systems.

We are concerned, though, that the Recommended Practices Manual as proposed will deal only with longitudinally oriented near-neutral pH SCC. There have been pipeline failures caused by circumferential SCC and this form of SCC should be addressed in future versions of the Recommended Practices Manual.

We are of the view that the SCC management program proposed by CEPA should be strengthened and made more explicit, as follows:

- The SCC management program should identify clear lines of accountability for the implementation of the program.

- The scope of the SCC management program should encompass the company's entire pipeline system to ensure that the pipelines are thoroughly assessed.

- A company's SCC management program should be regularly updated to reflect changes in operations, new facilities, new developments near the pipeline, the lessons learned from accidents, including those on other pipeline systems, technological developments and changes to standards.

- An initial susceptibility assessment should entail a thorough examination of the pipe's design, construction and maintenance records to identify the location of coatings which are associated with SCC. If the company does not

---

have current or reliable information, test excavations should be conducted to verify this information.

- If, after an initial assessment, a pipeline segment is not considered susceptible, the rationale for this determination should be documented.

- If the pipeline is considered to be susceptible to SCC, the SCC management program should require active monitoring of the pipeline through an investigative excavation program. As discussed in Chapter 4, a predictive model should be used to select excavation sites. An ILI tool may be used where a pipeline company believes this will assist in detecting SCC.

- The SCC management program should describe the predictive model and detail how the excavation sites will be selected. A company should select excavation sites based upon the probability of SCC existing and the consequences of a pipeline failure. The probability of SCC existing is dependent upon the likelihood of the three necessary conditions: a potent environment at the pipe surface, susceptible pipe material and a tensile stress. As discussed in Chapter 3, particular attention should be given to pipelines operating at or above 70 per cent SMYS when selecting sites. In considering the consequences of a failure, sites close to homes, roads, and railways or sensitive environmental areas like wet lands and water crossings should be given priority over other sites that are otherwise equally likely to have SCC. We note that the pressure of a gas pipeline and an HVP pipeline will influence the affected zone in the event of a failure and accordingly the consequences of a failure.

- If "insignificant" SCC is found, the company should incorporate this information into its records, and accordingly adjust the scope and frequency of its monitoring program.

- If a company determines through its investigative excavation program, a failure investigation or by some other means, that it has "significant" SCC, the company should take mitigative action as quickly as possible. The SCC management program should detail the criteria that will be used to decide among available mitigative alternatives.

- Should a Board-regulated company determine that it has "significant" SCC on its system, this fact, as well as information on any mitigative actions taken, should be reported to the Board immediately. The company should develop and submit a comprehensive mitigation program as soon as possible.

- A company should keep records of all activities and decisions related to its program and be able to show how the information gathered from its monitoring program and from the experiences of other companies is incorporated into its SCC management program.  The SCC management program should also outline how the experiences gained by the company are shared with the rest of the pipeline community.

CEPA could assist its member companies by developing guidelines for SCC management programs which reflect these features.

The recommendations that follow are intended to apply to NEB-regulated companies.

**Recommendations**

6-1   We **recommend** that the Board require each pipeline company to develop and implement an SCC management program by 30 June 1997.

6-2   We **recommend** that the Board require SCC management programs to identify the accountability for the implementation of the program.

6-3   We **recommend** that the Board require SCC management programs to provide for the review of the company's entire pipeline system and for regular updating.

6-4   We **recommend** that the Board require SCC management programs to consider the consequences and the probabilities of a failure when establishing priorities for investigative, mitigative and preventive activities.

6-5   We **recommend** that the Board require that SCC management programs contain three principal components:

a)   determination of pipeline susceptibility to SCC and active monitoring of pipelines believed to be susceptible to SCC;

b)   required mitigation, if "significant" SCC is found, and clear identification of the criteria a company must consider in deciding among mitigative options; and

c)   recording and sharing of information on susceptible pipelines.

6-6   We **recommend** that the Board require companies to report immediately to the Board any finding of "significant" SCC and any immediate mitigative actions taken and to

develop and submit a plan detailing the specific mitigative measures to be implemented and a schedule of implementation.

6-7     We **recommend** that, as part of its ongoing monitoring activities, the Board audit the documentation of SCC management programs.

6-8     We **recommend** that the Board request that CEPA continue development of its Recommended Practices Manual and file it with the Board by 31 March 1997.

6-9     We **recommend** that the Board request that CEPA develop procedures for the detection and mitigation of circumferential SCC and include them in future versions of the Recommended Practices Manual.

## 6.4   SCC database

In May of 1995, CEPA started to develop a computerized database to collect and analyze data related to SCC.  The data are taken primarily from investigative excavations and inspections for SCC, information from SCC failures, anomaly investigations and pipe replacements.

The types of data that have been included in the SCC database are the conditions which are currently known or suspected to contribute to SCC susceptibility.  Once collected, the data will be analyzed for trends or correlations which may exist between the conditions and SCC susceptibility.  The database contains a significant amount of information in the following categories:

- site information,
- excavation information,
- pipe information,
- magnetic particle inspection information,
- stress levels,
- environmental conditions,
- information on the most severe colony detected, and
- any general comments.

CEPA member companies have promised to participate in developing and maintaining the database.  The compiling of the database with the historical data of the CEPA member companies was finished in April 1996.  It will be updated yearly after each company's annual investigative programs are completed.  To ensure consistency in the way the data are recorded, CEPA has developed guidelines that set out what data should be collected when conducting an SCC investigative dig.  Member companies have agreed to following these

---

*STRESS CORROSION CRACKING REPORT*                                                   *113*

guidelines, which will be incorporated into CEPA's SCC Recommended Practices Manual.

CEPA has also asked non-CEPA member companies to participate in the database.  Both the CGA and CAPP have publicly expressed support for the database.  CEPA has arranged for members of its SCC Working Group to meet with both associations to identify database participants and to develop ground rules for their participation.  CEPA anticipated that these companies will begin to provide data by mid-1996.

The PRC*I* is also developing a database, primarily for high-pH SCC.  CEPA is currently working with this organization to ensure that the two SCC databases are compatible so that the data can be shared.

In order to encourage as many Canadian pipeline companies as possible to participate, CEPA contends that the database must have some limitations on accessibility to protect the proprietary nature of the data obtained from the companies.  CEPA proposes that the confidentiality of the database participants be guaranteed and that the database information not identify the contributing company.

CEPA's SCC Working Group will perform data trend analyses from the database information, supported by third party statistical expertise, if necessary. Reports of data trend analyses will be made available to regulatory agencies, participating companies, the public and research organizations on an annual basis.  CEPA expects to have the first trend information available by late 1996.

CEPA's SCC database is expected to be integrated into a more comprehensive database being discussed by the Pipeline Risk Assessment Steering Committee (PRASC).  Until now, the SCC database has been solely funded by the CEPA member companies.  CEPA has committed to maintaining the database until the data can be integrated into the more comprehensive PRASC database.

### 6.4.1 Conclusions

We are of the view that the careful analysis of field experience is very important in understanding SCC.  An industry-wide database on SCC is essential because it will help to identify those combinations of environmental and operating conditions that most influence SCC susceptibility.  Pipeline companies, regulatory agencies, researchers and the public can be kept informed of the status of SCC field experience through the results of analyses.

### Recommendations

6-10    We **recommend** that the Board request that CEPA continue to develop and maintain a database on SCC that is compatible with other international initiatives, and that CEPA

encourage the participation of non-member pipeline companies.

6-11    We **recommend** that the Board require pipeline companies to provide SCC-related data to the CEPA SCC database as they acquire it.

6-12    We **recommend** that the Board request that CEPA provide the results of the first data trend analyses to the Board as proposed, including any additional trend analyses requested by the Board.  As well, we **recommend** that other interested parties (for example, researchers and the public) be given the opportunity to identify the particular trend analyses that they require.

## 6.5    Research into SCC

Over the past 10 years, expenditures by CEPA member companies into SCC-related research have amounted to approximately $18.7 million.  In recent years, there has been a steady increase in expenditures on SCC-related research (Figure 6.8).  An amount of $11.8 million was projected to be spent in 1996.  Included in this is the amount of $2 million that CEPA, PRC*I*, GRI and British Gas are spending on ILI tool development.

The majority of SCC research has been focused on crack growth rates and the conditions for crack growth, rather than developing a deeper understanding of near-neutral pH SCC initiation.  The growth of existing cracks presents the most immediate concern to the industry.

According to CEPA, some of the achievements in the area of near-neutral pH SCC since the previous Inquiry include [13]:

- an improved understanding of electrochemistry of near-neutral pH SCC;

- demonstration of the lack of a correlation between SCC susceptibility and pipe steel chemistry or mechanical properties;

- development of an algorithm for cathodic protection penetration under disbonded tape coatings;

- development of a crack tip chemistry model;

- establishment of a CANMET consortium to study full scale pipe tests;

- confirmation that hydrostatic retesting does not adversely affect long term pipeline integrity;

- development of NOVAProbe® and establishment of a consortium to implement use of the probe;

- development of and improvement of SCC predictive models;



**Figure 6.8**
**Summary of research expenditures into SCC**

Source: Endnote [12]

> ... *I would say that we are further ahead in relation to understanding [near-neutral] pH than we were at the equivalent time in the context of high pH.*
>
> *We have also benefited in another way...that being that we have had considerable benefit from having a large amount of field data in relation to the [near-neutral] p H cracking case...* - R. Parkins.
>
> Source:  Endnote [14]

- identification of axial cracks in five pipeline systems using British Gas Elastic Wave in-line inspection tool;

- establishment of the CEPA SCC database;

- improvement of understanding of parameters affecting SCC growth;

- development of laboratory test techniques to study early life and later stages of crack growth;

- measurement of crack growth rates in the laboratory that were found to be representative of those in the field, i.e., $1 \times 10^{-9}$ to $2 \times 10^{-8}$ mm/s; and

- demonstration that laboratory crack growth is independent of stress from 40 per cent to 100 per cent SMYS.

In addition to the ongoing research efforts of individual CEPA member companies, CEPA has committed to fund the continued development and implementation of in-line inspection tools to detect SCC and to investigate factors controlling crack initiation. These programs involve collaboration between CEPA, PRC*I*, GRI and British Gas for the in-line inspection tool project and between CEPA and the Alberta Energy Research Council for the crack initiation project.

**Table 6.3**
**Current and future CEPA SCC research**

| | Research Subject | Current (in progress) | Future | Management Program Benefit | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Monitoring | Prioritizing | Mitigation |
| 1. | Coating disbondment | X | | X | | |
| 2. | Behaviour of high performance coatings | | X | X | | |
| 3. | Cracking environment - mechanistic studies | X | | X | X | |
| 4. | Macroscopic behaviour of cracks / colonies | X | | X | X | |
| 5. | Effects of surface conditions | | X | X | X | |
| 6. | Effect of periodic pressure variation | X | | X | X | |
| 7. | Effect of realistic pressure variation | | X | X | X | |
| 8. | Residual stress | | X | X | X | |
| 9. | Effect of steel composition and microstructure on susceptibility | X | X | X | | |
| 10. | Cyclic stress / strain behaviour | | X | X | X | |
| 11. | In-line inspection | X | | X | | X |
| 12. | Hydrostatic testing | X | | | | X |

Source: Endnote [15]

### 6.5.1 Areas for further SCC research

CEPA identified twelve areas for research as listed in Table 6.3. Seven of these are already in progress and work was expected to begin on the remaining areas in the near term.  These are the research topics that the industry believes are necessary to maintain the operation of their pipelines in a safe and reliable manner.  By the end of 1996, CEPA is expected to have prepared a plan for setting priorities for individual projects and the strategies for obtaining funding.  The majority of these research topics have the potential to affect current pipelines with or without SCC and all are planned for funding.

### 6.5.2 Initiatives to promote coordination among researchers

CEPA established an SCC working group in 1994, which reports to the CEPA Engineering and Operations Committee.  The group was formed to allow companies to share SCC experiences and develop pipeline industry protocols to address SCC investigation and mitigation measures.  CEPA intends that the SCC Working Group will continue to manage CEPA's long-term SCC initiatives, including acting as a focal point for sharing, discussing and disseminating SCC research information. The group will also promote and support the overall coordination of efforts among companies, industry groups such as CGA and CAPP, agencies such as PRC*I* or GRI and research activities through organizations such as British Gas and the Alberta Research Council.

CAPP suggested holding an industry-sponsored meeting for the purpose of exchanging information among industry, government and academia.  Such a meeting could be sponsored by the pipeline companies concerned and/or pipeline associations and would help to identify appropriate directions for future research.

### 6.5.3 Conclusions

It is essential to continue research into SCC.  As discussed in our Conclusions to Chapter 3, many of the basic questions about SCC have not yet been answered.  There is also a need to continue to develop mitigative measures to deal with SCC.  Most notably, the development of a fully reliable SCC in-line inspection tool would significantly improve the industry's ability to detect SCC.

Overall, further focused research will enhance knowledge of SCC and will contribute to the development of measures to protect the public and the environment from the consequences of pipeline failures due to SCC.

The research subjects in Table 6.3 were re-examined and we concluded that the subjects with the highest potential impact on pipelines relate to:

- SCC detection,
- hydrostatic retest frequency,
- monitoring of pipe coatings, and
- database analysis.

**SCC detection.**  The most critical item in terms of public safety is the ability to detect locations that have "significant" SCC present. Currently, there are two effective methods of detection: a predictive model and hydrostatic retesting.  Both these methods have limitations. The success of finding SCC with a predictive model is dependent upon how much information is available on the pipeline system.  Hydrostatic retesting only identifies areas where SCC has reached near-critical dimensions.  These methods are often used together to provide a better understanding of how much SCC is present on a pipeline section.

A large amount of the pipe coated with polyethylene tape has not yet been examined.  A proven in-line inspection tool that could be run through the complete pipeline system to locate areas of SCC would be very valuable.  While crack detection in-line inspection tools are under development, none are yet fully reliable.  High priority should be given to the further refinement of promising tools.

**Hydrostatic retest frequency.**  For hydrostatic retesting to be effective in mitigating SCC, it is important that the frequency of the retests be such that the line does not fail between tests.  Currently, the retest frequency is determined from average crack growth rates that have been estimated from field data.  Additional knowledge of the factors that control crack initiation and growth rates is needed so that laboratory tests can assess the significance of the controlling factors and their influence on crack growth rates and, hence, hydrostatic retest frequencies.  This should also be a priority item of research and specific areas of future research should include:

- the effect of coalescence on the latter stages of crack growth;
- the development of appropriate failure criteria for multiple crack arrays;
- the effect of crack blunting on crack growth;
- the effect of pressure reversals on the calculation of a safe test interval; and
- the effect of hydrostatic retesting on crack growth in thicker wall pipe.

**Monitoring of pipe coatings.**  Several coatings, such as fusion bonded epoxy and extruded polyethylene, are considered to be effective in protecting pipelines from SCC.  However, the long-term performance of these coatings should be continually monitored, especially at locations where SCC would be likely to develop.

**Database analysis.** Analysis of the CEPA SCC database should be given high priority. Rigorous analysis focused on the factors related to the incidence of SCC on various pipelines may help in refining predictive models and in locating SCC sites, as well as point to future research areas.

In summary, we support the ongoing research and coordination role of the SCC Working Group. However, we recommend that the Working Group invite SCC experts from other industries to participate in their research and also solicit expertise from a wider range of backgrounds such as metallurgy and microbiology.

**Recommendations**

6-13 We **recommend** that the Board request that CEPA continue its SCC research program and expand the program to include SCC experts from other industries and a wider range of disciplines.

6-14 We **recommend** that the Board request an annual status report from CEPA on SCC research activities, highlighting accomplishments to date and plans for future research indicating priorities, time lines and funding levels.

## 6.6 Follow-up to the Inquiry

CEPA has proposed a multi-stakeholder forum to promote broader participation in addressing SCC from all interested parties similar to the Pipeline Risk Assessment Steering Committee (PRASC). PRASC is a committee established in 1994 to review risk management in pipelines. Its membership includes CAPP, CEPA, CGA, AEUB, MIACC and the NEB.

The proposed scope of this new forum proposed by CEPA would include information sharing, coordinating research and development, promoting recommended practices and recommending possible changes to CSA standards. CEPA suggested that regulatory agencies, including the NEB, would provide valuable input and guidance as members of this group.

### 6.6.1 Conclusions

We feel that significant progress has been made as a result of this Inquiry. We have developed a good understanding of the issues from a variety of perspectives and a better appreciation of what pipeline safety means to Canadians. The Inquiry has served to disseminate to a much larger group than before information on SCC and mitigative measures. An annual workshop would be one method of ensuring continued

dissemination of information on SCC but undoubtedly other methods exist.

We would expect that the Board will monitor progress made by industry in managing SCC by auditing the SCC management programs of companies under NEB jurisdiction and receiving reports from CEPA on the analysis of the SCC database and on SCC research activities.

**Recommendations**

6-15    We **recommend** that the Board request that CEPA and other industry organizations create opportunities, through conferences and workshops, for the continued sharing of information among industry, researchers, regulatory agencies and the public about SCC field experience and research developments.

# Appendix I

## Terms of Reference

**NEB Inquiry on Pipeline Stress Corrosion Cracking**

1.    The Board authorized K.W. Vollman, A. Côté-Verhaaf, and R. Illing (hereafter "the Panel") pursuant to s. 15(1) of the Act to carry out an Inquiry encompassing:

   a)  an evaluation of the extent of SCC on oil and gas pipeline systems, including examination of all past SCC-related pipe failures;

   b)  a review of the current knowledge base on SCC, including past and current research and development initiatives and with specific emphasis on the mechanism of SCC, its detection, prevention, and mitigation;

   c)  an assessment of the public risk associated with SCC and the management of that risk in both the short and long term, taking into consideration:

   i)    the appropriate operating pressures for existing pipelines affected by SCC;

   ii)   other key areas of action (e.g. pipeline replacements, hydrostatic retesting, investigative excavations, and the development of internal inspection tools); and

   iii)  priorities for future research and development activity;

   d)  a consideration of initiatives which would promote coordinated efforts among stakeholders to address the SCC issue, including mechanisms to facilitate the sharing of technical data and research and development information; and

   e)  any other relevant related matters.

2.    The Panel will issue a public report or reports on the findings of the Inquiry and may make recommendations regarding:

   a)  changes to the Board's Onshore Pipeline Regulations and related technical standards;

   b)  decisions or orders to be made by the Board under s. 48(1) of the Act; and

   c)  any other measures to eliminate or mitigate the hazards associated with SCC.

3.   The Panel has full discretion in taking evidence or acquiring the information necessary for the purpose of making such a report and recommendations.

4.   The Panel will report to the Board from time to time on the progress of its work and also to seek such changes as it may consider necessary in the above mandate.

---

Note:   Mr. Vollman and Mr. Illing are engineers.
Mrs. Côté-Verhaaf is an economist.

# Appendix II

## List of Issues

**NEB Inquiry on Pipeline Stress Corrosion Cracking**

**1.    Extent and severity of SCC in oil and gas pipelines in Canada.**

**Preamble**

In its previous Inquiry into stress corrosion cracking (MHW-1-92), the Board found no evidence that SCC was a widespread problem in Canada.  Nevertheless, the Board encouraged companies to conduct investigative examinations of their systems for SCC and subsequently monitored the results of those examinations.  The Board has since determined that SCC exists on a number of pipeline systems.

**1.1    *What is known about the extent and severity of SCC in pipelines in Canada?***

The Board is seeking information on:

- the number of oil and gas pipeline systems known to have SCC;

- the number of kilometres of pipe affected by SCC;

- the history of failures due to SCC, including both operational and hydrostatic retest failures;

- the direct and indirect costs resulting from each known operational failure attributable to SCC;

- the severity of SCC found on pipelines and the criteria for assessing severity;

- any correlation of the extent, severity, and failure history of SCC with pipeline age, total length of a given system, type of coating, pipe manufacturing process, operating stress level, environment, and other factors that may contribute to the occurrence of SCC;

- whether SCC is more extensive and/or severe on gas or on oil pipelines and, if so, why; and

- why some pipeline systems have experienced more SCC failures than others.

### 1.2 What is the likelihood of SCC becoming more widespread and resulting in more operational failures in the future?

Responses should address what can be inferred from current Canadian and international experience with SCC on pipelines in respect of the likelihood of SCC becoming more extensive and/or severe over time.

### 1.3 What steps need to be taken to establish a comprehensive data base on SCC?

Responses should address the following:

- the specific information that should be collected to form a comprehensive data base on SCC; and

- who should collect the information and maintain the data base, and who should fund that service.

### 2.    Status of research into SCC on buried pipelines.

**Preamble**

An understanding of the SCC mechanism is critical for developing effective preventive and mitigative measures for pipelines.  In the previous Inquiry, the Board recognized the extensive level of research carried out on the nature of SCC and encouraged the continuation of those efforts.

### 2.1 What is the current level of understanding of the mechanism(s) for the initiation and growth of SCC on oil and gas pipelines?

Responses should address the following:

- whether there are different types of SCC (e.g., high pH and near-neutral pH);

- a discussion of the theories for the initiation and growth of SCC; the mechanical, environmental and metallurgical factors that are known to contribute to the initiation and growth of SCC; and how those factors influence SCC initiation and growth;

- whether there is a threshold stress level for the initiation of SCC; whether such a threshold level can be determined; whether it is constant along the length of a pipeline system; and the factors that affect the threshold value;

- whether there is a threshold stress intensity factor for the growth of SCC; the criterion used for the determination of the threshold stress intensity factor; whether such a threshold level can be determined; whether it is constant along the length of a pipeline system; and the factors that affect the threshold value; and

- a discussion of the research that is currently being conducted to better understand the mechanism for the initiation and growth of SCC (e.g., effect of stress levels and fluctuations, susceptibility of high strength steels, growth rates in heat affected zone (HAZ), etc.), and how the results of such research may be applied in the management of the SCC problem.

### 2.2    What areas pertaining to SCC need further study?

Responses should address the areas that are not fully understood and how the results of research into such areas may be applied to the management of the SCC problem.  Examples include the appropriate parameter(s) to be used to describe the SCC process (e.g., J-integral), the role of hydrogen, and the interaction between mechanically-driven processes (e.g., film rupture, crack tip blunting) and chemically-driven processes (e.g., anodic dissolution).

### 2.3    What initiatives would promote the overall coordination of efforts among researchers addressing the SCC problem?

Responses should address whether information on research is being properly disseminated; suggest mechanisms that would facilitate the sharing of information; discuss who should be funding the research; and the role of funding parties in deciding how the information is shared.

### 2.4    What expenditures have been made and are projected to be made on research related to SCC?

Responses should provide information on how much has been spent in the last 10 years; in 1994; in 1995; what funding commitments have been made for future research; and whether funding for future research is appropriate.

### 3.    Detection of SCC on buried pipelines.

### Preamble

The development of a reliable in-line inspection tool for the detection of SCC on pipelines would significantly enhance the ability of companies to eliminate SCC defects on their systems and to prevent operational failures.  Evidence submitted in the previous Inquiry indicated that a considerable amount of research had been aimed at developing such a tool, but that further work was required.  Until such a tool is developed, companies must rely on a predictive soils model to identify SCC-susceptible locations.

**3.1    *Would the development of an in-line inspection tool for detecting cracks be a viable long-term solution to the SCC problem?***

Responses should address the following:

- the capability of state-of-the-art in-line inspection tools for the detection of cracks, including available field data that demonstrates such capability;

- the limitations and restrictions on the practical use of such tools (e.g., size limitations, suitability for use on liquid and gas lines);

- whether such tools are currently commercially available and, if not, when they are expected to be available;

- the percentage of affected pipeline systems that could accommodate such tools;

- whether adequate commitment and funding is assured for the development of promising in-line inspection tools to operational and commercial viability, including the commitments being made and who is making them;

- the immediate and long-term costs associated with in-line inspection for SCC (including development costs for the tools, the cost of making each affected pipeline system able to accommodate such tools, etc.); and

- whether in-line inspection tools will be cost-competitive with other detection techniques.

**3.2    *How effective are predictive soils models at finding SCC on buried pipelines?***

Responses should address the following:

- the parameters included in predictive soils models;

- the effectiveness of such models in finding SCC-susceptible locations, including field data that demonstrates such effectiveness (e.g., ratio of finds/predictions);

- whether such models are generally applicable or limited to certain geographic areas;

- other possible limitations of such models; and

- the immediate and long-term costs associated with predictive soils models.

---

### 3.3    What other methods are available for finding SCC on buried pipelines?

Responses should address the theory and principles behind other methods; their effectiveness at detecting SCC on pipelines; the limitations of those methods; and the associated costs.

### 4.    Mitigative measures for SCC on buried pipelines.

**Preamble**

The previous Inquiry evaluated the effectiveness of certain mitigative measures (i.e., hydrostatic retesting, pressure reduction, selective pipe replacement, investigative excavations and repair) in preventing operational failures.  Since then, additional experience has been gained on the use of these techniques and other techniques have been identified.

### 4.1    How effective are the mitigative measures set out below at preventing operational failures and how viable are they as long-term solutions to the SCC problem?

In addition to the specific information requested below, each response should also address the comparative advantages and disadvantages (including limitations on use, circumstances wherein a particular measure may not be viable as a long-term approach, etc.), as well as the immediate and long-term costs associated with each mitigative measure:

### 4.1.1 Hydrostatic Retesting

Responses should address the following:

- the size of defects that can survive a retest;

- the accuracy and reliability of current life-prediction models when applied to SCC defects, including the limitations of these models (e.g., can the interaction between cracks be predicted and quantified?);

- the appropriate hydrostatic retest parameters: stress level, test duration, test frequency, etc.;

- whether repeated hydrostatic retests might impair the long-term integrity of a pipeline system;

- whether affected pipelines should be hydrostatically retested throughout, or only in SCC-susceptible areas;

- the advantages/disadvantages of hydrostatic retesting as a means of preventing operational failures; and

- the sources of information on the effects of hydrostatic retesting; i.e., laboratory data or field evidence.

---

### 4.1.2 Investigative Excavations and Repair

Responses should address the following:

- the appropriate criteria for repair vs cut-out of SCC-affected pipe, and the rationale and technical data justifying the use of such criteria;

- the appropriate repair methods (e.g., grinding, re-coating, sleeving, etc.); the rationale and technical data justifying the use of such repair methods; the criteria for selecting which repair method to use;  the limitations of each method;

- the effectiveness of excavations/repairs in preventing operational failures (e.g., have repaired sections ever failed during normal operation?); and

- whether repeated excavations and repairs might impair the long-term integrity of a pipeline system.

### 4.1.3 Selective Pipe Replacements

Responses should address the following:

- the guidelines for choosing replacement pipe (e.g., should replacement pipe be thicker? by how much? what type coating should be used? etc.);

- the critical locations along a pipeline that should be selected for pipe replacements; (e.g., those in proximity to dwelling units, to roads, to railways, to places of public assembly, to sensitive environmental areas, etc.) and the rationale for such selections;

- the appropriate distance criteria for pipe replacement, and the rationale and technical data supporting the use of such criteria;

- the factors that should be taken into consideration in determining the appropriate distance criteria (e.g., safety, property damage, environmental impacts);

- whether selective replacements should be applied system-wide or in SCC-susceptible locations only; and

- technical data that provides a measure of the effectiveness of selective replacements in preventing operational failures.

### 4.1.4 Pipe Recoating

Responses should address the available technology, the cost of recoating versus replacing the pipe, and effectiveness in arresting and preventing growth of SCC.

### 4.1.5 Limitations on Operating Conditions

Responses should consider at least the following operating conditions: operating pressure/stress levels, operating temperatures, stress fluctuations, and cathodic protection levels, and address the following:

- whether there are correlations between operating conditions and crack growth rates;

- whether limitations on operating conditions should differ between oil and gas pipelines;

- the rationale and technical data supporting limitations on operating conditions; and

- the practicality of imposing such limitations.

### 4.2   Are there other mitigative measures for SCC on buried pipelines?

Responses should discuss other mitigative measures that should be considered for preventing operational failures.

## 5.   Prevention of initiation of SCC on buried pipelines.

**Preamble**

The previous Inquiry was directed primarily at examining certain methods for controlling the growth of SCC on pipelines known to have or suspected of having SCC.  Other than an examination of the existence of a threshold stress level for the initiation of SCC, there was no attempt to determine what other methods should be considered to prevent the initiation of SCC on new pipeline systems or unaffected portions of existing systems.

### 5.1   Which methods or practices would contribute to the prevention of SCC on new and existing pipelines?

Responses should address the following:

- the metallurgical characteristics that affect the formation of SCC;

- the aspects in the manufacture of pipe that can be controlled to prevent SCC;

- the effectiveness of different types of coatings in preventing SCC;

- the modifications that can be made to the environment (soil, topography, electrochemical environment, microbial activity, etc.) that decreases the susceptibility of a pipeline to SCC;

- the construction practices that are effective in preventing SCC;

---

- the operating practices (e.g., operating pressures, pressure/stress fluctuations, operating temperature, cathodic protection levels, etc.) that are effective in preventing SCC; and

- an estimate of the immediate and long-term costs associated with the various preventive measures.

### 6. Safety of the public and of company employees, and protection of the environment and property.

**Preamble**

The previous Inquiry resulted in a number of changes to the Pipeline Maintenance Program of TransCanada PipeLines Limited to address the safety risk posed by SCC. The approved program included hydrostatic retesting, proximity pipe replacements, investigative excavations and research. The Board encouraged other companies to carefully review the TransCanada experience and to examine their own systems for SCC when opportunities occur while carrying out other inspection, repair, or maintenance activities.

Since that time, the development of an internal inspection device has continued, the predictive soils models have been refined, more is known about SCC, and other pipeline systems have been found to have SCC. As a result of these changing circumstances, the decision on how best to ensure the safety of the public and of company employees, and the protection of the environment and property should be re-evaluated.

### 6.1 How do the current integrity management practices of pipeline companies address the risk from SCC?

Responses should explain the following:

- how susceptible portions of the pipeline system are identified;

- the criteria used to assess and manage risk;

- how mitigative techniques are selected and employed;

- whether companies have initiated ongoing programs to detect SCC; and

- what components should be included in an effective integrity management program for SCC.

### 6.2 What changes should be made to current integrity management practices?

Responses should be based on what has been learned about SCC since existing integrity management practices were put into place, and should address the following:

- the techniques that could be used to monitor the extent and severity of SCC on operating pipelines;

- the criteria to be used in evaluating the suitability of a pipeline for continued operation; and

- long-term strategies for dealing with pipelines with SCC (e.g., periodic recertification, use of buffer zones, changes to codes and regulations).

### 6.3   Are current emergency response practices adequate for SCC-susceptible lines?

Responses should discuss industry practices in terms of leak detection, shutdown and isolation of failure sites and emergency preparedness.

# Appendix III

## Definition of "Significant" SCC

CEPA stated [1] that it would adopt the definition of "significant" SCC as follows:

Cracks in a colony are assessed to be "significant" if the deepest crack, in a series of interacting cracks, is greater than 10 per cent of wall thickness and the total interacting length is equal to or greater than 75 per cent of the critical crack length of a 50 per cent throughwall crack at a stress level of 110 per cent SMYS.  The procedure for assessing the existence of "significant" cracks is detailed as follows:

1.  Determine the critical length for rupture of a 50 per cent throughwall defect at 110 per cent SMYS.  This critical length is a function of line specific pipe characteristics and nominal properties and can be determined using such analysis algorithms as:

    i)  Pipe Axial Flaw Failure Criteria - developed by Battelle Memorial Institute for the PRC*I*, and

    ii)  CorLAS™ - developed by CC Technologies.

2.  Determine the cumulative interacting length of the cracks.  The interaction is dependent upon the circumferential and axial separation between individual cracks.  The interacting circumferential distance between two cracks is evaluated using the following formula:

$$Y \leq 0.14 \quad \frac{(l_1 + l_2)}{2}$$

    where Y    = actual circumferential separation between two cracks

    $l_1, l_2$    = crack lengths

In order for two cracks to be interacting, the axial separation between them must be evaluated using the following formula:

$$X \leq 0.25 \quad \frac{(l_1 + l_2)}{2}$$

    where  X    = actual axial separation between two cracks

    $l_1, l_2$    = crack lengths

3.  If one of the cracks within the cumulative interactive length has a depth greater than 10 per cent of wall thickness, compare the interacting length of the colony to the critical length calculated in Step 1.  If the interacting length exceeds 75 per cent of the critical length, the colony is considered "significant".

# Appendix IV

## Assessment of Failure Criteria

In order to quantify the relationship between critical defect size and pressure in pipelines, Battelle conducted an extensive series of burst tests in the early 1970s and developed an assessment methodology for analyzing axial flaws in pipelines [1].  The Battelle method, sometimes referred to as the log-secant criterion, was based on a strip-yield model and empirically derived for surface axial flaws.  Since its inception, the log-secant failure criterion has been used extensively in the pipeline industry as a conservative method of assessing the failure pressure for known defect dimensions.

More recently-developed failure criteria incorporate elastic-plastic fracture mechanics principles, the understanding of which has improved significantly in the past two decades.  In addition to the log-secant criterion, other failure criteria for axial flaws in pipelines that were considered in the Inquiry were the Pipe Axial Flaw Failure Criterion (PAFFC) developed at Battelle [2], the Level 2 Strip Yield Model developed at CANMET [3] and the CorLas™ model developed by Cortest [4].

CEPA provided calculations of predicted failure pressures for 14 given crack sizes [5].  The data used in the calculations are representative of the range of material properties, flaw shapes, and pipe diameters in which SCC failures have occurred in Canada.

The results were used to plot scatter graphs of predicted vs. actual failure pressures for the four failure criteria (Figures IV.1 and IV.2).  Points under the dashed lines indicate conservative predictions; conversely, points above are non-conservative.  Figure IV.1 shows that most of the failure pressures predicted by the different failure criteria are conservative and that there is a significant amount of scatter in the results.

Figures IV.2(a) and IV.2(b) show that, for this set of data, the log-secant and CANMET criteria can be very conservative, with significant variances in the level of conservatism.  In addition, the CANMET criterion was not consistently conservative.  In comparison, Figures IV.2(c) and IV.2(d) show much improved predictability for both the CorLAS™ and PAFFC criteria, with CorLAS™ giving comparatively better accuracy.  The figures illustrate the inconsistency and significant amount of conservatism that is possible in the application of these failure criteria.

It must be emphasized that the observations noted above with respect to each failure criterion are valid for the specific set of field data for which the calculations were made and may not necessarily hold true

for other sets of data.  Each failure criterion is developed on the basis of certain assumptions and generally has a limited range of applicability.  The predictive capability of a failure criterion improves if the specific situation under consideration is consistent with those assumptions and is within that range of applicability.

For example, in a study conducted by Battelle for TCPL, it was concluded that the log-secant criterion is not appropriate for assessing pipeline failure pressures for lines containing SCC, such as has occurred on the TCPL system [6].  The inconsistent and overly conservative predictions of failure pressure were attributed primarily to the effect of multiple cracking that is associated with SCC, as compared to the single rectangular axial flaw assumed in deriving the log-secant criterion.  The study also identified the empirical calibration of the criterion as contributing to the observed conservatism and inconsistency.  In another study conducted by Battelle for TCPL, the results suggest that the presence of multiple cracks effectively reduces the crack driving force below that for a single crack [7].  Therefore, failure criteria based on a single crack will tend to underestimate failure pressures where multiple cracks are present.  According to TransCanada, Battelle is currently working on developing a correction factor for single-crack failure criteria that will improve its predictive accuracy for multiple cracks.

**Figure IV.1**

**Predicted vs. actual failure stress levels for various failure criteria**



Source:  Data from endnote [5]

**Figure IV.2   (a) Log-secant failure criterion predicted vs. actual failure stress levels**



**Figure IV.2   (b) CANMET failure criterion predicted vs. actual failure stress levels**



**Figure IV.2   (c) Pipe Axial Flaw Failure Criterion predicted vs. actual failure stress levels**



**Figure IV.2   (d) CorLAS™ failure criterion predicted vs. actual failure stress levels**



Source:  Data from endnote [5]

**Figure IV.3**
**Critical crack sizes at hydrostatic test pressure and at maximum operating pressure**



Crack Length

Once an appropriate failure criterion has been chosen, critical crack sizes can be calculated for the test pressure and the MOP of the pipeline. Figure IV.3 shows a typical graph of the critical crack sizes for two stress levels, corresponding to the hydrotest pressure and the MOP. It is a plot of crack depth versus crack length and represents the families of crack sizes that are critical at the test and maximum operating pressure. For example, both the short, deep crack, A, and the long, shallow crack, B, are critical at the test pressure.

After a hydrotest, it can be assumed that no cracks remain in the pipeline whose dimensions lie above the curve for $P_T$. Over time, cracks A and B will grow to A′ and B′, respectively, where the latter are critical at the operating pressure of the pipeline. The difference in depth between A′ and A, $\Delta d_A$, is the margin for growth in the depth direction that is necessary for crack A to fail in service. Similarly, for crack B, the crack growth margin is $\Delta d_B$. Unless there is data available (e.g., previous failures, ILI data) to support the assumption of a specific critical crack length, the minimum $\Delta d$ between the two curves should be used to arrive at a conservative value for a safe test interval. The assumption of an infinitely long crack would normally lead to conservative estimates of $\Delta d$.

Another advantage of assuming an infinitely long crack is that any further growth in crack length that might occur between tests becomes irrelevant and, consequently, any coalescence of cracks will not affect the calculations of a safe test interval. If, subsequent to a hydrotest, crack A in Figure IV.3 were to coalesce with a crack of

length $\ell$, the total length of the new crack would be significantly greater. Consequently, the critical crack depth at MOP would be smaller and the amount of growth in the depth direction that is necessary for crack A to fail in service would be $\Delta d_c$, which is significantly less than $\Delta d_A$. By assuming a longer crack or one of infinite length, the effect of any coalescence is minimized or eliminated altogether.

CEPA has taken the position, based on observations of field and laboratory cracks, that coalescence for low pH SCC occurs in the early stages of growth when cracks are small and then the coalesced crack continues to grow as a single crack. According to Beavers, the examination of fracture surfaces of failed pipelines indicate that the early stages of growth occur in the axial direction, during which time smaller cracks coalesce, and that the latter stages are characterized by growth in the depth direction [8]. Parkins indicates that laboratory results of specimens taken to failure suggest the same tendency for coalescence to occur early [9]. However, the Panel notes that this apparent tendency to coalesce in the early stages of growth does not preclude the scenario wherein cracks coalesce subsequent to a hydrotest, but do not lead to immediate failure. That situation could still occur and lead to nonconservative estimates for test intervals.

In summary, the failure criterion selected must be appropriate for the specific situation under consideration. It is therefore essential that the assumptions underlying a failure criterion, as well as its range of applicability, be fully understood and considered. Secondly, in the absence of reliable data regarding crack dimensions, the minimum $\Delta d$ should be used to arrive at a conservative value for a safe test interval.

# Appendix V

## Glossary

| | |
|---|---|
| anodic dissolution | localized corrosion in the presence of an electrical current |
| anchor pattern | roughing of the pipe surface in order to allow better adhesion of the coating |
| anaerobic soil | soil lacking in oxygen |
| aerobic soil | soil containing oxygen |
| Barlow's formula | relates the pressure in a pipe to the circumferential (hoop) stress as a function of the diameter and wall thickness |
| brittle fracture | pipeline failure with little plastic deformation at fracture surface |
| cathodic protection (CP) | method of controlling or reducing corrosion by applying a voltage to the pipe through the soil |
| class location | geographic area classified according to its approximate population density in a region 200 m on both sides of the centreline of any continuous 1.6 km of pipeline |
| coating disbondment | separation of coating from the pipe surface |
| cold expansion | mechanical expansion of pipe after forming and welding by 1 to 1.5 per cent to round out and size the pipe diameter |
| collinear | lying along the same line (coaxial) |
| compressive stress | stress that compresses or shortens the material |
| corrosion | degradation of steel by chemical or electro-chemical dissolution that occurs as a result of the interaction of the steel with its environment |
| crack blunting | plastic deformation of the crack tip due to an overload |
| crack coalescence | joining of two cracks that are in close proximity to form one longer crack |
| cracking | mechanical splitting into parts |

| | |
|---|---|
| cyclic softening | after a number of pressure cycles, many steels exhibit plastic strains at stress levels below those at which they would normally occur, i.e., the yield stress |
| diffusion | passage of a substance into a body (e.g., hydrogen into steel) |
| "dirty" steel | term used to denote a steel containing a high number of non-metallic inclusions |
| discrete repair | a short segment of pipeline identified to be repaired |
| dissolution | decomposition of steel into parts |
| double submerged arc weld (DSAW) | weld using filler metal passes on the inside and outside of the pipe |
| ductility | a measure of the capability of a material to be deformed plastically before fracturing |
| elastic limit | see proportional limit |
| electric potential | voltage existing between the pipe and its environment |
| electric resistance weld (ERW) | weld formed by resistance heating of the two edges of a pipe and then forcing them together to create a solid state weld |
| electrolyte | liquid that conducts electricity |
| fatigue | mechanism leading to fracture as a result of repeated or fluctuating stresses |
| flash-welded | distinct type of ERW pipe, made from individually rolled plates formed into cans before being welded |
| fracture mechanics | study of the physics of crack initiation and growth in a material |
| fracture toughness | a measure of a material's resistance to crack extension, either slow or rapid |
| free corrosion potential | electric potential that exists in the absence of an applied potential with corrosion occurring |
| free surface | a surface with one side not constrained by adjacent metal, just air |
| girth weld | circumferential weld joining two sections of pipe |
| high vapour pressure (HVP) liquid | hydrocarbons or hydrocarbon mixtures in the liquid or quasi-liquid state with a vapour pressure in excess of 107 kPa absolute at 38ºC |

| | |
|---|---|
| holiday | a hole or puncture in the coating of a pipeline |
| hoop stress | stress around the circumference of a pipe (i.e., perpendicular to the pipe length) which results from internal pressure |
| hydrogen embrittlement | a condition of low ductility in metals resulting from the absorption of hydrogen |
| hydrolysis | decomposition of a chemical compound by reaction with water |
| hydrostatic test | pressure test of a pipe or pressure vessel using water as the pressurizing medium |
| in-line inspection (ILI) or internal inspection | the inspection of a pipeline from the interior of the pipe |
| in-line inspection tool | the device or vehicle, also known as an intelligent or smart pig, that uses a nondestructive testing technique to inspect the wall of a pipe from the inside |
| "insignificant" SCC | SCC that is not large enough to be classified as "significant" |
| intergranular | crack growth or crack path that is between the grains of a metal |
| J-integral | a fracture mechanics parameter relating crack size, geometry and stress acting on a crack.  This parameter accounts for plasticity effects in crack growth |
| launcher | a pipeline facility used for inserting a pig into a pressurized pipeline |
| leak | a small opening, crack or hole in a pipeline causing some product loss, but not immediately impairing the operation of the pipeline |
| loading rate | rate at which pressure increases in a pipeline |
| low vapour pressure (LVP) liquid | hydrocarbons or hydrocarbon mixtures in the liquid or quasi-liquid state with a vapour pressure of 107 kPa absolute or less at 38°C |
| magnetic particle inspection (MPI) | a nondestructive examination procedure for locating surface flaws in steel using fine magnetic particles and magnetic fields |

| | |
|---|---|
| microplastic strain | a small area of plastic strain usually on the pipe surface, such as in a pit or other areas where the strain is locally confined, that does not spread through the wall thickness resulting in gross plastic deformation of the pipe |
| microstructure | structure of metals and alloys as revealed after polishing and etching them; hot rolled steels usually consist of bands of ferrite (iron) and pearlite (carbon) but may contain other microstructures such as martensite (hard brittle grains) or bainite (not as hard or brittle as martensite) |
| mill scale | scale remaining on the surface of the pipe due to steel manufacturing process |
| non-metallic inclusions | a particle of foreign material in a metallic matrix; usually the foreign material is an oxide, sulfide or silicate but may be of any substance foreign to the matrix |
| nucleate | initiate, such as start the growth of a crack |
| off-line inspection | inspection of a pipeline section that is removed from service; accomplished by the installation of temporary launchers and receivers |
| on-line inspection | inspection of a pipeline section while it is in service; accomplished by the use of permanently installed launchers and receivers |
| passivity | function of the electrochemical environment where a passive or protective film forms |
| pH | measure of the acidity or alkalinity of a substance |
| pig | a generic term signifying any independent, self-contained device, tool or vehicle that moves through the interior of the pipeline for inspecting, dimensioning or cleaning purposes |
| pigging | see in-line inspection |
| pressure | level of force per unit area exerted on the inside of a pipe or pressure vessel |
| pressure reversal | failure of a defect (e.g., crack) at a pressure level below the maximum level reached on a prior loading (e.g., hydrostatic retest) |

| | |
|---|---|
| proportional limit | maximum stress a material is capable of sustaining without any permanent (plastic) deformation upon release of the stress (also know as elastic limit) |
| proximity replacements | see selective pipe replacements |
| R-ratio | ratio of the minimum to maximum stress to characterize the pressure fluctuations experienced in cyclic loading |
| receiver | a pipeline facility used for removing a pig from a pressurized pipeline |
| redox potential | potential of the soil for oxidation to occur; measures the oxygen that is available to combine with other compounds |
| residual stress | stress present in an object in the absence of any external loading; results from manufacturing process, heat treatment, or mechanical working of material |
| rupture | the instantaneous tearing or fracturing of pipe material causing large-scale product loss and immediately impairing the operation of the pipeline |
| selective pipe replacements | pipe replacements which are undertaken adjacent to critical areas such as dwellings |
| SMYS | specified minimum yield strength; the minimum yield strength prescribed by the specifications or standard to which pipe is manufactured |
| sour gas | natural gas containing hydrogen sulphide in such proportions as to require treating in order to meet domestic sales gas specifications |
| strain | increase in length of a material expressed on a unit length basis (e.g., inches per inch) |
| strain hardening | an increase in hardness and strength caused by plastic deformation at a temperature below the recrystallization range |
| stress | tensile or compressive force per unit area in the pipe wall as a result of the loads applied to the structure |
| stress associated dissolution | see anodic dissolution |
| stress focused dissolution | see anodic dissolution |

| | |
|---|---|
| stress intensity factor | a fracture mechanics term relating the crack size, geometry and stress acting on a crack |
| stress raiser or concentration | a change in contour, discontinuity, gouge or notch that causes the local increases in the stress in a pipe |
| stress relief | reduction of the residual stresses either through a mechanical overload or through an elevated temperature (i.e., 200 to 450ºC for a period of time) |
| "significant" SCC | SCC that is deeper than 10 per cent of the pipe wall thickness and is as long as, or longer than, the critical crack length of a 50 per cent throughwall crack at a stress level of 110 per cent of the pipe's SMYS |
| subcritical crack | a crack that is not large enough to cause a failure of a pipeline at a given pressure |
| tensile stress | stress that elongates the material |
| terrain conditions | the soil type, drainage and topography at a given location |
| thermal flux | a measurement of heat intensity |
| thermal stress relief | process of relieving residual stress by elevating the steel temperature for a defined period of time |
| transducer | a device for converting energy from one form to another;  for example, in ultrasonic testing, conversion of electrical pulses to acoustic waves and vice-versa |
| transgranular | crack growth or crack path that is through or across the grains of a metal |
| TÜV Rheinland | an organization authorized by the German Government to verify the compliance with directives defined by Regulations covering the operation and inspection of pipelines in Germany |
| weld seam | the longitudinal weld in pipe, which is made in the pipe mill |
| yield strength | stress level at which a material exhibits a specified deviation from linear proportionality of stress and strains (usually 0.5 per cent strain) |

# Endnotes

**Chapter 1**

1.  Statistics Canada. *Gas Utilities*, Cat. No. 57-205 and *Oil Pipeline Transport*, Cat. No. 55-201.

**Chapter 2**

1.  Transportation Safety Board of Canada (1992). *Commodity Pipeline Safety Interim Recommendations*, 2 November 1992.

2.  NEB Order MHW-1-92: An Inquiry Concerning the Recommendations of the Transportation Safety Board of Canada on Stress Corrosion Cracking in Pipelines and The National Energy Board Reassessment of TransCanada PipeLines Limited's Pipeline Maintenance Program.

3.  National Energy Board (1993). *Report of the Inquiry Concerning the Recommendations of the Transportation Safety Board of Canada on Stress Corrosion Cracking in Pipelines and The National Energy Board Reassessment of TransCanada PipeLines Limited's Pipeline Maintenance Program, August 1993*, p 15.

4.  *Ibid.*

5.  *Ibid.*, p 5.

6.  *Ibid.*, p 15.

7.  *Ibid.*

8.  *Ibid.*

**Chapter 3**

1.  Parkins, R.N. (1992). *Environment Sensitive Cracking of High-Pressure Pipelines in Contact with Carbon-Dioxide-Containing Solutions, AGA NG-18 Report 205*, p 61.

2.  CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 2, table 2.1 and *Response to OPLA Information Request # 8 of Proceeding MH-2-95*.

3.  National Energy Board (1996). *MH-2-95 Hearing Transcript, 16 April 1996*, pp 138-139, lines 5-22.

4.     CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 2, Appendix D, Tab 6, p 7.

5.     Parkins, R.N. (1992).  *Environment Sensitive Cracking of High-Pressure Pipelines in Contact with Carbon Dioxide-Containing Solutions, AGA NG-18 Report 205*, p 66.

6.     CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 2, Appendix D, Tab 1, p 8.

7.     *Ibid.*

8.     *Ibid.*, Tab 9, p 10.

9.     *Ibid.*, Tab 13, pp 7-8.

10.    *Ibid.*, Tab 5, p 3.

11.    Parkins, R.N. (November 1994).  *Overview of Intergranular Stress Corrosion Cracking Research Activities, AGA PRC Report PR-232-9401*, p 54.

12.    CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 2, Appendix D, Tab 4, p 3.

13.    *Ibid.*, Tab 6, p 3.

14.    *Ibid.*, Vol. 1, Issue 1, p 13 and table 1.1 (revised in response to Undertakings given by Mr. Delanty to Mr. McCarthy and by Mr. Argument to Mr. McCarthy at MH-2-95 Hearing Transcript, 15 April 1996, p 49-50).

15.    NEB (1996).  *Notes from 12 January 1996 meeting between NEB SCC Inquiry Panel and Shaw Pipe Protection*, Exhibit No. A-59.

16.    CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 1, p 14.  Double-wrapped tape-coated pipe is not more susceptible to SCC than single-wrapped tape-coated pipe.  The single-wrap SCC data was collected during the early development of the TCPL predictive model; the double-wrap data was collected with the benefit of a more fully developed model. The higher SCC hit rate for double-wrapped tape is an artifact of when the sampling was done.

17.    *Ibid.*, Issue 2, p 9.

18.    *Ibid.*, Vol. 2, Appendix D, Tab 6, p 10.

19.    Wilmott, M.J. and Diakow, D.A. (1996).  Factors influencing stress corrosion cracking of gas transmission pipelines: detailed studies following a failure. Part 1, environmental conditions.  *ASME Intl. Pipeline Conf.*, Vol. 1, pp 507-524.

20.    Parkins, R.N., Blanchard, W.K. and Delanty, B.S. (1994). Transgranular stress corrosion cracking of high-pressure pipelines in contact with solutions of near-neutral pH. *Corrosion*, 50, pp 394-408.

21.    Diakow, D. and Wilmott, M.J. (February 1996). *Stress Corrosion Cracking of Pipeline Steels - Field Investigation of the NPS 8 Virginia Hills Pipeline, Part 1, NRTC Report No. 01131.*

22.    CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 2, Appendix D, Tab 5, p 16.

23.    Van Boven, G. and Wilmott, M. (December 1995). *Pulsed Cathodic Protection 1995 - An Investigation of Current Distribution Under Disbonded Pipeline Coatings, NRTC Report No. 01118.*

24.    CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 2, Appendix D, Tab 6, p 12.

25.    *Ibid.*, Vol. 1, Issue 5, p 6.

26.    Barlo, T.J. et al. (1977). *Test Procedures to Evaluate the Effectiveness of Inhibitor-Containing Coating in Controlling SCC in Line Pipe Steels, PRCI NG-18 Report 109*; Davis, J.A. (1977). *Addition of Inhibitors to the Soil Above Pipelines to Minimize SCC, PRCI NF-18 Report 110.*

27.    CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 1, table 1.10.

28.    TCPL (1996). *Response to National Energy Board Information Request # 2 of Proceeding MH-2-5*, p 3.

29.    CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 2, Appendix D, Tab 5, p 6.

30.    Parkins, R.N. (November 1994). *Overview Of Intergranular Stress Corrosion Cracking Research Activities, AGA PRC Report PR-232-9401*, p 85.

31.    Leis, B.N. (1990). Update on SCC life prediction models for pipelines. *First Pipeline Technology Conference*, Ostende, Belgium.

32.    CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 2, Appendix D, Tab 1, p 8.

33.    Leis, B.N. (1991). Some aspects of SCC analysis for gas transmission pipelines. *CIM Intl. Symp. on Materials Performance and Maintenance*, Ottawa, Canada, Aug. 18-22, 1991.

34.    Surkov, Y.P. et al. (1994). Corrosion crack initiation in gas pipelines. *The Physics of Metals and Metallography*, Vol. 78, No. 1, pp 102-104.

35.  TCPL (1996).  *Response to National Energy Board Information Request # 7 of Proceeding MH-2-95*, table 7.1, p 4.

36.  Parkins, R. N. (November 1994).  *Overview of Intergranular Stress Corrosion Cracking Research Activities, AGA PRC Report PR-232-9401*, p 86.

37.  CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 2, Appendix D, Tab 6, pp 5-6.

38.  U.S. Department of Transportation (October 1994).  *Pipeline Safety Regulations*, CFR Parts 192 and 195;  Institute of Gas Engineers (1993).  *Steel Pipelines for High Pressure Gas Transmission, Edition 3*.

39.  CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 2, fig 2.7.

40.  *Ibid.*, Vol 2, Appendix D, Tab 6, p 9.

41.  NEB (1996).  *Notes from 12 January 1996 meeting between NEB SCC Inquiry Panel and Camrose Pipe Company Ltd.*, Exhibit No. A-58.

42.  National Energy Board (1996).  *MH-2-95 Hearing Transcript, 17 April 1996*, p 325.

43.  CEPA (1996).  *Final Argument to Proceeding MH-2-95*, p 5.

44.  CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 1, p 19.

45.  *Ibid.*, Issue 2, pp 6-9.

46.  *Ibid.*, Vol. 2, Appendix D, Tab 6, p 8.

47.  *Ibid.*

48.  *Ibid.*, p. 9.

49.  *Ibid.*, Vol. 1, Issue 1, p 19.

50.  *Ibid.*, Issue 2, p 20.

51.  *Ibid.*, Vol. 2, Appendix D, Tab 1, p 1.

52.  *Ibid.*, Tab 5, p 16.

53.  TCPL (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Issue 1, p 2.

54.  CEPA (1996).  *Response to Undertaking given by Mr. Anderson to Mr. McCarthy at MH-2-95 Hearing Transcript, 15 April 1996*, p 90.

55.  TCPL (1996).  *Response to National Energy Board Information Request # 10 of Proceeding MH-2-95*, fig. 1.

56.  *Ibid.*, pp 3-4.

57.  *Ibid.*, fig. 2.

58.   *Ibid.*, fig. 5.

59.   TCPL (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Issue 4, p 26.

60.   CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 2, Appendix D, Tab 1, fig. 5.

61.   *Ibid.*, Tab 5, p 7.

62.   *Ibid.*, Tab 6, pp 7-9.

63.   *Ibid.*, Tab 9, p 15.

64.   *Ibid.*, Tab 4, p 8.

65.   *Ibid.*, Vol 1, Issue 2, fig 2.5, p. 15.

66.   *Ibid.*, Vol. 2, Appendix D, Tab 9, fig. 3 and p 11.

67.   *Ibid.*, Vol. 1, Issue 2, p 22.

68.   Parkins, R.N. (July 1995).  *Stress Corrosion Cracking of Pipelines in Contact with Near-Neutral pH Solutions, AGA PRC Report 232-9501*, p 23.

69.   CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 2, Appendix D, Tab 6, p 15.

70.   *Ibid.*, Tab 1, p 2.

71.   *Ibid.*, Tab 5, p 16.

72.   TCPL (1996).  *Response to National Energy Board Information Request # 10 of Proceeding MH-2-95*, p 4.

73.   National Energy Board (1996).  *MH-2-95 Hearing Transcript, 16 April 1996*, p 209, line 20.

74.   CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 2, fig 2.1.

75.   *Ibid.*, Vol. 2, Appendix D, Tab 6, p 3.

76.   National Energy Board (1996).  *MH-2-95 Hearing Transcript, 15 April 1996*, p 35.

77.   National Energy Board (1996).  *Notes from 18 January 1996 meeting between NEB SCC Inquiry Panel and Dr. R.N. Parkins*, Exhibit A-60.

78.   Krishnamurthy, R.M., McDonald, R.W. and Marreck, P.M. (1996).  Stress corrosion cracking of a liquid transmission line.  *Intl. Pipeline Conference*, Vol. 1, pp 495-506.

79.   National Energy Board (1996).  *MH-2-95 Hearing Transcript, 22 April 1996*, p 672, lines 25-28.

80. CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 2, pp 12-13.

81. *Ibid.*, Vol. 2, Appendix D, Tab 1, p 13.

82. *Ibid.*, Vol. 1, Issue 2, p 11.

83. National Energy Board (1996). *MH-2-95 Hearing Transcript, 16 April 1996*, pp 149-150.

84. CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 2, Appendix D, Tab 9, pp 9-10.

85. *Ibid.*, Tab 1, p 11.

86. Leis, B.N. (1995). Characteristic features of SCC colonies in gas pipelines - implications for NDI systems and related integrity analyses. *Pipeline Technology*, Vol. 1, p 611.

87. CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 2, Appendix D, Tab 13, pp 3-4.

88. *Ibid.*, Tab 5, p 9.

**Chapter 4**

1. CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 5, p 2.

2. *Ibid.*

3. Beavers, J.A. and Thompson, N.G. (1996). Corrosion beneath disbonded coatings: a review. *The NACE International Annual Conference and Exposition 1996* (Paper No. 208).

4. Canadian Standards Association (1994). CAN/CSA Z662-94, *Oil and Gas Pipeline Systems*, Clause 9.2.8.1, p 163.

5. Beavers, J.A. and Thompson, N.G. (1994). Effects of coatings on SCC of pipelines: new developments. *Prevention of Pipeline Corrosion Conference*, Houston, Texas, October 1994.

6. CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 5, p 3.

7. *Ibid.*, p 4.

8. *Ibid.*

9. *Ibid.*

10. *Ibid.*, Issue 4, p 20.

11. TCPL (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Issue 4,  p 4.

12. National Energy Board (1996). *MH-2-95 Hearing Transcript, 17 April 1996*, p 290, line 8.

13. CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 4, p 21.

14. TCPL (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Issue 4, p 21.

15. TCPL (1996). *Closing Statement to Proceeding MH-2-95*, p 22.

16. CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 3, pp 11-12.

17. CEPA (1996). *Final Argument to Proceeding MH-2-95, p 3 and Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 2, Appendix C.

18. CAPP (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, p 9.

19. CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 3, p 13 and Vol. 2, Appendix B, tables 1 and 2.

20. *Ibid.*, pp 13-14.

21. CEPA (1996). *Response to National Energy Board Information Request # 26 of Proceeding MH-2-95*.

22. CEPA (1996). *Response to National Energy Board Information Request # 3 of Proceeding MH-2-95*, table 3.1 and *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 1, table 1.7.

23. CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 3, table 3.8.

24. Diakow, D., Dupuis, B., Geerligs, J., Jack, T.R., Sutherby, R.L. and Wilmott, M.J. (1995). Soil probe measures several properties to predict corrosion. *Oil & Gas Journal*, 3 April 1995, p 54.

25. CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 4, p 9.

26. *Ibid.*, Vol. 2, Appendix B.

27. *Ibid.*, Vol. 1, Issue 1, p 11.

28. The severity of all SCC field data collected to date has been assessed using these definitions. As such, these definitions are used for the purpose of discussing the extent and severity of SCC throughout this report. A more precise definition for "significant" SCC, outlined in CEPA's Submission to the Inquiry, will be used by CEPA member companies in the future. This criterion (detailed in Appendix III) takes into account the effect of interacting cracks.

29. National Energy Board (1996). *MH-2-95 Hearing Transcript, 16 April 1996*, p 159.

30. CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 2, Appendix B, pp 27-28.

31. Kiefner & Associates, Inc. (1994). *Pipeline Repair Manual, AGA Contract No. PR-218-9307*, p 7.

32. CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 4, pp 11-13.

33. Kiefner & Associates, Inc. (1994). *Pipeline Repair Manual, AGA Contract No. PR-218-9307*, p 11.

34. Willems, H. and Barbian O.A. (1995). *First Field Experiences with a New Ultrasonic Tool for Inline Crack Detection*, Pipetronix GmbH, Germany.

35. TCPL (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Issue 3, p 5.

36. National Energy Board (1996). *MH-2-95 Hearing Transcript, 19 April 1996*, p 593 and p 622.

37. CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 2, Appendix D, Tab 2, p 9.

38. National Energy Board (1996). *MH-2-95 Hearing Transcript, 19 April 1996*, p 617, line 12.

39. CEPA (1996). *Response to National Energy Board Information Request # 9 of Proceeding MH-2-95*, table 9.1.

40. TCPL (1996). *Closing Statement to Proceeding MH-2-95*, pp 18-19.

41. *Ibid.*, p 19.

42. TCPL (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Issue 3, p 4.

43. *Ibid.*, p 7.

44. CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 3, p 1.

45. *Ibid.*, p 3.

46. CEPA (1996). *Final Argument to Proceeding MH-2-95*, p 12.

47. CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 2, p 30.

48. TCPL (1996). *Closing Statement to Proceeding MH-2-95*, p 20.

49. TCPL (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Issue 3, p 8.

50.  *Ibid.*, Issue 4, p 13.

51.  CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 4, p 24.

52.  CGA (1996).  *Supplementary Evidence to Proceeding MH-2-95 under letter dated 12 April 1996*, Exhibit No. B7-4.

53.  CEPA (1996).  *Response to Undertaking given by Mr. Delanty to Mr. Abes at MH-2-95 Hearing Transcript, 17 April 1996*, p 273.

54.  CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 4, p 8.

55.  *Ibid.*, p 3.

56.  Duffy, A.R., McClure, G.M., Maxey, W.A. and Atterbury, T.J. (1968).  *Study of Feasibility of Basing Natural Gas Pipeline Operating Pressure on Hydrostatic Test Pressure, AGA NG-18 Report.*

57.  McClure, G.M., Atterbury, T.J. and Duffy, A.R. (June 1966).  Hydrostatic testing pipe lines to yield.  *Pipe Line Industry.*

58.  Leis, B.N. and Brust. F.W. (July 1992).  *Hydrotest Strategies for Gas Transmission Pipelines Based on Ductile-Flaw-Growth Considerations, AGA Topical Report NG-18 No. 194.*

59.  TCPL (1996).  *Response to National Energy Board Information Request # 3 of Proceeding MH-2-95*, p 4.

60.  CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 4, p 5.

61.  TCPL (1996).  *Response to National Energy Board Information Request #3 of Proceeding MH-2-95*, p 5.

62.  CEPA (1996).  *Submission to the National Energy Board,  Proceeding MH-2-95*, Vol. 2, Appendix D, Tab 1, p 13.

63.  CEPA (1996).  *Response to National Energy Board Information Request # 10.2 of Proceeding MH-2-95*, p 9.

64.  CEPA (1996).  *Response to Undertaking given by Mr. Delanty to Mr. Abes at MH-2-95 Hearing Transcript, 17 April 1996*, p 276.

65.  Parkins, R.N. (July 1995).  *Stress Corrosion Cracking of Pipelines in Contact with Near-Neutral pH Solutions, AGA Report.*

66.  CEPA (1996).  *Response to National Energy Board Information Request # 11 of Proceeding MH-2-95.*

67.  TCPL (1996).  *Response to National Energy Board Information Request # 3 of Proceeding MH-2-95.*

68.  CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 4, p 5.

69.   Diakow, D. and Wilmott, M.J. (February 1996). *Stress Corrosion Cracking of Pipeline Steels - Field Investigations of the NPS 8 Virginia Hills Pipeline, Part I NRTC Report No. 01131.*

70.   Delbeck. W., Engel, A., Knoclsnki, A. and Mueller, D. (1993). Effects of stress testing on pipeline components with stress corrosion damage. *Gas/Erdgas*, 134, Issue 5, pp 263-271.

71.   TCPL (1993). *Effect of Repeated Hydrostatic Testing on Crack Growth*.

72.   TCPL (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Issue 4, p 10.

73.   Leis, B.N. and Brust. F.W. (July 1992). *Hydrotest Strategies for Gas Transmission Pipelines Based on Ductile-Flaw-Growth Considerations, AGA Topical Report NG-18 No. 194.*

74.   CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 4, p 3.

75.   *Ibid.*

76.   *Ibid.*, p 18.

77.   *Ibid.*, p 17.

78.   *Ibid.*, p 16.

79.   *Ibid.*, Issue 6, p 14.

80.   CEPA (1996). *Response to National Energy Board Information Request # 23 of Proceeding MH-2-95.*

81.   *Ibid.*

82.   National Energy Board (1996). *MH-2-95 Hearing Transcript, 18 April 1996*, p 459, line 22.

83.   *Ibid.*, p 461, line 18.

84.   CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 4, p 19.

**Chapter 5**

1.   OPLA (1996). *Request for Further Information* under letter to CEPA dated 22 March 1996.

2.   CEPA (1996). *Response to OPLA Information Request #2 of Proceeding MH-2-95*.

3.   National Energy Board (1996). *MH-2-95 Hearing Transcript, 18 April 1996*, p 457.

4.   CEPA (1996). *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 6, p 16.

5.    TCPL (1996).  *Response to National Energy Board Information Request # 9 of Proceeding MH-2-95.*

6.    TCPL (1996).  *Closing Statement to Proceeding MH-2-95*, p 12.

7.    OPLA (1996).  *Argument on behalf of the Ontario Pipeline Landowners Association (OPLA)*, p 8.

## Chapter 6

1.    National Energy Board (1996).  *Notes from 13 February 1996 meeting between NEB SCC Inquiry Panel and INGAA*, Exhibit No. A-62.

2.    CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 1, pp 24-25; National Energy Board (1996). *MH-2-95 Hearing Transcript, 15 April 1996*, p 82; and Exhibit Nos. C-70, C-80 and C-86.

3.    CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 6, fig. 6.1.

4.    TCPL (1996).  *Closing Statement to Proceeding MH-2-95*, p 3.

5.    CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 1, table 1.1 (revised in response to Undertakings given by Mr. Delanty to Mr. McCarthy and by Mr. Argument to Mr. McCarthy at MH-2-95 Hearing Transcript, 15 April 1996, pp 49-50).  Additional information on Federated's 1993 leak provided at MH-2-95 Hearing Transcript, 22 April 1996, p 688.

6.    *Ibid.*, p 21.

7.    CEPA (1996).  *Response to National Energy Board Information Request #1 of Proceeding MH-2-95* and *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 1, table 1.2 (revised in response to Undertaking given by Mr. Argument to Mr. McCarthy at MH-2-95 Hearing Transcript, 15 April 1996, p 54).

8.    IPL subsequently retested the section of their system where the failure occurred.

9.    CEPA (1996).  *Response to National Energy Board Information Request #20 of Proceeding MH-2-95.*

10.   CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 6, p 10.

11.   *Ibid.*, p 15.

12.   *Ibid.*, Issue 2, p 29.

13.   CEPA (1996).  *Final Argument to Proceeding MH-2-95*, p 6.

14.    National Energy Board (1996).  *MH-2-95 Hearing Transcript, 17 April 1996*, pp 312-313.

15.    CEPA (1996).  *Submission the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 2, p 23.

**Appendix III**

1.    CEPA (1996).  *Submission to the National Energy Board, Proceeding MH-2-95*, Vol. 1, Issue 6, p 11-12.

**Appendix IV**

1.    Kiefner, J.F., Maxey, W.A., Eiber, R.J. and Duffy, A.R. (1973). Failure stress levels of flaws in pressurized cylinders.  *Progress in Flaw Growth and Fracture Toughness Testing, ASTM STP 536.*

2.    Leis, B.N., Brust, F.W. and Scott, P.M. (June 1991).  *Development and Validation of a Ductile Flaw Growth Analysis for Gas Transmission Line Pipe, AGA Topical Report NG-18 No. 193.*

3.    Tyson, W.R. and Shen, G. (March 1995).  A collapse-modified strip yield model for axial surface cracks in linepipe.  *CANMET Metals Technology Laboratories Report MTL 94-35 (TR).*

4.    Jaske, C.E., Beavers, J.A. and Harle, B.A. (March 1996).  Effect of stress corrosion cracking on integrity and remaining life of natural gas pipelines.  *NACE Corrosion 96* (Paper 255).

5.    CEPA (1996).  *Response to Undertaking given by Mr. Delanty to Mr. Abes at MH-2-95 Hearing Transcript*, 17 April 1996, p 276, Exhibit No. B3-31.

6.    Leis, B.N. and Mohan, R. (August 1993).  *Suitability of the Log-Secant Criterion to Predict Failure Pressure for Pipelines with Stress-Corrosion Cracking,* Battelle Memorial Institute Report to TransCanada Pipelines Limited.

7.    Leis, B.N. and Mohan, R. (October 1994).  *Influence of Adjacent Cracks on the Predicted Failure Pressure for Pipelines with Stress Corrosion Cracking*, Battelle Memorial Institute.

8.    National Energy Board (1996).  *MH-2-95 Hearing Transcript, 16 April 1996*, pp 149-150.

9.    *Ibid.*, p 151 and 179.



# EXHIBIT M



**Department of Transportation**
**Research and Special Programs Administration**
**Office of Pipeline Safety**



*TTO Number 6*

*Integrity Management Program*
*Delivery Order DTRS56-02-D-70036*

*Spike Hydrostatic Test Evaluation*

*FINAL REPORT*

*Submitted by:*
*Michael Baker Jr., Inc.*
*July 2004*

**ChallengeUs.**

This report is intended to serve as a technical resource for OPS and State pipeline safety inspectors evaluating operators' integrity management (IM) programs. Inspectors consider information from a number of sources in determining the adequacy of each IM program. Development of this report was funded via a Congressional appropriation specifically designated for implementation of IM oversight. This and other similar reports are separate and distinct from the work products associated with and funded via OPS's R&D Program.

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

*This page intentionally left blank*

**Challenge Us.**

Michael Baker Jr., Inc.      OPS TTO6 – Spike Hydrostatic Test Evaluation

# TTO Number 6
# Spike Hydrostatic Test Evaluation

# Table of Contents

EXECUTIVE SUMMARY ........................................................................................................................1

1      INTRODUCTION ...........................................................................................................................3

2      BACKGROUND..............................................................................................................................5
     2.1    TEST-PRESSURE-TO-OPERATING-PRESSURE RATIOS.....................................................................5
     2.2    DURATION OF HOLD TIME ...........................................................................................................8
     2.3    PRESSURE REVERSALS ...............................................................................................................10
     2.4    TEST PRESSURE LEVEL AND RETEST INTERVAL ........................................................................11

3      REVIEW OF CURRENT SHT PRACTICES .............................................................................13
     3.1    SUBTASK 01 – SCOPE.................................................................................................................13
     3.2    GENERAL SHT PRACTICES ........................................................................................................13

4      SHT TO ASSESS PIPELINES AFFECTED BY PRESSURE-CYCLE-INDUCED FATIGUE..................15
     4.1    SUBTASK 03 – SCOPE.................................................................................................................15
     4.2    DISCUSSION ..............................................................................................................................15
     4.3    RELATIVE AGGRESSIVENESS OF PRESSURE CYCLES...................................................................20
     4.4    EFFECTS OF VARIATIONS IN PRESSURE-CYCLE AGGRESSIVENESS AND MATERIAL CONSTANTS ON FLAW GROWTH....................................................................................................................................22
     4.5    RECOMMENDED SHT PROCEDURES ..........................................................................................26

5      SHT TO ASSESS PIPELINES AFFECTED BY SCC OR SELECTIVE SEAM CORROSION ...............29
     5.1    SUBTASK 03 – SCOPE.................................................................................................................29
     5.2    DISCUSSION ..............................................................................................................................29
     5.3    RECOMMENDED SHT PROCEDURES ..........................................................................................32

6      SENSITIVITY TO PIPE PARAMETERS.....................................................................................35
     6.1    CHANGES IN DIAMETER .............................................................................................................35
     6.2    CHANGES IN WALL THICKNESS..................................................................................................39
     6.3    CHANGES IN YIELD STRENGTH ..................................................................................................42
     6.4    CHANGES IN FRACTURE TOUGHNESS .........................................................................................45
     6.5    CHANGES IN HTP AND MOP .....................................................................................................49

7      CONSIDERATIONS FOR PRE-1970 LF-ERW PIPE ...............................................................53
     7.1    SUBTASK 04 – SCOPE.................................................................................................................53
     7.2    DISCUSSION ..............................................................................................................................53

8      COMPARISON OF SHT METHODS FOR GAS VERSUS LIQUID LINES ............................................55
     8.1    SUBTASK 04 – SCOPE.................................................................................................................55
     8.2    DISCUSSION ..............................................................................................................................55

9      RECOMMENDATIONS .................................................................................................................57

10     REFERENCES ..............................................................................................................................59

**Challenge Us.**

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

## List of Figures

FIGURE 2.1      FAILURE PRESSURE VS. DEFECT SIZE RELATIONSHIP—HTP/MOP = 90/72.....................................7
FIGURE 2.2      FAILURE PRESSURE VS. DEFECT SIZE RELATIONSHIP—HTP/MOP = 100/72....................................7
FIGURE 2.3      FAILURE PRESSURE VS. DEFECT SIZE RELATIONSHIP—HTP/MOP = 110/72....................................8
FIGURE 2.4      COD VERSUS TIME ...............................................................................................................9
FIGURE 2.5      DEFECT GROWTH AND PRESSURE-REVERSAL PHENOMENON ..........................................................11
FIGURE 2.6      EFFECT OF CRACK GROWTH ON PIPELINE INTEGRITY ..............................................................12
FIGURE 4.1      EXAMPLE RELATIONSHIP BETWEEN FAILURE STRESS AND FLAW SIZE ...........................................23
FIGURE 4.2      EXAMPLE CRACK GROWTH IN SERVICE .................................................................................24
FIGURE 4.3      EXAMPLE OF THE EFFECT OF OPERATING PRESSURE SPECTRUM ....................................................25
FIGURE 4.4      ILLUSTRATION OF THE EFFECT OF VARIATIONS IN $C$ ................................................................25
FIGURE 4.5      ILLUSTRATION OF THE EFFECT OF VARIATIONS IN $N$...............................................................26
FIGURE 5.1      FAILURE PRESSURE VS. DEFECT SIZE RELATIONSHIP – MOP EQUAL TO 72% SMYS......................31
FIGURE 5.2      FAILURE PRESSURE VS. DEFECT SIZE RELATIONSHIP – MOP EQUAL TO 50 % SMYS....................31
FIGURE 6.1      FAILURE PRESSURE VS. DEFECT SIZE—12-INCH NOMINAL DIAMETER ................................................35
FIGURE 6.2      FAILURE PRESSURE VS. DEFECT SIZE—16-INCH NOMINAL DIAMETER ................................................36
FIGURE 6.3      FAILURE PRESSURE VS. DEFECT SIZE—20-INCH NOMINAL DIAMETER ................................................36
FIGURE 6.4      FAILURE PRESSURE VS. DEFECT SIZE—24-INCH NOMINAL DIAMETER ................................................37
FIGURE 6.5      FAILURE PRESSURE VS. DEFECT SIZE—36-INCH NOMINAL DIAMETER ................................................37
FIGURE 6.6      COMPARISON OF FAILURE PRESSURE VS. DEFECT SIZE FOR DIFFERENT PIPE DIAMETERS ..............38
FIGURE 6.7      COMPARISON OF TIME TO FAILURE VS. DEFECT SIZE FOR DIFFERENT PIPE DIAMETERS .................39
FIGURE 6.8      FAILURE PRESSURE VS. DEFECT SIZE—0.250-INCH WALL THICKNESS............................................40
FIGURE 6.9      FAILURE PRESSURE VS. DEFECT SIZE—0.312-INCH WALL THICKNESS............................................40
FIGURE 6.10     FAILURE PRESSURE VS. DEFECT SIZE—0.375-INCH WALL THICKNESS............................................41
FIGURE 6.11      COMPARISON OF FAILURE PRESSURE VS. DEFECT SIZE FOR DIFFERENT WALL THICKNESSES .........41
FIGURE 6.12      COMPARISON OF TIME TO FAILURE VS. DEFECT SIZE FOR DIFFERENT WALL THICKNESSES............42
FIGURE 6.13     FAILURE PRESSURE VS. DEFECT SIZE—API 5L X-42 STEEL ...........................................................43
FIGURE 6.14     FAILURE PRESSURE VS. DEFECT SIZE—API 5L X52 STEEL ............................................................43
FIGURE 6.15     FAILURE PRESSURE VS. DEFECT SIZE—API 5L X60 STEEL ............................................................44
FIGURE 6.16     COMPARISON OF FAILURE PRESSURE VS. DEFECT SIZE FOR DIFFERENT API STEEL GRADES...........44
FIGURE 6.17     COMPARISON OF TIME TO FAILURE VS. DEFECT SIZE FOR DIFFERENT API STEEL GRADES .............45
FIGURE 6.18     FAILURE PRESSURE VS. DEFECT SIZE—CVN VALUE EQUAL TO 5 FT-LB .......................................46
FIGURE 6.19     FAILURE PRESSURE VS. DEFECT SIZE—CVN VALUE EQUAL TO 15 FT-LB ......................................46
FIGURE 6.20     FAILURE PRESSURE VS. DEFECT SIZE—CVN VALUE EQUAL TO 25 FT-LB ......................................47
FIGURE 6.21     FAILURE PRESSURE VS. DEFECT SIZE—CVN VALUE EQUAL TO 35 FT-LB ......................................47
FIGURE 6.22     FAILURE PRESSURE VS. DEFECT SIZE—CVN VALUE EQUAL TO 40 FT-LB ......................................48
FIGURE 6.23     COMPARISON OF FAILURE PRESSURE VS. DEFECT SIZE FOR DIFFERENT CVN VALUES ....................48
FIGURE 6.24     COMPARISON OF TIME TO FAILURE VS. DEFECT SIZE FOR DIFFERENT CVN VALUES ......................49
FIGURE 6.25     COMPARISON OF TIME TO FAILURE VS. DEFECT SIZE FOR DIFFERENT HTP LEVELS WITH AN MOP OF 72% SMYS ...............................................................................................................................50
FIGURE 6.26     COMPARISON OF TIME TO FAILURE VS. DEFECT SIZE FOR DIFFERENT HTP LEVELS WITH AN MOP OF 60% SMYS ...............................................................................................................................50
FIGURE 6.27     COMPARISON OF TIME TO FAILURE VS. DEFECT SIZE FOR DIFFERENT HTP LEVELS WITH AN MOP OF 50% SMYS ...............................................................................................................................51



Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

## List of Tables

TABLE 4.1    MODEL PIPELINE PARAMETERS ...................................................................................................16
TABLE 4.2    HTP/MOP RATIOS FOR PRESSURE-CYCLE FATIGUE CASES ANALYZED..............................................16
TABLE 4.3    SUMMARY OF INITIAL CRACK SIZE PARAMETERS.................................................................................17
TABLE 4.4    SUMMARY OF YEARS/CYCLES TO FAILURE .......................................................................................19
TABLE 4.5    SUMMARY OF FINAL CRACK SIZE PARAMETERS.................................................................................19
TABLE 4.6    BENCHMARK CYCLE COUNTS—ANNUAL...........................................................................................22
TABLE 4.7    REMAINING LIFE BASED ON CATEGORIZED AGGRESSIVENESS .............................................................22
TABLE 4.8    TIME TO FAILURE BASED ON TEST SCENARIOS OF 1.25 X MOP AND 1.39 X MOP ..............................22
TABLE 4.9    HTP/MOP RATIOS AND RESULTANT STRESSES IN TERMS OF %SMYS.................................................27
TABLE 5.1    HTP/MOP RATIOS FOR SCC CASES ANALYZED................................................................................30
TABLE 5.2    TIMES TO FAILURE OF SCC DEFECTS FOR VARIOUS HTP/MOP RATIOS ............................................32
TABLE 5.3    HTP/MOP RATIOS AND RESULTANT STRESSES IN TERMS OF %SMYS.................................................33

OPS TTO6 Final Report.doc
7/16/2004



Michael Baker Jr., Inc.                                          OPS TTO6 – Spike Hydrostatic Test Evaluation

*This page intentionally left blank*

**Challenge*Us.***

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

## Executive Summary

This report documents an evaluation of the concept of using a spike hydrostatic test (SHT) as applied to the hydrostatic retesting of existing oil and gas pipelines. A SHT is a test in which the test-pressure-to-operating-pressure ratio significantly exceeds the minimum value of 1.25 required by federal regulations and the duration of which is considerably shorter than the minimum time of 8 hours also required by federal regulations.

Test pressures that result in hoop stress levels between 100 percent and 110 percent of the specified minimum yield strength (SMYS) of the pipe, or in terms of Maximum Operating Pressure (MOP), 1.39 and 1.53, respectively, have typically been used for SHT. These values are all based on the assumption that the pipeline is designed to operate at a hoop stress level equal to 72 percent of SMYS. For cases where operating stress levels are less than 72 percent of SMYS, the concept of SHT is still valid even test stress levels below 100 percent of SMYS are used. However, simply requiring the test pressure to be between 1.39 and 1.53 of the operating pressure does not necessarily result in the best assessment of pipeline integrity.

Two guideline formulae for calculating the appropriate test pressure are given, one if the main concern is pressure-cycle-induced fatigue, and the other for when stress-corrosion cracking (SCC) or selective seam corrosion is suspected. Engineering judgment should be applied before using these formulae when considering a pipeline containing segments of low-frequency electric-resistance welded (LF-ERW) pipe, since testing such lines to 100 percent of SMYS may result in excessive numbers of failures, and therefore careful consideration of the actual desired operating pressure should be made.

The hold time at maximum pressure is also a consideration for SHT. Various hold times are found in the literature, with the most common being between ½- and 1-hour. And while a ½-hour hold time is recommended in this report, discussion provided in this report indicates that the length of hold time has no discernible impact on the effectiveness of a hydrostatic test in establishing an adequate safety margin. The most important consideration is attaining the highest possible test pressure even if for only a few minutes. This philosophy is apparent in ASME B31.8S, *Managing System Integrity of Gas Pipelines*, (ASME B31.8S), which specifies a 10-minute hold time when testing for SCC.

The reassessment interval is another important consideration of SHT. Developing a universal reassessment interval is not possible due to the failure mechanisms and the way degradation of the structural integrity occur. However, methodologies for determining appropriate reassessment intervals for pressure-cycle fatigue and SCC or selective seam corrosion are described.



Michael Baker Jr., Inc.                                          OPS TTO6 – Spike Hydrostatic Test Evaluation

*This page intentionally left blank*



# 1   Introduction

This report was prepared in accordance with the Statement of Work and proposal submitted in response to RFP for Technical Task Order Number 6 (TTO 6) entitled *"Spike Hydrostatic Test Evaluation"*.

This scope entails assessing the concept of using a spike hydrostatic test (SHT) as applied to the hydrostatic retesting of existing oil and gas pipelines. In this context, a SHT means a test in which the test-pressure-to-operating-pressure ratio significantly exceeds the minimum value of 1.25 required by federal regulations and the duration of which is considerably shorter than the minimum time of 8 hours also required by federal regulations. The purpose of conducting a SHT as opposed to, or in addition to a standard regulatory minimum test is to optimize the level of pipeline integrity demonstrated by the test while minimizing the exposure to unnecessary test breaks. An additional subsequent constant-pressure test conducted at a pressure level significantly below the SHT level may be necessary to accomplish an appropriate test for leak tightness. It is generally understood that the short-duration SHT, more effectively than the lower minimum required test, either removes or proves the absence of defects that could affect the serviceability of a pipeline. Following a SHT, a lower pressure leak test of appropriate duration can prove leak tightness of the pipeline without the concern for additional test breaks occurring because of continuing defect growth. The purpose of this report is to establish what ranges of SHT parameters (test-pressure-to-operating-pressure ratios and test durations) are adequate for demonstrating pipeline integrity and serviceability.

The Office of Pipeline Safety (OPS) noted during initial comprehensive integrity management inspections of large liquid pipeline operators that SHT were being conducted utilizing a variety of procedures or formats. Hydrostatic testing has been included in OPS regulations for many years, and therefore the purpose and process for conducting hydrostatic testing are well documented. However, a SHT is not addressed by current regulations nor is there an industry standard for conducting such a test.

This report begins with a background section that describes why the SHT concept meets the "common sense" test. The next section discusses current SHT practices. The brief length of this section highlights the fact that there is limited "standardization" of SHT practices. There are a variety of rational options available to pipeline operators. Selecting a SHT procedure for a specific application involves a compromise between selecting higher test pressures and less-frequent tests versus lower test pressures and more-frequent tests. The appropriate choice is usually a matter of assessing the circumstances and planning a test scenario that best fits.

The original scope of work alludes to discussing SHT concepts for two categories of pipelines. One category envisioned was low-frequency electric-resistance welded (LF-ERW) pipelines. The other original category included pipelines affected by stress-corrosion cracking (SCC) and pressure-cycle induced fatigue. As organization of this report progressed, two slightly different categories were identified as being more appropriate and efficient. Consequently, Section 4 of this report addresses pipelines affected by pressure-cycle induced fatigue, irrespective of the type of line pipe. Section 5 addresses pipelines affected by SCC, irrespective of the type of line pipe, along with LF-ERW that has suffered selective seam corrosion. These categories were selected based upon the type of



Michael Baker Jr., Inc.                                          OPS TTO6 – Spike Hydrostatic Test Evaluation

analysis required in each case. Each of these sections has recommendations for determining the appropriate pressure ratio of test pressure to maximum operating pressure for SHT.

A brief study was performed to show how changing various parameters (pipe diameter, wall thickness, specified minimum yield strength (SMYS) and Charpy V-notch (CVN) toughness values) affect the analysis results.

Finally, the report briefly discusses considerations for pre-1970 LF-ERW pipe and the differences between SHT for liquid and gas pipelines, and also presents a list of references.



Michael Baker Jr., Inc.                                                OPS TTO6 – Spike Hydrostatic Test Evaluation

## 2      Background

SHT is hydrostatic testing in which the maximum test pressure is greater than that normally used for compliance with the Code of Federal Regulations (CFR) for commissioning new pipelines or replacement segments, while the duration of the SHT may be significantly less. Hydrostatic tests conducted for compliance with 49 CFR 192 and 195 are normally conducted at a pressure equal to 1.25 times the Maximum Operating Pressure (MOP) of the line being tested for a period of at least four hours. In the case of a pipeline that is not visually inspected for leakage during the test, the pressure test must continue for an additional 4 hours at a pressure of at least 1.10 times the MOP.

The pressure used during SHT is typically equal to 1.39 times the MOP of the line. This value is based on the ratio of 100 percent of SMYS to 72 percent of SMYS (maximum hoop stress). The upper limit is normally set at SMYS due to concerns that higher pressures may result in permanent expansion of the pipe. However, the Canadian Energy Pipeline Association (CEPA) has stated that significant permanent expansion of the pipe would not result from pressurizing up to 110 percent of SMYS, a fact that was established by industry-sponsored research (Duffy, 1968). This is further reinforced by the finding in the American Gas Association (AGA) Topical Report NG-18 No. 194 (Leis, 1992) that a maximum pressure level between 100 and 110 percent of SMYS appears to provide a good balance between removing large flaws that might cause failure in service and producing growth only in a relatively few near-critical flaws. Thus, the pressure for SHT may be as high as 1.53 times the MOP for lines that are designed to operate at the upper limit allowed by 49 CFR.

As for duration of SHT, the AGA Topical Report NG-18 No. 194 found that a maximum pressure hold time of one-hour is a reasonable upper limit, as it causes a very high percentage of the near-critical flaws to fail, while still minimizing the growth of the remaining flaw population. CEPA recommends a one-hour high pressure test between 100 and 110 percent of SMYS, followed by a leak test at no more than 90 percent of the peak test pressure. More recently, ASME B31.8S recommends a SHT hold time of 10 minutes.

Hydrostatic testing has been proven effective in removing defects oriented longitudinally; however, hydrostatic testing has not proven as effective for removing circumferential defects. The difference in effectiveness in removing the two types of defects is related to the magnitude of the stresses that hydrostatic testing imposes on these defects. Longitudinal defects are subjected to circumferential stresses due to internal pressure (hoop stress), while defects oriented in the circumferential direction are subjected to longitudinal or axial stresses. Since the longitudinal component of hoop stress is one-third to one-half the circumferential stress, the stress imposed upon a circumferential defect is only a valid demonstration that the pipeline can withstand the longitudinal stress due to the service pressure and is of little or no value for demonstrating the ability of the pipeline to withstand other externally imposed longitudinal stresses.

### 2.1   Test-Pressure-to-Operating-Pressure Ratios

Practical experience (Bergman, 1974) and early pipeline-industry-supported research on hydrostatic testing at Battelle (Duffy, 1968) demonstrated unequivocally the role of hydrostatic testing in preventing pipeline service failures. The empirical evidence provided by industry experience and by



Michael Baker Jr., Inc.                                          OPS TTO6 – Spike Hydrostatic Test Evaluation

the pressure tests conducted at Battelle showed that the effectiveness of a hydrostatic test arises from a basic physical principle. That principle is that there is a unique relationship between the stress applied to a structure and the size of defect that will cause the structure to fail at that stress level. The higher the stress level, the smaller the flaw required to cause the structure to fail. From this principle, it follows that the higher the hydrostatic test pressure (HTP) to maximum operating pressure (MOP) ratio (HTP/MOP) the more effective the test is as a demonstration of fitness for service at the MOP.

Figure 2.1, Figure 2.2 and Figure 2.3 illustrate the principle. Each of these figures is based on the same failure-pressure-versus-defect-size relationship for 30-inch outside diameter, 0.375-inch wall, API 5L X52 pipe. The MOP of this pipe at 72 percent of SMYS is 936 psig. Figure 2.1 depicts a hydrostatic test at a maximum pressure of 1,170 psig (corresponding to 90 percent of SMYS), and it represents an HTP/MOP of 1.25, the minimum required test under federal regulations. The shaded band in Figure 2.1 represents the size range of defects that will either be removed by such a test or that did not exist prior to the test. After such a test, only defects with sizes lying above the shaded band can exist. Similarly, Figure 2.2 and Figure 2.3 reveal shaded bands representing higher test pressure levels of 1,300 psi (corresponding to 100 percent of SMYS and HTP/MOP = 1.39) and 1,430 psig (corresponding to 110 percent of SMYS and HTP/MOP = 1.53), respectively. These figures reveal that the representative sizes of defects that survive each of these tests decrease with increasing HTP/MOP.

For example, the "0.5" curve in Figure 2.1 representing the failure pressures of various defects length rises above the shaded band at a defect length of approximately 5 inches. By comparison, the "0.5" curve in Figure 2.2 rises above the shaded band at a defect length of 3 inches, and in Figure 2.3 at a defect length of 1.5 inches. Comparison of the depth/thickness ratios (*a/t* Ratio) at the tops of the three bands for a fixed defect length of 5 inches also illustrates the benefits of the higher HTP/MOP ratios. In Figure 2.1, *a/t* is approximately 0.47. In Figure 2.2, *a/t* is aprroximately 0.34. In Figure 2.3, *a/t* is approximately 0.2. Clearly, the higher the test pressure level, the smaller are the remaining (surviving) defects. The inescapable conclusion is that the higher the HTP/MOP ratio, the more effective a hydrostatic test is as a demonstration of fitness for service.

OPS TTO6 Final Report.doc
                                                                                     07/16/04

**Challenge**Us.

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 2.1      Failure Pressure vs. Defect Size Relationship—HTP/MOP = 90/72**



**Figure 2.2      Failure Pressure vs. Defect Size Relationship—HTP/MOP = 100/72**

Michael Baker Jr., Inc.                                        OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 2.3      Failure Pressure vs. Defect Size Relationship—HTP/MOP = 110/72**

## 2.2   Duration of Hold Time

The residence time at the maximum pressure of a hydrostatic test is characterized as the hold time. The effect of hold time on what is accomplished by a hydrostatic test is highly dependent on the population (number and characteristics) of defects that are present in a section of pipe being tested. Research conducted at Battelle under the sponsorship of the pipeline industry (Kiefner, 1980 and Leis, 1992) demonstrated that the duration of the hold time at a given test pressure level does not contribute to the effectiveness of the test as a demonstration of fitness for service.

As the work described by Leis, et al. (Leis, 1992) and Kiefner, et al. (Kiefner, 1980) showed, a longitudinally oriented, part-through-the-wall defect changes in measurable ways as the test pressure approaches the "failure" pressure of the defect. Strain levels in the material surrounding the defect increase at increasingly rapid rates as the failure pressure is approached. The defective region will bulge radially outward and the defect will begin to tear through the remaining ligament of wall thickness. These changes are irreversible and constitute potential damage with respect to future pressurizations if the pressure is reduced prior to failure of the defect. Once these changes reach a certain level with increasing pressure, they may continue even if the test pressure is held constant. The resulting "creep-like" behavior can be measured using "crack opening displacement" (COD) as the pressure within the pipe containing the defect is held at a constant level.

The implications of this creep-like behavior are illustrated by the hypothetical example presented in Figure 2.4. Hypothetical COD-versus-time relationships for four defects each having slightly different failure pressures are presented in Figure 2.4. The failure pressure of Defect 1 is the lowest such that as the "hold time" begins at "1" on the logarithmic time axis, it is almost ready to fail. In

---

**ChallengeUs.**

Michael Baker Jr., Inc.                                                OPS TTO6 – Spike Hydrostatic Test Evaluation

fact, as Figure 2.4 shows, Defect 1 grows to failure in slightly more than 10 minutes after the hold time at constant pressure begins. Defect 2, if held for slightly more than 2 hours, will fail as well. Defects 3 and 4, which are smaller than Defects 1 and 2, will not grow to failure unless held for several thousand minutes (more than 24 hours).

The 10-minute hold time was included in Figure 2.4 since this is the hold time recommended by ASME B31.8S for addressing stress corrosion cracking. Other hold times of up to 24 hours have also been employed by the pipeline industry for hydrostatic testing.



**Figure 2.4    COD versus Time**

(Note: Information presented is purely hypothetical for illustration only.)

The hypothetical information in Figure 2.4 illustrates why hold time cannot be counted upon to contribute to the effectiveness of a pressure test of a pipeline segment containing a population of defects similar to Defect 1, 2, 3 and 4. The outcome of a ½-hour hold would be that Defect 1 would fail, but Defects 2, 3, and 4 would not. Instead, Defects 2, 3 and 4 would survive the ½-hour test having been strained, and perhaps, though not necessarily, they might not survive another test to the same pressure level.

The outcome of a test with a 2-hour hold time would also be that Defect 1 fails, while Defects 2, 3, and 4 survive. But, the three nonfailing defects have been caused to grow more by the 2-hour hold than they would have been by the ½-hour hold. The growth of Defects 2, 3 and 4 caused by the additional 1-½ hour hold time would likely have a negative effect on the integrity of a pipeline segment with respect to a future pressurization.

**Challenge Us.**

Michael Baker Jr., Inc.                                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

The outcome of a test with an 8-hour hold time would be that Defects 1 and 2 would grow to failure. Some may opine that an 8-hour hold time is better than a 2-hour hold time because the longer hold time would remove Defect 2. However, Defects 3 and 4 have grown more than they would have with a 2-hour hold time and significantly more than with a ½-hour hold time. Finally, Figure 2.4 illistrates that a 24-hour hold causes additional growth of Defects 3 and 4 without the benefit of removing additional defects.

These examples from Figure 2.4 illustrate that the best hold time for integrity purposes depends on factors that cannot be known prior to a pressure test, namely, the numbers and sizes of defects that will be affected by the maximum test pressure. Irrespective of the selected hold time one cannot know the status of surviving defects. Therefore, the potential benefit of one hold time over another cannot be assessed.

Hold time at a constant pressure does have value from the standpoint of leak detection. However, as the above example illustrates, holding at the maximum test pressure may or may not be beneficial. It is better to conduct a leak test at a slightly reduced pressure after a satisfactory integrity test has been achieved. The integrity test itself need not be held longer than a few minutes to an hour. One could opine that a ½-hour hold is sufficient for an integrity test. Experiments described by Duffy, et al. (Duffy, 1968) showed that no additional growth of surviving defects would occur after an integrity test level is attained if the pressure level is reduced from the "spike" level by at least five percent.

### 2.3    Pressure Reversals

From the earliest field experiences with hydrostatic testing, pipeline operators were aware of a phenomenon referred to as a "pressure reversal" (Brooks, 1968). A pressure reversal describes a situation in which a segment of pipe being pressurized fails at a pressure level lower than a level that it has survived on a recent prior pressurization. Research by Battelle (Kiefner, 1980) demonstrated that a pressure reversal occurs because the defect that fails was extended nearly to failure on a prior pressurization, but the pressure was reduced or relieved before the defect had a chance to grow to failure. The phenomenon arises precisely because of the creep-like behavior of near-failure pressure levels illustrated in Figure 2.4. A pressure reversal is schematically illustrated in Figure 2.5. The magnitude of a given pressure reversal is usually expressed as the difference between the highest prior pressure that the defect survived and the pressure at which it eventually fails divided by the previous highest pressure. The pressure reversal phenomenon is associated with one to a very few cycles of pressurization, so that the mode of crack propagation is ductile tearing rather than fatigue crack growth of the type that can occur with hundreds to thousands of pressure cycles typical of pressure fluctuations that occur in pipeline service. Duffy, et al. (Duffy, 1968) showed that pressure reversals of one to a few percent were not that uncommon in hydrostatic tests where tens of dozens of test failures take place. They also showed that the size of pressure reversal is inversely related to its probability of occurrence. Given that a 20 percent pressure reversal would be needed to cause a defect that survived a 90-percent-of-SMYS test to fail at 72 percent of SMYS upon being subjected to service pressure, they concluded that the chance of a pressure reversal causing a service failure was an extremely improbably event. Calculations based on typical pressure-reversal data indicate the probability to be less than one in ten million. Therefore, pressure reversals are not considered to be a significant threat to pipeline integrity.

OPS TTO6 Final Report.doc
                                                                                              07/16/04



Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 2.5      Defect Growth and Pressure-Reversal Phenomenon**

## *2.4    Test Pressure Level and Retest Interval*

The relationship between test-pressure-to-operating-pressure ratio (HTP/MOP) and the frequency of retesting is illustrated in Figure 2.6 (a and b). The fracture mechanics principle discussed previously, namely, the higher the applied stress level, the smaller is the defect that can remain in a structure is illustrated in Figure 2.6. Thus, if an operator conducts a test at the pressure level, PT, the largest remaining flaw can have a crack depth no greater than $a_T$. At the MOP, no flaw smaller than $a_S$ can cause a failure. Hence, the test assures a safety margin based on the difference between $a_T$ and $a_S$ or between PT and MOP (the same thing as HTP/MOP).

When a mechanism for flaw growth exists (such as SCC, pressure-cycle induced fatigue, or corrosion), then the size of flaws will increase with the passage of time. When the size of the largest flaw reaches $a_S$, a failure is likely to occur. Timely intervention on the part of the operator (for example the conducting of a hydrostatic retest to the level of the initial test, PT) can eliminate the growing defects and reestablish the maximum surviving crack size as $a_T$. It is apparent that the larger the HTP/MOP ratio, the longer the interval between retests can be.

ChallengeUs.

Michael Baker Jr., Inc.                                          OPS TTO6 – Spike Hydrostatic Test Evaluation



a. Failure presure as a function of crack size



b. Crack growth with time

**Figure 2.6        Effect of Crack Growth on Pipeline Integrity**

**ChallengeUs.**

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

# 3    Review of Current SHT Practices

## 3.1    Subtask 01 – Scope

This chapter addresses Subtask 01 of the Work Scope that states:

> **Overview:** Review current SHT practices employed by pipeline operators, both generally and specifically for pre-70 LF-ERW pipe seam integrity assessment and for identifying areas of SCC or fatigue related issues.

> **Activities:**
>
>    a)  Research and collate information regarding current SHT general practices.
>
>    b)  Research and collate information regarding current SHT practices specific to evaluation of pre-1970 LF-ERW pipe.
>
>    c)  Research and collate information regarding current SHT practices specific to identification of areas of SCC and fatigue.

> **Deliverables:**
>
>    a)  Narrative of general SHT practices
>
>    b)  Narrative of SHT techniques specific to pre-1970 LF-ERW pipe
>
>    c)  Narrative of SHT methods specific to SCC and fatigue issues
>
>    d)  Narrative discussing differences between specific practices

## 3.2    General SHT Practices

As early as 1979, one of the leading experts on SCC in pipelines at the time, Ray Fessler, was advocating a form of spike testing. The following is a quote from his 1979 paper "Detection and Removal of Stress-Corrosion Cracks from a Pipeline" (Fessler, 1979).

> "From the standpoint of removing other defects, a relatively high pressure—in the vicinity of 100 to 110 percent of SMYS—impressed for a short period of time followed by a hold period at a pressure level 15 to 20 percent lower for a longer time is expected to be optimum for maximizing the safety of the line and minimizing adverse effects to the line".

Fessler's advice is consistent with the principles discussed in Section 2. It is believed that numerous gas pipeline operators adopted this practice following the presentation of the paper if they had not already done so. It is necessary to note that Fessler's advice was predicated on the assumption that the pipelines at issue were being operated at stress levels of 72 percent of SMYS or more. Thus, he stressed the use of spike test pressures in the range of 100 to 110 percent of SMYS. As will become apparent, it is unrealistic to expect that operators of older pipelines containing low-frequency-welded or dc-welded ERW materials to test those pipelines to such levels. Nevertheless, the spike-test principle can be applied to lower test stress levels with significantly beneficial effects.

The Canadian pipeline industry has adopted a recommended SHT procedure consisting of "a 1-hour high-pressure test between 100 and 110 percent of SMYS, followed by a leak test at no more than 90



percent of the peak test pressure" (Canadian Energy Pipeline Association, 1997 and National Energy Board, 1996).

While the above practices allude to the use of an SHT for SCC, pipeline operators have used SHT as parts of return-to-service plans in response to Corrective Action Orders from the OPS on several occasions. In some of these instances, the SHT consisted of a HTP/MOP ratio of 1.39.

At least one pipeline operator has prepared a draft standard for conducting a 1-hour maximum duration SHT that embodies an HTP/MOP ratio of 1.39 at the high-elevation point in each test section. The maximum pressure is limited to 100 percent of SMYS at the low elevation, so that this procedure involves a maximum stress level of less than 100 percent of SMYS for the vast majority of the pipe in each test section. This procedure is designed to be applied to older ERW pipelines among other pipelines within a system, so it is not surprising to see the imposed stress limit. Nevertheless, the SHT concept has merit for reasons discussed in Section 2. For liquid pipelines, the effective margin of test-pressure-to-operating pressure ratio at many locations is actually much greater than the HTP/MOP ratio because a large part of most liquid pipelines are never exposed to pressure levels approaching the MOP owing to the hydraulic gradient.



# 4    SHT to Assess Pipelines Affected by Pressure-Cycle-Induced Fatigue

## 4.1    Subtask 03 – Scope

This chapter addresses Subtask 03 of the Work Scope which states:

> **Overview**: Develop practicable SHT criteria for application to identifying areas of SCC and fatigue, including minimum test pressure, as a function of Specified Minimum Yield
>
> Strength (SMYS), and duration for a minimum of three categories of operating pressure. These categories, based on the hoop stress as a function of SMYS are: 72 percent or higher, 50 to 72 percent, and less than 50 percent. Based on the criteria developed and an assumed pressure cycling of one cycle per month, determine a minimum re-test interval for each category.
>
> **Activities**:
>
> a) Evaluate effects of test pressure and duration on critical flaws for each category of operating pressure.
>
> b) Develop SHT procedures for each category of operating pressure.
>
> c) Evaluate effects of postulated pressure cycling on critical flaws for each category.
>
> d) Determine minimum re-test interval based on postulated pressure cycling for each category.
>
> **Deliverables**:
>
> a) Narrative discussing effects of test pressure and duration on critical flaws.
>
> b) SHT procedures.
>
> c) Narrative discussing effects of pressure cycling on critical flaws.
>
> d) Narrative presenting the recommended minimum re-test interval and the process used to determine this interval.

## 4.2    Discussion

The SHT concept is applicable for the retesting of existing pipelines affected by pressure-cycle-induced fatigue, though the level of hoop stress achievable may not always be as high as 100 to 110 percent of SMYS. This section of the report addresses the impact of both the HTP/MOP ratio and the absolute hoop stress levels (test and operating) on the effectiveness of a SHT from the standpoint of mitigating pressure-cycle-induced fatigue. The approach consists of looking at seven cases of SHT applied to one particular liquid petroleum pipeline. The need for retesting this pipeline arises from the presumption that its operational pressure cycles could produce a service failure as the result of fatigue crack growth of the worst-case hypothetical defects that could survive an initial baseline hydrostatic test. The times to failure are computed using standard linear-elastic fatigue-crack-growth-modeling techniques. The analysis can be easily extended to a gas pipeline where the intensity of pressure cycling would be much lower.



Michael Baker Jr., Inc.                                       OPS TTO6 – Spike Hydrostatic Test Evaluation

The parameters for the "model" pipeline are presented in Table 4.1, while the HTP/MOP ratios, as well as the corresponding pressures both in psig and percent of SMYS for each case discussed are given in Table 4.2.

**Table 4.1      Model Pipeline Parameters**

| | |
|---|---|
| Outside diameter | 12.75 inches |
| Wall thickness | 0.250 inch |
| Grade | X46 |
| SMYS | 46,000 psi |
| Material toughness (full-size Charpy equivalent energy) | 25 ft-lb |
| $C$ (for $\Delta K$ in psi $\sqrt{in}$ units) | 8.6E – 19 |
| $n$ | 3 |
| Pressure cycles | One per day zero to MOP and back to zero |

**Table 4.2      HTP/MOP Ratios for Pressure-Cycle Fatigue Cases Analyzed**

| Case | HTP/MOP | HTP | | MOP | |
|---|---|---|---|---|---|
| | | psig | % SMYS | psig | % SMYS |
| 1 | 1.39 | 1,804 | 100 | 1,299 | 72 |
| 2 | 1.25 | 1,624 | 90 | 1,299 | 72 |
| 3 | 1.50 | 1,353 | 75 | 902 | 50 |
| 4 | 1.39 | 1,254 | 69.5 | 902 | 50 |
| 5 | 1.25 | 1,128 | 62.5 | 902 | 50 |
| 6 | 1.625 | 1,173 | 65 | 722 | 40 |
| 7 | 1.25 | 902 | 50 | 722 | 40 |

The first step of the analysis is to determine the critical crack length for a given crack depth that will just survive the stipulated test pressure. This can be done using the NG-18 "ln-secant" equation:

$$\frac{C_V \pi E}{4 A_C L_e \sigma_f^2} = \ln\left[\sec\left(\frac{\pi M_S \sigma_H}{2\sigma_f}\right)\right]$$

where:

$E$ is the elastic modulus,

$L_e$ is an effective flaw length equal to the total flaw length multiplied by $\pi/4$ for a semi-elliptical flaw shape common in fatigue,

$\sigma_f$ is the flow stress typically taken as the yield strength plus 10 ksi or else as the average of yield and ultimate tensile strengths,

$\sigma_H$ is nominal hoop stress due to internal pressure,

$C_V$ is the upper shelf Charpy V-Notched impact toughness,



Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

$A_c$ is the cross-sectional area of the Charpy impact specimen. (Note that a constant for compatibility of units between $C_V$ and $A_c$ may be necessary.)

The term $M_S$ is a stress magnification factor for a surface-breaking axial flaw, calculated as

$$M_S = \frac{1-(a/t)(M_T)^{-1}}{1-a/t}$$

where

$a$ is flaw depth, and

$t$ is the pipe wall thickness.

The term $M_T$ is Folias' original bulging factor for a through-wall axial flaw, written as

$$M_T = \sqrt{1+1.255\left(\frac{L_e^2}{2Dt}\right)-0.0135\left(\frac{L_e^4}{4D^2t^2}\right)}, \text{ for } \left(\frac{L_e^2}{Dt}\right) \le 50$$

or

$$M_T = 0.032\left(\frac{L_e^2}{Dt}\right)+3.3, \text{ for } \left(\frac{L_e^2}{Dt}\right) > 50$$

The results from this step for each case analyzed are presented in Table 4.3 for various crack depth-to-wall thickness ratios.

**Table 4.3      Summary of Initial Crack Size Parameters**

| Case | Initial Crack Lengths in Inches for Various Depth/Thickness Ratios | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 0.9 | 0.8 | 0.7 | 0.6 | 0.5 | 0.4 | 0.3 | 0.2 | 0.1 |
| 1 | 0.65 | 0.99 | 1.34 | 1.75 | 2.29 | 3.16 | 4.92 | 8.47 | 13.07 |
| 2 | 0.83 | 1.30 | 1.79 | 2.43 | 3.39 | 5.23 | 8.79 | 13.67 | 19.16 |
| 3 | 1.13 | 1.83 | 2.68 | 4.00 | 6.58 | 11.26 | 17.44 | 24.29 | 32.00 |
| 4 | 1.26 | 2.07 | 3.13 | 4.960 | 8.67 | 14.59 | 21.70 | 29.61 | 38.69 |
| 5 | 1.44 | 2.44 | 3.91 | 6.820 | 12.39 | 19.98 | 28.49 | 38.34 | 49.79 |
| 6 | 1.37 | 2.30 | 3.59 | 6.050 | 10.90 | 17.92 | 25.84 | 34.91 | 45.42 |
| 7 | 1.86 | 3.46 | 6.63 | 13.48 | 23.21 | 34.44 | 47.93 | 63.90 | 76.86 |

Crack growth is then evaluated using Paris' Law:

$$\frac{da}{dN} = C(\Delta K)^n$$

where:

$da/dN$ is the increment of crack extension per load cycle,

$\Delta K$ is the magnitude of stress intensity range for a given load cycle, and

$C$ and $n$ are material properties.

**Challenge Us.**

Michael Baker Jr., Inc.                                      OPS TTO6 – Spike Hydrostatic Test Evaluation

Raju and Newman (Raju, Unknown) give an expression for crack-tip stress intensity for a semi-elliptical surface flaw as:

$$K = \sigma_H \cdot F \cdot \sqrt{\pi \cdot \frac{a}{Q}}$$

where:

$$Q = 1 + 4.595 \left( \frac{a}{L_e} \right)^{1.65}, \quad \frac{a}{L_e} \leq 0.5,$$

$$F = M_1 + M_2 \left( \frac{a}{t} \right)^2 + M_3 \left( \frac{a}{t} \right)^4,$$

$$M_1 = 1.13 - 0.18 \left( \frac{a}{L_e} \right),$$

$$M_2 = \frac{0.445}{0.1 + \dfrac{a}{L_e}} - 0.54, \text{ and}$$

$$M_3 = 0.5 - \frac{0.5}{0.325 + \dfrac{a}{L_e}} + 14 \left( 0.5 - 2 \left( \frac{a}{L_e} \right) \right)^{24}$$

In this example, since the pressure cycles from zero to MOP and back to zero, $\Delta K$ is equal to $K$ at MOP. Note that values for $a$ and $L_e$ change during each pressure cycle and thus values for $Q$, $F$, $M_1$, $M_2$, and $M_3$ must be reevaluated after each cycle. The resulting crack dimensions must also be evaluated after each cycle using the "ln-secant" equation to determine whether the crack has grown to critical size.

"Years to Failure" and "Cycles to Failure" for Various Depth/Thickness Ratios are presented in Table 4.4, while final flaw depths and lengths calculated are presented in Table 4.5.

OPS TTO6 Final Report.doc
                                                                                   07/16/04

**ChallengeUs.**

Michael Baker Jr., Inc.                                OPS TTO6 – Spike Hydrostatic Test Evaluation

**Table 4.4        Summary of Years/Cycles to Failure**

| Case | | Depth to Thickness Ratio | | | | | | | | |
|------|--|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| | | **0.9** | **0.8** | **0.7** | **0.6** | **0.5** | **0.4** | **0.3** | **0.2** | **0.1** |
| 1 | Years to Failure | 2.21 | 2.00 | 1.98 | 2.14 | 2.49 | 3.23 | 5.33 | 12.53 | 39.36 |
| | Cycles to Failure | 808 | 731 | 723 | 781 | 909 | 1179 | 1946 | 4573 | 14366 |
| 2 | Years to Failure | 0.97 | 0.90 | 0.95 | 1.03 | 1.23 | 1.80 | 3.84 | 10.94 | 36.68 |
| | Cycles to Failure | 355 | 327 | 346 | 376 | 448 | 656 | 1402 | 3993 | 13389 |
| 3 | Years to Failure | 2.06 | 2.00 | 1.95 | 1.85 | 2.18 | 4.21 | 11.73 | 36.44 | 123.13 |
| | Cycles to Failure | 752 | 731 | 711 | 677 | 795 | 1537 | 4283 | 13302 | 44944 |
| 4 | Years to Failure | 1.41 | 1.39 | 1.28 | 1.19 | 1.58 | 3.64 | 11.01 | 35.18 | 120.43 |
| | Cycles to Failure | 513 | 509 | 468 | 434 | 577 | 1330 | 4018 | 12840 | 43956 |
| 5 | Years to Failure | 0.78 | 0.76 | 0.64 | 0.61 | 1.05 | 2.95 | 9.68 | 32.01 | 112.15 |
| | Cycles to Failure | 284 | 278 | 233 | 223 | 383 | 1078 | 3534 | 11683 | 40933 |
| 6 | Years to Failure | 2.99 | 2.85 | 2.39 | 2.05 | 2.92 | 7.26 | 22.46 | 72.03 | 245.58 |
| | Cycles to Failure | 1090 | 1039 | 872 | 747 | 1065 | 2649 | 8197 | 26292 | 89635 |
| 7 | Years to Failure | 0.89 | 0.70 | 0.46 | 0.58 | 1.54 | 5.21 | 18.32 | 62.26 | 227.68 |
| | Cycles to Failure | 324 | 255 | 168 | 213 | 562 | 1903 | 6685 | 22725 | 83103 |

**Table 4.5        Summary of Final Crack Size Parameters**

| Case | | Final Depth to Thickness Ratio and Crack Lengths | | | | | | | | |
|------|--|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| 1 | Ratio | 0.961 | 0.922 | 0.876 | 0.823 | 0.759 | 0.679 | 0.581 | 0.482 | 0.399 |
| | Length (in) | 0.697 | 1.032 | 1.372 | 1.771 | 2.303 | 3.166 | 4.922 | 8.470 | 13.07 |
| 2 | Ratio | 0.944 | 0.884 | 0.819 | 0.745 | 0.663 | 0.569 | 0.475 | 0.389 | 0.307 |
| | Length (in) | 0.853 | 1.318 | 1.803 | 2.437 | 3.394 | 5.231 | 8.790 | 13.67 | 19.16 |
| 3 | Ratio | 0.953 | 0.901 | 0.842 | 0.775 | 0.701 | 0.627 | 0.558 | 0.490 | 0.420 |
| | Length (in) | 1.148 | 1.844 | 2.689 | 4.004 | 6.582 | 11.26 | 17.44 | 24.29 | 32.00 |
| 4 | Ratio | 0.944 | 0.883 | 0.816 | 0.742 | 0.664 | 0.588 | 0.515 | 0.441 | 0.366 |
| | Length (in) | 1.272 | 2.079 | 3.135 | 4.962 | 8.671 | 14.59 | 21.70 | 29.61 | 38.69 |
| 5 | Ratio | 0.931 | 0.858 | 0.779 | 0.696 | 0.613 | 0.532 | 0.451 | 0.369 | 0.288 |
| | Length (in) | 1.447 | 2.45 | 3.912 | 6.821 | 12.39 | 19.98 | 28.49 | 38.34 | 49.79 |
| 6 | Ratio | 0.954 | 0.903 | 0.845 | 0.780 | 0.713 | 0.650 | 0.587 | 0.523 | 0.458 |
| | Length (in) | 1.384 | 2.310 | 3.596 | 6.053 | 10.90 | 17.92 | 25.84 | 34.91 | 45.42 |
| 7 | Ratio | 0.927 | 0.850 | 0.770 | 0.678 | 0.607 | 0.526 | 0.444 | 0.363 | 0.307 |
| | Length (in) | 1.864 | 3.462 | 6.631 | 13.48 | 23.21 | 34.44 | 47.93 | 63.90 | 76.50 |

Perhaps the easiest way to get at the meaning of the results is to consider Cases 2, 5, and 7 in Table 4.4. Each of these represents a standard pressure test per 49 CFR 192 or 195 (i.e. test pressure of 1.25 times MOP). In Case 2, the pipeline is operated at an MOP corresponding to 72 percent of SMYS. In Case 5, the pipeline is operated at an MOP corresponding to 50 percent of SMYS, and in Case 7, the pipeline is operated at an MOP corresponding to 40 percent of SMYS. Note that the times to failure are not the same for these three cases even thought they were subjected to the same HTP/MOP-ratio test, namely 1.25. The pipeline operated at 72 percent of SMYS (Case 2) has the longest minimum time to failure of the three (0.90 years or 327 cycles) for the 1.3-inch-long 80-percent-through-wall defect. The pipeline operated at 50 percent of SMYS (Case 5) has the second longest time to failure (0.61 years or 223 cycles) for the 6.82-inch-long 60-percent through- wall defect. The pipeline operated at 40 percent of SMYS (Case 7) has the shortest time to failure (0.46

**ChallengeUs.**

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

years or 168 cycles) for the 6.63-inch-long 70-percent-through-wall defect. The point of comparing these three cases is to show that the effectiveness of the HTP/MOP ratio is dependent on the absolute test and operating stress levels. The lower the absolute levels, the less effective is a given HTP/MOP ratio.

Next, consider Cases 1 and 2. In both cases, the pipeline is operated at an MOP corresponding to 72 percent of SMYS. As indicated in Table 4.4, the use of an HTP/MOP ratio of 1.39 (Case 1) assures a minimum time to failure of 1.98 years (*a/t* ratio of 0.7) whereas the use of an HTP/MOP ratio of 1.25 (Case 2) assures a minimum time to failure of 0.90 years (*a/t* ratio of 0.8). Thus, an SHT with an HTP/MOP ratio of 1.39 is slightly more than twice as effective as a standard "Subpart E" test with an HTP/MOP ratio of 1.25.

Next, consider Cases 1 and 4. The HTP/MOP ratios are the same (1.39), but the times to failure are not. The minimum times to failure for Case 4, where the pipeline is operated at an MOP corresponding to 50 percent of SMYS, is only 1.19 years (*a/t* of 0.6) whereas that of Case 1 is 1.98 years (*a/t* of 0.7). As in the comparisons of Cases 2, 5, and 7 discussed above, the Case 1/Case 4 comparison shows that the effectiveness of a given HTP/MOP ratio decreases with decreasing absolute stress level.

The final comparison to consider is that of Cases 1, 3, and 6. These three cases reveal the appropriate HTP/MOP ratios to use to achieve about equal times to failure, that is, about equal test effectiveness for the pipeline being operated at maximum hoop stress levels corresponding to 72, 50, and 40 percent of SMYS, respectively. For Case 1, the HTP/MOP ratio of 1.39 yields a minimum time to failure of 1.98 years (*a/t* of 0.7). For Case 3, the HTP/MOP ratio of 1.50 yields a minimum time to failure of 1.85 years (*a/t* of 0.6). For Case 6, the HTP/MOP ratio of 1.625 yields a minimum time to failure of 2.05 years (*a/t* of 0.6).

The results provide useful guidance for operators that may need to perform seam integrity assessments on older ERW pipelines. It is unlikely that an operator would choose to test such a pipeline to a hoop stress level in excess of 100 percent of SMYS. Therefore, a reasonable upper bound or HTP/MOP for a pipeline operated at 72 percent of SMYS would seem to be 1.39. It will be recognized from these results, however, that higher HTP/MOP ratios would be needed to achieve equivalent effectiveness in terms of times to failure for pipelines operated at maximum hoop stress levels below 72 percent of SMYS.

It should be noted that the times to failure presented in Table 4.4 and in the foregoing discussion are illustrative only. They are not meant to imply that a specific test margin is good for only 1 or 2 years, or any other specific time frame. The actual time to failure is dependent on actual pipeline system operation as well as on pipe material crack-growth properties.

### *4.3    Relative Aggressiveness of Pressure Cycles*

An important element in evaluating the effects of pressure cycling on pipeline integrity is the relative aggressiveness of the pressure cycles. One may evaluate relative aggressiveness by comparing the fatigue lives associated with the spectra provided by the operator to those associated with the pressure cycles listed on a benchmarking scale given in *Dealing with Low-Frequency-Welded ERW Pipe and Flash-Welded Pipe with Respect to HCA-Related Integrity Assessments*



(Kiefner, 2002). The benchmarking list is shown in Table 4.6. It is based on actual pressure patterns observed for pipelines in which fatigue failures have occurred. These four spectra are used with other parameters of the actual segment of interest (i.e., diameter, wall thickness, grade, toughness, etc.) to calculate times to failure. One assumes that the pipeline has been tested to 100 percent of SMYS[1] and that it is operated at a MOP corresponding to 72 percent of SMYS[2]. These assumptions establish initial and final flaw sizes and key the ranges of pressure cycles to the segment being analyzed. Note that the aggressiveness comparisons are independent of the crack-growth-rate constants, because the same constants are used for time-to-failure calculations involving both the actual and the benchmark cycles.

The values in the left-hand column of Table 4.6 indicate fluctuations in hoop stress in terms of SMYS (e.g., 72% means a cycle from 72 percent of SMYS to zero and back to 72 percent of SMYS, 65% means a cycle from 72 percent of SMYS to 7 percent of SMYS and back to 72 percent of SMYS, 55% means a cycle from 72 percent of SMYS to 17 percent of SMYS and back to 72 percent of SMYS, and so on). The cycles are top-down instead of bottom-up because some crack growth models consider the often-real effect of mean stress on fatigue life. In some situations, the higher the mean stress, the shorter the time to failure.

Direct comparison of the actual cycles for a given pipeline to the cycles in the four benchmark categories is very difficult. A more practical approach is to employ a crack growth model and perform a series of five evaluations on a set of initial defects using the same pipe attributes including a set of crack growth rate constants (*C* and *n* values). One run is based on the actual pressure cycles for the pipeline; the other four runs employ each of the four benchmark sets. In the run based on the actual cycles the real hydrostatic test pressure is used to establish initial flaw sizes. In the runs based on the benchmark cycles the hydrostatic test pressure corresponds to 100 percent of SMYS for the pipe. For the sake of consistency in initial flaw sizes, 25 ft-lb Charpy energy is used to represent the toughness. The user then compares the times to failure with the actual cycles to those associated with each of the four benchmark aggressiveness categories.

An example set of resulting times to failure for the four benchmark cases is shown in Table 4.7. Note that this example is based on different pipeline parameters than those described in Table 4.1. A comparison set of resulting times to failure for an actual segment is presented in Table 4.8. As seen in Table 4.7, the very aggressive benchmark cycles produce a life less than 2 years and the aggressive cycles produce a minimum time to failure around 7 years. Since the pressure cycles for the actual segment, as shown in Table 4.8, result in minimum predicted times to failure for the deeper defects around 5 years, the actual cycles are considered aggressive for the case in which the starting defect size was established by a hydrostatic test to 1.25 times MOP. The predictions for times to failure based on the flaws that would survive a test to 1.39 times MOP show that the pressure cycles in this case lie in the moderate-to-aggressive range.

---

[1] Whether or not it actually has been tested to this level does not matter.  The purpose of the calculation is to assess the aggressiveness of the actual cycles relative to the benchmark cycles.

[2] The benchmark cycles have a maximum stress range of 72 percent of SMYS, so the benchmark cycles are keyed to a maximum of 72 percent of SMYS for the segment being examined.

**ChallengeUs.**

Michael Baker Jr., Inc.                                          OPS TTO6 – Spike Hydrostatic Test Evaluation

**Table 4.6        Benchmark Cycle Counts—Annual**

| Percent SMYS | Very Aggressive | Aggressive | Moderate | Light |
|---|---|---|---|---|
| 72% | 20 | 4 | 1 | 0 |
| 65% | 40 | 8 | 2 | 0 |
| 55% | 100 | 25 | 10 | 0 |
| 45% | 500 | 125 | 50 | 25 |
| 35% | 1000 | 250 | 100 | 50 |
| 25% | 2000 | 500 | 200 | 100 |
| **Total** | **3660** | **912** | **363** | **175** |

**Table 4.7        Remaining Life Based on Categorized Aggressiveness**

| Pressure Cycle Category | Years to Failure for Various Defect Depth-to-Thickness Ratios | | | |
|---|---|---|---|---|
| | 90% | 70% | 50% | 30% |
| Very Aggressive | 1.88 | 1.88 | 2.38 | 5.38 |
| Aggressive | 7.12 | 7.37 | 9.62 | 21.67 |
| Moderate | 18.12 | 19.12 | 25.12 | 56.12 |
| Light | 55.63 | 56.89 | 71.38 | 144.89 |

**Table 4.8        Time to Failure Based on Test Scenarios of 1.25 x MOP and 1.39 x MOP**

| Test Stress Level | Years to Failure for Various Defect Depth to Thickness Ratios | | | |
|---|---|---|---|---|
| | 90% | 70% | 50% | 30% |
| 1.25 x MOP | 5.00 | 5.47 | 7.52 | 24.10 |
| 1.39 x MOP | 10.32[*] | 10.62 | 13.79 | 31.08 |
| [*]Minimum value of 10.06 occurred for 80-percent-through defect. | | | | |

## 4.4   Effects of Variations in Pressure-Cycle Aggressiveness and Material Constants on Flaw Growth

Consider a 22-inch OD x 0.344-inch WT X46 pipeline being evaluated for susceptibility to fatigue from a hook crack. Hook cracks are manufacturing defects in the longitudinal weld of the pipe, caused by inclusions at the plate edge that are turned out of the plane of the steel during the welding process. The CVN upper shelf absorbed energy is 18 ft-lb equivalent from a full-size specimen. The pipeline maximum operating pressure (MOP) is 1,035 psig, corresponding to a hoop stress equal to 72 percent of SMYS.

The assumed fatigue crack length is $L=2(Dt)^{1/2}=5.5$ inches. The "ln-secant" equation results in the relationships between flaw size and failure pressure shown in Figure 4.1. At a flaw length of 5.5 inches, a defect would become critical at the MOP at a depth of 64.5 percent of the wall thickness, or 0.222 inches. If the pipe were hydrostatically tested to a pressure level of 90 percent of SMYS, a flaw of this length would be critical at a depth of 47.1 percent of SMYS or 0.162 inch; if the pipe

**Challenge Us.**

were hydrostatically tested to a pressure level of 100 percent of SMYS, a flaw of this length would be critical at a depth of 34.1 percent of SMYS or 0.117 inches.



D = 22.00, t = 0.344, SMYS = 46,000, CVN = 18.00, CVN Area = 0.124

**Figure 4.1    Example Relationship Between Failure Stress and Flaw Size**

The best means for selecting *C* and *n* values is to benchmark the values against a known incident where the initial flaw size, the final flaw size, a detailed operating pressure spectrum, and the hydrostatic test history are all known. Even so, there is no one combination of *C* and *n* that uniquely defines the crack growth curve between initial and final flaw sizes for any given operating spectrum, unless another hydrostatic pressure test or reliable crack-detection in-line inspection (ILI) occurred some time later in service. The later test or ILI puts an upper bound on how large the flaw could have been at a given point in time. The test may also have left an arrest mark on the fracture surface giving an indication of the flaw size at that time, although it is usually difficult to make such correlations. If only an initial and final flaw size are known with no intermediate test or ILI, then it is not possible to define a unique *C* and *n* combination, other than by selecting a reasonable *n* value, perhaps based on analyses of other pipe of the same type, and changing *C* to match the known conditions. Considerable judgment is involved in making these choices.

Consider that for the example pipe, it was already established that $C=5.56\text{x}10^{-18}$ (for $\Delta K$ in psi $\sqrt{in}$ units) and $n=2.77$ based on prior studies. Figure 4.2 shows the crack growth over time under the influence of a particular operating pressure spectrum that happens to be moderate in terms of cycle aggressiveness. The curve shows failure at the MOP at a flaw depth of 0.222 inches, potentially as

early as 9 years after a hydrostatic test to 85 percent of SMYS, or 21 years after a hydrostatic test to 90 percent of SMYS, or 61 years after a hydrostatic test to 100 percent of SMYS if the flaws had the maximum survivable depth at the time of the test.



**Figure 4.2      Example Crack Growth in Service**

Figure 4.3 shows the effect on crack growth over time, for this particular case, of more aggressive and less aggressive operating conditions. Figure 4.4 and Figure 4.5 show the effects of greater or lesser values for *C* with the same *n* value, and greater or lesser values for *n* with the same *C* value, respectively. Note that by pure coincidence, the curve shown for lower *C* and the same *n* is almost identical to the curve for the same *C* and lower *n*. This result might not necessarily occur with a different operating spectrum, however.

**Challenge**Us.

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 4.3      Example of the Effect of Operating Pressure Spectrum**



**Figure 4.4      Illustration of the Effect of Variations in *C***

Michael Baker Jr., Inc.                                           OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 4.5      Illustration of the Effect of Variations in *n***

## 4.5    *Recommended SHT Procedures*

It is recommended that SHT be used whenever practical to enhance the integrity assessment effectiveness of a hydrostatic test of a pipeline. A guideline for choosing an appropriate test-pressure-to-operating-pressure ratio (HTP/MOP) to achieve approximately equal levels of effectiveness for cases where MOP is less than or equal to 72 percent of SMYS is given by the linear equation:

HTP/MOP = -0.00736 (% SMYS at MOP) + 1.919

For example, if a pipeline is operating at a maximum pressure that produces hoop stress equivalent to 72 percent of SMYS, then the HTP/MOP ratio is equal to –0.00736(72) + 1.919, or 1.39. This ratio results in a test pressure that would produce a hoop stress equivalent to 100 percent of SMYS. HTP/MOP ratios and resulting stresses in terms of %SMYS for several levels of MOP in terms of %SMYS are presented in Table 4.9.

**Challenge**Us.

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

**Table 4.9        HTP/MOP Ratios and Resultant Stresses in Terms of %SMYS**

| MOP as % SMYS | Fatigue | |
| --- | --- | --- |
| | HTP/MOP | %SMYS |
| 20 | 1.77 | 35 |
| 30 | 1.70 | 51 |
| 40 | 1.62 | 65 |
| 50 | 1.55 | 77 |
| 60 | 1.48 | 88 |
| 72 | 1.39 | 100 |

It is unrealistic to expect an operator to employ this equation to justify pressurizing a pipeline containing older ERW pipe to a pressure level exceeding the equivalent of 100 percent of SMYS. Furthermore, there is a trade-off between the HTP/MOP ratio and the retest interval. A relatively low HTP/MOP used in conjunction with an appropriately short retest interval can be as effective as a higher HTP/MOP used in conjunction with a long retest interval.

As discussed in Section 2.2, ½ hour, with an upper limit of 1-hour, is the recommended hold time for a SHT.

**Challenge**Us.

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

*This page intentionally left blank*



Michael Baker Jr., Inc.                                      OPS TTO6 – Spike Hydrostatic Test Evaluation

# 5    SHT to Assess Pipelines Affected by SCC or Selective Seam Corrosion

## 5.1    Subtask 03 – Scope

This chapter addresses Subtask 03 of the Work Scope which states:

> **Overview**: Develop practicable SHT criteria for application to identifying areas of SCC and fatigue, including minimum test pressure, as a function of Specified Minimum Yield Strength (SMYS), and duration for a minimum of three categories of operating pressure. These categories, based on the hoop stress as a function of SMYS are: 72 percent or higher, 50 to 72 percent, and less than 50 percent. Based on the criteria developed and an assumed pressure cycling of one cycle per month, determine a minimum re-test interval for each category.

> **Activities**:
>
> a)  Evaluate effects of test pressure and duration on critical flaws for each category of operating pressure.
>
> b)  Develop SHT procedures for each category of operating pressure.
>
> c)  Evaluate effects of postulated pressure cycling on critical flaws for each category.
>
> d)  Determine minimum re-test interval based on postulated pressure cycling for each category.

> **Deliverables**:
>
> a)  Narrative discussing effects of test pressure and duration on critical flaws.
>
> b)  SHT procedures.
>
> c)  Narrative discussing effects of pressure cycling on critical flaws.
>
> d)  Narrative presenting the recommended minimum re-test interval and the process used to determine this interval.

## 5.2    Discussion

Historically, the SHT concept was first applied to hydrostatically retesting pipelines affected by SCC (Fessler, 1979). The early uses of SHT for SCC involved arbitrarily selected retest intervals because the rate of growth for SCC in any given situation was difficult if not impossible to estimate. The normal practice was to select an initial interval of 1 to 3 years. If no service failures from SCC occurred between tests, the interval was gradually lengthened. Multiple companies continued this approach. A study of the effectiveness of this approach is not within the scope of this report. It is still clear, however, that a successful retest program depends on either knowing or conservatively estimating the rate of SCC growth.

Researchers have developed laboratory data on SCC growth rates that show rates ranging from 0.03 mm/yr (1 mil/yr.) to 30 mm/yr (1,180 mils/yr) (National Energy Board, 1996). It is also known that SCC can become a dormant process. The Canadian National Energy Board states that safe retest



intervals can be calculated using a time-averaged value of 0.6 mm/yr. (24 mils/yr) (National Energy Board, 1996). This rate is used in the following analyses to show the effects of various SHT pressure ratios (that is, HTP/MOP ratios) on times to failure after the test. It is noted that the same analytical approach applies to selective seam corrosion of ERW seams. In the case of the latter, however, the rate of corrosion penetration is likely to be site-specific. Therefore, the following discussion is intended to show only the relative effects of HTP/MOP ratios; it is not meant to be a guide for selecting actual retest intervals for a particular pipeline.

The approach to setting appropriate HTP/MOP ratios for retests of pipelines affected by SCC or selective seam corrosion is based on the same model pipeline that was used to discuss HTP/MOP ratios for pipelines affected by fatigue (see Table 4.1 for pipeline parameters).

In the examination of appropriate HTP/MOP ratios for SCC and selective seam corrosion, the cases presented in Table 5.1 will be considered.

**Table 5.1        HTP/MOP Ratios for SCC Cases Analyzed**

| Case | HTP/MOP | HTP | | MOP | |
|---|---|---|---|---|---|
| | | psig | % SMYS | psig | % SMYS |
| 8 | 1.53 | 1,984 | 110 | 1,299 | 72 |
| 9 | 1.39 | 1,804 | 100 | 1,299 | 72 |
| 10 | 2.0 | 1,804 | 100 | 902 | 50 |
| 11 | 1.8 | 1,624 | 90 | 902 | 50 |
| 12 | 1.53 | 1,380 | 76.5 | 902 | 50 |

Unlike the analysis for fatigue, the analysis for SCC and selective seam corrosion is based on the assumption that cracks or grooves that survive a hydrostatic test will grow at a linear rate with time. Therefore, the analysis can be based on the failure-pressure-versus-defect-size relationships shown in Figure 5.1 and Figure 5.2. On these figures, a pressure level (test or operating) can be represented as a horizontal line. Along each such line lie the families of defects that can barely survive that pressure level or, alternatively, fail at that pressure level. Hence, defects that survive a test pressure level will fail in service at a lower pressure level if they grow over a long enough period of time.

Figure 5.1 represents Cases 8 and 9 where the test pressure levels are 1,984 psig (110 percent of SMYS) and 1,804 psig (100 percent of SMYS). The MOP for both cases is 1,299 (72 percent of SMYS), so the HTP/MOP ratios are 1.53 and 1.39, respectively. Arrows on the figure represent hypothetical crack-growth scenarios for four different lengths of cracks (2, 4, 6, and 8 inches).

Figure 5.2 represents Cases 10, 11, and 12 where the test pressure levels are 1,804 (100 percent of SMYS), 1,624 (90 percent of SMYS), and 1,380 psig (77 percent of SMYS). The MOP for all three cases is 902 psig (50 percent of SMYS), so the HTP/MOP ratios are 2, 1.8, and 1.53, respectively. As in Figure 5.1, the arrows on Figure 5.2 at total lengths of 2, 4, 6, and 8 inches represent hypothetical crack-growth scenarios.

**ChallengeUs.**

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 5.1      Failure Pressure vs. Defect Size Relationship – MOP Equal to 72% SMYS**



**Figure 5.2      Failure Pressure vs. Defect Size Relationship – MOP Equal to 50 % SMYS**

Michael Baker Jr., Inc.                                      OPS TTO6 – Spike Hydrostatic Test Evaluation

To analyze the crack-growth scenarios represented by the arrows in Figure 5.1 and Figure 5.2, one needs to consider the *a/t* value corresponding to the intersection of the arrow's shaft with a horizontal pressure line. For example, in Figure 5.1, the shaft of the arrow at a total length of 2 inches intersects the 1,984-psig level at an *a/t* of 0.30, the 1,804-psig level at an *a/t* of approximately 0.47, and the MOP level of 1,299 psig at an *a/t* of approximately 0.73. This means that a 2-inch-long crack that barely survives a test pressure of 1,984 psig will be no more than 30 percent through the wall. Yet in order to fail in service, it must grow to a depth that is 73 percent through the wall. This growth of 43 percent of the 0.250-inch wall thickness will take place in 4.5 years at a growth rate of 24 mils per year (the time-averaged rate suggested by the NEB (NEB, 1996)). By the same reasoning, if a 2-inch-long defect had barely survived a test pressure of 1,804 psig, it would have grown to failure in only 2.7 years. This is because one must assume its initial depth after the test was 47 percent of the wall thickness. If it then grows through 26 percent of the wall thickness (65 mils) at a rate of 24 mils per year, it will reach a depth of 73 percent of the wall thickness in 2.7 years and it will fail at the MOP of 1,299 psig.

Table 5.2 presents a summary of the analysis of Cases 8 through 12 based on Figure 5.1 and Figure 5.2 and the thought process described above. In much the same manner as revealed for fatigue crack growth, the effectiveness of a given HTP/MOP ratio for SCC is dependent on the operating stress level. As one can see by comparing Cases 8 and 10, an HTP/MOP ratio of 1.53 for a pipeline that is operated at 72 percent of SMYS has about the same effectiveness as an HTP/MOP ratio of 2.00 for a pipeline that is operated at 50 percent of SMYS.

**Table 5.2       Times to Failure of SCC Defects for Various HTP/MOP Ratios**

| Case | *a/t* at HTP | | | | *a/t* at MOP | | | | Years to Failure | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | L=2 in | L=4 in | L=6 in | L=8 in | L=2 in | L=4 in | L=6 in | L=8 in | L=2 in | L=4 in | L=6 in | L=8 in |
| 8 | 0.30 | 0.17 | 0.10 | 0.07 | 0.73 | 0.58 | 0.50 | 0.45 | 4.5 | 4.3 | 4.2 | 4.0 |
| 9 | 0.47 | 0.30 | 0.22 | 0.16 | 0.73 | 0.58 | 0.50 | 0.45 | 2.7 | 2.9 | 2.9 | 3.0 |
| 10 | 0.47 | 0.30 | 0.22 | 0.16 | 0.85 | 0.73 | 0.68 | 0.63 | 4.0 | 4.5 | 4.8 | 4.9 |
| 11 | 0.59 | 0.41 | 0.33 | 0.28 | 0.85 | 0.73 | 0.68 | 0.63 | 2.7 | 3.3 | 3.6 | 3.6 |
| 12 | 0.70 | 0.53 | 0.46 | 0.40 | 0.85 | 0.73 | 0.68 | 0.63 | 1.6 | 2.1 | 2.3 | 2.4 |

### *5.3   Recommended SHT Procedures*

It is recommended that SHT be used whenever practical to enhance the integrity assessment effectiveness of a hydrostatic test of a pipeline. A guideline for choosing an appropriate test-pressure-to-operating-pressure ratio (HTP/MOP) to achieve approximately equal levels of effectiveness for addressing SCC or selective seam corrosion is given by the equation:

$$(HTP/MOP) = -0.02136 \ (MOP \text{ in } \% \ SMYS) + 3.068.$$

For example, if a pipeline is operating at a maximum pressure that produces hoop stress equivalent to 72 percent of SMYS, then the HTP/MOP ratio is equal to –0.02136(72) + 3.068, or 1.53. This ratio results in a test pressure that would produce a hoop stress equivalent to 110 percent of SMYS. HTP/MOP ratios and resulting stresses in terms of %SMYS for several levels of MOP in terms of %SMYS are presented in Table 5.3.

**ChallengeUs.**

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

**Table 5.3        HTP/MOP Ratios and Resultant Stresses in Terms of %SMYS**

| MOP as % SMYS | SCC | |
| --- | --- | --- |
| | **HTP/MOP** | **%SMYS** |
| 20 | 2.64 | 53 |
| 30 | 2.43 | 73 |
| 40 | 2.21 | 89 |
| 50 | 2.00 | 100 |
| 60 | 1.79 | 107 |
| 72 | 1.53 | 110 |

In using this equation it should be remembered that it is unrealistic to expect an operator to pressurize a pipeline comprised of older ERW pipe to a pressure level exceeding the equivalent of 100 percent of SMYS even if the pipeline is operated at 72 percent of SMYS. Also, it is well to remember that there is a trade-off between the HTP/MOP ratio and the retest interval. A relatively low HTP/MOP used in conjunction with an appropriately short retest interval can be as effective as a higher HTP/MOP used in conjunction with a long retest interval.

As discussed in Section 2.2, the recommended hold time for SHT is 1/2 –hour, with an upper limit of 1-hour.

*Challenge*Us.

Michael Baker Jr., Inc.                                          OPS TTO6 – Spike Hydrostatic Test Evaluation

*This page intentionally left blank*

OPS TTO6 Final Report.doc
                                                                                    07/16/04

**Challenge*Us.***

Michael Baker Jr., Inc.    OPS TTO6 – Spike Hydrostatic Test Evaluation

## 6  Sensitivity to Pipe Parameters

The relationship between failure pressure and defect size is dependent upon a few key pipe parameters: diameter, wall thickness, SMYS and fracture toughness (Charpy V-Notch energy measurements) of the pipe material. The relationship also depends on the Young's Modulus value for the material, though variations in this value typically have a minor impact on the results when analyzing steel pipe.

### 6.1  Changes in Diameter

Series of analyses were conducted to show the effect changing the diameter of the pipe has on the failure-pressure-versus-defect-size relationship. Analyses were conducted for 12-, 16-, 20-, 24- and 36-inch nominal diameter pipe. All other variables were held constant; wall thickness was 0.312-inch, yield strength was 52,000 psi, and CVN value was 15 ft-lb. The results are presented in Figure 6.1, Figure 6.2, Figure 6.3, Figure 6.4 and Figure 6.5. A direct comparison of the failure-pressure-versus-defect-size relationship for all diameters analyzed assuming a constant *a/t* ratio of 0.5 is shown in Figure 6.6.



**Figure 6.1      Failure Pressure vs. Defect Size—12-inch Nominal Diameter**

**Challenge**Us.

Michael Baker Jr., Inc.                                   OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 6.2    Failure Pressure vs. Defect Size—16-inch Nominal Diameter**



**Figure 6.3    Failure Pressure vs. Defect Size—20-inch Nominal Diameter**

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 6.4      Failure Pressure vs. Defect Size—24-inch Nominal Diameter**



**Figure 6.5      Failure Pressure vs. Defect Size—36-inch Nominal Diameter**

**ChallengeUs.**

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 6.6    Comparison of Failure Pressure vs. Defect Size for Different Pipe Diameters**

Another series of analyses were conducted to show the effect changing the diameter of the pipe has on the time-to-failure-versus-defect-size relationship. These analyses assumed the same pipe parameters and assumed a HTP equivalent to 100 percent of SMYS and an MOP equivalent to 72 percent of SMYS. The analyses followed the procedure described in Section 5 for SCC with an average corrosion rate of 24 mils per year. The results are presented in Figure 6.7.

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 6.7    Comparison of Time to Failure vs. Defect Size for Different Pipe Diameters**

### 6.2    Changes in Wall Thickness

Similarly, additional analyses were conducted to show the effect changing the wall thickness of the pipe has on the failure-pressure-versus-defect-size relationship. These analyses were conducted for a 20-inch diameter pipe with wall thicknesses of 0.250 and 0.375 inches. All other variables were held constant; yield strength was 52,000 psi, and CVN value was 15 ft-lb. The results are presented in Figure 6.8 and Figure 6.10. The results for a wall thickness of 0.312 inches were presented in Figure 6.3 and are repeated in Figure 6.9 for completeness and ease in comparison with the results for the other wall thicknesses analyzed. A direct comparison of the failure-pressure-versus-defect-size relationship for all wall thicknesses analyzed assuming a constant $a/t$ ratio of 0.5 is shown in Figure 6.11.

**ChallengeUs.**

Michael Baker Jr., Inc.                                      OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 6.8     Failure Pressure vs. Defect Size—0.250-inch Wall Thickness**



**Figure 6.9     Failure Pressure vs. Defect Size—0.312-inch Wall Thickness**

Michael Baker Jr., Inc.                                      OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 6.10    Failure Pressure vs. Defect Size—0.375-inch Wall Thickness**



**Figure 6.11    Comparison of Failure Pressure vs. Defect Size for Different Wall Thicknesses**

OPS TTO6 Final Report.doc
                                                                        07/16/04

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

Once again, a series of analyses were conducted to show the effect changing the wall thickness of the pipe has on the time-to-failure-versus-defect-size relationship. These analyses assumed the same pipe parameters and assumed a HTP equivalent to 100 percent of SMYS and an MOP equivalent to 72 percent of SMYS. The analyses followed the procedure described in Section 5 for SCC with an average corrosion rate of 24 mils per year. The results are presented in Figure 6.12.



**Figure 6.12    Comparison of Time to Failure vs. Defect Size for Different Wall Thicknesses**

## 6.3    Changes in Yield Strength

Similarly, additional analyses were conducted to show the effect changing the yield strength of the pipe material has on the failure-pressure-versus-defect-size relationship. These analyses were conducted for yield strengths of 42,000 and 60,000 psi assuming a 20-inch diameter pipe with a wall thickness of 0.312 inches. A CVN value of 15 ft-lb was also used for the analyses. The results are presented in Figure 6.13 and Figure 6.15. The results for a yield strength of 52,000 psi were presented in Figure 6.3 and are repeated in Figure 6.14 for completeness and ease in comparison with the results for the other yield strengths analyzed. A direct comparison of the failure-pressure-versus-defect-size relationship for all yield strengths analyzed assuming a constant *a/t* ratio of 0.5 is shown in Figure 6.16.

**ChallengeUs.**

Michael Baker Jr., Inc.                                        OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 6.13    Failure Pressure vs. Defect Size—API 5L X-42 Steel**



**Figure 6.14    Failure Pressure vs. Defect Size—API 5L X52 Steel**

OPS TTO6 Final Report.doc
                                                               07/16/04

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 6.15    Failure Pressure vs. Defect Size—API 5L X60 Steel**



**Figure 6.16    Comparison of Failure Pressure vs. Defect Size for Different API Steel Grades**

**ChallengeUs.**

Michael Baker Jr., Inc.                                     OPS TTO6 – Spike Hydrostatic Test Evaluation

Another series of analyses were conducted to show the effect changing the yield strength of the pipe material has on the time-to-failure-versus-defect-size relationship. These analyses assumed the same pipe parameters and assumed a HTP equivalent to 100 percent of SMYS and an MOP equivalent to 72 percent of SMYS. The analyses followed the procedure described in Section 5 for SCC with an average corrosion rate of 24 mils per year. The results are presented in Figure 6.17.



**Figure 6.17    Comparison of Time to Failure vs. Defect Size for Different API Steel Grades**

### 6.4    Changes in Fracture Toughness

A series of analyses were conducted to show the effect changing the fracture toughness of the pipe material has on the failure-pressure-versus-defect-size relationship. These analyses were conducted for CVN values of 5, 25, 35 and 40 ft-lb assuming a 20-inch diameter pipe with a wall thickness of 0.312 inches. A yield strength of 52,000 psi was used for the analyses. The results are presented in Figure 6.18, Figure 6.20, Figure 6.21 and Figure 6.23. The results for a CVN value of 15 ft-lb were presented in Figure 6.3 and are repeated in Figure 6.19 for completeness and ease in comparison with the results for the other yield strengths analyzed. A direct comparison of the failure-pressure-versus-defect-size relationship for all yield strengths analyzed assuming a constant *a/t* ratio of 0.5 is shown in Figure 6.23.

**Challenge**Us.

Michael Baker Jr., Inc.                                        OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 6.18     Failure Pressure vs. Defect Size—CVN Value Equal to 5 ft-lb**



**Figure 6.19     Failure Pressure vs. Defect Size—CVN Value Equal to 15 ft-lb**

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 6.20    Failure Pressure vs. Defect Size—CVN Value Equal to 25 ft-lb**



**Figure 6.21    Failure Pressure vs. Defect Size—CVN Value Equal to 35 ft-lb**

**Challenge Us.**

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 6.22    Failure Pressure vs. Defect Size—CVN Value Equal to 40 ft-lb**



**Figure 6.23    Comparison of Failure Pressure vs. Defect Size for Different CVN Values**

**Challenge Us.**

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

A series of analyses were conducted to show the effect changing the fracture toughness of the pipe material has on the time-to-failure-versus-defect-size relationship. These analyses assumed the same pipe parameters and assumed a HTP equivalent to 100 percent of SMYS and an MOP equivalent to 72 percent of SMYS. The analyses followed the procedure described in Section 5 for SCC with an average corrosion rate of 24 mils per year. An analysis for a CVN of 500 ft-lb was also conducted to show the effect of an "ultimate" toughness. The results are presented in Figure 6.24.



**Figure 6.24    Comparison of Time to Failure vs. Defect Size for Different CVN Values**

### 6.5    Changes in HTP and MOP

Finally, a number of analyses were conducted to determine the effect changing the HTP and MOP has on the time-to-failure-versus-defect-size relationship. The pipe parameters used were 20-inch diameter, 0.312-inch wall thickness, SMYS of 52,000 psi, and a CVN of 15 ft-lb. The HTP values examined were equivalent to 110 percent, 100 percent and 90 percent of SMYS, while the values of MOP were equivalent to 72 percent, 60 percent and 50 percent of SMYS. The results are presented in Figure 6.25, Figure 6.26, and Figure 6.27, for MOP of 72 percent, 60 percent and 50 percent of SMYS, respectively. The analyses followed the procedure described in Section 5 for SCC, where two different defect $a/t$ ratios are calculated for a given length and the difference between the two is first multiplied by the wall thickness then divided by the assumed average corrosion rate (24 mils per year in these examples).

**ChallengeUs.**

Michael Baker Jr., Inc.                              OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 6.25    Comparison of Time to Failure vs. Defect Size for Different HTP Levels with an MOP of 72% SMYS**



**Figure 6.26    Comparison of Time to Failure vs. Defect Size for Different HTP Levels with an MOP of 60% SMYS**

**ChallengeUs.**

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation



**Figure 6.27    Comparison of Time to Failure vs. Defect Size for Different HTP Levels with an MOP of 50% SMYS**

**Challenge**Us.

Michael Baker Jr., Inc.                                              OPS TTO6 – Spike Hydrostatic Test Evaluation

*This page intentionally left blank*

**Challenge Us.**

Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

# 7   Considerations for Pre-1970 LF-ERW Pipe

## 7.1   Subtask 04 – Scope

This chapter addresses Subtask 03 of the Work Scope that states:

**Overview**: Develop practicable SHT criteria for application to pre-1970 LF-ERW pipe, including minimum test pressure, as a function of Specified Minimum Yield Strength (SMYS), and duration for a minimum of three categories of operating pressure. These categories, based on the hoop stress as a function of SMYS are: 72 percent or higher, 50 to 72 percent, and less than 50 percent. Based on the criteria developed and an assumed pressure cycling of one cycle per month, determine a minimum re-test interval for each category.

**Activities**:

a) Evaluate effects of test pressure and duration on critical flaws for each category of operating pressure.

b) Develop SHT procedures for each category of operating pressure.

c) Evaluate effects of postulated pressure cycling on critical flaws for each category.

d) Determine minimum re-test interval based on postulated pressure cycling for each category.

**Deliverables**:

a) Narrative discussing effects of test pressure and duration on critical flaws.

b) SHT procedures.

c) Narrative discussing effects of pressure cycling on critical flaws.

d) Narrative presenting the recommended minimum re-test interval and the process used to determine this interval.

## 7.2   Discussion

Longitudinal seam failures on pre-1970 LF-ERW pipe due to defects generic to the seam-welding process have raised concerns related to determining operational integrity of pipelines containing this type of pipe. The typical causes of these seam failures are pressure-cycle-induced fatigue and selective (grooving) corrosion of the bondline region of the seam.

The most common manufacturing-related defects in LF-ERW pipe are lack of fusion (welds that are intermittently fused), mismatched edges, and hook cracks (Kiefner, 2002). Hook cracks are caused by inclusions at the plate edge that are turned out of the plane of the steel during the welding process. It is the turning out of the metal at the weld that gives the characteristic "hook" or "J" shape to the crack. Seam manufacturing defects that passed the manufacturer's initial hydrostatic test possibly can fail later due to pressure-cycle-induced fatigue.



Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

Selective seam corrosion is affected primarily by the degree of exposure to corrosive conditions (i.e., poor or absent coating and ineffective cathodic protection) and by the nature of non-metallic inclusions in the bondline region. Since most of older ERW materials have these types of non-metallic inclusions, they should be considered susceptible to selective seam corrosion.

Based on this information, the discussions in both Sections 4 and 5 have some applicability when evaluating pipelines containing LF-ERW pipe. However, as stated at the end of each of these sections, the recommended SHT procedures may need to modified somewhat for application to lines containing LF-ERW pipe to avoid stress levels in excess of 100 percent of SMYS.



Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

# 8   Comparison of SHT Methods for Gas versus Liquid Lines

## 8.1   Subtask 04 – Scope

This chapter addresses Subtask 04 of the Work Scope that states:

**Overview:** Compare SHT methods for assessing integrity issues on gas lines to those recommended for liquid lines.

**Activities**:

a)   Evaluate differences in SHT criteria for use in gas versus liquid lines.

**Deliverables**:

a)   Narrative presenting differences and considerations for using SHT on gas versus liquid lines.

## 8.2   Discussion

SHT are applicable to both liquid and gas pipelines. The problems for which SHT may be needed may differ, however, depending on whether the pipeline transports gas or liquid. For example, the threat of failure from pressure-cycle-induced fatigue is more likely to affect a liquid pipeline than a gas pipeline. In the analysis on HTP/MOP ratios for fatigue presented in Section 4, it was assumed that the pipeline was subjected to 365 cycles per year with the pressure ranging from zero to MOP and back to zero once each day. The resulting times to failure were on the order of 1 to 2 years. A gas pipeline would seldom experience pressure cycling more intense than the equivalent of one of these cycles per year. That being the case, the comparable times to failure for the gas pipeline cycled once per year from zero to MOP and back to zero would range from 365 to 730 years. Even if the cyclic frequency were as intense as one cycle every 30 days, the times to failure would lie in the range of 12 to 24 years. Therefore, it is much more likely that SHT will be used on liquid pipelines to assess integrity from the standpoint of fatigue than on gas pipelines.

From the standpoint of SCC or selective seam corrosion, the susceptibilities of liquid and gas pipelines should be considered equal. In reality, the rates of SCC for liquid lines could be different from those of gas pipelines; there is simply not enough published information to know. For the time being, however, it seems reasonable to treat them the same.



Michael Baker Jr., Inc.                                      OPS TTO6 – Spike Hydrostatic Test Evaluation

*This page intentionally left blank*

**ChallengeUs.**

Michael Baker Jr., Inc.                                OPS TTO6 – Spike Hydrostatic Test Evaluation

## 9   Recommendations

Application of SHT whenever practical, is likely to improve the integrity assessment of a pipeline. Determining the appropriate test pressure is somewhat dependent upon the desired MOP for the pipeline and the anticipated failure mechanism: pressure-cycle-induced fatigue, or corrosion (SCC or selective seam corrosion). Two values of test pressure commonly used are 1.39 times MOP and 1.53 times MOP, these correspond to 100 percent of SMYS and 110 percent of SMYS for lines with an MOP equaling 72 percent of SMYS. However, for lines with an MOP other than that equating to 72 percent of SMYS, the basic recommended SHT pressures are different and can be determined from the following equations:

$$HTP/MOP = -0.00736 \, (\% \text{ SMYS at MOP}) + 1.919$$

when pressure-cycle-induced fatigue is anticipated, and

$$(HTP/MOP) = -0.02136 \, (\% \text{ SMYS at MOP}) + 3.068$$

when SCC or selective seam corrosion are anticipated.

These formulae are only guidelines and there may be justifiable reasons for using different pressures. In either case, the duration of hold-time is of less import than assuring that the test pressure is as high as possible. A hold-time of only a few minutes is sufficient to prove integrity of a pipeline. The recommended hold time is ½-hour, with an upper limit of 1-hour. Reassessment interval on the other hand is not as easily determined, in fact, it is not possible to develop a universal recommendation since there are multiple pipeline specific variables affecting this determination. In addition to the basic pipe parameters (diameter, wall thickness, SMYS), the pressure of the last hydrostatic test, the MOP, as well as, an estimate of the material toughness are necessary in order to determine the maximum size of flaws that may have still existed in the line after testing and to determine the maximum size of flaws that will not cause a leak or rupture under normal operating conditions.

In pipelines subject to pressure cycling, the pressure cycle history or projection are also required in order to calculate the number of cycles, or time, required to grow the flaws that remained after testing to the critical size that would result in a leak or rupture under normal operating conditions.

For pipelines where either SCC or selective seam corrosion is the issue, the determination of reassessment interval is somewhat more straightforward since it only depends on the estimated rate of corrosion, the basic pipe parameters, MOP, and last test pressure.



Michael Baker Jr., Inc.                                      OPS TTO6 – Spike Hydrostatic Test Evaluation

*This page intentionally left blank*



Michael Baker Jr., Inc.                                    OPS TTO6 – Spike Hydrostatic Test Evaluation

## 10  References

1. Bergman, S. A., *"Why Not Higher Operating Pressures for Lines Tested to 90% SMYS?",* Pipeline and Gas Journal*,* December 1974.

2. Brooks, L. E., *"High-Pressure Testing - Pipeline Defect Behavior and Pressure Reversals"* ASME, 68-PET-24, 1968.

3. Canadian Energy Pipeline Association (CEPA), *"Stress Corrosion Cracking Recommended Practices"*, May 1997.

4. Duffy, A. R., G. M. McClure, W. A. Maxey, and T. J. Atterbury, *"Study of Feasibility of Basing Natural Gas Pipeline Operating Pressure on Hydrostatic Test Pressure"*, American Gas Association, Inc. Catalogue No. L30050, February 1968.

5. Fessler, R. R., *"Overview of Solutions to the Stress-Corrosion Cracking Problem"*, *6th Symposium on Line Pipe Research*, A.G.A. Catalogue No. L30175, 1979.

6. Kiefner, J. F., W. A. Maxey, and R. J. Eiber, *"A Study of the Causes of Failure of Defects That Have Survived a Prior Hydrostatic Test"*, Pipeline Research Committee, American Gas Association, NG-18 Report No. 111, November 3, 1980.

7. Kiefner, John F., "*Dealing with Low-Frequency-Welded ERW Pipe and Flash-Welded Pipe with Respect to HCA-Related Integrity Assessments*", ASME Engineering Technology Conference on Energy, February 2002.

8. Leis, B. N. and F. W. Brust, *"Hydrotest Strategies for Gas Transmission Pipelines Based on Ductile-Flaw Growth Considerations"*, American Gas Association, Pipeline Research Committee, NG-18 Report No. 194, July 27, 1992.

9. National Energy Board (NEB), *"Public Inquiry Concerning Stress Corrosion Cracking on Canadian Oil and Gas Pipelines"*, MH-2-95, Catalog No. NE23-58/1996E, pp 158, November 1996.

10. Raju, I. S., and J. C. Newman, Jr., *"Stress-Intensity Factors for Internal and External Surface Cracks in Cylindrical Vessels"*, ASME Journal of Pressure Vessel Technology, Unknown.

**Challenge**Us.

# EXHIBIT N

# Hydrostatic pressure spike testing of pipelines: why and when?

**by Michael J Rosenfeld**

**Kiefner/Applus-RTD, Worthington, OH, USA**

FOLLOWING ITS INVESTIGATION of the San Bruno pipeline accident, the NTSB recommended hydrostatic pressure tests be performed using the spike-test format. The California Public Utility Commission has specified that pressure tests performed in conjunction with integrity validation work use the pressure-spike format. This paper reviews the difference between the pressure-spike test and conventional pressure tests, the technical basis for the pressure-spike test, what constitutes an effective pressure-spike test, limitations of the spike test, regulatory recognition of spike testing, and under what circumstances the pressure-spike test is or is not of value.

FOLLOWING ITS INVESTIGATION of the San Bruno pipeline accident, the NTSB recommended to the pipeline operator that pipelines in Class 1 and Class 2 high-consequence areas (HCAs), and those in Class 3 and Class 4 areas, be subjected to hydrostatic-pressure tests using the spike-test format[1]. The California Public Utility Commission has adopted this recommendation in specifying that pipeline pressure tests performed in conjunction with integrity validation work within California use the pressure-spike format[2]. The NTSB also recommended to PHMSA that regulations eliminate the "grandfather clause" and that pre-1970 pipelines be required to undergo hydrostatic-pressure testing using the pressure-spike format[3].

As a result of these actions, keen interest in the details of a 'spike test' has developed in the pipeline community. Current federal regulations implemented in 1970 do not require a spike test: the concept was first introduced in 1979 almost a decade after the regulations were written. This paper reviews the difference between the pressure-spike test and conventional pressure tests, the technical basis and purpose of the pressure-spike test, what constitutes an effective pressure-spike test, limitations of the spike test, regulatory factors to consider, and under what circumstances the pressure-spike test is or is not of value.

## What is a spike test?

The concept of hydrostatic testing pipelines considers that if a pipeline can withstand a test to a high pressure, it is logical that it can safely operate at a lower pressure. The larger the ratio of test pressure to operating pressure (the 'test-pressure ratio' or TPR), the greater the demonstrated margin of safety. Stress in the pipe is proportional to pressure, and defects that survive a high stress are smaller than defects that could fail at a lower stress. Therefore, larger TPRs also provide longer times to failure and longer retest or re-inspection intervals where a mechanism for defect growth in service exists, for example fatigue or stress-corrosion cracking (SCC). These facts have been well established by theoretical fracture-mechanics' analysis, laboratory testing, and industry operating experience as extensively described in the literature [1].

A hydrostatic-pressure spike test is one that is conducted initially at a high pressure or hoop-stress level (relative to the operating pressure), held for a short period of time, followed by an extended hold period at a lower pressure level. Figure 1 shows the test pattern schematically: the initial high-level portion of the test is the 'spike'. Unlike what the term 'spike' may connote, the spike portion of the test is not sudden, extremely brief, or extremely high relative to the remainder of the test. It would be more properly referred to as a 'bi-level' pressure test. The spike portion of the test may or may not exceed the specified minimum yield strength (SMYS) of the pipe, depending on the purpose of the test and the characteristics of the pipe.

1. NTSB Pipeline Safety Recommendation P-10-004, 3 January, 2011.
2. Memorandum from the Commission's Consumer Protection and Safety Division to Pacific Gas & Electric Company, 12 September, 2011.
3. NTSB Pipeline Safety Recommendation P-11-0014, 26 September, 2011.

This paper was presented at the 2013 AGA Operation Conference in Orlando, Florida, USA, and is published here by kind permission of the AGA.

Author's contact details:
tel: +1 614 410 1602
email: michael.rosenfeld@applusrtd.com

*Fig. 1. Schematic representation of the spike-test pattern.*

It is only necessary to achieve and hold the high-level target pressure for a short time to establish the integrity of the pipeline. The spike portion of the test must be held for a long enough time to assure that the pipeline has experienced a continuous pressure at or above the target level, and to cause defects that are near-critical (near the point of failure) to fail, but not so long as to cause additional crack growth in defects that are too small to be near the failure point (referred to as sub-critical). Consistent with that objective, ASME B31.8-S recommends a minimum period of 10 mins [2]. Other guidance documents recommend a half hour to an upper bound of one hour [3, 4]. For reasons discussed below, the effectiveness and value of the high-level integrity portion of the test (the 'spike') is not improved by a longer period at the upper test pressure. In fact, extended hold periods at near-failure levels can be counterproductive and that fact is the primary rationale for conducting tests in the spike or bi-level format.

At the completion of the high-level spike portion of the test, the pressure is reduced by at least 5% and preferably 10% of the spike pressure, and to not less than 110% of the maximum operating pressure, and held for an extended time. The sole purpose of the hold period at the reduced pressure that follows the spike is to verify that no leaks are present, since the integrity of the pipe was already proven by successful completion of the spike portion of the test. Verification that no leaks are present is accomplished by monitoring pressure and temperature levels for a long enough period of time to determine whether any pressure losses are explained by thermal contraction of the test water, or by test water escaping from the pipe due to a leak, which can require several hours. Standard test requirements for this period of time may range from 4 hrs minimum to 8 hrs, in accordance with applicable regulations. Present regulations provide for only a limited recognition of the spike-testing strategy, as discussed later in this paper. They also do not recognize potentially viable alternatives for locating leaks.

## Technical basis for the spike test

A standard hydrostatic-pressure strength or proof test is held at a more-or-less constant pressure level that is greater than the maximum allowable operating pressure (MAOP) for natural gas, or maximum operating pressure (MOP) for liquids, by a minimum ratio that is specified by regulations or standards for the pipeline construction and operation. The minimum test pressure must be maintained for a minimum period of time as specified by the applicable standard or regulation. During the test period, the pressure is usually allowed to vary within a range above the minimum test pressure to allow for the effects of thermal expansion of the test fluid. Water may be added to make up for any pressure loss during the test. Decades of industry-operating experience and scientific analysis has shown that the standard hydrostatic-pressure test, without a pressure spike, is a reliable and proven technique for demonstrating the strength of the pipe and components installed in a pipeline, and for establishing their MAOP or MOP [5, 6].

The spike test is a variant of the hydrostatic-proof test. Its purpose is two-fold: the spike portion of the test will induce failure in the pipe where significant defects may be present, while the subsequent relaxation of pressure to the long-hold-time pressure level allows any surviving cracks to stabilize and avoids subcritical crack growth during the lengthy hold period to detect significant leaks. Testing in this manner was initially developed as a technique for validating the integrity of pipelines affected by stress-corrosion cracking (SCC). In that application, the spike-pressure level is generally in the range of 105% to 110% of SMYS, while the hold for leaks is between 90% and 100% of SMYS [7]. Testing to such high stress levels for dealing with SCC is possible for three key reasons:

- linepipe is generally stronger than the specified minimum properties;
- the biaxial stress state of a buried pipeline is such



| a. 1F602 | b. 1F603 | c. 1F604 |
| Defect No. 1. Failure (Leak) (L x d, 4.4 x 0.195 inch) | Defect No. 2. 97 Percent of Failure Stress Level (4.4 x 0.171 inch) | Defect No. 4. 94 Percent of Failure Stress Level (4.4 x 0.142 inch) |

| d. 1F605 | e. 1F606 | f. 1F607 |
| Defect No. 4. 91 Percent of Failure Stress Level (4.4 x 0.125 inch) | Defect No. 5. 89 Percent of Failure Stress Level (4.4 x 0.101 inch) | Defect No. 6. 87 Percent of Failure Stress Level (4.4 x 0.078 inch) |

*Fig. 2. Test notches exhibiting flaw extension when held at stresses near failure (from Kiefner et al., NG-18 Report No. 111).*

that yielding would not be expected to occur until the hoop stress exceeds approximately 112.5% of the actual yield strength of the pipe material unless large external loads acting on the pipe are present; and

- at least in the case with SCC, the resistance to crack growth is dominated by ductile pipe body fracture properties.

Several investigators have suggested or demonstrated that defects in a ductile material, when held at a steady stress very near the point of failure, would enlarge at a steady stress by stable tearing [8, 9]. The closer that the defect is to failure, the greater would be the enlargement. This was demonstrated graphically in tests performed on a piece of 36-in (914-mm) OD X-60 linepipe containing a series of artificial defects machined into the pipe surface, each of the same length but differing depths ranging from 20% to 50% of the wall thickness [10]. The defects were sized so that the deepest would fail as a rupture (rather than a leak) at approximately 1,300 psig (8,963 kPa). The test pipe was pressure cycled twice: once to 1,330 psig (9,170 kPa), and once to 1,300 psig (8,963 kPa) for 30 secs each time. It then failed in the deepest defect at 1,230 psig (8,481 kPa) which was well below what it had previously experienced. The surviving defects were then cut out and examined.

All defects were exposed to the same pressure at the same time. Each surviving defect was progressively shallower and therefore was less severe and less near the point of failure compared to the defect that failed. Figure 2 shows cross-sections at high magnification of the tips of the defects from the test. Several of the defects in Fig. 2 exhibit enlargement by tearing due to exposure to stresses near the point of failure. The amount of tearing successively decreases as the defect depth, and consequently proximity to failure, decreases. Only a small amount of tearing occurred at the tip of the defect for which the maximum test pressure was 94% of its expected failure pressure, and negligible tearing occurred in any defect for which the maximum test pressure was 90% of the expected failure pressure or less. This result indicates that maintaining a stress below 90% of a defect's failure pressure would not be expected to cause worsening of the defect by tearing, while maintaining a stress above 90% but below 95% of the failure pressure would only cause a small amount of tearing. These results were consistent with what had been suggested by prior researchers, which was that some flaw enlargement by tearing could occur at 90% to 95% of the critical-stress level, and more significant tearing could occur at greater than 95% of the critical-stress level. Above the 95% level the tearing could worsen or become unstable if held for a long enough period of time.

Further testing of defects more likely to leak rather than rupture showed that tearing occurred at lower proportions

was below the immediately critical level. Additional tests performed in similar material to the tearing test demonstrated that the failure pressure of a defect held to near the point of failure decreases the longer it is held at that point. The relative damaging effect of hold time was shown to be greater with more severe defects, and greater with proximity of the hold level to the immediately critical stress level [11].

One cannot know from the pressure test alone about defects that do not fail during the test. Therefore, one cannot be certain that, at the successful conclusion of a pressure test, there is not a defect present that was near failure at the time that the test was terminated. This would be the case irrespective of the test level or the test duration. Since a longer hold-time worsens the condition of defects that would not fail quickly and therefore would not threaten the integrity of the pipe, it follows that holding the pipe for a long time period at its maximum test level potentially leaves the pipe in worse condition than would a shorter-duration hold at the same maximum test level. An extended hold-time at the maximum level is therefore of no value, and could be counterproductive [12, 13].

To be effective, the duration of the spike test interval only needs to be a few minutes, and recommendations for the length of test vary from 10 mins to 1 hr. In order to stop flaw extension at the highest test pressure, the subsequent pressure reduction must be at least 5% of the spike-test pressure level. A reduction of 10% appears to prevent most flaw growth during the test in flaws that would fail as a rupture, and most spike-testing plans reduce the pressure by 10% accordingly. Note that additional tests to the cases presented in Fig.2 showed that with very deep defects, that would only fail as a leak, the pressure reduction to avoid further crack growth during the hold period may need to be as large as 15%. Finally, it should be apparent that the test sequence is important: in order to achieve the intended result of the spike test, the spike portion of the test must be done first, followed by the hold period at reduced pressure, not *vice versa*.

## Spike testing in light of present regulations and standards

Regulations for natural gas pipelines are contained in 49 CFR Part 192 [14] (Part 192), and for hazardous liquid pipelines are contained in 49 CFR 195 [15] (Part 195). Parts 192 and 195 are administrated by the Department of Transportation, Pipeline, and Hazardous Materials Safety Administration (PHMSA), and are generally adopted by individual US state pipeline safety regulators, often with additional requirements to meet the needs of the state's public-utility and fire-safety regulators. Both parts contain requirements for hydrostatic-pressure testing of pipelines.

Part 192, Subpart J: 'Test requirements' requires that a test pressure be held for a full 8 hrs (or 4 hrs for prefabricated assemblies that will not be tested in-line). The minimum TPR varies with the location class of construction, while the maximum stress as a percentage of SMYS is limited when testing with gas or air. The minimum test requirements, normalized to the MAOP, are indicated by the solid blue and red lines in Fig.3.

A spike test is not required by Subpart J to establish the MAOP of the pipe. A spike test where the high level equals the minimum required test pressure, followed by a pressure reduction for the hold period, would not meet the requirements of Subpart J although, as explained above, such a test could be justified on technical grounds. In order to perform a spike test, and simultaneously comply with present regulations, the spike portion of the test must be at a higher pressure than the minimum test level required by regulations by at least 5%, and preferably by 10%. These are indicated by the orange and light blue dashed lines in Fig.3.

Part 195, Subpart E: 'Pressure testing' requires that a test pressure equal to at least 125% of the MOP be held for at least four continuous hours, and in the case of a buried pipeline that is not visually inspectable for leaks, an additional 4 hrs at a pressure equal to 110% or more of the MOP. This bi-level test, indicated by the green solid line in Fig.3, is essentially an extended-hold spike test followed by a leak test at 88% of the integrity test level.

With natural gas pipelines, different maximum allowed operating stress levels apply with each location class of construction (defined by density of development adjacent to the pipeline), while different minimum test ratios also apply. Thus differing location classes would require differing spike tests as well, and these requirements are summarized in Table 1. The first two columns list the standard location class and maximum design factor, $F$, as a proportion of SMYS (or percentage divided by 100). The two columns under the heading 'Std. Part 192 test' list the minimum test pressure ratio for each class and the ratio of test stress to SMYS assuming the pipeline operates at the maximum design factor allowed per location class[4].

The two columns under the heading 'Part 192 test x 1.1' represent a spike-test level equal to 110% of the Part 192 standard minimum test requirement, and the ratios of the spike test to MAOP and to SMYS are listed. These are compared for reference to the two columns under the 'Std. Part 192 test'. Alternatively, if the Part 192 test is to be 90% of the spike test, slightly different values apply as listed under the heading 'Part 192 test/0.9'. Under both of these scenarios, the spike test occurs at a higher pressure, 110% or 111.1%, of the standard Part 192 test,

---

4. Currently Part 192 permits Class 1 pipelines having a maximum operating stress of 72% SMYS to enter service with a hydrostatic pressure test of only 1.1 x MAOP, which is not reflected in Table 1. This paper will subsequently recommend changing the 1.1 factor to 1.25. It is noted that ASME B31.8 deleted that option even for testing with air or inert gas with the 2012 Edition.



Fig.3. Aggregated pressure test requirements, Parts 192 and 195, normalized.

while the standard Part 192 test serves as a leak test, not an integrity test.

Alternatively, one could consider that the standard Part 192 test pressure adequately demonstrates pipe integrity, a reasonable position if the historic regulatory test levels actually are adequate. In that case, if the benefit of a spike test is desired, the pressure after the first 10 mins to 1 hr should be reduced to 90% of that level for the leak-detection hold period. The ratios of the leak test to MAOP and to SMYS are presented under the heading 'Part 192 as spike'. While this modification appears to be a reduction in the rigour of the test requirement, it actually represents an improvement over the standard test by avoiding further tearing while achieving the same benefit from the standpoint of the demonstrated integrity.

## Integrity benefit from spike testing

As discussed above, one benefit of the spike test is to avoid tearing that worsens surviving defects; a second benefit, if the spike test is performed above the standard regulatory test level, is that the maximum size of surviving defects will be somewhat smaller. If there is a mechanism for defects to enlarge in service, the time to failure and the reassessment interval will be greater. This is solely an outcome of an increase in the maximum test pressure, not of using a spike-test pattern *per se*.

The size of defects that would survive a normal Part 192 test, a spike test conducted at an elevated pressure above the normal test, and the critical defect sizes at the MAOP are compared in Figs 4a and 4b for a 16-in (406-mm) OD by 0.250-in (6.35-mm) wall thickness grade X-52 pipe

having Charpy V-notch impact energy of 25 ft-lb (34 J), in Classes 1 and 4, respectively. Such a pipe is typical of a broad category of services. (The results produced here consider only one wall dimension and different pressures consistent with the maximum hoop stress limits in each location class. It is recognized that a conventional natural gas pipeline crossing multiple location class areas would maintain a uniform MAOP and utilize different wall-thickness dimensions in each class to conform to maximum hoop-stress limits.) The critical defect sizes were estimated using a suitable relationship between defect size and failure-stress level in a pressurized pipe [16], treating the defects as planar cracks. The results would be conservative for rounded defects such as corrosion. It is noted that there is a negligible difference in the effectiveness, as measured by the critical-defect sizes, between a spike test performed at 110% of the standard Part 192 test, or at the standard Part 192 test divided by 90%.

If the remaining defects can enlarge in service, the slightly smaller size of those defects that survive the spike test will take longer to attain a critical size at the MAOP than would those defects that only undergo the standard Part 192 test. The time-to-failure gained can be estimated by dividing the defect-size difference by a defect-growth rate. The response times recommended in B31.8S, Fig. 7.2.1-1 [17] (numbered as Fig.4 in earlier editions) were based on a defect-growth rate of 12 mils/yr (0.305 mm/yr) in 0.500-in (12.7-mm) wall thickness pipe, or about 2.4%WT/yr [18]. An equivalent rate would be 6 mils/yr (0.152 mm/yr) for the example pipe, which corresponds to average apparent growth rates frequently observed with pitting corrosion, stress-corrosion cracking, and fatigue-crack growth, although obviously significantly slower or faster rates may also occur and are highly dependent on local conditions,

The Journal of Pipeline Engineering

| Loc. class | Design factor F | Std. Part 192 test | | Part 192 test x 1.1 | | Part 192 test/0.9 | | Part 192 as spike | |
|---|---|---|---|---|---|---|---|---|---|
| | | Test MAOP | Test SMYS | Spike MAOP | Spike SMYS | Spike MAOP | Spike SMYS | Leak MAOP | Leak SMYS |
| 1* | 0.8 | 1.25 | 1.00 | 1.375 | 1.100 | 1.389 | 1.111 | 1.125 | 0.9 |
| 1 | 0.72 | 1.25 | 0.90 | 1.375 | 0.990 | 1.389 | 1.000 | 1.125 | 0.81 |
| 2 | 0.6 | 1.25 | 0.75 | 1.375 | 0.825 | 1.389 | 0.833 | 1.125 | 0.675 |
| 3 | 0.5 | 1.5 | 0.75 | 1.65 | 0.825 | 1.667 | 0.833 | 1.350 | 0.675 |
| 4 | 0.4 | 1.5 | 0.6 | 1.65 | 0.660 | 1.667 | 0.667 | 1.350 | 0.54 |

Table 1. Spike-test parameters for gas pipeline classes of construction.



Fig.4. Critical defect sizes for 16-in (406-mm) OD x 0.250-in (6.35-mm) WT X-52 pipe at standard Part 192 test levels, spike-test levels, and operating pressure: (a - top) Class 1; (b - bottom) Class 4.

of SMYS than what was described above for defects likely to rupture. This occurred due to the smaller remaining ligament of metal at the start of the test where the defects were axially short but deep. This suggests that spike testing may not be very effective for mitigating leaks; this is also true for normal hydrostatic testing.

The tests discussed above were part of an extensive testing programme to investigate the causes of 'pressure reversals' – failures that occur during a hydrostatic test or during the process of entering service after a test at a pressure lower than a previously experienced pressure level. The tests determined that pressure reversals occur as a result of subcritical crack growth of defects that were near failure during the previous test cycle but that did not fail before the pressure was reduced (either because another defect failed or the test was concluded without failure). In addition, damage from compressive yielding at the crack tip and exhaustion of ductility are contributing factors. The defect that failed in Fig.2 experienced a pressure reversal of 5.4% when it failed at 70 psig (483 kPa) less pressure than the prior pressure level.

The pressure levels in the test discussed above were held for only a brief time. The amount of tearing in the defect that attained 97% of its expected failure pressure (without failing) suggests that, if it had been held long enough, it would have eventually failed even though the pressure



Fig.5. Improved time-to-failure for enhanced spike test, example pipe.

interaction with pressure cycles, and other factors. The increased time-to-failure in years from performing a spike test to above the standard level is shown in Fig.5.

A few comments about Figure 5 are in order. Each location class is indicated with two lines: the solid line represents a spike level determined from the standard Part 192 test divided by 90%, while the dashed line represents a spike level determined as the standard Part 192 test multiplied by 110%. In most cases the difference between the two spike-test levels is of the order of a few months, which is less than the potential differences due to normal variability of material strength or variability in hydrostatic-test pressure with elevation. The largest difference between the two spike test levels, about 1 yr, occurs over a narrow range of defect lengths in pipe operating at stress levels greater than 72% of SMYS, which comprise a special class of pipelines. (It is unlikely that a 16-in (406-mm) outside diameter pipe would be operated at such stress levels, so the presentation of these results for that category of pipeline is to illustrate trends and sensitivity only.) The conclusion from this is that both spike-test levels – the Part 192 test multiplied by 110%, and the Part 192 test divided by 90% – should be considered effectively equivalent even though they are not identical.

Figure 5 also shows that the benefit of the spike test in terms of increased time to failure, if the test is performed at a higher level than the standard test, decreases with operating stress level. The benefit is three to five additional years for Class 1 pipelines operating at 72% of SMYS. Class 2 and 3 pipelines, which share the same curves in Fig.5 because they have the same minimum test stress level even though their test pressure ratios differ, gain about three years. The benefit for a pipeline operating

in Location Class 4 areas is less than three years. This suggests that spike testing is of decreasing value (at least in terms of extending the time to failure) as operating stress level decreases below 50% SMYS, unless the minimum test pressure ratio exceeds 1.5.

The vertical marks in Fig.5 indicate the length boundary between defects that would fail as a leak (those whose length lies to the left of the vertical marks) versus defects that would fail as a rupture (those whose length lies to the right of the vertical marks), at the MAOP. (There are two marks for Class 2 and 3 pipelines because their operating stresses differ even though they have the same minimum test-stress level.) The leak-rupture boundaries for defects that would fail on test lie about where the Fig.5 curves start sloping downward. It is apparent that the benefit of the spike test tends to diminish as the defect lengths get very short, consistent with the fact that hydrostatic testing fundamentally is not a very effective method to mitigate leaks.

As a final point, it should be understood that the results shown in Figs 4 and 5 are for illustrative purposes. Outcomes will vary for pipelines of other specifications.

## Some practical considerations

Controlling the test pressure may be of particular concern in some hydrostatic-testing situations, including when testing across large elevation changes within the tested section, testing exposed pipe in hot weather, testing close to the pressure capacity of pressure-rated components, or testing pipe that may exhibit sensitivity above a particular pressure level such as a mill test. Conducting a pressure-

spike test at a pressure above the regulatory minimum required test level may pose additional challenges in these situations, as will be discussed below.

## Flanges, valves, and components

Flange standards specify pressure-temperature service ratings, and specify that the flanges be capable of withstanding a system hydrostatic pressure test to 1.5 times the room temperature (RT) pressure rating [19, 20]. This requirement has been in place since the earliest piping flange standards and thus would have applied to flanges in most older vintage piping systems still in service. Test pressures that exceed 1.5 times the RT pressure rating by a small amount (how much is a matter of judgment) are likely to be tolerable. Test pressures well above 1.5 times the RT pressure rating, and perhaps occurring in conjunction with external loading acting across the flanged joint, may result in leaks during the test due to gasket failure and could warp or damage the flange. Note that flanges are sometimes modified for piggability by through-boring to match ID with thin-walled linepipe. This is most often practiced with flanges manufactured from low-strength A105 or A350 plain carbon steel mated to high-strength linepipe, and can lower the pressure rating. (Counterboring only the welding end within specified tapered transition dimensions in order to achieve fit-up does not constitute a harmful modification, however.) The reduced pressure rating may be acceptable where the system MAOP or MOP does not utilize the full original pressure rating, but flanges known to have been modified should be evaluated to verify that they do not pose a special limit on the spike test.

Valve standards require the valve shell or body be tested by the manufacturer to 1.5 times the room-temperature pressure rating and, like flanges, must be capable of withstanding a system pressure test (in the open position) to 1.5 times the pressure rating [21, 22]. Wrought butt-welding fittings (forged tees and elbows) are typically sized and selected to provide the same burst pressure as the pipe they are used in line with [23, 24]. If high-strength flanges were selected to match the linepipe, the fitting should provide comparable resistance to yielding during a test as well as the pipe. Hence a test to 1.25 or 1.5 times the MAOP or MOP of a pipeline will generally fall within the performance envelope specified for pipeline fittings and components, assuming they have been selected to meet or exceed the expected service conditions and have not been significantly modified. Testing of a pipeline section containing a component so as to achieve a spike level of 110% of the minimum test-pressure ratio of 1.25 for Class 1 and Class 2 systems will result in a test factor of 1.375 with respect to the operating pressure, which is generally within the expected performance envelope. However, testing of a pipeline section containing a component so as to achieve a spike level of 110% of the minimum test-pressure ratio of 1.5 for Class 3 and Class 4 systems will

result in a test factor of 1.65 with respect to the operating pressure and may exceed the component's expected performance capability, or perhaps void a manufacturer's warranty. Flanged components may pose a significant limitation to achieving high spike-test targets in terms of pipe hoop stress where flange ratings limit operating pressure and the pipe operates at a low stress due to being of heavy-wall specification.

## Vintage linepipe

Some varieties of vintage pipe, for example lap-welded pipe or early ERW pipe, may experience difficulties sustaining test pressures much above the highest pressure they were historically exposed to, which may have been the pressure test at the pipe mill. Mill-test requirements for any pre-1942 pipe were typically in the range of 45% to 50% of SMYS. Post-1942 lap-welded pipe was mill tested to 60% of SMYS; ERW pipe smaller than NPS 10 would have been tested to 60% to 75% SMYS; ERW pipe NPS 10 through NPS 18 was tested to 85% of SMYS; and only NPS 20 or larger pipe would have been tested to 90% SMYS [25]. Thus a pipeline segment consisting of lap-welded linepipe operating at more than 35% of SMYS, or some vintage ERW pipe operating at more than 62% of SMYS, could potentially experience difficulties achieving a test to 110% of the minimum required test pressure. This concern increases if there are elevation differences as well.

## Elevation differences

The minimum required test pressure applies at all elevations of the tested section of pipeline. Sections of pipe in the test section at lower elevations will experience increased test pressure relative to the high-elevation points. When testing with water, the pressure increases by 0.433 psig/ft (9.80 kPa/m) drop in elevation from the high point. Consider a pipeline designed to work with ANSI 300 class flanges and valves having a pressure rating of 740 psig (5,102 kPa) at 100° F (38° C). In a Location Class 1 or Class 2 area, 110% of the test-pressure ratio of 1.25 results in a test pressure of 1,018 psig (7,019 kPa). The reasonable maximum pressure that Class-300 flanges or valves should be subjected to is 740 x 1.5 = 1,110 psig (7,653 kPa). Thus there should be no pipe within the test section at an elevation more than (1110 psig − 1018 psig)/0.433 psig/ft = 212 ft (64.6 m) higher than a flange or valve, which could present important constraints outside of flat terrain.

For an example concerning older-vintage ERW pipe, consider a natural gas pipeline constructed from pipe that had been tested at the pipe mill to 85% SMYS and operating at a hoop stress of 60% SMYS. In order to not exceed the mill test, the total margin available is 41.7% of the operating pressure or 25% SMYS. The portion available to accommodate elevation changes while achieving an aggregate test pressure ratio of 1.35 (from 1.25 + 0.10) is

85% − (1.35 x 60%) = 4% of SMYS. With a 12.75-in (324-mm) OD x 0.219-in (5.56-mm) wall thickness Grade X-52 pipe, the differential pressure to accommodate elevation change is 71.5 psig (493 kPa), so the elevation difference within the test section should not exceed 165 ft (50.3 m). The acceptable elevation difference is less with a lower-strength grade of pipe.

If the pipeline operates at 72% of SMYS, it will be impossible for test stresses to remain below 90% SMYS even in a conventional non-spike test and with a zero elevation change. Thus, in order to accommodate a spike test above the standard test, it will be necessary to exceed a test stress of 90% of SMYS. Many older-vintage pipelines will sustain such tests well, but there is some potential for test breaks in flaws that would not have been detected by the mill test or any prior field test, if they are present. Setting a target of 95% SMYS and a smaller spike of 5% over the standard test margin (which is not as effective as a 10% spike) would allow for an elevation difference of 58 ft (17.7 m) in the example pipe. Bounding the test parameters must consider and account for the specific gravities of the product and test fluids, the elevations within the test segment, the minimum required test-pressure ratio, and the maximum tolerable test-stress level[5].

These results suggest that spike testing above standard test levels in the highest operating-stress older vintage pipelines in hilly terrain could: (a) require very short test segmentation, (b) encounter larger numbers of test breaks compared to standard testing, or (c) lead the operator to reduce the test pressure in order avoid test breaks (which may affect the operating pressure). The operator may understandably wish to avoid the cost and inconvenience of having any test breaks, but the purpose of the testing is, in fact, to eliminate defects that could soon or someday be harmful, and from that perspective larger test-pressure ratios are desirable. The occurrence of test breaks at decreasing pressure levels in subsequent test attempts would be evidence that the attempt to test to the target level is causing damage. Methods exist for estimating the possible number of test breaks due to pressure reversals that could be expected, particularly once one or more test breaks occur, as well as the probability that a pressure reversal could ever affect the pipeline in operation after completion of testing [26]. The probability of a pressure reversal affecting the pipe after completing testing decreases with increased test-pressure ratio.

## Thermal expansion

The analyses above do not consider the effects of temperature increases that could occur during a test in warm weather. The thermal expansion or contraction of shut-in test water in response to changes in temperature can have significant effects on the pressure in the pipe while it is on test. The change in pressure is a function of the compressibility of the water and the elastic strain levels in the pipe, and these factors vary with the absolute temperature and the pressure [27]. The effect of an increase in temperature will be to increase the pressure and the hoop stress in the pipeline. As an example, the 16-in (406-mm) outside diameter pipeline discussed above when tested at typical pressure levels and at a temperature of 60° F (15.5° C) might experience a pressure increase of 15 psig per degree Fahrenheit (57 kPa per degree C) increase in temperature. A temperature increase of 3° F (1.7° C) would consume half the margin available for elevation change in the situation discussed above where Class-300 flanges or fittings are in place. Thermal effects are larger where the initial temperatures are higher, such as when testing above-ground piping in a hot climate. Note, however, that the above analysis considers the temperature increase to occur during the pressure-spike portion of the test. A short-duration spike should minimize the effect, while the reduced pressure during the leak-test hold period increases the margin for temperature change. Strategies for minimizing the adverse effects of test-fluid thermal expansion include conducting the spike portion of the test in as short a time as possible to minimize thermal gain while at the highest pressure, timing the test to occur during a period of falling temperatures in the test fluid, or installing pressure-relief devices.

## Pneumatic testing

Some pipeline facilities are tested pneumatically using air, nitrogen, or even natural gas. Standards and regulations impose strict maximum-hoop-stress limits on pneumatic testing due to concerns for the release of stored energy from the compressed test medium in the event of a test failure. These same concerns would exist with a spike test conducted pneumatically. A pneumatic spike test performed at a higher level than existing maximum-hoop-stress limits for pneumatic testing would require careful consideration of hazards to the public and may require risk mitigation. If the risk associated with a pneumatic spike test above standard maximum levels is deemed unacceptable, the only way to obtain the benefit of a spike test when using a gaseous test medium is to test to the standard maximum level for a duration between 10 mins and 1 hr, and then reduce the pressure to 90% of that level for the leak-test hold. It should be no more difficult to test for leaks at the reduced pressure than if the maximum test level were sustained.

## When is spike testing appropriate?

It is possible to identify three categories for the suitability for a spike test: (1) advisable, (2) discretionary, and (3)

---

5. Note that where the pressure-test fluid is water, the test-pressure ratio increases going uphill when the specific gravity of the transported product exceeds the reciprocal of the test-pressure ratio at the low-elevation point, and decreases when the specific gravity is less. This rule of thumb applies for a no-flow operating pressure.

inadvisable. These are described as follows:

Spike testing is beneficial and therefore recommended in certain specific circumstances, namely:

- when crack-like defects such as SCC, selective corrosion of ERW seams, bond line defects in older-vintage ERW seams, and seam fatigue cracks are expected to exist based on evidence from inspections, failures; or consideration of pipeline-integrity threats;
- when it is desired to increase the retest interval for time-dependent flaws, particularly in high-stress pipelines; or
- when documentation is unable to confirm the attributes of the pipe or is unable to confirm that a prior hydrostatic test has occurred.

Spike testing is neither necessary nor harmful in the following situations:

- when the purpose of the test is to demonstrate the strength of the pipe where crack-like defects are not expected to be present;
- when the standard test margin is at least 1.4;
- when the operating stress is below 40% of SMYS; or
- when the pipe being tested is new and of known good quality.

Spike testing to higher than the standard test level may be inadvisable in a limited set of specific circumstances, including:

- when the spike-test pressure would significantly exceed the mill-test pressure or damage the pipe, particularly with pipe susceptible to manufacturing defects in seams;
- when the spike-test pressure would exceed the maximum test pressure recommended by manufacturers of components such as flanges or valves;
- when the margin above the spike-test pressure could be insufficient to prevent excessive stress due to fluid thermal expansion effects during the test;
- when large elevation changes must be accommodated during testing; or
- when pneumatic testing is practiced, except with consideration for risk.

Note that some of the benefit of a spike test in the 'inadvisable' circumstances listed above can be gained by treating the standard minimum pressure limit as the spike-test phase, with a hold of short duration accordingly, and then reducing the pressure to 90% of the minimum required test pressure for the rest of the test period. Testing in this manner will not increase the reassessment interval over the standard test, but it ensures that during the test no additional flaw growth has occurred in undetected

flaws that survived the test. However, that testing strategy will not meet the test requirements in the regulations as currently written.

## Recommendations for revising regulations and standards to consider spike testing

At the time that the current regulations were first published, the concept of spike testing, as well as the fact that there is no benefit to an extended hold time at the maximum level, were not recognized. Currently, Part 192, Subpart J, requires that the test minimum pressure level be held for eight hours. Thus it is not possible to perform a spike test without testing above the required test level. Part 195, Subpart E, requires that the minimum test level be held for four hours followed by a leak test at a reduced pressure level of 90% of the strength test level. The Part 195 bi-level test resembles an extended spike test in which the spike portion of the test exceeds the recommended time period at the spike-test level.

ASME B31.8 [28] requires post-construction strength testing for new pipelines that will operate at a hoop stress of 30% of SMYS or greater to 1.25 x MAOP for Classes 1 and 2[6], and 1.5 x MAOP for Classes 3 and 4, for a period of at least two hours. A leak test is also required after construction using a method capable of disclosing a leak, which could include attempting to hold a steady pressure above the MAOP for a defined period but does not preclude using other effective leak-detection methods[7]. ASME B31.4 [29] requires post-construction strength testing of pipelines that will operate at a hoop stress of 20% SMYS or greater. The minimum test pressure is 1.25 x MOP for four continuous hours. If the piping was not visually inspected for leaks during the proof test, a leak test is required for four hours at a pressure equal to 1.1 times the MOP.

The testing requirements in Part 192, Part 195, B31.4, and B31.8 discussed above are in the context of new construction. The sections of Part 192 and Part 195 dealing with integrity-management planning for pipelines located in high-consequence areas (HCAs) allow hydrostatic testing as an integrity-assessment method. Such testing is required to be performed in accordance with the requirements of Subpart J or Subpart E, respectively, meaning integrity testing is to be the same as for new construction. B31.8S only requires that a test attain 1.25 x MAOP for seam-

---

6. The minimum requirement of 1.1 x MAOP in Class 1 was revised to 1.25 x MAOP even for systems to be tested with air or gas, effective with the 2010 Edition. The reason for this revision was a recognition that 1.1 is an inadequate test-pressure ratio to avoid long-term susceptibility to pressure-cycle fatigue effects in seams.

7. However, if the strength-test hoop stress exceeded 20% of SMYS and the test was conducted using air or gas, the leak test must be made at a pressure between 100 psig (689 kPa) and a hoop stress of 20% SMYS.

manufacturing integrity threats, and be in accordance with the requirements of B31.8. A test to at least 100% of SMYS for at least ten minutes, followed by an instrumented leak test in service, is discussed as an integrity assessment in a prescriptive integrity-management plan for SCC.

The test requirements in regulations and standards have not been updated to reflect improved understanding of the effects of testing. Three options are available to address this gap:

(a) do nothing and allow confusion on the part of operators and state regulators to continue;

(b) require a spike test to higher levels than the currently specified minimum test levels; or

(c) treat the presently required minimum test levels as the required spike-test pressure and allow or require a subsequent reduction from that level for the leak test.

Option (a) is not viewed as a preferred course of action. Continuing the *status quo* will result in wide variations in spike-test practices, including misapplication of the concept or the conduct of spike testing of limited effectiveness.

Option (b) would involve spike testing to higher than standard minimum test levels. Table 1 shows that with Class 1 pipelines, the hoop stress during the test would approach and likely exceed 100% of SMYS. Buried pipelines, where the pipe strength meets or exceeds the SMYS, seams do not have a known susceptibility to manufacturing defects, and large external loadings are not present, can safely withstand hoop stresses well above 100% of SMYS without yielding. Thus a spike-test requirement for new construction, though perhaps unnecessary, could generally be accommodated except perhaps in very hilly terrain due to the static head effect and the potential for large external loadings. (Some pipelines in very hilly terrain are built with heavier-wall pipe at lower elevations to reduce the number of test sections. This strategy would be effective for avoiding excessive stress levels and minimizing test sections with a spike test.) Where testing is for integrity-related purposes, such as revalidating integrity following an incident, revalidating the MAOP of 'grandfathered' pipelines, and integrity assessment of pipeline segments that operate at hoop stress levels of 40% SMYS or greater in HCAs, there are clear benefits to testing as high as possible provided such testing does not lead to the inadvisable conditions discussed above.

Option (c) is justifiable if presently required test-pressure levels are believed to be adequate for proving the integrity of the pipe (excepting the 1.1 test-pressure ratio for Class 1 pipelines). Despite appearances, Option (c) is not a lessening of the effectiveness of the currently-required test; on the contrary, it improves the test by avoiding the potential damage of a long hold at the maximum test level. This could be called a bi-level test to distinguish it from a

spike test that exceeds present minimum test requirements. Option (c) could represent the easiest way to gain some of the benefits of a spike test with minimal regulatory changes, but there are two potential issues. Firstly, the appearance that Option (c) results in a less-rigorous test than current requirements, even though incorrect, could pose a public-perception problem; secondly, some operators may use it as a pretext to avoid spike testing to higher levels than are currently required when they should instead be considering testing to higher levels to achieve longer reassessment intervals.

Thus this paper recommends that both regulations (Part 192 and Part 195) and all three industry standards (B31.4, B31.8, and B31.8S) be revised to clearly and unambiguously require spike testing (Option (b)) for new construction and for other integrity-related purposes – for example revalidating integrity following an incident, revalidating the MAOP of 'grandfathered' pipelines, and integrity assessment of pipeline segments that operate at hoop stress levels of 40% SMYS or greater in HCAs. Relief from spike-testing requirements and reverting to a bi-level test (Option (c)) should be allowed for situations where a true spike test would be inadvisable, as in the situations described earlier, and for pipelines operating below 40% SMYS and having test-pressure ratios larger than 1.4. Bi-level testing (Option (c)) should also be specified for pneumatic testing of pipelines.

## Other recommended revisions

In addition to the above changes to accommodate spike testing, Part 192 should be revised to raise the minimum test pressure ratio for Class 1 gas pipelines from 1.1 to 1.25. Certainly a test to 1.1 times the MAOP demonstrates that a pipeline can safely hold the MAOP in the short term. However, analysis has shown that a test-pressure ratio of only 1.1 is inadequate to provide long-term mitigation of the effects of pressure-cycle fatigue acting on manufacturing defects in natural gas pipelines at any operating stress level [30, 31]. ASME B31.8 has abandoned the 1.1 x MAOP test level even for pneumatic testing.

Finally, it is noted that holding pressure is not always efficient or effective for confirming an absence of leaks in a buried pipeline. Many operators have observed leaks within a few weeks or months of having performed a hydrostatic-pressure test. It is possible that the leaks were not new and were in fact present during the test but went unobserved at the time, or suspicions of a leak could not be confirmed. It is also possible for tests over sustained periods at high stress to stimulate leaks from very small through-wall ERW bond-line defects that were plugged with brittle high-temperature scale. Consideration should be given to allowing leak detection by flame ionization or other technology with natural gas pipelines where the entire length of the tested section is in a location where a small leak would not be hazardous and conditions

would not hinder the effectiveness of the leak-detection method. The leak test should be conducted immediately after the pipeline enters service. Obviously this is not an appropriate strategy for pipelines where even small leaks cannot be tolerated due to public hazard or environmental concern.

## Acknowledgements

The author wishes to thank Dr John F. Kiefner and Harvey H. Haines, both with Kiefner/Applus-RTD, and Robert Fassett with Kleinfelder, for contributing their ideas and opinions on these matters. This paper is based on a presentation by the author to the American Gas Association (AGA) May 2013 Operations Conference in Orlando, Florida. The author is grateful to AGA for permission to republish this paper. Minor modifications have been made from the original to improve clarity.

## References

1. J.F.Kiefner, 2001. Chapter 4, Hydrostatic testing. Finding and using pipeline industry research, Gas Research Institute, GRI-00/0192, March.

2. ASME, 2012. Paragraph A-3.4.2(b), Managing system integrity of gas pipelines. Supplement to B31.8, ASME, B31.8S-2012.

3. B.N.Leis and .W.Brust, 1992. Hydrotest strategies for gas transmission pipelines based on ductile-flaw-growth considerations. Pipeline Research Committee, NG-18 Report No. 194, AGA, 31 July.

4. NEB, 1996. Stress corrosion cracking on Canadian oil and gas pipelines. National Energy Board, Report of the Inquiry MH-2-95, November.

5. L.E.Brooks, 1968. High-pressure testing - pipeline defect behavior and pressure reversals. ASME, 68-PET-24.

6. A.R.Duffy, G.M.McClure, W.A.Maxey, and T.J.Atterbury, 1968. Study of feasibility of basing natural gas pipeline operating pressure on hydrostatic test pressure. American Gas Association, Inc., Catalogue No. L30050, February.

7. R.R.Fessler, 1979. Overview of solutions to the stress-corrosion cracking problem. 6th Symposium on Line Pipe Research, AGA Catalogue No. L30175.

8. C.F.Tiffany and J.N.Masters, 1965. Applied fracture mechanics: symposium of fracture toughness testing and its applications. ASTM STP 381.

9. J.E.Collipriest, Jr., and D.E.Kizer, 1969. Experimental verification of proof test logic. Metals Engineering Quarterly, American Society for Metals, November.

10. J.F.Kiefner, W.A.Maxey, and R.J.Eiber, 1980. A study of the causes of failures in defects that have survived a prior hydrostatic test. Pipeline Research Council, NG-18 Report No. 111, AGA, 3 November.

11. J.F.Kiefner, et al., 1980.

12. J.F.Kiefner, et al., 1980.

13. H.Haines, J.F.Kiefner, and M.J.Rosenfeld, 2012. Study questions specified hydrotest hold time's value. Oil & Gas Journal, 5 March.

14. Code of Federal Regulations, Title 49 – Transportation, Chapter 1, Subchapter D – Pipeline Safety, Part 192 – Transportation of natural and other gas by pipeline: minimum Federal safety standards.

15. Code of Federal Regulations, Title 49 – Transportation, Chapter 1, Subchapter D - Pipeline Safety, Part 195 – Transportation of hazardous liquids by pipeline.

16. J.F.Kiefner, 2008. Defect assessment – 1: Modified equation aids integrity management, and Defect assessment – Conclusion: modified Ln-Sec equation improves failure prediction. Oil & Gas Journal, 6 October and 13 October.

17. ASME B31.8S-2012.

18. J.F.Kiefner, 2002. Criteria for reinspection intervals for low-stress steel pipelines. Gas Technology Institute, Topical Report GRI-02/0060.

19. ASME, 2009. Pipe flanges and flanged fittings. B16.5-2009.

20. Manufacturers Standardization Society, 1996. Steel pipeline flanges. MSS Standard Practice SP-44.

21. ASME, 2004. Valves – flanged, threaded and welding end. B16.34-2004.

22. API, 2009. Pipeline valves. Specification 6D, 23rd Edn.

23. ASME, 2007. Factory-made wrought buttwelding fittings. B16.9-2007.

24. Manufacturers Standardization Society, 1993. Specification for high test wrought butt welding fittings. Standard Practice SP-75.s

25. J.F.Kiefner, 2007. Evaluating the stability of manufacturing and construction defects in natural gas pipelines. US Department of Transportation, Office of Pipeline Safety, Contract DTFAAC05P02120, 26 April 26.

26. J.F.Kiefner, K.M.Kolovich, and S.Karyawasam, 2010. A study of cases of hydrostatic tests where multiple test failures have occurred. 8th International Pipeline Conference, Calgary, Paper IPC2010-31157.

27. J.C.Gray, 1976. How temperature affects pipeline hydrostatic testing. Pipeline and Gas Journal, December.

28. ASME, 2012. Code for pressure piping, Section 8, Gas transmission and distribution piping systems. B31.8-2012.

29. ASME, 2012. Code for pressure piping, Section 4, Pipeline transportation systems for liquids and slurries. B31.4-2012.

30. J.F.Kiefner, 2007.

31. J.F.Kiefner and M.J.Rosenfeld, 2004. Effects of pressure cycles on natural gas pipelines. Gas Research Institute, Report GRI 04/0178, 17 September.

# EXHIBIT O

like to know that they reached the facility, please enclose a stamped, self-addressed postcard or envelope.

We will consider all comments and materials received during the comment period. FMCSA may issue a final determination any time after the close of the comment period.

## V. Viewing Comments and Documents

To view comments, as well as any documents mentioned in this preamble, go to *http://www.regulations.gov* and in the search box insert the docket number FMCSA–2016–0315 and click "Search." Next, click "Open Docket Folder" and you will find all documents and comments related to this notice.

Issued on: March 9, 2017.

**Larry W. Minor,**

*Associate Administrator for Policy.*

[FR Doc. 2017–05256 Filed 3–15–17; 8:45 am]

**BILLING CODE 4910–EX–P**

## DEPARTMENT OF TRANSPORTATION

### Pipeline and Hazardous Materials Safety Administration

[Docket No. PHMSA–2016–0131]

### Pipeline Safety: Deactivation of Threats

**AGENCY:** Pipeline and Hazardous Materials Safety Administration (PHMSA), DOT.

**ACTION:** Notice; issuance of advisory bulletin.

**SUMMARY:** PHMSA is issuing this Advisory Bulletin to inform owners and operators of gas transmission pipelines that PHMSA has developed guidance on threat identification and the minimum criteria for deactivation of threats, as established by a previously issued rule. This Advisory Bulletin also provides guidance to gas transmission pipeline operators regarding documenting their rationale of analyses, justifications, determinations, and decisions related to threat deactivation.

**FOR FURTHER INFORMATION CONTACT:** Allan Beshore by phone at (816) 329–3811 or email at *allan.beshore@dot.gov.* All materials in this docket may be accessed electronically at *http://www.regulations.gov.* Information about PHMSA may be found at *http://www.phmsa.dot.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Background

A critical element in an integrity management (IM) program is the identification of threats to pipeline integrity. As required by section

192.911(c), an IM program must contain "[a]n identification of threats to each covered pipeline segment, which must include data integration and a risk assessment. An operator must use the threat identification and risk assessment to prioritize covered segments for assessment (section 192.917) and to evaluate the merits of additional preventive measures and mitigative measures (section 192.935) for each covered segment." Further requirements detailed in section 192.921(a) state, "[a]n operator must select the [assessment] method or methods best suited to address the threats identified to the covered segment." The threats to a particular pipeline segment dictate the type of assessments the operator must perform to fulfill the requirements of section 192.921(a).

According to the Standard established by the American Society of Mechanical Engineers (ASME), ASME B31.8S–2004, Section 2.2, an operator must consider nine individual threat categories as part of an IM program. As stated by ASME B31.8S–2004, Section 5.10, an IM program should provide criteria for eliminating a threat from consideration during a risk assessment; however, 49 CFR part 192—Subpart O does not include provisions for the permanent elimination of threats. An operator, therefore, must continually consider all threats in the evaluation of their IM program through periodic reviews and assessments, as required by section 192.937.

PHMSA acknowledges that threats may be categorized as active, requiring an integrity assessment, or inactive, meaning that during a specific assessment cycle the threat does not trigger an integrity assessment, per section 192.921(a). Operators, however, must understand that threats to a pipeline are not static, but vary over time. Changes in threats can occur suddenly, as in the case of catastrophic outside forces like hurricanes, earthquakes, or down-slope land movements, or they can be gradual changes, such as the introduction of new wet-production gas sources into a previously dry gas environment. Issues may also develop into active threats over time, such as coating degradation that allows stress corrosion cracking or external corrosion to develop. In other cases, threats may become inactive over time due to pipeline replacement programs, the implementation of effective preventative actions, or other improvements to systems.

The periodic review required by section 192.937 for a mature IM plan must include the re-analysis of the nine threat categories to determine status

changes for active or inactive threats. An operator must continually monitor operations and maintenance (O&M) and other activities, integrating relevant information during a threat analysis that might indicate a change in the status of a threat. Some operators inappropriately label threats as inactive after they are eliminated from consideration during prior reviews and assessments, ignoring the continuous supply of new information provided during routine O&M activities.

Some operators have opted to eliminate threats from consideration based on a lack of data, including missing, incomplete, or unsubstantiated data. Using insufficient data to eliminate a threat is not technically justified and is contrary to the guidance in ASME B31.8S–2004, Appendices A1–A9. Each of these appendices includes language that states, "[w]here the operator is missing data, conservative assumptions shall be used when performing the risk assessment or, alternatively, the segment shall be prioritized higher." Additionally, section 192.947(d) requires that operators maintain, "[d]ocuments to support any decision, analysis and process developed and used to implement and evaluate each element of the baseline assessment plan and integrity management program." Section 192.947(d) further states, "[d]ocuments include those developed and used in support of any identification, calculation, amendment, modification, justification, deviation and determination made, and any action taken to implement and evaluate any of the program elements."

PHMSA provides the following guidance for determining the active or inactive status of the nine threat categories, with the understanding that the status of a threat will change over time:

*Time-Dependent Threats*

1. External Corrosion

For steel pipelines, the threat of external corrosion may never be eliminated.

2. Internal Corrosion

An operator should consider the past operational history of the pipeline, including, but not limited to: Upset conditions, gas monitoring (including partial-pressure analysis), bacterial culture tests, flow direction and rates, gas sources, solid and liquid analyses, critical angles and liquid holdup points, pigging and other cleaning history, the presence of internal coatings, chemical

treatments, and internal pipeline inspection reports.

After consideration of operational history and supporting documentation, the threat of internal corrosion may be deemed inactive if:

i. It can be demonstrated that a corrosive gas is not being transported, per section 192.475(a);

ii. In-line inspection data confirms that a corrosive environment does not exist within the pipeline; or

iii. Application of internal corrosion direct assessment (ICDA) demonstrates that there is no internal corrosion occurring at the most likely locations, and is accompanied by sufficient documentation to demonstrate the assumptions used with the ICDA model (normally dry gas with occasional upsets) are valid for the pipeline's entire operating history.

The threat of internal corrosion should be considered active if:

i. Production, storage, or non-pipeline-quality gas was transported at any time during the history of the pipeline;

ii. The pipeline has been converted from another type of service that is susceptible to internal corrosion;

iii. Unmonitored or inoperative drips, siphons, dead legs, or other liquid holdup points are present anywhere in the pipeline;

iv. There is evidence that liquids from drips, siphons, dead legs, or other liquid holdup points are present anywhere in the pipeline;

v. Pipe inspection reports, as required by section 192.475(b), indicate evidence of internal corrosion; or

vi. The operator does not have a complete pipeline operating history.

### 3. Stress Corrosion Cracking

The threat of stress corrosion cracking (SCC) should always be considered active. The operator must continually inspect the pipeline for the presence of SCC during pipeline examination, as required by section 192.459.

*Static or Stable Threats*

### 4. Manufacturing

There is substantial guidance provided in the original Gas Transmission IM protocols (*e.g.* Protocol C.01 Threat Identification), part 192—subpart O, ASME B31.8S–2004, and the PHMSA Gas Transmission IM FAQs (*e.g.*, 219, 220, 221, and 231) regarding the deactivation of manufacturing threats for a segment for any given assessment cycle. Some of this guidance includes FAQ 219 (manufacturing and construction (M&C) defects when subpart J tested), FAQ 220 (M&C defects

when never subpart J tested), and FAQ 231 (5-year operating history).

Additionally, section 192.917(e)(3) provides guidance for determining when a manufacturing threat is active. Section 192.917(e)(3) states, "[i]f any of the following changes occur in the covered segment, an operator must prioritize the covered segment as a high-risk segment for the baseline assessment or a subsequent reassessment.

i. Operating pressure increases above the maximum operating pressure experienced during the preceding five years;

ii. MAOP increases; or

iii. The stresses leading to cyclic fatigue increase."

### 5. Construction

There is substantial guidance provided in the original Gas Transmission IM protocols, part 192—subpart O, ASME B31.8S–2004, and the PHMSA Gas Transmission IM FAQs regarding deactivation of construction threats for a segment for any given assessment cycle. Some of this guidance includes FAQ 219 (M&C defects when subpart J tested), FAQ 220 (M&C defects when never subpart J tested), and FAQ 231 (5-year operating history).

Section 192.917(e)(3) provides guidance for determining when a construction threat is active, stating, "[i]f any of the following changes occur in the covered segment, an operator must prioritize the covered segment as a high-risk segment for the baseline assessment or a subsequent reassessment:

i. Operating pressure increases above the maximum operating pressure experienced during the preceding five years;

ii. MAOP increases; or

iii. The stresses leading to cyclic fatigue increase."

### 6. Equipment

An equipment threat is defined in ASME B31.8S–2004, Appendix A6.1, as pressure control equipment, relief equipment, gaskets, O-rings, seal/pump packing, or any equipment other than pipe and pipe components. The equipment threat may be inactive depending on an operator's history and review of the records, as required by sections 192.613, 192.617, 192.603, 192.605, 192.739, and 192.743. Operating history, failures, and abnormal operations records should be evaluated by integrity personnel to assist in determining trends and issues that may not be recognized by local or other operations personnel.

As identified in ASME B31.8S–2004, Appendix A6.4, assessments for

equipment threats are normally conducted during maintenance activities, per the requirements of the O&M procedures. Monitoring the data from operating history and failures is essential for identifying trends related to this threat. Communication between O&M and integrity personnel is a key component to integrating this threat, as well as the potential increased risk that it poses to pipeline segments, into risk assessments.

Preventative measures and mitigative measures are an important factor in maintaining the inactive status of equipment threats. For example, recognizing a system-wide problem with set point drift in a particular regulator may necessitate a shorter maintenance cycle or the replacement of the in-service regulators impacted by this problem.

*Time Independent Threats*

### 7. Third-Party Damage

The third-party threat should never be considered inactive.

### 8. Incorrect Operations

Incorrect operations are defined in ASME B31.8S–2004, Appendix A8.1, as incorrect operating procedures or failure to follow a procedure. This threat should always be considered active.

### 9. Weather-Related and Outside Forces

Weather-related and outside forces are defined in ASME B31.8S–2004, Appendix A9.1, as earth movement, heavy rains or floods, cold weather and lightning, or events that may cause pipe to be susceptible to extreme loading. This threat should always be considered active.

*Cyclic Fatigue*

In addition to the nine threats referenced in ASME B31.8S–2004, § 192.917(e)(2) states, "[a]n operator must evaluate whether cyclic fatigue or other loading condition (including ground movement, suspension bridge condition) could lead to a failure or a deformation, including a dent or gouge, or other defect in the covered segment. An evaluation must assume the presence of threats in the covered segment that could be exacerbated by cyclic fatigue. An operator must use the results from the evaluation together with the criteria used to evaluate the significance of this threat to the covered segment to prioritize the integrity baseline assessment or reassessment."

Cyclic fatigue is a concern because it is a threat that interacts with all other threats. Interactive threats are two or more threats acting on a pipeline or pipeline segment that increase the

probability of failure to a level significantly greater than the effects of the individual threats acting alone. In order to manage cyclic fatigue, therefore, operators must have system-specific data applicable to their unique operating environment to justify the inactive status of the cyclic fatigue threat. A system-wide or generic study of cyclic fatigue may be used by an operator as long as the operator documents why the study is applicable to the segment-specific conditions.

## II. Advisory Bulletin (ADB–2017–01)

*To:* Owners and Operators of Natural Gas Transmission Pipelines
*Subject:* Deactivation of Threats

*Advisory:* The threats identified in ASME B31.8S–2004 may be considered active or inactive, but are never permanently eliminated. ASME B31.8S–2004, Appendix A, identifies the information an operator must collect and analyze for threats, which must demonstrate an individual threat is not acting on the pipe before an operator can properly declare the threat inactive for each assessment period. A threat must be considered active if any data required by Appendix A is missing, as lack of data indicating the existence of a threat is not acceptable justification for considering the threat inactive. Documents to support the determination of an inactive threat status must be maintained, as per the requirements of § 192.947(d). An operator does not need to assess a threat for the current assessment cycle if that threat is properly deemed inactive. When conditions warrant a review or new information becomes available during the required § 192.937 evaluation operators are required to examine each applicable threat to determine its active or inactive status.

Issued in Washington, DC, on March 9, 2017, under authority delegated in 49 CFR 1.97.

**Alan K. Mayberry,**
*Associate Administrator for Pipeline Safety.*
[FR Doc. 2017–05262 Filed 3–15–17; 8:45 am]
**BILLING CODE 4910–60–P**

---

## DEPARTMENT OF THE TREASURY

### Comptroller of the Currency

### Agency Information Collection Activities: Information Collection Renewal; Submission for OMB Review; Financial Management Policies— Interest Rate Risk

**AGENCY:** Office of the Comptroller of the Currency (OCC), Treasury.

**ACTION:** Notice and request for comment.

**SUMMARY:** The OCC, as part of its continuing effort to reduce paperwork and respondent burden, invites the general public and other Federal agencies to take this opportunity to comment on a continuing information collection as required by the Paperwork Reduction Act of 1995 (PRA).

In accordance with the requirements of the PRA, the OCC may not conduct or sponsor, and the respondent is not required to respond to, an information collection unless it displays a currently valid Office of Management and Budget (OMB) control number.

The OCC is soliciting comment concerning renewal of its information collection titled, "Financial Management Policies—Interest Rate Risk." The OCC also is giving notice that it has sent the collection to OMB for review.

**DATES:** Comments must be submitted on or before April 17, 2017.

**ADDRESSES:** Because paper mail in the Washington, DC area and at the OCC is subject to delay, commenters are encouraged to submit comments by email, if possible. Comments may be sent to: Legislative and Regulatory Activities Division, Office of the Comptroller of the Currency, Attention: 1557–0299, 400 7th Street SW., Suite 3E–218, Mail Stop 9W–11, Washington, DC 20219. In addition, comments may be sent by fax to (571) 465–4326 or by electronic mail to *prainfo@occ.treas.gov*. You may personally inspect and photocopy comments at the OCC, 400 7th Street SW., Washington, DC 20219. For security reasons, the OCC requires that visitors make an appointment to inspect comments. You may do so by calling (202) 649–6700 or, for persons who are deaf or hard of hearing, TTY, (202) 649–5597. Upon arrival, visitors will be required to present valid government-issued photo identification and submit to security screening in order to inspect and photocopy comments.

All comments received, including attachments and other supporting materials, are part of the public record and subject to public disclosure. Do not include any information in your comment or supporting materials that you consider confidential or inappropriate for public disclosure.

Additionally, please send a copy of your comments by mail to: OCC Desk Officer, 1557–0299, U.S. Office of Management and Budget, 725 17th Street NW., #10235, Washington, DC 20503 or by email to *oira submission@ omb.eop.gov*.

**FOR FURTHER INFORMATION CONTACT:** Shaquita Merritt, OCC Clearance Officer, (202) 649–5490 or, for persons who are deaf or hard of hearing, TTY, (202) 649–5597, Legislative and Regulatory Activities Division, Office of the Comptroller of the Currency, 400 7th Street SW., Washington, DC 20219.

**SUPPLEMENTARY INFORMATION:** Under the PRA (44 U.S.C. 3501–3520), Federal agencies must obtain approval from OMB for each collection of information that they conduct or sponsor. The term "collection of information" is defined in 44 U.S.C. 3502(3) and 5 CFR 1320.3(c) and includes agency requests or requirements that members of the public submit reports, keep records, or provide information to a third party. The OCC requests that OMB extend approval of the following information collection.

*Title:* Financial Management Policies—Interest Rate Risk.

*OMB Control No.:* 1557–0299.

*Type of Review:* Regular.

*Affected Public:* Businesses or other for-profit.

*Frequency of Response:* On occasion.

*Burden Estimate:*

*Estimated Number of Respondents:* 372.

*Estimated Annual Burden:* 14,880.

*Description:* This information collection covers the recordkeeping burden for maintaining data in accordance with OCC's regulation on interest rate risk procedures for Federal savings associations, 12 CFR 163.176. The purpose of the regulation is to ensure that Federal savings associations are managing their exposure to interest rate risk appropriately. To comply with this reporting requirement, institutions need to maintain sufficient records to document how their interest rate risk exposure is monitored and managed internally.

*Comments:* The OCC issued a notice for 60 days of comment on December 27, 2016, 81 FR 95302. The OCC received one comment from an individual. The commenter stated that the OCC should rescind 12 CFR 163.176 or, if the OCC determines that it is important and should not be removed, it should be amended to also apply to national banks. The commenter stated that, while interest rate risk exposure at one time was different for savings associations and commercial banks, today there is no difference and the two charter types should be subject to similar regulation. The commenter also stated that the regulation is outdated and unnecessary and should be rescinded, citing several OCC bulletins that the commenter claims state expectations for interest rate risk

# EXHIBIT P

ROSENFELD

# REPORT

FINAL REPORT

# Project PR 3-805
# A Modified Criterion for Evaluating the Remaining Strength of Corroded Pipe

To

Pipeline Corrosion

Supervisory Committee

of the

Pipeline Research Committee

of the

American Gas Association


**Battelle**
. . . *Putting Technology To Work*

DECEMBER 22, 1989

*AGA CAT. NO. L51609*

FINAL REPORT


on


PROJECT PR 3-805

A MODIFIED CRITERION FOR EVALUATING
THE REMAINING STRENGTH OF CORRODED PIPE


to


PIPELINE CORROSION SUPERVISORY COMMITTEE
OF THE
PIPELINE RESEARCH COMMITTEE
OF THE
AMERICAN GAS ASSOCIATION


DECEMBER 22, 1989


by


J. F. Kiefner and P. H. Vieth


BATTELLE
505 King Avenue
Columbus, Ohio   43201

This report was furnished to the Pipeline Research Committee (PRC) of the American Gas Association (A.G.A.) by Battelle Columbus Division at the request of A.G.A. in fulfillment of PRC project PR-3-805. The contents of this report are furnished as received from the contractor. The opinions, findings, and conclusions expressed are those of the author and not necessarily those of the American Gas Association. Mention of company or product name is not to be considered an endorsement by A.G.A. or Battelle.

Copyright, 1989
American Gas Association

The Pipeline Research Committee (PRC) is an autonomous body within the American Gas Association (A.G.A.) organized in response to the need to sponsor and direct basic, developmental, and applied research aimed at optimizing all technical aspects of the natural gas transmission industry and its related activities. Its major activity is the direction of a cooperative research program funded by means of a subscription raised from its individual member companies and carried out under the direct supervision of its member company engineering and technical representatives. Program administration is the responsibility of assigned staff members at A.G.A.

AMERICAN GAS ASSOCIATION

PIPELINE RESEARCH COMMITTEE

J. A. Alholm, Panhandle Eastern Pipe Line Company
T. D. Boss, MidCon Corp.
E. D. Burger, ARCO Oil and Gas Company
A. H. Carameros, El Paso Natural Gas Company
D. L. Coates, Enron Corp
J. H. Deakin, Columbia Gas Transmission Corp.
P. W. Fisher, Texas Eastern Gas Pipeline Company
W. R. Harper, Texas Gas Transmission Corporation
J. J. Hibbs, Tenneco Gas
J. P. Lucido, ANR Pipeline Company
R. L. Moore, CNG Transmission Corp.
D. H. Nimmo, Pipelines Authority of South Australia
J. O'Beirne, TransCanada PipeLines, Ltd.
R. J. Odlevak, Consumers Power Company
C. W. Peterson, Exxon Production Research Company
H. J. Rasmusen, Dansk Olie- & Gasproduktion A/S
G. G. Rochfort, The Pipeline Authority
F. W. Schemm, Oklahoma Natural Gas Company
E. H. Shelton, NOVA Corporation of Alberta
G. E. Strang, Southern California Gas Company
E. E. Thomas, Southern Natural Gas Company
O. J. Tveit, Statoil
G. L. Walker, Pacific Gas Transmission Company
E. G. Ward, Shell Development Company
P. M. J. Wolfs, N. V. Nederlandse Gasunie
T. F. Murphy, American Gas Association
J. M. Holden, American Gas Association

CORROSION SUPERVISORY COMMITTEE

G. E. Strang, Southern California Gas Company
G. M. Shaw, Texas Gas Transmission Corp.
***J. L. Banach, TransCanada PipeLines, Ltd.
L. Bone, ARCO Oil and Gas Company
***J. C. Bowles, Jr., Tenneco Gas
A. O. Bryant, Natural Gas Pipeline Co. of America
***K. E. W. Coulson, NOVA Corporation of Alberta
E. D. Dooley, Oklahoma Natural Gas Company
***A. D. Eastman, El Paso Natural Gas Company
S. Eliassen, Statoil
D. R. Gratton, Pipelines Authority of South Australia
I. H. Haddow, The Pipeline Authority
A. W. Hamlin, Consumers Power Company
***D. L. Johnson, Enron Corp
C. Juhl, Dansk Olie og Naturgas A/S
**K. J. Kennelley, Exxon Production Research Company
***D. Koster, N. V. Nederlandse Gasunie

W. R. Lambert, Columbia Gas Transmission Corporation
***D. E. Miller, Columbia Gas Transmission Corporation
 **S. E. Newton, Southern California Gas Company
 **T. E. Ott, ANR Pipeline Company
   E. G. Pierson, Exxon Pipe Line Company
***M. D. Platzke, ANR Pipeline Company
   T. P. Rittenhour, Panhandle Eastern Pipe Line Company
   H. U. Schutt, Shell Development Company
   N. R. Thresher, The East Ohio Gas Company
  *S. P. White, Colorado Interstate Gas Company
   J. M. Holden, American Gas Association


 *Ad Hoc Group Member Only
 **Alternate
***PR-3-805 Ad Hoc Group Member

## EXECUTIVE SUMMARY

Described herein is an improved method for evaluating the remaining strength of corroded pipe. The pipeline industry currently uses the "B31G" criterion to evaluate corroded pipe for removal or repair or for leaving it in service if the metal loss is within safe size limits as defined in the B31G criterion. A new and improved criterion was desired because of the known excess conservatism in the original B31G method. Even though the use of the B31G criterion has undoubtedly helped pipeline operators to avoid many unnecessary cut outs, the excess conservatism continues to cause some unnecessary cut outs that could be avoided without compromising safety. Thus, this project was undertaken to devise a modified criterion that, while still assuring adequate pipeline integrity, would eliminate as much as possible the excess conservatism embodied in the existing criterion.

The proposed modified criterion presented herein is less conservative than the existing B31G criterion. It will permit metal-loss anomalies of greater size to remain in service at the current maximum operating pressure. And, for anomalies which exceed the newly recommended allowable size, the modified criterion will require less pressure reduction to maintain an adequate margin of safety for all cases in which the reduced pressure level exceeds 55 percent of SMYS.

The new criterion was made less conservative by means of a change in the manner in which the flow stress of the material is considered and by means of a change in the format of the stress-intensifying effect of the metal loss.

The original body of data on burst tests of corroded pipe that was used to validate the original B31G criterion was expanded considerably by data obtained from companies who have performed their own burst tests. The expanded data base shows that the proposed modified criterion embodies an adequate margin of safety.

The proposed modified criterion can be used with detailed measurements of the metal loss and successive trial calculations to predict a minimum failure pressure for an area of metal loss based upon its "effective" area. Used in this mode, it tends to further reduce the

i

excess conservatism embodied in the existing criterion. This more complex analysis approach can be carried out by means of a PC-based program called RSTRENG.

The new criterion can also be applied via tables or curves or a long-hand equation with knowledge of only the maximum depth and overall length of the metal loss for cases in which a simplified analysis is preferred. In such cases, the area of metal missing is approximated as 0.85 times the overall axial length of corrosion times the maximum depth of the corrosion. The new area representation replaces the old "parabolic" area representation (2/3 times the axial length times the depth of the corrosion). The new area representation by itself is actually a more conservative representation than the old area representation, but as used with the improved definition of flow stress and the more accurate stress intensity representation, the new area representation method offers the following advantages. It is less conservative than the existing B31G method when used to assess the allowable length of a corroded area and when used to calculate a reduced operating stress level for all stress levels exceeding 55 percent of SMYS. It is more conservative than the existing B31G criterion when used to calculate a reduced operating stress level for stress levels below 55 percent of SMYS. In addition, the proposed new area representation permits more accurate (less conservative) assessments of long defects. A restrictive limit is placed on the length of defect that can be considered under the existing B31G criterion. Beyond this limit, the user is required to revert to a reduction in operating stress in proportion to the depth of the anomaly. With the proposed new area representation, the user is permitted to analyze much longer defects. The result is that many flaws which would require removal, repair, or pressure reduction under the existing criterion can be tolerated under the proposed new criterion with either no pressure reduction or less pressure reduction.

The limit on corrosion depth to not more than 80 percent of the wall thickness for purposes of using the old criterion is retained in the new criterion. However, unlike the old criterion, corroded areas of not more than 20 percent through the wall thickness may be left in

service regardless of length (for pipelines operating at stress levels not exceeding 72 percent of SMYS as long as the remaining thickness is not less than 80 percent of that required by the design stress level).

While the factor of safety of 1.39 embodied in the old criterion is retained for cases of pipelines operating at 72 percent of SMYS, provisions are made for use of the criterion with other factors of safety and for pipelines with design factors other than 0.72. Finally, a rationale is provided for applying the modified criterion to corrosion in submerged-arc seam welds. Such corrosion may be treated in the same manner as if it were in the body of the pipe.

iii

## TABLE OF CONTENTS

Page

EXECUTIVE SUMMARY........................................................  i

INTRODUCTION.............................................................  1

BACKGROUND..............................................................  2

    Basis of the B31G Criterion.......................................  2

        Basic Equation................................................  2

        Assumptions Embodied in the B31G Criterion...................  4

        Factor of Safety..............................................  5

    Formats and Limitations of the B31G Criterion.....................  5

        Evaluating a Corroded Region..................................  5

        Calculating a Reduced Operating Pressure Level...............  7

        Limitations of the B31G Criterion.............................  8

DEVELOPMENT OF A MODIFIED CRITERION.....................................  9

    Sources of Excess Conservatism....................................  9

        Modified Flow Stress..........................................  9

        Modified Folias Factor........................................ 10

        Modified Representation of Metal-Loss Area.................... 11

    Format of the Modified Criterion.................................. 15

        Equation for Allowable Length of Corrosion................... 15

        Equation for Reduced Operating Pressure Level............... 18

        Options for Pipelines Designed to Operate at Stress Levels
        Other Than 72 Percent of SMYS............................... 19

        PC Format.................................................... 22

        Revised Curves and Tables.................................... 23

        Analysis of Corroded Areas Having Depths Not More Than 20
        Percent Through the Wall..................................... 24

    Comparison of the Old and the New Criteria........................ 24

# Table of Contents (Cont'd)

Page

Evaluating Allowable Lengths.............................. 25

Evaluating Safe Operating Pressures....................... 26

Analysis of the Examples Using RSTRENG.................... 28

VALIDATION OF THE METHODOLOGY...................................... 31

Predictions of Failure Pressure Via RSTRENG Compared to Burst Test Results........................................... 32

Predictions of Failure Pressure Via Approximate Methods Compared to Exact-Area Methods......................................... 34

Further Justification for Using the Effective-Area Method and 0.85 dL........................................... 35

Defect Parameters and Failure Stress Prediction Methods.... 35

Comparison of the Eight Methods........................... 37

Statistical Analysis of the Predictive Methods.................. 39

Summary of the Validation Effort.............................. 41

CORROSION IN VARIOUS TYPES OF LONGITUDINAL SEAMS.................... 41

RESULTS, CONCLUSIONS, AND RECOMMENDATIONS....................... 43

Recommendations........................................... 46

REFERENCES...................................................... 48

## APPENDIX A

MORE EXACT CALCULATIONS OF REMAINING STRENGTH FROM DETAILED MEASUREMENTS OF CORRODED AREAS..........................................A-1

## APPENDIX B

RSTRENG MANUAL........................................................B-1

## APPENDIX C

TABLES AND CURVES FOR ACCEPTABLE LENGTHS OF CORROSION................C-1

## Table of Contents (Cont'd)

Page

### APPENDIX D

BURST TEST DATA FOR CORRODED PIPE...................................D-1

### LIST OF TABLES

Table 1.  Example of Table to be Used in a Modified Version of B31G.. 49

Table 2.  Predicted Failure Pressure Level for Cases 1 Through 9
Using RSTRENG................................................ 50

Table 3.  Comparisons of the Behaviors of Through-Wall Flaws in
Longitudinal Welds with Identical Defects in the Pipe
Material...................................................... 52

### LIST OF FIGURES

Figure  1.  Parameters of Metal Loss Using in Analysis of Remaining
Strength...................................................... 53

Figure  2.  Parabolic Representation of Metal Loss as Used in the
B31G Criterion................................................ 54

Figure  3.  The B31G Criterion for Acceptable Length of a Corroded
Region........................................................ 55

Figure  4.  Graphical Representation of Folias Factors Used in the
Modified Criterion............................................ 56

Figure  5.  Contour Map of Pit Depths................................. 57

Figure  6.  Profile of Pit Depths Along "River-Bottom" Path in
Figure 4...................................................... 58

Figure  7.  Comparison of Allowable Lengths Under the Old and the New
Criteria...................................................... 59

Figure  8.  Comparison of Predicted Safe Operating Pressures Under
the Old and New Criteria...................................... 60

Figure  9.  Example Case 1............................................ 61

Figure 10.  Example Case 4............................................ 62

Figure 11.  Example Case 7............................................ 63

Figure 12.  Comparison of RSTRENG Minimum Failure Pressures to Burst
Test Results for Cases of Ruptures............................ 64

## List of Figures (Cont'd)

<div align="right"><u>Page</u></div>

Figure 13.  Comparison of RSTRENG Minimum Failure Pressures to Burst Test Results for Cases of Leaks........................... 65

Figure 14.  Comparison of Predictions by Various Methods to Burst Test Results for Cases of Ruptures....................... 66

Figure 15.  Comparison of Predictions by Various Methods to Burst Test Results for Cases of Leaks......................... 67

Figure 16.  Bases for Calculations of Failure Pressure for a Flaw Having Nonuniform Depth.................................. 68

Figure 17.  Comparisons of Calculations of Failure Pressure by Various Methods for a Flaw of Nonuniform Depth........... 69

## A MODIFIED CRITERION FOR EVALUATING
## THE REMAINING STRENGTH OF CORRODED PIPE

**by**

**J. F. Kiefner and P. H. Vieth**


### INTRODUCTION

In the late 1960s and early 1970s, a criterion was developed through research sponsored by Texas Eastern Transmission Corporation and the Pipeline Research Committee of A.G.A. to evaluate the serviceability of corroded pipe. This criterion has been embodied in both the B31.4 and B31.8 pipeline design codes and is described in detail in a separate document: "ANSI/ASME B31G - 1984 Manual for Determining the Remaining Strength of Corroded Pipelines". The criterion, commonly referred to as the "B31G criterion", can be used by a pipeline operator to assess corroded pipe for rehabilitation purposes. The remaining pressure-carrying capacity of a pipe segment is calculated on the basis of the amount and distribution of metal lost to corrosion and the yield strength of the material. If the calculated remaining pressure-carrying capacity exceeds the maximum allowable operating pressure of the pipeline by a sufficient margin of safety, the corroded segment can remain in service. If not, it must be repaired or replaced. Applying this criterion, pipeline operators have saved millions of dollars by not removing corroded pipe which is still fit for service in spite of having sustained some loss of metal.

From its inception, the B31G criterion was intended to embody a large factor of safety to protect pipelines from failure. Experience has shown that the amount of conservatism embodied in the criterion is excessive, resulting in the removal or repair of more pipe than is necessary to maintain adequate integrity. Therefore, it is desirable to have a modified criterion which will still preserve adequate pipeline

2

integrity but will result in less removal of pipe. A modified criterion which meets this requirement is described in this report.

## BACKGROUND

The B31G criterion is based upon a semiempirical fracture mechanics relationship referred to as the "NG-18 surface flaw equation" because of its origin in work sponsored by the NG-18 Line Pipe Research Committee of the American Gas Association. The original equation was conceived by Maxey[1]* and is described in detail in Reference 2. It was based upon a "Dugdale" plastic-zone-size model, a "Folias" analysis[3] of an axial crack in a pressurized cylinder, and an empirically established flaw-depth-to-pipe-thickness relationship. The extensive data base of flawed-pipe burst tests presented in Reference 2 demonstrated its usefulness and validity for axial flaws in line pipe. Subsequently, Kiefner[4] conducted a series of burst tests of corroded pipes which demonstrated the applicability of the NG-18 surface flaw equation to predicting the remaining strengths of such pipes. The applicability of this approach to the analysis of corroded pipe was further substantiated in a program of research conducted by British Gas (Shannon, Reference 5). From the work of Reference 4, the B31G criterion was derived.

### Basis of the B31G Criterion

#### Basic Equation

The B31G criterion is based upon Equation (1) which is explained in Reference 2.

$$S_f = \bar{S} \left[ \frac{1 - A/A_0}{1 - (A/A_0)(M^{-1})} \right] \tag{1}$$

---

*Numbers in parenthesis refer to References on Page 48.

3

where

> $M$     is the "Folias" factor, a function of L, D, and t
>
> $S_f$     is the hoop stress level at failure, psi
>
> $\bar{S}$     is the flow stress of the material, a material property related to its yield strength, psi
>
> $A$     is the area of crack or defect in the longitudinal plane through the wall thickness, $in^2$
>
> $A_0$     is Lt, $in^2$
>
> $L$     is the axial extent of the defect, inches
>
> $t$     is the wall thickness of the pipe, inch
>
> $D$     is the diameter of the pipe, inches.

Equation (1) is used to calculate the failure stress level of a pressurized pipe containing a longitudinally oriented crack or defect. It is also used to predict the remaining strength of corroded pipe where the parameters of the metal loss are handled as shown in Figure 1. The overall axial length of the corrosion is taken as L even if the corrosion is an array of pitting not necessarily lined up along an axial line. The projection of the pitted profile onto the axially oriented plane through the wall thickness as shown in Figure 1 yields the area, A, to be used in Equation (1). The maximum depth of a corroded area, d, as shown in Figure 1 does not appear in Equation (1) but is used in the analysis of corroded pipe as will be shown.

The use of L and A as defined in Figure 1 for an array of pits tends to result in a conservative assessment of the remaining strength for several reasons. First, corrosion pits are seldom lined up along an axial line as assumed in the use of Equation (1). When they are not so lined up, Equation (1) will tend to underestimate the remaining strength. If a reliable method to account for this misalignment existed, it could be used to reduce this aspect of the conservatism of Equation (1) with respect to the analysis of corroded pipe. So far, however, none has been developed. Thus, in the present effort to modify the B31G criterion, no attempt was made to change this aspect of the analysis.

4

Secondly, corrosion pits are blunt defects compared to cracks and many other kinds of flaws found in line pipe. It has been demonstrated that blunt surface flaws have appreciably higher failure stress levels than sharp surface flaws. Thus, Equation (1) which was developed on the basis of burst tests involving relatively sharp flaws will tend to give conservative predictions for the effects of blunt flaws. This aspect of the conservatism is built into the B31G method and has not been changed in the modified approach described herein.

Factors influencing the conservatism of Equation (1) which have been addressed in this project are the flow stress, $\bar{S}$ , and the "Folias" factor, M. First, however, the assumptions which resulted in the original B31G criterion are discussed.

## Assumptions Embodied in the B31G Criterion

In adapting Equation (1) to predicting the remaining strength of corroded pipe, the following assumptions were made. First, the Folias factor M was represented as follows

$$M = \left[ 1 + \frac{0.8L^2}{Dt} \right]^{1/2} \tag{2}$$

Secondly, the flow stress of the material, $\bar{S}$ , was taken as 1.1 SMYS where SMYS is the specified minimum yield strength of the material. As noted above, both of these assumptions resulted in built-in conservatism.

To simplify the evaluation of corroded pipe, the area of metal loss, A, was represented by a parabola as shown in Figure 2. This permits one to calculate A on the basis of two simple parameters of the metal loss, its overall length, L, and its maximum depth, d. The resulting area, A, is equal to (2/3)Ld. $A_0$, of course, is Lt.

The format of Equation (1) as used in the B31G criterion is

$$S_f = 1.1 \text{ SMYS} \left[ \frac{1 - (2/3)(Ld/Lt)}{1 - (2/3)(Ld/Lt)M^{-1}} \right]$$

5

$$= 1.1 \text{ SMYS} \left[ \frac{1 - (2/3)(d/t)}{1 - (2/3)(d/t)(M^{-1})} \right] \tag{3}$$

$$M = \left[ 1 + \frac{0.8L^2}{Dt} \right]^{1/2} \tag{2}$$

## Factor of Safety

Equation (3) predicts the hoop stress level which will cause the failure of a corroded pipe with diameter, D, wall thickness, t, and minimum yield strength, SMYS, where the metal loss has an axial length L and a maximum depth of d. Sound engineering judgement requires that corrosion should not be allowed to reach a size (L and d) so large that the predicted failure stress level is at or below the maximum operating stress level. Therefore, a factor of safety must be applied to Equation (3). The basis for the factor of safety consists of the reasonable requirement that the failure stress level, $S_f$, not be less than 100 percent of SMYS. In that manner, the acceptance or rejection of corroded areas by the criterion would embody the same factor of safety as a hydrostatic test of the pipeline to 100 percent of SMYS. For those pipelines in which the maximum operating stress level does not exceed 72 percent of SMYS, the factor of safety embodied in the B31G criterion (not considering any other built-in conservatism of which there is some) is 100/72 = 1.39.

## Formats and Limitations of the B31G Criterion

### Evaluating a Corroded Region

A given corroded region in a pipeline is evaluated on the basis of its maximum length, L, and maximum depth, d, via a transformation and combination of Equations (2) and (3). Letting

6

$S_f = 1.0$ SMYS in accord with the requirement for a factor of safety as discussed above, one can solve Equation (3) for M in terms of d/t because the SMYS terms on both sides of the equation cancel one another.

$$M = \frac{d/t}{1.1(d/t) - 0.15} \tag{4}$$

Next, observing that the right hand side of Equation (4) can be set equal to the right hand side of Equation (2), one can solve for L in terms of d, t, and D.

$$L = 1.12 \left[ \left( \frac{d/t}{1.1 \, d/t - 0.15} \right)^2 - 1 \right]^{1/2} [Dt]^{1/2} \tag{5}$$

The corroded area L is acceptable if L is less than or equal to the value given by Equation (5).

The B31G document provides tables of acceptable lengths of corroded areas. Alternatively, the B31G document provides the relationship shown in Figure 3 and the equation

$$L \leq 1.12 \, B\sqrt{Dt} \tag{6}$$

as a means of evaluating a given anomaly.

Pits with depths greater than 0.8 of the wall thickness are not permitted because of the chances that very deep pits would develop leaks even though the criterion predicts that they will not cause ruptures. Because the parabolic representation becomes less and less an accurate representation of the actual area of metal loss as the length increases, the use of B values greater than 4.0 is not permitted. A value of B equal to 4.0 corresponds to a d/t of 0.175. Anomalies with depths in terms of d/t greater than 0.125 but less than 0.175 are not allowed to have lengths exceeding $4.0\sqrt{Dt}$. Anomalies of depths in terms of d/t less than or equal to 0.125[*] may be of unlimited length since

---

[*]This is permitted only for cases in which the remaining wall thickness is 0.875 times the nominal wall thickness, t, used in the design of the pipeline. If the remaining thickness is less than 0.875 t, the anomaly should be treated as if its depth were the measured depth plus the amount of metal not present because the pipe was under thickness to begin with.

7

such cases would be expected to have the same remaining strength as a pipe which just meets the minimum wall thickness requirement (for some grades of API line pipe).

## Calculating a Reduced Operating Pressure Level

The B31G criterion provides that if L exceeds the allowable length, an acceptable reduced operating pressure may be calculated by keeping the factor of safety equal to 1.39. The reduced operating pressure is defined as follows on the basis of Equation (3)

$$S_f = \text{SMYS} = 1.1 \text{ SMYS} \left[ \frac{1 - (2/3)(d/t)}{1 - (2/3)(d/t)(M^{-1})} \right] . \tag{3}$$

For the left hand side of the equation, it is desired that the new (reduced) operating pressure, P', shall be related to SMYS by a factor of safety, $F_s$. Thus,

$$S_f = \text{SMYS} = \frac{P'DF_s}{2t} . \tag{7}$$

For the right hand side of the equation, it is convenient to express the SMYS term in terms of the original design pressure, P,

$$\text{SMYS} = \frac{PD}{2tF} \tag{8}$$

where F is the design factor as defined for the appropriate class location in the B31.8 code.

Making appropriate substitutions into Equation (3) one gets

$$\frac{P'DF_s}{2t} = \frac{1.1 \text{ PD}}{2tF} \left[ \frac{1 - (2/3)(d/t)}{1 - (2/3)(d/t)(M^{-1})} \right] \tag{9}$$

If one further requires that $F_s$ = 1.39 (the desired factor of safety) and observes that F = 1/1.39 for a Class 1 location, one gets

$$P' = 1.1 \text{ P} \left[ \frac{1 - (2/3)(d/t)}{1 - (2/3)(d/t)(M^{-1})} \right] \tag{10}$$

8

This equation is embodied in a set of curves in the B31G document[*].  It permits the calculation of reduced pressure levels in the event that the length of the corroded area is found to be unacceptable via Equation (6).  Because of the previously mentioned inadequacy of the parabolic approximation of a long corroded area, Equation (10) is used only for B values less than or equal to 4.0.  When B is greater than 4.0, the 2/3 factor on Ld is converted to 1.0 (a rectangular rather than a parabolic representation) and M is assumed to approach infinity.  The result is that P' is calculated as follows for such cases.

$$P' = 1.1 \ P \ [1 - d/t] \tag{11}$$

except that P' must be less than or equal to P.

## Limitations of the B31G Criterion

A number of limitations on the use of the B31G criterion are stated in the B31G document.  One limitation which is reconsidered in this report is that the criterion is not to be applied to anomalies in welds of any kind.  As will be discussed, the modified approach presented in this report can be applied to corrosion anomalies in submerged-arc seam welds.  In addition, no provision is included for the consideration of interaction of corroded areas which do not touch but are separated by small islands of full or near full wall thickness pipe.

---

[*]In the B31G document, the M value is shown as $(1 + Q^2)^{1/2}$ because one must calculate $Q = 0.893L/\sqrt{Dt}$ to use the curves.

9

## DEVELOPMENT OF A MODIFIED CRITERION

The rationale for developing a modified criterion for evaluating corroded pipe is that as a result of excess conservatism embodied in the original B31G criterion, too much serviceable pipe is being removed during rehabilitation efforts.  For the sake of optimizing safety, it is better to concentrate rehabilitation efforts on the portions of the systems which truly need repair as soon as possible rather than stretch out rehabilitation efforts to meet a criterion known to contain an unnecessarily large margin of safety.  To obtain the desired improvement in the criterion, the sources of excess conservatism and the serious limitations of the original approach were reconsidered as described below.

### Sources of Excess Conservatism

The sources of excess conservatism in the original B31G criterion are

- The expression for flow stress
- The approximation used for the Folias factor
- The parabolic representation of the metal loss (as used within the B31G limitations)
- The inability to consider the strengthening effect of islands of full thickness or near full thickness pipe at the ends of or between arrays of corrosion pits.

### Modified Flow Stress

It was known even when the original B31G criterion was developed that 1.1 SMYS substantially underestimates the flow stress of a line-pipe material.  In Reference 2, it was clearly demonstrated that

10

yield strength + 10,000 psi closely approximates the flow stress.  Even if one takes yield strength to be SMYS, this latter value would exceed the 1.1 SMYS value for all available grades of line pipe.

The effect of this difference is illustrated as follows for three common grades of line pipe.

| Grade | 1.1 SMYS | SMYS + 10,000 | Percent Difference (based upon 1.1 SMYS) |
|-------|----------|---------------|-------------------------------------------|
| B     | 38,500   | 45,000        | 16.9                                      |
| X52   | 57,200   | 62,000        | 8.4                                       |
| X60   | 66,000   | 70,000        | 6.2                                       |

The effect diminishes with increasing yield strength but is significant for the lower strength grades which are the ones most likely to be rehabilitated at the present time.  Incidently, the effect on *estimated* remaining strength is direct.  That is, in Equation (1), the predicted failure stress level (or remaining strength) is a linear function of the flow stress.  For the modified criterion, then, the value of flow stress will be taken as SMYS + 10,000 psi.

## Modified Folias Factor

The two-term approximation for M, the Folias factor, used in the original B31G criterion has been presented herein in Equation (2). A more exact and less conservative approximation of $M_T$ is as follows. For values of $(L^2/Dt) \leq 50$:

$$M_T = \left[ 1 + 0.6275 \frac{L^2}{Dt} - 0.003375 \frac{L^4}{D^2 t^2} \right]^{1/2} . \qquad (12)$$

For values of $(L^2/Dt) > 50$

$$M_T = 0.032(L^2/Dt) + 3.3. \qquad (12a)$$

The alternate form of $M_T$ is illustrated in Figure 4.  It is needed for very long anomalies because the negative term of the three-term series starts to dominate and the three-term approximation is no longer valid

11

beyond the stated limit.  It is derived by extrapolating the $M_T$ versus $L^2/Dt$ relationship by means of a straight line tangent to the curve of Equation (12) at $L^2/Dt = 50$.

A comparison of the three-term M to the old two-term M for 30-inch O.D. by 0.375-inch wall pipe is as follows.

| Flaw Length, inches | Two-Term M | Three-Term $M_T$ | Percent Difference (based on two-term M) |
|---|---|---|---|
| 2 | 1.1333 | 1.1058 | 2.5 |
| 5 | 1.6670 | 1.5420 | 7.7 |
| 10 | 2.8480 | 2.5122 | 12.0 |

Because the remaining strength of the pipe is not a linear function of M, the effect of changing M is smaller than these differences imply. For example, the estimated remaining strengths for the same pipe geometry and flaw lengths for 50 percent through-the-wall rectangular defects in a material having a flow stress of 62,000 psi are as follows.

| Flaw Length, inches | Two-Term M | Three-Term M | Percent Difference (based upon two-term M value) |
|---|---|---|---|
| 2 | 55,444 | 56,586 | 2.1 |
| 5 | 44,248 | 45,875 | 3.7 |
| 10 | 37,580 | 38,703 | 3.0 |

Thus, the three-term M gives higher (less conservative) predictions of remaining strength but only on the order of 3 percent higher.

## Modified Representation of Metal-Loss Area

Parabolic Area (Original B31G Criterion).  The exact area of metal loss as portrayed in Figure 1 is difficult to represent in terms of simple geometric shapes definable by maximum length and depth.  Two shapes which were considered in the development of the original B31G criterion were the rectangle (A = Ld) and the parabola (A = 2/3Ld).  On

12

the basis of the 47 burst tests of corroded pipe presented in Reference 4, it was easily shown that the parabolic method was preferable. Predictions of remaining strength using the rectangular method were too conservative, but those made using the parabolic method as described in the form of Equation (3) consistently underestimated the actual failure stress levels as shown in Reference 4 (Table 4). The ratios of actual-to-predicted failure stress levels range from 1.07 to 3.07. It is apparent that even with the parabolic method, many of the predictions greatly underestimated the strengths of the pipes.

In reality, the parabolic method has significant limitations. Obviously, if the corroded area were very long, the effect of the metal loss would be underestimated and the remaining strength would be over estimated. The fact that the method of Equation (3) underestimated the strengths in all 47 cases is probably the result of circumstances such as the pits not being lined up axially and the deepest areas being separated by islands of greater remaining wall thickness. To prevent misuse of the criterion in cases where long, deep corroded areas might actually have lower strengths than the criterion would predict, the method was limited as described earlier to defects where the B values obtained from Figure 3 are less than or equal to 4.0.

Exact Area. More realistic representations of the metal loss are available if more detailed measurements of the pit depth profile are made. For example, a contour map of pit depths can be made as shown in Figure 5. Then, the "exact" profile can be made by plotting points along the "river bottom" path of the contour map. The profile corresponding to the dashed (river bottom) path in Figure 5 is shown in Figure 6.

Figure 6 presents 16 L values to illustrate the possible methods of predicting the remaining strength of a corroded region based upon detailed profile measurements. First, one could consider the total area within the entire length, $L_{16}$, of the corroded region. The area is calculable by means of summing up all of the areas of the trapezoids formed by the discrete depth measurement points. If the discrete

13

points, $d_i$, are evenly spaced with an interval of x as shown in Figure 6, the total area is defined as

$$A = 1/2 \ (d_0x + d_1x) + 1/2 \ (d_1x + d_2x) + \cdots + 1/2 \ (d_{n-1}x + d_nx) \quad (13)$$

If the end values $d_0$ and $d_n$ are zero,

$$A = x \sum_{i=1}^{i=n-1} d_i = n \ x \ d_{avg} \left( = L_{total} \ d_{avg} \right) \quad (14)$$

Thus, the exact area is being represented by a rectangular area which is the product of the total length times the average depth. With the parameters $L_{total}$ and $d_{avg}$ thus defined, one can use Equation (12) to calculate $M_T$ based upon $L_{total}$ and Equation (1) to calculate $S_f$. Note that $A/A_0$ in Equation (1) becomes $d_{avg}/t$.

Equivalent Area. A second method (more accurate than the parabolic method) of analyzing the remaining strength on the basis of the profile shown in Figure 6 is called the equivalent length method. In this method, the metal-loss area, A, is defined as

$$A = L_{eq}d = L_{total} \ d_{avg} \quad (15)$$

where d is the maximum depth. In this method, the area is identical to that of the total length method but $L_{eq}$ is used as the length instead of $L_{total}$.

$$L_{eq} = L_{total} \ (d_{avg}/d) \ . \quad (16)$$

In this case, the area of the defect is being represented by a rectangle $L_{eq}d$. $L_{eq}$ is used in Equation (12) to calculate $M_T$ and Equation (1) is used to calculate $S_f$. Note that $A/A_0$ in Equation (1) becomes $d/t$.

Effective Area. A third more accurate method to predict the remaining strength involves calculations based upon various subsections of the total area of metal loss. For example, one could calculate 16 different predicted failure pressures based upon the profile shown in Figure 6. Each calculation involves the length, $L_i$ where i varies from

14

1 to 16.  The area of each individual flaw is calculated as the sum of the areas of the trapezoids made up by the discrete depth points within $L_i$.  The area of each is slightly more than $L_i d_{avg}$ because the end-point d values are nonzero.  The procedure usually, though not always, results in a minimum predicted failure stress that is less than the value corresponding to the exact-area total-length method.  This method is referred to as the "effective area" method.  It is based upon the effective area and effective length of the defect and is embodied in the software developed as a part of this project.

The calculation of remaining strength via one or more of these more exact methods tends to give predictions that are in better agreement with actual burst-test results than those made using the parabolic representation of metal loss.  However, there is no fixed relationship between the results predicted by the various methods. Furthermore, as will be shown, there is merit to retaining  a representation of a corroded region based solely upon its overall length and maximum depth in the criterion while permitting the use of more exact methods.  As a result, the excess conservatism that may be associated in some cases with the use of the parabolic method or any other method based solely on overall length and maximum depth cannot be arbitrarily eliminated.

A final point that must be made with regard to any type of profile representation of metal loss is that some excess conservatism will always be present when the deepest parts of the corrosion are not lined up along the axis of the pipe and when deeper portions of the pitting are separated by islands of greater remaining wall thickness. Within the present state of technology, it is not practical to deal analytically with these variables.

Appendix A provides a guide for making more exact measurements of metal loss in the typical case where the deepest portions of the corrosion do not all lie on the same axial line.

15

## Format of the Modified Criterion

### Equation for Allowable Length of Corrosion

Development of the modified criterion begins as the original criterion begins, namely, with Equation (1) which, for convenience, we restate here as Equation (17).

$$S_f = \bar{S} \left[ \frac{1 - A/A_0}{1 - (A/A_0)(M_T^{-1})} \right] \qquad A/A_0 \simeq 0.85\, d/t \qquad (17)$$

In the new criterion, $M_T$ is the three-term Folias factor as defined in Equation (12) for $L^2/Dt \leq 50$.

$$M_T = \left[ 1 + 0.6275 \frac{L^2}{Dt} - 0.003375 \frac{L^4}{D^2 t^2} \right]^{1/2} \qquad (12)$$

and Equation (12a) for $L^2/Dt > 50$

$$M_T = 0.032(L^2/Dt) + 3.3. \qquad (12a)$$

To arrive at a format for determining allowable values of L, some substitutions and transformations of Equations (12) and (17) are necessary. First, we let $S_f = SMYS$ and $\bar{S} = SMYS + 10,000$. Then, if we define q as

$$q = \frac{SMYS + 10000}{SMYS}^* \qquad (18)$$

we can solve Equation (17) for $M_T$

---

*Note that this assumption means that we are defining the allowable axial length of a corroded area such that for a given $A/A_0$ ratio, all anomalies as short as or shorter than the allowable value would be expected to fail at stress levels of 100 percent of SMYS or more. The implications of this assumption are discussed in more detail starting on Page 18.

16

$$M_T = \frac{(-1/q)(A/A_o)}{1 - A/A_o - 1/q} \tag{19}$$

Next, we can set the right side of Equation (12) equal to the right side of Equation (19) and solve for L. The fourth order equation yields four roots, of which only one is the valid solution for L we are seeking, namely

$$L = \sqrt{Dt}\left[ 92.963 - \left[ (92.963)^2 + \right.\right.$$

$$\left.\left. 296.296\left( 1 - \frac{(1/q)^2(A/A_o)^2}{(1 - A/A_o - 1/q)^2} \right) \right]^{1/2} \right]^{1/2} \tag{20}$$

for values of $L \leq \sqrt{50Dt}$. For values of $L \geq \sqrt{50\ Dt}$, use

$$L = \sqrt{Dt}\left[ \frac{31.25(-1/q)(A/A_o)}{1 - A/A_o - 1/q} - 103.125 \right]^{1/2} \tag{20a}$$

Allowable lengths of corrosion are those which are less than or equal to L as defined in Equation (20) or (20a). It is recalled that with the parabolic representation of area A = 2/3 Ld, $A/A_o$ becomes 2/3(d/t) in the original criterion. As will become apparent in subsequent sections of the report, it is not prudent to use the parabolic representation in the new criterion. The most appropriate area representation is the effective area arrived at by iteration as defined on Page 13. To define the effective area, however, one must calculate the minimum failure pressure and define the effective length. Hence, there would be no need for Equation (20) in such a case. However, one can also use exact area and total length as described previously or a geometric representation of the anomaly. For single long-hand calculations and for the purposes of tables and curves it becomes appropriate to use a geometric shape approximation in which A is 0.85dL and $A/A_o$ is 0.85d/t. The choice of

17

0.85 dL for A is arbitrary as was the choice of 2/3 dL in the original criterion. Without the other changes (i.e., flow stress and to the Folias factor) this new area representation would be more conservative than the parabolic representation. However, the 0.85 dL value becomes a reasonable choice because it has wider applicability than the parabolic representation. In particular it can be used safely to analyze much longer flaws than the parabolic representation. As a result, the restrictive limits associated with the existing B31G criterion which require reverting to remaining thickness to determine a reduced pressure level are extended significantly.

The new area representation satisfactorily fits the data from corroded pipe burst tests (as will be shown starting on Page 34) and it provides a better estimate of one particular test result involving a compound machined flaw consisting of a short, deep defect within a long, shallow defect, as will be shown starting on Page 35. Finally, when used with the new value of flow stress and the three-term Folias factor, it is shown to be less conservative than the 2/3dL representation (used with the old value of flow stress and the two-term Folias factor) with respect to limiting the allowable length of corrosion at a 72 percent SMYS operating stress and with respect to calculating reduced allowable operating pressures above 55 percent SMYS. Unlike the 2/3 dL area for which the geometric shape is defined by a parabola, the 0.85 dL area does not correspond to a unique shape. Instead, as will be shown, it is possible to define an arbitrary but reasonable shape.

As with the case of the original criterion, Equation (20) or (20a) should not be used for certain values of $A/A_0$. A similar situation occurred in the old criterion for a d/t value of 0.136. These values exist because Equation (20) is based upon a failure stress of 100 percent SMYS excluding from consideration the family of small flaws which would fail at stress levels between 100 percent of SMYS and flow stress (SMYS + 10,000). The range of values of $A/A_0$ not allowed for this reason varies with SMYS. For example, it is clear that in dealing with X52 pipe (q = 1.193), a value of $A/A_0$ = 0.1613 would result in the term $(1 - A/A_0 - 1/q)$ being zero. For Grade B pipe, the limiting value

18

of $A/A_0$ in Equation (20) is 0.222.  For X60, it is 0.1429.  Defects with lower $A/A_0$ values are undefined because they would have failure stress levels in excess of 100 percent of SMYS.  As in the original B31G criterion, the cutoff value of d/t at the high end remains 0.8.  Defects deeper than 80 percent of the wall thickness should be repaired or removed to prevent leakage.

It is immediately obvious that the new criterion is very difficult to handle in the form shown above.  As will be shown, revised curves, tables, and a PC (personal computer)-based format are practically a necessity.  Before those options are presented, however, let us consider how one would use the new criterion to calculate a reduced operating pressure.

## Equation for Reduced Operating Pressure Level

The format of Equation (17) used to calculate a reduced operating pressure level under the new criterion is derived by letting $S_f = P'DF_S/2t$ and $\bar{S} = PD/2tF + 10,000$ where

$F_S$ is 1.39, the factor of safety

$F$ is 0.72, the design factor for a Class 1 location.

Thus,

$$\frac{P'DF_S}{2t} = \left[\frac{PD}{2tF} + 10,000\right]\left[\frac{1 - A/A_0}{1 - (A/A_0)M_T^{-1}}\right] \tag{21}$$

When Equation (20) is solved for $M_T^{-1}$ (in the form of Equation (19) the new equation for reduced operating pressure becomes

$$P_1' = \frac{P_1\left[1 + \frac{14400t}{P_1D}\right]\left[1 - A/A_0\right]}{1 - (A/A_0)\left[1 - \frac{(92.963-L^2/Dt)^2 - (92.963)^2}{296.296}\right]^{-1/2}} \tag{22}$$

For clarity, the variables are defined again here as

19

$P_1'$ is the <u>reduced</u> operating pressure which would be expected to exceed the failure pressure of the anomaly by a margin of 1.39 to 1. (Values of $P_1'$ which calculate to be larger than $P_1$ are not valid), psig

$P_1$ is the operating pressure which corresponds to a stress level of 72 percent of SMYS, psig

D is the outside diameter of the pipe, inches

t is the nominal wall thickness of the pipe (or actual wall thickness, if known), inch

L is the axial extent of the corroded area, inch

A is the area of metal missing in the longitudinal plane through the wall thickness, inch$^2$

$A_0$ is Lt, inch$^2$.

The safe operating pressure, $P_1'$, for values of L which are too large to satisfy Equation (20) are calculated via Equation (22).

One may elect to use the exact area A determined from detailed measurements, or instead one may use the representation of A = 0.85 dL based only upon the maximum depth of the corrosion. In using Equation (22) please note that $P_1'$ must be less than or equal to $P_1$.

As in the calculation of allowable length, the new criterion for reduced operating pressure is difficult to handle from a long-hand calculation standpoint. Thus, the curves, tables, and PC program presented below become almost a necessity.

## Options for Pipelines Designed to Operate at Stress Levels Other Than 72 Percent of SMYS

Equation (22) strictly applies only to pipelines designed to operate at a stress level of 72 percent of SMYS because the value of F in Equation (21) was set at 0.72. One can derive appropriate analogous equations dealing with pipelines operating at other stress levels in one

20

of two ways[*]. One may either retain the factor of safety, $F_s$, of 1.39 or one may elect to let the factor of safety "float" resulting in increased conservatism for operating stress levels below 72 percent of SMYS and a lower margin of safety for operating stress levels above 72 percent. Examples are as follows.

Suppose one chooses to retain a factor of safety of 1.39 and let defect failure pressures vary with the operating stress levels. This means that $F_s$ in Equation (21) remains as 1.39 while F varies. For a Class 2 location, for example, $F_2$ would be 0.60 and Equation (21) would become

$$\frac{P_2'D\ (1.39)}{2t} = \left[ \frac{P_2D}{2t(.60)} + 10,000 \right] \left[ \frac{1 - A/A_o}{1 - (A/A_o)\ M_T^{-1}} \right] \quad (23)$$

Equation (22) then becomes
(60 percent SMYS operation) $F_s$ = 1.39;   F = 0.60

$$P_2' = \frac{P_2 \left[ 1.2 + \frac{14400t}{P_2D} \right] \left[ 1 - A/A_o \right]}{1 - (A/A_o) \left[ 1 - \frac{(92.963 - L^2/Dt)^2 - (92.963)^2}{296.296} \right]^{-1/2}} \quad (24)$$

For other operating stress levels such as $F_3$ = 0.50, $F_4$ = 0.40, and $F_0$ = 0.80 the corresponding equations for reduced pressure are

(50 percent SMYS operation)  $F_s$ = 1.39; F = 0.50

$$P_3' = \frac{P_3 \left[ 1.44 + \frac{14400\ t}{P_3D} \right] \left[ 1 - A/A_o \right]}{1 - (A/A_o) \left[ 1 - \frac{(92.963 - L^2/Dt)^2 - (92.963)^2}{296.296} \right]^{-1/2}} \quad (25)$$

---

[*]Note: It is not necessary to have equations such as Equation (22) or those which follow if one elects to use the effective-area method to calculate failure pressure. This will be explained later in the report.

21

(40 percent SMYS operation)  $F_s = 1.39$;  $F = 0.40$

$$P_4' = \frac{P_4 \left[ 1.8 + \dfrac{14400\ t}{P_4 D} \right] \left[ 1 - A/A_o \right]}{1 - (A/A_o) \left[ 1 - \dfrac{(92.963 - L^2/Dt)^2 - (92.963)^2}{296.296} \right]^{-1/2}} \quad (26)$$

(80 percent SMYS operation)  $F_s = 1.39$;  $F = 0.80$

$$P_0' = \frac{P_0 \left[ 0.9 + \dfrac{14400\ t}{P_0 D} \right] \left[ 1 - A/A_o \right]}{1 - (A/A_o) \left[ 1 - \dfrac{(92.963 - L^2/Dt)^2 - (92.963)^2}{296.296} \right]^{-1/2}} \quad (27)$$

Considering the other option where one chooses to let the factor of safety float and to hold the failure stress level of the anomalies constant at 100 percent of SMYS, one arrives at the following equations.

(60 percent SMYS operation) $F_s = 1.67$;  $F = 0.60$

$$P_2'' = \frac{P_2 \left[ 1 + \dfrac{12000\ t}{P_2 D} \right] \left[ 1 - A/A_o \right]}{1 - (A/A_o) \left[ 1 - \dfrac{(92.963 - L^2/Dt)^2 - (92.963)^2}{296.296} \right]^{-1/2}} \quad (28)$$

(50 percent operation) $F_s = 2.00$;  $F = 0.50$

$$P_3'' = \frac{P_3 \left[ 1 + \dfrac{10000\ t}{P_3 D} \right] \left[ 1 - A/A_o \right]}{1 - (A/A_o) \left[ 1 - \dfrac{(92.963 - L^2/Dt)^2 - (92.963)^2}{296.296} \right]^{-1/2}} \quad (29)$$

(40 percent SMYS operation) $F_s = 2.50$;  $F = 0.40$

$$P_4'' = \frac{P_4 \left[ 1 + \dfrac{8000\ t}{P_4 D} \right] \left[ 1 - A/A_o \right]}{1 - (A/A_o) \left[ 1 - \dfrac{(92.963 - L^2/Dt)^2 - (92.963)^2}{296.296} \right]^{-1/2}} \quad (30)$$

(80 percent SMYS operation) $F = 1.25$;  $F = 0.80$

22

$$P_0'' = \frac{P_0 \left[ 1 + \frac{16000\ t}{P_0 D} \right] \left[ 1 - A/A_0 \right]}{1 - (A/A_0) \left[ 1 - \frac{(92.963 - L^2/Dt)^2 - (92.963)^2}{296.296} \right]^{-1/2}} \quad (31)$$

## PC Format

A software package has been developed for pipeline operators to use in order to simplify the necessary calculations embodied in the modified B31G criterion. Repetitive calculations using the long-hand solutions of Equation (17) could be done to define the effective area but this would prove to be very time consuming. The PC program makes the calculations quickly, defines the effective area, and provides documentation of the anomaly.

As mentioned above, the PC program uses the three-term Folias factor (or the extended version of Equation (12a)), a flow stress of SMYS + 10,000[*] psi, detailed measurements, and an iterative calculation method to determine the minimum predicted failure pressure based on an effective area (CASE 1). The PC program also performs two additional calculations. One uses the three-term Folias factor (or the extended version of Equation (20a), a flow stress of SMYS + 10,000 and the 0.85 dL area representation (CASE 2). The other uses the two-term Folias factor, a flow stress of 1.1 SMYS and the parabolic area representation (CASE 3). This case corresponds to the previous B31G analysis method.

Because the PC format calculates the above-mentioned three cases of failure pressure with no factor of safety included, the user has a great deal of flexibility regarding how the answer is used. All one has to do is define the desired factor of safety, $F_s$ to determine the "safe" operating pressure, $P_{allow}$. If $P_{allow}$ is greater than or equal to the MAOP (maximum allowable operating pressure), the corroded

---

[*]An option of using flow stress as actual yield plus 10,000 psi is available. This option is useful for comparing predictions with burst-test results as is done herein for the 86 burst tests.

23

region is acceptable.  If $P_{allow}$ is less than the MAOP, the pressure should be reduced to $P_{allow}$ or the corroded region should be repaired or replaced.  The pipeline operator must decide what constitutes an acceptable $F_s$.  Also, since an alternate $M_T$ for $L^2/Dt > 50$ exists in the CASE 1 and CASE 2 formats, there is no limit on the L value with which one can make the CASE 1 and CASE 2 calculations[*].

A disk containing this PC program called "RSTRENG" can be found in the back cover of this report.  A manual for using RSTRENG can be found in Appendix B.  Example calculations will be covered in a subsequent section of the report.

Revised Curves and Tables

The existing B31G document contains a B versus d/t curve as shown in Figure 3 based upon a parabolic representation for the corroded area.  The analogous curve for the new criterion along with the old criterion is shown in Figure 7 for a 30-inch O.D. by 0.375-inch X52 material.  Note that the old allowable length L is given by

$$L \leq 1.12 \ B_1 \ \sqrt{Dt}$$

where $B_1$ is the B value from the old curve in Figure 7 and that the new allowable length L is given by

$$L \leq B_2 \ \sqrt{Dt}$$

where $B_2$ is the B value from the new curve in Figure 7.  Also, note that with the new criterion, unlike with the old criterion, it is necessary to have a separate curve for each grade of material.  This is because of the fact that the new definition of flow stress is not simply proportional to SMYS.  A table of allowable lengths for the same pipe material under the new criterion is shown as Table 1.  This table is for Grade X52 only; the new criterion necessitates a table for each grade. A set of curves and tables for the new criterion is presented in

---

[*] CASE 3 calculations are automatically flagged to the user's attention when $L^2/Dt$ exceeds 20.  In such instances, the calculation is based upon the assumption that the flaw is infinitely long and everywhere as deep as the maximum depth.

24

Appendix C for Grades B, X52, and X60 and pipe diameters of 24, 30, and 36 inches.

## Analysis of Corroded Areas Having Depths Not More Than 20 Percent Through the Wall

Shannon[5] of British Gas proposed a "no-failure" boundary for corroded pipe which can be used to define the depth of pitting below which failure is not a concern in a pipeline operating at a given maximum stress level. The "no-failure" boundary was developed from Equation (1) and was validated by British Gas using their own and early A.G.A. corroded pipe burst tests. It is in fact derived from Equation (1) by letting $A/A_0$ equal $d/t$ (true for a rectangular flaw), $M_T$ approach $\infty$, and $\bar{S}$ be 1.15 SMYS. Hence,

$$S = 1.15 \text{ SMYS } (1 - d/t) \tag{32}$$

The failure stresses of all corroded pipe tested up to that time exceeded S regardless of the length of the corrosion. As shown in Figure D-1 of Appendix D (a plot of S/SMYS versus 1-d/t), the results of all 86 burst tests in A.G.A. data base satisfy Equation (32) also.

For pipelines operating at stress levels not exceeding 72 percent of SMYS, it would seem acceptable to say that S should not be less than 90 percent of SMYS. Setting S = 0.9 SMYS in Equation (32) and solving for d/t, one finds that d/t = 0.217. Therefore, it is reasonable to state that a pipeline containing corrosion not exceeding 20 percent of the wall thickness can be safely left in service regardless of the length of the corrosion as long as the operating stress level does not exceed 72 percent of SMYS and as long as the remaining wall thickness is at least 80 percent of that required by the design stress level.

## Comparison of the Old and the New Criteria

Comparisons of the old and the new criteria are made in several ways as illustrated below. These examples also provide

25

information on the advantages and limitations of both criteria. The example problems all involve 30-inch O.D. by 0.375-inch wall X52 pipe. Nine cases are considered as described below.

| Case | Flaw Shape | Flaw Length | Maximum Depth (percent of wall) |
|------|-----------|-------------|--------------------------------|
| 1 | Rectangular | 10 | 50 |
| 2 | Rectangular | 3 | 50 |
| 3 | Rectangular | 2 | 50 |
| 4 | Parabolic | 10 | 50 |
| 5 | Parabolic | 3 | 50 |
| 6 | Parabolic | 2 | 50 |
| 7 | 0.85dL | 10 | 50 |
| 8 | 0.85dL | 3 | 50 |
| 9 | 0.85dL | 2 | 50 |

The maximum flaw depth in every case in 187 mils. For the rectangular flaws, the depth is uniform. For the parabolic flaws, the depth is 187 mils at the center (0.5L) and zero at the ends. The depths of the intermediate points are defined as follows: 67 mils at 0.1L and 0.9L, 120 mils at 0.2L and 0.8L, 157 mils at 0.3L and 0.7L, and 180 mils at 0.4L and 0.6L. For the new area representation, the maximum depth is 187 mils at the center (0.5L) and zero at the ends. The depths at the intermediate points are defined as follows:

83 percent of maximum depth at 0.1L and 0.9L

95 percent of maximum depth at 0.2L and 0.8L

98 percent of maximum depth at 0.3L and 0.7L

99 percent of maximum depth at 0.4L and 0.6L.

The resulting depths are 155 mils at 0.1L and 0.9L, 178 mils at 0.2L and 0.8L, 184 mils at 0.3L and 0.7L, and 185 mils at 0.4L and 0.6L.

Evaluating Allowable Lengths

First we will treat these samples cases as if we only know the maximum lengths and maximum depth. In this situation, all three shapes will be considered based on the parabolic shape in the old criterion and

26

based on the new area representation in the new criterion. Using Figure 7, one follows the vertical line at d/t = 0.5 until it intersects both curves. The corresponding $B_1$ value via the old criterion is 0.75. This results in an allowable length of 2.82 inches (allowable L = 1.12 $B_1\sqrt{Dt}$). By the old criterion, then, only the 2-inch flaws of Cases 3, 6, and 9 would be permitted. The $B_2$ value via the new criterion is 1.152[*]. This results in an allowable length of 3.86 inches (allowable L = $B_2\sqrt{Dt}$). Thus, by the new criterion not only would Cases 3, 6, and 9 be acceptable, but Cases 2, 5, and 8, the 3-inch flaws, would also be acceptable. Only Cases 1, 4, and 7 fail to pass both criteria.

## Evaluating Safe Operating Pressures

Next, we will calculate safe operating pressures for the 3-inch flaws via the old criterion and for the 10-inch flaws via both criteria. In each case, the flaws were too long to allow the pipeline to continue to operate at 72 percent of SMYS. For this we turn to Figure 8, a plot of Q versus d/t for both the new and the old criteria. Note that we must deal with a specific curve for Grade X52 pipe because of the definition of flow stress in the new criterion. This was not necessary for the old criterion. To use the old criterion, we calculate $Q_1$ = 0.893 $L/\sqrt{Dt}$. $Q_1$ = 0.799 for Cases 2, 5, and 8 and $Q_2$ = 2.662 for Cases 1, 4, and 7. Since both $Q_1$ and $Q_2$ are less than 4, one can use

---

[*]Note that when the arbitrary 0.85 dL representation is used, the upper limit on $B_2$ is not 4 as in the old criterion. The limit on $B_2$ is for practical purposes set at 10 because as mentioned earlier, Equations (20) and (20a) become undefined for the families of small flaws which have failure stress levels above 100 percent of SMYS. In using the new criterion, one must use a value of 10 if the calculated $B_2$ exceeds this amount. This corresponds to a d/t level of about 0.30 for Grade B, 0.22 for Grade X52, and 0.20 for Grade X60. However, it is clear from the previous analysis involving Equation (32) that corrosion pits which are not more than 20 percent through the wall can be safely left in service regardless of their length for pipelines operating at stress levels not exceeding 72 percent of SMYS. Therefore, for those few cases in which d/t lies between 0.20 and 0.30 for Grade B and 0.20 and 0.22 for Grade X52, it is recommended that $B_2$ be set at 10 when one is using the 0.85dL calculation.

27

the $(P'/P)_{old}$ curves of Figure 8. If this had not been the case, one would have had to revert to Equation (11). Using Figure 8, one follows the vertical line at $d/t = 0.5$ until it reaches the horizontal lines at $Q_1 = 0.799$ and $Q_2 = 2.662$. The intersection of $Q_1$ and $d/t = 0.5$ lies between the old $(P'/P)_{old}$ curves of 0.9 and 1.0. This results in an estimated $(P'/P)_1 = .99$. Therefore, $P_1' = 927$ psig. The intersection of $Q_2 = 2.662$ and $d/t = 0.5$ lies between the old 0.8 and 0.9 curves. $(P'/P)_{old}$ is about 0.83 which corresponds to a safe operating pressure of 777 psig based upon P = 936 psig.

To perform a similar operation for Cases 1, 4, and 7 under the new criterion, one must calculate a value of $Q_3 = L/\sqrt{Dt} = 2.981$ and use the $(P'/P)_{new}$ curve of Figure 8. Using Figure 8, one follows the vertical line at $d/t = 0.5$ until it intersects a value of $Q_3 = 2.981$. This point lies between the new curves of 0.8 and 0.9. One can then extrapolate a value of $(P'/P)_{new} = 0.83$ which corresponds to an allowable pressure of 777 psig based upon P = 936 psig.

The fact that the calculated safe pressure for the 10-inch flaws is the same for both criteria is more than a coincidence. As one can see from Figure 8, the safe pressure levels for the new criterion start out higher for a given flaw size at the relatively high pressure levels (i.e., $P'/P > 0.8$) but end up lower for a given flaw size at relatively low pressure levels (i.e., $P'/P < 0.8$). At $P'/P = 0.8$, the safe pressures are about the same for a given flaw size. The old criterion is excessively conservative at failure stress levels of about 90 percent of SMYS, about right at failure stress levels of 80 percent of SMYS and inadequately conservative at low failure stress levels. Since it is generally applied to exclude corrosion which will fail at or below 100 percent of SMYS, this situation has not created any problems. The new criterion is more adequate over the entire range of evaluation and certainly adequately conservative in the 100 percent of SMYS range where it will be used the most.

Note that with both the old and the new criteria, the actual flaw shape is immaterial. For both sets of curves, the calculations utilize only the maximum length and maximum depth.

28

## Analysis of the Examples Using RSTRENG

Using Equation (17) repetitively, one could determine the effective area of a corrosion anomaly and calculate an allowable length or, alternatively, a safe operating pressure.  Given the complexity of iteration by hand, however, it is much easier to use Equation (17) via RSTRENG to calculate the effective area that gives the minimum failure pressure level of the flaw and then see whether or not it exceeds the maximum operating pressure level by the pipeline operator's designated factor of safety.

As an example of how one uses RSTRENG, let us consider the 10-inch rectangular flaw (Case 1) covered in the previous comparisons of the old and the new criteria.  The output format for the calculation is shown in Figure 9.  After calling up RSTRENG, entering the file name, choosing the "INPUT" option (see Appendix B for the detailed "user's manual"), and selecting either the "PIT DEPTH" or the "REMAINING WALL THICKNESS" option, one inputs "SPECIMEN IDENTIFICATION", (Rectangular - 10") and a "COMMENT" (if desired).  Next, the particulars of the pipe material are entered when indicated by the cursor:  DIAMETER = 30.00 in., THICKNESS = 0.375 in., YIELD STRENGTH = 52,000 psi, and SMYS 52,000 psi[*].

Next, enter the overall LENGTH of the anomaly (10 inches in this case) and the INCREMENT over which pit depth measurements have been made (1.00 inch in this case).  Note that it is not necessary that the measurements be made on any exact grid.  One can make pit depth or wall thickness measurements as required by the corroded geometry so as to reflect the worst-case corrosion even if the locations are not exactly at an even spacing.  There is very little loss of accuracy when one then

---

[*]Note that both yield strength and SMYS are included and may not be the same. The actual yield strength is useful in checking the method against burst-test results, however, since RSTRENG CASE 1 uses actual yield strength, the user should specify the actual yield strength as SMYS to evaluate anomalies in pipelines.

29

enters the data as if they had been taken on a uniform spacing. The interval of measurement, however, should be chosen judiciously. In our example, a 10-inch flaw, measurements on a 1-inch spacing, even if the actual measurements may be located 1/2 inch off of the uniform grid, will be adequate. If the flaw had been only 2 inches in length, an adequate measurement spacing might have been 1/4 or 1/2 inch. Similarly, in highly irregular areas, it may be desirable to use a finer spacing.

The pit depth measurements in mils are entered as prompted by the cursor and will appear on the screen as entered. After the last measurements have been entered, the data will be written to the designated file. The user can then EDIT the data, INPUT another case, perform ANALYSIS, or QUIT. If ANALYSIS is selected, a screen will appear with the file names of all stored examples. If one moves the cursor to the desired case and evokes a carriage return, the example will be analyzed and CALCULATING will flash on the screen. When the calculation is complete, Screen 1 of Figure 9 will appear. This screen identifies the example, presents some of the inputs to the problem, shows the corroded profile (length versus depth indicated by asterisks), and gives the minimum predicted hoop stress level at failure and the failure pressure. In our example, the depth portrayed on the screen is uniform at 0.180 (the nearest 0.02 inch increment to the actual depth of 0.187 inch) over the 10-inch length. The actual value of 0.187 inch is used in the calculations, however. The predicted failure pressure is 970 psig. The arrows over the 0 and the 10 joined by a dashed line indicate the position of the flaw constituting the "effective" length which gives the minimum predicted failure pressure. In this example, the effective length was the total length, 10 inches.

One uses the CASE 1[*] minimum pressure of 970 psig as follows. Suppose that a factor of safety of 1.39 is desired. This means that a "safe" operating pressure for this anomaly is 970/1.39 = 698 psig. If

---

[*]NOTE: CASE 1 (all uppercase letters) refers to the minimum pressure prediction as opposed to Case 1 (our example calculation).

30

the MAOP of the pipeline is 698 or less, this anomaly is acceptable. If the MAOP is higher than 698, the operator must lower the pressure to 698 to maintain a factor of safety of 1.39. Similarly, if a factor of safety of 1.67 had been used, the safe pressure would be 970/1.67 = 581 psig.

The user can view Screen 2 (as shown in Figure 9) by evoking PAGE DOWN. This screen shows the original pit depth measurements and presents two additional calculations. CASE 2 is the minimum failure pressure based upon the modified method (three-term Folias, flow stress of SMYS + 10,000 psi and Area = 0.85 dL). Note that this is not the safe pressure calculable via Equation (22). The safe pressure is 1074/1.39 = 773 psig (factor of safety of 1.39). This example shows an extreme case of the weakness in approximate representation of a corroded area. The consideration of the actual area via RSTRENG as opposed to 0.85 dL results in a 10 percent lower value of safe pressure (698 as opposed to 773). In actual practice, however, corrosion does not occur as a uniform depth phenomenon, and the 0.85 dL representation will be adequate.

CASE 3 calculated by RSTRENG represents the failure pressure calculable by the existing B31G criterion (two-term Folias, flow stress of 1.1 SMYS, and Area = (2/3) dL). This is not the safe pressure calculable via Equation (10) or (11). The safe pressure is 1081/1.39 = 778 psig. As with the CASE 2 calculation, the existing B31G method tends to overestimate the strength of a "rectangular" flaw. This has been recognized from the outset of the development of the B31G criterion in 1970. Adequate safeguards have always been present, however, to prevent misuse of the criterion.

Additional examples of the use of RSTRENG are provided in Figures 10 and 11. These represent the 10-inch-long parabolic and 0.85 dL areas of previously discussed examples. In both cases, the "effective" lengths indicated by the arrows are 8 inches instead of the full 10 inches. The CASE 1 minimum predicted failure pressures are 1,160 psig and 1,045 psig, respectively. Also, in both cases the CASE 2

31

and CASE 3 calculated minimum failure pressures are 1,074 psig and 1,081 psig, the same as for the rectangular example. .

Failure pressure levels for all nine cases calculated via RSTRENG on the basis of a 1.39 factor of safety are presented in Table 2. Note that the RSTRENG outputs are the $P_f$ values in Table 2. For rectangular flaws, the effective area is the same as the exact area and the minimum level based on the effective area is the same as that based on the full length of the flaw. For the cases of the new area representations and the parabolic flaws, however, the effective areas which give the minimum failure pressures are in some cases less than the exact areas.

## VALIDATION OF THE METHODOLOGY

The original B31G criterion was validated by means of 47 burst tests of corroded pipe as described in Reference 4. Failure pressures for the 47 test results calculated via Equation (1) using (2/3)dL as the area of the anomaly, the two-term M of Equation (2) and the flow stress equal to 1.1 SMYS ranged from 1.07 to 3.07 times the observed failure pressure. Thus, when used with the factor of safety of 1.39, the original criterion provides more than adequate assurance that anomalies accepted by the criterion will not fail in service. Because the goal of this project is to reduce excess conservatism without creating an unsafe condition, it is necessary to revisit these 47 burst test results and to assess whether or not the modified criterion provides an adequate means of predicting the effects of metal loss on the remaining strength of the corroded pipe. In addition, through efforts of individual companies 39 additional burst test results have been made available for this validation effort.

32

## Predictions of Failure Pressure Via
## RSTRENG Compared to Burst Test Results

A detailed list of all 86 burst test results including the associated predictions of failure pressure is presented in Appendix D. All predictions of failure pressure used in these comparisons are the minimum values predicted from CASE 1 calculations via RSTRENG. The list contains two groups of tests, tests which resulted in ruptures and tests which resulted in leaks. The distinction is necessary because the method of prediction based upon Equation (1) appears to do a better job of predicing ruptures than it does in predicting leaks. As will be discussed, however, this results from probable experimental measurements errors in the first 47 experiments.

The comparisons of actual to predicted failure pressures for the 41 ruptures are shown in Figure 12. The diagonal line indicates the point of exact agreement between actual and predicted failure pressure. Points which lie above the line represent cases in which the actual failure pressure observed in the burst test exceeded the predicted level indicating that the pipe had greater remaining strength than the methodology based on Equation (1) predicts.

As shown in Figure 12, the burst pressures exceeded the predicted pressures in 38 out of the 41 cases. The three cases in which the predicted levels exceeded the actual levels were Cases 48, 49, and 86 listed in Appendix D. In Case 48 the predicted failure pressure was 785 psig, 6 percent greater than the actual burst pressure of 742 psig. In Case 49, the predicted failure pressure was 813 psig, 3 percent greater than the actual burst pressure of 788 psig. In Case 86, the predicted failure pressure was 844, two percent greater than the actual burst pressure of 828 psig.

The comparisons of Figure 12 provide a high degree of confidence that the RSTRENG methodology used for predicting rupture pressures of corroded pipe can be used to predict safe operating pressure levels for corroded pipe.

33

The comparisons of actual to predicted failure pressures for the 45 leaks are shown in Figure 13.  Again, the diagonal line represents exact agreement between actual and predicted failure pressure.  In the case of leaks, the predicted failure pressures do not seem to provide a reliably conservative estimate of the actual failure pressures as in the case of ruptures.  This situation is thought to be attributable to two circumstances.  One is that Equation (1) does not work as well for deep defects as it does for less deep defects.  Defects which are more than 80 percent through the wall are prone to develop leakage from local stress conditions in the remaining thickness that are not well described in Equation (1).  In addition, it is known that several of the leaks in the original 47 burst tests developed after several cycles of pressurizations indicating that low-cycle fatigue effects may have been a factor[*].  Also, it is felt that the early data were prone to errors in wall thickness as a result of the pipe being seamless (highly variable thickness) and the fact that because of weld-over repairs of each leak, plaster casts were used to make measurements rather than the pipe itself.  In fact, as will be seen in Figure 15 and as discussed below, the predictions of Equation (1) were in much better agreement with the results of leaks in the 39 new burst tests where thickness measurements were taken directly and cyclic pressurizations were avoided.  In any case, the method embodied in Equation (1) cannot be expected to reliably predict the development of a leak at a very deep pit (greater than 80 percent of the wall thickness).  As a result, the original B31G criterion was not intended to be applied to anomalies having depths greater than 80 percent of the wall thickness.  This same limitation should be retained in any modified criterion.

---

[*]In Table D-1 of Appendix D, Tests 9 through 24 occurred on successive cycles of pressurization of one sample.  Repairs were made after each cycle to close prior leaks.  This made it virtually impossible to check final wall thickness after the test.  The cyclic pressurizations and the poor documentation of actual thickness are believed to have led to previous misinterpretation of the ability of Equation (1) to predict leaks.  Note that except for Tests 37 and 41 which involved flaws exceeding 80 percent of the wall thickness, almost all of the "poor-fit" data in Figure 15 are attributable to the multiple tests on one specimen.

34

## Predictions of Failure Pressures Via
## Approximate Methods Compared to Exact Area Methods

Recognizing that some pipeline operators will choose to use the approximate methods rather than RSTRENG to evaluate corrosion, we made additional comparisons as shown in Figures 14 and 15. These figures compare failure pressures predicted by RSTRENG (CASE 1) and by two approximate methods, CASE 2 (0.85 dL) and CASE 3 (2/3 dL) to the actual failure pressures in the 86 burst tests. Both the CASE 2 and CASE 3 predictions are based upon the full length, L, of the corroded area and its maximum depth, d. CASE 2 utilizes the new area representation (0.85dL), the flow stress equal to SMYS plus 10,000 psi, and the three-term M. CASE 3 utilizes the parabolic representation (2/3dL), the flow stress equal to 1.1 times SMYS, and the two-term M. Note that in making these predictions of failure pressure, the safety factor has been eliminated so that if perfect agreement existed the points would lie on the line at a value of 1 on the Y-axis of Figures 14 and 15. The format of Figures 14 and 15 differs from that of Figures 12 and 13 because it is desirable to compare the predictions of three methods instead of only one to the actual burst pressures. Also, note that the RSTRENG predictions (CASE 1) in Figures 14 and 15 (as in Figures 12 and 13) are based upon the use of actual yield rather than SMYS.

Figures 14 and 15 reveal that the approximate methods gave consistently conservative estimates of the actual failure pressures. For both CASE 2 and CASE 3, the predictions are consistently more conservative than those of RSTRENG.

The comparison of Figures 14 and 15 show that the approximate methods, one embodied in the current B31G criterion and one proposed for a modified criterion, consistently underestimate the remaining strengths of the corroded pipes. Also, it is noted that the predictions of leaks in Figure 15 tended to overestimate the actual failure pressures most often for the early data where, as mentioned above, the data on wall

35

thicknesses were less accurate.  Predictions for later data, except for two very deep flaws (37 and 41), tended to underestimate remaining strength.

## Further Justification for Using the Effective-Area Method and 0.85 dL

To examine further the rationale for using the effective area and 0.85 dL as a "modified" B31G approach, let us compare several calculation methods on the basis of a flaw of nonuniform depth.  The flaw of interest consists of a defect within a defect as shown in Figure 16.  In this situation, the existing B31G criterion requires the use of the maximum length ($L_1$) and the maximum depth (within the relatively short $L_2$ region) to determine allowable length or reduced operating pressure.  In some cases, this results in an overconservative assessment; in other cases, it results in an underconservative assessment.  The point is, the existing criterion of A = 2/3 dL is not adequate for dealing with this kind of defect.

## Defect Parameters and Failure Stress Prediction Methods

The geometric parameters of the defect are shown in Figure 16. Also shown are the lengths and areas related to eight candidate types of analysis with respect to predicting the failure stress of the defect. These methods are described below.  All are based upon Equation (1). Note that nothing in the analysis requires the deep defect to be centered within the shallow defect.  Hence, two defects of unequal depths touching end-to-end may be treated in this manner.

Method 1 - Exact Area.  In this method as shown in Figure 16, the length is taken as $L_1$, and the area is taken as $A = L_1 d_1 + L_2 (d_2 - d_1)$.  $A_o$ is $L_1 t$.

36

**Method 2 - Short, Deep Defect Only.** In this case, the long defect is ignored. The defect length is taken as $L_2$ and the area is taken as $A = L_2 d_2$. $A_0$ is $L_2 t$.

**Method 3 - Short, Deep Defect in a Reduced Thickness Pipe.** For this method, the short, deep defect is considered to exist in a pipe the thickness of which is equal to the net thickness beneath the long defect $(t - d_1)$. The length of the defect is $L_2$ and the area $A$ is $L_2(d_2 - d_1)$. $A_0$ is $L_2 (t - d_1)$. Because the pipe is assumed to be $(t - d_1)$ in thickness, the hoop stress must be calculated from the Barlow formula using $(t - d_1)$. Hence,

$$S = \frac{P \times R}{(t - d_1)}$$

**Method 4 - Equivalent Length, Total (Equivalent) Area.** In this method, the entire defect area is considered. That is $A = L_1 d_1 + L_2 (d_2 - d_1)$ as in Method 1, but the length is defined as $L = A/d_2$ or the total area divided by the maximum depth $d_2$. This method creates for analysis purposes, a single rectangular defect with an area and maximum depth equal to that of the actual defect. $A_0$ is $Lt$.

**Method 5 - Long, Shallow Defect Only.** In this case, the existence of the deep defect is ignored. Length is taken as $L_1$ and area is $A = L_1 d_1$. $A_0$ is $L_1 t$.

**Method 6 - Effective Area (RSTRENG).** In this case, RSTRENG is used to find the minimum failure pressure based on the effective area and length.

**Method 7 - Parabolic Area.** This is the method currently embodied in the B31G criterion.

**Method 8 - 0.85 dL.** This is the method recommended to replace the parabolic area when only the maximum length and depth of the defect are known.

37

## Comparisons of the Eight Methods

Comparisons of six of the eight methods for predicting the behavior of a specific case of this type of defect are shown in Figure 17. The figure represents a sensitivity study using the variations on length and area and Equation (1). The pipe material is 36-inch O.D. by 0.400-inch wall X60 (actual flow stress = 73,100 psi). Methods 2 and 5 are not included in these comparisons because upon brief consideration it becomes obvious that neither of these methods is appropriate. In the case of Method 2, the predicted failure pressures would become unrealistically high as the length, $L_2$, becomes very short. In the case of Method 5, the failure pressure is independent of $L_2$ and $d_2$, clearly not a realistic situation. Hence, the following comparisons involve only Methods 1, 3, 4, 6, 7, and 8.

The analyses are summarized in Figure 17. The flaw parameters are as follows. The overall flaw is 13 inches in length. In one region its depth, $d_1$, is 0.120 inch. Its depth in the other region, $d_2$, is 0.300 inch. The length of the deeper region, $L_2$, varies from 0 to 6.5 inches. For the trivial case, $L_2 = 0$, the failure pressure level of the 13-inch-long rectangular flaw with a uniform depth of 0.120 inch is 1,203 psig as predicted by both the exact area method and RSTRENG. As $L_2$ becomes nonzero, the failure pressures predicted by both Method 1, the exact-area method and Method 6, the effective-area method, decrease. For $L_2$ values in excess of 2 inches, the effective-area predictions fall below those of the exact area method. The RSTRENG predictions at higher values of $L_2$ reflect the observable fact that the behavior of the flaw becomes controlled to an increasing extent by the shorter flaw. It is seen that the failure pressure predicted by the effective-area method (RSTRENG) for the situation in which $L_2 = 6.5$ is 735 psig. This result merely reflects the fact that RSTRENG found the minimum failure pressure to be based on the 6.5-inch-long 0.300-inch-deep effective area, independent of the longer defect.

$A_o = (13)(0.4) = 5.2 \text{ in}^2$ } $A/A_o = 0.505$

$A = 2.73 \text{ in}^2$

$d/t = 0.300/0.400 = 0.75$

38

The one available test result for this type of flaw was
obtained on a 36-inch-diameter, 0.400-inch wall pipe material with a
flow stress level of 73,100 psi.  The defect in the specimen was 13
inches in length overall with a centrally located shorter flaw of 6.5
inches in length.  The depths, respectively, were 0.120 inch and 0.300
inch.  Its failure pressure level was 749 psig.  The failure pressure
predicted by RSTRENG was 735 psig.  Thus, the failure pressure of the
test flaw was adequately predicted by the effective-area method but was
overestimated by the exact-area method which gave a predicted failure
pressure of 910 psig.

Note that the failure pressures predicted by Methods 3 and 4
fall considerably below those predicted by RSTRENG indicating that they
are considerably more conservative than RSTRENG.

Lastly, consider the predictions via Method 7 (parabolic or
existing B31G method) and Method 8 (0.85 dL method proposed to replace
the parabolic representation).  Neither method is capable of considering
the fact that $L_2$ varies and both are based on $L_1 = 13$, and $d_2 = 0.300$.
However, the difference between the two is significant.  Method 7 yields
a predicted failure pressure (with no factor of safety) of 982 psig,
1.31 times the actual failure pressure of test specimen with the
compound flaw of 6.5 inches at 0.300-inch depth within the 13-inch-
long, 0.120-inch-deep flaw.  In contrast, Method 8 yields a predicted
failure pressure (with no factor of safety) of 756 psig.  The latter
compares favorably with the one test result and is in fact part of the
reason why 0.85 was chosen as opposed to some other factor.

The use of either the effective-area method or the 0.85 dL
area representation is clearly preferable to the handling of this type
of defect by means of the old B31G criterion.  If considered on the
maximum-length-maximum-depth basis, the whole family of anomalies
discussed (except for the trivial $L_2 = 0$ case) could be viewed as a 13-
inch-long 0.300-inch-deep flaw in a 36-inch 0.390-inch nominal wall
thickness X60 material (flow stress = 70,000 psi).  In such a case, the
existing B31G criterion allows a defect of 0.300-inch depth to be no
more than 1.97 inches in length or the 13-inch-long flaw to be operated

39

at no more than 595 psig.  The new criterion would allow only a slightly longer 2.13-inch-long flaw, but it would allow the 13-inch-long flaw to be operated at a pressure of only 491 psig.  This illustrates a case in which the 0.85 dL representation is less conservative than the parabolic method as it should be at a 72 percent SMYS operating stress but more conservative than the parabolic method in the case of a greatly reduced operating pressure as anticipated and as it should be.  Note that the safe pressure level under the existing B31G approach is not sufficiently low to assure a factor of safety of 1.39 while that of the new area representation is (the actual failure pressure of the one test result was 749 psig).

## Statistical Analysis of the Predictive Methods

The accuracies of the predictive methods can be assessed statistically by considering ratios of predicted-to-actual failure pressures.  Such ratios are listed in Appendix D for predictions via RSTRENG (CASE 1), the 0.85 dL representation (CASE 2), and the existing 2/3 dL representation (CASE 3).  The mean values and standard deviations of these ratios are as follows.  It is assumed that the data correspond to a "normal" distribution.

|  | CASE 1 (RSTRENG) | CASE 2 (0.85 dL) | CASE 3[a] (2/3 dL) |
|---|---|---|---|
|  | | Ruptures | |
| Mean | 0.850 | 0.622 | 0.537 |
| Std. Dev. | 0.150 | 0.138 | 0.178 |
| Quantity | 41 | 41 | 41 |
|  | | Leaks | |
| Mean | 0.992 | 0.675 | 0.630 |
| Std. Dev. | 0.180 | 0.221 | 0.209 |
| Quanity | 45 | 45 | 49 |

(a)  Includes results for $L^2/Dt > 20$.  In such cases, the existing criterion reverts to the remaining thickness approach embodied in Equation (11), an overconservative approach.

40

The meanings of these results are discussed below.

First, consider the ruptures.  The mean value for the RSTRENG predictions is 0.850 reflecting the fact that most of the time RSTRENG underestimates the remaining strength.  The standard deviation of 0.150 means that 95 percent of the data can be expected to lie within 0.850 $\pm$ 2(0.150) of the mean.  This means that only 2-1/2 percent of the data would be expected to have ratios above 1.15.  Similarly, only 0.5 percent of the data would be expected to have ratios above 1.30 (three standard deviations from the mean).  By using a factor of safety of 1.39 on the failure pressure calculated by RSTRENG, then, one can expect that corrosion anomalies left in a pipeline via this screening analysis would be extremely unlikely to rupture in service.

From the standpoint of the 0.85 dL representation, the mean for the 41 ruptures is 0.622, the standard deviation is 0.138 and the two and three standard deviation upper bounds on the predictions are 0.622 + 2(0.138) = 0.898 and 0.622 + 3(0.138) = 1.036, respectively.  Utilizing a factor of safety of 1.39 with the new area representation, one can have a very high degree of confidence that no "acceptable" corroded area will rupture in service.

From the standpoint of the existing B31G method (2/3 dL), the mean for the 41 ruptures is 0.537 and the standard deviation is 0.178, and the two and three standard deviation upper bounds on the predictions are 0.893 and 1.071, respectively.

Now, consider the 45 leaks.  The mean value for the RSTRENG predictions is 0.992 and the standard deviation is 0.180.  The two and three standard deviation upper bounds are 1.352 and 1.532.  Clearly, a 1.39 factor of safety is not adequate.  It is recalled, however, that the use of the criterion is limited to anomalies not greater than 80 percent of the wall thickness in depth.  If one can overlook the suspect early corroded pipe tests in which leaks occurred at unexpectedly low pressures, this limit would be expected to eliminate most, if not all, circumstances wherein "acceptable" pits would leak in service.

41

The mean value for the 0.85 dL representation is 0.675 and the standard deviation is 0.221.  This results in two and three standard deviation upper bounds of 1.117 and 1.338, respectively.  These predictions are clearly more conservative than those of RSTRENG, but again, one must retain a limit on depth 0.80 d/t to avoid leaks in service.

The mean value for the existing B31G method (2/3 dL) is 0.630 and the standard deviation is 0.205.  This results in two and three standard deviation upper bounds of 1.040 and 1.215, respectively.  These predictions are also more conservative than those of RSTRENG.

It is reasonably clear that with an adequate factor of safety and a limit on maximum pit depth, the new methods can be used prudently to assess the remaining strength of corroded pipe.

## Summary of the Validation Effort

The foregoing comparisons strongly suggest that the methodology embodied in both the existing B31G criterion and the proposed modified criterion can be used safely to assess corroded line pipe and to predict safe operating pressure levels.

## CORROSION IN VARIOUS TYPES OF LONGITUDINAL SEAMS

The existing B31G criterion does not apply to corrosion in any type of seam weld.  This situation can and should be changed as follows. Corrosion in submerged-arc welds should be treated exactly as corrosion in the body of the pipe.  Corrosion (i.e., selective corrosion) in ERW or flash-welded seams should not be evaluated on the basis of either the existing B31G criterion or the proposed modified criterion.  The rationale for these recommendations is presented below.

The justification for treating corrosion in a submerged-arc seam in the same manner as corrosion in the body of the pipe is that both operating experience and test data show that such seams tend to be at least as resistant to defects as the pipe material itself.  Evidence

42

of this was gathered over 20 years ago as shown in Table 3. This table is taken from Reference 6. It involves pairs of tests in which identical through-wall flaws[*] were fabricated into two samples of the same length of pipe. In one sample, the defect was located in the heat-affected zone of the submerged-arc seam or in the fusion line on the ERW seam or flash-welded seam, while in the other sample the defect was located in the body of the pipe. The burst pressures of the flawed specimens were compared as shown in Table 3. In every instance the failure stress levels of defects in the submerged-arc welded seams were higher than those of the defects in the body of the pipe. In contrast, defects located in ERW and flash-welded pipe exhibited failures at stress levels below those of the defects in the body of the pipe.

Besides the evidence from these tests, experience has shown that hydrostatic test ruptures and service failures which originate in or near submerged-arc welds seldom propagate preferentially in the weld or heat-affected zone. More commonly, such fractures tend to move farther from the weld as they propagate. In contrast, experience in relation to hydrostatic test failures and service failures originating in or near ERW or flash-welded seams reveals many cases in which the fracture propagated end-to-end in the weld often at obviously higher speeds judging by the lack of fracture arrest. While this experience may not be typical of currently fabricated ERW pipe, it is a major consideration for the vast majority of ERW pipe that has been in service for some time and will be likely to be involved in inspection or revalidation projects.

One other factor which serves to discourage the consideration of corrosion in ERW or flash-welded seams by these methods is the fact that such corrosion is generally "selective" in nature, progressing more deeply and narrowly at the fusion line of the seam that into the surrounding pipe. Thus, a situation is created in which a relatively sharp defect exists in a material with less than optimum toughness. In

---

[*]Through-wall flaws were evaluated by means of patches glued to the inside of the pipe to prevent leakage. Failure pressure is defined as the pressure level at which such a flaw causes a rupture.

43

addition, its crevice-like nature makes it difficult to obtain the critical depth dimensions for the analysis. Given these situations, it is not prudent to use the flow-stress dependent analysis methods of both the existing B31G and the proposed modified criterion to evaluate corrosion in ERW or flash-welded seams.

## RESULTS, CONCLUSIONS, AND RECOMMENDATIONS

The results of this project are as follows.

- A modified method involving two calculation techniques has been developed to predict the failure pressure of corroded pipe.
- The modified method utilizes SMYS plus 10,000 psi as the flow stress of the material and a three-term "Folias" factor to describe the stress-intensity effect of a metal-loss anomaly.
- One embodiment of the modified method utilizes detailed measurements of metal loss and successive trial calculations to obtain a minimum value of predicted failure pressure corresponding to the "effective" area of the metal loss. In this embodiment there is no limit to the length of anomaly that may be analyzed.
- A PC-based program called RSTRENG has been created to facilitate the calculation of the minimum failure pressure via the effective-area technique.
- Another embodiment of the modified method utilizes only the maximum depth and overall length of the corroded region, approximating the metal-loss area as

44

0.85dL to predict the failure pressure of the pipe.

- Provisions have been included for evaluation of corrosion in pipelines with design factors of 72 percent of SMYS and for other design factors as well (i.e., 0.40, 0.50, 0.60, and 0.80).  Also, although the safety factor of 1.39 has been retained for primary use of the new methods in any future B31G document, the optional formulas are given for use with other factors of safety.

- Results of 39 additional burst tests of corroded pipe have been compiled as the result of tests by various pipeline operators.  These were added to the data base of 47 burst tests used to validate the original B31G criterion.  All 86 results were then used to evaluate the modified criterion.  The new data, more so than the old data, strongly suggest that the basic equation embodied in the B31G criterion and the proposed modified criterion is applicable to leaks as well as ruptures.

- The modified criterion underestimated the remaining strengths of 38 of the 41 burst test which terminated in rupture.  In the remaining three cases, it overestimated the strengths by amounts ranging from 2 to 6 percent.

- While the existing criterion and the proposed new criterion are applicable to leaks as well as ruptures, the application

45

of the method should still be limited to pits no more than 80 percent through the wall thickness.

- The burst-test data support the position that any corrosion not greater than 20 percent through the wall thickness can safely be left in service in lines operating at 72 percent of SMYS or less regardless of the length of the corrosion as long as the remaining wall thickness is at least 80 percent of that required by the design stress level.

- Example tables of acceptable lengths and curves for predicting safe pressures have been generated for the modified criterion that can be used to replace those of the existing B31G criterion.

- A review of data presented in Reference 6 on the behavior of defects in longitudinal seams of various types (submerged-arc, ERW, and flash weld) revealed that flaws in submerged-arc seams tend to fail at higher pressures than identical flaws in the body of the pipe and that flaws in ERW and flash-weld seams tend to fail at lower pressures than identical flaws in the body of the pipe.

From these findings, it is concluded that

(1) The modified method as used in either of the two embodiments represents an improved method for evaluating corroded pipe compared to the existing B31G criterion because it eliminates two known sources of

46

excess conservatism embodied in the existing criterion.

(2) When used with a factor of safety of 1.39 (equivalent to a hydrostatic test to 100 percent of SMYS for a pipeline operating at 72 percent of SMYS), the modified criterion provides an adequately safe indication of the integrity of a corroded pipe.

(3) The modified criterion would allow corroded regions on the order of 50 percent greater length than the existing B31G criterion and would predict higher safe operating pressures in cases where the safe operating pressures exceed 55 percent of SMYS.

(4) Corrosion in submerged-arc seams should be handled in the same manner as corrosion in the body of the pipe. Neither the existing B31G criterion nor the proposed modified criterion should be applied to selective corrosion in ERW or flash-welded seams.

## Recommendations

It is recommended that the modified criterion be substituted for the existing B31G criterion and that the criterion be made applicable to corrosion in submerged-arc seams. The new criterion should also permit areas of corrosion pits that are not more than 20 percent through the wall to remain in service regardless of length in pipelines that operate at 72 percent of SMYS or less as long as the remaining wall thickness is at least 80 percent of that required by the

47

design stress level.  However, the current limitation on accepting pits no more than 80 percent through the wall should be retained.

48

# REFERENCES

(1)  Maxey, W. A., Kiefner, J. F., Eiber, R. J., and Duffy, A. R., "Ductile Fracture Initiation, Propagation, and Arrest in Cylindrical Vessels", Fracture Toughness, Proceedings of the 1971 National Symposium on Fracture Mechanics, Part II, ASTM STP 514, American Society for Testing and Materials, pp 70-81 (1972).

(2)  Kiefner, J. F., Maxey, W. A., Eiber, R. J., and Duffy, A. R., "Failure Stress Levels of Flaws in Pressurized Cylinders", Progress in Flaw Growth and Fracture Toughness Testing, ASTM STP 536, American Society for Testing and Materials, pp 461-481 (1973).

(3)  Folias, E. S., "The Stresses in a Cylindrical Shell Containing an Axial Crack", ARL 64-174, Aerospace Research Laboratories (October 1964).

(4)  Kiefner, J. F., and Duffy, A. R., Summary of Research to Determine the Strength of Corroded Areas in Line Pipe, presented at a Public Hearing at the U.S. Department of Transportation (July 20, 1971).

(5)  Shannon, R. W. E., "The Failure Behavior of Line Pipe Defects", International Journal of Pressure Vessels and Piping, (2) (1974) - Applied Science Publishers, Ltd., England, Printed in Great Britain (1974).

(6)  Kiefner, J. F., "Fracture Initiation", in the 4th Symposium on Line Pipe Research, Paper G, American Gas Association Catalogue No. L30075 (November 18, 1969).

## TABLE 1.  EXAMPLE OF TABLE TO BE USED IN A MODIFIED VERSION OF B31G

SMYS = 52,000 psi.
Diameter = 30.000 inches

Wall thickness, inch

| Depth, inch | 0.250 | 0.312 | 0.375 | 0.438 | 0.500 | 0.625 | 0.688 |
|---|---|---|---|---|---|---|---|
| 0.02 | .... | .... | .... | .... | .... | .... | .... |
| 0.03 | .... | .... | .... | .... | .... | .... | .... |
| 0.04 | .... | .... | .... | .... | .... | .... | .... |
| 0.05 | 27.39 | .... | .... | .... | .... | .... | .... |
| 0.06 | 14.56 | .... | .... | .... | .... | .... | .... |
| 0.07 | 8.53 | 25.00 | .... | .... | .... | .... | .... |
| 0.08 | 6.32 | 12.41 | 33.54 | .... | .... | .... | .... |
| 0.09 | 5.11 | 8.84 | 17.84 | 36.25 | .... | .... | .... |
| 0.10 | 4.33 | 7.04 | 11.98 | 26.16 | 38.73 | .... | .... |
| 0.11 | 3.77 | 5.92 | 9.32 | 15.86 | 36.23 | .... | .... |
| 0.12 | 3.34 | 5.13 | 7.74 | 11.97 | 20.60 | .... | .... |
| 0.13 | 2.99 | 4.55 | 6.68 | 9.80 | 14.98 | 43.30 | .... |
| 0.14 | 2.71 | 4.09 | 5.90 | 8.38 | 12.06 | 35.79 | 45.43 |
| 0.15 | 2.46 | 3.72 | 5.30 | 7.37 | 10.22 | 23.03 | 45.21 |
| 0.16 | 2.25 | 3.41 | 4.82 | 6.60 | 8.94 | 17.66 | 28.80 |
| 0.17 | 2.06 | 3.14 | 4.42 | 6.00 | 7.98 | 14.60 | 21.20 |
| 0.18 | 1.89 | 2.90 | 4.09 | 5.50 | 7.23 | 12.57 | 17.22 |
| 0.19 | 1.73 | 2.69 | 3.80 | 5.09 | 6.62 | 11.10 | 14.68 |
| 0.20 | 1.58 | 2.51 | 3.54 | 4.73 | 6.12 | 9.99 | 12.89 |
| 0.21 | .... | 2.33 | 3.31 | 4.42 | 5.69 | 9.11 | 11.55 |
| 0.22 | .... | 2.18 | 3.11 | 4.15 | 5.33 | 8.40 | 10.50 |
| 0.23 | .... | 2.03 | 2.92 | 3.91 | 5.00 | 7.80 | 9.65 |
| 0.24 | .... | 1.89 | 2.75 | 3.69 | 4.72 | 7.28 | 8.95 |
| 0.25 | .... | .... | 2.60 | 3.49 | 4.46 | 6.84 | 8.35 |
| 0.26 | .... | .... | 2.45 | 3.31 | 4.23 | 6.46 | 7.84 |
| 0.27 | .... | .... | 2.31 | 3.14 | 4.02 | 6.11 | 7.39 |
| 0.28 | .... | .... | 2.18 | 2.98 | 3.83 | 5.81 | 7.00 |
| 0.29 | .... | .... | 2.06 | 2.83 | 3.65 | 5.53 | 6.64 |
| 0.30 | .... | .... | 1.94 | 2.70 | 3.48 | 5.28 | 6.33 |
| 0.31 | .... | .... | .... | 2.56 | 3.33 | 5.04 | 6.04 |
| 0.32 | .... | .... | .... | 2.44 | 3.18 | 4.83 | 5.78 |
| 0.33 | .... | .... | .... | 2.32 | 3.04 | 4.63 | 5.54 |
| 0.34 | .... | .... | .... | 2.21 | 2.91 | 4.45 | 5.32 |
| 0.35 | .... | .... | .... | 2.10 | 2.79 | 4.28 | 5.11 |
| 0.36 | .... | .... | .... | .... | 2.67 | 4.12 | 4.92 |
| 0.37 | .... | .... | .... | .... | 2.55 | 3.96 | 4.74 |
| 0.38 | .... | .... | .... | .... | 2.44 | 3.82 | 4.57 |
| 0.39 | .... | .... | .... | .... | 2.34 | 3.68 | 4.41 |
| 0.40 | .... | .... | .... | .... | 2.24 | 3.55 | 4.26 |
| 0.41 | .... | .... | .... | .... | .... | 3.43 | 4.12 |
| 0.42 | .... | .... | .... | .... | .... | 3.31 | 3.99 |
| 0.43 | .... | .... | .... | .... | .... | 3.20 | 3.86 |
| 0.44 | .... | .... | .... | .... | .... | 3.09 | 3.73 |
| 0.45 | .... | .... | .... | .... | .... | 2.98 | 3.61 |
| 0.46 | .... | .... | .... | .... | .... | 2.88 | 3.50 |
| 0.47 | .... | .... | .... | .... | .... | 2.78 | 3.39 |
| 0.48 | .... | .... | .... | .... | .... | 2.69 | 3.29 |
| 0.49 | .... | .... | .... | .... | .... | 2.59 | 3.18 |
| 0.50 | .... | .... | .... | .... | .... | 2.50 | 3.08 |
| 0.51 | .... | .... | .... | .... | .... | .... | 2.99 |

TABLE 2.   PREDICTED FAILURE PRESSURE LEVEL FOR CASES 1 THROUGH 9 USING RSTRENG
(All 30-inch O.D. by 0.375-inch wall, X52 material)

| Case Number | Shape | Length, L, inches | Maximum Depth, d, inch | Failure Pressure[a] $P_f$, psig | Safe Pressure, $P_f/1.39$ | MAOP with no Defect | Status |
|---|---|---|---|---|---|---|---|
| 1 | Rectangle | 10 | 0.1875 | 970 | 698 | 936 | Repair or reduce pressure to 698 psig |
| 2 | Rectangle | 3 | 0.1875 | 1309 | 942 | 936 | Continue to operate at 936 psig |
| 3 | Rectangle | 2 | 0.1875 | 1415 | 1018 | 936 | Continue to operate at at 936 psig |
| 4 | Parabolic | 10 | 0.1875 | 1160 | 835 | 936 | Repair or reduce pressure to 835 psig |
| 5 | Parabolic | 3 | 0.1875 | 1421 | 1022 | 936 | Continue to operate at 936 psig |
| 6 | Parabolic | 2 | 0.1875 | 1479 | 1064 | 936 | Continue to operate at 936 psig |

## TABLE 2. (Cont'd)

| Case Number | Shape | Length, L, inches | Maximum Depth, d, inch | Failure Pressure[a] $P_f$, psig | Safe Pressure, $P_f/1.39$ | MAOP with no Defect | Status |
|---|---|---|---|---|---|---|---|
| 7 | New area (0.85dL) | 10 | 0.1875 | 1045 | 752 | 936 | repair or reduce pressure to 752 psig |
| 8 | New area (0.85dL) | 3 | 0.1875 | 1365 | 982 | 936 | Continue to operate at 936 psig |
| 9 | New area (0.85dL) | 2 | 0.1875 | 1448 | 1042 | 936 | Continue to operate at 936 psig |

(a) $P_f$ calculated via Equation (1) using $M_T$ based on Equation (12) and the "effective" area as determined by RSTRENG.

52

TABLE 3.   COMPARISONS OF THE BEHAVIORS OF THROUGH-WALL FLAWS IN
LONGITUDINAL WELDS WITH IDENTICAL DEFECTS IN THE PIPE
MATERIAL (FROM REFERENCE 6)

| Material | Type of Longitudinal Weld | Flaw Length, inches | Failure Pressure, psig | Ratio of Failure Pressure of Weld Flaw to That of Flaw in Pipe Material, percent |
|---|---|---|---|---|
| 30 x 0.328 inch X60 | | | | |
| Pipe | | 7.00 | 705 | --- |
| Weld | DSA | 7.00 | 870 | 123 |
| 30 x 0.360-inch X60 | | | | |
| Pipe | --- | 6.00 | 925 | --- |
| Weld | DSA | 6.00 | 995 | 108 |
| 36 x 0.390-inch X60 | | | | |
| Pipe | --- | 3.00 | 1265 | --- |
| Weld HAZ[a] | DSA | 3.00 | 1334 | 106 |
| 30 x 0.375-inch X52 | | | | |
| Pipe | --- | 7.00 | 785 | --- |
| Weld | FW | 7.00 | 695 | 89 |
| 30 x 0.360-inch X60 | | | | |
| Pipe | | 5.30 | 950 | --- |
| Weld | FW[b] | 5.30 | 830 | 88 |
| 20 x 0.250-inch X52 | | | | |
| Pipe | --- | 3.00 | 1193 | --- |
| Weld | ERW | 3.00 | 1102 | 92 |

(a)   Flaw was located approximately in the heat-affected zone at mid
thickness of the pipe wall.  Both inside and outside reinforcements
were ground off.

(b)   Normalized flash welds.

53



FIGURE 1.  PARAMETERS OF METAL LOSS USED IN ANALYSIS OF REMAINING STRENGTH

54



EXACT AREA

PARABOLIC AREA

$A = 2/3\,Ld$

FIGURE 2. PARABOLIC REPRESENTATION OF METAL LOSS AS USED IN THE B31G CRITERION

55



$$L \lesssim 1.12 \ B \sqrt{Dt}$$

FIGURE 3.    THE B31G CRITERION FOR ACCEPTABLE LENGTH OF A CORRODED REGION



FIGURE 4.   GRAPHICAL REPRESENTATION OF FOLIAS FACTORS USED IN THE MODIFIED CRITERION



FIGURE 5.   CONTOUR MAP OF PIT DEPTHS

58



FIGURE 6.    PROFILE OF PIT DEPTHS ALONG "RIVER—BOTTOM" PATH IN FIGURE 4

59



FIGURE 7.  COMPARISON OF ALLOWABLE LENGTHS UNDER THE OLD AND THE NEW CRITERIA

60



FIGURE 8.   COMPARISON OF PREDICTED SAFE OPERATING PRESSURES UNDER THE OLD AND THE NEW CRITERIA

61

## SCREEN 1

```
Specimen = RECT - 10 INCH        Date =      10-19-1989
Diameter =    30.00 in.          Thickness =   0.375 in.
Yield Str. = 52,000 psi.         Comment =


       ↓--------------------------------------------------------------↓
       0                                                              10
0.00   ----------------------------------------------------------------
0.02   -
0.04   -
0.06   -
0.08   -
0.10   -
0.12   -
0.14   -
0.16   -
0.18   *      *      *      *      *      *      *      *      *      *      *
0.20   -
       CASE 1 MINIMUM          CASE 1 MINIMUM
       Failure Stress          Failure Pressure (NOTE: No Safety Factor Applied)
          psi.                       psi.
         38,781                      970
```

## SCREEN 2

```
SMYS = 52,000 psi.  (NOTE: No Safety Factors Applied to CASE 1, 2 or 3)
    CASE 2   MODIFIED METHOD USING AREA = 0.85 dL    :      1,074 psi.
    CASE 3   EXISTING B31G METHOD USING AREA = 2/3 dL :      1,081 psi.

--- PIT DEPTH MEASUREMENTS (MILS) ----- (MAX. Pit Depth =  0.187 inch) ------

    0.00   187
    1.00   187
    2.00   187
    3.00   187
    4.00   187
    5.00   187
    6.00   187
    7.00   187
    8.00   187
    9.00   187
   10.00   187
```

FIGURE 9.   EXAMPLE CASE 1

.62

## SCREEN 1

```
Specimen = PARAB. - 10 INCH      Date =      10-19-1989
Diameter =    30.00 in.          Thickness =   0.375 in.
Yield Str. = 52,000 psi.         Comment =


        ↓--------------------------------------------------------↓
        0                                                      10
0.00    *--------------------------------------------------------*
0.02    -
0.04    -
0.06    -       *                                         *
0.08    -
0.10  ' -
0.12    -               *                         *
0.14    -
0.16    -                       *                 *
0.18    -                   *       *       *
0.20    -
        CASE 1 MINIMUM          CASE 1 MINIMUM
        Failure Stress         Failure Pressure (NOTE: No Safety Factor Applied)
           psi.                       psi.
          46,418                     1,160
```

## SCREEN 2

```
SMYS = 52,000 psi.  (NOTE: No Safety Factors Applied to CASE 1, 2 or 3)
     CASE 2   MODIFIED METHOD USING AREA = 0.85 dL    :     1,074 psi.
     CASE 3   EXISTING B31G METHOD USING AREA = 2/3 dL :     1,081 psi.

--- PIT DEPTH MEASUREMENTS (MILS) ----- (MAX. Pit Depth =  0.187 inch) ------

     0.00    0
     1.00   67
     2.00  120
     3.00  157
     4.00  180
     5.00  187
     6.00  180
     7.00  157
     8.00  120
     9.00   67
    10.00    0
```

FIGURE 10.  EXAMPLE CASE 4

63

## SCREEN 1

```
Specimen = 0.85 dL - 10 INCH      Date =      10-19-1989
Diameter =    30.00 in.           Thickness =   0.375 in.
Yield Str. = 52,000 psi.          Comment =
```

```
        ↓--------------------------------------------------------↓
        0                                                          10
0.00    *---------------------------------------------------------*
0.02    -
0.04    -
0.06    -
0.08    -
0.10    -
0.12    -
0.14    -
0.16    -       *                                              *
0.18    -           *      *      *      *      *      *      *
0.20    -
```

```
        CASE 1 MINIMUM         CASE 1 MINIMUM
        Failure Stress        Failure Pressure (NOTE: No Safety Factor Applied)
           psi.                      psi.
           41,795                    1,045
```

## SCREEN 2

```
SMYS = 52,000 psi.  (NOTE: No Safety Factors Applied to CASE 1, 2 or 3)
    CASE 2    MODIFIED METHOD USING AREA = 0.85 dL    :      1,074 psi.
    CASE 3    EXISTING B31G METHOD USING AREA = 2/3 dL :      1,081 psi.
```

--- PIT DEPTH MEASUREMENTS (MILS) ----- (MAX. Pit Depth =  0.187 inch) ------

```
 0.00    0
 1.00  155
 2.00  178
 3.00  184
 4.00  185
 5.00  187
 6.00  185
 7.00  184
 8.00  178
 9.00  155
10.00    0
```

FIGURE 11.   EXAMPLE CASE 7



# RUPTURES
## 10/26/89

FIGURE 12. COMPARISON OF RSTRENG MINIMUM FAILURE PRESSURES TO BURST TEST RESULTS FOR CASES OF RUPTURES

Case 2:26-cv-05242-SVW-SSC    Document 26    Filed 05/14/26    Page 374 of 1309    Page ID #:12925

Case 2:26-cv-05242-SVW-SSC    Document 26    Filed 05/14/26    Page 375 of 1309    Page ID #:12926



FIGURE 13.    COMPARISON OF RSTRENG MINIMUM FAILURE PRESSURES TO BURST TEST RESULTS FOR CASES OF LEAKS



Case 2:26-cv-05242-SVW-SSC   Document 26   Filed 05/14/26   Page 376 of 1309   Page ID #:12927

# RUPTURES
## 10/26/89

FIGURE 14.  COMPARISON OF PREDICTIONS BY VARIOUS METHODS TO BURST TEST RESULTS FOR CASES OF RUPTURES

Case 2:26-cv-05242-SVW-SSC   Document 26   Filed 05/14/26   Page 377 of 1309   Page ID #:12928



FIGURE 15.   COMPARISON OF PREDICTIONS BY VARIOUS METHODS TO BURST TEST RESULTS FOR CASES OF LEAKS

68



| | Method | Defect Length | Defect Area |
|---|---|---|---|
| 1. | Exact area | $L_1$ | $A = L_1 d_1 + L_2(d_2 - d_1)$ <br> $A_0 = L_1 t$ |
| 2. | Considering only the deeper flaw | $L_2$ | $A = L_2 d_2$ <br> $A_0 = L_2 t$ |
| 3. | Considering deeper flaw in pipe of reduced wall thickness | $L_2$ | $A = L_2(d_2 - d_1)$ <br> $A_0 = L_2(t - d_1)$ <br> Hoop Stress $= P \times R/(t - d_1)$ |
| 4. | Equivalent area | $A/d_2$ | $A = L_1 d_1 + L_2(d_2 - d_1)$ <br> $A_0 = (A/d_2) t$ |
| 5. | Ignoring deeper flaw | $L_1$ | $A = L_1 d_1$ <br> $A_0 = L_1 t$ |
| 6. | Effective area | Effective | Effective Area |
| 7. | Parabolic area | $L_1$ | $A = 2/3 (L_1 d_2)$ <br> $A_0 = L_1 t$ |
| 8. | 0.85 dL | $L_1$ | $A = 0.85 L_1 d_2$ <br> $A_0 = L_1 t$ |

FIGURE 16.   BASES FOR CALCULATIONS OF FAILURE PRESSURE FOR A FLAW HAVING NONUNIFORM DEPTH

69



FIGURE 17.    COMPARISONS OF CALCULATIONS OF FAILURE PRESSURE BY VARIOUS METHODS FOR A FLAW OF NONUNIFORM DEPTH

# APPENDIX A

## MORE EXACT CALCULATIONS OF REMAINING STRENGTH FROM DETAILED MEASUREMENTS OF CORRODED AREAS

A-1

## More Exact Calculations of Remaining Strength from Detailed Measurements of Corroded Areas

It is possible and often useful to make more detailed analyses of corroded areas than those based on overall length and maximum depth. More exact evaluations of the remaining strength of corroded pipe may be made if more detailed information on the metal loss is gathered than the simple overall length and maximum depth needed to apply the B31G method. Such data would be useful, for example, to thoroughly evaluate the magnetic flux leakage tool log grading system. In the event that it becomes desirable to gather such information in large quantities in the future, the following procedures are suggested.

### Type of Information Needed

The type of detailed information needed to determine a more exact value of remaining strength of a corroded pipe segment than is possible with only maximum depth and overall length is illustrated in Figures A-1 and A-2. The boundaries of these two corroded regions are shown along with several longitudinal profiles of the missing metal. The boundaries have been defined by placing a sheet of paper over the corroded region and tracing the edges of the metal-loss areas.

The profiles of metal loss shown in Figures A-1 and A-2 were recorded by means of a "contour" gage which may be purchased in most hardware stores. A contour gage is a set of parallel wires clamped together so that the wires can be slide by one another to conform to and duplicate any irregular curve. Another effective means of measurement consists of using a long straight edge to span the area of metal loss and a narrow or sharpened scale to measure from the straight edge to the bottom of the pits at intervals along the corrosion.

As seen in Figures A-1 and A-2, several profiles of the metal loss are measured parallel (or nearly parallel) to the axis of the pipe. In some cases (Figure A-2, for example), it may be preferable to select profiles that are slightly at an angle to the axis of the pipe to

A-2

minimize the number of profiles taken.  However, the deviation from the axial direction must not exceed 5 degrees or so; otherwise, the profile will be significantly affected by the curvature of the pipe.  The main idea in selecting profiles is to record the deepest areas of metal loss within the boundaries of the corroded area.

The next step in calculating the remaining strength consists of compiling the "worst case" composite of all of the profiles within a given metal-loss area.  For example, as shown in Figure A-1, 4.5 inches of Profile C and 1.5 inches of Profile B located as shown seemed to constitute a worst-case composite profile.  Combining profiles in this manner is necessary because it has been observed in tests of corroded pipe that the origin of failure encompasses the thinnest regions as one might logically expect.  Obviously, there are limits beyond which widely separated profiles need not be combined if they cannot possibly interact.  Thus, combining profiles requires some judgement based upon experience.  When experienced personnel are not available, the most conservative procedure is to combine the worst-case profile from all of the individual profiles regardless of their circumferential separation.

## Calculating Remaining Strength

Calculations of remaining strength are made on the basis of the area of missing metal in the composite profile.  A convenient means of quantifying the area is illustrated in Figure A-3.  The depths of metal loss at regular intervals are recorded (every 1/4 inch in the case of Figure A-3).  The area is calculated from the resulting trapezoids as follows:

$$A = \ell \left(\frac{h_0 + h_1}{2}\right) + \ell \left(\frac{h_1 + h_2}{2}\right) + \ldots + \ell \left(\frac{h_{n-1} + h_n}{2}\right)$$
$$= \ell \left[h_0/2 + h_n/2 + \sum_{i=2}^{n-1} h_i\right] \tag{1}$$

A-3

where

$A$  is the area of the missing metal, $inch^2$

$\ell$  is the uniform interval between depth measurements, inch

$h_i$ is the depth measurement at a given interval

$h_o$ and $h_n$ are the depths at the edge of the corroded area

(Note:  Ideally, $h_o$ and $h_n$ should be zero indicating a return to full wall thickness.  This may not always be the case, however).

The area of missing metal, A, is used to calculate remaining strength via the following equations.

$$S_f = \bar{S} \left[ \frac{1 - A/A_o}{1 - (A/A_o)(M_T^{-1})} \right] \tag{2}$$

$$M_T = \left[ 1 + 0.6275 \frac{L^2}{Dt} - 0.003375 \frac{L^4}{D^2t^2} \right]^{1/2} . \tag{3}$$

when $(L^2/Dt) \leq 50$

$$M_T = 0.032(L^2/Dt) + 3.3. \tag{4}$$

when $(L^2/Dt > 50$

where

$S$ is the hoop stress at failure, psi

$\bar{S}$  is the flow stress of the material, (yield strength + 10,000 psi)

$D$ is the diameter of the pipe, inches

$t$ is the wall thickness of the pipe, inch

$L$ is the axial length of the corroded region, inches.

For irregular defects such as corrosion, calculating remaining strength on the basis of the total area and total length of the defect does not always lead to the minimum value of remaining strength.  The

A-4

minimum remaining strength can be found by trial and error on the basis of portions of the whole defect.  For example, as shown in Figure A-3, one can compare the calculated strengths for the twelve partial defects $L_1$ through $L_{12}$ to find the minimum value.  Thus, the following calculations can be made via Equations 1 through 5.  On a conservative bases, $\bar{S}$ is taken to be SMYS + 10,000 = 70,000 psi (D = 36 and t = 0.390).

## Corroded Area A

| Trial Length | Value of L, inches | Value of A, inch$^2$ | Resulting Value of S, psi |
|---|---|---|---|
| $L_1$ | 0.5 | 0.05000 | 69,867 |
| $L_2$ | 1.0 | 0.09875 | 69,491 |
| $L_3$ | 1.5 | 0.14625 | 68,926 |
| $L_4$ | 2.0 | 0.19500 | 68,208 |
| $L_5$ | 2.5 | 0.24250 | 67,419 |
| $L_6$ | 3.0 | 0.28750 | 66,633 |
| $L_7$ | 3.5 | 0.35500 | 65,816 |
| $L_8$ | 4.0 | 0.38500 | 64,987 |
| $L_9$ | 4.5 | 0.43250 | 64,241 |
| $L_{10}$ | 5.0 | 0.47500 | 63,627 |
| $L_{11}$ | 5.5 | 0.51000 | 63,185 |
| $L_{12}$ | 6.0 | 0.52500 | 63,096 |

In this case, the calculation based on Defect $L_{12}$ (the entire defect) does lead to the minimum value of remaining strength.  This level of hoop stress corresponds to 105 percent of SMYS and a safe operating pressure level of 984 psig (failure pressure divided by 1.4).

A similar trial and error procedure can be used to evaluate the minimum remaining strength of the defect shown in Figure A-4.  In this case, the shape of the defect is quite irregular.  Consequently, the minimum value of remaining strength appears to correspond to less than the full length (i.e., to Defect $L_7$).  Notice that the choice of trial defects is somewhat arbitrary.  Defects $L_{10}$, $L_{11}$, and $L_{12}$ could

A-5

have been chosen in numerous ways.  Also, in this case the interval between depth measurements is 1/2 inch.  Finally, the starting defect, Defect $L_1$ was centered on the deepest point and not on the physical center of the defect.  In any case, Defect $L_7$, in which $L = 7$ inches and $A = 0.755$ inch$^2$, results in a predicted failure stress level, S, of 59,900 psi.  This is based upon $\bar{S} = 70,000$, $D = 36$, and $t = 0.390$.  The resulting hoop stress level is 100 percent of SMYS and the safe operating pressure level is 936 psig.  The calculated stress levels for each of the trial defects are shown below.

### Corroded Area B

| Trial Length | Value of L, inches | Value of A, inch$^2$ | Resulting Value of S, psi |
|---|---|---|---|
| $L_1$ | 1.0 | 0.1650 | 68,908 |
| $L^2$ | 2.0 | 0.2800 | 67,040 |
| $L^3$ | 3.0 | 0.3825 | 65,096 |
| $L^4$ | 4.0 | 0.4875 | 63,233 |
| $L^5$ | 5.0 | 0.5925 | 61,633 |
| $L^6$ | 6.0 | 0.6900 | 60,440 |
| $L^7$ | 7.0 | 0.7550 | 59,990 |
| $L^8$ | 8.0 | 0.7825 | 60,199 |
| $L^9$ | 8.5 | 0.7875 | 60,426 |
| $L^{10}$ | 7.5 | 0.7500 | 60,374 |
| $L^{11}$ | 8.0 | 0.7775 | 60,271 |
| $L^{12}$ | 8.5 | 0.8125 | 60,081 |

A-6



FIGURE A-1.   PLAN VIEW AND SELECTED PROFILES OF CORRODED AREA A

Case 2:26-cv-05242-SVW-SSC   Document 26   Filed 05/14/26   Page 387 of 1309   Page ID #:12938



FIGURE A–2.   PLAN VIEW AND SELECTED PROFILES OF CORRODED AREA B



FIGURE A-3.    DETAILED MEASUREMENTS FOR CALCULATION OF REMAINING STRENGTH OF CORRODED AREA A

Case 2:26-cv-05242-SVW-SSC   Document 26   Filed 05/14/26   Page 389 of 1309   Page ID #:12940

Defect Depth, inch

| 0.05 | 0.06 | 0.04 | 0.01 | 0.04 | 0.08 | 0.10 | 0.10 | 0.10 | 0.10 | 0.11 | 0.20 | 0.15 | 0.10 | 0.11 | 0.11 | 0.11 | 0.10 | 0.04 | 0.02 | 0 |

Actual wall thickness

Exaggerated profile

A-9

|←— 1.0 —→| L1
|←——— 2.0 ———→| L2
|←———— 3.0 ————→| L3
|←————— 4.0 —————→| L4
|←————— 5.0 —————→| L5
|←—————— 6.0 ——————→| L6
|←——————— 7.0 ———————→| L7
|←———————— 8.0 ————————→| L8
|←————————— 8.5 —————————→| L9
|←————————— 7.5 —————————→| L10
|←—————————— 8.0 ——————————→| L11
|←——————————— 8.5 ———————————→| L12

Defect Length, inches

FIGURE A-4.   DETAILED MEASUREMENTS FOR CALCULATION OF REMAINING STRENGTH OF CORRODED AREA B

# APPENDIX B

# RSTRENG MANUAL

B-2

```
RRRRRRR     SSSSSSS  TTTTTTTT  RRRRRRR    EEEEEEE  NN      NN  GGGGGGGG
RR    RR    SS          TT     RR    RR   EE       NNN     NN  GG    GG
RR    RR    SS          TT     RR    RR   EE       NN NN   NN  GG
RRRRRRR     SSSSSSS     TT     RRRRRRR    EEEEE    NN   NN NN  GG  GGGG
RR    RR         SS     TT     RR    RR   EE       NN    NN N  GG  G GG
RR     RR        SS     TT     RR     RR  EE       NN      NNN GG    GG
RR     RR   SSSSSSS     TT     RR     RR  EEEEEEE  NN      NN  GGGGGGGG
```

Ver. 2.0

This RSTRENG program was developed by Battelle Memorial Institute for the American Gas Association.

Contractual obligations apply to this program which restrict any copying AND use.

Because of the research nature of this work, the user undertakes the sole responsibility for the consequences of any use, misuse, or inability to use, any information or results obtained from the RSTRENG program.

B-3

## INTRODUCTION

RSTRENG has been written to predict the remaining strength of corroded line pipe using methods outlined in the text. RSTRENG was written to be supported by DOS version 3.0 or higher. Some problems may be encountered if any earlier versions of DOS are used but the program should still be operational.

This version of RSTRENG (Ver. 2.0) is not compatible with the data files that have been generated using the previous version of RSTRENG (Ver. 1.0). The reason for this is that both the Specified Minimum Yield Strength and the actual Yield Strength are both being used as part of the data file. Previously, only the Specified Minimum Yield Strength was being used.

Throughout the program, a display will appear in the upper-left corner of the screen. This display references the location in this manual where the user can obtain additional information or help.

There are 6 main areas that will be described below which include:

|   |   |
|---|---|
| A. | Getting started, |
| B. | INTRODUCTION to the program, |
| C. | INPUT of the data, |
| D. | EDIT the data, |
| E. | ANALYSIS, and |
| F. | Explanation of output files. |

A few terms that will be used throughout this manual are explained below.

| | |
|---|---|
| <CR> | short for carriage return or enter, |
| <ARROWS> | arrow keys used to move the cursor around the screen, |
| <HOME> | the HOME key found on the keyboard, |
| <PAGE UP> | the PAGE UP key found on the keyboard, |
| <PAGE DOWN> | the PAGE DOWN key found on the keyboard, |
| <ESC> | the ESCAPE key found on the keyboard, or |
| PATH | a location for the disk drive (either hard disk or floppy disk) such as "A:\" or "C:\" or "C:\DATA\", |

B-4

## A.  GETTING STARTED

A-1.  This program was developed for people with a general knowledge of the DOS operating system.  An overview of how to get started is given below.  You can refer to your DOS manual to perform such operations as creating subdirectories and getting around on a hard disk drive system.

If you are going to be operating the program from a **5.25-inch** drive system, insert the RSTRENG disk into the drive (for example, the A drive) then type:

> **A: <CR>**
> **RSTRENG <CR>.**

At this point, the Introduction to the program will be displayed on the screen.

If you are going to be operating the program from the **hard disk drive**, insert the RSTRENG disk into the floppy disk drive (for example, either A: drive or B: drive), move to the location on the hard disk drive where you want to place the program (for example, CD\RSTRENG to move to the subdirectory titled RSTRENG if it exists), then type:

> **COPY A:\*.\* <CR>**
> **RSTRENG <CR>.**

At this point, the Introduction to the program will be displayed on the screen.

## B.    INTRODUCTION TO THE PROGRAM

B-1.  INTRODUCTION.  Once the program has been started, the Introduction to RSTRENG informs the user of the restrictions for use of the program. This introduction will be displayed each time the program is started. The version of RSTRENG being used is displayed in the top-right corner of the screen.

### User Options

> <   >      Hit ANY KEY to continue with the program.

B-2.  INTRODUCTION.  After hitting any key to continue, a short explanation of program is displayed on the screen, filenames for output of the calculated results, and the factors used to determine the predicted failure pressure for a given anomaly.  At this point, the user is prompted to decide on filenames to store the results.

B-5

There are two files that will be created each time the program is started.  The default filenames are displayed on the screen (RSTRENG.OUT and RSTRENG.PLT) and the disk drive being used to store the results (for example, A:\ or C:\) is displayed in the top-right corner.  An explanation of the use of these two files can be found in SECTION F of this manual.

If the user decides to use the output filenames displayed on the screen, then enter <CR>.  WARNING:  If these files exist, they will be overwritten.  The user will then proceed with the MAIN MENU of the program which is explained in SECTION B-4.

If the user decides to change the output filenames, then use the ARROW KEYS to move the cursor at the bottom of the screen to highlight "Change OUTPUT filename", then <CR>.

B-3.   CHANGE OUTPUT FILENAMES.  If the user has decided to change the output filenames, then the user will be prompted to enter the first eight characters for the output filename at the bottom of the screen.

    User Options

           <   >        enter any valid character to be used for the output filename (for example, "C:\SAMPLE"),

           <BACKSPACE> to delete any characters,

           <ESC>        returns the user to the introduction without making any of the changes, or

           <CR>          enters the filename at the bottom of the screen to be used for the output files.

The program will accept up to 8 characters to be used for the output filename and automatically give an extension of ".OUT" and ".PLT".  For example, if "C:\SAMPLE" is entered as mentioned in the example above, two files will be created and named "C:\SAMPLE.OUT" and "C:\SAMPLE.PLT".  The user will then be returned to the screen explained in SECTION B-2 and will need to enter <CR> to select output filenames as they are displayed in the center of the screen.

B-6

B-4.  <u>MAIN MENU.</u>  The main menu allows the user to either input data, edit data, analyze the data, or quit the program.

<u>User Options</u>

        <ARROW KEYS>      highlight the desired module, or

        <CR>             selects the highlighted module.

After the desired module has been selected, then the program will continue with the selected module as explained in each section below.

## C.  INPUT DATA

C-1.  <u>INPUT SECTION.</u>  The user is prompted to enter a path and filename at the bottom of the screen for the data file.  It is suggested that the filename have an extension of ".RST" in order to keep the data used for this program in order (for example, "C:\DATSET1.RST").

    <u>User Options</u>

        <  >        enter any valid character to be used for the filename (for example, "C:\DATSET1.RST"),

        <BACKSPACE> to delete any characters,

        <ESC>       returns the user to the MAIN MENU, or

        <CR>           enters the filename at the bottom of the screen to be used for the data file.

WARNING:  If the data file exists, it will be overwritten.

C-2.  <u>INPUT SECTION.</u>  The user has the option to enter either PIT DEPTH MEASUREMENTS  or REMAINING WALL THICKNESS measurements.  The filename being used to store the data appears in the top-right corner of the display.

    <u>User Options</u>

        <ARROW KEYS>      highlight option,

        <ESC>     returns to the MAIN MENU, or

        <CR>          selects the highlighted option.

B-7

C-3.  INPUT SECTION.  The user will be prompted at the bottom of the screen to enter all of the necessary information to be used in the analysis.  The user should enter the desired input at the bottom of the screen then <CR> to enter.  After each <CR>, the information will be written to the screen.  The necessary input are:

| | |
|---|---|
| SPECIMEN IDENTIFICATION. | enter any identification or <CR> to leave blank, |
| COMMENT................. | enter any comment or <CR> to leave blank, |
| DIAMETER................ | enter nominal diameter (inches), |
| THICKNESS............... | enter actual or nominal wall thickness (inches), |
| YIELD STRENGTH.......... | enter the yield strength (psi.) if available  otherwise enter the SMYS (psi.), |
| SMYS.................... | enter the specified minimum yield strength  (psi.), |
| LENGTH.................. | enter the length of the anomaly (inches), and |
| INCREMENT............... | enter the spacing increment between measurements (inches). |

The measurements along the anomaly must have an equal spacing between the measurements.

If the user selected to enter pit measurements, then a prompt will appear at the bottom of the screen to enter the pit depths measured in thousandths of an inch (MILS) to the nearest MIL.

If the user selected to enter remaining wall thickness measurements, then a prompt will appear at the bottom of the screen to enter the remaining wall thickness measured in thousandths of an inch (MILS) to the nearest MIL.  The remaining wall thickness will be subtracted from the wall thickness and the pit measurement will be displayed on the screen.

User Options

| | |
|---|---|
| <    > | enter any valid character or number for corresponding input, |
| <BACKSPACE> | to delete any characters, |
| <ESC> | returns the user to the MAIN MENU without saving, or |

B-8

User Options (Cont.)

                &lt;CR&gt;                    enters the information at the bottom of the screen to be written to the data file.

After the final pit depth measurement or remaining wall thickness measurement has been entered, all of the data will be written to the file displayed in the top-right corner.  The user will then be returned to the MAIN MENU.

The data is stored in ASCII format.  Table B-1 shows an example of a data file that has been created along with an explanation.

**D.  EDIT SECTION**

D-1.  EDIT SECTION.  The user must first select the file to be edited. If the desired filename exists on the screen, then use the ARROW KEYS to highlight the desired filename then &lt;CR&gt;.  If there are more filenames than appear on the screen ("-- PAGE DOWN --" appears near the bottom of the screen), then enter &lt;PAGE DOWN&gt; to see more filenames.

User Options

        &lt;ARROW KEYS&gt;      highlight filename,

        &lt;PAGE DOWN&gt; shows additional filenames if applicable,

        &lt;ESC&gt;        returns to MAIN MENU,

        &lt;HOME&gt;          to change the path and/or default listing (See SECTION D-2), or

        &lt;CR&gt;            selects the highlighted filename and the user proceeds with SECTION D-3.

D-2.  EDIT SECTION.  If the desired filename does not appear on the screen, then the user must change the path and/or default listing.  This is accomplished by entering &lt;HOME&gt; in SECTION D-1.  The user can enter the location of the files to be listed to select from or simply enter the path and filename to be used.

B-9

For Example:

| | |
|---|---|
| C:\*.RST | will list all files that have an extension of "RST" on the C drive, |
| A:\S*.RST | will list all of the files on the A drive that begin with an S, |
| C:\S*.RST | will list all of the files on the C drive that begin with an S and have an extension of "RST", or |
| C:\DATSET1.RST | will list just the filename "DATSET1.RST" to the screen. |

### User Options

&lt;   &gt;         enter any valid character for the path and default listing (for example, C:\*.RST),

&lt;BACKSPACE&gt; to delete any characters,

&lt;ESC&gt;        returns the user to the MAIN MENU <u>without saving</u>, or

&lt;CR&gt;         enters the path and default listing.

D-3.  <u>EDIT SECTION.</u>  Once a data file has been selected to be edited, the options will appear at the bottom of the screen.  The specific data is all of the data located on the left side of the screen and the pit measurements are located on the right side of the screen.  The path and filename being edited is displayed in the top-right corner of the screen. Use the ARROW KEYS to highlight the desired option.  The choices are:

| | |
|---|---|
| Edit Specific Data | allows user to edit the data on the left side of the screen, |
| Edit Pit Measurements | allows user to edit the data on the right side of the screen, |
| Abort Changes | ignores any changes made and returns to the MAIN MENU, and |
| Quit and Save | saves the changes as they appear on the screen and returns to the MAIN MENU. |

### User Options

&lt;ARROW KEYS&gt;    highlight desired option,

&lt;ESC&gt;        returns to MAIN MENU <u>without saving any changes</u>, or

B-10

<u>User Options (Cont.)</u>

              &lt;CR&gt;                  selects the highlighted option.

Once "Quit and Save" has been selected, the user is returned to the MAIN MENU.

D-4.  <u>EDIT SECTION.</u>  Once one of the four options described above has been selected, the cursor will appear in the appropriate screen (i.e., either the left side or right side of the screen).  Use the ARROW KEYS to move the cursor and highlight the data to be changed.  Once the data that is to be changed has been highlighted, enter &lt;CR&gt;.  At this point, a prompt will appear at the bottom of the screen to enter the new data then enter &lt;CR&gt; when done.

       <u>User Options</u>

            &lt;  &gt;        enter any appropriate valid character or number,

          &lt;BACKSPACE&gt; to delete any characters or numbers,

          &lt;ESC&gt;         returns the options available in SECTION D-3 <u>without saving</u> the change, or

          &lt;CR&gt;             enters the new character or number on the screen.

After the new character or number has been entered, the user again has the options available in SECTION D-3.

E.  ANALYSIS

E-1.  <u>ANALYSIS SECTION.</u>  The user must first select the file to be analyzed.  The default listing of filenames lists all of the filenames with an extension of ".RST" in the current directory or drive location.

If the desired filename exists on the screen, then use the ARROW KEYS to highlight the desired filename then &lt;CR&gt;.  If there are more filenames than appear on the screen, then enter &lt;PAGE DOWN&gt; to see more filenames.

       <u>User Options</u>

          &lt;ARROW KEYS&gt;     highlight filename,

          &lt;PAGE DOWN&gt; shows additional filenames if applicable,

          &lt;ESC&gt;        returns to MAIN MENU,

B-11

User Options (Cont.)

<HOME>                    to change the path and/or default listing
                         (See SECTION E-2), or

<CR>                     selects the highlighted filename and the
                         user proceed with SECTION E-3.

E-2.  ANALYSIS SECTION.  If the desired filename does not appear on the
screen, then the user must change the path and/or default listing.  This
is accomplished by entering <HOME> in SECTION E-1.  The user can enter
the location of the files to be listed to select from or simply enter the
path and filename to be used.

For Example:

C:\*.RST          will list all files that have an extension
                  of "RST" on the C drive,
A:\S*.RST         will list all of the files on the A drive
                  that begin with an S,
C:\S*.RST         will list all of the files on the C drive
                  that begin with an S and have an extension
                  of "RST", or
C:\DATSET1.RST    will list just the filename "DATSET1.RST"
                  to the screen.

Once the data files are listed on the screen, the user has the option to
select a data file to be analyzed.  The user also has the option to
select "*** ALL ***" which will analyze all of the data files listed on
the screen assuming each of the files are in RSTRENG format.  If "*** ALL
***" is selected, an analysis will be performed on each of the data
files, the results will be written to the output files of results, and
the MAIN MENU will appear when completed.

User Options

<    >           enter any valid character for the path and
                 default listing (for example, C:\*.RST),

<BACKSPACE> to delete any characters,

<ESC>            returns the user to the MAIN MENU without saving,
                 or

<CR>             enters the path and default listing.

B-12

E-3. <u>ANALYSIS SECTION.</u> If a single data file is selected to be analyzed, "CALCULATING" will appear on the middle of the screen while the program is calculating the results. Once the program has completed the calculations, the results will appear on the screen. The screen will be similar to the output shown in the upper portion of Table B-2.

Above the profile, data corresponding to the analysis are presented such as the specimen identification, date of the analysis, pipe diameter (D), wall thickness (t), yield strength (YS), and any comment that appears in the data file.

A corrosion profile will appear in the middle of the screen. The length (in inches) in the axial direction for the anomaly appears above the profile. The pit depths (in inches) appear along the left side of the profile. The asterisks (*'s) correspond to each measured pit depth that had been entered into the data file.

Below the corrosion profile is the predicted minimum failure stress and failure pressure (related by means of the Barlow equation) based on 100% of the yield strength. The arrows above the corrosion profile indicate the location along the profile where the minimum predicted failure pressure was determined; i.e., the effective length and effective area. The predicted failure pressure is determined by:

$$P = (2t/D) * (YS+10 \text{ ksi}) * \frac{[1 - A/Ao]}{[1 - (A/Ao)MT^{-1}]} \qquad (B-1)$$

$$MT = \left| \left[ 1 + \frac{1.255 \, L^2}{2Dt} - \frac{0.0135 \, L^4}{4(Dt)^2} \right| \right|^{1/2} \qquad (B-2)$$

where A  - exact area effected by corrosion,
     Ao - original area (Lt),
     MT - 3-term Folias Factor,
     P  - is the predicted failure pressure.

The 3-term Folias Factor is valid for L^2/Dt <=50. If L^2/Dt > 50, then MT is approximated as:

$$MT = \frac{0.032 \, L^2}{Dt} + 3.3 \qquad (B-3)$$

This analysis is valid only when the maximum measured pit depth (dmax) is less than 80-percent of the wall thickness (t). If the maximum measured pit depth exceeds 80-percent of the wall thickness, then a note will appear next to the wall thickness shown above the profile (See Table B-3 for example).

B-13

### User Options

| | |
|---|---|
| <CR> | writes the results to the output files of results and returns to the MAIN MENU, |
| <ESC> | returns to the MAIN MENU without writing the results to the output files |
| <UP ARROW> | allows the user to redefine the endpoints used in the calculation of predicted failure pressure (SECTION E-4) |
| <PAGE DOWN> | allows the user to review other calculation methods used to predict the failure pressure (SECTION E-5). |

E-4.  If the user decided to manually chose the endpoints (by selecting <UP-ARROW> in SECTION E-3), then the user will use the Arrow keys to move across the top on the corrosion profile and select the first and last pit measurement by entering a <DOWN ARROW> to make the selection.  By selecting the first and last pit measurement, the user is specifying the length (L) and areas (A and Ao) as defined in Equation B-1.

### User Options

| | |
|---|---|
| <LEFT ARROW> | moves the cursor to the left across the top of the corrosion profile |
| <RIGHT ARROW> | moves the cursor to the right across the top of the corrosion profile |
| <DOWN ARROW> | select the point as either the first or last data point |
| <ESC> | returns the user to the previous corrosion profile and results without making any changes and the user has the User Options in E-4. |

Once the user has selected the first and last pit measurement, the calculation will be performed and the results will be displayed on the screen.  The user again has the User Options given defined in SECTION E-3.

CAUTION:  Once the user has manually selected endpoints, the predicted failure pressure in no longer the minimum.  If the predicted failure pressure is the minimum, then MINIMUM FAILURE STRESS and MINIMUM FAILURE PRESSURE will be displayed below the corrosion profile.  If the predicted failure pressure is not the minimum, then PREDICTED FAILURE STRESS and PREDICTED FAILURE PRESSURE will be displayed below the corrosion profile.

B-14

Table B-3 is an example of predicted failure pressure not being the minimum failure pressure.

E-5.  If the user decided to review other calculation methods (by selecting <PAGE DOWN> in SECTION E-3), then the results of additional calculation methods along with a listing of the pit measurements will be displayed on the screen.  There are two additional calculation methods shown that are based on the FULL LENGTH of the anomaly.  These additional predictions are determined by:

CASE 2

$$P' = (2t/D)(YS + 10 \text{ ksi})\frac{[1 - A/Ao]}{[1 - (A/Ao)*M_T^{-1}]} \quad (B-4)$$

where  A  = 0.85*dmax * t
       Ao = L*t
       dmax -  maximum corrosion pit depth.

For $L^2/Dt \le 50$, $M_T$ is defined by Equation B-2.
For $L^2/Dt > 50$, $M_T$ is defined by Equation B-3.

CASE 3

For $L^2/Dt \le 20$ then

$$P' = (2t/D)(1.1*SMYS)\frac{[1-A2/Ao]}{[1-(A2/Ao)*M_{T2}^{-1}]} \quad (B-5)$$

where A2 = (2/3)(dmax*L)

$$M_{T2} = \left[1 + \frac{0.8 \, L^2}{Dt}\right]^{1/2}$$

For $L^2/Dt > 20$ then

$$P' = (2t/D)(1.1*SMYS)[1-dmax/t]. \quad (B-6)$$

B-15

An example of two outputs are presented in Tables B-2 and B-3.

### User Options

&lt;    &gt;              hit any key to return to the corrosion profile.

## F.  EXPLANATION OF RESULTS

F-1.  There are 2 files created to store the results of all of the analyses performed during the program execution.  One of the files has an extension of ".OUT" and the other has an extension ".PLT".  Each of these files are described below.

F-2.  ".OUT".  This file has been created to store the results of the analyses and specifically created to be incorporated into a spreadsheet such as LOTUS 1-2-3.  In order to use the results in this file, refer to the LOTUS manual for IMPORTING NUMBERS into a spreadsheet.  If you are familiar with LOTUS, the results can be brought into the spreadsheet by means of File-Import-Numbers.  A sample of the results found in this file can be found in Table B-4.  The results given in this table were produced using the 86 anomalies that were evaluated for this project.  An explanation for each column of results is given below:

| | |
|---|---|
| File | filename of data analyzed |
| Ident. | specimen identification |
| Diam. | pipe diameter (inch) |
| Thick. | pipe wall thickness (inch) |
| Yield Strength | yield strength (psi.) |
| SMYS | specified minimum yield strength (psi.) |
| Spacing Increment | length of spacing between measurements (inch) |
| Total Length | total length of the anomaly (inches) |
| Start Location | pit measurement number for the starting location of the failure pressure prediction, |
| Stop Location | pit measurement number for the stopping location of the failure pressure prediction, |
| Effective Length | effecitve length of anomaly used for the failure pressure prediction (inches), |
| Effective Ex. Area | effective exact area of corrosion used for the failure pressure prediction, |
| Maximum Pit Depth | maximum measured pit depth (dmax) along the total length of the anomaly (inch), |
| CASE 1 | predicted failure pressure using the Modified Criterion (psi.), |
| CASE 2 | predicted failure pressure using the Modified Criterion except that A = 0.85*dmax*Total Length, |

B-16

CASE 3            predicted failure pressure using the B31G criterion, and

NOTES     (a)    Alerts that the maximum pit depth exceeds 80-percent of the wall thickness,

              (b)    Alerts that (Total Length)^2/Dt > 20 and alternative calculation methods outlined in SECTION E-5 have been used for CASE 3.

              (c)    Alerts that the predicted failure press (CASE 1) is not the minimum,

F-3. ".PLT". This file has been created to store the results of the analyses and specifically created to be incorporated into a word processor (for example, WordPerfect). The output file has been created by namely using ASCII characters so refer to your word processor manual on retrieving DOS text. A sample of the results found in this file can be found in Table B-2.

Explanation of the output along the top of the page:

| | |
|---|---|
| Filename | filename of the data file used for the analysis, |
| Specimen | the specimen identification for the anomaly, |
| Date | the date of the analysis, |
| Diameter | pipe diameter (inches), |
| Thickness | pipe wall thickness (inch), |
| Yield Str. | yield strength (psi.), |
| Comment | comment that was entered in the data file, |

Explanation of the corrosion profile:

A profile of the total length of the corroded area is presented in the center of the page. The asterisks (*'s) designate the location of the pit depth measurements along the anomaly. The numbers above the profile refer to the length of the anomaly (in inches) in the axial direction. The numbers along the left side of the profile indicate the measured pit depth (in inches). The arrows (or exclamation marks) along the top of the corrosion profile indicate the end points used to determine the predicted failure stress and pressure by means of the iterative calculation method. If the MINIMUM failure stress and pressure are being provided, then the captions below the corrosion profile will specify MINIMUM FAILURE STRESS and MINIMUM FAILURE PRESSURE. If the failure pressure predictions being provided are not the minimums, then the captions below the corrosion profile will specify PREDICTED FAILURE STRESS and PREDICTED FAILURE PRESSURE.

If a predicted failure pressure is displayed on the screen and has used the MT approximation (for $L^2/Dt > 50$), then a

B-17

note stating "USE WITH CAUTION" will appear next to the predicted failure pressure.

Explanation of the output along the bottom of the page:

All of the pit depth measurements (MILS) are provided along the bottom of the page for the total length of the anomaly. If any of the modified calculation methods for CASE 2 and CASE 3 exceed there corresponding $(\text{Total Length})^2/Dt$ limitations, then a footnote will appear below the pit depth measurements.  An example of this can be found in Table B-3.

B-18

TABLE B-1.  EXAMPLE OF THE FORMAT USED FOR THE DATA FILE

```
RSTRENG              - always the first line of file
Sample 1             - specimen identification
Mile 126.2   -  comment
 12                  -  number of measurements
 24                  -  pipe diameter (inches)
 .365                -  pipe wall thickness (inch)
 41800               -  yield strength (if available)
                        (psi.)
 35000               -  specified minimum yield strength
                        (psi.)
 2.75                -  length of anomaly
 .25         -  length of spacing between   measurements
 0                   -  Pit Depth Measurement (MILS) #1
 136         -  Pit Depth Measurement (MILS)  #2
 188         -  Pit Depth Measurement (MILS)  #3
 261         -  Pit Depth Measurement (MILS)  #4
 219         -  Pit Depth Measurement (MILS)  #5
 188         -  Pit Depth Measurement (MILS)  #6
 157         -  Pit Depth Measurement (MILS)  #7
 178         -  Pit Depth Measurement (MILS)  #8
 178         -  Pit Depth Measurement (MILS)  #9
 157         -  Pit Depth Measurement (MILS)  #10
 136         -  Pit Depth Measurement (MILS)  #11
 0                   -  Pit Depth Measurement (MILS)  #12
```

B-19

TABLE B-2.  EXAMPLE CORROSION PROFILE

```
FILENAME:  C:\DATSET1 .RST
        Specimen = Sample 1              Date =      10-25-1989
        Diameter =    24.00 in.          Thickness =   0.365 in.
        Yield Str. = 41,800 psi.         Comment = Mile 126.2


        !------------------------------------------------------------!
        0                        1                        2
0.00    *-----------------------------------------------------------*
0.04    -
0.08
0.12    -       *                                             *
                                                                       0.16    -
                        *     *     *     *               0.20    -             *
*       *                                         0.24    -
                             0.28    -                *
               0.32    -
0.36    -                                                          0.40    -
```

      CASE 1 MINIMUM            CASE 1 MINIMUM
      Failure Stress           Failure Pressure (NOTE: No Safety Factor Applied)
          psi.                     psi.
          44,759                   1,361

SMYS = 35,000 psi.  (NOTE: No Safety Factors Applied to CASE 1, 2 or 3)
     CASE 2    MODIFIED METHOD USING AREA = 0.85 dL    :      1,052 psi.
     CASE 3    EXISTING B31G METHOD USING AREA = 2/3 dL :       968 psi.

--- PIT DEPTH MEASUREMENTS (MILS) ----- (MAX. Pit Depth =  0.261 inch) ------

```
0.00    0
0.25  136
0.50  188
0.75  261
1.00  219
1.25  188
1.50  157
1.75  178
2.00  178
2.25  157
2.50  136
2.75    0
```

B-20

TABLE B-3.  EXAMPLE OF THE ".PLT" FILE

FILENAME:  C:\DATSET2 .RST
        Specimen = Sample 2                Date =      10-25-1989
        Diameter =     24.00 in.           Thickness =   0.375 in.  (dmax >0.8t)
        Yield Str. = 42,000 psi.           Comment = Mile 135.2

```
              !-----------------------------------------!
       0   2   4   6   8  10  12  14  16  18  20  22  24  26  28  30  32
 0.00  ------------------------------------------------------------------           0.04    -
                                                      *******         0.08    ********    *          *
                                              0.12    -
                                              *      *
                        0.16    -
                        *                                       ***       **           **    *
             0.20    -         *                                                          0.28    -
 0.24   -               *      ***          *** *  ***     **   * *                    ***
 ***     *    ****    **** ***       *        **         *                 0.32    -
      *                    **                          0.36    -
                        0.40    -
```

        CASE 1 MINIMUM              CASE 1 MINIMUM
        Failure Stress             Failure Pressure (NOTE: No Safety Factor Applied)
            psi.                         psi.
          18,791                         587

SMYS = 37,000 psi.  (NOTE: No Safety Factors Applied to CASE 1, 2 or 3)
    CASE 2   MODIFIED METHOD USING AREA = 0.85 dL    :        441 psi.
    CASE 3   EXISTING B31G METHOD USING AREA = 2/3 dL : (*)   180 psi.

--- PIT DEPTH MEASUREMENTS (MILS) ----- (MAX. Pit Depth =  0.322 inch) ------

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 0.00 | 73 | 7.50 | 322 | 15.00 | 286 | 22.50 | 204 | 30.00 | 193 |
| 0.50 | 69 | 8.00 | 320 | 15.50 | 286 | 23.00 | 240 | 30.50 | 53 |
| 1.00 | 76 | 8.50 | 279 | 16.00 | 308 | 23.50 | 240 | 31.00 | 53 |
| 1.50 | 64 | 9.00 | 159 | 16.50 | 291 | 24.00 | 244 | 31.50 | 36 |
| 2.00 | 65 | 9.50 | 97 | 17.00 | 294 | 24.50 | 268 | 32.00 | 43 |
| 2.50 | 91 | 10.00 | 233 | 17.50 | 279 | 25.00 | 272 | 32.50 | 46 |
| 3.00 | 83 | 10.50 | 283 | 18.00 | 202 | 25.50 | 318 | 33.00 | 41 |
| 3.50 | 74 | 11.00 | 296 | 18.50 | 194 | 26.00 | 305 | 33.50 | 34 |
| 4.00 | 210 | 11.50 | 293 | 19.00 | 215 | 26.50 | 244 | | |
| 4.50 | 172 | 12.00 | 271 | 19.50 | 252 | 27.00 | 238 | | |
| 5.00 | 98 | 12.50 | 230 | 20.00 | 258 | 27.50 | 204 | | |
| 5.50 | 262 | 13.00 | 225 | 20.50 | 251 | 28.00 | 203 | | |
| 6.00 | 275 | 13.50 | 246 | 21.00 | 269 | 28.50 | 226 | | |
| 6.50 | 294 | 14.00 | 280 | 21.50 | 247 | 29.00 | 280 | | |
| 7.00 | 313 | 14.50 | 281 | 22.00 | 193 | 29.50 | 259 | | |

(*) L^2/Dt > 20  P`=1.1*SMYS*2*t/D*[1-dmax/t] for P`<SMYS*2*t/D

## TABLE B-4.   EXAMPLE OF THE ".OUT" FILE WHICH CONTAINS RESULTS OF THE 86 ANOMALIES

| Filename | | Iden | Diam. inch | Thick. inch | Yield Strength psi. | SMYS psi. | Spacing Increment inch | Total Length inch | Start Location | Stop Location | Effective Length in | Effective Ex. Area in^2 | Maximum Pit Depth inch. | CASE 1 Press. psi. | CASE 2 Press. psi | CASE 3 Press. psi. | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NUM1 | .RST | Sample 1 | 30.0 | 0.370 | 58,700 | 52,000 | 0.250 | 2.500 | 1 | 11 | 2.500 | 0.233 | 0.146 | 1,618 | 1,428 | 1,330 | |
| NUM2 | .RST | Sample 2 | 30.0 | 0.370 | 58,700 | 52,000 | 0.250 | 2.250 | 1 | 10 | 2.250 | 0.219 | 0.146 | 1,626 | 1,443 | 1,342 | |
| NUM3 | .RST | Sample 3 | 30.0 | 0.370 | 58,700 | 52,000 | 0.250 | 4.250 | 1 | 18 | 4.250 | 0.292 | 0.157 | 1,588 | 1,311 | 1,244 | |
| NUM4 | .RST | Sample 4 | 30.0 | 0.375 | 63,800 | 52,000 | 0.250 | 5.500 | 1 | 23 | 5.500 | 0.472 | 0.240 | 1,655 | 1,060 | 1,079 | |
| NUM5 | .RST | Sample 5 | 30.0 | 0.375 | 58,800 | 52,000 | 0.250 | 4.750 | 1 | 20 | 4.750 | 0.605 | 0.209 | 1,469 | 1,193 | 1,167 | |
| NUM6 | .RST | Sample 6 | 24.0 | 0.365 | 40,500 | 35,000 | 0.250 | 3.000 | 1 | 12 | 2.750 | 0.581 | 0.271 | 1,213 | 995 | 934 | |
| NUM7 | .RST | Sample 7 | 24.0 | 0.365 | 40,500 | 35,000 | 0.250 | 4.750 | 2 | 18 | 4.000 | 0.807 | 0.251 | 1,105 | 893 | 859 | |
| NUM8 | .RST | Sample 8 | 24.0 | 0.365 | 40,500 | 35,000 | 0.250 | 5.250 | 2 | 21 | 4.750 | 0.939 | 0.251 | 1,061 | 863 | 839 | |
| NUM9 | .RST | Sample 9 | 24.0 | 0.370 | 41,800 | 35,000 | 0.250 | 1.750 | 1 | 8 | 1.750 | 0.258 | 0.261 | 1,506 | 1,218 | 1,077 | |
| NUM10 | .RST | Sample 10 | 24.0 | 0.375 | 41,800 | 35,000 | 0.250 | 4.250 | 2 | 17 | 3.750 | 0.711 | 0.282 | 1,251 | 885 | 870 | |
| NUM11 | .RST | Sample 11 | 24.0 | 0.365 | 41,800 | 35,000 | 0.250 | 2.000 | 1 | 9 | 2.000 | 0.300 | 0.261 | 1,455 | 1,157 | 1,035 | |
| NUM12 | .RST | Sample 12 | 24.0 | 0.365 | 41,800 | 35,000 | 0.250 | 2.250 | 1 | 10 | 2.250 | 0.287 | 0.219 | 1,463 | 1,191 | 1,050 | |
| NUM13 | .RST | Sample 13 | 24.0 | 0.365 | 41,800 | 35,000 | 0.250 | 2.500 | 1 | 11 | 2.500 | 0.358 | 0.230 | 1,421 | 1,146 | 1,021 | |
| NUM14 | .RST | Sample 14 | 24.0 | 0.365 | 41,800 | 35,000 | 0.250 | 2.750 | 1 | 12 | 2.750 | 0.450 | 0.261 | 1,361 | 1,052 | 968 | |
| NUM15 | .RST | Sample 15 | 24.0 | 0.380 | 41,800 | 35,000 | 0.250 | 3.750 | 1 | 16 | 3.750 | 0.543 | 0.251 | 1,395 | 1,043 | 967 | |
| NUM16 | .RST | Sample 16 | 24.0 | 0.370 | 41,800 | 35,000 | 0.250 | 2.000 | 1 | 9 | 2.000 | 0.232 | 0.188 | 1,516 | 1,274 | 1,106 | |
| NUM17 | .RST | Sample 17 | 24.0 | 0.370 | 41,800 | 35,000 | 0.250 | 3.000 | 1 | 13 | 3.000 | 0.483 | 0.240 | 1,368 | 1,095 | 993 | |
| NUM18 | .RST | Sample 18 | 24.0 | 0.375 | 41,800 | 35,000 | 0.250 | 3.750 | 2 | 16 | 3.500 | 0.367 | 0.240 | 1,468 | 1,047 | 964 | |
| NUM19 | .RST | Sample 19 | 24.0 | 0.365 | 41,800 | 35,000 | 0.250 | 1.750 | 1 | 8 | 1.750 | 0.272 | 0.261 | 1,473 | 1,194 | 1,059 | |
| NUM20 | .RST | Sample 20 | 24.0 | 0.375 | 41,800 | 35,000 | 0.250 | 2.250 | 1 | 10 | 2.250 | 0.316 | 0.251 | 1,494 | 1,187 | 1,059 | |
| NUM21 | .RST | Sample 21 | 24.0 | 0.375 | 41,800 | 35,000 | 0.250 | 2.250 | 2 | 10 | 2.000 | 0.393 | 0.292 | 1,436 | 1,104 | 1,017 | |
| NUM22 | .RST | Sample 22 | 24.0 | 0.375 | 41,800 | 35,000 | 0.250 | 2.500 | 1 | 11 | 2.500 | 0.271 | 0.219 | 1,517 | 1,210 | 1,068 | |
| NUM23 | .RST | Sample 23 | 24.0 | 0.375 | 41,800 | 35,000 | 0.250 | 2.000 | 1 | 9 | 2.000 | 0.204 | 0.188 | 1,552 | 1,295 | 1,124 | |
| NUM24 | .RST | Sample 24 | 24.0 | 0.375 | 41,800 | 35,000 | 0.250 | 2.250 | 1 | 10 | 2.250 | 0.253 | 0.177 | 1,527 | 1,286 | 1,116 | |
| NUM25 | .RST | Sample 25 | 24.0 | 0.380 | 41,800 | 35,000 | 0.250 | 5.000 | 2 | 21 | 4.750 | 0.889 | 0.271 | 1,206 | 890 | 871 | |
| NUM26 | .RST | Sample 26 | 30.0 | 0.375 | 62,000 | 52,000 | 0.250 | 2.750 | 1 | 12 | 2.750 | 0.392 | 0.375 | 1,639 | 811 | 1,031 | (a) |
| NUM27 | .RST | Sample 27 | 30.0 | 0.375 | 61,300 | 52,000 | 0.250 | 5.500 | 1 | 22 | 5.250 | 0.322 | 0.146 | 1,662 | 1,301 | 1,240 | |
| NUM28 | .RST | Sample 28 | 30.0 | 0.375 | 62,000 | 52,000 | 0.250 | 4.500 | 1 | 19 | 4.500 | 0.319 | 0.115 | 1,678 | 1,396 | 1,309 | |
| NUM29 | .RST | Sample 29 | 30.0 | 0.375 | 66,200 | 52,000 | 0.250 | 4.000 | 1 | 17 | 4.000 | 0.421 | 0.230 | 1,723 | 1,196 | 1,173 | |
| NUM30 | .RST | Sample 30 | 30.0 | 0.375 | 70,600 | 52,000 | 0.200 | 1.600 | 1 | 9 | 1.600 | 0.183 | 0.209 | 1,960 | 1,465 | 1,365 | |
| NUM31 | .RST | Sample 31 | 30.0 | 0.375 | 66,500 | 52,000 | 0.200 | 2.000 | 1 | 11 | 2.000 | 0.209 | 0.209 | 1,845 | 1,427 | 1,337 | |
| NUM32 | .RST | Sample 32 | 20.0 | 0.325 | 41,000 | 35,000 | 0.250 | 5.750 | 2 | 23 | 5.250 | 0.576 | 0.209 | 1,336 | 908 | 883 | |
| NUM33 | .RST | Sample 33 | 20.0 | 0.325 | 41,100 | 35,000 | 0.250 | 6.500 | 3 | 24 | 5.250 | 0.491 | 0.219 | 1,394 | 842 | 841 | |
| NUM34 | .RST | Sample 34 | 16.0 | 0.310 | 28,600 | 25,000 | 0.250 | 4.500 | 3 | 18 | 3.750 | 0.550 | 0.230 | 1,102 | 755 | 708 | |
| NUM35 | .RST | Sample 35 | 16.0 | 0.310 | 28,600 | 25,000 | 0.250 | 5.000 | 4 | 20 | 4.000 | 0.609 | 0.240 | 1,064 | 688 | 670 | |

TABLE B-4 (Cont'd)

| Filename | | Iden | Diam. inch | Thick. inch | Yield Strength psi. | SMYS psi. | Spacing Increment inch | Total Length inch | Start Location | Stop Location | Effective Length in | Effective Ex. Area in^2 | Maximum Pit Depth inch | CASE 1 Press. psi. | CASE 2 Press. psi | CASE 3 Press. psi. | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NUM36 | .RST | Sample 36 | 16.0 | 0.310 | 28,600 | 25,000 | 0.250 | 6.000 | 6 | 19 | 3.250 | 0.735 | 0.282 | 776 | 461 | 546 | (a) |
| NUM37 | .RST | Sample 37 | 16.0 | 0.310 | 28,600 | 25,000 | 0.250 | 2.750 | 2 | 10 | 2.000 | 0.349 | 0.272 | 1,209 | 740 | 728 | (a) |
| NUM38 | .RST | Sample 38 | 16.0 | 0.310 | 28,400 | 25,000 | 0.250 | 6.250 | 2 | 23 | 5.250 | 0.704 | 0.199 | 1,064 | 798 | 724 | |
| NUM39 | .RST | Sample 39 | 24.0 | 0.417 | 50,200 | 35,000 | 0.250 | 13.000 | 9 | 49 | 10.000 | 1.963 | 0.290 | 1,348 | 781 | 817 | |
| NUM40 | .RST | Sample 40 | 24.0 | 0.410 | 46,800 | 35,000 | 0.250 | 8.000 | 3 | 32 | 7.250 | 1.786 | 0.380 | 1,093 | 505 | 668 | (a) |
| NUM41 | .RST | Sample 41 | 24.0 | 0.396 | 50,200 | 35,000 | 0.250 | 5.750 | 8 | 22 | 3.500 | 0.935 | 0.360 | 1,299 | 598 | 727 | (a) |
| NUM42 | .RST | Sample 42 | 24.0 | 0.444 | 50,200 | 35,000 | 0.250 | 8.250 | 1 | 33 | 8.000 | 1.354 | 0.220 | 1,675 | 1,191 | 1,101 | |
| NUM43 | .RST | Sample 43 | 24.0 | 0.366 | 53,900 | 35,000 | 1.000 | 15.000 | 10 | 15 | 5.000 | 0.978 | 0.275 | 1,340 | 594 | 292 | (b) |
| NUM44 | .RST | Sample 44 | 24.0 | 0.364 | 52,000 | 35,000 | 1.000 | 13.000 | 2 | 11 | 9.000 | 1.550 | 0.254 | 1,216 | 671 | 705 | |
| NUM45 | .RST | Sample 45 | 24.0 | 0.355 | 52,000 | 35,000 | 0.250 | 6.500 | 3 | 18 | 3.750 | 0.687 | 0.289 | 1,392 | 626 | 688 | (a) |
| NUM46 | .RST | Sample 46 | 24.0 | 0.319 | 47,500 | 35,000 | 0.250 | 5.500 | 1 | 22 | 5.250 | 0.470 | 0.216 | 1,304 | 737 | 721 | |
| NUM47 | .RST | Sample 47 | 24.0 | 0.332 | 45,000 | 35,000 | 0.250 | 4.500 | 2 | 18 | 4.000 | 0.512 | 0.220 | 1,259 | 838 | 797 | |
| NUM48 | .RST | Sample 48 | 24.0 | 0.375 | 53,800 | 35,000 | 1.000 | 16.000 | 4 | 15 | 11.000 | 2.883 | 0.295 | 785 | 559 | 257 | (b) |
| NUM49 | .RST | Sample 49 | 24.0 | 0.375 | 48,800 | 37,000 | 0.250 | 9.000 | 9 | 32 | 5.750 | 1.593 | 0.320 | 813 | 566 | 684 | (a) |
| NUM50 | .RST | Sample 50 | 20.0 | 0.312 | 50,000 | 35,000 | 0.250 | 12.000 | 1 | 48 | 11.750 | 2.688 | 0.252 | 626 | 540 | 231 | (a) (b) |
| NUM51 | .RST | Sample 51 | 20.0 | 0.305 | 55,100 | 35,000 | 0.500 | 10.500 | 5 | 21 | 8.000 | 1.411 | 0.210 | 1,068 | 690 | 719 | |
| NUM52 | .RST | Sample 52 | 24.0 | 0.361 | 47,400 | 35,000 | 0.500 | 10.500 | 11 | 19 | 4.000 | 0.784 | 0.319 | 1,254 | 454 | 578 | (a) |
| NUM53 | .RST | Sample 53 | 24.0 | 0.361 | 41,200 | 35,000 | 0.500 | 12.500 | 9 | 14 | 2.500 | 0.564 | 0.285 | 1,201 | 557 | 634 | |
| NUM54 | .RST | Sample 54 | 24.0 | 0.355 | 50,300 | 35,000 | 0.500 | 8.500 | 7 | 15 | 4.000 | 0.439 | 0.243 | 1,560 | 729 | 740 | |
| NUM55 | .RST | Sample 55 | 24.0 | 0.371 | 45,000 | 35,000 | 0.500 | 10.500 | 5 | 22 | 8.500 | 1.035 | 0.276 | 1,321 | 656 | 706 | |
| NUM56 | .RST | Sample 56 | 24.0 | 0.371 | 45,000 | 35,000 | 0.500 | 10.500 | 9 | 20 | 5.500 | 0.799 | 0.291 | 1,331 | 604 | 675 | |
| NUM57 | .RST | Sample 57 | 24.0 | 0.372 | 48,200 | 35,000 | 0.500 | 22.000 | 18 | 43 | 12.500 | 1.022 | 0.284 | 1,508 | 562 | 282 | (b) |
| NUM58 | .RST | Sample 58 | 24.0 | 0.364 | 48,100 | 35,000 | 0.500 | 8.500 | 1 | 18 | 8.500 | 1.154 | 0.224 | 1,304 | 829 | 809 | |
| NUM59 | .RST | Sample 59 | 24.0 | 0.366 | 43,000 | 35,000 | 0.500 | 12.500 | 9 | 24 | 7.500 | 0.615 | 0.242 | 1,396 | 723 | 740 | |
| NUM60 | .RST | Sample 60 | 24.0 | 0.366 | 51,500 | 35,000 | 0.500 | 4.000 | 1 | 9 | 4.000 | 0.725 | 0.191 | 1,433 | 1,097 | 984 | |
| NUM61 | .RST | Sample 61 | 24.0 | 0.368 | 47,700 | 35,000 | 0.500 | 28.000 | 29 | 47 | 9.000 | 1.025 | 0.288 | 1,391 | 518 | 257 | (b) |
| NUM62 | .RST | Sample 62 | 20.0 | 0.283 | 37,900 | 35,000 | 1.000 | 30.000 | 13 | 26 | 13.000 | 3.279 | 0.274 | 188 | 250 | 35 | (a) (b) |
| NUM63 | .RST | Sample 63 | 20.0 | 0.274 | 40,500 | 35,000 | 0.500 | 12.000 | 11 | 24 | 6.500 | 0.586 | 0.130 | 1,078 | 821 | 554 | (b) |
| NUM64 | .RST | Sample 64 | 20.0 | 0.311 | 35,300 | 35,000 | 0.500 | 8.500 | 6 | 16 | 5.000 | 0.242 | 0.239 | 1,298 | 633 | 695 | |
| NUM65 | .RST | Sample 65 | 20.0 | 0.311 | 35,300 | 35,000 | 0.500 | 11.000 | 1 | 19 | 9.000 | 0.315 | 0.105 | 1,300 | 1,088 | 982 | |
| NUM66 | .RST | Sample 66 | 20.0 | 0.266 | 40,200 | 35,000 | 0.500 | 15.500 | 10 | 32 | 11.000 | 0.789 | 0.144 | 1,053 | 716 | 470 | (b) |
| NUM67 | .RST | Sample 67 | 20.0 | 0.309 | 41,900 | 35,000 | 0.500 | 12.000 | 8 | 21 | 6.500 | 0.393 | 0.218 | 1,412 | 664 | 350 | (b) |
| NUM68 | .RST | Sample 68 | 30.0 | 0.372 | 60,750 | 52,000 | 1.000 | 36.000 | 15 | 33 | 18.000 | 1.745 | 0.130 | 1,387 | 1,129 | 923 | (b) |
| NUM69 | .RST | Sample 69 | 30.0 | 0.376 | 52,000 | 52,000 | 0.500 | 12.000 | 1 | 25 | 12.000 | 1.868 | 0.230 | 1,062 | 908 | 967 | |
| NUM70 | .RST | Sample 70 | 30.0 | 0.375 | 60,264 | 52,000 | 0.500 | 12.000 | 5 | 25 | 10.000 | 1.198 | 0.140 | 1,370 | 1,188 | 1,160 | |

# TABLE B-4 (Cont'd)

| Filename | | Iden | Diam. inch | Thick. inch | Yield Strength psi. | SMYS psi. | Spacing Increment inch | Total Length inch | Start Location | Stop Location | Effective Length in | Effective Ex. Area in^2 | Maximum Pit Depth inch | CASE 1 Press. psi. | CASE 2 Press. psi | CASE 3 Press. psi. | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NUM71 | .RST | Sample 71 | 30.0 | 0.382 | 63,542 | 52,000 | 1.000 | 20.000 | 2 | 20 | 18.000 | 1.223 | 0.145 | 1,611 | 1,156 | 904 | (b) |
| NUM72 | .RST | Sample 72 | 30.0 | 0.376 | 59,030 | 52,000 | 1.000 | 20.000 | 2 | 20 | 18.000 | 1.515 | 0.130 | 1,422 | 1,177 | 938 | (b) |
| NUM73 | .RST | Sample 73 | 30.0 | 0.378 | 62,082 | 52,000 | 1.000 | 33.000 | 2 | 20 | 16.000 | 1.540 | 0.110 | 1,489 | 1,223 | 1,022 | (b) |
| NUM74 | .RST | Sample 74 | 30.0 | 0.379 | 65,419 | 52,000 | 1.000 | 14.000 | 6 | 15 | 9.000 | 1.060 | 0.170 | 1,518 | 1,096 | 1,098 | |
| NUM75 | .RST | Sample 75 | 30.0 | 0.381 | 52,000 | 52,000 | 0.500 | 12.000 | 5 | 16 | 5.500 | 1.030 | 0.300 | 1,148 | 678 | 819 | |
| NUM76 | .RST | Sample 76 | 30.0 | 0.378 | 61,221 | 52,000 | 0.500 | 8.000 | 1 | 15 | 7.000 | 0.678 | 0.170 | 1,542 | 1,179 | 1,157 | |
| NUM77 | .RST | Sample 77 | 30.0 | 0.377 | 61,794 | 52,000 | 0.500 | 12.000 | 4 | 25 | 10.500 | 1.020 | 0.160 | 1,486 | 1,137 | 1,126 | |
| NUM78 | .RST | Sample 78 | 30.0 | 0.373 | 60,173 | 52,000 | 1.000 | 9.000 | 2 | 9 | 7.000 | 0.680 | 0.110 | 1,493 | 1,295 | 1,236 | |
| NUM79 | .RST | Sample 79 | 24.0 | 0.375 | 42,000 | 37,000 | 0.500 | 33.500 | 12 | 54 | 21.000 | 5.433 | 0.322 | 587 | 441 | 160 | (a) (b) |
| NUM80 | .RST | Sample 80 | 30.0 | 0.365 | 58,600 | 52,000 | 0.500 | 16.000 | 10 | 31 | 10.500 | 2.233 | 0.229 | 894 | 822 | 519 | (b) |
| NUM81 | .RST | Sample 81 | 30.0 | 0.375 | 68,770 | 52,000 | 0.500 | 27.000 | 1 | 55 | 27.000 | 5.603 | 0.245 | 981 | 769 | 496 | (b) |
| NUM82 | .RST | Sample 82 | 30.0 | 0.375 | 64,400 | 56,000 | 0.500 | 7.500 | 1 | 14 | 6.500 | 0.542 | 0.150 | 1,648 | 1,310 | 1,282 | |
| NUM83 | .RST | Sample 83 | 20.0 | 0.260 | 61,000 | 52,000 | 0.500 | 16.000 | 5 | 33 | 14.000 | 2.498 | 0.218 | 684 | 543 | 240 | (a) (b) |
| NUM84 | .RST | Sample 84 | 36.0 | 0.330 | 65,000 | 65,000 | 1.000 | 16.000 | 3 | 14 | 11.000 | 2.120 | 0.218 | 734 | 714 | 445 | (b) |
| NUM85 | .RST | Sample 85 | 30.0 | 0.298 | 71,000 | 60,000 | 1.000 | 63.000 | 15 | 56 | 41.000 | 7.057 | 0.269 | 725 | 338 | 128 | (a) (b) |
| NUM86 | .RST | Sample 86 | 22.0 | 0.198 | 60,967 | 52,000 | 1.000 | 6.000 | 2 | 7 | 5.000 | 0.489 | 0.148 | 844 | 550 | 630 | |

CASE 1   MODIFIED METHOD USING EXACT AREA
CASE 2   MODIFIED METHOD USING AREA = 0.85 dL
CASE 3   EXISTING B31G METHOD USING AREA = 2/3 dL

(NOTE:  No Safety Factor Applied to CASE 1, CASE 2, or CASE 3)

(a)  Maximum Pit Depth exceeds 80% of the wall thickness - USE WITH CAUTION
(b)  For CASE 3, L^2/Dt > 20   P'=1.1*SMYS*(2*t/D)*[1-dmax/t] for P' < SMYS*2*t/D
(c)  The MINIMUM failure pressure is not shown

APPENDIX C

**TABLES AND CURVES FOR ACCEPTABLE LENGTHS OF CORROSION**

Case 2:26-cv-05242-SVW-SSC    Document 26    Filed 05/14/26    Page 414 of 1309    Page ID #:12965



## SMYS = 35,000 psi.

Assumes A/Ao = 0.85 (d/t)   10/19/89

B

d/t

——— Bo=L/[1.12*(Dt)^.5]          ——— Bn=L/[Dt]^.5

C-1





SMYS =  35,000 psi.
Diameter =  24.000 inches

C-4

Wall Thickness, inch

| Depth, inch | 0.250 | 0.312 | 0.375 | 0.438 | 0.469 | 0.500 | 0.562 | 0.625 |
|---|---|---|---|---|---|---|---|---|
| 0.02 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.03 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.04 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.05 | 24.49 | .... | .... | .... | .... | .... | .... | .... |
| 0.06 | 24.49 | .... | .... | .... | .... | .... | .... | .... |
| 0.07 | 24.49 | 27.36 | .... | .... | .... | .... | .... | .... |
| 0.08 | 14.09 | 27.36 | 30.00 | .... | .... | .... | .... | .... |
| 0.09 | 8.50 | 27.36 | 30.00 | 32.42 | .... | .... | .... | .... |
| 0.10 | 6.33 | 15.59 | 30.00 | 32.42 | 33.55 | 34.64 | .... | .... |
| 0.11 | 5.12 | 10.19 | 30.00 | 32.42 | 33.55 | 34.64 | .... | .... |
| 0.12 | 4.32 | 7.82 | 17.25 | 32.42 | 33.55 | 34.64 | 36.73 | .... |
| 0.13 | 3.74 | 6.43 | 11.88 | 32.42 | 33.55 | 34.64 | 36.73 | 38.73 |
| 0.14 | 3.30 | 5.49 | 9.31 | 18.78 | 32.28 | 34.64 | 36.73 | 38.73 |
| 0.15 | 2.94 | 4.81 | 7.75 | 13.46 | 19.36 | 32.12 | 36.73 | 38.73 |
| 0.16 | 2.65 | 4.28 | 6.69 | 10.74 | 14.14 | 19.92 | 36.73 | 38.73 |
| 0.17 | 2.39 | 3.86 | 5.90 | 9.04 | 11.39 | 14.80 | 32.01 | 38.73 |
| 0.18 | 2.17 | 3.51 | 5.29 | 7.86 | 9.64 | 12.02 | 21.01 | 38.73 |
| 0.19 | 1.97 | 3.21 | 4.80 | 6.98 | 8.41 | 10.23 | 16.07 | 32.51 |
| 0.20 | 1.79 | 2.95 | 4.39 | 6.29 | 7.49 | 8.95 | 13.25 | 22.27 |
| 0.21 | .... | 2.72 | 4.04 | 5.73 | 6.76 | 7.99 | 11.37 | 17.39 |
| 0.22 | .... | 2.52 | 3.74 | 5.26 | 6.18 | 7.24 | 10.02 | 14.51 |
| 0.23 | .... | 2.33 | 3.48 | 4.87 | 5.69 | 6.62 | 8.99 | 12.55 |
| 0.24 | .... | 2.16 | 3.24 | 4.53 | 5.27 | 6.11 | 8.17 | 11.11 |
| 0.25 | .... | .... | 3.03 | 4.23 | 4.91 | 5.67 | 7.50 | 10.01 |
| 0.26 | .... | .... | 2.84 | 3.97 | 4.60 | 5.29 | 6.94 | 9.13 |
| 0.27 | .... | .... | 2.66 | 3.73 | 4.32 | 4.96 | 6.46 | 8.41 |
| 0.28 | .... | .... | 2.50 | 3.51 | 4.07 | 4.67 | 6.05 | 7.80 |
| 0.29 | .... | .... | 2.34 | 3.31 | 3.84 | 4.40 | 5.69 | 7.28 |
| 0.30 | .... | .... | 2.19 | 3.13 | 3.63 | 4.16 | 5.36 | 6.83 |
| 0.31 | .... | .... | .... | 2.96 | 3.44 | 3.95 | 5.08 | 6.43 |
| 0.32 | .... | .... | .... | 2.80 | 3.26 | 3.75 | 4.81 | 6.08 |
| 0.33 | .... | .... | .... | 2.65 | 3.10 | 3.56 | 4.57 | 5.76 |
| 0.34 | .... | .... | .... | 2.51 | 2.94 | 3.39 | 4.36 | 5.48 |
| 0.35 | .... | .... | .... | 2.38 | 2.79 | 3.22 | 4.15 | 5.22 |
| 0.36 | .... | .... | .... | .... | 2.65 | 3.07 | 3.97 | 4.98 |
| 0.37 | .... | .... | .... | .... | 2.52 | 2.93 | 3.79 | 4.76 |
| 0.38 | .... | .... | .... | .... | .... | 2.79 | 3.62 | 4.56 |
| 0.39 | .... | .... | .... | .... | .... | 2.66 | 3.47 | 4.37 |
| 0.40 | .... | .... | .... | .... | .... | 2.53 | 3.32 | 4.19 |
| 0.41 | .... | .... | .... | .... | .... | .... | 3.18 | 4.02 |
| 0.42 | .... | .... | .... | .... | .... | .... | 3.05 | 3.86 |
| 0.43 | .... | .... | .... | .... | .... | .... | 2.92 | 3.71 |
| 0.44 | .... | .... | .... | .... | .... | .... | 2.80 | 3.57 |
| 0.45 | .... | .... | .... | .... | .... | .... | .... | 3.43 |
| 0.46 | .... | .... | .... | .... | .... | .... | .... | 3.30 |
| 0.47 | .... | .... | .... | .... | .... | .... | .... | 3.18 |
| 0.48 | .... | .... | .... | .... | .... | .... | .... | 3.06 |
| 0.49 | .... | .... | .... | .... | .... | .... | .... | 2.94 |
| 0.50 | .... | .... | .... | .... | .... | .... | .... | 2.83 |
| 0.51 | .... | .... | .... | .... | .... | .... | .... | .... |

SMYS = 35,000 psi.
Diameter = 30.000 inches

C-5

Wall Thickness, inch

| Depth, inch | 0.250 | 0.312 | 0.375 | 0.438 | 0.500 | 0.625 | 0.688 |
|---|---|---|---|---|---|---|---|
| 0.02 | .... | .... | .... | .... | .... | .... | .... |
| 0.03 | .... | .... | .... | .... | .... | .... | .... |
| 0.04 | .... | .... | .... | .... | .... | .... | .... |
| 0.05 | 27.39 | .... | .... | .... | .... | .... | .... |
| 0.06 | 27.39 | .... | .... | .... | .... | .... | .... |
| 0.07 | 27.39 | 30.59 | .... | .... | .... | .... | .... |
| 0.08 | 15.75 | 30.59 | 33.54 | .... | .... | .... | .... |
| 0.09 | 9.51 | 30.59 | 33.54 | 36.25 | .... | .... | .... |
| 0.10 | 7.08 | 17.43 | 33.54 | 36.25 | 38.73 | .... | .... |
| 0.11 | 5.72 | 11.39 | 33.54 | 36.25 | 38.73 | .... | .... |
| 0.12 | 4.83 | 8.74 | 19.29 | 36.25 | 38.73 | .... | .... |
| 0.13 | 4.18 | 7.19 | 13.28 | 36.25 | 38.73 | 43.30 | .... |
| 0.14 | 3.69 | 6.14 | 10.41 | 20.99 | 38.73 | 43.30 | 45.43 |
| 0.15 | 3.29 | 5.38 | 8.67 | 15.04 | 35.91 | 43.30 | 45.43 |
| 0.16 | 2.96 | 4.79 | 7.48 | 12.01 | 22.27 | 43.30 | 45.43 |
| 0.17 | 2.68 | 4.32 | 6.60 | 10.11 | 16.55 | 43.30 | 45.43 |
| 0.18 | 2.43 | 3.92 | 5.91 | 8.79 | 13.44 | 43.30 | 45.43 |
| 0.19 | 2.21 | 3.59 | 5.36 | 7.80 | 11.44 | 36.35 | 45.43 |
| 0.20 | 2.00 | 3.30 | 4.91 | 7.03 | 10.01 | 24.90 | 45.43 |
| 0.21 | .... | 3.04 | 4.52 | 6.40 | 8.94 | 19.45 | 36.99 |
| 0.22 | .... | 2.81 | 4.18 | 5.89 | 8.09 | 16.22 | 26.24 |
| 0.23 | .... | 2.60 | 3.89 | 5.45 | 7.40 | 14.03 | 20.86 |
| 0.24 | .... | 2.41 | 3.63 | 5.07 | 6.83 | 12.43 | 17.58 |
| 0.25 | .... | .... | 3.39 | 4.73 | 6.34 | 11.19 | 15.31 |
| 0.26 | .... | .... | 3.17 | 4.44 | 5.92 | 10.21 | 13.62 |
| 0.27 | .... | .... | 2.97 | 4.17 | 5.55 | 9.40 | 12.32 |
| 0.28 | .... | .... | 2.79 | 3.93 | 5.22 | 8.72 | 11.26 |
| 0.29 | .... | .... | 2.62 | 3.71 | 4.92 | 8.14 | 10.40 |
| 0.30 | .... | .... | 2.45 | 3.50 | 4.66 | 7.63 | 9.67 |
| 0.31 | .... | .... | .... | 3.31 | 4.41 | 7.19 | 9.04 |
| 0.32 | .... | .... | .... | 3.13 | 4.19 | 6.80 | 8.50 |
| 0.33 | .... | .... | .... | 2.97 | 3.98 | 6.44 | 8.02 |
| 0.34 | .... | .... | .... | 2.81 | 3.79 | 6.13 | 7.59 |
| 0.35 | .... | .... | .... | 2.66 | 3.61 | 5.83 | 7.21 |
| 0.36 | .... | .... | .... | .... | 3.43 | 5.57 | 6.87 |
| 0.37 | .... | .... | .... | .... | 3.27 | 5.32 | 6.55 |
| 0.38 | .... | .... | .... | .... | 3.12 | 5.09 | 6.26 |
| 0.39 | .... | .... | .... | .... | 2.97 | 4.88 | 6.00 |
| 0.40 | .... | .... | .... | .... | 2.83 | 4.68 | 5.75 |
| 0.41 | .... | .... | .... | .... | .... | 4.49 | 5.52 |
| 0.42 | .... | .... | .... | .... | .... | 4.32 | 5.31 |
| 0.43 | .... | .... | .... | .... | .... | 4.15 | 5.11 |
| 0.44 | .... | .... | .... | .... | .... | 3.99 | 4.92 |
| 0.45 | .... | .... | .... | .... | .... | 3.84 | 4.74 |
| 0.46 | .... | .... | .... | .... | .... | 3.69 | 4.57 |
| 0.47 | .... | .... | .... | .... | .... | 3.56 | 4.41 |
| 0.48 | .... | .... | .... | .... | .... | 3.42 | 4.25 |
| 0.49 | .... | .... | .... | .... | .... | 3.29 | 4.11 |
| 0.50 | .... | .... | .... | .... | .... | 3.17 | 3.96 |
| 0.51 | .... | .... | .... | .... | .... | .... | 3.83 |

```
SMYS =  35,000 psi.                        C-6
Diameter =  36.000 inches
                                    Wall Thickness, inch
```

| Depth, inch | 0.250 | 0.281 | 0.312 | 0.375 | 0.406 | 0.469 | 0.562 | 0.688 |
|---|---|---|---|---|---|---|---|---|
| 0.02 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.03 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.04 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.05 | 30.00 | .... | .... | .... | .... | .... | .... | .... |
| 0.06 | 30.00 | 31.81 | .... | .... | .... | .... | .... | .... |
| 0.07 | 30.00 | 31.81 | 33.51 | .... | .... | .... | .... | .... |
| 0.08 | 17.25 | 31.81 | 33.51 | 36.74 | .... | .... | .... | .... |
| 0.09 | 10.41 | 18.19 | 33.51 | 36.74 | 38.23 | .... | .... | .... |
| 0.10 | 7.75 | 11.47 | 19.09 | 36.74 | 38.23 | 41.09 | .... | .... |
| 0.11 | 6.27 | 8.68 | 12.48 | 36.74 | 38.23 | 41.09 | .... | .... |
| 0.12 | 5.29 | 7.08 | 9.58 | 21.13 | 38.23 | 41.09 | 44.98 | .... |
| 0.13 | 4.58 | 6.01 | 7.87 | 14.55 | 21.91 | 41.09 | 44.98 | .... |
| 0.14 | 4.04 | 5.24 | 6.73 | 11.41 | 15.45 | 39.54 | 44.98 | 49.77 |
| 0.15 | 3.61 | 4.65 | 5.89 | 9.50 | 12.24 | 23.71 | 44.98 | 49.77 |
| 0.16 | 3.24 | 4.17 | 5.25 | 8.19 | 10.25 | 17.32 | 44.98 | 49.77 |
| 0.17 | 2.93 | 3.77 | 4.73 | 7.23 | 8.88 | 13.95 | 39.20 | 49.77 |
| 0.18 | 2.66 | 3.43 | 4.30 | 6.48 | 7.86 | 11.81 | 25.73 | 49.77 |
| 0.19 | 2.42 | 3.14 | 3.93 | 5.88 | 7.07 | 10.30 | 19.68 | 49.77 |
| 0.20 | 2.19 | 2.88 | 3.61 | 5.38 | 6.43 | 9.17 | 16.22 | 49.77 |
| 0.21 | .... | 2.64 | 3.33 | 4.95 | 5.90 | 8.28 | 13.93 | 40.52 |
| 0.22 | .... | 2.42 | 3.08 | 4.58 | 5.44 | 7.56 | 12.27 | 28.75 |
| 0.23 | .... | .... | 2.85 | 4.26 | 5.05 | 6.96 | 11.01 | 22.86 |
| 0.24 | .... | .... | 2.64 | 3.97 | 4.71 | 6.46 | 10.01 | 19.26 |
| 0.25 | .... | .... | .... | 3.71 | 4.40 | 6.02 | 9.19 | 16.77 |
| 0.26 | .... | .... | .... | 3.48 | 4.13 | 5.63 | 8.50 | 14.92 |
| 0.27 | .... | .... | .... | 3.26 | 3.88 | 5.29 | 7.92 | 13.49 |
| 0.28 | .... | .... | .... | 3.06 | 3.65 | 4.98 | 7.41 | 12.34 |
| 0.29 | .... | .... | .... | 2.87 | 3.44 | 4.70 | 6.97 | 11.39 |
| 0.30 | .... | .... | .... | 2.69 | 3.24 | 4.45 | 6.57 | 10.59 |
| 0.31 | .... | .... | .... | .... | 3.05 | 4.21 | 6.22 | 9.91 |
| 0.32 | .... | .... | .... | .... | 2.88 | 3.99 | 5.90 | 9.31 |
| 0.33 | .... | .... | .... | .... | .... | 3.79 | 5.60 | 8.79 |
| 0.34 | .... | .... | .... | .... | .... | 3.60 | 5.33 | 8.32 |
| 0.35 | .... | .... | .... | .... | .... | 3.42 | 5.09 | 7.90 |
| 0.36 | .... | .... | .... | .... | .... | 3.25 | 4.86 | 7.52 |
| 0.37 | .... | .... | .... | .... | .... | 3.09 | 4.64 | 7.18 |
| 0.38 | .... | .... | .... | .... | .... | .... | 4.44 | 6.86 |
| 0.39 | .... | .... | .... | .... | .... | .... | 4.25 | 6.57 |
| 0.40 | .... | .... | .... | .... | .... | .... | 4.07 | 6.30 |
| 0.41 | .... | .... | .... | .... | .... | .... | 3.90 | 6.05 |
| 0.42 | .... | .... | .... | .... | .... | .... | 3.73 | 5.82 |
| 0.43 | .... | .... | .... | .... | .... | .... | 3.58 | 5.60 |
| 0.44 | .... | .... | .... | .... | .... | .... | 3.43 | 5.39 |
| 0.45 | .... | .... | .... | .... | .... | .... | .... | 5.19 |
| 0.46 | .... | .... | .... | .... | .... | .... | .... | 5.00 |
| 0.47 | .... | .... | .... | .... | .... | .... | .... | 4.83 |
| 0.48 | .... | .... | .... | .... | .... | .... | .... | 4.66 |
| 0.49 | .... | .... | .... | .... | .... | .... | .... | 4.50 |
| 0.50 | .... | .... | .... | .... | .... | .... | .... | 4.34 |
| 0.51 | .... | .... | .... | .... | .... | .... | .... | 4.19 |

SMYS = 52,000 psi.  
Diameter = 24.000 inches

C-7

Wall Thickness, inch

| Depth, inch | 0.250 | 0.312 | 0.375 | 0.438 | 0.469 | 0.500 | 0.562 | 0.625 |
|---|---|---|---|---|---|---|---|---|
| 0.02 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.03 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.04 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.05 | 24.49 | .... | .... | .... | .... | .... | .... | .... |
| 0.06 | 13.03 | .... | .... | .... | .... | .... | .... | .... |
| 0.07 | 7.63 | 22.36 | .... | .... | .... | .... | .... | .... |
| 0.08 | 5.65 | 11.10 | 30.00 | .... | .... | .... | .... | .... |
| 0.09 | 4.57 | 7.91 | 15.95 | 32.42 | .... | .... | .... | .... |
| 0.10 | 3.87 | 6.30 | 10.72 | 23.40 | 33.55 | 34.64 | .... | .... |
| 0.11 | 3.37 | 5.29 | 8.33 | 14.18 | 20.18 | 32.41 | .... | .... |
| 0.12 | 2.98 | 4.59 | 6.92 | 10.71 | 13.71 | 18.42 | 36.73 | .... |
| 0.13 | 2.68 | 4.07 | 5.97 | 8.77 | 10.73 | 13.40 | 24.12 | 38.73 |
| 0.14 | 2.42 | 3.66 | 5.28 | 7.50 | 8.96 | 10.79 | 16.58 | 32.01 |
| 0.15 | 2.20 | 3.33 | 4.74 | 6.59 | 7.75 | 9.14 | 13.08 | 20.60 |
| 0.16 | 2.01 | 3.05 | 4.31 | 5.91 | 6.87 | 7.99 | 10.96 | 15.80 |
| 0.17 | 1.84 | 2.81 | 3.96 | 5.36 | 6.19 | 7.14 | 9.52 | 13.05 |
| 0.18 | 1.69 | 2.60 | 3.65 | 4.92 | 5.65 | 6.47 | 8.46 | 11.24 |
| 0.19 | 1.55 | 2.41 | 3.39 | 4.55 | 5.20 | 5.92 | 7.64 | 9.93 |
| 0.20 | 1.41 | 2.24 | 3.17 | 4.23 | 4.83 | 5.47 | 6.99 | 8.94 |
| 0.21 | .... | 2.09 | 2.96 | 3.96 | 4.50 | 5.09 | 6.45 | 8.15 |
| 0.22 | .... | 1.95 | 2.78 | 3.71 | 4.22 | 4.76 | 6.00 | 7.51 |
| 0.23 | .... | 1.82 | 2.62 | 3.50 | 3.97 | 4.48 | 5.61 | 6.97 |
| 0.24 | .... | 1.69 | 2.46 | 3.30 | 3.75 | 4.22 | 5.27 | 6.52 |
| 0.25 | .... | .... | 2.32 | 3.12 | 3.54 | 3.99 | 4.97 | 6.12 |
| 0.26 | .... | .... | 2.19 | 2.96 | 3.36 | 3.78 | 4.71 | 5.77 |
| 0.27 | .... | .... | 2.07 | 2.81 | 3.19 | 3.60 | 4.47 | 5.47 |
| 0.28 | .... | .... | 1.95 | 2.67 | 3.04 | 3.42 | 4.25 | 5.19 |
| 0.29 | .... | .... | 1.84 | 2.53 | 2.89 | 3.26 | 4.05 | 4.94 |
| 0.30 | .... | .... | 1.73 | 2.41 | 2.76 | 3.11 | 3.87 | 4.72 |
| 0.31 | .... | .... | .... | 2.29 | 2.63 | 2.97 | 3.70 | 4.51 |
| 0.32 | .... | .... | .... | 2.18 | 2.51 | 2.84 | 3.55 | 4.32 |
| 0.33 | .... | .... | .... | 2.08 | 2.39 | 2.72 | 3.40 | 4.14 |
| 0.34 | .... | .... | .... | 1.97 | 2.29 | 2.60 | 3.26 | 3.98 |
| 0.35 | .... | .... | .... | 1.88 | 2.18 | 2.49 | 3.13 | 3.83 |
| 0.36 | .... | .... | .... | .... | 2.08 | 2.39 | 3.01 | 3.68 |
| 0.37 | .... | .... | .... | .... | 1.99 | 2.28 | 2.89 | 3.55 |
| 0.38 | .... | .... | .... | .... | .... | 2.19 | 2.78 | 3.42 |
| 0.39 | .... | .... | .... | .... | .... | 2.09 | 2.68 | 3.30 |
| 0.40 | .... | .... | .... | .... | .... | 2.00 | 2.58 | 3.18 |
| 0.41 | .... | .... | .... | .... | .... | .... | 2.48 | 3.07 |
| 0.42 | .... | .... | .... | .... | .... | .... | 2.38 | 2.96 |
| 0.43 | .... | .... | .... | .... | .... | .... | 2.29 | 2.86 |
| 0.44 | .... | .... | .... | .... | .... | .... | 2.20 | 2.76 |
| 0.45 | .... | .... | .... | .... | .... | .... | .... | 2.67 |
| 0.46 | .... | .... | .... | .... | .... | .... | .... | 2.58 |
| 0.47 | .... | .... | .... | .... | .... | .... | .... | 2.49 |
| 0.48 | .... | .... | .... | .... | .... | .... | .... | 2.40 |
| 0.49 | .... | .... | .... | .... | .... | .... | .... | 2.32 |
| 0.50 | .... | .... | .... | .... | .... | .... | .... | 2.24 |
| 0.51 | .... | .... | .... | .... | .... | .... | .... | .... |

SMYS = 52,000 psi.
Diameter = 30.000 inches

C-8

Wall Thickness, inch

| Depth, inch | 0.250 | 0.312 | 0.375 | 0.438 | 0.500 | 0.625 | 0.688 |
|---|---|---|---|---|---|---|---|
| 0.02 | .... | .... | .... | .... | .... | .... | .... |
| 0.03 | .... | .... | .... | .... | .... | .... | .... |
| 0.04 | .... | .... | .... | .... | .... | .... | .... |
| 0.05 | 27.39 | .... | .... | .... | .... | .... | .... |
| 0.06 | 14.56 | .... | .... | .... | .... | .... | .... |
| 0.07 | 8.53 | 25.00 | .... | .... | .... | .... | .... |
| 0.08 | 6.32 | 12.41 | 33.54 | .... | .... | .... | .... |
| 0.09 | 5.11 | 8.84 | 17.84 | 36.25 | .... | .... | .... |
| 0.10 | 4.33 | 7.04 | 11.98 | 26.16 | 38.73 | .... | .... |
| 0.11 | 3.77 | 5.92 | 9.32 | 15.86 | 36.23 | .... | .... |
| 0.12 | 3.34 | 5.13 | 7.74 | 11.97 | 20.60 | .... | .... |
| 0.13 | 2.99 | 4.55 | 6.68 | 9.80 | 14.98 | 43.30 | .... |
| 0.14 | 2.71 | 4.09 | 5.90 | 8.38 | 12.06 | 35.79 | 45.43 |
| 0.15 | 2.46 | 3.72 | 5.30 | 7.37 | 10.22 | 23.03 | 45.21 |
| 0.16 | 2.25 | 3.41 | 4.82 | 6.60 | 8.94 | 17.66 | 28.80 |
| 0.17 | 2.06 | 3.14 | 4.42 | 6.00 | 7.98 | 14.60 | 21.20 |
| 0.18 | 1.89 | 2.90 | 4.09 | 5.50 | 7.23 | 12.57 | 17.22 |
| 0.19 | 1.73 | 2.69 | 3.80 | 5.09 | 6.62 | 11.10 | 14.68 |
| 0.20 | 1.58 | 2.51 | 3.54 | 4.73 | 6.12 | 9.99 | 12.89 |
| 0.21 | .... | 2.33 | 3.31 | 4.42 | 5.69 | 9.11 | 11.55 |
| 0.22 | .... | 2.18 | 3.11 | 4.15 | 5.33 | 8.40 | 10.50 |
| 0.23 | .... | 2.03 | 2.92 | 3.91 | 5.00 | 7.80 | 9.65 |
| 0.24 | .... | 1.89 | 2.75 | 3.69 | 4.72 | 7.28 | 8.95 |
| 0.25 | .... | .... | 2.60 | 3.49 | 4.46 | 6.84 | 8.35 |
| 0.26 | .... | .... | 2.45 | 3.31 | 4.23 | 6.46 | 7.84 |
| 0.27 | .... | .... | 2.31 | 3.14 | 4.02 | 6.11 | 7.39 |
| 0.28 | .... | .... | 2.18 | 2.98 | 3.83 | 5.81 | 7.00 |
| 0.29 | .... | .... | 2.06 | 2.83 | 3.65 | 5.53 | 6.64 |
| 0.30 | .... | .... | 1.94 | 2.70 | 3.48 | 5.28 | 6.33 |
| 0.31 | .... | .... | .... | 2.56 | 3.33 | 5.04 | 6.04 |
| 0.32 | .... | .... | .... | 2.44 | 3.18 | 4.83 | 5.78 |
| 0.33 | .... | .... | .... | 2.32 | 3.04 | 4.63 | 5.54 |
| 0.34 | .... | .... | .... | 2.21 | 2.91 | 4.45 | 5.32 |
| 0.35 | .... | .... | .... | 2.10 | 2.79 | 4.28 | 5.11 |
| 0.36 | .... | .... | .... | .... | 2.67 | 4.12 | 4.92 |
| 0.37 | .... | .... | .... | .... | 2.55 | 3.96 | 4.74 |
| 0.38 | .... | .... | .... | .... | 2.44 | 3.82 | 4.57 |
| 0.39 | .... | .... | .... | .... | 2.34 | 3.68 | 4.41 |
| 0.40 | .... | .... | .... | .... | 2.24 | 3.55 | 4.26 |
| 0.41 | .... | .... | .... | .... | .... | 3.43 | 4.12 |
| 0.42 | .... | .... | .... | .... | .... | 3.31 | 3.99 |
| 0.43 | .... | .... | .... | .... | .... | 3.20 | 3.86 |
| 0.44 | .... | .... | .... | .... | .... | 3.09 | 3.73 |
| 0.45 | .... | .... | .... | .... | .... | 2.98 | 3.61 |
| 0.46 | .... | .... | .... | .... | .... | 2.88 | 3.50 |
| 0.47 | .... | .... | .... | .... | .... | 2.78 | 3.39 |
| 0.48 | .... | .... | .... | .... | .... | 2.69 | 3.29 |
| 0.49 | .... | .... | .... | .... | .... | 2.59 | 3.18 |
| 0.50 | .... | .... | .... | .... | .... | 2.50 | 3.08 |
| 0.51 | .... | .... | .... | .... | .... | .... | 2.99 |

C-9

SMYS =  52,000 psi.
Diameter =  36.000 inches

Wall Thickness, inch

| Depth, inch | 0.250 | 0.281 | 0.312 | 0.375 | 0.406 | 0.469 | 0.562 | 0.688 |
|---|---|---|---|---|---|---|---|---|
| 0.02 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.03 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.04 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.05 | 30.00 | .... | .... | .... | .... | .... | .... | .... |
| 0.06 | 15.95 | 31.81 | .... | .... | .... | .... | .... | .... |
| 0.07 | 9.35 | 14.36 | 27.39 | .... | .... | .... | .... | .... |
| 0.08 | 6.92 | 9.50 | 13.59 | 36.74 | .... | .... | .... | .... |
| 0.09 | 5.60 | 7.33 | 9.69 | 19.54 | 33.96 | .... | .... | .... |
| 0.10 | 4.74 | 6.05 | 7.71 | 13.12 | 18.08 | 41.09 | .... | .... |
| 0.11 | 4.13 | 5.19 | 6.48 | 10.21 | 13.03 | 24.72 | .... | .... |
| 0.12 | 3.65 | 4.56 | 5.62 | 8.48 | 10.44 | 16.79 | 44.98 | .... |
| 0.13 | 3.28 | 4.08 | 4.99 | 7.31 | 8.81 | 13.15 | 29.54 | .... |
| 0.14 | 2.96 | 3.68 | 4.48 | 6.46 | 7.68 | 10.97 | 20.31 | 49.77 |
| 0.15 | 2.70 | 3.35 | 4.07 | 5.81 | 6.84 | 9.49 | 16.02 | 49.52 |
| 0.16 | 2.46 | 3.07 | 3.73 | 5.28 | 6.18 | 8.41 | 13.43 | 31.55 |
| 0.17 | 2.25 | 2.83 | 3.44 | 4.84 | 5.65 | 7.58 | 11.66 | 23.22 |
| 0.18 | 2.07 | 2.61 | 3.18 | 4.48 | 5.20 | 6.92 | 10.36 | 18.87 |
| 0.19 | 1.89 | 2.41 | 2.95 | 4.16 | 4.82 | 6.37 | 9.36 | 16.08 |
| 0.20 | 1.73 | 2.23 | 2.74 | 3.88 | 4.50 | 5.91 | 8.56 | 14.12 |
| 0.21 | .... | 2.06 | 2.56 | 3.63 | 4.21 | 5.51 | 7.90 | 12.65 |
| 0.22 | .... | 1.91 | 2.38 | 3.41 | 3.95 | 5.17 | 7.35 | 11.50 |
| 0.23 | .... | .... | 2.22 | 3.20 | 3.72 | 4.86 | 6.87 | 10.57 |
| 0.24 | .... | .... | 2.07 | 3.02 | 3.51 | 4.59 | 6.46 | 9.80 |
| 0.25 | .... | .... | .... | 2.84 | 3.31 | 4.34 | 6.09 | 9.15 |
| 0.26 | .... | .... | .... | 2.68 | 3.14 | 4.12 | 5.77 | 8.59 |
| 0.27 | .... | .... | .... | 2.53 | 2.97 | 3.91 | 5.47 | 8.10 |
| 0.28 | .... | .... | .... | 2.39 | 2.81 | 3.72 | 5.21 | 7.66 |
| 0.29 | .... | .... | .... | 2.25 | 2.67 | 3.54 | 4.97 | 7.28 |
| 0.30 | .... | .... | .... | 2.12 | 2.53 | 3.38 | 4.74 | 6.93 |
| 0.31 | .... | .... | .... | .... | 2.39 | 3.22 | 4.54 | 6.62 |
| 0.32 | .... | .... | .... | .... | 2.27 | 3.07 | 4.34 | 6.33 |
| 0.33 | .... | .... | .... | .... | .... | 2.93 | 4.16 | 6.07 |
| 0.34 | .... | .... | .... | .... | .... | 2.80 | 4.00 | 5.83 |
| 0.35 | .... | .... | .... | .... | .... | 2.67 | 3.84 | 5.60 |
| 0.36 | .... | .... | .... | .... | .... | 2.55 | 3.69 | 5.39 |
| 0.37 | .... | .... | .... | .... | .... | 2.43 | 3.54 | 5.19 |
| 0.38 | .... | .... | .... | .... | .... | .... | 3.41 | 5.01 |
| 0.39 | .... | .... | .... | .... | .... | .... | 3.28 | 4.84 |
| 0.40 | .... | .... | .... | .... | .... | .... | 3.15 | 4.67 |
| 0.41 | .... | .... | .... | .... | .... | .... | 3.03 | 4.52 |
| 0.42 | .... | .... | .... | .... | .... | .... | 2.92 | 4.37 |
| 0.43 | .... | .... | .... | .... | .... | .... | 2.81 | 4.22 |
| 0.44 | .... | .... | .... | .... | .... | .... | 2.70 | 4.09 |
| 0.45 | .... | .... | .... | .... | .... | .... | .... | 3.96 |
| 0.46 | .... | .... | .... | .... | .... | .... | .... | 3.83 |
| 0.47 | .... | .... | .... | .... | .... | .... | .... | 3.71 |
| 0.48 | .... | .... | .... | .... | .... | .... | .... | 3.60 |
| 0.49 | .... | .... | .... | .... | .... | .... | .... | 3.49 |
| 0.50 | .... | .... | .... | .... | .... | .... | .... | 3.38 |
| 0.51 | .... | .... | .... | .... | .... | .... | .... | 3.27 |

SMYS = 60,000 psi.
Diameter = 24.000 inches

C-10

Wall Thickness, inch

| Depth, inch | 0.250 | 0.312 | 0.375 | 0.438 | 0.469 | 0.500 | 0.562 | 0.625 |
|---|---|---|---|---|---|---|---|---|
| 0.02 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.03 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.04 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.05 | 19.69 | .... | .... | .... | .... | .... | .... | .... |
| 0.06 | 8.57 | .... | .... | .... | .... | .... | .... | .... |
| 0.07 | 5.96 | 11.91 | .... | .... | .... | .... | .... | .... |
| 0.08 | 4.69 | 8.06 | 16.13 | .... | .... | .... | .... | .... |
| 0.09 | 3.92 | 6.29 | 10.50 | 21.57 | .... | .... | .... | .... |
| 0.10 | 3.38 | 5.23 | 8.08 | 13.26 | 18.08 | 27.85 | .... | .... |
| 0.11 | 2.98 | 4.51 | 6.68 | 10.05 | 12.57 | 16.26 | .... | .... |
| 0.12 | 2.67 | 3.99 | 5.75 | 8.24 | 9.93 | 12.12 | 19.66 | .... |
| 0.13 | 2.41 | 3.58 | 5.07 | 7.07 | 8.33 | 9.88 | 14.38 | 23.84 |
| 0.14 | 2.19 | 3.25 | 4.56 | 6.23 | 7.24 | 8.43 | 11.62 | 16.95 |
| 0.15 | 2.00 | 2.97 | 4.14 | 5.59 | 6.44 | 7.41 | 9.87 | 13.55 |
| 0.16 | 1.84 | 2.74 | 3.80 | 5.08 | 5.81 | 6.64 | 8.65 | 11.45 |
| 0.17 | 1.69 | 2.54 | 3.52 | 4.67 | 5.32 | 6.03 | 7.74 | 10.00 |
| 0.18 | 1.55 | 2.35 | 3.27 | 4.32 | 4.90 | 5.54 | 7.03 | 8.92 |
| 0.19 | 1.42 | 2.19 | 3.05 | 4.02 | 4.56 | 5.13 | 6.45 | 8.09 |
| 0.20 | 1.30 | 2.05 | 2.86 | 3.76 | 4.26 | 4.79 | 5.98 | 7.42 |
| 0.21 | .... | 1.91 | 2.68 | 3.54 | 3.99 | 4.48 | 5.57 | 6.87 |
| 0.22 | .... | 1.79 | 2.53 | 3.33 | 3.76 | 4.22 | 5.22 | 6.40 |
| 0.23 | .... | 1.67 | 2.38 | 3.15 | 3.56 | 3.98 | 4.92 | 6.01 |
| 0.24 | .... | 1.56 | 2.25 | 2.98 | 3.37 | 3.77 | 4.65 | 5.66 |
| 0.25 | .... | .... | 2.12 | 2.83 | 3.20 | 3.58 | 4.41 | 5.35 |
| 0.26 | .... | .... | 2.01 | 2.69 | 3.04 | 3.41 | 4.19 | 5.08 |
| 0.27 | .... | .... | 1.90 | 2.56 | 2.90 | 3.25 | 4.00 | 4.83 |
| 0.28 | .... | .... | 1.79 | 2.43 | 2.76 | 3.10 | 3.81 | 4.61 |
| 0.29 | .... | .... | 1.69 | 2.32 | 2.63 | 2.96 | 3.65 | 4.41 |
| 0.30 | .... | .... | 1.60 | 2.21 | 2.52 | 2.83 | 3.49 | 4.22 |
| 0.31 | .... | .... | .... | 2.10 | 2.40 | 2.71 | 3.35 | 4.05 |
| 0.32 | .... | .... | .... | 2.00 | 2.30 | 2.60 | 3.21 | 3.89 |
| 0.33 | .... | .... | .... | 1.91 | 2.20 | 2.49 | 3.09 | 3.74 |
| 0.34 | .... | .... | .... | 1.82 | 2.10 | 2.38 | 2.97 | 3.60 |
| 0.35 | .... | .... | .... | 1.73 | 2.01 | 2.28 | 2.86 | 3.46 |
| 0.36 | .... | .... | .... | .... | 1.92 | 2.19 | 2.75 | 3.34 |
| 0.37 | .... | .... | .... | .... | 1.83 | 2.10 | 2.65 | 3.22 |
| 0.38 | .... | .... | .... | .... | .... | 2.01 | 2.55 | 3.11 |
| 0.39 | .... | .... | .... | .... | .... | 1.93 | 2.45 | 3.00 |
| 0.40 | .... | .... | .... | .... | .... | 1.84 | 2.36 | 2.90 |
| 0.41 | .... | .... | .... | .... | .... | .... | 2.28 | 2.80 |
| 0.42 | .... | .... | .... | .... | .... | .... | 2.19 | 2.71 |
| 0.43 | .... | .... | .... | .... | .... | .... | 2.11 | 2.62 |
| 0.44 | .... | .... | .... | .... | .... | .... | 2.03 | 2.53 |
| 0.45 | .... | .... | .... | .... | .... | .... | .... | 2.45 |
| 0.46 | .... | .... | .... | .... | .... | .... | .... | 2.37 |
| 0.47 | .... | .... | .... | .... | .... | .... | .... | 2.29 |
| 0.48 | .... | .... | .... | .... | .... | .... | .... | 2.21 |
| 0.49 | .... | .... | .... | .... | .... | .... | .... | 2.13 |
| 0.50 | .... | .... | .... | .... | .... | .... | .... | 2.06 |
| 0.51 | .... | .... | .... | .... | .... | .... | .... | .... |

SMYS = 60,000 psi.  
Diameter = 30.000 inches

C-11

Wall Thickness, inch

| Depth, inch | 0.250 | 0.312 | 0.375 | 0.438 | 0.500 | 0.625 | 0.688 |
|---|---|---|---|---|---|---|---|
| 0.02 | .... | .... | .... | .... | .... | .... | .... |
| 0.03 | .... | .... | .... | .... | .... | .... | .... |
| 0.04 | .... | .... | .... | .... | .... | .... | .... |
| 0.05 | 22.02 | .... | .... | .... | .... | .... | .... |
| 0.06 | 9.58 | .... | .... | .... | .... | .... | .... |
| 0.07 | 6.66 | 13.31 | .... | .... | .... | .... | .... |
| 0.08 | 5.25 | 9.01 | 18.03 | .... | .... | .... | .... |
| 0.09 | 4.38 | 7.03 | 11.74 | 24.12 | .... | .... | .... |
| 0.10 | 3.78 | 5.85 | 9.03 | 14.83 | 31.14 | .... | .... |
| 0.11 | 3.34 | 5.05 | 7.47 | 11.23 | 18.18 | .... | .... |
| 0.12 | 2.98 | 4.46 | 6.43 | 9.22 | 13.55 | .... | .... |
| 0.13 | 2.69 | 4.00 | 5.67 | 7.90 | 11.04 | 26.66 | .... |
| 0.14 | 2.45 | 3.63 | 5.10 | 6.96 | 9.42 | 18.95 | 32.37 |
| 0.15 | 2.24 | 3.33 | 4.63 | 6.25 | 8.28 | 15.15 | 22.13 |
| 0.16 | 2.05 | 3.06 | 4.25 | 5.68 | 7.42 | 12.80 | 17.48 |
| 0.17 | 1.88 | 2.83 | 3.93 | 5.22 | 6.75 | 11.18 | 14.68 |
| 0.18 | 1.73 | 2.63 | 3.65 | 4.83 | 6.20 | 9.98 | 12.77 |
| 0.19 | 1.59 | 2.45 | 3.41 | 4.50 | 5.74 | 9.05 | 11.37 |
| 0.20 | 1.46 | 2.29 | 3.19 | 4.21 | 5.35 | 8.30 | 10.29 |
| 0.21 | .... | 2.14 | 3.00 | 3.95 | 5.01 | 7.68 | 9.43 |
| 0.22 | .... | 2.00 | 2.82 | 3.73 | 4.72 | 7.16 | 8.72 |
| 0.23 | .... | 1.86 | 2.66 | 3.52 | 4.45 | 6.71 | 8.12 |
| 0.24 | .... | 1.74 | 2.51 | 3.33 | 4.22 | 6.32 | 7.61 |
| 0.25 | .... | .... | 2.37 | 3.16 | 4.00 | 5.98 | 7.17 |
| 0.26 | .... | .... | 2.24 | 3.00 | 3.81 | 5.68 | 6.79 |
| 0.27 | .... | .... | 2.12 | 2.86 | 3.63 | 5.40 | 6.44 |
| 0.28 | .... | .... | 2.00 | 2.72 | 3.46 | 5.15 | 6.13 |
| 0.29 | .... | .... | 1.89 | 2.59 | 3.31 | 4.93 | 5.85 |
| 0.30 | .... | .... | 1.79 | 2.47 | 3.17 | 4.72 | 5.60 |
| 0.31 | .... | .... | .... | 2.35 | 3.03 | 4.52 | 5.37 |
| 0.32 | .... | .... | .... | 2.24 | 2.90 | 4.34 | 5.15 |
| 0.33 | .... | .... | .... | 2.13 | 2.78 | 4.18 | 4.95 |
| 0.34 | .... | .... | .... | 2.03 | 2.66 | 4.02 | 4.77 |
| 0.35 | .... | .... | .... | 1.93 | 2.55 | 3.87 | 4.60 |
| 0.36 | .... | .... | .... | .... | 2.45 | 3.73 | 4.43 |
| 0.37 | .... | .... | .... | .... | 2.35 | 3.60 | 4.28 |
| 0.38 | .... | .... | .... | .... | 2.25 | 3.48 | 4.14 |
| 0.39 | .... | .... | .... | .... | 2.15 | 3.36 | 4.00 |
| 0.40 | .... | .... | .... | .... | 2.06 | 3.24 | 3.87 |
| 0.41 | .... | .... | .... | .... | .... | 3.13 | 3.75 |
| 0.42 | .... | .... | .... | .... | .... | 3.03 | 3.63 |
| 0.43 | .... | .... | .... | .... | .... | 2.93 | 3.52 |
| 0.44 | .... | .... | .... | .... | .... | 2.83 | 3.41 |
| 0.45 | .... | .... | .... | .... | .... | 2.74 | 3.30 |
| 0.46 | .... | .... | .... | .... | .... | 2.65 | 3.20 |
| 0.47 | .... | .... | .... | .... | .... | 2.56 | 3.11 |
| 0.48 | .... | .... | .... | .... | .... | 2.47 | 3.01 |
| 0.49 | .... | .... | .... | .... | .... | 2.39 | 2.92 |
| 0.50 | .... | .... | .... | .... | .... | 2.30 | 2.83 |
| 0.51 | .... | .... | .... | .... | .... | .... | 2.75 |

SMYS = 60,000 psi  
Diameter = 36.000 inches

C-12

Wall Thickness, inch

| Depth, inch | 0.250 | 0.281 | 0.312 | 0.375 | 0.406 | 0.469 | 0.562 | 0.688 |
|---|---|---|---|---|---|---|---|---|
| 0.02 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.03 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.04 | .... | .... | .... | .... | .... | .... | .... | .... |
| 0.05 | 24.12 | .... | .... | .... | .... | .... | .... | .... |
| 0.06 | 10.50 | 17.03 | .... | .... | .... | .... | .... | .... |
| 0.07 | 7.30 | 10.06 | 14.58 | .... | .... | .... | .... | .... |
| 0.08 | 5.75 | 7.49 | 9.87 | 19.75 | .... | .... | .... | .... |
| 0.09 | 4.80 | 6.09 | 7.70 | 12.86 | 17.41 | .... | .... | .... |
| 0.10 | 4.14 | 5.18 | 6.41 | 9.90 | 12.46 | 22.15 | .... | .... |
| 0.11 | 3.65 | 4.52 | 5.53 | 8.18 | 9.95 | 15.40 | .... | .... |
| 0.12 | 3.27 | 4.03 | 4.88 | 7.04 | 8.40 | 12.16 | 24.08 | .... |
| 0.13 | 2.95 | 3.63 | 4.38 | 6.22 | 7.32 | 10.20 | 17.61 | .... |
| 0.14 | 2.68 | 3.30 | 3.98 | 5.58 | 6.52 | 8.86 | 14.23 | 35.46 |
| 0.15 | 2.45 | 3.03 | 3.64 | 5.08 | 5.89 | 7.88 | 12.09 | 24.25 |
| 0.16 | 2.25 | 2.78 | 3.36 | 4.66 | 5.39 | 7.12 | 10.60 | 19.15 |
| 0.17 | 2.06 | 2.57 | 3.11 | 4.31 | 4.97 | 6.51 | 9.48 | 16.08 |
| 0.18 | 1.90 | 2.38 | 2.88 | 4.00 | 4.61 | 6.01 | 8.61 | 13.99 |
| 0.19 | 1.74 | 2.21 | 2.69 | 3.74 | 4.30 | 5.58 | 7.90 | 12.45 |
| 0.20 | 1.60 | 2.05 | 2.51 | 3.50 | 4.03 | 5.21 | 7.32 | 11.27 |
| 0.21 | .... | 1.90 | 2.34 | 3.29 | 3.79 | 4.89 | 6.82 | 10.32 |
| 0.22 | .... | 1.76 | 2.19 | 3.09 | 3.57 | 4.61 | 6.40 | 9.55 |
| 0.23 | .... | .... | 2.04 | 2.92 | 3.37 | 4.35 | 6.03 | 8.90 |
| 0.24 | .... | .... | 1.91 | 2.75 | 3.19 | 4.13 | 5.70 | 8.34 |
| 0.25 | .... | .... | .... | 2.60 | 3.02 | 3.92 | 5.40 | 7.86 |
| 0.26 | .... | .... | .... | 2.46 | 2.86 | 3.72 | 5.14 | 7.43 |
| 0.27 | .... | .... | .... | 2.32 | 2.72 | 3.55 | 4.89 | 7.06 |
| 0.28 | .... | .... | .... | 2.19 | 2.58 | 3.38 | 4.67 | 6.72 |
| 0.29 | .... | .... | .... | 2.07 | 2.45 | 3.23 | 4.47 | 6.41 |
| 0.30 | .... | .... | .... | 1.96 | 2.32 | 3.08 | 4.28 | 6.13 |
| 0.31 | .... | .... | .... | .... | 2.20 | 2.94 | 4.10 | 5.88 |
| 0.32 | .... | .... | .... | .... | 2.09 | 2.81 | 3.94 | 5.64 |
| 0.33 | .... | .... | .... | .... | .... | 2.69 | 3.78 | 5.43 |
| 0.34 | .... | .... | .... | .... | .... | 2.57 | 3.64 | 5.22 |
| 0.35 | .... | .... | .... | .... | .... | 2.46 | 3.50 | 5.03 |
| 0.36 | .... | .... | .... | .... | .... | 2.35 | 3.37 | 4.86 |
| 0.37 | .... | .... | .... | .... | .... | 2.24 | 3.24 | 4.69 |
| 0.38 | .... | .... | .... | .... | .... | .... | 3.12 | 4.53 |
| 0.39 | .... | .... | .... | .... | .... | .... | 3.00 | 4.38 |
| 0.40 | .... | .... | .... | .... | .... | .... | 2.89 | 4.24 |
| 0.41 | .... | .... | .... | .... | .... | .... | 2.79 | 4.10 |
| 0.42 | .... | .... | .... | .... | .... | .... | 2.68 | 3.98 |
| 0.43 | .... | .... | .... | .... | .... | .... | 2.58 | 3.85 |
| 0.44 | .... | .... | .... | .... | .... | .... | 2.49 | 3.73 |
| 0.45 | .... | .... | .... | .... | .... | .... | .... | 3.62 |
| 0.46 | .... | .... | .... | .... | .... | .... | .... | 3.51 |
| 0.47 | .... | .... | .... | .... | .... | .... | .... | 3.40 |
| 0.48 | .... | .... | .... | .... | .... | .... | .... | 3.30 |
| 0.49 | .... | .... | .... | .... | .... | .... | .... | 3.20 |
| 0.50 | .... | .... | .... | .... | .... | .... | .... | 3.10 |
| 0.51 | .... | .... | .... | .... | .... | .... | .... | 3.01 |

APPENDIX D

## BURST TEST DATA FOR CORRODED PIPE

# TABLE D-1. COMPLETE LIST OF RESULTS FOR THE 86 ANOMALIES

| File | Diam. inch | Thick. inch | Yield Strength psi. | SMYS psi. | Total Length inch | Effect. Length in | Effect. Ex. Area in^2 | Maximum Pit Dept inch | CASE 1 Press. psi. | CASE 2 Press. psi | CASE 3 Press. psi. | ACTUAL Failure Press. psi. | LEAK/ RUPTURE | CASE 1 /Actual Press. | CASE 2 /Actual Press. | CASE 3 /Actual Press. | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 30.0 | 0.370 | 58,700 | 52,000 | 2.500 | 2.500 | 0.233 | 0.146 | 1,618 | 1,428 | 1,330 | 1623 | L | 0.997 | 0.880 | 0.820 | |
| 2 | 30.0 | 0.370 | 58,700 | 52,000 | 2.250 | 2.250 | 0.219 | 0.146 | 1,626 | 1,443 | 1,342 | 1620 | L | 1.004 | 0.891 | 0.828 | |
| 6 | 24.0 | 0.365 | 40,500 | 35,000 | 3.000 | 2.750 | 0.581 | 0.271 | 1,213 | 995 | 934 | 1100 | L | 1.103 | 0.905 | 0.849 | |
| 7 | 24.0 | 0.365 | 40,500 | 35,000 | 4.750 | 4.000 | 0.807 | 0.251 | 1,105 | 893 | 859 | 1165 | L | 0.949 | 0.766 | 0.738 | |
| 9 | 24.0 | 0.370 | 41,800 | 35,000 | 1.750 | 1.750 | 0.256 | 0.261 | 1,506 | 1,218 | 1,077 | 1040 | L | 1.448 | 1.171 | 1.036 | 1st Cycle |
| 10 | 24.0 | 0.375 | 41,800 | 35,000 | 4.250 | 3.750 | 0.711 | 0.282 | 1,251 | 885 | 870 | 1165 | L | 1.074 | 0.759 | 0.747 | 2nd Cycle |
| 11 | 24.0 | 0.365 | 41,800 | 35,000 | 2.000 | 2.000 | 0.300 | 0.261 | 1,455 | 1,157 | 1,035 | 1020 | L | 1.427 | 1.134 | 1.015 | 4th Cycle |
| 12 | 24.0 | 0.365 | 41,800 | 35,000 | 2.250 | 2.250 | 0.287 | 0.219 | 1,463 | 1,191 | 1,050 | 1215 | L | 1.204 | 0.981 | 0.864 | 8th Cycle |
| 13 | 24.0 | 0.365 | 41,800 | 35,000 | 2.500 | 2.500 | 0.358 | 0.230 | 1,421 | 1,146 | 1,021 | 1320 | L | 1.077 | 0.868 | 0.774 | 14th Cycle |
| 14 | 24.0 | 0.365 | 41,800 | 35,000 | 2.750 | 2.750 | 0.450 | 0.261 | 1,361 | 1,052 | 968 | 1320 | L | 1.031 | 0.797 | 0.733 | 14th Cycle |
| 15 | 24.0 | 0.380 | 41,800 | 35,000 | 3.750 | 3.750 | 0.543 | 0.251 | 1,395 | 1,043 | 967 | 1335 | L | 1.045 | 0.782 | 0.725 | 15th Cycle |
| 16 | 24.0 | 0.370 | 41,800 | 35,000 | 2.000 | 2.000 | 0.232 | 0.188 | 1,516 | 1,274 | 1,106 | 1350 | L | 1.123 | 0.944 | 0.819 | 16th Cycle |
| 17 | 24.0 | 0.370 | 41,800 | 35,000 | 3.000 | 3.000 | 0.483 | 0.240 | 1,368 | 1,095 | 993 | 1375 | L | 0.995 | 0.796 | 0.722 | 17th Cycle |
| 18 | 24.0 | 0.375 | 41,800 | 35,000 | 3.750 | 3.500 | 0.367 | 0.240 | 1,468 | 1,047 | 964 | 1438 | L | 1.021 | 0.728 | 0.670 | 20th Cycle |
| 19 | 24.0 | 0.365 | 41,800 | 35,000 | 1.750 | 1.750 | 0.272 | 0.261 | 1,473 | 1,194 | 1,059 | 1450 | L | 1.016 | 0.824 | 0.730 | 21st Cycle |
| 20 | 24.0 | 0.375 | 41,800 | 35,000 | 2.250 | 2.250 | 0.318 | 0.251 | 1,494 | 1,187 | 1,059 | 1200 | L | 1.245 | 0.989 | 0.882 | 23rd Cycle |
| 21 | 24.0 | 0.375 | 41,800 | 35,000 | 2.250 | 2.000 | 0.393 | 0.292 | 1,436 | 1,104 | 1,017 | 1490 | L | 0.964 | 0.741 | 0.683 | 25th Cycle |
| 22 | 24.0 | 0.375 | 41,800 | 35,000 | 2.500 | 2.500 | 0.271 | 0.219 | 1,517 | 1,210 | 1,068 | 1520 | L | 0.998 | 0.796 | 0.703 | 29th Cycle |
| 23 | 24.0 | 0.375 | 41,800 | 35,000 | 2.000 | 2.000 | 0.204 | 0.188 | 1,552 | 1,295 | 1,124 | 1520 | L | 1.021 | 0.852 | 0.739 | 29th Cycle |
| 24 | 24.0 | 0.375 | 41,800 | 35,000 | 2.250 | 2.250 | 0.253 | 0.177 | 1,527 | 1,286 | 1,116 | 1520 | L | 1.005 | 0.846 | 0.734 | 30th Cycle |
| 30 | 30.0 | 0.375 | 70,600 | 52,000 | 1.600 | 1.600 | 0.183 | 0.209 | 1,960 | 1,465 | 1,365 | 2140 | L | 0.916 | 0.685 | 0.638 | |
| 32 | 20.0 | 0.325 | 41,000 | 35,000 | 5.750 | 5.250 | 0.576 | 0.209 | 1,336 | 908 | 883 | 1150 | L | 1.161 | 0.790 | 0.768 | |
| 33 | 20.0 | 0.325 | 41,100 | 35,000 | 6.500 | 5.250 | 0.491 | 0.219 | 1,394 | 842 | 841 | 1695 | L | 0.823 | 0.497 | 0.496 | |
| 34 | 16.0 | 0.310 | 28,600 | 25,000 | 4.500 | 3.750 | 0.550 | 0.230 | 1,102 | 755 | 708 | 1100 | L | 1.002 | 0.687 | 0.644 | |
| 35 | 18.0 | 0.310 | 28,600 | 25,000 | 5.000 | 4.000 | 0.609 | 0.240 | 1,064 | 688 | 670 | 1270 | L | 0.837 | 0.542 | 0.527 | |
| 37 | 16.0 | 0.310 | 28,600 | 25,000 | 2.750 | 2.000 | 0.349 | 0.272 | 1,209 | 740 | 728 | 890 | L | 1.359 | 0.832 | 0.818 | (a) |
| 38 | 16.0 | 0.310 | 28,400 | 25,000 | 6.250 | 5.250 | 0.704 | 0.199 | 1,064 | 798 | 724 | 1290 | L | 0.825 | 0.619 | 0.561 | |
| 41 | 24.0 | 0.396 | 50,200 | 35,000 | 5.750 | 3.500 | 0.935 | 0.360 | 1,299 | 598 | 727 | 930 | L | 1.397 | 0.643 | 0.782 | (a) |
| 45 | 24.0 | 0.355 | 52,000 | 35,000 | 6.500 | 3.750 | 0.687 | 0.289 | 1,392 | 626 | 688 | 1505 | L | 0.925 | 0.416 | 0.457 | (a) |
| 46 | 24.0 | 0.319 | 47,500 | 35,000 | 5.500 | 5.250 | 0.470 | 0.216 | 1,304 | 737 | 721 | 1732 | L | 0.753 | 0.425 | 0.416 | |
| 47 | 24.0 | 0.332 | 45,000 | 35,000 | 4.500 | 4.000 | 0.512 | 0.220 | 1,259 | 838 | 797 | 1752 | L | 0.719 | 0.478 | 0.455 | |
| 52 | 24.0 | 0.361 | 47,400 | 35,000 | 10.500 | 4.000 | 0.784 | 0.319 | 1,254 | 454 | 578 | 1290 | L | 0.972 | 0.352 | 0.448 | (a) |
| 53 | 24.0 | 0.361 | 41,200 | 35,000 | 12.500 | 2.500 | 0.564 | 0.285 | 1,201 | 557 | 634 | 1475 | L | 0.814 | 0.378 | 0.430 | |
| 54 | 24.0 | 0.355 | 50,300 | 35,000 | 8.500 | 4.000 | 0.439 | 0.243 | 1,560 | 729 | 740 | 1741 | L | 0.896 | 0.419 | 0.425 | |
| 55 | 24.0 | 0.371 | 45,000 | 35,000 | 10.500 | 8.500 | 1.035 | 0.276 | 1,321 | 656 | 706 | 1357 | L | 0.974 | 0.483 | 0.520 | |

| | <------SPECIFIC DATA | | | | ----> | | | | | | | | ACTUAL | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| File | Diam. inch | Thick. inch | Yield Strength psi. | SMYS psi. | Total Length inch | Effect. Length in | Effect. Ex. Area in^2 | Maximum Pit Dept inch | CASE 1 Press. psi. | CASE 2 Press. psi | CASE 3 Press. psi. | Failure Press. psi. | LEAK/ RUPTURE | CASE 1 /Actual Press. | CASE 2 /Actual Press. | CASE 3 /Actual Press. | NOTES |
| 56 | 24.0 | 0.371 | 45,000 | 35,000 | 10.500 | 5.500 | 0.799 | 0.291 | 1,331 | 604 | 675 | 1357 | L | 0.981 | 0.445 | 0.497 | |
| 57 | 24.0 | 0.372 | 48,200 | 35,000 | 22.000 | 12.500 | 1.022 | 0.284 | 1,508 | 562 | 282 | 1599 | L | 0.943 | 0.352 | 0.177 | (b) |
| 59 | 24.0 | 0.366 | 43,000 | 35,000 | 12.500 | 7.500 | 0.615 | 0.242 | 1,396 | 723 | 740 | 1808 | L | 0.772 | 0.400 | 0.409 | |
| 61 | 24.0 | 0.368 | 47,700 | 35,000 | 28.000 | 9.000 | 1.025 | 0.288 | 1,391 | 518 | 257 | 1530 | L | 0.909 | 0.339 | 0.168 | (b) |
| 64 | 20.0 | 0.311 | 35,300 | 35,000 | 8.500 | 5.000 | 0.242 | 0.239 | 1,298 | 633 | 695 | 1694 | L | 0.766 | 0.374 | 0.410 | |
| 65 | 20.0 | 0.311 | 35,300 | 35,000 | 11.000 | 9.000 | 0.315 | 0.105 | 1,300 | 1,088 | 982 | 1694 | L | 0.768 | 0.642 | 0.580 | |
| 66 | 20.0 | 0.266 | 40,200 | 35,000 | 15.500 | 11.000 | 0.789 | 0.144 | 1,053 | 716 | 470 | 1507 | L | 0.698 | 0.475 | 0.312 | (b) |
| 67 | 20.0 | 0.309 | 41,900 | 35,000 | 12.000 | 6.500 | 0.393 | 0.218 | 1,412 | 664 | 350 | 1816 | L | 0.777 | 0.366 | 0.193 | (b) |
| 75 | 30.0 | 0.381 | 52,000 | 52,000 | 12.000 | 5.500 | 1.030 | 0.300 | 1,148 | 678 | 819 | 1120 | L | 1.025 | 0.605 | 0.732 | |
| 76 | 30.0 | 0.378 | 61,221 | 52,000 | 8.000 | 7.000 | 0.678 | 0.170 | 1,542 | 1,179 | 1,157 | 1720 | L | 0.896 | 0.686 | 0.673 | |

CASE 1   MODIFIED METHOD USING EXACT AREA
CASE 2   MODIFIED METHOD USING AREA = 0.85 dL
CASE 3   EXISTING B31G METHOD USING AREA = 2/3 dL

(NOTE:  No Safety Factor Applied to CASE 1, CASE 2, or CASE 3)

(a)  Maximum Pit Depth exceeds 80% of the wall thickness - USE WITH CAUTION
(b)  For CASE 3, L^2/Dt > 20  P'=1.1*SMYS*(2*t/D)*[1-dmax/t] for P' < SMYS*2*t/D
(c)  The MINIMUM failure pressure is not shown

D-3

TABLE D-1 (Cont'd)

| File | Diam. inch | Thick. inch | Yield Strength psi. | SMYS psi. | Total Length inch | Effect. Length in | Effect. Ex. Area in^2 | Maximum Pit Dept inch | CASE 1 Press. psi. | CASE 2 Press. psi | CASE 3 Press. psi. | Failure Press. psi. | LEAK/ RUPTURE | CASE 1 /Actual Press. | CASE 2 /Actual Press. | CASE 3 /Actual Press. | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 30.0 | 0.370 | 58,700 | 52,000 | 4.250 | 4.250 | 0.292 | 0.157 | 1,588 | 1,311 | 1,244 | 1700 | R | 0.934 | 0.771 | 0.732 | |
| 4 | 30.0 | 0.375 | 63,600 | 52,000 | 5.500 | 5.500 | 0.472 | 0.240 | 1,655 | 1,060 | 1,079 | 1670 | R | 0.991 | 0.635 | 0.646 | |
| 5 | 30.0 | 0.375 | 58,800 | 52,000 | 4.750 | 4.750 | 0.605 | 0.209 | 1,469 | 1,193 | 1,167 | 1525 | R | 0.963 | 0.782 | 0.766 | |
| 8 | 24.0 | 0.365 | 40,500 | 35,000 | 5.250 | 4.750 | 0.939 | 0.251 | 1,061 | 863 | 839 | 1220 | R | 0.870 | 0.707 | 0.688 | |
| 25 | 24.0 | 0.380 | 41,800 | 35,000 | 5.000 | 4.750 | 0.889 | 0.271 | 1,206 | 890 | 871 | 1510 | R | 0.799 | 0.589 | 0.577 | |
| 26 | 30.0 | 0.375 | 62,000 | 52,000 | 2.750 | 2.750 | 0.392 | 0.375 | 1,639 | 811 | 1,031 | 1745 | R | 0.939 | 0.465 | 0.591 | (a) |
| 27 | 30.0 | 0.375 | 61,300 | 52,000 | 5.500 | 5.250 | 0.322 | 0.146 | 1,662 | 1,301 | 1,240 | 1840 | R | 0.903 | 0.707 | 0.674 | |
| 28 | 30.0 | 0.375 | 62,000 | 52,000 | 4.500 | 4.500 | 0.319 | 0.115 | 1,678 | 1,396 | 1,309 | 1895 | R | 0.885 | 0.737 | 0.691 | |
| 29 | 30.0 | 0.375 | 66,200 | 52,000 | 4.000 | 4.000 | 0.421 | 0.230 | 1,723 | 1,196 | 1,173 | 1775 | R | 0.971 | 0.674 | 0.661 | |
| 31 | 30.0 | 0.375 | 66,500 | 52,000 | 2.000 | 2.000 | 0.209 | 0.209 | 1,845 | 1,427 | 1,337 | 2000 | R | 0.922 | 0.714 | 0.669 | |
| 36 | 16.0 | 0.310 | 28,600 | 25,000 | 6.000 | 3.250 | 0.735 | 0.282 | 776 | 461 | 546 | 820 | R | 0.946 | 0.563 | 0.666 | (a) |
| 39 | 24.0 | 0.417 | 50,200 | 35,000 | 13.000 | 10.000 | 1.963 | 0.290 | 1,348 | 781 | 817 | 1395 | R | 0.967 | 0.560 | 0.586 | |
| 40 | 24.0 | 0.410 | 46,800 | 35,000 | 8.000 | 7.250 | 1.786 | 0.380 | 1,093 | 505 | 668 | 1660 | R | 0.658 | 0.304 | 0.403 | (a) |
| 42 | 24.0 | 0.444 | 50,200 | 35,000 | 8.250 | 8.000 | 1.354 | 0.220 | 1,675 | 1,191 | 1,101 | 1900 | R | 0.881 | 0.627 | 0.580 | (a) |
| 43 | 24.0 | 0.366 | 53,900 | 35,000 | 15.000 | 5.000 | 0.976 | 0.275 | 1,340 | 594 | 292 | 1469 | R | 0.912 | 0.405 | 0.199 | (b) |
| 44 | 24.0 | 0.364 | 52,000 | 35,000 | 13.000 | 9.000 | 1.550 | 0.254 | 1,216 | 671 | 705 | 1264 | R | 0.962 | 0.531 | 0.558 | |
| 48 | 24.0 | 0.375 | 53,800 | 35,000 | 16.000 | 11.000 | 2.883 | 0.295 | 785 | 559 | 257 | 742 | R | 1.058 | 0.753 | 0.346 | (b) |
| 49 | 24.0 | 0.410 | 48,800 | 37,000 | 9.000 | 5.750 | 1.593 | 0.320 | 813 | 566 | 684 | 788 | R | 1.032 | 0.718 | 0.868 | (a) |
| 50 | 20.0 | 0.312 | 50,000 | 35,000 | 12.000 | 11.750 | 2.688 | 0.252 | 626 | 540 | 231 | 713 | R | 0.877 | 0.758 | 0.324 | (a) |
| 51 | 20.0 | 0.305 | 55,100 | 35,000 | 10.500 | 8.000 | 1.411 | 0.210 | 1,068 | 690 | 719 | 1673 | R | 0.638 | 0.412 | 0.430 | (b) |
| 58 | 24.0 | 0.364 | 48,100 | 35,000 | 8.500 | 8.500 | 1.154 | 0.224 | 1,304 | 829 | 809 | 1645 | R | 0.793 | 0.504 | 0.492 | |
| 60 | 24.0 | 0.366 | 51,500 | 35,000 | 4.000 | 4.000 | 0.725 | 0.191 | 1,433 | 1,097 | 984 | 1583 | R | 0.905 | 0.693 | 0.622 | |
| 62 | 20.0 | 0.283 | 37,900 | 35,000 | 30.000 | 13.000 | 3.279 | 0.274 | 188 | 250 | 35 | 1090 | R | 0.173 | 0.229 | 0.032 | (a) |
| 63 | 20.0 | 0.274 | 40,500 | 35,000 | 12.000 | 6.500 | 0.586 | 0.130 | 1,078 | 821 | 554 | 1739 | R | 0.620 | 0.472 | 0.319 | (b) |
| 68 | 30.0 | 0.372 | 60,750 | 52,000 | 36.000 | 18.000 | 1.745 | 0.130 | 1,387 | 1,129 | 923 | 1844 | R | 0.752 | 0.612 | 0.500 | (b) |
| 69 | 30.0 | 0.376 | 52,000 | 52,000 | 12.000 | 12.000 | 1.868 | 0.230 | 1,052 | 908 | 967 | 1515 | R | 0.701 | 0.600 | 0.638 | |
| 70 | 30.0 | 0.375 | 60,264 | 52,000 | 12.000 | 10.000 | 1.198 | 0.140 | 1,370 | 1,188 | 1,160 | 1815 | R | 0.755 | 0.654 | 0.639 | |
| 71 | 30.0 | 0.382 | 63,542 | 52,000 | 20.000 | 18.000 | 1.223 | 0.145 | 1,611 | 1,156 | 984 | 1902 | R | 0.847 | 0.608 | 0.475 | (b) |
| 72 | 30.0 | 0.376 | 59,030 | 52,000 | 20.000 | 18.000 | 1.515 | 0.130 | 1,422 | 1,177 | 938 | 1785 | R | 0.797 | 0.659 | 0.526 | (b) |
| 73 | 30.0 | 0.378 | 62,082 | 52,000 | 33.000 | 18.000 | 1.540 | 0.110 | 1,489 | 1,223 | 1,022 | 1916 | R | 0.777 | 0.639 | 0.533 | (b) |
| 74 | 30.0 | 0.379 | 65,419 | 52,000 | 14.000 | 9.000 | 1.060 | 0.170 | 1,518 | 1,096 | 1,098 | 1775 | R | 0.855 | 0.618 | 0.619 | |
| 77 | 30.0 | 0.377 | 61,794 | 52,000 | 12.000 | 10.500 | 1.020 | 0.160 | 1,486 | 1,137 | 1,126 | 1789 | R | 0.831 | 0.636 | 0.629 | |
| 78 | 30.0 | 0.373 | 60,173 | 52,000 | 9.000 | 7.000 | 0.680 | 0.110 | 1,493 | 1,295 | 1,236 | 1840 | R | 0.811 | 0.704 | 0.672 | |
| 79 | 24.0 | 0.375 | 42,000 | 37,000 | 33.500 | 21.000 | 5.433 | 0.322 | 587 | 441 | 180 | 804 | R | 0.730 | 0.548 | 0.224 | (a) |
| 80 | 30.0 | 0.365 | 58,600 | 52,000 | 16.000 | 10.500 | 2.233 | 0.229 | 894 | 822 | 519 | 987 | R | 0.906 | 0.833 | 0.525 | (b) |

| File | SPECIFIC DATA Diam. inch | Thick. inch | Yield Strength psi. | SMYS psi. | Total Length inch | Effect. Length in | Effect. Ex. Area in^2 | Maximum Pit Dept inch | CASE 1 Press. psi. | CASE 2 Press. psi | CASE 3 Press. psi. | ACTUAL Failure Press. psi. | LEAK/ RUPTURE | CASE 1 /Actual Press. | CASE 2 /Actual Press. | CASE 3 /Actual Press. | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 81 | 30.0 | 0.375 | 68,770 | 52,000 | 27.000 | 27.000 | 5.603 | 0.245 | 981 | 769 | 496 | 992 | R | 0.988 | 0.775 | 0.500 | (b) |
| 82 | 30.0 | 0.375 | 64,400 | 56,000 | 7.500 | 6.500 | 0.542 | 0.150 | 1,648 | 1,310 | 1,282 | 1970 | R | 0.837 | 0.665 | 0.651 | |
| 83 | 20.0 | 0.260 | 61,000 | 52,000 | 16.000 | 14.000 | 2.498 | 0.218 | 684 | 543 | 240 | 835 | R | 0.820 | 0.650 | 0.288 | (a) (b) |
| 84 | 36.0 | 0.330 | 65,000 | 65,000 | 16.000 | 11.000 | 2.120 | 0.218 | 734 | 714 | 445 | 775 | R | 0.947 | 0.922 | 0.574 | (b) |
| 85 | 30.0 | 0.298 | 71,000 | 60,000 | 63.000 | 41.000 | 7.057 | 0.269 | 725 | 338 | 128 | 815 | R | 0.889 | 0.415 | 0.157 | (a) (b) |
| 86 | 22.0 | 0.198 | 60,967 | 52,000 | 6.000 | 5.000 | 0.489 | 0.148 | 844 | 550 | 630 | 828 | R | 1.019 | 0.664 | 0.761 | |

CASE 1   MODIFIED METHOD USING EXACT AREA
CASE 2   MODIFIED METHOD USING AREA = 0.85 dL
CASE 3   EXISTING B31G METHOD USING AREA = 2/3 dL

(NOTE:  No Safety Factor Applied to CASE 1, CASE 2, or CASE 3)

(a)  Maximum Pit Depth exceeds 80% of the wall thickness – USE WITH CAUTION
(b)  For CASE 3, L^2/Dt > 20   P'=1.1*SMYS*(2*t/D)*[1-dmax/t] for P' < SMYS*2*t/D
(c)  The MINIMUM failure pressure is not shown



12/22/89

$$S_f = 1.15 \text{ SMYS } (1 - d/t)$$

FIGURE D-1.   THE "NO-FAILURE" BOUNDARY COMPARED TO THE 86 BURST TESTS

D-5



**Battelle**

*. . . Putting Technology To Work*

505 King Avenue
Columbus, Ohio 43201-2693

# EXHIBIT Q

# Managing System Integrity for Hazardous Liquid Pipelines

API RECOMMENDED PRACTICE 1160
THIRD EDITION, FEBRUARY 2019



*energy* **API**

AMERICAN PETROLEUM INSTITUTE

## Special Notes

API publications necessarily address problems of a general nature. With respect to particular circumstances, local, state, and federal laws and regulations should be reviewed.

Neither API nor any of API's employees, subcontractors, consultants, committees, or other assignees make any warranty or representation, either express or implied, with respect to the accuracy, completeness, or usefulness of the information contained herein, or assume any liability or responsibility for any use, or the results of such use, of any information or process disclosed in this publication. Neither API nor any of API's employees, subcontractors, consultants, or other assignees represent that use of this publication would not infringe upon privately owned rights.

API publications may be used by anyone desiring to do so. Every effort has been made by the Institute to ensure the accuracy and reliability of the data contained in them; however, the Institute makes no representation, warranty, or guarantee in connection with this publication and hereby expressly disclaims any liability or responsibility for loss or damage resulting from its use or for the violation of any authorities having jurisdiction with which this publication may conflict.

API publications are published to facilitate the broad availability of proven, sound engineering and operating practices. These publications are not intended to obviate the need for applying sound engineering judgment regarding when and where these publications should be utilized. The formulation and publication of API publications is not intended in any way to inhibit anyone from using any other practices.

Any manufacturer marking equipment or materials in conformance with the marking requirements of an API standard is solely responsible for complying with all the applicable requirements of that standard. API does not represent, warrant, or guarantee that such products do in fact conform to the applicable API standard.

All rights reserved. No part of this work may be reproduced, translated, stored in a retrieval system, or transmitted by any means, electronic, mechanical, photocopying, recording, or otherwise, without prior written permission from the publisher. Contact the Publisher, API Publishing Services, 200 Massachusetts Avenue, NW, Suite 1100, Washington, DC 20001.

*Copyright © 2019 American Petroleum Institute*

# Foreword

Nothing contained in any API publication is to be construed as granting any right, by implication or otherwise, for the manufacture, sale, or use of any method, apparatus, or product covered by letters patent. Neither should anything contained in the publication be construed as insuring anyone against liability for infringement of letters patent.

The verbal forms used to express the provisions in this specification are as follows:

— the term "shall" denotes a minimum requirement in order to conform to the standard;

— the term "should" denotes a recommendation or that which is advised but not required in order to conform to the standard;

— the term "may" is used to express permission or a provision that is optional;

— the term "can" is used to express possibility or capability.

Informative elements—As used in a standard, "informative" denotes elements that identify the document, introduce its content, and explain its background, development, and its relationship with other documents or provide additional information intended to assist the understanding or use of the document.

Normative elements—As used in a standard, "normative" denotes elements that describe the scope of the document and that set out provisions that are required to implement the standard.

This document was produced under API standardization procedures that ensure appropriate notification and participation in the developmental process and is designated as an API standard. Questions concerning the interpretation of the content of this publication or comments and questions concerning the procedures under which this publication was developed should be directed in writing to the Director of Standards, American Petroleum Institute, 200 Massachusetts Avenue, NW, Suite 1100, Washington, DC 20001. Requests for permission to reproduce or translate all or any part of the material published herein should also be addressed to the director.

Generally, API standards are reviewed and revised, reaffirmed, or withdrawn at least every five years. A one-time extension of up to two years may be added to this review cycle. Status of the publication can be ascertained from the API Standards Department, telephone (202) 682-8000. A catalog of API publications and materials is published annually by API, 200 Massachusetts Avenue, NW, Suite 1100, Washington, DC 20001.

Suggested revisions are invited and should be submitted to the Standards Department, API, 200 Massachusetts Avenue, NW, Suite 1100, Washington, DC 20001, standards@api.org.

# Contents

Page

1    Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
2    Normative References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
3    Terms, Definitions, Acronyms, and Abbreviations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
3.1    Terms and Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
3.2    Acronyms and Abbreviations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
4    Integrity Management Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.1    Program Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.2    Elements of Integrity Management. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
5    Threat Assessment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
5.1    Threats . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
5.2    Threat Interaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
6    Identifying Critical Locations with Respect to the Consequences of a Release. . . . . . . . . . . . . . . . 18
6.1    General. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
6.2    Determining Whether a Release from a Pipeline Segment or a Facility Could Affect a Critical
        Location . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
6.3    Documentation and Updating . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
7    Data Integration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
7.1    General. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
7.2    Effective Data Integration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
7.3    Types of Data to Integrate to Support Integrity Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
7.4    Data Maintenance (Management of Change). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
7.5    Integration of Data to Validate MOP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
8    Risk Assessment Implementation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
8.1    General Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
8.2    Developing a Risk Assessment Approach. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
8.3    Characteristics of Risk Assessment Approaches. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
9    Integrity Assessment and Remediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
9.1    General. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
9.2    In-line Inspection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
9.3    Hydrostatic Pressure Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
9.4    Other Assessment Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
9.5    Repair Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
10    Reassessment Intervals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
10.1    General. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
10.2    Anomaly Growth Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
10.3    Establishing the Reassessment Interval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
11    Preventive and Mitigative Measures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
11.1    General. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
11.2    Prevention and Mitigation of Threats . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
11.3    Mitigating the Consequences of Unintended Releases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
11.4    Reducing Pressure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
12    Integrity Management of Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
12.1    General Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
12.2    Facility Threat Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
12.3    Gathering, Reviewing, and Integrating Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
12.4    Facility Risk Assessment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

# Contents

Page

12.5    Facility Integrity Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
12.6    Reassessment Intervals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
12.7    Prevention and Mitigation Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
13      Program Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
13.1    General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
13.2    Performance Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
13.3    Performance Tracking and Trending . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
13.4    Self-Reviews . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
13.5    Performance Improvement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
14      Management of Change . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
14.1    General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
14.2    Management of Change—Newly Constructed Systems or New Acquisitions . . . . . . . . . . . . . . . . . . 80
14.3    Management-of-Change Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
14.4    Management-of-Change Pipeline Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
Annex A (normative) Threats to Pipeline Integrity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
Annex B (informative) In-line Inspection Technologies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
Annex C (informative) Repair Strategies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
Annex D (normative) Calculating Reassessment Intervals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
Annex E (informative) Other Technologies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111
Annex F (informative) Leak Detection Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
Annex G (informative) Facilities Piping and Equipment Threats . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
Annex H (informative) Example Visual/Surveillance Inspection Form for Facilities . . . . . . . . . . . . . . . . . . 121
Annex I (informative) Advisory Bulletins and National Transportation Safety Board (NTSB) Pipeline
        Accident Report References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
Bibliography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

Figures
1       PDCA Cycle Applied to an Integrity Management Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
2       Identifying Pipeline Segments or Facilities Located Within Critical Locations . . . . . . . . . . . . . . . . . . 20
3       Simplified Depiction of Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
4       ILI Process Flow Diagram . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
5       Inspection Terminology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
6       Example Timing for Scheduled Responses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
A.1     Example of Seismic Threshold Response Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
B.1     An Example Tool Selection Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
D.1     Reassessment Intervals Based on a Specific Failure-pressure vs Flaw-size Model . . . . . . . . . . . . . 105
D.2     Example of Seismic Threshold Response Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
D.3     Remaining Life of a Crack-like Flaw in a Material of Less-Than--Optimum Toughness . . . . . . . . . . . . 107
H.1     Example of Seismic Threshold Response Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Tables
1       Threat Categories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
2       Integrity Assessment Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
3       In-line Inspection Tools and Capabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# Contents

Page

## Tables (continued)

| | | |
|---|---|---|
| 4 | Corrosion Rates Related to Soil | 45 |
| 5 | Examples of Preventive Measures to Address Pipeline Integrity Threats | 49 |
| 6 | Examples of Mitigative Measures to Address Consequences | 49 |
| 7 | Leak Detection Methods | 57 |
| 8 | Direct Inspection Methods Applicable to Facilities | 66 |
| 9 | Examples of Preventive Measures to Address Facility Integrity Threats | 69 |
| 10 | Examples of Mitigative Measures to Address Consequences at Facilities | 70 |
| 11 | Examples of Integrity Performance Measurement by Threat | 73 |
| 12 | Performance Measures by Process Step | 75 |
| 13 | Examples of Management Change | 79 |
| A.1 | Example Seismic Activity Response Criteria | 92 |
| D.1 | Benchmark Cycles to Determine Cycle Aggressiveness | 109 |
| G.1 | Organization of Topics Covered in Annex G | 115 |

# Introduction

The goal of any pipeline operator is to operate the pipeline so that there are no adverse effects on the public, employees, the environment, or customers. The goal is an error-free, spill-free, and incident-free operation of the pipeline.

An integrity management program provides a way to improve the safety of pipeline systems and to allocate operator resources effectively to:

— identify and analyze actual and potential precursor events that can result in pipeline incidents,

— examine the likelihood and potential severity of pipeline incidents,

— provide a comprehensive and integrated method for examining and comparing the spectrum of risks and risk reduction activities available,

— provide a structured, easily-communicated way for selecting and implementing risk reduction activities,

— establish and track system performance with the goal of improving that performance.

This recommended practice (RP) outlines a process that an operator of a pipeline system can use to assess risks and make decisions about risks in operating a hazardous liquid pipeline to achieve a number of goals, including reducing both the number and consequences of incidents. Section 4 describes the components of an integrity management program. This RP also supports the development of integrity management programs required under 49 CFR 195.452 of the U.S. federal pipeline safety regulations.

This RP is intended for use by individuals and teams charged with planning, implementing, and improving a pipeline integrity management program. A team may include engineers, operating personnel, and technicians or specialists with specific experience or expertise (such as corrosion, in-line inspection, and right-of-way patrolling). Users of this RP should be familiar with applicable pipeline safety regulations (e.g. 49 CFR 195). This RP is also designed to serve as a roadmap to relevant consensus standards, recommended practices, guidance documents, technical reports, advisory bulletins, and safety regulations that can help operators manage integrity for hazardous liquid pipelines.

## Guiding Principles

The development of this RP was based on certain guiding principles. These principles are reflected in multiple sections and are provided to give the reader the opportunity to view pipeline integrity from a broader perspective.

Integrity should be built into pipeline systems from initial planning, design, and construction. Integrity management of a pipeline starts with the sound design and construction of the pipeline. Guidance for new construction is provided in several consensus standards, including ASME B31.4, as well as pipeline safety regulations. As these standards and guidelines are applied to the design of a pipeline, the designer should consider the area the pipeline traverses and the possible impacts that the pipeline may have on that area, and the people that reside in its vicinity. New construction is not a subject of this RP, but the design specifications and as-built condition of the pipeline provide important baseline information for an integrity management program.

Effective integrity management is built on qualified people using defined processes to operate maintained facilities. The integrity of the physical facility is only part of the complete system that allows an operator to reduce both the number of incidents and the adverse effects of errors and incidents. The total system also includes the people that operate the facility and the work processes that the employees use and follow. A comprehensive integrity management program should address people, processes, and facilities.

An integrity management program should be flexible. An integrity management program should be customized to

An integrity management program should be flexible. An integrity management program should be customized to support each operator's unique conditions. Furthermore, the program should be continually evaluated and modified to accommodate changes in the pipeline design and operation, changes in the environment in which the system operates, and new operating data and other integrity-related information.

Continuous evaluation is required to ensure the program takes appropriate advantage of improved technology and that the program remains integrated with the operator's business practices, and effectively supports the operator's integrity goals.

The integration of information is a key component for managing system integrity. A key element of the integrity management program is the integration of all relevant information in the decision-making process. Information that can impact an operator's understanding of the important risks to a pipeline system comes from a variety of sources. The operator is in the best position to gather and analyze this information. By integrating all of the relevant information, the operator can determine where the risks of an incident are applicable and are the greatest and make prudent decisions to reduce these risks.

Preparing for and conducting a risk assessment is a key element in managing pipeline system integrity. Risk assessment is an analytical process through which an operator determines the types of adverse events or conditions that might impact pipeline integrity, the likelihood that those events or conditions will lead to a loss of integrity, and the nature and severity of the consequences that might occur following a failure. This analytical process involves the integration and analysis of design, construction, operating, maintenance, testing, and other information about a pipeline system. Risk assessments can have varying scopes, varying levels of detail, and use different methods. The ultimate goal of assessing risks is to identify and prioritize the most significant risks so that an operator can make informed decisions about these issues.

Assessing risks to pipeline integrity is an iterative process. The operator continuously gathers new and refreshed information about the pipeline system through operating, maintenance, and testing experience. This information should be factored into the understanding of system risks. As the significance and relevance of this newer information to risk is understood, the operator may need to adjust its integrity plan accordingly. This may result in changes to inspection methods or frequency or additional modifications to the pipeline system in response to the data. As changes are made, different pipelines within a single operating company and different operators will be at different places with regard to the goal of incident-free operation. Each pipeline system and each company should implement specific goals and measures to monitor the improvements in integrity, and to assess the need for additional changes. The following applies to operators:

— Operators have multiple options available to address risks. Components of the facility or system can be changed; additional training can be provided to the people that operate the system; processes or procedures can be modified; or a combination of actions can be used to optimize risk reduction.

— Operators should address integrity issues raised from assessments and information analysis.

— Operators should evaluate anomalies and identify those that are potentially injurious to pipeline integrity.

— Operators should remediate or eliminate injurious defects.

— Operators should periodically assess the capabilities of new technologies and techniques that may provide improved understanding about the pipe's condition or provide new opportunities to reduce risk. Knowledge about what is available and effective will allow the operator to apply the most appropriate technologies or techniques to a specific risk to best address potential impacts.

Pipeline system integrity and integrity management programs should be evaluated on a continual basis. Operators are encouraged to perform internal reviews to ensure the effectiveness of the integrity management program in achieving the program's goals. Some operators may choose to use the services of third parties to assist with such evaluations.

# Managing System Integrity for Hazardous Liquid Pipelines

## 1  Scope

This recommended practice (RP) is applicable to pipeline systems used to transport hazardous liquids as defined in U.S. Title 49 CFR Part 195.2. The use of this RP is not limited to pipelines regulated under 49 CFR 195 and the principles embodied in integrity management are applicable to all pipeline systems.

This RP is specifically designed to provide the operator with a description of industry-proven practices in pipeline integrity management.

The RP is largely targeted to onshore pipelines along the right-of-way, but the process and approach can be applied to pipeline facilities, including pipeline stations, terminals, and delivery facilities associated with pipeline systems. Certain sections of this RP provide guidance specific to pipeline stations, terminals, and delivery facilities.

## 2  Normative References

The following referenced documents are indispensable for the application of this document. For dated references, only the edition cited applies. For undated references, the latest edition of the referenced document (including any amendments) applies.

API Bulletin 5T1, *Imperfection and Defect Terminology*

API Standard 653, *Tank Inspection, Repair, Alteration, and Reconstruction*

API Recommended Practice 1110, *Pressure Testing of Steel Pipelines for the Transportation of Gas, Petroleum Gas, Hazardous Liquids, Highly Volatile Liquids or Carbon Dioxide*

API Standard 1163, *In-line Inspection Systems Qualification*

API Recommended Practice 1166, *Excavation Monitoring and Observation for Damage Prevention*

API Recommended Practice 1173, *Pipeline Safety Management Systems*

API Recommended Practice 1176, *Assessment and Management of Cracking in Pipelines*

ASME B31G, *Manual for Determining the Remaining Strength of Corroded Pipelines: A Supplement to ASME B31, Code for Pressure Piping*

ASME B31.4, *Liquid and Slurry Piping Transportation Systems*

ASME B31.8S, *Managing System Integrity of Gas Pipelines*

ASTM E1049-85, *Standard Practices for Cycle Counting in Fatigue Analysis*

NACE SP0169, *Control of External Corrosion on Underground or Submerged Metallic Piping Systems*

NACE SP0204, *Stress Corrosion Cracking (SCC) Direct Assessment Methodology*

NACE SP0502, *Pipeline External Corrosion Direct Assessment Methodology*

1



## 3   Terms, Definitions, Acronyms, and Abbreviations

### 3.1   Terms and Definitions

For the purposes of this document, the following definitions apply.

**3.1.1**
**abandoned pipeline**
Pipeline has been shut down, physically isolated from other in-service lines, connections to all sources of hazardous liquid or gasnatural or other gas are isolated (capped or blinded), system purged of combustibles, sealed, and permanently removed from service. Some or all of the pipeline may have been physically removed.

NOTE   See also decommissioned pipeline and idle pipeline.

**3.1.2**
**actionable anomaly**
An anomaly that may exceed acceptable limits based on the operator's anomaly and pipeline data analysis; see API 1163.

**3.1.3**
**active pipeline**
A pipeline or pipeline segment being used to transport hazardous liquids in accordance with the provisions of the applicable code.

NOTE   See also in-service pipeline.

**3.1.4**
**anomaly**
An unexamined deviation from the normal sound pipe material, coatings, or welds.

NOTE 1   See also flaw, defect, and imperfection.

NOTE 2   Also, an indication generated by nondestructive inspection; see NACE 35100.

**3.1.5**
**cathodic protection**
Technique by which metallic pipe is protected against external corrosion.

**3.1.6**
**check valve**
A valve that permits fluid to flow freely in only one direction and contains a mechanism to automatically prevent flow in the other direction.

**3.1.7**
**critical location**
Locations such as populated areas, commercially navigable waterways, drinking water resources, ecologically sensitive areas, and others as designated by the operator.

NOTE 1   See also high consequence area.

NOTE 2   Operators in the United States shall comply with 49 CFR 195 requirements for high consequence areas.

**3.1.8**
**decommissioned pipeline**
Pipeline has been shut down, physically isolated from other in-service lines, connections to all sources of hazardous liquid or gasnatural or other gas are sealed (capped or blinded), system purged of combustibles, sealed, and removed from service. Decommissioned pipelines are generally not intended to be returned to service.

NOTE    See also idle pipeline and abandoned pipeline.

**3.1.9**
**defect**
Imperfection of a type or magnitude exceeding acceptable criteria.

NOTE    See also anomaly, flaw, and imperfection.

**3.1.10**
**design pressure**
Pressure defined by the yield strength, wall thickness, nominal outside diameter, and appropriate joint and design factors.

**3.1.11**
**direct assessment**
**DA**
Integrity assessment processes for detecting time-dependent degradation of a pipeline caused by external corrosion, internal corrosion, or stress corrosion cracking that involve making certain measurements, conducting certain analyses, and excavating the pipeline where appropriate to examine its condition.

NOTE    See also external corrosion direct assessment, internal corrosion direct assessment, and stress corrosion cracking direct assessment.

**3.1.12**
**double submerged arc welded pipe**
**DSAW pipe**
Pipe that has a straight longitudinal or helical seam containing filler metal deposited on both sides of the joint by the submerged-arc process.

**3.1.13**
**electric resistance welded pipe**
**ERW pipe**
Pipe that has a straight longitudinal seam produced without the addition of filler metal by the application of mechanical force and heat obtained from electric resistance.

**3.1.14**
**emergency flow restriction device**
**EFRD**
A valve that restricts fluid flow to only one flow direction or can be closed from a location remote from where the valve is installed.

NOTE    See check valve or remote control valve.

**3.1.15**
**environmentally assisted cracking**
**EAC**
Corrosive attack of the pipe metal caused by exposure to specific environments either internal or external to the pipe and resulting in any of several forms of metal cracking. EAC includes, but is not limited to, hydrogen-induced cracking

(HIC), stress-oriented hydrogen-induced cracking (SOHIC), sulfide-stress cracking (SSC), or stress corrosion cracking (SCC).

**3.1.16**
**estimated rupture pressure**
**ERP**
Failure pressure, estimated using an appropriate fitness for service calculation without a factor of safety.

**3.1.17**
**external corrosion direct assessment**
An integrity assessment process for locating possible external corrosion, damaged coating, or deficiencies in cathodic protection on a pipeline by making above-ground measurements and following up with excavations to examine the pipe where appropriate; see NACE SP0502.

**3.1.18**
**failure pressure ratio**
**FPR**
Ratio of the ERP to the maximum pressure expected during service, i.e. the ratio of the calculated failure pressure of an anomaly to the maximum operating pressure (MOP) at the location of the anomaly, i.e. FPR = ERP/MOP.

**3.1.19**
**Fatigue (cited in API RP 1176)**
Process of forming or enlarging a defect or flaw due to cycles of stress.

**3.1.20**
**flaw**
An imperfection that is smaller than the maximum allowable size.

NOTE    See also anomaly, defect, and imperfection.

**3.1.21**
**guided wave ultrasonic testing**
**GWUT**
A technique for detecting anomalies in a pipeline that involves introducing mechanical stress waves that propagate axially from a circumferential array of low-frequency transducers placed around the pipeline at a fixed location.

NOTE 1    The wall thickness of the pipe serves as a wave guide, and the locations of anomalies are established by the timing of the arrival of a wave reflected from the anomaly back to the location of the emitting device.

NOTE 2    The technique is applicable for distances up to several hundred feet depending on site specific conditions such as bends, coating type, weld spacing or other factors.

**3.1.22**
**heat-affected zone**
**HAZ**
The portion of the base metal that was not melted during brazing, cutting, or welding, but whose microstructure and properties were affected by the heat of these processes.

**3.1.23**
**hard spot**
Area in the pipe with a hardness level considerably higher than that of the surrounding metal, usually due to localized quenching or alloy segregation.



**3.1.24**
**high consequence area**
**HCA**
Those locations where a pipeline release might have a significant adverse effect on an unusually sensitive area, a high population area, another populated area, or a commercially navigable waterway.

NOTE 1    This definition is specific to the federal regulations in the United States, see 49 CFR 195.

NOTE 2    An unusually sensitive area is a drinking water or ecological resource area that is unusually sensitive to environmental damage from a hazardous liquid pipeline release.

**3.1.25**
**high pressure test**
A test undertaken at pressures potentially greater than necessary for qualifying a pipeline for service under regulations in order to address or assess for an identified or targeted pipeline threat.

NOTE    Similar to a "spike" test, an alternative when spike testing may not be advised or warranted.

**3.1.26**
**highly volatile liquid**
A hazardous liquid which will form a vapor cloud when released to the atmosphere and which has a vapor pressure exceeding 40 psia (276 kPa) at 100 °F (37.8 °C).

**3.1.27**
**hydrogen-induced cracking**
**stepwise cracking**
**HIC**
Cracking that may occur in line pipe steels containing manganese sulfide inclusions exposed to atomic hydrogen generated at the surface of the pipe externally by a cathodic reaction or internally by a corrosion reaction of sour products and water.

**3.1.28**
**hydrogen stress cracking**
A form of cracking that may occur in localized hard spots or hard heat-affected zones in a line pipe steel if those zones are exposed to atomic hydrogen.

**3.1.29**
**hydrostatic test**
Means of assessing the integrity of a new or existing pipeline that involves filling the pipeline with water and pressurizing to a level significantly in excess of the MOP for an appropriate duration to confirm no leaks are present and to demonstrate that the pipeline is fit for service at the MOP.

NOTE    See API RP 1110.

**3.1.30**
**idle pipeline**    -
Pipeline has been shut down, physically isolated from all sources of hazardous liquid or gasnatural or other gas (capped or blinded), system purged of combustibles or maintain a blanket of natural gas at pressure and removed from service. An idled line may be returned to active service. Certain inspection and maintenance activities may be suspended.

**3.1.31**
**imperfection**
A flaw or other discontinuity noted during inspection that passes acceptance criteria during an engineering and inspection analysis.

NOTE    See also anomaly, defect, and flaw.

### 3.1.32
### indication
A discovery from nondestructive testing (NDT), inspection technique, or signal from an ILI system.

### 3.1.33
### in-line inspection
### ILI
Inspection of a pipeline from the interior of the pipe using an inspection tool.

NOTE 1    This is also called intelligent or smart pigging.

NOTE 2    This includes free swimming, tethered, and self-propelled inspection tools.

### 3.1.34
### in-service pipeline
### active pipeline
A pipeline or pipeline segment that currently transports hazardous liquids.

### 3.1.35
### integrity assessment
Method for determining the pipe's condition.

NOTE    Methods can include ILI, pressure testing, direct assessment, or other technologies that can demonstrate the integrity of the pipe.

### 3.1.36
### internal corrosion direct assessment
### ICDA
Integrity assessment process conducted for the purpose of locating and remediating anomalies arising from internal corrosion of a pipeline.

NOTE    See NACE SP0208 (LP-ICDA standard for liquid petroleum), NACE SP0206 (DG-ICDA standard for dry gas), and NACE SP0110 (WG-ICDA standard for wet gas).

### 3.1.37
### maximum operating pressure
### MOP
Maximum pressure at which a liquid pipeline system may be operated in accordance with the provisions of the applicable code.

### 3.1.38
### mill test pressure
The test pressure applied in the pipe mill as part of the original pipe manufacturing process.

### 3.1.39
### mitigation
### mitigative action
Taking appropriate action based on an assessment of risk factors to reduce the overall level of pipeline integrity risk by reducing the amount of risk from a probability or consequence standpoint.

### 3.1.40
### operator
Entity that operates pipeline facilities.

**3.1.41**
**piping circuit**
A section of piping that has all points exposed to an environment of similar threat state and that is of similar design conditions and construction material.

**3.1.42**
**preventive and mitigative measures**
Activities designed to reduce the likelihood of a pipeline failure (preventive) and/or minimize or eliminate the consequences of a pipeline failure (mitigative).

**3.1.43**
**remediation**
Taking action to remove one or more causes of pipeline risk or to neutralize the potentially adverse effects of an injurious anomaly consisting of, but not limited to, further testing and evaluation, changes to the physical environment, operational changes, continued monitoring, administrative/procedural changes, and repairs of defects.

**3.1.44**
**remote control valve**
Any valve that is operated from a location remote from where the valve is installed.

NOTE    A remote control valve is usually operated by the supervisory control and data acquisition (SCADA) system.

**3.1.45**
**risk**
Measure of loss in terms of both the incident likelihood of occurrence and the magnitude of the consequences.

**3.1.46**
**risk assessment**
Systematic, analytical process in which potential hazards from facility operation are identified and the likelihood and consequences of potential adverse events are determined.

**3.1.47**
**risk management**
An overall program consisting of identifying potential threats to an area or equipment; assessing the risk associated with those threats in terms of incident likelihood and consequences; mitigating risk by reducing the likelihood, the consequences, or both; and measuring the risk-reduction results achieved.

**3.1.48**
**selective seam weld corrosion**
**SSWC**
Form of external or internal corrosion attack that occurs preferentially along the weld bond line of ERW or FW line pipe that often has the appearance of a wedge-shaped groove when conditions exist that cause the bond line region or the ERW or FW seam to corrode at a faster rate than the surrounding base metal.

**3.1.49**
**spike hydrostatic test**
Short-duration hydrostatic test wherein the pressure level is higher than the strength test, the purpose of which is to achieve an increased level of confidence in the serviceability of the pipeline or an increased interval until the next assessment.

NOTE    Similar to high pressure testing.

**3.1.50**
**stand-up (operational) test**
A pressure test to determine the leak tightness of a pipeline or pipeline segment, typically conducted with product or water at a pressure significantly less than hydrostatic test pressure and does not exceed the MOP of the pipe.

NOTE     A pipeline company may conduct this test after a pipeline is constructed but prior to beginning shipment of product delivery.

**3.1.51**
**stress corrosion cracking direct assessment**
**SCCDA**
Direct assessment conducted for the purpose of locating and remediating anomalies arising from stress corrosion cracking (SCC) of a pipeline or evaluating whether SCC is a threat on a particular pipeline.

NOTE     See NACE SP0204.

**3.1.52**
**stress riser**
a scrape, gouge, groove, notch, or metal loss unrelated to corrosion.

**3.1.53**
**surge pressure (transient pressure)**
Pressure produced by a change in the velocity of the moving stream that results from shutting down a pump station or pumping unit, closure of a valve, or any other blockage of the moving stream.

**3.1.54**
**transit fatigue**
Development of longitudinal fatigue cracks in line pipe as the result of transportation by rail car, truck, or marine vessel.

## 3.2   Acronyms and Abbreviations

| | |
|---|---|
| AC | alternating current |
| AFD | axial flaw detection |
| ASME | American Society of Mechanical Engineers |
| ASNT | American Society for Nondestructive Testing |
| AUT | automated ultrasonic testing |
| CEPA | Canadian Energy Pipeline Association |
| CFR | Code of Federal Regulations |
| CMFL | circumferential magnetic flux leakage |
| CP | cathodic protection |
| CUI | corrosion under insulation |
| DC | direct current |
| DC-ERW | direct current welded electric resistance welding |
| DIRT | Damage Incident Reporting Tool |
| DSAW | double submerged arc welding |
| EAC | environmentally assisted cracking |
| ECDA | external corrosion direct assessment |
| EFRD | emergency flow restriction device |

| | |
|---|---|
| EMAT | electromagnetic acoustic transducer |
| ERP | estimated rupture pressure |
| ERW | electric resistance welding |
| FMECA | Failure Modes, Effects, and Criticality Analysis |
| FPR | failure pressure ratio |
| FW | flash welded |
| GIS | geographic information system |
| GPS | global positioning system |
| GW | girth weld |
| GWUT | guided wave ultrasonic testing |
| HAZ | heat affected zone adjacent to a weld |
| HAZID | Hazard Identification |
| HAZOP | Hazard and Operability Study |
| HCA | high consequence area |
| HF-ERW | high-frequency welded electric resistance welding |
| HIC | hydrogen-induced cracking |
| HSAW | helical seam double submerged arc welding |
| HVAC | high voltage alternating current |
| HVDC | high voltage direct current |
| HVL | highly volatile liquid |
| ICDA | internal corrosion direct assessment |
| ID | inner diameter |
| ILI | in-line inspection |
| IMP | integrity management plan |
| JSA | job safety analysis |
| LF-ERW | low-frequency welded electric resistance welding |
| LPR | linear polarization resistance |
| LW | lap welded |
| MFL | magnetic flux leakage |
| MIC | microbially induced corrosion |
| MOC | management of change |
| MOP | maximum operating pressure |
| MPI | magnetic particle inspection |
| MPT | magnetic particle testing |
| MTR | mill test report |
| NAEC | narrow axial external corrosion |
| NDE | nondestructive examination |
| NDT | nondestructive testing |
| NPS | nominal pipe size |
| NTSB | National Transportation Safety Board |

| OD | outer diameter |
| OQ | operator qualification |
| PDCA | Plan-Do-Check-Act (a systematic approach to pipeline integrity management) |
| PFD | process flow diagram |
| PHA | process hazard analysis |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| P&ID | piping and instrumentation diagram |
| POD | probability of detection |
| POE | probability of exceedance |
| POI | probability of identification |
| PPTS | Pipeline Performance Tracking System |
| PT | liquid-penetrant testing |
| RCA | root cause analysis |
| RCM | Reliability Centered Maintenance |
| ROW | right-of-way |
| SCADA | supervisory control and data acquisition |
| SCC | stress corrosion cracking |
| SCCDA | stress corrosion cracking direct assessment |
| SME | subject matter expert |
| SMS | safety management system |
| SMYS | specified minimum yield strength |
| SOHIC | stress-oriented hydrogen-induced cracking |
| SOP | safe operating pressure |
| SSC | sulfide-stress cracking |
| SSWC | selective seam weld corrosion |
| TOFD | time of flight diffraction |
| USCD | ultrasonic crack detection |
| UT | ultrasonic testing |
| WFMT | wet fluorescent magnetic particle testing |

# 4   Integrity Management Program

## 4.1   Program Considerations

### 4.1.1   Integrity Management Program Components

A pipeline integrity management program is a documented set of policies, processes, and procedures to manage pipeline risk. The program should begin with threat identification and then facilitate appropriate and timely actions on the part of a pipeline operator to ensure that a pipeline system is continually operated in a manner that manages risk to the public, employees, the environment, and customers. In addition to traditional integrity management activities related to assessment, inspection, and maintenance of the pipeline system, a comprehensive pipeline integrity management program should also include activities that assess and improve the performance of the program itself. The program elements that should be included in an integrity management program are depicted in Figure 1 and discussed in detail in Section 4.2.

To address pipeline risk changing over time, a pipeline operator must continue to assess its pipelines at specified intervals and periodically evaluate the integrity of its pipelines. A pipeline operator ensures these periodic reassessments are effective through a continuous cycle of monitoring pipeline condition, identifying and assessing risks, and taking action to reduce the most significant risks. Risk assessments should be periodically updated and revised to reflect current conditions so operators can most effectively use their finite resources to achieve the goal of error-free, spill-free operation.

### 4.1.2   Continuous Integrity Management Improvement with a Pipeline Safety Management System

Figure 1 illustrates one example of the continuous cycle of a pipeline integrity management program. Figure 1 also reflects the way this continuous cycle aligns with the Plan-Do-Check-Act (PDCA) cycle of a pipeline safety management system (pipeline SMS). Discussed in greater detail in API RP 1173, Pipeline Safety Management Systems, a pipeline SMS provides a mechanism for enhanced risk assessment and continuous pipeline safety performance improvement. While API RP 1173 is a flexible and scalable framework, its core principles of learning from experience, continuous improvement, and awareness and management of many linked activities will improve the effectiveness of a pipeline integrity management program. To emphasize these benefits, the elements of an integrity management program discussed in Section 4.2 are organized by their occurrence in the PDCA cycle of a pipeline SMS. Programs may evolve and mature over time. The PDCA elements depicted in Figure 1 also apply to facility integrity management programs which are discussed in Section 12.

In addition to organizing integrity management program activities in a continuous PDCA improvement loop, application of individual elements of API RP 1173 will enhance the effectiveness of integrity management program activities. Examples include the following:

— Supporting integrity management resource needs and commercial trade-offs

　　— Leadership and Management Commitment (API RP 1173, Section 5)

— Influencing pipeline integrity risk assessment

　　— Stakeholder Engagement (API RP 1173, Section 6)

　　— Risk Management (API RP 1173, Section 7)

　　— Operational Controls (API RP 1173, Section 8)

　　— Management of Change (API RP 1173, Section 8.3)

— Benefiting pipeline integrity assessment and program evaluation activities

　　— Incident Investigation, Evaluation and Lessons Learned (API RP 1173, Section 9)

　　— Safety Assurance (API RP 1173, Section 10)

　　— Management Review and Continuous Improvement (API RP 1173, Section 11)

A further concept for operators to consider is applying the PDCA cycle to individual integrity management activities. Just as the activities of the integrity management program may be arrayed around the PDCA cycle as illustrated in Figure 1, each of those activities may have their own PDCA cycle of tasks. For example, the activity of Conduct Pipeline Inspections, Testing, and Examinations is positioned in Figure 1 in the "Do" stage of the cycle. Conducting pipeline inspections also involves planning the inspections, performing the inspections, tasks to verify the inspections, and potential improvement tasks for the next round of inspections. Organizing individual tasks formally by PDCA stage is up to the operator, but the model may prove useful for some operators.



**Figure 1—PDCA Cycle Applied to an Integrity Management Program**

## 4.2 Elements of Integrity Management

Integrity management program elements accomplish the threat management goals of the program through both direct pipeline integrity-related activities as well as supporting activities to improve the quality of the program itself. In pipeline SMS terms, a successful integrity management program includes integrity management "Plan and Do" assessment, inspection and maintenance activities, "Check and Act" performance measuring, evaluation, and improvement activities.

### 4.2.1 "Plan" Integrity Management Elements

(1) Gather Data to Identify Integrity Threats—To understand the potential threats to the integrity of a pipeline segment an operator should gather, review, and integrate the relevant and available information. Such information generally consists of the design of the pipeline, the attributes of the pipeline, the operational history including operating pressure ranges and past releases if any, the results of prior inspections and assessments including any in-line inspections (ILIs) or hydrostatic tests, previously made repairs or other mitigative responses, corrosion and cathodic protection surveys, and measures taken to prevent releases or the effects of a release. In addition, as the system continues to be operated, the accumulated operating, maintenance, and surveillance data should be collected for

input into the next scheduled re-evaluation of risk prior to the next integrity assessment. Section 5 provides an overview of hazardous liquid pipeline threats and Annex A provides a detailed description of each threat. Section 7 provides a summary of the data sources, common data elements that are typically used in risk analyses, and approaches to data review and integration.

(2) Identify Potential Pipeline Impacts to Critical Locations—This program element involves the identification of pipeline segments that may affect critical locations in the event of a release. Identification of critical locations involves evaluating populated, environmentally sensitive, and navigable water area information, integrating this information with pipeline mapping data, and determining at which locations a release may impact these areas. The identified critical locations may change with time or with changes to the pipeline system. Therefore, critical locations need to be reviewed and updated on a regular basis. Guidance for making these determinations is provided in Section 6 of this RP.

(3) Assess Risk and Rank Segments—Data assembled from the previous steps are used to conduct a risk assessment of the pipeline system. Risk reassessments should be performed at established intervals to factor in recent operating data and to consider changes to the pipeline system design (e.g. new valves, newly replaced pipeline segments, or rehabilitation projects) and operation (e.g. a change in flow or the hydraulic pressure profile). Changes in population, changes altering segments that can affect critical locations, the results of previous integrity assessments, and the impacts of repairs and mitigative measures should also be taken into account in these risk reassessments. The goal should be to ensure that the analytical process reflects the latest understanding of pipe condition. Section 8 provides guidance for developing and implementing a risk assessment approach.

(4) Develop or Revise a Pipeline Integrity Assessment Plan—The pipeline operator should develop a plan to assess the integrity of the pipeline system, or modify as appropriate, an existing plan that has been followed previously. The pipeline operator's plan should identify the internal inspection technique(s), pressure testing, or other technology that will be used to assess the integrity of the pipeline. It should also establish the schedule for conducting these assessments, the justification for the integrity assessment method(s) selected, and mitigative measures that will be employed. Section 9 provides guidance for conducting integrity assessments, and Annex B provides a description of the various internal inspection techniques available and guidance to assist operators in selecting an integrity assessment method.

### 4.2.2 "Do" Integrity Management Elements

(5) Conduct Pipeline Inspections, Testing, and Examinations—The pipeline operator should implement the in-line inspection (ILI), hydrostatic pressure testing, or direct assessment described in the pipeline integrity assessment plan. The specific type of inspection, testing, or examination undertaken will reflect the most appropriate method for addressing the threat and risks identified in the integrity assessment plan. Section 9 provides guidance for conducting integrity assessments and Annex B provides a description of available internal inspection techniques.

(6) Integrate Integrity Assessment Data—The pipeline operator should collect data on the integrity of its pipeline, including data generated by integrity inspections, testing, and examination. The pipeline operator should gather data in a timely manner, including results and reports generated by inspection vendors. The pipeline operator should pay particular attention to regulatory or other recommended timeframes within which to obtain results from inspection vendors.

In addition to data on its pipelines, the operator should also collect data on its inspection, testing, and examination methods. The pipeline operator will use this inspection tool and method data to analyze the effectiveness of its inspection tools and integrity program. Data on in-line inspections should be collected to compare to integrity excavations and non-destructive examination results to assess the effectiveness of each inspection tool or examination method. Section 7 provides a summary of the data sources, common data elements, and approaches to data review and integration.

(7) Collect Program Performance Data—The pipeline operator should collect program performance metrics that indicate the effectiveness of its integrity management program. The operator should collect measures of the quality of

its threat assessment, critical location selection, risk assessment, assessment planning, inspection, integrity assessment, remediation activities, preventive and mitigative activities, reassessment intervals, and program improvement. Section 13 provides guidance for developing performance measures to evaluate program effectiveness and for conducting audits of integrity management programs.

### 4.2.3   "Check" Integrity Management Elements

(8) Review Management of Change (MOC) Measures—Pipeline systems and the environments in which they operate are not static. A systematic process should be used to ensure that changes to the pipeline system design, operation, or maintenance are evaluated for their potential risk impacts prior to implementation and to ensure that changes in the environment in which the pipeline operates are documented and evaluated. Furthermore, after these changes have been made, they should be incorporated, as appropriate, into future risk assessments to be sure the risk assessment process addresses the system as it is currently configured, operated, and maintained. Section 14 discusses the important aspects of MOC as it relates to integrity management.

(9) Integrate Pipeline, Tool, and Program Performance Data Together with MOC Information—The pipeline operator should integrate data from pipeline inspections, testing and examination, data on inspection tool performance, and MOC information. Each of these data sources analyzed individually may produce an incomplete picture of the integrity of a specific pipeline segment. Data integration will allow the operator to understand the cumulative impact of each threat factor reflected by multiple data sources when evaluating pipeline integrity.

Operators should ensure that policies, processes, procedures, and records are in place to provide integrity management program managers with the multiple streams and sources of data and information they need to review and integrate. Depending upon the specific organizational or authority structure of an operator, sources of data or information needed for pipeline integrity management may be generated or stored outside the purview of integrity managers. Established policies, processes, and procedures will ensure necessary data and information is generated and delivered into the integrity management program in alignment with the program's PDCA cycle. Section 7 provides guidance on data maintenance and management of change.

(10) Review Operator, Industry, and Regulator Learnings, and Recommendations—An operator should also gather, review, and integrate applicable industry trends, regulatory notices, and other operators' experiences where applicable. Pipeline safety information and lessons learned shared by pipeline operators through industry groups and forums may relate to a specific risk or threat faced by a pipeline operator. Recommendations or reports issued by investigators after incidents, as well as advisory bulletins issued by regulators, may also contain information beneficial to pipeline integrity. Many of the products produced for the Management Review and Continuous Improvement element of a pipeline SMS, discussed in Chapter 11 of API RP 1173, will benefit pipeline integrity management including results of risk management review, results and recommendations of incident investigations, evaluations and lessons learned, results of internal and external audits, and evaluations and stakeholder feedback. Section 13 discusses performance tracking and trending to facilitate continuous improvement efforts.

(11) Evaluate Integrity Program Performance—Reviews need to be performed on a periodic basis to evaluate the effectiveness of a pipeline operator's integrity management program. The operator should review program performance metrics and periodically evaluate the effectiveness of its integrity assessment methods and its preventive and mitigative risk control activities, including repair. The operator should also evaluate the effectiveness of its management systems and processes in supporting integrity management decisions. A combination of performance measures and system self-reviews is necessary to evaluate the overall effectiveness of a pipeline integrity management program. Section 13.4 describes integrity management program issues recommended for review and evaluation. Results of this evaluation may also feed into a Management Review conducted as part of an operator's pipeline SMS.

(12) Assess Pipeline Integrity—The pipeline operator should assess the integrity of its pipeline segments based on an evaluation and consideration of the results of its integrated data. As discussed above, pipeline inspection results, data on inspection tool performance, and MOC information are all necessary to develop a comprehensive assessment of a pipeline's integrity. Pipeline operators should also incorporate into integrity assessments any applicable operator,

industry, or regulator lessons, recommendations, or advisories. For pipeline segments that may affect critical locations, the operator should establish reasonable and technically justifiable time limits for the examination of several classes of anomalies detected by ILI. This schedule should consider applicable regulatory statutes. Section 9.2 provides guidance for prioritizing features identified by ILI for examination and repair. Annex C provides a description of commonly used repair techniques to address the different types of defects that might be discovered during integrity assessment.

### 4.2.4 "Act" Integrity Management Elements

(13) Perform Pipeline Remediation Activities—The pipeline operator should implement appropriate remediation activities based on its pipeline integrity assessment(s). Specific remediation activities should address the threats to the pipeline segment and the risk represented by those threats. Section 9.2 describes strategies for responding to anomalies identified by pipeline inspection, testing, or examination, including conditions requiring immediate or scheduled response.

(14) Perform Pipeline Preventive and Mitigative Activities—A pipeline operator should establish and implement a process to evaluate the need for additional measures to reduce pipeline risk. The following list provides some examples of potential measures:

— Preventing mechanical damage. Generally, this involves participating in one-call systems, locating and marking a pipeline segment when excavation is to take place on the right-of-way, monitoring contractors working on the right-of-way, establishing and maintaining a public awareness program, maintaining visible right-of-ways, and conducting periodic aerial or ground surveillance of the right-of-ways.

— Establishing and maintaining a corrosion mitigation program.

— Installing emergency flow restriction devices (EFRDs) at appropriate locations.

— Developing emergency response plans to limit the amounts of unrecovered product in the event of a release.

Additional preventive and mitigative measures are described in Section 11.

(15) Calculate Pipeline Reassessment Intervals—The pipeline operator should conduct integrity reassessments on a periodic basis. The pipeline operator should develop a schedule for reassessments that considers items such as the rates of deterioration, the consequences of an event, and other risk factors. Section 10 provides guidelines for scheduling reassessments. Examples of how one might go about calculating reassessment intervals are presented in Annex D.

(16) Undertake Integrity Program Improvement—The operator should use the results of the program performance evaluation to modify the integrity management program as part of a continuous improvement process. Recommendations for changes or improvements, or both, should be based on analysis of the performance measures and the audits. All recommendations for changes or improvements, or both, should be documented, and the recommendations should be implemented in the next cycle of integrity assessment. Section 13 provides guidance for developing performance measures to evaluate program effectiveness and Section 14 discusses the important aspects of MOC related to integrity management.

## 5   Threat Assessment

### 5.1   Threats

Integrity management begins with a systematic and comprehensive consideration of potential threats to the integrity of the pipeline or facility. The threats for hazardous liquid pipelines that operators should consider are as follows:

a) external corrosion;

b)  internal corrosion;

c)  selective seam weld corrosion (SSWC), external or internal;

d)  environmentally assisted cracking (EAC) including stress corrosion cracking (SCC), hydrogen-induced cracking (HIC), stress-oriented hydrogen-induced cracking (SOHIC), and sulfide-stress cracking (SSC);

e)  manufacturing defects including defective pipe seams, hard heat-affected zones (HAZ), and defective pipe including pipe body hard spots;

f)  construction and fabrication defects including defective girth welds, defective fabrication welds, wrinkle bends, and stripped threads/broken pipe/coupling failures;

g)  equipment failure including gasket or o-ring failure, control or relief equipment failure, seal or pump packing failure, and miscellaneous;

h)  mechanical damage caused by accident, negligence or deliberate act of vandalism;

i)  incorrect operations; and

j)  weather and outside forces including cold weather, lightning, heavy rains or floods, or earth movements, or a combination thereof, which may cause wrinkles, buckles, cracked valve bodies, and girth weld cracks.

An operator shall review data for each pipeline segment or facility to determine which of these threats are credible and need to be addressed.

It is recognized that not all 10 threats may apply to every hazardous liquid pipeline and that pipeline operators may want to customize their approach to considering these threats. These 10 threats are discussed in detail in Annex A. Any of these threats may have a time-delayed or interactive component to them. While fatigue by itself is not a threat, it can facilitate crack initiation and growth from an extant defect.

Failure of dents through environmental cracking, and delayed failure of mechanical damage are considered interactive threats and are discussed in 5.2.

## 5.2   Threat Interaction

A review of industry failure databases has shown that threats can interact and combine to create a more severe situation than the individual threats alone. Identifying threats and their interactions is performed by overlaying, comparing, and integrating relevant data sets for the pipeline, including pipeline attributes, construction factors, operating parameters and history, integrity assessment history, maintenance and repair history, and incident data. The processes and considerations relevant to the integration of the data are discussed in Section 7. Additional information can be found in API Bulletin 1178.

Examples of specific threat interactions can be broadly categorized by the following:

—  corrosion (external or internal) with manufacturing defects like defective pipe seams, EAC (typically SCC) or SSWC;

—  mechanical damage that contains stress concentrators (gouges, grooves, arc burns, or cracks) or corroded areas;

—  localized loading from weather and outside force events that would impact an anomaly's probability of failure;

—  incorrect operations (e.g. valve closure leading to overpressure) affecting existing anomalies.

An additional reference is provided in the PHMSA Report Task III.B.2 Report DTPH56-14-H-00004, *Improving Models to Consider Complex Loadings, Operational Considerations, and Interactive Threats*. Inspection considerations for coincidental or interacting threats are provided in Annex B.8.

### 5.2.1   EAC and Manufacturing Defects Interacting with External or Internal Corrosion

The presence of external or internal corrosion in the same area as a cracking threat, either EAC (typically SCC), SSWC, or manufacturing defects (longitudinal seam weld anomalies) can create challenges for assessment methods. External or Internal corrosion can obscure the crack response for some ILI technologies and affect the depth measurement accuracy. Manufacturing defects interacting with external or internal corrosion can result in a narrow axially-oriented defect (more commonly known as SSWC) that is not easily detected or characterized with conventional metal loss ILI tools. The growth rate for SSWC, based on failure analysis experience, is typically two to four times the rate of growth in the base metal. This condition can lead to rapid development of a critically sized flaw in a defective seam bondline and has the potential to cause a rupture at low operating stress levels.

### 5.2.2   Mechanical Damage Interacting with External Corrosion or Cracking

Mechanical damage often damages the pipeline coating and creates a local stress in the pipeline which makes it more susceptible to external corrosion or EAC at the location of the damage. Threat interaction with external corrosion can occur where the indentation is sufficient to damage the coating and the cathodic protection is locally impaired. The increase in residual stress associated with the indentation or gouge can also be sufficient to initiate and grow cracks at this location.

Plain indentations less than six percent of the pipe diameter do not immediately reduce the strength of the pipe. Section 6.4.2 of API RP 1176 describes certain deformation geometries and susceptible environments that may potentially result in cracking and eventual failure (generally occurring as a leak) of an indentation. Factors that may lead to cracking include, but are not limited to, diameter to wall thickness ($D/t$) ratio (with a ratio of 100 and higher being more prone to cracking), pressure cycle severity, indentation shape, and physical restraint of the indentation. Data evaluation and opportunistic excavations may enable an operator to identify where cracking in plain indentations may be a threat.

There is significant and ongoing research being done in this field, including by the Pipeline Research Council International, which was not available at the time of this writing.

### 5.2.3   Equipment, Construction and Fabrication Defects Interacting with Weather and Outside Force

Weather events, such as heavy rains and floods, can produce scouring of backfill, mudslides, floatation of a pipeline, and vortex shedding in water current. The resulting lateral forces can cause pipes to pull out of mechanical couplings, threaded pipe or fittings to break, and pipelines to fail at the girth weld. The bending moments associated with the weather and outside force loading events can contribute to the severity (i.e. the non-dormancy) of flaws in the girth welds. Given that these features are less sensitive to the internal pressure due to their circumferential orientation, they may fail from secondary loads where the hoop stress is well below the maximum allowable. Using ILI technology to detect girth weld anomalies as described in API RP 1176 and inertial mapping can help assess these interacting threats.

Cold weather can also produce threat interactions with equipment, specifically associated with water freezing inside a pipe or component. Water can expand within a component causing it to fail, flow restrictions or blockages can lead to a pressure excursion, or ice falling from a roof can break small diameter threaded connections.

### 5.2.4   Incorrect Operations Interacting with Other Threats

Incorrect operations can interact with the other nine threats through overpressure events causing failure of flaws that are not of a critical size during normal operation. Improperly installed equipment or misaligned valves can result in accelerated fatigue of welds, components, or the pipe body.

### 5.2.5  Time Dependent Interactions

Operational or environmental conditions can act on resident features in the pipeline to cause degradation over time. Examples include the threat of cracks forming and growing due to fatigue from pressure and temperature cycles or vortex-induced or mechanical vibrations. An additional example is the effects of hydrogen that can arise from cathodic protection (CP) systems or sour crude systems. The operator shall assess for the conditions that can lead to time dependent degradation. Section 10 provides guidance to determine appropriate reassessment intervals.

## 6  Identifying Critical Locations with Respect to the Consequences of a Release

### 6.1  General

Because the main goal of pipeline integrity management is to reduce risk to the public, employees, the environment, and the customers, a pipeline operator should place a high priority on the inspection, evaluation, and maintenance of pipeline segments in areas where the consequences of a spill would be most likely to affect a critical location. For operators in the United States, a critical location may be identified as a high consequence area (HCA) and therefore the requirements in 49 CFR 195.452 shall be followed. Note that commercial software including geographic information system (GIS) technology is available to perform many of the tasks described in the following sections. This technology is available from numerous service providers. Information about pipeline segments and facilities that may affect critical locations is used in several key elements of an integrity management program, such as:

— data gathering;

— risk assessment;

— inspection and mitigation;

— decisions on placement of EFRDs;

— installation and use of leak detection systems;

— preventive and mitigative measures;

— development and implementation of spill response plans.

### 6.2  Determining Whether a Release from a Pipeline Segment or a Facility Could Affect a Critical Location

#### 6.2.1  General

As part of the process of data gathering and integration of information into a pipeline integrity management program (IMP), a pipeline operator should determine if there is a reasonable likelihood that a particular pipeline segment or facility (e.g. pump station, delivery terminal) could affect a critical location in the event of a release. Operators should consider critical locations that are in proximity to the segment or facility as well as those that the pipeline segment actually crosses. Below is a list of items for consideration when determining a potential consequence:

a) the proximity of the pipe to identified critical locations;

b) the nature and characteristics of the product or products transported (such as refined products, crude oil, and highly volatile liquids [HVLs]);

c) the operating conditions of the pipeline (such as pressure, temperature, and flow rate);

d)  the topography of the land associated with the critical location and the pipeline segment;

e)  the hydraulic gradient of the pipeline;

f)  the diameter of the pipeline, the potential release volume (including drain out), and the distance between isolation points;

g)  the type and characteristics of the critical location crossed or in proximity to the segment;

h)  potential physical pathways between the pipeline and the critical location, including overland spread, water transport including drainage systems, or air dispersion in the case of an HVL;

i)  response capability (such as time to detect, confirm, and locate a release; time to respond; and nature of the response).

An outline of the process is shown in Figure 2.

### 6.2.2   Determining Critical Location Boundaries

The boundary of each critical location should be defined taking into account the amount of product that could be released, the means by which the product could spread, and the potential for personal injuries or property damage associated with a spreading plume of product in the soil, air dispersion of an HVL, pooling or spreading of liquid on the surface, or ignition causing a fire or explosion. Allowance should be made for any possible inaccuracies of the locations of the boundaries.

### 6.2.3   Identifying Segments or Facilities Located Within Critical Locations

By comparing a map of the pipeline's route to an appropriate map of the critical location, the operator should establish the points where the segment enters and leaves the critical location. Any facility lying within the boundaries of a critical location should be noted as well. This process will identify the segments or facilities where a release will directly affect the critical location.

### 6.2.4   Identifying Segments or Facilities That Could Affect a Critical Location When Such Segments or Facilities Are Not Located Within the Boundaries of the Critical Location

It should be recognized that a release from a pipeline segment or a facility could affect a critical location even if the segment or the facility is not within the boundaries of the critical location. To identify such segments or facilities, the operator should determine the extent to which released product or the effects of the release can be transported to the critical location. For example, the operator should consider that released product could be transported by overland spread, by water, or by aerial dispersion of a vapor cloud, and that the effects of ignition or explosion could be widespread. Operators may also consider that released product could be transported by spraying of product into the air.

Using topographical maps, maps of populated areas, and knowledge possessed or acquired by the operator's personnel in the area, the operator should consider scenarios for released product being transported to a critical location. Each scenario should be based on postulating a release from a point along the pipeline segment or from key points such as breakout tanks within a facility. Successive release points along a pipeline segment at some reasonable spacing should be considered. Any point where the release scenario evaluation(s) indicates product reaching a critical location should be identified as one that could affect the critical location. Similarly, the operator should identify each facility as one that could affect a critical location if the release scenario for any key point within that facility results in product being transported to the critical location.



**Figure 2—Identifying Pipeline Segments or Facilities Located Within Critical Locations**

Factors for consideration in establishing release scenarios include the following:

— Release Volume—pipeline diameter, elevation profile, flow rate, time for detection, time to isolate, viscosity and vapor pressure of the product, and tank volume for tanks at facilities;

— Surface Transport—topography, terrain, extremes in ambient temperature, water pathways (surface and underground), ditches, sewers and drain tiles, porosity, and soil permeability;

— Aerial Dispersion—internal pressure and its effect on spraying product into the air, wind direction, analysis HVL (vapor cloud, effect that a vapor cloud fire, a pool fire, or a vapor cloud explosion would have on the critical location).

Case 2:26-cv-05242-SVW-SSC    Document 26    Filed 05/14/26    Page 462 of 1309  Page ID #:13013

### 6.3   Documentation and Updating

The operator should document all pipeline segments and facilities that could affect critical locations. Supporting analyses should be made available to subject matter experts (SMEs) or others who will conduct risk assessments and for prioritizing integrity assessments. Periodically, the operator should conduct a review to see if any changes in segments or facilities that could affect critical locations have occurred. Alternatively, the operator may establish a process to identify changes during the conduct of typical operations and maintenance activities (e.g. aerial patrols, locate requests, management of change, right-of-way maintenance). Any new segments or facilities so identified should be added to the list of segments and facilities that could affect critical locations.

## 7   Data Integration

### 7.1   General

This section provides an overview of considerations, processes, and data elements involved in data integration to identify and manage the integrity threats on a pipeline system. The approach described herein recognizes that users of this RP will have numerous data sources on their pipeline systems managed through existing processes. These data may need to be gathered and organized differently for integrity management purposes.

Data integration generally refers to the process of utilizing two or more data sets to identify conditions of interest on the pipeline. API Bulletin 1178 provides detailed information on methodologies and considerations to integrating the underlying data used to support integrity management. Examples of data sets are provided in 7.3. In more advanced applications, the data integration process may include computer applications that spatially align and correlate the available data along the pipeline.

Classic examples of data integration are the overlaying of ILI data from two or more different types of tools and the overlaying of ILI data with other information such as coating condition, cathodic protection levels, or aerial surveillance records. In the first instance, an overlaying of data from a metal loss inspection with a geometry tool inspection may show that metal loss anomaly coincides with a geometric anomaly. The implication is that the anomaly is likely mechanical damage rather than corrosion-caused metal loss. In this case, the operator may elect to investigate the anomaly even though the metal loss or deformation anomaly alone would not warrant investigation. In the second instance, overlaying ILI data showing a metal loss anomaly with the knowledge from aerial surveillance records that a utility company had been seen installing poles and guy wires near the right-of-way at that location may indicate mechanical damage from the pole auger.

### 7.2   Effective Data Integration

The structure and breadth of many pipeline companies may result in relevant data being produced and stored in different locations, by disparate owners, using potentially inconsistent formats. Policies and procedures within the SMS are one way to ensure that the necessary inputs are effectively aggregated and normalized. Operators should develop and implement procedures to:

— identify the types of data needed to support integrity management (discussed in 7.3),

— identify the location of the data within the organization,

— deliver identified information from the data owner to the group responsible for data integration and analysis,

— disseminate integrated data and the knowledge generated to the applicable stakeholders across the enterprise responsible for identifying and managing integrity threats.

Where the data are missing or lack sufficient quality, operators may need to account for the additional uncertainty. Section 5 of API Bulletin 1178 provides guidance on elements of data quality that are needed to ensure the data are

fit for purpose in supporting the intended process. The use of default values in the absence of actual data may be necessary at times, but the acquisition of actual data should be pursued when possible. The use of default values should be delineated such that inferred versus actual values can readily be identified.

## 7.3   Types of Data to Integrate to Support Integrity Management

### 7.3.1   General

The types of data used to assess the threats and associated risk to a pipeline segment or facility can be broadly categorized as pipe attributes, construction factors, operating parameters, and assessment history. The data elements listed below should be collected and integrated in support of an integrity management program. Where an operator determines that data is missing or incomplete, the operator should attempt to collect this data. If this data is not collectible, appropriate estimates should be used to replace it. The operator may consider implementing mitigative measures they deem necessary for the facility or pipe segment.

### 7.3.2   Pipeline Attributes

Pipeline attributes are typically contained on alignment sheets or system maps. The following is a representative list of these data elements:

— Pipe and system attributes—diameter, wall thickness, specified minimum yield strength (SMYS), manufacturer, dates of manufacture and construction, type of pipe (seamless, seam welded, and spiral), type of seam (low-frequency (LF) or direct current (DC) ERW, high-frequency (HF) ERW, flash welded (FW), single or double submerged arc welded), pipe coating, girth weld (GW) coating, operating pressures, and maximum design temperature;

— Appurtenances—valves (types and performance characteristics), flanges, fittings, dead legs, and instrumentation lines;

— Facilities—pump stations, booster stations, and terminals;

— Crossings—highway and road crossings (cased or uncased, and shorted where applicable), water crossings (river, creek, and lake), pipeline and other utility crossings, shared right-of-ways, and power lines (crossing and parallel);

— Corrosion mitigation and monitoring equipment

    — External corrosion—CP test stations, sacrificial anode installations, impressed current installations, and isolation equipment, AC and stray current mitigation

    — test stations, isolation equipment, voltage mitigation equipment, and monitoring equipment, Internal corrosion

    — inhibitor injection equipment, fluid sampling equipment, and monitoring equipment.



### 7.3.3   Construction Factors

Construction factors can typically be sourced from design and construction records. The following is a representative list of these data elements:

— Construction—year, season, GW data including type, alignment and inspection, special protection (directional drills, concrete coating, barriers, and warning strips), pipeline weights installed during construction (types and locations);

— Coating installation method—over-the-ditch versus factory-applied coating of pipe and field coating of joints;

— Right-of-way—soil type (sand, silt, clay, and rock), soil resistivity, depth of burial, width of right-of-way, land use, and terrain.

### 7.3.4   Operating Parameters and History

Pipeline operating data elements can be found in the operator's Operation and Maintenance manuals, Standard Operating Procedures or Operator Training materials, or a combination thereof. Others, such as representative pressure histories, test lead survey reports, valve inspection reports, river crossing inspection reports, and the actual records of aerial or ground patrols, will be contained in operating and maintenance records. The following is a representative list of these data elements:

— Operating Parameters—type(s) of liquids transported, bulk flow velocity, representative pressure histories, operating temperature range;

— Systems and Processes—SCADA and leak detection attributes, emergency response plans, public awareness program, one-call systems, excavation monitoring policy, qualifications and training programs, quality assurance practices, signage and markers requirements;

— Inspections—test lead surveys, river crossing inspections, valve inspections, cleaning pig frequency, inhibitor or biocide applications, aerial and ground patrol frequencies; and

— Reports—failure investigations, leak histories, incident reports, near-miss reports, soil and water sampling reports, corrosion coupons, and resistance measurements.

### 7.3.5   Integrity Assessment History

Pipeline Integrity assessments will be contained in documents describing specific tests or inspections and the results. The following is a representative list of these data elements:

— Pressure levels achieved in previous hydrostatic test and test failure history;

— Anomaly lists from previous ILIs along with disposition of anomalies;

— Results of any additional assessments such as close-interval pipe-to-soil potential surveys, DCVG surveys, pipeline current surveys, soil resistivity surveys, direct visual inspections of the pipe and the coating, right-of-way condition surveys, and depth-of-burial surveys;

— Documentation of severe weather events and outside force exposure including hydrotechnical scour, slope instability, and seismicity;

— Previous repair types and practices.

## 7.4    Data Maintenance (Management of Change)

Various data elements used to assess the applicability of a threat and its potential for failure may change with time. These changes may be caused by modifications to operating practices, changes in land use, or changes in pipe properties associated with replacements, reroutes, and new lines. The pipeline operator should be alert to these types of changes and make certain that the data used for threat and risk assessment reflect the current conditions of the pipeline.

## 7.5    Integration of Data to Validate MOP

An owner or operator of a pipeline should have traceable (i.e. clearly linked to original information about a pipeline segment or facility) records of the essential variables that support the determination of MOP. These attributes include the specified minimum yield strength (SMYS), wall thickness, diameter and hydrostatic test pressure. As an alternative to address gaps in historical documentation and records, the operator may resolve this information from one or more assessments, such as ILI, pressure testing, or in-situ examination.

Information from a transcribed document with its implied uncertainty, in many cases, should be verified with complementary or supporting documents (e.g. pressure charts or field logs), where available. Similarly, complete records are those in which the record is finalized as evidenced by a signature, date or other appropriate marking. An affidavit prepared and signed at the time of the assessment by a qualified individual familiar with the assessment would be acceptable, as verified complete, and complementary documentation.

Where an aggregation of records completely spans a pipe segment, linkage to an individual pipe joint within the segment is not necessary. For instance, if multiple hydrostatic test sections completely span a pipe segment and adequately support the MOP, delineating exactly where the transition point is between tests is not required if they are continuous.

## 8    Risk Assessment Implementation

### 8.1    General Considerations

Risk to a liquid pipeline system arises from the combination of the probability that the system will sustain damage from one or more of the 10 threats listed in Section 5 and Annex A and the consequences (in terms of effects to critical locations as defined in Section 6) if the damage is sufficient to cause a release. Risk is commonly described as the product of the likelihood of a release times the consequences of the release. The higher the product of these two quantities, the higher the risk as depicted in Figure 3. By assessing risk as it varies throughout a pipeline system, a pipeline operator can identify and categorize locations according to risk. Prioritizing or ranking the calculated risks allows the operator to direct risk management personnel and resources to various parts of the system in a manner that has the most impact on system integrity. Risk can be described in either relative or absolute terms. Relative risk considers how the identified risk ranks compared to other risks identified on the system or segment. Absolute risk considers the expected consequences based on occurrence of the identified risk element.

When developing a risk assessment approach, it is important to understand the end use of the assessment. Risk assessments should be used for determining the type and order of integrity assessments (see Section 9) and preventive and mitigative action implementation (see Section 11). The need for the risk assessment to identify which threats are relevant to the asset in question and also to prioritize the order in which follow-up activities are implemented should be considered when the risk assessment approach is designed.

## 8.2   Developing a Risk Assessment Approach

Risk assessment has one or more of the following goals depending on the approach:

— to identify relevant threats to a given pipeline segment's integrity;

— to rank segments of a pipeline system in the order of greatest need for additional integrity assessment or mitigative action;

— to determine any segments where the risk level has exceeded the desired threshold

— to compare different prevention or mitigation options in terms of the risk reduction benefits and costs;

— to provide risk-based input to guide integrity decision making (e.g. repair criteria, reassessment intervals, etc.); and

— to facilitate reassessment and re-ranking once the preventive and mitigative actions have been completed.

A pipeline risk assessment process should address the following questions.

1) What kind of events or conditions might lead to a loss of system integrity?

2) How likely, in a relative or absolute sense, are these events or conditions to occur?

3) What are the nature and the severity of the consequences if these events or conditions occur?

4) What risks are associated with these events or conditions either in a relative sense or an absolute sense?

There are several approaches that can be taken to implement a risk process, each of which will provide answers to questions 1) through 4) above. The approaches vary in complexity depending on the complexity of the asset in question, the data needed to complete the process, and the quality and quantity of data available. The use of subject matter experts (SMEs) to design and implement risk processes is critical regardless of the approach taken. The following are generally accepted approaches:

— using SMEs;

— using a relative risk assessment;

— using a scenario-based model;

— using a probabilistic risk assessment.

Using SMEs—Typically, SMEs will be experienced company personnel who specialize in the subjects of relevance to pipeline integrity such as design, construction, corrosion mitigation, inspection and testing, maintenance, risk management, right-of-way maintenance, and operations. They will have detailed knowledge of the systems including size and nature, the critical locations (see Section 6), which of the 10 threats to pipeline integrity may be applicable to the system, and the types of data outlined in Section 7 (i.e. the pipeline attributes, the construction factors, the operational factors, and the assessment history). The SMEs jointly evaluate the threats to each pipeline segment, and consider the boundaries of critical locations to estimate the risk for each segment, and provide a relative ranking of segments for integrity assessments. The SMEs may or may not request assistance from an outside consultant but usually review relevant technical literature, and where possible, industry-wide data sources to aid them in their evaluations of threats to pipeline integrity.



Figure 3—Simplified Depiction of Risk

Using a Relative Risk Assessment—In a relative risk assessment, an arithmetic model is developed or an existing model is purchased that allows numerical scores to be calculated for each pipeline segment based on the identified threats to pipeline integrity and the nature and distribution of critical locations that could be affected by a release. Probabilities and consequences are expressed as equations containing the relevant parameters that are typically multiplied by weighting factors that have been validated by sensitivity studies and comparisons to historic situations. Typically, these models provide algorithms for calculating the risk score associated with each individual threat. These models typically provide for calculating the effects of integrity assessments and mitigation on the basis of the score of a given segment. Thus the value of potential integrity assessment methods and mitigative actions appropriate for addressing a particular threat can be compared prior to their selection and use. The scores that result provide comparisons that are relative to each other; hence, the method is termed "relative" risk assessment. Pipeline segments can be ranked according to the calculated scores with the highest relative risk sections being scheduled first for assessment and mitigation. Re-ranking of segments can also be carried out after a round of assessments has been completed, and this allows the operator to plan the next assessment based on the re-ranking.

Using a Scenario-based Model—This approach involves considering events or sequences of events that lead to the risk of a release. A probability is assigned to each event based on a historical rate of occurrence. A fault tree is constructed from the interaction of individual events that leads to a calculated probability of a release. Fault Tree analyses can be constructed for each of the 10 threats listed in Section 5 and Annex A that are considered to be applicable to a given pipeline segment. The probability that releases of different types will occur within the boundaries of a segment where it could affect a critical location and the associated costs can be considered by means of a Fault Tree analysis as well. By multiplying the probability of the release occurring within a critical location times the cost of

potential damage and cleanup following a release, the operator obtains an "expectation" in cost terms for each scenario. The operator calculates expectations for all applicable scenarios and compares the results to determine which segments need integrity assessment soonest.

Using a Probabilistic Risk Assessment—This method requires the consideration of probabilities of undesirable events (such as a release or the remaining pressure carrying capacity of the pipe falling below the MOP of the pipeline in a segment located within the boundaries of a critical location) and their associated costs. Integrity assessments can then be implemented on the segments for which the calculated risk (probability times consequence) of the undesirable event is unacceptably high. Probabilistic risk assessment requires large amounts of reliable data to establish credible probabilities of events and situations. An example is the use of probability-of-exceedance (POE) for mitigating external corrosion following an ILI. Each anomaly identified through the inspection has length and depth dimensions, as predicted by the inspection technology, which are used to calculate an ERP based on the properties and operating parameters of the pipe. The uncertainty embodied in the tool error allows the calculation of the probability that a detected and sized anomaly will leak or fail at the MOP at the location of the anomaly. The operator should then choose a probability level and remediate anomalies having a higher probability; the inference is that this probabilistic approach would supersede prescriptive response criteria.

## 8.3   Characteristics of Risk Assessment Approaches

A pipeline operator needs to be aware of certain characteristics of risk assessment methods to use them appropriately. One is that they are data driven. As shown in Section 7, system data consisting of pipeline attributes, construction factors, operational factors, and integrity assessment histories should be available to assess the risk of each threat to pipeline integrity. The nature and extent of the critical locations should be well defined to determine the ways in which a pipeline release can affect a critical location as outlined in Section 6. The quality of the risk assessment is related to the quality of the data used and the expertise provided by the operator.

Probabilities of releases and consequences can be meaningfully combined to calculate risk for a specific location only if the data used in the calculation apply to that location. Therefore, all data should be available and valid for the location to which the calculations apply. Some models use dynamic segmentation, which provides for a continuous interrogation of the pipeline data along the route, calculating a new value of risk every time any input variable changes. Other models use fixed segmentation, which is designed to calculate risk for a specific set of data applied to a predefined segment with constant values of the input data. In the case of dynamic segmentation, points of data change should be provided. In the case of fixed segmentation, the user should define segments for which the data remain constant.

In some situations, data weaknesses may lead to risk scores being driven by a single variable in a way that creates doubt about the reliability of the risk scores. For example, if a model shows the probability of external corrosion to be based on coating type, coating condition, soil type, age, and pipe-to-soil potential readings and the assumption is made that coating type, coating condition, soil type, and age are constant throughout the segment, the risk will be totally controlled by the pipe-to-soil potential readings. It is unlikely that coating condition and soil type are constant over long distances, so to obtain a more reliable calculation of the corrosion threat, the operator could invest in efforts to determine how coating condition and soil type vary along a pipeline. For each risk calculation, threat-by-threat, the operator needs to examine both the data being used, and the output calculations to be sure that they agree with experience.

To determine the rate of mitigation needed to avoid a failure within an unassessed segment, the operator who uses relative risk scores should review the results of the assessments, remediations, and mitigations from the first few segments with the highest scores. Working through the first few segments provides an indication of the reliability of the risk assessment. The operator can then adjust the rate of integrity assessment and preventive and mitigative measure implementation accordingly.

Because the scenario-based approach and the probabilistic approach to risk assessment tend to give risk values in terms of probability of failure, the user has to decide how much risk to accept for a given period of time. For example, a probability of failure of $1 \times 10^{-6}$ might indicate that a segment could go X years before needing an integrity



assessment whereas a probability of failure of $1 \times 10^{-3}$ might suggest a need for integrity assessment within Y years where Y is considerably less than X.

Risk assessment is not static and does not deliver absolute certainty regarding scheduling integrity assessments or other preventive and mitigative activities. However, it does offer a methodology with which to start an integrity assessment program, and if allowed to evolve with experience, it becomes a tool for continual planning of integrity assessments. Risk assessment should also continually identify those preventive and mitigative measures an operator should be considering for implementation. As integrity assessments, remediations, and mitigative actions are carried out, the particular model used by an operator can be validated, improved, or replaced, if necessary, to conform with the experience gained through integrity management activities. The properly evolving risk assessment model will remain an essential tool for planning integrity assessments and preventive and mitigative actions in the future in a manner that ensures the continued integrity of the system.

The experience that comes from carrying out integrity assessments and mitigative actions should be fed back into the risk assessment process for it to remain reliable. Data that should be gathered for future integration and considered in reassessing risk (that may necessitate modifications to the risk assessment approach) are discussed in detail in API Bulletin 1178. Some examples are as follows:

— number of repairs required during the previous inspection, testing, and mitigative activity;

— type of defects found and their significance to pipeline integrity;

— causes of defects found;

— rate of degradation;

— different assessment technologies and improvements in technology used;

— changes in pipeline attributes and pipeline operations;

— alignment of findings from inspections and tests with what the model predicted;

— results of preventive and mitigative actions.

## 9   Integrity Assessment and Remediation

### 9.1   General

This section provides guidance on integrity assessment methods and repair methods, and includes the following topics:

— appropriate ILI techniques for the various pipeline integrity threats;

— schedules for dealing with anomalies found by ILI;

— benefits and limitations of hydrostatic testing;

— various types of other technologies for finding anomalies;

— various types of repair methods that can be used to restore the serviceability of pipe affected by defects.

The threats for hazardous liquid pipelines that operators should address are listed in 5.1 and explained in detail in Annex A.



The categorization of the threats as time-dependent, stable or time-independent (random events) is provided in the ASME B31.8S standard for gas transmission pipelines. Liquid pipeline operators should consider the physical and regulatory differences between gas and liquid pipelines since the potential for pressure-cycle-induced fatigue is much greater for liquid pipelines than it is for gas pipelines. An additional category, potentially time-dependent, can be helpful in categorizing some threats in liquid pipelines. Table 1 lists the categories for the threats listed in this RP. The internal corrosion, external corrosion, SSWC, and EAC threats are clearly time-dependent threats that should be addressed by periodic assessment and monitoring. The manufacturing, construction and fabrication threats are considered possibly time-dependent threats because of the potential for their enlargement by fatigue. For the latter threats, the pipeline operator will be called upon to determine the need for additional assessments or monitoring. The equipment failure, incorrect operations, weather and outside force threats along with the immediate mechanical damage threat are considered time independent because they involve random events for which the time of occurrence is usually not predictable. Management of time independent threats involves employing preventive and mitigative measures.

## Table 1—Threat Categories

| Time Dependent Threat | Potentially Time Dependent | Time Independent (Random Events) |
|---|---|---|
| Requires Periodic Assessment and Monitoring | Requires Analysis of Need for Periodic Assessment or Monitoring | Occurrence Not Predictable |
| External Corrosion<br>Internal Corrosion<br>SSWC<br>EAC<br>Fatigue | Manufacturing Defects<br>Construction and Fabrication Defects<br>Mechanical Damage (that does not cause an immediate failure) | Equipment Failure<br>Mechanical Damage (causing immediate failure)<br>Incorrect Operations<br>Weather or Outside Force |

If no prior integrity assessment has been performed for a pipeline system, an initial integrity assessment plan should be developed based on identifying critical locations (Section 6), initial data gathering (Section 7), and risk assessment (Section 8). If prior integrity assessments have been performed, the integrity assessment plan going forward should be modified by reviewing critical locations for possible changes or additions (Section 6); reviewing and updating data in response to changes in attributes, changes in operations, knowledge gained from company and industry failure reports, and the results of prior assessments (Section 7); and by reassessing risk and reprioritizing segments for future integrity assessments. The relation of these activities to other integrity management functions and their placement in the PDCA cycle of activities is discussed in Section 4.

It is expected that the appropriate pipeline integrity assessments will be performed periodically and remediation activities will be carried out at intervals that are appropriate to prevent releases that might result from time-dependent deterioration (especially for the time-dependent threats described previously). Reassessments are discussed in Section 10 and guidance for calculating reassessment intervals is given in Annex D.

Regardless of the assessment or repair method selected, the operator should have applicable written procedures and adequate training regarding them. When outsourcing integrity assessment or remediation activities the operator should define responsibilities and accountability. API RP 1173 provides additional guidance on operational controls that can be used to establish and improve integrity assessments and remediation.

Table 2 shows applicable integrity assessment methods for each threat discussed in Section 5. This list is not meant to be all inclusive and does not preclude the use of ILI, hydrostatic testing, or different technology for use in certain threat assessments proven to be effective through experience.

## 9.2   In-line Inspection

This section presents guidelines for the use of ILI technology to assess pipeline integrity. The generic classes of ILI tools and a brief overview of their capabilities are shown in Table 3 and detailed descriptions of the various ILI

**Table 2—Integrity Assessment Methods**

| Threat | ILI | Hydrostatic Testing | Other |
|---|---|---|---|
| External corrosion | a (preferred) | a | ECDA  GWUT |
| Internal corrosion | a (preferred) | a | ICDA  GWUT |
| SSWC (external or internal) | a | a | ECDA  ICDA |
| **EAC** | | | |
| Axially oriented EAC | a | a | SCCDA  NDE |
| Axially oriented stress fatigue cracking and other cracks | a | a | NDE |
| Circumferential EAC | a | b | SCCDA  NDE |
| **Manufacturing defects** | | | |
| Axially oriented crack-like seam defects (i.e. hook cracks, cold welds) | a | a | NDE |
| Hard spots | a | b | NDE |
| Laminations | a | b | NDE |
| **Construction and fabrication defects** | | | |
| Defective girth weld | b | b | NDE |
| Defective fabrication weld | b | b | NDE |
| Wrinkle bends | a | a | NDE |
| Stripped threads, broke pipe, coupling failures | b | b | Visual Exam |
| Equipment failure | b | b | Visual Exam  NDE |
| **Mechanical damage** | | | |
| Immediate failure | c | c | Damage Prevention Programs |

**Table 2—Integrity Assessment Methods (Continued)**

| Threat | ILI | Hydrostatic Testing | Other |
|---|---|---|---|
| Delayed failure | a (preferred) | a | Damage Prevention Programs<br>NDE |
| Illegal tapping (vandalism) | a | b | Visual Exam<br>ROW Patrol |
| Incorrect operations | c | c | Operator Training and Qualification<br>Procedures |
| **Weather and outside force related defect** | | | |
| Vortex-induced vibration | b | b | Monitoring |
| Flooding | b | b | Monitoring<br>Visual Exam |
| Lightning | a | b | Leak Detection |
| Ground movement (i.e. subsidence, earthquake, liquefaction, landslide) | a | b | Monitoring<br>LIDAR<br>ROW Patrol |
| High winds (i.e. hurricanes, tornadoes) | b | b | Monitoring<br>Visual Exam |

a   Represents commonly used industry practices.

b   Represents assessment practices which generally are not recommended due to limited effectiveness although in certain circumstances operators may have found them effective.

c   N/A = Non applicable

technologies appear in Annex B. Neither the information in Table 3 nor in Annex B should be considered all-inclusive of every tool and capability that is available. For example, using two types of tools and overlaying the results can provide useful information on interacting threats such as metal loss or cracking within a dent or cracking in combination with metal loss. ILI technology evolves rapidly such that tools may exist that are not covered in this RP. A pipeline operator is well advised to stay current with ILI vendors, technology center researchers, industry conferences, and other pipeline operators. Operators are encouraged to discuss improved inspection technologies with their vendors. Pipeline operators are encouraged to consult other industry standards on ILI including:

—   NACE SP0102, *In-Line Inspection of Pipelines*;

—   API Standard 1163, *In-line Inspection Systems Qualification*;

—   API RP 1176, *Assessment and Management of Cracking in Pipelines*;

—   ASNT ILI-PQ, *In-Line Inspection Personnel Qualification and Certification*;

—   Pipeline Operators Forum, version 2016, *Specifications and requirements for intelligent pig inspection of pipelines*.

32                                    API RECOMMENDED PRACTICE 1160

Table 3—In-line Inspection Tools and Capabilities

| Integrity Assessment Detection/Sizing Objective | MFL Tools | | | | Ultrasonic Tools (UT) | | | | Geometry Tools | | | Pipeline Profile and Alignment Tools |
| | Axial MFL | Circumferential MFL (Transverse Field) | Helical MFL (Spiral Field) | Residual or Low Field MFL | Normal Beam UT (Wall Thickness) | Angle Beam Shear Wave UT (Crack Detection) | EMAT UT (Crack Detection) | | Caliper | High Resolution | Inertial Mapping |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Metal loss external or internal | S | S | S | | S | D | D | | | D (internal) | |
| SSWC external or internal | | S | S | | | D | D | | | | |
| Axially oriented EAC | | | | | | S | S | | | | |
| Axially oriented stress fatigue cracking and other cracks | | | | | | S | S | | | | |
| Axially oriented crack-like manufacturing defects (i.e. hook cracks, cold welds) | | D | D | | | S | S | | | | |
| Circumferential cracking | | | | | | S [b] | S [b] | | | | |
| Dents | D | D | D | D | D | D | D | | S | S | |
| Gouge or groove | DM | DM | DM | D | DM | | | | | | |
| Wrinkles or buckles | D | D | D | D | D | D | D | | D | S | |
| Expanded pipe | | | | | | | | | D | S | |
| Laminations | D | D | D | | S | D | D | | | | |
| Hard spots | | | | D | | | | | | | |
| Evidence of strain | | | | D | | | | | | S [a] | S |
| Bends or curvatures | D | D | D | D | D | D | D | | D | S | S |

S is detection and sizing capability as specified by vendor.

D is detection capability with limited or no sizing capability as specified by vendor.

DM is detection capability of metal loss portion of mechanical damage with limited or no sizing capability as specified by vendor.

NOTE 1    Refer to Table 1 of API RP 1176 for additional details on crack detection tools.

NOTE 2    Inertial mapping tool information can be used to calculate safe operating pressure automatically.

[a]    Requires offline calculation.

[b]    With special setup.

### 9.2.1    ILI Tool Workflow

In planning for ILIs, the process flow diagram shown in Figure 4 (from API 1163) can be used to outline the workflow associated with conducting an ILI.



**Figure  4—ILI Process Flow Diagram**

A pipeline operator contemplating the use of ILI for integrity assessment should first determine whether the pipeline to be assessed can accommodate ILI tools. To accommodate ILI tools, the pipeline should be equipped either permanently or temporarily with the means to launch and receive tools, ideally, without taking the pipeline out of service. An appropriate tool should be available for the diameter of the segment to be assessed. Diameter or ovality restrictions, short-radius fittings, and miter bends may interfere with the passage of the tool. Dual diameter lines can be inspected but getting full assessment data can be problematic. Full-opening tees should be fabricated with bars that prevent a tool from turning into the branch. The fluid should be compatible with the tool both from the standpoint of not damaging the tool and from the standpoint that the fluid is capable of signal transmission if the technology relies upon signal transmission through the fluid. Many tools are sensitive to temperature extremes and fluctuations.

The cleanliness of the pipeline may be a factor in the effectiveness of an ILI assessment. Wax and solid debris may degrade the performance of an ILI tool. Lastly, capabilities of a tool for locating and sizing the target anomalies may vary with tool speed. In some instances, a tool can collect accurate data at flow rates faster than it can reliably survive the wear and tear of an inspection. Long runs and the presence of fittings can damage the tool. Therefore, in selecting tool speed, the run length and the number of fittings (check valves, tees, etc.) should be considered; additionally, check valves may need to be lifted open and locked in place. The pipeline operator may have to reduce bulk flow velocity to achieve satisfactory results. The operator should review relevant aspects of the pipeline with the potential ILI vendors before committing to use ILI tools (or sets of tools).

Different tools are designed to address anomalies created by different threats. It may be necessary to run multiple tools or combinations of tools if there are multiple threats to be assessed. The pipeline operator should carry out the data analyses outlined in Section 7 and the risk assessment outlined in Section 8 to identify any threats that could affect the segment to be inspected. Only then can an informed decision be made as to which ILI tools are appropriate for integrity assessment of a particular pipeline segment. Figure 5 outlines the terminology associated with the ILI analysis and deliverables.

34                                    API RECOMMENDED PRACTICE 1160



**Figure 5—Inspection Terminology**

First, although the tools typically measure distance traveled, the operator should work with the vendor to place above-ground marking equipment to "mark" the data as the tool passes particular locations. These markers, along with the known locations of other physical features, are needed to calibrate the distance measurements recorded for each anomaly to facilitate location of the feature if further examination is necessary. Some tools use inertial navigation or guidance systems to increase accuracy and ease of locating actionable anomalies. Inertial guidance tools (discussed in Annex B) combined with integrity assessment tools can obtain pipeline position information and assign calculated GPS coordinates. API Bulletin 1178 provides additional guidance and considerations regarding the use of GPS coordinates.

Second, there are several attributes of an ILI technology that will control whether and how features are reported. The ability of an ILI technology to detect an anomaly is based on the depth and magnitude threshold for the particular

anomaly. The probability of detection (POD), typically reported as an 80 % or 90 % confidence (typically this increases for larger anomalies), is controlled by a combination of depth, type, shape and possible location of the anomaly. Even if detected, the anomaly also needs to be correctly characterized, typically referred to as probability of identification (POI). Incorrect identification may result in an anomaly being erroneously characterized as non-injurious or non-actionable. The operator should understand the limitations of each type of tool prior to its use. The operator can assess the tool's probability of detection and probability of correct identification by comparing field findings with reported anomalies.

Third, many tools have the ability to characterize the sizes of anomalies within a certain stated tool tolerance; and as such, the anomaly sizing found upon excavation and measurement are often different to some degree from the sizes predicted by the tools. The operator should determine the amount of tool error associated with a particular tool run by excavating and examining a representative number of anomalies while also considering field measurement error. The statistical distribution of error should be considered in the evaluation of the tool's performance and the evaluation of other anomalies for remediation.

In some cases, special ILI tools can be set up to locate certain types of anomalies. For example, if pipe body hard spots are suspected, an MFL ILI tool can be used in a special setup to locate them. For additional information, see Annex A.

The pipeline operator should be aware that the routine grading of anomalies provided by an ILI vendor may not be sufficient to satisfactorily assess certain anomalies. In such cases, the operator may find it advantageous to request a reexamination by the vendor of the raw data acquired by the tool. Analysis of the raw data by the vendor's experts may help in assessing a particular anomaly where the normally reported data were insufficient to resolve the nature of the anomaly particularly when detailed data integration is needed to identify threats.

### 9.2.2   Validating ILI Tool Performance

API 1163 describes three methodologies that can be used to validate that the reported inspection results that meet or are within the performance specification for the pipeline being inspected or to establish the as-run specification on the basis of validation data.

— An operator may have a unique understanding of the threat mechanism or access to other datasets that provide the opportunity for additional insight into characterizing anomalies from an ILI. Application of this value added interpretation may give rise to a two-tier performance specification; the first one "as reported by the service provider" and the second one "as interpreted by the operator." This is exemplified by the approach detailed in API RP 1176 where cracking anomalies are characterized as likely, possible, or unlikely. This approach does not limit the service providers' obligations to meet or exceed their performance specifications in terms of the "as-reported" data.

— In terms of validating tool performance for multiple ILI runs, consideration should be given to the commonality of essential variables across runs. This can provide the opportunity to aggregate multiple ILI runs to determine and apply the calculated sizing error.

— A root cause analysis (RCA) may be considered for results of individual features that significantly vary from the performance specification such as those incorrectly sized by twice the 80 % certainty sizing error. Typically a RCA is reserved for anomalies of significance, but it could be engaged where the remaining population of features merits additional consideration.

### 9.2.2.1   Artificial Feature Validation

Early in the life of the pipeline or new assessment type, it is unlikely any suitable anomalies will be detected, making it difficult or impossible to validate data. Thus, the operator may consider using manufactured metal-loss or crack (notch) anomalies reinforced with steel or composite sleeves to validate in-line inspection tools. The use of machined features guarantees a full spectrum of anomaly geometries and severities are considered in preparing unity plots. It

also ensures enough features are provided to statistically evaluate the true probability of detection and sizing accuracies across the full range of potential anomalies. Consideration should be given to the placement of calibration spools with machined defects spools at the beginning, mid-point, and end of the pipeline. The installation of sleeve repairs should result in the higher burst pressure ratings than the original pipe. Using a machined-premeasured set of anomalies for tool validation precludes the need to conduct excavations, which could damage the sensitive ecosystem. Also, because all features were accurately measured in a controlled environment, there is less potential for measurement error.

### 9.2.3 Responding to Anomalies Identified by ILIs

#### 9.2.3.1 General

The central part of this methodology is to determine an appropriate response for each anomaly called out by an ILI tool. To most effectively respond to anomalies found by ILIs, operators should have a fundamental understanding of the abilities and limitations of the ILI technology used and the operating parameters of the pipeline in question. This operating knowledge should be known about the specific location of the anomaly as much as practical. Critical parameters, such as the permissible pressure at that location, potential pressure at that location during a transient or abnormal event, or maximum potential pressure achievable during steady state operations should all be known to correctly categorize the severity of anomalies found. Hydraulic gradients and pressure surges can cause these critical parameters to vary widely from location to location, and an operator should know the differing level of risk when comparing the safe pressure capacity of anomalies to these different parameters.

Pipeline operators are reminded that some regulatory jurisdictions have requirements for the examination and repair of certain injurious defects and that the recommended timing for examination and repair listed below may differ. In addition, certain regulations also contain reporting requirements when certain conditions are found.

#### 9.2.3.2 Discovery of Condition

Discovery of a condition occurs when an operator has adequate information about the condition to determine that the condition presents a potential threat to the integrity of the pipeline. Operators should establish a reasonable process and timeline for discovery (e.g. six months after completion of the tool run).

In general, an operator, who becomes aware of an integrity-threatening condition, should take appropriate action within a reasonable amount of time to confirm the status of the condition by further analysis and to remediate the condition, if necessary, so that the integrity of the pipeline is no longer threatened. Discovery includes receiving dimensions of an anomaly from an ILI vendor that indicate the existence of an integrity-threatening anomaly. For example, the operator receives information that a particular metal loss anomaly exists that has ILI-indicated dimensions that result in a calculated failure pressure that is at or below the operating pressure at the location of the anomaly. Similarly, the finding based on geometry tool data, of a dent on the topside of the pipe that has a depth exceeding 6 % of the diameter of the pipe constitutes discovery of a potentially integrity-threatening condition. Discovery could also mean finding upon overlaying data from a geometry tool and a crack-detection tool that a crack coincides with a dent creating a potentially integrity-threatening condition. Operators should establish a communications protocol with the vendor for timely reporting of anomalies that may require urgent action.

The pipeline operator should excavate and examine those anomalies that appear on the basis of the high-level screening of ILI data to be an immediate response condition (as defined in 9.2.2.3), that is, potentially a threat to pipeline integrity. The effect of an anomaly on the remaining strength of a pipeline depends on its physical dimensions and the strength and (in the case of a crack-like anomaly) the toughness of the material. When the remaining strength of an anomaly is lower than the potential stress in the pipe wall that could be achieved during current and future operations, then certain immediate actions are warranted. The comparison of remaining strength to pipe stress should consider internal design pressure, MOP, and potential surge pressures. When operators cannot take immediate action to repair these defects, they should consider lowering their operating pressures. The remaining strength calculations provide a basis for determining appropriate operating levels. When remaining strength cannot be calculated, then a pressure reduction may be based on previous operating history. Historically, a 20 % reduction

from previous known operating pressure has been used, but operators should analyze each specific system to determine the pressure reduction that is appropriate. Models for predicting the effects of certain types of anomalies on the pressure-carrying capacity of pipe are available in various pipeline industry publications. Generically, these models are termed fitness-for-service models or engineering critical assessment models.

From the standpoint of corrosion-caused metal loss, the applicable ILI technologies provide axial length and depth-of-wall-thickness-penetration dimensions with sufficient accuracy that reasonable predictions of remaining pressure-carrying capacity can be made with confidence based on the data obtained from a given tool run. The list of graded anomalies will indicate to the pipeline operator the locations and severities of anomalies that need to be addressed to preserve the integrity of the pipeline.

The data obtained from crack tools may be of adequate quality to permit the grading of cracks as well; the ability to accurately depict the crack type anomaly is dependent on the technology as well as the type of feature (e.g. ERW seam crack versus SCC or circumferential field MFL versus ultrasonic). API RP 1176 details the considerations applicable to the various crack ILI technologies as well as the associated fracture mechanics calculation methods.

To calculate an estimated rupture pressure (ERP) to determine remaining strength, selection of a suitable calculation method depends on several factors, including the failure mode of the anomaly. Appropriate calculation methods include but are not limited to:

a) For metal loss anomalies susceptible to failure in plastic collapse—ASME B31G, *Manual for Determining the Remaining Strength of Corroded Pipelines* (2012) or AGA Pipeline Research Committee Project PR-3-805, *A Modified Criterion for Evaluating the Remaining Strength of Corroded Pipe* (December 1989); anomalies with a predominantly circumferential extent may be assessed with the Kastner et al (1981) local collapse (flow stress dependent) failure criterion; other suitable models exist and are in common usage.

b) For crack anomalies or SSWC associated with FW and vintage ERW seams susceptible to failure through fracture narrow metal loss susceptible to fracture—the Battelle Model (Modified Log-Secant), IPC 2016-64605, or API 579, Part 9; consideration for delineating SSWC from corrosion which is coincidental to the seam weld is discussed in Annex A.

c) For dent anomalies: the safe working pressure can be determined using PRCI PR-218-063505, *Safe Inspection Procedures for Dent and Gouge Damage* (2010).

d) For all anomalies: If the formulas above are not applicable to the type of anomaly, an operator should use an alternative acceptable method to calculate a reduced operating pressure, or implement additional measures to provide acceptable operating parameters, or reduce operating pressure at the location of the anomaly by a minimum of 20 %.

The characterization of a crack is further defined in API RP 1176, but a succinct summary is provided here for ease of reference. A key aspect in the crack response methodology is determining the likelihood that an ILI indication is a crack. A likely crack is defined as having a reasonable degree of confidence that the anomaly called by the ILI vendor correlates to a crack-like defect. This can be the case where the operator's previous experience on a pipeline segment or other similar pipeline segments has found cracks or the case where the data integration indicates a strong likelihood that cracks could exist even though no historical data suggests cracking has occurred. A possible crack is defined as having a reduced certainty of being, or rarely been, an actual crack. When it is a crack, it occurs under different circumstances or the operator cannot determine with a high degree of confidence that the indication is not a crack-like defect.

Whenever pressure reductions are implemented, including long-term pressure reductions, regulatory statutes for reporting and timing should be followed. A schedule for addressing anomalies judged not to be immediate response conditions but which could affect pipeline integrity in the future should be established that will ensure that mitigative action is taken in time to prevent a leak or a rupture of the pipe. Section 10 provides guidance for assessing the remaining life of anomalies that fall outside the category of immediate or near-term response conditions. An operator

should consider the calculated failure pressures of the associated anomaly population relative to future, normal and maximum operating pressures of the pipeline segment when deciding the extent of further long-term pressure reductions.

### 9.2.3.3   Immediate Response Conditions

When a pipeline is inspected by an ILI tool, the final results of the inspection should be provided to the operator within a reasonable timeline. Anomalies that meet the immediate response criteria should be brought to the operator's attention through a preliminary ILI report as soon as practicable after completion of the inspection.

Immediate response conditions describe anomalies or conditions that could potentially represent severe and immediate threats to pipeline integrity. The operator should consider mitigation within five days whether they are found within a segment of pipeline that could potentially impact a critical location or not. In absence of further analysis removing the anomaly from the immediate response, mitigation would typically entail excavation and repair. Alternatively, an operator may temporarily reduce the operating pressure or shut down the pipeline to provide additional time to complete the repair. The temporary pressure reduction shall be determined by considering the remaining strength of the anomaly. Where the remaining strength of an anomaly cannot be calculated, the operating pressure should be reduced by a minimum of 20 %. Although such a temporary pressure reduction can be maintained for up to a year, immediate features should be mitigated in accordance with regulations and as expeditiously as practicable.

Immediate response conditions include, but are not limited to, the following:

a)  Metal loss greater than 80 % of nominal wall regardless of dimensions;

b)  Likely crack anomalies greater than 70 % of nominal wall or of an indeterminate depth that exceeds the maximum depth sizing capabilities of the tool, as stated by the vendor's performance specification, where the depth cannot otherwise be established through correlation with previous ILI runs. These criteria are not intended to include tool tolerance in depth comparisons.

c)  A calculation of the remaining strength of the pipe at the metal loss or likely crack anomaly that shows a failure pressure ratio (FPR) less than 1.1 at the location of the anomaly. The FPR calculation is not intended to include tool tolerance.

d)  A dent, located anywhere on the pipeline, that has any indication of a gouge, likely or possible crack, or stress riser, unless an industry recognized engineering analysis shows that it poses minimal risk to pipeline integrity.

e)  A dent located on the top of the pipeline (above the 4 o'clock and 8 o'clock positions) with a depth greater than 6 % of the nominal pipe diameter unless an industry recognized engineering analysis shows that it poses minimal risk to pipeline integrity.

f)  An anomaly that in the judgment of the person designated by the operator to evaluate the assessment results requires immediate action.

### 9.2.3.4   Near-term Response Conditions

The following sets of investigation and response criteria describe conditions that could, if left unaddressed, represent threats to pipeline integrity. The prescribed timing depends on whether the anomaly is on a section of pipe that could affect a critical location or not, within 270 days that could affect a critical location and 540 days if it does not affect a critical location. Operators should understand the growth mechanism(s) for each anomaly and verify that the time to failure (including appropriate safety factors) of these anomalies is not less than the time period for response. Anomalies that are predicted to fail within this period should be scheduled for remediation prior to their projected failure date. These criteria are not intended to include tool tolerance in depth comparisons or ERP calculations.



Applicable conditions include:

a)  A dent with a depth greater than 2 % of the pipeline's diameter (0.250 in. in depth for a pipeline diameter less than NPS 12) that interacts with a girth weld or a longitudinal seam weld unless an industry recognized engineering analysis shows that it poses minimal risk to pipeline integrity.

b)  A dent located on the top of the pipeline (above 4 and 8 o'clock position) with a depth greater than 2 % of the pipeline's diameter (0.250 in. in depth for a pipeline diameter less than NPS 12) unless an industry recognized engineering analysis shows that it poses minimal risk to pipeline integrity.

c)  A dent located on the bottom of the pipeline with a depth greater than 6 % of the pipeline's diameter unless an industry recognized engineering analysis shows that it poses minimal risk to pipeline integrity.

d)  A calculation of the remaining strength of the pipe at the metal loss, likely crack (that is time dependent or possibly time dependent) or possible crack (that is time dependent) anomaly that shows an FPR less than 1.25 at that location.

e)  An area of general corrosion with a predicted metal loss greater than 50 % of nominal wall.

f)  SSWC with a predicted metal loss greater than 50 % of nominal wall.

g)  Predicted metal loss greater than 50 % of nominal wall that is located at a crossing of another pipeline or is in an area with widespread circumferential corrosion, or is in an area that could affect a girth weld.

h)  A likely crack (that is time dependent or possibly time dependent) or a possible crack (that is time dependent) with depth greater than 50 % of nominal wall.

i)  A dent located anywhere on the pipeline with corrosion unless an industry recognized engineering analysis shows that it poses minimal risk to pipeline integrity.

j)  A gouge or groove greater than 12.5 % of nominal wall resulting from mechanical damage.

### 9.2.3.5   Scheduled Response Conditions

An operator should investigate and, if necessary, repair items a) and b) below prior to the condition being met unless the next inspection period is scheduled to precede it.

Following an integrity assessment, time dependent threats should be evaluated for response timing. These calculations should include:

a)  a calculation of the remaining strength of the pipe (including allowances for growth and tool measurement error) to show an FPR less than 1.1 at the location of the anomaly,

b)  a calculation of the maximum depth of a metal loss feature (including allowances for growth and tool measurement error) predicted to be greater than 80 % of nominal wall regardless of dimensions.

If an anomaly fails a scheduled response criterion including tool tolerance but without the application of growth, the anomaly should be addressed as a Near-term Response (i.e. 270 days or 540 days). The applicable discovery date may be delayed depending upon when the elevated tool measurement error was determined. Additional guidance on scheduled response conditions for cracks can be found in API RP 1176.

### 9.2.3.6   Monitored Conditions

An operator does not have to schedule the following conditions for remediation but should record and monitor the conditions during subsequent integrity assessments for any change that may require attention.

a) Any manufacturing or construction condition that an industry recognized engineering evaluation or technical analysis shows to be stable and for which operating conditions have not significantly changed since the last successful pressure test; or

b) Any condition identified by an integrity assessment or information analysis that is not currently deemed to impair the integrity of the pipeline.

Additional guidance on monitor conditions for cracks can be found in API RP 1176.

## 9.3   Hydrostatic Pressure Testing

### 9.3.1   General

Hydrostatic testing is a widely used method of establishing MOP, integrity verification when records are incomplete or missing, and conducting a periodic integrity assessment of existing pipelines as part of an integrity management program. Its value as an integrity assessment technique is embodied in the probability that increasing the test pressure beyond the MOP will cause defects that are critical at the test pressure to fail thereby eliminating the possibility that the defects could fail at the operating pressure. The higher the test-pressure-to-operating-pressure ratio, the more effective the test is as a demonstration of pipeline integrity. API RP 1110 provides additional guidance for performing pressure tests.

In most cases, pressure testing is conducted with water. However, in certain conditions, other media such as nitrogen or another inert media may be used. When using an alternative medium than water, consideration should be given to safety and environmental concerns.

Hydrostatic testing is generally suitable for assessing flaws associated with time dependent and stable threats (see Section 5 and Annex A for more information on threats), each specific threat needs to be matched with the appropriate integrity assessment options.

ILI tools have proven to be more effective than hydrostatic testing for identifying small corrosion pits. Short, deep pits that would be detectable by ILI may survive a hydrostatic test but leak soon thereafter. Moreover, the ILI results show where corrosion is occurring and record the locations and dimensions of corroded areas that, while not in danger of imminent failure, may become a problem if corrosion continues. In addition, hydrostatic testing is generally not effective for assessing circumferential flaws, such as girth weld defects or circumferential SCC, because the applied stress is from axial loading or longitudinal bending, not internal pressure. API TR 1179 provides detailed guidance on the applicability of hydrostatic testing for integrity management. Hydrostatic testing may be used to validate ILI processes for specific threat management (see API TR 1179 and API RP 1176).

Where hydrostatic testing is an appropriate assessment method, a test either eliminates defects that have failure pressures less than the test pressure or it shows that any surviving flaws have failure pressures at or above the test pressure (except for the possibility of a pressure reversal as explained in Section 9.3.6). The validation provided by a test is highest at the time of the test, but the margin of safety embodied in the test-pressure-to-operating-pressure ratio will be degraded with the passage of time for time-dependent flaws that are increasing in severity (i.e. their failure pressures are declining) with the passage of time. Therefore, as is the case with integrity assessment by means of ILI, the process should be repeated periodically to ensure continuing pipeline integrity. Guidelines for estimating the time interval between hydrostatic retests are presented in Section 10.

### 9.3.2   Hydrostatic Testing Limitations

Hydrostatic testing has some technical limitations. First, the only defects identified by a hydrostatic test are those that fail during the test. Flaws having failure pressures above the test pressure will not be discovered. This means that short, deep flaws (that have inherently high failure pressures, yet relatively short fatigue lives) could go undetected. Moreover, the operator gains no knowledge of the numbers and locations of flaws that have survived the test. Therefore, in establishing the time for the next integrity assessment by testing, one should assume that the failure pressure of the most severe remaining flaw is no higher than the test pressure, and that the flaw could be located anywhere within the segment. One should also be careful to use appropriate pipe properties in estimating the reassessment interval as high strength values, beyond the mill certification value, are common and can result in remaining flaws with short fatigue lives. Unless a large number of defects fail during the test, the pipeline operator learns little or nothing about the locations of potential flaws and problem spots where a line may be susceptible to phenomena such as corrosion, SCC, or pressure-cycle-induced fatigue. A history of hydrostatic tests and failures over time can provide some insight into problematic segments. Therefore, it is important to document where failures occurred, the cause of the failure, and the failure pressure.

The successive cycles of test pressure may cause other flaws to grow such that successive failures can occur at pressure levels below that of a prior pressurization (see pressure reversals in 9.3.6). While this phenomenon tends to prolong the testing process, adding to the cost, the impact of potential pressure reversals on pipeline integrity at the operating pressure is usually negligible. (See API TR 1179). Lastly, hydrostatic testing of a pipeline that has been in service is complicated by the need to interrupt liquid transportation service and by the difficulties in acquiring water for testing, and in disposing of the water once it has become contaminated by contact with a petroleum product or crude oil.

### 9.3.3   Minimum Test-Pressure-to-Operating-Pressure Ratio

Typical strength test levels are a minimum of 1.25 × MOP and leak test levels of 1.1 × MOP. Where the test may approach SMYS, a yield plot should be performed to mitigate the potential for plastic yielding of the pipe wall. The selection of a minimum test pressure to operating pressure ratio for integrity assessments should be guided by API TR 1179.

### 9.3.4   Minimum Hold Time

Holding the test pressure at a constant level for a period of time is an appropriate method to detect leaks. Beyond the regulatory requirements, the length of hold time employed to assess for leaks should be based on the volume of water in the test section: the larger the volume, the longer holding at constant pressure is required to detect a leak of a given size. It should be noted that the value of hold time is solely that of establishing that the test segment is free of leaks. It does not add to the value of the test with respect to the margin of safety. Defects that are on the verge of failure at the test pressure may continue to grow during the hold period. If a growing defect fails, it is eliminated, and the hold period should be restarted. If no failure occurs during the hold period but one or more flaws grow without failing, the hold time has potentially made the defects worse. Since there is no way to determine the status of flaws that survive the hold period, the test pressure is the sole measure of the effectiveness of the test with respect to the margin of safety for operating the pipeline at its MOP.

### 9.3.5   High-pressure Integrity Test

Hydrostatic tests which are designed to address specific threats and verify that these threats are being managed by the integrity management system may be referred to as high-pressure integrity tests. The test pressure is typically greater than or equal to 1.25 times MOP. It is not designed to qualify for a change in MOP but is an integrity management tool. See API TR 1179 for more details.

### 9.3.6   Spike Test

A hydrostatic pressure spike test is one that is conducted initially at a high-pressure level, relative to the operating pressure, held for a short time, followed by an extended hold period at a lower-pressure level. The spike portion of the test may or may not exceed the mill test pressure or a hoop stress equal to SMYS of the pipe, depending on the purpose of the test and the characteristics of the pipe.

It is only necessary to achieve and hold the high pressure for a short time to establish the integrity of the pipeline. The spike portion of the test must be held for a long enough time to assure that the pipeline has experienced a continuous pressure at or above the target level and to cause defects that are near critical (near the point of failure) to fail but not so long as to cause additional crack growth in flaws that are too small to be near the failure point (referred to as subcritical). Consistent with that objective, ASME B31.8S recommends a minimum period of 10 minutes. The effectiveness and value of the spike portion of the test is not improved by a longer period and extended hold periods at near-failure levels can be counterproductive.

The spike test is a variant of the hydrostatic proof test. Its purpose is two-fold: the spike portion of the test will induce failure in the pipe where significant defects may be present, while the subsequent relaxation of pressure allows any surviving cracks to stabilize and avoids subcritical crack growth during the hold period to detect leaks. For guidance on when a spike test is advisable, see API RP 1176.

One caveat with respect to conducting a spike test is that the test should not be terminated with a test failure. This may require lowering the target pressure level of the spike test to avoid another failure. Terminating a test with a failure greatly increases the chance that one or more surviving flaws will have a failure pressure less than the final level of test pressure achieved (see 9.3.7).

### 9.3.7   Pressure Reversals

The term "pressure reversal" is commonly used to describe the following situation which may occur repeatedly within a single hydrostatic test section. As test failures begin to occur, it is possible, that successive failures will occur at a pressure below a prior test failure. This phenomenon, commonly called a "pressure reversal" arises from the tendency for a flaw to grow by slow ductile tearing as the applied pressure approaches its failure pressure. If this growth is terminated just before the flaw fails because another defect in the test section fails, it is possible that the failure pressure of the just-surviving flaw will now be less than the pressure it has just survived.

Pressure reversals are common in hydrostatic tests of pipeline segments that contain families of defects having similar failure pressures. Generally, their impact on pipeline integrity at the MOP is negligible for two reasons. First, the potential size of a pressure reversal is inversely proportional to its likelihood. Secondly, in most cases where pressure reversals have been observed, the probability of a flaw being present that would fail at the MOP because of a pressure reversal is extremely small.

### 9.3.8   Detrimental Effects of Hydrostatic Testing

There are potential detrimental effects of hydrostatic testing, such as growth of sub-critical manufacturing and crack-like flaws, and these should be considered in the design of a hydrostatic test for integrity management purposes. Hydrostatic testing can also cause additional fatigue, shortening the segment's service life. API RP 1110 and API TR 1179 describe some of these detrimental effects of hydrostatic testing.

### 9.3.9   Test Results Analysis

If no failures occurred during the hydrostatic test, then the test effectively determined that at the time of the test no leaks or injurious defects remained. A history of hydrostatic tests, pressure ratios, and subsequent failures can demonstrate the effectiveness of hydrostatic testing as an integrity management tool. A declining or stable rate of test failures or a decrease of in-service failures demonstrates hydrostatic test effectiveness.

Test failures should be investigated to determine their causes. The causes of failures will indicate the types of threats that are affecting the segment and their significance. The information on causes should be fed back into the data integration process and the risk assessment model to see if the segment needs to be reprioritized.

## 9.4   Other Assessment Methods

Technologies other than ILI or hydrostatic testing that could be used to assess pipeline integrity include "direct assessment" (applicable to external corrosion, internal corrosion, SCC, and possibly to mechanical damage-delayed failure) and guided wave ultrasonic technology (GWUT-applicable to external and internal corrosion). Visual inspection or other traditional nondestructive examination (NDE) methods [ultrasonic testing (UT), magnetic particle testing (MPT), liquid-penetrant testing (PT), etc.] can be used on excavated or above-ground piping. These methods offer ways of assessing for the time-dependent threats (excluding assessment to control a pressure-cycle-induced-fatigue threat) in pipeline segments that are difficult-to-pig (meaning that ILI is not reasonably feasible) or cannot be taken out of service, or both, to accommodate a hydrostatic test. Understanding the use of other assessment methods is important. The application of one or more of these technologies could suffice for assessing the integrity where applicable threats are limited. Each direct assessment methodology is designed to assess a specific threat. There are limitations when applying a direct assessment methodology to threats for which the method is not applicable. It is possible to use multiple direct assessment methods on a single segment where those methods each address the appropriate threat. Moreover, the direct assessment technologies can be usefully applied in conjunction with hydrostatic testing or ILI, particularly in conjunction with hydrostatic testing where little if any knowledge is gathered regarding the nature of the threat. For example, the application of SCCDA could help an operator decide whether an assessment for SCC is necessary.

## 9.5   Repair Methods

Anomalies exposed for direct examination on the basis of engineering critical assessments that are found to be injurious to pipeline integrity should be repaired by an acceptable repair method. Acceptable repair methods for a wide variety of defects are described in various industry standards and documents such as ASME B31.4, the *PRCI Repair Manual,* API RP 1176, and CSA Z662. Alternatively, the pieces of pipe containing injurious defects may be cut out and replaced with sound previously hydrostatically tested pipe (see Annex C). The tie-in welds for the replacement pipe should be radiographed or ultrasonically inspected. As a temporary mitigative measure or to protect personnel conducting a repair, the operator may choose to reduce the operating pressure of the pipeline. When a pressure reduction is employed to mitigate the effects of an anomaly, the time limit before a permanent repair should be made and calculated in accordance with the method shown in Annex D. Acceptable repair methods include but are not necessarily limited to:

— pipe replacement,

— full-encirclement split steel sleeves,

— steel compression sleeves,

— composite wrap repairs,

— mechanical clamps,

— deposited weld metal.

Annex C provides descriptions for several different repair strategies. The applicability of each of these repair strategies to the various types of anomalies can be found in several different industry standards and documents. Repair methods that might not be suitable for a permanent repair may be appropriate as a temporary repair. Note that pipe replacement is an acceptable permanent solution. For relatively shallow defects (defects that decrease the wall thickness by an amount equal to the manufacturing tolerance applicable to the pipe), removal by grinding, followed by nondestructive examination to ensure the absence of cracks, is an acceptable repair. Grinding and inspection to

ensure the absence of cracks is generally acceptable for defects up to 40 % of the actual wall thickness, if the length of the ground-out area does not exceed the allowable length based on the maximum depth of grinding determined by ASME B31G.

Operators should consider the quality and material properties of a pipe's ERW seam when conducting grinding operations.

# 10   Reassessment Intervals

## 10.1   General

Pipeline integrity assessment and remediation as described in Section 9 establishes the integrity of a pipeline segment at a given point in time. Some of the threats to pipeline integrity are time dependent as noted previously. Reassessment of the integrity of a pipeline segment subject to an anomaly growth mechanism should be carried out at appropriate intervals to minimize the risk of a pipeline failure caused by a flaw that was too small or was under the reporting size criteria detected in the last assessment. The appropriate interval for reassessment in the case of a time-dependent flaw growth mechanism depends on the failure pressures of the anomalies established by the most recent integrity assessment, an FPR less than 1.1, or the maximum calculated surge pressure of the pipeline, and the rates of growth of the flaws. Section 10 and Annex D provide guidance for pipeline operators in establishing representative growth rates and for calculating reassessment intervals. It is incumbent on the operator to confirm the applicability of the growth rates or methodologies that it is applying, realizing that circumstances associated with anomalous environments (e.g. high temperature, microbially induced corrosion (MIC), CP shielding) may lead to non-conservative results.

## 10.2   Anomaly Growth Rates

### 10.2.1   General

The pipeline operator should establish the actual effective growth rates for every growth mechanism that affects any segment that is to be considered for reassessment. Some techniques for determining growth rates are described below. Alternatively, if the operator cannot establish the actual effective growth rates, default rates may be available from other standards as explained below.

### 10.2.2   Linear Growth Rates

It is customary to assume that flaws created by external and internal corrosion and SSWC grow deeper linearly with time even though in reality these processes are likely to be intermittent. In other words, if the pit depth is $d_1$ measured at time $t_1$ and its depth increases to $d_2$ at a later time $t_2$, it is customarily assumed that the growth rate of the corrosion is $(d_2 - d_1)/(t_2 - t_1)$ at that pit. An operator therefore may establish the actual effective rate of external or internal corrosion at the location of any given point where the particular phenomenon has occurred by comparing the depths of a pit as seen in two successive ILI runs after measurement errors are taken into account. Comparing a large number of pits in this manner may indicate a range of anomaly growth rates wherein the worst-case rate may be established from the distribution of rates with an appropriate degree of confidence. If only one ILI run is available or if only pit depth measurements made at specific locations are available, the 80 % confidence level, worst-case anomaly growth rate can be established from the family of pit depths determined by the tool or by means of physical measurements taking into account measurement errors by a Monte Carlo simulation using an appropriate distribution of corrosion starting times. If the Monte Carlo technique is applied in the case where actual pit depths are determined from a few excavations instead of from ILI data covering the whole segment, the pit growth rate determined should be conservatively increased. Approaches can include increasing the growth rate by a factor of 2 or 3 standard deviations above the mean growth rate from the Monte Carlo estimate or doubling the mean growth rate.

Actual external corrosion rates at specific locations along a segment also may be determined by means of buried coupons or linear polarization resistance measurements. These measurements should be taken at sufficient locations to represent the corrosion conditions along the segment.

If the pipeline operator is not able to determine the actual effective rate of external corrosion, a credible default value may be selected using the criteria stated in ASME B31.8S-2010, Appendix B, Table B-1. Those criteria are reproduced in Table 4.

### Table 4—Corrosion Rates Related to Soil

| Resistivity (from ASME B31.8S-2010) | |
| --- | --- |
| Corrosion Rate mils/year | Soil Resistivity ohm-cm |
| 3 | >15,000 and no active corrosion |
| 6 | 1000 to 15,000 and/or active corrosion |
| 12 | <1000 (worst case) |

If the operator has not determined the actual effective rate, has no information concerning soil resistivity, and has reason to suspect that unusually aggressive corrosion mechanisms are present, such as stray currents or MIC, a default rate of 16 mils per year should be assumed (see NACE SP0502).

Actual internal corrosion rates at specific locations along a segment may be determined by means of coupons or electrical resistance change measurements taken through hot tap fittings. These measurements should be taken at locations where internal corrosion is most likely to occur along the segment (i.e. places where water and solids are likely to accumulate).

Periodic seam integrity assessments should be conducted for any segment that has experienced either an in-service or a hydrostatic test failure from SSWC. As in the case of external or internal corrosion, the rate of SSWC (external or internal) is customarily assumed to be constant (i.e. varies linearly with time). The rate of corrosion at the bondline of an ERW or FW seam will be higher than that of the immediately adjacent base metal if SSWC is occurring. The ratio of the corrosion rate in the bondline to that in the base metal is referred to as the "grooving" ratio, and grooving ratios as high as 4-to-1 have been observed.

If the segment is bare or poorly coated and is inadequately cathodically protected, susceptibility to SSWC should not be ruled out without additional supporting data. If deemed susceptible, a seam integrity assessment is needed. whether periodic assessment is needed depends on the outcome of the seam integrity assessment. If pressure test leaks or test breaks occur because of SSWC anomalies or if SSWC anomalies are found by ILI, periodic seam assessment should be conducted. SSWC appears to occur irrespective of the operating stress level of the pipeline; therefore, even low-stress pipelines comprised of materials with susceptible seams should be investigated with respect to exposure to SSWC.

If the pipeline operator has no way to determine the actual effective rate of SSWC, a default rate could be based on the worst-case known rates of external and internal corrosion for the segment multiplied by the grooving ratio. If the grooving ratio is unknown, the pipe body corrosion rate should be multiplied by 4 to establish the rate for SSWC reflecting the highest grooving ratio that has been commonly seen in ERW line pipe materials that are susceptible to SSWC.

### 10.2.3   Non-linear Growth Rates

Fatigue crack growth and growth from environmental cracking are non-linear. API RP 1176 provides guidance on calculating growth rates for these threats.

Laminations have the potential to grow in the presence of hydrogen from CP systems or sour crude. Lamination growth from hydrogen is also referred to as hydrogen blistering or bulging. Growth rates for hydrogen blisters can depend on several factors including the hydrogen evolution rate, amount of hydrogen present and properties of the steel, and can be difficult to determine. One effective method to establish a growth rate can involve aligning data from

ILI and deformation tools to determine if internal bulging has occurred at a lamination and how much the internal deformation has changed between two ILI runs.

## 10.3   Establishing the Reassessment Interval

Generically, establishing a reassessment interval to deal with a time-dependent threat to pipeline integrity requires calculating the failure pressure of the worst-case flaw remaining in the segment after an initial assessment and determining the time it will take for the flaw to reach a size that will cause failure at the MOP. Calculating failure pressures require the use of a failure-pressure-versus-flaw-size model as discussed in Annex D. The time for the failure pressure of a growing flaw to decay from the benchmark value established by the last assessment to the MOP depends on the rate of growth. Since it is not prudent to allow this entire calculated time period to expire before carrying out a reassessment, a safety factor is embodied in the calculation.

The pipeline operator should establish the lengths and depths of the flaws that remain after an integrity assessment, and the amount of growth that could cause the FPR to decay to 1.1 as described above. The operator should also establish the rate of growth appropriate to the time-dependent growth mechanism as described in 10.2. For anomalies that are believed to grow at constant rates (i.e. linear growth over time) such as external corrosion, internal corrosion, or SSWC, the process described below may be used.

Consider that for long metal-loss defects having uniform depth equal to the maximum depth, given by Equation (1):

$$FPR = \frac{P_{fail}}{P_{op}} = \left(\frac{t_{cor}}{t_{nom}}\right)\left(\frac{S_{flow}}{FS_Y}\right) \tag{1}$$

where

$P_{fail}$      is the failure pressure,

$P_{op}$      is the pipeline design operating pressure,

$t_{cor}$      is the minimum corroded or remaining wall thickness,

$t_{nom}$      is the nominal or design wall thickness,

$S_Y$      is the pipe grade SMYS,

$S_{flow}$      is the flow stress usually taken to be SY+10 ksi, and

$F$      is the design operating factor (e.g. 0.72).

Consider further a corrosion rate, $CR$, measured or estimated in accordance with Section 10.2. The value of remaining wall thickness corresponding to a value of FPR is given in Equation (2):

$$t_{cor} = (FPR)(t_{nom})\left(\frac{FS_Y}{S_Y + 10\ ksi}\right) \tag{2}$$

The response time, $T_{resp}$, is then the difference in time for the $FPR$ to decrease from the value at the time of assessment, $FPR_{ILI}$, to a critical value, $FPR_{crit}$, due to an increase in $t_{cor}$ divided by $CR$ as given in Equation (3):

$$T_{resp} = (FPR_{ILI} - FPR_{crit})\left(\frac{t_{nom}}{CR}\right)\left(\frac{FS_Y}{S_Y + 10\ ksi}\right) \tag{3}$$

The minimum recommended value of $FPR_{crit}$ is 1.1. $FPR_{ILI}$ is determined using the first equation above and $t_{corr} = t_{nom} - td_{ILI}$ where $d_{ILI}$ is the depth of metal loss indicated by ILI. The response time varies with nominal wall thickness, SMYS, operating stress level, corroded wall thickness or repair criterion, and corrosion growth rate. Some illustrative examples are given below.

Consider a pipeline with nominal wall thickness of 0.250, design factor of 0.72, and pipe grade X52. ILI was performed and the operator elects to repair all features that would fail in a hydrostatic test to 100 % of SMYS, so $FPR = 1.00/0.72 = 1.39$. Consider also a corrosion rate of 0.004 in./yr (4 mils per year). Then the response time would be calculated as shown in Equation (4):

$$T_{resp} = (1.39 - 1.1)\left(\frac{0.250}{0.004}\right)\left(\frac{(0.72)(52000)}{52000 + 10000}\right) = 10.95 \text{ years} \tag{4}$$

If the operator instead elects to repair all features that would fail in a hydrostatic test to 1.25 times the maximum operating pressure, corresponding to a hoop stress of 90 % SMYS, then $FPR = 1.25$ and $T_{res} = 5.75$ years. This is shown in Figure 6. The response times for this same pipeline for corrosion features that have more metal loss resulting in lower FPR values can also be read off this curve. If the corrosion rate is 50 % faster (6 mpy), the response time reduces to $^2/_3$ of what it would be at 4 mpy (e.g. 7.3 years at the FPR of 1.39), as shown in Figure 6.

Consider a pipeline of having nominal wall thickness, pipe grade, and corrosion rate the same as the previous example but operating at only 55 % of SMYS, or $F = 0.55$. Using the same repair criterion in which all indications with failure pressure corresponding to a hoop stress of 90 % of SMYS or lower would be repaired, $FPR = 0.90/0.55 = 1.636$, so response time is calculated in Equation (5):

$$T_{resp} = (1.636 - 1.1)\left(\frac{0.250}{0.004}\right)\left(\frac{(0.55)(52000)}{52000 + 10000}\right) = 15.45 \text{ years} \tag{5}$$

Note that $t_{cor} = 0.189$ in, the same as the first example, because the repair criterion of 90 % SMYS is the same. This shows that response time increases as operating stress decreases for the same amount of corrosion because a pipe operating at a lower stress can tolerate larger flaws. On the other hand, if the repair criterion is based on the indicated FPR equal to a test pressure of 1.25 times the maximum operating pressure, response time $T_{resp} = 4.3$ years. Thus pipelines operating at lower stress levels have reduced response time based on a given FPR because the lower-stress pipe can tolerate deeper flaws with less remaining wall thickness which then require less time to corrode to failure.

Consider the pipeline having the same wall thickness and design factor as in the first example, 0.250 in. and 0.72, respectively, but consisting of Grade B material with SMYS of 35 ksi. The operating pressure would be lower, commensurate with the lower grade SMYS. In that case, at a repair criterion of 1.39, response time reduces slightly to $T_{res} = 10.15$ years compared with 10.95 years for the X52 pipe. This is shown in Figure 6 as well.

As a final example, consider a pipeline having operating pressure the same as in the first case, but consisting of heavier-wall pipe due to it being a lower-strength material, Grade B with SMYS of 35 ksi. For a design factor of 0.72, $t_{nom} = 0.375$ in. (rounding up slightly to a standard wall dimension). At an FPR of 1.39, $T_{resp} = 15.2$ years because of the 50 % greater wall thickness.

The examples described herein indicate that a pipeline operator should establish assessment intervals for the specific circumstances of wall thickness, anomaly growth rate, MOP, and minimum failure-pressure-to-MOP ratio achieved by the current assessment in order to determine either when reassessment is needed or when it is necessary to remediate a particular anomaly. The process can be applied to corrosion-caused metal loss, SCC, and SSWC (i.e. to any time-dependent anomaly growth mechanism where it is safe to assume a constant anomaly growth rate). For each particular type of threat other than corrosion-caused metal loss in the body of the pipe the user should account for the effect of material toughness on the sizes of defects that will fail at particular benchmark pressure levels.

# 11   Preventive and Mitigative Measures

## 11.1   General

The preceding sections, Section 9 and Section 10, are focused primarily on integrity assessment and reacting to what is found through integrity assessments to address the time-dependent degradation threats such as corrosion, environmental cracking, SSWC and fatigue growth of flaws. In addition to conducting integrity assessments, a pipeline operator should implement preventive and mitigative measures that reduce the probability of a release or the



**Figure 6—Example Timing for Scheduled Responses**

consequences of a release from these time-dependent threats and from random (time-independent) threats such as third-party damage, equipment failure, and incorrect operations. Section 11 provides guidance for establishing and implementing preventive and mitigative measures to reduce the probabilities of releases and the consequences of releases from all threats.

The process of establishing and implementing preventive and mitigative measures begins with data gathering, data integration, and informational analysis as outlined in Section 7. Data integration and the analysis of the information developed through data gathering often reveal aspects of an operator's operations and maintenance that allow the operator to address the threats to pipeline integrity and reduce the consequences of potential releases. The incident history associated with certain assets or circumstances should be considered. One or more incidents associated with any asset or circumstance may indicate the need for enhanced preventive and mitigative measures associated with the particular asset or circumstance. Some examples for prevention of each threat are shown in Table 5 and for mitigating consequences in Table 6.

In addition to their application to specific problems identified by data analysis and integration, preventive and mitigative measures are needed to address all threats to pipeline integrity, including those that can be assessed as described in Section 9 and Section 10. Threats that cannot be addressed by the previously discussed integrity assessment methods include:

— some manufacturing anomalies (hard heat-affected zones in ERW pipe),

— equipment failure,

— mechanical damage (causing an immediate failure),

— incorrect operations,

— weather and outside force (floods, landslides, subsidence, earthquakes, etc.).

The threat of mechanical damage causing an immediate failure and the threat of failure from weather and outside force are threats that potentially affect all pipelines. The threats of hard spots and hard heat-affected zones affect pipelines constructed with certain older materials that are susceptible to these phenomena. The measures for preventing and mitigating these are addressed in 11.2.1 1through 11.2.3. In addition, Sections 11.2.4 and 11.2.5 present minimum requirements for preventing corrosion, and in 11.3 presents guidance for limiting consequences of pipeline releases by means of leak detection programs, flow restriction devices, and emergency response planning.

Lastly, Section 11.4 discusses the use of reducing operating pressure as a means to ensure pipeline integrity. The preventive and mitigative measures for the threats of equipment failure and incorrect operations can be defined based on data gathering as shown in Table 5. Prevention of equipment failure is a subject to be addressed in a pipeline operator's operating and maintenance procedures. Prevention of incorrect operations should be covered in a pipeline operator's operating procedures and operator training practices.

### Table 5—Examples of Preventive Measures to Address Pipeline Integrity Threats

| Threat | Problems Identified through Data Gathering and Integration | Preventive Measures |
|---|---|---|
| External corrosion | Leak history; external ILI anomalies and/or low cathodic protection readings. | Conduct appropriate cathodic protection and/or stray current surveys. Increase cathodic protection. |
| Internal corrosion | Leak history, internal ILI anomalies; internal UT anomalies; increased corrosiveness of sampled transported fluids; analysis of pigging debris. | Conduct fluid sampling; performance of the corrosion inhibitor injection program; conduct an scraping/swabbing program. Run cleaning pigs more frequently. |
| SSWC, external or internal | Axially oriented anomalies identified with circumferential or helical ILI in a low-frequency ERW seam and low cathodic protection readings. Hydrostatic test failure. | Conduct appropriate cathodic protection and/or stray current surveys. Increase cathodic protection. |
| EAC | Ultrasonic crack detection or EMAT anomalies discovered in a pipe with tape wrap coating. | Increase cathodic protection on pipelines without shielding coatings. Reduce operating pressures and/or temperatures. |
| Manufacturing defects | Ultrasonic crack detection or EMAT anomalies discovered in pipe with a low-frequency ERW seam. | Reduce the magnitude and/or frequency of pressure cycles. Reduce the operating pressure. |
| Construction and fabrication defects | Defective girth weld found in a location with ground movement. | Run inertial mapping unit tool to find possible locations of ground movement. |
| Equipment failure | Seeps or stains in facilities at fittings or flanges. Increase frequency of inspections. | Replace gasket materials at specific intervals or when inspections indicate gasket deterioration. Develop flange torque procedures. |
| Mechanical dam-age with immediate failure | Near hits from landowners not making one-calls. | Install line-of-sight markers, trim right-of-ways more frequently, enhance contact with landowners, or establish agreements not to cultivate. |
| Mechanical damage with delayed failure | Alignment of ILI anomalies with geometric anomalies reveals locations of previous damage to pipelines. | Increase frequency of aerial and foot patrols in areas of frequent new construction. |
| Incorrect operations | Surges caused by poorly coordinated start-ups and unexpected shutdowns from power failures. Third Party valve operations. | Conduct advanced hydraulic studies to optimize start-up procedures and train opera-tors to use the new procedures. Install im-proved electrical gear at remote stations to minimize power outages. |
| Weather and out-side force related defects | River crossing inspections identify exposed pipe due to river scouring. | Install protective mats in some cases or replace crossings with directional drills. |

### Table 6—Examples of Mitigative Measures to Address Consequences

| Consequences | Mitigative Measures |
|---|---|
| Contamination of drinking water aquifer. | Install hydrocarbon detection cable next to pipeline across the aquifer recharge area. Conduct spill drills aimed at rapid containment. Install monitoring wells. |
| Ignition of vapor cloud in populated area. | Educate the public as to the danger of a vapor cloud. Provide emergency phone number to residents. Increase frequency of ILI. Improve emergency response criteria. |
| A release results in large drain-down. | Install EFRDs. Increase frequency of ILI. Improve emergency response criteria. |
| Small leak over time accumulates into large release. | Improve leak detection; increase frequency of ILI; enhance patrol technology. |

## 11.2    Prevention and Mitigation of Threats

### 11.2.1    Mechanical Damage

#### 11.2.1.1    General

To protect a pipeline system from immediate failures caused by mechanical damage, a pipeline operator should establish a program to detect and prevent unauthorized encroachments on the right-of-way of the pipeline system. A damage prevention program should:

— maintain adequate, up-to-date maps of the system,

— participate in a one-call system,

— provide for timely temporary marking of any portion of the operator's system that falls within the location scope of a one-call ticket,

— establish written guidelines for excavators authorized to work on the right-of-way stating and state what procedures an excavator should follow,

— provide a full-time observer while excavation is in progress on or in proximity to the pipeline,

— establish and continue a public awareness program with land occupants, excavators, and contractors,

— maintain adequate permanent pipeline-identifying markers along the right-of-way and trimming and mowing the right-of-way, where permissible, so that they remain identifiable and visible from the air,

— conduct periodic aerial and/or ground-based surveillance of all right-of-ways,

— install continuous markers or physical barriers where appropriate on new or reinstalled segments, or provide providing for deeper burial where appropriate,

— document all detected hits or near misses associated with either authorized or unauthorized encroachments on right-of-ways and investigating the causes for the hits or near misses,

— minimize impacts to critical locations.

See API RP 1166 for additional guidance on excavation monitoring and observation and API RP 1162 for guidance on public awareness programs.

Implementation of an effective damage prevention program requires adequate resources and adequately trained personnel to execute it. A pipeline operator should use qualified personnel that are responsible for the damage prevention program, and should provide the training necessary to ensure that they have sufficient knowledge and skills to understand the elements of damage prevention to be able to execute the program effectively. At a minimum, the damage prevention personnel should:

— be familiar with the pipeline system so that one-call tickets will be screened in a timely manner,

— be able to communicate easily with the appropriate one-call centers,

— be trained in locating underground facilities,

— be able to communicate with excavators, land occupants, emergency response personnel, and the public,

— be trained to monitor excavation and are familiar with the pipelines to which they are assigned,

— be familiar with pipeline surveillance techniques and have the opportunity to communicate with patrol pilots.

### 11.2.1.2   Mapping

A pipeline operator should create and maintain an up-to-date map of each pipeline facility. The maps of appropriate parts of the system should be provided to all one-call centers whose coverage includes those pipeline segments. Alternatively, the operator should indicate to all one-call centers covering regions containing segments of the operator's pipelines, the "grid squares" through which those segments pass (see 11.2.1.3). Preferably, electronic maps should be provided which show each of the operator's pipelines within a corridor of suitable width (e.g. 500 ft on either side of the centerline of the pipeline).

### 11.2.1.3   One-call Systems

States within the United States and many countries require operators of underground utilities to participate in a one-call system. The United States has established 811 as a nationwide one-call number. The purpose of the one-call system is to accept calls from potential excavators and to relay the location, scope, and time of the excavation to each utility having a facility located within a particular square of the grid covered by the one-call system (a typical grid square might be 1000 ft by 1000 ft). The information provided by the excavator is recorded on a document commonly referred to as a ticket. Copies of the ticket are sent to each of the participating utilities to notify them of the location, scope, and time of the excavation. Each notified utility is then responsible for locating and marking their facilities located within the square that could be affected by the excavation. A pipeline operator should participate in a one-call system in every area in which the operator has facilities. The operator should either indicate which of the system's grids contain segments of the operator's pipelines and/or supply the one-call center with up-to-date maps of the pipeline segments.

### 11.2.1.4   Locating and Marking

Upon receipt of a ticket from a one-call center, a pipeline operator should attempt to determine whether the excavation could affect one of the operator's pipelines. If the operator is certain that the excavation will not encroach upon any of the operator's facilities, the ticket should be "cleared," that is, the operator should notify the one-call center that none of the operator's facilities will be impacted or make contact with the excavator directly if the one-call center does not have positive response capability. If the excavation will be on or close to the operator's right-of-way, the operator should promptly locate the pipeline that could be affected and mark its location with temporary markings. The markings should indicate the location of the centerline and size of the pipeline or the sides of the pipeline (or pipelines if it is a multiple-pipeline right-of-way). The operator should renew the markings if they become displaced by excavation or if they become degraded with the passage of time until all excavation activity has ceased.

### 11.2.1.5   Communication with an Excavator and Monitoring an Excavation

The pipeline operator, besides locating and temporarily marking the pipeline, should establish a communication link with the excavator that may involve the following:

— exchange of names of contacts and phone numbers;

— issuance of a written procedure for the excavator to follow that includes a distance-to-the-pipeline limit within which non-mechanical excavating techniques should be used, a description of how any exposed pipe should be supported, and a procedure for back-filling that will avoid damaging the coating on the pipeline or any cathodic protection attachments;

— agreement on a start time and the fact that the operator's observer should be present when excavation is approaching within a specified distance of the pipeline.

Pipeline operators may obtain detailed guidance on how to monitor and observe excavations in API RP 1166.

### 11.2.1.6  Public Awareness

Although a potential excavator may not be aware of the dangers of excavating near a hazardous liquid pipeline, a pipeline operator should establish a public awareness program. Pipeline operators may obtain detailed guidance on how to establish and maintain a public awareness program in API RP 1162.

### 11.2.1.7  Right-of-way Maintenance and Surveillance

As a defense against unauthorized encroachments, a pipeline operator should clear the right-of-way of underbrush, tall weeds, trees, and canopy (where permissible). Keeping the right-of-way clear in this manner facilitates aerial surveillance, alerts land occupants and others to presence of a pipeline corridor, and increases the likelihood that anyone happening onto a right-of-way will see one or more permanent markers indicating the presence of an underground pipeline.

A pipeline operator should regularly conduct surveillance of each right-of-way, either by aerial patrol or other ways such as ground patrol. When using aerial patrols, operators should consider the use of a separate observer in addition to the pilot to improve the effectiveness of this type of right-of-way surveillance.

Alternatively, a pipeline operator may decide to patrol certain right-of-ways on foot or use of a vehicle.

### 11.2.1.8  Permanent Markers, Warning Techniques, and Physical Barriers

A pipeline operator should install permanent markers to alert anyone approaching a pipeline right-of-way that a pipeline is present. For guidance on the appropriate design of pipeline markers including where to put them and the types of information that should be provided on the markers, the operator should consult API RP 1109.

A pipeline operator may consider installing physical barriers such as concrete slabs above the pipeline to protect it. Alternatively, the operator may elect to bury a warning tape or plastic mesh above the pipeline to alert an excavator to the presence of a buried pipeline. These measures, if desired, can usually only be taken in conjunction with the construction of a new pipeline or the relocation of an existing pipeline. A pipeline operator may also consider lowering an existing pipeline by exposing and reburying it at a deeper depth. This may be necessary where a new road or railroad is being built over an existing pipeline. Another option is performing a depth of cover survey and proactively lowering shallow pipe in actively tilled land or areas where significant construction activity is occurring, planned or expected.

### 11.2.1.9  Documenting Hits and Near Misses

To determine which damage prevention techniques are the most cost effective, it is helpful to study and evaluate past mechanical damage hits and near misses. By understanding how these hits or near misses occurred, pipeline operators will be able to focus resources on the preventive techniques that are the most effective. In North America, the Common Ground Alliance has established a formal, but voluntary, damage incident reporting tool (DIRT). An operator of an underground facility who wishes to participate in this effort is asked to document each hit or near miss in conjunction with any excavation that takes place on, above, or immediately adjacent to the facility whether authorized or unauthorized. Analyses of these data have helped to identify when and how preventive measures either work as intended or fail to do their job. As this effort continues, it is reasonable to expect that pipeline operators will learn which preventive measures are the most effective.

Case 2:26-cv-05242-SVW-SSC    Document 26    Filed 05/14/26    Page 494 of 1309   Page ID #:13045

### 11.2.2  Manufacturing Defects

#### 11.2.2.1  Hard Spots and Hard Heat-affected Zones in Line Pipe

Pipeline operators have dealt successfully with round or oval hard spots in the body of the pipe by locating them with ILI magnetic tools and eliminating them or shielding them from cathodic protection. Currently, there is no ILI technique available that can locate the narrow hard zones adjacent to some ERW bondlines. Pipeline operators that experience the latter phenomenon generally had to bar the transport of sour crude or to monitor cathodic protection levels, and to limit them to levels that are adequate to prevent corrosion, but not so high as to generate excessive amounts of hydrogen at coating holidays.

#### 11.2.2.2  Defective Pipe Seams

Pipeline operators can effectively manage longitudinal seam weld cracking by conducting periodic hydrostatic test assessments or inspecting pipelines with crack detection ILI tools, and performing excavations to repair cracks that might be service limiting. Operators can take measures to reduce the magnitude and/or frequency for pressure cycles as well as reevaluate pressure data on a regular basis to determine that no appreciable change in operation has occurred. If changes have occurred, the operator may need to conduct additional assessments or at a minimum, update remaining life calculations to reflect these operational changes. Additional guidance is provided in Section 16 of API RP 1176.

### 11.2.3  Weather and Outside Force Damage

A pipeline operator should attempt to prevent or mitigate the damage from weather events such as extreme cold, high winds, and flooding, and from geophysical events such as landslides, land erosion, or subsidence that could cause releases. Preventive or mitigative activities that an operator should consider are:

— inspecting drain valves and pipe extensions before cold weather arrives to eliminate water that will freeze and could cause breakage;

— monitoring river crossings for exposed pipe in crossings or at riverbanks;

— shutting down and, if feasible, purging pipeline segments that could be damaged by impending hurricanes or floods;

— providing for movement of the pipeline to occur without damaging the pipeline at seismic fault crossings, unstable slopes, or areas of subsidence;

— training patrol pilots to spot areas of developing soil instability, landslides, and subsidence;

— conducting patrols as soon as feasible after the passage of severe weather or flooding;

— routinely gathering updated GIS data regarding fault zones, land use, etc.

API RP 1133 provides detailed guidance for managing waterway crossings and hydrodynamic hazards under a risk-based approach.

### 11.2.4  External Corrosion

All buried steel pipelines should be protected from external corrosion by the installation of a protective external coating and an adequate cathodic protection system. NACE SP0169 provides minimum criteria for applying cathodic protection to mitigate external corrosion of a buried steel pipeline. Cathodic protection should also be applied to an existing pipeline whether it is coated or bare. Pipeline operators should follow NACE SP0169 regarding the minimum level of protection that should be maintained on an existing pipeline. Cathodic protection levels should be monitored

at least once every 365 days. The levels of protection should be determined by making pipe-to-soil potential measurements at test leads typically located at intervals frequent enough to obtain electrical measurements indicating the adequacy of cathodic protection.

At areas where the potentials fall below the levels indicated by NACE SP0169, the operator should investigate the cause of the low potentials and mitigate them. Mitigation should consist of bringing the cathodic protection levels into compliance with the levels specified in NACE SP0169 either by making sufficient repairs to the coating and/or by increasing the current outputs of existing anodes or adding anodes to increase the current output necessary to achieve the recommended levels. A pipeline operator may also find it useful to employ one or more of the ECDA techniques described in 9.4 to enhance the mitigation of external corrosion of a given pipeline segment.

Thermal insulation and some coating systems can decrease the effectiveness of CP systems. In addition, elevated temperatures can increase corrosion growth rates and the cathodic potential required to inhibit corrosion.

Induced AC corrosion has become better understood and should be controlled. For information on mitigating induced AC corrosion, see NACE 35110 and NACE SP0177.

Similar prevention and mitigation methods as discussed for external and internal corrosion can also be applied for SSWC of ERW seams such as installation of a protective coating and an adequate cathodic protection system for external corrosion.

## 11.2.5  Internal Corrosion

If the fluid being transported in a pipeline has the potential to corrode the internal surface of the pipeline, the operator should determine the nature of the corrosion that could occur and should take adequate steps to mitigate it. The most common form of internal corrosion arises in conjunction with the holdup of water or the deposition of sediment, or both. These phenomena are functions of the fluid characteristics and the flow velocity, and the elevation profile. The operator can monitor critical locations by installing coupons or resistance-change devices, or by measuring wall thickness to detect loss of metal. Mitigative steps include:

— injecting or batching a suitable chemical control,

— frequently cleaning with cleaning pigs to remove sediment and water,

— maintaining a flow velocity to entrain water and sediment,

— flushing dead legs or valve bodies,

— preventing oxygen ingress to the pipeline by careful control of non-standard operations.

A pipeline operator may also find it useful to employ one or more of the internal corrosion direct assessment (ICDA) techniques described in 9.4 to enhance the mitigation of internal corrosion of a given pipeline segment. See also NACE SP0208 and NACE SP0106.

## 11.2.6  Environmentally Assisted Cracking

## 11.2.6.1  Stress Corrosion Cracking

Pipeline operators effectively manage SCC by conducting periodic hydrostatic test assessments or inspecting pipelines with crack detection ILI tools and performing excavations to repair cracks that might be service limiting. Other preventive measures may include improving or upgrading cathodic protection systems for lines that do not contain a shielding coating like polyethylene tape or shrink sleeves, reducing operating temperatures, or reducing the operating pressure. Additional guidance is provided in Section 16 of API RP 1176.

### 11.2.6.2   Hydrogen-induced Cracking

Hydrogen-induced cracking (HIC) can occur in hard spots or at internal discontinuities such as laminations or large inclusions. Controlling the amount of hydrogen present (i.e. adequate CP system control) in the environment and eliminating hard spots (see 11.2.2.1) can be used to prevent or mitigate HIC.

### 11.2.6.3   Sulfide Stress Cracking

Pipelines that transport wet, sour products or are in other sulfidic environments can experience sulfide stress cracking (SSC). Therefore, methods to prevent SSC include removing moisture from sour products, lowering the sulfur content of such products, reducing operating stress levels, or locating and removing materials with hard microstructures.

### 11.2.7   Construction and Fabrication Defects

A pipeline operator can prevent construction and fabrication related defects by having an effective quality management system in place during construction that focuses on planning, specifications, proper installation procedures, inspections, documentation, and continuous improvement. API RP 1177 details how to create and manage a quality management system for new construction.

Where construction and fabrication defects may enter service, prevention and mitigation measures may include above-ground surveys to detect locations of coating damage or monitoring for locations with high axial stress.

### 11.2.8   Equipment Failure

Prevention or mitigation measures for equipment can include regular visual inspections for corrosion, leaking gaskets, leaking seals, stripped threads, and valve packing leaks. Specific equipment components that experience wear and tear, such as bearings and seals, should be placed on a preventative maintenance schedule. Ultrasonic and radiographic wall thickness measurements can also be combined with visual inspections to monitor for corrosion on certain pieces of equipment such as dead legs, drain lines, relief lines, and at supports and hangers. Operation of mainline valves and overpressure protection devices should also be verified on a regular basis.

### 11.2.9   Incorrect Operations

Prevention and mitigation measures for incorrect operations can include employee and contractor training and qualification to ensure they are technically qualified to perform the work for which they are assigned. Refresher training as well as regular dissemination of the causes of near miss or incident reports can also serve as a way to reduce incidents related to incorrect operations. Robust procedures that are updated on a regular basis, followed by training of personnel, and simple to use systems will facilitate proper use by employees and contractors.

## 11.3 Mitigating the Consequences of Unintended Releases

### 11.3.1 General

An IMP should contain protocols for detecting leaks and for limiting the consequences in the event of an unintended release. Elements of the plan should describe the methods and procedures for:

— minimizing the time required for detection of a release,

— minimizing the time required to locate a release,

— minimizing the volume that can be released,

— minimizing emergency response time,

— protecting the public and limiting adverse effects on the environment.

API RP 1130 and RP 1175 detail leak detection programs and methods.

### 11.3.2 Reducing the Time to Detect and Locate Unintentional Releases

A pipeline operator should select, install, and maintain a leak detection system or systems appropriate for the length and size of the pipeline, the type of products within the pipeline, and the spill scenarios for critical locations developed in Section 6. The abilities to detect a leak of a certain minimum size and to locate where such a leak has occurred depend on the type of leak detection system or systems employed. The leak detection methods and their characteristics are summarized in Table 7. Brief descriptions of leak detection methods are presented below.

A pipeline operator may find it advantageous to employ a combination of these methods. For example, the computational methods could be augmented by a volume balance approach or tracer chemicals or a stand-up test, or a combination thereof, could be used on occasion as a check on the real-time methods. In any case all real-time leak detection systems should be tied to the SCADA system, and the operating personnel should be well-versed as to the nature, characteristics, and operation of each leak detection system.

#### 11.3.2.1 Isolation and Control of a Release

If a release is suspected or has been confirmed, the pipeline should be shut down. An exception to this would be leaving a pump station in operation if it is pulling product away from the release site. Shutting down the system and/or pumping product away from the release limits the subsequent volume of the release to the gravity drain-down volume (or vaporization of a HVL). The pipeline operator should locate and isolate the release as rapidly as possible to further limit the quantity of the release by minimizing gravity drain-down (or the size of the vapor cloud in the event of the release of an HVL).

Manually closing block valves may aid in limiting the gravity drain-down volume. Operators should consider installing block valves or check valves in appropriate locations to minimize spills. Emergency flow restriction devices such as remote control valves, automatic valves, or check valves can be employed to further limit the gravity drain-down volume. Automatic valves should be employed only in situations where normally expected transients will not cause them to close when there is no leak.

It should be noted that adding additional valves to a pipeline right-of-way may increase the risk of certain threats such as pipeline overpressurization during rapid valve closure or the risk of leaks from improperly installed or maintained valves. The potential increase in risk associated with the addition of new valves should be considered in a manner consistent with considering other risk factors.

## Table 7—Leak Detection Methods

| Method | Locates Leak | Availability | Beneficial Feature | Biggest Limitation |
|---|---|---|---|---|
| Periodic auditory, visual, and olfactory inspections | Yes | Periodic | Simplicity | Delayed recognition of leak between intervals |
| Volume balance | No | Intermittent based on comparison time | Simplicity | Transients tend to cause false alarms |
| Dynamic flow modeling | Yes, if analysis is done | Continuous even when transients are present | Best method to detect small leak rapidly | Complexity and cost |
| Tracer chemical | Yes | Can be either continuous or one time | Accurately locates small leaks | Must add something to the product and requires air sampling |
| Release detection cable | Yes | Continuous | Accurately locates small leaks | Next to impossible to retrofit to an existing pipeline |
| Shut-in leak detection | No | Periodic | Simplicity | Requires shutting off flow and accurate pressure monitoring |
| Pressure point analysis | Yes, if multiple points used | At the sampling rate except during transient operation | Simplicity | Not suitable for large pipelines or compressible fluids |
| Acoustic leak detection | Yes | Continuous | Direct measurement of leak location and rate | Implementation complexity and cost |
| | | Periodic | | Operational restrictions |

### 11.3.3  Emergency Response

The operator should implement a response management system that provides a sufficient and timely response to releases and spills. The operator's response management system should include:

— response planning requirements (including response plans and planning during response);

— training and drills;

— response activation (including discovery, internal and external notifications, and resource mobilization and deployment);

— performance measures;

— consider equipment, spares, material, consumables etc., strategically located near a pipeline needed to cover a leak or rupture scenario,

— continual improvement.

NOTE    The operator may receive notice of a release or spill from a variety of sources, including leak detection systems, notification by field personnel, reports from the public, or other third-party sources.

Operators of onshore hazardous liquid pipelines (including operators of pipelines that transport highly volatile liquids) should refer to API RP 1174 and applicable regulations for guidance on emergency response management systems, planning, training, and activation.

## 11.4   Reducing Pressure

A reduction in operating pressure can be used to lower the risk associated with threats to pipeline integrity that are hoop stress related (i.e. corrosion-caused metal loss, SCC, SSWC, mechanical damage, or the growth of a flaw through fatigue). A pressure reduction can be either permanent or temporary. If operators are unable to meet repair or reassessment deadlines, they should implement a temporary pressure reduction. If an operator chooses to employ a pressure reduction, the amount shall be determined in the same manner as discussed in Section 9.

## 12   Integrity Management of Facilities

### 12.1   General Considerations

Integrity management can be more complex for facilities than for mainline pipe due to the different functions that facilities serve and to the variation of equipment in service. Because the piping and operation of facilities are distinctly different from that of mainline pipe, the threats at facilities such as pump stations, terminals, and loading facilities are characterized and grouped in a different manner than they are for mainline pipe. Experience suggests that facilities incidents typically involve small volume releases that are contained on site. Large-volume releases (greater than 50 barrels) in facilities are less likely. The attributes of facilities piping that distinguish it from mainline piping and the need to be considered in the management of its integrity are:

— relatively low operating stresses, except downstream of pump discharge or at booster stations,

— multiple types and sizes of piping and tubing,

— smaller sizes of pipe often joined by non-welded fittings,

— branches of the system that are used infrequently leading to low or intermittent flow,

— the majority of the system installed above ground on supports,

— above-ground and below-ground piping sometimes covered with insulation,

— piping configurations that result in "trapped space" i.e. dead legs where water may accumulate,

— difficult to inspect and unpiggable piping,

— the location within a facility where access is controlled by the operator and often protected with secondary containment.

### 12.2   Facility Threat Assessment

#### 12.2.1   Facility Piping and Equipment Threats

The hazardous liquids industry's pipeline performance tracking system (PPTS) has studied facilities piping and equipment releases and several advisory bulletins have been issued. These advisory bulletins, which identify the



primary threats to facilities piping and equipment include but are not limited to:

— external corrosion at supports or hangers, at soil-to-air interfaces, corrosion under insulation (CUI), CP interference;

— internal corrosion from trapped water or sludge particularly with crude oil-types of piping most susceptible are drain lines, relief lines, low points, intermittently used facility lines, stub lines, and "dead legs" that experience low or intermittent flow of product;

— internal erosion and corrosion/erosion;

— environmental cracking associated with the transport of fuel grade ethanol and SCC;

— manufacturing defects including seam and equipment body defects;

— construction and fabrication defects including installation girth weld failures;

— equipment failure including pump seal, packing, gasket, and o-ring failures, control or relief equipment failures, external fitting leaks; improper support of piping spans, flanged or other connection leaks;

— mechanical damage and vandalism causing an immediate or delayed failure;

— incorrect operations including overpressure from transients or thermal effects, tank and sump overfills, incorrect valve positions, improperly installed equipment or fittings in small bore tubing and pipeline (<2 in. nominal pipe size), operator errors;

— weather and outside force defects including freezing of trapped water, potentially from hydrostatic testing, in fittings or small diameter piping (especially <3 in. nominal pipe size), ground movement, and settlement.

There are several techniques that can be used to identify threats at a particular facility including SME based identification, checklists, Hazard Identification (HAZID), Hazard and Operability Study (HAZOP), What-If Analysis, reliability centered maintenance (RCM), and failure modes, effects, and criticality analysis (FMECA).

More detailed descriptions of the facility piping and equipment threats are provided in Annex G.

### 12.2.2   Time Dependent Interactions

Operational or environmental conditions can act on resident features in facility piping or equipment to cause degradation over time. For example, some of the facility piping and equipment threats listed in 12.2.1 can experience fatigue from vibration, thermal cycling, or pressure cycling which needs to be considered as part of a facilities integrity management program.

## 12.3   Gathering, Reviewing, and Integrating Data

### 12.3.1   Data Elements

The types of data that are useful for integrity management of facilities include but are not limited to:

— Scope of facility integrity management program;

— Type of facility (pump station, metering, storage, mainline valve, etc.) and its location;

— Products transported or stored;

— Piping and Instrumentation Diagrams (P&IDs) and Process Flow Diagrams (PFDs);

— List of equipment and piping, including location, age, material of construction, and construction documents (MTRs, NDT reports, pressure test records);

— Throughput and storage capacity;

— Operating conditions including design limits, product corrosivity (including impurities), operating history;

— Inspection and maintenance history including monitoring locations, repair history, maintenance and inspection records, pressure test records;

— Failure history (incidents and near misses).

The pipeline operator should conduct a thorough review of the incident history of the facility and of facilities with similar designs and characteristics. Operators should also consider industry incident history such as the PPTS Operator Advisory 2009-5, NTSB Reports and PHMSA Advisories. The focus of mitigative actions to prevent releases at facilities should be on the highest threats that are known to have caused releases in the past. In addition, any near misses or incidents that required repairs to facilities and reconstruction of certain components should be studied. Lastly, other common facility incident causes that have not caused failures or near losses but are probable for a facility should also be considered.

### 12.3.2   Data Integration

Data integration is the process of combining multiple pieces of information to gain a better understanding of overall facility integrity. Examples of data integration for managing integrity for pipeline are provided in 7.3. Although ILI is not regularly conducted for facility piping, the results from NDE can be integrated with knowledge about facility cathodic protection effectiveness, evidence of corrosion from visual inspections, operating temperatures, low-flow locations, and product corrosivity to indicate where the corrosion threat might be more severe. Data from routine equipment inspections can also be integrated with operational knowledge to determine where threats may be more severe from vibration, wear, improper installation, and mechanical damage.

## 12.4   Facility Risk Assessment

A general approach for facility risk assessment should start with high level screening to prioritize facilities by top integrity-related threats, consequences, or risk scenarios. Example parameters that can be used for the screening process include tank sizes, throughputs, product types, proximity to populations or sensitive environmental areas, and business impacts. After all facilities are evaluated with a high-level screening, this can be followed by a more detailed, facility-specific risk assessment to prioritize where assessments or routine maintenance is needed, and how often. Example facility-specific risk factors include severity of service, flow rates, frequency of usage, low points, prior failure history, inspection coverage and frequency, knowledge of piping or equipment condition from inspections, credible damage mechanisms, and rate of deterioration.

Facility risks differ from pipeline risks since most equipment and piping is above ground and may operate at lower pressures; similar risk assessment methods as discussed in 8.2 can be applied to determine facility risk. Characteristics of these risk assessment approaches are discussed in 8.3 and are also relevant, except that facilities are fixed locations rather than linear assets like pipelines.

## 12.5  Facility Integrity Assessment

With a multitude of approaches for facility integrity assessment, it is important for operators to develop a standardized approach to inspection practices for use throughout their facilities. The initial step, as discussed previously, is for operators to identify and document the threats that may be present as well as potential threats so that the operator can effectively manage the integrity of individual circuits or systems within a facility. Systems that can be susceptible to multiple threats may require multiple integrity assessments to fully evaluate the integrity. As inspection technologies improve with time, operators are encouraged to evaluate and adjust their inspection program. Appropriate measures should be taken upon discovery of threat severity, consistent with established practices as well as any regulatory requirements.

One example of a systematic approach that could be used by the operator is to develop inspection isometric schematics. These schematics can be used to inventory the facility piping operating characteristics and pipe properties, and equipment circuits as well as help identify the risk reduction opportunities based on inspection technology capabilities coupled with inspection frequencies.

More thorough guidance is available in documents such as API 570, API 2610, and API 2611. Operators should conduct periodic visual and NDE to ensure that necessary elements of a facility are inspected. Elements to be considered for inspection at recurring intervals should include the following:

— Valves and flanges:

— Review valve and flange leak history;

— Examine for signs of leakage such as stains;

— Examine studs and nuts for looseness or corrosion; torque nuts to manufacturer specifications;

— Ensure threads extend through and beyond nuts;

— Ensure flanges are aligned according to procedures;

— Examine gasket condition;

— Confirm that buried flange connections are not leaking.

— Threaded, compression, or flared fittings:

— Examine for signs of leakage, misalignment, corrosion, or mechanical damage; and

— Ensure that the piping schedule (wall thickness) of threaded nipples provides adequate structural integrity.

— Vibration:

— Examine for observable oscillation;

— Examine for excessive overhung weight;

— Evaluate for inadequate support;

— Examine for loose supports that could cause metal wear.

— Dead legs:

— Eliminate, isolate, or drain identified dead legs, if possible;

— Purge with nitrogen;

— Ensure that an established and periodic flushing procedure is followed;

— Develop a method to assess the integrity of the dead leg (e.g. wall thickness measurements).

— Drain lines and relief lines:

— Measure wall thickness at low spots;

— Purge water from low spots each year before start of freezing weather;

— Verify buried piping has adequate CP;

— Where feasible, flush with product, potentially containing inhibitor or biocide, or both.

— Supports:

— Examine for missing shoes;

— Examine for hanger distortion or breakage;

— Evaluate brace distortion or breakage;

— Tighten loose brackets;

— Examine for metal wear or corrosion at support contact.

— Coating:

— Examine for general coating or paint deterioration;

— Evaluate soil-to-air interface for missing or deteriorated coating.

— Insulation:

— Evaluate for damage or penetrations;

— Note and correct missing jacketing or insulation;

— Replace deteriorated end seals;

— Examine for bulging, sagging, and buckling;

— Repair broken or missing banding.

— Casings:

- — Modify both ends of the casing extending beyond the ground line, if practical;

- — Verify that the pipe and casing are not metallically shorted.

— Signs of leakage or seepage.

In addition to these scheduled external inspections by inspection personnel, other personnel who frequent the facility should be observing and reporting deterioration, changes to the facility, or other irregularities.

### 12.5.1   Visual/Surveillance

External visual/surveillance inspections are performed to assess for abnormal physical conditions of a facility such as missing or degraded insulation, deteriorated coating, misalignments, evidence of corrosion, excessive vibration, and leakage. An operator may choose to incorporate visual inspections of specific facility equipment on a monthly or more frequent basis per API RP 570.

Regularly Scheduled Walkaround—Typically consists of a visual inspection using a predefined list of equipment or tasks to capture the physical condition of the facility. Items on the list may include observations of rotating equipment, pipe supports, air-to-soil interface coating condition, vibration, leaks, misalignment, paint condition, and tank appurtenances.

Focused Visual Walkarounds—Typically, the inspection is performed by a certified ASNT level inspector, and a formalized report is provided that describes the various individual facilities and descriptions of their physical condition, including photographs. An example of this type of report is provided in Annex H.

### 12.5.2   Leak Detection

When selecting a leak detection technology and establishing programmatic drivers, an operator should consider various factors which include objectives, monitoring capabilities, leak repairs, environmental reporting, and understanding the technology's capabilities and limitations. Each leak detection system should be evaluated based on the following:

- — sensitivity to small leaks;

- — accuracy in distinguishing leaks from spurious signals;

- — reliability to identify leaks for many years without maintenance or calibration;

- — robustness to withstand adverse conditions;

- — adaptability to many environments;

- — detection limitations.

An operator's response to potential releases should be based on these parameters. Common leak detection approaches are discussed in the following paragraphs.

Tracer Gas—This methodology uses specifically tuned detection equipment that is sensitive to trace amounts of an inert chemical not otherwise found at the facility which is added to the product at low concentration levels. Tracer gas detection is accomplished by sampling vapors with probes placed throughout the facility or by using handheld units during facility walkthroughs. Since the probes are dispersed along facilities, detection of a leak at a specific probe(s) can also help pinpoint its location. This method can be used during normal operation and does not require service

interruption while the test is being performed. A variety of tracer gas inoculations can also be used to differentiate which component might be leaking.

Cameras—Various types of specialized video cameras can be used at facilities to monitor operations and identify leaks but generally require humans to view and interpret the video images. Specific gases such as hydrogen, methane, carbon monoxide, and carbon dioxide can be detected by optical gas imaging (OGI) cameras where a leaking gas plume appears in real time as a smoke-like cloud from the leaking components. In addition, escaping hot gases and local cooling caused by expansion of gases from high-pressure systems can be detected by infra-red (IR) cameras. Factors that could affect the recorded IR image include temperature difference between vapor and background, and distance between the camera and plume source. A protocol for consistent and qualitative OGI surveys has been developed in the Netherlands (Standard NTA 8399).

Acoustic Techniques—As a pressurized system leaks, acoustic energy is emitted that can be detected by sensors in the vicinity of the leak. Acoustic leak detection systems typically use piezoelectric sensors. Sensor tuning and digital signal processing are needed to detect low amplitude leak signals in the presence of more dominant facility noise. This method is not intended to determine leak size but rather is used as a qualitative technique (e.g. a leak is occurring). The system can be susceptible to interferences from mechanical noise (grinding, welding, impact wrenches, compressors, pumps etc.) or electrical noise, and these phenomena could affect the sensor's sensitivity. See ASTM E1211/E1211M-12, *Standard Practice for Leak Detection and Location Using Surface-Mounted Acoustic Emission Sensors.*

Liquid Hydrocarbon Monitors—Fiber optic cable systems detect leaks by monitoring for changes in light transmission properties in the presence of hydrocarbons that contact the cable. Cables must be strategically placed near valves, flanges, pipes and other components with the potential to leak. Another method involves hydrocarbon vapor monitoring sensors at sumps, catch basins, and underground monitoring wells. These two methods directly detect liquid hydrocarbon leaks without the need for tracer gases, temperature changes, or acoustic emissions.

### 12.5.3   Screening Assessments

Guided Wave Ultrasonics (GWUT)—The GWUT method is used to inspect a length of pipe for corrosion and other anomalies with significant circumferential extent. This method is most useful where the pipe is difficult to directly access such as at road crossings, tank dike penetrations, transitioning from above ground to below, penetrating walls or structures, and at pipe supports.

The methodology sends a full circumference ultrasonic (UT) wave through the pipe in the axial direction to detect changes in cross sectional areas of piping (internally or externally). While quantitative measurements of area are provided, this method is considered as a screening method since the length and depth dimensions of corrosion anomalies are not provided in sufficient detail to perform accurate integrity assessments. Other places where GWUT can be used are on above ground locations where full inspection coverage is desired. Screening by GWUT is first applied and then followed up by more specific inspection tools such as radiography, automated ultrasonic testing (AUT), laser scanners, or EMAT to quantify the feature(s) called out by GWUT. One limitation of the technology is that it is not able to detect pin-hole sized metal loss.

Inspection systems use many methods to generate UT waves and listen for the return energy from anomalies including piezoelectric, magnetostrictive, and EMAT. Each system has unique advantages and limitations including resolution of small anomalies and inspection range along the pipe. Inspection range can also be affected by attenuation of the GWUT signal, which can be attributed to coating type, pipe diameter and wall thickness, girth welds, bends, fitting, branch connection, and product in the pipe. For pipe with a thin coating, uniform girth welds, and no fittings or obstructions, an inspection range of a few hundred feet is possible. Some combinations of factors limit inspection range to tens of feet.

There are four references that provide guidance on use of GWUT technologies:

1) ASME *Boiler and Pressure Vessel Code (BPVC)* Section V, Article 19, *Guided Wave Examination Method for Piping*

2) BS 9690-1&2, *Non-destructive testing-Guided wave testing*

3) ASTM E2775, *Standard Practice for Guided Wave Testing of Above Ground Steep Pipework Using Piezoelectric Effect Transduction*

4) PRCI Catalog No PR-306-123740-R01, *Comparative Analysis of Pipeline Inspection Technologies Using Guided Waves and Ranges of Applicability*

Direct Assessment (ACVG/DCVG/CIS/Current Attenuation Survey)—Many of the direct assessment processes used for line pipe can also be applied to facilities. The focus of an ECDA, ICDA, or SCCDA is to identify more probable locations of external corrosion, internal corrosion, or SCC. The direct assessment process can be applied for multiple facility integrity threats by integrating knowledge of the physical characteristics and operating history of a pipeline with the results of diagnostic and direct measurements performed on the pipeline or equipment. A detailed description of the direct assessment process is available in Annex E.

### 12.5.4 Direct Inspection Techniques

Several direct inspection techniques exist to quantify features that can affect the integrity condition of the piping circuits in a facility. Each technique has advantages and disadvantages that the operator must consider while planning an inspection. Multiple inspection techniques may be required to accurately assess the integrity condition of a circuit. The integrity inspection plan should be assessed prior to commencing the job at each site. An operator is encouraged to analyze and define the potential integrity threats that may be encountered so that the inspection instruments selected are appropriate to assess the facility. Techniques on how to perform such tasks are described in API 570, API RP 571, API RP 574, API RP 577, and API RP 2611. These techniques coupled with a robust risk-based inspection (RBI) methodology can form an operator's risk managed inspection program. API RP 580, API RP 581, and ASME PCC-3 are recommended practices that can guide an operator through RBI techniques. A complete inspection equipment list can be reviewed from ASME *BPVC* Section V, Table A-110 Imperfection vs Type of NDE Method. Examples of inspection techniques that can be used are provided in Table 8, with hydrostatic testing included at the end for comparison.

### 12.5.5 Repair Methods

Facility operators should identify the features that require repair as well as determine the extent and timing of a response. Acceptable repair methods for a wide variety of defects are described in Annex C and industry standards and documents such as API 570, ASME B31.4, the *PRCI Repair Manual*, API RP 1176, and CSA Z662. Fitness for service methods to determine response timing include RSTRENG, Modified B31G, or methods described in API 579.

## 12.6 Reassessment Intervals

### 12.6.1 Scheduling Based on Threats

Section 10 and Annex D provide detailed information on anomaly growth rates and determining reassessment intervals. The same methodologies can be applied to facilities. Other useful references for determining growth rates and reassessment intervals include API RP 1176, API RP 2611, API 580, API 581, and API 570.

**Table 8—Direct Inspection Methods Applicable to Facilities**

| Technique | Typical Applications | Advantages | Limitations |
|---|---|---|---|
| UT—thickness gauging | Measures wall thickness. Attenuation and velocity changes in acoustic wave assist in evaluation of materials properties and in-service damage. | — Direct measurement<br><br>— Quick<br><br>— Can be combined with a scanner to produce and image (AUT) | — Requires a liquid couplant<br><br>— Surface must be smooth<br><br>— Limited coverage proportional to the size of the probe |
| UT—flaw detection (shear wave, angle beam, time-of-flight diffraction (TOFD)) | Quantifies and qualifies anomalies such as cracks, crack-like, non-fusion, and slag. | — Direct measurement<br><br>— Quantifies flaw size | — Requires a highly trained inspector<br><br>— A slow process that can be costly<br><br>— Laminations can hide features or cause a false positive call. |
| Radiography | Detection of cracks, voids, inclusions, thickness changes, lack of fusion, incomplete penetration, and corrosion. | — Direct image of flaw (size and location)<br><br>— Permanent record<br><br>— Simple interpretation<br><br>— Applicable to many materials | — Radiation hazard<br><br>— Orientation of flaw affects detection<br><br>— Difficult to apply on complex parts<br><br>— Defect volume (planar vs volumetric)<br><br>— Thickness and pipe diameter limitations |
| Direct Magnetic Particle Inspection (MPI) or Liquid Dye Penetrant Inspection | Finds narrow surface breaking discontinuities, cracks, or porosity. | — Relatively inexpensive<br><br>— Fast and simple to use | — Only finds surface breaking features<br><br>— Depth not provided<br><br>— Requires good illumination and a clean surface |
| Direct Electro-Magnetic Acoustic Transducer (EMAT) | Locates and qualitatively assesses wall loss, corrosion under supports, air-to-soil interfaces, mill related features, cracks, and coating disbondment | — Fast screening tool<br><br>— No liquid couplant needed | — Requires a highly trained inspector<br><br>— Wall thickness must be less than $3/4$ in.<br><br>— Flaw detection sensitivity usually lower than conventional UT |

**Table 8—Direct Inspection Methods Applicable to Facilities (Continued)**

| Technique | Typical Applications | Advantages | Limitations |
|---|---|---|---|
| Laser Scanning | Maps metal loss areas as well as dents with and without metal loss. | — Quick scanning<br><br>— Image quality within a ±50 micron accuracy<br><br>— The system via software can perform fitness for purpose calculations | — Only for surface and volumetric type features |
| In-Line Inspection (ILI) Using Tethered Tools and Robotic Crawlers | Useful when standard free swimming tools are impractical due to piping constraints (e.g. multiple diameters, tight or complex bends or miters, fittings, valve restrictions, low flow or no flow conditions, no launcher or receiver facilities) | — More thorough assessment of pipe integrity.<br><br>— Uses conventional ILI technologies such as MFL, Eddy Current, Ultrasonic, Electromagnetic Acoustic Transmitter, and Geometry | — The technology selected can have limitations that are inherent to any other manual methodology (e.g. crack like features with no volume may be missed using MFL technology or external metal in close proximity will not be detected by UT technology). |
| Hydrostatic Testing | Used as a way to establish MOP or that the piping system is not leaking.<br><br>This method can also be used as a way to remove any features that will not be able to withstand pressures above a certain value of MOP (e.g. MOP × 1.25 or 1.39). | — Simple to use, reliable, and proven | — Can be difficult to administer at an existing facility with multiple manifold connections or lack thereof<br><br>— Does not provide detailed integrity conditions for the piping system<br><br>— Pass/fail test at a specific moment in time<br><br>— Short reassessment intervals (i.e. months) can result |

## 12.6.2  Scheduling Based on Routine Maintenance

Equipment that requires routine maintenance should be included on a maintenance schedule so that it is maintained according to the equipment manufacturer's recommendations or as dictated by the operating conditions. Items may include gaskets, seals, bearings, and lubricating oils. In addition, equipment and incorrect operation threats should be addressed through operating procedures, equipment maintenance and inspection procedures, and operator training and qualification procedures that are reviewed and updated on a regular basis.

Storage tanks are an important part of facilities and tank integrity management is covered under API 653.

## 12.7  Prevention and Mitigation Measures

As discussed in 11.1, data integration often reveals aspects about operations and maintenance that allow an operator to address facility integrity threats and reduce the consequences of potential releases. The incident history associated with certain assets or circumstances should be considered. One or more incidents associated with any asset or circumstance may indicate the need for enhanced preventive and mitigative measures. Some examples of prevention of each facility threat are shown in Table 9 and for mitigating consequences in Table 10.

### 12.7.1  Corrosion (External and Internal)

Facility piping generally cannot be inspected by ILI or subjected to periodic hydrostatic testing. Inspections of facility piping and tubing depends on periodic visual inspection and other methods of indirect or direct assessment, such as the use of ultrasonic and radiographic wall thickness measurements. For additional information, see API 570 and API 2611. Pipeline operators should perform visual and wall thickness measurements more frequently where corrosion rates are known to be higher than average. Each operator should establish periodic inspection programs for the following specific types and areas of deterioration:

— external corrosion at supports and hangers;

— external corrosion at soil-to-air interfaces;

— external corrosion under insulation;

— external corrosion from interference;

— internal corrosion in dead legs, drain lines, and relief lines;

— internal erosion and corrosion/erosion.

In all cases, periodic inspections in conjunction with wall thickness measurements are suggested as ways to monitor these situations. The frequency of inspection can be based on a corrosion rate established from the measured wall thickness loss. In the absence of established corrosion rates, other methods may be used to determine corrosion rates (e.g. a Monte Carlo simulation with distributions of pit depths and corrosion starting times). Models for calculating remaining strength of corroded pipe such as Modified B31G, RSTRENG, or API 579 can be used to predict safe operating pressures on corroded tubing and piping within facilities. Operators should be cautious about using these models alone with piping that is operated at low levels of hoop stress (i.e. less than 50 % of SMYS) because the effect of contact stresses or secondary stresses could cause the failure stress to be less than that predicted by such models. In such cases the operator should consider carrying out a more sophisticated analysis, for example, by using finite element modeling.

Areas suspected to have localized corrosion/erosion should be inspected using appropriate NDE methods that will yield wall thickness data over a wide area, such as UT, GWUT, ultrasonic scanning, radiographic profile, eddy current, or external MFL. The effect of wall thickness loss on facility integrity should be determined using industry approved

**Table 9—Examples of Preventive Measures to Address Facility Integrity Threats**

| Threat | Problems Identified through Data Gathering and Integration | Preventive Measures |
|---|---|---|
| External corrosion | Anomalies detected with NDE methods for wall loss at a piping support and low cathodic protection readings. | Increase cathodic protection. Conduct more frequent inspections. |
| Internal corrosion | Internal anomalies discovered by UT at dead legs, drain lines, relief lines, or low spots. | Inject inhibitor. Conduct periodic flushing. Remove dead legs. Conduct more frequent inspections. Monitoring corrosion rate with coupons or probes. Sample and analyze water collected from drains or low points. |
| Erosion and corrosion/ erosion | Wall thickness measurement using UT discovered thinning at a 90 degree bend. | Install filters to remove particulates; minimize locations with abrupt velocity changes; increase frequency of inspections at locations more susceptible to erosion. |
| Environmental cracking— Ethanol related cracking | PAUT identified internal cracking in ethanol piping. | Inject inhibitors and oxygen scavengers. Apply internal coatings. Reduce residual tensile stresses. |
| Manufacturing defects | Quality control identified out of specification butt welded tee and elbow. | Improve procurement practices to meet specifications. Quality control during installation. Identify similar issues in other locations. |
| Construction and fabrication defects | Heavy fittings installed on small piping exposed to vibration. | Quality control during installation. Install additional support to minimize vibration. |
| Equipment failure | Seeps or stains in facilities at fittings, flanges, pump seals, or valve packing. | Increase frequency of inspections. Replace gasket materials at specific intervals or when inspections indicate gasket deterioration. Develop flange torque procedures. |
| Mechanical damage with immediate failure | Vehicular impacts to facility equipment. | Establish exclusion zones where large vehicles are not permitted without additional surveillance. |
| Incorrect operations | Improper installation of tubing and small piping. Flanges installed without considering torque limits. Tank overfill. | Establish procedures and conduct training to reduce the likelihood of improper installation of equipment. |
| Weather/outside force | Water freezing in tubing causing actuated equipment to malfunction. | Increase inspection frequency for equipment prone to water accumulation and exposed to cold temperatures |

methods such as Modified B31G, RSTRENG, or API 579, and piping that exhibits inadequate remaining strength should be repaired, reinforced, or replaced.

Operators should specifically consider the potential for interference at facilities because of the close proximity to electrical systems that may not be isolated. For equipment that might be affected by interference, operators should ground and bond equipment, use sacrificial anodes, or try to eliminate sources of interference, where possible.

### 12.7.2 Erosion and Corrosion/Erosion

Areas suspected to have localized erosion or corrosion/erosion should be inspected using appropriate NDE methods that will yield wall thickness data over a wide area, such as UT, GWUT, ultrasonic scanning, radiographic profile, eddy current, or external MFL. The effect of wall thickness loss on piping integrity should be determined using industry approved methods such as Modified B31G or RSTRENG, and piping that exhibits inadequate remaining strength should be repaired, reinforced, or replaced.

**Table 10—Examples of Mitigative Measures to Address Consequences at Facilities**

| Consequences | Mitigative Measures |
|---|---|
| Ignition of vapor cloud in occupied area. | Educate the employees and nearby public as to the danger of a vapor cloud. Provide emergency phone number to residents. Increased frequency of inspections. Improve emergency response criteria. |
| A release results in large drain-down. | Install EFRDs and containment berms or dikes. Increase frequency of inspection. Improve emergency response criteria. |
| Small leak over time accumulates into large release. | Improve leak detection systems. Increase frequency of inspections. |
| Fire that causes the loss of a facility | Upgrade fire detection and prevention measures. Improve remote monitoring of the facility. Enhance emergency response criteria. |

### 12.7.3   Environmentally Assisted Cracking

Where specific segments or piping circuits have a demonstrated susceptibility to environmental cracking, the operator should schedule supplemental inspections. Such inspections can take the form of NDE, PT or magnetic-particle testing (MT). Where feasible, suspect spools may be removed from the piping system and split open for internal surface examination. API Bulletin 939E provides guidelines for identification, mitigation and prevention of ethanol SCC.

### 12.7.4   Manufacturing Defects

Manufacturing defects at facilities can include equipment body defects, components not meeting engineering specifications, and seam weld defects. Quality control during procurement can prevent manufacturing defects from entering service. Inspection protocols and procedures can identify equipment and piping manufacturing defects in service.

### 12.7.5   Construction and Fabrication Defects

Construction defects at facilities can include fabrication weld defects, dents, or gouges that occur during construction activities, and improper installation of equipment, piping, flanges, and fittings. These threats can be prevented or mitigated through the use of approved procedures, inspection protocols, and robust quality assurance and control programs during construction activities.

### 12.7.6   Equipment Failure

Pipeline operators should take steps to minimize the risk of tubing and small-bore piping failures by replacing instrumentation lines with electrical signal devices where possible. For example, pressure readings can be conveyed electrically from pressure transducers rather than through tubing connecting the pressurized fluid to a mechanical pressure gage. Operators should also maintain adequate and up-to-date P&IDs. Configuration of the tubing should be designed to eliminate long runs, reduce or prevent vibration, and allow for periodic inspection. Visual inspections of the tubing and piping should be carried out at regular intervals to ensure that they are properly installed and inspected per manufacturer's recommendations.

A pipeline operators facility IMP should address the periodic inspection and routine maintenance of such equipment with the intent of preventing equipment failures. Attention should be paid to known mean times to failure for commonly used components, and a timely replacement of parts or units.

### 12.7.7   Mechanical Damage

Facility locations susceptible to damage from vehicular impact should be protected by fencing, concrete bollards, or other physical barriers. First, second, and third party impacts on above-ground and below-ground facility piping and equipment are also possible. Similar methods as discussed in 11.2.1 can also be applied to pipeline facilities such as surveillance, observers during construction activities, and guidelines for contractors.

### 12.7.8   Incorrect Operations

Incorrect operations can involve process upsets due to slug flow, cavitation, changes in fluid dynamics, upstream or downstream process changes, overpressures, and tank overfills. When appropriate, an operator should use root cause analysis to uncover underlying drivers that can lead to operator error incidents. Operators can reduce or eliminate situations that provide an opportunity for human error throughout the lifecycle of a facility. Operators can maximize learning opportunities by communicating lessons learned from incident investigations and periodic reviews of operations and maintenance practices and procedures. For unusual operations and one-time events, operators should consider developing detailed work plans and conducting a job safety analysis (JSA) or process hazard analysis (PHA) to reduce the risk of error during unfamiliar situations. Operator qualification (OQ) programs help to reduce human error through training on specific tasks under normal and abnormal conditions.

### 12.7.9   Weather and Outside Force Related Defects

Equipment at facilities can be susceptible to damage from weather events such as tornadoes, hurricanes, floods, lightning, and extreme temperatures and as such, operators should implement spill prevention and control measures to reduce potential consequences of a release from weather events. In addition, where inspections or patrols indicate ground movement could increase the stress on piping and equipment, operators should consider increasing monitoring or performing additional inspections.

### 12.7.10   Mitigation of Consequences at Facilities

Multiple methods are used to mitigate consequences at facilities. Storage tanks are constructed inside berms or dikes to prevent releases from impacting surrounding areas. Emergency flow restriction devices (EFRDs) and leak detection are used to minimize the amount of product that can be released during an unintended release. Sumps and drains contain and direct spills to safe locations. Mitigation can also include the use of higher toughness materials for pipe and vessels, improved methods for recovery and clean-up, and limiting the presence of personnel in hazardous areas.

## 13   Program Evaluation

### 13.1   General

Operators should periodically measure and evaluate the effectiveness of their IMP. The review should include both measures of integrity performance, as well as measures of the program itself. The intent of this section is to provide operators with a methodology that can be used to evaluate the effectiveness of their pipeline and facility integrity management. An integrity management program evaluation should help an operator answer the following questions:

a)  Were all integrity management program objectives accomplished?

b)  Were pipeline and facility integrity and safety effectively improved through the integrity management program?

The operator should collect performance information and periodically evaluate the effectiveness of its integrity assessment methods and its preventive and mitigative risk control activities including repair. The operator should also evaluate the effectiveness of its management systems and processes in supporting integrity management decisions. A combination of performance metrics and system self-reviews is necessary to evaluate the overall effectiveness of an integrity management program. Operators may consider communicating the benefits and accomplishments of

their IMPs and activities to various stakeholders including regulators and the public. For further guidance, refer to the PHMSA document, *Guidance for Strengthening Pipeline Safety Through Rigorous Program Evaluation and Meaningful Metrics*.

## 13.2  Performance Measures

There are multiple categories of measures necessary to demonstrate the effectiveness of an IMP. The integrity of the pipeline or facility, operations and maintenance activities performed, as well as program management activities all contribute to the safety performance of a pipeline or facility. Each of these types of measures can be made through comparisons between leading (proactive or goal-oriented) activities or benchmarks and lagging (reactive or outcomes-oriented) indicators. Operators are encouraged to select as many measures as needed for their system. Evidently, the period of measuring may vary because it may take years rather than weeks or months to achieve a meaningful measurement of the effectiveness of some integrity assessments, mitigation, and preventive measures.

### 13.2.1  Integrity Performance Measures

Pipeline and facility integrity performance measures examine the state of the asset itself. Integrity measures can include issues surrounding pipe corrosion, cracking or dents in the pipeline. While not the most frequent cause of pipeline incidents, these integrity issues can result in larger releases per incident and the largest portion of total barrels released. Examples of integrity performance measurements from the standpoint of threats to pipeline and facility integrity are presented in Table 11.

The performance measures are presented by an integrity threat in Table 11. All threats applicable to an operator's system should be included. For the hypothetical example represented in Table 11, the operator was concerned with six of the 10 threats listed in Section 5 and Annex A. For simplicity, only one or two performance measures are included in this example, but an operator may identify many performance measures for each threat.

As shown in Table 11, a similar review and evaluation matrix exists for the other five threats. The actual matrix of performance measurements used by any given operator may or may not look similar to Table 11. It will probably contain many more performance measurements and goals than observed, because many aspects of integrity management should be assessed.

### 13.2.2  Operation and Maintenance Performance Measures

Operations and maintenance measures can track issues associated with operator error and equipment failure. Even though operations and maintenance issues generally result in smaller releases per incident, they are a leading cause of pipeline incidents and should be measured as a category of safety performance. Specific examples of incorrect operation might include storage tank overfills or valves left in the wrong position. Equipment failure measures may track pump failures, defective relief valves or loose fittings. Operators should also consider measuring excavation damage by operator personnel or contractors. These described measures of incident causes are lagging indicators. Thus, operators should also consider leading indicators of operations and maintenance effectiveness, such as providing training on new leak-detection software or conducting fire alarm drills for control room operators.

### 13.2.3  Program Management Performance Measures

In addition to measures of integrity and measures reflecting operation and maintenance of the pipeline and facilities, operators should also measure the management of their integrity program. As discussed in Section 4, elements of an IMP accomplish the threat management goals of the program through both direct integrity-related activities, as well as supporting activities to improve the quality of the program itself. IMP elements from Section 4 are repeated in Table 12 with potential measures of their effectiveness.

**Table 11—Examples of Integrity Performance Measurement by Threat**

| Threat | Measure Numbering | Process Measures | | Operational Measures | | Integrity Measures | |
|---|---|---|---|---|---|---|---|
| | | Leading | Lagging | Leading | Lagging | Leading | Lagging |
| External corrosion | 1 | Planned to inspect 20 highest risk segments in Year 1 | Actually inspected 19 highest risk segments | Installed 10 new rectifiers in Year 1. Repaired or replaced out-of-service rectifiers for all impressed current CP systems. Installed temporary CP equipment when/where necessary. | CP Potentials on all segments brought into compliance with required criteria. | Reduce leaks caused by external corrosion with a goal of zero by the end of Year 5 | Reduced leaks by 88 % |
| Internal corrosion | 1 | Planned to inspect one problematic segment | Inspected segment and repaired all anomalies over 50 % of wall | Reliably injected approved corrosion inhibitor at proper rates. Ran cleaning pigs with an appropriate frequency. | ILI or spot checks of hold up locations after five years showed no more wall loss. Sampled transported fluids, examined debris from running of cleaning pigs, reviewed internal corrosion monitoring equipment results (metal loss coupons, fluid resistivity probes, UT wall thickness measure-ments, etc.). | Reduce leaks caused by internal corrosion with a goal of zero by the end of Year 5 | One leak in Year 1, zero leaks thereafter through Year 5 |
| Stress corrossion cracking (SCC) | 1 | Planned to hydro-statically test two segments every 10 years | Hydro-statically tested two segments in Year 1 | Recoated 20 miles of pipe where old coating was mostly disbonded | Spot checks after 10 years showed no areas of disbonding | Goal of zero releases from SCC before the next test | No releases from SCC have occurred through Year 5 |

74                                    API RECOMMENDED PRACTICE 1160

**Table 11—Examples of Integrity Performance Measurement by Threat (Continued)**

| Threat | Measure Numbering | Process Measures | | Operational Measures | | Integrity Measures | |
|---|---|---|---|---|---|---|---|
| | | Leading | Lagging | Leading | Lagging | Leading | Lagging |
| Mechanical damage (immediate failure) | 1 | Contact every land occupant once in three years | Personal contact was made with 95 % of land occupants | Land occupants informed of risks and obligations More than | 50 times in 5 years occupants called to warn operator | Goal of reducing hits and near misses by 50 % in five years | Hits and near misses reduced by 75 % in five years |
| | 2 | Hire additional personnel for ground patrolling | Four technicians added to ground patrol staff | Enhanced ground patrols to once a week in critical areas | 20 % more activities with no one-call spotted per year | | |
| Fatigue crack growth of seam defects | 1 | Conduct hydrostatic retest of 10 segments once every 10 years | Hydrostatic retests of five segments completed within first two years | Install variable speed pumps at stations in fatigue affected segments at outset of program | Reduced frequency and magnitude of pressure cycles | Goal of no releases from fatigue enlarged seam defects | No release from a seam-related defect in the last five years |

**Table 12—Performance Measures by Process Step**

| Program ID | Program Element | Potential Measures |
|---|---|---|
| 1 | Identification of Threats to Pipeline Integrity | Are threats identified for particular pipeline segments accurate? Are they comprehensive? Are they up-to-date? |
| 2 | Identification of Potential Impacts to Critical Locations | Are populated and environmentally sensitive locations accurately identified? Does information reflect recently changed or expanded critical locations? |
| 3 | Risk Assessment and Segment | Did risk assessments appropriately reflect threat and consequence data? Were the prioritized segments ranked appropriately based on the integrity assessment findings? |
| 4 | Assessment Plan Development or Revision | Did planned inspection techniques or technologies accurately reflect assessed risks? Did assessment schedule appropriately reflect assessed risks? |
| 5 | Pipeline Inspections, Testing and Examinations | Did the type and timing of inspection, testing and examination reflect the assessment plan? |
| 6 | Pipeline Integrity Data Collection | Was pipeline integrity data from inspections, testing and examination collected thoroughly and in a timely manner? Was integrity excavations and maintenance information collected? |
| 7 | Program Performance Data | Were program performance metrics developed and data collected on program elements? |
| 8 | Management of Change Review | Were changes to system design, operation, or maintenance identified and evaluated? Were changes incorporated into risk assessments? |
| 9 | Integration of Tool and Program Performance Data with MOC Measures | Were sources of information identified and procedures established to ensure collection from those sources? Was data collected from those sources? Was data integrated and analyzed for its cumulative impact? |
| 10 | Review of Operator, Industry, and Regulator Learnings and Recommendations | Were operator, industry and regulator learnings and recommendations identified? Incorporated into risk assessment or integrity plans? |
| 11 | Evaluate Integrity Program Performance | Were results of program measures evaluated? Was effectiveness of integrity program evaluated? |
| 12 | Assess Pipeline Integrity | Were results of integrity measures and operations and maintenance measures evaluated? Were results of integrated data analysis evaluated? Were pipeline integrity results integrated into risk assessment and plan development? |
| 13 | Pipeline Remediation Activities | Did remediation activities reflect pipeline integrity results? Did remediation activities reflect identified threats and assessed risks? |
| 14 | Preventive and Mitigative Activities | Did damage prevention, corrosion, emergency response or other activities effectively prevent and mitigate threats? |
| 15 | Reassessment Interval Calculations | Are the reassessment intervals appropriate? |
| 16 | Integrity Program Improvement Actions | Were program improvement actions taken in response findings of integrity program evaluation? |

### 13.2.4   Meaningful Measures and Incidents Impacting the Public or Environment

While it is important to measure a broad range of integrity activities and performance results, some measures are considered more meaningful because they reflect incidents with an impact to the public or environment. An example is the meaningful measures developed in the United States jointly by regulators, liquid pipeline operators and pipeline safety advocates. These measures, defined below, track liquid pipeline incidents impacting people or the environment (IPE).

a) Regardless of incident location, incidents resulting in:

— death;

— serious personal injury;

— fire;

— explosion;

— wildlife impacts;

— ocean water, drinking water or ground water contamination;

— soil contamination;

— public or non-operator private property damage.

b) For incidents not totally contained on operator controlled property:

— unintentional release volume greater than or equal to 5 gallons in an HCA;

— unintentional release volume greater than or equal to 5 barrels outside an HCA;

— surface water contamination;

— soil contamination.

In addition to total IPE incidents, also measured are IPE incidents with causes expected to be found by integrity inspection and IPE incidents with causes dependent on operations and maintenance. Operators should consider including in their internal performance measures these or similar types of meaningful measures based on public, environmental or sensitive location, and volume factors.

## 13.3   Performance Tracking and Trending

Evaluating performance relative to actions taken, calculations made, and goals set for improvement as Table 9 are, in a sense, relative measures. A pipeline operator should also evaluate IMP in more holistic terms by considering questions such as:

— Will the goals, if achieved, enhance pipeline and facility safety and integrity significantly? (i.e. will the benefits outweigh the costs)

— Are the results on par with those of other operators?

— Will regulatory expectations, if applicable, be met?

To meet these conditions, the operator should conduct periodic evaluations of their own performance in comparison with industry-wide data sources. For example, a U.S. operator can review its performance in comparison with the database of reportable incidents maintained by the U.S. Department of Transportation. Other countries maintain similar incident databases as well. U.S. operators may also take advantage of two voluntary performance tracking programs. Both were mentioned previously in Section 11 and Section 12. One is the DIRT database of excavation hits and near misses maintained by the Common Ground Alliance. The other is a general incident reporting database maintained by API that is referred to as the PPTS. By participating in and examining such databases, a pipeline operator can compare its integrity management effectiveness against the levels of effectiveness with other operators' programs. The pipeline operator should then make improvements in its program if the need is indicated by the comparisons.

## 13.4   Self-Reviews

Self-reviews of integrity management programs should be performed to establish and maintain the quality and effectiveness of the programs. These reviews should be performed periodically by the operator's own personnel, and external reviews by an independent outside organization should occur when deemed necessary (e.g. self-reviews found significant deficiencies in the IMP, the occurrence of a significant incident identified a weakness in the plan). In some jurisdictions, inspections by regulatory authorities will be mandated. Reviews should address the following questions:

—   Are activities being performed as outlined in the operator's program documentation?

—   Is someone assigned responsibility for each subject area?

—   Are appropriate resources available to those who need them?

—   Are the people who do the work trained in the subject area?

—   Are qualified or certified people used where required by code or regulation?

—   Are activities being performed using an appropriate integrity management program as outlined in this document?

—   Are all required activities documented by the operator?

—   Are action items followed-up?

—   Is there a formal review of the rationale used for developing the risk criteria used by the operator?

—   Are the criteria for assessing and remediating anomalies adequate?

—   Are the criteria for establishing reassessment frequencies adequate?

—   Are the criteria for preventive and mitigative measures adequate?

—   Are the criteria for the assessment of non-pipeline facilities adequate?

—   Are there processes for internal and outside auditing?

—   Is there a process for review and updating of the program in response to changes in the pipeline attributes, changes in operating conditions, changes in technology, and changes in code or regulatory requirements?

—   Are incidents being reduced?

— Are procedures being updated based on new knowledge (major events, new regulations, new advisories, new research)?

— Is knowledge being shared throughout the organization?

— Is knowledge being shared throughout the pipeline industry?

## 13.5    Performance Improvement

The results of the performance evaluation should be used to modify the IMP as part of a continuous improvement process. Recommendations for changes and improvements should be based on analysis of the performance measures and the audits. All recommendations for changes and improvements should be documented, and the recommendations should be implemented in the next cycle of integrity assessment.

## 14    Management of Change

### 14.1    General

The operator should develop formal management of change procedures to identify and consider the impact of changes in pipeline attributes, pipeline operations, technology, and code or regulatory requirements on an operator's IMP. See API RP 1173, First Edition, Section 8.3 regarding management of change.

Management of change should address operational, technical, physical, procedural, and organizational changes to the operator's pipeline system. A management-of-change process should include the following:

— description of the change;

— reason for the change;

— effective date for change to occur;

— authority approving the change;

— analysis of implications of the change;

— acquisition of required work permits for any necessary construction or operational changes;

— list of roles, responsibilities, and accountabilities for management-of-change stakeholders;

— modification of appropriate elements of the IMP;

— documentation of change and rationale;

— communication of change to affected parties;

— implementation of the change;

— workflow process for assuring that management-of-change stakeholder concerns are addressed.

Examples of how an operator might organize a management-of-change plan are provided in Table 13.

## Table 13—Examples of Management Change

| Description | Reason | Effective Date | Implications | Authority | Work Permits | Modifications to IMP | Documentation | Communication | Implementation |
|---|---|---|---|---|---|---|---|---|---|
| Raising MOP | To increase capacity | Two years from current date | New pumping units to be in-stalled at Stations 1 and 2. Need to retest to 1.25 times new MOP. | Authorized by Board of Directors and approved by FERC | Construction permits to install new pumps and associated control equipment. Work and environmental permits for retest. | Reevaluate remaining life of unrepaired anomalies. Calculate effect of retest to see if it holds the margin of safety until the next ILI. Manager of pipe-line integrity will change, not expected to impact IMP. | Managers of pipeline and facility integrity will prepare full reports of all construction and retesting and modify the IMP as required | Managers of pipeline and facility integrity will prepare memos to staff and operating personnel and inform PHMSA and state regulators | Upon completing of construction and retesting the MOP will be raised to the new level |
| Appointment of new company president | Retirement of current president | Six months from current date | Organizational changes will follow | Authorized by Board of Directors | None | Change text where necessary to indicate use of new tool is man-dated | New organization chart will follow | New organization chart will serve as documentation | Schedule for IMP will be unaffected |
| New crack tool to be used to assess Line 1 | Improved sensitivity | Next scheduled ILI | Staff responsible for ILI will attend orientation on new tool | Authorized by Manager of Pipeline Integrity | None | IMP public awareness section will be modified to indicate the land occupant contact program | Person responsible for ILI section of IMP will make the necessary changes to the text | Manager of Pipeline Integrity to send memo to all staff involved in IMP implementation. | New tool to be used for next assessment of Line 1 |
| Begin program of personal contacts with land occupants. | Need to reduce encroachments with no one-call | Beginning three months from current date | Selected staff will be trained to interact with land occupants, informing them of the risks and trying to secure their cooperation | Authorized by Manager of Pipeline Integrity | None | | Manager of pipe-line integrity will see that the appropriate sections of IMP are changed and document training of the relevant staff | Manager of Pipeline Integrity to send memo to all staff involved in IMP implementation | Contacts will begin in three months and a full cycle of contacts is expected to be completed in two years. Cycle will be repeated every two years |

## 14.2   Management of Change—Newly Constructed Systems or New Acquisitions

For newly constructed systems considerations should be taken for a risk-based design approach that makes design and route adjustments based upon area hazards and risk factors. These considerations should identify the pipeline's impact to critical locations. In addition, a quality management system should be in place for quality assurance of construction, materials procurement, and services provided. Refer to API 1177, *Construction Quality Management Systems*, API Specification Q1, *Specifications for Quality Management Systems for Manufacturers for Petroleum and Natural Gas Industries*, and API Specification Q2, *Specifications for Quality Management Systems for Service Providers for Petroleum and Natural Gas Industries* for additional guidance.

Onboarding systems via acquisition or change of operatorship should identify all relevant information and data to ensure adequate transition of the IMP from the previous operator to the new operator.

## 14.3   Management-of-Change Operations

Operational changes, such as flow reversals, product changes, conversion of service, and increase in throughput, should be evaluated for their impact on integrity. These operational changes can impact various aspects of a pipeline's operation, maintenance, monitoring, integrity management, and emergency response, including the following:

—   Pressure gradient, velocity, and the location, magnitude, and frequency of pressure surges and cycles may change.

—   Throughput increases may impact the pressure profile and pressure transients.

—   Product changes may warrant a material compatibility and corrosion susceptibility review.

—   Leak detection and monitoring systems may be affected.

—   Significant additions, removal or modifications of pump stations, tank farms, and ILI launching/receiving facilities may be required.

—   Appurtenances such as flow meters, strainers, corrosion control devices, leak detection devices, control valves and sectionalizing valves may need to be altered.

Refer to the PHMSA Document, *Guidance to Operators Regarding Flow Reversals, Product Changes and Conversion to Service* for additional guidance.

## 14.4   Management-of-Change Pipeline Status

Changes in the operational status of a pipeline, i.e. active, idle, decommissioned, abandoned, or combinations thereof, should consider implications of such a change on integrity management of the pipeline.

Regulatory requirements for the type and frequency of integrity assessments may differ based on a pipeline's operational status, especially for pipelines that have been appropriately purged and isolated. Operators should be aware of these differences and make appropriate changes to integrity management programs to account for a pipeline's operational status.

NOTE      PHMSA *Advisory Bulletin ADB-2016-05* and the PHMSA NPMS *Operator Standards Manual* provide clarification of terms and expectations of the operational status of pipelines in the United States.

# Annex A
## (normative)

# Threats to Pipeline Integrity

## A.1  Introduction

Ten common integrity threats to hazardous liquid pipelines that operators should address are identified in 5.1. Not all 10 threats may apply to every hazardous liquid pipeline and therefore pipeline operators may want to customize their integrity management approach when considering these threats. Annex A presents definitions and descriptions that are intended to assist a pipeline operator with the identification of these threats to pipeline integrity.

## A.2  External Corrosion

Corrosion is defined as the deterioration of a material, usually a metal, that results from a reaction with its environment. The rate in which a metal will deteriorate (corrode) is primarily governed by the environment in which it resides and by the nature and aggressiveness of measures that have been put in place to mitigate the reaction. Although there are several different forms of corrosion, each share some common elements:

— an anode;

— a cathode;

— a metallic path connecting the anode and cathode (typically the pipe itself);

— an electrolytic path connecting the anode and cathode (typically the soil and groundwater when external corrosion is being considered).

Eliminating any of the four elements will stop the electrochemical reaction. The elimination of one of the four common elements is the basis for a corrosion control program. The most common methods of external corrosion control are selecting a material with inherent resistance to corrosion in a particular environment, applying protective paints and coatings to exposed external surfaces, applying cathodic protection, and preventing external stray currents.

When a pipeline is placed in the ground, the pipeline itself is the metallic path and the soil is the electrolyte. Areas of the pipe surface that come into contact with the electrolyte because of faults in any protective coating will tend to be either anodic to the environment (meaning ions will flow from the metal surface to the environment and metal will be consumed) or cathodic to the environment (meaning ions will flow from the environment to the metal surface and the metal will be protected). External corrosion may be controlled by the combined use of protective coatings and cathodic protection. Protective coatings form a barrier between the pipe steel and the soil, thus isolating the pipe from the electrolyte.

### A.2.1  Galvanic (Electrolytic) Corrosion

One form of external corrosion, galvanic or electrolytic corrosion, may occur simply because the amount and distribution of cathodic protection current is inadequate. A pipeline operator should periodically monitor the pipe-to-soil potential levels along the pipeline. This should be done at least once a year using permanent test leads installed at intervals (usually every mile or so) along the pipeline. Occasionally, a pipeline operator should consider doing a "close-interval" pipe-to-soil potential survey. Such a survey involves acquiring potential measurements every few feet along the pipeline. The close-interval survey is much more likely to disclose local areas of inadequate cathodic protection than the test lead monitoring. Suggested levels of pipe-to-soil potential required for adequate protection are given in NACE International SP0169. Galvanic corrosion can also occur when dissimilar metals are embedded in an electrolyte such as moist soil. Thus, corrosion may occur preferentially at a weld in a piece of buried pipe because the microstructure and chemical content of the weld metal may differ significantly from those of the base metal.

81

Corrosion may occur even when pipe-to-soil potential measurements suggest adequate protection. Examples are cases where disbonded coating, rocky areas, or road-crossing casings shield the pipe from the protective current. Pipeline operators should be aware that such areas could exist along a pipeline and consider possibly enhanced inspections or mitigative measures.

Some external coating systems used to protect pipelines can lead to accelerated corrosion rates, including:

— thermally insulating coating materials,

— shrink wrap coatings typically applied at girth welds during construction and repair,

— polyethylene tape wrapped coatings.

For each of these coating systems, reduction in the effectiveness of cathodic protection systems and the potential for water to collect next to the external surface of the pipe underneath the coating can result in higher corrosion rates. For thermally insulated pipe, corrosion under insulation (CUI) can occur with the formation of oxygen starved corrosion products such as magnetite and goethite which are magnetic to different extents and can affect ILI accuracy. NACE International publication 10A392 provides reasons why CP has limited effectiveness on buried insulated underground structures. Shrink wrap coatings on girth welds can be effective when applied properly. Inadequate surface preparation and contamination during the application of shrink wrap coatings can cause the coating to disbond, trap moisture and shield protective currents. For polyethylene wrapped coating, raised seam welds, improper wrap tension, and overlap areas can result in a tented area for water to collect; the polyethylene tape can also shield the cathodic currents.

## A.2.2   Stray Current Corrosion

Stray current corrosion is corrosion (usually pitting) caused by the influence of outside sources of electrical currents that cause electrons to flow off of exposed pipe surfaces. Stray current corrosion can be caused by either direct current (DC) or alternating current (AC). Pipeline operators should be aware that DC corrosion can be caused by interference from foreign cathodic protection systems, from mining operations, from electric railways, or from ground return or unbalanced phases of DC power transmission systems. AC corrosion can arise when a pipeline runs parallel to a high-voltage AC transmission system and AC voltage is induced onto the pipeline. In many of these cases, AC corrosion may be most severe where the pipeline right-of-way becomes parallel to, or diverges from, the adjacent AC transmission right-of-way. AC corrosion on nearby pipelines can also be caused by AC fault currents flowing through the ground.

## A.2.3   Microbiologically Influenced Corrosion (MIC)

Another corrosion threat to pipeline integrity arises from MIC. Acidic compounds produced by certain types of bacteria may attack an external or internal pipeline surface. The bacteria are often capable of forming an external film that shields the pipe from cathodic protection. Pipeline operators should be aware of this phenomenon and take appropriate steps to mitigate its effects.

## A.2.4   Other Forms of External Corrosion

The real extent of external corrosion usually depends on how large an area of external coating is damaged or missing and on the ability of cathodic protection current to reach the surface of the pipe underneath the area of coating disbondment. Typically, the metal loss that results is not uniform but instead appears as isolated pits or arrays of pits of various sizes and shapes. The effect of the metal loss on the pressure carrying capacity depends on the amount of material remaining along the axis of the pipe. When the pitting is randomly oriented, the integrity of the pipe becomes seriously impaired if and only if one or more pits becomes deep enough to penetrate the wall thickness (resulting in a leak) or a sufficient number of pits overlap along a sufficient length of the pipe to cause the remaining ligament to fail (often resulting in a rupture). Corrosion can also occur in the longitudinal seam without displaying a concentrated

attack in the weld bondline, fusion zone, or HAZ. Less typically, the metal loss may occur in a concentrated manner predominantly in the longitudinal direction of the pipe. One such case is SSWC that is discussed separately in Section A.3. Another is narrow axial external corrosion (NAEC) often found at double submerged arc welded seams coated with polyethylene tape. The "tenting" of the tape over the crown of the weld allows the intrusion of water and provides an environment that could shield the external surface of the pipe from cathodic protection. This shielded area is axially oriented and limited to the area immediately adjacent to the seam weld. The resultant groove-like defect is more likely to rupture than typical pitting corrosion.

## A.3    Internal Corrosion

As discussed in Section A.1, an anode, a cathode, a metallic path connecting the anode and cathode, and an electrolytic path connecting the anode and cathode must be present for corrosion to occur. Eliminating any of the four will stop the electrochemical reaction and can be used as the basis for a corrosion control program. The most common methods of internal corrosion control are selecting a material with inherent resistance to corrosion in a particular environment, applying internal coatings or linings to exposed surfaces, removing electrolytes from product streams, injecting corrosion inhibiting chemicals, and preventing internal stray currents.

Internal corrosion has, mechanically speaking, the same deleterious effect on the pipe as external corrosion, but its causes are different. Refined petroleum products and crude oil can contain water, bacteria, chemical contaminants, and debris that can create a corrosive environment on the internal surface of the pipe. Water based pipeline products, being transported for commercial use or disposal, can often be considered to be environmental hazards if unintentionally released. Localized corrosion, uniform corrosion, environmentally assisted cracking (EAC), and flow-assisted damage are the typical forms of internal corrosion attack. While cathodic protection applied internally can be effective in mitigating internal corrosion (such as inside a water tank), it is typically not used internally in pipelines due to difficulties in application, disruption of product flow, presence of valves, inaccessibility, etc. Corrosion treatment chemicals such as inhibitors or biocides, or both, are often used to combat internal corrosion. Using cleaning pigs at regular intervals, and often in conjunction with chemical treatment, is an effective technique for removing accumulated water and debris from a product pipeline and helps prevent internal corrosion. It is also helpful to maintain sufficient product flow rates to avoid pooling of water in low spots along the pipeline route or at the beginning of steep inclines.

### A.3.1    Low or Intermittent Flow

Pipeline operators should be aware of, and take available measures to minimize, low flow conditions that allow water to stagnate. Dead leg piping, for example, is a place where water and/or sludge could accumulate and cause corrosive conditions. If dead-leg piping is necessary, it should be checked regularly to see that internal corrosion and wall thickness loss is not occurring. MIC can occur internally if water containing certain kinds of bacteria is introduced into a pipeline. In such cases, treatment of the fluid with a biocide may be necessary.

### A.3.2    Corrosive Products

Internal corrosion and hydrogen blisters, that form at laminations in the pipe material, can threaten pipeline integrity if the product being shipped is "sour". If water is present as well as hydrogen sulfide and/or carbon dioxide, an acid reaction can occur that causes internal pitting of the pipe. Moreover, atomic hydrogen generated by the acid reaction can easily diffuse into the pipe steel. If the atomic hydrogen passes clear through the wall thickness, it dissipates harmlessly, but if it encounters a lamination in the pipe wall, hydrogen gas (H2) can form. The hydrogen gas can continue to form as long as atomic hydrogen is being generated at the ID surface of the pipe. The pressure of the hydrogen gas will tend to separate the lamination forming a blister. Along the longitudinal edges of a blister, cracks may form and propagate to the ID surface of the pipe. Since most laminations are located mid-wall, once the crack penetrates to the ID surface, the outer half of the wall thickness becomes the effective thickness. At that point a failure of the pipeline may occur. Operators of sour service pipelines should be aware of this potential threat and take mitigative action. Inhibitors can be used to prevent the acid reaction from occurring. Ultrasonic metal loss ILI tools can find laminations and blisters so that they can be repaired prior to an integrity failure.

## A.4    Selective Seam Weld Corrosion (SSWC)

SSWC, also called preferential seam corrosion, is corrosion-caused metal loss, either internal or external, of or along an ERW or FW seam. The corrosion process attacks the seam bondline region at a higher rate than the surrounding body of the pipe, resulting in a corrosion crevice or groove aligned with the bondline. In some ERW and FW materials, this bond line region exhibits low fracture toughness. This definition is not meant to cover preferential corrosion along a sub-arc long seam.

SSWC can evade detection by conventional magnetic or ultrasonic metal loss ILI tools, but can usually be detected using CMFL, SMFL, or USCD tools. Accurate measurements in the ditch of the depth of the SSWC groove can be difficult due to the narrow groove geometry and poor reference surface condition. The combination of SSWC and low toughness in the seam bondline (if that condition is present) may create a serious defect that is more likely to cause a rupture than coincident corrosion in the body of the pipe or cause a rupture at low hoop stress. Conventional corrosion evaluation methods such as ASME B31G cannot be reliably used to evaluate SSWC if the flaw cannot be accurately sized or if the seam exhibits low-toughness behavior.

Both LF-ERW and HF-ERW can be affected by SSWC. Susceptibility may be enhanced by high sulfur content in the steel and may be reduced by calcium treatment for sulfide shape control. The presence of other elements (Cu, Ce) and thermal history may also influence susceptibility. The occurrence of SSWC may be more critical in some LF-ERW or FW pipe because of the potential for relatively low toughness of the bond line region. Electric welds were required by API 5L and 5LX to be post-weld heat treated after 1967, reducing susceptibility to low toughness due to hard microstructures in the seam bondline. Steel used to make pipe in the mid-1980s and later generally exhibit reduced sulfur content. A linear polarization resistance (LPR) test can be useful for indicating susceptibility even where no SSWC has previously been observed. Discovery of SSWC confirms susceptibility irrespective of the outcome of an LPR test.

### A.4.1    SSWC Characterization

To characterize the relative corrosion rate of SSWC compared to the corrosion rate and associated overall metal loss by the base metal, Equation (A.1) shows the grooving factor is sometimes used as:

$$\alpha = \frac{d_1}{d_2} = 1 + \frac{a}{d_2} \tag{A.1}$$

where alpha is the grooving factor, $d_1$ is the distance from the original metal surface prior to the onset of corrosion to the depth of the weld groove, and $d_2$ quantifies the overall metal loss of the material. Thus, a grooving factor of 1.0 would indicate that SSWC had not occurred and that all metal loss was general and uniform across the surface. Grooving factor values greater than 2 (e.g. the seam weld is corroding at a rate that is twice that of the rest of the surface) are typically considered to indicate susceptibility and threat of SSWC, though the rationale for selecting this value is unclear.

## A.5    Environmentally Assisted Cracking (EAC)

### A.5.1    Stress Corrosion Cracking (SCC)

SCC is a form of EAC, where small cracks form and often continue to lengthen and deepen over a period of time. Typically, multiple small individual cracks form adjacent to one another in an array. If the cracks continue to grow, they frequently overlap or coalesce or both such that they become the equivalent of a large single crack in terms of their effect on the pressure carrying capacity of the pipe. If crack growth continues, a crack can eventually become large enough to cause the pipeline to leak or rupture. Three conditions must be present for SCC to occur:

1) a susceptible material;

2) a conducive environment;

Case 2:26-cv-05242-SVW-SSC    Document 26    Filed 05/14/26    Page 526 of 1309   Page ID #:13077

3) a tensile stress.

Material—All commonly used line pipe steels are susceptible, though susceptibility may vary considerably from one material to another.

Environment—Specific forms of SCC are associated with specific terrain and soil types, particularly those having alternated wet-dry conditions and those that tend to damage or disbond coatings. SCC can occur in almost any soil type since the local electrochemistry at the pipe surface may be isolated from the surrounding conditions. Thus pipe coating type and condition can be an important factor.

Stress Level—Susceptibility to SCC increases with stress level, and pipelines that are operated at stress levels above 60 % of SMYS appear to be most susceptible, although SCC has been identified in pipelines operated at lower stress levels typically associated with localized phenomena such as dents or gouges. SCC has been identified at points of stress concentration such as weld toes and mechanical damage. Residual stresses from pipe forming or welding can also contribute to susceptibility. Circumferentially oriented SCC has occurred where longitudinal stresses due to soil movement exceed a stress threshold, even in pipelines operating at low levels of hoop stress. Refer to API RP 1176 for further discussion of the relative importance of causal factors and their relationships.

Two forms of SCC have been identified as high-pH and near-neutral pH SCC. The high-pH form tends to occur within a narrow cathodic potential range and at a local pH over 9. It is associated with increased pipe operating temperatures. Cracks tend to be narrow and primarily intergranular. Pipe with coal tar and asphalt coatings are sometimes susceptible to this type of cracking. Near-neutral pH SCC tends to occur at a local pH of 5.5 to 7.5. It is associated with mild concentrations of $CO_2$ in groundwater. Cracks are usually trans-granular, wide, and more corroded than those found in high pH SCC. Generally, tape coated systems are susceptible to this type of environment. At the time this document was prepared, no one appears to have ever encountered SCC on a pipeline with a properly applied fusion-bonded epoxy coating. The absence of SCC in conjunction with such a coating is thought to be attributable to the facts that the pipe surface has to be shot-blasted before its application and that the compressive residual stress induced at the pipe surface by the shot-blasting raises the threshold stress for SCC above the level that the pipe will experience in service.

### A.5.1.1    SCC Susceptibility

Pipeline operators should determine whether a segment of pipe may be susceptible to SCC particularly if the pipeline is known to be subjected to a significant level of hoop stress. A segment should be considered susceptible if it has sustained an in-service or hydrostatic test failure where SCC is identified as the cause. A segment should also be deemed susceptible to SCC if evidence of arrays of cracks is discovered as a result of running an ILI crack detection tool and verified during pipe surface examinations. For assistance in determining whether a segment is susceptible to SCC, a pipeline operator is advised to consult such documents as OPS-TTO8, NACE SP0204, the Canadian Energy Pipeline Association's (CEPA) SCC Recommended Practices, and other standards such as ASME STP-PT-011, *Integrity Management of Stress Corrosion Cracking in Gas Pipeline High Consequence Areas*. Although the different approaches for the detection and assessment of SCC apply data integration to varying degrees, it is particularly important in regards to SCCDA.

### A.5.1.2    SCC Characterization

Since it has been observed that SCC can be superficial (the occurrence of shallow, non-propagating cracks), the designation of "noteworthy" SCC should be used to clearly communicate the threshold for moving from a nominal monitoring phase into an active assessment and mitigation phase on a particular pipeline asset. Noteworthy as defined in ASME STP-PT-011, *Integrity Management of Stress Corrosion Cracking in Gas Pipeline High Consequence Areas*, with the inclusion of a pure depth criteria, represents an enhancement of the term "significant" that was originally defined by CEPA regarding SCC and then adopted in the NACE SP0204. The importance of the pure depth criteria is that it encompasses the potential for short deep cracks associated with high pH SCC. Both ASME STP-PT-011 and CEPA's SCC Recommended Practices provide a further delineation of the crack severity into a ranking, with the ASME criteria providing more clarity through its reference to failure pressure.

It is important to understand that the effective management of SCC will not be solely achieved through strict adherence to a standard. Rather, the operator managing the presence of noteworthy SCC needs to develop a program in consideration of the specifics of the pipeline and the limitations of the assessment techniques and technologies as applied. The effective management of noteworthy SCC typically requires periodic assessment via hydrostatic testing or ILI using a crack-detection tool. Reassessment intervals can be calculated by the method applied to anomalies with linear crack growth rates discussed in 10.2 and Annex D.

In-the-ditch inspection for SCC cracks requires a clean surface and the use of an appropriate NDE method (e.g. magnetic particle inspection). Where blast media is used in surface preparation, care should be taken to not peen the cracks shut prior to inspection.

ILI technologies are available that detect and evaluate SCC within reasonable bounds. Limitations inherent in the ILI technology and data interpretation lead to some challenges in the detection and characterization of SCC. For information on ILI technologies for assessing SCC, refer to API RP 1176.

### A.5.2   Other Forms of Environmental Cracking

Pipelines that transport sour service products may be susceptible to other forms of cracking including sulfide stress cracking (SSC), hydrogen-induced cracking (HIC), or stress-oriented hydrogen-induced cracking (SOHIC).

Sulfide stress cracking is a form of hydrogen embrittlement that can affect a line pipe steel exposed to hydrogen sulfide and water while the material is subjected to tensile stress. A cathodic reaction in the presence of hydrogen sulfide and water can allow atomic hydrogen to diffuse into the steel. Normally, this will not affect the base metal of a line pipe steel, but if weldments on the pipe have created heat-affected zones with hardnesses of Rockwell C 22 or more, hydrogen cracking of the microstructure may occur. The phenomenon can be mitigated by preheating the material before welding or by post-weld heat treatment to eliminate zones of high hardness. Treatment of sour crude oil to eliminate free water and/or the use of an inhibitor to prevent the cathodic reaction may be an effective way to prevent the occurrence of SSC.

HIC and SOHIC are also threats associated with the transportation of sour crude oil containing water and are forms of SSC. The main characteristic of HIC is that diffusing atomic hydrogen tends to recombine into molecular hydrogen at manganese sulfide inclusions in the steel. The inclusions tend to "blister," and hydrogen cracks will then propagate through the wall thickness from one inclusion to another in stepwise fashion. SOHIC has a similar appearance and is caused by the same cathodic generation of atomic hydrogen, but the presence of manganese sulfide inclusions is not necessary for SOHIC to occur. The stepwise cracking instead begins at planes of weakness parallel to the surfaces of the plate. Hence, SOHIC may occur in steels that have been purposely manufactured with low sulfur to prevent the formation of manganese sulfide inclusions. Unlike SSC, both HIC and SOHIC can occur in the normal line pipe material; high hardness is not necessary. Prevention of HIC and SOHIC requires either removal of water or the introduction of an inhibitor that prevents the cathodic reaction between water and hydrogen sulfide.

More information about the phenomena of SSC, HIC, and SOHIC may be obtained from the following:

— NACE MR0175/ISO 15156;

— R.J. Pargeter, "Susceptibility to SOHIC for Linepipe and Pressure Vessel Steels—Review of Current Knowledge," CORROSION 2007, Paper 07115, NACE International, Nashville, Tennessee, March 11–15, 2007.

### A.6   Manufacturing Defects (Defective Pipe Seams Including Hard Heat-affected Zones and Defective Pipe Including Pipe Body Hard Spots)

Seam integrity for line pipe material with a longitudinal seam made by means of double submerged arc welding (DSAW), helical seam double submerged arc welding (HSAW), or high-frequency welded electric resistance welding (HF-ERW) manufactured after about 1980 is usually not a more significant concern than overall pipeline integrity. For more information on manufacturers of ERW and other types of pipe, see *History of Line Pipe Manufacturing in North*

*America*. Pipeline operators should be aware that the seam characteristics of some types of older line pipe materials, particularly furnace lap welded (LW) pipe, low-frequency welded electric resistance welding (LF-ERW) or FW pipe, and "susceptible" HF-ERW (see next two paragraphs) may require a special assessment of seam integrity. See API TR 1179 for guidance on hydrostatic testing for seam integrity. The concerns with these materials are further detailed within API RP 1176 but include:

— inherently low fracture toughness within the seams,

— higher likelihood that the seams will contain defects due to the nature of the hot-rolled skelp from Bessemer or open-hearth processes,

— nondestructive seam inspections that may have limited capabilities,

— manufacturers' hydrostatic tests that frequently achieved a hoop stress less than 90 % of SMYS, even including end effects.

Cracks, pits, scabs, slivers, and laminations in the body of the pipe may arise from the manufacture of pipe skelp or the manufacture of line pipe, or both. These include longitudinal or helical seam anomalies which are usually crack-like. Definitions and descriptions of these types of anomalies appear in API 5T1. The user should refer to that document for the standard definitions of these anomalies and imperfections. If any such anomalies are not found by means of the manufacturer's hydrostatic test or nondestructive examinations or both and they are not eliminated by the initial preservice hydrostatic test of the pipeline, they will remain as anomalies in the pipeline. Frequently, such anomalies are revealed by ILI or hydrostatic retests. Having survived an initial preservice hydrostatic test to a level of at least 1.25 times MOP, these types of anomalies will be non-injurious to pipeline integrity unless they are subject to enlargement by pressure-cycle induced fatigue or interaction with other defects (see A.5.1).

## A.6.1   Pressure-Cycle-Induced Fatigue

As mentioned above, some HF-ERW pipe materials may be susceptible to the same seam integrity threats that affect LF-ERW and FW pipe. Until sometime in the early 1980s, most HF-ERW pipe was made from the same type of skelp as LF-ERW and FW pipe, that is, skelp hot-rolled from open-hearth, ingot-cast steels with sulfur contents typically in the range of 0.015 % to 0.030 % by weight. These materials were often characterized by high inclusion contents that could lead to the formation of "hook" cracks adjacent to the bondline of the ERW seam. Hook cracks are one of the primary initiators of pressure-cycle-induced fatigue (discussed below). The threat of pressure-cycle-induced fatigue in HF-ERW pipe may exist if any one of the three following conditions has occurred:

1) Pipeline has experienced failure due to pressure-cycling-induced fatigue.

2) Hydrostatic test records indicate numerous seam splits.

3) Pressure cycle spectrum is known to have caused fatigue failures in other types of pipe subjected to similar circumstances.

Therefore, these types of HF-ERW materials should be considered possibly susceptible to pressure-cycle-induced fatigue and should be treated as potentially having the same seam integrity assessment needs as LF-ERW and FW pipe materials.

Pressure-cycle-induced fatigue crack growth of seam-related manufacturing anomalies is one concern with a LF-ERW material, a direct current welded electric resistance welding (DC-ERW) material, a FW material, or a susceptible HF-ERW material.

## A.6.2 Hook Cracks

As steel manufacturers in the early 1980s changed over to basic oxygen steel making (which is capable of reducing sulfur contents to levels below 0.01 % by weight) and continuous casting, the quality of the skelp used to make ERW pipe greatly improved. Alternatively, some manufacturers used sulfide shape control to prevent the formation of elongated manganese sulfide inclusions that contribute to the formation of hook cracks. These types of improvements along with improved seam inspection by the manufacturers greatly reduced the potential for hook cracks ending up in finished line pipe. Thus HF-ERW pipe made after the early 1980s generally will not have the same seam integrity issues as HF-ERW pipe made prior to that time. HF-ERW materials that generally are not susceptible to the problems associated with hook cracks would be characterized by low sulfur contents (<0.01 % by weight) or the absence of elongated sulfide inclusions, or both, as viewed on a metallographic section. When available, a review of the vintage and manufacturing history of HF-ERW materials may help determine the potential for the existence of hook cracks. Factors such as being manufactured prior to 1980, skelp being rolled from an open-hearth furnace steel, sulfur content being in excess of 0.01 % by weight, low toughness being exhibited in Charpy impact tests in the vicinity of the ERW bond line, or elongated sulfide inclusions appearing in a metallographic section would tend to indicate potential susceptibility to hook cracks. If the existence of hook cracks is confirmed and the operational pressure cycles are considered to be relatively aggressive, the operator should consider the particular HF-ERW material as "susceptible" and implement a program of seam integrity assessment for that pipe.

## A.6.3 Hard Spots or Hard Heat-affected Zones

Hard spots are regions of the pipe material that possess hardness levels (and ultimate tensile strength levels) significantly higher than the ranges of hardness that characterize the normal parent pipe material. Hard spots may exist as local round or oval areas in the body of the material or in a narrow zone immediately adjacent to the seam bond lines of some older-vintage ERW materials. Both types of hard zones arise from excessive cooling rates applied to the zones as they were cooled from temperatures above 777.8 °C (1432 °F) during the manufacturing process. The round or oval hard spots in the pipe body were most likely to be found occasionally in older Grade X52 materials made in the late 1940s or early 1950s. The hard zones adjacent to ERW seams were most likely to be found occasionally in materials of Grade X46 and Grade X52 manufactured prior to 1960.

The hazard associated with hard zones or hard spots is that if their hardness levels exceed 350 Hv10 (33 to 35 Rockwell C), they are prone to hydrogen induced cracking in the presence of atomic hydrogen (that is, hydrogen ions in solution, not hydrogen gas, H2). Sources of atomic hydrogen arise internally if sour crude is transported and externally from cathodic protection with sour crude being the more aggressive of the two environments. Service failures have been known to occur as a result of exposure of hard spots or hard zones to either of these environments.

Neither hard spots in the body of the pipe nor hard heat-affected zones adjacent to the bond line can be satisfactorily addressed by hydrostatic testing. Prior to the formation of any cracking in these materials, no defect exists that would cause them to fail in a hydrostatic test. If and when they begin to crack after sufficient exposure to atomic hydrogen, the cracking can lead to rapid or even immediate failure. Therefore, there is no way to apply hydrostatic testing in a timely manner.

## A.6.4 Furnace Lap Welded (LW) Pipe

If a segment comprised of furnace LW pipe has never sustained a seam-related failure and it has been tested to at least 1.25 times MOP, the need for assessment is based on whether the MOP exceeds 30 % of SMYS. Assessment is not needed if the MOP does not exceed 30 % of SMYS. Assessment is also not needed if the MOP does exceed 30 % of SMYS but does not exceed 72 % of the manufacturer's hydrostatic test pressure. If none of these conditions is satisfied, the operator should perform a baseline seam integrity assessment to ensure that no seam manufacturing flaws could cause a failure at the MOP. Periodic seam integrity assessment is probably not necessary for segments comprised of furnace LW pipe. There is insufficient knowledge concerning the possible modes of time-dependent deterioration of the furnace LW materials. While no known instances of failure have occurred from either SSWC or

pressure-cycle-induced fatigue, in-service failures of furnace LW pipe materials have occurred after such materials have been pressure tested to levels in excess of their MOP. Some of these, perhaps all of them, may be attributable to accidental over-pressurization. The operator of a LW pipeline that is operated at a pressure level that exceeds 72 % of the manufacturer's hydrostatic test pressure should monitor the condition and service history of the pipeline, and consider periodically assessing its integrity if the operating history suggests that in-service seam-related failures have taken place after a hydrostatic test to at least 1.25 times the MOP. ILI tools designed for seam weld inspection, while capable of detecting some anomalies in lap welded pipe, have poorer overall detection and sizing capabilities. Inspection challenges associated with small diameter and low pressure pipelines can also limit the success of ILI for lap welded pipe.

### A.6.5    Determining Need to Conduct Seam Integrity Assessment

To determine whether a special seam integrity assessment is needed, the pipeline operator should review the below attributes for all pipeline segments as part of their IMP. Additional guidance for prioritizing pipe segments for seam integrity assessments can be found in API RP 1176, Section 6.3, "Manufacturing Defects Associated with Longitudinal Seams". This document provides a flowchart to determine a system prioritization of low, medium, or high. High priority is where a pipeline has had a time-dependent failure mechanism cause service or test failures and has a remaining fatigue life of 10 years or less. Medium priority is where a time-dependent failure mechanism has not been observed but other conditions exist that make a future seam integrity issue more likely. Low priority is where a time-dependent failure mechanism has not been observed and the other conditions are such that a future seam integrity issue is unlikely. The prioritization takes into account the following factors of the longitudinal seam:

— year of manufacture;

— service or hydrostatic test failure history related to grooving corrosion or fatigue

— operating stress level;

— hydrostatic test pressure levels;

— coating condition and CP effectiveness;

— pressure cycle aggressiveness.

### A.7    Construction and Fabrication Defects

Construction defects include girth weld defects, rock dents, installation damage, flaws in fabricated fittings or branch connections, bending mandrel marks, ripples, buckles, and wrinkle bends.

Electric arc girth welds seldom cause a pipeline to fail without other threats being present. Usually when a girth weld has failed it is because the pipeline has been subjected to some extreme longitudinal load such as that from a landslide or washout. There are some exceptions that cause girth welds to remain on the threat list. First, acetylene girth welds, an obsolete joining technique employed in some old pipelines, have had a significant number of failures. Second, some modern higher-strength pipeline steels can have lower strengths in the heat-affected zone (HAZ) adjacent to the girth weld. Overly strong weld metals and pipe can concentrate strain into softened HAZ regions resulting in an increased failure rate due to small anomalies, joint-to-joint misalignment and weld transition profiles when wall thicknesses are different. Therefore, girth welds, except as noted, are usually not a significant threat to pipeline integrity. As part of its IMP, a pipeline operator that operates a pipeline fabricated by means of acetylene girth welds should establish a program of monitoring soil stability and riverbank erosion for signs of movement or change that might add stress to such welds. Such an operator should be prepared to mitigate any situations where it appears that the acetylene welds might be experiencing added stress.

Although the use of an intentional wrinkle bend (a buckle allowed to form intentionally during cold field bending) is prohibited by safety codes such as ASME B31.4, some may exist in older pipelines designed prior to the existence of

consensus safety codes. These will show up during ILI runs. Removal of wrinkle bends is recommended, but if they cannot be removed, the operator should periodically check the stability of the soil in their vicinity since movement of the pipeline at a wrinkle bend is one reason for its failure.

Ripples and bending mandrel marks are considered non-injurious to pipeline integrity. A criterion for acceptable ripple height is contained in ASME B31.4. Buckles are anything that falls outside the limits on ripple height, and any such buckle should be repaired.

Flaws in fabricated fittings are usually not something that can be reliably detected in an integrity assessment. Therefore, a pipeline operator should have a quality control program that ensures the satisfactory fabrication and inspection of fabricated fittings.

Some procedures used in the past to repair pipe defects are not recommended today. For example, puddle welding was used to replace lost or damaged metal and restore pipe continuity. Puddle welding should not be confused with the current deposited weld metal technology, which has been shown to produce repairs of acceptable quality.

Patches and half wraps may have been used to repair leaking pipelines. These repairs are no longer recommended for high-strength line pipe because of the potential weak point at the juncture between the longitudinal fillet weld and the patch or half wrap.

An arc burn results from momentary contact between a welding electrode and a pipe or fitting that leaves little or no weld metal, but may cause local pitting and almost always results in a small area of damaged microstructure at the point of contact. Because of their small size, arc burns are generally not a threat to pipeline integrity. If arc burns with no indications of cracking are discovered on a pipeline as the result of an integrity assessment, they need not be repaired. However, they are usually a sign of poor workmanship and should not be tolerated on any new construction.

## A.8   Equipment Failure

Pumps, valve, seals, o-rings, meters, pressure switches, temperature gauges, prover loops, scraper traps, strainers, truck loading racks, etc. are types of equipment found mostly at terminals and pump stations. These components are subject to occasional malfunction and/or failure, and they may in certain cases cause an unintended release. A pipeline operator's facility IMP should address the periodic inspection and routine maintenance of such equipment with the intent of preventing equipment failures. Attention should be paid to known mean times to failure for commonly used components, and a timely replacement of parts or units should also be part of the facility's IMP.

## A.9   Mechanical Damage

### A.9.1   Mechanical Damage Resulting in Immediate Failure

This threat arises from excavation, drilling, boring, farming, or other soil moving or removal activities where the mechanical equipment being used comes in contact with a buried pipeline causing it to leak or rupture. Other failures have also been known to occur in conjunction with someone imposing a heavy load on the soil over a pipeline. Immediate failures have occurred as the result of vandalism as well. Preventive measures such as one-call systems, locating and marking for a potential excavation, monitoring of any excavation on or near a pipeline, public awareness campaigns, and aerial or ground surveillance are intended to prevent such occurrences. When an excavator makes a one-call and the pipeline operator responds appropriately, the risk of such an incident is small. Firm lines of communication between the excavator and the pipeline operator and continued diligence on the part of both is essential to minimize the chances of an incident or near miss. A more perplexing problem arises in conjunction with land occupants and others who initiate excavations without making a one-call and without notifying the operator of the pipeline. A pipeline operator should consider the value of occasional communications with land occupants and other potential excavators to educate them of the risks associated with excavating around a pipeline and encourage them to make a one-call before excavating even on their own land. In addition, a pipeline operator should conduct regular aerial or ground patrols of their right-of-ways except in remote or inaccessible areas.

## A.9.2   Mechanical Damage Resulting in Delayed Failure

This threat arises from excavation, drilling, boring, farming, or other soil moving or removal activities where the mechanical equipment being used comes in contact with a buried pipeline leaving a dent or dent and gouge that are not severe enough to cause it to leak or rupture immediately. Dents arising from lowering a pipeline onto a rock or from pushing a rock onto the pipe during backfilling also fall into this category. If the anomalies created in this manner are not discovered or if they go unreported, they may become more severe with the passage of time such that eventually they cause a leak or a rupture. Factors that may cause them to become more severe with the passage of time include, external corrosion, SCC, further creep of the defect or settlement of the pipeline, and pressure-cycle-induced fatigue. A hydrostatic test does not guarantee that such a threat will be neutralized unless the anomaly causes a leak or a rupture during the test. ILI metal loss tools and geometry tools, especially if used in combination, are the best ways to locate and mitigate any such anomalies. A pipeline operator's IMP should address using ILI for that purpose, and it should contain criteria for deciding if and when a discovered anomaly should be excavated and examined.

## A.10   Incorrect Operations

The threats to integrity from incorrect operations include but are not necessarily limited to accidental over-pressurization; failure to design properly for or limit surges; improper closing or opening of valves; overfilling tanks; exercising inadequate or improper corrosion control measures; misinterpreting alarms or leak indications; and improperly maintaining, repairing, or calibrating piping, fittings, or equipment. A pipeline operator should create and maintain an operating and maintenance manual and make sure that all operating and maintenance personnel are well-versed in its contents and properly trained and equipped to comply with its requirements. Pipeline operators should consult documents such as API RP 1168 and ASME B31Q, *Standard for Pipeline Operator Qualification* with regard to proper training for pipeline operators.

## A.11   Weather and Outside Force Related Defects (Cold Weather, Lightning, Heavy Rains or Floods, and Earth Movement)

Cold weather, lightning, floods, landslides, subsidence, earthquake, etc. are known causes of pipeline failures. Since these are random, often unpredictable events, an operator should establish a preventive and mitigative program to minimize the risk of a pipeline failure from such phenomena. API RP 1133 should be referenced for industry best practice.

Cold weather can cause water in liquid pipelines to freeze in low points of a pipeline system resulting in cracked piping and valves. Release of the product then occurs when the ice thaws and releases the product through broken fittings, valves and piping. Plugged bottoms of valves are a particular risk if water can seep by the valve and is trapped by the plug then expands breaking the valve.

Lightning strikes and high-voltage power line breaks have the potential to cause significant damage to pipelines.

Heavy rains and flooding can create various hydrotechnical hazards (exposures, landslides, dynamic loading, debris impacts and vortex-induced vibration), to susceptible pipeline crossings of water ways as further detailed in API RP 1133.

Earthquakes and earth movement—Seismic monitoring of known geologically unstable areas can assist in providing warning of earth movement. Strain gauges can monitor the strains being applied to the pipeline as a result of gradual earth movement.

An initially non-injurious anomaly arising from any one of the above hazards can grow into an injurious defect via fatigue. Repeated cycles of stress are known to cause defects above a certain threshold size to grow, and if the growth continues long enough the defect can cause structural failure. The types of pipeline anomalies that are considered potentially susceptible to growth by pressure-cycle-induced fatigue include longitudinally oriented manufacturing defects, stress corrosion cracks, gouges, gouges in dents, and stress risers associated with poorly

fabricated repairs. The degree of this threat is strongly dependent on the initial size of the defect, the aggressiveness of the pressure cycles in terms of stress range and frequency, and the effective crack-growth rate. Details are provided in Section 9 and Section 10 on how an operator might evaluate the degree of threat presented by pressure-cycle-induced fatigue.

## A.11.1   Seismic Activity

Ground movement resulting from seismic activity may put the integrity of a pipeline in the vicinity of the movement at risk. As such, a Seismic Response Protocol should be developed to describe the processes and procedures for recognizing and responding to seismic events. This protocol may provide guidance on seismic event discovery methods, response thresholds, field and control center response procedures, assessment guidelines and startup criteria.

Seismic activity may be discovered through a variety of methods including: direct detection by field personnel, alerts from the USGS Earthquake Hazard Program (EHP), and various instrumentation alarms in SCADA (such as pump vibration monitors, strain gauges, or leak detection systems). Of these discovery methods, the first two can easily be correlated to seismic activity and allow for an actionable seismic response protocol.

USGS data can be analyzed to determine the magnitude and epicenter of the earthquake in relation to an operator's assets. If established thresholds are exceeded, corresponding response procedures should be keyed and notifications made to the appropriate personnel.

Some suggested seismic magnitude threshold levels for Shutdown and Visual Assessment response zones are described in Table A.1. Note that the response zones are more conservative for pipelines crossing through liquefiable soils. This is because the pipe will move differently in liquefied soils vs non-liquefiable soils and at the boundary between the two soil types, there is increased likelihood of pipeline damage. Responding at lower magnitude levels should be considered in areas containing critical locations, pipeline segments that contain pre-1970s construction and pipeline segments that contain acetylene girth welds. If the epicenter of the earthquake is within 1 mile of an active fault line (documented movement in the last 10,000 years), the response zone for any pipelines crossing that fault line should match that of the liquefiable soil criteria outlined in Table A.1 regardless of soil type. Consulting a geotechnical firm familiar with pipeline and terminal assets can be helpful in establishing appropriate thresholds, identifying areas of liquefiable soils, and determining areas of active fault lines.

### Table A.1—Example Seismic Activity Response Criteria

| Magnitude | Distance from Pipeline/Facilities to Earthquake Epicenter (mi) | |
|---|---|---|
| | Shutdown Facility | Visual Inspection Required |
| LIQUEFIABLE SOIL | | |
| 5.0 | < 20 | 20 to 40 |
| 6.0 | < 50 | 50 to 75 |
| 7.0+ | < 100 | 100 to 200 |
| NON-LIQUEFIABLE SOIL | | |
| 5.0 | < 10 | 10 to 20 |
| 6.0 | < 20 | 20 to 40 |
| 7.0+ | < 40 | 40 to 80 |

EXAMPLE    A Mw 5.4 earthquake occurs near a pipeline system in Oklahoma (see Figure A.1). Pipeline A is within 6 miles of the epicenter. Pipeline B is within 13 miles of the epicenter. Based on the threshold levels described in Table A.1, a minimum response should include immediate shutdown of Pipeline A and initiation of a visual assessment of Pipeline B. Additional records investigations should take place for both pipelines. If Pipeline B is known to have vintage or acetylene girth welds, a shutdown should also be considered until the visual inspection can be completed.



**Figure A.1—Example of Seismic Threshold Response Application**

Whether the alert is made via an automated system or by field personnel, procedures should be developed to either shutdown and/or perform visual assessments on assets in the affected area, and within a reasonable amount of time (72 hours for visual assessment). Visual assessments may include the following:

a) Examine the pipeline ROW, especially at areas of newly exposed pipe or known fault crossings and landslide areas, for:

— ground cracking,

— soil settlement,

— land movement (landslides),

— fault shifting.

b) Inspect aboveground assets such as pipe transitions and supports, flange connections, equipment foundations, and tank shells for evidence of the following:

— cracking,

— buckled or bent pipe,

— shifted equipment,

— bent or loose tubing,

— abnormal noise or vibration.

An operator should consider consulting a geotechnical or structural engineer to evaluate the pipeline if damage is apparent and the integrity of the pipeline is unknown.

A standup pressure test can be useful to help verify pipeline integrity prior to a restart. If the assets show no visible damage and there are no other indicators of integrity risks (no further pressure, leak detection or other alarms in SCADA), consideration can be given to restarting the assets. After startup, all conditions shall be monitored closely to ensure continued safe operation.

# Annex B
## (informative)

# In-line Inspection Technologies

## B.1  Metal Loss Tools

ILI tools are available for locating and sizing internal and external corrosion-caused metal loss. The generic technologies preferred for this purpose are:

—  high-resolution axial field MFL tools,

—  transverse flux MFL (inclusive of circumferential or helical field MFL) tools,

—  ultrasonic compression wave tools.

Axial Field MFL Tools—This type of tool establishes a direct magnetic field circuit using the pipe wall as a conductor. The magnetic field is oriented parallel to the axis of the pipe. Metal loss within the pipe causes flux to leak outside or inside the pipe wall, and arrays of sensors are used to detect the flux leakage. Most tools use Hall-element sensors that can detect the absolute flux field even when the tool is not moving. Some older tools use coil-type sensors that rely on movement of the tool through the flux leakage field to induce a detectable voltage in the coil. The physical dimensions of the metal loss are inferred from the size and shape of the flux disturbance. The axial orientation of the flux field makes the tool particularly sensitive to the circumferential width and depth of an anomaly but less sensitive to its axial length. The length is usually inferred from the location of the beginning and end of the flux disturbance. In areas of multiple metal loss anomalies, the accuracy of the sizing may vary from vendor to vendor depending on the criterion a particular vendor uses for "clustering" the anomalies.

The magnetic phenomena are independent of the type of fluid in the pipe, as product does not affect the amount of magnetism that is coupled into the pipe through brushes or skid plates. The amount of magnetism is affected by debris and deposits which can increase the separation or liftoff between the steel brushes or skid plates and the pipe. The tools are fairly insensitive to velocity over the range of typical liquid pipeline flow velocities; tools with coil-type sensors must be moving at some minimum velocity to work. Axial field tools almost always include a mechanism to detect when the metal loss is internal and when it is external. An evolving variant of this type of tool uses bi- or tri-directional hall elements which measure magnetic flux levels in two or more directions. It is believed that the use of this technology will improve quantitative measurement of clusters of pits and complex corrosion profiles.

Axial field MFL tools have poor capability to sense the presence of axially oriented crack-like anomalies, and are not particularly good at characterizing "narrow axial external corrosion," a particular type of external corrosion described in Annex A that is associated with the "tenting" of tape-type coating over the crown of a submerged arc seam weld. Such tools cannot be relied upon to detect SSWC either. When used in conjunction with adequate verification excavations to evaluate sensitivity these tools have been found to be highly reliable for detecting and characterizing the severity of wide corrosion-caused metal loss (i.e. remaining strength of the pipe) and other volumetric anomalies but generally have decreased sensitivity to mechanical damage gouges due to the cold working of the metal beneath the gouge, which affects the magnetic field. Axial field MFL tools are probably the most frequently used type of ILI tool.

Transverse (Circumferential or Helical) Field MFL Tools—These tools employ a direct magnetic field to detect flux leakage at metal loss anomalies in much the same manner as the axial field MFL tools. The main difference is that the field is oriented circumferentially instead of axially. This makes the technology more sensitive to the axial length and less to the circumferential width of the anomaly. Depths of anomalies are also detectable by this method. The circumferential orientation of the flux makes it possible to detect narrow axial external corrosion, SSWC, and some types of crack-like anomalies that arise from pipe manufacturing (e.g. ERW seam anomalies). The user of this type of tool may be able to better characterize the axial lengths of corrosion-caused metal loss (particularly for narrow axial

95

external corrosion) for the purpose of calculating the effect of an anomaly on remaining strength. Generally, these tools are capable of identifying the orientation of the long seam, even in ERW pipe. Calculating the remaining strength at a bond line anomaly such as SSWC by means of standard remaining strength equations for metal loss (i.e., RSTRENG, ASME B31G) is not recommended. If accurate values of depth and length are known, then a remaining strength for a SSWC anomaly ostensibly could be calculated from an operator-selected crack equation. This requires careful consideration as the bondline toughness values can vary significantly from joint to joint.

Ultrasonic Compression Wave Tools—Ultrasonic compression wave tools are equipped with arrays of individual ultrasonic transducers that transmit and receive acoustic energy through the transported fluid in the pipeline. This is an important point because the tools may work better in some fluids than others. They do not work at all in natural gas, and their performance may be degraded in some lighter hydrocarbons. Two reflections of the signal from each transducer are transmitted back to the transducer: one from the ID surface of the pipe and one from the OD surface. The difference in arrival times is calculated from the wave speed and constitutes a direct measure of the wall thickness at a point. If the arrival time of the first reflection is longer than the arrival time for the standoff distance from the normal ID pipe surface, the corrosion is assumed to be internal. If the arrival time of the first reflection is the same as the time for the standoff distance and the arrival time of the second reflection is shorter than the arrival time from the normal OD surface, the corrosion is assumed to be external. While these tools can be quite accurate and can give thickness along the length of an anomaly, they have some limitations. Wax or debris or an irregular surface can prevent a recapture of the return wave resulting in no useful information. High tool velocity within the pipeline can degrade the signal. At bends the tool sensor standoff distance can change, resulting in misinterpretation of the signal. At dents with certain curvature, the reflection can be lost resulting in an area of no inspection. If the pipe is significantly laminated, the signal can be almost entirely reflected by the lamination resulting in unreliable inspection for external metal loss behind the lamination. These tools have been found to give highly reliable detection and characterization of corrosion-caused metal loss, and they have been widely used.

## B.2   Crack Tools

ILI tools are available for locating and sizing cracks and crack-like anomalies. The generic technologies available for this purpose are:

—   ultrasonic angle beam tools,

—   electromagnetic acoustic transducer (EMAT) tools,

—   transverse flux MFL (inclusive of circumferential or helical field MFL) tools.

API RP 1176 contains a summary of the commercial ILI tool types and utilization considerations to detect cracks.

## B.3   Geometry Tools

ILI tools are available for locating and sizing geometric features such as dents, ovalities, and buckles. The generic technologies available for this purpose are:

—   caliper tools,

—   high-resolution geometry tools.

Caliper Tools—Caliper tools employ mechanical arms that contact the inner wall of a pipeline at discrete locations. As the tool moves along the pipeline, the arms deflect in response to physical irregularities in the circular shape of the pipe. The recorded deflections reveal the circumferential deviations from circularity and the manner in which they vary along the axis of the pipe. Using this type of tool, a pipeline operator can locate and characterize dents, ovality, and buckles in a pipeline segment. The level of accuracy depends on the number of mechanical arms employed and the number of data channels recorded. At a minimum caliper tools can indicate the maximum height of the geometric

anomaly and its overall length. Generally, caliper tools are not sufficiently sensitive to determine curvature of the pipe wall in the vicinity of a geometric anomaly.

High-resolution Geometry Tools—These tools provide measurements of the position of the centerline and ID surface of the pipe with a higher degree of accuracy than most caliper tools. The physical locations of the pipe wall may be sensed by electromagnetic or acoustic signals, and in some tools both position sensors and mechanical arms are used. The accuracy of the data usually is sufficient to indicate the curvature of the pipe wall in the vicinity of a geometric anomaly. A pipeline operator using a high-resolution geometry tool may be able to estimate metal strains as well as to determine the height and length of the anomaly. In such cases, the sharpness of the anomaly which bears on its potential effect on pipeline integrity can be determined without excavating.

## B.4   Pipeline Profile and Alignment Tools

Inertial guidance tools, utilizing very high accuracy optical gyroscopes, are available for detecting changes in profile and changes in alignment as well as the pipeline centerline that can then be used to locate pipeline equipment and defects in geographical/photographical based systems. This type of information is useful for locating areas of possible landslide or settlement that could threaten the integrity of the pipeline as well as looking for coincident geographic features that would lead to root causes of certain threats being uncovered e.g. low points at crossings coincident with internal corrosion. Note that having a baseline profile and alignment is necessary to determine from a subsequent inspection whether a change has occurred.

## B.5   Combination Tools

ILI vendors are increasingly offering ILI tools with multiple inspection technologies on a single tool chassis. These tools offer reduced inspection costs and data that are fully integrated between the technologies on-board. This capability is particularly helpful in identifying certain threats, such as mechanical damage anomalies (gouge and dent combinations created by mechanical excavating equipment that require multiple inspection technologies to properly identify and characterize). Some vendors offer a modular approach to tool design that allows operators the flexibility to pick which inspection technologies they want on-board. Sometimes the combination of these features in one tool results in the vendor being able to provide a more accurate depiction of the combination anomaly such as a dent containing metal loss or better characterizing an anomaly class such as a gouge versus metal loss or SSWC.

## B.6   Additional ILI Technologies

Below are some additional ILI technologies that may address various needs:

A two magnetic field level approach to MFL, either low field (below saturation) or residual, can detect pipe material property changes. This can be useful for the detection and assessment of hard spots, gouging in dents, or localized residual stresses.

## B.7   Using Multiple ILI Technologies

Choosing the most appropriate ILI technology is an important decision in assuring the integrity of a pipeline. An example tool selection process is illustrated in Figure B.1 and described next. An ILI program should start with a bore diameter or geometry inspection to assure the safe passage of tools to assess anomalies such as corrosion and cracking. This is typically followed by an axial MFL tool for the detection of metal loss. The results of the inspections can help define future tool selection. Since axial MFL has limitations assessing narrow axially aligned corrosion as discussed in Section A.1, a multi-tool approach would include choosing a different tool for a future inspection. A circumferential MFL tool would be appropriate in this case to assure axially aligned corrosion anomalies were not missed or undersized. This circumferential MFL tool can be used to address other threats associated with the longitudinal seam. Another situation could be use of an ultrasonic wall thickness tool after an axial MFL tool. Examples for this approach include pipelines that have a large number of corrosion anomalies of significant depth or when axial MFL results are not meeting specification. An analysis of the results may produce a recommendation that the axial MFL inspection be repeated in the next cycle. This approach may be used to establish a corrosion growth

rate. The results from secondary tool inspections can lead to the selection of alternative tools for future inspections. For example, if a circumferential MFL tool detects anomalies in a vintage ERW seam that are confirmed in the ditch, additional inspection with a more sensitive ultrasonic crack tool may be appropriate. Tools that may be used, as detailed in API RP 1176, include ultrasonic shear wave and EMAT technology. Since anomaly type, size and density along with operational considerations are just some of the variables associated with ILI, no single approach is best for all pipelines. Using multiple ILI technologies can improve integrity by more completely assessing anomalies.



**Figure B.1—An Example Tool Selection Process**

## B.8   Considerations for Interacting Threats

### B.8.1   Internal or External Corrosion and Cracking Threats

The presence of internal corrosion or external corrosion in the same area as a cracking threat, either EAC (typically SCC), or manufacturing defects (seam weld anomalies) challenges detection technology and assessment methods. Internal or external corrosion can obscure the crack response for some ILI technologies and affect the depth measurement accuracy for these technologies. Inspection methods must define the length of the remaining ligament for the crack tip to the far wall, which could be the original surface or corroded region. Corrosion can affect ILI and external NDE in three ways:

1) Rough surfaces and internal debris associated with corrosion can interfere with the coupling of ultrasonic energy into the pipe.

2) Signals returning from interacting cracks and corrosion can combine, adding to the complexity of determining crack depth.

3) Inspection methods may provide the size of the crack with or without factoring in the metal loss depth.

Although transverse flux MFL tools run in association with an EMAT tool are primarily used to assist in discriminating steep-sided corrosion, they also identify the presence of any coincidental or interacting corrosion. An important aspect of this is that when the EMAT tool identifies cracking features in corrosion, the reported depth is inclusive of the corrosion depth. Additionally, certain feature classes detectable by EMAT may not exhibit a magnetic discontinuity (cold welds) and are therefore undetected with MFL.

Shear wave UT combined with compressive wave UT can identify the interaction of corrosion and cracking, but the resolved depth of the cracking would be determined in consideration of the depth of corrosion (i.e. the depth that the corrosion adds will depend on the morphology of the corrosion).

### B.8.2    External Corrosion Interacting with Internal Corrosion

As both internal and external metal loss are reported by the same technology within the same ILI dataset, the review for their interaction is integral to the ILI vendor's analysis process and would be addressed in the reporting.

Data analysis can be complicated when internal and external metal loss anomalies are coincident to each other. For MFL data, coincident ID and OD corrosion would be reported as internal. When an ILI calls both types of corrosion in a region where interaction could occur, additional analysis and assessment may be required. For compression wave UT data, coincident ID and OD can be reported separately, however, there is the potential for reduced accuracy since the amount of missing data due to echo loss may increase.

### B.8.3    Mechanical Damage Interacting with External Corrosion, Internal Corrosion, or EAC

Mechanical damage often damages the pipeline coating and creates a local stress in the pipeline which makes it more susceptible to EAC, or external corrosion at the location of the damage. Threat interaction with external corrosion can occur where the deformation is sufficient to damage the coating and the cathodic protection is locally impaired. The increase in residual stress associated with the dent or gouge can also be sufficient to initiate and grow SCC at this location.

The combination of MFL and caliper technologies support dent with metal loss (i.e. gouge or corrosion) as a distinct reported feature type. There are approaches that have extended the capability of this combination by using the caliper sizing for screening, but then manually reviewing the MFL signal data for the presence of cracking. This approach has successfully identified circumstances where cracks were found in association with dents. Alternatively, cracking ILI technologies can be overlaid against the caliper data, however the probability of detecting cracks in dents by ILI may be reduced.

# Annex C
## (informative)

# Repair Strategies

## C.1   General

Inspections conducted per the operator's IMP will result in features that should be evaluated. Several of these will be classified as defects that will require repair and this annex provides guidance to develop repair strategies. The information provided in this annex should not be considered a complete summary of every type of repair, but an overview of some of the more frequently used techniques in the industry today. In the absence of detailed company procedures for pipe replacement or repair, ASME B31.4, ASME PCC-2, CSA Z662 or the PRCI *Pipeline Repair Manual* R2260-01R (Catalog L52047) should be consulted.

An effort has been completed that maps specific defects to appropriate repair strategies and provides a reference for individuals determining the appropriate repair strategy for a certain type of defect in a certain location (seam, body, and girth weld) of line pipe. This compilation document is only intended to be used as reference showing at a high level how the various industry standards and documents approach use of these repair methods. For details on the applicability of a specific repair method, refer to the individual documents referenced within.

ASME B31.4, Paragraph 451.6, *Pipeline Integrity Assessments and Repairs*, describes thresholds for repair of specific defects.

Title 49 CFR Part 195 describes rules for repair. The current rule states that repairs shall be made in a safe manner and are made to prevent damage to persons or property. This gives the operator the flexibility to use new or innovative repair technologies.

All repairs shall be made in a manner that complies with applicable safety codes and regulations.

## C.2   Pipe Replacement

If a section of pipe is found to have a severe defect(s), or a steel reinforcement sleeve will not fit, or a composite reinforcement sleeve will not fit, the replacement of a defective section of pipe with another pipe section may be required. The replacement pipe should have the capability to carry the MOP of the pipeline safely, and it should be hydrostatically tested prior to commissioning to a four-hour-long pressure test to 1.25 times MOP while being visually monitored for leakage.

## C.3   Re-coat

After an external anomaly has been evaluated and determined to not require a repair, the anomaly may be re-coated. After the pipe has been re-coated, the anomaly will once again be under the protection of coating and cathodic protection. If the pipe was previously coated and cathodically protected, some determination of the root cause of the corrosion anomaly should be made and mitigative measures taken so as to preclude recurrence or an increase in severity of the anomaly.

## C.4   Pipe Sleeves

Steel full encirclement sleeves are one of the most widely used methods of general repair of defects in pipelines. In the early 1970s, the American Gas Association funded a major project on the effectiveness of various repair methods, with special emphasis on full-encirclement sleeves. This work showed that a properly fabricated sleeve will restore the strength of a defective piece of pipe to at least 100 % SMYS.



There are many types and configurations of steel full encirclement sleeves that can be used, dependent upon the configuration of the pipeline segment and the defect area to be repaired. Certain types of repair sleeves or their quality, while detectable by ILI tools, cannot be differentiated by the tool. For more information, see API 1176.

### C.4.1   Type A Sleeves

A Type A sleeve consists of two halves of a pipe cylinder or two curved plates placed around the carrier pipe at the defective area and joined by welding the side seams via a full penetration butt weld, by fillet-welding an overlapping strap across the joint, or via a single fillet weld. The ends are not welded to the carrier pipe but should be sealed to prevent migration of water between the pipe and reinforcing sleeve. The resulting sleeve cannot contain pressure and can only be used on non-leaking defects. To be effective, the Type A sleeve should reinforce the defective area, restraining it from bulging radially as much as possible. Reduction in operating pressure while the sleeve is being installed makes for a more effective repair. This is also true for using incompressible resin filler in the annular space.

a)  Advantages:

— No welding to the carrier pipe is required.

— Longitudinal welds can be made with cellulose rods, if necessary.

— The repair is easily detected by a traditional magnetic metal loss ILI tool.

b)  Disadvantages:

— The repair is not recommended for circumferentially oriented defects.

— It cannot be used to repair any leaking anomalies or anomalies that will eventually leak.

— Dents not effectively filled with resin or dent filler may fatigue and crack.

### C.4.2   Type B Sleeves

Another type of steel sleeve used to repair defects in pipelines is the Type B sleeve in which the ends are fillet welded to the carrier pipe. The Type B sleeve consists of two halves of a pipe cylinder or two curved plates fabricated and positioned in the same manner as a Type A sleeve. A Type B sleeve may contain pressure and/or carry substantial longitudinal stress imposed on the pipeline by lateral loads. In any case, it should be designed to safely carry the MOP of the pipeline. This type of sleeve can be used to repair leaks and strengthen circumferentially oriented defects. Sometimes Type B sleeves used to repair non-leaking defects are pressurized by hot tapping through the sleeve and the pipe to relieve hoop stress from the defective area. The Type B sleeve should be fabricated using full penetration welds for the side seam. Only Type A sleeves that have butt welded longitudinal side seams and that are designed to safely carry the MOP of the pipeline may be made into Type B sleeves by fillet-welding the ends to the pipe.

a)  Advantages:

— It can be used on most every type of anomaly, including leaking defects.

— It can be used for circumferentially oriented anomalies.

— The repair is easily detected by a traditional magnetic metal loss ILI tool.

— Annular space between the sleeve and the carrier pipe is protected from corrosion.

b) Disadvantages:

— There is a potential for delayed cracking associated with the circumferential fillet welds if the welds are made while the line is in service using a non-low-hydrogen welding process.

— The quality of welding needed, and the heat sink conditions associated with the end fillet welds require that only skilled welders who are qualified to use low-hydrogen processes be used to fabricate a Type B sleeve.

### C.4.3   Pumpkin Sleeves

In many older pipelines, joints were made by mechanical compression type couplings. These couplings usually included longitudinal bolts and collars used to compress packing or gaskets to seal against the pipe. They provided negligible longitudinal stress transfer along the pipeline, so they were subject to "pull-out" incidents when unusual longitudinal loads were imposed upon the pipeline. To overcome the pullout problem and leakage problem, a "pumpkin" sleeve may be installed over the coupling and fillet welded to the pipe on both ends. The side seams are also welded so the sleeve can contain pressure. Pumpkin sleeves may also be used to repair buckles, ovalities, and wrinkle bends because they can fit over such anomalies. This type of pumpkin sleeve should be installed in the same manner as a conventional Type B sleeve. Because pumpkins typically have a diameter significantly larger than the carrier pipe, they need to be thicker or of higher grade than the carrier pipe to carry the design pressure; therefore, a thorough technical design check should be carried out prior to the installation of a pumpkin.

Another type of pumpkin may be installed over a leaking tap after the leak has been stopped. A small piece of pipe (pup) with a cap welded to the end is welded to the pipe to prevent any possible leaking from the tap. The pumpkin has typically been used only as a last resort technique when a Type A or Type B steel reinforcement sleeve proves to be inadequate. Used in this manner, they typically are considered temporary.

### C.4.4   Over Sleeves

An over sleeve is a sleeve specifically designed to fit the outer diameter of the type A or type B sleeve, and can be used to bridge two adjacent sleeves, extending the length of the repair.

### C.5   Split Sleeve Reinforcement Clamps (or Bolt-on Clamps)

Split sleeve reinforcement clamps are a widely used method to repair anomalies to restore full pipeline MOP and may be considered a permanent repair in most situations. They can be used on both high and low pressure pipelines carrying oil, gas, or products. Typically, bolt-on clamps are quite thick and heavy due to the large bolts needed to ensure adequate clamping force. Although there are many types of commercially available bolt-on clamps, there are two basic installation configurations:

1) elastomeric sealing only,

2) elastomeric sealing with welding.

The elastomeric seal is designed to contain the pressure if the defect is leaking. The welding option is designed as a backup device. If the elastomeric seal should fail, the welded clamp is designed to seal the leak and continue to contain the pressure. The welded-up option should be chosen on an individual case basis, but care should be taken



when welding bolt-on clamps, especially due to wall thickness mismatch. In addition, packing materials should not be overheated, yet fusion to the heavy wall must be obtained. Split sleeve reinforcement clamps consist of the following:

a) Advantages:

— Clamps are sometimes cost effective.

— No welding to the carrier pipe is required.

— Clamps can be used to repair leaking defects.

b) Disadvantages:

— The short length prevents use on larger anomalies although custom sleeves can be fabricated in longer lengths.

— Typically used on straight sections of pipe but custom applications for elbows and fittings are available.

## C.6   Composite Reinforcement Sleeve

Composite reinforcement sleeves are used to reinforce a defect-weakened area of pipe as an alternative to a Type A split steel sleeve for non-leaking defects. They are designed to repair blunt corrosion defects and are available in a variety of technologies. An operator should investigate each technology to ensure that reliable engineering tests and analysis show the repair can permanently restore the serviceability of the pipe.



Installers should be trained on the specific composite sleeve being installed if the manufacturer is not performing the work. Certain composite sleeve manufacturers require their approval of the installation design prior to installation, even with training.

a) Advantages:

— No welding is involved.

— The material does not corrode.

— Sleeves can repair bends and long radius elbows.

b) Disadvantages:

— The installed sleeve has less reinforcing ability than a steel sleeve of comparable thickness. This limits its use to repair of blunt defects and dents.

— As with a Type A steel sleeve, the composite sleeve cannot be used to repair a leaking defect or one that may develop a leak.

— The repair cannot be seen by an ILI tool without the installation of a marker, such as a steel band.

— There is limited data available on the performance of non-destructive methods to determine if the wrap has been properly installed and is properly supporting the anomaly.

## C.7   Other Repairs

**C.7.1**   Other types of pipeline repairs include:

— Weld Deposit Repairs—Repairing a pipeline by means of deposited weld metal involves replacing lost or damaged metal with a filler metal to restore the continuity of the pipe. This type of repair requires special procedures.

— Hot Tapping—Some defects, leaking or non-leaking, may be removed on an in-service pipeline by hot tapping a fitting over the defect and cutting out the defect. This type of repair also requires special procedures.

— Leak Clamps—Temporary, low-stress repairs lasting only until the pipe segment can be replaced. Leak clamps are distinguished from pipe clamps or sleeves due to their temporary nature and their inability to carry significant hoop stress.

— Incompressible Resin-filled Sleeve—This system uses a metallic shell filled with epoxy grout. The technique is considered to be a permanent repair for gouges, corrosion, dents, circumferential, or girth-weld defects, without any welding on the carrier pipe.

— Grinding Repairs—Grinding by hand filing or power disk grinding is widely accepted for repairing superficial defects and some more significant defects such as gouges.

— Incompressible Resin-filled Sleeve—This system uses a metallic shell filled with epoxy grout. The technique is considered to be a permanent repair for gouges, corrosion, dents, circumferential, or girth-weld defects, without any welding on the carrier pipe.

— Grinding Repairs—Grinding by hand filing or power disk grinding is widely accepted for repairing superficial defects and some more significant defects such as gouges.

UTT readings should be made at the location of the grind to determine wall thickness remaining pre- and post-grind. PAUT or other NDE needs to be used to evaluate the defect that is to be removed to determine depth and then if grinding operations can proceed. Great care should be taken when grinding in seams, particularly vintage seams. The area in question also needs to be able to pass ASME B31G calculations for strength remaining at that location (L-tables, Effective Area Method).

— Other Composite Repairs—Other wet layup wraps can be used to repair elbows, tees, or other fittings. When using this repair, operators should verify compatibility of wet layup material with the product being transported.

# Annex D
## (normative)

## Calculating Reassessment Intervals

### D.1 Reassessment Intervals for Linear Growth Rates

#### D.1.1 Reassessment Interval Based on a Failure Pressure versus Flaw Size Relationship

The principle involved in calculating reassessment intervals for flaws with linear growth rates is illustrated in Figure D.1.



**Figure D.1—Reassessment Intervals Based on a Specific Failure-pressure vs Flaw-size Model**

Figure D.1 is based on a specific failure-pressure-versus-flaw-size model, but generically, the procedure would be similar for any validated model. In this example, it is assumed that an initial integrity assessment has established a minimum failure pressure corresponding to 100 % of SMYS for the worst case (i.e., lowest-failure pressure flaw) that could possibly remain in the pipeline segment. This level can be established either by completing a hydrostatic test of the segment to a minimum hoop stress level of 100 % of SMYS or by remediating all anomalies that were shown by ILI to be of a size that would cause failure at a hoop stress level less than 100 % of SMYS. For the 12.75 in. OD, 0.156 in. wall, X42 pipe (SMYS = 42,000 psi) considered in this example, the 100 % of SMYS level cuts across the specific maximum depth-to-thickness curves at specific lengths (e.g. a length of 2 in. for a d/t ratio of 0.5, a length of 6 in. for a d/t ratio of 0.3, etc.). Growth of a flaw in depth has a much greater deleterious effect on failure pressure than growth in length, whereas growth in length can be safely ignored. Therefore, each length of a flaw is considered for its growth through the wall thickness (i.e. an increase in d/t with the passage of time).

A pipeline operator should plan to remediate a potentially growing flaw or prevent it from failing in service by performing a reassessment of the integrity of the segment by the time the flaw has grown to a depth that will cause a failure at 1.1 times the MOP of the segment. When planning the reassessment, the amount of time it could take to excavate an area should be considered such that the flaw can be remediated before a timeline is exceeded. If the MOP of the segment corresponds to 72 % of SMYS, the limiting d/t ratio for each anomaly corresponds to the point

where the vertical arrow for each length of a flaw intersects the horizontal line at 1.1 × 72 % of SMYS. The level of hydrostatic test that is performed should be evaluated by the operator on a case-by-case basis; not all pipelines need to be tested to a minimum hoop stress of 100 % SMYS (see API RP 1179 for guidance).

According to Figure D.1, a 2 in. long flaw could survive a test to 100 % of SMYS if it has a d/t not exceeding 0.5. If the flaw grows to a d/t of 0.72, it will fail at a pressure level of 1.1 × 72 % of SMYS. Similarly, a 5 in. long flaw could survive a test to 100 % of SMYS if it has a d/t not exceeding 0.31, but it will fail at a pressure level of 1.1 × 72 % of SMYS if it grows to a d/t of 0.53. The change in d/t required for the decay from 100 % to 1.1 × 72 % varies over a narrow range irrespective of the length of the flaw, so the assumption that length is not important when it comes to calculating a retest interval is a good one. However, the operator should focus on the lowest amount of growth required, in this case, a change of 20 % of the wall thickness. Note that decay to a lower pressure level requires more growth of a flaw, and that means that lowering the operating pressure is one option for prolonging the time between assessments.

Armed with information that a change in d/t ratio of 0.2 will lower the failure pressures of the worst-case flaws in the example pipe material by a critical amount that should not be exceeded, the pipeline operator then calculates the maximum time allowed before remediation of the flaw dividing the corresponding wall thickness change by the rate of flaw growth for any mechanism expected to have a constant growth rate (i.e. corrosion or SCC, but not fatigue). For the 0.156 in. wall pipe of the example, 20 % of the wall thickness is 0.031 in. or 31 mils. If the flaw growth rate does not exceed 3.1 mils/year, the operator would have 10 years to either remediate the worst-case flaw (and others as their 1.1 × 72 % of SMYS failure pressure level is approached) or conduct a reassessment of the integrity of the segment.

## D.1.2   Reassessment Intervals Based on Material Toughness

In one respect, calculating a reassessment interval for a segment affected by external or internal corrosion-caused metal loss is similar to calculating a reassessment interval for a segment affected by SCC. Both phenomena can be assumed to have constant growth rates (SCC rates in liquid pipelines can vary over time but an average, linear growth rate can be applied). The major difference between calculating reassessment intervals for corrosion-caused anomalies and calculating reassessment intervals for SCC arises because the corrosion-caused anomalies are blunt anomalies and SCC anomalies are comprised of sharp cracks. Failures of blunt defects tend to be controlled solely by the size of the defect and the strength of the material. In contrast, failures of sharp cracks tend to be controlled by the size of the defect, the strength of the material, and the toughness of the material (i.e. its resistance to tearing in the presence of a sharp crack). Sharp cracks in materials of less-than-optimum toughness tend to fail at stress levels below that at which the same-size blunt defect would fail. The significance of this difference in behavior can be seen by comparing Figure D.2 and Figure D.3.

Figure D.2 gives failure-pressure-versus-flaw-size relationships for flaws in a 20 in. OD, 0.250 in. wall, X52 (SMYS = 52,000 psi) material. The toughness of the material is characterized by a Charpy V-notch upper shelf energy of 500 ft-lb. This level is fictitious since it exceeds the maximum level that is technologically possible. A material with this level of energy is so tough that all defects fail when the stress level in their remaining ligaments reach the flow stress of the material. This is also how blunt flaws behave. Therefore, Figure D.2 can be used to represent corrosion-caused metal loss flaws.

Figure D.2 is the basis for the example used in Section 10 with Figure 6. In that example a 14 in. long flaw was considered. The upper end of the vertical arrow in Figure D.2 represents the maximum depth-to-thickness ratio that would allow the 14 in. long flaw to survive the integrity assessment hydrostatic test to 100 % of SMYS, namely, $d/t = 0.20$. Since the nominal wall thickness is 0.250 in., $d_{initial}$ is 0.050 in. The lower end of the arrow (representing growth to the depth that causes the failure pressure of the flaw to decline to 1.1 × 72 % of SMYS) is located at a depth-to-thickness ratio of 0.40. The $d_{final}$ is 0.100 in. Thus growth of 0.050 in.(50 mils) lowers that failure pressure of the flaw from an initial value of 100 % of SMYS to a final value of 1.1 × 72 % of SMYS.

Figure D.3 also gives failure-pressure-versus-flaw-size relationships for flaws in a 20 in. OD, 0.250 in. wall thickness, X52 (SMYS = 52,000 psi) material, but the toughness in this case is less than optimum. The toughness of the material is characterized by a Charpy V-notch upper shelf energy of 25 ft-lb. A material with this level of energy is typical of



**Figure D.2—Remaining Life of a Blunt or Crack-like Flaw in a Material of Optimum Toughness**

older vintage (pre-1970) line pipe materials. It may be expected that sharp defects will fail at a stress level in their remaining ligament that is somewhat less than the flow stress of the material. For example, the 14 in.-long flaws that survived the 100 % of SMYS test with optimum toughness as shown in Figure D.2 had a depth-to-thickness ratio of 0.20. As shown in Figure D.3, the 14 in.-long flaw would have a depth-to-thickness ratio of 0.14 if the toughness corresponds to 25 ft-lb of Charpy energy. Figure D.3 can be used to represent SCC in the base metal of a line pipe material, but the actual Charpy energy of the material being considered should be used to generate the curves.



**Figure D.3—Remaining Life of a Crack-like Flaw in a Material of Less-Than-Optimum Toughness**

Using these two figures, an individual can compare the amount of growth in depth required for the failure pressure of a 14 in.-long flaw to decay from 1300 psig (100 % of SMYS) to 1030 psig (1.1 × 72 % of SMYS). For the blunt flaw or optimum toughness case (Figure D.2) the depth of the flaw changes from 20 % of the wall thickness to 40 % of the wall thickness. This corresponds to a change of depth of 50 mils. For the SCC in a material with a Charpy shelf

energy of 25 ft-lb the depth changes from 14 % of the wall thickness to 31 % of the wall thickness. This also corresponds to a change in depth of 42.5 mils. Note that the depth of the flaw in the latter case is less at each benchmark pressure level than in the case of the blunt flaw. In both cases the times to reassessment are calculated by dividing the changes in depth by the rate of growth. If the blunt corrosion flaw grows at a rate of 10 mils per year, reassessment will be required in 5 years. If the SCC grows at a rate of 10 mils per year, reassessment will be required in 4.25 years.

The model used to generate Figure D.1 through Figure D.3 is valid for use with materials that exhibit a minimum Charpy upper shelf energy of 15 ft-lb. It cannot be used to address flaws in the bondline of LF-ERW pipe where the level of Charpy energy is likely to be much less than 15 ft-lb. A similar procedure can be carried out for predicting reassessment intervals for bondline flaws in such materials. One way of doing this is to use the failure assessment diagram (FAD) approach outlined in API Standard 579-1/ASME FFS-1, *Fitness-For-Service*. For the 20 in. OD, 0.250 in. wall thickness, X52 (SMYS = 52,000 psi) pipe discussed, a FAD calculation based on an assumed Charpy energy of 4 ft-lb results in predictions that a 14 in.-long crack in such a material could only survive a hydrostatic test to 1300 psig if the flaw was no deeper than 11 mils and that at the $1.1 \times 72$ % of SMYS pressure of 1030 psig, the crack could be no deeper than 31 mils. Therefore, with a margin for growth of only 20 mils, a reassessment would be needed in two years if the growth rate of the flaw was 10 mils per year.

## D.2    Reassessment Intervals for Non-linear Growth Rates

### D.2.1    Reassessment Intervals for Crack-like Flaws

Remaining life calculations using data from either ILI or hydrostatic testing combined with applicable growth models are used to determine reassessment intervals for crack-like flaws. An appropriate factor of safety should be applied to remaining life calculations, and the result added to the date of the previous assessment. The factor of safety should consider the level(s) of conservatism applied to the remaining life calculation and also should take into account the risk associated with the pipeline. Consideration should also be given to the overall timeframe because short calculated times to failure can be overly sensitive to input assumptions.

Aside from regulatory requirements, the reassessment needs to occur before any potential cracks reach a critical size, taking into account the uncertainties associated with tool technology and inputs to the remaining life calculations. The assessment method chosen needs to be able to detect or eliminate the size of cracks that have set the reassessment interval.

### D.2.2    Benchmark Cycles for Assessing Fatigue Crack Growth

For a pipeline operator to determine whether a particular segment needs a seam integrity assessment from the standpoint of flaws that may be growing as the result of pressure-cycle-induced fatigue, the following procedure may be used. The objective is to compare the actual cycles experienced by the segment to a set of benchmark cycles that have been developed based on actual pipeline experience that indicate the degree of aggressiveness of the cycles in terms of the likelihood that fatigue crack growth will occur. The benchmark cycles, which were developed from pipelines of CX52 pipe, are shown in Table D.1.

The actual cycles experienced for a representative year should be obtained from the operating data for the segment. A sampling rate of two minutes or less is recommended to capture all pressure fluctuations of 25 psig or more. Cycles are counted by paring maximums and minimums in a systematic way. Although a number of schemes for counting cycles exist, rain-flow counting has been found to be one of the most conservative and therefore it is appropriate for fatigue crack growth in pipelines (see ASTM E1049-85, *Standard Practices for Cycle Counting in Fatigue Analysis*).

Once the pressure cycles are counted they can be compared to the benchmark cycles in Table D.1. In most cases they have to be adjusted to make a legitimate comparison. Adjustments to convert the actual cycles to benchmark-equivalent cycles can be done by means of techniques such as Miner's rule using an applied-stress versus cycles-to-failure relationship such as the one given for carbon steel in the ASME *BPVC*, Section VIII, Division 2, Appendix 5 (Figure 5-110.1). The ASME "fatigue" curve applies to specimens containing no anomaly. Therefore, comparing time

to failure using a fatigue crack growth model would be expected to produce times to failure for the actual cycles for any surviving anomalies. This would provide a more reliable assessment of cycle severity, and it establishes for the user the worst-case anomalies that remain after the last integrity assessment.

### Table D.1—Benchmark Cycles to Determine Cycle Aggressiveness

| Cycle Size, % SMYS (X52 Pipe) | Cycle Size, psi (X52 Pipe) | Very Aggressive | Aggressive | Moderate | Light |
|---|---|---|---|---|---|
| Over 65 to 72 | 33,801 to 37,440 | 20 | 4 | 1 | 0 |
| Over 55 to 65 | 28,601 to 33,800 | 40 | 82 | 0 | 0 |
| Over 45 to 55 | 23,401 to 28,600 | 100 | 25 | 10 | 0 |
| Over 35 to 45 | 18,201 to 23,400 | 500 | 125 | 50 | 25 |
| Over 25 to 35 | 13,001 to 18,200 | 1000 | 250 | 100 | 50 |
| 25 or less | 13,000 or less | 2000 | 500 | 200 | 100 |
| TOTAL | | 3660 | 912 | 363 | 175 |

The process of comparing cycle aggressiveness using a fatigue-crack-growth model is illustrated by the following examples. Consider a pipeline comprised of 20 in. OD, 0.250 in. wall, X52 pipe with a Charpy shelf energy of 100 ft-lb. Assume that the pipeline experiences one pressure cycle from zero to the MOP of 936 psig (72 % of SMYS) and back to zero every 16 days and that the last integrity assessment consisted of a hydrostatic test of the pipeline to a minimum pressure of 1300 psig (100 % of SMYS). It is possible to compare this spectrum with the four benchmark spectrums using Miner's rule and the ASME fatigue curve mentioned above, but it is better to use a fatigue crack growth model if one is available. Using a typical fatigue crack growth model and the default C and n values, one can show that the shortest calculated time to failure arises from an anomaly that is initially 80 % through the wall and 1.16 in. long. The calculated time is 16.6 years, so applying a factor of safety of two, the pipeline operator might decide to reassess the pipeline in 8.8 years anyway even if the cycles do not turn out to be aggressive or very aggressive. One reason that the operator might not reassess the pipeline in that amount of time could be that there is sound evidence that no 80 % through-the-wall anomaly exists. The same analysis shows, for example, that a 40 % through-the-wall anomaly has a remaining life of 30.2 years. Another reason could be that the default crack growth rate is too conservative for the particular environment of the pipeline segment.

To evaluate the degree of cycle aggressiveness one has to run the fatigue-crack-growth model for the same pipeline four times using the very aggressive, aggressive, moderate, and light cycles of Table D.1. The same C and n values should be used throughout that were used for the calculation using the actual operating spectrum. The model shows that the minimum remaining lives in these cases are also associated with an 80 % through, 1.16 in. long anomaly. The times to failure are:

—   0.9 year for very aggressive cycles,

—   3.7 years for aggressive cycles,

—   9.6 years for moderate cycles,

—   23.3 years for light cycles.

Thus, the operator can conclude that one cycle from zero to the MOP and back to zero every 16 days constitutes light to moderate cycle aggressiveness. This does not mean that the pipeline would never experience a fatigue failure, but experience has shown that pipelines that do exhibit fatigue failures tend to have aggressive to very aggressive cycles.

Some additional points about cycle severity worth noting are as follows.

—   If the cyclic spectrum changed from one full-MOP cycle every 16 days to one full-MOP cycle every four days, the minimum calculated time to failure would change by a factor of 4 to 4.4 years. This would put the pipeline in the aggressive category.

—   If the pipeline experiences one full-MOP cycle every 16 days, but it was tested to only 90 % of SMYS instead of 100 % of SMYS the minimum calculated time to failure is 3.9 years. Thus the pipeline would be placed in the aggressive category. This illustrates why it is good to test a pipeline to as high a pressure as possible, or if ILI is the means of assessment, anomalies having predicted failure pressures below 100 % of SMYS should be remediated.

—   If the pipeline was comprised of a pipe material of the same geometry and Charpy energy, was tested to 100 % of SMYS, is operated at 72 % of SMYS, and is operated with one full-MOP cycle every 16 days, but is comprised of X60 pipe instead of X52, the minimum calculated time to failure is 13.2 years (compared to 16.6 years for X52). The 100 % of SMYS pressure for X60 is 1500 psig and the 72 % of SMYS pressure is 1080 psig. Therefore, a full-MOP cycle is zero to 1080 psig (43,200 psi hoop stress) and back to zero for the X60 pipeline in contrast to the full-MOP cycle for X52 (37,440-psig hoop stress). The larger stress cycle produces a shorter fatigue life even though both pipelines were subjected to the same test-pressure-to-operating-pressure ratio.

# Annex E
## (informative)

# Other Technologies

## E.1 Direct Assessment

Direct assessment is a four-step process:

1) Pre-assessment is carried out for a segment based on the attributes of the segment and its operating history.

2) Indirect measurements are made to detect possible locations where anomalies may exist.

3) Direct examinations (excavations and examinations of the pipeline) at selected locations (based on the indirect measurements) are made to assess the nature of anomalies, if any.

4) Post-examination is carried out to evaluate remaining life and to evaluate the direct assessment process itself.

In the case of ECDA, the pre-assessment identifies whether ECDA is feasible for a given segment. ECDA cannot be used for underwater pipelines. The electrical measurements typically used for ECDA do not work inside casings; GWUT can be used as an indirect inspection method for pipes inside steel casings as part of the ECDA. Other factors such as extremely poor coating or excessively deep burial may defeat the use of ECDA. The indirect assessment entails utilizing at least two types of above-ground electrical measurements such as close-interval pipe-to-soil potential surveys, DC voltage gradient surveys, or current attenuation surveys to locate coating faults and cathodic protection current anomalies that may indicate that external corrosion has occurred, may be occurring, or could occur in the future.

Since mechanical damage inherently is associated with coating damage, it is likely that locations of mechanical damage will be identified by the electrical surveys. Locations for direct examinations are selected based on the findings of the electrical surveys, and usually, some random locations not indicated by the surveys are examined as well to check the validity of the surveys. Repairs are made to any coating anomalies, the anomalies are assessed in terms of their effect on remaining strength and repaired if necessary, and data are gathered on coating condition and soil properties that could affect corrosion. Repairs are made to any pipe defects which would impair pipeline integrity based on criteria such as B31G, Modified B31G, or RSTRENG. The post-examination step involves calculating remaining life, setting reassessment intervals, and determining whether ECDA has been shown to work for the segment. A pipeline operator who elects to use ECDA for integrity assessment should carry out the assessment in accord with NACE SP0502-2002.

In the case of ICDA, the pre-assessment involves examining pipeline attributes and historical data; gathering terrain (elevation profile) and flow rate data; and consideration of factors such as product type, water content, inhibitor or biocide programs, and cleaning pig frequency to be able to identify locations where internal corrosion might be expected to occur. Note that the flow rate should be great enough to entrain water and solids into the fluid stream; the presence of turbulent flow alone does not necessarily guarantee sufficient velocity. The use of ICDA is not recommended if these data cannot be acquired, if the likely rate of corrosion cannot be inferred, if a continuous water phase is present, or if direct examination of the likely locations of corrosion is not feasible. Indirect examination involves identifying the likely locations for internal corrosion to have occurred. This is done by considering where liquid water and/or solid waste or sediment could accumulate as the result of elevation profile and flow rate. Models are available for determining such locations. Locations for direct examinations are selected based on the findings of the evaluations of likely locations for internal corrosion to have occurred, and usually, some random locations not indicated by the evaluations are examined as well to check the validity of the evaluations.

Nondestructive thickness measurements are made at the selected locations to determine whether wall thickness degradation has taken place. Repairs are made to any pipe defects which would impair pipeline integrity based on

111

criteria such as B31G, Modified B31G, or RSTRENG. The post-examination step involves estimating remaining life, setting reassessment intervals, and determining whether ICDA has been shown to work for the segment. A pipeline operator who elects to use ICDA for integrity assessment should carry out the assessment in accordance with NACE SP0208.

In the case of stress corrosion cracking direct assessment (SCCDA), the pre-assessment involves reviewing historical data for a given segment that would suggest whether the segment might be susceptible to SCC. The factors that control susceptibility to "high-pH" SCC for a liquid pipeline are operating stress level (60 % of SMYS is threshold above which susceptibility is assumed likely), an operating temperature above 100 °F, the years the system has operated in the susceptible range, and the coating type is other than fusion-bonded epoxy. The factors that control susceptibility to "near-neutral-pH" SCC are the same except that susceptibility may exist irrespective of the operating temperature. When determining the susceptibility of a pipeline segment for near-neutral-pH SCC, it is important to consider the presence of dents with high residual strain as potentially susceptible sites. The indirect assessment entails acquiring data such as pipe-to-soil potential measurements from close-interval surveys and DC voltage gradient surveys to indicate where coating disbondment may have occurred and information on terrain, soil type and drainage as these factors are known to influence susceptibility. Locations for direct examinations are selected based on the findings of the electrical, soil type, terrain, and drainage surveys.

Soil models exist that may assist the operator in identifying locations of likely susceptibility. Usually, some random locations not indicated by the surveys are examined as well to check the validity of the surveys and any soil model that may be employed. The direct examinations involve examining the coating, terrain, soil, and drainage conditions and examining the pipe surface by means of magnetic particle inspection to ascertain whether SCC exists and, if so, which type of cracking (high-pH or near-neutral-pH) is taking place. Repairs are made to any pipe defects which would impair pipeline integrity based on an engineering fracture mechanics assessment criterion. The post-examination step involves setting reassessment intervals, and determining whether the SCCDA survey and analysis process have been shown to work for the segment. A pipeline operator who elects to use SCCDA for integrity assessment should carry out the assessment in accord with NACE SP0204.

GWUT involves inducting ultrasound waves into a pipe segment through a concentric collar (the pipe does not have to be out of service). Waves propagate axially using the pipe wall thickness as a wave guide. Wall thickness anomalies cause reflections that are interpretable in terms of thickness loss. The distance capability for this to work is limited. It is on the order of 100 ft to 200 ft, depending on energy absorption characteristics of the pipe-coating-soil interface, so it is not practical to inspect long segments of pipe by this method. The technique has proven useful for short segments where neither access to the pipe nor pigging is feasible. Examples are pipe inside a casing, risers at platforms, and short delivery lines. The technique can locate areas of metal loss caused by either external or internal corrosion.

## E.2   Visual Inspection

Visual inspection of an aboveground pipeline is useful for identifying areas of external corrosion or mechanical damage. Visual inspection of pipe exposed by excavation is useful for identifying areas of sagging or missing coating. All anomalies identified at an excavation site should be visually inspected and photographed in addition to whatever physical measurement or nondestructive inspections are used.

# Annex F
## (informative)

# Leak Detection Methods

## F.1   Introduction

The well-known leak detection systems are as follows.

— Periodic Auditory, Visual, and Olfactory Inspections—Operators use a variety of periodic inspections to detect leaks. These may include aerial patrols, surface patrols, station walk-throughs, etc., and personnel looking for dead vegetation, stained areas, pooled or free-flowing product, vapor or vapor clouds, ground frost, hissing sounds, or odors, or a combination thereof.

— Volume Balance—One of the oldest techniques involves comparing the mass of fluid put into the pipeline with the mass of fluid coming out at the other end. The comparison should be made over a period of time such as one hour or longer to eliminate the effects of transients (i.e. its application is based on the assumption that the flow is steady state). The method does not locate the leak. Errors in measurement, metering, or temperature can limit success.

— Dynamic Flow Modeling—Dynamic flow modeling involves simulating the operating conditions of the pipeline through hydraulic calculations based on flow rate, temperature, pipeline profile, and fluid properties. The calculated conditions are then compared to real time data acquired from various measurement points along the pipeline. Deviations are evaluated against alarm set points. The alarm set points should be selected to find the smallest leak that is distinguishable from background noise so as to minimize false alarms. The size of leak that can be found will be a certain percentage of the volume of fluid in the system. The software models for this purpose are normally integrated into the SCADA system of the pipeline. Leak location information is not provided automatically, but analysis of transients can be used to locate a leak. A pipeline operator may find it useful to consult API 1149 and API 1130 in conjunction with employing a dynamic flow model leak detection system.

— Tracer Chemical—This approach to leak detection requires mixing a small amount of a specific volatile chemical tracer with the contents of a pipeline. The chemical tracer is not a component of the pipeline contents and does not occur naturally in soil. After the chemical is injected into the pipeline, soil vapor samples are obtained from probes or other devices installed intermittently along the pipeline. The vapor samples are analyzed by a gas chromatograph for the specific tracer chemical. Presence of the chemical in the sample can only occur through leakage from the pipeline. This method can be used periodically or continuously to examine for leakage. Since the locations of the samples are known, it is possible to locate the leak within the limits of distances between sample points. One limitation of this method is that you need to restart a line with a suspected leak in order for tracer chemicals to work.

— Release Detection Cable—Leak-detection-sensing cables can be installed in the pipeline trench over, under, or along-side the pipeline. Typically, the cable is installed within a continuous perforated plastic tube. The presence of a hydrocarbon creates a circuit between two sensing wires within the cable, sending a signal of the leak and the location to the pipeline control center. This kind of system most likely can only be installed as the pipeline is being constructed. It would seem that retrofitting an existing pipeline would be prohibitively expensive. One limitation of detection cables is that they can be defeated by previously existing contamination.

— Shut-in Leak Detection—Shut-in leak detection, also known as a "stand-up test" consists of shutting off flow in a pipeline and closing the valves to hold the pressure constant. The pressure will remain constant except for changes due to temperature variations unless a leak exists. The rate of pressure decay in the event of a leak is indicative of the size of the leak. It should be noted that leakage through valves, if it occurs, will confound the ability to judge whether a leak exists. No information on the location of the leak is provided by this type of test.

— Pressure Point Analysis Leak Detection Software—This software examines pressure data acquired at high sampling rates from discreet locations and it calculates mass balance in real time. Pattern recognition algorithms are used to distinguish leak events from normal operations. Since the locations of the pressure point samples are known, it is possible to locate the leak within the limits of distances between sample points.

— Acoustic Leak Detection—Acoustic leak detection technologies use listening devices, such as microphones, hydrophones and accelerometers, to detect sound emitted from a pipeline leak. The sound level and tone from a leak depends on the orifice size, the pipe diameter, the pipeline pressure, product type, and the soil conditions (soil type, compaction, and depth of cover) surrounding the pipeline. For leaks to be detected, sound levels from leaks need to exceed the natural sound level in the pipeline caused by the pumps, operations, and the flowing product. The sound from a leak dissipates and is dispersed below this natural background noise level over distances that make distributing listening devices along a pipeline rarely practical. Newer technologies deploy listening devices internally propelled by the product, similar to ILI tools. The advantage of the in-line listening tools is the proximity of the listening device to the leak which enables detection of leaks significantly smaller than those found using conventional dynamic flow modeling systems. As for limitations, these internal devices can interfere with pipeline operations and throughput due to launching and receiving operations and flow restrictions. A potential effective use of this technology is to ensure that no additional leaks exist on a pipeline that has experienced a small leak that was not detected by the more conventional leak detection methods.

# Annex G
## (informative)

# Facilities Piping and Equipment Threats

## G.1   Introduction

Facility threats are discussed in this section. Threats from equipment failure and incorrect operations should be addressed through operating procedures, equipment maintenance and inspection, operator qualification, and quality control processes. Inspection and maintenance of pipeline breakout storage tanks are covered by API 653.

Annex G is organized as shown in Table G.1.

### Table G.1—Organization of Topics Covered in Annex G

| Main Topic | Subtopic | Subject Matter |
|---|---|---|
| G.2 External Corrosion | Soil-to-Air Interface | Visual inspection, removing soil and coating if necessary, carefully replacing coating and seals. |
| | Contact Corrosion | Visual inspection possibly supplemented by UT or GWUT, use of dielectric materials to separate pipe from support structures or hangers. |
| | Corrosion Under Insulation | Preventing water ingress, checking for missing or damaged insulation, using "plugs" for inspection sites. |
| G.3 Internal Corrosion | Dead legs, Drain Lines, and Relief Valves | Periodic flushing to remove water and sludge, periodic UT measurements of wall thickness, GWUT for inspection of buried segments, remove unnecessary dead legs. |
| G.4 Erosion and Corrosion/Erosion | | Inspecting wall thickness at locations of high flow and/or direction changes. |
| G.5 Environmental Cracking—Ethanol Related Cracking | | Inspection for systems that have demonstrated susceptibility, reference documents for detailed prevention and mitigation. |
| G.6 Manufacturing Defects | | Quality assurance and control programs during procurement activities to prevent manufacturing defects from entering service. |
| G.7 Construction and Fabrication Defects | | Quality assurance and control programs during construction activities to prevent construction defects from entering service. |
| G.8 Equipment Failures—Tubing and Small Bore Piping | | Importance of proper installation, mitigation of vibration and stress, use of electrical instrumentation in place of small tubing. |
| G.9 Mechanical Damage | | Susceptibility of facilities to mechanical damage from vehicles and construction equipment from increased activity as well as vandals. |
| G.10 Incorrect Operations | | Taking precautions to minimize human error incidents for tubing and small bore piping, valves, and overfill of tanks and sumps. |
| G.11 Weather and Outside Force—Freezing of Trapped Water | | Inspecting areas where water may become trapped and draining any water before freezing weather occurs. |

115

## G.2  External Corrosion

Since facility piping generally cannot be inspected by ILI or subjected to periodic hydrostatic testing, inspections of facility piping and tubing depends on periodic visual inspection and the use of ultrasonic and radiographic wall thickness measurements. For additional information, see API 570 and API 2611. Pipeline operators should perform visual and wall thickness measurements where corrosion rates are known to be higher than average. Each operator should establish periodic inspection programs for the following specific types and areas of deterioration:

— external corrosion at supports and hangers;

— external corrosion at soil-to-air interfaces;

— external CUI.

In all cases, periodic inspections in conjunction with wall thickness measurements are suggested as ways to monitor these situations. The frequency of inspection can be based on a corrosion rate established from the measured wall thickness loss. In the absence of established corrosion rates, other methods may be used to determine corrosion rates (e.g. a Monte Carlo simulation with distributions of pit depths and corrosion starting times). Models for calculating remaining strength of corroded pipe such as Modified B31G or RSTRENG can be used to predict SOPs or corroded tubing and piping within facilities. Operators should be cautious about using these models alone with piping that is operated at low levels of hoop stress (i.e. less than 50 % of SMYS) because the effect of contact stresses or secondary stresses could cause the failure stress to be less than that predicted by such models. In such cases, the operator should consider carrying out a more sophisticated analysis, for example, by using finite element modeling.

### G.2.1  Soil-to-Air Interface

Inspection at grade should include checking for coating damage, bare pipe, and pit depth measurements. If significant corrosion is noted, thickness measurements and excavation may be required to assess whether the corrosion is sufficient to impair the integrity of the piping. Consideration should be given to excavating 12 in. deep to assess the potential for hidden damage. Significantly impaired piping should be repaired or replaced. Thickness readings at soil/air interfaces may expose the metal and accelerate corrosion if coatings and wrappings are not properly restored. If the buried piping has satisfactory cathodic protection, excavation is required only if there is evidence of coating or wrapping damage. At concrete-to-air and asphalt-to-air interfaces for buried piping without cathodic protection, the interface should be inspected for evidence that the caulking or seal at the interface has deteriorated and allowed moisture ingress. If such a condition exists on piping systems over 10 years old, it may be necessary to inspect for corrosion beneath the surface before resealing the joint.

### G.2.2  Contact Corrosion

Contact corrosion, particularly more aggressive in humid climates or coastal locations, or both, needs to be monitored. Typical areas for more aggressive corrosion are between the pipe support and contact area of the pipe, and welds/joints along the pipe. Corrosion cells may arise from moisture/dew collection and/or dissimilar metals (i.e. weld material has different composition than the pipe base metal).

Where visual inspection at supports or hangers suggests the presence of corrosion products, the piping and support should be separated to permit detailed inspection with equipment to determine the remaining wall thickness. Whenever possible, the use of NDE, such as UT or GWUT, should be considered in addition to visual inspection. Care should be taken to avoid overstressing the piping by temporarily supporting the pipe adequately if the pipe is to be lifted or the support is to be removed. Piping that has sustained significant wall loss such that either internal pressure or support stresses could cause leakage should be repaired or replaced.

To prevent further corrosion, operators should consider re-coating or installation of dielectric material between the pipe and support. Operators could also design out or minimize the crevice. If no corrosion exists, operators should consider applying epoxy or other sealant material to the pipe support interface.

## G.2.3  Corrosion Under Insulation in Aboveground Piping

External inspection of insulated piping systems should include a review of the integrity of the insulation system for conditions that could lead to Corrosion Under Insulation (CUI) and for signs of ongoing CUI. Sources of moisture may include rain, water leaks, condensation, and firewater deluge systems. The most common forms of CUI are localized corrosion of carbon steel.

The extent of a CUI inspection program may vary depending on the local climate. Warmer, marine locations may require an active program, whereas cooler, drier, mid-continent locations may not need as extensive a program.

Certain areas and types of piping systems are potentially more susceptible to CUI, including the following:

— areas exposed to frequent rains;

— areas exposed to steam vents;

— areas exposed to firewater deluge systems;

— areas subject to spills, ingress of moisture, or acid vapors (i.e. from neighboring businesses);

— carbon steel piping systems, including those insulated for personnel protection, operating between 4 °C and 120 °C. CUI is particularly aggressive where operating temperatures cause frequent or continuous condensation and re-evaporation of atmospheric moisture;

— attachments that protrude from insulated piping and operate at a different temperature than the operating temperature of the active line;

— vibrating piping systems that have a tendency to inflict damage to insulation jacketing providing a path for water ingress;

— steam traced piping systems that may experience tracing leaks, especially at tubing fittings beneath the insulation;

— piping systems with deteriorated coatings or wrappings, or both.

Piping systems may have specific locations within them that are more susceptible to CUI, including the following.

— All penetrations or breaches in the insulation jacketing systems, such as:

    — dead legs (vents, drains, and other similar items),

    — pipe hangers and other supports,

    — valves and fittings (irregular insulation surfaces),

    — bolted-on pipe shoes,

    — steam tracer tubing penetrations.

— Termination of insulation at flanges and other piping components;

— Damaged or missing insulation jacketing;

— Insulation jacketing seams located on the top of horizontal piping or improperly lapped or sealed insulation jacketing;

— Termination of insulation in a vertical pipe;

— Caulking that has hardened, has separated, or is missing;

— Bulges or staining of the insulation or jacketing system or missing bands (Bulges may indicate corrosion product buildup);

— Low points in piping systems that have a known breach in the insulation system, including low points in long unsupported piping runs.

Locations where insulation plugs have been removed to permit piping thickness measurements on insulated piping should receive particular attention. These plugs should be promptly replaced and sealed. Several types of removable plugs are commercially available that permit inspection and identification of inspection points for future reference.

## G.3    Internal Corrosion

### G.3.1    Dead legs, Drain Lines, and Relief Lines

Dead legs are segments of pipe connected at one end to active piping that experiences constant or frequent flow but are closed at one end so that they experience no flow. They may exist for a variety of reasons such as stubs installed for planned future expansions or locations where some type of equipment has been removed. Drain lines are used to drain product from the system when drain-down is required. Relief lines connect pressure relief valves to tanks or flare stacks. The common characteristic of these lines is that the flow of product is either intermittent or nonexistent. As a result, water and or sludge may accumulate in these lines possibly resulting in internal corrosion. The problem is most pronounced with crude oil, but water/condensation is also a cause of internal corrosion in refined product systems. Such systems may be subject to MIC as well. The wall thickness should be monitored periodically at locations where water may be expected to accumulate (i.e. at the stagnant end of a dead leg and at the point of its connection to an active line, and low points and blocked ends to drain lines and relief lines). Wall thickness measures on aboveground piping can be made by an appropriate nondestructive examination method such ultrasonic or radiographic thickness determination. Buried segments may be inspected by GWUT. Where wall thickness losses portend the occurrence of leakage, the particular piping should be repaired or replaced.

Consideration should be given to removing dead legs that serve no further process purpose. Where possible, dead legs, drain lines, and relief lines should be flushed out/displaced on a regular basis. The addition of biocides and corrosion inhibitors to the flushing fluid can slow the rate of deterioration.

## G.4    Erosion and Corrosion/Erosion

Erosion can be defined as the removal of surface material by the action of numerous individual impacts of solid or liquid particles, or cavitation. It can be characterized by grooves, rounded holes, waves, and valleys in a directional pattern. Erosion is prone to occur in areas of turbulent flow, such as at changes of direction in a piping system or downstream of control valves, where vaporization may take place. Erosion damage is usually increased in streams with large quantities of solid particles and high velocities. A combination of corrosion and erosion (corrosion/erosion) results in significantly greater metal loss than can be expected from corrosion or erosion alone. This type of corrosion occurs at high velocity and high turbulence areas. Examples of places to potentially inspect include:

— downstream of orifices,

— downstream of pump discharges,

— location of at any point of flow direction change, such as the outside radius of elbows.

## G.5   Environmental Cracking

Where specific segments or piping circuits have a demonstrated susceptibility to environmental cracking, the operator should schedule supplemental inspections. Such inspections can take the form of NDE, for example, PT or wet fluorescent magnetic-particle testing (WFMT). Where feasible, suspect spools may be removed from the piping system and split open for internal surface examination.

Environmental cracking is not common in pipeline facilities. For consideration of fuel ethanol transport, see API 939-D. Another document for consideration is API 939-E.

## G.6   Manufacturing Defects

Manufacturing defects at facilities can include equipment body defects, components not meeting engineering specifications, and seam weld defects. Quality control during procurement, construction, and operations can identify manufacturing defects prior to product entering service. Inspection protocols and procedures can identify equipment and piping manufacturing defects in service. Manufacturing defects discussed in Annex A may also apply at facilities.

## G.7   Construction and Fabrication Defects

Construction defects at facilities can include fabrication weld defects, dents or gouges that occur during construction activities, and improper installation of equipment, piping, flanges, and fittings. These threats can be prevented or mitigated through the use of approved procedures, inspection protocols, and robust quality assurance and control programs during construction activities.

### G.7.1   Tubing and Small-bore Piping

Noted causes of releases from tubing and small-bore piping include improper installation, vibration and damage by outside force. These problems tend to arise from inadequate design or protection of piping and tubing systems. Piping spans should be supported and protected such that the effects of mechanical vibrations and exposure to outside forces will be minimized. Long unsupported spans of tubing or piping should be avoided. Using tubing or piping to support concentrated loads should be avoided. Tubing and small-bore piping should be protected from vehicles that may be moving around a facility.

## G.8   Equipment Failure

Pumps, valve, seals, O-rings, meters, pressure switches, temperature gauges, prover loops, scraper traps, strainers, truck loading racks, etc. are types of equipment found mostly at terminals and pump stations. These components are subject to occasional malfunction and/or failure, and they may in certain cases cause an unintended release. According to the *PPTS Advisory 2005-4*, valve failures are the second most common cause of releases at facilities (behind pipe failures). The largest cause of valve failures is due to equipment malfunction including gasket or O-ring failure, malfunction of control or relief equipment, seal or packing failures, and stripped threads. Malfunction of control or relief equipment can lead to overfilling of sumps.

## G.9   Mechanical Damage

Construction, operation, and maintenance activities are common at pipeline facilities making them susceptible to mechanical damage from vehicular traffic, construction equipment, and other impact mechanisms. Because many facilities are above ground they can be a target for vandals.

## G.10   Incorrect Operations

Tubing and small-bore piping (generally considered to be piping of $\leq 2$ in. NPS) have many uses within a facility including instrumentation lines and control lines. Often these lines are assembled with fittings of various types rather that with electric arc girth welding as is the case with mainline pipe. The previously mentioned PPTS advisory found

that improperly installed fittings were one of the most frequent causes of leaks in tubing and small-bore piping. Pipeline operators should establish written standards for the assembly of piping and tubing with fittings. Fitting manufacturers' assembly instructions should be carefully followed, and individuals employed for the purpose of assembling piping and tubing with fittings should be adequately trained for that purpose.

### G.10.1    Overfill of Sumps or Storage Tanks

Storage tanks and more commonly sumps or separators can be overfilled releasing product to the environment. Various errors can lead to overfills including opening or closing of the wrong valve, not monitoring sump fill levels during drain down of pig traps, or misinterpreting alarms.

### G.10.2    Valve Misalignment

According to the PPTS Advisory 2005-4, valves left or placed in the wrong position are by far the most prevalent type of error leading to unintentional releases of product or accidental over-pressurization of equipment. Procedures and training of operators during start-up, normal operations, abnormal operation, emergency operations, shut-down, and maintenance activities ensure that valves are appropriately aligned for the specific operational condition.

### G.11    Weather and Outside Force Related Defects

At subfreezing temperatures, water and aqueous solutions in piping systems may freeze and cause failure because of the expansion of these materials. After freezing weather, it is important to check for freeze damage to exposed piping components before the system thaws. If rupture has occurred, leakage may be temporarily prevented by the frozen fluid. Low points, drain nipples with valves or caps, and dead legs of piping systems containing water should be carefully examined. If possible, low points and drain lines should be purged of water each year before the start of freezing weather.

Winter weather can also cause extreme contraction and expansion of soft goods (i.e. gaskets and seals) resulting in small volume releases. Proper installation and maintenance is necessary to ensure adequate protection against releases. Refer to manufacturer guidance for specific details.

## Annex H
### (informative)

## Example Visual/Surveillance Inspection Form for Facilities

### H.1   Introduction

**H.1.1**   Figure H.1 shows a sample form to be used by operators performing a facility inspection.

---

**Inspection Check List**

Customer _____   Date _____

Location _____   Drawing _____

Line number/Description _____   Material _____

A= Acceptable, FEN= Further Evaluation Needed, NA= Not Applicable, NI= Not Inspected

Item Number

| 1 | Leaks |
| 2 | Misalignments |
| 3 | Vibration |
| 4 | Supports |
| 5 | Corrosion |
| 6 | Insulation/Coating |
| 7 | Flange and Pipe Information |
| 8 | Piping Start and Stop Locations |
| 9 | Injection or Mixing Locations |
| 10 | Dead Leg Piping |
| 11 | Pressure and Temperature |
| 12 | PSV External Inspection Checklist |

    a)   Equipment Integrity/Serviceability

        i)   Leakage at Flange

        ii)   Evidence of mechanical Damage

        iii)   Bolting Corroded

        iv)   Isolation valves open and car-sealed

        v)   Bleeder valves closed and capped

        vi)   Service tag attached

    b)   Vent piping

        i)   Closed system

        ii)   Vent piping properly supported

        iii)   Weep hole open and clear

    c)   Insulation Condition

        i)   Blanket or sheathing in place

        ii)   Evidence of damage to sheating

        iii)   Bands/wires secure

        iv)   Leakage onto insulation

    d)   Paint Condition

        i)   Fair to Good

        ii)   Blisters

        iii)   Peeling

        iv)   Other

    e)   Service tag information

---

**Figure  H.1—Example of a Visual/Surveillance Inspection Form for Facilities**

**Annex I**
(informative)

# Advisory Bulletins and National Transportation Safety Board (NTSB) Pipeline Accident Report References

— ADB-2016-05, *Clarification of Terms Relating to Pipeline Operational Status,* PHMSA-2016-0075, August 16, 2016

— ADB-2016-04, *Ineffective Protection, Detection, and Mitigation of Corrosion Resulting from Insulated Coatings on Buried Pipelines,* PHMSA-2016-0071, June 21, 2016

— ADB-2016-01, *Potential for Damage to Pipeline Facilities Caused by Flooding, River Scour, and River Channel Migration,* PHMSA-2015-0283, January 19, 2016

— ADB-2015-02, *Potential for Damage to Pipeline Facilities Caused by the Passage of Hurricanes,* PHMSA-2015-0140, June 23, 2015

— ADB-2015-01, *Potential for Damage to Pipeline Facilities Caused by Flooding, River Scour, and River Channel Migration,* PHMSA-2015-0105, April 9, 2015

— ADB-2014-05, *Guidance for Strengthening Pipeline Safety Through Rigorous Program Evaluation and Meaningful Metrics,* PHMSA-2014-0086, October 15, 2014

— ADB-2014-04, Guidance for Pipeline Flow Reversals, Product Changes and Conversion to Service, PHMSA-2014-0040, September 18, 2014

— ADB-2014-03, *Construction Notification,* PHMSA-2014-0017, September 12, 2014

— ADB-2014-02, *Lessons Learned from the Release at Marshall,* MI, PHMSA-2014-0020, May 6, 2014

— ADB-2014-01, *Improvements in Preparing Oil Spill Facility Response Plans,* PHMSA-2013-0226, January 28, 2014

— ADB-2013-02, *Potential for Damage to Pipeline Facilities Caused by Flooding,* PHMSA-2013-0136, July 12, 2013

— ADB-2013-01, *Accident and Incident Notification Time Limit,* PHMSA-2013-0015, January 30, 2013

— ADB-2012-10, *Using Meaningful Metrics in Conducting Integrity Management Program Evaluations,* PHMSA-2012-0279, December 5, 2012

— ADB-2012-09, *Communication During Emergency Situations,* PHMSA-2012-0201, October 11, 2012

— ADB-2012-06, *Verification of Records,* PHMSA-2012-0068, May 7, 2012

— ADB-2011-01, *Establishing Maximum Allowable Operating Pressure or Maximum Operating Pressure Using Record Evidence, and Integrity Management Risk Identification, Assessment, Prevention, and Mitigation,* PHMSA-2010-0381, January 10, 2011

— ADB-2011-05, *Potential for Damage to Pipeline Facilities Caused by the Passage of Hurricanes,* PHMSA-2011-0183, September 1, 2011

— ADB-2011-04, *Potential for Damage to Pipeline Facilities Caused by Flooding*, PHMSA-2011-0177, July 27, 2011

— NTSB Report PAB1701, *Colonial Pipeline Company Petroleum Product Leak*, June 5, 2017

— NTSB Report PAB-13-03, *Large Crude Oil Spill from Damaged Enbridge Energy Pipeline*, September 30, 2013

— NTSB Report PAR-12-01, *Enbridge Incorporated Hazardous Liquid Pipeline Rupture and Release*, July 10, 2012

# Bibliography

[1]  API Recommended Practice 5L1, *Recommended Practice for Railroad Transportation of Line Pipe*

[2]  API Recommended Practice 5LW, *Recommended Practice for Transportation of Line Pipe on Barges and Marine Vessels*

[3]  API 570, *Piping Inspection Code: In-Service Inspection, Rating, Repair, and Alteration of Piping Systems*

[4]  API Standard 579-1/ASME FFS-1, *Fitness-For-Service*

[5]  API Recommended Practice 580, *Risk-Based Inspection*

[6]  API Recommended Practice 581, *Risk-Based Inspection Technology*

[7]  API Bulletin 939-E, *Identification, Repair, and Mitigation of Cracking of Steel Equipment in Fuel Ethanol Service*

[8]  API Technical Report 939-D, *Stress Corrosion Cracking of Carbon Steel in Fuel Grade Ethanol-Review, Experience Survey, Field Monitoring, and Laboratory Testing*

[9]  API Recommended Practice 1109, *Marking Liquid Petroleum Pipeline Facilities*

[10] API Recommended Practice 1110, *Recommended Practice for the Pressure Testing of Steel Pipelines for the Transportation of Gas, Petroleum Gas, Hazardous Liquids, Highly Volatile Liquids, or Carbon Dioxide*

[11] API Recommended Practice 1130, *Computational Pipeline Monitoring for Liquid Pipelines*

[12] API Recommended Practice 1133, *Guidelines for Managing Hydrotechnical Hazards for Pipelines located Onshore or within Coastal Zone Areas*

[13] API Publication 1149, *Pipeline Variable Uncertainties and Their Effects on Leak Detectability*

[14] API Publication 1161, *Guidance Document for the Qualification of Liquid Pipeline Personnel*

[15] API Recommended Practice 1162, *Public Awareness Programs for Pipeline Operators*

[16] API Standard 1163, *In-line Inspection Systems Qualification*

[17] API Standard 1164, *Pipeline SCADA Security*

[18] API Recommended Practice 1165, *Recommended Practice for Pipeline SCADA Displays*

[19] API Recommended Practice 1168, *Pipeline Control Room Management*

[20] API Recommended Practice 1174, *Onshore Hazardous Liquid Pipeline Emergency Preparedness and Response*

[21] API Bulletin 1178, *Data Management and Integration Guidelines*

[22] API Technical Report 1179, *Guidelines for use of Hydrostatic Testing as an Integrity Management Tool*

124

[23] API Standard 2610, *Design, Construction, Operation, Maintenance and Inspection of Terminal and Tank Facilities*

[24] API Recommended Practice 2611, *Terminal Piping Inspection-Inspection of In-Service Terminal Piping Systems*

[25] API, *Pipeline Performance Tracking System (PPTS)*

[26] ASME B31.4, *Pipeline Transportation Systems for Liquid Hydrocarbons and Other Liquids*

[27] ASME B31Q, *Pipeline Personnel Qualification*

[28] ASME STP-PT-011, *Integrity Management of Stress Corrosion Cracking in Gas Pipeline High Consequence Areas*

[29] ASNT ILI-PQ, *In-Line Inspection Personnel Qualification and Certification*

[30] BSI BS 7910, *Guide to methods for assessing the acceptability of flaws in metallic structures*

[31] CGA, *Damage Information Reporting Tool (DIRT)*

[32] NACE MR0175/ISO 15156, *Petroleum and Natural Gas Industries-Materials for Use in H2S-Containing Environments in Oil and Gas Production*

[33] NACE RP0177, *Mitigation of Alternating Current and Lightning Effects on Metallic Structures and Corrosion Control Systems*

[34] NACE SP0102, *In-Line Inspection of Pipelines*

[35] NACE SP0106, *Control of Internal Corrosion in Steel Pipelines and Piping Systems*

[36] NACE SP0208, *Internal Corrosion Direct Assessment Methodology for Liquid Petroleum Pipelines*

[37] NACE 35100, *In-Line Nondestructive Inspection of Pipelines*

[38] NACE 35110, *AC Corrosion State-of-the-Art: Corrosion Rate, Mechanism, and Mitigation Requirements*

[39] OPS-TTO8, *Stress Corrosion Cracking Study*

[40] POF 10, Specifications and requirements for intelligent pig inspection of pipelines

[41] PRCI, *Pipeline Repair Manual* R2260-01R (Catalog L52047)

[42] PRCI, Source for technical reports on pipeline integrity issues available at: https://www.prci.org/1.aspx

[43] Alexander, C. and K. Brownlee, "Methodology for Assessing the Effects of Plain Dents, Wrinkle Bends, and Mechanical Damage on Pipeline Integrity," CORROSION 2007, Paper 07139, NACE International, Nashville, Tennessee, March 11–15, 2007

[44] Alexander, C. R., and J.F. Kiefner, *Effects of Smooth and Rock Dents on Liquid Petroleum Pipelines*, API Publication 1156, November 1997

[45] Alexander, C. R., and J. F. Kiefner, *Effects of Smooth and Rock Dents on Liquid Petroleum Pipelines,* (Phase 2), Addendum to API Publication 1156, October 1999

[46] Beavers, J. A., C. J. Maier, C. E. Jaske, and R. Worthingham, "Methodology for Ranking SCC Susceptibility of Pipeline Segments Based on the Pressure Cycle History," CORROSION 2007, Paper 07128, NACE International, Nashville, Tennessee, March 11–15, 2007

[47] Brossia, S., "Selective Seam Weld Corrosion Literature Review", the deliverable of Subtask 3.1 on U.S. Department of Transportation Other Transaction Agreement No.DTPH56-11-T-000003, November 11, 2012, Available at: http://primis.phmsa.dot.gov/matrix/PrjHome.rdm?prj=390

[48] Canadian Energy Pipeline Association, *Stress Corrosion Cracking Recommended Practices*, May 1997

[49] Dawson, S. J., A. Patterson, and A. Russell, "Emerging Techniques for Enhanced Assessment and Analysis of Dents," Proceedings of IPC2006, Paper IPC2006-10264, Sixth International Pipeline Conference, Calgary, Alberta, Canada, September 25–29, 2006

[50] Fessler, R. R., and S. Rapp, "Method for Establishing Hydrostatic Re-Test Intervals for Pipelines with Stress-Corrosion Cracking," Proceedings of IPC2006, Paper IPC2006-10163, Sixth International Pipeline Conference, Calgary, Alberta, Canada, September 25–29, 2006

[51] Keating, P. B., and R. L. Hoffman, *Fatigue Behavior of Dented Petroleum Pipelines*—Task 4 USDOT RSPA, Contract DTRS56-95-C-0003, May 1997.

[52] Kiefner, J. F., W. A. Bruce, and D. R. Stephens, *Pipeline (In-Service) Repair Manual*, Pipeline Research Council International, Project PR-218-9307, December 1994, www.prci.com.

[53] Kiefner, J. F., and E. B. Clark, *History of Line Pipe Manufacturing in North America: An ASME Research Report*, CRTD, Vol. 43, 1996

[54] Kiefner, J. F., and P. H. Vieth, A Modified Criterion for Evaluating the Remaining Strength of Corroded Pipe, Final Report to the Pipeline Corrosion Supervisory Committee of the Pipeline Research Committee of the American Gas Association, December 22, 1989

[55] Muhlbauer, W. K., *Pipeline Risk Management Manual*, Third Edition, Gulf Publishing Company, 2004

[56] National Energy Board, *Public Inquiry Concerning Stress Corrosion Cracking on Canadian Oil and Gas Pipelines*, MH-2-05, Catalog ED23-58/1996E, pp. 158, November 1996

[57] Pargeter, R. J., "Susceptibility to SOHIC for Linepipe and Pressure Vessel Steels-Review of Current Knowledge," CORROSION 2007, Paper 07115, NACE International, Nashville, Tennessee, March 11–15, 2007

[58] Rosenfeld, M. J., *Guidelines for the Assessment of Dents on Welds*, Pipeline Research Council International, Project PR-218-9822, December 1999, www.prci.com

[59] Rosenfeld, M. J., J. W. Pepper, and K. Leewis, "Basis of the New Criteria in ASME B31.8 for Prioritization and Repair of Mechanical Damage," Proceedings of IPC2002, Paper IPC2002-27122, Fourth International Pipeline Conference, Calgary, Alberta, Canada, September 29 to October 3, 2002

[60] Sen, M., and S. Kariyawasam, "Analytical Approach to Determine Hydrotest Intervals," Proceedings of IPC08, Paper IPC2008-64537, Seventh International Pipeline Conference, Calgary, Alberta, Canada, September 29 to October 3, 2008

[61] U.S. Department of Transportation, Office of Pipeline Safety, *Common Ground: Study of One-Call Systems and Damage Prevention Best Practices,* August 1999, www.commongroundalliance.com

[62] U.S. Department of Transportation, Office of Pipeline Safety, National Pipeline Mapping System, www.phmsa.dot.gov

[63] U.S. Department of Transportation, Research and Special Programs Administration, Office of Pipeline Safety, TTO 5, Low Frequency ERW and Lap Welded Longitudinal Seam Assessment, Integrity Management Program Delivery Order, DTRS56-02-D-70036, submitted by Michael Baker Jr., in association with Kiefner and Associates, Inc. and CorrMet Engineering Services, PC, October 2003

[64] U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Task 3.1, SSWC Literature Review, November 11, 2012

## Dent Assessment Methodologies

With respect to predicting the effects on the remaining strength of dents or dents containing metal loss, cracks, or gouges, the pipeline operator should seek the assistance of a qualified expert. Alternatively, an operator may find useful guidance in one or more of the following documents.

— Alexander, C. R., and J. F. Kiefner, *Effects of Smooth and Rock Dents on Liquid Petroleum Pipelines*, API Publication 1156, November, 1997

— Alexander, C. R., and J. F. Kiefner, *Effects of Smooth and Rock Dents on Liquid Petroleum Pipelines* (Phase 2), Addendum to API Publication 1156, October 1999

— Dawson, S. J., A. Patterson, and A. Russell, "Emerging Techniques for Enhanced Assessment and Analysis of Dents," Proceedings of IPC2006, Paper IPC2006-10264, Sixth International Pipeline Conference, Calgary, Alberta, Canada, September 25-29, 2006

— Eiber, R. J., W. A. Maxey, C. W. Bert, and G. M. McClure, *The Effects of Dents on the Failure Characteristics of Line Pipe*, NG-18 Report 125, American Gas Association, Catalog L51403, May 8, 1981

— Keating, P. B., and R. L. Hoffman, *Fatigue Behavior of Dented Petroleum Pipelines*—Task 4 USDOT RSPA, Contract DTRS56-95-C-0003, May 1997

— Kiefner, J. F., and C. R. Alexander, *Repair of Pipeline Dents Containing Minor Scratches*, Final Report on Contract No. PR 218-9508, Pipeline Research Council International, March 18, 1999, www.prci.com

— Roovers, P., M. R. Galli, R. J. Bood, U. Marewski, M. Steiner, and M. Zarea, *EPRG Methods for Assessing the Tolerance and Resistance of Pipelines to External Damage (Part 1)*, 3R International, October 11, 1999

— Rosenfeld, M. J., *Toward Acceptance Criteria for Shallow Dents Affecting Girth Welds in Gas Transmission Pipelines*, PVP, Vol. 353, ASME Pressure Vessel and Piping Conference, Orlando, Florida, July 1997

— Rosenfeld, M. J., J. W. Pepper, and K. Leewis, "Basis of the New Criteria in ASME B31.8 for Prioritization and Repair of Mechanical Damage," Proceedings of IPC2002, Paper IPC2002-27122, Fourth International Pipeline Conference, Calgary, Alberta, Canada, September 29 to October 3, 2002



1220 L Street, NW
Washington, DC 20005-4070
USA

202.682.8000

**Additional copies are available through Techstreet**
Email Address:     techstreet.service@clarivate.com
Online Orders:     www.techstreet.com

Information about API Publications, Programs and Services
is available on the web at **www.api.org**

Product No. D116003

# EXHIBIT R

# Changes to In-Line Inspection Approaches to Consider with Changing Regulations

by J. Bruce Nestleroth, Ph.D.[1], and Michael J. Rosenfeld, PE[2]

[1] Kiefner, Columbus, Ohio, USA
[2] RSI Pipeline Solutions LLC, New Albany, Ohio, USA



## Pipeline Pigging and Integrity Management Conference

Marriott Marquis Hotel, Houston, USA

**February 19-21, 2020**



*Organized by*
**Clarion Technical Conferences**
*and* **Tiratsoo Technical**

Pipeline Pigging and Integrity Management Conference, Houston, February 2020

# Changes to In-Line Inspection Approaches to Consider with Changing Regulations

The expected changes to pipeline regulations include provision for applying engineering critical assessment (ECA) of anomalies that would normally need investigation within a short period of time to potentially extend the response time to a monitored condition. The caveat for the ECA analysis is that the analysis must be completed and documented within a period allowed for by the regulation, for example, 10 days for immediate anomalies. Having data and analyses on hand for an ECA is key to meeting the deadlines as required by regulation. This paper will provide some examples and scenarios where changes to the traditional approach to in-line inspection (ILI) can maintain the same level of integrity while using ECA to place anomalies on a more reasonable schedule. Examples of approaches for addressing dents with metal loss, corrosion of or along a longitudinal seam, and stress-corrosion cracking are presented. Steps that can be taken in advance to prepare for rapid assessment within certain specified timeframes are discussed as well as steps that can be taken that would improve the chances of achieving an extended response time.

**Keywords:** In-line Inspection, Integrity Assessment,

*Proceedings of the 2018* **Pipeline Pigging and Integrity Management Conference.** *Copyright* ©*2019 by* **Clarion Technical Conferences,**
**Tiratsoo Technical (a division of Great Southern Press)** *and* **the author(s).**
*All rights reserved. This document may not be reproduced in any form without permission from the copyright owners.*

Pipeline Pigging and Integrity Management Conference, Houston, February 2020

## Introduction

Historically the pipeline safety regulations in the United States (US) have used prescriptive thresholds to ensure pipeline integrity. An example would be the current regulation regarding the repair of all dents with metal loss; the goal of this regulation was to reduce the number of failures due to mechanical damage where a pipeline was dented and metal was moved or removed as part of the gouging process. The regulation on dents is both overly conservative with many dents with metal loss, typically corrosion, being repaired even though the anomaly would have negligible chance of impacting integrity. This conservative, prescriptive approach was still imperfect since a dent with a gouge with undetectable metal loss could fail in service. An alternative approach is an engineering critical assessment (ECA) where the safety of a pipeline with anomalies is determined using proven engineering principles. ECAs utilize the material properties, anomaly geometry, stress states and history to determine a flaw acceptance criterion which would ensure that the pipeline would not fail during the service life or the next reassessment interval. ECAs are used throughout the energy, manufacturing, and infrastructure industries. ECAs are based heavily upon fracture mechanics principles and reflect an improvement over traditional methods of pipeline integrity assurance, which can be arbitrary or overly conservative.

The US pipeline safety regulations are undergoing revisions sufficiently substantial to require three parts, the first of which was issued in October 2019. The second part will involve repair criteria and will have clarifications on acceptable approaches to integrity management which is expected to allow for the application of ECA as part of the process for establishing response time. For anomalies that would normally need investigation within a short period of time, ECA could be used to extend the response time to a longer period such as a year or even potentially to a monitored condition. The caveat for the ECA analysis is that the analysis must be completed and documented within a period allowed for by the regulation, for example 10 days for immediate anomalies. Having data and analyses on hand for an ECA is key to meeting the deadlines as required by regulation. One source of data is in-line inspection (ILI). This paper discusses changes to ILI approaches, including data types and analysis results, to enable ECA of anomalies within a specified timeframe.

## Background

In 2011, in response to a significant and tragic pipeline failure in San Bruno, CA, the US Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) published an advanced notice of potential rule making (ANPRM) [1] seeking comment on whether integrity management (IM) and other requirements should be strengthened or expanded, and other related issues. The US Congress passed the 2011 Pipeline Safety Act [2], which directed PHMSA to pursue the topics addressed in the ANPRM. The process for transitioning from the ANPRM to a final rule is extensive since it requires input from many stakeholders and is only coming to a close almost nine years later. In 2016, some of the details of the impending changes to the regulation were released in a notice of potential rule making (NPRM). [3] To help with the preparation of new regulations, PHMSA has three advisory committees mandated by law; PHMSA informally refers to two of the committees as the Gas Pipeline Advisory Committee (GPAC) and the Liquid Pipeline Advisory Committee (LPAC). When referenced together, the two are known as the Pipeline Advisory Committees (PAC). The third committee is the Voluntary Information-sharing System (VIS) Working

3

Pipeline Pigging and Integrity Management Conference, Houston, February 2020

Group which is an advisory committee established in accordance with Section 10 of the Protecting Our Infrastructure of Pipelines and Enhancing Safety (PIPES) Act of 2016.

Because of the complexity of the rulemaking, PHMSA chose to issue the new rule in three parts, the first of which was issued as a final rule in October 2019.[4] This first ruleset (under Regulatory Identifier Number RIN 2137-AE72) covered maximum allowable operating pressure (MAOP) reconfirmation, material verification, the addition of a moderate consequence areas (MCA), records, seismicity, MAOP exceedance reporting, and a 6-month grace period for assessments. The term "ECA" occurs 89 times in the recently issued rule. Congress mandated that PHMSA consider safety testing methodologies that include other alternative methods, including ILI, determined to be of equal or greater effectiveness. The ECA content of RIN 2137-AE72 primarily focuses on determining whether anomalies in a pipe would survive a hydrostatic test pressure to a level needed to establish MAOP.

The second ruleset under RIN 2137-AF39 is expected to address repair criteria in high consequence areas (HCAs) and moderate consequence areas (MCAs), response to extreme weather events, corrosion control, integrity management clarifications, and strengthening assessment requirements. All PHMSA rulemaking is intended to consider input from the applicable advisory committee; if the PAC guidance is not explicitly followed, an explanation is provided in the regulatory preamble. The guidance provided in the GPAC and LPAC meeting includes provisions for ECA as part of the revised repair criteria, as discussed in this paper. (The third ruleset under RIN 2137-AF38 is expected to extend regulatory requirements to certain gas gathering pipelines and will not involve ECA.)

## New repair criteria

PHMSA understands that the current criteria in the regulations often results in the identification of many anomalies that qualify as immediate repair conditions, but the anomalies are far less critical when exposed and remediated. Use of class location safety factors for 1-year (HCAs) and 2-year (MCAs) repair criteria is inconsistent with ASME B31.8S, Figure 4.[1] PHMSA's goal is to reduce the rate of immediate repair conditions. PHMSA suggests replacing reliance on Figure 4 with the class location based safety factors for 1-year conditions (HCAs) and 2-year conditions (MCAs). B31.8S, Section 7, Figure 4, allows operators to not repair scheduled anomalies until the defect has grown to the level of an immediate indication. "*Indications in the scheduled group are suitable for continued operation without immediate response provided they do not grow to critical dimensions prior to the scheduled response.*" By not repairing anomalies until they grow to critical dimensions for an immediate condition, many anomalies could grow until they use up much of the safety margin and become immediate conditions. PHMSA believes this is a contributing factor in explaining why the immediate repair rate has not dropped after completion of baseline assessments because scheduled conditions are allowed to grow until they become immediate conditions.

---

[1] It is Figure 4 in the 2004 edition of B31.8S, incorporated by reference in 49 CFR 192.  It is Figure 7.2.1-1 in the 2012 and later editions of B318S, however the actual figure is the same.

4

Pipeline Pigging and Integrity Management Conference, Houston, February 2020

PHMSA, in the NPRM, has proposed criteria that would require an operator, upon running an ILI tool or other assessment technology, to assure that corrosion anomalies are repaired before they grow to an immediate condition before the next assessment. The criteria are summarized in Table 1. The allowed response times for threshold metal loss flaws, indicated by the ratio of predicted failure pressure (PFP) relative to the MAOP are considerably more restrictive than what has been the case in accordance with 49 CFR 192, Subpart O with reference to B31.8S, Figure 4.

**Table 1. PHMSA-proposed criteria in the NPRM for corrosion anomalies**

| Class location | Metal loss severity, PFP | Proposed Response Time, years | Response Time, years ASME B31.8S Figure 4 |
|---|---|---|---|
| Class 1 | 1.25 x MAOP | 1-yr (HCA) or 2-yr (MCA) | 1.36 –5.00 |
| Class 2 | 1.39 x MAOP | | 2.64 –9.67 |
| Class 3 | 1.67 x MAOP | | 5.18 –10.0 |
| Class 4 | 2.00 x MAOP | | 8.18 –15.0 |

PHMSA has proposed response and repair criteria for certain conditions in HCAs and MCAs, to be in a significantly revised §192.713. These are summarized in Table 2 below. New requirements are indicated in the shaded cells.

**Table 2. HCA and MCA Response and Repair Criteria Proposed by PHMSA**

| Condition | HCA Response | MCA Response |
|---|---|---|
| Any condition with PFP/MAOP < 1.1 | Immediate | Immediate |
| Dent on top of pipe with indication of metal loss, cracking, or stress riser | Immediate | Immediate |
| Metal loss > 80% of the wall thickness (WT) | Immediate | Immediate |
| Preferential metal loss (SSWC) of ERW/EFW seam, PFP/MAOP ≤ 1.25 | Immediate | Immediate |
| Crack-like defect ≥ 50% WT and with PFP/MAOP ≤ 1.25 | Immediate | Immediate |
| Any other anomaly requiring immediate action | Immediate | Immediate |
| Dent on bottom with indication of metal loss, cracking, or stress riser | 1 Year | 2 Years |
| Smooth topside dent > 6% diameter in depth[2] | 1 Year | 2 Years |
| Dent > 2% diameter[3] that affects pipe curvature of a girth or seam weld | 1 Year | 2 Years |
| Corrosion, PFP/MAOP < 1.25 in Class 1, or < 1/F[4] in Class 2,3,4 | 1 Year | 2 Years |
| SSWC with PFP/MAOP < 1.39 in Class 1, or < 1/F in Class 2,3,4 | 1 Year | 2 Years |
| Metal loss > 50% WT at crossings, girth welds, or over wide areas | 1 Year | 2 Years |
| Crack-like defect ≥ 50% WT and PFP/MAOP < 1.39 in Class 1, or < 1.50 in Class 2,3,4 | 1 Year | 2 Years |
| Smooth dent on bottom of pipe > 6% OD | Monitored | Monitored |
| Any dent in Immediate or Scheduled category, strain < critical per ECA | Monitored | Monitored |
| SSWC with PFP/MAOP > 1.39 in Class 1, or > 1/F in Class 2,3,4 | Monitored | Monitored |
| Crack-like defect, PFP/MAOP > 1.39 in Class 1, or > 1.50 in Class 2,3,4 | Monitored | Monitored |

---

[2] Or greater than ½ inch deep for pipe smaller than NPS 12
[3] Or greater than ¼ inch deep for pipe smaller than NPS 12
[4] Class location design Factor

# Examples of the use of ECA repair decisions

The notes for the GPAC and LPAC meetings provide some specific areas where ECA may be applied in future regulations. These potential areas include dents with metal loss, selective seam weld corrosion and stress corrosion cracking. The following sections provide some details.

### 1. Dents, mechanical damage, dents with metal loss

The original repair criteria for dents were developed in the early 2000s timeframe for both hazardous liquid and gas integrity management rules. The current regulations for "dents with metal loss" specify an immediate repair after discovery in both liquid and natural gas pipelines. Both ILI technology and analytical techniques to assess dents in various forms, whether plain dents or dents with metal loss representing mechanical damage as well as metal loss associated with corrosion, have advanced significantly since that time. As noted from the GPAC meeting in March 2018, PHMSA has gained confidence in applying ECA techniques to analyse dent defects through the recent application of dent ECAs in special permits.

No mechanical damage other than plain dents in the pipe body can be considered a Monitored Condition in an HCA or MCA. In order to reduce unnecessary excavations, and consistent with PHMSA's recognition of applying proven analytical techniques to evaluate corrosion metal loss and cracking defects already, PHMSA proposes allowing application of an ECA to the Immediate-response or Scheduled-response Conditions listed above to convert them to Monitored Conditions, contingent on determining that strains do not exceed the critical strain (to be discussed below).

The strain analysis would be part of a more-comprehensive ECA analysis specified in a proposed new §192.714.  Steps that must be included in an ECA for denting are:
- Evaluate potential threats for the pipe segment in the vicinity of the dent including movement, loading, and corrosion;
- Identify and quantify loads acting on the dent;
- Review high resolution (HR) MFL and HR deformation ILI data for damage in the dent area and any associated weld region;
- Perform pipeline curvature-based strain analysis using recent HR deformation inspection data;
- Calculate strain limits and damage factors indicating possible cracking;
- Compare dent profile with the recent and past HR deformation inspections to identify significant changes in indentation depth and shape;
- Account for uncertainties in material properties, model error, and measurement error.

The analysis for potential cracking would have to be performed in accordance with the new rules for conducting a fracture mechanics analysis in §192.712 which were published under RIN 2137-AE72, using a suitable model and material toughness properties. The time to failure must be calculated using a suitable model for fatigue crack growth and applying a safety factor of at least 2.

GPAC meeting notes indicate that PHMSA may propose a default strain limit of 12%. Note that the dent strain criteria in ASME B31.8 were revised with the 2018 edition to:

Pipeline Pigging and Integrity Management Conference, Houston, February 2020

- 40% of the average extension under load (EUL) from pipe mill test reports (if available);
- 50% of the minimum EUL specified by the pipe product specification; or
- 6% strain where material test reports are unavailable and the pipe product specification is unknown.

The first two criteria will likely result in strain acceptance criteria of between 10% and 15% in most cases, so PHMSA's proposed default strain limit presents little hardship. Alternative criteria for critical strain values have also been proposed [5,6]. The dent strain is determined from curvatures and extensions of the pipe wall based on mathematical analysis of the deformed shape as altered from an initially circular shell. Various methods have been presented in the literature for performing a strain analysis [7,8]. Some ILI vendors, some pipeline operators, and some third parties (e.g., consultants) are capable of performing such an analysis if they have high-resolution three-dimensional geometry data throughout the indentation.

The GPAC meeting notes imply that meeting the strain limit is the main prerequisite for converting the Immediate or Timed response to a Monitored Condition, but the rest of the ECA process must still be performed to establish the subsequent response time limit. If the damage does not meet the strain criterion, then there may be no relief from the Immediate response time limit of 10 days. To perform this analysis in 10 days from discovery is a demanding task. But in a typical analysis, ILI tool data only provides deformation and metal loss data; strain analysis is not always provided. Calculating the strain levels in the allotted time may be challenging for an operator or third party; having a strain analysis delivered at the same time as the geometry report would accelerate the ECA. Therefore, operators should request strain analysis for all dents with metal loss if an ECA approach is anticipated.

The balance of the ECA will include some tasks that depend on the ILI vendor (identifying damage in and around the dent, and comparing against past ILI for changes in the condition), while other tasks could be performed by the operator or by others (evaluating other threats, quantifying loads, calculating strain limits, calculating fatigue life). The proposed regulation does not restrict who may perform the ECA, however the ECA must reviewed and confirmed by a Subject Matter Expert (SME).[5]  Other elements of the ECA may include the following:

- Determine whether apparent metal loss is due to internal corrosion or a scrape or gouge. Factors to consider include the probable damage cause (excavator hit, or the pipe bearing on a rock), the position of the damage on the pipe surface, and the shape, aspect ratio, or area of the metal loss.
- Perform a calculation of the PFP. If the metal loss can be classified as due to corrosion with a high degree of confidence, then the PFP may be calculated as for corrosion in undeformed pipe, in accordance with the maintenance provisions of ASME B31.8. Despite many years of research, however, a "B31G" for dent-with-gouge damage remains elusive. Assessment methods are complex and exhibit scatter [9] and may require finite element analysis or other special analysis.[10]
- Perform a calculation of the time to failure in order to establish whether the feature is within the Scheduled or Monitor category.

---

[5] Who employs the SME is not restricted; it may be the pipeline operator, the ILI vendor, or a third party. Nontechnical considerations may sometimes influence the optimal SME affiliation.

Pipeline Pigging and Integrity Management Conference, Houston, February 2020

Simplified approaches to the ECA process for evaluating dents with metal loss have been presented [11]. API is developing a recommended practice to set forth criteria and procedures for an ECA for mechanical damage [12].

In order to reduce the time impact of the SME review, the dent strain analysis process should be thoroughly vetted ahead of time by the SME; that vetting may be part of the ILI vendor selection process. Critical strain levels also should be established ahead of the ILI run so that the acceptability of the dents can be quickly determined. Calculating the time to failure presumably will not need to be completed within the 10-day window for Immediate Conditions. If the final rule does require that the full ECA be completed within 10 days, then additional preparation is required in terms of selecting assessment models in advance.

### 2.   Corrosion near the long seam

Example 2 considers corrosion near the long seam as an indicator of selective seam weld corrosion (SSWC). ECA must consider the mechanical properties of the seam and whether the seam is susceptible to preferential corrosion. The research literature shows that susceptibility of seam welds to grooving corrosion is affected by factors related to steel chemistry and seam thermal history acting individually or in combination [13-19]. Susceptibility has been observed to decrease with reduced sulfur content, reduced carbon content, increased post-weld heat treatment (PWHT) temperature, increased calcium content, increased copper content, and additions of rare earth elements. Susceptibility is also lower in modern pipe compared with older vintage pipe (manufactured prior to 1985), primarily as a result of changes to steel chemistry that have occurred with more modern skelp production methods.

Sulfur content in the steel has been identified as the key influence. No single factor assures immunity to SSWC, but approximate thresholds for reduced susceptibility are summarized in Table 3. There are no published correlations between combinations of attributes or elements and SSWC susceptibility analogous to carbon equivalency for describing resistance to hydrogen-assisted cracking (weldability).

**Table 3. SSWC-Resistance Factors**

| Attribute | SSWC Resistance |
|-----------|-----------------|
| Carbon | C < 0.010% |
| Sulfur | S < 0.005% |
| Copper | Cu > 0.3% |
| Calcium | Ca > 0.002% |
| PWHT | T > 850 degrees C |

The integrity concern with SSWC arises from the following issues:
- Conventional metal loss ILI tools, whether magnetic or ultrasonic, cannot detect the condition. Only tools capable of detecting narrow, axially oriented defects that may be surrounded by an irregular, corroded surface can be relied on;
- The condition is more prevalent in (though not exclusively limited to) older-vintage ERW seams, which could also exhibit low toughness if the seams were not subjected to PWHT;

8

Pipeline Pigging and Integrity Management Conference, Houston, February 2020

- The corrosion groove can exhibit a relatively sharp tip or even an actual crack at the tip [20] and should be evaluated as crack-like.
- The condition is associated with ruptures at low stress levels (as low as 5% SMYS).[21]

In view of these points, SSWC may not be a good candidate for fitness for service assessment if at least moderate ductility of the seam bondline cannot be expected. Thus, understanding the seam ductility characteristics is a prerequisite to even considering the ECA approach to concluding that SSWC can be classified as Monitored condition.

At the GPAC meetings, the industry made the following comments related to the proposed criteria of corrosion metal-loss affecting a detected longitudinal seam, if that seam was formed by direct current or low-frequency (LF) or high frequency (HF) ERW or by electric flash welding:

- The criterion should not apply to high-frequency ERW pipe;
- The criterion should clarify that the corrosion preferentially affects the long seam;
- Allow ECA to analyse such defects to avoid unnecessary excavations.

With respect to this first point, both research and operating experience has shown that early high-frequency ERW pipe made using high-sulfur steel (up until approximately 1985) could be susceptible to SSWC. The authors therefore cannot endorse this position without also considering the steel chemistry, the status of corrosion control measures, and whether SSWC has ever been identified previously in the pipeline segment of interest. They also note, however, that all Grade B or stronger ERW pipe manufactured after 1966, whether welded using low-frequency (LF) or high-frequency (HF) current, should be expected to exhibit relatively good seam ductility as a result of the PWHT requirement that appeared in API 5L-22nd Ed. and API 5LX-14th Ed., issued March 1967. Some LF or HF ERW pipe manufactured earlier than 1967 may also have received PWHT. Information about who manufactured the pipe, or results from appropriate pipe materials testing, may provide information about steel chemistry and seam ductility that could be used to understand susceptibility to the condition and the potential fracture mechanics implications.

PHMSA suggests allowing (but not requiring) ECA analysis for the evaluation of corrosion metal loss affecting a long seam in 192.713. Classification of the response time depends on the ratio of PFP to MAOP, depending on the location class, per Table 1. If the predicted failure pressure (PFP) is less than 1.25 x MAOP, the anomaly would be an Immediate response condition. Scheduled response conditions would be based upon the ratio of PFP/MAOP being less than the reciprocal of the Class Location Design Factor. PHMSA suggests inserting the word 'preferentially' to assure that this criterion would not be applied to small corrosion pits near a long seam. It would only apply to corrosion along the seam that could lead to grooving-type or crack-like defects.

Part of the process of considering integrity assessment for SSWC involves establishing the potential susceptibility to SSWC of the pipeline segment of interest. If the pipeline has ever exhibited SSWC in the past, then susceptibility is confirmed. Alignment of pipe material characteristics with the chemistry and vintage parameters that promote susceptibility may be sufficient to warrant looking for SSWC where coating degradation or inadequate cathodic protection (CP) is a known problem. Pipe that meets the material conditions for reduced susceptibility and where corrosion prevention has been effective may be considered not susceptible. Certain materials tests such as the linear polarization resistance (LPR) test may be useful for classifying susceptibility in conjunction with the other factors discussed above. Segments having confirmed or strongly suspected

9

Pipeline Pigging and Integrity Management Conference, Houston, February 2020

susceptibility to SSWC should be assessed for the condition using an appropriate technology, for example circumferential MFL ILI.

The ECA to address SSWC should be approached as with any axially oriented, crack-like condition. The ground rules for performing such an evaluation are contained in the new §192.712 issued with the October 2019 rule publication. At a minimum the operator must:

- Establish a reliable value to use for seam fracture toughness. That may come from data (e.g., mill test reports) or other testing pertaining to the pipe of interest. In the absence of applicable data, the rule specifies default Charpy V-notch impact values that depend on the service history of the seam. Other toughness values could be used with technical justification, subject to review and approval by PHMSA. Variability in material properties should be accounted for. This suggests that conservative values should be used relative to the expected variation.
- Select a fracture mechanics model that is valid and that will produce reliable results (i.e., it is an appropriate model) for the expected material toughness properties. Model error should be accounted for.
- Factor in ILI tool probability of detection and probability of identification of SSWC
- Account for error in defect size measurement (i.e., ILI tool error).
- Calculate time to failure using a suitable flaw growth rate and apply a factor of safety of 2.

A useful step would be to apply the established seam toughness value with the selected defect fracture model to develop acceptance curves for indicated flaw sizes (adding tool error) corresponding to the ratios of PFP/MAOP corresponding to each response time category. The required response time can then be quickly ascertained once the ILI draft report becomes available.

All of the above steps must be executed fully before an ILI for SSWC is performed, because the ECA will have to be performed within the 10-day Immediate Response time window in order to establish the proper response time. It is unlikely that many verification digs can be completed for quantification of tool error in that time. It seems plausible for verification digs conducted after the initial assessment for response time classification has been completed to throw doubt on an assessment that concludes that an SSWC feature is not an Immediate Response condition if discrepancies between the reported and confirmed flaw size are encountered. In order to minimize the chance of an inadvertent noncompliance, tool error should be accounted for in a conservative manner. Prior experience with the selected ILI tool technology can be valuable for addressing this concern.

**Stress corrosion cracking**

There is significant discussion in the GPAC notes on cracking. Industry representatives commented that PHMSA's proposed criteria for immediate repair of crack-like defects was too conservative and suggested 70% crack depth or PFP less than 1.1 x MAOP. PHMSA disagreed, and believes ILI tools for detection of cracks do not have the precision needed to allow cracks slightly shallower than 70% of the wall or a calculated PFP slightly greater than 1.1 x MAOP to be treated as 1-yr (HCA)/2-yr (MCA) conditions. This is because cracks can grow rapidly and material properties can have a dramatic effect on safe pressures.

10

Pipeline Pigging and Integrity Management Conference, Houston, February 2020

Based on successful application of comparable cracking criteria, PHMSA suggests the following crack criterion for an immediate condition:

- Crack depth plus metal loss > 50% of pipe wall thickness; or
- Crack depth plus any corrosion is greater than the inspection tool's maximum measurable depth; or
- The crack anomaly is determined to have (or will have prior to the next assessment) a PFP determined in accordance with the ECA fracture mechanics procedure that is less than 125% of the MAOP.

Industry representatives commented that PHMSA's proposed criteria for 1- or 2-Year repair of crack-like defects was too conservative and suggested 50% crack depth or PFP less than 1.25 x MAOP. Based on successful application of comparable cracking criteria, PHMSA suggested the following crack criterion for a 1-Year (HCA) or 2-Year (non-HCA) condition:

- Crack depth plus metal loss > 50% of pipe wall thickness; or
- The crack anomaly is determined to have (or will have prior to the next assessment) a predicted failure pressure (determined in accordance with the ECA fracture mechanics procedure) that is less than 1.39 times MAOP (100% SMYS) for Class 1 locations, or 1.5 times MAOP for Class 2, 3 and 4 locations, as appropriate.

The ability to effectively remove defects is related to the technology's ability to report anomalies that would fail. For an ECA, the size of cracks that must be detected for the ILI to be considered effective depends on pipeline characteristics (wall thickness, diameter, material properties) and operating parameters. In Figure 1 and Figure 2, hydrostatic test failure curves that were calculated using the Modified Ln-Secant equation are overlaid with a typical specification for an ultrasonic crack detection tool. The grey area corresponds to anomaly sizes where the probability of detection is less than 90 percent. The black diagonal line represents the boundary between leak and rupture modes of failure. The failure curves in Figure 1 illustrate that the ILI tool, if performing to specification, should detect anomalies that will rupture for the two thicker pipes and on the cusp for longer anomalies for the thinnest pipe. The failure curves in Figure 2 illustrate that the ILI tool, if performing to specification, may not be suitable to replace a hydrostatic test for all wall thicknesses. Actual tool performance for detection will vary based on inspection conditions such as line cleanliness and speed control; therefore, verification of results is critical.

A robust ECA includes related datasets to address specific pipeline threats. Consider additional data for managing a pipeline with stress corrosion cracking (SCC). Patches of light corrosion can indicate areas with disbonded coating and inadequate CP, which are necessary conditions for SCC nucleation and growth. However, the reporting of corrosion depths from an ILI run of less than 10% typically is not included in a standard metal loss report and may require additional analysis of raw data. Requesting an additional analysis or a second report on low level corrosion may be prudent.

From the standpoint of executing the ECA, the new rules in §192.712 apply to SCC similarly as for SSWC as discussed above.  The operator must:

- Establish appropriate material properties, except that in most cases the properties will be those of the pipe body rather than the ERW seam bondline;
- Select a valid fracture mechanics model, and account for model error;

11

- Account for measurement (ILI tool) error, which can vary with pipe size, wall thickness, and crack size; and
- Calculate a time to failure using a suitable (conservative) SCC growth rate with a factor of safety of 2.

Default SCC growth rates in guidance documents may be conservative (high) by a significant amount. Data based on measured flaw depths and informed estimates as to the likely start times for the SCC will usually be more representative. The authors' experience has been that SCC growth rates in the range of 0.005 to 0.006 inch/yr (0.13 to 0.15 mm/yr) are "typical" and that 0.009 to 0.011 inch/yr (0.23 to 0.28 mm/yr) represent 90th to 95th percentile growth rates.

## Implementing an ECA

The expected changes to pipeline regulations include provisions for applying ECA of anomalies that would normally need investigation within a short period of time to potentially extend the response time to a monitored condition. At first glance, the use of ECA may appear to be a simple process to reduce or eliminate immediate repairs. The caveat for the ECA analysis is that the analysis must be completed and documented within a period allowed for by the regulation, for example 10 days for immediate anomalies. Having data and analyses on hand for an ECA is key to meeting the deadlines as required by regulation. Also, implementing an ECA process will require advance planning.

The data inputs come from the pipeline operator and the ILI vendors; see an example illustrated in Figure 3. The data needs will be dependent on the anomaly type and potential regulatory requirement. Steps to consider in developing an ECA process are illustrated in Figure 4 and Figure 5. Figure 4 is applicable prior to running an ILI tool and Figure 5 identifies tasks to be performed after running an ILI tool.

Prior to the ILI tool run (Figure 4), the first step is to determine the responsibility for conducting an ECA. Some pipeline operators with a strong integrity engineering group may choose to keep this work in-house. This can help keep to tight schedules that are anticipated. Other approaches include contracting the ECA analysis to the ILI vendors or an engineering or consulting firm. The advantage of using the ILI vendor is their familiarity with the inspection results and tool performance, and experience in applying ECA to specific data sets. The advantage of an engineering or consulting firm is having an independent assessment of the pipeline and ILI data that are used in the ECA. Validation of the ECA methods and assumptions by an SME will be required.

No matter which party performs the ECA, the process starts with appropriate ILI data. Establishing the data requirements for anomaly detection and sizing and choosing an ILI approach to meet these data needs are fundamental steps. The ILI vendor must have the technical capability to supply accurate data and the company structure to deliver within the time constraints defined in the regulation.

The next step is to choose the ILI configuration and set-up needed to support the ECA. Points to consider are resolution requirements including circumferential resolution typically defined by the number of sensors and axial resolution defined by the spacing between data points recorded as the

Pipeline Pigging and Integrity Management Conference, Houston, February 2020

ILI tool travels down the pipeline. ILI tool set-up variables such as data thresholding or compression need to be considered. The approach used to analyse ILI data may also be a factor; the ECA engineer must decide whether the standard data analysis is adequate, or a higher-level approach is needed. For crack ILI tools, the detection threshold and sizing accuracy are units of length, not percentages of wall thickness. For some pipeline wall thicknesses, operating pressure, and configuration variables, the capabilities of the ILI tool can be more than adequate. A detailed analysis should be performed to understand whether the ILI tool is actually capable of producing useful results for a specific pipeline configuration.

The pipeline properties and ILI data flow into an ECA model that must be established in advance. Operators should consider testing the ECA model on previously recorded data. By examining data from immediate repairs that were previously excavated and repaired, the efficiency and effectiveness of the ECA approach can be evaluated. If the ECA model chosen does not produce a similar reduction in pipeline risk as the prescriptive regulation approach, consider modification to the model.

Because the time for analysis is constrained, a screening process should be considered to establish characteristics of anomalies that would be good candidates for ECA. Some anomalies may need immediate action based on an ECA and performing an ECA would just delay the inevitable while reducing available response time. The goal is to only perform an ECA on those anomalies that have a good chance of having the response time changed from an Immediate or short timeframe to a Scheduled or Monitored timeframe. It may be possible to perform a parametric study of the variables in the model to establish a threshold for anomaly sizes that would typically pass the ECA.

Tool performance in terms of detection threshold and sizing accuracy will be needed for a robust ECA. While ILI tools have specifications, confirmation that ILI tool met the specifications of the specific pipeline must be confirmed. Certain anomaly dimensions will trigger maintenance actions within a specified timeframe. However, if it can be shown that ILI calls provide dimensions that are overly conservative, response time can be extended.

Figure 5 presents five questions that the ECA must affirmatively answer after the ILI tool has been run in order to extend the response time. The first question is in regard to data quality. The ECA engineers must assure the data that were planned were actually collected and the quality is sufficient to perform the ECA. Then the ILI features are run though the screening process. Only anomalies that pass this screening process are candidates for a full ECA. There are three parts:
- Strain limit evaluation (for dents in the Immediate or Scheduled categories)
- Failure pressure analysis
- Time to failure analysis

## Conclusions

Proposed new regulations will expand the requirements for responding to pipeline defects of many different types within and outside of HCAs. The regulations are expected to allow the operator to apply ECA to reclassify features in the Immediate or Scheduled response categories to more flexible response times. In order to be reclassified, dents with metal loss must meet limitations on strains from deformation. Failure pressures and times to failure must also be determined. Crack-like defects

Pipeline Pigging and Integrity Management Conference, Houston, February 2020

such as seam manufacturing defects and SCC, as well as preferential corrosion of longitudinal seams (ERW SSWC) must be similarly analysed.

If features are to be reclassified from the Immediate Response category, the ECA process must be accomplished very quickly and efficiently. All relevant inputs related to material properties and applied stresses must be established in advance, as well as the party to be responsible for conducting the ECA and the models that will be used. The ILI vendor must be prepared to provide the anomaly data having quality and resolution that can support the ECA. This could require ILI tool set-up and data analysis practices that are over and above standard practices. Hence, the proposed ECA process offered by the expected regulations offers opportunities for operators to perform remediation on better terms, but taking advantage of that opportunity will require higher levels of preparation by the operator and the ILI vendor than the usual practice.

Pipeline Pigging and Integrity Management Conference, Houston, February 2020



Figure 1. Hydrostatic test failure curves for 24-inch diameter pipes of various wall thicknesses overlaid with a typical Crack ILI specification



Figure 2. Hydrostatic test failure curves for 6-inch diameter pipes of various wall thicknesses overlaid with a typical Crack ILI specification

15

Pipeline Pigging and Integrity Management Conference, Houston, February 2020



Figure 3. Example data inputs and responsibilities

Pipeline Pigging and Integrity Management Conference, Houston, February 2020



Figure 4. ECA process prior to running an ILI tool

17

Pipeline Pigging and Integrity Management Conference, Houston, February 2020



Figure 5. ECA process after running an ILI tool

Pipeline Pigging and Integrity Management Conference, Houston, February 2020

# References

1.  76 FR 53086, August 25, 2011.

2.  Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011, Public Law 112-90, January 3, 2012.

3.  81 FR 20722, April 8, 2016.

4.  84 FR 52180, October 1, 2019.

5.  Gao, M., Krishnamurthy, R., Tandon, S., and Arumugam, U., "Critical Strain Based Ductile Damage Criterion and its Application to Mechanical Damage in Pipelines", 13th International Conference on Fracture, Beijing, June 16-21, 2013.

6.  Arumugam, U., Gao, M., Krishnamurthy, R., Wang, R., and Kania, R., "Study of Plastic Strain Limit Damage Criterion for Pipeline Mechanical Damage Using FEA and Full-Scale Denting Tests", International Pipeline Conference, IPC2016-64548, Calgary, 2016.

7.  Gao, M., McNealy, R., Krishnamurthy, R., Colquhoun, I., "Strain-Based Models for Dent Assessment – A Review", International Pipeline Conference, IPC2008-64565, Calgary, 2008.

8.  Tinacos, K., Cacenave, P., Gao, M., Krishnamurthy, R., Seman, D., and Jones, C., "ILI Based Dent Screening and Strain Based Analysis", International Pipeline Conference, IPC2012-90484, Calgary, 2012.

9.  Bood, R., Gali, M., Marewski, U., Steiner, M., Zarea, M., "EPRG Methods for Assessing the Tolerance of and Resistance of Pipelines to External Damage (Parts 1 & 2)", 3R International, 10-11/1999, pp739-744, 12/1999, pp806-811.

10. Pipeline Research Council International, "Fatigue Life Assessment of Dents with and without Interacting Features", MD 4-9 PRCI Final Report prepared by BMT, Catalog No. PR-214-114500-R01, November 2018

11. Rosenfeld, M.J., and Zhang, F., "Technical Basis for Simplified ECA Process for Indicated Pipeline Indentations with Metal Loss", Paper No. 39, PPIM-2019, Houston.

12. American Petroleum Institute, Recommended Practice 1183, "Dent Assessment and Management", Draft (under development).

13. Duren, C., Treiss, E., and Herbsleb, G., "The Resistance of high frequency inductive welded pipe to grooving corrosion in salt water," Materials Performance, p. 41, September (1986)

14. Duren, C., Herbsleb, G., and Treiss, E., "HFI-Welded Line Pipe Resistant to Grooving Corrosion", 3R International, May 1986.

15. Heitman, W.E., Southwick, P.D., and Pausic, F., "ERW Line Pipe: The Effect of Welding and Annealing on the Properties, Microstructure, and Corrosion Resistance", HSLA Steels Technology and Applications, ASM, 1984.

16. Kato, C., Otoguro, Y., Kado, S., and Hisamatsu, Y., "Grooving Corrosion in Electric Resistance Welded Steel Pipe in Sea Water", Corrosion Science, Vol. 18, 1978.

Pipeline Pigging and Integrity Management Conference, Houston, February 2020

17. Masamura, K., and Matsushima, I., "Grooving Corrosion of Electric Resistance Welded Steel Pipe in Water: Case Histories and Effects of Alloying Elements", NACE Corrosion/81, Toronto, April 1981.

18. Groenveld, T.P., Davis, G.O., and Williams, D.N., "Evaluations of the Susceptibilities of Electric-Welded Pipe to Selective Seam-Weld Corrosion", Paper No. 14, EPRG/NG-18 Eighth Biennial Joint Technical Meeting on Line Pipe Research, Paris, May 1991.

19. Brossia, S., "Selective Seam Weld Corrosion Literature Review", Report to US DOT, DNV Report No. ANEUS 811CSEAN120106, Rev. 2, November 11, 2012.

20. Rosenfeld, M.J. and Kiefner, J.F., "Addressing Long Seam Weld Anomalies in Vintage ERW-EFW-DC Pipelines", presented to ADV Integrity-Elevara Partners Pipeline Crack Forum, Houston TX, Nov. 14, 2019.

21. Rosenfeld, M.J. and Fassett, R., "Study of Pipelines that Ruptured While Operating at a Hoop Stress Below 30% SMYS", Paper No, 21, PPIM 2013, Houston.

# EXHIBIT S

# ASSESSING MECHANICAL DAMAGE
# USING MULTIPLE DATA SETS IN INLINE INSPECTION

By: Chuck Harris, T.D. Williamson, Inc., USA

## Abstract

Mechanical damage by third party intervention continues to be a major factor in reportable incidents for hazardous liquid and gas pipelines. While several ongoing programs seek to limit third party damage incidents through public awareness, encroachment monitoring and one-call systems, others have focused efforts on the quantification of mechanical damage severity through modelling, the use of inline inspection (ILI) tools, and subsequent feature assessment at locations selected for excavation. Current generation ILI tools capable of acquiring multiple data sets in a single survey will provide an improved assessment of the severity of damaged zones using methods developed in earlier research programs as well as currently reported information. Magnetic flux leakage (MFL) type tools, using multiple field levels, varied field directions and high accuracy deformation sensors, enable accurate detection, sizing and classification, thus providing fundamental data for enhanced severity assessments. This paper will provide a review of multiple data set ILI results from several pipe joints with simulated mechanical damage locations created mimicking right-of-way encroachment events, in addition to field results from ILI surveys using multiple data set tools.

**Introduction**

Despite educational and monitoring efforts to reduce or eliminate mechanical damage to hazardous liquid and gas pipelines as a result of third party intervention, damage still occurs. As a result, quantifying the severity of this damage continues to be a priority for pipeline operators worldwide. The use of inline inspection (ILI) tools in conjunction with subsequent excavation and assessment remains the most reliable method for quantification of damage.

In the past, single technology ILI tools – for example, tools based solely on axial magnetic flux leakage (MFL) technology – were used to detect and quantify mechanical damage. However, studies have shown that, while single technology tools can collect useful data, there are also limitations to each type of technology. Therefore, multiple data set tools – tools incorporating multiple magnetic field levels, varied field directions, high accuracy deformation sensors and residual magnetism sensors – have been developed as a means to overcome these limitations and to provide more accurate and efficient detection, sizing and classification of third party induced defects.

**Axial MFL**

Axial MFL technology is the most commonly used method for inspecting pipelines for metal loss anomalies. Axial MFL is simpler and more robust than ultrasonic (UT) inline inspection. Further, the product in the line can be gas or liquid during the inspection. Axial MFL technology – and all MFL technology, for that matter – relies on the phenomenon of magnetic signal leakage which occurs at a metal loss defect in a pipe wall. In order to assure detection, the metal loss must be of sufficient volume and of a certain orientation relative to the induced magnetic flux within the pipe wall to create a flux disturbance that can then be detected by the inspection tool. As shown in Figure 1, axial MFL tools magnetize the pipe in the axial direction and are thus adept at detecting general metal loss and circumferential features.



**Figure 1: Axial MFL induces magnetism in the axial direction.**

However, axial MFL tools do not reliably detect narrow defects with axial length (axial grooving and axial slotting), including those within the longitudinal weld seam. As shown in Figure 2, visualizing axial MFL technology can be equivalent to comparing observations of airflow streams. The blue airflow streams are partially disrupted as they flow around the object.



**Figure 2: Visualization of axial MFL using airflow streams.**

**Circumferential MFL**

In an attempt to detect axially oriented and axial seam features, inspection companies turned to MFL tools designed to magnetize in the circumferential (rather than axial) direction. Turning the axial magnetizer 90 degrees results in a tool that introduces a magnetic field in the circumferential (or transverse) direction. But increased detection of axial features comes at a price; as shown in Figure 3, circumferential MFL requires the use of two offset magnetizers to achieve full pipe wall coverage. And though circumferential MFL will detect crack-like features in the long seams, its use can also result in the improper classification of anomalies in the long-seam.



**Figure 3: Circumferential MFL induces magnetism around the circumference but requires two magnetizers to achieve complete coverage.**

In fact, running circumferential MFL alone may only show a defect in the seam. However, this defect may in fact have width indicative of a volumetric anomaly (having depth, length and width). As a result, circumferential MFL might report a crack-like seam defect when in actuality the defect may be a mill anomaly or an axially oriented shallow corrosion anomaly. In Figure 4, the airflow traveling circumferentially (transversely) is significantly disrupted.

PPSA seminar 2012



**Figure 4: Visualization of circumferential MFL using airflow streams.**

### Oblique (Spiral) MFL

A third approach to seam assessment has been developed. This approach relies on an oblique (spiral) magnetic field. To investigate the theory of this concept, a relationship was established between the principal axis and the angle of incidence (spiral angle). A series of experiments were performed on flat plates with machined defects. As the plate was rotated in the field, the amplitude of flux leakage was measured in each of three coordinates. The spiral magnetizer was modeled in accordance to the flat plates. Various angles of spiral were then analyzed. It was determined that the optimum angle was 45 degrees, which achieves the same full-wall coverage as circumferential MFL but does so using just one compact magnetizer rather than the two that are traditionally required by circumferential MFL. As shown in Figure 5, this allows the magnetizer to be of a minimum length, contain the sensors within the optimum location and house this module without any sensor dead zone.



**Figure 5: Oblique (spiral) MFL achieves complete coverage with just one magnetizer.**

This research evolved into the technology now known as SpirALL[™] MFL (SMFL) technology developed by T.D. Williamson.[1,2] This tool magnetizes in a helical, nearly 45-degree direction, in order to detect axial features while still keeping tool length at a minimum. As shown in Figure 6, the object significantly displaces the helical airflow stream and illustrates the concept of oblique inspection technology.



**Figure 6: Visualization of oblique MFL using airflow streams.**

**Axial MFL and Oblique MFL in Combination**

Because oblique MFL is more compact in design than other longitudinal assessment technologies, the oblique tool can be paired with axial technologies to overcome the limitations of either the axial and circumferential approach alone. Looking at a single pipeline through a variety of technologies does two things. First, it improves probability of detection, providing more opportunities for a defect or anomaly to be detected. Second, when an anomaly has been found, use of multiple technologies assists accurate identification. Obtaining multiple views of an anomaly from a single inspection run provides analysts with more data, information that can be correlated more completely than ever before. The end result for the pipeline operator: superior reporting, resulting in enhanced characterization and elimination of unnecessary excavations.

For example, combining axial MFL and oblique MFL allows for traditional internal and external metal loss assessment. Combining analysis of axial and oblique signatures simultaneously also eliminates guesswork in calling seam-weld anomalies, and it assists the quantification of other longitudinal defects in the pipe body. This improves the quality of data obtained from the inspection and reduces the time and money spent by the pipeline operator making unnecessary digs.

Field results from a series of 16-inch inspection tool runs indicated that SpirALL[™] MFL technology successfully identifies narrow axial defects that normally would not be reported by axial MFL alone. In most cases, the anomalies found that are not detected by axial MFL are identified as planar, or crack-like in nature. Figure 7 shows examples of two such external anomalies, along with the corresponding SpirALL[™] MFL and axial MFL technology screenshots. Due to their geometry, these anomalies are not detected by axial MFL.

PPSA seminar 2012



**Figure 7: Very narrow defects.**

Figure 8 shows axial MFL data on the left and SpirALL™ MFL technology data on the right. A previous circumferential MFL inspection had identified an anomaly within the long-seam as a crack-like feature. However, the anomaly is very evident in the axial MFL data (at left), which means it is volumetric rather than crack-like. By combining axial MFL with SpirALL™ MFL in the same run, it becomes possible to identify the anomaly as a metal loss feature that happens to be in the seam weld instead of a crack-like feature in the seam. In this case, 14 other similarly-characterized anomalies were excavated based on the circumferential MFL inspection. Use of axial MFL in conjunction with SpirALL™ MFL would have correctly eliminated all 15 from the dig list. Analysis of axial MFL and SpirALL™ MFL technology signatures simultaneously eliminates guesswork in calling seam-weld anomalies, so the pipeline operator spends less time and money making unnecessary digs.



**Figure 8: Comparison of axial MFL and SpirALL™ MFL (SMFL) technologies.**

4-6

**Multiple Data Set Technology**

An ongoing effort to improve accuracy in pipeline integrity readings calls for the ability of inspection tools to yield multiple data sets. From the initial idea stage of the oblique MFL (SpirALL™ MFL) concept, the plan was always to incorporate multiple data-sensing technologies on a single tool to provide a comprehensive view of a pipeline. In addition to axial MFL and SpirALL™ MFL, a multiple data set platform can include:

- Mapping
- High-resolution deformation (DEF) for bore measurement and strain calculations
- Inside diameter/outside diameter (ID/OD) sensors incorporated on deformation arms for verification of internal/external metal loss classification and details on internal surface conditions; that is, discrimination of debris fields from dents or other bore reductions
- Residual or low-field sensors capable of detecting hard spots[3], the "halo-effect" due to dent re-rounding, and other differences in pipe characteristics (such as xGrade differences, etc.)

Inspection using varying magnetic fields and other sources, including deformation, improves detection and anomaly identification. Multiple views of the same anomaly in different data sets, from the same inspection, provide an increasingly clear picture, resulting in superior analysis and anomaly characterization.

Figure 9 shows the basic layout of a large diameter inspection tool with SpirALL™ MFL technology. In this case, a 24-inch tool is shown, which includes (front to rear, left to right) the drive section with high resolution deformation and odometers, SpirALL™ MFL technology section, axial MFL section, and low field section.



**Figure 9: TDW 24-inch DEF + SpirALL™ MFL technology + MFL + LFM tool.**

The anomaly shown in Figure 10 demonstrates the benefit of multiple data set technology. Availability of only the deformation (DEF) and MFL data would simply identify a dent at this location. DEF data reveals a dent at approximately seven o'clock and is confirmed in the MFL data including ID/OD overlay. The red hue indicates sensor lift-off at the indication, and with DEF plus MFL data, confirms the dent. The residual data indicates additional strain induced by the dent outside of the specific dent area, where the apparent strain that extends around the circumference beyond the dent area itself appears. The dent is located at the green oval, indicating that additional strain is present with the red background surrounding the dent. Note that the strain extends around the circumference.

However, what was not clear in the previous four data sets (DEF, MFL, ID/OD and residual) becomes very apparent upon review of SMFL data. There is a signature indicating the dent, though closer analysis reveals a gauss change. This gauss change confirms metal loss at the dent, metal loss which went undetected by MFL due to the geometry of the indication. This dent has associated metal loss (possibly from a gouge) that will rate a higher excavation priority from pipeline operators.

PPSA seminar 2012

**Figure 10: Using multiple data-sensing technologies to detect an anomaly.**

**Prioritizing Dents**

As previously noted, the oblique field approach requires just one magnetizer to accomplish wall saturation and sensor placement. This leaves room on multiple data set tools for the addition of other technologies, such as low field or residual magnetics sensors. These additional sensors can be combined with high resolution deformation data and dent strain calculations to populate the Battelle dent prioritization model. This model takes into account not only immediate threat issues as stated in 49 CFR Part 192, but also includes dent re-rounding and pressure cycling. The model distinguishes and prioritizes the threat level of all mechanical damage items in the pipeline.[4]

As shown in Figure 11, the Battelle model attempts to qualify the severity of dents into the following categories:

• high priority
• moderate-high priority
• moderate priority
• moderate-low priority
• low priority

The model categorizes threats based on features of the mechanical damage, such as:

• dent depth
• movement or removal of metal
• steel micro-structure damage
• residual stresses and strains
• wall thinning
• cracking in areas pushed out by internal pressure

PPSA seminar 2012



**Figure 11: Simplified Battelle Dent Prioritization Model (for entire model see PRCI L52084).**

Traditional MFL inspection tools detect metal-loss corrosion by using high magnetic fields to decrease noise. At high fields, dents with wall thinning and/or removed metal provide metal-loss corrosion like signals, and thus high-field MFL tools provide little information about micro-structure changes created as a result of mechanical damage. At much lower magnetization levels, structure changes (such as cold working, residual stresses and plastic deformation) are more pronounced. The big challenge in analyzing low-field magnetic flux density of micro-structure changes is that the measurements are less than ten gauss, which is an order of magnitude less than high-field. These problems are overcome with very low noise electronics.

Input for the prioritization model from low-field MFL includes dent re-rounding or pressure cycling. Figure 12 shows how the low-field data can be used to determine these inputs.

When the pipeline steel experiences a large loading the material flexes, and, if the load is great enough, the material will begin to yield plastically, changing the microstructure enough that the remnant ferro-magnetism will be altered. As a result, if the pipeline is dented enough to cause yield, then a low-field MFL will be able to qualify changes.

4-9

PPSA seminar 2012



**Figure 12: At left, theoretical concept shows sideview over time. At right, sample data view shows the deflection and low-field MFL signal for $T_1$ and Tn.**

The Battelle model considers a re-rounded dent as being of higher severity than one without re-rounding because some of the metal has been altered as a result of loading. To determine if the dent is re-rounded, the area of the metallurgical change is much larger in diameter than the area of the physical dent. If the load is removed and the steel is allowed to spring back, then the extent of the low-field MFL will be greater than that of the deformation shown at $T_1$ in Figure 12. On the other hand, if the low-field signal near the dent does not show change from the nominal background, the assumption is that the micro-structure has not been significantly altered and thus has a lower severity (this happens with most rock dents).

Figure 13 is a screen capture from TDW PigTrap™ software displaying the characteristic shape of dent re-rounding. The classification of this feature was indentified due to the stress captured by low-field MFL.



**Figure 13: Re-rounded dent.**

Because dent cycling can lead to fatigue, the Battelle model considers cycling as more severe than re-rounding. It is quite easy to identify cycling in the low-field data (see Tn of Figure 12). Over cycles of pressure, the edges of the dent flex, creating larger and larger gradients in the remnant magnetization.

Figure 14 is another screen capture of a dent showing the characteristic circular stress gradients indicative of pressure cycling. The classification of this feature was identified as cycled due to the "halo" effect seen around the dent. The halo is a collection of low field/residual magnetism coupled around the higher stress area surrounding the dent body.



**Figure 14: Pressure-cycled dent.**

PPSA seminar 2012

The Pipeline Research Council International (PRCI) report produced using the Battelle model utilized a decoupled low-field signal to determine the presence of gouging. The TDW multi-data set tool also uses the SMFL or oblique magnetization signals to help determine gouging, as it can be an easier way to interpret a data set, as seen in Figure 15. In this example, there is a manufactured dent with long gouge. Characterizing gouging using oblique data set is simpler as the long narrow features are clearly connected.  Note that the tail indicated by the arrow in the Oblique data represents the gouge, and this gouge is not visible in the Axial or High Level MFL data.



**Figure 15: Identifying gouging via multiple data set technology.**

PPSA seminar 2012

TDW makes two additions to the Battelle model. First is addition of dent strain analysis[5] using the methods described in ASME B31.8, with additional corrections suggested by Gao et al.[6] and Lukasiewicz et al.[7] If the strain is greater than 6%, the severity of the dent is increased.

Second, if the dent is coincident with a girth or seam weld, then the severity is increased because any compression or tension placed on the weld has a higher likelihood of leading to cracking.

A TDW-produced report contains a final ranking of each dent to help prioritize the threats within a given pipeline, facilitating immediate as well as long-term maintenance.

**Case Study**

In October 2011, TDW employed multiple data-sensing technologies to inspect a 16-inch pipeline for a liquids operator in the Midwestern United States. The line was built in the 1950s and contains mostly 0.250" wall thickness. As a result of repeated pipeline failures, the operator was looking for extremely small dents with very small metal loss and cold working. The inspection tool used for this project included high-field MFL, SMFL, deformation and low-field MFL.

Figure 16 shows an example of a dent indentified during inline inspection and verified during subsequent non-destructive evaluation (NDE) in April 2012. This dent was about 0.95% deep and thus smaller than anyone would normally ever dig. The TDW inline inspection tool could see corrosion in the high-field MFL, corrosion and gouging in the SMFL, very small dent depth in deformation, and severe work hardening in the low-field MFL around the rim of the dent, as well as stress at the gouge. As noted below, this stress in the gouge was later found to be cracking.

TDW reported that this set of corrosion and gouging was associated with a very small dent in a work hardened area. Corrosion and gouging in relation to work hardened areas near dents are extremely severe because they are crack initiation points. Once initiated, a crack may at any moment rip open, causing the pipeline to leak oil.

From a corrosion/metal loss perspective, the worst scenario is to be near a dent, such as this one, that has been continuously cycled over a period of years. Corrosion and gouging itself can be serious, but it is also important to note that these are locations for cracking genesis if they are in a stressed location as a result of differences in metal hardness.

PPSA seminar 2012



**Figure 16: Inline inspection data overlaid onto actual field location.**

**Summary and Conclusions**

Both axial MFL and circumferential MFL have inherent limitations. These limitations can be overcome through use of an oblique (spiral) magnetizer combined with axial MFL. SpirALL™ MFL technology will better detect axial features missed by axial MFL, and the fact that it is designed to run in combination with axial MFL will more effectively detect and characterize metal loss features in a pipeline including those within the long seam. To date, more than 5,000 miles (8,050 km) of pipeline have been successfully inspected using SpirALL™ MFL technology.

Capturing multiple data sets in a single inspection provides clarity of anomalies, which ultimately translates into greater accuracy of results delivered to the pipeline operator. Compared to circumferential MFL, SpirALL™ MFL technology has shown that it can eliminate unnecessary seam anomaly excavations and offer improved identification of other longitudinally oriented anomalies.

A key advantage afforded by oblique field technology is the ability to add other technologies, such as residual or low-field magnetics. The TDW Dent Prioritization Model combines all data sets with dent strain calculations into a comprehensive ranking system that can help operators prioritize dent excavations.

**Acknowledgement**

This paper is especially indebted to the work of Chris Goller, Senior Systems Engineer, T.D. Williamson, Inc.

PPSA seminar 2012

**References**

1.  Goller C., Simek J., and Ludlow J., 2012, "Multiple Data Set ILI for Mechanical Damage Assessment," Pipeline Pigging & Integrity Management Conference 2012, Clarion.

2.  Harris, C., 2011, "Improving Pipeline Inspection Results Using Oblique Field Magnetic Flux Leakage Methods," American Petroleum Institute Conference, 2011.

3.  Belanger A., Tuboscope P. S., and Narayanan R., 2006, "Calculation of Hardness Using High and Low Magnetic Fields," ECNDT 2006 - Tu.4.1.1, ECNDT, Berlin, Germany, pp. 1-9.

4.  Massopust P., Torres C., and Dean A., 2003, "Improving In-Line Inspection for Mechanical Damage in Natural Gas Pipelines," Des Plaines, IL.

5.  Noronha Jr. D. B., Martins R. R., Jacob B. P., and Souza E., 2005, "The Use of B-Splines in the Assessment of Strain Levels Associated with Plain Dents," Rio Pipeline Conference and Exposition, Rio de Janeiro, Brazil, pp. 1-10.

6.  Gao M., McNealy R., Krishnamurthy R., and Colquhoun I., 2008, "Strain-Based Models for Dent Assessment - A Review," Proceedings of the International Pipeline Conference 2008, ASME, pp. IPC2008-64565.

7.  Lukasiewicz S. A., Czyz J. A., Sun C., and Adeeb S., 2006, "Calculation of Strains in Dents Based on High Resolution In-Line Caliper Survey," Volume 2: Integrity Management; Poster Session; Student Paper Competition, ASME, Calgary, Alberta, pp. 129-134.

---

™ Trademark of T.D. Williamson, Inc. in the United States and other countries.

Notes

# EXHIBIT T

# Pipeline Integrity Management of CSCC using multiple ILI technologies

**by Ron Thompson[1], Ray Gardner[2], Katrina Dwyer[2], Richard Gonzales[2], Andrew Corbett[1], Guillermo Solano[1]**

1. Novitech Inc, Vaughan, ON, Canada.
2. Xcel Energy, Denver, CO, USA.



# Pipeline Pigging and Integrity Management Conference

Hilton Americas-Houston, USA
**February 22-26, 2021**



*Organized by*
**Clarion Technical Conferences** *and* **Great Southern Press**

Pipeline pigging and integrity management conference, Houston, February 2021

*Proceedings of the 2021* **Pipeline Pigging and Integrity Management conference.** *Copyright ©2021 by* **Clarion Technical Conferences,**
**Great Southern Press** *and* **the author(s).**
*All rights reserved. This document may not be reproduced in any form without permission from the copyright owners.*

Pipeline pigging and integrity management conference, Houston, February 2021

# Abstract

This paper is the continuation of a 3 year-long study in the use of magnetic based ultra-high sampling density in-line inspection (ILI) systems (up to 2,000 samples per square inch) to detect and size circumferential stress corrosion cracking (CSCC). The objective of the study is to enable a shift from the CSCC direct assessment approach to diagnostics by an ILI measurement system.

This phase of the study focuses on the detection of CSCC by multiple ILI systems that integrate axial and circumferential magnetic flux leakage (AMFL and CMFL) along with internal depth detection sensor arrays (IDD), a high precision geometry measurement unit (HP-GMU) and inertial mapping data (IMU).

To date a total of seven line segments have now been inspected for CSCC collecting a total amount of data exceeding 1 TB. This paper focuses on the five line segments inspected for Xcel Energy and the results from two other operators have been include in our data base. Individual line segments had collected data sizes that often exceeded 200 GB. This also required the development of detection and sizing algorithms along with data analysis processes that can categorize and prioritize relevant CSCC. This process was performed to differentiate CSCC amongst the hundreds of thousands of detected magnetic anomalies in any given line.

Included in this study are the CSCC inspection results from over 200 miles of natural gas pipelines in in NPS 6", 8" and 10" segments.  These results are utilized to review susceptibility factors for CSCC and discuss best practices for excavation and inspection of CSCC anomalies. Field non-destructive examination (NDE) and metallurgical analysis from identified anomalies have been used to baseline the system's probability of detection (POD) and probability of identification (POI) of critical and sub-critical CSCC.

# Introduction

In 2015, colonies of CSCC were coincidently discovered during in-line inspection verification digs for a natural gas pipeline.  The CSCC colonies were located in close proximity to external metal loss anomalies but were not detected by the in-line inspection tool.  The subject pipeline was constructed in 1965 of 6.625-in OD x 0.188-in WT, Grade X42 line pipe and is located in an area of rugged mountainous terrain.  A subsequent selective digging program was established utilizing the following susceptibility criteria [1]:

- Coating Type
- Presence of External Corrosion (indicating coating disbondment)
- Terrain with elevation changes and/or stream crossings
- O'clock position of metal loss
- Severity of Metal Loss

Although the selective digging program was successful in identifying additional locations of CSCC, it was insufficient to predict the severity of CSCC or confirm that all CSCC indications had been examined.

To reliably detect and quantify CSCC in susceptible pipeline systems, an advanced MFL ILI system was developed with initial viability studies performed in 2018, evaluating tool performance on pull test over manufactured circumferential slots and actual CSCC samples [2].

Pipeline pigging and integrity management conference, Houston, February 2021

In 2019 the ILI system was run on a pipeline segment that, through susceptibility analysis, ranked high for occurrence of CSCC. The pull test baseline was used to identify and prioritize 30 CSCC candidates which were excavated and removed from the pipeline. All CSCC findings were non-destructively field tested and a selected number of candidates were laboratory verified for sizing and evaluation of the tool performance [3].

These results were used to implement ILI runs of the new technology on five segments of pipeline and remedial action was taken per the criticality rankings provided by the ILI tool. The target pipe areas were cut out and evaluated using both non-destructive and destructive methods to validate the results, which are explored in this paper.

## 1. Integrated ILI design for the detection of CSCC, long seam flaws, metal loss, deformations and other anomalies.

The completion of five successful runs along with field confirmation and laboratory sizing of 78 occurrences of CSCC validated the targeted tool specifications concluding the design cycle for this portion of the study.

In summary, to reliably detect CSCC, the ILI system was designed with:

- A combined sample density of up to 2,000 readings per square inch from AMFL, CMFL, IDD and Geometry modules.
- A purposed build data acquisition electronic system for all modules with broad dynamic range that uses no data compression as all recorded samples are required to identify and quantify cracks and other very small anomalies.
- The capability to integrate AMFL and CMFL inspections both in the tool hardware as well as in the analysis software (either in single or separate runs) to discriminate CSCC from other anomalies. In this respect the system performs a comprehensive inspection of metal loss, long seam flaws, mechanical damage, and deformation threats.

The ILI system also required new analysis processes and software to facilitate the evaluation of AMFL, CMFL, Geometry, and IDD sensor modules simultaneously. Critical enhancements in this respect included judicious use of algorithm-based analysis and manual signal review to properly sort and identify pipe anomalies amongst the hundreds of thousands of recorded features with each run.

The sensitivity and sample density of the tool hardware resulted in large record files of all the magnetic signals generated by imperfections as minute as pipe surface roughness, debris, and other foreign elements present during the run. To confirm the robustness of the ILI hardware as well as the analysis software and reporting process, additional ILI pull testing was performed in the cut-out sections, prior to any destructive testing. The signal repeatability was found to be within 10% by amplitude from the AMFL responses confirming the ability of the entire system to accurately detect and discriminate relevant pipe anomalies.

**Figure One** below provides an example of the graphical representation for the AMFL and IDD signal responses as detected by the tool (amplitude based). The overall system provides a distinct response to an anomaly vs. the background level allowing for clear identification and discrimination of CSCC colonies, even when surrounded by hundreds of metal loss anomalies.

4

Pipeline pigging and integrity management conference, Houston, February 2021



**Figure One: Discriminating CSSC Amongst Hundreds of Metal Loss Anomalies**

**Figure Two** below illustrates how the integrated multi-modular approach confirms the presence of CSCC while ruling out false positives such as sensor lift off and surface roughness. Specifically, the combined AMFL and IDD sensor modules are also being used to help rank the severity of CSCC from detectable, severe, to very severe.



**Figure Two: Severity Ranking Using both AMFL and IDD Sensor Systems**

**Figure Three** further illustrates CSCC detectability, with a high POD and POI. At this location, the ILI system successfully identified the occurrence of 12 CSCC locations in a row that were axially aligned and in close proximity to each other.

Pipeline pigging and integrity management conference, Houston, February 2021



**Figure Three**: **Conformation of High POD and POI Showing 12 Consecutive CSCC Locations**

**Figure Four** illustrates the ILI system's resolution, as individual crack colonies that are separated by approximately 0.5" (12.7 mm) or more can be differentiated from each other and identified as individual crack anomalies. AMFL signals from tighter crack clusters blend into a single reportable anomaly.



**Figure Four:** **Detectable Resolution Between Cracks**

## 2. Integrity Excavations, NDE Results

The ILI data analysis provided a list of CSCC candidates categorized and prioritized as critical and subcritical flaws based on the amplitude signal response. While the threshold for defining the severity ranking can vary depending on the pipeline, the low number of CSCC occurrences per sector reported by the tool allowed for the excavation and verification of all CSCC candidates.

6

Pipeline pigging and integrity management conference, Houston, February 2021

In this phase of the study a total of 81 CSCC candidates identified by ILI in NPS 6" and 8" segments were excavated. These locations where removed from service resulting in multiple cut out sections totalling hundreds of feet of pipe.

Field evaluations were carried out using black and white MPI in all exposed areas to detect both the targeted colonies as well as any potential false negatives. Of the 81 CSCC candidates, 78 CSCC indications were located, with depths ranging from 30 to 100%, along with one additional colony which was not reported by the ILI system.  Three false positives were identified as low-level external metal loss.

The indications were sized using phased array ultrasonics (PAUT) under near laboratory conditions and subsequently cross sectioned for final verification. Upon noticing discrepancies between the initial PAUT sizing and the laboratory results a second set of PAUT tests were performed by a different vendor, utilizing higher specification equipment, higher frequency probe and new calibration set ups. These configurations are further discussed in section 3.1.

Noting the discrepancies between both sets of PAUT measurements and between PAUT and the laboratory results, it appears that some of the CSCC targets presented geometries or were positioned in a way that were not optimal for the PAUT setup while the MFL based ILI system seemed less affected by it. These conditions include:

- Off-angle CSCC, specifically following the helical tenting of the tape coat used in the carrier pipe.
- CSCC colonies composed of two offset segments in the process of coalescing.
- CSCC cracking with multiple branching or off angles resulting in weak tip ultrasonic reflectors.

## 3. Metallurgical Results

To date a total of 25 CSCC colonies have been destructively tested to size both the overall depth of the crack colony as well as minimum and maximum crack openings at the pipe's surface and throughout the body of the crack. Characterization of the cracks included cross-sections taken on multiple planes, crack width measurements and face break samples. Between two and four cross sections, no more than 0.5 inches apart, were made in each colony as well as some face breaks to ensure the deepest ligament of the crack was exposed.

The transgranular crack morphologies and minor branching for all the samples matched well with stress-corrosion cracking (SCC) [4]. Crack openings were found to be ranging from 11 to 183 microns as shown below in **Figures Five** and **Six** below.

7

Pipeline pigging and integrity management conference, Houston, February 2021



**Figure Five:** Crack openings were found to be ranging from 11 to 183 microns



**Figure Six:** Crack openings were found to be ranging from 11 to 183 microns

Pipeline pigging and integrity management conference, Houston, February 2021

## 3.1 Discussion on the use of Phased Array Ultrasonics for sizing and Metallurgical results for re-calibration of ILI data

PAUT sizing was used throughout the field evaluations of CSCC performed in this study, with each colony measured on two separate occasions by different NDE vendors. Each time the pipeline surface was interrogated with a sectorial scan, utilizing 5 MHz, 7.5 MHz, and 10 MHz probes, in 16 and 32 element configurations, with search units Olympus Omniscan MX2 and X3.

While the combination of the latest scanner (Onmiscan X3), with the 10MHz 32 element probe provided, on average, better results, the current samples showed measuring errors between 10 and 20% with outliers where both phased array instruments doubled the actual depth of the colony or undersized it by 48%.

**Table One** below shows a comparison of depth variation between two different PAUT operators and NDE companies on the same CSCC features verses laboratory results. Only about two thirds of the time the PAUT depth prediction was found within +/- 20% from the laboratory results. Some errors were found to be 40 to 48% off the laboratory results.

### PAUT vs Lab Results

| Item No. | Feature No. | Lab Depth | NDE Company 1 PAUT Depth | NDE Company 1 PAUT Error | Error % |
|---|---|---|---|---|---|
| 1 | 4522 | 54% | 61% | -7.0% | 7.0 |
| 2 | 4580 | 40% | 88% | -48.0% | 48.0 |
| 3 | 4581 | 41% | 77% | -36.0% | 36.0 |
| 4 | 4582 | 39% | 50% | -11.0% | 11.0 |
| 5 | 4583 | 39% | 79% | -40.0% | 40.0 |
| 6 | 4584 | 39% | 65% | -26.0% | 26.0 |
| 7 | 4595 | 47% | 91% | -44.0% | 44.0 |
| 8 | 9669 | 47% | 52% | -5.0% | 5.0 |
| 9 | 9670 | 44% | 54% | -10.0% | 10.0 |
| 10 | 9672 | 31% | 62% | -31.0% | 31.0 |
| 11 | 9673 | 51% | 40% | 11.0% | 11.0 |
| 12 | 9674 | 69% | 63% | 6.0% | 6.0 |
| 13 | 9675 | 37% | 52% | -15.0% | 15.0 |
| 14 | 9677 | 64% | 79% | -15.0% | 15.0 |
| 15 | 9679 | 75% | 80% | -5.0% | 5.0 |
| 16 | 9681 | 35% | 61% | -26.0% | 26.0 |
| 17 | 9682 | 45% | 64% | -19.0% | 19.0 |
| 18 | 9683 | 92% | 76% | 16.0% | 16.0 |
| 19 | 9684 | 65% | 68% | -3.0% | 3.0 |
| 20 | 9685 | 35% | 56% | -21.0% | 21.0 |
| | | | | | 395.0 |
| | | | | Average Error | 19.8 |
| | 60.0% | Percent with Errors less than 20% | | | |

| Item No. | Feature No. | Lab Depth | NDE Company 2 PAUT Depth | NDE Company 2 PAUT Error | Error % |
|---|---|---|---|---|---|
| 1 | 4522 | 54% | N/A | N/A | N/A |
| 2 | 4580 | 40% | N/A | N/A | N/A |
| 3 | 4581 | 41% | N/A | N/A | N/A |
| 4 | 4582 | 39% | N/A | N/A | N/A |
| 5 | 4583 | 39% | N/A | N/A | N/A |
| 6 | 4584 | 39% | N/A | N/A | N/A |
| 7 | 4595 | 47% | 53% | -6.0% | 6.0 |
| 8 | 9669 | 47% | 44% | 3.4% | 3.4 |
| 9 | 9670 | 44% | 52% | -8.1% | 8.1 |
| 10 | 9672 | 31% | 58% | -27.0% | 27.0 |
| 11 | 9673 | 51% | 59% | -8.0% | 8.0 |
| 12 | 9674 | 69% | 69% | -0.1% | 0.1 |
| 13 | 9675 | 37% | 56% | -19.4% | 19.4 |
| 14 | 9677 | 64% | 65% | -1.4% | 1.4 |
| 15 | 9679 | 75% | 65% | 9.6% | 9.6 |
| 16 | 9681 | 35% | 43% | -8.0% | 8.0 |
| 17 | 9682 | 45% | 46% | -1.0% | 1.0 |
| 18 | 9683 | 92% | 65% | 27.1% | 27.1 |
| 19 | 9684 | 65% | 43% | 22.4% | 22.4 |
| 20 | 9685 | 35% | 41% | -6.5% | 6.5 |
| | | | | | 148 |
| | | | | Average Error | 10.6 |
| | 78.6% | Percent with Errors less than 20% | | | |

| Item No. | Feature No. | Lab Depth | NDE Company 1 and 2 Error % |
|---|---|---|---|
| 1 | 4522 | 54% | 7.0 |
| 2 | 4580 | 40% | 48.0 |
| 3 | 4581 | 41% | 36.0 |
| 4 | 4582 | 39% | 11.0 |
| 5 | 4583 | 39% | 40.0 |
| 6 | 4584 | 39% | 26.0 |
| 7 | 4595 | 47% | 44.0 |
| 8 | 9669 | 47% | 9.1 |
| 9 | 9670 | 44% | 31.0 |
| 10 | 9672 | 31% | 11.0 |
| 11 | 9673 | 51% | 6.0 |
| 12 | 9674 | 69% | 15.0 |
| 13 | 9675 | 37% | 13.7 |
| 14 | 9677 | 64% | 5.0 |
| 15 | 9679 | 75% | 26.0 |
| 16 | 9681 | 35% | 19.0 |
| 17 | 9682 | 45% | 16.0 |
| 18 | 9683 | 92% | 3.0 |
| 19 | 9684 | 65% | 3.0 |
| 20 | 9685 | 35% | 21.0 |
| 7 | 4595 | 47% | 6.0 |
| 8 | 9669 | 47% | 3.4 |
| 9 | 9670 | 44% | 8.1 |
| 10 | 9672 | 31% | 27.0 |
| 11 | 9673 | 51% | 8.0 |
| 12 | 9674 | 69% | 0.1 |
| 13 | 9675 | 37% | 19.4 |
| 14 | 9677 | 64% | 1.4 |
| 15 | 9679 | 75% | 9.6 |
| 16 | 9681 | 35% | 8.0 |
| 17 | 9682 | 45% | 1.0 |
| 18 | 9683 | 92% | 27.1 |
| 19 | 9684 | 65% | 25.4 |
| 20 | 9685 | 35% | 14.5 |
| | | | 549.8 |
| Combined NDE Companies 1 and 2 Average Error from Both | | | 16.2 |
| Combined NDE Companies 1 and 2 Percent with Errors less than 20% | | | 67.6% |

9

Pipeline pigging and integrity management conference, Houston, February 2021

**Table 1: PAUT Compared to Laboratory Results**

It appears that certain crack morphologies were not represented or expected in the typical calibration set ups used for the PAUT equipment (artificial notch type slots on curved pipe of the same diameter and thickness as the target pipe) and thus were not sufficiently reflective (off angled) to be detected in either PAUT scan despite the inspection range of +30 to +70 degrees.

While undoubtedly PAUT can yield repeatable and accurate results, the current practice (specific combination of PAUT search unit, probe, calibration standard and type of scan) failed to provide sizing data of sufficient accuracy and reliability to calibrate and refine ILI sizing algorithms.

Until a larger sample of verifiable data is collected, the calibration and adjusting of ILI sizing algorithms for CSCC in this system has been established against actual metallurgical information, from confirmed face brake or multiple cross-sections that provides as close to actual the extent of any CSCC indication.

**Figure Seven** shows two separate PAUT scans that consistently undersized a CSCC indication at 60-65%, while laboratory results proved it to be 92% in depth.



**Figure Seven: PAUT Compared to Laboratory Results**


## 3.2 Detection Accuracy – POD of the ILI system

The current data base sample size confirms the pull test results and shows that the integrated ILI test has a consistent detection threshold for CSCC of 0.8" (20 mm) or longer and of 30% depth or greater, with crack openings as small as 0.001" (25 microns). The accuracy of the system allows for sizing and categorization of CSCC occurrences that can be used by the pipe operator to implement engineering and repair analysis, per prevalent regulation guidelines.


Confirmation of the tool specification allowed for final calculation of the system's POD per

10

Pipeline pigging and integrity management conference, Houston, February 2021

$$POD = \frac{Number\ of\ True\ Positives\ (whithin\ spec)}{Number\ of\ true\ positives + Number\ of\ False\ Negatives}$$

### 3.3 Detection Accuracy – False Positives of the ILI system

As we continue to perform research and build our current data base size of real crack investigations, false positives have been minimized to less than 1 in 10 locations that were identified as having CSCC.

### 3.4 Unreported or Mis-Characterized CSCC

To date we have had very few mis-characterized or unreported CSCC anomalies.  The total number of mischaracterized CSCC locations is 3 out of a total 81 validated locations. The unreported CSCC were found to be either less than 30% deep or less than 0.8" in circumferential width and therefore below the detection threshold of the current ILI system.

### 4.  Detection and Sizing of Off angle CSCC to the Magnetic Field

The ILI system proved capable of tolerating misalignment in the crack positioning so that off angle occurrences of CSCC, which can follow the tape coat helical pattern, can be detected. The analysis of these off-angle cracks showed them to have similar amplitude responses as perfectly circumferentially oriented cracks and thus were identified with a similar level of confidence.

**Figure Eight** demonstrates the detection of a crack that is at 22 degree's off angle to the circumferential axis of the pipe. The AMFL and IDD magnetic field and signal response vs. background level is clearly visible and was precisely quantified.

While the ability to detect off-angle cracking improves with ILI hardware design, particularly its sensor positioning, it is the overall test methodology, of magnetic flux leakage, which does not require the indications to be positioned perfectly perpendicular to the direction of lines of magnetic flux. In this respect the ILI MFL system can be relied upon for detection of a range of flaws that extend beyond those manufactured anomalies against which the system was originally tested and benchmarked with.

This translated into real world performance whereby crack occurrences that are off angled to the circumference or cracks with multiple or radially skewed branches are detected as reliably as a single branch predominantly through wall radial crack. The ILI MFL sizing capability does not rely in the detection of signals from the crack tips as the ultrasonic technique used in the PAUT field verification did.

The very high sampling rates used in all modules of the ILI system played a significant role in the reliability and confidence level of the tool. With this very high sampling density the ILI system maintained its CSCC detection capability at tool velocities up to 11 mph (5 m/s).
As an example, the indication shown in **Figure Eight** was detected with the tool traveling at 10 mph (4.5 m/s). Given that this study was conducted in natural gas transmission and distribution lines this was particularly valuable as the tool velocity can often exceed 9 mph (4 m/s).

For all its strengths and broad spectrum of operation, the ILI MFL system can struggle to detect very small flaws in pipes with nominal wall thicknesses greater than 0.375" (9.5 mm).  This limitation is a

11

consequence of the designed flux density and magnetic saturation levels that were optimized for wall thickness in the range from 0.125" to 0.365" (3.2 to 9.3 mm).



**Figure Eight: Detection and Sizing of Off Angle CSCC at 10 mph (4.5 m/s)**

# 5. Management of CSSC in a complete pipeline system

Since the time of initial discovery, Xcel Energy has completed five successful in-line inspection runs utilizing magnetic based ultra-high sampling density in-line inspection technology for the detection of CSCC. These runs covered over 200 miles of natural gas pipelines in in NPS 6", 8" and 10" segments and have confirmed 78 CSCC indications. This data, though not inclusive of all pipeline configurations, can be utilized to provide guidance for improved susceptibility criteria for prioritization of pipelines to be assessed for the threat of CSCC.

Comparing the susceptibility criteria utilized for the initial selective digging program with locations of confirmed CSCC following in-line inspection, good alignment is seen with coating type, presence of external corrosion, terrain with elevation changes, and o'clock position. Severity of metal loss was initially selected as a prioritization criterion considering that corrosion is time based and the depth of metal loss would be an indicator of the duration of time the coating had been dis-bonded allowing greater time for CSCC to develop. Although presence of external metal loss has proven a key indicator, the majority of identified CSCC indications have been in areas of minor metal loss and have not aligned with areas of more severe external metal loss.

Finally, the initial susceptibility criteria did not address factors such as the pipeline diameter or wall thickness which impact the bending strength of the pipeline. Although the data is not inclusive of all pipeline configurations, bending strength, or the pipeline's ability to resist environmental forces such as those caused by ground movement, does appear to impact the susceptibility of a given pipe segment to the threat of CSCC.

Pipeline pigging and integrity management conference, Houston, February 2021

## 6. Considerations for the Excavation and Examination of CSCC

Following completion of in-line inspection runs, excavations were conducted to confirm CSCC indications.  Given that CSCC indications are commonly found in areas of rugged terrain subject to earth movement and elevated pipeline bending stress, excavation and in-situ examination presents unique challenges.  These include but are not limited to access constraints, changing pipeline conditions and operations and reliability considerations.

In many cases, residual bending stress in the pipeline resulted in the pipeline shifting up to 14 inches as overburden was removed.  Additional temporary pipe support material was retained onsite during excavation to ensure the pipe could be adequately supported for in-situ examination.  Further, when pipeline cut-outs were performed, attention was given to stabilize the pipe to manage additional shifting.  **Figure Nine** shows pipeline shifting following an initial pipeline cut.



**Figure Nine: CSCC Indication Excavation Before and After Initial Pipe Cut**

Following excavation, the below steps were utilized for in-situ examination of CSCC candidate anomalies:

a)  Identify CSCC target area(s) called out by ILI. Use caution when removing coating with wire wheel or other mechanical devices to prevent masking of CSCC indications.
b)  Prior to examining suspected CSCC anomalies using NDE methods, information such as date, anomaly id, odometer, flow, pipeline name, anomaly o'clock position, distance to upstream/downstream weld, and long seam orientation should be written on the pipe or on another form of documentation that can be included in a picture.
c)  In-situ black and white MT was utilized to confirm the presence of CSCC.
d)  Map all CSCC target areas provided in the dig sheet(s).
e)  Compare the ILI predicted CSCC areas to the 'as found' in the pipe results.

## Conclusions

This paper continues a three-year effort in the development and implementation of ILI technology for the reliable identification, management, and repair of CSCC.

Based on the combined research between Xcel Energy and Novitech, the ILI system can successfully discriminate CSCC occurrences from other pipe anomalies such as metal loss, as well as rank CSCC severity into three categories': subcritical, significant, and severe.

13

Pipeline pigging and integrity management conference, Houston, February 2021

The repeatability from pull testing showed consistent amplitude measurements from existing CSCC samples; a pipeline operator may consider monitoring of subcritical CSCC colonies as part of their integrity management system. Further R&D work is underway to continue to improve the accuracy and the severity rankings and allow for monitoring of what is believed to be subcritical CSCC.

CSCC management by ILI technology is supported by:

- A data base of 84 confirmed CSCC anomalies originally detected by ILI.
- Only 3 false positives out of 81 CSCC locations. The false positives were found to be metal loss.
- Only 1 occurrence of CSCC that was not ILI detected, found in the vicinity of CSCC reported by the tool. In this location the depth was predicted to be less than 30% by PAUT and the circumferential width less than 0.8" (20 mm).
- Achievable POD ≥ 90% for CSCC ≥ 30% in depth and 0.8" (20 mm) of circumferential width.
- Achievable POI ≥ 90% for CSCC ≥ 30% in depth 0.8" (20 mm) of circumferential width.
- Detection of CSCC begins at ≥ 30% in depth and 0.8" (20 mm) of circumferential width.
- Preliminary depth sizing accuracy from field verifications and laboratory analysis is (± 20%).
- Preliminary circumferential width sizing accuracy (± 0.4" (10 mm).
- Laboratory verified minimum crack opening for all ILI reported CSSC from 0.001" (25 µm).
- Expected wall thickness range for reliable detection and sizing 0.120" (3 mm) to .280" (7.1 mm).
- Confirmed ILI tool velocity of up to 11 mph, (5 m/s) in the wall thickness range of 0.188 to 0.219" (4.8 to 5.6 mm).
- Run to Run Repeatability ± 10% on real CSCC ≥ 30% in depth (from R&D pull testing).

The use of a reliable diagnostic system allowed for the simplification of the CSCC field program with direct detection supplanting desktop analysis that are solely based on susceptibility factors and geotechnical data.

While it is understood that the larger the sample data base of CSCC occurrences incorporated into the development of the tool will promote further advancements and refinement of the identification and sizing algorithms as well as hardware enhancements, it is noted that CSCC occurrences are not as prevalent as axially oriented cracking [1] and thus the study of the subject, for the time being, will likely continue to be based on comparable sample size to the one presented here.

# Acknowledgements

We would like to thank Xcel Energy for their input into this paper, and the provision of test pipe and ongoing support for this project.

Further thanks as well go to Steel Image for the metallurgical microstructure and microscopy results that supplement Novitech's in-house efforts to characterize provided test specimens.

Thank you as well to Chris Chartier from NDT Group for his assistance with the NDE efforts in Toronto.

Thank you, Jade Horton for your diligent proofreading, compiling data information and creating many of the images used in this paper.

14

Pipeline pigging and integrity management conference, Houston, February 2021

# REFERENCES

[1] R. R. Fessler and A. D. Batte, "Criteria for susceptability to circumferential SCC," in *Pipeline Research Council International Report, Catalog No. PR-313-113603-R01*, Houston TX, 2013.

[2] R. Thompson, R. Gardner, K. Dwyer and J. Hare, "The detection and sizing of circumferentially oriented stress corrosion cracking using axially oriented magnetic flux leakage inspection," in *Proceedings, Pipeline Pigging Integrity Management Conference*, Houston, TX, 2019.

[3] R. Thompson, R. Gardner, K. Dwyer, and A. Corbett, "A Cased Study in the detection and sizing of Circumferential stress corrosion cracking" *Proceedings, Pipeline Pigging Integrity Management Conference*, Houston, TX, 2020

[4] K. Hasselman and C. Julich-Trojan, "Charqacterization of Cracks on Serviced Pipes (ID 4503 and 4522)," Steel Image Inc., Failure Analysis and Metallography, Flamborough, ON, 2020.

# EXHIBIT U

*Proceedings of the 2018 12th International Pipeline Conference*
**IPC2018**
**September 24-28, 2018, Calgary, Alberta, Canada**

# IPC2018-78522

# IN-LINE INSPECTION IN LIEU OF HYDROSTATIC TESTING FOR LOW FREQUENCY ELECTRIC RESISTANCE WELDED PIPE

**Matt Krieg**
Marathon Pipe Line LLC
Findlay, Ohio, USA

**J. Bruce Nestleroth**
Kiefner and Associates, Inc.
Columbus, Ohio, USA

**Thomas Hennig**
NDT Global
Dublin, Ireland

**Harvey Haines**
Applus RTD Technology Center
Houston, TX, USA

## ABSTRACT

Hydrostatic testing is a costly, operationally-impactful method of verifying seam integrity in low frequency electric resistance welded (LF-ERW) line pipe. Pipeline operators seek an alternative seam assessment method that provides a sufficiently conservative integrity assessment without the potentially negative impacts of hydrostatic testing. As in-line inspection (ILI) and field nondestructive evaluation (NDE) improve, pipelines that have been historically hydrostatic tested can now use ILI to ensure operational integrity. The improved ILI technology assessed in this work is an enhanced ultrasonic crack ILI tool with higher circumferential resolution and finer axial sample intervals. Magnetic ILI data from previous assessments is used to assist in anomaly identification. In addition to utilizing NDE technologies such as phased array, the emerging full matrix capture (FMC) imaging method that quantifies the size, position, and orientation of seam weld anomalies was examined. This paper discusses the work performed to ensure the efficacy of the improved ILI and NDE methods to accurately detect and quantify all anomalies that could possibly fail a hydrostatic test. An early step in the process was removing three sections of pipe from service for technology calibration and assessment. Each spool was examined with ILI technology in a pump-through facility, inspected using many NDE methods and then destructively tested. These results were communicated to ILI analysts and used to calibrate and improve the interpretation of the inspection results. Then the pipeline was inspected as part of the scheduled integrity assessment. Using field evaluation of anomalies detected by ILI, pipes were selected for removal from service to examine destructively. This paper presents the inspection and destructive testing results in addition to prognosis for the use of the ILI in lieu of hydrostatic testing for LF-ERW pipe.

## INTRODUCTION

For many pipelines built from pipe with a low frequency electric resistance weld (LF-ERW) that transport liquid products, managing the threat of cracks in the seam weld is an essential part of an overall integrity management program. A common method for managing this threat is hydrostatic testing. With the improvements to ILI technology, pipeline operators may have more efficient and effective approaches to detect, assess, and identify cracks and then repair those needing remediation to ensure safe pipeline operation.

Hydrostatic testing has some well-known technical limitations. The main limitation is that hydrostatic testing only identifies cracks that fail during the test. Any crack or other flaw that has a failure pressure greater than the test pressure will not be discovered. For example, short, deep cracks, which inherently have high failure pressures, can go undetected with hydrostatic testing. With hydrostatic testing, the operator will not gain additional knowledge of the possible number and locations of cracks that did not fail during the hydrostatic test. In some cases, cracks close to failure can extend in size during hydrostatic testing; this larger crack has a greater potential to grow to a critical size before the next scheduled hydrostatic

Copyright © 2018 by ASME

assessment or can even fail at a pressure lower than the hydrostatic test pressure known as a pressure reversal.

ILI has the potential to overcome some of the technical limitations of hydrostatic testing since it can detect cracks smaller than the critical size. But for ILI to be a successful replacement for hydrostatic testing, all anomalies greater than critical size must be detected and identified for remediation. While the improvements in ILI technology make this an attainable goal, the successful implementation of an integrity management program to use ILI in lieu of hydrostatic testing is dependent on understanding the types and dimensions of crack-like flaws that could fail, the probability that they are present in the pipeline, and the potential for any existing cracks to grow to failure given the operating parameters. A process for verifying ILI results to ensure the pipeline is adequately assessed for cracks is outlined in American Petroleum Institute (API) recommended practice (RP) API RP 1176 [1]. This paper describes an implementation of a process for integrating many data sets to provide the confidence that ILI can be used to assure the integrity of a pipeline.

## NOMENCLATURE

API – American Petroleum Institute
CFF – Chilled forced fracture
CMFL – Circumferential MFL
EDM – electrical discharge machining
ERW – Electric resistance weld
FMC – Full Matrix Capture
ID – Inner or inside diameter
ILI – In-line inspection
IWEX – Inverse Wave Extrapolation
KMAP™ – Kinder Morgan assessment protocol
LF-ERW – Low frequency electric resistance weld
MFL – Magnetic flux leakage
NDE – Nondestructive evaluation
OD – Outer or outside diameter
PA – Phased Array UT
RP – Recommended practice
SMYS – Specified minimum yield strength
TFM – Total Focus Method
UC – Ultrasonic crack ILI
UCh – High resolution ultrasonic crack ILI
UCx – Extra high resolution ultrasonic crack ILI
UT – Ultrasonic

## BACKGROUND

Any welding process may produce anomalies which over time could impact weld integrity. LF-ERW seams are a common long seam type for line pipe manufactured from the 1930s through 1970[2]. This welding process has a well-documented history of anomalies [3-5]. The two types of seam weld anomalies that have most commonly caused seam failures were

hook cracks and cold welds[1]. A cause of failure is the enlargement of hook cracks by pressure-cycle-induced fatigue. In-service leaks from short cold welds, sometimes referred to as penetrators, cannot be prevented by hydrostatic testing and it has been reported that testing may have contributed to such leakage [3].

API RP 1176 recognizes that ILI for detecting and sizing cracks is more challenging than ILI for metal loss. Each crack ILI inspection has unique factors, including:

- Potentially multiple known or suspected cracking threat(s)
- Pipe characteristics including steel vintage and manufacturing technique
- Crack ILI history of the specific line
- Level of inspection validation
- Specific capability of the ILI technology
- Method of field NDE or other in-situ crack measurement
- Operational history of the pipeline

API 1176 provides many recommendations for assessing these factors. An example implementation of these general recommendations for using ILI to assure integrity is provided next.

## CRACK ILI VERIFICATION PROCESS

Collecting, reviewing and integrating many data sets are needed to provide the confidence that ILI can be used to assure the integrity of the pipeline. The pipeline operational history that includes anomalies that may have caused a release, either in service or during a hydrotest, is the first data set that should be reviewed. Destructive testing is strongly recommended in API RP 1176 to confirm anomaly type, size and time dependency; actual pipe properties can also be determined which can help provide a better assessment of criticality for anomalies identified in the ILI report. The results of previous ILI crack integrity assessments should be collected in a manner that enables efficient correlation with the most recent test results. These data are used to select an appropriate ILI tool to assess the pipeline for cracks. Ensuring the ILI tool has performed adequately is an essential part of the process. Calibration features such as electrical discharge machining (EDM) notches can provide an assessment of the general ILI tool performance and illustrate potential limitations in the data collection and analysis. In-the-ditch NDE being used for the evaluation plays an important role for discrimination and sizing of selected anomalies, both cracks and other features. One added challenge when verifying with NDE results is that measurement error and

---

[1] While cold weld and lack of fusion are used interchangeably in the industry, cold weld is the term that appears in API BULL 5T1 Imperfection and Defect Terminology and will be used in this paper.

Copyright © 2018 by ASME

NDE inspector capability can make it difficult to quantify performance. Integrating these results can provide confidence that the ILI inspection can be used in place of a hydrostatic test in future integrity assessments. To demonstrate the validity of the process, hydrostatic testing can be used. This could initially require a test of the entire pipeline, but could over time focus on high-risk segments (based on anomaly density or potential for crack growth due to fatigue). The goal can be to eliminate hydrostatic testing as confidence in the process increases.

## Data Collection, Review and Integration

The subject pipeline was constructed with LF-ERW pipe made in 1956 by Republic Steel. A common assumption is that the weld bondline is straight and perpendicular to the inner and outer surfaces. This is a logical assumption, since it is likely that an equal amount of steel is displaced for each plate edge when the two square plate edges are forced together and the welding current is applied. This straight, perpendicular geometry is common for nearly all high frequency (HF) ERW welds and many low frequency welds. However, for this pipe, the bondline can be curved as illustrated in Figure 1. The figure also shows a crack that was broken open by impact after being cooled in a liquid nitrogen bath. This hook crack was connected to the inside diameter (ID) (bottom of the image) and followed the flow lines through a third of the wall thickness. The chilled forced fracture (CFF) portion of the break is nearly perpendicular to the OD surface.

The crack surfaces that are not purely perpendicular to the surface affect the crack sizing capabilities of liquid coupled ultrasonic ILI and many field NDE methods such as shear wave and phased array ultrasonic methods. Typically, with ultrasonic inspection techniques, the crack sizing is based on the amount of sound energy returning from the crack that is converted into signal amplitude by the ultrasonic transducer. The term corner echo or corner trap is used to describe the path of the sound energy from the ultrasonic transducer to the corner between the crack and the surface of the pipe and back to the transducer. When the bondline deviates from purely perpendicular, the amplitude of the signal returning for a crack is reduced. Since the amplitude is a function of angle and the angle is not known, crack sizing will be less accurate. This could even lead to non-detection of flaws as the reflected energy may be too low to be considered for data storage or not reported as the size may be below reporting threshold. Interrogating cracks from both sides of the weld provides some insight into the possibility that cracks are at an angle. It is generally assumed that when the amplitude of the reflection from a crack from both sides of the weld are nominally equal, then the flaw is a cold weld; when the amplitudes are significantly different, the anomaly is a hook crack. A bondline that is not purely perpendicular to the surface can make the identification of anomaly type more difficult.

Other data that are useful to collect are actual yield strength and toughness data. The strength for the pipe being studied consistently tested greater than the API 5L specified minimum yield strength (SMYS). These properties were measured using more than a hundred pipes removed from service for many reasons including class changes and hydrostatic test failures. The 99th percentile minimum yield strength was 7.4 ksi above SMYS. The toughness was 31.8 ft-lbs, which is good for this vintage. Both of these values were used to assess the pipeline anomalies which reduced conservatism.



**Figure 1. Curved ERW bondline in Republic ERW pipe.**

The pipeline has been subjected to many integrity assessments. The year, plus or minus one depending on segment and assessment types were:

- Hydrostatic testing: nine covering the entire pipeline with the three most recent in 2004, 2008, 2013
- Geometry: 2004, 2008, 2013
- Mapping: 2014
- Magnetic Flux Leakage (MFL): 2004, 2017
- Circumferential MFL: 2009, 2013
- Kinder Morgan Assessment Protocol (KMAP™) examination of CMFL data: 2013
- UT crack tool: 2013, 2018

There is a detailed leak history of this pipeline that goes back to the installation in 1958. Nearly all of the releases from this pipeline were hydrostatic test leaks or ruptures and were the result of seam anomalies. The investigation of the seam leaks and splits showed that anomalies that failed were either a hook crack or a cold weld, with nearly equal probability of occurrence. As for recent in-service releases, one leak has occurred on this pipeline after both the 2004 and the 2010 hydrostatic tests. There have not been any leaks or ruptures since the 2013 hydrostatic test. The leaks have been the result of short cold welds, one inch (25mm) or less in length often called penetrators. Detection of this type of anomaly is difficult

          Copyright © 2018 by ASME

with either hydrostatic testing or ILI [1]. The recent improvements in data recording technology translate to finer axial sample intervals and enable the detection of shorter anomalies such as penetrators. If penetrators are a significant cause of leaks on a particular pipeline, the use of UC tools with finer axial sample intervals coupled with running the ILI tool at slower product speed could improve the detection of this anomaly type.

The well documented hydrostatic test history makes this pipeline an excellent candidate for management using ILI. While the hydrostatic tests exposed a handful of anomalies each time, this can mainly be attributed to high test pressure, typically greater than 95% of SMYS. Only four of the anomalies that failed showed fatigue growth. There is a high potential that the hydrostatic testing may cause more harm than the operational cycles as the few cycles at high pressure may have caused the cold weld oxide layer to begin to break down and the hook cracks to grow. This was part of the motivation to investigate the use of ILI in lieu of hydrostatic testing.

### Integration of Current and Prior ILI Results
Aligning the ILI calls in a common database can be helpful when attempting to determine whether an ILI indication is crack or geometry variation in the seam. Circumferential MFL has the capability to reliably detect non-injurious geometric anomalies such as trim variation in the seam weld. This technology can also detect hook cracks that have an appreciable length, depth, and crack opening. Detection reliability is better for hook cracks open to the internal surface of the pipe. In general, ID and OD cracks are equally likely hence pipeline operators should review results to ensure an appropriate number of ID and OD cracks are identified [1]. Circumferential MFL is less reliable at detecting cold welds since the opening is typically negligible.

Aligning the data can help in the identification of the anomaly type. A crack-like indication from CMFL or KMAP and an ID indication from the UT crack tool results with divergent signal amplitudes form the clockwise and counter-clockwise sensors indicates that the anomaly is likely an ID hook crack. An indication of a seam variation such as poor trim or plate mismatch in the UT crack tool data can be confirmed by a corresponding indication in the CMFL or KMAP results. Other examples will be provided when specific anomalies are discussed later in this paper.

### Calibration Spool
The use of calibration spools containing simulated crack-like features is referenced in API RP 1176. Specifically, EDM notches that have known lengths and depths can be used as initial indicators of ILI tool performance. These notches typically have less complex geometries than actual crack-like features, so they should not be used to replace validation with actual flaws. However, they can be used as for initial screening

to determine the rate of detection and length and depth accuracies of ILI technologies in comparison to stated specifications. Additionally, installing a calibration spool in-situ gives results under actual inspection conditions and removes biases associated with flow loop testing [11].

The ILI vendor and pipeline operator collaborated to develop a framework for the use of calibration spools that would provide an initial indicator of tool performance, confirm data analysis parameters, and identify limitations of the UT crack tool platform. This included a statistically-valid methodology for sizing verification of ILI-detectable features, challenging vendor specifications using out-of-specification features, and utilizing known features provided by the ILI vendor to calibrate the analysis parameters.

An iterative analysis approach was implemented where the ILI vendor first analyzed notch-like features without any specific knowledge of dimensions or orientation. After blind analysis, the pipeline operator provided a sample set of actual feature sizes and locations to assist the ILI vendor with calibration. This led to a complete reanalysis of the calibration spool, applying enhanced sizing to deep (>120 mil) features. Ultimately, the ILI vendor was able to meet or exceed the stated detection and sizing specifications; the pipeline operator utilized the analysis as an initial validation of the rate of detection and length and depth sizing for the ILI tool.

### ILI Tool
The ILI tool type used in this study was a 12" NDT Global EVO Series 1.0 UCh tool. Like other shear wave UT crack ILI tools, this tool requires a liquid medium between the sensor and the pipe and is referred to as a liquid-coupled angle beam ultrasonic tool. In recent years, UT crack tools have achieved significant measurement resolution enhancements

Recent developments in ultrasonic crack detection tools focused on two areas. The first area of development is operational aspects such as maximum inspection speed, capability to inspect pipelines with high attenuation media and/or slow speed of sound as observed in condensates or LNGs [6,7]. The second area of development is resolution and measurement enhancement for crack detection tools. Figure 2 depicts a comparison of sensor arrangement for a conventional UC tool and a high resolution UCh tool. The number of sensors is doubled, consequently the sensor track spacing in the circumferential direction is reduced to 5.0 mm (0.20 inch).

Copyright © 2018 by ASME

 

**Figure 2. Picture of conventional UC (A) and high resolution UCx (B) sensor arrangement.**

As briefly described above, the detection and sizing capabilities of ultrasonic shear wave crack detection tools utilized the reflected energy of flaws. To achieve a homogeneous sensitivity distribution over the entire pipe surface, the number of sensors, sound beam characteristics and pipeline geometry (diameter and wall thickness) and even the ultrasonic properties of the product must be considered. A simplified example of the benefit of increasing the circumferential resolution for crack detection tools is shown in Figure 3. The variation of sensitivity over the circumference varies within a certain range. Conventional tools typically allow a variation of approximately -6dB at the maximum, whereas the increase of sensors reduces this variation by design down to -3dB. Consequently, flaws which are measured with high resolution tools show less variation in amplitudes; subsequently depth sizing will be more accurate than conventional crack detection tools. This effect becomes obvious with data collected in a pump test at the ILI

vendors' test facility. Identical spools with natural SCC colonies were tested with three different circumferential sensor resolutions: UC (10mm), UCh (7mm) and UCx (5mm). The effect in repeatability and consistency of signal responses for the repeated measurements is clearly visible. Conventional tools achieve a variation of approximately 6dB (as illustrated in Figure 4). High resolution UCx tools reduce the variation to less than 3 dB, and in this example only 2.4dB.



**Figure 3. Sensitivity distribution over circumference with increasing sensor density.**



**Figure 4. Variation of amplitudes for repeated measurements of natural SCC fields with different sensor resolutions (10mm, 7mm and 5mm).**

Copyright © 2018 by ASME



**Figure 5. Signal response based on simulations for three crack geometries as a function of tilt angle.**

Depth determination methods for cracks that are skewed or tilted with respect to the outer surface were improved by numerical simulation of ILI sensor response to seam anomalies. Simulations with in-house 3D finite difference software and a commercial software package were conducted to quantify the effects of tilt angle, skew angle, size, and shape of flaws on the detection and sizing potential. Figure 5 depicts the effect of tilt angles for three simplified crack morphologies. The pure notch provided the largest signal, while the more natural crack geometries have smaller maximum signal amplitudes. The radial notch also has the strongest decrease when the crack is tilted by approximately 30°. More natural cracks show in general a reduced amplitude level (approximately 50% of notch amplitude for radial orientation), but the decrease is not as significant for different tilt angles. As a simple explanation, the rough and facetted crack profile always has a surface oriented in a direction to produce some reflection that would reach the sensor. Additional parameter studies and results can improve depth determination [8].

### Field NDE Tool Verification

Two common in-the-ditch inspection methods were used to detect and quantify anomalies on the pipeline, magnetic particle inspection (MPI) and phased array (PA) ultrasonic testing. Two recognized limitations of ILI tool verification using field NDE is the measurement error of the inspection technology and the capability of the inspector making the NDE measurement. These inspection methods were used for the general assessment of ILI tool performance and confirmation of the location of anomalies for cutouts and destructive testing. The capability of an emerging ultrasonic imaging technique was also evaluated by comparing the output to ILI and destructive testing results.

Ultrasonic imaging using full matrix capture (FMC) is an in-the-ditch NDE technique based on capturing a matrix of full waveform data by firing each individual element and recording all the individual array elements; repeating this for all the

elements results in a matrix of A-scans of 128 firing elements by 128 receiving waveforms for a total of 16,384 waveforms. An image is produced from the acquired FMC by processing these data using a method such as the total focusing method (TFM). In contrast to beam forming as used by PA inspection, imaging approaches based upon FMC enable focusing at every point in a region of interest. Although TFM is evolving as the descriptor for image processing techniques using DMC data, there are actually several methodologies. The method used in this study for image processing is Inverse Wave Extrapolation (IWEX). IWEX linearizes the image processing algorithms and as a result can process up to 13 different modes simultaneously and overlay them into an image. Each mode represents an image determined by numerous skips off the ID or OD surfaces. The advantage of multiple modes is that some are better at imaging the ID surface, some are better at imaging the OD surface, others are better at imaging the crack-like flaws, and others can be used for corner reflections or tip diffraction detection. The advantage of using multiple modes is that they help in determining the orientation of the flaw with respect to the

surface because different modes are capable of imaging different inclinations to the OD or ID surface. In addition, different complementary modes are needed for tip diffraction signals used for sizing the flaw. [9]

IWEX and other TFM methods find their origin in the application field of seismic exploration, where recorded subsonic wave field data are used to reconstruct structures and layers in the subsurface in the search for oil and natural gas deposits. The image processing techniques in seismology are usually referred to as migration methods, but are very similar to TFM and IWEX data processing. With the introduction of ultrasonic array technology and advancements in computing processing power, the principles of seismic processing can be applied in real time to ultrasonic frequency FMC datasets. A goal of IWEX imaging is to produce images capable of detecting, discriminating, and sizing crack-like features such as cold welds, surface breaking hook cracks, and fatigue cracks. These images can be used to discriminate these crack-like features from indications such as non-surface breaking upturned fiber indications, poor trim, offset plate edges, laminations and inclusions [10] which are more likely to be non-injurious. In mapping these anomalies, the goal is to size accurately enough to qualify ILI tools used for crack inspection.

### Destructive Testing

While the hydrostatic test history provided details on anomalies that could fail, additional information on anomalies that were detectable by ILI but small enough to pass a hydrostatic test was needed. Understanding the detection and sizing capability of the ILI tools and field NDE is needed to better understand the safety margin associated with the inspection method. Based on prior ILI inspections, three pipe samples were removed from

Copyright © 2018 by ASME

the pipeline and prepared for inspection. These pipes had over 20 anomalies based on the 2013 ILI examination and other ILI inspections. The pipes were assessed with IWEX and PA after they were cut out. Then, they were tested by the ILI vendor in a pump test facility. After the results were presented, anomalies were chosen for destructive testing. Two criteria were used to select anomalies for CFF. The first criterion was a common approach of selecting the anomalies with the largest size as determined by the inspection method. The second criterion was to choose anomalies where the estimated sizes had some ambiguity to even an experienced analyst, such as multiple signals or significant difference in the automatic depth estimate from one side or the other. Selected results from the more challenging category are provided next.

**Error! Reference source not found.**6 shows a hook crack that is nearly perpendicular to the surface on the left edge and at about a 45-degree angle on the right edge. This depth as determined by CFF was 0.04 inch (1mm) for the open hook crack and a 0.02 inch (0.5mm) segregation band for the left side expanding to 0.04 inch (1mm) for the open hook crack and 0.04 inch (1mm) segregation band for the right side. The profiles for the crack generated by the UT crack tool and IWEX inspection methods are in close agreement. This anomaly was particularly difficult to size because of the difference in the amplitude of the signals for transducers sending ultrasonic energy in the

clockwise or counterclockwise direction. It was not clear whether the segregation band was intact or cracked during the inspection making absolute determination of accuracy debatable.

Figure 7 shows a hook crack which formed from a sloping lamination; this anomaly was 40 percent deep at the ID on the left edge and approximately mid-wall at the right edge. This hook crack was nearly perpendicular to the surface at the OD of the surface and quickly changed parallel to the surface near the mid-wall. The metallograph of the CFF is shown in Figure 8. This metallograph also shows the ERW electrode contact points with a benign planar anomaly on the left. The magnetic particle inspection detected both the hook crack and the contact mark. In the absence of a hook crack or well-defined trim, contact marks such as these can be reported by field NDE as cold welds unless properly characterized by the ultrasonic NDE method. The IWEX imaging of this anomaly showed a good correlation of length and depth and clearly identified the contact mark. The UT crack tool length correlated well but the depth was generally underestimated. For this anomaly, the ILI tool recorded signals from many sensors for both sides of the weld, but the geometry of this anomaly caused amplitudes to vary. While this anomaly visually appears to be significant, it passed 9 hydrostatic tests and did not show any signs of growth by fatigue.



**Figure 6. A hook crack that is nearly perpendicular to the surface on the left edge
and at about a 45 degree angle on the right edge.**

7                                                        Copyright © 2018 by ASME



**Figure 7.  Hook crack that formed from a sloping lamination.**



**Figure 8.  The metallograph of the hook crack opened by CFF with fracture surfaced mated.**



**Figure 9. Forked lamination with distorted seam.**



**Figure 10. IWEX image of forked lamination.**

Some unusual anomalies in the seam were detected by ILI of NDE methods that typically do not impact integrity nor would they be detected by a hydrostatic test.  One such feature is a forked lamination with a distorted seam shown in Figure 9.  For this anomaly, the midwall lamination was exposed on one plate edge.  When the two plates were forced together to form the ERW weld, the steel from the solid plate edge flowed into the lamination.  This anomaly was over a foot (30cm) in length.  At the upstream edge of this anomaly, a hook crack that broke to the ID formed.  In 2013, UT crack tool inspections by two vendors identified the entire anomaly as a hook crack.  The most recent inspection with the higher resolution UT crack tool correctly identified the midwall feature and the hook crack separately.  The IWEX image of this anomaly, shown in Figure 10, shows the midwall lamination and the crack tip diffraction signals from the ends of the forked lamination.  It also shows that the anomaly does not extend to the ID or OD of the pipe.  Again, this anomaly passed 9 hydrostatic tests and did not show any signs of growth by fatigue.

Another seam weld anomaly that typically does not impact integrity, nor would it be detected by a hydrotest is shown in Figure 11.  This is a tapered wall thickness variation anomaly that abruptly stops creating a notch-like anomaly.  A cross-section is shown in Figure 12.  This anomaly could be treated as a metal loss anomaly since one edge is sufficiently abrupt to cause a signal using ultrasonic inspection approaches, but not sharp enough to create a stress concentration sufficient to cause a crack to form and grow.  The grain structure shows this anomaly was present when the plate was rolled.  The object that

8     Copyright © 2018 by ASME



**Figure 11. Image of the ID of a wall thickness variation anomaly.**



**Figure 12. Cross-section of a wall thickness variation anomaly.**

was rolled in may have fallen out during the pipe forming process since the bondline of the weld seam deviates at the ID. The UT crack ILI tool detected this anomaly with a significant signal from one side, and almost nothing from the other side. Another occurrence of this benign anomaly was found in a different pipe sample. Therefore, since additional anomalies of this benign type could occur in this pipeline, interpretation methods that correlate other ILI data to identify the metal loss component would help avoid unnecessary excavations.

### Using Destructive Test Results in ILI Interpretation
After the ILI of the entire pipeline in late 2017, the destructive testing results were helpful in selecting anomalies for additional assessment. These anomalies were investigated either by excavation and field NDE assessment or cut-out and destructively lytesting. The destructive testing showed that anomalies that had significantly different ultrasonic signal amplitudes for ultrasonic transducers sending energy towards the anomaly from either side of the weld were most likely hook cracks. The cold welds typically had nominally similar ultrasonic signal amplitudes from either side of the weld. Since this anomaly type can grow by fatigue, a lower crack depth threshold could be chosen for these anomaly types over the cold weld anomaly. The one exception to the different amplitude rule indicating a hook crack is the roll-in anomaly. These could be identified by correlating the metal loss ILI results with the

crack detection tool results with the presence of the likely hook crack being nearly eliminated when a shallow metal loss anomaly on the ID is detected near the seam. Another way to confirm that an ID crack-like call is a hook crack is by comparing the results from previous CMFL inspections and advanced analyses protocol such as KMAP™ with UT ILI crack calls. If the CMFL or the advanced analysis identified an anomaly in the category as the most crack-like (for example, seam weld anomaly A, level 5), then a UT ILI crack call with significantly different ultrasonic signal amplitudes from either side of the weld are very likely hook cracks. The presence of the hook crack with a large flat top being undersized did raise some concerns. If this anomaly type is a common failure mode in the confirmatory hydrostatic test, a high resolution ultrasonic wall thickness tool may aid in the identification of the anomaly type. By correlating the results of laminations near the seam weld with crack ILI tool results may help identify this certain type of hook cracks that may be missed otherwise.

These rules for characterizing anomaly types will differ by mill and pipe vintage. The combination of destructive testing and careful field NDE will help a pipeline owner to tailor the analysis approach for the anomalies found in the specific pipe.

### Confirmation of Results
A hydrostatic test plan was developed to confirm that it is possible to use the crack ILI verification process with destructive assessment and field NDE to improve interpretation of ILI results so that ILI could be used in lieu of a hydrostatic test. The hydrostatic test pressure was greater than 95% of SMYS which was higher pressure than the pipeline had ever withstood. The pipeline was scheduled to be tested after the submission date of this paper, but the results will be presented at the conference.

### CONCLUSIONS

Technology improvements make the use of ILI in lieu of hydrostatic testing a viable approach to the integrity management of pipelines. Success is dependent on understanding the types and dimensions of cracks that could fail, the probability that they are present in the pipeline, and the potential that any existing cracks would grow given the operating parameters. Many data sets are needed to provide the confidence that ILI can be used to assure the integrity of the pipeline.

Evaluation of ILI performance must go beyond the verification of the largest anomalies identified in the inspection report. Understanding the types and morphology of cracks that have the potential to grow and affect the integrity of the pipeline is an important process. The approach chosen for this pipeline was to remove pipe sections from service for technology calibration and assessment. The pipe sections were examined with ILI technology in a pump-through facility, inspected with many

  Copyright © 2018 by ASME

NDE methods, and destructively tested. These results were communicated to ILI analysts and used to calibrate and improve the interpretation of the inspection results. The process for fully understanding the cracking threat is pipeline specific and other approaches that can rely more heavily on field NDE are possible. Emerging NDE imaging approaches that confirm crack dimensions can be a useful part of the process. Ultrasonic imaging techniques using FMC data such as TFM or IWEX are becoming commercially available and other imaging techniques are in the demonstration phase such as x-ray computed tomography (XCT). These imaging approaches can augment (and have the potential to replace) destructive examination.

For ILI to be accepted in lieu of hydrostatic testing, all significant anomalies must be found. For some anomalies, where interpretation can be difficult, the use of other ILI data sets and knowledge of the pipeline could help identify anomalies that have a higher potential for being undersized, thus increasing the confidence that all significant anomalies must be found.

In the 20th century, hydrostatic testing was the common method to ensure integrity of pipelines with corrosion, but metal loss ILI has superseded that approach in this century. This work shows the advances in crack ILI and field NDE that could make crack ILI inspection a viable alternative to hydrostatic testing for all pipelines in the near future.

## REFERENCES

[1] American Petroleum Institute (API) recommended practice (RP) API RP 1176, July 2016

[2] Kiefner, J.F., and Clark, E.B, "History of Line Pipe Manufacturing in North America", an ASME Research Project CRTD-Vol. 43 Copyright 1996.

[3] Kiefner, J.F., Nestleroth, J.B., Quickel, G.T, Beavers, J.A. and Leis, B.N., "Types of Defects that Affect ERW Seam Integrity in Response to NTSB Recommendation P-09-1, Arising From The Carmichael, MS Rupture" IPC2014-33068, Proceedings of the International Pipeline Conference 2014, September 29 – October 3 2014, Calgary, Alberta, Canada.

[4] Kiefner, J.F., and Kolovich, K.M., "ERW and Flash-Welded Seam Failures", one of the deliverables of Subtask 1.4 on U.S. Department of Transportation Other Transaction Agreement No.DTPH56-11-T-000003, September 24, 2012. This publication can be found at:
http://primis.phmsa.dot.gov/matrix/PrjHome.rdm?prj=390

[5] Leis, B.N., and Nestleroth, J.B., "Battelle's Experience with ERW and Flash-Welded Seam Failures: Causes and Implications", one of the deliverables of Subtask 1.4 on U.S. Department of Transportation Other Transaction Agreement

No.DTPH56-11-T-000003, September 20, 2012. This publication can be found at:
http://primis.phmsa.dot.gov/matrix/PrjHome.rdm?prj=390

[6] Brimacombe, M., Hennig, T. and Wargacki, C.: Circumferential crack detection: challenges, solutions, and results. International Pipeline Conference 2016, Calgary, Canada.

[7] Hennig, T., LaBaume, R., Jaeger, C., Meinzer, T.: Latest generation of UT Corrosion Tools for High Speed Pipeline Inspection. NACE Corrosion Risk Management Conference, 2016, Houston, USA

[8] Willems, H., Kopp, G., Haro, V.: Sizing Crack Indications From Ultrasonic ILI: Challenges and Options. Pipeline Technology Conference, 2017, Berlin, Germany.

[9] X. Deleye, L. Hörchens and K. Chougrani: Experimental comparison of wave-field based ultrasonic imaging with other advanced ultrasonic weld inspection techniques, in Proceedings of the 18th World Conference on Nondestructive Testing, Durban, South Africa, April 16-20 (2012).

[10] H. Haines, L. Hörchens, P. Tomar, (2016) Identifying and Sizing Axial Seam Weld Flaws in ERW Pipe Seams and SCC in the Pipe Body Using Ultrasonic Imaging, 11th IPC, Calgary, Alberta, Paper2016-64069.

[11] C.Sheets, P. Argwal, and M. Krieg. The development of in-situ test spools for assessing the performance of in-line inspection tools during pipeline inspection. Proceedings of the Pipeline Pigging and Integrity Management Conference 2018, January 31 – February 1, 2018, Houston, Texas

    Copyright © 2018 by ASME

<div align="center">

**PROOF OF SERVICE**

</div>

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) described as **DECLARATION OF MICHAEL J. ROSENFELD IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTON (VOL. 4 OF 4)** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: *See* Attached Service List.

☒    BY ELECTRONIC MAIL TRANSMISSION WITH ATTACHMENT:   On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

☒    [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/Josie Cisneros*

_____

**SERVICE LIST**

Julie Teel Simmons, Esq.
David Pettit, Esq.
Talia Nimmer, Esq.
Center for Biological Diversity
2011 Franklin Street, Suite 375
Oakland, CA 94612

ATTORNEYS FOR PETITIONERS
CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: jteelsimmonds@biologicaldiversity.org
dpettit@biologicaldiversity.org
            tnimmer@biologicaldiversity.org

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

ATTORNEYS FOR PETITIONERS
ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
            jfrankel@environmentaldefensecenter.org
            trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

ATTORNEYS FOR RESPONDENTS/ DEFENDANTS
California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

ATTORNEYS FOR REAL PARTIES IN INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
            benjaminhanelin@paulhastings.com
            natalierogers@paulhastings.com

Trevor D. Large, Esq.
FAUVER, LARGE, ARCHBALD & SPRAY LLP
820 State Street, 4th Floor
Santa Barbara, CA 93101

ATTORNEYS FOR REAL PARTIES IN INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (805) 966-7000
Email: TLarge@FLASllp.com

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

*Additional Counsel Listed on Signature Page*

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.<br><br>               Petitioners and Plaintiffs,<br><br>    v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et. al<br><br>               Respondents and Defendants.<br><br>    and<br><br>SABLE OFFSHORE CORP., et al.<br><br>               Real Parties in Interest. | Case No. 25CV02244 [Coordinated with Case No. 25CV02247]<br><br>Assigned for all purposes to the Honorable Judge Donna D. Geck<br><br>**REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>Complaint Filed:    June 3, 2025<br>Trial Date:    None set |

- 1 -

## INTRODUCTION

Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company ("Real Parties") hereby object to the evidence submitted by Petitioners Center for Biological Diversity and Wishtoyo Foundation ("Petitioners") in support of their *Ex Parte Application For Order to Show Cause and Temporary Restraining Order*. On June 3, 2025, the Court heard the *ex parte* application, and set a hearing for July 18, 2025, on the order to show cause regarding the preliminary injunction.

In support of their preliminary injunction, Petitioners submit declarations from witnesses Richard Kuprewicz, Kara Clauser, Brady Bradshaw, Blake Kopcho, Jeffrey Miller, Tevin Schmitt, and Julie Teel Simmonds. But in doing so, Petitioners rely heavily on declarants who offer legal conclusions disguised as facts, speculative risk assessments unsupported by data, and statements hypothesizing about pipeline conditions and regulatory actions outside the scope of their personal or expert knowledge. (*See, e.g.*, Kuprewicz Decl. ¶¶ 8-10.)  Petitioners, however, bear the burden of producing evidence that supports both a likelihood of success on the merits and a showing of irreparable harm.  Declarations that support these showings must be based on personal knowledge, may only set forth admissible evidence, and must affirmatively show that the declarant is competent to testify to the matters stated in the declaration.  Consequently, affidavits or declarations (or any portion thereof) that are not based on personal knowledge or that assert only inadmissible conclusions, opinions, or ultimate facts must be disregarded by the Court. (Cal. Evid. Code § 702(a); *Floveyor v. Internat., Ltd. v. Superior Court* (1997) 59 Cal.App.4th 789, 796; *Hayman v. Block* (1986) 176 Cal.App.3d 629, 638-39 ["Personal knowledge and competency must be shown in the supporting and opposing affidavits and declarations. The affidavits must cite evidentiary facts, not legal conclusions or 'ultimate facts.'"].)  The bulk of Petitioners' evidence fails to satisfy the foregoing requirements.

- 2 -

LEGAL02/46314994v1

## MR. KUPREWICZ'S DECLARATION DOES NOT MEET *SARGON*'S ADMISSIBILITY STANDARD

Under California law, the trial court has the duty to act as a "gatekeeper" in determining whether to exclude expert testimony from trial. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770.) An expert must "state on direct examination the reasons for his opinion and the matter . . . upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." (Cal. Evid. Code § 802.) "[T]he trial court must exclude speculative or irrelevant expert opinion." (*Garner v. BNSF Railway Co.* (2024) 98 Cal.App.5th 660, 675.) Further, an expert's opinion "may not be based 'on assumptions of fact without evidentiary support, or on speculative or conjectural factors." (*Sargon*, *supra*, 55 Cal.4th at pp. 769-770 [internal citations omitted].)

Here, Mr. Kuprewicz repeatedly runs afoul of the *Sargon* standard by offering sweeping conclusions about pipeline safety without any reliable basis or explanation. For example, he asserts that the pipeline's design renders its corrosion protection "ineffective," that inspection technology "cannot adequately" detect certain corrosion, and he even asserts that the pipeline system is "not safe to operate" at all. (*See* Kuprewicz Decl. ¶¶ 8 & 10.) Yet nowhere in his declaration does he explain how he reached these grave conclusions. He cites no data, performs no analysis particularized to the Pipelines at issue, and fails to detail any accepted methodology linking the facts to his opinions. (*See Lowery v. Kindred Healthcare Operating, Inc.* (2020) 49 Cal.App.5th 119, 122 [explaining that expert opinions which "include conclusory statements without any foundation for their reasoning" are inadmissible].) In fact, one of his hearsay reports admits that certain tracking process are "not specially required" in industry standard "pipeline safety regulations," or in the applicable State waivers. (Kuprewicz Decl. Exhibit C at 7; *see also Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123 ["An expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based."])

- 3 -

Mr. Kuprewicz further opines that higher operating temperatures will "significantly accelerate" corrosion without quantifying "significant" or citing any study of these pipelines, much less studying the Pipelines himself. (*See* Kuprewicz Decl. ¶ 8(c).)  He declares that the Pipelines "cannot be made as safe as new pipelines," a categorical claim unsupported by any engineering analysis or industry standard, and flatly contradicted by state and federal permits and waivers issued by regulatory agencies that actually have performed the requisite analyses. (*See* Kuprewicz Decl. ¶ 8(e).)   He also does not claim that his expertise extends to the specific corrosion history of the Pipelines at issue here; thus, his testimony offers nothing beyond what any layperson could read in a report. (*See* Cal. Evid. Code § 801, subds. (a) & (b) [explaining that expert evidence must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" and "[b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates"].)

Despite admitting that he is missing critical information necessary to form an opinion about the Pipelines, Mr. Kuprewicz opines upon the Pipelines' safety and functionality.  But many of his purportedly factual assertions reflect generalized beliefs or worst-case scenarios, not evidence-based statements supported by direct observation or verifiable experience with the Pipelines.  (*See* Kuprewicz Decl. ¶ 10 [opining that certain tools "***can***" miss cracks; that the State Waivers do not ***guarantee*** cracks will be identified; and that Mr. Kuprewicz's lack of information prevents him from drawing further conclusions].)  But "an expert's opinion that something *could* be true if certain assumed facts are true, without any foundation for concluding those assumed facts exist" is not admissible. (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 [emphasis in original]; *see also Geffcken v. D'Andrea* (2006) 137 Cal.4th 1298, 1311 [holding that an expert's conclusions based on assumptions unsupported by record have no evidentiary value and should be excluded].)   Mr. Kuprewicz even admits that he cannot be sure whether certain testing parameters or corrosion tracking processes mandated by the State Waivers are inadequate. (*See*

- 4 -

LEGAL02/46314994v1

Kuprewicz Decl. ¶ 10(c)-(d).)  Yet, he still advances opinions about them.  (*See* Kuprewicz Decl. ¶¶ 8-10; *see also Sargon*, 55 Cal.4th at 770 [mandating "[e]xclusion of expert opinions that rest on guess, surmise or conjecture"].)  This is not expert testimony, but unsubstantiated speculation dressed in technical language.

In short, Mr. Kuprewicz seems to argue that the Pipelines are *de facto* too unsafe to operate just because they are pipelines.  But that argument is inconsistent with the complex state and federal regulatory regimes relevant to this matter, and under *Sargon*, it is inadmissible.  This Court should reject it.

### MR. KUPREWICZ RELIES UPON INADMISSIBLE HEARSAY

While the Evidence Code allows expert witnesses to rely on hearsay evidence when forming their opinions, it does not authorize expert witnesses to launder otherwise inadmissible hearsay. (*I-CA Enterprises. Inc. v. Palram Americas. Inc.* (2015) 235 Cal.App.4th 257, 266 ["[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay"].)  Here, Mr. Kuprewicz repeatedly cites his own unsworn reports without ever adopting the conclusions in those reports. (*See* Kuprewicz Decl. ¶¶ 8 & 10.)  Mr. Kuprewicz merely summarizes the reports' opinions, failing to offer any sworn testimony as to the truth of their conclusions. (Kuprewicz Decl. at ¶¶ 8 & 10.) This alone renders the reports hearsay. (*See People v. Campos* (1995) 32 Cal.App.4th 304 [holding that unsworn expert reports are inadmissible hearsay].)

Further, while an expert may rely on otherwise inadmissible hearsay to provide background information and context (*see People v. Veamatahau* (2020) 9 Cal. 5th 16, 21), "[w]hat an expert cannot do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*People v. Sanchez* (2016) 63 Cal.4th 665, 686.)  Here, Mr. Kuprewicz repeatedly relies upon his own unsworn reports, not as sources of background information or context, but as the factual bases for his submission as a whole.  He is simply serving as a conduit for hearsay. (*See Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1044

- 5 -

["There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception."].) Because the materials upon which Mr. Kuprewicz relies for his testimony are hearsay, neither the testimony nor the materials should be admitted.

## THE FAILURE TO PRODUCE MR. KUPREWICZ FOR CROSS-EXAMINATION VIOLATED REAL PARTIES' DUE PROCESS RIGHTS

Petitioners ask the Court to impose extraordinary relief by allowing Mr. Kuprewicz's testimony without allowing Real Parties the opportunity to cross-examine him. But the law does not permit this. The "confrontation of witnesses against him in noncriminal proceedings is a part of procedural due process guaranteed by the Fifth Amendment and the Fourteenth Amendment to the federal Constitution." (*August v. Department of Motor Vehicles* (1968) 264 Cal.App.2d 52, 60 [finding hearing met requirements of due process where sworn statement was considered but there was no subsequent request to cross-examine the declarant]; *see also* CAL. CONST. ART. I. § 7.)

In fact, "[b]ecause it relates to the fundamental fairness of the proceedings, cross-examination is said to represent an 'absolute right,' not merely a privilege," (*Fost v. Marin County Superior Court* (2000) 80 Cal.App.4th 724, 733 [noting the rule applies in "either a criminal or a civil case" and if "a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony"].) Further, "[t]he lack of an opportunity to cross-examine the declarant deprives the opposing party of important evidence concerning the credibility of the declarant and the reliability of testimony in the declaration." (*In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 841-842 [relying on *Fost* and holding it was error for trial court to rely on declaration on motion for preliminary relief where declarant was not made available for cross-examination or live testimony].)

- 6 -

Injunctive relief cannot rest on untested expert assertions shielded from scrutiny. Despite subpoenaing Mr. Kuprewicz for deposition, and despite this Court ordering Mr. Kuprewicz to sit for that deposition, Petitioners have failed to produce him. His testimony should therefore be stricken as a result. (*Fost*, *supra*, 80 Cal.App.4th at p. 733.)

### IMPROPER LEGAL CONCLUSION

An expert may not opine on legal standards, draw conclusions about the legal effect of regulatory documents, or tell the Court which outcome the law requires. *Hayman v. Block*, 176 Cal. App. 3d 629, 638-39 (1986) [explaining that "affidavits must cite evidentiary facts, not legal conclusions or 'ultimate' facts"]; *see also* Evidence Code § 801.) Yet Petitioners' supporting declarations are replete with improper legal conclusions that exceed the permissible scope of expert opinion under California law. (*See Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 530 [holding that a declaration containing only legal conclusions and ultimate facts "has no evidentiary value"].) Here, Mr. Kuprewicz opines not only that the Pipelines are unsafe, but that they **cannot be made** safe. (*See* Kuprewicz Decl. at ¶¶ 8.) That opinion is a legal conclusion about **the** ultimate fact in this case, and it should be excluded. (*See Hayman*, *supra*.)

### IMPROPER EXPERT OPINION

Evidence Code § 801 requires expert testimony to be based upon matters "perceived by or personally known" by the expert. As explained above, because a substantial amount of his testimony is not based upon matters "perceived by or personally known" to Mr. Kuprewicz, and is instead based upon his speculation about what might happen under certain circumstances. Thus, his testimony does not meet Evidence Code § 801's requirements and should be excluded.

### SPECULATION AND CONJECTURE

Again, Evidence Code § 801 requires expert testimony to be based upon matters "perceived by or personally known" by the expert. As explained above, because a substantial

- 7 -

portion of Mr. Kuprewicz's declaration is based on speculation and conjecture, his testimony does not meet Evidence Code § 801's requirements and should be excluded.

## RELEVANCE

Under Evidence Code § 210, admissible evidence must have "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." In one of Mr. Kuprewicz's hearsay reports, he admits that certain tracking processes he prefers are "not specially required" in industry standard "pipeline safety regulations," or the applicable State waivers. (Kuprewicz Decl. Exhibit C at 7; *see also Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123 ["An expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based."]) In other words, it has no bearing on industry standards or the relevant standards in this case, and does not have any tendency to prove or disprove a fact of consequence. It, and any testimony that relies upon it, is therefore irrelevant under Evidence Code § 210 and should be excluded.

## OBJECTIONS TO PETITIONERS' DECLARATIONS

Below are point-by-point objections to the declarations of Richard Kuprewicz, Kara Clauser, Brady Bradshaw, Blake Kopcho, Jeffrey Miller, Tevin Schmitt, and Julie Teel Simmonds.

- 8 -

**OBJECTIONS TO THE DECLARATION OF RICHARD B. KUPREWICZ**

In addition to the above, Real Parties object to the declaration of Richard B. Kuprewicz ("Kuprewicz Decl.") as follows:

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| 1. | Kuprewicz Decl., Ex. B (*Evaluation of Las Flores Pipeline System Startup Proposal (Dec. 20, 2024))*. | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted. As explained above, Kuprewicz's Exhibit B is hearsay because it is unsworn expert testimony, and because it is not offered to provide background information or context.<br><br>**Due Process.** *Fost*, *supra*, 80 Cal.App.4th at p. 733. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. As explained above, the failure to produce Mr. Kuprewicz violates the Real Parties' Due Process Rights because it deprives the Real Parties of the opportunity to cross-examine the witness.<br><br>***Sargon***. The admission of speculative expert testimony that amounts to conjecture should not be admitted. *See Sargon*, supra. As explained above, Exhibit B does not meet *Sargon*'s admissibility standard because it is based on speculation and conjecture; thus, it should be excluded. | ☐ Sustained<br><br>☐ Overruled |

- 9 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|------------------------|--------|
|  |  | **Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, his testimony does not meet Evidence Code § 801's requirements and should be excluded.<br><br>**Relevance**. As explained above, because a substantial portion of this evidence is irrelevant to the Pipelines at issue, it should be excluded under Evidence Code § 210. |  |
| 2. | Kuprewicz Decl., Ex. C (*Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart (Feb. 21, 2025)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted. As explained above, Kuprewicz's Exhibit C is hearsay because it is unsworn expert testimony.<br><br>**Due Process.** *Fost*, *supra*, 80 Cal.App.4th at p. 733. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights.<br><br>***Sargon***. The admission of speculative expert testimony that amounts to conjecture should not be admitted. *See Sargon*, supra. As | ☐ Sustained<br><br>☐ Overruled |

- 10 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | explained above, Exhibit B does not meet *Sargon*'s admissibility standard because it is based on speculation and conjecture; thus, it should be excluded.<br><br>**Improper expert testimony.** As explained above, because a substantial amount of his testimony is not based upon matters "perceived by or personally known" to Mr. Kuprewicz, his testimony does not meet Evidence Code § 801's requirements and should be excluded. | |
| 3. | Kuprewicz Decl., Page 3, Paragraph 7, Lines 9-13: "I was asked by the Environmental Defense Center (EDC) and Center for Biological Diversity (CBD) to utilize my experience and expertise to evaluate safety and integrity issues regarding the proposal to restart the Las Flores Pipeline System, which includes CA-324 and CA-325A/B ("the Pipelines"). A true and correct copy of my report, titled *Evaluation of Las Flores Pipeline System Startup Proposal*, dated December 20, 2024, is attached to this declaration as **Exhibit B**." | **Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, supra, 55 Cal.4th at 770; *Lowery*, supra, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony. | ☐ Sustained<br>☐ Overruled |

- 11 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | **Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. | |
| | | **Improper expert testimony.** As explained above, because a substantial amount of his testimony is not based upon matters "perceived by or personally known" to Mr. Kuprewicz, his testimony does not meet Evidence Code § 801's requirements and should be excluded. | |
| | | **Relevance**. As explained above, because a substantial portion of this evidence is irrelevant to the Pipelines at issue, it should be excluded under Evidence Code § 210. | |
| | | **Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, his testimony does not meet Evidence Code § 801's requirements and should be excluded. | |
| 4. | Kuprewicz Decl., Page 3, Paragraph ¶ 8.a., Lines 27-28: "The design of the Pipelines renders the federal mandated | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, 235 Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for | ☐ Sustained<br>☐ Overruled |

- 12 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | cathodic protection system, intended to help address pipeline external corrosion, ineffective." | the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 3, ¶ 8, Line 15 & 26-27 "The report sets forth my opinion . . . In summary, I identified the following technical issues concerning the proposed restart of the Pipelines: [¶ 8.a].") <br><br>**Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony. <br><br>**Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion | |

- 13 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | without an opportunity to cross-examine the expert violates Real Parties' due process rights. | |
| 5. | Kuprewicz Decl., Page 4, Paragraph 8.b, Lines 1-2: "Current inline inspection (ILI) technologies cannot adequately assess all forms of external corrosion threats that most likely exist on the Pipelines." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, *235* Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 3, ¶ 8, Line 15 & 26-27 "The report sets forth my opinion . . . In summary, I identified the following technical issues concerning the proposed restart of the Pipelines: . . . [¶ 8.b].")<br><br>**Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such | ☐ Sustained<br><br>☐ Overruled |

- 14 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|----------------------|--------|
| | | foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony.<br><br>**Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights.<br><br>**Relevance**. Because this evidence is based on conjecture, it is irrelevant to the Pipelines at issue, and should be excluded under Evidence Code § 210. | |
| 6. | Kuprewicz Decl., Page 4, Paragraph 8.c, Lines 3-5: "The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective cathodic protection system once the Pipelines go into operation." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, 235 Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 3, ¶ 8, Line 15 & 26-27 "The report sets forth my opinion . . . In summary, I identified the following technical issues concerning the proposed restart of the Pipelines: . . . [¶ 8.c].") | ☐ Sustained<br><br>☐ Overruled |

- 15 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|------------------------|--------|
|     |                        | **Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony.<br><br>**Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights.<br><br>**Improper expert testimony.** Because this testimony is not based upon matters "perceived by or personally known" to Mr. Kuprewicz, it does not meet Evidence Code § 801's requirements and should be excluded. |  |

- 16 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | **Relevance**. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210. **Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| 7. | Kuprewicz Decl., Page 4, Paragraph 8.d, Lines 6-7: "Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, *235 Cal.App.4th* at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 3, ¶ 8, Line 15 & 26-27 "The report sets forth my opinion . . . In summary, I identified the following technical issues concerning the proposed restart of the Pipelines: . . . [¶ 8.d].") **Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 | ☐ Sustained ☐ Overruled |

- 17 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|-----------------------|----------------------|--------|
| | | Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony.<br><br>**Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded.<br><br>**Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay | |

- 18 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | under Evid. Code, § 1200 and should be excluded.<br><br>**Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. | |
| 8. | Kuprewicz Decl., Page 4, Paragraph 8.e, Line 8: "The poorly designed Pipelines cannot be made as safe as new pipelines." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, 235 Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 3, ¶ 8, Line 15 & 26-27 "The report sets forth my opinion . . . In summary, I identified the following technical issues concerning the proposed restart of the Pipelines: . . . [¶ 8.e].")<br><br>**Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis | ☐ Sustained<br><br>☐ Overruled |

- 19 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|----------------------|--------|
| | | supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony. | |
| | | **Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. | |
| | | **Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210. | |
| | | **Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| | | **Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay | |

- 20 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|------------------------|--------|
|     |                        | under Evid. Code, § 1200 and should be excluded. |  |
| 9.  | Kuprewicz Decl., Page 4, Paragraph 9, Line 9: "Following the preliminary approval of the State Waivers for the pipelines, . . ." | **Hearsay.** Evid. Code, § 1200. The statement is a reference to an out of court statement offered for the truth of the matter asserted.<br><br>**Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights.<br><br>**Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded.<br><br>**Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay | ☐ Sustained<br>☐ Overruled |

- 21 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | under Evid. Code, § 1200 and should be excluded. | |
| 10. | Kuprewicz Decl., Page 4, Paragraph 10.a, Lines 26-28: "The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, *235* Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 4, ¶ 10, Line 18 & 26-27 "The report sets forth my opinion . . . My opinion, as set forth in my report, is as follows: [¶ 10.a]")<br><br>**Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony. | ☐ Sustained<br><br>☐ Overruled |

- 22 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | **Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. | |
| | | **Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210. | |
| | | **Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| | | **Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay under Evid. Code, § 1200 and should be excluded. | |
| 11. | Kuprewicz Decl., Page 5, Paragraph 10.b, Lines 1-3: "The proposed hydrotests are also insufficient to address certain types of corrosion or predict corrosion growth. For example, MOP hydrotests are not adequate to test for crack | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, *235* Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true | ☐ Sustained<br>☐ Overruled |

- 23 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | forming potential on the Pipelines." | case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 4, ¶ 10, Line 18 & 26-27 "The report sets forth my opinion . . . My opinion, as set forth in my report, is as follows: . . . [¶ 10.b]")<br><br>**Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony.<br><br>**Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. | |

- 24 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|------------------------|--------|
|  |  | **Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded.<br><br>**Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay under Evid. Code, § 1200 and should be excluded. |  |
| 12. | Kuprewicz Decl., Page 5, Paragraph 10.c, Lines 4-10: "The State Waivers do not assure adequate spike hydrotesting, which is a method to address various forms of crack forming potential. The values for the spike test on Line 324 are too low for corrosion cracking screening and evaluation. Hydrotesting for Lines 325 A and B must be conducted in segments given the elevation changes. It is unclear, however, | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, *235* Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 4, ¶ 10, Line 18 & 26-27 "The report sets forth my opinion . . . My opinion, as set forth in my | ☐ Sustained<br><br>☐ Overruled |

- 25 -

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | whether the testing parameters are adequate for Line 325A due to missing information. In addition, the Waivers do not appear to require any hydrotesting for Line 325B." | report, is as follows: . . . [¶ 10.c]") <br><br> **Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony. <br><br> **Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. <br><br> **Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210. | |

- 26 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | **Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. **Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay under Evid. Code, § 1200 and should be excluded. | |
| 13. | Kuprewicz Decl., Page 5, Paragraph 10.d, Lines 11-14: "A key corrosion performance tracking process set in the State Waivers for the Pipelines is missing. This information, which helps identify possible corrosion "hot spots," is especially important given the history of extensive corrosion on the Pipelines." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, 235 Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 4, ¶ 10, Line 18 & 26-27 "The report sets forth my opinion . . . My opinion, as set forth in my report, is as follows: . . . [¶ 10.d]") **Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. | ☐ Sustained ☐ Overruled |

- 27 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|------------------------|--------|
| | | Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony.<br><br>**Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights.<br><br>**Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |

- 28 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | **Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay under Evid. Code, § 1200 and should be excluded. | |
| 14. | Kuprewicz Decl., Page 5, Paragraph 10.e, Lines 15-20: "The State Waivers will not provide an equal or greater level of safety as if the Pipelines were equipped with an effective cathodic protection system to avoid pipeline failure due to external corrosion. The current design of the Pipeline renders the cathodic protection system ineffective. External corrosion on the Pipelines is exacerbated by operation of the Pipelines at elevated temperatures, which seriously increases the corrosion rate." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, 235 Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 4, ¶ 10, Line 18 & 26-27 "The report sets forth my opinion . . . My opinion, as set forth in my report, is as follows: . . . [¶ 10.e]")<br><br>**Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz | ☐ Sustained<br><br>☐ Overruled |

- 29 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|------------------------|--------|
| | | provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony.<br><br>**Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights.<br><br>**Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded.<br><br>**Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay | |

- 30 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | under Evid. Code, § 1200 and should be excluded. | |
| 15. | Kuprewicz Decl., Page 5, Paragraph 11, Lines 21-23: "Based on the facts I reviewed and my professional analysis, in my opinion the Las Flores Pipeline System is not safe to operate, even if the conditions in the Fire Marshal's State Waivers are fulfilled." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, *235* Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statements of opinion are mere summaries of the inadmissible expert reports.<br><br>**Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony. | ☐ Sustained<br><br>☐ Overruled |

- 31 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|------------------------|--------|
|     |                        | **Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known" to Mr. Kuprewicz, does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded.<br><br>**Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay |        |

- 32 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|-----------------------|--------|
|     |                        | under Evid. Code, § 1200 and should be excluded. |        |

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

LEGAL02/46314994v1

## OBJECTIONS TO THE DECLARATION OF KARA CLAUSER

Real Parties object to the declaration of Kara Clauser ("Clauser Decl.") as follows:

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| 16. | Clauser Decl., Ex. 1 (*Map showing habitat for federally and state-listed threatened and endangered species*) | **Hearsay**: Evid. Code, § 1200. The evidence submitted constitutes and out of court statement offered for the truth of the matter asserted.<br><br>**Irrelevant**. Evid. Code §§ 210 & 350. The evidence submitted has no logical tendency to prove or disprove a fact of consequence in the case. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; *Odom*, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Speculation and conjecture**. Because a substantial portion | ☐ Sustained<br><br>☐ Overruled |

- 34 -

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| 17. | Clauser Decl., Ex. 2 (*Map showing hydrography information*) | **Hearsay**: Evid. Code, § 1200. The evidence submitted constitutes and out of court statement offered for the truth of the matter asserted.<br><br>**Irrelevant**. Evid. Code §§ 210 & 350. The evidence submitted has no logical tendency to prove or disprove a fact of consequence in the case. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; *Odom*, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br>☐ Overruled |

- 35 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | **Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Speculation and conjecture.** Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| 18. | Clauser Decl., Ex. 3 (*Map of quaternary faults*) | **Hearsay**: Evid. Code, § 1200. The evidence submitted constitutes and out of court statement offered for the truth of the matter asserted.<br><br>**Irrelevant**. Evid. Code §§ 210 & 350. The evidence submitted has no logical tendency to prove or disprove a fact of consequence in the case. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** | ☐ Sustained<br><br>☐ Overruled |

- 36 -

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | Evid. Code § 352; *Odom*, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Speculation and conjecture.** Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| 19. | Clauser Decl., Ex. 4 (*Map showing elevation information*) | **Hearsay**: Evid. Code, § 1200. The evidence submitted constitutes and out of court statement offered for the truth of the matter asserted.<br><br>**Irrelevant**. Evid. Code §§ 210 & 350. The evidence submitted has no logical tendency to prove or disprove a fact of consequence in the case. Because this evidence is based on conjecture and speculation, | ☐ Sustained<br>☐ Overruled |

- 37 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; *Odom*, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| 20. | Clauser Decl., Ex. 5 (*Map showing wildfire information*) | **Hearsay**: Evid. Code, § 1200. The evidence submitted constitutes and out of court statement offered for the truth of the matter asserted.<br><br>**Irrelevant**. Evid. Code §§ 210 | ☐ Sustained<br>☐ Overruled |

- 38 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | & 350. The evidence submitted has no logical tendency to prove or disprove a fact of consequence in the case. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; *Odom*, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | |
| 21. | Clauser Decl., Ex. 6 (*Land ownership map*) | **Hearsay**: Evid. Code, § 1200. The evidence submitted constitutes and out of court statement offered for the truth of the matter asserted.<br><br>**Irrelevant**. Evid. Code §§ 210 & 350. The evidence submitted has no logical tendency to prove or disprove a fact of consequence in the case. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; *Odom*, *supra*, 110 Cal.App.5th at 493. | ☐ Sustained<br><br>☐ Overruled |

- 39 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. **Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded. **Speculation and conjecture.** Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| 22. | Clauser Decl., Page 2, Paragraph 3, Lines 13-15: "I prepared the maps, attached as Exhibits 1 through 6 to this Declaration, depicting the Las Flores Pipeline of the Santa Ynez Unit (SYU) Pipeline System with important environmental resources, as provided in more detail below." | **Hearsay**: Evid. Code, § 1200. The evidence submitted constitutes and out of court statement offered for the truth of the matter asserted. **Irrelevant.** Evid. Code §§ 210 & 350. The evidence submitted has no logical tendency to prove or disprove a fact of consequence in the case. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210. | ☐ Sustained ☐ Overruled |

- 40 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | **Inflammatory/Prejudicial.** Evid. Code § 352; *Odom*, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. **Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded. **Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| 23. | Clauser Decl., Page 2, Paragraph 4, Lines 16-27: "To prepare the maps, I used ArcGIS Pro version 3.3.1 from Environmental Systems Research Institute (ESRI), using the Projected Coordinate System NAD1983 (2011) State Plane California V FIPS 0405 (Meters). To map the Las Flores Pipeline, I downloaded a California Active Pipelines shapefile from Koordinates.com at | **Hearsay**: Evid. Code, § 1200. The evidence submitted constitutes and out of court statement offered for the truth of the matter asserted. **Irrelevant**. Evid. Code §§ 210 & 350. The evidence submitted has no logical tendency to prove or disprove a fact of | ☐ Sustained ☐ Overruled |

- 41 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | https://koordinates.com/layer/96036-california-activepipelines/. Koordinates.com is a centralized GIS data and management cloud sharing site. This layer was uploaded on September 4, 2018, with the source data cited at: https://services.gis.ca.gov:443/ArcGIS/rest/services/Economy/Active_Pipelines/MapServer/0. This source layer has since been removed from the State of California Government's ArcGIS REST Services Directory. Additionally, I georeferenced Figure 1. Project Vicinity Map from the Notice of Preparation, available at https://files.ceqanet.opr.ca.gov/170616-2/attachment/kMgGnx0tQr16ZTEvxK9MMeqNrLQO9Zgzm79wtnPIiz9ypKehMDgvTH0hm3te5DOx4NMf_ebkpJow0wNe0, which I used to confirm the accuracy of the pipeline shapefile." | consequence in the case. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; *Odom*, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| 24. | Clauser Decl., Page 3, Paragraph 5, Lines 1-15: "Attached to this | **Hearsay**: Evid. Code, § 1200. The evidence submitted | ☐ Sustained |

- 42 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | Declaration as Exhibit 1 is a true and correct copy of a map I created showing federally and state-listed threatened and endangered species in proximity to the Las Flores Pipeline. I downloaded the GIS data describing critical habitat from the U.S. Fish & Wildlife Service (FWS) website at https://ecos.fws.gov/ecp/report/table/critical-habitat.html, as well as from the National Marine Fisheries Service (NMFS) website at https://noaa.maps.arcgis.com/home/item.html?id=f66c1e33f91d480db7d1b1c1336223c3. I downloaded the GIS data describing California Natural Diversity Database Occurrences from the California Department of Fish and Wildlife website at https://apps.wildlife.ca.gov/cnddb-subscriptions/downloads. This dataset requires a subscription, and was downloaded on March 27th, 2025. To create the map, I used ESRI's "Select by Location" tool, to select FWS critical habitat, NMFS critical habitat, and CNDDB records that directly overlap the pipeline. The CNDDB records were further refined by querying for only Federally Endangered (FE), Federally Threatened (FT), Federally Proposed Threatened (FPT), State Endangered (SE), State Threatened (ST), or State Candidate Endangered (SCE). Additionally, I added CNDDB records for the Southwestern willow flycatcher (FE,SE), despite not overlapping the pipeline directly." | constitutes and out of court statement offered for the truth of the matter asserted.<br><br>**Irrelevant**. Evid. Code §§ 210 & 350. The evidence submitted has no logical tendency to prove or disprove a fact of consequence in the case. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; *Odom*, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on | ☐ Overruled |

- 43 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| 25. | Clauser Decl., Page 3, Paragraph 6, Lines 16-23: "Attached to this Declaration as Exhibit 2 is a true and correct copy of a map I created showing hydrography information in proximity to the Las Flores Pipeline. I downloaded the GIS data describing hydrography from the USGS National Hydrography Dataset Plus High Resolution ArcGIS Living Atlas of the World website at https://services.arcgis.com/P3ePLMY s2RVChkJx/arcgis/rest/services/NHD Plus_High_Resolution_9Ma rch2023_view/FeatureServer.   This dataset was queried to display only Feature Codes 46006: Stream/River: Hydrographic Category = Perennial, 46003: Stream/River: Hydrographic Category = Intermittent, and 46007: Stream/River:   Hydrographic Category = Ephemeral." | **Hearsay**: Evid. Code, § 1200. The evidence submitted constitutes and out of court statement offered for the truth of the matter asserted.<br><br>**Irrelevant**. Evid. Code §§ 210 & 350. The evidence submitted has no logical tendency to prove or disprove a fact of consequence in the case. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; *Odom*, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's | ☐ Sustained<br><br>☐ Overruled |

- 44 -

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | requirements, and should be excluded. **Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| 26. | Clauser Decl., Page 3, Paragraph 7, Lines 24-27: "Attached to this Declaration as Exhibit 3 is a true and correct copy of a map I created showing quaternary faults in proximity to the Las Flores Pipeline. I downloaded the GIS data describing quaternary faults from the United States Geological Survey (USGS) at https://www.usgs.gov/programs/earthquake-hazards/faults." | **Hearsay**: Evid. Code, § 1200. The evidence submitted constitutes and out of court statement offered for the truth of the matter asserted. **Irrelevant**. Evid. Code §§ 210 & 350. The evidence submitted has no logical tendency to prove or disprove a fact of consequence in the case. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210. **Inflammatory/Prejudicial.** Evid. Code § 352; *Odom*, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. **Improper expert testimony.** Because this evidence is based | ☐ Sustained ☐ Overruled |

- 45 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| 27. | Clauser Decl., Page 4, Paragraph 8, Lines 1-15: "Attached to this Declaration as Exhibit 4 is a true and correct copy of a map I created showing elevation information for mile markers along the Las Flores Pipeline. I downloaded the GIS data describing elevation from the USGS National Map (v2.0) website at https://apps.nationalmap.gov/downloader/. From this website, I downloaded four 1/3 arc-second Digital Elevation Models (DEMs) of the area overlapping the pipeline: USGS_13_n35w121_20210301.tif, USGS_13_n35w120_20240207.tif, USGS_13_n36w120_20240207.tif, and USGS_13_n36w121_20240207.tif. I used the Geoprocessing Tool "Mosaic to New Raster" to combine these four DEMs into one mosaic DEM. To | **Hearsay**: Evid. Code, § 1200. The evidence submitted constitutes and out of court statement offered for the truth of the matter asserted.<br><br>**Irrelevant**. Evid. Code §§ 210 & 350. The evidence submitted has no logical tendency to prove or disprove a fact of consequence in the case. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; *Odom*, *supra*, 110 Cal.App.5th at 493. The statement is intended to | ☐ Sustained<br><br>☐ Overruled |

- 46 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | create mile markers, I utilized the "Generate Points Along Lines" Geoprocessing Tool, with the distance field set to one US Survey Mile and Z Values set to "enabled". I utilized the Geoprocessing Tool "Update Feature Z", with the input features set to the Mile Marker point layer, and the Input Surface set to the mosaic DEM. In the Mile Marker point layer, I created an attribute field for Elevation in meters, and used the "Calculate Geometry Attributes" tool for the property "Point z-coordinate". I multiplied these values by 3.28084 to convert meters to feet. The resulting field contained elevation in feet at each mile marker, which I used to symbolize the points in the resulting map using graduated colors." | evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| 28. | Clauser Decl., Page 4, Paragraph 9, Lines 16-23: "Attached to this Declaration as Exhibit 5 is a true and correct copy of a map I created showing wildfire information in proximity to the Las Flores Pipeline. I downloaded the GIS data describing wildfire perimeters from the California Department of Forestry and Fire Protection (CALFIRE) website at https://www.fire.ca.gov/what-we-do/fire-resource-assessment-program/fireperimeters. This layer was queried to display only wildfire | **Hearsay**: Evid. Code, § 1200. The evidence submitted constitutes and out of court statement offered for the truth of the matter asserted.<br><br>**Irrelevant**. Evid. Code §§ 210 & 350. The evidence submitted has no logical tendency to prove or disprove a fact of consequence in the case. Because this evidence is based on conjecture and speculation, | ☐ Sustained<br><br>☐ Overruled |

- 47 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | perimeters from 2015 to present. I downloaded the GIS data describing State and Local Responsibility Area Fire Hazard Severity Zones at the CALFIRE website at https://osfm.fire.ca.gov/what-we-do/community-wildfire-preparedness-andmitigation/ fire-hazard-severity-zones. These data were downloaded on May 20th, 2025." | it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; *Odom*, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| 29. | Clauser Decl., Pages 4-5, Paragraph 10, Lines 24-4: "Attached to this Declaration as Exhibit 6 is a true and correct copy of a map I created showing land ownership in proximity to Las Flores National Pipeline. I | **Hearsay**: Evid. Code, § 1200. The evidence submitted constitutes and out of court statement offered for the truth of the matter asserted. | ☐ Sustained<br>☐ Overruled |

- 48 -

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | downloaded the GIS data describing land ownership from the Bureau of Land Management (BLM) Geospatial Business Platform website at https://gbp-blm-egis.hub.arcgis.com/datasets/6bf2e737c59d4111be92420ee5ab0b46/about. I downloaded additional GIS data from the USGS Protected Area Database (PAD-US 4.0) website at https://www.usgs.gov/programs/gap-analysis-project/science/pad-us-data-download. The PAD-US layer was used to create labels of the following protected areas near the pipeline: Gaviota State Park, Los Padres National Forest, Carrizo Plain Ecological Reserve, Carrizo Plain National Monument, Bitter Creek National Wildlife Refuge, Refugio State Beach, and El Capitán State Beach." | **Irrelevant**. Evid. Code §§ 210 & 350. The evidence submitted has no logical tendency to prove or disprove a fact of consequence in the case. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; *Odom*, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |

- 49 -

LEGAL02/46314994v1

**OBJECTIONS TO THE DECLARATION OF BRADY BRADSHAW**

Real Parties object to the declaration of Brady Bradshaw ("Bradshaw Decl.") as follows:

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|------------------------|--------|
| 30. | Bradshaw Decl., Page 2, Paragraph 3, Lines 9-12 "I live in Santa Cruz, California, and frequently visit Santa Barbara for work and personal recreation. For example, I visited the area twice this spring, swimming and going on beach walks at Rincon Point and West Beach. I plan to visit a couple of times this summer or fall, during which I intend to visit Refugio State Beach and swim and dive in the Santa Barbara Channel." | **Irrelevant.** *Evid. Code* §§ 210, 350.  This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.**  Evid. Code § 352; *Odom*, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's | ☐ Sustained<br><br>☐ Overruled |

- 50 -

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | requirements and should be excluded. | |
| 31. | Bradshaw Decl., Page 2, Paragraph 4, Lines 13-19: "I visited Refugio State Beach just last Sunday (May 18) for a paddle-out in memory of the 10th anniversary of the Refugio Beach oil spill. I swam out into the water with friends, while others joined us on kayaks and surf boards. There were about 70 people there. It was a somber and mournful event, and I was brought to tears by the former tribal chair of the Coastal Band of the Chumash Nation, who spoke about what it's like to be ignored by people in power. I also reflected on what would happen if there was another spill that impacted Refugio State Beach. It was surreal to be in the water with so many people at a beautiful state beach while knowing that we could lose it all in another oil spill." | **Irrelevant.** *Evid. Code* §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's | ☐ Sustained<br>☐ Overruled |

- 51 -

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|-----------------------|--------|
|     |                        | requirements and should be excluded. |  |
| 32. | Bradshaw Decl., Page 2, Paragraph 5, Lines 20-25: "It was also jarring to see excavators, machinery, and trucks doing construction on the pipeline in Gaviota State Park on the same day that we were mourning the devastation caused by the oil spill. There was dirt flying in the air, and I thought about the endangered Southern California steelhead living in the Gaviota Coast's streams that may have already been harmed by all the construction activity and what other sensitive species and habitats may have been harmed in the State Park. Last fall, I photographed similar construction work on the pipeline happening in the sensitive coastal habitats." | **Irrelevant.** *Evid. Code* §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's | ☐ Sustained<br>☐ Overruled |

- 52 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|------------------------|--------|
| | | requirements and should be excluded. | |
| 33. | Bradshaw Decl., Page 3, Lines 1-15: Imbedded picture and text "Figure 1. An excavator I photographed working on the Las Flores Pipeline System on October 4, 2024." | **Irrelevant.** *Evid. Code* §§ 210, 350. Th statement and picture is irrelevant to demonstrate justification for the imposition of a preliminary injunction. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Speculation and conjecture.** Because a substantial portion of this evidence is based on speculation and conjecture, it does | ☐ Sustained<br>☐ Overruled |

- 53 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | not meet Evidence Code § 801's requirements and should be excluded. | |
| 34. | Bradshaw Decl., Page 3, Paragraph 6, Lines 17-20: "I enjoy the unique beauty of Santa Barbara's beaches, including places like Refugio State Beach and Rincon Point. Some of my favorite activities include swimming, snorkeling, and diving in the Santa Barbara Channel. I also enjoy skateboarding and biking along the coast. These activities are an important part of my life and something I will do as long as I can." | **Irrelevant.** *Evid. Code* §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known," does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on | ☐ Sustained<br>☐ Overruled |

- 54 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| 35. | Bradshaw Decl., Page 3, Paragraph 7, Lines 21-24: "I am a recreational and competitive freediver. I am on the U.S. National Team for freediving and have broken 13 national records. Freediving involves diving deep into the ocean without respiratory equipment and exploring the underwater world. My dives range from 10 to 180 feet, and I love being able to study the underwater world up close. Freediving is also central to my spirituality." | **Irrelevant.** *Evid. Code* §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br>☐ Overruled |
| 36. | Bradshaw Decl., Page 3, Paragraph 8, Lines 25-28: "I started freediving in 2015 and have done many trips off the Santa Barbara coast since 2018. I visit the area to dive at least once a year, but for the last two years I've gone diving and swimming there every few months. I love the natural diversity and environment in the area and intend to continue going as often and as long into the future as I can." | **Irrelevant.** *Evid. Code* §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br>☐ Overruled |
| 37. | Bradshaw Decl., Page 4, Paragraph 9, Lines 1-5: "One of my favorite places to dive is the Channel Islands. I did a | **Irrelevant.** *Evid. Code* §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary | ☐ Sustained<br>☐ Overruled |

- 55 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | particularly special dive in the Channel Islands in 2022. As I dove into the dense kelp forest, I was surrounded by marine life and recall seeing harbor seals swimming nearby. On the boat ride back to shore, I saw a superpod of dolphins, with hundreds of animals swimming freely. It gave me a lot of hope to see such an abundant, diverse, and thriving ecosystem." | injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | |
| 38. | Bradshaw Decl., Page 4, Paragraph 10, Lines 6-9: "I always look for native species on dives and beach walks near Santa Barbara, where I have seen crabs, stingrays, a shark, kelp, sea lions, dolphins, giant starfish, cormorants, seagulls, and pelicans. I appreciate seeing these animals in the wild, and it gives me a lot of joy and benefits being able to do so." | **Irrelevant.** *Evid. Code* §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br>☐ Overruled |
| 39. | Bradshaw Decl., Page 4, Paragraph 11, Lines 10-17: "The ocean is an important part of my spiritual practice. I found spirituality in the water in 2015 around the same time that I started freediving. I pray at the water's edge and conduct rituals of exchange with the ocean that symbolize the weaving of my body into the sea. These rituals have marked important transition points in my life, helping me let go of the | **Irrelevant.** *Evid. Code* §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, *supra*, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative | ☐ Sustained<br>☐ Overruled |

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | past while giving myself over to the ocean and fate. I have prayed and engaged in these rituals on Santa Barbara's beaches, including at Rincon Point and Gaviota State Park. In March, I visited Gaviota State Park to meditate and think about the coastal habitat and the way it connects to the marine ecosystems, while overlooking the Pacific Ocean and trying to envision a bright future." | value. | |
| 40. | Bradshaw Decl., Page 4, Paragraph 12, Lines 18-24: "I have closely followed and opposed efforts to resume offshore oil and gas drilling in the Santa Barbara Channel, including the Office of State Fire Marshal's decision to waive the requirement that the onshore pipelines have effective cathodic protections. I am aware of the immense habitat destruction and animal deaths that resulted from the tens of thousands of gallons of oil that spilled onto Refugio Beach in 2015. I am deeply concerned that if production resumes in the Santa Ynez Unit and oil flows through the Las Flores Pipeline System, another oil spill will occur and cause great harm to my personal and professional interests." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. | ☐ Sustained<br><br>☐ Overruled |

- 57 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered. **Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 41. | Bradshaw Decl., Page 4, Paragraph 13, Lines 25-28: "I find the biodiversity of the Santa Barbara Channel captivating and being able to swim and dive there is important to me recreationally, competitively, and spiritually. Oil production in the Santa Ynez Unit causes noise pollution, water pollution, vessel strikes, and other impacts that harm the animals I love to see and the coastal areas I love to explore." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction. **Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. **Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered. | ☐ Sustained ☐ Overruled |

- 58 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | **Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 42. | Bradshaw Decl., Page 5, Paragraph 14, Lines 1-8: "The impacts from production and risk of a spill exists every day that oil flows through the Las Flores Pipeline System. If production fully resumes, I believe it is only a matter of when—and not if—an oil spill will happen. I know the pipelines for the Santa Ynez Unit have already ruptured once, and know the pipelines are past their intended lifespans and are at higher risk of leaks and spills with each passing day. If a spill were to occur, I would not get back into the water for a very long time due to the health impacts the spill would cause. An oil spill would also inhibit my spiritual practices, preventing me from going to the affected shorelines to pray and conduct rituals of exchange with the ocean." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative | ☐ Sustained<br>☐ Overruled |

- 59 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | value. | |
| | | **Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered. | |
| | | **Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 43. | Bradshaw Decl., Page 5, Paragraph 15, Lines 9-13: "I know that the Santa Ynez Unit's processing facilities were the largest sources of air pollution in Santa Barbara County when they were in operation. The quality of the air I breathe is particularly important to my experience of freediving. Maintaining healthy lungs is the most important part of my training as a diver. I have asthma, and breathing in the toxic polluted air associated with oil | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br><br>☐ Overruled |

- 60 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | production and an oil spill would harm my health." | **Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 44. | Bradshaw Decl., Page 5, Paragraph 16, Lines 14-15: "But most troubling to me would be the irreparable harm that an oil spill would cause to the marine life that makes each dive so transformative, from kelp to fish to harbor seals." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative | ☐ Sustained<br><br>☐ Overruled |

- 61 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | value. | |
| | | **Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered. | |
| | | **Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 45. | Bradshaw Decl., Page 5, Paragraph 17, Lines 16-24: "Water quality is also very important to my health and safety, because I spend long periods of time in the water and may ingest the water. I could be exposed to pollutants that reach the water from a spill or oil production operations. I have seen oil sheens on the water in the past. When I see one, I will not get into the water and end up missing out on the activities that are so physically and spiritually important to me. I | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br>☐ Overruled |

- 62 -

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | have also seen oil sheens while diving, which harms my enjoyment of freediving because I know I may be breathing in fumes from pollutants while at the surface or absorbing them through my skin while underwater and that I may be harming my health. When this happens, I will end my dive. It also is upsetting to know that the sensitive plants and animals that live in the water could be sickened or killed by the oil." | **Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 46. | Bradshaw Decl., Pages 25-26, Paragraph 18, Lines 25-2: "My work is dedicated to ending offshore oil drilling because of the damage that fossil fuels cause our planet. I am deeply worried about the irreparable harm that could result from restarting oil production in the Santa Ynez Unit using decades-old, corroded pipelines and platforms. That's why I have taken so many | **Irrelevant**. Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative | ☐ Sustained<br><br>☐ Overruled |

- 63 -

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | actions to oppose it, including testifying at numerous local and statewide public hearings; organizing alongside community members who share my fears; contacting my elected representatives; and writing agency officials." | value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 47. | Bradshaw Decl., Page 6, Paragraph 19, Lines 3-12: "It's absurd that not a single agency has conducted an environmental review of this project to consider the impacts of repairing and restarting these aging pipelines and any mitigation measures or alternatives to protect the | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement | ☐ Sustained<br>☐ Overruled |

- 64 -

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | ecosystems and species harmed by oil spills and construction work. The environmental stakes are so high in this case. It's deeply alarming that Cal Fire has shut out the public's participation. If Cal Fire had conducted a public hearing on the waivers, I would have attended to express my concerns about the intolerable risk of another oil spill. I would have explained that restarting these old, corroded pipelines threatens to undo all the progress we've made in restoring the ocean since the Refugio Beach Oil Spill. On one of my recent dives off California's central coast, I saw reason for hope when I spotted three sea otters, who restore kelp forests by eating sea urchins. The threat of an oil spill jeopardizes that hope." | is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | |
| 48. | Bradshaw Decl., Page 6, Paragraph 20, Lines 13-15: "My freediving, swimming, and ocean-based spiritual practices are a core part of who I am and are central to my wellbeing. These interests are at risk of imminent, irreparable harm if this Court does not issue the requested relief." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br>☐ Overruled |

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

LEGAL02/46314994v1

**OBJECTIONS TO THE DECLARATION OF BLAKE KOPCHO**

Real Parties object to the declaration of Blake Kopcho ("Kopcho Decl.") as follows:

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| 49. | Kopcho Decl., Page 2, Paragraph 3, Lines 11-15: "I grew up in the coastal town of Rancho Palos Verdes and often spent time on the water and at the beach throughout Southern California, as my parents have a beach house in Newport Beach and my grandmother lives in Huntington Beach. These experiences led to a life-long love for the ocean and marine animals, and this love steered the direction of many aspects of my life—my educational pursuits, hobbies, and professional career." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br><br>☐ Overruled |
| 50. | Kopcho Decl., Page 2, Paragraph 4, Lines 16-19: "I love to surf, hike, scuba dive, sail, and spend other time in and around the ocean and beach, and it is no exaggeration to say my quality of life depends on the quality of its waters and shores. I've lived in Santa Barbara since 2020, and as someone who lives and recreates in the constant view of both natural beauty and offshore oil platforms, the worry of an oil spill is never far from my mind." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br><br>☐ Overruled |
| 51. | Kopcho Decl., Page 2, Paragraph 5, Lines 20-28: "I | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to | ☐ Sustained |

- 66 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
|  | received a bachelor's degree in aquatic biology from U.C. Santa Barbara in 2007 and a master's degree in marine biology from the University of Auckland, New Zealand, in 2011. My postgraduate work in New Zealand focused on marine ecology and evolutionary biology, with a year of intensive field work and studies on the nutritional ecology of herbivorous marine fish. I also participated in a semester abroad program focused on biological oceanography at Woods Hole Oceanographic Institution in 2008. During that time, I sailed for six weeks from Hawaii to Tahiti, assisting with navigation and sailing duties along the way, as well as data collection to study the equatorial undercurrent. These experiences gave me a deeper understanding and appreciation of the interactions and interdependence of everything in the ocean—from currents to seaweed and from plankton to whales." | demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Overruled |
| 52. | Kopcho Decl., Page 3, Paragraph 6, Lines 1-7: "I started surfing when I was 14 and it has grown into a self-described obsession. The act of riding waves is a big part of the attraction of course, but another big part is just being in and around the ocean. I enjoy | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 | ☐ Sustained<br><br>☐ Overruled |

- 67 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|------------------------|--------|
|  | being at the beach, sitting on my surfboard, watching the pelicans, dolphins, and occasional sea otter and experiencing the colors and textures of the water. It is something that not only improves my physical health but my mental health as well, giving me time to reconnect with the natural world and forget about the stress and busyness of the day. These psychological, emotional, and physical benefits from surfing are essential to my well-being." | Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | |
| 53. | Kopcho Decl., Page 3, Paragraph 7, Lines 8-15: "I regularly surf, hike, and spend time on the beaches near Santa Barbara and along the Gaviota Coast, including places like Jalama Beach near Point Conception, Refugio State Beach, El Capitán State Beach, Naples State Marine Conservation Area, Sands Beach, Rincon Beach, Oxnard Shores, and Silver Strand State Beach, to name a few. The Gaviota Coast is particularly special to me because so much of it is undeveloped, and I love hiking and surfing in places where I am surrounded by undisturbed natural beauty. I have surfed up and down the entire California coast and off the Channel Islands as well. I surf as often as possible—daily if the waves are good— | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br>☐ Overruled |

- 68 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | between Ventura and Jamala Beach, north of Point Conception." | | |
| 54. | Kopcho Decl., Page 3, Paragraph 8, Lines 16-25: "Several times a year I hike along the coastal bluffs near Gaviota and make my way to the coast to relax on the beaches at Tajiguas, surf the waves at Naples Beach, visit El Capitan State Park, or hang out in Gaviota State Park, enjoying the tranquil scenery with friends. All these areas are close to Sable's Las Flores Canyon facility or along the Las Flores pipeline route. A potential oil spill anywhere along this stretch of coast— depending on its size and severity—could irreparably damage the beaches and bluffs I visit to enjoy and recreate. I have seen hummingbirds, red tailed hawks, and California sea lions on the bluffs and beaches in these areas, and sea otters, bottlenose dolphin, and humpback whales in the surf zone. I am always awed and excited whenever I come across wildlife simply existing in their natural habitat. This is one of the last, vast undeveloped coastlines in Southern California and is beloved by the local community of Santa Barbara." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not | ☐ Sustained<br><br>☐ Overruled |

- 69 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 55. | Kopcho Decl., Pages 3-4, Paragraph 9, Lines 26-4: "I also own property on the Hollister Ranch, just to the west of Gaviota State Park. Over the last several years, I have visited Hollister Ranch dozens of times, spending days with friends on the beaches there, barbequing on the bluffs above the sea, and surfing the iconic waves, finding solace in the vast natural beauty of the area. I have seen bobcats; barn and great horned owls; hawks; and my favorite, ospreys, throughout the Ranch. Whales, dolphins, multiple species of pinnipeds, and sea otters frequent the breaks that I surf regularly there. I look forward to my visits to the Ranch and plan to continue spending as much time as possible there in the future." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br>☐ Overruled |
| 56. | Kopcho Decl., Page 4, Paragraph 10, Lines 5-8: "One of my favorite places to go is the Channel Islands. I go between one and three times a year to sail, scuba dive, surf, freedive, camp, and hike with family and friends, and it is something I always look forward to. I visited Santa Cruz Island three times last year and | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against | ☐ Sustained<br>☐ Overruled |

- 70 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | once in 2022, and twice in 2021; I also visited Santa Rosa Island in 2023 for a backpacking trip with friends." | Respondents, and has no probative value. | |
| 57. | Kopcho Decl., Page 4, Paragraph 11 (and imbedded picture), Lines 9-25: "My most recent trip to Santa Cruz Island on April 28 was spectacular. My friends and I surfed perfect waves all morning and felt like we had the place to ourselves. On our way back to Santa Barbara, we encountered a small pod of adult and juvenile humpback whales who swam alongside us. [Imbedded Picture] Figure 1. One of the humpback whales I saw in the Santa Barbara Channel on April 28, 2025." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br>☐ Overruled |
| 58. | Kopcho Decl., Pages 4-5, Paragraph 12, Lines 26-7: "While on the Channel Islands, I enjoy watching the wildlife that live around the islands, including elephant seals, harbor seals, fur seals, sea lions, and island foxes and looking for sea anemones, sea stars, urchins, abalone, and octopuses in tidepools. My most memorable trip was in 2005, when I went with a group of friends to Santa Rosa Island and spent eight days camping and hiking. Although we did some of the most hard-core hiking and surfing I've ever done, ran out of food, and were | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br>☐ Overruled |

- 71 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|----------------------|--------|
| | exhausted, the boat ride back made everything worthwhile: we saw a pod of endangered blue whales and were incredibly fortunate to see a blue whale fluke, which is very rare since they are so massive and do not usually dive deep enough for their tails to emerge from the water. We also saw a superpod of common dolphins numbering between 500 and 1,000 individuals, with dolphins swimming in every direction I looked and as far as my eye could see. It was a highlight of my life and an experience I will never forget." | | |
| 59. | Kopcho Decl., Page 5, Paragraph 13, Lines 8-11: "I have not seen blue whales since that 2005 trip, but I love to sail on the Santa Barbara Channel, and I look for them and other whales every time I am on the water. I also enjoy watching osprey, snowy plovers, and other shorebirds at the beach, and I recently saw a bald eagle for the first time at Anacapa Island." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br>☐ Overruled |
| 60. | Kopcho Decl., Page 5, Paragraph 14 and imbedded picture, Lines 12-25: "This last February, I was boating with friends off the coast of Santa Barbara and saw a large pod of orcas in the Channel, including several calves and a semi-albino juvenile known as | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction. | ☐ Sustained<br>☐ Overruled |

- 72 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | Frosty. There were about a dozen in all, and we were able to watch them for hours. It was an incredible encounter and something I hope to experience again and again. [Imbedded Picture] Figure 2. One of the orcas I saw just offshore of Santa Barbara while boating with friends in February 2025." | | |
| 61. | Kopcho Decl., Pages 5-6, Paragraph 15, Lines 26-3: "I sometimes charter a boat with friends and sail out to the Channel Islands, loading up the boat with gear and sleeping on it for three or four days. One of my favorite memories is chartering a sailboat with my parents in September 2019, when we sailed around the Channel Islands for three days and saw native foxes while hiking on Santa Rosa Island. Some of my friends now have boats of their own so I'm able to visit the Channel Islands more often, and I plan to continue doing these trips long into the future." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction. | ☐ Sustained ☐ Overruled |
| 62. | Kopcho Decl., Page 6, Paragraph 16, Lines 4-12: "I am also a scuba diver, which is something I started in college and enjoy doing around the Channel Islands. The last time I went was in 2023, when I did two or three dives from Santa Cruz Island. My favorite time to dive is in the late summer or | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.  **Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional | ☐ Sustained ☐ Overruled |

- 73 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | early fall, when visibility is best. I have done 20 or more dives around the islands over the last 20-plus years. I am fascinated by the richness and diversity of life found there and have seen some incredible things, including a giant moray eel, baby horn shark, schools of bat rays, garibaldi, damselfish, lots of different reef fish, mola mola (a type of sunfish), spiny lobster, sea hares, nudibranchs, and black, green, and red abalone. The Channel Islands are the gem of California's Gold Coast. Having access to this remarkable place is one of the main reasons I live here." | bias by the court against Respondents, and has no probative value. | |
| 63. | Kopcho Decl., Page 6, Paragraph 17, Lines 13-18: "I also enjoy standup paddle-boarding, swimming, and freediving along the coast, diving as deep as possible and swimming through kelp forests. I became fascinated with all types of seaweed from my time spent studying herbivorous fish and their diets for my master's thesis, and I appreciate everything about them—the way they look and feel, and the critical role they play in temperate marine ecosystems. They play a similar role in temperate water as coral reefs do in the tropics, providing habitat and food for a wide range of marine life." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br><br>☐ Overruled |

- 74 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| 64. | Kopcho Decl., Page 6, Paragraph 18, Lines 19-24: "Many of the best moments of my life have been spent surfing, sailing, and diving in the Santa Barbara Channel. Its beauty and biodiversity inspire and move me. These activities are a central part of my life— and whether it be boating, surfing, swimming, diving, or just enjoying time at the beach, I am on or in the Pacific on a near-daily basis. I will continue doing these activities as often and as long as possible, and an oil spill would have devastating, long-lasting impacts on the marine life and environment that mean so much to me." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Speculation/Lack of Foundation.** Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon, supra,* 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | ☐ Sustained<br><br>☐ Overruled |
| 65. | Kopcho Decl., Pages 6-7, Paragraph 19, Lines 25-6: "I | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to | ☐ Sustained |

- 75 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | am reminded every time I see offshore oil platforms on the horizon, or sail past them on my way to the Channel Islands, that another oil spill could happen any time. In fact, after the egregious spill caused by a corroded pipeline in the Las Flores Pipeline System in 2015, I urged my former coworkers at the Center to fight any resumption of oil and gas production from the Santa Ynez Unit because of the dangers it poses. I am incredulous that the Office of State Fire Marshal waived pipeline safety regulations that will enable the restart of the Las Flores Pipeline System without any consideration of the environmental impacts. These pipelines and associated infrastructure are in sensitive areas of the Gaviota coast, and another oil spill seems inevitable if these corroded pipelines are put back into use. This is especially true considering how old all the Santa Ynez Unit offshore and onshore infrastructure is and the fact that the onshore pipelines have already ruptured once." | demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon, supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | ☐ Overruled |

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| 66. | Kopcho Decl., Page 7, Paragraph 20, Lines 7-14: "I'm appalled and devastated to learn that offshore drilling has resumed off this gorgeous and priceless stretch of coast, and that oil has begun flowing into the Las Flores Canyon processing facility. It's diabolical that Sable has been allowed to resume oil operations after the devastating spill in 2015 emanated from the same infrastructure only 10 years ago. Drilling, transporting, and processing oil in the region threaten another catastrophic oil spill, will exacerbate the climate catastrophe we are currently facing, and worsen the air quality in the surrounding areas. The offshore platforms should be shut down permanently and decommissioned to protect our local community, stunning coastline, and fragile climate." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the | ☐ Sustained<br><br>☐ Overruled |

- 77 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | material on which the expert relies, and (3) speculative. | |
| 67. | Kopcho Decl., Page 7, Paragraph 21, Lines 15-21: "Restarting the Las Flores Pipeline System would cause me irreparable harm from the air pollution, water pollution, and risk of another oil spill in the places where I live and recreate. I know that when they were operating, the processing facilities for the Santa Ynez Unit were a major source of air pollutants known to cause a range of health problems— including nitrogen dioxide and gases that produce smog. Issuing the state waiver helps clear the way for operations to fully restart at these facilities, which would adversely affect the air I breathe since I live in Santa Barbara and take part in outdoor recreational activities near the facilities on a near-daily basis." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation.** Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of | ☐ Sustained<br>☐ Overruled |

- 78 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 68. | Kopcho Decl., Pages 7-8, Paragraph 22, Lines 22-5: "The Santa Ynez Unit was also the largest source of greenhouse gas emissions in Santa Barabara County, which undermines my work to reduce the effects of climate change. Continuing to use these aging facilities furthers our dependency on fossil fuels when we should be ending this dependency altogether. We are barreling towards a climate catastrophe, and science shows we need to stop new oil projects and decommission existing ones. We've already reached 1.5°C warming, and 2°C appears inevitable. We need to take dramatic action to avoid the worst consequences of climate change, and extending these leases and issuing these permits takes us in the wrong direction. This prolongs our use of fossil fuels and worsens the effects of climate change, which have real-life consequences for me. Climate change causes sea level rise that endangers beaches where I hike; alters currents and wave patterns that | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, | ☐ Sustained<br><br>☐ Overruled |

- 79 -

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | threaten some of my favorite surf breaks; and wipes out habitat of the animals I enjoy viewing and studying. These are activities I will do as long as I can, but I worry the effects of climate change—not old age—will determine how long I'm able to enjoy them." | *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 69. | Kopcho Decl., Page 8, Paragraph 23, Lines 6-10: "Another oil spill from the Las Flores Pipeline System could cause further damage to the intertidal zone and the health of everything I see in the underwater world—from sea hares to blue whales. Oil spills have serious long-term ecological effects. The animals who survive a spill face chronic health and reproductive problems, and the marine environments damaged by a spill take years or even decades to recover." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered. | ☐ Sustained<br>☐ Overruled |

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | **Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon, supra,* 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 70. | Kopcho Decl., Page 8, Paragraph 24, Lines 11-15: "I often think about the bald eagle and ospreys I've seen along the coast. They're usually hunting close to shore where they can see fish in the shallow water. Another oil spill from the Las Flores Pipeline System would kill or poison their prey and impact their ability to hunt. It would also harm the snowy plovers I see nesting in the dunes and hunting in the intertidal zone. Their reproduction, nesting, and feeding would all be irreparably harmed by another spill." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide | ☐ Sustained<br>☐ Overruled |

- 81 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 71. | Kopcho Decl., Page 8, Paragraph 25, Lines 16-25: "On a kayaking trip in May of last year, I encountered a population of sea otters who live in a large kelp bed just south of Point Conception, where they are starting to make a comeback. I kept my distance so as not to disturb them, and it was an amazing experience to watch them swim and play. It looked like there were dozens of them, spreading across an area about three to four football fields in length. I believe this is the only relatively robust population this far south in California, which makes them particularly special. These otters are very close to the Santa Ynez Unit platforms and onshore and offshore pipelines, and a large spill would be devastating to this population. There are images forever | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation.** Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without | ☐ Sustained<br>☐ Overruled |

- 82 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|------------------------|--------|
| | imprinted in my memory of pelicans covered in oil and dead dolphins on the beach from both the Deepwater Horizon spill, which happened in the Gulf of Mexico in 2010, and the 2015 Refugio spill. It would break my heart if the same thing happened to these otters." | adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 72. | Kopcho Decl., Page 8-9, Paragraph 26, Lines 26-8: "An oil spill could also harm my own health and safety. I've seen oil—often in big globs—on so many beaches, including beaches in Goleta, Santa Barbara, Montecito, Summerland, and Carpinteria. It smells terrible, sticks to your feet and surfboard, and is incredibly difficult to remove. One time at Leadbetter Beach, there was so much tar that I had to cancel my plans for a beach walk; after fewer than five minutes of walking on the beach, the bottoms of my feet were completely covered in a thick, foul-smelling layer of tar. Although there are natural oil seeps in the region, constant leaks and spills from offshore | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. | ☐ Sustained<br><br>☐ Overruled |

- 83 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
|  | drilling contributes to these impacts. I've personally seen an oil slick in the Santa Barbara Channel from the air when flying into the Santa Barbara Airport. Another oil spill from the Las Flores Pipeline System or Santa Ynez Unit would prevent me from engaging in activities that are so meaningful to me—including swimming, diving, surfing, and boating—for a long time. It would be devastating for the entire community." | Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon, supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. |  |
| 73. | Kopcho Decl., Page 9, Paragraph 27, Lines 9-16: "Environmental impacts, including air pollution, water pollution, and the very real risk of another catastrophic oil spill exist as long as oil flows through the Las Flores Pipeline System. My interests in hiking, swimming, surfing, sailing, diving, and studying marine life are harmed every day the Santa Ynez Unit is in operation. These interests are not just recreational, they are an intrinsic part of who I am and critical to my well-being. | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court | ☐ Sustained<br>☐ Overruled |

- 84 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | The decades-old pipelines, platforms, and wells in the Santa Ynez Unit should be retired and decommissioned, rather than rubberstamped with no environmental review. The Office of State Fire Marshal's decision to grant waivers of pipeline safety laws and refusal to conduct an environmental analysis puts my health, safety, and well-being at imminent risk." | statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation.** Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |

## OBJECTIONS TO THE DECLARATION OF JEFFREY MILLER

Real Parties object to the declaration of Jeffrey Miller ("Miller Decl.") as follows:

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| 74. | Miller Decl., Page 2, Paragraph 2, Lines 5-8: "I originally joined the Center because the organization has a longstanding and ongoing interest in advocating for imperiled wildlife and wild places that I care about. I rely in part on the Center to represent my interests in protecting rare species and their habitats." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br><br>☐ Overruled |
| 75. | Miller Decl., Page 2, Paragraph 3, Lines 9-15: "In addition to being a member, I have been employed full-time as a conservation advocate with the Center since 2001. My work with the Center includes writing outreach materials, writing press releases and talking with reporters, preparing endangered species listing petitions, working with scientists, organizing in communities to support many of the organization's species and habitat protection campaigns, and other work to protect and restore endangered and threatened species and their habitats, primarily in California and Oregon." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br><br>☐ Overruled |
| 76. | Miller Decl., Page 2, Paragraph 4, Lines 16-27: "I have worked | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to | ☐ Sustained |

- 86 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|----------------------|--------|
| | on conservation campaigns for a wide array of imperiled wildlife species in California, including native fish, birds, raptors, amphibians, reptiles, carnivores, ungulates, rodents, insects and plants. I have written or co-written many federal Endangered Species Act listing petitions, including petitions for the mountain yellow-legged frog, green sturgeon, Pacific lamprey, Delta smelt, longfin smelt, Clear Lake hitch, foothill yellow-legged frog, and Siskiyou Mountains salamander. I have also written, or co-written state California Endangered Species Act listing petitions for the western burrowing owl, Delta smelt, longfin smelt, mountain yellow-legged frog, Clear Lake hitch, foothill yellow-legged frog, and Cascades frog. I have worked on major conservation campaigns in California for endangered species such as California condors, western burrowing owls, southwestern willow flycatchers, San Joaquin kit foxes, pronghorn, tule elk, and numerous raptors." | demonstrate justification for the imposition of a preliminary injunction. **Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Overruled |
| 77. | Miller Decl., Page 3, Paragraph 5, Lines 1-4: "In 2024 I published a guide to San Francisco Bay Area wildlife | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary | ☐ Sustained ☐ Overruled |

- 87 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | through Heyday Books, which details the ecology, range, status, conservation efforts, and threats to more than 50 regional wildlife species, including mammals, marine mammals, birds, fishes, reptiles, amphibians, and invertebrates." | injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | |
| 78. | Miller Decl., Page 3, Paragraph 6, Lines 5-12: "Personally, I am an avid amateur naturalist and birdwatcher and frequently visit habitats for rare and endangered birds and other wildlife throughout California. To look for and observe such wildlife, I often visit habitats throughout the central California coast and Southern California, including places where the Las Flores Pipeline System crosses such as the Los Padres National Forest, Cuyama River valley, and Carrizo Plain. I also enjoy searching for and observing other wildlife species while birdwatching. In 2018 I took up wildlife and bird photography to better share the beauty and importance of California's native and imperiled bird and wildlife species with others." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br>☐ Overruled |
| 79. | Miller Decl., Page 3, Paragraph 7, Lines 13-21: "I go birdwatching almost every day. I often seek out rare and unusual species like California | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction. | ☐ Sustained<br>☐ Overruled |

- 88 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
|  | condors, southwestern willow flycatchers, and burrowing owls. In the last two decades, I have seen 541 different species of birds in California alone. I lead annual birdwatching trips for the public at the California Bird Festival at Morro Bay in San Luis Obispo County, having participated in the festival in 2025 and intending to continue to do so in the future. I also participate annually in several Christmas bird counts throughout California, volunteer-based citizen science survey efforts coordinated by the Audubon Society to promote bird conservation and assess long-term trends in winter bird populations." | **Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. |  |
| 80. | Miller Decl., Page 4, Paragraph 8, Lines 22-25: "I lived in San Luis Obispo County from 2018 through 2022 and regularly visited Carrizo Plain National Monument, Gaviota State Park, and Los Padres National Forest for birdwatching, nature photography, and conservation purposes. Most of my family still lives in San Luis Obispo County, so I continue to frequently visit these areas." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction. <br><br> **Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained <br> ☐ Overruled |
| 81. | Miller Decl., Page 3-4, Paragraph 9, Lines 26-4: "The pipelines at issue in this case | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the | ☐ Sustained |

- 89 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | affect places that are deeply important to me, including Carrizo Plain National Monument, Los Padres National Forest, Gaviota State Park, and the Cayuma River Valley, which I have been visiting for more than 20 years. In these places I especially enjoy seeing animals like San Joaquin kit foxes, pronghorn antelopes, tule elk, California condors, burrowing owls, and raptors. I have strong interests in viewing these animals and recreating in these habitats, and I will continue visiting them as long as I can." | imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Overruled |
| 82. | Miller Decl., Page 4, Paragraph 10, Lines 5-11: "I often visit Carrizo Plain to camp, photograph wildlife, and birdwatch. I often visit the Cayuma River Valley for birdwatching on the way to or from Carrizo. I made trips to Carrizo in February 2016; June 2018; twice in December 2018; March, April and May 2019; five trips in 2020 alone; January, March and April 2021; and in January and March 2022. In January 2025 I led a bird and wildlife viewing trip to Carrizo Plain as part of the Morro Bay Bird Festival. I have trips planned to return to Carrizo Plain in 2026." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br>☐ Overruled |

- 90 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| 83. | Miller Decl., Page 4, Paragraph 11, Lines 12-14: "I regularly hike, camp, and watch wildlife in the Los Padres National Forest in San Luis Obispo and Santa Barbara counties. I have been involved in conservation and habitat restoration campaigns throughout the Los Padres National Forest." | **Irrelevant.** Evid. Code §§ 210, 350.  This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493.  The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br><br>☐ Overruled |
| 84. | Miller Decl., Pages 4-5, Paragraph 12 (including imbedded picture), Lines 15-24: "The San Joaquin kit fox is listed as an endangered species under the federal Endangered Species Act. The San Joaquin kit fox is the smallest fox in North America and is an adorable creature with distinctive large ears and long legs. The kit fox once ranged throughout the San Joaquin Valley but now resides only at the edges. Carrizo Plain is an important remaining habitat for San Joaquin kit foxes. I have been lucky enough to see this one of California's signature endemic species several times in the wild. I have photographed San Joaquin kit foxes at Carrizo Plain in 2018 and 2025. I had a very close encounter with a San Joaquin kit fox at Carrizo in January 2025, and got the close-up | **Irrelevant.** Evid. Code §§ 210, 350.  This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493.  The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br><br>☐ Overruled |

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | photo included below. Seeing kit foxes is an amazing experience given how rare the species is. [imbedded picture] A rare San Joaquin kit fox at Carrizo Plain in January 2025. Photo: Jeffrey Miller." | | |
| 85. | Miller Decl., Page2 5-6, Paragraph 13, Lines 16-27: "I first became interested in the southwestern willow flycatcher in 1998, when I was part of the Center's campaign to force the U.S. Forest Service to amend its management plans for Southern California's four national forests to better protect riparian habitat for Bell's vireo and willow flycatcher. From 2010 to 2014 I was involved in the Center's successful campaign to reverse an Army Corps of Engineers' policy that would require stripping levees of vegetation that provides important habitat for imperiled California species, including the southwestern willow flycatcher. I saw my first southwestern willow flycatcher in 2009. I have since seen this species on 61 occasions while birdwatching in California, including in the central California coast area. I looked for the Bell's vireo and southwestern willow flycatcher in early 2025 in eastern San Luis Obispo County, including near Carrizo Plain and in the Cuyama River valley. I plan to | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br>☐ Overruled |

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | look for these birds in early 2026 in San Luis Obispo and Santa Barbara counties, near Carrizo Plain, in the Cuyama River valley, and in the Los Padres National Forest near Gaviota." | | |
| 86. | Miller Decl., Page 6, Paragraph 14 (including imbedded picture), Lines 3-28: "I have been working on protecting California condors since 2004. The condor is a critically endangered species that is slowly recovering in California but still faces numerous threats. These birds play an important role as scavengers, breaking down and removing carcasses, cycling nutrients back into the ecosystem, and controlling infectious diseases. I led the Center's national and state Get The Lead Out campaigns for more than 15 years, working to end chronic lead poisoning of condors in California by phasing out the use of lead ammunition in hunting. I have a strong affinity for condors and have seen them on 16 different occasions in California, including in San Luis Obispo County. The photograph below is of a condor I encountered close-up in Pinnacles National Park in 2022, condor #913, known to researchers as 'Marie Antionette.' [imbedded picture] California condor | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br><br>☐ Overruled |

- 93 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|------------------------|--------|
|     | #913, also known as 'Marie Antionette,' at Pinnacles National Park in 2022. Photo: Jeffrey Miller." | | |
| 87. | Miller Decl., Page 7, Paragraph 15, Lines 1-19: "I derive numerous benefits from visiting, observing, and restoring healthy habitat and ecosystems for endangered species, including stimulating my scientific curiosity, motivating me to get outdoors and exercise, and providing me with opportunities to unwind and forget the worries of the day. My enjoyment of these habitat areas for recreational, professional, and spiritual purposes is dependent upon healthy ecosystems and wildlife populations. As a lifetime conservationist, I have aesthetic, spiritual, and moral interests in native wildlife species. It is important to me that these and other species survive and thrive in their natural habitat, whether or not I am able to encounter them. It is my belief that no wildlife species should be allowed to be driven extinct by the actions of humans and that no species should be allowed to go extinct if it can be prevented. My spiritual fulfillment comes from interacting with nature and protecting wild places, wildlife, and intact native ecosystems. The loss of these | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br><br>☐ Overruled |

- 94 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | species will injure my aesthetic and spiritual enjoyment of native habitats in my home state. I believe that biodiversity has inherent value and it would be a moral and spiritual failure of our society to not protect our most vulnerable wildlife. As a conservationist, I have a professional and scientific interest in protecting and recovering these species. The protection and recovery of these and other species are essential to my work to promote funding, take regulatory action, advocate, and organize citizen involvement in efforts to protect endangered species." | | |
| 88. | Miller Decl., Pages 7-8, Paragraph 16, Lines 20-2: "I am alarmed that the California Department of Forestry and Fire Protection (Cal Fire) waived federal requirements to reduce pipeline corrosion when it authorized these pipelines to be used again—after one already ruptured due to corrosion and caused the massively destructive 2015 Refugio Oil Spill. It is even more alarming that Cal Fire authorized its re-use without any review under the California Environmental Quality Act despite the likelihood of major harm. The pipeline runs along important habitats for many species I care about, including | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted. | ☐ Sustained<br><br>☐ Overruled |

- 95 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | the Cuyama River valley and public lands like the Los Padres National Forest and Carrizo Plain. Another oil spill or even a small oil leak anywhere along the pipeline route would have devastating impacts on these habitats and imperiled wildlife that I love. I am concerned it is not a matter of if, but when this will occur if oil starts flowing through the pipeline again." | **Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 89. | Miller Decl., Page 8, Paragraph 17, Lines 3-9: "My interests in the Los Padres National Forest, Carrizo Plain, and the many rare species they support are at imminent risk of harm the minute oil starts flowing through the pipelines. Indeed, it is my understanding that construction activities to prepare for the re-start have already caused extensive damage from the unlawful work that was done in the coastal zone, water crossings, and other sensitive habitat. My interests will continue to be at risk unless and until this Court issues an order to prevent additional work on or use of the | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted. | ☐ Sustained<br><br>☐ Overruled |

- 96 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | pipeline." | **Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |

- 97 -

**OBJECTIONS TO THE DECLARATION OF TEVIN SCHMITT**

Real Parties object to the declaration of Tevin Schmitt ("Schmitt Decl.") as follows:

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| 90. | Schmitt Decl., Page 2, Paragraph 2, Lines 7-14: "I have been a member of Wishtoyo since the summer of 2014, after I took an environmental law and policy course taught by Wishtoyo's previous senior counsel, Jason Weiner, at California State University Channel Islands (CSU Channel Islands). I became a member of Wishtoyo because I wholeheartedly believe in the organization's mission; the visionary passion of Wishtoyo's Executive Director, Mati Waiya; Wishtoyo's dedication to protecting cultural keystone species and their habitats; and the centering of traditional ecological knowledge in their environmental advocacy. Wishtoyo's mission is to protect and preserve Chumash culture, the culture of all indigenous peoples, and the natural resources upon which all people depend." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br>☐ Overruled |
| 91. | Schmitt Decl., Page 2, Paragraph 3, Lines 15-20: "I am also the Watershed Scientist for Wishtoyo. I have held this position since January 2019. As Watershed Scientist, my responsibilities include managing the organization's watershed monitoring program | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction. | ☐ Sustained<br>☐ Overruled |

- 98 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | and our paid internship program; providing expert support for our environmental litigation; managing our lab space for wet chemistry at CSU Channel Islands; managing our environmental justice advocacy campaigns; and providing assistance for our cultural and environmental education programs." | | |
| 92. | Schmitt Decl., Pages 2-3, Paragraph 4, Lines 21-4: "I graduated from CSU Channel Islands with a Bachelor of Science in environmental science and resource management in 2016. This program included a rigorous senior capstone project that includes two semesters of courses, data collection and analysis, presentation at a research conference on campus, and a final thesis. For this academic undertaking, I studied invertebrate population ecology of the sandy beaches of Southern California. My capstone included data collection of 31 sandy beaches from Zuma Beach in Los Angeles County to Gaviota State Beach in Santa Barbara County. My data collection and thesis included the analysis of invertebrate infauna populations of El Capitan and Refugio State Beaches. I was collecting data for my capstone project at the time of the 2015 | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained<br><br>☐ Overruled |

- 99 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | oil spill at Refugio State Beach. I was at El Capitan State Beach, about three miles down coast from the spill location, when oil started to wash up on the beach. I will never forget the immense pain and anger I felt watching the ecosystems I am most passionate about covered with crude oil. The memory of the smell, while I witnessed the beach turn black with oil, still haunts me." | | |
| 93. | Schmitt Decl., Page 3, Paragraph 5, Lines 5-13: "During this time, I was also invited to take part in the CSU system's interdisciplinary research course and symposium, culminating in the publication of my research and a presentation of my research at a conference. Shortly following the 2015 oil spill, I continued to work as a research assistant in Dr. Sean Anderson's Pacific Institute for Restoration Ecology (PIRatE) lab for the summer. I collected hundreds of berried pacific mole crab (*Emerita analoga*) specimens to conduct ecotoxicology research connected to the oil spill. My research found that the oil from the 2015 spill caused significant developmental impacts and delays for pacific mole crab larval development. This species is the primary food source for migratory | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish | ☐ Sustained<br>☐ Overruled |

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|------------------------|--------|
|  | shorebirds that rely on the California coast for food along their migration to arctic breeding habitats." | personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. |  |
| 94. | Schmitt Decl., Page 3, Paragraph 6, Lines 14-23: "Since my time at CSU Channel Islands, I have been an avid birder. I am a member of the Ventura Audubon Society and regularly volunteer for their events and lead educational hikes to teach the public about local ecology and bird identification. One of my favorite hobbies is going to beaches, wetlands, nature preserves, parks, and forests to watch, photograph, and appreciate birds. I feel a deep connection with all wildlife, but birds are incredibly fascinating to me. I am enthralled by the evolution of flight, the mastery of terrestrial and marine ecological niches, and their songs. It is estimated that the 2015 oil spill killed at least 558 birds. This is just from the direct oiling of seabirds and does not include | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish | ☐ Sustained<br><br>☐ Overruled |

- 101 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | the indirect and long-lasting ecological impacts of the oil spill. Impacts to reproduction success of invertebrates like the pacific mole crab and hundreds of marine fish species undoubtedly caused severe impacts to the entire food web of the near shore and coastal environments of southern California." | personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 95. | Schmitt Decl., Pages 3-4, Paragraph 7, Lines 24-4: "I am planning on continuing to lead field trips for the Ventura Audubon Society and will likely be leading a hike this upcoming fall at Emma Wood State Beach, Ormond Beach/Wetlands, or the Santa Clara River Estuary/McGrath State Beach. All these beaches were impacted by the 2015 oil spill, and I am concerned that the restart of oil transportation through the Las Flores Pipeline System may cause another spill that will impact these areas. As Watershed Scientist for Wishtoyo, I collect water quality data nearly monthly from the Santa Clara River Estuary and train our interns on bird identification, estuarine ecology, and sandy beach ecology. Any future threats to the Santa Clara River estuary would have a significant | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish | ☐ Sustained<br><br>☐ Overruled |

- 102 -

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | impact on my enjoyment of this sensitive habitat and my ability to perform my duties as Watershed Scientist." | personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 96. | Schmitt Decl., Page 4, Paragraph 8, Lines 5-14: "I also host Wishtoyo's efforts in supporting the Snapshot Calcoast program, a statewide initiative to collect biodiversity data along California's coastline. Wishtoyo hosts one to two "bio blitzes" to support this program in the early summer of every year at locations like the Wishtoyo Chumash Village/Nicholas Canyon Beach, Santa Clara River Estuary, Goleta Beach, or Coal Oil Point. These "bio blitzes" involve volunteers, members, and Wishtoyo staff using the iNaturalist application to collect biodiversity data at various beaches and coastal ecosystems in the Chumash homelands. These events are fun for all ages and individuals with an interest in biological diversity and natural cultural | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish | ☐ Sustained<br>☐ Overruled |

- 103 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | resources. All the beaches where Wishtoyo has hosted bio blitzes experienced oiling from the 2015 spill, and these sensitive and ecologically significant beaches are threatened by the heightened risk of another spill if the Las Flores Pipeline System is allowed to restart without meaningful environmental review." | personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon, supra,* 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 97. | Schmitt Decl., Page 4, Paragraph 9, Lines 15-20: "I live on a property in the mountains above Carpinteria, with a view of the ocean and Santa Barbara Channel. My partner and I regularly take walks with our dog at Carpinteria Bluffs to observe birds and the harbor seal rookery at this park. We will continue to use these publicly available trails for wildlife and scenery viewing, and the increased risk of an oil spill from the restart of the Santa Ynez Unit operations and the Las Flores Pipeline System threatens our continued enjoyment of this public resource." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation.** Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish | ☐ Sustained<br><br>☐ Overruled |

- 104 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 98. | Schmitt Decl., Page 4, Paragraph 10, Lines 21-26: "The Office of State Fire Marshal's (Cal Fire's) decision to waive compliance with pipeline safety requirements for the decrepit Las Flores Pipeline System threatens our coastal and marine environments. Even worse, it issued the waivers without taking a careful look at the environmental consequences of restarting the pipeline system that lacks effective cathodic protections and without giving the public an opportunity to weigh in. In my opinion, actions like this betray public trust in government agencies and threaten public safety." | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish | ☐ Sustained<br><br>☐ Overruled |

- 105 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon, supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 99. | Schmitt Decl., Pages 4-5, Paragraph 11, Lines 27-9: "One of my responsibilities as Wishtoyo's Watershed Scientist is to understand the risks of restarting oil extraction and operations of the Santa Ynez Unit. I am appalled that there has been no environmental review or mitigation measures considered for the sensitive environmental and cultural resources of the region. This includes critical habitats of Southern California steelhead, red-legged frog, Gaviota tarplant, and other species at risk of extinction. It also includes the newly designated Chumash Heritage National Marine Sanctuary and the marine protected areas around the Channel Islands. It is Cal Fire's responsibility to conduct a full analysis of the potential impacts of restarting oil | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish | ☐ Sustained<br><br>☐ Overruled |

- 106 -

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|-----------------------|--------|
|  | production using a decades-old pipeline system that lacks effective corrosion protections. This analysis of impacts must include the increased risk of an oil spill, ongoing repair digs, and related environmental impacts. I believe that Cal Fire's waivers increase the probability of another oil spill, either along the Gaviota Coast or within one of the coastal watersheds that support sensitive species and their habitats." | personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon, supra,* 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 100. | Schmitt Decl., Page 5, Paragraph 12, Lines 10-17: "Cal Fire's actions will also extend the life of the increasingly aged and decrepit oil infrastructure in incredibly sensitive marine and coastal habitats. The continued use of the Las Flores Pipeline System—including extensive and continual repair digs—increases greenhouse gas emissions, causes adverse impacts to the unique landscape of the Santa Barbara coast, and threatens sensitive coastal wetlands, salt marshes, near shore marine environments, and sandy beaches of southern California. The restart of oil production and transportation through the offshore and onshore pipelines connected to the Santa Ynez Unit threatens our communities and my enjoyment of our | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without | ☐ Sustained<br><br>☐ Overruled |

- 107 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | beaches, bird watching hobbies, volunteer events, and psychological wellbeing." | adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered. **Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 101. | Schmitt Decl., Page 5, Paragraph 13, Lines 18-25: "I was horrified by the news that Sable Offshore Corporation restarted offshore operations of the Santa Ynez Unit. I was immediately reminded of the jet-black coastal waters in Santa Barbara and the immense tar buildup I had witnessed on the beaches of Santa Barbrara and Ventura counties. I remembered the loathing and unhealthy rage I felt as a young college student when I watched the black waves crash onto El Capitan State Beach. I remembered the hours I spent hunched over a microscope and the time I spent putting together saltwater aquariums in the lab, designing an ecotoxicology experiment as an incoming senior, and thinking I might actually be | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction. **Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value. | ☐ Sustained ☐ Overruled |

- 108 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | able to make a difference. I now feel terrified over the high, imminent risk of spills from dangerous oil operations." | | |
| 102. | Schmitt Decl., Pages 5-6, Paragraph 14, Lines 26-9: "Another oil spill from the Las Flores Pipeline System would cause me irreparable harm, as would the construction work, water pollution, and greenhouse gas emissions associated with restarting the pipelines. Gaviota State Park is one of my favorite beaches to visit and go birding with my partner. The beach includes a small coastal lagoon that is perfect for viewing waterfowl, wading birds, foraging shorebirds, and the occasional tern species, black skimmer, or rare seabird sighting. The construction, pipeline maintenance, and heightened risk of an oil spill threaten this beautiful beach and sensitive coastal lagoon. The Las Flores Pipeline System includes long sections of pipeline, lacking effective cathodic protection, through the Los Padres National Forest. The Los Padres National Forest is the closest and most accessible national forest in the region, where I grew up fishing with my father and now regularly enjoy birding, camping, , and hunting. The looming threat of an oil spill from these facilities, | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not | ☐ Sustained<br><br>☐ Overruled |

- 109 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | as well as construction and associated pollution and greenhouse gas emissions, have negative impacts on my ability to recreate and enjoy the aesthetic beauty of these forested lands." | reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |
| 103. | Schmitt Decl., Page 6, Paragraph 15, Lines 10-23: "I have been a passionate advocate for the restoration and recovery of Southern California steelhead throughout my career and have grown to love this critically endangered distinct population segment. To me, this anadromous fish symbolizes the integrity of all riparian, estuarine, and near-shore marine ecosystems in Southern California. Their recovery therefore requires the restoration and preservation of these diverse habitats. My passion for this fish has extended beyond my professional interests, as I have a steelhead tattooed on my right arm. The Las Flores Pipeline transverses the Sisquoc and Santa Ynez rivers. Both rivers have designated critical habitat for Southern California steelhead and are essential for the recovery of the species. The restart of oil transportation through these pipelines threatens steelhead critical habitat in both rivers, and a potential oil spill would | **Irrelevant.** Evid. Code §§ 210, 350. This statement is irrelevant to demonstrate justification for the imposition of a preliminary injunction.<br><br>**Inflammatory/Prejudicial.** Evid. Code § 352; Odom, supra, 110 Cal.App.5th at 493. The statement is intended to evoke an emotional bias by the court against Respondents, and has no probative value.<br><br>**Hearsay.** Evid. Code, § 1200. The statement contains out of court statement offered for the truth of the matter asserted.<br><br>**Speculation/Lack of Foundation**. Evid Code § 702, 800, and 801(b). The assertion constitutes speculative testimony without adequate evidentiary foundation. The witness has failed to establish personal knowledge or provide sufficient factual basis from which to draw the conclusions offered.<br><br>**Unreliable Expert Testimony.** Evid. Code §§ 801, 802; *Sargon*, | ☐ Sustained<br><br>☐ Overruled |

- 110 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|-----------------------|--------|
| | be devastating for the already critically endangered fish. The remediation of an oil spill in these zivers could further exacerbate harm to the fish by removing gravel substrate needed for spawning or removing riparian vegetation that helps reduce surface water temperatures and provides cover from aerial predators. My interests, passions, volunteer efforts, hobbies, and ability to conduct my responsibilities as Watershed Scientist all depend on a clean environment with thriving wildlife." | *supra*, 55 Cal.4th at 770. The statement is not of a qualified expert and is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, and (3) speculative. | |

- 111 -

**OBJECTIONS TO THE DECLARATION OF JULIE TEEL SIMMONDS**

Real Parties object to the declaration of Julie Teel Simmonds ("Teel Decl.") as follows:

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| 104. | Teel Decl., Ex. 1 (*Sable Offshore Corp. Form 8-K (May 19, 2025)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br><br>☐ Overruled |
| 105. | Teel Decl., Ex. 2 (*Sable Offshore Corp. Form 8-K (May 27, 2025)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br><br>☐ Overruled |
| 106. | Teel Decl., Ex. 3 (*Notice of Recent Developments, CBD v. Burgum, Case No. 2:24-cv-05459-MWC-MAA (May 23, 2025)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br><br>☐ Overruled |

- 112 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| 107. | Teel Decl., Ex. 4 (*Excerpt, California Coastal Commission Staff Report (March 28, 2025)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br>☐ Overruled |
| 108. | Teel Decl., Ex. 5 (*PHMSA Failure Investigation Report (2016)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br>☐ Overruled |
| 109. | Teel Decl., Ex. 6 (*Excerpt, Consent Decree, U.S. v. Plains All American Pipeline, Civil Action No. 2:20-cv-02415 (C.D. Cal. Mar. 13, 2020)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br>☐ Overruled |
| 110. | Teel Decl., Ex. 7 (*Sable Offshore Corp. letter to Cal | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter | ☐ Sustained<br>☐ Overruled |

- 113 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | *Fire (April 24, 2024)*). | asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | |
| 111. | Teel Decl., Ex. 8 (*State Waiver (CA-324)*) | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br>☐ Overruled |
| 112. | Teel Decl., Ex. 9 (*State Waiver (CA-325A/B)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br>☐ Overruled |
| 113. | Teel Decl., Ex. 10 (*Letter, CBD to Office of the State Fire Marshal (Dec. 23, 2024)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal** | ☐ Sustained<br>☐ Overruled |

- 114 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | **Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | |
| 114. | Teel Decl., Ex. 11 (*Letter, CBD to Office of the State Fire Marshal (March 2, 2025)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted. <br><br> **Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained <br> ☐ Overruled |
| 115. | Teel Decl., Ex. 12 (*Excerpt, Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted. <br><br> **Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained <br> ☐ Overruled |
| 116. | Teel Decl., Ex. 13 (*Excerpt, Plains Pipeline Form 10-K (Dec. 31, 2023)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted. <br><br> **Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that | ☐ Sustained <br> ☐ Overruled |

- 115 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | |
| 117. | Teel Decl., Ex. 14 (*Letter, CBD to Office of the State Fire Marshal (Sept. 24, 2024)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br>☐ Overruled |
| 118. | Teel Decl., Ex. 15 (*State Parks Notice of Exemption (May 9, 2025)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br>☐ Overruled |
| 119. | Teel Decl., Ex. 16 (*Letter, State Lands Commission to Sable (May 23, 2025)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the | ☐ Sustained<br>☐ Overruled |

- 116 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

LEGAL02/46314994v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | document purportedly attached. | |
| 120. | Teel Decl., Ex. 17 (*Superior Court ruling and order, Sable Offshore Corp. et al. v California Coastal Commission (25CV00974) (May 28, 2025)*) | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br>☐ Overruled |
| 121. | Teel Decl., Ex. 18 (*Excerpt, Sable Offshore Corp. Form 10-K (March 17, 2025)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br>☐ Overruled |
| 122. | Teel Decl., Ex. 19 (*Excerpt, Sable Form S-1 Registration Statement (Oct. 11, 2024)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br>☐ Overruled |
| 123. | Teel Decl., Ex. 20 (*Excerpt, | **Hearsay.** Evid. Code, § 1200. The | ☐ Sustained |

- 117 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | *Administrative Draft Environmental Impact Report for Plains Pipeline Replacement Project (2022)*). | exhibit is an out of court statement offered for the truth of the matter asserted. **Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Overruled |
| 124. | Teel Decl., Ex. 21 (*Letter, Staff Counsel for the California Department of Forestry and Fire Protection to CBD (May 2, 2025)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted. **Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained ☐ Overruled |
| 125. | Teel Decl., Ex. 22 (*Excerpt, August 1984 Draft EIR/ EIS for Celeron/All American and Getty Pipeline Projects (SCH No. 83110902)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted. **Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained ☐ Overruled |
| 126. | Teel Decl., Ex. 23 (*Email, Julie Teel Simmonds to Michael Dorsi (May 27, 2025)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter | ☐ Sustained ☐ Overruled |

- 118 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | asserted.<br><br>**Authentication/Personal Knowledge/Foundation.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | |
| 127. | Teel Decl., Page 2, Paragraph 2, Lines 9-20: "Petitioners have obtained information that Real Parties in Interest have recently resumed oil production from the Santa Ynez Unit and are pushing forward with plans to restart the transport of that oil using the Las Flores Pipeline System, which is the subject of this litigation. Attached as Exhibit 1 is a true and correct copy of a Form 8-K Sable Offshore Corp. (Sable) filed with the U.S. Securities and Exchange Commission (SEC) on May 19, 2025. I obtained this document on May 20, 2025, from this U.S. Securities and Exchange Commission (SEC) webpage: https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000119312525122079/d943067d8k.htm. This document states that on May 19, Sable "issued a press release announcing restart of oil production at the Santa Ynez Unit and anticipated oil sales from the Las Flores Pipeline | **Lacks Foundation/Personal Knowledge.** Evid. Code, § 702. The witness has failed to establish foundation to support a finding that the statement is made with personal knowledge.<br><br>**Hearsay.** Evid. Code, § 1200. The declarant's testimony contains out of court statements offered for the truth of the matter asserted. | ☐ Sustained<br><br>☐ Overruled |

- 119 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | System in July 2025." The press release included with the filing notes that Sable "restarted production" of oil from the Santa Ynez Unit on May 15, 2025 and "has begun flowing oil production to the Las Flores Canyon ('LFC',) where it expects to "fill the ~ 540,000 barrels of crude oil storage capacity" by the "middle of June." | | |
| 128. | Teel Decl., Page 2, Paragraph 3, Lines 24-27: "This filing states that on May 27, 2025, "Sable Offshore Corp. conducted a successful hydrotest of the final segment of Line 325 and has now successfully hydrotested all segments of Line 324 and Line 325 (collectively, the 'Onshore Pipeline'), satisfying the final operational condition to restart [sic] the Onshore Pipeline as outlined in the Consent Decree." | **Hearsay.** Evid. Code, § 1200. The declarant's testimony contains out of court statements offered for the truth of the matter asserted.<br><br>**Lacks Foundation/Personal Knowledge.** Evid. Code, § 702. The witness has failed to establish foundation to support a finding that the statement is made with personal knowledge. | ☐ Sustained<br>☐ Overruled |
| 129. | Teel Decl., Page 3, Paragraph 4, Lines 3-6: "This pleading states that counsel for the Federal Defendants learned of the restart of production on May 19, 2025 but had "not received notice from the California State Fire Marshal's Office Pipeline Division that Sable is approved to operate the onshore pipeline segments 901/903," which they had understood as a precondition of | **Hearsay.** Evid. Code, § 1200. The declarant's testimony contains out of court statements offered for the truth of the matter asserted.<br><br>**Lacks Foundation/Personal Knowledge.** Evid. Code, § 702. The witness has failed to establish foundation to support a finding that the statement is made with personal knowledge. | ☐ Sustained<br>☐ Overruled |

- 120 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | "returning to production." | | |
| 130. | Teel Decl., Page 4, Paragraph 12, Lines 9-12: "Attached as Exhibit 11 is a true and correct copy of a letter I sent to the Office of the State Fire Marshal on March 2, 2025, requesting revocation of the State Waivers for Pipelines CA-324 and CA-325 which included a copy of Accufacts Inc.'s second report on the proposed pipeline startup and the Fire Marshal's letters of decision on the State Waivers." | **Hearsay.** Evid. Code, § 1200. The declarant's testimony contains out of court statements offered for the truth of the matter asserted. | ☐ Sustained<br>☐ Overruled |
| 131. | Teel Decl., Page 5, Paragraph 18, Lines 8-12: "Attached as Exhibit 17 is a true and correct copy of a ruling and order issued by the Santa Barabara Superior Court on May 28, 2025 in *Sable Offshore Corp. et al. v. California Coastal Commission* (25CV00974) granting the Commission a preliminary injunction, which I obtained on May 30 2025 from the following Superior Court of California, County of Santa Barbara webpage: https://www. santa barbara.courts.ca.gov/ tentative-ruling/25cv00974." | **Hearsay.** Evid. Code, § 1200. The declarant's testimony contains out of court statements offered for the truth of the matter asserted.<br><br>**Lacks Foundation/Personal Knowledge.** Evid. Code, § 702. The witness has failed to establish foundation to support a finding that the statement is made with personal knowledge. | ☐ Sustained<br>☐ Overruled |
| 132. | Teel Decl., Page 6, Paragraph 23, Line 5: "The Draft EIR/EIS combined with an addendum, is the Final EIR/EIS for those projects." | **Hearsay.** Evid. Code, § 1200. The declarant's testimony contains out of court statements offered for the truth of the matter asserted.<br><br>**Lacks Foundation/Personal** | ☐ Sustained<br>☐ Overruled |

- 121 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | **Knowledge.** Evid. Code, § 702. The witness has failed to establish foundation to support a finding that the statement is made with personal knowledge. | |
| 133. | Teel Decl., Pages 6-7, Paragraph 27, Lines 26-27: "Mr. Dorsi called me that day and could not say with any certainty when his clients might approve final restart plans for the pipelines. On Wednesday, May 28, 2025, I received a call from Josh Cleaver, staff counsel for Respondents, who also did not know when final restart plans would be approved or made public." | **Hearsay.** Evid. Code, § 1200. The declarant's testimony contains out of court statements offered for the truth of the matter asserted. | ☐ Sustained<br>☐ Overruled |

- 122 -

Dated:  July 7, 2025

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE

**FAUVER, LARGE, ARCHIBALD & SPRAY LLP**
TREVOR D. LARGE

By: _____
                    Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE
COMPANY

- 123 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

LEGAL02/46314994v1

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 333 South Hope Street, Sixteenth Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) described as **REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows:

See Attached Service List

☐  BY MAIL:  I am readily familiar with this firm's practice for the collection and the processing of correspondence for mailing with the United States Postal Service.  In the ordinary course of business, the correspondence would be deposited with the United States Postal Service with postage fully prepaid the same day on which the correspondence was placed for collection and mailing at the firm.  Following ordinary business practices, I placed for collection and mailing with the United States Postal Service such envelope at Alston & Bird LLP, 333 South Hope Street, Los Angeles, California 90071.

☐  By ☐ UPS NEXT DAY AIR   ☐ OVERNIGHT DELIVERY:  I deposited such envelope in a facility regularly maintained by ☐ UPS     ☐ Overnight Delivery [specify name of service:  ] with delivery fees fully provided for or delivered the envelope to a courier or driver of  ☐ UPS   ☐ OVERNIGHT DELIVERY [specify name of service:] authorized to receive documents at Alston & Bird LLP, 333 South Hope Street, Los Angeles, California 90071.

☐  [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/Josie Cisneros*

Josie Cisneros

- 124 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

LEGAL02/46314994v1

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>CENTER FOR BIOLOGICAL DIVERSITY and<br>WISHTOYO FOUNDATION<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>        dpettit@biologicaldiversity.org<br>        tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS<br>ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>        jfrankel@environmentaldefensecenter.org<br>        trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/<br>DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal<br><br>Tel.:    (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (310) 620-5879<br>Email: djmoore@paulhastings.com<br>        benjaminhanelin@paulhastings.com<br>        natalierogers@paulhastings.com |
| Trevor D. Large, Esq.<br>FAUVER, LARGE, ARCHBALD & SPRAY LLP<br>820 State Street, 4th Floor | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company |

- 125 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

LEGAL02/46314994v1

Santa Barbara, CA 93101                    Tel.:    (805) 966-7000
                                           Email: TLarge@FLASllp.com

- 126 -

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
DarreE. Parker, Executive Officer
7/9/2025 5:30 PM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
LISA L. GARCIA, SBN 301362
lisa.garcia@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone: (213) 576-1000
Facsimile: (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>    Petitioners and Plaintiffs,<br><br>    v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERMANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,<br><br>    Respondents and Defendants,<br><br>    and<br><br>SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, | Case No. 25CV02244<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**NOTICE OF ERRATA RE: REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>*[Filed concurrently with Request for Judicial Notice and Stanton Declaration; Proposed Order]*<br><br>Date:          September 19, 2025<br>Time:         10:00 a.m.<br>Dept:          4 |

1

NOTICE OF ERRATA

Real Parties in Interest.

| | |
|---|---|
| Complaint Filed: | April 15, 2025 |
| Trial Date: | None set |

NOTICE OF ERRATA

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Due to a clerical error, the table of authorities for the Demurrer filed on July 7 contains pagination errors. A Notice of Errata attaching the Demurrer with a corrected table of authorities was submitted on July 8 and was rejected due to a case caption issue. Included with this Notice is a copy of the Demurrer containing a corrected table of authorities and an adjusted caption page pursuant to the Court's request. The Demurrer contains no other changes..

DATED:   July 9, 2025                     Respectfully submitted,

                                          **ALSTON & BIRD LLP**
                                          JEFFREY D. DINTZER
                                          GARRETT B. STANTON

                                          **PAUL HASTINGS LLP**
                                          DUNCAN JOSEPH MOORE

                                          _____
                                                Jeffrey D. Dintzer

                                          Attorneys for Real Parties in Interest
                                          **SABLE OFFSHORE CORP.**
                                          **PACIFIC PIPELINE COMPANY**

---

3

NOTICE OF ERRATA

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
LISA L. GARCIA, SBN 301362
lisa.garcia@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone: (213) 576-1000
Facsimile: (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, | Case No. 25CV02244 |
| Petitioners and Plaintiffs, | Assigned for all purposes to: Hon. Donna D. Geck |
| v. | **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES** |
| CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERMANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, | |
| Respondents and Defendants, | |
| and | *[Filed concurrently with Request for Judicial Notice and Stanton Declaration; Proposed Order]* |
| SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, | Date:       September 19, 2025<br>Time:       10:00 a.m.<br>Dept:       4 |

i

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES

| Real Parties in Interest. | Complaint Filed:  April 15, 2025<br>Trial Date:  None set |
|---|---|

ii

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on September 19, 2025 at 10:00 a.m., or as soon thereafter as this matter may be heard, in Department 4 of the above-entitled Court, located at 1100 Anacapa Street, Santa Barbara, CA 93101, Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") will and hereby do demur to the Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief ("Petition") filed by Petitioners and Plaintiffs Center for Biological Diversity and Wishtoyo Foundation ("Petitioners"). This Demurrer is made pursuant to Code of Civil Procedure section 430.10, subsection (e) on the grounds that the Petition's First, Second, and Third Causes of Action fail to state facts sufficient to constitute a cause of action.

This Motion is based upon this Notice, the following Demurrer, the accompanying Memorandum of Points and Authorities, the accompanying Declaration of Garrett B. Stanton, Request for Judicial Notice, all pleadings, papers and records in this action, and/or such further oral and documentary evidence presented before or at the hearing on this Motion.

<u>**DEMURRER**</u>

Sable demurs to the Petition's First, Second, and Third Causes of Action on the following bases:

1. Sable demurs to the First Cause of Action on the basis the claims made therein, made pursuant to 49 U.S.C. sections 60118 (c) and (d), fail to allege facts sufficient to constitute a cause of action. (See Code Civ. Proc. § 430.10(e); 49 U.S.C. §§ 60118 (c) and (d); Petition at ¶¶114–120.) Specifically, the First Cause of Action for "Violations of Federal Pipeline Safety Laws" pursuant to 49 U.S.C. section 60118 fail because that statute does not impose requirements for "public process" or for publication of a "statement of reasons" matter of law. (See Code Civ. Proc. § 430.10(e); 49 U.S.C. §§ 60118 (c) and (d); Petition at ¶¶ 114–120.)

2. Sable demurs to the Second Cause of Action on the basis that it fails to allege facts sufficient to constitute a cause of action. (See Code Civ. Proc. § 430.10(e); Petition at ¶¶ 121–125.) Specifically, the Second Cause of Action for "failure to provide a discussion of significant factors" pursuant to Government Code section 51011(c) fails as a matter of law because the

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES

State Waivers each contain 15 pages of information and factors OSFM considered in issuing the waivers. (See Code Civ. Proc. § 430.10(e); Gov. Code § 51011(C); Petition at ¶¶75–77 and 121–125; and RJN Exs. 1 and 2.)

3. Sable demurs to the Third Cause of Action on the basis that it fails to allege facts sufficient to constitute a cause of action. (See Code Civ. Proc. § 430.10(e); Petition at ¶¶ 126–131.) Specifically, the Third Cause of Action for "failure to prepare a subsequent EIR" fails because the "State Waivers" were issued pursuant to delegated federal authority, not subject to CEQA as a matter of law, and otherwise not a "project" requiring an EIR as a matter of law. (See Code Civ. Proc. § 430.10(e); 49 U.S.C. § 60105; Petition at ¶¶ 126–131.)

4. Sable demurs to the Petition to the extent that it alleges a claim for declaratory relief on the basis that it fails to allege facts sufficient to constitute a cause of action. (See Code Civ. Proc. §§ 1060, 1061.)

Based on the foregoing, Sable respectfully requests that (i) the Court sustain this Demurrer in its entirety and (ii) dismiss the Petition in its entirety with prejudice.

DATED:   July 3, 2025          Respectfully submitted,

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE

_____
Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP.**
**PACIFIC PIPELINE COMPANY**

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..........................................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND................................................2

      A.    The Las Flores Pipeline ...............................................................................2

      B.    The Petition and Meet and Confer Efforts..................................................5

III.  LEGAL STANDARD..................................................................................................5

IV.   ARGUMENT ...............................................................................................................5

      A.    First Cause of Action:  OSFM Provided Public Notice and Was Not Required to Hold a Public Hearing.............................................................................5

      B.    Second Cause of Action: OSFM Provided a Written Justification and Discussion of Factors Considered in its Approval of the State Waivers. ......................7

      C.    Third Cause of Action: State Waivers Do Not Constitute a Project Under CEQA.........................................................................................................8

      D.    Any Claims for Declaratory Relief. ...........................................................11

V.    CONCLUSION..........................................................................................................12

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Blank v. Kirwan*
(1985) 39 Cal.3d 311 ...........................................................................................................6

*Boyle v. City of Redondo Beach*
(1999) 70 Cal.App.4th 1109 ...............................................................................................5

*City of Morgan Hill v. Bay Area Air Quality Management District*
(2004) 118 Cal.App.4th 861 ...............................................................................................9

*Cohan v. City of Thousand Oaks*
(1994) 30 Cal.App.4th 547 ..................................................................................................6

*Fowler v. City of Lafayette*
(2020) 46 Cal.App.5th 360 ..................................................................................................6

*Fox Paine & Co., LLC v. Twin City Fire Ins. Co.*
(2024) 104 Cal.App.5th 1034 .............................................................................................8

*Friends of Juana Briones House v. City of Palo Alto*
(2010) 190 Cal.App.4th 286 .............................................................................................10

*Galbiso v. Orosi Pub. Util. Dist.*
(2010) 182 Cal.App.4th 652 ................................................................................................6

*IBP, Inc. v. Alvarez*
(2005) 546 U.S. 21...............................................................................................................7

*Kilgore v. Younger*
(1982) 30 Cal. 3d 770 ..........................................................................................................5

*Muzzy Ranch Co. v. Solano County Airport Land Use Com.*
(2007) 41 Cal.4th 372 ........................................................................................................10

*Olympic Pipe Line Co. v. City of Seattle*
(9th Cir. 2006) 437 F.3d 872 ...............................................................................................2

*Serrano v. Priest*
(1971) 5 Cal.3d 584 .............................................................................................................5

*Sierra Club v. County of Sonoma*
(2017) 11 Cal.App.5th 11 ..................................................................................................10

## STATUTES

49 U.S.C. §§ 60101 et seq.....................................................................................................2

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES

49 U.S.C. § 60102.................................................................................................................2

49 U.S.C. § 60105.............................................................................................................3, 9

49 U.S.C. § 60112.................................................................................................................7

49 U.S.C. § 60117.................................................................................................................7

49 U.S.C. § 60118........................................................................................................ passim

49 U.S.C. § 60122.................................................................................................................7

Cal. Code Civ. Proc. § 430.10 ...........................................................................................5

Cal. Code Civ. Proc. § 430.41 ...........................................................................................5

Cal. Gov. Code § 51010....................................................................................................3, 9

Cal. Gov. Code § 51011................................................................................................ passim

Cal. Pub. Resources Code § 21065 ..................................................................................10

Cal. Pub. Resources Code § 21080 ..................................................................................10

Cal. Pub Resources Code § 21166 .....................................................................................9

**OTHER AUTHORITIES**

49 C.F.R. § 195 ....................................................................................................................3

49 C.F.R. § 190.3 .................................................................................................................7

49 C.F.R. § 190.233 .............................................................................................................7

49 C.F.R. § 190.341 ..........................................................................................................6, 8

74 Fed. Reg. 2889, 2892 (Jan. 2009) ................................................................................7

74 Fed. Reg. 2893 (Jan. 2009) ...........................................................................................7

CEQA Guidelines § 15125 ...............................................................................................11

CEQA Guidelines § 15162 ..............................................................................................9, 11

CEQA Guidelines § 15268 ...............................................................................................10

CEQA Guidelines § 15301 ...............................................................................................10

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

The Petition rests on a fundamental misunderstanding of the approvals Sable needs from OSFM to restart pipeline operations.[1] Petitioners' lawsuits challenge OSFM's December 17, 2024, issuance of two waivers of certain pipeline safety regulatory requirements (the "State Waivers"). But the State Waivers do not allow oil to flow through the pipelines. Even if they did, Petitioners' claims each fail to state a claim as a matter of law and should be dismissed with prejudice.

*First*, Petitioners' First Cause of Action fails to state a claim that OSFM's approval of the State Waivers violated 49 U.S.C. section 60118, or that the approval was an abuse of discretion. Petitioners allege that section 60118 imposed public process and disclosure requirements on OSFM, but it does not. (Petition, ¶¶ 114 – 120.)

*Second*, Petitioners' Second Cause of Action fails to state a claim that OSFM's approval of the State Waivers violated Government Code section 51011(c), or that the approval was an abuse of discretion. (*Id.*, ¶¶ 121 – 125.) Petitioners allege that OSFM's State Waivers "did not include any analysis or justifications for their issuance" (*Id.*, ¶ 123), however, the Petition cites in part (but does not attach) the State Waivers, which include the factors OSFM considered across the 15 pages and over 60 conditions and requirements for the waivers. (See *id.*; RJN, Exs. 1 and 2 [the State Waivers].) The inclusion of these factors in the documents referenced by the Petition override Petitioners' conclusory allegations to the contrary.

*Third*, Petitioners' Third cause of action fails to state a claim that OSFM failed to comply with CEQA when it approved the State Waivers without preparing an EIR because the waivers implement federal law and thus are not subject to CEQA, are not a "project" requiring CEQA review, and otherwise are exempt from CEQA. (Petition, ¶¶ 126 – 131.)

---

[1] The Petition seeks "temporary, preliminary, and permanent injunctive relief prohibiting Cal Fire and the Real Parties in Interest from conducting any further activity in furtherance of the Project" (Petition, Prayer for Relief, ¶ 2), however, the State Waivers at issue in this litigation do not permit restart of the pipeline. A Restart Plan must be approved prior to restart, and none has been approved at this time. Accordingly, the Petition's prayer for injunctive relief "preventing restart" is unripe and should be stricken, as set forth in the Motion to Strike filed concurrently with this Demurrer.

1

*Finally*, the Petition fails to state a claim for declaratory relief as it fails to allege the existence of an actual controversy. (Petition, Prayer for Relief, ¶ 1.)

Accordingly, Sable respectfully requests that the Court sustain this Demurrer in its entirety and dismiss the Petition in its entirety with prejudice.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Las Flores Pipeline

In January 1985, the California State Lands Commission and federal Bureau of Land Management certified a joint Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for what was then known as the "Celeron Pipeline Project," which included the construction of what are now called the Las Flores Pipelines.[2] The EIR/EIS explains that its impact analysis extends through the pipelines' entire lifetime, including both "operation" and "maintenance."[3] After certification of the EIR/EIS, "all necessary approvals for construction and operation of the Las Flores Pipeline" were received, the pipeline was constructed, and it "went into service in or around 1992." (Petition, ¶ 67.)

Because the Las Flores Pipelines transport crude oil, a petroleum product, they are subject to the federal Hazardous Liquid Pipeline Safety Act ("Pipeline Safety Act") (codified at 49 U.S.C. §§ 60101 et seq.), which is administered by the Pipeline and Hazardous Materials Safety Administration ("Safety Administration"). The Pipeline Safety Act's singular purpose is to ensure the safe operation of hazardous liquid pipelines. (49 U.S.C. § 60102; *Olympic Pipe Line Co. v. City of Seattle* (9th Cir. 2006) 437 F.3d 872, 877.) The Safety Administration has adopted detailed regulations governing the design, construction, pressure testing, operation, and maintenance of hazardous liquid pipelines. (See

---

[2]   Two pipelines make up the Las Flores Pipelines. One is the Las Flores Pipeline CA-324 ("Line CA-324") (previously known as Line 901), which transports crude oil approximately 10.9 miles from the Las Flores Pump Station in Las Flores Canyon to the existing Gaviota Pump Station. The other is Las Flores Pipeline CA-325 ("Line CA-325") (previously known as Line 903), which transports crude oil approximately 113.5 miles north from the Gaviota Pump Station to the existing Pentland Delivery Point in Kern County.

[3]   For background information purposes, the Draft and Final EIR/EIS referenced by the Petition are publicly available: The Draft EIR/EIS is available on the County's website, at *https://cosantabarbara.app.box.com/s/gc3vhh8ns8aiwketnq35vwbehnhre672*. The Final EIR/EIS is available at: *https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt*.

2

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES

49 C.F.R. Part 195.) The Act also grants the Safety Administration the authority to "waive compliance with any part of an applicable standard … on terms [the Safety Administration] considers appropriate if [it] determines that the waiver is not inconsistent with pipeline safety." (49 U.S.C. § 60118, subd. (c)(1)(a).)

The Pipeline Safety Act also allows state agencies to apply and become certified to enforce equivalent or more stringent regulations with respect to intrastate pipelines. (See 49 U.S.C. § 60105.) In California, the State Legislature vested OSFM with the "exclusive safety[,] regulatory and enforcement authority over intrastate hazardous liquid pipelines and … to implement the [Pipeline Safety Act] and federal pipeline safety regulations as to those portions of interstate pipelines located within [California] as necessary to obtain annual federal certification." (Gov't Code, § 51010.) OSFM adopted the Safety Administration's regulations, and the Safety Administration certified OSFM to implement the Pipeline Safety Act. (Cal. Code Regs., tit. 19, § 2000.)

Like the Safety Administration, OSFM may "waive compliance with a safety standard" if the requested modification is not inconsistent with pipeline safety. (49 USC § 60118, subd. (c), (d).) Any such "State Waiver" may become effective only after OSFM provides the Safety Administration with 60 days' notice and the opportunity to make a written objection to its issuance. (See *ibid*.)

On March 13, 2020, the prior owner and operator of the Las Flores Pipelines entered into a Consent Decree with the United States and the State of California on behalf of several federal and state regulatory agencies—including OSFM and the Safety Administration—in the United States District Court, Central District of California (Civil Action No. 2:20-cv-02415) to resolve issues related to the 2015 Refugio oil spill that resulted from a leak in Line CA-324. (Petition, ¶ 59.)[4]

The Consent Decree imposes a series of prerequisites that the pipelines' operator must satisfy before restarting either of the Las Flores Pipelines. In particular, the Consent Decree requires that the operator must, with respect to both Lines CA-324 and CA-325, "apply for a State Waiver through the

---

[4]   For background information purposes, the Consent Decree is referenced by the Petition and is publicly available at the same website identified in the Petition as where Cal Fire posted the State Waivers: "Cal Fire posted the State Waivers on its website *Pathways for Restarting CA-324 and CA-325,* https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines." (Petition, ¶ 8 [Consent Decree is available under "#2 Consent Decree"].)

3

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES

OSFM for the limited effectiveness of cathodic protection" "prior to restarting" the pipelines. (Petition, ¶ 61.) In other words, the Consent Decree required Sable to apply for the waivers that Petitioners now challenge as a condition precedent to restart.

After Sable acquired the Las Flores Pipelines in February 2024, Sable submitted State Waiver applications to OSFM with respect to both Lines CA-324 and CA-325, as required under the Consent Decree. (See Petition, ¶ 70.) In May 2024, Sable began repair and maintenance work on the pipelines as required under the Consent Decree and consistent with Sable's understanding that such work was authorized by the Pipeline's existing approvals and permits.

Following several months of consideration of Sable's State Waiver applications, OSFM granted both State Waivers on December 17, 2024, and imposed over sixty separate conditions on Sable's operation of the Las Flores Pipelines to reflect the modified regulatory standards required under the Consent Decree. (RJN, Exs. 1 and 2 [State Waivers].) This grant was conditioned on the Safety Administration either issuing an Order approving the State Waivers or taking no action within 60 days after receiving the OSFM's Letter of Decision on the State Waivers. (Petition, ¶ 72.) On February 11, 2025, the Safety Administration notified OSFM that it had no objection to its issuance of the State Waivers, and the State Waivers became effective. (Petition, ¶ 79.) The Safety Administration's notice did not identify any procedural deficiencies with OSFM's grant of the State Waivers. Petitioners filed suit challenging OSFM's approval of the State Waivers over two months later, on April 15, 2025.

The Consent Decree separately requires Sable to submit and obtain OSFM's approval of a written "Restart Plan" before restarting either Line CA-324 or Line CA-325.[5] Sable submitted a draft Restart Plan to OSFM on July 29, 2024.[6] OSFM has taken no final action on that Plan and it remains under review.

---

[5] See footnote 4, supra, [Consent Decree] Appendix D, ¶¶ 1.b, 1.f.

[6] For background information purposes, the Restart Plan is also publicly available at the same website identified in the Petition as where Cal Fire posted the State Waivers: "Cal Fire posted the State Waivers on its website *Pathways for Restarting CA-324 and CA-325,* https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines." (Petition, ¶ 8 [Restart Plans are available under "#6 Startup Plans"].)

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES

**B.    The Petition and Meet and Confer Efforts**

On April 15, 2025, Petitioners filed their Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief challenging OSFM's approval of the State Waivers. The First cause of action seeks to enforce purported requirements for public process and disclosure of a statement of reasons pursuant to 49 U.S.C. section 60118, subsections c and d. (Petition, ¶¶ 114-120.) The Second cause of action seeks to enforce a purported requirement for disclosure of "a discussion of significant factors" pursuant to Government Code section 51011(c). (*Id.*, ¶¶ 121-125.) The Third cause of action alleges that OSFM failed to comply with CEQA when it approved the State Waivers without preparing a subsequent EIR. (*Id.*, ¶¶ 126-131.)

On June 11, 2025, the parties telephonically met and conferred regarding Sable's intent to file a demurrer based on Petitioners' failure to state a cause of action. (Stanton Declaration, ¶ 3; see Code Civ. Proc., § 430.41.) Having failed to reach a resolution, Sable hereby brings this Demurrer.

## III.    LEGAL STANDARD

A demurrer tests the legal sufficiency of the factual allegations in the complaint. (*Boyle v. City of Redondo Beach* (1999) 70 Cal.App.4th 1109, 1114.) In deciding a demurrer, the court should "treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591.) The court may also consider matters that are judicially noticeable. (*Ibid.*) The court must determine whether the complaint, in this light, states facts sufficient to support a cause of action. (Code Civ. Proc. § 430.10, subd. (e); *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) If the court finds that the demurrer should be sustained, it should dismiss the plaintiff's case without leave to amend where it finds there is no reasonable possibility that the defect can be cured by amendment. (*Kilgore v. Younger* (1982) 30 Cal. 3d 770, 783.)

## IV.    ARGUMENT

**A.    First Cause of Action:  OSFM Provided Public Notice and Was Not Required to Hold a Public Hearing.**

In the First Cause of Action, Petitioners claim OSFM violated the Pipeline Safety Act by failing to provide the public with notice and an opportunity for a hearing prior to granting the State

Waivers. (Petition, ¶¶ 115-118.) Petitioners have failed to state a claim because nothing under federal law requires public notice and an opportunity for hearing on a state waiver application pending with OSFM.  Although federal regulations provide that the Safety Administration "will provide notice to the public of its intent to consider the application [on the Federal Register] and invite comment" (49 C.F.R. § 190.341(d)(1)), OSFM cannot publish in the Federal Register.

Nevertheless, OSFM created a special website devoted to Sable's State Waiver applications providing the public with notice while OSFM considered them. (See Petition, ¶ 8 [referencing OSFM's public notice website that posts the State Waivers and related materials].)[7]

Importantly, OSFM's public outreach worked – ***Petitioners and others actively participated in OSFM's (and the Safety Administration's) consideration of the State Waiver applications***. (See Petition, ¶ 68 ["Since learning of this restart plan, Petitioners have repeatedly put Cal Fire on notice of their concerns and urged the agency (through calls, emails, and letters)"].) "For example, on September 24, 2024, Petitioners submitted a letter to Cal Fire about the agency's [purported] duty to conduct a CEQA review process and requesting it prepare an environmental impact report." (*Id*.) Petitioners, therefore, have suffered no prejudice.[8] (*Fowler v. City of Lafayette* (2020) 46 Cal.App.5th 360, 371 ["We do not set aside an agency's action unless the appellants show the violation caused prejudice"]; see also *Galbiso v. Orosi Pub. Util. Dist.* (2010) 182 Cal.App.4th 652, 670-671; *Cohan v. City of Thousand Oaks* (1994) 30 Cal.App.4th 547, 556.) Hence, any allegations by Petitioners that OSFM provided no notice are contradicted by references to OSFM's public notice website (e.g., Petition, ¶ 171) and by Petitioners' attached public comment letter (*id.*, Ex. C).

Further, while public notice was provided, no formal hearing was required for OSFM to act. The use of the term "hearing" in section 60118 refers to the applicant's entitlement to an opportunity for hearing on its pending application.  Where the phrase "opportunity for hearing" is used elsewhere

---

[7] OSFM also coordinated with the Safety Administration to establish publicly accessible federal dockets for the State Waivers, where members of the public (including Petitioners) could submit comments to the Safety Administration: Docket ID PHMSA-2025-002 for CA-324 and Docket ID PHMSA-2025-003 for CA 3-325 are publicly available on www.Regulations.gov.

[8] Further, Petitioners do not allege that any members of the public who would have participated in OSFM's process on the State Waivers were precluded from doing so.

6

in the Pipeline Safety Act, it primarily refers to the *applicant's* opportunity for hearing – not the general public's. (See, e.g., 49 U.S.C. §§ 60112, subd. (a), 60117, subd. (m), 60122, subd. (a)(1).)[9] Section 60118 should be read consistently with those provisions. (See *IBP, Inc. v. Alvarez* (2005) 546 U.S. 21, 23-24 ["identical words used in different parts of the same statute are generally presumed to have the same meaning"].)  Petitioners cite no authority demonstrating their or the public's entitlement to a public hearing on the State Waivers. In addition, any such "hearing" for the applicant does not refer to a formal public hearing at which testimony may be presented on the record. (See 49 C.F.R. § 190.3; see also 74 Fed. Reg. 2893 (Jan. 2009) [waivers "already involve extensive informal (technical) consultations between PHMSA and the applicant and . . . there is also an opportunity for (paper) hearing in the [waiver] process"].)[10]

**B.    Second Cause of Action: OSFM Provided a Written Justification and Discussion of Factors Considered in its Approval of the State Waivers.**

Similarly, the Second Cause of Action fails to state a claim because nothing in the federal or state pipeline safety laws requires OSFM to adopt a detailed statement of decision containing specific findings in support of the State Waivers—but even if it did, OSFM detailed its reasons for approval.

---

[9]  These provisions are implemented by PHMSA through 49 C.F.R. Sections 190.233(c) (noting notice and opportunity for hearing of corrective action order only to operator); 190.239(b) (noting notice and opportunity for hearing of proposed safety orders only to operator); 190.221 and 190.211 (noting notice of proposed violations and opportunity for hearing only to operator). Moreover, the Pipeline Safety Act only requires that hearings under these sections be noticed to the public through [the Safety Administration's] website.  (See 49 U.S.C. Section 60117, subd. (b)(2).)  Here, OSFM did not just make mere mention of Sable's State Waiver application; it created a distinct, special website devoted to Sable's State Waiver applications and coordinated with PHMSA to establish a federal docket. (Petition, ¶ 171.)

[10]  Although the Pipeline Safety Act does not require that the public be afforded an opportunity for hearing, either in the context of special permits or state waivers, or in the context of enforcement (such as corrective action orders, safety orders, or notices of probable violation), even if it were construed in such manner, here, the public was given the opportunity to be heard, through submission of comments.  In fact, in the federal docket that the Safety Administration created, public comments were submitted as part of the Safety Administration's consideration of the grant of the State Waivers.  Moreover, Petitioners submitted correspondence to OSFM regarding its consideration of the pending State Waiver applications.  The Safety Administration uses "paper hearings" in consideration of special permits, although as noted above (see, e.g., 74 Fed. Reg. 2889, 2892, Jan. 16, 2009), such procedures are not strictly required under the Pipeline Safety Act to be public-facing for it to grant special permits, with the focus instead on consultation with the applicant.

7

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES

Petitioners seek to elevate form over substance. (Petition at ¶¶ 121-125.) The federal regulations simply provide that a decision will be provided *to the applicant*. (See 49 C.F.R. § 190.341(d)(2) [whenever a decision is made to grant or deny an application, "***notice of the decision will be provided to the applicant***."] [emphasis added].) Government Code section 51011(c) requires that "[n]otification of exemptions … include a discussion of the factors that [OSFM] considers significant to the granting of the exemption."

Here, OSFM satisfied both requirements. In granting Sable's applications, OSFM issued 15-page State Waivers to Sable with detailed requirements and conditions that Sable must meet. (See RJN, Exs. 1 & 2.)  These factors include, but are not limited to, "that [Sable's] goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap," that Sable "provided the OSFM information from the completed in-line inspections and additional data requested by our office," that [t]he OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver" (*id.*, Ex. 1 at p. 2, Ex. 2 at pp. 1-2), as well as the over 60 requirements and conditions imposed on Sable as part of the State Waivers (*id.*, Ex. 1 at pp. 3-14, Ex. 2 at pp. 3-14).

Courts "assume the attachments to the complaint are true, and they take precedence over any conflicting allegations." (*Fox Paine & Co., LLC v. Twin City Fire Ins. Co.* (2024) 104 Cal.App.5th 1034, 1045.) The State Waivers (and the extensive factors discussed therein) therefore take precedence over any of the Petition's conclusory allegations to the contrary.

Accordingly, Petitioners' Second Cause of Action fails to state sufficient facts to state a claim and is subject to demurrer.

### C.    Third Cause of Action: State Waivers Do Not Constitute a Project Under CEQA

In the Third Cause of Action, Petitioners allege OSFM failed to comply with CEQA when it approved the State Waivers without preparing a subsequent EIR pursuant to Public Resources Code

8

section 21166 and CEQA Guidelines section 15162(a). (Petition, ¶¶ 126-131.) However, as a matter of law, CEQA does not apply to OSFM's issuance of the State Waivers because OSFM was implementing a federal safety program pursuant to its delegated authority under federal law.

### *The State Waivers are federal authorizations not subject to CEQA.*

CEQA does not apply to OSFM's issuance of the State Waivers because OSFM was implementing a *federal* safety program. (See *City of Morgan Hill v. Bay Area Air Quality Management District* (2004) 118 Cal.App.4th 861, 871 ["the conclusion that the [air] permit is a federal one would seem to preclude the application of any state law such as CEQA. The [Air] District issued the permit acting on behalf of federal authorities who are not bound by state law"].)

The Pipeline Safety Act authorizes the Safety Administration to certify state agencies enforce pipeline safety within their jurisdictional borders. (49 U.S.C. § 60105.) OSFM has the "exclusive safety[,] regulatory and enforcement authority … to implement the [Safety Administration's] and federal pipeline safety regulations." (Gov. Code, § 51010; see also Cal. Code Regs., tit. 19, § 2000.) Thus, instead of applying to the Safety Administration for a waiver of federal pipeline safety standards, California pipeline owners and operators apply to OSFM. OSFM, pursuant to its delegated authority, then issues State Waivers as a federal authorization, and the Safety Administration has 60 days' notice to object. (49 U.S.C. § 60118(d).) Just as the Safety Administration is not subject to CEQA in issuing a waiver under section 60118, OSFM is not subject to CEQA in implementing its federally delegated authority to waive pipeline safety standards. (*City of Morgan Hill*, *supra*, 118 Cal.App.4th at p. 871.)

Indeed, Petitioners cannot have it both ways. To support their pipeline safety law claims, Petitioners argue that OSFM must issue waivers to "in the same way and to the same extent" as the Safety Administration. (See Petition, ¶ 115.) While OSFM did comply with federal pipeline safety laws, consistent with Petitioners' own logic, OSFM need not undertake CEQA review in implementing those laws.

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES

***The State Waivers are a safety program to which CEQA does not apply.***

Even if state law applied to OSFM's actions implementing federal law (it does not), the State Waivers are merely a program ensuring pipelines operate safely within the boundaries of established law. Thus, CEQA still would not apply.

The State Waivers are not a "project" that triggers CEQA review. (See *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380 ["[a]n activity that is not a 'project' . . . is not subject to CEQA."].) "Project" "means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect change in the environment." (Pub. Resources Code, § 21065.) A state waiver is an order that modifies compliance with a regulatory requirement (49 U.S.C. § 60118). Thus, the State Waivers merely confirmed that what Sable proposed by way of pipeline protection is consistent with established federal pipeline safety standards. OSFM's determination that the State Waivers would be consistent with pipeline safety standards does not have the potential to result in a physical change in the environment.[11] Physical repair and maintenance work on the Pipelines was not contingent on OSFM's approval of the State Waivers, and began in May 2024 under separate authorization from the County.

Moreover, OSFM's issuance of the State Waivers is ministerial. (Pub. Resources Code, § 21080(b); CEQA Guidelines, § 15268.) OSFM assessed Sable's State Waiver applications pursuant the requirements set forth in applicable federal and state regulations. (See Petition, Exs. F & G.) This is no different than a local agency's issuance of building permit or other similar permits, which are typically ministerial. A local agency may allow a deviation from applicable codes or impose conditions without transforming the permit into a discretionary action. (See, e.g., *Sierra Club v. County of Sonoma* (2017) 11 Cal.App.5th 11, 24-31 [issuance of erosion control permit with conditions held ministerial]; *Friends of Juana Briones House v. City of Palo Alto* (2010) 190 Cal.App.4th 286, 300 [issuance of demolition permit held ministerial].) Here, too, OSFM may allow a deviation from applicable safety regulations through a state waiver without triggering CEQA. (49 U.S.C. § 60118.)

---

[11]  If anything, Petitioners' dispute lies with the County, which approved the physical construction work on the Pipelines through the issuance of the final development plan, conditional use permit, coastal development permits, and other entitlements over 30 years ago.

10

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES

*The State Waivers are categorically exempt from CEQA.*

Even if the State Waivers are a discretionary project triggering CEQA, the State Waivers are categorically exempt because they address an existing facility with no expansion of its former use. (CEQA Guidelines, § 15301.) The CEQA Guidelines specifically identify "[r]estoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety" as exempt. (See *id.*, subd. (d).) Here, the State Waivers do not authorize any expansion of the pipelines' capacity or the permitted volume of oil that ay flow through the pipelines.[12] The State Waivers do not even authorize physical construction. They merely impose safety measures to ensure the pipelines "meet current standards of public health and safety." No unusual circumstance exists because potential harms from a pipeline rupture or spill already were analyzed under CEQA. (See *id.*, § 15300.2(c).)

*Potential environmental impacts were previously analyzed in the certified EIR/EIS.*

Here, Petitioners fail to allege that any of CEQA's statutory triggers for further environmental review have been met. (See Petition, generally.) That a spill occurred in 2015 is not a new circumstance requiring further study. A subsequent EIR is not required. (CEQA Guidelines, § 15162.) Hence, the Third cause of action for failure to prepare an EIR fails as a matter of law and is subject to demurrer.

**D.      Any Claims for Declaratory Relief.**

Despite the inclusion of the words "declaratory relief" in the Petition's title and prayer, the Petition does not contain a standalone cause of action for declaratory relief pursuant to Code of Civil Procedure section 1060. (See Petition, generally.) Nor does the Petition allege any "case of actual controversy relating to the legal rights and duties of the respective parties" as required to demonstrate a declaration is "necessary and proper at [this] time under all the circumstances" pursuant to Code of Civil Procedure sections 1060 and 1061.

Accordingly, to the extent the Petition asserts a cause of action for declaratory relief, it fails to state sufficient facts to constitute a cause of action and is subject to demurrer.

---

[12]    The appropriate baseline against which to address potential environmental impacts here is historic operations. (See CEQA Guidelines, § 15125(a)(1).)

11

## V.    CONCLUSION

For the foregoing reasons, Sable respectfully requests that the Court sustain this Demurrer in its entirety and dismiss the Petition with prejudice.


DATED: July 3, 2025              Respectfully submitted,

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER
LISA L. GARCIA
GARRETT B. STANTON

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE


_____
Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP.**
**PACIFIC PIPELINE COMPANY**

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY          STATE BAR NUMBER: 281865 | FOR COURT USE ONLY |
|---|---|
| NAME: Michael S. Dorsi, Deputy Attorney General | |

ATTORNEY OR PARTY WITHOUT ATTORNEY    STATE BAR NUMBER: 281865

NAME: Michael S. Dorsi, Deputy Attorney General
FIRM NAME: California Attorney General's Office
STREET ADDRESS: 455 Golden Gate Avenue, Suite 11000
CITY: San Francisco          STATE: CA      ZIP CODE: 94102
TELEPHONE NO.: 415-510-3802          FAX NO.:
EMAIL ADDRESS: Michael.Dorsi@doj.ca.gov
ATTORNEY FOR (name): Respondents California Department of Forestry and Fire Protection, et al.

**FOR COURT USE ONLY**

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2025 9:05 AM
By: Terri Chavez , Deputy

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Santa Barbara
STREET ADDRESS: 1100 Anacapa Street
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Barbara, CA 93101
BRANCH NAME: Anacapa Divsiion

PLAINTIFF/PETITIONER: Center for Biological Diversity, et al.

DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection, et al.

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|
| *(Check one):*  [X] **UNLIMITED CASE**     [ ] **LIMITED CASE**    (Amount demanded      (Amount demanded is $35,000    exceeds $35,000)      or less) | 25CV02244 |

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date: July 18, 2025          Time: 8:30 a.m.      Dept.: 4          Div.:          Room:

Address of court *(if different from the address above)*:

[ ] **Notice of Intent to Appear by Telephone, by** *(name):*

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one):*
   a. [X] This statement is submitted by party *(name):* Respondents California Department of Forestry and Fire Protection, et al.
   b. [ ] This statement is submitted **jointly** by parties *(names):*

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date):* April 15, 2025
   b. [ ] The cross-complaint, if any, was filed on *(date):*

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. [X] All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. [ ] The following parties named in the complaint or cross-complaint
      (1) [ ] have not been served *(specify names and explain why not):*

      (2) [ ] have been served but have not appeared and have not been dismissed *(specify names):*

      (3) [ ] have had a default entered against them *(specify names):*

   c. [ ] The following additional parties may be added *(specify names, nature of involvement in case, and date by which they may be served):*

4. **Description of case**
   a. Type of case in [X] complaint    [ ] cross-complaint        *(Describe, including causes of action):*
      Petition for writ of mandate and complaint challenging California Department of Forestry and Fire Protection's Office of the State Fire Marshal issuance of State Waivers for Las Flores Pipeline System

**Page 1 of 5**

| Form Adopted for Mandatory Use Judicial Council of California CM-110 [Rev. January 1, 2024] | **CASE MANAGEMENT STATEMENT** | Cal. Rules of Court, rules 3.720–3.730 www.courts.ca.gov |
|---|---|---|

CM-110

| PLAINTIFF/PETITIONER: Center for Biological Diversity, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Department of Forestry and Fire Protections et al. | 25CV02244 |

4.  b.  Provide a brief statement of the case, including any damages *(if personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings; if equitable relief is sought, describe the nature of the relief):*

Petitioners violations of federal and state procedures for pipeline safety regulations and California Environmental Quality Act

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**

The party or parties request ☐ a jury trial ☒ a nonjury trial.  *(If more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**

a. ☐ The trial has been set for *(date):*

b. ☒ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c. Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**

The party or parties estimate that the trial will take *(check one)*

a. ☒ days *(specify number):*  1

b. ☐ hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*

The party or parties will be represented at trial ☒ by the attorney or party listed in the caption ☐ by the following:

a. Attorney:

b. Firm:

c. Address:

d. Telephone number:          f. Fax number:

e. Email address:          g. Party represented:

☐ Additional representation is described in Attachment 8.

9.  **Preference**

☒ This case is entitled to preference *(specify code section):*  Public Resources Code § 21167.1(a)

10. **Alternative dispute resolution (ADR)**

a. **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 of the California Rules of Court for information about the processes available through the court and community programs in this case.

(1) For parties represented by counsel: Counsel ☒ has ☐ has not  provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

(2) For self-represented parties: Party ☐ has ☐ has not  reviewed the ADR information package identified in rule 3.221.

b. **Referral to judicial arbitration or civil action mediation** (if available).

(1) ☐ This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

(2) ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

(3) ☒ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

Cal. Rules of Court, Rule 3.811(b)(1) [equitable relief]

| CM-110 [Rev. January 1, 2024] | **CASE MANAGEMENT STATEMENT** | **Page 2 of 5** |
|---|---|---|

CM-110

| PLAINTIFF/PETITIONER: | Center for Biological Diversity, et al. | CASE NUMBER: | |
|---|---|---|---|
| DEFENDANT/RESPONDENT: | Department of Forestry and Fire Protections et al. | | 25CV02244 |

10. c.  In the table below, indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information)*:

| | The party or parties completing this form **are willing** to participate in the following ADR processes *(check all that apply)*: | If the party or parties completing this form in the case **have agreed** to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation)*: |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled<br>☐ Mediation session scheduled for *(date)*:<br>☐ Agreed to complete mediation by *(date)*:<br>☐ Mediation completed on *(date)*: |
| (2) Settlement conference | ☒ | ☐ Settlement conference not yet scheduled<br>☐ Settlement conference scheduled for *(date)*:<br>☐ Agreed to complete settlement conference by *(date)*:<br>☒ Settlement conference completed on *(date)*:  June 12, 2025 |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled<br>☐ Neutral evaluation scheduled for *(date)*:<br>☐ Agreed to complete neutral evaluation by *(date)*:<br>☐ Neutral evaluation completed on *(date)*: |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled<br>☐ Judicial arbitration scheduled for *(date)*:<br>☐ Agreed to complete judicial arbitration by *(date)*:<br>☐ Judicial arbitration completed on *(date)*: |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled<br>☐ Private arbitration scheduled for *(date)*:<br>☐ Agreed to complete private arbitration by *(date)*:<br>☐ Private arbitration completed on *(date)*: |
| (6) Other *(specify)*: | ☐ | ☐ ADR session not yet scheduled<br>☐ ADR session scheduled for *(date)*:<br>☐ Agreed to complete ADR session by *(date)*:<br>☐ ADR completed on *(date)*: |

CM-110 [Rev. January 1, 2024]                    **CASE MANAGEMENT STATEMENT**                    **Page 3 of 5**

CM-110

| PLAINTIFF/PETITIONER: Center for Biological Diversity, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Department of Forestry and Fire Protections et al. | 25CV02244 |

**11. Insurance**

a. ☐ Insurance carrier, if any, for party filing this statement *(name):*

b. Reservation of rights: ☐ Yes ☐ No

c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**12. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.

☐ Bankruptcy ☐ Other *(specify):*

Status:

**13. Related cases, consolidation, and coordination**

a. ☒ There are companion, underlying, or related cases.

(1) Name of case: Envrionmental Defense Center et al. v. California Department of Forestry and Fire Protection et al.

(2) Name of court: Santa Barbara County Superior Court

(3) Case number: 25CV02247

(4) Status: Pending

☐ Additional cases are described in Attachment 13a.

b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**14. Bifurcation**

☒ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*
Possible, should be discussed at case management conference

**15. Other motions**

☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

**16. Discovery**

a. ☐ The party or parties have completed all discovery.

b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery):*

| Party | Description | Date |
|---|---|---|
| | | |

c. ☒ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify):*
Respondent is preparing the administrative record but, given the nature of the relevant agency process, this is more time-consuming than had initially been expected.

CM-110 [Rev. January 1, 2024]   **CASE MANAGEMENT STATEMENT**   **Page 4 of 5**

CM-110

| PLAINTIFF/PETITIONER: Center for Biological Diversity, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Department of Forestry and Fire Protections et al. | 25CV02244 |

17. **Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $35,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

18. **Other issues**

☒ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*
This Court should defer case management until after the resolution of the preliminary injunction/stay motions on July 18, 2025. We request that this be re-set for August 1, 2025--the same day as the case management conference in the related case of Envrional Defense Center et al. v. California Department of Forestry and Fire Protection et al., 25CV02247.

19. **Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*
The parties conferred on some subjects and expect to confer on other subjects between now and the date of the case management conference.

b. ☐ After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

20. Total number of pages attached *(if any):* 2

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date: July 9, 2025

Michael S. Dorsi, Deputy Attorney General
_____
(TYPE OR PRINT NAME)

▶ /s Michael S. Dorsi
_____
(SIGNATURE OF PARTY OR ATTORNEY)

_____
(TYPE OR PRINT NAME)

▶
_____
(SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.

## DECLARATION OF SERVICE

Case Names:      **CENTER FOR BIOLOGICAL DIVERSITY, et al. v. CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al.**

Case Nos.:       **25CV02244**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter.

On July 11, 2025, I served the attached:

- **CASE MANAGEMENT STATEMENT**

by transmitting a true copy via electronic mail addressed as follows:

| | |
|---|---|
| Linda Krop<br>lkrop@environmentaldefensecenter.org<br>Jeremy M. Frankel<br>jfrankel@environmentaldefensecenter.org<br>Tara C. Rengifo<br>trengifo@environmentaldefensecenter.org<br>ENVIRONMENTAL DEFENSE CENTER | Julie Teel Simmonds<br>jteelsimmonds@biologicaldiversity.org<br>David Pettit<br>dpettit@biologicaldiversity.org<br>Talia Nimmer<br>tnimmer@biologicaldiversity.org<br>CENTER FOR BIOLOGICAL DIVERSITY |
| Moore, DJ djmoore@paulhastings.com<br>Hanelin, Benjamin J.<br>benjaminhanelin@paulhastings.com<br>Rogers, Natalie C.<br>natalierogers@paulhastings.com<br>PAUL HASTINGS LLP | Bolender, Brooke<br>Brooke.Bolender@alston.com<br>Jeffrey Dintzer jeffrey.dintzer@alston.com<br>ALSTON & BIRD |

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on July 11, 2025 at San Francisco, California.

| C. Murphy | /s/ C. Murphy |
|:---:|:---:|
| Declarant | Signature |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2025 5:10 PM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
LISA L. GARCIA, SBN 301362
lisa.garcia@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone: (213) 576-1000
Facsimile: (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>    Petitioners and Plaintiffs,<br><br>    v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERMANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,<br><br>    Respondents and Defendants,<br><br>    and<br><br>SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, | Case No. 25CV02244<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**PROOF OF SERVICE RE: NOTICE OF ERRATA RE: REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Complaint Filed:    April 15, 2025<br>Trial Date:    None set |

Real Parties in Interest.

**PROOF OF SERVICE**

I, Sharon Pollard, declare:

I am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 55 Second Street, Suite 2100, San Francisco, CA 94105.

On July 11, 2025, I served the document(s) **NOTICE OF ERRATA RE: REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☐   (BY U.S. MAIL)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

☐   (BY FACSIMILE)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐   (BY OVERNIGHT MAIL)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☒   BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 11, 2025, at San Francisco, California.

                                   /s/ Sharon Pollard
                                     Sharon Pollard

PROOF OF SERVICE

**SERVICE LIST**

Julie Teel Simmons, Esq.
David Pettit, Esq.
Talia Nimmer, Esq.
Center for Biological Diversity
2011 Franklin Street, Suite 375
Oakland, CA 94612

**ATTORNEYS FOR PETITIONERS**
CENTER FOR BIOLOGICAL DIVERSITY and
WISHTOYO FOUNDATION

Tel.:   (510) 844-7100
Fax:   (510) 844-7150
Email: jteelsimmonds@biologicaldiversity.org
        dpettit@biologicaldiversity.org
        tnimmer@biologicaldiversity.org

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

**ATTORNEYS FOR PETITIONERS**
ENVIRONMENTAL DEFENSE CENTER, a
California non-profit corporation; GET OIL
OUT!, a California non-profit corporation;
SANTA BARBARA COUNTY ACTION
NETWORK, a California non-profit corporation;
SIERRA CLUB, a national non-profit
corporation; and SANTA BARBARA
CHANNELKEEPER, a California non-profit
corporation

Tel.:   (510) 844-7100
Fax:   (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
        jfrankel@environmentaldefensecenter.org
        trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

**ATTORNEYS FOR RESPONDENTS/
DEFENDANTS**
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal;
Daniel Berlant, in his official capacity as State
Fire Marshal

Tel.:   (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

**ATTORNEYS FOR REAL PARTIES IN
INTEREST**
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:   (310) 620-5879
Email: djmoore@paulhastings.com
        benjaminhanelin@paulhastings.com
        natalierogers@paulhastings.com

PROOF OF SERVICE

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2025 7:46 PM
By: Terri Chavez , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological
Diversity and Wishtoyo Foundation*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive, <br><br> Respondents/Defendants. | Case No.: 25CV02244 <br><br> **PETITIONERS' COMBINED REPLY IN SUPPORT OF APPLICATION FOR AN ADMINISTRATIVE STAY OR PRELIMINARY INJUNCTION** <br><br> [Filed Concurrently with Second Declaration of Julie Teel Simmonds, Second Request for Judicial Notice, Declaration of Paasha Mahdavi, Responses to Objections, and Evidentiary Objections] <br><br> Date: July 18, 2025 <br> Time: 10:00 a.m. <br> Dept.: 4 <br> Judge: Honorable Donna D. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |
| SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive, <br><br> Real Parties in Interest. | |

**INTRODUCTION**

Without conducting *any* California Environmental Quality Act (CEQA) review or complying with state and federal pipeline safety laws, Respondents/Defendants (collectively, Cal Fire) issued State Waivers that enable Real Parties in Interest (collectively, Sable) to restart and operate the Santa Ynez Unit (SYU) using the defective Las Flores Pipeline System (the Project). For all the devastation the 2015 Refugio Oil Spill inflicted—and considering both the pipelines' continuing vulnerability to corrosion and Sable's unilateral decision to start producing oil despite not having an operational pipeline—the Court should preserve the *status quo* and preclude the pipelines from prematurely restarting ten years after the catastrophic spill until this case is decided on the merits.

**ARGUMENT**

**I.    An Administrative Stay Can Issue**

Section 1094.5 applies in this case, where Cal Fire was required to hold a hearing and take evidence prior to issuing the State Waivers. (*See infra* at § III(B)(1).) Issuance of a stay protects the public interest in protecting irreplaceable resources and public safety. (*See* Petitioners' *Ex Parte* App. at pp. 13–19.)

**II.    Plaintiffs Have Established Imminent, Irreparable Harm**

**A.    The Consent Decree Requires Compliance With All Relevant Laws Prior to Restart**

Sable's contention that the Consent Decree precludes Petitioners from asserting they will be irreparably harmed by the Project (Sable Opp. at 18) is flatly contradicted by the Decree itself, which settled certain state and federal parties' claims related to the 2015 rupture and did not predetermine whether the pipelines could or would restart, be abandoned, or be replaced. And it certainly did not absolve anyone from compliance with all relevant laws in their pursuit of any one of these pathways.

As paragraph 78 explicitly states:

> State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of … Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

(Dintzer Decl., Exh. 3, p. 60.) Paragraph 79 explains that it does not "limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law." (*Id.* at p. 61.)

**B.       The Requested Relief Is Not "Unripe" While the Restart Plans Are Under Review**

Sable illogically argues that preliminary relief is somehow both "too early" and "too late" because Cal Fire has not approved the restart plans and Sable completed its construction work. (Sable Opp. at 7, 19.) As noted by Petitioner's and conceded by Cal Fire, the State Waivers are a fundamental pre-requisite for *restarting and operating* these pipelines in the absence of effective cathodic protection and ongoing corrosion—without them, operating the pipelines is unlawful. (Petitioners' *Ex Parte* App. at p. 12; Teel Decl. I, Exh. 6, p. 78; Cal Fire Opp. at p. 12) Sable's continued contention that Petitioners' claims are moot (Sable Opp. at 10) or that relief is unripe is based on a fundamental misunderstanding–this is not about construction work, but about Sable's *resumption* of the pipelines *operation* using the Waivers.

The time for requesting injunctive relief is *before* the project is "nearly completed" to ensure effective relief is still available. (*Parkford Owners for a Better Community v. County of Placer* (2020) 54 Cal.App.5th 714, 725.) Waiting until Cal Fire approved Sable's restart plans, which are submitted (Sable Opp. at 9) and "Under Review," (Teel Decl. II, Exhs. 1, 2), would mean Sable likely would have immediately restarted the pipelines. In fact, just after the Court granted the Temporary Restraining Order, Sable announced it was "targeting August 1, 2025 for first sales due to this delay." (*Id*. at Exh. 3, p. 28). Likewise, had Petitioners waited, it would have been significantly more difficult to obtain relief due to the intensive process of shutting in the pipelines and connected facilities. (*Id*. at Exh. 4, p. 49.)

**C.       The Harm to Petitioners from Restart Is Real**

Sable's assertion that harm is "purely speculative" (Sable Opp. at 19) is neither accurate nor legally sound. Courts have made clear that movants need not "wait until they have suffered actual harm before they apply for an injunction, but may seek injunctive relief against the threatened infringement of their rights" (*Costa Mesa City Employees Assn. v. City of Costa Mesa* (2012) 209 Cal.App.4th 298, 305 (citations omitted).) Here, Petitioners have suffered harm from the lack of public process and informed decisionmaking as the State Waivers were issued behind closed doors without any public notice, comment, hearing, or environmental review. (*Tulare Lake Canal Co. v. Stratford Public Utility Dist.* (2023) 92 Cal.App.5th 380, 409 ["T]he lack of information about the proposed pipeline's construction activity and operational activity. . . establishes the public interest in a public agency making an informed

decision was harmed"].) Such harm alone warrants the requested relief. (*Id*. at p. 414 ["[H]arm to the public from a failure to comply with CEQA's information disclosure provisions [need not] be accompanied by a showing of a likely environmental harm before a preliminary injunction may be issued"].)

Moreover, the fact that these very pipelines have already ruptured catastrophically once and would now operate without effective cathodic protection and without the normally required remediation of corrosion "of or along a longitudinal seam weld," (49 C.F.R. § 195.452(h)(4)(iii)(H); Teel Decl. I, Exs. 8–9) cannot possibly render the risk of another oil spill "speculative." Indeed, even Sable acknowledges that there are oil spill risks associated with the Project because, for example, the 1985 EIR found that oil spill-related impacts are unavoidable. (Sable Opp. at 17.) Sable cannot on the one hand acknowledge that oil spills from the pipelines are inherent risks, which have escaped environmental review for 40 years even after a catastrophic spill and contend on the other hand that "the Pipelines can be operated at a minimal risk to the environment." (Sable Opp. at 20.)

While old EIR includes an estimate of an 8,370-barrel spill (Sable Opp. at 17), that was not the estimated potential spill volume *along the coast*, which was a significantly lower volume (1,753 barrels). (Leininger Dec, Exh. C at 4–121.) The lower estimate is attributable, in part, to the agencies' fundamental mistaken belief about the pipelines' design integrity, underscoring the need for new review.

As detailed in PHMSA's Failure Report, this pipeline is fundamentally flawed. (Teel Decl. I, Exh. 5.) And as pipeline expert Richard Kuprewicz explained in two reports he prepared, which Petitioners submitted to Cal Fire (Teel Decl. I, Exs. 10–11; Teel Decl. II, Exhs. 5–6), the Pipeline System is unusually dangerous given its inherent design flaws and is at particularly high risk of spilling again. (Petitioners' *Ex Parte* App. at 15.) Notably, Cal Fire does not present any evidence or argument refuting Mr. Kuprewicz's findings. Sable, however, submitted a declaration from Michael J. Rosenfeld, asserting, *inter alia*, that Mr. Kuprewicz failed to consider certain mitigating factors such as the State Waivers' conditions. Not so. (Kuprewicz Decl., at ¶ 8, 10.) Mr. Rosenfeld's declaration also appears to base his opinion, at least in part, on issues related to the pipelines' previous owner and operator. (Rosenfeld Decl., at ¶ 4.) However, since Sable is a newly formed company with no track record of its own, it is premature to assume it will not have any implementation challenges or errors.

Although Mr. Kuprewicz's urgent health issues prevent him from rebutting Sable's expert declarations, he is a well-recognized pipeline safety expert with decades of experience who serves on the Technical Hazardous Liquid Pipeline Safety Standards Committee (49 U.S.C. § 60115), whose members are appointed by the U.S. Secretary of Transportation and advise Congress on pipeline safety matters. (Teel Decl. II, Exh. 7, p. 215; Kuprewicz Decl., ¶ 2.) Ultimately, as Sable recognizes, it is up to courts to "evaluat[e] the credibility of witnesses and make factual findings on disputed evidence." (Sable Mtn. to Strike at 19 [citing *Fleishman v. Superior Court* (2002) 102 Cal.App.4th 350, 356].)

Petitioners have also demonstrated that restarting the SYU using the 30+ year old, corrosion prone, already-failed and flawed pipelines absent thorough review of impacts, mitigation measures, and alternatives will result in other quantifiable harms. For instance, restarting the SYU will have significant greenhouse gas impacts, which have never been analyzed under CEQA. (Petitioners' *Ex Parte* App. at 18.) Also, the Waivers' requirement of extensive digs and excavations will result in significant unassessed air pollution, noise, aesthetic, and cultural, water, and biological resource impacts. (*Id*.)

**D.      Any Alleged Harm to Cal Fire and Sable is of Their Own Making**

The *status quo* is non-operational pipelines, and any alleged harm to Sable is of its own making. On May 15, 2025, Sable began producing and transporting oil to two onshore storage tanks even though it had not yet obtained all requisite approvals to restart the pipelines. (Petitioners' *Ex Parte* App. at 18.) Sable has repeatedly warned its investors that restart delays or even ultimate denial of approvals is possible. (*Id*. at 19.) To the extent that Sable may now run out of storage capacity, it has only itself to blame.

Additionally, any alleged harm to Cal Fire is unconvincing. "[A] party suffers no grave or irreparable harm by being prohibited from violating the law." (*People v. Uber Technologies, Inc.* (2020) 56 Cal.App.5th 266, 306.) As the agency issued the Waivers in violation of CEQA and pipeline safety laws, staying them or enjoining Cal Fire and Sable from acting upon them is not irreparable harm. Sable's claim the public will suffer harm by virtue of the relief causing increased reliance on foreign oil (Sable Opp. at 20–21) is unpersuasive and inconsistent with statistical analysis of the 2015 pause and an economic analysis of costs compared to major suppliers of crude oil. (Mahdavi Decl., ¶ 6.) Rather, it is restarting the SYU that will have significant greenhouse gas impacts (*id*.) and pose a continuing threat of

Petitioners' Combined Reply ISO Administrative Stay or Preliminary Injunction

another oil spill, inflicting unacceptable (and expensive) consequences. (Petitioners' *Ex Parte* App. at 15–16.)

### III.  Petitioners Are Likely to Succeed on the Merits

Under the balancing test for preliminary injunctions, Petitioners' establishment of concrete harm from the Project lowers the burden on the likelihood of success on the merits prong. (*See Butt v. State of California* (1992) 4 Cal.4th 668, 677–78.) Nevertheless, Petitioners are likely to succeed on the merits.

### A.  Respondents Violated the California Environmental Quality Act (CEQA)

#### 1.  CEQA Applies to the Project

The State Waivers squarely trigger CEQA as they indisputably have the potential to cause direct or indirect physical changes, such as water and air pollution and damage to wildlife habitat. The Waivers are fundamental pre-requisites for restarting the defective pipelines, which have a high likelihood of future spills. The Waivers also require actions whose impacts have not been analyzed or mitigated, including 190 or more verification digs and excavations over the next ten years (Petitioners' *Ex Parte* App. at pp. 12, 22). The notion that the State Waivers do not have the potential to cause physical changes is simply wrong.

Similarly, the Oppositions mischaracterize the State Waivers by arguing they are ministerial. A project is discretionary when the "agency can use its subjective judgment to decide whether and how to carry out or approve a project." (Cal. Code Regs., tit. 14, § 15357 (CEQA Guidelines).) Cal Fire exercised significant discretion and "subjective judgement" here in deciding whether and how to grant the Waivers. Neither the statutory authority for the Waivers nor the Consent Decree, which laid out three possibilities (abandonment, replacement, or restart), compel Cal Fire in any way to grant Waivers. The two cases Sable cites for the proposition that the conditions Cal Fire imposed are ministerial are readily distinguishable because this is no "run of the mill" permit. Cal Fire can approve or disapprove the Waivers, must use its subjective judgment, and can (and did) condition its approval. (Sable Opp. at 16.)

Finally, Sable contends that the State Waivers are not subject to CEQA because Cal Fire acted under delegated federal authority. The case they cite, *City of Morgan Hill v. Bay Area Air Quality Management Dist.* (2004) 118 Cal.App.4th 861 (Sable Opp. at 14–15) is inapplicable. That case involved certain provisions of the Clean Air Act, under which the "permits are considered

Petitioners' Combined Reply ISO Administrative Stay or Preliminary Injunction

[Environmental Protection Agency]-issued permits." (*In re Knauf Fiber Glass, GmbH* (1999), 8 E.A.D. 121, 123[1].) Here, Cal Fire issued *State* Waivers pursuant to its vested "exclusive safety[,] regulatory and enforcement authority over intrastate hazardous liquid pipelines." (Gov. Code, § 51010; *see also* Teel Decl. II, Exh. 8, p. 218 [the pipelines are "intrastate hazardous liquid pipelines subject to the regulatory and enforcement jurisdiction of [Cal Fire]"].) Additionally, the project in *Morgan Hill* fell under a certified regulatory program for which an environmental analysis document was prepared. (*Morgan Hill,* at 875.) This Project falls under no such program and lacks an environmental review document.

### 2.    No CEQA Exemption Applies

The Oppositions wrongly contend the State Waivers are exempt from CEQA. Cal Fire never filed a Notice of Exemption (CEQA Guidelines, § 15062) and its contention is at odds with the well-established principle that exemptions are reserved for projects that unquestionably have no significant impacts. (*See Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098, 1107 ["If a project may have a significant effect on the environment, CEQA review must occur"]; *see also Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1103 [If there is "a 'mere fair argument' that the project will have significant environmental effects, the agency may not apply a categorical exemption"].) The plain language of the exceptions to exemptions confirms that "[a] categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances," as is the case here where the pipelines are flawed and have already ruptured. (CEQA Guidelines, § 15300.2(c).) The grave risks posed by restart of these failed pipelines renders any categorical exemption inapplicable.

While this should end the categorical exemption inquiry, the invoked categorical exemptions are inapplicable for additional reasons. Cal Fire invokes CEQA Guidelines section 15301, (the Class 1 exemption for existing facilities), which applies to "the operation, repair, maintenance, permitting, … or minor alteration of existing public … structures, facilities, … involving negligible or no expansion of existing or former use." This exemption does not apply here for the reasons provided above and because the Project involves an *expansion* of use and capacity. (*See Save Our Carmel River v. Monterey*

---

[1] Permits issued pursuant to the Clean Air Act are statutorily exempt from the federal environmental review requirements (15 U.S.C. § 793(c)(1)), unlike special permits or waivers, *see infra* at § III(B)(1).

Petitioners' Combined Reply ISO Administrative Stay or Preliminary Injunction

*Peninsula Water Management Dist*. (2006) 141 Cal.App.4th 677, 697 ["[I]n all but the clearest cases of categorical exemptions, a project will be subject to some level of [CEQA] review"].)

To begin with, the pipelines have been non-operational for over ten years following a catastrophic rupture. Further, the SYU Development and Production Plan (DPP) EIS/EIR estimated recovery of the SYU's oil would occur "over a period of 25 to 35 years." (Teel Decl. II, Exh. 9, p. 223.) As first production from the Unit began in 1981, production should have ceased by 2016. Moreover, the DPP also stated that the operator "estimates that primary recovery by the proposed development will amount to approximately 300 to 400 million barrels … of crude oil." (*Id*.) However, the U.S. Bureau of Safety and Environmental Enforcement reports that Sable's predecessor already produced over 507.4 million barrels from the SYU, well beyond what was anticipated. (*See* Teel Decl. II, Exh. 10, pp. 225–27.) And in 2010, the previous operator drilled the "World's longest extended-reach well from an existing offshore fixed platform," increasing its ability to produce more oil. (Teel Decl. II, Exh. 11, p.231.)  Sable has also publicly stated that there are ">100 identified infill drilling and step-out opportunities" (Teel Decl. I, Exh. 1, p. 20) and 646 million barrels of oil left to extract over the 671 million barrels it indicates were produced from 112 wells between 1981 to 2014. (*Id*., p. 21–22.) Thus, the overall level of production associated with the Project, and associated impacts, is significantly larger than ever analyzed.

Sable also expects to "install[ ] new pump stations" and "construct[ ] multiple new control facilities." (Teel Decl. II, Exh. 12, p. 235.) Plus, the Project involves a transfer of ownership from ExxonMobil to Sable. (Petitioners' *Ex Parte* App. at 11.) The Project's expansion of production and infrastructure, along with its ownership change is not negligible or no expansion of use.[2] (*See County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 967 [exemption inapplicable where "ownership was transferred *and* the focus of the project's operation was [expanded]"].)

### 3.    The EIR Did Not Analyze the Project and Subsequent Review Is Required

The Oppositions also incorrectly argue that no CEQA review was required because the 1985

---

[2] For similar reasons, CEQA Guidelines section 15302, is inapplicable because exceptions apply and the Project does not involve "substantially the same production capacity". (*Save Our Carmel, supra,* 141 Cal.App.4th at 698.)

Petitioners' Combined Reply ISO Administrative Stay or Preliminary Injunction

EIR[3] analyzed the harms at issue. (Cal Fire Opp. at p. 14–15; Sable Opp. at pp. 16–17.) The dated EIR did not ever contemplate or analyze a post-catastrophic spill restart Project, necessitating new environmental review. (*See Martis Camp Community Ass'n v County of Placer* (2020) 53 CA5th 569, 606 n26 [subsequent review is "not apply if the agency has proposed a new project not previously analyzed in the original environmental document"].) Even if it did, Cal Fire was required, *at a minimum*, to conduct subsequent review due to new information indicating more severe significant impacts, substantial changes to the project, and circumstances requiring major EIR revisions. (CEQA Guidelines, § 15162.)

In arguing that the 1985 EIR's conclusion that oil spills risks were significant and unavoidable, Sable and Cal Fire overlook that the EIR's analysis, mitigation measures, alternatives, and ultimate findings were based on a fundamentally flawed understanding of the pipeline's integrity.[4] Specifically, the EIR based its analysis on the fact that the "pipeline used for analysis in this EIR/EIS would have the following specifications … [t]he entire pipeline would be protected from corrosion with cathodic protection systems." (Teel Decl. II, Exh. 13, p. 239), thus ensuring that it "should not experience the corrosion problems" that cause most spills. (Leininger Decl., Exh. C, p. 4–414.) However, Cal Fire admitted, the 2015 spill "exposed that the system did not work as intended due to certain features of the pipelines and their insulation systems." (Cal Fire Opp. at 6.) Sable's expert also notes the design of the pipelines "defeats the effectiveness of the cathodic protection system." (Rosenfeld Decl., Exh. G, p. 6.)

Such new information has significant implications as it may have drastically altered the course of the EIR's analysis, mitigation measures, and alternatives. To provide just one example, the State Lands Commission's proposed mitigation measure "to improve or replace pipeline segments as they age and deteriorate" may not have been rejected based on the now known inaccurate belief that the pipelines were "much safer than their predecessors." (Teel Decl. II, Exh. 14, p. 246)

What's more, the projected lifespan and production estimates for the SYU have now been exceeded. (Teel Decl. II, Exhs. 9–13.) Thus, there are substantial changes to the 1980s project and

---

[3] A finalizing addendum clarified that the Draft EIR combined with that finalizing addendum is the Final EIR for the proposed pipeline projects (Teel Decl. II, Exh. 14).

[4] That the EIR did not require a particular form of cathodic protection is irrelevant. (Cal Fire Opp. at 14.)

Petitioners' Combined Reply ISO Administrative Stay or Preliminary Injunction

circumstances requiring major EIR revisions. Even if no new CEQA analysis was required for this Project, Cal Fire must, at a minimum, conduct subsequent review.

### B.    Respondents Violated Pipeline Safety Laws

#### 1.    Petitioners Can Bring Its Claims, Including Public Notice and Hearing Violations

The Oppositions rely on *City and County of San Francisco v. U.S. Department of Transportation* (9th Cir. 2015) 796 F.3d 993 in arguing that Petitioners cannot pursue a writ of mandate to compel Cal Fire to comply with its duties under the Pipeline Safety Act. (Sable Opp. at 12; Cal Fire Opp. at pp. 16–17.) There, where a state agency had "assumed jurisdiction to regulate and enforce" the Act (*id.* at 996), the court held the Act's citizen suit provision does not allow mandamus type actions against [PHMSA] in its capacity as regulator." (*Id.* at 998.) Here, in contrast, Petitioners are neither suing PHMSA for its non-objection to the State Waivers nor bringing an action pursuant to 49 U.S.C. section 60121. Rather, Petitioners are suing a *state* agency under state law for its issuance of *State* Waivers without following the discrete mandates of both state and federal pipeline safety laws under.

The Oppositions then unavailingly contend Cal Fire was not required to provide public "notice and an opportunity for a hearing" under 49 U.S.C. § 60118(c) because such duty applies only to the applicant. (Sable Opp. at 13; Cal Fire Opp. at p. 16.) When interpreting statutory language, courts must read the words "in their context and with a view to their place in the overall statutory scheme." (*King v. Burwell* (2015) 576 U.S. 473, 475.) Here, both the section's context and the Act's overall statutory scheme support the conclusion that the duties are public requirements. For instance, section 60118(c)(2)(A) allows waiver of that "prior notice and comment" in emergency situations. The inclusion of "comment" indicates that the duty is a public requirement since it would defy logic to allow the applicant to comment on its own application, let alone to be given notice of its application. Moreover, contrary to Sable's assertion, section 60117 notes that hearings shall be "open" and "noticed to the public." (49 U.S.C. § 60118(B)(2)–(3)). PHMSA's own website even provides that it "is committed to public involvement and transparency in [waiver] proceedings." (Teel Decl. II, Exh. 15, p. 248.)

Cal Fire erroneously implies it provided public notice on www.regulations.gov (Cal Fire Opp. at 17). However, PHMSA created that scant federal non-rulemaking docket (*see* Teel Decl. II, Exh. 16, pp.

10

252-53) only after Petitioners sought copies of the Waivers and Waiver applications from PHMSA since Cal Fire had not provided them to the public. Cal Fire also did not provide the public with an opportunity to comment on or be heard prior to granting the Waivers. Such lack of public involvement and transparency cannot be said to be "harmless." (Sable Opp. at 13; *see also* Cal Fire Opp. at p. 19.). Finally, Cal Fire can only issue State Some Waivers "in the same way and to the same extent" that PHMSA issues waivers, or special permits. (49 U.S.C. § 60118(d).) As PHMSA must conduct environmental reviews before issuing waivers, so too must Cal Fire. (*See, e.g.* Teel Decl. II, Exh. 17, at p. 314 [PHMSA's special permits are "major Federal actions that are subject to NEPA review"].)

### 2.      Cal Fire Failed to Satisfy its Other Pipeline Safety Requirements

The Oppositions' remaining arguments fare no better. Cal Fire contends that the State Waivers contain the requisite discussion of significant factors and statement of reasons, because it "discussed the background and process of Sable's application and the applicable regulations before enumerating the conditions in each of the two Waivers." (Cal Fire Opp. at pp. 17–18.) But a recitation of the application history and applicable regulations is no substitute for a meaningful discussion of the Project's significant factors or statement of reasons for its approval. (Petitioners' *Ex Parte* App. at 20.) Even Cal Fire admits it had "a requirement to make findings," which it failed to formally do. (Cal Fire Opp. at p. 18.)

Moreover, Sable and Cal Fire fail to establish that the State Waivers are "not inconsistent with pipeline safety" and that the "risk to public safety is slight and the probability of injury or damage remote." (49 U.S.C. § 60118(c)(1)(A); Gov. Code § 51011(b).) They instead either blanketly assert such standards are satisfied (Sable Opp. at 14) or tout the mere number of conditions, with no explanation for how they supplant a functioning cathodic protection system and seam corrosion remediation or the environmental and safety impacts of operating are relying on such measures. (Cal Fire Opp. at p. 6.)

### CONCLUSION

The Court should issue an administrative stay of the State Waivers or a preliminary injunction prohibiting Cal Fire from approving restart plans and Sable from restarting the pipelines pending a judgment on the merits. As with the TRO, no bond should issue as none is required for a stay, and further Sable has no history of revenue with this or any other project, and these pipelines have been non-operational for ten years.

Dated: July 11, 2025                              Respectfully submitted,

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for*
*Biological Diversity and Wishtoyo Foundation*

Petitioners' Combined Reply ISO Administrative Stay or Preliminary Injunction

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2025 7:46 PM
By: Terri Chavez , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**
**SOUTH COUNTY REGION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br><br>**SECOND DECLARATION OF JULIE TEEL SIMMONDS RE: PETITIONERS' COMBINED REPLY IN SUPPORT OF APPLICATION FOR AN ADMINISTRATIVE STAY OR PRELIMINARY INJUNCTION**<br><br>[Filed Concurrently with Petitioners' Combined Reply, Second Request for Judicial Notice, Declaration of Paasha Mahdavi, Responses to Objections, and Evidentiary Objections]<br><br>Date: July 18, 2025<br>Time: 10:00 a.m.<br>Dept: 4<br>Judge: Hon. Donna D. Geck<br><br>[Action Filed: April 15, 2025] |

1

SECOND DECLARATION OF JULIE TEEL SIMMONDS

I, Julie Teel Simmonds, hereby declare as follows:

1.      I am at attorney at law admitted to practice before the courts of the State of California and am an attorney of record for Petitioners Center for Biological Diversity and Wishtoyo Foundation in the above-captioned case. I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify to them. I submit this declaration in support of Petitioners' concurrently filed Reply in Support of Administrative Stay or Preliminary Injunction.

2.      Attached as Exhibit 1 is a true and correct copy of Sable Offshore Corp.'s (Sable) Restart Plan for CA-324, which I obtained on July 7, 2025, from this Office of the State Fire Marshal (Cal Fire) webpage: https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

3.      Attached as Exhibit 2 is a true and correct copy of Sable's Restart Plan for CA-324, which I obtained on July 7, 2025, from this Cal Fire webpage: https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

4.      Attached as Exhibit 3 is a true and correct copy of Sable's June 3, 2025, Form 8-K filed with the U.S. Securities and Exchange Commission (SEC), which I obtained on July 7 2025, from this SEC webpage:
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000183148125000045/socc-20250603.htm.

5.      Attached as Exhibit 4 is a true and correct copy of excerpts of from a Mitigated Negative Declaration, *ExxonMobil Santa Ynez Unit (SYU) Offshore Power System Reliability – B Phase 2 Project* (July 2014), which I obtained on July 8, 2025, from this California State Lands Commission webpage: https://www.slc.ca.gov/ceqa/exxonmobil-santa-ynez/.

6.      Attached as Exhibit 5 is a true and correct copy of a letter (with attachments) that I sent to the Pipeline and Hazardous Materials Safety Administration (PHMSA) and Cal Fire on December 23, 2024, which included a copy of Accufacts Inc.'s first report on the proposed pipeline startup.

7.      Attached as Exhibit 6 is a true and correct copy of a letter (with attachments) that I sent to Cal Fire on March 2, 2025, requesting revocation of the State Waivers for Pipelines CA-324 and CA-

2

325, which included a copy of Accufacts Inc.'s second report on the proposed pipeline startup.

8.	Attached as Exhibit 7 is a true and correct copy of PHMSA's Liquid Pipeline Advisory Committee (LPAC) Roster and Biographies webpage (last updated Jan. 15, 2025), which I obtained on July 9, 2025, from this PHMSA webpage: https://www.phmsa.dot.gov/standards-rulemaking/pipeline/liquid-pipeline-advisory-committee-lpac-committee-roster-and.

9.	Attached as Exhibit 8 is a true and correct copy of a May 18, 2016, letter from PHMSA to the State Fire Marshal to "memorialize the understanding" between them about the transfer of oversight over Lines 901 and 903, which I obtained on July 9, 2025, from this PHMSA webpage: https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA-CSFM-MOU-Plains-line901-903.pdf.

10.	Attached as Exhibit 9 is a true and correct copy of excerpts of the June 1984 Final Environmental Impact Statement/Report for Santa Ynez Unit/Las Flores Canyon Development and Production Plan proposed by Exxon Company, U.S.A., which I obtained on July 9, 2025, from this Santa Barbara County webpage, https://cosantabarbara.app.box.com/s/p07x4k8ah41vmggyvm6qr2f7eqwvgwu1/file/1857841062039.

11.	Attached as Exhibit 10 is a true and correct copy of the U.S. Department of the Interior Bureau of Safety and Environmental Enforcement (BSEE) webpage for Sable Offshore Corp. listing information about the "Platforms Operated by Sable Offshore Corp.," which I obtained on July 9, 2025, from this BSEE webpage https://www.bsee.gov/stats-facts/ocs-regions/pacific/pacific-ocs-platforms/exxonmobil.

12.	Attached as Exhibit 11 is a true and correct copy of an April 16, 2010, ExxonMobil press release, *ExxonMobil Sets Drilling Records*, which I obtained on July 9, 2025, from this ExxonMobil webpage https://investor.exxonmobil.com/company-information/press-releases/detail/863/exxonmobil-sets-drilling-records.

13.	Attached as Exhibit 12 is a true and correct copy of Sable's July 10, 2024, Form 8-K filed with the U.S. Securities and Exchange Commission (SEC), which  I obtained on July 7 2025, from this SEC webpage: https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000119312524177531/d675159d8k.htm.

SECOND DECLARATION OF JULIE TEEL SIMMONDS

14. Attached as Exhibit 13 is a true and correct copy of excerpts from the Draft Environmental Impact Report/Environmental Impact Statement (August 1984) for the Proposed Celeron/All American and Getty Pipeline Projects, which I obtained on July 9, 2025, from this County of Santa Barbara webpage:

https://cosantabarbara.app.box.com/s/p07x4k8ah41vmggyvm6qr2f7eqwvgwu1/folder/320507419062.

15. Attached as Exhibit 14 is a true and correct copy of excerpts from the Final Environmental Impact Report/Environmental Impact Statement for the Proposed Celeron/All American and Getty Pipeline Projects (January 1985), which I obtained on July 9, 2025, from this County of Santa Barbara webpage:

https://cosantabarbara.app.box.com/s/p07x4k8ah41vmggyvm6qr2f7eqwvgwu1/folder/320507419062.

16. Attached as Exhibit 15 is a true and correct copy of the PHMSA "Pipeline Special Permits and State Waivers Overview" webpage, which I obtained on July 7, 2025, from this PHMSA webpage: https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

17. Attached as Exhibit 16 is a true and correct copy of a letter I received from PHMSA on January 17, 2025, in response to my December 23, 2024, correspondence.

18. Attached as Exhibit 17 is a true and correct copy of the U.S. Department of Transportation (DOT) Procedures for Considering Environmental Impacts (July 1, 2025), DOT Order 5610.1D, which I obtained on July 10, 2025, from this DOT webpage: https://www.transportation.gov/sites/dot.gov/files/2025-07/DOT_Order_5610.1D_OST-P-250627-001_508_Compliant.pdf.

I declare under penalty of perjury under the laws of the State of California that the foregoing declaration is true and correct to the best of my knowledge.

Executed this 10th day of July, 2025, in Boulder, Colorado.

s/ *Julie Teel Simmonds*
JULIE TEEL SIMMONDS (Bar No. 208282)
CENTER FOR BIOLOGICAL DIVERSITY
*Attorney for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

4

SECOND DECLARATION OF JULIE TEEL SIMMONDS

# INDEX OF EXHIBITS

## Second Declaration of Julie Teel Simmonds

| Exhibit No. | Description | Starting Page No. |
|---|---|---|
| Exhibit 1 | OSFM Line ID No. 0015<br>Line 324 (Las Flores to Gaviota 24")<br>Restart Plan | 7 |
| Exhibit 2 | OSFM Line ID No. 0001<br>Line 325 (Gaviota to Sisquoc 30" and Sisquoc to Pentland 30")<br>Restart Plan | 16 |
| Exhibit 3 | Sable Offshore Corp. Form 8-K (June 3, 2025) | 25 |
| Exhibit 4 | Mitigated Negative Declaration<br>ExxonMobile Santa Ynez Unit (SYU)<br>Offshore Power System Reliability – B Phase 2 Project<br>(July 2014) (Excerpts) | 30 |
| Exhibit 5 | Letter, CBD to PHMSA and Office of the State Fire Marshal<br>(Dec. 23, 2024) | 56 |
| Exhibit 6 | Letter, CBD to Office of the State Fire Marshal (Mar. 2, 2025) | 126 |
| Exhibit 7 | Liquid Pipeline Advisory Committee (LPAC)<br>Committee Roster and Biographies (last updated Jan. 15, 2025) | 213 |
| Exhibit 8 | Letter, PHMSA to Office of the State Fire Marshal<br>(May 18, 2016) | 217 |
| Exhibit 9 | Final Environmental Impact Statement/Report for Santa Ynez Unit/Las Flores Canyon Development and Production Plan<br>(June 1984) | 221 |

| Exhibit 10 | BSEE – Platforms Operated by Sable Offshore Corp. (undated) | 224 |
|---|---|---|
| Exhibit 11 | Press Release, ExxonMobil Sets Drilling Records (Apr. 16, 2010) | 229 |
| Exhibit 12 | Sable Offshore Corp. Form 8-K (July 10, 2024) | 233 |
| Exhibit 13 | Draft EIR/EIS Proposed Celeron/All American and Getty Pipeline Projects (August 1984) (EXCERPTS) | 237 |
| Exhibit 14 | Final EIR/EIS Proposed Celeron/All American and Getty Pipeline Projects (January 1985) (EXCERPTS) | 243 |
| Exhibit 15 | PHMSA, Pipeline Special Permits and State Waivers Overview (last updated June 30, 2025) | 247 |
| Exhibit 16 | Letter, PHMSA to CBD (Jan. 17, 2025) | 251 |
| Exhibit 17 | U.S. Department of Transportation, Procedures for Considering Environmental Impacts – DOT Order 5610.1D (July 1, 2025), | 254 |

# Exhibit 1

Second Declaration of Julie Teel Simmonds

**OSFM LINE ID NO. 0015**
**LINE 324 (LAS FLORES TO GAVIOTA 24")**
**RESTART PLAN**


## 1    Introduction

The following plan is intended to comply with the portions of Sections IX. (Injunctive Relief) and X. (Corrective Action Order) of the Consent Decree (Civil Action No. 2:20-cv-02415) applicable to the restart of Line 324[1] (California Office of the State Fire Marshal [OSFM] Line ID No. 0015 – Las Flores to Gaviota 24").  Section IX of the Consent Decree refers to Appendix B, which contains three requirements specific to a restart of Line 324:

- Article I, Section 1.A. concerning the application for a California State Waiver for Line 324;
- Article I, Section 2.B. allowing for the restart of Line 324 in accordance with the Consent Decree (including Appendix D) and applicable Law; and
- Article II, Section 12.A. Listing specific Control Room Management-related actions to be taken in the event of a restart.

Section X of the Consent Decree refers to Appendix D, which contains a section (1.b.) that requires the development of a Restart Plan specifically for Line 324, lists the required contents of the Plan and stipulates that the Plan must be submitted to the California OSFM at least 60-days in advance of a planned restart of Line 324.

Pacific Pipeline Company (PPC or the Operator) has prepared this Restart Plan and it is generally organized to follow the order of requirements in Appendix D of the Consent Decree.  The requirements of the sections of Appendix B applicable to a restart are included as appropriate within the Restart Plan elements. Consent Decree provisions related to pipeline restart are included here in *italic, underlined text* for reference.

## 2    Line 324 Restart Plan

Each of the required elements of the Restart Plan for Line 324 (found in Appendix D) are addressed below.

---

[1] The consent decree references Lines 901 and 903.  These line designations have since changed to Line 324 and 325 respectively and are referenced accordingly throughout this Restart Plan.

*2.1   Mandated Action Documentation and Management of Change Plan (**Appendix D, Section 1.b.1**)*

*Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into [the Operator's] operations and maintenance procedures manual*

For the purposes of this Restart Plan, PPC understands that "mandated actions" include:

- Those actions mandated by the Consent Decree that are applicable to the existing, non-operating Line 324 that is to be restarted;

- Those actions mandated by federal and state pipeline safety laws and regulations that are applicable to the existing, non-operating Line 324 that is to be restarted; and

- Documentation of procedural modifications to comply with the Consent Decree will be addressed in the operations and maintenance  (O&M) manual and integrity management plan (IMP) to comply with the management of change requirement of the Consent Decree.

2.1.a)  *Actions Mandated by the Consent Decree*

Those actions mandated by the Consent Decree that are applicable to the existing, non-operating Line 324 that is to be restarted.  These include:

- Consent Decree, Appendix B, Article I, Section 1.A.: Apply for and obtain a State Waiver for Line 324

- Consent Decree, Appendix B, Article I, Section 2.B.: Restart existing Line 324 in accordance with Appendix D and Applicable Law.

  This Restart Plan addresses all the restart requirements included in Appendix D to the Consent Decree.

- Consent Decree, Appendix D, Section 1.b.: Restart Plan for Line 324.

  This Restart Plan was prepared to comply with this requirement and addresses the restart requirements included in Appendix D to the Consent Decree

- Consent Decree, Appendix B, Section 12.A: Control Room Management provisions prior to restart.

  This Restart Plan includes documentation that the requirements of Section 12.A have been or will be implemented prior to restart, including point-to-point verification reviews for all components of the Pipeline's SCADA system, any necessary updates to piping and instrumentation diagrams, software, manuals, and operating procedures to reflect existing field configuration, confirmation that all "Lo-Lo" and "Hi-Hi" SCADA alarms are configured and programmed as critical safety-related alarms for pressures

and flows and that such notifications are correct and accurate, updating the names of all facilities, equipment, devices, measurement points, and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions, and implementation of the Control Room Management Plan measures and Control Center General Procedures referenced in Paragraph 23(a) of the Consent Decree.  See also further discussion of Control Room enhancements in Section 2.5 of this Restart Plan.

### 2.1.b)  *Actions Mandated by Federal and State Pipeline Safety Laws*

Those actions mandated by federal and state pipeline safety laws and regulations that are applicable to the existing, non-operating Line 324 that is to be restarted will be taken.

### 2.1.c)  *Management of Change Plan*

The "management of change plan" is understood to include those mandated actions that require procedural modifications to the O&M Manual and IMP to comply with the Consent Decree.  The list of O&M procedures and IMP modifications required as a result of the Consent Decree will be provided separately.

### 2.2  *Provisions for adequate patrolling of Line 324 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours (**Appendix D, Section 1.b.2**)*

The restart of Line 324 and Line 325 will take place in phases governed by the Start-Up Instructions in the Pipeline Specific Operating Manual for Line 324 and Line 325.  During flow restart, the pipelines will be brought up to operating pressure in stages.  Each stage will be a pressure increment which will be held for a minimum of two hours before proceeding to a higher-pressure increment.  During the hold period between pressure increments, the line pressures will be monitored for any fluctuation.  Only once the pressure has remained steady for a minimum of two hours will the next pressure stage be initiated.

If at any time, there is any indication that either pipeline is not holding pressure, both will be shut in and the reason for the pressure drop investigated and corrected before continuing.  During this phase, the pressure restrictions for Line 324 and Line 325 set forth in the Consent Decree (Appendix D – 1.c. and 1.g.) will be followed.

A more detailed Surveillance Plan for the restart of Line 324 will be provided.

### 2.3  *Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes (**Appendix D, Section 1.b.3**)*

The specific actions planned for pipeline surveillance during the restart of Line 324 will be provided in the Surveillance Plan for the restart of Line 324.

*2.4*   *A specific day-light restart that includes advance communications with local emergency response officials (**Appendix D, Section 1.b.4**)*

Phased restart of Lines 324 and 325 will be initiated during daylight hours  and advance communications and as well as communications during the restart effort will be coordinated with local emergency response officials.  These communications and the list of local agencies that will be contacted are more completely described in the Surveillance Plan.

*2.5*   *Master Control Room enhancements (**Appendix D, Section 1.b.5**)*

Section 1.b.5 of Appendix D to the Consent Decree lists six Master Control Room Enhancements that must be completed and documented prior to restart.  The following is a list of those enhancements and the actions taken and documentation demonstrating compliance.

2.5.a)   *Implementation of advanced leak-detection capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:*

*2.5.a)1. Revised alarm threshold adjustments*

Prior to restart, PPC will complete installation of addition of pressure and temperature monitoring instrumentation, additional flow measurement meters, and implementation of a Real Time Transient Model (RTTM)-based Computational Pipeline Monitoring (CPM) system along with an automated shutoff system (ASOS) for leak detection and response.  The instrumentation along with the RTTM leak detection and ASOS systems will be installed prior to restart.  Alarm thresholds for the RTTM leak detection system will be determined using API TR 1149 and will be implemented prior to initiating the restart of Line 324.  The alarm thresholds will be revised using operational data after resumption of pipeline operations.  These efforts are further enhanced by the installation of a new flow meter (tied into SCADA) at the termination of the pipeline segment at Gaviota Station which along with the existing flow meter at Las Flores Station provides comparative data at each end of the Las Flores and Gaviota pipeline segment.

*2.5.a)2. Additional required instrumentation; installation of additional safety valves as a result of the 2021 EFRD evaluation*

PPC will install seven (7) new "safety" valves along Line 324.  The number, type, function, and locations of these safety valves were determined by an Emergency Flow Restricting Device (EFRD) evaluation in compliance with the Consent Decree.  PPC has so far, despite substantial efforts, been unable to obtain the land use authorizations from Santa Barbara County to install additional valves in the county.  PPC's efforts to obtain such authorizations continue, and PPC will install the valves as soon as practicable once necessary authorizations are obtained.  It is possible that authorizations may occur after restart, in which case, PPC will schedule valve installation on a reasonable timeline and in safe coordination with other ongoing operations and maintenance activities.

2.5.b) *Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;*

Prior to restart, offline hydraulic models of the pipeline will be used to configure alarm setpoints for pressures and flow transmitters at all locations along the pipeline.  Operational data will be used to tune these setpoints after resumption of pipeline operations.  All alarm setpoints will be validated and approved by a pipeline integrity engineer and control room manager prior to implementation.

2.5.c) *Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories*

All associated alarm set point values, alarm descriptors and alarm priorities will be reviewed during the alarm rationalization process.  Additionally, all Safety Related Alarm (SRA) setpoints will be validated and approved by a pipeline integrity engineer and control room manager prior to implementation.

2.5.d) *Implementation of emergency shutdown programming associated with Line 324 that can be executed by the Shift Supervisor or Controller*

An automated shut off system (ASOS) that will initiate a shutdown sequence on the pipeline segment, automatically upon receipt of a rupture alarm, without Operator action will be installed to safely shut down and isolate Line 324 in response to identified alarm criteria.  This will specifically include a rupture alarm from either the installed RTTM CPM system in the Pipeline Control Center or other rupture detection systems deployed on the pipeline, without Operator action.  The ASOS will consist of a sequence programmed in the SCADA system that will first automatically de-energize the pumping equipment and then close the remotely actuated valves to isolate the pipeline in response to a rupture alarm.  The sequence will also be available for activation by the pipeline controller or shift supervisor to rapidly shut down the system any time the controller or shift supervisor questions the integrity of the pipeline.

2.5.e) *Development and implementation of training associated with the emergency shutdown programming described above; and*

The ASOS training curriculum shall include the following: System Design & Operation; Alarm Response, including emergency notifications; Returning to Normal Operations; Drills & Testing.

2.5.f)    *Provision of additional controller training that incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident*

Training procedures for the proper interpretation of operating parameters and alarms, abnormal operations scenarios, and consequences for incorrect operation for Line 324, including alarm set-point revisions for conditions similar to the Refugio Incident will be followed.

*2.6    Elimination and documentation of actions taken to prevent inappropriate un-commanded Valve 460 (Sisquoc Conoco) status and position changes (**Appendix D, Section 1.b.6**)*

This provision of the Consent Decree is not applicable to the Line 324 Restart Plan as Valve 460 (Sisquoc Conoco) is located at Sisquoc Pump Station, which is not part of the Line 324 pipeline segment (Las Flores to Gaviota).  The requirements of this provision of Appendix D to the Consent Decree are addressed in the Line 325 Restart Plan, as Sisquoc Station is part of the Line 325 pipeline segment (Gaviota to Sisquoc to Pentland).

*2.7    Installation of additional safety valves as a result of the Operator's EFRD evaluation (**Appendix D, Section 1.b.7**)*

Please refer to *Section 2.5.a)2.* above for a discussion of the EFRD evaluation and the installation of additional safety valves.

*2.8    Installation of additional pressure sensors as a result of the Operator's surge study (**Appendix D, Section 1.b.8**)*

Please refer to *Section 2.5.a)1.* above for a discussion of MOVs, fitted with pressure sensors on both the upstream and downstream ends, that will be installed.

*2.9    Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. The Operator shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run (**Appendix D, Section 1.b.9**)*

After completion of the restart activities, and within seven working days after steady-state operation is achieved in Line 324, an in-line inspection (ILI) of the pipeline will be conducted utilizing an Ultrasonic Tool (UT) in accordance with an ILI schedule approved by the OSFM.  The tool run will be conducted during daylight hours.

If, upon completion of the tool run, it is discovered that the tool failed to record the required data for all or a portion of the Line 324 pipeline segment, then the ILI tool run will be repeated as soon as possible after this discovery.  Once the tool run is determined to have produced a complete data set, the tool vendor will provide a preliminary report within 30 days.  The final preliminary report will be reviewed and analyzed within 15 days of receipt.  Any immediate repairs identified by the analysis of this data report will be addressed in accordance with 49 CFR 195.452(h)(4) and the Integrity Management Plan.

2.10    *Corrosion Prevention. The Operator shall include a long-term plan to address corrosion under insulation (CUI) on Line 324 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. The Operator may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c) (**Appendix D, Section 1.b.10**)*

This provision of Appendix D to the Consent Decree requires that a Corrosion Under Insulation (CUI) Prevention Plan be prepared and included in the Restart Plan.  The CUI Prevention plan shall meet the requirements of 49 CFR Part 195 Subpart H (Corrosion Control).  The Provision allows corrosion prevention via any method approved by the OSFM, including, but not limited to the provisions contained in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, Amendment Number 3, Section 2 (a) – (c), the relevant portions of which include:

*2b.  Repair or recoat the compromised portions of Line 324;*

This is not feasible because the presence of insulation and its associated shielding limits the effectiveness of cathodic protection (CP).  Repair or recoat won't address inadequate or ineffective CP on Line 324.

*2c.  Submit a request for a special permit in advance of a schedule start-up in accordance with 49 CFR 190.341.  It must include a long-term continuous monitoring plan to address the ineffective CP under insulation.  At a minimum, the plan must contain provisions to mitigate the threat of CUI including all of the following:*

- o   *Accelerated reassessments;*
- o   *Usage of the appropriate, complementary assessment tools for all threats, including stress corrosion cracking;*
- o   *Coordination of data from the appropriate alternating ILI technologies;*
- o   *More stringent repair criteria targeted at CUI; and*
- o   *Advanced data analysis techniques to account for potential growth of CUI including interaction criteria for anomaly assessment.*

Article I, Section 1.A. requires application for a State Waiver through the OSFM for the limited effectiveness of cathodic protection and receipt of the State Waiver prior to restarting Line 324. PPC submitted an application for a state waiver on July 10, 2023. The proposed waiver criteria

will allow for identification of external metal loss and includes stringent repair criteria that requires repairs for any anomaly greater than or equal to 40%, taking into considerations ILI tool tolerance. Issuance by OSFM of a State Waiver for the limited effectiveness of cathodic protection on Line 324 will address this requirement of the Restart Plan.



# Exhibit 2

Second Declaration of Julie Teel Simmonds

**OSFM LINE ID NO. 0001**
**LINE 325 (GAVIOTA TO SISQUOC 30" AND SISQUOC TO PENTLAND 30" SEGMENTS)**
**RESTART PLAN**

## 1    Introduction

The following plan is intended to comply with the portions of Sections IX. (Injunctive Relief) and X. (Corrective Action Order) of the Consent Decree (Civil Action No. 2:20-cv-02415) applicable to the restart of Line 325 A/B[1] (California Office of the State Fire Marshal [OSFM] Line ID No. 0001 – Gaviota to Sisquoc 30" and Sisquoc to Pentland 30" segments).  Section IX. of the Consent Decree refers to Appendix B, which contains three requirements specific to a restart of Line 325:

- Article I, Section 1.B. concerning the application for a California State Waiver for Line 325;
- Article I, Section 2.B. allowing for the restart of segments of Line 325 in accordance with the Consent Decree (including Appendix D) and applicable Law; and
- Article II, Section 12.A. Listing specific Control Room Management-related actions to be taken in the event of a restart.

Section X. of the Consent Decree refers to Appendix D, which contains a section (1.f.) that requires the development of a Restart Plan specifically for Line 325, lists the required contents of the Plan and stipulates that the Plan must be submitted to the California OSFM at least 60-days in advance of a planned restart of Line 325.

Pacific Pipeline Company (PPC or the Operator) has prepared this Restart Plan and it is generally organized to follow the order of requirements in Appendix D of the Consent Decree.  The requirements of the sections of Appendix B applicable to a restart are included as appropriate within the Restart Plan elements. Consent Decree provisions related to pipeline restart are included here in *italic, underlined text* for reference.

## 2    Line 325 Restart Plan

NOTE: As stated in Appendix D, Section 1.f. (Restart Plan for Line 325), "*In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include...*"  Subparagraphs 1.b.1)-11) [sic] refer the Restart Plan for Line 324 Las Flores to Gaviota 24" (OSFM Line ID No. 0015).  For simplicity, the required elements of the Restart Plan for Line 325 that are included in subparagraphs 1.b.1)-11) [sic] are listed in order and the subparagraph citations are left intact.  The requirement provided in subparagraph 1.b.6) is associated with Line 325 and is listed in order below.

---

[1] The consent decree references Lines 901 and 903.  These line designations have since changed to Line 324 and 325 respectively and are referenced accordingly throughout this Restart Plan.

Each of the required elements of the Restart Plan for Line 325 (found in Appendix D) are addressed below.

### 2.1    Mandated Action Documentation and Management of Change Plan (**Appendix D, Section 1.b.1**)

*Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into [the Operator's] operations and maintenance procedures manual*

For the purposes of this Restart Plan, PPC understands that "mandated actions" include:

- Those actions mandated by the Consent Decree that are applicable to the existing, non-operating Line 325 that is to be restarted;

- Those actions mandated by federal and state pipeline safety laws and regulations that are applicable to the existing, non-operating Line 325 that is to be restarted; and

- Documentation of procedural modifications to comply with the Consent Decree will be addressed in the operations and maintenance (O&M) manual and integrity management plan (IMP) to comply with the management of change requirement of the Consent Decree.

### 2.1.a)    Actions Mandated by the Consent Decree

Those actions mandated by the Consent Decree that are applicable to the existing, non-operating Line 325 that is to be restarted.  These include:

- Consent Decree, Appendix B, Article I, Section 1.B.: Apply for and obtain a State Waiver for Line 325

- Consent Decree, Appendix B, Article I, Section 2.B.: Restart existing Line 325 in accordance with Appendix D and Applicable Law.

  This Restart Plan addresses all the restart requirements included in Appendix D to the Consent Decree.

- Consent Decree, Appendix D, Section 1.f.: Restart Plan for Line 325.

  This Restart Plan was prepared to comply with this requirement and addresses the restart requirements included in Appendix D to the Consent Decree

- Consent Decree, Appendix B, Section 12.A: Control Room Management provisions prior to restart.

  This Restart Plan includes documentation that the requirements of Section 12.A have been or will be implemented prior to restart, including point-to-point verification reviews for all components of the Pipeline's SCADA system, any necessary updates to

piping and instrumentation diagrams, software, manuals, and operating procedures to reflect existing field configuration, confirmation that all "Lo-Lo" and "Hi-Hi" SCADA alarms are configured and programmed as critical safety-related alarms for pressures and flows and that such notifications are correct and accurate, updating the names of all facilities, equipment, devices, measurement points, and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions, and implementation of the Control Room Management Plan measures and Control Center General Procedures referenced in Paragraph 23(a) of the Consent Decree.  See also further discussion of Control Room enhancements in Section 2.5 of this Restart Plan.

### 2.1.b)  *Actions Mandated by Federal and State Pipeline Safety Laws*

Those actions mandated by federal and state pipeline safety laws and regulations that are applicable to the existing, non-operating Line 325 that is to be restarted will be taken.

### 2.1.c)  *Management of Change Plan*

The "management of change plan" is understood to include those mandated actions that require procedural modifications to the O&M Manual and IMP to comply with the Consent Decree.  The list of O&M procedures and IMP modifications required as a result of the Consent Decree will be provided separately.

### 2.2    *Provisions for adequate patrolling of Line 324 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours (**Appendix D, Section 1.f.1**)*

The restart of Line 324 and Line 325 will take place in phases governed by the Start-Up Instructions in the Pipeline Specific Operating Manual for Line 324 and Line 325.  During flow restart, the pipelines will be brought up to operating pressure in stages.  Each stage will be a pressure increment which will be held for a minimum of two hours before proceeding to a higher-pressure increment.  During the hold period between pressure increments, the line pressures will be monitored for any fluctuation.  Only once the pressure has remained steady for a minimum of two hours will the next pressure stage be initiated.

If at any time, there is any indication that either pipeline is not holding pressure, both will be shut in and the reason for the pressure drop investigated and corrected before continuing.  During this phase, the pressure restrictions for Line 324 and Line 325 set forth in the Consent Decree (Appendix D – 1.c. and 1.g.) will be followed.

A more detailed Surveillance Plan for the restart of Line 325 will be provided.

2.3     _Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes (**Appendix D, Section 1.f.2**)_

The specific actions planned for pipeline surveillance during the restart of Line 325 will be provided in the Surveillance Plan for the restart of Line 325.

2.4     _A specific day-light restart that includes advance communications with local emergency response officials (**Appendix D, Section 1.f.3**)_

Phased restart of Lines 324 and 325 will be initiated during daylight hours and advance communications as well as communications during the restart effort will be coordinated with local emergency response officials.  These communications and the list of local agencies that will be contacted are more completely described in the Surveillance Plan.

2.5     _Master Control Room enhancements (**Appendix D, Section 1.b.5**)_

Section 1.b.5 of Appendix D to the Consent Decree lists six Master Control Room Enhancements that must be completed and documented prior to restart.  The following is a list of those enhancements and the actions taken and documentation demonstrating compliance.

2.5.a)   _Implementation of advanced leak-detection capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:_

2.5.a)1. _Revised alarm threshold adjustments_

Prior to restart, PPC will complete installation of addition of pressure and temperature monitoring instrumentation, additional flow measurement meters, and implementation of a Real Time Transient Model (RTTM)-based Computational Pipeline Monitoring (CPM) system along with an automated shutoff system (ASOS) for leak detection and response.  The instrumentation along with the RTTM leak detection and ASOS systems will be installed prior to restart.  Alarm thresholds for the RTTM leak detection system will be determined using API TR 1149 and will be implemented prior to initiating the restart of Line 325.  The alarm thresholds will be revised using operational data after resumption of pipeline operations.  These efforts are further enhanced by the installation of a new flow meter (tied into SCADA) at the termination of the pipeline segment at Pentland Station which along with the existing flow meters at Sisquoc and Gaviota Stations provides comparative data at each end of the Gaviota to Sisquoc and Sisquoc to Pentland pipeline segments.

2.5.a)2. _Additional required instrumentation; installation of additional safety valves as a result of the 2021 EFRD evaluation_

PPC will install twenty (20) new "safety" valves along Line 325.  The number, type, function, and locations of these safety valves were determined by an Emergency Flow Restricting Device (EFRD) evaluation in compliance with the Consent Decree.  PPC has so far, despite

substantial efforts, been unable to obtain the land use authorizations from Santa Barbara County to install additional valves in the county.  PPC's efforts to obtain such authorizations continue, and PPC will install the valves as soon as practicable once necessary authorizations are obtained.  It is possible that authorizations may occur after restart, in which case, PPC will schedule valve installation on a reasonable timeline and in safe coordination with other ongoing operations and maintenance activities.

2.5.b) *Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;*

Prior to restart, offline hydraulic models of the pipeline will be used to configure alarm setpoints for pressures and flow transmitters at all locations along the pipeline.  Operational data will be used to tune these setpoints after resumption of pipeline operations.  All alarm setpoints will be validated and approved by a pipeline integrity engineer and control room manager prior to implementation.

2.5.c) *Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories*

All associated alarm set point values, alarm descriptors and alarm priorities will be reviewed during the alarm rationalization process.  Additionally, all Safety Related Alarm (SRA) setpoints will be validated and approved by a pipeline integrity engineer and control room manager prior to implementation.

2.5.d) *Implementation of emergency shutdown programming associated with Line 325 that can be executed by the Shift Supervisor or Controller*

An automated shut off system (ASOS) that will initiate a shutdown sequence on the pipeline segment, automatically upon receipt of a rupture alarm, without Operator action will be installed to safely shut down and isolate Line 325 in response to identified alarm criteria.  This will specifically include a rupture alarm from either the installed RTTM CPM system in the Pipeline Control Center or other rupture detection systems deployed on the pipeline, without Operator action.  The ASOS will consist of a sequence programmed in the SCADA system that will first automatically de-energize the pumping equipment and then close the remotely actuated valves to isolate the pipeline in response to a rupture alarm.  The sequence will also be available for activation by the pipeline controller or shift supervisor to rapidly shut down the system any time the controller or shift supervisor questions the integrity of the pipeline.

2.5.e) *Development and implementation of training associated with the emergency shutdown programming described above; and*

The ASOS training curriculum shall include the following: System Design & Operation; Alarm Response, including emergency notifications; Returning to Normal Operations; Drills & Testing.

2.5.f) *Provision of additional controller training that incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident*

Training procedures for the proper interpretation of operating parameters and alarms, abnormal operations scenarios, and consequences for incorrect operation for Line 325, including alarm set-point revisions for conditions similar to the Refugio Incident will be followed.

2.6    *Elimination and documentation of actions taken to prevent inappropriate un-commanded Valve 460 (Sisquoc Conoco) status and position changes (**Appendix D, Section 1.b.6**)*

Per the process flow diagram for Sisquoc Station and internal verification, Valve 460 is not on the 30-inch diameter Line 325 pipeline, but rather it is on the 12-inch diameter Line 300 pipeline owned by Phillips 66 between Sisquoc Station and the Santa Maria refinery.  Given the closure of the Santa Maria refinery, this valve will not be used.  The Line 300 connection to Sisquoc Station has been disconnected (air-gapped and isolated) from both Sisquoc Station and Line 325.  Documentation of the isolation of this pipeline and valve is maintained in the station file.

2.7    *Installation of additional safety valves as a result of the Operator's EFRD evaluation (**Appendix D, Section 1.b.7**)*

Please refer to *Section 2.5.a)2.* above for a discussion of the EFRD evaluation and the installation of additional safety valves.

2.8    *Installation of additional pressure sensors as a result of the Operator's surge study (**Appendix D, Section 1.b.8**)*

Please refer to *Section 2.5.a)1.* above for a discussion of MOVs, fitted with pressure sensors on both the upstream and downstream ends, that will be installed.

2.9   *Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. The Operator shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run (Appendix D, Section 1.b.9)*

After completion of the restart activities, and within seven working days after steady-state operation is achieved in Line 325, an in-line inspection (ILI) of the pipeline will be conducted utilizing an Ultrasonic Tool (UT) in accordance with an ILI schedule approved by the OSFM.  The tool run will be conducted during daylight hours.

If, upon completion of the tool run, it is discovered that the tool failed to record the required data for all or a portion of the non-operating Line 325 pipeline segment, then the ILI tool run will be repeated as soon as possible after this discovery.  Once the tool run is determined to have produced a complete data set, the tool vendor will provide a preliminary report within 30 days.  The final preliminary report will be reviewed and analyzed within 15 days of receipt.  Any immediate repairs identified by the analysis of this data report will be addressed in accordance with 49 CFR 195.452(h)(4) and the Integrity Management Plan.

2.10   *Corrosion Prevention. The Operator shall include a long-term plan to address corrosion under insulation (CUI) on Line 325 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. The Operator may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c) (Appendix D, Section 1.b.10)*

This provision of Appendix D to the Consent Decree requires that a Corrosion Under Insulation (CUI) Prevention Plan be prepared and included in the Restart Plan.  The CUI Prevention plan shall meet the requirements of 49 CFR Part 195 Subpart H (Corrosion Control).  The Provision allows corrosion prevention via any method approved by the OSFM, including, but not limited to the provisions contained in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, Amendment Number 3, Section 2 (a) – (c), the relevant portions of which include:

- *2b.  Repair or recoat the compromised portions of Line 325;*

   This is not feasible because the presence of insulation and its associated shielding limits the effectiveness of cathodic protection (CP).  Repair or recoat won't address inadequate or ineffective CP on Line 325.

- *2c.  Submit a request for a special permit in advance of a schedule start-up in accordance with 49 CFR 190.341.  It must include a long-term continuous monitoring plan to address the ineffective CP under insulation.  At a minimum, the plan must contain provisions to mitigate the threat of CUI including all of the following:*

  - *Accelerated reassessments;*
  - *Usage of the appropriate, complementary assessment tools for all threats, including stress corrosion cracking;*
  - *Coordination of data from the appropriate alternating ILI technologies;*
  - *More stringent repair criteria targeted at CUI; and*
  - *Advanced data analysis techniques to account for potential growth of CUI including interaction criteria for anomaly assessment.*

Article I, Section 1.B. requires application for a State Waiver through the OSFM for the limited effectiveness of cathodic protection and receipt of the State Waiver prior to restarting Line 325. Pacific Pipeline Company submitted an application for a state waiver on July 10, 2023. The proposed waiver criteria will allow for identification of external metal loss and includes stringent repair criteria that requires repairs for any anomaly greater than or equal to 40%, taking into considerations ILI tool tolerance.  Issuance by OSFM of a State Waiver for the limited effectiveness of cathodic protection on Line 325 will address this requirement of the Restart Plan.

# Exhibit 3

Second Declaration of Julie Teel Simmonds

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(D)
### OF THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): **June 3, 2025**

# Sable Offshore Corp.

(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **001-40111** | **85-3514078** |
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification Number) |

| | |
|---|---|
| **845 Texas Avenue, Suite 2920** | |
| **Houston, TX** | **77002** |
| (Address of Principal Executive Offices) | (Zip code) |

**(713) 579-6161**

(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.0001 | SOC | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company  ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 8.01    Other Events.**

***Center for Biological Diversity et al. v. California Department of Forestry and Fire Protection et al.*** **Matter**

On June 3, 2025, a Santa Barbara County Superior Court Judge granted *ex parte* requests from plaintiffs in *Center for Biological Diversity, et al. v. California Department of Forestry and Fire Protection, et al.* (25CV02244) and *Environmental Defense Center, et al. v. California Department of Forestry and Fire Protection, et al.* (25CV02247) for temporary restraining orders prohibiting Sable Offshore Corp. ("Sable") from restarting transportation of oil through the Las Flores Pipeline System pending the hearing on an order to show cause regarding a preliminary injunction scheduled for July 18, 2025. Sable is exploring all possible avenues available to address these preliminary rulings. Sable is now targeting August 1, 2025 for first sales due to this delay.

**Cautionary Statement Regarding Forward-Looking Statements**

The information in this Current Report on Form 8-K includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this press release, the words "could," "should," "will," " may," " believe," " anticipate," " intend," " estimate," "expect," "project," "continue," "plan," forecast," "predict," "potential," "future," "outlook," and "target," the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements will contain such identifying words. These statements are based on the current beliefs and expectations of Sable's management and are subject to significant risks and uncertainties. Actual results may differ materially from those described in the forward-looking statements. Factors that could cause Sable's actual results to differ materially from those described in the forward-looking statements include: the ability to recommence production of the SYU assets and the cost and time required therefor; litigation, complaints and/or adverse publicity; our ability to comply with laws and regulations applicable to our business; and other one-time events and other factors that can be found in Sable's Annual Report on Form 10-K for the year ended December 31, 2024, and any subsequent Quarterly Report on Form 10-Q or Current Report on Form 8-K, which are filed with the Securities and Exchange Commission and are available on Sable's website (www.sableoffshore.com) and on the Securities and Exchange Commission's website (www.sec.gov). Except as required by applicable law, Sable undertakes no obligation to publicly release the result of any revisions to these forward-looking statements to reflect the impact of events or circumstances that may arise after the date of this Current Report on Form 8-K.

**Item 9.01    Financial Statements and Exhibits**

(d) Exhibits:

| Exhibit No. | Description of Exhibits |
| --- | --- |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Sable Offshore Corp.**

Date: June 3, 2025

By: /s/ Gregory D. Patrinely

Name: Gregory D. Patrinely

Title: Executive Vice President and Chief Financial Officer

# Exhibit 4

Second Declaration of Julie Teel Simmonds

**MITIGATED NEGATIVE DECLARATION**

# EXXONMOBIL SANTA YNEZ UNIT (SYU) OFFSHORE POWER SYSTEM RELIABILITY – B PHASE 2 PROJECT

## July 2014



**Lead Agency:**

California State Lands Commission
100 Howe Avenue, Suite 100 South
Sacramento, California 95825

**Applicant:**

ExxonMobil Production Company
CORP-WGR-936, 222 Benmar
Houston, Texas 77060

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................................... i

LIST OF TABLES ........................................................................................................ iv

LIST OF FIGURES........................................................................................................ v

APPENDICES ............................................................................................................ vi

LIST OF ABBREVIATIONS AND ACRONYMS ......................................................... vii

EXECUTIVE SUMMARY ............................................................................................. 1

1.0 PROJECT AND AGENCY INFORMATION ......................................................... 1-1
1.1    PROJECT TITLE ...................................................................................... 1-1
1.2    LEAD AGENCY AND PROJECT SPONSOR ........................................... 1-1
1.3    PROJECT LOCATION ............................................................................. 1-1
1.4    ORGANIZATION OF MITIGATED NEGATIVE DECLARATION ....................... 1-5
1.5    PROJECT BACKGROUND AND OBJECTIVES ....................................... 1-5
1.6    PUBLIC REVIEW AND COMMENT ......................................................... 1-7
1.7    APPROVALS AND REGULATORY REQUIREMENTS............................. 1-7
        1.7.1    Regulatory Background and History ........................................ 1-7
        1.7.2    Regulatory Jurisdiction and Authorizations Required ............. 1-8

2.0 PROJECT DESCRIPTION ................................................................................ 2-1
2.1    NEED FOR PROJECT .............................................................................. 2-1
2.2    PROJECT LOCATION .............................................................................. 2-1
        2.2.1    Pre-Retrieval/Removal Surveys.............................................. 2-2
        2.2.2    Pre-Project Preparation Activities ........................................... 2-3
        2.2.3    CIV Vessel Mobilization ......................................................... 2-4
        2.2.4    Retrieval of Out-of-Service Cables ......................................... 2-4
        2.2.5    Cable Replacement ............................................................... 2-14
        2.2.6    Cable Execution Contingencies.............................................. 2-22
        2.2.7    Testing and Energization ....................................................... 2-24
        2.2.8    Post-Installation Marine Biological Survey............................. 2-25
2.3    EQUIPMENT/PERSONNEL REQUIREMENTS ....................................... 2-25
        2.3.1    Equipment Requirements ....................................................... 2-25
        2.3.2    Offshore Vessel Requirements............................................... 2-27
        2.3.3    Personnel Requirements ....................................................... 2-27
2.4    PROJECT CONSTRUCTION SCHEDULE ............................................. 2-28
2.5    SAFETY AND ENVIRONMENTAL MANAGEMENT SYSTEMS..................... 2-28
        2.5.1    Cable Protection System Components.................................... 2-29

*Table of Contents*

2.5.2   Crossing Protection ............................................................... 2-29
2.5.3   Bags Containing Sand or Other Materials ............................. 2-30
2.6    PROJECT OPERATIONS .................................................................. 2-30

**3.0 ENVIRONMENTAL ANALYSIS AND CHECKLIST ............................................. 3-1**
AGENCY DETERMINATION .................................................................. 3-2
3.1    AESTHETICS ...................................................................................... 3-3
3.1.1   Environmental Setting............................................................. 3-3
3.1.2   Regulatory Setting .................................................................. 3-4
3.1.3   Impact Analysis ...................................................................... 3-6
3.1.4   Mitigation Summary ................................................................ 3-7
3.2    AGRICULTURE AND FOREST RESOURCES .................................... 3-8
3.2.1   Environmental Setting............................................................. 3-8
3.2.2   Regulatory Setting .................................................................. 3-8
3.2.3   Impact Analysis ...................................................................... 3-10
3.2.4   Mitigation Summary ................................................................ 3-10
3.3    AIR QUALITY ...................................................................................... 3-11
3.3.1   Environmental Setting............................................................. 3-11
3.3.2   Regulatory Setting .................................................................. 3-13
3.3.3   Impact Analysis ...................................................................... 3-16
3.3.4   Mitigation Summary ................................................................ 3-22
3.4    BIOLOGICAL RESOURCES (TERRESTRIAL) .................................. 3-23
3.4.1   Environmental Setting............................................................. 3-23
3.4.2   Regulatory Setting .................................................................. 3-29
3.4.3   Impact Analysis ...................................................................... 3-31
3.4.4   Mitigation Summary ................................................................ 3-36
3.5    BIOLOGICAL RESOURCES (MARINE) ............................................. 3-37
3.5.1   Environmental Setting............................................................. 3-38
3.5.2   Regulatory Setting .................................................................. 3-59
3.5.3   Impact Analysis ...................................................................... 3-62
3.5.4   Mitigation Summary ................................................................ 3-82
3.6    CULTURAL AND PALEONTOLOGICAL ............................................. 3-84
3.6.1   Environmental Setting............................................................. 3-84
3.6.2   Regulatory Setting .................................................................. 3-88
3.6.3   Impact Analysis ...................................................................... 3-91
3.6.4   Mitigation Summary ................................................................ 3-95
3.7    GEOLOGY AND SOILS ...................................................................... 3-96
3.7.1   Environmental Setting............................................................. 3-96
3.7.2   Regulatory Setting .................................................................. 3-98
3.7.3   Impact Analysis ...................................................................... 3-99
3.7.4   Mitigation Summary ................................................................ 3-101
3.8    GREENHOUSE GAS EMISSIONS...................................................... 3-102
3.8.1   Environmental Setting............................................................. 3-102
3.8.2   Regulatory Setting .................................................................. 3-104
3.8.3   Impact Analysis ...................................................................... 3-106

3.8.4    Mitigation Summary .................................................................. 3-107
3.9    HAZARDS AND HAZARDOUS MATERIALS .............................................. 3-108
   3.9.1    Environmental Setting................................................................. 3-108
   3.9.2    Regulatory Setting ..................................................................... 3-109
   3.9.3    Impact Analysis ......................................................................... 3-112
   3.9.4    Mitigation Summary .................................................................. 3-117
3.10    HYDROLOGY AND WATER QUALITY ...................................................... 3-119
   3.10.1    Environmental Setting............................................................... 3-120
   3.10.2    Regulatory Setting ................................................................... 3-121
   3.10.3    Impact Analysis ....................................................................... 3-123
   3.10.4    Mitigation Summary ................................................................ 3-127
3.11    LAND USE AND PLANNING ................................................................... 3-128
   3.11.1    Environmental Setting............................................................... 3-128
   3.11.2    Regulatory Setting ................................................................... 3-129
   3.11.3    Impact Analysis ....................................................................... 3-130
   3.11.4    Mitigation Summary ................................................................ 3-130
3.12    MINERAL RESOURCES .......................................................................... 3-131
   3.12.1    Environmental Setting............................................................... 3-131
   3.12.2    Regulatory Setting ................................................................... 3-131
   3.12.3    Impact Analysis ....................................................................... 3-133
   3.12.4    Mitigation Summary ................................................................ 3-134
3.13    NOISE .................................................................................................. 3-135
   3.13.1    Environmental Setting............................................................... 3-135
   3.13.2    Regulatory Setting ................................................................... 3-136
   3.13.3    Impact Analysis ....................................................................... 3-138
   3.13.4    Mitigation Summary ................................................................ 3-140
3.14    POPULATION AND HOUSING ................................................................ 3-141
   3.14.1    Environmental Setting............................................................... 3-141
   3.14.2    Regulatory Setting ................................................................... 3-142
   3.14.3    Impact Analysis ....................................................................... 3-142
   3.14.4    Mitigation Summary ................................................................ 3-142
3.15    PUBLIC SERVICES ................................................................................ 3-143
   3.15.1    Environmental Setting............................................................... 3-143
   3.15.2    Regulatory Setting ................................................................... 3-143
   3.15.3    Impact Analysis ....................................................................... 3-144
   3.15.4    Mitigation Summary ................................................................ 3-144
3.16    RECREATION ........................................................................................ 3-145
   3.16.1    Environmental Setting............................................................... 3-145
   3.16.2    Regulatory Setting ................................................................... 3-145
   3.16.3    Impact Analysis ....................................................................... 3-146
   3.16.4    Mitigation Summary ................................................................ 3-149
3.17    TRANSPORTATION/TRAFFIC .................................................................. 3-150
   3.17.1    Environmental Setting............................................................... 3-150
   3.17.2    Regulatory Setting ................................................................... 3-152
   3.17.3    Impact Analysis ....................................................................... 3-153
   3.17.4    Mitigation Summary ................................................................ 3-155

Teel Declaration
Page 35

*Table of Contents*

3.18   UTILITIES AND SERVICE SYSTEMS ........................................................ 3-156
    3.18.1  Environmental Setting.................................................................. 3-156
    3.18.2  Regulatory Setting ...................................................................... 3-156
    3.18.3  Impact Analysis .......................................................................... 3-157
    3.18.4  Mitigation Summary .................................................................... 3-160
3.19   MANDATORY FINDINGS OF SIGNIFICANCE ............................................. 3-161
    3.19.1  Impact Analysis .......................................................................... 3-161

**4.0 OTHER MAJOR AREAS OF CONCERN................................................... 4-1**
4.1   COMMERCIAL FISHING............................................................................ 4-1
    4.1.1  Environmental Setting.................................................................. 4-1
    4.1.2  Regulatory Setting ...................................................................... 4-5
    4.1.3  Impact Analysis .......................................................................... 4-5
    4.1.4  Mitigation Summary .................................................................... 4-11
4.2   ENVIRONMENTAL JUSTICE..................................................................... 4-11
    4.2.1  Environmental Setting.................................................................. 4-11
    4.2.2  Regulatory Setting ...................................................................... 4-13
    4.2.3  Methodology ............................................................................... 4-15
    4.2.4  Impact Analysis .......................................................................... 4-15
    4.2.5  Mitigation Summary .................................................................... 4-16

**5.0 MITIGATION MONITORING PROGRAM................................................... 5-1**
5.1   PURPOSE ................................................................................................ 5-1
5.2   ENFORCEMENT AND COMPLIANCE........................................................ 5-1
5.3   MONITORING .......................................................................................... 5-1
5.4   MITIGATION MONITORING TABLE ........................................................... 5-2

**6.0 MND PREPARATION SOURCES AND REFERENCES.................................. 6-1**
6.1   CSLC STAFF............................................................................................ 6-1
6.2   SECTION AUTHORS AND/OR REVIEWERS.............................................. 6-1
6.3   REFERENCES CITED ............................................................................... 6-1

## LIST OF TABLES

Table ES-1.  Project Components ............................................................................ 4
Table ES-2.  Environmental Issues and Potentially Significant Impacts ........................ 7
Table ES-3.  Summary of Proposed Project Mitigation Measures ................................ 7
Table 1-1.   Project Components ......................................................................... 1-6
Table 1-2.   Other Agencies with Review/Approval over Project Activities................. 1-9
Table 1-3.   Major Coastal Laws, Regulations, and Policies ................................... 1-10
Table 2-1.   Power Cable Specifications .............................................................. 2-15
Table 2-2.   Construction Equipment Anticipated for Phase 2 Activities.................... 2-25
Table 2-3.   Proposed Project Schedule .............................................................. 2-28
Table 3.1-1.  Laws, Regulations, and Policies (Aesthetics) ..................................... 3-4

Table 3.2-1.   Laws, Regulations, and Policies (Agriculture and Forest Resources).....3-9
Table 3.3-1.   Laws, Regulations, and Policies (Air Quality) ........................................3-13
Table 3.3-2.   Ambient Air Quality Standards (State and Federal) ..............................3-15
Table 3.3-3.   Estimated Criteria Pollutant Total Project Emissions ...........................3-18
Table 3.4-1.   Laws, Regulations, and Policies (Biological Resources – Terrestrial) ..3-29
Table 3.5-1.   Fish Species Managed Under Pacific Fishery Management Plans.......3-51
Table 3.5-2.   Marine/Coastal Bird Species Seasonality and Abundance Within or Near the Project Area...........................................................................................3-56
Table 3.5-3.   Laws, Regulations, and Policies (Biological Resources – Marine)........3-59
Table 3.6-1.   Laws, Regulations, and Policies (Cultural Resources) .........................3-88
Table 3.7-1.   State Laws, Regulations, and Policies (Geology and Soils).................3-98
Table 3.8-1.   Laws, Regulations, and Policies (GHGs) ............................................3-104
Table 3.8-2.   Estimated GHG Total Project Emissions ............................................3-107
Table 3.9-1.   Laws, Regulations, and Policies (Hazards and Hazardous Materials) 3-110
Table 3.10-1. Key Water Quality Parameters, Units of Measure, and Characteristics 3-120
Table 3.10-2. Laws, Regulations, and Policies (Hydrology and Water Quality) ........3-121
Table 3.11-1. Laws, Regulations, and Policies (Land Use and Planning..................3-129
Table 3.12-1. State Laws, Regulations, and Policies (Mineral Resources)...............3-133
Table 3.13-1. Laws, Regulations, and Policies (Noise).............................................3-136
Table 3.14-1. Population and Housing Summary ......................................................3-141
Table 3.15-1. Laws, Regulations, and Policies (Public Services) .............................3-143
Table 3.16-1. Laws, Regulations, and Policies (Recreation).....................................3-145
Table 3.17-1. Traffic Data for HWY 101 Milepost Number 33.852 (Exit 117, El Capitan SB Park) ................................................................................................3-151
Table 3.17-2. Laws, Regulations, and Policies (Transportation/Traffic)....................3-152
Table 3.18-1. Laws, Regulations, and Policies (Utilities and Service Systems)........3-157
Table 4-1.     Summary of CDFW Fish Block (FB) Data, FB 655 & 656 (2007-2012)... 4-1
Table 4-2.     CDFW Commercial Catch and Value Information (2007-2011) .............. 4-2
Table 4-3.     Laws, Regulations, and (Commercial Fishing)....................................... 4-5
Table 4-4.     U.S. Census Regional Demographic Comparison Table (2010)........... 4-12
Table 4-5.     Socioeconomic Comparison of Affected Environment ......................... 4-13
Table 4-6.     Applicable State Laws, Regulations, and Policies ............................... 4-13
Table 5-1.     Mitigation Monitoring Program ............................................................... 5-4

## LIST OF FIGURES

Figure ES-1. Project Location ........................................................................................ 2
Figure ES-2. Proposed Project Components .................................................................. 3
Figure 1-1.   Project Site Location ............................................................................... 1-2
Figure 1-2.   Existing Facilities .................................................................................... 1-3
Figure 1-3.   Proposed Project Components ................................................................ 1-4
Figure 2-1.   Typical Cable Installation Vessel (CIV)................................................... 2-5

*Table of Contents*

Figure 2-2.   SYU LFCPF Onshore Facilities Overview...............................................2-7
Figure 2-3.   SYU LFCPF Onshore Facilities Overview (Aerial View) ........................2-8
Figure 2-4.   Diagram of Elevation of Tunnel and Conduit Area.................................2-9
Figure 2-5.   Anchor Locations for Support Vessels................................................ 2-10
Figure 2-6.   Power Cable Components ................................................................... 2-17
Figure 2-7.   Cable Installation (Main Lay Profile - Typical)..................................... 2-19
Figure 2-8.   Typical Articulated Concrete Protection Mat ....................................... 2-29
Figure 3.4-1. View of Proposed Work Area at Lower End of the LFCPF.................... 3-25
Figure 3.4-2. View of Concrete Trapezoidal Ditch and Willow Thicket...................... 3-26
Figure 3.4-3. View of Cable Tunnel's Southern Manhole at the Base of the Slope.... 3-26
Figure 3.4-4. Onshore Areas of Disturbance........................................................... 3-33
Figure 3.5-1. Project Site Location.......................................................................... 3-39
Figure 3.5-2. Hard Bottom, Eelgrass, and Kelp Resources within the Project Area... 3-40
Figure 3.5-3. Marine Protected Areas in Proximity to the Project Area ..................... 3-41
Figure 3.5-4. Gray Whale Migration Corridors ........................................................ 3-45
Figure 3.5-5. Marine Mammal Haulouts and Hard Bottom Habitat in Project Area .... 3-46
Figure 3.12-1. Plugged Wells Within/Adjacent to Onshore Construction Area ......... 3-132
Figure 3.16-1. Recreational Access ....................................................................... 3-148

## APPENDICES

Appendix A   Project Execution Plan

Appendix B   Cable Route Maps

Appendix C   Nearshore Anchoring Plan

Appendix D   2011 Fugro Survey

Appendix E   Marine Archaeology

Appendix F   Air Quality Spreadsheets

# EXECUTIVE SUMMARY

This Mitigated Negative Declaration (MND) has been prepared by the California State Lands Commission (CSLC), as lead agency under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) in order to analyze and disclose the potential environmental effects associated with the ExxonMobil Production Company (ExxonMobil or Applicant) Santa Ynez Unit (SYU) Offshore Power System Reliability-B Phase 2 Project (OPSR-B or Project). The proposed Project includes the installation and operation of replacement cables and electrical systems from the Las Flores Canyon Processing Facility (LFCPF) in Santa Barbara County to Outer Continental Shelf (OCS) Platforms Harmony and Heritage, and the retrieval of existing out-of-service cables from selected locations within the Project area (Figures ES-1 and ES-2). The CSLC would need to amend existing State Lease PRC 7163.1, a General Lease - Right-of-Way Use, to allow for Project implementation. This MND establishes the current environmental and regulatory setting, provides an analysis of Project-specific impacts, and includes recommended mitigation measures to reduce potential impacts of the Project to a less than significant level.

## ES.1   PROPOSED PROJECT

The OPSR-B has been divided into two phases: Phase 1, which has received its approvals and is currently ongoing (anticipated to be completed in April 2015); and Phase 2, which is analyzed in this MND.

Phase 1 is referred to in this MND as preparatory work required prior to Phase 2 activities. It occurs exclusively in Federal waters and involves modifications at Platforms Harmony and Heritage for the replacement cables and electrical systems required for Phase 2 installation. As lead agency for the Phase 1 Project, the Bureau of Safety and Environmental Enforcement (BSEE): (1) prepared an Environmental Assessment (EA), which concluded that no significant impacts are anticipated as a result of Phase 1 activities; and (2) issued, on April 18, 2013, a Finding of No Significant Impact (FONSI) for the Phase 1 Project.

Phase 2 involves the retrieval of existing Cables A (or B) and C1 from selected locations and installation of replacement Cables A2 (or B2), F2 and G2 (Table ES-1). The Project will use a primary cable installation vessel (CIV), which will be dynamically positioned and will not require the use of anchors. Several contingency scenarios have been included in case one of the existing out-of-service cables cannot be removed from, or a replacement cable cannot be installed into, a conduit or platform riser (i.e., Cable F2 at nearshore conduit, Cable G2 at Platform Heritage riser, Cable A2 (or B2) at nearshore conduit and at Platform Harmony riser). The decision on whether Cable A or B will be replaced will be based on a detailed analysis of the condition of each cable prior to installation.

Teel Declaration
Page 39



**Figure ES-1.   Project Location**

Teel Declaration
Page 40



Red Cables A2 (or B2), F2 & G2 will be installed replacement cables. Blue Cables B (or A), D, D1, & E are existing cables that will remain in operation. Black dashed Cables A (or B), C1 & C will be abandoned in place. Cables A (or B) & C1 will be retrieved in tunnel, conduits, State waters and adjacent to platforms.

**Figure ES-2.   Proposed Project Components**

ExxonMobil OPSR-B
Project MND

ES-3

July 2014

Teel Declaration
Page 41

*Executive Summary*

**Table ES-1.    Project Components**

| Cable | Cable Route | Status |
|---|---|---|
| ORIGINAL/EXISTING | | |
| A | Between LFCPF and Platform Harmony* | Original |
| B | Between LFCPF and Platform Harmony | Original; repaired in 2013 |
| C | Between LFCPF and Platform Heritage* | Original; replaced in 2003 with Cable C1 |
| C1 | Between LFCPF and Platform Heritage | Replaced Cable C in 2003; subsequently repaired twice |
| D | Between Platforms Harmony and Hondo | Original |
| D1 | Between Platforms Harmony and Hondo | Installed in 2003 to improve reliability |
| E | Between Platforms Harmony and Heritage | Original |
| PROPOSED | | |
| A2 or B2 | Between LFCPF and Platform Harmony | |
| F2 | Between LFCPF and Platform Harmony | |
| G2 | Between Platforms Harmony and Heritage (Federal waters only) | |

* Water depths at Platforms Harmony and Heritage are 1,198 feet and 1,075 feet, respectively.

Phase 2 would require the following primary components:

- Pre-Project preparation activities: Pre-retrieval/removal surveys - soil, marine, biological, and anchor locations; Installation aids and kelp cutting.

- Vessel mobilization.

- Retrieval of out-of-service cable at LFCPF (onshore) and offshore locations.

  o Prepare the onshore area, tunnel, and nearshore conduits to retrieve Cable C1 and Cable A [or B] from an onshore point at the southern end of the LFCPF to just beyond the State-Federal jurisdictional boundary (approximately at the OCS break).

  o Retrieve approximately 10.6 miles (17.1 kilometer [km]) of Cable C1 and A (or B). This includes removal of existing concrete blocks where the Project right-of-way crosses the Pacific Offshore Pipeline Company (POPCO) gas pipeline (POPCO crossing).

  o Retrieve a 1- to 6-mile-long (1.6 to 9.6 km) section of Cable A (or B) at and adjacent to Platform Harmony. Due to the restricted route available for installing the replacement cable, an additional section of Cable A (or B) may have to be retrieved from the State-Federal boundary to the platform.

  o Retrieve 1 to 2 miles (1.6 to 3.2 km) of Cable C1 at, and adjacent to, Platform Heritage.

- Cable replacement at LFCPF (onshore) and offshore locations.

  o Install approximately 10.6 miles (17.1 km) of replacement Cable A2 (or B2) between Platform Harmony and the southern end of the LFCPF. This includes placement of concrete blocks or articulated concrete mats at the POPCO crossing.

  o Install approximately 11.3 miles (18.2 km) of replacement Cable F2 between Platform Harmony and the southern end of the LFCPF. This includes the placement of concrete blocks or articulated concrete mats at the POPCO crossing area.

  o Install approximately 8.1 miles (13.0 km) of replacement Cable G2 between Platform Harmony and Platform Heritage.

- Cable execution contingencies (if necessary).

- Testing and energization of the cables.

- Post-installation marine biological survey.

ExxonMobil estimates that the Project will require approximately 8 to 12 months to complete. The Phase 2 onshore cable retrieval and installation activities are expected to commence in or about the fourth quarter of 2014 and be completed by about early fourth quarter 2015. The offshore cable retrieval and installation portion of Phase 2 is expected to require 1 to 2 months and be conducted during mid to late 2015.

## ES.2   BACKGROUND/EXISTING CONDITIONS

As part of the SYU Expansion Project in the early 1990s, Platforms Harmony, Heritage, and Hondo were required to use shore-based electric power. As such, the electrical power distribution systems for the platforms were installed. The systems consisted of an Offshore Substation (OSS) located at the LFCPF and three power cables from the substation going offshore; two to Platform Harmony (Cables A and B) and one to Platform Heritage (Cable C). In addition, power cables were installed from Platform Harmony to Platform Hondo (Cable D) and to Platform Heritage (Cable E). The installation also included the associated electrical equipment at each facility. Once the electrical distribution system was energized, the SYU offshore operations became completely reliant on these systems for all normal operations.

In 1999, Cable C experienced a failure in State waters that could not be repaired. The SYU Offshore Power System Repair-A Project (OPSR-A) replaced Cable C with Cable C1 in 2003 and installed Cable D1 between Platforms Harmony and Hondo to improve reliability. Since Cable C1 was installed, the cable has failed, and was repaired and returned to service, twice. In May 2013, Cable B failed at a splice in the onshore section of that cable near the southern end of the LFCPF. After approvals were received from

ExxonMobil OPSR-B
Project MND
ES-5
July 2014

Teel Declaration
Page 43

*Executive Summary*

Santa Barbara County (SBC) in June 2013, the failed section of Cable B was removed and a section of spare cable was spliced into the existing cable. The repaired Cable B was tested and returned to service in July 2013.

The reliability of the current offshore power distribution system requires improvement due to aging of existing individual circuits, history of submarine cable faults in the distribution system, and the obsolescence of offshore switchgear and electrical components. The Project will improve the reliability of electricity distribution from shore to, and between, the platforms.

CSLC actions that relate to Lease No. PRC 7163.1 and the Project are as follows.

- On January 21, 1988, the CSLC authorized the issuance of a General Lease — Right-of-Way Use to Exxon Corporation (now known as the ExxonMobil Production Company) for a crude oil/water emulsion pipeline, a treated water outfall line and three power cables (A, B and C) associated with the SYU in the Santa Barbara Channel.

- On February 21, 2003, the CSLC authorized an amendment to the Lease for the removal of the failed Cable C and installation of Cable C1 within State waters.

- On August 30, 2013, ExxonMobil submitted an application to the CSLC requesting an amendment to the existing lease to allow for Project implementation.

## ES.3   PUBLIC REVIEW AND COMMENT

Pursuant to State CEQA Guidelines sections 15072 and 15073, a lead agency must issue an MND in draft form for a minimum 30-day public review period. Agencies and the public will have the opportunity to review and comment on the draft document. Responses to written comments received by the CSLC during the public review period will be incorporated into the Final MND. In accordance with State CEQA Guidelines section 15074, subdivision (b), the CSLC will review and consider the proposed Final MND, together with any comments received during the public review process, prior to taking action on the MND and Project.

## ES.4   ENVIRONMENTAL IMPACTS AND PROPOSED MITIGATION MEASURES

Table ES-2 provides a summary of environmental resource areas that would have the potential to be affected by the proposed Phase 2 Project. Table ES-3 provides a list of Mitigation Measures incorporated into the Project to reduce or avoid potentially significant impacts as further described within Section 5.0, Mitigation Monitoring Program. As discussed further in Section 3.0 (Environmental Analysis and Checklist), with implementation of the proposed Mitigation Measures, all Project-related impacts would be reduced to less than significant.

**Table ES-2.    Environmental Issues and Potentially Significant Impacts**

| ☒ Aesthetics | ☐ Agriculture and Forest Resources | ☒ Air Quality |
|---|---|---|
| ☒ Biological Resources (Terrestrial and Marine) | ☒ Cultural Resources | ☒ Geology and Soils |
| ☒ Greenhouse Gas Emissions | ☒ Hazards and Hazardous Materials | ☒ Hydrology and Water Quality |
| ☒ Land Use and Planning | ☐ Mineral Resources | ☐ Noise |
| ☐ Population and Housing | ☐ Public Services | ☒ Recreation |
| ☒ Transportation/Traffic | ☒ Utilities and Service Systems | |
| ☒ Mandatory Findings of Significance | | |
| ☒ Other Major Areas of Concern: Commercial Fishing and Environmental Justice | | |

**Table ES-3.    Summary of Proposed Project Mitigation Measures/Applicant Proposed Measures (MMs/APMs)**

| **Aesthetics** | |
|---|---|
| MM VIS-1: | Glare Minimization |
| **Air Quality/Greenhouse Gas Emissions** | |
| MM AQ-1: | Emissions Reporting Plan |
| MM AQ-2: | Low-Sulfur Fuels |
| MM AQ-3: | Construction Emissions Reduction |
| MM AQ-4: | Dust Control Measures |
| **Biological Resources** | |
| MM TBIO-1: | Terrestrial Wildlife Awareness Training |
| MM TBIO-2: | Breeding/Nesting Bird Protection |
| MM MBIO-1a: | Pre-Construction Marine Biological Survey |
| MM MBIO-1b: | Anchoring Plan |
| MM MBIO-2: | Site Access |
| MM MBIO-3a: | Cable Installation and Retrieval |
| MM MBIO-3b: | Post-Project Survey |
| MM MBIO-3c: | Post-Project Technical Report |
| MM MBIO-4: | Excavated Sand Disposal (Conduit) |
| MM MBIO-5: | Abalone Avoidance |
| MM MBIO-6: | Marine Wildlife Monitoring and Contingency Plan (MWMCP) |
| MM MBIO-7: | Offshore Vessel Lighting |
| **Cultural and Paleontological Resources** | |
| MM CUL-1: | Avoidance of Offshore Cultural Resources. |
| MM CUL-2: | Avoidance of Onshore Cultural Resources. |
| **Geology and Soils** | |

ExxonMobil OPSR-B
Project MND

ES-7

July 2014

Teel Declaration
Page 45

*Executive Summary*

| | |
|---|---|
| MM GEO-1: | Engineering Design |
| **Hazards and Hazardous Materials** | |
| MM HAZ-1: | Use and Storage of Lubricating Oils, Hydraulic Fluids, and Waste Oils |
| MM HAZ-2: | Loading of Project Materials |
| MM HAZ-3: | Fueling Measure |
| MM HAZ-4: | Anchor Setback |
| MM HAZ-5: | Critical Operations and Curtailment Plan (COCP) |
| MM HAZ-6: | Cable Release Prevention Plan |
| MM HAZ-7: | Oil Spill Response Plan (OSRP) |
| MM HAZ-8: | Oil Spill Response Plan (OSRP) Training |
| MM HAZ-9: | Safety Plan for Tunnel Cable Installation and Removal Operations |
| MM HAZ-10: | Execution Plan |
| MM HAZ-11: | Cable Pulling Operations |
| **Hydrology and Water Quality** | |
| MM WQ-1: | Conduit Flushing |
| MM WQ-2: | Stormwater Pollution Prevention Plan (SWPPP) |
| **Mineral Resources** | |
| APM MIN-1: | Coordination with California Department of Conservation, Division of Oil, Gas, and Geothermal Resources (DOGGR) |
| **Recreation** | |
| MM REC-1: | Recreation Public Safety Measures |
| MM REC-2: | Pre- and Post-Construction Inspections |
| **Transportation/Traffic** | |
| MM TRANS-1: | Notice to Mariners |
| MM TRANS-2: | Vessel Traffic Corridors |
| **Utilities and Service Systems** | |
| MM WASTE-1: | Recycling Feasibility Analysis |
| **Commercial Fishing** | |
| MM CF-1: | Commercial Fishery Constraints |

# 1.0    PROJECT AND AGENCY INFORMATION

## 1.1    PROJECT TITLE

Santa Ynez Unit (SYU) Offshore Power System Reliability-B Phase 2 Project (OPSR-B or Project).

## 1.2    LEAD AGENCY AND PROJECT SPONSOR

**Lead agency:**
California State Lands Commission (CSLC)
100 Howe Avenue, Suite 100-South
Sacramento, CA 95825
Contact person:
Cynthia Herzog
Division of Environmental Planning and Management
Cynthia.Herzog@slc.ca.gov
(916) 574-1310

**Project sponsor (Applicant):**
ExxonMobil Production Company
CORP-WGR-936, 222 Benmar
Houston, TX  77060
Contact person:
Blake Hebert
c.blake.hebert@exxonmobil.com
(832) 624-4400

## 1.3    PROJECT LOCATION

The existing Las Flores Canyon onshore oil and gas processing facility (LFCPF) is located along the Gaviota Coast, approximately 20 miles (32 kilometers [km]) west of the city of Santa Barbara (Figure 1-1). Existing offshore facilities consist of the three platforms (Harmony, Heritage, and Hondo) and associated subsea pipelines and cables located in Federal waters, between 5 and 8 miles (8 to 13 km) offshore and in State waters to the coast line (Figure 1-2). Onshore, the pipelines and power cable conduits are buried beneath the surf zone and are therefore not visible from the beach area. Project activities, which include replacement of power cables and aging high voltage switchgear and electrical components on the platforms and installation of new electrical equipment for the replacement power cables, would occur both onshore and offshore as shown in Figure 1-3. (Refer to Section 2, Project Description, for further details on the Project location.)

*Project and Agency Information*



**Figure 1-1.    Project Site Location**



**Figure 1-2.     Existing Facilities**

*Project and Agency Information*



Red Cables A2 (or B2), F2 & G2 will be installed replacement cables. Blue Cables B (or A), D, D1, & E are existing cables that will remain in operation. Black dashed Cables A (or B), C1 & C will be abandoned in place. Cables A (or B) & C1 will be retrieved in tunnel, conduits, State waters and adjacent to platforms.

**Figure 1-3.    Proposed Project Components**

## 1.4   ORGANIZATION OF MITIGATED NEGATIVE DECLARATION

This Mitigated Negative Declaration (MND) is intended to provide the CSLC, as lead agency under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), and other responsible agencies with the information required to exercise their discretionary responsibilities with respect to the proposed Project. The document is organized as follows.

- Section 1 provides the Project background, Agency and Applicant information, Project Objective, anticipated agency approvals, and a summary of the public review and comment process.

- Section 2 describes the proposed Project including its location, layout, equipment, facilities, operations, and schedule.

- Section 3 provides the Initial Study (IS), including the environmental setting, identification and analysis of potential impacts, and discussion of various Project changes and other measures that, if incorporated into the Project, would mitigate or avoid those impacts, such that no significant effect on the environment would occur. The IS was conducted by the CSLC pursuant to section 15063 of the State CEQA Guidelines.[1]

- Section 4 includes a commercial fishing and an environmental justice analysis and discussion consistent with CSLC policy.

- Section 5 presents the Mitigation Monitoring Program (MMP).

- Section 6 presents information on report preparation and references.

- Appendices. The appendices include specifications, technical data, and other information supporting the analysis presented in this MND.
   - Appendix A: Project Execution Plan
   - Appendix B: Cable Route Maps
   - Appendix C: Nearshore Anchoring Plan
   - Appendix D: 2011 Fugro Survey
   - Appendix E: Marine Archaeology
   - Appendix F: Air Quality Spreadsheets

## 1.5   PROJECT BACKGROUND AND OBJECTIVES

As part of the SYU Expansion Project in the early 1990s, Platforms Harmony, Heritage, and Hondo were required to use shore-based electric power, and electrical power distribution systems for the platforms were subsequently installed. The systems consisted of: an Offshore Substation (OSS) located at the LFCPF; three power cables from the substation going offshore (two to Platform Harmony [Cables A and B] and one

---

[1] The State CEQA Guidelines are found in California Code of Regulations, Title 14, section 15000 et seq.

to Platform Heritage [Cable C]); and power cables from Platform Harmony to Platform Hondo (Cable D) and to Platform Heritage (Cable E) (Table 1-1). The installation also included the associated electrical equipment at each facility. Once the electrical distribution system was energized, the SYU offshore operations became completely reliant on these systems for all normal operations.

**Table 1-1.    Project Components**

| Cable | Cable Route | Status |
|---|---|---|
| ORIGINAL/EXISTING | | |
| A | Between LFCPF and Platform Harmony* | Original |
| B | Between LFCPF and Platform Harmony | Original; repaired in 2013 |
| C | Between LFCPF and Platform Heritage* | Original; replaced in 2003 with Cable C1 |
| C1 | Between LFCPF and Platform Heritage | Replaced Cable C in 2003; subsequently repaired twice |
| D | Between Platforms Harmony and Hondo | Original |
| D1 | Between Platforms Harmony and Hondo | Installed in 2003 to improve reliability |
| E | Between Platforms Harmony and Heritage | Original |
| PROPOSED | | |
| A2 or B2 | Between LFCPF and Platform Harmony | |
| F2 | Between LFCPF and Platform Harmony | |
| G2 | Between Platforms Harmony and Heritage (Federal waters only) | |

 * Water depths at Platforms Harmony and Heritage are 1,198 feet and 1,075 feet, respectively.

In 1999, Cable C experienced an unrepairable failure in State waters. The SYU Offshore Power System Repair-A Project (OPSR-A) replaced Cable C with Cable C1 in 2003 and installed Cable D1 between Platforms Harmony and Hondo to improve reliability (see MND/EA, State Clearinghouse [SCH] No. 2003011020; Santa Barbara County and Minerals Management Service [SBC and MMS] 2003). Since Cable C1 was installed, the cable has failed, and was repaired and returned to service, twice. In May 2013, Cable B failed at a splice in the onshore section of that cable near the southern end of the LFCPF. After approvals were received from the SBC in June 2013, the failed section of Cable B was removed and a section of spare cable was spliced into the existing cable. The repaired Cable B was tested and returned to service in July 2013.

The reliability of the current offshore power distribution system requires improvement due to the aging of individual circuits, the history of submarine cable faults in the distribution system, and the obsolescence of offshore switchgear and electrical components. The Project objective is to improve the reliability of electricity distribution from shore to, and between, the platforms.

## 1.6 PUBLIC REVIEW AND COMMENT

Pursuant to State CEQA Guidelines sections 15072 and 15073, a lead agency must issue an MND in draft form for a minimum 30-day public review period. Agencies and the public will have the opportunity to review and comment on the draft document. Responses to written comments received by the CSLC during the public review period will be incorporated into the Final MND. In accordance with State CEQA Guidelines section 15074, subdivision (b), the CSLC will review and consider the proposed Final MND, together with any comments received during the public review process, prior to taking action on the MND and Project.

## 1.7 APPROVALS AND REGULATORY REQUIREMENTS

### 1.7.1 Regulatory Background and History

The SYU is composed of 16 Outer Continental Shelf (OCS) leases that are located in northwestern Santa Barbara Channel. In 1968, Exxon Corporation (now ExxonMobil Production Company [ExxonMobil or Applicant]) and its partners acquired the majority of leases during OCS Lease Sale P-4. The first oil and gas discovery occurred in this area in 1968. In 1971, Exxon submitted a Development and Production Plan (DPP) for developing the leases to the U.S. Geological Survey (USGS) (predecessor to the Minerals Management Service [MMS], now Bureau of Ocean Energy Management [BOEM] and Bureau of Safety and Environmental Enforcement [BSEE]). The DPP included alternative plans for processing the oil onshore and offshore. In 1974, the USGS approved the DPP.

SBC permits were issued in 1974 for development of onshore oil and gas processing facilities in Las Flores Canyon to process the oil and gas produced at Platform Hondo, which was installed in 1976. In 1975, SBC approved the onshore component of the Project. In 1976, the California Coastal Zone Conservation Commission (predecessor to the California Coastal Commission [CCC]) approved Coastal Development Permit (CDP) No. 216-75 for developing onshore facilities associated with the SYU Project.

Exxon, however, objected to certain permit requirements, and subsequently installed an Offshore Storage and Treatment Vessel (OS&T) near Platform Hondo.[2] In 1981, oil production at Platform Hondo began and for the next 14 years, the OS&T processed the oil and loaded it onto a marine tanker for shipment to refineries. Beginning in 1984, produced gas was transported via the Pacific Offshore Pipeline Company (POPCO) pipeline to an onshore gas processing plant in Las Flores Canyon. In 1982, Exxon submitted a revised DPP to the MMS for expanded development of the SYU, with three additional platforms: Harmony, Heritage, and Heather. In addition to the new platforms,

---

[2] The OS&T was a converted oil tanker that operated from 1981 to 1994 and was moored to a Single Anchor Leg Mooring in Federal waters approximately 3.5 miles from shore.

the revised DPP proposed a consolidated onshore processing and storage facility at Las Flores Canyon (the LFCPF), a consolidated marine terminal at Las Flores Canyon, and subsea and onshore pipelines and power cables to connect these components. (Neither the marine terminal nor Platform Heather was installed.)

In September 1987, SBC approved a Final Development Plan (FDP) for expanded development of SYU. The FDP permit conditions required Exxon to discontinue use of the OS&T within 30 days after the time that the onshore oil processing facilities were fully operational and debugged, remove the OS&T and its mooring from the OCS within one year after initial production from Harmony and Heritage, and install power cables to provide electricity to the platforms from onshore generation facilities.

The jackets and topsides of Platforms Heritage and Harmony were installed in 1990 and 1992, respectively. The subsea and onshore pipelines and power cables were installed in 1991 and 1992. The LFCPF was dedicated in October 1993, and brought on line in December 1993 when the first oil was delivered by pipeline from Platform Harmony. The OS&T and its Single Anchor Leg Mooring were removed in 1994. The oil, water, and fuel gas lines and power cable from Platform Hondo to the OS&T were approved to be decommissioned in place until the end of the SYU's life.

### 1.7.2  Regulatory Jurisdiction and Authorizations Required

The CSLC's authority is set forth in Division 6 of the California Public Resources Code and it is regulated by California Code of Regulations, Title 2, sections 1900-2970. The CSLC has authority to issue leases or permits for the use of sovereign lands held in the public trust, including all ungranted tidelands, submerged lands, and the beds of navigable lakes and waterways, as well as certain residual and review authority for tidelands and submerged lands legislatively granted in trust to local jurisdictions (Pub. Resources Code, §§ 6301, 6306). All tidelands and submerged lands, granted or ungranted, as well as navigable lakes and waterways, are subject to the protections of the Common Law Public Trust. As general background, the State of California acquired sovereign ownership of all tidelands and submerged lands and beds of navigable lakes and waterways upon its admission to the U.S. in 1850. The State holds these lands for the benefit of all people of the State for statewide Public Trust purposes, which include but are not limited to waterborne commerce, navigation, fisheries, water-related recreation, habitat preservation and open space. On tidal waterways, the State's sovereign fee ownership extends landward to the mean high tide line, except for areas of fill or artificial accretion.

On August 30, 2013, ExxonMobil submitted an application to the CSLC requesting an amendment to their existing General Lease – Right-of-Way Use No. PRC 7163.1 to allow for Project implementation. CSLC actions that relate to Lease No. PRC 7163.1 and the Project are as follows.

- On January 21, 1988, the CSLC Commission authorized the issuance of a General Lease - Right-of-Way Use to Exxon Corporation for a crude oil/water emulsion pipeline, a treated water outfall line and three power cables (A, B and C) associated with the SYU in the Santa Barbara Channel.

- On February 21, 2003, the CSLC authorized an amendment to the lease for the removal of the failed Cable C and installation of Cable C1 within State waters.

The CSLC must comply with CEQA when it undertakes an activity defined by CEQA as a "project" that must receive some discretionary approval (i.e., the CSLC has the authority to deny the requested lease, permit, or other approval) which may cause either a direct physical change in the environment or a reasonably foreseeable indirect change in the environment. CEQA requires the CSLC to identify the significant environmental impacts of its actions and to avoid or mitigate those impacts, if feasible.

Other entities with statutory and/or regulatory jurisdiction over various aspects of the Project are listed in Table 1-2.

**Table 1-2.     Other Agencies with Review/Approval over Project Activities**

| Permitting Agency | | Anticipated Approvals/Regulatory Requirements |
|---|---|---|
| Federal | Bureau of Ocean Energy Management/Bureau of Safety and Environmental Enforcement | NEPA Compliance and Consultation with other Federal agencies (e.g., USFWS, NMFS, SHPO) |
| | U.S. Army Corps of Engineers | Clean Water Act (CWA) Section 404 (under Nationwide Permit No. 12) |
| | U.S. Fish and Wildlife Service (USFWS) | Section 7 Consultation under Federal Endangered Species Act (if necessary) |
| | National Marine Fisheries Service (NMFS) | |
| State | California Coastal Commission (CCC) | Coastal Development Permit Federal Consistency Certification |
| | California Department of Fish and Wildlife (CDFW) | Consultation for special-status species(if necessary) |
| | Department of Parks and Recreation | Permit for Construction Equipment Access |
| | State Historic Preservation Office (SHPO) | Concurrence Request - Opinion on Potential Effect to Cultural/Historic Resources |
| | Regional Water Quality Control Board | CWA Section 401 Water Quality Certification |
| Local | Santa Barbara County Planning and Development | Coastal Development Permit |
| | Santa Barbara County Air Pollution Control District | Determination of Conformance with Facilities' Existing Permit to Operate |

Table 1-3 identifies coastal-related U.S. and California laws and programs that are relevant to the Project; specific policies are listed in Section 3, Environmental Analysis and Checklist, of this MND for each environmental issue area.

# Exhibit 5

Second Declaration of Julie Teel Simmonds

CENTER *for* BIOLOGICAL DIVERSITY                    *Because life is good.*

*Via Electronic Mail and Certified First-Class U.S. Mail, Return Receipt Requested*

December 23, 2024

Tristan Brown, Deputy Administrator
Pipeline and Hazardous Materials Safety
Administration (PHMSA)
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590
Tristan.Brown@dot.gov

Joe Tyler, Director/Fire Chief, CAL FIRE
Office of the State Fire Marshal
715 P Street
Sacramento, CA 94244-2460
Joe.Tyler@fire.ca.gov

**Subject:**      **Request for Objection to State Waiver for Restart of Pipelines CA-324 and CA-325 (Formerly Lines 901/903); Accufacts Inc. Evaluation of Pipeline Startup**

Dear Deputy Administrator Brown and Fire Chief Tyler,

On December 17, 2024 Sable Offshore Corp. announced in a Form 8-K filing that the California Office of the State Fire Marshal ("CalFIRE") has issued the company a State Waiver for the Las Flores Pipeline System, pipelines CA-324 and CA-325, formerly Lines 901 and 903.[1] As we noted in our letter to the Pipeline and Hazardous Materials Safety Administration (PHMSA) on September 17, 2024 (attachment 2) and September 24, 2024 letter to CalFIRE (attachment 3) , the effort to restart this failed pipeline (after abandoning plans to build a new, replacement pipeline) poses grave risks to public safety and the environment and should not be enabled through issuance of a State Waiver.

News of the Waiver came as a surprise given that CalFIRE previously informed the public and state legislators that it would not issue any Waiver until it held a public meeting,[2] which we understood would occur sometime in mid- or late January. The State Waiver (if it indeed issued) has not yet been posted on CalFIRE's webpage for the restart proposal. Nor to our knowledge has its submittal to PHMSA for review been noticed in the Federal Register. That said, a State Waiver "information poster" added to the CalFIRE webpage on December 18, 2024 indicates that the State Waiver may be predicated on stand-in measures that raise many red flags about what the Waiver itself might contain.[3]

---

[1] Sable Offshore Corp., U.S. Securities and Exchange Commission, Form 8-K (Dec. 17, 2024) (Att. 1).
[2] Nick Welsh, Sable Offshore Energy Clears Major Hurdle to Restart Damaged Pipeline in Santa Barbara County, Santa Barbara Independent (Dec. 20, 2024), available at https://www.independent.com/2024/12/20/sable-offshore-energy-clears-major-hurdle-to-restart-damaged-pipeline-in-santa-barbara-county/ (Att. 4).
[3] CalFIRE, State Waiver Informational Poster (Dec. 18, 2024), available here (Att. 5).

While the public has yet to see the State Waiver, Accufacts Inc. has reviewed publicly available information and prepared the attached *Evaluation of the Las Flores Pipeline System Startup Proposal* for the Center for Biological Diversity and Environmental Defense Center (Att. 6). Accufacts Inc.'s president, Richard Kuprewicz, is a chemical engineer with over fifty years of experience in the energy industry, including extensive experience conducting pipeline incident investigations after pipeline rupture tragedies. As explained in detail in the attached report:

---

Accufacts finds that the main technical issues concerning the restart of the Pipelines are:

1. **The poorly designed pipeline system renders required federal mandated cathodic protection ("CP"), intended to help address pipeline external corrosion, ineffective.**
2. **Current inline inspection ("ILI") technologies cannot adequately allow the assessment of all forms of external corrosion threats that most likely exist on the Pipelines.**
3. **The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective CP system once the Pipelines go into operation.**
4. **Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure. The poorly designed Pipelines cannot be made as safe as new pipelines.**

---

*Accufacts Inc. Evaluation* at 1.

The report concludes that:

> Given the ineffectiveness of the CP system to protect against external corrosion and the fact that the Pipelines have sat for over nine years without effective CP, and the failure of the Consent Decree to address these possible threats via proper hydrotesting and ILI, it is imprudent to expect that such limited assessment techniques can adequately protect against corrosion failure. Poor pipeline design and using the wrong set of integrity management tools (i.e., tools that do not adequately detect and permit the prudent evaluation of the type of corrosion threats specific to a given pipeline) can make the risk of an oil spill orders of magnitude worse. The Las Flores Pipeline System is unusually dangerous given its age and inherent design flaws.

*Accufacts Inc. Evaluation* at 15.

We are writing to request that PHMSA object to any State Waiver issued to Sable Offshore Corp. for the restart of the pipeline system that caused the devastating Refugio State Beach oil spill in 2015 and has been out of service for nearly a decade. Issuing a Waiver to this decades-old, poorly designed, corrosion-prone pipeline system with a waiver of crucial pipeline safety requirements is inconsistent with the special permit/state waiver standards, pipeline safety, and the public interest (49 U.S.C. Section 60118; 49 C.F.R. Section 190.341); risks another serious

oil spill; and fails to adequately protect public safety and the environment. Furthermore, we request that CalFIRE suspend the State Waiver. The absence of meaningful environmental review, public oversight, and informed decisionmaking on this State Waiver is unlawful and violates legal requirements to ensure the safety and integrity of pipelines, the protection of public resources and the environment, and public participation and transparency.

Sincerely,

Julie Teel Simmonds
Senior Counsel
jteelsimmonds@biologicaldiversity.org

cc:     Linda Krop, Chief Counsel, Environmental Defense Center
        lkrop@environmentaldefensecenter.org

        Dustin, Hubbard, Western Region Pipeline Safety Director, PHMSA
        dustin.hubbard@dot.gov

        Linda Daugherty, Deputy Associate Administrator for Field Operations, PHMSA
        linda.daugherty@dot.gov

        Janet Whitlock, Regional Environmental Officer, Region IX, Department of Interior
        janet_whitlock@ios.doi.gov

        Tracy Stone-Manning, Director, Bureau of Land Management
        tstonemanning@blm.gov

        Joe Stout, California State Director, Bureau of Land Management
        castatedirector@blm.gov

        Lieutenant Governor Eleni Kounalakis
        eleni.kounalakis@ltg.ca.gov

        Lisa Plowman, Director, Santa Barbara County Planning & Development Department
        lplowman@countyofsb.org

        Jennifer Lucchesi, Executive Officer
        California State Lands Commission
        Jennifer.Lucchesi@slc.ca.gov

        Matthew Dumlao, Chief of Staff
        Office of the Lieutenant Governor
        matthew.dumlao@ltg.ca.gov

Brian Goldman, Deputy Legal Affairs Secretary
Office of Governor Gavin Newsom
brian.goldman@gov.ca.gov

Lauren Sanchez, Senior Climate Advisor
Office of Governor Gavin Newsom
lauren.sanchez@gov.ca.gov

Rob Bonta, Attorney General
State of California Department of Justice
rob.bonta@doj.ca.gov

Angela Mo, Senior Counsel
angela.mo@usdoj.gov

Daniel Berlant, State Fire Marshal
Daniel.Berlant@fire.ca.gov

Jim Hosler, Chief /Assistant Deputy Director, CAL FIRE
Jim.Hosler@fire.ca.gov

Wade Crowfoot, Secretary
California Natural Resources Agency
wade.crowfoot@resources.ca.gov
secretary@resources.ca.gov

Armando Quintero, Director
California Department of Parks and Recreation
Armando.Quintero@parks.ca.gov

Charlton Bonham, Executive Director
California Department of Fish and Wildlife
director@wildlife.ca.gov

Ryan Lodge, Executive Officer
Central Coast Regional Water Quality Control Board
Ryan.Lodge@waterboards.ca.gov

Steve Monfort, Executive Director
UC Natural Reserve System
steve.monfort@ucop.edu

Barton Loundsbury, Senior Counsel
Regents of the University of California
barton.lounsbury@ucop.edu

Heather Geldart, Administrator
Office of Spill Prevention & Response
California Department of Fish and Wildlife
Heather.Geldart@wildlife.ca.gov

Le-Quyen Nguyen, Deputy Secretary for Energy
California Natural Resources Agency
le-quyen.nguyen@resources.ca.gov

Gabe Tiffany, Acting Director
California Department of Conservation
gabe.tiffany@conservation.ca.gov

Benjamin Turner, Chief Policy and Planning Advisor
California Department of Conservation
Benjamin.turner@conservation.ca.gov

Kate Huckelbridge, Executive Director
California Coastal Commission
Kate.Huckelbridge@coastal.ca.gov

Cassidy Teufel, Deputy Director
California Coastal Commission
Cassidy.Teufel@coastal.ca.gov

Malia Cohen, State Controller
California State Controller's Office
malia.cohen@sco.ca.gov

Kristina Kunkel, Deputy State Controller
California State Controller's Office
kkunkel@sco.ca.gov

Joe Stephenshaw, Director
California Department of Finance
joe.stephenshaw@dof.ca.gov

Michele Perrault, Chief Deputy Director, Policy
California Department of Finance
michele.perrault@dof.ca.gov

Senator Monique Limón
California State Senate
Monique.limon@sen.ca.gov

Assemblymember Gregg Hart
California State Assembly
Gregg.hart@asm.ca.gov

Supervisor Das Williams, District 1
Santa Barbara County Board of Supervisors
dwilliams@countyofsb.org

Supervisor Laura Capps, District 2
Santa Barbara County Board of Supervisors
lcapps@countyofsb.org

Supervisor Joan Hartmann, District 3
Santa Barbara County Board of Supervisors
jhartmann@countyofsb.org
supervisorhartmann@countyofsb.org

Supervisor Bob Nelson, District 4
Santa Barbara County Board of Supervisors
bnelson@countyofsb.org

Supervisor Steve Lavagnino, District 5
Santa Barbara County Board of Supervisors
slavagnino@countyofsb.org

David Villalobos, Hearing Support Supervisor
Santa Barbara County Board of Supervisors
dvillalo@countyofsb.org

William Sarraf
Santa Barbara County Air Pollution Control District
SarrafW@sbcapcd.org

Deb Haaland, Secretary
U.S. Department of the Interior
Deb_Haaland@ios.doi.gov
exsec@ios.doi.gov

Martha Guzman, Regional Administrator
U.S. Environmental Protection Agency, Region IX
guzman.martha@epa.gov

Amy Miller, Director, Enforcement and Compliance Assurance Division
U.S. Environmental Protection Agency, Region IX
miller.amy@epa.gov

Tomas Torres, Director, Water Division
U.S. Environmental Protection Agency, Region IX
torres.tomas@epa.gov

Vasiliki Tsaganos, Acting Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety Administration
phmsachiefcounsel@dot.gov

# ATTACHMENT 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of Report (Date of earliest event reported): December 17, 2024**

---

# Sable Offshore Corp.
**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **001-40111** | **85-3514078** |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

| **845 Texas Avenue, Suite 2920** | |
|---|---|
| **Houston, Texas** | **77002** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**(713) 579-6161**
**(Registrant's telephone number, including area code)**

---

Check the appropriate box below if the Form 8-K is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencements communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.0001 per share | SOC | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

---

**Item 8.01        Other Events.**

On December 17, 2024, the California Office of the State Fire Marshal ("OSFM") approved Sable Offshore Corp.'s ("Sable") implementation of enhanced pipeline integrity standards for the intrastate pipeline segments, Lines CA-324 and CA-325A/B (the "Pipeline"). In recognition of these robust measures, OSFM granted state waivers of certain regulatory requirements related to cathodic protection and seam weld corrosion for the Pipeline. The state waivers represent a significant milestone achievement in satisfying the requirements of the federal court ordered consent decree, which includes the granting of these waivers by the OSFM as a condition for restarting the Pipeline. Sable expects to begin hydrotesting the Pipeline in January 2025 in advance of a potential restart of production from the Santa Ynez Unit offshore platforms and the associated Las Flores Canyon processing facilities in the first quarter of 2025.

**Cautionary Statement Regarding Forward-Looking Statements**

The information in this Current Report on Form 8-K includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this press release, the words "could," "should," "will," " may," " believe," " anticipate," " intend," " estimate," "expect," "project," "continue," "plan," forecast," "predict," "potential," "future," "outlook," and "target," the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements will contain such identifying words. These statements are based on the current beliefs and expectations of Sable's management and are subject to significant risks and uncertainties. Actual results may differ materially from those described in the forward-looking statements. Factors that could cause Sable's actual results to differ materially from those described in the forward-looking statements include: the ability to recommence production of the SYU assets and the cost and time required therefor; litigation, complaints and/or adverse publicity; our ability to comply with laws and regulations applicable to our business; and other one-time events and other factors that can be found in Sable's Annual Report on Form 10-K for the year ended December 31, 2023, and any subsequent Quarterly Report on Form 10-Q or Current Report on Form 8-K, which are filed with the Securities and Exchange Commission and are available on Sable's website (www.sableoffshore.com) and on the Securities and Exchange Commission's website (www.sec.gov). Except as required by applicable law, Sable undertakes no obligation to publicly release the result of any revisions to these forward-looking statements to reflect the impact of events or circumstances that may arise after the date of this Current Report on Form 8-K.

**Item 9.01        Financial Statements and Exhibits**

(d)    *Exhibits*

| Exhibit No. | Description of Exhibits |
| --- | --- |
| 104 | Cover page Interactive data file (embedded within the inline XBRL document). |

2

Teel Declaration
Page 66

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Sable Offshore Corp.**

Date: December 19, 2024

By: /s/ Gregory D. Patrinely

Name: Gregory D. Patrinely

Title: Executive Vice President and Chief Financial Officer

3

# ATTACHMENT 2

September 17, 2024

Tristan Brown, Deputy Administrator
Pipeline and Hazardous Materials Safety Administration (PHMSA)
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590
Tristan.Brown@dot.gov

**Subject: Object to State Waiver for Restart of Pipelines CA-324 and CA-325 (Formerly Lines 901/903)**

Dear Deputy Administrator Brown,

We are aware that the owners and operator(s) of the Santa Ynez Unit pipelines CA-324 and CA-325, formerly Lines 901 and 903, must obtain a State Waiver from the California Office of the State Fire Marshal ("OSFM") to restart the pipeline system and must secure a no-objection from PHMSA before restarting the pipelines. We write to urge you to object to any State Waiver issued to Sable Offshore Corp. (or ExxonMobil, the prior owner) for the restart of this pipeline system that was responsible for the devastating Santa Barbara oil spill in 2015 and has been out of service for nearly a decade. Rather than decommissioning or rebuilding the pipelines, Sable seeks to restart the aging infrastructure and bypass important requirements. The application for a State Waiver, including from important safety measures like effective cathodic protections, raises serious concerns about the safety and environmental impact of restarting these pipelines.

Any actions taken by the OSFM, or PHMSA, to approve a State Waiver would pose significant environmental risks, which have unlawfully evaded environmental review. The federal and state actions overseeing pipeline operation and authorizing the Santa Ynez Unit pipelines to restart has been flawed and segmented in a concerning way that appears to unlawfully circumvent the necessary environmental reviews under the California Environmental Quality Act (CEQA) and the National Environmental Policy Act (NEPA). The absence of meaningful environmental review, public oversight, and informed decisionmaking is unlawful and undermines the legal requirements to ensure the safety and integrity of the pipeline operations.

Among its many environmental impacts, restart of pipelines CA-324 and CA-325 through the use of a state waiver, threatens dangerous oil spills. In 2015, the pipeline spilled what is now believed to be 450,000 gallons of oil that killed hundreds of birds and marine mammals and closed fisheries and beaches—and now restarting the pipeline risks repeating that devastating spill.[1] The pipeline that ruptured was evaluated in the 1980s through a joint CEQA/NEPA

---

[1] See Expert Report of Igor Mezic, PhD at 16–17, *Andrews v. Plains All American Pipeline*, Case 2:15-cv-4113 (C.D. Cal.).

process then built in 1987 and has outlived its intended lifespan. PHMSA's own investigation report of the spill indicated the pipeline has had ineffective protection against external corrosion.[2] The environmental impact statement that was prepared for the construction and operation of the pipeline in 1984 by the Bureau of Land Management, California State Lands Commission, and Santa Barbara County acknowledged that spills happen and determined that the risk of a spill *more than doubles* as the pipeline aged from 20 to 40 years.[3] One recent analysis indicates that restarting the pipeline could result in a spill *once a year and a rupture once every four years*; another recent analysis by Sable indicates that a worst-case spill from this old pipeline could be *over 1.7 million gallons*.[4]

The action also prolongs the Santa Ynez Unit that will substantially increase oil production, air pollution, and water pollution, among other significant environmental impacts. For example, before it shut down in 2015, the Santa Ynez Unit was Santa Barbara County's largest facility source of volatile organic compounds, fine particulate matter, and formaldehyde pollution, and greenhouse gas emissions.[5] It contributed 55 percent of Santa Barbara County's total greenhouse gas emissions from point sources in 2014.[6]

Given these factors, the proposed restart of pipelines CA-324 and CA-325 without a thorough CEQA review, or joint CEQA and NEPA review, is not only risky but also irresponsible and unlawful. The safety of our communities and the protection of our environment must be the top priority. It is imperative that a thorough and transparent review is conducted and that there be a full public process and informed decisionmaking. The potential risks associated with corrosion, increased spill risk, and other safety hazards must be fully addressed and mitigated.

Please notify us if and when you receive any State Waiver for this pipeline system to review and of your final decision on any such submission. We urge PHMSA to reject and object to any State Waiver for the restart of pipelines CA-324 and CA-325 until a comprehensive environmental review is conducted. It is crucial that PHMSA ensures that all safety and environmental regulations are strictly adhered to and that no shortcuts are taken that could jeopardize public safety and environmental health.

Thank you for your attention to this critical matter. We request a prompt response to our letter with how you intend to proceed.

Sincerely,

---

[2] PHMSA, Failure Investigation Report: Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California (May 2016).
[3] California State Lands Commission & Bureau of Land Management, Draft Environmental Impact Report/ Environmental Impact Statement for the Celeron/All American and Getty Pipeline Projects (Aug. 1984) at 4-166.
[4] *See* County of Santa Barbara, Administrative Draft of Draft EIR for Plains Pipeline Replacement Project (March 2022) at 5.6-79; Sable Offshore Corp., Pacific Pipeline Company Integrated Contingency Plan Las Flores Canyon Core Plan (Apr. 2024) at 14-4.
[5] California Air Resources Board, Pollution Mapping Tool Data, spreadsheet of Santa Barbara emissions for 2014, available at https://www.arb.ca.gov/ei/tools/pollution_map/; *see also* U.S. Environmental Protection Agency, 2014 Greenhouse Gas Emissions from Large Facilities Santa Barbara County, https://ghgdata.epa.gov/
[6] *Id*.

*/s/ Miyoko Sakashita*
Miyoko Sakashita
Senior Counsel
miyoko@biologicaldiversity.org


cc:

Dustin, Hubbard, Western Region Pipeline Safety Director, PHMSA, dustin.hubbard@dot.gov
Linda Daugherty, Deputy Associate Administrator for Field Operations, PHMSA,
        linda.daughtery@dot.gov
Janet Whitlock, Regional Environmental Officer, Region IX, Department of Interior,
        janet_whitlock@ios.doi.gov
Joe Stout, California State Director, Bureau of Land Management, castatedirector@blm.gov

# ATTACHMENT 3

*Via e-mail and U.S. certified mail, return receipt requested*

September 24, 2024

Joe Tyler, Director/Fire Chief, CAL FIRE
Daniel Berlant, State Fire Marshal
Office of the State Fire Marshal
715 P Street
Sacramento, CA 94244-2460
Email: Joe.Tyler@fire.ca.gov; Daniel.Berlant@fire.ca.gov

Lisa Plowman, Director
Santa Barbara County
Planning & Development
123 East Anapamu Street
Santa Barbara, CA 93101
Email: lplowman@countyofsb.org

Jennifer Lucchesi, Executive Director
California State Lands Commission
100 Howe Avenue, Suite 100-South
Sacramento, CA 95825
Jennifer.Lucchesi@slc.ca.gov
Email: Jennifer.Lucchesi@slc.ca.gov

**Re:    Notice of CEQA Violation and Request to Prepare EIR for Restart of SYU Infrastructure, Including Onshore Lines 901/903 (CA-324, CA-325), After Pipeline Failure, Major Oil Spill, and Ten Years Idle**

Dear Fire Chief Tyler, State Fire Marshal Berlant, Planning and Development Director Plowman, and Executive Officer Lucchesi,

It is beyond comprehension that the unsafe pipeline system responsible for the 2015 Refugio Oil Spill, one of the largest oil spills in California's history, is on the brink of restart. While restart of this failed pipeline system should never be authorized, at a minimum, the Center for Biological Diversity and Wishtoyo Chumash Foundation request that the Office of the State Fire Marshal (CAL FIRE), the County of Santa Barbara, and the State Lands Commission initiate California Environmental Quality Act ("CEQA") review for this proposed restart project. No agency or local jurisdiction should issue any further or final approvals or other determinations concerning this restart of onshore pipelines 901 and 903 (now known as CA-324 and CA-325), and the connected offshore and onshore pipelines and other facilities, before a robust CEQA review

process is concluded. Approval of this restart project without full compliance with CEQA is unsafe and unlawful.[1]

In 2015, the rupture and spill from Line 901 (CA-324) caused one of the most disastrous oil spills in California history. The corroded pipeline ruptured and spilled what is now believed to be about 450,000 gallons of oil,[2] killing hundreds of birds and mammals and closing fisheries and beaches. Consequently, three offshore platforms, two processing facilities and the offshore and onshore pipeline systems have been idled for nearly a decade. There are severe environmental and safety risks posed by restarting the Santa Ynez Unit infrastructure that must be disclosed to the public and analyzed by decisionmakers before restart is even considered.

Previously, the operator proposed constructing a new pipeline and the County of Santa Barbara initiated an Environmental Impact Report (EIR) process for that proposal. Plans for a new pipeline have now been cancelled, and instead the operator appears close to re-starting the same pipeline that ruptured in 2015.

The Pipeline and Hazardous Materials Safety Administration ("PHMSA") failure investigation on the 2015 Refugio State Beach oil spill reported that the pipeline wall had corroded to 1/16[th] of an inch before the spill occurred, and that the rupture was caused in part by progressive external corrosion and ineffective protection against that corrosion.[3] Pipeline inspections from 2007 to 2015 showed "an increasing frequency and extent of corrosion anomalies" and excavations revealed moisture between the insulation and the pipeline.[4] Compounding the risk of aging infrastructure, facility startups are significantly more hazardous than normal operations.[5] It is irresponsible and dangerous to allow the old pipeline to return to service, certainly before any CEQA review is conducted.

The lack of any review for the proposal to re-start the existing failed pipeline is particularly startling given it is far more dangerous than building a new pipeline. As acknowledged by one prior analysis, the risk of a spill *more than doubles* as pipelines age from 20 to 40 years.[6] Further, there is a five times increase in failure frequencies for pipelines that are not equipped with cathodic protection over the average failure rate.[7] The County's draft EIR for the new pipeline proposal estimated that restarting the existing pipeline **could result in a spill once a year, and a rupture once every four years** even with the "installation of additional valve stations" as proposed in lieu of cathodic protection.[8]

---

[1] We note that there are multiple other agencies involved in the many aspects of this restart, and they should be included in the CEQA analysis as cooperating agencies.

[2] Expert Report of Igor Mezic, Ph.D., Andrews v. Plains All American Pipeline, L.P., United States District Court, Central District of California, Case No. 2:15-cv-04113-PSG-JEM, March 29, 2019 (pp. 16-17).

[3] U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 (May 2016).

[4] Id.

[5] Bridges, William, Necessity of Performing Hazard Evaluations (PHAs) of Non-Normal Modes of Operation (Startup, Shutdown,& Online Maintenance) (2015).

[6] *Id*. at 4-166.

[7] Administrative Draft of Draft EIR for Plains Pipeline Replacement Project, Section 5.6, p. 7.

[8] *Id*. at Section 5.6, p. 79.

Each agency here has oversight responsibilities and individually, and collectively, must conduct a meaningful environmental review. It appears, for example, that the California Department of Forestry and Fire Protection ("CAL FIRE") is poised to approve the restart of Lines 901/903 with a "State Waiver"[9], among other approvals, and without any CEQA review. Similarly, the County appears to be trying to limit its involvement in this momentous restart project to its consideration of applications to transfer permits to Sable, despite the County's prior commitment to require the Las Flores Pipeline systems' owners/operators to secure new permits or amendments to the Development Plan and Major Conditional Use Permit[10] should certain conditions arise (and with the 2015 catastrophic failure and spill and this proposal to restart, several conditions have).

And the State Lands Commission seems poised to allow restart of oil flow through offshore pipelines under its jurisdiction pursuant to leases that terminated several years ago (but that were extended in 2023 on a month to month basis) without any environmental review.[11] Nor to our knowledge (despite being a lead agency on the 1985 EIR/EIS for the Las Flores Pipeline system) has the State Lands Commission requested the County or CAL FIRE or any other state or federal agency to initiate a CEQA process for this pipeline system restart.

Taken together, the agencies' and County's failure to conduct CEQA on this restart is an absolutely startling prospect, is contrary to law, and poses considerable risks to both public safety and the environment. For something as significant as restarting the entire Santa Ynez Unit's offshore and onshore oil and gas operations after a significant oil spill, one would expect —and the law requires— a robust CEQA process alongside compliance with all other applicable laws before restart is even contemplated.

***The Santa Ynez Unit and its Infrastructure.*** There are currently 30 active oil and gas leases on the Pacific OCS from which oil and gas drilling extraction activities occur or have occurred. Most of these leases are organized into units. The Santa Ynez Unit ("SYU") is in the Santa Barbara Channel and consists of 16 leases issued between 1968 and 1982: Leases OCS-P 0180, 0181, 0182, 0183, 0187, 0188, 0189, 0190, 0191, 0192, 0193, 0326, 0329, 0461, 0194, 0195.[12]

There are three offshore production platforms at the SYU: Platform Harmony, Platform Heritage, and Platform Hondo. Platform Hondo was installed in June 1976, Platform Harmony in June

---

[9] A State Waiver is the term used to describe when a state waives or modifies compliance with a regulatory requirement, such as the requirement that cathodic protection is required to prevent external corrosion of buried pipelines. 49 C.F.R. § 195.563.

[10] ALL AMERICAN PIPELINE PROJECT FINAL DEVELOPMENT PLAN CONDITIONS 88-DPF-033 (RV01)z, 88-CP-60 (RV01) (88-DPF-25cz; 85-DP-66cz; 83-DP-25cz) December 12, 1988 (As Modified Through May 2003); Case No. 83-CP-97z.

[11] In 2023, the State Lands Commission approved the lease extensions on Exxon's expired leases with no environmental review and a legally questionable justification: "Staff recommends that the Commission find that this activity is exempt from the requirements of CEQA as a categorically exempt project. The project is exempt under Class 1, Existing Facilities; California Code of Regulations, title 2, section 2905, subdivision (a)(2)." Staff Report 58, Amendment of a General Lease – Right-of-Way Use (Lease No. 7163), December 5, 2023 meeting Agenda Item 58.

[12] *E.g.*, BOEM, Pacific OCS Region Map (updated May 2024).

1989, and Platform Heritage in October 1989.[13] Production began from these platforms between April 1981 and December 1993.[14] We can find very little information about precisely how the offshore pipelines that carry SYU oil were initially approved and what if any environmental review state and federal agencies conducted on those pipelines.

As far as the onshore pipelines, in 1986, Santa Barbara County approved the Celeron/All American Pipeline Project to transport oil from the SYU onshore under a Final Development Plan and Development Plan Conditions. The County relied on a 1984 Draft EIR/EIS and Final EIR/EIS (Addendum) that incorporated a series of Final Development Plan Conditions, which have subsequently been modified.[15] Pipelines with cathodic protections and other safety measures designed to prevent and minimize the risk of oil spills were an integral part of the pipeline system design, environmental analysis, and ultimate approvals. For example, the EIR/EIS claimed "[t]he entire pipeline would be protected from corrosion with cathodic protection systems."[16] It stated that the "following design features: were proposed "to prevent the adverse impacts of an oil spill," before listing a long, bulleted list of features starting with the first bullet for the cathodic protection system.[17]

The pipelines were constructed from 1988-91. Line 903 became operational in 1991, and Line 901 become operational in 1994.[18]

***The 2015 Refugio Oil Spill.*** For decades, the ExxonMobil Corporation ("Exxon") owned and operated all three platforms and produced oil from the SYU until the 2015 oil spill from the Plains All American Pipeline (Line 901), which ruptured and spilled what is now believed to be up to 460,000 gallons of oil on the Santa Barbara Coast.[19]

As noted above, the rupture was caused in part by progressive external corrosion and ineffective protection against that corrosion.[20] The PHMSA failure investigation report also stated that while

---

[13] *Id.*
[14] *Id.*
[15] ALL AMERICAN PIPELINE PROJECT FINAL DEVELOPMENT PLAN CONDITIONS, 88-DPF-033 (RV01)z, 88-CP-60 (RV01) (88-DPF-25cz; 85-DP-66cz; 83-DP-25cz) December 12, 1988 (As Modified Through May 2003).
[16] California State Lands Commission & Bureau of Land Management, Draft Environmental Impact Report/ Environmental Impact Statement ("1985 EIR/EIS") for the Celeron/All American and Getty Pipeline Projects (Aug. 1984) at 2-35 (as noted in a December 9, 1984 cover letter, the "Finalizing Addendum," "combined with the Draft EIR/EIS, is the Final EIR/ EIS for these projects," and was certified in January 1985); see also, for example *id.* at 2-13, 2-14, 4-106, 4-110 ("Internal corrosion is the largest cause of a spill due to pipeline fault and this is more characteristics of older pipelines which were constructed of different materials and did not have the cathodic protection systems proposed by Celeron/All American and Getty.").
[17] 1985 EIR/EIS at H-35.
[18] Revised NOP for Pipeline Replacement Project (April 26, 2022).
[19] Expert Report of Igor Mezic, Ph.D., Andrews v. Plains All American Pipeline, L.P., United States District Court, Central District of California, Case No. 2:15-cv-04113-PSG-JEM, March 29, 2019 (pp. 16-17).
[20] U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 (May 2016).

cathodic protection is "required under the federal Pipeline Safety Regulations to prevent external corrosion of buried pipelines," they failed here, and "[a]n increasing frequency and extent of corrosion anomalies were noted on both Lines 901 and 903 in [in line inspection] survey results."[21]

The 123.4-mile pipeline system (10.9-mile Line 901/CA-324 and 113.5-mile Line 903/CA-325) has sat idle in the environment ever since that disastrous rupture almost ten years ago. The pipelines had been regulated by PHMSA until 2016 as interstate pipelines. In 2016, after the pipeline failure, the federal government transferred the pipelines to the regulatory and enforcement jurisdiction of CAL FIRE, and to our knowledge from that date forward they have considered Lines 901 and 903 "intrastate hazardous liquid pipelines subject to the regulatory and enforcement jurisdiction of '[CAL FIRE], pursuant to state certification from PHMSA."[22]

After the spill and ensuing litigation, the parties entered into a Consent Decree, *U.S. v. Plains All American Pipeline*, Civil Action No. 2:20-cv-02415 (March 13, 2020), which incorporated elements of Corrective Action Orders issued by PHMSA and required many preconditions to restart (if chosen as an alternative to pipeline replacement or abandonment). Restart was a third option reflected in the Consent Decree, if done in accordance with its terms "and applicable law."[23] Regarding restart for Line 901 and 903, the Consent Decree required that prior to restart, "Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection" and that it "must receive a State Waiver from the OSFM prior to restarting."[24]

The Consent Decree notes that CAL FIRE has the discretion to require additional terms and conditions if it ever decides to grant any request for a State Waiver:

> To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms *that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver*. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.[25]

CAL FIRE clearly has the discretion to deny or modify the State Waiver and other elements of the restart project in ways to lessen and mitigate the higher risk of oil spill and devastating consequences on biological, cultural, water, and other resources, among other environmental harms.

---

[21] *Id.* at 13.
[22] PHMSA-CSFM-MOU for Plains Lines 901 and 903 (May 18, 2016).
[23] Consent Decree at Appendix B, Art. I, 2B.
[24] Consent Decree at Appendix B, Arts. I, 1A, 1B.
[25] Consent Decree at Appendix B, Art. I, 1E (emphasis added).

***The Sale of SYU Assets to Sable Offshore Corporation and Aggressive Push to Restart the Failed Pipeline System.*** In November 2022, Sable entered into a Purchase and Sale Agreement with ExxonMobil Corporation (Exxon) and Mobil Pacific Pipeline Company (MPPC) to acquire the SYU assets as well as all outstanding shares of Pacific Offshore Pipeline Company (POPCO) and Pacific Pipeline Company (PPC). The Purchase and Sale Agreement apparently closed on February 14, 2024. Sable asserts it is now the owner of the SYU assets, POPCO, and PPC. POPCO remains the legal owner of the POPCO Gas Plant, and PPC remains the legal owner of the Las Flores Pipelines.

Sable is now the listed owner and operator of Platforms Harmony, Heritage, and Hondo and lessee on all 16 oil and gas leases in the Santa Ynez Unit.

While its predecessors once pursued building replacement pipelines (and even proposed trucking oil on California highways in the interim),[26] Sable is not pursuing a pipeline replacement project and is instead doubling down on trying to restart the entire SYU operation using already-failed and ever-aging pipelines.[27] Sable recently told its investors that it "affirms that initial restart of production from Sable's [SYU] is expected in fourth quarter 2024."[28]

Sable is seeking a series of approvals from CAL FIRE. The agency posted a webpage laying out six critical requirements and approvals Sable will need before CAL FIRE would authorize restart.[29] They are:

1. Coastal Best Available Technology. This requirement came about in response to the Refugio Oil Spill. It mandates the use of best available technology pipelines like those at issue here.
2. Consent Decree compliance
3. Integrity Management Program to assess and mitigate risks associated with pipeline integrity
4. State Waiver, described as "an order that modifies compliance with a regulatory requirement if an operator demonstrates that alternative measures are consistent with pipeline safety."
5. Deferred Maintenance required for idled pipelines
6. Startup Plan that lays out "procedures and protocols for safely restarting"

---

[26] County of Santa Barbara, Planning & Development webpage for 901/903 Replacement Pipeline Project, https://www.countyofsb.org/3801/901903-Replacement-Pipeline-Project; County of Santa Barbara, Planning & Development, webpage for ExxonMobil Interim Trucking for SYU Phased Restart, https://www.countyofsb.org/872/ExxonMobil-Interim-Trucking-for-SYU-Phas (last visited September 21, 2024).

[27] Sable Offshore Corporation is now the listed owner and operator of Platforms Harmony, Heritage, and Hondo and lessee on all 16 oil and gas leases in the Santa Ynez Unit. It is also in the process of requesting assignment of its State Lands Commission-regulated offshore pipelines and associated infrastructure leases and its County of Santa Barbara-issued permits.

[28] Sable Offshore Corp., Security and Exchange Commission Form 8-K (Aug. 30, 2024).

[29] Pathways for Restarting CA-324 and CA-325 https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited September 21, 2024; last revised August 2, 2024).

Teel Declaration
Page 78

The CAL FIRE webpage posted for the restart of Lines 901/903 lays out the process generally and includes some documents. Yet , it lacks detail about what progress Sable has or has not made on the various restart steps. Further, some key documents are missing or not even mentioned, like the Startup Plan Sable contends it submitted to CAL FIRE in late July,[30] or they are heavily redacted, like the Line 901 Risk Analysis Plains Pipeline, L.P. submitted and CAL FIRE apparently approved (for Sable's use) that looks like this in the version made publicly available:[31]



Sable is also in the process of requesting assignment of its State Lands Commission-regulated offshore pipeline and associated infrastructure leases in state waters. To date, all of the Commission's meetings about this topic have been in Closed Session.[32] For example, on June 7, 2024, the Closed Session item was described as follows:

> **NOTICE OF CONFERENCE WITH REAL PROPERTY NEGOTIATOR**: Instructions to staff negotiators in Closed Session, pursuant to Government Code section 11126(c)(7), regarding applications for assignment of four leases governing the use of existing offshore oil and gas pipelines traversing state waters associated with the Santa Ynez Unit in federal waters, the Ellwood Pier, and two mooring buoys, offshore Santa Barbara County. Negotiating Parties: State Lands Commission, ExxonMobil, and Sable Offshore Corp. Under negotiation: price and terms.

---

[30] Sable Offshore Corp. Reports Second Quarter 2024 Financial and Operational Results (August 13, 2024) ("On July 29, 2024, Sable met its 60-day advanced notice requirement to submit its production restart plans for the Pipelines to the OSFM for review and approval.")

[31] Plains Pipeline, L.P., State of California Assembly Bill 864: Coastal Best Available Technology Regulation Section 2113 Implementation Plan to Retrofit with Best Available Technology OSFM Line ID No. 0015 (Plains Pipeline, L.P. Line 901 Las Flores to Gaviota 24") (April 1, 2021).

[32] See, e.g., Staff Report 70 (Informational), August 29, 2024.

Sable is also actively seeking the following transfers from the County of Santa Barbara:

- a Change of Owner, Operator, and Guarantor of the Santa Ynez Unit's (SYU) Final Development Plan Permit No. 87-DP-032cz (RV06) from ExxonMobil Corporation to Sable;
- a Change of Owner, Operator, and Guarantor of the Pacific Offshore Pipeline Company (POPCO) Gas Plant's Final Development Plan Permit No. 93-FDP-015 and 74-CP-11(RV1) from ExxonMobil Corporation to Sable; and
- a Change of Owner, Operator, and Guarantor of the Las Flores Pipeline System's Final Development Plan Permit No. 88-DPF-033 (RV01)cz, 88-CP-60 (RV01), and 88-DPF-25cz (85-DP-66cz; 83-DP-25cz) from ExxonMobil Pipeline Company and ExxonMobil Corporation to Sable. In other words, Sable would be the Guarantor and Operator for all of the facilities.

These requests are set to be heard by the Planning Commission on October 9, 2024.[33]

More importantly, the County must require the owner/operator get a new permit for this restart project or at a minimum revise or modify the Development Plan and Conditional Use Permit for the pipeline system and conduct CEQA .The Final Development Plan Conditions of approval for the failed pipeline system include that:

> The ***procedures, operating techniques, design, equipment and other descriptions*** (hereinafter procedures) described by AAPLP in its application to the County 83-DP-25 cz, 83-CP-97 cz, and in subsequent clarifications and additions to that application and the Final Development Plan ***are incorporated herein as permit conditions and shall be required elements of the project***. Since these procedures were part of the project description which received environmental analysis***, a failure to include such procedures in the actual project could result in significant unanticipated environmental impacts. Therefore, modifications of these procedures will not be permitted without a determination of substantial conformity or a new or modified permit***.[34]

The 1980s conditions of approval also require a "new or modified permit, or authority to continue operation under the existing permit prior to undertaking…: 1) major pipeline or pump station modifications"[35] and that the County can modify or revoke the permit under certain circumstances like failure to comply with any "permit condition."[36] Restart of these pipelines

---

[33] County of Santa Barbara, Planning & Development, webpage for Sable Offshore SYU, POPCO Gas Plant, and Las Flores Pipelines Change of Owner, Operator, and Guarantor, https://www.countyofsb.org/4189/SYU-POPCO-Gas-Plant-Las-Flores-Pipelines (last visited September 21, 2024).

[34] Las Flores Pipeline System Final Development Conditions, 88-DP-33 RV01, 88-CP-060 RV01, at A-7 (emphasis added).

[35] *Id.* at A-13.

[36] *Id.* at A-2 ("If the Planning Commission determines at a noticed public hearing that AAPLP is not in

after a catastrophic failure of its fundamental design and a massive oil spill (which now necessitates a whole new set of spill avoidance and mitigation measures, a State Waiver, assignments of leases and permits, new oil spill contingency plans, certificates of financial assurances, among other authorizations before restart may be allowed), are certainly such modifications.

***The Need for Robust Environmental Review Before Any Contemplation of Restart.*** This pipeline restart process cannot be approved until decisionmakers fully comply with CEQA. CEQA is California's bedrock environmental law. CEQA embodies the state's policy to "[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions." *No Oil, Inc. v. City of Los Angeles*, 13 Cal. 3d 68, 74 (1974) (quoting Pub. Res. Code § 21001(d)). To further CEQA's purpose, the statute must be "liberally construed to afford the fullest possible protection to the environment." *Protect Niles v. City of Fremont*, 25 Cal. App. 5th 1129, 1145 (2018); *see also Wildlife Alive v. Chickering*, 18 Cal. 3d 190, 206 (1976) (endorsing same principle).

CEQA mandates that public agencies prepare "an environmental impact report on any project that they intend to carry out or approve which may have a significant effect on the environment." Cal. Pub. Res. Code ("PRC") §§ 21151(a) (local agencies) and 21100(a) (state agencies). This EIR is "the heart of CEQA" and serves as "an environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return." *Laurel Heights Improvement Ass'n v. Regents of Univ. of Cal.*, 47 Cal. 3d 376, 392 (1989) (quoting *County of Inyo v. Yorty*, 32 Cal. App. 3d 795, 810 (1973)).

Here, CAL FIRE, the State Lands Commission, and Santa Barbara County have failed to initiate CEQA on the many discretionary approvals needed for a restart of this failed pipeline system. Santa Barbara County Planning & Development Department has previously acknowledged that discretionary action is needed from the County, CAL FIRE and PHMSA to restart the pipeline system, noting that it was adjusting the baseline conditions for the proposed 901/903 Replacement Pipeline Project after it had:

> confirmed with the California State Fire Marshal and the Pipeline and Hazardous Materials Safety Administration (PHMSA) that restarting the existing Line 901 and 903 pipeline system would require a State Waiver from the Fire Marshal and a Special Permit from PHMSA, as Plains cannot meet the current cathodic protection requirements outlined in PHMSA's Corrective Action Orders (CAOs) due to deficiencies in the existing pipeline coating. Further, if Plains were to pursue restart of the existing lines, they would be required to retrofit Line 901-903 using best available technologies pursuant to State Assembly Bill AB 864 prior to restart approval from the State Fire Marshal and PHMSA….Retrofits to the existing line (e.g installation of additional valves) would require discretionary action from SB County, via an amendment to the approved Development Plan No. 85-DP-66cz.

compliance with any permit condition*(s)*, pursuant to the provisions of Sec. 35-185 of Article II and/or Sec. 35-330 of Article III of the Santa Barbara County Code, the Planning Commission is empowered, in addition to revoking the permit pursuant to said section, to amend, alter, delete, or add conditions to this permit.")

The work requested under this amendment application (case number 21AMD-00000-00009 amending 85-DP-66cz) is considered outside of regular maintenance and repair activities. ***Because discretionary actions to permit restart activities are needed from the California State Fire Marshal, PHMSA, and SB County***, the baseline conditions evaluated in the Draft EIR/EIS were changed to the conditions that existed on the ground at the time the 2019 NOP and NOIs were released, which is, and continues to be, a non-operational pipeline.[37]

Yet in the case of this pipeline restart project and the various agency approvals needed, no CEQA review has been initiated, the public has been largely in the dark, and decisionmaking has for the most part occurred behind closed doors, thwarting the public disclosure, informed decisionmaking, and environmental protection purposes of CEQA.[38]

While they have to our knowledge issued no publicly available CEQA determination or explanation for why they have failed to commence CEQA review, CAL FIRE, the State Lands Commission, and the County of Santa Barbara certainly cannot rely for their 2024 authorizations on a 1985 Joint Environmental Impact Report/Environmental Impact Statement (1985 EIR/EIS) prepared by the State Lands Commission, U.S. Bureau of Land Management, and U.S. Department of Interior[39] for the Celeron/All American and Getty Pipeline Projects (SCH 83110902), a full forty years and a major oil spill later. The 1985 EIR/EIS specifically evaluated a pipeline system whose key features failed and were deemed ineffective by PHMSA at preventing dangerous corrosion. In other words, the pipeline system evaluated in 1985 does not exist. Not only did the 1985 EIR/EIS fail to evaluate the pipeline system that now exists or the spill mitigation approaches now proposed in light of the pipeline system's failure, but presciently, the Draft 1985 EIR/EIS only specified a "projected 30-year life of the project." [40] This anticipated lifespan of the project lapsed the very same year of the Refugio Oil Spill, almost a decade ago. In sum, this 40-year old EIR/EIS is of very little relevance now.

---

[37] Revised NOP for the Draft Environmental Impact Report / Environmental Impact Assessment for the 901/903 Replacement Pipeline Project at 2-3 (emphasis added); the County has since been involved in litigation over their denial of a stand-alone 901/903 Valve Upgrade project (a request for an amendment to the Major Conditional Use Permit, Case No. 83-CP-97z and Development Plan 85-DP-66cz to allow for the installation of 16 new valves on existing Line 901 and Line 903 running from the Gaviota Coast to the Los Padres National Forest within Santa Barbara County). On September 19, 2024, the U.S. District Court for the Central District of California issued an Order on Stipulation to Vacate All Dates and Stay the Case in Light of Conditional Settlement in that litigation. *Pacific Pipeline Company and Sable Offshore Corporation v. Santa Babara County Planning Commission and Board of Supervisors*, Case No. CV 23-09218-DMG (MRWx). This letter's References include the Final Conditional Settlement Agreement (August 30, 2024).

[38] We have seen no notice to the public that any such process has commenced or that any agency has invoked any statutory or regulatory exemption to CEQA, which in any case would not apply to this project or the extraordinary circumstances under which it is proposed.

[39] The Joint review panel included the Santa Barbara County Resource Management Department and cooperating agencies that included the U.S. Forest Service, the U.S. Fish and Wildlife Service, the U.S. Federal Highway Administration, and California Secretary of Environmental Affairs.

[40] 1985 EIR/EIS at 2-35.

The current plan to somehow rehabilitate a post-failure, post-spill, ten years-idled pipeline system is hard to fathom, and its environmental implications certainly have never been assessed. This is even more troubling because re-starting the old, unsafe pipeline is even more dangerous than constructing a new pipeline. As the 1985 EIR/EIS acknowledged, the risk of a spill *more than doubles* as pipelines age from 20 to 40 years.[41] It cannot be relied upon for this 2024 proposed pipeline system restart project, a fundamentally different, post-failure, post-spill pipeline system.

As discussed in our many other letters concerning the restart of the SYU's oil and gas operations, several of which we hereby incorporate by reference,[42] these pipelines and other SYU infrastructure contribute to greenhouse gas pollution and the climate emergency, air pollution,[43] risk of oil spills and other accidents, water pollution, harm to biological resources including threatened and endangered species and their habitat, and harm to cultural resources among other impacts. These impacts have never been analyzed with respect to this pipeline system restart.

The draft EIR issued for the abandoned 901/903 Replacement Pipeline Project[44] is instructive on the risks a restart poses. It flags the risk of failures due to age and if cathodic protections could not be restored. It cites a 1993 Office of the State Fire Marshall report for the proposition that there is:

> a five times increase in failure frequencies for pipelines that are not equipped with cathodic protection over the average failure rate. In addition, because the existing pipeline is older, it could experience a higher failure rate due to age.[45]

It then estimated that restarting Lines 901/903 (CA-324 and CA-325) could result in a spill once a year, and a rupture once every four years even with the "installation of additional valve stations" as proposed.[46] Another recent analysis by Sable indicates that a worst-case spill from

---

[41] *Id*. at 4-166.

[42] *See, e.g.* May 23, 2024 Letter and References re Draft Part 70 Renewal Permits for Sable Offshore's Santa Ynez Unit Stationary Source; February 8, 2023 Letter and References re Extensions of ExxonMobil's Oil and Gas Leases on the Pacific Outer Continental Shelf; September 27, 2021 Center Comments and References re ExxonMobil Interim Trucking for SYU Phased Restart Project; June 4, 2019 Center et al. Comments and References re Draft Supplemental Environmental Impact Report for the Proposed Interim Trucking for Santa Ynez Unit (SYU) Phased Restart Project.

[43] Before shutting down in 2015, Exxon/Sable's Las Flores Canyon facility was Santa Barbara County's largest source of greenhouse gas, volatile organic compounds, fine particulate matter, and formaldehyde pollution in Santa Barbara County. California Air Resources Board, Pollution Mapping Tool Data, spreadsheet of Santa Barbara emissions for 2014, available at https://www.arb.ca.gov/ei/tools/pollution_map/; *see also* U.S. Environmental Protection Agency, 2014 Greenhouse Gas Emissions from Large Facilities, https://ghgdata.epa.gov/.  It constituted 55 percent of Santa Barbara County's total greenhouse gas emissions. *Id*.

[44] County of Santa Barbara, Planning & Development webpage for 901/903 Replacement Pipeline Project, https://www.countyofsb.org/3801/901903-Replacement-Pipeline-Project (last visited September 21, 2024).

[45] Administrative Draft of Draft EIR for Plains Pipeline Replacement Project, Section 5.6, p. 7.

[46] *Id*. at Section 5.6, p. 79.

this old pipeline could be 41,899 barrels of oil or *over 1.7 million gallons*.[47] The current restart plan with its higher oil spill risk (and attendant threats to water, cultural, biological and other resources) certainly constitutes "a reasonable possibility that the activity will have a significant effect on the environment," CEQA Guidelines § 15300.2(c), and thus is inappropriate for any exemption from CEQA and must be analyzed in a full EIR.

As a coalition of environmental organizations (including the Center) communicated in a recent letter to CAL FIRE,[48] the previously requested transparency, public process, and environmental review of the state waiver and restart process has been lacking despite "OSFM's Commitment" to full compliance with all requirements and applicable regulations before restart:

> The OSFM remains steadfast in its commitment to pipeline safety, serving the interests of both the State and local communities. Both CA-324 and CA-325 must fulfill **all** the aforementioned requirements before restarting operations. The pipeline operator must undergo a multi-stage review process to comply with these requirements and is expected to work with other agencies to meet their regulations, ***including any environmental review***, before potentially restarting the subject pipelines.[49]

The Center is aware of no CEQA analysis initiated by any agency or the County to analyze the present and future environmental impacts and risks of restarting these old, already-compromised pipelines almost ten years after the Refugio Oil Spill and cessation of operations. To the best of our knowledge, there is no CEQA review underway despite the fact that multiple agencies are considering multiple applications for authorization to restart various aspects of the pipeline systems, including but not limited to the request for a State Waiver to deviate from the once considered essential cathodic protections that were at the heart of the 1980s pipeline system design (and the Final EIR/EIS and project approvals). The bottom line is that potential impacts of restarting this pipeline system after a catastrophic failure and ten years sitting idle has never been adequately evaluated under CEQA by any permitting or approving agency.

**CONCLUSION**

Restarting Lines 901/903 (CA-324 and CA-325) and its connected onshore and offshore infrastructure risks significant harm to our beaches, waterways, air quality, wildlife, Tribal cultural resources, human health, ecosystems, and coastal economy and is contrary California's commitment to transition away from fossil fuels and their infrastructure. At a minimum, this restart project cannot be considered absent full compliance with CEQA.

The Center for Biological Diversity and Wishtoyo Chumash Foundation request that the Office of the State Fire Marshal, the County of Santa Barbara, and the State Lands Commission:

---

[47] Sable Offshore Corp., Pacific Pipeline Company Integrated Contingency Plan Las Flores Canyon Core Plan (Apr. 2024) at 14-4.

[48] September 10, 2024 Letter from 28 organizations to the Office of the State Fire Marshal.

[49] Pathways for Restarting Pipelines, Requirements for Restarting the CA-324 and CA-325 Revised: August 2, 2024 https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited on Sept. 13, 2024) (second emphasis added).

- immediately pause any further or final approvals concerning the restart of onshore pipelines 901 and 903 (now known as CA-324 and CA-325), and the connected offshore and onshore pipelines and other facilities, including but not limited to the State Waiver and restart plan and lease and permit transfers;
- release key documents and other pertinent information about the restart project and pending approvals to the public without delay and hold a public hearing on the restart proposal;
- clarify that new permits are needed for the pipeline system to restart (if it ever can) or in the alternative require a substantial revision of the existing Development Plan and Conditional Use permits and notify the pipeline system owner(s)/operator(s) that they must submit new applications for review;
- initiate CEQA review for the pipeline system restart project should you proceed to consider restart as a feasible option (which we do not) to ensure public transparency and informed decisionmaking.

Too much of the restart process has already happened behind closed doors. For an issue as important as restarting this old pipeline system that has already ruptured disastrously once, the public deserves—and the law requires—transparency and accountability at every step of the way from Santa Barbara County and the State of California's regulatory, public safety, and environmental agencies.[50]

Sincerely,

Julie Teel Simmonds, Senior Counsel
Center for Biological Diversity
619-990-2999
jteelsimmonds@biologicaldiversity.org


cc:     Lieutenant Governor Eleni Kounalakis
        Office of the Lieutenant Governor of California
        eleni.kounalakis@ltg.ca.gov

        Matthew Dumlao, Chief of Staff
        Office of the Lieutenant Governor
        matthew.dumlao@ltg.ca.gov

        Brian Goldman, Deputy Legal Affairs Secretary


[50] We will mail cited references on a USB drive and make them available here. Please let me know if you have problems accessing any of the documents.

Office of Governor Gavin Newsom
brian.goldman@gov.ca.gov

Lauren Sanchez, Senior Climate Advisor
Office of Governor Gavin Newsom
lauren.sanchez@gov.ca.gov

Rob Bonta, Attorney General
State of California Department of Justice
rob.bonta@doj.ca.gov

Angela Mo, Senior Counsel
angela.mo@usdoj.gov

Jim Hosler, Chief /Assistant Deputy Director, CAL FIRE
Jim.Hosler@fire.ca.gov

Wade Crowfoot, Secretary
California Natural Resources Agency
wade.crowfoot@resources.ca.gov
secretary@resources.ca.gov

Armando Quintero, Director
California Department of Parks and Recreation
Armando.Quintero@parks.ca.gov

Charlton Bonham, Executive Director
California Department of Fish and Wildlife
director@wildlife.ca.gov

Ryan Lodge, Executive Officer
Central Coast Regional Water Quality Control Board
Ryan.Lodge@waterboards.ca.gov

Steve Monfort, Executive Director
UC Natural Reserve System
steve.monfort@ucop.edu

Barton Loundsbury, Senior Counsel
Regents of the University of California
barton.lounsbury@ucop.edu

Heather Geldart, Administrator
Office of Spill Prevention & Response
California Department of Fish and Wildlife
Heather.Geldart@wildlife.ca.gov

Le-Quyen Nguyen, Deputy Secretary for Energy
California Natural Resources Agency
le-quyen.nguyen@resources.ca.gov

Gabe Tiffany, Acting Director
California Department of Conservation
gabe.tiffany@conservation.ca.gov

Benjamin Turner, Chief Policy and Planning Advisor
California Department of Conservation
Benjamin.turner@conservation.ca.gov

Jennifer Lucchesi, Executive Officer
California State Lands Commission
Jennifer.Lucchesi@slc.ca.gov

Kate Huckelbridge, Executive Director
California Coastal Commission
Kate.Huckelbridge@coastal.ca.gov

Cassidy Teufel, Deputy Director
California Coastal Commission
Cassidy.Teufel@coastal.ca.gov

Malia Cohen, State Controller
California State Controller's Office
malia.cohen@sco.ca.gov

Kristina Kunkel, Deputy State Controller
California State Controller's Office
kkunkel@sco.ca.gov

Joe Stephenshaw, Director
California Department of Finance
joe.stephenshaw@dof.ca.gov

Michele Perrault, Chief Deputy Director, Policy
California Department of Finance
michele.perrault@dof.ca.gov

Senator Monique Limón
California State Senate
Monique.limon@sen.ca.gov

Assemblymember Gregg Hart

California State Assembly
Gregg.hart@asm.ca.gov

Supervisor Das Williams, District 1
Santa Barbara County Board of Supervisors
dwilliams@countyofsb.org

Supervisor Laura Capps, District 2
Santa Barbara County Board of Supervisors
lcapps@countyofsb.org

Supervisor Joan Hartmann, District 3
Santa Barbara County Board of Supervisors
jhartmann@countyofsb.org
supervisorhartmann@countyofsb.org

Supervisor Bob Nelson, District 4
Santa Barbara County Board of Supervisors
bnelson@countyofsb.org

Supervisor Steve Lavagnino, District 5
Santa Barbara County Board of Supervisors
slavagnino@countyofsb.org

David Villalobos, Hearing Support Supervisor
Santa Barbara County Board of Supervisors
dvillalo@countyofsb.org

William Sarraf
Santa Barbara County Air Pollution Control District
SarrafW@sbcapcd.org

Deb Haaland, Secretary
U.S. Department of the Interior
Deb_Haaland@ios.doi.gov
exsec@ios.doi.gov

Martha Guzman, Regional Administrator
U.S. Environmental Protection Agency, Region IX
guzman.martha@epa.gov

Amy Miller, Director, Enforcement and Compliance Assurance Division
U.S. Environmental Protection Agency, Region IX
miller.amy@epa.gov

Tomas Torres, Director, Water Division

U.S. Environmental Protection Agency, Region IX
torres.tomas@epa.gov

Vasiliki Tsaganos, Acting Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety Administration
phmsachiefcounsel@dot.gov

# ATTACHMENT 4

# Sable Offshore Energy Clears Major Hurdle to Restart Damaged Pipeline in Santa Barbara County

ⓘ independent.com/2024/12/20/sable-offshore-energy-clears-major-hurdle-to-restart-damaged-pipeline-in-santa-barbara-county/

By Nick Welsh                                                    December 20, 2024



State Senator Monique Limón (center) and State Assemblymember Gregg Hart (center left) have both expressed keen disappointment in the decision of the state Fire Marshal and governor's office to grant a "waiver" to Sable that qualifies as a key procedural victory in its plans to restart the oil pipeline that caused 2015's Refugio Oil Spill. | Credit: Courtesy Office of Monique Limón and Paul Wellman File Photo

California State Fire Marshal Daniel Berlant approved a key pipeline-corrosion-control plan submitted by the Sable Offshore oil company on December 17 that's absolutely pivotal in the company's long-range efforts to reactivate not just the pipeline — which ruptured and spilled about 450,000 gallons of crude in 2015 — but for restarting production at what used to be ExxonMobil's massive oil and gas operations in Las Flores Canyon. Exxon, like all oil operators off the Gaviota Coast, has been shut down the past nine years because of that pipeline rupture.

For Sable — which took over Exxon's processing plant, pipeline, and three offshore oil platforms two years ago — the Fire Marshal's decision on December 17 to issue a "waiver" for the plant's "cathodic protection" corrosion control system qualifies as a key procedural victory in its efforts to get the former Exxon plant restarted again.

State Assemblymember Gregg Hart and State Senator Monique Limón have both expressed keen disappointment in how the decision was made, coming 13 days after the California Fire Marshal had given them both strict assurances no such decision would be released until he'd first held a public meeting in Santa Barbara to hear concerns from community members. That meeting did not happen and has been tentatively postponed until sometime after January 1.

Waivers were required from Sable for the pipeline's cathodic protection system because that system is designed to protect pipelines that are both heated and insulated, as Sable's pipeline is, from corrosion. That system — which for many oil pipelines is regarded as fundamental essential safety equipment — utterly failed to protect the pipeline from the ravaging effects of corrosion that caused the 2015 rupture, spill, cleanup, and subsequent criminal conviction of Plains All American Pipeline, the pipeline's owner at the time of the spill.

In fact, the cathodic protection system was mandated by the conditions of approval for the pipeline when it was first approved and installed in the late 1980s by what was then the Celeron Pipeline Company. That pipeline was subsequently purchased by the Plains All American Pipeline Company, then by Exxon, and, now, most recently by Sable.

According to a statement issued by the Fire Marshal's office, the waiver does not "abandon" the requirement for cathodic protection but acknowledges that the system in place is not adequate to prevent leaks and spills and that Sable must use "alternate measures to meet or exceed" specified state and federal safety requirements. According to the statement, "There are 63 conditions listed in the State Waiver that ensure Sable will exceed minimum protections. These conditions include additional reporting requirements for leak detection and more stringent integrity testing."

Sable issued a statement expressing "appreciation" that the Fire Marshal approved the waiver and forwarded it to the federal agency in charge of pipeline safety for concurrence. Company spokesperson Alice Walton stated that Sable's proposal includes "state-of-the-art internal and external inspection" programs that will be deployed 10 times more frequently than currently required to address "potential anomalies." "Anomalies" is an industry term to refer to corrosion hot spots. After the 2015 spill, federal pipeline regulators determined there were at least 92 such anomalies.

Teel Declaration
Page 92

Walton added that Sable's waiver application pledged to repair such anomalies at a rate 20 percent higher than required by existing regulations. To put the amount of work anticipated in perspective, Walton stated, "Anomaly repairs average 1.5 excavations per mile along the 124-mile pipeline."

Attorneys with the Environmental Defense Center (EDC) and the Center for Biological Diversity — both leading the charge to stop Sable from restarting the former Exxon production facility — issued press releases blasting the Fire Marshal's action. Both press releases have the same headline: "California Allows Dangerous Santa Barbara Oil Project to Move Forward." Both question the fundamental safety of a pipeline that was allowed to get so badly corroded as the one Sable hopes to restart and have challenged the notion that such a damaged pipeline can be repaired to be "as new" as Sable has promised.

Likewise, the EDC has objected that the public has not been allowed to review the documents in which the details of the proposed waiver are outlined. They contended that the technology for in-line oil-pipeline integrity, on which Sable and the Fire Marshal are relying, is notably unreliable.

According to analysis of the 2015 spill by the federal pipeline agency, the in-line detection system then checking the pipeline missed the boat. According to inspection reports, the pipeline where the rupture occurred was 47 percent corroded. But when the pipeline was excavated and the level of actual corrosion measured, they discovered the true level of pipeline corrosion was 86 percent.

From their respective perches in Sacramento, State Assemblymember Hart and State Senator Limón have been working hard to bird-dog the project with the Fire Marshal and other state agencies with oversight jurisdiction. Hart acknowledged that he himself had not seen the waiver application or the waiver approval. "I probably wouldn't understand it if I did," he added. "These are highly technical documents."

Limón was equally blunt: "Let's get this straight. I am not a pipeline inspector, right."

Teel Declaration
Page 93



"I never experienced anything like this, a direct promise that was not kept," said State Assemblymember Gregg Hart of the "about-face" on the point-blank assurances he and State Senator Monique Limón received from state officials that no decision would be made about Sable and its waiver request until after a public meeting was held in Santa Barbara first. | Credit: Courtesy Office of Gregg Hart

While Sable executives have undeniable cause to sigh vast cumulonimbus clouds of relief, it remains premature for them to start popping champagne corks, suggested Limón. "Yes, this is a setback, and yes, it's disappointing. But it is hardly the last word on the proposal, and it's hardly the final decision," she stated. The Fire Marshal, she noted, still has two key decisions to make on pipeline and plant safety. Five other state agencies, she stressed, must sign off on aspects of Sable's proposal, as well.

When Hart and Limón spoke with the Fire Marshal and members of Governor Gavin Newsom's staff about this on December 4, the governor's staff committed to generating a flow chart clarifying just what jurisdictional bite out of Sable's proverbial apple each of these agencies had. What was their purview? What findings did they have to make to greenlight Sable? What evidence was required to make those findings? And what were their respective deadlines?

According to an interview with Hart on December 19, that flow chart has yet to be generated.

To the extent anyone currently has this information, it is the government affairs officers and land-use consultants working for Sable.

Hart and Limón have found themselves put in the unusual and uncomfortable position of having to herd cats for these six state agencies on behalf of the Santa Barbara community at large, because earlier this summer, the County of Santa Barbara settled the lawsuit Sable filed against the Board of Supervisors by agreeing that it had no jurisdiction over any work the company did on the pipeline. Once the county settled with Sable, it ceased to offer the traditional community portal for public hearings that the county's Planning Commission and the Board of Supervisors always has in the county's historic and often epic battles over oil development.

During Hart and Limón's December 4 meeting with the Fire Marshal and representatives of the governor's staff, they say they were given point-blank assurances by the Fire Marshal that no decision would be made about Sable and its waiver request until after a public meeting was held in Santa Barbara first. It was not clear at that point whether the meeting would involve just the Fire Marshal or representatives from the other state agencies with jurisdiction. What was clear, however, was that this gathering would not have the legal weight of a public hearing — where testimony is entered into the public record and has the quasi-legal weight of evidence that could be cited in the event of subsequent litigation. It was just a meeting. Mostly, it was courtesy being extended to Santa Barbara's two representatives in the statehouse. It was not legally required.

About 5 p.m. on December 7, Hart said he got an email from the staffer in the governor's office who had been party to the December 4 meeting. Call me, it said. Hart was informed that individuals higher up in the governor's office — higher up over the Fire Marshal — had other thoughts. The Fire Marshal, they had determined, was not the appropriate entity to convene a public meeting. As state agencies go, the Fire Marshal's office does not hold public hearings; its decisions are typically made behind closed doors with an air of papal infallibility and Vatican secrecy. To the extent the courtesy of a public process was extended to Santa Barbara, Hart said, he was told that perhaps the California Coastal Commission or the State Lands Commission — both of whom wield some degree of authority over aspects of Sable's proposal — would provide that forum.

Still, he was less than thrilled by how things played out. "It was a complete about-face. There was no warning. No advance notice. This was the exact opposite of what was promised," he said. "I never experienced anything like this: a direct promise that was not kept."

Limón was not happy either. "Clearly, I am disappointed that the waiver was been approved despite a commitment there would be a community discussion between the state agencies involved and the community of Santa Barbara first. This is a setback. But

in my eight years here, there have been setbacks involved in every major decision I've been involved with. It's not over by any means."

The agencies with jurisdiction and oversight that have yet to weigh in on key decision points include the California State Fire Marshal, the California Coastal Commission, the State Lands Commission, the California Department of Fish and Wildlife, the Division of Oil Spill Prevention and Response, and the California Geologic Energy Management Division.

## Related Posts

## Premier Events

Mon Dec 23, 2024 | 15:05pm

https://www.independent.com/2024/12/20/sable-offshore-energy-clears-major-hurdle-to-restart-damaged-pipeline-in-santa-barbara-county/

# ATTACHMENT 5

# State Waiver

**A State Waiver allows adjustments to regulations if alternative measures provide equal or better safety. The operator must obtain a State Waiver from the OSFM and approval from Pipeline and Hazardous Materials Safety Administration (PHMSA) as required by the Consent Decree before restarting CA-324 and CA-325.**



## What is the State Waiver and how long does it last?

- A State Waiver is an official allowance granted to ensure safety standards are met or exceeded for specific operations.

- The waiver's duration is ten years, but it may be terminated or modified by the Office of the State Fire Marshal if there is non-compliance or if new information or technology emerges.

## Process of State Waiver Approval

- Before a State Waiver is granted, the Office of the State Fire Marshal must send it to the Pipeline and Hazardous Materials Safety Administration (PHMSA) for a 60-day review period.

  PHMSA can approve, object to, or remain silent on the waiver within 60 days. If PHMSA has no objections or issues an approval, the waiver takes effect.

## Does the State Waiver Allow Pipeline Operation?

- No, the waiver alone doesn't clear Sable to operate the pipeline.

- Sable must complete further safety steps set by the Office of the State Fire Marshal and secure approvals from other state and federal agencies.

  The State Waiver is one of six requirements for restarting pipelines CA-324 and CA-325, which transport crude oil from the Las Flores processing plant to Emidio.

## Cathodic Protection and the State Waiver

- Cathodic Protection (CP) helps reduce corrosion on pipelines but may have limited effectiveness when insulation around the pipeline shields it.

  To compensate, the State Waiver mandates stricter inspection and repair standards. For instance, Sable must use In-Line Inspection tools to check for corrosion twice per year in the first two years and then annually.

# ATTACHMENT 6

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Evaluation of Las Flores Pipeline System Startup Proposal*

**Prepared For**

## The Center for Biological Diversity
## &
## The Environmental Defense Center

**December 20, 2024**

Accufacts Inc. 12-20-24

## Table of Contents

I.   *Executive summary and major findings* ..............................................................1

II.  *Accufacts experience qualifying me as an expert in this matter.*................................3

III. *A brief historical perspective*......................................................................4

IV.  *The Las Flores Pipeline System.* ...................................................................5

V.   *TIMP regulations are not working to protect the public or the environment.*.........8

    **1) Hydrotesting assessments.** ....................................................................**8**

    **2) ILI assessments.**..................................................................................**10**

VI.  *The greatest threat on the Las Flores Pipeline System is from external corrosion.* ..........................................................................................**11**

VII.  *High pipeline operating temperatures accelerate all forms of corrosion.*........... 13

VIII. *The Consent Decree agreement fails to require adequate IM processes to prevent another rupture of the poorly designed Pipelines.*..................................... 14

IX.  *The poorly designed Pipelines cannot be made as safe as new pipelines.*.............. 14

X.   *Conclusion.* ...................................................................................... 15

Accufacts Inc. 12-20-24          i

## I.    Executive summary and major findings

Accufacts Inc. ("Accufacts") was asked to review the documents related to the Las Flores Pipeline System ("Pipelines") for possible restart.   A Consent Decree signed in March, 2020 places responsibility for approving processes related to the onshore pipeline system restart on the California Office of the State Fire Marshal, or OSFM, the agency responsible for intrastate hazardous liquid pipeline safety.[1]  The Consent Decree replaces various Corrective Action Orders issued on the Pipelines by the Pipeline and Hazardous Materials Safety Administration, or PHMSA, the federal agency responsible for pipeline safety.[2]   PHMSA is the federal agency responsible for establishing minimum pipeline safety regulations for many pipelines operating in the U.S., including intrastate hazardous liquid transmission pipelines.   States meeting certain conditions can impose pipeline safety standards for intrastate pipelines beyond PHMSA regulations as long as such state regulations are not in conflict with PHMSA regulations.   By agreement, the Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed wavier alternative measures "provide an equal or greater level of safety."[3, 4]  The Consent Decree is inadequate, missing many corrosion threats to the Pipelines that can result in rupture.

Accufacts finds that the main technical issues concerning the restart of the Pipelines are:

1.  **The poorly designed pipeline system renders required federal mandated cathodic protection ("CP"), intended to help address pipeline external corrosion, ineffective.**
2.  **Current inline inspection ("ILI") technologies cannot adequately allow the assessment of all forms of external corrosion threats that most likely exist on the Pipelines.**
3.  **The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective CP system once the Pipelines go into operation.**
4.  **Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure. The poorly designed Pipelines cannot be made as safe as new pipelines.**

---

[1] Such state responsibility is dependent on whether the state agency meets certain qualifications required by PHMSA and whether the state Legislature has granted such state authority, as California has.

[2] UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA, UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, ex rel. DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, ex rel. CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, ex rel. CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, ex rel. CALIFORNIA STATE LANDS COMMISSION, ex rel. CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARCHALL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA (Plaintiffs) v. PLAINS ALL AMERICAN PIPELINE L.P. and PLAINS PIPELINE, L.P. (Defendants), Consent Decree, Civil Action No. 2:20-cv-20415 signed March 2020 ("Consent Decree").

[3] *Ibid.,* Appendix B & Appendix D, paragraph 1.

[4] PHMSA website, " Special Permits and State Waivers Overview," at https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

Accufacts Inc. 12-20-24                                                                    Page 1 of 15

Oil spills are catastrophic events, and operation of any pipeline carries a risk of spill. At best, good pipeline design and pipeline integrity management tools can reduce—but not eliminate—the risk. The Consent Decree is replacing incomplete integrity management ("IM") approaches implemented by Plains that failed to prevent a pipeline rupture from the poor design of the Pipelines, with another incomplete IM approach expecting a change in the outcome.

The Pipelines have been sitting shut down for over nine years at ambient temperatures without effective CP protection. While external corrosion rates in this shutdown mode are significantly reduced because of lower temperatures as discussed later in this report, **the risk of external corrosion is not eliminated**. The Consent Decree requires the OSFM to seek a waiver of the federal pipeline safety CP requirements defined under Subpart H, subject to the approval of PHMSA, to permit the Pipelines to restart.[5, 6] Complicating this matter is the incorporation of risk analysis by the state into the Consent Decree that is under the control of the pipeline operator and is not made fully public, but subject only to the "review and comment" of the OSFM. To be fair, the OSFM must meet certain state legislated risk analysis requirements that though well-meaning, are incomplete, such as, for example, how to define what a reasonable worst-case discharge is to prudently evaluate the risk of a pipeline failure.[7] This is a problem I often see abused in federal pipeline oil spill response plans that doesn't adequately capture pipeline rupture hydraulics.[8] One of the major problems with risk analysis, a determination of the likelihood of an event occurring, and why it is not codified into federal pipeline safety regulations, is that such approaches are usually not complete or representative of the true risks of a specific pipeline operation. The impacts of any pipeline failure are significant and long-lasting, causing destruction of habitats, death of wildlife, and even human fatalities. It is impossible to predict a pipeline failure, and decision-making based on the perceived probability of failure does not adequately account for the severe consequences that will ensue, particularly if those decisions fail to capture pipeline rupture hydraulics. I call this "Space Shuttle Syndrome," because, in the rush to launch the space shuttle program, NASA decisionmakers understated its true risks and dismissed well established safety culture protocols, resulting in the loss of two space shuttles and their crews and ending the space shuttle program.

The Consent Decree is placing undue responsibilities on the OSFM which might not appreciate the limits of current inline inspection technical capabilities. The Consent Decree overly relies on ILI technologies and their associated engineering critical assessments that are not capable of prudently addressing many forms of external corrosion, especially interactive forms such as Stress Corrosion Cracking, or SCC, whose time to failure is difficult, if not impossible, to predict as discussed later in this report. The current poorly designed Pipelines do not permit CP protection to mitigate external corrosion on the Pipelines that must operate at uniquely high temperatures. The required high temperatures accelerate all forms of external corrosion. New pipelines would incorporate proper design such as non-insulated pipe and newer forms of pipeline coating technology, that would permit CP to be effective in addressing external corrosion even at high temperatures to help assure pipeline safety. No pipeline waiver issued under the conditions addressed in the Consent Decree is consistent with pipeline safety nor can ensure the same level

---

[5] 49CFR§195 Subpart H - Corrosion Control.
[6] Consent Decree, Appendix B, "State Waivers for Line 901, 903 …..,".
[7] CA Code CCR 19§2111 – Risk Analysis.
[8] 49CFR§194 Response Plans for Onshore Oil Pipelines.

Accufacts Inc. 12-20-24                                                          Page 2 of 15

of safety as that associated with a prudently designed pipeline system. Neither Plains, the pipeline operator at the time of the May 19, 2015 failure, nor the new owner, Sable, designed or built the present Pipelines with their serious deficiencies, but as a pipeline operator Sable bears the ultimate responsibilities should the Pipelines fail.

## II.   Accufacts experience qualifying me as an expert in this matter.

Accufacts Inc. ("Accufacts") was asked to review the Line 901/903 pipelines, now renamed Lines CA-324/CA-325 ("Pipelines"), and related documents such as those produced by the OSFM on their website.  A Consent Decree places responsibility for approving processes related to the onshore pipeline system restart first on the OSFM, then on PHMSA.[9]  The Center for Biological Diversity and The Environmental Defense Center asked Accufacts to provide an independent evaluation of documents related to a possible restart of the Pipelines to safely move heavy oil production from offshore platforms in the Santa Barbara Channel into the Pipelines.  It should be noted that the OSFM has recently issued a waiver on PHMSA's CP obligations for the Pipelines. I have not seen the details related to OSFM's decision on the granting of such a waiver.

I am a chemical engineer with over fifty years of experience in the energy industry, including over 25 years as president of Accufacts Inc. ("Accufacts").  Accufacts provides independent expert consulting services to assist decision makers in making informed decisions concerning pipelines. Pipeline safety expertise is provided in areas including, but not limited to: pipeline failure investigation, risk management/risk analysis, siting, construction, design, operation, maintenance, training, control room management including Supervisory Control and Data Acquisition ("SCADA") approaches, leak/rupture detection, integrity management, emergency and spill response, and pipeline safety regulatory development and compliance.  Much of my background is grounded in pipeline incident investigations following numerous pipeline rupture tragedies spanning several decades.

For the past two decades I have been involved as a representative of the public, which carries special obligations to avoid a conflict of interest, in advancing pipeline safety regulations at the federal and various state levels as demonstrated by my CV that is included as Attachment 1.  For example, I played a significant role representing the public in developing integrity management federal pipeline safety regulations in the early 2000s for both liquid and gas transmission pipelines. These regulatory approaches emulated safety process approaches that I instituted and developed for the City of Bellingham, WA to assure that a ruptured pipeline there could be restarted and operated safely.  This safety process approach, identified as the Pipeline Safety Immediate Action Plan, or PSIAP, identified steps that the pipeline operator was to complete following the Bellingham rupture tragedy of June 10, 1999, before that pipeline could be permitted to safely return to service.  The PSIAP is a matter of public record compliments of Washington State's Right-to-Know laws.  PSIAP formed a template for the integrity management safety regulations developed by the Office of Pipeline Safety, which morphed into PHMSA in 2003.

---

[9] Consent Decree, Appendix B & Appendix D.

Accufacts Inc. 12-20-24                                                      Page 3 of 15

For approximately fifteen years, through the development of federal standards for Transmission Integrity Management Programs ("TIMP") for both liquid and gas integrity regulations, control room management ("CRM"), and Operator Qualification ("OQ") rulemaking efforts, to cite a few pipeline safety rulemaking efforts, I served on the Technical Hazardous Liquid Pipeline Safety Standards Committee, also referred to as the Liquid Pipeline Advisory Committee, or LPAC, to advise PHMSA on possible pipeline safety regulation advancement. After a brief hiatus of several years, I have recently been reappointed by the Secretary of Transportation to represent the public again on LPAC, which carries numerous obligations to avoid a conflict of interest. I believe I am more than qualified to comment as an expert on the various issues related to CA-324/CA-325 pipeline system possible restart.

## III.    A brief historical perspective



**Figure 1 – Overview of Pipelines**

Since the May 19, 2015 onshore pipeline rupture and oil release that spilled into the Santa Barbara Channel and beyond, the pipeline system known at the time as Lines 901/903, and offshore oil platforms feeding this system have been shut down. Lines 901/903 have recently been renumbered CA-324 and CA-325, respectively. These pipelines, which were classified as interstate pipelines at the time of the release, were ordered to be shut down and oil purged from the Pipelines and placed under nitrogen atmospheres under Corrective Action Orders instituted by PHMSA. Line 901 experienced an onshore pipeline rupture failure caused by massive external corrosion and released on the late morning of May 19, 2015 near Refugio State Beach that placed a considerable amount of oil into the sensitive waters of the Santa Barbara Channel and beyond. While the years since 2015 involved discussions for possible construction of new pipelines to replace the poorly

Accufacts Inc. 12-20-24                                                                                    Page 4 of 15

designed Lines 901/903, recent activities shifting ownership of the pipelines and associated infrastructure to Sable Offshore Corp. ("Sable"), are now focused on restarting the existing pipelines under new ownership and conditions stated under a Consent Decree.

The May 19, 2015 Line 901 rupture failure occurred at approximately 4 miles (MP 4) downstream of the Las Flores Canyon Pump Station due to extensive external corrosion. The Line 901 ruptured at approximately 56 % of the maximum operating pressure ("MOP") of 1341 pounds per square inch gauge ("psig") (which is 72 % specified minimum yield strength ("SMYS")).[10] In addition, further metallurgical forensic reports attached to the PHMSA Final Report, indicate that pipeline ruptured at a pressure of 737 psig, which was 39.6% of SMYS.[11] This pipeline failed at very low stress levels, not a surprise given that the depth of the corrosion failure was 89% of the measured wall thickness, and the ILI tools significantly mis indicated the size of the corrosion threats.[12]

**Figure 2 – Overview of Pipelines route with MPs estimated**



## IV.    The Las Flores Pipeline System.

The following is based on information readily in the public domain, as demonstrated by the footnote references. Because of many variations in MP numbers in various documents, MP numbers referenced in this report should be considered approximate with slight variations that don't really impact my findings/conclusions/recommendations.

---

[10] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.14 of 23.

[11] DNV-G Final Report, "Line 901 Release (5/15/15) Mechanical and Metallurgical Testing, - Report No: OAPUS309DNOR (PP136049)," September 18, 2015, p. iii.

[12] *Ibid.,* "Summary of Observations," p. vi.

Accufacts Inc. 12-20-24                                                                 Page 5 of 15

The Pipelines, formerly identified as Line 901/903 operated by Plains (aka Plains All American Pipeline L.P. and Plains Pipeline L.P.), represent a pipeline system of approximately 125 miles in length running from the Las Flores Canyon Pump Station (milepost 0) to the Pentland Metering (and Storage) facility (at Milepost 125.3).  Figure 1 is a general overview of the Pipelines routing.  CA-224 (old Line 901) that runs from the Las Flores Canyon Pump Station (Milepost 0) to the Gaviota Meter Station (Milepost 10.7).   Note that I have reversed the Milepost reported in PHMSA's Final Report to follow more conventional milepost numbering, increasing from the pipeline inlet at the Las Flores Canyon Pump Station (MP 0), to the pipeline outlet of the 24-inch diameter Line 901/CA-224 pipeline, the Gaviota Metering Station (MP 10.7).  CA-324 is the sole feed into the 30-inch pipeline, CA-325A.  CA-325A runs from the Gaviota Metering Station to the Sisquoc pump station (MP 49.2).  CA-325B, also a 30-inch diameter pipeline, runs from the Sisquoc pump station (MP 49.2) to the Pentland metering station (~MP 125.3).  Figure 2 shows the general route adding approximate MP numbers following this similar MP increasing numbering all the way to Pentland.

According to the PHMSA Final Report on the 2015 rupture:

> Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries. Plains' pipeline is composed of two major pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went into crude oil service in 1992 and 1991, respectively. The pipelines are coated with coal tar urethane and covered with foam insulation which in turn is covered by a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at all of the pipeline joints on Line 901 and multiple locations on Line 903. The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.

> Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles downstream of the Las Flores Station. All of Line 901 crude oil throughput enters Line 903. Line 901 was manufactured of low carbon steel by Nippon Steel in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam. The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990.  There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream. At Emidio Station crude oil is delivered to above-

Accufacts Inc. 12-20-24                                                    Page 6 of 15

ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.[13]

**Figure 3 - Approximate Elevation Profile - Las Flores Canyon Pump Station (MP 0) to Pentland Station (MP ~125.3)**



PHMSA provided additional information related to Line 903:

(2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). [14]

Plains has informed PHMSA that Line 903 has insulation and shrink wrap sleeves on the girth welds similar to the Affected Pipeline {Line 901}.[15]

It is not clear from the documents produced if Line 903 insulation is also tape wrapped like Line 901, that would further shield the CP system from the Pipelines, assuring that CP is ineffective.

Figure 3 is an approximate elevation profile (approximate elevation of pipeline in feet versus pipeline milepost) for the Las Flores Pipeline System developed by the Center for Biological Diversity's Geographic Information System, or GIS, specialist using information readily available in the public domain.  Pipeline elevation profiles play a critical role in understanding liquid transmission pipeline operation and risks, such as evaluating ILI runs, valve placement/actuator decisions, emergency and oil spill actions, and spill response planning.  In addition, if a pipeline hydraulic profile, also referred to as a hydraulic gradient, is superimposed on an elevation profile, much information about pipeline risk can be gained.  A hydraulic gradient is required of the pipeline operator under California Risk Analysis regulation.[16]  A pipeline hydraulic gradient includes a plot of operating pressure versus milepost for a specified crude oil gravity and flow rate, but for this unique system, a crude oil viscosity and temperature should also be included on the

---

[13] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016, pp. 4 & 5 of 21.

[14] *Ibid.,* p. 4 of 21.

[15] PHMSA – In the Matter of Plains Pipeline, LP, Respondent, "Amendment No. 1 to the Corrective Action Order – CPF No. 5-2015-5011H," p. 2.

[16] CA Code CCR 19§2111 – Risk Analysis (2) Pipeline Description (A).

Accufacts Inc. 12-20-24                                                          Page 7 of 15

hydraulic gradient as these parameters seriously impact the hydraulic gradient evaluation. Such hydraulic gradient information is important in evaluating the risks of a pipeline restart program, especially on the Pipelines given their highly unique elevation profile among other factors (See Figure 3). This information is probably not likely to be made public, though a competent experienced engineer can develop an approximate hydraulic profile for a pipeline system if they understand certain crude oil blended properties and temperatures.

## V.   TIMP regulations are not working to protect the public or the environment.

In the passage of the federal pipeline safety regulations setting standards for Transmission Integrity Management Programs, or TIMP, first for liquid, then gas, in 2002 and 2003, respectively, the use of performance-based approaches versus more prescriptive based regulations were agreed to as a compromise to advance important needed pipeline safety regulation in this area. Until the passage of TIMP regulations, pipeline operators were under no obligation to periodically assess the condition of their mainline pipelines. Performance-based regulation, in theory, allows a pipeline operator to choose between various alternatives that may work best for their pipeline. Prescriptive-based pipeline safety regulations historically have been imposed in federal pipeline safety regulatory efforts. Prescriptive regulations impose certain conditions that pipeline operators must, or shall, follow.

TIMP efforts for liquid pipelines define four basic approaches permitted in pipeline integrity assessment, depending on the pipeline threat that a pipeline segment might experience. Briefly, the major assessment methods most appropriate for this pipeline system are hydrostatic pressure testing ("hydrotesting") and inline inspection ("ILI") also known as smart pigging. As the Line 901 onshore oil release that flowed into sensitive waterway areas has clearly demonstrated, TIMP regulation is not working for many pipeline operators, even after the operator had run multiple ILI corrosion tool runs which I will expand on further below. Another unexpected outcome of TIMP performance-based regulation is that such less than clear regulation efforts are harder to enforce.

It's important to note that pipeline integrity management tools are not a substitute for proper pipeline design or effective cathodic protections. Their purpose is simply to monitor the condition of pipelines over time and identify threats to the pipeline's integrity.

### 1) Hydrotesting assessments.

Properly performed hydrotesting can be an important pipeline integrity assessment tool that proofs a pipeline's fitness for service to safely operate at MOP at the time of the hydrotest. Hydrotesting involves shutting down a pipeline and filling a pipeline segment with water. Proof of pipeline integrity or fitness for service testing is verified by carefully increasing water pressure with a water injection pump after air has been removed and the pipeline segment temperature stabilized. While federal pipeline safety regulations for liquid transmission pipelines define a "Subpart E" hydrotest to establish or verify maximum operating pressure, or MOP, a term having specific meaning in regulation, the regulations are not specific on important parameters to ensure a quality hydrotest that doesn't damage the pipe. Minimum hydrotest pressures are established to verify the MOP at the time of the hydrotest, with

Accufacts Inc. 12-20-24                                                            Page 8 of 15

sufficient pressure safety margin at the time of the hydrotest. A Subpart E hydrotest is a proof for fitness test that the pipeline, at the time of the test, can withstand pressures above the MOP with a certain margin of pressure safety.[17]

One important caveat is needed regarding Subpart E hydrotests, which are often called strength tests. For a pipeline experiencing certain cracking threats such as selective seam cracking (SSC) or stress corrosion cracking (SCC)—corrosion threats that likely exist along the Las Flores Pipeline System—**a subpart E hydrotest is inadequate**. Current ILI technology cannot reliably identify if such cracking threats are present. More importantly, nor can associated engineering critical assessments provide prudent evaluation of such threats due to the inability to reliably predict corrosion colonies that can interact or link together in unpredictable ways. SCC colonies can be associated with disbonded coatings such as that occurring on the Pipelines where CP current is prevented from reaching the outer pipewall steel. A much higher pressure (higher % Specified Minimum Yield Strength, or SMYS) hydrotest is warranted. A prudent risk analysis should clearly demonstrate if such external corrosion cracking threats from environmental factors are possible around the Pipelines. **I need to note that it is not clear whether hydrotesting, if performed, will be a Subpart E test or a higher % SMYS hydrotest intended to address cracking threats such as SCC**. The Consent Decree strangely makes no mention of corrosion cracking threats or hydrotesting.

While considerable discussion in the Consent Decree has focused on the use of ILI to identify possible general wall loss corrosion threats well before failure, this agreement makes no mention of other forms of corrosion related threats such as corrosion cracking SCC or SSC. These forms of corrosion cracking are very challenging to identify via ILI, and more importantly, engineering critical assessments associated with ILI to predict time to failure can be highly unreliable, given the inactive threat nature of these type of corrosion cracking threats. The corrosion cracking threats tend to fail as pipeline ruptures. It is important that the cracking threat potentials on the Pipelines be prudently addressed and proposed solution be made public and transparent.

For pipeline segments that undergo large elevation changes, like the Line 325A/B segments, the pipeline must be cut up into segments to assure hydrotesting pressure ranges do not permanently deform the pipe. Hydrotesting can be more expensive than other pipeline integrity assessments such as ILI, but there are no built-in assumptions about the quality and thoroughness of the assessment that can be mismanaged such as that which can and often does occur with ILI approaches resulting in numerous pipeline ruptures after ILI assessments, as the May 19, 2015 release has clearly demonstrated. Hydrotesting is much more reliable than other pipeline integrity assessment approaches, such as ILI, at verifying a pipeline's fitness for service at the time of the test. Hydrotesting is usually performed by contractor firms experienced and qualified to perform a proper hydrotest for specific types of threats. The Consent Decree requires certain threshold general corrosion threats if identified by ILI be remediated before restart.[18]

---

[17] 49CFR§195.304 Test pressure
[18] Consent Decree, Appendix B (4) Integrity Management.

Accufacts Inc. 12-20-24                                                                 Page 9 of 15

Hydrotesting is warranted, justified, and vastly appropriate for the Pipelines which have been sitting for over nine years without effective CP. I also need to mention that the use of nitrogen gas to idle the pipeline was meant to avoid internal corrosion attack and plays no role in preventing external corrosion attacks to keep the Pipelines in a "corrosion-free state" as mentioned by Steve Rusch, Sable's vice president of environmental and regulatory affairs.[19] The external corrosion sites experience reduced corrosion rates from the lower ambient soil temperatures as no hot oil was passing through the system, but the corrosion sites are not inactive, especially if CP systems are ineffective, such as on the Pipelines.

**2) ILI assessments.**

In the U.S.**,** ILI or smart pig tool efforts started to develop in the early 1980s depending on the threat a pipeline operator was trying to address. ILI tools are usually multi-ton devices run inside a pipeline while the pipeline is operating to ascertain the condition of the pipeline depending on the type of threats trying to be analyzed. Given the advancements in technology including shrinking the equipment, ultrasonic, or UT, approaches that focus on direct anomaly measurement has historically proven superior for general wall thinning corrosion evaluation to approaches using inferred software-based algorithms, such as magnetic flux leakage ("MFL") testing. Some ILI tools are more suitable than others depending on the threat. There is a wide spectrum of ILI tools and different technological approaches to select from depending on the type of threat trying to be reviewed. Operators don't always select the ILI technology best suited to help identify threats on their system. Even with the advances in tool development and approaches there can still be a wide variation as to whether a specific ILI tool or vendor can properly identify a specific pipe threat and permit it to be further properly characterized after an ILI run. This is why pipeline operators will incorporate ILI tool tolerances and perform field verification digs to produce "unity plots" for a specific ILI run, to verify ILI vendor claims about their technology and its specific performance. This field verification data was not shared by Plains with the ILI vendor, a serious deficiency in ILI utilization. It is worth noting the PHMSA made it a point in their Failure Analysis of the Line 901 release, that the pipeline operator had not provided field dig verification feedback to the ILI vendor to confirm ILI capability.[20] For example, corrosion attacks can take on many forms such as general pipewall thinning (usually the easiest to determine depending on the ILI technology), various forms of corrosion cracking such as stress corrosion cracking ("SCC"), selective seam corrosion cracking ("SSC"), and pit corrosion. All such corrosion threats can lead to a pipeline failure and release. Based on my experience involving investigations of liquid transmission pipeline ruptures from SCC and SSC after ILI runs, some segments of the Pipelines exhibit the potential for SCC or SSC. Such external corrosion cracking threats are often found on pipelines with disbonded coating that are exposed to corrosion environments such as that introduced by the Pipeline's insulation. It is incumbent on the new Pipeline operator, Sable, to demonstrate to the OSFM, and to the public and various regulatory agencies that SCC/SSC external cracking environments do not exist.

---

[19] Los Angeles Times article by Tony Briscoe, "*Plan to restart pipeline sparks anger*," Front page, October 20, 2024.
[20] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.13 of 21.

Accufacts Inc. 12-20-24                                      Page 10 of 15

Some forms of ILI technology to identify certain pipeline threats, if properly managed, can be superior to hydrotesting as they may identify some threats well before they go to failure. As too clearly demonstrated, however, in the May19, 2015 Line 901 rupture, ILI cannot address all forms of external corrosion threat that are likely to exist on the Pipelines because of their poor design, their unique high temperature operation, and ineffectiveness of CP. If a corrosion ILI tool can be utilized within the limits of the pig vendor specification (i.e., such as maintaining pig speed within the operating pipeline), and if the ILI tool run is independently field verified, some ILI tools can be a superior form of assessment for many types of pipeline threats, such as general internal and external corrosion (i.e. wall-thinning) if prudently managed. The more specialized forms of corrosion, cracking and pitting, or corrosion within dents, however, can be much more challenging as ILI tools and their related engineering critical assessments still have technical limits. ILI tool vendors place specific limitations on their various tools, and it is important that the pipeline operator follow such restrictions that can easily invalidate an ILI tool run reading or result. ILI runs in hilly terrain, such as that which exist with the Pipelines (See Figure 3) can be quite challenging for ILI tools that can easily exceed multiple tons in weight as gravity never shuts off.

In investigating numerous pipeline rupture failures after ILI tool runs, I consistently see failures on the part of the pipeline operators to perform sufficient field verification digs to determine if bias is being introduced in a specific ILI tool approach on a specific pipeline segment, for a specific pipeline threat, and that the ILI tool selected is really appropriate to identify certain pipeline threats. Some pipeline operators repeatedly fail to recognize or even consider ILI tool capabilities and tolerances, especially as ILI vendors and pipeline engineers have tried to improve technologies and assessment techniques. It is worth noting that no one markets ILI tools claiming they don't work. An important consideration in integrity management approaches is whether the right ILI technology has been selected and is being prudently utilized by the pipeline operator. It is further worth noting that while running an ILI tool is not inexpensive, the cost of running such a tool is relatively less expensive compared to the overall quality of the field integrity verification program to assure the ILI tool is doing its job for a specific type of pipeline threat, on a specific pipeline segment.

Part of the problem is that many forms of interactive external corrosion pipeline cracking threats cannot be accurately characterized to allow meaningful engineering critical assessments that are reliable. Such assumptions or inability to properly engineer and predict interactive threats introduce significant margins of error to fitness for service predictions using ILI assessments. Just doing ILI reassessments when they really aren't capable of dealing with interactive corrosion threats is an illusion of safety. Basically, performing an inappropriate ILI assessment more often is not the solution as further explained below.

## VI. The greatest threat on the Las Flores Pipeline System is from external corrosion.

It should not take a pipeline failure to identify that the greatest pipeline integrity threat on the Pipelines is from various forms of external corrosion due to poor design of these Pipelines rendering CP systems ineffective at reducing or preventing external corrosion failure.

Accufacts Inc. 12-20-24                                                      Page 11 of 15

The PHMSA Final Report stated:

**Proximate or Direct Cause**

PHMSA determined that the proximate or direct cause of the release was progressive external corrosion of the insulated 24-inch diameter steel pipeline. The corrosion occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied directly to the bare pipe, covered by foam thermal insulation with an overlying Polyken tape wrap. Water has been noted in the foam insulation at a number of digs, indicating that the integrity of the coating system had been compromised. The external corrosion was facilitated by the environment's wet/dry cycling, as determined by the PHMSA-approved, third-party metallurgical laboratory. The release was a single event caused at an area where external corrosion had thinned the pipeline wall. There is no evidence that the pipeline leaked before the rupture. There was a telltale "fish mouth" (a split due to over-pressurization) at the release site indicating the line failed in a single event.[21]

PHMSA goes on to list numerous contributory causes, among them a significant observation, "Corrosion under insulation (CUI) cannot be prevented on insulated lines where the coating system has been compromised."[22]  This important fact should also play a major role into any decision to restart the Las Flores Pipeline System as explained in further detail in this report.  This critically important PHMSA observation should not come as a surprise to any pipeline operator.  Bottom line, Plains acquired a poorly designed set of Pipelines in the early 1990s that rendered the CP system ineffective at preventing or mitigating external corrosion on a pipeline system operating at high temperatures.  Some years after acquiring the Pipelines and after TIMP regulations were promulgated in late 2002, Plains did not implement an appropriate integrity management program to prevent the pipeline failure from external corrosion attack.  The question now is whether Sable's compliance with the Consent Decree under the approval of the OSFM relying on the capabilities of ILI tools can prevent another failure on the Pipelines?  **Clearly, current ILI technology does not meet an obligation to reliably identify all forms of external corrosion most likely present on much of the Pipelines.**  The CP systems required by PHMSA regulations will not be effective on most of the pipeline mileage in the Las Flores Pipeline System as previously discussed, and from my perspective there is serious doubt as to whether these poorly designed pipelines can be made as safe as new pipelines that have properly functioning cathodic protections.

Regarding the Las Flores Pipeline restart decision and related integrity assessments, it is important to understand how CP systems are supposed to work.  In layman's terms, a CP system impresses a weak current into a pipeline turning the pipeline into a cathode in an electrochemical corrosion cell on the outside of a buried pipeline, to control or reduce external corrosion.  Older nonconducting pipeline coatings such as that which exists on the Pipelines do not allow for CP current to pass through them.  The purpose of the CP system is thus to introduce current to the outer pipewall where the older coatings have been penetrated, such as with holes or tears in the outer coating.  Unfortunately, older pipeline external coatings such as the urethane coal tar outer coatings, like those on the Pipelines, are also well known to not adhere tightly to a pipeline over time, causing coating separation or disbondment.  Such disbondment can result in external

---

[21] *Ibid*, p. 14 of 21.
[22] *Ibid.,* p. 14 of 21.

Accufacts Inc. 12-20-24                                                                    Page 12 of 15

pipewall corrosion cells under the coating, generating many different forms of corrosion, especially SCC and SSC cracking in the wrong environments, that are not protected by CP. To add to this threat of external corrosion, the Las Flores Pipeline System's external insulation traps and serves as a water conduit further increasing external corrosion as a water fed corrosion attack. And lastly, the Polyken tape wrap installed during pipeline installation around the outside of the insulation is also well known to not be conductive, further shielding and preventing CP current from reaching the outer pipe wall. **<u>This is a perfect storm or combination of factors all working to render CP ineffective.</u>** Without effective cathodic protections, the pipeline is at particularly high risk of spilling again. To further underscore the lack of a proper integrity management program, this pipeline operates at elevated temperature that accelerates external corrosion as explained further below. New types of pipeline coatings now allow the passage of CP current through such coating to mitigate external corrosion even if the coating disbonds from the pipeline.

## VII. High pipeline operating temperatures accelerate all forms of corrosion.

**Figure 4  Los Flores Temperature Data from DNV Line 901 Release (5/19/15) Technical Root Cause Analysis included in PHMSA Final Report.[23]**



If one is experienced in handling/refining the heavy crude oils produced offshore that feed into the Las Flores Pipeline System, this crude oil not only needs to be diluted with natural gas liquids, or NGLs, but the pipeline must be operated at high pipeline temperatures, approximately 135 °F, that also is required to reduce the blended oil viscosity to get the fluid over the main hill beyond the Sisquoc Pump Station to Pentland. While the PHMSA Final Report mentions 135 °F as a pipeline operating temperature, Figure 4 represents a temperature graph indicting 135 °F was not unusual, but higher fluid temperature to improve the flow and capacity of the Pipelines did occur.

Chemical engineers experienced in reaction kinetics are familiar with the Arrhenius equation which indicates that chemical reaction rates, such as that for corrosion, essentially double for every 10 °C (18 °F) increase in temperature. This means that the rate of corrosion at 140 °F is about 32

---

[23] *Ibid.,* "Figure 23, L901 Las Flores Station Temperature Data," p. 375 of 510.

Accufacts Inc. 12-20-24                                                    Page 13 of 15

times that for a pipeline operating at 60 °F, a typical ambient soil condition.  Because of the higher viscosity of unblended offshore oil there probably is little opportunity to reduce the Las Flores Pipeline System temperature to help reduce corrosion rates on a pipeline system where the CP system is ineffective. If the Pipelines are returned to operation, all forms of external corrosion will remain a primary threat of concern for pipeline failure.

## VIII.  The Consent Decree agreement fails to require adequate IM processes to prevent another rupture of the poorly designed Pipelines.

It is important to understand that the Consent Decree is just a compromise agreement between the signature parties and may be missing important technical matters related to the Pipelines.  I find it odd that many of the technical issues discussed above were not identified or addressed in the Consent Decree.  External corrosion cracking risk was well known for many decades to be a threat of concern for pipelines exhibiting disbonded external coating where CP systems are ineffective.

I find it especially strange that Plains the pipeline operator at the time of the Line 901 rupture got itself into serious trouble by failing to understand that the poor design of the Pipelines could not be adequately addressed by ILI.  It appears that the Consent Decree continues to foster the illusion that ILI can adequately permit assessment of corrosion risks, especially cracking threats most likely to exist on major segments of the Pipelines (see Figure 3, for example).  The Consent Decree doesn't even mention corrosion cracking threats for this system operating at high temperature that exacerbates all forms of external corrosion as previously discussed.

And lastly, I would caution that the Consent Decree gives authority to the OSFM on certain pipeline safety related decisions. These OSFM decisions, however, cannot violate federal pipeline safety regulations and that I believe require a public decision process for PHMSA approval to assure any waiver meets or exceeds the level of safety had the wavier not been requested.

## IX.  The poorly designed Pipelines cannot be made as safe as new pipelines.

Sable's website implies that the Pipelines will be repaired, stating "PPC undertook a comprehensive repair and maintenance program to restore the pipeline to "as-new" condition."[24] As referenced in footnote 19 above, this isn't the only time that a Sable representative has suggested the Pipelines will be restored to "as-new" condition or a "corrosion free" state.  A new pipeline would be properly designed such that the federal pipeline safety regulations requiring a CP system would be effective and do its job, while allowing CP monitoring to assure the new pipelines were adequately protected from external corrosion attack by an effective CP design.  A new pipeline would not be trying to utilize CP on a pipeline improperly coated, that seriously disbonds from the pipe, with a system insulated to assist in water reaching the outer pipe steel, while operating at higher temperature.  All these poor design factors accelerate all forms of external corrosion including cracking.  It is a misguided illusion that relying on ILI can attempt to stay ahead of pipeline failure on such a poorly designed system.  A cursory review of the PHMSA Final

---

[24] See Sable's website concerning, "Sable Offshore Corp. Provides Update on Pacific Pipeline Company Operations," October 28, 2024, at: https://www.sableoffshore.com/news/news-details/2024/Sable-Offshore-Corp.-Provides-Update-on-Pacific-Pipeline-Company-Operations/default.aspx.

Accufacts Inc. 12-20-24                                                    Page 14 of 15

Report, Appendix G In-Line Inspection report will indicate that even running ILI tools, it is impossible to return Line 901 to an "as new" condition given the numerous corrosion anomalies.[25] The idea that running ILI tools should be sufficient to assure an "as-new" pipeline condition and safe operation of these poorly designed Pipelines with ineffective CP protection is a false premise, as the Pipelines are far from being in a new condition, with numerous anomalies, given their poor design approach and operating history.

## X.    Conclusion.

Given the ineffectiveness of the CP system to protect against external corrosion and the fact that the Pipelines have sat for over nine years without effective CP, and the failure of the Consent Decree to address these possible threats via proper hydrotesting and ILI, it is imprudent to expect that such limited assessment techniques can adequately protect against corrosion failure.  Poor pipeline design and using the wrong set of integrity management tools (i.e., tools that do not adequately detect and permit the prudent evaluation of the type of corrosion threats specific to a given pipeline) can make the risk of an oil spill orders of magnitude worse. The Las Flores Pipeline System is unusually dangerous given its age and inherent design flaws.

The above represents my opinions based on experience with too many pipeline rupture investigations.  I reserve the right to update this report if more relevant information is made available.

Richard B. Kuprewicz
President
Accufacts Inc.

---

[25] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara Country, California, - Appendix G In-Line Inspection Report by Lamontagne for the Oak Ridge National Laboratory" May 2016, pp. 44 – 138 of 510.

Accufacts Inc. 12-20-24                                                    Page 15 of 15

**Attachment 1**

## Curriculum Vitae.

# Richard B. Kuprewicz

8151 164th Ave NE
Redmond, WA  98052

**Tel:  425-802-1200 (Office)**
**E-mail: kuprewicz@comcast.net**

---

**Profile:** As president of Accufacts Inc., I specialize in gas and liquid pipeline investigation, auditing, risk management, siting, construction, design, operation, maintenance, training, SCADA, leak detection, management review, emergency response, and regulatory development and compliance.  I have consulted for various local, state and federal agencies, NGOs, the public, and pipeline industry members on pipeline regulation, operation and design, with particular emphasis on operation in unusually sensitive areas of high population density or environmental sensitivity.

---

**Employment:**     **Accufacts Inc.**                    **1999 – Present**

Pipeline regulatory advisor, incident investigator, and expert witness on all matters related to gas and liquid pipeline siting, design, operation, maintenance, risk analysis, and management.

**Position:** President
**Duties:** > Full business responsibility
           > Technical Expert

**Alaska Anvil Inc.**                    **1993 – 1999**

Engineering, procurement, and construction (EPC) oversight for various clients on oil production facilities, refining, and transportation pipeline design/operations in Alaska.

**Position:** Process Team Leader
**Duties:** > Led process engineers group
           > Review process designs
           > Perform hazard analysis
           > HAZOP Team leader
           > Assure regulatory compliance in pipeline and process safety management

**ARCO Transportation Alaska, Inc.**       **1991 - 1993**

Oversight of Trans Alaska Pipeline System (TAPS) and other Alaska pipeline assets for Arco after the Exxon Valdez event.

**Position:** Senior Technical Advisor
**Duties:** > Access to all Alaska operations with partial Arco ownership
           > Review, analysis of major Alaska pipeline projects

**ARCO Transportation Co.**               **1989 – 1991**

Responsible for strategic planning, design, government interface, and construction of new gas pipeline projects, as well as gas pipeline acquisition/conversions.

**Position:** Manager Gas Pipeline Projects
**Duties:** > Project management
           > Oil pipeline conversion to gas transmission
           > New distribution pipeline installation
           > Full turnkey responsibility for new gas transmission pipeline, including FERC filing

10-22-24

**<u>Four Corners Pipeline Co.</u>**                    **1985 – 1989**

Managed operations of crude oil and product pipelines/terminals/berths/tank farms operating in western U.S., including regulatory compliance, emergency and spill response, and telecommunications and SCADA organizations supporting operations.

**Position:**      Vice President and Manager of Operations
**Duties:**        > Full operational responsibility
               > Major ship berth operations
               > New acquisitions
               > Several thousand miles of common carrier and private pipelines

**<u>Arco Product CQC Kiln</u>**                      **1985**

Operations manager of new plant acquisition, including major cogeneration power generation, with full profit center responsibility.

**Position:**      Plant Manager
**Duties:**        > Team building of new facility that had been failing
               > Plant design modifications and troubleshooting
               > Setting expense and capital budgets, including key gas supply negotiations
               > Modification of steam plant, power generation, and environmental controls

**<u>Arco Products Co.</u>**                         **1981 - 1985**

Operated Refined Product Blending, Storage and Handling Tank Farms, as well as Utility and Waste Water Treatment Operations for the third largest refinery on the west coast.

**Position:**      Operations Manager of Process Services
**Duties:**        > Modernize refinery utilities and storage/blending operations
               > Develop hydrocarbon product blends, including RFGs
               > Modification of steam plants, power generation, and environmental controls
               > Coordinate new major cogeneration installation, 400 MW plus

**<u>Arco Products Co.</u>**                         **1977 - 1981**

Coordinated short and long-range operational and capital planning, and major expansion for two west coast refineries.

**Position:**      Manager of Refinery Planning and Evaluation
**Duties:**        > Establish monthly refinery volumetric plans
               > Develop 5-year refinery long range plans
               > Perform economic analysis for refinery enhancements
               > Issue authorization for capital/expense major expenditures

**<u>Arco Products Co.</u>**                         **1973 - 1977**

Operating Supervisor and Process Engineer for various major refinery complexes.

**Position:**      Operations Supervisor/Process Engineer
**Duties:**        > FCC Complex Supervisor
               > Hydrocracker Complex Supervisor
               > Process engineer throughout major integrated refinery improving process yield and energy efficiency

10-22-24

**Qualifications:**

Served for over fifteen years as a member representing the public on the federal Technical Hazardous Liquid Pipeline Safety Standards Committee (THLPSSC), a technical committee established by Congress to advise PHMSA on pipeline safety regulations.

Committee members are appointed by the Secretary of Transportation.

Served seven years, including position as its chairman, on the Washington State Citizens Committee on Pipeline Safety (CCOPS).

Positions are appointed by the governor of the state to advise federal, state, and local governments on regulatory matters related to pipeline safety, routing, construction, operation and maintenance.

Served on Executive subcommittee advising Congress and PHMSA on a report that culminated in new federal rules concerning Distribution Integrity Management Program (DIMP) gas distribution pipeline safety regulations.

As a representative of the public, advised the Office of Pipeline Safety on proposed new liquid and gas transmission pipeline integrity management rulemaking following the pipeline tragedies in Bellingham, Washington (1999) and Carlsbad, New Mexico (2000).

Member of Control Room Management committee assisting PHMSA on development of pipeline safety Control Room Management (CRM) regulations.

Certified and experienced HAZOP Team Leader associated with process safety management and application.

**Education:**

| | |
|---|---|
| MBA (1976) | Pepperdine University, Los Angeles, CA |
| BS Chemical Engineering (1973) | University of California, Davis, CA |
| BS Chemistry (1973) | University of California, Davis, CA |

10-22-24

**Publications in the Public Domain:**

1. "An Assessment of First Responder Readiness for Pipeline Emergencies in the State of Washington," prepared for the Office of the State Fire Marshall, by Hanson Engineers Inc., Elway Research Inc., and Accufacts Inc., and dated June 26, 2001.

2. "Preventing Pipeline Failures," prepared for the State of Washington Joint Legislative Audit and Review Committee ("JLARC"), by Richard B. Kuprewicz, President of Accufacts Inc., dated December 30, 2002.

3. "Pipelines - National Security and the Public's Right-to-Know," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated May 14, 2003.

4. "Preventing Pipeline Releases," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated July 22, 2003.

5. "Pipeline Integrity and Direct Assessment, A Layman's Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated November 18, 2004.

6. "Public Safety and FERC's LNG Spin, What Citizens Aren't Being Told," jointly authored by Richard B. Kuprewicz, President of Accufacts Inc., Clifford A. Goudey, Outreach Coordinator MIT Sea Grant College Program, and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated May 14, 2005.

7. "A Simple Perspective on Excess Flow Valve Effectiveness in Gas Distribution System Service Lines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated July 18, 2005.

8. "Observations on the Application of Smart Pigging on Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated September 5, 2005.

9. "The Proposed Corrib Onshore System - An Independent Analysis," prepared for the Centre for Public Inquiry by Richard B. Kuprewicz, dated October 24, 2005.

10. "Observations on Sakhalin II Transmission Pipelines," prepared for The Wild Salmon Center by Richard B. Kuprewicz, dated February 24, 2006.

11. "Increasing MAOP on U.S. Gas Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2006. This paper was also published in the June 26 and July 1, 2006 issues of the Oil & Gas Journal and in the December 2006 issue of the UK Global Pipeline Monthly magazines.

12. "An Independent Analysis of the Proposed Brunswick Pipeline Routes in Saint John, New Brunswick," prepared for the Friends of Rockwood Park, by Richard B. Kuprewicz, dated September 16, 2006.

13. "Commentary on the Risk Analysis for the Proposed Emera Brunswick Pipeline Through Saint John, NB," by Richard B. Kuprewicz, dated October 18, 2006.

14. "General Observations On the Myth of a Best International Pipeline Standard," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2007.

15. "Observations on Practical Leak Detection for Transmission Pipelines – An Experienced Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated August 30, 2007.

16. "Recommended Leak Detection Methods for the Keystone Pipeline in the Vicinity of the Fordville Aquifer," prepared for TransCanada Keystone L.P. by Richard B. Kuprewicz, President of Accufacts Inc., dated September 26, 2007.

17. "Increasing MOP on the Proposed Keystone XL 36-Inch Liquid Transmission Pipeline," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated February 6, 2009.

18. "Observations on Unified Command Drift River Fact Sheet No 1: Water Usage Options for the current Mt. Redoubt Volcano threat to the Drift River Oil Terminal," prepared for Cook Inletkeeper by Richard B. Kuprewicz, dated April 3, 2009.

10-22-24                                                                                        Page 4 of 9

19. "Observations on the Keystone XL Oil Pipeline DEIS," prepared for Plains Justice by Richard B. Kuprewicz, dated April 10, 2010.

20. "PADD III & PADD II Refinery Options for Canadian Bitumen Oil and the Keystone XL Pipeline," prepared for the Natural Resources Defense Council (NRDC), by Richard B. Kuprewicz, dated June 29, 2010.

21. "The State of Natural Gas Pipelines in Fort Worth," prepared for the Fort Worth League of Neighborhoods by Richard B. Kuprewicz, President of Accufacts Inc., and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated October, 2010.

22. "Accufacts' Independent Observations on the Chevron No. 2 Crude Oil Pipeline," prepared for the City of Salt Lake, Utah, by Richard B. Kuprewicz, dated January 30, 2011.

23. "Accufacts' Independent Analysis of New Proposed School Sites and Risks Associated with a Nearby HVL Pipeline," prepared for the Sylvania, Ohio School District, by Richard B. Kuprewicz, dated February 9, 2011.

24. "Accufacts' Report Concerning Issues Related to the 36-inch Natural Gas Pipeline and the Application of Appleview, LLC Premises:  7009 and 7010 River Road, North Bergen, NJ," prepared for the Galaxy Towers Condominium Association Inc., by Richard B. Kuprewicz, dated February 28, 2011.

25. "Prepared Testimony of Richard B. Kuprewicz Evaluating PG&E's Pipeline Safety Enhancement Plan," submitted on behalf of The Utility Reform Network (TURN), by Richard B. Kuprewicz, Accufacts Inc., dated January 31, 2012.

26. "Evaluation of the Valve Automation Component of PG&E's Safety Enhancement Plan," extracted from full testimony submitted on behalf of The Utility Reform Network (TURN), by Richard B.Kuprewicz, Accufacts Inc., dated January 31, 2012, Extracted Report issued February 20, 2012.

27. "Accufacts' Perspective on Enbridge Filing to NEB for Modifications on Line 9 Reversal Phase I Project," prepared for Equiterre Canada, by Richard B. Kuprewicz, Accufacts Inc., dated April 23, 2012.

28. "Accufacts' Evaluation of Tennessee Gas Pipeline 300 Line Expansion Projects in PA & NJ," prepared for the Delaware RiverKeeper Network, by Richard B. Kuprewicz, Accufacts Inc., dated June 27, 2012.

29. "Impact of an ONEOK NGL Pipeline Release in At-Risk Landslide and/or Sinkhole Karst Areas of Crook County, Wyoming," prepared for landowners, by Richard B. Kuprewicz, Accufacts Inc., and submitted to Crook County Commissioners, dated July 16, 2012.

30. "Impact of Processing Dilbit on the Proposed NPDES Permit for the BP Cherry Point Washington Refinery," prepared for the Puget Soundkeeper Alliance, by Richard B. Kuprewicz, Accufacts Inc., dated July 31, 2012.

31. "Analysis of SWG's Proposed Accelerated EVPP and P70VSP Replacement Plans, Public Utilities Commission of Nevada Docket Nos. 12-02019 and 12-04005," prepared for the State of Nevada Bureau of Consumer Protection, by Richard B. Kuprewicz, Accufacts Inc., dated August 17, 2012.

32. "Accufacts Inc. Most Probable Cause Findings of Three Oil Spills in Nigeria," prepared for Bohler Advocaten, by Richard B. Kuprewicz, Accufacts Inc., dated September 3, 2012.

33. "Observations on Proposed 12-inch NGL ONEOK Pipeline Route in Crook County Sensitive or Unstable Land Areas," prepared by Richard B. Kuprewicz, Accufacts Inc., dated September 13, 2012.

34. "Findings from Analysis of CEII Confidential Data Supplied to Accufacts Concerning the Millennium Pipeline Company L.L.C. Minisink Compressor Project Application to FERC, Docket No. CP11-515-000," prepared by Richard B. Kuprewicz, Accufacts Inc., for Minisink Residents for Environmental Preservation and Safety (MREPS), dated November 25, 2012.

35. "Supplemental Observations from Analysis of CEII Confidential Data Supplied to Accufacts Concerning Tennessee Gas Pipeline's Northeast Upgrade Project," prepared by Richard B. Kuprewicz, Accufacts Inc., for Delaware RiverKeeper Network, dated December 19, 2012.

10-22-24

Page 5 of 9

36. "Report on Pipeline Safety for Enbridge's Line 9B Application to NEB," prepared by Richard B. Kuprewicz, Accufacts Inc., for Equiterre, dated August 5, 2013.

37. "Accufacts' Evaluation of Oil Spill Joint Investigation Visit Field Reporting Process for the Niger Delta Region of Nigeria," prepared by Richard B. Kuprewicz for Amnesty International, September 30, 2013.

38. "Accufacts' Expert Report on ExxonMobil Pipeline Company Silvertip Pipeline Rupture of July 1, 2011 into the Yellowstone River at the Laurel Crossing," prepared by Richard B. Kuprewicz, November 25, 2013.

39. "Accufacts Inc. Evaluation of Transco's 42-inch Skillman Loop submissions to FERC concerning the Princeton Ridge, NJ segment," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated June 26, 2014, and submitted to FERC Docket No. CP13-551.

40. Accufacts report "DTI Myersville Compressor Station and Dominion Cove Point Project Interlinks," prepared by Richard B. Kuprewicz for Earthjustice, dated August 13, 2014, and submitted to FERC Docket No. CP13-113-000.

41. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated September 3, 2014, and submitted to FERC Docket No. CP13-551.

42. Accufacts' "Evaluation of Actual Velocity Critical Issues Related to Transco's Leidy Expansion Project," prepared by Richard B. Kuprewicz for Delaware Riverkeeper Network, dated September 8, 2014, and submitted to FERC Docket No. CP13-551.

43. "Accufacts' Report to Portland Water District on the Portland – Montreal Pipeline," with Appendix, prepared by Richard B. Kuprewicz for the Portland, ME Water District, dated July 28, 1014.

44. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz and submitted to FERC Docket No. CP13-551.

45. Review of Algonquin Gas Transmission LLC's Algonquin Incremental Market ("AIM Project"), Impacting the Town of Cortlandt, NY, FERC Docket No. CP14-96-0000, Increasing System Capacity from 2.6 Billion Cubic Feet (Bcf/d) to 2.93 Bcf/d," prepared by Richard B. Kuprewicz, and dated Nov. 3, 2014.

46. Accufacts' Key Observations dated January 6, 2015 on Spectra's Recent Responses to FERC Staff's Data Request on the Algonquin Gas Transmission Proposal (aka "AIM Project"), FERC Docket No. CP 14-96-000) related to Accufacts' Nov. 3, 2014 Report and prepared by Richard B. Kuprewicz.

47. Accufacts' Report on Mariner East Project Affecting West Goshen Township, dated March 6, 2015, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

48. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing on the Proposed System Integrity Projects ("SIP") to the Mississippi Public Service Commission ("MPSC") under Docket No. 15-UN-049 ("Docket"), prepared by Richard B. Kuprewicz, dated June 12, 2015.

49. Accufacts' Report to the Shwx'owhamel First Nations and the Peters Band ("First Nations") on the Trans Mountain Expansion Project ("TMEP") filing to the Canadian NEB, prepared by Richard B. Kuprewicz, dated April 24, 2015.

50. Accufacts Report Concerning Review of Siting of Transco New Compressor and Metering Station, and Possible New Jersey Intrastate Transmission Pipeline Within the Township of Chesterfield, NJ ("Township"), to the Township of Chesterfield, NJ, dated February 18, 2016.

51. Accufacts Report, "Accufacts Expert Analysis of Humberplex Developments Inc. v. TransCanada Pipelines Limited and Enbridge Gas Distribution Inc.; Application under Section 112 of the National Energy Board Act, R.S.C. 1985, c. N-7," dated April 26, 2016, filed with the Canadian Nation Energy Board (NEB).

52. Accufacts Report, " A Review, Analysis and Comments on Engineering Critical Assessments as proposed in

PHMSA's Proposed Rule on Safety of Gas Transmission and Gathering Pipelines," prepared for Pipeline Safety Trust by Richard B. Kuprewicz, dated May 16, 2016.

53.  Accufacts' Report on Atmos Energy Corporation ("Atmos") filing to the Mississippi Public Utilities Staff, "Accufacts Review of Atmos Spending Proposal 2017 – 2021 (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 15, 2016.

54.  Accufacts Report, "Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL")," prepared for Earthjustice by Richard B. Kuprewicz, dated October 28, 2016.

55.  Accufacts' Report on Mariner East 2 Expansion Project Affecting West Goshen Township, dated January 6, 2017, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

56.  Accufacts Review of Puget Sound Energy's Energize Eastside Transmission project along Olympic Pipe Line's two petroleum pipelines crossing the City of Newcastle, for the City of Newcastle, WA, June 20, 2017.

57.  Accufacts Review of the Draft Environmental Impact Statement for the Line 3 Pipeline Project Prepared for the Minnesota Department of Commerce, July 9, 2017, filed on behalf of Friends of the Headwaters, to Minnesota State Department of Commerce for Docket Nos. CN-14-916 & PPL-15-137.

58.  Testimony of Richard B. Kuprewicz, president of Accufacts Inc., in the matter West Goshen Township and Concerned Citizens of West Goshen Township v. Sunoco Pipelines, L.P. before the Pennsylvania Public Utilities Commission, Docket No. C-2017-2589346, on July 18, 2017, on Behalf of West Goshen Township and Concerned Citizens of West Goshen Township.

59.  Direct Testimony of Richard B. Kuprewicz, president of Accufacts Inc., on Behalf of Friends of the Headwaters regarding Enbridge Energy, Limited Partnership proposal to replace and reroute an existing Line 3 to the Minnesota Office of Administrative Hearings for the Minnesota Public Utilities Commission (MPUC PL-9/CN-14-916 and MPUC PL-9/PPL-15-137), September 11, 2017 and October 23, 2017.

60.  Direct Testimony of Richard B. Kuprewicz On Behalf of The District of Columbia Government, before the Public Service Commission of the District of Columbia, in the matter of the merger of AltaGas Ltd. and WGL Holdings, Inc., Formal Case No. 1142, September 29, 2017.

61.  Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2018 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated December 4, 2017.

62.  Report to Hugh A. Donaghue, Esquire, Concord Township Solicitor, "Accufacts Comments on Adelphia Project Application to FERC (Docket No. CP18-46-000) as it might impact Concord Township," dated May 30, 2018.

63.  Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2019 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 20, 2018.

64.  Report to West Goshen Township Manager, PA, "Accufacts report on the repurposing of an existing 12-inch Sunoco pipeline segment to interconnect with the Mariner East 2 and Mariner East 2X crossing West Goshen Township," dated November 8, 2018.

65.  Report to West Whiteland Township Manager, PA, "Accufacts Observations on Possible Pennsylvania State Pipeline Safety Regulations," prepared by Richard B. Kuprewicz, dated March 22, 2019.

66.  Accufacts Public Comments on the Proposed Joint Settlement, BI&E v. Sunoco Pipeline L.P. ("SPLP"), Docket No. C-2018-3006534 ("Proposed Settlement"), submitted on August 15, 2019 to the Pennsylvania Public Utility Commission on the behalf of West Goshen Township as an intervener.

67.  Report to West Whiteland Township Manager, Ms. Mimi Gleason, "Accufacts Perspective on Two Questions from West Whiteland's Board of Supervisors on Proposed Changes to ME 2 and ME 2X Construction/Operational Activities within West Whiteland," dated September 5, 2019."

10-22-24                                                                                                    Page 7 of 9

68. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the episode on the evening of 8-5-19 at the Mariner East Boot Road Pump Station ("Event"), Boot Road, West Goshen Township, PA," dated September 16, 2019.

69. Provided direct testimony before the Arizona Corporation Commission, In the Matter of the Application of Southwest Gas Corporation for the Establishment of Just and Reasonable Rates and Charges Designed to Realize a Reasonable Rate of Return on Fair Value of the Properties of Southwest Gas Corporation Devoted to its Arizona Operations (Docket No. G-01551A-19-0055), testified on behalf of Utilities Division Arizona Corporation Commission, February 19, 2020.

70. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the Mariner East 2X Pipeline Affecting West Goshen Township," dated July 23, 2020.

71. Assisted the Commonwealth of Massachusetts, Office of the Attorney General in developing pipeline safety processes to be incorporated into the settlement agreement related to Columbia Gas' sale of Assets to Eversource following the Merrimack Valley, Massachusetts overpressure event of September 13, 2018.

72. Report to Natural Resources Defense Council, Inc., "Accufacts' Observations on the Use of Keystone XL Pipeline Pipe Exhibiting External Coating Deterioration Issues from Long Term Storage Exposure to the Elements," October 1, 2020.

73. Report to Pennsylvania Public Utilities Commission ("PAPUC"), "Accufacts Comments on Proposed Pennsylvania Intrastate Liquid Pipeline Safety Regulations," dated October 29, 2021, prepared for West Whiteland Township Board of Supervisors, West Whiteland Township, PA.  Filed to PAPUC public web docket November 5, 2021 by West Whiteland Township under Reference Docket Number L-2019-3010267.   Addresses suggested improvements in proposed pipeline safety rules for PA intrastate liquid transmission pipelines.

74. Submitted written testimony of Richard B. Kuprewicz on Behalf of Bay Mills Indian Community to ALJ Dennis Mack, dated December 14, 2021, in the matter of the Application of Enbridge Energy, Limited Partnership for Authority to Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac, before the State of Michigan Public Service Commission, U-20763.

75. Public presentation to New York State Indian Point Nuclear Facility Decommissioning Oversight Board on Holtec removal activities in proximity to Enbridge three Natural Gas Transmission Pipelines, March 17, 2022.

76. Report to Pipeline Safety Trust and Bold Alliance, "Accufacts' Perspectives on the State of Federal Carbon Dioxide Transmission Pipeline Safety Regulations as it Relates to Carbon Capture, Utilization, and Sequestration within the U.S.," March 23, 2022.

77. Accufacts Inc., Public Presentation for the National Academies of Science Engineering Medicine and The Transportation Research Board, "To Committee on Criteria for Installing Automatic and Remote-Controlled Shutoff Valves on Existing Gas and Hazardous Liquid Transmission Pipelines," 4/27/22.

78. Accufacts Inc, "6/13/22 Webinar to Illinois Emergency Responders, Healthcare Providers, & Local Officials on Responses to $CO_2$ Transmission Pipeline Releases," 6/13/22.

79. Accufacts Report for Pipeline Safety Trust, "Safety of Hydrogen Transportation by Gas Pipelines," 11/28/22.

80. Completed a series of testimonies related to Enbridge's Line 5 proposal to replace 2 – 20-inch diameter existing submerged pipelines currently lying across the bottom of the Straits of Mackinac with a 30-inch diameter grade X-70 pipeline, proposed to be installed in a 21-foot diameter concrete tunnel to be installed across the approximate 4-mile span of the Straits of Mackinac.  Testified on Behalf of the Bay Mill Indian Community before the State of Michigan Public Service Commission, Docket U-20763, in opposition to this very poorly designed proposal/installation allowing for movement of the pipeline on rollers within the tunnel.  Final testimony to the docket submitted May 19, 2023.  This is the only pipeline proposal I am aware of in the world that would place a crude oil and liquid propane pipeline, especially a 30-inch diameter pipeline, within a tunnel.

81. Issued to Ms. Niroop Srivatsa, City Manager, "Accufacts Report for the City of Lafayette on the Status of the Tree Assessment Process with PG&E," indicating most of the trees identified for removal by PG&E risk management

10-22-24

approach have nothing to do with gas pipeline safety, June 15, 2023.

82. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the Navigator Heartland Greenway LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0161, on behalf of Citizens Against Heartland Pipeline ("CAHGP"), McDonough County, Christian County and Hancock County (the "Counties") (jointly, "Citizen and County Intervenors" of "CCI"), raising serious questions as to PHMSA's recent assertions of pipeline safety jurisdiction, and underscoring the ICC's authority for pipeline siting jurisdiction of said pipeline proposal in the State of Illinois, filed June15, 2023.  Applicant has terminated their application.

83. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the WOLF Carbon Solutions US LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0475, for a certificate of authority to construct and operate a carbon dioxide pipeline and when necessary to take interest in property as provided by law of eminent domain, testifying on Behalf of Citizens Against Predatory Pipelines ("CAPP"): 1) identifying serious inadequacies in PHMSA's pipeline safety regulations, 2) explaining why the Commission should require pipeline temperature profiles 3) detailing why DNV-RP-F104 is not relevant to this filing and 4) underscoring the ICC's authority to require additional critical information from the Applicant in this matter, filed October 24, 2023.  Applicant has withdrawn their submission to the Commission.

84. Provided general summary, main observations/concerns, on "Draft Environmental Impact Statement: Otter Tail to Wilkin Carbon Dioxide Pipeline Project" submitted to Minnesota Public Utilities Commission regarding Summit Carbon Solutions, LLC proposed 28 mile long 4-inch diameter $CO_2$ liquid transmission pipeline ("Otter Tail Pipeline") within Minnesota, PUC Docket No. IP-7093/PPL-22-422, provided to Clean Up the River Environment ("CURE") on 1/29/2024.

85. Issued to EarthJustice, "Observations concerning Kern County's Draft Environmental Impact Report ("DEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated February 26, 2024, "Observations concerning Kern County's Recent Recirculated Draft Environmental Impact Report ("RDEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated July 17, 2024, and "Evaluation of Kern County Response to Comments and Final Recirculated Environmental Impact Report on the TerraVault I Carbon Capture and Storage Project, dated October 15, 2024.  The Project situated in Kern County is proposed by the California Resources Corporation to separate a portion of the pre-combustion Elk Hills field gas production, treat and inject via liquid transmission pipelines, $CO_2$ into two sequestration injection wells within the Elk Hill oil field.  The reports identify many technical gaps in filings to Kern County.

86. Issued for the Tribal Partnerships Program, "Observations on the U.S. Army Corps of Engineers Draft Environmental Assessment, Clean Water Act Section 404(b)(1) Guidelines Evaluation, and Public Interest Review (collectively referenced as "DCDD") for the Enbridge Line 5 Wisconsin Segment Relocation Project ("Project"), dated May 2024," report dated July 31, 2024 affecting the Bad River Band of the Lake Superior Tribe of Chippewa Indians reservation.

# Exhibit 6

Second Declaration of Julie Teel Simmonds

CENTER *for* BIOLOGICAL DIVERSITY

*Because life is good.*

*Via Electronic Mail*

March 2, 2025

Joe Tyler, Director/Fire Chief, CAL FIRE
Office of the State Fire Marshal
715 P Street
Sacramento, CA 94244-2460
Joe.Tyler@fire.ca.gov

**Subject:**    **Request for Revocation of State Waivers for Restart of Pipelines CA-324 and CA-325 (Formerly Lines 901/903); Accufacts Inc. Report on Letters of Decision**

Dear Fire Chief Tyler,

The Office of the State Fire Marshal ("CalFIRE") should revoke the State Waivers issued to Sable Offshore Corp. on December 17, 2024 for the Las Flores Pipeline System (CA-324 and CA-325, formerly Lines 901 and 903).[1] This decades-old, poorly designed, corrosion-prone pipeline system already failed catastrophically in 2015 and caused the devastating Refugio State Beach oil spill, which is now thought to have spilled over 450,000 gallons of oil.[2] As we have previously made clear to CalFIRE, issuance of State Waivers to restart this pipeline system is inconsistent with pipeline safety, public safety, and protection of the environment.[3] The Las Flores Pipeline System is unusually dangerous given its age and inherent design flaws, and the Santa Ynez Unit oil operations should not be allowed to restart using these fatally flawed pipelines.

CalFIRE nonetheless issued the State Waivers in December without public notice or a hearing and without the required review under the California Environmental Quality Act (CEQA), and

---

[1] CalFIRE Letter of Decision on the State Waiver Request for Limited Efectiveness [sic] of Cathodic Protection on Thermally Insulated Pipeline And Corrosion of or Along a Longitudinal Seam Weld (CA-324) (December 17, 2024); CalFIRE Letter of Decision on the State Waiver Request for Limited Efectiveness [sic] of Cathodic Protection on Thermally Insulated Pipeline And Corrosion of or Along a Longitudinal Seam Weld (CA-325A/B) (December 17, 2024).

[2] Expert Report of Igor Mezic, PhD, Case No. 2:15-cv-04113-PSG-JEM (Oct. 21, 2019) (Att. 1).

[3] Center for Biological Diversity letter to PHMSA and CalFIRE, Request for Objection to State Waiver for Restart of Pipelines CA-324 and CA-325 (Formerly Lines 901/903); Accufacts Inc. Evaluation of Pipeline Startup (December 23, 2024).

the agency received rubber-stamp concurrences from the Trump Administration on February 11, 2025.[4]

Once CalFIRE posted the State Waivers, Accufacts Inc. reviewed them and issued a report to supplement its *Evaluation of the Las Flores Pipeline System Startup Proposal*, which we previously submitted to CalFIRE. In this new February 25, 2025 report (Att.2), Accufacts Inc. explains its continuing, serious concerns about the restart of this pipeline system, which has ineffective cathodic protections across most the pipelines' mileage—due to fundamental flaws in its design and installation—and remains at high risk of dangerous corrosion and failure, which the waivers have not adequately addressed.

The State Waivers should be revoked as provided for in the "limitations" enumerated in the waivers themselves, which state that "[s]hould Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate" the agency "may revoke the state waiver and require Sable to comply with all applicable regulatory requirements."[5] The restart of the pipeline system using State Waivers is not appropriate, and Sable has also failed to comply with all applicable legal and regulatory requirements, including the most recent Cease and Desist Order issued by the California Coastal Commission,[6] among other legal violations the company still must resolve and approvals it must secure.[7] CalFIRE should revoke the State Waivers pending resolution of these various violations and outstanding permit/authorization requirements and then only proceed in full compliance with the procedural and substantive requirements of federal and state pipeline safety laws and CEQA.

Sincerely,

Julie Teel Simmonds
Senior Counsel
jteelsimmonds@biologicaldiversity.org

---

[4] PHMSA previously stated that "[a]llowing for additional time for review is merited here as it has been in certain other instances involving similar highly technical waiver reviews by PHMSA." *See* January 17, 2025 letter from PHMSA to Center for Biological Diversity (Att. 1). Yet shortly thereafter, it issued its concurrences. Letter from PHMSA to CalFIRE re Sable CA-324, Regulations.gov Docket No. PHMSA-2025-0002 (February 11, 2025); Letter from PHMSA to CalFIRE re Sable CA-325, Regulations.gov Docket No. PHMSA-2025-0003 (February 11, 2025).

[5] CA-324 State Waiver at ¶ 63; CA-325AB State Waiver at ¶ 63.

[6] Executive Director Cease and Desist Order No. ED-25-CD-01 and Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order (February 18, 2025) (Att. 3).

[7] *See, e.g.*, California Natural Resources Agency, Summary of State Regulation of Crude Oil Pipelines in Santa Barbara County (January 13, 2025) (Att. 4) (explaining that in addition to Coastal Commission notices of violations, Sable has received notices of violation from the California Department of Fish and Wildlife and the Central Coast Regional Water Quality Board and needs other authorizations, including a new easement from the California Department of Parks and Recreation).

cc:      Wade Crowfoot, Secretary, California Natural Resources Agency
Wade.Crowfoot@resources.ca.gov
secretary@resources.ca.gov

Kate Huckelbridge, Executive Director
California Coastal Commission
Kate.Huckelbridge@coastal.ca.gov

Rob Bonta, Attorney General
State of California Department of Justice
rob.bonta@doj.ca.gov

Charlton Bonham, Executive Director
California Department of Fish and Wildlife
director@wildlife.ca.gov

Armando Quintero, Director
California Department of Parks and Recreation
Armando.Quintero@parks.ca.gov

Ryan Lodge, Executive Officer
Central Coast Regional Water Quality Control Board
Ryan.Lodge@waterboards.ca.gov

Senator Monique Limón
California State Senate
Monique.limon@sen.ca.gov

Assemblymember Gregg Hart
California State Assembly
Gregg.hart@asm.ca.gov

Robert L. Lieff (CSB No. 037568)
Elizabeth J. Cabraser (CSB No. 083151)
Robert J. Nelson (CSB No. 132797)
Sarah R. London (CSB No. 267083)
Wilson M. Dunlavey (CSB No. 307719)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Lynn Lincoln Sarko
*(Admitted Pro Hac Vice)*
Gretchen Freeman Cappio
*(Admitted Pro Hac Vice)*
Daniel Mensher
*(Admitted Pro Hac Vice)*
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Suite 3200
Seattle, WA 98101
Telephone:  (206) 623-1900
Facsimile:   (206) 623-3384

Juli Farris (State Bar No. 141716)
Matthew J. Preusch (CSB No. 298144)
**KELLER ROHRBACK L.L.P.**
1129 State Street, Suite 8
Santa Barbara, CA 93101
Telephone:  (805) 456-1496
Facsimile:  (805) 456-1497

A. Barry Cappello (CSB No. 037835)
Leila J. Noël (CSB No. 114307)
Lawrence J. Conlan (CSB No. 221350)
David L. Cousineau (CSB No. 298801)
**CAPPELLO & NOËL LLP**
831 State Street
Santa Barbara, CA 93101-3227
Telephone: (805) 564-2444
Facsimile: (805) 965-5950

*Lead Trial Counsel*

William M. Audet (CSB No. 117456)
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 568-2555
Facsimile: (415) 568-2556

*Class Counsel*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KEITH ANDREWS, an individual, TIFFANI ANDREWS, an individual. BACIU FAMILY LLC, a California limited liability company, ROBERT BOYDSTON, an individual. CAPTAIN JACK'S SANTA BARBARA TOURS, LLC, a California limited liability company, MORGAN CASTAGNOLA, an individual, THE EAGLE FLEET. LLC., a California limited liability company, ZACHARY FRAZIER, an individual, MIKE GANDALL, an individual, ALEXANDRA B. GEREMIA, as Trustee for the Alexandra Geremia Family Trust dated 8/5/1998, JIM GUELKER, an individual, JACQUES HABRA, an | **Case No.  2:15-cv-04113-PSG-JEM**<br><br>[Consolidated with Case Nos. 2:15-CV- 04573 PSG (JEMx), 2:15-CV-4759 PSG (JEMx), 2:15-CV-4989 PSG (JEMx), 2:15-CV-05118 PSG (JEMx), 2:15-CV- 07051- PSG (JEMx)]<br><br>**EXPERT REPORT OF IGOR MEZIC, Ph.D.** |

individual, ISURF, LLC, a California limited liability company, MARK KIRKHART, an individual, MARY KIRKHART, an individual, RICHARD LILYGREN, an individual, HWA HONG MUH, an individual, OCEAN ANGEL IV, LLC, a California limited liability company, PACIFIC RIM FISHERIES. INC, a California corporation, SARAH RATHBONE, an individual, COMMUNITY SEAFOOD LLC, a California limited liability company, SANTA BARBARA UNI, INC., a California corporation, SOUTHERN CAL SEAFOOD, INC., a California corporation, TRACTIDE MARINE CORP., a California corporation, WEI INTERNATIONAL TRADING INC., a California corporation and STEPHEN WILSON, an individual, individually and on behalf of others similarly situated,

   Plaintiffs,

v.

PLAINS ALL AMERICAN PIPELINE, L.P., a Delaware limited partnership, PLAINS PIPELINE, L.P., a Texas limited partnership, and JOHN DOES 1 through 10,
Defendants.

## EXPERT REPORT OF IGOR MEZIĆ, Ph.D.

1.      I am a co-founder and Chief Technology Advisor of AIMdyn, Inc.  I am also a Professor at the University of California, Santa Barbara and a Fellow of the American Physical Society, the premier organization of researchers in physical sciences, and the Society for Industrial and Applied Mathematics, the premier organization of researchers in Applied Mathematics.  My research focuses on identifying key physical phenomena in a complex device or a natural system, and using that information to create forecasts or design new concepts on which devices can be built or improved.

2.      For example, complex natural phenomena such as dispersion of oil on and below the ocean surface involve a large set of physical phenomena. Nonetheless, accurate predictions of where oil will flow can be made by identifying the key indicators (phenomena) that impact the flow and then computing where they will direct the flow.  Such indicators and associated algorithms exist for a number of complex physical processes that involve mixing, including oil spills, jet engine instabilities and building energy efficiency indicators.  As a result of my work in this area of research, the American Physical Society elected me as a Fellow for my "fundamental contributions to the theory of three-dimensional chaotic advection, measures and control of mixing, and development of a spectral operator theory approach to decomposition of complex fluid flows."  In addition, the Society for Applied and Industrial Mathematics elected me as a Fellow for "sustained innovation at the dynamical systems theory/applications interface; notably for advances in the use of Koopman operator theory.

## ASSIGNMENT

3.      Plaintiffs in this action retained my services to develop an analysis to determine, to a reasonable degree of scientific certainty, where the oil from the Line 901 spill flowed in the ocean, including: (1) what geographic area it covered; (2) where it became submerged; (3) where it washed ashore, including duration and

volume; (4) the extent to which submerged oil reemerged onto the surface areas of the ocean; and (5) the duration and volume of oil in fishing blocks.

4.      In my first two declarations (Declaration of Igor Mezic, Ph.D., in Support of Plaintiffs' Motion for Class Certification [Dkt. 128], and Rebuttal Declaration of Igor Mezic, Ph.D. [Dkt. 216]), I explained how I could develop such an analysis, provided background on how oil "moves" in oceans, and presented the results of my preliminary analysis.[1]

5.      After the February 27, 2017 hearing, Plaintiffs asked that I determine, to a reasonable degree of scientific certainty, where the oil from the Line 901 spill flowed in the ocean, including some of the above parameters.  That work was presented in my third and fourth declarations [Dkt. 300-4 and Dkt. 399.].[2]

6.      After the April 17, 2017 Order Plaintiffs asked that I complete my work on: 1) analysis of the effects of cleaning procedures on the results of the simulation; 2) duration of oil concentration of different levels on the shoreline, divided by individual housing parcels on the shoreline; 3) analysis on the mass of oil present in individual fishing blocks over time; 4) model-based analysis of natural seeps in the area affected by the Line 901 oil spill and study of the effect of such natural seeps on prior conclusions; 5) analysis of oil presence above the mean high tide line; and 6) analysis of bounds on the amount of oil reaching the ocean.

7.      My company, Aimdyn is being compensated $350/hour for my work on this assignment.

### PROFESSIONAL BACKGROUND

8.      My research and teaching over the past twenty-eight years intersect the fields of fluid mechanics and mathematics.  My undergraduate degree is in

---

[1] Defendants filed a motion to strike my first declaration, but the Court denied that motion. (Order GRANTING IN PART and DENYING IN PART Plaintiffs' Motion for Class Certification, and DENYING Motions to Strike [Dkt. #257], pp. 9 and 13.)
[2] Defendants filed a motion to strike my third declaration, but the Court denied that motion. (Order GRANTING Plaintiffs' renewed motion for class certification and DENYING Defendants' Motion to Strike [Dkt. #454], pp. 5-8.)

Mechanical Engineering, with emphasis on Thermal and Fluids Engineering.  I received a Doctor of Philosophy (Ph.D.) from the California Institute of Technology ("Caltech"), within the Applied Mechanics Program, based on my Thesis entitled "On Geometrical and Statistical Properties of Dynamical Systems: Theory and Applications."  In my thesis, among other contributions, I developed a methodology to study kinematics of three-dimensional fluid flows, and published it in the paper Mezić, I., and Stephen Wiggins. "On the integrability and perturbation of three-dimensional fluid flows with symmetry." *Journal of Nonlinear Science* 4 .1 (1994): 157-194.  This led to a series of research papers on three-dimensional motion of fluid particles and fluid mixtures, such as dye-water mixtures.  I was credited with the development of this theory when I was inducted into the Fellowship of the American Physical Society, and based part of my analysis of advective and diffusive effects of the Line 901 spill on developments that followed from it.

9.      I was a postdoctoral fellow at the Mathematics Institute of the University of Warwick in the United Kingdom in 1994-1995.  Beginning in 1995, I was an Assistant Professor at the University of California, Santa Barbara ("UCSB") and I started a Nonlinear Dynamics research group at UCSB in 1995.

10.      From 2000-2001, I was an Associate Professor at Harvard University.  During that time I researched and then published one of the most cited papers on mixing in the history of the subject, in the prestigious journal *Science*.  (Stroock, A. D., Dertinger, S. K., Ajdari, A., Mezić, I., Stone, H. A., & Whitesides, G. M., "Chaotic Mixer For Microchannels," *Science* 295, 647-651 (2002).)  This paper was subject to strict peer review prior to publication, and involved a number of the issues related to my analysis in this case.

11.      I returned to UCSB and became a Full Professor there in 2003.  In 2006, I co-founded the Institute for Energy Efficiency at UCSB, where I still serve

Case 2:15-cv-04113-PSG-JEM   Document 558-1   Filed 10/21/19   Page 97 of 521   Page ID #:13713

as the Head of Buildings and Design Group and Director of the Center for Energy Efficient Design.

12.    I have received awards in three different scientific disciplines: automatic control; mathematics and dynamical systems theory; and technology development based on basic science.  Among other awards, I was the recipient of the prestigious Sloan Fellowship in Mathematics in 1999.  For my work on technology related to jet engines produced by Pratt and Whitney, I was awarded the United Technologies Senior Vice President's Special Award in 2007.  My research and work involved a combination of fluid flow processes of complexity similar to the problem that is considered here.  I was inducted to be a Fellow of the American Physical Society in 2016 and a Fellow of the Society for Industrial and Applied Mathematics in 2017.  I also have given a number of Plenary and Keynote lectures at conferences in Asia, Europe and the Americas on subjects similar to those discussed in this report.

13.    I am a co-Founder of three companies that produce software and hardware related to flow processes: Aimdyn, iFluidics and Ecorithm. Aimdyn, Inc. was established in 2003 to develop powerful forecasting technologies for broad use in industry.  Amongst its customers and collaborators are large corporations such as United Technologies, Ford and Cummins; researchers at prominent universities such as Princeton University; as well as preeminent national research agencies such as DARPA (Defense Advanced Research Project Agency) and NIH (the National Institutes of Health).  Aimdyn has developed a suite of software tools that enable users to forecast and propose best remedial or control action for engineered or natural systems.  Aimdyn has a depth of expertise in flow mechanics, mechanical engineering, automatic control, vehicle terrain or ocean coverage and cleanup strategies and has developed proprietary software in each of these fields.

14.     Many of the methods applicable to my analysis of where the oil flowed after entering the ocean relate to the topics described above, which I have been researching and applying for the past 28 years.

15.     This is the only matter in which I have provided expert testimony in the last four years.

16.     A copy of my CV is attached as Exhibit A.

### PREDICTING THE FLOW OF OIL IN THE OCEAN

17.     As noted above and in my prior declarations, years before the Deepwater Horizon oil spill, I developed an algorithm that I believed could be used to more accurately predict where the oil would flow in situations like that which ended up occurring in the Deepwater Horizon spill.  That algorithm had been presented – to positive reviews – in lectures at the California Institute of Technology and the École Normale Supérieure in Paris.

18.     After the Deepwater Horizon oil spill, and based on information available during that oil spill, I ran calculations through my algorithm and plotted where the oil would likely flow.  Satellite observations of the oil slick confirmed the accuracy of my analysis.

19.     The type of modeling that led to accurate prediction of oil distribution during the Deepwater Horizon oil spill has been subjected to a high degree of scrutiny.  The analysis and modeling underwent strict peer review and then was published in the journal *Science* in 2010.  (Mezić, Igor, et al., "A New Mixing Diagnostic and Gulf Oil Spill Movement," *Science* 330, 486-489 (2010).)  The publication of the analysis in *Science* attracted the attention of the scientific community.  According to Google Scholar, the work has been cited more than 150 times since its publication.

20.     The analysis was expanded by looking at the behavior of the microbiological populations in the Gulf and their behavior during and after the Deepwater Horizon oil spill.  The expanded work was invited for publication, and

Teel Declaration
Page 136

then published, in the *Proceedings of the National Academy of Sciences* by the then Administrator of NOAA and Under Secretary of Commerce for Oceans and Atmosphere, Dr. Jane Lubchenco. (Valentine, D., Mezić, I., Macesic, S., et al., "Dynamic Autoinoculation and the Microbial Ecology of a Deep Water Hydrocarbon Irruption," *Proceedings of the National Academy of Sciences* 109, 20286-20291 (2012).) This article also was subject to rigorous peer review. The article concluded that the analysis – performed using an ocean model – accounted for 80-90% of observed data within a kilometer range.

21. The analysis has been tested, subjected to peer review, published and is generally accepted in the scientific community. The analysis predicts, to reasonable degree of scientific certainty, the pathways of oil flowing from a spill site. The location of predicted pathways can be compared with the location of the observations from overflight data, satellite data, microbiological tests and shoreline samples, when such observations exist. Strict standards for processing of data are utilized when applying the methodology, the most important ones being the time and space resolution standards. The acceptance of the methodology in the scientific community is broad, with hundreds of papers citing its relevance for prediction of properties of mixing processes and oil spills.

22. A key component of this model is that it is able to derive the key flow structures in the ocean that impact the distribution of oil during and after a spill. These structures are not uniform in space, and produce what is known as an "effective diffusivity" that depends on non-uniform flow structures. This, in turn, is referred to as the spatial dependence of effective diffusivity.

23. By way of example, and speaking in simplified terms, ocean flows have three primary types of structures that can carry oil. Each impacts oil differently. (1) Eddies are rotational, relatively slow mixing zones. Oil will either not enter these zones or will enter them slowly and then rotate within the confined area of the eddy until the eddy, or a portion of the eddy, becomes a different

structure. (2) Shear regions move linearly in one spatial direction at a time and can change direction multiple times over the course of the day. Oil readily enters these regions, is stretched, and generally moves in the direction the shear region is moving. When the shear region's direction changes back and forth, the oil effectively sloshes back and forth. (3) Mixing zones are regions where rotational and shear motion is combined to produce a mixture over a surface area. In these zones, oil is repeatedly stretched and then folded back on itself, similar to how hand-pulled noodles are made.

24. Returning to the concept of the spatial dependence of effective diffusivity, the oil is pushed or pulled (effective diffusivity) differently based on where and when it encounters each structure (spatial dependence).

25. Eddies, shear regions, and mixing zones can be identified based on velocity – the rate at which positions in the ocean change. Information on velocity is readily available, either through actual data from high frequency radar measurements or through computed data.

26. The approach to calculating distinguished structures that are responsible for dispersion in ocean flows relies on following oil-carrying fluid volume tracks over a finite period of time corresponding to the period over which a prediction is required. For this, the velocity field v of the ocean is needed as an input. This is supplied either by a numerical model (as was the case during the Deepwater Horizon oil spill) or measured velocities (as was the case during the Refugio Line 901 oil spill).

27. Once you have the velocity field, you compute its average over particle tracks over a finite period, and call it v*, the average Lagrangian velocity. This quantity depends on the initial position of the oil particles and the time period over which it is computed.

28. The crucial step comes next: You compute the difference in average Lagrangian velocities that nearby oil particles experience. That difference is

Case 2:15-cv-04113-PSG-JEM   Document 558-1   Filed 10/21/19   Page 11 of 52   Page ID #:23496

labeled $\nabla v^{*}$. This is a matrix that depends on initial conditions and the time-period T. You then categorize the different regions by the values of the determinant of that matrix, $\det \nabla v^{*}$. The negative values of this quantity correspond to rotation with strain of nearby particles, and are presented graphically in red. The positive values, less than $4/T^2$, represent elliptic, quiescent regions and are labeled green or white. The positive values, larger than $4/T^2$, represent hyperbolic behavior and are shown in figures by blue color.

29.     Streaks of red and blue next to each other can be interpreted as shear zones, where the distribution of oil gets stretched along in the direction of the streak. Green zones can be interpreted as the regions where the motion of the oil does not produce much deformation in the shape of its spatial distributions. Zones with intricate mixtures of red and blue can be interpreted as mixing areas where the oil is spread over a substantial portion of the affected field. These structures are jointly called hypergraph structures.

30.     Once the distribution of these structures at different points in time are identified, other relevant data is incorporated to determine to a reasonable degree of scientific certainty where the oil is going to flow. For example, wind effects and evaporation effects can be included using appropriate modeling tools, as described below.

## THE PRELIMINARY HYPERGRAPH ANALYSIS

31.     A hypergraph analysis was performed to validate the accuracy of the velocity field. This analysis considered the flow structures in the relevant area over 30 days following the spill. This was the first step of my analysis. Actual oil sightings confirm the validity of this analysis.

32.     Based on the scientific method I employed, the scrutiny applied to that method, and real-world confirmation through oil sightings, I conclude that the velocity field accuracy is sufficient to identify, using additional analysis, the geographic area the oil covered to a reasonable degree of scientific certainty.

Case 2:15-cv-04113-PSG-JEM   Document 558-1   Filed 10/21/19   Page 22 of 52   Page ID #:13718

## THE ANALYSIS OF THE LINE 901 SPILL

33.    Because I have obtained daily velocity data and other relevant information, I have determined to a reasonable degree of scientific certainty what happened to the oil between the time of the Line 901 spill through the present.

34.    The analysis took the following approach:

- Velocity data was obtained from high frequency radar measurements. An example of the velocity field so obtained is shown in Ex. C of my first declaration [Dkt. #128-3]. This serves as the previously described velocity field v.

- The initial distribution of oil in the near-shore region was determined.

- Wind data was incorporated into the analysis through industry-accepted methodologies and its effect on the distribution evaluated.

- Evaporation data was incorporated into the analysis and its effect on the distribution evaluated.  This is a basic formula that has broad industry acceptance.

- To confirm the validity of the analysis, the results of the analysis were compared to available data on where oil was actually identified. This included the NOAA flyover data and SCAT data regarding oil located on shore.

- Cleanup information was incorporated into the model to address the effect of the cleaning activity on the maximal concentration and duration of the oil presence on the shoreline at different concentration levels and individual impacted parcels.

- Probability of distribution of oil above and below mean high tide line was determined using a generally accepted approach.

- Distribution of oil was determined for individual fishing blocks by aggregating information from spatial distribution of oil within each individual block.  The video of evolution of oil concentration in fishing

blocks and the raw data in Excel database format accompany this report in their respective native formats.[3]

- Determination of the impact of seeps on the oil distribution was performed using literature-based data on typical oil seep parameters in the Santa Barbara Channel.

- Determination of the most likely amount of oil that reached the sea was done using an optimization procedure.

35.   Using this approach, I was able to provide an hour-by-hour analysis, allowing me to determine to a reasonable degree of scientific certainty where (and when) the oil travelled, became submerged, and washed ashore, and the extent to which unbeached oil has reappeared on the shoreline. It also allowed me to determine the effects (if any) of cleaning procedures and natural seeps on the distribution and duration of oil present on the shoreline and in the ocean. The additional analysis sharpened the statement on the amount of oil that reached the ocean.

### A.   Lagrangian Oil Transport Model

36.   We use the Lagrangian formulation of oil spill transport.  The spill is represented as a collection of discrete particles which are affected by vector fields (flow fields, validated using the technique described above) governing their movement. The ocean current velocity fields were acquired from HF Radar measurements at 2 km spatial resolution and 1 hour temporal resolution, while the wind velocity fields at 10 meters above sea level were acquired from COAMPS data servers for 3 hour temporal resolution and 4 km spatial resolution.  Both fields were linearly interpolated at the required location (be it particle locations or the center of the oil slick).  The surface particles were affected by the current velocity

---

[3] See "fisheries_impact.mp4; fishing_blocks_8000bbl.xlsx; fishing_impact_10750bbl.xlsx"

field, the wind velocity field and turbulent diffusivity terms, while oil particles dispersed under the surface were not affected by the wind velocity field.

37.     The particle moving through the fluid undergoes Brownian motion, due to the action of incoherent turbulent motions.  This process is described with an effective diffusivity coefficient which governs the random walk motion of the particle at each given time step.

38.     The model simulates particle beaching and unbeaching.  If the particle is about to enter the simulation cell situated on the shoreline, the particle status is set as beached.  The beaching of a particle may not be permanent.  At subsequent time steps there is a probability that the particle may be washed back into the water.

39. The model takes into account the cleaning data (see paragraph 43, below).

**B.     Oil Fate Model**

40.     The changes of the surface oil volume are attributable to processes known collectively as weathering.  These include evaporation in which the lighter fractions of oil evaporate.  Oil particles can be dispersed below the water surface.  A surface spill spreads mechanically over the water surface under the action of gravitational forces.  The model incorporates emulsification, the mixing of the water with the oil.  The weathering processes are considered separately for the zones of thick and thin slick (or sheen).

41.     In order to solve for the advection–diffusion processes, and compute surface oil volume concentration, dispersed oil volume concentration and beached oil volume concentration, we define the particle state variables.  The initial surface volume is broken into constituent particles that are characterized by a particle volume, by a particle status index (representing whether the particle is surfaced,

dispersed or beached) and by a position vector.  A numerical grid is specified where we can count particles and compute the appropriate volumetric concentration.[4]

### C.    Windage and Diffusion Coefficient Optimization

42.    To determine the diffusion coefficient for random walk transport term as well as the windage coefficient which determines the percentage of wind velocity affecting the movement of the oil slick, an optimization analysis was performed using available data.

### D.    Effect of Cleaning Procedures

43.    The cleanup information was obtained from cleanup surveys.  The uniformly discretized shoreline points are each assigned a SCAT segment ID. These are cross-referenced with the available cleanup data based on the last conducted survey.  This data contains the status of the segment cleanup (whether the process is still active) and the date of the survey.  During the simulation a radius is checked around a shoreline point during the day stated in the data and then any arriving particle in that radius is removed from the simulation.  The assumed cleanup time is daily between 0800 and 1700 hours.  Total volume is updated by subtracting a percentage based on the relative number of removed particles. The duration of oil on the shoreline was calculated taking into account the cleaning procedures.[5]

### E.    Oiling in Fishing Blocks

44.    The numerical analysis of the concentration of oil in the ocean provides the mass of oil in volume near the surface.  From that mass we calculated the mass of oil in fishing blocks provided to us.  The calculation consisted of aggregation of the mass over the fishing block.  The mixing processes near the surface ensure that every portion of subsurface ocean volume is exposed to the

---

[4]Oil Fate Model source code, compiled application and source data previously produced as PLTF-EXPT-IM-0000262-263.
[5] See PLAINS-CL00195083; PLAINS-USCG-0284200

Case 2:26-cv-05242-SVW-SSC   Document 26-1   Filed 05/14/26   Page 950 of 1309   Page ID
Case 2:15-cv-04113-PSG-JEM   Document 558-1   Filed 10/21/19   Page 16 of 52   Page ID
#:237501
#:23501

surface oil concentration.  However, to provide a conservative estimate of the maximum exposure, we assumed that oil was distributed over the layer of ocean 1 meter below the surface, in kg/m^3[6].  This was converted to parts per million by other experts for use in toxicity estimates.

### F.    Duration and Amount of Oiling On The Shoreline

45.    The model of oil fate and transport that we developed includes the full model of transport of oil on and below the surface, as well as the processes of beaching and unbeaching of oil particles.  The beach segments identified in this analysis were modeled to determine the maximum level of oiling on each beach segment.  We then identified beach segments that were oiled at a level "Light" or above.[7]  The oiling on the beach segments identified in this analysis was further modeled to determine the total duration any of the identified beach segments was oiled at a level Light or above.[8]  Each beach segment then was subdivided by property boundaries, which yielded the duration each impacted property was oiled at a level Light or above.

46.    The property "segment file" containing geographical coordinates of individual property segments as well as other identifying data is preprocessed by calculating the midpoints of the segments themselves.[9]  These are used as referent concentration points for the property segments.  The actual concentrations are calculated by scanning a radius around each particular shoreline point for beached Lagrangian particles (which carry the oil volume and are transported by the surface currents) and then projecting that value on the length of the segment which is

---

[6] "fishing_blocks_8000bbl.xlsx; fishing_impact_10750bbl.xlsx"
[7]  Categories of oiling are derived from the NOAA Shoreline Assessment Manual, 4th Edition and include: Heavy, Medium, Light, Very Light or No Oil Observed (NOO) (previously produced as PLTF-EXPT-RB-0002857-3010.)
[8] The fate, cleaning and unbeaching processes ultimately lead to the Very Light or No Oil Observed state, pursuant to SCAT categories adjusted for no overlap.
[9] "040 Plains Oil Los Angeles excluding Long Beach.xlsx; Santa Barbara and Ventura.xlsx"

represented by that shoreline point to get a concentration value in a volume over length measure.

47.    The concentration results are calculated with a 15-minute resolution, so an average value is used to set a daily concentration value for each segment.  The concentration values for each point in each day are summed and then divided by the number of 15-minute timesteps in a day.  These daily values are then categorized into concentration bins which results in day counts of average oil concentration for each segment, on a range between the minimum and maximum concentration values for that segment across the duration of the entire simulation.

48.    The figure below shows the location and duration of oil concentration levels for the location indicated in the figure.  Such calculations have been performed for every impacted property, and accompany this report in native format.[10]  The duration of oiling at Light or above on the impacted parcels was as long as 86 days.



Daily mean oil amount durations: -118.957535, 34.049625
11770 Pacific Coast Hwy, 700-0-200-495

---

[10] "oil_durations.xlsx; property_durations.dbg; property_durations.shp; property_durations.shx"

### G.     Oil Above Mean High Tide Line

49.     An evaluation of the probability distribution of oil along the shoreline was performed to determine whether oil reached the high tide line.  The assumption of the Gaussian probability distribution for which the mean is set up using the SCAT manual information (NOAA Shoreline Assessment Manual, 4th edition) confirms that in most cases the amount of oil deposited above the high tide line was above 50% of all the oil present at that location, and in <u>all</u> cases the amount of oil above the high tide line was substantial.

### H.     Impact of Oil Seeps

50.     The simulation software is capable of performing a simulation of several discrete oil seeps with different source locations.  The total number of Lagrangian particles that carry the oil volume are uniformly distributed among 6 natural oil seeps and the locations of these seeps are set based on the available data. Each seep is treated as a continuous release of volume per timestep based on the total volume spilled from all seeps during a ten-day period, to cover the initial 10-day period of the Refugio Line 901 spill.  The particles are released based on a spatial Gaussian distribution with the center being the seep location and the spread of 150 meters.  The particles released are considered to have floated to the surface after release.  Each seep fate is updated independently.  Aside from the introduction of seeps, the simulation is run as the simulation of the Line 901 spill.

51.     The results of this simulation, with a variety of initial volumes, confirm that the profile of the oil distributed on the shoreline resulting from the natural seeps is drastically different than the profile of oil concentration calculated from SCAT team observations.  Even with the highest observed volume seep release of 600 bbl/day simulated over 10 days, the shoreline concentrations are 2-5 orders of magnitude lower than oil concentration calculated from SCAT team observations.  This proves that natural seeps do not change the conclusions from the previously conducted study.

52.     Videos showing the evolution of the shoreline concentration from natural seeps have been generated and accompany this report in native format.[11] Videos showing the evolution of comparisons between SCAT team observations and natural seeps have also been generated, and accompany this report in native format.[12]

## I.     Estimated Volume of The Spill in The Ocean

53.     According to the Final Report US Coast Guard, Order No. 2015 01-FPN A15017, prepared by Plains and its consultants, Plains estimated that Line 901 oil recovered from the ocean is 311 bbl. This is more than 50% of the 598 bbl that Plains estimated to have reached the ocean. However, according to the Office of Technology Assessment of the Congress of the United States, historically cleaning procedures show "The rapid spreading and fragmentation of oil that occurs after a spill has made cleanup of large percentages of oil exceedingly difficult. Historically, recovery from major spills has amounted to only a few percent . . ." It is highly probable that the Line 901 oil spill was no different. Our estimates of the oil volume spilled to the ocean from the Line 901 spill lead to the conclusion that the recovered amount was no larger than 2-3%, in accordance with the referenced OTA Assessment.

54.     We have performed an additional optimization procedure to sharpen the bounds on the estimated volume of oil spilled into the ocean.  The optimization included comparing output of numerous simulations with different initial oil volumes with the concentration data from SCAT observations.  This means that we have optimized the output of the model taking into account the uncertainty of the SCAT observations near the spill site where the collection was most accurate.  The results are as follows: The most probable volume of oil in the ocean was 10,750

[11] See "particle_transport.mp4; surface_volume.mp4", generated at 100, 300 and 600 bbl/day seep volume.
[12] "shoreline_concentrations_vs_max_scat.mp4", generated at 100, 300 and 600 bbl/day seep volume.

Case 2:26-cv-05242-SVW-SSC   Document 26-1   Filed 05/14/26   Page 954 of 1309   Page
ID #:23505
Case 2:15-cv-04113-PSG-JEM   Document 558-1   Filed 10/21/19   Page 26 of 52   Page ID
#:13720

bbl.  The range of possible volumes is between 8,000 and 11,500 bbl.  This is
clearly seen from the figure below.  Firstly, the curve describing the difference
between the model and the data monotonically decreases starting with an initial
volume of 600 bbl.  The curve clearly starts leveling off with the increase of oil
volume at 8,000 bbl, and is a minimum as the most probable oil volume.  These
estimates are consistent with an upper bound that I provided in my previous
declaration, based on the difference of oil concentration observed at Coal Oil Point
and its maximal historical concentration.



## CONCLUSIONS

55.     The result of the incorporation of the cleaning data did not change the
results of the previous analysis, as the analysis was based on the maxima of the
concentration on the shoreline.

56.     The new analysis of the impact of natural seeps confirmed that natural
seeps did not have an effect on the conclusions of the previous studies.

57.     New results that aggregated previous information on the concentration
of oil in the ocean in fishing blocks were obtained.

Teel Declaration
Page 148

58.    The analysis of the duration of oil concentration of various levels on the shoreline was performed.  The results were aggregated to show duration of oiling above Light on the shoreline.

59.    We estimated the volume of the spill by comparing the concentration of oil obtained from the model, initiated with various initial volumes, with the SCAT data.  We performed an optimization procedure that provided the upper and lower bound on the volume of oil in the ocean.  The lower bound is 8,000 bbl and the upper bound is 11,500 bbl.  The most probable volume is 10,750 bbl.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 29, 2019, in Santa Barbara, California.

_____
Igor Mezić, PhD

# EXHIBIT A

# Curriculum Vitae
October 2016.

**Name: IGOR MEZIĆ**

**Positions held:**

- *2008 - present:* Professor and Director,
  *Center for Energy-Efficient Design* and
  Head, *Buildings and Design Solutions Group of
  the Institute for Energy Efficiency*,
  University of California, Santa Barbara, USA.

- *2001-2010* Associate Professor and Professor,
  *Department of Mechanical Engineering*,
  University of California, Santa Barbara, USA.

- *January 2000 - August 2001*: Associate Professor,
  *Division of Engineering and Applied Science*,
  Harvard University, Cambridge, USA.

- *1995 -2000* Assistant Professor and Associate Professor,
  *Department of Mechanical Engineering*,
  University of California, Santa Barbara, USA.

- *June 1994 - June 1995*: Postdoctoral Research Fellow,
  *Mathematics Institute*, University of Warwick, UK.

**Education:**

- Ph.D. in *Applied Mechanics*, California Institute of Technology, Pasadena, CA, USA. (1994).
  Thesis advisor: Professor Stephen Wiggins.
  Thesis: "On Geometrical and Statistical Properties of Dynamical Systems: Theory and Applications".

- Dipl. Ing. in *Mechanical Engineering*, Technical School of Rijeka (TSR), University of Rijeka,
  Croatia. (1990) Thesis advisors: Professor Luka Sopta and Professor Zoran Mrša.
  Senior Thesis: "On Numerical Solution of Viscous Fluid Flow Using the Finite Elements Method".

**Selected honors and awards:**

- National Science Foundation CAREER Award for research on *"Nonlinear Dynamics and Control
  from Microscale to Macroscale"* (1999).

- Sloan Fellowship in *Mathematics* (1999).

- Axelby Outstanding Paper Award (IEEE Transactions on Automatic Control) for the paper on
  *"Control of Mixing: a Maximum Entropy Approach"* (2000).

- Invited Plenary Lecturer, *Dynamics Days Europe,* Palma de Mallorca, Spain (2003).

1

- Invited Plenary Lecturer, *SIAM Control Theory Meeting*, New Orleans, USA (2005).

- Invited Plenary Lecturer, *The Second International Conference on Dynamics, Vibration and Control,* Beijing, China (2006).

- Opening Lecturer, *First Lab on a Chip World Congress,* Edinburgh, Scotland (2007).

- United Technologies Senior Vice President's Special Award (2007)

- Invited Plenary Lecturer, *SIAM Conference on Applications of Dynamical Systems,* Snowbird, Utah (2009).

- Project on Dynamic Network Analysis for Network Uncertainty Management selected as one of the top AFOSR-sponsored projects in its 60 years of existence (2013)

- Invited Plenary Lecturer, *Control of PDE's* Paris (2014).

- Fellow of the American Physical Society (2015)

- Fellow of the Society for Industrial and Applied Mathematics (2017)

**Current research interests**:

- Operator theoretic methods in dynamical systems.

- Science and technology of dynamics of energy efficiency; including building systems and power grids.

- Mixing and separation in fluids across the scales with applications ranging from microfluidic phenomena to oceanographic flows.

- Nano and micro-scale particle dynamics induced by dielectrophoresis and other electrokinetic phenomena, with applications to biotechnology.

**Journal articles:**

1. I. Mezić and S. Wiggins, "On the integrability and perturbations of three-dimensional fluid flows with symmetry". *Journal of Nonlinear Science* **4**, 157-194 (1994).

2. I. Mezić and S. Wiggins, "On the dynamical origin of asymptotic $t^2$ dispersion of a non-diffusive tracer in incompressible laminar flows". *Physics of Fluids*, **6**, 2227-2229 (1994).

3. I. Mezić and S. Wiggins, "Nonergodicity, accelerator modes, and asymptotic quadratic-in-time diffusion in a class of volume-preserving maps". *Physical Review E*, **52**, 3215-3217 (1995).

4. I. Mezić, J. F. Brady and S. Wiggins, "Maximal effective diffusivity for time periodic incompressible fluid flows". *SIAM Journal of Applied Mathematics*, **56**, 40-56 (1996).

5. I. Min, I. Mezić and A. Leonard, "Lévy stable distributions for velocity and velocity difference in systems of vortex elements". *Physics of Fluids*, **8**, 1169-1180 (1996).

6. I. Mezić, "FKG inequalities in cellular automata and coupled map lattices." *Physica D*, **103**, 491-504 (1997).

2

7.  M.J. Keeling, I. Mezić, R. Hendry, J. McGlade, and D.A. Rand, "Characteristic length scales of spatial models in ecology via fluctuation analysis". *Philosophical Transactions of the Royal Society*, **B 352**, 1589-1601 (1997).

8.  G. Haller and I. Mezić, "Reduction of three-dimensional, volume-preserving flows with symmetry". *Nonlinearity*, **11**, 319-339 (1998).

9.  I. Mezić, A. Leonard and S. Wiggins, "Regular and chaotic particle motion near a helical vortex filament". *Physica D*, **111**, 179-201 (1998).

10. A.N. Yannacopoulos, I. Mezić, G. Rowlands, and G.P. King, "Eulerian diagnostics for lagrangian chaos in three dimensional Navier-Stokes flows". *Physical Review E*, **57**, 482-490 (1998).

11. M.A. Bees, I. Mezić and J. McGlade, "Planktonic interactions and chaotic advection in Langmuir circulations". *Mathematics and Computers in Simulation*, Vol. **44**, 527-544 (1998).

12. A. Majumdar and I. Mezić, "Stability regimes of thin liquid films". *Microscale Thermophysical Engineering*, **2**, 203-213 (1998).

13. N. Malhotra, I. Mezić and S. Wiggins, "Patchiness: A new diagnostic for Lagrangian trajectory analysis in fluid flows". *Journal of Bifurcations and Chaos*, **8**, 1053-1094 (1998).

14. I. Mezić and S. Wiggins, "A method for visualization of invariant sets of dynamical systems based on ergodic partition". *Chaos*, **9**, 213-218 (1999).

15. I. Mezić and S. Wiggins, "Residence-time distributions for chaotic flows in pipes". *Chaos*, **9**, 173-182 (1999).

16. A. Banaszuk, H. A. Hauksson and I. Mezić, "A backstepping controller for a nonlinear partial differential equation model of compression system instabilities". *SIAM Journal on Control and Optimization*, **37**, 1503-1537 (1999).

17. A.C. Poje, G. Haller and I. Mezić, "The geometry and statistics of mixing in aperiodic flows". *Physics of Fluids*, **11**, 2963-2968 (1999).

18. D. D'Alessandro, M. Dahleh and I. Mezić, "Control of mixing in fluid flows: a maximum entropy approach". *IEEE Transactions on Automatic Control,* **44**, 1852-1864 (1999).

19. M. Ashhab, M.V. Salapaka, M. Dahleh and I Mezić, "Dynamical analysis and control of microcantilevers". *Automatica*, **35**, 1663-1670 (1999).

20. M. Ashhab, M.V. Salapaka, M. Dahleh and I Mezić, "Melnikov-based dynamical analysis of microcantilevers in scanning probe microscopy". *Journal of Nonlinear Dynamics*, **20**, 197-220 (1999).

21. A. Majumdar and I. Mezić, "Instability of ultra-thin water films and the mechanism of droplet formation on hydrophilic surfaces," *Journal of Heat Transfer -Transactions ASME*, **121**, 964-971 (1999).

22. M. Basso, L. Giarre, M. Dahleh, I. Mezić "Complex dynamics in a harmonically excited Lennard-Jones oscillator: Microcantilever-sample interaction in scanning probe microscopes". *Journal of Dynamical Systems-Transactions ASME*, **122**, 240-245 (2000).

3

23. G.O. Fountain, D.V. Khakhar, I. Mezic, and J.M. Ottino, "Chaotic mixing in a bounded three-dimensional flow". *Journal of Fluid Mechanics*, **417**, 265-301 (2000).

24. I. Mezić, "Chaotic advection in three-dimensional bounded Navier-Stokes flows". *Journal of Fluid Mechanics*, **431**, 347-370 (2001).

25. V. Salapaka, M. Dahleh and I Mezić, "On the dynamics of a harmonic oscillator undergoing impacts with a vibrating platform". *Journal of Nonlinear Dynamics*, **24**, 333-358 (2001).

26. I. Mezić, "Break-up of invariant surfaces in action-angle-angle maps and flows". *Physica D*, **154**, 51-67 (2001).

27. D. D'Alessandro, I. Mezić and M. Dahleh, "Statistical properties of controlled fluid flows with applications to control of mixing". *Systems and Control Letters*, **45,** 249-256 (2002).

28. I. Mezić and F. Sotiropoulos, "Ergodic Theory and Experimental Visualization of Chaos", *Physics of Fluids*, **14**, 2235-2243 (2002).

29. A. D. Stroock, S. K. W. Dertinger, A. Ajdari, I. Mezić, H. A. Stone, G. M. Whitesides, "Chaotic mixer for microchannels". *Science*, **295**, 647-651 (2002).

30. P. K. Newton and I. Mezić, "Non-equilibrium statistical mechanics for a vortex gas". *Journal of Turbulence*, **3**, Article number 052 (2002).

31. I. Mezić, "An extension of Prandtl-Batchelor theory and consequences for chaotic advection". *Physics of Fluids*, **14**, 61-64 (2002).

32. A. X. C. N Valente, N. H. McClamroch and I. Mezić, "Hybrid dynamics of two coupled oscillators that can impact a fixed stop". *International Journal of Nonlinear Mechanics*, **38**, 677-689 (2003).

33. G. Hagen and I. Mezić, "Spillover stabilization in finite-dimensional control and observer design for dissipative evolution equations". *SIAM Journal on Control and Optimization*, **42**, 746-768 (2003).

34. I. Mezić, "Controllability, integrability and ergodicity". *Lecture Notes in Control and Information Sciences*, **289**, 213-229 (2003).

35. S. Balasuriya, I. Mezić and C. K. R. T. Jones, "Weak finite-time Melnikov theory and 3D viscous perturbations of Euler flows". *Physica D*, **176**, 82-106 (2003).

36. T. H. Solomon and I. Mezić "Uniform, resonant chaotic mixing in fluid flows". *Nature*, **425**, 376-380 (2003).

37. G. Hagen I. Mezić and B. Bamieh "Distributed control design for parabolic evolution equations: Application to compressor stall control". *IEEE Transactions on Automatic Control*, **49**, 1247-1258 (2004).

38. I. Mezić and A. Banaszuk "Comparison of systems with complex behavior". *Physica D*, **197**, 101-133 (2004).

39. D. E. Chang, S. Loire and I. Mezić "Closed-form solutions in the electrical field analysis for dielectrophoretic and travelling wave inter-digitated electrode arrays". *Journal of Physics D-Applied Physics*, **36**, 3073-3078 (2004).

4

40.  U. Vaidya and I. Mezić "Controllability for a class of area-preserving twist maps". *Physica D*, **189**, 234-246 (2004).

41.  D. Vainchtein and I. Mezić "Optimal control of a co-rotating vortex pair: averaging and impulsive control". *Physica D*, **192**, 63-82 (2004).

42.  F. Bottausci, I. Mezić, C. Cardonne and C. Meinhart  "Mixing in the shear superposition micromixer: three-dimensional analysis". *Philosophical Transactions of the Royal Society: Mathematical, Physical and Engineering Sciences theme issue 'Transport and mixing at the microscale'*, **362**, 1001-1018 (2004).

43.  D. Vainchtein and I. Mezić "Capture into resonance: A method for efficient control". *Physical Review Letters*, **93**, Art. No. 084301 (2004).

44.  B. R. Noack, I. Mezić, G. Tadmor and A. Banaszuk "Optimal mixing in recirculation zones". *Physics of Fluids*, **16**, 867-888 (2004).

45.  S. D, Muller, I. Mezić, J. H. Walther and P. Koumoutsakos "Transverse momentum micromixer optimization with evolution strategies". *Computers and Fluids*, **33**, 521-531 (2004).

46.  I. Mezić  "Spectral properties of dynamical systems, model reduction and decompositions". *Nonlinear Dynamics*, **41**, 309-325 (2005).

47.  G. Mathew, I. Mezić and L. Petzold "A Multiscale Measure for Mixing", *Physica D*, **41**, 23-46 (2005).

48.  I. Tuval, I. Mezić, F. Bottausci, Y. T. Zhang, N. C. MacDonald and O. Piro "Control of particles in microelectrode devices", *Physical Review Letters*, **95**, 236002 (2005).

49.  I. Mezić, "On the dynamics of molecular conformation", *Proceedings of the National Academy of Sciences of the USA*, **103**, 7542-7547 (2006).

50.  D. Vainchtein and I. Mezić "Vortex-based control algorithms," *Lecture Notes in Control and Information Sciences* , **330**, 189-212 (2006).

51.  D. Vainchtein, A. I. Neishtadt and I. Mezić "Resonances and Mixing in Stokes Flows ". *Chaos*, **16**, Art. No. 043123 (2006).

52.  D. M. Gorman, J. Mezić, I. Mezić and P. J. Gruenewald "Agent-based modeling of drinking behavior: A preliminary model and potential applications to theory and practice." *American Journal of Public Health*, **96**, 2055-2060 (2006).

53.  F. Bottausci, C. Cardonne, C. Meinhart and I. Mezić "An ultrashort mixing length micromixer,", *Lab on a Chip*, **7**, 396-398 (2007).

54.  G. Mathew, I. Mezić, S. Grivopoulos, U. Vaidya and L. Petzold "Optimal control of mixing in Stokes fluid flows", *Journal of Fluid Mechanics*, **580**, 261-281, (2007).

55.  T. John, I. Mezić "Maximizing mixing and alignment of orientable particles for reaction enhancement",  *Physics of Fluids*, **19** , 123602, (2007)

56.  B. Eisenhower, G. Hagen, A. Banaszuk, and I. Mezić "Passive control of limit cycle oscillations in a thermoacoustic system using asymmetry", *Journal of Applied Mechanics*, **75**, 011021, (2008)

5

57.  Y.T. Zhang, F. Bottausci, M. P. Rao, E. R. Parker, I. Mezić and N. C. MacDonald  "Titanium-based dielectrophoresis devices for microfluidic applications", *Biomedical Microdevices*, **10**, 509-517, (2008)

58.  I. Mezić, T. Runolfsson "Uncertainty propagation in dynamical systems", *Automatica* , **44**, 3003-3013 , (2008)

59.  P. Du Toit, I. Mezić, J. Marsden "Coupled oscillator models with no scale separation", *Physica D-Nonlinear Phenomena*, **238** , 490-501 ,(2009)

60.  M. M. Murr, G. S. Thakur, Y. L. Li, H. Tsuruta, I. Mezić, D. E. Morse "New pathway for self-assembly and emergent properties",  *Nano Today*,  **4**  ,116-124 ,(2009)

61.  S. E. Scott, T. C. Redd, L. Kuznetsov, I. Mezić, C. K. R. T. Jones "Capturing deviation from ergodicity at different scales" *Physica D-Nonlinear Phenomena*, **238**, 1668-1679 , (2009)

62.  C. W. Rowley, I. Mezić, S. Bagheri, P. Schlatter, and D. Henningson "Spectral analysis of nonlinear flows", *Journal of Fluid Mechanics* , **641**, 115-127 , (2009)

63.  B. Eisenhower and I. Mezić, "Targeted activation in deterministic and stochastic systems" *Physical Review E*, **81**, 26603, (2010)

64.  Z. Levnajić and I. Mezić, "Ergodic theory and visualization. I. Mesochronic plots for visualization of ergodic partition and invariant sets " *Chaos*, **20**, 033114, (2010)

65.  I. Mezić, S. Loire, V. Fonoberov and P. Hogan , "A New Mixing Diagnostic and Gulf Oil Spill Movement" *Science*, **330**, 486-489, (2010)

66.  G. Mathew and I. Mezić, "Metrics for ergodicity and design of ergodic dynamics for multi-agent systems", *Physica D*, **240**, 432-442, (2011)

67.  Lan Yueheng and I. Mezić "On the architecture of cell regulation networks, *BMC Systems Biology* , **5**, Article Number: 37, (2011)

68.  A. Banaszuk, V. A. Fonoberov, T. A. Frewen, M. Kobilarov, G. Mathew, I. Mezić, A. Pinto, T. Sahai, H. Sane, A. Speranzon, and A. Surana , "Scalable approach to uncertainty quantification and robust design of interconnected dynamical systems" *Annual Reviews in Control*, **35** , 77-98, (2011)

69.  Y. Susuki, I. Mezić and T. Hikihara "Coherent Swing Instability of Power Grids" *Journal of Nonlinear Science*, 1-37, (2011)

70.  Y. Susuki, I. Mezić  "Nonlinear Koopman modes and coherency identification of coupled swing dynamics",  *IEEE Transactions on Power Systems*, **99** , 1, (2011)

71.  A. Hubenko, V. A. Fonoberov, G. Mathew, and I. Mezić, , "Multiscale Adaptive Search" *IEEE Transactions on Systems, Man and Cybernetics Part B-Cybernetics*, **41** , 1076-1087, (2011)

72.  Yoshihiko Susuki, Igor Mezić, Takashi Hikihara "Coherent swing instability of interconnected power grids and a mechanism of cascading failure", *Control and Optimization Methods for Electric Smart Grids* . Book Chapter.

6

73. Maria Fonoberova, Vladimir A Fonoberov, Igor Mezić, Jadranka Mezić, P Jeffrey Branting-ham, "Nonlinear dynamics of crime and violence in urban settings", *Journal of Artificial Societies and Social Simulation* **15** (2012).

74. Valentine, D. L., Mezić, I., Maćešić, S., Črnjarić-Žic, N., Ivić, S., Hogan, P. J., and Loire, S.. "Dynamic autoinoculation and the microbial ecology of a deep water hydrocarbon irruption." *Proceedings of the National Academy of Science*s, **109**(50), 20286-20291 (2012).

75. Mezić, I. "Analysis of fluid flows via spectral properties of the Koopman operator." *Annual Review of Fluid Mechanics*, **45**, 357-378. (2013).

76. Eisenhower, B., O'Neill, Z., Fonoberov, V. A., and Mezi¿ I. "Uncertainty and sensitivity de-composition of building energy models." *Journal of Building Performance Simulation*, **5**(3), 171-184. (2012).

77. Loire, S., Kauffmann, P., Mezić, I., and Meinhart, C. D. "A theoretical and experimental study of ac electrothermal flows." Journal of Physics D: Applied Physics, 45(18), 185301. (2012).

78. Eisenhower, B., ONeill, Z., Narayanan, S., Fonoberov, V. A., and Mezić, I. "A methodology for meta-model based optimization in building energy models." Energy and Buildings, 47, 292-301. (2012).

79. Budišić, M., and Mezić, I. "Geometry of the ergodic quotient reveals coherent structures in flows." Physica D: Nonlinear Phenomena, 241(15), 1255-1269. (2012).

80. Vaidya, U., and Mezić, I. "Existence of invariant tori in three dimensional maps with degen-eracy." Physica D: Nonlinear Phenomena, 241(13), 1136-1145. (2012).

81. Susuki, Y., and Mezić, I. "Nonlinear Koopman modes and a precursor to power system swing instabilities." Power Systems, IEEE Transactions on, 27(3), 1182-1191. (2012).

82. Zou, Y., Fonoberov, V. A., Fonoberova, M., Mezić, I., and Kevrekidis, I. G. " Model reduction for agent-based social simulation: Coarse-graining a civil violence model." Physical Review E, 85(6), 066106. (2012).

83. Mauroy, A., and Mezić, I. "On the use of Fourier averages to compute the global isochrons of (quasi) periodic dynamics." Chaos: An Interdisciplinary Journal of Nonlinear Science, 22(3), 033112-033112. (2012).

84. Budišić, M., Mohr, R., and Mezić, I. "Applied Koopmanism. Chaos: An Interdisciplinary Journal of Nonlinear Science." 22(4), 047510-047510. (2012).

85. Susuki, Y., Mezić, I., and Hikihara, T. "Coherent swing instability of interconnected power grids and a mechanism of cascading failure." In Control and Optimization Methods for Electric Smart Grids (pp. 185-202). Springer New York. (2012).

86. Fonoberova, M., Fonoberov, V. A., and Mezić, I. "Global Sensitivity/Uncertainty Analysis for Agent-Based Models. Reliability" Engineering & System Safety 118, 8-17. (2013)

87. Rhoads, B., Mezić, I., and Poje, A. C. "Minimum time heading control of underpowered vehicles in time-varying ocean currents." Ocean Engineering, 66, 12-31. (2013).

88. Loire, S., Fonoberov, V., and Mezić, I. "Performance Study of an Adaptive Controller in the Presence of Uncertainty." IEEE Transactions on Control Systems Technology 21 (3), 1039-1043. (2013).

89. S Loire, I Mezić "Spatial filter averaging approach of probabilistic method to linear second-order partial differential equations of the parabolic type." Journal of Computational Physics 233, 175-191. (2013).

90. I. Mezić "Analysis of fluid flows via spectral properties of the Koopman operator." Annual Review of Fluid Mechanics 45, 357-378 30. (2013).

91. Y. Lan, I. Mezić "Linearization in the large of nonlinear systems and Koopman operator spectrum." Physica D: Nonlinear Phenomena 242 (1), 42-52. (2013).

92. Y. Susuki, I. Mezić "Nonlinear Koopman Modes and Power System Stability Assessment Without Models" IEEE Transactions on Power Systems 29, 899-907. (2014).

93. A. Mauroy, I. Mezić, J. Moehlis "Isostables, isochrons, and Koopman spectrum for the actio-nangle representation of stable fixed point dynamics". Physica D: Nonlinear Phenomena 261, 19-30. (2013).

94. Maria Fonoberova, Igor Mezić, Jennifer F Buckman, Vladimir A Fonoberov, Adriana Mezić, Evgeny G Vaschillo, Eun-Young Mun, Bronya Vaschillo, Marsha E Bates . "A computational physiology approach to personalized treatment models: the beneficial effects of slow breathing on the human cardiovascular system". American Journal of Physiology-Heart and Circulatory Physiology 307, (2014),

95. Susuki, Yoshihiko Mezić, Igor "Nonlinear Koopman Modes and Power System Stability Assessment Without Models." IEEE Transactions on Power Systems, 54, 899-907. (2014).

96. A. Mauroy, B. Rhoads, J. Moehlis, I. Mezić "Global Isochrons and Phase Sensitivity of Bursting Neurons". SIAM Journal on Applied Dynamical Systems 13 (1), 306-338. (2014).

97. Mauroy, Alexandre, Mezić, Igor "Global stability analysis using the eigenfunctions of the Koopman operator", IEEE Trans Aut. Cont. (In Press) (2016).

98. Georgescu, Michael, Mezic, Igor "Building energy modeling: A systematic approach to zoning and model reduction using Koopman Mode Analysis", Energy and buildings 86 (2015): 794-802. (2015).

99. Williams, Matthew O., Rowley, Clarence W. Mezić, Igor, Kevrekidis, Ioannis G. "Data fusion via intrinsic dynamic variables: An application of data-driven Koopman spectral analysis", EPL (Europhysics Letters), 109, 4. 40007 (2015) .

100. Mauroy, Alexandre, Mezić, I. "Extreme phase sensitivity in systems with fractal isochrones," Physica D: Nonlinear Phenomena 308 (2015): 40-51. (2015).

101. Mohr, Ryan; Mezić, Igor "Searching for Targets of Nonuniform Size Using Mixing Transformations: Constructive Upper Bounds and Limit Laws." Journal of Nonlinear Science, 25, 3, 741-777. (2015).

102. Rypina, I.I., Pratt, Larry J., Wang, Peng, Özgökmen, T.M., Mezić, I; Resonance phenomena in a time-dependent, three-dimensional model of an idealized eddy, Chaos: An Interdisciplinary Journal of Nonlinear Science, 25, 8, 87401. (2015).

8

103. Levnajić, Zoran, Mezić, Igor "Ergodic theory and visualization. II. Fourier mesochronic plots visualize (quasi) periodic sets," Chaos: An Interdisciplinary Journal of Nonlinear Science, 25, 5, 53105. (2015).

104. Susuki, Yoshihiko; Mezić, Igor; Hoshino, Hikaru; Hikihara, Takashi "A Unified Definition of Collective Instabilities in Coupled Generator Networks," IFAC-PapersOnLine, 48, 18, 89-94. (2015).

105. Susuki, Yoshihiko; Mezić, Igor; Raak, Fredrik; Hikihara, Takashi "Applied Koopman operator theory for power systems technology". Nonlinear Theory and Its Applications, IEICE, 7(4), 430-459. (2016).

106. Thakur, Gunjan S, Mohr, Ryan; Mezić, Igor "Programmable Potentials: Approximate N-body potentials from coarse-level logic." Scientific reports 6 (2016).

107. Rypina, I. I., L. J. Pratt, P. Wang, T. M. zgkmen, and I. Mezić. "Resonance phenomena in a time-dependent, three-dimensional model of an idealized eddy." Chaos: An Interdisciplinary Journal of Nonlinear Science 25, no. 8 (2015): 087401.

108. Sharma, Ati S., Igor Mezić, and Beverley J. McKeon. "Correspondence between Koopman mode decomposition, resolvent mode decomposition, and invariant solutions of the Navier-Stokes equations." Physical Review Fluids 1, no. 3 (2016): 032402.

109. Eden, A., M. Sigurdson, I. Mezić, and C. D. Meinhart. "A hybrid experimental-numerical technique for determining 3D velocity fields from planar 2D PIV data." Measurement Science and Technology 27, no. 9 (2016): 094010.

110. Mauroy, Alexandre, and Igor Mezić. "Global stability analysis using the eigenfunctions of the Koopman operator." IEEE Transactions on Automatic Control 61, no. 11 (2016): 3356-3369.

111. Kono, Yohei, Yoshihiko Susuki, Mitsunori Hayashida, Igor Mezić, and Takashi Hikihara. "Multi-scale modeling of in-room temperature distribution with human occupancy data: a practical case study." Journal of Building Performance Simulation (2017): 1-19.

112. Ivić, Stefan, Bojan Crnković, and Igor Mezić. "Ergodicity-Based Cooperative Multiagent Area Coverage via a Potential Field." IEEE transactions on cybernetics (2017).

113. Hassan Aref, John R. Blake, Marko Budišić, Silvana S.?S. Cardoso, Julyan H.?E. Cartwright, Herman J.?H. Clercx, Kamal El Omari, Ulrike Feudel, Ramin Golestanian, Emmanuelle Gouillart, GertJan F. van Heijst, Tatyana S. Krasnopolskaya, Yves Le Guer, Robert S. MacKay, Vyacheslav V. Meleshko, Guy Metcalfe, Igor Mezić, Alessandro P.?S. de Moura, Oreste Piro, Michel F.?M. Speetjens, Rob Sturman, Jean-Luc Thiffeault, and Idan Tuval Rev. Mod. Phys. 89, 025007.

**Books:**

- "Normally Hyperbolic Invariant Manifolds in Dynamical Systems" (with S. Wiggins and G. Haller) Springer-Verlag, New York (1994).

- "Control of Fluid Flow" (Editor, with P. Koumoutsakos) Springer-Verlag, New York (2006).

- "Analysis and Control of Mixing with an Application to Micro and Macro Flow Processes Edited by Luca Cortelezzi and Igor Mezić, Springer-Verlag, New York (2009).

9

Case 2:26-cv-05242-SVW-SSC   Document 26-1   Filed 05/14/26   Page 966 of 1309   Page ID
Case 2:15-cv-04113-PSG-JEM   Document 558-1   Filed 10/21/19   Page 32 of 52   Page ID
#:23738
#:23738

**Professional activities:**

*Conference/Workshop/minisymposium organizer:*

- Co-Organizer, mini-symposium on "Advanced data-driven techniques and numerical methods in Koopman operator theory" at the SIAM conference on Applications of Dynamical Systems (Snowbird, UT, USA), 2017.

- Co-Organizer,special session on "Koopman operator techniques for decision and control" at CDC 2016 in Las Vegas, USA.

- Co-Organizer, Invited Session on Operator-Theoretic Approach to Analysis of Nonlinear Systems: Koopman and Perron-Frobenius Operators , CDC 2015, Osaka, Japan.

- Co-Organizer, Mathematisches Forschungsinstitut Oberwolfach; Workshop on Applied Koopmanism, February 2016.

- Funding Agency Panel, 2015 SIAM Conference on Applications of Dynamical Systems, Snowbird, Utah 2015

- Mini-Symposium on Koopman Operator Techniques in Dynamical Systems: Theory and Practice, 2015 SIAM Conference on Applications of Dynamical Systems, Snowbird, Utah 2015.

- Invited Session on Operator-Theoretic Approach to Analysis of Nonlinear Systems: Koopman and Perron-Frobenius Operators , CDC 2015, Osaka, Japan.

- Mathematisches Forschungsinstitut Oberwolfach; Workshop on Applied Koopmanism, February 2016.

- Minisymposium: "Koopman Methods in Dynamical Systems", at the SIAM Conference on Applications of Dynamical Systems, Snowbird, Utah, (2013).

- Minisymposium: "Uncertainty Propagation in Large-scale Networked Dynamical Systems", at the SIAM Conference on Applications of Dynamical Systems, Snowbird, Utah, (2007).

- Workshop: "Coupled Nonlinear Oscillators and Applications in Nanosystems", Santa Barbara, CA, (with T. Hikihara, Kyoto University) 2007.

- A semester program in Dynamical Systems, Spring 2007, Mathematical Sciences Research Institute, Berkeley, CA. (with C. K. R. T. Jones (University of North Carolina), L.-S. Young (Courant Institute), A. Stewart (Warwick University) and J. Mattingley (Duke University)).

- Summer School and Workshop Analysis and Control of Mixing with an Application to Micro and Macro Flow Processes Sponsored by Marie Curie Program - EUA4X, CISM, Udine, Italy (with L. Cortelezzi, McGill University) (2005).

- Minisymposium: "Control of Hamiltonian Systems", at the SIAM Conference on Applications of Dynamical Systems, Snowbird, Utah (with J. Meiss (University of Colorado)), (2005).

- Invited Session: "Uncertainty Propagation - Theory and Tools", at the Conference on Decision and Control (with T. Kalmar-Nagy (United Technologies Research Center)), (2004).

10

- Pre-nominated session on Chaos in Fluid and Solid Mechanics, XXI International Congress of Theoretical and Applied Mechanics, Warsaw, Poland (session chair with G. Rega, Rome), (2004).

- Two Workshops on Uncertainty Analysis in the Design of Dynamical Systems, at CIMMS, Caltech and United Technologies Research Center (UTRC), Hartford, CT (with J. E. Marsden (Caltech), M. Myers (UTRC) and A. Banaszuk (UTRC)), (2003/2004).

- Minisymposium: "Transport by Chaotic Advection in Three Dimensional Flows and Maps", at the SIAM Conference on Applications of Dynamical Systems, Snowbird, Utah (with J. Meiss (University of Colorado)), (2003).

- Minisymposium: "Dimensional Reduction for Nonlinear Systems" , at the SIAM Conference on Applications of Dynamical Systems, Snowbird, Utah (with R. Kupferman (University of California, Berkeley)), (2003).

- The First International Symposium on Turbulence and Shear Flow Phenomena (Member of the Executive Committee) (1999).

- Workshop on Dynamical Systems and Statistical Mechanics Methods for Coherent Structures in Turbulent Flows (with M. Farge, ENS, Paris) (1997).

*Editorial Boards and Panels:*

- Physica D (2001-2011) Editor.

- Dynamics and Stability of Systems (2000-2002) Member of the Editorial Board.

- Journal of Applied Mechanics (2003-) Associate Editor.

- SIAM Journal on Control and Optimization (2005-2013) Associate Editor.

- ASCE Notes in Mechanics Book Series (2010-) Associate Editor.

- Nonlinear Theory and its Applications (2012-) Editor.

- Advisory Panel SIAM Activity Group on Dynamical Systems (2015-) Elected Member.

*Invited colloquium presentations (since 1999):*

- 1999 "A Large-scale Theory of Axial Compression System Dynamics", Institute for Fluid Mechanics, ETH Zurich.

- 1999 "A Large-scale Theory of Axial Compression System Dynamics", University of Illinois, Urbana-Champaign.

- 1999 "Three-Dimensional Chaotic Advection", Division of Engineering and Applied Sciences, Harvard University.

- 1999 "Chaotic Advection in Three-Dimensional, Bounded flows", Department of Mechanical Engineering, Massachusetts Institute of Technology.

- 2000 "Ergodic Theory and Control of Mixing", Laboratory for Information and Decision Systems, Massachusetts Institute of Technology.

- 2000 "Control of Mixing", Department of Mathematics, Boston University.

11

- 2000 "Ergodic Theory in Fluid Mechanics", Isaac Newton Institute for Mathematical Sciences, Cambridge University.

- 2001 "A Large-scale Theory of Axial Compression System Dynamics", Division of Applied Mathematics, Brown University.

- 2001 "Control of Mixing", Center for Nonlinear Science, Georgia Institute of Technology.

- 2002 "Modeling of Complex Systems", Center for Integrative Multiscale Modeling and Simulation (CIMMS), Caltech.

- 2002 "Comparison of Dynamical Systems Based on the Spectral Properties of the Koopman Operator", Department of Mathematics, UC Berkeley.

- 2002 "Micromixing", Department of Aerospace and Mechanical Engineering, University of Southern California.

- 2002 "Comparison of Dynamical Systems Based on the Spectral Properties of the Koopman Operator", Center for Nonlinear Science, Georgia Institute of Technology.

- 2002 "Chaotic Advection in Three-Dimensional Flows: Geometry and Physics", Applied Mathematics Department, Columbia University.

- 2002 "Chaotic Advection in Three-Dimensional Flows: Geometry and Physics", Courant Institute for Mathematical Sciences, New York University.

- 2002 "Comparison of Dynamical Systems Based on the Spectral Properties of the Koopman Operator", Program in Computational and Applied Mathematics, Princeton University.

- 2003 "Ergodic Theory and Control Theory", IGERT (Interdisciplinary Seminars in Nonlinear Science) Research Colloquium, Northwestern University.

- 2003 "Control of Mixing and Application in Microfluidic Devices", Computations in Science Seminar, University of Chicago.

- 2003 "Mixed Orthogonal Decomposition", Statistical and Applied Mathematical Sciences Institute, North Carolina.

- 2003 "Control and Mixing of Bioparticles", California Nanoscience Institute, University of California, Santa Barbara.

- 2003 "Ergodic Theory Methods for Controllability", Institute for Pure and Applied Mathematics, University of California, Los Angeles.

- 2003 "Mixing and Control of Particles in Microchannels", United Technologies Research Center, Hartford, Connecticut.

- 2003 "Nonlinear Dynamics of Atomic Force Microscopes", VEECO Inc.

- 2004 "Control of Mixing and Application in Microfluidic Devices", Mathematics Department, McMaster University.

- 2004 "Control of Mixing and Application in Microfluidic Devices", Mechanical Engineering Department, Stanford University.

- 2004 "Uncertainty in Analysis & Design: a Dynamical Systems Perspective", Center for Nonlinear Science, Georgia Institute of Technology Mixing and control of particles in microchannels, GALCIT, Caltech

- 2005 "Two topics in coupling probabilistic and dynamical systems approaches for complex systems", National Center for Atmospheric Research

- 2005 "Spectral Theory for Nonlinear Dynamical Systems", LIDS, MIT

- 2005 "Control of Mixing: Ergodic Theory and Biosensors ", University of Illinois at Urbana-Champaign.

12

- 2005 "Spectral Theory for Nonlinear Dynamical Systems", CIMMS, Caltech.

- 2006 "Spectral Theory for Nonlinear Dynamical Systems", University of Southern California.

- 2006 "Utilizing Nominal Dynamics in Control: A Theory for Hamiltonian Systems and Nanoscale Applications", Institut de Mathmatiques, Univ. Bordeaux.

- 2006 "Biomolecules as Nonlinear Oscillators: Life-Enabling Dynamics", Kyoto University.

- 2006 "Biomolecules as Nonlinear Oscillators: Life-Enabling Dynamics, Tokyo University

- 2007 "Physical Structure, Graph Structure and Uncertainty in Complex Systems", UCSB

- 2007 "Theory and Practice of Active Microfluidic Devices", MIT

- 2007 "Theory and Practice of Active Microfluidic Devices", Univeristy of Wisconsin, Madison

- 2007 "Characterization of mixing and hyperbolicity in flows", Ecole Normale Superieure, Paris

- 2007 "Active, Universal Particle Micromanipulators: CPUs for Microfluidics", LLNL, Livermore, CA

- 2007 "Physical Structure, Graph Structure and Uncertainty in Complex Systems", LLNL, Livermore, CA

- 2007 "Physical Structure, Graph Structure and Uncertainty in Complex Systems", Courant Institute of Mathematical Sciences, New York University, NY.

- 2007 "Modeling for Design of Energy Efficient Buildings", LBNL, Berkeley, CA

- 2008 "Uncertainty Analysis in Dynamical Systems, Institute for Pure and Applied Mathematics, UCLA

- 2008 " Prandtl-Batchelor Theory in 3D and Optimal Control of Fluid Mixing", Symposium in Honor of Anthony Leonard, California Institute of Technology.

- 2008 " Uncertainty Analysis in Dynamical Systems", CCDC, UCSB

- 2009 "Uncertainty Analysis: a Dynamical Systems Approach, Mechanical and Aerospace Engineering, Princeton

- 2009 Uncertainty Analysis: a Dynamical Systems Approach", Applied Mathematics, UCLA

- 2009 "Uncertainty Analysis: a Dynamical Systems Approach", Applied Mathematics, Arizona State University.

- 2010 "Integrated, Energy Efficient Design and Operation of Building Systems", Department of Building Services Engineering, The Hong Kong Polytechnic University.

- 2010 "Analysis of Large-Scale Interconnected Dynamical Systems", Tsinghua University, China.

- 2010 "Uncertainty Analysis: a Dynamical Systems Approach", Probability and Statistics, UCSB.

- 2010 "Energy Dynamics", Mechanical and Civil Engineering, Caltech.

- 2011 "Smart Grid and Analysis of Large-Scale Interconnected Dynamical Systems", Los Alamos National Laboratory, Los Alamos, NM.

- 2011 "Analysis of Large-Scale Interconnected Dynamical Systems", Caltech.

- "Energy Dynamics and a New System Analysis Framework", ETH Zurich.

- 2011 "Integrated, Energy Efficient Design and Operation of Building Systems", Nanyang Technological University, Singapore.

- 2012 "Mixing in Fluids: Visualization, Mode Decomposition and Diagnostics", Nanyang Technological University, Singapore.

- 2012 "A New Systems Analysis Framework", Mechanical Engineering, MIT

Case 2:26-cv-05242-SVW-SSC    Document 26-1    Filed 05/14/26    Page 970 of 1309    Page
Case 2:15-cv-04113-PSG-JEM    Document 558-1    Filed 10/21/19    Page 36 of 52    Page ID
ID #:23521
#:13752

- 2013 "Energy Management in Buildings and Grid using Koopman Operator Methods", Electrical Engineering, Kyoto University

- 2013 "Energy Management in Buildings and Grid using Koopman Operator Methods", Tokyo Institute of Technology

- 2013 "Smart Grid and Analysis of Large-Scale Interconnected Dynamical Systems", Electrical Engineering, UCLA.

- 2014 "Energy Management in Buildings and Grid using Koopman Operator Methods", Mechanical Engineering, UC Riverside.

- 2015 "Analysis of Fluid Flows and Mixing via Spectral Properties of Koopman Operator" UCLA, Mechanical Aerospace Engineering.

- 2015 "Koopman (Composition) Mode Expansion in Theory and Practice" Cambridge University, UK Control Theory Seminar.

- 2015 "Oil Spill Dynamics" BP Institute, UK.

- 2015 "Analysis of Fluid Flows and Mixing via Spectral Properties of Koopman Operator" DAMPT, Cambridge University, UK.

- 2015 "Koopman Operator Methods: Theory and Applications", UTRC DMD/Koopman workshop, Hartford, CT.

- 2016 "Theory and Application of Koopman Operator Methods" Hughes Research Laboratories.

- 2016 "Strongly Coupled Oscillators: A Koopman-Theoretic Approach", Network Frontier Workshop, Northwestern University.

- 2016 "Koopman Operator Methods: Theory and Applications", Mathematisches Forschungsinstitut Oberwolfach, Germany, Workshop on Applied Koopmanism.

- 2016 "Koopman Operator Theory in Fluid Mechanics" Department of Mathematics, University of Wisconsin, Madison.

- 2016 "Koopman Operator Theory in Fluid Mechanics" AEM Seminar at University of Minnesota.

- 2017 "Spectral Properties of the Koopman Operator: Theory, Computation and Applications", Electrical Engineering and Computer Science, University of Michigan.

- 2017 "Koopman Operator Theory in Dynamical Systems, Fluid Mechanics and Beyond", University of Rijeka, Croatia.

- 2017 "Spectral Properties of the Koopman Operator: Theory and Computation", University of Zagreb, Croatia.

*Selected conference presentations (since 1999):*

- 1999 "Transport and Mixing in Three-Dimensional Perturbations of Two-Dimensional Flows", American Physical Society Meeting, New Orleans. (Contributed).

- 1999 "Chaotic Advection in Three-Dimensional, Bounded flows", NSF-KDI/IGPP Workshop, San Diego, CA. (Invited Speaker).

- 1999 "Chaotic Advection in Three-Dimensional, Bounded flows", Integrating integrability into mathematics and science: Conference in honor of V. Zakharov's 60th Birthday. University of Arizona. (Invited).

- 1999 "Control of Mixing", NSF Workshop on Control of Fluids, UCSD. (Invited Speaker).

- 1999 "Dynamics and Transport in 3-D, Volume Preserving Maps and Flows", SIAM Conference on Applications of Dynamical Systems, Snowbird, Utah. (Contributed).

14

- 2000 "Instabilities in Rotating Flows With Body Forces: Turning Navier-Stokes into a Reaction-Diffusion Equation", American Physical Society Meeting, Washington DC. (Contributed).

- 2000 "Chaotic Advection in Bounded Navier-Stokes Flows", ICTAM 2000, Chicago. (Contributed).

- 2000 "Overview of Some Theoretical and Experimental Results on Modeling and Control of Shear Flows", Conference on Decision and Control, Sydney. (Contributed).

- 2000 "Comparison of Systems with Complex Behavior", Conference on Decision and Control, Sydney. (Contributed).

- 2001 "Control of Nonlocal Reaction-Diffusion Equations; Application to Control of Instabilities in Axial Compressors" , SIAM Conference on Applications of Dynamical Systems, Snowbird, Utah. (Contributed).

- 2001 "Control of Mixing", SIAM Conference on Applications of Dynamical Systems, Snowbird, Utah. (Contributed).

- 2001 "Controlled Group Translations and Controllability of Nonlinear Systems", NOLCOS 01, St. Petersburg, Russia. (Contributed).

- 2001 "An Extension of Prandtl-Batchelor Theory and Consequences for Chaotic Advection", American Physical Society Fluid Dynamics Meeting, San Diego, CA. (Contributed).

- 2002 "Ergodic Theory and Control Theory", Mohammed Dahleh Symposium, UCSB. (Invited Speaker).

- 2002 "Modeling and Numerical Analysis of Mixing in an Actively Controlled Micromixer", HEFAT01, South Africa. (Contributed).

- 2002 "Mixing in Three-Dimensional Flows", SIAM Annual Conference, Philadelphia, PA. (Invited).

- 2002 "Control of Fluid Particle Motion and (Anti)-KAM Theory", Workshop on Dynamical Systems Methods in Fluids, Mathematisches Forschungsinstitut Oberwolfach, Germany. (Invited Speaker).

- 2002 "Mixing, KAM, Anti-KAM and Controllability", AFOSR Contractors Meeting, Pasadena, CA. (Invited).

- 2002 "Mixing in Three-Dimensional Flows", Workshop on sediment transport, Monte Verita, Ascona, Switzerland. (Invited Speaker).

- 2002 "On Control of Vortex Dynamics", American Physical Society Fluid Dynamics Meeting, Dallas, Texas. (Contributed)

- 2003 "Mixed Orthogonal Decomposition", American Mathematical Society Meeting, Baltimore, MD. (Invited).

- 2003 "Control of Mixing and Application in Microfluidic Devices", Dynamics Days Europe, Palma de Mallorca, Spain. (Invited Plenary Speaker).

- 2003 "An Actively Controlled Micromixer: 3-D Theory", American Physical Society Fluid Dynamics Meeting, New Jersey. (Contributed).

- 2003 "A Multiscale Measure of Mixing and its Applications", Conference on Decision and Control, Maui, Hawaii. (Invited).

- 2003 "Uncertainty Analysis: a Dynamical Systems Approach", Workshop on Uncertainty Analysis, Pasadena, CA. (Contributed).

- 2004 "Uncertainty Analysis: a Dynamical Systems Approach, DARPA Workshop on Uncertainty Analysis, United Technologies Research Center, Hartford, CT. (Contributed)

- 2004 "Mathematical aspects of mixing theory and application in m icrofluidic mixing AIMS Dynamical Systems and Differential Equations Conference, Pomona, CA . (Invited).

- 2004 "Spectral properties of dynamical systems and model reduction AIMS Dynamical Systems and Differential Eq uations Conference, Pomona, CA. (Invited)

15

- 2004 "Nonlinear dynamics of multicomponenmt dynamical systems", ICTAM, Warsaw, Poland. (Contributed).

- 2004 "High Efficiency Mixing in the Shear Superposition Micromixer" APS DFD Meeting, Seattle, Washington. (Contributed)

- 2004 "Mixing and control of particles in microchannels" NOLTA 2004, Fukuoka, Japan (2004).(Invited)

- 2004 "Collaborations with UTRC 1997-2004" Conference on Decision and Control (CDC). (Invited)

- 2004 "Coupled Nonlinear Dynamical Systems: Asymptotic Behavior and Uncertainty Propagation" Conference on Decision and Control (CDC) (2004). (Contributed)

- 2005 "Coupled Nonlinear Dynamical Systems: Asymptotic Behavior and Uncertainty Propagation" SIAM Conference on Applications of Dynamical Systems, Snowbird, Utah . (Contributed).

- 2005 "Dynamics and Control of Macromolecules", SIAM Conference on Applications of Dynamical Systems, Snowbird, Utah (2005). (Contributed)

- 2005 "Uncertain, High-Dimensional Dynamical Systems" Workshop on Geophysical Dynamics, IPAM, UCLA (2005). (Invited)

- 2005 "Utilizing Nominal Dynamics in Control: A Theory for Hamiltonian Systems and Nanoscale Applications" Plenary Lecture at the 2005 SIAM Control Theory Meeting, New Orleans. (Invited)

- 2006 "Complex Systems Architectures: Rules, Interfaces, Modules, Dynamics", DARPA Microsystems Technology Office Complex Systems Architectures Workshop Arlington, VA. (Invited)

- 2006 "Biomolecules as Nonlinear Oscillators: Life-Enabling Dynamics", Plenary Lecture at the Second International Conference on Dynamics,Vibration and Control, Beijing, China. (Invited)

- 2006 "Biomolecules as Nonlinear Oscillators: Life-Enabling Dynamics", Keynote Lecture at the Nonlinear Dynamics of Nanosystems Workshop, TU-Chemnitz, Chemnitz, Germany (Invited)

- 2006 "Physical Structure, Graph Structure and Uncertainty in Complex Systems", Keynote Lecture at the Mathematics in the Science of Complex Systems Workshop Warwick University, UK

- 2006 "Optimal Control of Fluid Mixing" American Physical Society Division of Fluid Dynamics Meeting, Tampa, Florida (Contributed)

- 2007 "Robust Decision Making: Agent-Based Models and Dynamical Systems", Robust Decision Making Workshop, AFOSR, Arlington, Virginia (Invited)

- 2007 "Controllability, Integrability, Ergodicity", Mathematical Sciences Research Institute, Berkeley, CA (Invited)

- 2007 "Active, Universal Particle Micromanipulators: CPUs for Microfluidics", Lab-on-a-Chip World Congress, Edinburgh, Scotland (Invited)

- 2007 "Characterization of mixing and hyperbolicity in flows", International Congress on Industrial and Applied Mathematics, Zurich, Switzerland.

- 2007 "Nonlinear Multiscale Dynamical Systems, NOLTA, Vancouver 2007

- 2008 "Optimal control of mixing, The Southern California Conference on the Mathematics of Fluids, USC, March 29-30, 2008 (Invited)

- 2008 "Uncertainty Analysis in Dynamical Systems, Institute for Pure and Applied Mathematics, UCLA.

- 2008 "Prandtl-Batchelor Theory and Optimal Control of Fluid Mixing", Symposium in Honor of Anthony Leonard, California Institute of Technology. (Invited)

- 2008 "Theoretical tools for modeling of self-assembly", 6th International Symposium on Bioscience and Nanotechnology, Toyo University, Japan. (Invited)

16

- 2009 "Analysis of Large-Scale Interconnected Dynamical Systems", SIAM Conference on Applications of Dynamical Systems, Snowbird, Utah (2009). (Invited Plenary Lecture)

- 2009 "Adversarial Games and Dynamical Systems", AFOSR Workshop on Adversarial and Stochastic Elements In Autonomous Control, Arlington, VA, March 2009 (Invited)

- 2010 "Integrated, Energy-Efficient Design", International Workshop on Smart Energy Management , Kyoto, Japan. (Invited)

- 2010 "Mixing and Transport: Visualization, Norms, and Control", IMA Workshop on Transport and Mixing in Complex and Turbulent Flows, April 2010. (Invited)

- 2010 "Harmonic Analysis, Complex Systems and Mixing ", SIAM Minisymposium In Memory of Dennis Healy and His Scientific Vision, SIAM Annual Meeting, Pittsburgh, PA, July 2010. (Invited)

- 2011 "Koopman Operator and Mixing in Fluids: Visualization, Mode Decomposition and Diagnostics", Workshop on The Physics of Mixing, Leiden, Netherlands, January 2011.  (Invited Keynote Lecture)

- 2011 "Analysis of Large-Scale Interconnected Dynamical Systems: the Status, the Needs and the Future", Workshop on Future Directions in Applied Mathematics, North Carolina State University, May 2011. (Invited)

- 2011 "From Differential Topology to Koopmanism", ICIAM, Vancouver, Canada, July 2011. (Invited)

- 2011 "Uncertainty: Some Conceptual Thoughts and a Good Sampling Method", USA/South America Symposium on Stochastic Modeling & Uncertainty Quantification Rio de Janeiro, Brazil, August 1 5, 2011.  (Invited Keynote Lecture)

- 2012 "Analysis of Fluid Flows via Spectral Properties of Koopman Operator", APS DFD meeting, San Diego.

- 2013 "Koopman Operator Methods: An Overview", SIAM DS meeting, Snowbird, UT.

- 2013 "System-Level Tools for Whole Building Analyses", Intelligent Building Operations Workshop, University of Colorado Boulder.

- 2014 "Energy Management in Buildings and Grid using Koopman Operator Methods", UC Riverside.

- 2014 "Koopman Operator Methods and Control", Contol of PDE's, Paris (Invited Plenary Lecture).

- 2014 "On the relationship between Koopman Mode Decomposition and Dynamic Mode Decomposition." American Physical Society, Division of Fluid Dynamics Meeting, San Francisco.

- 2015 "Koopman Mode Expansion in Theory and Practice", SIAM Conference on Applications of Dynamical Systems.

- 2015 "On Applications of the Spectral Theory of the Koopman Operator in Dynamical Systems and Control Theory" Conference on Control and Decision, Osaka, Japan.

- 2016 "Koopman Operator Methods: Theory and Applications" Mathematisches Forschungsinstitut Oberwolfach; Workshop on Applied Koopmanism.

- 2016 "Spectral Expansions, A Schrdinger-Type Formalism and Observable Wavefunctions in Dynamical Systems", International Symposium on NOLTA, Yugawara, Japan.

- 2017 "Extensions of the Koopman Operator Theory", SIAM Conference on Applications of Dynamical Systems, Snowbird, Utah.

*Reviewing and refereeing activity:*

Air Force Office of Scientific Research, ASME, Automatica, IEEE Transactions on Automatic Control, Journal of Applied Mechanics, Journal of Computational Physics, Chaos, Control Systems Technology, International Journal of Robust and Nonlinear Control, European Physical Journal B,

Teel Declaration
Page 167

International Journal of Heat & Mass Transfer , Journal of Fluid Mechanics, Journal of Nonlinear Science, Journal of Physical Oceanography, Journal of Physics A, Mathematical Reviews, Nature, Physica D, Physical Review E, Physical Review Letters, Physics Letters A, Physics of Fluids, The Physical Review, Journal of Micromechanics and Microengineering, Lab on a Chip, Springer-Verlag, United Technologies Research Center, National Institute of Health, National Science Foundation.

*Consulting activity:*

Propulsion Research Institute (1996-1998), Honda R & D (2000-2002), Combustion Research and Flow Technology (2000-2001), Guidant (2002-2003), United Technologies Research Center (1998-2013), Codman (Johnson and Johnson) (2002-2003), Prevention Research Institute (2004-2007), Ford Motor Company (2005-2013), National Science Foundation (1995-), AFOSR (1996-), Electricite de France 2011-2012, Ecorithm 2009-2016, Aimdyn 2003-.

*Other professional activities:*

- 2016 Panelist Applied Dynamical Systems Panel, National Science Foundation.

- 2016 Member,Advisory Panel, Dynamical Systems Activity Group, Society for Industrial and Applied Mathematics.

- 2014 Participant ARPA-E Workshop: Reducing CAPEX for Energy-Efficient Building Controls, Washington, DC.

- 2012 Participant National Energy Efficiency Technology Roadmapping Summit, Portland, Oregon.

- 2011 Participant, Developing Dependable and Secure Automotive Cyber-Physical Systems from Components, Troy, Michigan

- 2011 Participant, A National Summit on Advancing Clean Energy Technologies, Washington DC

- 2009 Participant, AFOSR Workshop on Adversarial and Stochastic Elements In Autonomous Control

- 2009 Participant, Workshop on Complex Aerospace Systems, Organized by DARPA and NSF

- 2008 Member, discussant panel National Workshop on High Confidence Automotive Cyber-Physical Systems , Troy, Michigan

- 2008 Member, discussant panel NSF Workshop on Foundations for Complex Systems Research in the Physical Sciences and Engineering,

- 2008  Member, discussant panel, National Workshop on High Confidence Automotive Cyber-Physical Systems , Troy, Michigan

- 2007 Member, Organizing Committee SIAM Conference on Control and its Applications, San Francisco, CA

- 2007 Organizer (with T. Hikihara, Kyoto U. Coupled Nonlinear Oscillators and Applications in Nanosystems, UCSB

18

- 2006  Visiting Professor, Kyoto University , Japan.

- 2006  Visiting Professor, Institut de Mathmatiques, Univ. Bordeaux, France.

- 2005, Panelist, National Science Foundation panel on proposals in Dynamics (Engineering Directorate).

- 2005, Member, Panel of the Defense Sciences Research Council Workshop on Design Principles for Complex Biological Systems, Washington DC..

- 2004, Member, Program Committee, Division of Fluid Dynamics of the American Physical Society.

- 2004, Panelist, National Science Foundation panel on proposals in Applied Dynamical Systems (Mathematics Directorate).

- 2003, Member, *Institute for Collaborative Biotechnologies*, University of California, Santa Barbara.

- 2002, Panelist, *Panel on proposals in Control Theory (Engineering Directorate)*, National Science Foundation.

- 2002, Member, *California NanoSystems Institute*, University of California, Santa Barbara.

- 2001, Participant, *National Science Foundation Workshop on "Frontiers of Mathematics in Geosciences", Institute for Mathematics and its Applications*, University of Minnesota.

- 2000, Participant, *Programme on "Geometry and Topology of Fluid Flows"*, Isaac Newton Institute for Mathematical Sciences (Cambridge, UK).

- 2000, Participant, *Meeting of the "Future Directions in Control and Dynamical Systems" panel*, Washington DC.

- 1999 Participant, *Programme on "Turbulence"*, Isaac Newton Institute for Mathematical Sciences (Cambridge, UK).

- 1999 ERCOFTAC Visiting Professor, Institut fur Flüiddynamik, ETH Zürich.

- 1996 Participant, *Programme on "Mathematical Modelling of Plankton Population Dynamics"*, Isaac Newton Institute for Mathematical Sciences (Cambridge, UK).

**Grants and industrial gifts:**

- 1997-2000 NATO "Chaos and Mixing in 3-Dimensional Maps and Flows" $4,591 Co-Principal Investigator (Co-PI).

- 1997-2000 AFOSR "Dynamics and Control of Instabilities and Mixing in Complex Fluid Flows; Applications to Jet Engines", $151,083, Principal Investigator (PI).

- 1997-2000 ONR "Transport and Mixing in Three-dimensional Oceanographic Flows" $120,000, PI.

- 1998-2001 NSF "Mathematical Methods of Chaotic Advection in Three-Dimensional Fluid Flows" $75,000, PI.

- 1998-99 Honda Research Initiation Grant "Control of Mixing and Applications in Three-Dimensional Fluid Flows" $25,000, PI.

19

- 1998-99 Propulsion Research Institute, Industrial gift. $12,000, PI.

- 1999 Ford Motor Company, Industrial gift. $10,000, PI.

- 1999-2003 "Nonlinear Dynamics and Control from Microscale to Macroscale", NSF CAREER $200,000, PI.

- 2000-03 AFOSR "Nonlinear Dynamics and Ergodic Theory Methods in Control of Fluid Flows: Theory and Applications" $380,000, PI.

- 2000- NSF ITR "Computational Infrastructure for Microfluidic Systems with Applications to Biotechnology" $2,900,000, Co-PI.

- 2000- Honda R&D Industrial gift. $40,000, PI.

- 2000- NSF IGERT "Development of a Graduate Education Program in Computational Science and Engineering with Emphasis on Multi-scale Problems in Fluids and Materials." $2,900,000, (co-PI).

- 2004 Institute for Collaborative Biotechnologies, "Modeling of microfluidics processes for improved sensitivity and accuracy of bio/chemical sensing devices". $50,000 (PI).

- 2003-2006 AFOSR "Nonlinear Dynamics and Ergodic Theory Methods in Control" $450,000 (PI).

- 2003-2004 DARPA seed funding for research on "Analytical systems engineering: methodology for design of complex systems subject to uncertainty". $750,000, (In collaboration with the United Technologies Research Center).

- 2004-2007 NSF-NIRT, "Titanium-Based Biomolecular Manipulation Tools", $1,000,000. (co-PI).

- 2005 -2008 NSF-DMS, "Design of attractors for enhanced sensitivity biosensing", $310,000 (PI).

- 2006-2008 AFOSR " Uncertainty Analysis and Control for Nonlinear, Multiscale, Interconnected Systems", $532,796 (PI).

- 2006-2009 DARPA "Robust Uncertainty Management, $2,291,315 (PI).

- 2007-2010 ONR "Drifter Motion Planning for Optimal Surveillance of the Ocean, $561,145 (PI).

- 2008-2009 DARPA "Design of Microstructure for Shape-Adaptive and Reflectance-Adaptive Materials, $250,000 (PI).

- 2009-2013 AFOSR "Dynamical Systems Analysis of Complex Networks $1,454,839 (PI).

- 2009 Ford Motor Company, Industrial gift $30,000 (PI).

- 2009 Lawrence Berkely Laboratory (via DOE) "Real time Assessment and Visualization of Model-Based Energy Performance in High-Performance Buildings". $50,000 (PI).

- 2008-2010 Lawrence Livermore National Laboratory, "Design of Dielectrophoresis-based Microfluidic Devices $145,000 (PI).

- 2009 Sandia National Laboratory, "Complexity Issues in Mathematical Modeling of Infrastructure System Models $50,000 (PI).

- 2010 Air Force Office of Scientific Research, "Inferring Structure and Forecasting Dynamics on Evolving Networks ", $143,793 (PI).

- 2010-2012 "3-D Effects, Robustness and Uncertainty Issues in Drifter and Glider Motion Planning for Optimal Surveillance of the Ocean (DRIMPOS)", $450,000 (PI).

- 2010-2015 Office of Naval Research "Dynamical Systems Theory and Lagrangian Data Assimilation in 4D Geophysical Fluid Dynamics", $725,880 (PI).

- 2010-2013 AFOSR "Multi-Scale Uncertainty Propagation in Dynamical Systems", $953,565 (co-PI).

- 2014-2017 "ONR Koopman Mode Decomposition and mixing in Fluid Flows PI" $179,753 (PI)

20

- 2011-2016 ARO "Dynamics of System of Systems and Applications to Net Zero Energy Facilities", $875,000 (PI).

- 2014-2019 ARO MURI "New Theoretical and Experimental Methods for Predicting Fundamental Mechanisms of Complex Chemical Process, 3,750,000. (co-PI).

- 2017- ARO MURI "From Data-Driven Operator Theoretic Schemes to Prediction, Inference, and Control of Systems (From DDOTS to PICS)", 6,500,000 (PI).

21

**Patents :**

- Systems and methods for analyzing building operations sensor data, Mezic, Igor; Eisenhower, Bryan A; US Patent 9,043,163 (2015)

- Energy infrastructure sensor data rectification using regression models, Georgescu, Michael V; Mezic, Igor; US Patent 20,150,371,151 (2015)

- System and method for stability monitoring, analysis and control of electric power systems, Mezic, Igor; Susuki, Yoshihiko; US Patent 20,160,084,889 (2016)

- Dynamic equilibrium separation, concentration, and mixing apparatus and methods, Mezic; Igor , Bottausci; Frederic , Tuval; Idan, US Patent 8,182,669 (2012)

**Students and postdoctoral fellows:**
*Thesis advisor:*

1. George Mathew, (Researcher, United Technologies Research Center)

2. Domenico D'Alessandro, Ph. D. ( Professor, Mathematics Department, Iowa State University).

3. Gregory Hagen, Ph. D. (Senior Researcher, United Technologies Research Center).

4. David Betz, Ph. D. (Researcher, Boeing Phantom Works).

5. Umesh Vaidya, Ph. D. (Professor, Electrical Engineering, Iowa State University).

6. Zoran Levnajić, M. S. (Professor, Novo Mesto, Slovenia).

7. Sophie Loire, Ph. D. (Research Fellow, Ecorithm, Inc.)

8. Marko Budišić, Ph. D. (Assistant Professor, Clarkson)

9. Bryan Eisenhower, Ph. D. (Associate Director, Center for Energy Efficient Design, University of California, Santa Barbara)

10. Ryan Mohr, Ph. D. (Senior Researcher, Aimdyn, Inc.)

11. Gunjan Thakur, Ph. D. (Research Scientist, Harvard)

12. George Gilmore, M. S. (Vice-President, Co-Founder of Mekube);

13. Blane Rhoads, Ph. D. (Intel Research)

14. Michael Georgescu, Ph. D. (Director of Research, Ecorithm)

*Postdoctoral fellows and research scholars:*

1. Emir Yasun 2016-

2. Milan Korda, 2016-

3. Alexandre Mauroy, (Assistant Professor, University of Namur, Belgium)

4. Yoshihiko Susuki, (Associate Professor, Osaka Prefecture University, Japan)

5. Yueheng Lan, (Professor, Tsinghua University, Beijing, China)

6. Maud-Alix Mader 2008-2011

7. Alice Hubenko 2007-

8. George Mathew, 2006-2007, 2008-2010

9. Symeon Griveopoulos 2006-2009

10. Kaixia Zhang 1997-1998 (General Electric Research),

22

Case 2:15-cv-04113-PSG-JEM   Document 558-1   Filed 10/21/19   Page 45 of 52   Page ID #:23751

11. Dmitri Vainchtein (Harvard, UCSB) 2000-2005,

12. Dong-Eui Chang (UCSB) 2002-2003,

13. Frederic Bottausci (UCSB) 2002-2007.

14. Sophie Loire, (2009-)

15. Bryan Eisenhower, (2009-2012)

16. Paul Kauffmann (2010-2012)

17. Marin Sigurdson 2013-2015

23

## Documents Considered by Igor Mezic, Ph.D.

In addition to my prior Declarations and supporting exhibits submitted in this case, the following documents were considered in the preparation of my final report:

Declaration of Hunter S. Lenihan, Ph.D. [Dkt. 131]

Declaration of Randall Bell, PhD, MAI [Dkt. 125]

Declaration of Steve Roberts [Dkt. 129]

Declaration of Wade Bryant [Dkt. 371, 371-1, 371-2]

Declaration of Michael J. Fichera [Dkt. 373, 389-3]

Declaration of Paul D. Boehm [Dkt. 370, 370-1, 389-1]

Rebuttal Declaration of Paul D. Boehm [Dkt. 235]

Transcript of November 2, 2017 Deposition of Paul Boehm

Transcript of November 7, 2017 Deposition of Michael Fichera

Plains' Memorandum in Support of Motion to Strike [Dkt. 390]

Plains' Opposition to Renewed Motion for Class Certification [Dkt. 368, 389]

NOAA Shoreline Assessment Manual, 4th Edition; PLTF-EXPT-RB-0002857-3010

Alves et al, *Multidisciplinary oil spill modeling to protect coastal communities and the environment of the Eastern Mediterranean Sea* (Nature, Scientific Reports 6:36882, 2016); PLTF-EXPT-IM-006

Comparison of MEDSLIK and ADIOS models; PLT-EXPT-IM-0000348

Crosby, Bauer, Gardner, "*The Alaska Shoreline Cleanup Guidance and Standards Manual*" (International Oil Spill Conference Vol. 2008 No. 1. American Petroleum Institute, 2008.); PLTF-EXPT-IM-0000273

Cummings, James A. "*Operational multivariate ocean data assimilation*" (Quarterly Journal of the Royal Meteorological Society 131.613 (2005) 3583-3604.); PLTF-EXPT-IM-0000279

De Dominicis M, Falchetti S, Trotta F, Pinardi N, Giacomelli L, Napolitano E, Fazioli L, Sorgente R, Haley Jr PJ, Lermusiaux PF, and Martins F; "*A Relocatable Ocean Model in Support of Environmental Emergencies. Ocean Dynamics*." (2014 May 1;64(5):667-88); PLTF-EXPT-IM-006

De Dominicis M, Pinard N, Zodiatis G, Lardner R.; "*MEDSLIK-II, a Lagrangian marine surface oil spill model for short-term forecasting – Part 1: Theory*" (Geoscientific Model Development, 6, 1851-1869, 2013); PLTF-EXPT-IM-0000319

De Dominicis M, Pinard N, Zodiatis G, Archetti R.; "*MEDSLIK-II, a Lagrangian marine surface oil spill model for short-term forecasting – Part 2: Numerical simulations and validations*" (Geoscientific Model Development, 6, 1871-1888, 2013); PLTF-EXPT-IM-0000337

Farwell C, Reddy CM, Peacock E, Nelson RK, Washburn L, and Valentine DL, "*Weathering and the Fallout Plume of Heavy Oil from Strong Petroleum Seeps Near Coal Oil Point, CA.* (Environmental Science & Technology, 2009 Mar 5; 43(10):3542-8.)

Fitzpatrick, Faith A., et al, "*Oil-particle interactions and submergence from crude oil spills in marine and freshwater environments: review of the science and future research needs.*" (No. 2105-1076, U.S. Geological Survey, 2015)

Harlan, Terrill, Hazard, Otero, Roarty "*The Integrated Ocean Observing System HF Radar Network: Ten Year Status*" (Oceans 2015 – MTS/IEEE Washington); PLTF-EXPT-IM-006

Lehr, Jones, Evans, Simecek-Beatty, Overstreet, "*Revisions of the ADIOS oil spill model*" (Environmental Modelling & Software 17 (2002) 191-199); PLTF-EXPT-IM0000264

Owens, Engles, Lehmann, Parker-Hall, Reimer, Whitney, "*M/V Selendang Ayu Response: Shoreline Surveys and Data Management; Treatment Recommendations; and the Completion Inspection Process*" (International Oil Spill Conference (2008) 1193-1200); PLTF-EXPT-IM-0000345

Owens, E.H., and A.R. Teal. "*Shoreline cleanup following the Exxon Valdez oil spill: Field data collection within the SCAT program*" (Proceedings of the 13th Arctic and Marine Oil Spill Program Tech. Seminar, Environment Canada, Ottawa, ON, 1990)

Michel J, Owens EH, Zengel S, Graham A, Nixon Z, Allard T, Holton W, Reimer PD, Lamarche A, White M, and Rutherford N., "*Extent and Degree of Shoreline Oiling: Deepwater Horizon Oil Spill, Gulf of Mexico, USA*." (PloS one. 2013 Jun 12;8(6):e65087)

OTA-BP-0-63, "*Coping with an Oiled Sea*" (Mar. 1990, Congress of the United States, Office of Technology Assessment)

Supplemental Environmental Incident Report South Bay Incident, Prepared By: Steve Gibson, Environmental Scientist, California Department of Fish and Wildlife Office of Spill Prevention and Response

Tiago M. Alves; Eleni Kokinou, George Zodiatis, Hari Radhakrishnan, Costas Panagiotakis & Robin Lardner. "*Multidisciplinary oil spill modeling to protect coastal communities and the environment of the Eastern Mediterranean Sea*." (Scientific Reports 6, Article number: 36882 (2016); doi :10.1038.)

UReady4OS; Ready for the oil Spill; European Union and DG-ECHO (2018); http://www.medess4ms.eu/oil-spill-models

https://patch.com/california/newportbeach/mysterioustar-balls-wash-ashore-orange-county

Rbos_shoreline_exposure_oiling_points; PLTF-EXPT-IM-002

wind_data_coamps_10m_100days; PLTF-EXPT-IM-002

Original_wind_data.zip; PLTF-EXPT-IM-002

RTV_HFRADAR,_US_West_Coast,_2km_Resolution,_Hourly_RTV_best.nc; PLTF-EXPT-IM-002

Overflight_markers_2015-05-29.xlsx; PLTF-EXPT-IM-0000263

SCAT_oiling_points_m3_conct.xlsx; PLTF-EXPT-IM-0000263

Rbos_shoreline_exposure_linear_final_20161024.zip; PLTF-EXPT-IM-0000346

Zones_merged_split_24042017.zip; PLTF-EXPT-IM-0000347

MostRecentSurveys_08-25-15.xlsx; PLAINS-CL00195083

Final Report – United States Coast Guard Order no. 2015-01-FPN A15017; PLAINS-USCG-0284200

Durations\oil_durations.xlsx

Durations\property_durations.dbf

Durations\property_durations.shp

Durations\property_durations.shx

Durations\property_segment_data\040 Plains Oil Los Angeles excluding Long Beach.xlsx

Durations\property_segment_data\Santa Barbara and Ventura.xlsx

FishingBlocks\fishing_blocks_8000bbl.xlsx"

FishingBlocks\fishing_impact_10750bbl.xlsx"

FishingBlocks\_fisheries_impact.mp4

Seeps\seeps_10days_1000bbl\particle_transport.mp4

Seeps\seeps_10days_1000bbl\shoreline_concentrations_vs_max_scat.mp4

Seeps \seeps_10days_1000bbl\surface_volume.mp4

Seeps \seeps_10days_3000bbl\particle_transport.mp4

Seeps \seeps_10days_3000bbl\shoreline_concentrations_vs_max_scat.mp4

Seeps \seeps_10days_3000bbl\surface_volume.mp4

Seeps \seeps_10days_6000bbl\particle_transport.mp4

Seeps \seeps_10days_6000bbl\shoreline_concentrations_vs_max_scat.mp4

Seeps \seeps_10days_6000bbl\surface_volume.mp4

Email communications with Dr. Zach Nixon:

- - Igor Mezic _mezici@aimdyn.com_ - 2017-06-15 1015.eml;
- - Igor Mezic _mezici@aimdyn.com_ - 2017-06-15 1015-2.eml;
- - Igor Mezic _mezici@aimdyn.com_ - 2017-07-06 1023.eml;
- - Igor Mezic _mezici@aimdyn.com_ - 2017-07-06 1023-2.eml;
- - Igor Mezic _mezici@aimdyn.com_ - 2017-08-04 1428.eml;
- - Igor Mezic _mezici@aimdyn.com_ - 2017-08-04 1428-2.eml;
- - Igor Mezic _mezici@aimdyn.com_ - 2017-08-16 1149.eml;
- - Igor Mezic _mezici@aimdyn.com_ - 2017-08-16 1149-2.eml;
- - Igor Mezic _mezici@aimdyn.com_ - 2017-10-20 0949.eml;

- - Igor Mezic _mezici@aimdyn.com_ - 2017-10-31 0935.eml;
- - Igor Mezic _mezici@aimdyn.com_ - 2017-11-29 1405.eml;
- - Igor Mezic _mezici@aimdyn.com_ - 2018-02-02 1427.eml;
- - Igor Mezic _mezici@aimdyn.com_ - 2018-03-05 0844.eml;
- - Igor Mezic _mezici@aimdyn.com_ - 2018-03-08 1154.eml;
- - Igor Mezic _mezici@aimdyn.com_ - 2018-03-23 1317.eml;
- FW_ LA SCAT data - Zach Nixon _znixon@researchplanning.com_ - 2017-10-31 1327.eml;
- missing scat segment id's - Igor Mezic _mezici@aimdyn.com_ - 2017-07-01 0727.eml;
- missing scat segment id's - Igor Mezic _mezici@aimdyn.com_ - 2017-07-01 0727-2.eml;
- missing scat segment id's - Igor Mezic _mezici@aimdyn.com_ - 2017-07-02 0120.eml;
- missing scat segment id's - Igor Mezic _mezici@aimdyn.com_ - 2017-07-02 0120-2.eml;
- missing scat segment id's - Igor Mezic _mezici@aimdyn.com_ - 2017-07-02 0120-3.eml;
- RBOS SCAT Surveys west of Gaviota State Park - Zach Nixon _znixon@researchplanning.com_ - 2017-11-01 0934.eml
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-07-06 1027.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-07-06 1027-2.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-07-06 1308.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-07-06 1308-2.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-08-04 1431.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-08-04 1431-2.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-08-16 1254.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-08-16 1254-2.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-08-16 1448.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-08-16 1448-2.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-10-20 1218.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-10-20 1356.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-10-31 1005.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-10-31 1301.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-10-31 1332.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2017-11-29 1447.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2018-03-05 1052.eml;
- Re_ - Igor Mezic _mezici@aimdyn.com_ - 2018-03-05 1056.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-06-20 0635.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-07-06 1025.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-07-06 1027.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-07-06 1249.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-08-04 1430.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-08-16 1235.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-08-16 1252.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-08-16 1413.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-08-16 1537.eml;

- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-10-20 1156.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-10-20 1322.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-10-20 1353.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-10-20 1358.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-10-31 1000.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-10-31 1301.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-10-31 1302.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-10-31 1332.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-11-29 1445.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2017-11-29 1506.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2018-02-03 0529.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2018-03-05 1007.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2018-03-05 1054.eml;
- Re_ - Zach Nixon _znixon@researchplanning.com_ - 2018-03-06 1644.eml;
- Re_ missing scat segment id's - Igor Mezic _mezici@aimdyn.com_ - 2017-07-02 2158.eml;
- Re_ missing scat segment id's - Igor Mezic _mezici@aimdyn.com_ - 2017-07-02 2158-2.eml;
- Re_ missing scat segment id's - Igor Mezic _mezici@aimdyn.com_ - 2017-07-03 0834.eml;
- Re_ missing scat segment id's - Igor Mezic _mezici@aimdyn.com_ - 2017-07-03 0834-2.eml;
- Re_ missing scat segment id's - Igor Mezic _mezici@aimdyn.com_ - 2017-07-04 0734.eml;
- Re_ missing scat segment id's - Igor Mezic _mezici@aimdyn.com_ - 2017-07-04 0734-2.eml;
- Re_ missing scat segment id's - Igor Mezic _mezici@aimdyn.com_ - 2017-07-04 0811.eml;
- Re_ missing scat segment id's - Igor Mezic _mezici@aimdyn.com_ - 2017-07-04 0811-2.eml;
- Re_ missing scat segment id's - Igor Mezic _mezici@aimdyn.com_ - 2017-07-05 1237.eml;
- Re_ missing scat segment id's - Igor Mezic _mezici@aimdyn.com_ - 2017-07-05 1237-2.eml;
- Re_ missing scat segment id's - Zach Nixon _znixon@researchplanning.com_ - 2017-07-02 1352.eml;
- Re_ missing scat segment id's - Zach Nixon _znixon@researchplanning.com_ - 2017-07-03 0644.eml;
- Re_ missing scat segment id's - Zach Nixon _znixon@researchplanning.com_ - 2017-07-04 0726.eml;
- Re_ missing scat segment id's - Zach Nixon _znixon@researchplanning.com_ - 2017-07-04 0809.eml;
- Re_ missing scat segment id's - Zach Nixon _znixon@researchplanning.com_ - 2017-07-04 0832.eml;
- Re_ missing scat segment id's - Zach Nixon _znixon@researchplanning.com_ - 2017-07-05 1536.eml;

- Re_ RBOS SCAT Surveys west of Gaviota State Park - Igor Mezic _mezici@aimdyn.com_ - 2017-11-01 1610.eml;
- Re_ RE_ - Zach Nixon _znixon@researchplanning.com_ - 2018-09-19 0721.eml;
- Re_ Re_ RE_ - Igor Mezic _mezici@aimdyn.com_ - 2018-09-19 0819.eml;
- Re_ RE_ RE_ - Zach Nixon _znixon@researchplanning.com_ - 2018-09-24 0749.eml;

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart*

**Prepared For**

# The Center for Biological Diversity
# &
# The Environmental Defense Center

**February 21, 2025**

Accufacts Inc. Final

## Table of Contents

I.      Summary.............................................................................................................1

II.     The current installation renders the CP system ineffective........................2

III.    Compliance with CP regulatory requirements is ineffective, making
        performance with this regulatory requirement meaningless....................3

IV.     This is more than simple corrosion under installation (CUI) issue. .........3

V.      External corrosion on buried pipelines falls into four major categories...............4

        1.   Pipe wall loss corrosion is generally understood to occur over larger areas of
             the pipe.........................................................................................................4

        2.   Cracking or crack-like corrosion is usually an environmental threat difficult to
             assess.............................................................................................................4

        3.   Pitting corrosion is a special form of wall loss that is difficult to identify via ILI.
             .........................................................................................................................5

        4.   Corrosion within dents is a special form of dent threat............................5

VI.     Types of ILI technology. ................................................................................5

        1.   General wall loss corrosion. .......................................................................5

        2.   Cracking corrosion......................................................................................6

VII.    What is the purpose of hydrotesting?..........................................................6

VIII.   The illusion that corrosion growth rate can be accurately predicted needs to be
        explained. ..........................................................................................................7

IX.     Major state waiver deficiencies:...................................................................7

        1.   A key corrosion performance tracking process step in the state waivers for the
             Pipelines is missing. .....................................................................................7

        2.   A major state waiver deficiency for Line 324. ..........................................8

        3.   Major state waiver deficiencies for Line 325A/B. ....................................9

X.      Conclusions. .....................................................................................................9

Accufacts Inc. Final                                                                            i

## I.      Summary.

Accufacts Inc. ("Accufacts") was asked to provide my expert opinion on the Letters of Decision on the State Waivers for the startup of Line CA-324, CA-325A, and CA-325B ("Pipelines") made public in mid-January 2025 by the Office of the State Fire Marshal ("OSFM").[1]  This report builds on a previous Accufacts report issued on December 20, 2024."[2]  By agreement, a Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed state waiver alternative measures "provide an equal or greater level of safety."[3]  It is my understanding that PHMSA can choose to: 1) Not comment on this matter allowing the State Waiver to occur and startup to proceed, 2) Not approve the waiver preventing the startup, or 3) Impose additional requirements to assure an equal or greater level of safety to current minimum federal pipeline safety regulations occurs.

The current coating installations do not provide "limited effectiveness of the cathodic protection system," as mentioned by the Decision letters issued by the OSFM.  This I believe is a poor choice of words that understates the fact that the CP system is ineffective on most of the Pipelines' mileage.  The OSFM is thus being asked to grant a state waiver on federal pipeline safety minimum requirements intended to address external pipeline corrosion from an ineffective CP installation, while relying on hydrotesting and various forms of inline inspection, ILI or smart pigging, to avoid pipeline failure from the resulting external corrosion.

The waivers attempt to allow startup of the Pipelines relying mainly on ILI technology to identify corrosion threats before failure.  In addition, the Application by the Pipeline's operator appears to be relying on a circumferential magnetic flux leakage (MFL-C tool) approach run in February 2022 to argue for the removal of federal regulation requiring the 180 day condition for scheduling remediation of "corrosion of or along a longitudinal seam weld."[4, 5]  Our experience with MFL-C tools is that if certain parameters are not incorporated, such ILI tools can miss a lot of cracks.  I see no mention of such important conditions in the referenced letter that would demonstrate that this ILI run is reliable.  I do not see sufficient justification to waive 49CFR452(h)(4)(iii)(H) as such a waiver would not provide an equal or greater level of safety as no carbon steel pipeline, even new modern steel pipelines, are invincible to corrosion attack.

---

[1] OSFM letter to Sable/PPC Offshore Corp, "Letter of Decision on the Sate Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-324) ("Decision Letter 324") and Letter of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-325A/B) ("Decision Letter 325A/B")", dated 12/17/24.

[2] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024.

[3] PHMSA website:  https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

[4] Pacific Pipeline Company (Aka now as Sable/PPC) letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115)," July 10, 2023, p. 5 related to MFL-C February 2020 ILI run.

[5] 49CFR452(h)(4)(iii)(H).

Accufacts Inc. Final                                                                           Page 1 of 9

A simple plot of the type and approximate milepost location of external corrosion such as wall loss or cracking, including field as well as ILI indications along the Pipelines, will underscore how challenging the operation of the present Pipelines will be without effective CP.  Such a plot will clearly demonstrate that the Pipelines are not "like new" as indicated by some recent Sable/PPC representatives.  Further explanation is also warranted as to why the pipeline operator assumes there is no SCC or SSC risks associated with water on the Pipelines.

A proposal to replace the Pipelines with a new smaller diameter heated pipeline that would be uninsulated and built with modern unshielding coatings was aborted.[6]  This proposal would have permitted the CP system to do its job addressing external corrosion, while complying with federal pipeline regulation.

## II.      The current installation renders the CP system ineffective.

The construction of Line 324 in the late 1980s utilized coal tar urethane coating applied to the bare steel pipeline, covered by sprayed on insulation to assure the pipeline was operated at higher temperatures.  The insulation was then wrapped with a non-conductive polyethylene tape coating.[7] While there may be some confusion as to the coating installation on what is now named 325A/B, information leads us to believe this coating installation is similar on these pipelines as that on Line 324.   To anyone vaguely familiar with pipeline external corrosion protection and cathodic protection ("CP") intent, this approach is a fundamental failure of design/installation reflecting much inexperience in pipelines.  The polyethylene tape shields and prevents CP current from getting to the external pipeline steel, and the insulation system works to shield while increasing the likelihood of water in close proximity to the pipe, especially in areas where the coal tar coating directly on the pipeline steel has separated, or disbonded, from the pipe.[8]  <u>With such heavy shielding there is thus no way for any CP system current to ever reach the pipeline to reduce/prevent external corrosion.</u>

With the exception of a few feet of buried pipe that has undergone repairs, replacing the existing poor design and coating installations with a few feet of dual epoxy coatings, the shielded CP system is ineffective.  The various threats of external corrosion on the Pipelines are exacerbated by the elevated temperature, the potential for water to accumulate along the Pipelines via the insulation, the application of non-conducting tape wrap around the insulation, and the use of older coal tar coating directly on the pipeline that exhibits separation (aka disbondment) from the pipe steel.  Disbonded coating in the wrong environments is especially conducive to cracking threats, such as SCC or SSC as discussed in this report.  I have seen no convincing arguments that water environments conducive to corrosion cracking are not around or under the coating on the Pipelines.

---

[6] Plains Administrative Draft EIR, "Plains Replacement Pipeline Project," February 2022.

[7] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA"), "Failure Investigation Report Plains Pipeline LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California, May 2016, Appendix E: Corrosion Control and Pipeline Conditions, page 1 of 4.

[8] *Ibid.,* Page 3 of 21, and Mechanical and Metallurgical Testing, Photos Figure 1 through 20.

Accufacts Inc. Final                                                          Page 2 of 9

## III.   Compliance with CP regulatory requirements is ineffective, making performance with this regulatory requirement meaningless.

The Pipelines thus have ineffective CP protection from external corrosion that is exacerbated by operation of the Pipelines at elevated temperatures, seriously increasing corrosion rate as discussed in my previous report.[9]   Attempts to gauge the effectiveness of the CP system utilizing CP performance measures identified in PHMSA regulations are meaningless in such heavily shielded installations.   Just operating the Pipeline with CP "on" to meet federal minimum regulatory requirements will not prevent external corrosion attacks that can take on various forms on the Pipelines.  It should be noted that the OSFM has required "Where the operator discovers external corrosion in combination with coating deterioration, the operator must recoat with a two-part epoxy.  Sable must recoat in accordance with their repair procedure." which does allow repair replacing with the existing installation approach, given its many shortcomings to prevent external corrosion.[10]   This requirement places the responsibility on the pipeline operator to identify when or if any, field digs should occur to confirm coating degradation.  The operator should be primarily focused on identifying environments around the pipeline that are precursors to various forms of external corrosion attack, given the many conditions related to the pipeline design/installation conducive to external corrosion attack.

It is on the limited repaired sections, measured in feet, that the CP should be effective as such short length repairs replace the poorly designed shielding original coating installations.  For the vast majority of the Pipelines mileage, however, the CP remains ineffective.  The requirements to measure CP performance stated in 49CFR§195.2 (NACE SP 0169 – 2007 edition, paragraph 6.2.2) are meaningless when heavy shielding, such as that which occurs on CA-324 and CA-325A/B, prevents CP current from reaching the pipeline.

## IV.   This is more than simple corrosion under installation (CUI) issue.

Considerable past discussions have suggested that this is a corrosion under installation (or CUI") problem implying that this is the only controlling issue.  While CUI is certainly a contributing factor, the corrosion threats go well beyond CUI.  As previously discussed, heavy shielding, the tape coating around the insulation, the vintage/type of coating directly on the Pipelines prone to disbondment, the operating temperature, and the environment around the Pipelines, work in concert to create external corrosion in its various forms.  The Consent Decree is an agreement based on the premise that higher risks of external corrosion can be mainly addressed by ILI tools. The multiple forms of external corrosion which can occur on the Pipelines require various different approaches, beyond ILI, as discussed further in this report.

---

[9] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024, p. 13.
[10] OS OSFM letter to Sable/PPC Offshore Corp, "Decision Letter 324 and Decision Letter 325A/B")," dated 12/17/24, pp. 11 and 11 respectively.

Accufacts Inc. Final                                                                                  Page 3 of 9

## V.    External corrosion on buried pipelines falls into four major categories.

External corrosion on buried steel pipelines falls into four general categories:  1) wall loss or thinning of the pipe wall, 2) cracking or crack-like, 3) pitting, and 4) corrosion within dents.

1. **Pipe wall loss corrosion is generally understood to occur over larger areas of the pipe.**

   Internal or external corrosion can cause pipe wall thinning.  Such thinning differs from pit corrosion discussed below, in that pipe wall loss thinning tends to occur over a wider area of the pipe.  Despite previous multiple ILI runs, external corrosion pipe wall loss, or thinning, was the condition that resulted in the May 19, 2015 pipeline rupture failure.  External corrosion on the shielded pipe allowed general corrosion thinning of the pipeline until the pipe failed under pressure.  It should be worth noting that wall loss in excess of 0.8 wall thickness (actually 0.91) which occurred in the May 19, 2015 rupture, places the operator at great risks.  Ironically, pipe wall loss is generally one pipeline failure threat that advances in the ILI technology over recent decades was intended to address, either with ILI mag flux or ultrasonic approaches which are different technical methods.

2. **Cracking or crack-like corrosion is usually an environmental threat difficult to assess.**

   This is associated with various forms of pipeline cracking, such as selective seam corrosion or stress corrosion cracking.  While engineers like to think they can calculate time to failure, such time to failure estimates for these forms of corrosions are hard to reliably predict.  Given the probability that such cracking, especially if in clusters, can interact with other cracks, or weaknesses in the pipe body near/at welds, makes prediction to failure highly unreliable.  Such pipe weaknesses can occur at weld heat affected zones, at girth welds, or at manufacturing related pipe seams, in unpredictable ways that can quickly negate time to failure calculation/estimates, even if cracking potential is identified.

   Sable/PPC has requested an exemption from 49CFR452(h)(4)(iii)(H) explaining this is usually a SSC threat related to earlier vintage manufacturing processes such as LF-ERW which tends to exhibit lower pipe toughness. There are other related risks to the manufacturing process of modern steels such as DSAW and HF-ERW concerning cracking potential from poor coating/ineffective CP approaches.  Because of the nature of disbonded coating in proximity to water, coating can tent at weld seams creating potential for cracking corrosion attack, such as SSC.  Even modern pipe steels are not invincible to such cracking corrosion potential, especially on pipelines operating at elevated temperatures.  Unless the operator can show why such environments don't exist, their request to be exempted from 49CFR452(h)(4)(iii)(H) should be denied.  These explanations should go well beyond a MAG-C pig run the pipeline operator has provided.

Accufacts Inc. Final                                                                                          Page 4 of 9

3. **Pitting corrosion is a special form of wall loss that is difficult to identify via ILI.**

This is the loss of pipe steel in concentrated small areas, forming localized small holes or pits, usually at girth welds, that can weaken the pipeline and cause a release.  Pit corrosion identification via ILI, even newer generations of ILI tools, can be very challenging.  Pit corrosion threats are usually verified via field digs or pipeline releases.  While this threat can be a bona fide threat on the Pipelines that are heavily shielded rendering CP ineffective, there has been no mention that this threat has been identified.

4. **Corrosion within dents is a special form of dent threat.**

Corrosion or cracking within a dent, also known as "dents with stress concentrators" are hard to identify via ILI, and almost impossible to reliably predict time to failure.  Such threats are usually identified by high-definition geometric ILI dent tools, the location around the pipeline, and field dig verification assessments.  The ILI determination using high resolution caliper or geo pigs, have proven reliable at identifying dents and their location on a pipeline.

# VI.      Types of ILI technology.

Given the possible types of external corrosion on the Pipelines, I now focus on a simple high-level discussion of corrosion ILI technical approaches.

1. **General wall loss corrosion.**

After the advancement of geometric or deformation ILI technology, the next early phase of ILI use focused on general corrosion wall loss, or pipeline thinning along the axis or flow direction of the pipeline.  In this field, technology split into two different approaches, magnetic flux leakage and ultrasonic.  Magnetic flux leakage (or mag flux) approaches utilized software algorithms to characterize changes in magnetic flux to identify wall loss aligned in the axial, or direction of flow, usually the most insidious and common corrosion flaws for pipe.  Mag flux ILIs fall into two general categories: low resolution (usually associated with earlier generation) and high resolution (usually more complex and more expensive).  Mag flux technology shifted from low resolution to the more sophisticated high resolution approaches where corrosion is problematic.  There are still pipelines that utilize low resolution mag flux because of cost, so care should be exercised in the application of this form of ILI on liquid pipelines.  The waivers specifically require UT ILI the first two years of operation, but are moot, indicating magnetic flux ILI in the future could be allowed without clarification as to high res or low res ILI.

Ultrasonic ILI approaches use beams of ultrasonic energy to identify both external and internal corrosion wall loss.  While a simplification, ultrasonic approaches are analogous to radar, where reflected energy readings are utilized to measure changes in pipe wall thickness.  Originally, ultrasonic approaches, focusing on wall loss evaluation, directed UT energy directly into the pipe in the radial direction for wall thickness and resulting wall loss corrosion sizing determinations.

Accufacts Inc. Final                                                         Page 5 of 9

**2. Cracking corrosion.**

Pipeline ruptures from cracking threats drove a need for ILI tool cracking development. Thus, a next generation of ultrasonic ILI approaches advanced by changing the angle of the UT beam from radial into the pipe to at an angle to help spot cracks that might be developing. This form of UT approach is identified as shear wave. As more pipeline failures from cracking were uncovered, additional advances known as phased array ultrasonic (PAUT) have recently developed, though such measurements are currently focused on field measurement of uncovered pipeline, as ILI in this area I would categorize as still under development.

I have investigated too many pipeline ruptures that occurred after an ILI run which indicates more regulatory work is needed in ILI regulations related to applications of ILI. No ILI vendor provides such tools claiming they will not work. It is the pipeline operator's responsibility to ensure ILI runs meet the restrictions placed by the tool vendor (such as speed) and to verify the tool vendor's claimed capability with a proper number of field verification digs.

## VII.   What is the purpose of hydrotesting?

There are basically two types of hydrotesting mentioned in federal pipeline safety: 1) What I call a subpart E, or proof of MOP test, and 2) a crack hydrotest, what is referred to as a "spike hydrotest" that is performed at much higher test pressures as a %SMYS. Both forms of hydrotesting are proof test, good at the time of the test, and don't characterize time dependent pipeline threats such as corrosion.

The purpose of an MOP hydrotest is to proof the fitness for service of a pipeline at the time of the test, with a certain margin of pressure safety that usually deteriorates with time. Subpart E MOP tests are not crack integrity test. If a pipeline system has crack forming potential an MOP test is not appropriate.

Spike hydrotests are meant to avoid pressure reversals associated with crack threats on pipelines. Pressure reversals are where cracks remaining after MOP hydrotest tests can enlarge for various reasons to result in possible failure during operation, usually at lower pressures. It is my experience that spike hydrotests are meant to deal with cracking threats if such a threat exists. The performance metric for the suitability of a spike hydrotest is the range of %SMYS for the specific test segment. For pipeline elevation changes like that associated with 325A/B, a spike hydrotest requires the pipeline be segmented to keep test pressures within reasonable ranges that don't produce permanent yielding of the pipe. The information made public to date indicates that the previous hydrotests performed in 1986, because of elevation changes, required Line 325A to undergo hydrotesting in 9 segments and in Line 325B in 11 segments. Unfortunately, the hydrotest segments in the public record application are identified by station number and not by approximate milepost. Since there is usually no correlation between station number and milepost, I thus cannot evaluate whether the Decision Letter 325A/B pressure testing parameters are adequate for Line 325A.[11] It is worth noting that the Decision Letter 325A/B makes no mention of a subpart E

---

[11] Decision Letter 325A/B, "Pressure Testing," page 5.

Accufacts Inc. Final                                              Page 6 of 9

hydrotest or spike hydrotest on Line 325B.  The proposed segments for hydrotests on 325A need to be identified by approximate milepost to permit evaluation as to whether the waiver requirements are appropriate.  The reasons for hydrotesting exclusion on Line 325B need to be properly justified and made public by the OSFM.

## VIII.    The illusion that corrosion growth rate can be accurately predicted needs to be explained.

One of the critical parameters that I have observed in too many pipeline rupture investigations is that ILI can be utilized to accurately predict corrosion growth rates ("CGR") to help set a critical ILI run timing, for example.  The Pipelines essentially have no effective CP, operate as a higher temperature system, contain disbonded coating, incorporate heavy shielding which prevents CP from reaching the Pipelines and operate with insulation that moves water on/near the outside of the pipe.  Such a combination of factors can provide a wide variation in types of external corrosion as well as corrosion rate estimates.  CGR estimates can be especially problematic if CGR approaches miss possible corrosion interaction threats that can considerably shorten time to failure estimates.  I advise that CGR be utilized with extreme caution given this possible variation, especially for corrosion threats that can interact, such as SCC, whose time to failure can be highly unpredictable.  Corrosion growth rate estimates can vary considerably given the various form of external corrosion, especially related to cracking in combination with its location near sensitive pipe locations such as seam or girth welds.

## IX.    Major state waiver deficiencies:

Key observation on the state waivers for the Pipelines:

1. **A key corrosion performance tracking process step in the state waivers for the Pipelines is missing.**

   While not specially required in minimum pipeline safety regulations or the waivers, a prudent pipeline operator on a pipeline system highly susceptible to corrosion will plot or graph corrosion indications by type and severity, by approximate milepost.  This is especially important on the Pipelines given their history of extensive corrosion caused by the lack of CP effectiveness, poor coating types causing disbondment or shielding, increased temperature, insulation that tends to wick water, and poor performance of ILI.  Such graphing aids a pipeline operator in understanding possible corrosion "hot spot" segments whose threats on a pipeline increase because of environmental factors that merit additional assessment, and maybe even pipeline segment replacement from a corrosion point of view.

   Care also needs to be taken that all corrosion sites are prudently evaluated for possible interactive threats, such as general wall loss in combination with cracking, or near pipe welds, such as that which can occur with cluster corrosion.  I see no mention in the Letters of Decision and waivers requiring such important corrosion tracking on the Pipelines.

Accufacts Inc. Final                                                                 Page 7 of 9

## 2. A major state waiver deficiency for Line 324.

Given the pipeline properties stated for Line 324 (a single grade X65, 0.344 in wall thickness, 24-inch diameter, HF-ERW), I can calculate the various % SMYS for the spike (minimum and maximum test pressures, and MOP hydrotests) based on an estimated approximate elevation profile by milepost as Line 324 can be hydrotested as one segment given its limited elevation profile.

A critical condition in the OSFM Decision letter 324 is:

"12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after the spike hydrotest is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
   b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP."[12]

For the 24-inch diameter pipe, wall thickness and grade stated in the Decision Letter 324, 100% SMYS calculates to 1863 psig. 1.5 times the stated MOP of 1003 psig calculates to 1504 psig, at the highest elevation point. Thus, the spike test at the highest elevation point as required above is likely to be the lower maximum test pressure of 1504 psig which calculates to about 81% SMYS, **a value I believe is too low for corrosion cracking screening and evaluation**. The OSFM needs to explain why the proposed spike hydrotest of Line 324 is so low.

The bottom line is that Sable/PPCs should demonstrate whether there are environmental conditions around Line 324 that are conducive to cracking either SCC or SSC, and these conditions should go well beyond a Mag-C tool run (such as sufficient field digs to verify the ILI tool's claimed capability). I see no such important conditions in Sable/PPCs application that instill confidence that Line 324 does not have environments favoring external cracking. While it is true that certain pipe manufactured before 1970 is more prone to SSC, or SSWC, for various reasons, there is no modern pipe, even HF-ERW located in Line 324 or DSAW located in 325 A/B, that is invincible to such corrosion cracking threats, especially if the coating directly applied to the pipe has "tented" on the weld seam, allowing water to enter between the coating and the pipe to create a corrosion cell. There is no carbon steel pipeline, even new modern manufactured steel pipelines, invincible to such corrosion attack.

---

[12] Decision Letter 324, "Pressure Testing," pages 4 – 5.

Accufacts Inc. Final                                                      Page 8 of 9

**3.  Major state waiver deficiencies for Line 325A/B.**

Decision Letter 325 states that Line 325A and 325B is composed of 30-inch diameter of two pipe grades (X65 with a thickness of mainly 0.344 inch and X70 with a wall thickness mainly of 0.281 inches composed of DSAW, with one small segment of 0.03 miles containing HF-ERW).  I used the term "mainly" as Sable's/PPC's application indicates these two lines are also largely composed of these grades with a small percentage of varying thicknesses.[13]  For these two pipe grades, and thicknesses, 100 % SMYS calculates to 1490 psig for X65 and 1311 psig for X70.  Since the location of the various pipe grades by approximate mileposts within CA-325A/B are not indicated, and given the dramatic elevation profiles for 325A/B the proposed hydrotest segments, if any, by milepost and elevation segments need to be made public.  Without such information, I cannot calculate the % SMYS range for hydrotests given the OSFM conditions.  Hydrotest segments are identified by station number which don't necessarily sync with milepost or MP.[14]  **These important test segment parameters, by approximate MP, and elevation need to be made public to assure prudent hydrotesting is being required to address the possible general corrosion and cracking risks on Line 325A/B**.

It is worth noting that the OSFM does not require a MOP and spike hydrotest of 325B which has very significant elevation changes.  This would suggest that Line 325B is not being evaluated by hydrotesting.  The reason(s) for this decision needs to be made public.

## X.      Conclusions.

Hydrotest segments proposed for the Pipelines need to be made transparent and include approximate MP, given the major role that elevation change plays on this system.  Critical parameters related to location by milepost of the varying grades and thicknesses of pipe on 325 A/B and their associated hydrotest segments need to be identified by approximate MP as well, to verify if the OSFM parameters are sufficient for the specific types of corrosion threat.  The reason as to why a spike hydrotest on 324 and 325 A are limited needs to be explained, as well as to why 325B hydrotesting has not been included in either a subpart E or spike hydrotest,

The incompleteness of the waivers lead me to conclude that I cannot determine the waivers provide sufficient information to assure an equal or greater level of safety for the Pipelines had the operator had an unshielded coating design that complied with federal minimum pipeline CP protection intended to avoid pipeline failure from external corrosion.

Richard B. Kuprewicz
President
Accufacts Inc.

*Richard B Kuprewicz*

---

[13] Sable/PPC letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115). Pipeline System Background Data Attachment B of State Application Table B-3 Line Pipe Specifications," July 2023, p. 4.

[14] *Ibid*., "Table B-6 Historic Hydrotest Summary," p. 6.



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

Deputy Administrator

1200 New Jersey Avenue, SE
Washington, DC 20590

January 17, 2025

Ms. Julie Simmonds
Senior Counsel
Center for Biological Diversity
PO Box 701
Tucson, AZ 85702-0710

Dear Ms. Simmonds:

The Pipeline and Hazardous Materials Safety Administration (PHMSA) received your letter dated December 23, 2024, and your request to Secretary Buttigieg on January 10, 2025, wherein you voiced your objection to the California Department of Forestry and Fire Protection, Office of the State Fire Marshal (OSFM) grant of waivers for the restart of Sable Offshore Corp pipelines CA-324 and CA-325A/B (Formerly Lines 901/903), as well as the report titled *Evaluation of the Las Flores Pipeline System Startup Proposal*.

PHMSA is dedicating the necessary time, expertise, and resources to thoroughly review all aspects of this matter to ensure that safety measures are fully evaluated, and to ensure that any proposed alternative means of safety compliance result—*at minimum, in an equivalent or better level of safety*.

PHMSA received the notice of state waivers from OSFM on December 18, 2024, and, pursuant to 49 U.S. Code § 60118(d), has 60 days to provide a written objection, if determined necessary. As part of our evaluation, we are also reviewing your accompanying report. Should it be determined that any objections to these waivers are warranted, they will be addressed in full compliance with 49 U.S. Code § 60118(d). This week, PHMSA communicated to OSFM that should PHMSA need more time for its review, the Agency will notify OSFM accordingly, and take as much time as necessary to review and ensure adequate measures are in place to maintain full pipeline integrity and protect the public and the environment. We understand that the current national emergency related to the fires in Southern California may necessitate additional flexibility in terms of timing and back-and-forth communication around technical aspects of this matter. Allowing for additional time for review is merited here as it has been in certain other instances involving similar highly technical waiver reviews by PHMSA.

As part of PHMSA's review process, a public docket has been established to provide public access to the operator's application, the letter of decision to grant the waivers by OFSM, and

other relevant information. You can view the materials online at www.regulations.gov. The docket numbers for these waivers are PHMSA-2025-0002 and PHMSA-2025-0003. OSFM has also posted the waivers at their website https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

Should you have any further questions or require additional information during this process, please do not hesitate to contact Max Kieba, PHMSA's Director of Engineering and Research, Office of Pipeline Safety at max.kieba@dot.gov or 202-420-9169.

Thank you for your continued interest in pipeline safety.

Sincerely,

Tristan H. Brown

VIA CERTIFIED AND ELECTRONIC MAIL

February 18, 2025

Steve Rusch
Sable Offshore Corp.
12000 Calle Real
Goleta, CA 93117

DJ Moore
Latham & Watkins, LLP
355 South Grand Avenue, Suite 100
Los Angeles, California 90071

| | |
|---|---|
| Subject: | **Executive Director Cease and Desist Order No. ED-25-CD-01 and Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order** |
| Date Issued: | 02/18/2025 |
| Expiration Date: | 05/19/2025 |
| Violation Nos.: | V-9-25-0013 and V-9-24-0152 |
| Location: | The properties that are subject to this order are at various locations along the existing Las Flores Pipelines CA-324 and CA-325 within the Coastal Zone, between the Gaviota coast and the Las Padres National Forest, and areas surrounding the pipelines that are being or could be impacted by the development activities at issue here, in which the parties subject to this order are performing or intend to perform any of the activities described below, all within Santa Barbara County. The properties that are subject to the Notice of Intent to commence further enforcement proceedings are those same properties as well as areas previously impacted by similar work and offshore locations along the larger Santa Ynez Unit pipeline, in state waters, where the parties subject to this notice have undertaken unpermitted development in placing sand/cement bags |

Teel Declaration
Page 194

|  |  |
|---|---|
|  | and pallets on the seafloor below and adjacent to Sable's out-of-service offshore oil and water pipelines as part of an effort to restart SYU oil production operations and bring the pipelines back into use. |
| Violation Description: | Activities onshore including, but not limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates over water courses; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; installation of shutoff valves; and other development associated with the Las Flores Pipelines CA-324 and CA-325; as well as offshore development including, but not necessarily limited to, placing sand/cement bags and pallets on the seafloor below and adjacent to Sable's out-of-service offshore oil and water pipelines; all without the requisite Coastal Act authorization, as part of an effort to restart Santa Ynez Unit oil production operations and bring the pipelines back into use [1] |

Dear Sirs,

This is in furtherance of our discussions regarding the recent activities of Sable.  I want to note that we are not taking a position regarding the underlying merits of the pipeline and of Sable's recent activities here, but want to work with you to ensure that any actions taken here, in this iconic area, are done in a way that protects the fragile ecosystem, and the humans and animals in the area.  We remain more than willing to work with you to ensure that any work contains any necessary protections and conforms with applicable laws. We again offer to work with you and the County on a consolidated permit to move forward in the most efficient and streamlined manner possible and are available to discuss options with you going forward.

## I.    Order

Pursuant to my authority under California Public Resources Code ("PRC") Section 30809, as the Executive Director of the California Coastal Commission ("Commission"), I hereby issue this Executive Director Cease and Desist Order ("EDCDO" or "this Order"), which orders you, Sable Offshore Corp.  ("Sable"), as the owner and operator of Las Flores Pipelines CA-324 and CA-325 ("Pipeline"), to cease further work along the Pipeline and immediately surrounding areas unless and until authorized by a new, final coastal development permit ("CDP").[2]

---

[1] Please note that the description herein of the violations at issue is not necessarily a complete list of all unpermitted development on the properties in violation of the Coastal Act.

[2] A "final" coastal development permit as used here means one that is: (a) no longer subject to appeal, either within the County system or to the Commission, and whether because the time period for such appeals has elapsed or because all such appeals have been completed.

Compliance with the following terms is intended to ensure that all development described in Section E, below, remains halted, ensuring that further unnecessary damaging effects to coastal resources are avoided, while Sable obtains the legally necessary authorization for future, proposed development, and/or for any steps needed restore the site, as follows.

Pursuant to my authority under PRC Section 30809, I hereby order Sable:

1.  To cease and desist from conducting any further development at the onshore locations described above unless you have submitted evidence, for my review and approval, demonstrating that you possess the necessary Coastal Act authorization for the work and have received my written approval to proceed.

2.  If you decide you wish to proceed, either: (a) demonstrate, to my satisfaction, that Sable already possesses the necessary Coastal Act authorization for the work, which Sable has not yet demonstrated;[3] or (b) obtain a new, final, operative CDP or other valid Coastal Act authorization specifically covering the work at issue and comply with the terms of any final, validly issued CDPs.

## A.  ENTITITES SUBJECT TO THE ORDER

The parties whose actions or inactions are subject to this Order are Sable Offshore Corp; all employees, agents, and contractors of the foregoing; and any other person or entity acting in concert with the foregoing.

## B.  IDENTIFICATION OF THE PROPERTIES

The properties that are subject to this are various locations along the existing Las Flores Pipelines CA-324 and CA-325 within the Coastal Zone, between the Gaviota coast and the Las Padres National Forest, areas surrounding the Pipeline and impacted by the development activities at issue here, all within Santa Barbara County.

## C.  DESCRIPTION OF THE VIOLATIONS

The Coastal Act violations and threatened violations addressed by this Order involve development that has occurred in the Coastal Zone without the requisite Coastal act authorization, including, but not necessarily limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates over water courses; placement of fill in wetlands and coastal waters; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; any installation of shutoff valves; and other development associated with Pipeline.

## D.  COMMISSION AUTHORITY TO ACT

The Executive Director is issuing this Order pursuant to her authority under PRC Section 30809, including, but not necessarily limited to, subdivision (a)(2) thereof.  The County has

---

[3] We offer this option as an accommodation and remain willing to review and consider any additional permit language Sable may provide at any time, including after issuance of this EDCDO.

indicated that it believes the work at issue is authorized by prior permits, and thus, it does not agree with Commission staff's conclusion that the recently completed, ongoing and threatened, future work constitutes a violation of the Coastal Act and LCP.  Commission staff has explained its contrary position to the County on multiple occasions, most recently in a letter dated February 14, 2025.  In addition, on February 17, 2025, after a representative of Sable responded to my request that Sable forestall further activities and instead indicated that "Sable intends to proceed,"[4] Commission staff specifically requested that the County either take enforcement action or confirm that they were, in fact, not willing to take action to address the alleged violations noted above, pursuant to PRC Section 30809(a)(2).  Having received no response from the County by 12pm February 18, 2025, I am moving forward with issuing this EDCDO.

### E.  EXECUTIVE DIRECTOR'S FINDINGS

As the Executive Director of the Commission, I am issuing this Order pursuant to my authority under PRC Sections 30809(a) to prevent further significant damage to coastal resources that, without this order, would be likely to occur. As noted in our Notice, Sable's continued work on the Pipeline would be likely to contribute to environmental impacts that could have been avoided, including the destabilization of rain-soaked hillsides and habitat areas, discharge of mud and debris into watercourses and wetlands, disturbance to nesting birds that could lead to nest and habitat abandonment, and declines in breeding success. Further, the history of this site has made it clear that the utmost caution, and safety, must be taken to avoid catastrophic damage to coastal resources such as those seen after the 2015 pipeline failure and resulting Refugio Oil Spill.

Commission enforcement staff informed Sable of the violations of the Coastal Act in an initial Notice of Violation letter sent to Sable on September 27, 2024, a follow-up letter sent October 4, 2024, and continued to discuss the violations in multiple virtual meetings over the course of the following weeks.  On November 12, 2024, an EDCDO was issued directing Sable to immediately cease and desist from conducting any further unpermitted development along the Pipeline, submit an interim restoration plan to safely secure those sites where unpermitted development had occurred, and apply for a CDP for any proposed future work to be undertaken along the Pipeline, as well as for after-the-fact (ATF) authorization for unpermitted development that had already occurred.  On February 11, 2025, Commission staff additionally issued a Notice of Violation letter for unpermitted development undertaken by Sable at locations offshore, in state waters.  A more detailed recitation of the history is provided below.

With limited exceptions not applicable here, PRC Section 30600(a) states that, in addition to obtaining any other permit required by law, any person wishing to perform or undertake any development in the coastal zone must obtain a CDP. "Development" is defined by Section 30106 of the Coastal Act as follows:

> "'Development' means, <u>on land, in or under water</u>, <u>the placement or erection of any solid material or structure</u>; <u>discharge</u> or disposal of any dredged material or of any gaseous, <u>liquid</u>, solid, or thermal waste; <u>grading, removing</u>, dredging, mining, or

---

[4] February 17, 2025, letter from DJ Moore, of Latham & Watkins LLP, writing on behalf of Sable.

*extraction of any materials; change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; change in the intensity of use of water, or of access thereto; construction, reconstruction, demolition, or alteration of the size of any structure, including any facility of any private, public, or municipal utility…"*   (emphasis added)

The Development described herein clearly constitutes "development" within the meaning of the above-quoted definition and therefore requires a CDP. Sable has not submitted an application for a CDP for any of its proposed future work at either onshore, or offshore locations, as described above, nor has Sable submitted any ATF application for work previously undertaken along the Pipeline and within the Coastal Zone.

On September 27, 2024, Commission staff sent a "Notice of Violation" letter informing Sable that the Commission had become aware of unpermitted development activities taking place within the Coastal Zone, including excavation with heavy machinery, grading, and other activities at various locations along the Pipeline, apparently in connection with a proposed restart of the Santa Ynez Unit, consisting of three offshore platforms, Las Flores Canyon processing facility, and associated electrical transmission and onshore and offshore oil and gas transport pipelines. Commission staff requested Sable immediately cease all unpermitted development within the Coastal Zone, including all activities associated with Lines 324 and 325, as well as any potential development activities taking place along the offshore platforms and Pipeline. Commission staff further detailed the need for Coastal Act authorization for any development in the Coastal Zone, which should be sought through the submittal of an application(s) for the required CDP(s).

On October 1, 2024, Sable met with Commission staff to discuss the above-mentioned Coastal Act violations. In this conversation, Commission staff conveyed to Sable that all unpermitted development activities, along the Pipeline, must cease immediately. Immediate cessation of all work would result in several open pit sites, where excavation activities had already begun.  Because of this, Commission staff and Sable discussed steps necessary to ensure the open pit sites could be temporarily secured. However, my staff made it clear to Sable that all work must stop immediately. Nonetheless, Commission staff received an email from Sable on October 2, 2025, stating that work had been suspended, "subject to taking interim measures".  Commission staff met with Sable on October 3, 2025, to reiterate that all work must fully cease, and including any such "interim measures" which still amounted to development requiring Coastal Act authorization.

Despite these conversations, Commission staff received notice that Sable had yet to cease all work. Thus, on October 4, 2024, Commission staff sent a letter to Sable providing formal notice of the Executive Director's intent to issue an order, if necessary, to halt the ongoing project work, and requested written assurances by 2:00 pm that day, that Sable had, in fact ceased work entirely. Though Sable did send an email to Commission staff before this deadline to state that all work, including the actions in which Sable characterized as interim work measures, had ceased, Commission staff continued to

receive messages that work had not ceased and therefore, again, requested Sable provide written assurances that all work had, in fact, ceased. In response, Sable, confirmed all work, including any such interim measures, had ceased.

In addition to the cessation of all work, the October 4, 2024 letter required Sable provide information as to work undertaken along the Pipeline, specific plans as to future, proposed work, and written confirmation of intent to apply for a CDP(s) for ATF authorization for any work that had already occurred in the Coastal Zone and prospective authorization for any proposed future work.

Because Sable did not satisfactorily provide, as required by PRC Section 30809, detailed information as requested in Commission staff's October 4 letter, and further, failed to provide written confirmation as to its commitment to apply for an ATF CDP for work previously undertaken within the Coastal Zone, I issued a EDCDO on November 12, 2024. In this EDCDO, I directed Sable to complete an Interim Restoration Plan to safely secure the sites in the interim period necessary for Sable to apply for both an ATF CDP for all work previously undertaken along the Pipeline as well as CDP for future, proposed work. As an accommodation, I granted 120 days from the issuance of the EDCDO for Sable to apply for requisite CDPs. On December 20, 2024, Sable successfully completed the Interim Restoration Plan. However, to date, Sable has not submitted any application for an ATF CDP for work previously undertaken, or for a CDP for any future, proposed work to be taken along the Pipeline. Commission staff had repeatedly asked for greater information, including any full-scale workplans, so as to better understand the overall project. Without detailed information as to these plans, it is difficult for Commission staff to fully understand the scope of the work Sable has undertaken, as well as any proposed future plans and it is further difficult for Commission staff to provide a fully analysis as to what, if any, work has been authorized under applicable law.

Instead, Sable shifted operations offshore and carried out additional development activities without the benefit of a CDP including, but not limited to, the deployment of an unspecified number of "tea-bag pallets," sand-to-concrete bags, and soft-concrete bags, as part of an effort to restart oil production operations and bring the Santa Ynez Unit pipeline back into use. Specifically, the project deployed a remotely operated vehicle ("ROV") to place concrete bags and pallets along more than 750 linear feet of the pipelines to create support piers along 14 identified spans of between 41 and 70 feet. These activities took place over three days from November 29, 2024, to December 1, 2024.

Sable also sought authorization for the onshore violations described in the EDCDO through the County's zoning clearance process. On November 22, 2024, and December 5, 2024, Sable submitted applications to the County requesting authorization for pipeline "anomaly repair work" conducted along the Las Flores Pipelines, CA-324 and CA-325.

On January 10, 2025, the Commission held a conference call with the Santa Barbabra County Planning and Development Department ("County") to discuss Sable's pending Zoning Clearance applications, as well as the potential for a consolidated coastal development permit covering both onshore and offshore development activities.  During this conversation, the County agreed to follow up with information, including the citations

and provisions within existing County issued permit(s) that the County believed might have pre-authorized the recently completed and proposed Pipeline work, as well as any other evidence Sable provided that the County found to be compelling.  The parties to the call further confirmed that they would have a follow-up discussion before any County approval of Sable's Zoning Clearance applications.  Despite this, however, no such information was received, and the Commission, therefore, followed up on this conversation through email, on February 7, 2025, again requesting this information.

On February 12, 2025, Commission staff received a letter from the County, in response to the prior request made by Commission staff that the County agree to the Commission's review of a consolidated permit application, pursuant to California Public Resources Code section 30601.3(a)(2). In this letter, the County stated that it had concluded that the "anomaly repair work" addressed in Sable's zoning clearance applications "is authorized by existing permits" and therefore no further application to, or action by, the County is required. However, the County expressed its support for the Commission's review of a consolidated permit application, if submitted by Sable.

In addition to this letter, the County provided the Commission with copy of an additional letter, which the County sent to Sable, notifying Sable that work addressed in Sable's zoning clearance permits "is covered by prior permits," though neither letter provided any citation to or quotation of any language in any such permits to support this assertion.

In response to these two letters and a February 14 request from the Environmental Defense Center, on February 16, 2025, I issued a letter to the County initiating a review of the County's determination, pursuant to Section 13569 of the Commission's regulations, and requesting a complete copy of any coastal development permit applications submitted by Sable and/or its predecessor(s) for the shutoff valve installation work on the Pipeline and Sable's application for the zoning clearance(s) for the repair anomaly work along the Pipeline.

Additionally, on February 16, 2025, I provided Sable with notice of my intention to issue a new EDCDO to Sable. In this letter, I responded to arguments that Sable submitted on February 14, purporting to support the position the County had taken, and I explained why, despite those argument, based on the information I had received to date, I continued to believe that Sable's proposed activities lacked the necessary Coastal Act authorization.  I therefore directed Sable to confirm in writing by February 17, 2025, that Sable would cease all development as described in, and subject of, that letter unless and until Sable either: (a) demonstrates, to my satisfaction, that it already possesses the necessary Coastal Act authorization for the work, which Sable has not yet demonstrated.[5] On February 17, 2025, I received a letter from Sable reiterating their position that Sable's work "does not constitute a violation of the Coastal Act or the County's LCP because it is authorized under the pipelines' existing CDPs and other approvals,".

As a jurisdictional requirement to issue this Order, I have determined that Sable is undertaking or is threatening to undertake development that may require a CDP, without

---

[5] We offer this option as an accommodation and remain willing to review and consider any additional permit language Sable may provide either before, or after, issuance of Coastal Act authorization.

first securing a CDP and further determined Santa Barbara County has declined to act in a timely manner regarding the coastal act violations as detailed in the EDCDO, and this failure to act will cause damage to coastal resources.

Thus, as of the issuance of this Order, I have concluded that Sable has yet to apply for any CDP, or other valid Coastal Act authorization, covering the work at issue, nor has Sable demonstrated that it possesses the necessary Coastal Act authorization for this work. As such, I am issuing this EDCDO pursuant to my authority under PRC Sections 30809(a)(2).

## F.  COMPLIANCE OBLIGATION

Respondent's strict compliance with this Consent Order is required. Failure to comply with any term or condition of this Consent Order, including any deadline contained herein, unless the Executive Director grants an extension under Section I.5, above, will constitute a violation of this Consent Order and shall result in Respondent being liable for stipulated penalties in the amount of $1,000 per day per violation. Respondent shall pay stipulated penalties within 10 days of receipt of written demand by the Executive Director, regardless of whether Respondent subsequently complies. If Respondent violates this Consent Order, nothing in this agreement shall be construed as prohibiting, altering, or in any way limiting the ability of the Commission to seek any other remedies available, including the imposition of civil penalties and other remedies pursuant to PRC Sections 30820, 30821, 30821.6, and 30822, as a result of the lack of compliance with this Consent Order.

## G.  CHALLENGE

Pursuant to PRC Section 30803(b), any person or entity to whom this Consent Order is issued may file a petition with the Superior Court and seek a stay of this Consent Order. Also pursuant to PRC Section 30803(a), any person may maintain an action for declaratory and equitable relief to restrain any violation of this division, including of any orders issued pursuant to Section 30809, 30810 or 30811.

## H.  EFFECTIVE DATE

This Order shall be effective upon its issuance and shall expire 90 days from the date issued on 02/18/2025 unless extended consistent with the applicable regulations.

## II.    NOTICE OF INTENT TO COMMENCE A CEASE AND DESIST ORDER, RESTORATION ORDER, AND ADMINISTRATIVE CIVIL PENALTY PROCEEDINGS

While we hope that these matters can be addressed quickly via the EDCDO and that a Commission-issued order may not be necessary, I am also notifying you, as is provided for in Section 13187(B) and Section 13191(a) of the Commission's regulations (Title 14, Division 5.5 of the California Code of Regulations), of my intent to commence proceedings for issuance by the Commission of a Cease and Desist Restoration Order and Administrative Penalty Proceeding, which would include a direction to cease and desist from undertaking further unpermitted development, should such an order be required.

The EDCDO provides an interim solution to safeguard against damage to coastal resources immediately, and an interim period needed for Sable to obtain necessary CDPs. However, it does not address the work that has already been completed without the necessary authorization, including the additional work described below which will require a future order.

In addition to the above actions regarding Sable's unpermitted development activities undertaken onshore, Commission staff were additionally made aware of unpermitted activities undertaken offshore, at locations along the Santa Ynez Unit pipeline, and in state waters. On February 11, 2025, Commission staff provided a Notice of Violation letter to Sable regarding unpermitted development including, but not limited to, deploying sand/cement fill materials and pallets on the seafloor adjacent to and below Sable's out-of-service offshore oil and water pipelines as part of an effort to restart SYU oil production operations and bring the Pipeline back into use.

In an email sent on November 21, 2024, from Cassidy Teufel, Deputy Director of the Commission, to Steve Rusch of Sable, Mr. Teufel stated that it was his understanding, based on previous email correspondence, that Sable was not proceeding with any work associated with the offshore pipeline until Commission staff had an opportunity to discuss it and work through any authorizations that may be required. He noted that Mr. Rusch had indicated via email that a recent ROV survey had identified pipeline spans that Sable identified as needing to be addressed, and Mr. Teufel asked for clarification as to when this work was carried out, and for a description of its scope, including equipment and vessels used and the location, timing, and duration of that work. Mr. Teufel also reiterated that Sable needed to submit to the Commission a complete CDP application for the proposed span remediation work. Mr. Rusch never disputed or contested anything in this email from Mr. Teufel. Nevertheless, without having received any such application, circa mid-December 2024, the Commission received reports that span remediation work was underway.

On January 10, 2025, Mr. Teufel sent a follow up message informing Sable that the Commission had yet to receive the aforementioned permit application, and requesting a status update. The January email also asked Sable to clarify if Sable did in fact carry out activities and reemphasized the Coastal Act permitting requirements as previously explained.

In a letter dated January 15, 2025, from DJ Moore of Latham & Watkins, LLC (representing Sable) to Mr. Teufel, Mr. Moore acknowledged that the span remediation activities had occurred, specifically the placement of concrete fill material across 14 separate areas totaling over 750 linear feet adjacent to and below two seafloor pipelines, but claimed those activities did not require a new CDP or Consistency Certification ("CC") under the Coastal Act and the Coastal Zone Management Act, 16 U.S.C. §§ 1541 *et seq.* ("CZMA"), respectively. He asserted that these activities were already authorized by the existing Development and Production Plan ("DPP") previously authorized by the Department of the Interior's Minerals Management Service ("MMS"); the Coastal Commission-approved CDP No. E-88-1, which originally authorized the SYU pipeline in 1988; and the Coastal

Commission's concurrence in CC No. CC-64-87, all of which occurred more than 30 years ago and did not address the work undertaken in 2024-2025. Thus, on February 11, 2025, Commission staff issued a Notice of Violation letter directing Sable to immediately cease from performing any unpermitted development activities in state coastal waters (or elsewhere in the Coastal Zone) until and unless proper authorization is obtained.

Contrary to these claims, and as individually answered and described in greater detail in the Notice of Violation letter, the span remediation work conducted was not, and could not have been, pre-authorized by the permit in which the Commission issued for the original installation of the SYU Pipeline, nor was this work otherwise pre-authorized by the Commission. While the Commission has, on occasion in the past, specifically authorized future maintenance activities for certain projects it has approved, when it has done so, it is explicit about that, and it has not done so here. Further, Mr. Moore's claim that the DPP requires the pipeline to be in "good working condition" or that the Pipeline must meet federal standards has no bearing on the question as to whether pre-authorization of specific work was granted. The Pipeline in question is not currently in service, have been purged off all oil and does not pose a risk of oil spill if not addressed.  Mr. Moore's letter additionally asserts that inclusion of Commission staff on an email, sent from Exxon to a third party, 13 years ago, evidences the Commission's agreement with Sable's position that no further coastal act authorization is needed for this work. Again, this bears no evidence to support that the Commission pre-authorized future work or span remediation activities on the site.

In order to resolve this violation, Sable must complete a CDP application seeking ATF authorization for the unpermitted span remediation activities that have already taken place in state coastal waters, and which addresses any necessary restoration, and payment of administrative penalties to resolve civil liability.

I am hopeful that Sable will work with my staff to reach a consensual resolution of the entirety of this matter through a future Consent Cease and Desist Order and Restoration Order and Consent Administrative Penalty ("Consent Agreement"), which would then be taken to the California Coastal Commission ("Commission") for its approval in a formal public hearing.  We are available to assist you in this process.

Prior to bringing an order to the Commission, including a consent order, unless the requirement is waived, our regulations require notification of the initiation of formal proceedings. Therefore, in accordance with those regulations, this letter notifies you of my intent, as the Executive Director of the Commission, to commence formal enforcement proceedings to address the Coastal Act violations noted above by bringing to the Commission a recommendation for a Cease and Desist Order, Restoration Order, and assessment of an Administrative Penalty. The intent of this letter is not to discourage or supersede productive settlement discussions; rather it is to provide formal notice of our intent, consistent with our regulations, to resolve these issues through the order process, which in no way precludes a consensual resolution. However, please note that should we be unable to reach an amicable resolution in a timely manner this letter also lays the foundation for Commission staff to initiate a hearing before the Commission unilaterally, during which a proposed order or orders, including an assessment of administrative

penalties against you, would be presented for the Commission's consideration and possible adoption.

Again, if we are to settle this matter, such actions still must be addressed through this formal order process. This letter is intended to facilitate the resolution here, whether we address this matter through a consent or unilateral action, in providing you with the notice required under the Commission's Regulations; it in no way is intended to subvert the possibility of resolving this matter collaboratively.

The Commission's authority to issue Cease and Desist Orders is set forth in Section 30810(a) of the Coastal Act, which states, in part:

> **If the commission, after public hearing, determines that any person … has undertaken, or is threatening to undertake, any activity that (1) requires a permit from the commission without securing the permit or (2) is inconsistent with any permit previously issued by the commission, the commission may issue an order directing that person … to cease and desist. The order may also be issued to enforce any requirements of a certified local coastal program or port master plan, or any requirements of this division which are subject to the jurisdiction of the certified program or plan, under any of the following circumstances:**
>
> **(1) The local government or port governing body requests the commission to assist with, or assume primary responsibility for, issuing a cease and desist order.**
>
> **(2) The commission requests and the local government or port governing body declines to act, or does not take action within a timely manner, regarding an alleged violation which could cause significant damage to coastal resources.**

Section 30810(b) of the Coastal Act states that the cease and desist order may be subject to such terms and conditions that the Commission determines are necessary to ensure compliance with the Coastal Act, including removal of any items of unpermitted development.

Section 30600(a) of the Coastal Act states that, in addition to obtaining any other permit required by law, any person wishing to perform or undertake any development in the Coastal Zone must obtain a CDP through Section 35-169.2 of the County's certified LCP. As stated above, "Development" is defined by Section 30106 of the Coastal Act and Section 35-58 of the City's LCP.

The various instances of unpermitted development at issue here clearly constitute "development" within the meaning of the above-quoted definition and therefore are subject to the permit requirement of Section 30600(a) and Section 312-3.1.5 of the County's certified LCP. A CDP has not been issued to authorize the unpermitted development, thus

independent criteria for issuance of a cease and desist order under Section 30810(a) of the Coastal Act are thus satisfied.

In addition to the aforementioned items, any resolution of this matter via Consent Agreement would also include settlement of monetary claims associated with your civil liability under the Coastal Act for these violations. If a consensual resolution is not reached, resolution of penalties under Section 30821.3 of the Coastal Act would be addressed unilaterally via an Administrative Penalty Action, as described below.

**Restoration Order**

The Commission's authority to issue Restoration Orders is set forth in Section 30811 of the Coastal Act, which states, in part:

> **In addition to any other authority to order restoration, the commission…may, after a public hearing, order restoration of a site if it finds that the development has occurred without a coastal development permit from the commission…, the development is inconsistent with this division, and the development is causing continuing resource damage.**

Pursuant to Section 13191 of the Commission's regulations, I have determined that the activities specified in this letter meet the criteria of Section 30811 of the Coastal Act, based on the following:

1) "Development" as that term is defined by section 30106 of the Coastal Act, has occurred without a CDP from the Commission.

2) This unpermitted development is inconsistent with the resource protection policies of the Coastal Act including, but not necessarily limited to Coastal Act Section 30240 (protection of environmentally sensitive habitat areas), Section 30233 (protection of wetlands from filling), Section 30230 (protection of marine resources) and Section 30231 (protecting biological productivity).

3) The unpermitted development remains in place and/or unaddressed and therefore continues to cause resource damage, which is defined by Section 13190 of the Commission's regulations as: "any degradation or other reduction in quality, abundance, or other quantitative or qualitative characteristic of the resource as compared to the condition the resource was in before it was disturbed by unpermitted development." The unpermitted development continues to exist and therefore, it continues to cause damage to resources and prevent the Coastal Act resources that were displaced from re-establishing, and it continues to cause degradation and reduction in quality of surrounding resources as compared to their condition before the unpermitted development occurred.

For the reasons stated above, I am therefore issuing this "Notice of Intent" letter to commence proceedings for a Restoration Order before the Commission in order to require the restoration of the Property. The procedures for the issuance of Restoration Orders are

described in Sections 13190 through 13197 of the Commission's regulations, which are codified in Title 14 of the California Code of Regulations.

**Administrative Civil Penalties, Civil Liability, and Exemplary Damages**

Under Section 30821.3 of the Coastal Act, in cases involving violations of the Coastal Act, the Commission is authorized to impose administrative civil penalties by a majority vote of the Commissioners present at a public hearing. In this case, as described above, there are multiple violations of the resource protection provisions of the Coastal Act; and therefore, the criteria of Section 30821.3 have been satisfied. The penalties imposed may be in an amount up to $11,250, for each violation, for each day each violation has persisted or is persisting, for up to five (5) years. In addition, the 60-day time period to correct a violation that is allowed under the statute does not apply to violations of a CDP. If a person fails to pay an administrative penalty imposed by the Commission, under 30821.3(e) the Commission may record a lien on that person's property in the amount of the assessed penalty. This lien shall be equal in force, effect, and priority to a judgment lien.

The Coastal Act also includes several other penalty provisions that may be applicable as well. Section 30820(a)(1) provides for civil liability to be imposed on any person who performs or undertakes development without a CDP and/or that is inconsistent with any CDP previously issued by the Commission in an amount that shall not exceed $30,000 and shall not be less than $500 for each instance of development that is in violation of the Coastal Act. Section 30820(b) provides that additional civil liability may be imposed on any person who performs or undertakes development without a CDP and/or that is inconsistent with any CDP previously issued by the Commission when the person intentionally and knowingly performs or undertakes such development. Civil liability under Section 30820(b) shall be imposed in an amount not less than $1,000 per day and not more than $15,000 per day, for each violation and for each day in which each violation persists. Section 30821.6 also provides that a violation of a Cease and Desist Order of the Commission can result in civil liabilities of up to $6,000 for each day in which each violation persists. Lastly, Section 30822 provides for additional exemplary damages for intentional and knowing violations of the Coastal Act or a Commission Cease and Desist Order.

**Response Procedure**

In accordance with Sections 13181(a) and 13191 of the Commission's regulations, you have the opportunity to respond to the Commission staff's allegations as set forth in this notice of intent to commence Cease and Desist and Restoration Order proceedings by completing the enclosed statement of defense ("SOD") form. The SOD form would be directed to the attention of Stephanie Cook, no later than March 10, 2025.

We remain hopeful that we can reach an agreeable solution and that a Consent Order will fully address this matter so that we will not have to resort to bringing a formal action before our Commission. This additional notice to commence Commission proceedings is to give us options for the possibility that Sable fails to comply with the Consent Order or that the actions required in the Consent Order do not completely resolve the violations. Therefore, should this matter be resolved via the Consent Order (or if we do have to proceed with a

Commission action and we are able to still resolve this matter via a Consent Commission Order), an SOD form would not be necessary.  In any case and in the interim, staff would be happy to accept any information you wish to share regarding this matter and staff can extend deadlines for submittal of the SOD form to account for the goal of resolving this via this Consent Order and specifically allow additional time to discuss terms of Commission consent orders if that is necessary.  If it is necessary, Commission staff would schedule the hearings for the Cease and Desist and Restoration Order for the Commission's April or May 2025 hearing.  Again, we are hopeful that this matter can be fully resolved by compliance with this Consent Order and there will not be a need to commence a formal proceeding before the Commission.

For additional information you may contact Stephanie Cook at (415) 904-5220, Stephanie.Cook@Coastal.ca.gov, or at our Headquarters Enforcement Office at:

California Coastal Commission
Attn: Stephanie Cook
455 Market Street, Suite 300
San Francisco, CA 94105

Again, we remain willing and available to work with you to resolve these matters quickly and amicably and look forward to hearing from you.


Signed,

Kate Huckelbridge
Executive Director
California Coastal Commission


Enclosure:     Notice of Intent to Issue an Executive Director's Cease and Desist Order,
                      dated February 16, 2025
                      Statement of Defense Form

Cc:

                      Lauren Paull, Latham & Watkins, LLP
                      Cassidy Teufel, CCC, Deputy Director
                      Lisa Haage, CCC, Chief of Enforcement
                      Aaron McLendon, Deputy Chief of Enforcement
                      Alex Helperin, CCC, Deputy Chief Counsel
                      Sarah Esmaili, CCC, Senior Staff Attorney
                      Wesley Horn, CCC, Environmental Scientist
                      Stephanie Cook, CCC, Enforcement Counsel

# Summary of State Regulation of Crude Oil Pipelines in Santa Barbara County

January 13, 2025

Sable Offshore Corporation is attempting to restart the Santa Ynez Unit oil and gas operation in Santa Barbara County. The Santa Ynez Unit includes three offshore platforms in federal waters connected to shore by offshore pipelines, onshore pipelines, the Ellwood Pier, mooring buoys, and the Las Flores Canyon Processing Facility.  The onshore pipelines include pipelines identified as CA-324 and CA-325 that were responsible for the 2015 Refugio Oil Spill.

This summary outlines the many state agencies that oversee the Santa Ynez Unit operations, including oil pipeline construction, maintenance and operations, which would need to approve various actions to allow these pipelines to restart. This summary has been assembled to build public understanding of the regulatory processes over these pipelines.

## Overview

California's lands and offshore waters have hosted significant crude oil extraction for well over a century. Since the mid-1980s, however, crude oil extraction has declined each year largely due to decreasing levels of easily accessible crude oil.

Today, the state has three active crude oil/petroleum extraction platforms off its coast in state waters and eight active platforms in federal waters. These platforms are connected to the shore via undersea pipelines that transport crude oil from the offshore platforms to onshore facilities that process the oil for sale. This oil is eventually transported to refineries to be converted into products such as gasoline and diesel fuel.

California state government enforces a broad set of laws and regulations over many aspects of crude oil infrastructure. This includes oversight of the extraction, transport, and refining of crude oil. These laws and regulations exist to protect public health and safety and to safeguard California's natural resources and environment.

## Oversight By Agency

Multiple state agencies regulate the pipelines owned and operated (pipelines CA-324 and CA-325) by Sable Offshore Corporation in Santa Barbara County that the company is attempting to restart. Each of these state entities has specific authorities and obligations over these pipelines that is detailed in state law and discharges these responsibilities through regulatory and oversight processes.

The state entities with oversight over these pipelines include (in alphabetical order):

1. California Coastal Commission
2. California Department of Conservation, California Geologic Energy Management Division (CalGEM)

3. California Department of Fish and Wildlife (CDFW), including the Office of Spill Prevention and Response (OSPR)
4. California Department of Forestry and Fire Protection (CAL FIRE), Office of the State Fire Marshal (OSFM)
5. California Department of Parks and Recreation (State Parks)
6. Central Coast Regional Water Quality Control Board
7. Central Valley Regional Water Quality Control Board
8. State Lands Commission

These state entities, with the exception of the two regional Water Quality Control Boards, exist within the California Natural Resources Agency. The regional Water Boards fall under the umbrella of the California Environmental Protection Agency.

Below is a short summary of the referenced state entities with regulatory oversight over these pipelines.

### CALIFORNIA COASTAL COMMISSION
*Issues permits for approved development activity in coastal areas.*

- FOCUS: Environmental protection and public access to state coastal areas.
- ROLE & AUTHORITY: Under the California Coastal Act of 1976, the California Coastal Commission has permitting responsibility for non-exempt pipeline work and other development associated with the pipeline in the Coastal Zone, including any enforcement actions for permitting requirements. The Commission also has federal consistency review authority under the Coastal Zone Management Act of certain pipeline-related activities in federal waters.
- ACTIONS UNDERWAY: Commission staff is coordinating with Sable (and Santa Barbara County, which shares the permitting jurisdiction) to determine what permits are needed and the appropriate permitting process. Commission enforcement staff are in the process of investigating multiple potential violations.
  - *On September 27, 2024*, Commission staff issued a Notice of Violation and cease and desist letter to Sable due to then recent and ongoing development activities that were occurring on and around the pipeline within the Coastal Zone without any Coastal Act authorization.
  - *On October 4, 2024,* Commission staff issued a Notice of Intent to issue an Executive Director Cease and Desist Order and requested confirmation that all work on the pipeline had ceased and that Sable would apply for a Coastal Development Permit for the work that had already occurred.
  - *On November 11, 2024,* the Commission's Executive Director issued a Cease and Desist Order to Sable, directing Sable, among other things, to submit an application for a Coastal Development Permit *"for any proposed future work to be undertaken along the Pipelines, as well as for after-the-fact ('ATF') authorization for unpermitted development that has already occurred."*
  - *Currently:* Coastal Commission staff are coordinating with Sable and the federal government to determine the scope of required federal consistency review. Federal

agency approvals would only occur after the Commission acts on the federal consistency review.

- FOR MORE INFORMATION: Contact the California Coastal Commission at ExecutiveStaff@coastal.ca.gov or the Commission's Public Information Officer at (415) 200-8052.

**CALIFORNIA DEPARTMENT OF CONSERVATION: GEOLOGIC ENERGY MANAGEMENT DIVISION (CalGEM)**

*Oversees and regulates oil processing and production facilities.*

- FOCUS: Public health and safety, environmental quality.
- ROLE & AUTHORITY: The Department of Conservation oversees compliance for oil production facility management. While the department has oversight of the Los Flores Canyon oil processing facility, CalGEM approval is not required prior to restarting the pipeline. CalGEM does, however, have a role in ensuring compliance with other regulatory partners in completing an oil spill plan, a pipeline management plan, various testing and maintenance requirements, bonding to cover decommissioning costs, and oversight of any potential oil production work happening near communities (called health protection zones).
- ACTIONS UNDERWAY:
    - *On December 17, 2024*, the Department of Conservation sent a letter to Sable notifying them of the need for an additional inspection of facilities, and production and bonding requirements.
- FOR MORE INFORMATION: Contact Department of Conversation Public Affairs at PAO@conservation.ca.gov or the Office of the Director at (916) 322-1080.

**CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE/CDFW OFFICE OF SPILL PREVENTION AND RESPONSE**

*Manages natural resources for their ecological value and for public use.*

- FOCUS: Protecting wildlife.
- ROLE & AUTHORITY:  Exercises oversight as a landowner, as well as through its authority to protect fish and wildlife, and separately through one of its offices that oversees prevention, preparation for, and response to oil spills. CDFW-OSPR reviews and approves oil spill response plans and works to ensure that facilities have the financial resources necessary to cover the costs of oil spill scenarios. Under the Endangered Species Act and other Fish and Game Code laws, CDFW also oversees the review and approval process for evaluating impacts to wildlife due to altering the adjacent landscape.
- ACTIONS UNDERWAY:
    - *In October 2024*, CDFW-OSPR certified that Sable had the financial resources to cover the costs of a reasonable worst-case scenario oil spill.
    - *On November 22, 2024*, CDFW-OSPR sent a second notice to Sable sharing that its offshore contingency plan (C-Plan #CA-00-7239) was deficient.  On December 20, 2024, Sable submitted corrections to its plan.  CDFW-OSPR is reviewing these corrections and must respond by January 19, 2025.

- o *On December 17, 2024*, CDFW-OSPR sent a third notice to Sable sharing that its onshore contingency plan (C-Plan #CA-00-7217) was deficient.  On January 9, 2025, Sable submitted corrections to its plan.  CDFW-OSPR is reviewing these corrections and must respond by February 9, 2025.
  - o *On December 17, 2024,* CDFW also issued a notice of violation for Fish and Game Code violations. This notice requests that Sable discontinue any work on CDFW properties and contact CDFW to discuss remedial measures and other actions to address impacts.
- FOR MORE INFORMATION: Contact Department of Fish and Wildlife Public Information Officer at  Steve.Gonzalez@wildlife.ca.gov or (916) 804-1714.

**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION (CAL FIRE): OFFICE OF THE STATE FIRE MARSHAL**
*Oversees and regulates the safety and operation of intrastate pipelines moving hazardous liquid in California.*

- FOCUS: Protecting public safety and spill prevention.
- ROLE & AUTHORITY: With other regulatory partners, inspects, regulates, and oversees the overall safety of hazardous liquid pipelines. Prior to restarting any pipeline, the State Fire Marshal must approve a thorough list of requirements and regulations, including Sable's proposed plans for using technology to minimize oil spill impacts, a detailed risk analysis, safety compliance reports, pipeline integrity evaluations, field verifications and maintenance plans, start-up and safety inspection plans, and waiver applications proving equal or greater levels of safety than required regulations.
- ACTIONS UNDERWAY:
  - o CAL FIRE Office of the State Fire Marshal approved a risk analysis and implementation plan for Sable's use of best available technologies in 2021.
  - o *On December 17, 2024*, OSFM submitted waivers for federal review.
  - o All remaining oversight items listed above remain open and must be completed prior to restarting the pipeline.

FOR MORE INFORMATION: Contact CAL FIRE Communications at calfire.dutypio@fire.ca.gov or (916) 651-FIRE (3473).

**CALIFORNIA DEPARTMENT OF PARKS AND RECREATION**
*Protects and manages California state park land in areas where onshore pipelines are located.*

- FOCUS: Environmental protection, state-owned land stewardship.
- ROLE & AUTHORITY: The California Department of Parks and Recreation manages public land for public benefits in areas where onshore pipelines may cross. The Department may grant easements for pipelines on this property. Specifically, this would include an easement to accommodate a four-mile section for pipeline maintenance in Gaviota State Park. The previous 30-year easement expired in 2016. Since then, the Department has issued individual permits for accessing and maintaining the pipeline.

- ACTIONS UNDERWAY:
  - *On December 20, 2024*, the Department of Parks and Recreation sent a letter to Sable requesting a full project description to evaluate their request for an easement.
- FOR MORE INFORMATION: Contact Department of Parks and Recreation Communications at newsroom@parks.ca.gov or (916) 654-7538.

## CENTRAL COAST AND CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARDS
*Protects the state's waterways and drinking water.*

- FOCUS: Water quality and environmental public health.
- ROLE & AUTHORITY: The Central Coast and Central Valley Regional Water Quality Control Boards oversee water resources for the State of California within their respective jurisdictions, implementing the Clean Water Act and the Porter-Cologne Water Quality Control Act.  The Regional Water Boards regulate the discharge of waste, such as sediment, that could occur during pipeline repair or construction. This includes issuing permits for dredging and land disturbances, and discharges of waste and stormwater.
- ACTIONS UNDERWAY:
  - *On December 13, 2024*, following an inspection, the Central Coast Regional Water Quality Board issued violation and non-compliance notices for unauthorized waste discharge into Santa Barbara County waterways, as well as a directive to seek permit coverage. Sable must take corrective action, submit a waste discharge report, and apply for appropriate permits.
- FOR MORE INFORMATION: Contact the State Water Resources Control Board at opa@waterboards.ca.gov or (916) 341-5252.

## STATE LANDS COMMISSION
*Oversees and approves leases for offshore pipelines, piers, and buoys.*

- FOCUS: Safety of offshore pipelines to shore, spill prevention, environmental protection.
- ROLE & AUTHORITY: Under the Public Resources Code, the State Lands Commission must review and approve assignment of leases from the current owner (ExxonMobile) to Sable for offshore pipelines from federal platforms to shore, piers, and mooring buoys. Per this role and overview, Sable could restart the pipelines only if the terms and requirements of the current lease and operating agreements are met. This includes Sable performing detailed inspections of the pipeline line (in-line inspections), pressure testing (called hydrotesting), and using remotely operated vehicles to monitor the pipeline.
- ACTIONS UNDERWAY:
  - Ongoing review of assignment of leases as of December 20, 2024, with the most recent discussion at the State Lands Commission on December 17, 2024.
- FOR MORE INFORMATION: Contact the State Lands Commission External Affairs at ExternalAffairsChief.Public@slc.ca.gov or (916) 574-1992.

# Exhibit 7

Second Declaration of Julie Teel Simmonds

🇺🇸 An official website of the United States government Here's how you know ⌄

United States Department of Transportation

Sign-up for Email Alerts     Newsroom

Search

Home / Pipeline

IN THIS SECTION                                                                    +

## Related Documents

- LPAC Committee Roster (PDF)
- LPAC Biographies (PDF)

## Contact Us

Pipeline Standards and Rulemaking

U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration

1200 New Jersey Avenue, SE
Washington, DC 20590
United States

**Phone:** 202-366-4595 ☎
**Fax:** 202-366-4566 🖷
**Business Hours:**
9:00am-5:00pm ET, M-F

If you are deaf, hard of hearing, or have a speech disability, please dial 7-1-1 to access telecommunications relay services.

# Liquid Pipeline Advisory Committee (LPAC) - Committee Roster and Biographies

**Roster and Biographies - Liquid Pipeline Advisory Committee (LPAC)**

The individuals listed to the below were appointed by the Secretary of Transportation to serve on the LPAC. The letter in parenthesis shows the group represented — government, industry, or public.

### LPAC Members

| Government | Industry | Public |
|---|---|---|
| **Mr. Matt Smith (G)**<br><br>Assistant Director<br>Illinois Commerce Commission<br>527 E. Capitol Avenue<br>Springfield, IL 62701 | **Mr. Shawn M. Lyon (I)**<br><br>Senior Vice President<br>Logistics & Storage<br>MPLX GP LLC<br>Findlay, OH 45840 | **Mr. Mike Mikich (P)**<br><br>Special Representative<br>United Association of Plumbers and Pipefitters<br>220 Rolling Sage Circle<br>Vacaville, CA 95688 |

| **Mr. Jeffrey G. Lantz, USCG, Retired (G)** | **Mr. Graham W. Bacon (I)** | **Mr. Jack Willingham (P)** |
|---|---|---|
| Director<br>Commercial Regulations & Standards<br>U.S. Coast Guard Headquarters<br>2703 Martin Luther King Jr Avenue SE<br>Washington, DC 20593-7509 | Executive Vice President, Chief Operating Officer<br>Enterprise Products Partners, L.P.<br>1100 Louisiana Street, 10th Floor<br>Houston, TX 77002 | Director<br>Yazoo County Emergency Management Agency<br>2201 Gordon Avenue<br>Yazoo City, MS 39194 |
| **Mr. James Hosler (G)** | **Ms. Stephanie Wilson (I)** | **Ms. Sarah K. Magruder Lyle (P)** |
| Assistant Deputy Director<br>Pipeline Safety and Certified Unified Program Agency, CAL-FIRE Office of the State Fire Marshal<br>715 P Street, Sacramento, CA 95814 | Vice President<br>Chief of Staff, Midstream Operations<br>Phillips 66 Pipelines<br>2331 City West Blvd<br>Houston, TX 77042 | President and CEO<br>Common Ground Alliance<br>908 King St, Ste 200<br>Alexandria, VA 22314 |
| **Mr. Jon Wolfgram (G)** | **Ms. Melanie Little (I)** | **Mr. Richard Kuprewicz (P)** |
| Chief Engineer & Program Manager<br>Minnesota Department of Public Safety<br>9344 Haralson Road<br>Woodbury, MN 55125 | President and Chief Executive Officer<br>Colonial Pipeline Company<br>1000 Lake Street<br>Alpharetta, GA 30009 | President<br>Accufacts Inc<br>8151 164th Ave NE<br>Redmond, WA 98052 |
| **Mr. Eric Miller (G)** | **Mr. James Holland (I)** | **Mr. Bill Caram (P)** |
| Chief, Oil Spill Preparedness Division<br>Bureau of Safety and Environmental Enforcement<br>US Department of the Interior<br>45600 Woodland Road<br>Sterling, VA 20166 | Chief Operations Officer<br>Kinder Morgan Inc<br>1001 Louisiana St<br>Suite 1000<br>Houston, TX 77002 | Executive Director<br>Pipeline Safety Trust<br>300 N Commercial, Suite B<br>Bellingham, WA 98225 |

Last updated: Wednesday, January 15, 2025

U.S. DEPARTMENT OF TRANSPORTATION

**Pipeline and Hazardous Materials Safety Administration**

1200 NEW JERSEY AVENUE, SE
WASHINGTON, DC 20590
202-366-4433

HAZMAT Registration Help Desk: 202-366-4109
Hazardous Materials Information Center: 1-800-467-4922

Office of Pipeline Safety Hotline: 202-366-4595 or phmsa.pipelinesafety@dot.gov
Pipeline Safety Concerns or Feedback on our Performance and Conduct: 202-366-4595 or phmsa.pipelinesafety@dot.gov
Report Waste, Fraud, Abuse or Mismanagement: https://www.oig.dot.gov/hotline

Website Concerns or Feedback: phmsawebsitemanager@dot.gov

Subscribe To Email Updates

**About**

About PHMSA

Regulations and Compliance

Resources

Safety

**PHMSA Resources**

PHMSA Civil Rights

PHMSA Web Policies

Accessibility

Careers

**Policies, Rights, Legal**

About DOT

Budget and Performance

Civil Rights

FOIA

Information Quality

No FEAR Act

Office of Inspector General

USA.gov

Web Policies and Notices

Web Standards

# Exhibit 8

Second Declaration of Julie Teel Simmonds



**U.S. Department
Of Transportation**

1200 New Jersey Ave., SE
Washington, DC 20590

**Pipeline and
Hazardous Materials
Safety Administration**

May 18, 2016

Mr. Bob Gorham
Program Manager/Supervising Pipeline Safety Engineer
Pipeline Safety Division
California State Fire Marshal
3500 Paramount Boulevard, Suite 210
Lakewood, CA 90712

Dear Mr. Gorham:

This letter serves to memorialize the understanding between the Pipeline and Hazardous
Materials Safety Administration (PHMSA) and the California State Fire Marshal (CASFM) with
respect to the transfer or regulatory oversight over Plains Pipeline, LP's (Plains) Lines 901 and
903 located in Santa Barbara County, California.

On May 19, 2015, Plains' Line 901 pipeline ruptured, releasing approximately 2,934 barrels of
heavy crude oil into the environment (Failure). As a result, Line 901 and Line 903, which carries
all of Line 901's crude oil throughput, were shut down.[1] Two days later, on May 21, 2015,
PHMSA issued a Corrective Action Order (CAO) shutting down Line 901 and requiring
immediate remedial actions. PHMSA has since amended the CAO twice,[2] requiring, among
other actions, a shutdown of Line 903 between Gaviota and Pentland Station. Both lines remain
shut down as of the date of this letter. PHMSA is currently conducting an investigation into the
cause of the Failure.

Prior to the accident, Plains operated Lines 901 and 903 as interstate pipelines under Federal
Energy Regulatory Commission (FERC) tariffs and were subject to PHMSA's regulatory,
inspection and enforcement jurisdiction. After the Failure, Plains cancelled its FERC tariffs on
Line 901 and Line 903. Specifically, it cancelled its FERC tariff on Line 901 on February 12,
2016, and Line 903 on April 29, 2016 (collectively, Transfer Dates). Effective as of the Transfer
Dates, Lines 901 and 903 are now considered intrastate hazardous liquid pipelines subject to the
regulatory and enforcement jurisdiction of CASFM, pursuant to state certification from PHMSA.

---

[1] Lines 901 and 903 provide transportation service from Santa Barbara County to Pentland Station, Kern County.

[2] The first amendment was issued on June 3, 2015, and the second was issued on November 12, 2015.

2 | P a g e
Mr. Bob Gorham
California State Fire Marshal

The post-accident transfer of regulatory authority from PHMSA to CASFM does not affect or otherwise impact PHMSA's ongoing investigation(s) of, and any enforcement action(s) related to, the Failure or to any other events involving the operation of Lines 901 and 903 occurring prior to the Transfer Dates. As a result, PHMSA will continue to assert its enforcement authority with respect to all actions and incidents occurring on Lines 901 and 903 prior to the Transfer Dates. CASFM, meanwhile, will exercise jurisdiction over any actions or events related to Lines 901 and 903 occurring after the Transfer Dates. CASFM will continue to implement and enforce the federal minimum pipeline safety regulations relating to Lines 901 and 903 beginning as of the Transfer Dates, and may adopt and enforce additional or more stringent standards for intrastate hazardous liquid pipelines under 49 U.S.C. § 60104(c). PHMSA and CASFM will cooperate and collaborate with each other, as necessary, on PHMSA's investigatory and enforcement activities relating to the Failure and on any other matters relating to Lines 901 and 903.

More specifically, PHMSA will be responsible for:

- Completing and finalizing the root-cause investigation of the Failure ;
- Issuing and finalizing any enforcement actions arising out of the investigation and any other events occurring prior to the Transfer Dates, including, but not limited to, the following types of actions: Notice of Probable Violation, Proposed Civil Penalty, Proposed Compliance Order, and/or Corrective Action Order (CAO), etc.;
- Completing the CAO issued to Plains on May 21, 2015, and any amendments thereto, and issuing any future CAOs related to the Failure;
- Collaborating with CASFM on any additional or modified safety requirements that may be needed in connection with any CAO that has been or may be imposed by PHMSA relating to Lines 901 and 903, including any potential re-start of the pipelines; and
- Transitioning full regulatory authority from PHMSA to CASFM once all PHMSA investigations and enforcement actions have been completed and closed.

CASFM will be responsible for:

- Including Lines 901 and 903 in CASFM's Annual Inspection Program (SB 295);
- Including Lines 901 and 903 in CASFM's Leak Detection Program (AB 864);
- Including Line 901 in the CASFM Higher Risk pipeline program, due to the release and absence of effective Cathodic Protection. This will require the pipeline to be tested annually for 5 years; and
- Exercising authority over Lines 901 and 903 under existing and future regulations established by CASFM.

If either pipeline is replaced rather than repaired, such work will be considered new construction, and the design, construction, operation, and maintenance would fall under the regulatory authority of the CASFM.

**3 | P a g e**
**Mr. Bob Gorham**
**California State Fire Marshal**

This Letter Agreement is subject to change based on any future events or newly-discovered facts that may impact any terms set forth herein. Please sign below and email me a PDF of the signed letter to zach.barrett@dot.gov. Thank you for your assistance and cooperation in this matter.

Sincerely,

Zach Barrett
Director for State Programs
Office of Pipeline Safety

ACKNOWLEDGED:

Bob Gorham
Program Manager/Supervising Pipeline Safety Engineer
Pipeline Safety Division
California State Fire Marshal

# Exhibit 9

Second Declaration of Julie Teel Simmonds

LOAN COPY

June 1984

MMS—YN—EIS—84—001
SCH #82030906
SLC EIR—348
SBC #83-EIR—22



# FINAL
# Environmental Impact Statement/Report

for

# Santa Ynez Unit, Las Flores Canyon
# Development and Production Plan

Proposed by

EXXON COMPANY, U.S.A.



Prepared for

UNITED STATES MINERALS MANAGEMENT SERVICE
CALIFORNIA STATE LANDS COMMISSION
COUNTY OF SANTA BARBARA

By

SCIENCE APPLICATIONS, INC.

Test Declaration
Page 222

EXECUTIVE SUMMARY

ES.1.    INTRODUCTION

Exxon Company U.S.A. (Exxon), a division of Exxon Corporation, is the Operator of the Santa Ynez Unit (SYU). Exxon owns eight leases, has a one-half interest with Chevron U.S.A. in eight others, and has a two-thirds interest with Chevron in one lease. One lease is held entirely by Chevron and one entirely by Shell Oil Company. The SYU is located in western Santa Barbara Channel (Figure ES.1-1).

On December 17, 1982, Exxon filed a Development and Production Plan (DPP) and accompanying Environmental Report (ER) for the SYU with the U.S. Department of the Interior (DOI) Minerals Management Service (MMS). The DPP addressed the development of the SYU and its three associated major reserve fields (Hondo, Pescado, and Sacate), and was found complete in December 1982. The development is the largest oil development project proposed for the Santa Barbara Channel to date.

The County of Santa Barbara also received an application from Exxon for development, production, and treatment of offshore oil and gas resources in the Santa Barbara Channel. This application was found complete on April 11, 1983 by the Santa Barbara County Resource Management Department. Santa Barbara County, as lead agency under the California Environmnental Quality Act (CEQA); the MMS, as lead agency under the National Environmental Policy Act (NEPA); and the State of California State Lands Commission (SLC) entered into an agreement for preparation of a joint NEPA/CEQA environmental document called an Environmental Impact Statement/Report (EIS/R).

The preparation of the EIS/R was overseen by a Joint Review Panel (JRP), which consists of:

- Santa Barbara County (Resource Management Department)

- California State Lands Commission

- U.S. Department of the Interior (Minerals Management Service)

In addition, the Governor's Office of Planning and Research and the California Coastal Commission participated with the JRP in directing the preparation of this document.

ES.2.    DESCRIPTION OF THE PROPOSED PROJECT (OPTION A)

The proposed project would develop oil and natural gas reserves in the SYU, located on the federal Outer Continental Shelf (OCS) in the western Santa Barbara Channel. Under primary recovery techniques, development of the SYU would produce approximately 300 to 400 million barrels of oil and 600 to 700 billion standard cubic feet of natural gas over a period of 25 to 35 years.

ES-1

# Exhibit 10

Second Declaration of Julie Teel Simmonds

**U.S. DEPARTMENT OF THE INTERIOR**



MENU

# Bureau of Safety and Environmental Enforcement

Promoting Safety, Protecting the Environment and Conserving Offshore Resources

## Sable Offshore Corp.

Platforms Operated by Sable Offshore Corp.

### Hondo Field/Santa Ynez Unit

District: California
Location: Santa Barbara Channel
Installed: 6-23-1976
### Platform Hondo

Lease OCS-P 0188
First Production: 4-2-1981
Distance to Land: 5.1 miles
Well Slots: 28
Water Depth: 842'
Cum. Oil Production: 189,846,000
bbls
Cum. Gas Production: 425,510,000
mcf

Teel Declaration
Page 225

1/4

Case 2:26-cv-05242-SVW-SSC Document 26 Filed 05/14/26 Page 1032 of 1309 Page ID #:13583



District: California
Location: Santa Barbara Channel
Installed: 6-21-1989
**Platform Harmony**

Lease OCS-P 0190
First Production: 12-30-1993
Distance to Land: 6.4 miles
Well Slots: 60
Water Depth: 1,198'
Cum. Oil Production: 123,138,000 bbls
Cum. Gas Production: 263,930,000 mcf

Teel Declaration
Page 226



## Pescado & Sacate Fields/
## Santa Ynez Unit

District: California
Location: Santa Barbara Channel
Installed: 10-7-1989
## Platform Heritage

Lease OCS-P 0182
First Production: 12-18-1993
Distance to Land: 8.2 miles
Well Slots: 60
Water Depth: 1,075'
Cum. Oil Production: 194,420,000 bbls
Cum. Gas Production: 273,665,000 mcf

Case 2:26-cv-05242-SVW-SSC    Document 26    Filed 05/14/26    Page 1034 of 1309
Page ID #:13585



Note: The cumulative production listed is as of October 1, 2017.

**Return to top**

DOI Gov / USA Gov / Inspector General / Fees for Services / FOIA / No Fear Act / Accessibility / Privacy / Disclaimer / Equal Employment Opportunity / Vulnerability Disclosure

# Exhibit 11

Second Declaration of Julie Teel Simmonds

Case 2:26-cv-05242-SVW-SSC    Document 36    Filed 05/14/26    Page 1036 of 1309
Page ID #:13587



Press releases

## COMPANY INFO

Overview →

Press releases →

Governance →

Annual reports & proxy →

Contacts →

FAQ →

# ExxonMobil Sets Drilling Records

*April 16, 2010 8:00 AM CDT*

 **Download as PDF**

-- Advanced drilling technology boosts production from Santa Ynez Unit

-- World's longest extended-reach well drilled from an offshore fixed platform drilling rig

-- Longest extended-reach well drilled in North America

HOUSTON--(BUSINESS WIRE)-- ExxonMobil has completed the world's longest extended-reach well drilled from an existing offshore fixed platform drilling rig, increasing the company's ability to produce more domestic oil supplies from existing facilities at the Santa Ynez unit, offshore southern California. The well drilled from the Heritage platform using ExxonMobil's Fast Drill technology extends more than six miles horizontally and more than 7,000 feet below sea level.

Through the use of this extended reach drill technology, the well will be able to produce an additional 5.8 million barrels of oil equivalent, an amount equal to the annual energy consumption of over 144,000 Californians.

"ExxonMobil is applying its advanced drilling technologies to produce more domestic supplies of oil to meet America's growing energy needs," said Kok-Yew See, ExxonMobil's U.S. production manager. "These new tools and lessons learned from our recent work off Russia's Sakhalin Island have been key in helping us reach these resources safely and efficiently."

The Santa Ynez Unit, located in federal waters, is comprised of the Hondo, Harmony and Heritage platforms. They produce oil and gas from the Hondo, Pescado and Sacate fields. Since 1981, the Santa Ynez Unit has produced more than 450 million barrels of oil. During that time, the Santa Ynez Unit has earned 12 Safety Awards for Excellence from the Pacific Region of the U.S. Department of Interior Minerals Management Service (MMS) for outstanding safety and environmental performance on the Outer Continental Shelf.

In 2007, ExxonMobil advanced the science of extended reach drilling, which allowed oil production in the western Sacate field from the existing offshore Heritage platform. Geologists and engineers have employed this technology on the newest well to access previously unreachable resources without installing an additional structure.

ExxonMobil is also applying its leading-edge Fast Drill technology to achieve improvements in drilling rates by up to 80 percent. The technology is resulting in new production being brought on quickly, safely and at lower cost.

CAUTIONARY STATEMENT: Statements in this release regarding future events and conditions are forward-looking statements. Actual future results, including project plans and schedules and resource recoveries, could differ materially due to changes in long-term oil and gas price levels or other market

Case 2:26-cv-05242-SVW-SSC    Document 26    Filed 05/14/26    Page 1038 of 1309
Page ID #:13589

conditions affecting the oil and gas industry; political or regulatory developments; timely completion of development plans; reservoir performance; technical or operating factors; the outcome of commercial negotiations; and other factors discussed under the heading "Factors Affecting Future Results" posted in the "investors" section of our website (www.exxonmobil.com).

Photos/Multimedia Gallery Available: http://www.businesswire.com/cgi-bin/mmg.cgi?eid=6252180&lang=en

Source: Exxon Mobil Corporation

Released April 16, 2010

✉ Email alerts    🏢 Company profile    📇 Contacts    🔊 RSS news feed

ExxonMobil

Do not sell my personal information    Privacy policy    Terms and conditions    Privacy center    Resources

Market Data copyright © 2025 QuoteMedia. Data delayed 15 minutes unless otherwise indicated (view delay times for all exchanges). RT=Real-Time, EOD=End of Day, PD=Previous Day. Market Data powered by QuoteMedia. Terms of Use.

# Exhibit 12

Second Declaration of Julie Teel Simmonds

**UNITED STATES**
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of Report (Date of earliest event reported): July 10, 2024**

---

# Sable Offshore Corp.
**(Exact name of registrant as specified in its charter)**

---

| | | |
|---|---|---|
| **Delaware** | **001-40111** | **85-3514078** |
| **(State or other jurisdiction** | **(Commission** | **(I.R.S. Employer** |
| **of incorporation)** | **File Number)** | **Identification No.)** |

| | |
|---|---|
| **845 Texas Avenue, Suite 2920** | |
| **Houston, Texas** | **77002** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**(713) 579-6161**
**(Registrant's telephone number, including area code)**

---

Check the appropriate box below if the Form 8-K is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencements communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.0001 per share | SOC | The New York Stock Exchange |
| Warrants, each whole warrant exercisable for one share of Common Stock at an exercise price of $11.50 per share | SOC.WS | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

---

**Item 8.01        Other Events.**

The California Office of State Fire Marshall ("OSFM"), in a letter dated July 10, 2024, stated that Pacific Pipeline Company's ("PPC") approved April 2021Risk Analysis and Implementation Plan (the "2021 Plan") remains in effect and complies with California State Assembly Bill 864. PPC had filed a supplemental Revised Risk Analysis and Implementation Plan (the "Supplemental Plan") in response to the County of Santa Barbara's denial of permits requested by PPC to comply with the 2021 Plan. While OSFM recognized the efforts of PPC to reduce spill response times to a spill incident and subsequent release to waterways, it determined that the Supplemental Plan is not considered as effective in mitigating the potential environmental impact compared to the 2021 Plan and it re-affirmed that the 2021 Plan remains in effect and has the best available technology.

PPC and Santa Barbara County are actively engaged in discussions to resolve the issues surrounding the prior denial by the County of permits to allow for the installation of safety valves included in the 2021 Plan, which is the subject of ongoing litigation filed by PPC. These discussions are taking place against the backdrop of OSFM's recognition that the 2021 Plan provides the most effective mitigation of potential environmental impacts. PPC is committed to following the OSFM directive and looks forward to resolving this Santa Barbara County permit issue so that the safety valves can be installed.

In cooperation with and under the supervision of OSFM personnel, PPC is currently making pipeline repairs, installing new pump stations, and constructing multiple new control facilities for lines 324 and 325, all in preparation for restart of Las Flores Canyon processing facilities and associated Santa Ynez Unit offshore production platforms. Restart is expected in late third quarter 2024 or early fourth quarter 2024.

<div align="center">2</div>

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Sable Offshore Corp.**

Date: July 11, 2024

By: /s/ Gregory D. Patrinely

Name: Gregory D. Patrinely

Title: Executive Vice President and Chief Financial Officer

3

# Exhibit 13

Second Declaration of Julie Teel Simmonds

# DRAFT
# ENVIRONMENTAL IMPACT REPORT
# ENVIRONMENTAL IMPACT STATEMENT



# PROPOSED CELERON / ALL AMERICAN AND GETTY PIPELINE PROJECTS

## CALIFORNIA STATE LANDS COMMISSION
### AND
## BUREAU OF LAND MANAGEMENT
## DEPARTMENT OF THE INTERIOR

State Clearing House No. 83110902
Contract No. R-8353



A COMSAT COMPANY
ENVIRONMENTAL RESEARCH & TECHNOLOGY, INC.
ANCHORAGE · CHICAGO · CONCORD, MA · FORT COLLINS, CO
HOUSTON · LOS ANGELES · PITTSBURGH · WASHINGTON, DC

# AUGUST 1984

Teel Declaration
Page 238

- 2 pumping stations,
- 1 heating station,
- 10 pumping and heating stations,
- 20-acre tank farm at Cadiz,
- 2 delivery stations.

No new access roads longer than 2,600 feet (ft) would be required to reach the pumping stations. Utility requirements (electricity and natural gas) for the Celeron/All American pipeline are shown in Table 2-4.

The Celeron/All American pipeline used for analysis in this EIR/EIS would have the following specifications: 30-inch outside diameter; 0.344 to 0.562-inch wall thicknesses, with corresponding maximum operating pressures of 991 to 1,618 psig, respectively. The entire Celeron pipeline segment and a minimum of 20 miles of pipe downstream from each heating station on the All American pipeline segment would be insulated. Inlet temperature of the crude oil would average 160°F. The pipelines would be insulated with 1.5 inches of polyurethane with a vinyl outer jacket to minimize heat loss from the line. The pipe coating, where not insulated, would be a double wrap of plastic tape; in selected areas, such as river crossings, the pipe would have a coal tar coating overlaid with a concrete jacket.

The entire pipeline would be protected from corrosion with cathodic protection systems consisting of groundbeds and rectifiers. The number and location of these systems would be based on tests of pipe-to-soil potential after construction. Corrosion protection test stations would be installed at least every 10 miles to test the performance of the cathodic protection system. These stations, which are about the size of a parking meter, would be within the ROW.

Pipeline block and check valves would be located at strategic locations along the route (see Map 1-2). Block valves at the pump stations and on the upstream (of oil flow) side of major stream crossings (Refugio Creek, Gaviota Creek, Santa Ynez River, Sisquoc River, La Brea Creek, Cuyama River, Mojave River, Colorado River, Gila River, Wild Cat Canyon Creek, Rio Grande, and Pecos River) would be remotely operated. Check valves would be installed on the downstream (of oil flow) side of all major river and stream crossings, and block valves would be installed on both sides of all pump stations. Each block valve setting would require a 10-ft by 20-ft area. Figure 2-1 shows a typical block valve installation.

Remote control block valves installed at the sensitive areas identified above would be operated in two basic ways. The more traditional way would be to use an electric motor to open and close the valve. This system requires both power and communications. The second method would use a pneumatic or hydraulic actuator and requires only communications. Energy would be supplied by bottled nitrogen gas or solar panels operating a small hydraulic pump. The second method would be used at block valve sites which are too remote to be supplied with line power.

2-5

of different "exposure variables". In the present context, an "exposure variable" is a measureable (or countable) physical quantity which bears some direct and preferably simple connection to the production or transportation of oil, and which can be related to the statistical probability of an oil spill. The exposure variables most commonly used to describe the risk of an oil spill from pipeline operations are:

- volume of oil handled, e.g., the probability of a spill is described in terms of number of spills per billion barrels provided or handled; and

- miles of pipeline operational per year, e.g., the probability of a pipeline spill is described in terms of number of spills per mile of pipeline operating per year.

Different investigators have emphasized one or another of these exposure variables according to the information they now have or expect to have available for risk prediction. In the discussion below, historical accident statistics are presented using several exposure variables. Where possible, specific information about the Celeron/All American and Getty projects are utilized in estimating spill probabilities (i.e., pipeline mile length and age). Based on the conclusions of OIW (1978), this study selected pipeline mileage as the best exposure variable. This variable allows an evaluation of all the available data for risk estimation.

4.2.15.2 Pipeline Statistics. Table 4-22 shows the cause of U.S. pipeline accidents over the 5-year period from 1971 to 1975 (U.S. EPA 1982a). As shown, pipeline faults, including defective pipe and corrosion, accounted for 56 percent of the spills and 53 percent of the volume spilled. Internal corrosion is the largest cause of a spill due to pipeline fault and this is more characteristics of older pipelines which were constructed of different materials and did not have the cathodic protection systems proposed by Celeron/All American and Getty. However, the spill size associated with corrosion is substantially smaller than a spill resulting from seam failure, the second largest source of pipeline fault spills. In the category of impact damage, equipment impact is the largest cause of spills. The largest volume of oil spilled is also attributed to equipment impacts. The pipeline would be marked to DOT standards and with the state-of-the-art leak detection systems and automated block valves, damage from spills should be minimized.

Researchers for the Las Flores Marine Terminal Design Project found that the historical rate of oil spills from onshore pipelines has been estimated by numerous studies using pipeline mile-years as an exposure variable. The Oceanographic Institute of Washington (OIW 1978) calculated spill rates based on U.S. Coast Guard Pollution Incident Reporting System (USCG PIRS) data for the period 1973-1977. During this period, 1,580 spills >2.4 barrels (100 gallons) in size were recorded for a cumulative total of 728,000 mile-years of pipeline. The inferred rate of spillage is $2.2 \times 10^{3}$ spills >2.4 barrels per pipeline mile-year. The size distribution of oil spills stemming from accidents

4-110

(Mastandrea 1982).  Mastandrea's analysis is very conservative when the new pipeline design systems and materials are considered.  The Celeron/All American and Getty pipeline systems should not experience the corrosion problems which account for 39 percent of current spills. The quality assurance procedures for weld inspection and for the hydrostatic pressure testing will reduce the defective pipe incidents which account for 16 percent of the current spills.  Table 4-24 also provides a summary of the expected incidence of spills exceeding 9.5 barrels and 50 barrels for the proposed Getty and Celeron/All American pipelines.

4.2.15.3    <u>Statistics for Onshore Storage Facilities.</u>    The researchers for the Las Flores Marine Terminal Design Project found a historical rate of oil spills from onshore crude oil storage facilities has been estimated by OIW (1978) using storage volume (barrel-years) as the exposure variable.  The rate is based on the USCG PIRS data base covering the period 1973-1976.  During this period, there were 176 spills reported and a cumulative total of $6.98 \times 10^8$ barrel-years of oil stored.  This yields an average rate of about $2.52 \times 10^{-7}$ spills/barrel-year of storage.  The rate applies to spills >2.4 barrels in size.  A spill size frequency distribution of onshore storage facility spills was developed by OIW (1978) based on 176 incidents in the USCG PIRS data base.  The fraction of spills exceeding a specific volume is shown below.

<u>Volume Distribution on Onshore Storage</u>

| <u>Facility Spills[1]</u><br><u>Spill Volume in Barrels</u> | <u>Fraction of Spills</u><br><u>in this Size Class[2]</u> |
|---|---|
| $\geq$10 | 0.642 |
| $\geq$100 | 0.148 |
| $\geq$1,000 | 0.011 |
| $\geq$10,000 | 0 |

[1]Estimates based on Table IV-2 of OIW 1978

[2]Fractions apply to the class of spills >2.4 barrels in size

Table 4-25 summarizes the estimated spill volume frequencies for Celeron/All American's proposed Cadiz tank farm which consists of three 500,000 barrel tanks.  Over the 30-year life of the project, estimated spills include 11.4 spills equal or greater than 10 barrels, 2.58 spills equal or greater than 100 barrels, and 0.225 spills equal or greater than 1,000 barrels (i.e., approximately 1 spill in 133 years greater or equal to 1,000 barrels).

4.2.15.4    <u>Pipeline Spill Prevention.</u>    Pipeline safety measures proposed by Getty and Celeron/All American include both leak avoidance and leak detection measures.  Leak avoidance measures include careful material and system design, adequate depth of burial, hydrostatic pressure testing, corrosion prevention and inspection, and block valve systems.  Complete descriptions of proposed spill prevention measures and maintenance procedures are presented in Section 2.2.

Teel Declaration
Page 241

- Probabilities of tank farm spills during the 30-year life of project would be 11.4 spills equal to or greater than 10 barrels, 2.58 spills equal to or greater than 100 barrels, and 0.225 spills equal to or greater than 1,000 barrels (All American route, Emidio to Blythe segment).

## Santa Maria Canyon Alternative

### Air Quality

- No significant impacts.

### Geology

- No significant impacts (geologic hazards and risks are described in Chapter 4).

### Soils

- Major oil spills or leaks would contaminate soil affecting erosion rates, water uptake, and productivity. Small areas of agricultural lands, located primarily in the Sisquoc Valley, would be the most sensitive soils.

### Surface Water

- Major oil spills or leaks would degrade water quality below federal and state standards. Impacts would occur at and downstream from any stream crossing.

### Groundwater

- No significant impacts.

### Aquatic Biology

- No significant impacts.

### Terrestrial Biology

- Loss of about 63 acres of oak woodlands along Getty's route (50-ft ROW) and 126 acres along the Celeron/All American route (100-ft ROW) during construction.

- Loss of about 10 acres of riparian vegetation along Tepusquet Creek along Getty's pipeline route (50-ft ROW), and 10 acres along Celeron/All American's route (assuming 50-ft ROW as mitigation).

### Socioeconomics

- No significant impacts.

4-167

# Exhibit 14

Second Declaration of Julie Teel Simmonds

# FINAL
# ENVIRONMENTAL IMPACT REPORT
# ENVIRONMENTAL IMPACT STATEMENT



# PROPOSED CELERON / ALL AMERICAN
# AND GETTY PIPELINE PROJECTS

## CALIFORNIA STATE LANDS COMMISSION
### AND
## BUREAU OF LAND MANAGEMENT
## DEPARTMENT OF THE INTERIOR

State Clearing House No. 83110902
Contract No. R-8353



A COMSAT COMPANY
ENVIRONMENTAL RESEARCH & TECHNOLOGY, INC.
ANCHORAGE · CHICAGO · CONCORD, MA · FORT COLLINS, CO
HOUSTON · LOS ANGELES · PITTSBURGH · WASHINGTON, DC

# JANUARY 1985

Teel Declaration
Page 244

STATE OF CALIFORNIA

**STATE LANDS COMMISSION**

**KENNETH CORY,** *Controller*
**LEO T. McCARTHY,** *Lieutenant Governor*
**JESSE R. HUFF,** *Director of Finance*



GEORGE DEUKMEJIAN, *Governor*

**EXECUTIVE OFFICE**
1807 - 13th Street
Sacramento, California 95814

**CLAIRE T. DEDRICK**
**Executive Officer**

December 9, 1984

TO:   ALL INTERESTED PARTIES

Enclosed is a copy of the Finalizing Addendum for the Environmental Impact Report/Environmental Impact Statement on the following projects:

Celeron/All American Pipeline Companies  propose to construct a 1200 mile, buried pipeline to transport heated crude oil from the Santa Barbara and Santa Maria Basins through Emidio Station, California to McCamey, Texas.

Getty Trading and Transportation Company proposes to construct a 113 mile, buried pipeline to transport heated crude oil from Gaviota, California, to Emidio Station, California.

This addendum, combined with the Draft EIR/EIS, is the Final EIR/EIS for these projects.

Certification of this document is tentatively scheduled for State Lands Commission consideration at their January 31, 1985, meeting, beginning at 10:00 a.m.  The location will be Room 447 of the State Capitol, Sacramento, California.

Those desiring further information on the Commission meeting or the project should call Mary Griggs at (916) 322-0354.

CLAIRE T. DEDRICK
Executive Officer

Teel Declaration
Page 245

# COMMENT LETTER 37 (CONTINUED)

# RESPONSE TO COMMENT LETTER 37 (CONTINUED)

State Lands Commission
Page – 3
October 9, 1984

**37-4**

In discussing the operational impacts of the pipelines, the DEIR/S could be improved by including a mitigation measure to improve or replace pipeline segments as they age and deteriorate. Mitigation should be accomplished by regular on-site visual and x-ray inspections. This would supplement the operation and maintenance plans discussed on page 2-30 et seq. and would provide additional protection from pipelines failures which occur as the facilities age. This level of protection seems warranted especially where the right-of-way traverses areas with unique environmental characteristics such as the Los Padres National Forest and lands which are part of the California Desert Conservation Area.

Relationship of Projects to Regional Policies

Given the route location and associated facilities for the proposed Celeron/All American project, this pipeline is generally favorable when assessed in terms of regional policies. Adverse impacts on areas with regionally significant environmental resources can be mitigated. By routing OCS crude directly to the Gulf Coast, the potential policy conflicts outlined in the attached comments on the Santa Barbara OTP can be avoided.

**37-5**

It is ironic that the DEIR/S states that one of the reasons that the Southern California Pipeline project is not evaluated as an alternative is that it would require "inordinate amounts of analysis to consider in detail" (p. 2-40). This statement is probably very true, but provides an extremely weak rationale for not evaluating this project as an alternative. From all indications, the transportation of OCS crude, even a quantity as small as 100,000 barrels per day through existing pipelines, could have significant adverse impacts on Southern California. No analysis has been completed to verify the nature of the impacts whether positive or negative. Without this information, the Getty project cannot be evaluated relative to regional policies. Also, without this analysis it appears that this report fails to meet the mandate of the CEQA to assess all impacts within the State of California. In reviewing these comments, SCAG's Executive Committee has concluded that this report should not be finalized or certified unless this data is included in the report.

In addressing the DEIR for the Santa Barbara OTP and the findings of SCAG's OCS Task Force, SCAG's Executive Committee adopted a series of policies which are directly relevant to this DEIR/S. The policies state that pipelining is the preferred long-term transportation mode for California offshore oil; that stringent environmental requirements, including offsets and Best Available Control Technology(BACT), and other measures to prevent or mitigate potential adverse impacts disclosed in compliance with CEQA,



600 South Commonwealth Avenue · Suite 1000 · Los Angeles · California · 90005 · 213/385-1000

**37-4**

The two proposed pipelines would have service lives of approximately 30 years. Current construction standards are superior to those reflected in the data base used for risk assessment. The various inspections before and after the pipe is installed in the trench, hydrostatic testing, cathodic protection systems, and monitoring systems collectively suggest that these modern pipelines would be much safer than their predecessors. Regular visual inspections and cathodic protection checks would be conducted during the life of the projects since it is not possible to X-ray the pipeline once it has been buried. Faulty protection equipment or segments of pipe would be replaced as necessary. See Appendix 4.3 for a summary of System Safety.

**37-5**

See response to Comments 18-2, 37-1, 37-2 and 37-3. We acknowledge the possibility of an oil shipper refining OCS crude oil in the Los Angeles area. CEQA requires that when impacts cannot be reasonably ascertained or when forecasting becomes a speculative excercise, that the document shall acknowledge this fact and terminate the analysis. For the reasons cited in comments 18-2, 37-1, 37-2, 37-3 and others, a detailed analyses of impacts in Los Angeles, Gulf Coast, Kern County, and San Francisco refining areas were not performed. If other projects or specific refinery modifications are proposed, we anticipate that those proposals will be fully analyzed in accordance with the requirements of NEPA and CEQA at the appropriate time.

# Exhibit 15

Second Declaration of Julie Teel Simmonds

🇺🇸 An official website of the United States government Here's how you know ⌄

United States Department of Transportation

Sign-up for Email Alerts      Newsroom

Search

Home / Pipeline / Special Permits and State Waivers

IN THIS SECTION                                                                    +

---

**Contact Us**

Pipeline Standards and Rulemaking
U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, DC 20590
United States

**Phone:** 202-366-4595 ☏
**Fax:** 202-366-4566 🖨
**Business Hours:**
9:00am-5:00pm ET, M-F

If you are deaf, hard of hearing, or have a speech disability, please dial 7-1-1 to access telecommunications relay services.

---

# Pipeline Special Permits and State Waivers Overview

## Special Permits

A special permit (previously called a waiver) is an order that waives or modifies compliance with a regulatory requirement if the pipeline operator requesting it demonstrates the need and PHMSA determines that granting a special permit would be consistent with pipeline safety. Special permits are authorized by statute in 49 USC § 60118(c) and the application process is set forth in 49 CFR 190.341. PHMSA performs extensive technical analysis on special permit applications and typically conditions a grant of a special permit on the performance of alternative measures that will provide an equal or greater level of safety. PHMSA is committed to public involvement and transparency in special permit proceedings and publishes notice of every special permit application received in the Federal Register for comment.

For assistance with pipeline special permits or the application process, send an email to PipelineSPEngineeringDirector@dot.gov. For inquiries related to hazardous materials special permits, send an email to specialpermits@dot.gov.

- Special Permits Issued
- Special Permits Denied
- Special Permits Withdrawn, Expired or Terminated

For background information on general and emergency special permits, please refer to the following documents:.

- OPS Special Permit Requirements (§190.341)
- Emergency Special Permit Information
- Guidelines Related to Special Permits for 192.611 (Change in Class Location)

## State Waivers

A state waiver is similar to a special permit, except that it waives or modifies compliance with a regulation adopted by the state pursuant to its participation in the pipeline safety program under a certification authorized by 49 USC § 60105 or an agreement authorized by 49 USC § 60106. Prior to issuing a state waiver, the state is required to provide PHMSA with a 60 day review period.

For assistance with state waivers or the application process, send an email to PHMSAOPSStateWaivers@dot.gov.

- Historical State Waivers (1970-Present)
- State Waivers Denial
- State Waivers Withdrawn, Expired or Terminated

# Federal Register Notices Related to Special Permit Applications

| Federal Register (FR) Notices | Description | Publish Date |
|---|---|---|
| PHMSA-2008-0066 | New Segment | Jun 26, 2025 |
| PHMSA-2006-24058 | Extension, New Segment | Jun 26, 2025 |
| PHMSA-2016-0004 | Extension, New Segment | Jun 26, 2025 |
| PHMSA-2019-0152 | Extension | Jun 26, 2025 |
| PHMSA-2022-0035 | Extension | Jun 26, 2025 |
| PHMSA-2023-0001 | Extension | Jun 26, 2025 |
| PHMSA-2019-0202 | Extension | Jun 26, 2025 |
| PHMSA-2016-0006 | New Segment | Jun 26, 2025 |
| PHMSA-2018-0042 | Liquefied Natural Gas | Jun 09, 2025 |
| PHMSA-2025-0011 | Class Location & MAOP | Apr 21, 2025 |
| PHMSA-2024-0055 | Class Location | Oct 15, 2024 |
| PHMSA-2024-0011 | Valve Spacing | Oct 30, 2024 |
| PHMSA-2023-0136 | Class Location | Apr 24, 2024 |
| PHMSA-2023-0126 | Class Location | Sept 4, 2024 |
| PHMSA-2023-0071 | Odorization | Mar 1, 2024 |

Last updated: Monday, June 30, 2025

U.S. DEPARTMENT OF TRANSPORTATION

**Pipeline and Hazardous Materials Safety Administration**

1200 NEW JERSEY AVENUE, SE
WASHINGTON, DC 20590
202-366-4433

HAZMAT Registration Help Desk: 202-366-4109
Hazardous Materials Information Center: 1-800-467-4922

Office of Pipeline Safety Hotline: 202-366-4595 or phmsa.pipelinesafety@dot.gov
Pipeline Safety Concerns or Feedback on our Performance and Conduct: 202-366-4595 or phmsa.pipelinesafety@dot.gov
Report Waste, Fraud, Abuse or Mismanagement: https://www.oig.dot.gov/hotline

Website Concerns or Feedback: phmsawebsitemanager@dot.gov

Subscribe To Email Updates

## About

About PHMSA

Regulations and Compliance

Resources

Safety

## PHMSA Resources

PHMSA Civil Rights

PHMSA Web Policies

Accessibility

Careers

## Policies, Rights, Legal

About DOT

Budget and Performance

Civil Rights

FOIA

Information Quality

No FEAR Act

Office of Inspector General

USA.gov

Web Policies and Notices

Web Standards

# Exhibit 16

Second Declaration of Julie Teel Simmonds



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

Deputy Administrator

1200 New Jersey Avenue, SE
Washington, DC 20590

January 17, 2025

Ms. Julie Simmonds
Senior Counsel
Center for Biological Diversity
PO Box 701
Tucson, AZ 85702-0710

Dear Ms. Simmonds:

The Pipeline and Hazardous Materials Safety Administration (PHMSA) received your letter dated December 23, 2024, and your request to Secretary Buttigieg on January 10, 2025, wherein you voiced your objection to the California Department of Forestry and Fire Protection, Office of the State Fire Marshall (OSFM) grant of waivers for the restart of Sable Offshore Corp pipelines CA-324 and CA-325A/B (Formerly Lines 901/903), as well as the report titled *Evaluation of the Las Flores Pipeline System Startup Proposal*.

PHMSA is dedicating the necessary time, expertise, and resources to thoroughly review all aspects of this matter to ensure that safety measures are fully evaluated, and to ensure that any proposed alternative means of safety compliance result—*at minimum, in an equivalent or better level of safety*.

PHMSA received the notice of state waivers from OSFM on December 18, 2024, and, pursuant to 49 U.S. Code § 60118(d), has 60 days to provide a written objection, if determined necessary. As part of our evaluation, we are also reviewing your accompanying report. Should it be determined that any objections to these waivers are warranted, they will be addressed in full compliance with 49 U.S. Code § 60118(d). This week, PHMSA communicated to OSFM that should PHMSA need more time for its review, the Agency will notify OSFM accordingly, and take as much time as necessary to review and ensure adequate measures are in place to maintain full pipeline integrity and protect the public and the environment. We understand that the current national emergency related to the fires in Southern California may necessitate additional flexibility in terms of timing and back-and-forth communication around technical aspects of this matter. Allowing for additional time for review is merited here as it has been in certain other instances involving similar highly technical waiver reviews by PHMSA.

As part of PHMSA's review process, a public docket has been established to provide public access to the operator's application, the letter of decision to grant the waivers by OFSM, and

Teel Declaration
Page 252

other relevant information. You can view the materials online at www.regulations.gov. The docket numbers for these waivers are PHMSA-2025-0002 and PHMSA-2025-0003. OSFM has also posted the waivers at their website https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

Should you have any further questions or require additional information during this process, please do not hesitate to contact Max Kieba, PHMSA's Director of Engineering and Research, Office of Pipeline Safety at max.kieba@dot.gov or 202-420-9169.

Thank you for your continued interest in pipeline safety.

Sincerely,

Tristan H. Brown

# Exhibit 17

Second Declaration of Julie Teel Simmonds

**ORDER**

U.S. DEPARTMENT OF
TRANSPORTATION
Office of the Secretary
of Transportation

> **DOT Order
> 5610.1D**

SUBJECT: DOT'S PROCEDURES
FOR CONSIDERING
ENVIRONMENTAL IMPACTS

## Table of Contents

1. PURPOSE ...................................................................................................................................1

2. CANCELLATION AND EFFECTIVE DATE .......................................................................................1

3. APPLICABILITY ...........................................................................................................................2

4. POLICY .......................................................................................................................................3

5. ROLES AND RESPONSIBLITIES ...................................................................................................3

6. DETERMINING THE APPROPRIATE LEVEL OF NEPA REVIEW .....................................................4

7. NEPA AND AGENCY DECISIONMAKING .....................................................................................6

8. LEAD AND COOPERATING AGENCIES.........................................................................................8

9. CATEGORICAL EXCLUSIONS (CEs) ............................................................................................10

10. ENVIRONMENTAL ASSESSMENTS ............................................................................................13

11. FINDINGS OF NO SIGNIFICANT IMPACT...................................................................................15

12. NOTICES OF INTENT AND SCOPING .........................................................................................16

13. ENVIRONMENTAL IMPACT STATEMENTS.................................................................................17

14. AGENCY DECISION MAKING.....................................................................................................22

15. TERMINATION OF AN ENVIRONMENTAL DOCUMENT .............................................................22

16. EFFICIENT ENVIRONMENTAL REVIEWS ...................................................................................22

17. PROGRAMMATIC ENVIRONMENTAL DOCUMENTS..................................................................23

18. RELIANCE ON EXISTING ENVIRONMENTAL DOCUMENTS ........................................................24

19. INTEGRATING NEPA WITH OTHER ENVIRONMENTAL REQUIREMENTS....................................25

20. ELIMINATION OF DUPLICATION WITH STATE, TRIBAL, AND LOCAL PROCEDURES ...................25

21.     PROPOSALS FOR REGULATIONS ...............................................................................25

22.     UNIQUE IDENTIFICATION NUMBERS ........................................................................25

23.     EMERGENCIES...........................................................................................................25

24.     INTERNATIONAL ACTIONS ........................................................................................26

25.     PROCEDURES FOR APPLICANT-PREPARED ENVIRONMENTAL DOCUMENTS ............26

26.     DEFINITIONS .............................................................................................................27

27.     SEVERABILITY ...........................................................................................................29

28.     SUBPART A. GREAT LAKES ST. LAWRENCE SEAWAY DEVELOPMENT CORPORATION.................29

29.     SUBPART B. FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION .........................................31

30.     SUBPART C. MARITIME ADMINISTRATION ..................................................................48

31.     SUBPART D. NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION.....................................55

32.     SUBPART E. PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION ......................58

Appendix A – List of Department of Transportation Categorical Exclusions ......................................... A-1

1. PURPOSE

The purpose of these procedures is to describe the process by which DOT determines what actions are subject to the National Environmental Policy Act's (NEPA's) procedural requirements and the applicable level of NEPA review. These procedures ensure that relevant environmental information is identified and considered early in the process to ensure informed decision making. The procedures will enable DOT to conduct coordinated, consistent, predictable, and timely environmental reviews, thus reducing unnecessary burdens and delays. Furthermore, the procedures implement NEPA's mandates regarding lead and cooperating agency roles, page and time limits, and applicant preparation of environmental documents.

This Order sets forth DOT's procedures and practices for implementing NEPA. It further explains DOT's interpretation of certain key terms in NEPA. Sections 1 through 25 of this Order establishes procedures and processes that all Operating Administrations (OAs) should apply when implementing NEPA. In addition, OAs have specific NEPA implementing procedures that are either outlined in the subparts below or are contained in individual NEPA procedures. The following OAs have OA-specific guidance contained in the subparts of this Order below: Great Lakes St. Lawrence Seaway Development Corporation (GLS), Pipelines and Hazardous Materials Safety Administration (PHMSA), Maritime Administration (MARAD), Federal Motor Carrier Safety Administration (FMCSA), and National Highway Traffic Safety Administration (NHTSA). Federal Highway Administration, Federal Railroad Administration, and Federal Transit Administration NEPA implementing procedures are contained in 23 CFR Part 771. Federal Aviation Administration NEPA implementing procedures are outlined in FAA Order 1050.1. To the extent that NEPA implementing procedures exist outside the Order, those OAs should update their implementing procedures to be consistent with this Order and the NEPA statute.

This Order does not in fact, nor does it intend to govern the rights and obligations of any party outside the Federal government. Nothing contained in these procedures is intended or should be construed to limit DOT's other authorities or legal responsibilities.

2. CANCELLATION AND EFFECTIVE DATE

This Order cancels:

   a. DOT 5610.1C, "Procedures for Considering Environmental Impacts," issued September 18, 1979, and the changes issued July 13, 1982, and July 30, 1985;

   b. PHMSA Order 5610.3, "Procedures for Considering Environmental Impacts," dated January 16, 2025;

   c. FMCSA Order 5610.1, "National Environmental Policy Act Implementing Procedures and Policy for Considering Environmental Impacts," issued March 2004;

   d. St Lawrence Seaway Order SLS 10-5610.1B, issued May 28, 1981; and

   e. MARAD Order 600-1, issued July 23, 1985.

This Order will be effective immediately as an interim Order, but DOT is soliciting public comment on this Order and may update it based on comments received. This Order does not apply to or alter any decisions made and final environmental documents issued prior to the effective date of this Order. This Order should be applied to actions initiated on or after the effective date of this Order.

3.  APPLICABILITY

    a.  <u>Authority</u>. NEPA only imposes certain procedural requirements on the exercise of an OA's existing legal authority in relevant circumstances. To determine if NEPA applies, an OA must determine if the proposed action is a major federal action in Section 3b below.

    b.  <u>Major Federal Actions</u>. NEPA only applies to major Federal actions. In determining whether NEPA applies to a proposed agency action, DOT will consider only the action or project at hand. The terms "major" and "federal action" each have independent force. NEPA applies only when both of these criteria are met. While such a determination is inherently bound up in the facts and circumstances of each individual situation, and is thus reserved for the judgment of each agency in each instance, DOT provides the following interpretive guidance:

    (1)  DOT major federal actions may include grants, construction, regulatory actions, certifications, licenses, permits, approval of policies and plans, adoption or implementation of programs, waivers, legislation proposed by DOT, and any renewals or approvals of the above.

    (2)  An action is not a major federal action if:

        (a)  The activities or decisions do not result in final agency action under the Administrative Procedure Act (see 5 U.S.C. § 704) or other relevant statutes that also include a finality requirement;

        (b)  The proposed activity or decision is exempt from NEPA by law. For example, decisions concerning plans, Transportation Improvement Programs (TIPs), and Statewide Transportation Improvement Programs (STIPs) are not actions subject to NEPA pursuant to the express exemptions in 23 U.S.C. §§ 134 and 135;

        (c)  Compliance with NEPA would clearly and fundamentally conflict with the requirements of another law;

        (d)  In circumstances where Congress by statute has prescribed decisional criteria with sufficient completeness and precision such that an OA retains no residual discretion to alter its action based on the consideration of environmental factors. In these circumstances, the OA's function is nondiscretionary within the meaning of NEPA § 106(a)(4) and/or § 111(10)(B)(vii) (42 U.S.C. § 4336(a)(4) and § 4336e(10)(B)(vii), respectively);

        (e)  The proposed action is an action for which another statute's requirements serve the function of agency compliance with the Act; or

        (f)  The action is a "non-Federal action." NEPA does not apply to actions with no or minimal Federal funding, or with no or minimal Federal involvement where a Federal agency cannot control the outcome of a project. NEPA § 111(10)(B)(i), 42 U.S.C. § 4336e(10)(B)(i)(42 U.S.C. § 4336(a)(4)). A but-for causal relationship is insufficient to make an agency responsible for a particular action under NEPA. Minimal Federal funding or involvement, which may in a causal sense be a but-for cause of an action, does not by itself convert that action into a Federal action within the meaning of the language of the statute.

    (3)  The issuance or update of DOT or OA NEPA procedures is not subject to NEPA review.

(4) OAs can expressly identify actions that are subject to NEPA as well as actions that are not subject to NEPA under their individual agency NEPA procedures contained either in this Order as a subpart, FAA Order 1050.1, or within 23 CFR Part 771.

OAs are encouraged to define within their individual NEPA procedures their specific actions that are presumptively exempt from NEPA because the activities presumptively do not meet the definition of major federal action above. OAs should also consider whether a threshold could be established for "minimal" federal funding or involvement, such as a monetary or percentage threshold, that would exempt those activities from NEPA.

4. POLICY

a. Consistent with NEPA, the Department's policy is to integrate Federal environmental objectives into the programs of DOT to ensure the safest, most efficient and modern transportation system in the world, while avoiding or minimizing adverse environmental impacts where practicable, consistent with other considerations of National policy. DOT aims to preserve the natural beauty of the Nation's vital resources and preserve, restore, and enhance environmental quality of these resources in an effective and efficient manner.

b. The Department will strive to synchronize NEPA and other Federal environmental requirements and authorizations into a single, concurrent environmental review process that satisfies the requirements of all agencies with a role in a proposed action and expedites project delivery.

c. The Department will apply sound science, reliable data, and a systematic interdisciplinary approach to the environmental review process, including the use of geographic information systems and interactive maps, as appropriate.

d. The Department will maximize the use of proven strategies to efficiently complete the environmental review process, including use of electronic collaboration tools, applicable government-wide data standards[1], programmatic agreements and approaches, and planning processes and products with utility for satisfying NEPA requirements pursuant to applicable laws and regulations.

e. The Department encourages meaningful, proactive, open, and transparent public participation and collaboration with affected and interested stakeholders, including Federal agencies, States, Tribes, localities, and the public in its environmental decision-making process.

5. ROLES AND RESPONSIBLITIES

a. Responsibility. The Assistant Secretary for Transportation Policy (Assistant Secretary) establishes policy and oversees the implementation of the NEPA process for the Department. The Assistant Secretary may determine which OA will serve as the lead agency to prepare the environmental document for specific major federal actions taken by the Department for a proposed activity or decision. 42 U.S.C. § 4336a.

b. Office of Environment and Permitting. The Office of Environment and Permitting (Office of Environment) within the Office of Policy, Office of the Secretary oversees day-to-day NEPA implementation and compliance with related environmental requirements. OAs must consult with or notify the Office of Environment as set forth in this Order. The Office of Environment in turn must coordinate with the Office of the General Counsel, Office of Operations (OGC

---

[1] Including, but not limited to, permitting data standards such as that available at https://permitting.innovation.gov/resources/data-standard/

Operations) to ensure compliance with legal requirements. The Office of Environment promotes best practices to streamline the environmental review process. Additional information on the environmental review process may be obtained from the Office of Environment. The Office of Environment will consult on any revisions to this Order, in accordance with NEPA § 102(2)(B), 42 U.S.C. § 4332(B).

c.  Office of the General Counsel. OGC Operations provides counsel to the Department in interpretation and compliance with NEPA, this Order, and other applicable laws; determines the legal sufficiency of the Department's environmental documents, where appropriate; and liaises with OAs, the Office of Litigation and Enforcement, and the Department of Justice on NEPA-related litigation.

d.  Operating Administrations at DOT. Each OA must implement NEPA in accordance with the criteria set forth by this Order. An OA may have procedures and processes for their NEPA practitioners as well as any project applicant or sponsor, where appropriate. The OA procedures can be found as either a subpart to this Order, within Order 1050.1 for Federal Aviation Administration, or included in 23 CFR Part 771 for Federal Highway Administration, Federal Transit Administration, and Federal Railroad Administration.

When an OA has a proposal for revised OA procedures, they must consult with the Office of Environment, OGC Operations, and Council on Environmental Quality (CEQ). NEPA § 102(2)(B), 42 U.S.C. § 4332. The OAs should submit the proposals to the Office of Environment and OGC Operations for review and concurrence prior to CEQ consultation and any public notification. These offices will assist with CEQ consultation. OAs may provide notice of proposed revisions to OA procedures in the Federal Register for public comment. OAs should update their procedures, if warranted, in response to any public comments and provide a response to comments in a subsequent Federal Register notice. The OA must consult with and receive written concurrence by the Office of Environment, OGC Operations, and CEQ prior to publishing the final OA procedures in the Federal Register.

6.  DETERMINING THE APPROPRIATE LEVEL OF NEPA REVIEW

a.  Process Overview. At all steps in the following process, OAs will consider the proposed action and *its* impacts. The environmental review process should follow the following steps:

(1)  Determine if NEPA applies, see Section 3;

(2)  Define scope of the proposed action;

(3)  Determine appropriate level of NEPA Review; and

(4)  Analyze and document the environmental impacts of the proposed action in accordance with the NEPA statute, the Order, and any applicable OA-specific processes in their respective NEPA procedures, where appropriate.

b.  Scope of the Proposed Action. If an OA has determined that the proposed activity or decision (proposed action) is subject to NEPA, as outlined in Section 3.b, the OA will then make the determination as to the scope of the action and the appropriate level of NEPA review for the proposed action. The OA should consider the scope of the proposed action and determine if there are connected actions that should be considered in the same NEPA review. Connected actions are actions that are within the authority of DOT that are closely related to the proposed action because the proposed action:

(1)  automatically triggers other Federal actions;

(2)  cannot or will not proceed unless other Federal actions are taken previously or simultaneously; or

(3)  are interdependent parts of a larger Federal action and depend on the larger action for their justification.

c.  <u>Determine Potential for Impacts</u>. When considering whether the reasonably foreseeable impacts of the proposed action are significant, the OA will analyze the potentially affected environment and degree of the impacts of the proposed action. The OA must consider the proposed action and its impacts.

(1)  The potentially affected environment should encompass the geographic scale, the physical resources and the socioeconomic characteristics appropriate for the specific action.

(2)  Level of significance is determined by examining the difference between the impacts of the proposed action compared to the no action alternative. Whether an impact rises to the level of "significant" is a matter of the OA's expert judgment. The OA should consider the degree of impacts for each of the following, as appropriate, with respect to the difference between the no action alternative and the proposed action:

(a)  Both short- and long-term environmental impacts.

(b)  Both beneficial and adverse environmental impacts

(c)  Impacts on public health and safety

(d)  Economic Impacts

(e)  Impacts on the quality of life of the American people

(3)  OAs must use available reliable data sources and will not undertake new scientific or technical research to inform their analysis unless it is essential to a reasoned choice among alternatives and the cost and time of obtaining it are not unreasonable when analyzing the potentially affected environment and the degree of the impacts of the action.

(4)  When an OA is evaluating an action's reasonably foreseeable impacts on the human environment, and there is incomplete or unavailable information that cannot be obtained at a reasonable cost or the means to obtain it are unknown, the OA will make clear in the relevant environmental document that such information is lacking.

d.  <u>Scoping</u>. The scoping process is a tool for early coordination to determine the scope of issues for analysis in an environmental document, including identifying any substantive issues that meaningfully inform the consideration of environmental impacts and the resulting decision. Scoping can help eliminate from further study non-substantive issues and can ensure that all interested or affected persons or agencies are invited and have an opportunity to participate early in the process. Scoping may begin as soon as practicable after the proposal for action is sufficiently developed for consideration. As part of scoping, OAs should use early coordination tools such as planning, interactive maps, cloud-based repositories for documents, interagency working groups or agreements, programmatic approaches, coordination plans, and project schedules.

e.  <u>Level of Review</u>. Once the scope of the action and an initial evaluation of the potential impacts of the action have been determined, the OA can identify the appropriate level of review for the proposed action in the following sequence:

(1) If a categorical exclusion (CE) has been established or adopted (pursuant to NEPA § 109, 42 U.S.C. § 4336c) that covers the proposed action, an OA will determine whether they can apply the CE to the proposed action. See Section 9 below.

(2) If the proposed action is not covered by a CE, is not likely to have reasonably foreseeable significant impacts, or the significance of the impacts is unknown, an OA will prepare an environmental assessment (EA). See Section 10 below.

(3) If the proposed action is likely to have reasonably foreseeable significant impacts, an OA will prepare an environmental impact statement (EIS). See Section 14 below.

(4) Some OAs may have identified criteria and/or specific examples of proposed projects that meet the appropriate class of action. If so, these are contained within their NEPA implementing procedures either located as a subpart of this Order, FAA's Order 1050.1 or 23 CFR Part 771.

(5) If there is an unresolved disagreement between the OA and the project applicant regarding the appropriate class of action, the OA must notify the Office of Environment. The Office of Environment will assist in making the determination, when necessary.

7. NEPA AND AGENCY DECISIONMAKING

a. Timing. OAs should begin the environmental review process as early as reasonably practicable in the planning or development of an action.

(1) OAs should integrate the consideration of environmental resource impacts with other planning at the earliest possible time to avoid delays later in the process, head off potential conflicts, and ensure that the agency considers environmental impacts in their planning and decisions. For actions likely to require an EA or EIS, OAs must engage in early identification and evaluation of the environmental impacts of the proposed action, the purpose and need, reasonable alternatives, and measures to mitigate adverse environmental impacts, as appropriate.

(2) Unless otherwise provided by law, prior to making a final decision, OAs must not take any action that would have an adverse environmental impact or that may limit the choice of reasonable alternatives. If an OA becomes aware that an applicant is about to take an action within the OA's jurisdiction that would have an adverse environmental impact or that may limit the choice of reasonable alternatives, the OA must promptly notify the applicant and the Assistant Secretary for Transportation Policy and take appropriate action to ensure that the objectives and procedures of NEPA are achieved.

b. Coordination with Applicants. OAs must provide information so that applicants are aware of the environmental analysis and review requirements of this Order and any individual subparts or other OA NEPA implementing procedures and processes.

c. Actions Developed by Non-Federal Entities. For proposed actions that are initially developed by applicants or other non-Federal entities, OAs must advise applicants to:

(1) Coordinate with the OA at the earliest reasonable time in the planning process to inform what information the OA might need to comply with NEPA and establish a schedule for completing steps in the NEPA review process, consistent with NEPA's statutory deadlines and any internal OA NEPA scheduling requirements; and

(2) Begin the NEPA process by determining whether NEPA applies in coordination with the OA, and if it does, determine the appropriate level of NEPA review in coordination with the OA, as soon as practicable. Specific procedures exist for applicant-prepared environmental documents. See Section 25 below.

If an OA is considering an application from a non-Federal entity and becomes aware that the applicant is about to take an action within the OA's jurisdiction that would meet either of the criteria in section 7(a)(2), the OA will promptly notify the applicant that the OA will take appropriate action to ensure that the objectives and procedures of NEPA are achieved. This section does not preclude development by applicants of plans or designs or performance of other activities necessary to support an application for Federal, State, Tribal, or local permits or assistance. When considering a proposed action for Federal funding, the OA may authorize such activities, including, but not limited to purchase of long lead-time equipment and purchase options made by applicants.

d. Applicant Preparation. An applicant or contractor hired by the applicant may prepare documentation for a categorical exclusion, environmental assessment or environmental impact statement, where applicable. Please see section 25 below.

e. Use of Contractors hired by the OA. NEPA decision making is an inherently governmental function. OAs may use contractors to assist in the preparation of environmental documents, but must require contractors to comply with this Order, OA procedures, and relevant guidance. OAs must furnish guidance, participate in the preparation, and independently evaluate EAs and EISs, taking responsibility for their scope and contents when they use a contractor to prepare an environmental document.

When an OA acts as the lead agency and uses a contractor, it may select the contractor for preparation of an EIS or EA. The OA may select the contractor in cooperation with cooperating agencies. When an OA is selecting the contractor, the OA must require the contractor to execute a disclosure statement prior to entering into a contract for the preparation of an EA or EIS. The disclosure statement should specify any financial or other interest in the outcome of the proposed action, or attest that the contractor has no financial or other interests in the outcome of the proposed action.

f. Tracking. OAs must track and report environmental review milestones in compliance with DOT established tracking procedures and other applicable requirements, consistent with 23 U.S.C. § 139(o) and all reporting standards issued by the Office of Environment. As applicable, OAs must post information for infrastructure projects requiring an EA or EIS for which they serve as the lead agency, including the NEPA review and any permitting or authorization actions and associated milestones to the publicly accessible Federal Infrastructure Permitting Dashboard. OAs must post project information and schedules in a timely manner and update it as necessary within the timeframes established by the reporting standards. All OAs must publish project schedules for EISs, whether using their agency website, posting to the Federal Register, or using the Federal Permitting Dashboard. Any change to the initial schedule for EISs should be announced in the same manner as the original schedule.

g. Conflict Resolution.

(1) OAs should seek to expeditiously resolve all disputes as early as possible in the NEPA process, consistent with applicable requirements. OAs should communicate and collaborate to recognize and resolve disputes as they arise to maintain constructive relationships among all parties, including other OAs, Federal and State agencies, Tribes, localities, and members

of the public. OAs must report on their use of formal environmental conflict resolution in annual reports to the Office of Environment and OGC Operations on Environmental Collaboration and Conflict Resolution (ECCR).

(2) Projects under 23 U.S.C. § 139 have specific requirements and time limits for conflict resolution. Please see the FHWA, FTA, and FRA NEPA implementing procedures at 23 CFR Part 771, for these requirements and time limits.

(3) There may be times when a conflict arises that requires assistance by CEQ.

(a) <u>DOT Referrals to CEQ on Other Agency Proposals</u>. Whenever possible, OAs should make efforts to resolve issues informally to avoid referrals to CEQ. If the issues are not resolved prior to filing the Final EIS with EPA, the OA Administrator must obtain concurrence from the Office of Environment and OGC Operations to make a referral to CEQ.

(b) <u>Referrals on DOT Actions</u>. If another Federal agency advises an OA that it intends to make a referral to CEQ, the OA must coordinate with the Office of Environment. The OA should make a concerted, timely effort to resolve issues raised by another Federal agency with respect to an EIS for a proposed DOT action to avoid a referral to CEQ. The OA should document these efforts in the administrative record.

8.  LEAD AND COOPERATING AGENCIES

In many instances, a proposed activity or decision is undertaken in a context which entails activities or decisions undertaken by other federal agencies (e.g., where multiple federal authorizations are required with respect to an applicant's overall purpose and goal). These activities and decisions are "related actions," in that they are each the responsibility of a particular agency, but they are all related in a manner relevant to NEPA, e.g., by their relationship with one overarching project. These related actions should be reviewed under one environmental document. In such instances, Congress has provided that the multiple agencies involved shall determine which of them will be the lead agency pursuant to the criteria identified in NEPA § 107(a)(1)(A), 42 U.S.C. § 4336a(a)(1)(A). When serving as the lead agency, that agency is ultimately responsible for completing the NEPA process. When a joint lead agency relationship is established pursuant to NEPA § 107(a)(1)(B), 42 U.S.C. § 4336a(a)(1)(B), the joint lead agencies are collectively responsible for completing the NEPA process.

a.  <u>Lead Agency</u>. An OA with primary responsibility for a proposed action, including a multimodal transportation project, generally will serve as the lead agency for preparing and processing EAs and EISs, where appropriate, and inviting other agencies to serve as cooperating agencies or otherwise participate in the NEPA process. When an OA serves as lead agency, it is responsible for the scope, objectivity, accuracy, and content of the environmental documents and ensuring completion of the environmental review process. When more than one OA is involved in an action, the OAs should determine together their respective roles (i.e., lead agency, joint lead agency, cooperating agency) early in the process. However, if the OAs cannot agree on this determination, they must consult the Office of Environment, which will resolve the dispute. The lead agency must:

(1) Request participation of cooperating and participating agencies in the NEPA process at the earliest practicable time;

(2) Meet with a cooperating agency at their request;

(3) To the extent practicable, prepare a single environmental document and joint FONSI or record of decision (ROD) for the lead and cooperating agencies;

(4) Use environmental analysis and proposals from cooperating agencies with jurisdiction by law or special expertise to the maximum extent practicable;

(5) Determine the scope and the significant issues to be analyzed in depth in an EIS;

(6) Determine the purpose and need and range of alternatives in consultation with the cooperating agencies;

(7) Create and update as necessary the project schedule in consultation with the joint lead, cooperating agencies, and the applicant;

(8) Publish a notice of intent (NOI) after determining that a proposal is sufficiently developed to allow for meaningful public comment and requires an EIS;

(9) Notify the Office of Environment if an environmental review milestone will miss a target completion date and elevate issues to the Under Secretary for timely resolution, where appropriate; and

(10) Prepare an annual report to Congress in June for any missed deadline for an EA or final EIS where the schedule has not been extended pursuant to 42 U.S.C. § 4336a(h) ), Section 107(h) of NEPA.

b. Joint Lead Agencies. An OA serving as a joint lead agency assumes the same roles, responsibilities, and authority as a single lead agency. An OA should invite State, Tribal, or local agencies to serve as joint lead agencies, when appropriate.

c. Coordination with Other Agencies. OAs must coordinate with other OAs, Federal, State, Tribal, and local resource and regulatory agencies, stakeholders, and the public, as appropriate, to satisfy their responsibilities under NEPA, Section 4(f) of the DOT Act (49 U.S.C. §303 and 23 U.S.C. §138), and other relevant statutes, regulations, and Executive Orders. OAs should communicate with agencies early and often to identify and resolve issues. OAs may prioritize actions and improve early coordination with regulatory and resource agencies by executing interagency agreements such as Memoranda of Understanding (MOUs), Memoranda of Agreement (MOAs), or Programmatic Agreements (PAs), and using other tools at their disposal.

d. Cooperating Agencies. When serving as a lead or joint lead agency, OAs should identify and request Federal, State, Tribal, and local agencies that have jurisdiction by law or special expertise to be cooperating agencies. When an OA serves as a cooperating agency, it must fulfill its responsibilities in coordination with the lead agency.

(1) If another agency declines an OA's invitation to serve as a cooperating agency, the OA must still provide the declining agency with a copy of the environmental document and should attempt to coordinate with it to avoid potential issues that could delay the action. If that agency raises concerns or indicates that it may delay or withhold action on some aspect of the proposed action, the OA should initiate a conflict resolution process.

(2) When an agency requests an OA to serve as a cooperating agency, the OA must accept and participate if it has jurisdiction by law and should make every practicable effort to accept and participate if it has special expertise.

(3) If another agency fails to invite an OA to serve as a cooperating agency when it has jurisdiction by law or special expertise, the OA should ask the lead agency to extend an invitation to participate as a cooperating agency.

e. Participating Agencies. OAs should invite other agencies (including other Federal, State, Tribal, or local agencies) that may have an interest in the proposed action and are not identified elsewhere in this section to participate in the environmental review process. OAs should invite such other agencies as early as possible (ideally before or during scoping). However, OAs may invite these other agencies at any time during the environmental review process.

9. CATEGORICAL EXCLUSIONS (CEs)

CEs are categories of actions that an agency has determined normally do not significantly affect the quality of the human environment. This section describes the process an OA must use for applying a CE, revising existing or establishing new CEs, or relying on a CE determination from another agency.

a. List of CEs. DOT's CEs are listed in Appendix A. Each OA may list established CEs in either their subpart to this Order or in their separate NEPA implementing procedures, if applicable, in either FAA Order 1050.1 or 23 CFR Part 771. The list of CEs in Appendix A may be applied by any OA without consultation with the Office of the Environment as they are applicable department wide.

b. Application of a CE. If an OA determines that a CE covers a proposed action, the OA will evaluate the action for extraordinary circumstances that indicate when a normally excluded agency action is likely to have a reasonably foreseeable significant adverse impact. When determining whether there are extraordinary circumstances, the extraordinary circumstance list for the given CE must be used. For CEs in Appendix A of this Order, OAs should refer to the extraordinary circumstances listed in Section 9.c. below. For CEs listed in an OA's NEPA implementing procedures, OA should use the corresponding extraordinary circumstances in that OA's procedures. If the OA determines that it cannot apply a CE to a proposed action, the OA will prepare an environmental assessment or environmental impact statement, as appropriate.

c. Extraordinary Circumstances. With respect to the CEs listed in Appendix A of this part, extraordinary circumstances include 8.c(1) – 8.c(5). If an extraordinary circumstance is present, an OA may nevertheless apply a CE listed in Appendix A of this part to an action if the OA determines that the proposed action is not likely to result in reasonably foreseeable significant impacts. An OA may use mitigation measures to modify the proposed action to avoid significant impacts. Extraordinary circumstances include, but are not limited to:

(1) Inconsistency with any applicable Federal, State, Tribal, or local law, requirement, or administrative determination relating to protection of the environment;

(2) Substantial increases of noise in a noise-sensitive area;

(3) Substantial adverse impacts on the following aspects of the environment:

(a) Species listed or proposed to be listed on the List of Endangered or Threatened Species, or designated Critical Habitat for these species as promulgated under 16 U.S.C. § 1533(c)(1);

(b) Properties protected under Section 106 of the National Historic Preservation Act of 1966, as amended (54 U.S.C. § 306108);

    (c)  Properties protected under Section 4(f) of the U.S. Department of Transportation Act of 1966 (23 U.S.C. § 138 and 49 U.S.C. § 303);

    (d)  A site that involves a unique characteristic of the geographic area, such as prime or unique agricultural land, a coastal zone, a historic or cultural resource, park land, a wetland, a wild and scenic river, a designated wilderness or wilderness study area, a sole source aquifer (potential source of drinking water), or an ecologically critical area; or

    (e)  Applicable Federal, State, or local air quality standards, including those under the Clean Air Act, as amended;

  (4)  Substantial short- or long-term increases in traffic congestion or traffic volumes on any mode of transportation; or

  (5)  Substantial impacts on the environment resulting from the reasonably foreseeable release of hazardous or toxic substances.

d.  Applying legislative categorical exclusions. If an OA determines that a categorical exclusion established through legislation, or a categorical exclusion that Congress through legislation has directed an OA to establish, covers a proposed agency action, the OA will conclude review consistent with applicable law.

e.  Multimodal Projects. An OA may use the process created under 49 U.S.C. § 304 for the application of another OA's CEs for multimodal projects, as defined by 23 U.S.C. § 139(a), as applicable.

f.  Use of Other OA's CEs. An OA may apply a CE established in another OA's procedures. If an OA seeks to apply a CE established in another OA's procedures, it must evaluate the action for extraordinary circumstances identified in the OA procedures in which the CE is established to determine if a normally excluded action may have a significant impact and coordinate with the originating OA to ensure that the CE is being applied correctly.

g.  Documentation of CEs. When applying a CE listed in Appendix A, an OA should document the use of the CE, identifying the proposed action, why it falls within the category, any extraordinary circumstances that were identified, and what measures, if any, were applied to alter the proposed action to avoid any potential for significant impacts. OAs may use an OA CE checklist to document the CE as long as the extraordinary circumstances on the OA CE checklist cover the same types of extraordinary circumstances listed in 8.c.

  (1)  Reliance on a CE Determination by Another Federal Agency. An OA may also rely on another Federal agency's CE determination if the agency action covered by that determination and the OA's proposed action are substantially the same or if an OA's proposed action is a subset of the agency action covered by that determination. The CE documentation should describe how the OA determined that the actions are substantially the same.

h.  Establishing and Revising CEs. OAs are encouraged to review their agencies' EAs and findings of no significant impact (FONSIs) to determine if there are areas where a new CE can be established. To establish or revise a CE, an agency must determine that a category of actions normally does not significantly affect the quality of the human environment absent extraordinary circumstances. In making this determination, an OA must:

  (1)  Develop a written record containing information to substantiate its determination;

(2) Consult with CEQ on its proposed CE, including the written record, for a period not to exceed 30 days prior to providing public notice; and

(3) Provide public notice in the Federal Register of DOT's proposed CE or revision of a CE, and the location of availability of the written record.

i.  Establishing CEs Through a Programmatic Document.

(1) OAs may establish CEs through a decision document supported by a programmatic EA or programmatic EIS, or other equivalent planning or programmatic decision for which an environmental document has been prepared, so long as the OA:

(a) Provides CEQ an opportunity to review and comment for a period not to exceed 30 days prior to public comment;

(b) Provides notification;

(c) Substantiates its determination that the category of actions normally does not have significant impacts individually or in the aggregate;

(d) Identifies extraordinary circumstances;

(e) Establishes a process for determining that a CE applies to a specific action; and

(f) Publishes a list of all programmatic CEs on their website.

(2) Programmatic CEs can be established that:

(a) Cover specific geographic areas or areas that share common characteristics, e.g., habitat type;

(b) Have a limited duration;

(c) Provide criteria that would cause the CE to expire because the agency's determination that the category of action does not have significant impacts, individually or in the aggregate, is no longer applicable, including, as appropriate, because:

1. The number of individual actions covered by the CE exceeds a specific threshold;

2. Individual actions covered by the CE are too close to one another in proximity or time; or

3. Environmental conditions or information upon which the agency's determination was based have changed.

j.  Establishing CEs by Adopting CEs from Other Federal Agencies. OAs are encouraged to identify and adopt CEs of other federal agencies, where appropriate. Consistent with NEPA § 109, 42 U.S.C. § 4336c, an OA may adopt a CE listed in another agency's NEPA procedures. When adopting a CE, an OA must:

(1) Identify the CE listed in another agency's NEPA procedures that covers its category of proposed actions;

(2) Consult with the agency that established the CE to ensure that the proposed adoption of the CE is appropriate;

(3) Provide public notification of the CE that DOT is adopting, including a brief description of the proposed action or category of proposed actions to which DOT intends to apply the adopted

CE, a brief summary of the consultation with the originating agency, and the list of extraordinary circumstances that will apply; and

(4) Document that the OA has adopted the CE in accordance with these implementing procedures.

(5) Update the OA's or Department's NEPA procedures to include the adopted CE when those procedures are next revised.

k.  Coordination with Office of Environment and OGC Operations. OAs who establish a CE through 8.g. or 8.h. or adopt a CE through 8.i. must coordinate with the Office of Environment and OGC Operations prior to consulting with CEQ. OAs should consider whether to publish the CE in the Federal Register and whether to solicit comments.

10. ENVIRONMENTAL ASSESSMENTS

a.  In General. If an action is subject to NEPA, and the action cannot be categorically excluded under Section 9. above, the OA may prepare an EA for a proposed action that does not have reasonably foreseeable significant impacts or if the significance of the impacts is unknown. OAs should be mindful of Congress' direction that environmental assessments are to be "concise." NEPA § 106(b)(2); 42 U.S.C. § 4336(b)(2).

b.  Elements. For providing evidence and analysis to determine whether to prepare a finding of no significant impact (FONSI) or to prepare an EIS, EAs will briefly discuss the following:

(1) The purpose and need for the OA's proposed action based on their statutory authority. When the proposed action concerns an OA's duty to act on a request from a project applicant, the purpose and need for the proposed agency action should be informed by the goals of the project applicant.

(2) Alternatives in the EA, to the extent required by NEPA § 102(2)(H), 42 U.S.C. § 4332(2)(H), should address alternatives to a degree commensurate with the nature of the proposed action and OA experience with the environmental issues involved. The EA should indicate a preferred alternative if the OA has identified one. and

(3) The reasonably foreseeable impacts of the proposed agency action and the alternatives considered, including the no action alternative.

c.  Scope of analysis.
(1) In preparing the EA, the OA will focus its analysis on whether the environmental impacts of the action are significant.
(2) Similarly, the OA will document in the EA where and how it drew a reasonable and manageable line relating to its consideration of any environmental impacts from the action that extend outside the geographical territory of the project or might materialize later in time.
(3)  To the extent it assists in reasoned decision-making, the OA may, but is not required to by NEPA, analyze environmental impacts from other projects separate in time, or separate in place, or that fall outside of the OA's regulatory authority, or that would have to be initiated by a third party. If the OA determines that such analysis would assist it in reasoned decisionmaking, it will document this determination in the EA and explain where it drew a reasonable and manageable line relating to the consideration of such impacts from such separate projects.

d.  Compliance with Other Applicable Environmental Laws, Regulations, and Orders. The EA should reflect compliance or identify concrete steps being taken for compliance with the requirements of other applicable environmental laws, regulations, and orders. The EA should also reflect coordination with relevant agencies authorized to implement such laws, regulations, or orders.

e.  Independent Evaluation. If an applicant prepares an EA, the OA must independently evaluate the environmental issues and take responsibility for the accuracy, scope, and contents of the EA.

f.  Public Comment. An OA should involve the public, State, Tribal and local governments, relevant agencies, and any applicants, to the extent practicable, in the development of the EA. At its discretion, an OA may release a draft EA for public comment. When an OA releases a draft EA for public comment, it must consider substantive comments received on the draft EA. For rulemaking processes, the draft EA should normally accompany the proposed rule.

g.  Public Notification. OAs must notify the public of the availability of an EA and any accompanying FONSI. An OA should make all EAs available to the public on a project or agency website. OA procedures or subparts to this Order should identify where EAs will be made available.

h.  Page Limits.

    (1)  Pursuant to 42 U.S.C. § 4336a, EAs are strictly prohibited from exceeding 75 pages, not including citations and appendices.

    (2)  Appendices are to be used for voluminous materials, such as scientific tables, collections of data, statistical calculations, and the like, which substantiate the analysis provided in the environmental assessment. Appendices are not to be used to provide additional substantive analysis, because that would circumvent the congressionally mandated page limits.

    (3)  An EA should be as concise as possible while proportional to the magnitude of the proposed action and anticipated impacts. EAs must be formatted for an 8.5"x11" page with one-inch margins using a word processor with 12-point proportionally spaced font, single spaced. Footnotes may be in 10-point font. Such size restrictions do not apply to explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information, although pages containing such material do count towards the page limit. When an item of graphical material is larger than 8.5"x11", each such item shall count as one page. IIJA major projects have different page limits as described in 23 CFR Part 771.

i.  Deadlines. , NEPA is governed by a rule of reason. In establishing deadlines for the EA process in the 2023 revision of NEPA, § 107(g),),),) of NEPA, 42 U.S.C. § 4336a(g),Congress indicated that the agency, has presumptively spent a reasonable amount of time on analysis and the document should issue, absent very unusual circumstances. In such circumstances, an extension will be given only for such time as is *necessary* to complete the analysis. Thus:

    (1)  Pursuant to 42 U.S.C. § 4336g, EAs must be completed within one year from the start of the EA to the FONSI, unless it is determined to be a major project as defined under 23 U.S.C. § 139(a)(7). For most projects, the agency's determination to prepare an EA will be the official start of the environmental review process.

    (2)  To the maximum extent practicable, schedules for the environmental review process for major projects, as defined under 23 U.S.C. § 139(a)(7), should be consistent with an agency average of not more than 2 years.

(3) The EA and FONSI will publish no later than one year from the start of the EA, in as substantially complete form as is possible, unless the deadline is extended, pursuant to section h.(4) below.

(4) The lead agency may extend the deadline in consultation with any applicant pursuant to NEPA § 107(g)(1)(B), 42 U.S.C. § 4336a(g)(1)(B), to allow for only so much additional time as is needed to complete the EA. Cause of establishing a new deadline is only established if the EA is so incomplete at the time at which the OA determines it is not able to meet the statutory deadline that issuance would, in the OA's view, result in inadequate analysis. The announcement of the new deadline will specify the reason why the environmental assessment was not able to be completed under the statutory deadline and whether the applicant consented to the new deadline.

(5) IJJA major projects have different page limits and deadlines as described in 23 CFR Part 771.

j. <u>Certifications</u>. Each EA should include the following two certifications signed by a responsible agency official:

(1) *Certification with respect to page limits.* The breadth and depth of analysis in an EA will be tailored to ensure that the environmental analysis does not exceed the page limit. In this regard, as part of the finalization of the EA, a responsible official will certify (and the certification will be incorporated into the EA) that the OA has considered the factors mandated by NEPA. The EA represents DOT's good-faith effort to prioritize documentation of the most important considerations required by the statute within the congressionally mandated page limits. This prioritization reflects the OA's expert judgment. Any considerations addressed briefly or left unaddressed were, in the OA's judgment, comparatively not of a substantive nature that meaningfully informed the consideration of environmental impacts and the resulting decision on how to proceed.

(2) *Certification with respect to deadlines.* When the EA is published, a responsible official will certify (and the certification will be incorporated into the EA) that the resulting EA represents that the OA has made a good faith effort to fulfill NEPA's requirements within the Congressional timeline; that such effort is substantially complete; that, in the OA's expert opinion, it has thoroughly considered the factors mandated by NEPA; and that, in the OA's judgment, the analysis contained therein is adequate to inform and reasonably explain the OA's final decision regarding the proposed federal action.

11. FINDINGS OF NO SIGNIFICANT IMPACT

a. <u>In General</u>. An OA will prepare a FONSI if the OA determines, based on the EA, that there are no significant impacts, and therefore the proposed action does not require the preparation of an EIS. The FONSI must briefly explain why a proposed action analyzed in an EA will not have a significant impact on the environment. The FONSI must include the EA or summarize it and incorporate the EA by reference. The FONSI should identify any other related environmental documents and state that an EIS will not be prepared, concluding the NEPA process for that action.

b. <u>Mitigated FONSIs</u>. OAs may rely on mitigation measures to reduce potentially significant adverse impacts below the level of significance that would trigger the preparation of an EIS. To use this approach the OA must:

(1) Describe in the EA or FONSI the mitigation measures necessary to reduce the potential impacts below the threshold of significance and how any mitigation requirements or commitments will be enforced;

(2) Ensure that sufficient legal authority and an adequate commitment of resources exist to execute the mitigation measures, including funding, as necessary;

(3) Ensure that the articles of agreement, award or grant agreement, permit, license, authorization, or other document reflecting the OA's final decision on the action will require implementation of the mitigation measures;

(4) Ensure that monitoring strategies described in the FONSI will be adopted when the OA deems them appropriate for the particular action and set of mitigation measures. This may include making an applicant responsible for implementing the monitoring strategies. Environmental Management Systems may be used for tracking and monitoring mitigation commitments; and

(5) Provide for corrective action, where appropriate, in the event of a failure to implement the mitigation measures or a failure in the effectiveness of the mitigation measures.

12. NOTICES OF INTENT

A Notice of Intent (NOI) is normally the agencies' start of an EIS after the agency has determined that the proposed action has reasonably foreseeable significant impacts.

a. Pre-NOI activities. OAs should engage in activities, such as planning, interagency working groups or agreements, programmatic approaches, coordination plans, and project schedules prior to issuing the NOI to make the environmental review process more efficient.

b. Notice of Intent. As soon as practicable after determining that a proposal is sufficiently developed to allow for meaningful public comment and requires an EIS, an OA will publish a notice of intent to prepare an EIS in the Federal Register.

(1) The notice of intent should include:

   (a) The purpose and need for the proposed action;

   (b) A preliminary description of the proposed action and alternatives the EIS will consider;

   (c) A brief summary of expected impacts;

   (d) Anticipated permits and other authorizations (i.e., anticipated related actions);

   (e) A schedule for the decisionmaking process;

   (f) A description of the public scoping process, including any scoping meeting(s);

   (g) Contact information for a person within the OA who can answer questions about the proposed action and the EIS; and

   (h) Identification of any cooperating and participating agencies (i.e., agencies responsible for related actions), and any information that such agencies require in the notice to facilitate their decisions or authorizations; and

(2) The notice of intent must include a request for public comment on alternatives or impacts and on relevant information, studies, or analyses with respect to the proposed agency action. NEPA § 107(c); 42 U.S.C. § 4336a(c).

13. ENVIRONMENTAL IMPACT STATEMENTS

   a. When to Prepare an EIS. An OA must prepare an EIS for any proposed major Federal action that is not excluded pursuant to a categorical exclusion and that has a reasonably foreseeable significant impact on the quality of the human environment. 42 U.S.C. §§ 4332(2)(C), 4336(a)(2). Whether an impact rises to the level of "significant" is a matter of the OA's expert judgment.

   b. Notice of Intent. To formally initiate the EIS process, the OA must publish a notice of intent (NOI) to prepare an EIS in the *Federal Register*.

   c. EIS Impacts on Another State or Federal Land Management Agency. Pursuant to 42 U.S.C. § 4332(2)(G)(iv), when a State agency or official with statewide jurisdiction initiates a proposed action that may have significant impacts on another State or a Federal land management entity, the OA must provide early notice to and solicit the views of that State or Federal land management entity.

   d. Purpose and Need. The EIS must briefly describe the purpose and need for the proposed action, including the proposed agency action. The purpose and need is based on the OA's statutory authority and should also be informed by the goals of the applicant, if applicable (42 U.S.C. § 4336a(d) and 42 U.S.C. § 4332(c)(iii)).

   e. Alternatives. The OA must evaluate a reasonable range of alternatives, including the proposed action, and the no action alternative. The OA should present the environmental impacts of the proposal and alternatives in comparative form. Alternatives should be technically and economically feasible and meet the purpose and need of the proposal. The EIS must identify alternatives considered but eliminated from detailed analysis and briefly discuss the reasons for their exclusion. Where the OA is issuing a draft EIS, such draft EIS should identify the OA's preferred alternative or alternatives, if one or more exists, unless it would conflict with other laws. (42 U.S.C. § 4332(c) and 42 U.S.C. § 4332(h)).

   f. Analysis within the EIS.

      (1) The EIS will include a detailed statement on:

         (a)  Reasonably foreseeable environmental impacts of the proposed agency action;

         (b) Any reasonably foreseeable adverse environmental impacts which cannot be avoided should the proposal be implemented;

         (c) The relationship between local short-term uses of the human environment and the maintenance and enhancement of long-term productivity;

         (d) Any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented; and

         (e) Any means identified to mitigate adverse environmental impacts of the proposed action. Each OA should be mindful in this respect that NEPA itself does not require or authorize the OA or an applicant to impose any mitigation measures.

   g. Scope of analysis.
      (1) In preparing the EIS, an OA will focus its analysis on whether the environmental impacts of the action are significant.
      (2) The EIS will discuss impacts in proportion to their significance. With respect to issues that are not substantive and do not meaningfully inform the consideration of environmental impacts and the resulting decision on how to proceed, there will be no more than the

briefest possible discussion to explain why those issues are not substantive and therefore not worthy of any further analysis. EISs will be analytic, concise, and no longer than necessary to comply with NEPA in light of congressionally mandated page limits and deadlines.

(3) Similarly, an OA will document in the EIS where and how it drew a reasonable and manageable line relating to its consideration of any environmental impacts from the action that extend outside the geographical territory of the project or might materialize later in time.

(4) To the extent it assists in reasoned decision-making, an OA may, but is not required to by NEPA, analyze environmental impacts from other projects separate in time, or separate in place, or that fall outside of an OA OA's regulatory authority, or that would have to be initiated by a third party. If an OA determines that such analysis would assist it in reasoned decisionmaking, it will document this determination in the EIS and explain where it drew a reasonable and manageable line relating to the consideration of such impacts from such separate projects.

(5) OAs must consult with any and obtain comments of any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved or is authorized to develop and enforce environmental standards, this includes EPA's authority to comment on proposed projects that have a significant impact under their authority under Section 109 of the Clean Air Act.

h. <u>Page Limits</u>.

(1) Except as provided in paragraph (2) and (4), the text of an EIS will not exceed 150 pages, not including citations or appendices.

(2) An EIS for a proposed agency action of extraordinary complexity is strictly prohibited from exceeding 300 pages, not including any citations or appendices. An OA should determine at the earliest possible stage of preparation of an EIS whether the conditions for exceeding the page limit in paragraph (1) are present.

(3) Appendices are to be used for voluminous materials, such as scientific tables, collections of data, statistical calculations, and the like, which substantiate the analysis provided in the environmental assessment. Appendices are not to be used to provide additional substantive analysis, because that would circumvent the congressionally mandated page limits.

(4) EISs will be prepared on 8.5"x11" format with one-inch margins using a word processor with 12-point proportionally spaced font, single spaced. Footnotes may be in 10-point font. Such size restrictions do not apply to explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information. When an item of graphical material is larger than 8.5"x11", each such item will count as one page.

(5) IJJA Major Projects have different page limit and deadlines and are described in 23 CFR Part 771.

i. <u>Deadlines</u>. NEPA is governed by a "rule of reason." In establishing deadlines for the EIS process in the 2023 revision of NEPA § 107(g), 42 U.S.C. § 4336a(g), Congress indicated that an agency has presumptively spent a reasonable amount of time on analysis and the document should issue, absent very unusual circumstances. In such circumstances, an extension will be given only for such time as is *necessary* to complete the analysis. Thus:

(1) An OA will issue the Final EISs no later than 2 years after the start of the EIS per NEPA § 107(g)(1), 42 U.S.C. § 4336(a)(g). For most DOT projects, this will be the date of the NOI.

(2) If an OA cannot issue the ROD within 2 years from the NOI, the OA must consult with the applicant, if any, pursuant to NEPA § 107(g)(2), 42 U.S.C. § 4336a(g)(2). Any extension of the deadline requires consultation with the project applicant. Cause for establishing a new deadline is only established if the environmental impact statement is so incomplete, at the time at which the OA determines it is not able to meet the statutory deadline, that issuance pursuant to subsection (c) above would, in the OA's view, result in an inadequate analysis. Such new deadline must provide only so much additional time as is necessary to complete such EIS. The announcement of the new deadline will specify the reason why the environmental impact statement was not able to be completed under the statutory deadline and whether the applicant consented to the new deadline.

(3) IJJA Major Projects have different page limit and deadlines and are described in 23 CFR Part 771.

j. Filing Any Draft EISs with EPA. If an OA makes a Draft EIS available for public comment, the OA will file the Draft EIS with the U.S. Environmental Protection Agency (EPA) Office of Federal Activities for publication in the Federal Register no earlier than when they are transmitted to commenting agencies and made available to the public, or immediately thereafter. OAs must file EISs with EPA in accordance with EPA filing guidance.

k. Availability of a Draft EIS.

(1) Although NEPA does not require that a Draft EIS is published for comment, some OAs require public comment on a Draft EIS per statute. In addition, OAs should consider whether soliciting comments from the following would aid in the decisionmaking for the proposed action:

(a) Any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved or is authorized to develop and enforce environmental standards. This includes any cooperating agency.

(b) Appropriate State, Tribal, and local agencies that are authorized to develop and enforce environmental standards.

(c) State, Tribal or local governments that may be affected by the proposed action;

(d) Any agency that has requested to receive statements on actions of the kind proposed;

(e) The members of the public who may be interested or affected by the proposed action;

(f) Interested or affected persons, agencies, and organizations;

(g) The applicant; and

(h) Other OAs, where appropriate

(2) When issuing the Draft EIS for public comment, notifications to the public may include online notices, social media, direct notification to interested parties, and notices in local media to inform persons and agencies who may be interested or affected by the proposed action. In the case of an action with impacts of national concern, notice must include publication in the *Federal Register* (through EPA's notice of availability of EISs or a separate notice) and notice by email, mail, or other reasonable means to national organizations

reasonably expected to be interested. Although electronic distribution is preferred, the OA should make documents available in other formats when reasonably necessary and must make available hard copies of the EIS upon request. Notification to the public must comply with Federal civil rights laws including Section 508 of the Rehabilitation Act of 1973 and accommodate for individuals with limited English proficiency, when appropriate. For rulemaking, if an EIS is required, the Draft EIS should accompany the proposed rule and be available in the Docket for the rulemaking. In certain circumstances, a public hearing may be required. If a public hearing is required, the OA should ensure that any draft documents are made available prior to the hearing, where appropriate.

(3) Electronic Submission. OAs must provide for electronic submission of public comments as well as ensure that the comment process is accessible to persons who may be affected by the proposed action(s) when they are seeking public comment.

(4) Addressing Comments. DOT will address any substantive comments received during the EIS process. Substantive comments received during scoping will be summarized and considered in the analysis of the environmental impacts. Substantive comments received on a draft EIS will be responded to and may be included in the final EIS.

(5) The process of obtaining and requesting comments pursuant to k.(1) or k.(2) above may be undertaken at any time that is reasonable in the process of preparing the EIS. DOT will ensure that the process of obtaining and requesting comments and DOT's analysis of and response to those comments does not cause DOT to violate the congressionally mandated deadline for completion of an EIS.

l.   The Final EIS

(1) For proposed actions that do not have an associated Draft EIS, the EIS that is prepared will be considered the Final EIS.

(2) Compliance with Other Requirements. To the fullest extent possible, the Final EIS should reflect compliance or plans for compliance with the requirements of other applicable environmental laws, regulations, and orders. If such compliance is not possible by the time of Final EIS preparation, the Final EIS should reflect consultation with the appropriate agencies and provide reasonable assurance that the OA can meet the requirements.

(3) The Final EIS should identify the preferred alternative, including identifying any mitigation measures that the agency intends to adopt.

(4) Internal Review and Approval. The Administrator or Secretarial Officer (or designee) of the lead agency may approve a Final EIS. OAs should ensure that EISs are evaluated for technical sufficiency consistent with this Order and OA Procedures. The Chief Counsel of the OA, or designee, must review all Final EISs for legal sufficiency. OGC Operations must review Final EISs prepared by Secretarial offices for legal sufficiency.

(5) Office of Environment Notification. For Final EISs on highly controversial actions (i.e., actions opposed on environmental grounds by a Federal, State, or local government agency, or by a substantial number of the persons affected by such action), the OA must notify the Office of Environment that the Final EIS is under development. OAs should notify the Office of Environment as early as possible, and, where practicable, provide at least two weeks' notice before approving the Final EIS.

(6) Certifications. Each Final EIS should include the following two certifications signed by a responsible agency official:

    (a) *Certification with respect to page limits.* The OA has considered the factors mandated by NEPA. The EIS represents the OA's good-faith effort to prioritize documentation of the most important considerations required by the statute within the congressionally mandated page limits. This prioritization reflects the OA's expert judgment. Any considerations addressed briefly or left unaddressed were, in the OA's judgment, comparatively not of a substantive nature that meaningfully informed the consideration of environmental impacts and the resulting decision on how to proceed.

    (b) *Certification with respect to deadlines.* The resulting EIS represents the OA's good-faith effort to fulfill NEPA's requirements within the Congressional timeline; that such effort is substantially complete; and that, in the OA's expert opinion, it has thoroughly considered the factors mandated by NEPA; and that, in the OA's judgment, the analysis contained therein is adequate to inform and reasonably explain the OA's final decision regarding the proposed federal action.

(7) Addressing comments contained in the EIS. The OA should attach to the Final EIS substantive comments received on the Draft EIS, or summaries of comments where comments are particularly voluminous. The OA should make every practicable effort to resolve major relevant issues identified in comments on the Draft EIS, the public involvement process, and consultation with cooperating agencies. The Final EIS should identify any unresolved major issues, and the consultation and efforts made to resolve those issues. In response to substantive comments on the Draft EIS, the OA should do one or more of the following and state the response in the Final EIS:

    (a) Supplement, improve, or modify its analyses, alternatives, or proposed mitigation measures;

    (b) Make factual corrections; and

    (c) Explain why the comments do not warrant further response, citing the sources, authorities, or reasons that support the OA's position, and if appropriate, indicate those circumstances that would trigger the OA's reappraisal or further response.

(8) Errata Sheets. In preparing a Final EIS, if the OA makes minor changes to the Draft EIS in response to comments, and the changes are confined to factual corrections or explanations of why the comments do not warrant further response, the OA may write the changes on errata sheets attached to the Draft EIS instead of rewriting the Draft EIS. See 49 U.S.C. § 304a(a), 23 U.S.C. § 139(n). The errata sheets must cite the sources, authorities, and reasons that support the OA's position; and, if appropriate, indicate the circumstances that would trigger the OA's reappraisal or further response.

m. <u>Combined Final Environmental Impact Statement and Record of Decision (Final EIS/ROD).</u> Pursuant to 49 U.S.C. § 304a(b) or 23 U.S.C. § 139(n)(2), and 42 U.S.C. § 4336(b), as applicable, to the maximum extent practicable, an OA must expeditiously develop a single document that consists of a Final EIS and ROD, unless the Final EIS makes substantial changes to the proposed action that are relevant to environmental or safety concerns; or if there is a significant new circumstance or information relevant to environmental concerns that bears on the proposed action or the impacts of the proposed action. Cooperating agencies must, to the extent practicable, issue the Final EIS/ROD jointly with the lead agency for transportation actions.

n. <u>Circulation</u>. After the Final EIS is finalized, the OA will publish the Final EIS (or combined Final EIS/ROD). The OA will make available the entire Final EIS to any Federal agency with jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State, Trial, or local agency authorized to develop and enforce environmental standards; the applicant; and any Federal, State, Tribal, and local agencies, and private organizations and individuals that commented substantively on the Draft EIS or requested copies of the Final EIS, as well as the entities to which the OA was required to distribute the Draft EIS.

o. <u>Filing Final EIS with EPA</u>. OAs will file the Final EIS, together with comments and responses, if any were received, with the U.S. Environmental Protection Agency (EPA), Office of Federal Activities for notice in the Federal Register. OAs must file EISs with EPA in accordance with EPA filing guidance.

14. AGENCY DECISION MAKING

a. <u>Final EIS/ROD</u>. To the maximum extent practicable, an OA will develop a single document consisting of a combined Final EIS and ROD in accordance with 49 U.S.C. § 304a(b) and 23 U.S.C. § 139(n). When the proposal requires action by multiple Federal agencies, the OA should issue a single ROD with the other Federal agencies. An OA may integrate the ROD with any other record or decision document, such as a final rule.

b. <u>Record of Decision</u>. At the time of its decision on its proposed action, the OA will prepare and timely publish a concise public decision document or joint decision document notifying the public that the decisionmaker has certified that the OA has considered all relevant information raised in the NEPA process and that the NEPA process has closed. The ROD should not repeat analysis contained in the EIS but rather document the OA's decision; and briefly document compliance with all environmental laws applicable to the action, or the procedures and expected timeframe for completion of such compliance. The ROD may discuss preferences among alternatives based on relevant economic, technical, or other factors and OA mission.

15. TERMINATION OF AN ENVIRONMENTAL DOCUMENT

When an OA terminates an action, they must notify the public that the action has been terminated or cancelled in the same manner they notified the public in announcing its availability or intent to prepare the document.

16. EFFICIENT ENVIRONMENTAL REVIEWS

a. <u>Integration of All Environmental Reviews into the NEPA Process</u>. OAs should integrate relevant environmental and planning studies, reviews, and consultations into the NEPA process, as appropriate. To the extent possible, OAs should develop a single environmental document for all Federal agency actions necessary for a proposed activity or project. (42 U.S.C. § 4336(a)(b)).

b. <u>Incorporation by Reference</u>. OAs should incorporate by reference previously prepared and publicly available analyses wherever possible and provide a brief summary of the incorporated material in an environmental document. Types of documents that may be incorporated by reference include previously prepared studies, analyses, and, to the extent permitted by law, decisions from prior environmental or planning processes. When incorporating material by reference, the OA will cite and briefly describe the content and relevance to the environmental document and make the materials reasonably available for review by potentially interested parties within the time allowed. An OA will not use incorporation by reference as a means to evade the statutory page limits.

Although NEPA itself does not require cost-benefit analysis, an OA may conduct cost-benefit analysis for proposed rules. To the extent that this cost-benefit analysis is relevant to any alternatives analysis an OA is conducting pursuant to NEPA, an OA will incorporate the cost-benefit analysis by reference or append it to the statement to avoid duplication in evaluating the environmental impacts. In such cases, the environmental document will discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities.

c.  Focused, Quality Documents. Environmental documents should effectively and concisely communicate the environmental impacts of a proposed action to the public and the decision maker. Environmental documents should be written in plain language and be analytic rather than encyclopedic. The depth and scope of analysis and resulting documentation must be meaningful, high-quality, relevant, and proportionate to the complexity of the project and level of anticipated environmental impacts.

d.  Interdisciplinary Approach. OAs must use an interdisciplinary approach throughout the planning and preparation of EAs and EISs, as applicable, and ensure a systematic evaluation of alternatives and their potential environmental impacts. Analyses should identify applicable methodology and explain the use of best available information. Where appropriate, OAs may use professional services from other Federal, State, Tribal, or local agencies, universities, consulting firms, or other experts as long as OA staff have the capacity to evaluate the information these entities provide, and OAs take responsibility for the final content of their environmental documents.

17.  PROGRAMMATIC ENVIRONMENTAL DOCUMENTS

a.  In General. An OA may prepare environmental documents for programmatic Federal actions, such as the adoption of new agency programs. DOT may evaluate the proposal(s) in one of the following ways:

(1)  Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(2)  Generically, including actions that have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

(3)  By stage of technological development.

b.  Eliminating Repetition. OAs should use programmatic documents and reliance on other documents to improve or simplify the environmental analysis of proposed actions that are similar in nature, broad in scope, or where future decisions or unknown future conditions preclude a complete NEPA analysis. This eliminates repetitive discussions of the same issues, focuses on issues ripe for decision, and excludes issues already decided or not yet ripe at each level.

c.  Validity. Consistent with NEPA § 108, 42 U.S.C. § 4336b, after completing a programmatic environmental document, an OA may rely on that document for 5 years if there are not substantial new circumstances or information about the significance of adverse environmental impacts that bear on the analysis. The OA may continue to rely on the document after 5 years, as long as the OA reevaluates the analysis in the programmatic environmental document and any underlying assumptions to ensure that reliance on the analysis remains valid, and briefly documents its reevaluation and explains why the analysis remains valid, considering any new and substantial information or circumstances.

18. RELIANCE ON EXISTING ENVIRONMENTAL DOCUMENTS

    a. <u>In General</u>. An OA may rely on any pre-existing EIS, EA, or determination that a CE applies to a given project, or portion thereof, provided that the statement, assessment, determination, or portion thereof meets the standards for an adequate statement or assessment under their procedures. When relying on an EIS, EA, CE or portion thereof, an OA will cite and briefly describe the content and relevance to the environmental document and may make modifications that are necessary to render the relied-upon document, or portion thereof, sufficient to fulfill the requirements of NEPA for the proposed action.

    b. <u>Reliance</u>.

        (1) If the actions covered by the original EIS or EA and the proposed action are substantially the same, an OA can rely on that document. If the OA would normally seek public comment or post for public notice for the proposed action, the OA should publish or post the relied-upon statement or assessment, as appropriate.

        (2) If the actions are not substantially the same, an OA may modify the statement or assessment as necessary to render the content fit for fulfilling NEPA's analytic requirements for the action at hand, and publish the relied-upon statement or assessment, as modified. Where appropriate, an OA may solicit comment to the extent that solicitation of comment will assist DOT in expeditiously adapting the relied-upon statement or assessment so that it is sufficient to fulfill the DOT requirements of NEPA for the proposed action.

        (3) An OA may adopt an EA, Draft EIS, or Final EIS of another OA in accordance with 49 U.S.C. § 304a(c)(2).

    c. <u>Reevaluation</u>.

        (1) A reevaluation is a process that OAs should use to evaluate an existing CE determination, EA, or EIS to determine whether it remains adequate, accurate, and valid, or whether a supplemental NEPA analysis is needed.

        (2) An OA should engage in a reevaluation, consistent with its OA Procedures, where applicable, when, prior to the OA's completion of an action, there are changes in the proposed action that are relevant to environmental concerns; or there are new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

        (3) An OA must reevaluate in writing a Draft EIS or EA if the OA has not issued a Final EIS or Final EA within five years. An OA must reevaluate in writing a Final EIS or EA if major steps toward implementation have not commenced within five years from the date of the Final EIS, Final EIS supplement, or final EA.

    d. <u>Supplements to environmental documents</u>. An OA will prepare supplements to environmental documents only if a major Federal action remains to occur, and:

        (1) There are substantial changes to the proposed action that are relevant to environmental concerns; or

        (2) An OA decides, in its discretion, that there are substantial new circumstances or information about the significance of the adverse environmental impacts that bear on the proposed action or its impacts.

19. INTEGRATING NEPA WITH OTHER ENVIRONMENTAL REQUIREMENTS

    a.  To the fullest extent possible, the OA will prepare environmental documents concurrently with and integrated with analyses and related surveys and studies required by other Federal statutes.

    b.  The OA will combine an environmental document prepared in compliance with NEPA with any other agency document to reduce duplication and paperwork. Thus, the OA may combine an environmental document with related plans, rules, or amendments as a single consolidated document.

    c.  If comments on a notice of intent or other aspects of a scoping process identify consultations, permits, or licenses necessary under other environmental laws, the environmental document may contain a section briefly listing the applicable requirements and how the OA has or will meet them (e.g., permits applied for or received, consultations initiated or concluded).

20. ELIMINATION OF DUPLICATION WITH STATE, TRIBAL, AND LOCAL PROCEDURES

An OA will cooperate with State, Tribal, and local agencies that are responsible for preparing environmental documents to reduce duplication between NEPA and State, Tribal, and local requirements, including through use of studies, analysis, and decisions developed by State, Tribal, or local agencies. Such cooperation may include:

    a.  Joint planning processes;

    b.  Joint environmental research and studies;

    c.  Joint public hearings (except where otherwise provided by statute); and

    d.  Joint environmental documents.

21. PROPOSALS FOR REGULATIONS

Where the proposed action is the promulgation of a rule or regulation, procedures, and documentation pursuant to other statutory or Executive Order requirements may satisfy one or more requirements of this subchapter. When a procedure or document satisfies one or more requirements of this subchapter, an OA may substitute it for the corresponding requirements in this subchapter and need not carry out duplicative procedures or documentation. Agencies will identify which corresponding requirements in this subchapter are satisfied and consult first with OST, then with CEQ, when necessary to confirm such determinations.

22. UNIQUE IDENTIFICATION NUMBERS

For all environmental documents, the lead agency will provide a unique identification number for tracking purposes, which an OA will reference on all associated environmental documents prepared for the proposed agency action and in any database or tracking system for such documents. DOT will coordinate with the CEQ and other federal agencies to ensure uniformity of such identification numbers across federal agencies.

23. EMERGENCIES

Emergency circumstances may require immediate actions that preclude following standard NEPA procedures. Immediate emergency actions necessary to protect the lives and safety of the public or protect valuable resources should never be delayed in order to comply with NEPA. When time permits, OAs should prepare environmental documentation. Alternative arrangements for NEPA compliance are permitted for emergency actions. *See Fixing America's Surface Transportation Act*, Pub. L. 114-94, sec. 1432, as applicable. Where emergency circumstances make it necessary to take an action with

reasonably foreseeable significant environmental impacts without observing the provisions of these procedures, OAs will consult with the CEQ on alternative arrangements for compliance with NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C), Pub. L. 114-94, sec. 1432.

    a. <u>Notify Office of Environment</u>. OAs should notify the Office of Environment of the emergency. Where time allows, OAs should provide an opportunity for the Office of Environment to review any alternative arrangements in coordination with CEQ. The alternative arrangements should be limited to actions necessary to control the immediate impacts of the emergency.

    b. <u>Non-significant Impacts</u>. When the expected environmental impacts of the proposed action are not considered significant and the action is not covered by a CE, to the extent practicable, the OA should prepare a concise and focused EA that complies with this Order, OA procedures, and NEPA.

    c. <u>Significant Impacts</u>. Where emergency circumstances make it necessary to take an action with reasonably foreseeable significant environmental impacts without observing the provisions of these procedures, DOT will consult with the CEQ on alternative arrangements for compliance with NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C).

24. INTERNATIONAL ACTIONS

    a. <u>Executive Order 12114</u>. Executive Order 12114, *Environmental Effects Abroad of Major Federal Actions*, applies to major Federal actions having significant environmental impacts outside of the United States and its Territories and possessions. See E.O. 12114, sec. 2-3(a)–(d)). If an EIS is required under E.O. 12114, section 2-4(a)(i), the OA must prepare it in compliance with this Order and the OA procedures.

    b. <u>Coordination</u>. If an OA anticipates communication with a foreign government concerning agreements and other arrangements related to environmental studies or documentation, the OA must coordinate such communication with the U.S. Department of State, in consultation with the Office of Environment and the Office of the Assistant Secretary for Aviation and International Affairs. See E.O. 12114, sec. 3-2.

25. PROCEDURES FOR APPLICANT-PREPARED ENVIRONMENTAL DOCUMENTS

    a. <u>Procedures for Applicants</u>. In accordance with NEPA § 107(f), 42 U.S.C. § 4336a(f), OAs must establish procedures allowing applicants, or contractors hired by applicants, to prepare environmental documents under the OA's supervision, where applicable. For this reason, OAs may have specific instructions for applicants within their NEPA implementing procedures either located as a subpart of this Order, FAA's Order 1050.1, or 23 CFR Part 771.

    b. <u>Independent Evaluation</u>. In these instances, the OA must independently evaluate the environmental document and will take responsibility for its contents.

    c. <u>Assistance</u>. The OA will assist applicants and applicant-hired contractors by providing guidance and outlining the types of information required for the preparation of the environmental document. The OA may also provide appropriate guidance and assist in environmental document preparation, to the extent that the OA's resources and policy priorities permit. The OA will work with the applicant to define the purpose and need, and, when appropriate, to develop a reasonable range of alternatives to meet the purpose and need.

    d. <u>Schedule</u>. The OA will work with the applicant to develop a schedule for preparation of the environmental document. Major changes to the schedule or related matters will be documented through written correspondence.

e.  Additional Information. The OA may request from an applicant environmental information for use by the OA in preparing or evaluating an environmental document. This may include a decision file consisting of any factual, scientific, or technical information used, developed, or considered by the applicant or applicant-hired contractor while preparing the draft environmental document, including any correspondence with the OA or with third parties.

26. DEFINITIONS

Terms used in these implementing procedures have the meanings provided in NEPA § 111, 42 U.S.C. § 4336e. OAs may substitute alternative statutory definitions applicable to the OA in their own procedures. In addition:

a.  NEPA means the National Environmental Policy Act, as amended (42 U.S.C. § 4321, et seq.).

b.  Applicant means an individual; a State, Tribal or local government; a corporation, company, or any other party seeking an approval, financial assistance, special permit, license, waiver, certification, or other permission from an Operating Administration (OA).

c.  Authorization means any license, permit, approval, finding, determination, or other administrative decision issued by an agency that is required or authorized under Federal law to implement a proposed action.

d.  Connected action means a Federal action within the authority of DOT that is closely related to the proposed agency action and should be addressed in a single environmental document because the proposed agency action:
    (1) Automatically triggers a separate Federal action, which independently would require the preparation of additional environmental documents;
    (2) Cannot proceed unless the separate Federal action is taken previously or simultaneously; or
    (3) Is an interdependent part of a larger Federal action that includes a separate Federal action, which mutually depend on the larger Federal action for their justification.

e.  Environmental impacts mean changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives.

f.  Environmental review process means the integrated process for compliance with NEPA and any other applicable environmental statutes, regulations, or Executive Orders, including those that require a permit, approval, consultation, or authorization to proceed with an action.

g.  Extraordinary circumstances mean factors or circumstances that indicate a normally categorically excluded action may have a significant impact. Examples of extraordinary circumstances include potential substantial impacts on sensitive environmental resources, and potential substantial impacts on historic properties or cultural resources.

h.  Human environment means comprehensively the natural and physical environment and the relationship of Americans with that environment. (See also the definition of "environmental impacts" in paragraph (e) of this section.)

i.  Impacts include ecological (such as the impacts on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the impacts on employment), social, or health impacts. Impacts appropriate for analysis under NEPA may be either beneficial or adverse, or both, with respect to these values.

    A "but-for" causal relationship is insufficient to make an agency responsible for a particular impact under NEPA. Impacts should generally not be considered if they are remote in time,

geographically remote, or the product of a lengthy causal chain. Impacts do not include those impacts that the agency has no ability to prevent due to the limits of its regulatory authority, that would occur regardless of the proposed action, or that would need to be initiated by a third party.

j.   Jurisdiction by law means agency authority to approve, veto, or finance all or part of the proposal.

k.   Level of NEPA review means the appropriate type of analysis required for a particular action (i.e., a CE, an EA, or an EIS).

l.   Mitigation means measures that avoid, minimize, or compensate for environmental impacts caused by a proposed action or alternatives as described in an environmental document or record of decision and that have a nexus to those impacts. While NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation. Mitigation includes:

(1)  Avoiding the impact altogether by not taking a certain action or parts of an action.

(2)  Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(3)  Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(4)  Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(5)  Compensating for the impact by replacing or providing substitute resources or environments.

m.   NEPA process means all measures necessary for compliance with the requirements of section 2 and title I of NEPA § 102(2), 42 U.S.C. § 4332(2).

n.   Notice of intent means a public notice that an agency will prepare and consider an environmental document.

o.   Operating Administration (OA) means any agency established within the Department or, for the purposes of this Order, an office within the Office of the Secretary of Transportation (OST).

p.   Plain language means language that is clear, concise, well-organized, and follows other best practices appropriate to the subject or field and intended audience.

q.   Publish and publication mean methods found by the agency to efficiently and effectively make environmental documents and information available for review by interested persons, including electronic publication.

r.   Related action means an action undertaken by an agency, that bears a relationship to other actions undertaken by other agencies relevant to NEPA. This includes permitting actions, or some other type of authorization action, required by statute that relate to one overarching project.

s.   Reasonable alternatives mean a reasonable range of alternatives that are technically and economically feasible, meet the purpose and need for the proposed action, and, where applicable, meet the goals of the applicant.

t.   Reasonably foreseeable means an impact sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision.

u. Scope consists of the range of actions, alternatives, and impacts to be considered in an environmental document. The scope of an individual statement may depend on its relationships to other statements.

v. States means the 50 States of the Union, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, U.S. Virgin Islands, and Guam.

27. SEVERABILITY

The sections of this chapter are separate and severable from one another. If any section or portion therein is stayed or determined to be invalid, or the applicability of any section to any person or entity is held invalid, it is DOT's intention that the validity of the remaining parts will not be affected. The remaining sections or portions therein shall continue in effect.

28. SUBPART A. GREAT LAKES ST. LAWRENCE SEAWAY DEVELOPMENT CORPORATION

This subpart, DOT Order 5610.1D, and other applicable laws, regulations, and Executive Orders apply to all elements of the Great Lakes St. Lawerence Seaway Development Corporation (GLS) and all GLS actions, including but not limited to, new or revised agency rules and regulations, as well as projects and programs that are entirely or partly financed, assisted, conducted, regulated, or approved by GLS.

a. Applicability. GLS is required to conduct a NEPA review for proposed major federal actions and has no additional specific requirements from Section 3 of this Order.

b. Roles and Responsibilities. In administering the NEPA process to GLS actions, the following responsibilities apply:

(1) Chief, Office of Engineering. The term "Chief Engineer" means the Chief, Office of Engineering, GLS or designee.

(a) If a proposed major program or action may require a NEPA compliance review, the responsible GLS office shall report it to the Chief Engineer for review at the time of initial technical studies.

(b) The Chief Engineer reviews and determines if a program or action is one which (1) normally requires an EIS or (2) normally does not require an EIS or a CE. If the action is not covered by either of the foregoing, the Chief Engineer shall prepare an environmental assessment (EA) within 30 days of receipt of the document.

(c) The Chief Engineer is responsible for the preparation and processing of draft EISs. Professional services for this preparation may be obtained from other Federal, State, or local agencies, universities, or consulting firms; however, the Chief Engineer must review and evaluate the documents.

(2) GLS Chief Counsel. The GLS Chief Counsel or designee shall review all GLS EISs and EAs for legal sufficiency. The legal review should be completed within 30 days after receipt of the document. When the review is complete, the Chief Counsel will return the document to the Chief Engineer with approval for final processing.

(3) GLS Administrator. Final EISs may be approved by the GLS Administrator or designee. Concurrence of both the Assistant Secretary and the DOT General Counsel is required for actions which involve a 4(f) determination.

c.  Determination of the Level of NEPA Review. GLS has identified the following levels of NEPA review. (See Section 6 of this Order).

(1)  Environmental Assessment. If a decision has not been made to prepare an EIS and a proposed action cannot be categorically excluded under Section 28d, an EA shall be prepared. The EA will be the GLS's determination to prepare an EIS or to publish a finding of no significant impact (FONSI).

(2)  Environmental Impact Statements. An EIS shall be prepared for any proposed major Federal action significantly affecting the environment. Listed below are types of GLS actions which normally require the preparation of an EIS:

(a)  Construction projects (major) involving significant disturbances to earth, air, or water.

d.  Categorical Exclusions. GLS may utilize its own agency CEs in addition to DOT's CEs listed in Appendix A or another agency's CEs using the procedures described in this section and Section 9, to categorically exclude a proposed action. GLS will apply the extraordinary circumstances listed in Section 9.c. of this Order.

GLS has identified 13 categories of actions that are not major Federal actions with a significant impact on the environment, and do not require either an EA or an EIS. In cases of extraordinary circumstances whereby any of the following items, which are normally excluded, that may have a significant impact on the environment, or cause substantial controversy, an EA or EIS will be prepared.

(1)  Administrative procurements (e.g. general supplies) and contracts for personal services;

(2)  Personnel actions (e.g. promotions, hirings);

(3)  Project amendments (e.g. increases in costs) which do not significantly alter the environmental impact of the action;

(4)  Issuance of vessel passage permits as a matter of routine Seaway procedures;

(5)  Amendments to the Seaway Regulations;

(6)  Reconstruction, repair and maintenance of existing navigation aids and construction of new fixed aids;

(7)  De-icing equipment and measures at the locks and lock approaches;

(8)  Modifications to the St. Lawrence Seaway tariff of tolls;

(9)  Icebreaking: Icebreaking activity is limited to the intermediate pool and approximately three miles above Eisenhower Lock and one mile below Snell Lock, and one-half mile of the Grasse River between Snug Harbor and the St. Lawrence River.

(10)  Maintenance dredging: In some areas, the river bottom has high spots caused by silting in from the banks, anchor dragging and/or river current. In these areas, maintenance dredging is required to maintain GLS vessel operational areas and the congressionally mandated 27 feet. waterway. No other dredging will be allowed under this category. Maintenance dredging and upland material deposits are performed under specific permit conditions approved by the New York State Department of Environmental Conservation and the U.S. Army, Corps of Engineers.

(11)  Modifications to and maintenance of lock operating equipment, vessel traffic control equipment, buildings, grounds, floating plant, and existing facilities;

(12)    Equipment purchases and operating expenses;

(13)    Grants of leases, licenses, permits or easements for use of GLS-owned property.

e.    Where the Public Can Access Information or Status Reports on Projects. As soon as GLS determines that an EIS is to be prepared, GLS shall solicit public comments through a NOI to prepare an EIS by any or all of the following means: conducting public hearings, making personal contact with interested parties, issuing press releases, placing notices in newspapers, and publishing a NOI in the Federal Register. GLS shall develop lists of interested parties at the Federal, State, Tribes and local levels. Public involvement and environmental issues raised in the public commenting process will be documented in the EIS. GLS shall determine whether any additional public involvement is appropriate to further aid GLS's decisionmaking process, including a public hearing, using the following factors: the magnitude of the costs, environmental impact, degree of interest evidenced by the public, the complexity of the issue and the extent to which public involvement. If a public hearing is to be held, GLS must make the draft EIS available to the public 30 days prior to the hearing.

Interested persons may obtain information on GLS environmental procedures on GLS's official website.

29.  SUBPART B. FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

This subpart, DOT Order 5610.1D, and other applicable laws, regulations, and Executive Orders apply to all elements of the Federal Motor Carrier Safety Administration (FMCSA) and all FMCSA actions, including but not limited to, new or revised agency rules and regulations, as well as projects and programs that are entirely or partly financed, assisted, conducted, regulated, or approved by FMCSA.

a.    Applicability. FMCSA is required to conduct a NEPA review for proposed major federal actions. FMCSA actions include projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by FMCSA; new or revised agency rules, regulations, plans, policies, or procedures; and agency legislative proposals. Where FMCSA has no discretion to withhold or condition an action if the action is in accordance with specific statutory criteria and FMCSA lacks control and responsibility over the impacts of an action, that action is not subject to this Order. Actions do not include bringing judicial or administrative civil or criminal enforcement actions. Examples of judicial or administrative civil or criminal enforcement actions would be regulations implementing rules of practice for motor carrier, broker, freight forwarder and hazardous materials proceedings before the Assistant Administrator/Chief Safety Officer, under applicable provisions of the Federal Motor Carrier Safety Regulations (49 CFR parts 350–399), including the commercial regulations (49 CFR parts 360–379) and the Hazardous Materials Regulations (49 CFR parts 171–180) to determine whether:

(1)    A motor carrier, property broker, freight forwarder, or its agents, employees, or any other person subject to the jurisdiction of the FMCSA, has failed to comply with the provisions or requirements of applicable statutes and the corresponding regulations; and,

(2)    To issue an appropriate Order to compel compliance with the statute or regulation, assess a civil penalty, or both if such violations are found.

b.    Roles and Responsibilities. In administering the NEPA process to FMCSA actions, the following responsibilities apply:

(1)    Administrator Federal Motor Carrier Safety Administration. Acts on matters relating to NEPA implementation and is responsible for providing NEPA capabilities.

(a) Establishes and maintains the capability (personnel and other resources) to ensure adherence to the policies and procedures specified by this Order. This capability can be provided through contract support, matrix (other modal) support, and permanent staff, with sufficient staff to ensure:

1. FMCSA cognizance of the analyses and decisions being made; and

2. Familiarity with the requirements of NEPA and the provisions of this Order by every person preparing, implementing, supervising, and managing projects involving NEPA analysis.

(b) Ensures environmental responsibility and awareness among personnel to most effectively implement the goals and policies of NEPA. All personnel who are engaged in any activity or combination of activities that significantly affect the quality of the human environment will be aware of their NEPA responsibility. Only through alertness, foresight, and notification through Project and Program managers to the Associate Administrator for Policy and Program Delivery, and training and education will NEPA goals be realized.

1. Approves all environmental analyses and documentation for Administration-initiated actions, unless delegated to another FMCSA responsible official or another Federal agency. The Administrator may enter into contracts with a State or private entity to conduct initial environmental analyses and documentation, but the Administrator must review and approve all such environmental analyses and documentation and remains responsible for its scope and contents. The Administrator delegates the following: with the exception of highly controversial EISs, approval authority to Field Operations Service Center Administrators for FMCSA Draft EISs, Final EISs, and Supplemental EISs for actions that originate within, and having impacts confined to, their respective area;

2. Authority for the appropriate FMCSA Administrator-level Program Office to approve highly controversial EIS; and

3. For all other Final EISs (non-controversial), only a notice of approval will be made to DOT by the responsible Administrator-level Program Office via the Administrator.

(c) The Administrator, or the Administrator's designee, has authority to decide whether or, at a minimum, how to proceed with every action the FMCSA undertakes. Thus, the Administrator (unless his/her authority is delegated) is the decisionmaker and the responsible FMCSA official. The Administrator makes the following delegations:

1. The NEPA Liaison will act as the senior decisionmaker and senior environmental advisor for NEPA compliance and NEPA implementation of all FMCSA actions. The Administrator also delegates the responsibility to the NEPA Liaison to ensure accountability for implementation of the policies set forth in this Order. For Headquarters- originated actions, the Administrator delegates the responsibility to the NEPA Liaison to determine whether to prepare an EA, EIS, a FONSI, or a decision withdrawing the proposal on the basis of its environmental impacts in consultation with the Office Director for the program sponsoring the action or the person with the delegated authority to issue the regulation.

2. The Field or Division Administrators or their delegated Federal, State, or Division Program Managers, in consultation with their Field Environmental Quality Advisor

(FEQA) will hold authority to determine whether to prepare an EA, EIS, FONSI, or a decision withdrawing the proposal on the basis of its environmental impacts for actions that originate within, and have impacts confined to, their respective area. For Headquarters-originated actions, the NEPA Liaison makes this determination in consultation with the responsible FMCSA Program Manager.

(2) NEPA Liaison—Associate Administrator for Policy and Program Delivery (MC–P).

(a) Is the principal FMCSA environmental advisor and decisionmaker for the completion of the environmental analysis under NEPA, CEQ regulations, DOT and FMCSA Orders, and other environmental laws, statutes, and Executive Orders. The Regulatory Development Division (MC–PRR), in the Office of Policy, Plans and Regulation is the Program Office that will assist the NEPA Liaison in carrying out these duties.

(b) Is responsible for overseeing NEPA compliance and NEPA implementation of all FMCSA actions. The NEPA Liaison ensures accountability for implementation of the policies set forth in this Order and that all necessary NEPA analyses (CE, EA, and EIS) are completed before initiation of an FMCSA action.

(c) Reviews all FMCSA proposed projects and advises the responsible FMCSA official e.g., the FEQA or Project Manager on the appropriate level of environmental analysis and documentation needed for the proposal. For CEs, EAs and non-controversial EISs, the NEPA Liaison may direct the FEQAs or program staff to determine the appropriate level of environmental analysis and documentation needed for the proposal.

(d) Provides expert advice on NEPA- related matters to FMCSA Heads of Offices, Divisions, and Field Operations Service Center Units.

(e) Acts as the intra-agency and interagency liaison and coordinates NEPA-related matters on a national basis and is the principal contact for CEQ on all other FMCSA actions.

(f) Provides and periodically updates this FMCSA Order, program guidance and policies after consultation with the Chief Counsel, Heads of Offices, Divisions, and Field Operations Service Center Units. Updates must comply with requirements for public notice and CEQ review.

(g) Serves as FMCSA representative in coordination with outside groups at the national level regarding NEPA-related matters.

(3) Heads of Headquarters Offices and Divisions.

(a) Coordinate with the NEPA Liaison to ensure agency-wide consistency in areas of shared or related responsibility.

(b) Serve as the responsible agency officials under NEPA and CEQ regulations for actions subject to their approval.

(c) Ensure accountability for implementation of the policies set forth in this Order.

(d) In consultation with the NEPA Liaison, ensure that FMCSA staff responsible for the supporting function of the responsible agency official under CEQ and related authorities receive appropriate training in how to carry out FMCSA's responsibilities.

(e) Ensure completion of all environmental analysis and documentation for Headquarters Office- originated actions in consultation with environmental staff and the NEPA Liaison.

This responsibility includes ensuring that the appropriate environmental planning, analyses, and documentation are completed for the respective programs and actions.

(f) Notify the Policy, Plans, and Regulations Office Director (MC–PR) through appropriate chains of command of all actions involved in the NEPA review. The notification must include electronically filed monthly updates, electronically filed checklists, etc.

(4) The Office of Administration (MC–M). At the current time, the General Services Administration (GSA) is responsible for all building acquisition and construction projects to meet the needs of the FMCSA. The GSA is currently responsible for, and is required to comply with, all statutory and regulatory requirements of NEPA for such projects. In the event the FMCSA is authorized by Congress or the GSA delegates authority for the purchase, lease, and/or acquisition of real property in the future, the FMCSA's Office of Administration will assume primary responsibility for all necessary environmental analyses and documentation needed for building acquisition and construction projects, in consultation with the FMCSA's Office of Chief Counsel. The FMCSA will coordinate such environmental analyses, as appropriate, with the interested general public, as well as other Federal, State, local, and Tribal government agencies.

(5) The Office of the Chief Counsel (MC-CC).

(a) Is responsible for legal interpretation of NEPA and related authorities and represents FMCSA in litigation under such authorities.

(b) Must approve the implementation of the procedures of FMCSA Environmental Orders in consultation with the NEPA Liaison, NEPA FEQAs, MC–PR, and MC–RIA (Office of Data Analysis and Information Systems that would be responsible for acquiring a contractor for environmental support), for actions originated by the Administrator.

(c) Is responsible for the review and approval of FMCSA and non-FMCSA environmental documents submitted for Associate Administrator level review.

(d) Is responsible for the review and approval of guidance and training concerning this Order, in consultation with the NEPA liaison and the Professional Development and Training division.

(6) FMCSA Program Staff.

(a) This includes all FMCSA employees responsible for the management and implementation of program actions, such as, promulgating regulations, project planning and development, project management, and research.

(b) Program staff are responsible for:

1. Developing and maintaining a thorough understanding of NEPA requirements and the requirement of related authorities, as these pertain to their program areas with the assistance of the NEPA Liaison and the FEQA.

2. Ensuring that NEPA and related authorities are complied with, as early as possible in the planning of any action within their program areas.

3. Coordinating their programs, activities, and projects with FEQAs and the NEPA liaison, as appropriate.

4. Implementing all mitigation and other commitments resulting from NEPA compliance for actions under their authority.

5. Initiating early consultations with Field Operations Service Center Units, the FEQAs, Heads of Offices and Divisions, the NEPA liaison, as appropriate if uncertain regarding the need for environmental analysis or documentation for any project. The Field Operations Service Center Administrator will promptly notify the Policy, Plans, and Regulations Office Director (MC–PR) and the NEPA Liaison if uncertainty for NEPA review persists.

6. Notifying the Policy, Plans, and Regulations Office Director (MC–PR) through appropriate chains of command of all actions involved in the NEPA review. The notification must include electronically filed monthly updates, electronically filed checklists, etc.

(7) Field Operations Service Center Administrators

(a) Are accountable for execution of FMCSA's responsibilities under NEPA and related authorities with respect to actions under their jurisdiction.

(b) Serve as the responsible agency official with respect to the environmental impacts of actions under their jurisdiction.

(c) Maintain FEQA within their staffs, augmented as necessary through interagency agreements and contracts, to ensure field interdisciplinary competence in environmental matters.

(d) In consultation with the FMCSA NEPA Liaison, ensure that all field staff with responsibility for planning, approving, and implementing Commercial Vehicle Safety Plan grants, etc., receive training in how to carry out FMCSA's responsibilities under NEPA and related authorities.

(e) Comply with all environmental laws. What may appear to be a good idea initially may not be environmentally acceptable. It is, therefore, important that alternatives to a proposed action be available. Coordination of FMCSA environmental analyses and documents with Federal, State, local, and tribal officials may be necessary. Questions concerning environmental matters should be directed to the FEQA and appropriate Field Operations Service Center staff.

(f) Notify the Policy, Plans, and Regulations Office Director (MC–PR) through appropriate chains of command of all actions involved in the NEPA review. The notification must include electronically filed monthly updates, electronically filed checklists, etc.

(8) Heads of Units, Divisions, and Offices

(a) Ensure that all environmental analyses and documentation for FMCSA actions (except building acquisition and construction actions) they initiate, or are directed by higher authority to initiate, are completed.

(b) Ensure that a FEQA, Environmental Project Manager, and Environmental Specialists are available within the Field Operations Service Center territory.

(c) Ensure that Field Operations Service Center Units and Field Division Offices are notified as soon as possible of any needed environmental analyses or documentation required for field proposed actions and projects.

(d) Notify the Policy, Plans, and Regulations Office Director (MC–PR) through appropriate chains of command of all actions involved in the NEPA review. The notification must include electronically filed monthly updates, electronically filed checklists, etc.

(9) The Field Environmental Quality Advisor (FEQA)

(a) The FEQA is the center of expertise maintained at the Field Service Unit in which knowledge in NEPA-related environmental matters and other related authorities, such as the National Historic Preservation Act, the Clean Air Act, and the Endangered Species Act, is vital.

(b) The FEQA will be a collateral duty among others assigned to the employee.

(c) The FEQA will be located at the Field Service Unit where it can influence decision making early in FMCSA's planning or preparation for any project or action subject to review under NEPA and related authorities.

(d) The FEQA is responsible for participating in FMCSA planning and decision making, for advising the Administrator, the Office Heads, the Field Administrators, and other decisionmakers, and for providing training and technical assistance to all pertinent FMCSA employees and contractors.

(e) Maintains interdisciplinary expertise in environmental matters, through the employment of qualified staff and/or by interagency agreement or under contract.

(f) Reviews all documentary products of FMCSA NEPA analyses, and assists program staff in ensuring that such products, and the analyses they report, are adequate and defensible.

(g) Maintains records of FMCSA NEPA compliance activities.

(h) Routinely interacts with, and is assisted by, the NEPA Liaison.

(i) Maintains needed guidance material and recommends updates and/ or changes to this FMCSA Order, as appropriate. Updates must comply requirements for public notice and CEQ review.

(j) Develops and maintains an up-to- date checklist for use in determining whether an action requires an environmental assessment or impact statement.

(k) Notifies the Policy, Plans, and Regulations Office Director (MC–PR) through appropriate chains of command of all actions involved in the NEPA review. The notification must include electronically filed monthly updates, electronically filed checklists, etc.

(10) Field Operations Service Center Program Staff

(a) Ensure completion of all environmental analyses and documentation for FMCSA actions designated to them.

(b) Assist Headquarters Units, where appropriate, with their implementation of the procedures set forth in this Order.

(c) Coordinate these environmental analyses and documents with Federal, State, local, and tribal officials as necessary.

(d) Maintain close coordination with appropriate Field Division Office elements during the execution of these tasks. Questions concerning environmental matters should be directed to appropriate Field Operations Service Center Unit staff and the FEQA.

(e) Empower the FEQA to advise and assist in planning and decision making on actions that could affect the human environment, in a way and at a time in the planning and decisionmaking process that maximizes the effectiveness of the FEQA's advice and assistance.

(f) Ensure that all Field program staff involved in planning and decision making about actions that could affect the human environment are made aware of FMCSA's responsibilities under NEPA and related authorities, and other NEPA- or CEQ-related guidance, are held accountable for the quality of their actions and decisions and are required to coordinate effectively with the FEQA.

(g) Notify the Policy, Plans, and Regulations Office Director (MC–PR) through appropriate chains of command of all actions involved in the NEPA review. The notification must include electronically filed monthly updates, electronically filed checklists, etc.

f. NEPA and Agency Decisionmaking.

(1) The Federal Motor Carrier Safety Administration's primary mission is to prevent commercial motor vehicle- related fatalities and injuries. Administration activities contribute to ensuring safety in motor carrier operations through strong enforcement of safety regulations, targeting high-risk carriers and commercial motor vehicle (CMV) drivers; improving safety information systems and commercial motor vehicle technologies; strengthening commercial motor vehicle equipment and operating standards; and increasing safety awareness. To accomplish these activities, the FMCSA works with Federal, State, and local enforcement agencies; tribal governments; the motor carrier industry; labor safety interest groups; and others.

e. Any environmental impacts that result from FMCSA's oversight of motor carrier operations would most likely be in areas affecting air quality, noise, and hazardous materials transportation. Categorical Exclusions.

FMCSA may utilize its own agency CEs listed below, in addition to DOT's CEs listed in Appendix A or another agency's CEs, using the procedures described in this section and DOT Order 5610.1D, Section 9, to categorically exclude a proposed action.

When the specific CE requires that a checklist be completed, an Environmental Checklist will be completed and used to substantiate the use of the CE. The checklist must be submitted with the proposal for the action. If a CE is not appropriate, the Environmental Checklist will be used for developing an EA or EIS. A written Categorical Exclusion Determination (CED) must be prepared when a CE will be relied on to promulgate a regulation that requires an environmental checklist. Checklists and CEDs supplementary to the requirements of this Order may be developed by subordinate commands for specific types of actions. Those documents must be approved by the Administrator before they are adopted for use.

(1) Administration

(a) Preparation of guidance documents that implement decisions authorized by the applicable FMCSA's Office of Business Operations Directive or other Federal agency regulations, procedures, manuals, internal Orders, and other guidance documents not required to be published in the Federal Register under the Administrative Procedure Act, 5 U.S.C. § 552(a)(1).

(b) Routine intra-agency personnel, fiscal, and administrative activities, actions, procedures, and policies which clearly do not have environmental impacts, such as, hiring, recruiting, processing and paying of personnel, and recordkeeping.

(c) Routine procurement and contract activities and actions for goods and services, including office supplies, equipment, mobile assets, and utility services for routine administration, operation, and maintenance in accordance with Executive Orders 13101, 13148, and other applicable Executive Orders and Departmental policies regarding ''greening the government.''

(d) Decisions to set up or decommission equipment or temporarily discontinue use of facilities or equipment, such as:

　　1. Noise pollution monitors used in enforcement of the Noise Control Act of 1972.

　　2. Radioactive material detectors used in enforcement of the Hazardous Material Transportation Acts.

　　3. FMCSA-owned commercial motor vehicles used in the:

　　　　A. Office of Enforcement and Program Delivery;

　　　　B. Office of Research and Technology; or

　　　　C. Commercial Vehicle platform of the Intelligent Vehicle Initiative.

This does not preclude the need to review decommissioning under Section 106 of the National Historic Preservation Act.

(e) Routine and permitted movement of agency personnel and equipment, and the routine movement, handling, and distribution of non-hazardous and hazardous materials and wastes incidental to the routine and permitted movement of personnel and equipment in accordance with applicable regulations. Examples would include moving personnel from the Boise, Idaho, Division Office to the Pierre, South Dakota, Division Office or moving the agency's Intelligent Transportation System/Commercial Vehicle Operation Technology Truck working display from McLean, Virginia, to an awareness training venue in Oak Ridge, Tennessee.

(f) Personnel and other administrative actions associated with consolidations, reorganizations, or reductions in force resulting from identified inefficiencies, reduced personnel or funding levels, skill imbalances, or other similar causes.

(g) Financial assistance or procurements for motor carrier activities that do not commit the FMCSA or its applicants to a particular course of action affecting the environment.

(h) Hearings, meetings, or public affairs activities held at locations developed for such activities.

(2) Purchase, Lease, and Acquisitions

Lease of space in buildings or towers for a firm-term of one year or less when the intended use is in conformity with current uses.

(3) Operations

Realignment of mobile assets, including motor vehicles, to existing operational facilities that have the capacity to accommodate such assets or where supporting infrastructure changes will be minor in nature to perform as new terminals or for repair and overhaul.

If the realignment would result in more than a one for one replacement of assets at an existing facility, then the checklist required for this CE must specifically address whether such an increase in assets could trigger the potential for significant impacts to protected species or habitats before use of the CE can be approved.

(4) Data Gathering, Review of Environmental Tests, Studies, Analyses and Reports, and Research Activities

(a) Data gathering, information gathering, and studies that involve no detectable physical change to the environment.

(b) Research activities that are in accordance with inter-agency agreements and which are designed to improve or upgrade the FMCSA's ability to manage its resources. Examples of these resources would include FMCSA's stored data, its assets, and its properties, including its Intelligent Transportation System/Commercial Vehicle Operation Technology Trucks and its Safety Trucks.

(c) Environmental studies undertaken to define the elements of a proposal or alternatives sufficiently so that the environmental impacts may be assessed.

(d) Contracts for activities conducted at established laboratories and facilities, to include contractor-operated laboratories and facilities, on FMCSA-contracted property where all airborne emissions, waterborne effluents, external radiation levels, outdoor noise, and solid and bulk waste disposal practices are in compliance with existing applicable Federal, State, and local laws and regulations.

(e) Planning and technical studies that do not contain recommendations for authorization or funding for future construction but may recommend further study. This includes engineering efforts or environmental studies undertaken to define the elements of a proposal or alternatives sufficiently so that the environmental impacts may be assessed and does not exclude consideration of environmental matters in the studies.

(f) Establishment of Global Positioning System (GPS), intelligent transportation systems (ITS), or essentially similar systems that use overlay of existing procedures.

(g) Procedural actions requested by users on a test basis to determine the effectiveness of new technology and measurement of possible impacts on the environment.

(5) Training

(a) Simulated exercises, including tactical and logistical exercises that involve small numbers of personnel.

(b) Training of an administrative or classroom nature. Examples would include training to inspect a commercial motor vehicle brake system or to learn more about NEPA and how to prepare and develop environmental analyses for EAs and EISs.

(6) Establishing the Following Types of Regulations

(a) Regulations addressing Civil Rights procedures and guidance.

(b) Regulations which are editorial or procedural, such as, those updating addresses or establishing application procedures, and procedures for acting on petitions for waivers, exemptions and reconsiderations, including technical or other minor amendments to existing FMCSA regulations.

(c) Regulations concerning internal agency functions or organization or personnel administration, such as, funding or delegating authority.

(d) Regulations concerning the training, qualifying, licensing, certifying, and managing of personnel.

(e) Regulations to handle the processing of applications for operating authority and certificates of registration.

(f) Regulations implementing the Motor Carrier Safety Assistance Program (MCSAP), that provides financial assistance to States to reduce the number and severity of accidents and hazardous materials incidents involving commercial motor vehicles (CMVs) for the following activities:

1. Driver/vehicle inspections;

2. Traffic enforcement;

3. Safety audits;[2]

4. Compliance reviews;[3]

5. Public education and awareness; and

6. Data collection; and provide reimbursement for:

   A. Personnel expenses;

   B. Equipment and travel expenses;

   C. Indirect expenses for:

      i. Facilities (not including fixed scales, real property, land or buildings) used to conduct inspections or house enforcement personnel. Examples of facilities would include a motor vehicle trailer for inspection personnel to take cover while doing paperwork during a roadside inspection;

      ii. Support staff;

---

[2] A ''safety audit'' is an examination of motor carrier operations to provide educational and technical assistance on safety and the operational requirements of 49 CFR parts 100 through 178 and parts 350 through 399) and to gather critical safety data needed to make an assessment of the carrier's safety performance and basic safety management controls.

[3] A ''compliance review'' is an on-site examination of motor carrier operations (normally at the carrier's facility), such as driver's hours-of- service, maintenance and inspection, driver qualification, commercial driver's license requirements, financial responsibility, accident involvement, hazardous materials, and other safety and transportation records to determine whether a motor carrier has systems, policies, programs, practices or procedures to ensure compliance with the applicable Federal safety regulations.

      iii.    Equipment to the extent they are measurable and recurring (e.g., rent and overhead and maintenance and minor improvements);

      iv.    Expenses related to data acquisition, storage, and analysis; and

      v.    Clerical and administrative expenses.

(g) Regulations implementing procedures to:

1. Promote adoption and enforcement of State laws and regulations pertaining to CMV safety that are compatible with the FMCSRs;

2. Provide guidelines for a continuous regulatory review of State laws and regulations; and

3. Establish deadlines for States to achieve compatibility with appropriate parts of the FMCSRs with respect to interstate commerce.

(h) Regulations implementing procedures to collect fees that will be charged for motor carrier registration and insurance for the following activities:

1. Application filings;

2. Records searches; and

3. Reviewing, copying, certifying and related services.

(i) Regulations implementing procedures for which motor carriers and brokers designate their agents (persons) for whom court process may be served, describing activities, such as:

1. The forms upon which the carrier can make the designations;

2. The eligible persons that can be agents, and how carriers shall make the designations in each State in which it is authorized to operate and for each State traversed during such operations, and

3. Where such designations must be made.

(j) Regulations implementing uniform Single-State registration procedures for motor carriers registered with the Secretary of Transportation.

(k) Regulations for all brokers[4] of transportation by motor vehicles that describe the following activities:

1. The duties and obligations of a broker;

2. The records and accounts a broker must keep;

3. The type of brokerage service the broker must perform; and

4. The charges and compensation a broker is entitled to receive.

(l) Regulations requiring every motor carrier to issue and keep a receipt or bill of lading (or record) for property tendered for transportation in interstate or foreign commerce containing such information as:

---

[4] A ''broker'' is a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier. The broker has accepted the shipments and is legally bound to transport them.

1. What must be contained on the receipt; and

2. Who shall be given the original freight bill and who shall be given a copy, as well as how it can be transmitted to the payer.

(m) Regulations implementing procedures applicable to the operations of household good carriers engaged in the transportation of household goods[5], for the following activities:

1. The information that carriers must give to prospective shippers prior to holding themselves out to perform such service;

2. How carriers are to estimate the shipping costs which the shippers will be required to pay for these shipments;

3. How to determine the weight of the shipments prior to assessing any shipping charges;

4. How to accept shipments and provides carrier notification of delay;

5. The liability of carriers; and

6. How to file complaints.

(n) Regulations that apply to actions by motor carriers registered with the Secretary to transport property for the following:

1. The leasing of equipment (e.g., a motor vehicle, straight truck, tractor, semi-trailer, full trailer, any combination of these and any other type of equipment used by authorized carriers in the transportation of property for- hire) with which to perform transportation regulated by the Secretary;

2. The leasing of equipment to motor private carriers or shippers;

3. The interchange of equipment between motor common carriers in the performance of transportation regulated by the Secretary;

4. To provide written lease requirements for authorized carriers that do not own their transportation equipment; and

5. To set forth requirements for carriers to obtain exemptions for lease arrangements.

(o) Regulations that apply to the transportation by motor vehicle of C.O.D. shipments by all common carriers of property subject to 49 U.S.C. § 13702, except such transportation which is auxiliary to or supplemental of transportation by railroad and performed on railroad bills of lading, and for such transportation that is performed by freight forwarders and on freight forwarder bills of lading for the following activities:

1. Tariff filing requirements;

2. Extension of credit to shippers;

3. Presentation of freight bills; and

4. Computing time for shipments.

---

[5] ''Household goods'' means personal effects and property used or to be used in a dwelling when a part of the equipment or supply of such dwelling and such other similar property as the FMCSA may provide by regulation.

(p) Regulations that govern the processing of claims for overcharge, duplicate payment, or over-collection for the transportation of property in interstate commerce or foreign commerce by motor carriers for information concerning how to document and investigate claims, keep records, and dispose of claims.

(q) Regulations implementing preservation of records procedures for motor carriers and brokers, and household freight forwarders for the types of records that must be retained and the retention periods (e.g., until expiration or termination plus 3 years, 3 years, etc.).

(r) Regulations implementing controlled substances and alcohol use and testing procedures designed to help prevent accidents and injuries resulting from the misuse of alcohol or use of controlled substances by drivers of commercial motor vehicles and apply to every person and all employers of such persons who:

  1. Operate a commercial motor vehicle (as defined in 49 CFR 382.107) in commerce in any State; and

  2. Are required by 49 CFR part 383 to possess a commercial driver's license (CDL).

  3. Examples of the topics covered include rules prescribing activities for:

     A. Pre-employment controlled substances test requirements;

     B. Random, post accident, reasonable suspicion, return to duty and follow-up alcohol and controlled substances testing procedures for employers and employees;

     C. Random testing rates;

     D. Requirements for drivers to report immediately to a specimen collection site; and

     E. An action required by employers if an employee has a positive test result, and recordkeeping.

(s) Regulations intended to help reduce or prevent truck and bus accidents, fatalities, and injuries by requiring drivers to have a single commercial motor vehicle driver's license and by disqualifying drivers who operate commercial motor vehicles in an unsafe manner and provide for:

  1. A prohibition against a commercial motor vehicle driver having more than one commercial motor vehicle driver's license;

  2. A requirement for drivers to notify their current employer and State of domicile of certain convictions;

  3. A requirement for drivers to provide previous employment information when applying for employment as an operator of a commercial motor vehicle;

  4. A prohibition against an employer allowing a person with a suspended license to operate a commercial motor vehicle;

  5. Periods of disqualification and penalties for those persons convicted of certain criminal and other offenses and serious traffic violations, or subject to any suspensions, revocations, or cancellations of certain driving privileges; testing and licensing requirements for commercial motor vehicle operators;

6. A requirement for States to give knowledge and skills tests to all qualified applicants for commercial drivers' licenses which meet the Federal standard; and

7. Requirements for the State-issued commercial license documentation.

(t) Regulations to ensure that the States comply with the provisions of the Commercial Motor Vehicle Safety Act of 1986, by:

1. Including the minimum standards for the actions States must take to be in substantial compliance with each of the statutory requirements of 49 U.S.C. § 31311(a); and

2. Having the appropriate laws, regulations, programs, policies, procedures and information systems concerning the qualification and licensing of persons who apply for a commercial driver's license, and persons who are issued a commercial driver's license.

And establish procedures for:

1. Determining whether a State is in compliance with the rules of this part; and

2. The consequences of State noncompliance.

(u) Regulations implementing rules of practice for motor carrier, broker, freight forwarder and hazardous materials proceedings before the Assistant Administrator/Chief Safety Officer, under applicable provisions of the Federal Motor Carrier Safety Regulations (49 CFR parts 350– 399), including the commercial regulations (49 CFR parts 360–379) and the Hazardous Materials Regulations (49 CFR parts 171–180) to determine whether:

1. A motor carrier, property broker, freight forwarder, or its agents, employees, or any other person subject to the jurisdiction of the FMCSA, has failed to comply with the provisions or requirements of applicable statutes and the corresponding regulations; and,

2. To issue an appropriate Order to compel compliance with the statute or regulation, assess a civil penalty, or both if such violations are found.

(v) Regulations prescribing the minimum levels of financial responsibility required to be maintained by motor carriers of property and passengers operating motor vehicles in interstate, foreign, or intrastate commerce.

(w) Regulations to enable States to enter into cooperative agreements with the FMCSA to enforce the safety laws and regulations of a State and the agency concerning motor carrier transportation by filing a written acceptance of the terms.

(x) Regulations implementing procedures for the issuance, amendment, revision, and rescission of Federal motor carrier regulations (e.g., the establishment of procedural rules that would provide general guidance on how the agency manages its notice-and-comment rulemaking proceedings, including the handling of petitions for waivers, exemptions and reconsiderations, and how it manages delegations of authority to carry out certain rulemaking functions.).

(y) Regulations implementing:

1. Aiding or abetting prohibitions;

2. Motor carrier identification and registration reports, including Performance and Registration Information Systems Management program registrations;

3. Motor carrier and driver assistance with routine accident investigations;

4. Relief during regional and local emergencies, including tow trucks responding to emergencies;

5. Locations where motor carriers, drivers, brokers, and freight forwarders must store records;

6. Requirements about motor carriers, drivers, brokers, and freight forwarders copies of records; and

7. Prohibitions on motor carriers, agents, officers, representatives, and employees from making fraudulent or intentionally false statements on any application, certificate, report, or record, including interstate motor carrier noise emission applications, certificates, reports, or records required by FMCSA.

(z)    Regulations establishing:

    1.   The minimum qualifications for persons who drive CMVs as, for, or on behalf of motor carriers; and

    2.   The minimum duties of motor carriers with respect to the qualifications of their drivers.

(aa)  Regulations requiring a motor carrier, its officers, drivers, agents, representatives, and employees directly concerned with, or in control of a CMV to comply with when they inspect, repair, and provide maintenance for that vehicle.

(bb)  Regulations concerning vehicle operation safety standards (e.g., regulations requiring: certain motor carriers to use approved equipment which is required to be installed such as an ignition cut-off switch, or carried on board, such as a fire extinguisher, and/or stricter blood alcohol concentration (BAC) standards for drivers, etc.), equipment approval, and/or equipment carriage requirements (e.g. fire extinguishers and flares).

(cc)  Special local regulations issued in conjunction with a motor vehicle rodeo or motor vehicle parade; provided that, if a permit is required, the environmental analysis conducted for the permit included an analysis of the impact of the regulations.

(dd)  Regulations concerning rules of the road, traffic services, and marking of intelligent transportation systems.

(7)  Recreational Activities and Events

(a)    Approval of recreational activities or events at a location developed or created for that type of activity.

(b)    Approvals of motor vehicle rodeo and motor vehicle parade event permits for the following events:

    1.   Events that are not located in, proximate to, or above an area designated environmentally sensitive by an environmental agency of the Federal, State, or local government. For example, environmentally sensitive areas may include such areas as critical habitats or migration routes for endangered or threatened species or important fish or shellfish nursery areas.

    2.   Events that are located in, proximate to, or above an area designated as environmentally sensitive by an environmental agency of the Federal, State, or local

government and for which the FMCSA determines, based on consultation with the Governmental agency, that the event will not significantly affect the environmentally sensitive area.

f.  <u>Extraordinary Circumstances</u>. The listed extraordinary circumstances below and those in the DOT Order are addressed in the Environmental Checklist. FMCSA may determine that, notwithstanding the extraordinary circumstance, the proposed agency action is not likely to result in reasonably foreseeable adverse significant impacts and apply the CE. If a CE is not appropriate, an EA or an EIS must be prepared. With respect to the CEs listed in this part, extraordinary circumstances include, but are not limited to, when the proposed action:

(1)  Has greater size or scope than is generally experienced for the category of action.

(2)  Is reasonably likely to create controversy regarding the potential for significant environmental impacts.

(3)  Has highly uncertain impacts on the environment that involve unique or unknown risks or are scientifically controversial.

(4)  Is reasonably likely to establish a precedent (or makes decisions in principle) for future or subsequent actions that would have a future significant impact.

(5)  Is reasonably likely to have significant impacts on public health, safety, or the environment.

(6)  Is reasonably likely to be inconsistent with or cause a violation of any Federal, State, local or tribal law or requirement imposed for the protection of the environment.

(7)  Is reasonably likely to cause reportable releases of hazardous or toxic substances as specified in 40 CFR part 302, Designation, Reportable Quantities, and Notification.

(8)  Is reasonably likely to cause releases of petroleum, oils, and lubricants, application of pesticides and herbicides, or where the proposed action results in the requirement to develop or amend a Spill Prevention, Control, or Countermeasures Plan.

(9)  Is reasonably likely to generate air emissions that would exceed de minimis levels or otherwise require a formal Clean Air Act conformity determination.

(10)  Has reasonable potential for degradation of already existing poor environmental conditions. Also, reasonable initiation of a degrading influence, activity, or impact in areas not already significantly modified from their natural condition.

(11)  Is reasonably likely to have an unresolved impact on environmentally sensitive resources unless the impact has been resolved through another environmental process (e.g., CZMA, NHPA, CWA, etc.). Environmentally sensitive resources include:

(a)  Proposed federally listed, threatened, or endangered species or their habitats.

(b)  Properties listed or eligible for listing on the National Register of Historic Places.

(c)  A site that involves a unique characteristic of the geographic area, such as prime or unique agricultural land, a coastal zone, a historic or cultural resource, parkland, wetland, wild and scenic river, designated wilderness or wilderness study area, 100-year floodplain, sole source aquifer (potential sources of drinking water), ecologically critical area, or property requiring special consideration under 49 U.S.C. § 303(c). (Section 303(c) of Title 49 U.S.C. is commonly referred to as section 4(f) of the

Department of Transportation (DOT) Act, which includes any land from a public park, recreation area, wildlife and waterfowl refuge, or any historic site).

(12) May cause a change in traffic patterns or an increase in traffic volumes (road and/or waterway) that could require rerouting of roads, waterways, or traffic.

g.  Procedures for Applicant-Prepared Environmental documents.

(1) Applicants or proponents (e.g. a cooperating local government) may prepare environmental documents for a proposed action, but FMCSA will take an active guidance and evaluative role during EA/EIS preparation and will take final responsibility for the quality of the analysis and the resulting document pursuant to Section 25. Local governments, other applicants, or cooperating agencies may conduct studies on FMCSA's behalf, but FMCSA must oversee and approve the work. FMCSA staff will provide guidance to assist applicants in preparation of these documents.

(2) Documents Prepared by Contractors.

Contractors frequently prepare EAs and EISs. To obtain unbiased analyses, contractors must be selected in a manner that avoids, to the maximum extent possible, even the appearance of impropriety, including but not necessarily limited to, avoiding any conflicts of interest. Therefore, contractors must execute disclosure statements specifying that they have no financial or other interest in the outcome of the project or action. The contractor's efforts should be closely monitored throughout the contract to ensure an adequate assessment/statement and also to avoid extensive, time-consuming, and costly analyses or revisions. FMCSA Action proponents and NEPA program managers must be continuously informed and involved. When selecting a contractor the following rules will apply:

(a) A contractor will be chosen solely by Federal agencies to avoid any conflict of interest.

(b) Agencies will prepare disclosure statements for execution by contractors specifying that the contractor has no financial or other interest in the outcome of the action.

(c) The responsible Federal official shall independently evaluate the EIS and take responsibility for its scope and contents.

(d) All contractor-prepared documents must indicate the contractor's level of involvement in the following ways:

1. If contractor involvement is minimal and only for a limited portion of the NEPA analysis process, then the contractor must be included in the list of preparers and the FMCSA Environment Project Manager will sign as the Environment Project Manager.

2. If the contractor has a major involvement in the preparation of the environmental document, or if the contractor and the FMCSA preparer have equal involvement in the preparation, then the "cover page" of the environmental document will indicate that the CED and/or checklist, EA, and/or EIS was prepared by the contractor for FMCSA and be signed by the contractor as the preparer, or that the documentation was prepared by both the contractor and FMCSA and be signed by the contractor and the FMCSA Environmental Project manager as preparers.

h.  Where the Public Can Access Information or Status Reports on Projects.

(1) FMCSA will make diligent efforts to involve the public in preparing and implementing its NEPA procedures. FMCSA will provide public notice of NEPA-related hearings and hold or sponsor public hearings or meetings, if appropriate and in accordance with statutory requirements. Public involvement will be determined on a case-by-case basis. For actions that require rulemaking, the public involvement under NEPA will be coordinated with the rulemaking notice and comment whenever possible.

30. SUBPART C. MARITIME ADMINISTRATION

This subpart, DOT Order 5610.1D, and other applicable laws, regulations, and Executive Orders apply to all elements of the Maritime Administration (MARAD) and all MARAD actions, including but not limited to, new or revised agency rules and regulations, as well as projects and programs that are entirely or partly financed, assisted, conducted, regulated, or approved by MARAD.

a. Applicability. MARAD is required to conduct a NEPA review for proposed major federal actions. Proposed major Federal actions subject to NEPA are not limited to actions directly carried out by MARAD, but also include actions approved, authorized, licensed, or funded by the Agency and carried out by other parties. For example, actions where MARAD provides financial assistance to non-federal entities under contracts, grants, or cooperative agreements, require NEPA analysis by MARAD prior to initiating the action.

b. Roles and Responsibilities. In administering the NEPA process to MARAD actions, the following responsibilities apply:

(1) Associate Administrator, Office of Environment and Compliance (or designee as appropriate):

(a) Act as principal liaison, with the Office of the Secretary of the Department of Transportation (OST), the Council on Environmental Quality (CEQ), the Environmental Protection Agency (EPA), other Federal agencies, Congress, state governments, and the public with respect to significant NEPA matters.

(b) Determine whether environmental impacts discussed in EAs may be significant, and sign FONSIs.

(c) Serve as the responsible agency official under NEPA and this Order for certifications under Sections 10 and 14.

(2) Director, Office of Environmental Compliance (or designee as appropriate):

(a) Advise and assist project applicant regarding the preparation and coordination of environmental documentation.

(b) Determine the appropriate NEPA level of review (CE, EA, EIS).

(c) Manage the environmental review process for all NEPA levels of review.

(d) Approve the completion of all EAs and EISs by project applicant.

(e) Prepare CE documentation, FONSIs, RODs.

(f) Sign CE documentation on behalf of the Agency.

(g) Determine, in instances where MARAD may exercise discretion over the appropriate level of public participation or dissemination of environmental documents, whether to

submit an environmental document for public notice and comment and the form of any such participation or dissemination.

(3) The Maritime Administration Chief Counsel (or designee as appropriate):

(a) Act as legal advisor to the Office of Environmental Compliance; and upon request, provide legal advice for compliance with NEPA to all decision-makers.

(b) Perform a legal sufficiency review of NOIs and NOAs, final EAs and FONSIs, draft and final EIS and RODs.

(c) NOIs, NOAs, FONSIs, RODs, draft and final EAs, draft and final EISs, and any other documentation considered part of the Administrative Record shall be reviewed by MARAD's Office of Chief Counsel for legal sufficiency prior to the document being shared with any member of the public.

(4) All Associate Administrators (AA), Independent Office Directors, USMMA, and Field Activity Heads:

(a) Advance and promote knowledge of NEPA and environmental requirements to their organizations.

(b) Notify the Office of Environmental Compliance regarding potential proposed actions that require NEPA review.

(c) Prepare necessary environmental documentation with guidance and assistance from the Office of Environmental Compliance.

(d) Work collaboratively with the Office of Environmental Compliance and ensure all environmental documentation is reviewed and signed by the Director, Office of Environmental Compliance or the Associate Administrator for Environment and Compliance.

(5) Project Applicants (e.g. MARAD, USMMA, Grantees, Deepwater Port Applicants, or contractors and agents acting on behalf, or for the benefit, of MARAD) should:

(a) Consult with the Office of Environmental Compliance, who has sole responsibility to determine the level of NEPA review appropriate for the proposed action.

(b) Work collaboratively with the Office of Environmental Compliance and ensure all environmental documentation is reviewed and signed by the Director, Office of Environmental Compliance or the Associate Administrator for Environment and Compliance, as appropriate.

(c) Comply with this Order if preparing environmental documents (e.g. EA or EIS) with MARAD supervision.

(d) Coordinate any required local notifications and coordinate with the Office of Environmental Compliance to oversee the process of necessary public meetings, hearings, or other public involvement to comply with the public participation requirements in this Order. The project applicant, with assistance from the Office of Environmental Compliance and the Office of Chief Counsel, will prepare the notifications and ensure that other stakeholders are notified, as necessary.

(e) Where MARAD seeks public comments on EAs or EISs, provide assistance with processing the comments, as appropriate.

c.  <u>Determination of the Level of NEPA Review</u>. MARAD has identified the following levels of NEPA review. (See Section 6 of this Order).

(1) A determination of the NEPA level of review is made by the Office of Environmental Compliance once sufficient information has been provided to make the determination and federal funding has been awarded, thus starting the schedule and corresponding deadlines. MARAD, in consultation with the project applicant, will prepare a schedule of NEPA activities to complete the required NEPA review within one year or two years, as appropriate.

(2) An EIS will be prepared for any proposed major Federal action significantly affecting the environment. Listed below are types of proposed actions that normally require the preparation of an EIS:

(a) Deepwater Port license applications

(b) Large port infrastructure projects

(3) If a decision has not been made to prepare an EIS and a proposed action is not categorically excluded pursuant to section 30e, , an EA will be prepared.

(4) Draft and final EAs, draft and final EIS, NOIs, NOAs, FONSIs, RODs, and any other documentation considered part of the Administrative Record shall be reviewed by MARAD's Office of Chief Counsel for legal sufficiency prior to the document being shared with any member of the public.

d.  <u>NEPA and Agency Decision Making</u>.

(1) The Office of Environmental Compliance will work with project applicants in an iterative process to aid efficient completion of the environmental documentation in accordance with the provisions of this Order and related authorities. Non-federal entities without an identified major federal action are not eligible for the NEPA review process. This decision is at the discretion of the Director, Office of Environmental Compliance.

(2) All necessary environmental documentation must be completed before a final decision is made to proceed with an action. Consistent with Section 7 of this Order, no action concerning the proposed action may be taken that would adversely impact existing environmental resources; significantly alter the existing conditions of the site in any way; or limit the choice of reasonable alternatives for the proposed action until the NEPA review process has been completed. In the case of financial assistance, funding shall not be expended by the project applicant unless it has first received written approval from MARAD.

(3) Long-Lead Time Purchases and Pre-NEPA Field Investigations.

(a) Project applicants may purchase construction materials or equipment with long lead times prior to the completion of NEPA, so long as the purchase of such equipment or materials does not limit the choice of reasonable alternatives. Long lead time equipment or materials may not be purchased without prior notification and approval from MARAD. Expending any funds associated with the proposed action without prior written approval from MARAD may result in the revocation of the recipient's Federal assistance. Long lead time items are those that require more than six months from time of order to the time of delivery. Associated factors could include the complexity of the item or market availability, unknown fabrication dates due to supply chain issues, or built to order items. Approvals will be made on individual elements or items based on the justification provided. The proposed construction schedule cannot be used as

justification to request purchasing a piece of equipment or construction materials prior to the completion of NEPA. The Office of Environmental Compliance, in conjunction with the appropriate MARAD program office and Office of Chief Counsel, has discretion in determining what constitutes a long-lead time item.

(b) MARAD recognizes that certain field surveys, studies, and/or investigations are necessary to collect data, inform an environmental document, and comply with regulatory permits. Pedestrian and desktop site surveys are permitted during the NEPA review and do not require MARAD approval. However, certain field surveys that require minimally invasive environmental disturbances to the natural and manmade environment are permitted only with prior notification to and approval from MARAD. Disturbances to the natural and manmade environment include, but are not limited to, any change to existing infrastructure, soil, vegetation, wetlands, waterbodies, water discharges, or air emissions within or related to the proposed action. As such, preliminary engineering and other analyses such as topographic surveys, metes and bounds surveys, geotechnical investigations, hydrologic and hydraulic analyses, utility engineering, traffic studies, and hazardous materials assessments may be authorized by MARAD after notice from the project applicant. The Office of Environmental Compliance, in conjunction with the appropriate MARAD program office and Office of Chief Counsel, has discretion in determining whether the surveys, studies, and/or investigations are allowable.

(c) Final design activities, project construction, and/or other elements associated with the proposed action that will adversely impact the environment or limit the choice of reasonable alternatives shall not proceed until the MARAD Office of Environmental Compliance deems the NEPA process complete.

e. <u>Categorical Exclusions</u>. MARAD may utilize its own agency CEs, in addition to DOT's CEs listed in Appendix A or another agency's CEs, using the procedures described in this section and DOT Order 5610.1D, Section 9, to categorically exclude a proposed action. MARAD has identified seven categories of action, which under normal circumstances do not result in reasonably foreseeable significant environmental impacts, and for which preparation of an EA or an EIS is therefore not necessary. CEs will be signed by the Director, Office of Environmental Compliance, or their designee.

(1) Administrative procurements (e.g., general supplies), contracts for personal services, personnel actions, project amendments which do not significantly alter the environmental impact of an action; and operating or maintenance subsidies, ship financing guarantees, deferred tax programs, etc., not resulting in a change in the effect on the environment.

(2) Research studies and activities, including those at the Computer-Aided Operations Research Facility, which do not involve the direct construction of facilities.

(3) Internal orders and procedures not required to be published in the Federal Register promulgation of rules, regulations, directives, and amendments thereto which do not require a regulatory impact analysis under section 3 of or do not have a potential to cause a significant impact on the environment; routine enforcement of statutes, rules, and safety and environmental standards and requirements, e.g., enforcement of statutes and rules regarding transfer of certain U.S.-flag vessels to any person not a citizen of the United states (sections 9, 31 when operative, and 41, Shipping Act, 1916, as amended) and enforcement of requirements for admission to the United States Merchant Marine Academy (section

1303, Merchant Marine Act, 1936, as amended and 46 CFR Part 310, Subpart C); and hearings , meetings, and public affairs activities.

(4) Reconstruction, modification, modernization, replacement, repair, and maintenance (including emergency replacement, repair, or maintenance) of equipment, facilities, or structures which do not change substantially the existing character of the equipment/facility/structure.

(5) Purchase, installation, or replacement of operating or maintenance equipment to be located within a Maritime Administration facility and with no significant physical impacts off the site.

(6) Acquisition of land in which the property will not be modified, its use will not be changed J and displacements will not occur.

(7) Project or program actions for which applicable environmental documentation has been prepared previously and environmental circumstances have not subsequently changed.

(8) Excessing and disposing of Maritime Administration personal or real property to the General Services Administration or otherwise; use of space in Maritime Administration-owned buildings or buildings which are constructed for or controlled by the General Services Administration; lease of existing buildings; lease of space for a term of one year or less; and renewal of existing leases that do not involve significant changes in use of property.

(9) Demolition and removal of buildings and other structures; water, sewage, electrical, gas, or other utility extensions of temporary duration; new gardening or landscaping, or the maintenance of existing landscape, filling of earth into previously excavated land with material compatible where the surface is restored and excavated material is protected against was and runoffs; grading on land with a slope of less than 10 percent; removal of obstructions on Maritime Administration property; and erosion control actions with no o ff-Maritime Administration property impact.

(10) Construction on Maritime Administration installations of small (30,000 square feet or less) structures such as storage buildings, garages, small parking areas, foot or bicycle paths; installation of signs, fences, and security lighting; minor expansion of facilities which require no additional land; and where expansion is due to remodeling of space in current quarters or existing buildings.

f.  Extraordinary Circumstances. With respect to the CEs listed above, extraordinary circumstances include, but are not limited to, the following:

(1) The proposed action is greater in scope or size than normally encompassed for actions in the category.

(2) The proposed action is controversial or likely to create controversy on environmental grounds.

(3) The proposed action increases in traffic congestion or traffic volumes on any mode of transportation.

(4) The proposed action includes in-water work.

(5) The proposed action is inconsistent with any applicable Federal, State, Tribal, or local law, requirement, or administrative determination relating to the protection of the environment.

MARAD may determine that, notwithstanding the extraordinary circumstance, the proposed agency action is not likely to result in reasonably foreseeable adverse significant impacts and apply the CE.

g.  Reliance on Existing Environmental Documents.

(1) Reevaluation. After a FONSI or ROD is signed, the environmental commitments, environmental setting and circumstances, or project design may change. In such a case, a reevaluation of the environmental document may be necessary. Alternatively, the project applicant may request or amend the scope of the proposed action, in which case a reevaluation may be necessary.

(a) During a reevaluation, MARAD will evaluate the existing environmental document to determine whether it remains adequate, accurate, and valid, or whether a new or supplemental NEPA analysis is needed. Such reevaluation shall be in writing.

(b) For the simplest and least environmentally intrusive projects (e.g., CEs), reevaluations should succinctly verify whether the scope of the project remains essentially the same, address any changes to the project and resulting impacts to natural, cultural, or social resources, and determine whether the prior environmental document remains valid.

(c) For where an EA or EIS was originally prepared, additional analysis may be required to support a conclusion that there are no new significant impacts and that the prior environmental document remains valid for the requested action or next phase of the project. These additional analyses may be incorporated by reference into the reevaluation documentation or the supplemental document, if one is appropriate.

(d) Reevaluation of an EA or EIS shall occur if more than five (5) years have passed since the date the environmental document was issued and the proposed action has not yet begun, additional federal approvals are required, or MARAD's Office of Environmental Compliance determines that a re-evaluation is warranted.

(e) Reevaluations may also apply to tiered or programmatic environmental documents. When MARAD relies on tiered or programmatic environmental documents, the subsequent environmental document should reevaluate the higher-level documents on which they rely.

(f) During a reevaluation MARAD will coordinate with other agencies, as appropriate. The Office of Environmental Compliance should identify the applicable cooperating and participating agencies to the original environmental document to determine who should be consulted during the reevaluation process.

(g) When a reevaluation indicates supplemental review is warranted due to significant, or potentially significant, new impacts, a supplemental EA or EIS will be prepared.

h.  Procedures for Applicant-Prepared Environmental documents.

(1) MARAD is responsible for the accuracy, scope, and content of all environmental documents, and must independently evaluate and ensure that they are prepared with professional and scientific integrity, using reliable data and resources.

(2) A project applicant/grantee may prepare or MARAD may delegate the preparation of an environmental document (EA or EIS) and other supporting environmental documentation for a proposed action to grantees, deepwater port applicants, contractors, or agents acting

on behalf, or for the benefit, of MARAD. Project applicants may prepare Environmental documentation contemporaneously with a funding or deepwater port application.

(a) Project applicant should consult with the Office of Environmental Compliance, who has sole responsibility to determine the appropriate NEPA level of review.

(b) Prior to entering into a contract for the preparation of an environmental document, MARAD will review proof of a proposed contractor's qualifications and expertise in the preparation of environmental documentation to avoid delays in implementing the proposed action. No contractor may be retained prior to approval from the Office of Environmental Compliance.

(c) MARAD will require an approved contractor to execute a disclosure statement, consistent with Section 7e, specifying any financial or other interest if applicable, or stating it has no financial or other interests in the outcome of the proposed action.

(d) Environmental documents prepared by project applicants or third-party contractors should consist of a technically complete document, including attachments and/or appendices that do not have any outstanding information or known data gaps. Draft environmental documents should be submitted to the Office of Environmental Compliance in Word format, consistent with the provisions outlined in Section 10. Revised draft environmental documents (all subsequent reviews after the initial review) should be submitted to MARAD in Word format with track changes. Comments from MARAD should not be deleted by the project applicant; MARAD will resolve if the response to the comment is sufficient. MARAD will advise when it is appropriate for the project applicant to submit a final copy of the environmental document. The final environmental document should be submitted in pdf format. All documents must be in compliance with Section 508 of the Rehabilitation Act of 1973.

(e) The scope of work and schedule must be approved by the Office of Environmental Compliance. The information should be of sufficient detail for MARAD to determine the NEPA level of review. Design of the proposed action should not be less than 30%.

(f) When preparing a schedule for completion of NEPA review:

1. The Office of Environmental Compliance will coordinate with the project applicant to obtain and review all the necessary information to determine if an EA or EIS is the required level of NEPA review (e.g. the application, project scope, desktop reviews, permits, previous environmental analyses, and a site visit).

2. The Office of Environmental Compliance will provide a generic schedule template for the project applicant to complete.

3. The NEPA completion schedule should include dates for completion of important milestones: Agency consultations, reviews, permits, authorizations, start and end dates. See Sections 10 and 14 for deadlines.

4. The Office of Environmental Compliance will review and approve the schedule.

(g) Project applicants should work collaboratively with the Office of Environmental Compliance and ensure all environmental documentation is streamlined to the maximum extent practicable.

(h)  MARAD will evaluate, in a single review, environmental impact statement/proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action, consistent with 42 U.S.C. § 4336a(b). MARAD will make the determination of independent utility for projects with potential connected actions, as applicable consistent with section 6b above.

i.  Where the Public Can Access Information or Status Reports on Projects. MARAD will publish final EAs, FONSIs, final EISs, and RODs on MARAD's webpage and/or the project applicant/grantee webpage. Interested persons may obtain information on MARAD environmental procedures and on the status of environmental analysis conducted by MARAD from the Office of Environmental Compliance, U.S Maritime Administration, 1200 New Jersey Ave. SE Washington, DC 20590. Email: MARAD.NEPA.comments@dot.gov.

31. SUBPART D. NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION

This subpart, DOT Order 5610.1D, and other applicable laws, regulations, and Executive Orders apply to all elements of the National Highway Traffic Safety Administration (NHTSA) and all NHTSA actions, including but not limited to, new or revised agency rules and regulations, as well as projects and programs that are entirely or partly financed, assisted, conducted, regulated, or approved by NHTSA.

a.  Applicability. NHTSA is required to conduct a NEPA review for proposed major federal actions and has no additional specific requirements from section 3 of this Order.

b.  Roles and Responsibilities. In administering the National Environmental Policy Act (NEPA) process to NHTSA actions, the following responsibilities apply:

(1)  NHTSA Administrator. The NHTSA Administrator is the designated senior agency official responsible for the overall review of agency NEPA compliance, including resolving implementation issues.

(2)  Associate Administrators. Each Associate Administrator, in consultation with the Deputy Chief Counsel, is responsible for determining, in accordance with this Order and this subpart, whether the projects and activities under their jurisdiction require an environmental review and for preparing the required reviews.

(3)  Deputy Chief Counsel. The Deputy Chief Counsel serves as the designee to the NHTSA Administrator in carrying out their responsibilities for administering NEPA.

c.  Determining the Appropriate Level of NEPA Review. NHTSA has identified the following levels of NEPA review. (See Section 6 of this Order).

(1)  The Associate Administrator, or their designated representative, must conduct a preliminary analysis of any proposed action to determine the appropriate level of NEPA review, in accordance with the NEPA statute, DOT Order 5610.1D Section 6, and this subpart.

(2)  NHTSA actions which normally require an EA may include, but are not limited to, rulemaking actions for which no applicable categorical exclusion has been established; and for which the action is not likely to have significant impacts, or for which the significance of the impacts is unknown.

(3)  NHTSA actions which normally require an EIS may include, but are not limited to, rulemaking actions which are likely to have significant impacts on the quality of the human environment.

d.  NEPA and Agency Decisionmaking.

(1) NHTSA should coordinate with appropriate Federal, State, Tribal, or local agencies, as well as any interested persons and organizations, when their involvement is reasonably foreseeable during the early stages of environmental review, to assist in identifying areas of significance and concern.

(2) While work on a required programmatic environmental review is in progress and the action is not covered by an existing programmatic review, NHTSA must not undertake in the interim any major Federal action covered by the program that may significantly affect the quality of the human environment unless such action:

   (a) Is justified independently of the program;

   (b) Is itself accompanied by an adequate environmental review; and

   (c) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

(3) NHTSA must integrate the environmental review into the decision-making process by requiring that relevant environmental documents, comments, and responses accompany the proposal through existing agency review processes, so that the environmental document is used in the decision-making process. NHTSA must include all relevant environmental documents, comments, and responses as part of the record in rulemaking proceedings.

(4) Rulemaking Proceedings. When preparing environmental documents for regulatory actions, NHTSA should combine public notice and comment processes under NEPA with those required by the rulemaking process wherever possible. Absent special circumstances, NHTSA must allow 30 days to comment on public documents. NHTSA may consider longer comment periods as appropriate. When simultaneously requesting public comment on regulatory action and its associated environmental document, and if a comment period is extended for the rulemaking process, NHTSA must also extend the comment period for the NEPA process and provide public notice accordingly. NHTSA must consider public comments and address them in final EAs and EISs.

(5) Use of Contractors. NHTSA must exercise care in selecting contractors and in reviewing their work to ensure complete and objective consideration of all relevant project impacts and alternatives. Where NHTSA authorizes a contractor to prepare an environmental document under its supervision, NHTSA must review and approve the entire environmental document and take responsibility for its accuracy, scope, and contents.

   (a) Contractors may prepare background or preliminary material and assist in preparing environmental documents for which NHTSA takes responsibility.

   (b) Contractors may not prepare a FONSI or ROD. NHTSA is solely responsible for preparing these environmental documents.

e. Categorical Exclusions. NHTSA may utilize DOT's CEs listed in Appendix A or another agency's CEs, using the procedures described in this section and DOT Order 5610.1D, Section 9, to categorically exclude a proposed action.

(1) When applying a CE to a proposed action, NHTSA must document the following, at a minimum:

(a) A description of the proposed action.

(b) The applicable CE reference and an explanation of its applicability to the proposed action.

(c) An analysis of the potential for extraordinary circumstances to occur in which a normally excluded action may have a significant impact.

(2) NHTSA must include the name of the preparer in the CE documentation and obtain approval from the Associate Administrator before submitting it with the proposal for the action.

(3) In addition to the procedures identified in this section, when NHTSA applies a CE to a rulemaking action, NHTSA must include the following in the rulemaking text or the rulemaking docket:

(a) The applicable CE reference and an explanation of its applicability to the proposed action.

(b) A summary of NHTSA's conclusions on the potential for extraordinary circumstances to occur.

(4) For any action that is normally categorically excluded, NHTSA must evaluate the action to determine if the extraordinary circumstances listed in Section 9.c. of this Order may apply.

(5) NHTSA may determine that, notwithstanding the extraordinary circumstance, the proposed agency action is not likely to result in reasonably foreseeable adverse significant impacts and apply the CE. NHTSA may consider whether mitigating circumstances or other conditions are sufficient to avoid significant impacts and therefore categorically exclude the proposed action.

f.   Environmental Assessments. NHTSA may include a regulatory EA in the regulatory notices and analyses section of the Advanced Notice of Proposed Rulemaking, Notice of Proposed Rulemaking, supplemental Notice of Proposed Rulemaking, Direct Final Rule, or Interim Final Rule, or as a stand-alone document in the Regulations.gov docket for the rulemaking action.

g.   Reliance on Existing Environmental Documents. NHTSA may rely on existing environmental documents as outlined in Section 18.

(1) Reevaluations and Supplemental Environmental Documents. NHTSA must reevaluate and prepare supplements to either draft or final EISs if a major Federal action remains to occur, and NHTSA either makes substantial changes to the proposed action that are relevant to environmental concerns; or there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. NHTSA should prepare, publish, and file a supplement to an EA or EIS (exclusive of scoping) as a draft and final EA or EIS, as is appropriate to the stage of the environmental document involved.

h.   Where the Public Can Access Information or Status Reports on the NEPA Process.

(1) Website. The Deputy Chief Counsel is responsible for making available environmental documents, relevant notices, and other relevant information on NHTSA's website for use by agencies and interested persons. Interested persons may obtain information regarding the status of environmental documents and other elements of the NEPA process by contacting nhtsa.nepa_mailing@dot.gov.

(2) EIS Publication. NHTSA must publish an EIS for public review as three individual files: (1) Summary; (2) EIS Document (chapters); (3) EIS Appendices (if applicable). The three files

comprising the EIS should be posted to the NHTSA website, the appropriate docket, and e-NEPA, along with the public comment period end date.

32. SUBPART E. PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION

This subpart, DOT Order 5610.1D, and other applicable laws, regulations, and Executive Orders apply to all elements of the Pipeline Hazardous Materials Safety Administration (PHMSA) and all PHMSA actions, including but not limited to, new or revised agency rules and regulations, as well as projects and programs that are entirely or partly financed, assisted, conducted, regulated, or approved by PHMSA.

a. Applicability. PHMSA's mission is to protect people and the environment by advancing the safe transportation of energy and other hazardous materials. To do this, the agency establishes national policy, sets, and enforces standards, educates, and conducts research to prevent incidents. Based on this mission, PHMSA's major Federal actions that are subject to NEPA review generally fall into three categories: regulatory actions, special permits, and natural gas distribution grant actions:

(1) Regulatory Actions. PHMSA promulgates regulations to improve the safety of transportation of hazardous materials in all modes, including the Hazardous Materials Regulations (49 CFR parts 171–180) and the Pipeline Safety Regulations (49 CFR parts 190– 199). PHMSA does not site, permit, or authorize transportation infrastructure or the transportation of hazardous materials. PHMSA's regulatory standards are intended to reduce the likelihood of release of hazardous materials into the human environment during ongoing transportation of hazardous materials.

(2) Special Permits. A Special Permit sets forth alternative requirements, or variances, to the requirements in the Hazardous Materials Regulations (49 CFR parts 171–180) or Pipeline Safety Regulations (49 CFR parts 190–199).PHMSA may issue such variances if the applicant demonstrates an equivalent level of safety will be achieved or, if a required safety level does not exist, the alternative requirements are consistent with the public interest.

(3) Natural Gas Distribution Grants. PHMSA awards grants under programs including the Natural Gas Distribution Infrastructure Safety and Modernization grant program. This program assists municipalities or community-owned utilities (not including for-profit entities) in the repair, rehabilitation, or replacement of their natural gas distribution pipeline systems or portions thereof or in the acquisition of equipment to (1) reduce incidents and fatalities and (2) avoid economic losses.

(4) Other PHMSA actions subject to NEPA review may include administrative actions, such as administrative procurements or personnel actions.

b. Roles And Responsibilities. In administering the National Environmental Policy Act (NEPA) process to PHMSA's actions, the following responsibilities apply:

(1) Pipeline and Hazardous Materials Safety Administration (PHMSA) Administrator. The Administrator or designee is responsible for ensuring Agency compliance with NEPA pursuant to delegated authority under DOT regulation 49 CFR 1.81(a)(5).

(a) The Administrator or designee must review and approve all final EIS and RODs.

(b) The Administrator or designee must appoint an Agency Environmental Coordinator within the Environmental Analysis and Compliance Division (EACD) to manage day-to-day NEPA functions, including approval of any CE determination, EA, FONSI, or DEIS. The

Agency Environmental Coordinator, or a designee, must lead and review development of all CEs, EAs, FONSIs, EISs and RODs.

(2) Agency Environmental Coordinator. The Agency Environmental Coordinator must implement the provisions of NEPA on behalf of the Administrator or designee. This includes serving as an initial point of contact for interested parties to request information or status reports on environmental documents and other elements of the NEPA process. PHMSA must post the name and contact information of this individual on PHMSA's website.

    (a) The Agency Environmental Coordinator, or a designee, must lead and review development of all CEs, EAs, FONSIs, EISs and RODs.

    (b) The Agency Environmental Coordinator must implement a training program to ensure all PHMSA personnel engaged in programs and projects that may include a federal action subject to NEPA are familiar and comply with this Order.

    (c) The Administrator delegates authority to the Agency Environmental Coordinator to designate a Lead Environmental Protection Specialist and a Federal Preservation Officer.

(3) Lead Environmental Protection Specialist. The Lead Environmental Protection Specialist or appropriate representative must coordinate NEPA activities for grant programs and is authorized to approve EAs, FONSIs, and CE determinations for these programs, following consultation with the Program Offices and PHMSA Office of Chief Counsel, and final authorization from the Agency Environmental Coordinator.

(4) Federal Preservation Officer. The Federal Preservation Officer is authorized to act as the PHMSA agency official, under 36 CFR 800, consult on the behalf of PHMSA, sign PHMSA correspondence, and identify Program Alternatives for the purpose of compliance with section 106 of the National Historic Preservation Act and the Advisory Council on Historic Preservation.

(5) PHMSA Office of Chief Counsel. The PHMSA Office of Chief Counsel will review all EAs, FONSIs, Draft EISs, Final EISs, RODs, and analyses under Section 4(f) of the U.S. Department of Transportation Act (49 U.S.C. § 303). At its discretion, the Office of Chief Counsel may review any other environmental document, including CE determinations, to ensure legal compliance and assess legal risk.

c. Categorical Exclusions. PHMSA may utilize its own agency CE, in addition to DOT's CEs listed in Appendix A or another agency's CEs, using the procedures described in this section and DOT Order 5610.1, Section 9, to categorically exclude a proposed action. Approved CEs will be posted on the PHMSA website at www.phmsa.dot.gov/planning-and-analytics/environmental-analysis-and-compliance/implementing-procedures

(1) Equipment acquisition (including purchase or lease) of handheld and mobile methane detection equipment and associated vehicles.

(2) Granting, renewing, or denying a special permit related to waiving class location or odorization requirements, following the procedures set forth in 49 CFR 190.341, including the identification of any enforceable conditions, imposed pursuant to 49 CFR 190.341(d)(2), that are required to prevent and address pipeline safety and environmental risk.

(3) Rulemaking actions by the Office of Hazardous Materials Safety, other than deregulatory rulemaking actions, within one of the following categories:

(a) Policies, directives, regulations, and guidelines that are of an administrative, financial, legal, technical, or procedural nature;

(b) Regulations designating, defining, or classifying regulated materials (hazardous materials, hazardous substances, hazardous wastes, marine pollutants, elevated temperature materials, materials designated as hazardous in the Hazardous Materials Table (49 CFR 172.101), and materials that meet the defining criteria for hazard classes and divisions in 49 CFR part 173);

(c) Regulations imposing requirements on transportation of regulated materials, including shipping papers, marking, labeling, placarding, emergency response information, training, and safety and security plans;

(d) Regulations concerning stowage and segregation of regulated materials in transportation, including rail car, portable tank, and cargo tank placement; loading, unloading, transportation, and storage of regulated materials by mode (rail, aircraft, vessel, and highway); revising standards for bulk and non- bulk packages (cylinders, portable tanks, cargo tanks, radioactive packages, intermediate bulk containers, drums, jerricans, boxes, and composite packagings, etc.); or incident reporting or tracking of regulated movements;

(e) Editorial or technical revisions and clarifications to correct editorial errors and improve clarity; and

(f) Training, testing, and qualification of regulated materials personnel.

(4) Rulemaking actions by the Office of Pipeline Safety, other than deregulatory rulemaking actions, within one of the following categories:

(a) Policies, directives, regulations, and guidelines that are of an administrative, financial, legal, technical, or procedural nature;

(b) Regulations concerning corrosion control; training, testing, and qualification of operator personnel; or emergency response;

(c) Editorial or technical revisions and clarifications to correct editorial errors and improve clarity; and

(d) Revisions to civil penalty amounts that may be imposed for violations of certain DOT regulations.

(5) Repair, rehabilitation, or replacement of natural gas distribution pipelines and associated equipment within existing rights-of-way or easements. Associated actions include but are not limited to replacement of service lines, meters, metering stations, valves, taps, abandonment in place or abandonment by removal, minor excavation, replacement of pavement of existing roadway and/or sidewalks, and relocation within existing rights-of-way or easements. Actions will follow the applicable safety standards and requirements described at 49 CFR part 192.

d. Extraordinary Circumstances.

Extraordinary circumstances are factors or circumstances that indicate that a normally categorically excluded action may have a significant environmental impact. If an extraordinary circumstance exists, the Agency Environmental Coordinator, or designated representative, must consult the PHMSA Office of Chief Counsel and Program Offices to confirm whether the use of a

CE is appropriate. PHMSA may determine that, notwithstanding the extraordinary circumstance, the proposed agency action is not likely to result in reasonably foreseeable adverse significant impacts and apply the CE. If the Agency Environmental Coordinator or designated representative determines that use of a CE is inappropriate, the level of NEPA review should typically be an EA or EIS subject to the final determination of the Administrator. PHMSA will apply the extraordinary circumstances listed in Section 9.c. of this Order. Additional extraordinary circumstances PHMSA should consider include, but are not limited to:

(1) The proposed action may increase the likelihood of a reasonably foreseeable release under the Hazardous Materials Regulations (49 CFR parts 171–180) or Pipeline Safety Regulations (49 CFR parts 190–199).

(2) The proposed action may have an adverse impact on Floodplains, as defined in Executive Order 11988, Floodplain Management, as amended by Executive Order 13690, and DOT Order 5650.2. PHMSA's compliance with these Orders will inform its extraordinary circumstances analysis.

e. Procedures for Applicant-Prepared Environmental documents. PHMSA is responsible for the accuracy, scope, and content of all environmental documents, and must ensure they are prepared with professional and scientific integrity, using reliable data and resources. In accordance with section 107(f) of NEPA, applicants, including applicant-directed contractors, may prepare EAs and EISs under PHMSA's supervision, subject to the following procedures:

(1) If an applicant chooses to use a contractor to prepare an environmental document, PHMSA must ensure that all costs of using a contractor will be borne by the applicant. Furthermore, PHMSA must ensure a disclosure statement is prepared for the contractor's execution specifying that the contractor has no financial or other interest in the outcome of the action.

(2) PHMSA must participate in and supervise the document's preparation. PHMSA must assist contractors and applicants by providing guidance and outlining the types of information required for the preparation of the environmental document. Additionally, PHMSA must collaborate with the contractor to ensure the analysis is focused on areas where there is a higher potential for significant impacts.

(3) PHMSA must review and approve the statement of purpose and need and the alternatives that will be considered in the environmental document at an early time, before the applicant (or the applicant's contractor) prepares the rest of the environmental document.

(4) PHMSA must independently evaluate the environmental document and take responsibility for its accuracy, scope, and contents. PHMSA may choose in its discretion to accept, edit, revise, or independently author sections of the document or the whole document.

(5) PHMSA must include a statement in any environmental document prepared by an applicant or contractor stating that PHMSA has independently evaluated the document for its accuracy, scope, and contents. The environmental document must include the names and qualifications of individuals responsible for preparing and reviewing the document, including those individuals from PHMSA responsible for conducting the Agency's independent evaluation.

(6) PHMSA must independently prepare FONSIs and RODs without the support of an applicant or their contractor.

(7) PHMSA must ensure that the applicant preserves and includes in a decision file all factual, scientific, or technical information used, developed, or considered by the applicant in the course of preparing the draft environmental document, including any correspondence with PHMSA or with third parties.

f.  Where the Public Can Access Information or Status Reports on Projects. Interested persons may find information on projects and agency initiatives at PHMSA's Newsroom, located on the PHMSA website at https://www.phmsa.dot.gov/newsroom.

(1) Regulatory Actions. PHMSA must notify the public of the availability of Draft EAs and DEISs for regulatory actions subject to public notice and comment, to solicit public comment. PHMSA may publish the Draft EA in the "Regulatory Notices and Analyses" section of a Notice of Proposed Rulemaking or supplemental Notice of Proposed Rulemaking, or as a standalone document in the docket for the rulemaking action, found at www.regulations.gov (in which case PHMSA must include a citation to the docket in the "Regulatory Notices and Analyses" section).

(2) Special Permits. Special permits and associated environmental documents are posted in the Federal Register and available at www.regulations.gov. Copies these documents are also posted on the PHMSA website at https://www.phmsa.dot.gov/guidance. A special permit, or regulatory waiver, is an order by which PHMSA waives compliance with one or more of the requirements in the hazardous material regulations (49 C.F.R. Parts 171-180) or pipeline safety regulations (49 C.F.R. Parts 190-199), subject to conditions set forth in the permit.

(3) Natural Gas Distribution Grants. For site-specific construction projects, such as natural gas distribution grants, PHMSA provides public access to CEs, EAs, and DEISs on PHMSA's website at https://www.phmsa.dot.gov/about-phmsa/working-phmsa/grants/pipeline/phmsa-tier-2-site-specific-environmental-assessment. PHMSA must solicit public comment on Draft EAs and DEISs. PHMSA will confirm that grantees must also make these documents available in a location that is locally accessible to where the proposed action is located.

## Appendix A – List of Department of Transportation Categorical Exclusions

The following CEs are for DOT actions. OAs may utilize these CEs for their projects. When an OA uses these CEs, they may do so without following the cross-modal CE sharing process. When using these CEs, the OA must evaluate the extraordinary circumstances outlined in Section 9.

1. Administrative procurements (e.g., general supplies) and contracts for personnel services.

2. Personnel actions (e.g., promotions, hirings).

3. Training, technical assistance, and educational and informational programs and activities.

4. Project amendments (e.g., increases in costs) which do not significantly alter the environmental impact of an action.

5. Operating or maintenance subsidies when the subsidy will not result in a change in the effect on the environment.

6. The following actions relating to economic regulation of airlines:

    a. Actions implementing the essential air service program;

    b. Enforcement proceedings;

    c. Actions approving a carrier agreement; acquisition of control, merger, consolidation, or interlocking relationship;

    d. Finding a carrier fit under Section 410 of the Federal Aviation Act of 1958;

    e. Approving or setting carrier fares or rates;

    f. Route awards involving turboprop aircraft having a capacity of 60 seats or less and a maximum payload capacity of 18,000 pounds or less;

    g. Route awards that do not involve supersonic service and will not result in the increase in commercial aircraft operations of one or more percent;

    h. Determinations on termination of airline employees;

    i. Actions relating to consumer protection, including regulations;

    j. Authorizing carriers to serve airports already receiving the type of service authorized;

    k. Granting temporary or emergency authority;

    l. Negotiating bilateral agreements;

    m. Registration of an air taxi operator pursuant to the Department's Regulations (14 CFR Part 298); and

    n. Granting of charter authority to a U.S. or foreign air carrier under sections 401, 402 or 416 of the Federal Aviation Action or the Department's Economic Regulations.

Sean P. Duffy
Secretary of Transportation

7/1/25

Date

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darre E. Parker, Executive Officer
7/11/2025 7:46 PM
By: Terri Chavez , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SANTA BARBARA
SOUTH COUNTY REGION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br><br>**SECOND REQUEST FOR JUDICIAL NOTICE RE: PETITIONERS' COMBINED REPLY IN SUPPORT OF APPLICATION FOR AN ADMINISTRATIVE STAY OR PRELIMINARY INJUNCTION**<br><br>[Filed Concurrently with Petitioners' Combined Reply, Second Declaration of Julie Teel Simmonds, Declaration of Paasha Mahdavi, Responses to Objections, and Evidentiary Objections]<br><br>Date: July 18, 2025<br>Time: 10:00 a.m.<br>Dept: 4<br>Judge: Hon. Donna D. Geck<br><br>[Action Filed: April 15, 2025] |

1

SECOND REQUEST FOR JUDICIAL NOTICE

**REQUEST FOR JUDICIAL NOTICE**

Pursuant to California Evidence Code sections 452 and 453, Petitioners CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION (Petitioners) respectfully submit this Second Request for Judicial Notice in support of their Application for an Administrative Stay or Preliminary Injunction.

Evidence Code section 453 provides that a court must take judicial notice of any matter specified in section 452 when the requesting party "[g]ives each adverse party sufficient notice of the request" and "[f]urnishes the court with sufficient information to enable it to take judicial notice of the matter." (Evid. Code, § 453.) Petitioners have satisfied these conditions by serving the attached request on Respondents and Real Parties in Interest.

Courts may take judicial notice of "[o]fficial acts of the legislative, executive, and judicial departments of the United States and of any state of the United States." (Evid. Code, § 452, subd. (c).) Section 452(c) has "been read to allow judicial notice of administrative agency records." (*Associated Builders & Contractors, Inc. v. San Francisco Airports Comm'n* (1999) 21 Cal.4th 352, 374, fn.4.) The official acts covered by this provision "include records, reports, and orders of administrative agencies." (*Rodas v. Spiegel* (2001) 87 Cal.App.4th 513, 518.) Here, the Exhibits were prepared by state and federal administrative agencies and are obtainable from administrative agency websites.

Finally, under Evidence Code section 452, subdivision (h), courts may take judicial notice of "[f]acts . . . that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." As noted above, the Exhibits were prepared by state and federal agencies and are obtainable on agency websites, so they are capable of immediate and accurate determination.

Judicial notice is appropriate here because the administrative record has not been prepared and certified and in the meantime the facts contained in these documents are not reasonably subject to dispute and are highly relevant to Petitioners' Application. Accordingly, Petitioners respectfully request that this Court take judicial notice of the documents listed below pursuant to Evidence Code section 452, subdivisions (c) and (h):

1. Attached as Exhibit 1 to the concurrently filed Second Declaration of Julie Teel Simmonds is a true and correct copy of Sable Offshore Corp.'s (Sable) Restart Plan for CA-324, available on the Office of the State Fire Marshal's (Cal Fire) webpage at: https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

2. Attached as Exhibit 2 to the concurrently filed Second Declaration of Julie Teel Simmonds is a true and correct copy of Sable's Restart Plan for CA-324, available on Cal Fire's webpage at: https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

3. Attached as Exhibit 3 to the concurrently filed Second Declaration of Julie Teel Simmonds is a true and correct copy of Sable's June 3, 2025, Form 8-K filed with the U.S. Securities and Exchange Commission (SEC), available on SEC's webpage at: https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000183148125000045/socc-20250603.htm.

4. Attached as Exhibit 4 to the concurrently filed Second Declaration of Julie Teel Simmonds is a true and correct copy of excerpts of from a Mitigated Negative Declaration, *ExxonMobil Santa Ynez Unit (SYU) Offshore Power System Reliability – B Phase 2 Project* (July 2014), available on California State Lands Commission webpage: https://www.slc.ca.gov/ceqa/exxonmobil-santa-ynez/.

5. Attached as Exhibit 7 to the concurrently filed Second Declaration of Julie Teel Simmond is a true and correct copy of Pipeline and Hazardous Materials Safety Administration's (PHMSA) Liquid Pipeline Advisory Committee Roster and Biographies webpage, available on PHMSA's webpage at: https://www.phmsa.dot.gov/standards-rulemaking/pipeline/liquid-pipeline-advisory-committee-lpac-committee-roster-and

6. Attached as Exhibit 8 to the concurrently filed Second Declaration of Julie Teel Simmond is a true and correct copy of the May 18, 2016, letter from PHMSA to Cal Fire to "memorialize the understanding" between them about the transfer of oversight over Lines 901 and 903, available on PHMSA's webpage at:

SECOND REQUEST FOR JUDICIAL NOTICE

https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA-CSFM-MOU-Plains-line901-903.pdf.

7. Attached as Exhibit 9 to the concurrently filed Second Declaration of Julie Teel Simmonds is a true and correct copy of excerpts of the June 1984 Final Environmental Impact Statement/Report for Santa Ynez Unit/Las Flores Canyon Development and Production Plan proposed by Exxon Company, U.S.A., available on the Santa Barbara County (County) webpage at:

https://cosantabarbara.app.box.com/s/p07x4k8ah41vmggyvm6qr2f7eqwvgwu1/file/1857841062039.

8. Attached as Exhibit 10 to the concurrently filed Second Declaration of Julie Teel Simmonds is a true and correct copy of the U.S. Department of the Interior Bureau of Safety and Environmental Enforcement (BSEE) webpage for Sable Offshore Corp. listing information about the "Platforms Operated by Sable Offshore Corp.," available on the BSEE webpage at: https://www.bsee.gov/stats-facts/ocs-regions/pacific/pacific-ocs-platforms/exxonmobil.

9. Attached as Exhibit 12 to the concurrently filed Second Declaration of Julie Teel Simmonds is a true and correct copy of Sable's July 10, 2024, Form 8-K filed with the SEC, available on SEC's webpage at:

https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000119312524177531/d675159d8k.htm.

10. Attached as Exhibit 13 to the concurrently filed Second Declaration of Julie Teel Simmonds is a true and correct copy of excerpts from the Draft Environmental Impact Report/Environmental Impact Statement (August 1984) for the Proposed Celeron/All American and Getty Pipeline Projects, available on the County webpage at:

https://cosantabarbara.app.box.com/s/p07x4k8ah41vmggyvm6qr2f7eqwvgwu1/folder/320507419062

11. Attached as Exhibit 14 to the concurrently filed Second Declaration of Julie Teel Simmonds is a true and correct copy of excerpts from the Final Environmental Impact

4

Report/Environmental Impact Statement for the Proposed Celeron/All American and Getty Pipeline Projects, available on the County webpage at: https://cosantabarbara.app.box.com/s/p07x4k8ah41vmggyvm6qr2f7eqwvgwu1/folder/320507419062.

12. Attached as Exhibit 15 to the concurrently filed Second Declaration of Julie Teel Simmonds is a true and correct copy of PHMSA's "Pipeline Special Permits and State Waivers Overview", available on PHMSA's webpage at: https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

13. Attached as Exhibit 17 to the concurrently filed Second Declaration of Julie Teel Simmonds is a true and correct copy of the U.S. Department of Transportation's (DOT) Procedures for Considering Environmental Impacts (July 1, 2025), DOT Order 5610.1D, available on DOT's webpage at: https://www.transportation.gov/sites/dot.gov/files/2025-07/DOT_Order_5610.1D_OST-P-250627-001_508_Compliant.pdf.

Dated: July 11, 2025                              Respectfully Submitted,


                                                 s/ *Julie Teel Simmonds*
                                                 JULIE TEEL SIMMONDS (Bar No. 208282)
                                                 jteelsimmonds@biologicaldiversity.org
                                                 CENTER FOR BIOLOGICAL DIVERSITY
                                                 2100 Franklin St., Ste. 375
                                                 Oakland, CA 94612
                                                 Tel. (510) 844-7100

                                                 *Attorney for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

5

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2025 7:46 PM
By: Terri Chavez , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological
Diversity and Wishtoyo Foundation*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA BARBARA
## SOUTH COUNTY REGION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><hr>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br><br>**DECLARATION OF PAASHA MAHDAVI RE: PETITIONERS' COMBINED REPLY IN SUPPORT OF APPLICATION FOR AN ADMINISTRATIVE STAY OR PRELIMINARY INJUNCTION**<br><br>[Filed Concurrently with Petitioners' Combined Reply, Second Declaration of Julie Teel Simmonds, Second Request for Judicial Notice, Responses to Objections, and Evidentiary Objections]<br><br>Date: July 18, 2025<br>Time: 10:00 a.m.<br>Dept: 4<br>Judge: Hon. Donna D. Geck<br><br>[Action Filed: April 15, 2025] |

1

DECLARATION OF PAASHA MAHDAVI RE: PETITIONERS' COMBINED REPLY

**DECLARATION OF PAASHA MAHDAVI**

I, Paasha Mahdavi, hereby declare as follows:

1. I have personal knowledge of the matters set forth in this declaration and, if called as a witness, could and would competently testify thereto.

2. I am an Associate Professor and the Director of the Energy Governance and Political Economy (EGAPE) Lab at U.C. Santa Barbara. I hold degrees in economics (B.A.), international energy policy (M.A.), statistics (M.S.), and political science (Ph.D.) from Columbia University, Stanford University, and UCLA.

3. I am an expert in energy economics, statistics, and global energy policy based on my training, education, and experience. My research focuses on the impact of oil and gas resources on governance and environmental politics. Attached as **Exhibit A** is my curriculum vitae.

4. In 2024, Sable Offshore Corp. ("Sable") announced that restarting oil and gas production from three offshore platforms that comprise the Santa Ynez Unit (SYU) would reduce the need to import foreign oil and that without SYU production, foreign imports and domestic production would increase. I evaluated the evidence relating to these claims in my report, titled *Economic Analysis of Market Impacts of Resuming Oil and Gas Production from the Santa Ynez Unit*, dated February 2025. A true and correct copy of this report is attached hereto as **Exhibit B**.

5. The report sets forth my opinion, based on my review of historical data on oil supply offers, Sable's 2024 investor reports, California agency energy reports, and economic and statistics studies, including: crude oil supply data sourced from California Air Resources Board; Sable Offshore Corp.'s "Investor Presentation September 2024" and "Investor Presentation November 2024;" California Energy Commission's "Draft 2024 Integrated Energy Policy Report Update" and "Foreign Sources of Crude Oil Imports to California;" and "Estimated Carbon Intensity Values for the Crude Lookup Table, App. F to Proposed Amendments to the Low Carbon Fuel Standard Regulations," authored by California Air Resources Board. My opinion additionally draws on emissions data from the "Oil Production Greenhouse gas Emissions Estimator (OPGEE)," authored by researchers at Stanford University and California Air Resources Board, and supported by California Environmental Protection Agency and California Air Resources Board.

DECLARATION OF PAASHA MAHDAVI RE: PETITIONERS' COMBINED REPLY

6.      My opinion, as set forth in my report, is as follows:

a.    Restarting SYU production will not significantly reduce foreign imports, based on both statistical analysis of the 2015 pause and an economic analysis of costs compared to major suppliers of crude oil.

b.    Not restarting SYU will not have significant impacts on consumer markets over time, given declining demand for petroleum products in California through 2045 outpaces the loss of supply from SYU production.

c.    Production from SYU will increase global greenhouse gas emissions given the higher greenhouse gas intensity of operations compared to industry averages for operations from commensurate fields.

7.      Based on the facts I have reviewed and my professional analysis, in my opinion restarting the Las Flores Pipeline will not markedly benefit California's environment or economy.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 8th day of July, 2025, in Santa Barbara, California.

Paasha Mahdavi

3

DECLARATION OF PAASHA MAHDAVI RE: PETITIONERS' COMBINED REPLY

## INDEX OF EXHIBITS
### Declaration of Paasha Mahdavi

| Exhibit No. | Description | Starting Page No. |
|---|---|---|
| Exhibit A | Curriculum vitae of Paasha Mahdavi | 5 |
| Exhibit B | Report, Economic Analysis of Market Impacts of Resuming Oil and Gas Production from the Santa Ynez Unit (February 2025) | 14 |

# Exhibit A

Declaration of Paasha Mahdavi

# Paasha Mahdavi

| | | |
|---|---|---|
| CONTACT | Ellison 3807 | *Mobile:* 858 243 1840 |
| | Mail Code 9420 | *E-mail:* paasha@ucsb.edu |
| | Santa Barbara, CA 93106 | *Site:* www.paashamahdavi.com |

**ACADEMIC POSITIONS**

Vice Chair, Department of Political Science, UCSB, 2024–

Associate Professor (with tenure), Political Science, UCSB, 2022–

Director, Energy Governance and Political Economy (EGAPE) Lab, 2021–

Assistant Professor, Political Science, UCSB, 2018–2022

Assistant Professor, McCourt School of Public Policy, Georgetown University, 2015–2018

**EDUCATION**

UCLA: Ph.D. in Political Science (2015), M.S. in Statistics (2015)

Stanford University: M.A. in International Policy, *concentration in Energy Policy* (2009).

Columbia University: B.A. in Economics, *with Departmental Honors* (2006).

**AFFILIATIONS**

Co-founder, The 2035 Initiative at UCSB, 2022–

Affiliated faculty, Bren School of Environmental Science & Management, 2021–

Visiting faculty, Johns Hopkins SAIS, Spring 2024

Campbell Visiting Fellow, Hoover Institution, 2021–2022

Term Member, Council on Foreign Relations, 2019–2024

Payne Institute Non-resident Fellow, Colorado School of Mines, 2018–

Initiative for Sustainable Energy Policy (ISEP) Fellow, Johns Hopkins SAIS, 2017–

GFC Fellow for the Council on the Future of Energy, World Economic Forum, 2016–2018

**BOOK**

Paasha Mahdavi. 2020. *Power Grab: Political Survival Through Extractive Resource Nationalization.* Cambridge University Press (Series on Business and Public Policy).

* Reviews: *Democratization*, *Perspectives on Politics*, *Texas National Security Review*, *China International Strategy Review*
* Media coverage: *Huffington Post, Grist, Washington Examiner, New Books Network Podcast, The Elucidators Podcast, Eqtesād bā t'am siāsat (Economy with a Taste of Politics channel; in Persian), The New Republic*

**PEER-REVIEWED ARTICLES**

16. Matto Mildenberger, Sara M. Constantino, Paasha Mahdavi, Parrish Bergquist, Gabriel De Roche, Emma Franzblau, Cesar Martinez-Alvarez, Ingmar Sturm. 2025. "How vulnerable publics in small-island states view climate change and international responses to it." Forthcoming, *Proceedings of the National Academy of Sciences*

15. Paasha Mahdavi, Eve Simoni, and Michael Ross. 2025. "Fossil fuel subsidy reforms have grown more fragile." *Nature Climate Change.* 15: 569–574. [Cover article]

14. Parrish Bergquist and Paasha Mahdavi. 2023. "Examining the effect of cost information and framing on support for methane regulations in Europe." *Environmental Research Letters.* 18(9): 094046.

13. Cesar Martinez-Alvarez, Chad Hazlett, Paasha Mahdavi, and Michael Ross. 2022. "Political leadership has limited impact on fossil fuel taxes and subsidies." *Proceedings of the National Academy of Sciences.* 119(47): e2208024119, 1-8.

   ↪ "Reply to van den Bergh and Savin: Fossil fuel taxes are politically hard to change." *Proceedings of the National Academy of Sciences.* 120(14): e2302318120

12. Adam Crepelle, Paasha Mahdavi, and Dominic Parker. 2024. "Effects of per capita payments on governance: Evidence from tribal casinos." *Public Choice.* 199: 319–340.

11. Paasha Mahdavi, Cesar Martinez-Alvarez, and Michael Ross. 2022. "Why do governments tax or subsidize fossil fuels?" *Journal of Politics.* 84(4): 2123-2139.

10. Jessica Green, Jennifer Hadden, Thomas Hale, Paasha Mahdavi. 2022. "Transition, hedge, or resist? Understanding political and economic behavior toward decarbonization in the oil and gas industry." *Review of International Political Economy.* 29(6): 2036-2063.

9. Noel P. Johnston, Nicole Janz, and Paasha Mahdavi. 2022. "Expropriation and Human Rights: Does the seizure of FDI signal wider repression?" *Review of International Organizations.* 17: 847–875.

8. Paasha Mahdavi, Jessica Green, Jennifer Hadden, and Thomas Hale. 2021. "Using earnings calls to uderstand the political behavior of major polluters." *Global Environmental Politics.* 22(1): 159–174.

7. Raphael Calel and Paasha Mahdavi. 2020. "Unintended consequences of anti-flaring policies and measures for mitigation." *Proceedings of the National Academy of Sciences.* 117(23): 12503-12507.

6. Paasha Mahdavi. 2020. "Institutions and the 'resource curse': Evidence from cases of oil-related bribery." *Comparative Political Studies.* 53(1): 3–40.

5. Paasha Mahdavi and John Ishiyama. 2020. "Dynamics of the inner elite in dictatorships: Evidence from North Korea." *Comparative Politics.* 52(2): 221–249.

4. Paasha Mahdavi. 2019. "Scraping public co-occurrences for statistical network analysis of political elites." *Political Science Research and Methods.* 7(2): 385–392.

3. Michael Ross, Chad Hazlett, and Paasha Mahdavi. 2017. "Global progress and backsliding on gasoline taxes and subsidies." *Nature Energy.* 2(16201): 1-6.

2. Paasha Mahdavi. 2015. "Explaining the oil advantage: Effects of natural resource wealth on incumbent reelection in Iran." *World Politics.* 67(2): 226–267.

1. Paasha Mahdavi. 2014. "Why do leaders nationalize the oil industry? The politics of resource expropriation." *Energy Policy.* 75(C): 228–243.

BOOK
CHAPTERS

3. Paasha Mahdavi and Noosha Uddin. 2021. "Governance amidst the transition to alternative energy in the Middle East and North Africa." In Robin Mills and Li-Chen Sim (eds.) *Low Carbon Energy in the Middle East and North Africa.* London, UK: Palgrave Macmillan (International Political Economy Series).

2. Miriam Golden and Paasha Mahdavi. 2015. "The institutional components of political corruption." 2015. In Ruben Ruiz-Rufino and Jennifer Gandhi (eds.), *Handbook of Comparative Political Institutions.* New York, NY: Routledge Press.

1. Paasha Mahdavi. 2012. "Oil, monarchy, revolution, and theocracy: A study on the National Iranian Oil Company (NIOC)." In David Victor, David Hults and Mark Thurber (eds.), *Oil and Governance: State-owned Enterprises and the World Energy Supply*. Cambridge, UK: Cambridge University Press.

SELECTED
WORKS IN
PROGRESS

5. Coordinated Financial Crisis Resolution (with Christina Schneider and Jennifer Tobin). Conditionally Accepted, *Review of International Political Economy*

4. Public Opinion on Economic Transition Challenges and Opportunities in Oil Communities (with Matto Mildenberger, Dustin Tingley, Ranjit Deshmukh, and Cesar Martinez-Alvarez)

3. Limited Impacts of Shareholder Pressure on Climate Strategy of Fossil Firms (with Denis Lomov)

2. Measuring firm climate strategy using transformer-based language models (with Denis Lomov)

1. Developing an Indigenous Governance and Political Representation Database (with Christopher Alcantara and Dominic Parker)

PUBLISHED
DATA SETS

1. Michael Ross and Paasha Mahdavi. 2015 (September). Oil and Gas Data, 1932–2014. Harvard Dataverse, V2.

REPORTS &
OTHER
WRITINGS

30. "Government efforts to reduce fossil fuel subsidies have failed at a very high rate." 2025. *Nature Climate Change*: Policy Brief. (with Michael Ross and Evelyn Simoni).

29. "It's Time to Phase Out Oil in our County." 2025. *Santa Barbara Independent*. (with Leah Stokes).

28. "Restarting Sable's Pipeline Would Harm Our Communities, Environment, and Economy." 2025. *Santa Barbara Independent*.

27. "The Economic, Health, and Environmental Benefits of Phasing Out Onshore Oil Development in Santa Barbara County." 2025. Report. (with Olivia Quinn, Eleanor Thomas, Carrie Fernandes, and Leah Stokes).

26. "Green Backlash and Fossil Societies." 2025. IGCC Essay.

25. "Economic analysis of market impacts of resuming oil and gas production from the Santa Ynez Unit." Report submitted to Santa Barbara County Board of Supervisors in re: item 25-00144, Feb 25, 2025.

24. "National Oil Companies and the Global Methane Opportunity." 2024. *Global Policy*. (with Andrew Howell).

23. "Collaborative Levers for Methane Abatement in National Oil Companies." 2024. *Environmental Defense Fund*, Report.

22. "Strategies for Building Power to Shift Climate Politics and Policy." 2024. *The 2035 Initiative*, Evidence Review. (with Leah Stokes, Matto Mildenberger, and Lucas Boyd).

21. "Assessing National Oil Companies transition plans: an essential tool for banks, investors and regulators." 2023. *World Benchmarking Alliance*, Policy Brief. (with J. Roth, R. Poivet, N. Jones, and A. Picciariello)

20. "Opportunity NOCs: How investors can jumpstart energy transitions in national oil companies." 2023. *The 2035 Initiative* and *IISD*, Policy Brief. (with A. Picciariello)

19. "Bold vs. BS in corporate climate pledges." 2022. *A Matter of Degrees Podcast.* (Guest host with L. Stokes and K. Wilkinson)

18. "Paving a Credible Investment Pathway to Net Zero for Oil and Gas." 2022. *OECD Consultation on Investment Treaties and Climate Change.*

17. "Inuit Language and Community Engagement." 2022. Public report prepared for communities in Inuit-speaking parts of northern and northwest Alaska. (with U. Okleasik)

16. "Cultural programs and opportunities for engagement with CIRI." 2021. Report prepared for the the Cook Inlet Region Inc (CIRI) Alaska Native Regional Corporation.

15. "National Oil Companies and Climate Change: Insights for Advocates." 2021. *IISD and NRGI Policy Brief.* (with A. Gillies, P.R.P. Heller, D. Manley, V. Marcel, L. Melgar, F. Monaldi, G. Muttitt, A. Picciariello, and J. Roth)

14. Book review of *Crude Intentions: How Oil Corruption Contaminates the World* by Alexandra Gillies. 2021. *Perspectives on Politics* 19(1): 323–24.

13. "Oil companies aren't actually going green—but some are heading there faster than others." 2020. *Washington Post / Monkey Cage.* (with Jessica Green, Jennifer Hadden, and Thomas Hale)

12. "Stop Oil Production in Santa Barbara Once and for All." 2020. *Santa Barbara Independent.*

11. "Power Grabs and Crude Decisions." 2020. *Invisible Histories* caption essay, Harvard Center for History and Economics.

10. "New Oil Finds Could Mean a Tripling of Guyana's GDP." 2019. *Foreign Policy.* (with Morgan Bazilian)

9. "Recommendations on the Draft Lebanese National Oil Company Bill." 2018. Report prepared for the Lebanese Parliamentary Committee on Public Works, Transportation, Energy, and Water.

8. "Four things to know about nationalizations in the energy industry." 2017. *Initiative for Sustainable Energy Policy (ISEP) Blog.*

7. "Oil Conflict and Kurdish Independence." 2017. *Global Policy.* (with Morgan Bazilian, Peri-Khan Aqrawi-Whitcomb, and Cyril Widdershoven)

6. "How to get reelected if you are an Iranian MP." 2015. *Washington Post/Monkey Cage.*

5. 'Will Iran's parliament block the nuclear deal?" 2015. *Washington Post/Monkey Cage.*

  - Reprinted in Marc Lynch (ed.), *Iran and the Nuclear Deal*. The Project on Middle East Political Science (POMEPS) Studies, Vol. 13.

4. "Oil and Politics in Iran's *Majles-e Shurā-ye Eslāmi.*" 2014. *The International Society for Iranian Studies Newsletter.* 34(4): 10-13.

3. "Reforming National Oil Companies: Nine Recommendations." 2014. *Natural Resource Governance Institute Briefing.* (with Patrick Heller and Johannes Schreuder)

2. "The Petroleum Industry Bill and the Future of NNPC." 2012. *Revenue Watch Institute Briefing.* (with Aaron Sayne, Patrick Heller, and Johannes Schreuder)

1. "The Future Impact of Climate Change on the California Wine Industry."   2009. Stanford IPS Report, prepared for California State Assembly Member Noreen Evans. (with Jonathan Gatto, Byung-oh Kim, Hirochika Namekawa, and Hung Tran)

| | |
|---|---|
| AWARDS, GRANTS, & FELLOWSHIPS | **External** |

- Grant, ECF, 2025–2026.
- Resilient Energy Economies Initiative grant, joint from Bezos Earth Fund, Columbia Center for Global Energy Policy, and Resources for the Future, 2025
- Grant, Quadrature Climate Foundation, 2024
- FINOC grant, Environmental Defense Fund, 2023–2024
- Campbell Visiting Fellowship, Hoover Institution, 2021–2022.
- Governance, Liberty, and Prosperity for American Indians, Hoover Institution, 2021
- Balzan Foundation grant (with Matto Mildenberger and Leah Stokes, co-PIs), via Princeton University, 2018–2020
- Balzan Foundation grant (with Jessica Green, Jennifer Hadden, and Thomas Hale, co-PIs), via Princeton University, 2018–2020
- Energy for Economic Growth Research Programme, U.K. Department for International Development (DfID) seed grant (with Michael Ross, PI), 2016–2020
- Data Collection Grant, Natural Resource Governance Institute, 2014–15
- Adam Smith Fellowship, Mercatus Center at George Mason University, 2013–14
- Research Grant, Revenue Watch Institute and DfID, 2012

**Internal**

- Outstanding Service to Community Award, UCSB Political Science, 2025
- Cohen-Jennings Award for Excellence in Graduate Mentorship, UCSB PSGSA, 2021
- UCSB Academic Senate Research Grant, 2021
- UCSB Research Assistance Program, 2021
- UCSB ISBER Social Science Research Grants Program, 2019–2020
- Leslie Whittington Outstanding Faculty Member of the Year Award, McCourt School of Public Policy, 2017
- Seed grant (PI), Georgetown Environment Initiative, 2017–2018
- Seed grant (with Raphael Calel), Georgetown Environment Initiative, 2016–17
- Dissertation Year Fellowship, UCLA Graduate Division, 2014–15
- Graduate Research Mentorship, UCLA Graduate Division, 2012–13
- Graduate Summer Research Mentorship, UCLA Graduate Division, 2010 & 2011
- Graduate Research Opportunity Grant, Program on Energy and Sustainable Development, Stanford University, 2008–09
- Susan Ford Dorsey International Policy Fellowship, Stanford University, 2007–08
- Departmental Honors, Columbia University Department of Economics, 2006

| | |
|---|---|
| MEDIA | **For full list of media interviews and research coverage**: www.egapelab.com/media |

| | |
|---|---|
| INVITED TALKS, WORKSHOPS & CONFERENCE PRESENTATIONS | 2025: Climate Change, Green Backlash, and Democracy workshop at IGCC; London School of Economics and Political Science (online); Resilient Energy Economies; Environmental Defense Fund; Union of Concerned Scientists (online); American Political Science Association (APSA, scheduled). |

2024: Environmental Politics & Governance Deep Climate Conversations; Occidental College Geopolitics of the Green Energy Transition; Georgetown University Political Economy Seminar; Johns Hopkins SAIS Political Economy Speaker Series; Environmental Defense

Fund; Columbia University International Politics Seminar; Resilient Energy Economies; International Institute for Sustainable Development.

2023: UC Berkeley MIRTH Seminar Series; Public Choice Society (Seattle); Preparing for a Changing Climate Conference (Stanford University); APSA; Markets vs. Mandates for the Environment and Energy Workshop (Hoover/West Creek); Workshop on Economic and Politics of Tribal Governance, Past and Present (Hoover Institution).

2022: Public Choice Workshop (Hoover Institution); Western Political Science Association (WPSA); UC Riverside Political Science Speaker Series; Climate Futures Initiative (Princeton University); Climate Pipeline Engaged Scholarship Workshop (Harvard University); UCSB Ground-breaking Research/Innovative Technology (GRIT) talks; First Alaskans Institute (virtual).

2021: Midwestern Political Science Association (MPSA); UC-National Lab Fees Research Program Workshop; Governance, Liberty, and Prosperity for American Indians (Hoover Institution, held in Bozeman, MT); Climate Futures Initiative (Princeton University); International Institute for Sustainable Development and Natural Resources Governance Institute (webinar); University of KwaZulu Natal (webinar); APSA (virtual); Renewing Indigenous Economies (Hoover Institution); New Producers Group (Chatham House).

2020: Global Comparative Politics of Climate Change Policy Workshop (Stanford University); University of California Conference on International Cooperation (UC Riverside); International Studies Association (ISA)*; MPSA*; Claremont Graduate University*; UC Riverside*; Colorado School of Mines (webinar); Charting the Future Political Economy of Oil Workshop (ANU Crawford School of Public Policy, virtual); APSA (virtual); Global Research in International Political Economy (webinar); Johns Hopkins SAIS (webinar); World Bank, Office of Chief Economist of Sustainable Development (webinar).

2019: Global Comparative Politics of Climate Change Policy Workshop (Stanford University); WPSA (San Diego); APSA (Washington, DC); Southern California Methods Workshop (UC Riverside); University of Toronto; Ostrom Symposium on Natural Resource Governance for Young Scholars (Indiana University); RAI Inequality and Representation Workshop (Oxford University).

2018: Global Comparative Politics of Climate Change Policy Workshop (Stanford University); Research Frontiers in the Political Economy of Energy Policy (Princeton University); Stanley Kaplan Program in American Foreign Policy Keynote Lecture (Williams College).

2017: DC Area Climate & Energy Research Workshop (GWU); MPSA; University of Alaska Anchorage; Environmental Politics & Governance (Indiana University); APSA (San Francisco); Johns Hopkins SAIS; Harvard University Growth Lab.

2016: Columbia University International Politics Seminar; MPSA; Oxford University Department of Politics & International Relations; APSA (Philadelphia); Energy and Economic Growth Research and Matchmaking Conference (Center for Strategic & International Studies); Harvard University Comparative Politics Speaker Series.

2015: Energy & Extractives Communities of Practice (World Bank); MPSA; University of California Board of Visitors for Political Science (UCLA); APSA (San Francisco); Extractive Resources & Global Governance Workshop in Memory of Natasha Chichilnisky-Heal (Yale University); International Political Economy Society (Palo Alto).

TEACHING    PS 15: Introduction to Research in Political Science. Undergraduate lecture (methods requirement). Winter 2019, Spring 2020, Spring 2021, Spring 2022, Fall 2022, Winter 2025.

PS 106ET: Comparative Political Economy of the Energy Transition. Undergraduate lecture. Fall 2023.

PS 196: Climate and Extractive Politics. Undergraduate seminar. Spring 2022.

PS 205: Political Research Methods I. Graduate seminar (part one of core methods sequence). Fall 2022.

PS 206: Political Research Methods II. Graduate seminar (part two of core methods sequence). Winter 2019, Winter 2020, Winter 2021, Winter 2025.

PS 211: Research Design in Political Science. Graduate seminar. Spring 2020, Spring 2021, Spring 2022.

PS 295 / ESM 526: Environmental Politics Workshop. Weekly graduate workshop and seminar. 2018, 2019, 2020, 2021, 2023.

PS 594EE: Political Economy of Energy and Environment. Graduate seminar. Fall 2023.

PPOL 637: Comparative Politics & Policy of Energy. Graduate seminar (elective). Fall 2015, Fall 2016, Fall 2017.

PPOL 502: Regression Methods for Policy Analysis. Graduate seminar (part two of required three-semester statistics sequence). Spring 2016, Spring 2017, Spring 2018.

PH.D. ADVISING    * *Chair;*    ** *Co-Chair;*    ‡ *outside member*

- Corah Walker*
- So-Yeon Ellen Park (Postdoc, UC-IGCC)
- Navid Yousefian (Teaching Associate, Cambridge University)
- Jeff Feng (Postdoc, Northwestern University)
- Khobaib Osailan (Assistant Professor, King AbdulAziz University)
- Ariana Salas Castillo (Postdoc, Columbia University)
- Gabriela Alberola (Postdoc, University of Amsterdam)
- Noosha Uddin**
- Daniel Gamarnik
- Mohammad Sulaimani‡ (Assistant Professor, King Fahd University)
- Saber Khani‡
- Renae Marshall
- Denis Lomov* (pre-prospectus)
- Zhai Gen Tan* (pre-prospectus)

ACADEMIC SERVICE

At UCSB:
- Department Vice Chair, 2024-.
- Department Undergraduate Committee, Chair, 2024-2025.
- Decarbonization Study Project Committee, faculty advisor, 2023–2024.
- Lancaster Chair search committee, 2022–2023; 2024-2025.
- Diversity, Equity & Inclusion officer, Environmental Justice search committee, 2021–2022.
- Council on Research and Instructional Resources, Committee on Research Policy and Procedures and Committee on Faculty Grants, 2020–2023.
- Coordinator, Comparative Politics & Political Economy Webinar Series, 2020–2022.
- Committee on Mentoring Expectations in Political Science, 2020–2021.
- Dept. Liaison, Planning Committee for an Undergraduate Major in Data Science, 2019–
- Data Science Undergraduate Education Committee, 2019–
- Faculty mentor for PS 15, Department of Political Science, 2019–
- Faculty Advisor for UCSB Pi Sigma Alpha Political Science Honors Society, 2019–2022.

- Graduate Admissions Committee, Department of Political Science, 2019–2020.
- Chair, Comparative Politics Comprehensive Exam, Spring 2019.
- Awards Committee, Department of Political Science, 2018–2019.
- Subfield Coordinator, Political Methodology, 2018–

At Georgetown:
- Co-organizer, Energy & Climate Policy Research Seminar, 2015–18
- Advisory committee, Massive Data Institute, 2016–18
- Masters in Public Policy Thesis Prize committee, 2016.
- Steering committee, Georgetown Environment Initiative, 2016–18.
- Faculty search committee, Assistant Professor in Data Science, 2017.
- Judge, Georgetown University Energy Prize panel, 2017.
- Steering committee, Data Analytics Program, 2017–18.

Profession
- Discussant: APSA 2015–2016, 2019–2023; DC Area Climate & Energy Research Workshop 2016; Environmental Politics & Governance 2019; Virtual International Political Economy Society (V-IPES) 2020; MPSA 2014–2017, 2020; WPSA 2019; USC Political Economy of Native American Policy 2024; USC Political Economy of Energy 2024.
- Book workshops: Leah Stokes, UCSB, *Short-Circuiting Policy*, Feb 2018; Faisal Ahmed, Princeton University, *Conquest and Rents*, June 2020; Helen Milner and Alex Gazmararian, Princeton University (hosted at UCSB), *Climate Fault Lines*, Nov 2024.
- Committee member: APSA Public Policy Mentoring Award Committee; APSA Best Dissertation in Public Policy Award Committe; WPSA Climate Action Committee; WPSA Pi Sigma Alpha Award Committee; WPSA Climate Action Task Force.
- Reviewer/Advisor: Climate Pipeline Project; Political Economy of Climate and the Environment.
- Editorial Board: *Public Choice*

Referee
- *American Journal of Political Science, American Political Science Review, British Journal of Political Science, Comparative Political Studies, Comparative Politics, Communist and Post-Communist Studies, Electoral Studies, Energy Research & Social Science, Governance, International Organization, International Studies Quarterly, Journal of East Asian Studies, Journal of International Development, Journal of Politics, Journal of Public Policy, Nature Energy, Political Analysis, Political Research Quarterly, Proceedings of the National Academy of Sciences, Research & Politics, Resources Policy, Review of International Organizations, Review of Policy Research, Science, World Development, World Politics,* Cambridge University Press, Oxford University Press, Princeton University Press, National Science Foundation, Swiss National Science Foundation.

SPECIALIZED
TRAINING

*Languages*: English (native), Persian (intermediate), Italian (intermediate)

*Field Work*: Iran (June-July 2009); United Arab Emirates (July 2012); Qatar (August 2012); British Petroleum Archives, Coventry UK (June 2016); Alaska (May 2017, July 2019)

PRIOR
EMPLOYMENT

ICF International
- Wholesale Power (Electric Utilities) division, Analyst, 2006–07.

*Updated July 2025*

# Exhibit B

Declaration of Paasha Mahdavi



# Economic analysis of market impacts of resuming oil and gas production from the Santa Ynez Unit

*Prepared by Paasha Mahdavi[1]*

February 2025

## Introduction

Sable Offshore Corp ("Sable") plans to restart oil and gas production from three offshore platforms that comprise the Santa Ynez Unit ("SYU"), located in federal waters off the southern coast of Santa Barbara County. The company claims that restarting the SYU will reduce the need to import foreign oil and that, without SYU production, foreign imports and domestic production will increase.[2]

An economic analysis shows little evidence to support these claims. By contrast, well-established economic models of oil supply and a statistical evaluation of the SYU show that (1) foreign imports are not likely to increase in the absence of SYU production and (2) restarting oil production will have limited to no impacts on California oil markets through 2045.

The most substantial impacts of restarting the SYU are on emissions: if production resumes, global greenhouse gas emissions are likely to increase by 2.5 million tons of $CO_2e$, given higher greenhouse gas intensity of SYU oil and gas production compared to the typical blend of crude oil around the world.

---

[1] *Associate Professor and Director of the Energy Governance and Political Economy (EGAPE) Lab at UC Santa Barbara. Mahdavi holds degrees in economics (B.A), international energy policy (M.A.), statistics (M.S.), and political science (Ph.D.) from Columbia University, Stanford University, and UCLA. Mahdavi is solely responsible for the analysis contained in this report, which does not represent or reflect the positions of the University of California.*
[2] Based on Sable's statement to the County of Santa Barbara Planning Commission on October 30, 2024: "In our case, we're gonna be displacing a million barrels a month of foreign-based crude tankering into our ports in LA and San Francisco. The carbon index on the SYU crude is 3.5. You're displacing Iraq, Iranian, Iraqi crude at 12.6 or Libya… so that's up to a fourth cleaner fuel. And that's greenhouse gases. So when we bring the cogen on, that's already factored into it. So if it's a global issue then it's actually a net benefit to the environment by bringing this project back on." Video for the statement can be found here, starting at 6:30:32: https://sbcounty.granicus.com/player/clip/4837?view_id=3&redirect=true



**Figure 1: SYU production within overall crude oil supply to California, 2010-23**
*Author analysis. Data Sources: CARB, Enverus PRISM*

## SYU production in historical perspective

Production from the SYU averaged 29,000 barrels of oil per day and 27 million cubic feet of gas per day in 2014, the last complete year of production prior to the 2015 pipeline spill and subsequent pause in extraction.[3] This is roughly 30% of peak production from the SYU in 1996, consistent with expected depletion of the reservoir.

For the last full year of production, SYU oil supply averaged 1.8% of total statewide crude oil supply, including domestic and foreign imports (Figure 1).[4] These data also show that crude oil supplied to California has noticeably declined since 2018, reflective not just of the pandemic shock in 2020 but a reduction in consumer demand for petroleum products.[5]

---

[3] Sable Offshore Corp. (2024) *Investor Presentation November 2024.* Accessed in February 2025 from https://sableoffshore.com/events-and-presentations/default.aspx.
[4] CARB, *Major Sources of Crude Supplied to California.* Updated 2024, Accessed in February 2025 from https://ww2.arb.ca.gov/sites/default/files/2024-12/LCFS%20Crude%20Sources_0.xlsx.
[5] California Energy Commission. (2024). *Report - Draft 2024 Integrated Energy Policy Report Update.*

2

**The SYU pause had no statistical effect on imports of foreign oil**

Historical data on oil supply offers an opportunity to assess whether not restarting SYU production would lead to increases in foreign supply, given that markets responded to the loss of production from the SYU in 2015.

Data on crude oil supplied to California refineries from 2010 to 2023 show that domestic supply declined from 2010 to 2023, while imports increased over the same timespan (Figure 1). The primary shift in foreign import supply came during the 2010-2014 period of high prices, as foreign sources of crude exceeded domestic supply in 2011. Aside from a peak in imports in 2017-2019, and the pandemic collapse in 2020, foreign import levels in 2023 were roughly the same as in 2014-2015 (Figure 2). Looking at the period directly after the SYU went offline, there was no increase in foreign imports:  imports actually fell to 316 million barrels in 2016 from 320 million barrels in 2014 and 318 million barrels in 2015.

Applying a statistical model to the data shows that the pause in SYU production since May 2015 did not significantly impact changes in foreign imports despite declining domestic supply. Specifically, using the difference-in-difference estimator widely used in statistics and econometrics,[6] modeling indicates that the SYU pause caused a modest annual increase in imports by 463,936 barrels per year, though the increase is not statistically distinguishable from a scenario in which the pause had no effect.[7]

To put this number in perspective, all three SYU fields produced roughly 11 million barrels in 2014. Putting these numbers together, for every 1 barrel not produced from SYU fields, there was only a 0.04 barrel replacement by foreign imports to California refineries; the remaining 0.96 barrels to account for the loss of SYU production were offset by reduced demand, and to a lesser extent, increased Alaskan oil supply.[8]

Comparing non-SYU OCS production to imports also shows little impact. Here a model is applied to estimate how changes in non-SYU OCS production influence imports pre/post SYU pause. Results from this model show that declining production from non-SYU OCS had no statistical effect on changes in imports over the 2015-2023 period.[9]

---

[6] Abadie, A. (2005). Semiparametric difference-in-differences estimators. *Review of Economic Studies*, 72(1), 1-19.
[7] The model-estimated increase in foreign imports relative to declining domestic imports is 463,936 barrels per year with a p-value of 0.917, indicating that the difference in imports is not statistically significantly different from 0.
[8] Based on data from the California Energy Commission, crude oil supply to California from Alaska increased from 70.4 million barrels in 2014 and 73.6 million barrels in 2015 to 84.2 million barrels in 2023, though this increase primarily replaced the loss of crude oil supply from California (onshore and state offshore) over the same period. See footnote 3 for a review of declining consumer demand over time.
[9] The model-estimated effect on foreign imports relative to declining non-SYU OCS production is 30,237 barrels per day with a p-value of 0.759, indicating that the difference in imports is not statistically significantly different from 0.

3



**Figure 2: Foreign vs. domestic supply to California before and after SYU pause in 2015**
*Author analysis. Data Source: CARB.*

## Future SYU production will not displace foreign imports on a cost basis

One objection to the above finding would be that SYU barrels would replace production from California onshore fields given SYU's lower operating costs on a per-barrel basis. Purely from an operating cost and up-front capital cost perspective, the SYU is more cost-competitive than roughly 80% of California's onshore oil fields using data from a widely-used industry database.[10]

These figures are likely underestimated given non-accounting of remediation and retirement costs, which the BSEE estimates to range between $34,700,743 and $38,149,826 per platform given the SYU's platform depths of 850'-1,200', which are roughly 10 times the remediation costs for onshore California wells on a per-well basis.[11]

---

[10] This estimate is a comparison of Sable's projected costs from the November 2024 Investor Presentation (see footnote 1), and statewide data from Rystad Energy's UCube. Sable's projected revenues from a low-estimate base forecast of 133 total MMBoe of oil, gas, and NGL resources give an estimated present value cash flow of $2.3 billion assuming a 10% discount rate. Backing out operating costs based on Sable's market price assumptions gives an estimated break-even price between $41 and $47 per barrel, depending on assumed depletion rates over a 5-year period. By comparison, the cost curve for California's onshore and state-water offshore fields projected out to 2030 indicates that roughly 20% of fields have a break-even price below $44/barrel.
[11] Bureau of Safety and Environmental Enforcement and ICF International, *Decommissioning*

4

Yet even without accounting for retirement costs, SYU's barrels are not more cost-competitive than existing *foreign* suppliers to California. Assuming operating costs of roughly $44/barrel for SYU,[12] this would still exceed average per-barrel total costs—including capital expenditures, taxes, transport, and administrative costs—for California's top foreign suppliers of oil. This includes Saudi Arabia ($9/barrel), Iraq ($11/barrel), Colombia ($11/barrel), Ecuador ($7-$20/barrel), and Brazil ($21-28/barrel).[13]

This suggests that restarting SYU production would not lead to a reduction in imports on a strictly economic basis.

### SYU production will have limited impacts on statewide oil consumption

From a demand perspective, there is limited opportunity cost to consumption for not restarting SYU oil production. This is because there is no "perfect substitution" of supply and demand in global oil markets at the local level: one barrel not produced locally is not perfectly replaced by one barrel produced elsewhere to fill local demand. As a result, a production shock tends to reduce demand despite the relative fungibility of global oil markets.

This pattern particularly holds for oil produced in California, where studies estimate that for every barrel of oil not produced in California, oil consumption declines by between 0.2 and 0.6 barrels.[14] This estimate is consistent with a broad range of economic models from government sources, think tanks, energy consultants, and academic researchers, showing that a one-barrel loss in production corresponds to an average reduction in consumption by 0.5 barrels.[15] Extrapolating these results to the

---

*Methodology and Cost Evaluation.* BPA No. E13PA00010. These estimates are based on an assumed 60 wells per platform, which is roughly in line with Sable's development plans given 112 existing wells and 102 infill drilling and step-out opportunities across three platforms.

[12] See footnote 10 for sources on estimated opex at $44/barrel. Even sell-side models which reflect a lower opex in the $27/barrel range would show that SYU crude is still not competitive with imports, with the exception of a small range of Brazilian crudes.

[13] Saudi and Iraqi oil costs are drawn from Rystad Energy; Colombia estimates are from Ecopetrol via the *Rio Times*; Ecuador estimates are from PetroAmazonas via the Baker Institute; and Brazil estimates are drawn from Enverus data on pre-salt breakeven costs, plus an assumed $3/barrel administrative and transportation cost. For a list of all foreign suppliers to California, see California Energy Commision, *Foreign Sources of Crude Oil Imports to California*, Accessed from: https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports

[14] Erickson, P. and Lazarus, M. (2018). *How limiting oil production could help California meet its climate goals.* Stockholm Environment Institute discussion briefing report; Erickson, P. and Lazarus, M. (2014). Impact of the Keystone XL pipeline on global oil markets and greenhouse gas emissions. *Nature Climate Change*, 4(9). 778–81.

[15] Wolvovsky, E. and Anderson, W. (2016). *OCS Oil and Natural Gas: Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon.* BOEM OCS Report 2016-065. U.S. Department of Interior, Bureau of Ocean Energy Management; Metcalf, G. (2016). The Impact of Removing Tax Preferences for U.S. Oil and Gas Production. Council on Foreign Relations; ICF and Ensys (2014). *The Impacts of U.S. Crude Oil Exports on Domestic Crude Production,*

5

SYU based on hypothetical production at 10 million barrels per year in 2025, this suggests that on average there would be a 0.93% reduction in annual statewide consumption if production from the SYU is not restarted.[16]

Looking at future consumption, there is no support in existing demand models for additional supply needed over time. Modeling by the Institute for Transportation Studies (ITS) shows that under a conservative business-as-usual forecast—based on historical demand and future demand in the absence of new policies—there is an expected 30% decline in fuel consumption, from roughly 19 billion gasoline gallon-equivalent (GGE) in 2020 to roughly 13 GGE in 2045, corresponding to a 1.5% compound annual decline rate.[17] In this scenario, demand is still driven predominantly by petroleum-based fuels, but consumption declines due to efficiency improvements. In more extreme cases with substantial fuel replacement, such as the CARB 2022 Scoping Plan, demand reduction for liquid petroleum fuels declines 94% from 2020 to 2045, for a 10.9% compound annual decline rate.[18]

In either extreme—from business-as-usual with no change in statewide policy to a considerable shift in energy policy to achieve carbon neutrality—the impact of the loss of supply from not restarting the SYU is outweighed by declining consumer demand. Instead, it is likely that the over-time economic gains Sable aims to achieve from restarting the SYU will come from exporting the oil from California to other markets.

**Restarting the SYU will increase global greenhouse gas emissions**

If production were to resume from the SYU, estimates from the Oil Production Greenhouse Gas Emissions Estimator (OPGEE) used by CARB suggest that per-unit emissions from production from the Hondo, Pescado, and Sacate fields would be roughly 87% higher than per-unit emissions from the onshore Aliso Canyon fields in LA

---

*GDP, Employment, Trade, and Consumer Costs*. ICF International for the American Petroleum Institute; Bordoff, J. and Houser, T. (2015). *Navigating the U.S. Oil Export Debate*. Columbia University, Center on Global Energy Policy and Rhodium Group; and Rajagopal, D. and Plevin, R. J. (2013). Implications of market-mediated emissions and uncertainty for biofuel policies. *Energy Policy*, 56 75–82.

[16] SYU annual production of 10 million barrels/year is estimated from an expected 28,100 barrels/day production once online, from Sable Offshore Corp. (2024). *Investor Presentation September 2024*, accessed from https://sableoffshore.com/events-and-presentations/default.aspx. This is compared to 2023 statewide consumption of 532 million barrels based on CARB data.

[17] Brown, A. L; Sperling, D.; Austin, B.; DeShazo, JR; Fulton, L.; Lipman, T., et al. (2021). *Driving California's Transportation Emissions to Zero*. UC Office of the President: University of California Institute of Transportation Studies. http://dx.doi.org/10.7922/G2MC8X9X.

[18] California Air Resources Board. (2022). *2022 Scoping Plan for Achieving Carbon Neutrality*. Data extracted from: https://ww2.arb.ca.gov/sites/default/files/2022-11/2022-sp-PATHWAYS-data-E3.xlsx

County.[19] Existing models of the greenhouse gas intensity of oil and gas production show that these carbon intensity levels are underestimated as they do not capture methane emissions and poorly estimate emissions from flaring.[20] Nonetheless, they provide a comparison on an emissions basis to the SYU.

Using Aliso Canyon as an emissions-intensity comparison, the operational emissions intensity of production from the SYU would be roughly 440 kg $CO_2$e per barrel of oil and barrel-equivalent of gas using the OCI+ metrics of emissions intensity.[21] This is considerably higher than nearly all other fields rated by OCI+, which typically range between 80 kg $CO_2$e/mboe and 400 kg $CO_2$e/mboe. Iraqi crude, for example, has intensities of 175 $CO_2$e/mboe (Rumaila, medium oil), 234 $CO_2$e/mboe (Ahdab, medium/heavy oil), and 255 $CO_2$e/mboe (Fakka, heavy oil), all of which include emissions from production, gathering, storage, and transportation.[22]

The quality of SYU crude is a mix of heavy oil (18° API gravity) from the primary reservoir and light oil (37° API gravity) from the secondary reservoir.[23] Comparisons by quality also show that the greenhouse gas intensity of SYU crude exceeds that of commensurate foreign imports. Among heavy oil comparisons, SYU greenhouse gas intensity would be higher than any field rated by OCI+.[24] Among light oil comparisons, SYU greenhouse gas intensity exceeds all estimated fields with the exception of four that are not currently exported to California.[25]

Compared to production from Elk Hills in Kern County—which produces medium/light oil that is near global averages in emissions intensity taking methane emissions into account, and approximately equivalent to SYU barrels in terms of estimated break-even

---

[19] CARB. (2023). Estimated Carbon Intensity Values for the Crude Lookup Table, App. F to Proposed Amendments to the Low Carbon Fuel Standard Regulations. These values are roughly double what Sable stated at the October 30, 2024, Planning Commission hearing (see footnote 1). The 2010 carbon intensity (gCO2/MJ) for Hondo, Pescado, and Sacate is estimated at 6.84, 6.13, and 4.85, respectively, with a production-weighted average at 6.09 gCO2/MJ. This is compared to Aliso Canyon with carbon intensity of 3.26 gCO2/MJ.

[20] RMI, *Oil Climate Index plus Gas Model v.2.1.0* (2024); Mohammad S. Masnadi et al., Global carbon intensity of crude oil production. *Science* 361,851-853 (2018); Scarpelli, T. R., Jacob, D. J., Grossman, S., Lu, X., Qu, Z., Sulprizio, M. P., Zhang, Y., Reuland, F., Gordon, D., and Worden, J. R.: Updated Global Fuel Exploitation Inventory (GFEI) for methane emissions from the oil, gas, and coal sectors: evaluation with inversions of atmospheric methane observations. *Atmos. Chem. Phys.*, 22, 3235–3249 (2022).

[21] Based on data from the Oil Climate Index plus Gas (OCI+), accessed from https://ociplus.rmi.org/analysis. Aliso Canyon is rated at 235.84 kg CO2e/mboe industry GHG emissions intensity.

[22] Ibid.

[23] Based on information for Platform Hondo from: Air Pollution Control District, Santa Barbara County. (April 2024). *Draft Permit to Operate 9100 – R8 and Part 70 Operating Permit 9100: Sable Offshore – SYU Project Platform Hondo*. Accessed in February 2025 from https://www.ourair.org/wp-content/uploads/Draft-PT-70-09100-R8-Platform-Hondo-4-8-2024.pdf

[24] The highest intensity rated among heavy or extra heavy oil is Canada Peace River at 419 CO2e/mboe. Data drawn from OCI+ (see footnote 21).

[25] The exceptions are industry GHG intensities of 490 CO2e/mboe (Gabon Koula), 639 CO2e/mboe (Iran Agha Jari), 806 CO2e/mboe (Russia Kuyumbinskoye), and 964 CO2e/mboe (Mexico Teotleco). Data drawn from OCI+ (see footnote 21).

price per barrel—every barrel of oil from SYU would add 245 kg $CO_2e$ above and beyond emissions from barrels from Elk Hills (195 kg CO2e/mboe). Considering the anticipated annual volume of production, this translates to roughly 2.5 million tons of $CO_2e$ above what would be emitted if the SYU were not producing.

**Conclusion**

An overview of the economic analysis performed here of the market impacts of production from the SYU finds support for the following three claims:

(1) Restarting SYU production will not reduce foreign imports, based on both statistical analysis of the 2015 pause and an economic analysis of costs compared to major suppliers of crude;

(2) Not restarting SYU will not have significant impacts on consumer markets over time, given declining demand for petroleum products in California through 2045 outpaces the loss of supply from SYU production;

(3) Production from the SYU will increase global greenhouse gas emissions given the higher greenhouse gas intensity of operations compared to industry averages for operations from commensurate fields.

8

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2025 7:46 PM
By: Terri Chavez , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological
Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**
**SOUTH COUNTY REGION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br><br>**PETITIONERS' RESPONSES TO REAL PARTIES' OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONERS' APPLICATION FOR AN ADMINISTARTIVE STAY OR PRELIMINARY INJUNCTION**<br><br>[Filed Concurrently with Petitioners' Combined Reply, Second Declaration of Julie Teel Simmonds, Second Request for Judicial Notice, Declaration of Paasha Mahdavi, and Evidentiary Objections]<br><br>Date: July 18, 2025<br>Time: 8:30 a.m.<br>Dept: 4<br>Judge: Hon. Donna D. Geck |

1

**INTRODUCTION**

Petitioners Center for Biological Diversity and Wishtoyo Foundation (Petitioners) submit the following responses to the objections to evidence raised by Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (Sable) as part of its Opposition to Petitioners' Application for an Administrative Stay or Preliminary Injunction.

**PRELIMINARY STATEMENT**

Sable is trying to disguise its disagreement with Petitioners' expert Richard Kuprewicz's opinion that the proposed pipelines are unsafe to operate by raising evidentiary objections to Mr. Kuprewicz's expert declaration. But those objections are properly directed to the weight of the evidence that Mr. Kuprewicz provides, and in any event Sable's experts Michael Rosenfeld and Brien Vierra have gone through Mr. Kuprewicz's declaration and its exhibits (reports prepared by Mr. Kuprewicz which were submitted to the California Department of Forestry and Fire Protection and its Office of the State Fire Marshal (Cal Fire)) with a fine-toothed comb and presented their own opinions on each, in detail. Thus, even if there were evidentiary error in considering Mr. Kuprewicz's declaration, that error is harmless—especially where there are no jurors who may become confused.[1]

**EXPERT TESTIMONY**

Under California Evidence Code Section 801, experts may rely upon hearsay, and indeed upon any material on which experts in the field at hand traditionally rely. In this case, Sable's experts rely on material that would be hearsay under Sable's view of the law. (*See* Mr. Leininger's declaration at Exhibits A (portion of an environmental review document), B (final EIR), and C (draft EIR); Mr. Rosenfeld's declaration at Exhibits C (federal corrective action order), D (consent decree), and G (PHMSA failure report).) And one person's speculation is another person's educated guesswork about the future, as is seen in Sable's expert Michael Mische's and officer Steve Rusch's declarations opining about future oil supply, California and world oil prices, economic health in California, and Sable's alleged future revenues.

---

[1] We also note that Mr. Kuprewicz's prior reports to Cal Fire will be in the administrative record in the CEQA and traditional mandamus cases; that record has not yet been prepared by Cal Fire.

PETITIONERS' RESPONSES TO REAL PARTIES' OBJECTIONS

**SARGON**

In *Sargon Enterprises Inc. v. University of Southern California*, 55 Cal. 4th 747, 771-772 (2012), the Supreme Court explained:

> [U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. Other provisions of law, including decisional law, may also provide reasons for excluding expert opinion testimony.

In *People v. Veametahau*, 9 Cal. 5th 16, 34 at n. 6 (2020), a case about identification of a drug by a trained criminologist, the Supreme Court cautioned about *Sargon* that:

> As the above makes clear, it is the jury's role to decide the weight to accord to the expert testimony and "courts must … be cautious in excluding expert testimony" so as not to usurp that role. (*Sargon*, supra, 55 Cal.4th at p. 772.) Although "'[t]here is no bright line that divides evidence worthy of consideration by a jury … from evidence that is not,'" many of defendant's arguments concerning reliability may be better understood as directed at the weight of the expert testimony, not its admissibility.

(*Id*. at p. 769.)

It is indisputable that Mr. Kuprewicz is an expert in his field. For example, he is a well-recognized pipeline safety expert with decades of experience who serves on the Technical Hazardous Liquid Pipeline Safety Standards Committee (49 U.S.C. Section 60115), whose members are appointed by the U.S. Secretary of Transportation and advise Congress on pipeline safety matters. (*See* concurrently filed Second Declaration of Julie Teel Simmonds, Ex. 7.) What is left to analyze under *Sargon* is whether his conclusions are properly based. And we know from his Declaration what the bases of his conclusion are: many of the same investigative reports on which Sable's expert Rosenfeld relies, along with Mr. Kuprewicz's many years of experience in pipeline investigations. (*See* Rosenfeld Decl., Exs. C (Federal corrective action order), D (consent decree), and G (PHMSA failure investigation report); *see also* Kuprewicz Decl., ¶ 8.) Sable presents no argument that any of the documents that Mr. Kuprewicz relies on are inaccurate. And we know exactly what documents Mr. Kuprewicz relied on—he says so in his Declaration. (*Id*.) By the same token, we know what he did not rely on, and thus Sable is free to argue that Mr. Kuprewicz missed important facts—which they do, in fact, argue. This is enough

3

PETITIONERS' RESPONSES TO REAL PARTIES' OBJECTIONS

to satisfy the gatekeeping purpose of Sargon. And Sable is free to argue that their experts' conclusions are entitled to greater weight than Mr. Kuprewicz's.

### MR. KUPREWICZ'S UNAVAILABILITY FOR DEPOSITION

Sable tries to construct a due process issue out of Mr. Kuprewicz's unavailability for a deposition. Sable has already made a near identical request to strike Mr. Kuprewicz's declaration to no avail, and in any event Sable cannot show harm because, as noted above, Sable's experts were fully able to parse Mr. Kuprewicz's Declaration and supporting exhibits—which they did.

### AUTHENTICATION OF DOCUMENTS BY JULIE TEEL SIMMONDS

As is quite common in motion practice, one of Petitioners' counsel, attorney Julie Teel Simmonds, submitted a declaration authenticating several documents referred to by Mr. Kuprewicz and otherwise in Petitioners' brief. Sable did the same thing except it used its experts' declatation to authenticate documents. (*See* the attachments to Mr. Rosenfeld's, Mr. Leininger's and Mr. Vierra's Declarations.) No one is questioning the authenticity of any of the documents referred to in these Declarations and there is no proper objection to Ms. Simmond's Declaration in that respect.

### OBJECTIONS TO PETITIONERS' REMAINING SUPPORTING DECLARATIONS

Sable's objections to Petitioners' other supporting Declarations, including the declarations of Kara Clauser, Brady Bradshaw, Blake Kopcho, Jeffrey Miller, and Tevin Schmitt, all of whom have personal knowledge by virtue of being either members or employees of Petitioners, are also meritless. Where a trial court is confronted "with a large number of nebulous evidentiary objections, a fair sample of which appear to be meritless, the court can properly overrule . . . all of the objections on the ground that they constitute oppression of the opposing party and an imposition on the resources of the court." (*Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749, 764 n.6.)

Although Sable forwards boilerplate objections that the declarations lack relevance, are speculative, are prejudicial, and are unreliable, amongst others, Sable does the exact same thing by submitting a declaration from Steve Rusch, Sable's Vice President. Thus, Sable's contentions are belied by its own proffered evidence.

PETITIONERS' RESPONSES TO REAL PARTIES' OBJECTIONS

**RESPONSES TO OBJECTIONS TO THE DECLARATION OF RICHARD B. KUPREWICZ**

| No. | Challenged Material | Center's Responses to Objections | Ruling |
|---|---|---|---|
| 1 | Kuprewicz Decl., Ex. B (Evaluation of Las Flores Pipeline System Startup Proposal (Dec. 20, 2024)). | **Hearsay:** Experts may rely on hearsay per Evidence Code Section 801.<br><br>**Due Process:** See argument above re Mr. Kuprewicz's deposition.<br><br>*Sargon*: See discussion of *Sargon* above.<br><br>**Speculation and conjecture:** Mr. Kuprewicz's opinions are legitimate conclusions from the facts he relied on.<br><br>**Relevance:** Mr. Kuprewicz's opinions are relevant to whether the pipeline is safe to operate. | ☐ Sustained<br>☐ Overruled |
| 2 | Kuprewicz Decl., Ex. C (Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart (Feb. 21, 2025)). | **Hearsay:** For each objection in this numbered row, please see Petitioners' responses to objections in row number 1 and the introductory material above.<br><br>**Due Process:**<br><br>*Sargon*:<br><br>**Improper expert testimony:** | ☐ Sustained<br>☐ Overruled |
| 3 | Kuprewicz Decl., Page 3, Paragraph 7, Lines 9–13: "I was asked by the Environmental Defense Center (EDC) and Center for Biological Diversity (CBD) to | **Inadmissible Expert Testimony** (*Sargon*): For each objection in this numbered row, please see Petitioners' | ☐ Sustained<br>☐ Overruled |

5

| No. | Challenged Material | Center's Responses to Objections | Ruling |
|---|---|---|---|
| | utilize my experience and expertise to evaluate safety and integrity issues regarding the proposal to restart the Las Flores Pipeline System, which includes CA-324 and CA-325A/B ("the Pipelines"). A true and correct copy of my report, titled Evaluation of Las Flores Pipeline System Startup Proposal, dated December 20, 2024, is attached to this declaration as Exhibit B." | responses to objections in row number 1 and the introductory material above.<br><br>**Due Process:**<br><br>**Improper expert testimony:**<br><br>**Relevance:**<br><br>**Speculation and conjecture:** | |
| 4 | Kuprewicz Decl., Page 3, Paragraph ¶ 8.a., Lines 27–28: "The design of the Pipelines renders the federal mandated cathodic protection system, intended to help address pipeline external corrosion, ineffective." | **Hearsay:** For each objection in this numbered row, please see Petitioners' responses to objections in row number 1 and the introductory material above.<br><br>**Inadmissible Expert Testimony (*Sargon*):**<br><br>**Due Process:** | ☐ Sustained<br>☐ Overruled |
| 5 | Kuprewicz Decl., Page 4, Paragraph 8.b, Lines 1–2: "Current inline inspection (ILI) technologies cannot adequately assess all forms of external corrosion threats that most likely exist on the Pipelines." | **Hearsay:** For each objection in this numbered row, please see Petitioners' responses to objections in row number 1 and the introductory material above.<br><br>**Inadmissible Expert Testimony (*Sargon*):**<br><br>**Due Process:**<br><br>**Relevance:** | ☐ Sustained<br>☐ Overruled |
| 6 | Kuprewicz Decl., Page 4, Paragraph 8.c, Lines 3–5: "The high operating temperatures | **Hearsay:** For each objection in this numbered row, please see Petitioners' | ☐ Sustained<br>☐ Overruled |

6

PETITIONERS' RESPONSES TO REAL PARTIES' OBJECTIONS

| No. | Challenged Material | Center's Responses to Objections | Ruling |
|---|---|---|---|
| | needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective cathodic protection system once the Pipelines go into operation." | responses to objections in row number 1 and the introductory material above. **Inadmissible Expert Testimony** (*Sargon*): **Due Process:** **Improper expert testimony:** **Relevance:** **Speculation and conjecture:** | |
| 7 | Kuprewicz Decl., Page 4, Paragraph 8.d, Lines 6–7: "Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure." | **Hearsay:** For each objection in this numbered row, please see Petitioners' responses to objections in row number 1 and the introductory material above. **Inadmissible Expert Testimony** (*Sargon*): **Relevance:** **Speculation and conjecture:** **Hearsay:** **Due Process:** | ☐ Sustained ☐ Overruled |
| 8 | Kuprewicz Decl., Page 4, Paragraph 8.e, Line 8: "The poorly designed Pipelines cannot be made as safe as new pipelines." | **Hearsay:** For each objection in this numbered row, please see Petitioners' responses to objections in row number 1 and the introductory material above. | ☐ Sustained ☐ Overruled |

7

PETITIONERS' RESPONSES TO REAL PARTIES' OBJECTIONS

| No. | Challenged Material | Center's Responses to Objections | Ruling |
|---|---|---|---|
| | | **Inadmissible Expert Testimony** (*Sargon*): Due Process: Relevance: Speculation and conjecture: Hearsay: | |
| 9 | Kuprewicz Decl., Page 4, Paragraph 9, Line 9: "Following the preliminary approval of the State Waivers for the pipelines, …." | **Hearsay:** For each objection in this numbered row, please see Petitioners' responses to objections in row number 1 and the introductory material above. **Due Process:** **Relevance:** **Speculation and conjecture:** **Hearsay:** | ☐ Sustained ☐ Overruled |
| 10 | Kuprewicz Decl., Page 4, Paragraph 10.a, Lines 26–28: "The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them." | **Hearsay:** For each objection in this numbered row, please see Petitioners' responses to objections in row number 1 and the introductory material above. **Inadmissible Expert Testimony** (*Sargon*): **Due Process:** **Relevance:** | ☐ Sustained ☐ Overruled |

8

| No. | Challenged Material | Center's Responses to Objections | Ruling |
|---|---|---|---|
| | | **Speculation and conjecture:** <br><br> **Hearsay:** | |
| 11 | Kuprewicz Decl., Page 5, Paragraph 10.b, Lines 1–3: "The proposed hydrotests are also insufficient to address certain types of corrosion or predict corrosion growth. For example, MOP hydrotests are not adequate to test for crack forming potential on the Pipelines." | **Hearsay:** For each objection in this numbered row, please see Petitioners' responses to objections in row number 1 and the introductory material above. <br><br> **Inadmissible Expert Testimony (*Sargon*):** <br><br> **Due Process:** <br><br> **Relevance:** <br><br> **Speculation and conjecture:** <br><br> **Hearsay:** | ☐ Sustained <br> ☐ Overruled |
| 12 | Kuprewicz Decl., Page 5, Paragraph 10.c, Lines 4–10: "The State Waivers do not assure adequate spike hydrotesting, which is a method to address various forms of crack forming potential. The values for the spike test on Line 324 are too low for corrosion cracking screening and evaluation. Hydrotesting for Lines 325 A and B must be conducted in segments given the elevation changes. It is unclear, however, whether the testing parameters are adequate for Line 325A due to missing information. In addition, the Waivers do not appear to | **Hearsay:** For each objection in this numbered row, please see Petitioners' responses to objections in row number 1 and the introductory material above. <br><br> **Inadmissible Expert Testimony (*Sargon*):** <br><br> **Due Process:** <br><br> **Relevance:** <br><br> **Speculation and conjecture:** | ☐ Sustained <br> ☐ Overruled |

9

| No. | Challenged Material | Center's Responses to Objections | Ruling |
|---|---|---|---|
| | require any hydrotesting for Line 325B." | **Hearsay:** | |
| 13 | Kuprewicz Decl., Page 5, Paragraph 10.d, Lines 11–14: "A key corrosion performance tracking process set in the State Waivers for the Pipelines is missing. This information, which helps identify possible corrosion "hot spots," is especially important given the history of extensive corrosion on the Pipelines." | **Hearsay:** For each objection in this numbered row, please see Petitioners' responses to objections in row number 1 and the introductory material above.<br><br>**Inadmissible Expert Testimony (*Sargon*):**<br><br>**Due Process:**<br><br>**Relevance:**<br><br>**Speculation and conjecture:**<br><br>**Hearsay:** | ☐ Sustained<br>☐ Overruled |
| 14 | Kuprewicz Decl., Page 5, Paragraph 10.e, Lines 15–20: "The State Waivers will not provide an equal or greater level of safety as if the Pipelines were equipped with an effective cathodic protection system to avoid pipeline failure due to external corrosion. The current design of the Pipeline renders the cathodic protection system ineffective. External corrosion on the Pipelines is exacerbated by operation of the Pipelines at elevated temperatures, which seriously increases the corrosion rate." | **Hearsay:** For each objection in this numbered row, please see Petitioners' responses to objections in row number 1 and the introductory material above.<br><br>**Inadmissible Expert Testimony (*Sargon*):**<br><br>**Due Process:**<br><br>**Relevance:**<br><br>**Speculation and conjecture:**<br><br>**Hearsay:** | ☐ Sustained<br>☐ Overruled |

PETITIONERS' RESPONSES TO REAL PARTIES' OBJECTIONS

| No. | Challenged Material | Center's Responses to Objections | Ruling |
|---|---|---|---|
| 15 | Kuprewicz Decl., Page 5, Paragraph 11, Lines 21–23: "Based on the facts I reviewed and my professional analysis, in my opinion the Las Flores Pipeline System is not safe to operate, even if the conditions in the Fire Marshal's State Waivers are fulfilled." | **Hearsay:** For each objection in this numbered row, please see Petitioners' responses to objections in row number 1 and the introductory material above.<br><br>**Inadmissible Expert Testimony (*Sargon*):**<br><br>**Due Process:**<br><br>**Improper expert testimony:**<br><br>**Relevance:**<br><br>**Speculation and conjecture:**<br><br>**Hearsay:** | ☐ Sustained<br><br>☐ Overruled |

11

## OBJECTIONS TO THE DECLARATION OF JULIE TEEL SIMMONDS

| No. | Challenged Material | Center's Responses to Objections | Ruling |
|---|---|---|---|
| 104 | Teel Decl., Ex. 1 (Sable Offshore Corp. Form 8-K (May 19, 2025)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 105 | Teel Decl., Ex. 2 (Sable Offshore Corp. Form 8-K (May 27, 2025)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 106 | Teel Decl., Ex. 3 (Notice of Recent Developments, CBD v. Burgum, Case No. 2:24-cv-05459-MWC-MAA (May 23, 2025)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds. Also, Ms. Simmonds has personal knowledge of what health-related information she was given by Mr. Kuprewicz.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 107 | Teel Decl., Ex. 4 (Excerpt, California Coastal Commission Staff Report (March 28, 2025)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 108 | Teel Decl., Ex. 5 (PHMSA Failure Investigation Report (2016)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. | ☐ Sustained<br>☐ Overruled |

12

| No. | Challenged Material | Center's Responses to Objections | Ruling |
|---|---|---|---|
| | | Simmonds. In addition, this document is attached to the declarations of one or more of Sable's experts.<br><br>**Authentication/Personal Knowledge/Foundation:** | |
| 109 | Teel Decl., Ex. 6 (Excerpt, Consent Decree, U.S. v. Plains All American Pipeline, Civil Action No. 2:20-cv-02415 (C.D. Cal. Mar. 13, 2020)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds. In addition, this document is attached to the declarations of one or more of Sable's experts<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 110 | Teel Decl., Ex. 7 (Sable Offshore Corp. letter to CalFire (April 24, 2024)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds. Also, this document is a party admission.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 111 | Teel Decl., Ex. 8 (State Waiver (CA-324)) | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds. In addition, this document is attached to the declarations of one or more of Sable's experts.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 112 | Teel Decl., Ex. 9 (State Waiver (CA-325A/B)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds. In addition, this document | ☐ Sustained<br>☐ Overruled |

13

| No. | Challenged Material | Center's Responses to Objections | Ruling |
|---|---|---|---|
| | | is attached to the declarations of one or more of Sable's experts.<br><br>**Authentication/Personal Knowledge/Foundation:** | |
| 113 | Teel Decl., Ex. 10 (Letter, CBD to Office of the State Fire Marshal (Dec. 23, 2024)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds. As a lawyer for Petitioners, Ms. Simmonds has personal knowledge of this letter.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 114 | Teel Decl., Ex. 11 (Letter, CBD to Office of the State Fire Marshal (March 2, 2025)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds. As a lawyer for Petitioners, Ms. Simmonds has personal knowledge of this letter.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 115 | Teel Decl., Ex. 12 (Excerpt, Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds. In addition, this document is attached to the declarations of one or more of Sable's experts<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 116 | Teel Decl., Ex. 13 (Excerpt, Plains Pipeline Form 10-K (Dec. 31, 2023)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds. In addition, this document is a party admission. | ☐ Sustained<br>☐ Overruled |

14

PETITIONERS' RESPONSES TO REAL PARTIES' OBJECTIONS

| No. | Challenged Material | Center's Responses to Objections | Ruling |
|---|---|---|---|
| | | **Authentication/Personal Knowledge/Foundation:** | |
| 117 | Teel Decl., Ex. 14 (Letter, CBD to Office of the State Fire Marshal (Sept. 24, 2024)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds. As a lawyer for Petitioners, Ms. Simmonds has personal knowledge of this letter.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 118 | Teel Decl., Ex. 15 (State Parks Notice of Exemption (May 9, 2025)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 119 | Teel Decl., Ex. 16 (Letter, State Lands Commission to Sable (May 23, 2025)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 120 | Teel Decl., Ex. 17 (Superior Court ruling and order, Sable Offshore Corp. et al. v California Coastal Commission (25CV00974) (May 28, 2025)) | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 121 | Teel Decl., Ex. 18 (Excerpt, Sable Offshore Corp. Form 10-K (March 17, 2025)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. | ☐ Sustained<br>☐ Overruled |

15

| No. | Challenged Material | Center's Responses to Objections | Ruling |
|---|---|---|---|
| | | Simmonds. Also, this is a party admission.<br><br>**Authentication/Personal Knowledge/Foundation:** | |
| 122 | Teel Decl., Ex. 19 (Excerpt, Sable Form S-1 Registration Statement (Oct. 11, 2024)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds. Also, this is a party admission.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 123 | Teel Decl., Ex. 20 (Excerpt, Administrative Draft Environmental Impact Report for Plains Pipeline Replacement Project (2022)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 124 | Teel Decl., Ex. 21 (Letter, Staff Counsel for the California Department of Forestry and Fire Protection to CBD (May 2, 2025)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 125 | Teel Decl., Ex. 22 (Excerpt, August 1984 Draft EIR/ EIS for Celeron/All American and Getty Pipeline Projects (SCH No. 83110902)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmons. In addition, this document is attached to the declarations of one or more of Sable's experts<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |

PETITIONERS' RESPONSES TO REAL PARTIES' OBJECTIONS

| No. | Challenged Material | Center's Responses to Objections | Ruling |
|---|---|---|---|
| 126 | Teel Decl., Ex. 23 (Email, Julie Teel Simmonds to Michael Dorsi (May 27, 2025)). | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmons.  As a lawyer for Petitioners, Ms. Simmonds has personal knowledge of this letter.<br><br>**Authentication/Personal Knowledge/Foundation:** | ☐ Sustained<br>☐ Overruled |
| 127 | Teel Decl., Page 2, Paragraph 2, Lines 9–20: "Petitioners have obtained information that Real Parties in Interest have recently resumed oil production from the Santa Ynez Unit and are pushing forward with plans to restart the transport of that oil using the Las Flores Pipeline System, which is the subject of this litigation. Attached as Exhibit 1 is a true and correct copy of a Form 8-K Sable Offshore Corp. (Sable) filed with the U.S. Securities and Exchange Commission (SEC) on May 19, 2025. I obtained this document on May 20, 2025, from this U.S. Securities and Exchange Commission (SEC) webpage: https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000119312525122079/d943067d8k.htm. This document states that on May 19, Sable "issued a press release announcing restart of oil production at the Santa Ynez Unit and anticipated oil sales from the Las Flores Pipeline System in July 2025." The press release included with the filing notes that Sable "restarted production" of oil from the Santa Ynez Unit on May 15, 2025 and "has begun flowing oil production | **Lacks Foundation/Personal Knowledge:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds. The 8-K is a party admission.<br><br>**Hearsay:** | ☐ Sustained<br>☐ Overruled |

17

| No. | Challenged Material | Center's Responses to Objections | Ruling |
|---|---|---|---|
| | to the Las Flores Canyon ('LFC',) where it expects to "fill the ~ 540,000 barrels of crude oil storage capacity" by the "middle of June." | | |
| 128 | Teel Decl., Page 2, Paragraph 3, Lines 24–27: "This filing states that on May 27, 2025, "Sable Offshore Corp. conducted a successful hydrotest of the final segment of Line 325 and has now successfully hydrotested all segments of Line 324 and Line 325 (collectively, the 'Onshore Pipeline'), satisfying the final operational condition to restart [sic] the Onshore Pipeline as outlined in the Consent Decree." | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds. This document is a party admission.<br><br>**Lacks Foundation/Personal Knowledge:** | ☐ Sustained<br>☐ Overruled |
| 129 | Teel Decl., Page 3, Paragraph 4, Lines 3–6: "This pleading states that counsel for the Federal Defendants learned of the restart of production on May 19, 2025 but had "not received notice from the California State Fire Marshal's Office Pipeline Division that Sable is approved to operate the onshore pipeline segments 901/903," which they had understood as a precondition of "returning to production." | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds.<br><br>**Lacks Foundation/Personal Knowledge:** | ☐ Sustained<br>☐ Overruled |
| 130 | Teel Decl., Page 2, Paragraph 3, Lines 24–27: "This filing states that on May 27, 2025, "Sable Offshore Corp. conducted a successful hydrotest of the final segment of Line 325 and has now successfully hydrotested all segments of Line 324 and Line 325 (collectively, the 'Onshore Pipeline'), satisfying the final operational condition to restart | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds. | ☐ Sustained<br>☐ Overruled |

18

| No. | Challenged Material | Center's Responses to Objections | Ruling |
|---|---|---|---|
| | [sic] the Onshore Pipeline as outlined in the Consent Decree." | | |
| 131 | Teel Decl., Page 5, Paragraph 18, Lines 8–12: "Attached as Exhibit 17 is a true and correct copy of a ruling and order issued by the Santa Barabara Superior Court on May 28, 2025 in *Sable Offshore Corp. et al. v. California Coastal Commission* (25CV00974) granting the Commission a preliminary injunction, which I obtained on May 30 2025 from the following Superior Court of California, County of Santa Barbara webpage: https://www.santa barbara.courts.ca.gov/tentative-ruling/25cv00974." | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds.<br><br>**Lacks Foundation/Personal Knowledge:** | ☐ Sustained<br>☐ Overruled |
| 132 | Teel Decl., Page 6, Paragraph 23, Line 5: "The Draft EIR/EIS combined with an addendum, is the Final EIR/EIS for those projects." | **Hearsay:** For all objections in this row, see the introductory material above about authentication by Ms. Simmonds.<br><br>**Lacks Foundation/Personal Knowledge:** | ☐ Sustained<br>☐ Overruled |
| 133 | Teel Decl., Pages 6–7, Paragraph 27, Lines 26–27: "Mr. Dorsi called me that day and could not say with any certainty when his clients might approve final restart plans for the pipelines. On Wednesday, May 28, 2025, I received a call from Josh Cleaver, staff counsel for Respondents, who also did not know when final restart plans would be approved or made public." | **Hearsay:** Relating the contents of a conversation that Ms. Simmonds was a party to is testimony to an operational fact, not hearsay. | ☐ Sustained<br>☐ Overruled |

19

**CONCLUSION**

For the foregoing reasons, Petitioners request the Court overrule the evidentiary objections made by Sable.


Dated: July 11, 2025                                    Respectfully submitted,

                                                         s/ *Julie Teel Simmonds*
                                                       Julie Teel Simmonds (Bar No. 208282)
                                                       jteelsimmonds@biologicaldiversity.org
                                                       David Pettit (Bar No. 67128)
                                                       dpettit@biologicaldiversity.org
                                                       Talia Nimmer (Bar No. 331002)
                                                       tnimmer@biologicaldiversity.org
                                                       CENTER FOR BIOLOGICAL DIVERSITY
                                                       2100 Franklin St., Ste. 375 Oakland, CA 94612
                                                       Tel. (510) 844–7100 / Fax: (510) 844–7150

                                                       *Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

20

PETITIONERS' RESPONSES TO REAL PARTIES' OBJECTIONS

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2025 7:46 PM
By: Terri Chavez , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
mailto:tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological
Diversity and Wishtoyo Foundation*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA BARBARA
### SOUTH COUNTY REGION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive, <br><br> Respondents/Defendants. <br><br> SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive, <br><br> Real Parties in Interest. | Case No.: 25CV02244 <br><br> **PETITIONERS' EVIDENTIARY OBJECTIONS TO DECLARATIONS OF STEVE RUSCH, BART LEININGER, MICHAEL A. MISCHE, MICHAEL J. ROSENFELD, AND BRIAN VIERRA IN SUPPORT OF REAL PARTIES IN INTERESTS' OPPOSITION TO PETITIONERS' APPLICATION FOR AN ADMINISTARTIVE STAY OR PRELIMINARY INJUNCTION** <br><br> [Filed Concurrently with Petitioners' Combined Reply, Second Declaration of Julie Teel Simmonds, Second Request for Judicial Notice, Declaration of Paasha Mahdavi, and Responses to Objections] <br><br> Date: July 18, 2025 <br> Time: 10:00 a.m. <br> Dept: 4 <br> Judge: Hon. Donna D. Geck |

1

Petitioners' Objections to Real Parties' Declarations

Petitioners CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION (collectively, "Petitioners") hereby submit the following objections to the evidence submitted by Real Parties in Interest SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY (collectively, "Real Parties") in support of Real Parties' Opposition to Petitioners' Application for an Administrative Stay or Preliminary Injunction.

**Evidentiary Objections**

| Material Objected To: | Grounds for Objection(s): | Ruling on the Objection: |
|---|---|---|
| **1. Declaration of Steve Rusch ("Rusch Decl."), ¶ 71** "Real Parties' inability to complete, or any delay in, the restart and operation of the pipelines, will exacerbate California's ongoing energy crisis. Citizens of the State of California would therefore also suffer irreparable harm in the form of higher gasoline prices, lost jobs, lost tax revenues, lost royalty sharing, and increased regulatory uncertainty." | Lack of foundation as to how declarant's opinion (regarding impacts the pipeline restart will have on domestic energy supply or economic indicators) is supported by the declarant's personal knowledge as a lay witness. (Evid. Code §§ 702(a), 800(a).) | Sustained: _____ Overruled: _____ |
| **2. Rusch Decl., ¶ 72** "On the other hand, given the extensive regulatory and compliance framework governing the Pipelines, approval of the Restart Plan will ensure there will be no harm to the public or the environment." | Lack of foundation as to how declarant's opinion (regarding the pipeline's potential to harm the public or the environment) is supported by the declarant's personal knowledge as a lay witness. (Evid. Code §§ 702(a), 800(a).) | Sustained: _____ Overruled: _____ |
| **3. Declaration of Bart Leininger ("Leininger Decl."), ¶ 20** "The EIR stated that Environmental Justice (EJ) communities are disproportionately impacted from ship, truck, and rail emissions. Increasing | Lack of foundation. Expert opinion testimony that "increasing foreign crude oil imports would only exacerbate environmental impacts to EJ communities" is unsupported by the 2015 CalGEM | Sustained: _____ Overruled: _____ |

2

| | | |
|---|---|---|
| foreign crude oil imports would only exacerbate environmental impacts to EJ communities." | EIR upon which Mr. Leininger relies. (Evid. Code § 801(b); *Sargon Enters., Inc. v. Univ. of S. California* (2012) 55 Cal.4th 747, 771–72 [stating that, under Evid. Code §§ 801(b) and 802, an expert may not submit opinion testimony "unsupported by the material on which the expert relies"].) | |
| **4. Declaration of Michael Mische ("Mische Decl."), ¶ 94** "Santa Barbara County, in particular, stands to benefit economically the most from Sable operations. Historically, oil-related revenues in the county have funded essential public services such as fire protection districts, law enforcement staffing, road maintenance, and local school districts. The return of Sable's offshore activity, coupled with the rehabilitation of pipelines and treatment facility assets, will likely help restore and expand Santa Barbara's revenue flows, enabling the county to address long-standing infrastructure gaps and growing public service needs." | Lack of foundation. Expert opinion testimony that "[h]istorically, oil-related revenues in the county have funded essential public services such as fire protection districts, law enforcement staffing, road maintenance, and local school districts" is unsupported by the declarant's special knowledge, skill, experience, training, or education or by the materials upon which he relies. (Evid. Code § 801(b); *Sargon Enters., Inc. v. Univ. of S. California* (2012) 55 Cal.4th 747, 771–72 [stating that, under Evid. Code §§ 801(b) and 802, an expert may not submit opinion testimony "unsupported by the material on which the expert relies"].) | Sustained: _____  Overruled: _____ |
| **5. Declaration of Michael Rosenfeld ("Rosenfeld Decl."), ¶ 5** "By not accounting for these important facts Mr. Kuprewicz has set forth positions that are unfounded. To the extent that opinions were made without relevant information, they are uninformed and speculative. To the extent that relevant facts were knowable from information available to anyone in the public domains but were not considered or accounted for, his opinions were not based on evaluation performed to a reasonable standard of engineering practice. To the extent that such facts were known by him and deliberately omitted, or positions were | Lack of foundation. (Evid. Code § 801(b).) Improper legal conclusion. (*Hayman v. Block* (1986) 176 Cal.App.3d 629, 638-639 ["affidavits must cite evidentiary facts, not legal conclusions or 'ultimate' facts"].) Argumentative, misleading, and unduly prejudicial. (Evid. Code § 352.)  Declarant's expert opinion testimony asserting Mr. Kuprewicz's testimony may be biased, deceptive, unfounded, speculative, and uninformed is unsupported by the declarant's special knowledge, skill, | Sustained: _____  Overruled: _____ |

3

| | | |
|---|---|---|
| stated to the contrary, Mr. Kuprewicz's opinions are biased or deceptive." | experience, training, or education or by the materials upon which he relies. (Evid. Code § 801(b); *Sargon Enters., Inc. v. Univ. of S. California* (2012) 55 Cal.4th 747, 771–72 [stating that, under Evid. Code §§ 801(b) and 802, an expert may not submit opinion testimony "unsupported by the material on which the expert relies"].) Declarant's expert opinion testimony on Mr. Kuprewicz lacking foundation is an improper legal conclusion. Declarant's statements regarding Mr. Kuprewicz's testimony are argumentative, misleading, and unduly prejudicial. | |
| **6. Rosenfeld Decl., ¶ 6**<br>"These are pejorative statements built on an aggregation of claims made without supporting data, and which should be disregarded as nonfactual and noncredible. He has provided no data, scientific or engineering analysis, or factual evidence that supports these opinions." | Lack of foundation. (Evid. Code § 801(b).) Argumentative, misleading, and unduly prejudicial. (Evid. Code § 352.)<br><br>Declarant's assertion that Mr. Kuprewicz's statements are nonfactual and noncredible is unsupported by the declarant's special knowledge, skill, experience, training, or education or by the materials upon which he relies. (Evid. Code § 801(b); *Sargon Enters., Inc. v. Univ. of S. California* (2012) 55 Cal.4th 747, 771–72 [stating that, under Evid. Code §§ 801(b) and 802, an expert may not submit opinion testimony "unsupported by the material on which the expert relies"].) Further, these statements are argumentative, misleading, and unduly prejudicial. | Sustained: _____<br><br>Overruled: _____ |
| **7. Rosenfeld Decl., ¶ 12**<br>"Three other important enhancements specified by the OSFM state waiver, that Mr. Kuprewicz fails to account for in an apparent attempt to bias the reader of his statement. . . ." | Lack of foundation. (Evid. Code § 801(b).) Argumentative, misleading, and unduly prejudicial. (Evid. Code § 352.)<br><br>Declarant's expert opinion testimony asserting Mr. | Sustained: _____<br><br>Overruled: _____ |

4

Petitioners' Objections to Real Parties' Declarations

| | | |
|---|---|---|
| | Kuprewicz has testified with the intent to bias the reader noncredible is unsupported by the declarant's special knowledge, skill, experience, training, or education or by the materials upon which he relies. (Evid. Code § 801(b); *Sargon Enters., Inc. v. Univ. of S. California* (2012) 55 Cal.4th 747, 771–72 [stating that, under Evid. Code §§ 801(b) and 802, an expert may not submit opinion testimony "unsupported by the material on which the expert relies"].) The declarant's statement alleging Mr. Kuprewicz's attempt to bias the reader is argumentative, misleading, and unduly prejudicial. | |
| **8. Rosenfeld Decl., ¶ 14** "This is an effort to fabricate facts concerning the integrity of the Pipeline which Mr. Kuprewicz knows are baseless." | Lack of foundation. (Evid. Code § 801(b).) Argumentative and unduly prejudicial. (Evid. Code § 352.)<br><br>Declarant's statement asserting Mr. Kuprewicz knowingly fabricated facts is unsupported by the declarant's special knowledge, skill, experience, training, or education or by the materials upon which he relies. (Evid. Code § 801(b); *Sargon Enters., Inc. v. Univ. of S. California* (2012) 55 Cal.4th 747, 771–72 [stating that, under Evid. Code §§ 801(b) and 802, an expert may not submit opinion testimony "unsupported by the material on which the expert relies"].) The declarant's statements are argumentative and unduly prejudicial. | Sustained: _____<br><br>Overruled: _____ |
| **9. Rosenfeld Decl., ¶ 15** "Again Mr. Kuprewicz's statement with respect to the need for a new pipeline is without any foundation or justification." | Lack of foundation. (Evid. Code § 801(b).) Improper legal conclusion. (*Hayman v. Block* (1986) 176 Cal.App.3d 629, 638-639 ["affidavits must cite | Sustained: _____<br><br>Overruled: _____ |

5

Petitioners' Objections to Real Parties' Declarations

| | | |
|---|---|---|
| | evidentiary facts, not legal conclusions or 'ultimate' facts"].) Misleading and unduly prejudicial. (Evid. Code § 352.)<br><br>Declarant's statements alleging Mr. Kuprewicz's testimony has no foundation is unsupported by the declarant's special knowledge, skill, experience, training, or education or by the materials upon which he relies. (Evid. Code § 801(b); *Sargon Enters., Inc. v. Univ. of S. California* (2012) 55 Cal.4th 747, 771–72 [stating that, under Evid. Code §§ 801(b) and 802, an expert may not submit opinion testimony "unsupported by the material on which the expert relies"].)<br>Declarant's assertion that Mr. Kuprewicz lacks foundation is an improper legal conclusion. This statement is misleading and unduly prejudicial. | |
| **10. Rosenfeld Decl., ¶ 18**<br>"Mr. Kuprewicz has not reviewed the results of field digs to investigate corrosion analysis already performed by Sable, in response to ILI, to determine what different types of corrosion are present. His statement is entirely speculative without reviewing any factual data." | Lack of foundation. (Evid. Code § 801(b).) Argumentative, misleading, and unduly prejudicial. (Evid. Code § 352.)<br><br>The declarant's opinion that Mr. Kuprewicz reviewed no factual data is unsupported by the declarant's special knowledge, skill, experience, training, or education or by the materials upon which he relies. (Evid. Code § 801(b); *Sargon Enters., Inc. v. Univ. of S. California* (2012) 55 Cal.4th 747, 771–72 [stating that, under Evid. Code §§ 801(b) and 802, an expert may not submit opinion testimony "unsupported by the material on which the expert relies"].)<br>These statements are argumentative, misleading, and unduly prejudicial. | Sustained: _____<br><br>Overruled: _____ |

6

| | | |
|---|---|---|
| **11. Rosenfeld Decl., ¶ 21**<br>"Mr. Kuprewicz does not demonstrate by any rational engineering analysis why the pressure tests performed are inadequate for a plausible postulated crack growth scenario." | Lack of foundation. (Evid. Code § 801(b).) Misleading. (Evid. Code § 352.)<br><br>Declarant's statement that Mr. Kuprewicz does not demonstrate rational engineering analysis is unsupported by the materials upon which he relies. (Evid. Code § 801(b); *Sargon Enters., Inc. v. Univ. of S. California* (2012) 55 Cal.4th 747, 771–72 [stating that, under Evid. Code §§ 801(b) and 802, an expert may not submit opinion testimony "unsupported by the material on which the expert relies"].)<br>Further, the statement is misleading as to Mr. Kuprewicz's expertise and conclusions. | Sustained: _____<br><br>Overruled: _____ |
| **12. Rosenfeld Decl., ¶ 32**<br>"Mr. Kuprewicz also seems to be confusing regulatory compliance with actual safety, a common thought bias." | Lack of foundation/Improper expert testimony. Declarant's statement regarding the exhibition of "a common thought bias" is unsupported by the declarant's special knowledge, skill, experience, training, or education or by the materials upon which he relies. (Evid. Code § 801(b); *Sargon Enters., Inc. v. Univ. of S. California* (2012) 55 Cal.4th 747, 771–72 [stating that, under Evid. Code §§ 801(b) and 802, an expert may not submit opinion testimony "unsupported by the material on which the expert relies"].)<br>Alleging Mr. Kuprewicz is exhibiting any kind of bias is argumentative, misleading, and unduly prejudicial. (Evid. Code § 352.) | Sustained: _____<br><br>Overruled: _____ |
| **13. Rosenfeld Decl., ¶ 33**<br>"This statement is biased and misleading in that it gives a very incomplete picture of the TIMP process." | Lack of foundation. (Evid. Code § 801(b).) Information will not aid the trier of fact. (Evid. Code § 801(a).) Improper legal conclusion. (*Hayman v. Block* (1986) 176 Cal.App.3d 629, 638-639 ["affidavits must cite | Sustained: _____<br><br>Overruled: _____ |

7

Petitioners' Objections to Real Parties' Declarations

| | | |
|---|---|---|
| | evidentiary facts, not legal conclusions or 'ultimate' facts"].) Argumentative, misleading, and unduly prejudicial. (Evid. Code § 352.)<br><br>Declarant's testimony asserting Mr. Kuprewicz's statement is biased and misleading lacks foundation as to how declarant has personal or specialized knowledge to confirm this assertion, nor is it supported by materials reviewed. Alleging bias does not provide technical or specialized information to aid the trier of fact. Declarant's testimony that Mr. Kuprewicz's testimony is misleading is an improper legal conclusion. Declarant's statement itself is argumentative, misleading, and unduly prejudicial. | |
| **14. Rosenfeld Decl., ¶ 38**<br>"Clearly then he lacks necessary information to form an opinion and is speculating." | Lack of foundation/Improper expert testimony. (Evid. Code § 801(b).) Argumentative, misleading, and unduly prejudicial. (Evid. Code § 352.)<br><br>Declarant's assertion that Mr. Kuprewicz lacks necessary information lacks foundation as to the declarant's personal knowledge, perceptions, or materials relied on of what information and intentions Mr. Kuprewicz has, nor is it supported by materials reviewed. The declarant's assertion that Mr. Kuprewicz is speculating is argumentative, misleading, and unduly prejudicial. | Sustained: _____<br><br>Overruled: _____ |
| **15. Rosenfeld Decl., ¶ 39**<br>"Although no inspection process is perfect, ILI has proven over and over to be an effective integrity management tool." | Lack of foundation/Improper expert testimony. (Evid. Code § 801(b).) Declarant's opinion testimony regarding the continual proof that ILI is an effective integrity management tool is not based on the declarant's | Sustained: _____<br><br>Overruled: _____ |

Petitioners' Objections to Real Parties' Declarations

| | | |
|---|---|---|
| | established personal knowledge or the materials relied on. | |
| **16. Rosenfeld Decl., ¶ 42** "His position are biased and misleading, being based on pejorative sentiments intended to be alarming while ignoring important facts. | Lack of foundation/Improper expert testimony. (Evid. Code § 801(b).) Argumentative, misleading, and unduly prejudicial. (Evid. Code § 352.) <br><br> Declarant's expert opinion testimony lacks foundation as declarant has no personal or specialized knowledge regarding Mr. Kuprewicz's intentions, nor is declarant's testimony supported by the materials relied on. Further, the declarant's opinion regarding bias falls outside the declarant's demonstrated expertise. Asserting that Mr. Kuprewicz's statements are biased and misleading is itself argumentative, misleading, and unduly prejudicial. | Sustained: _____ <br><br> Overruled: _____ |
| **17. Rosenfeld Decl., ¶ 45** "This appears to be a deliberate omission by Mr. Kuprewicz to bias the reader." | Lack of foundation/Improper expert testimony. (Evid. Code § 801(b).) Argumentative, misleading, and unduly prejudicial. (Evid. Code § 352.) <br><br> Declarant lacks foundation as to how he has personal or specialized knowledge of Mr. Kuprewicz's alleged intention to omit facts to bias the reader, nor is the statement supported by materials reviewed. Further, the declarant's opinion regarding Mr. Kuprewicz's intentions falls outside the declarant's established expertise. The opinion is argumentative, misleading, and unduly prejudicial. | Sustained: _____ <br><br> Overruled: _____ |
| **18. Rosenfeld Decl., ¶ 48** "For the most part, [Mr. Kuprewicz] relies on the same erroneous positions taken without supporting data or analysis, or half-truths presented in an incomplete way to bias the reader, as has been discussed above." | Lack of foundation/Improper expert testimony. (Evid. Code § 801(b).) Argumentative, misleading, and unduly prejudicial. (Evid. Code § 352.) | Sustained: _____ <br><br> Overruled: _____ |

9

| | | |
|---|---|---|
| | Declarant's expert opinion testimony lacks foundation as to how declarant has personal or specialized knowledge of Mr. Kuprewicz's alleged intention to bias the reader, nor is it supported by the materials upon which the declarant relies. The statement alleging "half-truths" and bias is argumentative, misleading, and unduly prejudicial. | |
| **19. Vierra Decl. Page 13, Table 1** "In addition, the company has fostered a safety culture that empowers controllers to act decisively—prioritizing safety and enabling them to initiate shutdowns based on their training and judgement without hesitation." | Lack of foundation/Improper expert testimony. (Evid. Code § 801(b).) Declarant's statement regarding Sable's fostering of a safety culture is unsupported by the declarant's special knowledge, skill, experience, training, or education or by the materials upon which he relies. (Evid. Code § 801(b); *Sargon Enters., Inc. v. Univ. of S. California* (2012) 55 Cal.4th 747, 771–72 [stating that, under Evid. Code §§ 801(b) and 802, an expert may not submit opinion testimony "unsupported by the material on which the expert relies"].) | Sustained: _____ Overruled: _____ |
| **20. Vierra Decl., C.1.i, Page 18** "The hydraulic reports reviewed show the pipeline will operate below the maximum operating pressures established during the hydrotesting of the pipeline segments, and the temperatures will be below the maximum levels set by the OSFM State Waivers, which means that the Pipelines will be operating more safely than industry standards today." | Lack of foundation/Improper expert testimony. Declarant's statement that the Pipeline "will be operating more safely than industry standards today" is unsupported by the declarant's special knowledge, skill, experience, training, or education or by the materials upon which he relies. (Evid. Code § 801(b); *Sargon Enters., Inc. v. Univ. of S. California* (2012) 55 Cal.4th 747, 771–72 [stating that, under Evid. Code §§ 801(b) and 802, an expert may not submit opinion testimony "unsupported by the material on which the expert relies"].) Misleading. (Evid. Code § 352.) The declarant's assertion is | Sustained: _____ Overruled: _____ |

Petitioners' Objections to Real Parties' Declarations

| | misleading, as operations that are safer by comparison are not inherently safe. | |
|---|---|---|
| **21. Vierra Decl., C.12.vi. page 47** "Sable follows this guidance as required, just as Sable does with all of the foregoing." | Lack of foundation/Improper expert testimony. Declarant's statement as to Sable's past, present, and future adherence to all required guidance is unsupported by the declarant's special knowledge, skill, experience, training, or education or by the materials upon which he relies. (Evid. Code § 801(b); *Sargon Enters., Inc. v. Univ. of S. California* (2012) 55 Cal.4th 747, 771–72 [stating that, under Evid. Code §§ 801(b) and 802, an expert may not submit opinion testimony "unsupported by the material on which the expert relies"].) | Sustained: _____  Overruled: _____ |

Dated: July 11, 2025

Respectfully Submitted,

s/ *Julie Teel Simmonds*
Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375 Oakland, CA 94612
Tel. (510) 844–7100 / Fax: (510) 844–7150

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

11

Petitioners' Objections to Real Parties' Declarations

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2025 7:46 PM
By: Terri Chavez , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological
Diversity and Wishtoyo Foundation*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
# IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br><br>**PETITIONERS' OPPOSITION TO REAL PARTIES IN INTERESTS' MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ**<br><br>[Filed concurrently with Declaration of Talia Nimmer]<br><br>Date:    July 18, 2025<br>Time:   10:00 a.m.<br>Dept.:   4<br>Judge:   Honorable Donna D. Geck<br><br>Action Filed: April 15, 2025<br>Trial: None Set |

## I.    INTRODUCTION

Despite already having requested that the Court strike the declaration of Petitioners' expert consultant Richard B. Kuprewicz at the July 2, 2025, *ex parte* hearing to no avail, Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's (collectively, "Real Parties") nevertheless filed another Motion to Strike just five days later, on July 7, 2025. Real Parties' Motion is untimely since it was only noticed nine court days prior to the hearing, rather than the requisite sixteen. Moreover, the Motion is premised on unsupportable notions: (1) Real Parties are somehow entitled to cross-examine Mr. Kuprewicz, which they are not and (2) the declaration should be stricken under the Court's gatekeeping responsibility despite Mr. Kuprewicz's credibility. Accordingly, Petitioners respectfully request this Court deny Real Parties' improper, untimely, and meritless Motion.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Real Parties' Efforts to Restart the Defective Las Flores Pipeline System

This case arises from Real Parties' efforts to restart the Las Flores Pipeline System—a defective pipeline system that ruptured in 2015 at Refugio State Beach, causing one of the worst oil disasters in California history.

As was discovered after the spill, the pipeline system suffers from a critical design defect that leaves it vulnerable to pervasive corrosion and, consequently, another catastrophic rupture. Importantly, the pipeline system does not just threaten coastal resources: it passes through major sources of water supplies; renowned parks and ecological reserves; and a neighborhood in Buellton that includes schools, parks, and dozens of residential homes.

Rather than abandoning or replacing the pipeline,, Real Parties intend to simply restart the existing pipeline system under State Waivers issued by the Office of the State Fire Marshal. The State Waivers, which excuse Real Parties from complying with corrosion prevention and remediation requirements, were approved without any public process, environmental review, or analysis of the associated safety concerns . The Petition and Complaint in this action challenges these State Waivers.

### B.    Petitioners' *Ex Parte* Application for Preliminary Relief and Order to Show Cause

When Real Parties began publicly announcing they were on the precipice of restarting the defective Las Flores Pipeline System, Petitioners applied *ex parte* for an administrative stay, temporary

2

Petitioners' Opposition to Real Parties' Improper Motion to Strike

restraining order, and preliminary injunction ("*Ex Parte* Application") to prevent Real Parties from doing so. In support of Petitioners' *Ex Parte* Application, Petitioners submitted a declaration from Mr. Kuprewicz, Petitioners' expert consultant in this matter. Mr. Kuprewicz's declaration and two attached reports explain systemic issues with the pipeline system, why the State Waivers do not ensure the pipeline system is safe to operate, and why the pipeline system continues to pose a significant threat of rupturing.

On June 3, 2025, the Court granted Petitioners' request for a temporary restraining order and issued an order to show cause why a preliminary injunction and/or stay should not issue (the "OSC"). The hearing on the OSC is set for July 18, 2025. The Court ordered that briefing be completed per code, meaning that Real Parties' opposition was due by July 7, 2025, and Petitioners' reply by July 11, 2025.

**C.      Real Parties' Discovery Attempts and the Court's Order Regarding Real Parties' Request to Strike Mr. Kuprewicz's Declaration**

On June 5, 2025, counsel for Real Parties served Mr. Kuprewicz with a deposition subpoena for personal appearance and production of documents and things. That same day, counsel for Real Parties served Petitioners with a notice of deposition, noticing Mr. Kuprewicz's deposition for June 24, 2025, and attaching Mr. Kuprewicz's deposition subpoena. (Declaration of Talia Nimmer ("Nimmer Decl."), ¶ 6, Exh. A.) Real Parties also served Petitioners in the coordinated case, *Environmental Defense Center v. California Department of Forestry and Fire Protection*, 25CV0247 ("EDC Petitioners"), with a "cross-notice" of deposition. (Nimmer Decl., ¶ 7.)

Because counsel for Real Parties unilaterally scheduled the deposition without discerning availability and were unaware of Mr. Kuprewicz's health issues, there was an immediate need to meet and confer regarding the deposition date and reasonable accommodations for Mr. Kuprewicz. (Nimmer Decl., ¶ 8.) Thus, on June 10, 2025, Petitioners' counsel requested (1) the deposition be moved to July 1, 2025, to accommodate their schedule, and (2) reasonable accommodations for Mr. Kuprewicz, including that the deposition take place remotely in two, 3.5-hour sessions. (Nimmer Decl., ¶ 8, Exh. B; see also Declaration of Richard B. Kuprewicz ("Kuprewicz Decl."), ¶ 5.)

Counsel for Real Parties agreed to move the deposition to July 1, 2025, but refused the requests to accommodate Mr. Kuprewicz's health issues. (*Id*.) When EDC Petitioners' counsel clarified that Mr.

3

Petitioners' Opposition to Real Parties' Improper Motion to Strike

Kuprewicz was unable to travel, counsel for Real Parties continued to demand that the deposition proceed in person. (Nimmer Decl., ¶ 8.)

Outside counsel was then secured for Mr. Kuprewicz, Mr. Thomas Stolpman, and a teleconference meeting was set up with Real Parties' counsel to discuss Mr. Kuprewicz's health issues and possible accommodations for him. (Nimmer Decl., ¶ 9.) At the June 12, 2025, meeting, Mr. Stolpman volunteered to drive Mr. Kuprewicz to the deposition but warned that his various health conditions could prevent him from meaningfully participating. (Nimmer Decl., ¶ 9; *see also* Kuprewicz Declaration, ¶¶ 5, 6.) Mr. Stolpman also informed Real Parties that, in response to some concerning neurological symptoms (including double vision), Mr. Kuprewicz's doctor had ordered imaging for his brain, and an MRI was scheduled for June 23, 2025. Nimmer Decl., ¶ 9; *see also* Kuprewicz Decl., ¶ 6.) Importantly, while the parties negotiated the terms of a deposition should one proceed, at no point did Petitioners' counsel agree to produce Mr. Kuprewicz. Nor did Petitioners' counsel waive any right to contest the propriety of his potential deposition. (Nimmer Decl., ¶ 9.)

On June 20, 2025, counsel for Real Parties issued Mr. Kuprewicz a new deposition subpoena for personal appearance and production of documents and things ("Subpoena"). (Nimmer Decl., ¶ 10, Exh. C.) Also on June 20, 2025, counsel for Real Parties served Petitioners with an amended notice of deposition, noticing Mr. Kuprewicz's deposition for July 1, 2025 ("Notice"). (*Id.*)

The next business day, EDC Petitioners' counsel contacted Real Parties' counsel to explain their research revealed Real Parties are not currently entitled to depose Mr. Kuprewicz and offered to meet and confer regarding Petitioners' motion to quash. (Nimmer Decl., ¶ 12.) Opposing counsel accused Petitioners of acting in bad faith and a sanctionable fashion, and asserted they would not have moved the deposition date if they had been aware of Petitioners' objection. (*Id.*) EDC Petitioners' counsel explained that (1) the only reason the deposition was moved was because Real Parties unilaterally noticed it for a time when Petitioners' counsel was unavailable; (2) while the parties had discussed accommodations for Mr. Kuprewicz's health issues, at no time did Petitioners wave their right to object to his deposition; (3) Petitioners timely raised the objection before the date on which Mr. Kuprewicz's deposition was originally noticed; and (4) this is an unusual situation involving premature expert

Petitioners' Opposition to Real Parties' Improper Motion to Strike

discovery and, based on counsels' research, the proposed deposition exceeded the scope of permissible discovery. (*Id*., Exh. D.)

Petitioners also properly served a formal objection to the deposition before the statutory deadline. (*See* Code Civ. Proc., § 2025.410, subd. (a); Nimmer Decl., ¶ 13, Exh. E.) The parties were unable to resolve the issue informally, and on June 26, 2025, Petitioners filed a Motion to Quash the Deposition Subpoena, Quash the Deposition Notice, and Stay Taking of the Deposition. (Nimmer Decl., ¶ 14, Exh. E.) The next day, on June 27, 2025, Real Parties filed and served an *ex parte* application to compel or strike Mr. Kuprewicz's declaration. (*Id*., ¶ 15, Exh. F.)

On June 30, 2025, the Parties appeared *ex parte* and Petitioners represented to the Court that Mr. Kuprewicz had a scheduled appointment with a neurovascular specialist the next day. (*Id*., ¶ 16.) Thus, the Court continued the *ex parte* hearing to July 2, 2025. (*Id*.)

On July 2, 2025, the Parties appeared *ex parte* again and Petitioners represented to the Court that at his July 1, 2025, appointment, Mr. Kuprewicz's doctor told him he isunable to participate in a deposition in his current condition. (*Id*., ¶ 17.) Rather than striking Mr. Kuprewicz's declaration as Real Parties' requested, however, the Court ordered that Real Parties can file a responsive expert declaration and Petitioners will neither take the depositions of Real Parties in Interests' experts nor submit a reply declaration from Mr. Kuprewicz. (*Id*., ¶ 18, Exh. H.) Nevertheless, only five days later, Real Parties untimely filed the instant Motion. (*Id*., ¶ 19.)

## III. ARGUMENT

### A. Real Parties' Motion Is Improper

Real Parties' Motion is improper on numerous grounds. First, Real Parties already made a nearly identical request. (Nimmer Decl., Exhs. G–H.) Rather than granting that request, the Court allowed Real Parties to submit their own declaration(s), of which Real Parties submitted numerous, and specified that Petitioners cannot depose Real Parties' experts or submit a rebuttal declaration from Mr. Kuprewicz. (*Id*., Exh. H.) If Real Parties had it their way, the Court would now strike Petitioners' sole expert consultant's declaration, prevent Petitioners from deposing Real Parties' experts, and prevent Petitioners from submitting a rebuttal declaration. In other words, Real Parties not only want a second bite at the apple, they also want to have their cake and eat it too.

Petitioners' Opposition to Real Parties' Improper Motion to Strike

Second, the Motion is untimely. Code of Civil Procedure, section 1005(b), provides that noticed motions must be filed and served at least sixteen court days before the hearing. However, Real Parties only filed and served this Motion nine court days before the hearing. Real Parties did not move for or obtain an order to shorten time pursuant to California Rules of Court, Rule 3.1300(b). Real Parties' failure to comply with the time limits is severely prejudicial to Petitioners and thus the motion should be denied under the principles of equity. (*See Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 297 ("In general, fairness demands adherence to the statutory procedures, since they were designed to place the parties 'on roughly equal footing.'" (quoting *Kalaba v. Gray* (2002) 95 Cal.App.4th 1416, 1422).)

## B.    Expert Discovery Is Generally Prohibited Before Experts Are Formally Designated and No Pertinent Exception Applies

Beyond the Motion's impropriety, it is further meritless because, as Petitioners previously explained, depositions are generally not permitted at this stage of litigation. Under Civil Code of Procedure, section 2034.210 *et seq.*, the door to expert discovery opens only after a party formally demands to exchange expert witness information and the parties subsequently designate expert witnesses for trial. (*See* Code Civ. Proc., § 2034.210, subds. (a)–(b).) Expert discovery is generally "not appropriate until and unless there is such a designation." (*County of Los Angeles v. Superior Court,*, 224 Cal.App.3d 1445, 1456; *see also id.* at p. 1456–57 (recognizing information related to an expert's identity, qualifications, or opinion(s) is not discoverable before designation and reversing a trial court's order compelling deposition).)

This limitation on expert discovery—of which Real Parties' Notice and Subpoena exceeds— exists for good reason. As the court in *County of Los Angeles* explained, there are at least four substantial justifications for strictly controlling pretrial expert discovery:

> In the first place, access to the conclusions of an adversary's experts often provides strong clues to the theories, thoughts, and tactics of opposing counsel, . . . [para] Second, a limitless right to ascertain and probe the views of opposing experts could easily lead to an expensive and delay-producing round of discovery that would tend to feed on itself: . . . [para] Third, unrestricted discovery as to an adversary's experts enables "the stupid or lazy practitioners" to sit back secure in the knowledge that at the appropriate time they will be able "to 'ride free' on the opponent's industry." Since 1963, recognition of this "free ride" as a discovery evil has been articulated in the Discovery Act itself: "It is the policy of the

Petitioners' Opposition to Real Parties' Improper Motion to Strike

state . . . to prevent attorneys from taking undue advantage of their adversary's industry and efforts." Finally, . . . discovery as of right with respect to an adversary's experts is bound to have the dreaded "chilling effect" on the willingness of attorneys to use objective, fairminded consultants who will honestly and frankly point out the weaknesses and deficiencies of their side.

(*Id.* at 1457 (all alterations in original) (quoting 2 Hogan, Modern Cal. Discovery (4th ed. 1988), § 13.12, pp. 250–51).)

Additionally, premature expert discovery is in direct tension with protections afforded by the attorney-client privilege and attorney work-product doctrine. (*See DeLuca v. State Fish Co., Inc.* (2013) 217 Cal.App.4th 671, 687–88 (communications with party's *consulting* expert and information an expert prepares at the party's request are protected by attorney-client privilege and/or the work-product doctrine).) That the parties here have not designated experts pursuant to section 2034.210 is undisputed.

There is only one recognized exception to the prohibition on premature expert discovery, which originates from *St. Mary Medical Center v. Superior Court* (1996) 50 Cal.App.4th 1531. However, this exception only applies in the context of summary judgment proceedings, not preliminary injunction hearings, and is otherwise inapplicable here. The *St. Mary* court stressed this exception should be used sparingly so as not to turn proceedings into "mini trials." (*St. Mary*, at p. 1540.) Specifically, the exception is limited to cases where "*objective facts* [are] presented which create a *significant question* regarding the validity of [a] . . . declaration which, if successfully pursued, *will* impeach the foundational basis of the . . . declaration in question." (*Id.* at p. 1540–41 (emphases added).) Real Parties have presented no such facts as to Mr. Kuprewicz's declaration.

Finally, where applicable, the exception only permits a party to inquire into the factual underpinnings of the opinion(s) expressed in an expert's declaration. (*St. Mary*, at p. 1540 (permitting a deposition that "cover[ing] no more than the opinions rendered in the [expert's] declaration").) Neither Real Parties' Notice nor Subpoena so limited the scope of Mr. Kuprewicz's proposed deposition. Thus, Real Parties' Motion to Strike on the grounds that they are now prevented from taking Mr. Kuprewicz's deposition is meritless.

**C.     Real Parties' Assertion That They Are Entitled to "Cross-Examine" Mr. Kuprewicz or Have His Declaration Stricken Is Unsupportable**

Real Parties' Motion also rests upon the flawed contention that they have a fundamental right to cross-examine witnesses who submit statements in support of a preliminary injunction. Not so.

Real Parties cite cases bearing no resemblance to the pending proceeding and do not address the propriety of discovery. In *In re Crystal J.* (1993) 12 Cal.App.4th 407, the court affirmed a decision to permanently terminate a mother's parental rights after notice and a hearing, finding no due process violation because a social worker's report was provided to the parties before the hearing. In *August v. Department of Motor Vehicles* (1968) 264 Cal.App.2d 52, 54–56, 60–62, the court upheld a judgment as consistent with due process that suspended an individual's driver's license after he refused to submit to a drug test, regardless of the fact that the complainant officer was not present at the hearing.

Real Parties other citations fare no better and are also irrelevant. *Fost v. Superior Court* (2000) 80 Cal.App.4th 724 addresses the general importance *direct and cross-examination of witnesses at a criminal trial*. (*Fost* at pp. 732–34 (citing criminal cases and one civil case where the defendant "refused to respond to proper cross-examination").) Real Parties contend that *Fost* stands for the proposition that if "a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony." (*Ex Parte* App. at 3, 9, 19.) Real Parties omit the full sentence, which reads: "[w]here a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony *on direct*." (*Fost,* 80 Cal. App.4th at 735 (emphasis added).) Similarly, *In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 841-842 ruled that the trial court should not have considered a supported spouse's "income and expense declaration" submitted to the court but not made available to the paying spouse until the hearing, at which the supporting spouse did not appear. To the extent this case is at all analogous, Real Parties were duly provided with a copy of the declaration at issue more than a month before the forthcoming preliminary injunction hearing. *Fost* and *In re Marriage of Swan,* like the other cited cases cited by Real Parties, are decidedly not about the deposition of experts whose declarations are submitted in support of preliminary relief.

Petitioners' Opposition to Real Parties' Improper Motion to Strike

*Fleishman* is similarly unhelpful to Real Parties' arguments (*see Ex Parte* App. at 11), and better align with Petitioners' stance. Indeed, as *Fleishman* explains, before ruling on a motion for a preliminary injunction, *the court—*not the parties—carefully weighs the evidence and, if relevant, weighs the credibility of witnesses that appear at the hearing. (*Fleishman v. Superior Court* (2002) 102 Cal.App.4th 350, 356 (citing *People v Landlords Professional Services, Inc.* (1986) 178 Cal.App.3d 68, 71).) Similarly, as discussed above, *St. Mary, supra*, 50 Cal.App.4th at pp. 1539–40, carved out a narrow exception to the general rule against prematurely deposing experts where expert opinions are filed in support of or in opposition to a motion for summary judgment or adjudication, not preliminary relief. In sum, the cases Real Parties rely on are inapplicable to the situation at hand and fail to support their positions and arguments.

### D. Real Parties' Gatekeeper Argument Rests Upon the Flawed Notion that Mr. Kuprewicz's Declaration Lacks Credibility

Real Parties contend that the Court must strike Mr. Kuprewicz's declaration under its gatekeeping responsibilities pursuant to *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747. However, *Sargon* is inapplicable because it dealt with an expert who testified at trial, had a "lack of expertise," and relied upon "data bear[ing] any resemblance to Plaintiff's [claims]." (*Id*. at 755, 759–61). Here, however, Mr. Kuprewicz is not testifying at trial and relied upon documents concerning the very pipelines at issue. (Kuprewicz Decl., ¶¶ 8, 10.) He also is a well-recognized pipeline safety expert with decades of experience who serves on the Technical Hazardous Liquid Pipeline Safety Standards Committee (*see* 49 U.S.C. § 60115), appointed by the U.S. Secretary of Transportation to advise Congress on pipeline safety matters. (*See* July 11, 2025, Declaration of Julie Teel Simmonds Re: Petitioners' Reply in Support of Application for an Administrative Stay or Preliminary Injunction, Exh. 7; Kuprewicz Decl., ¶ 2.) Thus, contrary to Real Parties' contention, striking the declaration would "overstep[ ] [the Court's] limited role as an evidentiary gatekeeper by excluding . . . expert opinions" that "were not clearly invalid or unreliable." (*Garner v. BNSF Ry. Co.* (2024) 98 Cal. App. 5th 660, 681–90; *see also People v. Veametahau* (2020) 9 Cal. 5th 16, 34 at n. 16 ("'courts must . . . be cautious in excluding expert testimony' so as not to usurp that role. . . . [M]any of defendant's arguments concerning reliability may be better understood as directed at the weight of the expert testimony, not its

Petitioners' Opposition to Real Parties' Improper Motion to Strike

admissibility"). (first alteration in original) (first quoting *Sargon*, *supra*, 55 Cal.4th at p. 772, then citing *id.* at p. 769).)

Indeed, as Real Parties recognize, the *court*, not the parties, carefully weighs the evidence and, if relevant, weighs the credibility of witnesses. (*Fleishman*, *supra*, 102 Cal.App.4th at 356 (citing *People v Landlords Professional Services, supra*, 178 Cal.App.3d at 71).) Thus, it is not up to Real Parties to determine the credibility of Petitioners' witness.

Second, Real Parties wrongly assert Mr. Kuprewicz's declarations and reports lack credibility, claiming Mr. Kuprewicz fails to explain what analysis he performed to arrive at his conclusions. However, Mr. Kuprewicz's declaration and reports lists *all* documents he relied upon in forming his opinion and details his qualifications to opine upon such matters. (Kuprewicz Decl., ¶¶ 8, 10, Exhs. A–C.) Moreover, his reports demonstrate crucial information that form the basis of his opinion. For example, his second report notes that:

> A simple plot of the type and approximate milepost location of external corrosion such as wall loss or cracking, including field as well as ILI indications along the Pipelines, will underscore how challenging the operation of the present Pipelines will be without effective CP. Such a plot will clearly demonstrate that the Pipelines are not "like new" as indicated by some recent Sable/PPC representatives. Further explanation is also warranted as to why the pipeline operator assumes there is no SCC or SSC risks associated with water on the Pipelines.

(Kuprewicz Decl., Exh. C at 2.) That Mr. Kuprewicz's declaration summarizes his reports for ease of reference does not make his declaration or reports any less credible.

Finally, Real Parties' contention that Mr. Kuprewicz's declarations and reports lack credibility because they cannot "be found in the public literature, nor was either paper peer reviewed or published in any recognized scientific or engineering publication" (Motion at 14) cuts against their own expert declarations, which similarly were prepared for purposes of this litigation and are neither publicly available nor published. For these reasons too, Real Parties' Motion should be denied.

**IV.    CONCLUSION**

For all the above reasons, Petitioners respectfully request that this Court deny Real Parties' improper, untimely, and meritless Motion to Strike.

Dated: July 11, 2025

Respectfully submitted,

*/s/ Julie Teel Simmonds*
Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Counsel for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

11

Petitioners' Opposition to Real Parties' Improper Motion to Strike

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2025 7:46 PM
By: Terri Chavez , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological
Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br><br>**DECLARATION OF TALIA NIMMER IN SUPPORT OF PETITIONERS' OPPOSITION TO REAL PARTIES' IMPROPER MOTION TO STRIKE THE DECLARATION OF RICHARD B. KUPREWICZ**<br><br>[Filed concurrently with Petitioners' Opposition]<br><br>Date:    July 18, 2025<br>Time:    10:00 a.m.<br>Dept.:    4<br>Judge:    Honorable Donna D. Geck<br><br>Action Filed: April 15, 2025<br>Trial: None Set |

1

Declaration of Talia Nimmer ISO of Petitioners' Opposition to Real Parties' Improper Motion to Strike

## DECLARATION OF TALIA NIMMER

I, Talia Nimmer, declare as follows:

1. I am a staff attorney at Center for Biological Diversity and am counsel for Petitioners in this action. I am duly licensed to practice law before this Court. I have personal knowledge of the following and, if called as a witness, would and could testify competently thereto.

2. Richard Kuprewicz is one of the nation's leading pipeline safety experts. Petitioners retained Mr. Kuprewicz as an expert consultant to advise them during their advocacy to the various state and federal agencies overseeing Sable Offshore Corp.'s ("Sable") proposed restart of the Santa Ynez Unit and attendant infrastructure, including the Las Flores Pipeline System. As relevant here, Mr. Kuprewicz's contractual scope of work included evaluating the Las Flores Pipeline System's defects and systemic issues, and reviewing Sable's applications for State Waivers for the limited effectiveness of cathodic protection on the pipeline system.

3. At Petitioners' request, Mr. Kuprewicz prepared two reports: (1) a report generally outlining the dangers of restarting the Las Flores Pipeline System and (2) a report addressing the deficiencies of the State Waivers that the Office of the State Fire Marshal ("OSFM") ultimately issued to Sable. Petitioners submitted both reports to OSFM during the administrative stage of these proceedings. Together, the reports explain systemic issues with the pipeline system, why the State Waivers will not ensure that the pipeline system is safe to operate, and why the pipeline system continues to pose a significant threat of rupturing.

4. After Petitioners filed this action, Sable and Pacific Pipeline Company (together, "Real Parties") began publicly claiming that they were on the precipice of restarting the Las Flores Pipeline System. Accordingly, Petitioners applied *ex parte* for an administrative stay, a temporary restraining order, and a preliminary injunction (the "*Ex Parte* Application") to prevent them from doing so. In support of Petitioners' *Ex Parte* Application, Petitioners submitted a declaration from Mr. Kuprewicz, with his two reports attached.

5. On June 3, 2025, the Court granted Petitioners' request for a temporary restraining order and issued an order to show cause why a preliminary injunction should not issue (the "OSC"). The hearing on the OSC is set for July 18, 2025. The Court ordered that briefing be completed per

2

Declaration of Talia Nimmer ISO of Petitioners' Opposition to Real Parties' Improper Motion to Strike

code, meaning that Real Parties' opposition was due by July 7, 2025, and Petitioners' reply by July 11, 2025.

6.    On June 5, 2025, Real Parties served Mr. Kuprewicz with a notice of deposition and a deposition subpoena for personal appearance and production of documents and things, noticing Mr. Kuprewicz's deposition for June 24, 2025. True and accurate copies of the notice of deposition and deposition subpoena are attached as **Exhibit A**.

7.    That same day, Real Parties served a "cross-notice" of deposition and deposition subpoena on Petitioners in the coordinated case *Environmental Defense Center, et al. v. California Department of Forestry and Fire Protection, et al.*, 25CV02247 ("EDC Petitioners").

8.    Because counsel for Real Parties had unilaterally scheduled the deposition and were seemingly unaware of Mr. Kuprewicz's substantial health issues, there was an immediate need to meet and confer regarding the deposition date and reasonable accommodations for Mr. Kuprewicz. Thus, on June 10, 2025, I requested via email that (1) the deposition be moved to July 1, 2025, to accommodate Petitioners' counsel's schedule and (2) reasonable accommodations be made for Mr. Kuprewicz, including that the deposition take place remotely and occur in two, 3.5-hour sessions. Counsel for Real Parties agreed to move the deposition to July 1, 2025, but refused the requests to accommodate Mr. Kuprewicz's health issues. When EDC Petitioners' counsel then shared that Mr. Kuprewicz was unable to travel, counsel for Real Parties continued to demand that the deposition proceed in-person. A true and accurate copy of this email exchange is attached as **Exhibit B**.

9.    EDC Petitioners then secured outside counsel for Mr. Kuprewicz, Mr. Tom Stolpman, and set up a teleconference meeting with Real Parties counsel to discuss Mr. Kuprewicz's health issues and possible accommodations for him. At the June 12, 2025, meeting, Mr. Stolpman volunteered to drive Mr. Kuprewicz to the deposition, but warned that his various health conditions could prevent him from meaningfully participating. Mr. Stolpman also informed Real Parties that, in response to some concerning symptoms (including double vision), Mr. Kuprewicz's doctor had ordered imaging for his brain, and an MRI was scheduled for June 23, 2025. While the parties negotiated the terms of a deposition should one proceed, at no point did Petitioners' counsel agree to produce Mr. Kuprewicz. Nor did Petitioners' counsel waive any right to contest the propriety of his potential deposition

3

10.     On June 20, 2025, counsel for Real Parties issued Mr. Kuprewicz a new deposition subpoena for personal appearance and production of documents and things, the subpoena at issue, and an amended notice of deposition noticing Mr. Kuprewicz's deposition for July 1, 2025, the notice at issue. True and accurate copies of the amended subpoena and notice of deposition are attached as **Exhibit C**.

11.     That same day, Real Parties served an amended "cross-notice" of deposition and deposition subpoena on EDC Petitioners.

12.     The next business day, EDC Petitioners' counsel contacted counsel for Real Parties via email to explain that continuing research revealed Real Parties were not entitled to depose Mr. Kuprewicz, and to meet and confer regarding a motion to quash. Opposing counsel accused Petitioners of acting in bad faith, and claimed they would not have moved the deposition date if they were aware of Petitioners' objection. In response, EDC Petitioners' counsel explained that (1) the only reason the deposition was moved was because Real Parties unilaterally noticed it for a time when Petitioners' counsel were unavailable; (2) while the parties discussed accommodations for Mr. Kuprewicz's health issues, at no time did Petitioners wave their right to object to his deposition; (3) Petitioners timely raised the objection before the date for which Mr. Kuprewicz's deposition was originally noticed; and (4) this is an unusual situation involving premature expert discovery and, based on counsels' research, it was apparent the proposed deposition exceeded the scope of permissible discovery. A true and accurate copy of this email exchange is attached as **Exhibit D**.

13.     Petitioners properly served a formal objection to Mr. Kuprewicz's deposition on all interested parties on June 25, 2025. A true and accurate copy of Petitioners' objection is attached as **Exhibit E**.

14.     As the parties were unable to informally resolve the issues associated with the deposition, Petitioners filed a Motion a Quash the deposition subpoena, quash the deposition notice, and stay the taking of the deposition on June 26, 2025. A true and accurate copy of the Motion attached as **Exhibit F.**

15.     The next day, on June 27, 2025, Real Parties served Petitioners with an *Ex Parte* Application to Compel the Deposition or Strike the Declaration. A true and correct copy of the

4

Declaration of Talia Nimmer ISO of Petitioners' Opposition to Real Parties' Improper Motion to Strike

Application is attached as **Exhibit G.**

16.     On June 30, 2025, the Parties appeared *Ex Parte* and Petitioners represented to the Court that Mr. Kuprewicz had a scheduled appointment with a neurovascular specialist the next day. Thus, the Court continued the *Ex Parte* hearing to July 2, 2025.

17.     On July 2, 2025, the Parties appeared *Ex Parte* again and Petitioners represented to the Court that at his July 1, 2025, appointment, Mr. Kuprewicz's doctor told him that he is unable to participate in a deposition in his current condition.

18.     Rather than striking Mr. Kuprewicz's declaration as Real Parties' requested, however, the Court ordered that Real Parties can instead file a responsive expert declaration and that Petitioners will neither take the depositions of Real Parties in Interests' experts nor submit a reply declaration from Mr. Kuprewicz. A true and correct copy of the Court's Minute Order is attached as **Exhibit H.**

19.     Nevertheless, only five days later, Real Parties untimely filed the instant Motion to Strike.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 11th day of July, 2025, in Los Angeles, California.


_____
Talia Nimmer

5

Declaration of Talia Nimmer ISO of Petitioners' Opposition to Real Parties' Improper Motion to Strike

## INDEX OF EXHIBITS
### Declaration of Talia Nimmer

| Exhibit No. | Description | Starting Page No. |
|---|---|---|
| Exhibit A | Real Parties' Notice of Deposition and Deposition Subpoena of Richard B. Kuprewicz (June 5, 2025) | 7 |
| Exhibit B | Email exchange among Parties' counsel (June 10–12, 2025) | 23 |
| Exhibit C | Real Parties' Amended Cross-Notice of Deposition and Deposition Subpoena of Mr. Kuprewicz (June 20, 2025) | 36 |
| Exhibit D | Email exchange among Parties' counsel (June 23–24, 2025) | 53 |
| Exhibit E | Petitioners' Objections to Notice of Deposition and Deposition Subpoena of Mr. Kuprewicz (June 25, 2025) | 60 |
| Exhibit F | Petitioners' Notice of Motion and Motion to Quash Deposition Subpoena, Quash Notice of Deposition, and Stay Deposition (June 26, 2025) | 71 |
| Exhibit G | Real Parties' *Ex Parte* Application for Order Requiring Mr. Kuprewicz to Appear (June 27, 2025) | 87 |
| Exhibit H | Minute Order Re: Real Parties' *Ex Parte* Application for Order Requiring Mr. Kuprewicz To Appear (July 2, 2025) | 103 |

# Exhibit A

Declaration of Talia Nimmer

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
MATTHEW C. WICKERSHAM, SBN 241733
matt.wickersham@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN (SBN 237595)
benjaminhanelin@paulhastings.com
NATALIE C. Rogers (SBN 301254)
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive, <br><br> Respondents/Defendants, <br><br> _____ <br><br> SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive, <br><br> Real Parties in Interest. | Case No. <br> Coordinated with Case No. 25CV02247 <br><br> Assigned for all purposes to: <br> Hon. Donna D. Geck <br><br> **REAL PARTIES IN INTEREST'S NOTICE OF ISSUANCE OF SUBPOENA TO AND DEPOSITION OF RICHARD B. KUPREWICZ** <br><br> **Date**:   June 24, 2025 <br> **Time**:   9:00 a.m. <br> **Place**:  1605 Calle Joaquin, San Luis Obispo, California 93405 <br><br> Complaint Filed:   April 15, 2025 <br> Trial Date:        None set |

Nimmer Declaration
Page 8

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company ("Real Parties") have issued and served the Deposition Subpoena for Personal Appearance and Production of Documents and Things to Richard B. Kuprewicz (the "Deponent"), attached hereto as **Exhibit 1** (the "Deposition Subpoena").

**PLEASE TAKE FURTHER NOTICE** that the deposition of Deponent will take place on **June 24, 2025** at the Marriott, 1605 Calle Joaquin, San Luis Obispo, California 93405. The deposition will be coordinated by Veritext Legal Solutions, with a business address of 707 Wilshire Boulevard, Suite 3500, Los Angeles, California 90017. The deposition will be taken before an officer authorized to administer the oath to the deponent and will be recorded by stenographic means by a court reporter certified to record depositions and authorized to administer the oath and serve as the deposition officer in the State of California.

Real Parties intend to (1) record the deposition utilizing audio and video technology; (2) use instant visual display such that the reporter's writing of the proceeding will be available to all who are a party to this proceeding to request and receive it in real time; (3) use Exhibit Capture (picture-in-picture) technology in which any exhibit reviewed by the deponent during the deposition can be captured visually; and (4) conduct this deposition utilizing a paperless exhibit display process called Exhibit Share or a similar paperless virtual display platform. The parties are advised that, in lieu of a paper set, exhibits may be provided and displayed digitally to the deposition officer, deponent, parties, and counsel. The exhibits will be compiled by the deposition officer for the purposes of exhibit stamping, and ultimate production of the final certified transcript.

Please contact the noticing attorney at least five (5) calendar days prior to the deposition to advise of those who intend to appear via this remote participating means so that the necessary credentials, call-in numbers, firm name, email address, services, testing and information, if necessary, can be arranged and provided to you prior to the deposition.

///

///

///

DATED: June 5, 2025   Respectfully submitted,

         **ALSTON & BIRD**
         JEFFREY D. DINTZER
         GARRETT B. STANTON

         **PAUL HASTINGS**
         DUNCAN JOSEPH MOORE

            Jeffrey D. Dintzer

         Attorneys for Real Parties in Interest
         **SABLE OFFSHORE CORP.**
         **PACIFIC PIPELINE COMPANY**

# EXHIBIT 1

SUBP-020

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Jeffrey D. Dintzer (Cal. Bar No. 139056); Matthew C. Wickersham (Cal. Bar No. 241733); Garrett B. Stanton (Cal. Bar No. 324775) ALSTON & BIRD LLP 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071   TELEPHONE NO.: (213) 576-1000     FAX NO. *(Optional):* (213) 576-1100 E-MAIL ADDRESS *(Optional):* jeffrey.dintzer@alston.com; matt.wickersham@alston.com; garrett.stanton@alston.com   ATTORNEY FOR *(Name):* Real Parties in Interest | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**
 STREET ADDRESS: 1100 Anacapa Street
 MAILING ADDRESS: P.O. Box 21107
CITY AND ZIP CODE: Santa Barbara, CA 93121-1107
 BRANCH NAME:

PLAINTIFF/ PETITIONER: Center for Biological Diversity and Wishtoyo Foundation

DEFENDANT/ RESPONDENT: California Department of Forestry and Fire Protection, et al.

| **DEPOSITION SUBPOENA**  **FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS** | CASE NUMBER:  25CV02244 |
|---|---|

THE PEOPLE OF THE STATE OF CALIFORNIA, TO *(name, address, and telephone number of deponent, if known):*
Richard B. Kuprewicz, 1783 Trilogy Pkwy, Nipomo, CA 93444-6621

1. **YOU ARE ORDERED TO APPEAR IN PERSON TO TESTIFY AS A WITNESS in this action at the following date, time, and place:**

| Date: June 24, 2025 | Time: 9:00 a.m. | Address: Marriott, 1605 Calle Joaquin, San Luis Obispo, CA 93405 |
|---|---|---|

a. ☐ As a deponent who is not a natural person, you are ordered to designate one or more persons to testify on your behalf as to the matters described in item 4. (Code Civ. Proc, § 2025.230.)

b. ☒ You are ordered to produce the documents and things described in item 3.

c. ☒ This deposition will be recorded stenographically    ☐ through the instant visual display of testimony
and by    ☐ audiotape    ☒ videotape.

d. ☒ This videotape deposition is intended for possible use at trial under Code of Civil Procedure section 2025.620(d).

2. The personal attendance of the custodian or other qualified witness and the production of the original records are required by this subpoena. The procedure authorized by Evidence Code sections 1560(b), 1561, and 1562 will not be deemed sufficient compliance with this subpoena.

3. The documents and things to be produced and any testing or sampling being sought are described as follows:
 See Attachment 3
☒ Continued on Attachment 3.

4. If the witness is a representative of a business or other entity, the matters upon which the witness is to be examined are described as follows:

☐ Continued on Attachment 4.

5. **IF YOU HAVE BEEN SERVED WITH THIS SUBPOENA AS A CUSTODIAN OF CONSUMER OR EMPLOYEE RECORDS UNDER CODE OF CIVIL PROCEDURE SECTION 1985.3 OR 1985.6 AND A MOTION TO QUASH OR AN OBJECTION HAS BEEN SERVED ON YOU, A COURT ORDER OR AGREEMENT OF THE PARTIES, WITNESSES, *AND* CONSUMER OR EMPLOYEE AFFECTED MUST BE OBTAINED BEFORE YOU ARE REQUIRED TO PRODUCE CONSUMER OR EMPLOYEE RECORDS.**

6. *At the deposition, you will be asked questions under oath. Questions and answers are recorded stenographically at the deposition; later they are transcribed for possible use at trial. You may read the written record and change any incorrect answers before you sign the deposition. You are entitled to receive witness fees and mileage actually traveled both ways. The money must be paid, at the option of the party giving notice of the deposition, either with service of this subpoena or at the time of the deposition. Unless the court orders or you agree otherwise, if you are being deposed as an individual, the deposition must take place within 75 miles of your residence or within 150 miles of your residence if the deposition will be taken within the county of the court where the action is pending. The location of the deposition for all deponents is governed by Code of Civil Procedure section 2025.250.*

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE FOR THE SUM OF $500 AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.**

Date issued: June 4, 2025

▶ _____
(SIGNATURE OF PERSON ISSUING SUBPOENA)

Jeffrey D. Dintzer
_____
(TYPE OR PRINT NAME)

Attorney for Real Parties in Interest
_____
(TITLE)

(Proof of service on reverse)                                                                 **Page 1 of 2**

| Form Adopted for Mandatory Use Judicial Council of California SUBP-020 [Rev. January 1, 2009] | **DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS** | Code of Civil Procedure §§ 2020.510, 2025.220, 2025.230, 2025.250, 2025.620; Government Code, § 68097.1 *www.courts.ca.gov* |
|---|---|---|

Nimmer Declaration
Page 12

**SUBP-020**

| | |
|---|---|
| PLAINTIFF/PETITIONER: Center for Biological Diversity and Wishtoyo Foundation<br><br>DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection, et al. | CASE NUMBER:<br>25CV02244 |

## PROOF OF SERVICE OF DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE
### AND PRODUCTION OF DOCUMENTS AND THINGS

1. I served this *Deposition Subpoena for Personal Appearance and Production of Documents and Things* by personally delivering a copy to the person served as follows:

   a. Person served *(name)*: Richard B. Kuprewicz

   b. Address where served:

   c. Date of delivery:

   d. Time of delivery:

   e. Witness fees and mileage both ways *(check one)*:

   (1) ☐    were paid. Amount: .....................$ _____

   (2) ☐    were not paid.

   (3) ☐    were tendered to the witness's public entity employer as required by Government Code section 68097.2. The amount tendered was *(specify)*:...............$ _____

   f. Fee for service: ..........................................$ _____

2. I received this subpoena for service on *(date):*

3. Person serving:

   a. ☐    Not a registered California process server

   b. ☐    California sheriff or marshal

   c. ☐    Registered California process server.

   d. ☐    Employee or independent contractor of a registered California process server

   e. ☐    Exempt from registration under Business and Professions Code section 22350(b)

   f. ☐    Registered professional photocopier

   g. ☐    Exempt from registration under Business and Professions Code section 22451

   h. Name, address, telephone number, and, if applicable, county of registration and number:

**I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

▶ _____
(SIGNATURE)

**(For California sheriff or marshal use only)**
**I certify** that the foregoing is true and correct.

Date:

▶ _____
(SIGNATURE)

SUBP-020 [Rev. January 1, 2009]

**PROOF OF SERVICE**
**DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE**
**AND PRODUCTION OF DOCUMENTS AND THINGS**

**Page 2 of 2**

Nimmer Declaration
Page 13

**ATTACHMENT 3**

**DEFINITIONS**

1.      "YOU" and "YOUR" mean to Richard B. Kuprewicz, his agents, attorneys, and other representatives acting on his behalf.

2.      "SABLE" shall mean Sable Offshore Corp.

3.      "PPC" shall mean Pacific Pipeline Company.

4.      "PETITIONERS" shall mean Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper, Center for Biological Diversity, and Wishtoyo Foundation, as well as their agents, attorneys, and other representatives acting on their behalf

5.      "ACTION" shall mean the civil lawsuits filed by PETITIONERS entitled *Center for Biological Diversity et al. v. California Department of Forestry and Fire Protection et al.*, Superior Court for the State of California, Santa Barbara County Case No. 25CV02244, and the coordinated action entitled *Environmental Defense Center et al. v. California Department of Forestry and Fire Protection et al.*, Superior Court for the State of California, Santa Barbara County Case No. 25CV02247.

6.      "SYU PIPELINE" shall refer to the Santa Ynez Unit Pipelines located in waters offshore California.

7.      "LAS FLORES PIPELINE" shall refer to the Las Flores Pipelines located in waters offshore California.

8.       "DOCUMENTS" means all data, papers, and books, transcriptions, pictures, drawings or diagrams or every nature, whether transcribed by hand or by some mechanical, electronic, photographic or other means, as well as sound reproductions of oral statements or conversations by whatever means made, including written papers or memoranda which summarize

Page **1** of **6**

oral conversations, whether in your actual or constructive possession or under your control or not, relating to or pertaining to or in any way to the subject matters in connection which it is used and includes originals, all file copies, all other copies, no matter how prepared and all drafts prepared in connection with such writing, whether used or not, including by way of illustration and not by way of limitation, the following: books; records; reports; contracts; agreements; video, audio and other electronic recordings; memoranda (including written memoranda of telephone conversations, other conversations, discussions, agreements, acts and activities); minutes; diaries; calendars; desk pads; scrapbooks; notes; notebooks; correspondence; drafts; bulletins; electronic mail; facsimiles; circulars; forms; pamphlets; notice; statements; journals; postcards; letters; telegrams; publications; inter and intra- office communications; photocopies; microfilm; maps; drawings; diagrams; sketches; analyses; transcripts; electronically stored information (ESI) and any other documents within defendant's possession, custody or control from which information can be obtained or translated, if necessary, by detection devices into reasonably usable form, i.e. typed in English. DOCUMENTS does not include DOCUMENTS protected by the attorney-client and/or work product privileges.

9.    "COMMUNICATION" means any attempt by one or more persons or entities to communicate, including but not limited to written communications, including memoranda, letters, notes, telegrams, telexes and any other documents; oral communications including face-to-face meetings and telephone conversations; and, electronic or computerized communications, including emails (electronic mailings), Internet postings, word processing systems, magnetic tapes, disks and diskettes.

10.    "RELATE TO" or "RELATING TO" means directly or indirectly mentioning or describing, pertaining to, being connected with, or reflecting upon a stated subject matter.

## **INSTRUCTIONS**

1.      Produce all DOCUMENTS in your possession, custody, or control, as well as all DOCUMENTS in the possession, custody, or control of your agents, representatives, attorneys, investigators, consultants, independent contractors, or experts at least one (1) week before the deposition date reflected in the Subpoena. (As used herein, the term "DOCUMENT" means all original writings of any nature whatsoever and all copies thereof which are not identical to the original or which contain any commentary or notation that does not appear on the original, whether written, printed, recorded or graphic matter, photographic matter, or sound reproduction of any kind in any form whatsoever (including, but not limited to, reports, studies, charts, statistical compilations, letters, correspondence, telegrams, memoranda, ledgers, books of accounts, bookkeeping and accounting records, minutes, contracts, leases, notes, electronic transcriptions or tapings of conversations conducted by any means, work papers, schedules, computer printouts, computer files, e-mails, financial statements, and reports, calculations, diaries, appointment calendars or records, manuals, brochures, invoices, desk calendars, work sheets, tapes, records of telephone calls) of which you have knowledge, whether or not such documents are in YOUR possession, custody or control, and irrespective of who prepared or signed such documents. In all cases where originals and/or non-identical copies are not available, "DOCUMENTS" also means identical copies of original documents and copies of non-identical copies.)

2.      Produce each and every copy where such copy contains any commentary or notation that does not appear on the original. ESI should be produced in its Native Format, meaning the form that it is ordinarily maintained on your systems, including any metadata associated therewith. (As used herein, the term "ESI" means electronically stored information as defined in California Code of Civil Procedure section 2016.020(e), and shall include, but is not limited to, e-mails and text messages.) Should you choose to produce electronic images of paper DOCUMENTS instead of paper copies, you must product them in single-page TIFF FORMAT imaged at not less than 300 dpi resolution that shows all text and images that would be visible to

a user of the paper DOCUMENT. Color DOCUMENTS must be produced in color TIFF images. Each image should have a unique filename. If a paper DOCUMENT is more than one page, the unitization of the paper DOCUMENT and any attachments or affixed notes shall be maintained as it existed when collected, including, for example, emails or letters with their attachments.

3.      Produce all drafts, as well as the final version, of all responsive DOCUMENTS.

4.      Produce, where possible, originals of the DOCUMENTS requested, whether signed or unsigned, for inspection and copying.

5.      For each DOCUMENT requested which is sought to be withheld under a claim of privilege, provide the following information:

a.      The number of the request to which the DOCUMENT is responsive;

b.      A statement of the basis upon which the privilege is claimed and whether or not the subject matter of the contents of the DOCUMENT is limited to legal advice or information provided for the purpose of securing legal advice;

c.      The name and title of the sender and the name and title of the recipient of the DOCUMENT, if applicable;

d.      The place, approximate date, and manner of recording or otherwise preparing the DOCUMENT;

e.      The name of each person or persons participating in the preparation of the DOCUMENT; and

f.      The name and title, if any, of each person to whom the contents of the DOCUMENT has been communicated by copy, exhibition, reading or substantial summarization.

Page **4** of **6**

## DOCUMENTS TO BE PRODUCED

**REQUEST FOR PRODUCTION NO. 1**:

All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing YOUR declaration in support of PETITIONERS' *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 2**:

All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing Exhibit B to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 3**:

All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing Exhibit C to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 4**:

YOUR COMMUNICATIONS with PETITIONERS RELATED TO the ACTION.

**REQUEST FOR PRODUCTION NO. 5**:

YOUR COMMUNICATIONS discussing SABLE.

**REQUEST FOR PRODUCTION NO. 6**:

YOUR COMMUNICATIONS discussing PPC.

**REQUEST FOR PRODUCTION NO. 7**:

All DOCUMENTS reflecting any work YOU have performed RELATED TO the SYU PIPELINE.

**REQUEST FOR PRODUCTION NO. 8**:

Page **5** of **6**

Nimmer Declaration
Page 18

All DOCUMENTS reflecting any work YOU have performed RELATED TO the LAS FLORES PIPELINE.

**REQUEST FOR PRODUCTION NO. 9**:

All contracts and agreements YOU have with PETITIONERS.

**REQUEST FOR PRODUCTION NO. 10**:

DOCUMENTS sufficient to show YOUR work in "consult[ing] for various local, state, and federal agencies, nonprofit organizations, and members of the public on pipeline regulation, operation, and design," as stated in paragraph 3 of YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 11**:

All drafts and versions of YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 12**:

All drafts and versions of Exhibit B to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 13**:

All drafts and versions of Exhibit C to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 14**:

All of YOUR COMMUNICATIONS RELATED TO the civil action entitled *Sable Offshore Corp v. California Coastal Commission et al.*, Superior Court for the State of California, Santa Barbara County Case No. 25CV00974.

| **ALSTON & BIRD LLP** (213) 576-1000 | |
| Jeffrey D. Dintzer (Cal. Bar 139056); Matthew C. Wickersham (Cal. Bar No 241733); | |
| Garrett B. Stanton (Cal. Bar No. 327775) | |
| **350 South Grand Avenue, Suite 5100 , Los Angeles, CA 90071** | |
| ATTORNEY FOR *(Name):* **Real Parties in Interest** | |

| **SUPERIOR COURT OF THE STATE OF CALIFORNIA** **COUNTY OF SANTA BARBARA - ANACAPA DIVISON** | |

| PLAINTIFF/PETITIONER:   **Center for Biological Diversity and Wishtoyo Foundation** | |
| DEFENDANT/RESPONDENT: **California Department of Forestry and Fire Protection, et al.** | |

| **PROOF OF SERVICE** | HEARING DATE: **June 24, 2025** | TIME: **9:00 AM** | CASE NUMBER: **25CV02244** |

1. At the time of service I was 18 years of age and not a party to this action, and **I served copies** of the *(specify document(s)):*

**DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS**

2.   a. Party Served:          **Richard B. Kuprewicz**

     b. Person Served:       **Same as party in item 2a.**

     c. Address:                  **1783 Trilogy Parkway**
                                          **Nipomo, CA 934446621**

3.   I served the party in item 2

     a. **By personally delivering the copies.**

     (1) on *(date):*        **6/5/2025**
     (2) at *(time):*         **7:00 AM**

4.   **Witness fees were not demanded and were not paid.**

5.   Person Serving *(name, address, and telephone No.):*

**Joseph P. Stetz III**                                   f. **Fee** for service: $
Ace Attorney Service, Inc.                          c. Registered California Process Server.
800 S. Figueroa Street, Suite 900               (1) Employee or independent contractor.
Los Angeles, CA 90017                               (2) Registration No.: **270**
(213) 623-3979                                          (3) County : **SANTA BARBARA**

6.   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct

Date:   **June 5, 2025**

_____
*(signature)*

SUBP-020 [Rev. January 1,2009]                                                              Order#: 2455263/POS2

**PROOF OF SERVICE**

## PROOF OF SERVICE

I, Heather Thai, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On June 5, 2025, I served the document(s) **REAL PARTIES IN INTEREST'S NOTICE OF ISSUANCE OF SUBPOENA TO AND DEPOSITION OF RICHARD B. KUPREWICZ** on the interested parties stated below, by the following means of service:

### See Attached Service List

☒   (BY OVERNIGHT MAIL) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by UPS for overnight delivery.

☒   BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 5, 2025, at Los Angeles, California.

Heather Thai
Heather Thai

**SERVICE LIST**

Julie Teel Simmons, Esq.
David Pettit, Esq.
Talia Nimmer, Esq.
Center for Biological Diversity
2011 Franklin Street, Suite 375
Oakland, CA 94612

**ATTORNEYS FOR PETITIONERS**
CENTER FOR BIOLOGICAL DIVERSITY
and WISHTOYO FOUNDATION

Tel.:    (510) 844-7100
Fax:     (510) 844-7150
Email: jteelsimmonds@biologicaldiversity.org
         dpettit@biologicaldiversity.org
         tnimmer@biologicaldiversity.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

**ATTORNEYS FOR RESPONDENTS/
DEFENDANTS**
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal;
Daniel Berlant, in his official capacity as State
Fire Marshal

Tel.:    (415) 510-3802
Email:  Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

**ATTORNEYS FOR REAL PARTIES IN
INTEREST**
Sable Offshore Corp.; Pacific Pipeline
Company

Tel.:    (310) 620-5879
Email:  djmoore@paulhastings.com
         benjaminhanelin@paulhastings.com
         natalierogers@paulhastings.com

# Exhibit B

Declaration of Talia Nimmer

| | |
|---|---|
| **From:** | Dintzer, Jeffrey |
| **To:** | Jeremy Frankel; Stanton, Garrett |
| **Cc:** | djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; Wickersham, Matt; Talia Nimmer; Thai, Heather; Julie Teel Simmonds; David Pettit; Michael.dorsi@doj.ca.gov; Linda Krop; Tara Rengifo; Bolender, Brooke; Niz, Kim; tom@stolpmanlawgroup.com |
| **Subject:** | Re: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247) |
| **Date:** | Thursday, June 12, 2025 1:44:48 PM |

Ok

_____

From: Jeremy Frankel <jfrankel@environmentaldefensecenter.org>
Sent: Thursday, June 12, 2025 1:40:10 PM
To: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>; Stanton, Garrett <Garrett.Stanton@alston.com>
Cc: djmoore@paulhastings.com <djmoore@paulhastings.com>; benjaminhanelin@paulhastings.com <benjaminhanelin@paulhastings.com>; natalierogers@paulhastings.com <natalierogers@paulhastings.com>; Wickersham, Matt <Matt.Wickersham@alston.com>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Thai, Heather <Heather.Thai@alston.com>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; David Pettit <dpettit@biologicaldiversity.org>; Michael.dorsi@doj.ca.gov <Michael.dorsi@doj.ca.gov>; Linda Krop <lkrop@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; Bolender, Brooke <Brooke.Bolender@alston.com>; Niz, Kim <Kim.Niz@alston.com>; tom@stolpmanlawgroup.com <tom@stolpmanlawgroup.com>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

EXTERNAL SENDER – Proceed with caution

_____

How does 3 pm sound?

JEREMY FRANKEL (he/him/his)
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org<http://www.EnvironmentalDefenseCenter.org>

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

-----Original Message-----
From: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>

Sent: Thursday, June 12, 2025 1:38 PM
To: Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; Stanton, Garrett <Garrett.Stanton@alston.com>
Cc: djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com;
Wickersham, Matt <Matt.Wickersham@alston.com>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Thai,
Heather <Heather.Thai@alston.com>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; David Pettit
<dpettit@biologicaldiversity.org>; Michael.dorsi@doj.ca.gov; Linda Krop
<lkrop@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; Bolender,
Brooke <Brooke.Bolender@alston.com>; Niz, Kim <Kim.Niz@alston.com>; tom@stolpmanlawgroup.com
Subject: Re: Center for Biological Diversity v. California Department of Forestry, et al. (Case No.
25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

Yes, that will work. Please send a teams or zoom link. Jeffrey.

_____

From: Jeremy Frankel <jfrankel@environmentaldefensecenter.org>
Sent: Thursday, June 12, 2025 1:28:19 PM
To: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>; Stanton, Garrett <Garrett.Stanton@alston.com>
Cc: djmoore@paulhastings.com <djmoore@paulhastings.com>; benjaminhanelin@paulhastings.com
<benjaminhanelin@paulhastings.com>; natalierogers@paulhastings.com <natalierogers@paulhastings.com>;
Wickersham, Matt <Matt.Wickersham@alston.com>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Thai,
Heather <Heather.Thai@alston.com>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; David Pettit
<dpettit@biologicaldiversity.org>; Michael.dorsi@doj.ca.gov <Michael.dorsi@doj.ca.gov>; Linda Krop
<lkrop@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; Bolender,
Brooke <Brooke.Bolender@alston.com>; Niz, Kim <Kim.Niz@alston.com>; tom@stolpmanlawgroup.com
<tom@stolpmanlawgroup.com>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No.
25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

EXTERNAL SENDER - Proceed with caution
_____


Hi Jeffrey,


Are you available for a phone call this afternoon with myself and Tom Stolpman, cc'ed here, who will be serving as
counsel for Mr. Kuprewicz? Any time before 4:30 would work for us.


Thanks,


[cid:image001.jpg@01DBDB9D.DA252F20]

JEREMY FRANKEL (he/him/his)
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org<http://www.EnvironmentalDefenseCenter.org>
<http://www.environmentaldefensecenter.org>>

[Facebook icon] <https://www.facebook.com/EnvironmentalDefenseCenter>> [Instagram icon] <https://www.instagram.com/environmentaldefensecenter>> [LinkedIn icon] <https://www.linkedin.com/company/environmental-defense-center>> [Youtube icon] <https://www.youtube.com/user/EnviroDefenseCenter>>

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

From: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>
Sent: Wednesday, June 11, 2025 5:07 PM
To: Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; Stanton, Garrett <Garrett.Stanton@alston.com>
Cc: djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; Wickersham, Matt <Matt.Wickersham@alston.com>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Thai, Heather <Heather.Thai@alston.com>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; David Pettit <dpettit@biologicaldiversity.org>; Michael.dorsi@doj.ca.gov; Linda Krop <lkrop@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; Bolender, Brooke <Brooke.Bolender@alston.com>; Niz, Kim <Kim.Niz@alston.com>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

Thank you, I look forward to hearing from him/her tomorrow. Regards, Jeffrey.

From: Jeremy Frankel <jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>>
Sent: Wednesday, June 11, 2025 5:05 PM
To: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>; Stanton, Garrett <Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>; benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>; natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>; Wickersham, Matt <Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Talia Nimmer <tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>; Thai, Heather <Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit <dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>; Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>; Linda Krop

<lkrop@environmentaldefensecenter.org<[mailto:lkrop@environmentaldefensecenter.org](mailto:lkrop@environmentaldefensecenter.org)>>; Tara Rengifo <trengifo@environmentaldefensecenter.org<[mailto:trengifo@environmentaldefensecenter.org](mailto:trengifo@environmentaldefensecenter.org)>>; Bolender, Brooke <Brooke.Bolender@alston.com<[mailto:Brooke.Bolender@alston.com](mailto:Brooke.Bolender@alston.com)>>; Niz, Kim <Kim.Niz@alston.com<[mailto:Kim.Niz@alston.com](mailto:Kim.Niz@alston.com)>>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)


EXTERNAL SENDER - Proceed with caution

_____


We are working on obtaining outside counsel for Mr. Kuprewicz, which should be resolved some time tomorrow. Counsel for Mr. Kuprewicz will follow up with you about appropriate accommodations.


Thanks,


[cid:image001.jpg@01DBDB9D.DA252F20]

JEREMY FRANKEL (he/him/his)
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org<[http://www.EnvironmentalDefenseCenter.org](http://www.EnvironmentalDefenseCenter.org)>
<[http://www.environmentaldefensecenter.org>>](http://www.environmentaldefensecenter.org)




[Facebook icon] <https://www.facebook.com/EnvironmentalDefenseCenter>> [Instagram icon] <https://www.instagram.com/environmentaldefensecenter>> [LinkedIn icon] <https://www.linkedin.com/company/environmental-defense-center>> [Youtube icon] <https://www.youtube.com/user/EnviroDefenseCenter>>



We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.



CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

From: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>
Sent: Wednesday, June 11, 2025 3:53 PM
To: Jeremy Frankel
<jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>>; Stanton, Garrett
<Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>;
benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>;
natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>; Wickersham, Matt
<Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Talia Nimmer
<tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>; Thai, Heather
<Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>; Julie Teel Simmonds
<jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit
<dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>;
Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>; Linda Krop
<lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org>>; Tara Rengifo
<trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org>>; Bolender, Brooke
<Brooke.Bolender@alston.com<mailto:Brooke.Bolender@alston.com>>; Niz, Kim
<Kim.Niz@alston.com<mailto:Kim.Niz@alston.com>>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No.
25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

Mr. Frankel you have not answered my question, which is very simple, can Mr. Kuperwicz travel the short distance
to a local hotel to attend the deposition? You will have to answer this question if you intend to seek a protective
order. Please advise. If he is truly housebound then we can discuss other accommodations, but a remote deposition
is not one of them. Finally, please advise whether your offices are representing Mr. Kuperwicz as his personal
counsel in this matter. Regards, Jeffrey Dintzer.

From: Jeremy Frankel
<jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>>
Sent: Wednesday, June 11, 2025 3:43 PM
To: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>; Stanton, Garrett
<Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>;
benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>;
natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>; Wickersham, Matt
<Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Talia Nimmer
<tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>; Thai, Heather
<Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>; Julie Teel Simmonds
<jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit
<dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>;
Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>; Linda Krop
<lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org>>; Tara Rengifo
<trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org>>; Bolender, Brooke
<Brooke.Bolender@alston.com<mailto:Brooke.Bolender@alston.com>>; Niz, Kim
<Kim.Niz@alston.com<mailto:Kim.Niz@alston.com>>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No.
25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

EXTERNAL SENDER - Proceed with caution

_____

Hi Jeffrey,

It is my understanding that Mr. Kuprewicz is unable to travel. But he is able to participate remotely, so long as the sessions are limited to half-days.

Again, if you are not willing to make reasonable accommodations for Mr. Kuprewicz's health issues, we will seek appropriate relief.

Thanks,

[cid:image001.jpg@01DBDB9D.DA252F20]

JEREMY FRANKEL (he/him/his)
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org<http://www.EnvironmentalDefenseCenter.org>
<http://www.environmentaldefensecenter.org>>

[Facebook icon] <https://www.facebook.com/EnvironmentalDefenseCenter>> [Instagram icon] <https://www.instagram.com/environmentaldefensecenter>> [LinkedIn icon] <https://www.linkedin.com/company/environmental-defense-center>> [Youtube icon] <https://www.youtube.com/user/EnviroDefenseCenter>>

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

From: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>
Sent: Wednesday, June 11, 2025 3:09 PM
To: Jeremy Frankel
<jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>>; Stanton, Garrett
<Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>;
benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>;
natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>; Wickersham, Matt
<Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Talia Nimmer
<tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>; Thai, Heather
<Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>; Julie Teel Simmonds
<jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit
<dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>;
Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>; Linda Krop
<lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org>>; Tara Rengifo
<trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org>>; Bolender, Brooke
<Brooke.Bolender@alston.com<mailto:Brooke.Bolender@alston.com>>; Niz, Kim
<Kim.Niz@alston.com<mailto:Kim.Niz@alston.com>>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No.
25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

Mr. Frankel, we have agreed to move the deposition date and are going to travel to a location near Mr. Kuprewicz's home. We are prepared to take reasonable breaks to accommodate the witness so that he can rest between questioning sessions. We are not willing to conduct the deposition remotely. Is it your representation that he cannot leave his home and come to a local hotel and give live testimony? Please advise. Regards, Jeffrey Dintzer.

From: Jeremy Frankel
<jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>>
Sent: Wednesday, June 11, 2025 2:53 PM
To: Stanton, Garrett <Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>;
benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>;
natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>; Dintzer, Jeffrey
<Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>; Wickersham, Matt
<Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Talia Nimmer
<tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>; Thai, Heather
<Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>; Julie Teel Simmonds
<jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit
<dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>;
Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>; Linda Krop
<lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org>>; Tara Rengifo
<trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org>>; Bolender, Brooke
<Brooke.Bolender@alston.com<mailto:Brooke.Bolender@alston.com>>; Niz, Kim
<Kim.Niz@alston.com<mailto:Kim.Niz@alston.com>>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No.
25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

EXTERNAL SENDER - Proceed with caution

_____

Hi Garrett,

Mr. Kuprewicz is experiencing severe health issues that, among other things, prevent him from traveling. If you want to proceed with his deposition, it will have to be conducted remotely, and it will have to be split up between two, 3.5 hour sessions. Otherwise, we will be forced to seek a protective order and stay the deposition until the court can hear the issue.

We see these as very reasonable requests, and I'm sure the court would as well.

Thanks,

[cid:image001.jpg@01DBDB9D.DA252F20]

JEREMY FRANKEL (he/him/his)
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org<http://www.EnvironmentalDefenseCenter.org>
<http://www.environmentaldefensecenter.org>>

[Facebook icon] <https://www.facebook.com/EnvironmentalDefenseCenter>> [Instagram icon] <https://www.instagram.com/environmentaldefensecenter>> [LinkedIn icon] <https://www.linkedin.com/company/environmental-defense-center>> [Youtube icon] <https://www.youtube.com/user/EnviroDefenseCenter>>

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

From: Stanton, Garrett <Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>
Sent: Tuesday, June 10, 2025 5:36 PM
To: Talia Nimmer <tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>; Thai, Heather <Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit <dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>; Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>; Linda Krop <lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org>>; Jeremy Frankel <jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>>; Tara Rengifo <trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org>>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>; benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>; natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>; Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>; Wickersham, Matt <Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Bolender, Brooke <Brooke.Bolender@alston.com<mailto:Brooke.Bolender@alston.com>>; Niz, Kim <Kim.Niz@alston.com<mailto:Kim.Niz@alston.com>>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

Hi Talia,

We are agreeable rescheduling the deposition for July 1st to accommodate calendar conflicts. While the Code allows for remote depositions by agreement, the rules also permit "any party or attorney of record" to be "physically present at the deposition at the location of the deponent," as long as requisite notice is given. (Cal. Rules of Court, rule 3.1010(a)(3).)

As such, the deposition will be noticed to go forward in-person, and will need to take place in a single, 7-hour session as allowed by the Code since the deposition will require us to undertake substantial travel. We, of course, are agreeable to taking more frequent breaks during the deposition to accommodate the witness.

Thanks,

Garrett B. Stanton

Senior Associate

ALSTON & BIRD

350 South Grand Avenue, 51st Floor

Los Angeles, CA 90071

garrett.stanton@alston.com<mailto:garrett.stanton@alston.com> | t: 213.576.1151

From: Talia Nimmer <tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>
Sent: Tuesday, June 10, 2025 4:54 PM
To: Thai, Heather <Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit <dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>;
Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>;
lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org>;
jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>;
trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>;
benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>;
natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>; Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>; Wickersham, Matt <Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Stanton, Garrett <Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>; Bolender, Brooke <Brooke.Bolender@alston.com<mailto:Brooke.Bolender@alston.com>>; Niz, Kim <Kim.Niz@alston.com<mailto:Kim.Niz@alston.com>>
Subject: Re: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)


EXTERNAL SENDER - Proceed with caution

_____


Counsel,


Given scheduling conflicts, we would like to request that the deposition be rescheduled for the following week (June 30-July 3). Additionally, because the witness is currently experiencing health issues, we would like to further request that the deposition take place remotely and that should the deposition run more than 3.5 hours, it be split into two morning sessions.


Please advise whether this is amenable. Thank you for your anticipated cooperation.


Talia Nimmer (she/her)

Staff Attorney

Climate Law Institute

Center for Biological Diversity

(213) 341-1426

[cbd.circle.tag.rgb]


The information contained in this email message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this email message in error, please notify the sender by reply email and delete the message and any attachments.


_____

From: Thai, Heather <Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>
Sent: Thursday, June 5, 2025 12:32 PM
To: Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit <dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>; Talia Nimmer <tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>; Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov> <Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>>; lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org> <lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org>>; jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org> <jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>>; trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org> <trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org>>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com> <djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>>; benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com> <benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>>; natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com> <natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>>; Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>; Wickersham, Matt <Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Stanton, Garrett <Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>; Bolender, Brooke <Brooke.Bolender@alston.com<mailto:Brooke.Bolender@alston.com>>; Niz, Kim <Kim.Niz@alston.com<mailto:Kim.Niz@alston.com>>
Subject: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)


Electronically Served:

Dear Counsel:

Please see the attached documents listed documents:

Center for Biological Diversity v. California Department of Forestry, et al.

· Real Parties in Interest's Notice of Issuance of Subpoena to and Deposition of Richard B. Kuprewicz


Environmental Defense Center v. California Department of Forestry, et al.

· Real Parties in Interest's Notice of Issuance of Subpoena to and Deposition of Richard B. Kuprewicz

Thank you,

Heather L. Thai
ABassist Specialist
ALSTON & BIRD
350 South Grand Avenue

51st Floor
Los Angeles, CA 90071
+1 213 576 1017 (O)
Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>

_____

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

# Exhibit C

Declaration of Talia Nimmer

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN (SBN 237595)
benjaminhanelin@paulhastings.com
NATALIE C. Rogers (SBN 301254)
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants,<br><br>SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No. 25CV02244<br>Coordinated with Case No. 25CV02247<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**REAL PARTIES IN INTEREST'S AMENDED CROSS-NOTICE OF DEPOSITION OF RICHARD B. KUPREWICZ**<br><br>**Date**: July 1, 2025<br>**Time**: 9:00 a.m.<br>**Place**: 1605 Calle Joaquin, San Luis Obispo, California 93405<br><br>Complaint Filed:    April 15, 2025<br>Trial Date:    None set |

1

REAL PARTIES IN INTEREST'S NOTICE OF
DEPOSITION OF RICHARD B. KUPREWICZ

Nimmer Declaration
Page 37

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Real Parties in Interest Sable Offshore Cop. and Pacific Pipeline Company ("Real Parties") have issued and served the Amended Deposition Subpoena for Personal Appearance and Production of Documents and Things to Richard B. Kuprewicz (the "Deponent"), attached hereto as **Exhibit 1** (the "Deposition Subpoena").

**PLEASE TAKE FURTHER NOTICE** that the deposition of Deponent will take place on **July 1, 2025** at the Marriott, 1605 Calle Joaquin, San Luis Obispo, California 93405. The deposition will be coordinated by Veritext Legal Solutions, with a business address of 707 Wilshire Boulevard, Suite 3500, Los Angeles, California 90017. The deposition will be taken before an officer authorized to administer the oath to the deponent and will be recorded by stenographic means by a court reporter certified to record depositions and authorized to administer the oath and serve as the deposition officer in the State of California.

Real Parties intend to (1) record the deposition utilizing audio and video technology; (2) use instant visual display such that the reporter's writing of the proceeding will be available to all who are a party to this proceeding to request and receive it in real time; (3) use Exhibit Capture (picture-in-picture) technology in which any exhibit reviewed by the deponent during the deposition can be captured visually; and (4) conduct this deposition utilizing a paperless exhibit display process called Exhibit Share or a similar paperless virtual display platform. The parties are advised that, in lieu of a paper set, exhibits may be provided and displayed digitally to the deposition officer, deponent, parties, and counsel. The exhibits will be compiled by the deposition officer for the purposes of exhibit stamping, and ultimate production of the final certified transcript.

Please contact the noticing attorney at least five (5) calendar days prior to the deposition to advise of those who intend to appear via this remote participating means so that the necessary credentials, call-in numbers, firm name, email address, services, testing and information, if necessary, can be arranged and provided to you prior to the deposition.

/ / /

/ / /

/ / /

REAL PARTIES IN INTEREST'S NOTICE OF
DEPOSITION OF RICHARD B. KUPREWICZ

Nimmer Declaration
Page 38

DATED: June 20, 2025          Respectfully submitted,

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE

_____
Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP.**
**PACIFIC PIPELINE COMPANY**

3

# Exhibit 1

SUBP-020

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | *FOR COURT USE ONLY* |
|---|---|
| Jeffrey D. Dintzer (SBN 139056); Garrett B. Stanton (SBN 324775)<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071<br>    TELEPHONE NO.: (213) 576-1000    FAX NO. *(Optional):* (213) 576-1100<br>E-MAIL ADDRESS *(Optional):* jeffrey.dintzer@alston.com; garrett.stanton@alston.com<br>    ATTORNEY FOR *(Name):* Real Parties in Interest | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**
 STREET ADDRESS: 1100 Anacapa Street
 MAILING ADDRESS: P.O. Box 21107
 CITY AND ZIP CODE: Santa Barbara, CA 93121-1107
  BRANCH NAME:

    PLAINTIFF/ PETITIONER: Center for Biological Diversity and Wishtoyo Foundation

DEFENDANT/ RESPONDENT: California Department of Forestry and Fire Protection, et al.

| **DEPOSITION SUBPOENA**<br>**FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS** | CASE NUMBER:<br>25CV02244 |
|---|---|

**THE PEOPLE OF THE STATE OF CALIFORNIA, TO** *(name, address, and telephone number of deponent, if known):*
Richard B. Kuprewicz, 1783 Trilogy Pkwy, Nipomo, CA 93444-6621

1. **YOU ARE ORDERED TO APPEAR IN PERSON TO TESTIFY AS A WITNESS in this action at the following date, time, and place:**

| Date: July 1, 2025 | Time: 9:00 a.m. | Address: 1605 Calle Joaquin, San Luis Obispo, California 93405 |
|---|---|---|

   a. ☐   As a deponent who is not a natural person, you are ordered to designate one or more persons to testify on your behalf as to the matters described in item 4. (Code Civ. Proc, § 2025.230.)

   b. ☒   You are ordered to produce the documents and things described in item 3.

   c. ☒   This deposition will be recorded stenographically    ☐   through the instant visual display of testimony
        and by    ☐   audiotape    ☒   videotape.

   d. ☒   This videotape deposition is intended for possible use at trial under Code of Civil Procedure section 2025.620(d).

2. The personal attendance of the custodian or other qualified witness and the production of the original records are required by this subpoena. The procedure authorized by Evidence Code sections 1560(b), 1561, and 1562 will not be deemed sufficient compliance with this subpoena.

3. The documents and things to be produced and any testing or sampling being sought are described as follows:
   See Attachment 3
   ☒    Continued on Attachment 3.

4. If the witness is a representative of a business or other entity, the matters upon which the witness is to be examined are described as follows:

   ☐    Continued on Attachment 4.

5. **IF YOU HAVE BEEN SERVED WITH THIS SUBPOENA AS A CUSTODIAN OF CONSUMER OR EMPLOYEE RECORDS UNDER CODE OF CIVIL PROCEDURE SECTION 1985.3 OR 1985.6 AND A MOTION TO QUASH OR AN OBJECTION HAS BEEN SERVED ON YOU, A COURT ORDER OR AGREEMENT OF THE PARTIES, WITNESSES, *AND* CONSUMER OR EMPLOYEE AFFECTED MUST BE OBTAINED BEFORE YOU ARE REQUIRED TO PRODUCE CONSUMER OR EMPLOYEE RECORDS.**

6. *At the deposition, you will be asked questions under oath. Questions and answers are recorded stenographically at the deposition; later they are transcribed for possible use at trial. You may read the written record and change any incorrect answers before you sign the deposition. You are entitled to receive witness fees and mileage actually traveled both ways. The money must be paid, at the option of the party giving notice of the deposition, either with service of this subpoena or at the time of the deposition. Unless the court orders or you agree otherwise, if you are being deposed as an individual, the deposition must take place within 75 miles of your residence or within 150 miles of your residence if the deposition will be taken within the county of the court where the action is pending. The location of the deposition for all deponents is governed by Code of Civil Procedure section 2025.250.*

| **DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE FOR THE SUM OF $500 AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.** |
|---|

Date issued: June 20, 2025

▶ _____
(SIGNATURE OF PERSON ISSUING SUBPOENA)

Jeffrey D. Dintzer
_____
(TYPE OR PRINT NAME)

Attorney for Real Parties in Interest
_____
(TITLE)

(Proof of service on reverse)                                        **Page 1 of 2**

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUBP-020 [Rev. January 1, 2009] | **DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE<br>AND PRODUCTION OF DOCUMENTS AND THINGS** | Code of Civil Procedure §§ 2020.510,<br>2025.220, 2025.230, 2025.250, 2025.620;<br>Government Code, § 68097.1<br>www.courts.ca.gov |
|---|---|---|

Nimmer Declaration
Page 41

# Attachment 3

**ATTACHMENT 3**

**DEFINITIONS**

1.      "YOU" and "YOUR" mean to Richard B. Kuprewicz, his agents, attorneys, and other representatives acting on his behalf.

2.      "SABLE" shall mean Sable Offshore Corp.

3.      "PPC" shall mean Pacific Pipeline Company.

4.      "PETITIONERS" shall mean Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper, Center for Biological Diversity, and Wishtoyo Foundation, as well as their agents, attorneys, and other representatives acting on their behalf

5.      "ACTION" shall mean the civil lawsuits filed by PETITIONERS entitled *Center for Biological Diversity et al. v. California Department of Forestry and Fire Protection et al.*, Superior Court for the State of California, Santa Barbara County Case No. 25CV02244, and the coordinated action entitled *Environmental Defense Center et al. v. California Department of Forestry and Fire Protection et al.*, Superior Court for the State of California, Santa Barbara County Case No. 25CV02247.

6.      "SYU PIPELINE" shall refer to the Santa Ynez Unit Pipelines located in waters offshore California.

7.      "LAS FLORES PIPELINE" shall refer to the Las Flores Pipelines located in waters offshore California.

8.       "DOCUMENTS" means all data, papers, and books, transcriptions, pictures, drawings or diagrams or every nature, whether transcribed by hand or by some mechanical, electronic, photographic or other means, as well as sound reproductions of oral statements or conversations by whatever means made, including written papers or memoranda which summarize

Page **1** of **6**

oral conversations, whether in your actual or constructive possession or under your control or not, relating to or pertaining to or in any way to the subject matters in connection which it is used and includes originals, all file copies, all other copies, no matter how prepared and all drafts prepared in connection with such writing, whether used or not, including by way of illustration and not by way of limitation, the following: books; records; reports; contracts; agreements; video, audio and other electronic recordings; memoranda (including written memoranda of telephone conversations, other conversations, discussions, agreements, acts and activities); minutes; diaries; calendars; desk pads; scrapbooks; notes; notebooks; correspondence; drafts; bulletins; electronic mail; facsimiles; circulars; forms; pamphlets; notice; statements; journals; postcards; letters; telegrams; publications; inter and intra- office communications; photocopies; microfilm; maps; drawings; diagrams; sketches; analyses; transcripts; electronically stored information (ESI) and any other documents within defendant's possession, custody or control from which information can be obtained or translated, if necessary, by detection devices into reasonably usable form, i.e. typed in English. DOCUMENTS does not include DOCUMENTS protected by the attorney-client and/or work product privileges.

9.     "COMMUNICATION" means any attempt by one or more persons or entities to communicate, including but not limited to written communications, including memoranda, letters, notes, telegrams, telexes and any other documents; oral communications including face-to-face meetings and telephone conversations; and, electronic or computerized communications, including emails (electronic mailings), Internet postings, word processing systems, magnetic tapes, disks and diskettes.

10.     "RELATE TO" or "RELATING TO" means directly or indirectly mentioning or describing, pertaining to, being connected with, or reflecting upon a stated subject matter.

**INSTRUCTIONS**

1.      Produce all DOCUMENTS in your possession, custody, or control, as well as all DOCUMENTS in the possession, custody, or control of your agents, representatives, attorneys, investigators, consultants, independent contractors, or experts at least one (1) week before the deposition date reflected in the Subpoena. (As used herein, the term "DOCUMENT" means all original writings of any nature whatsoever and all copies thereof which are not identical to the original or which contain any commentary or notation that does not appear on the original, whether written, printed, recorded or graphic matter, photographic matter, or sound reproduction of any kind in any form whatsoever (including, but not limited to, reports, studies, charts, statistical compilations, letters, correspondence, telegrams, memoranda, ledgers, books of accounts, bookkeeping and accounting records, minutes, contracts, leases, notes, electronic transcriptions or tapings of conversations conducted by any means, work papers, schedules, computer printouts, computer files, e-mails, financial statements, and reports, calculations, diaries, appointment calendars or records, manuals, brochures, invoices, desk calendars, work sheets, tapes, records of telephone calls) of which you have knowledge, whether or not such documents are in YOUR possession, custody or control, and irrespective of who prepared or signed such documents. In all cases where originals and/or non-identical copies are not available, "DOCUMENTS" also means identical copies of original documents and copies of non-identical copies.)

2.      Produce each and every copy where such copy contains any commentary or notation that does not appear on the original. ESI should be produced in its Native Format, meaning the form that it is ordinarily maintained on your systems, including any metadata associated therewith. (As used herein, the term "ESI" means electronically stored information as defined in California Code of Civil Procedure section 2016.020(e), and shall include, but is not limited to, e-mails and text messages.) Should you choose to produce electronic images of paper DOCUMENTS instead of paper copies, you must product them in single-page TIFF FORMAT imaged at not less than 300 dpi resolution that shows all text and images that would be visible to

a user of the paper DOCUMENT. Color DOCUMENTS must be produced in color TIFF images. Each image should have a unique filename. If a paper DOCUMENT is more than one page, the unitization of the paper DOCUMENT and any attachments or affixed notes shall be maintained as it existed when collected, including, for example, emails or letters with their attachments.

3.      Produce all drafts, as well as the final version, of all responsive DOCUMENTS.

4.      Produce, where possible, originals of the DOCUMENTS requested, whether signed or unsigned, for inspection and copying.

5.      For each DOCUMENT requested which is sought to be withheld under a claim of privilege, provide the following information:

a.      The number of the request to which the DOCUMENT is responsive;

b.      A statement of the basis upon which the privilege is claimed and whether or not the subject matter of the contents of the DOCUMENT is limited to legal advice or information provided for the purpose of securing legal advice;

c.      The name and title of the sender and the name and title of the recipient of the DOCUMENT, if applicable;

d.      The place, approximate date, and manner of recording or otherwise preparing the DOCUMENT;

e.      The name of each person or persons participating in the preparation of the DOCUMENT; and

f.      The name and title, if any, of each person to whom the contents of the DOCUMENT has been communicated by copy, exhibition, reading or substantial summarization.

## DOCUMENTS TO BE PRODUCED

**REQUEST FOR PRODUCTION NO. 1**:

All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing YOUR declaration in support of PETITIONERS' *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 2**:

All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing Exhibit B to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 3**:

All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing Exhibit C to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 4**:

YOUR COMMUNICATIONS with PETITIONERS RELATED TO the ACTION.

**REQUEST FOR PRODUCTION NO. 5**:

YOUR COMMUNICATIONS discussing SABLE.

**REQUEST FOR PRODUCTION NO. 6**:

YOUR COMMUNICATIONS discussing PPC.

**REQUEST FOR PRODUCTION NO. 7**:

All DOCUMENTS reflecting any work YOU have performed RELATED TO the SYU PIPELINE.

**REQUEST FOR PRODUCTION NO. 8**:

Page **5** of **6**

All DOCUMENTS reflecting any work YOU have performed RELATED TO the LAS FLORES PIPELINE.

**REQUEST FOR PRODUCTION NO. 9**:

All contracts and agreements YOU have with PETITIONERS.

**REQUEST FOR PRODUCTION NO. 10**:

DOCUMENTS sufficient to show YOUR work in "consult[ing] for various local, state, and federal agencies, nonprofit organizations, and members of the public on pipeline regulation, operation, and design," as stated in paragraph 3 of YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 11**:

All drafts and versions of YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 12**:

All drafts and versions of Exhibit B to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 13**:

All drafts and versions of Exhibit C to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 14**:

All of YOUR COMMUNICATIONS RELATED TO the civil action entitled *Sable Offshore Corp v. California Coastal Commission et al.*, Superior Court for the State of California, Santa Barbara County Case No. 25CV00974.

Page **6** of **6**

**PROOF OF SERVICE**

I, Kim Niz, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On June 20, 2025, I served the document(s) AMENDED DEPOSITION SUBPOENA **FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS TO RICHARD B. KUPREWICZ** on the interested parties stated below, by the following means of service:

☐ (BY U.S. MAIL) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

☐ (BY FACSIMILE) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐ (BY OVERNIGHT MAIL) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☒ BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 20, 2025, at Los Angeles, California.

<div align="right">

*/s/ Kim Niz*
_____
Kim Niz

</div>

**SERVICE LIST**

Tom Stolpman                                    **Counsel for Robert Kuperwicz**
Stolpman Law Group                              **tom@stolpmanlawgroup.com**

**PROOF OF SERVICE**

I, Kim Niz, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On June 20, 2025, I served the document(s) **REAL PARTIES IN INTEREST'S NOTICE OF ISSUANCE OF SUBPOENA TO AND DEPOSITION OF RICHARD B. KUPREWICZ** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☐ (BY U.S. MAIL) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

☐ (BY FACSIMILE) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐ (BY OVERNIGHT MAIL) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☒ BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 20, 2025, at Los Angeles, California.

_/s/ Kim Niz_
Kim Niz

**SERVICE LIST**

Julie Teel Simmons, Esq.
David Pettit, Esq.
Talia Nimmer, Esq.
Center for Biological Diversity
2011 Franklin Street, Suite 375
Oakland, CA 94612

**ATTORNEYS FOR PETITIONERS**
CENTER FOR BIOLOGICAL DIVERSITY
and WISHTOYO FOUNDATION

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: jteelsimmonds@biologicaldiversity.org
        dpettit@biologicaldiversity.org
        tnimmer@biologicaldiversity.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

**ATTORNEYS FOR RESPONDENTS/
DEFENDANTS**
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal;
Daniel Berlant, in his official capacity as State
Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

**ATTORNEYS FOR REAL PARTIES IN
INTEREST**
Sable Offshore Corp.; Pacific Pipeline
Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
        benjaminhanelin@paulhastings.com
        natalierogers@paulhastings.com

# Exhibit D

Declaration of Talia Nimmer

| From: | Jeremy Frankel |
|---|---|
| To: | Dintzer, Jeffrey; djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; Stanton, Garrett; Daniel, Madeline; Seabolt, Dan; Vreeland, Shannon; Rusek, Vickie; Oberst, Brett; Brown, Frankie |
| Cc: | Linda Krop; Tara Rengifo; Julie Teel Simmonds; dpettit@biologicaldiversity.org; michael.dorsi@doj.ca.gov |
| Subject: | RE: Re Mr. Kuprewicz"s Deposition |
| Date: | Tuesday, June 24, 2025 5:25:00 PM |
| Attachments: | 2025_06_24_Objection to Deposition of Richard Kuprewicz.pdf |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |

Hi Jeffrey,

Again, our previous discussions were borne of an obvious and immediate need to reschedule the date of the proposed deposition, and to inform you of Mr. Kuprewicz's ongoing health issues. At no time did Petitioners waive their right to object to Mr. Kuprewicz's deposition on the grounds that it exceeds the scope of permissible discovery, which our ongoing research has since revealed.

We respectfully disagree with your below contentions, including that it is unreasonable or prejudicial to quash an improper deposition subpoena/notice. Our review of the law indicates that, under the circumstances, Real Parties are not entitled to take Mr. Kuprewicz's deposition at this time. Accordingly, should Real Parties' not withdraw their deposition subpoena/notices by 5:00 p.m. tomorrow, we will proceed with a motion to quash.

Attached please find the EDC Petitioners' formal objection to Real Parties deposition subpoena and cross-notice of deposition. A copy is also being served by mail.

Thanks,



**JEREMY FRANKEL (he/him/his)**
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org

   

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

**From:** Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>
**Sent:** Tuesday, June 24, 2025 3:51 PM
**To:** Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; Stanton, Garrett <Garrett.Stanton@alston.com>; Daniel, Madeline <Madeline.Daniel@alston.com>; Seabolt, Dan <Dan.Seabolt@alston.com>; Vreeland, Shannon <Shannon.Vreeland@alston.com>; Rusek, Vickie <Vickie.Rusek@alston.com>; Oberst, Brett <Brett.Oberst@alston.com>; Brown, Frankie <Frankie.Brown@alston.com>

Nimmer Declaration
Page 54

**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; Tara Rengifo
<trengifo@environmentaldefensecenter.org>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>;
dpettit@biologicaldiversity.org; michael.dorsi@doj.ca.gov
**Subject:** Re Mr. Kuprewicz's Deposition

Mr. Frankel,

It is true that we noticed the deposition for June 24th, and we moved the deposition date to July 1st to accommodate the schedules of counsel, *at counsel's request*. In that request, there was no objection for the deposition going forward, and that would have been the appropriate time to raise such objection. Such would have afforded the Real Parties with an opportunity to have the court compel the deposition in due time before Real Parties' opposition will be due on July 7th. On June 12th, we discussed Real Parties' need to take the deposition in time for our July 7th opposition, which is why we agreed upon July 1st. *At no time did any counsel object to the deposition going forward during this discussion either*. On the call, we all reached an agreement regarding the date, time, and location of the deposition to accommodate the witness. Mr. Stolpman further agreed to accept service on behalf of his client. Why would we discuss all of these topics and agree on them only to "make any deposition less burdensome" for Mr. Kuprewicz but not agree on a deposition going forward? That logically makes no sense. And based on the parties' agreement, Real Parties have reasonably had to incur necessary costs to reserve space for the deposition and for travel.

Further, waiting to move to quash the deposition only just before Real Parties' opposition is due is highly prejudicial for obvious reasons. Such prejudice cannot simply ensue because "it has come to [y]our attention that Real Parties are not entitled to proceed with Mr. Kuprewicz's deposition at this time" – offering no basis to prevent necessary cross-examination of evidence offered in support of an application for preliminary injunction that will greatly impact Real Parties' rights. The parties reached a clear agreement on June 12th to proceed with the deposition, and the law does not support your newfound position. (See *In re Crystal J.* (1993) 12 Cal.App.4th 407, 413 ["A meaningful hearing requires an opportunity to examine evidence and cross-examine witnesses."]; 5 California Trial Guide § 100.20 [discussing depositions are appropriate for use in pretrial proceedings "such as a motion for a preliminary injunction"]; *Fleishman v. Superior Court* (2002)102 Cal. App. 4th 350, 356 ["Before issuing a preliminary injunction, the trial court must 'carefully weigh the evidence and decide whether the facts require . . . such relief. The court evaluates the credibility of witnesses and makes factual findings on disputed evidence."]; see also *St. Mary Med. Ctr. v. Sup.Ct. (Mennella)* (1996) 50 Cal.App.4th 1531, 1539 [holding § 2034.010 et seq. procedure for deposing expert witnesses does not bar earlier depositions of experts whose opinions are filed in support of or in opposition to a motion for summary judgment or summary adjudication].)

Preventing the deposition of Mr. Kuprewicz, without removing his declaration from the record, is highly unreasonable, highly prejudicial to Real Parties, violates their due process rights, and certainly serves as a strong basis for sanctions. We expect your declarant to appear at his deposition on July 1, 2025, as noticed. Regards, Jeffrey.

Jeffrey Dintzer
ALSTON & BIRD
350 S. Grand Avenue, 51st Floor
Los Angeles, CA 90071
Office:  213-576-1063
Cell: 213-393-8664

---

**From:** Jeremy Frankel <jfrankel@environmentaldefensecenter.org>
**Sent:** Tuesday, June 24, 2025 10:20 AM

**To:** Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>; djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; Stanton, Garrett <Garrett.Stanton@alston.com>; Niz, Kim <Kim.Niz@alston.com>
**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; tnimmer@biologicaldiversity.or; jteelsimmonds@biologicaldiversity.or; dpettit@biologicaldiversity.org; michael.dorsi@doj.ca.gov
**Subject:** RE: Service Docs - Case Nos.: 25CV02244 and 25CV02247

**EXTERNAL SENDER – Proceed with caution**

Hi Jeffrey,

Thank you for your response.

We certainly appreciate your willingness to move the deposition date, but the only reason it was moved was because you unilaterally scheduled the deposition without consulting counsel for petitioners, and you noticed it for a date when counsel for CBD and Wishtoyo was unavailable. The only reason the date was moved was to accommodate counsel's schedule.

When we previously met and conferred, we did so to discuss a different issue: Mr. Kuprewicz's severe health issues, and possible accommodations for him to make any deposition less burdensome. Any "agreement" we reached at our previous meeting was strictly related to that issue. Notably, we are not seeking to quash the subpoena on the basis of Mr. Kuprewicz's health issues.

We are not proceeding in bad faith. This is an unusual situation, and based on our continuing research, it has come to our attention that Real Parties are not entitled to proceed with Mr. Kuprewicz's deposition at this time. Because, as explained in our previous email, the deposition exceeds the scope of permissible discovery, it remains reasonable for us to pursue a motion to quash, regardless of when the deposition was re-noticed for.

Moreover, it's not clear to us how pushing the deposition to July 1 – which, again, was necessary to accommodate counsel's schedule – resulted in any prejudice to Real Parties. We ultimately reached out to meet and confer *before* the date Mr. Kuprewicz's deposition was initially noticed for (June 24), and our formal objections will be served imminently.

Please let us know what times you are available today for a call.

Thanks,



**JEREMY FRANKEL (he/him/his)**
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org

  

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

Nimmer Declaration
Page 56

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

**From:** Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>

**Sent:** Monday, June 23, 2025 5:29 PM

**To:** Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; Stanton, Garrett <Garrett.Stanton@alston.com>; michael.dorsi@doj.ca.gov; Niz, Kim <Kim.Niz@alston.com>

**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; tnimmer@biologicaldiversity.or; jteelsimmonds@biologicaldiversity.or; dpettit@biologicaldiversity.org

**Subject:** RE: Service Docs - Case Nos.: 25CV02244 and 25CV02247

Mr. Frankel, we are happy to meet and confer with you tomorrow over the deposition of Mr. Kuprewicz.  But please know that if you file a motion to block the deposition from going forward, we will seek monetary sanctions against you. We agreed to move Mr. Kuprewicz's deposition to July 1 in good faith, with the understanding after *reaching an agreement with you and his independent counsel, Mr. Stolpman,* that deposition would proceed on July 1. The record reflects as much.

You never once mentioned any objection to the taking of his deposition before we agreed to move the deposition to July 1st, knowing our opposition is due on July 7th after a holiday weekend. The email below is the first we have heard of any objection to proceeding with this deposition as scheduled.  In fact, we met and conferred on June 12th, and all agreed that the deposition would proceed on July 1st at the location we selected near the witnesses' residence to accommodate his travel restrictions.  Had we been advised of such an objection, which could have been made at that time, we would not have moved the date to accommodate you and the witness.

Requesting a delay in the deposition of a declarant supporting an application for preliminary injunction so you can have additional time to file a motion for protective order or to quash the subpoena without advising opposing counsel of your intentions is bad faith and sanctionable.  Jeffrey

**From:** Jeremy Frankel <jfrankel@environmentaldefensecenter.org>

**Sent:** Monday, June 23, 2025 4:57 PM

**To:** djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>; Stanton, Garrett <Garrett.Stanton@alston.com>; michael.dorsi@doj.ca.gov; Niz, Kim <Kim.Niz@alston.com>

**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; tnimmer@biologicaldiversity.or;

jteelsimmonds@biologicaldiversity.or; dpettit@biologicaldiversity.org

**Subject:** RE: Service Docs - Case Nos.: 25CV02244 and 25CV02247

<span style="color:red">**EXTERNAL SENDER – Proceed with caution**</span>

Counsel,

After further consideration, we believe that Real Parties' attempt to depose Mr. Kuprewicz – Petitioners' retained expert consultant – exceeds the scope of permissible discovery. Generally, parties are not entitled to engage in expert discovery (including depositions) unless and until experts have been designated pursuant to CCP § 2034.210. (*See, e.g., County of Los Angeles v. Superior Court* (1990) 224 Cal.App.3d 1446, 1456-57 (recognizing that information related to an expert's identity, qualifications, or opinion(s) is not discoverable before designation).) The only recognized exception to that rule is limited to summary judgment proceedings and is inapplicable here. (*See St. Mary Medical Center v. Superior Court* (1996) 50 Cal.App.4th 1531, 1540-41.)

Accordingly, at this point, petitioners in both 25CV02244 and 25CV02247 intend to file motions to quash Mr. Kuprewicz's deposition subpoena and related notices of deposition. Filing the motions will automatically stay Mr. Kuprewicz's deposition until they can be heard. (CCP § 2025.410(b).)

That said, we welcome the opportunity to first attempt to resolve this informally. Please let us know your availability to meet and confer in the next few days.

(This effort to meet and confer is joined by counsel for petitioners in 25CV02244, cc'ed here.)

Thanks,



**JEREMY FRANKEL (he/him/his)**
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org

  

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

**From:** Niz, Kim <Kim.Niz@alston.com>
**Sent:** Friday, June 20, 2025 4:41 PM
**To:** Linda Krop <lkrop@environmentaldefensecenter.org>; Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; michael.dorsi@doj.ca.gov; djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; jteelsimmonds@biologicaldiversity.or; dpettit@biologicaldiversity.org; tnimmer@biologicaldiversity.or

**Cc:** Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>; Stanton, Garrett <Garrett.Stanton@alston.com>

**Subject:** Service Docs - Case Nos.: 25CV02244 and 25CV02247

**Electronic Service:**

Dear Counsel,

Please find attached electronic service documents:

- EDC v. Sable - Real Party in Interest's Amended Cross-Notice of Deposition of Richard B. Kuprewicz
- CBD v. Sable - Real Party in Interest's Amended Cross-Notice of Deposition of Richard B. Kuprewicz

Thank you,

Kim S. Niz | Legal Administrative Assistant
**ALSTON & BIRD**
Jeffrey D. Dintzer | Brett Oberst | Krista Hernandez
Jeff Carlin | Matthew C. Wickersham | Garrett Stanton

350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Direct:  213 576 1096 | Office:  213 576 1000
Kim.Niz@alston.com

---

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

# Exhibit E

Declaration of Talia Nimmer

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**
**SOUTH COUNTY REGION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>_____<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br><br>**PETITIONERS' OBJECTIONS TO NOTICE OF DEPOSITION AND DEPOSITION SUBPOENA OF RICHARD B. KUPREWICZ**<br><br>Date: July 1, 2025<br>Time: 9:00 a.m.<br>Location: 1605 Calle Joaquin, San Luis Obispo, CA 93405<br><br>Judge: Hon. Donna D. Geck<br>Dept: 4<br><br>Complaint Filed: April 15, 2025<br>Trial Date: None set |

1

PETITIONERS' OBJECTIONS TO NOTICE OF DEPOSITION AND DEPOSITION SUBPOENA OF KUPREWICZ

Petitioners Center for Biological Diversity and Wishtoyo Foundation ("Petitioners") object to Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's (collectively, "Real Parties") Notice of Deposition and Deposition Subpoena of Richard B. Kuprewicz, Petitioners' consultant in this matter, as follows:

**GENERAL OBJECTIONS**

1. Petitioners object to the Subpoena and Notice on the grounds that they are inconsistent with, enlarge upon, and exceed the scope of permissible discovery. Mr. Kuprewicz is Petitioners' retained expert consultant in this matter. While Petitioners filed a declaration from Mr. Kuprewicz in support of their ex parte application for a stay, temporary restraining order, and order to show cause, Mr. Kuprewicz has not been designated as an expert pursuant to Code of Civil Procedure section 2034.210. Unless and until he is so designated, Real Parties are precluded from deposing Mr. Kuprewicz or subpoenaing his records. (*County of Los Angeles v. Superior Court* (1990) 224 Cal.App.3d 1446, 1456–57 (recognizing that information related to an expert's identity, qualifications, or opinion(s) is not discoverable before designation and therefore reversing a trial court's order compelling expert testimony at a deposition).) Moreover, even assuming, arguendo, that Real Parties are not summarily precluded from deposing Mr. Kuprewicz in light of Petitioners' reliance on his declaration, his deposition would only be appropriate upon an affirmative showing by Real Parties of "objective facts . . . which create a significant question regarding the validity of [Mr. Kuprewicz's declaration] which, if successfully pursued, will impeach the foundational basis of the . . . declaration." (*St. Mary Medical Center v. Superior Court* (1996) 50 Cal.App.4th 1531, 1540–41.) Real Parties have not provided any such facts, and Petitioners are aware of none. Lastly, even if Real Parties were to make the requisite showing of such facts, any deposition of Mr. Kuprewicz must be limited to inquiring into the foundation of the opinions expressed in his declaration. (*See id.*) The Subpoena and Notice are not so limited.

2. Petitioners object to the Subpoena and Notice on the grounds that they seek to elicit information protected by attorney-client privilege and/or that is information that constitutes attorney work product. As noted, Mr. Kuprewicz is Petitioners' consultant in this matter, but he has not been designated as an expert pursuant to Code of Civil Procedure section 2034.210. Thus, all communications by and between Petitioners, their attorneys, and Mr. Kuprewicz remain privileged. (*DeLuca v. State Fish*

*Co., Inc.* (2013) 217 Cal.App.4th 671, 688 ("[T]he attorney-client privilege . . . clearly includes communications to a consulting expert.").) Likewise, any documents, opinions, or other information prepared by Mr. Kuprewicz at Petitioners' request and not already disclosed constitute attorney work product. (*See id.*) Moreover, save for Mr. Kuprewicz's declaration, all of Mr. Kuprewicz's services to date have been rendered purely in an advisory capacity. Accordingly, even if Petitioners' *were* to designate Mr. Kuprewicz as an expert, communications with Mr. Kuprewicz and information he developed at Petitioners' request as a consulting expert would remain protected as attorney work product. (*National Steel Products Co. v. Superior Court* (1985) 164 Cal.App.3d 476, 488–89 (holding that any information or opinions rendered by an expert in an advisory capacity remain subject to the work product limitation on discovery even after expert designation).)

3.     The assertion of any objection to a request below is neither intended as, nor shall in any way be deemed, a waiver of Petitioners' right to assert that or any other objection at a later date.

**OBJECTIONS TO REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:**

All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing YOUR declaration in support of PETITIONERS' ex parte application for a stay, order to show cause and temporary restraining order in the ACTION.

**OBJECTIONS TO REQUEST FOR PRODUCTION NO. 1:**

Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above. Petitioners further object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

**REQUEST FOR PRODUCTION NO. 2:**

All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing Exhibit B to YOUR declaration in support of PETITIONER's ex parte application for a stay, order to show cause and temporary restraining order in the ACTION.

**OBJECTIONS TO REQUEST FOR PRODUCTION NO. 2:**

Petitioners object to this request on the grounds that it exceeds the scope of permissible

3

discovery, as set forth in General Objection 1 above. Petitioners further object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

**REQUEST FOR PRODUCTION NO. 3:**

All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing Exhibit C to YOUR declaration in support of PETITIONER's ex parte application for a stay, order to show cause and temporary restraining order in the ACTION.

**OBJECTIONS TO REQUEST FOR PRODUCTION NO. 3:**

Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above. Petitioners further object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

**REQUEST FOR PRODUCTION NO. 4:**

YOUR COMMUNICATIONS with PETITIONERS RELATED TO the ACTION.

**OBJECTIONS TO REQUEST FOR PRODUCTION NO. 4:**

Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above. Petitioners further object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

**REQUEST FOR PRODUCTION NO. 5:**

YOUR COMMUNICATIONS discussing SABLE.

**OBJECTIONS TO REQUEST FOR PRODUCTION NO. 5:**

Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above. Petitioners further object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above. Petitioners further object to this request on the grounds that it is not reasonably particularized, vague, ambiguous, and overbroad as, for example, "discussing" is not defined. Petitioners object to this request on the grounds that it is not

relevant or reasonably calculated to lead to the discovery of admissible evidence and not proportional to the needs of the case.

**REQUEST FOR PRODUCTION NO. 6:**

YOUR COMMUNICATIONS discussing PPC.

**OBJECTIONS TO REQUEST FOR PRODUCTION NO. 6:**

Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above. Petitioners further object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above. Petitioners further object to this request on the grounds that it is not reasonably particularized, vague, and ambiguous, and overbroad as, for example, "discussing" in not defined. Petitioners object to this request on the grounds that it is not relevant or reasonably calculated to lead to the discovery of admissible evidence and not proportional to the needs of the case because it seeks materials beyond those that are relevant to the claims or defenses at issue in this litigation.

**REQUEST FOR PRODUCTION NO. 7:**

All DOCUMENTS reflecting any work YOU have performed RELATED TO the SYU PIPELINE.

**OBJECTIONS TO REQUEST FOR PRODUCTION NO. 7:**

Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above. Petitioners further object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above. Petitioners object to this request on the grounds that it is overbroad and unduly burdensome to the extent it seeks documents reflecting *any* work. Petitioners object to this request on the grounds that it is not relevant or reasonably calculated to lead to the discovery of admissible evidence and not proportional to the needs of the case because it seeks materials beyond those that are relevant to the claims or defenses at issue in this litigation.

PETITIONERS' OBJECTIONS TO NOTICE OF DEPOSITION AND DEPOSITION SUBPOENA OF KUPREWICZ

**REQUEST FOR PRODUCTION NO. 8:**

All DOCUMENTS reflecting any work YOU have performed RELATED TO the LAS FLORES PIPELINE.

**OBJECTIONS TO REQUEST FOR PRODUCTION NO. 8:**

Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above. Petitioners further object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above. Petitioners object to this request on the grounds that it is overbroad and unduly burdensome to the extent it seeks documents reflecting *any* work. Petitioners object to this request on the grounds that it is not relevant or reasonably calculated to lead to the discovery of admissible evidence and not proportional to the needs of the case because it seeks materials beyond those that are relevant to the claims or defenses at issue in this litigation.

**REQUEST FOR PRODUCTION NO. 9:**

All contracts and agreements YOU have with PETITIONERS.

**OBJECTIONS TO REQUEST FOR PRODUCTION NO. 9:**

Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above. Petitioners further object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above. Petitioners object to this request on the grounds that it is not relevant or reasonably calculated to lead to the discovery of admissible evidence and not proportional to the needs of the case because it seeks materials beyond those that are relevant to the claims or defenses at issue in this litigation.

**REQUEST FOR PRODUCTION NO. 10:**

DOCUMENTS sufficient to show YOUR work in "consult[ing] for various local, state, and federal agencies, nonprofit organizations, and members of the public on pipeline regulation, operation, and design," as stated in paragraph 3 of YOUR declaration in support of PETITIONER's ex parte application for a stay, order to show cause and temporary restraining order in the ACTION.

**OBJECTIONS TO REQUEST FOR PRODUCTION NO. 10:**

Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above. Petitioners object to this request on the grounds that it is vague, ambiguous, and overbroad because "work" is undefined. Petitioners object to this request on the grounds that it is not relevant or reasonably calculated to lead to the discovery of admissible evidence and not proportional to the needs of the case because it seeks materials beyond those that are relevant to the claims or defenses at issue in this litigation.

**REQUEST FOR PRODUCTION NO. 11:**

All drafts and versions of YOUR declaration in support of PETITIONER's ex parte application for a stay, order to show cause and temporary restraining order in the ACTION.

**OBJECTIONS TO REQUEST FOR PRODUCTION NO. 11:**

Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above. Petitioners further object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

**REQUEST FOR PRODUCTION NO. 12:**

All drafts and versions of Exhibit B to YOUR declaration in support of PETITIONER's ex parte application for a stay, order to show cause and temporary restraining order in the ACTION.

**OBJECTIONS TO REQUEST FOR PRODUCTION NO. 12:**

Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above. Petitioners further object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

**REQUEST FOR PRODUCTION NO. 13:**

All drafts and versions of Exhibit C to YOUR declaration in support of PETITIONER's ex parte application for a stay, order to show cause and temporary restraining order in the ACTION.

**OBJECTIONS TO REQUEST FOR PRODUCTION NO. 13:**

Petitioners object to this request on the grounds that it exceeds the scope of permissible

discovery, as set forth in General Objection 1 above. Petitioners further object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

**REQUEST FOR PRODUCTION NO. 14:**

All of YOUR COMMUNICATIONS RELATED TO the civil action entitled Sable Offshore Corp v. California Coastal Commission et al., Superior Court for the State of California, Santa Barbara County Case No. 25CV00974.

**OBJECTIONS TO REQUEST FOR PRODUCTION NO. 14:**

Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above. Petitioners further object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above. Petitioners object to this request on the grounds that it is not relevant or reasonably calculated to lead to the discovery of admissible evidence and not proportional to the needs of the case because it seeks materials beyond those that are relevant to the claims or defenses at issue in this litigation.

Dated: June 25, 2025

/s/ *Julie Teel Simmonds*
Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for*
*Biological Diversity and Wishtoyo Foundation*

8

<div align="center">**PROOF OF SERVICE**</div>

I, Cynthia Elkins, state as follows:

I am employed in Humboldt County, California. I am over the age of 18 and not a party to the foregoing action. My business address is Center for Biological Diversity, PO Box 220, Whitethorn, CA 95589. My email address is celkins@biologicaldiversity.org.

On June 25, 2025, I served a true and correct copy of

**PETITIONERS' OBJECTIONS TO NOTICE OF DEPOSITION AND DEPOSITION SUBPOENA OF RICHARD B. KUPREWICZ**

[X] BY ELECTRONIC SERVICE: By electronically mailing a true and correct copy to the email addresses shown below.

[X] BY MAIL SERVICE: By depositing a true and correct copy of the document for mail delivery at the addresses shown below.

Jeffrey Dintzer
Matthew C. Wickersham
Garrett Stanton
ALSTON & BIRD
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
jeffrey.dintzer@alston.com
garrett.stanton@alston.com
matt.wickersham@alston.com
*Attorneys for Real Parties in Interest*

DJ Moore
Benjamin Hanelin
Natalie Rogers
PAUL HASTINGS
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com
*Attorneys for Real Parties in Interest*

Michael S. Dorsi
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102
Michael.Dorsi@doj.ca.gov
*Attorney for Respondents/Defendants*

<div align="center">1
PROOF OF SERVICE</div>

I declare under penalty of perjury under the law of California that the foregoing is true and correct.

Executed on June 25, 2025, in Whitethorn, California.

Cynthia Elkins

# Exhibit F

Declaration of Talia Nimmer

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/26/2025 6:31 PM
By: Terri Chavez , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological
Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive, <br><br> Respondents/Defendants. <br><br> SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive, <br><br> Real Parties in Interest. | Case No.: 25CV02244 <br><br> **PETITIONERS' NOTICE OF MOTION AND MOTION TO QUASH REAL PARTIES' DEPOSITION SUBPOENA, QUASH REAL PARTIES' NOTICE OF DEPOSITION, AND STAY THE TAKING OF RICHARD B. KUPREWICZ'S DEPOSITION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> [*Filed concurrently with Declaration of Talia Nimmer and [Proposed] Order*] <br><br> Date:     October 24, 2025 <br> Time:     10:00 a.m. <br> Dept.:    4 <br> Judge:    Honorable Donna G. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION .................................................................................. 4

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 5

    I.      INTRODUCTION ................................................................................................. 5

    II.     FACTUAL AND PROCEDURAL BACKGROUND ........................................... 6

          A.     Real Parties' Efforts to Restart the Defective Las Flores
                Pipeline System ...................................................................................... 6

          B.     Petitioners' *Ex Parte* Application for Preliminary Relief and
                Order to Show Cause .............................................................................. 6

          C.     Real Parties' Discovery Attempts and Petitioners' Efforts to
                Meet and Confer ..................................................................................... 7

    III.    APPLICABLE LAW ........................................................................................... 8

    IV.   ARGUMENT ....................................................................................................... 9

          A.     Expert Discovery Is Generally Prohibited Before Experts Are
                Formally Designated .............................................................................. 9

          B.     The Limited Exception in Summary Judgment Proceedings Is
                Inapplicable Here ................................................................................. 10

                1.     The *St. Mary* Exception ........................................................... 10

                2.     *St. Mary* Is Plainly Inapplicable Here ...................................... 12

          C.     Additional, Equitable Factors Require That the Subpoena
                Be Quashed .......................................................................................... 13

    V.     CONCLUSION ................................................................................................. 14

**TABLE OF AUTHORITIES**

**Cases**

*County of Los Angeles v. Superior Court*
(1990) 224 Cal.App.3d 1446 ................................................................................... 9, 10, 14

*DeLuca v. State Fish Co., Inc.*
(2013) 217 Cal.App.4th 671 ................................................................................... 10

*Greyhound Corp. v. Superior Court*
(1961) 56 Cal.2d 355 [superseded by statute] ........................................................ 9

*Hernandez v. Superior Court*
(2003) 112 Cal.App.4th 285 ................................................................................... 14

*Kalaba v. Gray*
(2002) 95 Cal.App.4th 1416 ................................................................................... 14

*St. Mary Medical Center v. Superior Court*
(1996) 50 Cal.App.4th 1531 ................................................... 5, 9, 10, 11, 12, 13, 14

**Statutes**

Code Civ. Proc., § 437c, subds. (c), (g) .................................................................. 11

Code Civ. Proc., § 1987.1 ...................................................................................... 4

Code Civ. Proc., § 1987.1, subd. (a) ...................................................................... 9

Code Civ. Proc., § 1987.1, subd. (b)(1) ................................................................. 9

Code Civ. Proc., § 2025.290, subd. (a) .................................................................. 14

Code Civ. Proc., § 2025.410 ................................................................................... 4

Code Civ. Proc., § 2025.410, subd. (a) .................................................................. 8

Code Civ. Proc., § 2034.010 *et seq.* ...................................................................... 4, 5

Code Civ. Proc., § 2034.210 *et seq.* ...................................................................... 9

Code Civ. Proc., § 2034.210, subds. (a), (b) .......................................................... 9

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 24, 2025, at 10:00 a.m., or as soon thereafter as this matter may be heard, in Department 4 of the California Superior Court for the County of Santa Barbara, Anacapa Division, located at 1100 Anacapa Street, Santa Barbra, CA 93101, Petitioners and Plaintiffs Center for Biological Diversity and Wishtoyo Foundation (collectively, "Petitioners") will and hereby do move this Court for an order quashing Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's (collectively, "Real Parties") deposition subpoena, quashing Real Parties' notice of deposition, and staying the taking of Richard B. Kuprewicz's deposition.

Mr. Kuprewicz is Petitioners' retained expert consultant in this matter, but he has not been designated as an expert pursuant to Code of Civil Procedure section 2034.010 *et seq*. Unless and until he is so designated, Real Parties are precluded from deposing Mr. Kuprewicz. Moreover, the deposition of Mr. Kuprewicz would be unnecessary, manifestly unjust to Petitioners, and potentially set the stage for the upcoming July 18, 2025, hearing to devolve into a "mini-trial" of the ultimate issues in this case.

Petitioners bring this motion pursuant to Code of Civil Procedure sections 1987.1 and 2025.410. Petitioners' request is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Talia Nimmer filed concurrently herewith, the pleadings and papers on file in this action, and such other and further evidence as the Court may consider at the hearing on this Motion.

This Motion is made following the meeting and conferring of counsel. (Declaration of Talia Nimmer, ¶ 12.)

Dated: June 26, 2025                    Respectfully Submitted,

*/s/ Julie Teel Simmonds*
Julie Teel Simmonds
David Pettit
Talia Nimmer
CENTER FOR BIOLOGICAL DIVERSITY

*Counsel for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Real Parties") served a deposition subpoena for personal appearance and production of documents and things (the "Subpoena") on Richard B. Kuprewicz, Petitioners' retained expert consultant in this matter. They also served Petitioners with a notice of deposition, noticing Mr. Kuprewicz's deposition for July 1, 2025 (the "Notice").

While Petitioners filed a declaration from Mr. Kuprewicz in support of their *ex parte* application for a stay, temporary restraining order, and order to show cause, Mr. Kuprewicz has not been designated as an expert in this matter pursuant to Code of Civil Procedure section 2034.010 *et seq*. Unless and until he is so designated, Real Parties are precluded from deposing him.

The *only* recognized exception to this standard prohibition is limited to summary judgment proceedings. (*See St. Mary Medical Center v. Superior Court* (1996) 50 Cal.App.4th 1531.) However, even assuming, arguendo, that Real Parties could invoke that exception here, Mr. Kuprewicz's deposition would only be appropriate upon an affirmative showing by Real Parties of "objective facts . . . which create a significant question regarding the validity of [Mr. Kuprewicz's declaration] which, if successfully pursued, will impeach the foundational basis of the . . . declaration." (*Id.* at 1540–41.) Real Parties have provided no such facts, and Petitioners are aware of none. .

Lastly, aside from unnecessarily burdening Petitioners and Mr. Kuprewicz, who is currently experiencing severe health issues, Real Parties' attempt to depose Mr. Kuprewicz seeks to impermissibly tip the scales in Real Parties' favor. In the likely event that Real Parties submit expert declarations in support of their opposition to Petitioners' *ex parte* application, Petitioners, under the current briefing schedule, will not have an equal opportunity to depose Real Parties' experts.

Accordingly, Petitioners respectfully request that this Court quash the Notice and Subpoena. Alternatively, should the Court rule otherwise, Petitioners request that the Court issue an order appropriately limiting the scope of Mr. Kuprewicz's deposition and, if it has not yet occurred, continuing the July 18, 2025, hearing to allow time for Petitioners to depose Real Parties' experts.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Real Parties' Efforts to Restart the Defective Las Flores Pipeline System

This case arises from Real Parties' efforts to restart the Las Flores Pipeline System—a defective pipeline system that ruptured in 2015 at Refugio State Beach, causing one of the worst oil disasters in California history.

As was discovered after the spill, the pipeline system suffers from a critical design defect that leaves it vulnerable to pervasive corrosion and, consequently, another catastrophic rupture. Importantly, the pipeline system does not just threaten coastal resources; it passes through major sources of water supply; renowned parks and ecological reserves; and a populated suburban neighborhood in Buellton, California, complete with schools, parks, and dozens of residential homes.

Rather than replacing the pipeline system or retrofitting it with an effective means of corrosion prevention, Real Parties intend to simply restart the existing pipeline system under State Waivers issued by the Office of the State Fire Marshal ("OSFM"). The State Waivers, which excuse Real Parties from complying with critical corrosion prevention requirements, were approved without a public process, environmental review, or any analysis as to why the pipeline system can be safely restarted. The Petition and Complaint on file in this action challenges these State Waivers.

### B.    Petitioners' *Ex Parte* Application for Preliminary Relief and Order to Show Cause

When Real Parties began publicly claiming that they were on the precipice of restarting the defective Las Flores Pipeline System, Petitioners applied *ex parte* for an administrative stay, a temporary restraining order, and a preliminary injunction (the "*Ex Parte* Application") to prevent Real Parties from doing so. In support of Petitioners' *Ex Parte* Application, Petitioners submitted a declaration from Richard B. Kuprewicz, Petitioners' retained expert consultant in this matter. Mr. Kuprewicz's declaration and two reports attached thereto explain the systemic issues with the defective pipeline system, why the State Waivers do not ensure that the pipeline system is safe to operate, and why the pipeline system continues to pose a significant threat of rupturing.

On June 3, 2025, the Court granted Petitioners' request for a temporary restraining order, and it issued an order to show cause why a preliminary injunction and/or stay should not issue (the "OSC").

The hearing on the OSC is set for July 18, 2025. The Court ordered that briefing be completed per code, meaning that Real Parties' opposition is due by July 7, 2025, and Petitioners' reply by July 11, 2025.

### C.    Real Parties' Discovery Attempts and Petitioners' Efforts to Meet and Confer

On June 5, 2025, counsel for Real Parties served Mr. Kuprewicz with a deposition subpoena for personal appearance and production of documents and things. (Declaration of Talia Nimmer ("Nimmer Decl."), ¶ 6, Exh. A.) That same day, counsel for Real Parties served Petitioners with a notice of deposition, noticing Mr. Kuprewicz's deposition for June 24, 2025. (*Id.*) Real Parties also served Petitioners in the related case, *Environmental Defense Center et al. v. California Department of Forestry and Fire Protection et al.*, 25CV0247 ("EDC Petitioners") with a "cross-notice" of deposition. (Nimmer Decl., ¶ 7.)

Because counsel for Real Parties had unilaterally scheduled the deposition without discerning availability and were also seemingly unaware of Mr. Kuprewicz's substantial health issues, there was an immediate need to meet and confer regarding the deposition date and reasonable accommodations for Mr. Kuprewicz. (Nimmer Decl., ¶ 8.) Thus, on June 10, 2025, Petitioners' counsel requested that the deposition be moved to July 1, 2025 to accommodate their schedule and requested reasonable accommodations for Mr. Kuprewicz, including that the deposition take place remotely, and that it be split into two, 3.5-hour sessions. (Nimmer Decl., ¶ 8, Exh. B.)

Counsel for Real Parties agreed to move the deposition to July 1, 2025, but refused the requests to accommodate Mr. Kuprewicz's health issues. (*Id.*) When EDC Petitioners' counsel clarified that Mr. Kuprewicz was unable to travel, counsel for Real Parties continued to demand that the deposition proceed in-person. (*Id.*)

Counsel for EDC Petitioners then secured outside counsel for Mr. Kuprewicz, Mr. Tom Stolpman, and set up a teleconference meeting with counsel for Real Parties to discuss Mr. Kuprewicz's health issues and possible accommodations for him. (Nimmer Decl., ¶ 9.) At the June 12, 2025, meeting, Mr. Stolpman volunteered to drive Mr. Kuprewicz to the deposition but warned that his various health conditions could prevent him from meaningfully participating. (Nimmer Decl., ¶ 9.) Mr. Stolpman also informed Real Parties that, in response to some concerning symptoms (including double vision), Mr.

Kuprewicz's doctor had ordered imaging for his brain, and an MRI was scheduled for June 23, 2025. (*Id.*)

On June 20, 2025, counsel for Real Parties issued Mr. Kuprewicz a new deposition subpoena for personal appearance and production of documents and things—the Subpoena at issue. (Nimmer Decl., ¶ 10, Exh. C.) Also on June 20, 2025, counsel for Real Parties served Petitioners with an amended notice of deposition, noticing Mr. Kuprewicz's deposition for July 1, 2025—the Notice at issue. (*Id.*)

The next business day, EDC Petitioners' counsel reached out to counsel for Real Parties to explain that their continuing research revealed Real Parties are not currently entitled to depose Mr. Kuprewicz, and offered to meet and confer regarding the instant Motion. (Nimmer Decl., ¶ 12.) Opposing counsel accused Petitioners of acting in bad faith and in a sanctionable fashion, and asserted they would not have moved the deposition date if they had been aware of Petitioners' objection. (*Id.*) EDC Petitioners' counsel explained that (1) the only reason the deposition was moved was because Real Parties had unilaterally noticed it for a time when Petitioners' counsel was unavailable; (2) while the parties had discussed accommodations for Mr. Kuprewicz's health issues, at no time did Petitioners wave their right to object to his deposition; (3) Petitioners ultimately raised the objection before the date Mr. Kuprewicz's deposition was initially noticed for; and (4) this is an unusual situation involving premature expert discovery and, based on counsels' continuing research, it had become apparent that the proposed deposition exceeded the scope of permissible discovery. (*Id.*, Exh. D.)

The parties were unable to resolve the issue informally, necessitating that Petitioners bring this Motion. Petitioners also properly served a formal objection to the deposition, in the time required by the code. (*See* Code Civ. Proc., § 2025.410, subd. (a); Nimmer Decl., ¶ 13, Exh. E.)

## III.    APPLICABLE LAW

Code of Civil Procedure[1] section 1987.1 provides as follows:

> If a subpoena requires the attendance of a witness or the production of books, documents, electronically stored information, or other things . . . at the taking of a deposition, the court, upon motion reasonably made by. . . [any party], may make an order quashing the subpoena entirely, modifying it, or directing compliance with it upon those terms or conditions as the court shall declare, including protective orders.

---

[1] All references are to the Code of Civil Procedure unless otherwise specified.

(Code Civ. Proc., § 1987.1, subd. (a); *see also id.* at 1987.1, subd. (b)(1) (any party can bring a motion to quash under Section 1987.1.) "In addition, the court may make any other order as may be appropriate to protect the person from unreasonable and oppressive demands . . . ." (Code Civ. Proc., § 1987.1, subd. (a).)

Similarly, any party served with an improper deposition notice "may . . . move for an order staying the taking of the deposition and quashing the deposition notice." (Code Civ. Proc., § 2025.410, subd. (c).) Notably, "[t]he taking of the deposition is stayed pending the determination of this motion." (*Id.*)

"Whether to grant discovery in a given case falls within the sound discretion of the trial court based upon all of the facts presented." (*St Mary*, *supra*, 50 Cal.App.4th at p. 1540; *see also Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355, 378 [superseded by statute] ("Undoubtedly the discovery statutes vest a wide discretion in the trial court in granting or denying discovery.").)

## IV.    ARGUMENT

### A.    Expert Discovery Is Generally Prohibited Before Experts Are Formally Designated

Section 2034.210 *et seq.* provides "a carefully crafted legislative scheme for the regulation of discovery of the identity, qualifications and opinions of expert witnesses," including "the times and conditions for such discovery." (*County of Los Angeles v. Superior Court* (1990) 224 Cal.App.3d 1446, 1456–57.)

As set forth in Section 2034.210, the door to expert discovery opens only when a party formally makes a demand to exchange expert witness information, and the parties subsequently designate expert witnesses for trial. (*See* Code Civ. Proc., § 2034.210, subds. (a), (b).) Expert discovery is generally "not appropriate until and unless there is such a designation." (*County of Los Angeles*, *supra*, 224 Cal.App.3d at p. 1456; *see also id.* at 1456–57 (recognizing that information related to an expert's identity, qualifications, or opinion(s) is not discoverable before designation and therefore reversing a trial court's order compelling expert testimony at a deposition).)

This limitation on expert discovery—of which Real Parties' run afoul—exists for good reason. As the court in *County of Los Angeles* explained, there are at least four substantial justifications for strictly controlling pretrial expert discovery:

> In the first place, access to the conclusions of an adversary's experts often provides strong clues to the theories, thoughts, and tactics of opposing counsel, . . . [para] Second, a limitless right to ascertain and probe the views of opposing experts could easily lead to an expensive and delay-producing round of discovery that would tend to feed on itself: . . . [para] Third, unrestricted discovery as to an adversary's experts enables "the stupid or lazy practitioners" to sit back secure in the knowledge that at the appropriate time they will be able "to 'ride free' on the opponent's industry." Since 1963, recognition of this "free ride" as a discovery evil has been articulated in the Discovery Act itself: "It is the policy of the state . . . to prevent attorneys from taking undue advantage of their adversary's industry and efforts." Finally, . . . discovery as of right with respect to an adversary's experts is bound to have the dreaded "chilling effect" on the willingness of attorneys to use objective, fairminded consultants who will honestly and frankly point out the weaknesses and deficiencies of their side.

(*Id.* at 1457 (quoting 2 Hogan, Modern California Discovery (4th ed. 1988), § 13.12, pp. 250–51).) On top of that, premature expert discovery would appear to be in direct tension with protections afforded by the attorney-client privilege and attorney work product doctrine. (*See DeLuca v. State Fish Co., Inc.* (2013) 217 Cal.App.4th 671, 688 (a party's communications with their *consulting* expert, and any information prepared by the expert at the party's request, is protected by attorney-client privilege and/or the attorney work product doctrine).)

That the parties here have not designated experts pursuant to Section 2034.210 is undisputed. Accordingly, Real Parties' Subpoena and Notice exceed the scope of permissible discovery, and they expose Petitioners to the potential abuses of premature expert discovery described above.

**B.      The Limited Exception in Summary Judgment Proceedings Is Inapplicable Here**

There is only one recognized exception to the above-described prohibition on premature expert discovery, which originates from *St. Mary Medical Center v. Superior Court* (1996) 50 Cal.App.4th 1531. However, this limited exception has only been held to apply in the context of summary judgment proceedings and, as explained below, is otherwise inapplicable here.

1.      The *St. Mary* Exception

*St. Mary* involved a medical malpractice action that defendants sought to resolve on summary judgment. In response to defendants' summary judgment motion, plaintiffs produced a declaration from a medical expert whom they had retained but not yet designated as an expert pursuant to the discovery code. (*St. Mary*, at p. 1534–35.) The expert's declaration and opinion were based on the premise that defendants—two medical doctors—had improperly performed a particular procedure. (*Id.* at p. 1534.)

However, according to defendants, one of the doctors was not actually involved in that procedure, raising "a serious question . . . about whether or not [the expert's] declaration may have been factually incorrect." (*Id.* at 1540.)

When defendants took their motion off calendar and attempted to depose plaintiffs' expert, plaintiffs objected, arguing that the expert could not be deposed until the parties exchanged expert witness lists. (*St. Mary*, at pp. 1534–1535.) Defendants, in turn, moved to compel the expert's deposition, arguing that the deposition was necessary to "establish that the [expert's] opinions are not based on the facts which are the basis of this lawsuit" and prepare "an adequate reply to [plaintiffs'] opposition." (*Id.* at p. 1535.) They also represented that it was "defendants' intention to limit the deposition solely to [the expert's] opinions as they are reflected in his declaration." (*Ibid.*) The trial court denied defendants' motion, concluding that "you're not entitled to depose an expert until there's an expert designation done right before the first trial date" as "there is no provision in the law to depose somebody who *might* be an expert." (*Id.* at p. 1536 (emphasis added).) Defendants appealed. (*Id.* at p. 1537.)

The appellate court acknowledged that, generally, the standard way for defendants to proceed would not be by deposing plaintiffs' expert, but by presenting a reply declaration challenging the factual foundation of the expert's opinion. (*See St. Mary*, at p. 1540.) However, the court recognized the unique shortcomings of that approach in the summary judgment context. (*Id.*) As the court pointed out, "[w]hile counsel could have presented a reply declaration . . . it would have been contradictory to the declaration of [plaintiffs' expert] and the trial court would have been required to conclude that a triable issue of fact existed." (*Id.*) In other words, by submitting a reply declaration, defendants would create a factual ambiguity that would actually preclude the court from granting their summary judgment motion. (*See id.*; *see also* Code Civ. Proc., § 437c, subds. (c), (g) (summary judgment is only appropriate where there is no triable issue of material fact).) The court was uncomfortable with that result given that "[i]t [was] possible that upon deposition of [plaintiffs' expert], confronted with proof that he may have been mistaken in his belief that [both defendants were] involved in the procedure, he may concede his mistake." (*St. Mary*, 50 Cal.App.4th at p. 1540.)

Persuaded that some sort of limited discovery was justified under the circumstances, the court grappled with where to draw the line: on the one hand, "it would defeat the purpose of the summary procedure were we to recognize an absolute right of party involved in the process to depose any person who provides evidence in support of or opposition to the proceedings" but on the other, "it would defeat the concept of a summary procedure if the opposition party were to be allowed to defeat the motion by less than candid declarations or affidavits in opposition." (*St. Mary*, at p. 1538.) Ultimately, the court held that, "under the proper circumstances, the parties should be allowed to depose an expert who supplies a declaration or affidavit in support of or in opposition to summary judgment or summary adjudication where there is a legitimate question regarding the foundation of the opinion of the expert." (*Id.* at p. 1540.) Specifically, **"[t]here must be objective facts presented which create a significant question regarding the validity of the affidavit or declaration which, if successfully pursued, will impeach the foundational basis of the affidavit or declaration in question."** (*Id.* at p. 1540–41 (emphasis added).) The court concluded that because defendants had presented such information, the court abused its discretion by not allowing defendants to conduct a deposition that "would cover no more than the opinions rendered in the declaration of [plaintiffs' expert]." (*Id.* at p. 1540.)

2.      *St. Mary* Is Plainly Inapplicable Here

Of course, we are not dealing with summary proceedings here; the only hearing on calendar concerns the Court's OSC. No court has applied the exception from *St. Mary* outside of summary judgment proceedings. Nor would it be appropriate do so: the underlying reasoning for the exception—that it would be unjust to force a party moving for summary judgment to create a triable issue of fact to challenge a suspect declaration—only applies in the summary judgment context.

In any event, even if the exception could be invoked outside of the summary judgment context, it nonetheless would not apply here. The court in *St. Mary* suggested that the exception should be used sparingly so as not to turn proceedings into "mini-trials." (*St. Mary*, at p. 1540.) Hence, it is limited to cases where "*objective facts* [are] presented which create a *significant question* regarding the validity of [a] declaration which, if successfully pursued, *will* impeach the foundational basis of the . . . declaration in question." (*Id.* at p. 1540–41 (emphasis added).) Real Parties have not presented any such facts as to Mr. Kuprewicz's declaration. Nor are Petitioners aware of any.

Finally, the exception, where applicable, only permits a party to inquire into the factual underpinnings of the opinion(s) expressed in the expert's declaration. (*St. Mary*, at p. 1540 (permitting a deposition that "would cover no more than the opinions rendered in the declaration of [the expert]").) Neither Real Parties' Notice nor Subpoena so limit the scope of Mr. Kuprewicz's proposed deposition. Additionally, Real Parties' production demands are incredibly broad, encompassing a host of documents that have no bearing on the foundation of the opinions expressed in Mr. Kuprewicz's declaration.

In sum, the exception from *St. Mary* is patently inapplicable here. Plus, even assuming (1) the exception could be invoked outside of summary judgment proceedings, and (2) Real Parties presented the "objective facts" required thereunder, Real Parties' Notice and Subpoena, which are not properly limited to the foundation of Mr. Kuprewicz's opinion, would still exceed the scope of permissible discovery.

### C.    Additional, Equitable Factors Require That the Subpoena Be Quashed

As separate and further grounds for this Motion, the proposed deposition of Mr. Kuprewicz would be unnecessary, manifestly unjust to Petitioners, and potentially lead to exactly the type of "mini-trial" that the *St. Mary* court warned about. Thus, in the interest of equity and efficient case management, the Court should exercise its broad discretion over discovery matters to quash the Subpoena and Notice.

First, the deposition of Mr. Kuprewicz is not necessary for Real Parties to challenge his opinion. As suggested in *St Mary*, the standard way to challenge an expert declaration in pre-trial law and motion practice is by submitting a reply declaration from an opposing expert. That option remains available to them.

Second, aside from unnecessarily burdening Petitioners and Mr. Kuprewicz, Real Parties' attempt to depose Mr. Kuprewicz seeks to improperly tip the scales in Real Parties' favor. In the likely event that Real Parties submit expert declarations of their own in support of their opposition to Petitioners' *Ex Parte* Application, Petitioners, under the current briefing schedule, will not be afforded the same opportunity to depose Real Parties' experts in advance of the July 18, 2025, hearing given that Petitioners will only have five days to prepare their reply brief. Petitioners would be put on unequal footing with Real Parties, further underscoring the importance of sticking to the carefully crafted

discovery procedures in the code. (*See Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 297 ("In general, fairness demands adherence to the statutory procedures, since they were designed to place the parties 'on roughly equal footing.'" (quoting *Kalaba v. Gray* (2002) 95 Cal.App.4th 1416, 1422).)

Third, and relatedly, permitting the deposition to proceed at this stage "could easily lead to an expensive and delay-producing round of discovery that would tend to feed on itself." (*County of Los Angeles*, *supra*, 224 Cal.App.3d at p. 1457.) Petitioners would, in the interest of equity, seek to continue the OSC hearing to depose Real Parties' experts—an effort that may be challenged by Real Parties and cause additional discovery motions to be brought before the Court. And extensive expert discovery would all but set the stage for the OSC hearing to become a "mini-trial" on the safety of the Las Flores Pipeline System and the ultimate merits of this case, complete with live expert testimony, which is entirely inappropriate at the preliminary relief stage of these proceedings.

Accordingly, even if the deposition of Mr. Kuprewicz was not prohibited at this stage in the proceedings—which it *is*—the Court should nonetheless grant Petitioners' request in the interest of equity and efficiency.

## V.    CONCLUSION

For the above reasons, Petitioners respectfully request that this Court issue an order quashing Real Parties' Subpoena and Notice. However, should the Court find the exception from *St. Mary* applies here, and that Mr. Kuprewicz's deposition is otherwise appropriate, Petitioners request that the Court issue an order limiting and conditioning his deposition. Specifically, subject to Mr. Kuprewicz's ongoing health conditions permitting him to participate in a deposition, Petitioners request that the Court: (1) restrict Real Parties from deposing Mr. Kuprewicz for more than seven hours, and from noticing any further depositions of Mr. Kuprewicz during these proceedings (*see* Code Civ. Proc., § 2025.290, subd. (a)); (2) limit the scope of Mr. Kuprewicz's deposition to testing the factual foundation of the opinions expressed in his declaration (*see St. Mary*, *supra*, 50 Cal.App.4th at p. 1540); and (3) if it has not yet occurred, continuing the July 18, 2025, OSC hearing, as well as Petitioners' reply brief deadline, to allow Petitioners sufficient opportunity to depose any experts on whom Real Parties rely in their opposition.

Dated: June 26, 2025                    Respectfully submitted,

                                        */s/ Julie Teel Simmonds*
                                        Julie Teel Simmonds
                                        David Pettit
                                        Talia Nimmer
                                        CENTER FOR BIOLOGICAL DIVERSITY

                                        *Counsel for Petitioners Center for Biological Diversity and*
                                        *Wishtoyo Foundation*

# Exhibit G

Declaration of Talia Nimmer

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
LISA L. GARCIA, SBN 301362
lisa.garcia@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone: (213) 576-1000
Facsimile: (213) 576-1100

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERMANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,<br><br>Respondents and Defendants,<br><br>and<br><br>SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, | Case No. 25CV02244<br>Coordinated with Case No. 25CV02247<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**REAL PARTIES IN INTEREST'S *EX PARTE* APPLICATION FOR AN ORDER REQUIRING MR. KUPREWICZ TO APPEAR AT DEPOSITION OR, IN THE ALTERNATIVE, FOR AN ORDER SHORTENING TIME TO HEAR MOTION TO COMPEL DEPOSITION AND REQUEST FOR SANCTIONS OR, IN THE ALTERNATIVE, TO STRIKE THE DECLARATION OF MR. KUPREWICZ; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Filed concurrently with supporting Declaration of Jeffrey Dintzer and Exhibits, and [Proposed] Order]<br><br>Date:              June 30 2025 |

---

1

REAL PARTIES' *EX PARTE* APPLICATION FOR AN ORDER REQUIRING MR. KUPREWICZ TO APPEAR AT DEPOSITION OR, SHORTENING TIME TO HEAR MOTION TO COMPEL DEPOSITION; OR AN ORDER TO STRIKE THE DECLARATION OF MR. KUPREWICZ

| Real Parties in Interest. | Time: | 8:30 a.m. |
| | Dept: | 4 |
| | Complaint Filed: | April 15, 2025 |
| | Trial Date: | None set |

2

REAL PARTIES' *EX PARTE* APPLICATION FOR AN ORDER REQUIRING MR. KUPREWICZ TO APPEAR AT DEPOSITION OR, SHORTENING TIME TO HEAR MOTION TO COMPEL DEPOSITION; OR AN ORDER TO STRIKE THE DECLARATION OF MR. KUPREWICZ

### *EX PARTE* APPLICATION

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on June 30, 2025, at 8:30 a.m., or as soon thereafter as the matter may be heard in Department 4 of the California Superior Court for the County of Santa Barbara, Anacapa Division, located at 1100 Anacapa Street, Santa Barbara, CA 93121-1107, Real Parties in Interest Sable Offshore Corp. ("Sable") and Pacific Pipeline Company ("PPC" and collectively "Real Parties") will and hereby do apply *ex parte* for an order requiring Plaintiffs' expert Richard B. Kuprewicz ("Mr. Kuprewicz") to appear at his deposition on July 1, 2025 or, in the alternative, for an order shortening time for notice and advancing the hearing on Real Parties' Motion to Compel Mr. Kuprewicz's deposition or, in the alternative, for an order striking Plaintiffs' Declaration of Richard B. Kuprewicz submitted in support of Petitioners' *Ex parte* Application for Stay, Order to Show Cause and Temporary Restraining Order.

This Application is made pursuant to Rule 3.1200, *et seq.*, of the California Rules of Court, and is made on the grounds that good cause and exigent circumstances exist because Real Parties will suffer significant and irreparable harm if they are not afforded their due process right to cross-examine Plaintiff's expert and key declarant, Mr. Kuprewicz, on an expedited basis:

1. On June 2, 2025, Plaintiffs filed an *ex parte* application to stay, or in the alternative, an order to show cause and temporary restraining order against Defendants and Real Parties to stay the operation of the approval of State Waivers for CA-324 and CA-325A/B pending judgment of the Court.

2. Plaintiffs filed the Declaration of their expert Mr. Kuprewicz in support of their *ex parte* application, which also supports their OSC re preliminary injunction (the "Preliminary Injunction"). Mr. Kuprewicz serves as Plaintiffs' key witness supporting the Preliminary Injunction, offering in his declaration expert opinions regarding the effects of corrosion to the Pipelines. The Court scheduled the hearing on the Preliminary Injunction for July 18, 2025 and Real Parties' opposition to the Preliminary Injunction is due July 7, 2025.

3. Consistent with their right to cross-examine Mr. Kuprewicz to oppose the Preliminary Injunction, Real Parties served a deposition subpoena on Mr. Kuprewicz on June 5, 2025. On June 10,

REAL PARTIES' *EX PARTE* APPLICATION FOR AN ORDER REQUIRING MR. KUPREWICZ TO APPEAR AT DEPOSITION OR, SHORTENING TIME TO HEAR MOTION TO COMPEL DEPOSITION; OR AN ORDER TO STRIKE THE DECLARATION OF MR. KUPREWICZ

2025, Plaintiffs' counsel agreed that Mr. Kuprewicz would appear for deposition but asked that the deposition be moved one week later due to scheduling conflicts and sought certain accommodations due to Mr. Kuprewicz's health conditions.  Real Parties met and conferred in good faith to accommodate Mr. Kuprewicz, agreeing to delay the deposition one week and travel to a hotel near Mr. Kuprewicz to minimize his own travel.  On June 12, 2025, the parties finalized their agreement for the date, time, and location of Mr. Kuprewicz's deposition and Mr. Kuprewicz's personal counsel (who has never objected or moved to quash the deposition subpoena) accepted service of the amended deposition notice.

4.    But Plaintiffs "meet and confer" efforts were merely a ruse to buy themselves more time to quash the subpoena and disadvantage Real Parties.  Nearly two weeks after agreeing to produce Mr. Kuprewicz for deposition, Plaintiffs changed their mind (without legal support).  Plaintiffs then waited until two business days before Mr. Kuprewicz's deposition to move to quash.  This gamesmanship should not be tolerated.

5.    Real Parties have a fundamental right to cross-examine Mr. Kuprewicz and will be severely prejudiced without an adequate and sufficient opportunity to depose Mr. Kuprewicz about his opinions and declaration before their opposition to the Preliminary Injunction is due on July 7, 2025.  It would be extremely prejudicial to further extend the briefing and hearing schedule for the Preliminary Injunction while a TRO remains in place.  Furthermore, Real Parties have no alternative means of obtaining the information sought by the deposition subpoena served on Mr. Kuprewicz.  Because of Plaintiffs' purposeful delay and the upcoming holiday weekend, there is not enough time for a regularly noticed motion to compel the deposition of Mr. Kuprewicz to be heard before the opposition is due.  *Ex parte* relief is warranted. Mr. Kuprewicz should be ordered to appear at his deposition, duly noticed for July 1, 2025.  In the alternative, Real Parties' Motion to Compel Mr. Kuprewicz's Deposition currently set to be heard July 18, 2025 should be advanced to be heard by July 1, 2025 to allow time for Mr. Kuprewicz's deposition to take place during this shortened holiday week.  In the alternative, if due to Plaintiffs' delay Mr. Kuprewicz's deposition cannot feasibly take place before July 7, 2025, his declaration should be stricken.

REAL PARTIES' *EX PARTE* APPLICATION FOR AN ORDER REQUIRING MR. KUPREWICZ TO APPEAR AT DEPOSITION OR, SHORTENING TIME TO HEAR MOTION TO COMPEL DEPOSITION; OR AN ORDER TO STRIKE THE DECLARATION OF MR. KUPREWICZ

6.     Pursuant to Rule 3.1202, subdivision (a) of the California Rules of Court, the contact information for known counsel in this matter is as follows:

Jeffrey D. Dintzer
jeffrey.dintzer@alston.com
Garrett B. Stanton
garrett.stanton@alston.com
 ALSTON & BIRD LLP
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
(213) 576-1000

DJ Moore
djmoore@paulhastings.com
Benjamin J. Hanelin
benjaminhanelin@paulhastings.com
Natalie C. Rogers
natalierogers@paulhastings.com
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
(310) 620-5700

Linda Krop
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel
jfrankel@environmentaldefensecenter.org
Tara C. Rengifo
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
(805) 963-1622, Ext. 100

Julie Teel Simmonds
jteelsimmonds@biologicaldiversity.org
David Pettit
dpettit@biologicaldiversity.org
Talia Nimmer
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
(510) 844-7100

Michael S. Dorsi
Michael.Dorsi@doj.ca.gov

5

REAL PARTIES' *EX PARTE* APPLICATION FOR AN ORDER REQUIRING MR. KUPREWICZ TO APPEAR AT
DEPOSITION OR, SHORTENING TIME TO HEAR MOTION TO COMPEL DEPOSITION; OR AN ORDER TO
STRIKE THE DECLARATION OF MR. KUPREWICZ

California Attorney General's Office
455 Golden Gate Ave, Ste 11000
San Francisco, CA 94102
(415) 510-4400

7.      In accordance with California Rule of Court 3.1203, counsel for Real Parties provided notice of the nature of the relief to be requested and the date, time and place the Application will be made to counsel for Plaintiffs, Defendants, and Mr. Kuprewicz on June 27, 2025, by email at 6:45 a.m. Counsel for Plaintiffs intend to appear and oppose the application. Counsel for Defendants and counsel for Mr. Kuprewicz have not responded as to whether they intend to appear and oppose the application.

8.      No prior application has been made with respect to this matter.

This Application is made pursuant to California Rule of Court 3.1202 and is based on this Application and the accompanying Memorandum of Points and Authorities, the declaration of Jeffrey Dintzer filed concurrently herewith, and the Notice of Motion and Motion to Compel the Deposition of Richard B. Kuprewicz.


DATED:   June 27, 2025         Respectfully submitted,

                               **ALSTON & BIRD**
                               JEFFREY D. DINTZER
                               GARRETT B. STANTON

                               **PAUL HASTINGS**
                               DUNCAN JOSEPH MOORE


                               _____
                                    Jeffrey D. Dintzer

                               Attorneys for Real Parties in Interest
                               **SABLE OFFSHORE CORP.**
                               **PACIFIC PIPELINE COMPANY**

REAL PARTIES' *EX PARTE* APPLICATION FOR AN ORDER REQUIRING MR. KUPREWICZ TO APPEAR AT DEPOSITION OR, SHORTENING TIME TO HEAR MOTION TO COMPEL DEPOSITION; OR AN ORDER TO STRIKE THE DECLARATION OF MR. KUPREWICZ

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION AND STATEMENT OF RELEVANT FACTS

Real Parties in Interest Sable Offshore Corp. ("Sable") and Pacific Pipeline Company ("PPC" and collectively "Real Parties") seek *ex parte* relief for: (1) an order requiring Plaintiffs' expert Mr. Kuprewicz to appear at deposition on July 1, 2025 or, (2) in the alternative an order shortening time for notice and advancing the hearing on Real Parties' Motion to Compel Mr. Kuprewicz to appear for deposition or, (3) if Mr. Kuprewicz's deposition cannot feasibly take place before Real Parties' opposition to the Preliminary Injunction is due, in the alternative an order striking the declaration of Mr. Kuprewicz submitted in support of Plaintiffs' Application for a TRO and Motion for Preliminary Injunction.

Plaintiffs submitted the declaration of Mr. Kuprewicz in support of their OSC re Preliminary Injunction, which is scheduled to be heard on July 18, 2025. Consistent with their fundamental due process right to cross-examine Mr. Kuprewicz, Real Parties immediately served a deposition subpoena on Mr. Kuprewicz. The parties, including Mr. Kuprewicz's attorney agreed to appear. Plaintiffs asked that the deposition be rescheduled one week later and the parties met and conferred about deposition logistics to accommodate Mr. Kuprewicz's health issues. Real Parties agreed to reschedule the deposition for July 1, 2025 and made arrangements for the deposition to be taken at a hotel next to Mr. Kuprewicz's residence. Mr. Kuprewicz's attorney agreed and accepted service of the amended deposition subpoena. But then Plaintiffs suddenly reneged on that agreement, stating that Mr. Kuprewicz would not appear for his deposition. Notably, Mr. Kuprewicz's own attorney has never objected or moved to quash the subpoena. Plaintiffs then waited until roughly two business days before Mr. Kuprewicz's deposition to file a motion to quash. In light of the shortened workweek due to the 4th of July holiday, Real Parties are now left with insufficient time to move to compel Mr. Kuprewicz's deposition. These actions are clearly intended to deprive Real Parties of their fundamental right to cross-examine and prepare their opposition to Plaintiffs' Preliminary Injunction. Plaintiffs' clear gamesmanship should not be tolerated and the witness should be ordered to appear at his deposition on the agreed upon date, time and location.

REAL PARTIES' *EX PARTE* APPLICATION FOR AN ORDER REQUIRING MR. KUPREWICZ TO APPEAR AT DEPOSITION OR, SHORTENING TIME TO HEAR MOTION TO COMPEL DEPOSITION; OR AN ORDER TO STRIKE THE DECLARATION OF MR. KUPREWICZ

**A. Plaintiffs Filed the Declaration of Richard B. Kuprewicz in Support of Their Preliminary Injunction.**

On June 2, 2025, Plaintiffs filed an *ex parte* Application For Stay or Order to Show Cause and Temporary Restraining Order.  In support of their Application, Plaintiffs also filed the Declaration of Richard B. Kuprewicz, a purported pipeline safety expert, who opined that the pipelines cannot be safely operated and why the waivers will not ensure the integrity and safety of the pipelines or prevent another oil spill.  On June 3, 2025, the Court granted Plaintiffs' temporary restraining order and scheduled an Order to Show Cause why a preliminary injunction should not issue against Defendants and Real Parties prohibiting them from proceeding with the restart and operation of the Las Flores Pipeline System on July 18, 2025.  Real Parties' opposition to the Preliminary Injunction is currently due on July 7, 2025.

**B. Real Parties Personally Served Mr. Kuprewicz With a Deposition Subpoena for Personal Appearance and Mr. Kuprewicz Agreed to Appear.**

On June 5, 2025, Real Parties personally served a Deposition Subpoena for Personal Appearance and Production of Documents on Mr. Kuprewicz for June 24, 2025 and paid witness fees of $41.00.  [*See* Declaration of Jeffrey Dintzer ("Dintzer Decl."), ¶ 1.]  On June 10, 2025, counsel for Center for Biological Diversity agreed that Mr. Kuprewicz would appear for deposition but asked that the deposition be rescheduled to a later date, taken remotely, and split into two sessions due to Mr. Kuprewicz's health issues.  [*Id.*, ¶ 2.]  The parties conferred about deposition logistics and Real Parties worked in good faith to provide accommodations for Mr. Kuprewicz's stated health issues. [*Id.*, ¶ 2.]  On June 12, 2025, all parties (including Mr. Kuprewicz's personal counsel) agreed to a July 1, 2025 deposition date, time, and location close to Mr. Kuprewicz.  [*Id.*, ¶ 3.]  On June 20, 2025, Real Parties timely served an Amended Deposition Subpoena for Personal Appearance and Production of Documents on Mr. Kuprewicz for July 1, 2025 on Mr. Kuprewicz's counsel, who agreed to accept service of the subpoena.  [*Id.*, ¶ 3.]

**C. Nearly Two Weeks After Agreeing to Appear For Deposition, Plaintiffs Suddenly Refuse to Produce Mr. Kuprewicz for Deposition.**

On June 23, 2025, nearly two weeks after agreeing to appear for deposition and after accepting

8

REAL PARTIES' *EX PARTE* APPLICATION FOR AN ORDER REQUIRING MR. KUPREWICZ TO APPEAR AT DEPOSITION OR, SHORTENING TIME TO HEAR MOTION TO COMPEL DEPOSITION; OR AN ORDER TO STRIKE THE DECLARATION OF MR. KUPREWICZ

service of the Amended Deposition Subpoena for July 1, 2025, counsel for Environmental Defense Center emailed Real Parties for the first time stating that "[a]fter further consideration," they would not produce Mr. Kuprewicz for deposition – without any valid basis for their newfound position. [Dintzer Decl., ¶ 4.] Real Parties explained that during the meet and confer process in which all parties agreed to a date, time, and location for Mr. Kuprewicz's deposition, neither Plaintiffs, nor Mr. Kuprewicz ever objected to appearing for deposition. [*Id.*, ¶ 4.] Moreover, Real Parties explained why they are entitled to cross-examine witnesses in support of a Preliminary Injunction and that if Mr. Kuprewicz refused to appear, they would seek monetary sanctions. [*Id.*, ¶ 4.] On June 24, 2025, counsel for Environmental Defense Center confirmed Mr. Kuprewicz would not appear and served formal objections to the deposition. [*Id.*, ¶ 4.] On the evening of June 26, 2025, roughly two business days before Mr. Kuprewicz's deposition (and over two weeks after agreeing Mr. Kuprewicz would sit for deposition), Plaintiffs filed a motion to quash the subpoena. The timing of these motions will preclude Plaintiffs from taking Mr. Kuprewicz's deposition in time to use his testimony in opposition to the pending Motion for Preliminary Injunction. Notably, Mr. Kuprewicz's own counsel has never objected or filed a motion to quash the subpoena.

## II.   THE COURT IS AUTHORIZED TO SHORTEN TIME FOR NOTICE AND HEARING OF THE PROPOSED MOTION

Code Civ. Proc. § 1005(b) provides that "[t]he court, or a judge may prescribe a shorter time" than otherwise prescribed in § 1005 for written notice of a motion. California Rules of Court, rule 3.1300(b) states that the court "on application for an order shortening time supported by a declaration showing good cause, may prescribe shorter times for the filing and service of papers than the times specified in Code of Civil Procedure section 1005."

## III.   *EX PARTE* RELIEF IS WARRANTED

As stated in the *ex parte* application and the Declaration of Jeffrey Dintzer, good cause exists to order Mr. Kuprewicz to appear at his deposition on July 1, 2025 because Real Parties will be irreparably harmed if the Court does not grant the relief they seek. Due to Plaintiffs' intentional delay, Plaintiffs

REAL PARTIES' *EX PARTE* APPLICATION FOR AN ORDER REQUIRING MR. KUPREWICZ TO APPEAR AT DEPOSITION OR, SHORTENING TIME TO HEAR MOTION TO COMPEL DEPOSITION; OR AN ORDER TO STRIKE THE DECLARATION OF MR. KUPREWICZ

have left insufficient time to brief and hear the Motion to Compel *and* take Mr. Kuprewicz's deposition during this shortened holiday week before Real Parties' opposition is due on Monday July 7.

Without the opportunity to cross-examine Mr. Kuprewicz, Real Parties are denied their due process right to cross-examine. Real Parties served a valid Deposition Subpoena on Mr. Kuprewicz. Mr. Kuprewicz's own attorney accepted service of the subpoena and has never objected or moved to quash it. Plaintiffs also agreed that Mr. Kuprewicz would appear for deposition. At Plaintiffs' request, Real Parties agreed to reschedule the deposition to a later date and move the location closer to his home to accommodate his health issues. During these meet and confer efforts, Plaintiffs never objected to the deposition going forward; to the contrary, they insisted that certain conditions be put in place to address Mr. Kuprewicz's deposition. Those conditions were fully vetted and addressed to the satisfaction of Plaintiffs and Mr. Kuprewicz's counsel during a video teleconference on June 12, 2025. Had Plaintiffs objected earlier, Real Parties would have been afforded an opportunity to move to compel Mr. Kuprewicz's deposition. Instead, Plaintiffs waited until weeks later (and only a few days before his deposition) to notify Real Parties that they intended to object to the taking of Mr. Kuprewicz's deposition and only filed their motions to quash his deposition subpoena. Plaintiffs have offered no valid legal basis for refusing to allow this deposition to proceed.

Given Real Parties' upcoming July 7, 2025 opposition deadline, if the requested relief is not provided, Real Parties will be denied their right to cross-examine evidence submitted in support of Plaintiffs' Preliminary Injunction. Additionally, it would be extremely prejudicial to further extend the briefing and hearing schedule for the Preliminary Injunction while a TRO remains in place. For these reasons, the Court should grant the requested relief and order Mr. Kuprewicz to appear for his deposition on July 1, 2025. In the alternative, Real Parties request an order shortening time for notice and advancing the hearing date on Real Parties' Motion to Compel Mr. Kuprewicz's Deposition to later today, and use Plaintiffs' motions for to quash as their oppositions to the motion to compel.

REAL PARTIES' *EX PARTE* APPLICATION FOR AN ORDER REQUIRING MR. KUPREWICZ TO APPEAR AT DEPOSITION OR, SHORTENING TIME TO HEAR MOTION TO COMPEL DEPOSITION; OR AN ORDER TO STRIKE THE DECLARATION OF MR. KUPREWICZ

## IV.     MR. KUPREWICZ SHOULD BE COMPELLED TO APPEAR FOR DEPOSITION OR THE DELCARATION SHOULD BE STRICKEN

First, it is black-letter law in California that personal service of a deposition subpoena is effective to require any deponent who is a resident of California at the time of service to personally appear at deposition and give testimony.  Cal. Code Civ. Proc. § 2020.220(c)(1).  Where a non-party fails to appear for deposition after being served with a subpoena demanding his testimony, the Court may compel his attendance at deposition and impose sanctions.  (*See* Cal. Code Civ. Proc. §§ 1987.1, 1987.2, and 2025.450; *Terry v. SLICO* (2009) 175 Cal.App.4th 352, 355 [affirming trial court's order compelling deposition and sanctioning non-party witness who failed to appear at deposition or properly object to subpoena]).  Here, neither Plaintiffs nor Mr. Kuprewicz dispute that Real Parties properly served a valid deposition subpoena on Mr. Kuprewicz or that Mr. Kuprewicz is a resident of California.

Next, the California Code of Civil Procedure states that "a party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action . . . Discovery may relate to the claim or defense of the party seeking discovery . . . ."  (Code Civ. Proc. § 2017.010.)   California courts have construed the discovery statutes broadly in favor of permitting discovery, so as to uphold the right to discovery whenever possible.  (*Lipton v. Super. Ct.* (1996) 48 Cal.App.4th 1599, 1612; *Greyhound Corp. v. Super. Ct.* (1961) 56 Cal.2d 355, 377-78; *Emerson Elec. Co. v. Super. Ct.* (1997) 16 Cal.4th 1101, 1108.)

Finally, parties are entitled to cross-examine witnesses who submit testimony in support of a preliminary injunction.  (*See In re Crystal J.* (1993) 12 Cal.App.4th 407, 413 ["A meaningful hearing requires an opportunity to examine evidence and cross-examine witnesses."]; 5 California Trial Guide § 100.20 [discussing depositions are appropriate for use in pretrial proceedings "such as a motion for a preliminary injunction"]; *Fleishman v. Superior Court* (2002) 102 Cal.App.4th 350, 356 ["Before issuing a preliminary injunction, the trial court must 'carefully weigh the evidence and decide whether the facts require . . . such relief. The court evaluates the credibility of witnesses and makes factual findings on disputed evidence."]; *see also St. Mary Med. Ctr. v. Sup.Ct.* (1996) 50 Cal.App.4th 1531, 1539 [holding § 2034.010 et seq. procedure for deposing expert witnesses does not bar earlier

REAL PARTIES' *EX PARTE* APPLICATION FOR AN ORDER REQUIRING MR. KUPREWICZ TO APPEAR AT DEPOSITION OR, SHORTENING TIME TO HEAR MOTION TO COMPEL DEPOSITION; OR AN ORDER TO STRIKE THE DECLARATION OF MR. KUPREWICZ

Nimmer Declaration
Page 98

depositions of experts whose opinions are filed in support of or in opposition to a motion for summary judgment or summary adjudication].)  The "confrontation of witnesses against him in noncriminal proceedings is a part of procedural due process guaranteed by the Fifth Amendment and the Fourteenth Amendment to the federal Constitution." (*August v. Department of Motor Vehicles* (1968) 264 Cal.App.2d 52, 60 [finding hearing met requirements of due process where sworn statement was considered but there was no subsequent request to cross-examine the declarant]; *see also* Cal. Const. Art. I. § 7.)  In fact, "[b]ecause it relates to the fundamental fairness of the proceedings, cross-examination is said to represent an 'absolute right,' not merely a privilege," (*Fost v. Marin County Superior Court* (2000) 80 Cal.App.4th 724, 733 [noting the rule applies in "either a criminal or a civil case" and if "a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony"].)  Further, "[t]he lack of an opportunity to cross-examine the declarant deprives the opposing party of important evidence concerning the credibility of the declarant and the reliability of testimony in the declaration." (*In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 841-842 [relying on *Fost* and holding it was error for trial court to rely on declaration on motion for preliminary relief in family law case where declarant was not made available for cross-examination or live testimony].)

Because Real Parties have a fundamental right to cross-examine Mr. Kuprewicz.  Therefore, either he must appear for deposition or his declaration must be stricken.

## V.  PLAINTIFFS' ARGUMENTS HAVE NO MERIT

On the evening of June 26, 2025, Plaintiffs served a motion to quash the deposition subpoena outlining their position opposing Mr. Kupewicz's deposition.  Plaintiffs argue that Mr. Kuprewicz may not be deposed until he is designated as an expert pursuant to Code of Civil Procedure section 2034.210.  But this argument misses the mark.  Mr. Kuprewicz's deposition is not expert discovery – it is Real Parties exercising their due process right to cross-examine testimony submitted in support of a preliminary injunction that if ordered will have significant financial consequences to Real Parties.  (*St. Mary Med. Ctr. v. Sup.Ct.* (1996) 50 Cal.App.4th 1531, 1539 [holding § 2034.010 et seq. procedure for deposing expert witnesses does not bar earlier depositions of experts whose opinions are filed in support

REAL PARTIES' *EX PARTE* APPLICATION FOR AN ORDER REQUIRING MR. KUPREWICZ TO APPEAR AT DEPOSITION OR, SHORTENING TIME TO HEAR MOTION TO COMPEL DEPOSITION; OR AN ORDER TO STRIKE THE DECLARATION OF MR. KUPREWICZ

of or in opposition to a motion for summary judgment or summary adjudication]; *see also* Steve Rusch Declaration, ¶¶ 13-22 filed in opposition to the Ex-Parte Application for TRO.)  Plaintiffs' argument about expert discovery is inapplicable, nonsensical, and should be disregarded.  If Plaintiffs were to have it their way, they would be able to submit any evidence in support of their Preliminary Injunction without providing Real Parties any ability to challenge that evidence.  Not surprisingly, Plaintiffs fail to provide any applicable legal support for this position.

As explained above, parties have a fundamental right to cross-examine witnesses who submit statements in support of a preliminary injunction and Plaintiffs have not provided any support to the contrary.  There is simply no basis in law to refuse to produce Mr. Kuprewicz for deposition.

## VI.    CONCLUSION

Based on the foregoing facts and authorities, good cause exists for an *ex parte* order requiring Mr. Kuprewicz to appear at his deposition on July 1, 2025.  In the alternative, good cause exists to advance the hearing on Real Parties' Motion to Compel Mr. Kuprewicz to appear for deposition.  If none of the above relief is granted, in the alternative, Real Parties seek an order striking Plaintiffs' Declaration of Richard B. Kuprewicz submitted in support of Petitioners' Preliminary Injunction.

DATED:   June 27, 2025                Respectfully submitted,

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE

_____
Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP.**
**PACIFIC PIPELINE COMPANY**

13
REAL PARTIES' *EX PARTE* APPLICATION FOR AN ORDER REQUIRING MR. KUPREWICZ TO APPEAR AT DEPOSITION OR, SHORTENING TIME TO HEAR MOTION TO COMPEL DEPOSITION; OR AN ORDER TO STRIKE THE DECLARATION OF MR. KUPREWICZ

Nimmer Declaration
Page 100

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On June 27, 2025, I served the document(s) **REAL PARTIES IN INTEREST'S *EX PARTE* APPLICATION FOR AN ORDER REQUIRING MR. KUPREWICZ TO APPEAR AT DEPOSITION OR, IN THE ALTERNATIVE, FOR AN ORDER SHORTENING TIME TO HEAR MOTION TO COMPEL DEPOSITION AND REQUEST FOR SANCTIONS OR, IN THE ALTERNATIVE, TO STRIKE THE DECLARATION OF MR. KUPREWICZ; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☐ (BY U.S. MAIL)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

☐ (BY FACSIMILE)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐ (BY OVERNIGHT MAIL)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☒ BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 27, 2025, at Los Angeles, California.

/s/*Josie Cisneros*
_____
Josie Cisneros

**SERVICE LIST**

Julie Teel Simmons, Esq.
David Pettit, Esq.
Talia Nimmer, Esq.
Center for Biological Diversity
2011 Franklin Street, Suite 375
Oakland, CA 94612

**ATTORNEYS FOR PETITIONERS**
CENTER FOR BIOLOGICAL DIVERSITY and
WISHTOYO FOUNDATION

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: jteelsimmonds@biologicaldiversity.org
         dpettit@biologicaldiversity.org
         tnimmer@biologicaldiversity.org

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

**ATTORNEYS FOR PETITIONERS**
ENVIRONMENTAL DEFENSE CENTER, a
California non-profit corporation; GET OIL
OUT!, a California non-profit corporation;
SANTA BARBARA COUNTY ACTION
NETWORK, a California non-profit corporation;
SIERRA CLUB, a national non-profit
corporation; and SANTA BARBARA
CHANNELKEEPER, a California non-profit
corporation

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
         jfrankel@environmentaldefensecenter.org
         trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

**ATTORNEYS FOR RESPONDENTS/
DEFENDANTS**
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal;
Daniel Berlant, in his official capacity as State
Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

**ATTORNEYS FOR REAL PARTIES IN
INTEREST**
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
         benjaminhanelin@paulhastings.com
         natalierogers@paulhastings.com

# Exhibit H

Declaration of Talia Nimmer

**SUPERIOR COURT OF CALIFORNIA
COUNTY OF SANTA BARBARA**

Dated and Entered:  07/02/2025                    Time:  8:30 AM
Judicial Officer:    Donna D Geck
Deputy Clerk:        Maria Vidal                  Dept:   SB Dept 4
Bailiff/Court Officer:  Kenneth Toste             Case No: 25CV02244
Court Reporter:      Marie Castro

---

**Center for Biological Diversity  et al vs California Department of Forestry and Fire Protection  et al**

Parties Present:

Julie Simmonds         Petitioner's Attorney (via Zoom)
Talia Nimmer           Petitioner's Attorney (via Zoom)
Michael Dorsi          Respondent's Attorney (via Zoom)
Jeffrey Dintzer        Attorney for Real Party in Interest
Garrett Stanton        Attorney for Real Party in Interest
Trevor Large           Attorney for Real Party in Interest
Jeremy Frankel         Attorney for Non-Party

---

**NATURE OF PROCEEDINGS*: * Real Parties In Interest Ex Parte Application For An Order Requiring Mr. Kuprewicz To Appear At Deposition Or, In The Alternative, For An Order Shortening Time To Hear Motion To Compel Deposition And Request For Sanctions Or, In The Alternative To Strike the Declaration of Mr. Kuprewicz**

Counsel presented argument.

The Court made the following order:

The Court stated that Mr. Kuprewicz is unable to go forward with his deposition. Petitioners can file a responsive expert declaration. Petitioners have agreed not to take the depositions of Real Party in Interests' experts. Petitioners will not submit a reply declaration for Mr. Kuprewicz.

DARREL E. PARKER, EXECUTIVE OFFICER          Minutes Prepared by:

_____ , Deputy
                        Maria Vidal

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2025 7:46 PM
By: Terri Chavez , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><hr>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br><br>**PROOF OF SERVICE RE: PETITIONERS' COMBINED REPLY IN SUPPORT OF APPLICATION FOR AN ADMINISTRATIVE STAY OR PRELIMINARY INJUNCTION**<br><br>Date:    July 18, 2025<br>Time:    10:00 a.m.<br>Dept.:    4<br>Judge:    Honorable Donna D. Geck<br><br>Action Filed: April 15, 2025<br>Trial: None Set |

PROOF OF SERVICE RE: PETITIONERS' COMBINED REPLY IN SUPPORT OF APPLICATION FOR AN
ADMINISTRATIVE STAY OR PRELIMINARY INJUNCTION

I, Talia Nimmer, state:

I am over the age of 18 and not a party to the foregoing action. My business address is Center for Biological Diversity, 2100 Franklin St., Ste. 375, Oakland CA 94612. On July 11, 2025, I served a true and correct copy of:

1. **PETITIONERS' COMBINED REPLY IN SUPPORT OF APPLICATION FOR AN ADMINISTRATIVE STAY OR PRELIMINARY INJUNCTION;**

2. **SECOND DECLARATION OF JULIE TEEL SIMMONDS RE: PETITIONERS' COMBINED REPLY IN SUPPORT OF APPLICATION FOR AN ADMINISTRATIVE STAY OR PRELIMINARY INJUNCTION;**

3. **SECOND REQUEST FOR JUDICIAL NOTICE RE: PETITIONERS' COMBINED REPLY IN SUPPORT OF APPLICATION FOR AN ADMINISTRATIVE STAY OR PRELIMINARY INJUNCTION;**

4. **DECLARATION OF PAASHA MAHDAVI RE: PETITIONERS' COMBINED REPLY IN SUPPORT OF APPLICATION FOR AN ADMINISTRATIVE STAY OR PRELIMINARY INJUNCTION;**

5. **PETITIONERS' RESPONSES TO REAL PARTIES' OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONERS' APPLICATION FOR AN ADMINISTARTIVE STAY OR PRELIMINARY INJUNCTION;**

6. **PETITIONERS' EVIDENTIARY OBJECTIONS TO THE DECLARATIONS OF STEVE RUSCH, BART LEININGER, MICHAEL A. MISCHE, MICHAEL J. ROSENFELD, AND BRIAN VIERRA IN SUPPORT OF REAL PARTIES IN INTERESTS' OPPOSITION TO PETITIONERS' APPLICATION FOR AN ADMINISTARTIVE STAY OR PRELIMINARY INJUNCTION;**

7. **PETITIONERS' OPPOSITION TO REAL PARTIES IN INTERESTS' MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ; and**

8. **DECLARATION OF TALIA NIMMER IN SUPPORT OF PETITIONERS' OPPOSITION TO REAL PARTIES IN INTERESTS' MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ.**

[X] BY ELECTRONIC SERVICE: By electronically mailing a true and correct copy to the email addresses shown below pursuant to California Rule of Court Section 2.251(c)(3) and Local Rule 1012.

Michael S. Dorsi
California Attorney General's Office
55 Golden Gate Ave, Ste 11000
San Francisco, CA 94102
Michael.Dorsi@doj.ca.gov

PROOF OF SERVICE RE: PETITIONERS' COMBINED REPLY IN SUPPORT OF APPLICATION FOR AN ADMINISTRATIVE STAY OR PRELIMINARY INJUNCTION

*Attorney for Respondents/Defendants*

Jeffrey Dintzer
Matthew C. Wickersham
Garrett Stanton
ALSTON & BIRD
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Jeffrey.dintzer@alston.com
Matt.wickersham@alston.com
Garrett.stanton@alston.com
*Attorneys for Real Parties in Interest*

DJ Moore
Benjamin Hanelin
Natalie Rogers
PAUL HASTINGS
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com
*Attorneys for Real Parties in Interest*

Trevor D. Large
Victoria C. Diffenderfer
FAUVER LARGE ARCHBALD & SPRAY
820 State Street, 4th Floor
Santa Barbara, CA 93101
tlarge@flasllp.com
vdiffenderfer@flasllp.com
*Attorneys for Real Parties in Interest*

I declare under penalty of perjury under the law of California that the foregoing is true and correct. Executed on July 11, 2025, in Los Angeles, California.

_____
Talia Nimmer

3

PROOF OF SERVICE RE: PETITIONERS' COMBINED REPLY IN SUPPORT OF APPLICATION FOR AN
ADMINISTRATIVE STAY OR PRELIMINARY INJUNCTION

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/14/2025 5:43 PM
By: Narzralli Baksh , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Telephone:      (213) 576-1000
Facsimile:      (213) 576-1100

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California 90067
Telephone:      (310) 620-5879
Facsimile:      (310) 620-5899

*Attorneys for Real Parties in Interest*
*SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY*

*Additional Counsel Listed on Signature Page*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et. al<br><br>Respondents and Defendants.<br><br>and<br><br>SABLE OFFSHORE CORP., et al.<br><br>Real Parties in Interest. | Case No. 25CV02244<br><br>Assigned for all purposes to the Honorable Judge Donna D. Geck<br><br>**REPLY IN SUPPORT OF MOTION TO STRIKE THE DECLARATION OF RICHARD B. KUPREWICZ**<br><br>Date:        July 18, 2025<br>Time:        10:00 a.m.<br>Dept.:        4<br><br>Complaint Filed:    April 15, 2025<br>Trial Date:        None set |

- 1 -

REPLY IN SUPPORT OF MOTION TO STRIKE THE DECLARATION OF RICHARD B. KUPREWICZ

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to the California Supreme Court's holding of *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 ("*Sargon*"), and Evidence Code Sections 402, 801, and 802, Real Parties[1] moved to strike the Kuprewicz Declaration for reasons including lack of foundation. Rather than explain how Mr. Kuprewicz's declaration lays a proper foundation, Petitioners attempt to reframe Real Parties' motion as an attack on credibility.[2] It is not.

As explained in the Motion, *Sargon* requires the Court to act as a gatekeeper to exclude expert testimony that lacks foundation. (Mtn. at pp. 11-13 & Fn. 2; *citing Sargon*, *supra*, 55 Cal.4th at pp. 771-772.) Contrary to Petitioners' claims, this gatekeeping responsibility has nothing to do with credibility. "The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. (*Id*. at p. 772 [directing courts "not [to] weigh [the] probative value. . . ."].) Instead, the trial court must conduct a "'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusions that the expert's general theory of technique is valid.'" (*Ibid*.) In performing its gatekeeping function, the trial court is required to focus "solely on principles and methodology, and not on the conclusions they generate." (*Lowery v. Kindred Healthcare Operating, Inc.*, (2020) 49 Cal.App.5th 119, 124; *San Francisco Print Media Co. v. The Hearst Corp.* (2020) 44 Cal.App.5th 952, 962.)

Petitioners rely significantly on argument made by implication, presumably due to the fact that their arguments, when made expressly, have been rejected by California courts. For example, Petitioners argue that Mr. Kuprewicz is a "well-recognized pipeline safety expert with decades of experience." (Opp. at 9.) After identifying Mr. Kuprewicz's purported qualifications, Petitioners conclude that striking his **declaration** would "overstep[ ] [the Court's] limited role as an evidentiary

---

[1] Capitalized terms used herein but not defined have the meaning ascribed to them in the Motion.

[2] Petitioners also argue that *Sargon* does not apply because Mr. Kuprewicz is not testifying at trial. However, courts hold experts to the same standard of admissibility whether the testimony is offered at trial or by declaration. (See, e.g., *Lowery v. Kindred Healthcare Operating, Inc*. (2020) 49 Cal.App.5th 119, 122 [striking expert declaration]; *Lynn v. Tatitlek Support Services, Inc.* (2017) 8 Cal.App.5th 1096, 1115 [striking expert declaration]; *Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 229 [striking expert declaration].)

REPLY IN SUPPORT OF MOTION TO STRIKE THE DECLARATION OF RICHARD B. KUPREWICZ

gatekeeper." (*Ibid*.) Petitioners do not, however, explain any supposed logical connection between Mr. Kuprewicz's qualifications and their conclusion, but the implied argument is that Mr. Kuprewicz's qualifications standing alone satisfy *Sargon* and any further scrutiny constitutes evidence weighing. This argument necessarily fails because it is well-established that qualifications do not provide a foundation for an expert's opinion. (See, e.g., *People v. Wright* (2016) 4 Cal.App.5th 537, 545 ["an expert's opinions cannot rest on his or her qualifications alone. 'even when the witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise.'"].) Qualifications are not reasons, explanations, methodologies, principles, or analysis, and they are, thus, not a foundation for the expert's opinions.

Once Petitioners finally get around to attempting to explain the foundation for Mr. Kuprewicz's opinions (which they do in a single paragraph), they cite Mr. Kuprewicz's reports, not his testimony. (Opp. at p. 10 [arguing that Mr. Kuprewicz's "reports demonstrate crucial information that form the basis of his opinion."].) Mr. Kuprewicz's reports are not testimony; they are hearsay and may not be considered. [See Motion at pp. 14-15; *see also* Evidentiary Objections.] Also, in violation of at least the spirit, if not the letter, of the Court's determination regarding the rights the Real Parties to cross-examine witnesses upon whose testimony the preliminary injunction may be based, it is telling that Petitioners filed yet another purported expert declaration in support of their requested preliminary injunction (which is improper and should not be considered as well; see Real Parties' separately filed evidentiary objections), presumably in recognition that Mr. Kuprewicz's declaration must be stricken.

Petitioners have made several other specious arguments, particularly with respect to the due process rights of Real Parties to cross-examine Mr. Kuprewicz. While there is ample material to rebut, Real Parties' Motion adequately addressed this issue, which separately justifies the requested relief. Nothing raised by Petitioners' opposition explains how edicts of fairness and justice are satisfied by allowing this Court to render a decision on the merits while refusing Real Parties any opportunity to fully and fairly cross-examine Petitioners' key witness in support of their request.

///

///

- 3 -

REPLY IN SUPPORT OF MOTION TO STRIKE THE DECLARATION OF RICHARD B. KUPREWICZ

For these reasons, and those stated in the moving papers, Real Parties request that the Court enter an order striking the Kuprewicz Declaration.

Dated:  July 14, 2025

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE

**FAUVER, LARGE, ARCHBALD & SPRAY LLP**
TREVOR D. LARGE

By: _____
Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

- 4 -
REPLY IN SUPPORT OF MOTION TO STRIKE THE DECLARATION OF RICHARD B. KUPREWICZ

**PROOF OF SERVICE**

I, Martha Serrano, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 333 South Hope Street, Sixteenth Floor, Los Angeles, CA 90071.

On July 14, 2025, I served a true and correct copy of the document(s) described as **REPLY IN SUPPORT OF MOTION TO STRIKE THE DECLARATION OF RICHARD B. KUPREWICZ** on the interested parties in this action as follows: See Attached Service List

☒    BY ELECTRONIC SERVICE:  A true and correct copy of the foregoing document was electronically served on the parties listed in the attached service list.

☐    BY MAIL:  I am readily familiar with this firm's practice for the collection and the processing of correspondence for mailing with the United States Postal Service. In the ordinary course of business, the correspondence would be deposited with the United States Postal Service with postage fully prepaid the same day on which the correspondence was placed for collection and mailing at the firm. Following ordinary business practices, I placed for collection and mailing with the United States Postal Service such envelope at Alston & Bird LLP, 333 South Hope Street, Los Angeles, California 90071.

☐    By ☐ UPS NEXT DAY AIR    ☐ OVERNIGHT DELIVERY:  I deposited such envelope in a facility regularly maintained by ☐ UPS    ☐ Overnight Delivery [specify name of service:  ] with delivery fees fully provided for or delivered the envelope to a courier or driver of ☐ UPS    ☐ OVERNIGHT DELIVERY [specify name of service:] authorized to receive documents at Alston & Bird LLP, 333 South Hope Street, Los Angeles, California 90071.

☒    [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 14, 2025, at Los Angeles, California.

_Martha Serrano_
Martha Serrano

- 5 -
REPLY IN SUPPORT OF MOTION TO STRIKE THE DECLARATION OF RICHARD B. KUPREWICZ

***Center for Biological Diversity, et al.v.***
***California Department of Forestry and Fire Protection, et al.***
**Santa Barbara County Superior Court, Case No. 25CV02244**

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>CENTER FOR BIOLOGICAL DIVERSITY and<br>WISHTOYO FOUNDATION<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>    tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS<br>ENVIRONMENTAL DEFENSE CENTER, a<br>California non-profit corporation; GET OIL<br>OUT!, a California non-profit corporation;<br>SANTA BARBARA COUNTY ACTION<br>NETWORK, a California non-profit corporation;<br>SIERRA CLUB, a national non-profit<br>corporation; and SANTA BARBARA<br>CHANNELKEEPER, a California non-profit<br>corporation<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>    jfrankel@environmentaldefensecenter.org<br>    trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/<br>DEFENDANTS<br>California Department of Forestry and Fire<br>Protection, Office of the State Fire Marshal;<br>Daniel Berlant, in his official capacity as State<br>Fire Marshal<br><br>Tel.:    (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN<br>INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (310) 620-5879<br>Email: djmoore@paulhastings.com<br>    benjaminhanelin@paulhastings.com<br>    natalierogers@paulhastings.com |

REPLY IN SUPPORT OF MOTION TO STRIKE THE DECLARATION OF RICHARD B. KUPREWICZ

Trevor D. Large, Esq.
FAUVER, LARGE, ARCHBALD & SPRAY LLP
820 State Street, 4th Floor
Santa Barbara, CA 93101

ATTORNEYS FOR REAL PARTIES IN INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:   (805) 966-7000
Email: TLarge@FLASllp.com

- 7 -