# EXHIBIT LL

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
1/6/2026 9:43 PM
By: Terri Chavez , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 884-7100
*Attorneys for Petitioners/Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

Linda Krop (Bar No. 118773)
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
Tara C. Rengifo (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152
*Attorneys for Petitioners/Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,

      Petitioners/Plaintiffs,

  v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,

      Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation; and DOES 11 through 20, inclusive,

      Real Parties in Interest.

Case No.: 25CV02244
[Consolidated with Case No. 25CV02247]

**DECLARATION OF JULIE TEEL SIMMONDS IN SUPPORT OF PETITIONERS AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S EX PARTE APPLICATION FOR ORDER SHORTENING TIME FOR NOTICE OF MOTION AND MOTION FOR RECONSIDERATION (VOL. 1 OF 4)**

[Filed Concurrently with Opposition, Request for Judicial Notice, and [Proposed] Order]

Date:  January 7, 2026
Time:  10:00 a.m.
Dept.:  4
Judge:  Honorable Donna D. Geck

Action Filed: April 15, 2025
Case No. 25CV02247

1

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit coproration and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><hr>SABLE OFFSHORE CORP., a Delaware Corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,<br><br>Real Parties in Interest. | Case No. 25CV02247<br>[Consolidated with Case No. 25CV02244] |

2

Declaration of Julie Teel Simmonds ISO Petitioners' Opposition to Real Parties' Ex Parte Application to Shorten Time

I, Julie Teel Simmonds, hereby declare as follows:

1.      I am an attorney at law admitted to practice before the courts of the State of California and am an attorney of record for Petitioners Center for Biological Diversity (Center) and Wishtoyo Foundation in the above-captioned case. I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify to them. I submit this declaration in support of Petitioners' concurrently-filed Opposition to Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's *Ex Parte Application for Order Shortening Time for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's Notice of Motion and Motion for Reconsideration*.

2.      In 2020, following the oil spill, Sable's predecessor, Plains All American Pipeline, the Office of the State Fire Marshal (OSFM), and the Pipeline and Hazardous Materials Safety Administration (PHMSA) (among other parties) executed a Consent Decree. I obtained this document from the U.S. Environmental Protection Agency website: https://www.epa.gov/sites/default/files/2020-03/documents/plainsallamericanpipelinelp.pdf. A true and correct copy of Appendix B and Appendix D of that Consent Decree are attached as **Exhibit A**.

3.      On December 31, 2025, the California Natural Resources Agency ("CNRA") published an updated Summary of State Regulation of Crude Oil Pipelines in Santa Barbara County, which identifies several approvals Sable has yet to obtain before restart. I obtained this document via the CNRA website at: https://resources.ca.gov/-/media/CNRA-Website/Files/NewsRoom/Educational-Portal/Pipeline-Summary-12-31-2025-ADA-comp.pdf. A true and correct copy of the summary is attached hereto as **Exhibit B**.

4.      On September 19, 2025, Senate Bill ("SB") No. 237 was enacted which, among other things, requires that "[r]epair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more shall be considered a new or expanded development requiring a new coastal development permit" from the California Coastal Commission. SB 237 went into effect on January 1, 2026. I obtained this document via the California Legislative Information website at:

https://leginfo.legislature.ca.gov/faces/billCompareClient.xhtml?bill_id=202520260SB237&showamend

3

Declaration of Julie Teel Simmonds ISO Petitioners' Opposition to Real Parties' Ex Parte Application to Shorten Time

s=false. A true and correct copy of the enacted bill is attached hereto as **Exhibit C**.

5.  On October 22, 2025, OSFM issued Sable a letter noting that "OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart. . . [these] findings alone and the inconsistencies with the State Waiver requirements prevent restart under the law." I obtained this document from the United States Securities and Exchange Commission ("SEC") website at: https://www.sec.gov/Archives/edgar/data/1831481/000183148125000086/osfm-lettertosable.htm. A true and correct copy of the letter is attached hereto as **Exhibit D**.

6.  On November 26, 2025, Sable sent a letter to PHMSA requesting that PHMSA determine that the pipelines are "interstate" and that it take over jurisdiction of the pipelines. I was served with a copy of this letter on December 30, 2025 by counsel for PHMSA as part of a legal filing in *Environmental Defense Center, et al. v. U.S. Department of Transportation, et al.*, No. 25-8509. A true and correct copy of the letter is attached hereto as **Exhibit E**.

7.  On December 17, 2025, PHMSA sent Sable a concurrence letter with Sable's interstate determination request. I obtained this letter from the SEC website at: https://www.sec.gov/Archives/edgar/data/1831481/000183148125000137/sablelasflores_121725.htm. A true and correct copy of the letter is attached hereto as **Exhibit F**.

8.  On December 19, 2025, Sable submitted an application to PHMSA for an Emergency Special Permit. I obtained the Application Letter from PHMSA's docket for the Emergency Special Permit at: https://www.regulations.gov/docket/PHMSA-2025-1502/document. A true and correct copy of the letter is attached hereto as **Exhibit G**.

9.  On December 22, 2025, PHMSA approved Sable's restart plan. I obtained the approval from this SEC website at: https://www.sec.gov/Archives/edgar/data/1831481/000183148125000143/sableoffshore_approvalof.htm. A true and correct copy of the approval letter is attached hereto as **Exhibit H**.

10.  On December 23, 2025, PHMSA issued Sable an Emergency Special Permit for the pipelines, waiving compliance from certain pipeline safety regulations. I obtained the Permit from PHMSA's docket for the Emergency Special Permit at: https://www.regulations.gov/docket/PHMSA-

4

Declaration of Julie Teel Simmonds ISO Petitioners' Opposition to Real Parties' Ex Parte Application to Shorten Time

2025-1502/document. A true and correct copy of the Permit is attached hereto as **Exhibit I**.

11.     Petitioners challenged PHMSA's approval of Sable's restart plan and the agency's issuance of an Emergency Special Permit by filing a Petition for Review with the 9th Circuit (as required by federal law relating to the issuance of special permits) on December 24, 2025.  A true and correct copy of the Petition for Review in *Environmental Defense Center, et al. v. U.S. Department of Transportation, et al*., No. 25-8509 is attached hereto as **Exhibit J**.

12.     On December 16, 2025, the Santa Barbara County Board of Supervisors voted to deny the transfer of development permits from Exxon Mobil to Sable. I obtained the Board's Action Letter from this County of Santa Barbara website: https://cosantabarbara.app.box.com/s/wlihoyv3ntcd76py99nh2nemm555qco6. A true and correct copy of the Board's Action Letter is attached hereto as **Exhibit K**.

13.     On December 31, 2025, the Ninth Circuit Court of Appeals denied Petitioners' Emergency Motion and ordered expedited briefing in the case. Final briefs are due no later than March 17, 2025. A true and correct copy of the Court's order is attached hereto as **Exhibit L**.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of January, 2026.

/s/ *Julie Teel Simmonds*
JULIE TEEL SIMMONDS (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100
*Attorney for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

Declaration of Julie Teel Simmonds ISO Petitioners' Opposition to Real Parties' Ex Parte Application to Shorten Time

**LIST OF EXHIBITS**

| VOLUME 1 | Description |
|---|---|
| Exhibit A | Consent Decree Appendices B, D |
| Exhibit B | 12/31/25 CNRA Summary of State Regulation of Crude Oil Pipelines in Santa Barbara County |
| Exhibit C | 9/19/25 Senate Bill No. 237 |
| Exhibit D | 10/22/25 OSFM Letter to Sable re State Waivers |
| Exhibit E | 11/26/25 Letter from Sable to PHMSA re designation |
| Exhibit F | 12/17/25 Letter to Sable re designation |
| **VOLUME 2** | |
| Exhibit G | 12/19/25 Sable Application to PHMSA for Emergency Special Permit |
| **VOLUME 3** | |
| Exhibit H | 12/22/25 PHMSA Letter approving restart plan |
| Exhibit I | 12/23/25 PHMSA Emergency Special Permit |
| Exhibit J | 12/24/25 Petition for Review, EDC et al. v. DOT et al. (No. 25-8059) |
| **VOLUME 4** | |
| Exhibit K | 12/16/25 Santa Barbara County Action Letter |
| Exhibit L | 12/31/25 9th Circuit Order re Briefing |

6

Declaration of Julie Teel Simmonds ISO Petitioners' Opposition to Real Parties' Ex Parte Application to Shorten Time

# EXHIBIT A

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br> Plaintiffs, <br><br> v. <br><br> PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P., <br><br> Defendants. | Civil Action No. <br><br> 2:20-cv-02415 <br><br> **CONSENT DECREE** |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast Regional Water Quality Control Board, and California Department of Forestry and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 34    Filed 05/14/26    Page 11 of 256   Page
ID #:16547
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 75 of 102   Page ID #:172

# APPENDIX B

## *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

Case 2:26-cv-05242-SVW-SSC   Document 34   Filed 05/14/26   Page 12 of 256   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 80 of 102   Page ID #:1739
ID #:16548

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1.  **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

    A.  Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

    B.  Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

    C.  Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

    D.  Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

    E.  To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2.  **Replacement, Restart, or Abandonment of Lines 901 and 903:**

    A.  Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

Case 2:20-cv-02415 Document 6-1 Filed 05/13/20 Page 81 of 102 Page ID #:16549

1. On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

   a. Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

   b. Conduct a close interval survey (CIS) and AC/DC interference survey.

   c. Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B. As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C. As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3. **Third-Party Analysis of Line 2000 ILI Data**

A. Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B. The consultant shall:

   1. Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

   2. Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

   3. Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

   4. Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

5. Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6. Comply with additional requirements specified in the scope of work.

C. The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1. The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2. The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3. Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4. Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4. **Integrity Management**

A. For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1. Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a. In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

-77-

loss, within one year of discovery.  If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b.   Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c.   When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d.   Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e.   Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f.   Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g.   For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h.   Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i.   Integrate and analyze available data in its P&M process, including:

i.   Assessment data from ILI tool runs;

ii.   Dig and repair data;

4

-78-

iii.   Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv.   Operational data, such as pressure and flow data;

v.   Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi.   Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii.   Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2.   ILI Measures

a.   Initial ILI Runs.  Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU).  Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data.  If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i.   All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

5

ii. In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run. If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

b. <u>Subsequent ILI Runs</u>. After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year. Alternatively, Plains may run a UT tool each year. If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

c. <u>All ILI Runs</u>. Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5. **<u>Valves</u>**

A. Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

1. Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

2. Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B. Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C. Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

6. **Risk Analysis**

   A. For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

   1. Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

      a. The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

      b. Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis. The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

      c. The risk analysis shall be due within one year from entry of the CD.

7. **Leak Detection**

   A. For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

   B. Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8. **Non-waiver**

   A. Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

## ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES

9. **Integrity Management**

   A. New Procedures for Interim Reviews and Assessments

7

Case 2:26-cv-05242-SVW-SSC Document 34 Filed 05/14/26 Page 19 of 256 Page
Case 2:20-cv-02415 Document 6-1 Filed 05/13/20 Page 87 of 102 Page ID #:16555
ID #:16555

1.  Plains shall modify Section 9.5 of its Integrity Management Plan
    ("Continual Evaluation and Assessment of Pipeline Integrity") to provide
    for an annual, but not to exceed 15 months, Interim Review of each
    pipeline segment it operates to determine whether, since the last
    assessment (whether it was an Interim Assessment or a full periodic
    assessment under Section 6), conditions have changed or new information
    has been obtained that could significantly impact already-identified threats
    or create new threats for that segment. If so, Plains shall evaluate whether
    it should implement any P&M measure(s) to address that threat prior to
    the next regularly-scheduled assessment. Section 9.5 shall list all the
    categories of potential threats to be considered as part of the Interim
    Review and the types of conditions, information and data that will be
    included in the information analysis conducted under 49 CFR §
    195.452(g).

2.  Plains shall modify Section 9.5 of its IMP to provide new forms for P&M
    measures or actions to be taken as a result of an Interim Review. Section
    9.5 shall provide that Plains' Integrity Engineer may recommend any
    P&M measures that may be appropriate, including any P&M measures
    that could be recommended following a full assessment performed under
    Section 6 of its IMP.

3.  Plains shall submit its proposed modifications of Section 9.5 to PHMSA
    no later than 60 days after entry of the CD. If PHMSA does not object or
    request any modification within 60 days, Plains shall proceed to
    implement the revised procedures in Section 9.5, which shall be completed
    within 18 months from entry of the CD.

B.  Documentation for P&M Recommendations

1.  Within 90 days from entry of the CD, Plains shall revise Part B of its
    P&M Recommendation form (F11-2), to expand the scope and content of
    comments in the "Basis of Recommendation" field to provide a narrative
    explanation that reflects, at a minimum:

    a.  What drew the engineer's attention and caused him or her to make
        the recommendation (such as an anomaly, pattern, trend or
        potential correlation observed in the data, a particular event or
        occurrence, a particular change in the operation or configuration of
        the line or in its surrounding environment, "lessons learned" from
        another event or occurrence, a corporate goal or initiative, etc.);

    b.  The specific risk (likelihood or consequence of failure, or both) or
        concern that the recommended measure is intended to investigate
        or address; and

8

c.  The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

2.  In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

3.  In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C.  Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented.  Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

10.  **Valves and O&M**

A.  Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B.  Within two years of entry of the CD, Plains shall develop and implement procedures to:

1.  If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

2.  Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

3.  Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

4.  Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C.  Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

D.     For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

     1.     Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room. Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E.     Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11.     **Leak Detection**

A.     Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

     1.     Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B.     For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C.     Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

     1.     Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D.     Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

     1.     Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

10

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E. Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection. The results of the meetings will be documented and shared with appropriate personnel. The recommendations will be evaluated and documented.

F. Instrumentation and Display

    1. To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

        a. Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

        b. Track these conditions through to resolution, including instrumentation relocation when necessary.

12. **Control Room Management**

A. For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

    1. Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

    2. Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

    3. Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

    4. Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

11

B.      For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C.      Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13.    **Emergency Response and Oil Spill Response Plans**

A.      California-Specific Provisions:

1.      Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05.  Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B.      Company-Wide Provisions

1.      Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

2.      Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response.  Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

3.      Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

12

Plains.  Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills.  Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4.  Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter.  Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5.  Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment).  Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill.  Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6.  For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14.  **Safety Management System (SMS)**

A.  Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1.  Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173.  Plains shall direct the third party to transmit a copy of the final report to PHMSA.  Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

B.        Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15.     **Drug and Alcohol Program**

A.        Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

Case 2:26-cv-05242-SVW-SSC   Document 34   Filed 05/14/26   Page 26 of 256   Page
ID #:16562
Case 2:20-cv-02415   Document 6-1   Filed 05/13/20   Page 34 of 102   Page ID #:1679

# APPENDIX C

# (*Intentionally left blank*)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

# APPENDIX D

*(Remaining Corrective Actions from the PHMSA CAO)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-90-

## <u>APPENDIX D</u>

1.      All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

     a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

     b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. The Restart Plan shall include:

       1)      Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

       2)      Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

       3)      Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

       4)      A specific day-light restart that includes advance communications with local emergency response officials;

       5)      Master Control Room enhancements, including:

         a)  Implementation of advanced leak-detection

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1. Revised alarm threshold adjustments;

2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6) Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7) Installation of additional safety valves as a result of Plains' EFRD evaluation;

8) Installation of additional pressure sensors as a result of Plains' surge study;

9) Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10) **Corrosion Prevention.** Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

903 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1) Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2) Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3) Provisions for a daylight restart and advance communications with local emergency response officials.

g. **Line 903 Return to Service.** After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h. **Removal of Pressure Restriction for Line 903.** After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1) The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)      The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction.  Requests for removal of the pressure restriction may be submitted by pipeline segment.

i.  **Notifications.**  Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j.  **Reporting Requirements for Lines 901 and 903.**  If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)      The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)      Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

Case 2:20-cv-02415 Document 0-1 Filed 03/13/20 Page 102 of 102 Page ID #:1595

3) The Appendix D Documentation Report shall include but not be limited to:

A. Table of Contents;

B. [*intentionally left blank.*]

C. [*intentionally left blank.*]

D. Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

E. [*intentionally left blank.*]

F. [*intentionally left blank.*]

G. Lessons learned while fulfilling the requirements of this Appendix D.

# EXHIBIT B

# Summary of State Regulation of Crude Oil Pipelines
## in Santa Barbara County
December 31, 2025
(Updates in red)

Sable Offshore Corporation is attempting to restart the Santa Ynez Unit oil and gas operation in Santa Barbara County. The Santa Ynez Unit includes three offshore platforms in federal waters connected to shore by offshore pipelines, onshore pipelines, the Ellwood Pier, mooring buoys, and the Las Flores Canyon Processing Facility. The onshore pipelines include pipelines identified as CA-324 and CA-325 that were responsible for the 2015 Refugio Oil Spill.

This summary outlines the many state agencies that oversee the Santa Ynez Unit operations, including oil pipeline construction, maintenance and operations, which would need to approve various actions to allow these pipelines to restart. This summary has been assembled to build public understanding of the regulatory processes over these pipelines.

## Overview

California's lands and offshore waters have hosted significant crude oil extraction for well over a century. Since the mid-1980's, however, crude oil extraction has declined each year largely due to decreasing levels of easily accessible crude oil.

Today, the state has three active crude oil/petroleum extraction platforms off its coast in state waters and eight active platforms in federal waters. These platforms are connected to the shore via undersea pipelines that transport crude oil from the offshore platforms to onshore facilities that process the oil for sale. This oil is eventually transported to refineries to be converted into products such as gasoline and diesel fuel.

California state government enforces a broad set of laws and regulations over many aspects of crude oil infrastructure. This includes oversight of the extraction, transport, and refining of crude oil. These laws and regulations exist to protect public health and safety and to safeguard California's natural resources and environment.

## Oversight By Agency

Multiple state agencies regulate the pipelines owned and operated (pipelines CA-324 and CA-325) by Sable Offshore Corporation in Santa Barbara County that the company is attempting to restart. Each of these state entities has specific authorities and obligations over these pipelines that is detailed in state law and discharges these responsibilities through regulatory and oversight processes.

The state entities with oversight over these pipelines include (in alphabetical order):

1. California Coastal Commission
2. California Department of Conservation, California Geologic Energy Management Division (CalGEM)

1

3. California Department of Fish and Wildlife (CDFW), including the Office of Oil Spill Prevention and Response (OSPR)
4. California Department of Forestry and Fire Protection (CAL FIRE), Office of the State Fire Marshal (OSFM)
5. California Department of Parks and Recreation (State Parks)
6. Central Coast Regional Water Quality Control Board
7. Central Valley Regional Water Quality Control Board
8. State Lands Commission

These state entities, with the exception of the two regional Water Quality Control Boards, exist within the California Natural Resources Agency. The regional Water Boards fall under the umbrella of the California Environmental Protection Agency.

Below is a short summary of the referenced state entities with regulatory oversight over these pipelines.

**CALIFORNIA COASTAL COMMISSION**
*Issues permits for approved development activity in coastal areas.*

- FOCUS: Environmental protection and public access to state coastal areas.
- ROLE & AUTHORITY: Under the California Coastal Act of 1976, the California Coastal Commission has permitting responsibility for non-exempt pipeline work and other development associated with the pipeline in the Coastal Zone, including any enforcement actions for permitting requirements. The Commission also has federal consistency review authority under the Coastal Zone Management Act of certain pipeline-related activities in federal waters.
- ACTIONS UNDERWAY: Commission staff is coordinating with Santa Barbara County, which shares the permitting jurisdiction, on permitting processes related to Sable's work along the pipeline.  Commission staff continues to direct Sable to apply for a Coastal Development Permit to resolve Coastal Act violations that occurred both onshore and offshore.
    o *On September 27, 2024*, Commission staff issued a Notice of Violation letter to Sable due to then recent and ongoing development activities that were occurring on and around the pipeline within the Coastal Zone without any Coastal Act authorization, requesting that Sable cease and desist.
    o *On October 4, 2024,* Commission staff issued a Notice of Intent to issue an Executive Director Cease and Desist Order and requested confirmation that all work on the pipeline had ceased and that Sable would apply for a Coastal Development Permit for the work that had already occurred.
    o *On November 12, 2024,* the Commission's Executive Director issued a Cease and Desist Order to Sable, directing Sable, among other things, to submit an application for a Coastal Development Permit *"for any proposed future work to be undertaken along the Pipelines, as well as for after-the-fact ('ATF') authorization for unpermitted development that has already occurred."*
        ▪ Sable temporarily ceased its onshore activities.  The Cease and Desist Order expired on February 10, 2025.  The deadline established in the Order

2

for Sable to apply for a Coastal Development Permit expired on March 12, 2025.  Sable has not filed an application.

- ▪ *On February 18, 2025*, Sable filed a complaint against the Commission in Santa Barbara Superior Court, challenging two Notices of Violation and the Executive Director Cease and Desist Order issued on November 12, 2024. Sable is seeking declaratory and injunctive relief and inverse condemnation damages.

o *On February 11, 2025*, Commission staff issued a Notice of Violation letter to Sable regarding unpermitted development activities which had taken place offshore, in state coastal waters. This letter asked Sable to cease any further unpermitted development activities and apply for after-the-fact authorization for those development activities already undertaken.

o *Around February 14, 2025*, four days after the Executive Director Cease-and-Desist order had expired, Sable recommenced its onshore activities in the coastal zone, and *on February 18, 2025*, the Commission's Executive Director issued a second Executive Director Cease and Desist order addressing the unpermitted development activities Sable had recommenced onshore. This order, among other things, directed Sable to, again, cease any further development activities at the onshore locations. This Executive Director Cease and Desist Order also included notice of the Executive Director's intent to pursue a future Cease and Desist Order and other further enforcement actions from the Coastal Commission.  Sable did not cease its activities or comply with the order.

o On *April 10, 2025*, the Commission held a five-hour, noticed, public hearing, at the conclusion of which it issued Sable a Cease and Desist Order and Restoration Order and imposed an administrative penalty.  The Cease and Desist Order required, among other things, that Sable cease operations until securing Coastal Act authorization or a formal, final exemption determination for any work it wished to pursue.  It also required that Sable seek after-the-fact Coastal Act authorization for work already completed and prospective authorization for anticipated work.  The administrative penalty requires Sable to pay approximately $18 million, with a potential reduction to approximately $15 million if Sable complies with the requirement to seek Coastal Act authorization and pursues the most expeditious permitting approach.  Sable continued its work and did not apply for authorization under the Coastal Act.

o *On April 16, 2025*, the Commission filed a cross-complaint and an application for a temporary restraining order (TRO) and preliminary injunction (PI) against Sable to enforce the April 10, 2025 Cease and Desist Order.  That same day, Sable amended its complaint against the Commission to add a challenge to the Commission's April 10 actions.

o *On April 17, 2025*, the trial court reversed its tentative ruling in favor of the Commission, denied the Commission's request for a TRO, and set a hearing for May 14, 2025, on an Order to Show Cause (OSC) why a PI should not issue.

- o *On April 21, 2025*, the Commission filed a notice of appeal of the denial of the TRO, and on April 22, 2025, the Commission filed a writ petition with the Court of Appeal seeking immediate injunctive relief.
- o *On May 6, 2025*, the trial court issued an order moving the OSC hearing to May 28, 2025, and requiring the parties to submit briefs by May 14, 2025, on the question of whether the trial court retains jurisdiction to consider the issuance of a PI at an OSC hearing, given the Commission's appeal and writ petition.
- o *On May 15, 2025*, the Court of Appeal denied the Commission's April 22, 2025 request for a writ but confirmed that the trial court retained jurisdiction to act on the Commission's request for a PI, and the trial court denied the Commission's request to hold the OSC hearing on the Commission's request for a PI sooner than May 28, 2025, given the resolution of the jurisdictional issue.
- o *On May 16, 2025*, the Commission filed a demurrer to several of the causes of action in Sable's First Amended Complaint.
- o *On May 28, 2025*, the trial court granted the Commission's request for a PI and directed the Commission to submit a proposed order. After multiple rounds of objections to the Commission's proposed order from Sable, the court overruled the objections on June 9 and signed the order that the Commission had proposed on June 10.
- o *On June 4, 2025*, the court held a case management conference and set the case (including both Sable's case against the Commission and the Commission's cross-complaint against Sable to enforce its orders) for trial in October 2025.
- o *On June 13, 2025*, Sable filed a motion to stay the Cease-and-Desist Order that the Commission had issued on April 10 and that the court's preliminary injunction prohibits Sable from violating. Sable also filed a demurrer to the Commission's cross-complaint.
- o *On June 18, 2025*, the trial court sustained the Commission's demurrer to one cause of action in Sable's complaint but overruled it with respect to the other causes of action.
- o *On July 9, 2025,* the trial court held a hearing on the motion Sable filed on June 13, 2025, asking the court to stay the Commission's Cease-and-Desist Order. The court denied the motion.
- o *On July 15, 2025*, Sable filed a petition with the Court of Appeal for a writ of supersedeas to stay the effectiveness of the preliminary injunction issued by the trial court.
- o *On July 23, 2025*, the trial court overruled Sable's demurrer to the Commission's cross-complaint, granted the Commission's motion to bifurcate the case such that only Sable's petition for a writ of mandate would go to trial in October, and denied the Commission's motion for a protective order to preclude all post administrative hearing discovery.
- o *On July 29, 2025*, Sable filed a petition for a writ of mandate with the Court of Appeal to overturn the trial court's July 9 ruling and stay the Commission's Cease-and-Desist Order.

4

- o *On August 4, 2025*, the Court of Appeal denied both Sable's July 15 petition for a writ of supersedeas and its July 29 petition for a writ of mandate.
- o ~~Trial on Sable's first cause of action (petition for a writ of mandate) is set for October 15, 2025.~~
- o On *October 15, 2025*, <u>trial was held on Sable's first cause of action (petition for writ of mandate).  The</u> trial court ruled in favor of the Commission and against Sable, declining to issue the requested writ, rejecting Sable's challenges to the Commission's action, and upholding the Commission's April 10 orders and penalties.  It also scheduled a hearing and case management conference for December 3 to resolve the remaining issues.
- o *On November 5, 2025*, Sable filed three things with the Court of Appeal:  (1) Sable's opening brief on its appeal of the preliminary injunction that the trial court granted on May 28 and issued on June 10; (2) a petition for a writ of mandate, asking the Court of Appeal to overturn the October 15 trial court decision; and (3) a motion to consolidate the prior two items.
- o *On November 6, 2025*, the Commission filed a motion for judgment on the pleadings in the trial court, seeking to enforce its cross-complaint.
- o On *November 24, 2025*, the Court of Appeal denied Sable's petition for a writ of mandate seeking to overturn the trial court's October 15 ruling, as well as Sable's request to consolidate that proceeding with its pending appeal of the preliminary injunction that the trial court granted on May 28 and issued on June 10.
- o ~~A hearing is scheduled for~~ <u>On</u> *December 3, 2025*, ~~for~~ the trial court ~~to rule on~~ <u>denied</u> the Commission's motion for judgment on the pleadings<u>, granted</u> ~~and~~ Sable's motion~~s (1)~~ for leave to file a second amended complaint<u>, continued Sable's motion</u> ~~and (2)~~ to compel discovery<u>, and set a briefing schedule</u> ~~; at which  hearing the court indicated it would also~~ <u>for the parties to</u> address whether any of Sable's claims remain viable given the court's October 15 ruling<u>, with a hearing set for January 21</u>.
- o *On December 23, 2025,* following PHMSA's determination that Sable's lines CA-324 and CA-325 are interstate pipelines subject to PHMSA's regulatory jurisdiction, PHMSA's approval of Sable's Restart Plan, and PHMSA's approval of Emergency Special Permits for Sable, the Commission sent a letter to PHMSA, requesting review of the Restart Plan and Special Permit applications under Subpart D of the Coastal Zone Management Act (CZMA) to determine if the applications trigger federal consistency review as unlisted permits/licenses. The Commission is also reviewing PHMSA's jurisdiction determination to assess whether PHMSA must submit a consistency determination pursuant to Subpart C of the CZMA, which gives the Commission authority to review federal agency activities that have reasonably foreseeable effects on any coastal resource or use.
- • FOR MORE INFORMATION: Contact the California Coastal Commission at ExecutiveStaff@coastal.ca.gov or the Commission's Public Information Officer at (415) 200-8052.

**CALIFORNIA DEPARTMENT OF CONSERVATION: GEOLOGIC ENERGY MANAGEMENT DIVISION (CalGEM)**

*Oversees and regulates oil processing and production facilities.*

- FOCUS: Public health and safety, environmental quality.
- ROLE & AUTHORITY: The Department of Conservation oversees compliance for oil production facility management. While the department has oversight of the Las Flores Canyon oil processing facility, CalGEM approval is not required prior to restarting the pipeline. CalGEM does, however, have a role in ensuring compliance with other regulatory partners in completing an oil spill plan, a pipeline management plan, various testing and maintenance requirements, bonding to cover decommissioning costs, and oversight of any potential oil production work happening near communities (called health protection zones).
- ACTIONS UNDERWAY:
    - *On December 17, 2024*, the Department of Conservation sent a letter to Sable notifying them of the need for an additional inspection of facilities, and production and bonding requirements.
    - On *May 9, 2025,* the Department of Conservation sent a letter to Sable notifying them that a bond in the amount of $31.9 million must be filed and outlining additional production facility requirements.
- FOR MORE INFORMATION: Contact Department of Conservation Public Affairs at PAO@conservation.ca.gov or the Office of the Director at (916) 322-1080.

**CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE/CDFW OFFICE OF SPILL PREVENTION AND RESPONSE**

*Manages natural resources for their ecological value and for public use.*

- FOCUS: Protecting wildlife.
- ROLE & AUTHORITY:  Exercises oversight as a landowner, as well as through its authority to protect fish and wildlife, and separately through one of its offices that oversees prevention, preparation for, and response to oil spills. CDFW-OSPR reviews and approves oil spill response plans and works to ensure that facilities have the financial resources necessary to cover the costs of oil spill scenarios. Under the Endangered Species Act and other Fish and Game Code laws, CDFW also oversees the review and approval process for evaluating impacts to wildlife due to altering the adjacent landscape.
- ACTIONS UNDERWAY:
    - *In October 2024*, CDFW-OSPR certified that Sable had the financial resources to cover the costs of a reasonable worst-case scenario oil spill.
    - *On November 22, 2024*, CDFW-OSPR sent a second notice to Sable sharing that its offshore contingency plan (C-Plan #CA-00-7239) was deficient.  On December 20, 2024, Sable submitted corrections to its plan.  CDFW-OSPR is reviewing these corrections and must respond by January 19, 2025.
        - Additional corrections were submitted by Sable on December 20, 2024 and January 17, 2025. CDFW-OSPR has reviewed the plan and found no deficiencies.

- *On March 26, 2025*, following the completion of a formal review, CDFW OSPR issued an approval letter for the C-Plan and an updated COFR for #CA-00-7239.
- *On December 17, 2024*, CDFW-OSPR sent a third notice to Sable sharing that its onshore contingency plan (C-Plan #CA-00-7217) was deficient.  On January 9, 2025, Sable submitted corrections to its plan.  CDFW-OSPR is reviewing these corrections and must respond by February 9, 2025.
  - OSPR has reviewed the plan and found no deficiencies.
  - On *March 26, 2025*, following the completion of a formal review, CDFW OSPR issued an approval letter for C-Plan #CA-00-7217
- *On December 17, 2024,* CDFW also issued a notice of potential violation (NOPV) for Fish and Game Code violations.  This notice requests that Sable discontinue any work on CDFW properties and contact CDFW to discuss remedial measures and other actions to address impacts.  Specifically, the NOPV explained that Sable appeared to have: (a) violated Fish and Game Code section 1602(a)(1) by failing to notify CDFW prior to undertaking activities subject to that section, as well as sections 5650 and 5652; and (b) conducted work outside a 50-foot-wide pipeline easement on CDFW property. The NOPV requested Sable to discontinue any work on CDFW property inconsistent with the easement and to contact CDFW to discuss remedial measures and other actions to address impacts on fish and wildlife resources at the locations identified in the NOPV.
  - Sable submitted three notifications to CDFW under Fish and Game Code section 1602(a)(1), all to complete remediation work at the locations identified in the notifications.
    - *On February 18, 2025*, CDFW received a notification (No. EPIMS-SBA-57481-R5) pertaining to Sable's previous work at Site 280.65.19 (Unnamed Drainage East of Baron Ranch). *On March 18, 2025*, CDFW notified Sable that its notification was complete and because the project would not substantially adversely affect an existing fish or wildlife resource, a streambed alteration agreement was not required.
    - *On March 13, 2025*, CDFW received a second notification (No. EPIMS-SBA-58088-R5) pertaining to the three locations in Santa Barbara County that CDFW identified in the NOPV: Sites R5-1, R5-2, and R5-3. *On April 14, 2025*, CDFW determined the notification was complete. CDFW also determined the work at the three locations identified in the notification will not substantially adversely affect an existing fish or wildlife resource, and therefore a streambed alteration agreement would not be needed for any of the work. CDFW explained this in a letter to Sable dated April 14, 2025.
    - *On March 4, 2025*, CDFW received a third notification (No. EPIMS-SLO-57972-R4) pertaining to the location that CDFW identified in the NOPV: Site R4-1.
      - *On April 3, 2025*, CDFW sent Sable a letter, explaining the third notification was incomplete. *On April 25, 2025*, Sable

> submitted additional information to CDFW in response to CDFW's April 3, 2025, letter.
> - *On May 27, 2025*, CDFW sent Sable a letter explaining the third notification with the additional information was complete. The letter also explained that CDFW will have until *July 28, 2025*, to submit to Sable a draft streambed alteration agreement for the work described in the notification if CDFW determines an agreement is needed.
> - *On July 25, 2025*, CDFW submitted to Sable a draft streambed alteration agreement for the work described in the third notification.
> - *On August 26, 2025*, Sable responded to the draft streambed alteration agreement, requesting minor changes.
> - *On September 5, 2025*, CDFW submitted a revised draft streambed alteration agreement to Sable that included the changes discussed between CDFW and Sable. If Sable signs the revised draft agreement and CDFW subsequently signs, it will become the final agreement.
> - *On August 27, 2025*, CDFW received a fourth notification from Sable that included nine sites where Sable had previously completed work. None of the sites was included in CDFW's NOPV.
>   - *On September 29, 2025*, CDFW deemed the notification complete. CDFW has until *December 1, 2025* to submit a draft streambed alteration agreement for each of the work sites if an agreement is needed.
>   - On *December 1, 2025*, CDFW submitted a draft streambed alteration agreement to Sable that covers all nine work sites identified in Sable's fourth notification.
> - *On February 7, 2025*, one of Sable's contractors, SCS Engineers, requested a letter of permission from CDFW to access the Carrizo Plains Ecological Reserve to conduct work within a pipeline easement that precedes CDFW's ownership of the property. *On November 12, 2025*, CDFW granted permission.
> - Sable Offshore Corp continues to maintain compliance with OSPR's exercise requirements for both the offshore (CA-00-7217) and onshore (CA-00-7239) contingency plans. Both of Sable Offshore Corp's plans are Tier 1, which has the greatest drill and exercise requirements. There are two exercises scheduled for the remainder of the year:
>   - CA-00-7217 – Offshore plan. Exercise is scheduled for 7/17/25.
>     - 7/25/2024 Exercise. Received credit for multiple objectives
>   - CA-00-7239 – Onshore plan. Exercise scheduled for 9/18/2025.
>     - 9/18/2024 Exercise. Received credit for multiple objectives
> - OSPR's contingency plan exercise program is outlined in Title 14, California Code of Regulations (CCR), Section 820.1.  The program establishes

8

exercise requirement tiers based upon plan holders largest Reasonable Worst-Case Spill (RWCS) volume.

  o For facilities, the regulations establish 10 objectives; objectives (1) and (2) must be successfully achieved annually. Any number of objectives (3) through (10) may be tested during an exercise, but over any consecutive three-year period all objectives in (3) through (10) must be tested and successfully achieved.

