# EXHIBIT MM

**SUPERIOR COURT OF CALIFORNIA
COUNTY OF SANTA BARBARA**

Dated and Entered:  01/07/2026                     Time:   10:00 AM
Judicial Officer:       Donna D Geck
Deputy Clerk:          Maria Vidal                          Dept:   SB Dept 4
Bailiff/Court Officer:  Jorge Reyes                  Case No: 25CV02244
Court Reporter:        Melina Huser

---

**Center for Biological Diversity  et al vs California Department of Forestry and Fire
Protection  et al**

Parties Present:

| | |
|---|---|
| Linda Krop | Petitioner's Attorney |
| Talia Nimmer | Petitioner's Attorney |
| Jeremy Frankel | Petitioner's Attorney |
| Michael Dorsi | Respondent's Attorney (via Zoom) |
| Matthew Bullock | Respondent's Attorney (via Zoom) |
| Jeffrey Dintzer | Attorney for Real Party in Interest |
| Trevor Large | Attorney for Real Party in Interest |
| Garrett Stanton | Attorney for Real Party in Interest |

---

**NATURE OF PROCEEDINGS***:  **Ex Parte Application re Immediate Status Conference; Ex Parte
Application re Order Shortening Time, Notice of Motion for Reconsideration**

Counsel presented argument.

Sable's Motion for Reconsideration is set for hearing on February 27, 2026, at 10:00 a.m. in Dept. 4. Any
opposition shall be filed and served no later than February 13, 2026. Any reply shall be filed and served
no later than February 18, 2026.

Jeffrey Dintzer will prepare the order.

DARREL E. PARKER, EXECUTIVE OFFICER            Minutes Prepared by:

                                                    _____ , Deputy
                                                              Maria Vidal

SC-2411 (Revised July 1, 2013)                    **MINUTE ORDER**

Pursuant to CRC 2.259 this document has been electronically filed by the Superior Court of California, County of Santa Barbara, on 1/9/2026

Jeffrey D. Dintzer (SBN: 139056)
Garrett B. Stanton (SBN: 324775)
**ALSTON & BIRD, LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100
Jeffrey.Dintzer@alston.com
Garrett.Stanton@alston.com

Duncan Joseph Moore (SBN: 233955)
Benjamin J. Hanelin (SBN: 237595)
Natalie C. Rogers (SBN: 301254)
**PAUL HASTINGS LLP**
1999 Avenue of Stars, 27th Floor
Century City, CA 90067
Tel: (310) 620-5879; Fax: (310) 620-5899
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com

Trevor D. Large (SBN: 214886)
Victoria C. Diffenderfer (SBN: 350018)
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227
tlarge@flasllp.com
vdiffenderfer@flasllp.com

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

**F I L E D**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA

**01/15/2026**

Darrel E. Parker, Executive Officer

BY ___Chavez, Terri___
Deputy Clerk

**AMENDED ORDER FILED ON 1/16/2026**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE | Case No.: 25CV02244<br>[Consolidated with 25CV02247]<br><br>~~[PROPOSED]~~ ORDER GRANTING RULING FROM JANUARY 6, 2026 HEARING ON PARTIES' EX PARTE APPLICATIONS<br><br>Date:    January 6, 2026<br>Time:    8:30 a.m.<br>Dept.:    4<br><br>Complaints Filed: April 15, 2025<br><br>[Assigned for Purposes to the Honorable Donna D. Geck, Dept. 4] |

1

COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

Real Parties in Interest

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.

Real Parties in Interest.

Case No.: 25CV02247

2
[PROPOSED] ORDER

## ~~[PROPOSED]~~ ORDER

On January 6, 2026, the parties appeared for hearing on their *ex parte* applications before this Court. The Court hereby orders the following:

**IT IS HEREBY ORDERED THAT:**

1.  Sable Offshore Corp.'s and Pacific Pipeline Company's ("Sable") Motion for Reconsideration of the Preliminary Injunction will be held on February 27, 2026 at 10:00 AM in Department 4;

2.  Opposition Briefs for Petitioners and Respondent are be due by February 13, 2026;

3.  Sable's Reply Brief is due on February 18, 2026.

**IT IS SO ORDERED.**

DATED: **01/15/2026**_____

_Donna D. Geck_
_____
HONORABLE DONNA D. GECK
JUDGE OF THE SUPERIOR COURT

---

3

[PROPOSED] ORDER

**PROOF OF SERVICE**

I, Kim Niz, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On January 9, 2026, I served the document **[PROPOSED] ORDER GRANTING RULING FROM JANUARY 6, 2026 HEARING ON PARTIES' EX PARTE APPLICATIONS** the interested parties in this action addressed as follows:  **See Attached Service List**

1.  ☒  BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on January 9, 2026, at Los Angeles, California.

/s/ *Kim Niz*

Kim Niz

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>**CENTER FOR BIOLOGICAL DIVERSITY**<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD & SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge@flasllp.com<br>vdiffenderfer@flasllp.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>**ENVIRONMENTAL DEFENSE CENTER**<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |

Michael S. Dorsi, Esq.
**CALIFORNIA ATTORNEY GENERAL'S OFFICE**
55 Golden Gate Ave, Ste 11000
San Francisco, CA 94102
Tel.: (415) 510-3802
Michael.dorsi@doj.ca.gov

*Attorneys for Respondents/Defendants: California Department of Forestry and Fire Protection, Office of the State Fire Marshal, Daniel Berlant (in his official capacity as State Fire Marshal)*

Pursuant to CRC 2.259 this document has been electronically filed by the
Superior Court of California, County of Santa Barbara, on 1/14/2026

**F I L E D**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA

**01/16/2026**

Darrel E. Parker, Executive Officer

BY ___Chavez, Terri_____
Deputy Clerk

Jeffrey D. Dintzer (SBN: 139056)
Garrett B. Stanton (SBN: 324775)
**ALSTON & BIRD, LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100
Jeffrey.Dintzer@alston.com
Garrett.Stanton@alston.com

Duncan Joseph Moore (SBN: 233955)
Benjamin J. Hanelin (SBN: 237595)
Natalie C. Rogers (SBN: 301254)
**PAUL HASTINGS LLP**
1999 Avenue of Stars, 27th Floor
Century City, CA 90067
Tel: (310) 620-5879; Fax: (310) 620-5899
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com

Trevor D. Large (SBN: 214886)
Victoria C. Diffenderfer (SBN: 350018)
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227
tlarge@flasllp.com
vdiffenderfer@flasllp.com

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE | Case No.: 25CV02244<br>[Consolidated with 25CV02247]<br><br>**AMENDED [PROPOSED] ORDER GRANTING RULING FROM JANUARY 7, 2026 HEARING ON PARTIES' EX PARTE APPLICATIONS**<br><br>Date:      January 7, 2026<br>Time:     10:00 a.m.<br>Dept.:     4<br><br>Complaints Filed: April 15, 2025<br><br>[Assigned for All Purposes to the Honorable Donna D. Geck, Dept. 4] |

1

[PROPOSED] ORDER

COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

Real Parties in Interest

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.

Real Parties in Interest.

Case No.: 25CV02247

2
[PROPOSED] ORDER

**[PROPOSED] ORDER**

On January 7, 2026, the parties appeared for a hearing on their *ex parte* applications before this Court.  The Court hereby orders the following:

**IT IS HEREBY ORDERED THAT:**

1.    Sable Offshore Corp.'s and Pacific Pipeline Company's ("Sable") Motion for Reconsideration of the Preliminary Injunction will be held on February 27, 2026 at 10:00 AM in Department 4;

2.    Opposition Briefs for Petitioners and Respondents are be due by February 13, 2026;

3.    Sable's Reply Brief is due on February 18, 2026.


**IT IS SO ORDERED.**


DATED:  __01/16/2026__

HONORABLE DONNA D. GECK
JUDGE OF THE SUPERIOR COURT

3
[PROPOSED] ORDER

**PROOF OF SERVICE**

I, Kim Niz, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On January 14, 2026, I served the document **[PROPOSED] ORDER GRANTING RULING FROM JANUARY 6, 2026 HEARING ON PARTIES' EX PARTE APPLICATIONS** the interested parties in this action addressed as follows:  **See Attached Service List**

1.    ☒    BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on January 14, 2026, at Los Angeles, California.

/s/ *Kim Niz*

Kim Niz

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>**CENTER FOR BIOLOGICAL DIVERSITY**<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD & SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge@flasllp.com<br>vdiffenderfer@flasllp.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>**ENVIRONMENTAL DEFENSE CENTER**<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |

| Michael S. Dorsi, Esq. **CALIFORNIA ATTORNEY GENERAL'S OFFICE** 55 Golden Gate Ave, Ste 11000 San Francisco, CA 94102 Tel.: (415) 510-3802 Michael.dorsi@doj.ca.gov | *Attorneys for Respondents/Defendants: California Department of Forestry and Fire Protection, Office of the State Fire Marshal, Daniel Berlant (in his official capacity as State Fire Marshal)* |
|---|---|

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER: | FOR COURT USE ONLY |
|---|---|---|

NAME: Linda Krop (118773); Jeremy Frankel (344500); Tara Rengifo (307670)
FIRM NAME: Environmental Defense Center
STREET ADDRESS: 906 Garden Street
CITY: Santa Barbara          STATE: CA      ZIP CODE: 93101
TELEPHONE NO.: (805) 963-1622          FAX NO.:
EMAIL ADDRESS: lkrop@environmentaldefensecenter.org
ATTORNEY FOR (name): Petitioners/Plaintiffs Environmental Defense Center et al.

**ELECTRONICALLY FILED**
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/11/2026 1:26 PM
By: Laura Kenny , Deputy

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**
STREET ADDRESS: 1100 Anacapa Street
MAILING ADDRESS: P.O. Box 21107
CITY AND ZIP CODE: Santa Barbara, CA 93101
BRANCH NAME: Anacapa

PLAINTIFF/PETITIONER: Environmental Defense Center et al.

DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection et al.

| **CASE MANAGEMENT STATEMENT**<br><br>(Check one):   [X] **UNLIMITED CASE**<br>(Amount demanded exceeds $35,000)   [ ] **LIMITED CASE**<br>(Amount demanded is $35,000 or less) | CASE NUMBER:<br>25CV02247 |
|---|---|

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date: February 27, 2026          Time: 10:00 a.m.          Dept.: 4          Div.: Anacapa          Room:

Address of court (if different from the address above):

[ ]   **Notice of Intent to Appear by Telephone, by** (name):

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** (answer one):
   a. [ ]   This statement is submitted by party (name):
   b. [X]   This statement is submitted **jointly** by parties (names): Plaintiffs/Petitioners Environmental Defense Center et al.

2. **Complaint and cross-complaint** (to be answered by plaintiffs and cross-complainants only)
   a. The complaint was filed on (date):   April 15, 2025
   b. [ ]   The cross-complaint, if any, was filed on (date):

3. **Service** (to be answered by plaintiffs and cross-complainants only)
   a. [X]   All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. [ ]   The following parties named in the complaint or cross-complaint
      (1) [ ]   have not been served (specify names and explain why not):

      (2) [ ]   have been served but have not appeared and have not been dismissed (specify names):

      (3) [ ]   have had a default entered against them (specify names):

   c. [ ]   The following additional parties may be added (specify names, nature of involvement in case, and date by which they may be served):

4. **Description of case**
   a. Type of case in   [X] complaint   [ ] cross-complaint     (Describe, including causes of action):
   Petitioners challenge, under CCP 1085 and 1094.5, the Office of the State Fire Marshal's (OSFM) issuance of State Waivers for the Las Flores Pipeline System. Petitioners allege that, in issuing the waivers, OSFM failed to comply with federal and state pipeline safety laws, failed to comply with the California Environmental Quality Act, and otherwise abused its discretion.

**Page 1 of 5**

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-110 [Rev. January 1, 2024] | **CASE MANAGEMENT STATEMENT** | Cal. Rules of Court,<br>rules 3.720–3.730<br>www.courts.ca.gov |
|---|---|---|

CM-110

| PLAINTIFF/PETITIONER: Environmental Defense Center et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection et al. | 25CV02247 |

4. b. Provide a brief statement of the case, including any damages *(if personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings; if equitable relief is sought, describe the nature of the relief):*
See Attachment 4b

☒ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5. **Jury or nonjury trial**

The party or parties request ☐ a jury trial ☒ a nonjury trial. *(If more than one party, provide the name of each party requesting a jury trial):*

6. **Trial date**

a. ☐ The trial has been set for *(date):*

b. ☒ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c. Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7. **Estimated length of trial**

The party or parties estimate that the trial will take *(check one)*

a. ☒ days *(specify number):* 1-2

b. ☐ hours (short causes) *(specify):*

8. **Trial representation** *(to be answered for each party)*

The party or parties will be represented at trial ☒ by the attorney or party listed in the caption ☐ by the following:

a. Attorney:

b. Firm:

c. Address:

d. Telephone number:          f. Fax number:

e. Email address:             g. Party represented:

☐ Additional representation is described in Attachment 8.

9. **Preference**

☒ This case is entitled to preference *(specify code section):* Pub. Res. Code § 21167.1(a)

10. **Alternative dispute resolution (ADR)**

a. **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 of the California Rules of Court for information about the processes available through the court and community programs in this case.

(1) For parties represented by counsel: Counsel ☒ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

(2) For self-represented parties: Party ☐ has ☐ has not reviewed the ADR information package identified in rule 3.221.

b. **Referral to judicial arbitration or civil action mediation** (if available).

(1) ☐ This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

(2) ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

(3) ☒ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*
Cal. Rules of Court, rule 3.811(b)(1)

**CM-110**

| PLAINTIFF/PETITIONER: Environmental Defense Center et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection et al. | 25CV02247 |

10. c.  In the table below, indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information)*:

| | The party or parties completing this form **are willing** to participate in the following ADR processes *(check all that apply)*: | If the party or parties completing this form in the case **have agreed** to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation)*: |
|---|---|---|
| (1) Mediation | [x] | [x] Mediation session not yet scheduled<br>[ ] Mediation session scheduled for *(date)*:<br>[ ] Agreed to complete mediation by *(date)*:<br>[ ] Mediation completed on *(date)*: |
| (2) Settlement conference | [x] | [ ] Settlement conference not yet scheduled<br>[ ] Settlement conference scheduled for *(date)*:<br>[ ] Agreed to complete settlement conference by *(date)*:<br>[x] Settlement conference completed on *(date)*: June 12, 2025 |
| (3) Neutral evaluation | [ ] | [ ] Neutral evaluation not yet scheduled<br>[ ] Neutral evaluation scheduled for *(date)*:<br>[ ] Agreed to complete neutral evaluation by *(date)*:<br>[ ] Neutral evaluation completed on *(date)*: |
| (4) Nonbinding judicial arbitration | [ ] | [ ] Judicial arbitration not yet scheduled<br>[ ] Judicial arbitration scheduled for *(date)*:<br>[ ] Agreed to complete judicial arbitration by *(date)*:<br>[ ] Judicial arbitration completed on *(date)*: |
| (5) Binding private arbitration | [ ] | [ ] Private arbitration not yet scheduled<br>[ ] Private arbitration scheduled for *(date)*:<br>[ ] Agreed to complete private arbitration by *(date)*:<br>[ ] Private arbitration completed on *(date)*: |
| (6) Other *(specify)*: | [ ] | [ ] ADR session not yet scheduled<br>[ ] ADR session scheduled for *(date)*:<br>[ ] Agreed to complete ADR session by *(date)*:<br>[ ] ADR completed on *(date)*: |

| CM-110 [Rev. January 1, 2024] | **CASE MANAGEMENT STATEMENT** | **Page 3 of 5** |
|---|---|---|

**CM-110**

| PLAINTIFF/PETITIONER:  Environmental Defense Center et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT:  California Department of Forestry and Fire Protection et al. | 25CV02247 |

## 11. Insurance

a. ☐  Insurance carrier, if any, for party filing this statement *(name):*

b. Reservation of rights:  ☐ Yes   ☐ No

c. ☐  Coverage issues will significantly affect resolution of this case  *(explain):*

## 12. Jurisdiction

Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.

☐ Bankruptcy   ☐ Other  *(specify):*

Status:

## 13. Related cases, consolidation, and coordination

a. ☒  There are companion, underlying, or related cases.

   (1)  Name of case: Center for Biological Diversity et al. v. California Department of Forestry and Fire Protection et al.

   (2)  Name of court: Santa Barbara County Superior Court

   (3)  Case number:  25CV02444

   (4)  Status: Pending

   ☒  Additional cases are described in Attachment 13a.

b. ☐  A motion to  ☐ consolidate  ☐ coordinate  will be filed by *(name party):*

## 14. Bifurcation

☒ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*
On August 27, 2025, Petitioners filed a motion to bifurcate this action into two phases: consideration of (1) Petitioners' procedural claims under CEQA and federal/state pipeline safety acts, and (2) substantive pipeline safety claims. On September 19, 2025, the Court denied Petitioners' motion.

## 15. Other motions

☐ The party or parties expect to file the following motions before trial  *(specify moving party, type of motion, and issues):*

## 16. Discovery

a. ☐  The party or parties have completed all discovery.

b. ☐  The following discovery will be completed by the date specified *(describe all anticipated discovery):*

| Party | Description | Date |
|---|---|---|
| | | |

c. ☒  The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated  *(specify):*
Petitioners believe discovery is not necessary or appropriate for this action, and thus should be prohibited or strictly limited.

**CM-110**

| PLAINTIFF/PETITIONER: Environmental Defense Center et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection et al. | 25CV02247 |

17. **Economic litigation**

   a. ☐ This is a limited civil case (i.e., the amount demanded is $35,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

   b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

18. **Other issues**

   ☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

19. **Meet and confer**

   a. ☒ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

   b. ☐ After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

20. Total number of pages attached *(if any):* 2

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date: February 11, 2026

| Linda Krop | ▶ *Ldakp* |
|---|---|
| (TYPE OR PRINT NAME) | (SIGNATURE OF PARTY OR ATTORNEY) |

| | ▶ |
|---|---|
| (TYPE OR PRINT NAME) | (SIGNATURE OF PARTY OR ATTORNEY) |

   ☐ Additional signatures are attached.

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Environmental Defense Center et al. v. Cal Fire et al. | 25CV02247 |

**ATTACHMENT** *(Number):*  4b

*(This Attachment may be used with any Judicial Council form.)*

This case arises from the efforts of Sable Offshore Corp. and its wholly-owned subsidiary Pacific Pipeline Company ("Real Parties") to restart the Las Flores Pipeline System — a defective pipeline system that ruptured in 2015, causing one of the worst oil disasters in California history.

Upon investigation, the Pipeline Hazardous Materials Safety Administration (PHMSA) determined that the rupture was a result of "progressive external corrosion," and that the pipeline's cathodic protection system — intended to prevent such corrosion — had failed. Concerningly, PHMSA ultimately determined that, by flaw of design, cathodic protection is ineffective on the Las Flores Pipeline System, leaving it vulnerable to pervasive corrosion.

Because of the Las Flores Pipeline System's extensive corrosion issues, in order to restart it, Sable must obtain waivers from the Office of the State Fire Marshal (OSFM) that excuse it from complying with certain regulatory requirements. Real Parties thus applied for State Waivers "for the limited effectiveness of cathodic protection" on CA-324 and CA-325, the two pipeline segments that comprise the Las Flores Pipeline System. OSFM granted these State Waivers to Real Parties without providing a public process, without providing any justification for its decisions, and without conducting necessary environmental review.

Petitioners challenge OSFM's issuance of the State Waivers under Code of Civil Procedure sections 1085 and 1094.5. Petitioners allege that Respondents (1) failed to comply with mandatory procedures outlined in state and federal pipeline safety laws, (2) failed to comply with the California Environmental Quality Act's  review process, and (3) otherwise prejudicially abused its discretion in issuing the State Waivers.

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page  6  of  7

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT
to Judicial Council Form**

*www.courtinfo.ca.gov*

**MC-025**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Environmental Defense Center et al. v. Cal Fire et al. | 25CV02247 |

**ATTACHMENT** *(Number):* 13a

*(This Attachment may be used with any Judicial Council form.)*

13.a. Related cases, consolidation and coordination

Additional cases:
(1) Name of case: Environmental Defense Center et al. v. Pipeline and Hazardous Materials Safety Administration et al.
(2) Name of court: United States Court of Appeals, Ninth Circuit
(3) Case number: 25-8059
(4) Status: Pending

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

**Page** 7 **of** 7

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

*www.courtinfo.ca.gov*

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On February 11, 2026, I served the above document(s) described as **CASE MANAGEMENT STATEMENT** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒    **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 11, 2026, at Santa Barbara, California.

_____
Jeremy M. Frankel

1
Proof of Service

**SERVICE LIST**

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>Myung Park<br>Myung.Park@doj.ca.gov<br>Matthew Bullock<br>Matthew.Bullock@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEYS FOR<br>RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBAL & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY \ | | FOR COURT USE ONLY |
|---|---|---|
| NAME: Trevor D. Large (SBN 214886) \| Victoria C. DIffenderfer (SBN 350018)  STATE BAR NUMBER: | | ELECTRONICALLY FILED Superior Court of California County of Santa Barbara Darrel E. Parker, Executive Officer 2/11/2026 4:28 PM By: Narzralli Baksh , Deputy |

ATTORNEY OR PARTY WITHOUT ATTORNEY \
NAME: Trevor D. Large (SBN 214886) | Victoria C. DIffenderfer (SBN 350018)
STATE BAR NUMBER:
FIRM NAME: FAUVER LARGE ARCHBALD & SPRAY
STREET ADDRESS: 820 State Street, 4th Floor
CITY: Santa Barbara        STATE: CA        ZIP CODE: 93101
TELEPHONE NO.: (805) 966-7000        FAX NO.: (805) 966-7227
EMAIL ADDRESS: tlarge@flasllp.com
ATTORNEY FOR (name): Sable Offshore Corp., Pacific Pipeline Company

*FOR COURT USE ONLY*
ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/11/2026 4:28 PM
By: Narzralli Baksh , Deputy

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**
 STREET ADDRESS: 1107 Anacapa St.
 MAILING ADDRESS: P.O. Box 21107
CITY AND ZIP CODE: Santa Barbara, CA 93121-1107
  BRANCH NAME: Anacapa Division

   PLAINTIFF/PETITIONER: Center for Biological Diversity et al.

DEFENDANT/RESPONDENT: California Department of Foresty and Fire Protection et al.

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: 25CV02244 |
|---|---|
| **(Check one):** ☒ **UNLIMITED CASE** (Amount demanded exceeds $35,000) ☐ **LIMITED CASE** (Amount demanded is $35,000 or less) | |

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date:February27,2026        Dept.: 4        Div.:        Room:
Time: 10:00am
Address of court *(if different from the address above)*:

☐    **Notice of Intent to Appear by Telephone,  by** *(name)*:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one)*:
   a. ☒   This statement is submitted by party *(name)*: Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Co.
   b. ☐   This statement is submitted **jointly** by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a.   The complaint was filed on *(date)*:
   b. ☐   The cross-complaint, if any, was filed on *(date)*: April 15, 2025

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☒   All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. ☐   The following parties named in the complaint or cross-complaint
      (1) ☐   have not been served *(specify names and explain why not)*:

      (2) ☐   have been served but have not appeared and have not been dismissed *(specify names)*:

      (3) ☐   have had a default entered against them *(specify names)*:

   c. ☐   The following additional parties may be added *(specify names, nature of involvement in case, and date by which they may be served)*:

4. **Description of case**
   a.  Type of case in ☒ complaint  ☐ cross-complaint    *(Describe, including causes of action)*:
      Plaintiffs/Petitioners challenge the California Department of Foresty and Fire Protection and its Office of the State Fire Marshall's (OSFM) issuance of waivers of federal pipeline safety regulations (the State Waivers). Petitioners allege violations of the federal Pipeline Safety Act and state pipeline safety laws and the California Environmental Quality Act.

**Page 1 of 5**

| Form Adopted for Mandatory Use Judicial Council of California CM-110 [Rev. January 1, 2024] | **CASE MANAGEMENT STATEMENT** | Cal. Rules of Court, rules 3.720–3.730 www.courts.ca.gov |
|---|---|---|

CM-110

| PLAINTIFF/PETITIONER: Center for Biological Diversity et al. | CASE NUMBER: 25CV02244 |
|---|---|
| DEFENDANT/RESPONDENT: California Department of Foresty and Fire Protection et al. | |

4.  b.  Provide a brief statement of the case, including any damages *(if personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings; if equitable relief is sought, describe the nature of the relief):*

See Attachment 4b

☒ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**

The party or parties request ☐ a jury trial ☒ a nonjury trial. *(If more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**

a.  ☐ The trial has been set for *(date):*

b.  ☒ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**

The party or parties estimate that the trial will take *(check one)*

a.  ☒ days *(specify number):* 1

b.  ☐ hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*

The party or parties will be represented at trial ☒ by the attorney or party listed in the caption ☐ by the following:

a.  Attorney:

b.  Firm:

c.  Address:

d.  Telephone number:              f.  Fax number:

e.  Email address:              g.  Party represented:

☒ Additional representation is described in Attachment 8.

9.  **Preference**

☐ This case is entitled to preference *(specify code section):* Public Resources Code section 21167.1(a)

10.  **Alternative dispute resolution (ADR)**

a.  **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 of the California Rules of Court for information about the processes available through the court and community programs in this case.

(1)  For parties represented by counsel: Counsel ☒ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

(2)  For self-represented parties: Party ☐ has ☐ has not reviewed the ADR information package identified in rule 3.221.

b.  **Referral to judicial arbitration or civil action mediation** (if available).

(1) ☐ This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

(2) ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

(3) ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

**CM-110**

| PLAINTIFF/PETITIONER: Center for Biological Diversity et al. | CASE NUMBER: 25CV02244 |
|---|---|
| DEFENDANT/RESPONDENT: California Department of Foresty and Fire Protection et al. | |

10. c.  In the table below, indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information)*:

| | The party or parties completing this form **are willing** to participate in the following ADR processes *(check all that apply)*: | If the party or parties completing this form in the case **have agreed** to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation)*: |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled<br>☐ Mediation session scheduled for *(date)*:<br>☐ Agreed to complete mediation by *(date)*:<br>☐ Mediation completed on *(date)*: |
| (2) Settlement conference | ☒ | ☐ Settlement conference not yet scheduled<br>☐ Settlement conference scheduled for *(date)*:<br>☐ Agreed to complete settlement conference by *(date)*:<br>☒ Settlement conference completed on *(date)*: June 12, 2025 |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled<br>☐ Neutral evaluation scheduled for *(date)*:<br>☐ Agreed to complete neutral evaluation by *(date)*:<br>☐ Neutral evaluation completed on *(date)*: |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled<br>☐ Judicial arbitration scheduled for *(date)*:<br>☐ Agreed to complete judicial arbitration by *(date)*:<br>☐ Judicial arbitration completed on *(date)*: |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled<br>☐ Private arbitration scheduled for *(date)*:<br>☐ Agreed to complete private arbitration by *(date)*:<br>☐ Private arbitration completed on *(date)*: |
| (6) Other *(specify)*: | ☐ | ☐ ADR session not yet scheduled<br>☐ ADR session scheduled for *(date)*:<br>☐ Agreed to complete ADR session by *(date)*:<br>☐ ADR completed on *(date)*: |

CM-110

| PLAINTIFF/PETITIONER: Center for Biological Diversity et al. | CASE NUMBER: 25CV02244 |
|---|---|
| DEFENDANT/RESPONDENT: California Department of Foresty and Fire Protection et al. | |

**11. Insurance**

a. ☐ Insurance carrier, if any, for party filing this statement *(name):*

b. Reservation of rights: ☐ Yes ☐ No

c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**12. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.

☐ Bankruptcy    ☐ Other *(specify):*

Status:

**13. Related cases, consolidation, and coordination**

a. ☒ There are companion, underlying, or related cases.

(1) Name of case: Environmental Defense Center, et al. v. California Department of Foresty and Fire Protection, et al.

(2) Name of court: Santa Barbara Superior Court

(3) Case number: 25CV02247

(4) Status: Consolidated with this action

☐ Additional cases are described in Attachment 13a.

b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**14. Bifurcation**

☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**15. Other motions**

☒ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

On February 27, 2026, this court will hear Real Parties in Interest's Motion for Reconsideration of the Preliminary Injunction

**16. Discovery**

a. ☐ The party or parties have completed all discovery.

b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery):*

| Party | Description | Date |
|---|---|---|

c. ☒ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify):*

Discovery is unknown at this time. Real Parties in interest believe Plaintiff's entire case is now moot for the reasons stated in the motion for reconsideration.

**CM-110**

| PLAINTIFF/PETITIONER: Center for Biological Diversity et al. | CASE NUMBER: 25CV02244 |
|---|---|
| DEFENDANT/RESPONDENT: California Department of Foresty and Fire Protection et al. | |

**17. Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $35,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

**18. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

**19. Meet and confer**

a. ☒ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

b. ☐ After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

20. Total number of pages attached *(if any):*  __2_____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date: February 11, 2026

Trevor D. Large
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.

CM-110 [Rev. January 1, 2024]  **CASE MANAGEMENT STATEMENT**  **Page 5 of 5**

For your protection and privacy, please press the Clear This Form button after you have printed the form.

Print this form    Save this form    Clear this form

MC-025

| SHORT TITLE: Center for Biological Studies et al. v. California Department of Forestry and Fire Protection, et al. | CASE NUMBER: 25CV02244 |
|---|---|

**ATTACHMENT** *(Number):* _____4b._____

*(This Attachment may be used with any Judicial Council form.)*

Plaintiffs and Petitioners Center for Biological Diversity and Wishtoyo Foundation ("Petitioners") challenge the California Department of Forestry and Fire Protection, Office of the State Fire Marshal's ("OSFM") issuance of waivers of certain federal pipeline safety regulations (the "State Waivers") for the Las Flores Pipeline System. Petitioners allege that OSFM had a mandatory and nondiscretionary duty to provide a public process on the State Waivers, as well as issue a statement of reasons supporting its approval of the Waivers, under federal and state pipeline safety laws. Petitioners also assert that the State Waivers violate substantive federal and state pipeline safety law requirements and, thus, OSFM abused its discretion in issuing the Waivers. Finally, Petitioners allege that OSFM was required to conduct environmental review under the California Environmental Quality Act before issuing the State Waivers.

Petitioners seek a stay of the State Waivers, injunctive relief preventing any restart of the Pipeline System, a writ of mandate directing OSFM to set aside the State Waivers, declaratory relief, and attorneys' fees. Responding Parties oppose and deny the claims by Plaintiffs.

Lines CA-324 and CA-325 (formerly known as Lines 901 and 903) are portions of the Santa Ynez Pipeline System, which also includes offshore pipelines transporting crude oil from the Outer Continental Shelf and an onshore processing facility at Las Flores Canyon. Lines CA-324 and CA-325 together constitute the Las Flores Pipeline, which had been considered intrastate since 2016 and thus subject to oversight by the OSFM. At the time the Court entered the preliminary Injunction, Lines CA-324 and CA-325 were still designated as intrastate, and subject to OSFM's regulatory oversight.

On December 17, 2025, PHMSA determined that the entirety of the Santa Ynez Pipeline System is an interstate pipeline subject to PHMSA's exclusive jurisdiction. This determination eliminated any jurisdiction of OSFM over Lines CA-324 and CA-325. In making its determination that "***the Las Flores Pipeline is an interstate pipeline,***" PHMSA notified "OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA.

On December 22, 2025, PHMSA approved Sable's Restart Plan for Lines CA-324 and CA-325 (the "Restart Approval").

On December 23, PHMSA granted Sable an "emergency special permit" for the operation of Lines CA-324 and CA-325 pursuant to 49 U.S.C. Section 60118(c)(2)(A) (the "Emergency Special Permit").

Given PHMSA's assertion of jurisdiction over the Las Flores Pipeline as an interstate pipeline, OSFM is without jurisdiction to regulate Lines CA-324 and CA-325, or any other portion of the Santa Ynez Pipeline System.

This issue is the subject of the Motion for Reconsideration to be heard by the Court on February 27, 2026.

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page _____ of _____

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

www.courtinfo.ca.gov

MC-025

| SHORT TITLE:<br>— Center for Biological Studies et al. v. California Department of Forestry and Fire Protection, et al. | CASE NUMBER:<br>25CV02244 |
|---|---|

**ATTACHMENT** *(Number):*    8

Real Parties in Interest will be represented by the following attorneys:

ALSTON & BIRD LLP
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone: (213) 576-1000
Facsimile: (213) 576-1100


PAUL HASTINGS LLP
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899


FAUVER LARGE ARCHBALDLD & SPRAY, LLP
TREVOR D. LARGE, SBN 214886
tlarge@flasllp.com
VICTORIA C. DIFFENDERFER, SBN 350018
vdiffenderfer@flasllp.com
820 State Street, 4th Floor
Santa Barbara, CA 93101
Telephone: (805) 966-7000
Facsimile: (805) 966-7227

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page _____ of _____

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT
to Judicial Council Form**

www.courtinfo.ca.gov

**FAUVER · LARGE · ARCHBALD · SPRAY**

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen, and not a party to the within action. My business address is 820 State Street, 4th Floor, Santa Barbara, CA 93101. On February 11, 2026, I served the within document:

**CASE MANAGEMENT STATEMENT**

By Mail: By placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Santa Barbara, addressed as set forth below.

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postage cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

By Hand Delivery: By personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

By Overnight Delivery: I enclosed the document(s) in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the address(es) set forth below. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

X   By Electronic Mail: I caused said document(s) to be transmitted to the email address(es) of the addressee(s) designated below.

**SEE ATTACHED SERVED LIST**

I declare under penalty of perjury under the laws of the State of California, that the above is true and correct.

Executed on February 11, 2026, at Santa Barbara, California.

_____
Andrew T. Nettesheim

9
**PROOF OF SERVICE**

SERVICE LIST

| | |
|---|---|
| Jeffrey D. Dintzer<br>Lisa L. Garcia<br>Garrett B. Stanton<br>**ALSTON & BIRD, LLP**<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071<br>Tel: (213) 576-1000<br>Fax: (213) 576-1100<br>Jeffrey.Dintzer@alston.com<br>Lisa.Garcia@alston.com<br>Garrett.Stanton@alston.com | *Attorneys for* |
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |

| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000<br>San Francisco, CA 94102<br>Tel.: (415) 510-3802<br>Michael.dorsi@doj.ca.gov | *Attorneys for Respondents/Defendants: California Department of Forestry and Fire Protection, Office of the State Fire Marshal, Daniel Berlant (in his official capacity as State Fire Marshal)* |
|---|---|

FAUVER · LARGE · ARCHBALD · SPRAY

**PROOF OF SERVICE**

Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/13/2026 4:26 PM
By: Narzralli Baksh , Deputy

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
MATTHEW BULLOCK (SBN 243377)
MICHAEL S. DORSI (SBN 281865)
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3802
  Fax:  (415) 703-5480
  E-mail:  Michael.Dorsi@doj.ca.gov
*Attorneys for Respondents and Defendants
Department of Forestry and Fire Protection, by and
through the Office of the State Fire Marshal, an
agency of the State of California; Daniel Berlant, in
his official capacity as State Fire Marshal*

EXEMPT FROM FILING FEES
PURSUANT TO GOVERNMENT
CODE SECTION 6103

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA BARBARA

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,**<br><br>                              **Petitioner and Plaintiff,**<br><br>v.<br><br>**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,**<br><br>                   **Respondents and Defendants,**<br><br>**SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,**<br><br>                   **Real Parties in Interest.**<br><br>                              ***<br><br>**ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL** | Case No. 25CV02244<br>Consolidated with Case No. 25CV02247<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.'S OPPOSITION TO REAL PARTIES IN INTEREST'S MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION**<br><br>Date:          February 27, 2026<br>Time:          10:00 a.m.<br>Dept:          4<br>Judge:        Hon. Donna Geck<br><br>Trial Date:  Not Set<br>Action Filed: April 15, 2025 |

1

**OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,**

**Petitioners and Plaintiffs,**

**v.**

**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,**

**Respondents and Defendants,**

**SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,**

**Real Parties in Interest.**

2

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS:

PLEASE TAKE NOTICE that Respondents California Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California; and Daniel Berland, in his official capacity as State Fire Marshal (collectively OSFM) request that the court take judicial notice of the following documents and their legal effect, all of which are attached to this Request for Judicial Notice, and authenticated by the accompanying Declaration of Michael S. Dorsi.