- FOR MORE INFORMATION: Contact Department of Fish and Wildlife Public Information Officer at  Steve.Gonzalez@wildlife.ca.gov or (916) 804-1714.

**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION (CAL FIRE): OFFICE OF THE STATE FIRE MARSHAL**
*Oversees and regulates the safety and operation of intrastate pipelines moving hazardous liquid in California.*

- FOCUS: Protecting public safety and spill prevention.
- ROLE & AUTHORITY: With other regulatory partners, inspects, regulates, and oversees the overall safety of hazardous liquid pipelines. Prior to restarting any pipeline, the State Fire Marshal must approve a thorough list of requirements and regulations, including Sable's proposed plans for using technology to minimize oil spill impacts, a detailed risk analysis, safety compliance reports, pipeline integrity evaluations, field verifications and maintenance plans, start-up and safety inspection plans, and waiver applications proving equal or greater levels of safety than required regulations.
- ACTIONS UNDERWAY:
  o CAL FIRE Office of the State Fire Marshal (OSFM) approved a risk analysis and implementation plan for Sable's use of best available technologies in 2021.
  o *On December 17, 2024*, OSFM submitted waivers for federal review.
    ▪ *On February 11, 2025,* PHMSA provided its notification of non-objection.
  o Sable has completed most of the required pipeline repairs, and OSFM has inspected the field work. OSFM must verify records of those repairs. OSFM has completed two additional PHMSA-required inspections since August 15; both inspections resulted in minor recommended suggestions and no significant findings.
  o All remaining oversight items, including approving the pressure testing results of lines and Sable's submission of an updated start-up plan, which OSFM must review and approve, remain open and must be completed prior to restarting the pipeline. Following Sable's submission to OSFM of the final start-up plan, OSFM will review the plan and provide recommendations for approval or denial of the plan.
  o *On June 2, 2025*, Center for Biological Diversity and Environmental Defense Center separately moved ex parte for temporary restraining orders in Santa Barbara County Superior Court to prevent OSFM from issuing authorizations or proceeding with restart of the Las Flores Pipeline System.  The Superior Court granted each petitioner's request for a temporary restraining order and the judge clarified from the

9

bench that the orders would stop not just approval of the restart plan, but all activity by CAL FIRE relating to Lines 324 and 325. The court set a hearing on the requests for preliminary injunction for July 18, 2025.

o *On July 18, 2025*, the court issued a preliminary injunction that allows OSFM to resume pipeline safety inspections on lines CA-324 and CA-325, as warranted.   The court's order contained several other requirements, including that the restart of the Las Flores Pipelines would remain enjoined until 10 court days after Sable filed a notice with the court indicating that Sable had received all necessary approvals and permits for restart of the Las Flores Pipelines and that Sable intended to restart the lines.  OSFM will continue to uphold the laws and the court orders related to this case as staff works to ensure actions taken by the operator to restart lines 324 and 325 meet all pipeline safety requirements under the purview of OSFM.

o *On September 11, 2025*, Sable submitted its updated restart plan to OSFM. These documents are currently under review by OSFM staff.

o *On October 22, 2025,* the State Fire Marshal sent a letter to Sable notifying the company of deficiencies in its compliance with the State Waivers, which prevent the restart of the pipelines.  OSFM continues to review the restart plan submitted by Sable in September and reserves its rights to provide additional direction or comment as part of that review.

o *On December 17, 2025*, OSFM was notified that PHMSA determined Lines CA-324 & CA-325, operated by Sable Offshore Corp. in Santa Barbara County, are interstate pipelines and thus within PHMSA's federal jurisdiction. In its decision, PHMSA indicated that it would assume regulatory authority of the lines going forward.

o *On December 22, 2025,* OSFM was notified that PHMSA approved Sable's Restart Plan for Lines CA-324 & CA-325.

o *On December 23, 2025,* PHMSA issued Emergency Special Permits to Sable that allow alternative safety measures in lieu of compliance with regulations relating to cathodic protection. These permits are similar in nature to the State Waivers issued by OSFM in December 2024 and consented to by PHMSA in February 2025, but contain a significant modification relating to pre-operation repairs.

- FOR MORE INFORMATION: Contact <u>CAL FIRE</u> Communications at calfire.dutypio@fire.ca.gov or (916) 651-FIRE (3473).

**CALIFORNIA DEPARTMENT OF PARKS AND RECREATION**
*Protecting and managing California state park land in areas where onshore pipelines are located.*

- FOCUS: Environmental protection, state-owned land stewardship.
- ROLE & AUTHORITY: The California Department of Parks and Recreation manages public land for public benefits in areas where onshore pipelines may cross. The Department may grant easements for pipelines on this property. Specifically, this would include an easement to accommodate a four-mile section for pipeline maintenance in Gaviota State Park. The previous 30-year easement expired in 2016. Since then, the Department has issued individual permits for accessing and maintaining the pipeline.
- ACTIONS UNDERWAY:

10

- o *On December 20, 2024*, the Department of Parks and Recreation sent a letter to Sable requesting a full project description to evaluate their request for an easement.
  - o The Department of Parks and Recreation evaluated a request to perform maintenance anomaly digs and associated repair work along a four-mile section of pipeline on State Parks property.
  - o *On May 9, 2025*, the Department of Parks and Recreation issued a Right of Entry Permit to Sable to perform the 18 anomaly digs within Gaviota State Park, with work to commence on May 12, 2025.
  - o *As of June 6, 2025*, the work authorized by the Right of Entry Permit is complete, except for some of the restoration requirements, including restoring San Julian Road, which provides access to a local elementary school and some park visitor access. The section of road is not within the Coastal Zone.
  - o *On June 27, 2025*, staff sent Sable a letter detailing the steps for submitting a complete easement application.
  - o As of *August 12, 2025*, Sable has sent an easement request package. State Parks is reviewing and working with Sable to provide any other information needed for State Parks' review.
  - o *On November 13, 2025*, State Parks informed Sable it will be preparing an Initial Study to determine the proper CEQA documentation for Sable's easement request at Gaviota State Park.
- FOR MORE INFORMATION: Contact [Department of Parks and Recreation](#) Communications at [newsroom@parks.ca.gov](mailto:newsroom@parks.ca.gov).

**CENTRAL COAST AND CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARDS**
*Protecting the state's water ways and drinking water.*

- FOCUS: Water quality and environmental public health.
- ROLE & AUTHORITY: The Central Coast and Central Valley Regional Water Quality Control Boards oversee water resources for the State of California within their respective jurisdictions, implementing the Clean Water Act and the Porter-Cologne Water Quality Control Act.  The Regional Water Boards regulate the discharge of waste, such as sediment, that could occur during pipeline repair or construction. This includes issuing permits for dredging and land disturbances, and discharges of waste and stormwater.
- ACTIONS UNDERWAY FOR CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD:
  - o *On December 13, 2024*, following an inspection, the Central Coast Regional Water Quality Control Board issued violation and non-compliance notices for unauthorized waste discharge into Santa Barbara County waterways, as well as a directive to seek permit coverage. Sable must take corrective action, submit a waste discharge report, and apply for appropriate permits.
  - o *On January 22, 2025*, the Central Coast Regional Water Quality Control Board issued Sable a directive to submit a technical report describing Sable's activities at all pipeline work locations and associated potential discharges to waterways. The technical report was due March 10, 2025.

- ▪ *On March 8, 2025,* Sable submitted an incomplete response to the Central Coast Regional Water Quality Control Board's January 22, 2025 directive to submit a technical report.
- ▪ *On April 15, 2025*, Sable submitted additional incomplete information in response to the Central Coast Regional Water Quality Control Board's January 22, 2025 directive to submit a technical report.
- o *On January 31, 2025,* Sable submitted an application for waste discharge requirements for its work at one waterway location.
  - ▪ *On March 20, 2025,* the Central Coast Regional Water Quality Control Board issued authorization to Sable to restore the one waterway location identified in its January 31, 2025 application.
- o On *February 28, 2025*, the Central Coast Regional Water Quality Control Board inspected additional project work locations discovered as a result of public complaints. Staff observed unauthorized work within waters of the state and discharges of waste to waters of the United States.
- o *On March 4, 2025,* Sable submitted two applications for coverage under the statewide permit for stormwater discharges associated with construction and land disturbing activities. The applications are under review.
- o *On March 13, 2025,* Sable submitted applications for waste discharge requirements for its work at four additional waterway locations.
  - ▪ On *June 2, 2025*, the Central Coast Regional Water Quality Control Board issued authorization to Sable to restore the four waterway locations identified in its March 13, 2025 applications.
- o *On April 7, 2025*, Central Coast Regional Water Quality Control Board staff notified Sable and the public that the Board will consider adopting a resolution to refer alleged violations of the California Water Code for potential civil judicial enforcement to the California Office of the Attorney General at a public hearing on April 17, 2025.
- o *On April 15, 2025*, the Central Coast Regional Water Quality Control Board issued a second notice of violation for unauthorized waste discharge into Santa Barbara County waterways and for failure to submit the technical report due on March 10, 2025.
- o *On April 16, 2025,* the Central Coast Regional Water Quality Control Board issued a second directive to seek permit coverage.
- o *On April 17, 2025*, at a public hearing, the Central Coast Regional Water Quality Control Board adopted a resolution referring alleged violations of the California Water Code for potential civil judicial enforcement to the California Office of the Attorney General.
- o *On May 27, 2025,* Central Coast Regional Water Quality Control Board staff inspected recently conducted work sites in Gaviota State Park and adjacent to the Park.
- o *On June 11, 2025,* Sable submitted a response disagreeing with assertions in the April 15, 2025 notice of violation.

12

- o *On July 24, 2025,* Central Coast Regional Water Quality Control Board issued a third notice of violation for Sable's continued failure to submit the technical report due on March 10, 2025.
- o On *August 19, 2025*, Sable submitted applications for waste discharge requirements for its work at nine additional waterway locations.
  - ▪ On *December 16, 2025*, the Central Coast Regional Water Quality Control Board issued authorizations to Sable to restore eight additional waterway locations identified in its August 19, 2025 applications.
- o On *September 30, 2025*, Sable resubmitted an application for waste discharge requirements for its work at one waterway location, to align its application for the location with the correct waste discharge requirements permitting mechanism. An application for this waterway location was previously submitted on August 19, 2025.
  - ▪ On *November 13, 2025*, the Central Coast Regional Water Quality Control Board issued authorization to Sable to restore the one waterway location identified in its September 30, 2025 application.
- o On *October 3, 2025,* the Central Coast Regional Water Quality Control Board filed a complaint against Sable in Santa Barbara Superior Court seeking civil penalties for Sable's alleged failure to comply with the Board's investigative order, failure to seek required permits after being so requested, and unlawful discharges of waste.
  - ▪ On *November 25, 2025*, Sable filed an answer to the complaint denying the key allegations in the complaint and asserting several affirmative defenses.
- ACTIONS UNDERWAY FOR CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARD:
  - o *On March 20, 2025*, Pacific Pipeline Company submitted an application to the Central Valley Regional Water Quality Control Board to obtain coverage under State Water Resources Control Board Order 2003-0003-DWQ, *Statewide General Waste Discharge Requirements for Discharges to Land with a Low Threat to Water Quality, for* a proposed discharge of approximately 6.1 million gallons of water used in hydrostatic testing of the Las Flores Pipeline System to a 20-acre agricultural area in Kern County.
  - o *On April 9, 2025*, the Central Valley Regional Water Quality Control Board issued a notice to Pacific Pipeline Company, which authorized the proposed discharge pursuant to State Water Resources Control Board Order 2003-0003-DWQ.
  - o *On June 6, 2025*, Pacific Pipeline Company sought authorization from the Central Valley Regional Water Quality Control Board to increase the discharge of water associated with hydrostatic testing authorized under State Water Resources Control Board Order 2003-0003-DWQ to 8.9 million gallon.
  - o *On July 8, 2025*, the Central Valley Regional Water Quality Control Board authorized Pacific Pipeline Company's request to increase the discharge authorized under State Water Resources Control Board Order 2003-0003-DWQ.
- FOR MORE INFORMATION: Contact the State Water Resources Control Board at opa@waterboards.ca.gov or (916) 341-5252.

13

**STATE LANDS COMMISSION**

*Oversees and approves leases for offshore pipelines, piers, and buoys.*

- FOCUS: Safety of offshore pipelines to shore, spill prevention, environmental protection.
- ROLE & AUTHORITY: Under the Public Resources Code, the State Lands Commission must review and approve assignment of leases from the current owner (ExxonMobil) to Sable for offshore pipelines from federal platforms to shore, piers, and mooring buoys. Per this role and overview, Sable could restart the pipelines only if the terms and requirements of the current lease and operating agreements are met. This includes Sable performing detailed inspections of the pipeline line (in-line inspections), pressure testing (called hydrotesting), and using remotely operated vehicles to monitor the pipeline.
- ACTIONS UNDERWAY:
    - Ongoing review of assignment of leases as of December 20, 2024, with the most recent discussion at the State Lands Commission on December 17, 2024.
    - *On May 9, 2025*, Staff issued a letter to Exxon and Sable stating that the inspections required by the Commission's leases, for the portion of the offshore pipelines in state waters, and under the Commission's jurisdiction, have been completed and reviewed. This is not directly related to the repair work on the onshore pipeline.
- FOR MORE INFORMATION: Contact the State Lands Commission External Affairs at ExternalAffairsChief.Public@slc.ca.gov or (916) 574-1992.

# EXHIBIT C

## Senate Bill No. 237

### CHAPTER 118

An act to amend Sections 8670.28 and 8670.37.51 of, and to add Section 51014.1 to, the Government Code, to add Section 43830.5 to the Health and Safety Code, and to amend Sections 25371 and 30262 of, to add Section 25371.4 to, and to add and repeal Section 21080.81 of, the Public Resources Code, relating to oil and gas.

[Approved by Governor September 19, 2025. Filed with Secretary of State September 19, 2025.]

LEGISLATIVE COUNSEL'S DIGEST

SB 237, Grayson. Oil spill prevention: gasoline specifications: suspension: California Environmental Quality Act: exemptions: County of Kern: transportation fuels assessment: coastal resources.

(1) The Lempert-Keene-Seastrand Oil Spill Prevention and Response Act generally requires the administrator for oil spill response, acting at the direction of the Governor, to implement activities relating to oil spill response, including emergency drills and preparedness, and oil spill containment and cleanup, and to represent the state in any coordinated response efforts with the federal government. Existing law requires the Governor to establish a California oil spill contingency plan that provides for an integrated and effective state procedure to combat the results of major oil spills within the state and that specifies state agencies to implement the plan. Existing law requires the administrator to adopt and implement regulations governing the adequacy of oil spill contingency plans to be prepared and implemented and requires the regulations to provide for the best achievable protection of coastal and marine waters. Existing law requires these regulations to permit the development, application, and use of an oil spill contingency plan for similar vessels, pipelines, terminals, and facilities within a single company or organization, and across companies and organizations. Existing law requires these regulations to ensure, among other things, standards for determining a reasonable worst case oil spill.

Under the act, the owner or operator of a facility where a spill could impact waters of the state is required apply for and obtain a certificate of financial responsibility issued by the administrator for the facility or the oil to be handled, stored, or transported by the facility.

This bill would require the administrator to publicly post a list of all applications for certificates of financial responsibility submitted by facility owners and operators on the internet website of the Office of Spill Prevention and Response and would require the posting to include specified information about applicants, including reasonable worst case spill volume of the facility to be covered by the certificate and the amount of financial responsibility

92

Ch. 118                    — 2 —

demonstrated, as provided. This bill would, commencing January 15, 2027, and at least once every 10 years thereafter, require the administrator to solicit public input regarding both (A) the appropriateness of the reasonable worst case spill volumes for facilities and (B) the appropriateness of the financial responsibility requirements for facilities. The bill would require the supervisor, based on this feedback, to review and, as appropriate, revise the criteria and formulas for (A) calculating reasonable worst case spill volume and (B) calculating the financial assurances and setting the maximum amount of a certificate of financial responsibility necessary to respond to an oil spill, as provided.

(2) The Elder California Pipeline Safety Act of 1981 requires the State Fire Marshal to administer provisions regulating the inspection of intrastate pipelines used for the transportation of hazardous liquid. A violation of the act is a crime.

This bill would prohibit the restarting of an existing oil pipeline that is 6 inches or larger that has been idle, inactive, or out of service for 5 years or more without passing a spike hydrostatic testing program that meets the requirements established by the State Fire Marshal, as provided. By expanding the scope of a crime, the bill would impose a state-mandated local program. The bill would require these tests to be performed by a qualified testing company, as provided. The bill would require the Office of the State Fire Marshal to promulgate regulations as necessary to implement these provisions. The bill would require the State Fire Marshal to post on its public internet website information fully characterizing the parameters and results of each hydrostatic spike test performed, subject to any information deemed confidential and proprietary, no less than 30 calendar days after each hydrostatic spike test is conducted.

(3) Existing law authorizes the State Air Resources Board (state board) to adopt and implement motor vehicle fuel specifications for the control of air contaminants and sources of air pollution. Existing law requires the state board to establish, by regulation, maximum standards for the volatility of gasoline, as provided. Pursuant to these authorizations, the state board has adopted the California Reformulated Gasoline regulations establishing California-specific gasoline specifications for various regions of the state at specified time periods. Existing regulations also prohibit a person from selling, offering for sale, supplying, offering for supply, or transporting California gasoline that exceeds the applicable cap limit for Reid vapor pressure within each of specified air basins during various defined regulatory periods throughout the year.

This bill would require the Governor to suspend those regulatory control periods on which gasoline exceeding the Reid vapor pressure may be sold or supplied for use in the state, if the Governor, in consultation with the state board and the State Energy Resources Conservation and Development Commission, determines the average retail gasoline price increased substantially or is projected to increase substantially within any 30-day period and a suspension is necessary to protect consumers in the state from extraordinary gasoline price increases and determines, in the Governor's

discretion, that suspension is prudent and unlikely to yield unintended consequences. The bill would require the Governor, in considering whether to suspend the regulatory control periods, to consider the air quality effects and options to mitigate those effects, if necessary and subject to available resources.

(4) Existing law requires the State Energy Resources Conservation and Development Commission (energy commission), on or before January 1, 2024, and every 3 years thereafter, to submit an assessment to the Governor and the Legislature that, among other things, identifies methods to ensure a reliable supply of affordable and safe transportation fuels in California and evaluates the price of transportation fuels, including branded and unbranded retail prices, alternate formulations of gasoline with lower carbon impact, and other products suitable for production from refineries in California, as provided.

This bill would require the next version of the above-described transportation fuels assessment to evaluate the cost and supply impacts of allowing the sale of gasoline with alternative specifications from the state board's gasoline specifications, as provided. The bill would require the energy commission to recommend a strategy to facilitate the sale of gasoline with those alternative specifications that, at a minimum, considers a trigger mechanism for when the gasoline with those alternative specifications may be sold, the existing variance process, and the use of a fee associated with the sale of the gasoline with those alternative specifications, as provided. The bill would additionally require the next version of this assessment to evaluate the development of westwide gasoline specification that could be used in a western region to include California and areas outside of California as an alternative to the California-specific specification in order to stabilize the petroleum market and petroleum prices in the western region, as provided. The bill would additionally require the energy commission, on or before March 31, 2026, to submit an assessment to the Governor and the Legislature that evaluates recommendations and strategies identified by the vice chair of the energy commission in a specified letter, and offers recommendations to the Legislature on potential changes to working group authorities or structures to support the state's reliable, equitable, safe, and affordable transition away from petroleum fuels.

(5) The California Environmental Quality Act (CEQA) requires a lead agency, as defined, to prepare, or cause to be prepared, and certify the completion of an environmental impact report on a project that it proposes to carry out or approve that may have a significant effect on the environment or to adopt a negative declaration if it finds that the project will not have that effect. CEQA also requires a lead agency to prepare a mitigated negative declaration for a project that may have a significant effect on the environment if revisions in the project would avoid or mitigate that effect and there is no substantial evidence that the project, as revised, would have a significant effect on the environment. CEQA prohibits a lead agency or a responsible agency from requiring the preparation of a subsequent or supplemental EIR unless one or more of 3 specified events occurs.

92

Ch. 118                               — 4 —

Existing law establishes the Geologic Energy Management Division in the Department of Conservation under the direction of the State Oil and Gas Supervisor, who is required to supervise the drilling, operation, maintenance, and abandonment of oil and gas wells in the state and the operation, maintenance, and removal or abandonment of tanks and facilities related to oil and gas production within an oil and gas field so as to prevent damage to life, health, property, and natural resources. Existing law requires the operator of a well to file a written notice of intention to commence drilling with, and prohibits any drilling until approval is given by, the supervisor or district deputy. Existing law prohibits the division from approving any notice of intention within a health protection zone, defined as the area within 3,200 feet of certain residential, educational, health care, detention, or business facilities, except approvals necessary for specified purposes. Existing law requires oil or gas production facilities or wells with a wellhead within a health protection zone to comply with specified health, safety, and environmental requirements, as provided.

This bill would, among other things, deem a specified County of Kern environmental impact report sufficient for full compliance with the requirements of CEQA for purposes of consideration and adoption of amended revisions to a specified County of Kern zoning ordinance, and would establish that this determination of full compliance shall be final and conclusive for purposes of reliance on that environmental impact report by any responsible agency, as provided. The bill would establish that projects that satisfy the requirements of that zoning ordinance and that are approved by the County of Kern under that ordinance are deemed sufficient for full compliance with CEQA and no further environmental review shall be required pursuant to CEQA. This bill would prospectively apply these provisions concerning CEQA compliance to any approvals by the County of Kern with respect to the permitting of oil and gas production operations under any adopted local ordinance and associated development. The bill would also apply these provisions prospectively and retroactively to any pending causes of action and claims for which no final nonappealable judgment has been entered, as provided.

The bill would prohibit the granting of approvals by the County of Kern or the Geologic Energy Management Division in reliance on that environmental impact report for any operation located in a health protection zone, regardless of whether the above-described prohibitions on health protection zones are enforceable. The bill would require the division to be the lead agency for projects in Kern County that include approval of a notice of intention to drill or rework an oil or gas well within 3,200 feet of specified types of buildings, to the extent such projects may be authorized by law. The bill would prohibit the division from approving more than 2,000 notices of intention to drill new wells in reliance on that environmental impact report as a responsible agency, unless the State Energy Resources Conservation and Development Commission makes a formal finding that additional permit issuance is necessary for in-state crude oil production to

92

supply 25% of in-state refinery feedstock demand, and that such production would likely help reduce costs for retail consumers of gasoline in the state.

The bill would repeal all of the above-described provisions concerning CEQA in the County of Kern on January 1, 2036.

To the extent a lead agency would be required to determine the applicability of some of the above-described exemptions and determinations of full compliance with CEQA, the bill would impose a state-mandated local program.

(6) The California Coastal Act of 1976 requires a person wishing to perform or undertake any development in the coastal zone to obtain a coastal development permit. The act encourages coastal-dependent industrial facilities to locate or expand within existing sites and requires that facilities be permitted reasonable long-term growth, as provided. The act specifies that new or expanded oil and gas development is not to be considered a coastal-dependent industrial facility and is to be permitted only if it is consistent with the act and meets certain requirements, including a requirement that oil produced offshore is to be transported onshore by pipeline using the best achievable technology, as defined, and onshore transport of the oil to processing and refining facilities by pipeline. The act applies the pipeline requirements on new or expanded oil extraction operations, and defines terms for these purposes, including the term "expanded oil extraction." The act authorizes the transport of the oil by other modes of transportation if certain conditions are met.

This bill would require the onshore transportation of the oil to processing and refining facilities to use the best available technology, as provided. The bill would repeal authorization for the use of alternative modes of transportation. The bill would revise the definition of "expanded oil extraction" to include reactivation of a facility idled, inactive, or out of service for more than 5 years, or an increase in oil extraction from the use of hydraulic fracturing, extended reach drilling, acidization, or other unconventional technologies.

The act authorizes the repair and maintenance of an existing oil and gas facility to be permitted as a coastal-dependent industrial facility if certain requirements are met.

The bill would require a person to obtain a new coastal development permit for the repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for 5 years or more.

Because the bill would impose additional duties on a local government with a certified local coastal program in processing and reviewing an application for a coastal development permit, this bill would impose a state-mandated local program.

(7) Existing constitutional provisions require that a statute that limits the right of access to the meetings of public bodies or the writings of public officials and agencies be adopted with findings demonstrating the interest protected by the limitation and the need for protecting that interest.

This bill would make legislative findings to that effect.

92

Ch. 118                                — 6 —

(8)  This bill would make legislative findings and declarations as to the necessity of a special statute for the County of Kern.

(9)  The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that with regard to certain mandates no reimbursement is required by this act for a specified reason.

With regard to any other mandates, this bill would provide that, if the Commission on State Mandates determines that the bill contains costs so mandated by the state, reimbursement for those costs shall be made pursuant to the statutory provisions noted above.

*The people of the State of California do enact as follows:*

SECTION 1.  The Legislature finds and declares all of the following:

(a)  In California, the success of the state's decarbonization strategies has moved the state's transportation sector from its early transition phase into the "mid-transition" phase, in which the state must simultaneously continue supporting the rapid expansion of a zero-emission and low-carbon transportation system while actively retiring the incumbent fossil fuel-based systems.

(b)  A letter from the State Energy Resources Conservation and Development Commission to Governor Newsom, published in June 2025, recommended that the state, "Implement a suite of policies and programs to ensure environmental, public health, labor, economic, and consumer protections for a successfully managed transportation fuels transition […] Proactive planning and resources will be necessary to prepare communities for a future without petroleum industry, including refineries, and to ensure that fossil fuel-related legacies do not cause new harm."

(c)  The state lacks explicit requirements for a refinery's closure or otherwise cessation of refining, despite the state now anticipating those closures.

(d)  The state has an interest in understanding its potential financial liabilities. Absent any firm assurances to remediate these lands after a refinery's eventual closure, the obligations to fund cleanup are likely to fall upon the state and, by extension, the taxpayers, causing hundreds of prime acres to remain in disuse and leach hazardous waste or contaminants into surrounding communities for years.

(e)  Refineries are major local employers and provide high-paying jobs to thousands of workers.

(f)  Communities located near refineries and oil and gas extraction infrastructure bear the brunt of pollution in the state and have disproportionate negative health outcomes.

(g)  The state should protect communities and assist workers in the transition through a holistic suite of policies to ensure the health and safety of the people of the State of California.

(h) It is the intent of the Legislature for the State Energy Resources Conservation and Development Commission to convene a working group that, at a minimum, includes representation from the State Air Resources Board, relevant local air districts, and any other state, local, or regional governmental entities that the commission deems appropriate to coordinate implementation of statutes, regulations, and additional authorities and provide recommendations to the Legislature on permitting changes and reforms to support the state's reliable, equitable, safe, and affordable transition away from petroleum fuels and the achievement of state climate and air quality goals and mandates.

(i) It is the intent of the Legislature to enact immediate measures to stabilize the transportation fuels market and to take future action to holistically address the mid-transition.

SEC. 2.  Section 8670.28 of the Government Code is amended to read:

8670.28.  (a)  The administrator, taking into consideration the facility or vessel contingency plan requirements of the State Lands Commission, the Office of the State Fire Marshal, the California Coastal Commission, and other state and federal agencies, shall adopt and implement regulations governing the adequacy of oil spill contingency plans to be prepared and implemented under this article. All regulations shall be developed in consultation with the Oil Spill Technical Advisory Committee, and shall be consistent with the California oil spill contingency plan and not in conflict with the National Contingency Plan. The regulations shall provide for the best achievable protection of the waters and natural resources of the state. The regulations shall permit the development, application, and use of an oil spill contingency plan for similar vessels, pipelines, terminals, and facilities within a single company or organization, and across companies and organizations. The regulations shall, at a minimum, ensure all of the following:

(1)  All areas of state waters are at all times protected by prevention, response, containment, and cleanup equipment and operations.

(2)  Standards set for response, containment, and cleanup equipment and operations are maintained and regularly improved to protect the resources of the state.

(3)  All appropriate personnel employed by operators required to have a contingency plan receive training in oil spill response and cleanup equipment usage and operations.

(4)  Each oil spill contingency plan provides for appropriate financial or contractual arrangements for all necessary equipment and services for the response, containment, and cleanup of a reasonable worst case oil spill scenario for each area the plan addresses.

(5) Each oil spill contingency plan demonstrates that all protection measures are being taken to reduce the possibility of an oil spill occurring as a result of the operation of the facility or vessel. The protection measures shall include, but not be limited to, response to disabled vessels and identification of those measures taken to comply with requirements of Division 7.8 (commencing with Section 8750) of the Public Resources Code.

(6) Each oil spill contingency plan identifies the types of equipment that can be used, the location of the equipment, and the time taken to deliver the equipment.

(7) Each facility, as determined by the administrator, conducts a hazard and operability study to identify the hazards associated with the operation of the facility, including the use of the facility by vessels, due to operating error, equipment failure, and external events. For the hazards identified in the hazard and operability studies, the facility shall conduct an offsite consequence analysis that, for the most likely hazards, assumes pessimistic water and air dispersion and other adverse environmental conditions.

(8) Each oil spill contingency plan contains a list of contacts to call in the event of a drill, threatened discharge of oil, or discharge of oil.

(9) Each oil spill contingency plan identifies the measures to be taken to protect the recreational and environmentally sensitive areas that would be threatened by a reasonable worst case oil spill scenario.

(10) (A) Standards for determining a reasonable worst case oil spill.

(B) Commencing January 15, 2027, and at least once every 10 years thereafter, in order to increase public participation, the administrator shall solicit public input regarding the appropriateness of the reasonable worst case spill volumes for facilities. Based on this feedback, the administrator shall review and, as appropriate, revise the criteria and formulas for calculating reasonable worst case spill volumes to reflect the best available information. If revisions are appropriate, the administrator shall initiate a rulemaking action pursuant to the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3), which includes a public notice and comment process.

(C) Notwithstanding subparagraphs (A) and (B), for a nontank vessel, the reasonable worst case is a spill of the total volume of the largest fuel tank on the nontank vessel.

(11) Each oil spill contingency plan specifies an agent for service of process. The agent shall be located in this state.

(12) The review and potential subsequent rulemaking action pursuant to paragraph (10) shall be combined with and be used to inform the review and potential subsequent rulemaking action pursuant to paragraph (3) of subdivision (d) of Section 8670.37.51, related to financial responsibility.

(b) The regulations and guidelines adopted pursuant to this section shall also include provisions to provide for public review and comment on submitted oil spill contingency plans.

(c) The regulations adopted pursuant to this section shall specifically address the types of equipment that will be necessary, the maximum time that will be allowed for deployment, the maximum distance to cooperating response entities, the amounts of dispersant, and the maximum time required for application should the use of dispersants be approved. Upon a determination by the administrator that booming is appropriate at the site and necessary to provide best achievable protection, the regulations shall require that vessels engaged in lightering operations be boomed prior to the commencement of operations.

(d)  The administrator shall adopt regulations and guidelines for oil spill contingency plans with regard to mobile transfer units, small marine fueling facilities, and vessels carrying oil as secondary cargo that acknowledge the reduced risk of damage from oil spills from those units, facilities, and vessels while maintaining the best achievable protection for the public health and safety and the environment.

SEC. 3.   Section 8670.37.51 of the Government Code is amended to read:

8670.37.51.  (a)  A tank vessel or vessel carrying oil as a secondary cargo shall not be used to transport oil across waters of the state unless the owner or operator has applied for and obtained a certificate of financial responsibility issued by the administrator for that vessel or for the owner of all of the oil contained in and to be transferred to or from that vessel.

(b)  An operator of a marine terminal within the state shall not transfer oil to or from a tank vessel or vessel carrying oil as a secondary cargo unless the operator of the marine terminal has received a copy of a certificate of financial responsibility issued by the administrator for the operator of that vessel or for all of the oil contained in and to be transferred to or from that vessel.

(c)  An operator of a marine terminal within the state shall not transfer oil to or from any vessel that is or is intended to be used for transporting oil as cargo to or from a second vessel unless the operator of the marine terminal has first received a copy of a certificate of financial responsibility issued by the administrator for the person responsible for both the first and second vessels or all of the oil contained in both vessels, as well as all the oil to be transferred to or from both vessels.

(d)  (1)  An owner or operator of a facility where a spill could impact waters of the state shall apply for and obtain a certificate of financial responsibility issued by the administrator for the facility or the oil to be handled, stored, or transported by the facility.

(2)  The administrator shall publicly post on the Office of Spill Prevention and Response internet website a list of all applications for certificates of financial responsibility submitted by facility owners and operators. The posting shall include the legal name of the applicant, the name and reasonable worst case spill volume of the facility to be covered by the certificate, the amount of financial responsibility demonstrated, and the type of evidence furnished to demonstrate the financial responsibility. The administrator shall post this information within seven business days of receiving an application.

(3) Commencing January 15, 2027, and at least once every 10 years thereafter, in order to increase public participation, the administrator shall solicit public input regarding the appropriateness of the financial responsibility requirements for facilities. Based on this feedback, the administrator shall review and, as appropriate, revise the criteria and formulas for calculating the financial assurances and setting the maximum amount of a certificate of financial responsibility necessary to respond to an oil spill to reflect the best available information, pursuant to the rulemaking requirements of the Administrative Procedure Act (Chapter 3.5

(commencing with Section 11340) of Part 1 of Division 3), which includes a public notice and comment process.

(e) Pursuant to Section 8670.37.58, nontank vessels shall obtain a certificate of financial responsibility.

SEC. 4.  Section 51014.1 is added to the Government Code, to read:

51014.1.  (a)  Any existing oil pipeline that is six inches or larger that has been idle, inactive, or out of service for five years or more, shall not be restarted without passing a spike hydrostatic testing program.

(b)  (1)  (A)  The hydrostatic spike test shall be at least 139 percent of the maximum operating pressure of the pipeline and shall not exceed 80 percent of the specific minimum yield strength, as determined appropriate by the State Fire Marshal.

(B)  Notwithstanding subparagraph (A), at the operator's request, the minimum hydrostatic spike test pressure may be lower than 100 percent of the specified minimum yield strength if the maximum operating pressure of the pipeline is correspondingly reduced.

(i)  Pursuant to this subparagraph the hydrostatic spike test shall be at least 139 percent of the reduced maximum operating pressure of the pipeline, as determined appropriate by the State Fire Marshal.

(ii)  The hydrostatic spike test shall be performed in segments to ensure every elevation point is tested.

(2)  If the specified minimum yield strength is unknown, the specified minimum yield strength shall be determined pursuant to Section 195.106(b) of Title 49 of the Code of Federal Regulations before performing the hydrostatic spike test.

(c)  The hydrostatic spike test shall be no more than 15 minutes, and be immediately followed by a hydrostatic test, which shall be held for a minimum of eight hours and meet the requirements of the State Fire Marshal.

(d)  The hydrostatic and hydrostatic spike test shall be performed in segments to ensure every elevation point is tested.

(e)  All tests shall be performed by a qualified testing company that is compliant with this chapter, as determined by the State Fire Marshal.

(f)  The Office of the State Fire Marshal shall promulgate regulations as necessary to implement this section.

(g)  The requirements of this section shall become operative upon the effective date of this statute.

(h)  The State Fire Marshal shall post on its public internet website information fully characterizing the parameters and results of each hydrostatic spike test performed, subject to any such information deemed confidential and proprietary, no less than 30 calendar days after each hydrostatic spike test is conducted pursuant to this section.