### Court Documents

This Court may take judicial notice of court documents, including pleadings, in this Court and other courts of the United States or the State of California under Evidence Code section 452, subdivision (d), as records of a court of the United States or any state, and subdivision (h), as facts and propositions not reasonably subject to dispute and capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy. Exhibits A–D, F–G, and N are court documents.

*Note on Exhibit A:* Exhibit A is California's Petition for Review, filed with the Ninth Circuit Court of Appeals. It contains three numbered exhibits, which are PHMSA's orders dated December 17, 22, and 23, 20025. For clarity, in this Request and the accompanying Opposition, PHMSA's Orders are designated as Exhibits A-1, A-2, and A-3. PHMSA's orders, as exhibits, are court documents, and independently are agency documents.

### Agency Documents

This Court may take judicial notice of documents that record official acts of agencies of the United States and the State of California, including local governments within the State of California including orders, agency decisions, and letters to regulated parties, under Evidence Code section 452, subdivision (c), as official acts of the executive department of the United States or any state, and subdivision (h), as facts and propositions not reasonably subject to dispute and capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy. Exhibits H–K and O–P are agency documents.

3

**Documents Submitted to Agencies**

This Court may take judicial notice documents submitted to government agencies, including documents submitted consistent with court procedures that require service but not filing, under Evidence Code section 452, subdivision (h), as facts and propositions not reasonably subject to dispute and capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy (i.e., the sources of reasonably indisputable accuracy are the documents themselves submitted by Sable to OSFM, the Pipeline and Hazardous Materials Safety Administration (PHMSA) and the Securities and Exchange Commission). Exhibits E, L–M and Q–R are documents submitted to agencies. Sable submitted Exhibit E as required by the Consent Decree, which itself is a court document.

If the Court declines to take judicial notice of Exhibits E, L–N and Q–R, it may still consider these exhibits as evidence under Evidence Code section 1220 as admissions by a party opponent, and on that basis the Court may consider these documents for any purpose.

**Note on Selected Pages**

For certain large documents, only selected pages are attached to this Request. For those documents, the Index of Exhibits identifies these documents and indicates where the complete document can be found within the records of this case or online.

Dated:  February 13, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG PARK
Supervising Deputy Attorney General

MICHAEL S. DORSI
Deputy Attorney General
*Attorneys for Respondents and Defendants*
*Dep't of Forestry and Fire Protection, et al*

LA2025400847
44961528

4

Request for Judicial Notice in Support of Opposition to Motion for Reconsideration  (25CV02244)

## **INDEX OF EXHIBITS**

Exhibit A:     Petition for Review filed by California on January 23, 2026

Exhibit A-1:   PHMSA Preemption Letter, dated December 17, 2025

Exhibit A-2:   PHMSA Restart Plan Approval, dated December 22, 2025

Exhibit A-3:   PHMSA Special Permit, dated December 23, 2025

Exhibit B:     Complaint, *Pacific Pipeline Company v. California* (Kern County) (*Exhibits to Complaint omitted*), filed September 29, 2025

Exhibit C:     Amended Complaint, *Pacific Pipeline Company v. California* (Kern County) (*Exhibits to Amended Complaint omitted*), filed January 21, 2026

Exhibit D:     Selected Pages from Consent Decree, filed March 13, 2020 (*Entire document filed as Exhibit 3 to Declaration of Michael S. Dorsi, filed July 7, 2025*)

Exhibit E:     Sable Assumption Agreement, dated February 19, 2024

Exhibit F:     Selected pages from Preliminary Injunction Order, entered on July 29, 2025 (*Entire document filed in this case*)

Exhibit G:     Selected Pages from Answer by Sable Offshore Corp and Pacific Pipeline Company, filed on September 17, 2025 (*Entire document filed in this case*)

Exhibit H:     Letter from PHMSA to OSFM re Intrastate Designation, dated May 18, 2016

Exhibit I:     Selected pages from State Waiver for CA-324 (*Entire document filed as Exhibit 1 to Declaration of Michael S. Dorsi, filed July 7, 2025*)

Exhibit J:     Selected pages from State Waiver for CA-325 (*Entire document filed as Exhibit 2 to Declaration of Michael S. Dorsi, filed July 7, 2025*)

Exhibit K:     OSFM letter to Sable re Tool Tolerance, dated October 22, 2025

Exhibit L:     Sable letter to OSFM re Tool Tolerance, dated October 23, 2025

Exhibit M:     Sable letter to PHMSA re Interstate Designation, dated November 26, 2025

Exhibit N:     Order on Consent Decree, entered October 14, 2020

Exhibit O:     Selected pages from Santa Barbara County Air District permit (*Entire document available at* https://www.ourair.org/wp-content/uploads/Final-PT-70-5651-R7-Las-Flores-Canyon-2-15-2023.pdf, last visited February 11, 2026)

Exhibit P:     Appendix to 49 CFR Part 195, Appendix A

Exhibit Q:     Sable 8-K Form (Securities and Exchange Com.), dated September 29, 2025

Exhibit R:     Selected pages from Sable Exhibit 99.2 to SEC filings (*Entire document available at* https://www.sec.gov/Archives/edgar/data/1831481/000183148125000071/a992-sableoffshorecorpin.htm , last visited February 11, 2026)

5

# Exhibit A

Exhibit A
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026

Case 2:26-cv-05242-SVW-SSC   Document 35   Filed 05/14/26   Page 40 of 251   Page ID #:16832

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

STATE OF CALIFORNIA,

*Petitioner*,

v.

PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, PAUL ROBERTI, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, UNITED STATES DEPARTMENT OF TRANSPORTATION, AND SEAN DUFFY, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF TRANSPORTATION,

*Respondents*,

## PETITION FOR REVIEW

ROB BONTA
*Attorney General of California*
ANNADEL A. ALMENDRAS
DEBORAH M. SMITH
  *Senior Assistant Attorneys General*
MYUNG J. PARK
VANESSA MORRISON
  *Supervising Deputy Attorneys General*

MATTHEW BULLOCK
MICHAEL S. DORSI
MITCHELL RISHE
RAFAEL J. HURTADO
REBECCA HUNTER
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 510-3802
Fax: (415) 703-1107
Michael.Dorsi@doj.ca.gov
Mitchell.Rishe@doj.ca.gov
  *Attorneys for State of California*

January 23, 2026

## PETITION FOR REVIEW

Pursuant to 49 U.S.C. Section 60119(a)(1), Federal Rule of Appellate Procedure 15, and Ninth Circuit Rule 15-1, the State of California, by and through Attorney General Rob Bonta and Office of the State Fire Marshal (OSFM), a unit of the California Department of Forestry and Fire Protection, petitions this Court for review of orders issued by the Pipeline and Hazardous Materials Safety Administration (PHMSA), an agency within the United States Department of Transportation.

This Petition challenges three unlawful orders by PHMSA.

First, on December 17, 2025, PHMSA issued an order (the "Federalization Order") purporting to assume exclusive federal jurisdiction over the Las Flores Pipelines—a pair of onshore pipelines designated CA-324 and CA-325 that, in sequence, originate at Las Flores Canyon in Santa Barbara County, California, and terminate at the Pentland Station terminal, in Kern County, California. The assertion of federal jurisdiction is erroneous, and, if allowed to stand, would displace OSFM from its role in regulating pipeline safety for the Las Flores Pipelines. PHMSA's December 17, 2025, Federalization Order is attached to this Petition as Exhibit 1.

Second, on December 22, 2025, PHMSA issued an order approving a Restart Plan (the "Restart Approval Order") for the Las Flores Pipelines, allowing

them to return to service without completion of OSFM's requirements imposed pursuant to the consent decree—to which PHMSA and OSFM are signatories—after the catastrophic 2015 oil spill on these lines near Refugio State Beach, in Santa Barbara County, California. *See United States, et al. v. Plains All American Pipeline, L.P., et al.*, Case No. 2:20-cv-02415, ECF Nos. 6, 6-1, and 33 (C.D. Cal. 2020). The Restart Approval Order, if permitted to become effective, would allow the Las Flores Pipelines to operate (a) despite the failure to finish required repairs and remediation on the pipelines to address the lack of corrosion protection, which PHMSA determined to be the root cause of the Refugio Oil Spill, and (b) without complying with OSFM's alternative conditions, outlined in the OSFM State Waivers.[1] Pursuant to 49 USC § 60118(d), PHMSA did not object to granting of these waivers by OSFM for the CA-324 and CA-325 pipelines. A copy of PHMSA's Restart Approval Order is attached to this Petition as Exhibit 2.

Third, on December 23, 2025, PHMSA issued an order granting an "Emergency Special Permit" (the "Emergency Special Permit") to the Las Flores Pipelines' owner, Sable Offshore Corp., pursuant to 49 U.S.C. Section

---

[1] A State Waiver is an order that allows a state to impose additional safety requirements on a pipeline facility where continued operation would violate State or federal pipeline safety laws. Every State Waiver must be submitted to PHMSA for review; if PHMSA does not object to the terms of the order, it will issue. The State Waivers issued to Sable are available on CAL FIRE's web page Pathways for Restarting CA-324 and CA-325, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

3

60118(c)(2)(A), waiving compliance with federal pipeline safety regulations. The

Emergency Special Permit bypassed federal procedures for approval of a special

permit and lacks any legal or factual basis. PHMSA's Emergency Special Permit is

attached to this Petition as Exhibit 3.

Pursuant to 49 U.S.C. Section 60119(a), orders issued by PHMSA under the

Pipeline Safety Act ("PSA") may be challenged by filing a Petition for Review

directly in the federal court of appeals where the petitioner resides, and the petition

must be filed within 89 days of the issuance of PHMSA's order. Accordingly,

Petitioner has timely and properly sought review of PHMSA's orders directly in

this Court.

Judicial review of PHMSA orders is conducted under the standards of Section

706 of the Administrative Procedure Act. 49 U.S.C. § 60119(a)(3). As the basis for

this Petition for Review, Petitioner alleges that PHMSA's actions and orders were

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law" and/or "without observance of procedure required by law." 5 U.S.C. §

706(2)(A) & (D).

Petitioner prays for an order setting aside PHMSA's orders dated December

17, 22, and 23, 2025.

Respectfully submitted this 23rd day of January, 2026.


ROB BONTA
*Attorney General of California*

*/s/ Michael S. Dorsi*
MICHAEL S. DORSI
*Deputy Attorney General*
455 Golden Gate Ave, Suite 11000
San Francisco, CA 94102
Tel: (415) 510-3802
Email: Michael.Dorsi@doj.ca.gov
*Attorneys for State of California*

## STATEMENT OF RELATED CASES

The following related case is pending: *Environmental Defense Center, et al. v. Pipeline and Hazardous Materials Safety Administration*, Ninth Circuit Court of Appeals Case No. 25-8059.

5

# Exhibit 1

Exhibit 1
to Petition for Review



U.S. Department
of Transportation

1200 New Jersey Avenue SE
Washington, D.C. 20590

**Pipeline and Hazardous
Materials Safety
Administration**

December 17, 2025

Via Electronic Mail to: cflores@sableoffshore.com

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.
845 Texas Ave. Ste 2920
Houston, TX 77002

Re:  Determination of Interstate Classification

Dear Mr. Flores:

This responds to your letter of November 26, 2025 regarding the Las Flores Pipeline owned and operated by Sable Offshore Corp. (Sable). Your letter notifies the Pipeline and Hazardous Materials Safety Administration (PHMSA) that Sable has determined the pipeline to be an interstate pipeline facility under the Pipeline Safety Act (PSA) and requests PHMSA transition regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

As noted in your letter, portions of the Las Flores Pipeline (previously known as Lines 901 and 903) have been considered intrastate since 2016 and subject to regulatory oversight by OSFM pursuant to its certification with PHMSA under 49 U.S.C. § 60105(a). Prior to 2016, Lines 901 and 903 were considered interstate and regulated by PHMSA. The classification change in 2016 corresponded to the pipelines' previous owner cancelling tariffs with the Federal Energy Regulatory Commission (FERC). In 2024, Sable acquired Lines 901 and 903 and other assets comprising the Las Flores Pipeline, including offshore pipelines transporting crude oil from the Outer Continental Shelf (OCS) and an onshore processing facility at Las Flores Canyon. Sable operates the Las Flores Pipeline assets as a single pipeline system transporting crude oil from the OCS to the Pentland Station terminal in Kern County, California.

Upon receipt of your letter, PHMSA initiated a review of the Las Flores Pipeline. This review included an on-site inspection on December 9 through December 11, 2025. OSFM representatives accompanied PHMSA on the inspection. PHMSA also reviewed Sable's written procedures and records and conducted field observations of the Las Flores facility, the pump stations at Gaviota and Sisquoc, the control room in Santa Maria, and the offshore Harmony platform. In addition, PHMSA reviewed the 2025 program inspections conducted by OSFM. For

the following reasons, PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline.

The PSA authorizes PHMSA to prescribe and enforce minimum safety standards for pipeline transportation and for pipeline facilities.[1] The PSA vests with PHMSA exclusive regulatory authority over interstate pipelines and preempts States from adopting or continuing in force safety standards for interstate pipelines.[2] With respect to intrastate pipelines, the PSA provides a State authority may regulate the intrastate pipelines within its borders upon submission to PHMSA of an annual certification.[3] Both the PSA and the Federal pipeline safety regulations define interstate and intrastate pipelines.[4] An interstate pipeline is a pipeline or part of a pipeline used to transport hazardous liquids in interstate or foreign commerce; an intrastate pipeline is a hazardous liquid pipeline that is not an interstate pipeline.

Determining whether a hazardous liquid pipeline is an interstate or intrastate pipeline requires a factual inquiry.[5] To assist in that determination, PHMSA adopted Appendix A to 49 CFR Part 195 providing a statement of agency policy and interpretation on the delineation between Federal and State jurisdiction.[6] In short, "if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility . . . then [PHMSA] will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." The absence of a FERC tariff generally means a pipeline is intrastate; however, in certain situations, PHMSA will consider a pipeline to be interstate despite the lack of a filing with FERC. Several examples of this are listed in Appendix A. As it relates to the Las Flores Pipeline, one example provides that a pipeline originating on the OCS will be considered an interstate pipeline even if the pipeline does not have a tariff with FERC.[7]

PHMSA's evaluation of the Las Flores Pipeline confirms that it transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California. Consistent with Appendix A, the Las

---

[1] 49 U.S.C. § 60101 et seq.

[2] 49 U.S.C. § 60104(c). *See* Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872, 878 (9th Cir. 2006) (discussing how the "PSA differentiates between the regulation of interstate and intrastate hazardous liquid pipelines.")

[3] 49 U.S.C. § 60105(a). OSFM has a certification with PHMSA to regulate intrastate hazardous liquid pipelines in California.

[4] 49 U.S.C. § 60101(a)(7), (a)(8)(B), (a)(10); 49 CFR § 195.2. *See* S. Pac. Pipe Lines Inc. v. DOT, 796 F.2d 539 (D.C. Cir. 1986) (finding PHMSA's definition of interstate and intrastate pipelines reasonable under the PSA).

[5] Transportation of Liquids by Pipeline, 46 Fed. Reg. 38,357, 38,359 (Jul. 27, 1981) (PHMSA's predecessor agency (hereafter PHMSA) explained that it had "reviewed examples of what it believes are the most frequent and likely configurations of liquid pipelines and pipeline facilities and considered various ways of cataloging or classifying them as either interstate or intrastate."); *see also* Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052, 1064 (9th Cir. 1987) (noting that whether the pipeline was interstate or intrastate turned on a disputed issue of fact).

[6] Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985).

[7] 49 CFR Part 195, App. A. "Example 7. Pipeline Company P operates a pipeline that originates on the Outer Continental Shelf. P does not file any tariff for that line with FERC. [PHMSA] will consider the pipeline to be an interstate pipeline facility."

Case: 26-508, 01/23/2026, DktEntry: 1.1, Page 9 of 30
Case 2:26-cv-05242-SVW-SSC   Document 35   Filed 05/14/26   Page 48 of 251   Page
ID #:16840

3

Flores Pipeline is an interstate pipeline.[8] As portions of the Las Flores Pipeline were previously considered to be intrastate and regulated by OSFM, PHMSA is notifying OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA. Please direct further correspondence on this matter to Dustin Hubbard, Director, Western Region, Office of Pipeline Safety, PHMSA, at (720) 963-3183.

Sincerely,

LINDA GAIL DAUGHERTY    Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.17 07:56:55 -05'00'

Linda Daugherty
Acting Associate Administrator for Pipeline Safety


cc:    James Hosler, Chief, Pipeline Safety Division, OSFM
       Varun Shekhar, Shareholder, Babst Calland Clements & Zomnir, PC

---

[8] PHMSA regulations consider the Las Flores Pipeline to be an "active" pipeline. *See* Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")

# Exhibit 2

Exhibit 2
to Petition for Review



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

12300 W. Dakota Ave., Suite 340
Lakewood, CO  80228

**VIA ELECTRONIC MAIL TO: lyearwood@sableoffshore.com**

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**RE:    Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration (PHMSA) received several documents from Sable Offshore Corp. These documents included:

1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
2. A letter requesting the removal of pressure restrictions for Line CA-324
3. A letter requesting the removal of pressure restrictions for Line CA-325
4. The Las Flores Pipeline Linefill Positioning Plan Assignments
5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at dustin.hubbard@dot.gov.

Sincerely,

DUSTIN B HUBBARD   Digitally signed by DUSTIN B HUBBARD
Date: 2025.12.22 13:19:33 -07'00'

Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

cc:      Trent Fontenot, Sr. Vice President - Operations, tfontenot@sableoffshore.com
Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire,
jim.hosler@fire.ca.gov

# Exhibit 3

Exhibit 3
to Petition for Review

# U.S. DEPARTMENT OF TRANSPORTATION

# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION

# EMERGENCY SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | 2025-1502 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |
| **Expiration Date:** | February 21, 2026 |
| **Code Section:** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] grants this emergency special permit to Sable Offshore Corp. PPC (Sable) for 124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 (*special permit segments*), transporting crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties, California.  This emergency special permit waives compliance from 49 CFR § 195.452(h)(4)(iii)(H), which requires corrosion of or along a longitudinal seam weld be scheduled for evaluation and remediation within 180 days of discovering the condition.

## I.    Purpose and Need

On December 19, 2025,[2] Sable requested an emergency special permit for relief from the requirement to evaluate and remediate corrosion occurring at longitudinal seam welds within 180 days.  The *special permit segments* are under polyurethane foam and polyethylene tape wrap insulation, which can inhibit the effectiveness of cathodic protection and contribute to a risk of corrosion due to shielding effects. Sable proposed an alternative approach to safely manage this risk, which was previously reviewed and approved as part of two state waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for the *special permit segments*.  PHMSA previously reviewed the state waivers pursuant to 49 U.S.C. § 60118(d).

---

[1] Throughout this special permit, the usage of "PHMSA" means the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety.

[2] Sable submitted supplemental information related to its application on December 23, 2025.

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California, which provides, among other requirements, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and CA-325. The *special permit segments* were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). However, the *special permit segments* are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025. As a result, PHMSA has exclusive pipeline safety regulatory agency over Lines CA-324 and CA-325.  The conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement.

Sable requested PHMSA grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). In its application, Sable stated that expedited review of its application was warranted in light of the national energy emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) in Executive Order 14156 (January 20, 2025). In Executive Order 14156, the President declared a national energy emergency based on a finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[3]  The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[4]  The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[5]

Sable's application stated that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and CA-325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.[6]  Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the OSFM State Waivers created by redesignation of Lines CA-324 and CA-325 as interstate, given that the proposed special permit is substantially the same as that which was previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

This emergency special permit allows Sable to operate Lines CA-324 and CA-325 without being subject to the requirement to evaluate and remediate corrosion of or along a longitudinal seam weld within 180 days.  On the condition that Sable comply with the terms and conditions set forth below, the emergency special permit waives compliance with 49 CFR § 195.452(h)(4)(iii)(H) for the *special permit segments*.

---

[3] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.
[4] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 2(a).  The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).
[5] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 3(b).
[6] For more information regarding these effects, see Attachments C, D, E, and F.

## II. Special Permit Segments

This emergency special permit pertains to the specified pipeline segments which make up the Las Flores Pipeline called Line CA-324 and CA-325.  Line CA-325 can be further divided into two segments: Lines CA-325A and CA-325B.  The Las Flores Pipeline is part of the Santa Ynez Pipeline System (SYPS), an interstate pipeline facility that Sable operates from the Outer Continental Shelf off the coast of Santa Barbara to Kern County, California.  A map of the special permit segments is available in Revised Attachment A.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III.  Conditions

PHMSA grants this emergency special permit subject to Sable implementing each of the following conditions.  These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with limitations on scheduling instances of corrosion on or near longitudinal seam welds for evaluation and remediation within 180 days of discovery in 49 CFR § 195.452(h)(4)(iii)(H), which would be waived.

**General Conditions:**

1) The *special permit segments* may only be used to transport crude oil.

2) Prior to transporting crude oil in the *special permit segments*, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3) Sable shall not exceed maximum operating pressure (MOP) limits for the *special permit segments*, as follows:

   a) The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

   b) The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

   c) The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4) Sable shall not exceed maximum operating temperature limits for crude oil transported in the *special permit segments*, as follows:

   a) The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit for more than 12 consecutive hours.

   b) The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

   c) The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5) This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6) This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7) In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

   a) Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

   b) Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

   c) Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

8) Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 4 of 16

pipe body, heat affected zone (HAZ)[7], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9)   Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

   a)   API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

   b)   API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10)  All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[10] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11)  Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss

---

[7] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

[9] Sable indicated in its application that it has already completed the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12)  Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of CA-324 and CA-325A/B.

13)  Pressure Testing:[11]

   a)  Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

      i.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

      ii.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

   b)  Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

   c)  Prior to placing Line CA-325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

      i.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

      ii.  All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

   d)  Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

   e)  Prior to placing Line CA-325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the

---

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition.  Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

hydrostatic test on CA-325B:

    i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

f) Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

g) Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

h) Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

i) Section(s) of the *special permit segments* that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the *special permit segments* cannot be safely operated.

14) In-Line Inspection (ILI) Assessment and Frequency:

a) Prior to performing in-line inspections of the *special permit segment*, Sable shall provide PHMSA with a written notification to PHMSA describing its assessment plan with the following information:

    i. Dates for integrity assessment

    ii. In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

    iii. In-line inspection tool vendor(s)

    iv. Required tool specifications including operational specifications and anomaly sizing tolerances

    v. Tool validation methodology

    vi. Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

---

[12] All submissions to PHMSA required by this emergency special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[13] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

      vii.   Criteria used to identify locations for excavation and field verification

     viii.   Non-destructive examination

b) Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

c) Metal Loss Tool(s):

      i.   Initial ILI tool runs – Each year, during the first two (2) years of operating the ***special permit segments***, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

      ii.   Subsequent ILI tool runs – After the first two (2) years of operating the ***special permit segments***, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the ***special permit segment*** within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

d) Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

      i.   These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

      ii.   USCD Performance Specification Requirements

           1.   The USCD tools must have a probability of detection that is

---

[14] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval.  Changes to the reassessment interval are subject to PHMSA approval.

$\geq 90\%$ for axial and circumferential cracks.

2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

4. The depth sizing accuracy for cracks must be $\pm$ 0.8 mm for axial cracks and $\pm$ 1 mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

f) Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the *special permit segment* in which the ILI tool velocity was outside of the specified tool velocity range.

g) All ILI tool runs must obtain the Test ID from PHMSA prior to run.

h) Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

i) Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

j) Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second

---

[15] A minimum of four (4) independent direct examination excavations must be used for unity plots.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 9 of 16

Edition, April 2013).

15) Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16) Immediate Repair Conditions:[16]

    a) A crack or crack-like anomaly that meets any of the following criteria:

        i. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

        ii. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

    b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

    c) Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17) 180-Day Repair Conditions:[18]

    a) A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

    b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

    c) All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[19]

    d) For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18) Corrosion Growth Rate Analysis (CGRA):

    a) Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to

---

[16] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by PHMSA.

prior ILI) and perform pipeline remediations needed to assure the integrity of the *special permit segments* is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

b) The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

c) Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

a) Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

    ii. Sable must increase the metal loss anomaly's depth by 20% when

---

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

they input it into the formula for calculating the number of wraps needed for repair method 5.

    iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[25]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

    ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

d) Sable must send all field measurements to the ILI tool vendor within 90 days

---

[25] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the *special permit segments*. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is

g) occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the *special permit segments* and must be submitted to PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

i. Technical approach used for the analysis

ii. All data used and analyzed

iii. Pipe and longitudinal weld seam properties

iv. Procedures used to implement emergency special permit conditions

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 13 of 16

      v.      Evaluation methodology used

      vi.      Models used

      vii.      Direct in situ examination data

      viii.      All in-line inspection tool assessments information evaluated

      ix.      Pressure test data and results

      x.      All in-the-ditch assessments performed on the ***special permit segments***

      xi.      All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

      xii.      All finite element analysis results

      xiii.      The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

      xiv.      The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

      xv.      Safety factors used for fatigue life and/or predicted failure pressure calculations

      xvi.      Reassessment time interval and safety factors

      xvii.      The date of the review

      xviii.  Confirmation of the results by qualified technical subject matter expert(s)

      xix.      Approval by responsible Sable management personnel

      xx.      Records of additional preventive and mitigative (P&M) measures performed

      xxi.      Reports required by this emergency special permit.

24)    Reporting:

    a)  Any release on the ***special permit segments*** shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

    b)  An email notification shall be made at least three (3) days prior to a ***special permit segment*** being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

        i.  Tool type and run date

        ii.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state, or Federal regulations.

        iii. Dig sheets

        iv. Field contact information for Sable

        v.  Time and location of the field evaluation and repair.

  c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

        i.  Tool type

        ii.  Run date

        iii. Summary of Conditions Report[27]

        iv. Final Vendor Report and Pipe Tally

  d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit, including any renewals. The report shall be submitted to PHMSA. At a minimum, the annual report shall contain the following, if applicable:

        i.  A Closure Report for the previous calendar (CY) which contains:

            1.  Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

            2.  Identify features that remain to be assessed

            3.  Unity Plots for previous ILI runs

        ii.  Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

        iii. The third-party ILI expert reviews in accordance with condition 21(e).

        iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

        v.  A copy of the CGRA for prior year including:

            1.  Mean corrosion growth rate for the *special permit segments*

            2.  Distribution graph of the corrosion growth rate for the *special permit segments* (e.g. occurrences (#) vs. corrosion rate (mpy)

The above conditions are based on PHMSA's review and consideration of information provided by Sable, including information in their emergency special permit application which can be found at Docket No. PHMSA-2025-1502 in the Federal Docket Management System located at www.regulations.gov.  PHMSA has determined the conditions listed above would be necessary to ensure this Emergency Special Permit is not inconsistent with pipeline safety.

---

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

## IV.  Limitations:

This special permit is subject to the limitations set forth in 49 CFR § 190.341, as well as the following limitations:

1)  This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR § 190.341(g).

2)  Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

3)  PHMSA may order the *special permit segments* to be shutdown at any time.

4)  PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

5)  In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

6)  If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide PHMSA written notice of the change within 60 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.

AUTHORITY:  49 United States Code 60118 (c)(1) and 49 CFR § 1.97.

Issued in Washington, D.C., on <u>December 23, 2025</u>.

LINDA GAIL DAUGHERTY
Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.23 15:48:57 -05'00'

Linda Daugherty
Acting Associate Administrator
   for Pipeline Safety

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 16 of 16

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of January, 2026, the foregoing Petition for Review and exhibits were served on Respondents by sending a copy via certified mail, return receipt requested, to each of the following addresses:

Paul J. Roberti, Administrator
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Office of Chief Counsel
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Sean Duffy, Secretary of Transportation
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Pamela Bondi
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W. Washington,
D.C. 20530- 0001

Dated: January 23, 2026

*/s/ Michael S. Dorsi*
MICHAEL S. DORSI

# Exhibit B

Exhibit B
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:     (213) 576-1000
Facsimile:     (213) 576-1100

**PAUL HASTINGS**
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:     (310) 620-5879
Facsimile:     (310) 620-5899

Attorneys for Plaintiffs
PACIFIC PIPELINE COMPANY

FILED
KERN COUNTY
SUPERIOR COURT

SEP 29 2025

BY_____DEPUTY

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF KERN

| | |
|---|---|
| PACIFIC PIPELINE COMPANY, a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF CALIFORNIA and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No. BCV25103508<br><br>**VERIFIED COMPLAINT FOR DECLARATORY RELIEF**<br><br>(Code Civ. Proc. § 1060) |

- 1 -
VERIFIED COMPLAINT FOR DECLARATORY RELIEF

FILED BY FAX

Plaintiff Pacific Pipeline Company brings this Complaint for Declaratory Relief against Defendant the State of California. By this verified pleading, Plaintiff alleges as follows:

## INTRODUCTION

1.    Pacific Pipeline Company owns the Las Flores Pipelines, which include Line CA-324 and Line CA-325 (collectively, the "Las Flores Pipelines"). Portions of the Las Flores Pipelines are located in Kern County, with other portions in San Luis Obispo and an unincorporated area of the County of Santa Barbara ("County") that sits in the Coastal Zone.

2.    Sable Offshore Corp. ("Sable") owns the Santa Ynez Unit oil production infrastructure ("SYU Facilities") located both offshore of and onshore in the County's Gaviota Coast. Sable acquired the SYU Facilities and Pacific Pipeline Company, which owns the Las Flores Pipelines, in February 2024.

3.    Since that time, Pacific Pipeline Company has worked with federal and state agencies toward resuming petroleum transportation from the SYU Facilities through the Las Flores Pipelines, including performing repair and maintenance work on the Las Flores Pipelines.

4.    On September 13, 2025, the California Legislature adopted Senate Bill ("SB") 237.

5.    Among other things, SB 237 adds Section 51014.1 of the Government Code, which provides that "[a]ny existing oil pipeline that is six inches or larger that has been idle, inactive, or out of service for five years or more, shall not be restarted without passing a spike hydrostatic testing program."

6.    SB 237 also amends Section 30262 of the California Coastal Act to require a person to obtain a new coastal development permit ("CDP") for the "[r]epair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more."

7.    SB 237 does not define "idled, inactive, or out of service."

8.    On September 19, 2025, Governor Gavin Newsom signed SB 237 into law.

-2-

9.      The State of California has taken the position that the Las Flores Pipelines have been idled, inactive, or out of service for five years or more. Pacific Pipeline Company disagrees. The Las Flores Pipelines are active. They are not idle and not out of service. In fact, the pipelines have retained their active status under state and federal law since 2015. More recently, Pacific Pipeline Company has been diligently performing necessary work on the Las Flores Pipelines to resume petroleum transportation. Under all relevant and applicable meanings of the words, the Las Flores Pipelines are not idle, inactive, or out of service.

10.     An actual and present controversy exists between Pacific Pipeline Company and Defendant concerning their respective rights and duties regarding the Las Flores Pipelines' status. Consequently, Pacific Pipeline Company seeks a judicial declaration from this Court that the Las Flores Pipelines are not idle, inactive, or out of service as those terms are used in SB 237.

## THE PARTIES

11.     Plaintiff Pacific Pipeline Company is a Delaware Corporation and does business in Kern County, California. Pacific Pipeline Company owns the Las Flores Pipelines.

12.     Pacific Pipeline Company is a "person interested under a statute" within the meaning of Code of Civil Procedure § 1060, because Pacific Pipeline Company's rights and obligations under SB 237 are directly at issue in this action.

13.     Defendant State of California is responsible for enacting and enforcing the laws of the State of California.

14.     Pacific Pipeline Company is unaware of the true names and/or capacities of Defendants DOES 1 through 25, inclusive, and therefore sues said Defendants by such fictitious names. Pacific Pipeline Company will amend this pleading to insert the true names and/or capacities of DOES 1 through 25, inclusive, when the same have been ascertained. Pacific Pipeline Company is informed and believe and thereon alleges that each such fictitiously named Defendant is, in some manner or for some reason, responsible for the actions or omissions alleged in this pleading, and each is subject to the relief being sought herein.

- 3 -
VERIFIED COMPLAINT FOR DECLARATORY RELIEF

## JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction over this action under California Constitution, article VI, section 10, and section 1060 of the Code of Civil Procedure.

16.    Venue is proper in this Court pursuant to Code of Civil Procedure section 392 because portions of the Las Flores Pipelines at issue in this litigation are located in the County of Kern.

## FACTUAL AND LEGAL STATEMEMT

### A.    The SYU Facilities

17.    The Santa Ynez Unit consists of sixteen federal leases across approximately 76,000 acres of outer continental shelf and produces crude oil and natural gas from Platforms Hondo, Harmony, and Heritage, located in federal waters off the California Coast in the Santa Barbara Channel.

18.    The oil and gas are transported through the subsea SYU Facilities to the onshore Las Flores Canyon Oil and Gas Plant and the Pacific Offshore Pipeline Company Gas Plant, both of which are located in Las Flores Canyon in unincorporated Santa Barbara County.

19.    The onshore facilities in Las Flores Canyon separate oil, propane, butane, sulfur products, and fuel quality gas. The natural gas is dried, treated, compressed, and delivered to a local utility company. Oil is transferred through the Las Flores Pipelines to a refinery for final processing.

20.    In February 1988, the California Coastal Commission ("Coastal Commission") reviewed and analyzed Sable's predecessor-in-interest's (Exxon Company U.S.A.) proposal for the construction, operation, and ongoing maintenance of the SYU Facilities, as part of a "Development and Production Plan" ("DPP") submitted to the federal Minerals Management Service in 1987.

21.    The Coastal Commission issued two approvals for the SYU Facilities: (1) Consistency Certification No. CC-64-87, which confirmed pursuant to the federal Coastal Zone Management Act ("CZMA") that construction, operation, and maintenance of the SYU Facilities

- 4 -
VERIFIED COMPLAINT FOR DECLARATORY RELIEF

would be consistent with the Coastal Act, and (2) CDP No. E-88-1 (the "Offshore CDP"), which authorized the construction, operation, and maintenance of those portions of the SYU Facilities located in California state waters.

**B.      The Las Flores Pipelines**

22.      Line CA-325 is a thirty-inch diameter pipeline with a maximum permitted throughput capacity of 300,000-barrels of crude oil per day and transports crude oil approximately 113.5 miles north from the Gaviota Pump Station to the Sisquoc Pump Station, then east through the Los Padres National Forest and Cuyama Valley, ultimately delivering crude oil to the existing Pentland Delivery Point in the San Joaquin Valley in Kern County.

23.      Line CA-324 is a twenty-four-inch diameter pipeline with a maximum permitted throughput capacity of 150,000-barrels of crude oil per day. Line CA-324 transports crude oil approximately 10.9 miles from the Las Flores Pump Station in Las Flores Canyon, west along the Gaviota Coast, to the existing Gaviota Pump Station located approximately one mile east of Gaviota State Park in Santa Barbara County.