SEC. 5.  Section 43830.5 is added to the Health and Safety Code, to read:

43830.5.  Notwithstanding any other law, the Governor shall suspend the regulatory control periods under Section 2262.4 of Title 13 of the California Code of Regulations, during which gasoline exceeding the Reid vapor pressure limits in Title 13, Section 2262 of the California Code of Regulations may not be sold or supplied for use in the state, if the Governor,

92

in consultation with the State Energy Resources Conservation and Development Commission and the state board, determines the average retail gasoline price increased substantially or is projected to increase substantially within any 30-day period and a suspension is necessary to protect consumers in the state from extraordinary gasoline price increases and determines, in the Governor's discretion, that suspension is prudent and unlikely to yield unintended consequences. In considering whether to suspend the regulatory control periods, as described in this section, the Governor shall consider the air quality effects and options to mitigate those effects, if necessary and subject to available resources.

SEC. 6.   Section 21080.81 is added to the Public Resources Code, to read:

21080.81.   (a)   The Legislature finds and declares all of the following:

(1)   The Legislature recognizes the significance of oil and gas production in the County of Kern, while also affirming the state's commitment to protecting public health, safety, and environmental quality, particularly for communities located near oil and gas operations.

(2)   The County of Kern has adopted an oil and gas permitting ordinance, and in connection with that ordinance, has certified a Second Supplemental Environmental Impact Report (SSREIR) pursuant to this division. The County of Kern's SSREIR and oil and gas permitting ordinance impose comprehensive mitigations to address potential environmental impacts associated with oil and gas production.

(3)   Article 4.6 (commencing with Section 3280) of Chapter 1 of Division 3 establishes health protection zones to safeguard residents from the health risks associated with oil and gas extraction activities. The Geologic Energy Management Division's approval of a notice of intention under Section 3203 is required before drilling a new oil and gas well. Section 3281 prohibits approval of a notice of intention within a health protection zone absent certain limited exceptions. The Kern County SSREIR does not cover activities within a health protection zone.

(4)  Because the County of Kern's SSREIR does not cover activities within a health protection zone, the Geologic Energy Management Division is the lead agency under this division for projects that include permits to drill or rework an oil and gas well within a health protection zone in the County of Kern, to the extent that those activities might be allowed under Section 3281.

(b)   The Kern County Second Supplemental Recirculated Environmental Impact Report (SCH2013081079), including all appendices (SSREIR March 2025), is hereby deemed sufficient for full compliance with this division for purposes of consideration and adoption of amended Revisions to Title 19 - Kern County Zoning Ordinance Code 2025 (A), Focused on Oil and Gas Local Permitting by the County of Kern. No further environmental review is required under this division for the consideration and adoption of the Revisions to Title 19 - Kern County Zoning Ordinance Code - 2025 (A), Focused on Oil and Gas Local Permitting (SSREIR March 2025), as enacted as of January 1, 2026. Corrections of minor typographical errors and

formatting changes to the zoning ordinance version shall not require further environmental review. Any other modification to or readoption of the zoning ordinance, however, shall not be covered by this section but rather by the other provisions of this division.

(c)  Projects that satisfy the requirements of Revisions to Title 19 - Kern County Zoning Ordinance Code - 2025 (A), Focused on Oil and Gas Local Permitting, and that are approved by the County of Kern under that ordinance as enacted as of the effective date of this section, or as reenacted to incorporate corrections of minor typographical errors or formatting changes, are deemed sufficient for full compliance with this division and no further environmental review is required under this division, so long as the projects comply with Article 4.6 (commencing with Section 3280) of Chapter 1 of Division 3, as that article read on January 1, 2025.

(d)  This section applies prospectively to any approvals by the County of Kern with respect to the permitting of oil and gas production operations under any adopted local ordinance and associated development and also applies prospectively and retroactively to any causes of action and claims that are pending as of the effective date of this section, and for which no final nonappealable judgment has been entered before that date.

(e)  Notwithstanding Section 21166, the Legislature's determination in this section that the Kern County Second Supplemental Recirculated Environmental Impact Report (SCH2013081079), including all appendices (SSREIR March 2025), is sufficient for full compliance with this division and shall be final and conclusive for purposes of reliance on that report for its use by any responsible agencies. Reliance on use of that report by any responsible agency shall fully satisfy the responsible agency's obligations under this division and shall not be subject to challenge pursuant to Section 21166.

(f)  No approval may be granted by the County of Kern or the Geologic Energy Management Division in reliance on the Kern County Second Supplemental Recirculated Environmental Impact Report (SCH2013081079), including all appendices (SSREIR March 2025), with respect to any operation located in a health protection zone as defined in Section 3280, regardless of whether Section 3281 is enforceable or independently prohibits that approval.

(g)  The Geologic Energy Management Division shall be the lead agency under this division for projects in the County of Kern that include approval of a notice of intention under Section 3203 to drill or rework an oil gas well within 3,200 feet of a residence, educational facility, youth center, health care facility, live-in housing, or any building housing a business that is open to the public, to the extent those projects may be authorized by law. The measurement shall be made from the property line unless the building is more than 50 feet set back from the property line, in which case the measurement shall be made from the outline of the building footprint to 3,200 feet in all directions.

(h)  The Geologic Energy Management Division shall not approve more than 2,000 notices of intention per calendar year to drill new wells in reliance

on the Second Supplemental Recirculated Environmental Impact Report (SCH2013081079) as a responsible agency under this section, unless the State Energy Resources Conservation and Development Commission makes a formal finding that additional permit issuance is necessary for in-state crude oil production to supply 25 percent of in-state refinery feedstock demand, and that the production would likely help reduce costs for retail consumers of gasoline in the state.

(i) Because the Kern County Second Supplemental Recirculated Environmental Impact Report (SCH2013081079), including all appendices (SSREIR March 2025), analyzes activities only through the end of 2035, further environmental review is required to satisfy the lead agency's obligations under this division for any County of Kern ordinance on oil and gas permitting enacted on or after January 1, 2026, unless that ordinance only corrects minor typographical errors and formatting to the zoning ordinance referenced in subdivision (b).

(j) This section shall remain in effect only until January 1, 2036, and as of that date is repealed, unless a later enacted statute that is enacted before January 1, 2036, deletes or extends that date.

SEC. 7.  Section 25371 of the Public Resources Code is amended to read:

25371.  (a) (1) Notwithstanding Section 10231.5 of the Government Code, on or before January 1, 2024, and every three years thereafter, the commission shall submit an assessment to the Legislature, in accordance with Section 9795 of the Government Code, and to the Governor that does all of the following:

(A)  Identifies methods to ensure a reliable supply of affordable and safe transportation fuels in California. The assessment shall include estimates for the level of transportation fuels at the state level, and, to the extent feasible, at regional and local levels, and individual refineries if relevant, that should be held in reserve by refiners to prevent gasoline price spikes. The assessment shall consider all factors causing price fluctuations in retail gasoline prices when recommending adequate reserve levels. The commission shall consider all relevant evidence from any reasonably available source, including, but not limited to, information about imports, by amount, source, if known, and data received by the commission pursuant to existing laws, economic and business experts, and information from any local, state, and federal agencies. The commission shall transmit to the Legislature, in accordance with Section 9795 of the Government Code, any proposals it deems appropriate for mandatory reserve levels and the terms of a program to implement reserve levels.

(B) Evaluates the price of transportation fuels, including branded and unbranded retail prices, alternate formulations of gasoline with lower carbon impact, and other products suitable for production from refineries in California. This evaluation shall consider the market demand for these products at 3-, 7-, 10-, and 20-year intervals from the date of the assessment and shall rely on the most recent transportation forecasting and assessment activities conducted pursuant to Section 25304. This evaluation shall include both of the following:

Ch. 118                        — 14 —

(i)  An examination of whether branded fuel additives have any impact, and, if so, how much, on fuel efficiency and vehicle emissions.

(ii)  An assessment of the presence and availability of retail outlets, including monitoring changes in availability of retail outlets that contribute to increasing retail prices in local and regional areas.

(C)  Considers different levels of supply conditions and assesses the impact of potential refinery closures in California.

(D)  Includes an analysis of the impacts on production of refinery planned maintenance, unplanned maintenance, and turnaround. The assessment shall evaluate ways to manage necessary maintenance among the various facilities that would protect the health and safety of employees and the public, and minimize the impact of maintenance-related production losses. Notwithstanding any other law, the Department of Industrial Relations and Division of Occupational Safety and Health shall disclose to the commission, upon request, any information the department and division have received under Section 7872 of the Labor Code to ensure all aspects of refinery safety are incorporated into the assessment. All information designated confidential shall be treated as confidential by the commission.

(E)  Evaluates the utility and feasibility of alternative methods to maintain adequate supplies of transportation fuels, including delivery alternatives for fuel and components of refined fuel, such as delivery by rail, a publicly maintained strategic fuel reserve, and other solutions beyond the activities of refineries and petroleum market participants.

(F)  Proposes solutions to mitigate any impacts described in the assessment. The solutions shall include an assessment of the employment impacts and the cost and cost-effectiveness of any proposal, including cost impacts to all impacted sectors, both public and private. The assessment shall include recommendations and alternatives.

(G)  Beginning with the first assessment submitted after the effective date of this subparagraph, evaluates California's future petroleum product and crude oil import needs and identifies steps that can be taken to ensure that marine infrastructure and port facilities will be adequate to accommodate the efficient movement of petroleum products to meet those needs. In preparing the evaluation pursuant to this subparagraph, the commission shall consult with the ports in California at which petroleum and refined transportation fuels are imported, tanker terminal operators at California ports, the State Lands Commission, the California Coastal Commission, and the San Francisco Bay Conservation and Development Commission and evaluate ways to maximize the use of existing infrastructure and minimize cumulative pollution burdens.

(H)  Beginning with the first assessment submitted after the effective date of this subparagraph, evaluates the effects of state regulations on supplies of transportation fuels that the commission identifies may be causing supply constraints, or for which the commission believes alternative compliance pathways should be considered by state agencies to mitigate potential impacts on supply.

92

(I) In the first assessment submitted after the effective date of this subparagraph, evaluate the cost and supply impacts of allowing the sale of gasoline with alternative specifications from those in Subarticle 2 (commencing with Section 2260) of Article 1 of Chapter 5 of Division 3 of Title 13 of the California Code of Regulations to support a reliable and affordable supply of transportation fuels in California. If the evaluation finds that allowing the sale of gasoline with alternative specifications is likely to support a reliable and affordable supply of transportation fuels in California, the commission, in coordination with the State Air Resources Board, shall recommend a strategy to facilitate the sale of gasoline with those alternative specifications that, at a minimum, considers (i) a trigger mechanism for when the gasoline with those alternative specifications may be sold based on the conditions of the transportation fuels market, (ii) the existing variance process in Section 43013.2 of the Health and Safety code, and (iii) the use of a fee established pursuant to Section 43013.2 of the Health and Safety Code associated with the sale of gasoline with those alternative specifications to mitigate for any increase in emissions.

(J) (i) In the first assessment submitted after the effective date of this subparagraph, evaluate the development of a westwide gasoline specification that could be used in a western region to include California and areas outside of the state as an alternative to the California-specific specification established under Subarticle 2 (commencing with Section 2260) of Article 1 of Chapter 5 of Division 3 of Title 13 of the California Code of Regulations to stabilize the petroleum market and petroleum prices in the western region, including California. The commission, in coordination with the State Air Resources Board, shall conduct outreach to the western states, including the States of Arizona, Nevada, Oregon, and Washington, in furtherance of this evaluation.

(ii) The evaluation pursuant to this subparagraph shall assess the costs and benefits of each alternative specification, including economic impacts to the state and to consumers, labor impacts, public health impacts, and environmental impacts. In making this evaluation, the commission shall take into consideration the impacts of the state's electrification efforts and the requirements of the federal Clean Air Act (42 U.S.C. Sec. 7661 et seq.). The evaluation shall identify and recommend the alternative specification that would minimize the costs and maximize the benefits to the state.

(2) The first assessment shall include the evaluation of oil and gas extraction and refining that the State Air Resources Board outlined in the most recent update to the scoping plan prepared pursuant to Section 38561 of the Health and Safety Code.

(b) The assessment shall be separate from the report submitted pursuant to Section 25302 and shall be developed in a public process. The assessment shall be available to the public within the proceeding docket and shall be approved by a vote of the commission at its business meeting.

(c) The commission may enter into contracts to perform the assessment required by subdivision (a) and the contracts shall not require the review, consent, or approval of the Department of General Services or any other

state department or agency and do not need to comply with requirements under the State Contracting Manual or the Public Contract Code.

(d)  The Division of Petroleum Market Oversight shall provide input to and otherwise support other divisions of the commission in preparation of the assessment required by subdivision (a).

(e)  The Independent Consumer Fuels Advisory Committee established pursuant to Section 25373 shall provide input to the commission in preparation of the assessment required by subdivision (a).

SEC. 8.   Section 25371.4 is added to the Public Resources Code, immediately following Section 25371.3, to read:

25371.4.   The commission shall, on or before March 31, 2026, submit an assessment to the Legislature, in accordance with Section 9795 of the Government Code, and to the Governor that evaluates the recommendations and strategies put forward by the vice chair of the commission in the June 27, 2025, letter to Governor Newsom in order to, as described in that letter, "ensure that Californians have access to safe, affordable, and reliable transportation fuels and that petroleum refiners continue to see value in serving the California market..." The assessment shall also offer recommendations to the Legislature and the Governor on potential changes to working group authorities or structures, including on permitting changes and reforms, which may include one-stop-shop permitting, to support the state's reliable, equitable, safe, and affordable transition away from petroleum fuels.

SEC. 9.   Section 30262 of the Public Resources Code is amended to read:

30262.   (a)  New or expanded oil and gas development shall not be considered a coastal-dependent industrial facility for the purposes of Section 30260, and may be permitted only if found to be consistent with all applicable provisions of this division and if all of the following conditions are met:

(1)  The development is performed safely and consistent with the geologic conditions of the well site.

(2)  Activities related to that development are consolidated, to the maximum extent feasible and legally permissible, unless consolidation will have adverse environmental consequences and will not significantly reduce the number of producing wells, support facilities, or sites required to produce the reservoir economically and with minimal environmental impacts.

(3)  The development will not cause or contribute to subsidence hazards unless it is determined that adequate measures will be undertaken to prevent damage from that subsidence.

(4)  All oilfield brines are reinjected into oil-producing zones unless the Geologic Energy Management Division of the Department of Conservation determines to do so would adversely affect production of the reservoirs and unless injection into other subsurface zones will reduce environmental risks. Exceptions to reinjections will be granted consistent with the California Ocean Plan of the State Water Resources Control Board and where adequate provision is made for the elimination of petroleum odors and water quality problems.

(5) (A)  All oil produced offshore California shall be transported onshore by pipeline only. The pipelines used to transport this oil shall utilize the best achievable technology to ensure maximum protection of public health and safety and of the integrity and productivity of terrestrial and marine ecosystems.

(B) Once oil produced offshore California is onshore, it shall be transported to processing and refining facilities by pipeline that uses the best available technology pursuant to Section 51013.1 of the Government Code.

(C)  The following guidelines shall be used when applying subparagraphs (A) and (B):

(i)  "Best achievable technology," means the technology that provides the greatest degree of protection taking into consideration both of the following:

(I)  Processes that are being developed, or could feasibly be developed, anywhere in the world, given overall reasonable expenditures on research and development.

(II)  Processes that are currently in use anywhere in the world. This clause is not intended to create any conflicting or duplicative regulation of pipelines, including those governing the transportation of oil produced from onshore reserves.

(ii)  "Oil" refers to crude oil before it is refined into products, including gasoline, bunker fuel, lubricants, and asphalt. Crude oil that is upgraded in quality through residue reduction or other means shall be transported as provided in subparagraphs (A) and (B).

(iii)  Subparagraphs (A) and (B) shall apply only to new or expanded oil extraction operations. "New extraction operations" means production of offshore oil from leases that did not exist or had never produced oil, as of January 1, 2003, or from platforms, drilling islands, subsea completions, or onshore drilling sites, that did not exist as of January 1, 2003. "Expanded oil extraction" means an increase in the geographic extent of existing leases or units, including lease boundary adjustments, an increase in the number of well heads, reactivation of a facility idled, inactive, or out of service for more than five years, or an increase in oil extraction from the use of hydraulic fracturing, extended reach drilling, acidization, or other unconventional technologies, on or after January 1, 2003.

(6)  If a state of emergency is declared by the Governor for an emergency that disrupts the transportation of oil by pipeline, oil may be transported by a waterborne vessel, if authorized by permit, in the same manner as required by emergency permits that are issued pursuant to Section 30624.

(7)  In addition to all other measures that will maximize the protection of marine habitat and environmental quality, when an offshore well is abandoned, the best achievable technology shall be used.

(b) (1) Repair and maintenance of an existing oil and gas facility may be permitted in accordance with Section 30260 only if it does not result in expansion of capacity of the oil and gas facility, and if all applicable conditions of subdivision (a) are met.

Ch. 118 — 18 —

(2) Repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more shall be considered a new or expanded development requiring a new coastal development permit consistent with this section.

(3) Development associated with the repair, reactivation, or maintenance of an oil pipeline that has been idled, inactive, or out of service for five years or more requires a new coastal development permit consistent with this section.

(4) The commission or local government with a certified local coastal program shall review and approve, modify, condition, or deny the permit based on the requirements of this section.

(c) Where appropriate, monitoring programs to record land surface and near-shore ocean floor movements shall be initiated in locations of new large-scale fluid extraction on land or near shore before operations begin and shall continue until surface conditions have stabilized. Costs of monitoring and mitigation programs shall be borne by liquid and gas extraction operators.

(d) This section does not affect the activities of any state agency that is responsible for regulating the extraction, production, or transport of oil and gas.

SEC. 10.   The Legislature finds and declares that Section 4 of this act, which adds Section 51014.1 of the Government Code, imposes a limitation on the public's right of access to the meetings of public bodies or the writings of public officials and agencies within the meaning of Section 3 of Article I of the California Constitution. Pursuant to that constitutional provision, the Legislature makes the following findings to demonstrate the interest protected by this limitation and the need for protecting that interest:

The restrictions on information prescribed in Section 51014.1 of the Government Code are necessary to protect sensitive business information and trade secrets from public disclosure.

SEC. 11.   The Legislature finds and declares that a special statute is necessary and that a general statute cannot be made applicable within the meaning of Section 16 of Article IV of the California Constitution because of the unique circumstances concerning the County of Kern's oil and gas permitting ordinance.

SEC. 12.   No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because a local agency or school district has the authority to levy service charges, fees, or assessments sufficient to pay for the program or level of service mandated by this act or because costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

However, if the Commission on State Mandates determines that this act contains other costs mandated by the state, reimbursement to local agencies

and school districts for those costs shall be made pursuant to Part 7 (commencing with Section 17500) of Division 4 of Title 2 of the Government Code.

O

# EXHIBIT D

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



October 22, 2025

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:   STATE WAIVER REQUIREMENTS PRIOR TO RESTART OF LINES CA-324 AND CA-325A/B**

Dear Mr. Yearwood,

On December 17, 2024, the CAL FIRE - Office of the State Fire Marshal (OSFM) issued State Waivers for the above captioned pipelines. The Pipeline and Hazardous Materials Safety Administration (PHMSA) issued the concurrence with the terms of the State Waivers on February 11, 2025. Those State Waivers were issued in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

Sable sought the State Waivers to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection (CP) due to the shielding effects of the polyurethane foam and the polyethylene tape wrap surrounding the pipelines. It is critical to stress that a State Waiver prescribes alternative measures that provide an equal or greater level of safety than the required regulation. The OSFM granted the State Waivers on the condition that Sable complies with the specific requirements contained therein.

On September 11, 2025, Sable submitted a restart plan to OSFM for review and approval. OSFM's review of the restart plan is ongoing. During this process, OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart. Pursuant to item 9 in the State Waivers, Sable must repair all immediate and 180-day repair conditions prior to restart. Those conditions are further clarified in the sections titled "Immediate Repair Conditions" and "180-Day Repair Conditions." Most pertinent here is the 180-day repair condition language (see Condition 35 in the CA-324 State Waiver and Condition 36 in the CA-325A/B State Waiver) that includes "anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth." Footnotes 7 and 9 further

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Lance Yearwood
October 22, 2025
Page 2

clarify that remediation means "a permanent repair method." The State Waivers require all such anomalies to be remediated, including tool tolerance. According to OSFM records, Sable has not satisfied this condition in the State Waivers.

The above findings alone and the inconsistencies with the State Waiver requirements prevent restart under the law. The OSFM continues to review the restart plan submitted by Sable in September, and while OSFM is providing this initial notification of deficiency to Sable regarding the State Waiver requirements, OSFM may have further comment or requirements arising out of that review.

Sincerely,

DANIEL BERLANT
State Fire Marshal

cc:    James Hosler, OSFM, Assistant Deputy Director
       Alin Podoreanu, OSFM, Supervising Pipeline Safety Engineer
       Joshua Cleaver, CAL FIRE, Staff Counsel

# EXHIBIT E



November 26, 2025

Linda Daugherty
Acting Associate Administrator for Pipeline Safety
Pipeline and Hazardous Materials Administration (PHMSA)
United States Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590

*Via E-Mail and U.S. Mail*

Dear Ms. Daugherty,

Sable Offshore Corp. (Sable) is writing to notify the Pipeline and Hazardous Materials Safety Administration (PHMSA) of its determination that a pipeline facility that it operates on the Outer Continental Shelf (OCS) and in southern California constitutes an interstate pipeline facility under the Pipeline Safety Act (PSA). Consequently, Sable believes that PHMSA is the agency responsible for pipeline safety regulatory oversight on the portions of the pipeline facility that are subject to 49 C.F.R. Parts 194, 195 and 199. Sable requests from PHMSA concurrence with Sable's determination, as well as guidance on the orderly transition of regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

Sable shares PHMSA's commitment to pipeline safety and looks forward to working with the agency. Sable also notes that this transition only affects the interstate status of the subject pipelines, and will not otherwise change the regulatory classification of the pipelines. All portions of the pipelines that are currently subject to the pipeline safety regulations at 49 C.F.R. Parts 194, 195, and 199 will remain subject to those programs going forward.

**Background**

In 2024, Sable acquired certain assets, including, among other things, three offshore oil production platforms on the OCS off the coast of Santa Barbara, CA (Hondo, Heritage, and Harmony platforms), offshore subsea pipelines transporting oil from these platforms to onshore pipelines that, in turn, transport oil to the Las Flores Canyon facility to process crude oil for subsequent transportation, and onshore pipelines to transport oil from Las Flores Canyon to the Pentland Station terminal in Kern County, CA (Las Flores Pipeline). Sable operates all of these assets as part of a single system that moves crude oil from the OCS into California. Attachment A to this letter contains a map of these assets.

*Sable Offshore Corp.*
*Determination of Interstate Classification*
*November 26, 2025*

Prior to October 2022, Plains All American (Plains) owned and operated the Las Flores Pipeline (then-called Lines 901 and 903), and ExxonMobil owned the offshore platforms, subsea lines, and the Las Flores Canyon processing facility. Before 2016, Plains filed Interstate Commerce Act (ICA) tariffs with the Federal Energy Regulatory Commission (FERC) for Lines 901 and 903, and these pipelines were considered interstate pipelines subject to PHMSA's regulatory oversight. On February 12 and April 29, 2016, respectively, Plains cancelled these tariffs following the May 2015 release. On May 18, 2016, PHMSA sent a letter to OSFM indicating that, as a result of the cancelled tariffs, these pipelines were considered intrastate pipelines, subject to the regulatory jurisdiction of OSFM, pursuant to its state certification from PHMSA under 49 U.S.C. § 60105(a). The May 2016 letter indicated that the determination of intrastate status is "subject to change based on future events or newly-discovered facts."

**Interstate Classification**

Since PHMSA's May 2016 letter, there have been intervening events affecting the pipelines, which merit reassessment of the interstate versus intrastate status of these assets. As noted, Sable operates each of the offshore and onshore assets described above, which is distinct from the arrangement considered by PHMSA in 2016 where different, unrelated entities operated portions of the facility. Sable has determined that this pipeline facility is properly considered as an interstate hazardous liquid pipeline facility PSA, and therefore subject to PHMSA's exclusive regulatory authority under 49 U.S.C. § 60104(c).

This conclusion is based on applicable language from the PSA and PHMSA's hazardous liquid pipeline safety regulations at 49 C.F.R. Part 195. Under 49 U.S.C. § 60101(a)(5), a "hazardous liquid pipeline facility" is broadly defined as inclusive of "a pipeline, a right of way, a facility, a building, or equipment intended to be used in transporting hazardous liquid." The term "transporting hazardous liquid" is, in turn, defined at § 60101(a)(22) as "the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, in or affecting interstate or foreign commerce", but excludes, in relevant part, "onshore production, refining, or manufacturing facilities". Furthermore, the term "interstate or foreign commerce" is defined at § 60101(a)(8)(B) to mean, in the context of hazardous liquid, commerce between "a place in a State and a place outside that State."

Although PHMSA has generally considered the presence of a filed tariff to be an indicator of whether a line is interstate, PHMSA has recognized in Appendix A to its Part 195 regulations that there are certain situations in which a pipeline facility is interstate "despite the lack of a filing with FERC," providing specific examples of such circumstances. In one example, PHMSA stated that hazardous liquid pipelines that "originate[] on the Outer Continental Shelf" may be considered interstate pipeline facilities, regardless of whether the operator filed tariffs with FERC for them. See Part 195, Appendix A, Example 7.

As noted above, the assets that Sable operates include offshore lines connecting offshore production platforms to an onshore processing facility, as well as the Las Flores Pipeline. Collectively, these pipelines constitute a "pipeline facility" through which hazardous liquid

2

*Sable Offshore Corp.*
*Determination of Interstate Classification*
*November 26, 2025*

moves in transportation from its point of production on the OCS to the onshore Pentland Station terminal in California, and are not otherwise excluded in the PSA's definition of "transporting hazardous liquid."  As this pipeline facility originates on the OCS (which is located outside of California), and then travels within California, it constitutes commerce between a place in California and a place outside California and is thus properly considered as "interstate" pursuant to the PSA and Part 195, Appendix A.

**Transition of Regulatory Authority**

Sable seeks to coordinate with PHMSA to obtain concurrence with this determination and rescind the May 18, 2016 letter to OSFM, and to establish an orderly process to transition regulatory oversight over the pipeline facility from OSFM to PHMSA.  This includes, among other things, a framework for review of Sable's procedures, transitioning OSFM's December 17, 2024 State Waivers to federally administered special permits, review and approval of a Restart Plan submitted consistent with the 2020 Consent Decree in *U.S. et al v. Plains All American Pipeline, LP and Plains Pipeline, LP*, No. 20-cv-2415 (C.D. Cal.), as well as, more generally, Sable's performance of restart actions consistent with the applicable provisions of this Consent Decree.  Sable will provide all reasonable assistance to PHMSA in coordinating with OSFM to facilitate this transition.  Transition of regulatory oversight to PHMSA does not affect Sable's adherence to Part 195 or its performance of action items indicated in the Consent Decree.  Moreover, applicable injunctive measures specified in the Consent Decree, as well as the applicable requirements of the State Waivers, will be incorporated on a prospective basis into Sable's procedures, which are enforceable under Part 195.

Sable appreciates the positive working relationship it has developed with OSFM staff and looks forward to developing a similarly productive relationship with PHMSA going forward.

Sincerely,

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.

Cc:    Ben Fred (PHMSA)

3

*Sable Offshore Corp.*
*Determination of Interstate Classification*
*November 26, 2025*

ATTACHMENT A – Map of Assets Acquired by Sable



# EXHIBIT F

EX-99.1 2 sablelasflores_121725.htm EX-99.1



**U.S. Department
of Transportation**

1200 New Jersey Avenue SE
Washington, D.C. 20590

**Pipeline and Hazardous
Materials Safety
Administration**

December 17, 2025

Via Electronic Mail to: cflores@sableoffshore.com

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.
845 Texas Ave. Ste 2920
Houston, TX 77002

Re:  Determination of Interstate Classification

Dear Mr. Flores:

This responds to your letter of November 26, 2025 regarding the Las Flores Pipeline owned and
operated by Sable Offshore Corp. (Sable). Your letter notifies the Pipeline and Hazardous
Materials Safety Administration (PHMSA) that Sable has determined the pipeline to be an
interstate pipeline facility under the Pipeline Safety Act (PSA) and requests PHMSA transition
regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

As noted in your letter, portions of the Las Flores Pipeline (previously known as Lines 901 and
903) have been considered intrastate since 2016 and subject to regulatory oversight by OSFM
pursuant to its certification with PHMSA under 49 U.S.C. § 60105(a). Prior to 2016, Lines 901
and 903 were considered interstate and regulated by PHMSA. The classification change in 2016
corresponded to the pipelines' previous owner cancelling tariffs with the Federal Energy
Regulatory Commission (FERC). In 2024, Sable acquired Lines 901 and 903 and other assets
comprising the Las Flores Pipeline, including offshore pipelines transporting crude oil from the
Outer Continental Shelf (OCS) and an onshore processing facility at Las Flores Canyon. Sable
operates the Las Flores Pipeline assets as a single pipeline system transporting crude oil from the
OCS to the Pentland Station terminal in Kern County, California.

Upon receipt of your letter, PHMSA initiated a review of the Las Flores Pipeline. This review
included an on-site inspection on December 9 through December 11, 2025. OSFM
representatives accompanied PHMSA on the inspection. PHMSA also reviewed Sable's written
procedures and records and conducted field observations of the Las Flores facility, the pump
stations at Gaviota and Sisquoc, the control room in Santa Maria, and the offshore Harmony
platform. In addition, PHMSA reviewed the 2025 program inspections conducted by OSFM. For

2

the following reasons, PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline.

The PSA authorizes PHMSA to prescribe and enforce minimum safety standards for pipeline transportation and for pipeline facilities.[1] The PSA vests with PHMSA exclusive regulatory authority over interstate pipelines and preempts States from adopting or continuing in force safety standards for interstate pipelines.[2] With respect to intrastate pipelines, the PSA provides a State authority may regulate the intrastate pipelines within its borders upon submission to PHMSA of an annual certification.[3] Both the PSA and the Federal pipeline safety regulations define interstate and intrastate pipelines.[4] An interstate pipeline is a pipeline or part of a pipeline used to transport hazardous liquids in interstate or foreign commerce; an intrastate pipeline is a hazardous liquid pipeline that is not an interstate pipeline.

Determining whether a hazardous liquid pipeline is an interstate or intrastate pipeline requires a factual inquiry.[5] To assist in that determination, PHMSA adopted Appendix A to 49 CFR Part 195 providing a statement of agency policy and interpretation on the delineation between Federal and State jurisdiction.[6] In short, "if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility . . . then [PHMSA] will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." The absence of a FERC tariff generally means a pipeline is intrastate; however, in certain situations, PHMSA will consider a pipeline to be interstate despite the lack of a filing with FERC. Several examples of this are listed in Appendix A. As it relates to the Las Flores Pipeline, one example provides that a pipeline originating on the OCS will be considered an interstate pipeline even if the pipeline does not have a tariff with FERC.[7]

PHMSA's evaluation of the Las Flores Pipeline confirms that it transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California. Consistent with Appendix A, the Las

---

[1] 49 U.S.C. § 60101 et seq.

[2] 49 U.S.C. § 60104(c). *See* Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872, 878 (9th Cir. 2006) (discussing how the "PSA differentiates between the regulation of interstate and intrastate hazardous liquid pipelines.")

[3] 49 U.S.C. § 60105(a). OSFM has a certification with PHMSA to regulate intrastate hazardous liquid pipelines in California.

[4] 49 U.S.C. § 60101(a)(7), (a)(8)(B), (a)(10); 49 CFR § 195.2. *See* S. Pac. Pipe Lines Inc. v. DOT, 796 F.2d 539 (D.C. Cir. 1986) (finding PHMSA's definition of interstate and intrastate pipelines reasonable under the PSA).

[5] Transportation of Liquids by Pipeline, 46 Fed. Reg. 38,357, 38,359 (Jul. 27, 1981) (PHMSA's predecessor agency (hereafter PHMSA) explained that it had "reviewed examples of what it believes are the most frequent and likely configurations of liquid pipelines and pipeline facilities and considered various ways of cataloging or classifying them as either interstate or intrastate."); *see also* Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052, 1064 (9th Cir. 1987) (noting that whether the pipeline was interstate or intrastate turned on a disputed issue of fact).

[6] Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985).

[7] 49 CFR Part 195, App. A. "Example 7. Pipeline Company P operates a pipeline that originates on the Outer Continental Shelf. P does not file any tariff for that line with FERC. [PHMSA] will consider the pipeline to be an interstate pipeline facility."

3

Flores Pipeline is an interstate pipeline.[8] As portions of the Las Flores Pipeline were previously considered to be intrastate and regulated by OSFM, PHMSA is notifying OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA. Please direct further correspondence on this matter to Dustin Hubbard, Director, Western Region, Office of Pipeline Safety, PHMSA, at (720) 963-3183.

Sincerely,

LINDA GAIL DAUGHERTY
Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.17 07:56:55 -05'00'

Linda Daugherty
Acting Associate Administrator for Pipeline Safety


cc:   James Hosler, Chief, Pipeline Safety Division, OSFM
      Varun Shekhar, Shareholder, Babst Calland Clements & Zomnir, PC

---

[8] PHMSA regulations consider the Las Flores Pipeline to be an "active" pipeline. *See* Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")

## PROOF OF SERVICE

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On January 6, 2026, I served the above document(s) described as **DECLARATION OF JULIE TEEL SIMMONDS IN SUPPORT OF PETITIONERS AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S EX PARTE APPLICATION FOR ORDER SHORTENING TIME FOR NOTICE OF MOTION AND MOTION FOR RECONSIDERATION (VOL. 1 OF 4)** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒    **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 6, 2026, at Santa Barbara, California.

_____
Jeremy M. Frankel

**SERVICE LIST**

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>Myung Park<br>Myung.Park@doj.ca.gov<br>Matthew Bullock<br>Matthew.Bullock@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEYS FOR<br>RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
1/6/2026 9:43 PM
By: Terri Chavez , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 884-7100
*Attorneys for Petitioners/Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

Linda Krop (Bar No. 118773)
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
Tara C. Rengifo (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152
*Attorneys for Petitioners/Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><hr>SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation; and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br>[Consolidated with Case No. 25CV02247]<br><br>**DECLARATION OF JULIE TEEL SIMMONDS IN SUPPORT OF PETITIONERS AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S EX PARTE APPLICATION FOR ORDER SHORTENING TIME FOR NOTICE OF MOTION AND MOTION FOR RECONSIDERATION (VOL. 2 OF 4)**<br><br>[Filed Concurrently with Opposition, Request for Judicial Notice, and [Proposed] Order]<br><br>Date:      January 7, 2026<br>Time:      10:00 a.m.<br>Dept.:     4<br>Judge:    Honorable Donna D. Geck<br><br>Action Filed: April 15, 2025<br>Case No. 25CV02247 |

1

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit coproration and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><hr>SABLE OFFSHORE CORP., a Delaware Corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,<br><br>Real Parties in Interest. | Case No. 25CV02247<br>[Consolidated with Case No. 25CV02244] |

2

# EXHIBIT G



December 19, 2025

<u>VIA ELECTRONIC MAIL</u>

Linda Daugherty
Acting Associate Administrator for Pipeline Safety
Pipeline and Hazardous Materials Safety Administration (PHMSA)
US Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

**RE:    *Application for Emergency Special Permit
        Sable Offshore Corp.***

Dear Ms. Daugherty,

Sable Offshore Corp. (Sable) respectfully submits this Application for Emergency Special Permit pursuant to 49 U.S.C. § 60118(c)(2) and 49 C.F.R. § 190.341(g).  As part of this Application, Sable requests that PHMSA issue an Emergency Special Permit covering two pipeline segments (Lines CA-324 and CA-325) that together, constitute the Las Flores Pipeline, which is part of an interstate pipeline facility that Sable operates from the Outer Continental Shelf (OCS) off the coast of Santa Barbara, California to Kern County, California, known as the Santa Ynez Pipeline System (SYPS).  The Application seeks waiver of certain PHMSA regulations under 49 C.F.R. Part 195 to implement Appendix B, Article I.1.A of a Consent Decree issued in Civil Action No. 2:20-CV-02415 in the US District Court for the Central District of California.