24.      In the mid-1980s, the California State Lands Commission, federal Bureau of Land Management, and Department of the Interior prepared a joint Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for the Celeron Pipeline Project, which includes analysis of the construction and long-term operation of Lines CA-324 and CA-325. The locations of Lines CA-324 and CA-325 were identified as an environmentally superior alignment to minimize impacts to environmental resources. The State Lands Commission certified the EIR/EIS in January 1985.

25.      After reviewing the EIR/EIS, the County Planning Commission made a final decision to approve the Celeron Pipeline Project and associated entitlements in February 1986. The County's approval was not challenged during the appeal period, and the Planning Commission's approval action became final and effective.

26.      Pursuant to the County of Santa Barbara's certified Local Coastal Program ("LCP"), the County issued CDP No. 86-CDP-189 for the Celeron Pipeline Project on July 27,

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

1986. CDP No. 86-CDP-189 approved "[c]learing, grading and trenching activities for [the] Celeron Pipeline Project." On August 5, 1986, the County issued CDP No. 86-CDP-205 for the "[r]emainder of all construction activities for the Celeron Pipeline [P]roject." The CDPs were not appealed by any party and are, therefore, final, valid, and not subject to further appeal.

27.    Although the County has issued separate CDPs for major improvements, such as relocations and realignments of pipeline segments since the Las Flores Pipelines' CDPs were first issued, the County has not required new or amended CDPs for repair and maintenance work on the Las Flores Pipelines.

C.    The Refugio Oil Spill and Resulting Repair Work

28.    On May 19, 2015, a leak along CA-324 resulted in an oil spill. The Las Flores Pipelines have remained active, but petroleum has not flowed through them since that time. To maintain the Las Flores Pipelines in an active state, they were filled with nitrogen to prevent oxidation and internal corrosion, and the cathodic protection system is active and has been regularly inspected and maintained.

29.    On March 13, 2020, the prior owner and operator of the Las Flores Pipelines and SYU Facilities entered into a federal Consent Decree with the United States and the State of California on behalf of several federal and state regulatory agencies to resolve issues related to the oil spill. (See Consent Decree, *United States of America et al. v. Plains All American Pipeline, L.P. et al.*, Case No. 2:20-cv-02415 (C.D. Cal. Mar. 13, 2020).)

30.    Since that time, Pacific Pipeline Company (including its predecessor in interest, Plains Pipeline, L.P. ("Plains")), has maintained the pipelines as active and has undertaken substantial efforts to diligently repair the Las Flores Pipelines to ensure compliance with industry standards for active pipelines and resume petroleum transportation.

31.    For example, in April 2021, Plains secured approval from the Office of the State Fire Marshal ("OSFM") to retrofit the Pipelines with 16 safety valves as required by law, including seven valves in the Coastal Zone. In December 2021, Plains submitted applications to

- 6 -
VERIFIED COMPLAINT FOR DECLARATORY RELIEF

the County for approval to complete the safety valve installation work. Pacific Pipeline Company has since installed the safety valves in the Las Flores Pipelines.

32.    In addition, multiple in-line inspections ("ILI") have been conducted on the Las Flores Pipelines:

     a.  Two ILI runs have been performed on Line CA-324, one in February 2022 and another in December 2022;

     b.  An ILI run was performed on a portion of on Line CA-325 in September 2023; and

     c.  An ILI run was performed on the remainder of Line CA-325 in October 2023.

33.    In May 2024, Pacific Pipeline Company separately began anomaly[1] repair and maintenance work on the pipelines per the Consent Decree and under the County's 1986 approvals and permits that authorized ongoing pipeline maintenance. On February 12 and March 21, 2025, in response to Pacific Pipeline Company's request to address claims from the Coastal Commission that the repair and maintenance work was not authorized, the County confirmed that no further permits were required for Pacific Pipeline Company's anomaly repair work. Pacific Pipeline Company has completed the anomaly repairs, as well as subsequent pipeline hydrotesting, under OSFM supervision.

34.    In compliance with the Consent Decree, in April 2024, Pacific Pipeline Company submitted "State Waiver" applications to OSFM for Lines CA-324 and CA-325 to modify regulatory pipeline safety requirements based on the specifications applicable to the individual pipeline facilities. On December 17, 2024, OSFM granted both State Waivers and imposed over sixty separate conditions on Pacific Pipeline Company's operation of the Las Flores Pipelines, conditional on the Pipeline and Hazardous Materials Safety Administration ("PHMSA") expressing no objection to the State Waivers. On February 11, 2025, PHMSA notified OSFM that it had no objection to its issuance of the State Waivers.

---

[1] A pipeline anomaly refers to a pipeline segment with some deviation from its original configuration.

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

35.     The Consent Decree separately requires Pacific Pipeline Company to submit and obtain OSFM's approval of a written "Restart Plan" before resuming petroleum transportation in either Line CA-324 or Line CA-325. Pacific Pipeline Company submitted a Restart Plan to OSFM for review on July 29, 2024. OSFM is currently reviewing Pacific Pipeline Company's Restart Plan and associated documentation, and in August and September 2025, OSFM performed multiple inspections of the Las Flores Pipelines in connection with its review of the Restart Plan.

36.     As of May 15, 2025, Sable resumed petroleum transportation from the SYU Facilities' offshore platforms to its storage facilities in Las Flores Canyon.

37.     At all times, Pacific Pipeline Company intended to resume petroleum transportation from Sable's storage facilities in Las Flores Canyon through the Las Flores Pipelines. Pacific Pipeline Company and its predecessors never abandoned the Las Flores Pipelines, rather they have been operated as active pipelines under the law and Pacific Pipeline Company has worked diligently to maintain their use under existing and valid CDPs.

**D.     Senate Bill 237**

38.     On September 13, 2025, the California Legislature passed SB 237. On September 19, 2025, Governor Newsom signed SB 237 into law.

39.     SB 237 adds Section 51014.1 of the Government Code, which states in part, "[a]ny existing oil pipeline that is six inches or larger that has been *idle, inactive, or out of service* for five years or more, shall not be restarted without passing a spike hydrostatic testing program." (Emphasis added).

40.     SB 237 also amends Section 30262 of the Coastal Act to provide, in relevant part:

> (2) Repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more shall be considered a new or expanded development requiring a new coastal development permit.

> (3) Development associated with the repair, reactivation, or maintenance of an oil pipeline that has been idled, inactive, or out of service for five years or more requires a new coastal development permit consistent with this section. (Pub. Res. Code §§ 30262(b)(2) and (3)).

- 8 -

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

41.    State law does not define the terms "idled," "inactive," and "out of service." However, such terms are defined or described by PHMSA, the federal agency that administers the federal law pursuant to which the pipelines are regulated.

42.    The Pipelines are subject to the federal Hazardous Liquid Pipeline Safety Act ("Pipeline Safety Act") administered by PHMSA. (49 U.S.C. §§ 60101 *et seq.*) The Pipeline Safety Act provides that state agencies may apply to and become certified by PHMSA to enforce equivalent or more stringent intrastate pipeline safety regulations (49 U.S.C. § 60105.) In California, the Legislature has vested OSFM with the "exclusive safety[,] regulatory and enforcement authority over intrastate hazardous liquid pipelines ..." (Gov. Code, § 51010.)

43.    PHMSA recognizes two categories of pipeline status: (i) active and (ii) abandoned. (See 81 Fed. Reg. 54512 [federal "regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned."]; see also PHMSA Advisory Bulletin ADB 2016-0075 (Aug. 11, 2016).) Federal regulations for hazardous liquid pipelines define the term "abandoned" to mean "permanently removed from service." (See 49 C.F.R. 195.3.)

44.    Federal regulations do not recognize "idle," "inactive," or "out of service" status at all. (See 81 Fed. Reg. 54512.) "If a pipeline is not properly abandoned and may be used in the future for transportation of hazardous liquid or gas, PHMSA regulations consider it as an active pipeline." (81 Fed. Reg. 54513.) "Owners and operators of pipelines that are not operating but contain hazardous liquids and gas must comply with all applicable safety requirements, including periodic maintenance, integrity management assessments, damage prevention programs, response planning, and public awareness programs." (*Ibid.*)

45.    Pacific Pipeline Company is informed and believes, and on that basis alleges, that it is the position of the State of California that the Las Flores Pipelines have been "idled, inactive, or out of service for five years or more" and, therefore, repair, reactivation, maintenance, and development associated with such work is new or expanded development requiring a new CDP.

-9-
VERIFIED COMPLAINT FOR DECLARATORY RELIEF

46. The State, through the Coastal Commission and the Legislature, has previously made numerous statements and findings concerning its position on the Las Flores Pipelines' status.

47. The Staff Report for the Coastal Commission's Cease and Desist Order CCC-25-CD-01, Restoration Order CCC-25-RO-01, and Administrative Civil Penalty Order CCC-25-AP3-01, characterizes the Pipelines as "offline and out-of-service" since the 2015 oil spill. (Staff Report, p. 3.) "[T]he pipelines remained in service until the 2015 oil spill, at which point they were placed out of service." (*Ibid.*) The Staff Report also characterizes the Pipelines as "inoperable," having "sat inactive for a decade." (*Id.*, p. 65.)

48. Similarly, the Senate Rules Committee digest for SB 237 makes clear that SB 237 is intended to apply to the Las Flores Pipelines. (See Sen. Com. on Natural Resources, Analysis of Senate Bill No. 237 (2025-2026 Reg. Sess.) as amended on Sept. 10, 2025, attached hereto as Exhibit A.)

    a. "This Bill [applies to] pipelines of a certain size that have been out of service for more than five years (which would notably include certain pipelines serving the Sable Corporation's Santa Ynez Unit)[.]" (Ex. A, p. 3.)

    b. "Preventing oil spills from pipelines. On May 19, 2015 an offshore pipeline ruptured, spilling over 140,000 gallons of heavy crude oil along the Gaviota coast at Refugio Beach in Santa Barbara County. Sable announced they were restarting oil production in the Santa Ynez unit (in federal waters) on May 15, 2025, and restarting the use of those two pipelines. Sable has not replaced, but has rather made repairs to the pipelines. Some of the provisions of SB 237 are intended to address concerns surrounding the safety of restarting use of the repaired pipelines by requiring testing of the pipelines' durability." (Ex. A, p. 5.)

49. Based on the State's authority under the Coastal Act and SB 237, Pacific Pipeline Company faces an immediate choice to either (i) resume petroleum transportation pursuant to its existing entitlements, permits, and approvals, including County-issued CDPs, but risk possible

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

enforcement action, fines, and other penalties by the State; or (ii) not resume petroleum transportation at all. State law provides no administrative procedure for addressing a dispute concerning the applicability of SB 237 to the Las Flores Pipelines.

50.    Given the absence of a process under the law for resolving this dispute, a judicial determination concerning the applicability of SB 237 to the Las Flores Pipelines is necessary.

## FIRST CAUSE OF ACTION

### Declaratory Relief (Code of Civ. Proc., § 1060)

51.    Pacific Pipeline Company realleges and incorporates by reference each of the above paragraphs as though fully set forth herein.

52.    Pacific Pipeline Company is a "person interested" under Code of Civil Procedure § 1060, because Pacific Pipeline Company owns and operates the Las Flores Pipelines pursuant to existing CDPs issued by the County and is the target of the amendments to the Government Code and Coastal Act enacted by SB 237.

53.    The Las Flores Pipelines have not been "idled, inactive, or out of service for five years or more" within the meaning of SB 237, because Pacific Pipeline Company has diligently undertaken repair and maintenance efforts since the 2015 spill under existing entitlements, permits, and approvals to resume petroleum transportation through the Las Flores Pipelines. The Las Flores Pipelines have not been "abandoned" under federal or state law applicable to oil and gas pipelines. Rather, the Las Flores Pipelines are deemed "active" under these laws by the agencies who administer them.

54.    Further, the Legislature did not make SB 237 retroactive. As such, SB 237 and its new rules for what is an idled, inactive, or out of service pipelines and what permitting standards may or may not be followed only applies prospectively. This means that SB 237 can only apply to pipelines that are eventually "idled, inactive, or out of service for five years or more" commencing on January 1, 2026. Thus, since the five-year idle, inactive, or out of service period must commence on January 1, 2026, the earliest a pipeline could be "idled, inactive, or out of service *for five years or more*" is January 1, 2031 (i.e., five years from SB 237's effective date).

- 11 -

55.    Given statements the State, through the Coastal Commission and Legislature, has previously made concerning the Las Flores Pipelines' status as "idle," "inactive," and "out of service" for more than five years, an actual, present controversy exists between the parties concerning the applicability of SB 237 to the Las Flores Pipelines. This controversy is definite and concrete, touches the legal relations of parties with adverse legal interests, and is of sufficient immediacy and reality to warrant declaratory relief. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79–80.)

56.    This action does not seek an advisory opinion or abstract interpretation of law. Pacific Pipeline Company must make immediate operational and financial decisions regarding whether to resume petroleum transportation under its existing CDPs at the risk of enforcement actions, penalties, or orders by the State. This presents a justiciable controversy under Code of Civil Procedure § 1060. (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647.)

57.    Declaratory relief is necessary and proper within the meaning of Code of Civil Procedure § 1061, because a judicial declaration will clarify the parties' rights and duties, guide Pacific Pipeline Company's conduct, and prevent multiplicity of actions.

58.    Accordingly, Pacific Pipeline Company seeks a judicial declaration that the Las Flores Pipelines have not been "idled, inactive, or out of service for five years or more" under SB 237.

## PRAYER FOR RELIEF

WHEREFORE, Pacific Pipeline Company respectfully prays for judgment against the Defendant as follows:

1.    For a judicial declaration that the Las Flores Pipelines have not been "idled, inactive, or out of service for five years or more" under Government Code Section 51014.1 and Public Resources Code Sections 30262 (b)(1) and (b)(2), as amended by SB 237;

2.    For costs of suit incurred herein; and

3.    For such other and further relief as the Court deems just and proper, including supplemental relief under Code of Civil Procedure § 1062.

- 12 -

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

Respectfully submitted,

DATED:  September 29, 2025

ALSTON & BIRD LLP

By: _____

JEFFREY D. DINTZER

Attorney for Plaintiff
PACIFIC PIPELINE COMPANY

- 13 -
VERIFIED COMPLAINT FOR DECLARATORY RELIEF

## VERIFICATION

I, Steven P. Rusch, am Vice President of Regulatory and Environmental Affairs of Sable Offshore Corp., and I am an Authorized Representative of Pacific Pipeline Company. I am authorized to execute this verification on behalf of them. I have read the attached Verified Complaint for Declaratory Relief and am familiar with its contents. The Facts provided in the Complaint are true of my personal knowledge, except for those alleged on information and belief, and I believe those to be true.

DATED: September 29, 2025

Steven P. Rusch

---

- 14 -
VERIFIED COMPLAINT FOR DECLARATORY RELIEF

# Exhibit C

Exhibit C
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS LLP**
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Plaintiff
PACIFIC PIPELINE COMPANY

# SUPERIOR COURT OF CALIFORNIA

## COUNTY OF KERN

| | |
|---|---|
| PACIFIC PIPELINE COMPANY, a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF CALIFORNIA and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No. BCV-25-103508<br><br>**VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF**<br><br>(Code Civ. Proc. § 1060) |

- 1 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Plaintiff Pacific Pipeline Company brings this First Amended Complaint for Declaratory Relief against Defendant the State of California. By this verified pleading, Plaintiff alleges as follows:

## INTRODUCTION

1. Sable Offshore Corp. ("Sable") operates an interconnected pipeline facility known as the Santa Ynez Pipeline System, which includes both offshore and onshore components. Two onshore segments of this System are known as Segments CA-324 and CA-325, sometimes referred to as the Las Flores Pipeline, which are owned by Pacific Pipeline Company. Portions of Segments CA-325 are located in Kern County, San Luis Obispo County, and an unincorporated area of the County of Santa Barbara ("County"), including portions both inside and outside the Coastal Zone. Other onshore portions of the Santa Ynez Pipeline System, including Segment CA-324, are located in Santa Barbara County and within the Coastal Zone.

2. Sable is the lessee and operator of federal offshore oil and gas leases in federal waters off the coast of California that form the Santa Ynez Unit. Offshore pipeline segments (the "Offshore Pipeline Segments") transport oil from this offshore field to intermediate onshore processing facilities at Las Flores Canyon (the "LFC Facilities"), and Segments CA-324 and CA-325 transport oil from the LFC Facilities to Gaviota and Pentland Stations and further downstream. Sable operates the Offshore Pipeline Segments, the LFC Facilities, and Segments CA-324 and CA-325 as part of the integrated Santa Ynez Pipeline System, which moves crude oil from offshore waters into and through California. Sable acquired the Santa Ynez Unit, the Offshore Pipeline Segments, the LFC Facilities and Pacific Pipeline Company in February 2024.

3. Since that time, Sable and Pacific Pipeline Company have worked with federal and state agencies toward resuming petroleum transportation through the entirety of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325. This has involved the performance of repair and maintenance work on all components of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325.

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

4.    On September 13, 2025, the California Legislature adopted Senate Bill ("SB") 237.

5.    Among other things, SB 237 adds Section 51014.1 of the Government Code, which provides that "[a]ny existing oil pipeline that is six inches or larger that has been idle, inactive, or out of service for five years or more, shall not be restarted without passing a spike hydrostatic testing program."

6.    SB 237 also amends Section 30262 of the California Coastal Act to require a person to obtain a new coastal development permit ("CDP") for the "[r]epair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more."

7.    SB 237 does not define "idled, inactive, or out of service."

8.    On September 19, 2025, Governor Gavin Newsom signed SB 237 into law.

9.    The State of California has taken the position that Segments CA-324 and CA-325 have been idled, inactive, or out of service for five years or more. Pacific Pipeline Company disagrees. The entire Santa Ynez Pipeline System—including Segments CA-324 and CA-325—is active. The Segments are not idle nor out of service. In fact, the entire Pipeline System has retained its active status under state and federal law since 2015. More recently, Pacific Pipeline Company and Sable have been diligently performing necessary work on Segments CA-324 and CA-325 to resume petroleum transportation through them. Under all relevant and applicable meanings of the words, the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is not idle, inactive, or out of service.

10.    On December 17, 2025, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") determined the Santa Ynez Pipeline System is an interstate pipeline under its exclusive pipeline safety jurisdiction. In making its determination, PHMSA confirmed the Santa Ynez Pipeline System is considered an "active" pipeline. Since assuming jurisdiction over the Santa Ynez Pipeline System, PHMSA approved Sable's Restart Plan for Segments CA-

- 3 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

324 and CA-325 on December 22, 2025 and issued Sable an Emergency Special Permit with respect to Segments CA-324 and CA-325 on December 23, 2025.

11.     An actual and present controversy exists between Pacific Pipeline Company and Defendant concerning their respective rights and duties regarding the Santa Ynez Pipeline System's status, and the applicability of SB 237 to Segments CA-324 and CA-325 in light of PHMSA's assumption of jurisdiction over the Santa Ynez Pipeline System. Consequently, Pacific Pipeline Company seeks a judicial declaration from this Court that: 1) the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is not idle, inactive, or out of service as those terms are used in SB 237; and 2) the application of SB 237 as to the Santa Ynez Pipeline System is preempted by federal law.

## THE PARTIES

12.     Plaintiff Pacific Pipeline Company is a Delaware Corporation and does business in Kern County, California. Pacific Pipeline Company owns Segments CA-324 and CA-325, which are critical portions of the Santa Ynez Pipeline System.

13.     Pacific Pipeline Company is a "person interested under a statute" within the meaning of Code of Civil Procedure § 1060, because Pacific Pipeline Company's rights and obligations under SB 237 are directly at issue in this action.

14.     Defendant State of California is responsible for enacting and enforcing the laws of the State of California.

15.     Pacific Pipeline Company is unaware of the true names and/or capacities of Defendants DOES 1 through 25, inclusive, and therefore sues said Defendants by such fictitious names. Pacific Pipeline Company will amend this pleading to insert the true names and/or capacities of DOES 1 through 25, inclusive, when the same have been ascertained. Pacific Pipeline Company is informed and believe and thereon alleges that each such fictitiously named Defendant is, in some manner or for some reason, responsible for the actions or omissions alleged in this pleading, and each is subject to the relief being sought herein.

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

**JURISDICTION AND VENUE**

16.    This Court has subject-matter jurisdiction over this action under California Constitution, article VI, section 10, and section 1060 of the Code of Civil Procedure.

17.    Venue is proper in this Court pursuant to Code of Civil Procedure section 392 because significant portions of the Santa Ynez Pipeline System at issue in this litigation are located in Kern County and the Santa Ynez Pipeline System ultimately delivers crude oil to the Pentland Delivery Point in Kern County.

**FACTUAL AND LEGAL STATEMEMT**

**A.    The Santa Ynez Unit**

18.    The Santa Ynez Unit consists of sixteen federal leases across approximately 76,000 acres of outer continental shelf and produces crude oil and natural gas from Platforms Hondo, Harmony, and Heritage, located in federal waters off the California Coast in the Santa Barbara Channel.

19.    The oil and gas are transported through the Santa Ynez Pipeline System's Offshore Pipeline Segments to the onshore LFC Facilities, comprised principally of the Las Flores Canyon Oil and Gas Processing Facilities and the Pacific Offshore Pipeline Company-owned Gas Plant, both of which are located in Las Flores Canyon in unincorporated Santa Barbara County.

20.    The LFC Facilities separate oil, propane, butane, sulfur products, and fuel quality gas. The natural gas is dried, treated, compressed, and delivered to a local utility company. The partially processed crude oil continues through the Santa Ynez Pipeline System via Segments CA-324 and CA-325 to Pentland Station, where the oil enters third-party owned and operated infrastructure and is transported to a refinery for final processing.

21.    In February 1988, the California Coastal Commission ("Coastal Commission") reviewed and analyzed Sable's predecessor-in-interest's (Exxon Company U.S.A.) proposal for the construction, operation, and ongoing maintenance of the Santa Ynez Unit-related assets and

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

the Offshore Pipeline Segments, as part of a "Development and Production Plan" ("DPP") submitted to the federal Minerals Management Service in 1987.

22.     The Coastal Commission issued three approvals for the Santa Ynez Unit-related assets and Offline Pipeline Segments: (1) Consistency Certification No. CC-7-83, which confirmed pursuant to the federal Coastal Zone Management Act ("CMZA") that a Development and Production Plan ("DPP") for the Santa Ynez Unit-related assets would be consistent with the Coastal Act, (2) Consistency Certification No. CC-64-87, which confirmed pursuant to the CZMA that construction, operation, and maintenance of the Santa Ynez-related assets and Offshore Pipeline Segments pursuant to a revised DPP would be consistent with the Coastal Act, and (3) CDP No. E-88-1 (the "Offshore CDP"), which authorized the construction, operation, and maintenance of those portions of the Offshore Pipeline Segments located in California state waters.

**B.     Segments CA-324 and CA-325 of the Santa Ynez Pipeline System**

23.     The Santa Ynez Pipeline System is made up of various segments. One segment is known as Segment CA-325. Segment CA-325 is a thirty-inch diameter pipeline with a maximum permitted throughput capacity of 300,000-barrels of crude oil per day and transports crude oil approximately 113.5 miles north from the Gaviota Pump Station to the Sisquoc Pump Station, then east through the Los Padres National Forest and Cuyama Valley, ultimately delivering crude oil to the existing Pentland Delivery Point in the San Joaquin Valley in Kern County.

24.     Another segment is Segment CA-324. Segment CA-324 is a twenty-four-inch diameter pipeline with a maximum permitted throughput capacity of 150,000-barrels of crude oil per day. Segment CA-324 transports crude oil approximately 10.9 miles from the Las Flores Pump Station in Las Flores Canyon, west along the Gaviota Coast, to the existing Gaviota Pump Station located approximately one mile east of Gaviota State Park in Santa Barbara County. The Offshore Pipeline Segments, as described above, comprise a third segment of the Santa Ynez Pipeline System and transport oil from the Santa Ynez Unit to the onshore LFC Facilities in Las Flores Canyon.

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

25.    In the mid-1980s, the California State Lands Commission, federal Bureau of Land Management, and Department of the Interior prepared a joint Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for the Celeron Pipeline Project, which includes analysis of the construction and long-term operation of what are now known as Segments CA-324 and CA-325. The locations of Segments CA-324 and CA-325 were identified as an environmentally superior alignment to minimize impacts to environmental resources. The State Lands Commission certified the EIR/EIS in January 1985.

26.    After reviewing the EIR/EIS, the County Planning Commission made a final decision to approve the Celeron Pipeline Project and associated entitlements in February 1986. The County's approval was not challenged during the appeal period, and the Planning Commission's approval action became final and effective.

27.    Pursuant to the County of Santa Barbara's certified Local Coastal Program ("LCP"), the County issued CDP No. 86-CDP-189 for the Celeron Pipeline Project on July 27, 1986. CDP No. 86-CDP-189 approved "[c]learing, grading and trenching activities for [the] Celeron Pipeline Project." On August 5, 1986, the County issued CDP No. 86-CDP-205 for the "[r]emainder of all construction activities for the Celeron Pipeline [P]roject." The CDPs were not appealed by any party and are, therefore, final, valid, and not subject to further appeal.

28.    Although the County has issued separate CDPs for major improvements, such as relocations and realignments of pipeline segments since Segments CA-324 and CA-325's CDPs were first issued, the County has not required new or amended CDPs for repair and maintenance work on Segments CA-324 and CA-325.

**C.    The Refugio Oil Spill and Resulting Repair Work**

29.    On May 19, 2015, a leak along Segment CA-324 resulted in an oil spill. Segments CA-324 and CA-325 remained active, but petroleum has not flowed through them since that time, even though petroleum began flowing through other portions of the Santa Ynez Pipeline System in May 2025. To maintain Segments CA-324 and CA-325 in an active state, they were

- 7 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

filled with nitrogen to prevent oxidation and internal corrosion, and the cathodic protection system is active and has been regularly inspected and maintained.

30. Since 2015, Pacific Pipeline Company (including its predecessor in interest, Plains Pipeline, L.P. ("Plains")), has maintained Segments CA-324 and CA-325 as active and has undertaken substantial efforts to diligently repair Segments CA-324 and CA-325 to ensure compliance with industry standards for active pipelines and resume petroleum transportation.

31. For example, in April 2021, Plains secured approval from the Office of the State Fire Marshal ("OSFM") to retrofit Segments CA-324 and CA-325 with 16 safety valves as required by law, including seven valves in the Coastal Zone. In December 2021, Plains submitted applications to the County for approval to complete the safety valve installation work. Pacific Pipeline Company has since installed the safety valves along Segments CA-324 and CA-325.

32. In addition, multiple in-line inspections ("ILI") have been conducted on Segments CA-324 and CA-325:

    a. Two ILI runs have been performed on Segment CA-324, one in February 2022 and another in December 2022;

    b. An ILI run was performed on a portion of on Segment CA-325 in September 2023; and

    c. An ILI run was performed on the remainder of Segment CA-325 in October 2023.

33. In May 2024, Pacific Pipeline Company and Sable separately began anomaly[1] repair and maintenance work on Segments CA-324 and CA-325 under the County's 1986 approvals and permits that authorized ongoing pipeline maintenance. On February 12 and March 21, 2025, in response to Pacific Pipeline Company's request to address claims from the Coastal Commission that the repair and maintenance work was not authorized, the County confirmed that no further permits were required for Pacific Pipeline Company's anomaly repair work. Pacific

---

[1] A pipeline anomaly refers to a pipeline segment with some deviation from its original configuration.

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Pipeline Company has completed the anomaly repairs, as well as subsequent pipeline hydrotesting, under OSFM supervision.

34.     Since 2016, Segments CA-324 and CA-325 had been considered an "intrastate" pipeline under the regulatory oversight of OSFM. In April 2024, Pacific Pipeline Company submitted "State Waiver" applications to OSFM for Segments CA-324 and CA-325 to modify regulatory pipeline safety requirements based on the specifications applicable to the individual pipeline facilities. On December 17, 2024, OSFM granted both State Waivers and imposed over sixty separate conditions on Pacific Pipeline Company's operation of Segments CA-324 and CA-325, conditional on the Pipeline and Hazardous Materials Safety Administration ("PHMSA") expressing no objection to the State Waivers. On February 11, 2025, PHMSA notified OSFM that it had no objection to its issuance of the State Waivers. On December 17, 2025, PHMSA designated the entire Santa Ynez Pipeline System (including Segments CA-324 and CA-325) as an interstate pipeline. As a result, OSFM no longer retains any regulatory oversight of Segments CA-324 and CA-325 and the State Waivers have been rendered moot.

35.     Pacific Pipeline Company further submitted a Restart Plan to OSFM for review on July 29, 2024. In August and September 2025, OSFM performed multiple inspections of Segments CA-324 and CA-325 in connection with its review of the Restart Plan. As of December 17, 2025, PHMSA has assumed complete safety jurisdiction over the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, including the processing and approval of Pacific Pipeline Company's Restart Plan.

36.     As of May 15, 2025, Sable resumed petroleum transportation through the Santa Ynez Pipeline System's Offshore Pipeline Segments to its storage facilities in Las Flores Canyon.

37.     At all times, Pacific Pipeline Company has intended to resume petroleum transportation from Sable's storage facilities in Las Flores Canyon through the remainder of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325. Pacific Pipeline Company and its predecessors never abandoned Segments CA-324 and CA-325. Rather, these

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

segments have been operated as part of an active pipeline under the law and Pacific Pipeline Company has worked diligently to maintain their use under existing and valid CDPs.

**D.      Senate Bill 237**

38.      On September 13, 2025, the California Legislature passed SB 237. On September 19, 2025, Governor Newsom signed SB 237 into law.

39.      SB 237 adds Section 51014.1 of the Government Code, which states in part, "[a]ny existing oil pipeline that is six inches or larger that has been *idle, inactive, or out of service* for five years or more, shall not be restarted without passing a spike hydrostatic testing program." (Emphasis added).

40.      SB 237 also amends Section 30262 of the Coastal Act to provide, in relevant part:

> (2) Repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more shall be considered a new or expanded development requiring a new coastal development permit.

> (3) Development associated with the repair, reactivation, or maintenance of an oil pipeline that has been idled, inactive, or out of service for five years or more requires a new coastal development permit consistent with this section. (Pub. Res. Code §§ 30262(b)(2) and (3)).

41.      State law does not define the terms "idled," "inactive," and "out of service." However, such terms are defined or described by PHMSA, the federal agency that administers the federal law pursuant to which the Santa Ynez Pipeline System is regulated.

42.      The Santa Ynez Pipeline System is subject to the federal Hazardous Liquid Pipeline Safety Act ("Pipeline Safety Act") administered by PHMSA. (49 U.S.C. §§ 60101 *et seq.*) On December 17, 2025, PHMSA determined that the Santa Ynez Pipeline System is an interstate pipeline under PHMSA's exclusive jurisdiction. (See Dec. 17, 2025 Letter from PHMSA to Sable, attached hereto as Exhibit B.) In making its determination, PHMSA confirmed that PHMSA regulations consider the Santa Ynez Pipeline System to be an "active" pipeline. (Ex. B, p. 3, fn. 8.)

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

43.    PHMSA recognizes two categories of pipeline status: (i) active and (ii) abandoned. (See 81 Fed. Reg. 54512 [federal "regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned."]; see also PHMSA Advisory Bulletin ADB 2016-0075 (Aug. 11, 2016).) Federal regulations for hazardous liquid pipelines define the term "abandoned" to mean "permanently removed from service." (See 49 C.F.R. 195.3.)

44.    Federal regulations do not recognize "idle," "inactive," or "out of service" status at all. (See 81 Fed. Reg. 54512.) "If a pipeline is not properly abandoned and may be used in the future for transportation of hazardous liquid or gas, PHMSA regulations consider it as an active pipeline." (81 Fed. Reg. 54513.) "Owners and operators of pipelines that are not operating but contain hazardous liquids and gas must comply with all applicable safety requirements, including periodic maintenance, integrity management assessments, damage prevention programs, response planning, and public awareness programs." (*Ibid*.)

45.    Pacific Pipeline Company is informed and believes, and on that basis alleges, that it is the position of the State of California that Segments CA-324 and CA-325 have been "idled, inactive, or out of service for five years or more" and, therefore, repair, reactivation, maintenance, and development associated with such work is new or expanded development requiring a new CDP.

46.    The State, through the Coastal Commission and the Legislature, has previously made numerous statements and findings concerning its position on the status of Segments CA-324 and CA-325.

47.    The Staff Report for the Coastal Commission's Cease and Desist Order CCC-25-CD-01, Restoration Order CCC-25-RO-01, and Administrative Civil Penalty Order CCC-25-AP3-01, characterizes Segments CA-324 and CA-325 as "offline and out-of-service" since the 2015 oil spill. (Staff Report, p. 3.) "[T]he pipelines remained in service until the 2015 oil spill, at which point they were placed out of service." (*Ibid*.) The Staff Report also characterizes the Segments as "inoperable," having "sat inactive for a decade." (*Id*., p. 65.)

- 11 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

48. Similarly, the Senate Rules Committee digest for SB 237 makes clear that SB 237 is intended to apply to the Santa Ynez Pipeline System. (See Sen. Com. on Natural Resources, Analysis of Senate Bill No. 237 (2025-2026 Reg. Sess.) as amended on Sept. 10, 2025, attached hereto as Exhibit A.)

    a. "This Bill [applies to] pipelines of a certain size that have been out of service for more than five years (which would notably include certain pipelines serving the Sable Corporation's Santa Ynez Unit)[.]" (Ex. A, p. 3.)

    b. "Preventing oil spills from pipelines. On May 19, 2015 an offshore pipeline ruptured, spilling over 140,000 gallons of heavy crude oil along the Gaviota coast at Refugio Beach in Santa Barbara County. Sable announced they were restarting oil production in the Santa Ynez unit (in federal waters) on May 15, 2025, and restarting the use of those two pipelines. Sable has not replaced, but has rather made repairs to the pipelines. Some of the provisions of SB 237 are intended to address concerns surrounding the safety of restarting use of the repaired pipelines by requiring testing of the pipelines' durability." (Ex. A, p. 5.)

49. Based on the State's asserted authority under the Coastal Act and SB 237, Pacific Pipeline Company faces an immediate choice to either (i) resume petroleum transportation pursuant to its existing entitlements, permits, and approvals, including County-issued CDPs and PHMSA approvals, but risk possible enforcement action, fines, and other penalties by the State; or (ii) not resume petroleum transportation at all. State law provides no administrative procedure for addressing a dispute concerning the applicability of SB 237 to the Santa Ynez Pipeline System.

50. Given the absence of a process under the law for resolving this dispute, a judicial determination concerning the applicability of SB 237 to the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is necessary.

- 12 -

**E.      PHMSA's Assumption of Jurisdiction**

51.      On December 17, 2025, PHMSA determined that the entirety of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is an interstate pipeline subject to PHMSA's exclusive jurisdiction. This determination eliminated any jurisdiction of OSFM over Segments CA-324 and CA-325. In making its determination that the Santa Ynez Pipeline System is an interstate pipeline, PHMSA notified OSFM that the Pipeline System is "subject to the regulatory oversight of PHMSA." (Ex. B, p. 3.) PHMSA further confirmed that the Santa Ynez Pipeline System is considered an "active" pipeline under PHMSA regulations. (Ex. B, p. 3, fn. 8.)

52.      On December 22, 2025, PHMSA approved Sable's Restart Plan for Segments CA-324 and CA-325. (See Dec. 22, 2025 Letter from PHMSA to Sable, attached hereto as Exhibit C.)