Sable is committed to pipeline safety and is proposing to comply with substantial alternative measures that provide an equivalent, if not greater, measure of safety as compared to the base requirements under Part 195.  These measures include, but are not limited to, significantly increased frequency of In-Line Inspection (ILI) tool runs and more stringent anomaly repair criteria.  Moreover, Sable is proposing substantially the same measures in this Application that have already been reviewed and approved by the California Office of the State Fire Marshal (OSFM) through issuance of State Waivers dated December 17, 2024 granting waiver of the same standards for CA-324 and 325, at a time when these pipelines were considered intrastate. As part of the State Waiver process, PHMSA has also evaluated and approved the State Waivers pursuant to its federal oversight authority in 49 U.S.C. § 60118(d) by issuing letters of no-objection to OSFM on February 11, 2025.[1]

---

[1] See Docket Nos. PHMSA-2025-0002 and PHMSA-2025-0003.

Sable seeks this Emergency Special Permit from PHMSA due in part to Sable's November 26, 2025 determination, and PHMSA's December 17, 2025 concurrence of Sable's determination that Lines CA-324 and 325 (formerly known as Lines 901 and 903, respectively) are properly classified as interstate pipeline segments that are part of the interstate SYPS pipeline facility. By operation of 49 U.S.C. § 60104(c), the SYPS is subject exclusively to PHMSA's regulatory oversight in regards to pipeline safety.  As a result, and for the additional reasons provided in this application (including the existence of a national energy emergency as determined by the President), Sable respectfully requests that PHMSA issue a special permit on an expedited basis to replace the December 17, 2024 State Waivers issued by OSFM for CA-324 and 325.  Sable has patterned its application on Pacific Pipeline Company's July 10, 2023 applications for state waivers, with updates to reflect substantial integrity-related work completed since those applications were filed.

Recognizing that an Emergency Special Permit, if granted, is temporary, Sable is also preparing an application for a non-emergency Special Permit.

Below please find the information specified in 49 C.F.R. § 190.341 in support of this Application:

**(1)** **_The name, mailing address, and telephone number of the applicant and whether the applicant is an operator;_**

Sable Offshore Corp. PPC (Operator ID #40881)
Attn: Lance Yearwood
845 Texas Avenue
Suite 2800
Houston, TX 77002
(713) 579-8118

**(2)** **_A detailed description of the pipeline facilities for which the special permit is sought, including:_**

   **(i)** **_The beginning and ending points of the pipeline mileage to be covered and the Counties and States in which it is located_**

Sable operates the SYPS pipeline facility that encompasses, among other things, a Part 195-regulated emulsion line that transports oil from offshore oil production platforms to the Las Flores Canyon Processing Facility (LFC), LFC, and the Las Flores Pipeline, consisting of Part 195-regulated Lines CA-324 and CA-325.  A special permit is sought specifically for two pipelines that are part of Sable's SYPS pipeline facility: Lines CA-324 and CA-325.  Line CA-325 can be further divided into two segments: CA-325A and CA-325B.   Table 2-1 summarizes relevant information.  A map of the pipeline system is included as **_Attachment A_** and further details about these pipelines are below:

**Table 2-1: Pipelines Applicable to Emergency Special Permit Application**

| Pipeline Facility Name | Pipeline Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|---|
| SYPS | CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| SYPS | CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| SYPS | CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

### a. Description of Lines CA-324 and 325

The CA-324 24-inch pipeline segment (formerly referred to as Line 901) is approx. 10.86 miles in length and generally parallels U.S. Highway 101 along the south coast between the Las Flores Canyon consolidated oil and gas processing facility and the Gaviota Station.  This pipeline segment is located north of U.S. 101 and generally follows powerline and/or natural gas pipeline rights-of-way across coastal terraces and incised canyons.

The CA-325A 30-inch pipeline segment (formerly referred to as Line 903 – Gaviota to Sisquoc) is approx. 38.72 miles in length.  This pipeline segment extends west from the Gaviota Station to an MOV located east of Gaviota Creek and U.S. Highway 101.  It then enters Gaviota State Park approx. 0.5 miles east of U.S. Highway 101 and extends westerly across the gently sloping coastal terrace and Cañada del Barro before dropping into the Cañada de la Gaviota drainage area.  It then crosses U.S. Highway 101 and Gaviota Creek (Cañada de la Gaviota) immediately south of the U.S. Highway 101  "Caltrans" rest stop area.  The pipeline segment then extends west and north from the Gaviota Creek MOV.

CA-325A continues west up a broad spur ridge to the ridge crest and the westerly boundary of Gaviota State Park.  The pipeline segment traverses narrow ridge crests, crosses out of the Park and onto Hollister Ranch for approx. 0.5 miles, and then crosses back into the Park before descending toward the west fork of Gaviota Creek (Betty Creek).  The right-of-way passes west of the Vista del Mar School and Las Cruces Adobe and then crosses beneath Highway 1 west of its intersection with U.S. Highway 101.  The pipeline segment continues northward along the west side of U.S. Highway 101 through the Santa Ynez Mountains.  It crosses long expanses of grasslands across the Las Cruces Ranch and steep walled canyons that form part of the Nojoqui Creek watershed.  North of Moonshine Creek, the route crosses ridges with rock outcroppings.

3

The pipeline crosses beneath the Santa Ynez River west and south of Buellton and continues north across the Purisima and Solomon Hills.  It crosses the northern edge of the San Rafael Mountains and the eastern edge of the Santa Maria Valley.  The pipeline segment crosses beneath the Sisquoc River and continues north across the River Valley.  It traverses moderately to severely sloping foothills at Kelly Canyon and extends west to the Sisquoc Station at the southern end of Santa Maria Canyon.

The CA-325B 30-inch pipeline segment (formerly referred to as Line 903 – Sisquoc to Pentland) is approx. 74.84 miles in length.  The pipeline segment follows Santa Maria Canyon after leaving the Sisquoc Station.  It then extends northeast towards Tepusquet Road.  The route crosses relatively gentle terrain until it reaches the crest of the Sierra Madre Mountains where it traverses steep slopes approaching Suey Canyon and Buckhorn Canyon.  The pipeline segment follows the northern edge of the Sierra Madre Mountains south of State Highway 166 through the Los Padres National Forest.  The route crosses rugged terrain across the crests of the Sierra Madre Mountains, descends the mountains, crosses the Sierra Madre Ridge Road, and enters the Cuyama River Valley near Gypsum Canyon.  At the Cuyama River crossing, CA-325B exits Santa Barbara County and enters San Luis Obispo County. The pipeline segment continues for approx. 44.5 miles through ranch land, terminating at the Pentland Station in Kern County.

Table 2-2 indicates High Consequence Areas (HCAs) along the Lines CA-324 and 325.

**TABLE 2-2: HIGH CONSEQUENCE AREA SUMMARY**

| Pipeline Segment Designation | Total Mileage | High Consequence Area (HCA) Type |
|---|---|---|
| CA-324 | 10.86 | Impact to ecologically sensitive regions (coastline) |
| CA-325A | 38.72 | Impact to the city of Buellton (population center, drinking water), and ecologically sensitive regions |
| CA-325B | 74.84 | Impact to ecologically sensitive regions |

Lines CA-324 and 325 traverse multiple Counties as well as State and Federal land. Approximate mileage is included in Table 2-3, below.

4

**TABLE 2-3: JURISDICTIONAL MILEAGE**

| | Jurisdiction | CA-324 (miles) | CA-325A (miles) | CA-325B (miles) | Total (miles) |
|---|---|---|---|---|---|
| **County** | Santa Barbara County | 10.9 | 38.7 | 23.8 | 73.4 |
| | San Luis Obispo County | 0 | 0 | 37.2 | 37.2 |
| | Kern County | 0 | 0 | 13.8 | 13.8 |
| | Total | 10.9 | 38.7 | 74.8 | 124.4 |
| **Sub-Jurisdiction (Note 1)** | California State Parks and Recreation (Gaviota State Park) | 0 | 4.1 | 0 | 4.1 |
| | U.S. Forest Service | 0 | 0 | 6.3 | 6.3 |
| | U.S. Fish and Wildlife (Bitter Creek Wildlife Refuge) | 0 | 0 | 4.5 | 4.5 |
| | California Dept. of Fish and Wildlife (Carrizo Plain Ecological Reserve) | 0 | 0 | 4.5 | 4.5 |
| | Bureau of Land Management | 0 | 0 | 1.0 | 1.0 |
| | City of Buellton | 0 | 1.1 | 0 | 1.1 |
| | Total | 0 | 5.2 | 16.3 | 21.5 |

*Note 1: Mileage included in County jurisdiction*

**(ii)** *<u>Whether the pipeline is interstate or intrastate and a general description of the right-of-way including proximity of the affected segments to populated areas and unusually sensitive areas</u>*

The SYPS pipeline facility that Sable operates, including segments CA-324 and 325 that are parts of the SYPS, are all interstate.  CA-324 and 325 have potential to impact High Consequence Areas (HCAs), including unusually sensitive areas.  A map of the pipeline facility is included as Attachment A and further details about CA-324 and 325 and its right-of way are provided above.

### (iii) *Relevant pipeline design and construction information including the year of installation, the material, grade, diameter, wall thickness, and coating type;*

### a. *Pipeline Design and Construction Information*

Line CA-324 is manufactured of low carbon steel.  It contains predominantly 0.344-inch nominal wall thickness, high frequency electric resistance welded (HF-ERW) API 5L X65 pipe manufactured in 1985 and 1986 by Nippon Steel Corp., Hikari Works mill, in Japan using plate steel with UOE pipe forming process.  A summary of CA-324 line pipe specifications is included in Table 2-4.

CA-325A/B is manufactured of low carbon steel.  It contains various grades and wall thicknesses of double submerged arc welded (DSAW) API 5L pipe manufactured between 1984 and 1986, from a variety of mills in Belgium, Brazil, France, Germany, and Israel, summarized in Table B-4.  Additionally, it includes small portions of replaced sections with newer pipe, including HF-ERW.  A summary of CA-325A/B line pipe specifications is included in Table 2-4.

**TABLE 2-4: LINE PIPE SPECIFICATIONS**

| Pipeline Segment Designation | Outside Diameter (in) | Nominal Wall Thickness (in) | Grade | Seam Type | Year Installed | Length (mi) |
|---|---|---|---|---|---|---|
| CA-324 Las Flores Canyon to Gaviota | 24 | 0.344 | X65 | HF-ERW | 1990 | 10.69 |
| | 24 | 0.375 | X65 | HF-ERW | 1990 | 0.02 |
| | 24 | 0.5 | X60 | HF-ERW | 1990 | 0.16 |
| CA-325A Gaviota to Sisquoc | 30 | 0.281 | X70 | DSAW | 1986 | 21.85 |
| | 30 | 0.344 | X65 | DSAW | 1986 | 12.47 |
| | 30 | 0.375 | X65 | DSAW | 1986 | 2.27 |
| | 30 | 0.375 | X65 | DSAW | 2014 | 0.12 |
| | 30 | 0.406 | X65 | DSAW | 1986 | 0.38 |
| | 30 | 0.406 | X65 | HF-ERW | 2000 | 0.03 |
| | 30 | 0.438 | X70 | DSAW | 1986 | 0.17 |
| | 30 | 0.5 | X60 | DSAW | 1986 | 0.75 |
| | 30 | 0.5 | X70 | DSAW | 1986 | 0.28 |
| | 30 | 0.562 | X65 | DSAW | 1986 | 0.06 |
| | 30 | 0.75 | X65 | DSAW | 1986 | 0.35 |
| CA-325B Sisquoc to Pentland | 30 | 0.281 | X70 | DSAW | 1986 | 19.29 |
| | 30 | 0.344 | X65 | DSAW | 1986 | 17.03 |
| | 30 | 0.344 | X65 | DSAW | 2007 | 0.24 |
| | 30 | 0.375 | X65 | DSAW | 1986 | 12.88 |
| | 30 | 0.375 | X70 | DSAW | 2017 | 0.16 |
| | 30 | 0.375 | X70 | DSAW | 2018 | 0.02 |
| | 30 | 0.406 | X65 | DSAW | 1986 | 0.12 |
| | 30 | 0.438 | X70 | DSAW | 1986 | 24.41 |
| | 30 | 0.5 | X60 | DSAW | 1986 | 0.13 |
| | 30 | 0.5 | X70 | DSAW | 1986 | 0.28 |
| | 30 | 0.625 | X65 | DSAW | 1986 | 0.01 |
| | 30 | 0.75 | X70 | DSAW | 1986 | 0.27 |

*b. Coating*

Lines CA-324 and 325 are externally coated with the following coating system as illustrated in Figure 2-5:
- Coal tar urethane (CTU) coating in intimate contact with the steel pipe
- Layer of rigid thermal polyurethane (PU) foam insulation
- Outer layer of polyethylene (PE) tape wrap

**FIGURE 2-5: EXTERNAL COATING SYSTEM DIAGRAM**



Shrink sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at original construction pipeline field joints.  The use of the PU foam and PE tape was selected at the time of original construction to minimize heat loss of the crude oil within the pipeline during transit.  The pipeline segments have an impressed-current cathodic protection (CP) system that was energized at the time of installation.  The CP system consists of active rectifiers at Las Flores Canyon Station, Gaviota Station, and Sisquoc Station, a critical bond and new, deep well anode bed at Pentland, as well as over 140 test stations across the entire CA-324 and CA-325A/B pipeline segments.  The PU insulation and PE tape wrap has the ability to shield the cathodic protection.  As a result, the CP current may not reach the pipe surface to arrest corrosion in the limited instance the CTU coating becomes disbonded.  As a result, despite ongoing operation of the cathodic protection system in compliance with applicable regulations, the pipeline remains at risk of corrosion under insulation (CUI).

The CP system remains active and provides a level of external corrosion deterrence, and it is highly effective on portions of the pipeline without insulation (e.g. fusion bonded epoxy (FBE) and epoxy-coated regions).  Cathodic protection has and will continue to be implemented, tested, and maintained on the pipeline at appropriate levels and in compliance with applicable regulations.  Additionally, the use of modern, advanced in-line inspection technologies, along with explicit integrity management programs and procedures for robust characterization, validation, and criteria for anomaly repair support supplemental integrity management steps that exceed regulatory corrosion protection requirements and enable safe, responsible operation.  Comprehensive conditions for effective management of the threat of external corrosion are described in subsequent sections in this Application.

    *(iv)*   ***Relevant operating information including operating, leak history, and most recent testing or assessment results;***

**a.  *Operating Information and Leak History***

Lines CA-324 and 325 were previously owned and operated by Plains All American Pipeline LP to transport crude oil, and were formerly known as Lines 901 and 903, respectively.  These pipeline segments have remained under "active" status pursuant to PHMSA's Part 195 regulations,[2] but have not transported crude oil since May 19, 2015.

Prior to May 19, 2015, there were no releases from CA-324 or 325 which met reportable criteria under PHMSA's Part 195 standards.  On May 19, 2015, CA-324 (then known as Line 901) experienced a release on a section of buried pipe.  PHMSA's Failure Investigation Report (May 2016) attributed the rupture of the pipeline to "progressive external corrosion of the insulated, 24-inch diameter steel pipeline."  PHMSA's findings indicate that the direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released crude oil.  PHMSA's investigation identified the following categories of contributory causes:

1. Ineffective protection against external corrosion of the pipeline
   - The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.
   - The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.

2. Failure to detect and mitigate the corrosion
   - The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

Subsequently, PHMSA issued Corrective Action Orders (CAOs) to the operator (Plains).  On October 14, 2020, a Consent Decree was entered by the United States District Court for the Central District of California.

In October 2022, Pacific Pipeline Company (PPC), then a subsidiary of ExxonMobil, acquired CA-324 and 325 from Plains.  In 2024, Sable acquired PPC, and currently serves as the designated operator of CA-324 and 325, as well as other components of the SYPS pipeline facility.

Maximum Operating Pressure (MOP) information for CA-324 and 325 is provided in Tables 2-6 and 2-7.

---

[2] See Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")  See also, PHMSA December 17, 2025 Determination of Interstate Classification, p.3, n.8, confirming active status of Las Flores Pipeline.

**TABLE 2-6: SUMMARY OF MOP BASIS**

| Pipeline Designation | Explanation of MOP Basis |
|---|---|
| CA-324 | 100 psi above max steady-state & transient pressure profile |
| CA-325A | 100 psi above max steady-state & transient pressure profile |
| CA-325B | 50 psi above max steady-state & transient pressure profile for Mile Post 49.57 to Mile Post 107.55. 80% of hydrostatic test pressure and 72% SMYS based upon the low elevation point (663 ft) at Mile Post 121.91 for Mile Post 107.55 to Mile Post 124.42 |

**TABLE 2-7: DOCUMENTED MOP and %SMYS**

| Pipeline Designation | %SMYS | Documented MOP (psig) |
|---|---|---|
| CA-324 | 55.8% | 1003 |
| CA-325A | 69.3% | 1000 |
| CA-325B (MP 49.57-107.55) | 71.5% | 1292 |
| CA-325B (MP 107.55-124.42) | 72.0% | 1170 |

b.  ***Most Recent Testing and Assessment Results***

*i.        Hydrostatic Testing*

CA-324 was originally hydrostatically pressure-tested on November 25, 1990 to 1765 pounds per square inch gauge (psig), as calculated at the highest elevation.  CA-325A was originally hydrostatically pressure-tested in nine separate segments between pressures of approx. 778 to 1757 psig, as calculated at the highest elevations of each segment, between October 14, 1986 and December 3, 1986.  CA325B was originally hydrostatically pressure-tested within eleven separate segments between pressures of 686 to 1753 psig, as measured at the highest elevations of each segment, between January 13, 1986 and November 8, 1986.  Portions of pipe replaced after original construction hydrotest were tested at or above the originally established test pressure and established maximum operating pressure (MOP) prior to being placed into service.

Sable hydrostatically pressure-tested Lines CA-324 and 325 from March 30 through May 27, 2025, dividing the lines in 8 segments.  Lines CA-324 and CA-325A were spike-tested as well to 150% and 139% of MOP, respectively.

A summary of the percent of specified minimum yield strength (% SMYS) and the corresponding MOP, as established by the construction hydrotest records, is included above in Table 2-7.  A summary of hydrotest records by segment are included in Table 2-8.

**TABLE 2-8: HYDROSTATIC TEST SUMMARY**

| Pipeline Segment | Location | Date | Begin Station | End Station | Type | High Point Min Pressure (psig) | Low Point Max Pressure (psig) | Elevation Adjusted MOP (psig) (Note 1) |
|---|---|---|---|---|---|---|---|---|
| CA-324 | Las Flores Sta | 5/12/25 | 0+00 | 573+75 | Spike (150%) | 1166 | 1514 | 1003 |
| | | | | | 8-hour (125%) | 915 | 1264 | 1003 |
| CA-325A | Gaviota Sta | 5/27/25 | 554+21 | 1337+21 | Spike (139%) | 872 | 1400 | 1000 |
| | | | | | 8-hour (125%) | 730 | 1260 | 1000 |
| | MP 25.71 | 3/30/25 | 1338+21 | 2602+76 | Spike (139%) | 800 | 1289 | 1000 |
| | | | | | 8-hour (125%) | 660 | 1149 | 1000 |
| CA-325B | Sisquoc Sta | 4/13/25 | 2603+76 | 3186+76 | 8-hour (125%) | 892 | 1625 | 1292 |
| | MP 60.63 | 4/14/25 | 3187+76 | 3914+76 | 8-hour (125%) | 751 | 1614 | 1292 |
| | MP 74.44 | 4/22/25 | 3915+76 | 4455+76 | 8-hour (125%) | 1209 | 1379 | 1292 |
| | MP 84.65 | 5/2/25 | 4456+76 | 5669+76 | 8-hour (125%) | 922 | 1253 | 1292 |
| | MP 107.64 | 5/9/25 | 5670+76 | 6554+49 | 8-hour (125%) | 459 | 1473 | 1170 |
| | Pentland Sta | | | | | | | |

*Note 1: This value is simply the resultant, corresponding, MOP based upon the hydrostatic test record. It does not reflect the MOP value Sable assigns the pipelines and is only included for context.*

12

*ii.*        *In-Line Inspection History*

The following Table 2-9 provides a summary of CA-324, CA-325A, and CA-325B In-Line Inspection (ILI) activities, as of July 2023. Note that CA-324 Las Flores Canyon to Gaviota has been inspected since the 2015 release, in February and December of 2022 (circumferential magnetic flux leakage (MFL-C) and ultrasonic wall measurement (UTWM) surveys, respectively). Also note that CA-325A Gaviota to Sisquoc, and CA-325B Sisquoc to Pentland, have been inspected since the 2015 release, with axial magnetic flux leakage (MFL-A) surveys in September and October 2023, respectively.

**TABLE 2-9: IN LINE INSPECTION SUMMARY**

| Pipeline Segment | Date of Inspection | Technology | Vendor |
|---|---|---|---|
| CA-324 | 6/18/07 | Def+MFL+IMU | Rosen |
| | 7/3/12 | Def+MFL+IMU | Rosen |
| | 5/6/15 | Def+MFL+IMU | Rosen |
| | 2/23/22 | CMFL | Baker Hughes |
| | 12/10/22 | UTWM | Baker Hughes |
| CA-325A | 1/1/03 | Def+MFL+IMU | Tuboscope |
| | 3/20/08 | Def+MFL+IMU | Rosen |
| | 4/29/13 | Def+MFL+IMU | TD Williamson |
| | 9/20/23 | AMFL | Baker Hughes |
| CA-325B | 10/1/94 | Unknown | Tuboscope |
| | 1/8/03 | Def+MFL | Tuboscope |
| | 10/21/06 | Def+MFL | Tuboscope |
| | 3/10/12 | Def+MFL | TD Williamson |
| | 6/12/13 | AMFL | TD Williamson |
| | 10/1/23 | AMFL | Baker Hughes |

**(3)  *A list of the specific regulation(s) from which the applicant seeks relief;***

Sable seeks relief from 49 C.F.R. 195.452(h)(4)(iii)(H), requiring remediation within 180 days of discovery of corrosion of or along a longitudinal seam weld.

Moreover, Sable is seeking this Emergency Special Permit pursuant to Appendix B.1.A and B of the Consent Decree entered in Civil Action No. 2:20-CV-02415 (C.D. Cal. 2020), stating that a "State Waiver" for limited effectiveness of cathodic protection must be applied for and received prior to restarting Lines 901 and 903 (now CA-324 and 325).  Given that Lines CA-324 and 325 were then-considered intrastate at the time of the Consent Decree but are now considered interstate (removing any regulatory jurisdiction of OSFM over these pipelines), Sable interprets these provisions to require obtaining a special permit from PHMSA for limited effectiveness of cathodic protection prior to restarting CA-324 and 325.  Sable already had received State Waivers from OSFM pursuant to this language of the Consent Decree in December 2024.  Sable now seeks a special permit from PHMSA (the current safety regulator of CA-324 and 325) that substantially carries over the conditions entered in those State Waivers.

**(4)  *An explanation of the unique circumstances that the applicant believes make the applicability of that regulation or standard (or portion thereof) unnecessary or inappropriate for its facility;***

**A.  *General External Corrosion Under Insulation***

CA-324 and 325 were shut down in 2015 following the above-described release on CA-324.  A Consent Decree was entered by the US District Court for the Central District of California on October 14, 2020, that requires a State Waiver prior to restarting CA-324 and CA-325A/B.  CA-324 and 325 are comprised of buried and insulated pipe.  The pipeline has a coal-tar coating system and insulation wrap that provides corrosion deterrence.

Sable seeks approval to manage external corrosion of CA-324 and 325 through a supplemental combination of accelerated reassessments, usage of the appropriate assessment tools, integration of data from the appropriate alternating ILI technologies, enhanced anomaly response criteria targeted at corrosion under insulation, and advanced data analysis techniques to account for potential growth of corrosion under insulation including feature interaction criteria for anomaly assessment.

**B.  *Selective Seam Weld Corrosion (SSWC)***

The PHMSA Fact Sheet on Selective Seam Corrosion (known in industry as SSC or SSWC) describes SSWC as "a localized corrosion attack along the bond line of low-frequency electric resistance welded (LF-ERW) and electric flash welded (EFW) piping, that leads to the development of a wedge-shaped groove that is often filled with corrosion products."

14

[1]  The Fact Sheet goes on to say that "LF-ERW or EFW pipe manufacturing processes first came into use in the 1920s.  Both types of pipe are manufactured by forming steel plates into round cylinders and then joining the longitudinal edges through a welding process.  Due to technology and quality control issues with some of the pipe manufactured prior to 1970, the weld bondline may be susceptible to corrosion processes.  This is particularly true if the pipeline has the following conditions present:

- Exposure to corrosive conditions due to poor or absent coating;
- Ineffective cathodic protection; or
- The presence of non-metallic inclusions in the weld bondline region (e.g., contaminants present during the manufacturing process).

SSWC is generally not considered to be a concern with pipe manufactured after 1970 due to the use of cleaner steels having greatly reduced sulfur contents and the replacement of low frequency welding equipment with high frequency equipment in the manufacturing process." As noted above, Line CA-324 contains exclusively high frequency ERW (HF-ERW) longitudinal seamed pipe manufactured in 1985 and 1986.  When ILI tools call corrosion along the seam, it may simply be corrosion incidental to the seam rather than preferential.  Indeed, SSWC has not been observed in the previous direct examinations that make up the extensive dig history on this system.  Therefore, the threat of SSWC is not considered applicable to Line CA-324.  As such, selection of future inspection technologies will prioritize the identification and characterization of external blunt metal loss as the primary threat to this buried, insulated line, namely ultrasonic wall measurement (UTWM) and axial magnetic flux leakage (MFL-A) technologies.

Note that Sable only accepts calls from circumferential magnetic flux leakage (MFL-C), spiral magnetic flux leakage (SMFL), ultrasonic crack detection (UTCD) and/or electro magnetic acoustic transducer (EMAT) ILI systems when applying criteria for corrosion interaction with the longitudinal seam weld, as these technologies are designed for and, therefore are best suited for detection of the longitudinal seam weld and axially oriented corrosion.  MFL-A and/or UTWM are not designed for detection of the longitudinal seam weld or axially oriented corrosion, so calls from those ILI systems are not reviewed for longitudinal seam weld interaction.

CA-324 was inspected using an MFL-C tool in February 2022, to better characterize the threat of external metal loss under insulation. Since SSWC has not been observed in the previous direct examinations that make up the extensive dig history on this pipeline, Sable is therefore requesting PHMSA to issue a special permit which allows for the use of engineering analysis and protocols to differentiate between corrosion anomalies that do not present a specific risk to the seam weld and associated heat affected zones in lieu of the current requirement under 49

---

[1] PHMSA Fact Sheet on Selective Seam Corrosion, December 1, 2011;
<https://primis.phmsa.dot.gov/comm/FactSheets/FSSelectiveSeamCorrosion.htm>

15

C.F.R. § 195.452(h)(4)(iii)(H).  Remediation and repair activities would then be scheduled according to the findings of the proposed evaluation.

**(5)  _A description of any measures or activities the applicant proposes to undertake as an alternative to compliance with the relevant regulation, including an explanation of how such measures will mitigate any safety or environmental risks_**

The Application includes memorializing certain integrity management procedures included in the Consent Decree in addition to further measures beyond Part 195 to maintain the integrity of the pipeline, including measures specific to SSWC.  Many of these measures were negotiated and agreed upon as part of the Consent Decree.

A comprehensive list of these proposed measures is contained in draft Emergency Special Permit conditions, at Attachment B.  These measures include, among other things, temperature limitations and monitoring, hydrostatic testing, including spike test, requirements (which Sable has already completed), a five-fold more frequent than required by § 195.452 ILI assessment schedule, a substantially more stringent set of anomaly repair criteria, corrosion growth rate analysis, in-field direct examination, and additional recordkeeping and reporting requirements, as compared to the baseline Integrity Management requirements in Part 195.  These measures, in their totality, in addition to hundreds of recently completed anomaly repairs under the repair conditions of the Consent Decree, will substantially minimize the possibility that future conditions that threaten the integrity and safety of the pipeline will go undiscovered or unremediated.

**(6)  _A description of any positive or negative impacts on affected stakeholders and a statement indicating how operating the pipeline pursuant to a special permit would be in the public interest_**

Grant of a special permit would create many positive impacts on affected stakeholders and operating the covered pipeline segments in accordance with the special permit would be in the public interest based on the fact that granting it would facilitate restart of Lines CA-324 and 325 which would address the national energy emergency that has been declared by the President this year, as explained further in Item (10).  Moreover, grant of this special permit would create the following additional positive impacts:

- Facilitating the restart of CA-324 and 325, which would boost California-produced oil and reduce California's need for imported oil to meet regional fuel demand by the public and the numerous military facilities in California and provide energy security;

- Reduce refinery feedstock price per barrel by over a projected $3;

- Reduce greenhouse gas emissions by approximately 500,000 tons;

16

- Favorably contribute to local employment, both through generating hundreds to thousands of direct jobs, and thousands more indirect jobs such as through contractors and affiliated employees;

- Limit impacts to the environment and potential locations for cultural resources by reducing unnecessary anomaly digs in areas of low or no risk;

- Reduce the environmental impacts associated with long-haul tanker shipments of crude oil to California from current import sources such as Iraq, Brazil and Ecuador;

- Maintain the priority of pipeline maintenance activities to sections of the pipelines in greatest need of monitoring for pipeline safety;

- Reduce unnecessary excavation around other critical infrastructure;

- Reduce the permitting workload of public agencies along the pipeline right-of-way;

- Reduce the general risks and impacts, to both the workforce and the public, associated with excavations in and along public highways and other rights-of-way.

**(7)** ***A certification that operation of the applicant's pipeline under the requested waiver would not be inconsistent with pipeline safety***

Sable certifies that operation of CA-324 and 325 under the requested special permit is not inconsistent with pipeline safety and maintains equivalent or greater protection than that prescribed under 49 C.F.R. Part 195.

**(8)** ***If the application is for a renewal of a previously granted waiver or special permit, a copy of the original grant of the waiver or permit; and***

N/A; this is an initial application. Note however that this application seeks to carry forward substantially the same conditions as two existing state waivers issued by CA OSFM on December 17, 2024, as referenced above.

**(9)** ***Any other information PHMSA may need to process the application including environmental analysis where necessary.[1]***

---

[1] Section 23 of DOT Order 5610.1D (July 1, 2025) states that "Emergency circumstances may require immediate actions that preclude following standard NEPA procedures" and that "Immediate emergency actions necessary to protect the lives and safety of the public or protect valuable resources should never be delayed in order to comply

17

Note that Sable is not seeking relief from 49 C.F.R. § 195.563 and the requirements to provide cathodic protection for buried pipelines.  The cathodic protection system remains active and continues to be maintained on CA-324 and 325.  Rather, Sable proposes the aforementioned inspection and remediation actions as a means of addressing the limitations of cathodic protection PHMSA observed for buried, insulated pipe.

Cathodic protection will continue to be implemented on the pipeline system at appropriate levels in adherence to 49 C.F.R. 195 and tested at appropriate intervals.  Cathodic protection will continue to function with high effectiveness at pipeline repair locations where the thermal insulation has been removed.

As noted above, Sable already received State Waivers from OSFM in December 2024 (which PHMSA evaluated and approved) regarding waiver of the same standards for CA-324 and 325. Due to the fact that these pipelines have since been designated as interstate, Sable is seeking from PHMSA a special permit containing substantially the same conditions as reflected in these State Waivers (with adjustments for tasks already completed by Sable under the State Waivers).

### (10)        *Conditions Necessitating Grant of Special Permit on Emergency Basis*

Pursuant to 49 C.F.R. § 190.341(i), applications for emergency special permits must include further information beyond that provided above.  This additional information is described herein:

### (i)        *An explanation of the actual or impending emergency and how the applicant is affected;*

Pursuant to 49 U.S.C. § 60118(c)(2)(A), PHMSA is authorized to waive compliance with any part of an applicable standard under Part 195 on terms it considers "appropriate without prior notice and comment" if it determines that: "(i) it is in the public interest to grant the waiver; (ii) the waiver is not inconsistent with pipeline safety; and (iii) the waiver is necessary to address an actual or impending emergency involving pipeline transportation, including an emergency caused by a natural or manmade disaster."  Although the term "emergency" is not defined in this provision, the statute's reference to both natural and manmade types of circumstances indicates a broad scope of exigent conditions that may constitute an emergency.[1]

---

with NEPA."  Notwithstanding, Sable reserves the right to supplement this Application with additional information on environmental impacts (or lack thereof) associated with this proposed emergency special permit.

[1] See also "Emergency." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/emergency ("an unforeseen combination of circumstances or the resulting state that calls for immediate action").

As noted in § 190.341(g), "emergency" events may be "local, regional, or national in scope" and includes a wide variety of conditions, including, among others, "significant fuel supply disruptions," "war-related activities," or other similar events.  On January 20, 2025, President Trump issued Executive Order 14156, determining and declaring pursuant to the National Emergencies Act (50 U.S.C. 1601 et seq) that the energy production and transportation capacity of the United States "are all far too inadequate to meet our Nation's needs" and that "hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets."  EO 14156 specifically notes that these problems "are most pronounced in our Nation's Northeast and West Coast, where dangerous State and local policies jeopardize our Nation's core national defense and security needs and devastate the prosperity of not only local residents but the entire United States population."  EO 14156 concludes that our nation's "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy," and that "in light of these findings, [the President] hereby declare[s] a national emergency."

EO 14156 also instructs executive agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate the … production, transportation, refining, and generation of domestic energy resources…"  It also directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States…"  EO 14156 defines "energy" as inclusive of, among other things, "crude oil", and defines "transportation" as inclusive of movement of energy specifically through pipelines.

Based on EO 14156, there exists an energy shortage on the West Coast that rises to the level of an emergency condition.  Pursuant to EO 14156's directive to agencies to exercise lawful emergency-related authorities to address this condition, Sable requests that PHMSA issue the applied-for special permit on an emergency basis.

In addition to the energy emergency determined in EO 14156, there are independent bases for a finding of actual or impending emergency and the issuance of an Emergency Special Permit under 49 U.S.C. § 60118(c)(2) and 49 C.F.R. § 190.341(g).  Specifically, current crude oil supply conditions in California create the additional risks of a motor fuel supply emergency in the state.  The reduction in regional sources of crude caused by declining onshore production, the current inability to move oil out of the Santa Ynez Unit and lack of adequate pipeline transportation into California has increased the state's reliance on the foreign imports of crude oil from countries such as Iraq, Ecuador and Brazil.  Oil from these locations must be shipped significant distances to California by ocean-going tanker at greater expense and environmental impact than oil produced in-state.  California's reliance on foreign crude creates significant risk of disruptions given current geopolitical conditions.  Issuance of Emergency Special Permit

19

would facilitate the prompt and safe restart of CA-324 and CA-325, which would immediately and significantly improve energy security by offsetting the need for imported crude.

Grant of the requested special permit on an emergency basis is also indicated due to a potential gap in coverage under the State Waivers previously issued to Sable for CA-324 and 325 when these pipelines were considered intrastate. As CA-324 and 325 have since been reclassified as interstate pipelines, it is necessary to immediately grant a special permit to replace the State Waivers that now have limited effect pursuant to operation of 49 U.S.C. § 60104(c).