53.      On December 23, 2025, PHMSA granted Sable an Emergency Special Permit for Segments CA-324 and CA-325. (See Dec. 23, 2025 Emergency Special Permit issued by PHMSA to Sable, attached hereto as Exhibit D.) The Emergency Special Permit takes the place of the OSFM-issued State Waivers and carried forward substantially the same conditions as issued in the State Waivers.

54.      No other PHMSA approvals or permits are necessary to flow oil through Segments CA-324 and CA-325.

55.      Given PHMSA's assumption of jurisdiction over the Santa Ynez Pipeline System as an interstate pipeline, OSFM is without jurisdiction to regulate Segments CA-324 and CA-325, or any other portion of the Santa Ynez Pipeline System. The requirements of the State Waivers have therefore been mooted and preempted by these federal actions. A judicial determination concerning whether the application of SB 237 as to the Santa Ynez Pipeline System is preempted by federal law is therefore necessary.

- 13 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

**FIRST CAUSE OF ACTION**

**Declaratory Relief (Code of Civ. Proc., § 1060)**

56.    Pacific Pipeline Company realleges and incorporates by reference each of the above paragraphs as though fully set forth herein.

57.    Pacific Pipeline Company is a "person interested" under Code of Civil Procedure § 1060, because Pacific Pipeline Company owns and operates Segments CA-324 and CA-325 of the Santa Ynez Pipeline System, which are operated pursuant to existing CDPs issued by the County and are the target of the amendments to the Government Code and Coastal Act enacted by SB 237.

58.    Segments CA-324 and CA-325 of the Santa Ynez Pipeline System have not been "idled, inactive, or out of service for five years or more" within the meaning of SB 237, because Pacific Pipeline Company has diligently undertaken repair and maintenance efforts since the 2015 spill under existing entitlements, permits, and approvals to resume petroleum transportation through Segments CA-324 and CA-325. Segments CA-324 and CA-325 have not been "abandoned" under federal or state law applicable to oil and gas pipelines. Rather, the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, has been deemed "active" under these laws by the agencies who administer them.

59.    Further, the Legislature did not make SB 237 retroactive. As such, SB 237 and its new rules for what is an idled, inactive, or out of service pipelines and what permitting standards may or may not be followed only applies prospectively. This means that SB 237 can only apply to pipelines that are eventually "idled, inactive, or out of service for five years or more" commencing on January 1, 2026. Thus, since the five-year idle, inactive, or out of service period must commence on January 1, 2026, the earliest a pipeline could be "idled, inactive, or out of service *for five years or more*" is January 1, 2031 (i.e., five years from SB 237's effective date).

60.    Given statements the State, through the Coastal Commission and Legislature, has previously made concerning the status of Segments CA-324 and CA-325 as "idle," "inactive," and "out of service" for more than five years, an actual, present controversy exists between the

- 14 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

parties concerning the applicability of SB 237 to the Santa Ynez Pipeline System, including Segments CA-324 and CA-325. This controversy is definite and concrete, touches the legal relations of parties with adverse legal interests, and is of sufficient immediacy and reality to warrant declaratory relief. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79–80.)

61.    This action does not seek an advisory opinion or abstract interpretation of law. Pacific Pipeline Company must make immediate operational and financial decisions regarding whether to resume petroleum transportation under its existing CDPs at the risk of enforcement actions, penalties, or orders by the State. This presents a justiciable controversy under Code of Civil Procedure § 1060. (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647.)

62.    Declaratory relief is necessary and proper within the meaning of Code of Civil Procedure § 1061, because a judicial declaration will clarify the parties' rights and duties, guide Pacific Pipeline Company's conduct, and prevent multiplicity of actions.

63.    Accordingly, Pacific Pipeline Company seeks a judicial declaration that the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, have not been "idled, inactive, or out of service for five years or more" under SB 237.

## SECOND CAUSE OF ACTION

### Declaratory Relief (Code of Civ. Proc., § 1060)

64.    Pacific Pipeline Company realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

65.    Pacific Pipeline Company is a "person interested" under Code of Civil Procedure § 1060, because Pacific Pipeline Company owns and operates Segments CA-324 and CA-325 of the Santa Ynez Pipeline System pursuant to existing CDPs and is the target of the amendments to the Government Code and Coastal Act enacted by SB 237.

66.    With PHMSA's assumption of jurisdiction and December 17, 2025 determination that the Santa Ynez Pipeline System is an interstate pipeline under its exclusive regulatory oversight, OSFM no longer retains any regulatory authority over Segments CA-324 and CA-325, including the resumption of petroleum transportation through the Segments.

- 15 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

67. Moreover, with PHMSA's approval of Sable's Restart Plan on December 22, 2025 and issuance of the Emergency Special Permit (which overrides the State Waivers) on December 23, 2025, no other PHMSA approvals or permits are necessary to flow oil through Segments CA-324 and CA-325.

68. Under the federal Pipeline Safety Act, at 49 U.S.C. § 60104(c), state agencies, such as OSFM or the Coastal Commission, are precluded from imposing any safety standards for interstate pipeline facilities, including the Santa Ynez Pipeline System.

69. Moreover, under the federal pipeline safety regulations administered by PHMSA under 49 C.F.R. Part 195, Pacific Pipeline Company, as owner of Segments CA-324 and CA-325, is subject to several ongoing pipeline operation, maintenance, and repair requirements that are, in many cases, time-sensitive and not otherwise subject to advance permitting or approval requirements by PHMSA.

70. Article VI, Clause 2 of the U.S. Constitution provides that "the Laws of the United States … shall be the supreme Law of the Land," such that federal laws preempt state laws that purport to override or otherwise conflict with the implementation of federal laws.

71. This action does not seek an advisory opinion or abstract interpretation of law. Segments CA-324 and CA-325 are now ready for resumed petroleum transportation pursuant to PHMSA's approvals and Pacific Pipeline Company must make immediate operational and financial decisions regarding whether to resume petroleum transportation through the Segments at the risk of enforcement actions, penalties, or orders by the State. This presents a justiciable controversy under Code of Civil Procedure § 1060. (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647.)

72. Declaratory relief is necessary and proper within the meaning of Code of Civil Procedure § 1061, because a judicial declaration will clarify the parties' rights and duties, guide Pacific Pipeline Company's conduct, and prevent multiplicity of actions.

73. Accordingly, Pacific Pipeline Company seeks a judicial declaration that the application of SB 237 as to the Santa Ynez Pipeline System has been preempted by federal law.

- 16 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

**PRAYER FOR RELIEF**

WHEREFORE, Pacific Pipeline Company respectfully prays for judgment against the Defendant as follows:

1.    For a judicial declaration that the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, has not been "idled, inactive, or out of service for five years or more" under Government Code Section 51014.1 and Public Resources Code Sections 30262 (b)(1) and (b)(2), as amended by SB 237;

2.    For a judicial declaration that the application of SB 237 as to the Santa Ynez Pipeline System is preempted by federal law;

3.    For costs of suit incurred herein; and

4.    For such other and further relief as the Court deems just and proper, including supplemental relief under Code of Civil Procedure § 1062.

Respectfully submitted,

DATED:  January 21, 2026

ALSTON & BIRD LLP

By: _____
JEFFREY D. DINTZER
Attorney for Plaintiff
PACIFIC PIPELINE COMPANY

- 17 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

## **VERIFICATION**

I, Steven P. Rusch, am Vice President of Regulatory and Environmental Affairs of Sable Offshore Corp., and I am an Authorized Representative of Pacific Pipeline Company. I am authorized to execute this verification on behalf of them. I have read the attached Verified Complaint for Declaratory Relief and am familiar with its contents. The Facts provided in the Complaint are true of my personal knowledge, except for those alleged on information and belief, and I believe those to be true.

DATED: January 21, 2026

_____
Steven P. Rusch

- 18 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

# Exhibit D

Exhibit D
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026

Case 2:20-cv-02415-SVW-AS Document 81 Filed 03/13/20 Page 1 of 102 Page ID #:94

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br> Plaintiffs, <br><br> v. <br><br> PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P., <br><br> Defendants. | Civil Action No. <br><br> 2:20-cv-02415 <br><br> **CONSENT DECREE** |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:20-cv-02413-SVW-AS   Document 8-1   Filed 03/13/20   Page 2 of 102   Page ID #:95

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast
Regional Water Quality Control Board, and California Department of Forestry
and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and
California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

      a.      49 C.F.R. Part 194 Subpart B – Response Plans;

      b.      49 C.F.R. Part 195 Subpart B – Reporting;

      c.      49 C.F.R. Part 195 Subpart E – Pressure Testing;

      d.      49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

      e.      49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

      f.      49 C.F.R. Part 195 Subpart H – Corrosion Control;

      g.      49 C.F.R. Part 199 – Drug and Alcohol Testing; and

      h.      All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71.    The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72.    This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

Case 2:20-cv-02415-SVW-AS Document 6-1 Filed 05/13/20 Page 53 of 102 Page ID #:146

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87. The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

## XVIII. TRANSFER AND ACQUISITION OF ASSETS

88. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision. Those provisions of Appendix B are:

> a. For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;
>
> b. For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;
>
> c. For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and
>
> d. For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer. Defendants shall

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements.  Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree.  Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90.     In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree.  Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer.  Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91.     For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX.  COSTS

92.     Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

## XXVII.  INTEGRATION

107.  This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII.    FINAL JUDGMENT

108.  Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109.  For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of _____, 20__.


_____
UNITED STATES DISTRICT JUDGE


*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 57 -

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1.    **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

   A.    Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901.  Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

   B.    Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

   C.    Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

   D.    Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

   E.    To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver.  Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received.  Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver.  Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2.    **Replacement, Restart, or Abandonment of Lines 901 and 903:**

   A.    Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners.  Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

-75-

1.      On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

    a.      Test for potential AC/DC interference.  Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

    b.      Conduct a close interval survey (CIS) and AC/DC interference survey.

    c.      Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B.      As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C.      As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3.      **Third-Party Analysis of Line 2000 ILI Data**

A.      Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B.      The consultant shall:

    1.      Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

    2.      Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

    3.      Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

    4.      Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

-76-

Case 2:20-cv-02415-SVW-AS   Document 6-1   Filed 03/13/20   Page 96 of 102   Page ID #:16905

# APPENDIX D

1.      All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. The Restart Plan shall include:

1)      Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

2)      Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

3)      Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

4)      A specific day-light restart that includes advance communications with local emergency response officials;

5)      Master Control Room enhancements, including:

a) Implementation of advanced leak-detection

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1.  Revised alarm threshold adjustments;

2.  Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b)  Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running.  Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c)  Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d)  Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e)  Development and implementation of training associated with the emergency shutdown programming described above; and

f)  Provision of additional controller training that

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6)     Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7)     Installation of additional safety valves as a result of Plains' EFRD evaluation;

8)     Installation of additional pressure sensors as a result of Plains' surge study;

9)     Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM.  The tool run shall be initiated during daylight hours.  If the tool run does not collect a complete data set, the UT tool shall be promptly re-run.  A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report.  Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10)     **Corrosion Prevention.**  Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan.  Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

Case 2:20-cv-02415-SVW-AS   Document 6-1   Filed 03/13/20   Page 100 of 102   Page ID #:1930

903 to the OSFM for review and approval.  Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree.  In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1)      Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2)      Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3)      Provisions for a daylight restart and advance communications with local emergency response officials.

g. **Line 903 Return to Service.**  After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h. **Removal of Pressure Restriction for Line 903.**  After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1)      The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

Case 2:26-cv-05242-SVW-SSC Document 35 Filed 05/14/26 Page 118 of 251 Page
Case 2:20-cv-02415-SVW-AS Document 6-1 Filed 03/13/20 Page 101 of 102 Page
ID #:16910

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)    The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction.  Requests for removal of the pressure restriction may be submitted by pipeline segment.

i.  **Notifications.**  Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j.  **Reporting Requirements for Lines 901 and 903.**  If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)    The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)    Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

3)      The Appendix D Documentation Report shall include but not be limited to:

> A.  Table of Contents;
>
> B.  [*intentionally left blank.*]
>
> C.  [*intentionally left blank.*]
>
> D.  Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;
>
> E.  [*intentionally left blank.*]
>
> F.  [*intentionally left blank.*]
>
> G.  Lessons learned while fulfilling the requirements of this Appendix D.

# Exhibit E

Exhibit E
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026

**ExxonMobil Pipeline Company LLC**
22777 Springwoods Village Parkway
Spring, Texas  77389



February 19, 2024

*Via Electronic Delivery*

Mr. Joshua Cleaver
Staff Counsel
Legal Services Office
California Department of Forestry and Fire Protection
P.O. Box 944246
Sacramento, California 94244
joshua.cleaver@fire.ca.gov

See Attached Service List

**Re:    Civil Action No. 2:20-CV-02415 Consent Decree**
**DOJ Case #90-5-1-1-1130**
**Notification of Transfer of Assets**

Mr. Cleaver:

In accordance with Section XVIII, Paragraph 89, of the above referenced Consent Decree, Exxon Mobil Pipeline Company LLC, and its affiliate, Mobil Pacific Pipeline Company, hereby provide notice to the California Department of Forestry and Fire Protection's Office of the State Fire Marshal, of the transfer of certain assets subject to the Consent Decree.  All terms used but not defined herein shall have the meanings given such terms in the Consent Decree.

On February 14, 2024, Mobil Pacific Pipeline Company, the exclusive shareholder of Pacific Pipeline Company, divested 100% of its interest in Pacific Pipeline Company to Sable Offshore Corp.  Pacific Pipeline Company owns Line 901 and the Gaviota to Pentland segment of Line 903 and all associated personal property related to these lines (collectively, the Assets). Enclosed for your records is a copy of the executed Consent Decree Assumption Agreement whereby Sable Offshore Corp. has agreed to be bound by the provisions of the Consent Decree and Appendices B and D thereof that are transferrable and specifically applicable to the Assets. Please direct future communications concerning the Assets and their corresponding Consent Decree obligations to:

> Anthony Duenner
> General Counsel
> Sable Offshore Corp.
> 700 Milam St, Suite 3400
> Houston, TX 77002
> E-Mail: aduenner@sableoffshore.com

ExxonMobil Pipeline Company LLC and its affiliates, including but not limited to, Mobil Pacific Pipeline Company, retain no ownership interest in the Assets or responsibility for complying with the Consent Decree.

If you have any questions, please contact Rebekah Bennett, General Counsel, ExxonMobil Pipeline Company LLC at (346) 467-9756 or rebekah.r.bennett@exxonmobil.com.

Sincerely,

Andrew Craig
Venture Manager
ExxonMobil Pipeline Company LLC


Enclosure
Consent Decree Assumption Agreement

cc:     Brian Carlin, ExxonMobil Pipeline Company LLC
        Rebekah Bennett, ExxonMobil Pipeline Company LLC
        Karah Brazell, ExxonMobil Pipeline Company LLC
        Anthony Duenner, Pacific Pipeline Company and Sable Offshore Corp.

An **ExxonMobil** Subsidiary

Consent Decree: Notification of Transfer of Assets                                                                    Page 3

# SERVICE LIST: CONSENT DECREE CONTACTS OF RECORD

United States:

    EES Case Management Unit
    Environmental and Natural Resource Division
    U.S. Department of Justice
    P.O. Box 7611
    Washington, D.C 20044-7611
    Re: DJ # 90-5-1-1-1130
    eescdcopy.enrd@usdoj.gov

PHMSA:

    Joseph E. Hainline
    Attorney-Advisor
    Office of Chief Counsel
    U.S. Department of Transportation
    Pipeline and Hazardous Materials
    Safety Administration
    1200 New Jersey Ave. SE. E-26
    Washington, D.C. 20590
    joseph.hainline@dot.gov

EPA:

    Andrew Helmlinger
    Supervising Attorney
    U.S. EPA Region IX
    75 Hawthorne Street (ORC-3)
    San Francisco, California 94105
    helmlinger.andrew@epa.gov

DOI:

    Clare Cragan
    U.S. Department of the Interior
    Office of the Solicitor
    755 Parfet St., Suite 151
    Lakewood, Colorado 80215
    clare.cragan@sol.doi.gov

NOAA:

    National Oceanic and Atmospheric
    Administration
    Office of General Counsel
    Natural Resources Section
    ATTN: Christopher J. Plaisted
    501 W. Ocean Blvd, Suite 4470
    Long Beach, California 90802
    christopher.plaisted@noaa.gov

USCG:

    Patricia V. Kingcade
    Attorney Advisor
    National Pollution Funds Center,
    US Coast Guard
    2703 Martin Luther King Jr. Ave SE
    Washington, D.C. 20593-7605
    patricia.v.kingcade@uscg.mil

State Agencies:

    Michael Zarro
    Deputy Attorney General
    Office of the Attorney General
    Natural Resources Law Section
    300 S. Spring St., Suite 11220
    Los Angeles, California 90013
    michael.zarro@doj.ca.gov

CDFW:

    California Department of Fish and Wildlife
    Office of Spill Prevention and Response
    Attn: Eric B. Milstein
    Assistant Chief Counsel
    P.O. Box 944209
    Sacramento, California 94244-2090
    eric.milstein@wildlife.ca.gov

CDPR:

    California Department of Parks and Recreation
    Attn: Laura A. Reimche, Senior Counsel
    1416 Ninth Street, Room 1404-6
    Sacramento, California 95814
    Laura.Reimche@parks.ca.gov

CSLC:

    California State Lands Commission
    Legal Division
    Attn: Warren L. Crunk,
    Assistant Chief Counsel
    100 Howe Avenue, Suite 100-South
    Sacramento, California 95825
    warren.crunk@slc.ca.gov

OSFM:

    California Department of Forestry and Fire Protection
    Legal Services Office
    Attn: Joshua Cleaver, Staff Counsel
    P.O. Box 944246
    Sacramento, California 94244-2460
    joshua.cleaver@fire.ca.gov

RWQCB:

    California Central Coast Regional Water
    Quality Control Board
    Office of Enforcement
    Attn: Naomi Rubin, Attorney III
    801 K Street, Suite 2300
    Sacramento, California 95814
    naomi.rubin@waterboards.ca.gov

UC:

    Barton Lounsbury, Managing Counsel
    University of California
    Office of the General Counsel
    1111 Franklin Street, 8th Floor
    Oakland, California 94607
    barton.lounsbury@ucop.edu

An **ExxonMobil** Subsidiary

## CONSENT DECREE ASSUMPTION AGREEMENT

This CONSENT DECREE ASSUMPTION AGREEMENT (this "*Agreement*"), dated as of February 14, 2024 (the "*Effective Date*"), is made and entered into by and between Mobil Pacific Pipeline Company, a Delaware corporation ("*Seller*"), Pacific Pipeline Company, a Delaware corporation ("*PPC*") and Sable Offshore Corp., a Delaware corporation ("*Buyer*").

## WITNESSETH:

**WHEREAS**, reference is made herein to that certain Consent Decree issued by the United States District Court for the Central District of California in relation to Civil Action No. 2:20-cv-02415 (*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*) (the "*Consent Decree*"), a copy of which was provided to Buyer on January 18, 2024;

**WHEREAS**, pursuant to that certain Purchase and Sale Agreement, dated November 1, 2022, by and between Seller and Buyer (the "*Purchase Agreement*") and those certain instruments of sale, assignment, transfer and conveyance executed in connection with the Purchase Agreement, Buyer has acquired one hundred percent (100%) of the issued equity of PPC from Seller.

**WHEREAS,** PPC is the owner of Line 901 (as defined in Consent Decree) and the segment of Line 903 (as defined in the Consent Decree) from Gaviota pump station to Pentland pump station (collectively, the "*Assets*") pursuant to that certain Purchase and Sale Agreement dated October 10, 2022 between Plains Pipeline, L.P. ("*Plains*") and PPC;

**WHEREAS,** Paragraphs 88-89 of the Consent Decree require that PPC agree to be bound by those provisions of the Consent Decree and Appendices B and D thereof that are specifically applicable to the Assets, unless Seller has already completed the required action or unless the California Department of Forestry and Fire Protection's – Office of the State Fire Marshal (and any of its successor departments or agencies) agrees to relieve Buyer of the obligations of any otherwise applicable provision, which agreement is evidenced by that certain Consent Decree Assumption Agreement dated October 13, 2022 between Plains and PPC (the "*PPC Assumption Agreement*"); and

**WHEREAS**, pursuant to this Agreement, Seller and Buyer intend to evidence Buyer's agreement to cause PPC to be bound by, and to affirm and acknowledge PPC's agreement to those provisions of the Consent Decree and Appendices B and D thereof that are specifically applicable to the acquired Assets as required by Paragraphs 88-89 of the Consent Decree.

**NOW, THEREFORE**, in consideration of the mutual covenants set forth herein and in the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller, PPC and Buyer hereby agree as follows:

1. Pursuant to Paragraphs 88-89 of the Consent Decree, PPC hereby agrees to be bound by those provisions of the Consent Decree and Appendices B and D thereof that are specifically applicable to the Assets.

2.  From time to time, as and when requested by Seller, PPC shall execute and deliver, and Buyer shall cause to be executed and delivered by PPC, such documents and instruments and shall take, or cause to be taken, such further or other actions, as Seller or its successors and permitted assigns may reasonably deem necessary or desirable to comply with the Consent Decree, including Paragraphs 88-89 thereof.

3.  This Agreement may be executed in one or more counterparts (including be means of facsimile or a portable document format (*.pdf)), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

4.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCLUDING ANY CHOICE OF LAW RULES WHICH MAY DIRECT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. EACH OF THE PARTIES HERETO IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT HEREOF SHALL BE BROUGHT AND DETERMINED IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN HOUSTON, HARRIS COUNTY, TEXAS. EACH OF THE PARTIES HERETO HEREBY (I) IRREVOCABLY SUBMITS WITH REGARD TO ANY SUCH ACTION OR PROCEEDING TO THE EXCLUSIVE PERSONAL JURISDICTION OF THE AFORESAID COURTS IN THE EVENT ANY DISPUTE ARISES OUT OF THIS AGREEMENT AND WAIVES THE DEFENSE OF SOVEREIGN IMMUNITY, (II) AGREES THAT IT SHALL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM ANY SUCH COURT OR THAT SUCH ACTION IS BROUGHT IN AN INCONVENIENT FORUM AND (III) AGREES THAT IT SHALL NOT BRING ANY ACTION RELATING TO THIS AGREEMENT IN ANY COURT OTHER THAN THE ABOVE COURTS. THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY A PARTY HERETO AGAINST THE OTHER PARTY IN ANY MATTER WHATSOEVER ARISING OUT OF OR IN RELATION TO OR IN CONNECTION WITH THIS AGREEMENT.

5.  This Agreement shall not be assigned by any party hereto without the written consent of the other party hereto, and nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement.

[*Signature Pages to Follow*]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.


**MOBIL PACIFIC PIPELINE COMPANY**

By: _David H. Welsh_

Name: David H. Welsh

Title: President

*Signature Page to Consent Decree Assumption Agreement*

DocuSign Envelope ID: 9DF541ED-FF14-4502-8FA9-35E2D307312A

**PACIFIC PIPELINE COMPANY**

By: _____

Name: Saul Flota

Title: Vice President

*Signature Page to Consent Decree Assumption Agreement*

**SABLE OFFSHORE CORP.**

By: _____

Name: James C. Flores

Title: Chairman and Chief Executive Officer

*Signature Page to Consent Decree Assumption Agreement*

# Exhibit F

Exhibit F
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026

Case 2:25-cv-05512-SSC Document 35 Filed 07/25/26 Page 130 of 251 Page ID #:6927

**F I L E D**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA
**07/29/2025**
Darrel E. Parker, Executive Officer
BY__Chavez, Terri_____
Deputy Clerk

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br>_____<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br><br>[~~PROPOSED~~] ORDER RE: PRELIMINARY INJUNCTION AND UNDERTAKING<br><br>Hearing: July 18, 2025<br>Time:     10:00 a.m.<br>Dept.:    4<br>Judge:   Hon. Donna D. Geck<br><br>Action Filed: April 15, 2025<br>Trial: None Set |

**TO RESPONDENTS AND REAL PARTIES IN INTEREST IN THE ABOVE-CAPTIONED ACTION:**

The application of Petitioners Center for Biological Diversity and Wishtoyo Foundation ("Petitioners") for a preliminary injunction was heard on July 18, 2025, at 10:00 A.M. in Department 4 of the above-captioned Court. Appearing as attorneys were Talia Nimmer for Petitioners; Michael Dorsi for Respondents California Department of Fire and Forestry and State Fire Marshal Daniel Berlant (collectively, "Respondents"); and Jeffrey Dintzer, Garret Stanton, and Trevor Large for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable").

At the hearing, the Court adopted its tentative ruling to grant, in part, Petitioners' application. The order of the Court is set forth in its tentative — and now final — ruling, attached hereto as **Exhibit A.**

**IT IS SO ORDERED.**

DATED: _____, 2025

07/29/2025

JUDGE OF THE SUPERIOR COURT
**Donna D. Geck**

Given the specific findings required by section 51011, subdivision (b), it appears that the statutorily-required discussion of subdivision (c) must in some appropriate way at least connect the factors stated (and their significance) to the findings that the risk to public safety is slight and the probability of injury or damage remote. The court finds that petitioners have established a reasonable probability of success on the merits on this claim.

(B)     Greater Harms

Petitioners argue that they, and the portion of the public they represent, would suffer the greater harm by the erroneous denial of a preliminary injunction. In particular, petitioners argue that the potential harm to natural resources and the failure to consider impacts of the project or to allow public input outweigh any delay for Sable. Sable argues that such harm is purely speculative and that it, and the general public, would suffer economic harms delaying or preventing the domestic oil production from Sable's use of the pipelines by the erroneous issuance of a preliminary injunction. The OSFM argues that erroneous issuance of an injunction against public officers in performing their duties is a form of irreparable injury.

As discussed below, because the petitions focus on deficiencies in the State Waivers as issued by OSFM and because additional approvals are required before the pipelines subject to the State Waivers may be restarted, the court finds that no party has made a strong showing that it would suffer greater harm by the erroneous grant or denial of the preliminary injunction.

(C)     Balance of Equities

In arguing that CEQA is inapplicable, Sable and OSFM make the point that the State Waivers constitute but one approval of several necessary to restart the Las Flores Pipelines. This argument is carried forward into their analysis of the relative harms: "Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition, at p. 19.)

The principal harms argued both by petitioners and by Sable are based upon what would or would not happen when the Las Flores Pipelines are restarted. The evidence presented by all parties, however, shows that the restart of the Las Flores Pipelines is dependent upon approvals that have not yet been given. The respective potential harms are thus premature in this analysis. As the OSFM argues, there are potential harms in premature and potentially unnecessary judicial interference with the activities of regulators.

As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits.

(D)    Bond

"On granting an injunction, the court or judge must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding an amount to be specified, the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction." (Code Civ. Proc., § 529, subd. (a).)

In view of the nature of the injunction issued, the potential damages caused by a wrongful injunction are minimal. The court fixes the amount of the undertaking required by section 529 at $1,000.00, to be filed by CBD and EDU, respectively in each case, on or before July 25, 2025.

(2)    Motions re Richard B. Kuprewicz

In addition to the applications for issuance of preliminary injunctions, the parties have filed motions related to petitioners' expert witness Richard B. Kuprewicz: (1) motion of Sable (case No. 25CV02244) to compel the deposition of Kuprewicz; (2) the motion of Sable (case No. 25CV02244) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions; (3) motion of Sable (case No. 25CV02247) to compel the deposition of Kuprewicz; and (4) the motion of Sable (case No. 25CV02247) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions. There are also motions now set for hearing in October in each case to quash Sable's deposition subpoena and notice of deposition, and to stay the deposition of Kuprewicz.

As discussed briefly above, the court has considered, but does not rely upon, the substance of the declaration of Kuprewicz to reach its conclusions in this ruling. The motions to strike the declaration will be denied. The motions to compel the deposition of Kuprewicz are denied as moot. To the extent these ruling moot the pending motions to quash, the court expects the parties to advise the court of that fact.

Based upon the court's ruling on the merits of the applications for preliminary injunction, it is not necessary at this time to determine what role, if any, the testimony of Kuprewicz may have in further proceedings. The court expects that petitioners will fully consider the issues raised by Sable in these motions in any further filings with the court.

## JUDGES

### JUDGE DONNA GECK

Dept. 4 SB-Anacapa

1100 Anacapa Street P.O. Box 21107

Santa Barbara, CA 93121-1107

US

# Exhibit G

Exhibit G
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
9/17/2025 10:13 PM
By: Narzralli Baksh , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:     (213) 576-1000
Facsimile:     (213) 576-1100

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:     (310) 620-5879
Facsimile:     (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

*Additional Counsel Listed on Signature Page*

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants,<br><br>SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No. 25CV02244<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**REAL PARTIES' ANSWER AND AFFIRMATIVE DEFENSES TO PETITIONERS' VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Complaint Filed:     April 15, 2025<br>Trial Date:          None set |

1

REAL PARTIES' ANSWER AND AFFIRMATIVE DEFENSES

**TWENTIETH AFFIRMATIVE DEFENSE**

**(Preemption)**

20.    Petitioners claims are preempted by federal law.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

**(No Private Right of Action)**

21.    Petitioners are barred from maintaining this action, either in whole or in part, because Petitioners' statutory claims provide no private right of action.

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

**(Improper Control of a Public Agency)**

22.    Petitioners improperly seek to control the exercise of discretion of a public agency and to compel the exercise of discretion on a particular manner.

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

**(Contrary to Public Policy)**

23.    The relief that Petitioners seek, if granted, would compel Cal Fire and Sable to act in a manner contrary to public policy.

**TWENTY-FOURTH AFFIRMATIVE DEFENSE**

**(No Public Benefit)**

24.    The relief that Petitioners seek, if granted, would not confer a public benefit.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

26

REAL PARTIES' ANSWER AND AFFIRMATIVE DEFENSES

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (Future Defenses)

25.     Sable reserves the right to amend this Answer and its defenses, to assert additional affirmative defenses, and to supplement, alter, or change this Answer upon revelation of more definite facts by Petitioners or other parties, and upon the undertaking of an investigation of this matter.

Dated:  September 17, 2025                    Respectfully submitted,

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE

**FAUVER, LARGE, ARCHBALD & SPRAY LLP**

TREVOR D. LARGE

_____
                    Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP.**
**PACIFIC PIPELINE COMPANY**

27

REAL PARTIES' ANSWER AND AFFIRMATIVE DEFENSES

**VERIFICATION**

I, Steven P. Rusch, am Vice President of Regulatory and Environmental Affairs of Sable Offshore Corp., and I am an Authorized Representative of Pacific Pipeline Company. I am authorized to execute this verification on behalf of them. I have read the attached Verified Answer to the Petitioners' Verified Petition and Complaint for Declaratory Relief and Injunctive Relief and am familiar with its contents. The facts provided in the petition and complaint are true of my personal knowledge, except for those alleged on information and belief, and I believe those to be true.

DATED:  September 17, 2025

_____
Steven P. Rusch

---

28

REAL PARTIES' ANSWER AND AFFIRMATIVE DEFENSES

# Exhibit H

Exhibit H
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026



U.S. Department
Of Transportation

1200 New Jersey Ave., SE
Washington, DC 20590

**Pipeline and
Hazardous Materials
Safety Administration**

May 18, 2016

Mr. Bob Gorham
Program Manager/Supervising Pipeline Safety Engineer
Pipeline Safety Division
California State Fire Marshal
3500 Paramount Boulevard, Suite 210
Lakewood, CA 90712

Dear Mr. Gorham:

This letter serves to memorialize the understanding between the Pipeline and Hazardous Materials Safety Administration (PHMSA) and the California State Fire Marshal (CASFM) with respect to the transfer or regulatory oversight over Plains Pipeline, LP's (Plains) Lines 901 and 903 located in Santa Barbara County, California.

On May 19, 2015, Plains' Line 901 pipeline ruptured, releasing approximately 2,934 barrels of heavy crude oil into the environment (Failure). As a result, Line 901 and Line 903, which carries all of Line 901's crude oil throughput, were shut down.[1] Two days later, on May 21, 2015, PHMSA issued a Corrective Action Order (CAO) shutting down Line 901 and requiring immediate remedial actions. PHMSA has since amended the CAO twice,[2] requiring, among other actions, a shutdown of Line 903 between Gaviota and Pentland Station. Both lines remain shut down as of the date of this letter. PHMSA is currently conducting an investigation into the cause of the Failure.

Prior to the accident, Plains operated Lines 901 and 903 as interstate pipelines under Federal Energy Regulatory Commission (FERC) tariffs and were subject to PHMSA's regulatory, inspection and enforcement jurisdiction. After the Failure, Plains cancelled its FERC tariffs on Line 901 and Line 903. Specifically, it cancelled its FERC tariff on Line 901 on February 12, 2016, and Line 903 on April 29, 2016 (collectively, Transfer Dates). Effective as of the Transfer Dates, Lines 901 and 903 are now considered intrastate hazardous liquid pipelines subject to the regulatory and enforcement jurisdiction of CASFM, pursuant to state certification from PHMSA.

---

[1] Lines 901 and 903 provide transportation service from Santa Barbara County to Pentland Station, Kern County.

[2] The first amendment was issued on June 3, 2015, and the second was issued on November 12, 2015.

2 | P a g e
**Mr. Bob Gorham**
**California State Fire Marshal**

The post-accident transfer of regulatory authority from PHMSA to CASFM does not affect or otherwise impact PHMSA's ongoing investigation(s) of, and any enforcement action(s) related to, the Failure or to any other events involving the operation of Lines 901 and 903 occurring prior to the Transfer Dates. As a result, PHMSA will continue to assert its enforcement authority with respect to all actions and incidents occurring on Lines 901 and 903 prior to the Transfer Dates. CASFM, meanwhile, will exercise jurisdiction over any actions or events related to Lines 901 and 903 occurring after the Transfer Dates. CASFM will continue to implement and enforce the federal minimum pipeline safety regulations relating to Lines 901 and 903 beginning as of the Transfer Dates, and may adopt and enforce additional or more stringent standards for intrastate hazardous liquid pipelines under 49 U.S.C. § 60104(c). PHMSA and CASFM will cooperate and collaborate with each other, as necessary, on PHMSA's investigatory and enforcement activities relating to the Failure and on any other matters relating to Lines 901 and 903.

More specifically, PHMSA will be responsible for:

- Completing and finalizing the root-cause investigation of the Failure ;
- Issuing and finalizing any enforcement actions arising out of the investigation and any other events occurring prior to the Transfer Dates, including, but not limited to, the following types of actions: Notice of Probable Violation, Proposed Civil Penalty, Proposed Compliance Order, and/or Corrective Action Order (CAO), etc.;
- Completing the CAO issued to Plains on May 21, 2015, and any amendments thereto, and issuing any future CAOs related to the Failure;
- Collaborating with CASFM on any additional or modified safety requirements that may be needed in connection with any CAO that has been or may be imposed by PHMSA relating to Lines 901 and 903, including any potential re-start of the pipelines; and
- Transitioning full regulatory authority from PHMSA to CASFM once all PHMSA investigations and enforcement actions have been completed and closed.

CASFM will be responsible for:

- Including Lines 901 and 903 in CASFM's Annual Inspection Program (SB 295);
- Including Lines 901 and 903 in CASFM's Leak Detection Program (AB 864);
- Including Line 901 in the CASFM Higher Risk pipeline program, due to the release and absence of effective Cathodic Protection. This will require the pipeline to be tested annually for 5 years; and
- Exercising authority over Lines 901 and 903 under existing and future regulations established by CASFM.