*(ii)      A citation of the regulations that are implicated and the specific reasons the permit is necessary to address the emergency (e.g., lack of accessibility, damaged equipment, insufficient manpower)*

As noted above, Sable seeks relief from 49 C.F.R. 195.452(h)(4)(iii)(H), requiring remediation within 180 days of discovery of corrosion of or along a longitudinal seam weld. Sable also seeks a special permit pursuant to Appendix B.1.A and B of the Consent Decree entered in Civil Action No. 2:20-CV-02415 (C.D. Cal. 2020), stating that a "State Waiver" for limited effectiveness of cathodic protection must be applied for and received prior to restarting Lines 901 and 903 (now CA-324 and 325). In order to address the ongoing energy shortage that acutely affects the West Coast, it is necessary to restart CA-324 and 325 to facilitate transportation of crude oil produced upstream of the SYPS and to provide adequate supply of crude to regional refineries to positively affect fuel supplies. Since restart of these pipelines is predicated on grant of a special permit pursuant to the Consent Decree, granting Sable's application on an emergency basis would facilitate the expedited provision of relief towards the ongoing fuel shortage.

*(iii)      A statement indicating how operating the pipeline pursuant to an emergency special permit is in the public interest (e.g., continuity of service, service restoration)*

Operation of CA-324 and 325 pursuant to an emergency special permit would expediently help to address the pressing energy security and supply issues that acutely affect the West Coast, as noted in EO 14156. Not granting the special permit on an emergency basis would unnecessarily delay provision of such relief and would contradict EO 14156's explicit directive that agencies exercise emergency-related authorities to address such energy shortage and security issues. In particular, operation of CA-324 and 325 would serve as a vital source of crude oil transportation to local and regional refineries (amounting to 10-15% of current California-wide production levels), would help reverse unfavorable market conditions for refineries by lowering the cost of feedstock crude by over $3 per barrel, and displace the need for imported oil and gasoline from other nations to California, which have dramatically increased in 2025. It would also reduce the economic and political leverage that entities in these foreign nations can exploit to threaten the domestic petroleum market.

20

***(iv)    A description of any proposed alternatives to compliance with the regulation (e.g., additional inspections and tests, shortened reassessment intervals)***

Sable proposes the alternatives to compliance with the regulation outlined above in item (5) and in the attached draft special permit conditions. As noted above, these conditions are substantially the same as those finalized in the State Waivers previously issued by OSFM for these pipelines.

***(v)    A description of any measures to be taken after the emergency situation or permit expires—whichever comes first—to confirm long-term operational reliability of the pipeline facility.***

Sable will separately apply for a non-emergency special permit to replace the emergency special permit upon its expiration.

Sable believes that the proposed Emergency Special Permit reflects a conservative and measured approach to the identification and remediation of external corrosion metal loss features on CA-324 and 325, will adequately manage risk factors associated with cathodic protection, and enable safe, long-term operation of the pipeline.

We appreciate PHMSA's consideration of this Application. Should you have any questions, or require anything further to conduct your review of this Application please do not hesitate to contact me.

Sincerely,

J. Caldwell Flores
President and Chief Operating Officer
Pacific Pipeline Company / Sable Offshore Corp.

21

**Attachment:  A:   Lines CA-324 and 325 System Map**



**Attachment B:**
**Proposed Emergency Special Permit Conditions**

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
# <span style="color:red">DRAFT EMERGENCY</span> SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | PHMSA-2025-0546 |
| **Requested By:** | Sable Offshore Corp. |
| **Operator ID #:** | 40881 |
| **Original Date Requested:** | December 19, 2025 |
| **Original Issuance Date:** | <span style="color:red">December [   ], 2025</span> |
| **Code Section(s):** | 49 CFR § 195.452(h)(4)(iii)(H) |

**<span style="color:red">Proposed</span> Grant of Emergency Special Permit:**

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] <span style="color:red">proposes to grant</span> this emergency special permit to Sable Offshore Corp. (Sable) for two hazardous liquid pipelines (Lines CA-324 and CA-325) that are constituents of the interstate Santa Ynez Pipeline System (SYPS) pipeline facility, located on the Outer Continental Shelf (OCS) and in California.

## I.    Purpose and Need:

Sable sought this special permit to waive requirements of 49 CFR §195.452(h)(4)(iii)(H) as applicable to Lines CA-324 and CA-325.  The regulation requires remediation within 180 days of discovery of corrosion of or along a longitudinal seam weld.  These pipelines present a risk of such corrosion under insulation that may occur as a result of limited effectiveness of cathodic protection due to shielding effects of polyurethane foam and polyethylene tape wrap installed on these pipelines.   Sable proposes an alternative approach to appropriately manage this risk, which approach was previously reviewed and

---

[1] Throughout this special permit, the usage of "PHMSA" or "PHMSA OPS" means the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration Office of Pipeline Safety.

24

approved as part of State Waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for Lines CA-324 and CA-325.

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the US District Court for the Central District of California, which provides, among other things, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and 325. These pipelines were formerly considered intrastate at the time of entry of this Consent Decree, and were regulated by OSFM pursuant to its state certification received under 49 USC § 60105(a). However, these pipelines are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025, of the SYPS as an interstate pipeline facility. As a result, PHMSA, and not OSFM, is the sole pipeline safety regulatory agency with authority to grant waiver of the pipeline safety regulations. This change in designation immediately affects the measures implemented in the two State Waivers issued by OSFM for CA-324 and 325 in December 2024.

Sable requested PHMSA to grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). Sable noted the existence of a national energy emergency pursuant to declaration made under the National Emergencies Act (50 USC 1601 et seq) in Executive Order 14156 (January 20, 2025), which remains active. Executive Order 14156 declares that energy production and transportation capacity are inadequate to meet domestic needs, and that this shortage is particularly pronounced on the West Coast (including in California), and that this shortage is enabling foreign actors to target domestic energy infrastructure, weaponize the United States' reliance on foreign energy, and cause dramatic swings within international commodity markets. Executive Order 14156 further instructs federal agencies to "use all lawful emergency and other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States." Executive Order 14156 specifically defines "energy" to include "crude oil", and "transportation" to include movement by pipeline.

Sable noted that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and 325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.

Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the current OSFM State Waivers created by redesignation of Lines CA-324 and 325 as interstate, given that the proposed special permit is substantially the same as that which was

25

previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

**II.      Special Permit Segments**

This permit pertains to the specified special permit segments and corresponding special permit inspection area defined in this section.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

**III.      Conditions**

PHMSA proposes to grant this special permit subject to Sable implementing each of the following conditions.  These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with requirements in 49 CFR §195.452(h)(4)(iii)(H).

**General Conditions:**

**1)**      The Special Permit Segments may only be used to transport crude oil.

**2)**      Prior to transporting crude oil in the Special Permit Segments, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

**3)** Sable shall not exceed maximum operating pressure (MOP) limits for the Special Permit Segments, as follows:

  **a)** The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

  **b)** The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

  **c)** The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

**4)** Sable shall not exceed maximum operating temperature limits for crude oil transported in the Special Permit Segments, as follows:

  **a)** The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degree Fahrenheit for more than 12 consecutive hours.

  **b)** The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours.  Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

  **c)** The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours.  Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

**5)** This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

**6)** This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

**7)** In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

  **a)** Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

       i.   Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

      ii.   General corrosion means uniform or gradually varying loss of wall thickness over an area.

**b)**   Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

**c)**   Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

**8)**   Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s.  At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[2], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[3]

**9)**   Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

**a)**   API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

**b)**   API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected

---

[2] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[3] Sable has already completed all of the testing required in this condition and must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[4]

10) All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[5] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11) Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12) Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

13) Pressure Testing:[6]

   a) Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must field evaluate and

---

[4] Sable has already completed the testing required in this condition and must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[5] Sable has already completed the repairs required in this sentence and must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

[6] Sable has already completed all of the testing and repairs required in this Condition and must submit the results to PHMSA prior to restart.  No failures occurred during the required pressure testing.

remediate the following anomalies before performing the spike hydrostatic test on CA-324:

    i.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

**b)**  Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

**c)**  Prior to placing Line 325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

    i.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii.  All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

**d)**  Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

**e)**  Prior to placing Line 325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:

    i.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii.  All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

**f)** Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

**g)** Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

**h)** Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to the PHMSA via email at [].

**i)** Section(s) of the Special Permit Segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the Special Permit Segments cannot be safely operated.

**14)** In-Line Inspection (ILI) Assessment and Frequency:

**a)** Prior to performing in-line inspections of the Special Permit Segment, Sable shall provide PHMSA with a written notification to [email] describing its assessment plan with the following information:

    **i.** Dates for integrity assessment

    **ii.** In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[7] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

    **iii.** In-line inspection tool vendor(s)

    **iv.** Required tool specifications including operational specifications and anomaly sizing tolerances

    **v.** Tool validation methodology

    **vi.** Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

    **vii.** Criteria used to identify locations for excavation and field verification

    **viii.** Non-destructive examination

---

[7] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

31

**b)** Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

**c)** Metal Loss Tool(s):

**i.** Initial ILI tool runs – Each year, during the first two (2) years of operating the Special Permit Segments, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

**ii.** Subsequent ILI tool runs – After the first two (2) years of operating the Special Permit Segments, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the Special Permit Segment within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

**d)** Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[8] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

**i.** These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

---

[8] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval.  Changes to the reassessment interval are subject to PHMSA approval.

    **ii.** USCD Performance Specification Requirements

      **1.** The USCD tools must have a probability of detection that is $\geq 90\%$ for axial and circumferential cracks.

      **2.** The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      **3.** The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      **4.** The depth sizing accuracy for cracks must be $\pm 0.8$ mm for axial cracks and $\pm 1$ mm for circumferential cracks.

**e)** Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

**f)** Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the Special Permit Segment in which the ILI tool velocity was outside of the specified tool velocity range.

**g)** All ILI tool runs must obtain the Test ID from PHMSA prior to run.

**h)** Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

**i)** Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

**j)** Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[9] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been

---

[9] A minimum of four (4) independent direct examination excavations must be used for unity plots.

consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

**k)** Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

**15)** Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

**16)** Immediate Repair Conditions:[10]

**a)** A crack or crack-like anomaly that meets any of the following criteria:

**i.** Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

**ii.** Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

**b)** Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

**c)** Any external cluster corrosion or external general corrosion that is located on the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[11]

**17)** 180-Day Repair Conditions:[12]

**a)** A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

**b)** Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

**c)** All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[13]

---

[10] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[11] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[12] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[13] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41%

34

    **d)** For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**18)** Corrosion Growth Rate Analysis (CGRA):

    **a)** Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the Special Permit Segments is maintained.[14] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

    **b)** The CGRA procedure must include ILI data matching methods[15] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

    **c)** Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

    **d)** When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[16]

    **e)** All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**19)** Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**20)** In Field Direct Examination of Pipe:

---

metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the PHMSA.

[14] At a minimum, Sable must include signal matching between ILI data sets.

[15] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[16] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

a) Direct examinations[17] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[18] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

    ii. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[19]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21)    Integrity Management:

---

[17] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[18] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

[19] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

    **a)** A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

        i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

        ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

    **b)** Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

    **c)** When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

    **d)** Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

    **e)** Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the Special Permit Segments. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

    **f)** Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

**22)** Data Requirements for Predicted Failure Analysis:

    **a)** Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining

37

uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the Special Permit Segments and must be submitted to the PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

   i. Technical approach used for the analysis

   ii. All data used and analyzed

   iii. Pipe and longitudinal weld seam properties

   iv. Procedures used to implement emergency special permit conditions

   v. Evaluation methodology used

   vi. Models used

   vii. Direct in situ examination data

   viii. All in-line inspection tool assessments information evaluated

   ix. Pressure test data and results

   x. All in-the-ditch assessments performed on the Special Permit Segments

   xi. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

   xii. All finite element analysis results

   xiii. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

   xiv. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

   xv. Safety factors used for fatigue life and/or predicted failure pressure calculations

   xvi. Reassessment time interval and safety factors

   xvii. The date of the review

   xviii. Confirmation of the results by qualified technical subject matter expert(s)

   xix. Approval by responsible Sable management personnel

   xx. Records of additional preventive and mitigative (P&M) measures performed

38

           xxi.   Reports required by this emergency special permit.

**24)**    Reporting:

    **a)**   Any release on the Special Permit Segments shall be reported to the PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at [email].[20]

    **b)**   An email notification shall be made at least three (3) days prior to a Special Permit Segment being exposed for non-emergency purposes of field evaluation and repair via email at [email]. The email notification shall include, if applicable:

       i.   Tool type and run date

       ii.   Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

       iii.   Dig sheets

       iv.   Field contact information for Sable

       v.   Time and location of the field evaluation and repair.

    **c)**   Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at [] and include:

       i.   Tool type

       ii.   Run date

       iii.   Summary of Conditions Report[21]

       iv.   Final Vendor Report and Pipe Tally

    **d)**   Sable shall provide a report to the PHMSA by June 15th of every year for the duration of this emergency special permit. The report shall be addressed to [CONTACT]. At a minimum, the annual report shall contain the following, if applicable:

       i.   A Closure Report for the previous calendar (CY) which contains:

          1.   Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

          2.   Identify features that remain to be assessed

          3.   Unity Plots for previous ILI runs

       ii.   Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

       iii.   The third-party ILI expert reviews in accordance with condition 21(e).

---

[20] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[21] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

    iv.  AC and DC Interference surveys that are due in accordance with condition 21(f).

    v.  A copy of the CGRA for prior year including:

        1.  Mean corrosion growth rate for the Special Permit Segments

        2.  Distribution graph of the corrosion growth rate for the Special Permit Segments (e.g. occurrences (#) vs. corrosion rate (mpy)

**25)**    Limitations:

    **a)**  This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR 190.341(g).

    **b)**  Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

    **c)**  PHMSA may order the Special Permit Segments to be shutdown at any time.

    **d)**  PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

    **e)**  In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

    **f)**  If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide the PHMSA written notice of the change within 30 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On January 6, 2026, I served the above document(s) described as **DECLARATION OF JULIE TEEL SIMMONDS IN SUPPORT OF PETITIONERS AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S EX PARTE APPLICATION FOR ORDER SHORTENING TIME FOR NOTICE OF MOTION AND MOTION FOR RECONSIDERATION (VOL. 2 OF 4)** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒    **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 6, 2026, at Santa Barbara, California.

_____
Jeremy M. Frankel

1
Proof of Service

**SERVICE LIST**

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>Myung Park<br>Myung.Park@doj.ca.gov<br>Matthew Bullock<br>Matthew.Bullock@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEYS FOR<br>RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire<br>Protection, Office of the State Fire Marshal; and<br>Daniel Berlant, in his official capacity as State Fire<br>Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN<br>INTEREST<br>Sable Offshore Corp. and Pacific Pipeline<br>Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN<br>INTEREST<br>Sable Offshore Corp. and Pacific Pipeline<br>Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN<br>INTEREST<br>Sable Offshore Corp. and Pacific Pipeline<br>Company |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
1/6/2026 9:47 PM
By: Terri Chavez , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 884-7100
*Attorneys for Petitioners/Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

Linda Krop (Bar No. 118773)
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
Tara C. Rengifo (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152
*Attorneys for Petitioners/Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,

                    Petitioners/Plaintiffs,

    v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,

                    Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation; and DOES 11 through 20, inclusive,

                    Real Parties in Interest.

Case No.: 25CV02244
[Consolidated with Case No. 25CV02247]

**DECLARATION OF JULIE TEEL SIMMONDS IN SUPPORT OF PETITIONERS AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S EX PARTE APPLICATION FOR ORDER SHORTENING TIME FOR NOTICE OF MOTION AND MOTION FOR RECONSIDERATION (VOL. 3 OF 4)**

[Filed Concurrently with Opposition, Request for Judicial Notice, and [Proposed] Order]

Date:     January 7, 2026
Time:    10:00 a.m.
Dept.:    4
Judge:   Honorable Donna D. Geck

Action Filed: April 15, 2025
Case No. 25CV02247

1

Declaration of Julie Teel Simmonds ISO Petitioners' Opposition to Real Parties' Ex Parte Application to Shorten Time

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit coproration and WISHTOYO FOUNDATION, | Case No. 25CV02247<br>[Consolidated with Case No. 25CV02244] |

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

Real Parties in Interest.

2

Declaration of Julie Teel Simmonds ISO Petitioners' Opposition to Real Parties' Ex Parte Application to Shorten Time

# EXHIBIT H

EX-99.1 2 sableoffshore_approvalof.htm EX-99.1

**Exhibit 99.1**



**U.S. Department
of Transportation
Pipeline and Hazardous
Materials Safety
Administration**

12300 W. Dakota Ave., Suite 340
Lakewood, CO  80228

<u>**VIA ELECTRONIC MAIL TO:**</u>

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

RE:    **Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration (PHMSA) received several documents from Sable Offshore Corp. These documents included:

1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
2. A letter requesting the removal of pressure restrictions for Line CA-324
3. A letter requesting the removal of pressure restrictions for Line CA-325
4. The Las Flores Pipeline Linefill Positioning Plan Assignments
5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at dustin.hubbard@dot.gov.

Sincerely,

**DUSTIN B HUBBARD** Digitally signed by DUSTIN B HUBBARD
Date: 2025.12.22 13:19:33 -07'00'

Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

**Exhibit 99.1**

cc:   Trent Fontenot, Sr. Vice President - Operations,
      Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire
      jim.hosler@fire.ca.gov

# EXHIBIT I

# U.S. DEPARTMENT OF TRANSPORTATION

# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION

# EMERGENCY SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | 2025-1502 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |
| **Expiration Date:** | February 21, 2026 |
| **Code Section:** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] grants this emergency special permit to Sable Offshore Corp. PPC (Sable) for 124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 (***special permit segments***), transporting crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties, California.  This emergency special permit waives compliance from 49 CFR § 195.452(h)(4)(iii)(H), which requires corrosion of or along a longitudinal seam weld be scheduled for evaluation and remediation within 180 days of discovering the condition.

## I.    Purpose and Need

On December 19, 2025,[2] Sable requested an emergency special permit for relief from the requirement to evaluate and remediate corrosion occurring at longitudinal seam welds within 180 days.  The ***special permit segments*** are under polyurethane foam and polyethylene tape wrap insulation, which can inhibit the effectiveness of cathodic protection and contribute to a risk of corrosion due to shielding effects. Sable proposed an alternative approach to safely manage this risk, which was previously reviewed and approved as part of two state waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for the ***special permit segments***.  PHMSA previously reviewed the state waivers pursuant to 49 U.S.C. § 60118(d).

---

[1] Throughout this special permit, the usage of "PHMSA" means the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety.

[2] Sable submitted supplemental information related to its application on December 23, 2025.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC                               Page 1 of 16
Emergency Special Permit – Corrosion Mitigation – California

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California, which provides, among other requirements, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and CA-325. The *special permit segments* were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). However, the *special permit segments* are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025. As a result, PHMSA has exclusive pipeline safety regulatory agency over Lines CA-324 and CA-325.  The conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement.

Sable requested PHMSA grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). In its application, Sable stated that expedited review of its application was warranted in light of the national energy emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) in Executive Order 14156 (January 20, 2025). In Executive Order 14156, the President declared a national energy emergency based on a finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[3]  The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[4]  The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[5]

Sable's application stated that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and CA-325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.[6]  Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the OSFM State Waivers created by redesignation of Lines CA-324 and CA-325 as interstate, given that the proposed special permit is substantially the same as that which was previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

This emergency special permit allows Sable to operate Lines CA-324 and CA-325 without being subject to the requirement to evaluate and remediate corrosion of or along a longitudinal seam weld within 180 days.  On the condition that Sable comply with the terms and conditions set forth below, the emergency special permit waives compliance with 49 CFR § 195.452(h)(4)(iii)(H) for the *special permit segments*.

---

[3] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.
[4] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 2(a).  The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).
[5] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 3(b).
[6] For more information regarding these effects, see Attachments C, D, E, and F.

## II. Special Permit Segments

This emergency special permit pertains to the specified pipeline segments which make up the Las Flores Pipeline called Line CA-324 and CA-325.  Line CA-325 can be further divided into two segments: Lines CA-325A and CA-325B.  The Las Flores Pipeline is part of the Santa Ynez Pipeline System (SYPS), an interstate pipeline facility that Sable operates from the Outer Continental Shelf off the coast of Santa Barbara to Kern County, California.  A map of the special permit segments is available in Revised Attachment A.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III.  Conditions

PHMSA grants this emergency special permit subject to Sable implementing each of the following conditions.  These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with limitations on scheduling instances of corrosion on or near longitudinal seam welds for evaluation and remediation within 180 days of discovery in 49 CFR § 195.452(h)(4)(iii)(H), which would be waived.

**General Conditions:**

1)      The *special permit segments* may only be used to transport crude oil.

2)      Prior to transporting crude oil in the *special permit segments*, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3)      Sable shall not exceed maximum operating pressure (MOP) limits for the *special permit segments*, as follows:

   a)  The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

   b)  The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

c) The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4) Sable shall not exceed maximum operating temperature limits for crude oil transported in the *special permit segments*, as follows:

a) The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit for more than 12 consecutive hours.

b) The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

c) The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5) This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6) This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7) In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

a) Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

b) Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

c) Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

8) Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the

pipe body, heat affected zone (HAZ)[7], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9) Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

   a) API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

   b) API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10) All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[10] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11) Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss

---

[7] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

[9] Sable indicated in its application that it has already completed the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12) Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of CA-324 and CA-325A/B.

13) Pressure Testing:[11]

    a) Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

        i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

        ii. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

    b) Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

    c) Prior to placing Line CA-325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

        i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

        ii. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

    d) Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

    e) Prior to placing Line CA-325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the

---

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

hydrostatic test on CA-325B:

    i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

f) Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

g) Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

h) Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

i) Section(s) of the *special permit segments* that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the *special permit segments* cannot be safely operated.

14) In-Line Inspection (ILI) Assessment and Frequency:

a) Prior to performing in-line inspections of the *special permit segment*, Sable shall provide PHMSA with a written notification to PHMSA describing its assessment plan with the following information:

    i. Dates for integrity assessment

    ii. In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

    iii. In-line inspection tool vendor(s)

    iv. Required tool specifications including operational specifications and anomaly sizing tolerances

    v. Tool validation methodology

    vi. Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

---

[12] All submissions to PHMSA required by this emergency special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[13] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

     vii.  Criteria used to identify locations for excavation and field verification

    viii.  Non-destructive examination

b) Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

c) Metal Loss Tool(s):

    i.  Initial ILI tool runs – Each year, during the first two (2) years of operating the *special permit segments*, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

    ii.  Subsequent ILI tool runs – After the first two (2) years of operating the *special permit segments*, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the *special permit segment* within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

d) Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

    i.  These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

    ii.  USCD Performance Specification Requirements

        1.  The USCD tools must have a probability of detection that is

---

[14] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval.  Changes to the reassessment interval are subject to PHMSA approval.

≥ 90% for axial and circumferential cracks.

2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

4. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

f) Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the *special permit segment* in which the ILI tool velocity was outside of the specified tool velocity range.

g) All ILI tool runs must obtain the Test ID from PHMSA prior to run.

h) Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

i) Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

j) Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second

---

[15] A minimum of four (4) independent direct examination excavations must be used for unity plots.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 9 of 16

Edition, April 2013).

15)    Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16)    Immediate Repair Conditions:[16]

   a)  A crack or crack-like anomaly that meets any of the following criteria:

      i.  Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

      ii. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

   b)  Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

   c)  Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17)    180-Day Repair Conditions:[18]

   a)  A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

   b)  Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

   c)  All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[19]

   d)  For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18)    Corrosion Growth Rate Analysis (CGRA):

   a)  Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to

---

[16] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H).  All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by PHMSA.

prior ILI) and perform pipeline remediations needed to assure the integrity of the *special permit segments* is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

b) The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

c) Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

a) Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

    ii. Sable must increase the metal loss anomaly's depth by 20% when

---

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

they input it into the formula for calculating the number of wraps needed for repair method 5.

    iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[25]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

    ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

d) Sable must send all field measurements to the ILI tool vendor within 90 days

---

[25] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the ***special permit segments***. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is

g) occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the ***special permit segments*** and must be submitted to PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

    i. Technical approach used for the analysis

    ii. All data used and analyzed

    iii. Pipe and longitudinal weld seam properties

    iv. Procedures used to implement emergency special permit conditions

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 13 of 16

v.       Evaluation methodology used

vi.      Models used

vii.     Direct in situ examination data

viii.    All in-line inspection tool assessments information evaluated

ix.      Pressure test data and results

x.       All in-the-ditch assessments performed on the *special permit segments*

xi.      All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

xii.     All finite element analysis results

xiii.    The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

xiv.     The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

xv.      Safety factors used for fatigue life and/or predicted failure pressure calculations

xvi.     Reassessment time interval and safety factors

xvii.    The date of the review

xviii.   Confirmation of the results by qualified technical subject matter expert(s)

xix.     Approval by responsible Sable management personnel

xx.      Records of additional preventive and mitigative (P&M) measures performed

xxi.     Reports required by this emergency special permit.

24)     Reporting:

a)  Any release on the *special permit segments* shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

b)  An email notification shall be made at least three (3) days prior to a *special permit segment* being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

i.  Tool type and run date

ii. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state, or Federal regulations.

      iii. Dig sheets

      iv. Field contact information for Sable

      v. Time and location of the field evaluation and repair.

c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

      i. Tool type

      ii. Run date

      iii. Summary of Conditions Report[27]

      iv. Final Vendor Report and Pipe Tally

d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit, including any renewals. The report shall be submitted to PHMSA. At a minimum, the annual report shall contain the following, if applicable:

      i. A Closure Report for the previous calendar (CY) which contains:

            1. Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

            2. Identify features that remain to be assessed

            3. Unity Plots for previous ILI runs

      ii. Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

      iii. The third-party ILI expert reviews in accordance with condition 21(e).

      iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

      v. A copy of the CGRA for prior year including:

            1. Mean corrosion growth rate for the *special permit segments*

            2. Distribution graph of the corrosion growth rate for the *special permit segments* (e.g. occurrences (#) vs. corrosion rate (mpy)

The above conditions are based on PHMSA's review and consideration of information provided by Sable, including information in their emergency special permit application which can be found at Docket No. PHMSA-2025-1502 in the Federal Docket Management System located at www.regulations.gov.  PHMSA has determined the conditions listed above would be necessary to ensure this Emergency Special Permit is not inconsistent with pipeline safety.

---

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 15 of 16

## IV.  Limitations:

This special permit is subject to the limitations set forth in 49 CFR § 190.341, as well as the following limitations:

1)   This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR § 190.341(g).

2)   Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

3)   PHMSA may order the *special permit segments* to be shutdown at any time.

4)   PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

5)   In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

6)   If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide PHMSA written notice of the change within 60 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.


AUTHORITY:  49 United States Code 60118 (c)(1) and 49 CFR § 1.97.

Issued in Washington, D.C., on <u>December 23, 2025</u>.

LINDA GAIL DAUGHERTY
Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.23 15:48:57 -05'00'

Linda Daugherty
Acting Associate Administrator
   for Pipeline Safety

# EXHIBIT J

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ENVIRONMENTAL DEFENSE
CENTER, GET OIL OUT!, SANTA
BARBARA COUNTY ACTION
NETWORK, SIERRA CLUB, SANTA
BARBARA CHANNELKEEPER,
CENTER FOR BIOLOGICAL
DIVERSITY, and WISHTOYO
FOUNDATION,

                     Petitioners,

vs.

U.S. DEPARTMENT OF
TRANSPORTATION, SEAN DUFFY, in
his official capacity as Secretary of the U.S.
Department of Transportation, PIPELINE
AND HAZARDOUS MATERIALS
SAFETY ADMINISTRATION, and PAUL
ROBERTI, in his official capacity as
Administrator of the Pipeline and
Hazardous Materials Safety
Administration,

                     Respondents.

Docket No. _____

[Agency Docket No. 2025-1502]

## PETITION FOR REVIEW

Linda Krop
lkrop@environmentaldefensecenter.org
Margaret M. Hall
mhall@environmentaldefensecenter.org
Jeremy M. Frankel
jfrankel@environmentaldefensecenter.org

Julie Teel Simmonds
jteelsimmonds@biologicaldiversity.org
David Pettit
dpettit@biologicaldiversity.org
CENTER FOR BIOLOGICAL
DIVERSITY

ENVIRONMENTAL DEFENSE
CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel: (805) 963-1622
*Attorneys for Petitioners Environmental
Defense Center, Get Oil Out!, Santa
Barbara County Action Network, Sierra
Club, and Santa Barbara Channelkeeper*

2100 Franklin Street, Suite 375
Oakland, CA 94612
Tel: (510) 844-7100
*Attorneys for Petitioners Center for
Biological Diversity and Wishtoyo
Foundation*

## PETITION FOR REVIEW

Pursuant to 49 U.S.C. Section 60119(a)(1), Federal Rule of Appellate Procedure 15, and Ninth Circuit Rule 15-1, the Environmental Defense Center (EDC), Get Oil Out! (GOO!), Santa Barbara County Action Network (SBCAN), Sierra Club, Santa Barbara Channelkeeper (SBCK), Center for Biological Diversity (CBD), and Wishtoyo Foundation (collectively, "Petitioners") hereby petition this Court for review of orders issued by the Pipeline and Hazardous Materials Safety Administration (PHMSA), an agency within the United States Department of Transportation.

Specifically, on December 22, 2025, PHMSA issued an order approving a Restart Plan (the "Approval") for defective oil pipelines CA-324 and CA-325 (together, the "Pipeline System"), allowing them to return to service ten years after causing a catastrophic oil spill at Refugio State Beach Park, in Santa Barbara County, California. The Approval allows the 120-mile Pipeline System to operate despite its lack of protection from corrosion — the root cause of the 2015 oil spill.

1

PHMSA's Approval is attached hereto as **Exhibit A**. Additionally, on December 23, 2025, PHMSA issued an order granting an "emergency special permit" to Sable Offshore Corp. under 49 U.S.C. Section 60118(c)(2)(A), waiving compliance with federal pipeline safety regulations ("Emergency Special Permit"). PHMSA's Emergency Special Permit is attached hereto as **Exhibit B**.

In issuing the Approval and Emergency Special Permit, PHMSA bypassed the required public notice, opportunity for public participation, statement of reasons for its decisions, and other conditions generally required for pipeline safety regulation waivers under the federal Pipeline Safety Act (PSA), 49 U.S.C. § 60101 *et seq.*; 49 C.F.R. § 190.341. PHMSA likewise failed to conduct any environmental review under the National Environmental Policy Act (NEPA). 42 U.S.C. § 4321 *et seq.*; U.S. Department of Transportation, DOT Order 5610.1D (2025).

Pursuant to 49 U.S.C. Section 60119(a), orders issued by PHMSA under the PSA — e.g., the Approval and Emergency Special Permit— must be challenged by filing a Petition for Review directly in the court of appeals for the District of Columbia or the circuit in which the petitioner(s) resides within eighty-nine days after its issuance. Accordingly, Petitioners have timely and properly sought review of PHMSA's orders directly in this Court.

Judicial review of PHMSA orders is conducted under the standards set

forth in Section 706 of the Administrative Procedure Act (APA). 49 U.S.C. § 60119(a)(3). As grounds for this Petition for Review, Petitioners allege that PHMSA's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" and/or "without observance of procedure required by law," including for, but not limited to, the following reasons:

(1)    PHMSA did not meet the requirements for issuing an Emergency Special Permit, specifically that (a) it is "in the public interest" to grant the waiver; (b) the waiver is "not inconsistent with pipeline safety;" and (c) the waiver "is necessary to address an actual or impending emergency involving pipeline transportation." 49 U.S.C. § 60118(c)(2)(A)(i)-(iii).

(2)    In issuing the Approval and Emergency Special Permit orders, PHMSA failed to provide public notice, an opportunity for public participation, a statement of reasons for its decisions, and other required elements for non-emergency waivers of pipeline safety requirements under the PSA. *See* 49 U.S.C. § 60118(c)(1)(A), (B). Likewise, PHMSA failed to follow its procedures for the issuance of non-emergency special permits

3

under 49 C.F.R. Section 190.341.

(3)     PHMSA failed to conduct required environmental review under

NEPA, 42 U.S.C. § 4321 *et seq.*

Petitioners are non-profit organizations whose missions include protecting the environment along California's coast and inland areas. Advocating for the protection and preservation of the environment from oil and gas development and transportation is central to their work. Petitioners have members who live and recreate near, and otherwise utilize, the land and waters along the route of the Pipeline System. They have a substantial interest in PHMSA's decision to issue the Approval and Emergency Special Permit because restarting the Pipeline System would allow for the resumption of oil and gas drilling off the Gaviota coast and transportation of oil by pipeline, thereby threatening to degrade the environment, including from another oil spill from the Pipeline System, and ground-disturbing activities related to pipeline repairs and inspections. Thus, PHMSA's action has adverse impacts on the Petitioners and their members' interests in the resources and ecosystems found along the Pipeline System route.

4

Respectfully submitted this 24th day of December, 2025.

/s/ Linda J. Krop
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE
CENTER
*Counsel for Petitioners
Environmental Defense Center, Get
Oil Out!, Santa Barbara County
Action Network, Sierra Club, and
Santa Barbara Channelkeeper*

/s/ Julie Teel Simmonds
Julie Teel Simmonds
David Pettit
CENTER FOR BIOLOGICAL
DIVERSITY
*Counsel for Petitioners Center for
Biological Diversity and Wishtoyo
Foundation*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and this Court's

Rule 26.1, Petitioners Environmental Defense Center (EDC), Get Oil Out!

(GOO!), Santa Barbara County Action Network (SBCAN), Sierra Club, by and

though the Santa Barbara-Ventura Chapter ("Sierra Club"), Santa Barbara

Channelkeeper (SBCK), the Center for Biological Diversity (CBD), and Wishtoyo

Foundation state as follows:

These Petitioners are non-profit organizations and do not have any parent

corporations or any publicly held corporations that own 10 percent or more of their

stock.

Respectfully submitted this 24th day of December, 2025.

*/s/ Linda J. Krop*
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE CENTER
*Counsel for Petitioners Environmental
Defense Center, Get Oil Out!, Santa
Barbara County Action Network, Sierra
Club, and Santa Barbara Channelkeeper*

*/s/ Julie Teel Simmonds*
Julie Teel Simmonds
David Pettit
CENTER FOR BIOLOGICAL
DIVERSITY
*Counsel for Petitioners Center for
Biological Diversity and Wishtoyo
Foundation*

6

# CERTIFICATE OF SERVICE

I hereby certify that on December 24, 2025, I caused a true and correct copy of the Petition for Review, Exhibits A & B thereto, and Corporate Disclosure Statement to be served using the Appellate Electronic Filing system. I also caused the foregoing documents to be served on the following Respondents by third party commercial carrier Nationwide for delivery by December 26, 2025:

**Respondents**

Sean Duffy, Secretary of Transportation
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Paul J. Roberti, Administrator
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Office of Chief Counsel
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Pamela Bondi
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

I also emailed courtesy copies of the foregoing documents to applicants' counsel as follows:

7

| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | Attorneys for Sable Offshore Corp. and Pacific Pipeline Company |
|---|---|
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | Attorneys for Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | Attorneys for Sable Offshore Corp. and Pacific Pipeline Company |

*/s/ Julie Teel Simmonds*
Julie Teel Simmonds

8

# Exhibit A



**U.S. Department
of Transportation
Pipeline and Hazardous
Materials Safety
Administration**

12300 W. Dakota Ave., Suite 340
Lakewood, CO  80228

**VIA ELECTRONIC MAIL TO: lyearwood@sableoffshore.com**

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**RE:     Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration (PHMSA) received several documents from Sable Offshore Corp. These documents included:

1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
2. A letter requesting the removal of pressure restrictions for Line CA-324
3. A letter requesting the removal of pressure restrictions for Line CA-325
4. The Las Flores Pipeline Linefill Positioning Plan Assignments
5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at dustin.hubbard@dot.gov.