If either pipeline is replaced rather than repaired, such work will be considered new construction, and the design, construction, operation, and maintenance would fall under the regulatory authority of the CASFM.

3 | P a g e
**Mr. Bob Gorham**
**California State Fire Marshal**

This Letter Agreement is subject to change based on any future events or newly-discovered facts that may impact any terms set forth herein. Please sign below and email me a PDF of the signed letter to zach.barrett@dot.gov. Thank you for your assistance and cooperation in this matter.

Sincerely,

Zach Barrett
Director for State Programs
Office of Pipeline Safety

ACKNOWLEDGED:

Bob Gorham
Program Manager/Supervising Pipeline Safety Engineer
Pipeline Safety Division
California State Fire Marshal

# Exhibit I

Exhibit I
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                                      Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



### CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**    **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324)**

Operator:    Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

Pipeline:    OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s.  At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

## 180-Day Repair Conditions[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

# Exhibit J

Exhibit J
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



## CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR
LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON
THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG
A LONGITUDINAL SEAM WELD (CA-325A/B)**

**Operator:**   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**Pipeline:**   OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of
Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa
Barbara County, San Luis Obispo County, and Kern County, California as
described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under
insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 4

8.  Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
    a.  API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
    b.  API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.
    At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 9

**180-Day Repair Conditions**[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**Corrosion Growth Rate Analysis (CGRA)**

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

# Exhibit K

Exhibit K
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



October 22, 2025

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:    STATE WAIVER REQUIREMENTS PRIOR TO RESTART OF LINES CA-324 AND CA-325A/B**

Dear Mr. Yearwood,

On December 17, 2024, the CAL FIRE - Office of the State Fire Marshal (OSFM) issued State Waivers for the above captioned pipelines. The Pipeline and Hazardous Materials Safety Administration (PHMSA) issued the concurrence with the terms of the State Waivers on February 11, 2025. Those State Waivers were issued in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

Sable sought the State Waivers to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection (CP) due to the shielding effects of the polyurethane foam and the polyethylene tape wrap surrounding the pipelines. It is critical to stress that a State Waiver prescribes alternative measures that provide an equal or greater level of safety than the required regulation. The OSFM granted the State Waivers on the condition that Sable complies with the specific requirements contained therein.

On September 11, 2025, Sable submitted a restart plan to OSFM for review and approval. OSFM's review of the restart plan is ongoing. During this process, OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart. Pursuant to item 9 in the State Waivers, Sable must repair all immediate and 180-day repair conditions prior to restart. Those conditions are further clarified in the sections titled "Immediate Repair Conditions" and "180-Day Repair Conditions." Most pertinent here is the 180-day repair condition language (see Condition 35 in the CA-324 State Waiver and Condition 36 in the CA-325A/B State Waiver) that includes "anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth." Footnotes 7 and 9 further

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Lance Yearwood
October 22, 2025
Page 2


clarify that remediation means "a permanent repair method." The State Waivers require all such anomalies to be remediated, including tool tolerance. According to OSFM records, Sable has not satisfied this condition in the State Waivers.

The above findings alone and the inconsistencies with the State Waiver requirements prevent restart under the law. The OSFM continues to review the restart plan submitted by Sable in September, and while OSFM is providing this initial notification of deficiency to Sable regarding the State Waiver requirements, OSFM may have further comment or requirements arising out of that review.



Sincerely,


DANIEL BERLANT
State Fire Marshal

cc:    James Hosler, OSFM, Assistant Deputy Director
       Alin Podoreanu, OSFM, Supervising Pipeline Safety Engineer
       Joshua Cleaver, CAL FIRE, Staff Counsel

# Exhibit L

Exhibit L
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026



October 23, 2025

Mr. Daniel Berlant
Office of the State Fire Marshal
California Department of Forestry and Fire Protection
PO Box 944246
Sacramento, CA 94244-2460

**RE:    Response to October 22, 2025 OSFM Letter re CA-324 and CA-325A/B**

Dear Mr. Berlant,

Sable Offshore Corp. (Sable) provides this response to the California Office of the State Fire Marshal's (OSFM's) letter dated October 22, 2025.  OSFM asserts that Sable has not satisfied Condition 9 of the February 11, 2025 State Waivers.

OSFM conclusions are in error, ignore the remainder of the Waivers and are inconsistent with numerous discussions between OSFM and Sable.

Condition 9 provides:

All immediate and 180-day repair conditions that are <u>listed in this state waiver</u> must be evaluated and remediated prior to restarting CA-325A/B. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions (emphasis added).[1]

Despite the imprecise language used in the first sentence of Condition 9, it is readily apparent when considering the full text of Condition 9 and the rest of the State Waivers that immediate and 180-day repair conditions that are "listed in this state waiver" are only those which were identified through the UTWM and USCD ILI runs prescribed in Condition 9.  As expressly stated in Condition 9, these ILI runs only will (or could) occur

---

[1] See also Condition 9 of the State Waiver for CA-324.

after restart, which is a necessary precursor to achieving the requirement of "within 7 days of achieving initial steady state operation." Further, under the last sentence of Condition 9, Sable is required to use only the "most recent" ILI runs as prescribed in Condition 9 (specifically not older runs) when identifying the "repair conditions" referenced in the first sentence. By definition, conditions from pre-waiver ILI runs cannot constitute repair conditions "listed in this state waiver".

Pre-waiver anomalies and the ILIs used to detect them are separately and independently subject to the Consent Decree's Integrity Management Requirements at Appendix B, Article I, Section 4.A.1.a, which requires remediation of "all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, within one year of discovery." Tool tolerance is not a part of these requirements. As it was required to do by law, Sable complied in good faith with the repair criteria in the Consent Decree when actioning the results of ILI runs performed before the State Waivers were issued.

Further, the State Waivers consistently use the present or future tense in each of the assessment and repair-related conditions. For example, in Condition 19, the State Waivers require Sable to provide a 90-day advance notification to OSFM detailing several specifications of an ILI it intends to perform pursuant to Conditions 21 – 23, and which (per Condition 30) are to be used to "discover" repair conditions listed in Conditions 31-37 of the State Waivers. In Condition 26, the State Waivers provide that "Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater … prior to adding in any correction for tool tolerance." And in Condition 27, the State Waivers provide that "Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable."

There is nothing in the text of any of these conditions that suggests that the requirements *retroactively* apply to ILIs performed *prior* to the issuance of the State Waivers. Rather, they indicate that the requirements to account for tool tolerance in discovering an immediate or 180-day repair condition listed in the State Waivers are *prospective* in nature, attaching only to ILIs conducted and repair conditions discovered after the Waivers were issued and pursuant to the protocols and inspection timelines proscribed in the Waivers – which apply ***after restart***.

Additionally, Footnote 10 of the State Waivers states as follows: "For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, **temporarily reduce the operating pressure**, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or **until otherwise authorized by OSFM.**" This footnote is consistent with the understanding articulated above that the State

Wavier conditions are *prospective* and apply after restart has occurred.  Specifically, unless the restart has occurred, it would be impossible for Sable to "temporarily reduce the operating pressure" as required by Footnote 10.

In addition to this background on the content of the State Waivers and the Consent Decree, I have been personally involved in numerous discussions with OSFM personnel concerning restart and the application of Condition 9.  In those discussions, OSFM personnel have consistently and repeatedly confirmed to Sable that the requirements of Condition 9 apply prospectively after restart has commenced – and that the State Waiver requirements are distinct from the requirements in the Consent Decree applicable to the anomaly repair program Sable already has conducted.

More specifically, in July 2024, OSFM's Tuan Tran confirmed to Sable that it should continue its ongoing anomaly repair program (which began in May 2024—long before the State Waivers were issued by OSFM or became effective) consistent with federal law, applicable regulations, and the Consent Decree.  As part of that discussion, OSFM further confirmed that Sable's ongoing anomaly repair program would not be affected by any conditions adopted as part of the State Waivers, and that Sable would not be required to perform additional maintenance activities on already-completed anomaly repairs to comply with any alternate standards imposed by the State Waivers.  In discussions with OSFM's Tuan Tran and Alin Podreanu on August 5, 2024, Sable confirmed the scope of its ongoing repair program and intention to continue repairing identified anomalies with 40% metal loss or greater, consistent with the Consent Decree.  The OSFM representatives did not indicate that the Consent Decree's 40% metal loss threshold should include an allowance for tool tolerance.

After the State Waivers were issued, Sable repeatedly confirmed to OSFM that it had repaired anomalies with 40% or greater metal loss, and OSFM never required tool tolerance be considered.  For example, in a presentation shared with OSFM in advance of hydrotesting Line CA-325 in March 2025, Sable confirmed that "[a]ll metal loss anomalies [on Lines CA-324 and CA-324] that have an ILI reported depth of 40% and greater wall loss" were repaired.  As part of the same discussions, during a meeting with OSFM on March 12, 2025, OSFM asked Sable about the tool sizing tolerances used during the inspections that took place in 2023, which generated the metal loss rates used to determine which anomalies were repaired by Sable.  OSFM also identified several "State Waiver Remediation Conditions" that were intended to be "[r]equirements prior to hydrotest … and restart."  OSFM specifically asked whether Sable's anomaly repair threshold accommodated for tool sizing tolerance, consistent with Footnote 10.  Sable explained its understanding (based on the 2024 discussions with OSFM described above) that OSFM intended the State Waiver Conditions to apply on a prospective basis after restart, such that Sable would not be required to modify its repair methodology or perform any additional repairs to account for tool tolerance prior to restart.  OSFM concurred with Sable's understanding and approved proceeding with the hydrotests.

On May 19, 2025, Sable once again reconfirmed to OSFM that it had repaired all anomalies of 40% or greater metal loss as of May 18, 2025. As part of those discussions, OSFM did not assert that a tool sizing tolerance should have been considered. And, during Sable's recent August 12-14, 2025, Operations and Maintenance inspection with OSFM, which were attended by Assistant Deputy Director Hosler and at least five additional OSFM engineers, Sable again confirmed with OSFM that the State Waivers' tool tolerance condition was intended to apply prospectively—after restart occurs—given the successful spike and 8-hour hydrotests on the Pipelines. At this meeting, OSFM again agreed with Sable's understanding, and there was consensus among Sable and OSFM that the successful spike and 8-hour hydrotest was more than sufficient to confirm the integrity of the line and account for any possible tool tolerance from the 2022-23 ILI runs.

Based on this history, and the consistent interpretation of the State Waiver Conditions by OSFM experts and personnel, we believe that OSFM's letter contains a misunderstanding of the Conditions and how OSFM has consistently interpreted and applied them.

**Conclusion**

CA-324 and CA-325 A/B have received an extraordinary level of assessment, testing and repair – far beyond what industry standards require. That heightened assessment repair will continue after restart, with ILI runs and even more conservative repair criteria. To the extent that anomalies remain, Sable will address them pursuant to the terms of the State Waivers. Sable understands and respects OSFM's focus on pipeline safety, and that safety is of Sable's utmost concern. The correct interpretation of the State Waivers – with prospective application of anomaly repair requirements - ensures pipeline safety and that all conditions are remediated within 180 days of resuming oil transportation.

We respectfully request that, given this background, you coordinate further with the expert team at OSFM and revisit the statements in your October 22nd letter. We would be happy to discuss these issues with you further and look forward to the successful and prompt restart of CA-324 and CA-325 A/B.

Sincerely,

B. Lance Yearwood
Vice President, Pacific Pipeline Company
Sable Offshore Corp.

cc:    James Hosler, OSFM, Assistant Deputy Director
        Alin Podoreanu, OSFM, Supervising Pipeline Safety Engineer
        Joshua Cleaver, CAL FIRE, Staff Counsel

845 Texas Avenue, Suite 2920, Houston, TX 77002

# Exhibit M

Exhibit M
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026



November 26, 2025

Linda Daugherty
Acting Associate Administrator for Pipeline Safety
Pipeline and Hazardous Materials Administration (PHMSA)
United States Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590

*Via E-Mail and U.S. Mail*

Dear Ms. Daugherty,

Sable Offshore Corp. (Sable) is writing to notify the Pipeline and Hazardous Materials Safety Administration (PHMSA) of its determination that a pipeline facility that it operates on the Outer Continental Shelf (OCS) and in southern California constitutes an interstate pipeline facility under the Pipeline Safety Act (PSA).  Consequently, Sable believes that PHMSA is the agency responsible for pipeline safety regulatory oversight on the portions of the pipeline facility that are subject to 49 C.F.R. Parts 194, 195 and 199.  Sable requests from PHMSA concurrence with Sable's determination, as well as guidance on the orderly transition of regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

Sable shares PHMSA's commitment to pipeline safety and looks forward to working with the agency.  Sable also notes that this transition only affects the interstate status of the subject pipelines, and will not otherwise change the regulatory classification of the pipelines.  All portions of the pipelines that are currently subject to the pipeline safety regulations at 49 C.F.R. Parts 194, 195, and 199 will remain subject to those programs going forward.

**Background**

In 2024, Sable acquired certain assets, including, among other things, three offshore oil production platforms on the OCS off the coast of Santa Barbara, CA (Hondo, Heritage, and Harmony platforms), offshore subsea pipelines transporting oil from these platforms to onshore pipelines that, in turn, transport oil to the Las Flores Canyon facility to process crude oil for subsequent transportation, and onshore pipelines to transport oil from Las Flores Canyon to the Pentland Station terminal in Kern County, CA (Las Flores Pipeline).  Sable operates all of these assets as part of a single system that moves crude oil from the OCS into California.  Attachment A to this letter contains a map of these assets.

*Sable Offshore Corp.*
*Determination of Interstate Classification*
*November 26, 2025*

Prior to October 2022, Plains All American (Plains) owned and operated the Las Flores Pipeline (then-called Lines 901 and 903), and ExxonMobil owned the offshore platforms, subsea lines, and the Las Flores Canyon processing facility. Before 2016, Plains filed Interstate Commerce Act (ICA) tariffs with the Federal Energy Regulatory Commission (FERC) for Lines 901 and 903, and these pipelines were considered interstate pipelines subject to PHMSA's regulatory oversight. On February 12 and April 29, 2016, respectively, Plains cancelled these tariffs following the May 2015 release. On May 18, 2016, PHMSA sent a letter to OSFM indicating that, as a result of the cancelled tariffs, these pipelines were considered intrastate pipelines, subject to the regulatory jurisdiction of OSFM, pursuant to its state certification from PHMSA under 49 U.S.C. § 60105(a). The May 2016 letter indicated that the determination of intrastate status is "subject to change based on future events or newly-discovered facts."

**Interstate Classification**

Since PHMSA's May 2016 letter, there have been intervening events affecting the pipelines, which merit reassessment of the interstate versus intrastate status of these assets. As noted, Sable operates each of the offshore and onshore assets described above, which is distinct from the arrangement considered by PHMSA in 2016 where different, unrelated entities operated portions of the facility. Sable has determined that this pipeline facility is properly considered as an interstate hazardous liquid pipeline facility PSA, and therefore subject to PHMSA's exclusive regulatory authority under 49 U.S.C. § 60104(c).

This conclusion is based on applicable language from the PSA and PHMSA's hazardous liquid pipeline safety regulations at 49 C.F.R. Part 195. Under 49 U.S.C. § 60101(a)(5), a "hazardous liquid pipeline facility" is broadly defined as inclusive of "a pipeline, a right of way, a facility, a building, or equipment intended to be used in transporting hazardous liquid." The term "transporting hazardous liquid" is, in turn, defined at § 60101(a)(22) as "the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, in or affecting interstate or foreign commerce", but excludes, in relevant part, "onshore production, refining, or manufacturing facilities". Furthermore, the term "interstate or foreign commerce" is defined at § 60101(a)(8)(B) to mean, in the context of hazardous liquid, commerce between "a place in a State and a place outside that State."

Although PHMSA has generally considered the presence of a filed tariff to be an indicator of whether a line is interstate, PHMSA has recognized in Appendix A to its Part 195 regulations that there are certain situations in which a pipeline facility is interstate "despite the lack of a filing with FERC," providing specific examples of such circumstances. In one example, PHMSA stated that hazardous liquid pipelines that "originate[] on the Outer Continental Shelf" may be considered interstate pipeline facilities, regardless of whether the operator filed tariffs with FERC for them. See Part 195, Appendix A, Example 7.

As noted above, the assets that Sable operates include offshore lines connecting offshore production platforms to an onshore processing facility, as well as the Las Flores Pipeline. Collectively, these pipelines constitute a "pipeline facility" through which hazardous liquid

2

*Sable Offshore Corp.*
*Determination of Interstate Classification*
*November 26, 2025*

moves in transportation from its point of production on the OCS to the onshore Pentland Station terminal in California, and are not otherwise excluded in the PSA's definition of "transporting hazardous liquid." As this pipeline facility originates on the OCS (which is located outside of California), and then travels within California, it constitutes commerce between a place in California and a place outside California and is thus properly considered as "interstate" pursuant to the PSA and Part 195, Appendix A.

**Transition of Regulatory Authority**

Sable seeks to coordinate with PHMSA to obtain concurrence with this determination and rescind the May 18, 2016 letter to OSFM, and to establish an orderly process to transition regulatory oversight over the pipeline facility from OSFM to PHMSA. This includes, among other things, a framework for review of Sable's procedures, transitioning OSFM's December 17, 2024 State Waivers to federally administered special permits, review and approval of a Restart Plan submitted consistent with the 2020 Consent Decree in *U.S. et al v. Plains All American Pipeline, LP and Plains Pipeline, LP*, No. 20-cv-2415 (C.D. Cal.), as well as, more generally, Sable's performance of restart actions consistent with the applicable provisions of this Consent Decree. Sable will provide all reasonable assistance to PHMSA in coordinating with OSFM to facilitate this transition. Transition of regulatory oversight to PHMSA does not affect Sable's adherence to Part 195 or its performance of action items indicated in the Consent Decree. Moreover, applicable injunctive measures specified in the Consent Decree, as well as the applicable requirements of the State Waivers, will be incorporated on a prospective basis into Sable's procedures, which are enforceable under Part 195.

Sable appreciates the positive working relationship it has developed with OSFM staff and looks forward to developing a similarly productive relationship with PHMSA going forward.

Sincerely,

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.

Cc:     Ben Fred (PHMSA)

3

*Sable Offshore Corp.*
*Determination of Interstate Classification*
*November 26, 2025*

ATTACHMENT A – Map of Assets Acquired by Sable



4

# Exhibit N

Exhibit N
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026

**FILED**
CLERK, U.S. DISTRICT COURT

10/14/2020

**CENTRAL DISTRICT OF CALIFORNIA**
BY: _____**WH**_____ DEPUTY

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br> Plaintiffs, <br><br> v. <br><br> PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P., <br><br> Defendants. | Civil Action No. <br><br> 2:20-cv-02415-PSG-JEM <br><br> ~~[PROPOSED]~~ **ORDER TO ENTER CONSENT DECREE** <br><br> ~~**Date:** October 26, 2020~~ <br> ~~**Time:** 1:30 p.m.~~ <br> ~~**Location:** Telephonic~~ <br> **Judge:** Hon. Philip S. Gutierrez |

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
~~[Proposed]~~ Order to Enter Consent Decree

# [~~PROPOSED~~] ORDER

For the reasons set forth in the United States' Motion to Enter Consent Decree and Memorandum of Law in Support thereof that was filed on August 19, 2020 and for good cause shown, the Consent Decree that was lodged on March 13, 2020 (Docket No. 6-1), is hereby ENTERED and shall constitute final judgment of the Court in this matter.

IT IS SO ORDERED.

DATED: 10/14/2020 _____        _____

THE HONORABLE PHILIP S. GUTIERREZ
UNITED STATES DISTRICT JUDGE

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
[~~Proposed~~] Order to Enter Consent Decree
-1-

# Exhibit O

Exhibit O
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026



# PERMIT TO OPERATE 5651-R7
## AND
# PART 70 OPERATING PERMIT 5651

## EXXONMOBIL – SYU PROJECT
## LAS FLORES CANYON OIL & GAS PLANT

### 12000 CALLE REAL, GOLETA
### SANTA BARBARA COUNTY, CA

**OPERATOR**

**EXXONMOBIL PRODUCTION COMPANY (EXXONMOBIL)**

**OWNERSHIP**

**EXXONMOBIL PRODUCTION COMPANY (EXXONMOBIL)**

**SANTA BARBARA COUNTY**
**AIR POLLUTION CONTROL DISTRICT**

**FEBRUARY 2023**

## 2.0    Description of Project and Process Description

### 2.1.    Project and Process Description

2.1.1    Project Ownership:  ExxonMobil is the major owner and operator of the SYU offshore and onshore facilities.

2.1.2    Geographic Location:  The onshore facilities are located in Las Flores Canyon approximately 20 miles west of Santa Barbara, California in the southwestern part of Santa Barbara County. The ExxonMobil property consists of a pie-shaped piece of property, approximately 1500 acres, starting on the north side of Highway 101 and continuing to the north.  Of this area, approximately 110 acres have been cleared with 34 acres containing facilities and the remainder left as open space.  A paved road about 1.5 miles long from Calle Real, the frontage road off Highway 101, provides access to the facility.

Within the ExxonMobil property, approximately 17 acres is leased to Pacific Offshore Pipeline Company (POPCO) to operate a natural gas treating facility.  In addition, small areas are provided for installation of utility connections by Southern California Gas Company (SCG) and Southern California Edison Company (SCE) as well as a pump station by the All American Pipeline Company for crude transportation.

The ExxonMobil property is located within the western part of the Transverse Ranges physiographic province of Southern California.  This region is characterized by predominately east-west oriented topographic and structural elements.  The canyons area is predominately rural in character, with some agricultural and industrial uses present.

2.1.3    Facility Description:  The SYU Project develops production from three platforms (Platforms Hondo, Harmony and Heritage) located offshore California in the Santa Barbara Channel.  The production is transported to shore through a subsea pipeline and treated in production facilities located in Las Flores Canyon.  Overall recovery from the development totals approximately 500 million barrels of crude oil and almost one trillion cubic feet of natural gas.

The onshore facility is subdivided into the following plants:

- Oil Treating Plant (OTP)

- Stripping Gas Treating Plant (SGTP)

- Transportation Terminal (TT)

- Cogeneration Power Plant (CPP)

The onshore facilities receive the produced crude/water/gas emulsion from the offshore platforms via the 20-inch emulsion pipeline and produced gas from the platforms via the POPCO transportation system.  The onshore facilities produce oil, propane, butane, and sulfur products for sale and fuel quality gas for process needs and power generation of process heat and electricity.  The recovered produced water is treated to acceptable standards and returned to Harmony for release to the ocean.

An overview of the SYU offshore/onshore facilities is shown in Figures 2.1, 2.2, 2.3 and 2.4 and Table 2.1.  The data shown in the figures and table are not enforceable.  See Section 9 of this permit for what is enforceable.  Rates provided for key streams represent design base case conditions.

2.1.3.1    Oil Treating Plant (OTP):  The Oil Treating Plant, located at the north end of LFC, receives oil and water in the form of an emulsion from the offshore platforms.  The OTP dehydrates, stabilizes, and sweetens the crude oil to meet product specifications.  The separated, produced water is filtered, degassed and biologically treated with both anaerobic and aerobic bacteria to reduce dissolved oil and grease so that it is suitable for ocean disposal.

Two oil treating trains, each with a daily capacity of 50 KBPD of treated oil, are currently installed. This permit allows a third oil treating train to be constructed in the future.  The utility support systems and plant layout are designed to support 125 KBPD of emulsion on an annual average basis or 140 KBPD of emulsion on a stream day basis.  The existing two water treating trains have a total capacity of 60 KBPD of water.  If the additional water treating train is installed, it will increase the capacity of the plant to 90 KBPD of water.

2.1.3.2    Transportation Terminal (TT):  The Transportation Terminal, located southeast of the OTP, consists of two 270 KB storage tanks, 3 pipeline booster pumps and support facilities necessary to store oil received from the OTP and ship through the All American Pipeline system.  The booster pumps are designed to ship crude at various rates up to 300 KBPD.

Also located in the Transportation Terminal are the water outfall pipeline pig launcher and emulsion pipeline pig receiver.

2.1.3.3    Stripping Gas Treating Plant (SGTP):  The Stripping Gas Treating Plant, located on the west side of the OTP just north of the POPCO plant, processes up to 21 MSCFD of gas from the OTP, and Hondo, Heritage and/or Harmony Platforms, to produce a sweet fuel gas for use in the onshore facilities, Natural gas liquids (NGLs) and sulfur are also produced.

The recovered NGL products are sweetened and fractionated to produce up to 2900 BPD of a sales quality propane and 2600 BPD of a mixed butane product.  Acid gases from the fuel gas amine system, NGL sweetening system and OTP water treating system are treated in a sulfur recovery unit (combination Claus and tail gas units) to produce up to 20 LT/D specification sulfur product.  A small quantity of acid gas remaining after cleanup in the tail gas unit is incinerated.

2.1.3.4    Cogeneration Power Plant (CPP):  The 49.15 MW Cogeneration Power Plant, located on the east side of the OTP, consists of a natural gas fueled GE Frame 6 Gas Turbine Generator with a rated output of 39.35 MW and a non-condensing steam turbine rated at 9.8 MW.  The CPP generates electric power to supply both the onshore facilities and the offshore platforms.

Heat from the gas turbine exhaust is recovered in a waste Heat Recovery Steam Generator (HRSG) to generate steam to supply the LFC process heat requirements.  This system is also supplementary fired with fuel gas to provide heat to maintain operations when the turbine is down.

The SYU power plant operates in parallel with the SCE utility system.  SCE provides emergency backup and supplemental power during peak demand periods.  This tie-in also provides the flexibility to sell power to SCE when the plant generating capacity exceeds the SYU power demand.

2.1.4     <u>Process Description</u>:  The onshore processing systems, which are described below, have been divided into the following areas:

- Oil Treating Plant (OTP)
- Produced Water Treating System (WTS)
- Transportation Terminal (TT)
- Stripping Gas Treating Plant (SGTP)
- Cogeneration Power Plant (CPP)

2.1.4.1     <u>Oil Treating Plant</u>:  The OTP oil facilities have been divided into the following process systems:

- Emulsion Metering and Rerun System
- Crude Heat Exchange and Dehydration
- Crude and Condensate Stabilization, Gas Compression
- Thermal Oxidizer

Figure 2.2 shows a simplified block flow diagram of the Oil Treating Plant.

2.1.4.1.1     <u>Emulsion Metering and Rerun System</u>:  The Emulsion Metering and Rerun System measures the volume of inlet emulsion received from the offshore emulsion pipeline system and distributes the emulsion to the two parallel oil treating trains.  The metered emulsion is combined with any recycle from the crude rerun tanks and sent to the crude heat exchangers.  Two 30 KBPD rerun tanks are available to temporarily store or rerun any excess production or off spec product.

2.1.4.1.2     <u>Crude Heat Exchange and Dehydration</u>:  The Crude Heat Exchange and Dehydration System heats the emulsion to approximately 220°F, separates the sour gas and free water from the emulsion in a free water knockout (FWKO) and dehydrates the crude with electrostatic treaters.  The FWKO in each train is sized to handle 50 KBPD oil and 40 KBPD water.  Separated water is sent to the produced water treating system, flashed gas is sent to the condensate stabilizer and the emulsion to the electrostatic emulsion treaters for further water removal.  Each train has two electrostatic emulsion treaters in parallel which dehydrate the emulsion to 1 percent basic sediment and water (BS&W) to meet product specifications.

2.1.4.1.3     <u>Crude and Condensate Stabilization, Gas Compression</u>:  The Crude and Condensate Stabilization/Gas Compression System serves to sweeten and stabilize the crude to meet product specifications and recover NGLs from the inlet stream.  The crude stabilizer receives the sour dehydrated crude from the emulsion treaters and strips $H_2S$, light gases and NGL components from the crude, stabilizing the crude to the required vapor pressure.  Sweet stabilized bottom produced from the crude stabilizer is metered in the sweet crude ACT unit before flowing to the Transportation Terminal.  The gas from the crude stabilizer overhead is compressed in two stages to approximately 350 psig.  Hot gas from the second stage of compression, along with the condensed interstage liquids, flow to a condensate stabilizer.  This stabilizer removes most of the $H_2S$ and lighter components from the condensate for processing in the SGTP and recycles the heavy ends (mostly $C_5+$) back to the crude stabilizers.

**Figure 2.1 ExxonMobil – SYU Offshore/Onshore Facility Overview**



Note: In these figures MSCF = million standard cubic feet

**Figure 2.2 Oil Treating Plant and Transportation Terminal Simplified Block Flow Diagram**



Note: In these figures MSCF = million standard cubic feet

based on process design parameters.  Scenario S2 takes the true material balance data and inflates the result by 28 percent (as documented in the March 21, 1986 letter from ExxonMobil to the District).  Permitted emissions of $SO_x$ are based on operations with and without the Merox process.  Emission of $NO_X$ (as $NO_2$) are based on manufacturer data.

## *4.8.  Vapor Recovery Systems*

4.8.1    General:  The LFC facility has a number of vapor recovery systems designed to collect low pressure vapors from tanks, sumps, drains, separators and other process units.  Vapor recovery systems in the SGTP and TT are themselves routed to the main LFC vapor recovery system in the OTP.  Figure 4.2 shows a block diagram of the emission units connected to the OTP vapor recovery system.  The vapor recovery systems are assigned a control efficiency of 95 percent for short-term and 99.8 percent for long term emission scenarios.  For vessels that are designated as pressure vessels (by design), vapor recovery is assumed to be 100 percent.  Compliance with the vapor recovery efficiencies are based on monitoring the mass emissions emitted from the Oil Storage Tanks and Rerun Tanks.  ExxonMobil records the actual mass emissions from these tanks by continuously monitoring the position of all PSVs (closed/open), tank pressure and time open for each PSV.  This data, coupled with PSV manufacturer flow curves and actual tank headspace gas properties, is used to calculate the mass emissions during each PSV opening event.  The specific calculation procedures and manufacturer data sheets/flow curves for each PSV is contained in the District-approved NSPS Kb Operating Plan.  Non-compliance with any of the daily, quarterly or annual mass emission limits from the Oil Storage or Rerun Tanks is also assumed to be non-compliance with the vapor recovery system control efficiencies.

4.8.2    Oil Treating Plant:  The OTP vapor recovery system collects excess vapors from tanks and equipment containing organic compounds and acid gas and operating below the SOV compressor suction pressure of 35 psig.  The system has a suction scrubber, two compressors, and a recycle cooler.  One compressor is sized for normal vapor flow rate.  The second compressor is sized for the normal flow rate plus the vapor flow rate from the Rerun Tanks when all the inlet crude emulsion is diverted from the Inlet Emulsion Meter Drum.  The larger compressor starts automatically on high suction pressure.  The OTP compressors discharge to the inlet of the SOV Suction Cooler.

4.8.3    Stripping Gas Treating Plant:  The vapor recovery system in the SGTP consists of a low pressure header collection system and a vapor recovery compressor that discharges into the vapor recovery system of the Oil Treating Plant.  Another vapor recovery system is used to collect vapors from the LPG loading and storage operation.  A vapor balance line is used between the LPG trucks and LPG Storage Bullets.  Each of the LPG Storage Bullets is tied to the vapor recovery system, which recovers excess vapors and routes them to the Oil Treating Plant compression system.  A low pressure vapor recovery line is used to reduce emissions during the coupling operation between the LPG loading arm and the LPG trucks that is directly tied to the OTP vapor recovery system.

4.8.4    Cogeneration Power Plant:  The CPP 6-inch fuel gas line is connected to the OTP vapor recovery system.  The 1-inch vapor recovery line is valved to a normally closed position and is used for maintenance purposes.

4.8.5    Transportation Terminal:  The Crude Storage Tanks' vapor spaces are connected by a vapor transfer line.  This line allows transfer of vapor between the tanks during filling, tank emptying, and barometric and thermal value changes in the vapor space.  A pressure controller on the common line senses low pressure (below 0.6" w.c.) and allows gas from the Blanket Gas Header

# Exhibit P

Exhibit P
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026

Liquid Pipeline Interstate/Intrastate Delineation

# Part 195 - Liquid Pipeline
## Interstate/Intrastate Delineation



EXAMPLE 1

**Tariff with FERC
Company P
"Interstate"**

**Tariff with FERC
Company P
"Intrastate*"**

*(OPS yields jurisdiction to State because it's
not conected to any other pipeline facility)*

Appendix A.cdr
10/18/01 Page 1 of 12

# Part 195 - Liquid Pipeline
## Interstate/Intrastate Delineation



EXAMPLE 2

**No Tariff Filing
Company P
"Interstate"**

**Tariff with FERC
Company P
"Intrastate*"**

*(OPS yields jurisdiction to State because it's
not conected to any other pipeline facility)*

Appendix A.cdr
10/18/01 Page 2 of 12

Liquid Pipeline Interstate/Intrastate Delineation

## Part 195 - Liquid Pipeline
## Interstate/Intrastate Delineation



EXAMPLE 3

**Tariff with FERC & State**
**Company P**
**"Interstate"**

**Tariff with FERC**
**Company P**
**"Intrastate*"**

*(OPS yields jurisdiction to State because it's not conected to any other pipeline facility)

Appendix A.cdr
10/18/01 Page 3 of 12

## Part 195 - Liquid Pipeline
## Interstate/Intrastate Delineation



EXAMPLE 4A

**Other Pipeline**
**Company**
**"Interstate"**

**Tariff with FERC**
**Company P**
**"Interstate"**

**Tariff with FERC**
**Company P**
**"Interstate"**

Appendix A.cdr
10/18/01 Page 4 of 12

Liquid Pipeline Interstate/Intrastate Delineation

## Part 195 - Liquid Pipeline
## Interstate/Intrastate Delineation



EXAMPLE 4B

Other Pipeline
Company
"Interstate"

Tariff with FERC
Company P
"Interstate"

D

C

A

B

No Tariff
Company P
"Intrastate"

Appendix A.cdr
10/18/01 Page 5 of 12

## Part 195 - Liquid Pipeline
## Interstate/Intrastate Delineation



EXAMPLE 5A

D  Tariff with FERC
Company P
"Interstate"

Tariff with FERC
Company P
"Intrastate*"

If Tariff with FERC
on lateral, then
"Interstate"

A

C

B

*(OPS yields jurisdiction to State because it's
not conected to any other pipeline facility)

Appendix A.cdr
10/18/01 Page 6 of 12

Liquid Pipeline Interstate/Intrastate Delineation

## Part 195 - Liquid Pipeline
## Interstate/Intrastate Delineation



EXAMPLE 5B

D   **Tariff with FERC
Company P
"Interstate"**

**Tariff with FERC
Company P
"Intrastate*"**

**If No Tariff
on lateral, then
"Intrastate"**

A       C

B

*(OPS yields jurisdiction to State because it's
not conected to any other pipeline facility)*

Appendix A.cdr
10/18/01 Page 7 of 12

## Part 195 - Liquid Pipeline
## Interstate/Intrastate Delineation



EXAMPLE 6

D   **Tariff with FERC
Company P
"Interstate"**

**Tariff with FERC
Company P
"Intrastate*"**

C

A

B

*OPS yields jurisdiction to the state because it's
not conected to any other pipeline facility.
If there is no state enforcement authority or
their authority is challenge by the pipeline,
then OPS assumes jurisdictional authority.*

Appendix A.cdr
10/18/01 Page 8 of 12

Liquid Pipeline Interstate/Intrastate Delineation

## Part 195 - Liquid Pipeline
## Interstate/Intrastate Delineation



EXAMPLE 7

**No Tariff filing
Company P
"Interstate"**

B

**Outer Continental
Shelf**

A

Appendix A.cdr
10/18/01 Page 9 of 12

## Part 195 - Liquid Pipeline
## Interstate/Intrastate Delineation



EXAMPLE 8

B **Under Construction
Company P
"Interstate"**

A

Appendix A.cdr
10/18/01 Page 10 of 12

Liquid Pipeline Interstate/Intrastate Delineation

# Part 195 - Liquid Pipeline Interstate/Intrastate Delineation



EXAMPLE 9

**Under Construction Company P (Intends to file Tariff with FERC ) "Interstate*"**

**Company P or other pipeline facility "Interstate"**

D

E

C

*("Interstate", assuming it's tied into another interstate pipeline.)