Sincerely,


Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

cc:     Trent Fontenot, Sr. Vice President - Operations, tfontenot@sableoffshore.com
Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire,
jim.hosler@fire.ca.gov

# Exhibit B

# U.S. DEPARTMENT OF TRANSPORTATION

# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION

# EMERGENCY SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | 2025-1502 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |
| **Expiration Date:** | February 21, 2026 |
| **Code Section:** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] grants this emergency special permit to Sable Offshore Corp. PPC (Sable) for 124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 (*special permit segments*), transporting crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties, California. This emergency special permit waives compliance from 49 CFR § 195.452(h)(4)(iii)(H), which requires corrosion of or along a longitudinal seam weld be scheduled for evaluation and remediation within 180 days of discovering the condition.

## I. Purpose and Need

On December 19, 2025,[2] Sable requested an emergency special permit for relief from the requirement to evaluate and remediate corrosion occurring at longitudinal seam welds within 180 days. The *special permit segments* are under polyurethane foam and polyethylene tape wrap insulation, which can inhibit the effectiveness of cathodic protection and contribute to a risk of corrosion due to shielding effects. Sable proposed an alternative approach to safely manage this risk, which was previously reviewed and approved as part of two state waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for the *special permit segments*. PHMSA previously reviewed the state waivers pursuant to 49 U.S.C. § 60118(d).

---

[1] Throughout this special permit, the usage of "PHMSA" means the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety.

[2] Sable submitted supplemental information related to its application on December 23, 2025.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 1 of 16

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California, which provides, among other requirements, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and CA-325. The *special permit segments* were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). However, the *special permit segments* are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025. As a result, PHMSA has exclusive pipeline safety regulatory agency over Lines CA-324 and CA-325. The conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement.

Sable requested PHMSA grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). In its application, Sable stated that expedited review of its application was warranted in light of the national energy emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) in Executive Order 14156 (January 20, 2025). In Executive Order 14156, the President declared a national energy emergency based on a finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[3] The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[4] The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[5]

Sable's application stated that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and CA-325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.[6] Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the OSFM State Waivers created by redesignation of Lines CA-324 and CA-325 as interstate, given that the proposed special permit is substantially the same as that which was previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

This emergency special permit allows Sable to operate Lines CA-324 and CA-325 without being subject to the requirement to evaluate and remediate corrosion of or along a longitudinal seam weld within 180 days. On the condition that Sable comply with the terms and conditions set forth below, the emergency special permit waives compliance with 49 CFR § 195.452(h)(4)(iii)(H) for the *special permit segments*.

---

[3] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.
[4] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 2(a). The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).
[5] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 3(b).
[6] For more information regarding these effects, see Attachments C, D, E, and F.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 2 of 16

## II. Special Permit Segments

This emergency special permit pertains to the specified pipeline segments which make up the Las Flores Pipeline called Line CA-324 and CA-325. Line CA-325 can be further divided into two segments: Lines CA-325A and CA-325B. The Las Flores Pipeline is part of the Santa Ynez Pipeline System (SYPS), an interstate pipeline facility that Sable operates from the Outer Continental Shelf off the coast of Santa Barbara to Kern County, California. A map of the special permit segments is available in Revised Attachment A.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA grants this emergency special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with limitations on scheduling instances of corrosion on or near longitudinal seam welds for evaluation and remediation within 180 days of discovery in 49 CFR § 195.452(h)(4)(iii)(H), which would be waived.

**General Conditions:**

1)  The *special permit segments* may only be used to transport crude oil.

2)  Prior to transporting crude oil in the *special permit segments*, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3)  Sable shall not exceed maximum operating pressure (MOP) limits for the *special permit segments*, as follows:

    a)  The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

    b)  The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

    c) The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4) Sable shall not exceed maximum operating temperature limits for crude oil transported in the *special permit segments*, as follows:

    a) The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit for more than 12 consecutive hours.

    b) The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

    c) The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5) This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6) This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7) In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

    a) Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

        i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

        ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

    b) Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

    c) Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

8) Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the

pipe body, heat affected zone (HAZ)[7], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9)   Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

  a)   API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

  b)   API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10)   All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[10] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11)   Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss

---

[7] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

[9] Sable indicated in its application that it has already completed the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 5 of 16

anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12) Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of CA-324 and CA-325A/B.

13) Pressure Testing:[11]

   a) Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

      i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

      ii. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

   b) Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

   c) Prior to placing Line CA-325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

      i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

      ii. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

   d) Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

   e) Prior to placing Line CA-325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the

---

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 6 of 16

hydrostatic test on CA-325B:

    i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

f) Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

g) Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

h) Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

i) Section(s) of the *special permit segments* that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the *special permit segments* cannot be safely operated.

14) In-Line Inspection (ILI) Assessment and Frequency:

a) Prior to performing in-line inspections of the *special permit segment*, Sable shall provide PHMSA with a written notification to PHMSA describing its assessment plan with the following information:

    i. Dates for integrity assessment

    ii. In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

    iii. In-line inspection tool vendor(s)

    iv. Required tool specifications including operational specifications and anomaly sizing tolerances

    v. Tool validation methodology

    vi. Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

---

[12] All submissions to PHMSA required by this emergency special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[13] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 7 of 16

> vii.   Criteria used to identify locations for excavation and field verification
>
> viii.  Non-destructive examination

b) Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

c) Metal Loss Tool(s):

> i.   Initial ILI tool runs – Each year, during the first two (2) years of operating the *special permit segments*, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
>
> ii.  Subsequent ILI tool runs – After the first two (2) years of operating the *special permit segments*, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the *special permit segment* within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

d) Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

> i.   These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.
>
> ii.  USCD Performance Specification Requirements
>
> > 1.   The USCD tools must have a probability of detection that is

---

[14] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval.  Changes to the reassessment interval are subject to PHMSA approval.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 8 of 16

> $\geq 90\%$ for axial and circumferential cracks.

2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

4. The depth sizing accuracy for cracks must be $\pm 0.8$ mm for axial cracks and $\pm 1$ mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

f) Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the *special permit segment* in which the ILI tool velocity was outside of the specified tool velocity range.

g) All ILI tool runs must obtain the Test ID from PHMSA prior to run.

h) Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

i) Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

j) Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second

---

[15] A minimum of four (4) independent direct examination excavations must be used for unity plots.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 9 of 16

Edition, April 2013).

15)   Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16)   Immediate Repair Conditions:[16]

    a)   A crack or crack-like anomaly that meets any of the following criteria:

        i.   Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

        ii.   Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

    b)   Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

    c)   Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17)   180-Day Repair Conditions:[18]

    a)   A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

    b)   Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

    c)   All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[19]

    d)   For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18)   Corrosion Growth Rate Analysis (CGRA):

    a)   Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to

---

[16] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by PHMSA.

prior ILI) and perform pipeline remediations needed to assure the integrity of the *special permit segments* is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

b) The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

c) Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

a) Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

ii. Sable must increase the metal loss anomaly's depth by 20% when

---

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 11 of 16

they input it into the formula for calculating the number of wraps needed for repair method 5.

   iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[25]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

   i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

   ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

d) Sable must send all field measurements to the ILI tool vendor within 90 days

---

[25] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 12 of 16

of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the *special permit segments*. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is

g) occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the *special permit segments* and must be submitted to PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

   i.   Technical approach used for the analysis

   ii.  All data used and analyzed

   iii. Pipe and longitudinal weld seam properties

   iv.  Procedures used to implement emergency special permit conditions

v.      Evaluation methodology used

vi.     Models used

vii.    Direct in situ examination data

viii.   All in-line inspection tool assessments information evaluated

ix.     Pressure test data and results

x.      All in-the-ditch assessments performed on the *special permit segments*

xi.     All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

xii.    All finite element analysis results

xiii.   The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

xiv.    The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

xv.     Safety factors used for fatigue life and/or predicted failure pressure calculations

xvi.    Reassessment time interval and safety factors

xvii.   The date of the review

xviii.  Confirmation of the results by qualified technical subject matter expert(s)

xix.    Approval by responsible Sable management personnel

xx.     Records of additional preventive and mitigative (P&M) measures performed

xxi.    Reports required by this emergency special permit.

24)   Reporting:

a)   Any release on the *special permit segments* shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

b)   An email notification shall be made at least three (3) days prior to a *special permit segment* being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

   i.  Tool type and run date

   ii. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state, or Federal regulations.

      iii. Dig sheets

      iv. Field contact information for Sable

      v.  Time and location of the field evaluation and repair.

c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

      i.  Tool type

      ii.  Run date

      iii. Summary of Conditions Report[27]

      iv. Final Vendor Report and Pipe Tally

d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit, including any renewals. The report shall be submitted to PHMSA. At a minimum, the annual report shall contain the following, if applicable:

      i.  A Closure Report for the previous calendar (CY) which contains:

            1.  Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

            2.  Identify features that remain to be assessed

            3.  Unity Plots for previous ILI runs

      ii.  Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

      iii. The third-party ILI expert reviews in accordance with condition 21(e).

      iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

      v.  A copy of the CGRA for prior year including:

            1.  Mean corrosion growth rate for the *special permit segments*

            2.  Distribution graph of the corrosion growth rate for the *special permit segments* (e.g. occurrences (#) vs. corrosion rate (mpy)

The above conditions are based on PHMSA's review and consideration of information provided by Sable, including information in their emergency special permit application which can be found at Docket No. PHMSA-2025-1502 in the Federal Docket Management System located at www.regulations.gov.  PHMSA has determined the conditions listed above would be necessary to ensure this Emergency Special Permit is not inconsistent with pipeline safety.

---

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

## IV. Limitations:

This special permit is subject to the limitations set forth in 49 CFR § 190.341, as well as the following limitations:

1) This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR § 190.341(g).

2) Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

3) PHMSA may order the *special permit segments* to be shutdown at any time.

4) PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

5) In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

6) If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide PHMSA written notice of the change within 60 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.

AUTHORITY:  49 United States Code 60118 (c)(1) and 49 CFR § 1.97.

Issued in Washington, D.C., on <u>December 23, 2025</u>.

**LINDA GAIL DAUGHERTY** Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.23 15:48:57 -05'00'

Linda Daugherty
Acting Associate Administrator
  for Pipeline Safety

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On January 6, 2026, I served the above document(s) described as **DECLARATION OF JULIE TEEL SIMMONDS IN SUPPORT OF PETITIONERS AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S EX PARTE APPLICATION FOR ORDER SHORTENING TIME FOR NOTICE OF MOTION AND MOTION FOR RECONSIDERATION (VOL. 3 OF 4)** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒    **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 6, 2026, at Santa Barbara, California.

_____
Jeremy M. Frankel

**SERVICE LIST**

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>Myung Park<br>Myung.Park@doj.ca.gov<br>Matthew Bullock<br>Matthew.Bullock@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
1/6/2026 9:47 PM
By: Terri Chavez , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 884-7100
*Attorneys for Petitioners/Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

Linda Krop (Bar No. 118773)
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
Tara C. Rengifo (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152
*Attorneys for Petitioners/Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation; and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br>[Consolidated with Case No. 25CV02247]<br><br>**DECLARATION OF JULIE TEEL SIMMONDS IN SUPPORT OF PETITIONERS AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S EX PARTE APPLICATION FOR ORDER SHORTENING TIME FOR NOTICE OF MOTION AND MOTION FOR RECONSIDERATION (VOL. 4 OF 4)**<br><br>[Filed Concurrently with Opposition, Request for Judicial Notice, and [Proposed] Order]<br><br>Date:    January 7, 2026<br>Time:    10:00 a.m.<br>Dept.:    4<br>Judge:    Honorable Donna D. Geck<br><br>Action Filed: April 15, 2025<br>Case No. 25CV02247 |

1

Declaration of Julie Teel Simmonds ISO Petitioners' Opposition to Real Parties' Ex Parte Application to Shorten Time

|  |  |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit coproration and WISHTOYO FOUNDATION,<br><br>              Petitioners/Plaintiffs,<br><br>     v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>             Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,<br><br>             Real Parties in Interest. | Case No. 25CV02247<br>[Consolidated with Case No. 25CV02244] |

2

Declaration of Julie Teel Simmonds ISO Petitioners' Opposition to Real Parties' Ex Parte Application to Shorten Time

# EXHIBIT K

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

DEC 31 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER; et al.,<br><br>Petitioners,<br><br>v.<br><br>PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION,<br><br>Respondent,<br><br>----------------------------------------<br><br>SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY,<br><br>Intervenors - Pending. | No. 25-8059<br><br>Agency No. 2025-1502<br><br>Pipeline and Hazardous Materials Safety Administration<br><br>ORDER |

Before: HURWITZ and BRESS, Circuit Judges.

The motion (Docket Entry No. 4) for leave to intervene is granted.

The motion (Docket Entry No. 8) to stay the Pipeline and Hazardous Materials Safety Administration's December 22, 2025 approval of the Restart Plan and December 23, 2025 Emergency Special Permit is denied. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (defining standard for stay pending appeal).

This petition is expedited. The clerk will place this case on the next available calendar. *See* Gen. Ord. 3.3(f).

The opening brief is due January 26, 2026. The answering brief is due February 17, 2026. Intervenors' brief is due March 3, 2026. The optional reply brief is due 14 days after intervenors' brief is filed.

No streamlined extensions of time will be approved under Ninth Circuit Rule 31-2.2(a). Any request for an extension of time to file a brief must be made by written motion under Ninth Circuit Rule 31-2.2(b).

# EXHIBIT L



**Planning and Development**
Lisa Plowman, Director
Jeff Wilson, Assistant Director
Elise Dale, Assistant Director

December 23, 2025

Steven Rusch
VP, Regulatory and Environmental Affairs
Sable Offshore Corporation
845 Texas Ave., Suite 2920
Houston, Texas 77002
Via email at srusch@sableoffshore.com

**BOARD OF SUPERVISORS
HEARING OF DECEMBER 16, 2025**

Linda Krop
Environmental Defense Center
906 Garden Street
Santa Barbara, CA 93101
Via email at lkrop@environmentaldefensecenter.org

Miyoko Sakashita
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
Via email at miyoko@biologicaldiversity.org

*RE:    Board Action Letter*
*Appeals of the Planning Commission Approval of the Sable Offshore Corporation Change of Owner, Operator, and Guarantor of the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline Final Development Plan Permits*
*Case Nos. 24APL-00025 and 24APL-00026*

---

Dear Mr. Rusch, Ms. Krop, and Ms. Sakashita,

On December 16, 2025, the Board of Supervisors took the following actions on Case Nos. 24APL-00025 and 24APL-00026 for the appeals of the Planning Commission's approval of the Sable Offshore Corporation Change of Owner, Operator, and Guarantor of the Santa Ynez Unit, Pacific Offshore Pipeline Company (POPCO) Gas Plant, and Las Flores Pipeline Final Development Plan Permits.

December 23, 2025
Board Action Letter
Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline System Final Development Plan Permits
Page 2 of 2

Supervisor Lavagnino moved, seconded by Supervisor Lee and carried by a vote of 3 to 1 (Nelson no, Hartmann recused) to:

1.  Approve the appeals, Case Nos. 24APL-00025 and 24APL-00026;

2.  Make the required findings for denial of the Change of Owner, Operator, and Guarantor for the respective Santa Ynez Unit (SYU), Pacific Offshore Pipeline Company (POPCO) Gas Plant, and Las Flores Pipeline System Final Development Plan (FDP) Permits;

3.  Determine that denial of the requests is exempt from CEQA pursuant to CEQA Guidelines Section 15270(a); and

4.  Deny the Change of Owner, Operator, and Guarantor for the respective SYU, POPCO Gas Plant, and Las Flores Pipeline System FDP Permits.

**The attached findings reflect the Board of Supervisors actions of December 16, 2025.**

Sincerely,

Lisa Plowman
Planning & Development Director


xc:
      Case File: 24APL-00025 and 24APL-00026
      Deputy County Counsel: Jennifer Richardson
      Deputy Director: Errin Briggs
      Planner: Jacquelynn Ybarra
      Planning Commissioner Michael Cooney, First District
      Planning Commissioner John Parke, Third District
      Planning Commissioner Roy Reed, Fourth District


**Attachments:**    **Attachment 1 – Findings**
                       **Attachment 2 – Board Minute Order (Item #25-01067)**

**ATTACHMENT 1:  FINDINGS OF DENIAL**

**1.0   CEQA FINDINGS**

**1.1   CEQA EXEMPTION**

The Board of Supervisors finds that the Sable Offshore Corporation's (Sable) Change of Owner, Operator, and/or Guarantor for the Santa Ynez Unit (SYU), Pacific Offshore Pipeline Company (POPCO) Gas Plant, and Las Flores Pipeline System Final Development Plan (FDP) permits are not subject to the requirements of the California Environmental Quality Act (CEQA), as CEQA Guidelines Section 15270 [Projects Which are Disapproved] exempts projects if a public agency rejects or disapproves of the project. Please see Attachment C, Notice of Exemption.

**2.0   ADMINISTRATIVE FINDINGS**

The Board Agenda Letter dated December 16, 2025, the Set Hearing Board Letter dated October 21, 2025, the Board Agenda Letter dated November 4, 2025, the Set Hearing Board Letter dated February 4, 2025, the Board Agenda Letter dated February 25, 2025, and the Planning Commission Staff Report dated October 22, 2024, including all of their attachments for the Sable Offshore Corporation's Change of Owner, Change of Operator and Change of Guarantor for the SYU Permit No. 87-DP- 32cz (RV06), the Change of Guarantor and Change of Operator for the POPCO Gas Plant Permit No. 93-FDP-015 (AM03), and the Change of Guarantor and Change of Operator for the Las Flores Pipeline System Permit No. 88-DPF-033 (RV01)z, 88-CP-60 (RV01) (88- DPF-25cz; 85-DP-66cz; 83-DP-25cz), are incorporated by reference herein.

Sable submitted separate applications for each of the three Facilities requesting the following:

1.  A Change of Owner, Operator, and Guarantor for the SYU Final FDP permit;
2.  A Change of Operator and Guarantor for the POPCO Gas Plant FDP permit; and
3.  A Change of Operator and Guarantor for the Las Flores Pipeline System FDP permit.

Because each application requires a Change of Operator, and the findings required for a Change of Operator cannot be made, all the applications are denied.  The discussion below is limited to the required findings which cannot be made for the requests.

**2.1   CHANGE OF OWNER, OPERATOR, AND GUARANTOR FOR THE SANTA YNEZ UNIT ONSHORE FACILITIES, FINAL DEVELOPMENT PLAN PERMIT NO. 87-DP-32cz (RV06)**

**2.1.1   Findings required for Change of Operator**

In compliance with Section 25B-10 of the County Code, the planning commission [or the Board if on appeal] shall approve an application for change of operator only if the planning commission [or the Board if on appeal] makes the following findings.

*(9) Operator Capability. The proposed operator has the skills and training necessary to operate the permitted facility in compliance with the permit and*

Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 2

> *all applicable county codes and has a good working knowledge of the crucial compliance plans listed in Sec. 25B-10.1.f. The director shall require relevant records of compliance, and corrective actions taken subsequent to any major incidents for facilities, if any, that are similar in nature to those that are the subject of the permit, as may be necessary to make findings. These records shall be used to provide sufficient assurance that the proposed operator does not reflect a record of non-compliant or unsafe operations systemic in nature for similar facilities to those being considered for operatorship.*

The Board of Supervisors finds that Sable reflects a record of non-compliant or unsafe operations systemic in nature for the Facilities being considered for operatorship, and therefore does not have the skills, training, and resources necessary to operate the permitted Facilities in compliance with the applicable permits and all applicable county codes. Sable acquired the Facilities on February 14, 2024, and first applied for the changes in Owner, Operator, and/or Guarantor in March of 2024. The Planning Commission acted on the requests on October 30, 2024, and the Board heard the requests on appeal on February 25, 2025.  Given the unique circumstances of the Board's previous tie-vote on February 25, 2025, subsequent litigation, and remand for a rehearing, the Board has now had over a year and a half of Sable's compliance records pertaining to the Facilities to review, and is not limited to records of compliance for similar facilities as outlined in Finding 25B-10(a)(9).  In that time, Sable has amassed a significant track record of systemic noncompliance for the Facilities. This noncompliance demonstrates a lack of diligence, and a pattern and practice of failing to notify regulatory agencies and obtain authorization before beginning work, failing to maintain and/or provide necessary and accurate information to regulators, failing to comply with applicable laws, ignoring regulatory agency directives, and failing to competently operate and take all necessary measures to protect the environment. Further, Sable has made statements reflecting contempt for California's regulations and regulators. The Board finds evidence that Sable is not capable of following state law, and state agency directives indicate that Sable will be likewise incapable of operating the Facilities in compliance with the county permits and all applicable county codes. The Board of Supervisors has reviewed the following records, which it considers relevant records of systemic noncompliance for the reasons stated above. The Board also incorporates by reference the Board Agenda Letter dated December 16, 2025 and all attachments, as well as all public comments presented at and in advance of the Board Hearings held on February 25, 2025, November 4, 2025 and December 16, 2025.

Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 3

***Evidence that Sable has repeatedly undertaken activities prior to notifying regulators and obtaining prior authorizations***

<u>*County of Santa Barbara*</u>

- In May 2025, Sable unloaded 57 diesel trucks to fill onsite crude oil tanks at the SYU without notifying the County.  This required a Management of Change Protocol with the Systems Safety and Reliability Review Committee (SSRRC) per SYU FDP Permit Condition XI-2.a. (Safety Inspection and Maintenance Programs). (*Email from County consultant Jay Sheth to Justin Crowell on May 9, 2025.*)
- In May 2025, Sable unloaded liquified petroleum gas to partially fill the SYU Offspec Propane Bullet without notifying the County. This required review and consideration with the SSRRC per SYU FDP Permit Condition XI-2.a. (*Email from County consultant Jay Sheth to Errin Briggs on May 15, 2025.*)
- In May 2025, P&D was informed by its petroleum engineering consultant Jay Sheth that Sable had started moving oil from the platforms to the onshore SYU prior to formally notifying the County. (*Email from Steve Rusch to Lisa Plowman on May 21, 2025.*)
- In November 2024, Sable submitted retroactive Zoning Clearance applications for Las Flores Pipeline anomaly digs it had begun in September 2024.  The County ultimately determined that no new County permits were required for the work, but authorization should have been sought prior to initiating the digs.
- The presentation by staff at the California Coastal Commission's state compliance hearing on April 10, 2025, which includes the images below, provides photographic evidence that Sable began anomaly digs roughly two months before submitting Zoning Clearance applications to the County.

 

Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 4



### State Lands Commission

- On May 19, 2025, Sable announced that as of May 15, 2025, it has restarted production at the SYU and had begun flowing oil production to Las Flores Canyon.
- On May 23, 2025, the Chair of State Lands Commission Eleni Kounalakis sent a letter to Sable stating that Sable was required to communicate with State Lands Commission staff before initiating any oil flow through its offshore pipeline and its failure to do so *"undermines trust of Sable's motives, demonstrates a lack of understanding of the significant concerns held by many regarding the resumption of activities, and raises serious questions about Sable's willingness to be a transparent operator."*

### Central Coast Regional Water Quality Control Board (Water Board)

- A Report on an *"Inspection of Unauthorized Discharges to Waters by Sable Offshore"* documents observations by Water Board staff of violations observed during a February 28, 2025 site visit.
- The Water Board sent Sable notices of violation and/or non-compliance notices for unauthorized waste discharges into Santa Barbara County waterways on December 13, 2024, April 15, 2025, and April 16, 2025.
- In a staff report for a meeting held on April 17-18, 2025, Water Board staff wrote: *"Sable's practice of performing unauthorized work in waters of the state and United States has inhibited the Central Coast Water Board from ensuring that appropriate mitigation and best management practices are in place to protect water quality."*
- The Water Board passed a resolution on April 18, 2025 referencing alleged violations of the California Water Code for potential civil judicial enforcement to the California Office of the Attorney General.

### California Attorney General

- On October 3, 2025, the Attorney General filed a Civil Complaint (Case No. 25CV06285) against Sable alleging three causes of action under the Water Code:

Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 5

(1) failure to comply with an investigative order, (2) failure to report waste discharges, and (3) discharge of waste without permit requirements. The complaint alleges *"…Sable deliberately avoided its obligation to obtain waste discharge requirements before commencing work…."* and *"…Sable's blatant and knowing failure to first obtain waste discharge requirements…before commencing excavation work that could affect water quality."*

*California Department of Fish and Wildlife (CDFW):*
- On December 17, 2024, CDFW sent Sable a notice of potential violation explaining that Sable appeared to have: (a) violated Fish and Game Code section 1602(a)(1) by failing to notify CDFW prior to undertaking activities subject to that section, as well as sections 5650 and 5652; and (b) conducted work outside a 50-foot-wide pipeline easement on CDFW property.  The notice includes photographic evidence as shown below.





Lance Yearwood
December 17, 2024
Page 27 of 28

**Photo 23 (Site R5-4).** Photo taken from the linear center of the impact area, facing upstream by Environmental Scientist Andrew Aitken on November 25, 2024, showing the sediment pile in the riverbed and extending into the flowing stream. The vegetation is willow trees the sediment piles have compressed and partially buried.

Site R5-1: Hwy 101 (34.573883°, -120.195670°), Photos 11-14

**Photo 11 (Site R5-1).** Aerial photo taken by Warden Ryan Hitchings on November 18, 2024, showing the extent of the grading within the stream and the straw waddles placed. The upstream vegetation pictured was identified as mule fat growing in standing surface water.

***Evidence that Sable fails to maintain and/or provide necessary, timely, and accurate information to regulators***

*Water Board*
- On January 22, 2025, the Water Board sent Sable a directive to submit a technical report describing Sable's activities at all Las Flores Pipeline work locations and associated potential discharges to waterways.  Sable failed to do so.
- In the staff report for the Water Board's regular meeting of April 17-18, 2025, Water Board staff wrote that Sable's refusal to provide specified information regarding its work locations and work scope has inhibited the Water Board's ability to assess impacts to beneficial uses.

Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 6

- On July 24, 2025, the Water Board sent another notice of violation for Sable's continued failure to submit the technical report.

*California Attorney General*

In its civil complaint, the Attorney General alleges Sable's representations to the Water Board were *"patently false."* The complaint describes Sable as *"uninformed and unprepared"* and alleges:

- *"One would expect a responsible oil production company running 125 miles of underground pipeline with unique integrity challenges through the high consequence areas of Santa Barbara and San Luis Obispo Counties would have that information readily available in a database for use by its integrity and environmental management teams. Not so."*
- *"…the location of streams, channels and drainage along Sable's pipeline route is something any responsible operator should have at their fingertips."*
- *"…Sable management misinformed the Regional Water Board by assuring staff that Sable had assessed how its excavation work could affect water quality."*

**Evidence that Sable fails to comply with applicable laws**

- The Santa Barbara County Air Pollution Control District issued Sable Notices of Violation for the following:
  i. Failure to operate a vapor recovery compressor (July 15, 2025).
  ii. Failure to operate the flare pilot system flame at all times when combustible gases are being vented (July 15, 2025).
  iii. Failure to operate the Waste Gas Incinerator Continuous Emissions Monitoring System for SOx for 5 days (August 18, 2025).
  iv. Failure to conduct the boiler source test by due date (August 20, 2025).
- On May 23, 2025, the Chair of State Lands Commission Eleni Kounalakis sent a letter to Sable stating that Sable's May 19, 2025 press release entitled, *"Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit and Anticipated Oil Sales from the Las Flores Pipeline System in July 2025,"* was misleading because the well-testing activities Sable had undertaken did not constitute a resumption of commercial production or a full restart of the SYU. Subsequently, two Securities and Exchange Commission (SEC) lawsuits were filed alleging Sable misled investors by making false and misleading announcements that it had restarted operations at the SYU when it had not.
- On October 31, 2025, the news outlet Hunterbrook published an article and audio recording of an October 2025 meeting between Sable's Chief Executive Officer (CEO) Jim Flores and select investors where Flores appears to leak insider information. After initially claiming the audio was artificial intelligence (AI) generated, Sable published a notice that its Board of Directors had formed a

Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 7

Special Committee of independent directors to undertake an independent investigation of the allegations contained in the Hunterbrook report.

### *Evidence that Sable Ignores Regulatory Agency Directives*

- As described in the Tentative Ruling in Santa Barbara County Superior Court Case No. 25CV 00974 (October 14, 2025), adopted by the Court on October 15, 2025: On November 12, 2024, the California Coastal Commission's Executive Director issued an Executive Director Cease and Desist Order ordering Sable to cease and desist from conducting any further unpermitted development on the Las Flores Pipeline.
- On February 18, 2025, the Coastal Commission's Executive Director issued a second Cease and Desist Order.
- Sable nonetheless resumed onshore anomaly repair work on the Las Flores Pipeline because County staff had determined the work was covered by existing permits. Although County staff and the Coastal Commission disagreed about whether new permits are necessary, the County did not authorize Sable to ignore the directives of the Coastal Commission. The photograph below is from the Coastal Commission's hearing on April 10, 2025 and shows Sable continued anomaly repair work after the second Cease and Desist Order was issued.



### *Evidence that Sable Fails to Competently Operate and Take All Necessary Measures to Protect the Environment*

- An August 6, 2025 Hazardous Materials Spill Report documents that 280 gallons of Hydrochloric Acid (HCL) spilled at the SYU because tube fittings failed causing a release of the material to spill out onto the ground.

Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 8

- An August 27, 2025 Hazardous Materials Spill Report documents that 5,000 cubic feet of Anerobic Biosolid sludge material spilled during a power washing operation at the SYU.
- The Coastal Commission staff report dated March 28, 2025 on the recommendations and findings for cease and desist order, restoration order, and administrative civil penalty stated and provided evidence that Sable staged excavators in particularly sensitive areas, such as above a pool of water where a southwestern pond turtle and two southern California steelhead were swimming, and that erosion control measures were lacking or had been installed improperly and were therefore ineffective, as shown in the photographs below.





Change of Owner, Operator and/or Guarantor
SYU, POPCO Gas Plant, Las Flores Pipeline System Final Development Plan Permits
Hearing Date: December 16, 2025
Attachment 1, Page 9



***Evidence of Sable's Contempt for California's Environmental Regulations and Regulators***

An audio recording and unofficial transcript of a call in October 2025 between Sable's CEO Jim Flores and a select group of investors shows Flores disparaging California environmental laws and regulators and suggesting ExxonMobil was not capable of achieving what Sable has because ExxonMobil follows the law.  Examples from the transcribed audio include the following:

- 3:28: Describing a proposed offshore storage and treating (OS&T) plan so Sable does not have to *"depend on California's emotional winds of environmentalism"*
- 13:58: when asked why ExxonMobil wouldn't want the Facilities back, Flores responds: *"they would not do what we've done"* and *"they're not adept to operate in California because the California moves the goalpost so bad. They cheat so bad"*. And that Exxon will *"follow the rules and the rules keep changing and we're more adaptable than they are."*
- 26:35: *"Now we've got some bogus you know you know Santa Barbara County DA has some civil charges and they ramp them up to criminal and stuff. They they're trying all kind of stuff all the crazies."*

## 2.2    CHANGE OF OPERATOR AND GUARANTOR FOR THE PACIFIC OFFSHORE PIPELINE COMPANY GAS PLANT, FINAL DEVLOPMENT PLAN PERMIT NO. 93-FDP-015 (AM03)

### 2.2.1    Findings required for Change of Operator

In compliance with Section 25B-10 of the County Code, the planning commission shall approve an application for change of operator only if the planning commission makes the following findings.

> *(9) Operator Capability. The proposed operator has the skills and training necessary to operate the permitted facility in compliance with the permit and all applicable county codes and has a good working knowledge of the crucial compliance plans listed in Sec. 25B-10.1.f. The director shall require relevant*

> *records of compliance, and corrective actions taken subsequent to any major incidents for facilities, if any, that are similar in nature to those that are the subject of the permit, as may be necessary to make findings. These records shall be used to provide sufficient assurance that the proposed operator does not reflect a record of non-compliant or unsafe operations systemic in nature for similar facilities to those being considered for operatorship.*

The Board of Supervisors finds that this finding cannot be made for the reasons stated in Finding 2.1.1. above.

**2.3    CHANGE OF OPERATOR AND GUARANTOR FOR THE LAS FLORES PIPELINE SYSTEM, FINAL DEVLOPMENT PLAN PERMIT NO. 88-DPF-033 (RV01)z, 88-CP-60 (RV01)(88-DPF-25cz;85-DP-66cz; 83-DP-25cz)**

**2.3.1    Findings required for Change of Operator**

In compliance with Section 25B-10 of the County Code, the planning commission shall approve an application for change of operator only if the planning commission makes the following findings.

> *(9) Operator Capability. The proposed operator has the skills and training necessary to operate the permitted facility in compliance with the permit and all applicable county codes and has a good working knowledge of the crucial compliance plans listed in Sec. 25B-10.1.f. The director shall require relevant records of compliance, and corrective actions taken subsequent to any major incidents for facilities, if any, that are similar in nature to those that are the subject of the permit, as may be necessary to make findings. These records shall be used to provide sufficient assurance that the proposed operator does not reflect a record of non-compliant or unsafe operations systemic in nature for similar facilities to those being considered for operatorship.*

The Board of Supervisors finds that this finding cannot be made for the reasons stated in Finding 2.1.1. above.

# County of Santa Barbara

# BOARD OF SUPERVISORS



*one COUNTY | one FUTURE*

*First District - Roy Lee*
*Second District - Laura Capps, Chair*
*Third District - Joan Hartmann*
*Fourth District - Bob Nelson, Vice Chair*
*Fifth District - Steve Lavagnino*

*Mona Miyasato, County Executive Officer*

## Action Summary

### Tuesday, December 16, 2025

### 9:00 AM

### JOSEPH CENTENO BETTERAVIA GOVERNMENT ADMINISTRATION BUILDING, BOARD HEARING ROOM 511 EAST LAKESIDE PARKWAY, SANTA MARIA

The Board of Supervisors meets concurrently as the Board of Directors of the Flood Control & Water Conservation District, Water Agency, the Santa Barbara Fund for Public and Educational Access and other Special Districts.

Live Web Streaming of the Board of Supervisors Meetings, Agendas, Supplemental Materials and Minutes of the Board of Supervisors are available on the internet at: www.countyofsb.org.

## 9:00 A.M. ..... Convened to Regular Session

## Roll Call

**Present:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

## Pledge of Allegiance

## Moment of Silence in memory of Public Works employee Nian Gonzales

## Approval of Minutes of the December 9, 2025 Meeting

**A motion was made by Supervisor Nelson, seconded by Supervisor Hartmann, to approve the minutes. The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

## County Executive Officer's Report

**25-00001**

County Executive Officer's Report: Receive a report from the County Executive Officer (CEO) on County programs, County staff updates and achievements, staff recognitions, updates on major projects, updates on state and federal legislation, and upcoming events of interest to the Board and the public. There will be no Board discussion except to ask questions or refer matters to staff; and no action will be taken unless listed on a subsequent agenda.