Appendix A.cdr
10/18/01 Page 11 of 12

# Part 195 - Liquid Pipeline Interstate/Intrastate Delineation



EXAMPLE 10

**FERC economic regulated Company P "Interstate" ***

B

A

*Even if pipeline is no longer regulated by FERC, OPS will continue to consider the line to be "Interstate."

Appendix A.cdr
10/18/01 Page 12 of 12

# Exhibit Q

Exhibit Q
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

———————

# FORM 8-K

———————

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

Date of Report (date of earliest event reported): **September 29, 2025**

———————

# Sable Offshore Corp.

(Exact name of registrant as specified in its charter)

———————

| | | |
|---|---|---|
| **Delaware** | **001-40111** | **85-3514078** |
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification Number) |
| **845 Texas Avenue, Suite 2920** | | |
| **Houston, TX** | | **Houston, TX 77002** |
| (Address of principal executive offices) | | (Zip code) |

**(713) 579-6161**
(Registrant's telephone number, including area code)

———————

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $.0001 | SOC | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 12b-2 of the Exchange Act.

Emerging growth company    ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 7.01**               **Regulation FD Disclosure.**

On September 29, 2025, Sable Offshore Corp. (the "Company") issued a press release announcing an alternative offtake strategy. A copy of the press release is attached hereto as Exhibit 99.1 and is incorporated herein by reference.

Also, on September 29, 2025, the Company posted presentation materials on its website, www.sableoffshore.com. The presentation materials are attached hereto as Exhibit 99.2 and incorporated herein by reference. These materials may also be used by the Company at one or more presentations with analysts, investors or other stakeholders.

Additionally, the Company issued a letter to the United States of America's Secretary of Interior and Secretary of Energy, requesting support to proceed with the permitting and installation of a floating, processing, storage, and offloading vessel ("FPSO") at the Santa Ynez Unit. A copy of the letter is attached hereto as Exhibit 99.3 and is incorporated herein by reference.

The information contained in the attached press release and presentation materials is summary information that is intended to be considered in the context of the Company's Securities and Exchange Commission filings and other public announcements. The Company undertakes no duty or obligation to publicly update or revise this information, although it may do so from time to time.

The information furnished pursuant to this Item 7.01, including Exhibits 99.1, 99.2, and 99.3 shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities under that Section and shall not be deemed to be incorporated by reference in any filing made by the Company under the Securities Act of 1933, as amended (the "Securities Act"), or the Exchange Act.

**Item 9.01**               **Financial Statements and Exhibits**

(d) Exhibits:

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release of Sable Offshore Corp., dated September 29, 2025, Sable Offshore Corp. Announces Alternative Offtake Strategy. |
| 99.2 | Presentation materials for the period September 2025. |
| 99.3 | Letter to Secretary of the Interior and Secretary of Energy, dated September 19, 2025, Request for Expedited Support of FPSO Santa Ynez Unit – Pacific OCS Area. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Sable Offshore Corp.**

| Date: | September 29, 2025 | By: | /s/ Gregory D. Patrinely |
|---|---|---|---|
| | | Name: | Gregory D. Patrinely |
| | | Title: | Executive Vice President and Chief Financial Officer |

# Exhibit R

Exhibit R
to Request for Judicial Notice
in Support of Opposition
to Motion for Reconsideration
filed February 13, 2026

EX-99.2 3 a992-sableoffshorecorpin.htm EX-99.2



# Las Flores Canyon Infrastructure (Option 1)

Exhibit 99.2

**Wholly-owned infrastructure at Las Flores Canyon represents substantial capital investment and incremental value**



- Fully integrated oil and gas processing facilities acquired by Sable for managing 100% of the SYU produced volumes with additional capacity for future SYU development

- Gas and NGL volumes sold into the Southern California market to homes and businesses and oil volumes sold at Brent based pricing to local refineries

- Evaluating significant CCS opportunity leveraging existing infrastructure and access

**Las Flores Canyon Cogeneration & Processing Facility**

**Transportation Terminal**

**Produced Water Pipeline**

**Crude Storage Tanks**
- 540 kbbl capacity

**Biologic Water Treating Plant**
- Free Oil Removal
- Degassing
- Biological Treatment

**LPG Storage & Loading**

**POPCO Gas Plant**
- Gas Sweetening
- NGL Fractionation
- Sulfur Recovery
- Gas Compression

**Co-Generation Power Plant**
- Gas Turbine (40 MW)
- Steam Generation
- Steam Turbine (10 MW)

**Oil Treating Plant**
- Crude Dehydration
- Crude Stabilization
- Gas Separation & Compression

**Gas Processing Plant**
- Gas Sweetening
- Sulfur Recovery
- NGL Fractionation
- Fuel Gas sent to Power Plant
- CCS opportunities available through existing infrastructure



9

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/13/2026 4:26 PM
By: Narzralli Baksh , Deputy

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
MATTHEW BULLOCK (SBN 243377)
MICHAEL S. DORSI (SBN 281865)
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3802
  Fax:  (415) 703-5480
  E-mail:  Michael.Dorsi@doj.ca.gov
*Attorneys for Respondents and Defendants
Department of Forestry and Fire Protection, by and
through the Office of the State Fire Marshal, an
agency of the State of California; Daniel Berlant, in
his official capacity as State Fire Marshal*

EXEMPT FROM FILING FEES
PURSUANT TO GOVERNMENT
CODE SECTION 6103

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioner and Plaintiff,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,<br><br>Respondents and Defendants,<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest.<br><br>***<br><br>ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL | Case No. 25CV02244<br>Consolidated with Case No. 25CV02247<br><br>**RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.'S OPPOSITION TO REAL PARTIES IN INTEREST'S MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION**<br><br>Date:        February 27, 2026<br>Time:        10:00 a.m.<br>Dept:        4<br>Judge:      Hon. Donna Geck<br><br>Trial Date:  Not Set<br>Action Filed: April 15, 2025 |

1

Respondents' Opposition to Motion for Reconsideration of Preliminary Injunction (25CV02244)

**OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,**

**Petitioners and Plaintiffs,**

**v.**

**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,**

**Respondents and Defendants,**

**SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,**

**Real Parties in Interest.**

Respondents' Opposition to Motion for Reconsideration of Preliminary Injunction (25CV02244)

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................................. 7

Background ............................................................................................................................. 8

I.    The History of the Las Flores Pipelines Demonstrates That They Are *Intra*state, Not *Inter*state, Pipelines ........................................................................ 8

II.   After the Refugio Oil Spill, PHMSA Correctly Designated the Las Flores Pipelines as Intrastate ................................................................................. 9

III.  Consistent with Its Jurisdiction, OSFM Issued State Waivers to Sable ................. 9

IV.   Sable Failed to Fully Comply with the State Waivers ......................................... 10

V.    Sable Sought and Obtained Letters from PHMSA Purporting to Preempt OSFM's Regulation of the Las Flores Pipelines ................................................. 11

Legal Standards .................................................................................................................... 12

Interest of Respondents ........................................................................................................ 13

Argument .............................................................................................................................. 13

I.    This Court May Reasonably Maintain the Preliminary Injunction, Consistent with the Consent Decree, Until a Federal Court Alters the Controlling Law ..................................................................................................... 13

II.   Sable's Express Preemption Argument Fails ....................................................... 14

A.    PHMSA's Assertion of Jurisdiction Has No Legal Force in This Court ......................................................................................................... 14

B.    Sable's Position Is Barred by Claim Preclusion ...................................... 15

C.    Regardless of Whether the Las Flores Pipelines are Interstate or Intrastate Pipelines, Sable's Motion is Barred by Judicial Estoppel ......... 16

D.    The Las Flores Pipelines Are Intrastate Pipelines Because They Are a Facility that Transports Oil Between Two Points in California ............. 18

III.  Sable's Assertion of Preemption Based on Executive Order is Meritless ............ 21

Conclusion ............................................................................................................................ 21

---

Respondents' Opposition to Motion for Reconsideration of Preliminary Injunction (25CV02244)

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Apple, Inc. v. Franchise Tax Board*
(2011) 199 Cal.App.4th 1 .................................................................................... 13

*Barclays Bank PLC v. Franchise Tax Bd. of California*
(1994) 512 U.S. 298 ........................................................................................... 21

*Bean v. City of Thousand Oaks*
(2025) 114 Cal.App.5th 775 .............................................................................. 13

*Calaveras Telephone Co. v. Public Utilities Com.*
(2022) 87 Cal.App.5th 793 ............................................................................... 13

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*
(1984) 467 U.S. 837 ........................................................................................... 15

*Hooks v. Clark County School Dist.*
(9th Cir. 2000) 228 F.3d 1036 ........................................................................... 19

*Interstate Fire v. Underwriters at Lloyd's, London*
(9th Cir.1998) 139 F.3d 1234 ............................................................................ 17

*IT Corp. v. County of Imperial*
(1983) 35 Cal.3d 63 ........................................................................................... 13

*Lackey v. Stinnie*
(2025) 604 U.S. 192 ..................................................................................... 13–14

*Levy v. Cohen*
(1977) 19 Cal.3d 165 ......................................................................................... 15

*Littlejohn v. U.S.*
(9th Cir. 2003) 321 F.3d 915 ............................................................................. 16

*Loeffler v. Medina*
(2009) 174 Cal.App.4th 1495 ............................................................................ 13

*Loper Bright Enterprises v. Raimondo*
(2024) 603 U.S. 369 ........................................................................................... 15

*Mi Familia Vota v. Fontes*
(9th Cir. 2024) 111 F.4th 976 ............................................................................ 16

*Missouri v. Holland*
(1920) 252 U.S. 416 ........................................................................................... 13

4

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*
(1974) 418 U.S. 264 ........................................................................................... 21

*People ex rel. Brown v. iMergent, Inc.*
(2009) 170 Cal.App.4th 333 .............................................................................. 14

*People ex rel. Sneddon v. Torch Energy Services, Inc.*
(2002) 102 Cal.App.4th 181 ........................................................................ 16–17

*PLIVA, Inc. v. Mensing*
(2011) 564 U.S. 604 .......................................................................................... 15

*Russello v. U.S.*
(1983) 464 U.S. 16 ............................................................................................ 20

*Santa Clara Valley Water Dist. v. San Francisco Bay Regional Water Quality Control Bd.*
(2020) 59 Cal.App.5th 199 ............................................................................... 15

*Southern Pacific Pipe Lines Inc. v. U.S. Dept. of Transp.*
(D.C. Cir. 1986) 796 F.2d 539 .......................................................................... 19

*Taylor v. Sturgell*
(2008) 553 U.S. 880 .......................................................................................... 16

*Title Ins. & Trust Co. v. County of Riverside*
(1989) 48 Cal.3d 84 .......................................................................................... 18

*Wells Fargo Bank v. Superior Court*
(1991) 53 Cal.3d 1082 ...................................................................................... 20

*Western Radio Services Co., Inc. v. Glickman*
(9th Cir. 1997) 123 F.3d 1189 .......................................................................... 15

*Wyeth v. Levine*
(2009) 555 U.S. 555 ................................................................................ 7, 14, 15

*Youngstown Co. v. Sawyer*
(1952) 343 U.S. 579 .......................................................................................... 21

**STATUTES**

United States Code, Title 28
§ 1738 ................................................................................................................ 15

5

## TABLE OF AUTHORITIES
### (continued)

**Page**

United States Code, Title 49
§ 60101(a)(3) ................................................................................................ 20
§ 60101(a)(5) ................................................................................................ 20
§ 60101(a)(8)(A) ........................................................................................... 20
§ 60101(a)(8)(B) ..................................................................................7, 14, 18, 21
§ 60101(a)(10) .......................................................................................7, 14, 18, 21
§ 60101, *et seq.* ........................................................................................... 20
§ 60104(c) .................................................................................................. 18, 21
§ 60118(c)(1)(A) .......................................................................................... 10
§ 60118 (d) .................................................................................................. 10
§ 60119 .................................................................................................... 12, 15

Code of Civil Procedure
§ 533 ....................................................................................................... 12–13
§ 1008 ....................................................................................................... 12
§ 1908 ....................................................................................................... 15

Pipeline Safety Act ............................................................................. *passim*

**CONSTITUTIONAL PROVISIONS**

United States Constitution
Article IV, § 1 ............................................................................................. 15

**OTHER AUTHORITIES**

50 Federal Register 39,011 (1985) .......................................................... 19

Black's Law Dictionary (6th ed. 1990) 591 ............................................. 19

Code of Federal Regulations, Title 49
Part 195, Appendix A ................................................................................ 20
§ 195.2 ...................................................................................................... 18–19

Executive Order No. 14156 ...................................................................... 21

1 Restatement (Second) of Judgments (1980) § 40, p. 390 ..................... 16

Webster's II, New Riverside University Dictionary (1994) 460 ................ 19

6

**INTRODUCTION**

Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (Sable) ask this Court to reconsider its preliminary injunction based on Sable's allegation that the Las Flores Pipelines became interstate pipelines, preempting state regulation. But the Las Flores Pipelines are intrastate pipelines, subject to state jurisdiction and regulation by the Office of the State Fire Marshal (OSFM). No court has validated Sable's assertion, and two petitions for review at the Ninth Circuit Court of Appeals challenge Sable's position. In fact, Sable took a contrary position when it assented to the 2020 Consent Decree in federal district court. The Court should hold Sable to its prior position and deny the Motion for Reconsideration.

Under the Pipeline Safety Act, a pipeline facility that transports oil from one location in a state to another location in the same state, without passing through a different state, is an *intra*state pipeline. *Inter*state pipelines, by contrast, ship oil across state lines. (49 U.S.C. § 60101(a)(8)(B), (a)(10).) Interstate pipelines are subject to exclusive federal jurisdiction, while states can impose their own safety regulations on intrastate pipelines. The Las Flores Pipelines, designated CA-324 and CA-325, run from Las Flores Canyon in Santa Barbara County to Pentland Station in Kern County. They do not pass through any other state or into federal waters.

Sable now alleges that the Las Flores Pipelines are interstate, relying on three recent orders by the federal Pipeline and Hazardous Materials Safety Administration (PHMSA). PHMSA purported to re-define the Las Flores Pipelines as interstate by expanding the definition of the pipeline "facility" to include the processing and treatment facility as Las Flores Canyon and the undersea pipeline that extends to platforms in federal waters of the Outer Continental Shelf. But federal "agencies have no special authority to pronounce on pre-emption absent delegation by Congress." (*Wyeth v. Levine* (2009) 555 U.S. 555, 577.)

Finally, the 2020 Consent Decree, which is the final judgment of a federal district court, bars Sable's change of position on the interstate/intrastate determination. That decree relied on the intrastate nature of the Las Flores Pipelines to assign oversight responsibility to Respondent OSFM, not PHMSA. Sable agreed to be bound by the Consent Decree as a successor-in-interest, and its new contention to the contrary is barred by the doctrine of claim preclusion.

Sable asks this Court to reverse itself, disregard the Consent Decree, and prejudge the petitions for review presently pending before the Ninth Circuit—including California's recently-filed Petition for Review.[1] This Court should deny Sable's Motion and maintain the status quo.

## BACKGROUND

**I.    THE HISTORY OF THE LAS FLORES PIPELINES DEMONSTRATES THAT THEY ARE *INTRA*STATE, NOT *INTER*STATE, PIPELINES**

Before December 2025, no agency or court had ever concluded that the Las Flores Pipelines were part of the same "pipeline facility" as the undersea pipeline that extends from three offshore oil platforms to the shore. This novel interpretation, if accepted, would offer Sable a convenient escape from state pipeline safety regulations that it has failed to comply with. Sable's pretext runs contrary to history.

The first of the offshore oil platforms in the Santa Ynez Unit was Platform Hondo, constructed by 1976. Platforms Harmony and Heritage commenced drilling operations in 1993. All are in federal waters. At first, the platforms had no connection to onshore infrastructure and shipped oil via treating vessels. Later, construction of an undersea pipeline from the platforms to the Las Flores Canyon facility connected the platforms to the mainland (the Undersea Pipeline).

The first stop on land is the Las Flores Canyon processing facilities. As described by Sable's subsidiary Pacific Pipeline Company in its Complaint filed last fall in Kern County,

> The onshore facilities in Las Flores Canyon separate oil, propane, butane, sulfur products, and fuel quality gas. The natural gas is dried, treated, compressed, and delivered to a local utility company. Oil is transferred through the Las Flores Pipelines to a refinery for final processing.

(RJN, Exh. B, ¶ 19 [Complaint, *Pacific Pipeline Co. v. California*, Kern County Superior Court Case No. BCV-25-103508, ¶ 19].)

The Las Flores Pipelines, then designated Lines 901 and 903, now CA-324 and CA-325, came online in the early 1990s. They commence in Santa Barbara County, and were originally categorized as interstate pipelines because of the plan that they terminate in Texas. The interstate connection never materialized, and the pipelines terminate in Kern County. Through 2015,

---

[1] California's Petition for Review is attached to OSFM's Request for Judicial Notice (RJN) in Support of this Opposition as Exhibit A. PHMSA's three orders are exhibits to the Petition for Review. In this brief, those orders are identified as RJN Exhibits A-1, A-2, and A-3.

PHMSA maintained its position that the Las Flores Pipelines were subject to exclusive federal regulation based on tariffs with the Federal Energy Regulatory Commission (FERC).

## II. AFTER THE REFUGIO OIL SPILL, PHMSA CORRECTLY DESIGNATED THE LAS FLORES PIPELINES AS INTRASTATE

On May 19, 2015, the Las Flores Pipelines ruptured, releasing nearly 3,000 barrels of crude oil into the environment. In early 2016, then-operator Plains Pipeline, L.P. cancelled its tariffs with FERC. On May 18, 2016, PHMSA re-designated the Las Flores Pipelines as intrastate, with OSFM as the safety regulator. (RJN, Exh. H [May 18, 2016 Letter].)

After the Refugio Oil Spill, state and federal agencies engaged with Sable's predecessors, Plains All American Pipeline, L.P. and Plains Pipeline L.P. (collectively Plains) regarding harm from the spill, projects to remedy that harm, and civil penalties. Those efforts culminated in an agreed Consent Decree in 2020 filed in federal district court. (RJN, Ex. D [Consent Decree].) The Consent Decree resolved claims by agencies including PHMSA and OSFM. The Consent Decree required that, "Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901."[2] (*Id.* at p. 80[3].) This was consistent with the Pipeline Safety Act, which allows state regulators to adopt and enforce safety standards in addition to or more stringent than PHMSA's standards. The Consent Decree also assigns OSFM the power to approve a restart plan. (*Id.* at p. 96.)

## III. CONSISTENT WITH ITS JURISDICTION, OSFM ISSUED STATE WAIVERS TO SABLE

On February 14, 2024, Sable acquired a 100% interest in Pacific Pipeline Company, which owns and operates the Las Flores Pipelines. As a condition of this acquisition, Sable agreed to be bound by the Consent Decree. (RJN, Exh. E [Assumption Agreement].) Sable applied for State Waivers on April 24, 2024, which OSFM issued on December 17, 2024. The State Waivers require that "All immediate and 180-day repair conditions that are listed in this state waiver must

---

[2] Because the conditions are repeated for CA-324 and CA-325, to avoid duplication, this memorandum quotes conditions in the Consent Decree and State Waivers only for line CA-324 (formerly 901). All quoted conditions are the same for line CA-325 (formerly 902).

[3] Page citations to the Consent Decree refer to the blue page numbers at the top of the page, imposed by the ECF filing system, not the page numbers at the bottom of the page.

9

be evaluated and remediated *prior to* restarting CA-324." (RJN, Exs. I, J, ¶ 9, italics added.)

Neither Sable nor PHMSA objected to the terms of the State Waivers, and PHMSA provided its notices of non-objection to the State Waivers on February 11, 2025. (Cf. 49 U.S.C. § 60118(c)(1)(A), (d) [authorizing PHMSA to object to state regulations "inconsistent with pipeline safety."].). The petitioners in this case (collectively "EDC") challenged the State Waivers by filing these cases on April 15, 2025, alleging, *inter alia*, that OSFM was required to prepare an SEIR prior to issuing the State Waivers. EDC applied for a temporary restraining order, which this Court granted on June 3, 2025. This Court then set briefing and heard argument on whether a preliminary injunction should issue. On Thursday, July 17, 2025, this Court issued a tentative ruling granting in part and denying in part EDC's requests for a preliminary injunction. At the hearing, EDC contested the tentative ruling; OSFM and Sable did not. The Court adopted its tentative ruling. (RJN, Exh. F.) This Court correctly acknowledged that Sable could not lawfully restart the Las Flores Pipelines prior to obtaining additional approvals, most notably OSFM's approval of a restart plan. The Court then imposed a requirement that once Sable obtained all required approvals, it provide notice to the Court and all parties, and not restart until 10 days after that notice, to provide time to resolve any dispute as to completeness of those approvals. (*Ibid*.)

On September 17, 2025, Sable filed an Answer, including its Twentieth Affirmative Defense: Federal Preemption. (RJN, Exh. G [Answer], p. 26:1–3.)

**IV.   SABLE FAILED TO FULLY COMPLY WITH THE STATE WAIVERS**

In fall 2025, "OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart." (RJN, Exh. K [OSFM Letter to Sable dated October 22, 2025].) Condition 9 in the State Waivers dictates that "All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324." (RJN, Exh. I.) The State Waivers require that Sable remediate anomalies with measurement of loss of 40% of the thickness of the pipe, or where 40% plus the margin of error of the measurement tool (i.e., tool tolerance) exceeded 40%. Sable reported that it had remedied anomalies where it measured loss of 40% of the thickness, but Sable had not remedied anomalies where the measured loss *plus the tool tolerance* exceeded 40%. (*Ibid*.) Sable responded the next

day, disagreeing with OSFM's interpretation, but not disputing the underlying facts. Sable contended that the State Waivers did not require remediation of these anomalies prior to restart, and that these anomalies would be remediated within 180 days of the restart. (RJN, Exh. L [Sable Letter].) OSFM and Sable have not resolved this issue.

## V.    SABLE SOUGHT AND OBTAINED LETTERS FROM PHMSA PURPORTING TO PREEMPT OSFM'S REGULATION OF THE LAS FLORES PIPELINES

A month after OSFM informed Sable of its failure to comply with the State Waivers, Sable sent a letter to PHMSA requesting that PHMSA assume jurisdiction over the Las Flores Pipelines. (RJN, Exh. M [Nov. 26, 2025 letter to PHMSA].) Sable's letter asked that PHMSA treat the Undersea Pipeline, the Las Flores Canyon processing facilities, and the Las Flores Pipelines—and possibly also offshore platforms—as a single facility. (*Id.* at p. 1; see also map at p. 4.) Sable claimed that "intervening events . . . merit reassessment," but the only identified event was Sable's unification of ownership of these assets, and Sable offered no authority for the proposition that unified ownership is relevant to how a "facility" is defined. (*Id.* at p. 2.)

PHMSA gave Sable what it asked for with limited analysis. First, on December 17, 2025, PHMSA issued a letter asserting jurisdiction and purporting to preempt OSFM's regulation. According to PHMSA, CA-324 and CA-325 are part of a larger pipeline facility that "transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California." (RJN, Exh. A-1 [PHMSA Dec. 17 Letter]). Less than a week later, on December 22, PHMSA approved a restart plan for Lines CA-324 and CA-325. (RJN, Exh. A-2.) And the following day, December 23, PMHSA issued an Emergency Special Permit.[4] (RJN. Exh. A-3.) Although the Special Permit mirrored much of OSFM's State Waivers, PHMSA's Emergency Special Permit removed the tool tolerance provision, permitting Sable to restart without remediating the measured wall loss.

On December 24, 2025, EDC filed a Petition for Review in the Ninth Circuit Court of Appeals, challenging PHMSA's December 22 Restart Plan approval and December 23 Permit. EDC sought preliminary relief from the Ninth Circuit. PHMSA and Sable, as respondent-

---

[4] "Special Permit" is PHMSA's name for the federal analogue to OSFM's State Waivers.

11

intervenor, opposed. The Ninth Circuit denied preliminary relief but granted expedited briefing.[5]

Sable, in turn, raised preemption in two of its pending cases in California state courts:

First, on January 5, 2026, Sable filed this Motion for Reconsideration, seeking termination of the preliminary injunction, and asserting that "Lines CA-324 and CA-325 . . . are portions of the Las Flores Pipeline, which also includes offshore pipelines transporting crude oil from the Outer Continental Shelf and an onshore processing facility at Las Flores Canyon." (Mot. at p. 6 fn. 1.) On January 7, 2026, this Court set the briefing schedule and hearing for this Motion.

Second, on January 21, 2025, in *Pacific Pipeline Company v. State of California*, Kern County Superior Court case no. BCV-25-103508, Sable's wholly-owned subsidiary Pacific Pipeline Company filed an amended complaint alleging that California SB 237 (2025) was preempted in part. (RJN, Exh. C, at ¶ 11, 55, 64–73.) Pacific Pipeline asserted that its parent company Sable "operates an interconnected pipeline facility known as the Santa Ynez Pipeline System, which includes both offshore and onshore components," identifying those components as the Undersea Pipeline, the Las Flores Canyon facilities, and the Las Flores Pipelines. (*Id.* at ¶ 1.)

On January 23, 2026, California, by and through the Attorney General and OSFM, filed its own Petition for Review in the Ninth Circuit Court of Appeals, challenging PHMSA's December 17, 22, and 23 orders purporting to federalize the Las Flores Pipelines. (RJN, Exh. A [Petition for Review].) On January 30, 2025, PHMSA, with consent from all parties in both cases, moved to consolidate the two petitions for review. PHMSA's motion proposes a briefing schedule agreed to by PHMSA, Sable, EDC, and OSFM, with briefing to be completed on June 8, 2026.

## LEGAL STANDARDS

Under Code of Civil Procedure section 533, a party must show a "material change in the facts . . , that the law . . . has changed, or that the ends of justice would be served" by the dissolution of a preliminary injunction.[6] In applying Section 533, when "the restrained party later

---

[5] 49 U.S.C. § 60119 provides that petitions for review of PHMSA orders shall be filed in federal appellate courts, not federal district courts.

[6] A similar standard applies under Code of Civil Procedure 1008. But this Motion does not satisfy the timing requirements of Section 1008, which require a motion to be brought "within 10 days after service upon the party of written notice of entry of the order" to be reconsidered, not, as Sable suggests, within 10 days of an order by another court. Here, Section 533 controls.

12

seeks to terminate the restraining order, the burden is on the restrained party to show by a preponderance of the evidence that one of the circumstances set forth in Code of Civil Procedure section 533 is present and justifies a termination of the restraining order." (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1504, citations omitted.)

Preliminary injunctions issue and terminate based on weighing the likelihood of success on the merits, the immediate harm to the plaintiff in the absence of an injunction, and the harm the defendant would suffer from imposition of an injunction. (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69–70.) OSFM understands Sable to be asserting that it will prevail on a claim that OSFM's State Waivers and Restart Plan authority is preempted, so this case, which challenges whether OSFM is carrying out that authority, is moot. "The burden of proving preemption is on the party claiming it applies, and courts are reluctant to infer preemption." (*Calaveras Telephone Co. v. Public Utilities Com.* (2022) 87 Cal.App.5th 793, 809.)

## INTEREST OF RESPONDENTS

Respondents ask that this Court deny Sable's Motion for Reconsideration because it is in error, and it would confer relief based on an assertion of preemption that would displace the laws of the State of California. A state has a cognizable interest in the enforcement of its laws. (*Missouri v. Holland* (1920) 252 U.S. 416, 431.) Sable's Motion is adverse to Respondents' interests because Sable seeks preemption of California law. Established California law protects a party's right to oppose relief that is adverse to that party's interests, even against co-defendants. (See *Bean v. City of Thousand Oaks* (2025) 114 Cal.App.5th 775, 780 [co-defendant had a right to oppose summary judgment]; *Apple, Inc. v. Franchise Tax Board* (2011) 199 Cal.App.4th 1, 16 [nominally prevailing party had standing to appeal because of the effect of the order].)

## ARGUMENT

I. **THIS COURT MAY REASONABLY MAINTAIN THE PRELIMINARY INJUNCTION, CONSISTENT WITH THE CONSENT DECREE, UNTIL A FEDERAL COURT ALTERS THE CONTROLLING LAW**

"Preliminary injunctions . . . do not conclusively resolve legal disputes." (*Lackey v. Stinnie* (2025) 604 U.S. 192, 200.) Rather, "[a] preliminary injunction . . .temporarily preserves the parties' litigating positions based in part on a prediction of the likelihood of success on the

13

merits." (*Id.* at p. 207.) It is appropriate and ordinary for a preliminary injunction to compel parties to act consistent with their commitments in agreements. (*People ex rel. Brown v. iMergent, Inc.* (2009) 170 Cal.App.4th 333, 343 [the injunction "simply compels them to abide by their agreement and to maintain the status quo that was established when they stipulated to the final judgment and permanent injunction in the prior action."].) Here, Sable agreed to have OSFM issue the State Waivers and control issuance of a Restart Plan when it agreed to be bound by the Consent Decree. (RJN, Exhs. E [Agreement to be bound], D [Consent Decree], pp. 80 ["Plains must receive a State Waiver from the OSFM prior to restarting Line 901."], 96 ["Plains shall develop and submit . . . a written Restart Plan for Line 901 to the OSFM for review and approval."].) The State Waivers are an essential component of the Consent Decree, and this Court has jurisdiction to review whether OSFM's issuance of the State Waivers complied with California law. Sable's Motion contains no explanation of why Sable would no longer have to abide by its commitment to comply with the Consent Decree and accept the legal consequences (i.e., the preliminary injunction). This Court's most conservative and prudent course is to hold Sable to its commitment, maintain its injunction until there is a final resolution in federal court, and then apply any preclusive effect of a federal court judgment in this case.

II.    **SABLE'S EXPRESS PREEMPTION ARGUMENT FAILS**

        **A.    PHMSA's Assertion of Jurisdiction Has No Legal Force in This Court**

        Sable argues that PHMSA's assertion of federal jurisdiction deprives California agencies and courts of jurisdiction over the Las Flores Pipelines, and that California courts and agencies maintaining jurisdiction conflicts with PHMSA's approvals. (Mot. at pp. 10:16–11:12.) But Sable offers no authority for the proposition that a federal agency's unsupported assertion of its position on interstate status and jurisdiction over a pipeline somehow creates law that binds this Court. It does not, and none of the four cases cited by Sable say otherwise. It is the Pipeline Safety Act, not PHMSA, which defines interstate and intrastate pipelines. (49 U.S.C. § 60101(a)(8)(B), (a)(10).) The Pipeline Safety Act does not delegate to PHMSA discretion to decide which pipelines are interstate. (See *Wyeth v. Levine* (2009) 555 U.S. 555, 576 & fn. 9 [comparing absence of delegation in that case with examples of statutes with delegations to grant and waive

14

preemption].) PHMSA's orders are reviewable, 49 U.S.C. § 60119, and presently under review by the Ninth Circuit Court of Appeals. There is no basis to place a thumb on the scale in favor of Sable and PHMSA while challenges to PHMSA's orders are adjudicated.

PHMSA's determination is not afforded deference. Courts "do not defer to an agency's ultimate conclusion about whether state law should be pre-empted." (*PLIVA, Inc. v. Mensing* (2011) 564 U.S. 604, 613 fn. 3, citing *Wyeth v. Levine* (2009) 555 U.S. 555, 576.) Any deference afforded under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.* (1984) 467 U.S. 837, is no longer effective because the United States Supreme Court overruled *Chevron*. (*Loper Bright Enterprises v. Raimondo* (2024) 603 U.S. 369, 400–401 [Federal "agencies have no special competence in resolving statutory ambiguities. Courts do."].)

Absent deference, Sable needed to explain to this Court why PHMSA is correct. Its moving papers did not do so, and the Court should not permit it to do so in reply papers. (See, e.g., *Santa Clara Valley Water Dist. v. San Francisco Bay Regional Water Quality Control Bd.* (2020) 59 Cal.App.5th 199, 219.)

### B.    Sable's Position Is Barred by Claim Preclusion

Sable asks this Court to reconsider its likely success on the merits based on preemption of state regulation of interstate pipelines, but is barred from asserting preemption on this (or any) basis by claim preclusion. As a result, Sable is unlikely to prevail on the merits of this defense.

Courts must give full faith and credit to judgements issued in other jurisdictions. (U.S. Const. art. IV, § 1, 28 U.S.C. § 1738, Code Civ. Proc., § 1908.) Full faith and credit requires that this Court apply the preclusion rules of the court that issued the first judgment. (*Levy v. Cohen* (1977) 19 Cal.3d 165, 173.) Here, the original judgment is the Consent Decree from the United States District Court for the Central District of California, so its preclusive effect is governed by federal law. One aspect of full faith and credit is res judicata, now usually called claim preclusion. And "for res judicata to apply there must be: 1) an identity of claims, 2) a final judgment on the merits, and 3) identity or privity between parties." (*Western Radio Services Co., Inc. v. Glickman* (9th Cir. 1997) 123 F.3d 1189, 1192.) The Consent Decree satisfies all three elements:

First, there is an identity of claims. OSFM asserts the same power here as established by the

15

Consent Decree to compel Sable to comply with the State Waivers. (RJN, Exh. D [Consent Decree], pp. 80 ["Plains must receive a State Waiver from the OSFM prior to restarting Line 901."], 96 ["Plains shall develop and submit . . . a written Restart Plan for Line 901 to the OSFM for review and approval."].) The fact that no party in the Consent Decree case asserted preemption based on interstate status is immaterial. Claim preclusion "bars the subsequent application of all *defenses* that could have been asserted in a previous action between the same parties on the same cause of action, even if such contentions were not raised." (*Littlejohn v. U.S.* (9th Cir. 2003) 321 F.3d 915, 919–920, italics added.) This bars Sable's defense because it could have been asserted to bar the relief obtained by OSFM from the Consent Decree.

Second, under Ninth Circuit law, "[a] consent decree approved by a court is an enforceable, final judgment with the force of res judicata." (*Mi Familia Vota v. Fontes* (9th Cir. 2024) 111 F.4th 976, 982.) Here, the Consent Decree states that it is a judgment. (RJN, Exh. D, ¶ 108.)

Third, there is privity between the parties because Sable agreed to be bound by the Consent Decree to become the successor to Plains. (RJN, Exh. E [Assumption Agreement].) "A person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement." (*Taylor v. Sturgell* (2008) 553 U.S. 880, 893, quoting 1 Restatement (Second) of Judgments (1980) § 40, p. 390.)

**C.   Regardless of Whether the Las Flores Pipelines are Interstate or Intrastate Pipelines, Sable's Motion is Barred by Judicial Estoppel**

In *People ex rel. Sneddon v. Torch Energy Services, Inc.* (2002) 102 Cal.App.4th 181, the California Court of Appeal considered whether terms agreed to, by an oil company for the operation of an interstate pipeline, can be enforced under the doctrine of judicial estoppel. The court explained that preemption did not bar the application of judicial estoppel as a federal law defense, and judicial estoppel sufficed as a basis to impose an injunction. (*Id.* at pp. 186–90.)