Swearing-In for New County Fire Chief Garrett Huff

**County Executive Officer, Mona Miyasato announced the following:**

**Chief Deputy District Attorney Jennifer Karapetian was named Attorney of the Year by Santa Barbara Women Lawyers, recognizing her exceptional contributions to the legal profession and the community; and**

**The County held a swearing-in ceremony for the new Fire Chief, formally welcoming Chief Garrett Huff into his new role following Chief Mark Hartwig's retirement.**

BOARD OF SUPERVISORS                    **Action Summary**                    December 16, 2025

## Administrative Agenda

*All matters listed hereunder constitute a consent agenda, and will be acted upon by a single roll call vote of the Board.  Matters listed on the Administrative Agenda will be read only on the request of a member of the Board or the public, in which event the matter shall be removed from the Administrative Agenda and considered as a separate item.*

## Resolutions to be Presented

**A-1)**    <u>SUPERVISOR HARTMANN</u>                                   **25-01074**

Adopt a Resolution of Commendation honoring Sheriff's Deputy, Special Duty Vincent Ray Buck upon his retirement from the Sheriff's Department after over 22 years of faithful and dedicated service to the citizens of Santa Barbara, Tulare, Lassen and San Luis Obispo Counties.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be adopted.**

**RESOLUTION NO. 25-265**

**The motion carried by the following vote:**

**Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**A-2)**    <u>SUPERVISOR NELSON</u>                                   **25-00965**

Adopt a Resolution of Commendation honoring Angelica Muñoz upon her retirement from the Probation Department after over 22 years of faithful and distinguished service to the citizens of Santa Barbara County.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be adopted.**

**RESOLUTION NO. 25-266**

**The motion carried by the following vote:**

**Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

| BOARD OF SUPERVISORS | Action Summary | December 16, 2025 |
|---|---|---|

**A-3)**     <u>SUPERVISOR NELSON</u>                                          **25-01075**

Adopt a Resolution of Commendation honoring Martin Jay Wilder upon his retirement from the Public Works Department after 37 years of faithful and dedicated service to the citizens of Santa Barbara County.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be adopted.**
>
> **RESOLUTION NO. 25-267**
>
> **The motion carried by the following vote:**

> **Ayes:**     5 -     Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

## Honorary Resolutions

**A-4)**     <u>SUPERVISOR CAPPS</u>                                           **25-01091**

Adopt a Resolution of Commendation honoring Deborah Hartman upon her retirement from the Social Services Department after over 28 years of faithful and dedicated service to the citizens of Santa Barbara County.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be adopted.**
>
> **RESOLUTION NO. 25-268**
>
> **The motion carried by the following vote:**

> **Ayes:**     5 -     Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

BOARD OF SUPERVISORS                     Action Summary                     December 16, 2025

## Administrative Items

**A-5)**     <u>BEHAVIORAL WELLNESS DEPARTMENT</u>                     **25-01066**

Consider recommendations regarding First Amendments to the Behavioral Health Student Services Act Grant Agreements with the Behavioral Health Services Oversight and Accountability Commission for Round 4, Category 3: Sustainability and Round 4, Category 4: Other Priorities grant funds for Fiscal Years 2024-2028, as follows: (4/5 Vote Required)

a) Approve, ratify, and authorize the Director of the Department of Behavioral Wellness or designee to execute a First Amendment (No. 24MHSOAC018.A1) to the Behavioral Health Student Services Act, Round 4, Category 3: Sustainability Grant Agreement with the Behavioral Health Services Oversight and Accountability Commission to extend the term end date to March 31, 2028; modify reporting requirements; and reallocate grant year budget amounts with no change to the total maximum grant award amount of $449,650.00;

b) Approve, ratify, and authorize the Director of the Department of Behavioral Wellness or designee to execute a First Amendment (No. 24MHSOAC057.A1) to the Behavioral Health Student Services Act, Round 4, Category 4: Other Priorities Grant Agreement (No.24MHSOAC057) with the Behavioral Health Services Oversight and Accountability Commission to extend the term end date to March 31, 2028, and modify reporting requirements with no change to the total maximum grant award amount of $300,000.00; and

c) Determine that the above-recommended actions are not a project that is subject to environmental review under the California Environmental Quality Act (CEQA), pursuant to CEQA Guidelines section 15378(b)(4), finding that the actions are governmental funding mechanisms and/or fiscal activities that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) and b) Approved, ratified and authorized; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**     5 -     Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**BOARD OF SUPERVISORS**                    **Action Summary**                    **December 16, 2025**

A-6)        BEHAVIORAL WELLNESS DEPARTMENT                          **25-01076**

Consider recommendations regarding a First Amended and Restated Business Associate Agreement (BAA) under the Health Insurance Portability and Accountability Act of 1996 with California Mental Health Services Authority (CalMHSA) (No. 1327-BAA-2022-SB), as follows:

a) Approve, ratify, and authorize the Chair to execute a First Amended and Restated BAA under the Health Insurance Portability and Accountability Act of 1996 (No. 1327-BAA-2022-SB [Rev. 10.28.25] First Amended and Restated) with CalMHSA to meet current State and federal requirements; and

b) Determine that the above-recommended action is not a project that is subject to environmental review under the California Environmental Quality Act (CEQA), pursuant to CEQA Guidelines section 15378(b)(5), finding that the action consists of an administrative activity of the government that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved, ratified and authorized; Chair to execute; and**

**b) Approved.**

**The motion carried by the following vote:**

**Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**BOARD OF SUPERVISORS**               **Action Summary**               **December 16, 2025**

---

**A-7)**    <u>BEHAVIORAL WELLNESS DEPARTMENT</u>                                    **25-01079**

Consider recommendations regarding a First Amendment to the Services Agreement with the Santa Barbara County Education Office (SBCEO) for Mental Health Services for School-Based Programs for Fiscal Years 2022-2025, as follows:

a) Approve, ratify, and authorize the Chair to execute a First Amendment to the Agreement for Services of Independent Contractor with SBCEO (Board Contract No. 22-194) to update certain standard terms and conditions and program budget requirements to comply with state requirements or business needs; extend the term of the Agreement to end on March 31, 2028; reduce the number of Navigators to 4.50 Full-Time Equivalent (FTE) within the Behavioral Mental Health Services Oversight and Accountability Commission (formerly Mental Health Services Oversight and Accountability Commission (MHSOAC)) Behavioral Health Student Services Act (formerly Mental Health Student Services Act (MHSSA)) Program, terminate the now Behavioral Health Services Oversight and Accountability Commission (BHSOAC) Behavioral Health Student Services Act (BHSSA) Program, effective December 31, 2026; add the BHSOAC BHSSA Round 4, Categories 3 and 4 Program, effective March 28, 2025; update Standard Indemnification and Insurance Provisions; add Addendum BHSOAC Grant Agreements No. 24MHSOAC018, No. 24MHSOAC018.A1, No. 24MHSOAC057 and No. MHSOAC057.A1; and increase the contract amount by $390,386.00, for a revised total maximum contract amount not to exceed $1,983,918.00, for the period of January 1, 2023, through March 31, 2028, contingent upon the Board's approval of BHSOAC Grant Agreement Amendments No. 24MHSOAC018.A1 and No. 24MHSOAC057.A1 at the December 16, 2025 Board hearing;

b) Delegate authority to the Director of the Department of Behavioral Wellness or designee to make changes to staffing requirements per Exhibits A-1 and A-2; all without altering the total maximum contract amount and without requiring the Board of Supervisors' ability to rescind the delegated authority at any time; and

c) Determine that the above-recommended actions are not a project that is subject to environmental review under the California Environmental Quality Act (CEQA), pursuant to CEQA Guidelines section 15378(b)(4), finding that the actions are governmental funding mechanisms and/or fiscal activities that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved, ratified and authorized; Chair to execute;**

**b) Delegated; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

| BOARD OF SUPERVISORS | Action Summary | December 16, 2025 |
|---|---|---|

**A-8)**    <u>BEHAVIORAL WELLNESS DEPARTMENT</u>    **25-01081**

Consider recommendations regarding a Memorandum of Understanding (MOU) between the Housing Authority of the City of Santa Barbara (HACSB) and the Department of Behavioral Wellness (BWell) for In-Kind Match Services for Permanent Supportive Housing Program Services at 3055 De La Vina Street for Fiscal Years (FYs) 2025-2026 and 2026-2027, Second District, as follows:

a) Approve and authorize the Director of BWell, or designee, to execute a MOU with the HACSB for the provision of permanent supportive housing program services at 3055 De La Vina Street in Santa Barbara, in return BWell will provide an in-kind match through services provided by its Housing Assistance and Retention Team (HART) for the period of December 1, 2025 through April 30, 2027;

b) Delegate to the Director of BWell or designee the authority to extend the term of the Agreement upon written mutual agreement with the HACSB, which is subject to funding availability, without requiring the Board of Supervisors' approval of an amendment of the Agreement, subject to the Board of Supervisors' ability to rescind this delegated authority at any time; and

c) Determine that the above-recommended actions are not a project that is subject to environmental review under the California Environmental Quality Act (CEQA), pursuant to CEQA Guidelines section 15378(b)(4) and (b)(5), finding that the actions are governmental funding mechanisms and/or administrative or fiscal activities that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized;**

**b) Delegated; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

| BOARD OF SUPERVISORS | Action Summary | December 16, 2025 |
|---|---|---|

**A-9)**  <u>BEHAVIORAL WELLNESS DEPARTMENT</u>                    **25-01094**

Consider recommendations regarding the California Mental Health Services Authority (CalMHSA) Healthcare Effectiveness Data Information Sets (HEDIS) Performance Measurement Program Participation Agreement (PA) for Fiscal Years 2025-2029, as follows: (4/5 Vote Required)

a) Approve, ratify, and authorize the Chair to execute the multi-year PA (11635-SB-QM-25_26), with CalMHSA for the HEDIS Performance Measurement Program for Measurement Year (MY) 2025 and Reporting Year (RY 2026), for a maximum contract amount of $60,750.00, from January 1, 2025, through December 31, 2029;

b) Approve the Budget Revision Request No. 0010898, increasing appropriations of $30,375.00, in the Behavioral Wellness Department, Mental Health Services Fund, for services and supplies by an increase in Cost Reimbursement Federal billing and State sources;

c) Delegate to the Director of the Department of Behavioral Wellness or designee the authority to adjust Program timeliness and technical requirements per Exhibit A of the Agreement and approve additional analysis of HEDIS data per Exhibit B, all without altering the terms of the Agreement or maximum agreement amount and without requiring the Board's approval of an amendment of the Agreement, subject to the Board's ability to rescind this delegated authority at any time; and

d) Determine that the above actions are a government funding mechanism or other government fiscal activity that does not involve any commitment to any specific project that may result in a potentially significant physical impact on the environment to and is therefore not a project under the California Environmental Quality Act (CEQA) pursuant to section 15378(b)(4) of the CEQA Guidelines.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved, ratified and authorized; Chair to execute;**

**b) Approved;**

**c) Delegated; and**

**d) Approved.**

**The motion carried by the following vote:**

**Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

**A-10)**    BEHAVIORAL WELLNESS DEPARTMENT                                   **25-01083**

Consider recommendations regarding a Third Amendment to the Services Agreement with the
Council on Alcoholism and Drug Abuse (CADA) for Alcohol and Drug Program and Mental
Health Services for Fiscal Years 2023-2027, as follows:

a) Approve, ratify, and authorize the Chair to execute a Third Amendment to the Agreement for
Services of Independent Contractor with CADA (a local vendor) (Board Contract No. 23-091) to
terminate perinatal services from the Early Intervention Services, Outpatient Treatment Services,
and Intensive Outpatient Treatment Services program as of October 29, 2025; to update the
Designated Representative and Notices Contact for CADA; modify certain standard terms and
conditions, certain general Alcohol and Drug Program programmatic provisions, Contingency
Management Program provisions relating to recovery principles, certain general Alcohol and Drug
Program financial provisions, and service codes; and reduce the contract amount by $139,400.00
for a revised, total maximum contract amount of $15,179,350.00 with no change to the contract
term of July 1, 2023, through June 30, 2027:

i) Approve, ratify, and authorize the Director of the Department of Behavioral Wellness' issuance
of a Notice of Intent to Partially Terminate the Agreement;

ii) Approve and authorize the Director of Behavioral Wellness' issuance of a Notice of Partial
Termination of the Agreement; and

iii) Approve, ratify, and authorize the Director of Behavioral Wellness or designee to take actions
necessary for the partial wind-down of the Agreement, subject to the Board's ability to rescind this
delegated authority at any time; and

b) Determine that the above-recommended actions are not a project that is subject to
environmental review under the California Environmental Quality Act (CEQA), pursuant to CEQA
Guidelines sections 15378(b)(4), finding that the actions are governmental funding mechanisms
and/or fiscal activities that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that
this matter be acted on as follows:**

**a) i) through iii) Approved, ratified and authorized; Chair to execute; and**

**b) Approved.**

**The motion carried by the following vote:**

**Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor
                        Nelson, and Supervisor Lavagnino

| BOARD OF SUPERVISORS | Action Summary | December 16, 2025 |
| --- | --- | --- |

**A-11)**     BEHAVIORAL WELLNESS DEPARTMENT, PUBLIC DEFENDER'S OFFICE     **25-01065**

Consider recommendations regarding the Grant Agreement with the California Board of State and Community Corrections for Proposition 47 Cohort 5 Safe Neighboorhoods and Schools Act Grant for Justice and Healing Collaborative with Behavioral Wellness and Public Defender for Fiscal Years 2025-2029, as follows: (4/5 Vote Required)

a) Approve, ratify, and authorize the Director of the Department of Behavioral Wellness, or designated representative, to execute the California Board of State and Community Correction Standard Agreement No. 1416-25 for the Proposition 47 Cohort 5 Safe Neighboorhoods and Schools Act Program to provide pre-trial services to individuals with behavioral health challenges for a total grant maximum amount of $8,000,000.00 for the term of October 1, 2025 through June 30, 2029:

i) Approve and authorize the Director of the Department of Behavioral Wellness or designee to execute any amendments to Board of State and Community Corrections Standard Agreement No. 1416-25 and any and all other documents required or deemed necessary to secure these funds and participate in the Proposition 47 Cohort 5 Program without having to return to the Board for approval, subject to the Board's authority to rescind this delegated authority at any time; and

ii) Direct the Director of the Department of Behavioral Wellness or designee to obtain concurrence from Risk Management, Auditor-Controller, and County Counsel before exercising the delegated authority for the above recommended action;

b) Adopt an amendment to the Salary Resolution (No. 07-207), effective December 22, 2025, to add one (1.0) full-time equivalent [FTE]) Deputy Public Defender III and one (1.0) FTE Alcohol and Drug Mental Health Services (ADMHS) Case Worker to the Public Defender's Office;

c) Approve Budget Revision Request No. 0010896, to increase appropriations of $1,320,725.00 in Behavioral Wellness Mental Health Service Act Fund for Salaries and Benefits ($185,525.00), Services and Supplies ($974,370.00), and other Financing Uses ($160,830.00) funded by unanticipated revenue Intergovernmental Rev-State ($1,320,725.00); increase appropriations of $160,430.00 in Public Defender General Funds for Salaries and Benefits ($153,694.00), Services and Supplies ($6,736.00) funded by unanticipated revenue from Intergovernmental Rev-State ($160,430.00); increase appropriations of $400.00 in Probation General Funds for Services and Supplies ($400.00) funded by unanticipated revenue from Intergovernmental Rev-State ($400.00); and

d) Determine that the above-recommended actions are not a "Project" that is subject to environmental review under the California Environmental Quality Act (CEQA), pursuant to CEQA Guidelines section 15378(b)(4), finding that these actions are a governmental funding mechanism and/or fiscal activity that will not result in direct or indirect physical changes in the environment.

**BOARD OF SUPERVISORS**       **Action Summary**       **December 16, 2025**

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) i) and ii) Approved, ratified and authorized;**
>
> **b) Adopted; and**
>
> **RESOLUTION NO. 25-269**
>
> **c) and d) Approved.**
>
> **The motion carried by the following vote:**

Ayes:      5 -     Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**A-12)**     CLERK-RECORDER-ASSESSOR-ELECTIONS DEPARTMENT      **25-01064**

Consider recommendations regarding Certification of Election Results of the Statewide Special Election, held on November 4, 2025, as follows:

a) Accept and file the Certified Statement of the Results of the Official Canvass and Official Election Summary for the Statewide Special Election held on November 4, 2025, as required by law; and

b) Determine that the above action is not a project under the California Environmental Quality Act (CEQA) pursuant to CEQA Guidelines Section 15378(b)(5), because it consists of organizational or administrative activities of governments that will not result in direct or indirect physical changes in the environment.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) Accepted and filed; and**
>
> **b) Approved.**
>
> **The motion carried by the following vote:**

Ayes:      5 -     Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

A-13)      <u>COMMUNITY SERVICES DEPARTMENT</u>                                        **25-01023**

Consider recommendations regarding the Goleta Beach Parking Lot Pavement Rehabilitation Phase 2, Project No. PRJ-001053, Award of Construction Contract, Second District, as follows:

a) Approve the plans and specifications on file in the Community Services Department for the Goleta Beach Parking Lot Pavement Rehabilitation Phase 2;

b) Award, approve and authorize the Chair to execute, a contract in the amount of $1,164,425.70 to the lowest responsible bidder, PaveWest LLC, for the Project, subject to the provisions of the documents and certifications as set forth in the plans and specifications applicable to the Project and as required by California law;

c) Authorize the Director of Community Services to order changes or additions in the work being performed for the Project via change orders in the amount not to exceed $70,721.00 as authorized under California Public Contract Code Section 20142; and

d) Determine that pursuant to the California Environmental Quality Act (CEQA) Guidelines Section 15162, no substantial changes are proposed to the project, and no new information of substantial importance has come to light regarding environmental effects of the project, and therefore these actions are within the scope of the project covered by the Notice of Exemption approved by the Board of Supervisors for this project on October 1, 2024, and no new environmental document is required.

**A motion was made by Supervisor Capps, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved;**

**b) Awarded, approved and authorized; Chair to execute;**

**c) Authorized; and**

**d) Approved.**

**The motion carried by the following vote:**

Ayes:      5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

A-14)       COMMUNITY SERVICES DEPARTMENT                                    **25-01073**

Consider recommendations regarding Fiscal Year 2025-2026 Countywide Library System Agreement, as follows: (4/5 Vote Required)

a) Approve, ratify and authorize the Chair of the Board of Supervisors to execute a one-year Agreement for Operation of a Countywide Library System, by and between the County and the Cities of Carpinteria, Santa Barbara, Goleta, Lompoc and Santa Maria for the period of July 1, 2025 through June 30, 2026, in the total amount not to exceed $5,147,814.00;

b) Approve Budget Revision Request No. 0010921 to establish appropriations of $130,000.00 for infrastructure improvements for the Goleta Valley Library funded by AB1600 Goleta Library Impact Fees; and

c) Determine that the above recommended actions are not the approval of a project that is subject to environmental review under the California Environmental Quality Act (CEQA) pursuant to CEQA Guidelines Section 15378(b)(5), finding that the action involves government organizational or administrative activities which do not involve any commitment to any specific project which may result in a potentially significant physical impact on the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved, ratified and authorized; Chair to execute;**

**b) and c) Approved.**

**The motion carried by the following vote:**

Ayes:        5 -   Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

A-15)    COMMUNITY SERVICES DEPARTMENT                              **25-01077**

Consider recommendations regarding the approval of Subrecipient Agreements with Good
Samaritan Shelter (GSS) for the Ongoing Operations of the Hope Village and Hedges House of
Hope Interim Housing facilities, as follows:

a) Approve and authorize the Chair of the Board of Supervisors to execute a Subrecipient
Agreement with GSS for the distribution of Housing and Homelessness Incentive Program, Round
3 (HHIP-3) funding in the amount of $825,000.00 and Homeless Housing Assistance and
Prevention Program, Round 5 (HHAP-5) funding in the amount of $825,000.00, for a total of
$1,650,000.00 for Operations and Services of Hope Village Interim Housing Facility in
accordance with the five year operational support plan;

b) Approve and authorize the Chair of the Board of Supervisors to execute a Subrecipient
Agreement with GSS for the distribution of HHAP-5 funding in the amount of $1,229,400.00 for
Operations and Services of Hedges House of Hope Interim Housing Facility in Isla Vista in
accordance with the five-year operational support plan; and

c) Determine that the above-recommended actions are exempt from the California Environmental
Quality Act (CEQA) pursuant to CEQA Guidelines Section 15269(c); and finding that the actions
consist of specific actions necessary to prevent or mitigate an emergency; Government Code
Section 8698.4, finding that the County has declared a shelter crisis and the action includes leasing
of County-owned land for a homeless shelter and financial assistance; and direct staff to file a
Notice of Exemption on these bases.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that
> this matter be acted on as follows:**
>
> **a) and b) Approved and authorized; Chair to execute; and**
>
> **c) Approved.**
>
> **The motion carried by the following vote:**

Ayes:       5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor
                   Nelson, and Supervisor Lavagnino

**BOARD OF SUPERVISORS**                     *Action Summary*                     December 16, 2025

A-16)      <u>COMMUNITY SERVICES DEPARTMENT</u>                                   **<u>25-01089</u>**

Consider recommendations regarding an Agreement to Provide Affordable Housing and Rental Restrictive Covenant for SBSR, LLC Apartments 22DVP-00000-00004, Second District, as follows:

a) Approve the execution by the Board Chair of an Agreement to Provide Affordable Housing and Rental Restrictive Covenant and Preemptive Right with SBSR, LLC; and

b) Determine that the above recommended action is exempt from the California Environmental Quality Act (CEQA) pursuant to CEQA Guidelines Section 21159.25, Exemption: Residential or Mixed-Use Housing Projects.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved; Chair to execute; and**

**b) Approved.**

**The motion carried by the following vote:**

Ayes:          5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**BOARD OF SUPERVISORS**  Action Summary  December 16, 2025

A-17)  <u>COMMUNITY SERVICES DEPARTMENT</u>  **25-01090**

Consider recommendations regarding approval of Sub-Recipient Agreements for the Housing and Disability Advocacy Program (HDAP), as follows:

a) Approve and authorize the Chair of the Board of Supervisors to execute a Subrecipient Agreement with Good Samaritan Shelter (GSS) for the distribution of State of California HDAP funds for outreach, case management and housing assistance, for the period of January 1, 2026, through June 30, 2026, in an amount not to exceed $121,356.00;

b) Approve and authorize the Chair of the Board of Supervisors to execute a Subrecipient Agreement with Legal Aid Foundation of Santa Barbara County (Legal Aid) for disability benefits advocacy and legal services for the period of January 1, 2026, through June 30, 2026, in an amount not to exceed $95,000.00; and

c) Determine that the above recommended actions are exempt from the California Environmental Quality Act (CEQA) per CEQA Guidelines Section 15378(b)(4) since the recommended actions are government fiscal activities which do not involve commitment to any specific project which may result in a potentially significant physical impact on the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) and b) Approved and authorized; Chair to execute; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**  5 -  Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

**A-18)**       COMMUNITY SERVICES DEPARTMENT                         **25-01092**

Consider recommendations regarding a County HOME Loan to Hollister Lofts L.P., for a Permanent Supportive Housing Development Project, Second District, as follows:

a) Approve and authorize the Chair of the Board of Supervisors to execute a County HOME Funding Loan Agreement; and Regulatory Agreement; setting forth terms, conditions and requirements for Hollister Lofts, L.P. (Owner), acceptance of the County Loan;

b) Approve and authorize the Chair of the Board of Supervisors to execute a Subordination Agreement, wherein the County agrees to Subordinate its HOME loan to a Construction Loan provided by Banc of California (Construction Loan);

c) Approve and authorize the Chair of the Board of Supervisors to execute a Subordination Agreement, wherein the County agrees to subordinate its County Land Loan Agreement (Land Loan), to the Construction Loan; and

d) Determine that the approval of this Item is not subject to environmental review under the California Environmental Quality Act (CEQA) pursuant to California Government Code Section 65913.4 as it being developed "by right" subject to AB2162 and provides affordable permanent supportive rental housing.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) through c) Approved and authorized; Chair to execute; and**

**d) Approved.**

**The motion carried by the following vote:**

Ayes:          5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

A-19)    COMMUNITY SERVICES DEPARTMENT                                     25-01100

Consider recommendations regarding an Agreement to Provide Affordable Housing and Rental Restrictive Covenant for San Marcos Ranch Development, 24ZCI-00083, Second District, as follows:

a) Approve and authorize the Chair of the Board of Supervisors to execute an Agreement to Provide Affordable Housing and Rental Restrictive Covenant and Preemptive Right with San Marcos Holdings, LLC, SWBradford LLC, Ryan W. Hale, Trustee of the Bradford 2023 Irrevocable Trust dated April 18, 2023, and Natalie Penn Hodges, as Trustee of the Brett Edward Hodges Irrevocable Trust dated January 30, 2023 (Market Rate Parcel Owners) and San Marcos Ranch Associates, LP (Affordable Parcel Owner) for the San Marcos Ranch Development (Covenant), and direct its recordation;

b) Authorize the Director of the County's Community Services Department to approve future transfers of interest in the subject property, and to approve and execute amendments to the Covenant with such transferees; and

c) Determine that the proposed actions are exempt from the California Environmental Quality Act (CEQA) guidelines, pursuant to Santa Barbara County Code Section 35.39.010.C, finding that the proposed project has been designed to comply with the applicable development code requirements for a "use by right" development, as such the required entitlement is a zoning clearance and the County shall not require an Environmental Impact Report under CEQA.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; Chair to execute;**

**b) Authorized; and**

**c) Approved.**

**The motion carried by the following vote:**

Ayes:        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

---

*County of Santa Barbara*                    *Page 19*

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

A-20)    COUNTY EXECUTIVE OFFICE                                    **25-01088**

Approve Budget Revision Request No. 0010919 (Majority Vote Required); and Budget Revision Request Nos. 0010818; 001089; 0010908; 0010913; 0010916; 0010922; 0010923; 0010925; and 0010929 (4/5 Vote Required).

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be approved. The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

A-21)    COUNTY HEALTH DEPARTMENT                                    **25-01084**

Consider recommendations regarding approval of the Emergency Medical Care Committee (EMCC) adopted Bylaws and Appointments, as follows:

a) Approve Bylaws for the EMCC adopted by unanimous consent of EMCC members in attendance on July 16, 2025;

b) Appoint two new committee members to the EMCC as follows:

i) Garrett Huff, County Fire District representative, Santa Barbara County Fire District; and

ii) Dave Schierman, private ambulance provider representative, American Medical Response;

c) Affirm the appointment of Ryland McCracken, Montecito Fire District, on November 5, 2024, as the Public Agency Paramedic appointment by the County Health Director to correct a clerical error on the listed public agency; and

d) Determine the above actions do not constitute a "Project" subject to environmental review under the California Environmental Quality Act (CEQA) pursuant to CEQA Guidelines section 15378(b)(5), as the actions are organizational or administrative activities that will not result in direct or indirect physical changes to the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved;**

**b) i)  and ii) Appointed;**

**c) Affirmed; and**

**d) Approved.**

**The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

| BOARD OF SUPERVISORS | Action Summary | December 16, 2025 |
|---|---|---|

**A-22)**   <u>COUNTY HEALTH DEPARTMENT</u>   <span style="color:blue">**25-01085**</span>

Consider recommendations regarding the Acceptance of $25,000.00 Grant Award from Maddie's Fund, as follows: (4/5 Vote Required)

a) Approve, ratify, and authorize the Director of the County Health Department, or designee, to accept a Grant Award received by the Santa Barbara County Animal Services in the amount of $25,000.00 from Maddie's Fund to fund veterinary care;

b) Approve and authorize the Director of the County Health Department, or designee, to make any certifications and assurances that may be required by the Grant Agreement;

c) Approve Budget Revision Request No. 0010892 in the amount of $25,000.00 for unanticipated revenue for use in the Animal Services Fiscal Year 2025-2026 budget; and

d) Determine that the recommended actions are not a "Project" within the meaning of the California Environmental Quality Act (CEQA) and are exempt per CEQA Guidelines section 15378(b)(5), because the recommended actions consist of organizational or administrative activities of governments that will not result in direct or indirect physical changes to the environment.

**Lee Heller addressed the Board**

**A motion was made by Supervisor Capps, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved, ratified and authorized;**

**b) Approved and authorized; and**

**c) and d) Approved.**

**The motion carried by the following vote:**

**Ayes:**   5 -   Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**A-23)**  <u>COUNTY HEALTH DEPARTMENT</u>       **25-01096**

Consider recommendations regarding Animal Shelter Pet Food Agreements with Mars and Central Pet Distribution, as follows:

a) Authorize the County Health Director, or designee, to enter into an Agreement with Mars Petcare US, Inc., for exclusive purchasing of Mars and/or its Affiliates' pet food products to feed pets in shelter, and to provide certain data to Mars and its Affiliates in compliance with all applicable laws;

b) Authorize the County Health Director, or designee, to (1) submit a wholesale account application to Central Pet Distribution (Vendor Number 227694) in the form of the Central Pet Distribution Mars Shelter Program New Account Application, (2) enter in a purchasing contract with Central Pet Distribution in accordance with County purchasing guidelines, and (3) to submit orders under the Central Pet Agreement, in the form of the Central Pet Mars Shelter Food Order Form, an aggregate amount not to exceed $60,000.00 annually; and

c) Determine that the recommended actions are not a "Project" within the meaning of the California Environmental Quality Act (CEQA) and are exempt per CEQA Guidelines section 15378(b)(5), because the recommended actions consist of organizational or administrative activities of governments that will not result in direct or indirect physical changes to the environment.

**Lee Heller addressed the Board.**

**A motion was made by Supervisor Capps, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) and b) Authorized; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**  5 - Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**BOARD OF SUPERVISORS**                    *Action Summary*                    December 16, 2025

A-24)      <u>GENERAL SERVICES DEPARTMENT</u>                              **25-01059**

Consider recommendations regarding a Second Amendment to the Calle Real Water Loop Phase 2 Construction Contract, County Project 25014 (WD PRJ-000861), as follows: (4/5 Vote Required)

a) Approve and authorize the Chair of the Board of Supervisors to execute a Second Amendment to Board Contract No. 24134 with Tierra Contracting, Inc. for the construction of the Calle Real Water Loop Phase 2 Project (Project) extending the contract Term from December 31, 2025 to March 31, 2026; and

b) Determine that the Project continues to be exempt from the California Environmental Quality Act (CEQA) pursuant to Section 15302 of the State Guidelines for the Implementation of CEQA which consists of replacement or reconstruction of existing structures and facilities where the new structure will be located on the same site as the structure replaced and have substantially the same purpose and capacity as the structure replaced, and that a Notice of Exemption on this basis was approved by the Board on August 27, 2024 and filed.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; Chair to execute; and**

**b) Approved.**

**The motion carried by the following vote:**

Ayes:          5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

**A-25)**      GENERAL SERVICES DEPARTMENT                                         **25-01060**

Consider recommendations regarding an Amendment to the Professional Services Agreement with Ravatt Albrecht and Associates for expanded design and construction support for the Santa Maria Probation Juvenile Justice Center Units 1/2/3 Remodel Project No. PRJ-000139 (21055), Fourth District, as follows: (4/5 Vote Required)

a) Approve, ratify and authorize the Chair of the Board to execute an updated Professional Services Agreement with Ravatt Albrecht Architects in a base contract not to exceed amount of $297,450.00, which includes $200,000.00 under Contract No. CN3119, as amended under CO9627, CO10936, CO11211, and CO12421, and, as of the effective date of the Agreement, amends, restates, and supersedes Contract CN3119, to provide additional design services to include requested design changes in the security scope by Probation, and construction administration services for the design and bid documents for the Units 1/2/3 housing units remodel Project No. PRJ-000139(21055);

b) Approve and authorize the Director of General Services, or his Assistant Director or Capital Projects Division Manager designee, to approve supplemental service orders in a maximum aggregate amount not to exceed $9,745.00 for a maximum aggregate contract amount not to exceed $307,195.00; and

c) Find that the recommended actions are not a project under the California Environmental Quality Act (CEQA) pursuant to sections 15378(b)(4) and 15378(b)(5) of the CEQA Guidelines because they consist of administrative and fiscal activities of government that will not result in indirect physical changes in the environment.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) Approved, ratified and authorized; Chair to execute;**
>
> **b) Approved and authorized; and**
>
> **c) Approved.**
>
> **The motion carried by the following vote:**

**Ayes:**      5 -   Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

BOARD OF SUPERVISORS                     Action Summary                     December 16, 2025

A-26)     GENERAL SERVICES DEPARTMENT                               25-01082

Consider recommendations regarding the termination of a contract with UltraSystems Environmental Incorporated for Orcutt Library Environmental Services, Project No. PRJ-000233 (20056); Fourth District, as follows: (4/5 Vote Required)

a) Approve and authorize the Director of General Services to execute a 30-day Notice of Termination of Agreement dated December 16, 2025, terminating for convenience the Professional Services Agreement with UltraSystems Environmental Incorporated for Environmental Consulting services for the new Orcutt Library Project (Agreement), County Project No. PRJ-000233 (20056);

b) Delegate authority to the Director of the General Services, or his designee, to take actions necessary for the close-out of the Agreement, subject to the Board's ability to rescind this delegated authority at any time; and

c) Determine the above actions are not a project under the California Environmental Quality Act guidelines pursuant to Section 15378(b)(5) because it consists of organizational or administrative activities of governments that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized;**

**b) Delegated; and**

**c) Approved.**

**The motion carried by the following vote:**

Ayes:        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

Action Summary

**A-27)**        <u>GENERAL SERVICES DEPARTMENT</u>                                        <u>**25-01078**</u>

Consider recommendations regarding the Ground Lease Agreement with Santa Barbara Volleyball Club (SBVC), 4550 Hollister Avenue, Goleta, CA 93110; APN No. 061-040-050 (portion), Second District, as follows:

a) Approve and authorize the Chair to execute the fifteen (15) year Ground Lease Agreement between the County and SBVC, a 501(c)(3), for the development of an indoor volleyball facility with restrooms, storage, reception, and 18 parking spaces on a portion County-owned property at 4550 Hollister Avenue, Goleta, CA 93110 (APN 061-040-050);

b) Find, that pursuant to Section 12A-10.3 of the Santa Barbara County Code, that the County-owned property at 4550 Hollister Avenue, Goleta, CA 93110 is not and will not be needed for County purposes and the proposed activity meets the social needs of the population of the County;

c) Approve the waiver of rent in exchange for SBVC's demolition of existing structures and construction of a new youth sports facility to meet the social needs of the County at its sole cost, to be financed through philanthropic donations and fundraising; and

d) Find that the proposed action is an organizational or administrative activity that will not result in direct or indirect physical changes in the environment and is therefore not a project under California Environmental Quality Act Guidelines 14 CCR 15378(b)(5).