*Sneddon* concerned the 1997 oil spill that resulted from a rupture in the Undersea Pipeline connecting Platform Irene, in federal waters offshore from Point Pedernales, to its processing plant near Lompoc. But unlike the onshore 2015 Refugio Oil Spill, spilling oil that had already been processed at Las Flores Canyon, the 1997 spill occurred in state waters, resulting from a

16

rupture in the pipeline connecting Platform Irene to the onshore processing plant. The Court of Appeal concluded that the pipeline from Platform Irene was an interstate pipeline. But that was not the end of the inquiry. The Superior Court, Judge Anderle presiding, imposed an injunction, reasoning that because the defendant company had accepted the benefits of certain state permits, it was estopped from asserting preemption as a basis to be excused from compliance with those permits. (*Id.* at p. 184–85.) The California Court of Appeal, Second District, Division Six, affirmed the injunction, explaining that while only federal-law principles of estoppel could be invoked in response to preemption, those principles applied. (*Id.* at pp. 189–90.)

Judicial estoppel, under federal principles, requires that "(1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that the position was adopted by the first tribunal in some manner such as by rendering a favorable judgment." (*Sneddon*, *supra*, 102 Cal.App.4th at p. 189, citing *Interstate Fire v. Underwriters at Lloyd's, London* (9th Cir.1998) 139 F.3d 1234, 1239.) The prior assertion may be made to a court or a government agency. (*Id.* at p. 189.) Here, Sable made two such assertions, with two benefits.

First, Sable assumed the role of Plains under the Consent Decree, accepting the obligation to obtain and comply with OSFM's State Waivers. (RJN, Exh. E.) Sable's assumption of the role of Plains facilitated Sable's acquisition of the Las Flores Pipelines. Although the involvement of a court is not required for judicial estoppel, here, unlike in *Sneddon*, *supra*, 102 Cal.App.4th at page 185, Sable's representations were part of a court-sanctioned process.

Second, in this case, when Petitioners sought a preliminary injunction, Sable (and OSFM) correctly notified this Court that there was no exigency because OSFM would have to approve a restart plan before Sable could transport oil through the Las Flores Pipelines. This Court relied on these representations to craft an injunction that "narrowly grant[ed] the motions for preliminary injunctions." (RJN, Exh. F [Preliminary Injunction Order].) As evidenced by neither OSFM nor Sable contesting the tentative ruling, this was a favorable result for OSFM and Sable.

The application of judicial estoppel is discretionary. (*Sneddon*, *supra*, 102 Cal.App.4th at p. 189.) But sound discretion favors its application here. The underlying facts are even more convincing than in *Sneddon* because Sable made the representations in judicial processes.

17

**D.** **The Las Flores Pipelines Are Intrastate Pipelines Because They Are a Facility that Transports Oil Between Two Points in California**

Under the Pipeline Safety Act, intrastate hazardous liquid (here, oil) pipelines are subject to state regulation, while interstate pipelines are subject to exclusive federal jurisdiction. (49 U.S.C. § 60104(c).) The Pipeline Safety Act permits state regulators, including OSFM, to adopt and enforce safety standards more stringent than PHMSA's standards. (*Ibid*.) The task presented in the Petitions for Review to the Ninth Circuit, and as part of the likely success on the merits analysis here, is to determine whether the Las Flores Pipelines are intrastate or interstate pipelines. PHMSA's assertion turns on where one facility ends and the next facility begins. The Las Flores Canyon processing facilities are not a "pipeline facility" and, as a result, the boundary of the "pipeline facility" is where line CA-324 meets the Las Flores Canyon facilities.

"In interpreting the meaning of a statute we begin, as we must, with the language used." (*Title Ins. & Trust Co. v. County of Riverside* (1989) 48 Cal.3d 84, 91.) Under the Pipeline Safety Act, an interstate pipeline is a pipeline facility that transports hazardous liquid "between (i) a place in a State and a place outside that State; or (ii) places in the same State through a place outside the State." (49 U.S.C. § 60101(a)(8)(B).) Conversely, "'intrastate hazardous liquid pipeline facility' means a hazardous liquid pipeline facility that is not an interstate hazardous liquid pipeline facility." (49 U.S.C. § 60101(a)(10).) In other words, a pipeline that transports hazardous liquid from a place within a state to another place within the same state without passing through another state is *intra*state. PHMSA historically defined the relevant "facility" as the Las Flores Pipelines themselves. Now PHMSA purports to redefine the Las Flores Pipelines as part of a larger system that includes the Undersea Pipeline and the Las Flores Canyon processing facilities. PHMSA's prior interpretation was correct.

Federal regulations define a "pipeline facility" as "new and existing pipe, rights-of-way and any equipment, facility, or building used in the transportation of hazardous liquids or carbon dioxide." (49 C.F.R. § 195.2.) Similarly, the same regulation states:

> Pipeline or pipeline system means all parts of a pipeline facility through which a hazardous liquid or carbon dioxide moves in transportation, including, but not limited to, line pipe, valves, and other appurtenances connected to line pipe, pumping units, fabricated

18

assemblies associated with pumping units, metering and delivery stations and fabricated assemblies therein, and breakout tanks.

(49 C.F.R. § 195.2.) These definitions include the pipelines themselves and the appurtenances that cause oil to move through the pipelines. Under this definition, a pipeline facility includes pipelines like CA-324 and CA-325, and plausibly the attached pump and metering stations. But none of these definitions describe the processing facilities at Las Flores Canyon. "The onshore facilities in Las Flores Canyon separate oil, propane, butane, sulfur products, and fuel quality gas." (RJN, Exh. B [Kern County Complaint], ¶ 19.) PHMSA's categorization is inconsistent with PHMSA's own regulations because the Las Flores Canyon facilities do not fit within the regulations' definitions of *pipeline*, *pipeline facility*, or *pipeline system*. (49 C.F.R. § 195.2.)

Neither the Pipeline Safety Act nor the regulations define the word "facility," but dictionary definitions are reasonably consistent. "[A] 'facility' can be commonly defined as '[s]omething created to serve a particular function . . . .'" (*Hooks v. Clark County School Dist.* (9th Cir. 2000) 228 F.3d 1036, 1040, quoting Webster's II, New Riverside University Dictionary (1994) p. 460 and citing Black's Law Dictionary (6th ed. 1990) p. 591 [first definition of "facility" is "Something that is built or installed to perform some particular function . . . ."].) The Las Flores Pipelines were built and installed to serve a particular purpose: to transport oil from Las Flores Canyon, California, to Pentland, California. The Las Flores Canyon processing facilities serve a different purpose: to separate and treat hydrocarbons and sulphur products. (RJN, Exh. B [Kern County Complaint], ¶ 19.) Further upstream, the Undersea Pipeline serves yet another purpose, delivering a mix of oil, gas, water, and other substances from offshore to the Las Flores Canyon facilities. (*Id.* at ¶ 18.) These three structures are separate facilities. And because the Las Flores Pipelines, correctly understood as their own "facility," run between two points in California, they are intrastate pipelines.

The intrastate status of the Las Flores Pipelines is consistent with the fact that, "Congress . . . has always recognized a major role for the states in pipeline safety." (*Southern Pacific Pipe Lines Inc. v. U.S. Dept. of Transp.* (D.C. Cir. 1986) 796 F.2d 539, 542, quoting 50 Fed.Reg. 39,011 (1985).) When Congress wants to provide broader federal preemption, it knows how to do

19

so. (See *Russello v. U.S.* (1983) 464 U.S. 16, 23 ["[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."]; *Wells Fargo Bank v. Superior Court* (1991) 53 Cal.3d 1082, 1096–1097 ["It is hornbook law that where Congress has carefully employed a term in one place and excluded it in another, it should not be implied where excluded."].) The Pipeline Safety Act, 49 U.S.C. § 60101, et seq., does in fact impose broader preemption for *gas* pipelines than for hazardous liquid (e.g., oil) pipelines. The provision defining interstate gas pipelines includes pipelines that reach a place outside of the state—like for oil pipelines—plus additional preemption for pipelines that "affect[] any commerce" . . . "between a place in a State and a place outside that State." (49 U.S.C. § 60101(a)(8)(A).) And the definition of a "gas pipeline facility" includes "equipment used in . . . treating gas[,]" while the definition of a "hazardous liquid pipeline facility" contains no reference to treating hazardous liquid (e.g., treating oil). (49 U.S.C. § 60101(a)(3), (a)(5).) The distinctions between these definitions are instructive. First, an interstate oil pipeline must reach a place outside of a state—it cannot become interstate by virtue of affecting interstate commerce. And second, a gas pipeline facility may include equipment used in treating gas, but an oil pipeline cannot include equipment used in treating oil.

PHMSA defines the Las Flores Pipelines as reaching federal waters by redefining the extent of the facility to stretch through the treatment at Las Flores Canyon processing facilities and on to the Undersea Pipeline.[7] But in doing so, PHMSA improperly expands the meaning of a pipeline facility and includes the oil treatment plant and other non-pipeline facilities in Las Flores Canyon. (RJN, Exhs. O [Santa Barbara air district document describing Oil Treatment Plant], R [Sable investor document describing Oil Treatment Plant].) This redefinition contradicts the statute, undermining Congress' purpose and the stability that states rely upon to make policy.

In its December 17, 2025, letter, PHMSA relies on 49 C.F.R. Part 195, Appendix A, Example 7, to support its new position that the Las Flores Pipelines are interstate. (RJN, Exh. A-

---

[7] Also, Sable suggests that its unification of ownership of various assets supports its definition of the "facility." (RJN, Exh. M.) But Sable and PHMSA have not cited any authority indicating that ownership determines the extent of a pipeline facility.

20

1.) Example 7 shows a drawing of a pipeline running from Point A in the Gulf of Mexico to Point B in Texas. (RJN, Exh. P.) But Example 7 is equally consistent with PHMSA's prior position that the Undersea Pipeline, as a separate facility, is an interstate pipeline, but that pipeline terminates at the Las Flores Canyon processing facilities. Example 7 says nothing about where one facility ends and the next begins, which is the question PHMSA purported to answer in its letter.

In light of this analysis, Sable is not likely to prevail on the merits of its defense.

### III. SABLE'S ASSERTION OF PREEMPTION BASED ON EXECUTIVE ORDER IS MERITLESS

In a one-sentence argument, Sable asserts that "[p]reemption may be based on an Executive Order, such as the President's Executive Order 14156 issued on January 20, 2025 . . . ." (Mot. at p. 11:12–16, citing *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin* (1974) 418 U.S. 264, 273.) *Old Dominion* is the rare case where the Supreme Court held that an executive order "create[d] rights protected against inconsistent state laws through the Supremacy Clause"—and did so because a statute authorized the President to make regulations in an area of exclusive federal control: the union labor relations of the federal workforce. (*Old Dominion*, *supra*, 418 U.S. at p. 273, fn. 5.) Sable makes no effort to explain how the Energy Emergency Executive Order is analogous. The Court should disregard this unexplained argument.

Sable is also wrong. The President cannot create preemption of state law when a statute enacted by Congress preserves a state's sovereign authority. (See *Barclays Bank PLC v. Franchise Tax Bd. of California* (1994) 512 U.S. 298, 330 [executive branch policy pronouncements do not preempt "congressionally condoned" state law].) see also (*Youngstown Co. v. Sawyer* (1952) 343 U.S. 579, 637 (conc. opn. of Jackson, J.) ["When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . . ."].) Here, Congress defined and preserved state jurisdiction over intrastate pipelines. (49 U.S.C. §§ 60101(a)(8)(B), (a)(10), 60104(c).)

### CONCLUSION

This Court should not dissolve or modify its injunction on account of Sable's allegation of preemption prior to resolution by a federal court. Sable is wrong on the law and bound by the Consent Decree. This Court should deny Sable's Motion.

21

Dated:  February 13, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG PARK
Supervising Deputy Attorney General


MICHAEL S. DORSI
Deputy Attorney General
*Attorneys for Respondents and Defendants*
*Dep't of Forestry and Fire Protection, et al.*

LA2025400847
44961031

22

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/13/2026 4:26 PM
By: Narzralli Baksh , Deputy

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
MATTHEW BULLOCK (SBN 243377)
MICHAEL S. DORSI (SBN 281865)
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3802
  Fax:  (415) 703-5480
  E-mail:  Michael.Dorsi@doj.ca.gov
*Attorneys for Respondents and Defendants
Department of Forestry and Fire Protection, by and
through the Office of the State Fire Marshal, an
agency of the State of California; Daniel Berlant, in
his official capacity as State Fire Marshal*

EXEMPT FROM FILING FEES
PURSUANT TO GOVERNMENT
CODE SECTION 6103

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SANTA BARBARA

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,**<br><br>Petitioner and Plaintiff,<br><br>v.<br><br>**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,**<br><br>Respondents and Defendants,<br><br>**SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,**<br><br>Real Parties in Interest.<br><br>***<br><br>**ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL** | Case No. 25CV02244<br>Consolidated with Case No. 25CV02247<br><br>**DECLARATION OF MICHAEL S. DORSI IN SUPPORT OF RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.'S OPPOSITION TO REAL PARTIES IN INTEREST'S MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION**<br><br>Date:          February 27, 2026<br>Time:          10:00 a.m.<br>Dept:          4<br>Judge:        Hon. Donna Geck<br><br>Trial Date:   Not Set<br>Action Filed: April 15, 2025 |

1

Request for Judicial Notice in Support of Opposition to Motion for Reconsideration  (25CV02244)

OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

      **Petitioners and Plaintiffs,**

       **v.**

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,

     **Respondents and Defendants,**

SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

      **Real Parties in Interest.**

2

I, Michael S. Dorsi, declare:

1. I am an attorney licensed to practice before all courts of the State of California. I am a Deputy Attorney General with the California Department of Justice, Office of the Attorney General, and am counsel for Respondents California Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California; and Daniel Berlant, in his official capacity as State Fire Marshal (collectively OSFM).

2. I have personal knowledge of the facts asserted in this Declaration, and if called as a witness, I could and would competently testify to these facts.

3. I obtained, compiled, and reviewed the documents attached to the Request for Judicial Notice filed along with this Declaration. For each document attached to the Request for Judicial Notice, I confirmed that the exhibits are true and correct copies of the documents.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 13th Day of February, 2026.

MICHAEL S. DORSI
DEPUTY ATTORNEY GENERAL

LA2025400847
44962655

3

Request for Judicial Notice in Support of Opposition to Motion for Reconsideration  (25CV02244)

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/13/2026 4:26 PM
By: Narzralli Baksh , Deputy

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
MATTHEW BULLOCK (SBN 243377)
MICHAEL S. DORSI (SBN 281865)
Deputy Attorney General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3802
 Fax:  (415) 703-5480
 E-mail:  Michael.Dorsi@doj.ca.gov
*Attorneys for Respondents and Defendants*
*Department of Forestry and Fire Protection, by and*
*through the Office of the State Fire Marshal, an*
*agency of the State of California; Daniel Berlant, in*
*his official capacity as State Fire Marshal*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA BARBARA

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,** | Case No. 25CV02244<br>Consolidated with Case No. 25CV02247 |
| **Petitioner and Plaintiff,** | **DECLARATION OF SERVICE BY EMAIL** |
| **v.** | |
| **CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,** | |
| **Respondents and Defendants,** | |
| **SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,** | |
| **Real Parties in Interest.** | |
| *** | |
| **ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL** | |

1

**OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,**

**Petitioners and Plaintiffs,**

**v.**

**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,**

**Respondents and Defendants,**

**SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,**

**Real Parties in Interest.**

2

## DECLARATION OF SERVICE BY E-MAIL

**Case Name:** Center for Biological Diversity v. CalFire/OSFM
**Case Number:** 25CV02244
**Party Represented:** Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California; Daniel Berlant, in his official capacity as State Fire Marshal

**Declaration of Electronic Service**

1. I am at least 18 years of age and not a party to this matter.

2. I am employed in the Office of the Attorney General of the State of California. My business address is 1515 Clay Street, 20th Floor, P.O. Box 70550, Oakland, CA 94612-0550, County of Alameda.

3. My electronic service address is Tania.Martinez@doj.ca.gov.

4. On February 13, 2026, I electronically served the following document[s]:

   a. **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION ET AL.'S OPPOSITION TO REAL PARTIES IN INTEREST'S MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION**
   b. **RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.'S OPPOSITION TO REAL PARTIES IN INTEREST'S MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION**
   c. **DECLARATION OF MICHAEL S. DORSI IN SUPPORT OF RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, ET AL.'S OPPOSITION TO REAL PARTIES IN INTEREST'S MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION**
   d. **CASE MANAGEMENT STATEMENT**

5. I electronically served the aforementioned document[s] by emailing them to the following individual[s]:

| | |
|---|---|
| Linda Krop<br>Jeremy M. Frankel<br>Tara C. Rengifo<br>ENVIRONMENTAL DEFENSE CENTER<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org | Julie Teel Simmonds<br>David Pettit<br>Talia Nimmer<br>CENTER FOR BIOLOGICAL DIVERSITY<br>**Email Addresses:**<br>jteelsimmonds@biologicaldiversity.org |

| trengifo@environmentaldefensecenter.org<br>**Attorneys for Petitioners**<br>**Environmental Defense Center** | dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org<br>**Attorneys for Petitioners Center for**<br>**Biological Diversity** |
|---|---|
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>PAUL HASTINGS, LLP<br>**Email Addresses:**<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com<br>**Attorneys for Real Parties in Interest**<br>**Sable Offshore Corp Pacific Pipeline Company** | Brooke Bolender<br>Jeffrey Dintzer<br>ALSTON & BIRD, LLP<br>**Email Addresses:**<br>Brooke.Bolender@alston.com<br>jeffrey.dintzer@alston.com<br>**Attorneys for Real Parties in Interest**<br>**Sable Offshore Corp Pacific Pipeline**<br>**Company** |
| Trevor D. Large<br>FAUVER, LARGE, ARCHIBALD & SPRAY, LLP<br>**Email Address:** TLarge@FLASllp.com<br>**Attorney for Real Parties in Interest**<br>**Sable Offshore Corp Pacific Pipeline Company** | |

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, and that this declaration was executed on February 13, 2026.

| Tania Martinez | *Tania Martinez* |
|---|---|
| Declarant | Signature |

LA2025400847
92087036.docx

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY | | FOR COURT USE ONLY |
|---|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY    STATE BAR NUMBER: 281865

NAME: Michael S. Dorsi, Deputy Attorney General

FIRM NAME: California Attorney General's Office

STREET ADDRESS: 455 Golden Gate Avenue, Suite 11000

CITY: San Francisco        STATE: CA      ZIP CODE: 94102

TELEPHONE NO.: 415-510-3802      FAX NO.:

EMAIL ADDRESS: Michael.Dorsi@doj.ca.gov

ATTORNEY FOR (name): Respondents California Department of Forestry and Fire Protection, et a

**FOR COURT USE ONLY**

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/13/2026 4:26 PM
By: Narzralli Baksh , Deputy

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Santa Barbara

STREET ADDRESS: 1100 Anacapa Street

MAILING ADDRESS:

CITY AND ZIP CODE: Santa Barbara, CA 93101

BRANCH NAME: Anacapa Division

PLAINTIFF/PETITIONER: Center for Biological Diversity, et al.

DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection, et al.

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|
| *(Check one):*  [X] **UNLIMITED CASE** (Amount demanded exceeds $35,000)   [ ] **LIMITED CASE** (Amount demanded is $35,000 or less) | 25CV02244 (consolidated w/ 25CV02247) |

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date: February 27, 2025      Time: 10:00 a.m.    Dept.: 4      Div.:      Room:

Address of court *(if different from the address above)*:

[ ] **Notice of Intent to Appear by Telephone, by** *(name):*

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one):*

   a. [X] This statement is submitted by party *(name):* Respondent California Department of Forestry and Fire Protection, et al.

   b. [ ] This statement is submitted **jointly** by parties *(names):*

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*

   a. The complaint was filed on *(date):* April 15, 2025

   b. [ ] The cross-complaint, if any, was filed on *(date):*

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*

   a. [X] All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.

   b. [ ] The following parties named in the complaint or cross-complaint

      (1) [ ] have not been served *(specify names and explain why not):*

      (2) [ ] have been served but have not appeared and have not been dismissed *(specify names):*

      (3) [ ] have had a default entered against them *(specify names):*

   c. [ ] The following additional parties may be added *(specify names, nature of involvement in case, and date by which they may be served):*

4. **Description of case**

   a. Type of case in [X] complaint   [ ] cross-complaint      *(Describe, including causes of action):*

      Petition for writ of mandate and complaint challenging Respondents' issuance of state waivers for the Las Flores Pipelines.

Page 1 of 5

| Form Adopted for Mandatory Use Judicial Council of California CM-110 [Rev. January 1, 2024] | **CASE MANAGEMENT STATEMENT** | Cal. Rules of Court, rules 3.720–3.730 www.courts.ca.gov |
|---|---|---|

**CM-110**

| PLAINTIFF/PETITIONER: Center for Biological Diversity, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection, et al. | 25CV02244 (consolidated w/ 25CV02247) |

4.  b.  Provide a brief statement of the case, including any damages *(if personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings; if equitable relief is sought, describe the nature of the relief)*:

Petitioners allege violations of federal and state procedures for pipeline regulations and California Environmental Quality Act.

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**

The party or parties request ☐ a jury trial ☒ a nonjury trial. *(If more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**

a.  ☐ The trial has been set for *(date):*

b.  ☒ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

Relationship to other cases may justify continuing case management past 12 months.

c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*
September 20-October 20, 2026

7.  **Estimated length of trial**

The party or parties estimate that the trial will take *(check one)*

a.  ☒ days *(specify number):* 1

b.  ☐ hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*

The party or parties will be represented at trial ☒ by the attorney or party listed in the caption ☐ by the following:

a.  Attorney:

b.  Firm:

c.  Address:

d.  Telephone number:     f.  Fax number:

e.  Email address:     g.  Party represented:

☐ Additional representation is described in Attachment 8.

9.  **Preference**

☒ This case is entitled to preference *(specify code section):* Public Resources Code, section 21167.1, subd. (a)

10. **Alternative dispute resolution (ADR)**

a.  **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 of the California Rules of Court for information about the processes available through the court and community programs in this case.

(1)  For parties represented by counsel: Counsel ☒ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

(2)  For self-represented parties: Party ☐ has ☐ has not reviewed the ADR information package identified in rule 3.221.

b.  **Referral to judicial arbitration or civil action mediation** (if available).

(1) ☐ This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

(2) ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

(3) ☒ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*
Cal. Rules of Court, rule 3.811(b)(1)

---

CM-110 [Rev. January 1, 2024]     **CASE MANAGEMENT STATEMENT**     **Page 2 of 5**

**CM-110**

| PLAINTIFF/PETITIONER: Center for Biological Diversity, et al.<br>DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection, et al. | CASE NUMBER:<br>25CV02244 (consolidated w/ 25CV02247) |
|---|---|

10. c.  In the table below, indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information)*:

| | The party or parties completing this form **are willing** to participate in the following ADR processes *(check all that apply)*: | If the party or parties completing this form in the case **have agreed** to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation)*: |
|---|---|---|
| (1) Mediation | [ ] | [ ] Mediation session not yet scheduled<br>[ ] Mediation session scheduled for *(date)*:<br>[ ] Agreed to complete mediation by *(date)*:<br>[ ] Mediation completed on *(date)*: |
| (2) Settlement conference | [x] | [ ] Settlement conference not yet scheduled<br>[ ] Settlement conference scheduled for *(date)*:<br>[ ] Agreed to complete settlement conference by *(date)*:<br>[x] Settlement conference completed on *(date)*: June 12, 2025 |
| (3) Neutral evaluation | [ ] | [ ] Neutral evaluation not yet scheduled<br>[ ] Neutral evaluation scheduled for *(date)*:<br>[ ] Agreed to complete neutral evaluation by *(date)*:<br>[ ] Neutral evaluation completed on *(date)*: |
| (4) Nonbinding judicial arbitration | [ ] | [ ] Judicial arbitration not yet scheduled<br>[ ] Judicial arbitration scheduled for *(date)*:<br>[ ] Agreed to complete judicial arbitration by *(date)*:<br>[ ] Judicial arbitration completed on *(date)*: |
| (5) Binding private arbitration | [ ] | [ ] Private arbitration not yet scheduled<br>[ ] Private arbitration scheduled for *(date)*:<br>[ ] Agreed to complete private arbitration by *(date)*:<br>[ ] Private arbitration completed on *(date)*: |
| (6) Other *(specify)*: | [ ] | [ ] ADR session not yet scheduled<br>[ ] ADR session scheduled for *(date)*:<br>[ ] Agreed to complete ADR session by *(date)*:<br>[ ] ADR completed on *(date)*: |

CM-110

| PLAINTIFF/PETITIONER: | Center for Biological Diversity, et al. | CASE NUMBER: |
|---|---|---|
| DEFENDANT/RESPONDENT: | California Department of Forestry and Fire Protection, et al. | 25CV02244 (consolidated w/ 25CV02247) |

**11. Insurance**

a. ☐ Insurance carrier, if any, for party filing this statement *(name):*

b. Reservation of rights: ☐ Yes ☐ No

c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**12. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.

☐ Bankruptcy ☐ Other *(specify):*

Status:

**13. Related cases, consolidation, and coordination**

a. ☒ There are companion, underlying, or related cases.

(1) Name of case: Environmental Defense Center, et al. v. California Department of Forestry and Fire Protection, et al.

(2) Name of court: Santa Barbara County Superior Court

(3) Case number: 25CV02247

(4) Status: Consolidated with this case

☒ Additional cases are described in Attachment 13a.

b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**14. Bifurcation**

☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**15. Other motions**

☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

**16. Discovery**

a. ☐ The party or parties have completed all discovery.

b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery):*

| Party | Description | Date |
|---|---|---|

c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify):*

**CM-110**

| PLAINTIFF/PETITIONER:     Center for Biological Diversity, et al.<br>DEFENDANT/RESPONDENT:     California Department of Forestry and Fire Protection, et al. | CASE NUMBER:<br>25CV02244 (consolidated w/ 25CV02247) |
|---|---|

17. **Economic litigation**

    a. ☐ This is a limited civil case (i.e., the amount demanded is $35,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

    b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

18. **Other issues**

    ☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

19. **Meet and confer**

    a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

    b. ☐ After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

20. Total number of pages attached *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:  February 13, 2026

Michael S. Dorsi
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.

| CM-110 [Rev. January 1, 2024] | **CASE MANAGEMENT STATEMENT** | **Page 5 of 5** |
|---|---|---|

**Attachment 13(a)**

**Related Cases**

*Environmental Defense Center, et al. v. Pipeline and Hazardous Materials Safety Administration, et al.*, United State Court of Appeals for the Ninth Circuit, case no. 25-8059
>	*Pending, opening briefs due March 23, 2026*

*California v. Pipeline and Hazardous Materials Safety Administration, et al.*, United State Court of Appeals for the Ninth Circuit, case no. 26-508
>	*Pending, opening briefs due March 23, 2026*

*Pacific Pipeline Company v. California*, Superior Court of California for the County of Kern, case no. BCV25103508
>	*Pending, Amended Complaint filed January 21, 2026*

*United States, et al. v. Plains All American Pipeline, et al.*, United States District Court for the Central District of California, case no. 2:20-cv-02415
>	*Judgment entering Consent Decree issued October 14, 2020*

*Sable Offshore Corp. v. County of Santa Barbara*, United States District Court for the Central District of California, case no. CV 25-4165-DMG (AGRX)
>	*Defendant's Return of Writ filed on February 5, 2026*
>	*Plaintiff's notice of intent to file amended complaint filed on February 9, 2026*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/13/2026 8:49 PM
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 884-7100
*Attorneys for Petitioners/Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

Linda Krop (Bar No. 118773)
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
Tara C. Rengifo (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152
*Attorneys for Petitioners/Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><hr>SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation; and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br>[Consolidated with Case No. 25CV02247]<br><br>**PETITIONERS' AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION**<br><br>*[Filed Concurrently with Request for Judicial Notice; Proposed Order Granting Request for Judicial Notice; and Declaration of Julie Teel Simmonds]*<br><br>Date:    February 27, 2026<br>Time:    10:00 a.m.<br>Dept.:    4<br>Judge:    Honorable Donna D. Geck<br><br>Action Filed: April 15, 2025 |

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

                    Petitioners/Plaintiffs,

      v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,

                 Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

               Real Parties in Interest.

Case No. 25CV02247
[Consolidated with Case No. 25CV02244]

---

Petitioners' Combined Opposition to Real Parties' Motion for Reconsideration of Preliminary Injunction

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND...........................................2

        A.   The Basis for this Lawsuit and the Court's Preliminary Injunction Order .................................2

        B.   Sable's Discontent with OSFM, Courtship of PHMSA, and Resulting Petitions for Review in the Ninth Circuit .................................3

        C.   Sable's Outstanding Permits and Other Approvals .........................................5

III.    LEGAL STANDARD............................................................................................5

IV.     ARGUMENT ........................................................................................................6

        A.   Sable's Motion in Untimely..............................................................................6

        B.   PHMSA's Unlawful Attempt to Seize Jurisdiction of the Pipelines Does Not Warrant Rescission of this Court's Injunction Under CCP 533. .................................6

             1.   OSFM's State Waivers Remain In Effect, Are Necessary for Restart, and May Continue to Be Relied Upon By Sable. .................................6

             2.   OSFM Retains Sole Regulatory Authority Over the Pipelines.............................7

                  a.   OSFM is Vested with Exclusive Oversight Over the Pipelines Pursuant to the Consent Decree.........................7

                  b.   OSFM Maintains Jurisdiction Over the Intrastate Pipelines. ...........................8

        C.   Sable's Conclusory Supremacy Clause and Preemption Arguments Fail. .................................9

        D.   There is No Risk of Collateral Disputes or Indirect Directives. .................................11

        E.   Sable Will Not Suffer Any Harm From the Injunction Remaining In Place.............................12

        F.   The Preliminary Injunction Remains Necessary to Prevent Irreparable Harm to Petitioners, the Public, and the Environment.....................................13

V.      CONCLUSION....................................................................................................14

i

# TABLE OF AUTHORITIES

**Cases**

*Atlantic C. L. R. Co. v. Brotherhood of Locomotive Engineers*

(1970) 398 U.S. 281 .......................................................................................................... 10, 11

*County of Sacramento v. Singh*

(2021) 65 Cal.App.5th 858 ........................................................................................................ 8

*Laurel Heights Improvement Assn. v. Regents of Univ. of California*

(1988) 47 Cal.3d 376 .............................................................................................................. 14

*Local Number 93, Internat. Assn. of Firefighters v. Cleveland*

(1986) 478 U.S. 501 .................................................................................................................. 7

*Loeffler v. Medina*

(2009) 174 Cal.App.4th 1495 ............................................................................................... 5, 7

*Nehmer v. VA*

(9th Cir. 2007) 494 F.3d 846 .................................................................................................... 8

*Nelson v. County of Kern*

(2010) 190 Cal.App.4th 252 ................................................................................................... 11

*Old Dominion Branch No. 496 v. Austin*

(1974) 418 U.S. 264 ................................................................................................................ 10

*Parsons Steel, Inc. v. First Alabama Bank*

(1986) 474 U.S. 518 ................................................................................................................ 11

*San Diego Public Library Foundation v. Fuentes*

(2025) 111 Cal.App.5th 711 ..................................................................................................... 7

*Tellez v. Rich Voss Trucking, Inc.*

(2015) 240 Cal.App.4th 1052 ................................................................................................... 8

*Tulare Lake Canal Co. v. Stratford Public Utility Dist*.

(2023) 92 Cal.App.5th 380 ..................................................................................................... 14

Petitioners' Combined Opposition to Real Parties' Motion for Reconsideration of Preliminary Injunction

*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.*

   (2007) 41 Cal.4th 929 ...................................................................................................... 10

*Yost v. Forestiere*

   (2020) 51 Cal.App.5th 509 .............................................................................................. 14


**Statutes**

Code Civ. Proc. § 1008, subd. (a) ..................................................................................... 6

Code Civ. Proc. § 533 ................................................................................................. 2, 5, 8

28 U.S.C. § 2283 ............................................................................................................. 10

49 U.S.C. § 60105(a) .................................................................................................... 8, 10

49 U.S.C. § 60118(c)(2)..................................................................................................... 4

49 U.S.C. § 60118(c)(2)(B) ............................................................................................... 9

49 U.S.C. § 60118(d) ........................................................................................................ 3

Pub. Resources Code § 30262(b)(2) .............................................................................. 5, 12


**Regulations**

49 C.F.R. § 190.341(g) ...................................................................................................... 4

iii

## I.  INTRODUCTION

The Court should reject Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's (collectively, Sable) Motion for Reconsideration of this Court's July 29, 2025 Preliminary Injunction (the Preliminary Injunction) as untimely and otherwise unjustified.

The thrust of Sable's Motion is that, because the federal Pipeline and Hazardous Materials Safety Administration (PHMSA) has purported to wrest jurisdiction of the Las Flores Pipeline System from Respondent Office of the State Fire Marshal (OSFM), Petitioners' challenge to the State Waivers has become moot, and thus the basis for the Preliminary Injunction is likewise moot. Sable's argument fails for at least two reasons.

First, despite PHMSA's recent actions — which Petitioners and OSFM have challenged in consolidated cases before the Ninth Circuit Court of Appeals — the State Waivers remain in effect. They have not been rescinded or vacated and may still be relied upon by Sable as it seeks to restart the Las Flores Pipeline System. Unless and until Sable surrenders the Waivers, or acknowledges that they are permanently void and without effect, this case still presents a live controversy.

Second, Sable incorrectly assumes that PHMSA has properly asserted authority over the pipelines — an issue that, again, is currently before the Ninth Circuit. However, OSFM is vested with "sole regulatory oversight" over the Pipeline System pursuant to a federal Consent Decree that is binding on both PHMSA and Sable. Moreover, and irrespective of the Consent Decree, the pipelines, which begin and end within state boundaries, are *intrastate* and thus lie beyond PHMSA's jurisdictional reach. Sable's remaining arguments, addressed below, are conclusory, undeveloped, and, to the extent this Court entertains them, unavailing.

As there are still numerous outstanding permits and other discretionary approvals Sable must acquire to legally restart, Sable's motion must be seen for what it is: yet another attempt to evade oversight and accountability in its haste to restart its defective oil pipelines. As Sable has failed to demonstrate that justice is served by, or that material changes in fact or law warrant modification,

1

Petitioners respectfully urge the Court to deny Sable's Motion and maintain its Preliminary Injunction. (*See* Code Civ. Proc. § 533.)

## II. FACTUAL AND PROCEDURAL BACKGROUND

This case arises from Sable's efforts to restart oil pipelines CA-324 and CA-325, which together comprise the Las Flores Pipeline System (the Pipeline System or Pipelines) — a defective pipeline system that ruptured in 2015 at Refugio State Beach, causing one of the worst oil disasters in California history. As was discovered after the spill, the Pipeline System suffers from a critical design defect that leaves it vulnerable to pervasive corrosion and, consequently, another catastrophic rupture. In addition to sensitive coastal areas, the Pipeline System passes through major sources of water supply; renowned parks and an ecological reserve; and a populated suburban neighborhood in Buellton, California, complete with schools, parks, and dozens of residential homes.

### A. The Basis for this Lawsuit and the Court's Preliminary Injunction Order

PHMSA initially had jurisdiction over pipelines CA-324 and CA-325, because when they were first permitted in the 1980's, the pipelines were proposed as a subset of a larger project, known as the Celeron/All American Pipeline Project, which envisioned an *interstate* pipeline system that would extend from Las Flores Canyon all the way to refineries in Midland, Texas. However, while the pipelines at issue were installed in the early 1990's, it is unclear if the broader project connecting them to Texas ever came to fruition, and, as early as 2000, it was acknowledged that the pipelines were not actually being used to transport crude oil out of state. Recognizing as much, after the 2015 spill, PHMSA formally reclassified the pipelines as *intrastate* facilities that would be subject to the exclusive regulatory authority of OSFM. (*See* Declaration of Julie Teel Simmonds [Teel Simmonds Decl.], Exh. L; Request for Judicial Notice [RJN] ¶ 12.) The reclassification of the pipelines as *intrastate,* and the corollary transfer of jurisdiction to OSFM, was memorialized in a 2016 Memorandum of Understanding between PHMSA and OSFM. (*Id*.)

In 2020, following the oil spill, Sable's predecessor (Plains All American Pipeline), OSFM, and PHMSA (among other state and federal parties) executed a Consent Decree, entered by the United States District Court for the Central District of California. As relevant here, in order to restart the defunct

Pipeline System, the Consent Decree requires Sable to obtain State Waivers (due to the Pipelines' defects) and approval of Restart Plans from OSFM. (Teel Simmonds Decl., Exhs. A, M; RJN ¶¶ 1, 13) In accordance with this agreement, Sable applied to OSFM for approval of the Waivers and Restart Plans.

On December 17, 2024, OSFM preliminarily approved the State Waivers and submitted them to PHMSA the following day, as required by 49 U.S.C. section 60118, subd. (d). On February 11, 2025, PHMSA notified OSFM that it would not object to the State Waivers.

On April 15, 2025, Petitioners filed lawsuits challenging the legality and adequacy of the State Waivers. The Petitions include claims that OSFM failed to comply with the California Environmental Quality Act (CEQA) and federal and state pipeline safety law requirements in issuing the State Waivers.

On June 3, 2025, the Court granted Petitioners' request for a Temporary Restraining Order, ordering OSFM and Sable to maintain the status quo until Petitioners' request for a Preliminary Injunction could be heard. Thereafter, on July 29, 2025, the Court granted, in part, Petitioners' request for a Preliminary Injunction, ordering that:

> The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart.

(July 29, 2025 Order re: Preliminary Injunction, Exh. A, p. 2.)

**B. Sable's Discontent with OSFM, Courtship of PHMSA, and Resulting Petitions for Review in the Ninth Circuit**

On September 11, 2025, Sable submitted updated Restart Plans to OSFM for approval. (Teel Simmonds Decl., Exh. B, p. 40; RJN ¶ 2.) On October 22, 2025, OSFM issued Sable a letter stating that Sable must conduct additional, critical repairs of the corroded Pipeline System before OSFM could lawfully approve Sable's Restart Plans. (Teel Simmonds Decl., Exh. C; RJN ¶ 3.) Such repairs, said OSFM, were explicitly required by the State Waivers, and "the inconsistencies with the State Waiver requirements prevent restart under the law." (*Id.*) The letter additionally noted that OSFM continues to

3

Petitioners' Combined Opposition to Real Parties' Motion for Reconsideration of Preliminary Injunction

review Sable's submitted Restart Plans. (*Id.*)

Instead of conducting the repairs identified by OSFM, Sable sought to circumvent OSFM's authority. To that end, on November 26, 2025, Sable sent a letter to PHMSA requesting that PHMSA determine that the pipelines are "interstate," not "intrastate". (Teel Simmonds Decl., Exh. D; RJN ¶ 4.) On December 17, 2025, PHMSA sent Sable a letter concurring in Sable's determination that the Pipeline System is "interstate" and, on that basis, purported to wrest jurisdiction of the Pipeline System from OSFM. (Declaration of J. Caldwell Flores in Support of Motion for Reconsideration (Flores Decl.), Exh. A.)

From December 4 to 12, 2025, Sable submitted documents to PHMSA in support of a proposed Restart Plan. (Flores Decl., Exh. B.) On December 19, 2025, Sable sent PHMSA an application for an Emergency Special Permit under 49 U.S.C. Section 60118(c)(2) and 49 C.F.R. Section 190.341(g) (the federal equivalent of a State Waiver, albeit on an emergency basis), including a draft Permit. (Teel Simmonds Decl., Exh. E; RJN ¶ 5.) On December 22, 2025, PHMSA approved Sable's submitted Restart Plan. (Flores Decl., Exh. B.) On December 23, 2025, PHMSA issued Sable an Emergency Special Permit (ESP) with a February 21, 2026, expiration date. (Flores Decl., Exh. C.)

On December 24, 2025, Petitioners filed a Petition for Review of PHMSA's decisions (Teel Simmonds Decl., Exh. F; RJN ¶ 6) and an Emergency Motion for a Stay Pending Appeal in the Ninth Circuit Court of Appeals, Case No. 25-8059. On December 31, 2025, the Ninth Circuit denied Petitioners' Emergency Motion and ordered expedited briefing in the case. (Teel Simmonds Decl., Exh. G; RJN ¶ 7.)

On January 23, 2026, the State of California, by and through Attorney General Rob Bonta and OSFM, filed its own Petition for Review in the Ninth Circuit Court of Appeals (Case No. 26-508) challenging PHMSA's assumption of jurisdiction over the pipelines and issuance of the Emergency Special Permit and Restart Plan Approval. (Teel Simmonds Decl., Exh. H, RJN ¶ 8.) PHMSA filed a Motion to consolidate the two cases on January 30, 2026. (Teel Simmonds Decl., Exh. I; RJN ¶ 9.) On February 5, the Ninth Circuit granted the motion and set forth a schedule for briefing with an expected

Petitioners' Combined Opposition to Real Parties' Motion for Reconsideration of Preliminary Injunction

hearing date in July 2026. (Teel Simmonds Decl., Exh. J; RJN ¶ 10.)

## C.  Sable's Outstanding Permits and Other Approvals

While Sable attempts to remove the Pipeline System from OSFM oversight, it notably still lacks several permits and other approvals necessary to legally restart the pipelines. This includes a Coastal Development Permit from the California Coastal Commission. (*See* Pub. Resources Code § 30262(b)(2) [requiring new coastal development permit for oil and gas facilities, including oil pipelines, that have been idled, inactive, or out of service for five or more years].) Sable also needs a new easement to operate the Pipeline System within Gaviota State Park from the California Department of Parks and Recreation, which notified Sable on November 13, 2025 that the new easement was not exempt from environmental review and that the agency would prepare an Initial Study to determine what level of environmental review is required. (Teel Simmonds Decl., Exh. B, p. 41; RJN ¶ 2.) Additionally, on December 16, 2025, the Santa Barbara County Board of Supervisors voted to deny Sable's applications to take over as the owner, operator, and guarantor on final development permits for the Santa Ynez Unit facilities, including the Las Flores Pipeline System. (Teel Simmonds Decl., Exh. K; RJN ¶ 11.)

## III. LEGAL STANDARD

Code of Civil Procedure (CCP) section 533 provides that a court may modify an injunction or temporary restraining order "upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification." However, "the burden is on the restrained party to show by a preponderance of the evidence that one of the circumstances set forth in Code of Civil Procedure section 533 is present and justifies" modification of the order. (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1504.) Absent such evidence, denial of the modification request is warranted. (*Id*. at 1507-1508.)

## IV. ARGUMENT

### A. Sable's Motion in Untimely.

To the extent Sable attempts to proceed under CCP section 1008(a) (*see* Motion at p. 8), its Motion should be denied because it was not filed within ten days of the Court's order. Specifically, a party seeking reconsideration of an order under that provision must do so "within 10 days after service upon the party *of written notice of entry of the order* and based upon new or different facts, circumstances, or law, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order." (Code Civ. Proc. § 1008, subd. (a) [emphasis added].) Here, Sable filed its Motion on January 5, 2026, over five months after the Court's Order. As such, Sable's Motion is untimely as a Motion for Reconsideration pursuant to CCP section 1008(a).

### B. PHMSA's Unlawful Attempt to Seize Jurisdiction of the Pipelines Does Not Warrant Rescission of This Court's Injunction Under CCP 533.

Sable argues that Petitioners' challenge to the Waivers is moot because OSFM no longer has regulatory authority over the Pipelines. Thus, Sable continues, the basis for the Court's Preliminary Injunction is likewise moot, requiring that it be rescinded. However, Sable's argument fails on multiple accounts.

1.  OSFM's State Waivers Remain In Effect, Are Necessary for Restart, and May Continue to Be Relied Upon By Sable.

Nothing about PHMSA's actions, including its issuance of a sixty-day Emergency Special Permit, has rendered this case or the Preliminary Injunction moot. Importantly, Sable has not conceded that the State Waivers at issue in this case are no longer in effect or were otherwise voided by PHMSA's actions. If Petitioners and OSFM prevail in their respective challenges to PHMSA's December 2025 decisions, Sable could revert to relying on the State Waivers to continue pursuing restart. Put differently, either the State Waivers are void, and Sable cannot rely on them if its federal scheme falls through, or they are still effective, and this action is not moot. Sable cannot have it both ways. Indeed, the State Waivers remain a precondition to restart under the federal Consent Decree to which PHMSA and Sable are bound.

6

Petitioners' Combined Opposition to Real Parties' Motion for Reconsideration of Preliminary Injunction

As discussed further below, the Consent Decree explicitly requires that Sable "receive a State Waiver *from the OSFM* prior to restarting," and it vests OSFM with "sole regulatory oversight" over the pipelines. (Teel Simmonds Decl., Exhs. A, p. 7; RJN ¶ 1 [emphasis added].) Thus, PHMSA's ESP — which is neither a "State Waiver" nor issued "from the OSFM" — cannot satisfy the restart conditions of the Consent Decree, and the State Waivers remain necessary in order to restart the Pipelines. Unless and until the State Waivers are voided, this case still presents a live controversy. (*See San Diego Public Library Foundation v. Fuentes* (2025) 111 Cal.App.5th 711, 722 [case is not moot if the court's opinion still affects the outcome of the case or has practical implications].) For this reason, Sable has not met its burden of demonstrating the existence of any material changes in fact or law warranting modification of the Preliminary Injunction. (*See Loeffler, supra,* 174 Cal.App.4th at 1507-1508.)

> 2. <u>OSFM Retains Sole Regulatory Authority Over the Pipelines.</u>
>> a. *OSFM is Vested with Exclusive Oversight Over the Pipelines Pursuant to the Consent Decree.*

Sable's argument that PHMSA's actions "eliminat[e] OSFM's jurisdiction over the Las Flores Pipeline" expressly contravenes the Consent Decree by which it is bound. (Motion at p. 10.) The Consent Decree specifies that the Pipelines are "subject to the sole regulatory oversight of the OSFM," and provides that all efforts to remediate and restart the Pipelines are subject to OSFM's exclusive oversight. Indeed, the Consent Decree expressly provides that an operator "shall not operate [the Pipeline System] until authorized to do so by the *OSFM*." (Teel Simmonds Decl., Exh. A, p. 23; RJN ¶ 1 [emphasis added].) Likewise, prior to restarting, the operator "must receive a State Waiver from the *OSFM*," and any Restart Plan must be submitted "to the *OSFM* for review and approval." (*Id*. at pp. 7, 23. [emphasis added].) Notably, PHMSA's Emergency Special Permit explicitly provides that "[t]his emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree." (Flores Decl., Exh. C at p. 4 of 16.)

Accordingly, so long as the court-approved Consent Decree remains valid and effective (*see* Teel Simmonds Decl., Exh. M; RJN ¶ 13), its terms control and are dispositive here: OSFM retains sole authority to regulate the pipelines exclusive of PHMSA. (*See Local Number 93, Internat. Assn. of Firefighters v. Cleveland* (1986) 478 U.S. 501, 525 [recognizing that a consent decree imposes legal

7

obligations upon a party to that decree and that "the parties' consent animates the legal force of a consent decree"]; *see also Nehmer v. VA* (9th Cir. 2007) 494 F.3d 846, 860 [a party "cannot dictate the meaning of [a consent] decree to [a] court or relieve itself of its obligations under the decree without the [issuing] district court's approval"].) There has been absolutely no material change in fact or law absolving the parties to the Consent Decree of their legal obligations, and the ends of justice thus would certainly not be served by a modification of the injunction.

        *b.   OSFM Maintains Jurisdiction Over the Intrastate Pipelines.*

Moreover, and irrespective of the Consent Decree, this Pipeline System begins and ends within state boundaries, and is thus an *intrastate* facility beyond PHMSA's jurisdictional reach. (*See* 49 U.S.C. § 60105(a).)

While Sable repeatedly points out that PHMSA has "asserted regulatory oversight over the [Pipelines]," it never actually explains *why* PHMSA lawfully asserted jurisdiction of the Pipelines, or, more specifically, why the Pipeline System ought to be considered interstate. A conclusory assertion that the Pipeline System is interstate is insufficient to meet their burden under CCP section 533, and the Court should not consider any argument as to why the Pipeline System should be considered interstate if raised for the first time on reply. (*See, e.g., County of Sacramento v. Singh* (2021) 65 Cal.App.5th 858, 867 ["We do not consider undeveloped claims."]; *Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066 ["[P]oints raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument" [citation omitted]].) That said, for the reasons stated in section II(D) of Respondent OSFM's Opposition Brief, which Petitioners join, the pipelines are *intrastate* facilities.

Indeed, the Pipeline System's intrastate character was expressly recognized by PHMSA in a 2016 memorandum of understanding with OSFM, and there have been no changes to the facilities in the interim that would warrant their recharacterization as interstate. (*See* Teel Simmonds Decl., Exh. L; RJN ¶ 12.) Thus, PHMSA is prohibited from regulating the Pipeline System, and sole regulatory authority properly lies with OSFM. (49 U.S.C. § 60105(a) [PHMSA "may not prescribe or enforce safety

Petitioners' Combined Opposition to Real Parties' Motion for Reconsideration of Preliminary Injunction

standards and practices for an intrastate pipeline facility or intrastate pipeline transportation to the extent that the safety standards and practices are regulated by a State authority"].)

Petitioners' challenge to PHMSA's issuance of approvals to Sable in no way concedes that the pipelines are now interstate. The issue of whether PHMSA lawfully asserted jurisdiction over the pipelines is a core issue before the Ninth Circuit Court of Appeals, and Petitioners intend to fully brief why the Pipelines remain intrastate in their Opening Brief. (Teel Simmonds Decl., ¶ 11.) Similarly, OSFM itself has challenged PHMSA's interstate determination and assertion of jurisdiction over the pipelines in the Ninth Circuit Court of Appeals. (Teel Simmonds Decl., Exh. H; RJN ¶ 8.)

### C.  Sable's Conclusory Supremacy Clause and Preemption Arguments Fail.

Sable's supremacy clause and preemption arguments are undeveloped and otherwise unpersuasive. As an initial matter, because Sable fails to provide any explanation whatsoever for *how* the Preliminary Injunction frustrates the supremacy clause, the Court should give this conclusory argument no weight. To the extent the Court considers this argument, Sable's suggestion that the Preliminary Injunction is somehow preventing it from complying with PHMSA's ESP and Restart Plan Approval decisions or frustrating their purposes is unavailing. (Motion at p. 10.)

The Court's Preliminary Injunction does not prohibit Sable from ever restarting the Pipelines, but rather requires that Sable provide 10 court days' notice when it has secured all necessary permits and other approvals and intends to restart the Pipelines. Plus, neither PHMSA approval *requires* Sable to restart or operate the Pipelines but instead merely *allows* Sable to do so assuming it is able to obtain all other necessary approvals to restart. (*See e.g.* Flores Decl., Exh. B ["PHMSA has reviewed [Sable's] documents and hereby approves the submitted Restart Plan"]; *id*. at Exh. C, p. 3 of 4 ["the scope of the proposed emergency action is narrow" in that it solely waives certain federal pipeline safety requirements].) As such, the Preliminary Injunction does not conflict with PHMSA's decisions.[1]

---

[1] That there is no conflict between the ESP and this Court's Injunction is further illustrated by the fact that PHMSA's ESP expires on February 21, 2026, just before the Court's February 27, 2026 hearing on this motion. (Flores Decl., Exh. C.) Although PHMSA could thereafter renew the permit, it may only do so after a statutorily-mandated notice and opportunity for a hearing. (49 U.S.C. § 60118(c)(2)(B).) This imminent expiration of the ESP highlights yet another distinction between the State Waivers at issue here and PHMSA's decisions.

9

Further putting Sable's argument to rest, OSFM has historically assumed and continues to exercise its jurisdiction over the Pipelines and pipeline safety consistent with, not in conflict with, federal law. (Teel Simmonds Decl., Exh. L; RJN ¶ 12.) Under the Pipeline Safety Act, PHMSA is expressly prohibited from "prescrib[ing] or enforc[ing] safety standards and practices for an intrastate pipeline facility or intrastate pipeline transportation to the extent that the safety standards and practices are regulated by a State authority." (49 U.S.C. § 60105(a).) Sable's claim that the Preliminary Injunction is preempted by Executive Order 14156 fares no better. In the absence of express preemptive text, "[c]ourts are reluctant to infer preemption." (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935). Sable's blanket mention of the Executive Order without any explanation as to how it preempts the Preliminary Injunction, and its citation to a case bearing no resemblance to the instant situation where an emergency Executive Order is merely "referenced in PHMSA's findings supporting Sable's Emergency Special Permit," does not fit the bill. (Motion at p 11 [*citing Old Dominion Branch No. 496 v. Austin* (1974) 418 U.S. 264, 273 [concluding that an Executive Order concerning labor-management relations in the federal service explicitly preempted state libel laws]].)

Finally, to date, Sable has not sought from a federal court an order to stay this Court's proceeding or rescind its Preliminary Injunction, and in any event, no such order would be permissible under the Anti-Injunction Act, which provides that "a court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." (28 U.S.C. § 2283.) A stay of this Court's proceedings is not expressly authorized by Congress nor necessary to aid the Ninth Circuit Court of Appeal's jurisdiction or to protect or effectuate its judgments. As noted above, this case does not in any way "seriously impair the federal court's flexibility and authority to decide [its] case" which here involves a *different* agency's issuance of *separate* approvals. (*Atlantic C. L. R. Co. v. Brotherhood of Locomotive Engineers* (1970) 398 U.S. 281, 295.) The limitations imposed by the Anti-Injunction Act mean that Sable's alleged preemption and supremacy clause claims would not afford

relief in federal court. (*See id.* at 294 ["a federal court does not have inherent power to ignore the limitations of [the Anti-Injunction Act] and to enjoin state court proceedings" even where "those proceedings interfere with a protected federal right or invade an area preempted by federal law"].) The Court can and should continue to enforce its Preliminary Injunction and oversee this case while the attempt by PHMSA to improperly seize control over the Pipelines and issue approvals to facilitate their restart plays out in the Ninth Circuit Court of Appeals.

### D.  There is No Risk of Collateral Disputes or Indirect Directives.

Finally, Sable's argument that "the operation of the Preliminary Injunction increases the risk of collateral disputes and inconsistent directives across forums while the parties litigate parallel issues in federal proceedings" is unfounded and misses the mark. (Motion at p. 11.) State and federal courts can and do routinely hear overlapping cases involving related legal issues, particularly in situations involving urgency. (*See e.g. Atlantic C. L. R. Co., supra,* 398 U.S. at 295 ["the state and federal courts had concurrent jurisdiction in this case, and neither court was free to prevent either party from simultaneously pursuing [related] claims in both courts. . . [rather, the parties were] undoubtedly free to seek such relief from [one] cour[t], and might possibly in certain emergency circumstances seek such relief from [another] Court as well"]; *see also Parsons Steel, Inc. v. First Alabama Bank* (1986) 474 U.S. 518, 525 [concurrent jurisdiction is simply "one of the costs of our dual court system"].) Indeed, "the CEQA Guidelines plainly contemplate overlapping state and federal jurisdiction in the sense that certain projects may be subject to *both* CEQA and NEPA and hence may involve review . . . by both state or local *and* federal agencies," as is the case here where Petitioners are bringing distinct CEQA and NEPA challenges to separately issued permits. (*Nelson v. County of Kern* (2010) 190 Cal.App.4th 252, 278.)

Sable's concern about "collateral disputes and inconsistent directives" (Mot. at p. 11) is no reason to rescind this Court's Preliminary Injunction. Similarly, Sable's final assertion that "[t]he parties are now actively litigating [the same] issues in federal court" is inaccurate and misleading. (*Id.*) What the Ninth Circuit ultimately decides on the question of whether a separate agency (PHMSA) lawfully

issued separate approvals (the ESP and Restart Plan decision) does not now dictate the modification of, or otherwise conflict with, this Court's Preliminary Injunction.

### E.  Sable Will Not Suffer Any Harm From the Injunction Remaining In Place.

Despite Sable's contention that it will "suffer significant and irreparable harm if the Preliminary Injunction is not immediately rescinded" (Motion at p. 3), it does not actually offer any evidence showing that it would be harmed. Nor can it since the option to dissolve the injunction by properly filing a 10-day notice with the Court remains available to Sable. That Sable has still not filed any such notice to date confirms that Sable must not be on the precipice of restarting the Pipeline System since it still needs additional entitlements from various state and local agencies before it can lawfully restart.

As noted above, Sable still needs OSFM approval of its Restart Plans, as required by the Consent Decree. (Teel Simmonds Decl., Exh. A, p. 23; RJN ¶ 1.) Sable also has not obtained "an easement to accommodate a four-mile section for pipeline maintenance in Gaviota State Park" from the California Department of Parks and Recreation. (Teel Simmonds Decl., Exh. B, p. 40; RJN ¶ 2.) Nor has Sable obtained a Coastal Development Permit from the California Coastal Commission despite the Commission continually "direct[ing] Sable to apply for [one]." (Teel Simmonds Decl., Exh. B, p. 32; *see* Case No. 25CV02247 June 2, 2025 Request for Judicial Notice, Exh. C, p. 223.) Indeed, Senate Bill No. 237 confirms that as of January 1, 2026, Sable is required to obtain a new Coastal Development Permit to restart the pipelines. (Pub. Resources Code § 30262(b)(2).) Finally, Sable has not obtained from the County of Santa Barbara the transfer of Final Development Permits from Exxon Mobil Corporation. Rather, on December 16, 2025, the County's Board of Supervisors denied the transfer of owner, operator and guarantor permits. (Teel Simmonds Decl., Exh. K; RJN ¶ 11.)

Sable's alleged harm is belied by the additional permits and approvals it still needs to lawfully restart the Pipelines. Contrary to Sable's assertions, the Preliminary Injunction is far from the only obstacle to restarting. Thus, the ends of justice would be served by no modification of the injunction's modest requirement that Sable provide 10-days' notice to the Court and the parties when it has obtained all necessary approvals and intends to restart.

Petitioners' Combined Opposition to Real Parties' Motion for Reconsideration of Preliminary Injunction

**F. The Preliminary Injunction Remains Necessary to Prevent Irreparable Harm to Petitioners, the Public, and the Environment.**

The Preliminary Injunction remains critical to ensure that Petitioners' rights are upheld and that there is no irreparable harm to the public and the environment particularly given Sable's position at the January 7, 2026 hearing that, despite not having all of their approvals, the Preliminary Injunction is the only thing standing in the way of restart. (*See* Teel Simmonds Decl., Exh. N, p. 263, lines 9-12; RJN, ¶ 14.) As recently as October 22, 2025, OSFM determined that the Pipelines should *not* be restarted until further repairs are made. (Teel Simmonds Decl., Exh. C; RJN, ¶ 3.)

As Petitioners described in detail in their motions for a Preliminary Injunction, the risks of operating the Pipeline System without effective cathodic protection have never been fully evaluated even though restarting the existing Pipelines could result in an oil spill *once a year* and a rupture *once every four years*. (Case No. 25CV02244 Petition at ¶ 6; Case No. 25CV02247 June 2, 2025 Declaration of Linda Krop, Exh. E.) Petitioners and the public have already witnessed first-hand the devastation that this Pipeline System can wreak on coastal resources. The 120-mile long Pipeline System threatens major rivers and groundwater supply sources, renowned parks and ecological reserves, a number of endangered and special-status species, and even a populated suburban neighborhood. (Case No. 25CV02244 Petition at ¶¶ 45-48; Case No. 25CV02244 June 2, 2025 Declaration of Kara Clauser, Exhs. 1-6.) The lack of any environmental review, public process, and compliance with pipeline safety laws renders operation of these Pipelines an immediate concern given the possibility of imminent irreparable harm to the surrounding community, environment, and natural resources, necessitating the Court's continued enforcement of its Preliminary Injunction.

What's more, if the Preliminary Injunction is rescinded and Sable restarts the Pipeline System, Petitioners will no longer have the opportunity to contest whether Sable has secured all necessary approvals and permits; nor will they be able to seek further relief from the Court to maintain the status quo pending the resolution of this case. If Sable restarts before Petitioners have an opportunity to present their arguments to the Court, any CEQA and pipeline safety review ultimately ordered by this Court

13

would "likely become nothing more than post hoc rationalizations to support action already taken." (*Tulare Lake Canal Co. v. Stratford Public Utility Dist*. (2023) 92 Cal.App.5th 380, 416 [quoting *Laurel Heights Improvement Assn. v. Regents of Univ. of California* (1988) 47 Cal.3d 376, 392].) The Court imposed the Preliminary Injunction for these very reasons, to avoid "the restart of the Las Flores Pipelines without compliance with all applicable law" and to ensure an opportunity for Petitioners to respond *prior to restart*. (July 29, 2025 Order re: Preliminary Injunction, p. 18.) Thus, the Court can and should maintain the Preliminary Injunction to ensure that the procedural measures it put in place to address the risk of irreparable harm to Petitioners and the public at large are maintained. (*See Yost v. Forestiere* (2020) 51 Cal.App.5th 509, 529 ["the court addressing a modification request must consider the circumstances that produced [the] original finding . . . and use that understanding to evaluate the conditions existing at the time of the modification hearing. . . [including] whether precipitating circumstances continue to exist so as to establish the likelihood of future harm"], citations omitted.)

## V.   **CONCLUSION**

Given the lack of any material change in fact or law warranting a modification of the Court's July 29, 2025 Preliminary Injunction, Petitioners respectfully request that the Court deny Sable's Motion for Reconsideration. Keeping the injunction in place is critical to protect the public and parties from a premature or unwarranted restart of this defective, long-idled pipeline system.

Dated: February 13, 2026                    Respectfully submitted,


                                            */s/ Julie Teel Simmonds*
                                            Julie Teel Simmonds
                                            David Pettit
                                            Talia Nimmer
                                            CENTER FOR BIOLOGICAL DIVERSITY
                                            2100 Franklin St., Ste. 375
                                            Oakland, CA 94612
                                            Tel. (510) 844-7100

                                            *Attorneys for Petitioners Center for*
                                            *Biological Diversity and Wishtoyo Foundation*

Petitioners' Combined Opposition to Real Parties' Motion for Reconsideration of Preliminary Injunction

/s/ *Linda Krop*_____

Linda Krop
Jeremy M. Frankel
Tara C. Rengifo
ENVIRONMENTAL DEFENSE CENTER
906 Garden St.,
Santa Barbara, CA 93101
Tel. (805) 963-1622

*Attorneys for Petitioners Environmental Defense Center, Get Out Oil!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

15

Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/13/2026 8:49 PM
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 884-7100
*Attorneys for Petitioners/Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

Linda Krop (Bar No. 118773)
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
Tara C. Rengifo (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152
*Attorneys for Petitioners/Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation; and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br>[Consolidated with Case No. 25CV02247]<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PETITIONERS' AND PLAINTIFFS' COMBINED OPPOSITION TO REAL PARTIES IN INTEREST'S NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION**<br><br>[Filed Concurrently with Opposition, Declaration of Julie Teel Simmonds, and [Proposed] Order]<br><br>Date:     February 27, 2026<br>Time:     10:00 a.m.<br>Dept.:     4<br>Judge:    Honorable Donna D. Geck<br><br>Action Filed: April 15, 2025 |

Request for Judicial Notice ISO Petitioners' Combined Opposition to Motion for Reconsideration

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

                        Petitioners/Plaintiffs,

    v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,

                      Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

                      Real Parties in Interest.

Case No. 25CV02247
[Consolidated with Case No. 25CV02244]

**REQUEST FOR JUDICIAL NOTICE**

Pursuant to California Evidence Code sections 452 and 453, Petitioners Center for Biological Diversity, Wishtoyo Foundation, Environmental Defense Center, Get Out Oil!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (collectively, Petitioners) respectfully submit this Request for Judicial Notice in support of their Opposition to Real Parties in Interest's (Sable) Notice of Motion and Motion for Reconsideration of Preliminary Injunction filed concurrently herewith.

Evidence Code section 453 provides that a court must take judicial notice of any matter specified in section 452 when the requesting party "[g]ives each adverse party sufficient notice of the request" and "[f]urnishes the court with sufficient information to enable it to take judicial notice of the matter." (Evid. Code, § 453.) Petitioners have satisfied these conditions by serving this request on Respondents and Real Parties in Interest.

Courts may take judicial notice of "[o]fficial acts of the legislative, executive, and judicial departments of the United States and of any state of the United States." (Evid. Code, § 452, subd. (c).) Section 452(c) has "been read to allow judicial notice of administrative agency records." (*Associated Builders & Contractors, Inc. v. San Francisco Airports Comm'n* (1999) 21 Cal.4th 352, 374, fn.4.) The official acts covered by this provision "include records, reports, and orders of administrative agencies." (*Rodas v. Spiegel* (2001) 87 Cal.App.4th 513, 518.) Here, **Exhibits A-E and K-L** were prepared by state and federal administrative or are obtainable from administrative agency websites.

Under Evidence Code section 452, subdivision (d), judicial notice may be taken of "[r]ecords of (1) any court of this state or (2) any court of record of the United States or of any state of the United States. **Exhibits F-J, and M-N** fall under this section as they are court documents or records.

Finally, under Evidence Code section 452, subdivision (h), courts may take judicial notice of "[f]acts . . . that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." As noted above, **Exhibits A-E and K-L** were prepared by state and federal agencies or are obtainable on agency websites, so they are capable of immediate and accurate determination.

Judicial notice is appropriate here because the administrative record in this case has not been prepared and certified, and in the meantime, the facts contained in these documents are not reasonably

subject to dispute and are highly relevant to Petitioners' Opposition. Accordingly, Petitioners respectfully request that this Court take judicial notice of the documents listed below pursuant to Evidence Code section 452, subdivisions (c), (d), and (h):

1. Attached as **Exhibit A** to the concurrently filed Declaration of Julie Teel Simmonds is a true and correct copy of excerpts of the Consent Decree entered into by Sable's predecessor, Plains All American Pipeline, the Office of the State Fire Marshal (OSFM), and the Pipeline and Hazardous Materials Safety Administration (PHMSA) (among other parties), available on the U.S. Environmental Protection Agency website at: https://www.epa.gov/sites/default/files/2020-03/documents/plainsallamericanpipelinelp.pdf.

2. Attached as **Exhibit B** to the concurrently filed Declaration of Julie Teel Simmonds is a true and correct copy of the California Natural Resources Agency's (CNRA) December 31, 2025 updated Summary of State Regulation of Crude Oil Pipelines in Santa Barbara County, available on the CNRA website at: https://resources.ca.gov/-/media/CNRA-Website/Files/NewsRoom/Educational-Portal/Pipeline-Summary-12-31-2025-ADA-comp.pdf

3. Attached as **Exhibit C** to the concurrently filed Declaration of Julie Teel Simmonds is a true and correct copy of an October 22, 2025 letter from the OSFM to Sable regarding unmet State Waiver conditions, available on the United States Securities and Exchange Commission (SEC) Website at: https://www.sec.gov/Archives/edgar/data/1831481/000183148125000086/osfm-lettertosable.htm.

4. Attached as **Exhibit D** to the concurrently filed Declaration of Julie Teel Simmonds is a true and correct copy of a November 26, 2025 letter from Sable to PHMSA requesting that the pipelines be redesignated as interstate.

5. Attached as **Exhibit E** to the concurrently filed Declaration of Julie Teel Simmonds is a true and correct copy of a December 19, 2025 application letter from Sable to PHMSA for an Emergency Special Permit, available on PHMSA's docket for the Emergency Special Permit at: https://www.regulations.gov/docket/PHMSA-2025-1502/document.

6. Attached as **Exhibit F** to the concurrently filed Declaration of Julie Teel Simmonds is a true and correct copy of Petitioners' December 24, 2025 Petition for Review filed in the Ninth Circuit

Court of Appeals challenging PHMSA's approval of Sable's Restart Plan and issuance of an Emergency Special Permit for the Las Flores Pipeline System.

7. Attached as **Exhibit G** to the concurrently filed Declaration of Julie Teel Simmonds is a true and correct copy of the Ninth Circuit Court of Appeals' denial of Petitioners' Emergency Motion and Order expediting briefing in the case.

8. Attached as **Exhibit H** to the concurrently filed Declaration of Julie Teel Simmonds is a true and correct copy of the State of California's January 23, 2026 Petition in the Ninth Circuit Court of Appeals.

9. Attached as **Exhibit I** to the concurrently filed Declaration of Julie Teel Simmonds is a true and correct copy of the January 30, 2026 Motion to Consolidate Petitioners' and the State of California's Petitions, filed in the Ninth Circuit Court of Appeals.

10. Attached as **Exhibit J** to the concurrently filed Declaration of Julie Teel Simmonds is a true and correct copy of the Ninth Circuit Court of Appeals' February 5, 2026 Order granting the Motion to Consolidate.

11. Attached as **Exhibit K** to the concurrently filed Declaration of Julie Teel Simmonds is a true and correct copy of the Santa Barbara County Board of Supervisors' December 23, 2025 Action Letter, available on the County's website at:
https://cosantabarbara.app.box.com/s/wlihoyv3ntcd76py99nh2nemm555qco6.

12. Attached as **Exhibit L** to the concurrently filed Declaration of Julie Teel Simmonds is a true and correct copy of the May 18, 2016 letter from PHMSA to OSFM memorializing the understanding between the two agencies with respect to the regulatory oversight of the pipelines.

13. Attached as **Exhibit M** to the concurrently filed Declaration of Julie Teel Simmonds is a true and correct copy of the United States District Court, Central District of California's October 14, 2020 Order to Enter Consent Decree.

14. Attached as **Exhibit N** to the concurrently filed Declaration of Julie Teel Simmonds is a true and correct copy of the certified transcript from the Court's January 7, 2026 hearing on the parties' ex parte motions.

Dated: February 13, 2026                    Respectfully submitted,


                                            */s/ Julie Teel Simmonds*
                                            Julie Teel Simmonds
                                            David Pettit
                                            Talia Nimmer
                                            CENTER FOR BIOLOGICAL DIVERSITY
                                            2100 Franklin St., Ste. 375
                                            Oakland, CA 94612
                                            Tel. (510) 844-7100

                                            *Attorneys for Petitioners Center for*
                                            *Biological Diversity and Wishtoyo Foundation*


                                            */s/ Linda Krop*
                                            Linda Krop
                                            Jeremy Frankel
                                            ENVIRONMENTAL DEFENSE CENTER
                                            906 Garden St.,
                                            Santa Barbara, CA 93101
                                            Tel. (805) 963-1622

                                            *Attorneys for Petitioners Environmental Defense*
                                            *Center, Get Out Oil!, Santa Barbara County Action*
                                            *Network, Sierra Club, and Santa Barbara*
                                            *Channelkeeper*

4

Request for Judicial Notice ISO Petitioners' Combined Opposition to Real Parties Motion for Reconsideration