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; Chair to execute;**

**b) through d) Approved.**

**The motion carried by the following vote:**

**Ayes:**        5 -        Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**BOARD OF SUPERVISORS**　　　　　　　Action Summary　　　　　　　December 16, 2025

**A-28)**　　**GENERAL SERVICES DEPARTMENT**　　　　　　　**25-01086**

Consider recommendations regarding the Casa Nueva - Heating Ventilation and Air Conditioning (HVAC) and Building Energy Management System (BEMS) Upgrade, as follows:

a) Approve, and authorize the Chair of the Board to execute, a General Construction Contract (Agreement) with Mesa Energy System, Inc. in the base contract amount of $797,426.00, with a contingency amount not to exceed $52,371.00, for a maximum aggregate contract amount not to exceed $849,797.00, for construction and commissioning of new HVAC equipment with BEMS improvements at the Casa Nueva Building located at 260 N. San Antonio Rd. in Santa Barbara, CA 93110 (APN 059-140-029);

b) Authorize the Director of General Services, or his designee, to approve change orders to the Agreement in an aggregate amount not to exceed $52,371.00; and

c) Determine that the project is statutorily exempt from the provisions of California Environmental Quality Act pursuant to California Public Resources Code Sections 15301 (minor alterations to existing facilities) and 15303 (limited construction of small facilities) of Title 14 of the California Code of Regulations and direct staff to file a Notice of Exemption on that basis.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; Chair to execute;**

**b) Authorized; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**　　5 -　Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

A-29)    GENERAL SERVICES DEPARTMENT                              25-01099

Consider recommendations regarding the First Amendment of the Professional Service Agreement for Community Workforce Coordinator Services, First and Third Districts, as follows: (4/5 Vote Required)

a) Approve and authorize the Chair to execute the First Amendment to a Professional Service Agreement, Board Contract No. 24270 (SCON-001812), with Vanir Construction Management, Inc.; correcting the base contract amount to $241,500.00 in section 2.02 of the Agreement to match the original cost proposal and Exhibit C of the same Agreement and increasing the maximum contract limit from $248,170.00 to $278,870.00, to continue to provide Community Workforce Agreement compliance services for General Services (Capital) and Public Works (Transportation and Resource Recovery) Projects;

b) Approve and authorize the Director of General Services, or his Assistant Director or Capital Division Manager designee, to approve Supplemental Service Orders in a maximum aggregate amount not to exceed $37,370.00, for a maximum aggregate contract amount not to exceed $278,870.00;

c) Authorize the Director of General Services to approve an extension to the Term of the Agreement as necessary up to an additional 18 months until June 31, 2028;

d) Approve Budget Revision Request No. 0010926 to establish appropriations of $30,700.00 for projects in the General Services Capital Outlay Fund for Fiscal Year (FY) 2025-2026; and

e) Continue to find that the recommended actions are not a project under the California Environmental Quality Act (CEQA) pursuant to sections 15378(b)(4) and 15378(b)(5) of the CEQA Guidelines, because they consist of administrative and fiscal activities of government that will not result in direct or indirect physical changes in the environment, and that a Notice of Exemption on these bases was approved and filed on May 6, 2025.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; Chair to execute;**

**b) Approved and authorized;**

**c) Authorized; and**

**d) and e) Approved.**

**The motion carried by the following vote:**

Ayes:        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**BOARD OF SUPERVISORS**          *Action Summary*          December 16, 2025

**A-30)**     GENERAL SERVICES DEPARTMENT          **25-01080**

Consider recommendations regarding a Professional Service Agreement for Orcutt Library Architectural and Engineering Services, Project No. PRJ-000233 (20056)-Orcutt Library Facility, Fourth District, as follows:

a) Approve and authorize the Chair to execute a Professional Services Agreement (Agreement) with RRM Design Group (Consultant) for architectural and engineering services for Phase 1 and Phase 2 of the Orcutt Library Design (Project), County Project No. PRJ-000233 (20056) Fourth District, in the amount of Six-Hundred Ninety-Nine Thousand, Five-Hundred Fifty-Three Dollars and Zero Cents ($699,553.00);

b) Authorize the Director of General Services or his Capital Division Chief designee to approve Supplemental Service Orders in an aggregate amount not to exceed Sixty-Nine Thousand, Nine-Hundred Fifty-Five Dollars and Zero Cents ($69,955.00) to address changes or additions to the work being performed under the Professional Services Agreement with RRM Design Group;

c) Authorize the Director of General Services to: (i) amend the Agreement to extend the Term of the Agreement by up to six (6) additional months; and (ii) terminate the Agreement in accordance with the provisions of the Agreement; and

d) Find that the proposed action(s) are exempt from the California Environmental Quality Act (CEQA) pursuant to Section 15262 of the CEQA Guidelines, which exempts feasibility and planning studies for possible future actions that have not been approved, adopted, or funded by the agency.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) Approved and authorized; Chair to execute;**
>
> **b) and c) Authorized; and**
>
> **d) Approved.**
>
> **The motion carried by the following vote:**

**Ayes:**     5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

A-31)        GENERAL SERVICES DEPARTMENT                                    **25-01017**

Consider recommendations regarding Haven Energy Battery Energy Storage System Memorandums of Understanding (MOUs), as follows:

a) Approve and authorize the Chair to execute an MOU with Haven Energy, Inc. to memorialize the initial steps toward the installation of a battery energy storage system at the Santa Barbara Social Services Building (234 Camino del Remedio, Santa Barbara, CA 93110);

b) Approve and authorize the Chair to execute an MOU with Haven Energy, Inc. to memorialize the initial steps toward the installation of a battery energy storage system at the Naomi Schwartz Building (130 E. Victoria St., Santa Barbara, CA 93101); and

c) Determine that the proposed actions are not a "project" as defined by the California Environmental Quality Act (CEQA) Guidelines Section 15378(b) (5), as it is an administrative activity that will not result in direct or indirect changes in the environment.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Capps, that this matter be acted on as follows:**
>
> **a) and b) Approved and authorized; Chair to execute; and**
>
> **c) Approved.**
>
> **The motion carried by the following vote:**

  **Ayes:**        4 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, and Supervisor Lavagnino

  **Noes:**        1 -    Supervisor Nelson

| BOARD OF SUPERVISORS | Action Summary | December 16, 2025 |
| --- | --- | --- |

**A-32)**      <u>GENERAL SERVICES DEPARTMENT, INFORMATION TECHNOLOGY DEPARTMENT</u>      **25-01068**

Consider recommendations regarding the Lease Agreement with Rancho San Julian-Los Palos Colorados LLC. at White Hills, Santa Barbara County for Public Safety Radio Network, Third District, as follows:

a) Approve and authorize the Chair to execute the Ground Lease Agreement, between the County of Santa Barbara and Rancho San Julian-Los Palos Colorados- LLC, a California limited liability company, for a term of twenty years and six months until June 30, 2046, for a total leased area of approximately 3,250 square foot area of land; and

b) Determine that the recommended action of approving the Lease is exempt from the California Environmental Quality Act (CEQA) pursuant to Section 15303, New Construction or Conversion of Small Structures, and Section 15304, Minor Alterations to Land, and approve and direct staff to file and post the Notice of Exemption on that basis.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) Approved and authorized; Chair to execute; and**
>
> **b) Approved.**
>
> **The motion carried by the following vote:**

     **Ayes:**      5 -      Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**BOARD OF SUPERVISORS**                    Action Summary                    December 16, 2025

A-33)    <u>HUMAN RESOURCES DEPARTMENT</u>                    **25-01105**

Consider recommendations regarding authorization to Execute Side Letter Agreements with SEIU Local 620 and SEIU Local 721 for Temporary Labor Cost-Saving Measures in the Department of Social Services (DSS), as follows:

a) Authorize the County Human Resources Director, or designee to execute Side Letter Agreements with SEIU Local 620 and SEIU Local 721 establishing a six-month temporary delay in merit eligibility for represented employees in the DSS, consistent with ratified Tentative Agreements;

b) Approve the application of the same six-month merit eligibility delay to unrepresented Confidential, Management, and Executive employees assigned to DSS and covered under Resolution 24-187; and

c) Determine that the above actions are not a project under the California Environmental Quality Act (CEQA), because pursuant to sections 15378(b)(4) and 15378(b)(5) the recommended actions consist of organizational, administrative, or fiscal activities of government that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Authorized; and**

**b) and c) Approved.**

**The motion carried by the following vote:**

**Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**BOARD OF SUPERVISORS**                **Action Summary**                **December 16, 2025**

A-34)   PLANNING AND DEVELOPMENT DEPARTMENT                **25-01057**

Consider recommendations regarding the adoption (Second Reading) of an Ordinance Amending Fees for Planning and Development Services, as follows:

a) Determine that the adoption of an Ordinance Amending Fees for Planning and Development Department Services is not subject to the requirements of the California Environmental Quality Act (CEQA), pursuant to CEQA Guidelines Sections 15273(a)(1) and 15378(b)(5); and

b) Adopt (Second Reading) "An Ordinance Amending Fees for Planning and Development Services".

**Karin Hauenstein addressed the Board.**

**A motion was made by Supervisor Capps, seconded by Supervisor Hartmann, that this matter be acted on as follows:**

**a) Approved; and**

**b) Adopted.**

**ORDINANCE NO. 5271**

**The motion carried by the following vote:**

Ayes:         4 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, and Supervisor Lavagnino

Noes:         1 -    Supervisor Nelson

**BOARD OF SUPERVISORS**                    Action Summary                    December 16, 2025

**A-35)**     PLANNING AND DEVELOPMENT DEPARTMENT                          **25-01061**

Consider recommendations regarding the Fisher Edison Property Trust New Agricultural Preserve Contract, Buellton area, Third District, as follows:

a) Adopt a resolution creating Agricultural Preserve New Contract No. 25AGP-00004 consisting of 44.88 acres located at 2000 West Highway 246, in the Buellton area (APNs 099-230-014 and 099-230-005);

b) Approve and authorize the Chair to execute Agricultural Preserve New Contract No. 25AGP-00004;

c) Authorize recordation by the Clerk of the Board; and

d) Find that the proposed action is exempt from the California Environmental Quality Act (CEQA) pursuant to State CEQA Guidelines Section 15317 [Open Space Contracts or Easements].

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Adopted;**

**RESOLUTION NO. 25-270**

**b) Approved and authorized; Chair to execute;**

**c) Authorized; and**

**d) Approved.**

**The motion carried by the following vote:**

**Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**BOARD OF SUPERVISORS**                    Action Summary                    December 16, 2025

A-36)    <u>PROBATION DEPARTMENT</u>                                        **25-01070**

Consider recommendations regarding an Assembly Bill (AB) 143 Backfill Allocation Spending Report for Fiscal Year (FY) 2024-2025 for Criminal Justice Fees Eliminated by AB 1869, as follows:

a) Consider and adopt the Report, the Board of Supervisors' Annual Report for FY 2024-2025 as required by Government Code section 29553 subsection (f), documenting the County's spending of State backfill allocations which provide fiscal relief for revenues lost from fees repealed by Chapter 92, Statutes of 2020 (AB 1869);

b) Authorize the Chair to sign the letter regarding the submission of the above referenced Report, and direct Probation staff to submit the letter and Report to the State of California Director of Finance, the Legislative Analyst's Office, and the Joint Legislative Budget Committee; and

c) Determine pursuant to California Environmental Quality Act (CEQA) Guidelines 15378(b)(5) that the above actions are not a project subject to CEQA review, because they are government administrative activities that do not result in direct or indirect physical changes to the environment.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) Considered and adopted;**
>
> **b) Authorized; Chair to execute; and**
>
> **c) Approved.**
>
> **The motion carried by the following vote:**

    **Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**BOARD OF SUPERVISORS**  Action Summary  December 16, 2025

A-37)  PROBATION DEPARTMENT  **25-01071**

Consider recommendations regarding the Assembly Bill (AB) 199 Backfill Allocation Spending Report for Fiscal Year (FY) 2024-2025 for Criminal Justice Fees Eliminated by AB 177, as follows:

a) Consider and adopt the Board of Supervisors' Annual Report for FY 2024-2025 as required by Government Code section 29554 subsection (f), documenting the County's spending of State backfill allocations which provides fiscal relief due to the repeal of the fees specified in Chapter 257, Statutes of 2021 (AB 177);

b) Authorize the Chair to sign the letter, regarding the submission of the above referenced Report, and direct Probation staff to submit the letter and Report to the State of California Director of Finance, the Legislative Analyst's Office, and the Joint Legislative Budget Committee; and

c) Determine pursuant to California Environmental Quality Act (CEQA) Guidelines 15378(b)(5) that the above actions are not a project subject to CEQA review, because they are government administrative activities that do not result in direct or indirect physical changes to the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Considered and adopted;**

**b) Authorized; Chair to execute; and**

**c) Approved.**

**The motion carried by the following vote:**

Ayes:  5 -  Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

A-38)      PUBLIC WORKS DEPARTMENT                                **25-01036**

Consider recommendations regarding the adoption (Second Reading) of a proposed Transportation Impact Mitigation Fee Ordinance for the Public Works Department services, as follows:

a) Adopt the Ordinance (Second Reading) updating transportation impact mitigation fees for the Santa Barbara County Public Works Department, pertaining to the Goleta and Orcutt Planning Areas;

b) Adopt the updated fee schedule to take effect upon the effective date of the Ordinance; and

c) Find that the proposed actions are administrative activities of the County approving charges that are for the purpose of meeting operating expenses, which will not result in direct or indirect physical changes in the environment, and are therefore not subject to the California Environmental Quality Act (CEQA) under CEQA Guidelines Section 15273(a)(l), not a "project" as defined for purposes of the CEQA under CEQA Guidelines Sections 15378(b)(4) and (b)(5).

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Adopted;**

**ORDINANCE NO. 5272**

**b) Adopted; and**

**c) Approved.**

**The motion carried by the following vote:**

Ayes:          5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**BOARD OF SUPERVISORS**                        Action Summary                        December 16, 2025

A-39)      PUBLIC WORKS DEPARTMENT                        **25-01062**

Consider recommendations regarding Amendment No. 1 for Services of Independent Contractor for the Santa Maria River Levee Bike Trail Project, County Project No. 862372, Fifth District, as follows:

a) Approve and authorize the Chair to execute Amendment No. 1 to the Agreement for Services of Independent Contractor for the Santa Maria River Levee Bike Trail Project, County Project No. 862372(PRJ-000619), increasing the cost by $23,003.07 for a total not to exceed contract amount of $334,175.07 and extending the period of performance to December 31, 2027;

b) Approve and authorize the Director of Public Works, or designee, to, in accordance with the Agreement: extend the period of performance for up to one additional year (Section 4.B); make immaterial amendments (Section 34); and suspend performance (Section 46.); and

c) Determine the above actions are not a "project" under the California Environmental Quality Act guidelines pursuant to Section 15378(b)(5) because it consists of organizational or administrative activities of governments that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; Chair to execute;**

**b) Approved and authorized; and**

**c) Approved.**

**The motion carried by the following vote:**

Ayes:          5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**A-40)**      <u>PUBLIC WORKS DEPARTMENT</u>                         **<u>25-01063</u>**

Consider recommendations regarding Cooperative Agreement between California Department of Transportation (Caltrans) and County for construction of Santa Claus Lane Streetscape Improvements and Coastal Access Project - Phase 2; State Project No. 525000106, County Project No. 720864, First District, as follows:

a) Approve and authorize the Chair to execute a Cooperative Agreement with Caltrans for the allocation of construction funding and reimbursement to the County of Santa Barbara for work on the Santa Claus Lane Streetscape Improvements and Coastal Access Project Phase 2;

b) Approve and authorize the Director of Public Works or designee to advertise for bids for the project as described in the Cooperative Agreement; and

c) Consider the environmental effects of the project as shown in the Final Mitigated Negative Declaration (19NGD-00000-00005) dated September 16, 2019, adopted by the County of Santa Barbara on September 25, 2019, and find that pursuant to California Environmental Quality Act Guidelines Section 15162(a), no substantial changes are proposed, and there are no substantial changes in circumstances or new information of substantial importance regarding significant impacts or feasibility of mitigation measures and alternative, and therefore approval of the Recommended Actions are within the scope of the Final Mitigated Negative Declaration (19NGD-00000-00005).

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; Chair to execute;**

**b) Approved and authorized; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**      5 -     Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

| BOARD OF SUPERVISORS | Action Summary | December 16, 2025 |
|---|---|---|

**A-41)**  **SOCIAL SERVICES DEPARTMENT**  **25-01072**

Consider recommendations regarding the Third Amendment to the Agreement with Santa Barbara Family Care Center dba Children's Resource and Referral of Santa Barbara County, as follows:

a) Approve, ratify, and authorize the Chair to execute Third Amendment to the Agreement with Santa Barbara Family Care Center dba Children's Resource and Referral of Santa Barbara (local vendor), to provide Emergency Child Care Bridge Program for Foster Children to increase the total contract amount not to exceed to $1,523,832.00 for the period of July 1, 2024 through June 30, 2026; and

b) Determine that the activity is not a "Project" subject to California Environmental Quality Act (CEQA) review per CEQA Guideline Section 15378(b)(5), since the activity is an organizational or administrative activity of government that will not result in direct or indirect physical changes in the environment.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved, ratified and authorized; Chair to execute; and**

**b) Approved.**

**The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

## Board of Supervisors

**A-42)**  **SUPERVISOR LEE**  **25-01093**

Approve the appointment of Adriana Gonzales-Smith to the Air Pollution Control District Community Advisory Council, open term, First District.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be approved. The motion carried by the following vote:**

**Ayes:**    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**BOARD OF SUPERVISORS**                    Action Summary                    December 16, 2025

**A-43)**          SUPERVISOR LEE                                                                    **25-01097**

Consider recommendations regarding a contribution to Mission Canyon Association for Maintenance of Tunnel Trailhead, as follows: (4/5 Vote Required)

a) Approve and authorize a contribution of $2,098.00 to the Mission Canyon Association for trailhead maintenance services, funded by the First District's Discretionary Funds held in Dept 990 fund balance;

b) Approve Budget Revision Request No. 0010912 to increase appropriations of $2,098.00 in the General County Programs General Fund for Services and Supplies, funded by a release of Committed Emerging Issues fund balance;

c) Find that the above program is necessary to meet the social needs of the population of the County, including public health, safety, and recreational access; and

d) Determine that the above actions are organizational or administrative activities of government that will not result in direct or indirect physical changes in the environment and are not a project under the California Environmental Quality Act (CEQA) pursuant to section 15378(b)(5) of the CEQA Guidelines.

> **A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**
>
> **a) Approved and authorized; and**
>
> **b) through d) Approved.**
>
> **The motion carried by the following vote:**

**Ayes:**        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**BOARD OF SUPERVISORS**                    Action Summary                    December 16, 2025

A-44)    SUPERVISOR LAVAGNINO                                          **25-01101**

Consider recommendations regarding the contribution of Fifth District Discretionary Funds to Guadalupe Community Action Coalition, as follows:

a) Approve and authorize the contribution of $10,000.00 to Guadalupe Community Action Coalition, a 501(c)(3) nonprofit, (EIN No. 99-1740664), to support the Royal Theater Renovation Project, from the Fifth District General County Programs Department 990 discretionary fund;

b) Find that the project provides a community benefit that meets the social needs of the County; and

c) Determine that the above actions are organizational or administrative activities of the government that will not result in direct or indirect physical changes in the environment and are not a project under the California Environmental Quality Act (CEQA) pursuant to section 15378(b)(5) of the CEQA Guidelines.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; and**

**b) and c) Approved.**

**The motion carried by the following vote:**

Ayes:         5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**A-45)**   <u>SUPERVISOR LAVAGNINO</u>                                    **25-01102**

Consider recommendations regarding the Contribution of Fifth District Discretionary Funds to Family Service Agency of Santa Barbara County, as follows:

a) Approve and authorize the contribution of $1,500.00 to Family Service Agency of Santa Barbara County, a 501(c)(3) nonprofit, (EIN No. 95-1644031), to support their Toys for Tots Program, from the Fifth District General County Programs Department 990 discretionary fund;

b) Find that the project provides a community benefit that meets the social needs of the County; and

c) Determine that the above actions are organizational or administrative activities of the government that will not result in direct or indirect physical changes in the environment and are not a project under the California Environmental Quality Act (CEQA) pursuant to section 15378(b)(5) of the CEQA Guidelines.

**A motion was made by Supervisor Hartmann, seconded by Supervisor Nelson, that this matter be acted on as follows:**

**a) Approved and authorized; and**

**b) and c) Approved.**

**The motion carried by the following vote:**

Ayes:        5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**25-00002**

### Public Comment Period

*THE PUBLIC COMMENT PERIOD IS RESERVED FOR COMMENT ON MATTERS WITHIN THE SUBJECT MATTER JURISDICTION OF THE BOARD OF SUPERVISORS. EACH PERSON MAY ADDRESS THE BOARD FOR UP TO THREE MINUTES AT THE DISCRETION OF THE CHAIR, FOR A TOTAL PUBLIC COMMENT PERIOD OF NO MORE THAN 15 MINUTES.  (Resolution No. 09-368) (25-00002)*

*WHEN TESTIFYING BEFORE THE BOARD OF SUPERVISORS, PERSONAL ATTACKS AND OTHER DISRUPTIVE BEHAVIOR ARE NOT APPROPRIATE.*

**Re: Expressed concerns regarding oil production in Santa Barbara County and thanked the Board for approving recent oil-related appeals - Drew Hart addressed the Board**

**Re: Promoted YouTube channel "Coast Audits"; and Expressed concerns regarding politically driven celebrations involving a 501(c)(4) nonprofit organization - Karin Hauenstein addressed the Board**

**Re: Expressed concerns regarding the affordable housing policy, revenue neutrality, and the County's ability to recover the full cost of Planning and Development (P&D) fees - Andy Caldwell addressed the Board**

BOARD OF SUPERVISORS                 Action Summary                 December 16, 2025

---

**12:00 P.M. ..... Recessed to Closed Session**


### Closed Session


**25-01106**


CONFERENCE WITH LEGAL COUNSEL-EXISTING LITIGATION
(Paragraph (1) of subdivision (d) of Government Code section 54956.9)

Luis Miguel Alejandro Lazaro v. Santa Barbara County Sheriff's Office et al., Santa Barbara County Superior Court Case No. 24CV05620.


**Report from Closed Session**


**No reportable action taken.**

---

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

### Departmental Agenda
### Planning Items and Public Hearings

**1)**     <u>COUNTY EXECUTIVE OFFICE</u>                                      **25-01104**

HEARING - Consider recommendations regarding the 2025 Annual Report and Accomplishments from Federal and State Legislative Advocates and 2026 Legislative Platform Adoption, as follows: (EST. TIME: 30 MIN.)

a) Receive and file the annual report and accomplishments for 2025 from the County's State legislative advocates, Hurst, Brooks, Espinosa, LLC., and Federal legislative advocate, Thomas Walters and Associates;

b) Adopt the County of Santa Barbara 2026 Legislative Platform as approved by the Legislative Program Committee at its December 8, 2025 meeting; and

c) Determine that the above actions are not a project under the California Environmental Quality Act (CEQA), because pursuant to sections 15378(b)(4) and 15378(b)(5) the recommended actions consist of organizational, administrative or fiscal activities of government that will not result in direct or indirect physical changes in the environment.

COUNTY EXECUTIVE OFFICER'S RECOMMENDATION: POLICY

*HEARING TIME: 10:05 AM - 10:38 AM (33 MIN.)*

**Received and filed staff presentation and conducted a public hearing.**

**A motion was made by Supervisor Hartmann, seconded by Supervisor Capps, that this matter be acted on as follows:**

**a) Received and filed;**

**b) Adopted the County of Santa Barbara 2026 Legislative Platform as amended during the December 16, 2025 Board of Supervisors meeting to include additional language to amend the 2026 Legislative Platform plank under Housing, as follows:**

**"Support clarifying reforms to the Builder's Remedy that balance the State's housing objectives with local discretion, and ensure communities are not compelled to approve projects that disregard zoning, safety, infrastructure, or neighborhood context-including extreme or out-of-scale proposals filed solely due to technical housing-element timing issues"; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**     5 -     Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

BOARD OF SUPERVISORS                   Action Summary                   December 16, 2025

**2)**        COMMUNITY SERVICES DEPARTMENT                                    **25-01098**

HEARING - Consider recommendations regarding a Request for Proposals (RFP) for Workforce Housing Development, First District, as follows: (EST. TIME: 30 MIN.)

a) Receive a presentation and direct staff to publish a RFP, as revised by direction provided by the Board during the hearing, to solicit proposals from experienced development teams to partner with the County to plan, finance, design, construct, operate and maintain a new affordable housing development at 117 East Carrillo Street (APN 029-211-025) in the City of Santa Barbara;

b) Provide staff direction regarding the following for inclusion in the RFP:

i) Whether the County should voluntarily subject the Project to the County's zero net policy regarding construction of public buildings; and

ii) Tenant income levels for this Project; and

c) Determine that the proposed actions do not constitute a "Project" within the meaning of the California Environmental Quality Act (CEQA), pursuant to Section 15378(b)(5) of the CEQA Guidelines, because it consists of an organizational or administrative activity of government which will not result in direct or indirect physical changes in the environment.

COUNTY EXECUTIVE OFFICER'S RECOMMENDATION: POLICY

*HEARING TIME: 10:38 AM - 11:27 AM (49 MIN.)*

**Received and filed staff presentation and conducted a public hearing.**

**Jeanne Sparks, Leonardo De Casaus, Karin Hauenstein, Linda Honikman, and Craig Minus addressed the Board.**

**A motion was made by Supervisor Capps, seconded by Supervisor Hartmann, that this matter be acted on as follows:**

**a) Received and filed and directed staff to publish a Request for Proposals (RFP);**

**b) i) and ii) Directed staff, as follows: (1) Return with additional information regarding applicability of Local Preference; (2) Address impact fees; (3) Consider concerns related to downtown employee parking; (4) Subject the project to the County's zero net policy (all electric project); and (5) Regarding tenant income levels, the preference is for low- to moderate-income tenants, while allowing above-moderate income levels as well; and**

**c) Approved.**

**The motion carried by the following vote:**

**Ayes:**      5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**BOARD OF SUPERVISORS**                    Action Summary                    December 16, 2025

**3)**     COUNTY EXECUTIVE OFFICE, BOARD OF DIRECTORS, FIRE              **25-01103**
PROTECTION DISTRICT, BOARD OF DIRECTORS, FLOOD
CONTROL AND WATER CONSERVATION DISTRICT, BOARD OF
DIRECTORS, LAGUNA COUNTY SANITATION DISTRICT, BOARD
OF DIRECTORS, WATER AGENCY
HEARING - Consider recommendations regarding Fiscal Years (FYs) 2026-2031 Five-Year
Forecast, as follows: (EST. TIME: 1 HR.)

Acting concurrently as the Board of Supervisors; the Board of Directors, Fire Protection District;
the Board of Directors, Flood Control and Water Conservation District; the Board of Directors,
Laguna County Sanitation District; the Board of directors, Water Agency and other special districts
under the supervision and control of the Board of Supervisors:

a) Receive and file the Five-Year Forecast for FYs 2026-2027 through 2030-2031;

b) Adopt the FY 2026-2027 Budget Development Policies;

c) Review funding priorities for FY 2026-2027;

d) Review Budget Balancing Framework and provide direction as appropriate; and

e) Determine pursuant to California Environmental Quality Act Guidelines Section 15378 that the
above activity is not a project under the California Environmental Quality Act.

COUNTY EXECUTIVE OFFICERS RECOMMENDATION: POLICY

*HEARING TIME: 11:40 AM - 12:44 PM (1 HR. 4 MIN.)*

**Received and filed staff presentation and conducted a public hearing.**

**Gail Osherenko, Lawanda Lyons-Pruit, Jeanne Sparks, Maureen Earls, and
Robert Ornstein addressed the Board.**

**A motion was made by Supervisor Hartmann, seconded by Supervisor Lavagnino,
that this matter be acted on as follows:**

**Acting concurrently as the Board of Supervisors; the Board of Directors, Fire
Protection District; the Board of Directors, Flood Control and Water
Conservation District; the Board of Directors, Laguna County Sanitation
District; the Board of directors, Water Agency and other special districts under
the supervision and control of the Board of Supervisors:**

**a) Received and filed;**

**b) Adopted the Fiscal Year 2026-2027 Budget Development Policies; and**

**c) through e) Approved.**

**The motion carried by the following vote:**

**Ayes:**     5 -     Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor
Nelson, and Supervisor Lavagnino

**4)**     COUNTY EXECUTIVE OFFICE                                    **25-01087**

HEARING - Consider recommendations regarding Fiscal Year (FY) 2025-2026 First Quarter Budget Status Report, as follows: (EST. TIME: 20 MIN.)

a) Receive and file the FY 2025-2026 First Quarter Budget and Status Report as of September 30, 2025, showing the status of appropriations and financing for departmental budgets adopted by the Board of Supervisors; and

b) Determine that the above actions are not a project under the California Environmental Quality Act (CEQA), because pursuant to sections 15378(b)(4) and 15378(b)(5) the recommended actions consist of organizational, administrative, or fiscal activities of government that will not result in direct or indirect physical changes in the environment.

COUNTY EXECUTIVE OFFICER'S RECOMMENDATION: APPROVE

*HEARING TIME: 12:45 PM - 12:57 PM (12 MIN.)*

**Received and filed staff presentation and conducted a public hearing.**

**A motion was made by Supervisor Nelson, seconded by Supervisor Lee, that this matter be acted on as follows:**

**a) Received and filed; and**

**b) Approved.**

**The motion carried by the following vote:**

Ayes:          5 -     Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

**5)**     PLANNING AND DEVELOPMENT DEPARTMENT               **25-01069**

HEARING - Consider recommendations regarding Ordinance Streamlining and Housing Accommodation Amendments, as follows: (EST. TIME: 1 HR.)

a) Make the required findings for approval, including California Environmental Quality Act (CEQA) findings, for the Ordinance Amendments, Case Nos. 25ORD-00006, 25ORD-00007, and 25ORD-00008;

b) Determine that the Ordinance Amendments, Case Nos. 25ORD-00006, 25ORD-00007, and 25ORD-00008, are exempt from CEQA pursuant to CEQA Guidelines Sections 15061(b)(3), 15168(c), and 15265;

c) Approve the Ordinance Streamlining and Housing Accommodation Amendments by taking the following actions:

i) Adopt an Ordinance amending the Zoning Regulations of the County Land Use and Development Code (Case No. 25ORD-00006), Section 35-1 of Chapter 35, Zoning, of the Santa Barbara County Code;

ii) Adopt an Ordinance amending the Zoning Regulations of the Article II Coastal Zoning Ordinance (Case No. 25ORD-00007), of Chapter 35, Zoning, of the Santa Barbara County Code; and

iii) Adopt an Ordinance amending the Zoning Regulations of the Montecito Land Use and Development Code (Case No. 25ORD-00008), Section 35-2 of Chapter 35, Zoning, of the Santa Barbara County Code;

d) Adopt a Resolution authorizing the Planning and Development Department to submit the Coastal Zoning Ordinance Streamlining and Housing Accommodation Amendments (Case No. 25ORD-00007) to the California Coastal Commission (CCC) for review and certification as an amendment to the Santa Barbara County Local Coastal Program; and

e) Direct the Planning and Development Department to transmit the adopted Resolution to the Executive Director of the CCC.

COUNTY EXECUTIVE OFFICER'S RECOMMENDATION: POLICY

*HEARING TIME: 1:38 PM - 3:18 PM (1 HR. 40 MIN.)*

**Received and filed staff presentation and conducted a public hearing.**

**Jeannie Sparks, and Karin Hauenstein addressed the Board.**

**A motion was made by Supervisor Nelson, seconded by Supervisor Hartmann, that this matter be continued to the January 27, 2026 Board of Supervisors meeting in Santa Maria.**

**The motion carried by the following vote:**

Ayes:    5 -    Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

BOARD OF SUPERVISORS                    Action Summary                    December 16, 2025

**6)**     PLANNING AND DEVELOPMENT DEPARTMENT                                    **25-01067**

HEARING - Consider recommendations regarding the appeals of the Planning Commission Approval of the Sable Offshore Corporation's Change of Owner, Operator, and Guarantor for the Santa Ynez Unit (SYU), Pacific Offshore Pipeline Company (POPCO) Gas Plant, and Las Flores Pipeline System Final Development Plan (FDP) Permits, Third, Fourth, and First Districts, as flows: (EST.  TIME: 1 HR. 15 MIN.)

a) Approve the appeals, Case Nos. 24APL-00025 and 24APL-00026;

b) Make the required findings for denial of the Change of Owner, Operator, and Guarantor for the respective SYU, POPCO Gas Plant, and Las Flores Pipeline System FDP Permits;

c) Determine that denial of the requests is exempt from the California Environmental Quality Act (CEQA) pursuant to CEQA Guidelines Section 15270(a); and

d) Deny the Change of Owner, Operator, and Guarantor for the respective SYU, POPCO Gas Plant, and Las Flores Pipeline System FDP Permits.

COUNTY EXECUTIVE OFFICER'S RECOMMENDATION: POLICY

*HEARING TIME: 3:18 PM - 4:42 PM (1 HR. 24 MIN.)*

**Received and filed staff presentation and conducted a public hearing.**

**Sarah Ebe, Jonathan Ullman, Seth Steiner, Nikki Talebi, Bill Hickman, Larry Bishop, Lawanda Lyons-Pruit, Tina Calderon, Thomas Becker, Paasha Mahdavi, Patrick Kennedy, Adam Maingot, Patrice Surmeier, Greg Orr, Jason Joyce, Karin Hauenstein, Jeannie Sparks, Joyce Howerton, Ellen Bougher-Harvey, Mike Stoker, and Ted Morton addressed the Board.**

**A motion was made by Supervisor Lavagnino, seconded by Supervisor Lee, that this matter be acted on as follows: Accept into the record the following documents: Public Comment letter from Shelley Smyers and a Public Comment letter from Brandon Sparks-Gillis.**

**The motion failed for lack of the required four-fifths vote, as follows:**

|              |     |                                                              |
|--------------|-----|--------------------------------------------------------------|
| **Ayes:**    | 3 - | Supervisor Lee, Supervisor Capps, and Supervisor Lavagnino   |
| **Noes:**    | 1 - | Supervisor Nelson                                            |
| **Recused:** | 1 - | Supervisor Hartmann                                          |

A motion was made by Supervisor Lavagnino, seconded by Supervisor Lee, that this matter be acted on as follows:

a) Approved the appeals, Case Nos. 24APL-00025 and 24APL-00026;

b) Made the required findings for denial of the Change of Owner, Operator, and Guarantor for the respective SYU, POPCO Gas Plant, and Las Flores Pipeline System FDP Permits;

c) Approved; and

d) Denied the Change of Owner, Operator, and Guarantor for the respective SYU, POPCO Gas Plant, and Las Flores Pipeline System FDP Permits.

The motion carried by the following vote:

|  |  |  |
|---|---|---|
| **Ayes:** | 3 - | Supervisor Lee, Supervisor Capps, and Supervisor Lavagnino |
| **Noes:** | 1 - | Supervisor Nelson |
| **Recused:** | 1 - | Supervisor Hartmann |

7)    <u>SUPERVISOR NELSON</u>    **25-01107**

HEARING - Consider recommendations regarding the introduction and intent to adopt an Ordinance adding Section 2-24.11 to the Santa Barbara County Code to change the election timing for the Treasurer-Tax Collector-Public Administrator, as follows: (EST. TIME: 15 MIN.)

a) Approve the introduction (first reading) of an Ordinance of the Santa Barbara County Board of Supervisors, State of California, adding Section 2-24.11 to the Santa Barbara County Code to move the election of the Treasurer-Tax Collector-Public Administrator to the presidential primary cycle;

b) Read the title and waive full reading of the Ordinance;

c) Set a hearing for January 13, 2026, to consider adoption (second reading) of the Ordinance; and

d) Determine that the above actions are organizational or administrative activities of the government that will not result in direct or indirect physical changes in the environment and are not a project under the California Environmental Quality Act (CEQA) pursuant to section 15378(b)(5) of the CEQA Guidelines.

*HEARING TIME: 2:58 PM - 3:17 PM (19 MIN.)*

**Received and filed staff presentation and conducted a public hearing.**

**No further action taken.**

## Adjourned at 4:42 PM

## Adjourned to

## Tuesday, January 13, 2026

## County Administration Building
## Board Hearing Room
## 105 East Anapamu Street , Fourth Floor
## Santa Barbara

## Challenges

*IF YOU CHALLENGE A DETERMINATION MADE ON A MATTER ON THIS AGENDA IN COURT, YOU MAY BE LIMITED TO RAISING ONLY THOSE ISSUES YOU OR SOMEONE ELSE RAISED AT THE PUBLIC HEARING DESCRIBED IN THIS NOTICE, OR IN WRITTEN CORRESPONDENCE TO THE BOARD OF SUPERVISORS AT, OR PRIOR TO, THE PUBLIC HEARING.*

## Announcements

*The meeting of Tuesday, December 16, 2025 will be telecast live on County of Santa Barbara TV Channel 20 at 9:00 AM, and will be rebroadcast on Thursday, December 18, 2025, at 5:00 PM and on Saturday, December 20, 2025, at 10:00 AM on CSBTV Channel 20.*

## http://www.countyofsb.org

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On January 6, 2026, I served the above document(s) described as **DECLARATION OF JULIE TEEL SIMMONDS IN SUPPORT OF PETITIONERS AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S EX PARTE APPLICATION FOR ORDER SHORTENING TIME FOR NOTICE OF MOTION AND MOTION FOR RECONSIDERATION (VOL. 4 OF 4)** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒    **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 6, 2026, at Santa Barbara, California.

_____
Jeremy M. Frankel

**SERVICE LIST**

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>Myung Park<br>Myung.Park@doj.ca.gov<br>Matthew Bullock<br>Matthew.Bullock@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |